## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., | |
| Plaintiff, | C.A. No. 24-64-JLH |
| v. | **JURY TRIAL DEMANDED** |
| APOTEX INC., AND APOTEX CORP., | |
| Defendants. | |
| EAGLE PHARMACEUTICALS, INC., | |
| Plaintiff, | C.A. No. 24-65-JLH |
| v. | **JURY TRIAL DEMANDED** |
| SLAYBACK PHARMA LLC, | |
| Defendant. | |
| EAGLE PHARMACEUTICALS, INC., | |
| Plaintiff, | C.A. No. 24-66-JLH |
| v. | **JURY TRIAL DEMANDED** |
| BAXTER HEALTHCARE CORPORATION, | |
| Defendant. | |

## JOINT CLAIM CONSTRUCTION BRIEF

**Table of Contents**

I.      INTRODUCTION ......................................................................................................1

        A.     Plaintiff's Opening Position.........................................................................1

        B.     Defendants' Answering Position ..................................................................2

II.     AGREED-UPON CONSTRUCTION ......................................................................3

III.    DISPUTED CONSTRUCTIONS .............................................................................4

        A.     "a liquid bendamustine-containing composition comprising"....................4

               1.      Plaintiff's Opening Position..............................................................4
               2.      Defendants' Answering Position .......................................................8
               3.      Plaintiff's Reply Position................................................................12
               4.      Defendants' Sur-Reply Position ......................................................15

        B.     "a pharmaceutically acceptable fluid consisting of polyethylene glycol and
               optionally one or more of propylene glycol, ethanol, benzyl alcohol and
               glycofurol" / "wherein the pharmaceutically acceptable fluid consists of
               polyethylene glycol and optionally one or more of propylene glycol,
               ethanol, benzyl alcohol and glycofurol" ...................................................16

               1.      Plaintiff's Opening Position............................................................17
               2.      Defendants' Answering Position .....................................................22
               3.      Plaintiff's Reply Position................................................................33
               4.      Defendants' Sur-Reply Position ......................................................43

        C.     "wherein the bendamustine concentration in the composition is from about
               25 mg/mL"...................................................................................................50

               1.      Plaintiff's Opening Position............................................................50
               2.      Defendants' Answering Position .....................................................54
               3.      Plaintiff's Reply Position................................................................60
               4.      Defendants' Sur-Reply Position ......................................................66

# Table of Authorities

## Cases

*3Shape A/S v. Align Tech., Inc.*,
  No. 18-886-JLH-LPS, 2020 WL 2188857 (D. Del. May 6, 2020),
  *report and recommendation adopted*, 2020 WL 7695898 (D. Del. Dec. 28, 2020).........61

*AFG Indus., Inc. v. Cardinal IG Co.*,
  239 F.3d 1239 (Fed. Cir. 2001)................................................................18

*Al-Site Corp. v. VSI Int'l, Inc.*,
  174 F.3d 1308 (Fed. Cir. 1999)................................................................39

*Amgen Inc. v. Amneal Pharms. LLC*,
  945 F.3d 1368 (Fed. Cir. 2020)........................................................*passim*

*Andersen Corp. v. Fiber Composites, LLC*,
  474 F.3d 1361 (Fed. Cir. 2007)................................................................54

*Apple Inc. v. Omni MedSci, Inc.*,
  No. 2023-1034, 2024 WL 3084509 (Fed. Cir. June 21, 2024) ..................21, 34

*Aptiv Techs. Ltd. v. Microchip Tech., Inc.*,
  2024 WL 3400109 (D. Del. 2024)...........................................................56

*Azurity Pharms., Inc. v. Alkem Lab'ys Ltd.*,
  582 F. Supp. 3d at 198 ..........................................................................42

*BASF Corp. v. Johnson Matthey Inc.*,
  875 F.3d 1360 (Fed. Cir. 2017).................................................................61

*Beckmann v. Gandhi*,
  646 F. App'x 950 (Fed. Cir. 2016) ..........................................................20

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
  616 F.3d 1249 (Fed. Cir. 2010).................................................................19

*Bioverativ Inc. v. CSL Behring LLC*,
  No. 17-914-RGA, 2019 WL 1276030 (D. Del. Mar. 20, 2019) .........................5

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
  320 F.3d 1339 (Fed. Cir. 2003)...................................................................7

*Canatex Completion Sols., Inc. v. Wellmatics, LLC*,
  2023 WL 9645474 (S.D. Tex. Dec. 14, 2023)........................................59, 64

*CBT Flint Partners, LLC v. Return Path, Inc.*,
    654 F.3d 1353 (Fed. Cir. 2011).................................................................... 54, 58, 59, 65

*Chemours Co. FC, LLC v. Daikin Indus., Ltd.*,
    2022 WL 855518 (D. Del. Mar. 23, 2022) ...................................................... 60

*Chrimar Holding Co., LLC v. ALE USA Inc.*,
    732 F. App'x 876 (Fed. Cir. 2018) ................................................................... 39

*CIAS, Inc. v. Alliance Gaming Corp.*,
    504 F.3d 1356 (Fed. Cir. 2007)......................................................................... 5

*Conoco, Inc. v. Energy & Env't Int'l, L.C.*,
    460 F.3d 1349 (Fed. Cir. 2006).......................................................... 18, 21, 30, 42

*Cree, Inc. v. SemiLEDs Corp.*,
    2012 Markman 975697, 2012 WL 975697 (D. Del. 2012) ............................. 56

*Digene Corp. v. Third Wave Techs., Inc.*,
    323 F. App'x 902 (Fed. Cir. 2009) ................................................ 9, 11, 12, 16

*Eis, Inc. v. Intihealth Ger GMBH*,
    2023 WL 346631 (D. Del. Jan. 9, 2023)................................................... 30, 31

*Exeltis USA, Inc. v. Lupin Ltd.*,
    2023 WL 2306736 (D. Del. Mar. 1, 2023) ............................................... 54, 61

*Fargo Elecs., Inc. v. Iris, Ltd.*,
    287 F. App'x 96 (Fed. Cir. 2008) .................................................................... 66

*Genuine Enabling Tech. LLC v. Nintendo Co.*,
    29 F.4th 1365 (Fed. Cir. 2022) ....................................................................... 39

*Hospira, Inc. v. Fresenius Kabi USA, LLC*,
    946 F.3d 1322 (Fed. Cir. 2020)....................................................................... 34

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
    849 F.3d 1034 (Fed. Cir. 2017)....................................................................... 61

*Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*,
    2014 WL 1493665 (N.D. Cal. Apr. 16, 2014) ............................................... 30

*In re Sitagliptin Phosphate ('708 & '921) Pat. Litig.*,
    No. 19-2902-RGA, 2020 WL 6743022 (D. Del. Nov. 17, 2020) .................... 39

*Integra Lifesciences Corp. v. HyperBranch Med. Tech., Inc.*,

2017 WL 3578695 (D. Del. Aug. 18, 2017),
*report and recommendation adopted*, 2017 WL 5172396 (D. Del. Nov. 8, 2017) .... 32, 33

*InterDigital Commc'ns, Inc. v. U.S. ITC*,
601 F. App'x 972 (Fed. Cir. 2015) ................................................................... 37

*Intermec Technologies Corp. v. Palm Inc.*,
811 F. Supp. 2d 973 (D. Del. 2011) ........................................................... 53, 58

*INVISTA N. Am. S.a.r.l. v. M & G USA Corp.*,
951 F. Supp. 2d 604 (D. Del. 2013) ................................................................... 5

*IPPV Enters., LLC v. Echostar Commc'n Corp.*,
106 F.Supp.2d 595 (D. Del. 2000) .................................................................. 18

*KeyMe, LLC v. Hillman Grp., Inc.*,
No. 19-1539-LPS, 2021 WL 243252 (D. Del. Jan. 25, 2021) ......................... 63

*Koito Mfg. Co. v. Turn-Key-Tech, LLC*,
381 F.3d 1142 (Fed. Cir. 2004) ...................................................................... 61

*Mars Inc. v. H.J. Heinz Co.*,
377 F.3d 1369 (Fed. Cir. 2004) ........................................................................ 5

*Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*,
831 F.3d 1350 (Fed. Cir. 2016) .............................................................. passim

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014) ........................................................................................ 54

*Nippon Shinyaku Co. v. Sarepta Therapeutics, Inc.*,
No. 21-1015-GBW, 2023 WL 4314485 (D. Del. July 3, 2023) ......................... 7

*Norian Corp. v. Stryker Corp.*,
363 F.3d 1321 (Fed. Cir. 2004) .............................................................. *passim*

*Norian Corp. v. Stryker Corp.*,
432 F.3d 1356 (Fed. Cir. 2005) ...................................................................... 25

*Novo Indus., L.P. v. Micro Molds Corp.*,
350 F.3d 1348 (Fed. Cir. 2003) .......................................................... 55, 58, 66

*Novo Nordisk Inc. v. Mylan Pharms. Inc.*,
2024 WL 1255531 (D. Del. Mar. 25, 2024) .............................................. 54, 61

*Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Lab'ys, Ltd.*,

476 F.3d 1321 (Fed. Cir. 2007)................................................................. 51, 63, 67

*Osteoplastics, LLC v. ConforMIS, Inc.*,
    2021 WL 4452306 (D. Del. Sept. 29, 2021)
    *report and recommendation adopted*, 2022 WL 610738 (D. Del. Feb. 14, 2022) .......... 68

*Otsuka Pharm. Co. v. Lupin Ltd.*,
    2022 WL 2952759 (D. Del. July 26, 2022) ................................................. *passim*

*Otsuka Pharm. Co. v. Mylan Lab'ys Ltd.*,
    No. 22-464-CFC-JLH, 2023 WL 5928313 (D. Del. Sept. 12, 2023)................... 19, 33, 49

*Pall Corp. v. Micron Separations, Inc.*,
    66 F.3d 1211 (Fed. Cir. 1995)............................................................................ 60

*Pavo Sols. LLC v. Kingston Tech. Co.*,
    35 F.4th 1367 (Fed. Cir. 2022) ............................................................ 50, 51, 56

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)....................................................................... 29, 37

*Power-One, Inc. v. Artesyn Techs., Inc.*,
    599 F.3d 1343 (Fed. Cir. 2010)........................................................................... 41

*Princeton Digit. Image Corp. v. Amazon.com, Inc.*,
    No. 13-237-LPS, 2019 WL 351258 (D. Del. Jan. 29, 2019) ......................... 60, 62, 63, 67

*Promptu Sys. Corp. v. Comcast Corp.*,
    92 F.4th 1372 (Fed. Cir. 2024) ..................................................................... 6, 48, 49

*Quectel Wireless Sols. Co. v. Koninklijke Philips N.V.*,
    No. 2023-1155, 2024 WL 2064617 (Fed. Cir. May 9, 2024) ........................................ 37

*Rembrandt Data Techs., LP v. AOL, LLC*,
    641 F.3d 1331 (Fed. Cir. 2011)........................................................................... 55

*Sanders v. The Mosaic Co.*,
    418 F. App'x 914 (Fed. Cir. 2011) ....................................................................... 5

*Satius Holding, Inc. v. Samsung Elecs. Co., Ltd.*,
    2024 WL 5090284 (D. Del. Dec. 12, 2024)............................................................. 67

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001)........................................................................... 29

*Server Tech., Inc. v. Am. Power Conversion Corp.*,

657 F. App'x 1030 (Fed. Cir. 2016) ............................................................... 5

*Shire Dev. Inc. v. Cadila Healthcare Ltd.*,
No. 10-581-KAJ, 2015 WL 4596410 (D. Del. July 28, 2015),
*aff'd sub nom.*, 688 F. App'x 912 (Fed. Cir. 2017) ............................ 18, 33, 49

*Shire Dev., LLC v. Watson Pharms., Inc.*,
848 F.3d 981 (Fed. Cir. 2017)................................................................ *passim*

*Silvergate Pharms. Inc. v. Bionpharma Inc.*,
No. 16-876, 2018 WL 1610513 (D. Del. Apr. 3, 2018)............................ 18, 33

*Smith v. ORBCOMM, Inc.*,
2015 WL 5302815 (E.D. Tex. Sept. 10, 2015) ........................................ 59, 64

*Springs Window Fashions LP v. Novo Indus., L.P.*,
323 F.3d 989 (Fed. Cir. 2003)......................................................................... 25

*Sulzer Textil A.G. v. Picanol N.V.*,
358 F.3d 1356 (Fed. Cir. 2004)....................................................................... 41

*Sw. Software, Inc. v. Harlequin Inc.*,
226 F.3d 1280 (Fed. Cir. 2000)....................................................................... 64

*Synchronoss Techs., Inc. v. Dropbox, Inc.*,
987 F.3d 1358 (Fed. Cir. 2021)....................................................................... 67

*Thorner v. Sony Comput. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012)................................................................... 6, 14

*Trintec Indus., Inc. v. Top-U.S.A. Corp.*,
295 F.3d 1292 (Fed. Cir. 2002)....................................................................... 13

*Trusted Knight Corp. v. Int'l Bus. Machines Corp.*,
681 F. App'x 898 (Fed. Cir. 2017) .................................................................. 59

*Trustees of the Univ. of Penn. v. Eli Lilly & Co.*,
2016 WL 3059538 (E.D. Pa. May 31, 2016) ...................................... 55, 56, 62

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
587 F.3d 1339 (Fed. Cir. 2009).................................................. 50, 55, 56, 58

*Välinge Innovation AB v. Halstead New England Corp.*,
2018 WL 2108199 (D. Del. May 7, 2018)....................................................... 48

*Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*,

212 F.3d 1377 (Fed. Cir. 2000)................................................................... 9, 43

*ViaTech Techs., Inc. v. Microsoft Corp*.,
    2020 WL 2616226 (D. Del. May 22, 2020).......................................... 59, 68

*Vivus, Inc. v. Actavis Labs. FL Inc.*,
    2016 WL 3919455 (D.N.J. July 20, 2016)................................................. 48

*VTT Tech. Rsch. Ctr. Of Finland Ltd. v. SiTime Corp.*,
    No. 19-1174, 2020 WL 4193374 (N.D. Cal. July 21, 2020),
        *aff'd*, 849 F. App'x 928 (Fed. Cir. 2021)............................................. 51, 58, 67

*Warner Chilcott Co. v. Teva Pharms. USA, Inc.*,
    No. 08-627-LPS, 2011 WL 7121450 (D. Del. Dec. 29, 2011) ................................. 53, 58

*Yodlee, Inc. v. Plaid Techs., Inc.*,
    No. 14-1445-LPS, 2016 WL 204372 (D. Del. Jan. 15, 2016) ........................................ 65

## Statutes

35 U.S.C. § 112................................................................................................. 45

35 U.S.C. § 271(a) ............................................................................................ 34

## Rules

37 C.F.R. § 1.438.............................................................................................. 37

## Other Authorities

MANUAL OF PATENT EXAMINING PROCEDURE § 1485 .................................................. 64

MANUAL OF PATENT EXAMINING PROCEDURE § 2111.03 ............................................... 5

## I.    INTRODUCTION

### A.    Plaintiff's Opening Position

These coordinated claim construction proceedings concern two disputes in the construction of certain terms in U.S. Patent Nos. 11,844,783 (the "'783 patent") (Exhibit 1) and 11,872,214 (the "'214 patent") (Exhibit 2), which cover Eagle's Bendeka® and Belrapzo® bendamustine drug products and/or the use thereof.  The matters are consolidated for pretrial purposes preceding separate jury trials involving each Defendant in 2026.

The first dispute centers on Defendants' effort to improperly limit the scope of the asserted claims by redefining transitional phrases, long-used and well-defined terms of art for drafting patent claims.  Specifically, Defendants attempt to close off the open-ended transitional phrase "comprising" – negating its plain and ordinary meaning – by importing a confusing and negative limitation with no legal support and untethered to the intrinsic evidence.  Defendants further seek to upend well-established legal principles that guide construction of transitional phrases in their treatment of "consisting of" and "consists of" by omitting the principles that they find inconvenient.  Defendants' constructions, if adopted, will result in juror confusion and error by applying the "consisting of" or "consists of" term in a way that impermissibly fails to explicitly permit the presence of impurities or other components that are unrelated to the claim element.  The juries should not be subjected to such confusion or error.  Rather, the juries should be instructed (1) as to the plain and ordinary meaning of the open-ended transitional phrase "comprising," and (2) that "consisting of"/"consists of" does not foreclose the presence of impurities or components unrelated to the claim element.

The second dispute involves a throwaway indefiniteness defense based on certain claim elements that recite a numeric bendamustine concentration but contain a typographic error – the presence of the word "from."  According to Defendants, that error instead amounts to a claimed

range that lacks an upper bound. But the intrinsic evidence makes clear that "from" was mistakenly carried over when certain claims were amended during prosecution. There is no legitimate dispute that the law allows the Court to correct such ministerial errors, and accordingly, Eagle respectfully requests that the Court do so here.

For these reasons set forth herein, the Court should adopt Eagle's proposed constructions.

## B.    Defendants' Answering Position

Eagle's proposed claim constructions are an attempt to undo its drafting choices during prosecution by asking the Court to broaden claims that the Patent Office required to be narrowed. Eagle amended all the claims-in-suit using the narrow transitional phrase "consisting of" to avoid the prior art and secure allowance. The Court should construe that phrase according to the century-old maxim that the affected claim element is closed to unrecited ingredients and should not allow Eagle to confuse this issue by reference to language elsewhere in the claims.

The patents-in-suit, U.S. Patent Nos. 11,844,783 (the "'783 Patent") and 11,872,214 (the "'214 Patent") (collectively, the "Asserted Patents"), claim formulations of liquid bendamustine. The applications that matured into the Asserted Patents originally claimed "liquid bendamustine-containing compositions ***comprising***" certain elements, with the term "comprising" being the only transition phrase in the claims. To obtain the Asserted Patents, Eagle was forced to amend its claims during prosecution to avoid the prior art the Examiner cited as a basis for rejecting them. Specifically, Eagle limited its claims by adding the phrase "***consisting of***" to the "pharmaceutically acceptable fluid" element in the claims. This addition creates a "very strong," century-old presumption that Eagle's claims exclude formulations with a pharmaceutically acceptable fluid that contains any ingredient other than those specifically recited in the claims. Eagle's use of the phrase "comprising" elsewhere in the claims does not change that presumption. Defendants'

proposed constructions reflect these well-settled principles, and they will ensure the jury does not conflate Eagle's "comprising" and "consisting of" limitations. In contrast, Eagle is attempting to use the claim construction process to undo its narrowing claim amendments, such that its "pharmaceutically acceptable fluid" element can include additional ingredients beyond what it has claimed. Because Eagle's arguments are contrary to law and will mislead the jury, the Court should adopt Defendants' proposed constructions.

Additionally, during prosecution of the '214 Patent, Eagle amended two independent claims to recite an open-ended bendamustine concentration of "from about 25 mg/mL." This limitation provides no upper bound and is indefinite. Eagle does not dispute that the claims as written are indefinite. Instead, Eagle suggests that the word "from" is a typo and that the Court should redraft Eagle's claims for it. But because the claims, specification, and prosecution history do not support Eagle's "typo" argument, Eagle cannot meet its heavy burden to show that the correction is "not subject to a reasonable debate." The Court should therefore decline Eagle's request for a correction and find the asserted '214 Patent claims invalid as indefinite.

## II.    AGREED-UPON CONSTRUCTION

The parties have agreed that the following term in the Asserted Patents should be construed as follows. *See* C.A. No. 24-64, D.I. 85 at Ex. A; C.A. No. 24-65, D.I. 64 at Ex. A; C.A. No. 24-66, D.I. 65 at Ex. A (Joint Claim Construction Chart).

| Term | Joint Proposed Construction |
|---|---|
| "pharmaceutically acceptable fluid" ('783 patent, claim 1; '214 patent, claims 1 and 6) | "fluid which is suitable for pharmaceutical use" |

## III.    DISPUTED CONSTRUCTIONS

### A.    "a liquid bendamustine-containing composition comprising"

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "a liquid bendamustine-containing composition comprising" ('783 patent, claim 1; '214 patent, claims 1 and 6) | Plain and ordinary meaning, i.e., "a liquid bendamustine-containing composition that includes, but is not limited to" | Plain and ordinary meaning, i.e., "a liquid bendamustine-containing composition including," but it cannot open the closed "consisting of" / "consists of" limitation. |

### 1.    Plaintiff's Opening Position

The parties' dispute over this claim term is narrow.  The parties agree that the plain meaning of "a liquid bendamustine-containing composition comprising" is "a liquid bendamustine-containing composition that includes . . . ."  Defendants, however, propose a construction that omits the requisite "but not limited to" concept that is part of the plain and ordinary meaning of "comprising."  Defendants' construction adds a confusing and unsupported negative limitation that cross-references the "consisting of" transitional phrase that appears only in the "pharmaceutically acceptable fluid" element, as shown below:

> A sterile vial containing a liquid bendamustine-containing composition comprising
>> about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 25 mg/mL;
>> a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
>> a stabilizing amount of an antioxidant,
>> wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

Claim 1 of the '214 patent (emphases added).

4

Eagle's straightforward construction embraces the well-established plain meaning. "Comprising" is a commonly-used and well-understood transitional phrase indicating that the claim's scope is open to additional, unrecited elements. The Federal Circuit has repeatedly emphasized that "'comprising' is a term of art that means 'including but not limited to.'" *Server Tech., Inc. v. Am. Power Conversion Corp.*, 657 F. App'x 1030, 1034 (Fed. Cir. 2016) (citing *CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) ("In the patent claim context the term 'comprising' is well understood to mean 'including but not limited to.'")); *Sanders v. The Mosaic Co.*, 418 F. App'x 914, 918 (Fed. Cir. 2011) ("'[C]omprising . . . a 'micronutrient' should be given its plain meaning, which is 'including, but not limited to, . . . a micronutrient.'"). Courts uniformly construe "comprising" consistent with that precedent. *See, e.g.*, *Bioverativ Inc. v. CSL Behring LLC*, No. 17-914-RGA, 2019 WL 1276030, at *8 (D. Del. Mar. 20, 2019) ("I will construe 'comprising' to mean 'including but not limited to' and 'comprises' to mean 'includes but is not limited to.'"); *INVISTA N. Am. S.a.r.l. v. M & G USA Corp.*, 951 F. Supp. 2d 604, 616 (D. Del. 2013) (construing "copolyester comprising a metal sulfonate salt" as "a copolyester including, but not limited to, a metal sulfonate salt group"). The U.S. Patent and Trademark Office ("USPTO") also recognizes that comprising "is inclusive or open-ended and does not exclude additional, unrecited elements or method steps." MANUAL OF PATENT EXAMINING PROCEDURE § 2111.03 (citing *Mars Inc. v. H.J. Heinz Co.*, 377 F.3d 1369, 1376 (Fed. Cir. 2004)).

The intrinsic evidence underscores that the claims use "comprising" in its well-established, plain and ordinary sense. The specification of the asserted patents repeatedly describes the

invention as "bendamustine-containing compositions *including*" various excipients or uses similar language.  *See, e.g.*, '214 patent at 3:1-3, 4:31-33, 5:11-13 (emphasis added).[1]

Against that backdrop, Defendants' construction suffers from two key flaws:  (a) it omits the critical language reflecting that the claim is "not limited to" the listed elements; and (b) it includes additional, unnecessary, and confusing language that "it cannot open the closed 'consisting of'/'consists of' limitation."

Omitting the "not limited to" language from the construction of "comprising" lacks any legal basis.  As explained *supra*, the Federal Circuit, district courts, and the USPTO all recognize that the ordinary meaning of "comprising" is "including, *but not limited to*."  Eagle's proposed construction *is* this ordinary meaning.  Defendants have not articulated any basis for lexicography or disclaimer.  As such, the ordinary meaning of "comprising" controls.  *See Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

Beyond lacking a basis in the law, Defendants' erroneous construction is likely to confuse the jury.  Such an outcome cuts against the entire purpose of the claim construction exercise.  *See Promptu Sys. Corp. v. Comcast Corp.*, 92 F.4th 1372, 1381 (Fed. Cir. 2024) ("Importantly, a claim construction, if needed at all, should help resolve, not add to, uncertainty in the understanding the finder of fact is to use in applying a claim term.").

The potential for jury confusion is manifest.  The phrasing of Defendants' construction – "cannot open the closed 'consisting of'/'consists of' limitation" – is objectively awkward and confusing, particularly to jurors who are not patent experts and will serve as the finders of fact in these cases.  And worse, Defendants' unqualified characterization of "consisting of"/"consists of"

---

[1]  The '214 patent and '783 patent share the same specification.  Eagle cites to the '214 patent, except where citing to specific claims.

elements as "closed" in the construction of "comprising" is an inaccurate statement of the law. Even aside from the confusing (and inaccurate) phrasing, Defendants' proposed circular, cross-referencing of the "consisting of"/"consists of" element in the construction for the "comprising" element is likely to confound the jury. This concrete risk of jury confusion is wholly unnecessary and avoidable because the Court's construction of the "consisting of"/"consists of" element will provide jurors with sufficient guidance on those terms.[2] Because the "consisting of"/"consists of" claim element is distinct, and a unique term of art, it is entitled to its own construction, and separate instructions from the Court to the juries as to its meaning. To confuse the issue here by importing "consisting of"/"consists of" language into the construction for the "comprising" element invites error.

That Defendants resort to a negative limitation in their proposed construction provides yet another independent basis to reject it. Such negative limitations are generally disfavored. *See, e.g.*, *Nippon Shinyaku Co. v. Sarepta Therapeutics, Inc.*, No. 21-1015-GBW, 2023 WL 4314485, at *13 (D. Del. July 3, 2023) ("[N]egative limitations, which define an invention in terms of what it does not do rather than what it does, are generally disfavored."); *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1349 (Fed. Cir. 2003) ("Rather than insert an additional limitation into the claim, the better course is to rely on a construction . . . that does not require such an interpolation.").

Eagle respectfully submits that "comprising" be afforded its plain and ordinary meaning, and that the Court appropriately address the parties' disputes over the "consisting of"/"consists of" term in the construction of that term.

---

[2] The crux of the dispute over the "consisting of"/"consists of" element is how to address the established exceptions to the general rule that a "consisting of" element can only include what is listed in that claim element. *Infra* at § III.B.1.

### 2. Defendants' Answering Position

Eagle identified the phrase "a liquid bendamustine containing composition comprising" as needing construction, and the parties agree that this phrase should be construed according to its plain and ordinary meaning. Moreover, as Defendants told Eagle during the parties' meet and confer, Defendants do not object to Eagle's "but not limited to" language. The parties' dispute concerns whether the Court's construction should include language that clearly explains the consequences of Eagle's patent drafting choices to the jury. For the reasons set forth below, the Court should adopt Defendants' proposal to include this language to aid the jury and avoid confusion.

### i. Defendants' Construction Correctly Explains the Well-Established Difference Between "Comprising" and "Consisting Of"

There is no dispute that the transitional phrases "comprising" and "consisting of" are terms of art in patent law, each with very different meanings. To a jury, however, these terms and concepts are likely to be confusing. Where both phrases appear in the same claim, as is the case for each of the claims of the Asserted Patents, jury confusion is a certainty in the absence of explanation from the Court. Claim 1 of the '214 Patent, which is representative of all asserted independent claims on this point, recites:

> 1. A sterile vial containing a liquid bendamustine-containing composition *comprising*…
>    about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 25 mg/mL;
>    a pharmaceutically acceptable fluid *consisting of* polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
>    a stabilizing amount of an antioxidant,
>    wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

Ex. 2 at Claim 1 (emphasis added).

It is black letter law that the phrase "consisting of" means that "the claimed invention contains only what is expressly set forth in the claim." *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1358 (Fed. Cir. 2016). This phrase "creates a very strong presumption that that claim element is 'closed' and therefore exclude[s] any elements, steps, or ingredients not specified in the claim." *Id.*; *see also Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1331 (Fed. Cir. 2004) ("'Consisting of' is a term of patent convention meaning that the claimed invention contains only what is expressly set forth in the claim.").

In contrast, the term "comprising" indicates that "the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements." *Multilayer*, 831 F.3d at 1358. As the Federal Circuit has explained, "[a] drafter uses the phrase 'consisting of' to mean 'I claim what follows and nothing else.' A drafter uses the term 'comprising' to mean 'I claim at least what follows and potentially more.'" *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1382-83 (Fed. Cir. 2000).

Where—as here—a patent claim includes both "comprising" and "consisting of," the Federal Circuit has explained that the "comprising" transitional phrase does not permit the addition of unrecited ingredients to the "consisting of" limitation:

> In [prior] cases we held that a claim with the overall transitional phrase "comprising," containing a limitation with the transitional phrase "consisting of," allowed for the addition of other elements to the overall claim. However, ***neither case opened the individual elements limited by the term "consisting of."*** If the term "consists of" appears in the body of a claim, it does not limit the entire claim as such, but it does limit the clause for which it acts as a transition to only those elements found in that particular clause.

*Digene Corp. v. Third Wave Techs., Inc.*, 323 F. App'x 902, 909 (Fed. Cir. 2009) (emphasis added); *see also Shire Dev., LLC v. Watson Pharms., Inc.*, 848 F.3d 981, 984 (Fed. Cir. 2017) (noting that the phrase "consisting of" "creates a very strong presumption that that claim element

is 'closed' and therefore 'exclude[s] any elements, steps, or ingredients not specified in the claim.'").  In other words, the scope of a claim element that is preceded by "consists of" is limited to the recited items after "consists of" and cannot be expanded by the presence of a "comprising" phrase in the preamble of the claim.

Given the nested structure of the claims at issue here, it is important that the open-ended "comprising" claim language not be construed in a manner that vitiates the closed "consisting of" language—especially where that closed "consisting of" language was needed to obtain allowance of the claims, as discussed below.  The jury must understand the interaction between these two transitional phrases and how each transitional phrase applies (or doesn't apply) to the respective parts of the claim.

The Federal Circuit's *Shire* decision, which also involved nested "comprising" and "consisting of" terms, is instructive.  There, the representative claim recited, in relevant part:

> 1. Controlled-release oral pharmaceutical compositions containing as an active ingredient 5-amino-salicylic acid, ***comprising***…(b) an *outer hydrophilic matrix* wherein…said outer hydrophilic matrix ***consists of*** compounds selected from the group consisting of….c) optionally other excipients.

*Id*. at 983.  The accused product contained an outer hydrophilic matrix that included magnesium stearate—a compound ***not*** listed in the "consists of" limitation. The district court found infringement because it believed that magnesium stearate was allowed by the "optionally other excipients" element encompassed by the claim's "comprising" preamble.  *Id*. at 986 n.2.   The Federal Circuit reversed, explaining that the presence of "comprising" in the preamble could not overcome the "exceptionally strong presumption" that later-appearing "consisting of" elements of the claim are closed to unrecited ingredients.  *Id*. (*citing Multilayer*, 831 F.3d at 1359).  In other words, the plaintiff was not permitted to use the "comprising" language in the preamble to open up the closed "consisting of" limitation applicable to the outer hydrophilic matrix.  *Id*. at 986

(declining plaintiff's invitation to "in effect equate the scope of a Markush group's 'consisting of' language with either 'comprising' or 'consisting essentially of' language").

Similarly here, every claim of the Asserted Patents recites "comprising" in the preamble and subsequently a "pharmaceutically acceptable fluid" "consisting of" or that "consists of" expressly recited ingredients.[3]  As in *Shire* and *Digene*, Eagle cannot use the "comprising" language in the preamble to expand the scope of the "pharmaceutically acceptable fluid" element to include ingredients not expressly recited in the claims.  *Shire*, 848 F.3d at 984; *Digene*, 323 F. App'x at 909.  Defendants' proposed construction clearly and succinctly explains to a lay jury how it should resolve these unfamiliar, nested "comprising" and "consisting of" terms, and the Court should adopt it.

In opposition, Eagle argues that Defendants' construction is "an inaccurate statement of the law" and "generally disfavored".  *Supra* at 6-7.  Not so.  *See, e.g.*, *Digene*, 323 F. App'x at 909 (discussed above); *Shire*, 848 F.3d at 986 (same).  Eagle cites to no authority that suggests that any part of Defendants' clarifying language incorrectly applies the settled principles concerning claims having nested "comprising" and "consisting of" phrases. In particular, Eagle cites to no authority that suggests that the "comprising" term in the preamble of its claims allows Eagle to open the closed "pharmaceutically acceptable fluid" element to include ingredients other than the recited polyethylene glycol, propylene glycol, ethanol, benzyl alcohol and glycofurol.  Moreover, Defendants' proposed clarifying language does not attempt to define Eagle's invention "in terms of what it does not do," as Eagle suggests.  *Supra* at 7.  Rather, Defendants' construction correctly

---

[3] Claim 6 of the '214 Patent recites "wherein the pharmaceutically acceptable fluid ***consists of*** polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol." (emphasis added).  There is no dispute that "consists of" has the same narrowing effect as "consisting of."

effectuates the restrictions of Eagle's chosen language, while **Eagle** is attempting to blur the distinction between "comprising" and "consisting of" to confound a lay jury that is certain to be unfamiliar with the legal consequences of Eagle's drafting choices.

Defendants' proposed construction—which uses clear, simple language—adopts the accepted meaning of "comprising" and clarifies the relationship between that term and the "consisting of" limitation in a manner supported by more than a century of applicable law. *See Multilayer*, 831 F.3d at 1358. The Court should adopt Defendants' proposal.

### 3.    Plaintiff's Reply Position

The two key distinctions between the parties' proposed constructions are:  (1) Eagle's language making explicit that the liquid bendamustine-containing composition "is not limited to" the listed elements, consistent with the well-established meaning of "comprising"; and (2) Defendants' extraneous language that the "comprising" term "cannot open the closed 'consisting of' / 'consists of' limitation."  Defendants have now conceded that Eagle's proposed construction *is* the ordinary meaning and thus correct. *Supra* at 8 ("Defendants do not object to Eagle's 'but not limited to language'").  Thus, the only remaining dispute is whether to include Defendants' proposed language about opening the "consisting of" term.  The Court should not.

Defendants devote four pages of their answering brief to addressing the straw man argument that "the scope of a claim element that is preceded by 'consists of' is limited to the recited items after 'consists of' and cannot be expanded by the presence of a 'comprising' phrase in the preamble of the claim." *Supra* at 8-11.  Nowhere does Eagle argue that the "comprising" phrase expands the "consisting of" term.[4]

---

[4] Defendants' reliance on *Digene* and *Shire* is similarly misplaced, as both of those cases addressed attempts to "open[] the individual elements limited by the term 'consisting of,'" a position that Eagle is not advocating.  *Digene*, 323 F. App'x at 909; *see also Shire*, 848 F.3d at 984 (same).

The proper construction of the "pharmaceutically acceptable fluid" term is being addressed separately, consistent with the Federal Circuit's approach to claim construction. *Infra* at 18; *see Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1296 (Fed. Cir. 2002) ("The two terms, however, have distinct meanings. Each term appears in claim language. Each therefore imparts a different scope.").

Further, separating the broader "liquid bendamustine-containing composition comprising" term, which addresses the entire "composition" from the narrower "pharmaceutically acceptable fluid consisting of" term, is also logical. The "pharmaceutically acceptable fluid" is only one component of the "liquid bendamustine containing composition," which includes both the solvents that make up the "pharmaceutically acceptable fluid," as well as the components *dissolved in that fluid*, such as the bendamustine and antioxidant, which are each explicitly claimed. Critically, because of the "comprising" term, the liquid bendamustine-containing composition can also include additional components, so long as they are *dissolved* in the pharmaceutically acceptable fluid and do not make up part of the pharmaceutically acceptable fluid itself.[5] Defendants' additional language improperly incorporates the separate "consisting of" term, making the scope of both claim terms unclear and fostering jury confusion. Under Eagle's proposed construction, each term can readily and independently be understood by the jury. Defendants' construction creates the impression that the constructions of the two terms are somehow intertwined, instead of the jury simply reading and understanding each individual construction on its own.

Moreover, Defendants have not provided any basis for their proposed language. As the Federal Circuit has explained "[t]he words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context

---

[5] Subject to the recognized exceptions to "consisting of" discussed *infra*.

of the specification and prosecution history." *Thorner*, 669 F.3d at 1365. "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Id.* Defendants do not argue for either exception, nor do they identify any evidence from the specification or prosecution history that supports their additional language. In fact, Defendants cite no intrinsic evidence at all in this section of their brief, other than the asserted claims themselves. *See generally supra* at 8-12. Similarly, Defendants do not identify any case that included similar extraneous language. As such, the legally correct construction is the plain meaning of "a liquid bendamustine-containing composition comprising," without Defendants' unsupported addendum.

Defendants argue that "Eagle cites to no authority that suggests that any part of Defendants' clarifying language incorrectly applies the settled principles concerning claims having nested 'comprising' and 'consisting of' phrases." *Supra* at 11. This is simply incorrect. *See Amgen Inc. v. Amneal Pharms. LLC*, 945 F.3d 1368, 1376 (Fed. Cir. 2020) ("*Multilayer* and *Shire* did not hold broadly that, whenever 'consisting of' Markush group language is present in a particular claim limitation, even when the limitation follows a general claim transition phrase of 'comprising,' all components of an accused product that perform the general function of the particular limitation must meet the requirements of that limitation, thus precluding components outside the Markush group."). As explained previously, Defendants' description of the "consisting of" term as "closed" with no further context muddles the law, particularly for the lay jury that will apply these constructions. As Eagle addressed in its opening brief and further below, there are two recognized exceptions to the closed nature of a "consisting of" transitional phrase allowing for: (1) impurities and (2) substances unrelated to the claim element. *Infra* at 18; *see also infra* at 41-43. Both

exceptions potentially are relevant here, and Defendants' oversimplified description of the "pharmaceutically acceptable fluid" term as "closed" elides both.

Defendants conclude with an argument that "Eagle is attempting to blur the distinction between 'comprising' and 'consisting of' to confound a lay jury." Defendants' argument is incorrect. Under Eagle's proposed construction these elements remain separate, and each has its plain and ordinary meaning. Defendants' construction blurs the lines between the two terms by including an unnecessary cross-reference to the comprising term within the "consisting of" term. Eagle's approach is simpler and clearer for a lay jury, and should be adopted, regardless of the Court's construction of the "consisting of" term.

### 4.    Defendants' Sur-Reply Position

The principal dispute between the parties is how to make sense of Eagle's decision to nest two distinct terms of art—"comprising" and "consisting of"—in the same claim. On this term, Defendants simply request that the Court's construction include the well-settled legal principle that the presence of "comprising" in a preamble cannot open a later "consisting of" element of the claim. Indeed, Eagle concedes, as it must, that *Digene* and *Shire* squarely forbid using a "comprising" term to "open[] the individual elements limited by the term 'consisting of.'" *Digene,* 323 F. App'x at 909; *Shire ,* 848 F.3d at 984; *accord supra* at 12 n.4. That is the end of the matter with respect to the issue before the Court on the "comprising" element.[6]

Eagle criticizes Defendants' construction for advancing a "straw man" argument that "creates the impression that the constructions of ["comprising" and "consisting of"] are somehow

---

[6] Eagle inaptly compares Defendants' arguments to those made in *Amgen*, 945 F.3d at 1376 (discussed below). Pl. Rep. Br. 3. Defendants are ***not*** arguing that all elements of Eagle's claimed formulation—including the bendamustine and antioxidant—"must meet the requirements" of the "consisting of" limitation. Rather, Defendants' construction properly reflects that Eagle cannot use the "comprising" preamble to include additional ingredients in the "consisting of" pharmaceutically acceptable fluid element.

intertwined[.]" *Supra* at 12-13.  But, as the Federal Circuit made clear in *Digene* and *Shire*, the breadth normally afforded to the term "comprising" does not attach to any "consisting of" elements that also appear in the claim.  *Digene*, 323 F. App'x at 909; *Shire*, 848 F.3d at 984.  Indeed, despite insisting that the "comprising" and "consisting of" terms should be addressed "separately" and "independently," *supra* at 13, Eagle spends twelve pages addressing the relationship between these terms.  *See, e.g.*, *infra* at 36.  Defendants' construction accurately reflects the state of the law and is necessary to explain the undisputed legal consequences of Eagle's decision to nest both phrases in a single claim. The jury will need to be informed as to how these terms relate to each other, and Defendants' proposed construction of the term "comprising" is an appropriate vehicle for such an explanation. The Court should adopt it.  "Comprising" should be accorded its ordinary meaning in a nested claim—that it cannot be used to open a "consisting of" element.  What "consisting of" means is addressed below.

B.    **"a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol" / "wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol"**

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol" ('783 patent, claim 1 and '214 patent, claim 1)<br><br>"wherein the pharmaceutically acceptable fluid consists of polyethylene | "a fluid which is suitable for pharmaceutical use that is limited to polyethylene glycol and optionally, one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol (but does not exclude impurities and substances unrelated to this element)"<br><br>"wherein the fluid which is suitable for pharmaceutical use is limited to polyethylene | "a fluid suitable for pharmaceutical use having only polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol, as ingredients"<br><br>"wherein the fluid suitable for pharmaceutical use has only polyethylene glycol and optionally one or more of propylene glycol, ethanol, |

| glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol" ('214 patent, claim 6) | glycol and optionally, one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol (but does not exclude impurities and substances unrelated to this element)" | benzyl alcohol and glycofurol, as ingredients." |
| --- | --- | --- |

### 1.    Plaintiff's Opening Position

Eagle's proposed construction reflects that the recited pharmaceutically acceptable fluid "is limited to" the listed solvents but also that the phrase "consisting of"/"consists of" does not foreclose the presence of certain other substances.  Eagle's proposed construction thus affords the "consisting of"/"consists of" phrase its plain and ordinary meaning, while also making clear to the lay jurors—who will be the finders of fact at trial—that "consisting of"/"consists of" does not preclude the presence of impurities or substances unrelated to the claim element.  Defendants' proposed construction does not provide the jury with the full understanding of "consisting of"/"consists of" under the law and should be rejected.

Beginning with the claims themselves, Eagle's proposed construction correctly gives effect to the "consisting of"/"consists of" transitional phrase by reciting the listed solvents.  At the same time, Eagle's proposed construction properly allows for (1) the well-established exceptions permitted by the "consisting of"/"consists of" transitional phrase, and (2) additional components that can be present in the "liquid bendamustine-containing composition" claim element, which is accompanied by the transitional phrase "comprising" and of which the "pharmaceutically acceptable fluid" is but a component.

With regard to the well-established exceptions, Eagle's construction correctly reflects the

two exceptions under the law that allow for additional, unlisted elements following the "consisting of"/"consists of" transitional phrase. Courts have routinely recognized that the phrase does not exclude impurities (*Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1360 (Fed. Cir. 2006)), or substances unrelated to the claim element (*Norian*, 363 F.3d at 1331-32). Eagle's construction correctly recites both such legal exceptions. As this district has recognized, those exceptions appropriately are stated explicitly in a claim construction. *See, e.g.*, *Shire Dev. Inc. v. Cadila Healthcare Ltd.*, No. 10-581-KAJ, 2015 WL 4596410, at *7 (D. Del. July 28, 2015), *aff'd sub nom.*, 688 F. App'x 912 (Fed. Cir. 2017) (construing "consisting of" and related terms as "exclusionary terms specifying that the element contains only what is expressly set forth in a recited list, but not excluding impurities and substances unrelated to said element"); *Silvergate Pharms. Inc. v. Bionpharma Inc.*, No. 16-876, 2018 WL 1610513, at *6 (D. Del. Apr. 3, 2018) (construing "consisting of" as "including all recited ingredients, however, not excluding components or steps unrelated to the invention"). Those explicit references are particularly important here, where juries will be considering the constructions as part of the infringement analysis. *See AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239, 1247 (Fed. Cir. 2001) ("It is critical for trial courts to set forth an express construction of the material claim terms in dispute, in part because the claim construction becomes the basis of the jury instructions, should the case go to trial.") (citing *IPPV Enters., LLC v. Echostar Commc'n Corp.*, 106 F.Supp.2d 595, 601 (D. Del. 2000)).

The intrinsic evidence also supports Eagle's proposed construction. In each asserted claim, the "consisting of"/"consists of" transitional phrase solely modifies the "pharmaceutically acceptable fluid" element. '783 patent at claim 1; and '214 patent at claims 1 and 6. The claim language, consistent across the patent family, distinguishes between the various solvents that make

up the "pharmaceutically acceptable fluid" and the additional components that can be part of the "liquid bendamustine-containing composition." Thus, the claim language recognizes that certain components – for example, the claimed "bendamustine" and "antioxidant" – are part of the "bendamustine-containing composition." Accordingly, the claim language itself tells a person of ordinary skill in the art ("POSA") that the claim is open to other components.

The specification reinforces that the claimed "liquid bendamustine-containing composition" is open to various components other than the listed solvents in the "pharmaceutically acceptable fluid." For instance, Example 1 characterizes the "bendamustine-containing compositions" as "including a pharmaceutically acceptable fluid *and* a stabilizing amount of a chloride salt." '214 patent at 7:34-36. Simple grammar dictates that the excipient "chloride salt," set off by the word "and" is separate from the "pharmaceutically acceptable fluid," and is rather something else dissolved in the fluid. *See Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (finding that elements set off by the word "and" were distinct components); *Otsuka Pharm. Co. v. Mylan Lab'ys Ltd.*, No. 22-464-CFC-JLH, 2023 WL 5928313, at *3 (D. Del. Sept. 12, 2023) (four elements, with the final element set off by the word "and," were distinct components). The specification repeatedly makes the same distinction between the "pharmaceutically acceptable fluid" itself and other components that may be part of the "liquid bendamustine-containing composition." For instance, the specification explains that "the bendamustine-containing compositions include a) a pharmaceutically acceptable fluid which contains one or more of propylene glycol, ethanol, polyethylene glycol, benzyl alcohol, and glycofurol; *and* b) a stabilizing amount of a chloride salt." '214 patent at 2:3-8 (emphasis added). The following embodiment from the specification provides another example:

> In accordance with other aspects of the invention, there are provided long term storage stable bendamustine-containing

19

> compositions, including:
> a) bendamustine or a pharmaceutically acceptable salt thereof;
> b) a pharmaceutically acceptable fluid including one or more of the following: propylene glycol, ethanol, polyethylene glycol, benzyl alcohol and glycofurol; and
> c) a stabilizing amount of a chloride salt.

*Id.* at 4:49-57. The specification thus distinguishes between the "pharmaceutically acceptable fluid" ("b") and the "stabilizing amount of a chloride salt" ("c"). These elements are presumed to be different. *Beckmann v. Gandhi*, 646 F. App'x 950, 959 (Fed. Cir. 2016) (when a claim is structured with "clauses separated by line indentation[s]" each clause is a different element). Elsewhere, the inventors made that distinction similarly clear, describing the dissolution of bendamustine "in a pharmaceutically acceptable fluid, such as polyethylene glycol, in the presence of a stabilizing amount of an antioxidant." '214 patent at 8:36-40; *see also* 9:61-64.

The prosecution history likewise supports Eagle's proposed construction. Eagle's pending claims were rejected over the Drager reference ("Drager"), which described certain compositions that "must comprise a polar 'aprotic' solvent, for example, dimethylacetamide, dimethyl sulfoxide, dimethylformamide," or others, as well as optionally consisting of polar protic solvents such as polyethylene glycol ("PEG"). Exhibit 3, Reply to Office Action dated June 14, 2023, p. 6. Eagle amended its claims to include the "consisting of" element and argued that "Drager fails to disclose or suggest any bendamustine formulations with solvent systems composed of protic solvent in the absence of any aprotic solvent." *Id.* at p. 6-8. The Examiner withdrew the rejection. Exhibit 4, Final Office Action dated July 11, 2023, p. 2-3. Thus, both Eagle and the Examiner understood the "consisting of"/"consists of" transitional phrase to be directed to the solvent systems of Drager that possessed one or more "aprotic solvent[s]," but not to close off the "liquid bendamustine-containing composition" to other components or "ingredients," as Defendants' proposed construction would suggest.

Defendants' proposal is erroneous because of two key flaws. First, it fails to explicitly recognize the existence of the well-settled exceptions described *supra*. Second, it inappropriately limits the "ingredients" in the pharmaceutically acceptable fluid to the listed solvents.

Defendants' proposed construction does not account for the recognized exceptions to the "consisting of"/"consists of" transitional phrase, which allow for the inclusion of impurities and substances unrelated to the claim element. By omitting these exceptions, Defendants' construction excludes elements that are permissible under the law and therefore improperly narrows the claim (in hopes of avoiding a finding of infringement). Defendants do not assert either lexicography or disclaimer. As such, the term "must be given the full scope of its plain and ordinary meaning." *Apple Inc. v. Omni MedSci, Inc.*, No. 2023-1034, 2024 WL 3084509, at *4 (Fed. Cir. June 21, 2024). And the construction provided to jurors should articulate that full plain and ordinary meaning.

Worse, Defendants' proposed construction explicitly limits the claim element by stating that the listed solvents are the only "ingredients" that can be part of the "pharmaceutically acceptable fluid." By doing so, Defendants disregard the open-ended nature of the claims, which, as Eagle's construction correctly reflects, allows for additional components in the "liquid bendamustine-containing composition." Defendants' use of the word "ingredients" also improperly implies that only the listed solvents may be intentionally added. Defendants' construction thus contradicts the legal exceptions to "consisting of" claim elements, particularly the exception allowing for additional impurities. As the Federal Circuit recognized, even if a component is added intentionally, that "does not change its status as an impurity ordinarily associated therewith." *Conoco, Inc.*, 460 F.3d at 1360 (internal quotation marks omitted). Consequently, Defendants' construction would mislead the juries by presenting an overly

restrictive view of the claim, contrary to the broader understanding supported by the intrinsic evidence and the well-recognized exceptions that they seek to elide.

Accordingly, Eagle respectfully requests that the Court adopt its proposed construction and reject Defendants' attempt to improperly construe the "consisting of"/"consists of" term in a manner contrary to established law and that will confuse the juries.

### 2.    Defendants' Answering Position

"The presumption that a claim term set off by the transitional phrase 'consisting of' is closed to unrecited ingredients is at least a century old and has been reaffirmed many times by our court and other courts." *Multilayer*, 831 F.3d at 1358.  There is no dispute between the parties that Eagle's use of "consisting of" in every one of the asserted claims carries with it an "exceptionally strong presumption" that the claimed "pharmaceutically acceptable fluid" is closed to any unlisted ingredients. *Shire*, 848 F.3d at 986 (Fed. Cir. 2017) (citing *Multilayer*, 831 F.3d at 1359). Here that presumption is strengthened by Eagle's insertion of the phrase during the prosecution of its patents.

Recognizing that it cannot rebut this presumption, Eagle attempts to avoid it altogether. To do so, however, Eagle commits the "cardinal sin" of importing embodiments from the specification into the claims and ignores its actions before the Patent Office. Eagle, however, cannot now recapture through the claim construction process claim scope it willingly relinquished during prosecution with its "consisting of" amendment. Lacking support for its contrived interpretation of its claims, Eagle resorts to injecting extraneous and ambiguous legal concepts into its construction that will only sow confusion at trial.

For the reasons set forth below, the Court should adopt Defendants' proposed construction because it reflects Eagle's clear intention to narrow the "pharmaceutically acceptable fluid" element to only the specific ingredients recited in its claims.

i.      **The Intrinsic Evidence Supports Defendants' Construction**

a.  **Eagle Narrowed the "Pharmaceutically Acceptable Fluid" to the Expressly Recited Ingredients During Prosecution**

The prosecution history supports Defendants' proposed construction—not Eagle's.  As originally filed, the applications that led to the Asserted Patents included independent claims that recited "a liquid bendamustine-containing composition comprising" certain elements.  These claims did not include a "consisting of" phrase.  For example, original Claim 1 and 11 of the '214 Patent recited compositions comprising: (1) bendamustine; (2) polyethylene glycol ("PEG"); and (3) an antioxidant; and claim 11 included a pharmaceutically acceptable fluid that "comprises" polyethylene glycol:

> 1.      A sterile vial containing a liquid bendamustine-containing composition ***comprising*** bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL; polyethylene glycol; and a stabilizing amount of an antioxidant.

> 11.      A bendamustine-containing composition ***comprising*** bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid; wherein the pharmaceutically acceptable fluid ***comprises*** polyethylene glycol; and wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 20 mg/mL to about 60 mg/mL.

Ex. 5 at 21-22 (emphases added).

Likewise, original Claims 1 and 19 of the '783 Patent recited compositions comprising (1) bendamustine; (2) polyethylene glycol; and (3) an antioxidant:

> 1. A ready for dilution, liquid bendamustine-containing composition ***comprising*** bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL; polyethylene glycol; and a stabilizing amount of an antioxidant.

> 19. A bendamustine-containing composition ***comprising*** one or more doses of bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid that is polyethylene glycol; wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 20 mg/mL to about 60 mg/mL.

23

Ex. 13 at EAGLEBEN-SA_00000029-0000030(emphasis added).

The Patent Office rejected both sets of claims as obvious over prior art that taught bendamustine formulations containing PEG and various antioxidants.  Ex. 9 at 7; Ex. 13 at EAGLEBEN-SA_00000097.  Besides PEG and antioxidants, the prior art solutions included additional solvents, like DMA (dimethylacetamide), and non-solvent complexing agents, like niacinamide.  Ex. 12 [US Pub. No. 2011/0190363] at ¶¶ 30, 34 (noting that "[t]he solubility of bendamustine hydrochloride was also determined for *two solutions, 25 mg/mL niacinamide in DMA* and 66% DMA/34% propylene glycol (PG).") (emphasis added).

Eagle responded by amending the pending claims with an exclusionary "consisting of"/"consists of" phrase that limits the pharmaceutically acceptable fluid to "polyethylene glycol and optionally one of or more of propylene glycol, ethanol benzyl alcohol and glycofurol."  Ex. 3 at 6-7; Ex. 13 at EAGLEBEN-SA_00000242-243.  Eagle then distinguished these amended claims from what it described as the prior art's "solvent *systems*" by arguing that its claimed "pharmaceutically acceptable fluid" is strictly limited only to the explicitly recited ingredients, *i.e.*, "polyethylene glycol and optionally one of or more of propylene glycol, ethanol benzyl alcohol and glycofurol."  Ex. 3 at 10; Ex. 13 at EAGLEBEN-SA_00000246 (emphasis added).  Indeed, Eagle argued that the prior art "teaches away" from Eagle's limited "pharmaceutically acceptable fluid" that contains no more than five particular ingredients.  *Id*.  As a result, Eagle's compositions excluded the prior art's "pharmaceutically acceptable fluid" that contained other solvents, like DMA, as well as non-solvent ingredients, like niacinamide.  *Id*.  The Examiner then withdrew the rejections.  Ex. 4 at 2-3; Ex. 13 at EAGLEBEN-SA_00000836-837.

In sum, to avoid a prior art rejection, Eagle deliberately narrowed the scope of the "pharmaceutically acceptable fluid" limitation using exclusionary "consisting of"/"consists of"

language.  Indeed, in then-pending claim 11 of the '214 Patent, Eagle actually replaced the open-ended "comprises" with "consists of" for this element.  *See* Ex. 3 at 7.  In so doing, Eagle intentionally narrowed the scope of its claims to exclude from the "pharmaceutically acceptable fluid" limitation any ingredients that are not explicitly listed in the claim.  *See Norian Corp. v. Stryker Corp.*, 432 F.3d 1356, 1360 (Fed. Cir. 2005) (giving effect to narrowing amendment when "[i]n response to one series of rejections, [the applicant] narrowed the claim by changing the transitional phrase from 'comprising' to 'consisting essentially of' and then ultimately to 'consisting of.'").

Eagle cannot reverse its decision to narrow the claims through the claim construction process.  As Eagle readily admits, it distinguished its claims from what it refers to as the "solvent *systems*" of the prior art by limiting its "pharmaceutically acceptable fluid" to specific ingredients.  *Supra* at 20.  While Eagle faults Defendants for "explicitly limit[ing]" the "pharmaceutically acceptable fluid" element to the "listed solvents," it was ***Eagle*** that did so by amending its claims to use the "consisting of" language and disclaiming any ingredients not recited in this limitation to avoid the prior art.  *Supra* at 20-21.

Likewise, while Eagle complains that Defendants' use of the phrase "ingredients" indicates that "***only*** the listed solvents may be intentionally added" to the pharmaceutically acceptable fluid, Eagle has only its own decisions during prosecution to blame.  *See, e.g.*, *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003) ("The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent.").  To the extent Eagle is suggesting that Defendants' use of the term "ingredients" does not properly describe the permitted constituents of the pharmaceutically acceptable fluid, Eagle is wrong.  *See, e.g.*, *Norian*, 432 F.3d at 1362.  In *Norian*, the Federal

25

Circuit found that because the patentee "characterized the solution in terms of the ***components put into it…***the claims remained product claims, but their scope was limited to the designated ***ingredients*** from which the claimed solution was made." *Norian*, 432 F.3d at 1362 (emphasis added); *see also Shire*, 848 F.3d at 984 ("consisting of" phrase "creates a very strong presumption that that claim element is 'closed' and therefore exclude[s] any elements, steps, ***or ingredients*** not specified in the claim.") (emphasis added); *Multilayer*, 831 F.3d at 1358 (same).

As in *Norian*, Eagle overcame a prior art rejection by "characteriz[ing] the [pharmaceutically acceptable fluid] in terms of the components put into it": PEG, and optionally one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol. Indeed, the specification consistently describes the claimed "pharmaceutically acceptable fluid" in terms of what it is made from:[7]

- "In other embodiments of the invention however, the pharmaceutically acceptable fluid is a ***mixture of PEG and PG***." Ex. 1 ['783 Patent] at 3:39-41.

- "[T]he resulting bendamustine degradants are unexpectedly and substantially reduced over extended periods of time when PEG is a ***substantial part*** of the pharmaceutically acceptable fluid." Ex. 1 ['783 Patent] at 3:62-65.

- "[B]endamustine, when dissolved in a pharmaceutically acceptable fluid, such as a ***combination of polyethylene glycol and propylene glycol***, in the presence of a stabilizing amount of an antioxidant, such as thioglycerol, α-lipoic acid or dihydrolipoic acid, had substantially no increase in total degradants after a period of 1 month." Ex. 1 ['783 Patent] at 10:50-53 (emphasis added).

- "Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in a ***mixture of polyethylene glycol 400 and propylene glycol*** as indicated in Table 5 below." Ex. 1 ['783 Patent] at 10:60-64 (emphasis added).

- "The compositions can include …a pharmaceutically acceptable fluid ***which can include*** in some embodiments ***PEG, PG or mixtures thereof and an antioxidant or chloride ion source***." Ex. 1 ['783 Patent] at Abstract (emphasis added).

---

[7] The specifications of the Asserted Patents are identical in all material respects.

- "[S]ome preferred long term storage stable bendamustine-containing compositions in accordance with the invention compositions include: … b) a pharmaceutically acceptable fluid *including i) polyethylene glycol and propylene glycol; and ii) a stabilizing amount of thioglycerol*; or … b) a pharmaceutically acceptable fluid *including i) about 90% PEG and about 10% PG; and ii) about 2.5 mg/mL thioglycerol*." Ex. 1 ['783 Patent] at 4:27-39 (emphasis added).

As the above disclosures make clear, Eagle repeatedly chose to describe the pharmaceutically acceptable fluid in terms of the ingredients "put into it." The issued claims reflect Eagle's decisions. Eagle should be bound by these decisions, and the Court should reject Eagle's attempt to expand the claim scope.

### b. Eagle's Construction Applies an Improper Interpretation of the "Pharmaceutically Acceptable Fluid" Element

In support of its construction, Eagle attempts to distinguish "between the various *solvents* that make up the 'pharmaceutically acceptable fluid' and the *additional components* that can be part of the 'liquid bendamustine-containing composition.'" *Supra* at 18-19 (emphasis added). In essence, Eagle is attempting to recapture claim scope it willingly gave up with its "consisting of" amendments. By arguing that the term "pharmaceutically acceptable fluid" was only ever intended to apply to solvents, Eagle is attempting to rescue from the "consisting of" language non-solvent ingredients, which it contends are always "additional components" allowed by the scope of its claims. As set forth below, however, the specification refutes Eagle's contrived interpretation. *Id.*

For example, Eagle expressly defined the term "pharmaceutically acceptable fluid" in the Asserted Patents as "a fluid which is suitable for pharmaceutical use." Ex. 1 ['783 Patent] at 2:53-55. And the parties agreed that is the definition for "pharmaceutically acceptable fluid." The specification further explains that "[i]n several embodiments of the invention, [the] pharmaceutically acceptable fluid is non-aqueous and *may be, but is not necessarily, a solvent* for the bendamustine or salt thereof." *Id.* at 3:35-37 (emphasis added). Indeed, Eagle's specification

27

is replete with examples that contemplate the "pharmaceutically acceptable fluid" including additional ingredients beyond solvents. For example, Eagle expressly taught in the Asserted Patents that a "pharmaceutically acceptable fluid" can include antioxidants, chloride salts and other ingredients:

- "The compositions can include …a ***pharmaceutically acceptable fluid*** which can include in some embodiments PEG, PG or mixtures thereof and ***an antioxidant or chloride ion source***." Ex. 1 ['783 Patent] at Abstract (emphasis added).

- "[S]ome preferred long term storage stable bendamustine-containing compositions in accordance with the invention compositions include: … b) ***a pharmaceutically acceptable fluid*** including i) polyethylene glycol and propylene glycol; and ***ii) a stabilizing amount of thioglycerol***; or … b) ***a pharmaceutically acceptable fluid*** including i) about 90% PEG and about 10% PG; and ***ii) about 2.5 mg/mL thioglycerol***." Ex. 1 ['783 Patent] at 4:27-39 (emphasis added) (emphasis added).

- "In other aspects of the invention, the bendamustine-containing compositions ***include DMSO (dimethyl sulfoxide) as part of the pharmaceutically acceptable fluid*** included therein." Ex. 1 ['783 Patent] at 2:7-10 (emphasis added).

- "In accordance with another aspect of the invention, there is provided long term storage stable bendamustine-containing compositions, including: a) bendamustine or a pharmaceutically acceptable salt thereof; and b) ***a pharmaceutically acceptable fluid including DMSO***." Ex. 1 ['783 Patent] at 5:7-12 (emphasis added).

- "The methods include combining an amount of bendamustine or a pharmaceutically acceptable salt thereof with a sufficient amount of a ***pharmaceutically acceptable fluid*** containing one of the following: A) i) PEG, PG or mixtures thereof; ***and ii) a stabilizing amount of an antioxidant;*** B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and ***ii) a stabilizing amount of a chloride salt***; or C) DMSO." Ex. 1 ['783 Patent] at 5:38-46 (emphasis added).

These disclosures definitively show that Eagle did not limit the "pharmaceutically acceptable fluid" to solvent ingredients. Consistent with these disclosures, Eagle expressly claimed a "pharmaceutically acceptable fluid" including solvent and non-solvent ingredients in numerous other patents in the same family as the Asserted Patents. *See, e.g.,* Ex. 10 at Claim 1 (USP No. 9,265,831 claiming "a pharmaceutically acceptable fluid comprising . . . propylene glycol . . . [PEG], and . . . a stabilizing amount of an antioxidant"); Ex. 11 at Claim 1 (USP 9,572,797

claiming same). But, as discussed above, in prosecution of *these* Asserted Patents and *these* claims, Eagle distinguished its claims from the prior art by deliberately narrowing the claimed "pharmaceutically acceptable fluid" to an express set of ingredients recited in the claims, excluding anything else that otherwise could have been part of this element.

Tellingly, Eagle conveniently ignores these disclosures and cherry-picks embodiments from the specification that support its artificially narrowed interpretation that the "pharmaceutically acceptable fluid" represents a "solvents" only element. *Supra* at 19-20. Eagle's reliance on *these* select embodiments does not demonstrate that "non-solvent" ingredients cannot, as a matter of law, be part of the "pharmaceutically acceptable fluid." *Id.* Indeed, such an argument should be rejected because it would require the Court to commit "one of the cardinal sins of patent law—reading a limitation from the written description into the claims[.]" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1320 (Fed. Cir. 2005) (citing *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001)). Accordingly, Eagle's construction should be rejected. *Phillips*, 415 F.3d at 1323 ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments").

### ii. Eagle's Proposed Construction is Ambiguous and Will Confuse the Jury

Finally, Eagle's proposed qualifying language—"(but does not exclude impurities and substances unrelated to this element)"—attempts to inject into the claims two exceptions to the "exceptionally strong presumption" that the "pharmaceutically acceptable fluid" element is closed to ingredients not expressly listed in Eagle's claims. *Shire*, 848 F.3d at 986. This language should be rejected because it is unnecessary and introduces ambiguity that will only confuse the jury about the legal implications of Eagle's drafting choices. *Eis, Inc. v. Intihealth Ger GMBH*, 2023 WL

29

346631, at *15 (D. Del. Jan. 9, 2023) (rejecting proposed construction when it "risks introducing undesired ambiguity."); *Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, 2014 WL 1493665, at *3 (N.D. Cal. Apr. 16, 2014) (rejecting a construction that "does not explain what it means for a region to be 'specific' and 'localized.'").  Moreover, courts routinely construe "consisting of" terms without including these exceptions.  *See, e.g.*, *Multilayer*, 831 F.3d at 1355-61.  Put simply, Eagle cannot leverage two ambiguous qualifiers to muddy the bounds of the "pharmaceutically acceptable fluid" limitation, in hopes of turning it from a narrow set of ingredients to one that can encompass almost anything.

Judge Andrews' decision in *Otsuka v. Lupin* is instructive.  *Otsuka Pharm. Co., Ltd. v. Lupin Ltd.*, 2022 WL 2952759, at *3-5 (D. Del. July 26, 2022).  *Otsuka* was a Hatch-Waxman case where the parties disputed the construction of a "consisting of" limitation, and the patent owner proposed adding a qualifying clause nearly identical to the one Eagle proposes here.  *Id.* at *3.  The court rejected plaintiff's proposal, finding that there was "no need to include impurities in the construction" and that the "unrelated to the...invention" language "fails to clarify the [claim] term." *Id.*  *3-5.  Judge Andrews' logic applies equally here.

### a.  Eagle's "Impurities" Language is Unnecessary and Confusing

As to "impurities," Eagle's proposed construction is unnecessary and inaccurate.  As Judge Andrews recognized, the "Federal Circuit has held that 'impurities normally associated with the component of a claimed invention are implicitly adopted by the ordinary meaning of the components themselves.'"  *Otsuka*, 2022 WL 2952759, at *4 (citing *Conoco*, 460 F.3d at 1360).  Thus, the plain meaning of the expressly recited ingredients of the "pharmaceutically acceptable fluid" in Eagle's claims already include the impurities 'normally associated' with those ingredients.  There is therefore no reason to clutter the construction of "consisting of" with

extraneous legal concepts that are likely to confuse the jury.

Jury confusion is particularly likely here because Eagle uses the word "impurities" elsewhere in its claims, but in a very different context.  The claims characterize "impurities" as the degradation products of bendamustine that may form over time—not as non-infringing ingredients added to the composition.  *See* Ex. 1 ['783 Patent] at Claims 1, 11; *See* Ex. 2 ['214 Patent] at Claims 1, 6 ("[W]herein the ***total impurities in the liquid bendamustine-containing composition*** resulting from the degradation of ***the bendamustine*** is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.") (emphasis added).  These impurities are plainly different than the ingredient "impurities" that Eagle proposes to add to the construction of "consisting of," but the jury may not understand this.  Eagle's proposed construction would introduce a second instance of the term "impurities" without providing any guidance to the jury as to how "impurities" means something different in the construction of the "pharmaceutically acceptable fluid."

### b. Eagle's "Substances Unrelated to this Element" Language is Confusing and Irrelevant

Eagle's proposal to interpret the "pharmaceutically acceptable fluid" to include "substances unrelated to this element" is even more problematic.  As an initial matter, the additional language is ambiguous.[8]  Eagle does not explain what substances this phrase is intended to encompass, let alone how a jury should determine whether or how a substance is "unrelated to" the "pharmaceutically accepted fluid" element.  If anything, this phrase requires further construction, which is reason enough to reject it.  *Eis*, 2023 WL 346631, at *15.  Judge Andrews

---

[8] While Eagle criticizes Defendants for including a "negative limitation" in their construction of the "comprising term" (*supra* at 7), Eagle's proposed construction for this term includes a ***triple*** negative.  Read in full, the limitation (as construed by Eagle) would state that the "pharmaceutically acceptable fluid…***does not exclude*** impurities and substances ***un***related to this element."

expressly recognized this problem in his *Otsuka* decision, where he refused to include similar language as relying on "inapposite caselaw" and because it risks "turning the 'consisting of' transition to a 'comprising' transition." *Otsuka*, 2022 WL 2952759, at *5, n. 9.  As he explained, "Plaintiff does not explain what it is for something to 'consist of' elements unrelated to itself." *Id.* at *4 n.8 (citing *Norian*).

Moreover, Eagle has not explained why the Court's construction should include language allowing for not only the five listed solvents, but also other "substances unrelated to this element," an obscure concept that has been described by the Federal Circuit and this Court as a "rare exception." *Shire*, 848 F.3d at 984 ("Though the 'consisting of' presumption is very strong, we permit the rare exception for 'aspects unrelated to the invention.'"); *Integra Lifesciences Corp. v. HyperBranch Med. Tech., Inc.*, 2017 WL 3578695, at *5 (D. Del. Aug. 18, 2017), *report and recommendation adopted*, 2017 WL 5172396 (D. Del. Nov. 8, 2017) (Stark, J.) ("The Federal Circuit has recently emphasized that ['unrelated to the invention'] is a 'rare exception' that is not often implicated.")

The provenance of this "rare exception" also illustrates that it has no place here.  The "unrelated to this element" exception originated from the Federal Circuit's *Norian* decision, where the asserted patent recited "[a] kit for preparing a calcium mineral, said kit consisting of" specific chemicals; the accused product was a kit that contained the accused chemicals plus a spatula. *Norian*, 363 F.3d at 1332.  The Federal Circuit found that "[i]nfringement is not avoided by the presence of a spatula, for the spatula has no interaction with the chemicals, and is irrelevant to the invention." *Id.*  Eagle has not explained why this exception is remotely applicable here, where the facts are entirely different, or how a pharmaceutically acceptable fluid of a chemical formulation can possibly "consist of" an ingredient "unrelated" to itself.  *See Shire*, 848 F.3d at 984-987

(discussing the district court's misapplication of "what constitutes a component unrelated to the invention" in that case); *Integra*, 2017 WL 3578695, at *6 ("Under Plaintiffs' view, the claims permit other biodegradable groups, aside from esters, to exist in the hydrogel. But the Court cannot understand how inclusion of other biodegradable groups in the hydrogel would not be an aspect related to this invention").  As a result, adding the "unrelated to this element" concept will only confuse the jury.  Worse, as Judge Andrews warned, it will invite the jury to turn the "consisting of" transition to a "comprising" transition and allow additional unrecited ingredients that Eagle disclaimed during prosecution.[9]  *Otsuka*, 2022 WL 2952759, at *5 n.9.

### 3.    Plaintiff's Reply Position

Defendants' answering position asserts that "the claimed 'pharmaceutically acceptable fluid' [is limited] to an express set of ingredients recited in the claims, ***excluding anything else that otherwise could have been part of this element***."  *Supra* at 29.  Importantly, according to Defendants, "anything else" means both "solvent and non-solvent ingredients."  *Id.* at 28.  This improper interpretation would functionally limit the scope of the ***entire claim*** to the explicitly recited elements and thereby vitiate the preceding "comprising" transitional phrase.  It should be rejected.

First, Defendants apparently advocate for a claim scope even narrower than Defendants' proposed construction.  On its face, Defendants' construction recites "a fluid" made up of only the

---

[9] The decisions adopting similar qualifiers relied upon by Eagle, *supra* at 18, were all Hatch-Waxman cases where the trial would be to the bench, so there—unlike here—avoiding needlessly complicated constructions with the potential to confuse a jury was not an issue.  *See Shire v. Cadila*, 2015 WL 4596410, at *7; *Silvergate*, 2018 WL 1610513, at *6.  Although *Otsuka*, cited above, also was not a jury case, Judge Andrews' explanations as to why the qualifiers there were both unnecessary and "fail[ed] to clarify the [claim] term" apply equally to Eagle's nearly identical proposed qualifiers here, which would be even more unhelpful and confusing for a lay jury.  *Otsuka*, 2022 WL 2952759, at *4.

listed solvents.  To the extent that Defendants now attempt to argue that the "consisting of" limits "non-solvent ingredients" as well, that argument has been waived.

Second, Defendants cite no case that includes the "as ingredients" language in a construction of "consisting of."  *See supra* at 25-29.  And Eagle is aware of no such authority.  In short, there is no basis to include that contrived portion of Defendants' proposed construction.  Indeed, the specification does not include that phrase, nor did Eagle use the words "as ingredients" during prosecution.  As such, the "consisting of" term "must be given the full scope of its plain and ordinary meaning."  *Apple*, 2024 WL 3084509, at *4.  As set forth *infra*, the "full scope" of "consisting of" includes the established exceptions for impurities and substances unrelated to the claim element.  *See* disc. *infra* at 41-43.

Third, Defendants repeatedly focus on the notion that "the pharmaceutically acceptable fluid" is characterized "in terms of the ingredients 'put into it,'" (*supra* at 27), but that notion is both erroneous and irrelevant.  The asserted claims are neither methods of manufacture nor product-by-process claims, as Defendants' argument implicitly suggests.  *See, e.g.*, *Hospira, Inc. v. Fresenius Kabi USA, LLC*, 946 F.3d 1322, 1330 (Fed. Cir. 2020) ("Claim 6 is directed to a composition[;] . . . [it] is not a method claim, it is not a product-by-process claim, and there are no limitations [in the claim] regarding the manufacturing process by which the [claimed] composition must be prepared.").  Infringement is determined by the compositions that are used, imported, sold, and offered for sale in the United States.  *See* 35 U.S.C. § 271(a).

Last, Defendants' admissions on this point underscore the pernicious nature of their proposed construction and why it should be rejected.  Defendants plainly intend to argue to a jury that the "as ingredients" language would reach excipients other than the solvents recited in the subject claim element, which would be plain error.

a.      **The Intrinsic Record Supports Eagle's Proposed Construction**

Defendants argue that their construction is supported by Eagle's "actions before the Patent Office" (Ans. Br. at 8), but that position ignores the most significant portions of the intrinsic evidence:  the claims themselves, as well as the weight of the specification.  As Eagle previously explained, that intrinsic evidence is the best guide for construing claims.  *Supra* at 17-21.

The claim language Defendants ignore makes clear that their position is wrong.  As shown in the exemplary claim below (and as Defendants do not dispute), the "consisting of" transitional phrase applies *only* to the "pharmaceutically acceptable fluid" claim term.  And each and every excipient listed in that claim term is indisputably a solvent.

> A  sterile  vial  containing  a  liquid  bendamustine-containing  composition *comprising* . . .
>
> > a pharmaceutically acceptable fluid *consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol*; and . . . .

'214 patent at claim 1 (emphasis added).

Conversely, other components of the "liquid bendamustine-containing composition" that are not solvents and are therefore not part of the pharmaceutically acceptable fluid (*i.e.*, the "bendamustine" and the "antioxidant") are set off as separate claim elements and are governed by the "comprising" transitional phrase.  Thus, while the "consisting of" term limits what *solvents* may make up the claimed "pharmaceutically acceptable fluid," it does not limit other *ingredients* that may be added to the pharmaceutically acceptable fluid to make up the "liquid bendamustine-containing composition."   To interpret the claim otherwise would be to exclude the claimed bendamustine and antioxidant governed by the "comprising" transitional phrase.  Even allowing for those explicit elements, Defendants' interpretation would read the "comprising" phrase out entirely, and erroneously limit the entire claim to only the listed ingredients.  *See Amgen*, 945 F.3d

at 1378 (concluding the proper interpretation of "consisting of" requires looking at the rest of the claims and here "[t]here is no language in Amgen's claim indicating that every binder or disintegrant in the claimed formulation must be within the Markush groups").

The specification repeatedly distinguishes between: (1) the solvents that make up the pharmaceutically acceptable fluid itself; and (2) the excipients that are dissolved in that fluid to make up the "liquid bendamustine-containing composition." Even the portions of the specification that Defendants cite in an attempt to support their argument that "Eagle repeatedly chose to describe the pharmaceutically acceptable fluid in terms of the ingredients 'put into it'" (*supra* at 27), show that the inventors consistently distinguished between the solvents of the pharmaceutically acceptable fluid and the components dissolved in those solvents. For instance, the specification states that "[i]n other embodiments of the invention however, the pharmaceutically acceptable fluid *is* a mixture of PEG and PG." *Supra* at 26 (citing '783 patent at 3:39-41). Both PEG and PG are unquestionably solvents. *See* Ex. 1, '783 patent at 3:37-39; *id.* at 7:23-24; Ex. 2, '214 patent at 3:41-43; *id.* at 7:25-27. Similarly, the specification explains that "[i]n other aspects of the invention, the bendamustine-containing compositions include DMSO (dimethyl sulfoxide) *as part of* the pharmaceutically acceptable fluid included therein." *Supra* at 28 (citing '783 patent at 2:7-10). DMSO is likewise unquestionably a solvent. *See* Ex. 1, '783 patent at 7:63-64; Ex. 2, '214 patent at 8:1-2. Even where Defendants identify portions of the specification that reference other excipients, the inventors clearly separated the solvents that make up the pharmaceutically acceptable fluid from the excipients dissolved in the fluid. This can be seen most clearly where the specification calls for "bendamustine, *when dissolved in* a pharmaceutically acceptable fluid, such as a combination of polyethylene glycol and propylene glycol, *in the presence of* a stabilizing amount of an antioxidant." *Supra* at 26 (citing '783 patent

at 10:50-53) (emphasis added).  Elsewhere, the dissolved excipients are set off as separate items, such as the specification's statement that the "bendamustine-containing compositions . . . include: . . . a pharmaceutically acceptable fluid including i) polyethylene glycol and propylene glycol; and ii) a stabilizing amount of thioglycerol."  *Supra* at 27 (citing '783 patent at 4:27-39).

The single instance Defendants identify that lists the fluids and the dissolved excipients without some sort of separation is the statement in the abstract that "[t]he compositions can include . . . a pharmaceutically acceptable fluid which can include in some embodiments PEG, PG or mixtures thereof and an antioxidant or chloride ion source."  *Supra* at 26 (citing '783 patent at Abstract).  Yet the Abstract is a short, summary paragraph generally limited to 50 to 150 words (37 C.F.R. § 1.438 (incorporating PCT Rule 8.1(b)), which the specification then expands on to provide greater detail and clarity.  The sole outlier in the Abstract does not overcome the clear statements throughout the rest of the specification.  *See Quectel Wireless Sols. Co. v. Koninklijke Philips N.V.*, No. 2023-1155, 2024 WL 2064617, at *3 (Fed. Cir. May 9, 2024) ("[T]he Abstract's general description of the claimed invention does not, on the particular facts of this case, override the clear language in the body of the specification."); *see also InterDigital Commc'ns, Inc. v. U.S. ITC*, 601 F. App'x 972, 978 (Fed. Cir. 2015) ("[S]ummary statements . . . in the Abstract and Summary of the Invention—where full explanations of the term are not expected—are [not] sufficient to justify a broader reading of [a disputed term].").

Tellingly, Defendants' analysis begins with the prosecution history, in contravention of Federal Circuit authority.  *Supra* at 23-25; *Phillips*, 415 F.3d  at 1317 ("[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification [and claims] and thus is less useful for claim construction purposes.").  Yet the prosecution history similarly supports

Eagle's proposed construction. As explained in Eagle's opening brief, Eagle narrowed its claims by adding the "consisting of" transitional phrase to the "pharmaceutically acceptable fluid" term explicitly to exclude specific solvents recited in the Drager reference. *Supra* at 20-21. That reference required "polar, aprotic solvents," which are not among the solvents listed in the asserted claims. *Supra* at 20. As Eagle explained when it amended its claims "Drager fails to disclose or suggest any bendamustine formulations with solvent systems composed of protic solvent in the absence of any aprotic solvent." Ex. 3 at EAGLEBEN-SA_00001275. Indeed, Eagle spent pages of its response making clear that these polar aprotic solvents are what distinguishes Drager from the claimed invention. Thus, unlike in *Norian*, Eagle did not surrender any other claim scope through "narrowing amendments and clarifying explanations from the prosecuting attorney." *Norian*, 432 F.3d at 1360.

Defendants struggle to fit Eagle's prosecution into *Norian*'s mold, arguing that "Eagle's compositions excluded the prior art's 'pharmaceutically acceptable fluid' that contained other solvents, like DMA, as well as non-solvent ingredients, like niacinamide." Ans. Br. at 10. But that reading is flawed for two reasons. Initially, it ignores the fact that even before the "consisting of" transitional phrase was added, the pharmaceutically acceptable fluid was still only made up of solvents. As Defendants note, the original claim also limited the "pharmaceutically acceptable fluid" to a solvent, specifically polyethylene glycol.

> A bendamustine-containing composition comprising one or more doses of bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid ***that is polyethylene glycol;*** wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 20 mg/mL to about 60 mg/mL.

*Supra* at 23 (citing Ex. 13 at EAGLEBEN-SA_0000030) (emphasis added).

Just as in the issued claims, the non-solvent excipients were set off as separate claim elements, making clear that they were a part of the "bendamustine-containing composition" that is

38

dissolved in the "pharmaceutically acceptable fluid" and not a part of the "pharmaceutically acceptable fluid" itself.  For this same reason, Defendants' reliance on a related patent that includes an antioxidant as an element of the pharmaceutically acceptable fluid is misplaced.  *Supra* at 28-29.  Here, unlike that patent, the antioxidant is broken out separately because the pharmaceutically acceptable fluid is limited to solvents.  Ignoring that distinction deprives that difference in claim structure of any meaning.  *See Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1322 (Fed. Cir. 1999) (rejecting defendant's contention that the court had already construed a term to have a particular meaning in a related patent because "[t]hese claims have different language and [thus] different meanings"); *see also Chrimar Holding Co., LLC v. ALE USA Inc.*, 732 F. App'x 876, 884 (Fed. Cir. 2018) ("It is hardly unknown for one set of claims to use language that picks out one among several embodiments, especially where other claims (perhaps in the same or related patents) claim more broadly or focus on other embodiments.").

Second, Defendants contend that because the Drager reference mentions non-solvent excipients like niacinamide, the narrowing must have surrendered such non-solvent excipients as well.  But that wrongly assumes that such excipients were part of the pharmaceutically acceptable fluid in the first place, which they are not.  Indeed, niacinamide was never mentioned in the rejection or the narrowing amendment—it could hardly form the basis for "narrowing" as Defendants suggest.  Ex. 3 at EAGLEBEN-SA_00001274-77; *see also Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1374-75 (Fed. Cir. 2022) (explaining that any statements or amendments in the prosecution history must be considered in context and viewed under the totality of all circumstances to determine whether, or to what extent, the statements actually expressly disclaim claim scope); *see also In re Sitagliptin Phosphate ('708 & '921) Pat. Litig.*, No. 19-2902-RGA, 2020 WL 6743022, at *12 (D. Del. Nov. 17, 2020) (explaining the "disclaimer only goes so

39

far as to reach 'surfactant' . . . there is nothing in the prosecution history to extend the disclaimer to include 'sodium lauryl sulfate' as well").

Drager references an extensive laundry list of other "pharmaceutically acceptable excipients" its formulations could include. *See* Ex. 12, U.S. Patent Pub. No. 2011/0190363 to Drager et al. at ¶ 0030. If Defendants' argument was correct, no such excipients would be included in the claim scope and the entire claim would be essentially limited to the listed claim elements. Such an interpretation completely reads out the "comprising" transitional phrase, closing the entire claim to all but the listed elements. That cannot be correct.

### b. The Construction Must Include the Recognized Exceptions to "Consisting of" to Allow the Jury to Apply Them

Defendants also argue that including in the construction the recognized exceptions to the "consisting of" phrase renders it "ambiguous and will confuse the jury." *Supra* at 29. Far from it. Indeed, Courts routinely incorporate the exception language into their constructions. *Supra* at 18. While Defendants have identified *Multilayer* and *Otsuka* as instances where Courts did not incorporate such language, both are inapposite here. With respect to *Multilayer*, Defendants argue that "courts routinely construe 'consisting of' terms without including these exceptions." *Supra* at 30 (citing *Multilayer*, 831 F.3d 1350, 1355-61 (Fed. Cir. 2016)). But *Multilayer* does not even discuss the exceptions because they were not relevant to the dispute between the parties. 831 F.3d at 1358.

*Otsuka* is similarly inapplicable. That case involved a bench trial, which was critical to Judge Andrews's decision not to include the exceptions. There, the Court found that "the presence of impurities [wa]s 'implicit' in the ordinary meaning of the recited components, and the parties do not dispute that impurities may be present," so there was "no need to include impurities in the construction." *Otsuka*, 2022 WL 2952759, at *4. The Court then explained that "[a]ny trial will

40

be a bench trial, so making sure the jury will understand a term is not an issue in this case." *Id.* at n.4.  None of that rationale applies to this case for two independent reasons.  First, one or more Defendants have propounded non-infringement arguments based on the presence of sodium hydroxide in their formulations.  *See, e.g.*, C.A. No. 24-64-JLH, D.I. 44 at 14-17.[10]  As Eagle has explained, one reason that argument fails is because the sodium hydroxide would fall within these exceptions.  C.A. No. 24-64-JLH, D.I. 60 at 17-20.  The exceptions are therefore relevant to a live dispute, unlike in *Otsuka*.  Second, each action will involve a jury trial, unlike in *Otsuka*.  At trial, the jury will have to apply these constructions, so they must be able to understand and apply the exceptions.

Defendants go on to raise specific objections for each of the two exceptions.  For the "impurities" exception, Defendants first argue that "the plain meaning of the expressly recited ingredients of the 'pharmaceutically acceptable fluid' in Eagle's claims already include the impurities 'normally associated' with those ingredients."  *Supra* at 30.  This is a concession that the impurities exception Eagle seeks to include in the construction is correctly encompassed by the term.  Including that explanation in the constructions that the lay jury will be provided is plainly appropriate.  The purpose of claim construction is to clarify exactly these sorts of "implicit" meanings that a lay jury might not appreciate.  *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004)) ("The terms, as construed by the court, must 'ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims.'").

Defendants also argue that the term would be confusing because "Eagle uses the word

---

[10] The Protective Order prevents Eagle from relying on Defendants' confidential information in its claim construction briefs.  *See, e.g.*, C.A. 24-64-JLH, D.I. 74 at § 4(d) n.1.  Eagle is willing to present additional information supporting this assertion if the Court requests and permits same.

'impurities' elsewhere in its claims, but in a very different context," referencing the claim element that "the total impurities . . . resulting from the degradation of the bendamustine is less than about 5%." *Supra* at 31. But the use of the word "impurities" elsewhere in the claim does not mean the construction is confusing. If anything, it means that the jury will have to understand it regardless. While Defendants argue that the context is different, the word means the same thing in both places. As the claim explains, the 5% claim element is specific to "impurities . . . resulting[ from the degradation of the bendamustine." '214 patent at claim 1. Similarly, the case law does not create some separate category of "ingredient 'impurities'" as Defendants contend. *Supra* at 31. Rather, the law states that even if a component is added intentionally, that "does not change its status as an 'impurity.'" *Conoco*, 460 F.3d at 1360. Impurities are a concept the jury will need to understand regardless so hiding this exception language from them would do nothing but foster confusion.

As for the exception for substances unrelated to the claim element, Defendants argue that the exception is "rare," as well as "confusing and irrelevant." *Supra* at 31-32. As to the first point, that merely underscores that it is a recognized exception. And that the unrelated substances exception is rarely utilized hardly means that it is non-existent, as Defendants suggest. Failing to recognize that established exception invites error. *See Norian*, 363 F.3d at 1331; *Azurity Pharms., Inc. v. Alkem Lab'ys Ltd.*, 582 F. Supp. 3d 192, 198 (D. Del. 2022).

Defendants invoke *Otsuka* in asserting that "Plaintiff does not explain what it is for something to 'consist of' elements unrelated to itself." 2022 WL 2952759, at *5. But that rhetorical question stemmed from the specific claim term at issue and the construction Plaintiffs sought in that case, which the Court characterized as "amorphous composites consist[ ] of . . . elements unrelated to the amorphous composites of the invention." *Id.* at *4 n.8. The same issue

is not present here.  Rather, at least one Defendant here seeks to sweep sodium hydroxide out as something excluded by the "pharmaceutically acceptable fluid" element, despite sodium hydroxide being a dissolved solid (not a fluid) and, as Eagle has argued in the context of its 12(c) briefing, consumed during the manufacturing process.  *See* C.A. No. 24-64-JLH, D.I. 60 at 2, 6-8.  In fact, *Otsuka* recognizes a similar point, finding that what is relevant is "what the amorphous composites contain, not the conditions under which the amorphous composites are produced."  2022 WL 2952759, at *4 n.5.

Defendants also argue a jury will be unable to determine whether a substance is unrelated to a claim element.  *Supra* at 31-32.  But a jury can assess whether sodium hydroxide or any other material is unrelated to the claim element the same way they assess any other standard in patent law, by considering the evidence, including expert testimony, to determine whether a substance is part of the pharmaceutically acceptable fluid or the "liquid bendamustine containing composition." Defendants' proposal to simply omit this exception is nothing more than an attempt to provoke the Court into a premature decision that the exception does not apply before the jury even has an opportunity to consider such evidence.

### 4.    Defendants' Sur-Reply Position

The parties' dispute can be distilled to two issues to be resolved by the Court: (i) whether Defendants' use of the term "ingredients" properly characterizes the permitted components of the "pharmaceutically acceptable fluid" element; and (ii) whether inclusion of rare legal exceptions injects unnecessary confusion into the construction of the "consisting of" claim terms.

### i.    Eagle's "Solvents Only" Interpretation Lacks Any Support

It is black letter law that "the phrase 'consisting of' [] mean[s] 'I claim what follows ***and nothing else***.'" *Vehicular Techs.*, 212 F.3d at 1383 (emphasis added).  Consequently, when Eagle amended its claims to recite a "pharmaceutically acceptable fluid consisting of" specifically

identified ingredients, Eagle excluded from that element ***all other*** unclaimed ingredients. Eagle objects to Defendants' use of the phrase "***ingredients***" to argue that its use of "consisting of" limits only "what ***solvents*** may make up the claimed 'pharmaceutically acceptable fluid.'"[11] *Supra* at 35. But that is not the construction that Eagle put forward in the Joint Claim Construction Chart, which fails to even mention the word "solvent." Instead, Eagle ***agreed*** that the term means what the specification says it means: "a fluid which is suitable for pharmaceutical use." *Supra* at 3; No. 24-66, D.I. 65 at Ex. A. If Eagle wanted to limit the definition of "fluid" to "solvents only," surely it was required to actually use that word in its construction and explain what it means and how it is supported. It is neither possible nor reasonable to expect Defendants to oppose a construction that Eagle never proposed.[12]

Eagle's litigation-inspired construction is nothing more than an attempt to recapture claim scope it willingly gave up during prosecution. By narrowly interpreting the "pharmaceutically acceptable fluid" to allow for only solvent ingredients, Eagle limits the exclusionary effect of "consisting of," because any non-solvent ingredients in the fluid would be permitted by the "comprising" language in the claims' preamble. *See supra* at 35 ("the 'consisting of' term. . . does

---

[11] Eagle's objection to the term "ingredients" falls flat, *supra* at 34, because courts routinely characterize the components limited by "consisting of" terms as "ingredients," including in chemical compositions. *See Norian*, 432 F.3d 1356, 1362 (Fed. Cir. 2005). ("[T]he patentee characterized the solution in terms of the components put into it, which the evidence [] showed to be a conventional means of describing a solution. Because the patentee chose to describe the solution in that fashion…their scope was limited to the designated ***ingredients*** from which the claimed solution was made") (emphasis added); *see also supra* at 26. Here, Eagle's claimed composition includes components that ultimately dissociate, but Eagle claimed the initial components—the ingredients—not the dissociated reaction products. And ***Eagle*** repeatedly describes the components of the claimed composition as "ingredients." *Supra* at 35.

[12] Ironically, Eagle asserts that Defendants "waived" the argument that the "consisting of" language "limits 'non-solvent' ingredients" by using the term "fluid." *Supra* at 34. Not so. Defendants' construction has ***always*** made clear that the only permitted ingredients in the "pharmaceutically acceptable fluid" are the five enumerated in the claims, and that no other ingredient—solvent ***or*** non-solvent—is permitted.

not limit other ingredients that may be added to the pharmaceutically acceptable fluid."). If the Court were to construe this term as "solvents only," it would negate the restriction Eagle placed on its claims by using "consisting of" to secure allowance. Further, Eagle's newly-asserted construction—that "pharmaceutically acceptable fluids" are only solvents—raises a new issue, which is that the construction would render the claims indefinite under 35 U.S.C. § 112 because: (1) the difference between solvents and non-solvents is unclear (including ambiguity regarding which solutes, and how much solute, must dissolve to define the "solvent"); and thus (2) the dividing line between ingredients in the "liquid composition" and those in the "pharmaceutically acceptable fluid" is also unclear.[13] Likewise, assessing infringement would be impossible: Is an unclaimed solvent part of the "consisting of" fluid? Or is it part of the "comprising" liquid? The Court should not adopt a construction that renders the claims unintelligible.

The specification also contradicts Eagle's "solvents only" interpretation. Eagle's specification clearly contemplates that the "pharmaceutically acceptable fluid" can include both solvent and non-solvent ingredients. In advocating a "solvents only" theory, Eagle ignores the specification's crystal-clear disclosure that "[i]n several embodiments of the invention [the] pharmaceutically acceptable fluid is non-aqueous and *may be, but is not necessarily, a solvent*...." Ex. 1 at 3:35-37 (emphasis added). Eagle further ignores the numerous examples in the specification describing a "pharmaceutically acceptable fluid" that includes *non-solvent* ingredients (as well as unclaimed solvents). *Supra* at 28 (citing Ex. 1 at Abstract, 2:7-10, 4:27-39, 5:7-12, 5:38-46). Incredibly, Eagle insists that Defendants identified only a "single instance"— the Abstract—where the specification described a "pharmaceutically acceptable fluid" with non-

---

[13] The parties agreed to reserve indefiniteness arguments for later briefing (other than regarding the "from about" term) and, should Eagle's claim construction be adopted, or where other grounds of indefiniteness exist, Defendants intend to move on indefiniteness at an appropriate time.

solvent ingredients.  *Supra* at 37.  Not so.  Defendants identified many examples throughout the specification where Eagle disclosed that a "pharmaceutically acceptable fluid" can expressly include non-solvent ingredients such as thioglycerol or a chloride salt.  *Supra* at 28; *accord* Ex. 1 at 4:27-39 ("a pharmaceutically acceptable fluid *including* i) polyethylene glycol and propylene glycol; *and ii) a stabilizing amount of thioglycerol*.") (emphases added).  Accordingly, the specification clearly contemplates that Eagle's "pharmaceutically acceptable fluid" "is not necessarily, a solvent," and can include non-solvent ingredients.  Thus, when Eagle limited the claimed pharmaceutically acceptable fluid to the five specific enumerated ingredients to avoid the prior art, it *excluded* any unclaimed ingredients in the pharmaceutically acceptable fluid, whether they are alternative solvents or non-solvent ingredients.[14]

Eagle is also wrong about the prosecution history.  Eagle suggests that it distinguished only "specific *solvents* in the Drager reference."  *Supra* at 38.  But Eagle disclaimed something broader: Drager's "solvent *systems*," which included solvents like DMA as well as non-solvent ingredients like niacinamide.  Ex. 13 at EAGLEBEN-SA_00000246.  Neither of Eagle's arguments regarding Drager hold up.  Eagle first argues that its disclaimer over Drager during prosecution is irrelevant because the "*original claim* also limited the 'pharmaceutically acceptable fluid' to a solvent, specifically polyethylene glycol [PEG]."  *Supra* at 38 (emphasis added).  But what matters is what Eagle did *during prosecution*—and Eagle amended the initial claims to strictly limit the "pharmaceutically acceptable fluid" to five specific ingredients while distinguishing the claims from the "solvent *systems*" of Drager, which included additional ingredients—both solvents and non-solvents.  Ex. 3 at 10; Ex. 13 at EAGLEBEN-SA_00000246; Ex. 12 at ¶¶ 30, 34.

---

[14] That Eagle recited only solvent ingredients in its claims is irrelevant. By using "consisting of," Eagle excluded *from the claims* all ingredients not expressly recited therein. But this amendment does not alter the specification's broader description of "pharmaceutically acceptable fluid."

Eagle next argues that because "niacinamide" was not mentioned in Eagle's narrowing amendment, Eagle did not exclude it or any other "non-solvent excipients" from the scope of the "pharmaceutically acceptable fluid." *Supra* at 38-39. Eagle is wrong: Eagle expressly distinguished Drager's "solvent *systems*," which included both solvents and non-solvent ingredients, and narrowed the claimed "pharmaceutically acceptable fluid" to a specific list of ingredients. Eagle deliberately used the "consisting of" term and excluded all other ingredients, whether solvent or non-solvent. The Court should reject Eagle's attempt to rewrite history. *Norian*, 432 F.3d at 1361-62 ("We have held the patentees to the scope of what they ultimately claim, and we have not allowed them to assert that claims should be interpreted as if they had surrendered only what they had to.").

Eagle insists that Defendants' construction would "limit the ***entire claim*** to only the listed ingredients," but Eagle is wrong again. *Supra* at 35 (emphasis added). There is no dispute that Eagle's claims recite additional elements, such as the claimed bendamustine and a "stabilizing amount of an antioxidant." *See, e.g.,* Ex. 1 at Claim 1. Defendants' construction limits only the claimed "pharmaceutically acceptable fluid" to the five recited ingredients, because that is what ***Eagle*** did by closing the "pharmaceutically acceptable fluid" with the "consisting of" term. Eagle cannot now blame Defendants for the decisions it made during prosecution.

Finally, *Amgen v. Amneal*, cited by Eagle, does not suggest otherwise. There, the asserted claims recited "[a] pharmaceutical composition comprising . . . [] ***at least one*** binder selected from the group consisting of . . . [and] ***at least one*** disintegrant selected from the group consisting of . . .," and the question was "whether ***all*** binders or disintegrants in the claimed formulation" were so limited. *Amgen*, 945 F.3d at 1371, 1378 (emphasis added). The Federal Circuit relied on the "at least one" language in the claims to find that the asserted patent "does not indicate that the only

47

binders and disintegrants in the claimed formulation are those listed in the groups." *Id.* Here, in contrast, there is no "at least one" language in the claim and the "pharmaceutically acceptable fluid" in the claimed composition was expressly limited in prosecution to avoid Drager. *Supra* at 24-25. As in *Shire* and *Multilayer*, the "normal restrictive meaning" of "consisting of" applies here, and limits the "pharmaceutically acceptable fluid" to the five recited ingredients. *Amgen*, 945 F.3d at 1378.

### ii.    Eagle's Proposed Construction Will Confuse the Jury

"The purpose of claim construction is to ***resolve*** disputed meanings and technical scope, to ***clarify*** and when necessary to ***explain*** what the patentee covered by the claims." *Promptu Sys.*, 92 F.4th at 1380 (emphasis added). In other words, "[t]he purpose of claim construction is to reduce ambiguity for the jury." *Vivus, Inc. v. Actavis Labs. FL Inc.*, 2016 WL 3919455, at *3 (D.N.J. July 20, 2016). Eagle's Reply confirms what Judge Andrews found in *Otsuka*: including the "impurities" and "unrelated to this element" exceptions would inject ambiguity and require additional explanation, defeating the purpose of claim construction. *Otsuka*, 2022 WL 2952759, at *4-*5. Because this language "does not help to clarify the meaning of the term and may confuse the jury," the Court should reject it.[15] *Välinge Innovation AB v. Halstead New England Corp.*, 2018 WL 2108199, at *8 (D. Del. May 7, 2018) (Stark, J.)

***The "impurities" exception.*** Eagle argues that adding this language will "clarify" that the "impurities exception…is correctly encompassed by the term," *supra* at 41, but that misses the point. The question is whether the construction will clarify the claim term—not whether it will alert the jury to the existence of a rare legal exception. The answer is no. Eagle has not explained why this language will help clarify the claim term for a lay jury. To the contrary, Eagle does not

---

[15] Eagle's arguments regarding the role of sodium hydroxide in the accused formulations (*supra* at 41) raise issues not before the Court and are irrelevant to claim construction.

dispute that the term "impurities" appears in the claims in a very different context—as degradation products of bendamustine, rather than as intentionally added ingredients. *Supra* at 42. Introducing additional "impurities" language in a different context will almost certainly confuse the jury, particularly because Eagle's proposed construction provides no guidance on the differences between the two "impurities." Eagle suggests that "the jury will need to understand [impurities] regardless," *supra* at 42, but when "the presence of impurities is 'implicit[ ]' in the ordinary meaning of the recited components, and the parties do not dispute that impurities may be present, then ***there is no need to include impurities in the construction***." *Otsuka*, 2022 WL 2952759, at *4 (emphasis added). Moreover, Eagle does not explain ***how*** this language will help the jury understand the concept of impurities. *Supra* at 42-43. The Court should reject it.

       ***The "unrelated to this element" exception.*** Eagle does not deny that this language requires further construction, which is reason alone to reject it. *Supra* at 31. Nor has Eagle explained what this term means. Eagle does not even attempt to argue that this language would aid the jury's understanding of the claim term. Instead, Eagle argues that the jury "can assess whether sodium hydroxide or any other material is unrelated to the claim element the same way they assess any other standard in patent law." *Supra* at 43. In other words, Eagle wants the Court to adopt this language now and expects the jury to determine its meaning later. That is completely contrary to the purpose of claim construction. *Promptu*, 92 F.4th at 1380. Eagle still has not explained what it means "for [pharmaceutically acceptable fluid] to 'consist of' elements unrelated to itself," nor has it provided any guidance for how the jury should understand this confusing argument. *Otsuka*, 2022 WL 2952759, at *4 n.8 (citing *Norian*). The Court should reject it.[16]

---

[16] Eagle has not identified a single precedential decision that adopted its proposed language of "unrelated to ***this element***," rather than "unrelated to ***the invention***," which is what appears in *Norian*. *Norian*, 363 F.3d at 1331-32. And the one non-precedential decision cited by Eagle that

C.     **"wherein the bendamustine concentration in the composition is from about 25 mg/mL"**

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|------|-----------------------------------|-----------------------------------|
| "wherein the bendamustine concentration in the composition is from about 25 mg/mL" ('214 patent, claims 1 and 6) | "wherein the bendamustine concentration in the composition is about 25 mg/mL" | Indefinite. The claim does not explicitly recite an upper bound and the specification does not clearly provide an upper bound. |

1.     **Plaintiff's Opening Position**

Defendants contend that this term is indefinite because "from about 25 mg/mL" does not recite an upper bound. But the intrinsic record demonstrates that the word "from" is a clear typographical error, inadvertently carried over from the original claims when the element was amended to recite a specific concentration as opposed to a range. Eagle readily concedes that "from" in this claim term is a typographical error. As explained below, "from" is a byproduct of copying certain dependent claim language into independent claims during prosecution. This is the precise type of error courts routinely fix during claim construction.

Eagle respectfully requests that Court correct this obvious mistake because "(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Pavo Sols. LLC v. Kingston Tech. Co.*, 35 F.4th 1367, 1373-78 (Fed. Cir. 2022).

The error in claims 1 and 6 of the '214 patent is "not subject to reasonable debate." *Id.* When the typographical error in the claims is "clear based on the understanding of one of ordinary

adopted this language noted that the "case law exception[]" was for "aspects truly unrelated to ***the invention***." *Shire Dev. Inc. v. Cadila Healthcare Ltd.*, 2015 WL 4596410, at *7 (emphasis added).

50

skill," it should be corrected by the court.  *See Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1352 (Fed. Cir. 2009) (fixing a missing comma in a chemical formula that was obvious to a POSA).  A POSA looking at the claim language here would immediately recognize that there was a mistake because "from about 25 mg/mL" is clearly missing any corresponding end point value that is necessary to complete a concentration range and thus interpreting it as a concentration range would make no sense.  *See, e.g.*, *Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Lab'ys, Ltd.*, 476 F.3d 1321, 1327 (Fed. Cir. 2007) ("[O]ne of ordinary skill in the art would understand the inventors intended a range when they claimed one and something more precise when they did not."); *see also VTT Tech. Rsch. Ctr. Of Finland Ltd. v. SiTime Corp.*, No. 19-1174, 2020 WL 4193374, at *9 (N.D. Cal. July 21, 2020), *aff'd*, 849 F. App'x 928 (Fed. Cir. 2021) (holding "the error of the omitted temperature range is obvious from the face of the [] Patent" because a POSA would know "temperature drift is ordinarily expressed with reference to a temperature range").  The language in the specification confirms the error in the claims by always coupling "from about" language with "to about" language when referring to a range.  *See, e.g.*, '214 patent at 2:14 ("from about 20 mg/mL to about 60 mg/mL"); 3:25-27 ("from about 10 mg/mL to about 100 mg/mL"); 3:29-30 ("from about 25 mg/mL to about 50 mg/mL"); 3:30-31 ("from about 30 mg/mL to about 50 mg/mL").  And this phraseology is not limited to discussions of concentrations:  all twenty-four (24) times the words "from about" are used in the specification, they are accompanied by a corresponding "to about."  *See, e.g.*, *id.* at 6:2-3 (temperature).  Recitation of language in a claim that is different from how it is "exclusively" and "consistently" used in the specification "confirms the error in the claims" justifying judicial correction.  *See Pavo*, 35 F.4th at 1375.

The prosecution history confirms that "from" is a typographical error readily corrected by

the Court. Originally, the independent claims recited a liquid bendamustine-containing composition having a concentration range "from about 20 mg/mL to about 60 mg/mL" while the dependent claims recited a narrower specific concentration of "about 25 mg/mL." *See* Exhibit 5, Claims dated December 14, 2022 at claims 1 and 11 (independent claims); *id.* at claims 3 and 11 (dependent claims). During prosecution, Eagle amended the independent claims to incorporate the specific "25 mg/mL" concentration recited in corresponding dependent claims as shown below.

> 1.    (Currently Amended) A sterile vial containing a liquid bendamustine-containing composition comprising
>
>    about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 25 mg/mL 20 mg/mL to about 60 mg/mL;
>
>    a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
>
>    a stabilizing amount of an antioxidant,
>
>    wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

*See* Exhibit 6, Reply to Office Action dated November 8, 2023, p. 2.

The remarks accompanying this amendment confirm that Eagle intended "to include [the] subject matter of [dependent] claims 2 and 3" in independent claim 1. *See id.*, p. 4; *see also* Exhibit 7, Reply to Office Action dated July 28, 2023, p. 2 (claims 2 and 3 shown below).

> 2.    (Original) The sterile vial of claim 1, wherein the composition comprises about 100 mg of bendamustine.
>
> 3.    (Original) The sterile vial of claim 1, wherein the bendamustine concentration in the composition is about 25 mg/mL.

The word "from" plainly should have been removed as part of the deletion of "20 mg/mL to about 60 mg/mL." Additional aspects of the prosecution history further confirm this understanding. First, in describing why these amended claims were inventive, Eagle stated a POSA "would not have produced a composition including ~100 mg of bendamustine (or a salt thereof) at a concentration of ~25 mg/mL . . . *as claimed*." *See* Exhibit 6, Reply to Office Action dated November 8, 2023, p. 4; *see also id.* at 8 (explaining why a POSA would not have selected "a concentration of about 25 mg/mL"). Second, throughout prosecution, the Examiner consistently interpreted the claims to teach "about 20-60 mg/mL or about 25 mg/mL bendamustine concentration," never raising the issue of indefiniteness. *See* Exhibit 4, Final Office Action dated July 11, 2023, p. 7; Exhibit 8, Non-Final Office Action dated August 21, 2023, p. 7-8; *see also* Exhibit 9, Non-Final Office Action dated March 14, 2023, p. 7 (noting the prior art reference taught "the range of from about 20 mg/mL to about 60 mg/mL *as well as the claimed amount of about 25 mg/mL*") (emphasis added). And as the Supreme Court explained in the seminal case of *I.T.S. Rubber Co. v. Essex Rubber Co.*, what "counsel for the applicant and the examiner understood" as contained in the claim should govern when there is "a clerical error due to oversight." 272 U.S. 429, 442 (1926).

The court's opinion in *Intermec Technologies Corp. v. Palm Inc.* is also instructive. 811 F. Supp. 2d 973 (D. Del. 2011). There, after reviewing a similar amendment that resulted in the "extraneous word 'adapted'" remaining in the claim, the court concluded it was "obvious that the word adapted should have been removed as part of the deletion [of the surrounding terms]." *Id.* at 985. The court went on to correct the error noting "there can be no reasonable debate" regarding the proper construction. *Id.* And this is just one example, courts routinely correct such typographical errors. *See, e.g.*, *Warner Chilcott Co. v. Teva Pharms. USA, Inc.*, No. 08-627-LPS,

2011 WL 7121450, at *6 (D. Del. Dec. 29, 2011) (eliminating the article "a" from the claim because of a clear "drafting error"); *CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1359 (Fed. Cir. 2011) (finding the omission of "and" from the claim to be obvious).

The intrinsic evidence leaves no possibility of reasonable debate. The presence of "from" is clearly an unintended remnant from the original claims that should have been removed when the range was replaced with a specific value during prosecution. For these reasons, Eagle respectfully requests that the Court correct the typographical error.

### 2.    Defendants' Answering Position

#### i.    Defendants' Construction is Supported By the Well-Settled Law of Indefiniteness

The limitation "from about 25 mg/mL" is indefinite because it lacks an upper bound. *See, e.g.*, *Novo Nordisk Inc. v. Mylan Pharms. Inc.*, 2024 WL 1255531, at *1–2 (D. Del. Mar. 25, 2024) (noting that claim reciting "administering semaglutide once weekly in an amount of ***at least 0.7 mg***" was deemed indefinite during prosecution because "there is no upper limit in the claims") (emphasis added); *Exeltis USA, Inc. v. Lupin Ltd*., 2023 WL 2306736, at *6 (D. Del. Mar. 1, 2023) (finding claim that recited the word "about" before "a specific value" was indefinite because "there is no definitive upper bound on the size of the deviation that is encompassed by 'about' a specific value"). Lacking a specific upper bound, the affected claims are invalid unless an inherent upper limit is supported by the specification. *See Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1376-77 (Fed. Cir. 2007) ("[Open-ended patent claims] may be supported if there is an inherent, albeit not precisely known, upper limit and the specification enables one of skill in the art to approach that limit."); *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014) (abrogating the "insolubly ambiguous" standard and holding "that a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the

prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope

of the invention."). But the claims of the '214 Patent do not include any inherent upper bound, the

'214 Patent specification does not disclose any such limit, and Eagle does not even attempt to show

otherwise. At most, the specification describes various concentrations greater than 25 mg/mL, but

does not disclose any maximum possible concentration—whether 60 mg/mL, 100 mg/mL or

otherwise. *See, e.g.*, '214 Patent, 3:25-38.

Eagle does not dispute any of this. In fact, Eagle agrees that the claims are "missing any

corresponding end point value." *See supra* at 51. As a result, the Court should find these claims

indefinite.

### ii.    Claims 1 and 6 Do Not Include a "Typographical Error"

Lacking a credible argument to suggest that Claims 1 and 6 of the '214 Patent are definite,

Eagle tries to enlist the Court to fix its claims by arguing its intentional drafting choice was nothing

more than a typographical error. The Federal Circuit, however, "repeatedly and consistently has

recognized that courts may not redraft claims, whether to make them operable or to sustain their

validity." *Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331, 1339 (Fed. Cir. 2011). Indeed,

courts may correct patents "***only*** if (1) the correction ***is not subject to reasonable debate*** based on

consideration of the claim language and the specification" and (2) the prosecution history does not

suggest a different interpretation of the claims." *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d

1348, 1357 (Fed. Cir. 2003) (emphasis added); *see also Trustees of the Univ. of Penn. v. Eli Lilly

& Co.*, 2016 WL 3059538, at *1 (E.D. Pa. May 31, 2016) ("Courts can only correct minor

typographical and clerical errors" such as "misspelling or a wrong keystroke or a mistake of

punctuation") (quotations omitted). Further, "[t]hose determinations must be made from the point

of view of one skilled in the art." *Ultimax Cement*, 587 F.3d at 1353. As explained below, Eagle

has failed to satisfy this exacting standard and the Court should decline Eagle's request to re-draft

its claims.

**(a)    The Intrinsic Evidence Does Not Reveal a "Typo"**

Nothing in the intrinsic evidence suggests that "***from*** about 25 mg/mL" is a "typo."  First, there is no clear error in the claim language.  The phrase "from about 25 mg/mL" does not contain a misspelling, wrong keystroke, or mistake of punctuation that is correctable by the Court. *Trustees*, 2016 WL 3059538, at *1.[17]  Eagle does not argue otherwise, saying only—without evidence—that a POSA would believe that this language includes a typo.  *Supra* at 51.

Next, the specification does not reveal that the claim language is a "typo."  Eagle suggests that the claims' recitation of "from about" without an upper bound must be an error because the specification repeatedly couples the phrase "from about" with an upper "to about" limit.  *Supra* at 51.  But that is hardly clear from reading the specification, which contains examples covering a wide range of bendamustine concentrations—from 10 mg/mL to 100 mg/ML—and expressly states that "[i]n alternative aspects, the amount of bendamustine is ***outside these ranges***."  Ex. 2 at 3:25-38 (emphasis added).  To one of skill in the art, the plain language of the claim says it covers a range of "about 25 mg/mL or more."

Eagle relies on *Pavo v. Kingston*, *supra* at 50-51 (citing *Pavo*, 35 F.4th at 1373–78), but that case involved a specification that "confirm[ed] the error in the claims," where the error was "evident from the face of the patent" and "clear from the full context of the claim language."  *Id.* at 1374.  Here, as discussed above, Eagle has not identified any error that is evident from the face of the patent.  The claim is easily understood both based on its text and in conjunction with the

---

[17] *See e.g.*, *Ultimax Cement*, 587 F.3d at 1339 (correcting error by adding a single comma in a chemical formula); *Cree, Inc. v. SemiLEDs Corp*., 2012 Markman 975697, 2012 WL 975697, at *14-*15 (D. Del. 2012) (correcting the word "on" to "an"); *Aptiv Techs. Ltd. v. Microchip Tech., Inc*., 2024 WL 3400109, at *3 (D. Del. 2024) (correcting "USB hub" to "USB host" because "hub" made no sense in context).

specifications' description of a wide range of different concentrations.

Finally, contrary to Eagle's assertion, the prosecution history does not support deleting the word "from." As described above, original claims 1 and 11 of the '214 Patent (which eventually issued as claims 1 and 6) claimed a "bendamustine-containing composition" wherein the bendamustine concentration "is from about 20 mg/mL to about 60 mg/mL." Ex. 5 at 21. In response to an office action, Eagle modified the phrase "from about 20 mg/mL to about 60 mg/ML" to "from about 25 mg/ML" in both claims 1 and 11. Ex. 6 at 4-5. The application was allowed shortly thereafter and issued with claims 1 and 6.

Nothing in this history suggests that the word "*from*" is a typo. As an initial matter, if "from" were really an "obvious mistake," in Eagle's words, there is no reason why Eagle would have amended the claim language identically in *two separate independent claims*. This was not a one-off slip; the repetition implies intentionality. Moreover, contrary to Eagle's arguments, Eagle's remarks accompanying these amendments are consistent with the open-ended "from about 25 mg/mL" language. *Supra* at 52. The art that Eagle was addressing contained 5 mg/ml of bendamustine. Ex. 6 at 10-11. Accordingly, Eagle amended its claims to raise and emphasize the *lower* bound of bendamustine in the claimed compositions—not to cut off any potential *upper* bound. Indeed, Eagle told the Examiner that "[w]ithout Applicant's disclosure, those skilled in the art would have had no reason to prepare *more concentrated* bendamustine liquids, *e.g., 25 mg/mL*, when preparing bendamustine," Ex. 6 at 11 (emphasis added), distinguishing the *more* concentrated, claimed formulations from the *lower* concentrations in the cited art. Further, because "*e.g.*" means "for example,"[18] this statement suggests that 25 mg/mL is only *one* example of concentrations intended to be covered by the claims—and that the claims encompass *other* "more

---

[18] https://www.merriam-webster.com/grammar/ie-vs-eg-abbreviation-meaning-usage-difference

concentrated" solutions, including those exceeding 25 mg/mL. This statement is therefore consistent with the open-ended claim language of "from about 25 mg/mL." As a result, the prosecution history supports that Eagle intended to claim "*from* about 25 mg/mL." And it certainly refutes that the claim language is a clear "typo." *Novo Indus.*, 350 F.3d at 1357 (correction can only be made if it "is not subject to reasonable debate").

Eagle's cases do not suggest otherwise. In *Intermec*, the applicant's "obvious" failure to delete the word "adapted" rendered the limitation unintelligible.[19] *Intermec*, 811 F. Supp. 2d at 985. Here, in contrast, the "from about 25 mg/mL" limitation is not an obvious error, as it has an intelligible, if indefinite, meaning. Likewise, Eagle's remaining cases are distinguishable because they involve errors that were clear from the face of the claims, the specification, and/or the prosecution history.[20] That is not the case here.

### iii. Eagle's Failure to Correct the Claims Confirms That "From" Is Not a Typo

Eagle's attempt to spin the "from about 25 mg/mL" limitation as a "typo" rings hollow for another reason: Eagle has had ample opportunity to remove the word "from" from claims 1 and 6 but has not done so. The '214 Patent issued on January 16, 2024, and Eagle has had nearly a year to correct this mistake with the Patent Office. The fact that Eagle never did suggests either that Eagle intended to include the word "from" in claims 1 and 6, or that Eagle believed that this "typo"

---

[19] The limitation read "a portable computing device adapted that is detachably coupleable to a communication device." *Intermec*, 811 F. Supp. 2d at 984.

[20] *See Ultimax Cement*., 587 F.3d at 1339 (correcting error by adding a single comma in a chemical formula); *VTT Tech.*, 2020 WL 4193374, at *9 (adding an omitted temperature range where both parties' experts agreed that "temperature drift" is always "expressed with reference to a temperature range"); *Warner Chilcott Co. v. Teva Pharms. USA, Inc.,* 2011 WL 7121450, at *6 (D. Del. Dec. 29, 2011) (correcting "a" to read "said" to fix antecedent basis issue); *CBT Flint Partners*, 654 F.3d at 1359 (correcting the nonsensical "detect analyze" by inserting the word "and").

is "not evident on its face."  *See, e.g.*, *Canatex Completion Sols., Inc. v. Wellmatics, LLC*, 2023 WL 9645474, at *3 (S.D. Tex. Dec. 14, 2023).  Indeed, "[i]f the error was evident from the face of the patent, then [Eagle] would not continue to argue for an alternative construction.  Instead, once identified, [Eagle] could have sought to correct the error with the PTO."  *Smith v. ORBCOMM, Inc.*, 2015 WL 5302815, at *13 (E.D. Tex. Sept. 10, 2015).  Either way, Eagle's failure to correct the '214 Patent confirms that the word "from" was not a typo.

### iv. There are Multiple Reasonable Ways to Correct Eagle's Purported "Typo"

Moreover, even accepting Eagle's argument that it made a typographical error, there are multiple reasonable ways to fix this "typo."  As a result, the Court cannot correct this error.

"Where multiple possible corrections exist, even a small change is improper."  *ViaTech Techs., Inc. v. Microsoft Corp.*, 2020 WL 2616226, at *3 (D. Del. May 22, 2020); *Trusted Knight Corp. v. Int'l Bus. Machines Corp.*, 681 F. App'x 898 (Fed. Cir. 2017) (rejecting proposed correction when there were alternative reasonable corrections).  Such a correction is proper only when the multiple "reasonable interpretations would result in the same claim scope."  *CBT Flint Partners*, 654 F.3d at 1359.

Here, Eagle's purported "typo" could be corrected in at least two reasonable ways:

- "wherein the bendamustine concentration in the composition is ***~~from~~*** about 25 mg/mL"; or

- "wherein the bendamustine concentration in the composition is ***~~from about~~*** 25 mg/mL."

According to Eagle's argument, it described the claimed invention in both ways during prosecution.  *See, e.g.*, Ex. 6 at 11 ("Without Applicant's disclosure, those skilled in the art would have had no reason to prepare more concentrated bendamustine liquids, e.g., ***25 mg/mL***"); *id.* at 8 ("the obviousness inquiry does not ask whether a person of ordinary skill could have dissolved

Brittain's lyophilized compositions to a concentration of _**about 25 mg/mL**_ - it requires that the Examiner establish why a person of ordinary skill would have."). If the word "from" is an unintentional remnant of pre-amendment claim language, there is no reason to believe that the word "about" is any less so. Moreover, the '783 Patent includes claims with concentrations of both "about 25 mg/mL" and "25 mg/mL." Ex. 1 at Claims 3, 4. Both would therefore be reasonable changes.

Of course, whether the claims include the word "about" affects their scope. If the Court corrects the claims to read "_**is about**_ 25 mg/mL," their scope would encompass concentrations slightly higher and lower than 25 mg/mL. If the claims are corrected to read "_**is**_ 25 mg/mL," then this represents a "strict numerical boundary" where the concentration must be 25 mg/mL. _See Pall Corp. v. Micron Separations, Inc._, 66 F.3d 1211, 1217 (Fed. Cir. 1995); _see also Chemours Co. FC, LLC v. Daikin Indus., Ltd._, 2022 WL 855518, at *5 (D. Del. Mar. 23, 2022) (construing "about" to mean "approximately," and rejecting a strict numerical limit). Thus, Eagle's purported "typo" is susceptible to correction in multiple ways that would result in different claim scope. The Court therefore cannot issue a correction.

### 3.    Plaintiff's Reply Position

Defendants argue that the error is not "obvious" because the term "has an intelligible, if indefinite, meaning." _Supra_ at 58. That defies common sense and misapplies the law. The word "from" creates an ambiguity, but "the meaning of the claim itself is not subject to reasonable debate." _See Princeton Digit. Image Corp. v. Amazon.com, Inc._, No. 13-237-LPS, 2019 WL 351258, at *8 (D. Del. Jan. 29, 2019). Since a POSA would conclude from the intrinsic record that "from" was included in error, there is no "reasonable debate" that correction is appropriate.

### a.    "About 25 mg/mL" Is Not Indefinite

Defendants' one page argument fails to carry their burden of proving indefiniteness by

clear and convincing evidence. *See 3Shape A/S v. Align Tech., Inc.*, No. 18-886-JLH-LPS, 2020 WL 2188857, at *2 (D. Del. May 6, 2020), *report and recommendation adopted*, 2020 WL 7695898 (D. Del. Dec. 28, 2020) (citing *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017)) ("The party asserting indefiniteness has the burden to prove it by clear and convincing evidence."). "Attorney argument is not evidence." *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017). Because Defendants fail to carry their burden, the Court should reject their indefiniteness challenge.

Even if the Court entertains Defendants' indefiniteness argument on the merits, they have failed to meet that burden. The indefiniteness inquiry here asks whether a POSA would understand with reasonable certainty the concentration of bendamustine covered by the "from about 25 mg/mL" claim language in light of the intrinsic record. *See BASF Corp.*, 875 F.3d at 1365-66. Defendants concede that this term "is easily understood both based on its text and in conjunction with the specification." *Supra* at 56-57. Thus, the term is definite. The only "evidence" Defendants cite in support of their indefiniteness theory is that "the specification describes various concentrations greater than 25 mg/mL, but does not disclose any maximum possible concentration." *Supra* at 55 (citing '214 patent at 3:25-38). This "does not suffice as substantial evidence of invalidity." *See Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004). And each of Defendants' cited cases are distinguishable.[21]

Defendants go on to make three unsupported arguments for why there is no typographical error: (1) that the intrinsic evidence does not reveal a "typo"; (2) that Eagle did not pursue a

---

[21] *See Novo Nordisk*, 2024 WL 1255531, at *2 (holding claims rejected as indefinite *during prosecution* had a narrowed claim scope in view of the patentee's amendment to overcome the indefiniteness rejection); *Exeltis*, 2023 WL 2306736, at *5-6 (finding the term "about" before a "specific value" indefinite because "Plaintiffs *acted as their own lexicographer* to redefine 'about'" resulting in a boundless range).

certificate of correction; and (3) there are multiple ways to correct the typo.  Each argument fails.

### b.    Intrinsic Record Evidences a Clear Typographical Error

Starting with the claim language, Defendants contend "there is no clear [typographical] error" and "Eagle does not argue otherwise."  *Supra* at 56.  This is incorrect.  As Eagle explained, a POSA would immediately notice "from about" is missing a corresponding "to about" value and thus any interpretation of the term "from about 25 mg/mL" as a concentration range would be illogical.  *Supra* at 51.  Rather than provide evidence or argue why a POSA would not recognize the clear typographical error, Defendants contend that Eagle made its arguments without support. *Supra* at 56.  But Eagle cited two Federal Circuit opinions demonstrating that a POSA would readily understand that the inventors did not intend to claim a range, so the inclusion of "from" was obviously a mistake.  *Supra* at 51 (citing *Ortho-McNeil*, 476 F.3d at 1327 and *VTT Tech.*, 2020 WL 4193374, at *9).

Defendants, relying on non-binding caselaw, argue that because "from" is not a "misspelling, wrong keystroke, or mistake of punctuation" it cannot be corrected by the Court. *See supra* at 56 (citing *Trs. of the Univ. of Penn.*, 2016 WL 3059538, at *1).  This is not the law. There can be an obvious correctable error even where the term appears "intelligible" but creates an apparent ambiguity.  Judge Stark's opinion in *Princeton Digital* is instructive on this point. *Princeton Digit.*, 2019 WL 351258 at *8-9.  There the disputed term contained the additional word "length" which was not a misspelling, wrong keystroke, or mistake of punctuation[22] it simply "create[d] an ambiguity."  *Id.* at *8.  Judge Stark explained that a POSA would recognize this ambiguity and look to the intrinsic record to determine "the meaning of the claim."  *Id.*  Performing this proper analysis, the Court held "there is an obvious and correctable error in the claim—the

---

[22] The term read: "organized statistically with said first given order codeword length."  *Princeton Digit.*, 2016 WL 3059538, at *8.

inclusion of the word 'length'—the construction of which is not subject to reasonable debate. Thus, the claim is not indefinite." *Id.* at *9.

Turning to the specification, Defendants argue there are "examples covering a wide range of bendamustine concentrations" so a POSA would understand the claim to cover a range. *Supra* at 56. But the specification includes examples of ranges with "from about" and "to about" language. *See supra* at 51 (citing '214 patent at 2:14; 3:25-31; and 6:2-3). The claim does not mirror that phrasing, instead including only the artifact "from." That further confirms that a POSA would readily identify this does not claim a range so "from" must be an error. *See Ortho-McNeil*, 476 F.3d at 1327. Defendants' other "evidence" that the specification includes amounts "outside these ranges" (*supra* at 56) further supports Eagle's position that disclosed ranges are easily differentiated from claimed concentrations.

Finally, contrary to Defendants' assertion, the prosecution history "support[s] deleting the word 'from.'" *Supra* at 57. Defendants make much of Eagle's "amend[ing] the claim language identically in ***two separate independent claims***." *Id.* (emphasis in original). This fact supports Eagle's contention that the same copy and paste error was inadvertently applied twice. *See KeyMe, LLC v. Hillman Grp., Inc.*, No. 19-1539-LPS, 2021 WL 243252, at *5-6 n.10 (D. Del. Jan. 25, 2021) (Stark, J.) (correcting claim language that was amended identically during prosecution in two separate independent claims). Defendants' attempt to differentiate these facts from the cases that support Eagle's position fails because the inclusion of "from" in this case is an error "clear from the face of the claims, the specification and[] the prosecution history" (*supra* at 58), *i.e.*, the type of error Defendants agree can be corrected.

   c. **The Law Imposes No Requirement to Correct Claims with the Patent Office**

Defendants next wrongly assert that Eagle's choice not to file a certificate of correction

with the Patent Office ("PTO") bears on whether the Court can correct the clear typographical error. This is wrong for three reasons. First, Defendants' contention that because "[t]he '214 Patent issued on January 16, 2024, [] Eagle has had nearly a year to correct this mistake with the Patent Office" (*supra* at 58) is both irrelevant and factually incomplete. Eagle filed this lawsuit on January 17, 2024, the day after the '214 patent issued. A "certificate of correction is only effective for causes of action arising ***after it was issued***." *Sw. Software, Inc. v. Harlequin Inc.*, 226 F.3d 1280, 1294 (Fed. Cir. 2000) (emphasis added). And the PTO indicates that certificates of correction take "approximately 6 weeks" to process. *See* MANUAL OF PAT. EXAMINING PROC. § 1485. Thus, even if Eagle filed for a certificate of correction on the day the '214 patent issued, it would not have been effective in this litigation and Eagle would still be seeking this correction from the Court.

Second, Defendants' citation to two non-precedential Texas cases are inapt. In *Smith*, Plaintiff contended that two independent claims contained a typographical error but also proposed an alternative construction with a different scope. *See Smith*, 2015 WL 5302815, at *8. The Texas court held there cannot be an "obvious clerical error when Plaintiff continues to argue for an alternative construction." *Id.* at *12. In *Canatex*, the Texas court found that the erroneous claim language was "pervasive" throughout the specification and noted "the prosecution history [was] not helpful" because the error was present in the original claims and not amended during prosecution. *Canatex*, 2023 WL 9645474, at *3 (S.D. Tex. Dec. 14, 2023).

Finally, Delaware courts have rejected the contention that failure to seek correction with the PTO confirms there is no typographical error. In *Yodlee*, the defendant made exactly the same argument that Defendants advance here and Judge Stark soundly rejected it because there was "no evidence that [plaintiff] intended to deceive anyone by neglecting to seek formal correction from

the PTO." *Yodlee, Inc. v. Plaid Techs., Inc.*, No. 14-1445-LPS, 2016 WL 204372, at *7 (D. Del. Jan. 15, 2016). The same is true here since Defendants offer no evidence of any intentional deception by Eagle, nor could they, for the reasons explained *supra*. As such, Eagle's decision not to seek correction with the PTO is wholly irrelevant.

### d. There Is Only One Reasonable Way to Correct the Typographical Error: Remove "From"

Contrary to Defendants' contention, there are not "multiple ***reasonable*** ways to fix this 'typo,'" so the Court can correct it. *Supra* at 59. Defendants assert that the error "could be corrected in at least two reasonable ways" by removing "from" or by removing "from about" because Eagle allegedly "described the claimed invention both ways during prosecution." *Id.* But any alleged discrepancy in how Eagle referred to the claimed concentration in the "Remarks" (Ex. 6) accompanying the relevant amendment is easily reconciled by Defendants' own explanation and "result[s] in the same claim scope" making correction proper. *See CBT Flint Partners*, 654 F.3d at 1359.

Eagle describes the claimed concentration during prosecution both as "e.g., 25 mg/mL" and "about 25 mg/mL." *Supra* at 59-60 (citing Ex. 6 at pp. 8, 11). At first blush, these two descriptions appear to conflict with "e.g., 25 mg/mL" representing a "'strict numerical boundary' where the concentration must be 25 mg/mL" (*supra* at 60) and "about 25 mg/mL . . . encompass[ing] concentrations slightly higher and lower than 25 mg/mL" (*id.*). But as Defendants explain "'e.g.' means 'for example,'" which "suggests that 25 mg/mL is only ***one*** example of concentrations intended to be covered by the claims." *Supra* at 57 (emphasis in original) (citing *Merriam Webster* dictionary definition of "e.g."). Thus, any apparent conflict between the descriptions is immediately resolved.

With the imaginary discrepancy settled, the rest of Defendants' argument falls flat. It is

clear that Eagle's statement referring to the claimed concentration as "e.g. 25 mg/mL" was by way of example only. This is reinforced by the context in which this statement appears in the "Remarks." *See* Ex. 6 at p. 9. As Defendants note, Eagle made this statement to differentiate the invention from the prior art reference which taught using 5 mg/mL. *Supra* at 57. Eagle's statement makes clear "the claims encompass ***other*** 'more concentrated' solutions, including" for example 25 mg/mL. *Id.* (emphasis in original). Compare this to the context in which the "about 25 mg/mL" statement appears—in the topic sentence characterizing the Examiner's rejection of the claim language which calls for "a concentration of about 25 mg/mL." *Supra* at 59-60 (citing Ex. 6 at p. 8); *see also* Ex. 6 at p. 4 (describing the claim as covering "a concentration of ~25 mg/mL").

Whether Eagle used the words "about 25 mg/mL," "~25 mg/mL," or "e.g., 25 mg/mL" to describe the concentration in the remarks accompanying the relevant amendment, there can be no dispute that the scope of this claim was intended to "encompass concentrations slightly higher and lower than 25 mg/mL." *Supra* at 60. Therefore, nothing in the prosecution history supports Defendants' contention that removing "about" is a "reasonable change." *Id.* Rather, correction to "is 25 mg/mL" is objectively unreasonable. And as the Federal Circuit explained, when the prosecution history evidences "only a single reasonable construction" that governs. *See Fargo Elecs., Inc. v. Iris, Ltd.*, 287 F. App'x 96, 102 (Fed. Cir. 2008). Since the prosecution history here shows that removing "from" is the only reasonable change, the Court can issue a correction, and Eagle respectfully requests the Court do so.

### 4. Defendants' Sur-Reply Position

Eagle has failed to prove a typographical error "not subject to reasonable debate." *Novo Indus.*, 350 F.3d at 1357. While Eagle argues that "a POSA would immediately notice" the purported typo, Eagle offers no supporting evidence, whether in an expert declaration or otherwise. *Supra* at 62. Eagle does not even define who the POSA is, and the parties have not litigated this

issue. Instead, Eagle cites decisions where inventors intended to claim a range, but there the parties submitted supporting expert evidence—something Eagle did not do. *See VTT Tech.*, 2020 WL 4193374, at *9; *Ortho-McNeil*, 476 F.3d at 1328.

Eagle's key case—*Princeton Digital*—is not remotely on point. *Supra* at 62. There, Judge Stark found the relevant claim not indefinite where ambiguity created by the word "length" could be resolved by "reading the claim in light of the specification." *Princeton Digit.*, 2019 WL 351258, at *8. As explained above, the phrase "from about 25 mg/mL" is not ambiguous—it simply fails to provide any upper bound—and the specification provides no upper bound to the intended bendamustine concentrations. Ex. 2 at 3:25-38 (listing concentrations from 10 mg/ML to 100 mg/ML and noting that "[i]n alternative aspects, the amount of bendamustine is outside these ranges.")

Further, Eagle does not identify anything in the prosecution history that supports deleting the word "from" as some kind of mistake. *Supra* at 63. As Defendants explained—and as Eagle does not contest—Eagle amended its claims to emphasize the lower bound of the bendamustine concentration, not to cap the upper bound, and told the Examiner that it was claiming "more concentrated bendamustine liquids" than what existed in the prior art. *Supra* at 57.

### i.    The Court Should Not Correct Eagle's Claims

Eagle cannot ask the Court to "rewrite [its] claims to preserve their validity." *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1367 (Fed. Cir. 2021); *see also Satius Holding, Inc. v. Samsung Elecs. Co., Ltd.*, 2024 WL 5090284, at *8-*9 (D. Del. Dec. 12, 2024). While Eagle argues that a correction to "is 25 mg/ML" is "objectively unreasonable," *supra* at 66, in the '783 Patent—which shares a specification with the '214 Patent and resulted from a virtually identical prosecution history—Eagle claimed concentrations of *both* "about 25 mg/mL" and "25 mg/mL." Ex. 1 at Claims 3 and 5. Accordingly, correcting the claims to read "is 25 mg/mL" is also

67

reasonable.  And because there is more than one reasonable correction to Eagle's purported typo, the Court cannot correct it.[23]  *ViaTech*, 2020 WL 2616226, at *3.

Dated: January 8, 2025

MCCARTER & ENGLISH, LLP

/s/ Daniel M. Silver
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Maliheh Zare (#7133)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com
mzare@mccarer.com

*Attorneys for Plaintiff*

MORRIS JAMES LLP

/s/ Kenneth L. Dorsney
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendants Apotex Inc. and Apotex Corp.*

POTTER ANDERSON & CORROON LLP

/s/ Philip A. Rovner
Philip A. Rovner (#3215)
Andrew M. Moshos (#6685)
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
amoshos@potteranderson.com

*Attorneys for Defendant Baxter Healthcare Corporation*

SMITH KATZENSTEIN & JENKINS LLP

/s/ Daniel A. Taylor
Neal C. Belgam (No. 2721)
Daniel A. Taylor (No. 6934)
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
dtaylor@skjlaw.com

*Attorneys for Defendant Slayback Pharma LLC*

---

[23] If Court finds that Eagle has not proven the presence of a "typo" but also that Defendants have not yet met their burden on indefiniteness, the Court should leave the claim unchanged, allow the record to develop on indefiniteness, and decide the issue at summary judgment. *See Osteoplastics, LLC v. ConforMIS, Inc.*, 2021 WL 4452306, at *1 (D. Del. Sept. 29, 2021) (Hall, J.), *report and recommendation adopted*, 2022 WL 610738 (D. Del. Feb. 14, 2022).