# EXHIBIT 1

US011844783B2

(12) **United States Patent**
Palepu et al.

(10) Patent No.: **US 11,844,783 B2**
(45) Date of Patent: **\*Dec. 19, 2023**

(54) **FORMULATIONS OF BENDAMUSTINE**

(71) Applicant: **Eagle Pharmaceuticals, Inc.**, Woodcliff Lake, NJ (US)

(72) Inventors: **Nagesh R. Palepu**, Southampton, PA (US); **Philip Christopher Buxton**, Uxbridge (GB)

(73) Assignee: **Eagle Pharmaceuticals, Inc.**, Woodcliff Lake, NJ (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **18/081,238**

(22) Filed: **Dec. 14, 2022**

(65) **Prior Publication Data**

US 2023/0115164 A1    Apr. 13, 2023

**Related U.S. Application Data**

(63) Continuation of application No. 17/412,623, filed on Aug. 26, 2021, which is a continuation of application No. 16/509,920, filed on Jul. 12, 2019, now Pat. No. 11,103,483, which is a continuation of application No. 16/015,656, filed on Jun. 22, 2018, now abandoned, which is a continuation of application No. 15/432,335, filed on Feb. 14, 2017, now Pat. No. 10,010,533, which is a continuation of application No. 15/013,436, filed on Feb. 2, 2016, now Pat. No. 9,572,797, which is a continuation of application No. 14/031,879, filed on Sep. 19, 2013, now Pat. No. 9,265,831, which is a continuation of application No. 13/016,473, filed on Jan. 28, 2011, now Pat. No. 8,609,707.

(60) Provisional application No. 61/299,100, filed on Jan. 28, 2010.

(51) **Int. Cl.**
| | |
|---|---|
| *A61K 47/10* | (2017.01) |
| *A61K 47/18* | (2017.01) |
| *A61K 9/08* | (2006.01) |
| *A61P 35/00* | (2006.01) |
| *A61K 31/4184* | (2006.01) |
| *A61K 47/20* | (2006.01) |
| *A61K 47/12* | (2006.01) |
| *A61K 47/22* | (2006.01) |
| *A61K 9/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ............ *A61K 31/4184* (2013.01); *A61K 9/08* (2013.01); *A61K 47/10* (2013.01); *A61K 47/12* (2013.01); *A61K 47/18* (2013.01); *A61K 47/20* (2013.01); *A61K 47/22* (2013.01); *A61K 9/0019* (2013.01)

(58) **Field of Classification Search**
CPC ...... A61K 31/4184; A61K 9/08; A61K 47/10; A61K 47/12; A61K 47/18; A61K 47/20; A61K 47/22; A61K 9/0019
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,071,620 | A | 1/1978 | Sklar |
| 4,711,906 | A | 12/1987 | Von et al. |
| 4,879,286 | A | 11/1989 | Alam et al. |
| 5,204,335 | A | 4/1993 | Sauerbier et al. |
| 5,223,515 | A | 6/1993 | Mikura et al. |
| 5,741,523 | A | 4/1998 | Tengarden et al. |
| 7,252,799 | B2 | 8/2007 | Miekka et al. |
| 7,772,274 | B1 | 8/2010 | Palepu |
| 8,076,366 | B2 | 12/2011 | Courvoisier et al. |
| 8,344,006 | B2 | 1/2013 | Drager et al. |
| 8,389,558 | B2 | 3/2013 | Alakhov et al. |
| 8,609,707 | B2 | 12/2013 | Palepu et al. |
| 8,791,270 | B2 | 7/2014 | Brittain et al. |
| 9,000,021 | B2 | 4/2015 | Sundaram et al. |
| 9,034,908 | B2 | 5/2015 | Sundaram |
| 9,144,568 | B1 | 9/2015 | Sundaram |
| 9,265,831 | B2 | 2/2016 | Palepu et al. |
| 9,572,796 | B2 | 2/2017 | Palepu et al. |
| 9,572,797 | B2 | 2/2017 | Palepu et al. |
| 9,572,887 | B2 | 2/2017 | Sundaram |
| 9,572,888 | B2 | 2/2017 | Sundaram |
| 9,579,384 | B2 | 2/2017 | Sundaram et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1850048 A | 10/2006 |
| CN | 101584668 A | 11/2009 |

(Continued)

OTHER PUBLICATIONS

Kumar et al. (AAPS PharmSciTech 2006;7(3):E1-E7) (Year: 2006).\*

(Continued)

*Primary Examiner* — Ernst V Arnold
(74) *Attorney, Agent, or Firm* — BakerHostetler

(57) **ABSTRACT**

Long term storage stable bendamustine-containing compositions are disclosed. The compositions can include bendamustine or a pharmaceutically acceptable salt thereof, and a pharmaceutically acceptable fluid which can include in some embodiments PEG, PG or mixtures thereof and an antioxidant or chloride ion source. The bendamustine-containing compositions have less than about 5% total impurities, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

**14 Claims, No Drawings**

# US 11,844,783 B2

Page 2

## (56) References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,597,397 B2 | 3/2017 | Sundaram | |
| 9,597,398 B2 | 3/2017 | Sundaram | |
| 9,597,399 B2 | 3/2017 | Sundaram | |
| 10,010,533 B2 | 7/2018 | Palepu et al. | |
| 11,707,450 B1 * | 7/2023 | Chinnari | A61K 47/10 |
| | | | 514/394 |
| 2002/0102215 A1 | 8/2002 | Klaveness et al. | |
| 2002/0122768 A1 | 9/2002 | Liu et al. | |
| 2004/0014964 A1 | 1/2004 | Cheesman et al. | |
| 2004/0043069 A1 | 3/2004 | Vanderbist et al. | |
| 2005/0025702 A1 | 2/2005 | Decicco et al. | |
| 2005/0042285 A1 | 2/2005 | Ukai et al. | |
| 2006/0035945 A1 | 2/2006 | Attardo et al. | |
| 2006/0128777 A1 | 6/2006 | Bendall et al. | |
| 2006/0159713 A1 | 7/2006 | Brittain et al. | |
| 2006/0205694 A1 | 9/2006 | Alonso et al. | |
| 2007/0116729 A1 | 5/2007 | Palepu | |
| 2008/0118544 A1 | 5/2008 | Wang | |
| 2009/0082416 A1 | 3/2009 | Czarnik | |
| 2009/0209606 A1 | 8/2009 | Bendall et al. | |
| 2009/0264488 A1 | 10/2009 | Cooper et al. | |
| 2009/0325978 A1 | 12/2009 | Onai et al. | |
| 2010/0092474 A1 | 4/2010 | Gallagher et al. | |
| 2010/0145266 A1 | 6/2010 | Orlowski | |
| 2010/0216858 A1 | 8/2010 | Popek et al. | |
| 2010/0247669 A1 | 9/2010 | Eliasof et al. | |
| 2010/0273730 A1 | 10/2010 | Hsu et al. | |
| 2011/0015244 A1 | 1/2011 | Alakhov et al. | |
| 2011/0015245 A1 | 1/2011 | Alakhov et al. | |
| 2011/0184036 A1 | 7/2011 | Palepu et al. | |
| 2011/0190363 A1 | 8/2011 | Drager et al. | |
| 2012/0059000 A1 | 3/2012 | Ren et al. | |
| 2012/0071532 A1 | 3/2012 | Cooper et al. | |
| 2012/0157505 A1 | 6/2012 | Labell et al. | |
| 2012/0308516 A1 | 12/2012 | Hlavinka et al. | |
| 2013/0041003 A1 | 2/2013 | Brittain et al. | |
| 2013/0041004 A1 | 2/2013 | Drager et al. | |
| 2013/0210878 A1 | 8/2013 | Soppimath et al. | |
| 2013/0210879 A1 | 8/2013 | Palepu et al. | |
| 2013/0217888 A1 | 8/2013 | Shrawat et al. | |
| 2013/0253025 A1 | 9/2013 | Sundaram | |
| 2014/0094496 A1 | 4/2014 | Sundaram | |
| 2014/0275196 A1 | 9/2014 | Sundaram | |
| 2018/0000789 A1 | 1/2018 | Palepu et al. | |
| 2018/0000938 A1 | 1/2018 | Sundaram | |
| 2018/0185488 A1 | 7/2018 | Sundaram | |
| 2018/0296535 A1 | 10/2018 | Palepu et al. | |
| 2018/0296536 A1 | 10/2018 | Palepu et al. | |
| 2018/0369383 A1 | 12/2018 | Sundaram | |
| 2019/0192659 A1 | 6/2019 | Sundaram | |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 102164579 A | 8/2011 |
| DE | 80967 A | 1/1970 |
| DE | 159289 A1 | 3/1983 |
| JP | 09-508128 A | 8/1997 |
| JP | 2005-537285 A | 12/2005 |
| JP | 2008-526991 A | 7/2008 |
| JP | 2012-503666 A | 2/2012 |
| JP | 2012-525387 A | 10/2012 |
| JP | 2015-501814 A | 1/2015 |
| WO | 99/01118 A2 | 1/1999 |
| WO | 2001/097860 | 12/2001 |
| WO | 2001/097861 | 12/2001 |
| WO | 2001/098294 | 12/2001 |
| WO | 02/02125 A1 | 1/2002 |
| WO | 2006/054315 A1 | 5/2006 |
| WO | 2006/110551 A2 | 10/2006 |
| WO | 2010/036702 A1 | 4/2010 |
| WO | 2010/126676 A1 | 11/2010 |
| WO | 2010/148288 A2 | 12/2010 |
| WO | 2011/094565 A1 | 8/2011 |
| WO | 2011/103150 A2 | 8/2011 |
| WO | 2012/015810 A2 | 2/2012 |
| WO | 2013/142358 A1 | 9/2013 |

## OTHER PUBLICATIONS

McGinity et al. (Journal of Pharmaceutical Sciences 1975;64(2):356-357) (Year: 1975).*

Wasylaschuk et al. (Journal of Pharmaceutical Sciences, vol. 96, No. 1, Jan. 2007:106-116). (Year: 2007).*

"Draft Note for Guidance on Excipients, Antioxidants and Antimicrobial Preservatives In the Dossier for Application for Marketing Authorisation of Medicinal Product", EMEA, 2003, pp. 1-10.

American Heart Association, "Living With Heart Failure" (https://www.heart.org/idc/groups/heart-public/@wcm/@hcm/@gwtg/documents/downloadable/ucm_309068.pdf) (2001).

American Society of Hospital Pharmacists. ASHP Technical Assistance Bulletin On Hospital Distribution and Control. Am J. Hosp. Pharm. 1980, 37:1097-103.

Armstrong et al., Separation of Drug Stereoisomers by the Formation of . . . beta-Cyclodextrin Inclusion Complexes, Science, vol. 232, pp. 1132-1135, May 30, 1986.

Baldi et al., Statistical Procedures for Optimizing the Freeze-Drying of a Model Drug in Tert-Butyl Alcohol: Water Mixtures, Eur. J. of Pharm. & Biopharm. 40(3):138-41 (1994).

Bergsagel et al., Effect of cyclophosphamide on Advanced Lung Cancer and the Hematological Toxicity of Large, Intermittent Intravenous Doses, Canad. Med. Ass. J., 98, 532-538 (1968).

Biewenga et al. "The Pharmacology of the Antioxidant Lipoic Acid," Gen. Pharmac., 1997, 29, 3, 315-331.

Boylan et al., Parenteral Products, Chapter 12 in Banker, et al., Modern Pharmaceutics, Fourth Ed. (2002).

Brigitte C. Scott, et al., Lipoic and Dihydrolipoic Acids . . . , Free Rad. Res., vol. 20, No. 2, pp. 119-133, 1994.

Broadhead, Pharmaceutical Preformulation and Formulation, Chapter 9 in "Parenteral Dosage Forms," (Interpharm) 2001.

Canadian Society of Hospital Pharmacists: Guidelines for Drug-Use Control, 2008.

Center for Drug Evaluation and Research, Andrew Dmytrijuk, FDA Medical Review for the Approval of Bendeka (2015).

Cephalon, Inc., v. Slayback Pharma Limited Liability Company—Civil Action No. 1:17-cv-01154: Joint Status Report (Document 164), dated Oct. 19, 2018.

Cerhalon, Inc, et al. v. Slayback Pharma Limited Liability Company—Civil Action No. 1:17-cv-01154: Complaint (Document 1), dated Aug. 16, 2017.

Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.—Civil Action No. 1:17-cv-01154: Answer to Slayback Pharma Limited Liability Company's Counterclaims (Document 56), dated Mar. 5, 2018.

Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.—Civil Action No. 1:17-cv-01154: Joint Claim Construction Chart (Document 94), dated Jul. 24, 2018.

Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.—Civil Action No. 1:17-cv-01154: Answer to Apotex Inc. and Apotex Corp.'s Counterclaims (Document 22), dated Dec. 18, 2017.

Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.—Civil Action No. 1:17-cv-01154: Answer to Slayback Pharma Limited Liability Company's Counterclaims, dated Oct. 20, 2017.

Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company—Civil Action No. 1:17-cv-00154: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint and Counterclaims (Document 11), dated Sep. 29, 2017.

Charles P. Carpenter, et al., A Study of the Polyethylene Glycols as Vehicles . . . , Journal of the American Pharmaceutical Association, vol. XII, No. 1.

Cheson et al., Bendamustine: Rebirth of an Old Drug, J. Clin. Oncol. 27,1492-1501 (2009).

Cheung et al., Safety and Pharmacokinetics of Bendamustine Rapid-Infusion Formulation, J. of Clinical Pharmacology 2017.00(0)1-11.

**US 11,844,783 B2**

Page 3

(56)        **References Cited**

OTHER PUBLICATIONS

Chu et al., Common Chemotherapy Regimens in Clinical Practice, Physicians' Cancer Chemotherapy Drug Manual 2009.
Cyclobond(Registered) Handbook, A Guide to Using Cyclodextrin Bonded Phases for Chiral LC Separations, 6th ed., 2002, Advanced Separation Technologies, Inc., pp. 1-58, pp. 42-45.
Derry E. Wilman, Application of 15N Nuclear Magnetic Resonance . . . , J. Med. Chem., vol. 38, pp. 2256-2258, 1995.
E. Santacesaria, et al., Thermal Stability of Nonionic Polyoxyalkylene . . . , Journal of Applied Polymer Science, vol. 42, pp. 2053-2061, 1991.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01459: Answer to Slayback Pharma LLC's Counterclaims (Document 13), dated Oct. 31, 2018.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01459: Complaint (Document 1), dated Sep. 20, 2018.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01459: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses, and Counterclaims (Document 9), dated Oct. 10, 2018.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Answer to Slayback Pharma LLC's Counterclaims (Document 12), dated Jan. 3, 2019.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Complaint (Document 1), dated Dec. 11, 2018.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses, and Counterclaims(Document 11), public version dated Dec. 20, 2018.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Eagle Pharmaceuticals' Opposition to Slayback Pharma's Motion for Judgment on the Pleadings (Document 23), redacted-public version dated Feb. 12, 2019.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Opening Brief in Support of Slayback Pharma Limited Liability Company's Motion for Judgment on the Pleadings (Document 17), public version dated Jan. 11, 2019.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Reply Brief in Further Support of Slayback Pharma Limited Liability Company's Motion for Judgment on the Pleadings (Document 27), public verison dated Mar. 1, 2019.
*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Exhibit Index-Includes Confidential Information (Document 21), public version dated Sep. 7, 2018.
*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Complaint (Document 1), dated Jul. 19, 2018.
*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Defendant Hospira, Inc's Motion to Dismiss (Document 13), dated Aug. 31, 2018.
*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Hospira's Reply Brief in Support of its Motion to Dismiss Plaintiffs' Complaint (Document 29), public version dated Nov. 26, 2018.
*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Hospira, Inc's Brief in Support of its rule 12(b)(6) Motion to Dismiss Plaintiffs' Complain (Document 20), public version dated Sep. 7, 2018.
*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Plaintiffs' Opposition to Motion to Dismiss (Document 26), redacted-public version dated Nov. 2, 2018.
EC Safety Data Sheet: Ribomustin(Registered) 2007.
Eric Watson, et al., Kinetics of Phosphoramide Mustard . . . , Journal of Pharmaceutical Sciences, vol. 74, No. 12, pp. 1283-1292, 1985.
Eugene C. Corbett, Jr., Intravenous Fluids: It's More Than Just 'Fill 'Er Up!', Series #52 Practical Gastroenterology 44-60 (2007).
Excipient-Drug Interactions in Parenteral Formulations', Akers et al., Journal of Pharmaceutical Sciences, vol. 91, issue 11, pp. 2283-2300, Nov. 2002.

Flamberg et al., Low Temperature Vacuum Drying of Sterile Parenterals From Ethanol, Bulletin of the Parenteral Drug Association, 24(5):209-17 (1970).
Floss et al., Intravenous fluids principles of treatment, Clinical Pharmacist, 3:274-283 (Oct. 2011).
Friedberg et al., Bendamustine in Patients with Rituximab-Refractory Indolent and Transformed Non-Hodgkin's Lymphoma: Results from a Phase II Multicenter, Single-Agent Study, J. Clin. Oncol., 26(2):204-210 (2008).
Galacid Excel 88 fact sheet (lactic acid 88%).
Gandhi & Burger, Bendamustine in B cell malignancies: the new, 46-year old kid on the block, Clin Cancer Res. Dec. 15, 2009; 15(24):7456-7461.
Gibson et al., "Pharmaceutical preformulation and formulation: A practical guide from candidate drug selection to commercial dosage form", Informa Healthcare USA, 2009, vol. 199, 2d ed, pp. 1-559.
Glimelius et al., Bolus-Injection (2-4 min) Versus Short-term (10-20 min) Infusion of 5-Fluorouracil in Patients with Advanced Colorectal Cancer: a Prospective Randomised Trial, Eur J. Cancer, 34, 674-678 (1998).
Gust and Krauser. Investigations on the Stability of Bendamustin, a Cytostatic Agent of the Nitrogen Mustard Type I. Synthesis, Isolation, and Characterization of Reference Substances, in Monatshefte fur Chemie, 128:291-99 (1997).
Heider et al., Efficacy and Toxicity of Bendamustine in Patients with Relapsed Low-Grade non-Hodgkin's Lymphomas, Anticancer Drugs, 12, 725-729 (2001).
HFSA Guidelines, Journal of Cardiac Failure vol. 16 No. 6 (2010).
ICH Harmonised Tripartite Guideline, Stability testing of New Drug Substances and Products Q1A(R2), dated Feb. 6, 2003.
Interlocutory decision in Opposition proceedings of EP 2528602 issued Apr. 8, 2019.
International Conference on Harmonisation in Guideline on Impurities in New Drug Products: Availability, 62 Fed. Reg. 27, 454-27,461 (May 19, 1997).
International Search Report and Written Opinion for No. PCT/US2013/032289 dated Jun. 6, 2013. (5 Pages).
International Search Report and Written Opinion issued in counterpart PCT/US2013/032295 dated Jun. 2013 (4 pages).
International Search Report and Written Opinion issued in counterpart PCT/US2013/26187.
International Search Report and Written Opinion of International application based on PCT/US2011/022958, dated Apr. 2011 (8 pages).
Jay S. Trivedi, et al., Water-Insoluble Drug Formulation, 7. Solubilization Using CoSolvent Approach, pp. 141-168, 2000.
Jay S. Trivedi, Water-Insoluble Drug Formulation, Second Edition, 9 Solubilization Using Cosolvent Approach, pp. 161-194, 2008.
JC Price, Handbook of Pharm. Excipients, 5th Edition, Polyethylene Glycol, pp. 545-550, Aug. 9, 2005.
Jerry March, Advanced Organic Chemistry (4th ed., John Wiley & Sons, Inc. 1992).
John D. Roberts & Marjorie C. Caserio, Basic Principles of Organic Chemistry 612-13, 615-16, 617-18 (W. A. Benjamin, Inc., 2d ed. 1977).
Jonkman-de Vries et al., Pharmaceutical Development of (Investigational) Anticancer Agents for Parental Use—A Review, Drug Dev Ind Pharm. 22(6):475-494 (1996).
Julia A. Barman Balfour, et al., "Bendamustine", Drugs, vol. 61, No. 5, pp. 631-638, 2001.
Kalaycio. M., Clinical Experience With Bendamustine: A New Treatment for Patients With Chronic Lymphocytic Leukemia; Clin Leukemia. 2008; 2(4): 223-229.
Kenneth E. Avis, et al., Remington, Parenteral Preparations, Chapter 41, pp. 780-786, 2000.
Knauf et al., Bendamustine Versus Chlorambucil in Treatment-Naive Patients with B-Cell Chronic Lymphocytic Leukemia (B-CLL): Results of an International Phase III Study, Blood, 110(11), 609a (abstract 2043) (2007).
Koomans et al., Sodium Balance in Renal Failure: A Comparison of Patients with Normal Subjects Under Extremes of Sodium Intake, Hypertension 7:714-721 (1985).

**US 11,844,783 B2**

Page 4

(56)        **References Cited**

OTHER PUBLICATIONS

Kurt H. Bauer, et al., Pharmazeutische Technologies, pp. 225-228, HW9, 1993.

Kurt H. Bauer, et al., Pharmazeutische Technologies, pp. 424-425, HW10, 1993.

Leonard & Jann, A New Synthesis of Aziridinium Salts. 2,2-Pentamethylene-1,1-tetramethyleneaziridinium Perchlorate A Prototype, 82 J. Am. Chemistry Soc'y 6418-6419 (1960).

Leoni et al., SDX-105 (Bendamustine), a Clinically Active Antineoplastic Agent Possesses a Unique Mechanism of Action, Abstract, 102(11) Blood, Abstract #2363 (Nov. 16, 2003).

Lissitchkov et al., Phase-I/II study to Evaluate Dose Limiting Toxicity, Maximum Tolerated Dose, and Tolerability of Bendamustine HCl in Pre-treated Patients With B-Chronic Lymphocytic Leukaemia (Binet stages B and C) Requiring Therapy, J. Cancer Res. Clin. Oncol. 132:99-104 (2006).

Liu (ed). Water-Insoluble Drug Formulation, 1st ed., CRC Press, Chapters 7 and 9, 2000.

Liu (ed). Water-Insoluble Drug Formulation, 2nd ed., CRC Press, Chapters 7 and 9, 2008.

Lyondell Tebol(Registered) 99, Tertiary Butyl Alcohol in Freeze-Drying Applications,(Lyondell Chemical Co., 2003).

Lyophilization Of Biopharmaceuticals (Henry R. Costantino & Michael K. Pikal eds., Association of Pharmaceutical Scientists 2004).

Maas et al., "Stabilitat von Bendamustinhydrochlorid in Infusionslosungen," Die Pharmazie, Govi Verlag Pharmazeutischer Verlag Gmbh, vol. 49. No. 10 pp. 775-777 (1994). (Abstract Only).

Margolin et al., Shortening the Infusion Time of Anticancer Drugs: Who Will Benefit?, J. of Clinical Oncology, 25(19):2642-2643 (2007).

McGinity, et al., Journal of Pharmaceutical Sciences, Influence of Peroxide Impurities in Polyethylene Glycols . . . , vol. 64, No. 2 pp. 356-357, 1975.

Michael J. Akers, Remington, The Science and Practice of Pharmacy 21st Edition, Parenteral preparation, chapter 41, pp. 802-835, 2005.

Michael P. Gamcsik, et al., NMR Studies of the Conjugation . . . , J. Med. Chem., vol. 33, pp. 1009-1014, 1990.

National Kidney Foundation, "Clinical Practice Guidelines and Clinical Practice Recommendations" (http://kidneyfoundation.cachefly.net/professionals/KDOQI/guideline_upHD_PD_VA/hd_guide5.htm) (2006).

Neelam Seedher, et al., Solubilization of Nimesulide; Use of Co-solvents, Indian J. Pharm. Sci., vol. 65, No. 1, pp. 58-61, 2003.

Nema et al., Excipients and Their Use in Injectable Products, PDA J. Pharma. Sci. & Tech., 51(4):166-171 (Jul.-Aug. 1997).

Ni et al., Stabilization and Preformulation of Anticancer Drug-SarCNU, Int'l J. of Pharma., 249:257-264 (2002).

Ni et al., Use of Pure t-Butanol as a Solvent for Freeze-Drying: A Case Study, Int'l. J. of Pharma., 226:39-46 (2001).

Nuijen et al., Pharmaceutical Development of a Parenteral Lyophilized Formulation of the Novel Antitumor Agent Aplidine, PDA J. Pharmaceut. Sci. and Technol. 54(3):193-208 (May-Jun. 2000).

O'Connor, Hydrolysis and Alkylating Reactivity of Aromatic Nitrogen Mustards, J.Chem. Soc. Perkin Trans. 2, 1933-1939(1991).

Ozegowski et al., IMET 3393, ?-[1-Methyl-5-bis-(Beta-chloroethyl)-amino-benzimidazolyl-(2)]-butyric acid hydrochloride, a new cytostatic agent from the benzimidazole mustard gas series, 110 Zbl Pharm. 1013-1019 (1971).

Paul J. Sheskey, Handbook of Pharmaceutical Excipients, 7th Edition, Propyl Gallate.

Pokorny et al., Antioxidants in Food: Practical Applications 2001, CRC Press, p. 324.

Poulsen, Introduction to Chemistry (2010).

Pramod K. Gupta, et al., "Injectable Drug Development Techniques to Reduce Pain and Irritation", pp. 183, Informa Healthcare, 2008, ISBN 13: 978-1-5749-1095-7.

Preiss et al., "Pharmacological and clinical date of Bendamustine," 17th International Cancer Congress, pp. 1637-1640 (1998).

Preiss et al., Studies on the Pharmacokinetics of Bendamustine (Cytostasan®) in Humans, Pharmazie, 40(11):782-784 (1985).

R.A. Pethrick et al., Excerpt from Polymer Yearbook 13, CRC Press, Oct. 1, 1996, Technology & Engineering Vinogradova et al. Rassachaert et al., "A phase 1 study of bendamustine hydrochloride administered once every 3 weeks in patients with solid tumors," Anti-Cancer Drugs, vol. 18 No. 5 pp. 587-595 (2007).

Remington's Pharmaceutical Sciences, 18th edition, (1990), p. 1322.

Remington's Pharmaceutical Sciences, 18th edition, (1990), pp. 1286-1288.

Remington's Pharmaceutical Sciences 1990 (Eighteenth Edition), Mack Publishing Company, Chapter 85, 1570-1580.

Renu Chadha, et al., Drug Carrier Systems for Anticancer Agents: A Review, Journal of Scientific & Industrial Reasearch, vol. 67, pp. 185-197, 2008.

Ribomustin Monograph (Updated Aug. 2005).

Ribomustin Monograph (Updated Jan. 2002).

Ribomustin Product Information, Janssen-Cilag Pty Ltd (Updated Sep. 15, 2016).

Rote Liste 1996 for Ribomustin (86 023).

Rote Liste 2003 for Ribomustin (86 045).

Rowe et al. Handbook of Pharmaceutical Excipients, 6th edition, 2009, pp. 454-455.

Rowe et al., "Handbook of Pharmaceutical Excipients," Pharmaceutical Press, 6th edition pp. 857 (extract from index) (2009).

Rowe, et al., (ed) Handbook of Pharmaceutical Excipients, 5th ed., Pharmaceutical Press, pp. 545-550, Polyethylene Glycol, 2006.

Safety Data Sheet, Lactic Acid, 88%, Columbus Chemical Industries, 2013.

Scasnar at al., Radiochemical Assay of Stability of 14C-Cytostasan Solutions During Preparation and Storage, Journal of Radioanalytical and Nuclear Chemistry, Articles 121(2):489-497 (1988).

Schoffski et al., "Weekly administration of bendamustine: A phase 1 study in patients with advanced progressive solid tumors," Annals of Oncology II, pp. 729-734 (2000).

Schoffski et al., Repeated administration of short infusions of bendamustine: a phase 1 study in patients with advanced progressive solid tumours, J. Cancer Res Clin Oncol, vol. 126 No. 1 pp. 41-47 (2000).

Schwanen et al., In vitro evaluation of bendamustine induced apoptosis in B-chronic lymphocytic leukemia, Leukemia 16:2096-2105 (2002).

Scifinder, Hydrolytic degradation of IMET 3393, American Chemical Society, 2018.

Seager et al., Structure of Products Prepared by Freeze-Drying Solutions Containing Organic Solvents, PDA Journal of Pharmaceutical Science and Technology, 39(4): 161-179 (1985).

Search History issued in connection with PCT/US2013/32295 dated May 10, 2013.

Shah et al., Physical, Chemical, and Bioavailability Studies of Parenteral Diazepam Formulations Containing Propylene Glycol and Polyethylene Glycol 400, Drug Development and Industrial Pharm.), 17:12, 1635-1654 (Oct. 20, 2008).

Sigma-Aldrich, Webpage Catalog for poly(ethylene glycol), http://www.sigmaaldrich.com/catalog/product/aldrich/202398?lang=en&ion=-US#, accessed Nov. 15, 2015 (2 pages).

Sikora, "Cancer drug development in the post-genomic age," Current Science, vol. 81 No. 5 pp. 549-554 (2001).

Spectra Analysis, Inc., Oxidative Degradation of Polyethyleneglycol . . . , Application Note 016, Mar. 2008.

Spiegel et al., "Use of Nonaqueous Solvents in Parenteral Products," Journal of Pharmaceutical Sciences, vol. 52, No. 10 pp. 917-927 (1963).

Strickley, Solubilizing Excipients in Oral and Injectable Formulations, Pharmaceutical Research 21(2):201-230 (Feb. 2004).

Supplemental European Search Report issued in connection with PCT/US2011/022958 dated Dec. 16, 2013.

T. W. Graham Solomons, Organic Chemistry (John Wiley & Sons, 3d ed. 1984).

Tageja, Bendamustine: Safety and Efficacy in the Management of Indolent Non-Hodgkins Lymphoma, Clinical Medicine Insights: Oncology 2011:5 145-156.

**US 11,844,783 B2**

Page 5

(56)    **References Cited**

OTHER PUBLICATIONS

Teagarden & Baker, Practical Aspects of Freeze-Drying of Pharmaceutical and Biological Products Using Non-Aqueous Co-Solvent Systems, Chapter 8 in Freeze-Drying/Lyophilization of Pharmaceutical and Biological Products, 239-76 (2nd Edition, Edited by Rey, L. & May, J., Marcel Dekker, New York) (2004).
Teagarden & Baker, Practical Aspects of Lyophilization Using Non-Aqueous Co-Solvent Systems, 15 Eur. J. Pharma. Sciences, 115-33 (2002).
Teva Pharmaceuticals International GMBH, et al. v. Apotex Inc., et al—Civil Action 1:17-cv-01164: Defendants Apotex Inc. and Apotex Corp.'s Answer to Complaint, Defenses and Counterclaims (Document 17), dated Nov. 27, 2017.
Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi USA, LLC.—Civil Action No. 1:17-cv-01201: Answer to Complaint, Separate Defenses, and Counterclaims (Document 10), dated Sep. 15, 2017.
Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi USA, LLC.—Civil Action No. 1:17-cv-01201: Answer to Fresenius Kabi USA, LLC's Counterclaims (Document 14), dated Oct. 6, 2017.
Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi USA, LLC.—Civil Action No. 1:17-cv-01201: Complaint (Document 1), dated Aug. 24, 2017.
Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al—Civil Action No. 1:18-cv-01586: Answer to Fresenius Kabi USA, LLC's Counterclaims (Document 13), dated Nov. 27, 2018.
Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al—Civil Action No. 1:18-cv-01586: Complaint (Document 1), dated Oct. 15, 2018.
Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al—Civil Action No. 1:18-cv-01586: Defendant Mylan Laboratories LTD.'s Answer to Complaint for Patent Infringement (Document 11), dated Nov. 9, 2018.
Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al.—Civil Action No. 1:18-cv-01586: Defendant Fresenius Kabi USA, LLC's Answer to Complaint, Separate Defenses, and Counterclaims (Document 9), dated Nov. 6, 2018.
Teva Pharmaceuticals International GMBH, et al. v. Mylan Laboratories Limited—Civil Action No. 1:17-cv-01790: Complaint (Document 1), dated Dec. 12, 2017.
Teva Pharmaceuticals International GMBH, et al. v. Slayback Pharma Limited Liability Company—Civil Action No. 1:18-cv-00117: Complaint (Document 1), dated Jan. 19, 2018.
Teva Pharmaceuticals International GMBH, et al. v. Slayback Pharma Limited Liability Company—Civil Action No. 1:18-cv-00117: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses and Counterclaims (Document 9), dated Feb. 12, 2018.
U.S. Appl. No. 17/412,623, filed Aug. 26, 2021.
U.S. Appl. No. 16/509,920, filed Jul. 12, 2019.
U.S. Appl. No. 16/015,656, filed Jun. 22, 2018.
U.S. Appl. No. 15/432,335, filed Feb. 14, 2017.
U.S. Appl. No. 15/013,436, filed Feb. 2, 2016.
U.S. Appl. No. 14/031,879, filed Sep. 19, 2013.
U.S. Appl. No. 13/016,473, filed Jan. 28, 2011.

Teva Pharmaceuticals International GMBH, etal. v. Apotex Inc., etal—Civil Action No. 1:17-cv-01164: Complaint (Document 1), dated Aug. 18, 2017.
Thiesen, "Bendamustine, a well-tollerated cytotoxic agent used in Germany for may years, is soon to be marketed in the rest of Europe for a range of indicaons including chronic lymphocytic leukaemia," pp. 1-4 (2010). Available at http://www.hospitalpharmacyeurope.com/featured-articles/bendamustine.
Third Party Submission in related EP2528602 based on PCT/US2011/022958 dated Nov. 19, 2013 (9 pages).
Thomas A. Jennings, Lyophilization, Introduction and Basic Principles (2006)(original copyright 1999).
Treanda (Highlights of prescribing information 2008) (Year: 2008).
Treanda, "Highlights of Prescribing Information," Treanda (bendamustine hydrochloride) for Injection, for intravenous infusion, pp. 1-13 (2010).
Treanda, "Highlights Of Prescribing Information," Treanda (bendamustine hydrochloride) for Injection, for intravenous infusion, pp. 1-6 (2008).
U.S. Pharmacopeia 32-NF-27-General Notices and Requirements (2009).
USP 24/NF 19 (2000) entry for Propylene Glycol (USP).
V.G. Vinogradova, et al., Polymer Yearbook 13, New Metal Chelates as Antioxidant Stabilizers for Polymers . . . , pp. 87-111, 1996.
V.M. Mikhal'chuk, et al., Antioxidative Stabilization of Polyethylene . . . , Russian Journal of Applied Chemistry, vol. 77, No. 1, pp. 131-135, 2004.
Vlok, Manual of Nursing, vol. 1 (9th edition), 1988.
W. Furst, et al., "About the Hydrolytic Decomposition of IMET 3393," Pharmazeutische Zentralhalle, vol. 108, Issue 9, pp. 608-614, 1969 (English translation and the original article).
Wayne P. Olson, Volatile Solvents for Drying and Microbial Kill in the Final Container, Pharmaceutical Engineering, 110-118(1997).
Weide et al., Bendamustine Mitoxantrone and Rituximab (BMR): A New Effective Regimen for Refractory or Relapsed Indolent Lymphomas, Leukemia & Lymphoma, 43(2):327-331 (2002).
Werner et al., Hydrolysis Products of Cancerostatic Cytostasan(Registered) (Bendamustine), 42 (4) Die Pharmazie, Govi Verlag Pharmazeutische Verlag GMBH, Eschborn, DE, 272-73.
William H. Brown, Organic Chemistry 5th Edition, pp. 358-360, 2009.
Wittaya-Areekul and Nail, Freeze-Drying of tert-Butyl Alcohol/Water Cosolvent Systems: Effects of Formulation and Process Variables on Residual Solvents, Journal of Pharmaceutical Sciences 87(4):491-495 (1998).
Written Opinion issued in counterpart PCT/US2013/032289 dated Jun. 6, 2013.
Written Opinion issued in counterpart PCT/US2013/032295 dated Jun. 3, 2013.
Zimmerman et al., Elements of Organic Chemistry (1977).
Zips et al., "New Anticancer Agents: In Vitro and In Vivo Evaluation," In Vivo, vol. 19 pp. 1-8 (2005).
Zumdahl et al., Chemistry, 7th Ed. (2007).
Cephalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al., Civil Action No. 1:17-cv-01154: Responsive Expert Report of Juergen Siepmann, Ph.D., 525 pages.
Cephalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al., Civil Action No. 1:17-cv-01154: Opinion, dated Apr. 27, 2020, 70 pages.

* cited by examiner

US 11,844,783 B2

**1**

# FORMULATIONS OF BENDAMUSTINE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 17/412,623, filed Aug. 26, 2021, which is a continuation of application Ser. No. 16/509,920, filed Jul. 12, 2019, now U.S. Pat. No. 11,103,483, which is a continuation of application Ser. No. 16/015,656, filed Jun. 22, 2018, now abandoned, which is a continuation of application Ser. No. 15/432,335, filed Feb. 14, 2017, now U.S. Pat. No. 10,010, 533, issued Jul. 3, 2018, which is a continuation of application Ser. No. 15/013,436, filed Feb. 2, 2016, now U.S. Pat. No. 9,572,797, issued Feb. 21, 2017, which is a continuation of application Ser. No. 14/031,879, filed Sep. 19, 2013, now U.S. Pat. No. 9,265,831, issued Feb. 23, 2016, which is a continuation of application Ser. No. 13/016,473, filed Jan. 28, 2011, now U.S. Pat. No. 8,609,707, issued Dec. 17, 2013, which claims the benefit of U.S. Provisional Patent Application No. 61/299,100, filed Jan. 28, 2010, the contents of each of which are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

Bendamustine free base is represented by the following structural formula (I)



(I)

Bendamustine is used in the treatment of a number of cancers including leukemias, Hodgkins disease and multiple myelomas. Bendamustine is the active ingredient of the commercial product Treanda™, a lyophilized powder for reconstitution.

Bendamustine exhibits rapid degradation upon reconstitution of the lyophilized product. Bendamustine undergoes hydrolysis by direct substitution rather than an addition elimination process due to the presence of the highly labile aliphatic chlorine atoms. Some of the main degradants of bendamustine are the monohydroxy compound known as HP1 (hydrolysis product 1) and dihydroxy compound HP2 (hydrolysis product 2). The monohydroxy compound appears as the main impurity at Relative Retention Time (RRT) 0.6 and the dihydroxy compound appears as the main impurity at RRT 0.27. Minor peaks appear at RRT 1.2, which are presently unknown.

The stability of bendamustine in water is measured in hours, and is therefore, not suitable for long-term storage in liquid form. The lyophile possesses good chemical stability. However, reconstitution of the lyophile is clinically inconvenient, taking 15-30 mins with implications of chemical instability. There is a need for ready to use (RTU) bendamustine formulations having enhanced stability.

**2**

## SUMMARY OF THE INVENTION

In other aspects of the invention, the bendamustine-containing compositions include a) a pharmaceutically acceptable fluid which contains one or more of propylene glycol, ethanol, polyethylene glycol, benzyl alcohol and glycofurol, and b) a stabilizing amount of a chloride salt. In other aspects of the invention, the bendamustine-containing compositions include DMSO (dimethyl sulfoxide) as part of the pharmaceutically acceptable fluid included therein. Regardless of the pharmaceutically acceptable fluid included, the amount of bendamustine included in the composition is preferably from about 20 mg/mL to about 60 mg/mL. Still further aspects of the invention include methods of treatment using bendamustine-containing compositions and kits containing the same.

One of the advantages of the inventive liquid compositions is that they have substantially improved long term stability when compared to currently available formulations. For example, the inventive bendamustine compositions are substantially free of impurities after at least about 15 months at a temperature of from about 5° C. to about 25° C. The inventive formulations are advantageously ready to use or ready for further dilution. Reconstitution of lyophilized powders is not required.

## DETAILED DESCRIPTION OF THE INVENTION

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art to which this invention belongs. In the event that there is a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

As used herein, RRT is calculated by dividing the retention time of the peak of interest by the retention time of the main peak. Any peak with an RRT<1 elutes before the main peak, and any peak with an RRT>1 elutes after the main peak.

For purposes of the present invention, "substantially free of impurities" shall be understood to include bendamustine-containing compositions in which the amount of total impurities is less than about 5%, as calculated on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after a period of about 15 months at a temperature of from about 5° C. to about 25° C. The amount of impurities is further calculated as being based upon the original amount bendamustine (or salt thereof) being present in the composition or formulation.

For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.

Preferably, the amount of any individual degradant in the inventive compositions does not exceed 2% PAR as determined by HPLC at a wavelength of 223 nm after storage periods of at least about 15 months at a temperature of from about 5° C. to about 25° C. In some aspects, the amount of time the inventive compositions demonstrate long term storage stability is at least about 18 months and preferably at least about 2 years when stored under the conditions described herein.

In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions including:

US 11,844,783 B2

3

a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including
   i) PEG, PG or mixtures thereof; and
   ii) a stabilizing amount of an antioxidant.

The total impurities in the inventive compositions resulting from the degradation of the bendamustine in the compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of from about 5° C. to about 25° C., and thus have long term stability for at least the same period of time or longer. Preferably, the bendamustine-containing compositions demonstrate long term storage stability for at least about 2 years, especially when stored at the lower (refrigerated) temperatures. In one embodiment, the amount of total impurities in the inventive compositions resulting from the degradation of the bendamustine is less than about 3% PAR as determined by HPLC at a wavelength of 223 nm after at least about 2 years at a temperature of from about 5° C. to about 25° C.

In some aspects of the invention, the bendamustine concentration in the inventive compositions is from about 10 mg/mL to about 100 mg/mL, preferably 20 mg/mL to about 60 mg/mL. Preferably the bendamustine concentration in the inventive compositions is from about 25 mg/mL to about 50 mg/mL, and more preferably from about 30 mg/mL to about 50 mg/mL. It will be understood that compositions containing any useful concentration within the ranges, i.e. 10, 20, 25, 30, 35, 40, 45, 50, 55, 60 . . . 100 are contemplated. In other embodiments, the bendamustine concentration in the composition is about 50 mg/mL. In alternative aspects, the amount of bendamustine is outside these ranges but the amounts will be sufficient for single or multiple administrations of dosages generally regarded as effective amounts.

In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof. Within this aspect, the pharmaceutically acceptable fluid is propylene glycol (PG) or polyethylene glycol (PEG). In other embodiments of the invention however, the pharmaceutically acceptable fluid is a mixture of PEG and PG. For example, the pharmaceutically acceptable fluid can include about 50% PEG and about 50% PG. Alternatively, pharmaceutically acceptable fluid includes about 95% PEG and about 5% PG. The amount of PEG and PG can also be varied within the ranges, i.e. the ratio of PEG:PG in the pharmaceutically acceptable fluid can range from about 95:5 to about 50:50. Within this range, is a pharmaceutically acceptable fluid containing about 75% PEG and about 25% PG, and preferably 80% PEG and 20% PG. In another embodiment, a pharmaceutically acceptable fluid can include about 85% PEG and about 15% PG while another preferred pharmaceutically acceptable fluid includes about 90% PEG and about 10% PG. The molecular weight of the PEG will be within the range of pharmaceutically acceptable weights although PEG 400 is preferred in many aspects of the invention.

Without meaning to be bound by any theory or hypothesis, the hydroxide of the polyethylene glycol molecule is less reactive than the hydroxides of propylene glycol. As a result, the ester forms at a slower rate in polyethylene glycol than propylene glycol and the resulting bendamustine degradants are unexpectedly and substantially reduced over extended periods of time when PEG is a substantial part of the pharmaceutically acceptable fluid.

The bendamustine-containing compositions according to several preferred aspects of the invention include a stabiliz-

4

ing amount of an antioxidant. For purposes of the present invention, "stabilizing amount" shall be understood to include those amounts which increase or enhance the stability of the bendamustine in the compositions described herein. The presence of one or more antioxidants described herein thus contributes, at least in part to the long term stability of the composition. Within this guideline, suitable antioxidant concentrations in the compositions can range from about 2.5 mg/mL to about 35 mg/mL, and preferably from about 5 mg/mL to about 20 mg/mL or from about 10 mg/mL to about 15 mg/mL. In some other embodiments, the concentration of the antioxidant in the bendamustine-containing composition is about 5 mg/mL.

Suitable antioxidants for inclusion include those which are pharmaceutically acceptable for use in human and veterinary formulations although not limited to those currently regarded as safe by any regulatory authority. For example, the antioxidant can be selected from among lipoic acid, thioglycerol (also known as monothioglycerol) and analogs thereof, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds, dihydrolipoic acid and mixtures of the foregoing. Preferably, the antioxidant is thioglycerol, lipoic acid or a mixture thereof. Some particularly preferred embodiments of the invention include thioglycerol.

In view of the foregoing, some preferred long term storage stable bendamustine-containing compositions in accordance with the invention compositions include:

I. a) bendamustine or a pharmaceutically acceptable salt thereof; and
   b) a pharmaceutically acceptable fluid including
      i) polyethylene glycol and propylene glycol; and
      ii) a stabilizing amount of thioglycerol; or

II. a) about 50 mg/mL bendamustine or a pharmaceutically acceptable salt thereof; and
   b) a pharmaceutically acceptable fluid including
      i) about 90% PEG and about 10% PG; and
      ii) about 2.5 mg/mL thioglycerol.

Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total impurities, PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

In accordance with other aspects of the invention, there are provided long term storage stable bendamustine-containing compositions, including:

a) bendamustine or a pharmaceutically acceptable salt thereof;
b) a pharmaceutically acceptable fluid including one or more of the following: PG, ethanol, PEG, benzyl alcohol and glycofurol; and
c) a stabilizing amount of a chloride salt.

These compositions also have the low levels of impurities and long term stability mentioned herein. Preferred pharmaceutically acceptable fluids include PG, PEG or ethanol in this embodiment of the invention. Preferably, the PEG is PEG 400. If desired, glycerin and/or 88% (w/w) lactic acid can be added to the pharmaceutically acceptable fluid.

Suitable chloride salts include but are not limited to organic chloride salts, sodium chloride, choline chloride, hydrochloride salts of amino acids and mixtures thereof. Thus, as will be appreciated by those of ordinary skill, one can select from among a number of suitable chloride salts and it is Applicants' intention that the scope of the invention includes all such chloride salts that are capable of being included in bendamustine-containing formulations for

US 11,844,783 B2

5

extended periods without having a deleterious effect on the drug. In one embodiment of the invention, the chloride salt concentration is from about 10 to about 300 mg/mL. In another embodiment, the chloride salt concentration is from about 50 to about 215 mg/mL. In one preferred embodiment, the chloride salt concentration is about 215 mg/mL.

In accordance with another aspect of the invention, there is provided long term storage stable bendamustine-containing compositions, including:

a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including DMSO.

These compositions also have the low levels of impurities and long term stability mentioned herein. In some aspects, the bendamustine concentration in these compositions is from about 10 mg/mL to about 100 mg/mL. Preferably, the bendamustine concentration is from about 20 mg/mL to about 50 mg/mL, more preferably from about 25 mg/mL to about 50 mg/mL. In an alternative embodiment, the bendamustine concentration is about 50 mg/mL.

Another embodiment of the invention provides methods of treating cancer in mammals. The methods include administering to a mammal in need thereof an effective amount of one of the bendamustine-containing compositions described herein. Since the active ingredient portion of the inventive composition is an FDA-approved drug, those of ordinary skill will recognize that the doses of bendamustine employed in this aspect of the invention will be similar to those employed in any treatment regimens designed for bendamustine as marketed under the trade name TRE-ANDA. The patient package insert containing dosing information is incorporated herein by reference. The methods of treatment also include administering the inventive formulations for any purpose or physical condition for which bendamustine has been indicated as being useful.

Another embodiment of the invention includes methods of preparing bendamustine-containing compositions described herein. The methods include reconstituting lyophilized bendamustine in a pharmaceutically acceptable fluid containing one of the following:

A) i) PEG, PG or mixtures thereof; and

ii) a stabilizing amount of an antioxidant;

B) i) one or more of PG, ethanol, PEG, benzyl alcohol and glycofurol; and

ii) a stabilizing amount of a chloride salt; or

C) DMSO.

The steps are carried out under pharmaceutically acceptable conditions for sterility and manufacturing.

In a further aspect of the invention, there are provided methods of controlling or preventing the formation of impurities in bendamustine-containing compositions during long term storage. The methods include combining an amount of bendamustine or a pharmaceutically acceptable salt thereof with a sufficient amount of a pharmaceutically acceptable fluid containing one of the following:

A) i) PEG, PG or mixtures thereof; and

ii) a stabilizing amount of an antioxidant;

B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and

ii) a stabilizing amount of a chloride salt; or

C) DMSO.

Further optional steps in accordance therewith include transferring one or more pharmaceutically acceptable doses of the formulations into a suitable sealable container and storing the sealed container at a temperature of from about 5° C. to about 25° C. As a result of carrying out these steps, it is possible to control or substantially prevent the formation

6

of impurities which otherwise occur with bendamustine-containing compositions during long term storage so that the artisan is provided with bendamustine-containing formulations having less than about 5% total impurities PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

The compositions of the present invention can be packaged in any suitable sterile vial or container fit for the sterile storage of a pharmaceutical such as bendamustine. Suitable containers can be glass vials, polypropylene or polyethylene vials or other special purpose containers and be of a size sufficient to hold one or more doses of bendamustine.

A further aspect of the invention includes kits containing lyophilized bendamustine or a pharmaceutically acceptable salt thereof in a first container or vial; and, in a second container, a sufficient amount of a pharmaceutically acceptable fluid such as those described herein, i.e. one of the following:

A) i) PEG, PG or mixtures thereof; and

ii) a stabilizing amount of an antioxidant;

B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and

ii) a stabilizing amount of a chloride salt; or

C) DMSO.

For purposes of this embodiment, the amount of fluid which is sufficient is an amount which allows the bendamustine to be dissolved or dispersed to a degree which renders the liquid composition ready for use.

As will be appreciated by those of ordinary skill, the kit will contain other pharmaceutically necessary materials for storing and/or administering the drug, including instructions for storage and use, additional diluents, if desired, etc.

### Examples

The following examples serve to provide further appreciation of the invention but are not meant in any way to restrict the effective scope of the invention.

### Example 1

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10 mg/ml in one of ethanol, propylene glycol and benzyl alcohol as indicated in Table 1 below. 215 mg/ml of choline chloride was added in half of the samples as a source of soluble chloride ions. The samples were maintained at 40° C. and analyzed periodically for drug content and total impurities. The results obtained are presented in Table 1.

TABLE 1

| Stability of Bendamustine HCl | | | | |
|---|---|---|---|---|
| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
| BDM - 10 mg/mL | | Initial | 10.43 | 0.27 |
| Choline chloride - | 40° C. | 48 hrs | 10.48 | 1.27 |
| 215 mg/mL | | 7 day | 10.26 | 2.11 |
| Ethanol qs to 1 mL | | | | |
| BDM - 10 mg/mL | | Initial | 10.55 | 0.27 |
| Ethanol qs to 1mL | 40° C. | 48 hrs | 10.30 | 2.39 |
| | | 7 day | 9.55 | 6.66 |

US 11,844,783 B2

7

8

### TABLE 1-continued

Stability of Bendamustine HCl

| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
|---|---|---|---|---|
| BDM - 10 mg/mL Choline chloride - 215 mg/mL Propylene glycol qs to 1 mL | 40° C. | Initial 48 hrs 7 day | 9.99 9.95 9.43 | 0.21 0.60 2.31 |
| BDM - 10 mg/mL Propylene glycol qs to 1 mL | 40° C. | Initial 48 hrs 7 day | 9.68 9.45 9.00 | 0.21 0.88 3.44 |
| BDM - 10 mg/mL Choline Chloride - 215 mg/mL Benzyl alcohol qs to 1 mL | 40° C. | Initial 48 hrs 7 day | 9.95 9.89 8.97 | 3.51 4.24 |
| BDM - 10 mg/mL Benzyl alcohol qs to 1 mL | 40° C. | Initial 48 hrs 7 day | 9.52 8.67 7.49 | 0.33 4.18 7.84 |

Note:
In Table 1 the total % impurities include total contributions from peaks at various RRTs.

As shown in Table 1, the bendamustine formulations are very stable in solutions containing solvent and chloride salt. Table 1 shows that bendamustine, when dissolved at a concentration of about 10 mg/mL, in a pharmaceutically acceptable fluid, such as ethanol and propylene glycol, and containing a stabilizing amount of a chloride salt, such as choline chloride, had less than about 5% after at least 7 days storage at 40° C.

The data presented in Table 1 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of a chloride salt having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including ethanol alone exhibited more than 6.5 total degradants after 7 days storage at 40° C. The sample including benzyl alcohol alone exhibited more than 7.5% total degradants after 7 days storage at 40° C. Bendamustine-containing compositions with such high levels of degradation would not be suitable for long-term storage.

### Example 2

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10 mg/ml in DMSO. The samples were maintained at 40° C. and analyzed periodically for drug content and impurity profile. The results obtained are presented in Table 2.

### TABLE 2

Stability of Bendamustine HCl in DMSO

| Formulation | Temp | Time | Content (mg/mL) | % Total Imp |
|---|---|---|---|---|
| BDM - 10 mg/mL DMSO qs to 1 mL | 40° C. | Initial 48 hrs 1 week | 10.2 9.80 10.0 | 0.23 0.30 0.56 |

Note:
In Table 2 the total % impurities include total contributions from peaks at various RRTs.

Table 2 shows that bendamustine, when dissolved in DMSO, had substantially no increase in total degradants. The data presented in Table 2 translates to bendamustine-containing compositions including DMSO having a shelf life of at least about 15 months at 5° C. and 25° C. In fact,

such compositions are expected to have long term stability for periods beyond 15 months, i.e. up to 2 years or greater.

### Example 3

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 20 mg/ml in polyethylene glycol 400 and 5 mg/ml of lipoic acid was added as a stabilizing antioxidant as indicated in Table 3 below. The samples were maintained at 40° C. or 25° C. and analyzed after 15 days for drug content and impurities. The results obtained are presented in Table 3.

### TABLE 3

Stability of Bendamustine (20 mg/ml) in PEG 400 and Antioxidants

| Antioxidant | T ° C. | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
| | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

As shown in Table 3, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as polyethylene glycol, in the presence of a stabilizing amount of an antioxidant, such as lipoic acid, had substantially no increase in total degradants after a period of 15 days. The data presented in Table 3 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of an antioxidant having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including PEG alone, on the other hand, which did not contain an antioxidant, did not exhibit stabilizing effects at 40° C. This sample had more than 40% more total impurities than the sample including lipoic acid. Bendamustine-containing compositions with such high levels of total impurities would not be suitable for long-term storage.

### Example 4

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 5 mg/ml of thioglycerol, α-lipoic acid or dihydrolipoic acid was added as a stabilizing antioxidant as indicated in Table 4 below. The samples were maintained at 40° C. and analyzed after 15 days or one month for drug content and impurity profile as indicated in Table 4 below. The results obtained are presented in Table 4.

### TABLE 4

Stability of Bendamustine (50 mg/ml) in 90% PEG 400, 10% Propylene Glycol and Antioxidant

| Antioxidant | T (° C.) | Time | Content (mg/mL) | % Initial | % Impurities RRT HP1 0.59 | PG ester 1.10 | % Total Imps |
|---|---|---|---|---|---|---|---|
| Thioglycerol | 40 | initial | 48.8 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 48.5 | 99.4 | 0.06 | 0.20 | 0.71 |
| α-lipoic acid | 40 | initial | 49 | 100 | <LD | <LD | 0 |
| | 40 | 15 days | 48.8 | 99.6 | 0.19 | 0.13 | 0.32 |
| | 40 | 1 month | 48.7 | 99.4 | 0.34 | 0.26 | 0.79 |

US 11,844,783 B2

9

10

TABLE 4-continued

| | | | | | % Impurities RRT | | % |
|---|---|---|---|---|---|---|---|
| | | | | | HP1 | PG ester | |
| Anti-oxidant | T (° C.) | Time | Content (mg/mL) | % Initial | 0.59 | 1.10 | Total Imps |
| Dihydro-lipoic acid | 40 | initial | 49.3 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 47.7 | 97.4 | 0.63 | 0.12 | 1.84 |

Stability of Bendamustine (50 mg/ml) in 90% PEG 400, 10% Propylene Glycol and Antioxidant

<LD = Below Level of Detection

As shown in Table 4, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as a combination of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of an antioxidant, such as thioglycerol, α-lipoic acid or dihydrolipoic acid, had substantially no increase in total degradants after a period of 1 month. This data supports the position that bendamustine-containing compositions according to the invention have a shelf life of at least about 2 years when stored at temperatures between 5° C. and 25° C.

Example 5

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in a mixture of polyethylene glycol 400 and propylene glycol as indicated in Table 5 below. 5 mg/ml of lipoic acid was added as a stabilizing antioxidant. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed after 1 week, 15 days or one month for drug content and impurity profile as indicated in Table 5 below. The results obtained are presented in Table 5.

TABLE 5

Stability of Bendamustine (50 mg/ml) and Lipoic Acid (5 mg/ml) in PEG400 and Propylene glycol

| | | | | | % Area of degradants | | | % |
|---|---|---|---|---|---|---|---|---|
| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | HPI 0.58 | PG ester 1.10 | PG ester 1.13 | Total Imp. |
| BDM- | | Initial | 49.6 | 100 | BDL | BDL | BDL | 0.18 |
| 50 mg/mL | 40° C. | 1 W | 49.0 | 98.8 | 0.05 | 0.13 | BDL | 0.38 |
| Lipoic acid- | | 15 d | 48.3 | 97.4 | 0.08 | 0.26 | BDL | 0.55 |
| 5 mg/mL | | 1 M | 48.0 | 96.8 | 0.11 | 0.43 | 0.13 | 1.03 |
| PEG | 25° C. | 15 d | 49.6 | 100.0 | BDL | 0.10 | BDL | 0.30 |
| 400:PG | | 1 M | 48.4 | 97.6 | 0.05 | 0.19 | BDL | 0.43 |
| (75:25) qs to 1 mL | 5° C. | 1 M | 49.6 | 100.0 | BDL | 0.07 | BDL | 0.27 |
| BDM- | | Initial | 50.2 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/mL | 40° C. | 1 W | 49.9 | 99.4 | BDL | 0.15 | BDL | 0.30 |
| Lipoic acid- | | 15 d | 49.1 | 97.8 | 0.06 | 0.35 | BDL | 0.73 |
| 5 mg/mL | | 1 M | 49.0 | 97.6 | 0.09 | 0.90 | 0.25 | 1.82 |
| PEG | 25° C. | 15 d | 49.9 | 99.4 | BDL | 0.12 | BDL | 0.32 |
| 400:PG | | 1 M | 49.7 | 99.0 | BDL | 0.25 | BDL | 0.59 |
| (50:50) qs to 1 mL | 5° C. | 1 M | 50.0 | 99.6 | BDL | 0.11 | BDL | 0.33 |
| BDM- | | Initial | 50.8 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/mL | 40° C. | 1 W | 50.4 | 99.2 | BDL | 0.11 | BDL | 0.30 |
| Lipoic acid- | | 15 d | 49.7 | 97.8 | 0.07 | 0.17 | BDL | 0.43 |
| 5 mg/mL | | 1 M | 49.7 | 97.8 | 0.13 | 0.27 | 0.09 | 0.84 |
| PEG | 25° C. | 15 d | 50.8 | 100.0 | BDL | 0.10 | BDL | 0.26 |
| 400:PG | | 1 M | 50.8 | 100.0 | 0.05 | 0.14 | BDL | 0.39 |
| (90:10) qs to 1 mL | 5° C. | 1 M | 50.8 | 100.0 | BDL | 0.06 | BDL | 0.34 |

BDL = Below Detectable Limit

As shown in Table 5, bendamustine, when dissolved in certain mixtures of polyethylene glycol and propylene glycol and a stabilizing amount of lipoic acid, had substantially no increase in total degradants after a period of 1 month. The data presented in Table 5 translates to bendamustine-containing compositions having a shelf life of at least about 2 years when stored at temperatures between 5° C. and at 25° C.

Example 6

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol and α-lipoic acid was added as a stabilizing antioxidant as indicated in Table 6 below. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed for drug content and impurity profile as indicated in Table 6 below. The results obtained are presented in Table 6.

US 11,844,783 B2

11 | 12

TABLE 6

Stability of Bendamustine in 90% PEG 400, 10% PG and α-lipoic acid

| Formulation | Temp | Time Per. | Amt. mg/ml | % of Initial | 0.59 | 1.10 | 1.13 | 1.15 | 1.17 | 1.20 | 1.22 | 1.30 | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | % Area of degradants | | | | | |
| BDM-50 mg/mL α-lipoic acid-10 mg/mL PEG 400:PG (90:10) qs to 1 mL | Initial | | 51.0 | 100 | 0.20 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.26 |
| | 40° C. | 1 M | 50.5 | 99.0 | 0.21 | 0.31 | 0.13 | 0.07 | 0.13 | 0.10 | <LD | <LD | 0.95 |
| | | 2 M | 49.7 | 97.5 | 0.22 | 0.71 | 0.28 | 0.14 | 0.12 | 0.21 | 0.12 | <LD | 2.02 |
| | | 3 M | 48.7 | 95.5 | 0.22 | 1.01 | 0.45 | 0.21 | 0.14 | 0.37 | 0.16 | 0.05 | 2.96 |
| | 25° C. | 3 M | 50.5 | 99.0 | 0.20 | 0.36 | 0.07 | <LD | <LD | 0.10 | <LD | <LD | 0.73 |
| | | 6 M | 50.4 | 98.8 | 0.22 | 0.60 | 0.17 | 0.06 | 0.06 | 0.09 | 0.10 | 0.08 | 1.44 |
| | 5° C. | 6 M | 50.9 | 99.8 | 0.16 | 0.05 | <LD | <LD | <LD | <LD | <LD | <LD | 0.21 |
| | | 12 M | 50.6 | 99.2 | 0.20 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | 0.38 |
| BDM-50 mg/mL α-lipoic acid-15 mg/mL PEG 400:PG (90:10) qs to 1 mL | Initial | | 50.3 | 100 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | <LD | 0.18 |
| | 40° C. | 1 M | 50.0 | 99.4 | 0.19 | 0.32 | 0.08 | 0.06 | 0.08 | 0.06 | 0.06 | <LD | 0.85 |
| | | 2 M | 49.8 | 99.0 | 0.19 | 0.65 | 0.21 | 0.12 | 0.13 | 0.23 | 0.14 | 0.06 | 1.85 |
| | | 3 M | 49.5 | 98.4 | 0.15 | 0.89 | 0.37 | 0.17 | 0.13 | 0.32 | 0.10 | <LD | 2.40 |
| | | 6 M | 47.0 | 93.4 | 0.20 | 1.76 | 0.66 | 0.19 | 0.31 | 0.47 | 0.33 | 0.17 | 4.93 |
| | 25° C. | 3 M | 50.0 | 99.4 | 0.20 | 0.35 | 0.08 | <LD | <LD | <LD | 0.11 | <LD | 0.79 |
| | | 6 M | 49.5 | 98.4 | 0.19 | 0.58 | 0.15 | 0.06 | 0.07 | 0.09 | 0.08 | 0.10 | 1.38 |
| | 5° C. | 6 M | 50.3 | 100 | 0.17 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.23 |
| | | 12 M | 50.2 | 99.8 | 0.19 | 0.15 | <LD | <LD | <LD | <LD | <LD | <LD | 0.34 |

<LD = Below Level of Detection

The data reported in Table 6 along with the data in Table 5 demonstrates that bendamustine solutions are stable when dissolved in mixtures of PEG and PG and 5-15 mg/mL α-lipoic acid. As shown in Table 6, bendamustine, when dissolved in combinations of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of lipoic acid, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6-12 months at 5° C. and 25° C. The data corresponds to bendamustine solutions being stable under ambient or refrigerated storage conditions for well in excess of 2 years, and thus long term stable.

Example 7

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 2.5 mg/ml of thioglycerol was added as an antioxidizing agent. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table 7 below. The results obtained are presented in Table 7.

TABLE 7

Stability of Bendamustine in 90% PEG 400, 10% PG and Thioglycerol

| Formulation | Temp | Time Per. | Amt mg/ml | % of Initial | 0.15 | 0.37 | 1.10 | 1.13 | 1.15 | 1.17 | 1.18 | 1.20 | 1.22 | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | RRTs of degradants | | | | | | |
| BDM-50 mg/mL Thioglycerol-2.5 mg/mL PEG 400:PG (90:10) qs to 1 mL | Initial | | 50.3 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | 40° C. | 15 d | 50.2 | 99.8 | BDL | BDL | 0.18 | BDL | BDL | BDL | 0.05 | 0.08 | BDL | 0.31 |
| | | 1 M | 49.9 | 99.2 | BDL | 0.12 | 0.32 | 0.07 | BDL | BDL | 0.09 | 0.08 | BDL | 0.75 |
| | | 2 M | 49.1 | 97.6 | BDL | 0.18 | 0.56 | 0.24 | 0.09 | 0.17 | 0.19 | 0.12 | 0.11 | 1.76 |
| | | 3 M | 48.8 | 97.0 | BDL | 0.23 | 0.85 | 0.34 | 0.16 | 0.30 | 0.34 | 0.29 | 0.19 | 2.94 |
| | 25° C. | 3 M | 49.9 | 99.2 | 0.06 | 0.12 | 0.23 | 0.07 | BDL | BDL | 0.06 | 0.07 | 0.06 | 0.67 |
| | | 6 M | 49.3 | 98.0 | BDL | 0.23 | 0.53 | 0.22 | 0.11 | BDL | 0.21 | 0.22 | 0.20 | 2.07 |

US 11,844,783 B2

13                                                                                              14

TABLE 7-continued

| | | | % of Ini- | | | | RRTs of degradants | | | | | | % Total |
| Formu-lation | Temp | Time Per. | Amt mg/ml | tial | 0.15 | 0.37 | 1.10 | 1.13 | 1.15 | 1.17 | 1.18 | 1.20 | 1.22 | Imp. |

BDL = Below Detectable Limit

The stability is similar to that of α-lipoic acid samples in Example 6 above. As shown in Table 7, bendamustine, when dissolved in a combination of polyethylene glycol and propylene glycol, and a stabilizing amount of thioglycerol, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6 months at 25° C. The data reported supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for about 2 years.

Example 8

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 85% PEG 400 and 15% PG in the presence of 5 mg/ml of thioglycerol. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table 8 below. The results obtained are presented in Table 8.

TABLE 8

Stability of Bendamustine in 85% PEG 400, 15% PG and Thioglycerol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Total Imp. |
| --- | --- | --- | --- | --- | --- |
| BDM - 50 mg/mL | Initial | | 51.5 | 100 | 0.12 |
| Thioglycerol - 5 mg/mL | 40° C. | 1 M | 50.4 | 97.9 | 1.18 |
| PEG 400:PG (85:15) qs to 1 mL | 25° C. | 1 M | 51.4 | 99.8 | 0.41 |
| | | 3 M | 50.4 | 97.9 | 1.21 |
| | 5° C. | 3 M | 51.0 | 99.0 | 0.26 |

The stability is similar to that of thioglycerol samples in Example 7 above. As reported in Table 8, total impurities did not exceed 2% at 40° C. or 25° C. storage over one month, or at 25° C. and 5° C. storage after three months. The data reported in Table 8 supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for at least about 2 years if not longer.

We claim:

1. A method of treating leukemia in a human in need thereof comprising
   providing a liquid bendamustine-containing composition comprising
      bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL,,
      a pharmaceutically acceptable fluid consisting of poly-ethylene glycol and optionally one or more of pro-pylene glycol, ethanol, benzyl alcohol and glycofu-rol; and
      a stabilizing amount of an antioxidant

wherein the total impurities in the liquid bendamustine-containing composition resulting from the degrada-tion of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wave-length of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.;
diluting the liquid bendamustine containing composition; and
intravenously administering the diluted composition to the human.

2. The method of claim 1, wherein the liquid bendamus-tine containing composition is diluted with about 50 mL of a diluent.

3. The method of claim 1, wherein the concentration of bendamustine in the liquid bendamustine-containing com-positions is about 25 mg/ml.

4. The method of claim 1, wherein the concentration of bendamustine in the liquid bendamustine-containing com-position is 25 mg/ml.

5. The method of claim 1, wherein the liquid bendamus-tine-containing composition includes 100 mg of bendamus-tine at a concentration of 25 mg/mL.

6. The method of claims 1, wherein the antioxidant is monothioglycerol.

7. The method of claim 1, wherein the antioxidant in the liquid bendamustine containing composition is monothio-glycerol in a concentration of about 5 mg/mL.

8. The method of claim 1, wherein the liquid bendamus-tine-containing composition is stable for at least about 15 months at 5° C. or for at least about 15 months at 25° C., prior to dilution.

9. The method of claim 1, wherein the liquid bendamus-tine-containing composition further comprises ethanol.

10. The method of claims 1, wherein the liquid benda-mustine-containing composition is packages in a sterile vial.

11. A method of treating leukemia in a human in need thereof comprising providing a liquid bendamustine-con-taining composition packaged in a sterile vial and compris-ing
   100 mg of bendamustine, or a pharmaceutically accept-able salt thereof, at a concentration of about 25 mg/mL;
   a pharmaceutically acceptable fluid consisting of polyeth-ylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
   a stabilizing amount of an antioxidant that is monothio-glycerol;
   wherein the total impurities in the liquid bendamustine-containing composition resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. or for at least about 15 months at 25° C.;
   diluting the liquid bendamustine containing composition with about 50 mL of a diluent;
   and intravenously administering the diluted composition to the human.

US 11,844,783 B2

15

16

**12**. The method of claim **11**, wherein the liquid benda-mustine-containing composition comprises100 mg of ben-damustine, or a pharmaceutically acceptable salt thereof, at a concentration of 25 mg/mL.

**13**. The method of claim **12**, wherein the liquid benda-mustine-containing composition further comprises ethanol.

**14**. The method of claim **12**, wherein the liquid benda-mustine containing composition is diluted with about 50 mL of a diluent.

\* \* \* \* \*

# EXHIBIT 2

US011872214B2

(12) **United States Patent**
Palepu et al.

(10) Patent No.: **US 11,872,214 B2**
(45) Date of Patent: **\*Jan. 16, 2024**

(54) **FORMULATIONS OF BENDAMUSTINE**

(71) Applicant: **Eagle Pharmaceuticals, Inc.**, Woodcliff Lake, NJ (US)

(72) Inventors: **Nagesh R. Palepu**, Southampton, PA (US); **Philip Christopher Buxton**, Uxbridge (GB)

(73) Assignee: **Eagle Pharmaceuticals, Inc.**, Woodcliff Lake, NJ (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **18/081,251**

(22) Filed: **Dec. 14, 2022**

(65) **Prior Publication Data**
US 2023/0115693 A1    Apr. 13, 2023

**Related U.S. Application Data**

(63) Continuation of application No. 17/412,623, filed on Aug. 26, 2021, which is a continuation of application No. 16/509,920, filed on Jul. 12, 2019, now Pat. No. 11,103,483, which is a continuation of application No. 16/015,656, filed on Jun. 22, 2018, now abandoned, which is a continuation of application No. 15/432,335, filed on Feb. 14, 2017, now Pat. No. 10,010,533, which is a continuation of application No. 15/013,436, filed on Feb. 2, 2016, now Pat. No. 9,572,797, which is a continuation of application No. 14/031,879, filed on Sep. 19, 2013, now Pat. No. 9,265,831, which is a continuation of application No. 13/016,473, filed on Jan. 28, 2011, now Pat. No. 8,609,707.

(60) Provisional application No. 61/299,100, filed on Jan. 28, 2010.

(51) **Int. Cl.**
| | |
|---|---|
| *A61K 9/08* | (2006.01) |
| *A61K 47/10* | (2017.01) |
| *A61K 47/18* | (2017.01) |
| *A61P 35/00* | (2006.01) |
| *A61K 31/4184* | (2006.01) |
| *A61K 47/20* | (2006.01) |
| *A61K 47/12* | (2006.01) |
| *A61K 47/22* | (2006.01) |
| *A61K 9/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ............ *A61K 31/4184* (2013.01); *A61K 9/08* (2013.01); *A61K 47/10* (2013.01); *A61K 47/12* (2013.01); *A61K 47/18* (2013.01); *A61K 47/20* (2013.01); *A61K 47/22* (2013.01); *A61K 9/0019* (2013.01)

(58) **Field of Classification Search**
CPC ...... A61K 31/4184; A61K 9/08; A61K 47/10; A61K 47/12; A61K 47/18; A61K 47/20; A61K 47/22; A61K 9/0019
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,071,620 A | 1/1978 | Sklar | |
| 4,711,906 A | 12/1987 | Von et al. | |
| 4,879,286 A | 11/1989 | Alam et al. | |
| 5,204,335 A | 4/1993 | Sauerbier et al. | |
| 5,223,515 A | 6/1993 | Mikura et al. | |
| 5,741,523 A | 4/1998 | Teagarden et al. | |
| 7,252,799 B2 | 8/2007 | Miekka et al. | |
| 7,772,274 B1 | 8/2010 | Palepu | |
| 8,076,366 B2 | 12/2011 | Courvoisier et al. | |
| 8,344,006 B2 | 1/2013 | Drager et al. | |
| 8,389,558 B2 | 3/2013 | Alakhov et al. | |
| 8,609,707 B2 | 12/2013 | Palepu et al. | |
| 8,791,270 B2 | 7/2014 | Brittain et al. | |
| 9,000,021 B2 | 4/2015 | Sundaram et al. | |
| 9,034,908 B2 | 5/2015 | Sundaram | |
| 9,144,568 B1 | 9/2015 | Sundaram | |
| 9,265,831 B2 | 2/2016 | Palepu et al. | |
| 9,572,796 B2 | 2/2017 | Palepu et al. | |
| 9,572,797 B2 | 2/2017 | Palepu et al. | |
| 9,572,887 B2 | 2/2017 | Sundaram | |
| 9,572,888 B2 | 2/2017 | Sundaram | |
| 9,579,384 B2 | 2/2017 | Sundaram et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1850048 A | 10/2006 |
| CN | 101584668 A | 11/2009 |

(Continued)

OTHER PUBLICATIONS

Kumar et al. (AAPS PharmSciTech 2006;7(3):E1-E7) (Year: 2006).\*
McGinity et al. (Journal of Pharmaceutical Sciences 1975;64(2):356-357) (Year: 1975).\*

(Continued)

*Primary Examiner* — Ernst V Arnold
(74) *Attorney, Agent, or Firm* — BakerHostetler

(57) **ABSTRACT**

Long term storage stable bendamustine-containing compositions are disclosed. The compositions can include bendamustine or a pharmaceutically acceptable salt thereof, and a pharmaceutically acceptable fluid which can include in some embodiments PEG, PG or mixtures thereof and an antioxidant or chloride ion source. The bendamustine-containing compositions have less than about 5% total impurities, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

**9 Claims, No Drawings**

## US 11,872,214 B2
Page 2

(56)  **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,597,397 | B2 | 3/2017 | Sundaram |
| 9,597,398 | B2 | 3/2017 | Sundaram |
| 9,597,399 | B2 | 3/2017 | Sundaram |
| 10,010,533 | B2 | 7/2018 | Palepu et al. |
| 2002/0102215 | A1 | 8/2002 | Klaveness et al. |
| 2002/0122768 | A1 | 9/2002 | Liu et al. |
| 2004/0014964 | A1 | 1/2004 | Cheesman et al. |
| 2004/0043069 | A1 | 3/2004 | Vanderbist et al. |
| 2005/0025702 | A1 | 2/2005 | Decicco et al. |
| 2005/0042285 | A1 | 2/2005 | Ukai et al. |
| 2006/0035945 | A1 | 2/2006 | Attardo et al. |
| 2006/0128777 | A1 | 6/2006 | Bendall et al. |
| 2006/0159713 | A1 | 7/2006 | Brittain et al. |
| 2006/0205694 | A1 | 9/2006 | Alonso et al. |
| 2007/0116729 | A1 | 5/2007 | Palepu |
| 2008/0118544 | A1 | 5/2008 | Wang |
| 2009/0082416 | A1 | 3/2009 | Czarnik |
| 2009/0209606 | A1 | 8/2009 | Bendall et al. |
| 2009/0264488 | A1 | 10/2009 | Cooper et al. |
| 2009/0325978 | A1 | 12/2009 | Onai et al. |
| 2010/0092474 | A1 | 4/2010 | Gallagher et al. |
| 2010/0145266 | A1 | 6/2010 | Orlowski |
| 2010/0216858 | A1 | 8/2010 | Popek et al. |
| 2010/0247669 | A1 | 9/2010 | Eliasof et al. |
| 2010/0273730 | A1 | 10/2010 | Hsu et al. |
| 2011/0015244 | A1 | 1/2011 | Alakhov et al. |
| 2011/0015245 | A1 | 1/2011 | Alakhov et al. |
| 2011/0184036 | A1 | 7/2011 | Palepu et al. |
| 2011/0190363 | A1 | 8/2011 | Drager et al. |
| 2012/0059000 | A1 | 3/2012 | Ren et al. |
| 2012/0071532 | A1 | 3/2012 | Cooper et al. |
| 2012/0157505 | A1 | 6/2012 | Labell et al. |
| 2012/0308516 | A1 | 12/2012 | Hlavinka et al. |
| 2013/0041003 | A1 | 2/2013 | Brittain et al. |
| 2013/0041004 | A1 | 2/2013 | Drager et al. |
| 2013/0210878 | A1 | 8/2013 | Soppimath et al. |
| 2013/0210879 | A1 | 8/2013 | Palepu et al. |
| 2013/0217888 | A1 | 8/2013 | Shrawat et al. |
| 2013/0253025 | A1 | 9/2013 | Sundaram |
| 2014/0094496 | A1 | 4/2014 | Sundaram |
| 2014/0275196 | A1 | 9/2014 | Sundaram |
| 2018/0000789 | A1 | 1/2018 | Palepu et al. |
| 2018/0000938 | A1 | 1/2018 | Sundaram |
| 2018/0185488 | A1 | 7/2018 | Sundaram |
| 2018/0296535 | A1 | 10/2018 | Palepu et al. |
| 2018/0296536 | A1 | 10/2018 | Palepu et al. |
| 2018/0369383 | A1 | 12/2018 | Sundaram |
| 2019/0192659 | A1 | 6/2019 | Sundaram |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 102164579 A | 8/2011 |
| DE | 80967 A | 1/1970 |
| DE | 159289 A1 | 3/1983 |
| JP | 09-508128 A | 8/1997 |
| JP | 2005-537285 A | 12/2005 |
| JP | 2008-526991 A | 7/2008 |
| JP | 2012-503666 A | 2/2012 |
| JP | 2012-525387 A | 10/2012 |
| JP | 2015-501814 A | 1/2015 |
| WO | 99/01118 A2 | 1/1999 |
| WO | 2001/097860 | 12/2001 |
| WO | 2001/097861 | 12/2001 |
| WO | 2001/098294 | 12/2001 |
| WO | 02/0125 A1 | 1/2002 |
| WO | 2006/054315 A1 | 5/2006 |
| WO | 2006/110551 A2 | 10/2006 |
| WO | 2010/036702 A1 | 4/2010 |
| WO | 2010/126676 A1 | 11/2010 |
| WO | 2010/148288 A2 | 12/2010 |
| WO | 2011/094565 A1 | 8/2011 |
| WO | 2011/103150 A2 | 8/2011 |
| WO | 2012/015810 A2 | 2/2012 |
| WO | 2013/142358 A1 | 9/2013 |

OTHER PUBLICATIONS

Wasylaschuk et al. (Journal of Pharmaceutical Sciences, vol. 96, No. 1, Jan. 2007:106-116). (Year: 2007).*
Pokorny et al., Antioxidants in Food: Practical Applications 2001, CRC Press, p. 324.
Poulsen, Introduction to Chemistry (2010).
Pramod K. Gupta, et al.. "Injectable Drug Development Techniques to Reduce Pain and Irritation", pp. 183, Informa Healthcare, 2008, ISBN 13: 978-1-5749-1095-7.
Preiss et al., "Pharmacological and clinical date of Bendamustine," 17th International Cancer Congress, pp. 1637-1640 (1998).
Preiss et al., Studies on the Pharmacokinetics of Bendamustine (Cytostasan®) in Humans, Pharmazie, 40(11):782-784 (1985).
R.A. Pethrick et al., Excerpt from Polymer Yearbook 13, CRC Press, Oct. 1, 1996, Technology & Engineering Vinogradova et al.
Rassachaert et al., "A phase 1 study of bendamustine hydrochloride administered once every 3 weeks in patients with solid tumors," Anti-Cancer Drugs, vol. 18 No. 5 pp. 587-595 (2007).
Remington's Pharmaceutical Sciences, 18th edition, (1990), p. 1322.
Remington's Pharmaceutical Sciences, 18th edition, (1990), pp. 1286-1288.
Remington's Pharmaceutical Sciences 1990 (Eighteenth Edition), Mack Publishing Company, Chapter 85, 1570-1580.
Renu Chadha, et al., Drug Carrier Systems for Anticancer Agents: A Review, Journal of Scientific & Industrial Reasearch, vol. 67, pp. 185-197, 2008.
Ribomustin Monograph (Updated Aug. 2005).
Ribomustin Monograph (Updated Jan. 2002).
Ribomustin Product Information, Janssen-Cilag Pty Ltd (Updated Sep. 15, 2016).
Rote Liste 1996 for Ribomustin (86 023).
Rote Liste 2003 for Ribomustin (86 045).
Rowe et al. Handbook of Pharmaceutical Excipients, 6th edition, 2009, pp. 454-455.
Rowe et al., "Handbook of Pharmaceutical Excipients," Pharmaceutical Press, 6th edition pp. 857 (extract from index) (2009).
Rowe, et al., (ed) Handbook of Pharmaceutical Excipients, 5th ed., Pharmaceutical Press, pp. 545-550, Polyethylene Glycol, 2006.
Safety Data Sheet, Lactic Acid, 88%, Columbus Chemical Industries, 2013.
Scasnar at al., Radiochemical Assay of Stability of 14C-Cytostasan Solutions During Preparation and Storage, Journal of Radioanalytical and Nuclear Chemistry, Articles 121(2):489-497 (1988).
Schöffski et al., "Weekly administration of bendamustine: A phase 1 study in patients with advanced progressive solid tumors," Annals of Oncology II, pp. 729-734 (2000).
Schöffski et al., Repeated administration of short infusions of bendamustine: a phase 1 study in patients with advanced progressive solid tumours, J. Cancer Res Clin Oncol, vol. 126 No. 1 pp. 41-47 (2000).
Schwanen et al., In vitro evaluation of bendamustine induced apoptosis in B-chronic lymphocytic leukemia, Leukemia 16:2096-2105 (2002).
SciFinder, Hydrolytic degradation of IMET 3393, American Chemical Society, 2018.
Seager et al., Structure of Products Prepared by Freeze-Drying Solutions Containing Organic Solvents, PDA Journal oi Pharmaceutical Science and Technology, 39(4):161-179 (1985).
Search History issued in connection with PCT/US2013/32295 dated May 10, 2013.
Shah at al., Physical, Chemical, and Bioavailability Studies of Parenteral Diazepam Formulations Containing Propylene Glycol and Polyethylene Glycol 400, Drug Development and Industrial Pharm.), 17:12, 1635-1654 (Oct. 20, 2008).
Sigma-Aldrich, Webpage Catalog for poly(ethylene glycol), http://www.sigmaaldrich.com/catalog/product/aldrich/202398?lang=en®ion-=US#, accessed Nov. 15, 2015 (2 pages).
Sikora, "Cancer drug development in the post-genomic age," Current Science, vol. 81 No. 5 pp. 549-554 (2001).
Spectra Analysis, Inc., Oxidative Degradation of Polyethyleneglycol . . . , Application Note 016, Mar. 2008.

**US 11,872,214 B2**

Page 3

(56)                **References Cited**

OTHER PUBLICATIONS

Spiegel et al., "Use of Nonaqueous Solvents in Parenteral Products," Journal of Pharmaceutical Sciences, vol. 52, No. 10 pp. 917-927 (1963).

Strickley, Solubilizing Excipients in Oral and Injectable Formulations, Pharmaceutical Research 21(2):201-230 (Feb. 2004).

Supplemental European Search Report issued in connection with PCT/US2011/022958 dated Dec. 16, 2013.

T. W. Graham Solomons, Organic Chemistry (John Wiley & Sons, 3d ed. 1984).

Tageja, Bendamustine: Safety and Efficacy in the Management of Indolent Non-Hodgkins Lymphoma, Clinical Medicine Insights: Oncology 2011:5 145-156.

Teagarden & Baker, Practical Aspects of Freeze-Drying of Pharmaceutical and Biological Products Using Non-Aqueous Co-Solvent Systems, Chapter 8 in Freeze-Drying/Lyophilization of Pharmaceutical and Biological Products, 239-76 (2nd Edition, Edited by Rey, L. & May, J., Marcel Dekker, New York) (2004).

Teagarden & Baker, Practical Aspects of Lyophilization Using Non-Aqueous Co-Solvent Systems, 15 Eur. J. Pharma. Sciences, 115-33 (2002).

*Teva Pharmaceuticals International GMBH, et al.* v. *Apotex Inc., et al*—Civil Action 1:17-cv-01164: Defendants Apotex Inc. and Apotex Corp.'s Answer to Complaint, Defenses and Counterclaims (Document 17), dated Nov. 27, 2017.

*Teva Pharmaceuticals International GMBH, et al.* v. *Fresenius Kabi USA, LLC.*—Civil Action No. 1:17-cv-01201: Answer to Complaint, Separate Defenses, and Counterclaims (Document 10), dated Sep. 15, 2017.

*Teva Pharmaceuticals International GMBH, et al.* v. *Fresenius Kabi USA, LLC.*—Civil Action No. 1:17-cv-01201: Answer to Fresenius Kabi USA, LLC's Counterclaims (Document 14), dated Oct. 6, 2017.

*Teva Pharmaceuticals International GMBH, et al.* v. *Fresenius Kabi USA, LLC.*—Civil Action No. 1:17-cv-01201: Complaint (Document 1), dated Aug. 24, 2017.

*Teva Pharmaceuticals International GMBH, et al.* v. *Fresenius Kabi, LLC.*, et al—Civil Action No. 1:18-cv-01586: Answer to Fresenius Kabi USA, LLC's Counterclaims (Document 13), dated Nov. 27, 2018.

*Teva Pharmaceuticals International GMBH, et al.* v. *Fresenius Kabi, LLC.*, et al—Civil Action No. 1:18-cv-01586: Complaint (Document 1), dated Oct. 15, 2018.

*Teva Pharmaceuticals International GMBH, et al.* v. *Fresenius Kabi, LLC.*, et al—Civil Action No. 1:18-cv-01586: Defendant Mylan Laboratories LTD.'s Answer to Complaint for Patent Infringement (Document 11), dated Nov. 9, 2018.

*Teva Pharmaceuticals International GMBH, et al.* v. *Fresenius Kabi, LLC.*, et al—Civil Action No. 1:18-cv-01586: Defendant Fresenius Kabi USA, LLC's Answer to Complaint, Separate Defenses, and Counterclaims (Document 9), dated Nov. 6, 2018.

*Teva Pharmaceuticals International GMBH, et al.* v. *Mylan Laboratories Limited*—Civil Action No. 1:17-cv-01790: Complaint (Document 1), dated Dec. 12, 2017.

*Teva Pharmaceuticals International GMBH, et al.* v. *Slayback Pharma Limited Liability Company*—Civil Action No. 1:18-cv-00117: Complaint (Document 1), dated Jan. 19, 2018.

*Teva Pharmaceuticals International GMBH, et al.* v. *Slayback Pharma Limited Liability Company*—Civil Action No. 1:18-cv-00117: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Addtional Defenses and Counterclaims (Document 9), dated Feb. 12, 2018.

*Teva Pharmaceuticals International GMBH, et al.* v. *Apotex Inc., etal*—Civil Action No. 1:17-cv-01164: Complaint (Document 1), dated Aug. 18, 2017.

Thiesen, "Bendamustine, a well-tollerated cytotoxic agent used in Germany for may years, is soon to be marketed in the rest of Europe for a range of indicatons including chronic lymphocytic leukaemia," pp. 1-4 (2010). Available at http://www.hospitalpharmacyeurope.com/featured-articles/bendamustine.

Third Party Submission in related EP2528602 based on PCT/US2011/022958 dated Nov. 19, 2013 (9 pages).

Thomas A. Jennings, Lyophilization, Introduction and Basic Principles (2006)(original copyright 1999).

Treanda (Highlights of prescribing information 2008) (Year: 2008).

Treanda, "Highlights of Prescribing Information," Treanda ( bendamustine hydrochloride) for Injection, for intravenous infusion, pp. 1-13 (2010).

Treanda, "Highlights of Prescribing Information," Treanda ( bendamustine hydrochloride) for Injection, for intravenous infusion, pp. 1-6 (2008).

U.S. Pharmacopeia 32-NF-27-General Notices and Requirements (2009).

USP 24/NF 19 (2000) entry for Propylene Glycol (USP).

V.G. Vinogradova, et al., Polymer Yearbook 13, New Metal Chelates as Antioxidant Stabilizers for Polymers . . . , pp. 87-111, 1996.

V.M. Mikhal'chuk, et al., Antioxidative Stabilization of Polyethylene . . . , Russian Journal of Applied Chemistry, vol. 77, No. 1, pp. 131-135, 2004.

Vlok, Manual of Nursing, vol. 1 (9th edition), 1988.

W. Furst, et al., "About the Hydrolytic Decomposition of IMET 3393," Pharmazeutische Zentralhalle, vol. 108, Issue 9, pp. 608-614, 1969 (English translation and the original article).

Wayne P. Olson, Volatile Solvents for Drying and Microbial Kill in the Final Container, Pharmaceutical Engineering, 110-118(1997).

Weide et al., Bendamustine Mitoxantrome and Rituximab (BMR): A New Effective Regimen for Refractory or Relapsed Indolent Lymphomas, Leukemia & Lymphoma, 43(2):327-331 (2002).

Werner et al., Hydrolysis Products of Cancerostatic Cytostasan(Registered) (Bendamustine), 42 (4) Die Pharmazie, Govi Verlag Pharmazeutischer Verlag GMBH, Eschborn, DE, 272-73.

William H. Brown, Organic Chemistry 5th Edition, pp. 358-360, 2009.

Wittaya-Areekul and Nail, Freeze-Drying of tert-Butyl Alcohol/Water Cosolvent Systems: Effects of Formulation and Process Variables on Residual Solvents, Journal of Pharmaceutical Sciences 87(4):491-495 (1998).

Written Opinion issued in counterpart PCT/US2013/032289 dated Jun. 6, 2013.

Written Opinion issued in counterpart PCT/US2013/032295 dated Jun. 3, 2013.

Zimmerman et al., Elements of Organic Chemistry (1977).

Zips et al., "New Anticancer Agents: In Vitro and In Vivo Evaluation," In Vivo,vol. 19 pp. 1-8 (2005).

Zumdahl et al., Chemistry, 7th Ed. (2007).

Gandhi & Burger, Bendamustine in B cell malignancies: the new, 46-year old kid on the block, Clin Cancer Res. Dec. 15, 2009; 15(24):7456-7461.

Gibson et al., "Pharmaceutical preformulation and formulation: A practical guide from candidate drug selection to commercial dosage form", Informa Healthcare USA, 2009, vol. 199, 2d ed, pp. 1-559.

Glimelius et al., Bolus-Injection (2-4 min) Versus Short-term (10-20 min) Infusion of 5-Fluorouracil in Patients with Advanced Colorectal Cancer: a Prospective Randomised Trial, Eur J. Cancer, 34, 674-678 (1998).

Gust and Krauser. Investigations on the Stability of Bendamustin, a Cytostatic Agent of the Nitrogen Mustard Type I. Synthesis, Isolation, and Characterization of Reference Substances, in Monatshefte fur Chemie, 128:291-99 (1997).

Heider et al., Efficacy and Toxicity of Bendamustine in Patients with Relapsed Low-Grade non-Hodgkin's Lymphomas, Anticancer Drugs, 12, 725-729 (2001).

HFSA Guidelines, Journal of Cardiac Failure vol. 16 No. 6 (2010).

ICH Harmonised Tripartite Guideline, Stability testing of New Drug Substances and Products Q1A(R2), dated Feb. 6, 2003.

Interlocutory decision in Opposition proceedings of EP 2528602 issued Apr. 8, 2019.

International Conference on Harmonisation in Guideline on Impurities in New Drug Products: Availability, 62 Fed. Reg. 27, 454-27,461 (May 19, 1997).

International Search Report and Written Opinion for No. PCT/US2013/032289 dated Jun. 6, 2013. (5 Pages).

# US 11,872,214 B2

Page 4

## (56)  References Cited

### OTHER PUBLICATIONS

International Search Report and Written Opinion issued in counterpart PCT/US2013/032295 dated Jun. 2013 (4 pages).

International Search Report and Written Opinion of International application based on PCT/US2011/022958, dated Apr. 2011 (8 pages).

Jay S. Trivedi, et al., Water-Insoluble Drug Formulation, 7. Solubilization Using CoSolvent Approach, pp. 141-168, 2000.

Jay S. Trivedi, Water-Insoluble Drug Formulation, Second Edition, 9 Solubilization Using Cosolvent Approach, pp. 161-194, 2008.

JC Price, Handbook of Pharm. Excipients, 5th Edition, Polyethylene Glycol, pp. 545-550, Aug. 9, 2005.

Jerry March, Advanced Organic Chemistry (4th ed.. John Wiley & Sons, Inc. 1992).

John D. Roberts & Marjorie C. Caserio, Basic Principles of Organic Chemistry 612-13, 615-16, 617-18 (W. A. Benjamin, Inc., 2d ed. 1977).

Jonkman-de Vries et al., Pharmaceutical Development of (Investigational) Anticancer Agents for Parental Use—A Review, Drug Dev Ind Pharm. 22(6):475-494 (1996).

Julia A. Barman Balfour, et al., "Bendamustine", Drugs, vol. 61, No. 5, pp. 631-638, 2001.

Kalaycio. M., Clinical Experience With Bendamustine: A New Treatment for Patients With Chronic Lymphocytic Leukemia; Clin Leukemia. 2008; 2(4): 223-229.

Kenneth E. Avis, et al., Remington, Parenteral Preparations, Chapter 41, pp. 780-786, 2000.

Knauf et al., Bendamustine Versus Chlorambucil in Treatment-Naive Patients with B-Cell Chronic Lymphocytic Leukemia (B-CLL): Results of an International Phase III Study, Blood, 110(11), 609a (abstract 2043) (2007).

Koomans et al., Sodium Balance in Renal Failure: A Comparison of Patients with Normal Subjects Under Extremes of Sodium Intake, Hypertension 7:714-721 (1985).

Kurt H. Bauer, et al., Pharmazeutische Technologies, pp. 225-228, HW9, 1993.

Kurt H. Bauer, et al., Pharmazeutische Technologies, pp. 424-425, HW10, 1993.

Larry A. Gatlin, et al., Injectable Drug Development, 17. Formulation and Administration . . . Products, pp. 401-420.

Leonard & Jann, A New Synthesis of Aziridinium Salts. 2,2-Pentamethylene-1,1-tetramethyleneaziridinium Perchlorate A Prototype, 82 J. Am. Chemistry Soc'y 6418-6419 (1960).

Leoni et al., SDX-105 (Bendamustine), a Clinically Active Antineoplastic Agent Possesses a Unique Mechanism of Action, Abstract, 102(11) Blood, Abstract #2363 (Nov. 16, 2003).

Lian-Feng Huang, et al., Water-Insoluble Drug Formulation, Second Edition, Ch. 7. Formulation Strategies and Practice . . . Support, pp. 113-132.

Lissitchkov et al., Phase-I/II study to Evaluate Dose Limiting Toxicity, Maximum Tolerated Dose, and Tolerability of Bendamustine HCl in Pre-treated Patients With B-Chronic Lymphocytic Leukaemia (Binet stages B and C) Requiring Therapy, J. Cancer Res. Clin. Oncol. 132:99-104 (2006).

Liu (ed). Water-Insoluble Drug Formulation, 1st ed., CRC Press, Chapters 7 and 9, 2000.

Liu (ed). Water-Insoluble Drug Formulation, 2nd ed., CRC Press, Chapters 7 and 9, 2008.

Lyondell Tebol(Registered) 99, Tertiary Butyl Alcohol in Freeze-Drying Applications,(Lyondell Chemical Co., 2003).

Lyophilization of Biopharmaceuticals (Henry R. Costantino & Michael K. Pikal eds., Association of Pharmaceutical Scientists 2004).

Maas et al., "Stabilitat von Bendamustinhydrochlorid in Infusionslosungen," Die Pharmazie, Govi Verlag Pharmazeutischer Verlag Gmbh, vol. 49. No. 10 pp. 775-777 (1994). (Abstract Only).

Margolin et al., Shortening the Infusion Time of Anticancer Drugs: Who Will Benefit?, J. of Clinical Oncology, 25(19):2642-2643 (2007).

McGinity, et al., Journal of Pharmaceutical Sciences, Influence of Peroxide Impurities in Polyethylene Glycols . . . , vol. 64, No. 2 pp. 356-357, 1975.

Michael J. Akers, Remington, The Science and Practice of Pharmacy 21st Edition, Parenteral preparation, chapter 41, pp. 802-835, 2005.

Michael P. Gamcsik, et al., NMR Studies of the Conjugation . . . , J. Med. Chem., vol. 33, pp. 1009-1014, 1990.

National Kidney Foundation, "Clinical Practice Guidelines and Clinical Practice Recommendations" (http://kidneyfoundation.cachefly.net/professionals/KDOQI/guideline_upHD_PD_VA/hd_guide5.htm) (2006).

Neelam Seedher, et al., Solubilization of Nimesulide; Use of Cosolvents, Indian J. Pharm. Sci., vol. 65, No. 1, pp. 58-61, 2003.

Nema et al., Excipients and Their Use in Injectable Products, PDA J. Pharma. Sci. & Tech., 51(4):166-171 (Jul.-Aug. 1997).

Ni et al., Stabilization and Preformulation of Anticancer Drug-SarCNU, Int'l J. of Pharma., 249:257-264 (2002).

Ni et al., Use of Pure t-Butanol as a Solvent for Freeze-Drying: A Case Study, Int'l J. of Pharma., 226:39-46 (2001).

Nuijen et al., Pharmaceutical Development of a Parenteral Lyophilized Formulation of the Novel Antitumor Agent Aplidine, PDA J. Pharmaceut. Sci. and Technol. 54(3):193-208 (May-Jun. 2000).

O'Connor, Hydrolysis and Alkylating Reactivity of Aromatic Nitrogen Mustards, J.Chem. Soc. Perkin Trans. 2, 1933-1939(1991).

Orrie M. Friedman, et al., Colorimetric Estimation of Nitrogen . . . , Analytical Chemistry, pp. 906-910.

Ozegowski et al., IMET 3393, ?-[1-Methyl-5-bis-(Beta-chloroethyl)-amino-benzimidazolyl-(2)]-butyric acid hydrochloride, a new cytostatic agent from the benzimidazole mustard gas series, 110 Zbl Pharm. 1013-1019 (1971).

"Draft Note for Guidance on Excipients, Antioxidants and Antimicrobial Preservatives in the Dossier for Application for Marketing Authorisation of Medicinal Product", EMEA, 2003, pp. 1-10.

American Heart Association, "Living With Heart Failure" (https://www.heart.org/idc/groups/heart-public/@wcm/@hcm/@gwtg/documents/downloadable/ucm_309068.pdf) (2001).

American Society of Hospital Pharmacists. ASHP Technical Assistance Bulletin on Hospital Distribution and Control. Am J. Hosp. Pharm. 1980, 37:1097-103.

Armstrong et al., Separation of Drug Stereoisomers by the Formation of . . . beta-Cyclodextrin Inclusion Complexes, Science, vol. 232, pp. 1132-1135, May 30, 1986.

Baldi et al., Statistical Procedures for Optimizing the Freeze-Drying of a Model Drug in Tert-Butyl Alcohol: Water Mixtures, Eur. J. of Pharm. & Biopharm. 40(3):138-41 (1994).

Bergsagel et al., Effect of cyclophosphamide on Advanced Lung Cancer and the Hematological Toxicity of Large, Intermittent Intravenous Doses, Canad. Med. Ass. J., 98, 532-538 (1968).

Bernard Testa et al., Hydrolysis in Drug and Prodrug Metabolism, pp. 681-684.

Biewenga et al. "The Pharmacology of the Antioxidant Lipoic Acid," Gen. Pharmac., 1997, 29, 3, 315-331.

Boylan et al., Parenteral Products, Chapter 12 in Banker, et al., Modern Pharmaceutics, Fourth Ed. (2002).

Brigitte C. Scott, et al., Lipoic and Dihydrolipoic Acids . . . , Free Rad. Res., vol. 20, No. 2, pp. 119-133, 1994.

Broadhead, Pharmaceutical Preformulation and Formulation, Chapter 9 in "Parenteral Dosage Forms," (Interpharm) 2001.

Canadian Society of Hospital Pharmacists: Guidelines for Drug-Use Control, 2008.

Center for Drug Evaluation and Research, Andrew Dmytrijuk, FDA Medical Review for the Approval of Bendeka (2015).

*Cephalon, Inc., et al., v. Slayback Pharma Limited Liability Company*—Civil Action No. 1:17-cv-01154: Joint Status Report (Document 164), dated Oct. 19, 2018.

*Cerhalon, Inc, et al. v. Slayback Pharma Limited Liability Company*—Civil Action No. 1:17-cv-01154: Complaint (Document 1), dated Aug. 16, 2017.

*Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.*—Civil Action No. 1:17-cv-01154: Answer to Slayback Pharma Limited Liability Company's Counterclaims (Document 56), dated Mar. 5, 2018.

**US 11,872,214 B2**

Page 5

(56)                **References Cited**

OTHER PUBLICATIONS

*Cerhalon, Inc., et al.*, v. *Slayback Pharma Limited Liability Company; et al.*—Civil Action No. 1:17-cv-01154: Joint Claim Construction Chart (Document 94), dated Jul. 24, 2018.

*Cerhalon, Inc., et al.*, v. *Slayback Pharma Limited Liability Company; et al.*—Civil Action No. 1:17-cv-1154: Answer to Apotex Inc. and Apotex Corp.'s Counterclaims (Document 22), dated Dec. 18, 2017.

*Cerhalon, Inc., et al.*, v. *Slayback Pharma Limited Liability Company; et al.*—Civil Action No. 1:17-cv-01154: Answer to Slayback Pharma Limited Liability Company's Counterclaims, dated Oct. 20, 2017.

*Cerhalon, Inc., et al.*, v. *Slayback Pharma Limited Liability Company*—Civil Action No. 1:17-cv-00154: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint and Counterclaims (Document 11), dated Sep. 29, 2017.

Charles P. Carpenter, et al., A Study of the Polyethylene Glycols as Vehicles . . . , Journal of the American Pharmaceutical Association, vol. XII, No. 1.

Cheson et al., Bendamustine: Rebirth of an Old Drug, J. Clin. Oncol. 27,1492-1501 (2009).

Cheung et al., Safety and Pharmacokinetics of Bendamustine Rapid-Infusion Formulation, J. of Clinical Pharmacology 2017.00(0)1-11.

Chu et al., Common Chemotherapy Regimens in Clinical Practice, Physicians' Cancer Chemotherapy Drug Manual 2009.

Cyclobond(Registered) Handbook, A Guide to Using Cyclodextrin Bonded Phases for Chiral LC Separations, 6th ed., 2002, Advanced Separation Technologies, Inc., pp. 1-58, pp. 42-45.

Derry E. Wilman, Application of 15N Nuclear Magnetic Resonance . . . , J. Med. Chem., vol. 38, pp. 2256-2258, 1995.

E. Santacesaria, et al., Thermal Stability of Nonionic Polyoxyalkylene . . . , Journal of Applied Polymer Science, vol. 42, pp. 2053-2061, 1991.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01459: Answer to Slayback Pharma LLC's Counterclaims (Document 13), dated Oct. 31, 2018.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01459: Complaint (Document 1), dated Sep. 20, 2018.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01459: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses, and Counterclaims (Document 9), dated Oct. 10, 2018.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Answer to Slayback Pharma LLC's Counterclaims (Document 12), dated Jan. 3, 2019.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Complaint (Document 1), dated Dec. 11, 2018.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses, and Counterclaims(Document 11), public version dated Dec. 20, 2018.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Eagle Pharmaceuticals' Opposition to Slayback Pharma's Motion for Judgment on the Pleadings (Document 23), redacted-public version dated Feb. 12, 2019.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Opening Brief in Support of Slayback Pharma Limited Liability Company's Motion for Judgment on the Pleadings (Document 17), public version dated Jan. 11, 2019.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Reply Brief in Further Support of Slayback Pharma Limited Liability Company's Motion for Judgment on the Pleadings (Document 27), public verison dated Mar. 1, 2019.

*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Exhibit Index—Includes Confidential Information (Document 21), public version dated Sep. 7, 2018.

*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Complaint (Document 1), dated Jul. 19, 2018.

*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Defendant Hospira, Inc's Motion to Dismiss (Document 13), dated Aug. 31, 2018.

*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Hospira's Reply Brief in Support of its Motion to Dismiss Plaintiffs' Complaint (Document 29), public version dated Nov. 26, 2018.

*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Hospira, Inc's Brief in Support of its rule 12(b)(6) Motion to Dismiss Plaintiffs' Complain (Document 20), public version dated Sep. 7, 2018.

*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Plaintiffs' Opposition to Motion to Dismiss (Document 26), redacted-public version dated Nov. 2, 2018.

EC Safety Data Sheet: Ribomustin(Registered) 2007.

Eric Watson, et al., Kinetics of Phosphoramide Mustard . . . , Journal of Pharmaceutical Sciences, vol. 74, No. 12, pp. 1283-1292, 1985.

Eugene C. Corbett, Jr., Intravenous Fluids: It's More Than Just 'Fill 'Er up!', Series #52 Practical Gastroenterology 44-60 (2007).

Excipient—Drug Interactions in Parenteral Formulations', Akers et. al., Journal of Pharmaceutical Sciences, vol. 91, issue 11, pp. 2283-2300, Nov. 2002.

Flamberg et al., Low Temperature Vacuum Drying of Sterile Parenterals From Ethanol, Bulletin of the Parenteral Drug Association, 24(5):209-17 (1970).

Floss et al., Intravenous fluids principles of treatment, Clinical Pharmacist, 3:274-283 (Oct. 2011).

Friedberg et al., Bendamustine in Patients with Rituximab-Refractory Indolent and Transformed Non-Hodgkin's Lymphoma: Results from a Phase II Multicenter, Single-Agent Study, J. Clin. Oncol., 26(2):204-210 (2008).

Fujisawa Deutschland GmbH Ribomustin(Registered) Products and Technical Specifications.

*Cephalon, Inc., et al.,* v. *Slayback Pharma Limited Liability Company, et al.,* Civil Action No. 1:17-cv-01154: Responsive Expert Report of Juergen Siepmann, Ph.D., 525 pages.

*Cephalon, Inc., et al.,* v. *Slayback Pharma Limited Liability Company, et al.,* Civil Action No. 1:17-cv-01154: Opinion, dated Apr. 27, 2020, 70 pages.

* cited by examiner

US 11,872,214 B2

1

# FORMULATIONS OF BENDAMUSTINE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 17/412,623, filed Aug. 26, 2021, which is a continuation of application Ser. No. 16/509,920, filed Jul. 12, 2019, now U.S. Pat. No. 11,103,483, which is a continuation of application Ser. No. 16/015,656, filed Jun. 22, 2018, now abandoned, which is a continuation of application Ser. No. 15/432,335, filed Feb. 14, 2017, now U.S. Pat. No. 10,010, 533, issued Jul. 3, 2018, which is a continuation of application Ser. No. 15/013,436, filed Feb. 2, 2016, now U.S. Pat. No. 9,572,797, issued Feb. 21, 2017, which is a continuation of application Ser. No. 14/031,879, filed Sep. 19, 2013, now U.S. Pat. No. 9,265,831, issued Feb. 23, 2016, which is a continuation of application Ser. No. 13/016,473, filed Jan. 28, 2011, now U.S. Pat. No. 8,609,707, issued Dec. 17, 2013, which claims the benefit of U.S. Provisional Patent Application No. 61/299,100, filed Jan. 28, 2010, the contents of each of which are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

Bendamustine free base is represented by the following structural formula (I)

(I)



Bendamustine is used in the treatment of a number of cancers including leukemias, Hodgkins disease and multiple myelomas. Bendamustine is the active ingredient of the commercial product Treanda™, a lyophilized powder for reconstitution.

Bendamustine exhibits rapid degradation upon reconstitution of the lyophilized product. Bendamustine undergoes hydrolysis by direct substitution rather than an addition elimination process due to the presence of the highly labile aliphatic chlorine atoms. Some of the main degradants of bendamustine are the monohydroxy compound known as HP1 (hydrolysis product 1) and dihydroxy compound HP2 (hydrolysis product 2). The monohydroxy compound appears as the main impurity at Relative Retention Time (RRT) 0.6 and the dihydroxy compound appears as the main impurity at RRT 0.27. Minor peaks appear at RRT 1.2, which are presently unknown.

The stability of bendamustine in water is measured in hours, and is therefore, not suitable for long-term storage in liquid form. The lyophile possesses good chemical stability. However, reconstitution of the lyophile is clinically inconvenient, taking 15-30 mins with implications of chemical instability. There is a need for ready to use (RTU) bendamustine formulations having enhanced stability.

2

## SUMMARY OF THE INVENTION

In other aspects of the invention, the bendamustine-containing compositions include a) a pharmaceutically acceptable fluid which contains one or more of propylene glycol, ethanol, polyethylene glycol, benzyl alcohol and glycofurol, and b) a stabilizing amount of a chloride salt. In other aspects of the invention, the bendamustine-containing compositions include DMSO (dimethyl sulfoxide) as part of the pharmaceutically acceptable fluid included therein. Regardless of the pharmaceutically acceptable fluid included, the amount of bendamustine included in the composition is preferably from about 20 mg/mL to about 60 mg/mL. Still further aspects of the invention include methods of treatment using bendamustine-containing compositions and kits containing the same.

One of the advantages of the inventive liquid compositions is that they have substantially improved long term stability when compared to currently available formulations. For example, the inventive bendamustine compositions are substantially free of impurities after at least about 15 months at a temperature of from about 5° C. to about 25° C. The inventive formulations are advantageously ready to use or ready for further dilution. Reconstitution of lyophilized powders is not required.

## DETAILED DESCRIPTION OF THE INVENTION

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art to which this invention belongs. In the event that there is a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

As used herein, RRT is calculated by dividing the retention time of the peak of interest by the retention time of the main peak. Any peak with an RRT<1 elutes before the main peak, and any peak with an RRT>1 elutes after the main peak.

For purposes of the present invention, "substantially free of impurities" shall be understood to include bendamustine-containing compositions in which the amount of total impurities is less than about 5%, as calculated on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after a period of about 15 months at a temperature of from about 5° C. to about 25° C. The amount of impurities is further calculated as being based upon the original amount bendamustine (or salt thereof) being present in the composition or formulation.

For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.

Preferably, the amount of any individual degradant in the inventive compositions does not exceed 2% PAR as determined by HPLC at a wavelength of 223 nm after storage periods of at least about 15 months at a temperature of from about 5° C. to about 25° C. In some aspects, the amount of time the inventive compositions demonstrate long term storage stability is at least about 18 months and preferably at least about 2 years when stored under the conditions described herein.

US 11,872,214 B2

3

In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions including:

    a) bendamustine or a pharmaceutically acceptable salt thereof; and

    b) a pharmaceutically acceptable fluid including

        i) PEG, PG or mixtures thereof; and

        ii) a stabilizing amount of an antioxidant.

The total impurities in the inventive compositions resulting from the degradation of the bendamustine in the compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of from about 5° C. to about 25° C., and thus have long term stability for at least the same period of time or longer. Preferably, the bendamustine-containing compositions demonstrate long term storage stability for at least about 2 years, especially when stored at the lower (refrigerated) temperatures. In one embodiment, the amount of total impurities in the inventive compositions resulting from the degradation of the bendamustine is less than about 3% PAR as determined by HPLC at a wavelength of 223 nm after at least about 2 years at a temperature of from about 5° C. to about 25° C.

In some aspects of the invention, the bendamustine concentration in the inventive compositions is from about 10 mg/mL to about 100 mg/mL, preferably 20 mg/mL to about 60 mg/mL. Preferably the bendamustine concentration in the inventive compositions is from about 25 mg/mL to about 50 mg/mL, and more preferably from about 30 mg/mL to about 50 mg/mL. It will be understood that compositions containing any useful concentration within the ranges, i.e. 10, 20, 25, 30, 35, 40, 45, 50, 55, 60 . . . 100 are contemplated. In other embodiments, the bendamustine concentration in the composition is about 50 mg/mL. In alternative aspects, the amount of bendamustine is outside these ranges but the amounts will be sufficient for single or multiple administrations of dosages generally regarded as effective amounts.

In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof. Within this aspect, the pharmaceutically acceptable fluid is propylene glycol (PG) or polyethylene glycol (PEG). In other embodiments of the invention however, the pharmaceutically acceptable fluid is a mixture of PEG and PG. For example, the pharmaceutically acceptable fluid can include about 50% PEG and about 50% PG. Alternatively, pharmaceutically acceptable fluid includes about 95% PEG and about 5% PG. The amount of PEG and PG can also be varied within the ranges, i.e. the ratio of PEG:PG in the pharmaceutically acceptable fluid can range from about 95:5 to about 50:50. Within this range, is a pharmaceutically acceptable fluid containing about 75% PEG and about 25% PG, and preferably 80% PEG and 20% PG. In another embodiment, a pharmaceutically acceptable fluid can include about 85% PEG and about 15% PG while another preferred pharmaceutically acceptable fluid includes about 90% PEG and about 10% PG. The molecular weight of the PEG will be within the range of pharmaceutically acceptable weights although PEG 400 is preferred in many aspects of the invention.

Without meaning to be bound by any theory or hypothesis, the hydroxide of the polyethylene glycol molecule is less reactive than the hydroxides of propylene glycol. As a result, the ester forms at a slower rate in polyethylene glycol than propylene glycol and the resulting bendamustine degradants are unexpectedly and substantially reduced over

4

extended periods of time when PEG is a substantial part of the pharmaceutically acceptable fluid.

The bendamustine-containing compositions according to several preferred aspects of the invention include a stabilizing amount of an antioxidant. For purposes of the present invention, "stabilizing amount" shall be understood to include those amounts which increase or enhance the stability of the bendamustine in the compositions described herein. The presence of one or more antioxidants described herein thus contributes, at least in part to the long term stability of the composition. Within this guideline, suitable antioxidant concentrations in the compositions can range from about 2.5 mg/mL to about 35 mg/mL, and preferably from about 5 mg/mL to about 20 mg/mL or from about 10 mg/mL to about 15 mg/mL. In some other embodiments, the concentration of the antioxidant in the bendamustine-containing composition is about 5 mg/mL.

Suitable antioxidants for inclusion include those which are pharmaceutically acceptable for use in human and veterinary formulations although not limited to those currently regarded as safe by any regulatory authority. For example, the antioxidant can be selected from among lipoic acid, thioglycerol (also known as monothioglycerol) and analogs thereof, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds, dihydrolipoic acid and mixtures of the foregoing. Preferably, the antioxidant is thioglycerol, lipoic acid or a mixture thereof. Some particularly preferred embodiments of the invention include thioglycerol.

In view of the foregoing, some preferred long term storage stable bendamustine-containing compositions in accordance with the invention compositions include:

    I. a) bendamustine or a pharmaceutically acceptable salt thereof; and

        b) a pharmaceutically acceptable fluid including

            i) polyethylene glycol and propylene glycol; and

            ii) a stabilizing amount of thioglycerol; or

    II. a) about 50 mg/mL bendamustine or a pharmaceutically acceptable salt thereof; and

        b) a pharmaceutically acceptable fluid including

            i) about 90% PEG and about 10% PG; and

            ii) about 2.5 mg/mL thioglycerol.

Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total impurities, PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

In accordance with other aspects of the invention, there are provided long term storage stable bendamustine-containing compositions, including:

    a) bendamustine or a pharmaceutically acceptable salt thereof;

    b) a pharmaceutically acceptable fluid including one or more of the following: PG, ethanol, PEG, benzyl alcohol and glycofurol; and

    c) a stabilizing amount of a chloride salt.

These compositions also have the low levels of impurities and long term stability mentioned herein. Preferred pharmaceutically acceptable fluids include PG, PEG or ethanol in this embodiment of the invention. Preferably, the PEG is PEG 400. If desired, glycerin and/or 88% (w/w) lactic acid can be added to the pharmaceutically acceptable fluid.

Suitable chloride salts include but are not limited to organic chloride salts, sodium chloride, choline chloride, hydrochloride salts of amino acids and mixtures thereof. Thus, as will be appreciated by those of ordinary skill, one

US 11,872,214 B2

5

can select from among a number of suitable chloride salts and it is Applicants' intention that the scope of the invention includes all such chloride salts that are capable of being included in bendamustine-containing formulations for extended periods without having a deleterious effect on the drug. In one embodiment of the invention, the chloride salt concentration is from about 10 to about 300 mg/mL. In another embodiment, the chloride salt concentration is from about 50 to about 215 mg/mL. In one preferred embodiment, the chloride salt concentration is about 215 mg/mL.

In accordance with another aspect of the invention, there is provided long term storage stable bendamustine-containing compositions, including:

    a) bendamustine or a pharmaceutically acceptable salt thereof; and

    b) a pharmaceutically acceptable fluid including DMSO.

These compositions also have the low levels of impurities and long term stability mentioned herein. In some aspects, the bendamustine concentration in these compositions is from about 10 mg/mL to about 100 mg/mL. Preferably, the bendamustine concentration is from about 20 mg/mL to about 50 mg/mL, more preferably from about 25 mg/mL to about 50 mg/mL. In an alternative embodiment, the bendamustine concentration is about 50 mg/mL.

Another embodiment of the invention provides methods of treating cancer in mammals. The methods include administering to a mammal in need thereof an effective amount of one of the bendamustine-containing compositions described herein. Since the active ingredient portion of the inventive composition is an FDA-approved drug, those of ordinary skill will recognize that the doses of bendamustine employed in this aspect of the invention will be similar to those employed in any treatment regimens designed for bendamustine as marketed under the trade name TRE-ANDA. The patient package insert containing dosing information is incorporated herein by reference. The methods of treatment also include administering the inventive formulations for any purpose or physical condition for which bendamustine has been indicated as being useful.

Another embodiment of the invention includes methods of preparing bendamustine-containing compositions described herein. The methods include reconstituting lyophilized bendamustine in a pharmaceutically acceptable fluid containing one of the following:

    A) i) PEG, PG or mixtures thereof; and

       ii) a stabilizing amount of an antioxidant;

    B) i) one or more of PG, ethanol, PEG, benzyl alcohol and glycofurol; and

       ii) a stabilizing amount of a chloride salt; or

    C) DMSO.

The steps are carried out under pharmaceutically acceptable conditions for sterility and manufacturing.

In a further aspect of the invention, there are provided methods of controlling or preventing the formation of impurities in bendamustine-containing compositions during long term storage. The methods include combining an amount of bendamustine or a pharmaceutically acceptable salt thereof with a sufficient amount of a pharmaceutically acceptable fluid containing one of the following:

    A) i) PEG, PG or mixtures thereof; and

       ii) a stabilizing amount of an antioxidant;

    B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and

       ii) a stabilizing amount of a chloride salt; or

    C) DMSO.

Further optional steps in accordance therewith include transferring one or more pharmaceutically acceptable doses

6

of the formulations into a suitable sealable container and storing the sealed container at a temperature of from about 5° C. to about 25° C. As a result of carrying out these steps, it is possible to control or substantially prevent the formation of impurities which otherwise occur with bendamustine-containing compositions during long term storage so that the artisan is provided with bendamustine-containing formulations having less than about 5% total impurities PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

The compositions of the present invention can be packaged in any suitable sterile vial or container fit for the sterile storage of a pharmaceutical such as bendamustine. Suitable containers can be glass vials, polypropylene or polyethylene vials or other special purpose containers and be of a size sufficient to hold one or more doses of bendamustine.

A further aspect of the invention includes kits containing lyophilized bendamustine or a pharmaceutically acceptable salt thereof in a first container or vial; and, in a second container, a sufficient amount of a pharmaceutically acceptable fluid such as those described herein, i.e. one of the following:

    A) i) PEG, PG or mixtures thereof; and

       ii) a stabilizing amount of an antioxidant;

    B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and

       ii) a stabilizing amount of a chloride salt; or

    C) DMSO.

For purposes of this embodiment, the amount of fluid which is sufficient is an amount which allows the bendamustine to be dissolved or dispersed to a degree which renders the liquid composition ready for use.

As will be appreciated by those of ordinary skill, the kit will contain other pharmaceutically necessary materials for storing and/or administering the drug, including instructions for storage and use, additional diluents, if desired, etc.

EXAMPLES

The following examples serve to provide further appreciation of the invention but are not meant in any way to restrict the effective scope of the invention.

Example 1

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10 mg/ml in one of ethanol, propylene glycol and benzyl alcohol as indicated in Table 1 below. 215 mg/ml of choline chloride was added in half of the samples as a source of soluble chloride ions. The samples were maintained at 40° C. and analyzed periodically for drug content and total impurities. The results obtained are presented in Table 1.

TABLE 1

| Stability of Bendamustine HCl | | | | |
|---|---|---|---|---|
| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
| BDM - 10 mg/mL Choline chloride - 215 mg/mL | | Initial | 10.43 | 0.27 |
| | 40° C. | 48 hrs | 10.48 | 1.27 |
| Ethanol qs to 1 mL | | 7 day | 10.26 | 2.11 |
| BDM - 10 mg/mL | | Initial | 10.55 | 0.27 |
| Ethanol qs to 1 mL | 40° C. | 48 hrs | 10.30 | 2.39 |
| | | 7 day | 9.55 | 6.66 |

US 11,872,214 B2

<table>
<tr><td>7</td><td>8</td></tr>
</table>

TABLE 1-continued

Stability of Bendamustine HCl

| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
|---|---|---|---|---|
| BDM - 10 mg/mL | | Initial | 9.99 | 0.21 |
| Choline chloride - 215 mg/mL | 40° C. | 48 hrs | 9.95 | 0.60 |
| Propylene glycol qs to 1 mL | | 7 day | 9.43 | 2.31 |
| BDM - 10 mg/mL | | Initial | 9.68 | 0.21 |
| Propylene glycol qs to 1 mL | 40° C. | 48 hrs | 9.45 | 0.88 |
| | | 7 day | 9.00 | 3.44 |
| BDM - 10 mg/mL | | Initial | 9.95 | 1.19 |
| Choline Chloride - 215 mg/mL | 40° C. | 48 hrs | 9.89 | 3.51 |
| Benzyl alcohol qs to 1 mL | | 7 day | 8.97 | 4.24 |
| BDM - 10 mg/mL | | Initial | 9.52 | 0.33 |
| Benzyl alcohol qs to 1 mL | 40° C. | 48 hrs | 8.67 | 4.18 |
| | | 7 day | 7.49 | 7.84 |

Note:
In Table 1 the total % impurities include total contributions from peaks at various RRTs.

As shown in Table 1, the bendamustine formulations are very stable in solutions containing solvent and chloride salt. Table 1 shows that bendamustine, when dissolved at a concentration of about 10 mg/mL, in a pharmaceutically acceptable fluid, such as ethanol and propylene glycol, and containing a stabilizing amount of a chloride salt, such as choline chloride, had less than about 5% after at least 7 days storage at 40° C.

The data presented in Table 1 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of a chloride salt having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including ethanol alone exhibited more than 6.5 total degradants after 7 days storage at 40° C. The sample including benzyl alcohol alone exhibited more than 7.5% total degradants after 7 days storage at 40° C. Bendamustine-containing compositions with such high levels of degradation would not be suitable for long-term storage.

Example 2

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10 mg/ml in DMSO. The samples were maintained at 40° C. and analyzed periodically for drug content and impurity profile. The results obtained are presented in Table 2.

TABLE 2

Stability of Bendamustine HCl in DMSO

| Formulation | Temp | Time | Content (mg/mL) | % Total Imp |
|---|---|---|---|---|
| BDM - 10 mg/mL | | Initial | 10.2 | 0.23 |
| DMSO qs to 1 mL | 40° C. | 48 hrs | 9.80 | 0.30 |
| | | 1 week | 10.0 | 0.56 |

Note:
In Table 2 the total % impurities include total contributions from peaks at various RRTs

Table 2 shows that bendamustine, when dissolved in DMSO, had substantially no increase in total degradants. The data presented in Table 2 translates to bendamustine-containing compositions including DMSO having a shelf life of at least about 15 months at 5° C. and 25° C. In fact, such compositions are expected to have long term stability for periods beyond 15 months, i.e. up to 2 years or greater.

Example 3

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 20 mg/ml in polyethylene glycol 400 and 5 mg/ml of lipoic acid was added as a stabilizing antioxidant as indicated in Table 3 below. The samples were maintained at 40° C. or 25° C. and analyzed after 15 days for drug content and impurities. The results obtained are presented in Table 3.

TABLE 3

Stability of Bendamustine (20 mg/ml) in PEG 400 and Antioxidants

| Antioxidant | T ° C. | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid | 25 | 15 | 98.5 | <LD | 0.23 |
| 5 mg/ml | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

As shown in Table 3, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as polyethylene glycol, in the presence of a stabilizing amount of an antioxidant, such as lipoic acid, had substantially no increase in total degradants after a period of 15 days. The data presented in Table 3 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of an antioxidant having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including PEG alone, on the other hand, which did not contain an antioxidant, did not exhibit stabilizing effects at 40° C. This sample had more than 40% more total impurities than the sample including lipoic acid. Bendamustine-containing compositions with such high levels of total impurities would not be suitable for long-term storage.

Example 4

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 5 mg/ml of thioglycerol, α-lipoic acid or dihydro-lipoic acid was added as a stabilizing antioxidant as indicated in Table 4 below. The samples were maintained at 40° C. and analyzed after 15 days or one month for drug content and impurity profile as indicated in Table 4 below. The results obtained are presented in Table 4.

US 11,872,214 B2

9

### TABLE 4

Stability of Bendamustine (50 mg/ml) in 90% PEG 400, 10% Propylene Glycol and Antioxidant

| Antioxidant | T (° C.) | Time | Content (mg/mL) | % Initial | % Impurities RRT HP1 0.59 | PG ester 1.10 | % Total Imps |
|---|---|---|---|---|---|---|---|
| Thioglycerol | 40 | initial | 48.8 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 48.5 | 99.4 | 0.06 | 0.20 | 0.71 |
| α-lipoic acid | 40 | initial | 49 | 100 | <LD | <LD | 0 |
| | 40 | 15 days | 48.8 | 99.6 | 0.19 | 0.13 | 0.32 |
| | 40 | 1 month | 48.7 | 99.4 | 0.34 | 0.26 | 0.79 |

### TABLE 4-continued

Stability of Bendamustine (50 mg/ml) in 90% PEG 400, 10% Propylene Glycol and Antioxidant

| Antioxidant | T (° C.) | Time | Content (mg/mL) | % Initial | % Impurities RRT HP1 0.59 | PG ester 1.10 | % Total Imps |
|---|---|---|---|---|---|---|---|
| Dihydrolipoic acid | 40 | initial | 49.3 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 47.7 | 97.4 | 0.63 | 0.12 | 1.84 |

<LD = Below Level of Detection

As shown in Table 4, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as a combination of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of an antioxidant, such as thioglycerol, α-lipoic acid or dihydrolipoic acid, had substantially no increase in total degradants after a period of 1 month. This data supports the position that bendamustine-containing

10

compositions according to the invention have a shelf life of at least about 2 years when stored at temperatures between 5° C. and 25° C.

### Example 5

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in a mixture of polyethylene glycol 400 and propylene glycol as indicated in Table 5 below. 5 mg/ml of lipoic acid was added as a stabilizing antioxidant. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed after 1 week, 15 days or one month for drug content and impurity profile as indicated in Table 5 below. The results obtained are presented in Table 5.

### TABLE 5

Stability of Bendamustine (50 mg/ml) and Lipoic Acid (5 mg/ml) in PEG400 and Propylene glycol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Area of degradants HP1 0.58 | PG ester 1.10 | PG ester 1.13 | % Total Imp. |
|---|---|---|---|---|---|---|---|---|
| BDM— | | Initial | 49.6 | 100 | BDL | BDL | BDL | 0.18 |
| 50 mg/mL | 40° C. | 1 W | 49.0 | 98.8 | 0.05 | 0.13 | BDL | 0.38 |
| Lipoic acid— | | 15 d | 48.3 | 97.4 | 0.08 | 0.26 | BDL | 0.55 |
| 5 mg/mL | | 1 M | 48.0 | 96.8 | 0.11 | 0.43 | 0.13 | 1.03 |
| PEG | 25° C. | 15 d | 49.6 | 100.0 | BDL | 0.10 | BDL | 0.30 |
| 400:PG | | 1 M | 48.4 | 97.6 | 0.05 | 0.19 | BDL | 0.43 |
| (75:25) qs to 1 mL | 5° C. | 1 M | 49.6 | 100.0 | BDL | 0.07 | BDL | 0.27 |
| BDM— | | Initial | 50.2 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/mL | 40° C. | 1 W | 49.9 | 99.4 | BDL | 0.15 | BDL | 0.30 |
| Lipoic acid— | | 15 d | 49.1 | 97.8 | 0.06 | 0.35 | BDL | 0.73 |
| 5 mg/mL | | 1 M | 49.0 | 97.6 | 0.09 | 0.90 | 0.25 | 1.82 |
| PEG | 25° C. | 15 d | 49.9 | 99.4 | BDL | 0.12 | BDL | 0.32 |
| 400:PG | | 1 M | 49.7 | 99.0 | BDL | 0.25 | BDL | 0.59 |
| (50:50) qs to 1 mL | 5° C. | 1 M | 50.0 | 99.6 | BDL | 0.11 | BDL | 0.33 |
| BDM— | | Initial | 50.8 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/mL | 40° C. | 1 W | 50.4 | 99.2 | BDL | 0.11 | BDL | 0.30 |
| Lipoic acid— | | 15 d | 49.7 | 97.8 | 0.07 | 0.17 | BDL | 0.43 |
| 5 mg/mL | | 1 M | 49.7 | 97.8 | 0.13 | 0.27 | 0.09 | 0.84 |
| PEG | 25° C. | 15 d | 50.8 | 100.0 | BDL | 0.10 | BDL | 0.26 |
| 400:PG | | 1 M | 50.8 | 100.0 | 0.05 | 0.14 | BDL | 0.39 |
| (90:10) qs to 1 mL | 5° C. | 1 M | 50.8 | 100.0 | BDL | 0.06 | BDL | 0.34 |

BDL = Below Detectable Limit

As shown in Table 5, bendamustine, when dissolved in certain mixtures of polyethylene glycol and propylene glycol and a stabilizing amount of lipoic acid, had substantially no increase in total degradants after a period of 1 month. The data presented in Table 5 translates to bendamustine-containing compositions having a shelf life of at least about 2 years when stored at temperatures between 5° C. and at 25° C.

### Example 6

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol and α-lipoic acid was added as a stabilizing antioxidant as indicated in Table 6 below. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed for drug content and impurity profile as indicated in Table 6 below. The results obtained are presented in Table 6.

US 11,872,214 B2

**11**                                                                                     **12**

TABLE 6

Stability of Bendamustine in 90% PEG 400, 10% PG and α-lipoic acid

| Formulation | Temp | Time Per. | Amt. mg/ml | % of Initial | 0.59 | 1.10 | 1.13 | 1.15 | 1.17 | 1.20 | 1.22 | 1.30 | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BDM— | Initial | | 51.0 | 100 | 0.20 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.26 |
| 50 mg/mL | 40° C. | 1 M | 50.5 | 99.0 | 0.21 | 0.31 | 0.13 | 0.07 | 0.13 | 0.10 | <LD | <LD | 0.95 |
| α-lipoic | | 2 M | 49.7 | 97.5 | 0.22 | 0.71 | 0.28 | 0.14 | 0.12 | 0.21 | 0.12 | <LD | 2.02 |
| acid— | | 3 M | 48.7 | 95.5 | 0.22 | 1.01 | 0.45 | 0.21 | 0.14 | 0.37 | 0.16 | 0.05 | 2.96 |
| 10 mg/mL | 25° C. | 3 M | 50.5 | 99.0 | 0.20 | 0.36 | 0.07 | <LD | <LD | 0.10 | <LD | <LD | 0.73 |
| PEG | | 6 M | 50.4 | 98.8 | 0.22 | 0.60 | 0.17 | 0.06 | 0.06 | 0.09 | 0.10 | 0.08 | 1.44 |
| 400:PG | 5° C. | 6 M | 50.9 | 99.8 | 0.16 | 0.05 | <LD | <LD | <LD | <LD | <LD | <LD | 0.21 |
| (90:10) qs | | 12 M | 50.6 | 99.2 | 0.20 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | 0.38 |
| to 1 mL | | | | | | | | | | | | | |
| BDM— | Initial | | 50.3 | 100 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | <LD | 0.18 |
| 50 mg/mL | 40° C. | 1 M | 50.0 | 99.4 | 0.19 | 0.32 | 0.08 | 0.06 | 0.08 | 0.06 | 0.06 | <LD | 0.85 |
| α-lipoic | | 2 M | 49.8 | 99.0 | 0.19 | 0.65 | 0.21 | 0.12 | 0.13 | 0.23 | 0.14 | 0.06 | 1.85 |
| acid— | | 3 M | 49.5 | 98.4 | 0.15 | 0.89 | 0.37 | 0.17 | 0.13 | 0.32 | 0.10 | <LD | 2.40 |
| 15 mg/mL | | 6 M | 47.0 | 93.4 | 0.20 | 1.76 | 0.66 | 0.19 | 0.31 | 0.47 | 0.33 | 0.17 | 4.93 |
| PEG | 25° C. | 3 M | 50.0 | 99.4 | 0.20 | 0.35 | 0.08 | <LD | <LD | 0.11 | <LD | <LD | 0.79 |
| 400:PG | | 6 M | 49.5 | 98.4 | 0.19 | 0.58 | 0.15 | 0.06 | 0.07 | 0.09 | 0.08 | 0.10 | 1.38 |
| (90:10) qs | 5° C. | 6 M | 50.3 | 100 | 0.17 | <LD | <LD | <LD | <LD | <LD | <LD | <LD | 0.23 |
| to 1 mL | | 12 M | 50.2 | 99.8 | 0.19 | 0.15 | <LD | <LD | <LD | <LD | <LD | <LD | 0.34 |

<LD = Below Level of Detection

The data reported in Table 6 along with the data in Table 5 demonstrates that bendamustine solutions are stable when dissolved in mixtures of PEG and PG and 5-15 mg/mL α-lipoic acid. As shown in Table 6, bendamustine, when dissolved in combinations of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of lipoic acid, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6-12 months at 5° C. and 25° C. The data corresponds to bendamustine solutions being stable under

ambient or refrigerated storage conditions for well in excess of 2 years, and thus long term stable.

Example 7

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 2.5 mg/ml of thioglycerol was added as an antioxidizing agent. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table 7 below. The results obtained are presented in Table 7.

TABLE 7

Stability of Bendamustine in 90% PEG 400, 10% PG and Thioglycerol

| Formulation | Temp | Time Per. | Amt mg/ml | % of Initial | 0.15 | 0.37 | 1.10 | 1.13 | 1.15 | 1.17 | 1.18 | 1.20 | 1.22 | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BDM— | Initial | | 50.3 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| 50 mg/ | 40° C. | 15 d | 50.2 | 99.8 | BDL | BDL | 0.18 | BDL | BDL | BDL | BDL | 0.05 | 0.08 | 0.31 |
| Thio | | 1 M | 49.9 | 99.2 | BDL | 0.12 | 0.32 | 0.07 | BDL | BDL | 0.09 | 0.08 | BDL | 0.75 |
| glycerol— | | 2 M | 49.1 | 97.6 | BDL | 0.18 | 0.56 | 0.24 | 0.09 | 0.17 | 0.19 | 0.12 | 0.11 | 1.76 |
| 2.5 mg/mL | | 3 M | 48.8 | 97.0 | BDL | 0.23 | 0.85 | 0.34 | 0.16 | 0.30 | 0.34 | 0.29 | 0.19 | 2.94 |
| PEG | 25° C. | 3 M | 49.9 | 99.2 | 0.06 | 0.12 | 0.23 | 0.07 | BDL | 0.06 | 0.07 | 0.06 | BDL | 0.67 |
| 400:PG | | 6 M | 49.3 | 98.0 | BDL | 0.23 | 0.53 | 0.22 | 0.11 | BDL | 0.21 | 0.22 | 0.20 | 2.07 |
| (90:10) qs | | | | | | | | | | | | | | |
| to 1 mL | | | | | | | | | | | | | | |

BDL = Below Detectable Limit

US 11,872,214 B2

13

The stability is similar to that of α-lipoic acid samples in Example 6 above. As shown in Table 7, bendamustine, when dissolved in a combination of polyethylene glycol and propylene glycol, and a stabilizing amount of thioglycerol, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6 months at 25° C. The data reported supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for about 2 years.

Example 8

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 85% PEG 400 and 15% PG in the presence of 5 mg/ml of thioglycerol. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table 8 below. The results obtained are presented in Table 8.

TABLE 8

Stability of Bendamustine in 85% PEG 400, 15% PG and Thioglycerol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Total Imp. |
|---|---|---|---|---|---|
| BDM - 50 mg/mL | | Initial | 51.5 | 100 | 0.12 |
| Thioglycerol - 5 mg/mL | 40° C. | 1 M | 50.4 | 97.9 | 1.18 |
| PEG 400:PG (85:15) qs | 25° C. | 1 M | 51.4 | 99.8 | 0.41 |
| to 1 mL | | 3 M | 50.4 | 97.9 | 1.21 |
| | 5° C. | 3 M | 51.0 | 99.0 | 0.26 |

The stability is similar to that of thioglycerol samples in Example 7 above. As reported in Table 8, total impurities did not exceed 2% at 40° C. or 25° C. storage over one month, or at 25° C. and 5° C. storage after three months. The data reported in Table 8 supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for at least about 2 years if not longer.

14

We claim:

1. A sterile vial containing a liquid bendamustine-containing composition comprising
   about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 25 mg/mL;
   a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
   a stabilizing amount of an antioxidant,
   wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

2. The sterile vial of claim 1, wherein the antioxidant is monothioglycerol.

3. The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

4. The composition of claim 1, wherein the composition is stable for at least about 15 months at 5° C. or for at least about 15 months at 25° C.

5. The sterile vial of claim 1, wherein the liquid bendamustine-containing composition further comprises ethanol.

6. A liquid bendamustine-containing composition comprising
   100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid;
   wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
   wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 25 mg/mL,
   wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

7. The composition of claim 6, wherein the antioxidant is monothioglycerol.

8. The composition of claim 6, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

9. The composition of claim 6, further comprising ethanol.

* * * * *

# EXHIBIT 3

**USPTO**

**UNITED STATES
PATENT AND TRADEMARK OFFICE**

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC ACKNOWLEDGEMENT RECEIPT

| APPLICATION #<br>**18/081,251** | RECEIPT DATE / TIME<br>**06/14/2023 05:47:24 PM ET** | ATTORNEY DOCKET #<br>**107071.000583** |
|---|---|---|

## Title of Invention

FORMULATIONS OF BENDAMUSTINE

## Application Information

| | | | |
|---|---|---|---|
| APPLICATION TYPE | Utility - Nonprovisional Application under 35 USC 111(a) | PATENT # | - |
| CONFIRMATION # | 8743 | FILED BY | VeAndra Luckett |
| PATENT CENTER # | 62271751 | FILING DATE | 12/14/2022 |
| CUSTOMER # | 23377 | FIRST NAMED INVENTOR | Nagesh R. Palepu |
| CORRESPONDENCE ADDRESS | - | AUTHORIZED BY | Stephanie Lodise |

## Documents

# TOTAL DOCUMENTS: 12

| DOCUMENT | | PAGES | DESCRIPTION | SIZE (KB) |
|---|---|---|---|---|
| 107071.000583 - Response NFOA.pdf | | 9 | - | 162 KB |
| 107071.000583 - Response NFOA-A....pdf | (1-1) | 1 | Amendment/Request for Reconsideration-After Non-Final Rejection | 83 KB |
| 107071.000583 - Response NFOA-CLM.pdf | (2-4) | 3 | Claims | 86 KB |
| 107071.000583 - Response NFOA-REM.pdf | (5-9) | 5 | Applicant Arguments/Remarks Made in an Amendment | 152 KB |
| 107071.000583 Terminal | | 2 | Terminal Disclaimer Filed | 300 KB |

EAGLEBEN-SA_00001847

Disclaimer - Applications.pdf

| 107071.000583 NPL - Siepmann Responsive Expert Report.pdf | 525 | Non Patent Literature | 20735 KB |
| 107071.000583 IDS.pdf | 4 | Information Disclosure Statement (IDS) Form (SB08) | 1029 KB |
| NPL - Opinion_Part1.pdf | 20 | Non Patent Literature | 18225 KB |
| NPL - Opinion_Part2.pdf | 20 | Non Patent Literature | 19226 KB |
| NPL - Opinion_Part3.pdf | 20 | Non Patent Literature | 19815 KB |
| NPL - Opinion_Part4.pdf | 10 | Non Patent Literature | 8900 KB |
| 107071.000583 POA.pdf | 2 | Power of Attorney | 857 KB |
| 107071.000583 Terminal Disclaimer Patents.pdf | 5 | Terminal Disclaimer Filed | 267 KB |

## Digest

| DOCUMENT | MESSAGE DIGEST(SHA-512) |
| --- | --- |
| 107071.000583 - Response NFOA.pdf | D5E84A5C686C3C7AD966185FF62D3BD2140467920EA55E0B5 6E060EAA578A0D0BF8DCE25BA9737DDAB2FAE0BAC378812A FAB08614A27EF17B3EB95EB1A2734FC |
| 107071.000583 - Response NFOA-A....pdf | 43DBF9D13269016B3A93DC3C2D5C0F18A7004F358FBC834EE 914BA471095359A8A482163023F48CD92672999E35402BE12B1 E79689AF5F3D5CAC420672F0BB39 |
| 107071.000583 - Response NFOA-CLM.pdf | B7E75D25E5A43F45287915A806CD1DAE072F1BF8814D5460F 6618D1CB5574C6B508E6D1E83CE616B32F395E28BDED66743 6B8AC64E22CDF362047C45E5B7A53F |

EAGLEBEN-SA_00001848

| 107071.000583 - Response NFOA-REM.pdf | 6DCB163745D9EC4F6D9032A2AF76E8690C5F7C4A97E5C7A9 C7BF62B0C5BA6EB4CF0AAF8CA24C8AEB3B1C9512744ABED D64E4D1E07191218B05ACBC1A8B6C053E |
|---|---|
| 107071.000583 Terminal Disclaimer - Applications.pdf | DBB664C28E2CC2357B162DAD30504D7ED1FF01AB38E677FC 385B3CB9C05B561C2131158476A5844DD0FFDCB4A46185996 ACDA58D4300FCA4B768D0BE173C9DBD |
| 107071.000583 NPL - Siepmann Responsive Expert Report.pdf | A231C9BB0C699D62F012733CA40204061704ADB40248CC7306 31E36B454A7F7209276E4B539BF721FDD642B891EB988D9D3 AB8192232F3653FBC7EA383DBB882 |
| 107071.000583 IDS.pdf | E5C228E494466C0D2420770F4739741248521C7D3E2EA0BB49 375F9C6D56F1EFF6A62E9708846BC9E31E2C174CB72D868A1 E5D159141913AB283711E1AC77002 |
| NPL - Opinion_Part1.pdf | 71BAB33B3E13EA51274D61369808A2BBAD9E8620649180D2C 94F94E3355AE0C2E81349CE3AB1A47E380485A56953663A1CB CFC9D9759F89E09F745173F0FE37E |
| NPL - Opinion_Part2.pdf | 8C79788A307960CFC33A9397FDA39B24A1ED9267A913D971A B41A95A7046F9DF5F9E49E968E943B72549BDCAF64786365D8 9DA3BD498649FC074692AD1CC003E |
| NPL - Opinion_Part3.pdf | 061F7E6168E4CB9B943923FE25A6610ADBBDF1E38CCDD5A3 D7E1D0D1FD49FC3A5CE404E95AAB583B2343D9C94B84A105 2FBDFD1BED9A3519072F794B228B2B78 |
| NPL - Opinion_Part4.pdf | AEDBA9496075F20E089853F861A808ABE80035F39F22F88E65 74A87D77235E2FF95B2D5CD058340DE8BE0653A27FCC327E8 CEE55D403D9D7E8E4699D7D349A12 |
| 107071.000583 POA.pdf | 8AD35F1D8330BE2B91545694FC0DCA92CDA4014D1A3CD742 A06B0D1A6655CDDA0E3120600470AAF1D0EDD0CC244CBEE0 318C8BF6EE72A5BFB4BD1AA0D42496AD |
| 107071.000583 Terminal Disclaimer Patents.pdf | A5A9946C13373BC9968EA1F998FA08CCDB384A88C0DB3F2D 731BB8FC29EC664A41D943F15EF8D3AC85CD5AAC8728DB82 CACF0FD78BB869A36AAA4BF173794EFE |

EAGLEBEN-SA_00001849

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

### New Applications Under 35 U.S.C. 111

If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)–(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application

### National Stage of an International Application under 35 U.S.C. 371

If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

### New International Application Filed with the USPTO as a Receiving Office

If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

EAGLEBEN-SA_00001850

**DOCKET NO.:** 107071.000583                                                **PATENT**
**Application No.:** 18/081,251
**Office Action Dated:  March 14, 2023**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

    **Nagesh R. Palepu et al.**                     **Confirmation No.:  8743**

**Application No.:  18/081,251**                      **Group Art Unit:  1613**

**Filing Date:  December 14, 2022**                  **Examiner:  ERNST V ARNOLD**

For:   **FORMULATIONS OF BENDAMUSTINE**

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

### REPLY PURSUANT TO 37 CFR § 1.111

    In response to the Official Action dated March 14, 2023, reconsideration is respectfully requested in view of the amendments and/or remarks as indicated below:

☐    **Amendments to the Specification** begin on page of this paper.

☐    **Amendments to the Abstract** begin on page of this paper.

☒    **Amendments to the Claims** are reflected in the listing of the claims which begins on page 2 of this paper.

☐    **Amendments to the Drawings** begin on page of this paper and include an attached replacement sheet.

☒    **Remarks** begin on page 5 of this paper.

☒    The Commissioner is hereby authorized to charge any fee deficiency, charge any additional fees, or credit any overpayment of fees, associated with this application in connection with this filing, or any future filing, submitted to the U.S. Patent and Trademark Office during the pendency of this application, to Deposit Account No. 23-3050.

EAGLEBEN-SA_00001270

DOCKET NO.: 107071.000583                                                      **PATENT**
**Application No.:** 18/081,251
**Office Action Dated: March 14, 2023**

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims:**

1.    (Currently Amended) A sterile vial containing a liquid bendamustine-containing composition comprising

      bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL;

      a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

      a stabilizing amount of an antioxidant.

2.    (Original) The sterile vial of claim 1, wherein the composition comprises about 100 mg of bendamustine.

3.    (Original) The sterile vial of claim 1, wherein the bendamustine concentration in the composition is about 25 mg/mL.

4.    (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol.

5.    (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

6.    (Original) The composition of claim 1, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.

7.    (Original) The composition of claim 1, wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

4877-7558-5623.3

EAGLEBEN-SA_00001271

DOCKET NO.: 107071.000583                                        **PATENT**
**Application No.:** 18/081,251
**Office Action Dated: March 14, 2023**

8.      (Original) The sterile vial of claim 1, wherein the liquid bendamustine-containing
        composition further comprises ethanol.

9.      (Cancelled)

10.     (Cancelled)

11.     (Currently Amended) A bendamustine-containing composition comprising
        bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of
                an antioxidant, in a pharmaceutically acceptable fluid;
        wherein the pharmaceutically acceptable fluid ~~comprises~~ <u>consists of</u> polyethylene glycol
                <u>and optionally one or more of propylene glycol, ethanol, benzyl alcohol and</u>
                <u>glycofurol</u>; and
        wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from
                about 20 mg/mL to about 60 mg/mL.

12.     (Original) The composition of claim 11, comprising 100 mg of bendamustine.

13.     (Original) The composition of claim 11, wherein the bendamustine concentration is about
        25 mg/mL.

14.     (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol.

15.     (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol in a
        concentration of about 5 mg/mL.

16.     (Original) The composition of claim 11, wherein the composition is stable for at least
        about 15 months at 5 °C or for at least about 15 months at 25 °C.

4877-7558-5623.3

EAGLEBEN-SA_00001272

**DOCKET NO.:** 107071.000583                                                  **PATENT**
**Application No.:** 18/081,251
**Office Action Dated:  March 14, 2023**

17.    (Original) The composition of claim 11, wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

18.    (Currently Amended) The composition of claim 11, further comprising ethanol.

4877-7558-5623.3

EAGLEBEN-SA_00001273

DOCKET NO.: 107071.000583                                                    PATENT
Application No.: 18/081,251
Office Action Dated: March 14, 2023

## REMARKS

The Examiner alleges that claims 9 and 10 are only accorded a filing date of December 14, 2022 and that "intravenously administering" is not found in the parent applications. Applicant disagrees. Claims 9 and 10 are entitled to priority to U.S. 61/299,200. Nevertheless, in order to advance this application to allowance, claims 9 and 10 are cancelled.

Claims 1 and 11 have been amended and support for the amendments can be found throughout the specification, for example, at paragraph [0006].

No new subject matter has been added.

An Information Disclosure Statement accompanies this response.

## Claim Objections

Claims 10-11 and 16 stand objected to because of the following informalities:

In claims 10 and 11, the numbering of claims is not in accordance with 37 CFR 1.126. There are two claims 10 and two claims 11. The claims have been renumbered to correct this issue.

Claim 16 does not end in a period as required by MPEP 608.01(m). *Office Action*, at 3. A period has been added to claim 16 (now claim 18 after being renumbered).

## Claim Rejections – 35 U.S.C. § 112

Claim 10 stands rejected under 35 U.S.C. § 112(b), second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter. *Office Action*, at 4.

Duplicate claim 10 has been corrected by renumbering it to be claim 12.

Duplicate claim 11 has been corrected by renumbering it to be claim 13.

## Claim Rejections – 35 U.S.C. § 103

Claims 1-3, 6-8, 11-13, and 16-18 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over U.S. Publication No. 2011/0190363 (hereinafter "Drager"). *Office Action*, at 6. Applicant requests reconsideration and withdrawal of the rejection.

The claims are directed to liquid, bendamustine-containing compositions comprising 20 mg/mL to about 60 mg/mL of bendamustine, along with a stabilizing amount of an antioxidant, in polyethylene glycol. Polyethylene glycol is "protic" and has the following general formula:

4877-7558-5623.3

EAGLEBEN-SA_00001274

DOCKET NO.: 107071.000583                                                                    **PATENT**
Application No.: 18/081,251
Office Action Dated: **March 14, 2023**



Drager's composition must comprise a polar "aprotic" solvent, for example, dimethylacetamide, dimethyl sulfoxide, dimethylformamide, or 1-methyl-2-pyrrolidinone. Drager at *e.g.,* paragraphs [0014], [0017]. Drager explains that polar, aprotic solvents are sufficiently non-nucleophilic towards bendamustine such that polar aprotic solvent-bendamustine adducts do not form over the course of typical commercial storage conditions. Drager at paragraph [0015].

Drager teaches that each of its formulations must include some amount of polar aprotic solvent. While Drager references that polar protic solvent may be used, that is only ***in addition to***, ***not instead of***, the polar aprotic solvent. Drager fails to disclose or suggest any bendamustine formulations with solvent systems composed of protic solvent in the absence of any aprotic solvent. Indeed, Drager teaches away from the use of formulations including only polar protic solvent, stating that "while nonaqueous polar protic solvents are of sufficient nucleophilicity to form potentially undesirable polar protic solvent-bendamustine adducts, such adducts will not form during typical commercial storage if the concentration of the polar protic solvent is kept within the scope of the present invention." Drager at paragraph [0019]. Drager's Figure 3 depicts bendamustine degradation in protic solvent (99% propylene glycol) at 5 °C and 25 °C:

4877-7558-5623.3

EAGLEBEN-SA_00001275

DOCKET NO.: 107071.000583                                                                PATENT
Application No.: 18/081,251
Office Action Dated: March 14, 2023

  *See also,* Drager at paragraph [0036], stating "As can be seen in FIG. 3, bendamustine (BM1) in 99% propylene glycol degrades significantly when stored at 25 °C for less than 100 days. After storage at 5 °C for about 365 days, the purity of the bendamustine is about 80% or less."

  Even if the person of ordinary skill in the art were motivated to include a polar protic solvent in a bendamustine formulation, Drager provides no motivation or reason to use polyethylene glycol, specifically. Rather, polyethylene glycol is included – without emphasis or differentiation – in a laundry list of pharmaceutically acceptable nonaqueous polar protic solvents. Polyethylene glycol is not otherwise mentioned in Drager, nor is its use exemplified. The generic list of nonaqueous polar protic ingredients would not have motivated a person of ordinary skill to use polyethylene glycol in a bendamustine formulation. *See, e.g.,* Expert Report of Dr. Siepmann at page 23 *et seq.*[1] *See also, Cephalon, Inc. v. Slayback Pharma Limited Liability Co.,* CA 17-1154-CFC, Opinion (D. Del. April 27, 2020) at 14-15 (court determining that "Drager also taught that protic solvents-i.e., solvents including PEG and PG, that have OH groups-are acceptable to use with bendamustine but only when combined with aprotic solvents."); at 19-20, 21-22 (court determining that Drager teaches away from using polyols such as PEG with bendamustine); at 22-23 (court determining that a person of ordinary skill would have followed Drager's teaching not to use protic solvents such as PEG).

  In order to arrive at any claimed composition, the person of ordinary skill in the art would have had to modify Drager's formulations to remove polar aprotic solvent. This proposed modification would have changed the principle of operation of Drager and a *prima facie* case of obviousness cannot be supported. *See* MPEP 2143(VI). Moreover, even if the person of ordinary skill in the art considered removing Drager's required polar aprotic solvent, they would not have had any reasonable expectation of successfully producing a stable liquid formulation of bendamustine in view of Drager's evidence that bendamustine degrades without the polar aprotic solvent. The claims are patentable over Drager and Applicant requests reconsideration and withdrawal of the rejection.

---

[1] Dr. Siepmann's expert report was submitted in *Cephalon, Inc. v. Slayback Pharma Limited Liability Co.,* C.A. No. 17-01154-CFC (D. Del). Trade secret information has been redacted from the submitted report.

4877-7558-5623.3

EAGLEBEN-SA_00001276

DOCKET NO.: 107071.000583                                                            **PATENT**
Application No.: 18/081,251
Office Action Dated: **March 14, 2023**

Claims 4-5 and 14-15 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Drager in view of WO Publication No. 02/02125 (hereinafter "Tait"). *Office Action*, at 10. As explained above, Drager does not teach or suggest any claimed composition. Tait does not cure Drager's deficiencies, nor is it alleged to. Tait is merely cited for its general description of certain antioxidants. Applicant requests withdrawal of the rejection.

### Claim Rejections – Double Patenting

Claims 1-8 and 11-18 stand rejected for non-statutory double patenting as being unpatentable over claims 1-6 of U.S. Patent No. 9,265,831. *Office Action*, at 17.

Claims 1-18 stand rejected for non-statutory double patenting as being unpatentable over claims 1-27 of U.S. Patent No. 9,572,797. *Office Action*, at 18.

Claims 1-18 stand rejected for non-statutory double patenting as being unpatentable over claims 1-26 of U.S. Patent No. 9,572,796 in view of Tait. *Office Action*, at 21.

Claims 1-18 stand rejected for non-statutory double patenting as being unpatentable over claims 1-22 of U.S. Patent No. 8,609,707. *Office Action*, at 23.

Claims 1-18 stand rejected for non-statutory double patenting as being unpatentable over claims 1-23 of U.S. Patent No. 9,579,384. *Office Action*, at 25.

Claims 1-18 stand rejected for non-statutory double patenting as being unpatentable over claims 1-24 of U.S. Patent No. 9,034,908. *Office Action*, at 27.

Claims 1-18 stand rejected for non-statutory double patenting as being unpatentable over claims 1-17 of U.S. Patent No. 9,597,399 in view of Tait. *Office Action*, at 29.

Claims 1-18 stand rejected for non-statutory double patenting as being unpatentable over claims 1-23 of U.S. Patent No. 9,144,568. *Office Action*, at 31.

Claims 1-16 stand rejected for non-statutory double patenting as being unpatentable over claims 1-29 of U.S. Patent No. 9,572,887. *Office Action*, at 32.

Claims 1-18 stand rejected for non-statutory double patenting as being unpatentable over claims 1-7 of U.S. Patent No. 9,597,397. *Office Action*, at 33.

Claims 1-8 and 11-18 stand rejected for non-statutory double patenting as being unpatentable over claims 1-26 of U.S. Patent No. 10,010,533. *Office Action*, at 35.

4877-7558-5623.3

EAGLEBEN-SA_00001277

DOCKET NO.: 107071.000583                                                                    **PATENT**
**Application No.:** 18/081,251
**Office Action Dated:  March 14, 2023**

Claims 1-18 stand provisionally rejected for non-statutory double patenting as being unpatentable over claims 1-29 of U.S. Application No. 18/081,238. *Office Action*, at 37.

Claims 1-18 stand provisionally rejected for non-statutory double patenting as being unpatentable over claims 1-16 of U.S. Application No. 17/412,623. *Office Action*, at 38.

Claims 1-18 stand rejected for non-statutory double patenting as being unpatentable over claims 1-16 of U.S. Patent No. 11,103,483. *Office Action*, at 39.

Claims 1-18 stand rejected for non-statutory double patenting as being unpatentable over claims 1-9 of U.S. Patent No. 10,052,385. *Office Action*, at 40.

Claims 1-18 stand rejected for non-statutory double patenting as being unpatentable over claims 1-10 of U.S. Patent No. 9,597,398 in view of Tait. *Office Action*, at 42.

Claims 1-18 stand rejected for non-statutory double patenting as being unpatentable over claims 1-18 of U.S. Patent No. 9,572,888 in view of Tait. *Office Action*, at 44.

While not conceding to the propriety of the rejections, terminal disclaimers are filed herewith in order to advance this application to allowance.

## CONCLUSION

Applicant respectfully submits that the present application is in condition for allowance. Reconsideration of the application and an early Notice of Allowance are respectfully requested. In the event the Examiner cannot allow the application for any reason, the Examiner is encouraged to contact Applicant's representative.

Date: June 14, 2023                         /Stephanie A. Lodise/
                                            Stephanie A. Lodise
                                            Registration No. 51430

BakerHostetler
312 Walnut Street
Suite 3200
Cincinnati, OH 45202
Telephone: 513.929.3400
Facsimile:  513.929.0303

4877-7558-5623.3

EAGLEBEN-SA_00001278

# EXHIBIT 4

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/081,251 | 12/14/2022 | Nagesh R. Palepu | 107071.000583 | 8743 |

23377          7590          07/11/2023
BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501

| EXAMINER |
|---|
| ARNOLD, ERNST V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1613 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 07/11/2023 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

eofficemonitor@bakerlaw.com

PTOL-90A (Rev. 04/07)

EAGLEBEN-SA_00001897

| *Office Action Summary* | Application No.<br>18/081,251 | | Applicant(s)<br>Palepu et al. | |
|---|---|---|---|---|
| | Examiner<br>ERNST V ARNOLD | | Art Unit<br>1613 | AIA (FITF) Status<br>No |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --**

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☑ Responsive to communication(s) filed on <u>6/14/23</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a)☑ This action is **FINAL.**        2b)☐ This action is non-final.
3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5)  ☑  Claim(s)  <u>1-8 and 11-16</u> is/are pending in the application.
      5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6)  ☐  Claim(s) _____ is/are allowed.
7)  ☑  Claim(s) <u>1-8 and 11-16</u> is/are rejected.
8)  ☐  Claim(s) _____ is/are objected to.
9)  ☐  Claim(s) _____ are subject to restriction and/or election requirement

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10)☐ The specification is objected to by the Examiner.
11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    **Certified copies:**
       a)☐ All        b)☐ Some**     c)☐ None of the:
       1.☐  Certified copies of the priority documents have been received.
       2.☐  Certified copies of the priority documents have been received in Application No. _____.
       3.☐  Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)
2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.
3) ☐ Interview Summary (PTO-413)  Paper No(s)/Mail Date _____.
4) ☐ Other: _____.

Application/Control Number: 18/081,251                                                    Page 2
Art Unit: 1613

### Notice of Pre-AIA or AIA Status

The present application is being examined under the pre-AIA first to invent

provisions.

### Claim Status

Claims 9 and 10 have been cancelled.

Claims 1-8 and 11-16 are pending. Applicant's amendment has necessitated new

ground of rejection. Accordingly, this Action is FINAL.

### Withdrawn rejections

Applicant's amendments and arguments filed 6/14/23 are acknowledged and

have been fully considered.  The Examiner has re-weighed all the evidence of record.

Any rejection and/or objection not specifically addressed below is herein withdrawn.

Claims 1-3, 6-8, 11-13 and 16-18 were rejected under 35 U.S.C. 103(a) as being

unpatentable over Drager et al. (US 20110190363, of record, with benefit of

PCT/US09/58023 filed September 23, 2009, which claims priority form provisional

61100074 filed September 25, 2008); Claims 4, 5, 14 and 15 were rejected under 35

U.S.C. 103(a) as being unpatentable over Drager et al. (US 20110190363), as applied

to claims 1-3, 6-8, 11-13 and 16-18 above, in further view of Tait et al. (WO 0202125),

of record; Claims 9 and 10 were rejected under 35 U.S.C. 103(a) as being unpatentable

over Drager et al. (US 20110190363 with benefit of PCT/US09/58023 filed September

23, 2009, which claims priority form provisional 61100074 filed September 25, 2008).

EAGLEBEN-SA_00001899

Application/Control Number: 18/081,251                                          Page 3
Art Unit: 1613

Applicant's amendments and arguments are persuasive and the rejections are

withdrawn.

The following rejections and/or objections are either reiterated or newly applied.

They constitute the complete set of rejections and/or objections presently being applied

to the instant application.


### *Terminal Disclaimer*

The terminal disclaimer filed on 6/14/23 disclaiming the terminal portion of any

patent granted on this application which would extend beyond the expiration date of US

Patents:

9,572,797
9,265,831
9,572,888
9,597,398
10,052,385
11,103,483

10,610,533
9,597,397
9,572,796
8,609,707
9,579,384

9,597,399
9,034,908
9,144,568
9,572,887

Application/Control Number: 18/081,251                                      Page 4
Art Unit: 1613

    And applications:

    17412623

    18081238

has been reviewed and is accepted.  The terminal disclaimer has been recorded.

Applicant's citation of MPEP 804.02 is acknowledged. The double patenting rejections

are withdrawn.

### *Claim Rejections - 35 USC § 103*

    In the event the determination of the status of the application as subject to AIA 35

U.S.C. 102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any

correction of the statutory basis for the rejection will not be considered a new ground of

rejection if the prior art relied upon, and the rationale supporting the rejection, would be

the same under either status.

    The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

    (a) A patent may not be obtained though the invention is not identically disclosed
    or described as set forth in section 102 of this title, if the differences between the
    subject matter sought to be patented and the prior art are such that the subject
    matter as a whole would have been obvious at the time the invention was made
    to a person having ordinary skill in the art to which said subject matter pertains.
    Patentability shall not be negatived by the manner in which the invention was
    made.

    The factual inquiries set forth in *Graham* **v.** *John Deere Co.*, 383 U.S. 1, 148

USPQ 459 (1966), that are applied for establishing a background for determining

obviousness under 35 U.S.C. 103(a) are summarized as follows:

Application/Control Number: 18/081,251                                        Page 5
Art Unit: 1613

1. Determining the scope and contents of the prior art.
2. Ascertaining the differences between the prior art and the claims at issue.
3. Resolving the level of ordinary skill in the pertinent art.
4. Considering objective evidence present in the application indicating obviousness or nonobviousness.

Claims 1-3, 8, 11-13 and 16-18 are rejected under 35 U.S.C. 103(a) as being unpatentable over Brittain et al. (US 20060159713); of record.

This application currently names joint inventors. In considering patentability of the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g) prior art under 35 U.S.C. 103(a).

Applicant claims, for example:

1. (Currently Amended) A sterile vial containing a liquid bendamustine-containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL;

a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

a stabilizing amount of an antioxidant.

Application/Control Number: 18/081,251                                    Page 6
Art Unit: 1613

11.     (Currently Amended) A bendamustine-containing composition comprising
        bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of
               an antioxidant, in a pharmaceutically acceptable fluid;
        wherein the pharmaceutically acceptable fluid ~~comprises~~ consists of polyethylene glycol
               and optionally one or more of propylene glycol, ethanol, benzyl alcohol and
               glycofurol; and
        wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from
               about 20 mg/mL to about 60 mg/mL.

Claim interpretation: The MPEP provides, "Claim scope is not limited by claim language that suggests or makes optional but does not require steps to be performed, or by claim language that does not limit a claim to a particular structure." See M.P.E.P § 2111.04; see also M.P.E.P §§ 2103(C) and 2173.05(h).

## Level of Ordinary Skill in the Art
## (MPEP 2141.03)

MPEP 2141.03 (I) states: "The "hypothetical 'person having ordinary skill in the art' to which the claimed subject matter pertains would, of necessity have the capability of understanding the scientific and engineering principles applicable to the pertinent art." *Ex parte Hiyamizu*, 10 USPQ2d 1393, 1394 (Bd. Pat. App. & Inter. 1988). The level of skill is that of a ***medical/pharmaceutical cancer*** research scientist, as is the case here, then one can assume comfortably that such an educated artisan will draw conventional ideas from oncology medicine, oncology pharmacy and chemistry— without being told to do so.

In addition, the prior art itself reflects an appropriate level (MPEP 2141.03(II)).

EAGLEBEN-SA_00001903

## Determination of the scope and content of the prior art

### (MPEP 2141.01)

Regarding claims 1, 2, 8, 11, 12 and 18, Brittain et al. teach a sterile vial containing about 10-500 mg of lyophilized bendamustine powder ([0099]; claims 73-74). Brittain et al. teach reconstitution of the lyophilized formulations with a sterile fluid to provide an appropriate solution of bendamustine for administration [0100]. Brittain et al. teach that the liquid carrier for the ultimate dosage form can be from a limited list of liquid polyethyelene glycol, propylene glycol, ethanol or mixtures thereof [0067], thereby providing an immediately envisaged embodiment with a pharmaceutically acceptable fluid that consists of polyethyelene glycol and optionally one or more of propylene glycol and ethanol.

Regarding claims 1 and 11, Brittain et al. teach adding antioxidants [0088], which implicitly stabilize the composition to oxidation.

## Ascertainment of the difference between the prior art and the claims
### (MPEP 2141.02) and Finding of prima facie obviousness
### Rational and Motivation (MPEP 2142-2143)

The difference between the instant application and Brittain et al. is that Brittain et al. do not expressly teach about 20-60 mg/mL or about 25 mg/mL bendamustine concentration. However, it would have been obvious to one of ordinary skill in the art at the time of the claimed invention to reconstitute the lyophilized bendamustine composition in the sterile vial with a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally propylene glycol or ethanol to a concentration of

Application/Control Number: 18/081,251                                               Page 8
Art Unit: 1613

about 20-60 mg/mL or about 25 mg/mL bendamustine and produce the instant

invention. One of ordinary skill in the art would have been motivated to do this because

it is merely adding an appropriate amount of a pharmaceutically acceptable fluid

consisting of polyethylene glycol and optionally propylene glycol or ethanol to a

concentration of about 20-60 mg/mL or about 25 mg/mL bendamustine prior to

administration. Especially when Brittain et al. teach and suggest that the vials contain

about 10-500 mg bendamustine lyophilized powder [0099] and occupy between 30-50%

of the vial volume and teach 20 mL vials [0151] as well as 50 mL vials [0008].

Accordingly, the ordinary artisan would have a reasonable expectation of success in

adding enough pharmaceutically acceptable fluid consisting of polyethylene glycol and

optionally propylene glycol or ethanol to the sterile vial to obtain a concentration of

about 20-60 mg/mL or about 25 mg/mL bendamustine prior to administration based on

vial size and bendamustine amount. It is a simple dilution and calculation any

pharmaceutical artisan can perform with no inventive skill but rather ordinary skill. See

MPEP 2143: "a person of ordinary skill has good reason to pursue the known options

within his or her technical grasp. If this leads to the anticipated success, it is likely that

product [was] not of innovation but of ordinary skill and common sense. In that instance

the fact that a combination was obvious to try might show that it was obvious under §

103." *KSR*, 550 U.S. at ___, 82 USPQ2d at 1397.

 Regarding claims 6, 7, 16 and 17, since Brittain et al. teach and suggest the

same component in the same amounts as claimed, then the composition of Brittain et

al. will also achieve the same stability and total impurities as claimed. "When the PTO

shows a sound basis for believing that the products of the applicant and the prior art are

Application/Control Number: 18/081,251                                           Page 9
Art Unit: 1613

the same, the applicant has the burden of showing that they are not." *In re Spada,* 911

F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990). Therefore, the *prima facie*

case can be rebutted by evidence showing that the prior art products do not <u>necessarily</u>

possess the characteristics of the claimed product. *In re Best,* 562 F.2d at 1255, 195

USPQ at 433.

In light of the forgoing discussion, the Examiner concludes that the subject matter

defined by the instant claims would have been obvious within the meaning of 35 USC

103(a).

From the combined teachings of the references, it is apparent that one of

ordinary skill in the art would have had a reasonable expectation of success in

producing the claimed invention. Therefore, the invention as a whole was *prima facie*

obvious to one of ordinary skill in the art at the time the invention was made, as

evidenced by the combined references, especially in the absence of evidence to the

contrary.


**Claims 4, 5, 14 and 15** are rejected under 35 U.S.C. 103(a) as being

unpatentable over Brittain et al. (US 20060159713), as applied to claims 1-3, 8, 11-13

and 16-18 above, in further view of Tait et al. (WO 0202125).

Applicant claims, for example:

4.    (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol.

5.    (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a
      concentration of about 5 mg/mL.

EAGLEBEN-SA_00001906

Application/Control Number: 18/081,251                                                    Page 10
Art Unit: 1613

14.    (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol.

15.    (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol in a
       concentration of about 5 mg/mL.

Brittain et al. is discussed in detail above and that discussion is incorporated by
reference.

Regarding claims 4, 5, 14 and 15, Tait et al. teach stabilized injectable
compositions of the alkylating agent ifosfamide (Abstract; page 1, line 7) comprising
PEG200-600, ethanol (page 6, lines 16-24; page 9, lines 15-21; claims 4-6) and
antioxidants such as BHA, BHT and up to 5% monothioglycerol (page 9, lies 11-14;
page 14, line 6) that are stable for at least 180 days (page 6, lines 25-26).

The difference between the instant application and Brittain et al. is that Brittain et
al. do not expressly teach about 5 mg/mL of monothioglycerol antioxidant. This
deficiency in Brittain et al. is cured by the teachings of Tait et al. It would have been
obvious to one of ordinary skill in the art at the time of the claimed invention to add
about 5 mg/mL of monothioglycerol antioxidant to the composition of Brittain et al., as
suggested by Tait et al., produce the instant invention.

One of ordinary skill in the art would have been motivated to do this because as
noted above Brittain et al. suggest adding an antioxidant and name, for example butyl-
hydroxyanisole (BHA) and butyl-hydroxytoluene (BHT). Tait et al. teach the equivalence
of monothioglycerol, BHA and BHT as antioxidants to stabilize alkylating agents and
thus have interchangeable function. "The combination of familiar elements according to
known methods is likely to be obvious when it does no more than yield predictable

EAGLEBEN-SA_00001907

Application/Control Number: 18/081,251                                    Page 11
Art Unit: 1613

results." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007). Moreover, "Where two

known alternatives are interchangeable for a desired function, an express suggestion to

substitute one for the other is not needed to render a substitution obvious." *In re Fout*,

675 F.2d 297, 301 (CCPA 1982). Accordingly, the ordinary artisan would select the

antioxidant monothioglycerol and optimize the amount to about 5 mg/mL to achieve the

desired degree of stability with a reasonable expectation of success especially when

Tait et al. teach using from 0-5%.

In light of the forgoing discussion, the Examiner concludes that the subject matter

defined by the instant claims would have been obvious within the meaning of 35 USC

103(a).

From the combined teachings of the references, it is apparent that one of

ordinary skill in the art would have had a reasonable expectation of success in

producing the claimed invention. Therefore, the invention as a whole was *prima facie*

obvious to one of ordinary skill in the art at the time the invention was made, as

evidenced by the combined references, especially in the absence of evidence to the

contrary.

**Response to Arguments:**

Applicant's arguments are moot in view of the new ground of rejection

necessitated by amendment. In the present case, the scope of the claims is different

from the scope of the claims previously allowed by the Examiner and Brittain et al. is

relevant now that the rejection over Drager et al. has been overcome. The Examiner

has these brief comments concerning the IDS documents filed 6/14/23. Even the

responsive expert report of Juergen Siepmann acknowledged in paragraph 61 that

EAGLEBEN-SA_00001908

Application/Control Number: 18/081,251                                                    Page 12
Art Unit: 1613

Brittain et al. teach and suggest liquid polyethyelene glycol in the ultimate dosage form

from a very limited list of carrier/vehicle solvents. However, in the expert's opinion

stated in paragraph 304, that paragraph [0067] in Brittain would not have caused the

POSA to limit her or his consideration of solvents to PG, PEG and glycerol because the

list of solvents is exemplary, not based on any actual experiments conducted and not

related to shelf-stable liquid bendamustine formulations. However, that is not the test for

obviousness. "In the consideration of references, the question is, could one skilled in the

art with the references before him make the combination of elements here claimed

without exercise of the inventive faculty," *In re Goepfrich*, 136 F.2d 918, 920 (C.C.P.A.

1943). In the Examiner's analysis that answer is yes. All that is required to show

obviousness is that the applicant "make his claimed invention merely by applying

knowledge clearly present in the prior art. Section 103 requires us to presume full

knowledge by the inventor of the *prior* art in the field of his endeavor." *In re*

*Winslow*, 365 F.2d 1017, 1020, 53 C.C.P.A. 1574, 1578 (1966). *Application of Sheckler*,

438 F.2d 999, 1001 (C.C.P.A. 1971). Here, there reference of Brittain et al. guides the

artisan to adding polyethylene glycol, a common conventional pharmaceutical excipient,

to a sterile vial of bendamustine. It does not matter if Brittain et al. did so in an example

or not; the teaching is present. Shelf stability is naturally present in the ultimate dosage

form of Brittain et al. when so reconstituted whether Brittain et al. recognized it or not.

Furthermore, "a formulation intended to be stored for the shelf life of the product",

paragraph 306, is merely intended use of the formulation.

Additionally, the expert argues in paragraph 305 that in their opinion, "paragraph

67 of Brittain 2006 would not have provided the POSA with such a motivation or reason.

Application/Control Number: 18/081,251                                          Page 13
Art Unit: 1613

The teachings of Brittain 2006 that Dr. Pinal cites are entirely focused on lyophilized

bendamustine formulations, not liquid bendamustine formulations." The Examiner does

not agree because Brittain et al. teach and suggest to the ordinary artisan that once you

have the sterile vial with lyophilized bendamustine, in order to make the ultimate dosage

form, polyethyelene glycol with optionally ethanol and/or propylene glycol is added. Just

having a sterile vial of lyophilized bendamustine is of no use because it has to be

reconstituted in order to be administered. Therefore, Brittain et al. does focus on liquid

bendamustine formulations as well as lyophilized ones.


### *Conclusion*

No claims are allowed.

Applicant's amendment necessitated the new ground(s) of rejection presented in

this Office action.  Accordingly, **THIS ACTION IS MADE FINAL**.  See MPEP

§ 706.07(a).  Applicant is reminded of the extension of time policy as set forth in 37

CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action.  In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the date of this final action.

EAGLEBEN-SA_00001910

Application/Control Number: 18/081,251                                          Page 14
Art Unit: 1613

Any inquiry concerning this communication or earlier communications from the examiner should be directed to ERNST V ARNOLD whose telephone number is (571)272-8509. The examiner can normally be reached M-F 7-3:30.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Brian Y Kwon can be reached on 571-272-0581. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of published or unpublished applications may be obtained from Patent Center. Unpublished application information in Patent Center is available to registered users. To file and manage patent submissions in Patent Center, visit: https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-center for more information about Patent Center and https://www.uspto.gov/patents/docx for information about filing in DOCX format. For additional questions, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/ERNST V ARNOLD/
Primary Examiner, Art Unit 1613

# EXHIBIT 5



8460068

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

### UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

*February 16, 2024*

**THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF THE FILE WRAPPER AND CONTENTS OF:**

**APPLICATION NUMBER:** *18/081,251*
**FILING DATE:** *December 14, 2022*
**PATENT NUMBER:** *11872214*
**ISSUE DATE:** *January 16, 2024*



Certified by

*Kathi*

Performing the Functions and Duties of the
Under Secretary of Commerce
for Intellectual Property
and Director of the United States
Patent and Trademark Office

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 47207301 |
| **Application Number:** | 18081251 |
| **International Application Number:** | |
| **Confirmation Number:** | 8743 |
| **Title of Invention:** | FORMULATIONS OF BENDAMUSTINE |
| **First Named Inventor/Applicant Name:** | Nagesh R. Palepu |
| **Customer Number:** | 23377 |
| **Filer:** | Stephanie A. Lodise/VeAndra Luckett |
| **Filer Authorized By:** | Stephanie A. Lodise |
| **Attorney Docket Number:** | 107071.000583 |
| **Receipt Date:** | 14-DEC-2022 |
| **Filing Date:** | |
| **Time Stamp:** | 15:58:30 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | DA |
| Payment was successfully received in RAM | $6160 |
| RAM confirmation Number | E2022BDF58583235 |
| Deposit Account | 233050 |
| Authorized User | VeAndra Luckett |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: ||
| 37 CFR 1.16 (National application filing, search, and examination fees) ||
| 37 CFR 1.17 (Patent application and reexamination processing fees) ||

37 CFR 1.19 (Document supply fees)

37 CFR 1.20 (Post Issuance fees)

37 CFR 1.21 (Miscellaneous fees and charges)

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Track One Request | 107071-583_Certification-RequestforPrioritizedExamination.pdf | 118788 / 0ca059cea2d078e6b0894f5b436906f4bed87f5ca | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 2 | Application Data Sheet | 107071-583_ADS.pdf | 1256830 / 7d87b6755017413562f2c37d7ea298656bd94776 | no | 9 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 3 | | 107071-583_BEND01-US-CON10_application.pdf | 212839 / dc95981115e0b4214742abe7c8edd60073e27f0d | yes | 19 |

| Multipart Description/PDF files in .zip description | | | |
|---|---|---|---|
| Document Description | | Start | End |
| Specification | | 1 | 16 |
| Claims | | 17 | 18 |
| Abstract | | 19 | 19 |

| | | | | | |
|---|---|---|---|---|---|
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 4 | Oath or Declaration filed | 107071-583_Declarations.pdf | 379006 / 647acf26e47b6daed47253a89306af0ac4d59e6c | no | 3 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 5 | Transmittal Letter | 107071-583_ContentofIDS.pdf | 120897 / 7ae3809fe2666018f274297d7dd318c8ed83b52d | no | 1 |

EAGLEBEN-SA_00001154

| | Warnings: | | | | |
|---|---|---|---|---|---|
| | Information: | | | | |
| 6 | Information Disclosure Statement (IDS) Form (SB08) | 107071-583_IDS_1.pdf | 99930<br>8b8119cf68c7e79e7c732f5ca67cfbeba78c2af3 | no | 17 |
| | Warnings: | | | | |
| | Information: | | | | |
| This is not an USPTO supplied IDS fillable form | | | | | |
| 7 | Information Disclosure Statement (IDS) Form (SB08) | 107071-583_IDS_2.pdf | 81904<br>aaf0ca7z9eccf8906f7a1d69ac81bbf9d5d5e380 | no | 8 |
| | Warnings: | | | | |
| | Information: | | | | |
| This is not an USPTO supplied IDS fillable form | | | | | |
| 8 | Information Disclosure Statement (IDS) Form (SB08) | 107071-583_IDS_3.pdf | 80474<br>a5f4133ee7b46f4d4d0b75f3238c5ce7ff44d7cd | no | 8 |
| | Warnings: | | | | |
| | Information: | | | | |
| This is not an USPTO supplied IDS fillable form | | | | | |
| 9 | Information Disclosure Statement (IDS) Form (SB08) | 107071-583_IDS_4.pdf | 73950<br>31519fd4a2c3ffcbc9e45b3238e7d9b00f8c0f | no | 6 |
| | Warnings: | | | | |
| | Information: | | | | |
| This is not an USPTO supplied IDS fillable form | | | | | |
| 10 | Fee Worksheet (SB06) | fee-info.pdf | 50693<br>17ba11b7086129f6ebe9ec3c4be40ee4fd926fc6 | no | 2 |
| | Warnings: | | | | |
| | Information: | | | | |
| | | **Total Files Size (in bytes):** | 2475311 | | |

EAGLEBEN-SA_00001155

# FORMULATIONS OF BENDAMUSTINE

## CROSS-REFERENCE TO RELATED APPLICATIONS

[0001]    This application is a continuation of Application Serial No. 17/412,623, filed August 26, 2021, which is a continuation of Application Serial No. 16/509,920, filed July 12, 2019, now U.S. Patent No. 11,103,483, which is a continuation of Application Serial No. 16/015,656, filed June 22, 2018, now abandoned, which is a continuation of Application Serial No. 15/432,335, filed February 14, 2017, now U.S. Patent No. 10,010,533, issued July 3, 2018, which is a continuation of Application Serial No. 15/013,436, filed February 2, 2016, now U.S. Patent No. 9,572,797, issued February 21, 2017, which is a continuation of Application Serial No. 14/031,879, filed September 19, 2013, now U.S. Patent No. 9,265,831, issued February 23, 2016, which is a continuation of Application Serial No. 13/016,473, filed January 28, 2011, now U.S. Patent No. 8,609,707, issued December 17, 2013, which claims the benefit of U.S. Provisional Patent Application No. 61/299,100, filed January 28, 2010, the contents of each of which are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

[0002]    Bendamustine free base is represented by the following structural formula (I)



(I).

[0003]    Bendamustine is used in the treatment of a number of cancers including leukemias, Hodgkins disease and multiple myelomas.  Bendamustine is the active ingredient of the commercial product Treanda™, a lyophilized powder for reconstitution.

[0004]    Bendamustine exhibits rapid degradation upon reconstitution of the lyophilized product. Bendamustine undergoes hydrolysis by direct substitution rather than an addition elimination process due

EAGLEBEN-SA_00001089

107071.000583

to the presence of the highly labile aliphatic chlorine atoms.  Some of the main degradants of bendamustine are the monohydroxy compound known as HP1 (hydrolysis product 1) and dihydroxy compound HP2 (hydrolysis product 2).  The monohydroxy compound appears as the main impurity at Relative Retention Time (RRT) 0.6 and the dihydroxy compound appears as the main impurity at RRT 0.27.  Minor peaks appear at RRT 1.2, which are presently unknown.

[0005]   The stability of bendamustine in water is measured in hours, and is therefore, not suitable for long-term storage in liquid form.  The lyophile possesses good chemical stability.  However, reconstitution of the lyophile is clinically inconvenient, taking 15 – 30 mins with implications of chemical instability.  There is a need for ready to use (RTU) bendamustine formulations having enhanced stability.

## SUMMARY OF THE INVENTION

[0006]   In other aspects of the invention, the bendamustine-containing compositions include a) a pharmaceutically acceptable fluid which contains one or more of propylene glycol, ethanol, polyethylene glycol, benzyl alcohol and glycofurol, and b) a stabilizing amount of a chloride salt.  In other aspects of the invention, the bendamustine-containing compositions include DMSO (dimethyl sulfoxide) as part of the pharmaceutically acceptable fluid included therein.  Regardless of the pharmaceutically acceptable fluid included, the amount of bendamustine included in the composition is preferably from about 20 mg/mL to about 60 mg/mL.  Still further aspects of the invention include methods of treatment using bendamustine-containing compositions and kits containing the same.

[0007]   One of the advantages of the inventive liquid compositions is that they have substantially improved long term stability when compared to currently available formulations.  For example, the inventive bendamustine compositions are substantially free of impurities after at least about 15 months at a temperature of from about 5 ºC to about 25 ºC.  The inventive formulations are advantageously ready to use or ready for further dilution.  Reconstitution of lyophilized powders is not required.

## DETAILED DESCRIPTION OF THE INVENTION

[0008]   Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art to which this invention belongs.  In the event that there is a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

4858-3672-1988.1

EAGLEBEN-SA_00001090

107071.000583

[0009]    As used herein, RRT is calculated by dividing the retention time of the peak of interest by the retention time of the main peak. Any peak with an RRT <1 elutes before the main peak, and any peak with an RRT >1 elutes after the main peak.

[0010]    For purposes of the present invention, "substantially free of impurities" shall be understood to include bendamustine-containing compositions in which the amount of total impurities is less than about 5%, as calculated on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223nm, after a period of about 15 months at a temperature of from about 5ºC to about 25ºC. The amount of impurities is further calculated as being based upon the original amount bendamustine (or salt thereof) being present in the composition or formulation.

[0011]    For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.

[0012]    Preferably, the amount of any individual degradant in the inventive compositions does not exceed 2% PAR as determined by HPLC at a wavelength of 223nm after storage periods of at least about 15 months at a temperature of from about 5°C to about 25°C. In some aspects, the amount of time the inventive compositions demonstrate long term storage stability is at least about 18 months and preferably at least about 2 years when stored under the conditions described herein.

[0013]    In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions including:

a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including

i) PEG, PG or mixtures thereof; and

ii) a stabilizing amount of an antioxidant.

[0014]    The total impurities in the inventive compositions resulting from the degradation of the bendamustine in the compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223nm after at least about 15 months at a temperature of from about 5 ºC to about 25 ºC, and thus have long term stability for at least the same period of time or longer. Preferably, the bendamustine-containing compositions demonstrate long term storage stability for at least about 2 years, especially when stored at the lower (refrigerated) temperatures. In one embodiment, the amount of total impurities in the inventive compositions resulting from the degradation of the  bendamustine is less than about 3% PAR as determined by HPLC at a wavelength of 223nm after at least about 2 years at a temperature of from about 5 ºC to about 25 ºC.

[0015]    In some aspects of the invention, the bendamustine concentration in the inventive compositions is from about 10 mg/mL to about 100 mg/mL, preferably 20 mg/mL to about 60 mg/mL.

3

EAGLEBEN-SA_00001091

107071.000583

Preferably the bendamustine concentration in the inventive compositions is from about 25 mg/mL to about 50 mg/mL, and more preferably from about 30 mg/mL to about 50 mg/mL. It will be understood that compositions containing any useful concentration within the ranges, i.e. 10, 20, 25, 30, 35, 40, 45, 50, 55, 60 . . . 100 are contemplated. In other embodiments, the bendamustine concentration in the composition is about 50 mg/mL. In alternative aspects, the amount of bendamustine is outside these ranges but the amounts will be sufficient for single or multiple administrations of dosages generally regarded as effective amounts.

[0016]    In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof. Within this aspect, the pharmaceutically acceptable fluid is propylene glycol (PG) or polyethylene glycol (PEG). In other embodiments of the invention however, the pharmaceutically acceptable fluid is a mixture of PEG and PG. For example, the pharmaceutically acceptable fluid can include about 50% PEG and about 50% PG. Alternatively, pharmaceutically acceptable fluid includes about 95% PEG and about 5% PG. The amount of PEG and PG can also be varied within the ranges, i.e. the ratio of PEG:PG in the pharmaceutically acceptable fluid can range from about 95:5 to about 50:50. Within this range, is a pharmaceutically acceptable fluid containing about 75% PEG and about 25% PG, and preferably 80% PEG and 20% PG. In another embodiment, a pharmaceutically acceptable fluid can include about 85% PEG and about 15% PG while another preferred pharmaceutically acceptable fluid includes about 90% PEG and about 10% PG. The molecular weight of the PEG will be within the range of pharmaceutically acceptable weights although PEG 400 is preferred in many aspects of the invention.

[0017]    Without meaning to be bound by any theory or hypothesis, the hydroxide of the polyethylene glycol molecule is less reactive than the hydroxides of propylene glycol. As a result, the ester forms at a slower rate in polyethylene glycol than propylene glycol and the resulting bendamustine degradants are unexpectedly and substantially reduced over extended periods of time when PEG is a substantial part of the pharmaceutically acceptable fluid.

[0018]    The bendamustine-containing compositions according to several preferred aspects of the invention include a stabilizing amount of an antioxidant. For purposes of the present invention, "stabilizing amount" shall be understood to include those amounts which increase or enhance the stability of the bendamustine in the compositions described herein. The presence of one or more antioxidants described herein thus contributes, at least in part to the long term stability of the composition. Within this guideline, suitable antioxidant concentrations in the compositions can range from about 2.5 mg/mL to about 35 mg/mL, and preferably from about 5 mg/mL to about 20 mg/mL or from about 10 mg/mL to about 15 mg/mL. In some other embodiments, the concentration of the antioxidant in the bendamustine-containing composition is about 5 mg/mL.

4

EAGLEBEN-SA_00001092

107071.000583

[0019]    Suitable antioxidants for inclusion include those which are pharmaceutically acceptable for use in human and veterinary formulations although not limited to those currently regarded as safe by any regulatory authority.  For example, the antioxidant can be selected from among lipoic acid, thioglycerol (also known as monothioglycerol) and analogs thereof, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds, dihydrolipoic acid and mixtures of the foregoing.  Preferably, the antioxidant is thioglycerol, lipoic acid or a mixture thereof. Some particularly preferred embodiments of the invention include thioglycerol.

[0020]    In view of the foregoing, some preferred long term storage stable bendamustine-containing compositions in accordance with the invention compositions include:

I.      a)  bendamustine or a pharmaceutically acceptable salt thereof; and

       b)  a pharmaceutically acceptable fluid including

            i)  polyethylene glycol and propylene glycol; and

            ii)  a stabilizing amount of thioglycerol; or

II.     a)  about 50 mg/mL bendamustine or a pharmaceutically acceptable salt thereof; and

       b)  a pharmaceutically acceptable fluid including

            i)  about 90% PEG and about 10% PG; and

            ii)  about 2.5 mg/mL thioglycerol.

[0021]    Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total impurities, PAR as determined by HPLC at a wavelength of 223nm, after at least about 15 months of storage at a temperature of from about 5 °C to about 25 °C.

[0022]    In accordance with other aspects of the invention, there are provided long term storage stable bendamustine-containing compositions, including:

a)  bendamustine or a pharmaceutically acceptable salt thereof;

b)  a pharmaceutically acceptable fluid including one or more of the following: PG, ethanol, PEG, benzyl alcohol and glycofurol; and

c)  a stabilizing amount of a chloride salt.

[0023]    These compositions also have the low levels of impurities and long term stability mentioned herein. Preferred pharmaceutically acceptable fluids include PG, PEG or ethanol in this embodiment of the invention.  Preferably, the PEG is PEG 400.  If desired, glycerin and/or 88% (w/w) lactic acid can be added to the pharmaceutically acceptable fluid.

4858-3672-1988.1

EAGLEBEN-SA_00001093

107071.000583

[0024]    Suitable chloride salts include but are not limited to organic chloride salts, sodium chloride, choline chloride, hydrochloride salts of amino acids and mixtures thereof. Thus, as will be appreciated by those of ordinary skill, one can select from among a number of suitable chloride salts and it is Applicants' intention that the scope of the invention includes all such chloride salts that are capable of being included in bendamustine-containing formulations for extended periods without having a deleterious effect on the drug. In one embodiment of the invention, the chloride salt concentration is from about 10 to about 300 mg/mL. In another embodiment, the chloride salt concentration is from about 50 to about 215 mg/mL. In one preferred embodiment, the chloride salt concentration is about 215 mg/mL.

[0025]    In accordance with another aspect of the invention, there is provided long term storage stable bendamustine-containing compositions, including:

a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including DMSO.

[0026]    These compositions also have the low levels of impurities and long term stability mentioned herein. In some aspects, the bendamustine concentration in these compositions is from about 10 mg/mL to about 100 mg/mL. Preferably, the bendamustine concentration is from about 20 mg/mL to about 50 mg/mL, more preferably from about 25 mg/mL to about 50 mg/mL. In an alternative embodiment, the bendamustine concentration is about 50 mg/mL.

[0027]    Another embodiment of the invention provides methods of treating cancer in mammals. The methods include administering to a mammal in need thereof an effective amount of one of the bendamustine-containing compositions described herein. Since the active ingredient portion of the inventive composition is an FDA-approved drug, those of ordinary skill will recognize that the doses of bendamustine employed in this aspect of the invention will be similar to those employed in any treatment regimens designed for bendamustine as marketed under the trade name TREANDA. The patient package insert containing dosing information is incorporated herein by reference. The methods of treatment also include administering the inventive formulations for any purpose or physical condition for which bendamustine has been indicated as being useful.

[0028]    Another embodiment of the invention includes methods of preparing bendamustine-containing compositions described herein. The methods include reconstituting lyophilized bendamustine in a pharmaceutically acceptable fluid containing one of the following:

A)    i) PEG, PG or mixtures thereof; and

ii) a stabilizing amount of an antioxidant;

B)    i) one or more of PG, ethanol, PEG, benzyl alcohol and glycofurol; and

6

EAGLEBEN-SA_00001094

107071.000583

    ii) a stabilizing amount of a chloride salt; or

C)    DMSO.

[0029]    The steps are carried out under pharmaceutically acceptable conditions for sterility and manufacturing.

[0030]    In a further aspect of the invention, there are provided methods of controlling or preventing the formation of impurities in bendamustine-containing compositions during long term storage. The methods include combining an amount of bendamustine or a pharmaceutically acceptable salt thereof with a sufficient amount of a pharmaceutically acceptable fluid containing one of the following:

    A)    i) PEG, PG or mixtures thereof; and

        ii) a stabilizing amount of an antioxidant;

    B)    i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and

        ii) a stabilizing amount of a chloride salt; or

    C)    DMSO.

[0031]    Further optional steps in accordance therewith include transferring one or more pharmaceutically acceptable doses of the formulations into a suitable sealable container and storing the sealed container at a temperature of from about 5 °C to about 25 °C. As a result of carrying out these steps, it is possible to control or substantially prevent the formation of impurities which otherwise occur with bendamustine-containing compositions during long term storage so that the artisan is provided with bendamustine-containing formulations having less than about 5 % total impurities PAR as determined by HPLC at a wavelength of 223nm, after at least about 15 months of storage at a temperature of from about 5 °C to about 25 °C.

[0032]    The compositions of the present invention can be packaged in any suitable sterile vial or container fit for the sterile storage of a pharmaceutical such as bendamustine. Suitable containers can be glass vials, polypropylene or polyethylene vials or other special purpose containers and be of a size sufficient to hold one or more doses of bendamustine.

[0033]    A further aspect of the invention includes kits containing lyophilized bendamustine or a pharmaceutically acceptable salt thereof in a first container or vial; and, in a second container, a sufficient amount of a pharmaceutically acceptable fluid such as those described herein, i.e. one of the following:

    A)    i) PEG, PG or mixtures thereof; and

        ii) a stabilizing amount of an antioxidant;

    B)    i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and

        ii) a stabilizing amount of a chloride salt; or

4858-3672-1988.1

EAGLEBEN-SA_00001095

107071.000583

C)    DMSO.

[0034]    For purposes of this embodiment, the amount of fluid which is sufficient is an amount which allows the bendamustine to be dissolved or dispersed to a degree which renders the liquid composition ready for use.

[0035]    As will be appreciated by those of ordinary skill, the kit will contain other pharmaceutically necessary materials for storing and/or administering the drug, including instructions for storage and use, additional diluents, if desired, etc.

## EXAMPLES

[0036]    The following examples serve to provide further appreciation of the invention but are not meant in any way to restrict the effective scope of the invention.

## Example 1

[0037]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10mg/ml in one of ethanol, propylene glycol and benzyl alcohol as indicated in Table 1 below.  215 mg/ml of choline chloride was added in half of the samples as a source of soluble chloride ions.  The samples were maintained at 40 ºC and analyzed periodically for drug content and total impurities.  The results obtained are presented in Table 1.

Table 1 – Stability of Bendamustine HCl

| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
|---|---|---|---|---|
| **BDM - 10mg/mL Choline chloride - 215mg/mL Ethanol qs to 1mL** | Initial | | 10.43 | **0.27** |
| | **40°C** | 48 hrs | 10.48 | **1.27** |
| | | 7 day | 10.26 | **2.11** |
| **BDM - 10mg/mL Ethanol qs to 1mL** | Initial | | 10.55 | **0.27** |
| | **40°C** | 48 hrs | 10.30 | **2.39** |
| | | 7 day | 9.55 | **6.66** |
| **BDM - 10mg/mL Choline chloride - 215mg/mL** | Initial | | 9.99 | **0.21** |
| | **40°C** | 48 hrs | 9.95 | **0.60** |

8

EAGLEBEN-SA_00001096

107071.000583

| | | | | |
|---|---|---|---|---|
| Propylene glycol qs to 1mL | | 7 day | 9.43 | **2.31** |
| **BDM - 10mg/mL** **Propylene glycol qs to 1mL** | Initial | | 9.68 | **0.21** |
| | **40°C** | 48 hrs | 9.45 | **0.88** |
| | | 7 day | 9.00 | **3.44** |
| **BDM - 10mg/mL** **Choline Chloride - 215mg/mL** **Benzyl alcohol qs to 1mL** | Initial | | 9.95 | **1.19** |
| | **40°C** | 48 hrs | 9.89 | **3.51** |
| | | 7 day | 8.97 | **4.24** |
| **BDM - 10mg/mL** **Benzyl alcohol qs to 1mL** | Initial | | 9.52 | **0.33** |
| | **40°C** | 48 hrs | 8.67 | **4.18** |
| | | 7 day | 7.49 | **7.84** |

[0038]    Note:  In Table 1 the total % impurities include total contributions from peaks at various RRTs.

[0039]    As shown in Table 1, the bendamustine formulations are very stable in solutions containing solvent and chloride salt.  Table 1 shows that bendamustine, when dissolved at a concentration of about 10 mg/mL, in a pharmaceutically acceptable fluid, such as ethanol and propylene glycol, and containing a stabilizing amount of a chloride salt, such as choline chloride, had less than about 5% after at least 7 days storage at 40 °C.

[0040]    The data presented in Table 1 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of a chloride salt having a shelf life of at least about 15 months at 5 °C and 25 °C.

[0041]    The sample including ethanol alone exhibited more than 6.5 total degradants after 7 days storage at 40 °C.  The sample including benzyl alcohol alone exhibited more than 7.5% total degradants after 7 days storage at 40 °C.  Bendamustine-containing compositions with such high levels of degradation would not be suitable for long-term storage.

## Example 2

[0042]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10mg/ml in DMSO.  The samples were maintained at 40 °C and analyzed periodically for drug content and impurity profile.  The results obtained are presented in Table 2.

4858-3672-1988.1

EAGLEBEN-SA_00001097

107071.000583

Table 2 - Stability of Bendamustine HCl in DMSO

| Formulation | Temp | Time | Content (mg/mL) | % Total Imp |
|---|---|---|---|---|
| BDM - 10mg/mL DMSO qs to 1mL | | Initial | 10.2 | 0.23 |
| | 40°C | 48 hrs | 9.80 | 0.30 |
| | | 1 week | 10.0 | 0.56 |

Note:  In Table 2 the total % impurities include total contributions from peaks at various RRTs.

[0043]    Table 2 shows that bendamustine, when dissolved in DMSO, had substantially no increase in total degradants.  The data presented in Table 2 translates to bendamustine-containing compositions including DMSO having a shelf life of at least about 15 months at 5 ºC and 25 ºC.  In fact, such compositions are expected to have long term stability for periods beyond 15 months, i.e. up to 2 years or greater.

## Example 3

[0044]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 20 mg/ml in polyethylene glycol 400 and 5 mg/ml of lipoic acid was added as a stabilizing antioxidant as indicated in Table 3 below.  The samples were maintained at 40 ºC or 25 ºC and analyzed after 15 days for drug content and impurities.  The results obtained are presented in Table 3.

Table 3: Stability of Bendamustine (20mg/ml) in PEG 400 and Antioxidants

| Antioxidant | T ºC | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
| | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

10

EAGLEBEN-SA_00001098

107071.000583

[0045]    As shown in Table 3, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as polyethylene glycol, in the presence of a stabilizing amount of an antioxidant, such as lipoic acid, had substantially no increase in total degradants after a period of 15 days.  The data presented in Table 3 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of an antioxidant having a shelf life of at least about 15 months at 5 ºC and 25 ºC.

[0046]    The sample including PEG alone, on the other hand, which did not contain an antioxidant, did not exhibit stabilizing effects at 40 ºC.  This sample had more than 40% more total impurities than the sample including lipoic acid.  Bendamustine-containing compositions with such high levels of total impurities would not be suitable for long-term storage.

## Example 4

[0047]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol.  5 mg/ml of thioglycerol, α-lipoic acid or dihydrolipoic acid was added as a stabilizing antioxidant as indicated in Table 4 below.  The samples were maintained at 40 ºC and analyzed after 15 days or one month for drug content and impurity profile as indicated in Table 4 below.  The results obtained are presented in Table 4.

Table 4: Stability of Bendamustine (50mg/ml) in 90% PEG 400,
10% Propylene Glycol and Antioxidant

| Antioxidant | T (ºC) | Time | Content (mg/mL) | % Initial | % Impurities RRT | | % Total Imps |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | HP1 | PG ester | |
| | | | | | 0.59 | 1.10 | |
| Thioglycerol | 40 | initial | 48.8 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 48.5 | 99.4 | 0.06 | 0.20 | 0.71 |
| α-lipoic acid | 40 | initial | 49 | 100 | <LD | <LD | 0 |
| | 40 | 15 days | 48.8 | 99.6 | 0.19 | 0.13 | 0.32 |
| | 40 | 1 month | 48.7 | 99.4 | 0.34 | 0.26 | 0.79 |
| Dihydrolipoic acid | 40 | initial | 49.3 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 47.7 | 97.4 | 0.63 | 0.12 | 1.84 |

11

4858-3672-1988.1

EAGLEBEN-SA_00001099

107071.000583

<LD = Below Level of Detection

[0048]   As shown in Table 4, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as a combination of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of an antioxidant, such as thioglycerol, α-lipoic acid or dihydrolipoic acid, had substantially no increase in total degradants after a period of 1 month. This data supports the position that bendamustine-containing compositions according to the invention have a shelf life of at least about 2 years when stored at temperatures between 5 ºC and 25 ºC.

## Example 5

[0049]   Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in a mixture of polyethylene glycol 400 and propylene glycol as indicated in Table 5 below.  5 mg/ml of lipoic acid was added as a stabilizing antioxidant.  The samples were maintained at 40 ºC, 25 ºC and 5 ºC and analyzed after 1 week, 15 days or one month for drug content and impurity profile as indicated in Table 5 below.  The results obtained are presented in Table 5.

Table 5: Stability of Bendamustine (50 mg/ml) and Lipoic Acid (5 mg/ml) in PEG400 and Propylene glycol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | %Area of degradants | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|
| | | | | | HP1 0.58 | PG ester 1.10 | PG ester 1.13 | |
| BDM - 50mg/mL Lipoic acid - 5mg/mL PEG 400:PG (75:25) qs to 1mL | Initial | | 49.6 | 100 | BDL | BDL | BDL | 0.18 |
| | 40 ºC | 1 W | 49.0 | 98.8 | 0.05 | 0.13 | BDL | 0.38 |
| | | 15 d | 48.3 | 97.4 | 0.08 | 0.26 | BDL | 0.55 |
| | | 1 M | 48.0 | 96.8 | 0.11 | 0.43 | 0.13 | 1.03 |
| | 25°C | 15 d | 49.6 | 100.0 | BDL | 0.10 | BDL | 0.30 |
| | | 1 M | 48.4 | 97.6 | 0.05 | 0.19 | BDL | 0.43 |
| | 5°C | 1 M | 49.6 | 100.0 | BDL | 0.07 | BDL | 0.27 |
| BDM - 50mg/mL Lipoic acid - 5mg/mL PEG 400:PG (50:50) qs to 1mL | Initial | | 50.2 | 100 | BDL | BDL | BDL | 0.21 |
| | 40 ºC | 1 W | 49.9 | 99.4 | BDL | 0.15 | BDL | 0.30 |
| | | 15 d | 49.1 | 97.8 | 0.06 | 0.35 | BDL | 0.73 |
| | | 1 M | 49.0 | 97.6 | 0.09 | 0.90 | 0.25 | 1.82 |
| | 25°C | 15 d | 49.9 | 99.4 | BDL | 0.12 | BDL | 0.32 |
| | | 1 M | 49.7 | 99.0 | BDL | 0.25 | BDL | 0.59 |
| | 5°C | 1 M | 50.0 | 99.6 | BDL | 0.11 | BDL | 0.33 |
| BDM - 50mg/mL | Initial | | 50.8 | 100 | BDL | BDL | BDL | 0.21 |
| | 40 ºC | 1 W | 50.4 | 99.2 | BDL | 0.11 | BDL | 0.30 |

12

EAGLEBEN-SA_00001100

107071.000583

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Lipoic acid - 5mg/mL PEG 400:PG (90:10) qs to 1mL | | 15 d | 49.7 | 97.8 | 0.07 | 0.17 | BDL | 0.43 |
| | | 1 M | 49.7 | 97.8 | 0.13 | 0.27 | 0.09 | 0.84 |
| | 25°C | 15 d | 50.8 | 100.0 | BDL | 0.10 | BDL | 0.26 |
| | | 1 M | 50.8 | 100.0 | 0.05 | 0.14 | BDL | 0.39 |
| | 5°C | 1 M | 50.8 | 100.0 | BDL | 0.06 | BDL | 0.34 |

BDL = Below Detectable Limit

[0050]    As shown in Table 5, bendamustine, when dissolved in certain mixtures of polyethylene glycol and propylene glycol and a stabilizing amount of lipoic acid, had substantially no increase in total degradants after a period of 1 month.  The data presented in Table 5 translates to bendamustine-containing compositions having a shelf life of at least about 2 years when stored at temperatures between 5 ºC and at 25 ºC.

## Example 6

[0051]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol and α-lipoic acid was added as a stabilizing antioxidant as indicated in Table 6 below.  The samples were maintained at 40 ºC, 25 ºC and 5 ºC and analyzed for drug content and impurity profile as indicated in Table 6 below.  The results obtained are presented in Table 6.

Table 6: Stability of Bendamustine in 90% PEG 400, 10% PG and α-lipoic acid

| Formu-lation | Temp | Time Per. | Amt. mg/ml | % of Ini-tial | %Area of degradants | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0.59 | 1.10 | 1.13 | 1.15 | 1.17 | 1.20 | 1.22 | 1.30 | |
| BDM - 50mg/mL α-lipoic acid - 10mg/mL PEG 400:PG (90:10) qs to 1mL | Initial | | 51.0 | 100 | 0.20 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.26 |
| | 40°C | 1 M | 50.5 | 99.0 | 0.21 | 0.31 | 0.13 | 0.07 | 0.13 | 0.10 | <LD | <LD | 0.95 |
| | | 2 M | 49.7 | 97.5 | 0.22 | 0.71 | 0.28 | 0.14 | 0.12 | 0.21 | 0.12 | <LD | 2.02 |
| | | 3 M | 48.7 | 95.5 | 0.22 | 1.01 | 0.45 | 0.21 | 0.14 | 0.37 | 0.16 | 0.05 | 2.96 |
| | 25°C | 3 M | 50.5 | 99.0 | 0.20 | 0.36 | 0.07 | <LD | <LD | 0.10 | <LD | <LD | 0.73 |
| | | 6 M | 50.4 | 98.8 | 0.22 | 0.60 | 0.17 | 0.06 | 0.06 | 0.09 | 0.10 | 0.08 | 1.44 |
| | 5°C | 6 M | 50.9 | 99.8 | 0.16 | 0.05 | <LD | <LD | <LD | <LD | <LD | <LD | 0.21 |
| | | 12 M | 50.6 | 99.2 | 0.20 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | 0.38 |

13

EAGLEBEN-SA_00001101

107071.000583

| Formulation | Temp | Time Per. | Amt mg/mL | % Initial | | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BDM - 50mg/mL α-lipoic acid - 15mg/mL PEG 400:PG (90:10) qs to 1mL | Initial | | 50.3 | 100 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | <LD | 0.18 |
| | 40°C | 1 M | 50.0 | 99.4 | 0.19 | 0.32 | 0.08 | 0.06 | 0.08 | 0.06 | 0.06 | <LD | 0.85 |
| | | 2 M | 49.8 | 99.0 | 0.19 | 0.65 | 0.21 | 0.12 | 0.13 | 0.23 | 0.14 | 0.06 | 1.85 |
| | | 3 M | 49.5 | 98.4 | 0.15 | 0.89 | 0.37 | 0.17 | 0.13 | 0.32 | 0.10 | <LD | 2.40 |
| | | 6 M | 47.0 | 93.4 | 0.20 | 1.76 | 0.66 | 0.19 | 0.31 | 0.47 | 0.33 | 0.17 | 4.93 |
| | 25°C | 3 M | 50.0 | 99.4 | 0.20 | 0.35 | 0.08 | <LD | <LD | <LD | 0.11 | <LD | 0.79 |
| | | 6 M | 49.5 | 98.4 | 0.19 | 0.58 | 0.15 | 0.06 | 0.07 | 0.09 | 0.08 | 0.10 | 1.38 |
| | 5°C | 6 M | 50.3 | 100 | 0.17 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.23 |
| | | 12 M | 50.2 | 99.8 | 0.19 | 0.15 | <LD | <LD | <LD | <LD | <LD | <LD | 0.34 |

<LD = Below Level of Detection

[0052]    The data reported in Table 6 along with the data in Table 5 demonstrates that bendamustine solutions are stable when dissolved in mixtures of PEG and PG and 5-15mg/mL α-lipoic acid.  As shown in Table 6, bendamustine, when dissolved in combinations of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of lipoic acid, had less than 3% increase in total degradants after a period of 3 months at 40 ºC.  Additionally, the same compounds had substantially no increase in total degradants after a period of 6-12 months at 5 ºC and 25 ºC.  The data corresponds to bendamustine solutions being stable under ambient or refrigerated storage conditions for well in excess of 2 years, and thus long term stable.

## Example 7

[0053]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol.  2.5 mg/ml of thioglycerol was added as an antioxidizing agent.  The samples were maintained at 40 ºC and 25 ºC and analyzed for drug content and impurity profile as indicated in Table7 below.  The results obtained are presented in Table 7.

Table 7: Stability of Bendamustine in 90% PEG 400, 10% PG and Thioglycerol

| Formu-lation | Temp | Time Per. | Amt mg/ml | % of Ini-tial | RRTs of degradants | | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0.15 | 0.37 | 1.10 | 1.13 | 1.15 | 1.17 | 1.18 | 1.20 | 1.22 | |

14

4858-3672-1988.1

4858-3672-1988.1

EAGLEBEN-SA_00001102

107071.000583

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Initial | | 50.3 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| BDM - 50mg/mL Thio glycerol - 2.5mg/mL PEG 400:PG (90:10) qs to 1mL | 40°C | 15 d | 50.2 | 99.8 | BDL | BDL | 0.18 | BDL | BDL | BDL | 0.05 | 0.08 | BDL | 0.31 |
| | | 1 M | 49.9 | 99.2 | BDL | 0.12 | 0.32 | 0.07 | BDL | BDL | 0.09 | 0.08 | BDL | 0.75 |
| | | 2 M | 49.1 | 97.6 | BDL | 0.18 | 0.56 | 0.24 | 0.09 | 0.17 | 0.19 | 0.12 | 0.11 | 1.76 |
| | | 3 M | 48.8 | 97.0 | BDL | 0.23 | 0.85 | 0.34 | 0.16 | 0.30 | 0.34 | 0.29 | 0.19 | 2.94 |
| | 25°C | 3 M | 49.9 | 99.2 | 0.06 | 0.12 | 0.23 | 0.07 | BDL | 0.06 | 0.07 | 0.06 | BDL | 0.67 |
| | | 6 M | 49.3 | 98.0 | BDL | 0.23 | 0.53 | 0.22 | 0.11 | BDL | 0.21 | 0.22 | 0.20 | 2.07 |

BDL = Below Detectable Limit

[0054]    The stability is similar to that of α-lipoic acid samples in Example 6 above.  As shown in Table 7, bendamustine, when dissolved in a combination of polyethylene glycol and propylene glycol, and a stabilizing amount of thioglycerol, had less than 3% increase in total degradants after a period of 3 months at 40 ºC.  Additionally, the same compounds had substantially no increase in total degradants after a period of 6 months at 25 ºC.  The data reported supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for about 2 years.

### Example 8

[0055]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 85% PEG 400 and 15% PG in the presence of 5 mg/ml of thioglycerol. The samples were maintained at 40 ºC and 25 ºC and analyzed for drug content and impurity profile as indicated in Table 8 below.  The results obtained are presented in Table 8.

Table 8: Stability of Bendamustine in 85% PEG 400, 15% PG and Thioglycerol

| Formulation | Temp. | | Time Period | Content (mg/mL) | % of Initial | % Total Imp. |
|---|---|---|---|---|---|---|
| BDM - 50mg/mL Thioglycerol - 5mg/mL PEG 400:PG (85:15) qs to 1mL | Initial | | | 51.5 | 100 | 0.12 |
| | 40°C | | 1 M | 50.4 | 97.9 | 1.18 |
| | 25°C | | 1 M | 51.4 | 99.8 | 0.41 |
| | | | 3 M | 50.4 | 97.9 | 1.21 |
| | 5°C | | 3 M | 51.0 | 99.0 | 0.26 |

15

EAGLEBEN-SA_00001103

107071.000583

[0056]    The stability is similar to that of thioglycerol samples in Example 7 above.  As reported in Table 8, total impurities did not exceed 2% at 40 ºC or 25°C storage over one month, or at 25 ºC and 5 ºC storage after three months.  The data reported in Table 8 supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for at least about 2 years if not longer.

4858-3672-1988.1

EAGLEBEN-SA_00001104

107071.000583

# CLAIMS

We claim:

1.    A sterile vial containing a liquid bendamustine-containing composition comprising bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL; polyethylene glycol; and a stabilizing amount of an antioxidant.

2.    The sterile vial of claim 1, wherein the composition comprises about 100 mg of bendamustine.

3.    The sterile vial of claim 1, wherein the bendamustine concentration in the composition is about 25 mg/mL.

4.    The sterile vial of claim 1, wherein the antioxidant is monothioglycerol.

5.    The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

6.    The composition of claim 1, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.

7.    The composition of claim 1, wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

8.    The sterile vial of claim 1, wherein the liquid bendamustine-containing composition further comprises ethanol.

9.    A method of treating leukemia in a human in need thereof comprising providing a sterile vial comprising liquid bendamustine-containing composition comprising about 25 mg/ml of bendamustine; diluting the liquid bendamustine containing composition; and

17

EAGLEBEN-SA_00001105

107071.000583

intravenously administering the diluted composition to the human.

10.    The method of claim 9, wherein the liquid bendamustine containing composition is diluted with about 50 mL of a diluent.

11.    A bendamustine-containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid;

wherein the pharmaceutically acceptable fluid comprises polyethylene glycol; and

wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 20 mg/mL to about 60 mg/mL.

10.    The composition of claim 11, comprising 100 mg of bendamustine.

11.    The composition of claim 11, wherein the bendamustine concentration is about 25 mg/mL.

12.    The composition of claim 11, wherein the antioxidant is monothioglycerol.

13.    The composition of claim 11, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

14.    The composition of claim 11, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.

15.    The composition of claim 11, wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

16.    The composition of claim 11, further comprising ethanol

4858-3672-1988.1

EAGLEBEN-SA_00001106

107071.000583

**ABSTRACT**

Long term storage stable bendamustine-containing compositions are disclosed.  The compositions can include bendamustine or a pharmaceutically acceptable salt thereof, and a pharmaceutically acceptable fluid which can include in some embodiments PEG, PG or mixtures thereof and an antioxidant or chloride ion source. The bendamustine-containing compositions have less than about 5% total impurities, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223nm, after at least about 15 months of storage at a temperature of from about 5 °C to about 25 °C.

4858-3672-1988.1

EAGLEBEN-SA_00001107

# EXHIBIT 6

**USPTO**

**UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC ACKNOWLEDGEMENT RECEIPT

| APPLICATION # | RECEIPT DATE / TIME | ATTORNEY DOCKET # |
|---|---|---|
| **18/081,251** | **11/08/2023 08:41:38 AM Z ET** | **107071.000583** |

## Title of Invention

FORMULATIONS OF BENDAMUSTINE

## Application Information

| APPLICATION TYPE | Utility - Nonprovisional Application under 35 USC 111(a) | PATENT # | - |
|---|---|---|---|
| CONFIRMATION # | 8743 | FILED BY | VeAndra Luckett |
| PATENT CENTER # | 63189179 | FILING DATE | 12/14/2022 |
| CUSTOMER # | 23377 | FIRST NAMED INVENTOR | Nagesh R. Palepu |
| CORRESPONDENCE ADDRESS | - | AUTHORIZED BY | Scott Conley |

## Documents

# TOTAL DOCUMENTS: 3

| DOCUMENT | PAGES | DESCRIPTION | SIZE (KB) |
|---|---|---|---|
| 107071.000583 Response NFOA 8-21-2023.pdf | | 15 | - | 497 KB |
| 107071.000583 Response NFOA 8-21-2023-A....pdf | (1-1) | 1 | Amendment/Request for Reconsideration-After Non-Final Rejection | 86 KB |
| 107071.000583 Response NFOA 8-21-2023-CLM.pdf | (2-3) | 2 | Claims | 87 KB |
| 107071.000583 Response NFOA 8-21-2023-REM.pdf | (4-15) | 12 | Applicant Arguments/Remarks Made in an Amendment | 488 KB |

EAGLEBEN-SA_00002064

## Digest

| DOCUMENT | MESSAGE DIGEST(SHA-512) |
| --- | --- |
| 107071.000583 Response NFOA 8-21-2023.pdf | 689F9BFF257EC8E3EEA6A40DF756E71DD6DE2E7DC2EE3B53 0EE9D9E8989607B97AB765A81627CD8C405484F69A1747A60D 531E1A396A8664FDC5EE42646B93EB |
| 107071.000583 Response NFOA 8-21-2023-A....pdf | 52223F432B7CF6A83F26C97B12267511BD932761900685E6AF 3ABFDA37CDD190C2AED0F775816B8AE70FFDF1DCBA2BAD8 7A3881F2DBCD87EF0B451FC9D5DDF36 |
| 107071.000583 Response NFOA 8-21-2023-CLM.pdf | F4A05C2EBC7B34FDF30358AC4D7BD92664B1A2A28D921672F A0F461CC96E0B0C3FA94F9DFF7A910BFF019AD977D49C0FC A0C428C212833FA7AD9B324778AD169 |
| 107071.000583 Response NFOA 8-21-2023-REM.pdf | A0DD63E5FBD815BFF02EE56247E73085ADD16082BB5787672 14794A1817C41B3BF64150E97F3E96C3714296DC777BD1DD5 889A0DB0A8890635A67E4F7AC37DC8 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**

If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application

**National Stage of an International Application under 35 U.S.C. 371**

If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**

If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

EAGLEBEN-SA_00002065

**DOCKET NO.:** 107071.000583                                                    **PATENT**
**Application No.:** 18/081,251
**Office Action Dated:  August 21, 2023**

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

    **Nagesh R. Palepu et al.**           **Confirmation No.:  8743**

**Application No.:  18/081,251**                **Group Art Unit:  1613**

**Filing Date:  December 14, 2022**            **Examiner:  ERNST V ARNOLD**

For:    **FORMULATIONS OF BENDAMUSTINE**

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

### REPLY PURSUANT TO 37 CFR § 1.111

In response to the Official Action dated August 21, 2023, reconsideration is respectfully requested in view of the amendments and/or remarks as indicated below:

    ☐    **Amendments to the Specification** begin on page of this paper.

    ☐    **Amendments to the Abstract** begin on page of this paper.

    ☒    **Amendments to the Claims** are reflected in the listing of the claims which begins on page 2 of this paper.

    ☐    **Amendments to the Drawings** begin on page of this paper and include an attached replacement sheet.

    ☒    **Remarks** begin on page 4 of this paper.

    ☒    The Commissioner is hereby authorized to charge any fee deficiency, charge any additional fees, or credit any overpayment of fees, associated with this application in connection with this filing, or any future filing, submitted to the U.S. Patent and Trademark Office during the pendency of this application, to Deposit Account No. 23-3050.

EAGLEBEN-SA_00002066

DOCKET NO.: 107071.000583                                                                PATENT
Application No.: 18/081,251
Office Action Dated: August 21, 2023

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims:**

1.    (Currently Amended) A sterile vial containing a liquid bendamustine-containing composition comprising

about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 25 mg/mL ~~20 mg/mL to about 60 mg/mL~~;

a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

a stabilizing amount of an antioxidant,

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

2-3.    (Cancelled)

4.    (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol.

5.    (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

6.    (Original) The composition of claim 1, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.

7.    (cancelled)

8.    (Original) The sterile vial of claim 1, wherein the liquid bendamustine-containing composition further comprises ethanol.

9-10.    (Cancelled)

4894-0848-0634.1

EAGLEBEN-SA_00002067

DOCKET NO.: 107071.000583                                                     **PATENT**
Application No.: 18/081,251
Office Action Dated: August 21, 2023

11.     (Currently Amended) A liquid bendamustine-containing composition comprising
        <u>100 mg of</u> bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing
                amount of an antioxidant, in a pharmaceutically acceptable fluid;
        wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and
                optionally one or more of propylene glycol, ethanol, benzyl alcohol and
                glycofurol; and
        wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from
                about 25 mg/mL ~~20 mg/mL to about 60 mg/mL~~,
        wherein the total impurities resulting from the degradation of the bendamustine is less
                than about 5% peak area response, as determined by HPLC at a wavelength of 223
                nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

12-13.  (Cancelled)

14.     (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol.

15.     (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol in a
        concentration of about 5 mg/mL.

16-17.  (cancelled)

18.     (Previously Presented) The composition of claim 11, further comprising ethanol.

4894-0848-0634.1

EAGLEBEN-SA_00002068

DOCKET NO.: 107071.000583                                              PATENT
Application No.: 18/081,251
Office Action Dated: August 21, 2023

## REMARKS

Claim 1 has been amended to include subject matter of claims 2 and 3, now cancelled. Claim 11 has been amended to include subject matter of claims 12 and 13. No new matter has been added. Applicant reserves the right to file the cancelled claims in one or more continuing applications.

### Claim Rejections – 35 U.S.C. § 103

The Examiner alleges that claims 1-3, 6, 8, 11-13 and 18 would have been obvious over Brittain[1] in view of Kumar,[2] McGinity,[3] and Wasylaschuk.[4] Without the benefit of Applicant's specification, those of ordinary skill in the art would not have produced a composition including ~100 mg of bendamustine (or a salt thereof) at a concentration of ~25 mg/mL, along with an antioxidant and any of the recited fluids, nor would they have considered containing such a composition is a sterile vial, as claimed. Moreover, the person of ordinary skill in the art would not have predicted that any recited composition would have exhibited the stability presently claimed. Applicant respectfully requests reconsideration and withdrawal of the rejection.

### Those of Ordinary Skill in the Art Would Not Have Included Polyethylene Glycol and an Antioxidant in Any Liquid Bendamustine Composition

The Examiner alleges that a person skilled in the art would have prepared a bendamustine composition with polyethylene glycol (PEG). Action at 11. The Examiner further contends that since PEG was known to produce hydrogen peroxide, the skilled person would have added an antioxidant to the liquid to prevent that from happening. Action at 12. The evidence of record establishes that this proposed scenario would not have been undertaken by anyone skilled in the art.

The rejection relies on a person of ordinary skill picking one of Britain's lyophilized compositions and selecting PEG as a reconstitution vehicle, prior to intravenous administration. Office Action at 11. The rejection notes that PEG's use as an excipient was impeded by its oxidative liabilities. *Id.* at 12. The rejection supposes that, rather than selecting a less troublesome reconstitution vehicle, *e.g.* water, the person of ordinary skill would have proceeded

---

[1] U.S. Publication No. 2006/0159713
[2] AAPS PharmSciTech 2006;7(3):E1-E7
[3] Journal of Pharmaceutical Sciences 1975;64(2):356-357
[4] Journal of Pharmaceutical Sciences, vol. 96, no. 1, January 2007:106-116

4894-0848-0634.1

EAGLEBEN-SA_00002069

DOCKET NO.: 107071.000583                                                    PATENT
Application No.: 18/081,251
Office Action Dated: August 21, 2023

with PEG because the oxidative problem can be "cured" by adding an antioxidant. The cited art,
as well as expert testimony presented during district court litigation, demonstrates that this series
of events would not have taken place.

Industry guidance at the time of the invention discouraged antioxidant use in
pharmaceuticals, instructing that antioxidants should only be used when there is no other way to
avoid oxidation. For example, the European Agency for the Evaluation of Medicinal Product
(EMEA) stated:

> Antioxidants should only be included in a formulation if it has been proven hat their use
> cannot be avoided. This applies to cases where the manufacturing process is optimised to
> minimise the potential for oxidation.

(EMEA Guidance at 8 of 9). Indeed, it had been suggested at the time of the invention that the
use of antioxidants in liquid formulations intended for parenteral administration was "now in
decline" and that a "preferred method of preventing oxidation is simply to exclude oxygen":

> Use of Excipients
> Excipients may be useful in preventing chemical and physical instability. Antioxidants are
> included in parenteral formulations, although their use is now in decline, and EU guidelines
> discourage their use unless no other alternative exists (see sect. "Parenteral Products and the

Broadhead at 334.

The Office Action relies on a person of ordinary skill not only selecting the troublesome
PEG for lyophilizate dissolution, it requires that the person of ordinary skill also try to address
PEG's known oxidative liabilities by pre-emptively including an antioxidant. Expert testimony
clearly explains why a person of ordinary skill in the art would not have selected an antioxidant-
containing PEG excipient to prepare a liquid bendamustine product, especially since the only
known therapeutic use of such a product would have been for parenteral administration.

During district court litigation, an antioxidant-PEG excipient hypothesis, similar to the
one proposed by the Examiner, was alleged. There, the court found Dr. Siepmann's testimony
persuasive. Dr. Siepmann testified that a person of ordinary skill in the art would not have
chosen PEG as a bendamustine excipient. Dr. Siepmann explained that none of the four marketed
PEG-containing parenteral formulations available in the United States as of this application's
priority date contained an antioxidant. In addition, a person of skill in the art would have
understood that antioxidants were not routinely added to any PEG-containing formulation that

EAGLEBEN-SA_00002070

would have been parenterally administered. In fact, adding an antioxidant to fix the degradation caused by PEG was not conventional, so a person of skill in the art would not have used PEG if it necessitated using an antioxidant. And finally, a person of skill in the art would not have used PEG with a drug that was subject to degradation *via* PEG's oxidation products.

As Dr. Siepmann's testified:

> 355. A review of the marketed parenteral formulations available in the United States as of the priority date that contained PEG indicates that those formulations do not have antioxidants:
>
> - Ativan® (lorazepam) contains "0.18 mL polyethylene glycol 400 in propylene glycol with 2.0% benzyl alcohol as preservative." Ativan® Label at 1 (2006), JDG_BENDA_00005945 at 5948.
> - Busulfex™ (busulfan) contains "N-N-dimethylacetamide (DMA) 33% wt/wt and polyethylene glycol 400, 67% wt/wt." Busulfex™ Label at 1 (1999), JDG_BENDA_00005643 at 5643.
> - Robaxin® (methocarbamol) contains "polyethylene glycol 300, NF 0.5 mL, Water for Injection, USP q.s." Robaxin® Label at 1 (2003), JDG_BENDA_00005854 at 5854.
> - VePesid® (etoposide) contains 60% PEG 300, 30% ethanol, 8.0% Tween 80, 3% benzyl alcohol, and 2 mg/mL citric acid. Strickley 2004 at 219, JDG_BENDA_00003290 at 3308.
>
> 356. Of the four formulations listed above containing PEG, none of them contain excipients that are listed in Nema 1997's list of Antioxidants/Reducing Agents (Table IV). Nema 1997 at 167, JDG_BENDA_00002272 at 2273. This state of the art refutes clearly Dr. Pinal's opinion that the POSA would have used PEG and then added an antioxidant to avoid the oxidation of PEG.
>
> 358. From the above information, the POSA would have understood that, as of the priority date, none of the four commercially available parenteral formulations that contained PEG 300 or PEG 400 also contained an antioxidant. This would have taught the POSA that antioxidants were not routinely added to parenteral formulations containing PEG. [redacted]
>
> [redacted] REDACTED

**DOCKET NO.:** 107071.000583                                             **PATENT**
**Application No.:** 18/081,251
**Office Action Dated: August 21, 2023**

359.    The POSA likewise would have understood that Dr. Pinal's suggested formulation approach—to add PEG to the formulation and also to add an antioxidant to fix the degradation caused by the PEG—was not conventional. Rather, in view of the small number of marketed parenteral drugs containing PEG, and the fact that none of those drugs contained an antioxidant, the POSA would have inferred that formulators simply did not use PEG with drugs that might be susceptible to degradation via PEG's oxidation products. In my opinion, and based on my experience as a formulator, the POSA would not have been motivated or had reason to add PEG to a formulation if she or he believed that doing so would have necessitated also adding an antioxidant.

360.    In view of the lack of any marketed parenteral drugs containing PEG and an antioxidant, the POSA likely would have hypothesized that PEG was only used with drugs that were not subject to degradation by PEG oxidation products (for example, acid-catalyzed esterification). To test that hypothesis, the POSA could have reviewed the molecular structures of the four APIs listed above. I have depicted those structures below. Most notably, none of those molecules contain a carboxylic acid moiety. As such, none of those molecules would have been prone to esterification via the PEG molecule, which is the only degradation pathway that Dr. Pinal has identified as motivating the use of an antioxidant in formulations of the claimed inventions. This would have bolstered the POSA's understanding that PEG was only used in liquid parenteral formulations where the active ingredients were not susceptible to degradation via PEG's oxidation products. Because bendamustine plainly is a drug molecule whose degradation is accelerated by such oxidation products—as Dr. Pinal acknowledges—the POSA would have avoided using PEG with bendamustine.

Siepmann Report at ¶¶355-356, 358-360, of record in this application.

EAGLEBEN-SA_00002072

DOCKET NO.:  107071.000583                                            **PATENT**
Application No.:  18/081,251
Office Action Dated:  August 21, 2023

Indeed, not even Wasylaschuk recommends adding antioxidant to liquid formulations.

Instead, Wasylaschuk's refers to antioxidant use only in **solid dosage forms**:

> Controlling HPO-drug reactions in solid dosage forms can be achieved by selecting excipients with low HPO levels, controlling crystallinity of the drug substance, and by adding antioxidants to stop HPO propagation and single-electron degradation processes.

Waslylaschuk at page 113, left column.

No evidence in the cited art supports the sequence of steps that the Office Action alleges would have been taken by a person of ordinary skill in the art. PEG would not have been selected for bendamustine's dissolution, but even if it was, antioxidants would have been excluded, not added. Applicant respectfully requests reconsideration and withdrawal of the rejection.

**Those of Ordinary Skill in the Art Would Not Have Had Any Reason to Prepare a Liquid Composition Having a Bendamustine Concentration of about 20 mg/ml to 60 mg/mL**

The Examiner alleges that reconstituting Brittain's lyophilized bendamustine with PEG to a concentration of about 25 mg/mL would have been obvious because "it is merely adding an appropriate amount of a pharmaceutically acceptable fluid. . . to a concentration of about . . . about 25 mg/mL bendamustine prior to administration. . . . It is a simple dilution and calculation any pharmaceutical artisan can perform with no inventive skill." Office Action at 12. But the obviousness inquiry does not ask whether a person of ordinary skill *could have* dissolved Brittain's lyophilized compositions to a concentration of about 25 mg/mL - it requires that the Examiner establish *why* a person of ordinary skill *would have*.

That bendamustine could *theoretically* be diluted to a concentration of about 25 mg/mL fails to establish a *prima facie* case of obviousness. The obviousness inquiry requires that the Examiner explain why a person of ordinary skill in the art would have selected ~25 mg/mL as a suitable bendamustine concentration. Here, the evidence establishes that the skilled person would have prepared much more dilute bendamustine concentrations.

At the time of this application's filing, a lyophilized bendamustine product had been approved for use in the United States - Treanda®.  The prescribing information for Treanda® would have been considered by a person of ordinary skill in the art seeking to use any bendamustine formulation. The Prescribing Information for Treanda® instructs that lyophilized bendamustine should be reconstituted with water to a concentration of **no more than 5 mg/mL** before being further diluted to 0.2 – 0.5 mg/mL:

4894-0848-0634.1

EAGLEBEN-SA_00002073

DOCKET NO.: 107071.000583                                          PATENT
Application No.: 18/081,251
Office Action Dated: August 21, 2023

2.3  Reconstitution/Preparation for Intravenous Administration
Aseptically reconstitute each TREANDA vial as follows:
o    25 mg TREANDA vial: Add 5 mL of only Sterile Water for Injection, USP.
o    100 mg TREANDA vial: Add 20 mL of only Sterile Water for Injection, USP.

Shake well to yield a clear, colorless to a pale yellow solution with a bendamustine HCl concentration of 5 mg/mL.  The lyophilized powder
should completely dissolve in 5 minutes.  If particulate matter is observed, the reconstituted product should not be used.

Aseptically withdraw the volume needed for the required dose (based on 5 mg/mL concentration) and immediately transfer to a 500 mL infusion
bag of 0.9% Sodium Chloride Injection, USP (normal saline). As an alternative to 0.9% Sodium Chloride Injection, USP (normal saline), a 500

mL infusion bag of 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, may be considered.  The resulting final concentration of
bendamustine HCl in the infusion bag should be within 0.2 – 0.6 mg/mL.  The reconstituted solution must be transferred to the infusion bag
within 30 minutes of reconstitution. After transferring, thoroughly mix the contents of the infusion bag. The admixture should be a clear and
colorless to slightly yellow solution.

(Treanda® Prescribing Information at Section 2.3; *see also,* Brittain at paragraph [0100] (stating

that Brittain's lyophilized formulations are reconstituted with water and then further diluted)).

Brittain refers to polyethylene glycol as an example of a "liquid carrier or vehicle" for preparing

the ultimate dosage form.  (Brittain at paragraph [0067]). Brittain does not suggest, however, that

the skilled person should deviate from the concentrations specified by Treanda®.

While Treanda® refers to a "concentrated solution of bendamustine which is

subsequently further diluted for administration," it is clear that Treanda® refers to 5 mg/mL

(bendamustine in water), which is much more dilute than presently claimed.  Treanda® then

instructs that this concentration should be "immediately" transferred to an infusion bag to

provide the 0.2-0.6 mg/mL concentration for administration.  Without Applicant's disclosure,

those skilled in the art would have had no reason to prepare more concentrated bendamustine

liquids, *e.g.,* 25 mg/mL, when preparing bendamustine.

Brittain does not suggest that the skilled person should deviate from the concentrations

specified by Treanda®. Without the benefit of Applicant's specification, they would have had no

reason to prepare ~100 mg of bendamustine at a 25 mg/ml concentration, as claimed. Applicant

respectfully requests reconsideration and withdrawal of the rejection.

**Those of Ordinary Skill in the Art Would Not Have Included an Antioxidant in Any
Bendamustine Composition**

Industry guidance discouraged antioxidant use, suggesting that it be reserved when no

other means to protect the active pharmaceutical ingredient or drug product can be established.

Those of ordinary skill in the art would not have expected the addition of an antioxidant to be

beneficial to bendamustine's storage stability because no reference had suggested that

bendamustine degraded *via* an oxidative mechanism.

4894-0848-0634.1

EAGLEBEN-SA_00002074

DOCKET NO.: 107071.000583                                                      **PATENT**
**Application No.:** 18/081,251
**Office Action Dated:  August 21, 2023**

***Brittain does not teach that an antioxidant should be added to a bendamustine composition***

Brittain does not suggest that lyophilized bendamustine requires an antioxidant. None of Brittain's exemplified compositions includes an antioxidant and the publication states that an antioxidant could be used as a lyophilization excipient only "if desired."  (Brittain at paragraph [0088]).

***The art does not teach that bendamustine can degrade via an oxidative mechanism***

Bendamustine rapidly degrades in water *via* several pathways, none of which are oxidative.  (*See, e.g.,* Specification at page 2)  One pathway by which bendamustine degrades is *via* aziridinium ring hydrolysis, which produces HP1 and HP2:

(Brittain at paragraph [0022]; Maas,[5] Studies and Results, Scheme; U.S. 8,344,066 (the 066 patent)[6] at col. 1, lines 50-65; col. 4, lines 33-45).

Bendamustine also degrades *via* dimer formation, which occurs when a molecule of bendamustine attacks the aziridinium ring:

---

[5] Maas is of record in this application.
[6] The 066 patent is of record in this application.

4894-0848-0634.1

EAGLEBEN-SA_00002075

DOCKET NO.:  107071.000583                                                    PATENT
Application No.:  18/081,251
Office Action Dated:  August 21, 2023



(Brittain at paragraph [0027]; the 066 patent at col. 4, lines 50-67).

Another pathway for bendamustine degradation is esterification of the -COOH with mono- and poly-hydroxy-containing compounds.  Various bendamustine ester degradation products have been reported in the art:



(Brittain at paragraph [0111]; the 066 patent at col. 5, lines 13-44).

While many bendamustine degradation mechanisms have been reported, the art did *not* teach that bendamustine degrades *via* any oxidative pathway.

4894-0848-0634.1

EAGLEBEN-SA_00002076

DOCKET NO.: 107071.000583                                                          PATENT
Application No.: 18/081,251
Office Action Dated: August 21, 2023

"Antioxidants are used to reduce the oxidation of active substances and excipients in the finished product." (Note for Guidance, European Agency for the Evaluation of Medicinal Products, page 8 of 9 (of record)). Since bendamustine was not known to degrade *via* an oxidative process, those of ordinary skill in the art would not have tried adding an antioxidant to a bendamustine composition.[7]

**The Recited Bendamustine-Containing Liquid Compositions are Surprisingly and Unexpectedly Stable During Storage**

As reported in the specification, a composition including bendamustine in PEG exhibited 2.28% of impurities after storage at room temperature for 15 days and 41.9% impurities after storage for 15 days at 40 °C. (Specification at Example 3, page 13, Table 3, reproduced below).

| Antioxidant | $T^o C$ | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
| | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

As Dr. Siepmann has testified, based on these poor stability results, a person would have forsaken development of a liquid bendamustine/PEG composition.

359.    The POSA likewise would have understood that Dr. Pinal's suggested formulation approach—to add PEG to the formulation and also to add an antioxidant to fix the degradation caused by the PEG—was not conventional. Rather, in view of the small number of

---

[7] Noteworthy is that the Treanda® lyophilized product does not include any antioxidant – it contains only bendamustine HCl and mannitol. (Treanda® at Section 11).

4894-0848-0634.1

EAGLEBEN-SA_00002077

**DOCKET NO.:** 107071.000583                                                                **PATENT**
**Application No.:** 18/081,251
**Office Action Dated:  August 21, 2023**

marketed parenteral drugs containing PEG, and the fact that none of those drugs contained an antioxidant, the POSA would have inferred that formulators simply did not use PEG with drugs that might be susceptible to degradation via PEG's oxidation products.  In my opinion, and based on my experience as a formulator, the POSA would not have been motivated or had reason to add PEG to a formulation if she or he believed that doing so would have necessitated also adding an antioxidant.

469.    I further agree with Dr. Pinal that it was known that PEG could form various degradation products.  As I explain above, the POSA would have viewed the degradation products of PEG as a disadvantage that would have discouraged the use of that solvent.  *See, e.g.,* ¶¶ 339–360.

470.    I disagree, however, with Dr. Pinal that PEG's known sensitivity to oxidation would have motivated or provided reason for the POSA to use an antioxidant with PEG.  I likewise disagree that the POSA would have been motivated or had reason to use an antioxidant in conjunction with PG and bendamustine.

471.    As I explain in detail above, the POSA would have been strongly motivated to avoid using an antioxidant in the formulation.  *See* ¶¶ 344–360.  The POSA would have preferred to keep the formulation as simple as possible; adding an antioxidant would have introduced substantial complexity into the formulation, including increasing the risk of unwanted interactions between the excipients and bendamustine.  *See* ¶¶ 344–345.  The POSA would have understood that antioxidants are particularly reactive and likely to cause unwanted interactions in the formulation.  *See* ¶ 346.  Adding an antioxidant would also have been undesirable because the concentration of the antioxidant would have to be maintained throughout the shelf life of the product—in effect, the stability of the product would become dependent on the antioxidant.  *See* ¶ 347.  The POSA also would have understood that an antioxidant might not completely solve any potential oxidation problem and that finding an appropriate antioxidant would, in the first instance, be an unpredictable research effort.  *See* ¶¶ 349–352.

EAGLEBEN-SA_00002078

DOCKET NO.: 107071.000583                                                    **PATENT**
**Application No.:** 18/081,251
**Office Action Dated: August 21, 2023**

(*See* Siepmann Report at ¶¶ 359, 469-71, of record in this application)

A composition presenting such a poor initial stability profile would have been deemed unsuitable as a starting point to create a storage-stable composition. Despite the poor stability of bendamustine/PEG, surprisingly, adding an antioxidant substantially eliminated the formation of degradation products. As shown in the specification, and Table 3 (above), a bendamustine/PEG composition including antioxidant exhibited no substantial increase in degradants after storage for 15 days at either room temperature or 40 °C. (Specification at Example 3, page 13, Table 3).

The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if an antioxidant is added. Such an unexpected result could not have been predicted. This result is particularly unexpected given the absence of any report in the literature of an oxidative degradation pathway for bendamustine. The claims are patentable for at least this reason and Applicant respectfully requests reconsideration and withdrawal of the rejection.

The Examiner alleges that claims 4, 5, 14, and 15 would have been obvious over the Brittain, Kumar, McGinity, and Wasylaschuck, in further view of Tait.[8] As discussed above, the combination of Brittain, Kumar, McGinity, and Wasylaschuck fails to render any of claim 1-3, 6, 8, 11-13, or 18 unpatentable. Tait does not cure those deficiencies, nor is it allege to. Tait is merely cited for its purported disclosure of antioxidants. Claims 4, 5, 14, and 15 are patentable and applicant requests withdrawal of the rejection.

## CONCLUSION

Applicant respectfully submits that the present application is in condition for allowance. Reconsideration of the application and an early Notice of Allowance are respectfully requested. In the event that the Examiner cannot allow the application for any reason, the Examiner is encouraged to contact Applicant's representative.

---

[8] WO Publication No. 200202125

4894-0848-0634.1

EAGLEBEN-SA_00002079

**DOCKET NO.:** 107071.000583                      **PATENT**
**Application No.:** 18/081,251
**Office Action Dated:  August 21, 2023**

Date: November 8, 2023                    / Scott R. Conley / _____
                                                Scott R. Conley
                                                Registration No. 57289

BakerHostetler
312 Walnut Street
Suite 3200
Cincinnati, OH 45202
Telephone: 513.929.3400
Facsimile:  513.929.0303

4894-0848-0634.1

EAGLEBEN-SA_00002080

# EXHIBIT 7

**USPTO**  **UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC ACKNOWLEDGEMENT RECEIPT

| APPLICATION # | RECEIPT DATE / TIME | ATTORNEY DOCKET # |
|---|---|---|
| **18/081,251** | **07/28/2023 12:44:43 PM ET** | **107071.000583** |

## Title of Invention

FORMULATIONS OF BENDAMUSTINE

## Application Information

| | | | |
|---|---|---|---|
| APPLICATION TYPE | Utility - Nonprovisional Application under 35 USC 111(a) | PATENT # | - |
| CONFIRMATION # | 8743 | FILED BY | VeAndra Luckett |
| PATENT CENTER # | 62522974 | FILING DATE | 12/14/2022 |
| CUSTOMER # | 23377 | FIRST NAMED INVENTOR | Nagesh R. Palepu |
| CORRESPONDENCE ADDRESS | - | AUTHORIZED BY | Stephanie Lodise |

## Documents

# TOTAL DOCUMENTS: 5

| DOCUMENT | | PAGES | DESCRIPTION | SIZE (KB) |
|---|---|---|---|---|
| 107071.000583 AFCP request form.pdf | | 2 | After Final Consideration Program Request | 221 KB |
| 107071.000583 Reply FOA 7-11-2023.pdf | | 92 | - | 5426 KB |
| 107071.000583 Reply FOA 7-11-2023-A.NE.pdf | (1-1) | 1 | Response After Final Action | 86 KB |
| 107071.000583 Reply FOA 7-11-2023-CLM.pdf | (2-4) | 3 | Claims | 89 KB |
| 107071.000583 Reply FOA 7-11-2023-REM.pdf | (5-14) | 10 | Applicant Arguments/Remarks Made in an Amendment | 350 KB |

107071.000583 Reply FOA    (15-92)    78    Miscellaneous Incoming Letter    5065 KB
7-11-2023-LET..pdf

## Digest

| DOCUMENT | MESSAGE DIGEST(SHA-512) |
| --- | --- |
| 107071.000583 AFCP request form.pdf | DD403C69B608E4B1B6A38B2261560DFA1BF917915FB5E58B1 4721BFE351D02A76DFF361C23B590DA461493195BD91B0F3B BA0FDE16AA2333E3B46A3913429830 |
| 107071.000583 Reply FOA 7-11-2023.pdf | 42236FD9D44E556B6E491258C38F3CD5B57FBD88F49F032ED 1B0150AB4C310B3D7F3C5C3718027D6A442A3D053748006CD 93C5713DD1DB533B0980CEE968639B |
| 107071.000583 Reply FOA 7-11-2023-A.NE.pdf | 929C35140A1879A26D72418D62459B890D1561AA5E9FA7F3F7 FA5150D57D647FBCD1A2211391E70AA8D0C7EB1C9531ABC7 41652E7288D37E2F53E569DB55637E |
| 107071.000583 Reply FOA 7-11-2023-CLM.pdf | 4A9888AB26B3E43EF9E1E6132924D8BC735708DF8C8BFD49A 8EA7D7AF96A49E08E53F1DE8771FB69152A5225823270FF593 AE8E54AEDAEB6E3A08D3B6B220D19 |
| 107071.000583 Reply FOA 7-11-2023-REM.pdf | C15B6F39F29E3BC7B7EE57FD18582ACEC700A5BE8D92EC3F 3EC3BD3A6AE859ADF7A86760B6D1A03F4504CBE9FE2525F37 E7CA8C14A6A7D656F966E2A5720187F |
| 107071.000583 Reply FOA 7-11-2023-LET..pdf | B0B056A2D871C3BBAE327D584138457AE425B73B8364FCA08 8DA0CCCEAF8A8375F26E427B7AAFB9853DA4A2B2628C78B2 334978DD803ED4BF900DD7BFCA49BCC |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application

**National Stage of an International Application under 35 U.S.C. 371**

If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**

If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Doc Code: A.NE.AFCP
Document Description: After Final Consideration Pilot Program Request

PTO/SB/434 (05-13)

### CERTIFICATION AND REQUEST FOR CONSIDERATION UNDER THE AFTER FINAL CONSIDERATION PILOT PROGRAM 2.0

| Practitioner Docket No.: 107071.000583 | Application No.: 18/081,251 | Filing Date: December 14, 2023 |
|---|---|---|
| First Named Inventor: Nagesh R. Palepu | Title: Formulations for Bendamustine | |

APPLICANT HEREBY CERTIFIES THE FOLLOWING AND REQUESTS CONSIDERATION UNDER THE AFTER FINAL CONSIDERATION PILOT PROGRAM 2.0 (AFCP 2.0) OF THE ACCOMPANYING RESPONSE UNDER 37 CFR 1.116.

1. The above-identified application is (i) an original utility, plant, or design nonprovisional application filed under 35 U.S.C. 111(a) [a continuing application (*e.g.*, a continuation or divisional application) is filed under 35 U.S.C. 111(a) and is eligible under (i)], or (ii) an international application that has entered the national stage in compliance with 35 U.S.C. 371(c).

2. The above-identified application contains an outstanding final rejection.

3. Submitted herewith is a response under 37 CFR 1.116 to the outstanding final rejection. The response includes an amendment to at least one independent claim, and the amendment does not broaden the scope of the independent claim in any aspect.

4. This certification and request for consideration under AFCP 2.0 is the only AFCP 2.0 certification and request filed in response to the outstanding final rejection.

5. Applicant is willing and available to participate in any interview requested by the examiner concerning the present response.

6. This certification and request is being filed electronically using the Office's electronic filing system (EFS-Web).

7. Any fees that would be necessary consistent with current practice concerning responses after final rejection under 37 CFR 1.116, *e.g.*, extension of time fees, are being concurrently filed herewith. [There is no additional fee required to request consideration under AFCP 2.0.]

8. By filing this certification and request, applicant acknowledges the following:

- Reissue applications and reexamination proceedings are not eligible to participate in AFCP 2.0.
- The examiner will verify that the AFCP 2.0 submission is compliant, *i.e.*, that the requirements of the program have been met (see items 1 to 7 above). For compliant submissions:
  - The examiner will review the response under 37 CFR 1.116 to determine if additional search and/or consideration (i) is necessitated by the amendment and (ii) could be completed within the time allotted under AFCP 2.0. If additional search and/or consideration is required but cannot be completed within the allotted time, the examiner will process the submission consistent with current practice concerning responses after final rejection under 37 CFR 1.116, *e.g.*, by mailing an advisory action.
  - If the examiner determines that the amendment does not necessitate additional search and/or consideration, or if the examiner determines that additional search and/or consideration is required and could be completed within the allotted time, then the examiner will consider whether the amendment places the application in condition for allowance (after completing the additional search and/or consideration, if required). If the examiner determines that the amendment does not place the application in condition for allowance, then the examiner will contact the applicant and request an interview.
    - The interview will be conducted by the examiner, and if the examiner does not have negotiation authority, a primary examiner and/or supervisory patent examiner will also participate.
    - If the applicant declines the interview, or if the interview cannot be scheduled within ten (10) calendar days from the date that the examiner first contacts the applicant, then the examiner will proceed consistent with current practice concerning responses after final rejection under 37 CFR 1.116.

| Signature /Stephanie A. Lodise/ | Date July 28, 2023 |
|---|---|
| Name (Print/Typed) Stephanie A. Lodise | Practitioner Registration No. 51430 |

***Note:*** *This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4(d) for signature requirements and certifications. Submit multiple forms if more than one signature is required, see below\*.*

| ☐ | * Total of _____ forms are submitted. |
|---|---|

EAGLEBEN-SA_00001919

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EAGLEBEN-SA_00001920

**DOCKET NO.:** 107071.000583                                                                **PATENT**
**Application No.:** 18/081,251
**Office Action Dated:  July 11, 2023**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

    **Nagesh R. Palepu et al.**

    **Confirmation No.:  8743**

**Application No.:  18/081,251**          **Group Art Unit:  1613**

**Filing Date:  December 14, 2022**          **Examiner:  ERNST V ARNOLD**

For:    **FORMULATIONS OF BENDAMUSTINE**

Mail Stop AF
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

### REPLY PURSUANT TO 37 CFR § 1.116

      In response to the Official Action dated July 11, 2023, reconsideration is respectfully requested in view of the amendments and/or remarks as indicated below:

☐      **Amendments to the Specification** begin on page of this paper.

☐      **Amendments to the Abstract** begin on page of this paper.

☒      **Amendments to the Claims** are reflected in the listing of the claims which begins on page 2 of this paper.

☐      **Amendments to the Drawings** begin on page of this paper and include an attached replacement sheet.

☒      **Remarks** begin on page 5 of this paper.

☒      The Commissioner is hereby authorized to charge any fee deficiency, charge any additional fees, or credit any overpayment of fees, associated with this application in connection with this filing, or any future filing, submitted to the U.S. Patent and Trademark Office during the pendency of this application, to Deposit Account No. 23-3050.

EAGLEBEN-SA_00001921

**DOCKET NO.:** 107071.000583                                          **PATENT**
**Application No.:** 18/081,251
**Office Action Dated: July 11, 2023**

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims:**

1.    (currently amended) A sterile vial containing a liquid bendamustine-containing composition comprising

   bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL;

   a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

   a stabilizing amount of an antioxidant,

   wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

2.    (Original) The sterile vial of claim 1, wherein the composition comprises about 100 mg of bendamustine.

3.    (Original) The sterile vial of claim 1, wherein the bendamustine concentration in the composition is about 25 mg/mL.

4.    (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol.

5.    (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

6.    (Original) The composition of claim 1, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.

7.    (cancelled)

4877-8133-8480.2

EAGLEBEN-SA_00001922

DOCKET NO.: 107071.000583                                   **PATENT**
**Application No.:** 18/081,251
**Office Action Dated: July 11, 2023**

8.    (Original) The sterile vial of claim 1, wherein the liquid bendamustine-containing composition further comprises ethanol.

9.    (Cancelled)

10.    (Cancelled)

11.    (currently amended) A <u>liquid</u> bendamustine-containing composition comprising bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid;

wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 20 mg/mL to about 60 mg/mL<u>,</u>

<u>wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.</u>

12.    (Original) The composition of claim 11, comprising 100 mg of bendamustine.

13.    (Original) The composition of claim 11, wherein the bendamustine concentration is about 25 mg/mL.

14.    (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol.

15.    (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

EAGLEBEN-SA_00001923

**DOCKET NO.:** 107071.000583                                           **PATENT**
**Application No.:** 18/081,251
**Office Action Dated: July 11, 2023**

16.     (cancelled)


17.     (cancelled)


18.     (Previously Presented) The composition of claim 11, further comprising ethanol.

4877-8133-8480.2

EAGLEBEN-SA_00001924

DOCKET NO.: 107071.000583                                                PATENT
Application No.: 18/081,251
Office Action Dated: July 11, 2023

## REMARKS

Claims 1-6, 8, 11-15, and 17-18 are pending, with claims 1 and 11 being independent. Claims 1 and 11 have been amended to incorporate subject matter of claims 7 and 17, respectively. No new subject matter has been added.  A Request for Consideration Under AFCP 2.0 accompanies this response.

Applicant's representative thanks Examiner Arnold for the courtesy of the telephone conference conducted on July 12, 2023, for the related 18/081,238. The office action and cited art were discussed, as well as arguments and evidence submitted and found persuasive in U.S. 11,103,483.

### Withdrawn Rejections

Applicant thanks Examiner Arnold for his comments that the rejections over Drager[1] have been withdrawn and that the terminal disclaimers Applicant filed have been accepted.

### Brief Description of the Claimed Inventions

The pending claims recite, among other things, liquid bendamustine-containing compositions having from about 20 mg/mL to about 60 mg/mL of bendamustine; polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol; and an antioxidant. The recited compositions are not reconstituted lyophilized powders; they are concentrated, bendamustine-containing liquids for administration through infusion with an appropriate diluent.  (*See, e.g.,* Specification at page 2).  This avoids the multi-step reconstitution and preparation for administration required for the Brittain[2] products, including TREANDA®. These liquid compositions, which only need to be diluted prior to patient administration, are surprisingly stable and do not exhibit significant bendamustine degradation after storage for at least 15 months at refrigerated or room temperature conditions.

### Claim Rejections – 35 U.S.C. § 103

The Examiner alleges that claims 1-3, 8, 11-13 and 16-18 would have been obvious Brittain.[3] At the time of the invention, one of ordinary skill in the art would not have been

_____

[1] US20110190363
[2] US 2006159713
[3] US 2006/0159713

4877-8133-8480.2

EAGLEBEN-SA_00001925

DOCKET NO.: 107071.000583                                              **PATENT**
Application No.: 18/081,251
Office Action Dated: July 11, 2023

motivated to make a liquid bendamustine-containing composition incorporating polyethylene

glycol (PEG) and an antioxidant, as claimed.  Moreover, the stability achieved by the claimed

compositions would have been unexpected in view of the cited art.  Applicant requests

reconsideration and withdrawal of the rejection.

**Those of Ordinary Skill in the Art Would Not Have Had Any Reason to Prepare a
Bendamustine-Containing Liquid Having a Concentration of 20 mg/ml to about 60 mg/mL**

Brittain fails to motivate anyone of skill in the art to prepare a liquid composition having

a bendamustine concentration of 20 mg/mL to about 60 mg/mL, or any amount within that range.

Prior to Applicant's invention, Treanda® (lyophilized bendamustine hydrochloride) was

commercially available and would have informed those of ordinary skill about administering

bendamustine to a human.  In view of that information, the skilled person would not have

arbitrarily deviated from those Treanda® administration instructions, as the Examiner suggests.

Action at 8-9.

The Prescribing Information for Treanda®, which is of record in this application,

instructs that lyophilized bendamustine should be reconstituted with water to a concentration of

no more than 5 mg/mL, before being added to a 500 mL infusion bag of aqueous

dextrose/sodium chloride to achieve further dilution to 0.2 – 0.6 mg/mL for patient

administration:

2.3  Reconstitution/Preparation for Intravenous Administration
Aseptically reconstitute each TREANDA vial as follows:
○    25 mg TREANDA vial: Add 5 mL of only Sterile Water for Injection, USP.
○    100 mg TREANDA vial: Add 20 mL of only Sterile Water for Injection, USP.

Shake well to yield a clear, colorless to a pale yellow solution with a bendamustine HCl concentration of 5 mg/mL.  The lyophilized powder
should completely dissolve in 5 minutes.  If particulate matter is observed, the reconstituted product should not be used.

Aseptically withdraw the volume needed for the required dose (based on 5 mg/mL concentration) and immediately transfer to a 500 mL infusion
bag of 0.9% Sodium Chloride Injection, USP (normal saline).  As an alternative to 0.9% Sodium Chloride Injection, USP (normal saline), a 500

mL infusion bag of 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, may be considered.  The resulting final concentration of
bendamustine HCl in the infusion bag should be within 0.2 – 0.6 mg/mL.  The reconstituted solution must be transferred to the infusion bag
within 30 minutes of reconstitution. After transferring, thoroughly mix the contents of the infusion bag. The admixture should be a clear and
colorless to slightly yellow solution.

(Treanda at Section 2.3;  *see also,* Brittain at paragraph [0100] (stating that Brittain's lyophilized

formulations are reconstituted with water and then further diluted with, *e.g.,* saline).  Brittain

refers to polyethylene glycol as an example of a "liquid carrier or vehicle" for preparing the

ultimate dosage form.  (Brittain at paragraph [0067]).  Brittain does not suggest, however, that the

skilled person should deviate from the concentrations specified by Treanda®.

EAGLEBEN-SA_00001926

DOCKET NO.: 107071.000583                                                                    **PATENT**
Application No.: 18/081,251
Office Action Dated: July 11, 2023

While Treanda® refers to a concentrated solution of bendamustine which is subsequently
further diluted for administration, it is clear that Treanda® refers to 5 mg/mL (bendamustine in
water), which is much more dilute than presently claimed. Treanda® then instructs that this
concentration should be "immediately" transferred to an infusion bag to provide the 0.2-0.6
mg/mL concentration for administration. Without Applicant's disclosure, those skilled in the art
would have had no reason to prepare more concentrated bendamustine liquids, *e.g.*, 20 mg/mL to
60 mg/mL. Nor would they have had any expectation that those more concentrated liquids
would have had the claimed stability characteristics. The rejection should be withdrawn for at
least these reasons.

**Those of Ordinary Skill in the Art Would Not Have Included an Antioxidant in Any Liquid
Bendamustine Composition**

Despite the Examiner's assertions, Brittain does not suggest that an antioxidant should be
added to a liquid bendamustine/PEG composition. In fact, those of ordinary skill in the art
would not have expected the addition of an antioxidant to be beneficial to bendamustine's
storage stability because no reference had suggested that bendamustine degraded *via* an oxidative
mechanism.[4,5] Moreover, industry guidance discouraged the use of antioxidants, recommending
other methods for reducing oxidation.

***Brittain does not teach that an antioxidant should be added to a liquid bendamustine
composition***

The Examiner alleges that Brittain teaches lyophilizing bendamustine with an
antioxidant. (Action at 7). Brittain provides no such disclosure. None of Brittain's exemplified
compositions includes an antioxidant. Moreover, the paragraph relied upon by the Examiner
merely states that an antioxidant could be used as a lyophilization excipient only "if desired."
(Brittain at paragraph [0088]; Action at 7). This statement hardly provides the "clear and
unambiguous" instruction to include an antioxidant, as the Examiner appears to imply. The
Examiner has not articulated how Brittain would have suggested to one of ordinary skill in the

---

[4] *See, e.g.,* Exhibit B, Excerpts from the *Responsive Expert Report of Juergen Siepmann, Ph.D.* ("Siepmann
Report").
[5] *See also,* Exhibit A, pages 25-26 (finding that "Defendants did not establish by clear and convincing evidence that
[the prior art] would have motivated a POSITA to use an antioxidant" to curb PEG oxidation).

4877-8133-8480.2

EAGLEBEN-SA_00001927

DOCKET NO.: 107071.000583                                                    **PATENT**
Application No.: 18/081,251
Office Action Dated: July 11, 2023

art that an antioxidant should be included in a liquid bendamustine/PEG composition and the rejection should be withdrawn for at least this reason.

***The art does not teach that bendamustine can degrade via an oxidative mechanism***

      Bendamustine rapidly degrades in water *via* several pathways, none of which are oxidative. (*See, e.g.,* Specification at page 2). One pathway by which bendamustine degrades is *via* aziridinium ring hydrolysis, which produces HP1 and HP2:



(Brittain at paragraph [0022]; Maas,[6] Studies and Results, Scheme; U.S. 8,344,066 (the 066 patent)[7] at col. 1, lines 50-65; col. 4, lines 33-45).

      Bendamustine also degrades *via* dimer formation, which occurs when a molecule of bendamustine attacks the aziridinium ring:

---

[6] Maas is of record in this application. A copy of Maas, along with an English translation, accompanies this response.
[7] The 066 patent is of record in this application.

EAGLEBEN-SA_00001928

DOCKET NO.: 107071.000583                                    PATENT
Application No.: 18/081,251
Office Action Dated: July 11, 2023



(Brittain at paragraph [0027]; the 066 patent at col. 4, lines 50-67).

Another pathway for bendamustine degradation is esterification of the -COOH with mono- and poly-hydroxy-containing compounds. Various bendamustine ester degradation products have been reported in the art:



(Brittain at paragraph [0111]; the 066 patent at col. 5, lines 13-44).

While many bendamustine degradation mechanisms have been reported, the art did *not* teach that bendamustine degrades *via* any oxidative pathway.

EAGLEBEN-SA_00001929

DOCKET NO.: 107071.000583            **PATENT**
Application No.: 18/081,251
Office Action Dated: July 11, 2023

"Antioxidants are used to reduce the oxidation of active substances and excipients in the finished product." (Note for Guidance, European Agency for the Evaluation of Medicinal Products, page 8 of 9 (of record)). Since bendamustine was not known to degrade *via* an oxidative process, those of ordinary skill in the art would not have tried to reduce degradation by adding an antioxidant to a bendamustine composition.[8] The claims are non-obvious for at least this reason.

### Industry Guidance Discouraged Using Antioxidants in Parenteral Formulations

Even if those skilled in the art sought to discourage oxidation in a particular bendamustine composition, the guidance to the industry at the time of the invention was to ***not*** include an antioxidant. Instead, industry guidance encouraged addressing oxidation by ***other*** means. For example, the European Agency for the Evaluation of Medicinal Products (EMEA) stated that:

> Antioxidants should only be included in a formulation if it has been proven hat their use cannot be avoided. This applies to cases where the manufacturing process is optimised to minimise the potential for oxidation.

(EMEA Guidance at 8 of 9). Indeed, it had been suggested at the time of the invention that the use of antioxidants in parenteral formulations was "now in decline" and that a "preferred method of preventing oxidation is simply to exclude oxygen." (Broadhead at 334)[9].

Even if oxidation of a liquid bendamustine composition was for some reason a concern,[10] industry guidance discouraged adding antioxidants and recommended other means for preventing oxidation.[11] Those of ordinary skill in the art, therefore, would have been dissuaded from including antioxidants in any liquid bendamustine composition and the rejection should be

---

[8] Noteworthy is that the Treanda® lyophilized product does not include any antioxidant – it contains only bendamustine HCl and mannitol. (Treanda® at Section 11).

[9]

**Use of Excipients**

Excipients may be useful in preventing chemical and physical instability. Antioxidants are included in parenteral formulations, although their use is now in decline, and EU guidelines discourage their use unless no other alternative exists (see sect. "Parenteral Products and the

[10] As discussed *supra*, Applicant does not concede this point.

[11] There were four marketed PEG-containing parenteral formulations available in the United States as of this application's priority date and none of them contained an antioxidant. (*See* Appendix A, attached hereto, Siepmann Report at ¶¶355-358 (discussing Ativan®, Busulfex®, Robaxin®, and VePesid®))

EAGLEBEN-SA_00001930

DOCKET NO.: 107071.000583                                                        PATENT
Application No.: 18/081,251
Office Action Dated: July 11, 2023

withdrawn for at least this reason. *See, e.g.,* Exhibit A, Opinion of J. Connelly at pages 26, reproduced, below:

> Other prior art references, however, teach away from the use of antioxidants. *See* Tr. 1452:20–53:21; *Note for Guidance,* European Agency for the Evaluation of Medicinal Products, PTX-0629 at TEVABEND00290713, TEVABEND00290720 ("Antioxidants should only be included in a formulation if it has been proven [t]hat their use cannot be avoided."); *Pharmaceutical Preformulation and Formulation,* Interpharm, PTX-0391 at JDG_BENDA_00000415 (stating that antioxidant use "is now in decline" and that "[a] preferred method of preventing oxidation [over antioxidants] is simply to exclude oxygen"). Moreover, none of the four approved injectable products in the prior art that contained PEG included an antioxidant. Tr. 600:4–6, 1454:24–55:17; PTX-0722 (Ativan); PTX-0718 (Busulfex); PTX-0720 (Robaxin); PTX-0569 at JDG_BENDA_00003308 (VePesid). In addition, the

**The Claimed Compositions Are Surprisingly and Unexpectedly Stable During Storage**

As reported in the specification, a composition including bendamustine in PEG exhibited 2.28% of impurities after storage at room temperature for 15 days and 41.9% impurities after storage for 15 days at 40 °C. (Specification at Example 3, page 13, Table 3, reproduced below).

EAGLEBEN-SA_00001931

**DOCKET NO.:** 107071.000583                                          **PATENT**
**Application No.:** 18/081,251
**Office Action Dated: July 11, 2023**

| Antioxidant | T°C | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
|  | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
|  | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

Based on these poor stability results, a person would have forsaken development of a liquid bendamustine/PEG composition. A composition presenting such a poor initial stability profile would have been deemed unsuitable as a starting point to create a storage-stable composition. *See, e.g.,* Exhibit B, attached hereto, Siepmann Report at ¶¶ 359, 469-71, reproduced, below:

> 359.    The POSA likewise would have understood that Dr. Pinal's suggested formulation approach—to add PEG to the formulation and also to add an antioxidant to fix the degradation caused by the PEG—was not conventional. Rather, in view of the small number of marketed parenteral drugs containing PEG, and the fact that none of those drugs contained an antioxidant, the POSA would have inferred that formulators simply did not use PEG with drugs that might be susceptible to degradation via PEG's oxidation products. In my opinion, and based on my experience as a formulator, the POSA would not have been motivated or had reason to add PEG to a formulation if she or he believed that doing so would have necessitated also adding an antioxidant.

4877-8133-8480.2

EAGLEBEN-SA_00001932

DOCKET NO.: 107071.000583                                                                    PATENT
Application No.: 18/081,251
Office Action Dated: July 11, 2023

469.    I further agree with Dr. Pinal that it was known that PEG could form various degradation products. As I explain above, the POSA would have viewed the degradation products of PEG as a disadvantage that would have discouraged the use of that solvent. *See, e.g.,* ¶¶ 339–360.

470.    I disagree, however, with Dr. Pinal that PEG's known sensitivity to oxidation would have motivated or provided reason for the POSA to use an antioxidant with PEG. I likewise disagree that the POSA would have been motivated or had reason to use an antioxidant in conjunction with PG and bendamustine.

471.    As I explain in detail above, the POSA would have been strongly motivated to avoid using an antioxidant in the formulation. *See* ¶¶ 344–360. The POSA would have preferred to keep the formulation as simple as possible; adding an antioxidant would have introduced substantial complexity into the formulation, including increasing the risk of unwanted interactions between the excipients and bendamustine. *See* ¶¶ 344–345. The POSA would have understood that antioxidants are particularly reactive and likely to cause unwanted interactions in the formulation. *See* ¶ 346. Adding an antioxidant would also have been undesirable because the concentration of the antioxidant would have to be maintained throughout the shelf life of the product—in effect, the stability of the product would become dependent on the antioxidant. *See* ¶ 347. The POSA also would have understood that an antioxidant might not completely solve any potential oxidation problem and that finding an appropriate antioxidant would, in the first instance, be an unpredictable research effort. *See* ¶¶ 349–352.

Despite the poor stability of bendamustine/PEG, surprisingly, adding an antioxidant substantially eliminated the formation of degradation products. As shown in the specification, and the Table above, a bendamustine/PEG composition including antioxidant exhibited no

Page 13 of 14

EAGLEBEN-SA_00001933

DOCKET NO.: 107071.000583                                           **PATENT**
Application No.: 18/081,251
Office Action Dated: July 11, 2023

substantial increase in degradants after storage for 15 days at either room temperature or 40 °C.

(Specification at Example 3, page 13, Table 3).

The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if
an antioxidant is added.  Such an unexpected result could not have been predicted.  This result is
particularly unexpected given the absence of any report in the literature of an oxidative
degradation pathway.  The claims are patentable for at least this reason.

Claims 4, 5, 14 and 15 stand rejected under 35 U.S.C. § 103(a) as being unpatentable
over Brittain in view of Tait.[12] As discussed above, Brittain fails to disclose or suggest a liquid
bendamustine composition in PEG, with an antioxidant. Tait does not cure Brittain's
deficiencies, nor is it alleged to. Tait is merely cited for its purported disclosure that antioxidants
like BHA, BHT, and monothioglycerol might be used in ifosfamide formulations. Action at 11-
12. The claims are patentable over the combination of Brittain and Tait and Applicant requests
withdrawal of the rejection.

## CONCLUSION

Applicant respectfully submits that the present application is in condition for allowance.
Reconsideration of the application and an early Notice of Allowance are respectfully requested.
In the event that the Examiner cannot allow the application for any reason, the Examiner is
encouraged to contact Applicant's representative.

Date: July 28, 2023                          /Stephanie A. Lodise/
                                             Stephanie A. Lodise
                                             Registration No. 51,430

Baker & Hostetler LLP
1735 Market Street, Suite 3300
Philadelphia, PA  19103
(215)-568-3100

_____

[12] WO 200202125

Page 14 of 14

4877-8133-8480.2

EAGLEBEN-SA_00001934

# EXHIBIT 8

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/081,251 | 12/14/2022 | Nagesh R. Palepu | 107071.000583 | 8743 |

| 23377          7590          08/21/2023 | |
|---|---|
| BakerHostetler<br>1735 Market Street<br>Suite 3300<br>Philadelphia, PA 19103-7501 | |

| EXAMINER |
|---|
| ARNOLD, ERNST V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1613 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 08/21/2023 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

eofficemonitor@bakerlaw.com

PTOL-90A (Rev. 04/07)

EAGLEBEN-SA_00002016

| *Office Action Summary* | Application No. 18/081,251 | Applicant(s) Palepu et al. | |
|---|---|---|---|
| | Examiner ERNST V ARNOLD | Art Unit 1613 | AIA (FITF) Status No |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☑ Responsive to communication(s) filed on <u>7/28/23</u>.
    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a)☐ This action is **FINAL.**    2b)☑ This action is non-final.
3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☑  Claim(s) <u>1-6,8,11-15 and 18</u> is/are pending in the application.
    5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐  Claim(s) _____ is/are allowed.
7) ☑  Claim(s) <u>1-6,8,11-15 and 18</u> is/are rejected.
8) ☐  Claim(s) _____ is/are objected to.
9) ☐  Claim(s) _____ are subject to restriction and/or election requirement

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10)☐ The specification is objected to by the Examiner.
11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    **Certified copies:**
      a)☐ All    b)☐ Some**    c)☐ None of the:
      1.☐  Certified copies of the priority documents have been received.
      2.☐  Certified copies of the priority documents have been received in Application No. _____.
      3.☐  Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

| 1) ☑ Notice of References Cited (PTO-892) | 3) ☑ Interview Summary (PTO-413) |
|---|---|
| | Paper No(s)/Mail Date _____. |
| 2) ☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____. | 4) ☑ Other: <u>2323</u>. |

U.S. Patent and Trademark Office

EAGLEBEN-SA_00002017

Application/Control Number: 18/081,251                                                Page 2
Art Unit: 1613

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent

provisions.

### *Claim Status*

Claims 7, 9-10, 16 and 17 have been cancelled.

Claims 1-6, 8, 11-15 and 18 are pending. Upon further consideration of

Applicant's arguments concerning the last Office Action, the finality of that action is

withdrawn. This Action is non-FINAL.


### *Withdrawn rejections*

Applicant's amendments and arguments filed 7/28/23 are acknowledged and

have been fully considered.  The Examiner has re-weighed all the evidence of record.

Any rejection and/or objection not specifically addressed below is herein withdrawn.

Claims 1-3, 8, 11-13 and 16-18 were rejected under 35 U.S.C. 103(a) as being

unpatentable over Brittain et al. (US 20060159713; of record) and claims 4, 5, 14, and

15 were rejected under 35 U.S.C. 103(a) as being unpatentable over Brittain et al. (US

20060159713) in further view of Tait et al. (WO 0202125). These rejections are

withdrawn in favor of the following rejections.

The following rejections and/or objections are either reiterated or newly applied.

They constitute the complete set of rejections and/or objections presently being applied

to the instant application.

Application/Control Number: 18/081,251                                                    Page 3
Art Unit: 1613

## Claim Rejections - 35 USC § 103

In the event the determination of the status of the application as subject to AIA 35

U.S.C. 102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any

correction of the statutory basis for the rejection will not be considered a new ground of

rejection if the prior art relied upon, and the rationale supporting the rejection, would be

the same under either status.

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed
> or described as set forth in section 102 of this title, if the differences between the
> subject matter sought to be patented and the prior art are such that the subject
> matter as a whole would have been obvious at the time the invention was made
> to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was
> made.

The factual inquiries set forth in *Graham* **v.** *John Deere Co.*, 383 U.S. 1, 148

USPQ 459 (1966), that are applied for establishing a background for determining

obviousness under 35 U.S.C. 103(a) are summarized as follows:

1.   Determining the scope and contents of the prior art.
2.   Ascertaining the differences between the prior art and the claims at issue.
3.   Resolving the level of ordinary skill in the pertinent art.
4.   Considering objective evidence present in the application indicating
     obviousness or nonobviousness.

Claims 1-3, 6, 8, 11-13 and 18 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Brittain et al. (US 20060159713; of record) and Kumar et al. (AAPS

PharmSciTech 2006;7(3):E1-E7) and McGinity et al. (Journal of Pharmaceutical

EAGLEBEN-SA_00002019

Application/Control Number: 18/081,251                                    Page 4
Art Unit: 1613

Sciences 1975;64(2):356-357) and Wasylaschuk et al. (JOURNAL OF

PHARMACEUTICAL SCIENCES, VOL. 96, NO. 1, JANUARY 2007:106-116).

    This application currently names joint inventors. In considering patentability of the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g) prior art under 35 U.S.C. 103(a).

    Applicant claims, for example:

1.    (currently amended) A sterile vial containing a liquid bendamustine-containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL;

a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

a stabilizing amount of an antioxidant,

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

EAGLEBEN-SA_00002020

Application/Control Number: 18/081,251                                    Page 5
Art Unit: 1613

11.     (currently amended) A liquid bendamustine-containing composition comprising
        bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of
                an antioxidant, in a pharmaceutically acceptable fluid;
        wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and
                optionally one or more of propylene glycol, ethanol, benzyl alcohol and
                glycofurol; and
        wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from
                about 20 mg/mL to about 60 mg/mL,
        wherein the total impurities resulting from the degradation of the bendamustine is less
                than about 5% peak area response, as determined by HPLC at a wavelength of
                223 nm after at least about 15 months at a temperature of about 5 °C to about 25
                °C.

        Claim interpretation: The MPEP provides, "Claim scope is not limited by claim
language that suggests or makes optional but does not require steps to be performed,
or by claim language that does not limit a claim to a particular structure." See M.P.E.P §
2111.04; see also M.P.E.P §§ 2103(C) and 2173.05(h).

## Level of Ordinary Skill in the Art
## (MPEP 2141.03)

        MPEP 2141.03 (I) states: "The "hypothetical 'person having ordinary skill in the
art' to which the claimed subject matter pertains would, of necessity have the capability
of understanding the scientific and engineering principles applicable to the pertinent art."
*Ex parte Hiyamizu*, 10 USPQ2d 1393, 1394 (Bd. Pat. App. & Inter. 1988). The level of
skill is that of a ***medical/pharmaceutical cancer*** research scientist, as is the case here,
then one can assume comfortably that such an educated artisan will draw conventional

EAGLEBEN-SA_00002021

Application/Control Number: 18/081,251                                              Page 6
Art Unit: 1613

ideas from oncology medicine, oncology pharmacy and chemistry— without being told

to do so.

In addition, the prior art itself reflects an appropriate level (MPEP 2141.03(II)).


## Determination of the scope and content of the prior art
### (MPEP 2141.01)

Regarding claims 1, 2, 8, 11, 12 and 18, Brittain et al. teach a sterile vial

containing about 10-500 mg of lyophilized bendamustine powder ([0067, 0099]; claims

73-74). Brittain et al. teach reconstitution of the lyophilized formulations with a sterile

fluid to provide an appropriate solution of bendamustine for administration [0100].

Brittain et al. teach that in the presence of water, nitrogen mustards like bendamustine

undergo degradation by hydrolysis [0004, 0010, 0107]. Brittain et al. teach that the liquid

carrier for the ultimate dosage form can be from a limited list of liquid polyethyelene

glycol, propylene glycol, ethanol or mixtures thereof [0067, 0090], thereby providing an

immediately envisaged embodiment with a pharmaceutically acceptable fluid that

consists of polyethyelene glycol and optionally one or more of propylene glycol and

ethanol.

Regarding claims 1 and 11, Brittain et al. teach adding antioxidants if desired

include ascorbic acid, aceytylcysteine, cysteine, sodium hydrogen sulfite, butyl-

hydroxyanisole, butyl-hydroxytoluene, alpha-tocopherol acetate or chelators [0088],

which implicitly stabilize the composition to oxidation.

McGinity et al. noted in 1975 that polyethylene glycol 300 had high concentration

of peroxides in the vehicle (page 356, left column first paragraph) as well as PEG400

Application/Control Number: 18/081,251                                          Page 7
Art Unit: 1613

(page 356, left column second paragraph) where samples of polyethylene glycols from

all manufacturers contained peroxides (page 356, right column first paragraph).

McGinity et al. teach that the level of peroxide in polyethylene glycols increases with

aging but that antioxidants in the vehicle helped to decrease the concentration of

peroxides (page 356, right column third paragraph).

Kumar et al. teach that the peroxide content in PEGs increases upon storage

(Abstract) but the levels of residual peroxides can be controlled by the use of

antioxidants (Page E2, left column second paragraph). Kumar et al. also teach that

elevated temperature is known to accelerate the formation of peroxides in PEGs (page

E4, left column Results and Discussion) as shown in Figure 2 at 40° C (page E4).

Wasylaschuk et al. teach that commercial sources of PEG400 can have a

mixture of hydrogen peroxide ($H_2O_2$) and organic hydroperoxide between 20-50% $H_2O_2$

of the hydroperoxides (page 112, Table 7). Wasylaschuk et al. suggest adding

antioxidants to stop HPO propagation (page 113, left column first paragraph).


**Ascertainment of the difference between the prior art and the claims**

**(MPEP 2141.02) and Finding of prima facie obviousness**

**Rational and Motivation (MPEP 2142-2143)**


The difference between the instant application and Brittain et al. is that Brittain et

al. do not expressly teach about 20-60 mg/mL or about 25 mg/mL bendamustine

concentration. However, it would have been obvious to one of ordinary skill in the art at

the time of the claimed invention to reconstitute the lyophilized bendamustine

EAGLEBEN-SA_00002023

composition in the sterile vial with a pharmaceutically acceptable fluid consisting of

polyethylene glycol and optionally propylene glycol or ethanol to a concentration of

about 20-60 mg/mL or about 25 mg/mL bendamustine and produce the instant

invention. One of ordinary skill in the art would have been motivated to do this because

it is merely adding an appropriate amount of a pharmaceutically acceptable fluid

consisting of polyethylene glycol and optionally propylene glycol or ethanol to a

concentration of about 20-60 mg/mL or about 25 mg/mL bendamustine prior to

administration. Especially when Brittain et al. teach and suggest that the vials contain

about 10-500 mg bendamustine lyophilized powder [0099] and occupy between 30-50%

of the vial volume and teach 20 mL vials [0151] as well as 50 mL vials [0008].

Accordingly, the ordinary artisan would have a reasonable expectation of success in

adding enough pharmaceutically acceptable fluid consisting of polyethylene glycol and

optionally propylene glycol or ethanol to the sterile vial to obtain a concentration of

about 20-60 mg/mL or about 25 mg/mL bendamustine prior to administration based on

vial size and bendamustine amount. It is a simple dilution and calculation any

pharmaceutical artisan can perform with no inventive skill but rather ordinary skill. See

MPEP 2143: "a person of ordinary skill has good reason to pursue the known options

within his or her technical grasp. If this leads to the anticipated success, it is likely that

product [was] not of innovation but of ordinary skill and common sense. In that instance

the fact that a combination was obvious to try might show that it was obvious under §

103." *KSR*, 550 U.S. at ___, 82 USPQ2d at 1397.

Regarding the addition of an antioxidant, as noted above, Brittain et al. teach

adding antioxidants when desirable including butyl hydroxytoluene and sulfur containing

Application/Control Number: 18/081,251                                    Page 9
Art Unit: 1613

antioxidants cysteine, sodium hydrogen sulfite and acetylcysteine. The references of

McGinity et al., Kumar et al. and Wasylaschuk et al. establish that commercial sources

of polyethylene glycol contain hydrogen peroxide impurity and that levels of hydrogen

peroxide increase over time when polyethylene glycol is stored and one way to

counteract that is to provide an antioxidant. Thus, it is desirable to add an antioxidant to

the polyethyelene glycol vehicle to not only decrease any oxidants present from the

commercial manufacturing source but also prevent any hydrogen peroxide that may

accumulate over storage time, which would not be beneficial for administration to a

patient. Furthermore, the prevention of peroxide formation over storage time by the

antioxidant has the beneficial function of removing a potential source of water from the

storage solution because it is known that hydrogen peroxide decomposes into water

and oxygen.

$$2H_2O_{2(l)} \longrightarrow 2H_2O_{(l)} + O_2\uparrow$$

Hydrogen peroxide          Water          oxygen

    The water would then detrimentally react with the hydrolysis susceptible

bendamustine to produce undesirable degradation products. Accordingly, the ordinary

artisan is motivated to add antioxidants to the bendamustine-PEG containing

composition to prevent the formation of hydrogen peroxide over shelf storage time with

a reasonable expectation of success.

    Regarding claims 1, 6 and 11, since Brittain et al. teach and suggest the same

components in the same amounts as claimed, then the composition of Brittain et al. will

Application/Control Number: 18/081,251                                    Page 10
Art Unit: 1613

also achieve the same stability and total impurities as claimed. "When the PTO shows a

sound basis for believing that the products of the applicant and the prior art are the

same, the applicant has the burden of showing that they are not." *In re Spada,* 911 F.2d

705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990). Therefore, the *prima facie* case can

be rebutted by evidence showing that the prior art products do not <u>necessarily</u> possess

the characteristics of the claimed product. *In re Best,* 562 F.2d at 1255, 195 USPQ at

433.

In light of the forgoing discussion, the Examiner concludes that the subject matter

defined by the instant claims would have been obvious within the meaning of 35 USC

103(a).

From the combined teachings of the references, it is apparent that one of

ordinary skill in the art would have had a reasonable expectation of success in

producing the claimed invention. Therefore, the invention as a whole was *prima facie*

obvious to one of ordinary skill in the art at the time the invention was made, as

evidenced by the combined references, especially in the absence of evidence to the

contrary.

    <u>**Response to arguments**</u>:

Applicant asserts that: "At the time of the invention, one of ordinary skill in the art

would not have been motivated to make a liquid bendamustine-containing composition

incorporating polyethylene glycol (PEG) and an antioxidant, as claimed. Moreover, the

stability achieved by the claimed compositions would have been unexpected in view of

the cited art." Respectfully, the Examiner cannot agree. It is without question that

Brittain teach and suggest both aqueous carriers and suitable other carriers to provide a

EAGLEBEN-SA_00002026

liquid formulation of bendamustine [0090] where the "suitable other carriers" include polyols such as propylene glycol or liquid polyethylene glycols [0067]. However, it is known through the secondary references that polyethylene glycols can produce hydrogen peroxide in storage but to prevent that from happening antioxidants can be added. Brittain teaches that antioxidants can be added when desirable [0088]. It is desirable to prevent hydrogen peroxide from forming because hydrogen peroxide decomposes to produce water, which is deleterious to the hydrolytically unstable bendamustine. Accordingly, the ordinary artisan is motivated to add an antioxidant when the carrier is polyethyelene glycol.

Applicant asserts that: "Brittain fails to motivate anyone of skill in the art to prepare a liquid composition having a bendamustine concentration of 20 mg/mL to about 60 mg/mL, or any amount within that range. Prior to Applicant's invention, Treanda® (lyophilized bendamustine hydrochloride) was commercially available and would have informed those of ordinary skill about administering bendamustine to a human. In view of that information, the skilled person would not have arbitrarily deviated from those Treanda® administration instructions…" Respectfully, the Examiner does not agree because the prescribing information for Treanda® is not being combined with Brittain to make the rejection and Brittain allows for variation in the amount of bendamustine in the vials. As asserted above, Brittain et al. teach and suggest that the vials contain about 10-500 mg bendamustine lyophilized powder [0099] and occupy between 30-50% of the vial volume and teach 20 mL vials [0151] as well as 50 mL vials [0008]. Accordingly, the ordinary artisan would have a reasonable expectation of success in adding enough pharmaceutically acceptable fluid consisting of polyethylene

glycol and optionally propylene glycol or ethanol to the sterile vial to obtain a

concentration of about 20-60 mg/mL or about 25 mg/mL bendamustine prior to

administration based on vial size and bendamustine amount. It is a simple dilution and

calculation any pharmaceutical artisan can perform with no inventive skill but rather

ordinary skill. Simply having 250 mg of bendamustine and diluting with 10 mL of liquid

PEG provides 25 mg/mL concentration. Applicant's argument is not persuasive.

Applicant asserts that: "Those of Ordinary Skill in the Art Would Not Have

Included an Antioxidant in Any Liquid Bendamustine Composition"; and "Brittain does

not teach that an antioxidant should be added to a liquid bendamustine composition".

Applicant also argues that: "In fact, those of ordinary skill in the art would not have

expected the addition of an antioxidant to be beneficial to bendamustine's storage

stability because no reference had suggested that bendamustine degraded *via* an

oxidative mechanism." However, the Examiner has shown with a preponderance of

evidence that it was well known to the ordinary artisan that increases levels of hydrogen

peroxide are expected to accumulate on storage of PEG. This is detrimental to the

stability of hydrolytically unstable bendamustine because hydrogen peroxide

decomposes into water and oxygen. So, the expectation is that bendamustine may

hydrolytically degrade over time when stored in a PEG vehicle due to accumulating

hydrogen peroxide and subsequent decomposition into water and consequently it is

advantageous and desirable to add antioxidants to prevent that from happening.

Applicant's comments on the hydrolysis of bendamustine is noted and reinforces the

importance of keeping any potential source of water, such as hydrogen peroxide, out of

the system. Applicant's arguments are not persuasive.

EAGLEBEN-SA_00002028

Applicant argues that the industry guidance discouraged using antioxidants in parenteral formulations. However, the Examiner has shown that it is desirable to add antioxidants to prevent PEG from producing hydrogen peroxide leading to bendamustine hydrolysis, which trumps any discouragement of using antioxidants by the industry. Exhibit A has been carefully considered but is not controlling because the facts are different in the present case.

Applicant asserts that the claimed compositions are surprisingly stable during storage for 15 days at 40° C. However, it is known through Kumar et al. that increasing temperature, such as 40° C increases the amount of hydrogen peroxide significantly (Figure 2 and appropriate text). That peroxide is expected to decompose into water. That water is expected to react with hydrolytically unstable bendamustine. So, it would appear that Applicant's observation is an expected and predictable result.

Applicant asserts that: "Based on these poor stability results, a person would have forsaken development of a liquid bendamustine/PEG composition." Respectfully, the Examiner cannot agree because the ordinary artisan would be aware of the art of McGinity et al., Kumar et al. and Wasylaschuk et al. and simply added an antioxidant to the composition to prevent hydrogen peroxide formation and ultimately water, which is ostensibly the cause of the bendamustine degradation observed by Applicant. The opinion of Exhibit B paragraph 359 is noted but not controlling. Adding antioxidants to pharmaceutical formulations is common practice by the pharmaceutical formulation scientist, does not introduce any complexity into the formulation or risk of unwanted interactions with bendamustine. Brittain even states when desirable to add those antioxidants to the bendamustine formulation [0088] and to make the ultimate dosage

Application/Control Number: 18/081,251                           Page 14
Art Unit: 1613

form stable under conditions of manufacture and storage [0067]. Accordingly, paragraph

471 is full allegations unsupported by any evidence.  Nor is there any unpredictable

research effort as the art has provided guidance on what antioxidants to employ.

Respectfully, Applicant's arguments are not persuasive.


**Claims 4, 5, 14 and 15** are rejected under 35 U.S.C. 103(a) as being

unpatentable over Brittain et al. (US 20060159713) and Kumar et al. (AAPS

PharmSciTech 2006;7(3):E1-E7) and McGinity et al. (Journal of Pharmaceutical

Sciences 1975;64(2):356-357) and Wasylaschuk et al. (JOURNAL OF

PHARMACEUTICAL SCIENCES, VOL. 96, NO. 1, JANUARY 2007:106-116), as

applied to claims 1-3, 6, 8, 11-13 and 18 above, in further view of Tait et al. (WO

0202125).

Applicant claims, for example:

4.    (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol.

5.    (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a
      concentration of about 5 mg/mL.


14.   (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol.

15.   (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol in a
      concentration of about 5 mg/mL.


Brittain et al., McGinity et al., Kumar et al. and  Wasylaschuk et al. are discussed

in detail above and that discussion is incorporated by reference.

EAGLEBEN-SA_00002030

Application/Control Number: 18/081,251                                    Page 15
Art Unit: 1613

Regarding claims 4, 5, 14 and 15, Tait et al. teach stabilized injectable compositions of the alkylating agent ifosfamide (Abstract; page 1, line 7) comprising PEG200-600, ethanol (page 6, lines 16-24; page 9, lines 15-21; claims 4-6) and antioxidants such as BHA, BHT and up to 5% monothioglycerol (page 9, lies 11-14; page 14, line 6) that are stable for at least 180 days (page 6, lines 25-26).

The difference between the instant application and Brittain et al. as modified by McGinity et al., Kumar et al. and Wasylaschuk et al., is that Brittain et al. do not expressly teach about 5 mg/mL of monothioglycerol antioxidant. This deficiency in Brittain et al. is cured by the teachings of Tait et al. It would have been obvious to one of ordinary skill in the art at the time of the claimed invention to add about 5 mg/mL of monothioglycerol antioxidant to the composition of Brittain et al. as modified by McGinity et al., Kumar et al. and Wasylaschuk et al., as suggested by Tait et al., produce the instant invention.

One of ordinary skill in the art would have been motivated to do this because as noted above Brittain et al. as modified by McGinity et al., Kumar et al. and Wasylaschuk et al. suggest adding an antioxidant and name, for example butyl-hydroxyanisole (BHA) and butyl-hydroxytoluene (BHT). Tait et al. teach the equivalence of monothioglycerol, BHA and BHT as antioxidants to stabilize alkylating agents and thus have interchangeable function. "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007). Moreover, "Where two known alternatives are interchangeable for a desired function, an express suggestion to substitute one for the other is not needed to render a substitution obvious." *In re Fout*,

EAGLEBEN-SA_00002031

Application/Control Number: 18/081,251                                    Page 16
Art Unit: 1613

675 F.2d 297, 301 (CCPA 1982). Accordingly, the ordinary artisan would select the

antioxidant monothioglycerol and optimize the amount to about 5 mg/mL to achieve the

desired degree of stability with a reasonable expectation of success especially when

Tait et al. teach using from 0-5%.

In light of the forgoing discussion, the Examiner concludes that the subject matter

defined by the instant claims would have been obvious within the meaning of 35 USC

103(a).

From the combined teachings of the references, it is apparent that one of

ordinary skill in the art would have had a reasonable expectation of success in

producing the claimed invention. Therefore, the invention as a whole was *prima facie*

obvious to one of ordinary skill in the art at the time the invention was made, as

evidenced by the combined references, especially in the absence of evidence to the

contrary.

### Response to Arguments:

Applicant asserts that Tait does not cure Brittain's deficiencies. Respectfully, the

Examiner does not agree for the reasons set forth above.


### *Conclusion*

No claims are allowed.

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to ERNST V ARNOLD whose telephone number is

(571)272-8509. The examiner can normally be reached M-F 7-3:30.

Examiner interviews are available via telephone and video conferencing using a

USPTO supplied web-based collaboration tool. To schedule an interview, applicant is

EAGLEBEN-SA_00002032

Application/Control Number: 18/081,251                                    Page 17
Art Unit: 1613

encouraged to use the USPTO Automated Interview Request (AIR) at

http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Brian Y Kwon can be reached on 571-272-0581. The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of published or unpublished applications may be

obtained from Patent Center. Unpublished application information in Patent Center is

available to registered users. To file and manage patent submissions in Patent Center,

visit: https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-

center for more information about Patent Center and

https://www.uspto.gov/patents/docx for information about filing in DOCX format. For

additional questions, contact the Electronic Business Center (EBC) at 866-217-9197

(toll-free). If you would like assistance from a USPTO Customer Service

Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/ERNST V ARNOLD/
Primary Examiner, Art Unit 1613

EAGLEBEN-SA_00002033

# EXHIBIT 9

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/081,251 | 12/14/2022 | Nagesh R. Palepu | 107071.000583 | 8743 |

| 23377 | 7590 | 03/14/2023 |
|---|---|---|

BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501

| EXAMINER |
|---|
| ARNOLD, ERNST V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1613 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 03/14/2023 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

eofficemonitor@bakerlaw.com

PTOL-90A (Rev. 04/07)

EAGLEBEN-SA_00001166

| *Office Action Summary* | Application No.<br>18/081,251 | | Applicant(s)<br>Palepu et al. | |
|---|---|---|---|---|
| | Examiner<br>ERNST V ARNOLD | | Art Unit<br>1613 | AIA (FITF) Status<br>No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☐ Responsive to communication(s) filed on _____.
  ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a) ☐ This action is **FINAL.**  2b) ☑ This action is non-final.
3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____ ; the restriction requirement and election have been incorporated into this action.
4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☑ Claim(s)  <u>1-18</u> is/are pending in the application.
  5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☑ Claim(s) <u>1-18</u> is/are rejected.
8) ☑ Claim(s) <u>10-11 and 16</u> is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10) ☐ The specification is objected to by the Examiner.
11) ☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.
  Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
  **Certified copies:**
  a)☐ All    b)☐ Some**    c)☐ None of the:
  1.☐ Certified copies of the priority documents have been received.
  2.☐ Certified copies of the priority documents have been received in Application No. _____.
  3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)
2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)<br>Paper No(s)/Mail Date _____.
3) ☑ Interview Summary (PTO-413)<br>Paper No(s)/Mail Date _____.
4) ☐ Other: _____.

PTOL-326 (Rev. 11-13)    Office Action Summary    Part of Paper No./Mail Date 20230303

EAGLEBEN-SA_00001167

### Notice of Pre-AIA or AIA Status

The present application is being examined under the pre-AIA first to invent

provisions.

### Claim Status

Claims 1-16 are pending. Please note that Applicant has misnumbered the

claims. After claim 11, Applicant has "Claim 10" and the total number of claims is

actually 18.

### Priority

# Continuity/Reexam Information for 18/081251

**Parent Data**
18081251, filed 12/14/2022 is a continuation of 17412623, filed 08/26/2021
17412623 is a continuation of 16509920, filed 07/12/2019 ,now U.S. Patent #11103483 and having 1 RCE-type filing therein
16509920 is a continuation of 16015656, filed 06/22/2018 ,now abandoned
16015656 is a continuation of 15432335, filed 02/14/2017 ,now U.S. Patent #10010533
15432335 is a continuation of 15013436, filed 02/02/2016 ,now U.S. Patent #9572797
15013436 is a continuation of 14031879, filed 09/19/2013 ,now U.S. Patent #9265831 and having 1 RCE-type filing therein
14031879 is a continuation of 13016473, filed 01/28/2011 ,now U.S. Patent #8609707 and having 1 RCE-type filing therein
13016473 Claims Priority from Provisional Application 61299100, filed 01/28/2010

The limitation of "sterile vial" in claims 1-8 is first found in 13016473 filed 01/28/2011.

The limitation of "intravenously administering" is not found in the parent applications.

Accordingly, claims 9 and 10 are only afforded the instant filing date of 12/14/22 for

application of prior art. The limitations of claims 11-16 appear to be fully supported by

provisional application 61299100 and have the benefit of 01/28/2010. Applicants with

this filing of claims 9 and 10 appear to introduce a concept and claim scope absent from

prior-filed applications, and on this basis appears to be a Continuation in Part, rather

than CON, of the earlier filed applications.

### Information Disclosure Statement

The information disclosure statements (IDSs) submitted on 12/14/22 are mostly in compliance with the provisions of 37 CFR 1.97. Citations without a publication date have a line drawn through them and have not been considered.

### Claim Objections

The numbering of claims is not in accordance with 37 CFR 1.126. There are two claims 10 and two claims 11 as shown below:

10.     The method of claim 9, wherein the liquid bendamustine containing composition is diluted with about 50 mL of a diluent.

11.     A bendamustine-containing composition comprising
bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid;
wherein the pharmaceutically acceptable fluid comprises polyethylene glycol; and
wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 20 mg/mL to about 60 mg/mL.

10.     The composition of claim 11, comprising 100 mg of bendamustine.

11.     The composition of claim 11, wherein the bendamustine concentration is about 25 mg/mL.

Correction is required.

Claim 16 is objected to because of the following informalities: claim 16 does not end in a period as required by MPEP 608.01(m): Each claim begins with a capital letter and ends with a period. Appropriate correction is required.

EAGLEBEN-SA_00001169

Application/Control Number: 18/081,251                                    Page 4
Art Unit: 1613

### *Claim Rejections - 35 USC § 112*

The following is a quotation of 35 U.S.C. 112(b):

(b)  CONCLUSION.—The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention.

The following is a quotation of 35 U.S.C. 112 (pre-AIA), second paragraph:

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Claim 10 is rejected under 35 U.S.C. 112(b) or 35 U.S.C. 112 (pre-AIA), second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which the inventor or a joint inventor (or for applications subject to pre-AIA 35 U.S.C. 112, the applicant), regards as the invention. Claim 10 is not dependent upon a preceding claim but on following claim 11:

> 10.   The composition of claim 11, comprising 100 mg of bendamustine.

Correction is required.

Claim 11 is rejected under 35 U.S.C. 112(b) or 35 U.S.C. 112 (pre-AIA), second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which the inventor or a joint inventor (or for applications subject to pre-AIA 35 U.S.C. 112, the applicant), regards as the invention. Claim 11 is dependent upon itself.

> 11.   The composition of claim 11, wherein the bendamustine concentration is about 25 mg/mL.

Correction is required.

### *Claim Rejections - 35 USC § 103*

In the event the determination of the status of the application as subject to AIA 35

U.S.C. 102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any

correction of the statutory basis for the rejection will not be considered a new ground of

rejection if the prior art relied upon, and the rationale supporting the rejection, would be

the same under either status.

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed
> or described as set forth in section 102 of this title, if the differences between the
> subject matter sought to be patented and the prior art are such that the subject
> matter as a whole would have been obvious at the time the invention was made
> to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was
> made.

The factual inquiries set forth in *Graham* **v.** *John Deere Co.*, 383 U.S. 1, 148

USPQ 459 (1966), that are applied for establishing a background for determining

obviousness under 35 U.S.C. 103(a) are summarized as follows:

1. Determining the scope and contents of the prior art.
2. Ascertaining the differences between the prior art and the claims at issue.
3. Resolving the level of ordinary skill in the pertinent art.
4. Considering objective evidence present in the application indicating obviousness or nonobviousness.

This application currently names joint inventors. In considering patentability of
the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of
the various claims was commonly owned at the time any inventions covered therein
were made absent any evidence to the contrary. Applicant is advised of the obligation
under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was
not commonly owned at the time a later invention was made in order for the examiner to
consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g)
prior art under 35 U.S.C. 103(a).

EAGLEBEN-SA_00001171

Application/Control Number: 18/081,251                                                 Page 6
Art Unit: 1613

**Claims 1-3, 6-8, 11-13 and 16-18** (the Examiner has rejected renumbered

claims) are rejected under 35 U.S.C. 103(a) as being unpatentable over Drager et al.

(US 20110190363, of record, with benefit of PCT/US09/58023 filed September 23,

2009, which claims priority form provisional 61100074 filed September 25, 2008).

Applicant claims:

A sterile vial containing a liquid bendamustine-containing composition comprising
bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine
concentration in the composition is from about 20 mg/mL to about 60 mg/mL;
polyethylene glycol; and
a stabilizing amount of an antioxidant.

11.   A bendamustine-containing composition comprising
bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of
an antioxidant, in a pharmaceutically acceptable fluid;
wherein the pharmaceutically acceptable fluid comprises polyethylene glycol; and
wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from
about 20 mg/mL to about 60 mg/mL.

## Level of Ordinary Skill in the Art

## (MPEP 2141.03)

MPEP 2141.03 (I) states: "The "hypothetical 'person having ordinary skill in the

art' to which the claimed subject matter pertains would, of necessity have the capability

of understanding the scientific and engineering principles applicable to the pertinent art."

*Ex parte Hiyamizu*, 10 USPQ2d 1393, 1394 (Bd. Pat. App. & Inter. 1988). The level of

skill is that of a ***medical/pharmaceutical cancer*** research scientist, as is the case here,

then one can assume comfortably that such an educated artisan will draw conventional

EAGLEBEN-SA_00001172

ideas from oncology medicine, oncology pharmacy and chemistry— without being told

to do so.

In addition, the prior art itself reflects an appropriate level (MPEP 2141.03(II)).


## Determination of the scope and content of the prior art
## (MPEP 2141.01)


Regarding claims 1, 3, 11 and 13, Drager et al. teach stable liquid formulations of

bendamustine (Abstract) and that bendamustine comes in vial, diluted just before dose

administration to the saphenous vein [0037]. Drager et al. teach that the bendamustine

concentration can range from about 5 mg/mL to about 200 mg/mL (claim 12) with

preferred concentrations of, for example, about 20 mg/mL and about 60 mg/mL [0028],

which embraces the range of from about 20 mg/mL to about 60 mg/mL as well as the

claimed amount of about 25 mg/mL. See MPEP 2144.05(I): In the case where the

claimed ranges "overlap or lie inside ranges disclosed by the prior art" a *prima facie*

case of obviousness exists. *In re Wertheim*, 541 F.2d 257, 191 USPQ 90 (CCPA 1976).

Regarding claims 1 and 11, Drager et al. teach that it has been discovered that

stable formulation of bendamustine or a pharmaceutical salt thereof can be obtained by

mixing with a polar aprotic solvent such as polyethylene glycol ([0016]; claims 1, 3, 4)

such as PEG300 or PEG400 [0030] as well as antioxidants such as vitamin E, ascorbic

acid, BHA, BHT, propyl gallate ([0030]; claim 11), which naturally stabilizes the

composition.

EAGLEBEN-SA_00001173

Application/Control Number: 18/081,251                                                    Page 8
Art Unit: 1613

Regarding claims 2 and 12, Drager et al. teach embodiments with about 100

mg/mL bendamustine [0028], which renders obvious a composition with 100 mg

bendamustine in 1 mL.

Regarding claims 6-7 and 16-17, Drager et al. teach:

> [0022]  In preferred embodiments of the present invention, analysis of formulations of the present invention will exhibit 1.50% or less of DCE, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C. More preferably, the formulations will exhibit 1.0% or less of DCE, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C. Even more preferably, the formulations will exhibit 0.5% or less of DCE, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C. Most preferably, the formulations will exhibit about 0.1% or less of DCE, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C.
> [0023]  In other embodiments of the present invention, analysis of the formulations will exhibit about 0.4% or less of HP1, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C. Preferably, the formulations will exhibit about 0.10% or less of HP1, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C.

Regarding claims 8 and 18, Drager et al. teach adding mixtures of polyalkylene

glycol and an alcohol (claim 4) and name ethanol [0016].


### Ascertainment of the difference between the prior art and the claims

### (MPEP 2141.02) and Finding of prima facie obviousness

### Rational and Motivation (MPEP 2142-2143)

The difference between the instant application and Drager et al. is that Drager et

al. do not expressly teach providing a sterile vial and the limitation of 15 month stable at

5 °C or 25 °C wherein the total impurities resulting from the degradation of the

bendamustine is less than about 5% peak area response, as determined by HPLC at a

EAGLEBEN-SA_00001174

Application/Control Number: 18/081,251                                          Page 9
Art Unit: 1613

wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

It would have been obvious to one of ordinary skill in the art at the time of the claimed invention to perform the method of Drager et al. by providing a sterile vial containing the bendamustine liquid composition and achieve the 15 month stable at 5 °C or 25 °C wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C and produce the instant invention.

One of ordinary skill in the art would have been motivated to do this because the ordinary medical artisan understands that the vial must be sterile otherwise not only does it defeat the purpose of using sterile water for injection [0004] but also the patient runs the risk of infection from a dirty vial. Thus, the ordinary artisan is motivated to do so for at least for the welfare of the patient with a reasonable expectation of success. Drager et al. teach that the compositions are stable to about 365 days, which is about a year and teach less than 0.1% or less degradation products ([0022-0024]). Accordingly, the ordinary artisan can extrapolate out to 15 months and be reasonably certain that the compositions will be stable with less than about 5% peak area response as determined by HPLC for total impurities. Especially when the compositions comprise the same polyethylene glycol and antioxidants as claimed and would have a reasonable expectation of success of having a stable composition for at least about 15 months at 5 °C to about 25 °C.

Application/Control Number: 18/081,251                                    Page 10
Art Unit: 1613

In light of the forgoing discussion, the Examiner concludes that the subject matter

defined by the instant claims would have been obvious within the meaning of 35 USC

103(a).

From the combined teachings of the references, it is apparent that one of

ordinary skill in the art would have had a reasonable expectation of success in

producing the claimed invention. Therefore, the invention as a whole was *prima facie*

obvious to one of ordinary skill in the art at the time the invention was made, as

evidenced by the combined references, especially in the absence of evidence to the

contrary.

**Claims 4, 5, 14 and 15** (the Examiner has rejected renumbered claims) are

rejected under 35 U.S.C. 103(a) as being unpatentable over Drager et al. (US

20110190363), as applied to claims 1-3, 6-8, 11-13 and 16-18 above, in further view of

Tait et al. (WO 0202125), of record.

Applicant claims:

4.      The sterile vial of claim 1, wherein the antioxidant is monothioglycerol.

5.      The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a concentration
        of about 5 mg/mL.

12.     The composition of claim 11, wherein the antioxidant is monothioglycerol.

13.     The composition of claim 11, wherein the antioxidant is monothioglycerol in a
        concentration of about 5 mg/mL.

### Level of Ordinary Skill in the Art

### (MPEP 2141.03)

EAGLEBEN-SA_00001176

Application/Control Number: 18/081,251                                                Page 11
Art Unit: 1613

     MPEP 2141.03 (I) states: "The "hypothetical 'person having ordinary skill in the art' to which the claimed subject matter pertains would, of necessity have the capability of understanding the scientific and engineering principles applicable to the pertinent art." *Ex parte Hiyamizu*, 10 USPQ2d 1393, 1394 (Bd. Pat. App. & Inter. 1988). The level of skill is that of a ***medical/pharmaceutical cancer*** research scientist, as is the case here, then one can assume comfortably that such an educated artisan will draw conventional ideas from oncology medicine, oncology pharmacy and chemistry— without being told to do so.

     In addition, the prior art itself reflects an appropriate level (MPEP 2141.03(II)).

## Determination of the scope and content of the prior art
## (MPEP 2141.01)

     Drager et al. is discussed above and that discussion is incorporated by reference.

     Regarding claims 4, 5, 14 and 15, Tait et al. teach stabilized injectable compositions of the alkylating agent ifosfamide (Abstract; page 1, line 7) comprising PEG200-600, ethanol (page 6, lines 16-24; page 9, lines 15-21; claims 4-6) and antioxidants such as BHA, BHT and up to 5% monothioglycerol (page 9, lies 11-14; page 14, line 6) that are stable for at least 180 days (page 6, lines 25-26).

## Ascertainment of the difference between the prior art and the claims
## (MPEP 2141.02) and Finding of prima facie obviousness
## Rational and Motivation (MPEP 2142-2143)

EAGLEBEN-SA_00001177

Application/Control Number: 18/081,251                                    Page 12
Art Unit: 1613

The difference between the instant application and Drager et al. is that Drager et al. do not expressly teach about 5 mg/mL of monothioglycerol antioxidant. This deficiency in Drager et al. is cured by the teachings of Tait et al.

It would have been obvious to one of ordinary skill in the art at the time of the claimed invention to add about 5 mg/mL of monothioglycerol antioxidant to the composition of Drager et al., as suggested by Tait et al., produce the instant invention.

One of ordinary skill in the art would have been motivated to do this because as noted above Drager et al. suggest adding an antioxidant and name, for example BHA and BHT. Tait et al. teach the equivalence of monothioglycerol, BHA and BHT as antioxidants to stabilize alkylating agents and thus have interchangeable function. "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007). Moreover, "Where two known alternatives are interchangeable for a desired function, an express suggestion to substitute one for the other is not needed to render a substitution obvious." *In re Fout*, 675 F.2d 297, 301 (CCPA 1982). Accordingly, the ordinary artisan would select the antioxidant monothioglycerol and optimize the amount to about 5 mg/mL to achieve the desired degree of stability with a reasonable expectation of success especially when Tait et al. teach using from 0-5%.

In light of the forgoing discussion, the Examiner concludes that the subject matter defined by the instant claims would have been obvious within the meaning of 35 USC 103(a).

From the combined teachings of the references, it is apparent that one of ordinary skill in the art would have had a reasonable expectation of success in

EAGLEBEN-SA_00001178

Application/Control Number: 18/081,251                                                  Page 13
Art Unit: 1613

producing the claimed invention. Therefore, the invention as a whole was *prima facie*

obvious to one of ordinary skill in the art at the time the invention was made, as

evidenced by the combined references, especially in the absence of evidence to the

contrary.

**Claims 9 and 10** are rejected under 35 U.S.C. 103(a) as being unpatentable

over Drager et al. (US 20110190363 with benefit of PCT/US09/58023 filed September

23, 2009, which claims priority form provisional 61100074 filed September 25, 2008).

Applicant claims:

A method of treating leukemia in a human in need thereof comprising
providing a sterile vial comprising liquid bendamustine-containing composition
comprising about 25 mg/ml of bendamustine;
diluting the liquid bendamustine containing composition; and

intravenously administering the diluted composition to the human.

### Level of Ordinary Skill in the Art

### (MPEP 2141.03)

MPEP 2141.03 (I) states: "The "hypothetical 'person having ordinary skill in the

art' to which the claimed subject matter pertains would, of necessity have the capability

of understanding the scientific and engineering principles applicable to the pertinent art."

*Ex parte Hiyamizu*, 10 USPQ2d 1393, 1394 (Bd. Pat. App. & Inter. 1988). The level of

skill is that of a ***medical/pharmaceutical cancer*** research scientist, as is the case here,

then one can assume comfortably that such an educated artisan will draw conventional

Application/Control Number: 18/081,251                                  Page 14
Art Unit: 1613

ideas from oncology medicine, oncology pharmacy and chemistry— without being told

to do so.

In addition, the prior art itself reflects an appropriate level (MPEP 2141.03(II)).


## Determination of the scope and content of the prior art

## (MPEP 2141.01)

Regarding claims 9 and 10, Drager et al. teach a method of treating cancer

comprising:

- providing a liquid pharmaceutical composition comprising a therapeutically

  effective amount of bendamustine or pharmaceutically acceptable salt thereof

  and non-aqueous solvent;

- diluting the liquid pharmaceutical formulation with a pharmaceutically acceptable

  injectable diluent to form a pharmaceutical preparation; and

- administering the pharmaceutical preparation to the patient in need of treatment

  (claim 47) intravenously [0032].

Drager et al. teach that bendamustine comes in vial, diluted just before dose

administration to the saphenous vein, hence intravenous administration [0037]. Drager

et al. teach that the cancer includes leukemia [0031]. Drager et al. teach that the

bendamustine concentration can range from about 5 mg/mL to about 200 mg/mL with

preferred concentrations of about 20 mg/mL, about 30 mg/mL [0028], thereby creating a

range of about 20-30 mg/mL, which embraces the claimed amount of about 25 mg/mL.

See MPEP 2144.05(I): In the case where the claimed ranges "overlap or lie inside

Application/Control Number: 18/081,251                                    Page 15
Art Unit: 1613

ranges disclosed by the prior art" a *prima facie* case of obviousness exists. *In re*

*Wertheim*, 541 F.2d 257, 191 USPQ 90 (CCPA 1976).


**Ascertainment of the difference between the prior art and the claims**

**(MPEP 2141.02) and Finding of prima facie obviousness**

**Rational and Motivation (MPEP 2142-2143)**

The difference between the instant application and Drager et al. is that Drager et

al. do not expressly teach providing a sterile vial and diluting with about 50 mL of a

diluent.

It would have been obvious to one of ordinary skill in the art at the time of the

claimed invention to perform the method of Drager et al. by providing a sterile vial

containing the bendamustine liquid composition and dilute it with about 50 mL of a

diluent and produce the instant invention.

One of ordinary skill in the art would have been motivated to do this because the

ordinary medical artisan understands that the vial must be sterile otherwise not only

does it defeat the purpose of using sterile water for injection [0004] but also the patient

runs the risk of infection from a dirty vial. Thus, the ordinary artisan is motivated to do so

for at least for the welfare of the patient with a reasonable expectation of success. The

amount of diluent is a result effect variable routinely optimized by the ordinary artisan to

provide the proper concentration of bendamustine to the patient from the concentrated

formulation. Thus, absent any criticality of "about 50 mL of a diluent", such is readily

determined by the ordinary artisan in this art with no inventive skill required.

Application/Control Number: 18/081,251                                          Page 16
Art Unit: 1613

In light of the forgoing discussion, the Examiner concludes that the subject matter

defined by the instant claims would have been obvious within the meaning of 35 USC

103(a).

From the combined teachings of the references, it is apparent that one of

ordinary skill in the art would have had a reasonable expectation of success in

producing the claimed invention. Therefore, the invention as a whole was *prima facie*

obvious to one of ordinary skill in the art at the time the invention was made, as

evidenced by the combined references, especially in the absence of evidence to the

contrary.

### Double Patenting

The nonstatutory double patenting rejection is based on a judicially created
doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the
unjustified or improper timewise extension of the "right to exclude" granted by a patent
and to prevent possible harassment by multiple assignees. A nonstatutory double
patenting rejection is appropriate where the conflicting claims are not identical, but at
least one examined application claim is not patentably distinct from the reference
claim(s) because the examined application claim is either anticipated by, or would have
been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46
USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed.
Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*,
686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619
(CCPA 1970); *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).
A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d)
may be used to overcome an actual or provisional rejection based on nonstatutory
double patenting provided the reference application or patent either is shown to be
commonly owned with the examined application, or claims an invention made as a
result of activities undertaken within the scope of a joint research agreement. See
MPEP § 717.02 for applications subject to examination under the first inventor to file
provisions of the AIA as explained in MPEP § 2159. See MPEP § 2146 *et seq.* for
applications not subject to examination under the first inventor to file provisions of the
AIA. A terminal disclaimer must be signed in compliance with 37 CFR 1.321(b).
The USPTO Internet website contains terminal disclaimer forms which may be
used. Please visit www.uspto.gov/patent/patents-forms. The filing date of the application
in which the form is filed determines what form (e.g., PTO/SB/25, PTO/SB/26,
PTO/AIA/25, or PTO/AIA/26) should be used. A web-based eTerminal Disclaimer may
be filled out completely online using web-screens. An eTerminal Disclaimer that meets

EAGLEBEN-SA_00001182

all requirements is auto-processed and approved immediately upon submission. For more information about eTerminal Disclaimers, refer to www.uspto.gov/patents/process/file/efs/guidance/eTD-info-I.jsp.

1. Claims 1-8, 11-18 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-6 of U.S. Patent No. 9265831. Although the claims at issue are not identical, they are not patentably distinct from each other because the patent is directed to:

US 9,265,831 B2

**13**

TABLE 8

Stability of Bendamustine in 85%
PEG 400, 15% PG and Thioglycerol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Total Imp. |
|---|---|---|---|---|---|
| BDM—50 mg/mL | Initial | | 51.5 | 100 | 0.12 |
| Thioglycerol—5 mg/mL | 40° C. | 1 M | 50.4 | 97.9 | 1.18 |
| PEG 400:PG (85:15) qs to | 25° C. | 1 M | 51.4 | 99.8 | 0.41 |
| 1 mL | | 3 M | 50.4 | 97.9 | 1.21 |
| | 5° C. | 3 M | 51.0 | 99.0 | 0.26 |

The stability is similar to that of thioglycerol samples in Example 7 above. As reported in Table 8, total impurities did not exceed 2% at 40° C. or 25° C. storage over one month, or at 25° C. and 5° C. storage after three months. The data reported in Table 8 supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for at least about 2 years if not longer.

We claim:

1. A non-aqueous liquid bendamustine-containing composition, comprising:
   a) bendamustine or a pharmaceutically acceptable salt thereof; and
   b) a pharmaceutically acceptable fluid comprising;
      i) about 5% to about 10% by volume propylene glycol,
      ii) polyethylene glycol, and

**14**

   iii) a stabilizing amount of an antioxidant selected from the group consisting of: thioglycerol, monothioglycerol, lipoic acid, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds and dihydrolipoic acid;
   the bendamustine-containing composition having less than or equal to 0.11% total PG esters at about 1 month of storage at a temperature of about 5° C.,
   wherein the ratio of polyethylene glycol to propylene glycol is selected from the group consisting of: about 95:5, about 90:10, about 85:15, about 80:20 and about 75:25.

2. The liquid bendamustine-containing composition of claim 1, wherein said bendamustine-containing composition has less than or equal to 0.18% total PG esters at about 12 months of storage at a temperature of about 5° C.

3. The liquid bendamustine-containing composition of claim 1, wherein the amount of propylene glycol in the pharmaceutically acceptable fluid is about 10%.

4. The liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

5. The liquid bendamustine-containing composition of claim 4, wherein the bendamustine concentration is from about 25 mg/mL to about 50 mg/mL.

6. The liquid bendamustine-containing composition of claim 5, wherein the bendamustine concentration is about 50 mg/mL.

\* \* \* \* \*

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

EAGLEBEN-SA_00001183

Application/Control Number: 18/081,251                                                    Page 18
Art Unit: 1613

The patent does not expressly teach about 100 mg of bendamustine. However, if the concentration is 25 mg/mL (claim 5) then in 4 mL the artisan would have 100 mg bendamustine present with a reasonable expectation of success.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches a stabilizing amount of antioxidant and it is merely routine optimization to determine how much monothioglycerol (thioglycerol) to have to achieve the desired stabilization by the ordinary artisan.

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

The patent does not expressly the claimed stability at about 15 months at about 5-25 C or less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at about 5-25 C to determine the total impurities from the degradation of bendamustine at the period of time or temperatures instantly claimed. However, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

2. Claims 1-18 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-27 of U.S. Patent No. 9572797.

EAGLEBEN-SA_00001184

Application/Control Number: 18/081,251                                          Page 19
Art Unit: 1613

Although the claims at issue are not identical, they are not patentably distinct

from each other because the patented method is directed to using the instantly claimed

compositions of about 20-60 mg/mL bendamustine (claims 1, 4-6), polyethylene glycol

and about 2.5-35 mg/mL monothioglycerol antioxidant (claims 1, 11, 12) in a method of

treating, for example leukemia (claims 13, 25) with similar stability (claims 2, 7-10, 16-

20).

We claim:
1. A method of treating leukemia, Hodgkin's disease, or
multiple myeloma in a mammal, comprising administering
to the mammal, a liquid bendamustine-containing compo-
sition comprising:
a) bendamustine or a pharmaceutically acceptable salt
thereof; and
b) a non-aqueous pharmaceutically acceptable fluid com-
prising
about 5% to about 10%, based on the volume of the
pharmaceutically acceptable fluid, of propylene gly-
col,
polyethylene glycol,
and a stabilizing amount of an antioxidant selected
from the group consisting of thioglycerol, monoth-
ioglycerol, lipoic acid, propyl gallate, methionine,
cysteine, metabisulfites, sodium formaldehyde sul-
foxylate, phenol-containing aromatic and aliphatic
compounds and dihydrolipoic acid;
the bendamustine-containing composition having less
than or equal to 0.11% total PG esters at about 1 month
of storage at a temperature of about 5° C.;
wherein the ratio of polyethylene glycol to propylene
glycol is selected from the group consisting of: about
95:5, about 90:10, about 85:15, about 80:20, and about
75:25.

13. The method of claim 1, for the treatment of leukemia.
14. The method of claim 1, for the treatment of Hodgkin's
disease.

The patent does not expressly teach a sterile vial. However, the ordinary artisan

in the pharmaceutical arts would place the bendamustine composition in a sterile vial to

avoid microbiological contamination, which would ruin the pharmaceutical product, with

a reasonable expectation of success.

Application/Control Number: 18/081,251                                          Page 20
Art Unit: 1613

The patent does not expressly teach about 100 mg of bendamustine. However, if
the concentration is 25 mg/mL (claim 5) then in 4 mL the artisan would have 100 mg
bendamustine present with a reasonable expectation of success.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However,
the patent teaches a stabilizing amount of antioxidant and it is merely routine
optimization to determine how much monothioglycerol (thioglycerol) to have to achieve
the desired stabilization by the ordinary artisan.

The patent does not expressly teach a step in the method of diluting with about
50 mL of diluent. However, the ordinary artisan understands that the concentrated
solution needs dilution prior to administration and dilution with 50 mL is just an arbitrary
amount to achieve the desired therapeutic concentration. The ordinary artisan can do so
with a reasonable expectation of success.

The patent does not expressly teach intravenous administration but intravenous
administration is a common method to administer liquid compositions well-known to the
ordinary artisan.

The patent does not expressly teach adding ethanol. However, ethanol is a well-
known pharmaceutical solvent in which bendamustine is soluble. The artisan would add
ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable
expectation of success.

The patent does not expressly the claimed stability at about 15 months at about
5-25 C or less than about 5% peak area response of total impurities as determined
using HPLC with a wavelength of 223 nm at least about 15 months at about 5-25 C to
determine the total impurities from the degradation of bendamustine at the period of

Application/Control Number: 18/081,251                                                    Page 21
Art Unit: 1613

time or temperatures instantly claimed. However, such would be inherent in the

composition comprising the same components. See MPEP 2112.01(II): "Products of

identical chemical composition cannot have mutually exclusive properties." *In re Spada*,

911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

Therefore, the ordinary artisan would have recognized the obvious variation of

the instantly claimed subject matter over the patented subject matter.

3. Claims 1-18 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-26 of U.S. Patent No. 9572796 in view of Tait et al.

(WO 0202125). Although the claims at issue are not identical, they are not patentably

distinct from each other because the patent is directed to:

> 1. A non-aqueous liquid composition comprising:
> bendamustine, or a pharmaceutically acceptable salt
> thereof;
> a pharmaceutically acceptable fluid comprising a mixture
> of polyethylene glycol and propylene glycol, wherein
> the ratio of polyethylene glycol to propylene glycol in
> the pharmaceutically acceptable fluid is from about
> 95:5 to about 50:50; and
> a stabilizing amount of an antioxidant;
> wherein the composition has less than about 5% total
> impurities after 15 months of storage at about 5° C., as
> calculated on a normalized peak area response basis as
> determined by high performance liquid chromatogra-
> phy at a wavelength of 223 nm.
> 2. The non-aqueous liquid composition of claim 1,
> wherein the bendamustine concentration is from about 10
> mg/mL to about 100 mg/mL.
> 3. The non-aqueous liquid composition of claim 1,
> wherein the bendamustine concentration is from about 20
> mg/mL to about 60 mg/mL.
> 4. The non-aqueous liquid composition of claim 1,
> wherein the bendamustine concentration is from about 25
> mg/mL to about 50 mg/mL.
> 5. The non-aqueous liquid composition of claim 1,
> wherein the bendamustine concentration is about 25 mg/mL.
> 6. The non-aqueous liquid composition of claim 1,
> wherein the concentration of the antioxidant is from about
> 2.5 mg/mL to about 35 mg/mL.
> 7. The non-aqueous liquid composition of claim 1,
> wherein the concentration of the antioxidant is from about 5
> mg/mL to about 20 mg/mL.
> 8. The non-aqueous liquid composition of claim 1,
> wherein the concentration of the antioxidant is from about
> 10 mg/mL to about 15 mg/mL.
> 9. The non-aqueous liquid composition of claim 1, com-

Application/Control Number: 18/081,251                                    Page 22
Art Unit: 1613

> 10. A method of treating leukemia, Hodgkin's disease, or
> multiple myeloma in a mammal comprising administering to
> the mammal an effective amount of the composition of claim
> 1.
> 5     11. The method of claim 10, for the treatment of leukemia.
> 12. The method of claim 10, for the treatment of Hodg-
> kin's disease.

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at a temperature of about 5-25 C to determine the total impurities from the degradation of bendamustine or is stable at 25 C for at least about 15 months. However, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches a stabilizing amount of antioxidant (claim 1) and Tait et al. teach stabilized injectable compositions of the nitrogen mustard alkylating agent ifosfamide (Abstract; page 1, line 7) comprising PEG200-600, ethanol (page 6, lines 16-24; page 9, lines 15-21; claims 4-6) and antioxidants such as BHA, BHT and up to 5% monothioglycerol (page 9, lies 11-14; page 14, line 6) that are stable for at least 180 days (page 6, lines 25-26). Thus, it is merely judicious selection and routine optimization of the amount of monothioglycerol to achieve the desired stabilization of the nitrogen

mustard alkylating agent bendamustine by the ordinary artisan with a reasonable
expectation of success.

The patent does not expressly teach a step in the method of diluting with about
50 mL of diluent. However, the ordinary artisan understands that the concentrated
solution needs dilution prior to administration and dilution with 50 mL is just an arbitrary
amount to achieve the desired therapeutic concentration. The ordinary artisan can do so
with a reasonable expectation of success.

The patent does not expressly teach intravenous administration but intravenous
administration is a common method to administer liquid compositions well-known to the
ordinary artisan.

The patent does not expressly teach adding ethanol. However, ethanol is a well-
known pharmaceutical solvent in which bendamustine is soluble. The artisan would add
ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable
expectation of success.

Therefore, the ordinary artisan would have recognized the obvious variation of
the instantly claimed subject matter over the patented subject matter.

4. Claims 1-18 are rejected on the ground of nonstatutory double patenting as
being unpatentable over claims 1-22 of U.S. Patent No. 8609707. Although the claims
at issue are not identical, they are not patentably distinct from each other because the
patent is also directed to bendamustine compositions and methods of treating leukemia
as shown, for example, claims:

We claim:
1. A long term storage stable non-aqueous liquid benda-
mustine-containing composition, comprising:

Application/Control Number: 18/081,251                                    Page 24
Art Unit: 1613

US 8,609,707 B2

**13**

a) bendamustine or a pharmaceutically acceptable salt thereof, and
b) a pharmaceutically acceptable fluid comprising
    i) about 90% polyethylene glycol and about 10% propylene glycol; and
    ii) a stabilizing amount of an antioxidant.

2. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

3. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim 2, wherein the bendamustine concentration is from about 25 mg/mL to about 50 mg/mL.

4. The long term storage stable non-aqueous liquid benda-

... ... ... ... ... ... ...

16. A method of treating cancer in mammals, comprising administering an effective amount of a long term storage stable non-aqueous liquid bendamustine-containing composition of claim 1 to a mammal in need thereof.

... ... ... ... ...

long term storage is at least 2 years.

21. The method of treating cancer in mammals of claim 16, wherein the cancer is leukemia.

22. The method of treating cancer in mammals of claim 16, wherein the cancer is Hodgkin's disease.

**14**

12. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim 10, wherein the stabilizing amount of the antioxidant is about 5 mg/mL.

13. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim 1, wherein said long term storage is at least 2 years.

14. A long term storage stable non-aqueous liquid bendamustine-containing composition, comprising:
    a) bendamustine or a pharmaceutically acceptable salt thereof, and
    b) a pharmaceutically acceptable fluid comprising
        i) about 90% polyethylene glycol and about 10% propylene glycol; and
        ii) a stabilizing amount of thioglycerol.

Thus, the patent teaches long term storage of at least 2 years (claims 13, 20), thereby implicitly meeting the instantly claimed stability parameters, of a composition comprising about 20-60 mg/mL or about 25-50 mg/mL bendamustine and polyethyelene glycol (claims 1-5, 15, 17-19) with about 5mg/mL monothioglycerol antioxidant (claims 6, 7, 10, 12, 14-15) for treating leukemia (claims 16, 21). The patent does not expressly less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at a temperature of about 5-25 C to determine the total impurities from the degradation of bendamustine or is stable at 5 C or 25 C for at least about 15 months. However, as stated above, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

EAGLEBEN-SA_00001190

Application/Control Number: 18/081,251                                    Page 25
Art Unit: 1613

The patent does not expressly teach a sterile vial. However, the ordinary artisan
in the pharmaceutical arts would place the bendamustine composition in a sterile vial to
avoid microbiological contamination, which would ruin the pharmaceutical product, with
a reasonable expectation of success.

The patent does not expressly teach adding ethanol. However, ethanol is a well-
known pharmaceutical solvent in which bendamustine is soluble. The artisan would add
ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable
expectation of success.

The patent does not expressly teach a step in the method of diluting with about
50 mL of diluent. However, the ordinary artisan understands that the concentrated
solution needs dilution prior to administration and dilution with 50 mL is just an arbitrary
amount to achieve the desired therapeutic concentration. The ordinary artisan can do so
with a reasonable expectation of success.

The patent does not expressly teach intravenous administration but intravenous
administration is a common method to administer liquid compositions well-known to the
ordinary artisan.

Therefore, the ordinary artisan would have recognized the obvious variation of
the instantly claimed subject matter over the patented subject matter.

5. Claims 1-18 are rejected on the ground of nonstatutory double patenting as
being unpatentable over claims 1-23 of U.S. Patent No. 9579384. Although the claims
at issue are not identical, they are not patentably distinct from each other because the
patent is directed to a liquid bendamustine, polyethylene glycol and antioxidant
composition (claims 1, 4) where the antioxidant is monothioglycerol (claim 8) used in the

Application/Control Number: 18/081,251                                    Page 26
Art Unit: 1613

method of treating leukemia (claim 1 and 10) where the volume is 50 mL (claims 7, 9)

administered intravenously (claims 17-19).

The patent does not expressly teach a sterile vial. However, the ordinary artisan

in the pharmaceutical arts would place the bendamustine composition in a sterile vial to

avoid microbiological contamination, which would ruin the pharmaceutical product, with

a reasonable expectation of success.

The patent does not expressly teach about 25 mg/mL bendamustine for use in

the method of treating leukemia. However, the patent teaches a parenterally acceptable

diluent (claim 1) and a volume of about 50 mL (claims 7 and 9) to arrive at about 0.5-5.6

mg/mL bendamustine to administer in a total volume of 100 mL or less. Thus, having a

stock solution of about 25 mg/mL to be diluted with about 50 mL diluent to achieve the

desired therapetuic concentration prior to administration is obvious to the ordinary

artisan.  Because about 25 mg/mL is obvious, then that renders obvious the claimed

composition claims where, for example, a 4 mL volume would have 100 mg

bendamustine.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However,

the patent teaches an antioxidant (claim 1) and names monothioglycerol (claim 8).

Thus, it is merely judicious selection and routine optimization of the amount of

monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating

agent bendamustine by the ordinary artisan with a reasonable expectation of success.

The patent does not expressly less than about 5% peak area response of total

impurities as determined using HPLC with a wavelength of 223 nm at least about 15

months at a temperature of about 5-25 C to determine the total impurities from the

EAGLEBEN-SA_00001192

Application/Control Number: 18/081,251                                    Page 27
Art Unit: 1613

degradation of bendamustine or is stable at 5 C or 25 C for at least about 15 months.

However, such would be inherent in the composition comprising the same components.

See MPEP 2112.01(II): "Products of identical chemical composition cannot have

mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658

(Fed. Cir. 1990)."

The patent does not expressly teach adding ethanol. However, ethanol is a well-

known pharmaceutical solvent in which bendamustine is soluble. The artisan would add

ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable

expectation of success.

Therefore, the ordinary artisan would have recognized the obvious variation of

the instantly claimed subject matter over the patented subject matter.

6. Claims 1-18 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-24 of U.S. Patent No. 9034908. Although the claims

at issue are not identical, they are not patentably distinct from each other because the

patent is directed to: methods of treating cancer or malignant disease such as leukemia

(claim 15) using a composition comprising bendamustine with a PEG/propylene glycol

solubilizer and an antioxidant (claims 1, 24) where the antioxidant can be

monothioglycerol (claim 13) and the ratio of PEG:propylene glycol is about 90:10 (claim

10) to treat cancer or malignant disease in a subject (claims 1 and 15) by intravenous

administration (claims 16, 17, 21).

The patent does not expressly teach a sterile vial. However, the ordinary artisan

in the pharmaceutical arts would place the bendamustine composition in a sterile vial to

EAGLEBEN-SA_00001193

Application/Control Number: 18/081,251                                      Page 28
Art Unit: 1613

avoid microbiological contamination, which would ruin the pharmaceutical product, with

a reasonable expectation of success.

The patent does not expressly teach about 25 mg/mL bendamustine. However,

the patent teaches using a parenterally acceptable diluent to arrive at about 0.05-12.5

mg/mL bendamustine to administer in a total volume of 100 mL or less. The purpose of

a diluent is to dilute a stock solution. Thus, having a stock solution of about 25 mg/mL to

be diluted with 50 mL diluent to achieve the desired therapetuic concentration prior to

administration is merely the routine optimization by the ordinary artisan practicing the

patented method.  Because about 25 mg/mL is obvious, then that renders obvious the

claimed composition claims where, for example, a 4 mL volume would have 100 mg

bendamustine.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However,

the patent teaches an antioxidant (claim 1) and names monothioglycerol (claim 8).

Thus, it is merely judicious selection and routine optimization of the amount of

monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating

agent bendamustine by the ordinary artisan with a reasonable expectation of success.

The patent does not expressly less than about 5% peak area response of total

impurities as determined using HPLC with a wavelength of 223 nm at least about 15

months at a temperature of about 5-25 C to determine the total impurities from the

degradation of bendamustine or is stable at 5 C or 25 C for at least about 15 months.

However, such would be inherent in the composition comprising the same components.

See MPEP 2112.01(II): "Products of identical chemical composition cannot have

EAGLEBEN-SA_00001194

Application/Control Number: 18/081,251                                           Page 29
Art Unit: 1613

mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658
(Fed. Cir. 1990)."

The patent does not expressly teach adding ethanol. However, ethanol is a well-
known pharmaceutical solvent in which bendamustine is soluble. The artisan would add
ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable
expectation of success.

Therefore, the ordinary artisan would have recognized the obvious variation of
the instantly claimed subject matter over the patented subject matter.

7. Claims 1-18 are rejected on the ground of nonstatutory double patenting as
being unpatentable over claims 1-17 of U.S. Patent No. 9597399 in view of Tait et al.
(WO 0202125). Although the claims at issue are not identical, they are not patentably
distinct from each other because the patent is directed to a method of treating cancer or
malignant disease using a composition comprising bendamustine, propylene glycol,
PEG, a parenterally acceptable diluent and an antioxidant by intravenous administration
(claims 1-17) where the volume administered is about 50 mL (claims 3-4).

The patent does not expressly teach a sterile vial. However, the ordinary artisan
in the pharmaceutical arts would place the bendamustine composition in a sterile vial to
avoid microbiological contamination, which would ruin the pharmaceutical product, with
a reasonable expectation of success.

The patent does not expressly teach treating leukemia. However, leukemia is
well-known cancer/malignant diseases and obvious to treat with bendamustine by the
ordinary artisan in this art.

Application/Control Number: 18/081,251                                          Page 30
Art Unit: 1613

The patent does not expressly teach about 25 mg/mL bendamustine. However, the patent teaches using a parenterally acceptable diluent to arrive at about 0.05-12.5 mg/mL bendamustine to administer in a total volume of 100 mL or less. The purpose of a diluent is to dilute a stock solution. Thus, having a stock solution of about 25 mg/mL to be diluted with 50 mL diluent to achieve the desired therapetuic concentration prior to administration is merely the routine optimization by the ordinary artisan practicing the patented method. Because about 25 mg/mL is obvious, then that renders obvious the claimed composition claims where, for example, a 4 mL volume would have 100 mg bendamustine.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches an antioxidant (claim 1) and Tait et al. teach stabilized injectable compositions of the nitrogen mustard alkylating agent ifosfamide (Abstract; page 1, line 7) comprising PEG200-600, ethanol (page 6, lines 16-24; page 9, lines 15-21; claims 4-6) and antioxidants such up to 5% monothioglycerol (page 9, lies 11-14; page 14, line 6) that are stable for at least 180 days (page 6, lines 25-26). Thus, it is merely judicious selection and routine optimization of the amount of monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating agent bendamustine by the ordinary artisan with a reasonable expectation of success.

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

Application/Control Number: 18/081,251                                    Page 31
Art Unit: 1613

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

8. Claims 1-18 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-23 of U.S. Patent No. 9144568. Although the claims at issue are not identical, they are not patentably distinct from each other because the patent is directed to a method of treating leukemia by intravenously administering a composition comprising bendamustine, a parenterally acceptable diluent, a solubilizer comprising PEG and propylene glycol in a ratio of about 90:10 a parenterally acceptable diluent (claims 1-5, 9-10, 16, 23) and the antioxidant monothioglycerol (claim 7) where the volume administered is 50 ml (claims 6 and 8).

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 25 mg/mL bendamustine. However, the patent teaches using a parenterally acceptable diluent to arrive at about 0.05-12.5 mg/mL bendamustine to administer in a total volume of 100 mL or less. The purpose of a diluent is to dilute a stock solution. Thus, having a stock solution of about 25 mg/mL to be diluted with 50 mL diluent to achieve the desired therapetuic concentration prior to administration is merely the routine optimization by the ordinary artisan practicing the patented method. Because about 25 mg/mL is obvious, then that renders obvious the claimed composition claims where, for example, a 4 mL volume would have 100 mg bendamustine.

EAGLEBEN-SA_00001197

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches an antioxidant (claim 1) and names monothioglycerol (claim 7). Thus, it is merely judicious selection and routine optimization of the amount of monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating agent bendamustine by the ordinary artisan with a reasonable expectation of success.

The patent does not expressly less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at a temperature of about 5-25 C to determine the total impurities from the degradation of bendamustine or is stable at 5 C or 25 C for at least about 15 months. However, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

9. Claims 1-16 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-29 of U.S. Patent No. 9572887. Although the claims at issue are not identical, they are not patentably distinct from each other because the patent is directed to a method of treating leukemia by providing a composition of liquid

Application/Control Number: 18/081,251                                     Page 33
Art Unit: 1613

about 10-100 mg/ml bendamustine with the same stability parameters (claim 1) with

propylene glycol and PEG (claims 2 and 3), and ethanol (claim 5) and stabilizing

antioxidants (claim 14) such as monothioglycerol (claim 15) and diluting the composition

to a volume of about 50 mL prior to administering it intravenously to a patient (claims 1,

13, 17)

     The patent does not expressly teach a sterile vial. However, the ordinary artisan

in the pharmaceutical arts would place the bendamustine composition in a sterile vial to

avoid microbiological contamination, which would ruin the pharmaceutical product, with

a reasonable expectation of success.

     The patent does not expressly teach about 5 mg/mL monothioglycerol. However,

it is merely judicious selection and routine optimization of the amount of

monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating

agent bendamustine by the ordinary artisan with a reasonable expectation of success.

     The patent does not expressly teach a step in the method of diluting with about

50 mL of diluent. However, the patent teaches using a diluent the ordinary artisan

understands that the concentrated solution needs dilution prior to administration and

dilution with 50 mL is just an arbitrary amount to achieve the desired therapeutic

concentration. The ordinary artisan can do so with a reasonable expectation of success.

     Therefore, the ordinary artisan would have recognized the obvious variation of

the instantly claimed subject matter over the patented subject matter.

     10. Claims 1-18 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-7 of U.S. Patent No. 9597397. Although the claims at

issue are not identical, they are not patentably distinct from each other because the

EAGLEBEN-SA_00001199

Application/Control Number: 18/081,251                          Page 34
Art Unit: 1613

patent is directed to a method of treating cancer or malignant disease employing a

bendamustine composition comprising PEG, propylene glycol and the antioxidant

monothioglycerol in a PEG:propylene glycol ratio of about 90:10 (claims 1-7).

The patent does not expressly teach treating Hodgkin's or leukemia. However,

Hodgkin's and leukemia are well known cancer/malignant diseases and obvious to treat

with bendamustine.

The patent does not expressly teach a sterile vial. However, the ordinary artisan

in the pharmaceutical arts would place the bendamustine composition in a sterile vial to

avoid microbiological contamination, which would ruin the pharmaceutical product, with

a reasonable expectation of success.

The patent does not expressly teach about 25 mg/mL bendamustine. However,

the patent teaches using a parenterally acceptable diluent to arrive at about 0.05-12.5

mg/mL bendamustine to administer in a total volume of 100 mL or less. The purpose of

a diluent is to dilute a stock solution. Thus, having a stock solution of about 25 mg/mL to

be diluted with about 50 mL diluent to achieve the desired therapetuic concentration

prior to administration is merely the routine optimization by the ordinary artisan

practicing the patented method. Because about 25 mg/mL is obvious, then that renders

obvious the claimed composition claims where, for example, a 4 mL volume would have

100 mg bendamustine.

The patent does not expressly the claimed stability at about 15 months at about

5-25 C or less than about 5% peak area response of total impurities as determined

using HPLC with a wavelength of 223 nm at least about 15 months at about 5-25 C to

determine the total impurities from the degradation of bendamustine at the period of

Application/Control Number: 18/081,251                                              Page 35
Art Unit: 1613

time or temperatures instantly claimed. However, such would be inherent in the

composition comprising the same components. See MPEP 2112.01(II): "Products of

identical chemical composition cannot have mutually exclusive properties." *In re Spada*,

911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

The patent does not expressly teach intravenous administration but intravenous

administration is a common method to administer liquid compositions well-known to the

ordinary artisan.

Therefore, the ordinary artisan would have recognized the obvious variation of

the instantly claimed subject matter over the patented subject matter.

11. Claims 1-8, 11-18 are rejected on the ground of nonstatutory double

patenting as being unpatentable over claims 1-26 of U.S. Patent No. 10010533.

Although the claims at issue are not identical, they are not patentably distinct from each

other because the patent is directed to:

Application/Control Number: 18/081,251                                    Page 36
Art Unit: 1613

1. A liquid bendamustine-containing composition, comprising:
   a) bendamustine or a pharmaceutically acceptable salt thereof; and
   b) a pharmaceutically acceptable fluid comprising about 5% to about 10% propylene glycol, polyethylene glycol and a stabilizing amount of an antioxidant selected from the group consisting of thioglycerol, monothioglycerol, lipoic acid, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds and dihydrolipoic acid;
   the bendamustine-containing composition having less than or equal to 0.11% total PG esters at about 1 month of storage at a temperature of about 5° C.;
   wherein the ratio of polyethylene glycol to propylene glycol is selected from the group consisting of: about 95:5, about 90:10, about 85:15, about 80:20 and about 75:25.

pharmaceutically acceptable fluid is about 10%.

4. The liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

5. The liquid bendamustine-containing composition of

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 100 mg of bendamustine. However, if the concentration is 25 mg/mL (claim 5) then in 4 mL the artisan would have 100 mg bendamustine present with a reasonable expectation of success.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches a stabilizing amount of antioxidant monothioglycerol and it is merely routine optimization to determine how much monothioglycerol (thioglycerol) to have to achieve the desired stabilization by the ordinary artisan.

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

The patent does not expressly the claimed stability at about 15 months at about 5-25 C or less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at about 5-25 C to determine the total impurities from the degradation of bendamustine at the period of time or temperatures instantly claimed. However, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

12. Claims 1-18 are provisionally rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-29 of copending Application No. 18081238. Although the claims at issue are not identical, they are not patentably distinct from each other because the copending application also teaches a bendamustine liquid composition comprising about 20-60 mg/mL bendamustine or 25 mg/mL, antioxidant and polyethyelene glycol in a sterile vial (claims 1, 3, 10, 12, 18, 19, 21, 27) where there can be 100 mg of bendamustine (claims 2, 11, 20) with about 5 mg/mL monothioglycerol (claims 4-5, 13-14, 22-23) with the same stability (claims 6-7, 15-16, 24-25) and further comprising ethanol (claims 8, 17, 26). Methods of treating leukemia

Application/Control Number: 18/081,251                                    Page 38
Art Unit: 1613

by providing, diluting and intravenously administering with about 50 ml of diluent are

taught (claims 28 and 29).

Accordingly, the ordinary artisan would have recognized the obvious variation of

the instantly claimed subject matter over the copending subject matter.

This is a provisional nonstatutory double patenting rejection because the

patentably indistinct claims have not in fact been patented.

13. Claims 1-18 are provisionally rejected on the ground of nonstatutory double

patenting as being unpatentable over claims 1-16 of copending Application No.

17412623. Although the claims at issue are not identical, they are not patentably distinct

from each other because the copending application also teaches a liquid bendamustine

HCl composition from about 10-100 mg/mL or about 20-100 mg/mL or about 25 mg/mL,

polyethylene glycol and antioxidant with the same stability at 15 months (claims 1, 3-7)

where the antioxidant is thioglycerol, which his synonymous with monothioglycerol

(claim 2). A method of treating leukemia is taught (claims 8-16).

The copending does not expressly teach a sterile vial. However, the ordinary

artisan in the pharmaceutical arts would place the bendamustine composition in a sterile

vial to avoid microbiological contamination, which would ruin the pharmaceutical

product, with a reasonable expectation of success.

The copending does not expressly teach a step in the method of diluting with

about 50 mL of diluent. However, the ordinary artisan understands that the concentrated

solution needs dilution prior to administration and dilution with 50 mL is just an arbitrary

amount to achieve the desired therapeutic concentration. The ordinary artisan can do so

with a reasonable expectation of success.

Application/Control Number: 18/081,251                                    Page 39
Art Unit: 1613

The copending does not expressly teach intravenous administration but intravenous administration is a common method to administer liquid compositions well-known to the ordinary artisan.

The copending does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

Accordingly, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the copending subject matter.

This is a provisional nonstatutory double patenting rejection because the patentably indistinct claims have not in fact been patented.

14. Claims 1-18 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-16 of U.S. Patent No. 11103483. Although the claims at issue are not identical, they are not patentably distinct from each other because the patent is directed to liquid bendamustine compositions (claims 1-7) and methods of treating cancer (claims 8-16) such as leukemia (claim 9) where there is about 10-100 mg/mL or about 20-60 mg/mL or 25 mg/mL bendamustine, polyethylene glycol and a stabilizing amount of thioglycerol (claims 1, 2 and 5-6) with the same stability over at least 15 months (claims 1, 3-4, 12, 13).

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 100 mg of bendamustine. However, if the concentration is 25 mg/mL (claims 6 and 15) then in 4 mL the artisan would have 100 mg bendamustine present with a reasonable expectation of success.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches a stabilizing amount of antioxidant monothioglycerol and it is merely routine optimization to determine how much monothioglycerol (thioglycerol) to have to achieve the desired stabilization by the ordinary artisan.

The patent does not expressly teach a step in the method of diluting with about 50 mL of diluent. However, the ordinary artisan understands that the concentrated solution needs dilution prior to administration and dilution with 50 mL is just an arbitrary amount to achieve the desired therapeutic concentration. The ordinary artisan can do so with a reasonable expectation of success.

The patent does not expressly teach intravenous administration but intravenous administration is a common method to administer liquid compositions well-known to the ordinary artisan.

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

Accordingly, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

15. Claims 1-18 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-9 of U.S. Patent No. 10052385. Although the claims

Application/Control Number: 18/081,251                                    Page 41
Art Unit: 1613

at issue are not identical, they are not patentably distinct from each other because the

patent is directed to methods of treating leukemia by parenterally administering liquid

bendamustine compositions (claims 1-8) comprising bendamustine, polyethylene glycol,

a parenterally acceptable diluent and an antioxidant monothioglycerol (claims 1 and 7).

The patent does not expressly teach a sterile vial. However, the ordinary artisan

in the pharmaceutical arts would place the bendamustine composition in a sterile vial to

avoid microbiological contamination, which would ruin the pharmaceutical product, with

a reasonable expectation of success.

The patent does not expressly teach about 25 mg/mL bendamustine. However,

the patent teaches using a parenterally acceptable diluent to arrive at the concentration

of bendamustine to administer in a total volume of 100 mL or less. The purpose of a

diluent is to dilute a stock solution. Thus, having a stock solution of about 25 mg/mL to

be diluted with 50 mL diluent to achieve the desired therapetuic concentration prior to

administration is merely the routine optimization by the ordinary artisan practicing the

patented method.  Because about 25 mg/mL is obvious, then that renders obvious the

claimed composition claims where, for example, a 4 mL volume would have 100 mg

bendamustine.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However,

it is merely judicious selection and routine optimization of the amount of

monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating

agent bendamustine by the ordinary artisan with a reasonable expectation of success.

The patent does not expressly the claimed stability at about 15 months at about

5-25 C or less than about 5% peak area response of total impurities as determined

EAGLEBEN-SA_00001207

Application/Control Number: 18/081,251                                    Page 42
Art Unit: 1613

using HPLC with a wavelength of 223 nm at least about 15 months at about 5-25 C to

determine the total impurities from the degradation of bendamustine at the period of

time or temperatures instantly claimed. However, such would be inherent in the

composition comprising the same components. See MPEP 2112.01(II): "Products of

identical chemical composition cannot have mutually exclusive properties." *In re Spada*,

911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

The patent does not expressly teach adding ethanol. However, ethanol is a well-

known pharmaceutical solvent in which bendamustine is soluble. The artisan would add

ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable

expectation of success.

Therefore, the ordinary artisan would have recognized the obvious variation of

the instantly claimed subject matter over the patented subject matter.

16. Claims 1-18 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-10 of U.S. Patent No. 9597398 in view of Tait et al.

(WO 0202125). Although the claims at issue are not identical, they are not patentably

distinct from each other because the patent is directed to methods of treating cancer by

parenterally administering liquid bendamustine compositions (claims 1-10) comprising

bendamustine, polyethylene glycol, a parenterally acceptable diluent and an antioxidant

with an administered volume of about 50 ml (claim 3).

The patent does not expressly teach a sterile vial. However, the ordinary artisan

in the pharmaceutical arts would place the bendamustine composition in a sterile vial to

avoid microbiological contamination, which would ruin the pharmaceutical product, with

a reasonable expectation of success.

Application/Control Number: 18/081,251                                                    Page 43
Art Unit: 1613

 The patent does not expressly teach about 25 mg/mL bendamustine. However, the patent teaches using a parenterally acceptable diluent to arrive at the concentration of bendamustine to administer in a total volume of 100 mL or less. The purpose of a diluent is to dilute a stock solution. Thus, having a stock solution of about 25 mg/mL to be diluted with 50 mL diluent to achieve the desired therapetuic concentration prior to administration is merely the routine optimization by the ordinary artisan practicing the patented method. Because about 25 mg/mL is obvious, then that renders obvious the claimed composition claims where, for example, a 4 mL volume would have 100 mg bendamustine.

 The patent does not expressly teach intravenous administration but intravenous administration is a common method to administer liquid compositions well-known to the ordinary artisan.

 The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches an antioxidant (claim 1) and Tait et al. teach stabilized injectable compositions of the nitrogen mustard alkylating agent ifosfamide (Abstract; page 1, line 7) comprising PEG200-600, ethanol (page 6, lines 16-24; page 9, lines 15-21; claims 4-6) and antioxidants such up to 5% monothioglycerol (page 9, lies 11-14; page 14, line 6) that are stable for at least 180 days (page 6, lines 25-26). Thus, it is merely judicious selection and routine optimization of the amount of monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating agent bendamustine by the ordinary artisan with a reasonable expectation of success.

 The patent does not expressly the claimed stability at about 15 months at about 5-25 C or less than about 5% peak area response of total impurities as determined

EAGLEBEN-SA_00001209

Application/Control Number: 18/081,251                                    Page 44
Art Unit: 1613

using HPLC with a wavelength of 223 nm at least about 15 months at about 5-25 C to

determine the total impurities from the degradation of bendamustine at the period of

time or temperatures instantly claimed. However, such would be inherent in the

composition comprising the same components. See MPEP 2112.01(II): "Products of

identical chemical composition cannot have mutually exclusive properties." *In re Spada*,

911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

    The patent does not expressly teach adding ethanol. However, ethanol is a well-

known pharmaceutical solvent in which bendamustine is soluble. The artisan would add

ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable

expectation of success.

    Therefore, the ordinary artisan would have recognized the obvious variation of

the instantly claimed subject matter over the patented subject matter.

    17. Claims 1-18 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-18 of U.S. Patent No. 9572888 in view of Tait et al.

(WO 0202125). Although the claims at issue are not identical, they are not patentably

distinct from each other because the patent is directed to methods of treating leukemia

by intravenously administering liquid bendamustine compositions (claims 1-28)

comprising bendamustine, polyethylene glycol, a parenterally acceptable diluent and an

antioxidant (claims 1 and 27) and an administered volume of about 50 ml (claim 7).

    The patent does not expressly teach a sterile vial. However, the ordinary artisan

in the pharmaceutical arts would place the bendamustine composition in a sterile vial to

avoid microbiological contamination, which would ruin the pharmaceutical product, with

a reasonable expectation of success.

Application/Control Number: 18/081,251                                    Page 45
Art Unit: 1613

The patent does not expressly teach about 25 mg/mL bendamustine. However,

the patent teaches using a parenterally acceptable diluent to arrive at the concentration

of bendamustine to administer in a total volume of 100 mL or less. The purpose of a

diluent is to dilute a stock solution. Thus, having a stock solution of about 25 mg/mL to

be diluted with 50 mL diluent to achieve the desired therapetuic concentration prior to

administration is merely the routine optimization by the ordinary artisan practicing the

patented method.  Because about 25 mg/mL is obvious, then that renders obvious the

claimed composition claims where, for example, a 4 mL volume would have 100 mg

bendamustine.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However,

the patent teaches an antioxidant (claim 27) and Tait et al. teach stabilized injectable

compositions of the nitrogen mustard alkylating agent ifosfamide (Abstract; page 1, line

7) comprising PEG200-600, ethanol (page 6, lines 16-24; page 9, lines 15-21; claims 4-

6) and antioxidants such up to 5% monothioglycerol (page 9, lies 11-14; page 14, line 6)

that are stable for at least 180 days (page 6, lines 25-26). Thus, it is merely judicious

selection and routine optimization of the amount of monothioglycerol to achieve the

desired stabilization of the nitrogen mustard alkylating agent bendamustine by the

ordinary artisan with a reasonable expectation of success.

The patent does not expressly the claimed stability at about 15 months at about

5-25 C or less than about 5% peak area response of total impurities as determined

using HPLC with a wavelength of 223 nm at least about 15 months at about 5-25 C to

determine the total impurities from the degradation of bendamustine at the period of

time or temperatures instantly claimed. However, such would be inherent in the

EAGLEBEN-SA_00001211

Application/Control Number: 18/081,251                                      Page 46
Art Unit: 1613

composition comprising the same components. See MPEP 2112.01(II): "Products of

identical chemical composition cannot have mutually exclusive properties." *In re Spada*,

911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

The patent does not expressly teach adding ethanol. However, ethanol is a well-

known pharmaceutical solvent in which bendamustine is soluble. The artisan would add

ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable

expectation of success.

Therefore, the ordinary artisan would have recognized the obvious variation of

the instantly claimed subject matter over the patented subject matter.

### *Conclusion*

No claims are allowed.

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to ERNST V ARNOLD whose telephone number is

(571)272-8509. The examiner can normally be reached M-F 7-3:30.

Examiner interviews are available via telephone, in-person, and video

conferencing using a USPTO supplied web-based collaboration tool. To schedule an

interview, applicant is encouraged to use the USPTO Automated Interview Request

(AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Brian Y Kwon can be reached on 571-272-0581. The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of published or unpublished applications may be

obtained from Patent Center. Unpublished application information in Patent Center is

available to registered users. To file and manage patent submissions in Patent Center,

visit: https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-

Application/Control Number: 18/081,251                                      Page 47
Art Unit: 1613

center for more information about Patent Center and

https://www.uspto.gov/patents/docx for information about filing in DOCX format. For

additional questions, contact the Electronic Business Center (EBC) at 866-217-9197

(toll-free). If you would like assistance from a USPTO Customer Service

Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/ERNST V ARNOLD/
Primary Examiner, Art Unit 1613

# EXHIBIT 10

US009265831B2

(12) **United States Patent**
Palepu et al.

(10) Patent No.:     **US 9,265,831 B2**
(45) Date of Patent:     *Feb. 23, 2016

(54) **FORMULATIONS OF BENDAMUSTINE**

(71) Applicant: **Eagle Pharmaceuticals, Inc.**, Woodcliff Lake, NJ (US)

(72) Inventors: **Nagesh R. Palepu**, Southampton, PA (US); **Philip Christopher Buxton**, Great Dunmow (GB)

(73) Assignee: **Eagle Pharmaceuticals, Inc.**, Woodcliff Lake, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/031,879**

(22) Filed: **Sep. 19, 2013**

(65) **Prior Publication Data**

US 2014/0024691 A1     Jan. 23, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 13/016,473, filed on Jan. 28, 2011, now Pat. No. 8,609,707.

(60) Provisional application No. 61/299,100, filed on Jan. 28, 2010.

(51) **Int. Cl.**

| | |
|---|---|
| *A61K 47/10* | (2006.01) |
| *A61K 9/08* | (2006.01) |
| *A61K 9/00* | (2006.01) |
| *A61K 31/4184* | (2006.01) |
| *A61K 31/25* | (2006.01) |
| *A61K 47/18* | (2006.01) |
| *A61K 47/20* | (2006.01) |
| *A61K 47/12* | (2006.01) |

(52) **U.S. Cl.**
CPC . *A61K 47/18* (2013.01); *A61K 9/08* (2013.01); *A61K 31/4184* (2013.01); *A61K 47/10* (2013.01); *A61K 47/12* (2013.01); *A61K 47/20* (2013.01); *A61K 9/0019* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,071,620 A | 1/1978 | Sklar | |
| 4,711,906 A * | 12/1987 | von Stetten et al. | 514/561 |
| 7,772,274 B1 | 8/2010 | Palepu | |
| 8,076,366 B2 | 12/2011 | Courvoisier et al. | |
| 8,344,006 B2 | 1/2013 | Drager | |
| 8,389,558 B2 | 3/2013 | Alakhov et al. | |
| 2004/0043069 A1 | 3/2004 | Vanderbist et al. | |
| 2005/0042285 A1* | 2/2005 | Ukai et al. | 424/464 |
| 2006/0159713 A1* | 7/2006 | Brittain et al. | 424/400 |
| 2008/0118544 A1 | 5/2008 | Wang | |
| 2009/0209606 A1 | 8/2009 | Bendall et al. | |

| | | |
|---|---|---|
| 2009/0264488 A1 | 10/2009 | Cooper et al. |
| 2010/0092474 A1 | 4/2010 | Gallagher |
| 2010/0145266 A1 | 6/2010 | Orlowski |
| 2010/0216858 A1 | 8/2010 | Popek et al. |
| 2010/0273730 A1 | 10/2010 | Hsu et al. |
| 2011/0051244 A1 | 1/2011 | Alakhov et al. |
| 2011/0184036 A1 | 7/2011 | Palepu et al. |
| 2011/0190363 A1 | 8/2011 | Drager et al. |
| 2012/0059000 A1 | 3/2012 | Ren et al. |
| 2012/0071532 A1 | 3/2012 | Cooper et al. |
| 2012/0157505 A1 | 6/2012 | La Bell et al. |
| 2013/0041003 A1 | 2/2013 | Brittain et al. |
| 2013/0041004 A1 | 2/2013 | Drager et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 159289 | * 6/1981 | ............ A61K 31/41 |
| DE | 159289 | 3/1983 | |
| WO | WO-2010/036702 | 4/2010 | |
| WO | WO-2010/148288 A2 | 12/2010 | |
| WO | WO-2012/015810 A2 | 2/2012 | |

OTHER PUBLICATIONS

Rowe et al. Handbook of Pharmaceutical Excipients, 6th edition, 2009, pp. 454-455.*
Biewenga, et al., "The Pharmacology of the Antioxidant Lipoic Acid," Gen. Pharmac., vol. 29, No. 3, pp. 315-331 (1997).
Rowe, et al., "Handbook of Pharmaceutical Excipients," 6th edition, pp. 454-455 (2009).
Spiegel, et al., "Use of Nonaqueous Solvents in Parenteral Products," J. Pharmac. Sciences, vol. 52, No. 10, pp. 917-927 (1963).
International Search Report of International Appln. No. PCT/US2013/032289 mailing date Jun. 6, 2013.
Written Opinion of the International Searching Authority re: International Appln. No. PCT/US2013/032289 mailing date Jun. 6, 2013.
PCT Notification of Transmittal of International Search Report and Written Opinion for PCT/US2013/032295.
PCT Written Opinion of International Search Authority for PCT/US2013/26187.
Search History: Limited Classification Search dated May 10, 2013, PCT/US2013/032295.
International Search Report PCT/US2011/022958 dated Apr. 12, 2011.
Third Party Submission in related EP2528602 dated Nov. 19, 2013.
Supplementary European Search Report in related EP 2528602 dated Jan. 2014.
International Search Report and Written Opinion issued in counterpart PCT/US2013/26187.
Maas B: "Stabilitaet von Bendamustinhydrochlorid in Infusionsloesungen" Die Pharmazie, Govi Verlag Pharmazeutischer Verlag Gmbh, Eschborn, DE, vol. 49, No. 10, Jan. 1, 1994.

* cited by examiner

*Primary Examiner* — Peter J Reddig
*Assistant Examiner* — Kauser M Akhoon
(74) *Attorney, Agent, or Firm* — Lucas & Mercanti, LLP.

(57)     **ABSTRACT**

Long term storage stable bendamustine-containing compositions are disclosed. The compositions can include bendamustine or a pharmaceutically acceptable salt thereof, and a pharmaceutically acceptable fluid which can include in some embodiments PEG, PG or mixtures thereof and an antioxidant or chloride ion source. The bendamustine-containing compositions have less than about 5% total impurities, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

**6 Claims, No Drawings**

US 9,265,831 B2

**1**

## FORMULATIONS OF BENDAMUSTINE

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 13/016,473, filed Jan. 28, 2011, issued as U.S. Pat. No. 8,609,707 which claims the benefit of U.S. Provisional Patent Application No. 61/299,100, filed Jan. 28, 2010, the contents of each of which are incorporated herein by reference.

### BACKGROUND OF THE INVENTION

Bendamustine free base is represented by the following structural formula (I)



Bendamustine is used in the treatment of a number of cancers including leukemias, Hodgkins disease and multiple myelomas. Bendamustine is the active ingredient of the commercial product Treanda™, a lyophilized powder for reconstitution.

Bendamustine exhibits rapid degradation upon reconstitution of the lyophilized product. Bendamustine undergoes hydrolysis by direct substitution rather than an addition elimination process due to the presence of the highly labile aliphatic chlorine atoms. Some of the main degradants of bendamustine are the monohydroxy compound known as HP1 (hydrolysis product 1) and dihydroxy compound HP2 (hydrolysis product 2). The monohydroxy compound appears as the main impurity at Relative Retention Time (RRT) 0.6 and the dihydroxy compound appears as the main impurity at RRT 0.27. Minor peaks appear at RRT 1.2, which are presently unknown.

The stability of bendamustine in water is measured in hours, and is therefore, not suitable for long-term storage in liquid form. The lyophile possesses good chemical stability. However, reconstitution of the lyophile is clinically inconvenient, taking 15-30 mins with implications of chemical instability. There is a need for ready to use (RTU) bendamustine formulations having enhanced stability.

### SUMMARY OF THE INVENTION

In other aspects of the invention, the bendamustine-containing compositions include a) a pharmaceutically acceptable fluid which contains one or more of propylene glycol, ethanol, polyethylene glycol, benzyl alcohol and glycofurol, and b) a stabilizing amount of a chloride salt. In other aspects of the invention, the bendamustine-containing compositions include DMSO (dimethyl sulfoxide) as part of the pharmaceutically acceptable fluid included therein. Regardless of the pharmaceutically acceptable fluid included, the amount of bendamustine included in the composition is preferably from

**2**

about 20 mg/mL to about 60 mg/mL. Still further aspects of the invention include methods of treatment using bendamustine-containing compositions and kits containing the same.

One of the advantages of the inventive liquid compositions is that they have substantially improved long term stability when compared to currently available formulations. For example, the inventive bendamustine compositions are substantially free of impurities after at least about 15 months at a temperature of from about 5° C. to about 25° C. The inventive formulations are advantageously ready to use or ready for further dilution. Reconstitution of lyophilized powders is not required.

### DETAILED DESCRIPTION OF THE INVENTION

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art to which this invention belongs. In the event that there is a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

As used herein, RRT is calculated by dividing the retention time of the peak of interest by the retention time of the main peak. Any peak with an RRT<1 elutes before the main peak, and any peak with an RRT>1 elutes after the main peak.

For purposes of the present invention, "substantially free of impurities" shall be understood to include bendamustine-containing compositions in which the amount of total impurities is less than about 5%, as calculated on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after a period of about 15 months at a temperature of from about 5° C. to about 25° C. The amount of impurities is further calculated as being based upon the original amount bendamustine (or salt thereof) being present in the composition or formulation.

For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.

Preferably, the amount of any individual degradant in the inventive compositions does not exceed 2% PAR as determined by HPLC at a wavelength of 223 nm after storage periods of at least about 15 months at a temperature of from about 5° C. to about 25° C. In some aspects, the amount of time the inventive compositions demonstrate long term storage stability is at least about 18 months and preferably at least about 2 years when stored under the conditions described herein.

In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions including:

a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including

i) PEG, PG or mixtures thereof; and

ii) a stabilizing amount of an antioxidant.

The total impurities in the inventive compositions resulting from the degradation of the bendamustine in the compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of from about 5° C. to about 25° C., and thus have long term stability for at least the same period of time or longer. Preferably, the bendamustine-containing compositions demonstrate long term storage stability for at least about 2 years, especially when stored at the lower (refrigerated) temperatures. In one embodiment, the amount of total impurities in the inventive compositions resulting from the degra-

US 9,265,831 B2

3

dation of the bendamustine is less than about 3% PAR as determined by HPLC at a wavelength of 223 nm after at least about 2 years at a temperature of from about 5° C. to about 25° C.

In some aspects of the invention, the bendamustine concentration in the inventive compositions is from about 10 mg/mL to about 100 mg/mL, preferably 20 mg/mL to about 60 mg/mL. Preferably the bendamustine concentration in the inventive compositions is from about 25 mg/mL to about 50 mg/mL, and more preferably from about 30 mg/mL to about 50 mg/mL. It will be understood that compositions containing any useful concentration within the ranges, i.e. 10, 20, 25, 30, 35, 40, 45, 50, 55, 60 . . . 100 are contemplated. In other embodiments, the bendamustine concentration in the composition is about 50 mg/mL. In alternative aspects, the amount of bendamustine is outside these ranges but the amounts will be sufficient for single or multiple administrations of dosages generally regarded as effective amounts.

In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof. Within this aspect, the pharmaceutically acceptable fluid is propylene glycol (PG) or polyethylene glycol (PEG). In other embodiments of the invention however, the pharmaceutically acceptable fluid is a mixture of PEG and PG. For example, the pharmaceutically acceptable fluid can include about 50% PEG and about 50% PG. Alternatively, pharmaceutically acceptable fluid includes about 95% PEG and about 5% PG. The amount of PEG and PG can also be varied within the ranges, i.e. the ratio of PEG:PG in the pharmaceutically acceptable fluid can range from about 95:5 to about 50:50. Within this range, is a pharmaceutically acceptable fluid containing about 75% PEG and about 25% PG, and preferably 80% PEG and 20% PG. In another embodiment, a pharmaceutically acceptable fluid can include about 85% PEG and about 15% PG while another preferred pharmaceutically acceptable fluid includes about 90% PEG and about 10% PG. The molecular weight of the PEG will be within the range of pharmaceutically acceptable weights although PEG 400 is preferred in many aspects of the invention.

Without meaning to be bound by any theory or hypothesis, the hydroxide of the polyethylene glycol molecule is less reactive than the hydroxides of propylene glycol. As a result, the ester forms at a slower rate in polyethylene glycol than propylene glycol and the resulting bendamustine degradants are unexpectedly and substantially reduced over extended periods of time when PEG is a substantial part of the pharmaceutically acceptable fluid.

The bendamustine-containing compositions according to several preferred aspects of the invention include a stabilizing amount of an antioxidant. For purposes of the present invention, "stabilizing amount" shall be understood to include those amounts which increase or enhance the stability of the bendamustine in the compositions described herein. The presence of one or more antioxidants described herein thus contributes, at least in part to the long term stability of the composition. Within this guideline, suitable antioxidant concentrations in the compositions can range from about 2.5 mg/mL to about 35 mg/mL, and preferably from about 5 mg/mL to about 20 mg/mL or from about 10 mg/mL to about 15 mg/mL. In some other embodiments, the concentration of the antioxidant in the bendamustine-containing composition is about 5 mg/mL.

Suitable antioxidants for inclusion include those which are pharmaceutically acceptable for use in human and veterinary formulations although not limited to those currently regarded as safe by any regulatory authority. For example, the antioxi-

4

dant can be selected from among lipoic acid, thioglycerol (also known as monothioglycerol) and analogs thereof, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds, dihydrolipoic acid and mixtures of the foregoing. Preferably, the antioxidant is thioglycerol, lipoic acid or a mixture thereof. Some particularly preferred embodiments of the invention include thioglycerol.

In view of the foregoing, some preferred long term storage stable bendamustine-containing compositions in accordance with the invention compositions include:

    I. a) bendamustine or a pharmaceutically acceptable salt thereof; and
       b) a pharmaceutically acceptable fluid including
         i) polyethylene glycol and propylene glycol; and
         ii) a stabilizing amount of thioglycerol; or
    II. a) about 50 mg/mL bendamustine or a pharmaceutically acceptable salt thereof; and
       b) a pharmaceutically acceptable fluid including
         i) about 90% PEG and about 10% PG; and
         ii) about 2.5 mg/mL thioglycerol.

Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total impurities, PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

In accordance with other aspects of the invention there are provided long term storage stable bendamustine-containing compositions, including:

    a) bendamustine or a pharmaceutically acceptable salt thereof;
    b) a pharmaceutically acceptable fluid including one or more of the following: PG, ethanol, PEG, benzyl alcohol and glycofurol; and
    c) a stabilizing amount of a chloride salt.

These compositions also have the low levels of impurities and long term stability mentioned herein. Preferred pharmaceutically acceptable fluids include PG, PEG or ethanol in this embodiment of the invention. Preferably, the PEG is PEG 400. If desired, glycerin and/or 88% (w/w) lactic acid can be added to the pharmaceutically acceptable fluid.

Suitable chloride salts include but are not limited to organic chloride salts, sodium chloride, choline chloride, hydrochloride salts of amino acids and mixtures thereof. Thus, as will be appreciated by those of ordinary skill, one can select from among a number of suitable chloride salts and it is Applicants' intention that the scope of the invention includes all such chloride salts that are capable of being included in bendamustine-containing formulations for extended periods without having a deleterious effect on the drug. In one embodiment of the invention, the chloride salt concentration is from about 10 to about 300 mg/mL. In another embodiment, the chloride salt concentration is from about 50 to about 215 mg/mL. In one preferred embodiment, the chloride salt concentration is about 215 mg/mL.

In accordance with another aspect of the invention, there is provided long term storage stable bendamustine-containing compositions, including:

    a) bendamustine or a pharmaceutically acceptable salt thereof; and
    b) a pharmaceutically acceptable fluid including DMSO.

These compositions also have the low levels of impurities and long term stability mentioned herein. In some aspects, the bendamustine concentration in these compositions is from about 10 mg/mL to about 100 mg/mL. Preferably, the bendamustine concentration is from about 20 mg/mL to about 50 mg/mL, more preferably from about 25 mg/mL to about 50 mg/mL, more preferably from about 25 mg/mL to about 50

US 9,265,831 B2

**5**

mg/mL. In an alternative embodiment, the bendamustine concentration is about 50 mg/mL.

Another embodiment of the invention provides methods of treating cancer in mammals. The methods include administering to a mammal in need thereof an effective amount of one of the bendamustine-containing compositions described herein. Since the active ingredient portion of the inventive composition is an FDA-approved drug, those of ordinary skill will recognize that the doses of bendamustine employed in this aspect of the invention will be similar to those employed in any treatment regimens designed for bendamustine as marketed under the trade name TREANDA. The patient package insert containing dosing information is incorporated herein by reference. The methods of treatment also include administering the inventive formulations for any purpose or physical condition for which bendamustine has been indicated or being useful.

Another embodiment of the invention includes methods of preparing bendamustine-containing compositions described herein. The methods include reconstituting lyophilized bendamustine in a pharmaceutically acceptable fluid containing one of the following:

A) i) PEG, PG or mixtures thereof; and
   ii) a stabilizing amount of an antioxidant;
B) i) one or more of PG, ethanol, PEG, benzyl alcohol and glycofurol; and
   ii) a stabilizing amount of a chloride salt; or
C) DMSO.

The steps are carried out under pharmaceutically acceptable conditions for sterility and manufacturing.

In a further aspect of the invention, there are provided methods of controlling or preventing the formation of impurities in bendamustine-containing compositions during long term storage. The methods include combining an amount of bendamustine or a pharmaceutically acceptable salt thereof with a sufficient amount of a pharmaceutically acceptable fluid containing one of the following:

A) i) PEG, PG or mixtures thereof; and
   ii) a stabilizing amount of an antioxidant;
B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and
   ii) a stabilizing amount of a chloride salt; or
C) DMSO.

Further optional steps in accordance therewith include transferring one or more pharmaceutically acceptable doses of the formulations into a suitable sealable container and storing the sealed container at a temperature of from about 5° C. to about 25° C. As a result of carrying out these steps, it is possible to control or substantially prevent the formation of impurities which otherwise occur with bendamustine-containing compositions during long term storage so that the artisan is provided with bendamustine-containing formulations having less than about 5% total impurities PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

The compositions of the present invention can be packaged in any suitable sterile vial or container fit for the sterile storage of a pharmaceutical such as bendamustine. Suitable containers can be glass vials, polypropylene or polyethylene vials or other special purpose containers and be of a size sufficient to hold one or more doses of bendamustine.

A further aspect of the invention includes kits containing lyophilized bendamustine or a pharmaceutically acceptable salt thereof in a first container or vial; and, in a second container, a sufficient amount of a pharmaceutically acceptable fluid such as those described herein, i.e. one of the following:

**6**

A) i) PEG, PG or mixtures thereof; and
   ii) a stabilizing amount of an antioxidant;
B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and
   ii) a stabilizing amount of a chloride salt; or
C) DMSO.

For purposes of this embodiment, the amount of fluid which is sufficient is an amount which allows the bendamustine to be dissolved or dispersed to a degree which renders the liquid composition ready for use.

As will be appreciated by those of ordinary skill, the kit will contain other pharmaceutically necessary materials for storing and/or administering the drug, including instructions for storage and use, additional diluents, if desired, etc.

## EXAMPLES

The following examples serve to provide further appreciation of the invention but are not meant in any way to restrict the effective scope of the invention.

### Example 1

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10 mg/ml in one of ethanol, propylene glycol and benzyl alcohol as indicated in Table 1 below. 215 mg/ml of choline chloride was added in half of the samples as a source of soluble chloride ions. The samples were maintained at 40° C. and analyzed periodically for drug content and total impurities. The results obtained are presented in Table 1.

TABLE 1

| Stability of Bendamustine HCl | | | | |
|---|---|---|---|---|
| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
| BDM - 10 mg/mL | Initial | | 10.43 | 0.27 |
| Choline chloride - | 40° C. | 48 hrs | 10.48 | 1.27 |
| 215 mg/mL | | 7 day | 10.26 | 2.11 |
| Ethanol qs to 1 mL | | | | |
| BDM - 10 mg/mL | Initial | | 10.55 | 0.27 |
| Ethanol qs to 1 mL | 40° C. | 48 hrs | 10.30 | 2.39 |
| | | 7 day | 9.55 | 6.66 |
| BDM - 10 mg/mL | Initial | | 9.99 | 0.21 |
| Choline chloride - | 40° C. | 48 hrs | 9.95 | 0.60 |
| 215 mg/mL | | 7 day | 9.43 | 2.31 |
| Propylene glycol qs to 1 mL | | | | |
| BDM - 10 mg/mL | Initial | | 9.68 | 0.21 |
| Propylene glycol qs to | 40° C. | 48 hrs | 9.45 | 0.88 |
| 1 mL | | 7 day | 9.00 | 3.44 |
| BDM - 10 mg/mL | Initial | | 9.95 | 1.19 |
| Choline Chloride - | 40° C. | 48 hrs | 9.89 | 3.51 |
| 215 mg/mL | | 7 day | 8.97 | 4.24 |
| Benzyl alcohol qs to 1 mL | | | | |
| BDM - 10 mg/mL | Initial | | 9.52 | 0.33 |
| Benzyl alcohol qs to | 40° C. | 48 hrs | 8.67 | 4.18 |
| 1 mL | | 7 day | 7.49 | 7.84 |

Note:
In Table 1 the total % impurities include total contributions from peaks at various RRTs.

As shown in Table 1, the bendamustine formulations are very stable in solutions containing solvent and chloride salt. Table 1 shows that bendamustine, when dissolved at a concentration of about 10 mg/mL, in a pharmaceutically acceptable fluid, such as ethanol and propylene glycol, and containing a stabilizing amount of a chloride salt, such as choline chloride, had less than about 5% after at least 7 days storage at 40° C.

US 9,265,831 B2

7

The data presented in Table 1 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of a chloride salt having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including ethanol alone exhibited more than 6.5 total degradants after 7 days storage at 40° C. The sample including benzyl alcohol alone exhibited more than 7.5% total degradants after 7 days storage at 40° C. Bendamustine-containing compositions with such high levels of degradation would not be suitable for long-term storage.

Example 2

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10 mg/ml in DMSO. The samples were maintained at 40° C. and analyzed periodically for drug content and impurity profile. The results obtained are presented in Table 2.

TABLE 2

| Stability of Bendamustine HCl in DMSO | | | | |
|---|---|---|---|---|
| Formulation | Temp | Time | Content (mg/mL) | % Total Imp |
| BDM - 10 mg/mL | | Initial | 10.2 | 0.23 |
| DMSO qs to 1 mL | 40° C. | 48 hrs | 9.80 | 0.30 |
| | | 1 week | 10.0 | 0.56 |

Note:
In Table 2 the total % impurities include total contributions from peaks at various RRTs.

Table 2 shows that bendamustine, when dissolved in DMSO, had substantially no increase in total degradants. The data presented in Table 2 translates to bendamustine-containing compositions including DMSO having a shelf life of at least about 15 months at 5° C. and 25° C. In fact, such compositions are expected to have long term stability for periods beyond 15 months, i.e. up to 2 years or greater.

Example 3

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 20 mg/ml in polyethylene glycol 400 and 5 mg/ml of lipoic acid was added as a stabilizing antioxidant as indicated in Table 3 below. The samples were maintained at 40° C. or 25° C. and analyzed after 15 days for drug content and impurities. The results obtained are presented in Table 3.

8

TABLE 3

| Stability of Bendamustine (20 mg/ml) in PEG 400 and Antioxidants | | | | | |
|---|---|---|---|---|---|
| Antioxidant | T° C. | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid | 25 | 15 | 98.5 | <LD | 0.23 |
| 5 mg/ml | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

As shown in Table 3, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as polyethylene glycol, in the presence of a stabilizing amount of an antioxidant, such as lipoic acid, had substantially no increase in total degradants after a period of 15 days. The data presented in Table 3 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of an antioxidant having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including PEG alone, on the other hand, did not contain an antioxidant, did not exhibit stabilizing effects at 40° C. This sample had more than 40% more total impurities than the sample including lipoic acid. Bendamustine-containing compositions with such high levels of total impurities would not be suitable for long-term storage.

Example 4

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 5 mg/ml of thioglycerol, α-lipoic acid or dihydrolipoic acid was added as a stabilizing antioxidant as indicated in Table 4 below. The samples were maintained at 40° C. and analyzed after 15 days or one month for drug content and impurity profile as indicated in Table 4 below. The results obtained are presented in Table 4.

TABLE 4

| Stability of Bendamustine (50 mg/ml) in 90% PEG 400, 10% Propylene Glycol and Antioxidant | | | | | % Impurities RRT | | |
|---|---|---|---|---|---|---|---|
| Antioxidant | T (° C.) | Time | Content (mg/mL) | % Initial | HP1 0.59 | PG ester 1.10 | % Total Imps |
| Thioglycerol | 40 | initial | 48.8 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 48.5 | 99.4 | 0.06 | 0.20 | 0.71 |
| α-lipoic acid | 40 | initial | 49 | 100 | <LD | <LD | 0 |
| | 40 | 15 days | 48.8 | 99.6 | 0.19 | 0.13 | 0.32 |
| | 40 | 1 month | 48.7 | 99.4 | 0.34 | 0.26 | 0.79 |
| Dihydrolipoic acid | 40 | initial | 49.3 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 47.7 | 97.4 | 0.63 | 0.12 | 1.84 |

<LD = Below Level of Detection

As shown in Table 4, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as a combination of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of an antioxidant, such as thioglycerol, α-lipoic acid or dihydrolipoic acid, had substantially no increase in total degradants after a period of 1 month. This data supports the position that bendamustine-containing compositions according to the invention have a shelf life of at

US 9,265,831 B2

**9**

least about 2 years when stored at temperatures between 5° C. and 25° C.

### Example 5

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in a mixture of polyethylene glycol 400 and propylene glycol as indicated in Table 5 below. 5 mg/ml of lipoic acid was added as a stabilizing antioxidant. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed after 1 week, 15 days or one month for drug content and impurity profile as indicated in Table 5 below. The results obtained are presented in Table 5.

**10**

increase in total degradants after a period of 1 month. The data presented in Table 5 translates to bendamustine-containing compositions having a shelf life of at least about 2 years when stored at temperatures between 5° C. and at 25° C.

### Example 6

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol and α-lipoic acid was added as a stabilizing antioxidant as indicated in Table 6 below. The samples were maintained at

TABLE 5

Stability of Bendamustine (50 mg/ml) and Lipoic Acid (5 mg/ml) in PEG400 and Propylene glycol

| Formulation | Temp. | Time Peiriod | Content (mg/mL) | % of Initial | HP1 0.58 | PG ester 1.10 | PG ester 1.13 | % Total Imp. |
|---|---|---|---|---|---|---|---|---|
| BDM - | | Initial | 49.6 | 100 | BDL | BDL | BDL | 0.18 |
| 50 mg/mL | 40° C. | 1 W | 49.0 | 98.8 | 0.05 | 0.13 | BDL | 0.38 |
| Lipoic acid - | | 15 d | 48.3 | 97.4 | 0.08 | 0.26 | BDL | 0.55 |
| 5 mg/mL | | 1 M | 48.0 | 96.8 | 0.11 | 0.43 | 0.13 | 1.03 |
| PEG 400:PG | 25° C. | 15 d | 49.6 | 100.0 | BDL | 0.10 | BDL | 0.30 |
| (75:25) qs to | | 1 M | 48.4 | 97.6 | 0.05 | 0.19 | BDL | 0.43 |
| 1 mL | 5° C. | 1 M | 49.6 | 100.0 | BDL | 0.07 | BDL | 0.27 |
| BDM - | | Initial | 50.2 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/mL | 40° C. | 1 W | 49.9 | 99.4 | BDL | 0.15 | BDL | 0.30 |
| Lipoic acid - | | 15 d | 49.1 | 97.8 | 0.06 | 0.35 | BDL | 0.73 |
| 5 mg/mL | | 1 M | 49.0 | 97.6 | 0.09 | 0.90 | 0.25 | 1.82 |
| PEG 400:PG | 25° C. | 15 d | 49.9 | 99.4 | BDL | 0.12 | BDL | 0.32 |
| (50:50) qs to | | 1 M | 49.7 | 99.0 | BDL | 0.25 | BDL | 0.59 |
| 1 mL | 5° C. | 1 M | 50.0 | 99.6 | BDL | 0.11 | BDL | 0.33 |
| BDM - | | Initial | 50.8 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/mL | 40° C. | 1 W | 50.4 | 99.2 | BDL | 0.11 | BDL | 0.30 |
| Lipoic acid - | | 15 d | 49.7 | 97.8 | 0.07 | 0.17 | BDL | 0.43 |
| 5 mg/mL | | 1 M | 49.7 | 97.8 | 0.13 | 0.27 | 0.09 | 0.84 |
| PEG 400:PG | 25° C. | 15 d | 50.8 | 100.0 | BDL | 0.10 | BDL | 0.26 |
| (90:10) qs to | | 1 M | 50.8 | 100.0 | 0.05 | 0.14 | BDL | 0.39 |
| 1 mL | 5° C. | 1 M | 50.8 | 100.0 | BDL | 0.06 | BDL | 0.34 |

BDL = Below Detectable Limit

As shown in Table 5, bendamustine, when dissolved in certain mixtures of polyethylene glycol and propylene glycol and a stabilizing amount of lipoic acid, had substantially no

40° C., 25° C. and 5° C. and analyzed for drug content and impurity profile as indicated in Table 6 below. The results obtained are presented in Table 6.

TABLE 6

Stability of Bendamustine in 90% PEG 400, 10% PG and α-lipoic acid

| Formulation | Temp | Time Per. | Amt. mg/ml | % of Initial | 0.59 | 1.10 | 1.13 | 1.15 | 1.17 | 1.20 | 1.22 | 1.30 | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BDM - | | Initial | 51.0 | 100 | 0.20 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.26 |
| 50 mg/ml | 40° C. | 1 M | 50.5 | 99.0 | 0.21 | 0.31 | 0.13 | 0.07 | 0.13 | 0.10 | <LD | <LD | 0.95 |
| α-lipoic | | 2 M | 49.7 | 97.5 | 0.22 | 0.71 | 0.28 | 0.14 | 0.12 | 0.21 | 0.12 | <LD | 2.02 |
| acid - | | 3 M | 48.7 | 95.5 | 0.22 | 1.01 | 0.45 | 0.21 | 0.14 | 0.37 | 0.16 | 0.05 | 2.96 |
| 10 mg/ml | 25° C. | 3 M | 50.5 | 99.0 | 0.20 | 0.36 | 0.07 | <LD | <LD | 0.10 | <LD | <LD | 0.73 |
| PEG | | 6 M | 50.4 | 98.8 | 0.22 | 0.60 | 0.17 | 0.06 | 0.06 | 0.09 | 0.10 | 0.08 | 1.44 |
| 400:PG | 5° C. | 6 M | 50.9 | 99.8 | 0.16 | 0.05 | <LD | <LD | <LD | <LD | <LD | <LD | 0.21 |
| (90:10) qs to 1 mL | | 12 M | 50.6 | 99.2 | 0.20 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | 0.38 |

US 9,265,831 B2

11 12

TABLE 6-continued

| Formulation | Temp | Time Per. | Amt. mg/ml | % of Initial | 0.59 | 1.10 | 1.13 | 1.15 | 1.17 | 1.20 | 1.22 | 1.30 | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | % Area of degradants | | | | | | |
| BDM - | Initial | | 50.3 | 100 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | <LD | 0.18 |
| 50 mg/mL | 40° C. | 1 M | 50.0 | 99.4 | 0.19 | 0.32 | 0.08 | 0.06 | 0.08 | 0.06 | 0.06 | <LD | 0.85 |
| α-lipoic | | 2 M | 49.8 | 99.0 | 0.19 | 0.65 | 0.21 | 0.12 | 0.13 | 0.23 | 0.14 | 0.06 | 1.85 |
| acid - | | 3 M | 49.5 | 98.4 | 0.15 | 0.89 | 0.37 | 0.17 | 0.13 | 0.32 | 0.10 | <LD | 2.40 |
| 15 mg/mL | | 6 M | 47.0 | 93.4 | 0.20 | 1.76 | 0.66 | 0.19 | 0.31 | 0.47 | 0.33 | 0.17 | 4.93 |
| PEG | 25° C. | 3 M | 50.0 | 99.4 | 0.20 | 0.35 | 0.08 | <LD | <LD | <LD | <LD | <LD | 0.79 |
| 400:PG | | 6 M | 49.5 | 98.4 | 0.19 | 0.58 | 0.15 | 0.06 | 0.07 | 0.09 | 0.08 | 0.10 | 1.38 |
| (90:10) qs | 5° C. | 6 M | 50.3 | 100 | 0.17 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.23 |
| to 1 mL | | 12 M | 50.2 | 99.8 | 0.19 | 0.15 | <LD | <LD | <LD | <LD | <LD | <LD | 0.34 |

Stability of Bendamustine in 90% PEG 400, 10% PG and α-lipoic acid

<LD = Below Level of Detection

The data reported in Table 6 along with the data in Table 5 demonstrates that bendamustine solutions are stable when dissolved in mixtures of PEG and PG and 5-15 mg/mL α-lipoic acid. As shown in Table 6, bendamustine, when dissolved in combinations of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of lipoic acid, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6-12 months at 5° C. and 25° C. The data corresponds to bendamustine solutions being stable under ambient or refrigerated storage conditions for well in excess of 2 years, and thus long term stable.

### Example 7

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 2.5 mg/ml of thioglycerol was added as an antioxidizing agent. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table 7 below. The results obtained are presented in Table 7.

The stability is similar to that of α-lipoic acid samples in Example 6 above. As shown in Table 6, bendamustine, when dissolved in a combination of polyethylene glycol and propylene glycol, and a stabilizing amount of thioglycerol, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6 months at 25° C. The data reported supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for about 2 years.

### Example 8

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 85% PEG 400 and 15% PG in the presence of 5 mg/ml of thioglycerol. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table 8 below. The results obtained are presented in Table 8.

TABLE 7

Stability of Bendamustine in 90% PEG 400, 10% PG and Thioglycerol

| Formulation | Temp | Time Per. | Amt. mg/ml | % of Initial | 0.15 | 0.37 | 1.10 | 1.13 | 1.15 | 1.17 | 1.18 | 1.20 | 1.22 | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | RRTs of degradants | | | | | | |
| BDM - | Initial | | 50.3 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| 50 mg/mL | 40° C. | 15 d | 50.2 | 99.8 | BDL | BDL | 0.18 | BDL | BDL | BDL | 0.05 | 0.08 | BDL | 0.31 |
| Thio | | 1 M | 49.9 | 99.2 | BDL | 0.12 | 0.32 | 0.07 | BDL | BDL | 0.09 | 0.08 | BDL | 0.75 |
| glycerol - | | 2 M | 49.1 | 97.6 | BDL | 0.18 | 0.56 | 0.24 | 0.09 | 0.17 | 0.19 | 0.12 | 0.11 | 1.76 |
| 2.5 mg/mL | | 3 M | 48.8 | 97.0 | BDL | 0.23 | 0.85 | 0.34 | 0.16 | 0.30 | 0.34 | 0.29 | 0.19 | 2.94 |
| PEG | 25° C. | 3 M | 49.9 | 99.2 | 0.06 | 0.12 | 0.23 | 0.07 | BDL | 0.06 | 0.07 | 0.06 | BDL | 0.67 |
| 400:PG | | 6 M | 49.3 | 98.0 | BDL | 0.23 | 0.53 | 0.22 | 0.11 | BDL | 0.21 | 0.22 | 0.20 | 2.07 |
| (90:10) qs | | | | | | | | | | | | | | |
| to 1 mL | | | | | | | | | | | | | | |

BDL = Below Detectable Limit

US 9,265,831 B2

13

TABLE 8

| Stability of Bendamustine in 85% PEG 400, 15% PG and Thioglycerol | | | | | |
|---|---|---|---|---|---|
| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Total Imp. |
| BDM—50 mg/mL | Initial | | 51.5 | 100 | 0.12 |
| Thioglycerol—5 mg/mL | 40° C. | 1 M | 50.4 | 97.9 | 1.18 |
| PEG 400:PG (85:15) qs to | 25° C. | 1 M | 51.4 | 99.8 | 0.41 |
| 1 mL | | 3 M | 50.4 | 97.9 | 1.21 |
| | 5° C. | 3 M | 51.0 | 99.0 | 0.26 |

The stability is similar to that of thioglycerol samples in Example 7 above. As reported in Table 8, total impurities did not exceed 2% at 40° C. or 25° C. storage over one month, or at 25° C. and 5° C. storage after three months. The data reported in Table 8 supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for at least about 2 years if not longer.

We claim:

**1**. A non-aqueous liquid bendamustine-containing composition, comprising:
a) bendamustine or a pharmaceutically acceptable salt thereof; and
b) a pharmaceutically acceptable fluid comprising;
i) about 5% to about 10% by volume propylene glycol,
ii) polyethylene glycol, and
iii) a stabilizing amount of an antioxidant selected from the group consisting of thioglycerol, monothioglycerol, lipoic acid, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds and dihydrolipoic acid;
the bendamustine-containing composition having less than or equal to 0.11% total PG esters at about 1 month of storage at a temperature of about 5° C.;
wherein the ratio of polyethylene glycol to propylene glycol is selected from the group consisting of: about 95:5, about 90:10, about 85:15, about 80:20 and about 75:25.

**2**. The liquid bendamustine-containing composition of claim **1**, wherein said bendamustine-containing composition has less than or equal to 0.18% total PG esters at about 12 months of storage at a temperature of about 5° C.

**3**. The liquid bendamustine-containing composition of claim **1**, wherein the amount of propylene glycol in the pharmaceutically acceptable fluid is about 10%.

**4**. The liquid bendamustine-containing composition of claim **1**, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

**5**. The liquid bendamustine-containing composition of claim **1**, wherein the bendamustine concentration is from about 25 mg/mL to about 50 mg/mL.

**6**. The liquid bendamustine-containing composition of claim **5**, wherein the bendamustine concentration is about 50 mg/mL.

*    *    *    *    *

# EXHIBIT 11

US009572797B2

(12) **United States Patent**
Palepu et al.

(10) Patent No.: **US 9,572,797 B2**
(45) Date of Patent: *Feb. 21, 2017

(54) **FORMULATIONS OF BENDAMUSTINE**

(71) Applicant: **Eagle Pharmaceuticals, Inc.**, Woodcliff Lake, NJ (US)

(72) Inventors: **Nagesh R. Palepu**, Southampton, PA (US); **Philip Christopher Buxton**, Great Dunmow (GB)

(73) Assignee: **EAGLE PHARMACEUTICALS, INC.**, Woodcliff Lake, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/013,436**

(22) Filed: **Feb. 2, 2016**

(65) **Prior Publication Data**

US 2016/0143888 A1    May 26, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 14/031,879, filed on Sep. 19, 2013, now Pat. No. 9,265,831, which is a continuation of application No. 13/016,473, filed on Jan. 28, 2011, now Pat. No. 8,609,707.

(60) Provisional application No. 61/299,100, filed on Jan. 28, 2010.

(51) **Int. Cl.**
| *A61K 31/4184* | (2006.01) |
| *A61K 47/10* | (2006.01) |
| *A61K 47/12* | (2006.01) |
| *A61K 47/18* | (2006.01) |
| *A61K 47/20* | (2006.01) |
| *A61K 47/22* | (2006.01) |
| *A61K 9/08* | (2006.01) |
| *A61K 9/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ............. *A61K 31/4184* (2013.01); *A61K 9/08* (2013.01); *A61K 47/10* (2013.01); *A61K 47/12* (2013.01); *A61K 47/18* (2013.01); *A61K 47/186* (2013.01); *A61K 47/20* (2013.01); *A61K 47/22* (2013.01); *A61K 9/0019* (2013.01)

(58) **Field of Classification Search**
CPC .... A61K 31/4184; A61K 47/10; A61K 47/12; A61K 47/18; A61K 47/186; A61K 47/20; A61K 47/22; A61K 9/0019; A61K 9/08
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 4,071,620 | A | 1/1978 | Sklar |
| 4,711,906 | A | 12/1987 | von Stetten et al. |
| 5,223,515 | A | 6/1993 | Mikura et al. |
| 7,772,274 | B1 | 8/2010 | Palepu |
| 8,076,366 | B2 | 12/2011 | Courvoisier et al. |
| 8,344,006 | B2 | 1/2013 | Drager et al. |
| 8,389,558 | B2 | 3/2013 | Alakhov et al. |
| 8,609,707 | B2 | 12/2013 | Palepu et al. |
| 9,000,021 | B2 | 4/2015 | Sundaram et al. |
| 9,034,908 | B2 | 5/2015 | Sundaram |
| 9,144,568 | B1 | 9/2015 | Sundaram |
| 9,265,831 | B2 | 2/2016 | Palepu et al. |
| 2004/0043069 | A1 | 3/2004 | Vanderbist et al. |
| 2005/0042285 | A1 | 2/2005 | Ukai et al. |
| 2006/0035945 | A1 | 2/2006 | Attardo et al. |
| 2006/0128777 | A1 | 6/2006 | Bendall et al. |
| 2006/0159713 | A1 | 7/2006 | Brittain et al. |
| 2008/0118544 | A1 | 5/2008 | Wang |
| 2009/0082416 | A1 | 3/2009 | Czarnik |
| 2009/0209606 | A1 | 8/2009 | Bendall et al. |
| 2009/0264488 | A1 | 10/2009 | Cooper et al. |
| 2009/0325978 | A1 | 12/2009 | Onai et al. |
| 2010/0092474 | A1 | 4/2010 | Gallagher et al. |
| 2010/0145266 | A1 | 6/2010 | Orlowski et al. |
| 2010/0216858 | A1 | 8/2010 | Popek et al. |
| 2010/0273730 | A1 | 10/2010 | Hsu et al. |
| 2011/0015244 | A1 | 1/2011 | Alakhov et al. |
| 2011/0015245 | A1 | 1/2011 | Alakhov et al. |
| 2011/0184036 | A1 | 7/2011 | Palepu et al. |
| 2011/0190363 | A1 | 8/2011 | Drager et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| CA | 2787568 | 1/2011 |
| CA | 2867295 | 3/2013 |

(Continued)

OTHER PUBLICATIONS

Olthoff et al. ("Olthoff", DD 159289, cited in IDS filed Jan. 24, 2014, translation ).*
U.S. Appl. No. 14/098,094, filed Dec. 5, 2013.
U.S. Appl. No. 14/097,904, filed Dec. 5, 2013.
U.S. Appl. No. 14/522,581, filed Oct. 23, 2014.
U.S. Appl. No. 14/554,269, filed Nov. 26, 2014.
U.S. Appl. No. 14/031,879, filed Sep. 19, 2013.
U.S. Appl. No. 13/767,672, filed Feb. 14, 2013.

(Continued)

*Primary Examiner* — Ernst V Arnold

(74) *Attorney, Agent, or Firm* — Lucas & Mercanti, LLP

(57) **ABSTRACT**

Long term storage stable bendamustine-containing compositions are disclosed. The compositions can include bendamustine or a pharmaceutically acceptable salt thereof, and a pharmaceutically acceptable fluid which can include in some embodiments PEG, PG or mixtures thereof and an antioxidant or chloride ion source. The bendamustine-containing compositions have less than about 5% total impurities, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

**27 Claims, No Drawings**

## US 9,572,797 B2

Page 2

(56)            **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2012/0059000 | A1 | 3/2012 | Ren et al. |
| 2012/0071542 | A1 | 3/2012 | Cooper et al. |
| 2012/0157505 | A1 | 6/2012 | La Bell et al. |
| 2013/0041003 | A1 | 2/2013 | Brittain et al. |
| 2013/0041004 | A1 | 2/2013 | Drager et al. |
| 2013/0210878 | A1 | 8/2013 | Soppimath et al. |
| 2013/0210879 | A1 | 8/2013 | Palepu et al. |
| 2013/0253025 | A1 | 9/2013 | Sundaram et al. |
| 2014/0094496 | A1 | 4/2014 | Sundaram et al. |
| 2014/0275196 | A1 | 9/2014 | Sundaram |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 2867343 | | 3/2013 |
| CN | 101584668 | A | 11/2009 |
| CN | 102164579 | A | 8/2011 |
| CN | 201380017489.7 | | 2/2013 |
| CN | 201380023657.3 | | 3/2013 |
| CN | 201380023660.5 | | 3/2013 |
| DE | 159289 | | 3/1983 |
| EP | 11737745.7 | | 1/2011 |
| EP | 13764989.3 | | 3/2013 |
| EP | 13765020.6 | | 3/2013 |
| JP | H09508128 | A | 8/1997 |
| JP | 2005537285 | A | 12/2005 |
| JP | 2008526991 | A | 7/2008 |
| JP | 2012-551333 | | 1/2011 |
| JP | 2015-160351 | | 1/2011 |
| JP | 2012503666 | A | 2/2012 |
| JP | 2012525387 | A | 10/2012 |
| JP | 2015-501813 | | 3/2013 |
| JP | 2015501814 | A | 1/2015 |
| WO | 2010036702 | A1 | 4/2010 |
| WO | 2010126676 | A1 | 11/2010 |
| WO | 2010148288 | A2 | 12/2010 |
| WO | 2011094565 | A1 | 8/2011 |
| WO | 2012015810 | A2 | 2/2012 |
| WO | 2013142358 | A1 | 9/2013 |

### OTHER PUBLICATIONS

Biewenga et al., "The Pharmacology of the Antioxidant Lipoic Acid," Gen. Pharmac., vol. 39, No. 3, pp. 315-331 (1997).
Rowe et al., "Handbook of Pharmaceutical Excipients," 6th edition, pp. 454-455 (2009).
Spiegel et al., "Use of Nonaqueous Solvents in Parenteral Products," Journal of Pharmaceutical Sciences, vol. 52, No. 10 pp. 917-927 (1963).
International Search Report and Written Opinion issued in counterpart PCT/US2013/26187 dated May 2013 (2 pages).
Thiesen, "Bendamustine, a well-tollerated cytotoxic agent used in Germany for many years, is soon to be marketed in the rest of Europe for a range of indicatons including chronic lymphocytic leukaemia," pp. 1-4 (2010). Available at http://www.hospitalpharmacyeurope.com/featured-articles/bendamustine.
Preiss et al., "Pharmacological and clinical date of Bendamustine," 17th International Cancer Congress, pp. 1637-1640 (1998).
Schoffski et al., "Weekly administration of bendamustine: A phase 1 study in patients with advanced progressive solid tumors," Annals of Oncology II, pp. 729-734 (2000).
Rassachaert et al., "A phase 1 study of bendamustine hydrochloride administered once every 3 weeks in patients with solid tumors," Anti-Cancer Drugs, vol. 18 No. 5 pp. 587-595 (2007).
Schoffski et al., Repeated administration of short infusions of bendamustine: a phase 1 study in patients with advanced progressive solid tumours, J. Cancer Res Clin Oncol, vol. 126 No. 1 pp. 41-47 (2000).
Treanda, "Highlights of Prescribing Information," TREANDA (bendamustine hydrochloride) for Injection, for intravenous infusion, pp. 1-13 (2010).
Zips et al., "New Anticancer Agents: In Vitro and In Vivo Evaluation," In Vivo,vol. 19 pp. 1-8 (2005).
Sikora, "Cancer drug development in the post-genomic age," Current Science, vol. 81 No. 5 pp. 549-554 (2001).
International Search Report and Written Opinion issued in counterpart PCT/US2013/032295 dated Jun. 2013 (4 pages).
International Search Report and Written Opinion of International application based on PCT/US2011/022958, dated Apr. 2011 (8 pages).
Third Party Submission in related EP2528602 based on PCT/US2011/022958 dated Nov. 2013.
Supplementary European Search Report in related EP 2528602 dated Jan. 2014.
Maas et al., "Stabilitat von Bendamustinhydrochlorid in Infusionslosungen," Die Pharmazie, Govi Verlag Pharmazeutischer Verlag Gmbh, vol. 49. No. 10 pp. 775-777 (1994). (Abstract Only).
International Search Report and Written Opinion for No. PCT/US2013/032289 dated Jun. 2013.
Sigma-Aldrich, Webpage Catalog for poly(ethylene glycol), http://www.sigmaaldrich.com/catalog/product/aldrich/202398?lang=en&region=US#, accessed Nov. 15, 2015 (2 pages).

* cited by examiner

US 9,572,797 B2

1

**FORMULATIONS OF BENDAMUSTINE**

CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 14/031,879, filed Sep. 19, 2013, which is a continuation of application Ser. No. 13/016,473, filed Jan. 28, 2011, now U.S. Pat. No. 8,609,707, issued Dec. 17, 2013, which claims the benefit of U.S. Provisional Patent Application No. 61/299,100, filed Jan. 28, 2010, the contents of each of which are incorporated herein by reference.

BACKGROUND OF THE INVENTION

Bendamustine free base is represented by the following structural formula (I)



(I)

Bendamustine is used in the treatment of a number of cancers including leukemias, Hodgkins disease and multiple myelomas. Bendamustine is the active ingredient of the commercial product Treanda™, a lyophilized powder for reconstitution.

Bendamustine exhibits rapid degradation upon reconstitution of the lyophilized product. Bendamustine undergoes hydrolysis by direct substitution rather than an addition elimination process due to the presence of the highly labile aliphatic chlorine atoms. Some of the main degradants of bendamustine are the monohydroxy compound known as HP1 (hydrolysis product 1) and dihydroxy compound HP2 (hydrolysis product 2). The monohydroxy compound appears as the main impurity at Relative Retention Time (RRT) 0.6 and the dihydroxy compound appears as the main impurity at RRT 0.27. Minor peaks appear at RRT 1.2, which are presently unknown.

The stability of bendamustine in water is measured in hours, and is therefore, not suitable for long-term storage in liquid form. The lyophile possesses good chemical stability. However, reconstitution of the lyophile is clinically inconvenient, taking 15-30 mins with implications of chemical instability. There is a need for ready to use (RTU) bendamustine formulations having enhanced stability.

SUMMARY OF THE INVENTION

In other aspects of the invention, the bendamustine-containing compositions include a) a pharmaceutically acceptable fluid which contains one or more of propylene glycol, ethanol, polyethylene glycol, benzyl alcohol and glycofurol, and b) a stabilizing amount of a chloride salt. In other aspects of the invention, the bendamustine-containing compositions include DMSO (dimethyl sulfoxide) as part of the pharmaceutically acceptable fluid included therein.

2

Regardless of the pharmaceutically acceptable fluid included, the amount of bendamustine included in the composition is preferably from about 20 mg/mL to about 60 mg/mL. Still further aspects of the invention include methods of treatment using bendamustine-containing compositions and kits containing the same.

One of the advantages of the inventive liquid compositions is that they have substantially improved long term stability when compared to currently available formulations. For example, the inventive bendamustine compositions are substantially free of impurities after at least about 15 months at a temperature of from about 5° C. to about 25° C. The inventive formulations are advantageously ready to use or ready for further dilution. Reconstitution of lyophilized powders is not required.

DETAILED DESCRIPTION OF THE INVENTION

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art to which this invention belongs. In the event that there is a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

As used herein, RRT is calculated by dividing the retention time of the peak of interest by the retention time of the main peak. Any peak with an RRT<1 elutes before the main peak, and any peak with an RRT>1 elutes after the main peak.

For purposes of the present invention, "substantially free of impurities" shall be understood to include bendamustine-containing compositions in which the amount of total impurities is less than about 5%, as calculated on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after a period of about 15 months at a temperature of from about 5° C. to about 25° C. The amount of impurities is further calculated as being based upon the original amount bendamustine (or salt thereof) being present in the composition or formulation.

For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.

Preferably, the amount of any individual degradant in the inventive compositions does not exceed 2% PAR as determined by HPLC at a wavelength of 223 nm after storage periods of at least about 15 months at a temperature of from about 5° C. to about 25° C. In some aspects, the amount of time the inventive compositions demonstrate long term storage stability is at least about 18 months and preferably at least about 2 years when stored under the conditions described herein.

In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions including:

a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including

i) PEG, PG or mixtures thereof; and

ii) a stabilizing amount of an antioxidant.

The total impurities in the inventive compositions resulting from the degradation of the bendamustine in the compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of from about 5° C. to about 25° C., and thus have long term stability for at least the same period of time

US 9,572,797 B2

3

or longer. Preferably, the bendamustine-containing compositions demonstrate long term storage stability for at least about 2 years, especially when stored at the lower (refrigerated) temperatures. In one embodiment, the amount of total impurities in the inventive compositions resulting from the degradation of the bendamustine is less than about 3% PAR as determined by HPLC at a wavelength of 223 nm after at least about 2 years at a temperature of from about 5° C. to about 25° C.

In some aspects of the invention, the bendamustine concentration in the inventive compositions is from about 10 mg/mL to about 100 mg/mL, preferably 20 mg/mL to about 60 mg/mL. Preferably the bendamustine concentration in the inventive compositions is from about 25 mg/mL to about 50 mg/mL, and more preferably from about 30 mg/mL to about 50 mg/mL. It will be understood that compositions containing any useful concentration within the ranges, i.e. 10, 20, 25, 30, 35, 40, 45, 50, 55, 60 . . . 100 are contemplated. In other embodiments, the bendamustine concentration in the composition is about 50 mg/mL. In alternative aspects, the amount of bendamustine is outside these ranges but the amounts will be sufficient for single or multiple administrations of dosages generally regarded as effective amounts.

In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof. Within this aspect, the pharmaceutically acceptable fluid is propylene glycol (PG) or polyethylene glycol (PEG). In other embodiments of the invention however, the pharmaceutically acceptable fluid is a mixture of PEG and PG. For example, the pharmaceutically acceptable fluid can include about 50% PEG and about 50% PG. Alternatively, the pharmaceutically acceptable fluid includes about 95% PEG and about 5% PG. The amount of PEG and PG can also be varied within the ranges, i.e. the ratio of PEG:PG in the pharmaceutically acceptable fluid can range from about 95:5 to about 50:50. Within this range, is a pharmaceutically acceptable fluid containing about 75% PEG and about 25% PG, and preferably 80% PEG and 20% PG. In another embodiment, a pharmaceutically acceptable fluid can include about 85% PEG and about 15% PG while another preferred pharmaceutically acceptable fluid includes about 90% PEG and about 10% PG. The molecular weight of the PEG will be within the range of pharmaceutically acceptable weights although PEG 400 is preferred in many aspects of the invention.

Without meaning to be bound by any theory or hypothesis, the hydroxide of the polyethylene glycol molecule is less reactive than the hydroxides of propylene glycol. As a result, the ester forms at a slower rate in polyethylene glycol than propylene glycol and the resulting bendamustine degradants are unexpectedly and substantially reduced over extended periods of time when PEG is a substantial part of the pharmaceutically acceptable fluid.

The bendamustine-containing compositions according to several preferred aspects of the invention include a stabilizing amount of an antioxidant. For purposes of the present invention, "stabilizing amount" shall be understood to include those amounts which increase or enhance the stability of the bendamustine in the compositions described herein. The presence of one or more antioxidants described herein thus contributes, at least in part to the long term stability of the composition. Within this guideline, suitable antioxidant concentrations in the compositions can range from about 2.5 mg/mL to about 35 mg/mL, and preferably from about 5 mg/mL to about 20 mg/mL or from about 10 mg/mL to about 15 mg/mL. In some other embodiments, the

4

concentration of the antioxidant in the bendamustine-containing composition is about 5 mg/mL.

Suitable antioxidants for inclusion include those which are pharmaceutically acceptable for use in human and veterinary formulations although not limited to those currently regarded as safe by any regulatory authority. For example, the antioxidant can be selected from among lipoic acid, thioglycerol (also known as monothioglycerol) and analogs thereof, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds, dihydrolipoic acid and mixtures of the foregoing. Preferably, the antioxidant is thioglycerol, lipoic acid or a mixture thereof. Some particularly preferred embodiments of the invention include thioglycerol.

In view of the foregoing, some preferred long term storage stable bendamustine-containing compositions in accordance with the invention compositions include:

I. a) bendamustine or a pharmaceutically acceptable salt thereof; and
   b) a pharmaceutically acceptable fluid including
      i) polyethylene glycol and propylene glycol; and
      ii) a stabilizing amount of thioglycerol; or
II. a) about 50 mg/mL bendamustine or a pharmaceutically acceptable salt thereof;
and
   b) a pharmaceutically acceptable fluid including
      i) about 90% PEG and about 10% PG; and
      ii) about 2.5 mg/mL thioglycerol.

Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total impurities, PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

In accordance with other aspects of the invention, there are provided long term storage stable bendamustine-containing compositions, including:

   a) bendamustine or a pharmaceutically acceptable salt thereof;
   b) a pharmaceutically acceptable fluid including one or more of the following: PG, ethanol, PEG, benzyl alcohol and glycofurol; and
   c) a stabilizing amount of a chloride salt.

These compositions also have the low levels of impurities and long term stability mentioned herein. Preferred pharmaceutically acceptable fluids include PG, PEG or ethanol in this embodiment of the invention. Preferably, the PEG is PEG 400. If desired, glycerin and/or 88% (w/w) lactic acid can be added to the pharmaceutically acceptable fluid.

Suitable chloride salts include but are not limited to organic chloride salts, sodium chloride, choline chloride, hydrochloride salts of amino acids and mixtures thereof. Thus, as will be appreciated by those of ordinary skill, one can select from among a number of suitable chloride salts and it is Applicants' intention that the scope of the invention includes all such chloride salts that are capable of being included in bendamustine-containing formulations for extended periods without having a deleterious effect on the drug. In one embodiment of the invention, the chloride salt concentration is from about 10 to about 300 mg/mL. In another embodiment, the chloride salt concentration is from about 50 to about 215 mg/mL. In one preferred embodiment, the chloride salt concentration is about 215 mg/mL.

In accordance with another aspect of the invention, there is provided long term storage stable bendamustine-containing compositions, including:

US 9,572,797 B2

5

a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including DMSO.

These compositions also have the low levels of impurities and long term stability mentioned herein. In some aspects, the bendamustine concentration in these compositions is from about 10 mg/mL to about 100 mg/mL. Preferably, the bendamustine concentration is from about 20 mg/mL to about 50 mg/mL, more preferably from about 25 mg/mL to about 50 mg/mL. In an alternative embodiment, the bendamustine concentration is about 50 mg/mL.

Another embodiment of the invention provides methods of treating cancer in mammals. The methods include administering to a mammal in need thereof an effective amount of one of the bendamustine-containing compositions described herein. Since the active ingredient portion of the inventive composition is an FDA-approved drug, those of ordinary skill will recognize that the doses of bendamustine employed in this aspect of the invention will be similar to those employed in any treatment regimens designed for bendamustine as marketed under the trade name TRE-ANDA. The patient package insert containing dosing information is incorporated herein by reference. The methods of treatment also include administering the inventive formulations for any purpose or physical condition for which bendamustine has been indicated as being useful.

Another embodiment of the invention includes methods of preparing bendamustine-containing compositions described herein. The methods include reconstituting lyophilized bendamustine in a pharmaceutically acceptable fluid containing one of the following:

A) i) PEG, PG or mixtures thereof; and
  ii) a stabilizing amount of an antioxidant;
B) i) one or more of PG, ethanol, PEG, benzyl alcohol and glycofurol; and
  ii) a stabilizing amount of a chloride salt; or
C) DMSO.

The steps are carried out under pharmaceutically acceptable conditions for sterility and manufacturing.

In a further aspect of the invention, there are provided methods of controlling or preventing the formation of impurities in bendamustine-containing compositions during long term storage. The methods include combining an amount of bendamustine or a pharmaceutically acceptable salt thereof with a sufficient amount of a pharmaceutically acceptable fluid containing one of the following:

A) i) PEG, PG or mixtures thereof; and
  ii) a stabilizing amount of an antioxidant;
B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and
  ii) a stabilizing amount of a chloride salt; or
C) DMSO.

Further optional steps in accordance therewith include transferring one or more pharmaceutically acceptable doses of the formulations into a suitable sealable container and storing the sealed container at a temperature of from about 5° C. to about 25° C. As a result of carrying out these steps, it is possible to control or substantially prevent the formation of impurities which otherwise occur with bendamustine-containing compositions during long term storage so that the artisan is provided with bendamustine-containing formulations having less than about 5% total impurities PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

The compositions of the present invention can be packaged in any suitable sterile vial or container fit for the sterile

6

storage of a pharmaceutical such as bendamustine. Suitable containers can be glass vials, polypropylene or polyethylene vials or other special purpose containers and be of a size sufficient to hold one or more doses of bendamustine.

A further aspect of the invention includes kits containing lyophilized bendamustine or a pharmaceutically acceptable salt thereof in a first container or vial; and, in a second container, a sufficient amount of a pharmaceutically acceptable fluid such as those described herein, i.e. one of the following:

A) i) PEG, PG or mixtures thereof; and
  ii) a stabilizing amount of an antioxidant;
B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and
  ii) a stabilizing amount of a chloride salt; or
C) DMSO.

For purposes of this embodiment, the amount of fluid which is sufficient is an amount which allows the bendamustine to be dissolved or dispersed to a degree which renders the liquid composition ready for use.

As will be appreciated by those of ordinary skill, the kit will contain other pharmaceutically necessary materials for storing and/or administering the drug, including instructions for storage and use, additional diluents, if desired, etc.

EXAMPLES

The following examples serve to provide further appreciation of the invention but are not meant in any way to restrict the effective scope of the invention.

Example 1

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10mg/m1 in one of ethanol, propylene glycol and benzyl alcohol as indicated in Table 1 below. 215 mg/ml of choline chloride was added in half of the samples as a source of soluble chloride ions. The samples were maintained at 40° C. and analyzed periodically for drug content and total impurities. The results obtained are presented in Table 1.

TABLE 1

| Stability of Bendamustine HCl | | | | |
|---|---|---|---|---|
| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
| BDM - 10 mg/mL | | Initial | 10.43 | 0.27 |
| Choline chloride - 215 mg/mL | 40° C. | 48 hrs | 10.48 | 1.27 |
| Ethanol qs to 1 mL | | 7 day | 10.26 | 2.11 |
| BDM - 10 mg/mL | | Initial | 10.55 | 0.27 |
| Ethanol qs to 1 mL | 40° C. | 48 hrs | 10.30 | 2.39 |
| | | 7 day | 9.55 | 6.66 |
| BDM - 10 mg/mL | | Initial | 9.99 | 0.21 |
| Choline chloride - 215 mg/mL | 40° C. | 48 hrs | 9.95 | 0.60 |
| Propylene glycol qs to 1 mL | | 7 day | 9.43 | 2.31 |
| BDM - 10 mg/mL | | Initial | 9.68 | 0.21 |
| Propylene glycol qs to 1mL | 40° C. | 48 hrs | 9.45 | 0.88 |
| | | 7 day | 9.00 | 3.44 |
| BDM - 10 mg/mL | | Initial | 9.95 | 1.19 |
| Choline Chloride - 215 mg/mL | 40° C. | 48 hrs | 9.89 | 3.51 |
| Benzyl alcohol qs to 1 mL | | 7 day | 8.97 | 4.24 |
| BDM - 10 mg/mL | | Initial | 9.52 | 0.33 |

US 9,572,797 B2

7

TABLE 1-continued

Stability of Bendamustine HCl

| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
|---|---|---|---|---|
| Benzyl alcohol qs to 1 mL | 40° C. | 48 hrs | 8.67 | 4.18 |
| | | 7 day | 7.49 | 7.84 |

Note:
In Table 1 the total % impurities include total contributions from peaks at various RRTs.

As shown in Table 1, the bendamustine formulations are very stable in solutions containing solvent and chloride salt. Table 1 shows that bendamustine, when dissolved at a concentration of about 10 mg/mL, in a pharmaceutically acceptable fluid, such as ethanol and propylene glycol, and containing a stabilizing amount of a chloride salt, such as choline chloride, had less than about 5% after at least 7 days storage at 40° C.

The data presented in Table 1 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of a chloride salt having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including ethanol alone exhibited more than 6.5 total degradants after 7 days storage at 40° C. The sample including benzyl alcohol alone exhibited more than 7.5% total degradants after 7 days storage at 40° C. Bendamustine-containing compositions with such high levels of degradation would not be suitable for long-term storage.

Example 2

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10mg/m1 in DMSO. The samples were maintained at 40° C. and analyzed periodically for drug content and impurity profile. The results obtained are presented in Table 2.

TABLE 2

Stability of Bendamustine HCl in DMSO

| Formulation | Temp | Time | Content (mg/mL) | % Total Imp |
|---|---|---|---|---|
| BDM - 10 mg/mL | | Initial | 10.2 | 0.23 |
| DMSO qs to 1 mL | 40° C. | 48 hrs | 9.80 | 0.30 |
| | | 1 week | 10.0 | 0.56 |

Note:
In Table 2 the total % impurities include total contributions from peaks at various RRTs.

Table 2 shows that bendamustine, when dissolved in DMSO, had substantially no increase in total degradants. The data presented in Table 2 translates to bendamustine-containing compositions including DMSO having a shelf life of at least about 15 months at 5° C. and 25° C. In fact, such compositions are expected to have long term stability for periods beyond 15 months, i.e. up to 2 years or greater.

Example 3

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 20 mg/ml in polyethylene glycol 400 and 5 mg/ml of lipoic acid was added as a stabilizing antioxidant as indicated in Table 3 below. The samples were maintained at 40° C. or 25° C.

8

and analyzed after 15 days for drug content and impurities. The results obtained are presented in Table 3.

TABLE 3

Stability of Bendamustine (20 mg/ml) in PEG 400 and Antioxidants

| Antioxidant | T° C. | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
| | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

As shown in Table 3, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as polyethylene glycol, in the presence of a stabilizing amount of an antioxidant, such as lipoic acid, had substantially no increase in total degradants after a period of 15 days. The data presented in Table 3 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of an antioxidant having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including PEG alone, on the other hand, which did not contain an antioxidant, did not exhibit stabilizing effects at 40° C. This sample had more than 40% more total impurities than the sample including lipoic acid. Bendamustine-containing compositions with such high levels of total impurities would not be suitable for long-term storage.

Example 4

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 5 mg/ml of thioglycerol, a-lipoic acid or dihydrolipoic acid was added as a stabilizing antioxidant as indicated in Table 4 below. The samples were maintained at 40° C. and analyzed after 15 days or one month for drug content and impurity profile as indicated in Table 4 below. The results obtained are presented in Table 4.

TABLE 4

Stability of Bendamustine (50 mg/ml) in 90% PEG 400, 10% Propylene Glycol and Antioxidant

| | | | | | % Impurities RRT | | |
|---|---|---|---|---|---|---|---|
| Antioxidant | T (° C.) | Time | Content (mg/mL) | % Initial | HP1 0.59 | PG ester 1.10 | % Total Imps |
| Thioglycerol | 40 | initial | 48.8 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 48.5 | 99.4 | 0.06 | 0.20 | 0.71 |
| α-lipoic acid | 40 | initial | 49 | 100 | <LD | <LD | 0 |
| | 40 | 15 days | 48.8 | 99.6 | 0.19 | 0.13 | 0.32 |
| | 40 | 1 month | 48.7 | 99.4 | 0.34 | 0.26 | 0.79 |
| Dihydrolipoic acid | 40 | initial | 49.3 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 47.7 | 97.4 | 0.63 | 0.12 | 1.84 |

<LD = Below Level of Detection

As shown in Table 4, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as a combination of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of an antioxidant, such as thioglycerol, a-lipoic acid or dihydrolipoic acid, had substantially no increase in total degradants after a period of 1 month. This data supports the position that bendamustine-containing

US 9,572,797 B2

| 9 | 10 |

compositions according to the invention have a shelf life of at least about 2 years when stored at temperatures between 5° C. and 25° C.

### Example 5

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in a mixture of polyethylene glycol 400 and propylene glycol as indicated in Table 5 below. 5 mg/ml of lipoic acid was added as a stabilizing antioxidant. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed after 1 week, 15 days or one month for drug content and impurity profile as indicated in Table 5 below. The results obtained are presented in Table 5.

TABLE 5

Stability of Bendamustine (50 mg/ml) and Lipoic Acid (5 mg/ml) in PEG400 and Propylene glycol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | HP1 0.58 | PG ester 1.10 | PG ester 1.13 | % Total Imp. |
|---|---|---|---|---|---|---|---|---|
| BDM- | | Initial | 49.6 | 100 | BDL | BDL | BDL | 0.18 |
| 50 mg/ml | 40° C. | 1 W | 49.0 | 98.8 | 0.05 | 0.13 | BDL | 0.38 |
| Lipoic acid- | | 15 d | 48.3 | 97.4 | 0.08 | 0.26 | BDL | 0.55 |
| 5 mg/mL | | 1 M | 48.0 | 96.8 | 0.11 | 0.43 | 0.13 | 1.03 |
| PEG 400:PG | 25° C. | 15 d | 49.6 | 100.0 | BDL | 0.10 | BDL | 0.30 |
| (75:25) | | 1 M | 48.4 | 97.6 | 0.05 | 0.19 | BDL | 0.43 |
| qs to 1 mL | 5° C. | 1 M | 49.6 | 100.0 | BDL | 0.07 | BDL | 0.27 |
| BDM- | | Initial | 50.2 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/ml | 40° C. | 1 W | 49.9 | 99.4 | BDL | 0.15 | BDL | 0.30 |
| Lipoic acid- | | 15 d | 49.1 | 97.8 | 0.06 | 0.35 | BDL | 0.73 |
| 5 mg/mL | | 1 M | 49.0 | 97.6 | 0.09 | 0.90 | 0.25 | 1.82 |
| PEG 400:PG | 25° C. | 15 d | 49.9 | 99.4 | BDL | 0.12 | BDL | 0.32 |
| (50:50) | | 1 M | 49.7 | 99.0 | BDL | 0.25 | BDL | 0.59 |

TABLE 5-continued

Stability of Bendamustine (50 mg/ml) and Lipoic Acid (5 mg/ml) in PEG400 and Propylene glycol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | HP1 0.58 | PG ester 1.10 | PG ester 1.13 | % Total Imp. |
|---|---|---|---|---|---|---|---|---|
| qs to 1 mL | 5° C. | 1 M | 50.0 | 99.6 | BDL | 0.11 | BDL | 0.33 |
| BDM- | | Initial | 50.8 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/ml | 40° C. | 1 W | 50.4 | 99.2 | BDL | 0.11 | BDL | 0.30 |
| Lipoic acid- | | 15 d | 49.7 | 97.8 | 0.07 | 0.17 | BDL | 0.43 |
| 5 mg/mL | | 1 M | 49.7 | 97.8 | 0.13 | 0.27 | 0.09 | 0.84 |
| PEG 400:PG | 25° C. | 15 d | 50.8 | 100.0 | BDL | 0.10 | BDL | 0.26 |
| (90:10) | | 1 M | 50.8 | 100.0 | 0.05 | 0.14 | BDL | 0.39 |
| qs to 1 mL | 5° C. | 1 M | 50.8 | 100.0 | BDL | 0.06 | BDL | 0.34 |

BDL = Below Detectable Limit

As shown in Table 5, bendamustine, when dissolved in certain mixtures of polyethylene glycol and propylene glycol and a stabilizing amount of lipoic acid, had substantially no increase in total degradants after a period of 1 month. The data presented in Table 5 translates to bendamustine-containing compositions having a shelf life of at least about 2 years when stored at temperatures between 5° C. and at 25° C.

### Example 6

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol and a-lipoic acid was added as a stabilizing antioxidant as indicated in Table 6 below. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed for drug content and impurity profile as indicated in Table 6 below. The results obtained are presented in Table 6.

TABLE 6

Stability of Bendamustine in 90% PEG 400, 10% PG and α-lipoic acid

| Formulation | Temp | Time Per. | Amt. mg/ml | % of Ini-tial | % Area of degradants | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0.59 | 1.10 | 1.13 | 1.15 | 1.17 | 1.20 | 1.22 | 1.30 | |
| BDM- | | Initial | 51.0 | 100 | 0.20 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.26 |
| 50 mg/mL | 40° C. | 1 M | 50.5 | 99.0 | 0.21 | 0.31 | 0.13 | 0.07 | 0.13 | 0.10 | <LD | <LD | 0.95 |
| α-lipoic acid- | | 2 M | 49.7 | 97.5 | 0.22 | 0.71 | 0.28 | 0.14 | 0.12 | 0.21 | 0.12 | <LD | 2.02 |
| 10 mg/mL | | 3 M | 48.7 | 95.5 | 0.22 | 1.01 | 0.45 | 0.21 | 0.14 | 0.37 | 0.16 | 0.05 | 2.96 |
| PEG 400:PG | 25° C. | 3 M | 50.5 | 99.0 | 0.20 | 0.36 | 0.07 | <LD | <LD | 0.10 | <LD | <LD | 0.73 |
| (90:10) | | 6 M | 50.4 | 98.8 | 0.22 | 0.60 | 0.17 | 0.06 | 0.06 | 0.09 | 0.10 | 0.08 | 1.44 |
| qs to 1 mL | 5° C. | 6 M | 50.9 | 99.8 | 0.16 | 0.05 | <LD | <LD | <LD | <LD | <LD | <LD | 0.21 |
| | | 12 M | 50.6 | 99.2 | 0.20 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | 0.38 |
| BDM- | | Initial | 50.3 | 100 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | <LD | 0.18 |
| 50 mg/mL | 40° C. | 1 M | 50.0 | 99.4 | 0.19 | 0.32 | 0.08 | 0.06 | 0.08 | 0.06 | 0.06 | <LD | 0.85 |
| α-lipoic acid- | | 2 M | 49.8 | 99.0 | 0.19 | 0.65 | 0.21 | 0.12 | 0.13 | 0.23 | 0.14 | 0.06 | 1.85 |
| 15 mg/mL | | 3 M | 49.5 | 98.4 | 0.15 | 0.89 | 0.37 | 0.17 | 0.13 | 0.32 | 0.10 | <LD | 2.40 |
| PEG 400:PG | | 6 M | 47.0 | 93.4 | 0.20 | 1.76 | 0.66 | 0.19 | 0.31 | 0.47 | 0.33 | 0.17 | 4.93 |
| (90:10) | 25° C. | 3 M | 50.0 | 99.4 | 0.20 | 0.35 | 0.08 | <LD | <LD | 0.11 | <LD | <LD | 0.79 |
| qs to 1 mL | | 6 M | 49.5 | 98.4 | 0.19 | 0.58 | 0.15 | 0.06 | 0.07 | 0.09 | 0.08 | 0.10 | 1.38 |
| | 5° C. | 6 M | 50.3 | 100 | 0.17 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.23 |
| | | 12 M | 50.2 | 99.8 | 0.19 | 0.15 | <LD | <LD | <LD | <LD | <LD | <LD | 0.34 |

<LD = Below Level of Detection

US 9,572,797 B2

11

The data reported in Table 6 along with the data in Table 5 demonstrates that bendamustine solutions are stable when dissolved in mixtures of PEG and PG and 5-15mg/mL a-lipoic acid. As shown in Table 6, bendamustine, when dissolved in combinations of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of lipoic acid, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6-12 months at 5° C. and 25° C. The data corresponds to bendamustine solutions being stable under ambient or refrigerated storage conditions for well in excess of 2 years, and thus long term stable.

Example 7

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 2.5 mg/ml of thioglycerol was added as an antioxidizing agent. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table7 below. The results obtained are presented in Table 7.

TABLE 7

Stability of Bendamustine in 90% PEG 400, 10% PG and Thioglycerol

| Formulation | Temp | Time Per. | Amt mg/ml | % of Ini- tial | \multicolumn{8}{c}{RRTs of degradants} | % Total Imp. |
| | | | | | 0.15 | 0.37 | 1.10 | 1.13 | 1.15 | 1.17 | 1.18 | 1.20 | 1.22 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BDM- 50 mg/mL Thio glycerol- 2.5 mg/mL PEG 400:PG (90:10) qs to 1 mL | Initial | Initial | 50.3 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | 40° C. | 15 d | 50.2 | 99.8 | BDL | BDL | 0.18 | BDL | BDL | BDL | 0.05 | 0.08 | BDL | 0.31 |
| | | 1 M | 49.9 | 99.2 | BDL | 0.12 | 0.32 | 0.07 | BDL | BDL | 0.09 | 0.08 | BDL | 0.75 |
| | | 2 M | 49.1 | 97.6 | BDL | 0.18 | 0.56 | 0.24 | 0.09 | 0.17 | 0.19 | 0.12 | 0.11 | 1.76 |
| | | 3 M | 48.8 | 97.0 | BDL | 0.23 | 0.85 | 0.34 | 0.16 | 0.30 | 0.34 | 0.29 | 0.19 | 2.94 |
| | 25° C. | 3 M | 49.9 | 99.2 | 0.06 | 0.12 | 0.23 | 0.07 | BDL | 0.06 | 0.07 | 0.06 | BDL | 0.67 |
| | | 6 M | 49.3 | 98.0 | BDL | 0.23 | 0.53 | 0.22 | 0.11 | BDL | 0.21 | 0.22 | 0.20 | 2.07 |

BDL = Below Detectable Limit

The stability is similar to that of a-lipoic acid samples in Example 6 above. As shown in Table 7, bendamustine, when dissolved in a combination of polyethylene glycol and propylene glycol, and a stabilizing amount of thioglycerol, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6 months at 25° C. The data reported supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for about 2 years.

Example 8

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 85% PEG 400 and 15% PG in the presence of 5 mg/ml of thioglycerol. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table 8 below. The results obtained are presented in Table 8.

12

TABLE 8

Stability of Bendamustine in 85% PEG 400, 15% PG and Thioglycerol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Total Imp. |
|---|---|---|---|---|---|
| BDM - 50 mg/mL | Initial | | 51.5 | 100 | 0.12 |
| Thioglycerol - 5 mg/mL | 40° C. | 1 M | 50.4 | 97.9 | 1.18 |
| PEG 400:PG (85:15) qs to | 25° C. | 1 M | 51.4 | 99.8 | 0.41 |
| 1 mL | | 3 M | 50.4 | 97.9 | 1.21 |
| | 5° C. | 3 M | 51.0 | 99.0 | 0.26 |

The stability is similar to that of thioglycerol samples in Example 7 above. As reported in Table 8, total impurities did not exceed 2% at 40° C. or 25° C. storage over one month, or at 25° C. and 5 ° C. storage after three months. The data reported in Table 8 supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for at least about 2 years if not longer.

We claim:
1. A method of treating leukemia, Hodgkin's disease, or multiple myeloma in a mammal, comprising administering to the mammal, a liquid bendamustine-containing composition comprising:
   a) bendamustine or a pharmaceutically acceptable salt thereof; and
   b) a non-aqueous pharmaceutically acceptable fluid comprising
      about 5% to about 10%, based on the volume of the pharmaceutically acceptable fluid, of propylene glycol,
      polyethylene glycol,
      and a stabilizing amount of an antioxidant selected from the group consisting of thioglycerol, monothioglycerol, lipoic acid, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds and dihydrolipoic acid;
   the bendamustine-containing composition having less than or equal to 0.11% total PG esters at about 1 month of storage at a temperature of about 5° C.;
   wherein the ratio of polyethylene glycol to propylene glycol is selected from the group consisting of: about 95:5, about 90:10, about 85:15, about 80:20, and about 75:25.

US 9,572,797 B2

13

**2**. The method of claim **1**, wherein the bendamustine-containing composition has less than or equal to 0.18% total PG esters at about 12 months of storage at a temperature of about 5° C.

**3**. The method of claim **1**, wherein the amount of propylene glycol in the pharmaceutically acceptable fluid is about 10%.

**4**. The method of claim **1**, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

**5**. The method of claim **4**, wherein the bendamustine concentration is from about 25 mg/mL to about 50 mg/mL.

**6**. The method of claim **5**, wherein the bendamustine concentration is about 50 mg/mL.

**7**. The method of claim **1**, wherein said bendamustine-containing composition has less than or equal to 0.12% total PG esters at about 15 days of storage at a temperature of about 25° C.

**8**. The method of claim **1**, wherein said bendamustine-containing composition has less than or equal to 0.25% total PG esters at about 1 month of storage at a temperature of about 25° C.

**9**. The method of claim **1**, wherein said bendamustine-containing composition has less than or equal to 0.43% total PG esters at about 3 months of storage at a temperature of about 25° C.

**10**. The method of claim **1**, wherein said bendamustine-containing composition has less than or equal to 0.77% total PG esters at about 6 months of storage at a temperature of about 25° C.

**11**. The method of claim **1**, wherein the antioxidant is thioglycerol or monothioglycerol.

**12**. The method of claim **1**, wherein the antioxidant concentration is from about 2.5 mg/mL to about 35 mg/mL.

**13**. The method of claim **1**, for the treatment of leukemia.

**14**. The method of claim **1**, for the treatment of Hodgkin's disease.

**15**. The method of claim **1**, for the treatment of multiple myeloma.

**16**. A method of treating leukemia, Hodgkin's disease, or multiple myeloma in a mammal, comprising administering to the mammal, a liquid bendamustine-containing composition, comprising:

 a) bendamustine or a pharmaceutically acceptable salt thereof; and

 b) a non-aqueous pharmaceutically acceptable fluid comprising propylene glycol, polyethylene glycol, and a stabilizing amount of an antioxidant selected from the

14

group consisting of thioglycerol, monothioglycerol, lipoic acid, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds and dihydrolipoic acid;

 the bendamustine-containing composition having less than or equal to 0.12% total PG esters at about 15 days of storage at a temperature of about 25° C.;

 wherein the ratio of polyethylene glycol to propylene glycol is selected from the group consisting of: about 95:5, about 90:10, about 85:15, about 80:20, and about 75:25.

**17**. The method of claim **16**, wherein said bendamustine-containing composition has less than or equal to 0.25% total PG esters at about 1 month of storage at a temperature of about 25° C.

**18**. The method of claim **16**, wherein said bendamustine-containing composition has less than or equal to 0.43% total PG esters at about 3 months of storage at a temperature of about 25° C.

**19**. The method of claim **16**, wherein said bendamustine-containing composition has less than or equal to 0.77% total PG esters at about 6 months of storage at a temperature of about 25° C.

**20**. The method of claim **16**, wherein the bendamustine-containing composition has less than or equal to 0.25% total PG esters at about 1 month of storage at a temperature of about 25° C., has less than or equal to 0.43% total PG esters at about 3 months of storage at a temperature of about 25° C., and has less than or equal to 0.77% total PG esters at about 6 months of storage at a temperature of about 25° C.

**21**. The method of claim **16**, wherein the amount of propylene glycol in the pharmaceutically acceptable fluid is about 10%.

**22**. The method of claim **16**, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

**23**. The method of claim **16**, wherein the bendamustine concentration is from about 25 mg/mL to about 50 mg/mL.

**24**. The method of claim **23**, wherein the bendamustine concentration is about 50 mg/mL.

**25**. The method of claim **16**, for the treatment of leukemia.

**26**. The method of claim **16**, for the treatment of Hodgkin's disease.

**27**. The method of claim **16**, for the treatment of multiple myeloma.

* * * * *

# EXHIBIT 12

Case 1:24-cv-00066-JLH    Document 76-1    Filed 01/08/25    Page 209 of 321 PageID #: 1565

US 20110190363A1

(19) **United States**
(12) **Patent Application Publication**    (10) Pub. No.: **US 2011/0190363 A1**
     Drager et al.    (43) Pub. Date:    **Aug. 4, 2011**

(54) **LIQUID FORMULATIONS OF BENDAMUSTINE**

(75) Inventors:    **Anthony S. Drager**, Thorndale, PA (US); **Rachel Y. LaBell**, Coatesville, PA (US); **Piyush R. Patel**, Wallingford, PA (US)

(73) Assignee:    **CEPHALON, INC.**, Frazer, PA (US)

(21) Appl. No.:    **13/048,325**

(22) Filed:    **Mar. 15, 2011**

**Related U.S. Application Data**

(63) Continuation of application No. PCT/US09/58023, filed on Sep. 23, 2009.

(60) Provisional application No. 61/100,074, filed on Sep. 25, 2008.

**Publication Classification**

(51) **Int. Cl.**
    *A61K 31/4184*    (2006.01)
    *A61P 35/00*    (2006.01)

(52) **U.S. Cl.** ....................................................... **514/394**

(57)    **ABSTRACT**

Stable liquid formulations of bendamustine, and pharmaceutically acceptable salts thereof, and polar aprotic solvents, are described.

FIG. 1



Bendamustine Purity at 25 °C

FIG. 2



Bendamustine Purity at 5 °C

FIG. 3



FIG. 4



US 2011/0190363 A1

Aug. 4, 2011

1

## LIQUID FORMULATIONS OF BENDAMUSTINE

### TECHNICAL FIELD OF THE INVENTION

[0001]    The present invention relates to liquid formulations of bendamustine, and the pharmaceutical salts thereof.

### BACKGROUND OF THE INVENTION

[0002]    Bendamustine, (4-{5-[bis(2-chloroethyl)amino]-1-methyl-2-benzimidazolyl}butyric acid



Bendamustine

is an atypical structure with a benzimidazole ring, which structure includes an active nitrogen mustard. Bendamustine was initially synthesized in 1963 in the German Democratic Republic and was available from 1971 to 1992 in that location under the name Cytostasan®. Since that time, it has been marketed in Germany under the tradename Ribomustin®. It is currently available for use in the United States under the tradename Treanda® (Cephalon, Inc., Frazer, Pa.). It has been widely used to treat chronic lymphocytic leukemia, Hodgkin's disease, non-Hodgkin's lymphoma, multiple myeloma, and breast cancer.

[0003]    Like other nitrogen mustards, bendamustine hydrolyzes in aqueous solution, with the major degradant being the primary alcohol HP1 (See U.S. application Ser. No. 11/330, 868, the entirety of which is incorporated herein):



[0004]    In light of its instability in aqueous solution, bendamustine is currently supplied as a lyophilized powder for injection. Just prior to its infusion, the medical practitioner reconstitutes the powder with Sterile Water for Injection. Reconstitution should yield a clear, colorless to pale yellow solution and the powder should completely dissolve in about 5 minutes. If particulate matter is observed, the reconstituted product should not be used and should be discarded. The reconstituted product is then transferred to a 0.9% Sodium Chloride Injection infusion bag within 30 minutes of reconstitution. This admixture should be a clear and colorless to slightly yellow solution. If the admixture comprises particulate matter or is discolored, it should be discarded and a fresh sample prepared.

[0005]    The reconstitution of the bendamustine lyophilized powder is time consuming and cumbersome. Moreover, lyophilization of solids on a commercial scale requires specialized equipment and incurs significant expense. As such, formulations of bendamustine that do not require lyophilization and/or reconstitution are needed.

[0006]    Solutions of bendamustine hydrochloride in anhydrous propylene glycol, prepared under an inert gas atmosphere, have been reported (GDR Patent 159289). It was reported that analysis of these solutions using thin-layer chromatography, eluting with butanol/acetic acid/water (4:1:5) and detection with Dragendorff reagent and UV (360 nm) did not suggest any decomposition. Curiously, however, commercial development of propylene glycol formulations have heretofore not been reported. Thus, improved liquid formulations of bendamustine are still needed.

### SUMMARY OF THE INVENTION

[0007]    The present invention is directed to liquid pharmaceutical formulations comprising bendamustine, or a pharmaceutically acceptable salt or prodrug thereof, and a polar aprotic solvent. Certain preferred embodiments include liquid pharmaceutical formulations comprising bendamustine, or a pharmaceutically acceptable salt or prodrug thereof, a polar aprotic solvent, and a non-aqueous polar protic solvent. Methods of making and using the formulations of the present invention are also described, as are methods of treating cancer using the claimed formulations.

### BRIEF DESCRIPTION OF THE DRAWINGS

[0008]    FIG. 1 is a graph of a stability analysis of bendamustine in various solvents at 25° C.

[0009]    FIG. 2 is a graph of a stability analysis of bendamustine in various solvents at 5° C.

[0010]    FIG. 3 is a graph of a bendamustine purity, over time, in 99% propylene glycol, at 5° C. and at 25° C.

[0011]    FIG. 4 shows the mean±standard deviation concentration-versus-time profiles of bendamustine in male Cynomolgus monkeys (N=4) administered single 3 mg/kg bolus intravenous doses of bendamustine hydrochloride in 3 different formulations.

### DETAILED DESCRIPTION OF THE INVENTION

[0012]    Stable, liquid formulations of bendamustine have been discovered and are reported herein.

[0013]    Experiments to produce commercially viable propylene glycol preparations have been performed. Unfortunately, the results described in GDR Patent 159289 were not reproducible. Solutions of bendamustine in 99% propylene glycol degraded to non-bendamustine products over a time equivalent to commercial storage. Two of the impurities were identified as propylene glycol esters of bendamustine. As such, a 100% propylene glycol commercial formulation of bendamustine is not feasible for pharmaceutical purposes.

[0014]    It has been determined that pharmaceutically acceptable liquid formulations of bendamustine, and the pharmaceutically acceptable salts thereof, in particular the hydrochloride salt, can be prepared by combining bendamustine, or the pharmaceutically acceptable salt thereof, with a polar aprotic solvent or mixture of polar aprotic solvents.

2

Polar, aprotic solvents are known in the art and include, for example, 1-methyl-2-pyrrolidone, 1,3-dimethyl-2-imidazolidinone, dimethylacetamide, dimethyl sulfoxide, acetone, tetrahydrofuran, 1,4-dioxane, acetonitrile, dimethyl formamide, propylene carbonate. See also, e.g., Florence Mottu, et al. *Organic solvents for pharmaceutical parenterals and embolic liquids: A review of toxicity data*, PDA J. Pharma. Sci. & Tech. vol 54, no.6, 456-469 (November-December 2000). Particularly preferred polar aprotic solvents include dimethylacetamide, dimethyl sulfoxide, and mixtures thereof.

[0015] Without wishing to be held to any particular theory, it is believed that polar, aprotic solvents are sufficiently nonnucleophilic towards bendamustine such that polar aprotic solvent-bendamustine adducts do not form over the course of typical commercial storage conditions. Typical commercial storage conditions include time periods of, for example, about 30 days, about 90 days, about 180 days, and about 365 days (about 1 month, about 3 months, about 6 months, and about 1 year). Typical commercial storage conditions also include temperatures of about 23° C. (ambient room temperature) and refrigerated temperatures below ambient room temperature, for example, about 5° C. Preferably, the liquid formulations of the present invention are stored at refrigerated temperatures.

[0016] It has also been discovered that stable formulations of bendamustine can be obtained by mixing a polar aprotic solvent, or a mixture of polar aprotic solvents, with a nonaqueous polar protic solvent or mixture of nonaqueous polar protic solvents. Pharmaceutically acceptable nonaqueous polar protic solvents are known in the art and include alkyl alcohols, for example, ethanol, ethylene glycol, propylene glycol, butylene glycol, glycerin, polysorbates, for example TWEEN 20, TWEEN 40, and TWEEN 80, and cyclodextrins (such as hydroxypropyl-β-cyclodextrin), polyalkylene glycols, such as polyethylene glycol, polypropylene glycol, and polybutylene glycol, and primary amides such as niacinamide.

[0017] Such formulations will typically comprise 90% or less, by volume of the formulation, of the nonaqueous polar protic solvent. In other preferred embodiments, formulations will comprise between about 20% and about 85%, by volume of the formulation, of the nonaqueous polar protic solvent. In still other embodiments, formulations will comprise between about 30% and about 70%, by volume of the formulation, of the nonaqueous polar protic solvent. In most preferred embodiments, formulations will comprise about 80%, about 67% or about 34%, by volume of the formulation, of the nonaqueous polar protic solvent.

[0018] Alternatively, formulations of the present invention will comprise 10 moles per liter, or less, of the nonaqueous polar protic solvent. Preferably, formulations of the present invention will comprise between about 4 moles per liter to about 9.5 moles per liter, of the nonaqueous polar protic solvent. In certain embodiments, formulations will comprise about 9.1 moles per liter of the nonaqueous polar protic solvent. In other embodiments, formulations will comprise about 4.6 moles per liter of the nonaqueous polar protic solvent.

[0019] While not wishing to be held to any particular theory, it is believed that while nonaqueous polar protic solvents are of sufficient nucleophilicity to form potentially undesirable polar protic solvent-bendamustine adducts, such adducts will not form during typical commercial storage if the concentration of the polar protic solvent is kept within the scope of the present invention.

[0020] Liquid formulations of the present invention are stable over the course of a typical commercial storage period. As used herein, "stable" is defined as no more than about a 10% loss of bendamustine under typical commercial storage conditions. Preferably, formulations of the present inventions will have no more than about a 10% loss of bendamustine, more preferably, no more than about a 5% loss of bendamustine, under typical commercial storage conditions.

[0021] Bendamustine converts to non-bendamustine products (i.e., "degrades") upon exposure to certain nucleophiles, for example, water and alkyene glycols such as propylene glycol. Exposure of bendamustine to water can produce "HP1," which is undesirable.

(HP1)



Another undesirable compound that bendamustine can convert to over time is "BM1 dimer."

(BM1 dimer)

US 2011/0190363 A1

Aug. 4, 2011

3

Still another undesirable compound that bendamustine can convert to over time is "DCE."

(DCE)

Upon exposure to an alkylene glycol, for example, propylene glycol, esters of bendamustine can form, e.g., PG-1 and PG-2.

PG-1

PG-2

[0022] In preferred embodiments of the present invention, analysis of formulations of the present invention will exhibit 1.50% or less of DCE, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C. More preferably, the formulations will exhibit 1.0% or less of DCE, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C. Even more preferably, the formulations will exhibit 0.5% or less of DCE, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C. Most preferably, the formulations will exhibit about 0.1% or less of DCE, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C.

[0023] In other embodiments of the present invention, analysis of the formulations will exhibit about 0.4% or less of HP1, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C. Preferably, the formulations will exhibit about 0.10% or less of HP1, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C.

[0024] In certain other embodiments of the present invention, analysis of the formulations will exhibit about 0.70% or less of BM1 dimer, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C. Preferably, the formulations will exhibit about 0.30% or less of dimer, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C. In most preferred embodiments, the formulations will exhibit about 0.10% or less of BM1 dimer, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C.

[0025] In those embodiments of the present invention comprising alkylene glycol as the nonaqueous polar protic solvent, analysis of those formulations will exhibit 1.5% or less of alkylene glycol esters of bendamustine, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C. For example, in those embodiments comprising propylene glycol, analysis of those formulations will exhibit 1.5% or less of propylene glycol esters PG-1 and PG-2, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C.

[0026] Analysis of the liquid formulations of the present invention can be performed using techniques known in the art, including, for example, HPLC, gas chromatography, and NMR. After exposure to typical commercial storage conditions, analysis of the formulations of the present invention will indicate that the formulation contains no less than about 90% of the amount of bendamustine present prior to exposure to the storage conditions. Preferably, analysis will indicate that the formulation contains no less than about 95% of the amount of bendamustine present prior to exposure to the storage conditions.

[0027] In preferred embodiments of the present invention, analysis of the formulations of the present invention will indicate that the formulation contains no less than about 90% of the amount of bendamustine present prior to exposure to storage conditions that include temperatures of about 5° C. and time periods of about 30 days (about 1 month) to about 365 days (about 1 year). Preferably, analysis of the formulations of the present invention will indicate that the formulation contains no less than about 90% of the amount of bendamustine present prior to exposure to storage conditions that include temperatures of about 5° C. and time periods of about 30 days (about 1 month), about 90 days (about 3 months), and about 180 days (about 6 months). Preferably, analysis will indicate that the formulation contains no less than about 95% of the amount of bendamustine present prior to exposure to storage conditions that include temperatures of about 5° C. and time periods of about 30 days (about 1 month) to about 365 days (about 1 year). More preferably, analysis will indicate that the formulation contains no less than about 95% of the amount of bendamustine present prior to exposure to storage conditions that include temperatures of about 5° C. and time periods of about 30 days (about 1 month), about 90 days (about 3 months), and about 180 days (about 6 months).

[0028] Formulations of the present invention can comprise pharmaceutically useful concentrations of bendamustine, or a pharmaceutically acceptable salt thereof. Useful concentrations include concentrations ranging from about 5 mg/mL to about 200 mg/mL. Preferably, the concentration of bendamustine, or a pharmaceutically acceptable salt thereof, ranges from about 5 mg/mL to about 120 mg/mL. Preferred concentrations include about 5 mg/mL, about 10 mg/mL, about 20 mg/mL, about 30 mg/mL, about 40 mg/mL, about 50 mg/mL, about 60 mg/mL, about 100 mg/mL and about 200 mg/mL of

Aug. 4, 2011

4

bendamustine, or a pharmaceutically acceptable salt thereof. Greater than 200 mg/ml of bendamustine, or a pharmaceutically acceptable salt thereof, for example, greater than about 300 mg/mL, are also within the scope of the present invention, as are saturated solutions of bendamustine, or a pharmaceutically acceptable salt thereof.

[0029]  As used herein, the term "about" is defined as ±10%, preferably ±5%,

[0030]  In addition to comprising a polar aprotic solvent, or mixture of polar aprotic solvents, and optionally, a nonaqueous polar protic solvent, or mixture of solvents, formulations of the present invention may further comprise other pharmaceutically acceptable excipients. Pharmaceutically acceptable excipients are known in the art and include, for example, antioxidants (e.g., tocopherol (Vitamin E), ascorbic acid, methyl paraben, butylhydroxyanisole (BHA), butylhydroxytoluene (BHT), and propyl gallate), surfactants, (e.g., polysorbates (TWEEN 20, TWEEN 40, TWEEN 80)), lipids (e.g., dimyristoylphophatidylcholine (DMPC), Dimyristoylphosphatidylglycerol (DMPG), distearoylphophatidylglycerol (DSPG), fillers (e.g., mannitol), organic acids (e.g., citric acid, lactic acid, benzoic acid), hydrophilic polymers (e.g., polyethylene glycols (PEG 300, PEG 400), complexing agents (e.g., niacinamide, nicotinic acid, creatine, cyclodextrins), and preservatives (e.g., benzyl alcohol).

[0031]  Also within the scope of the invention are methods of treating diseases, such as, for example, chronic lymphocytic leukemia, Hodgkin's disease, non-Hodgkin's lymphoma, multiple myeloma, or breast cancer, with a pharmaceutical formulation of the present invention. These methods comprise administering to the patient a therapeutically effective amount of a preparation prepared from a pharmaceutical formulation of the present invention. The term "therapeutically effective amount," as used herein, refers to the amount determined to be required to produce the physiological effect intended and associated with a given drug, as measured according to established pharmacokinetic methods and techniques, for the given administration route. Appropriate and specific therapeutically effective amounts can be readily determined by the attending diagnostician, as one skilled in the art, by the use of conventional techniques. The effective dose will vary depending upon a number of factors, including the type and extent of progression of the disease or disorder, the overall health status of the particular patient, the relative biological efficacy of the compound selected, the formulation of the active agent with appropriate excipients, and the route of administration.

[0032]  The liquid formulations of bendamustine described herein are intended to be administered via injection, for example, they may be administered subcutaneously, intracutaneously, intravenously, intramuscularly, intra-articularly, intrasynovially, intrasternally, intrathecally, intralesionally, intracranially or via infusion. In a typical preparation, the volume of the liquid formulation of the present invention needed for the required dose can be aseptically withdrawn and transferred to an infusion bag of 0.9% Sodium Chloride (or other pharmaceutically acceptable intravenous solution) for injection. After transfer, the contents of the infusion bag are thoroughly mixed. Administration by intravenous infusion is typically provided over a time period of from about 30 to about 60 minutes. Previously described lyophilized formulations of bendamustine required reconstitution of the lyophilized bendamustine prior to mixture with the acceptable intravenous solution before infusion.

[0033]  It is envisioned that the pharmaceutical formulations and preparations of the present invention can be administered in combination with one or more anti-neoplastic agents where the anti-neoplastic agent is given prior to, concurrently with, or subsequent to the administration of the formulation or preparation of the present invention. Pharmaceutically acceptable anti-neoplastic agents are known in the art. Preferred anti-neoplastic agents are those disclosed in co-pending U.S. application Ser. No. 11/330,868, filed Jan. 12, 2006, the entirety of which is incorporated herein by reference.

EXAMPLES

Solubility and Stability of Bendamustine Hydrochloride in Polar Aprotic Solvents

[0034]  Equilibrium solubility was determined for solvents including 1-methyl-2-pyrrolidone (NMP), 1,3-dimethyl-2-imidazolidinone (DMI), dimethylacetamide (DMA), dimethyl sulfoxide (DMSO), acetone, tetrahydrofuran (THF), dimethylformamide (DMF), and propylene carbonate (PC). The solubility of bendamustine hydrochloride was also determined for two solutions, 25 mg/mL niacinamide in DMA and 66% DMA/34% propylene glycol (PG). A saturated solution of bendamustine hydrochloride was made in triplicate for each solvent or solution and mixed on a Lab-Quake with gentle mixing and low shear for 3 days at room temperature. A sample of each suspension was put into a microcentrifuge tube and spun at 10,000 rpm for 5 min on an Eppendorf microcentrifuge. The supernatant was removed and put into a clean vial. Each solution was diluted with sample solvent: 50% NMP/50% 0.1% trifluoroacetic acid in water. A reverse phase method for bendamustine hydrochloride was used to determine the concentration of each sample calculated from a standard. Analysis was performed within 18 hours of preparation of the diluted sample. The solubilities are listed in Table I below. Each value is an average of three samples.

TABLE I

| Sample* | % Purity | Assay (mg/mL) |
|---|---|---|
| NMP | 99.1 | 104.0 |
| DMI | 98.5 | 75.8 |
| DMSO | 99.5 | 311.7 |
| DMF | 99.6 | 71.8 |
| 66% DMA/34% PG | 99.5 | 110.1 |
| DMA | 99.4 | 56.2 |
| PC | 98.7 | 7.7 |
| Niacinamide/DMA | 99.2 | 61.3 |

*acetone and THF have no measurable solubility of bendamustine.

[0035]  The three replicates were combined and mixed well and then pipetted into amber HPLC vials and placed in stability chambers at 25° C. and 5° C. All the samples were clear and colorless except for the DMI sample which was clear and yellow. The 25° C. stability leveled out from about 180 days (about 6 months) to about 365 days (about 12 months, about 1 year). At 5° C., all solutions had a purity greater than 90%. The analysis of stability samples can be seen in the graphs of FIGS. 1 and 2.

US 2011/0190363 A1

Aug. 4, 2011

5

TABLE II

Impurity profile of certain liquid formulations of Bendamustine
HCl after storage at 5° C. for about 12 months

| Formulation | DCE (Area %) | HP1 (Area %) | BM1 dimer (Area %) | PG-1 (Area %) | PG-2 (Area %) |
|---|---|---|---|---|---|
| Niacinamide/ DMA | 1.40 | 0.08 | 0.06 | ND | ND |
| DMA | 1.10 | 0.08 | 0.05 | ND | ND |
| 66% DMA/ 34% PG | 0.12 | 0.08 | 0.06 | 1.09 | 0.27 |
| DMF | 0.07 | 0.11 | 0.07 | ND | ND |
| NMP | 0.90 | 0.10 | ND | ND | ND |
| DMSO | 0.04 | 0.38 | 0.70 | ND | ND |

ND = not detected

Analysis conducted using reverse phase HPLC with 50% NMP/50% 0.1% trifluoroacetic acid in water as the running solvent.

[0036]    As can be seen in FIG. 3, bendamustine (BM1) in 99% propylene glycol degrades significantly when stored at 25° C. for less than 100 days. After storage at 5° C. for about 365 days, the purity of the bendamustine is about 80% or less.

Pharmacokinetic Study of Formulations in Monkey

[0037]    4 fasted (18 to 23 hr), drug-naive male cynomolgus monkeys consecutively received single 3-mg/kg bolus intravenous doses of bendamustine hydrochloride prepared from 3 different formulations. The formulations evaluated in the study included:

1) TREANDA (lyophilized mixture of bendamustine hydrochloride and mannitol; 25 mg (bendamustine hydrochloride) vials; 2) a 66% dimethylacetamide (DMA)/34% propylene glycol (PG) (w/w) solution (90 mg (bendamustine hydrochloride)/mL stock); and 3) a 100% DMA solution (45 mg (bendamustine hydrochloride)/mL stock). The lyophilized powder and stock solutions of bendamustine hydrochloride were constituted or diluted with 0.9% saline, as appropriate, to give solutions of 3 mg bendamustine hydrochloride/ml, just prior to dose administration. The resulting solutions were administered as a bolus via a saphenous vein at a fixed volume of 1.0 mL/kg. There was at least a 7-day washout period separating successive doses. During all 3 phases of dosing, blood samples for pharmacokinetic profiling of bendamustine and its 2 active circulating metabolites, γ-hydroxybendamustine (M3) and N-des-methylbendamustine (M4), were collected via a femoral vein immediately prior to dosing and at preselected timepoints through 12 hr postdose. Concentrations of bendamustine, M3 and M4 in plasma samples were determined using a validated high-performance liquid chromatography method with tandem mass spectrometric detection (LC-MS/MS) as follows. Bendamustine and the M3 and M4 metabolites are extracted from plasma by protein precipitation using acetonitrile. After the extraction, the aliquoted sample is acidified with 1% formic acid and bendamustine with an added carbon in the carboxylic acid chain is added as an internal standard. The samples are evaporated to dryness and the residue is reconstituted with an acetonitrile/water/ formic acid/ammonium formate mixture. The sample is injected into an HPLC system with LC-MS/MS detection using a Phenomenex Synergi Max-RP column with an aceto-

nitrile/water/formic acid/ammonium formate mobile phase. Pharmacokinetic analyses were performed using noncompartmental methods.

[0038]    After single bolus intravenous doses of bendamustine hydrochloride to male cynomolgus monkeys, the shapes of the mean plasma concentration-versus-time profiles of bendamustine were similar in each of the 3 formulations (See FIG. 4). In all cases, the highest observed plasma levels of bendamustine were achieved at 0.083 hr postdose (ie, the first sampling time after dose administration) and subsequent removal of the compound from plasma occurred in a biphasic manner that was characterized by an initial rapid distribution phase and a somewhat slower terminal phase of drug elimination. The harmonic mean $t_{1/2}$ of the terminal phase was approximately 0.6 hr for each formulation (See Table III).

[0039]    In addition to the similarities in the shapes of the mean plasma concentration-versus-time profiles, the 3 formulations were also similar with respect to bendamustine systemic exposure (i.e., $C_{max}$ and AUC). Specifically, the respective mean values of $C_{max}$ and AUG, for bendamustine were 6037 ng/mL and 2314 ng·hr/mL for the TREANDA formulation, 7380 ng/mL and 2854 ng·hr/mL for the 66% DMA/34% PG formulation and 6209 ng/mL and 2372 ng·hr/mL for the 100% DMA formulation. Plasma clearance (CL) and volume of distribution ($V_Z$ and $V_{SS}$) for bendamustine were also comparable between each of the 3 formulations (See Table III). In Table III, $t_{max}$, hr is given as Median [range], $t_{1/2}$, hr is given as the Harmonic Mean, $\lambda_z$, hr$^{-1}$ is the slope of line in elimination phase used to calculate half-life, and $MRT_{0-∞}$, is the mean residence time.

[0040]    In summary, the pharmacokinetic profiles of bendamustine, M3 and M4 for the 2 liquid formulations of bendamustine hydrochloride were qualitatively and quantitatively similar to those obtained for the TREANDA formulation after single bolus intravenous doses to monkeys.

[0041]    Table III shows the mean+/−Standard Deviation pharmacokinetic parameters of bendamustine in male Cynomolgus monkeys (N=4) administered single 3 mg/kg bolus intravenous doses of bendamustine hydrochloride in the three different formulations.

TABLE III

| Parameter | TREANDA | Formulation 66% DMA/ 34% PG | 100% DMA |
|---|---|---|---|
| $C_0$, ng/mL | 8664 ± 3841 | 10716 ± 2033 | 8956 ± 1965 |
| $C_{max}$ ng/mL | 6037 ± 2456 | 7380 ± 1170 | 6209 ± 1300 |
| $t_{max}$, hr | 0.083 [0.083 for all] | 0.083 [0.083 for all] | 0.083 [0.083 for all] |
| $AUC_{0-t}$, ng•hr/mL | 2313 ± 800 | 2853 ± 398 | 2371 ± 535 |
| $AUC_{0-∞}$, ng•hr/mL | 2314 ± 800 | 2854 ± 398 | 2372 ± 535 |
| $\lambda_z$, hr$^{-1}$ | 1.220 ± 0.111 | 1.295 ± 0.108 | 1.092 ± 0.219 |
| $t_{1/2}$, hr | 0.57 | 0.54 | 0.63 |
| CL, L/hr/kg | 1.27 ± 0.40 | 0.96 ± 0.14 | 1.18 ± 0.27 |
| $V_z$, L/kg | 1.04 ± 0.36 | 0.74 ± 0.05 | 1.17 ± 0.44 |
| $V_{ss}$, L/kg | 0.34 ± 0.11 | 0.26 ± 0.05 | 0.30 ± 0.04 |
| $MRT_{0-∞}$, hr | 0.26 ± 0.02 | 0.27 ± 0.02 | 0.26 ± 0.03 |

In-Use Studies of Formulations

[0042]    Admixtures in 0.9% sodium chloride (500 mL bag) were prepared at a high dose (360 mg bendamustine hydrochloride) and purity was determined over time at room temperature for up to 8 hours using HPLC, using a Zorbax Bonus-

US 2011/0190363 A1

Aug. 4, 2011

6

RP column with a gradient from 93% 0.1% trifluoroacetic acid in water (Mobil Phase A)/7% 0.1% trifluoroacetic acid in acetonitrile (Mobile Phase B) to 10% Mobil Phase A/90% Mobil Phase B.

[0043] The 66% DMA/34% PG formulation had a concentration of bendamustine hydrochloride of 90 mg/g, so 4 mL was injected into a 500 mL bag of saline, inverted 10 times and sampled at room temperature for 8 hours. After 8 hours the purity was 95.4%. This is within the label requirements for dosing Treanda. This formulation of the present invention could be used for up to 8 hours at room temperature. By way of contrast, reconstituted Treanda can only be stored at room temperature for up to 3 hours.

[0044] The 100% DMA formulation had a concentration of 45 mg/g, so 8 mL was injected into a 500 mL bag of saline, inverted 10 times, and sampled at room temperature for 4 hours. After 4 hours the purity was 97.9%. This formulation of the present invention could be used for more than 4 hours at room temperature.

[0045] The comparative Treanda admixture purity was 95.0% after 4 hours at 25° C.

[0046] As those skilled in the art will appreciate, numerous modifications and variations of the present invention are possible in view of the above teachings. It is therefore understood that within the scope of the appended claims, the invention can be practiced otherwise than as specifically described herein, and the scope of the invention is intended to encompass all such variations.

What is claimed:

**1**. A liquid pharmaceutical formulation comprising bendamustine, or a pharmaceutically acceptable salt or prodrug thereof, and a polar aprotic solvent.

**2**. The formulation of claim **1**, wherein the polar aprotic solvent is 1-methyl-2-pyrrolidone, 1,3-dimethyl-2-imidazolidinone, dimethylacetamide, dimethyl sulfoxide, acetone, tetrahydrofuran, 1,4-dioxane, acetonitrile, dimethyl formamide, propylene carbonate, or a mixture thereof.

**3**. The formulation of claim **1**, further comprising a non-aqueous polar protic solvent.

**4**. The formulation of claim **3**, wherein the non-aqueous polar protic solvent is an alcohol, a polyalkylene glycol, an amide, or a mixture thereof.

**5**. The formulation of claim **3**, wherein the non-aqueous polar protic solvent is an alcohol.

**6**. The formulation of claim **5**, wherein the alcohol is a glycol.

**7**. The formulation of claim **5**, wherein the alcohol is a cyclodextrin.

**8**. The formulation of claim **7**, wherein the cyclodextrin is hydroxypropyl-β-cyclodextrin.

**9**. The formulation of claim **3**, wherein the formulation comprises 90% or less, by volume of the formulation, of the non-aqueous polar protic solvent.

**10**. The formulation of claim **3**, wherein the polar aprotic solvent is dimethylacetamide and the nonaqueous polar protic solvent is propylene glycol.

**11**. The formulation of claim **1**, further comprising a pharmaceutically acceptable antioxidant.

**12**. The formulation of claim **1**, comprising about 5 mg/ml to about 200 mg/mL of bendamustine, or the pharmaceutically acceptable salt thereof.

**13**. The formulation of claim **1**, comprising about 5 mg/ml to about 120 mg/mL of bendamustine, or the pharmaceutically acceptable salt thereof.

**14**. The formulation of claim **1**, comprising at least about 5 mg/mL of bendamustine, or the pharmaceutically acceptable salt thereof.

**15**. The formulation of claim **1**, wherein the formulation is stable at about 5° C. for about 30 days to about 365 days.

**16**. The formulation of claim **1**, wherein the formulation is stable at about 5° C. for at least about 180 days.

**17**. The formulation of claim **1**, wherein analysis of the formulation indicates that the formulation contains no less than about 90% of the amount of bendamustine present prior to exposure to storage conditions.

**18**. The formulation of claim **1**, wherein analysis of the formulation indicates that the formulation contains no less than about 95% of the amount of bendamustine present prior to exposure to storage conditions.

**19**. The formulation of claim **17** where the storage conditions are about 5° C. for about 30 days to about 365 days.

**20**. The formulation of claim **17** where the storage conditions are about 5° C. for at least about 30 days.

**21**. The formulation of claim **17** where the storage conditions are about 5° C. for at least about 90 days.

**22**. The formulation of claim **17**, where the storage conditions are about 5° C. for at least about 180 days.

**23**. The formulation of claim **1**, further comprising at least one pharmaceutically acceptable excipient.

**24**. The formulation of claim **3**, further comprising at least one pharmaceutically acceptable excipient.

**25**. The formulation of claim **1**, further comprising an antioxidant, a surfactant, a lipid, a filler, an organic acid, a hydrophilic polymer, a complexing agent, a preservative, or a combination thereof.

**26**. The formulation of claim **3**, further comprising an antioxidant, a surfactant, a lipid, a filler, an organic acid, a hydrophilic polymer, a complexing agent, a preservative, or a combination thereof.

**27**. The formulation of claim **1**, further comprising at least one anti-neoplastic agent.

**28**. The formulation of claim **3**, further comprising at least one anti-neoplastic agent.

**29**. The formulation of claim **3**, wherein the formulation comprises 10 moles per liter, or less, of the non-aqueous polar protic solvent.

**30**. The formulation of claim **3**, wherein the formulation comprises between about 4 to about 9.5 moles per liter of the non-aqueous polar protic solvent.

**31**. The formulation of claim **3**, wherein the formulation comprises 90% or less, by volume of the formulation, of the non-aqueous polar protic solvent.

**32**. The formulation of claim **1**, comprising about 0.4% or less of HP1.

**33**. The formulation of claim **3**, comprising about 0.4% or less of HP1.

**34**. The formulation of claim **1**, comprising about 0.1% or less of HP1.

**35**. The formulation of claim **3**, comprising about 0.1% or less of HP1.

**36**. The formulation of claim **1**, comprising about 1.5% or less of DCE.

**37**. The formulation of claim **3**, comprising about 1.5% or less of DCE.

**38**. The formulation of claim **1**, comprising about 0.7% or less of BM1 dimer.

**39**. The formulation of claim **3**, comprising about 0.7% or less of BM1 dimer.

**40**. The formulation of claim **10**, comprising about 1.5% or less of PG-1, PG-2, or a combination thereof.

**41**. A method of preparing an injectable formulation of bendamustine, or a pharmaceutically acceptable salt thereof, comprising:

   providing a liquid pharmaceutical formulation comprising bendamustine, or a pharmaceutically acceptable salt thereof, and a nonaqueous solvent;

   diluting the liquid pharmaceutical formulation with a pharmaceutically acceptable injectable diluent.

**42**. The method of claim **41**, wherein the nonaqueous solvent is a polar aprotic solvent.

**43**. The method of claim **42**, wherein the polar aprotic solvent is 1-methyl-2-pyrrolidone, 1,3-dimethyl-2-imidazolidinone, dimethylacetamide, dimethyl sulfoxide, acetone, tetrahydrofuran, 1,4-dioxane, acetonitrile, dimethyl formamide, propylene carbonate, or a mixture thereof.

**44**. The method of claim **41**, wherein the liquid pharmaceutical formulation further comprising a non-aqueous polar protic solvent.

**45**. The method of claim **44**, wherein the nonaqueous polar protic solvent is an alcohol, a polyalkylene glycol, a primary amide, or a mixture thereof.

**46**. The method of claim **41** wherein the pharmaceutically acceptable injectable diluent is Sodium Chloride Injection.

**47**. A method of treating cancer comprising

   identifying a patient in need of treatment of cancer;

   providing a liquid pharmaceutical formulation comprising a therapeutically effective amount of bendamustine, or a pharmaceutically acceptable salt thereof, and nonaqueous solvent;

   diluting the liquid pharmaceutical formulation with a pharmaceutically acceptable injectable diluent to form a pharmaceutical preparation;

   administering the pharmaceutical preparation to the patient in need of treatment.

**48**. The method of claim **47**, wherein the nonaqueous solvent is a polar aprotic solvent.

**49**. The method of claim **48**, wherein the polar aprotic solvent is 1-methyl-2-pyrrolidone, 1,3-dimethyl-2-imidazolidinone, dimethylacetamide, dimethyl sulfoxide, acetone, tetrahydrofuran, 1,4-dioxane, acetonitrile, dimethyl formamide, propylene carbonate, or a mixture thereof.

**50**. The method of claim **47**, wherein the liquid pharmaceutical formulation further comprising a non-aqueous polar protic solvent.

**51**. The method of claim **50**, wherein the nonaqueous polar protic solvent is an alcohol, a polyalkylene glycol, a primary amide, or a mixture thereof.

**52**. The method of claim **47**, wherein the pharmaceutically acceptable injectable diluent is Sodium Chloride Injection.

*    *    *    *    *

# EXHIBIT 13



8460068

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

*February 16, 2024*

**THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF THE FILE WRAPPER AND CONTENTS OF:**

**APPLICATION NUMBER:** *18/081,238*
**FILING DATE:** *December 14, 2022*
**PATENT NUMBER:** *11844783*
**ISSUE DATE:** *December 19, 2023*

Certified by



Kathi

Performing the Functions and Duties of the
Under Secretary of Commerce
for Intellectual Property
and Director of the United States
Patent and Trademark Office

EAGLEBEN-SA_00000001

# FORMULATIONS OF BENDAMUSTINE

## CROSS-REFERENCE TO RELATED APPLICATIONS

[0001]    This application is a continuation of Application Serial No. 17/412,623, filed August 26, 2021, which is a continuation of Application Serial No. 16/509,920, filed July 12, 2019, now U.S. Patent No. 11,103,483, which is a continuation of Application Serial No. 16/015,656, filed June 22, 2018, now abandoned, which is a continuation of Application Serial No. 15/432,335, filed February 14, 2017, now U.S. Patent No. 10,010,533, issued July 3, 2018, which is a continuation of Application Serial No. 15/013,436, filed February 2, 2016, now U.S. Patent No. 9,572,797, issued February 21, 2017, which is a continuation of Application Serial No. 14/031,879, filed September 19, 2013, now U.S. Patent No. 9,265,831, issued February 23, 2016, which is a continuation of Application Serial No. 13/016,473, filed January 28, 2011, now U.S. Patent No. 8,609,707, issued December 17, 2013, which claims the benefit of U.S. Provisional Patent Application No. 61/299,100, filed January 28, 2010, the contents of each of which are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

[0002]    Bendamustine free base is represented by the following structural formula (I)



(I).

[0003]    Bendamustine is used in the treatment of a number of cancers including leukemias, Hodgkins disease and multiple myelomas.  Bendamustine is the active ingredient of the commercial product Treanda™, a lyophilized powder for reconstitution.

[0004]    Bendamustine exhibits rapid degradation upon reconstitution of the lyophilized product. Bendamustine undergoes hydrolysis by direct substitution rather than an addition elimination process due

EAGLEBEN-SA_00000013

107071.000582

to the presence of the highly labile aliphatic chlorine atoms.  Some of the main degradants of bendamustine are the monohydroxy compound known as HP1 (hydrolysis product 1) and dihydroxy compound HP2 (hydrolysis product 2).  The monohydroxy compound appears as the main impurity at Relative Retention Time (RRT) 0.6 and the dihydroxy compound appears as the main impurity at RRT 0.27.  Minor peaks appear at RRT 1.2, which are presently unknown.

[0005]    The stability of bendamustine in water is measured in hours, and is therefore, not suitable for long-term storage in liquid form.  The lyophile possesses good chemical stability.  However, reconstitution of the lyophile is clinically inconvenient, taking 15 – 30 mins with implications of chemical instability.  There is a need for ready to use (RTU) bendamustine formulations having enhanced stability.


## SUMMARY OF THE INVENTION

[0006]    In other aspects of the invention, the bendamustine-containing compositions include a) a pharmaceutically acceptable fluid which contains one or more of propylene glycol, ethanol, polyethylene glycol, benzyl alcohol and glycofurol, and b) a stabilizing amount of a chloride salt.  In other aspects of the invention, the bendamustine-containing compositions include DMSO (dimethyl sulfoxide) as part of the pharmaceutically acceptable fluid included therein.  Regardless of the pharmaceutically acceptable fluid included, the amount of bendamustine included in the composition is preferably from about 20 mg/mL to about 60 mg/mL.  Still further aspects of the invention include methods of treatment using bendamustine-containing compositions and kits containing the same.

[0007]    One of the advantages of the inventive liquid compositions is that they have substantially improved long term stability when compared to currently available formulations.  For example, the inventive bendamustine compositions are substantially free of impurities after at least about 15 months at a temperature of from about 5 $^{\circ}$C to about 25 $^{\circ}$C.  The inventive formulations are advantageously ready to use or ready for further dilution.  Reconstitution of lyophilized powders is not required.


## DETAILED DESCRIPTION OF THE INVENTION

[0008]    Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art to which this invention belongs.  In the event that there is a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

2

EAGLEBEN-SA_00000014

[0009]    As used herein, RRT is calculated by dividing the retention time of the peak of interest by the retention time of the main peak.  Any peak with an RRT <1 elutes before the main peak, and any peak with an RRT >1 elutes after the main peak.

[0010]    For purposes of the present invention, "substantially free of impurities" shall be understood to include bendamustine-containing compositions in which the amount of total impurities is less than about 5%, as calculated on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223nm, after a period of about 15 months at a temperature of from about 5ºC to about 25ºC.  The amount of impurities is further calculated as being based upon the original amount bendamustine (or salt thereof) being present in the composition or formulation.

[0011]    For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.

[0012]    Preferably, the amount of any individual degradant in the inventive compositions does not exceed 2% PAR as determined by HPLC at a wavelength of 223nm after storage periods of at least about 15 months at a temperature of from about 5°C to about 25ºC.  In some aspects, the amount of time the inventive compositions demonstrate long term storage stability is at least about 18 months and preferably at least about 2 years when stored under the conditions described herein.

[0013]    In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions including:

    a)  bendamustine or a pharmaceutically acceptable salt thereof; and

    b)  a pharmaceutically acceptable fluid including

        i)  PEG, PG or mixtures thereof; and

        ii)  a stabilizing amount of an antioxidant.

[0014]    The total impurities in the inventive compositions resulting from the degradation of the bendamustine in the compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223nm after at least about 15 months at a temperature of from about 5 ºC to about 25 ºC, and thus have long term stability for at least the same period of time or longer. Preferably, the bendamustine-containing compositions demonstrate long term storage stability for at least about 2 years, especially when stored at the lower (refrigerated) temperatures.  In one embodiment, the amount of total impurities in the inventive compositions resulting from the degradation of the  bendamustine is less than about 3% PAR as determined by HPLC at a wavelength of 223nm after at least about 2 years at a temperature of from about 5 ºC to about 25 ºC.

[0015]    In some aspects of the invention, the bendamustine concentration in the inventive compositions is from about 10 mg/mL to about 100 mg/mL, preferably 20 mg/mL to about 60 mg/mL.

3

EAGLEBEN-SA_00000015

107071.000582

Preferably the bendamustine concentration in the inventive compositions is from about 25 mg/mL to about 50 mg/mL, and more preferably from about 30 mg/mL to about 50 mg/mL.  It will be understood that compositions containing any useful concentration within the ranges, i.e. 10, 20, 25, 30, 35, 40, 45, 50, 55, 60 . . . 100 are contemplated.  In other embodiments, the bendamustine concentration in the composition is about 50 mg/mL.  In alternative aspects, the amount of bendamustine is outside these ranges but the amounts will be sufficient for single or multiple administrations of dosages generally regarded as effective amounts.

[0016]    In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof.  Within this aspect, the pharmaceutically acceptable fluid is propylene glycol (PG) or polyethylene glycol (PEG).  In other embodiments of the invention however, the pharmaceutically acceptable fluid is a mixture of PEG and PG.  For example, the pharmaceutically acceptable fluid can include about 50% PEG and about 50% PG.  Alternatively, pharmaceutically acceptable fluid includes about 95% PEG and about 5% PG.  The amount of PEG and PG can also be varied within the ranges, i.e. the ratio of PEG:PG in the pharmaceutically acceptable fluid can range from about 95:5 to about 50:50.  Within this range, is a pharmaceutically acceptable fluid containing about 75% PEG and about 25% PG, and preferably 80% PEG and 20% PG.  In another embodiment, a pharmaceutically acceptable fluid can include about 85% PEG and about 15% PG while another preferred pharmaceutically acceptable fluid includes about 90% PEG and about 10% PG.  The molecular weight of the PEG will be within the range of pharmaceutically acceptable weights although PEG 400 is preferred in many aspects of the invention.

[0017]    Without meaning to be bound by any theory or hypothesis, the hydroxide of the polyethylene glycol molecule is less reactive than the hydroxides of propylene glycol.  As a result, the ester forms at a slower rate in polyethylene glycol than propylene glycol and the resulting bendamustine degradants are unexpectedly and substantially reduced over extended periods of time when PEG is a substantial part of the pharmaceutically acceptable fluid.

[0018]    The bendamustine-containing compositions according to several preferred aspects of the invention include a stabilizing amount of an antioxidant.  For purposes of the present invention, "stabilizing amount" shall be understood to include those amounts which increase or enhance the stability of the bendamustine in the compositions described herein.  The presence of one or more antioxidants described herein thus contributes, at least in part to the long term stability of the composition.  Within this guideline, suitable antioxidant concentrations in the compositions can range from about 2.5 mg/mL to about 35 mg/mL, and preferably from about 5 mg/mL to about 20 mg/mL or from about 10 mg/mL to about 15 mg/mL. In some other embodiments, the concentration of the antioxidant in the bendamustine-containing composition is about 5 mg/mL.

4

EAGLEBEN-SA_00000016

107071.000582

[0019]    Suitable antioxidants for inclusion include those which are pharmaceutically acceptable for use in human and veterinary formulations although not limited to those currently regarded as safe by any regulatory authority.  For example, the antioxidant can be selected from among lipoic acid, thioglycerol (also known as monothioglycerol) and analogs thereof, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds, dihydrolipoic acid and mixtures of the foregoing.  Preferably, the antioxidant is thioglycerol, lipoic acid or a mixture thereof. Some particularly preferred embodiments of the invention include thioglycerol.

[0020]    In view of the foregoing, some preferred long term storage stable bendamustine-containing compositions in accordance with the invention compositions include:

I.      a)  bendamustine or a pharmaceutically acceptable salt thereof; and

        b)  a pharmaceutically acceptable fluid including

                i)  polyethylene glycol and propylene glycol; and

                ii)  a stabilizing amount of thioglycerol; or

II.     a)  about 50 mg/mL bendamustine or a pharmaceutically acceptable salt thereof; and

        b)  a pharmaceutically acceptable fluid including

                i)  about 90% PEG and about 10% PG; and

                ii)  about 2.5 mg/mL thioglycerol.

[0021]    Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total impurities, PAR as determined by HPLC at a wavelength of 223nm, after at least about 15 months of storage at a temperature of from about 5 °C to about 25 °C.

[0022]    In accordance with other aspects of the invention, there are provided long term storage stable bendamustine-containing compositions, including:

        a)  bendamustine or a pharmaceutically acceptable salt thereof;

        b)  a pharmaceutically acceptable fluid including one or more of the following: PG, ethanol, PEG, benzyl alcohol and glycofurol; and

        c)  a stabilizing amount of a chloride salt.

[0023]    These compositions also have the low levels of impurities and long term stability mentioned herein. Preferred pharmaceutically acceptable fluids include PG, PEG or ethanol in this embodiment of the invention.  Preferably, the PEG is PEG 400.  If desired, glycerin and/or 88% (w/w) lactic acid can be added to the pharmaceutically acceptable fluid.

4894-3816-6595.1

EAGLEBEN-SA_00000017

107071.000582

[0024]    Suitable chloride salts include but are not limited to organic chloride salts, sodium chloride, choline chloride, hydrochloride salts of amino acids and mixtures thereof.  Thus, as will be appreciated by those of ordinary skill, one can select from among a number of suitable chloride salts and it is Applicants' intention that the scope of the invention includes all such chloride salts that are capable of being included in bendamustine-containing formulations for extended periods without having a deleterious effect on the drug.   In one embodiment of the invention, the chloride salt concentration is from about 10 to about 300 mg/mL. In another embodiment, the chloride salt concentration is from about 50 to about 215 mg/mL.  In one preferred embodiment, the chloride salt concentration is about 215 mg/mL.

[0025]    In accordance with another aspect of the invention, there is provided long term storage stable bendamustine-containing compositions, including:

a)  bendamustine or a pharmaceutically acceptable salt thereof; and

b)  a pharmaceutically acceptable fluid including DMSO.

[0026]    These compositions also have the low levels of impurities and long term stability mentioned herein.  In some aspects, the bendamustine concentration in these compositions is from about 10 mg/mL to about 100 mg/mL.  Preferably, the bendamustine concentration is from about 20 mg/mL to about 50 mg/mL, more preferably from about 25 mg/mL to about 50 mg/mL.  In an alternative embodiment, the bendamustine concentration is about 50 mg/mL.

[0027]    Another embodiment of the invention provides methods of treating cancer in mammals. The methods include administering to a mammal in need thereof an effective amount of one of the bendamustine-containing compositions described herein.  Since the active ingredient portion of the inventive composition is an FDA-approved drug, those of ordinary skill will recognize that the doses of bendamustine employed in this aspect of the invention will be similar to those employed in any treatment regimens designed for bendamustine as marketed under the trade name TREANDA.  The patient package insert containing dosing information is incorporated herein by reference.  The methods of treatment also include administering the inventive formulations for any purpose or physical condition for which bendamustine has been indicated as being useful.

[0028]    Another embodiment of the invention includes methods of preparing bendamustine-containing compositions described herein.  The methods include reconstituting lyophilized bendamustine in a pharmaceutically acceptable fluid containing one of the following:

A)    i)  PEG, PG or mixtures thereof; and

ii)  a stabilizing amount of an antioxidant;

B)    i) one or more of PG, ethanol, PEG, benzyl alcohol and glycofurol; and

6

EAGLEBEN-SA_00000018

107071.000582

ii)  a stabilizing amount of a chloride salt; or

C)    DMSO.

[0029]    The steps are carried out under pharmaceutically acceptable conditions for sterility and manufacturing.

[0030]    In a further aspect of the invention, there are provided methods of controlling or preventing the formation of impurities in bendamustine-containing compositions during long term storage.  The methods include combining an amount of bendamustine or a pharmaceutically acceptable salt thereof with a sufficient amount of a pharmaceutically acceptable fluid containing one of the following:

A)    i)  PEG, PG or mixtures thereof; and

ii)  a stabilizing amount of an antioxidant;

B)    i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and

ii)  a stabilizing amount of a chloride salt; or

C)    DMSO.

[0031]    Further optional steps in accordance therewith include transferring one or more pharmaceutically acceptable doses of the formulations into a suitable sealable container and storing the sealed container at a temperature of from about 5 °C to about 25 °C.  As a result of carrying out these steps, it is possible to control or substantially prevent the formation of impurities which otherwise occur with bendamustine-containing compositions during long term storage so that the artisan is provided with bendamustine-containing formulations having less than about 5 % total impurities PAR as determined by HPLC at a wavelength of 223nm, after at least about 15 months of storage at a temperature of from about 5 °C to about 25 °C.

[0032]    The compositions of the present invention can be packaged in any suitable sterile vial or container fit for the sterile storage of a pharmaceutical such as bendamustine.  Suitable containers can be glass vials, polypropylene or polyethylene vials or other special purpose containers and be of a size sufficient to hold one or more doses of bendamustine.

[0033]    A further aspect of the invention includes kits containing lyophilized bendamustine or a pharmaceutically acceptable salt thereof in a first container or vial; and, in a second container, a sufficient amount of a pharmaceutically acceptable fluid such as those described herein, i.e. one of the following:

A)    i)  PEG, PG or mixtures thereof; and

ii)  a stabilizing amount of an antioxidant;

B)    i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and

ii)  a stabilizing amount of a chloride salt; or

7

EAGLEBEN-SA_00000019

107071.000582

C)    DMSO.

[0034]    For purposes of this embodiment, the amount of fluid which is sufficient is an amount which allows the bendamustine to be dissolved or dispersed to a degree which renders the liquid composition ready for use.

[0035]    As will be appreciated by those of ordinary skill, the kit will contain other pharmaceutically necessary materials for storing and/or administering the drug, including instructions for storage and use, additional diluents, if desired, etc.

## EXAMPLES

[0036]    The following examples serve to provide further appreciation of the invention but are not meant in any way to restrict the effective scope of the invention.

### Example 1

[0037]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10mg/ml in one of ethanol, propylene glycol and benzyl alcohol as indicated in Table 1 below.  215 mg/ml of choline chloride was added in half of the samples as a source of soluble chloride ions.  The samples were maintained at 40 ºC and analyzed periodically for drug content and total impurities.  The results obtained are presented in Table 1.

Table 1 – Stability of Bendamustine HCl

| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
|---|---|---|---|---|
| BDM - 10mg/mL Choline chloride - 215mg/mL Ethanol qs to 1mL | Initial | | 10.43 | 0.27 |
| | 40°C | 48 hrs | 10.48 | 1.27 |
| | | 7 day | 10.26 | 2.11 |
| BDM - 10mg/mL Ethanol qs to 1mL | Initial | | 10.55 | 0.27 |
| | 40°C | 48 hrs | 10.30 | 2.39 |
| | | 7 day | 9.55 | 6.66 |
| BDM - 10mg/mL Choline chloride - 215mg/mL | Initial | | 9.99 | 0.21 |
| | 40°C | 48 hrs | 9.95 | 0.60 |

8

EAGLEBEN-SA_00000020

107071.000582

| | | | | |
|---|---|---|---|---|
| Propylene glycol qs to 1mL | | 7 day | 9.43 | **2.31** |
| BDM - 10mg/mL Propylene glycol qs to 1mL | Initial | | 9.68 | **0.21** |
| | 40°C | 48 hrs | 9.45 | **0.88** |
| | | 7 day | 9.00 | **3.44** |
| BDM - 10mg/mL Choline Chloride - 215mg/mL Benzyl alcohol qs to 1mL | Initial | | 9.95 | **1.19** |
| | 40°C | 48 hrs | 9.89 | **3.51** |
| | | 7 day | 8.97 | **4.24** |
| BDM - 10mg/mL Benzyl alcohol qs to 1mL | Initial | | 9.52 | **0.33** |
| | 40°C | 48 hrs | 8.67 | **4.18** |
| | | 7 day | 7.49 | **7.84** |

[0038]    Note:  In Table 1 the total % impurities include total contributions from peaks at various RRTs.

[0039]    As shown in Table 1, the bendamustine formulations are very stable in solutions containing solvent and chloride salt.  Table 1 shows that bendamustine, when dissolved at a concentration of about 10 mg/mL, in a pharmaceutically acceptable fluid, such as ethanol and propylene glycol, and containing a stabilizing amount of a chloride salt, such as choline chloride, had less than about 5% after at least 7 days storage at 40 °C.

[0040]    The data presented in Table 1 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of a chloride salt having a shelf life of at least about 15 months at 5 °C and 25 °C.

[0041]    The sample including ethanol alone exhibited more than 6.5 total degradants after 7 days storage at 40 °C.  The sample including benzyl alcohol alone exhibited more than 7.5% total degradants after 7 days storage at 40 °C.  Bendamustine-containing compositions with such high levels of degradation would not be suitable for long-term storage.


## Example 2


[0042]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10mg/ml in DMSO.  The samples were maintained at 40 °C and analyzed periodically for drug content and impurity profile.  The results obtained are presented in Table 2.

9

EAGLEBEN-SA_00000021

107071.000582

Table 2 - Stability of Bendamustine HCl in DMSO

| Formulation | Temp | Time | Content (mg/mL) | % Total Imp |
|---|---|---|---|---|
| **BDM - 10mg/mL DMSO qs to 1mL** | | Initial | 10.2 | **0.23** |
| | **40°C** | 48 hrs | 9.80 | **0.30** |
| | | 1 week | 10.0 | **0.56** |

Note:  In Table 2 the total % impurities include total contributions from peaks at various RRTs.

[0043]    Table 2 shows that bendamustine, when dissolved in DMSO, had substantially no increase in total degradants.  The data presented in Table 2 translates to bendamustine-containing compositions including DMSO having a shelf life of at least about 15 months at 5 °C and 25 °C.  In fact, such compositions are expected to have long term stability for periods beyond 15 months, i.e. up to 2 years or greater.

**Example 3**

[0044]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 20 mg/ml in polyethylene glycol 400 and 5 mg/ml of lipoic acid was added as a stabilizing antioxidant as indicated in Table 3 below.  The samples were maintained at 40 °C or 25 °C and analyzed after 15 days for drug content and impurities.  The results obtained are presented in Table 3.

Table 3: Stability of Bendamustine (20mg/ml) in PEG 400 and Antioxidants

| Antioxidant | T °C | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
| | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

10

EAGLEBEN-SA_00000022

107071.000582

[0045]    As shown in Table 3, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as polyethylene glycol, in the presence of a stabilizing amount of an antioxidant, such as lipoic acid, had substantially no increase in total degradants after a period of 15 days.  The data presented in Table 3 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of an antioxidant having a shelf life of at least about 15 months at 5 °C and 25 °C.

[0046]    The sample including PEG alone, on the other hand, which did not contain an antioxidant, did not exhibit stabilizing effects at 40 °C.  This sample had more than 40% more total impurities than the sample including lipoic acid.  Bendamustine-containing compositions with such high levels of total impurities would not be suitable for long-term storage.

## Example 4

[0047]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol.  5 mg/ml of thioglycerol, α-lipoic acid or dihydrolipoic acid was added as a stabilizing antioxidant as indicated in Table 4 below.  The samples were maintained at 40 °C and analyzed after 15 days or one month for drug content and impurity profile as indicated in Table 4 below.  The results obtained are presented in Table 4.

Table 4: Stability of Bendamustine (50mg/ml) in 90% PEG 400, 10% Propylene Glycol and Antioxidant

| Antioxidant | T (°C) | Time | Content (mg/mL) | % Initial | % Impurities RRT | | % Total Imps |
|---|---|---|---|---|---|---|---|
| | | | | | HP1 | PG ester | |
| | | | | | 0.59 | 1.10 | |
| Thioglycerol | 40 | initial | 48.8 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 48.5 | 99.4 | 0.06 | 0.20 | 0.71 |
| α-lipoic acid | 40 | initial | 49 | 100 | <LD | <LD | 0 |
| | 40 | 15 days | 48.8 | 99.6 | 0.19 | 0.13 | 0.32 |
| | 40 | 1 month | 48.7 | 99.4 | 0.34 | 0.26 | 0.79 |
| Dihydrolipoic acid | 40 | initial | 49.3 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 47.7 | 97.4 | 0.63 | 0.12 | 1.84 |

11

EAGLEBEN-SA_00000023

107071.000582

<LD = Below Level of Detection

[0048]    As shown in Table 4, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as a combination of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of an antioxidant, such as thioglycerol, α-lipoic acid or dihydrolipoic acid, had substantially no increase in total degradants after a period of 1 month. This data supports the position that bendamustine-containing compositions according to the invention have a shelf life of at least about 2 years when stored at temperatures between 5 ºC and 25 ºC.

## Example 5

[0049]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in a mixture of polyethylene glycol 400 and propylene glycol as indicated in Table 5 below. 5 mg/ml of lipoic acid was added as a stabilizing antioxidant. The samples were maintained at 40 ºC, 25 ºC and 5 ºC and analyzed after 1 week, 15 days or one month for drug content and impurity profile as indicated in Table 5 below. The results obtained are presented in Table 5.

Table 5: Stability of Bendamustine (50 mg/ml) and Lipoic Acid (5 mg/ml) in PEG400 and Propylene glycol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | %Area of degradants | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|
| | | | | | HP1 0.58 | PG ester 1.10 | PG ester 1.13 | |
| BDM - 50mg/mL Lipoic acid - 5mg/mL PEG 400:PG (75:25) qs to 1mL | Initial | | 49.6 | 100 | BDL | BDL | BDL | 0.18 |
| | 40 ºC | 1 W | 49.0 | 98.8 | 0.05 | 0.13 | BDL | 0.38 |
| | | 15 d | 48.3 | 97.4 | 0.08 | 0.26 | BDL | 0.55 |
| | | 1 M | 48.0 | 96.8 | 0.11 | 0.43 | 0.13 | 1.03 |
| | 25°C | 15 d | 49.6 | 100.0 | BDL | 0.10 | BDL | 0.30 |
| | | 1 M | 48.4 | 97.6 | 0.05 | 0.19 | BDL | 0.43 |
| | 5°C | 1 M | 49.6 | 100.0 | BDL | 0.07 | BDL | 0.27 |
| BDM - 50mg/mL Lipoic acid - 5mg/mL PEG 400:PG (50:50) qs to 1mL | Initial | | 50.2 | 100 | BDL | BDL | BDL | 0.21 |
| | 40 ºC | 1 W | 49.9 | 99.4 | BDL | 0.15 | BDL | 0.30 |
| | | 15 d | 49.1 | 97.8 | 0.06 | 0.35 | BDL | 0.73 |
| | | 1 M | 49.0 | 97.6 | 0.09 | 0.90 | 0.25 | 1.82 |
| | 25°C | 15 d | 49.9 | 99.4 | BDL | 0.12 | BDL | 0.32 |
| | | 1 M | 49.7 | 99.0 | BDL | 0.25 | BDL | 0.59 |
| | 5°C | 1 M | 50.0 | 99.6 | BDL | 0.11 | BDL | 0.33 |
| BDM - 50mg/mL | Initial | | 50.8 | 100 | BDL | BDL | BDL | 0.21 |
| | 40 ºC | 1 W | 50.4 | 99.2 | BDL | 0.11 | BDL | 0.30 |

12

EAGLEBEN-SA_00000024

107071.000582

| Lipoic acid - 5mg/mL PEG 400:PG (90:10) qs to 1mL | | 15 d | 49.7 | 97.8 | 0.07 | 0.17 | BDL | 0.43 |
| | | 1 M | 49.7 | 97.8 | 0.13 | 0.27 | 0.09 | 0.84 |
| | 25°C | 15 d | 50.8 | 100.0 | BDL | 0.10 | BDL | 0.26 |
| | | 1 M | 50.8 | 100.0 | 0.05 | 0.14 | BDL | 0.39 |
| | 5°C | 1 M | 50.8 | 100.0 | BDL | 0.06 | BDL | 0.34 |

BDL = Below Detectable Limit

[0050]   As shown in Table 5, bendamustine, when dissolved in certain mixtures of polyethylene glycol and propylene glycol and a stabilizing amount of lipoic acid, had substantially no increase in total degradants after a period of 1 month.  The data presented in Table 5 translates to bendamustine-containing compositions having a shelf life of at least about 2 years when stored at temperatures between 5 ºC and at 25 ºC.

## Example 6

[0051]   Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol and α-lipoic acid was added as a stabilizing antioxidant as indicated in Table 6 below.  The samples were maintained at 40 ºC, 25 ºC and 5 ºC and analyzed for drug content and impurity profile as indicated in Table 6 below. The results obtained are presented in Table 6.

Table 6: Stability of Bendamustine in 90% PEG 400, 10% PG and α-lipoic acid

| Formulation | Temp | Time Per. | Amt. mg/ml | % of Initial | %Area of degradants | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0.59 | 1.10 | 1.13 | 1.15 | 1.17 | 1.20 | 1.22 | 1.30 | |
| BDM - 50mg/mL α-lipoic acid - 10mg/mL PEG 400:PG (90:10) qs to 1mL | Initial | | 51.0 | 100 | 0.20 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.26 |
| | 40°C | 1 M | 50.5 | 99.0 | 0.21 | 0.31 | 0.13 | 0.07 | 0.13 | 0.10 | <LD | <LD | 0.95 |
| | | 2 M | 49.7 | 97.5 | 0.22 | 0.71 | 0.28 | 0.14 | 0.12 | 0.21 | 0.12 | <LD | 2.02 |
| | | 3 M | 48.7 | 95.5 | 0.22 | 1.01 | 0.45 | 0.21 | 0.14 | 0.37 | 0.16 | 0.05 | 2.96 |
| | 25°C | 3 M | 50.5 | 99.0 | 0.20 | 0.36 | 0.07 | <LD | <LD | 0.10 | <LD | <LD | 0.73 |
| | | 6 M | 50.4 | 98.8 | 0.22 | 0.60 | 0.17 | 0.06 | 0.06 | 0.09 | 0.10 | 0.08 | 1.44 |
| | 5°C | 6 M | 50.9 | 99.8 | 0.16 | 0.05 | <LD | <LD | <LD | <LD | <LD | <LD | 0.21 |
| | | 12 M | 50.6 | 99.2 | 0.20 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | 0.38 |

13

EAGLEBEN-SA_00000025

107071.000582

| Formulation | Temp | Time Per. | Amt mg/ml | % of Initial | | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BDM - 50mg/mL α-lipoic acid - 15mg/mL PEG 400:PG (90:10) qs to 1mL | Initial | | 50.3 | 100 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | <LD | 0.18 |
| | 40°C | 1 M | 50.0 | 99.4 | 0.19 | 0.32 | 0.08 | 0.06 | 0.08 | 0.06 | 0.06 | <LD | 0.85 |
| | | 2 M | 49.8 | 99.0 | 0.19 | 0.65 | 0.21 | 0.12 | 0.13 | 0.23 | 0.14 | 0.06 | 1.85 |
| | | 3 M | 49.5 | 98.4 | 0.15 | 0.89 | 0.37 | 0.17 | 0.13 | 0.32 | 0.10 | <LD | 2.40 |
| | | 6 M | 47.0 | 93.4 | 0.20 | 1.76 | 0.66 | 0.19 | 0.31 | 0.47 | 0.33 | 0.17 | 4.93 |
| | 25°C | 3 M | 50.0 | 99.4 | 0.20 | 0.35 | 0.08 | <LD | <LD | <LD | 0.11 | <LD | 0.79 |
| | | 6 M | 49.5 | 98.4 | 0.19 | 0.58 | 0.15 | 0.06 | 0.07 | 0.09 | 0.08 | 0.10 | 1.38 |
| | 5°C | 6 M | 50.3 | 100 | 0.17 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.23 |
| | | 12 M | 50.2 | 99.8 | 0.19 | 0.15 | <LD | <LD | <LD | <LD | <LD | <LD | 0.34 |

<LD = Below Level of Detection

[0052]    The data reported in Table 6 along with the data in Table 5 demonstrates that bendamustine solutions are stable when dissolved in mixtures of PEG and PG and 5-15mg/mL α-lipoic acid.  As shown in Table 6, bendamustine, when dissolved in combinations of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of lipoic acid, had less than 3% increase in total degradants after a period of 3 months at 40 ºC.  Additionally, the same compounds had substantially no increase in total degradants after a period of 6-12 months at 5 ºC and 25 ºC.  The data corresponds to bendamustine solutions being stable under ambient or refrigerated storage conditions for well in excess of 2 years, and thus long term stable.

## Example 7

[0053]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol.  2.5 mg/ml of thioglycerol was added as an antioxidizing agent.  The samples were maintained at 40 ºC and 25 ºC and analyzed for drug content and impurity profile as indicated in Table 7 below.  The results obtained are presented in Table 7.

Table 7: Stability of Bendamustine in 90% PEG 400, 10% PG and Thioglycerol

| Formu- lation | Temp | Time Per. | Amt mg/ml | % of Ini- tial | RRTs of degradants | | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0.15 | 0.37 | 1.10 | 1.13 | 1.15 | 1.17 | 1.18 | 1.20 | 1.22 | |

4894-3816-6595.1

EAGLEBEN-SA_00000026

107071.000582

| Formulation | Temp. | Time | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BDM - 50mg/mL Thio glycerol - 2.5mg/mL PEG 400:PG (90:10) qs to 1mL | Initial | | 50.3 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | 40°C | 15 d | 50.2 | 99.8 | BDL | BDL | 0.18 | BDL | BDL | BDL | 0.05 | 0.08 | BDL | 0.31 |
| | | 1 M | 49.9 | 99.2 | BDL | 0.12 | 0.32 | 0.07 | BDL | BDL | 0.09 | 0.08 | BDL | 0.75 |
| | | 2 M | 49.1 | 97.6 | BDL | 0.18 | 0.56 | 0.24 | 0.09 | 0.17 | 0.19 | 0.12 | 0.11 | 1.76 |
| | | 3 M | 48.8 | 97.0 | BDL | 0.23 | 0.85 | 0.34 | 0.16 | 0.30 | 0.34 | 0.29 | 0.19 | 2.94 |
| | 25°C | 3 M | 49.9 | 99.2 | 0.06 | 0.12 | 0.23 | 0.07 | BDL | 0.06 | 0.07 | 0.06 | BDL | 0.67 |
| | | 6 M | 49.3 | 98.0 | BDL | 0.23 | 0.53 | 0.22 | 0.11 | BDL | 0.21 | 0.22 | 0.20 | 2.07 |

BDL = Below Detectable Limit

[0054]    The stability is similar to that of α-lipoic acid samples in Example 6 above.  As shown in Table 7, bendamustine, when dissolved in a combination of polyethylene glycol and propylene glycol, and a stabilizing amount of thioglycerol, had less than 3% increase in total degradants after a period of 3 months at 40 ºC.  Additionally, the same compounds had substantially no increase in total degradants after a period of 6 months at 25 ºC.  The data reported supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for about 2 years.

### Example 8

[0055]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 85% PEG 400 and 15% PG in the presence of 5 mg/ml of thioglycerol. The samples were maintained at 40 ºC and 25 ºC and analyzed for drug content and impurity profile as indicated in Table 8 below.  The results obtained are presented in Table 8.

Table 8: Stability of Bendamustine in 85% PEG 400, 15% PG and Thioglycerol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Total Imp. |
|---|---|---|---|---|---|
| BDM - 50mg/mL Thioglycerol - 5mg/mL PEG 400:PG (85:15) qs to 1mL | Initial | | 51.5 | 100 | 0.12 |
| | 40°C | 1 M | 50.4 | 97.9 | 1.18 |
| | 25°C | 1 M | 51.4 | 99.8 | 0.41 |
| | | 3 M | 50.4 | 97.9 | 1.21 |
| | 5°C | 3 M | 51.0 | 99.0 | 0.26 |

15

EAGLEBEN-SA_00000027

107071.000582

[0056]     The stability is similar to that of thioglycerol samples in Example 7 above.  As reported in Table 8, total impurities did not exceed 2% at 40 ºC or 25°C storage over one month, or at 25 ºC and 5 ºC storage after three months.  The data reported in Table 8 supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for at least about 2 years if not longer.

16

EAGLEBEN-SA_00000028

107071.000582

# CLAIMS

We claim:

1.     A ready for dilution, liquid bendamustine-containing composition comprising
bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine
         concentration in the composition is from about 20 mg/mL to about 60 mg/mL;
polyethylene glycol; and
a stabilizing amount of an antioxidant.

2.     The composition of claim 1, comprising 100 mg of bendamustine.

3.     The composition of claim 1, wherein the bendamustine concentration is about 25 mg/mL.

4.     The composition of claim 1, wherein the antioxidant is monothioglycerol.

5.     The composition of claim 1, wherein the antioxidant is monothioglycerol in a
concentration of about 5 mg/mL.

6.     The composition of claim 1, wherein the composition is stable for at least about 15
months at 5 °C or for at least about 15 months at 25 °C.

7.     The composition of claim 1, wherein the total impurities resulting from the degradation
of the bendamustine is less than about 5% peak area response, as determined by HPLC at
a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to
about 25 °C.

8.     The composition of claim 1, further comprising ethanol.

9.     The composition of claim 1, wherein the liquid bendamustine-containing composition is
packaged in a sterile vial.

10.    A liquid bendamustine-containing composition comprising
bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine
         concentration in the composition is from about 20 mg/mL to about 60 mg/mL and
         wherein the bendamustine has not been reconstituted from a lyophilized powder;

4894-3816-6595.1

EAGLEBEN-SA_00000029

107071.000582

polyethylene glycol; and

a stabilizing amount of an antioxidant.

11.    The composition of claim 10, comprising 100 mg of bendamustine.

12.    The composition of claim 10, wherein the bendamustine concentration is about 25 mg/mL.

13.    The composition of claim 10, wherein the antioxidant is monothioglycerol.

14.    The composition of claim 10, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

15.    The composition of claim 10, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.

16.    The composition of claim 10, wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

17.    The composition of claim 10, further comprising ethanol.

18.    The composition of claim 10, wherein the liquid bendamustine-containing composition is packaged in a sterile vial.

19.    A bendamustine-containing composition comprising

one or more doses of bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid that is polyethylene glycol;

wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 20 mg/mL to about 60 mg/mL.

20.    The composition of claim 19, comprising 100 mg of bendamustine.

4894-3816-6595.1

EAGLEBEN-SA_00000030

107071.000582

21.    The composition of claim 19, wherein the bendamustine concentration is about 25
mg/mL.

22.    The composition of claim 19, wherein the antioxidant is monothioglycerol.

23.    The composition of claim 19, wherein the antioxidant is monothioglycerol in a
concentration of about 5 mg/mL.

24.    The composition of claim 19, wherein the composition is stable for at least about 15
months at 5 °C or for at least about 15 months at 25 °C.

25.    The composition of claim 19, wherein the total impurities resulting from the degradation
of the bendamustine is less than about 5% peak area response, as determined by HPLC at
a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to
about 25 °C.

26.    The composition of claim 19, further comprising ethanol.

27.    The composition of claim 19, wherein the liquid bendamustine-containing composition is
packaged in a sterile vial.

28.    A method of treating leukemia in a human in need thereof comprising
providing a liquid bendamustine-containing composition comprising about 25 mg/ml of
        bendamustine;
diluting the liquid bendamustine containing composition; and
intravenously administering the diluted composition to the human.

29.    The method of claim 28, wherein the liquid bendamustine containing composition is
diluted with about 50 mL of a diluent.

19

EAGLEBEN-SA_00000031

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/081,238 | 12/14/2022 | Nagesh R. Palepu | 107071.000582 | 5922 |

| 23377        7590        03/21/2023 | | EXAMINER | |
|---|---|---|---|
| BakerHostetler | | ARNOLD, ERNST V | |
| 1735 Market Street | | | |
| Suite 3300 | | ART UNIT | PAPER NUMBER |
| Philadelphia, PA 19103-7501 | | 1613 | |
| | | NOTIFICATION DATE | DELIVERY MODE |
| | | 03/21/2023 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

eofficemonitor@bakerlaw.com

PTOL-90A (Rev. 04/07)

EAGLEBEN-SA_00000091

| *Office Action Summary* | Application No. 18/081,238 | Applicant(s) Palepu et al. |
|---|---|---|
| | Examiner ERNST V ARNOLD | Art Unit 1613 | AIA (FITF) Status No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☐ Responsive to communication(s) filed on _____.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a) ☐ This action is **FINAL.**    2b) ☑ This action is non-final.

3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☑ Claim(s) <u>1-29</u> is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6) ☐ Claim(s) _____ is/are allowed.

7) ☑ Claim(s) <u>1-29</u> is/are rejected.

8) ☐ Claim(s) _____ is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10) ☐ The specification is objected to by the Examiner.

11) ☐ The drawing(s) filed on _____ is/are:  a)☐ accepted or  b)☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    **Certified copies:**
    a)☐ All    b)☐ Some**    c)☐ None of the:
    1.☐ Certified copies of the priority documents have been received.
    2.☐ Certified copies of the priority documents have been received in Application No. _____.
    3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
    ** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)

2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
   Paper No(s)/Mail Date _____.

3) ☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date _____.

4) ☐ Other: _____.

Application/Control Number: 18/081,238                                      Page 2
Art Unit: 1613

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent

provisions.

### *Claim Status*

Claims 1-29 are pending.

### *Priority*

## Continuity/Reexam Information for 18/081238

**Parent Data**

18081238, filed 12/14/2022 is a continuation of 17412623, filed 08/26/2021
17412623 is a continuation of 16509920, filed 07/12/2019 ,now U.S. Patent #11163483 and having 1 RCE-type filing therein
16509920 is a continuation of 16015656, filed 06/22/2018 ,now abandoned
16015656 is a continuation of 15432335, filed 02/14/2017 ,now U.S. Patent #10010533
15432335 is a continuation of 15013436, filed 02/02/2016 ,now U.S. Patent #9572797
15013436 is a continuation of 14031879, filed 09/19/2013 ,now U.S. Patent #9265831 and having 1 RCE-type filing therein
14031879 is a continuation of 13016473, filed 01/28/2011 ,now U.S. Patent #8609707 and having 1 RCE-type filing therein
13016473 Claims Priority from Provisional Application 61299109, filed 01/28/2010

### *Information Disclosure Statement*

The information disclosure statement (IDS) submitted on 12/14/22 are mostly in

compliance with the provisions of 37 CFR 1.97. Some references lack a date and a line

has been drawn through the reference as being not considered. Accordingly, the

information disclosure statement is being considered to that extent by the examiner.

EAGLEBEN-SA_00000093

Application/Control Number: 18/081,238                                            Page 3
Art Unit: 1613

### *Double Patenting*

Applicant is advised that should claims 1-9 be found allowable, claims 10-27 will be objected to under 37 CFR 1.75 as being a substantial duplicates thereof. When two claims in an application are duplicates or else are so close in content that they both cover the same thing, despite a slight difference in wording, it is proper after allowing one claim to object to the other as being a substantial duplicate of the allowed claim. See MPEP § 608.01(m). Independent claims 10 and 19 also comprise about 20 mg/mL to about 60 mg/mL bendamustine or a pharmaceutical acceptable salt thereof, polyethylene glycol and a stabilizing amount of an antioxidant. Thus, they are inherently "ready for dilution" and the independent claim anticipate one another as there are no other structural changes to the other independent claims.

### *Claim Rejections - 35 USC § 103*

In the event the determination of the status of the application as subject to AIA 35 U.S.C. 102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any correction of the statutory basis for the rejection will not be considered a new ground of rejection if the prior art relied upon, and the rationale supporting the rejection, would be the same under either status.

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

EAGLEBEN-SA_00000094

Application/Control Number: 18/081,238                                          Page 4
Art Unit: 1613

The factual inquiries set forth in *Graham* **v.** *John Deere Co.*, 383 U.S. 1, 148

USPQ 459 (1966), that are applied for establishing a background for determining

obviousness under 35 U.S.C. 103(a) are summarized as follows:

1.    Determining the scope and contents of the prior art.
2.    Ascertaining the differences between the prior art and the claims at issue.
3.    Resolving the level of ordinary skill in the pertinent art.
4.    Considering objective evidence present in the application indicating obviousness or nonobviousness.

This application currently names joint inventors. In considering patentability of the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g) prior art under 35 U.S.C. 103(a).

**Claims 1-3, 5-12,15-21 and 24-27** are rejected under 35 U.S.C. 103(a) as being

unpatentable over Drager et al. (US 20110190363, of record, with benefit of

PCT/US09/58023 filed September 23, 2009, which claims priority form provisional

61100074 filed September 25, 2008).

Applicant claims:

1.    A ready for dilution, liquid bendamustine-containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine

concentration in the composition is from about 20 mg/mL to about 60 mg/mL;

polyethylene glycol; and

a stabilizing amount of an antioxidant.

Application/Control Number: 18/081,238                                        Page 5
Art Unit: 1613

10.    A liquid bendamustine-containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine

concentration in the composition is from about 20 mg/mL to about 60 mg/mL and

wherein the bendamustine has not been reconstituted from a lyophilized powder;

polyethylene glycol; and

a stabilizing amount of an antioxidant.

19.    A bendamustine-containing composition comprising

one or more doses of bendamustine, or a pharmaceutically acceptable salt thereof, and a

stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid that is

polyethylene glycol;

wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from

about 20 mg/mL to about 60 mg/mL.

## Level of Ordinary Skill in the Art

### (MPEP 2141.03)

MPEP 2141.03 (I) states: "The "hypothetical 'person having ordinary skill in the

art' to which the claimed subject matter pertains would, of necessity have the capability

of understanding the scientific and engineering principles applicable to the pertinent art."

*Ex parte Hiyamizu*, 10 USPQ2d 1393, 1394 (Bd. Pat. App. & Inter. 1988). The level of

skill is that of a ***medical/pharmaceutical cancer*** research scientist, as is the case here,

then one can assume comfortably that such an educated artisan will draw conventional

ideas from oncology medicine, oncology pharmacy and chemistry— without being told

to do so.

In addition, the prior art itself reflects an appropriate level (MPEP 2141.03(II)).

Application/Control Number: 18/081,238                                                    Page 6
Art Unit: 1613

## Determination of the scope and content of the prior art

### (MPEP 2141.01)


Regarding claims 1, 3, 10, 12, 19 and 21, Drager et al. teach stable liquid
formulations of bendamustine (Abstract) and that bendamustine comes in vial, diluted
just before dose administration to the saphenous vein [0037]. Drager et al. teach that
the bendamustine concentration can range from about 5 mg/mL to about 200 mg/mL
(claim 12) with preferred concentrations of, for example, about 20 mg/mL and about 60
mg/mL [0028], which embraces the range of from about 20 mg/mL to about 60 mg/mL
as well as the claimed amount of about 25 mg/mL and reads on one or more doses.
See MPEP 2144.05(I): In the case where the claimed ranges "overlap or lie inside
ranges disclosed by the prior art" a *prima facie* case of obviousness exists. *In re
Wertheim*, 541 F.2d 257, 191 USPQ 90 (CCPA 1976). Regarding claims 1 and 10, the
liquid bendamustine composition of Drager et al. is ready for dilution because diluting
the liquid bendamustine composition is the next step in the method of treating cancer
(claim 47) and the bendamustine is not reconstituted from lyophilized powder ([0037]
formulations 2 and 3).

Regarding claims 1, 10 and 19, Drager et al. teach that it has been discovered
that stable formulation of bendamustine or a pharmaceutical salt thereof can be
obtained by mixing with a polar aprotic solvent such as polyethylene glycol ([0016];
claims 1, 3, 4) such as PEG300 or PEG400 [0030] as well as antioxidants such as
vitamin E, ascorbic acid, BHA, BHT, propyl gallate ([0030]; claim 11), which naturally
stabilizes the composition.

EAGLEBEN-SA_00000097

Application/Control Number: 18/081,238                                      Page 7
Art Unit: 1613

Regarding claims 2, 11 and 20, Drager et al. teach embodiments with about 100 mg/mL bendamustine [0028], which renders obvious a composition with 100 mg bendamustine in 1 mL.

Regarding claims 6-7, 15, 16 and 24-25, Drager et al. teach:

[0022]    In preferred embodiments of the present invention, analysis of formulations of the present invention will exhibit 1.50% or less of DCE, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C. More preferably, the formulations will exhibit 1.0% or less of DCE, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C. Even more preferably, the formulations will exhibit 0.5% or less of DCE, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C. Most preferably, the formulations will exhibit about 0.1% or less of DCE, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C.
[0023]    In other embodiments of the present invention, analysis of the formulations will exhibit about 0.4% or less of HP1, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C. Preferably, the formulations will exhibit about 0.10% or less of HP1, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C.

Regarding claims 8, 17 and 26, Drager et al. teach adding mixtures of polyalkylene glycol and an alcohol (claim 4) and name ethanol [0016].

**Ascertainment of the difference between the prior art and the claims (MPEP 2141.02) and Finding of prima facie obviousness Rational and Motivation (MPEP 2142-2143)**

The difference between the instant application and Drager et al. is that Drager et al. do not expressly teach providing a sterile vial and the limitation of 15 month stable at 5 °C or 25 °C wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a

EAGLEBEN-SA_00000098

Application/Control Number: 18/081,238                                        Page 8
Art Unit: 1613

wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

It would have been obvious to one of ordinary skill in the art at the time of the claimed invention to perform the method of Drager et al. by providing a sterile vial containing the bendamustine liquid composition and achieve the 15 month stable at 5 °C or 25 °C wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C and produce the instant invention.

One of ordinary skill in the art would have been motivated to do this because the ordinary medical artisan understands that the vial must be sterile otherwise not only does it defeat the purpose of using sterile water for injection [0004] but also the patient runs the risk of infection from a dirty vial. Thus, the ordinary artisan is motivated to do so for at least for the welfare of the patient with a reasonable expectation of success. Drager et al. teach that the compositions are stable to about 365 days, which is about a year and teach less than 0.1% or less degradation products ([0022-0024]). Accordingly, the ordinary artisan can extrapolate out to 15 months and be reasonably certain that the compositions will be stable with less than about 5% peak area response as determined by HPLC for total impurities. Especially when the compositions comprise the same polyethylene glycol and antioxidants as claimed and would have a reasonable expectation of success of having a stable composition for at least about 15 months at 5 °C to about 25 °C.

Application/Control Number: 18/081,238                                                Page 9
Art Unit: 1613

In light of the forgoing discussion, the Examiner concludes that the subject matter defined by the instant claims would have been obvious within the meaning of 35 USC 103(a).

From the combined teachings of the references, it is apparent that one of ordinary skill in the art would have had a reasonable expectation of success in producing the claimed invention. Therefore, the invention as a whole was *prima facie* obvious to one of ordinary skill in the art at the time the invention was made, as evidenced by the combined references, especially in the absence of evidence to the contrary.

**Claims 4, 5, 13, 14, 22 and 23** are rejected under 35 U.S.C. 103(a) as being unpatentable over Drager et al. (US 20110190363), as applied to claims 1-3, 5-12,15-21 and 24-27 above, in further view of Tait et al. (WO 0202125), of record.

Applicant claims:

4.      The composition of claim 1, wherein the antioxidant is monothioglycerol.

5.      The composition of claim 1, wherein the antioxidant is monothioglycerol in a
        concentration of about 5 mg/mL.

13.     The composition of claim 10, wherein the antioxidant is monothioglycerol.

14.     The composition of claim 10, wherein the antioxidant is monothioglycerol in a
        concentration of about 5 mg/mL.

EAGLEBEN-SA_00000100

Application/Control Number: 18/081,238                                        Page 10
Art Unit: 1613

22.    The composition of claim 19, wherein the antioxidant is monothioglycerol.

23.    The composition of claim 19, wherein the antioxidant is monothioglycerol in a
        concentration of about 5 mg/mL.

## Level of Ordinary Skill in the Art

## (MPEP 2141.03)

MPEP 2141.03 (I) states: "The "hypothetical 'person having ordinary skill in the

art' to which the claimed subject matter pertains would, of necessity have the capability

of understanding the scientific and engineering principles applicable to the pertinent art."

*Ex parte Hiyamizu*, 10 USPQ2d 1393, 1394 (Bd. Pat. App. & Inter. 1988). The level of

skill is that of a ***medical/pharmaceutical cancer*** research scientist, as is the case here,

then one can assume comfortably that such an educated artisan will draw conventional

ideas from oncology medicine, oncology pharmacy and chemistry— without being told

to do so.

In addition, the prior art itself reflects an appropriate level (MPEP 2141.03(II)).

## Determination of the scope and content of the prior art

## (MPEP 2141.01)

Drager et al. is discussed above and that discussion is incorporated by

reference.

Regarding claims 4, 5, 13, 14, 22 and 23, Tait et al. teach stabilized injectable

compositions of the alkylating agent ifosfamide (Abstract; page 1, line 7) comprising

PEG200-600, ethanol (page 6, lines 16-24; page 9, lines 15-21; claims 4-6) and

EAGLEBEN-SA_00000101

Application/Control Number: 18/081,238                                      Page 11
Art Unit: 1613

antioxidants such as BHA, BHT and up to 5% monothioglycerol (page 9, lies 11-14;

page 14, line 6) that are stable for at least 180 days (page 6, lines 25-26).


**Ascertainment of the difference between the prior art and the claims**

**(MPEP 2141.02) and Finding of prima facie obviousness**

**Rational and Motivation (MPEP 2142-2143)**

The difference between the instant application and Drager et al. is that Drager et

al. do not expressly teach about 5 mg/mL of monothioglycerol antioxidant. This

deficiency in Drager et al. is cured by the teachings of Tait et al.

It would have been obvious to one of ordinary skill in the art at the time of the

claimed invention to add about 5 mg/mL of monothioglycerol antioxidant to the

composition of Drager et al., as suggested by Tait et al., produce the instant invention.

One of ordinary skill in the art would have been motivated to do this because as

noted above Drager et al. suggest adding an antioxidant and name, for example BHA

and BHT. Tait et al. teach the equivalence of monothioglycerol, BHA and BHT as

antioxidants to stabilize alkylating agents and thus have interchangeable function. "The

combination of familiar elements according to known methods is likely to be obvious

when it does no more than yield predictable results." *KSR Int'l Co. v. Teleflex Inc.*, 550

U.S. 398, 417 (2007). Moreover, "Where two known alternatives are interchangeable for

a desired function, an express suggestion to substitute one for the other is not needed

to render a substitution obvious." <u>In re Fout</u>, 675 F.2d 297, 301 (CCPA 1982).

Accordingly, the ordinary artisan would select the antioxidant monothioglycerol and

Application/Control Number: 18/081,238                                    Page 12
Art Unit: 1613

optimize the amount to about 5 mg/mL to achieve the desired degree of stability with a

reasonable expectation of success especially when Tait et al. teach using from 0-5%.

In light of the forgoing discussion, the Examiner concludes that the subject matter

defined by the instant claims would have been obvious within the meaning of 35 USC

103(a).

From the combined teachings of the references, it is apparent that one of

ordinary skill in the art would have had a reasonable expectation of success in

producing the claimed invention. Therefore, the invention as a whole was *prima facie*

obvious to one of ordinary skill in the art at the time the invention was made, as

evidenced by the combined references, especially in the absence of evidence to the

contrary.


**Claims 28 and 29** are rejected under 35 U.S.C. 103(a) as being unpatentable

over Drager et al. (US 20110190363 with benefit of PCT/US09/58023 filed September

23, 2009, which claims priority form provisional 61100074 filed September 25, 2008).

Applicant claims:

28.    A method of treating leukemia in a human in need thereof comprising
          providing a liquid bendamustine-containing composition comprising about 25 mg/ml of
                 bendamustine;
          diluting the liquid bendamustine containing composition; and
          intravenously administering the diluted composition to the human.

29.    The method of claim 28, wherein the liquid bendamustine containing composition is
          diluted with about 50 mL of a diluent.


**Level of Ordinary Skill in the Art**

Application/Control Number: 18/081,238                                    Page 13
Art Unit: 1613

### (MPEP 2141.03)

MPEP 2141.03 (I) states: "The "hypothetical 'person having ordinary skill in the art' to which the claimed subject matter pertains would, of necessity have the capability of understanding the scientific and engineering principles applicable to the pertinent art." *Ex parte Hiyamizu*, 10 USPQ2d 1393, 1394 (Bd. Pat. App. & Inter. 1988). The level of skill is that of a ***medical/pharmaceutical cancer*** research scientist, as is the case here, then one can assume comfortably that such an educated artisan will draw conventional ideas from oncology medicine, oncology pharmacy and chemistry— without being told to do so.

In addition, the prior art itself reflects an appropriate level (MPEP 2141.03(II)).

### Determination of the scope and content of the prior art

### (MPEP 2141.01)

Regarding claims 28 and 29, Drager et al. teach a method of treating cancer comprising:

- providing a liquid pharmaceutical composition comprising a therapeutically effective amount of bendamustine or pharmaceutically acceptable salt thereof and non-aqueous solvent;

- diluting the liquid pharmaceutical formulation with a pharmaceutically acceptable injectable diluent to form a pharmaceutical preparation; and

- administering the pharmaceutical preparation to the patient in need of treatment (claim 47) intravenously [0032].

EAGLEBEN-SA_00000104

Application/Control Number: 18/081,238                                    Page 14
Art Unit: 1613

Drager et al. teach that bendamustine comes in vial, diluted just before dose administration to the saphenous vein, hence intravenous administration [0037]. Drager et al. teach that the cancer includes leukemia [0031]. Drager et al. teach that the bendamustine concentration can range from about 5 mg/mL to about 200 mg/mL with preferred concentrations of about 20 mg/mL, about 30 mg/mL [0028], thereby creating a range of about 20-30 mg/mL, which embraces the claimed amount of about 25 mg/mL. See MPEP 2144.05(I): In the case where the claimed ranges "overlap or lie inside ranges disclosed by the prior art" a *prima facie* case of obviousness exists. *In re Wertheim*, 541 F.2d 257, 191 USPQ 90 (CCPA 1976).

**Ascertainment of the difference between the prior art and the claims**

**(MPEP 2141.02) and Finding of prima facie obviousness**

**Rational and Motivation (MPEP 2142-2143)**

The difference between the instant application and Drager et al. is that Drager et al. do not expressly teach providing a sterile vial and diluting with about 50 mL of a diluent.

It would have been obvious to one of ordinary skill in the art at the time of the claimed invention to perform the method of Drager et al. by providing a sterile vial containing the bendamustine liquid composition and dilute it with about 50 mL of a diluent and produce the instant invention.

One of ordinary skill in the art would have been motivated to do this because the ordinary medical artisan understands that the vial must be sterile otherwise not only does it defeat the purpose of using sterile water for injection [0004] but also the patient

EAGLEBEN-SA_00000105

Application/Control Number: 18/081,238                                                  Page 15
Art Unit: 1613

runs the risk of infection from a dirty vial. Thus, the ordinary artisan is motivated to do so

for at least for the welfare of the patient with a reasonable expectation of success. The

amount of diluent is a result effect variable routinely optimized by the ordinary artisan to

provide the proper concentration of bendamustine to the patient from the concentrated

formulation. Thus, absent any criticality of "about 50 mL of a diluent", such is readily

determined by the ordinary artisan in this art with no inventive skill required.

In light of the forgoing discussion, the Examiner concludes that the subject matter

defined by the instant claims would have been obvious within the meaning of 35 USC

103(a).

From the combined teachings of the references, it is apparent that one of

ordinary skill in the art would have had a reasonable expectation of success in

producing the claimed invention. Therefore, the invention as a whole was *prima facie*

obvious to one of ordinary skill in the art at the time the invention was made, as

evidenced by the combined references, especially in the absence of evidence to the

contrary.

### *Double Patenting*

The nonstatutory double patenting rejection is based on a judicially created
doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the
unjustified or improper timewise extension of the "right to exclude" granted by a patent
and to prevent possible harassment by multiple assignees. A nonstatutory double
patenting rejection is appropriate where the conflicting claims are not identical, but at
least one examined application claim is not patentably distinct from the reference
claim(s) because the examined application claim is either anticipated by, or would have
been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46
USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed.
Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*,
686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619
(CCPA 1970); *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).
A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d)
may be used to overcome an actual or provisional rejection based on nonstatutory

Application/Control Number: 18/081,238                                      Page 16
Art Unit: 1613

double patenting provided the reference application or patent either is shown to be commonly owned with the examined application, or claims an invention made as a result of activities undertaken within the scope of a joint research agreement. See MPEP § 717.02 for applications subject to examination under the first inventor to file provisions of the AIA as explained in MPEP § 2159. See MPEP § 2146 *et seq.* for applications not subject to examination under the first inventor to file provisions of the AIA. A terminal disclaimer must be signed in compliance with 37 CFR 1.321(b).

     The USPTO Internet website contains terminal disclaimer forms which may be used. Please visit www.uspto.gov/patent/patents-forms. The filing date of the application in which the form is filed determines what form (e.g., PTO/SB/25, PTO/SB/26, PTO/AIA/25, or PTO/AIA/26) should be used. A web-based eTerminal Disclaimer may be filled out completely online using web-screens. An eTerminal Disclaimer that meets all requirements is auto-processed and approved immediately upon submission. For more information about eTerminal Disclaimers, refer to www.uspto.gov/patents/process/file/efs/guidance/eTD-info-I.jsp.

     1. Claims 1-27 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-6 of U.S. Patent No. 9265831. Although the claims at issue are not identical, they are not patentably distinct from each other because the

Application/Control Number: 18/081,238                                    Page 17
Art Unit: 1613

patent is directed to:

US 9,265,831 B2

| 13 | 14 |

**TABLE 8**

Stability of Bendamustine in 85%
PEG 400, 15% PG and Thioglycerol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Total | % Total Imp. |
|---|---|---|---|---|---|
| BDM—50 mg/mL | Initial | | 31.5 | 100 | 0.13 |
| Thioglycerol—5 mg/mL | 40° C. | 1 M | 30.4 | 97.9 | 1.18 |
| PEG 400:PG (85:15) qs to 1 mL | 25° C. | 1 M | 31.4 | 99.8 | 0.44 |
| | | 3 M | 30.4 | 97.9 | 1.21 |
| | 5° C. | 3 M | 31.9 | 99.0 | 0.26 |

The stability is similar to that of thioglycerol samples in Example 7 above. As reported in Table 8, total impurities did not exceed 2% at 40° C. or 25° C. storage over one month, or at 25° C. and 5° C. storage after three months. The data reported in Table 8 supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for at least about 2 years if not longer.

We claim:

1. A non-aqueous liquid bendamustine-containing composition, comprising:
   a) bendamustine or a pharmaceutically acceptable salt thereof; and
   b) a pharmaceutically acceptable fluid comprising,
      i) about 5% to about 10% by volume propylene glycol;
      ii) polyethylene glycol; and

iii) a stabilizing amount of an antioxidant selected from the group consisting of thioglycerol, monothioglycerol, lipoic acid, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds and dihydrolipoic acid;

the bendamustine-containing composition having less than or equal to 0.11% total PG esters at about 1 month of storage at a temperature of about 5° C.;

wherein the ratio of polyethylene glycol to propylene glycol is selected from the group consisting of: about 95:5, about 90:10, about 85:15, about 80:20 and about 75:25.

2. The liquid bendamustine-containing composition of claim 1, wherein said bendamustine-containing composition has less than or equal to 0.18% total PG esters at about 12 months of storage at a temperature of about 5° C.

3. The liquid bendamustine-containing composition of claim 1, wherein the amount of propylene glycol in the pharmaceutically acceptable fluid is about 10%.

4. The liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

5. The liquid bendamustine-containing composition of claim 4, wherein the bendamustine concentration is from about 25 mg/mL to about 50 mg/mL.

6. The liquid bendamustine-containing composition of claim 5, wherein the bendamustine concentration is about 50 mg/mL.

*  *  *  *  *

The bendamustine has not been reconstituted form a lyophilized powder, has same concentration range which indicates that the composition is ready for dilution and contains one or more doses of bendamustine. The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 100 mg of bendamustine. However, if the concentration is 25 mg/mL (claim 5) then in 4 mL the artisan would have 100 mg bendamustine present with a reasonable expectation of success.

Application/Control Number: 18/081,238                                        Page 18
Art Unit: 1613

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches a stabilizing amount of antioxidant and it is merely routine optimization to determine how much monothioglycerol (thioglycerol) to have to achieve the desired stabilization by the ordinary artisan.

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

The patent does not expressly the claimed stability at about 15 months at about 5-25 C or less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at about 5-25 C to determine the total impurities from the degradation of bendamustine at the period of time or temperatures instantly claimed. However, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

2. Claims 1-29 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-27 of U.S. Patent No. 9572797.

Although the claims at issue are not identical, they are not patentably distinct from each other because the patented method is directed to using the instantly claimed compositions of about 20-60 mg/mL bendamustine (claims 1, 4-6), polyethylene glycol

Application/Control Number: 18/081,238                                    Page 19
Art Unit: 1613

and about 2.5-35 mg/mL monothioglycerol antioxidant (claims 1, 11, 12) in a method of

treating, for example leukemia (claims 13, 25) with similar stability (claims 2, 7-10, 16-

20).

We claim:
1. A method of treating leukemia, Hodgkin's disease, or multiple myeloma in a mammal, comprising administering to the mammal, a liquid bendamustine-containing composition comprising:
   a) bendamustine or a pharmaceutically acceptable salt thereof; and
   b) a non-aqueous pharmaceutically acceptable fluid comprising
      about 5% to about 10%, based on the volume of the pharmaceutically acceptable fluid, of propylene glycol,
      polyethylene glycol,
      and a stabilizing amount of an antioxidant selected from the group consisting of thioglycerol, monothioglycerol, lipoic acid, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds and dihydrolipoic acid;
      the bendamustine-containing composition having less than or equal to 0.11% total PG esters at about 1 month of storage at a temperature of about 5° C.,
      wherein the ratio of polyethylene glycol to propylene glycol is selected from the group consisting of: about 95:5, about 90:10, about 85:15, about 80:20, and about 75:25.

13. The method of claim 1, for the treatment of leukemia.
14. The method of claim 1, for the treatment of Hodgkin's disease.

The bendamustine has not been reconstituted form a lyophilized powder, has

same concentration range which indicates that the composition is ready for dilution and

contains one or more doses of bendamustine.

The patent does not expressly teach a sterile vial. However, the ordinary artisan

in the pharmaceutical arts would place the bendamustine composition in a sterile vial to

avoid microbiological contamination, which would ruin the pharmaceutical product, with

a reasonable expectation of success.

Application/Control Number: 18/081,238                                                    Page 20
Art Unit: 1613

The patent does not expressly teach about 100 mg of bendamustine. However, if the concentration is 25 mg/mL (claim 5) then in 4 mL the artisan would have 100 mg bendamustine present with a reasonable expectation of success.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches a stabilizing amount of antioxidant and it is merely routine optimization to determine how much monothioglycerol (thioglycerol) to have to achieve the desired stabilization by the ordinary artisan.

The patent does not expressly teach a step in the method of diluting with about 50 mL of diluent. However, the ordinary artisan understands that the concentrated solution needs dilution prior to administration and dilution with 50 mL is just an arbitrary amount to achieve the desired therapeutic concentration. The ordinary artisan can do so with a reasonable expectation of success.

The patent does not expressly teach intravenous administration but intravenous administration is a common method to administer liquid compositions well-known to the ordinary artisan.

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

The patent does not expressly the claimed stability at about 15 months at about 5-25 C or less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at about 5-25 C to determine the total impurities from the degradation of bendamustine at the period of

EAGLEBEN-SA_00000111

Application/Control Number: 18/081,238                                    Page 21
Art Unit: 1613

time or temperatures instantly claimed. However, such would be inherent in the

composition comprising the same components. See MPEP 2112.01(II): "Products of

identical chemical composition cannot have mutually exclusive properties." *In re Spada*,

911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

Therefore, the ordinary artisan would have recognized the obvious variation of

the instantly claimed subject matter over the patented subject matter.

3. Claims 1-29 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-26 of U.S. Patent No. 9572796 in view of Tait et al.

(WO 0202125). Although the claims at issue are not identical, they are not patentably

distinct from each other because the patent is directed to:

> 1. A non-aqueous liquid composition comprising:
> bendamustine, or a pharmaceutically acceptable salt
>   thereof;
> a pharmaceutically acceptable fluid comprising a mixture
>   of polyethylene glycol and propylene glycol, wherein
>   the ratio of polyethylene glycol to propylene glycol in
>   the pharmaceutically acceptable fluid is from about
>   95:5 to about 50:50; and
> a stabilizing amount of an antioxidant;
> wherein the composition has less than about 5% total
>   impurities after 15 months of storage at about 5° C., as
>   calculated on a normalized peak area response basis as
>   determined by high performance liquid chromatogra-
>   phy at a wavelength of 223 nm.
> 2. The non-aqueous liquid composition of claim 1,
> wherein the bendamustine concentration is from about 10
> mg/mL to about 100 mg/mL.
> 3. The non-aqueous liquid composition of claim 1,
> wherein the bendamustine concentration is from about 20
> mg/mL to about 60 mg/mL.
> 4. The non-aqueous liquid composition of claim 1,
> wherein the bendamustine concentration is from about 25
> mg/mL to about 50 mg/mL.
> 5. The non-aqueous liquid composition of claim 1,
> wherein the bendamustine concentration is about 25 mg/mL.
> 6. The non-aqueous liquid composition of claim 1,
> wherein the concentration of the antioxidant is from about
> 2.5 mg/mL to about 35 mg/mL.
> 7. The non-aqueous liquid composition of claim 1,
> wherein the concentration of the antioxidant is from about 5
> mg/mL to about 20 mg/mL.
> 8. The non-aqueous liquid composition of claim 1,
> wherein the concentration of the antioxidant is from about
> 10 mg/mL to about 15 mg/mL.
> 9. The non-aqueous liquid composition of claim 1, com-

Application/Control Number: 18/081,238                                    Page 22
Art Unit: 1613

10. A method of treating leukemia, Hodgkin's disease, or
multiple myeloma in a mammal comprising administering to
the mammal an effective amount of the composition of claim
1.
5       11. The method of claim 10, for the treatment of leukemia.
12. The method of claim 10, for the treatment of Hodg-
kin's disease.

The bendamustine has not been reconstituted form a lyophilized powder, has
same concentration range which indicates that the composition is ready for dilution and
contains one or more doses of bendamustine.

The patent does not expressly teach a sterile vial. However, the ordinary artisan
in the pharmaceutical arts would place the bendamustine composition in a sterile vial to
avoid microbiological contamination, which would ruin the pharmaceutical product, with
a reasonable expectation of success.

The patent does not expressly less than about 5% peak area response of total
impurities as determined using HPLC with a wavelength of 223 nm at least about 15
months at a temperature of about 5-25 C to determine the total impurities from the
degradation of bendamustine or is stable at 25 C for at least about 15 months.
However, such would be inherent in the composition comprising the same components.
See MPEP 2112.01(II): "Products of identical chemical composition cannot have
mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658
(Fed. Cir. 1990)."

The patent does not expressly teach about 5 mg/mL monothioglycerol. However,
the patent teaches a stabilizing amount of antioxidant (claim 1) and Tait et al. teach
stabilized injectable compositions of the nitrogen mustard alkylating agent ifosfamide
(Abstract; page 1, line 7) comprising PEG200-600, ethanol (page 6, lines 16-24; page 9,
lines 15-21; claims 4-6) and antioxidants such as BHA, BHT and up to 5%

EAGLEBEN-SA_00000113

Application/Control Number: 18/081,238                                    Page 23
Art Unit: 1613

monothioglycerol (page 9, lies 11-14; page 14, line 6) that are stable for at least 180

days (page 6, lines 25-26). Thus, it is merely judicious selection and routine optimization

of the amount of monothioglycerol to achieve the desired stabilization of the nitrogen

mustard alkylating agent bendamustine by the ordinary artisan with a reasonable

expectation of success.

The patent does not expressly teach a step in the method of diluting with about

50 mL of diluent. However, the ordinary artisan understands that the concentrated

solution needs dilution prior to administration and dilution with 50 mL is just an arbitrary

amount to achieve the desired therapeutic concentration. The ordinary artisan can do so

with a reasonable expectation of success.

The patent does not expressly teach intravenous administration but intravenous

administration is a common method to administer liquid compositions well-known to the

ordinary artisan.

The patent does not expressly teach adding ethanol. However, ethanol is a well-

known pharmaceutical solvent in which bendamustine is soluble. The artisan would add

ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable

expectation of success.

Therefore, the ordinary artisan would have recognized the obvious variation of

the instantly claimed subject matter over the patented subject matter.

4. Claims 1-18 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-22 of U.S. Patent No. 8609707. Although the claims

at issue are not identical, they are not patentably distinct from each other because the

EAGLEBEN-SA_00000114

Application/Control Number: 18/081,238                                                         Page 24
Art Unit: 1613

patent is also directed to bendamustine compositions and methods of treating leukemia

as shown, for example, claims:

We claim:
1. A long term storage stable non-aqueous liquid benda-
mustine-containing composition, comprising:

US 8,609,707 B2

**13**

a) bendamustine or a pharmaceutically acceptable salt
thereof, and
b) a pharmaceutically acceptable fluid comprising
i) about 90% polyethylene glycol and about 10% propy-
lene glycol; and
ii) a stabilizing amount of an antioxidant.
2. The long term storage stable non-aqueous liquid benda-
mustine-containing composition of claim 1, wherein the ben-
damustine concentration is from about 20 mg/mL to about 60
mg/mL.
3. The long term storage stable non-aqueous liquid benda-
mustine-containing composition of claim 2, wherein the ben-
damustine concentration is from about 25 mg/mL to about 50
mg/mL.
4. The long term storage stable non-aqueous liquid benda-...

**16.** A method of treating cancer in mammals, comprising
administering an effective amount of a long term storage
stable non-aqueous liquid bendamustine-containing compo-
sition of claim 1 to a mammal in need thereof.
17. The long term storage stable non-aqueous liquid ben-...
long term storage is at least 2 years.
21. The method of treating cancer in mammals of claim 16,
wherein the cancer is leukemia.
22. The method of treating cancer in mammals of claim 16,
wherein the cancer is Hodgkin's disease.

**14**

12. The long term storage stable non-aqueous liquid ben-
damustine-containing composition of claim 10, wherein the
stabilizing amount of the antioxidant is about 5 mg/mL.
13. The long term storage stable non-aqueous liquid ben-
damustine-containing composition of claim 1, wherein said
long term storage is at least 2 years.
14. A long term storage stable non-aqueous liquid benda-
mustine-containing composition, comprising:
a) bendamustine or a pharmaceutically acceptable salt
thereof, and
b) a pharmaceutically acceptable fluid comprising
i) about 90% polyethylene glycol and about 10% propy-
lene glycol; and
ii) a stabilizing amount of thioglycerol.

Thus, the patent teaches long term storage of at least 2 years (claims 13, 20),

thereby implicitly meeting the instantly claimed stability parameters, of a composition

comprising about 20-60 mg/mL or about 25-50 mg/mL bendamustine and polyethyelene

glycol (claims 1-5, 15, 17-19) with about 5mg/mL monothioglycerol antioxidant (claims

6, 7, 10, 12, 14-15) for treating leukemia (claims 16, 21).  The bendamustine has not

been reconstituted form a lyophilized powder, has same concentration range which

EAGLEBEN-SA_00000115

Application/Control Number: 18/081,238                                    Page 25
Art Unit: 1613

indicates that the composition is ready for dilution and contains one or more doses of bendamustine.

The patent does not expressly less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at a temperature of about 5-25 C to determine the total impurities from the degradation of bendamustine or is stable at 5 C or 25 C for at least about 15 months. However, as stated above, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

The patent does not expressly teach a step in the method of diluting with about 50 mL of diluent. However, the ordinary artisan understands that the concentrated solution needs dilution prior to administration and dilution with 50 mL is just an arbitrary amount to achieve the desired therapeutic concentration. The ordinary artisan can do so with a reasonable expectation of success.

EAGLEBEN-SA_00000116

Application/Control Number: 18/081,238                                    Page 26
Art Unit: 1613

The patent does not expressly teach intravenous administration but intravenous administration is a common method to administer liquid compositions well-known to the ordinary artisan.

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

5. Claims 1-29 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-23 of U.S. Patent No. 9579384. Although the claims at issue are not identical, they are not patentably distinct from each other because the patent is directed to a liquid bendamustine, polyethylene glycol and antioxidant composition (claims 1, 4) where the antioxidant is monothioglycerol (claim 8) used in the method of treating leukemia (claim 1 and 10) where the volume is 50 mL (claims 7, 9) administered intravenously (claims 17-19).

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 25 mg/mL bendamustine for use in the method of treating leukemia. However, the patent teaches a parenterally acceptable diluent (claim 1) and a volume of about 50 mL (claims 7 and 9) to arrive at about 0.5-5.6 mg/mL bendamustine to administer in a total volume of 100 mL or less. Thus, having a stock solution of about 25 mg/mL to be diluted with about 50 mL diluent to achieve the desired therapeutic concentration prior to administration is obvious to the ordinary artisan.  Because about 25 mg/mL is obvious, then that renders obvious the claimed

EAGLEBEN-SA_00000117

Application/Control Number: 18/081,238                                        Page 27
Art Unit: 1613

composition claims where, for example, a 4 mL volume would have 100 mg

bendamustine. The bendamustine has not been reconstituted form a lyophilized

powder, is within same concentration range which indicates that the composition is

ready for dilution and contains one or more doses of bendamustine.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However,

the patent teaches an antioxidant (claim 1) and names monothioglycerol (claim 8).

Thus, it is merely judicious selection and routine optimization of the amount of

monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating

agent bendamustine by the ordinary artisan with a reasonable expectation of success.

The patent does not expressly less than about 5% peak area response of total

impurities as determined using HPLC with a wavelength of 223 nm at least about 15

months at a temperature of about 5-25 C to determine the total impurities from the

degradation of bendamustine or is stable at 5 C or 25 C for at least about 15 months.

However, such would be inherent in the composition comprising the same components.

See MPEP 2112.01(II): "Products of identical chemical composition cannot have

mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658

(Fed. Cir. 1990)."

The patent does not expressly teach adding ethanol. However, ethanol is a well-

known pharmaceutical solvent in which bendamustine is soluble. The artisan would add

ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable

expectation of success.

Therefore, the ordinary artisan would have recognized the obvious variation of

the instantly claimed subject matter over the patented subject matter.

Application/Control Number: 18/081,238                                    Page 28
Art Unit: 1613

   6. Claims 1-29 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-24 of U.S. Patent No. 9034908. Although the claims

at issue are not identical, they are not patentably distinct from each other because the

patent is directed to: methods of treating cancer or malignant disease such as leukemia

(claim 15) using a composition comprising bendamustine with a PEG/propylene glycol

solubilizer and an antioxidant (claims 1, 24) where the antioxidant can be

monothioglycerol (claim 13) and the ratio of PEG:propylene glycol is about 90:10 (claim

10) to treat cancer or malignant disease in a subject (claims 1 and 15) by intravenous

administration (claims 16, 17, 21).

   The patent does not expressly teach a sterile vial. However, the ordinary artisan

in the pharmaceutical arts would place the bendamustine composition in a sterile vial to

avoid microbiological contamination, which would ruin the pharmaceutical product, with

a reasonable expectation of success.

   The patent does not expressly teach about 25 mg/mL bendamustine. However,

the patent teaches using a parenterally acceptable diluent to arrive at about 0.05-12.5

mg/mL bendamustine to administer in a total volume of 100 mL or less. The purpose of

a diluent is to dilute a stock solution. Thus, having a stock solution of about 25 mg/mL to

be diluted with 50 mL diluent to achieve the desired therapeutic concentration prior to

administration is merely the routine optimization by the ordinary artisan practicing the

patented method.  Because about 25 mg/mL is obvious, then that renders obvious the

claimed composition claims where, for example, a 4 mL volume would have 100 mg

bendamustine. The bendamustine has not been reconstituted form a lyophilized

Application/Control Number: 18/081,238                                    Page 29
Art Unit: 1613

powder, is within same concentration range which indicates that the composition is ready for dilution and contains one or more doses of bendamustine.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches an antioxidant (claim 1) and names monothioglycerol (claim 8). Thus, it is merely judicious selection and routine optimization of the amount of monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating agent bendamustine by the ordinary artisan with a reasonable expectation of success.

The patent does not expressly less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at a temperature of about 5-25 C to determine the total impurities from the degradation of bendamustine or is stable at 5 C or 25 C for at least about 15 months. However, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

7. Claims 1-29 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-17 of U.S. Patent No. 9597399 in view of Tait et al.

Application/Control Number: 18/081,238                                    Page 30
Art Unit: 1613

(WO 0202125). Although the claims at issue are not identical, they are not patentably

distinct from each other because the patent is directed to a method of treating cancer or

malignant disease using a composition comprising bendamustine, propylene glycol,

PEG, a parenterally acceptable diluent and an antioxidant by intravenous administration

(claims 1-17) where the volume administered is about 50 mL (claims 3-4).

The patent does not expressly teach a sterile vial. However, the ordinary artisan

in the pharmaceutical arts would place the bendamustine composition in a sterile vial to

avoid microbiological contamination, which would ruin the pharmaceutical product, with

a reasonable expectation of success.

The patent does not expressly teach treating leukemia. However, leukemia is

well-known cancer/malignant diseases and obvious to treat with bendamustine by the

ordinary artisan in this art.

The patent does not expressly teach about 25 mg/mL bendamustine. However,

the patent teaches using a parenterally acceptable diluent to arrive at about 0.05-12.5

mg/mL bendamustine to administer in a total volume of 100 mL or less. The purpose of

a diluent is to dilute a stock solution. Thus, having a stock solution of about 25 mg/mL to

be diluted with 50 mL diluent to achieve the desired therapeutic concentration prior to

administration is merely the routine optimization by the ordinary artisan practicing the

patented method.  Because about 25 mg/mL is obvious, then that renders obvious the

claimed composition claims where, for example, a 4 mL volume would have 100 mg

bendamustine. The bendamustine has not been reconstituted form a lyophilized

powder, is within same concentration range which indicates that the composition is

ready for dilution and contains one or more doses of bendamustine.

EAGLEBEN-SA_00000121

Application/Control Number: 18/081,238                                      Page 31
Art Unit: 1613

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches an antioxidant (claim 1) and Tait et al. teach stabilized injectable compositions of the nitrogen mustard alkylating agent ifosfamide (Abstract; page 1, line 7) comprising PEG200-600, ethanol (page 6, lines 16-24; page 9, lines 15-21; claims 4-6) and antioxidants such up to 5% monothioglycerol (page 9, lies 11-14; page 14, line 6) that are stable for at least 180 days (page 6, lines 25-26). Thus, it is merely judicious selection and routine optimization of the amount of monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating agent bendamustine by the ordinary artisan with a reasonable expectation of success.

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

8. Claims 1-29 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-23 of U.S. Patent No. 9144568. Although the claims at issue are not identical, they are not patentably distinct from each other because the patent is directed to a method of treating leukemia by intravenously administering a composition comprising bendamustine, a parenterally acceptable diluent, a solubilizer comprising PEG and propylene glycol in a ratio of about 90:10 a parenterally acceptable diluent (claims 1-5, 9-10, 16, 23) and the antioxidant monothioglycerol (claim 7) where the volume administered is 50 ml (claims 6 and 8).

EAGLEBEN-SA_00000122

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 25 mg/mL bendamustine. However, the patent teaches using a parenterally acceptable diluent to arrive at about 0.05-12.5 mg/mL bendamustine to administer in a total volume of 100 mL or less. The purpose of a diluent is to dilute a stock solution. Thus, having a stock solution of about 25 mg/mL to be diluted with 50 mL diluent to achieve the desired therapeutic concentration prior to administration is merely the routine optimization by the ordinary artisan practicing the patented method.  Because about 25 mg/mL is obvious, then that renders obvious the claimed composition claims where, for example, a 4 mL volume would have 100 mg bendamustine. The bendamustine has not been reconstituted form a lyophilized powder, is within same concentration range which indicates that the composition is ready for dilution and contains one or more doses of bendamustine.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches an antioxidant (claim 1) and names monothioglycerol (claim 7). Thus, it is merely judicious selection and routine optimization of the amount of monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating agent bendamustine by the ordinary artisan with a reasonable expectation of success.

The patent does not expressly less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at a temperature of about 5-25 C to determine the total impurities from the

Application/Control Number: 18/081,238                                      Page 33
Art Unit: 1613

degradation of bendamustine or is stable at 5 C or 25 C for at least about 15 months.

However, such would be inherent in the composition comprising the same components.

See MPEP 2112.01(II): "Products of identical chemical composition cannot have

mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658

(Fed. Cir. 1990)."

    The patent does not expressly teach adding ethanol. However, ethanol is a well-

known pharmaceutical solvent in which bendamustine is soluble. The artisan would add

ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable

expectation of success.

    Therefore, the ordinary artisan would have recognized the obvious variation of

the instantly claimed subject matter over the patented subject matter.

    9. Claims 1-29 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-29 of U.S. Patent No. 9572887. Although the claims

at issue are not identical, they are not patentably distinct from each other because the

patent is directed to a method of treating leukemia by providing a composition of liquid

about 10-100 mg/ml bendamustine with the same stability parameters (claim 1) with

propylene glycol and PEG (claims 2 and 3), and ethanol (claim 5) and stabilizing

antioxidants (claim 14) such as monothioglycerol (claim 15) and diluting the composition

to a volume of about 50 mL prior to administering it intravenously to a patient (claims 1,

13, 17). The bendamustine has not been reconstituted form a lyophilized powder, has

same concentration range which indicates that the composition is ready for dilution and

contains one or more doses of bendamustine.

Application/Control Number: 18/081,238                                    Page 34
Art Unit: 1613

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, it is merely judicious selection and routine optimization of the amount of monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating agent bendamustine by the ordinary artisan with a reasonable expectation of success.

The patent does not expressly teach a step in the method of diluting with about 50 mL of diluent. However, the patent teaches using a diluent the ordinary artisan understands that the concentrated solution needs dilution prior to administration and dilution with 50 mL is just an arbitrary amount to achieve the desired therapeutic concentration. The ordinary artisan can do so with a reasonable expectation of success.

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

10. Claims 1-29 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-7 of U.S. Patent No. 9597397. Although the claims at issue are not identical, they are not patentably distinct from each other because the patent is directed to a method of treating cancer or malignant disease employing a bendamustine composition comprising PEG, propylene glycol and the antioxidant monothioglycerol in a PEG: propylene glycol ratio of about 90:10 (claims 1-7).

Application/Control Number: 18/081,238                                    Page 35
Art Unit: 1613

The patent does not expressly teach treating Hodgkin's or leukemia. However, Hodgkin's and leukemia are well known cancer/malignant diseases and obvious to treat with bendamustine.

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 25 mg/mL bendamustine. However, the patent teaches using a parenterally acceptable diluent to arrive at about 0.05-12.5 mg/mL bendamustine to administer in a total volume of 100 mL or less. The purpose of a diluent is to dilute a stock solution. Thus, having a stock solution of about 25 mg/mL to be diluted with about 50 mL diluent to achieve the desired therapeutic concentration prior to administration is merely the routine optimization by the ordinary artisan practicing the patented method.  Because about 25 mg/mL is obvious, then that renders obvious the claimed composition claims where, for example, a 4 mL volume would have 100 mg bendamustine. The bendamustine has not been reconstituted form a lyophilized powder, is within same concentration range which indicates that the composition is ready for dilution and contains one or more doses of bendamustine.

The patent does not expressly the claimed stability at about 15 months at about 5-25 C or less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at about 5-25 C to determine the total impurities from the degradation of bendamustine at the period of time or temperatures instantly claimed. However, such would be inherent in the

EAGLEBEN-SA_00000126

Application/Control Number: 18/081,238                                    Page 36
Art Unit: 1613

composition comprising the same components. See MPEP 2112.01(II): "Products of

identical chemical composition cannot have mutually exclusive properties." *In re Spada*,

911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

    The patent does not expressly teach intravenous administration but intravenous

administration is a common method to administer liquid compositions well-known to the

ordinary artisan.

    Therefore, the ordinary artisan would have recognized the obvious variation of

the instantly claimed subject matter over the patented subject matter.

    11. Claims 1-27 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-26 of U.S. Patent No. 10010533. Although the claims

at issue are not identical, they are not patentably distinct from each other because the

patent is directed to:

Application/Control Number: 18/081,238                                    Page 37
Art Unit: 1613

1. A liquid bendamustine-containing composition, comprising:

   a) bendamustine or a pharmaceutically acceptable salt thereof; and

   b) a pharmaceutically acceptable fluid comprising about 5% to about 10% propylene glycol, polyethylene glycol and a stabilizing amount of an antioxidant selected from the group consisting of thioglycerol, monothioglycerol, lipoic acid, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds and dihydrolipoic acid;

   the bendamustine-containing composition having less than or equal to 0.11% total PG esters at about 1 month of storage at a temperature of about 5° C.;

   wherein the ratio of polyethylene glycol to propylene glycol is selected from the group consisting of: about 95:5, about 90:10, about 85:15, about 80:20 and about 75:25.

pharmaceutically acceptable fluid is about 10%.

4. The liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

5. The liquid bendamustine containing composition of

   The bendamustine has not been reconstituted form a lyophilized powder, has same concentration range which indicates that the composition is ready for dilution and contains one or more doses of bendamustine.

   The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

   The patent does not expressly teach about 100 mg of bendamustine. However, if the concentration is 25 mg/mL (claim 5) then in 4 mL the artisan would have 100 mg bendamustine present with a reasonable expectation of success.

Application/Control Number: 18/081,238                                    Page 38
Art Unit: 1613

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches a stabilizing amount of antioxidant monothioglycerol and it is merely routine optimization to determine how much monothioglycerol (thioglycerol) to have to achieve the desired stabilization by the ordinary artisan.

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

The patent does not expressly the claimed stability at about 15 months at about 5-25 C or less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at about 5-25 C to determine the total impurities from the degradation of bendamustine at the period of time or temperatures instantly claimed. However, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

12. Claims 1-29 are provisionally rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-18 of copending Application No. 18081251. Although the claims at issue are not identical, they are not patentably distinct from each other because the copending application also teaches a bendamustine liquid composition comprising about 20-60 mg/mL bendamustine or 25 mg/mL, antioxidant

EAGLEBEN-SA_00000129

and polyethyelene glycol in a sterile vial (claims 1, 3, 11-13) where there can be 100 mg

of bendamustine (claims 2, 12) with about 5 mg/mL monothioglycerol (claims 4-5, 14-

15) with the same stability (claims 6, 7, 16-17) and further comprising ethanol (claims 8,

18). Methods of treating leukemia by providing, diluting and intravenously administering

with about 50 ml of diluent are taught (claims 9 and 10). The bendamustine has not

been reconstituted form a lyophilized powder, has same concentration range which

indicates that the composition is ready for dilution and contains one or more doses of

bendamustine.

Accordingly, the ordinary artisan would have recognized the obvious variation of

the instantly claimed subject matter over the copending subject matter.

This is a provisional nonstatutory double patenting rejection because the

patentably indistinct claims have not in fact been patented.

13. Claims 1-29 are provisionally rejected on the ground of nonstatutory double

patenting as being unpatentable over claims 1-16 of copending Application No.

17412623. Although the claims at issue are not identical, they are not patentably distinct

from each other because the copending application also teaches a liquid bendamustine

HCl composition from about 10-100 mg/mL or about 20-100 mg/mL or about 25 mg/mL,

polyethylene glycol and antioxidant with the same stability at 15 months (claims 1, 3-7)

where the antioxidant is thioglycerol, which his synonymous with monothioglycerol

(claim 2). A method of treating leukemia is taught (claims 8-16). The bendamustine has

not been reconstituted form a lyophilized powder, has same concentration range which

indicates that the composition is ready for dilution and contains one or more doses of

bendamustine.

EAGLEBEN-SA_00000130

Application/Control Number: 18/081,238                                           Page 40
Art Unit: 1613

The copending does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The copending does not expressly teach a step in the method of diluting with about 50 mL of diluent. However, the ordinary artisan understands that the concentrated solution needs dilution prior to administration and dilution with 50 mL is just an arbitrary amount to achieve the desired therapeutic concentration. The ordinary artisan can do so with a reasonable expectation of success.

The copending does not expressly teach intravenous administration but intravenous administration is a common method to administer liquid compositions well-known to the ordinary artisan.

The copending does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

Accordingly, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the copending subject matter.

This is a provisional nonstatutory double patenting rejection because the patentably indistinct claims have not in fact been patented.

14. Claims 1-29 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-16 of U.S. Patent No. 11103483. Although the claims at issue are not identical, they are not patentably distinct from each other because the

EAGLEBEN-SA_00000131

patent is directed to liquid bendamustine compositions (claims 1-7) and methods of treating cancer (claims 8-16) such as leukemia (claim 9) where there is about 10-100 mg/mL or about 20-60 mg/mL or 25 mg/mL bendamustine, polyethylene glycol and a stabilizing amount of thioglycerol (claims 1, 2 and 5-6) with the same stability over at least 15 months (claims 1, 3-4, 12, 13). The bendamustine has not been reconstituted form a lyophilized powder, has same concentration range which indicates that the composition is ready for dilution and contains one or more doses of bendamustine.

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 100 mg of bendamustine. However, if the concentration is 25 mg/mL (claims 6 and 15) then in 4 mL the artisan would have 100 mg bendamustine present with a reasonable expectation of success.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches a stabilizing amount of antioxidant monothioglycerol and it is merely routine optimization to determine how much monothioglycerol (thioglycerol) to have to achieve the desired stabilization by the ordinary artisan.

The patent does not expressly teach a step in the method of diluting with about 50 mL of diluent. However, the ordinary artisan understands that the concentrated solution needs dilution prior to administration and dilution with 50 mL is just an arbitrary amount to achieve the desired therapeutic concentration. The ordinary artisan can do so with a reasonable expectation of success.

The patent does not expressly teach intravenous administration but intravenous administration is a common method to administer liquid compositions well-known to the ordinary artisan.

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

Accordingly, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

15. Claims 1-29 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-9 of U.S. Patent No. 10052385. Although the claims at issue are not identical, they are not patentably distinct from each other because the patent is directed to methods of treating leukemia by parenterally administering liquid bendamustine compositions (claims 1-8) comprising bendamustine, polyethylene glycol, a parenterally acceptable diluent and an antioxidant monothioglycerol (claims 1 and 7).

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 25 mg/mL bendamustine. However, the patent teaches using a parenterally acceptable diluent to arrive at the concentration of bendamustine to administer in a total volume of 100 mL or less. The purpose of a diluent is to dilute a stock solution. Thus, having a stock solution of about 25 mg/mL to

Application/Control Number: 18/081,238                                    Page 43
Art Unit: 1613

be diluted with 50 mL diluent to achieve the desired therapeutic concentration prior to administration is merely the routine optimization by the ordinary artisan practicing the patented method.  Because about 25 mg/mL is obvious, then that renders obvious the claimed composition claims where, for example, a 4 mL volume would have 100 mg bendamustine. The bendamustine has not been reconstituted form a lyophilized powder, is within same concentration range which indicates that the composition is ready for dilution and contains one or more doses of bendamustine.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, it is merely judicious selection and routine optimization of the amount of monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating agent bendamustine by the ordinary artisan with a reasonable expectation of success.

The patent does not expressly the claimed stability at about 15 months at about 5-25 C or less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at about 5-25 C to determine the total impurities from the degradation of bendamustine at the period of time or temperatures instantly claimed. However, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

Application/Control Number: 18/081,238                                      Page 44
Art Unit: 1613

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

16. Claims 1-29 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-10 of U.S. Patent No. 9597398 in view of Tait et al. (WO 0202125). Although the claims at issue are not identical, they are not patentably distinct from each other because the patent is directed to methods of treating cancer by parenterally administering liquid bendamustine compositions (claims 1-10) comprising bendamustine, polyethylene glycol, a parenterally acceptable diluent and an antioxidant with an administered volume of about 50 ml (claim 3).

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 25 mg/mL bendamustine. However, the patent teaches using a parenterally acceptable diluent to arrive at the concentration of bendamustine to administer in a total volume of 100 mL or less. The purpose of a diluent is to dilute a stock solution. Thus, having a stock solution of about 25 mg/mL to be diluted with 50 mL diluent to achieve the desired therapeutic concentration prior to administration is merely the routine optimization by the ordinary artisan practicing the patented method.  Because about 25 mg/mL is obvious, then that renders obvious the claimed composition claims where, for example, a 4 mL volume would have 100 mg bendamustine. The bendamustine has not been reconstituted form a lyophilized

powder, is within same concentration range which indicates that the composition is ready for dilution and contains one or more doses of bendamustine.

The patent does not expressly teach intravenous administration but intravenous administration is a common method to administer liquid compositions well-known to the ordinary artisan.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches an antioxidant (claim 1) and Tait et al. teach stabilized injectable compositions of the nitrogen mustard alkylating agent ifosfamide (Abstract; page 1, line 7) comprising PEG200-600, ethanol (page 6, lines 16-24; page 9, lines 15-21; claims 4-6) and antioxidants such up to 5% monothioglycerol (page 9, lies 11-14; page 14, line 6) that are stable for at least 180 days (page 6, lines 25-26). Thus, it is merely judicious selection and routine optimization of the amount of monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating agent bendamustine by the ordinary artisan with a reasonable expectation of success.

The patent does not expressly the claimed stability at about 15 months at about 5-25 C or less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at about 5-25 C to determine the total impurities from the degradation of bendamustine at the period of time or temperatures instantly claimed. However, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

17. Claims 1-29 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-18 of U.S. Patent No. 9572888 in view of Tait et al. (WO 0202125). Although the claims at issue are not identical, they are not patentably distinct from each other because the patent is directed to methods of treating leukemia by intravenously administering liquid bendamustine compositions (claims 1-28) comprising bendamustine, polyethylene glycol, a parenterally acceptable diluent and an antioxidant (claims 1 and 27) and an administered volume of about 50 ml (claim 7).

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 25 mg/mL bendamustine. However, the patent teaches using a parenterally acceptable diluent to arrive at the concentration of bendamustine to administer in a total volume of 100 mL or less. The purpose of a diluent is to dilute a stock solution. Thus, having a stock solution of about 25 mg/mL to be diluted with 50 mL diluent to achieve the desired therapeutic concentration prior to administration is merely the routine optimization by the ordinary artisan practicing the

EAGLEBEN-SA_00000137

patented method.  Because about 25 mg/mL is obvious, then that renders obvious the claimed composition claims where, for example, a 4 mL volume would have 100 mg bendamustine. The bendamustine has not been reconstituted form a lyophilized powder, is within same concentration range which indicates that the composition is ready for dilution and contains one or more doses of bendamustine.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches an antioxidant (claim 27) and Tait et al. teach stabilized injectable compositions of the nitrogen mustard alkylating agent ifosfamide (Abstract; page 1, line 7) comprising PEG200-600, ethanol (page 6, lines 16-24; page 9, lines 15-21; claims 4-6) and antioxidants such up to 5% monothioglycerol (page 9, lies 11-14; page 14, line 6) that are stable for at least 180 days (page 6, lines 25-26). Thus, it is merely judicious selection and routine optimization of the amount of monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating agent bendamustine by the ordinary artisan with a reasonable expectation of success.

The patent does not expressly the claimed stability at about 15 months at about 5-25 C or less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at about 5-25 C to determine the total impurities from the degradation of bendamustine at the period of time or temperatures instantly claimed. However, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

EAGLEBEN-SA_00000138

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

### Conclusion

No claims are allowed.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to ERNST V ARNOLD whose telephone number is (571)272-8509. The examiner can normally be reached M-F 7-3:30.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Brian Y Kwon can be reached on 571-272-0581. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of published or unpublished applications may be obtained from Patent Center. Unpublished application information in Patent Center is available to registered users. To file and manage patent submissions in Patent Center, visit: https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-center for more information about Patent Center and

Application/Control Number: 18/081,238                                    Page 49
Art Unit: 1613

https://www.uspto.gov/patents/docx for information about filing in DOCX format. For

additional questions, contact the Electronic Business Center (EBC) at 866-217-9197

(toll-free). If you would like assistance from a USPTO Customer Service

Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/ERNST V ARNOLD/
Primary Examiner, Art Unit 1613

**DOCKET NO.:** 107071.000582                                                          **PATENT**
**Application No.:** 18/081,238
**Office Action Dated: March 21, 2023**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

    **Nagesh R. Palepu et al.**

**Confirmation No.:** 5922

**Application No.:** 18/081,238

**Group Art Unit:** 1613

**Filing Date: December 14, 2022**

**Examiner: ERNST V ARNOLD**

For:    **FORMULATIONS OF BENDAMUSTINE**

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

### REPLY PURSUANT TO 37 CFR § 1.111

In response to the Official Action dated March 21, 2023, reconsideration is respectfully requested in view of the amendments and/or remarks as indicated below:

☐    **Amendments to the Specification** begin on page of this paper.

☐    **Amendments to the Abstract** begin on page of this paper.

☒    **Amendments to the Claims** are reflected in the listing of the claims which begins on page 2 of this paper.

☐    **Amendments to the Drawings** begin on page of this paper and include an attached replacement sheet.

☒    **Remarks** begin on page 6 of this paper.

☒    The Commissioner is hereby authorized to charge any fee deficiency, charge any additional fees, or credit any overpayment of fees, associated with this application in connection with this filing, or any future filing, submitted to the U.S. Patent and Trademark Office during the pendency of this application, to Deposit Account No. 23-3050.

EAGLEBEN-SA_00000241

DOCKET NO.:  107071.000582                                                          PATENT
Application No.:  18/081,238
Office Action Dated:  March 21, 2023

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims:**

1.      (currently amended) A ready for dilution, liquid bendamustine-containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL;

a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

a stabilizing amount of an antioxidant;

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

2.      (Original) The composition of claim 1, comprising 100 mg of bendamustine.

3.      (Original) The composition of claim 1, wherein the bendamustine concentration is about 25 mg/mL.

4.      (Original) The composition of claim 1, wherein the antioxidant is monothioglycerol.

5.      (Original) The composition of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

6.      (Original) The composition of claim 1, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.

7.      (Cancelled)

4876-2014-3961.2

EAGLEBEN-SA_00000242

DOCKET NO.:  107071.000582                                                    PATENT
Application No.:  18/081,238
Office Action Dated:  March 21, 2023

8.        (Original) The composition of claim 1, further comprising ethanol.


9.        (Original) The composition of claim 1, wherein the liquid bendamustine-containing
          composition is packaged in a sterile vial.


10.       (currently amended) A liquid bendamustine-containing composition comprising
          bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine
                    concentration in the composition is from about 20 mg/mL to about 60 mg/mL and
                    wherein the bendamustine has not been reconstituted from a lyophilized powder;
          a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one
          or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
          a stabilizing amount of an antioxidant;
          wherein the total impurities resulting from the degradation of the bendamustine is less
                    than about 5% peak area response, as determined by HPLC at a wavelength of
                    223 nm after at least about 15 months at a temperature of about 5 °C to about 25
                    °C.


11.       (Original) The composition of claim 10, comprising 100 mg of bendamustine.


12.       (Original) The composition of claim 10, wherein the bendamustine concentration is about
          25 mg/mL.


13.       (Original) The composition of claim 10, wherein the antioxidant is monothioglycerol.


14.       (Original) The composition of claim 10, wherein the antioxidant is monothioglycerol in a
          concentration of about 5 mg/mL.


15.       (Original) The composition of claim 10, wherein the composition is stable for at least
          about 15 months at 5 °C or for at least about 15 months at 25 °C.

4876-2014-3961.2

EAGLEBEN-SA_00000243

16.     (Cancelled)

17.     (Original) The composition of claim 10, further comprising ethanol.

18.     (Original) The composition of claim 10, wherein the liquid bendamustine-containing composition is packaged in a sterile vial.

19.     (currently amended) A bendamustine-containing composition comprising

one or more doses of bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid that is polyethylene glycol;

wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 20 mg/mL to about 60 mg/mL; and

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

20.     (Original) The composition of claim 19, comprising 100 mg of bendamustine.

21.     (Original) The composition of claim 19, wherein the bendamustine concentration is about 25 mg/mL.

22.     (Original) The composition of claim 19, wherein the antioxidant is monothioglycerol.

23.     (Original) The composition of claim 19, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

24.     (Original) The composition of claim 19, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.

EAGLEBEN-SA_00000244

DOCKET NO.:  107071.000582                                                    **PATENT**
Application No.:  18/081,238
Office Action Dated:  March 21, 2023

25.     (Cancelled)

26.     (Original) The composition of claim 19, further comprising ethanol.

27.     (Original) The composition of claim 19, wherein the liquid bendamustine-containing
        composition is packaged in a sterile vial.

28.     (Currently Amended) A method of treating leukemia in a human in need thereof
        comprising
        providing a liquid bendamustine-containing composition <u>according to claim 3</u> ~~comprising~~
                ~~about 25 mg/ml of bendamustine~~;
        diluting the liquid bendamustine containing composition; and
        intravenously administering the diluted composition to the human.

29.     (Original) The method of claim 28, wherein the liquid bendamustine containing
        composition is diluted with about 50 mL of a diluent.

4876-2014-3961.2

EAGLEBEN-SA_00000245

DOCKET NO.:  107071.000582                                                      PATENT
Application No.:  18/081,238
Office Action Dated:  March 21, 2023

## REMARKS

Claims 1, 10, 19, and 28 have been amended. Claims 7, 16, and 25 are cancelled without prejudice. The amendments are supported by the original specification and claims and no new subject matter has been added.

### Claim Rejections – 35 U.S.C. § 103

Claims 1-3, 5-12, 15-21 and 24-27 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over U.S. Publication No. 2011/0190363 (hereinafter "Drager"). *Office Action*, at 4. Applicant request reconsideration and withdrawal of the rejection.

The claims are directed to, *e.g.,* liquid, bendamustine-containing compositions comprising 20 mg/mL to about 60 mg/mL of bendamustine, along with a stabilizing amount of an antioxidant, in polyethylene glycol. Polyethylene glycol is "protic" and has the following general formula:



Drager's composition must comprise a polar "aprotic" solvent, for example, dimethylacetamide, dimethyl sulfoxide, dimethylformamide, or 1-methyl-2-pyrrolidinone. Drager at *e.g.,* paragraphs [0014], [0017]. Drager explains that polar, aprotic solvents are sufficiently non-nucleophilic towards bendamustine such that polar aprotic solvent-bendamustine adducts do not form over the course of typical commercial storage conditions.  Drager at paragraph [0015].

Drager teaches that each of its formulations must include some amount of polar aprotic solvent. While Drager references that polar protic solvent may be used, that is only *in addition to*, *not instead of*, the polar aprotic solvent. Drager fails to disclose or suggest any bendamustine formulations with solvent systems composed of protic solvent in the absence of any aprotic solvent. Indeed, Drager teaches away from the use of formulations including only polar protic solvents, stating that "while nonaqueous polar protic solvents are of sufficient nucleophilicity to form potentially undesirable polar protic solvent-bendamustine adducts, such adducts will not form during typical commercial storage if the concentration of the polar protic solvent is kept

4876-2014-3961.2

EAGLEBEN-SA_00000246

DOCKET NO.:  107071.000582                                                    **PATENT**
Application No.:  18/081,238
Office Action Dated:  **March 21, 2023**

within the scope of the present invention." Drager at paragraph [0019]. Drager's Figure 3 depicts

bendamustine degradation in protic solvent (99% propylene glycol) at 5 °C and 25 °C:



*See also,* Drager at paragraph [0036], stating "As can be seen in FIG. 3, bendamustine

(BM1) in 99% propylene glycol degrades significantly when stored at 25 °C for less than 100

days. After storage at 5 °C for about 365 days, the purity of the bendamustine is about 80% or

less."

Even if the person of ordinary skill in the art were motivated to include a polar protic

solvent in a bendamustine formulation, Drager provides no motivation or reason to use

polyethylene glycol, specifically. Rather, polyethylene glycol is included – without emphasis or

differentiation – in a laundry list of pharmaceutically acceptable nonaqueous polar protic

solvents.  Polyethylene glycol is not otherwise mentioned in Drager, nor is its use exemplified.

The generic list of nonaqueous polar protic ingredients would not have motivated a person of

ordinary skill to use polyethylene glycol in a bendamustine formulation.  *See, e.g.,* Expert Report

of Dr. Siepmann at page 23 *et seq.*[1] *See also, Cephalon, Inc. v. Slayback Pharma Limited*

*Liability Co.,* CA 17-1154-CFC, Opinion (D. Del. April 27, 2020) at 14-15 (court determining

that "Drager also taught that protic solvents-i.e., solvents including PEG and PG, that have OH

groups-are acceptable to use with bendamustine but only when combined with aprotic

solvents."); at 19-20, 21-22 (court determining that Drager teaches away from using polyols such

---

[1] Dr. Siepmann's expert report was submitted in *Cephalon, Inc. v. Slayback Pharma Limited Liability Co.*, C.A. No. 17-01154-CFC (D. Del). Trade secret information has been redacted from the submitted report.

4876-2014-3961.2

EAGLEBEN-SA_00000247

DOCKET NO.:  107071.000582                                          **PATENT**
Application No.:  18/081,238
Office Action Dated:  **March 21, 2023**

as PEG with bendamustine); at 22-23 (court determining that a person of ordinary skill would have followed Drager's teaching not to use protic solvents such as PEG).

In order to arrive at any claimed composition, the person of ordinary skill in the art would have had to modify Drager's formulations to remove polar aprotic solvent. This proposed modification would have changed the principle of operation of Drager and a *prima facie* case of obviousness cannot be supported.  *See* MPEP 2143(VI). Moreover, even if the person of ordinary skill in the art considered removing Drager's required polar aprotic solvent, they would not have had any reasonable expectation of successfully producing a stable liquid formulation of bendamustine in view of Drager's evidence that bendamustine degrades without the polar aprotic solvent. The claims are patentable over Drager and Applicant requests reconsideration and withdrawal of the rejection.

Moreover, the recited compositions exhibit a stability profile that is significantly improved over Drager's formulations. Independent claims 1, 10, and 19 recite that the compositions include less than about 5% peak area response (by HPLC) of ***total impurities*** resulting from the degradation of bendamustine. *See, also,* original claims 7, 16, and 25, now cancelled. The Examiner alleges that Drager's formulations exhibit a similar stability profile. Action at 7. To the contrary, the data reported in Drager establishes that those formulations are significantly ***less*** stable than any claimed composition.

The present claims recite that the bendamustine-containing compositions will exhibit less than 5% of ***total*** bendamustine degradation impurities (by HPLC) after at least 15 months at about 5-25 °C. Drager's paragraphs [0022] and [0023], cited by the Examiner, do not refer to ***total impurities***; rather, Drager reports separately on levels of ***only five individual impurities*** after storage under only refrigerated conditions:

4876-2014-3961.2

EAGLEBEN-SA_00000248

DOCKET NO.: 107071.000582                                           PATENT
Application No.: 18/081,238
Office Action Dated: **March 21, 2023**

TABLE II

Impurity profile of certain liquid formulations of Bendamustine
HCl after storage at 5° C. for about 12 months

| Formulation | DCE (Area %) | HP1 (Area %) | BM1 dimer (Area %) | PG-1 (Area %) | PG-2 (Area %) |
|---|---|---|---|---|---|
| Niacinamide/ DMA | 1.40 | 0.08 | 0.06 | ND | ND |
| DMA | 1.10 | 0.08 | 0.05 | ND | ND |
| 66% DMA/ 34% PG | 0.12 | 0.08 | 0.06 | 1.09 | 0.27 |
| DMF | 0.07 | 0.11 | 0.07 | ND | ND |
| NMP | 0.90 | 0.10 | ND | ND | ND |
| DMSO | 0.04 | 0.38 | 0.70 | ND | ND |

ND = not detected

Significantly, none of Drager's tested formulations included polyethylene glycol, as recited in the pending claims. Moreover, Drager's 66% dimethylformamide/34% propylene glycol (a polar protic solvent) was the least stable of all formulations tested, producing each of the five identified impurities, even under refrigerated conditions. Noteworthy is that Drager considers a "stable" formulation to be one that includes up to 10% of bendamustine impurities. Drager at paragraph [0020] ("As used herein, "stable" is defined as no more than about a 10% loss of bendamustine under typical commercial storage conditions.")

One of ordinary skill in the art would not have predicted that polyethylene glycol-containing, bendamustine compositions, having the recited stability profile, would have been achievable, based on Drager's disclosure that polar protic solvent formulations had poor stability. The claims are patentable over Drager and Applicant requests reconsideration and withdrawal of the rejection.

Claims 4, 5, 13, 14, 22 and 23 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Drager in view of WO Publication No. 0202125 (hereinafter "Tait"). *Office Action*, at 9. As discussed above, Drager does not describe or suggest any claimed composition. Tait does not cure Drager's deficiencies, nor is it alleged to. Tait is cited merely for its general description of antioxidants. Applicant requests reconsideration and withdrawal of the rejection.

**DOCKET NO.:** 107071.000582                                                    **PATENT**
**Application No.:** 18/081,238
**Office Action Dated: March 21, 2023**

Claims 28 and 29 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Drager. *Office Action*, at 12. Claim 28 has been amended to refer to the composition of claim 3, which is not described or suggested by Drager, as discussed. Applicant requests reconsideration and withdrawal of the rejection.

### Claim Rejections – Double Patenting

Claims 1-27 stand rejected for non-statutory double patenting as being unpatentable over claims 1-16 of U.S. Patent No. 9,265,831. *Office Action*, at 16.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-27 of U.S. Patent No. 9,572,797. *Office Action*, at 18.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-26 of U.S. Patent No. 9,572,796 in view of Tait. *Office Action*, at 21.

Claims 1-18 stand rejected for non-statutory double patenting as being unpatentable over claims 1-22 of U.S. Patent No. 8,609,707. *Office Action*, at 23.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-23 of U.S. Patent No. 9,579,384. *Office Action*, at 26.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-24 of U.S. Patent No. 9,034,908. *Office Action*, at 28.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-17 of U.S. Patent No. 9,597,399 in view of Tait. *Office Action*, at 29.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-23 of U.S. Patent No. 9,144,568. *Office Action*, at 31.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-29 of U.S. Patent No. 9,572,887. *Office Action*, at 33.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-7 of U.S. Patent No. 9,597,397. *Office Action*, at 34.

Claims 1-27 stand rejected for non-statutory double patenting as being unpatentable over claims 1-26 of U.S. Patent No. 10,010,533. *Office Action*, at 36.

EAGLEBEN-SA_00000250

DOCKET NO.:  107071.000582                                                    **PATENT**
Application No.:  18/081,238
Office Action Dated:  March 21, 2023

Claims 1-29 stand provisionally rejected for non-statutory double patenting as being unpatentable over claims 1-18 of copending U.S. Application No. 18,081,251. *Office Action*, at 38.

Claims 1-29 stand provisionally rejected for non-statutory double patenting as being unpatentable over claims 1-16 of copending U.S. Application No. 17,412,623. *Office Action*, at 39.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-16 of U.S. Patent No. 11,103,483. *Office Action*, at 40.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-9 of U.S. Patent No. 10,052,385. *Office Action*, at 42.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-10 of U.S. Patent No. 9,597,398 in view of Tait. *Office Action*, at 44.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-18 of U.S. Patent No. 9,572,888 in view of Tait. *Office Action*, at 46.

While not conceding to the propriety of the rejections, and solely to advance this application to allowance, terminal disclaimers are filed herewith to obviate the rejections.

## CONCLUSION

Applicant respectfully submits that the present application is in condition for allowance. Reconsideration of the application and an early Notice of Allowance are respectfully requested. In the event that the Examiner cannot allow the application for any reason, the Examiner is encouraged to contact Applicant's representative.

Date: June 16, 2023                              /Stephanie A. Lodise/
                                                 Stephanie A. Lodise
                                                 Registration No. 51430

BakerHostetler
312 Walnut Street
Suite 3200
Cincinnati, OH 45202
Telephone: 513.929.3400
Facsimile:  513.929.0303

4876-2014-3961.2

EAGLEBEN-SA_00000251

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/081,238 | 12/14/2022 | Nagesh R. Palepu | 107071.000582 | 5922 |

23377        7590        07/11/2023
BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501

| EXAMINER |
|---|
| ARNOLD, ERNST V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1613 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 07/11/2023 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

eofficemonitor@bakerlaw.com

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | Application No. 18/081,238 | Applicant(s) Palepu et al. |
|---|---|---|
| | Examiner ERNST V ARNOLD | Art Unit 1613 | AIA (FITF) Status No |

| *Office Action Summary* | Application No.<br>18/081,238 | Applicant(s)<br>Palepu et al. | |
|---|---|---|---|
| | Examiner<br>ERNST V ARNOLD | Art Unit<br>1613 | AIA (FITF) Status<br>No |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --**

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☑ Responsive to communication(s) filed on <u>6/16/23</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☑ This action is **FINAL**.     2b)☐ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5)☑ Claim(s) <u>1-6,8-15,17-24 and 26-29</u> is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☑ Claim(s) <u>1-6,8-15,17-24 and 26-29</u> is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov**.

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☐ The drawing(s) filed on _____ is/are:  a)☐ accepted or  b)☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a)☐ All  b)☐ Some**  c)☐ None of the:
   1.☐ Certified copies of the priority documents have been received.
   2.☐ Certified copies of the priority documents have been received in Application No. _____.
   3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)

2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
     Paper No(s)/Mail Date _____.

3) ☐ Interview Summary (PTO-413)
     Paper No(s)/Mail Date _____.

4) ☐ Other: _____.

EAGLEBEN-SA_00000835

Application/Control Number: 18/081,238                                              Page 2
Art Unit: 1613

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent

provisions.

### *Claim Status*

Claims 7, 16 and 25 have been cancelled.

Claims 1-6, 8-15, 17-24 and 26-29 are pending. Applicant's amendment has

necessitated new ground of rejection. Accordingly, this Action is FINAL.


### *Withdrawn rejections*

Applicant's amendments and arguments filed 6/16/23 are acknowledged and

have been fully considered.  The Examiner has re-weighed all the evidence of record.

Any rejection and/or objection not specifically addressed below is herein withdrawn.

Claims 1-3, 5-12,15-21 and 24-27 were rejected under 35 U.S.C. 103(a) as being

unpatentable over Drager et al. (US 20110190363); Claims 4, 5, 13, 14, 22 and 23 were

rejected under 35 U.S.C. 103(a) as being unpatentable over Drager et al. (US

20110190363), as applied to claims 1-3, 5-12,15-21 and 24-27 above, in further view of

Tait et al. (WO 0202125) and Claims 28 and 29 were rejected under 35 U.S.C. 103(a)

as being unpatentable over Drager et al. (US 20110190363). Applicant's amendments

and arguments are persuasive and the rejections are withdrawn.

The following rejections and/or objections are either reiterated or newly applied.

They constitute the complete set of rejections and/or objections presently being applied

to the instant application.

EAGLEBEN-SA_00000836

Application/Control Number: 18/081,238                                            Page 3
Art Unit: 1613

### *Terminal Disclaimer*

The terminal disclaimer filed on 6/20/23 disclaiming the terminal portion of any

patent granted on this application which would extend beyond the expiration date of US

Patents:

9,572,797

9,265,831

9,572,888

9,597,398

10,052,385

11,103,483


10,010,533

9,597,397

9,572,796

8,609,707

9,579,384


9,597,399

9,034,908

9,144,568

9,572,887


And applications:

17412623

18081251

Application/Control Number: 18/081,238                                          Page 4
Art Unit: 1613

has been reviewed and is accepted.  The terminal disclaimer has been recorded.

Applicant's citation of MPEP 804.02 is acknowledged. The double patenting rejections

are withdrawn.


### Double Patenting

Applicant is advised that should claims 1-6, 8 and 9 be found allowable, claims

10-15, 17-24, 26 and 27 will be objected to under 37 CFR 1.75 as being a substantial

duplicates thereof. When two claims in an application are duplicates or else are so close

in content that they both cover the same thing, despite a slight difference in wording, it

is proper after allowing one claim to object to the other as being a substantial duplicate

of the allowed claim. See MPEP § 608.01(m). Independent claims 10 and 19 also

comprise about 20 mg/mL to about 60 mg/mL bendamustine or a pharmaceutical

acceptable salt thereof, polyethylene glycol and a stabilizing amount of an antioxidant.

Thus, they are inherently "ready for dilution" and the independent claim anticipate one

another as there are no other structural changes to the other independent claims.


### Claim Rejections - 35 USC § 103

In the event the determination of the status of the application as subject to AIA 35

U.S.C. 102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any

correction of the statutory basis for the rejection will not be considered a new ground of

rejection if the prior art relied upon, and the rationale supporting the rejection, would be

the same under either status.

EAGLEBEN-SA_00000838

Application/Control Number: 18/081,238                                   Page 5
Art Unit: 1613

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed
> or described as set forth in section 102 of this title, if the differences between the
> subject matter sought to be patented and the prior art are such that the subject
> matter as a whole would have been obvious at the time the invention was made
> to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was
> made.

The factual inquiries set forth in *Graham* **v.** *John Deere Co.*, 383 U.S. 1, 148

USPQ 459 (1966), that are applied for establishing a background for determining

obviousness under 35 U.S.C. 103(a) are summarized as follows:

1.    Determining the scope and contents of the prior art.
2.    Ascertaining the differences between the prior art and the claims at issue.
3.    Resolving the level of ordinary skill in the pertinent art.
4.    Considering objective evidence present in the application indicating
      obviousness or nonobviousness.

**Claims 1-3, 6, 8-12, 15, 17-21, 24, 26 and 27** are rejected under 35 U.S.C.

103(a) as being unpatentable over Brittain et al. (US 20060159713); of record.

This application currently names joint inventors.  In considering patentability of
the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of
the various claims was commonly owned at the time any inventions covered therein
were made absent any evidence to the contrary.  Applicant is advised of the obligation
under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was
not commonly owned at the time a later invention was made in order for the examiner to
consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g)
prior art under 35 U.S.C. 103(a).

Applicant claims, for example:

Application/Control Number: 18/081,238                                                      Page 6
Art Unit: 1613

1.      (currently amended) A ready for dilution, liquid bendamustine-containing composition
        comprising

        bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine
                concentration in the composition is from about 20 mg/mL to about 60 mg/mL;

        a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one
                or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

        a stabilizing amount of an antioxidant;

        wherein the total impurities resulting from the degradation of the bendamustine is less
                than about 5% peak area response, as determined by HPLC at a wavelength of
                223 nm after at least about 15 months at a temperature of about 5 °C to about 25
                °C.

10.     (currently amended) A liquid bendamustine-containing composition comprising

        bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine
                concentration in the composition is from about 20 mg/mL to about 60 mg/mL and
                wherein the bendamustine has not been reconstituted from a lyophilized powder;

        a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one
        or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

        a stabilizing amount of an antioxidant;

        wherein the total impurities resulting from the degradation of the bendamustine is less
                than about 5% peak area response, as determined by HPLC at a wavelength of
                223 nm after at least about 15 months at a temperature of about 5 °C to about 25
                °C.

EAGLEBEN-SA_00000840

Application/Control Number: 18/081,238                                                   Page 7
Art Unit: 1613

19.    (currently amended) A bendamustine-containing composition comprising

one or more doses of bendamustine, or a pharmaceutically acceptable salt thereof, and a
   stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid that is
   polyethylene glycol;

wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from
   about 20 mg/mL to about 60 mg/mL; and

wherein the total impurities resulting from the degradation of the bendamustine is less
   than about 5% peak area response, as determined by HPLC at a wavelength of 223
   nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

Claim interpretation: The MPEP provides, "Claim scope is not limited by claim language that suggests or makes optional but does not require steps to be performed, or by claim language that does not limit a claim to a particular structure." See M.P.E.P § 2111.04; see also M.P.E.P §§ 2103(C) and 2173.05(h). In claim 10, the limitation of "wherein the bendamustine has not been reconstituted from a lyophilized powder" is a product by process limitation. In the examination of a composition of matter claim, the source of the bendamustine is immaterial because the bendamustine remains bendamustine. See MPEP 2113: "[E]ven though product-by-process claims are limited by and defined by the process, determination of patentability is based on the product itself. The patentability of a product does not depend on its method of production. If the product in the product-by-process claim is the same as or obvious from a product of the prior art, the claim is unpatentable even though the prior product was made by a different process." *In re Thorpe*, 777 F.2d 695, 698, 227 USPQ 964, 966 (Fed. Cir. 1985).

EAGLEBEN-SA_00000841

Application/Control Number: 18/081,238                                    Page 8
Art Unit: 1613

## Level of Ordinary Skill in the Art

## (MPEP 2141.03)

MPEP 2141.03 (I) states: "The "hypothetical 'person having ordinary skill in the art' to which the claimed subject matter pertains would, of necessity have the capability of understanding the scientific and engineering principles applicable to the pertinent art." *Ex parte Hiyamizu*, 10 USPQ2d 1393, 1394 (Bd. Pat. App. & Inter. 1988). The level of skill is that of a ___**medical/pharmaceutical cancer**___ research scientist, as is the case here, then one can assume comfortably that such an educated artisan will draw conventional ideas from oncology medicine, oncology pharmacy and chemistry— without being told to do so.

In addition, the prior art itself reflects an appropriate level (MPEP 2141.03(II)).

## Determination of the scope and content of the prior art

## (MPEP 2141.01)

Regarding claims 1, 2, 8-11, 17-20, 26 and 27, Brittain et al. teach a sterile vial containing about 10-500 mg of lyophilized bendamustine powder ([0099]; claims 73-74). Brittain et al. teach reconstitution of the lyophilized formulations with a sterile fluid to provide an appropriate solution of bendamustine for administration [0100]. Brittain et al. teach that the liquid carrier for the ultimate dosage form can be from a limited list of liquid polyethyelene glycol, propylene glycol, ethanol or mixtures thereof [0067], thereby providing an immediately envisaged embodiment with a pharmaceutically acceptable fluid that consists of polyethyelene glycol and optionally one or more of propylene glycol and ethanol that is ready for dilution such as an appropriate intravenous admixture [0100]. Further regarding claim 10, as noted above claim 10 contains a product-by-

EAGLEBEN-SA_00000842

Application/Control Number: 18/081,238                                    Page 9
Art Unit: 1613

process limitation. While Brittain et al. teach reconstitution of a lyophilized

bendamustine powder, it is still the same bendamustine compound in the

pharmaceutically acceptable fluid consisting of polyethyelene glycol and optionally one

or more of propylene glycol or ethanol and therefore renders the claim obvious.

Regarding claims 1, 10 and 19, Brittain et al. teach adding antioxidants [0088],

which implicitly stabilize the composition to oxidation.


**Ascertainment of the difference between the prior art and the claims**

**(MPEP 2141.02) and Finding of prima facie obviousness**

**Rational and Motivation (MPEP 2142-2143)**

The difference between the instant application and Brittain et al. is that Brittain et

al. do not expressly teach about 20-60 mg/mL or about 25 mg/mL bendamustine

concentration. However, it would have been obvious to one of ordinary skill in the art at

the time of the claimed invention to reconstitute the lyophilized bendamustine

composition in the sterile vial with a pharmaceutically acceptable fluid consisting of

polyethylene glycol and optionally propylene glycol or ethanol to a concentration of

about 20-60 mg/mL or about 25 mg/mL bendamustine and produce the instant

invention. One of ordinary skill in the art would have been motivated to do this because

it is merely adding an appropriate amount of a pharmaceutically acceptable fluid

consisting of polyethylene glycol and optionally propylene glycol or ethanol to a

concentration of about 20-60 mg/mL or about 25 mg/mL bendamustine prior to

administration. Especially when Brittain et al. teach and suggest that the vials contain

about 10-500 mg bendamustine lyophilized powder [0099] and occupy between 30-50%

Application/Control Number: 18/081,238                                    Page 10
Art Unit: 1613

of the vial volume and teach 20 mL vials [0151] as well as 50 mL vials [0008].

Accordingly, the ordinary artisan would have a reasonable expectation of success in

adding enough pharmaceutically acceptable fluid consisting of polyethylene glycol and

optionally propylene glycol or ethanol to the sterile vial to obtain a concentration of

about 20-60 mg/mL or about 25 mg/mL bendamustine prior to administration based on

vial size and bendamustine amount. It is a simple dilution and calculation any

pharmaceutical artisan can perform with no inventive skill but rather ordinary skill. See

MPEP 2143: "a person of ordinary skill has good reason to pursue the known options

within his or her technical grasp. If this leads to the anticipated success, it is likely that

product [was] not of innovation but of ordinary skill and common sense. In that instance

the fact that a combination was obvious to try might show that it was obvious under §

103." *KSR*, 550 U.S. at ___, 82 USPQ2d at 1397.

        Regarding claims 1, 6, 10, 15, 19 and 24, since Brittain et al. teach and suggest

the same component in the same amounts as claimed, then the composition of Brittain

et al. will also achieve the same stability and total impurities as claimed. "When the PTO

shows a sound basis for believing that the products of the applicant and the prior art are

the same, the applicant has the burden of showing that they are not." *In re Spada,* 911

F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990). Therefore, the *prima facie*

case can be rebutted by evidence showing that the prior art products do not <u>necessarily</u>

possess the characteristics of the claimed product. *In re Best,* 562 F.2d at 1255, 195

USPQ at 433.

EAGLEBEN-SA_00000844

Application/Control Number: 18/081,238                                    Page 11
Art Unit: 1613

In light of the forgoing discussion, the Examiner concludes that the subject matter defined by the instant claims would have been obvious within the meaning of 35 USC 103(a).

From the combined teachings of the references, it is apparent that one of ordinary skill in the art would have had a reasonable expectation of success in producing the claimed invention. Therefore, the invention as a whole was *prima facie* obvious to one of ordinary skill in the art at the time the invention was made, as evidenced by the combined references, especially in the absence of evidence to the contrary.

**Claims 4, 5, 13, 14, 22 and 23** are rejected under 35 U.S.C. 103(a) as being unpatentable over Brittain et al. (US 20060159713), as applied to claims 1-3, 6, 8-12, 15, 17-21, 24, 26 and 27 above, in further view of Tait et al. (WO 0202125).

Applicant claims, for example:

4.    (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol.

5.    (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

Brittain et al. is discussed in detail above and that discussion is incorporated by reference.

Regarding claims 4, 5, 14 and 15, Tait et al. teach stabilized injectable compositions of the alkylating agent ifosfamide (Abstract; page 1, line 7) comprising PEG200-600, ethanol (page 6, lines 16-24; page 9, lines 15-21; claims 4-6) and

EAGLEBEN-SA_00000845

Application/Control Number: 18/081,238                                         Page 12
Art Unit: 1613

antioxidants such as BHA, BHT and up to 5% monothioglycerol (page 9, lies 11-14; page 14, line 6) that are stable for at least 180 days (page 6, lines 25-26).

The difference between the instant application and Brittain et al. is that Brittain et al. do not expressly teach about 5 mg/mL of monothioglycerol antioxidant. This deficiency in Brittain et al. is cured by the teachings of Tait et al. It would have been obvious to one of ordinary skill in the art at the time of the claimed invention to add about 5 mg/mL of monothioglycerol antioxidant to the composition of Brittain et al., as suggested by Tait et al., produce the instant invention.

One of ordinary skill in the art would have been motivated to do this because as noted above Brittain et al. suggest adding an antioxidant and name, for example butyl-hydroxyanisole (BHA) and butyl-hydroxytoluene (BHT). Tait et al. teach the equivalence of monothioglycerol, BHA and BHT as antioxidants to stabilize alkylating agents and thus have interchangeable function. "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007). Moreover, "Where two known alternatives are interchangeable for a desired function, an express suggestion to substitute one for the other is not needed to render a substitution obvious." *In re Fout*, 675 F.2d 297, 301 (CCPA 1982). Accordingly, the ordinary artisan would select the antioxidant monothioglycerol and optimize the amount to about 5 mg/mL to achieve the desired degree of stability with a reasonable expectation of success especially when Tait et al. teach using from 0-5%.

Application/Control Number: 18/081,238                                          Page 13
Art Unit: 1613

In light of the forgoing discussion, the Examiner concludes that the subject matter defined by the instant claims would have been obvious within the meaning of 35 USC 103(a).

From the combined teachings of the references, it is apparent that one of ordinary skill in the art would have had a reasonable expectation of success in producing the claimed invention. Therefore, the invention as a whole was *prima facie* obvious to one of ordinary skill in the art at the time the invention was made, as evidenced by the combined references, especially in the absence of evidence to the contrary.

**Claims 28 and 29** are rejected under 35 U.S.C. 103(a) as being unpatentable over Brittain et al. (US 20060159713), as applied against claim 3 above.

Applicant claims:

28.    (Currently Amended) A method of treating leukemia in a human in need thereof comprising
providing a liquid bendamustine-containing composition according to claim 3 comprising about 25 mg/ml of bendamustine;
diluting the liquid bendamustine containing composition; and
intravenously administering the diluted composition to the human.

29.    (Original) The method of claim 28, wherein the liquid bendamustine containing composition is diluted with about 50 mL of a diluent.

## Level of Ordinary Skill in the Art

## (MPEP 2141.03)

Application/Control Number: 18/081,238                                            Page 14
Art Unit: 1613

MPEP 2141.03 (I) states: "The "hypothetical 'person having ordinary skill in the art' to which the claimed subject matter pertains would, of necessity have the capability of understanding the scientific and engineering principles applicable to the pertinent art." *Ex parte Hiyamizu*, 10 USPQ2d 1393, 1394 (Bd. Pat. App. & Inter. 1988). The level of skill is that of a ***medical/pharmaceutical cancer*** research scientist, as is the case here, then one can assume comfortably that such an educated artisan will draw conventional ideas from oncology medicine, oncology pharmacy and chemistry— without being told to do so.

In addition, the prior art itself reflects an appropriate level (MPEP 2141.03(II)).

## Determination of the scope and content of the prior art
### (MPEP 2141.01)

Regarding claim 3, the reference of Brittain et al. is discussed in detail above where a bendamustine concentration of about 25 mg/mL was found to be obvious and that discussion is incorporated by reference.

Regarding claims 28 and 29, Brittain et al. teach methods of treating leukemia (claims 63 and 65; [0042]) in a human [0055] with the reconstituted lyophilized formulation following further dilution into an appropriate intravenous admixture [0100].

## Ascertainment of the difference between the prior art and the claims
### (MPEP 2141.02) and Finding of prima facie obviousness
### Rational and Motivation (MPEP 2142-2143)

EAGLEBEN-SA_00000848

The difference between the instant application and Brittain et al. is that Brittain et al. do not expressly teach providing a liquid bendamustine composition according to claim 3 and diluting with about 50 mL of a diluent to intravenously administer and treat a human leukemia patient. However, it would have been obvious to one of ordinary skill in the art at the time of the claimed invention to make the formulation of Brittain et al. according to claim 3 and perform the method of Brittain et al. by dilution with about 50 mL of a diluent and produce the instant invention. One of ordinary skill in the art would have been motivated to do this because the Examiner has established above that instant claim 3 is obvious over Brittain et al. and the amount of diluent to add to dilute the concentrate to an administrable amount is a result effect variable routinely optimized by the ordinary artisan to provide the proper concentration of bendamustine to the patient from the concentrated formulation. Thus, absent any criticality of "about 50 mL of a diluent", such is readily determined by the ordinary artisan in this art with no inventive skill required.

In light of the forgoing discussion, the Examiner concludes that the subject matter defined by the instant claims would have been obvious within the meaning of 35 USC 103(a).

From the combined teachings of the references, it is apparent that one of ordinary skill in the art would have had a reasonable expectation of success in producing the claimed invention. Therefore, the invention as a whole was *prima facie* obvious to one of ordinary skill in the art at the time the invention was made, as evidenced by the combined references, especially in the absence of evidence to the contrary.

Application/Control Number: 18/081,238                                    Page 16
Art Unit: 1613

**Response to Arguments:**

Applicant's arguments are moot in view of the new ground of rejection

necessitated by amendment. In the present case, the scope of the claims is different

from the scope of the claims previously allowed by the Examiner and Brittain et al. is

relevant now that the rejection over Drager et al. has been overcome. The Examiner

has these brief comments concerning the IDS documents filed 6/16/23. Even the

responsive expert report of Juergen Siepmann acknowledged in paragraph 61 that

Brittain et al. teach and suggest liquid polyethyelene glycol in the ultimate dosage form

from a very limited list of carrier/vehicle solvents. However, in the expert's opinion

stated in paragraph 304, that paragraph [0067] in Brittain would not have caused the

POSA to limit her or his consideration of solvents to PG, PEG and glycerol because the

list of solvents is exemplary, not based on any actual experiments conducted and not

related to shelf-stable liquid bendamustine formulations. However, that is not the test for

obviousness. "In the consideration of references, the question is, could one skilled in the

art with the references before him make the combination of elements here claimed

without exercise of the inventive faculty," *In re Goepfrich*, 136 F.2d 918, 920 (C.C.P.A.

1943). In the Examiner's analysis that answer is yes. All that is required to show

obviousness is that the applicant "make his claimed invention merely by applying

knowledge clearly present in the prior art. Section 103 requires us to presume full

knowledge by the inventor of the *prior* art in the field of his endeavor." *In re*

*Winslow*, 365 F.2d 1017, 1020, 53 C.C.P.A. 1574, 1578 (1966). *Application of Sheckler*,

438 F.2d 999, 1001 (C.C.P.A. 1971). Here, there reference of Brittain et al. guides the

artisan to adding polyethylene glycol, a common conventional pharmaceutical excipient, to a sterile vial of bendamustine. It does not matter if Brittain et al. did so in an example or not; the teaching is present. Shelf stability is naturally present in the ultimate dosage form of Brittain et al. when so reconstituted whether Brittain et al. recognized it or not. Furthermore, "a formulation intended to be stored for the shelf life of the product", paragraph 306, is merely intended use of the formulation.

Additionally, the expert argues in paragraph 305 that in their opinion, "paragraph 67 of Brittain 2006 would not have provided the POSA with such a motivation or reason. The teachings of Brittain 2006 that Dr. Pinal cites are entirely focused on lyophilized bendamustine formulations, not liquid bendamustine formulations." The Examiner does not agree because Brittain et al. teach and suggest to the ordinary artisan that once you have the sterile vial with lyophilized bendamustine, in order to make the ultimate dosage form, polyethyelene glycol with optionally ethanol and/or propylene glycol is added. Just having a sterile vial of lyophilized bendamustine is of no use because it has to be reconstituted in order to be administered. Therefore, Brittain et al. does focus on liquid bendamustine formulations as well as lyophilized ones.

### Conclusion

No claims are allowed.

Applicant's amendment necessitated the new ground(s) of rejection presented in this Office action.  Accordingly, **THIS ACTION IS MADE FINAL**.  See MPEP § 706.07(a).  Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

Application/Control Number: 18/081,238                                          Page 18
Art Unit: 1613

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action.  In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the date of this final action.

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to ERNST V ARNOLD whose telephone number is

(571)272-8509. The examiner can normally be reached M-F 7-3:30.

Examiner interviews are available via telephone and video conferencing using a

USPTO supplied web-based collaboration tool. To schedule an interview, applicant is

encouraged to use the USPTO Automated Interview Request (AIR) at

http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Brian Y Kwon can be reached on 571-272-0581. The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of published or unpublished applications may be

obtained from Patent Center. Unpublished application information in Patent Center is

available to registered users. To file and manage patent submissions in Patent Center,

visit: https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-

center for more information about Patent Center and

EAGLEBEN-SA_00000852

Application/Control Number: 18/081,238                                    Page 19
Art Unit: 1613

https://www.uspto.gov/patents/docx for information about filing in DOCX format. For

additional questions, contact the Electronic Business Center (EBC) at 866-217-9197

(toll-free). If you would like assistance from a USPTO Customer Service

Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/ERNST V ARNOLD/

Primary Examiner, Art Unit 1613