# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| EAGLE PHARMACEUTICALS, INC., ) <br> ) <br> Plaintiff, ) <br> ) C.A. No. 24-65-JLH <br> v. ) <br> ) **JURY TRIAL DEMANDED** <br> SLAYBACK PHARMA LLC, ) <br> ) <br> Defendant. ) <br> ) | |

## PLAINTIFF EAGLE PHARMACEUTICALS, INC.'S NOTICE OF RULE 30(b)(6) DEPOSITION OF SLAYBACK PHARMA LLC

PLEASE TAKE NOTICE that at a date to be agreed upon by the parties, at the law offices of McCarter & English, LLP, Renaissance Centre, 405 N. King Street, 8th Floor, Wilmington, DE 19801, or at such other place agreed upon by the parties, Plaintiff Eagle Pharmaceuticals, Inc. ("Eagle"), through its attorneys, will take the deposition of Defendant Slayback Pharma LLC ("Slayback"), pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure.

At the time of the deposition, Slayback shall designate one or more of its directors, officers, managing agents, or other persons who will testify on behalf of Slayback as to all information known or reasonably available to Slayback regarding the subject matters set forth in Attachment A.

The deposition will take place upon oral examination before a notary public or other person authorized to administer oaths, will be recorded by stenographic and/or sound-and-video means, and will continue from day to day until completed. You are invited to attend and participate.

Slayback shall identify the individual(s) designated for each topic below in writing at least ten (10) days prior to the first deposition(s) on any topic identified below.

| | |
|---|---|
| Dated: May 9, 2025 | **MCCARTER & ENGLISH, LLP** |
| | |
| | /s/ Alexandra M. Joyce |
| OF COUNSEL: | Daniel M. Silver (#4758) |
| | Alexandra M. Joyce (#6423) |
| Daniel G. Brown | Maliheh Zare (#7133) |
| Kelly A. Welsh | 405 N. King Street, 8th Floor |
| LATHAM & WATKINS LLP | Wilmington, DE 19801 |
| 555 Eleventh Street NW, Suite 1000 | (302) 984-6300 |
| Washington, DC 20004 | dsilver@mccarter.com |
| (202) 637-2200 | ajoyce@mccarter.com |
| daniel.brown@lw.com | mzare@mccarter.com |
| kelly.welsh@lw.com | |
| | |
| Kenneth G. Schuler | *Attorneys for Plaintiff Eagle* |
| Marc N. Zubick | *Pharmaceuticals, Inc.* |
| Alex Grabowski | |
| LATHAM & WATKINS LLP | |
| 330 North Wabash Avenue, Suite 2800 | |
| Chicago, IL 60611 | |
| (312) 876-7700 | |
| kenneth.schuler@lw.com | |
| marc.zubick@lw.com | |
| alex.grabowski@lw.com | |

# ATTACHMENT A

# INSTRUCTIONS AND DEFINITIONS

1. The terms "you," "your," "yours," "Defendant," and "Slayback" mean Slayback Pharma LLC. and its respective officers, directors, employees, divisions, parent companies, subsidiaries, affiliates, predecessors or successors-in-interest, any joint venture to which Slayback may be a party, consultants, agents, and accountants, including any person who served in any such capacity at any time.

2. The term "Plaintiff" or "Eagle" means Plaintiff Eagle Pharmaceuticals, Inc.

3. The terms "and" and "or" shall be construed either disjunctively or conjunctively, and references shall be construed either as singular or plural, as necessary to bring within the scope of these topics any information that might otherwise be construed to be outside their scope.

4. The term "all" shall be construed to mean all or any, and the term "any" shall be construed to mean all or any.

5. The use of the singular form of any word includes the plural and vice versa, as necessary to bring within the scope of these topics any information or documents and things that might otherwise be construed to be outside their scope.

6. The term "including" means "including but not limited to" or "including without limitation."

7. The term "communication" means any transmission of information from one person to another, including, without limitation, by personal meeting, telephone, facsimile, electronic transmission, including electronic mail, and teleconference.

8. The terms "person" and "entity" mean any natural person and any other cognizable entity, including without limitation corporations, proprietorships, partnerships, joint ventures,

3

businesses, consortiums, clubs, associations, foundations, governmental agencies or instrumentalities, societies, and orders.

9. The phrase "Slayback's NDA" refers to New Drug Application ("NDA") No. 212209 and any amendments and supplements thereto.

10. The phrase "Slayback's NDA Product" or "Product" refers to the drug product that is the subject of Slayback's NDA No. 212209 and any amendments and supplements thereto.

11. The term "test" or "testing" shall be construed to include but not be limited to any test, analysis, evaluation, comparison, study, experiment or trial for any purpose, including pre-clinical and clinical tests and results, whether published or unpublished.

12. The term "'783 patent" means U.S. Patent No. 11,844,783.

13. The term "'214 patent" means U.S. Patent No. 11,872,214.

14. The term "Asserted Patents" means U.S. Patent Nos. 11, 844,783 and 11,872,214.

15. The phrase "FDA" shall mean U.S. Food and Drug Administration.

16. The phrase "505(b)(2) filing" means an NDA that contains full reports of investigations of safety and effectiveness, where at least some of the information required for approval comes from studies not conducted by or for the applicant, and for which the applicant has not obtained a right of reference or use, including, for example, the Agency's finding of safety and/or effectiveness for a listed drug or published literature.

17. The phrase "Notice Letters" means letters received by Eagle regarding any patent listed in the Orange Book for any product containing bendamustine that is owned and/or licensed by Eagle.

## TOPICS

1. Slayback's decision to develop a liquid bendamustine product as a candidate for a 505(b)(2) filing, including the process by which Slayback decided to develop a liquid bendamustine product for a 505(b)(2) filing, the process by which Slayback decided to file a 505(b)(2) application for a liquid bendamustine formulation, the factors and information considered in making those decision, and the individuals and entities involved in the decision-making process.

2. Slayback's NDA (including amendments or supplements thereto) and the contents thereof, the drafting, preparation, and filing of Slayback's NDA, and any communications to and from the FDA regarding Slayback's NDA, including any deficiency letters or rejections and any discussions relating to tentative approval.

3. All patent certifications in connection with Slayback's NDA (including amendments or supplements thereto), the individual(s) involved in each patent certification, the basis for each certification, the consequences of each certification, and the information considered.

4. Slayback's knowledge of the Asserted Patents and any analyses thereof, including relating to validity of the Asserted Patents and/or infringement by Slayback's NDA Product and/or any other liquid bendamustine-containing product, and steps Slayback has taken to avoid infringement.

5. Any efforts by Slayback to design a bendamustine-containing product that does not include polyethylene glycol ("PEG") and/or an antioxidant.

6. The contents of the labeling for Slayback's NDA Product (including how medical professionals would understand the labeling), the decision-making and any related discussions as

to the contents of the label for Slayback's NDA Product, and the individuals involved in the decision making.

7.     The synthesis, identification, characterization, and properties of each ingredient in Slayback's NDA and/or any other liquid bendamustine-containing product, including the amount and/or concentration of each component, the active pharmaceutical ingredients, and the reason(s) Slayback chose to use each component in its formulations.

8.     Any testing by Slayback of bendamustine or any product containing bendamustine, including any comparison or comparative test of Slayback's NDA Product and/or any other liquid bendamustine-containing product with any other bendamustine-containing product or placebo.

9.     Any efforts by Slayback to test formulations of bendamustine with sodium hydroxide (NaOH), other antioxidants, and/or other solvents.

10.    Any stability studies and testing of Slayback's NDA Product and/or any other liquid bendamustine-containing product, including evaluations of (1) the proposed shelf life for Slayback's NDA Product and/or any other liquid bendamustine-containing product; (2) any impurities or degradants in Slayback's NDA Product and/or any other liquid bendamustine-containing product; and/or (3) stability of, or impurities or degradants in, Slayback's NDA Product, and/or any other liquid bendamustine-containing product, after such product has been stored for any time period and at any temperature and/or any testing conditions.

11.    Any batches of Slayback's NDA Product or any other liquid bendamustine-containing product that failed under the specifications set for that product, including any stability and/or purity specifications.

12. Slayback's knowledge of the pathways by which the degradants in Slayback's NDA Product or any other liquid bendamustine-containing product form, the conditions and parameters relating to degradant formation or stability, and any research or analysis thereof.

13. All manufactured batches of Slayback's NDA Product, including the batch size, batch number, or other identifying notation, and the dates of manufacturing and delivery.

14. Any supplier or potential supplier of bulk bendamustine or any pharmaceutical formulation or dosage form containing bendamustine, polyethylene glycol, propylene glycol, or ethanol, including, without limitation, any relationship or potential relationship between Slayback and such supplier and purchase orders to such supplier; communications with such suppliers (including documents constituting any such communications); specifications for bulk bendamustine, polyethylene glycol, propylene glycol, or ethanol; and any information relating to the manufacture, storage, handling, transfer and shipment of bulk bendamustine, polyethylene glycol, propylene glycol, or ethanol.

15. Any impurities in the polyethylene glycol or ethanol used in Slayback's NDA Product, including any elemental impurities or oxygen.

16. The research, development, formulation, and manufacturing of Slayback's NDA Product and/or any other liquid bendamustine-containing formulation, and any documents searched or considered during the research, development, formulation, or manufacturing of Slayback's NDA Product or any other liquid bendamustine-containing product, including but not limited to any literature and patents searched for and/or considered.

17. Any agreements to which Slayback is a party relating to bendamustine, Belrapzo®, a generic version of Belrapzo®, Slayback's NDA Product, or any other liquid bendamustine-containing product.

18. The authenticity and business records nature of the documents produced by Slayback in this litigation.

19. The manner in which Slayback has instructed, encouraged, and/or recommended health care personnel to administer Slayback's NDA Product.

20. All revenue forecasts, market share projections, consumer analyses, identification of potential customers (individually and categorically) and/or other financial or market analyses regarding Slayback's NDA Product and/or any other liquid bendamustine-containing product, and the bases and assumptions underlying any such forecasts, analyses or projections.

21. Slayback's organizational and corporate structure, including its past and present successors, subsidiaries, divisions, parents, or affiliates, and any joint ventures or other legal entities that Slayback wholly or partially owns or owned, either directly or indirectly.

22. The wholesale and suggested retail price of Slayback's NDA Product.

23. Proposed or executed agreements to which Slayback is a party licensing (including in-licenses and out-licenses) the Asserted Patents, any related patent, any patents that cover any part of or are listed in the Orange Book for Slayback's NDA Product, and/or any patent(s) that Slayback contends is technically comparable to the Asserted Patents, including but not limited to any settlement agreements and covenants not to sue, and communications relating thereto. This includes, but is not limited to, the identity of any licensing agreement that Slayback contends is comparable to a hypothetical license for the Asserted Patents.

24. The market for Slayback's NDA Product, or any other liquid bendamustine-containing product, and/or any competitive or potentially competitive product, competitors in the market, including any entities who manufacture, sell, or distribute any other oxybate-containing product, and/or any competitive or potentially competitive product.

25. Any forecasts, market analyses, projections on the market erosion and/or impact of generic products on the market, and the bases and assumptions underlying any such forecasts, analyses, or projections.

26. Any and all forecasts, market analyses, projections on the impact of Belrapzo® and/or Slayback's NDA product on the market, and the bases and assumptions underlying any such forecasts, analyses, or projections

27. The commercial relationship between Slayback and Eagle, including whether Slayback considers Eagle to compete in the same territory and the same market.

28. The market share (on an annual or quarterly basis) of each competitor in the market since the launch of Slayback's NDA Product.

29. The commercial success and the current popularity of Slayback's NDA Product.

30. Slayback's understanding of the product(s) that practice the Asserted Patents.

31. Any royalty or royalty rate calculated, proposed, considered, charted, or collected by Slayback in connection with Slayback's NDA Product, including but not limited to the amount and existence of any established royalty rate(s) for the patent(s) covering Slayback's NDA Product.

32. The sales, advertising, or marketing of Slayback's NDA Product, including without limitation all sales force training materials, all messages to be detailed by sales representatives for Slayback's NDA Product, and any efforts to convert physicians, patients, pharmacies, or other entities to Slayback's NDA Product, or to have Slayback's NDA Product listed as a preferred drug on any formulary.

33. Sales of Slayback's NDA Product by customer from the launch of such product to the present, including direct sales by Slayback to its customers (e.g., wholesalers and retailers),

indirect sales (e.g., through wholesalers to retailers), and documents relating to such sales, and the date on which each such product was first offered for sale and/or sold in the United States.

34. The revenue received by Slayback associated with Slayback's NDA Product, including but not limited to any revenue from sales, licensing, and royalties.

35. Slayback's manufacturing and marketing capability to exploit any demand for its NDA Product.

36. Slayback's plans, programs, and strategies to transition patients to Slayback's NDA Product, including any incentives offered for such transition and any comparisons of the relative benefits of each product.

37. The date on which Slayback first made, used, sold, and/or offered to sell its NDA Product in the United States, and/or imported its NDA Product into the United States.

38. Slayback's expenditures and costs relating to operating, developing, and marketing its NDA Product.

39. The identity of any acceptable non-infringing alternatives to Belrapzo® and/or any other product using the inventions claimed in the Asserted Patents, including the factual basis for why each alleged alternative would be available, acceptable (from a commercial, technical, and financial perspective), and non-infringing.

40. The design, features, operation, and financial performance (including market share, revenue, unit sales, and date of first sale) of each alleged acceptable non-infringing alternative to Belrapzo®, including the difference between each alleged alternative and Belrapzo®.

41. Slayback's knowledge of Eagle's products, patents, and services related to bendamustine, including any pre-suit communications with Eagle regarding the same.

42. Slayback's financial documents, including balance sheets and profit and loss statements, from January 1, 2022 to the present.

43. The factual basis regarding Slayback's contentions regarding the appropriate amount of damages in this case should Slayback be found to infringe at least one valid claim of the Asserted Patents, including the factual basis underlying Slayback's contentions regarding the *Panduit* factors, *Georgia-Pacific* factors, or other forms of damages.

44. Slayback's licensing policies (whether formal or informal), including the methods used by Slayback to determine the proper royalty base for determining patent license royalties either paid to or received from any third party.

45. The royalty or licensing rates customary in the industry for access to the technology relating to the Asserted Patents, including any documents evidencing, memorializing, concerning, or documenting such rates.