# IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., | |
| Plaintiff, | C.A. No. 24-64-JLH |
| v. | **JURY TRIAL DEMANDED** |
| APOTEX INC., AND APOTEX CORP, | ██████████ |
| Defendant. | |
| EAGLE PHARMACEUTICALS, INC., | |
| Plaintiff, | C.A. No. 24-65-JLH |
| v. | **JURY TRIAL DEMANDED** |
| SLAYBACK PHARMA LLC, | ██████████ |
| Defendant. | |

## RESPONSIVE LETTER TO THE HONORABLE CHRISTOPHER J. BURKE FROM DEFENDANTS APOTEX INC., APOTEX CORP., AND SLAYBACK PHARMA LLC

Neal C. Belgam (#2721)
Daniel A. Taylor (#6934)
SMITH KATZENSTEIN & JENKINS LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
Nbelgam@skjlaw.com
Dtaylor@skjlaw.com

Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendants
Apotex Inc. and Apotex Corp.*

*Attorneys for Defendant
Slayback Pharma LLC*

Dated: May 16, 2025

Dear Judge Burke:

Defendants Apotex Inc., Apotex Corp. ("Apotex") and Slayback Pharma LLC ("Slayback") (collectively, "Defendants") respectfully submit this letter brief pursuant to the Court's May 1, 2025 Order (Civil Action No. 24-64-JLH, D.I. 135; Civil Action No. 24-65-JLH, D.I. 113) in response to Plaintiff Eagle Pharmaceuticals, Inc. ("Eagle") two discovery disputes: (i) disputed demand for an excessive amount of samples from each Defendant without any compensation and (ii) disputed document requests directed to Apotex. Defendants respectfully request that the Court deny Eagle's requests.

### I.    Eagle's Excessive Request for Samples Imposes an Undue and Burdensome Expense

Eagle has failed to make any effort to justify the number of samples (50) it demands that each Defendant produce. The approximate expense to each Defendant of Eagle's sample demand would be ███████ This expense would be an undue burden on each Defendant. Moreover, Eagle offers no justification or proportionality rationale for the sheer volume of samples it requests. Thus, at a minimum, Eagle should be required to pay for the significant costs of the discovery it seeks. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978).

Defendants timely objected to Eagle's request for fifty samples as excessive because it lacked proportionality to the issues of infringement in this case and sought to impose an unnecessary burden on Defendants. *See* Eagle's Ex. 7 ("During the Meet and Confer, Apotex stated the request for fifty samples was burdensome because of the significant cost of the product and the specialized shipping/handling required."); *see* Slayback Ex. G ("Slayback explained that …fifty [samples] would be too burdensome to produce."). In an effort to resolve the dispute, Defendants requested that Eagle justify its need, reduce the number of samples requested, or cover the excessive costs of its request. *See, e.g.*, Eagle's Ex. 7 ("Apotex also stated that a significant portion of the burden associated with the production of samples was their cost, and enquired if Eagle would be willing to cover the costs associated with such production."). Eagle failed to explain why it required such a large number of samples or whether it would assume the costs of its burdensome request. Instead, Eagle attempted to use its request to extract an overbroad stipulation of infringement from Defendants. *Id.* ("Once Eagle understands Apotex's position regarding the stipulation, Eagle will provide a position regarding payment of the cost to produce samples."); *see* Slayback Ex. G (suggesting multiple stipulations in exchange for reducing number of samples). Defendants, however, are not obligated to accept Eagle's stipulation to avoid an undue and unjustified request for samples, and thus, rejected Eagle's proposal. To date, Eagle has made no effort to justify the number of samples requested.

There is no dispute that the costs of complying with Eagle's request – more than ███████ – imposes a significant burden on each Defendant. Indeed, the costs reflect the wholesale acquisition cost of these products, which is recognized as a "commercially reasonable,

---

[1] Following submission of Eagle's opening letter-brief, Slayback has confirmed to Eagle that it would be willing to produce the requested number of samples provided that Eagle pay the wholesale acquisition cost for such samples.

market-based term" for the provision of samples of costly pharmaceutical products. *See*, *e.g.*, CREATES Act, H.R. 1865, 116th Cong. § 610 (2020) ("the term 'commercially reasonable, market-based terms' means— (A) a nondiscriminatory price for the sale of the covered product at or below, but not greater than, the most recent ***wholesale acquisition cost for the drug***") (emphasis added).

The handful of cases cited by Eagle are inapt because they did *not* involve the costly request of numerous samples of hazardous "cytotoxic chemotherapy drugs," (D.I. 149, at 1) that must be shipped in accordance with "applicable special handling and disposal procedures." Ex. A at 2.2. Here, where Eagle advances an unjustified discovery request that imposes a undue and excessive burden on the producing party, it is entirely appropriate for the Court to issue a protective order under Fed. R. Civ. P. 26(C) denying the request or requiring the requesting party to pay the costs for compliance. *See* Fed. R. Civ. P. 26(c)(1); *Procter & Gamble Co. v. Be Well Marketing, Inc.*, No. 12-MC-392, 2013 WL 152801, at *4 (M.D. Pa. Jan. 15, 2013); *Invensas Corp. v. Renesas Elecs. Corp.*, Civil Action No. 11-448-GMS-CJB (D. Del. Dec. 21, 2012).

Put simply, Eagle's failure to justify its need for fifty samples, particularly when such an excessive request would impose significant costs on Defendants is improper and should be denied. Defendants invited Eagle to present any good-faith justification for a reasonable number of samples, but Eagle responded with nothing. Rather, Eagle foisted an unreasonable demand on Defendants – that they bear the significant burden of Eagle's request or agree to an overbroad stipulation of infringement. Eagle's failure to engage in good-faith negotiations warrants a denial of their request or the entry of an order protecting Defendants from the "undue burden or expense" by allocating the costs of compliance to Eagle. Fed. R. Civ. P. 26(c)(1)(B).

## II. Apotex Has Produced Documents Responsive to RFP No. 57

Apotex negotiated in good-faith to search for and produce documents responsive to Eagle's RFP No. 57. Specifically, pursuant to the Delaware Electronic Discovery Default Standard, Apotex elected to use search terms to "locate potentially responsive ESI" to RFP No. 57 and a number of other Eagle requests. Over a period of weeks, the parties extensively negotiated the parameters of Apotex's search in good-faith, including the search terms, the custodians, the sources and the date range. *See* Ex. C [9.13.2024-10.17. 2024 Email exchange]. Eagle agreed to the final parameters of the search without objection. Notably, the custodians to be searched included the Apotex employees most knowledgeable about the matters addressed by Eagle's RFP No. 57 – "the sale, marketing, pricing, and promotion of [Apotex's] NDA product." Civil Action No. 24-64-JLH, D.I. 149 at 2. These included Mr. Michael Bohling (Vice President of Sales and Marketing), Mr. David Link (Director of Associate Commercial Operations), and Ms. Patricia Walden (Senior Marketing Director).[2] As agreed by the parties, Apotex produced all non-privileged documents located from the ESI search. The Federal Rules and the Local Rules contemplate the exact steps taken by Apotex to avoid a dispute between the parties on this issue.

Eagle seeks to undue Apotex's efforts to comply with its discovery obligations by insisting that Apotex engage in another burdensome ESI search of an untold number of

---

[2] Contrary to Eagle's arguments, each of these custodians were identified by Apotex in its Paragraph 3 disclosures. *See* Ex. D [Apotex's 6.17.2024 Paragraph 3 Disclosures].

custodians for all communications "including those beyond emails, i.e., text messages, Slack messages, Teams messages" between the sales teams that work on the sale, marketing, pricing, or promotion of Apotex's NDA Product. *Id.* In support of its demand, Eagle contends (wrongly) that Apotex has not "produced *any* communications between its sales force regarding the sale, marketing, pricing, and/or promotion of Apotex's NDA Product" or "identified any custodian in its Paragraph 3 disclosures who communicates with Apotex's sales force, sales personnel, or marketing personnel, or any custodian who is a member of Apotex's sales force team such that no documents have been collected or produced." Eagle Ex. 9 at 2. Neither of these arguments have merit.

Apotex, as a generic pharmaceutical company, does not employ a "sales force" for its bendamustine products. Instead, Apotex conducted an ESI search of the custodial e-mails of the individuals within Apotex that were most knowledgeable about the sales, promotion and marketing of the bendamustine products at issue in this case and produced all non-privileged documents uncovered from that search. As confirmed by the documents cited by Eagle in its Opening Letter, Apotex's search did, in fact, result in the production of documents responsive to RFP No. 57. For example, Exhibit 19 makes ███████████████████████████



███████████████████████. Eagle Ex. 19. Exhibit 18 ████████████████████████████████ – ████████████ ████████████████████ Eagle Ex. 18. Moreover, other documents uncovered during the defense of this motion confirm that Apotex's ESI search located other responsive information to RFP No. 57, including chat messages and customer communications. *See, e.g.,* Ex. E (████████████████████████████████████████); Ex. F (██████████████████████████████). There is no basis for Eagle to suggest that an additional search would produce any more information than what they currently have. Apotex, however, remains available to investigate specific issues that Eagle may raise based on documents identified during its review.

Apotex has made good-faith efforts to comply with its discovery obligations in the exact manner contemplated by this Court's procedures governing ESI. Eagle's additional request is not possible ███████████████████████████████. Notably, Eagle has recently noticed the depositions of the individuals most knowledgeable about the subject matter of RFP No. 57 and a corporate deposition of Apotex. Eagle already possesses all of the responsive, non-privileged documents from the agreed-upon ESI search for RFP No. 57 and is free to explore the contents of those documents, including the veracity of Apotex's representations ████████████████████████during those upcoming depositions. Apotex remains committed to resolving any specific issues that arise at those depositions. Accordingly, Eagle's request for additional ESI searching should be denied because Apotex has complied in good-faith with its discovery obligations as contemplated by this Court's procedures and the Federal Rules.

Dated: May 16, 2025

__/s/ Daniel A. Taylor__
Neal C. Belgam (#2721)
Daniel A. Taylor (#6934)
SMITH KATZENSTEIN & JENKINS LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
Nbelgam@skjlaw.com
Dtaylor@skjlaw.com

*Attorneys for Defendant*
*Slayback Pharma LLC*

__/s/ Kenneth L. Dorsney__
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendants*
*Apotex Inc. and Apotex Corp.*

# EXHIBIT A

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use BENDAMUSTINE HYDROCHLORIDE INJECTION safely and effectively. See full prescribing information for BENDAMUSTINE HYDROCHLORIDE INJECTION.**

**BENDAMUSTINE HYDROCHLORIDE injection, for intravenous use.**
**Initial U.S. Approval: 2008**

------------------------------RECENT MAJOR CHANGES------------------------------
Indications and Usage, Chronic Lymphocytic Leukemia (CLL) indication removed (1.1)                                4/2024
Dosage and Administration, Dosing Instructions for CLL removed (2.1)                                4/2024

----------------------------INDICATIONS AND USAGE----------------------------
Bendamustine hydrochloride injection is an alkylating drug indicated for treatment of adult patients with:
• Indolent B-cell non-Hodgkin lymphoma (NHL) that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen. (1)

-----------------------DOSAGE AND ADMINISTRATION-----------------------
For NHL:
• 120 mg/m$^2$ infused intravenously over 60 minutes on Days 1 and 2 of a 21-day cycle, up to 8 cycles (2.1)

-------------------DOSAGE FORMS AND STRENGTHS-------------------
Injection: 100 mg/4 mL (25 mg/mL) in a multiple-dose vial. (3)

----------------------------CONTRAINDICATIONS----------------------------
Bendamustine hydrochloride injection is contraindicated in patients with a history of a hypersensitivity reaction to bendamustine, polyethylene glycol 400, absolute ethanol, sodium hydroxide and monothioglycerol. Reactions to bendamustine hydrochloride have included anaphylaxis and anaphylactoid reactions. (4, 5.4)

----------------------WARNINGS AND PRECAUTIONS----------------------
• Myelosuppression: Delay or reduce dose and restart treatment based on ANC and platelet count recovery. (5.1)
• Infections: Monitor for fever and other signs of infection or reactivation of infections and treat promptly. (5.2)
• Progressive multifocal leukoencephalopathy (PML): Monitor for new or worsening neurological, cognitive or behavioral signs or symptoms suggestive of PML. (5.3)
• Anaphylaxis and Infusion Reactions: Severe anaphylactic reactions have occurred. Monitor clinically and discontinue drug for severe

reactions. Pre-medicate in subsequent cycles for milder reactions. (5.4)
• Tumor Lysis Syndrome: May lead to acute renal failure and death; anticipate and use supportive measures in patients at high risk. (5.5)
• Skin Reactions: Discontinue for severe skin reactions. Cases of SJS, DRESS and TEN, some fatal, have been reported. (5.6)
• Hepatotoxicity: Monitor liver chemistry tests prior to and during treatment. (5.7)
• Other Malignancies: Pre-malignant and malignant diseases have been reported. (5.8)
• Extravasation Injury: Take precautions to avoid extravasation, including monitoring intravenous infusion site during and after administration. (5.9)
• Embryo-Fetal Toxicity: Can cause fetal harm. Advise females of reproductive potential and males with female partners of reproductive potential of the potential risk to a fetus and to use an effective method of contraception. (5.10, 8.1, 8.3)

----------------------------ADVERSE REACTIONS----------------------------
Adverse reactions (frequency >5%) during infusion and within 24 hours post-infusion are nausea and fatigue. (6.1)
• Most common adverse reactions (≥15%) for NHL are lymphopenia, leukopenia, anemia, neutropenia, thrombocytopenia, nausea, fatigue, vomiting, diarrhea, pyrexia, constipation, anorexia, cough, headache, weight decreased, dyspnea, rash, and stomatitis. (6.1)

**To report SUSPECTED ADVERSE REACTIONS, contact Apotex Corp. at 1-800-706-5575 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

----------------------------DRUG INTERACTIONS----------------------------
Consider alternative therapies that are not CYP1A2 inducers or inhibitors during treatment with bendamustine hydrochloride injection. (7.1)

----------------------USE IN SPECIFIC POPULATIONS----------------------
• Lactation: Advise not to breastfeed. (8.2)
• Infertility: May impair fertility. (8.3)
• Renal Impairment: Do not use in patients with creatinine clearance <30 mL/min. (8.6)
• Hepatic Impairment: Do not use in patients with total bilirubin 1.5-3 x ULN and AST or ALT 2.5-10 x ULN, or total bilirubin >3 x ULN. (8.7)

**See 17 for PATIENT COUNSELING INFORMATION**

**Revised: 4/2024**

---

**FULL PRESCRIBING INFORMATION: CONTENTS\***
**1 INDICATIONS AND USAGE**
**2 DOSAGE AND ADMINISTRATION**
  2.1 Dosing Instructions for NHL
  2.2 Preparation for Intravenous Administration
  2.3 Admixture Stability
  2.4 Stability of Partially Used Vials (Needle Punched Vials)
**3 DOSAGE FORMS AND STRENGTHS**
**4 CONTRAINDICATIONS**
**5 WARNINGS AND PRECAUTIONS**
  5.1 Myelosuppression
  5.2 Infections
  5.3 Progressive Multifocal Leukoencephalopathy (PML)
  5.4 Anaphylaxis and Infusion Reactions
  5.5 Tumor Lysis Syndrome
  5.6 Skin Reactions
  5.7 Hepatotoxicity
  5.8 Other Malignancies
  5.9 Extravasation Injury
  5.10 Embryo-Fetal Toxicity
**6 ADVERSE REACTIONS**
  6.1 Clinical Trials Experience
  6.2 Postmarketing Experience
**7 DRUG INTERACTIONS**
  7.1 Effect of Other Drugs on Bendamustine Hydrochloride Injection
**8 USE IN SPECIFIC POPULATIONS**
  8.1 Pregnancy
  8.2 Lactation
  8.3 Females and Males of Reproductive Potential
  8.4 Pediatric Use
  8.5 Geriatric Use
  8.6 Renal Impairment
  8.7 Hepatic Impairment
**10 OVERDOSAGE**
**11 DESCRIPTION**
**12 CLINICAL PHARMACOLOGY**
  12.1 Mechanism of Action
  12.2 Pharmacodynamics
  12.3 Pharmacokinetics
**13 NONCLINICAL TOXICOLOGY**
  13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
**14 CLINICAL STUDIES**
**15 REFERENCES**
**16 HOW SUPPLIED/STORAGE AND HANDLING**
**17 PATIENT COUNSELING INFORMATION**

\*Sections or subsections omitted from the full prescribing information are not listed.

**FULL PRESCRIBING INFORMATION**

**1 INDICATIONS AND USAGE**

**Non-Hodgkin Lymphoma (NHL)**

Bendamustine hydrochloride injection is indicated for the treatment of adult patients with indolent B-cell non-Hodgkin lymphoma that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen.

**2 DOSAGE AND ADMINISTRATION**

**2.1 Dosing Instructions for NHL**

Recommended Dosage:
The recommended dosage is 120 mg/m$^2$ administered intravenously over 60 minutes on Days 1 and 2 of a 21-day cycle, up to 8 cycles.

Dose Delays, Dosage Modifications and Reinitiation of Therapy for NHL:
Delay bendamustine hydrochloride injection administration in the event of a Grade 4 hematologic toxicity or clinically significant greater or equal to Grade 2 non-hematologic toxicity. Once non-hematologic toxicity has recovered to ≤ Grade 1 and/or the blood counts have improved [Absolute Neutrophil Count (ANC) ≥ 1 x 10$^9$/L, platelets ≥ 75 x 10$^9$/L], reinitiate bendamustine hydrochloride injection at the discretion of the treating physician. In addition, consider dose reduction. *[see Warnings and Precautions (5.1)]*

Dosage modifications for hematologic toxicity: for Grade 4 toxicity, reduce the dose to 90 mg/m$^2$ on Days 1 and 2 of each cycle; if Grade 4 toxicity recurs, reduce the dose to 60 mg/m$^2$ on Days 1 and 2 of each cycle.

Dosage modifications for non-hematologic toxicity: for Grade 3 or greater toxicity, reduce the dose to 90 mg/m$^2$ on Days 1 and 2 of each cycle; if Grade 3 or greater toxicity recurs, reduce the dose to 60 mg/m$^2$ on Days 1 and 2 of each cycle.

**2.2 Preparation for Intravenous Administration**

Bendamustine hydrochloride injection is a hazardous drug. Follow applicable special handling and disposal procedures.[1]

Bendamustine hydrochloride injection is in a multiple-dose vial. Bendamustine hydrochloride injection is a clear and colorless to yellow solution. Store bendamustine hydrochloride injection at recommended refrigerated storage conditions (2°C to 8°C or 36°F to 46°F). When refrigerated the contents may freeze. Allow the vial to reach room temperature (15°C to 30°C or 59°F to 86°F) prior to use. Observe the contents of the vial for any visible solid or particulate matter and discoloration. Do not use the product if solid or particulate matter is observed after reaching room temperature.

Intravenous Infusion
Aseptically withdraw the volume needed for the required dose from the 25 mg/mL solution as per Table A below and immediately transfer to a 500 mL infusion bag of one of the following diluents:

- 0.9% Sodium Chloride Injection, USP; or
- 2.5% Dextrose/0.45% Sodium Chloride Injection, USP.

2

The resulting final concentration of bendamustine hydrochloride injection in the infusion bag should be within 0.05 mg/mL to 0.7 mg/mL. After transferring, thoroughly mix the contents of the infusion bag. The admixture should be a clear and colorless to slightly yellow solution.

Use either 0.9% Sodium Chloride Injection, USP, or 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, for dilution, as outlined above. No other diluents have been shown to be compatible.

**Table A: Volume (mL) of Bendamustine Hydrochloride Injection required for <u>dilution into 500 mL</u> of 0.9% Sodium Chloride Injection, USP, or 0.45% Sodium Chloride/2.5% Dextrose Injection, USP for a given dose (mg/m$^2$) and Body Surface Area (m$^2$)**

| Body Surface Area (m$^2$) | Volume of Bendamustine Hydrochloride Injection to withdraw (mL) | | |
|---|---|---|---|
| | 120 mg/m$^2$ | 90 mg/m$^2$ | 60 mg/m$^2$ |
| 1 | 4.8 | 3.6 | 2.4 |
| 1.1 | 5.3 | 4 | 2.6 |
| 1.2 | 5.8 | 4.3 | 2.9 |
| 1.3 | 6.2 | 4.7 | 3.1 |
| 1.4 | 6.7 | 5 | 3.4 |
| 1.5 | 7.2 | 5.4 | 3.6 |
| 1.6 | 7.7 | 5.8 | 3.8 |
| 1.7 | 8.2 | 6.1 | 4.1 |
| 1.8 | 8.6 | 6.5 | 4.3 |
| 1.9 | 9.1 | 6.8 | 4.6 |
| 2 | 9.6 | 7.2 | 4.8 |
| 2.1 | 10.1 | 7.6 | 5 |
| 2.2 | 10.6 | 7.9 | 5.3 |
| 2.3 | 11 | 8.3 | 5.5 |
| 2.4 | 11.5 | 8.6 | 5.8 |
| 2.5 | 12 | 9 | 6 |
| 2.6 | 12.5 | 9.4 | 6.2 |
| 2.7 | 13 | 9.7 | 6.5 |
| 2.8 | 13.4 | 10.1 | 6.7 |
| 2.9 | 13.9 | 10.4 | 7 |
| 3 | 14.4 | 10.8 | 7.2 |

Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration whenever solution and container permit. Any unused solution should be discarded according to institutional procedures for antineoplastics.

## 2.3 Admixture Stability

Bendamustine hydrochloride injection contains no antimicrobial preservative. The admixture should be prepared as close as possible to the time of patient administration.

If diluted with 0.9% Sodium Chloride Injection, USP, or 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, the final admixture is stable for 24 hours when stored refrigerated (2°C to 8°C or 36°F to 46°F) or for 3 hours when stored at room temperature (15°C to 30°C or 59°F to 86°F) and room light. Administration of diluted bendamustine hydrochloride injection must be completed within this period of time.

Bendamustine hydrochloride injection is supplied in a multiple-dose vial. Retain the partially used vial in original package to protect from light and store refrigerated (2°C to 8°C or 36°F to 46°F) if additional dose withdrawal from the same vial is intended.

### 2.4 Stability of Partially Used Vials (Needle Punched Vials)

Bendamustine hydrochloride injection is supplied as a multiple-dose vial. Although it does not contain any antimicrobial preservative, bendamustine hydrochloride injection is bacteriostatic. The partially used vials are stable for up to 28 days when stored in its original carton under refrigeration (2°C to 8°C or 36°F to 46°F). Each vial is not recommended for more than a total of six (6) dose withdrawals.

After first use, store the partially used vial in original carton at 2°C to 8°C (36°F to 46°F), and then discard after 28 days.

### 3 DOSAGE FORMS AND STRENGTHS

Injection: 100 mg/4 mL (25 mg/mL) as a clear and colorless to yellow solution in a multiple-dose vial.

### 4 CONTRAINDICATIONS

Bendamustine hydrochloride injection is contraindicated in patients with a known hypersensitivity (e.g., anaphylactic and anaphylactoid reactions) to bendamustine, polyethylene glycol 400, absolute ethanol, sodium hydroxide and monothioglycerol. *[see Warnings and Precautions (5.4)]*

### 5 WARNINGS AND PRECAUTIONS

### 5.1 Myelosuppression

Bendamustine hydrochloride caused severe myelosuppression (Grade 3 to 4) in 98% of patients in the two NHL studies *[see Adverse Reactions (6.1)]*. Three patients (2%) died from myelosuppression-related adverse reactions; one each from neutropenic sepsis, diffuse alveolar hemorrhage with Grade 3 thrombocytopenia, and pneumonia from an opportunistic infection (CMV).

Bendamustine hydrochloride injection causes myelosuppression. Monitor complete blood counts, including leukocytes, platelets, hemoglobin (Hgb), and neutrophils frequently. In the clinical trials, blood counts were monitored every week initially. Hematologic nadirs were observed predominantly in the third week of therapy. Myelosuppression may require dose delays and/or subsequent dose reductions if recovery to the recommended values has not occurred by the first day of the next scheduled cycle. Prior to the initiation of the next cycle of therapy, the ANC should be ≥ 1 x 10$^9$/L and the platelet count should be ≥ 75 x 10$^9$/L. *[see Dosage and Administration (2.2)]*.

### 5.2 Infections

Infection, including pneumonia, sepsis, septic shock, hepatitis and death has occurred in adult and pediatric patients in clinical trials and in postmarketing reports for bendamustine hydrochloride *[see Adverse Reactions (6.1, 6.2)]*. Patients with myelosuppression following treatment with bendamustine hydrochloride are more susceptible to infections. Advise patients with myelosuppression following bendamustine hydrochloride injection treatment to contact a physician immediately if they have symptoms or signs of infection.

Patients treated with bendamustine hydrochloride injection are at risk for reactivation of infections including (but not limited to) hepatitis B, cytomegalovirus, Mycobacterium

4

tuberculosis, and herpes zoster. Patients should undergo appropriate measures (including clinical and laboratory monitoring, prophylaxis, and treatment) for infection and infection reactivation prior to administration.

### 5.3 Progressive Multifocal Leukoencephalopathy (PML)

Progressive multifocal leukoencephalopathy (PML), including fatal cases, have occurred following treatment with bendamustine hydrochloride, primarily in combination with rituximab or obinutuzumab *[see Adverse Reactions (6.2)]*. Consider PML in the differential diagnosis in patients with new or worsening neurological, cognitive or behavioral signs or symptoms. If PML is suspected, withhold bendamustine hydrochloride injection treatment and perform appropriate diagnostic evaluations. Consider discontinuation or reduction of any concomitant chemotherapy or immunosuppressive therapy in patients who develop PML.

### 5.4 Anaphylaxis and Infusion Reactions

Infusion reactions to bendamustine hydrochloride have occurred commonly in clinical trials *[see Adverse Reactions (6.1)]*. Symptoms include fever, chills, pruritus and rash. In rare instances severe anaphylactic and anaphylactoid reactions have occurred, particularly in the second and subsequent cycles of therapy. Monitor clinically and discontinue drug for severe reactions. Ask patients about symptoms suggestive of infusion reactions after their first cycle of therapy. Patients who experience Grade 3 or worse allergic-type reactions should not be rechallenged. Consider measures to prevent severe reactions, including antihistamines, antipyretics and corticosteroids in subsequent cycles in patients who have experienced Grade 1 or 2 infusion reactions. Discontinue bendamustine hydrochloride injection for patients with Grade 4 infusion reactions. Consider discontinuation for Grade 3 infusion reactions as clinically appropriate considering individual benefits, risks, and supportive care.

### 5.5 Tumor Lysis Syndrome

Tumor lysis syndrome associated with bendamustine hydrochloride has occurred in patients in clinical trials and in post-marketing reports *[see Adverse Reactions (6.1)]*. The onset tends to be within the first treatment cycle of bendamustine hydrochloride and, without intervention, may lead to acute renal failure and death. Preventive measures include vigorous hydration and close monitoring of blood chemistry, particularly potassium and uric acid levels. Allopurinol has also been used during the beginning of bendamustine hydrochloride therapy. However, there may be an increased risk of severe skin toxicity when bendamustine hydrochloride and allopurinol are administered concomitantly *[see Warnings and Precautions (5.6)]*.

### 5.6 Skin Reactions

Fatal and serious skin reactions have been reported with bendamustine hydrochloride treatment in clinical trials and postmarketing safety reports, including toxic skin reactions [Stevens-Johnson Syndrome (SJS), toxic epidermal necrolysis (TEN), and drug reaction with eosinophilia and systemic symptoms (DRESS), bullous exanthema, and rash *[see Adverse Reactions (6.1 and 6.2)]*. Events occurred when bendamustine hydrochloride was given as a single agent and in combination with other anticancer agents or allopurinol.

Where skin reactions occur, they may be progressive and increase in severity with further treatment. Monitor patients with skin reactions closely. If skin reactions are severe or progressive, withhold or discontinue bendamustine hydrochloride injection.

### 5.7 Hepatotoxicity

Fatal and serious cases of liver injury have been reported with bendamustine hydrochloride injection *[see Adverse Reactions (6.1)]*. Combination therapy, progressive disease or reactivation of hepatitis B were confounding factors in some patients *[see Warnings and*

*Precautions (5.2)]*. Most cases were reported within the first three months of starting therapy. Monitor liver chemistry tests prior to and during bendamustine hydrochloride injection therapy.

## 5.8 Other Malignancies

There are reports of pre-malignant and malignant diseases that have developed in patients who have been treated with bendamustine hydrochloride, including myelodysplastic syndrome, myeloproliferative disorders, acute myeloid leukemia, bronchial carcinoma, and non-melanoma skin cancer, including basal cell carcinoma and squamous cell carcinoma *[see Adverse Reactions (6.2)]*.

Monitor patients for the development of secondary malignancies. Perform dermatologic evaluations during and after treatment with bendamustine hydrochloride injection.

## 5.9 Extravasation Injury

Bendamustine hydrochloride extravasations have been reported in postmarketing resulting in hospitalizations from erythema, marked swelling, and pain *[see Adverse Reactions (6.2)]*. Assure good venous access prior to starting bendamustine hydrochloride injection infusion and monitor the intravenous infusion site for redness, swelling, pain, infection, and necrosis during and after administration of bendamustine hydrochloride injection.

## 5.10 Embryo-Fetal Toxicity

Based on findings from animal reproduction studies and the drug's mechanism of action, bendamustine hydrochloride injection can cause fetal harm when administered to a pregnant woman. Single intraperitoneal doses of bendamustine (that approximated the maximum recommended human dose based on body surface area) to pregnant mice and rats during organogenesis caused adverse developmental outcomes, including an increase in resorptions, skeletal and visceral malformations, and decreased fetal body weights. Advise pregnant women of the potential risk to a fetus. Advise females of reproductive potential to use an effective method of contraception during treatment with bendamustine hydrochloride injection and for 6 months after the last dose. Advise males with female partners of reproductive potential to use effective contraception during treatment with bendamustine hydrochloride injection and for 3 months after the last dose *[see Use in Specific Populations (8.1, 8.3) and Clinical Pharmacology (12.1)]*.

## 6 ADVERSE REACTIONS

The following clinically significant serious adverse reactions are discussed in greater detail in other sections of the prescribing information.
- Myelosuppression *[see Warnings and Precautions (5.1)]*
- Infections *[see Warnings and Precautions (5.2)]*
- Progressive Multifocal Leukoencephalopathy *[see Warnings and Precautions (5.3)]*
- Anaphylaxis and Infusion Reactions *[see Warnings and Precautions (5.4)]*
- Tumor Lysis Syndrome *[see Warnings and Precautions (5.5)]*
- Skin Reactions *[see Warnings and Precautions (5.6)]*
- Hepatotoxicity *[see Warnings and Precautions (5.7)]*
- Other Malignancies *[see Warnings and Precautions (5.8)]*
- Extravasation Injury *[see Warnings and Precautions (5.9)]*

## 6.1 Clinical Trials Experience

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in practice.

6

Clinical Trials Experience in NHL

The data described below reflect exposure to bendamustine hydrochloride in 176 patients with indolent B-cell NHL treated in two single-arm studies. The population was 31 to 84 years of age, 60% male, and 40% female. The race distribution was 89% White, 7% Black, 3% Hispanic, 1% other, and <1% Asian. These patients received bendamustine hydrochloride at a dose of 120 mg/m$^2$ intravenously on Days 1 and 2 for up to eight 21-day cycles.

The adverse reactions occurring in at least 5% of the NHL patients, regardless of severity, are shown in Table 3. The most common non-hematologic adverse reactions (≥30%) were nausea (75%), fatigue (57%), vomiting (40%), diarrhea (37%) and pyrexia (34%). The most common non-hematologic Grade 3 or 4 adverse reactions (≥5%) were fatigue (11%), febrile neutropenia (6%), and pneumonia, hypokalemia and dehydration, each reported in 5% of patients.

**Table 3: Non-Hematologic Adverse Reactions Occurring in at Least 5% of NHL Patients Treated with Bendamustine Hydrochloride by System Organ Class and Preferred Term (N=176)**

| Body System | Number (%) of patients* | |
|---|---|---|
| **Adverse Reaction** | **All Grades** | **Grade 3/4** |
| **Total number of patients with at least 1 adverse reaction** | 176 (100) | 94 (53) |
| **Cardiac disorders** | | |
| Tachycardia | 13 (7) | 0 |
| **Gastrointestinal disorders** | | |
| Nausea | 132 (75) | 7 (4) |
| Vomiting | 71 (40) | 5 (3) |
| Diarrhea | 65 (37) | 6 (3) |
| Constipation | 51 (29) | 1 (<1) |
| Stomatitis | 27 (15) | 1 (<1) |
| Abdominal pain | 22 (13) | 2 (1) |
| Dyspepsia | 20 (11) | 0 |
| Gastroesophageal reflux disease | 18 (10) | 0 |
| Dry mouth | 15 (9) | 1 (<1) |
| Abdominal pain upper | 8 (5) | 0 |
| Abdominal distension | 8 (5) | 0 |
| **General disorders and administration site conditions** | | |
| Fatigue | 101 (57) | 19 (11) |
| Pyrexia | 59 (34) | 3 (2) |
| Chills | 24 (14) | 0 |
| Edema peripheral | 23 (13) | 1 (<1) |
| Asthenia | 19 (11) | 4 (2) |
| Chest pain | 11 (6) | 1 (<1) |
| Infusion site pain | 11 (6) | 0 |
| Pain | 10 (6) | 0 |
| Catheter site pain | 8 (5) | 0 |
| **Infections and infestations** | | |
| Herpes zoster | 18 (10) | 5 (3) |
| Upper respiratory tract infection | 18 (10) | 0 |
| Urinary tract infection | 17 (10) | 4 (2) |
| Sinusitis | 15 (9) | 0 |

| | | |
|---|---|---|
| Pneumonia | 14 (8) | 9 (5) |
| Febrile neutropenia | 11 (6) | 11 (6) |
| Oral candidiasis | 11 (6) | 2 (1) |
| Nasopharyngitis | 11 (6) | 0 |
| **Investigations** | | |
| Weight decreased | 31 (18) | 3 (2) |
| **Metabolism and nutrition disorders** | | |
| Anorexia | 40 (23) | 3 (2) |
| Dehydration | 24 (14) | 8 (5) |
| Decreased appetite | 22 (13) | 1 (<1) |
| Hypokalemia | 15 (9) | 9 (5) |
| **Musculoskeletal and connective tissue disorders** | | |
| Back pain | 25 (14) | 5 (3) |
| Arthralgia | 11 (6) | 0 |
| Pain in extremity | 8 (5) | 2 (1) |
| Bone pain | 8 (5) | 0 |
| **Nervous system disorders** | | |
| Headache | 36 (21) | 0 |
| Dizziness | 25 (14) | 0 |
| Dysgeusia | 13 (7) | 0 |
| **Psychiatric disorders** | | |
| Insomnia | 23 (13) | 0 |
| Anxiety | 14 (8) | 1 (<1) |
| Depression | 10 (6) | 0 |
| **Respiratory, thoracic and mediastinal disorders** | | |
| Cough | 38 (22) | 1 (<1) |
| Dyspnea | 28 (16) | 3 (2) |
| Pharyngolaryngeal pain | 14 (8) | 1 (<1) |
| Wheezing | 8 (5) | 0 |
| Nasal congestion | 8 (5) | 0 |
| **Skin and subcutaneous tissue disorders** | | |
| Rash | 28 (16) | 1 (<1) |
| Pruritus | 11 (6) | 0 |
| Dry skin | 9 (5) | 0 |
| Night sweats | 9 (5) | 0 |
| Hyperhidrosis | 8 (5) | 0 |
| **Vascular disorders** | | |
| Hypotension | 10 (6) | 2 (1) |

**\*Patients may have reported more than 1 adverse reaction.**
**NOTE:** Patients counted only once in each preferred term category and once in each system organ class category

Hematologic toxicities, based on laboratory values and CTC grade, in NHL patients treated in both single arm studies combined are described in Table 4. Clinically important chemistry laboratory values that were new or worsened from baseline and occurred in >1% of patients at Grade 3 or 4, in NHL patients treated in both single arm studies combined were hyperglycemia (3%), elevated creatinine (2%), hyponatremia (2%), and hypocalcemia (2%).

**Table 4: Incidence of Hematology Laboratory Abnormalities in Patients Who Received Bendamustine Hydrochloride in the NHL Studies**

| Hematology Variable | Percent of Patients | |
|---|---|---|
| | **All Grades** | **Grade 3/4** |
| Lymphocytes Decreased | 99 | 94 |
| Leukocytes Decreased | 94 | 56 |
| Hemoglobin Decreased | 88 | 11 |
| Neutrophils Decreased | 86 | 60 |
| Platelets Decreased | 86 | 25 |

In both studies, serious adverse reactions, regardless of causality, were reported in 37% of patients receiving bendamustine hydrochloride. The most common serious adverse reactions occurring in ≥5% of patients were febrile neutropenia and pneumonia. Other important serious adverse reactions reported in clinical trials and/or post-marketing experience were acute renal failure, cardiac failure, hypersensitivity, skin reactions, pulmonary fibrosis, and myelodysplastic syndrome.

Serious drug-related adverse reactions reported in clinical trials included myelosuppression, infection, pneumonia, tumor lysis syndrome and infusion reactions. Adverse reactions occurring less frequently but possibly related to bendamustine hydrochloride treatment were hemolysis, dysgeusia/taste disorder, atypical pneumonia, sepsis, herpes zoster, erythema, dermatitis, and skin necrosis.

**6.2 Postmarketing Experience**
The following adverse reactions have been identified during post-approval use of bendamustine hydrochloride. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

*Blood and lymphatic systems disorders:* Pancytopenia

*Cardiovascular disorders:* Atrial fibrillation, congestive heart failure (some fatal), myocardial infarction (some fatal), palpitation
*General disorders and administration site conditions:* Injection site reactions (including phlebitis, pruritus, irritation, pain, swelling), infusion site reactions (including phlebitis, pruritus, irritation, pain, swelling)

*Immune system disorders:* Anaphylaxis

*Infections and infestations:* Pneumocystis jirovecii pneumonia, progressive multifocal leukoencephalopathy (PML)

*Renal and urinary disorders:* Nephrogenic diabetes insipidus (NDI)

*Respiratory, thoracic and mediastinal disorders:* Pneumonitis

*Skin and subcutaneous tissue disorders:* Drug reaction with eosinophilia and systemic symptoms (DRESS), non-melanoma skin cancer (NMSC), Stevens-Johnson syndrome (SJS), toxic epidermal necrolysis (TEN).

# 7 DRUG INTERACTIONS

## 7.1 Effect of Other Drugs on Bendamustine Hydrochloride Injection

<u>CYP1A2 Inhibitors</u>
The coadministration of bendamustine hydrochloride injection with CYP1A2 inhibitors may increase bendamustine plasma concentrations and may result in increased incidence of adverse reactions with bendamustine hydrochloride injection *[see Clinical Pharmacology (12.3)]*. Consider alternative therapies that are not CYP1A2 inhibitors during treatment with bendamustine hydrochloride injection.

<u>CYP1A2 Inducers</u>
The coadministration of bendamustine hydrochloride injection with CYP1A2 inducers may decrease bendamustine plasma concentrations and may result in decreased efficacy of bendamustine hydrochloride injection *[see Clinical Pharmacology (12.3)]*. Consider alternative therapies that are not CYP1A2 inducers during treatment with bendamustine hydrochloride injection.

# 8 USE IN SPECIFIC POPULATIONS

## 8.1 Pregnancy
<u>Risk Summary</u>
In animal reproduction studies, intraperitoneal administration of bendamustine to pregnant mice and rats during organogenesis at doses 0.6 to 1.8 times the maximum recommended human dose (MRHD) resulted in embryo-fetal and/or infant mortality, structural abnormalities, and alterations to growth *(see Data)*. There are no available data on bendamustine hydrochloride use in pregnant women to evaluate for a drug-associated risk of major birth defects, miscarriage or adverse maternal or fetal outcomes. Advise pregnant women of the potential risk to a fetus.

The estimated background risk of major birth defects and miscarriage for the indicated population is unknown. All pregnancies have a background risk of birth defect, loss, or other adverse outcomes. In the U.S. general population, the estimated background risk of major birth defects and miscarriage in clinically recognized pregnancies is 2% to 4% and 15% to 20%, respectively.

<u>*Data*</u>

*Animal Data*
Bendamustine hydrochloride was intraperitoneally administered once to mice from 210 mg/m$^2$ (approximately 1.8 times the MRHD) during organogenesis and caused an increase in resorptions, skeletal and visceral malformations (exencephaly, cleft palates, accessory rib, and spinal deformities) and decreased fetal body weights. This dose did not appear to be maternally toxic and lower doses were not evaluated. Repeat intraperitoneal administration of bendamustine hydrochloride in mice on gestation days 7 to 11 resulted in an increase in resorptions from 75 mg/m$^2$ (approximately 0.6 times the MRHD) and an increase in abnormalities from 112.5 mg/m$^2$ (approximately 0.9 times the MRHD), similar to those seen after a single intraperitoneal administration.

Bendamustine hydrochloride was intraperitoneally administered once to rats from 120 mg/m$^2$ (approximately the MRHD) on gestation days 4, 7, 9, 11, or 13 and caused embryo and fetal lethality as indicated by increased resorptions and a decrease in live fetuses. A significant increase in external (effect on tail, head, and herniation of external organs [exomphalos]) and internal (hydronephrosis and hydrocephalus) malformations were seen in dosed rats.

10

**8.2 Lactation**

Risk Summary

There are no data on the presence of bendamustine hydrochloride or its metabolites in either human or animal milk, the effects on the breastfed child, or the effects on milk production. Because of the potential for serious adverse reactions in the breastfed child, advise women not to breastfeed during treatment with bendamustine hydrochloride injection, and for 1 week after the last dose.

**8.3 Females and Males of Reproductive Potential**

Bendamustine hydrochloride injection can cause embryo-fetal harm when administered to a pregnant woman *[see Use in Specific Populations (8.1)]*.

Pregnancy Testing

Pregnancy testing is recommended for females of reproductive potential prior to initiation of treatment with bendamustine hydrochloride injection.

Contraception

*Females*

Advise female patients of reproductive potential to use effective contraception during treatment with bendamustine hydrochloride injection and for 6 months after the last dose.

*Males*

Based on genotoxicity findings, advise males with female partners of reproductive potential to use effective contraception during treatment with bendamustine hydrochloride injection and for 3 months after the last dose *[see Nonclinical Toxicology (13.1)]*.

Infertility

Based on findings from clinical studies, bendamustine hydrochloride injection may impair male fertility. Impaired spermatogenesis, azoospermia, and total germinal aplasia have been reported in male patients treated with alkylating agents, especially in combination with other drugs. In some instances, spermatogenesis may return in patients in remission, but this may occur only several years after intensive chemotherapy has been discontinued. Advise patients of the potential risk to their reproductive capacities.

Based on findings from animal studies, bendamustine hydrochloride injection may impair male fertility due to an increase in morphologically abnormal spermatozoa. The long-term effects of bendamustine hydrochloride injection on male fertility, including the reversibility of adverse effects, have not been studied *[see Nonclinical Toxicology (13.1)]*.

**8.4 Pediatric Use**

Safety and effectiveness in pediatric patients have not been established.

Safety, pharmacokinetics and efficacy were assessed in a single open-label trial (NCT01088984) in patients aged 1 to 19 years with relapsed or refractory acute leukemia, including 27 patients with acute lymphocytic leukemia (ALL) and 16 patients with acute myeloid leukemia (AML). Bendamustine hydrochloride was administered as an intravenous infusion over 60 minutes on Days 1 and 2 of each 21-day cycle. There was no treatment response (CR+ CRp) in any patient. The safety profile in these patients was consistent with that seen in adults, and no new safety signals were identified.

The pharmacokinetics of bendamustine in 43 patients, aged 1 to 19 years (median age of 10 years) were within range of values previously observed in adults given the same dose based on body surface area.

**8.5 Geriatric Use**

No overall differences in safety were observed between patients ≥65 years of age and younger patients. No overall differences in efficacy in patients with non-Hodgkin Lymphoma were observed between geriatric patients and younger patients.

**8.6 Renal Impairment**

Do not use bendamustine hydrochloride injection in patients with creatinine clearance (CLcr) < 30 mL/min *[see Clinical Pharmacology (12.3)]*.

**8.7 Hepatic Impairment**

Do not use bendamustine hydrochloride injection in patients with AST or ALT 2.5 to 10 × upper limit of normal (ULN) and total bilirubin 1.5 to 3 × ULN, or total bilirubin > 3 × ULN *[see Clinical Pharmacology (12.3)]*.

**10 OVERDOSAGE**

The intravenous $LD_{50}$ of bendamustine hydrochloride is 240 mg/m$^2$ in the mouse and rat. Toxicities included sedation, tremor, ataxia, convulsions and respiratory distress.

Across all clinical experience, the reported maximum single dose received was 280 mg/m$^2$. Three of four patients treated at this dose showed ECG changes considered dose-limiting at 7 and 21 days post-dosing. These changes included QT prolongation (one patient), sinus tachycardia (one patient), ST and T wave deviations (two patients) and left anterior fascicular block (one patient). Cardiac enzymes and ejection fractions remained normal in all patients.

No specific antidote for bendamustine hydrochloride overdose is known. Management of overdosage should include general supportive measures, including monitoring of hematologic parameters and ECGs.

**11 DESCRIPTION**

Bendamustine hydrochloride is an alkylating agent. The chemical name of bendamustine hydrochloride is 1H-benzimidazole-2-butanoic acid, 5-[bis(2-chloroethyl)amino]-1 methyl-, monohydrochloride, monohydrate. Its empirical molecular formula is $C_{16}H_{21}Cl_2N_3O_2 \cdot HCl$. $H_2O$ and the molecular weight is 412.74 g/mol. Bendamustine hydrochloride contains a mechlorethamine group and a benzimidazole heterocyclic ring with a butyric acid substituent, and has the following structural formula:



Bendamustine hydrochloride injection for intravenous use is supplied as a sterile, clear, and colorless to yellow solution in a multiple-dose clear glass vial. Each milliliter contains 25 mg of bendamustine hydrochloride, USP, 38 mg (3.8%) absolute ethanol, 5 mg monothioglycerol, NF in polyethylene glycol 400, and 0.08 mg sodium hydroxide is used to adjust the acidity of polyethylene glycol 400 NF. Each mL contains 25 mg Bendamustine hydrochloride, which is equivalent to 22.7 mg Bendamustine free base.

## 12 CLINICAL PHARMACOLOGY

### 12.1 Mechanism of Action

Bendamustine is a bifunctional mechlorethamine derivative containing a purine-like benzimidazole ring. Mechlorethamine and its derivatives form electrophilic alkyl groups. These groups form covalent bonds with electron-rich nucleophilic moieties, resulting in interstrand DNA crosslinks. The bifunctional covalent linkage can lead to cell death via several pathways. Bendamustine is active against both quiescent and dividing cells. The exact mechanism of action of bendamustine remains unknown.

### 12.2 Pharmacodynamics

Based on the pharmacokinetics/pharmacodynamics analyses of data from adult NHL patients, nausea increased with increasing bendamustine $C_{max}$.

<u>Cardiac Electrophysiology</u>
The effect of bendamustine on the QTc interval was evaluated in 53 patients with indolent NHL and mantle cell lymphoma on Day 1 of Cycle 1 after administration of rituximab at 375 mg/m$^2$ intravenous infusion followed by a 30-minute intravenous infusion of bendamustine at 90 mg/m$^2$/day. No mean changes greater than 20 milliseconds were detected up to one hour post infusion. The potential for delayed effects on the QT interval after one hour was not evaluated.

### 12.3 Pharmacokinetics

<u>Absorption</u>
Following a single IV dose of bendamustine hydrochloride $C_{max}$ typically occurred at the end of infusion. The dose proportionality of bendamustine has not been studied.

<u>Distribution</u>
The protein binding of bendamustine ranged from 94% to 96% and was concentration independent from 1 to 50 mcg/mL. The blood to plasma concentration ratios in human blood ranged from 0.84 to 0.86 over a concentration range of 10 to 100 mcg/mL.

The mean steady-state volume of distribution ($V_{ss}$) of bendamustine was approximately 20 to 25 L.

<u>Elimination</u>
After a single intravenous dose of 120 mg/m$^2$ of bendamustine over 1 hour, the intermediate half-life ($t_{\frac{1}{2}}$) of the parent compound is approximately 40 minutes. The mean terminal elimination $t_{\frac{1}{2}}$ of two active metabolites, $\gamma$-hydroxybendamustine (M3) and N-desmethylbendamustine (M4) are approximately 3 hours and 30 minutes, respectively. Bendamustine clearance in humans is approximately 700 mL/min.

*Metabolism*
Bendamustine is extensively metabolized via hydrolytic, oxidative, and conjugative pathways. Bendamustine is primarily metabolized via hydrolysis to monohydroxy (HP1) and dihydroxy-bendamustine (HP2) metabolites with low cytotoxic activity *in vitro*. Two active minor metabolites, M3 and M4, are primarily formed via CYP1A2 *in vitro*. M3 and M4 concentrations of these metabolites in plasma are 1/10[th] and 1/100[th] that of the parent compound, respectively.

*Excretion*
Following IV infusion of radiolabeled bendamustine hydrochloride in cancer patients, approximately 76% of the dose was recovered. Approximately 50% of the dose was recovered in the urine (3.3% unchanged) and approximately 25% of the dose was recovered in the feces.

13

Less than 1% of the dose was recovered in the urine as M3 and M4, and less than 5% of the dose was recovered in the urine as HP2.

*Specific Populations*
No clinically meaningful effects on the pharmacokinetics of bendamustine were observed based on age (31 to 84 years), sex, mild to moderate renal impairment (CLcr ≥ 30 mL/min), or hepatic impairment with total bilirubin 1.5 < ULN and AST or ALT < 2.5 × ULN. The effects of severe renal impairment (CLcr < 30 mL/min), or hepatic impairment with total bilirubin 1.5-3 × ULN and AST or ALT 2.5-10 × ULN or total bilirubin > 3 × ULN on the pharmacokinetics of bendamustine is unknown.

*Race/Ethnicity*
Exposures in Japanese subjects (n=6) were 40% higher than that in non-Japanese subjects receiving the same dose. The clinical importance of this difference on the safety and efficacy of bendamustine hydrochloride in Japanese subjects has not been established.

Drug Interaction Studies
*In Vitro Studies*

*Effect of Bendamustine on CYP Substrates*
Bendamustine did not inhibit CYP1A2, 2C9/10, 2D6, 2E1, or 3A4/5. Bendamustine did not induce metabolism of CYP1A2, CYP2A6, CYP2B6, CYP2C8, CYP2C9, CYP2C19, CYP2E1, or CYP3A4/5.

*Effect of Transporters on Bendamustine Hydrochloride*
Bendamustine is a substrate of P-glycoprotein and breast cancer resistance protein (BCRP).

## 13 NONCLINICAL TOXICOLOGY

### 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

Bendamustine was carcinogenic in mice. After intraperitoneal injections at 37.5 $mg/m^2$/day (the lowest dose tested, approximately 0.3 times the maximum recommended human dose [MRHD]) and 75 $mg/m^2$/day (approximately 0.6 times the MRHD) for 4 days, peritoneal sarcomas in female AB/jena mice were produced. Oral administration at 187.5 $mg/m^2$/day (the only dose tested, approximately 1.6 times the MRHD) for 4 days induced mammary carcinomas and pulmonary adenomas.

Bendamustine is a mutagen and clastogen. In a reverse bacterial mutation assay (Ames assay), bendamustine was shown to increase revertant frequency in the absence and presence of metabolic activation. Bendamustine was clastogenic in human lymphocytes *in vitro*, and in rat bone marrow cells *in vivo* (increase in micronucleated polychromatic erythrocytes) from 37.5 $mg/m^2$ (the lowest dose tested, approximately 0.3 times the MRHD).

Bendamustine induced morphologic abnormalities in spermatozoa in mice. Following tail vein injection of bendamustine at 120 $mg/m^2$ or a saline control on days 1 and 2 for a total of 3 weeks, the number of spermatozoa with morphologic abnormalities was 16% higher in the bendamustine-treated group as compared to the saline control group.

## 14 CLINICAL STUDIES

### Non-Hodgkin Lymphoma (NHL)

The efficacy of bendamustine hydrochloride was evaluated in a single arm study of 100 patients with indolent B-cell NHL that had progressed during or within six months of treatment with rituximab or a rituximab-containing regimen. Patients were included if they relapsed within 6 months of either the first dose (monotherapy) or last dose (maintenance regimen or

combination therapy) of rituximab. All patients received bendamustine hydrochloride intravenously at a dose of 120 mg/m$^2$, on Days 1 and 2 of a 21-day treatment cycle. Patients were treated for up to 8 cycles.

The median age was 60 years, 65% were male, and 95% had a baseline WHO performance status of 0 or 1. Major tumor subtypes were follicular lymphoma (62%), diffuse small lymphocytic lymphoma (21%), and marginal zone lymphoma (16%). Ninety-nine percent of patients had received previous chemotherapy, 91% of patients had received previous alkylator therapy, and 97% of patients had relapsed within 6 months of either the first dose (monotherapy) or last dose (maintenance regimen or combination therapy) of rituximab.

Efficacy was based on the assessments by a blinded independent review committee (IRC) and included overall response rate (complete response + complete response unconfirmed + partial response) and duration of response (DR) as summarized in Table 6.

**Table 6: Efficacy Data for NHL***

|  | Bendamustine Hydrochloride (N=100) |
|---|---|
| **Response Rate (%)** | |
| Overall response rate (CR+CRu+PR) | 74 |
| (95% CI) | (64.3, 82.3) |
| Complete response (CR) | 13 |
| Complete response unconfirmed (CRu) | 4 |
| Partial response (PR) | 57 |
| **Duration of Response (DR)** | |
| Median, months (95% CI) | 9.2 months (7.1, 10.8) |

CI = confidence interval
*IRC assessment was based on modified International Working Group response criteria (IWG-RC). Modifications to IWG-RC specified that a persistently positive bone marrow in patients who met all other criteria for CR would be scored as PR. Bone marrow sample lengths were not required to be ≥20 mm.

## 15 REFERENCES

1. OSHA Hazardous Drugs. OSHA.
   [http://www.osha.gov/SLTC/hazardousdrugs/index.html]

## 16 HOW SUPPLIED/STORAGE AND HANDLING

Safe Handling and Disposal
Bendamustine hydrochloride injection is a hazardous drug. Follow applicable special handling and disposal procedures[1]. Care should be exercised in the handling and preparation of solutions prepared from bendamustine hydrochloride injection. The use of gloves and safety glasses is recommended to avoid exposure in case of breakage of the vial or other accidental spillage. If gloves come in contact with bendamustine hydrochloride injection prior to dilution, remove gloves and follow disposal procedures[1]. If a solution of bendamustine hydrochloride injection contacts the skin, wash the skin immediately and thoroughly with soap and water. If bendamustine hydrochloride injection contacts the mucous membranes, flush thoroughly with water.

15

How Supplied

Bendamustine hydrochloride injection is supplied in individual cartons of clear multiple-dose vials containing 100 mg of bendamustine hydrochloride as a clear, and colorless to yellow solution.

NDC 60505-6228-0: 100 mg/4 mL (25 mg/mL).

Storage

Store bendamustine hydrochloride injection in refrigerator, 2ºC to 8ºC (36ºF to 46ºF). Retain in original carton until contents are used to protect from light.

## 17 PATIENT COUNSELING INFORMATION

Myelosuppression

Inform patients of the likelihood that bendamustine hydrochloride injection will cause a decrease in white blood cells, platelets, and red blood cells, and the need for frequent monitoring of blood counts. Advise patients to report shortness of breath, significant fatigue, bleeding, fever, or other signs of infection *[see Warnings and Precautions (5.1)]*.

Progressive Multifocal Leukoencephalopathy (PML)

Inform patients to immediately contact their healthcare provider if they experience confusion, memory loss, trouble thinking, difficulty talking or walking, vision loss or other neurological or cognitive symptoms *[see Warnings and Precautions (5.3)]*.

Anaphylaxis and Infusion Reactions

Inform patients of the possibility of serious or mild allergic reactions and to immediately report rash, facial swelling, or difficulty breathing during or soon after infusion. *[see Warnings and Precautions (5.4)]*

Skin Reactions

Advise patients that a rash or itching may occur during treatment with bendamustine hydrochloride injection. Advise patients to immediately report severe or worsening rash or itching. *[see Warnings and Precautions (5.6)]*

Hepatotoxicity

Inform patients of the possibility of developing liver function abnormalities and serious hepatic toxicity. Advise patients to immediately contact their health care provider if signs of liver failure occur, including jaundice, anorexia, bleeding or bruising *[see Warnings and Precautions (5.7)]*.

Fatigue

Advise patients that bendamustine hydrochloride injection may cause tiredness and to avoid driving any vehicle or operating any dangerous tools or machinery if they experience this side effect *[see Adverse Reactions (6.1)]*.

Nausea and Vomiting

Advise patients that bendamustine hydrochloride injection may cause nausea and/or vomiting. Patients should report nausea and vomiting so that symptomatic treatment may be provided *[see Adverse Reactions (6.1)]*.

Diarrhea

Advise patients that bendamustine hydrochloride injection may cause diarrhea. Patients should report diarrhea to the physician so that symptomatic treatment may be provided *[see Adverse Reactions (6.1)]*.

16

Non-melanoma Skin Cancer (NMSC)
Advise patients to undergo regular skin cancer screenings, and to report any suspicious skin changes to their healthcare provider *[see Warnings and Precautions (5.8)]*.

Embryo-Fetal Toxicity
Advise pregnant women and females of reproductive potential of the potential risk to a fetus. Advise females to inform their healthcare provider of a known or suspected pregnancy *[see Warnings and Precautions (5.10), Use in Specific Populations (8.1, 8.3), and Nonclinical Toxicology (13.1)]*. Advise female patients of reproductive potential to use effective contraception during treatment with bendamustine hydrochloride injection and for 6 months after the last dose *[see Use in Specific Populations (8.1, 8.3)]*. Advise males with female partners of reproductive potential to use effective contraception during treatment with bendamustine hydrochloride injection and for 3 months after the last dose *[see Use in Specific Populations (8.3), and Nonclinical Toxicology (13.1)]*.

Lactation
Advise females not to breastfeed during treatment with bendamustine hydrochloride injection and for 1 week after the last dose *[see Use in Specific Populations (8.2)]*.

Infertility
Advise males of reproductive potential that bendamustine hydrochloride injection may impair fertility *[see Use in Specific Populations (8.3)]*.

**Manufactured by:**
MSN Laboratories Private Limited, India
ML No. 5/MN/TS/2014/F/G

**Manufactured for:**
Apotex Corp.
Weston, Florida
USA 33326

Rev 3

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INVENSAS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 11-448-GMS-CJB |
| | ) | |
| RENESAS ELECTRONICS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

At Wilmington this **21st day of December, 2012.**

WHEREAS, on November 21, 2012, the Court issued an order that directed Defendant Renesas Electronics Corporation ("Defendant") to produce samples of certain of its BGA packaged products to Plaintiff Invensas Corporation ("Plaintiff") and provide to the Court with a submission stating both the market price for each sample and Defendant's cost to produce each sample, for the Court's consideration in deciding whether and how the cost of this production should be apportioned between the parties (D.I. 53 at 27–28);

WHEREAS, on December 12, 2012 and December 13, 2012, Defendant filed its submission and an amendment to that submission (D.I. 54, 55), which the Court has reviewed;

WHEREAS, Defendant has identified 226 sample products available to be produced to Plaintiff in accordance with the Court's November 21, 2012 Order (D.I. 55, ex. A at Amended Chart);[1]

---

[1] Defendant's submission offers to produce a scope of samples that is broader than that ordered by the Court. The Court's November 21, 2012 Order directed Defendant to "provide to Plaintiff samples of all of its BGA packaged products that it currently makes, uses, offers to

1

Case 1:24-cv-00064-JLH    Document 162    Filed 05/23/25    Page 26 of 66 PageID #:
3661
Case 1:11-cv-00448-GMS    Document 59    Filed 12/21/12    Page 2 of 4 PageID #: 923

WHEREAS, while the majority of the 226 sample products are "general products" for which Defendant can fulfill a special order of just one chip, twenty-five of the sample products can only be produced as a packaged box (the "twenty-five sample products"), meaning there is a minimum order quantity for those products that ranges from 100–1,000 units (D.I. 55, ex. A at 1–2);

WHEREAS, the estimated market value of the 201 samples for which Defendant can produce a single chip totals less than seven thousand dollars[2] (*Id.* at Amended Chart);

WHEREAS, the estimated market value of all sample products, including the twenty-five sample products for which a minimum order quantity must be produced, totals over two hundred seventy thousand dollars (such that the total market value of the twenty-five sample products is significantly greater than the total market value of the 201 remaining "general products") (*Id.*);

WHEREAS, Defendant has offered to produce to Plaintiff the core technical documents describing the substrate structures for each of the twenty-five sample products in lieu of producing the minimum order quantity for those products (*Id.* at 2–3);

WHEREAS, generally the "'responding party must bear the expense of complying with discovery requests.'" *Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 674 F.3d 158, 170–71 (3d Cir. 2012) (quoting *Oppenheimer Fund, Inc.* v. *Sanders*, 437 U.S. 340, 358 (1978));

---

sell or sells within the United States or imports into the United States." (D.I. 53 at 27) Defendant's submission includes the requested information for the "BGA products for which at least one sample was shipped or was subject to a purchase order from or to Renesas Electronics America—[Defendant's] U.S. distributor—since April 1, 2011." (D.I. 55, ex. A at 1)

[2]    Although Defendant asserts that it does not and cannot track the cost of production for the sample products on a chip-by-chip basis, it estimates this amount to be 106% of the market value for each sample product. (*Id.* at 2)

*see also Caliper Techs. Corp. v. Molecular Devices Corp.*, 213 F.R.D. 555, 558 (N.D. Cal. 2003) (noting that "[n]ormally, the producing party bears the cost of production . . . .");

WHEREAS, the Court may, if necessary, exercise its discretion to allocate all or part of discovery costs to the requesting party "'to protect the responding party from undue . . . expense.'" *Peskoff v. Faber*, 251 F.R.D. 59, 61 (D.D.C. 2008) (quoting *Oppenheimer*, 437 U.S. at 358); (*see also* D.I. 53 at 27 (citing cases));

THEREFORE, it is HEREBY ORDERED that:

1.  With regard to the 201 "general products," Defendant shall bear the entire cost of production of those products, as the Court finds that the estimated market value of these products does not place such an "undue expense" on Defendant that cost-shifting to Plaintiff is warranted.

2.  As to the production of the remaining twenty-five sample products for which there is a minimum order quantity, if Plaintiff does not choose to accept the proffered core technical documents for such products in lieu of the actual samples, and instead chooses to receive the actual sample products, Plaintiff shall pay to Defendant one-third of the total estimated market value of these products, as the Court finds that such cost-shifting will sufficiently protect Defendant from undue expense. *Cf. Caliper Techs.*, 213 F.R.D. at 558 (requiring non-producing party to pay $500 per kit for production of kits by defendant, where retail price of the kits was $1,600 per kit).

3.  Because this Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Order. Any such redacted version shall be submitted no later

than **January 4, 2013** for review by the Court.  The Court will subsequently issue a

publicly-available version of its Order.


Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

4

# EXHIBIT C

| From: | Alex.Grabowski@lw.com |
|---|---|
| To: | Ferenc, Christopher B.; Schweers, Rachel; Kelly.Welsh@lw.com; EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com; EagleLitigation@McCarter.com; DSilver@McCarter.com; amiller@mccarter.com; wproctor@McCarter.com; ajoyce@mccarter.com; mzare@mccarter.com |
| Cc: | Kenneth Dorsney; Cortlan Hitch; jppara@morrisjames.com; El-Khoury, Dawn S.; Soderstrom, Lance A.; Janusz, Joe; Mukerjee, Deepro R.; Malik, Jitty |
| Subject: | RE: Eagle Pharmaceuticals, Inc. v. Apotex Inc., et al., C.A. No. 24-64-JLH (D. Del) |
| Date: | Thursday, October 17, 2024 11:09:05 AM |
| Attachments: | image001.jpg |

*EXTERNAL EMAIL – EXERCISE CAUTION*



Chris,

Thank you for your proposal.  In light of Defendants' October 15 email agreeing to the production of key non-custodial documents, Eagle can agree to the search terms from Apotex's prior email.  For the sake of clarity, we have reproduced those terms in clean form below.

Best,
Alex

| |
|---|
| ("bendamustine hydrochloride" w/3 "liquid") w/15 (promot* OR advertis* OR commercial* OR sale* OR sell* OR sold OR profit* OR demand* OR revenue* OR market* OR forecast*) |
| (Belrapzo) w/5 (promot* OR advertis* OR commercial* OR sale* OR sell* OR sold OR profit* OR demand* OR revenue* OR market* OR forecast*) |
| (11844783 OR "11,844,783") AND patent<br>(11872214 OR "11,872,214") AND patent |
| 783 w/2 patent<br>214 w/2 patent |
| (Bendeka OR Belrapzo OR Eagle) w/15 (substit* OR market* OR share* OR compet* OR trend* OR switch*) |
| ((benda*) w/15 (label* OR insert OR indicat*)) AND NOT (lyo* OR "powder") |
| ((benda*) w/15 (NaOH OR "sodium hydroxide")) AND NOT (lyo* OR "powder") |

**Alex Grabowski**

**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800 | Chicago, IL 60611
D: +1.312.876.6556

---

**From:** Ferenc, Christopher B. <christopher.ferenc@katten.com>
**Sent:** Wednesday, October 16, 2024 4:13 PM
**To:** Schweers, Rachel <rachel.schweers@katten.com>; Grabowski, Alex (CH) <Alex.Grabowski@lw.com>; Welsh, Kelly (DC) <Kelly.Welsh@lw.com>; #C-M EAGLE BENDAMUSTINE LITIGATION - LW TEAM <EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com>; EagleLitigation@McCarter.com; DSilver@McCarter.com; amiller@mccarter.com; wproctor@McCarter.com; ajoyce@mccarter.com; mzare@mccarter.com

**Cc:** Kenneth Dorsney <kdorsney@morrisjames.com>; Cortlan Hitch <chitch@morrisjames.com>; ippara@morrisjames.com; El-Khoury, Dawn S. <dawn.el-khoury@katten.com>; Soderstrom, Lance A. <lance.soderstrom@katten.com>; Janusz, Joe <joe.janusz@katten.com>; Mukerjee, Deepro R. <deepro.mukerjee@katten.com>; Malik, Jitty <jitty.malik@katten.com>
**Subject:** RE: Eagle Pharmaceuticals, Inc. v. Apotex Inc., et al., C.A. No. 24-64-JLH (D. Del)

Alex,

Apotex would like to move forward with running the ESI search. Please let us know if Eagle agrees to the proposal set out in our October 3 e-mail.

Regards,

**Christopher B. Ferenc**
Partner

# Katten

Katten Muchin Rosenman LLP
1919 Pennsylvania Ave., NW., Suite 800 | Washington, DC 20006
direct +1.202.625.3647
christopher.ferenc@katten.com | katten.com

---

**From:** Schweers, Rachel <rachel.schweers@katten.com>
**Sent:** Thursday, October 3, 2024 3:32 PM
**To:** Alex.Grabowski@lw.com; Ferenc, Christopher B. <christopher.ferenc@katten.com>; Kelly.Welsh@lw.com; EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com; EagleLitigation@McCarter.com; DSilver@McCarter.com; amiller@mccarter.com; wproctor@McCarter.com; ajoyce@mccarter.com; mzare@mccarter.com
**Cc:** Kenneth Dorsney <kdorsney@morrisjames.com>; Cortlan Hitch <chitch@morrisjames.com>; ippara@morrisjames.com; El-Khoury, Dawn S. <dawn.el-khoury@katten.com>; Soderstrom, Lance A. <lance.soderstrom@katten.com>; Janusz, Joe <joe.janusz@katten.com>; Mukerjee, Deepro R. <deepro.mukerjee@katten.com>; Malik, Jitty <jitty.malik@katten.com>
**Subject:** RE: Eagle Pharmaceuticals, Inc. v. Apotex Inc., et al., C.A. No. 24-64-JLH (D. Del)

Alex,

The *Upsher* case cited in your e-mail is does not support Eagle's contention that it is allowed to propose additional search *strings*. In contrast, the *Frontier* case makes clear that the additional proposed terms are limited to modifiers in the search strings offered. As recognized by both the *Upsher* and *Frontier* courts, the "w/10" or "w/15" limits on the "substitution" string focuses that search on the issues relevant to case, without placing an undue burden on Apotex. Similarly, the "NOT" connectors in the last two strings have been revised to appropriately focus the search and to exclude documents directed to powder products. Your proposal was unworkable because its restrictions on the "lyo" exclusion are too severe. For example, the labeling for the lyophilized products includes the word "liquid." Such documents would be included in Eagle's proposed search.

In an effort to reach a compromise on the issue, we propose the following search. Please let us

know if Eagle agrees to the proposal.

| |
|---|
| ("bendamustine hydrochloride" w/3 "liquid") **w/15** (promot* OR advertis* OR commercial* OR sale* OR sell* OR sold OR profit* OR demand* OR revenue* OR market* OR forecast*) |
| (Belrapzo) w/5 (promot* OR advertis* OR commercial* OR sale* OR sell* OR sold OR profit* OR demand* OR revenue* OR market* OR forecast*) |
| (11844783 OR "11,844,783") AND patent<br>(11872214 OR "11,872,214") AND patent |
| 783 w/2 patent<br>214 w/2 patent |
| (Bendeka OR Belrapzo OR Eagle) **w/15** (substit* OR market* OR share* OR compet* OR trend* OR switch*) |
| ((benda*/3 "liquid") **w/15** (label* OR insert OR indicat*)) AND NOT (lyo* **OR "powder"**) ~~(AND NOT liquid))~~ |
| ((benda*/3 "liquid") **w/15** (NaOH OR "sodium hydroxide")) AND NOT (lyo* **OR "powder"**) ~~(AND NOT liquid))~~ |

Kind regards,
Rachel

**Rachel Leininger Schweers, Ph.D.**
Counsel

**Katten**

Katten Muchin Rosenman LLP
525 W. Monroe Street | Chicago, IL 60661-3693
direct +1.312.902.5413
rachel.schweers@katten.com | katten.com

---

**From:** Alex.Grabowski@lw.com <Alex.Grabowski@lw.com>
**Sent:** Tuesday, October 1, 2024 4:58 PM
**To:** Ferenc, Christopher B. <christopher.ferenc@katten.com>; Schweers, Rachel <rachel.schweers@katten.com>; Kelly.Welsh@lw.com; EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com; EagleLitigation@McCarter.com; DSilver@McCarter.com; amiller@mccarter.com; wproctor@McCarter.com; ajoyce@mccarter.com; mzare@mccarter.com
**Cc:** Kenneth Dorsney <kdorsney@morrisjames.com>; Cortlan Hitch <chitch@morrisjames.com>; ippara@morrisjames.com; El-Khoury, Dawn S. <dawn.el-khoury@katten.com>; Soderstrom, Lance A. <lance.soderstrom@katten.com>; Janusz, Joe <joe.janusz@katten.com>; Mukerjee, Deepro R. <deepro.mukerjee@katten.com>; Malik, Jitty <jitty.malik@katten.com>
**Subject:** RE: Eagle Pharmaceuticals, Inc. v. Apotex Inc., et al., C.A. No. 24-64-JLH (D. Del)

*EXTERNAL EMAIL – EXERCISE CAUTION*
Chris,

We appreciate your confirmation that Apotex will search for and produce sales call reports without the use of search terms. As to the remaining terms, you provided no citation to support your assertion that disjunctive combinations of multiple words necessarily constitute different terms. Courts in Delaware do not follow such a rigorous approach. *See, e.g.*, *Upsher-Smith Laboratories LLC v. Zydus Pharmaceuticals (USA) Inc. et al.*, C.A. No. 21-1132-GBW, D.I. 158, Slip. Op. at 2 (D. Del. Nov. 7, 2023) (treating "(Glenmark OR Zydus) w/15 (settl* OR licens* OR relinquish* OR waiv* OR exclusiv* OR launch*)" as a single term). Indeed, even the case you cite does not support such a position. *Frontier Commc'ns Corp. v. Google Inc.*, No. CV 10-545-GMS, 2014 WL 12606321, at *5, n.7 (D. Del. Feb. 3, 2014) (explaining that "((gv or (google /2 voice)) or (gc or grandcentral or (grand /2 central))) /s 10 (telephone o phone) constitutes one (1) search term."). To that end, we disagree with your removal of "OR market* OR share* OR compet* OR trend*" from the first ter█ in your list, particularly as they are all variants of terms related market analyses and forecasts that Eagle is seeking. As to the introduction of "/3 liquid" for the remaining terms, such a string will not capture documents relevant to Apotex's NDA product that do not specifically discuss its liquid nature. We are, however, willing to allow Apotex to exclude documents purely related to any lyophilized bendamustine product from those two strings. Please let us know if the below proposal is acceptable.

Additionally, our prior correspondence asked for an update with respect to Apotex's position regarding the other damages documents discussed on our meet and confer (i.e., marketing documents, projections, forecasts, net pricing data, and quarterly P&L data from Q2 2023 forward, including net sales, COGS, gross profits, and operating expenses.). Please let us know whether Apotex agrees to produce such materials.

| |
|---|
| ("bendamustine hydrochloride" w/3* "liquid") AND (promot* OR advertis* OR commercial* OR sale* OR sell* OR sold OR profit* OR demand* OR revenue* OR market* OR forecast*) |
| (Belrapzo) w/5* (promot* OR advertis* OR commercial* OR sale* OR sell* OR sold OR profit* OR demand* OR revenue* OR market* OR forecast*) |
| (11844783 OR "11,844,783") AND patent<br>(11872214 OR "11,872,214") AND patent |
| 783 w/2* patent<br>214 w/2* patent |
| (Bendeka OR Belrapzo OR Eagle) AND (substit* **OR market\* OR share\* OR compet\* OR trend\*** OR switch*) |
| **(**(benda* ~~/3 "liquid"~~) AND (label* OR insert OR indicat*)**)) AND NOT (lyo\* (AND NOT liquid))** |
| **(**(benda* ~~/3 "liquid"~~) AND (NaOH OR "sodium hydroxide")**) AND NOT (lyo\* (AND NOT liquid))** |

Best,
Alex

**Alex Grabowski**

**LATHAM & WATKINS** LLP
330 North Wabash Avenue, Suite 2800 | Chicago, IL 60611
D: +1.312.876.6556

**From:** Ferenc, Christopher B. <christopher.ferenc@katten.com>
**Sent:** Friday, September 27, 2024 8:40 AM
**To:** Grabowski, Alex (CH) <Alex.Grabowski@lw.com>; Schweers, Rachel <rachel.schweers@katten.com>; Welsh, Kelly (DC) <Kelly.Welsh@lw.com>; #C-M EAGLE BENDAMUSTINE LITIGATION - LW TEAM <EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com>; EagleLitigation@McCarter.com; DSilver@McCarter.com; amiller@mccarter.com; wproctor@McCarter.com; ajoyce@mccarter.com; mzare@mccarter.com
**Cc:** Kenneth Dorsney <kdorsney@morrisjames.com>; Cortlan Hitch <chitch@morrisjames.com>; ippara@morrisjames.com; El-Khoury, Dawn S. <dawn.el-khoury@katten.com>; Soderstrom, Lance A. <lance.soderstrom@katten.com>; Janusz, Joe <joe.janusz@katten.com>; Mukerjee, Deepro R. <deepro.mukerjee@katten.com>; Malik, Jitty <jitty.malik@katten.com>
**Subject:** RE: Eagle Pharmaceuticals, Inc. v. Apotex Inc., et al., C.A. No. 24-64-JLH (D. Del)

Alex,

The proposed search terms offered by Eagle include several disjunctive combinations of multiple words, which broaden the search, and thus, count as separate search terms. This is particularly problematic where the offered search strings include different terms (as opposed to variants of the same term (e.g., NaOH or "sodium hydroxide")). Moreover, the Default Standard does not permit Eagle to propose additional search strings. *See, e.g., Frontier Commc'ns Corp. v. Google Inc.*, No. CV 10-545-GMS, 2014 WL 12606321, at *5, n.7 (D. Del. Feb. 3, 2014). In the interest of compromise, Apotex offers the following edits to the proposed search terms, subject to any further modification based on excessive hits:

| |
|---|
| ("bendamustine hydrochloride" w/3 " liquid") AND (promot* OR advertis* OR commercial* OR sale* OR sell* OR sold OR profit* OR demand* OR revenue* OR market* OR forecast*) |
| (Belrapzo) w/5* (promot* OR advertis* OR commercial* OR sale* OR sell* OR sold OR profit* OR demand* OR revenue* OR market* OR forecast*) |
| (11844783 OR "11,844,783") AND patent<br>(11872214 OR "11,872,214") AND patent |
| 783 w/2* patent<br>214 w/2* patent |
| (Bendeka OR Belrapzo OR Eagle) AND (substit* ~~OR market* OR share* OR compet* OR trend*~~ OR switch*) |
| (benda* **/3 "liquid"**) AND (label* OR insert OR indicat*)) |
| (benda* **/3 "liquid"**) AND (NaOH OR "sodium hydroxide") |

As discussed on the meet and confer last week, Apotex will conduct a reasonable search for sales call reports for its liquid bendamustine product and will produce the same if they exist. Please let us know if we have Eagle's agreement.

Regards,
Chris

**Christopher B. Ferenc**

Partner

## Katten

Katten Muchin Rosenman LLP
1919 Pennsylvania Ave., NW., Suite 800 | Washington, DC 20006
direct +1.202.625.3647
christopher.ferenc@katten.com | katten.com

---

**From:** Alex.Grabowski@lw.com <Alex.Grabowski@lw.com>
**Sent:** Wednesday, September 25, 2024 7:07 PM
**To:** Ferenc, Christopher B. <christopher.ferenc@katten.com>; Schweers, Rachel <rachel.schweers@katten.com>; Kelly.Welsh@lw.com; EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com; EagleLitigation@McCarter.com; DSilver@McCarter.com; amiller@mccarter.com; wproctor@McCarter.com; ajoyce@mccarter.com; mzare@mccarter.com
**Cc:** Kenneth Dorsney <kdorsney@morrisjames.com>; Cortlan Hitch <chitch@morrisjames.com>; jppara@morrisjames.com; El-Khoury, Dawn S. <dawn.el-khoury@katten.com>; Soderstrom, Lance A. <lance.soderstrom@katten.com>; Janusz, Joe <joe.janusz@katten.com>; Mukerjee, Deepro R. <deepro.mukerjee@katten.com>; Malik, Jitty <jitty.malik@katten.com>
**Subject:** RE: Eagle Pharmaceuticals, Inc. v. Apotex Inc., et al., C.A. No. 24-64-JLH (D. Del)

*EXTERNAL EMAIL – EXERCISE CAUTION*
Chris,

Eagle proposed five search terms as shown below, and it is unclear to us how Apotex counted to 30 based on those five.  Regardless, we disagree that our terms were not compliant with the Delaware Default Standard.  The "benda* AND (label* OR insert OR indicat*)" term you identified is narrowly tailored to capture documents concerning the package insert or labeling for Apotex's bendamustine product.  Such documents are relevant to at least induced infringement and are responsive to at least RFPs 3, 4, 8, 16, 67 and 68.  As to "Benda* AND (sale* w/10 (call* OR report* OR office OR visit OR site OR hospital OR clinic OR center))," this term is designed to capture sales call reports, which were discussed on our prior meet and confer.  (Sep. 20, 2024 Ltr. from A. Grabowski to C. Ferenc at 2-3).  Our understanding is that such call reports would be likely to be maintained in a central database or otherwise may not require search terms to collect.  To the extent Apotex is willing to agree to produce those sales call reports concerning its bendamustine product, Eagle is willing to forego that term.  Please let us know if this compromise is acceptable.  If not, please let us know your availability for a meet and confer.  Additionally, please let us know Apotex's position with respect to the other damages documents we discussed on last week's call.

Best,
Alex

---

**From:** Ferenc, Christopher B. <christopher.ferenc@katten.com>
**Sent:** Tuesday, September 24, 2024 12:48 PM
**To:** Grabowski, Alex (CH) <Alex.Grabowski@lw.com>; Schweers, Rachel <rachel.schweers@katten.com>; Welsh, Kelly (DC) <Kelly.Welsh@lw.com>; #C-M EAGLE

BENDAMUSTINE LITIGATION - LW TEAM <EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com>; EagleLitigation@McCarter.com; DSilver@McCarter.com; amiller@mccarter.com; wproctor@McCarter.com; ajoyce@mccarter.com; mzare@mccarter.com
**Cc:** Kenneth Dorsney <kdorsney@morrisjames.com>; Cortlan Hitch <chitch@morrisjames.com>; jppara@morrisjames.com; El-Khoury, Dawn S. <dawn.el-khoury@katten.com>; Soderstrom, Lance A. <lance.soderstrom@katten.com>; Janusz, Joe <joe.janusz@katten.com>; Mukerjee, Deepro R. <deepro.mukerjee@katten.com>; Malik, Jitty <jitty.malik@katten.com>
**Subject:** RE: Eagle Pharmaceuticals, Inc. v. Apotex Inc., et al., C.A. No. 24-64-JLH (D. Del)

Alex,

We will have to agree to disagree on your mischaracterization of the parties call last week.

As to the ESI search, your proposed additional terms violate the Delaware Default ESI Order. As an initial matter, the additional terms greatly exceed the "no more than 10 additional terms" Eagle is afforded under the Order. By our count, you have proposed at least 30 additional search terms. Moreover, some of your suggestions are not appropriately focused on any issues in the case and will necessarily lead to burdensome and irrelevant discovery. For example, the "benda* AND (label* OR insert OR indicat*)" and "Benda* AND (sale* w/10 (call* OR report* OR office OR visit OR site OR hospital OR clinic OR center))" terms are objectionable as overbroad and not proportional to the needs of the case because they are not limited to liquid bendamustine products.

Please propose a revised list that is compliant with the Delaware Default ESI Order so that we can review with our client and decide if a further meet and confer is needed.

Regards,
Chris

**Christopher B. Ferenc**
Partner

# Katten

Katten Muchin Rosenman LLP
1919 Pennsylvania Ave., NW., Suite 800 | Washington, DC 20006
direct +1.202.625.3647
christopher.ferenc@katten.com | katten.com

---

**From:** Alex.Grabowski@lw.com <Alex.Grabowski@lw.com>
**Sent:** Monday, September 23, 2024 6:03 PM
**To:** Ferenc, Christopher B. <christopher.ferenc@katten.com>; Schweers, Rachel <rachel.schweers@katten.com>; Kelly.Welsh@lw.com; EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com; EagleLitigation@McCarter.com; DSilver@McCarter.com; amiller@mccarter.com; wproctor@McCarter.com; ajoyce@mccarter.com; mzare@mccarter.com
**Cc:** Kenneth Dorsney <kdorsney@morrisjames.com>; Cortlan Hitch <chitch@morrisjames.com>; jppara@morrisjames.com; El-Khoury, Dawn S. <dawn.el-khoury@katten.com>; Soderstrom, Lance A. <lance.soderstrom@katten.com>; Janusz, Joe <joe.janusz@katten.com>; Mukerjee, Deepro R.

<[deepro.mukerjee@katten.com](mailto:deepro.mukerjee@katten.com)>; Malik, Jitty <[jitty.malik@katten.com](mailto:jitty.malik@katten.com)>

**Subject:** RE: Eagle Pharmaceuticals, Inc. v. Apotex Inc., et al., C.A. No. 24-64-JLH (D. Del)

*EXTERNAL EMAIL – EXERCISE CAUTION*
Chris,

Your email below is incorrect in a number of ways, not least of which concerns the damages documents.  It was Apotex's counsel who first tied the date of infringement to the issuance of the patents.  Eagle did not set forth a contention regarding the earliest date of infringement during that conversation because, as expressed on the call, determining that date is one of the purposes of the discovery we are seeking.  As to search terms, our letter does not suggest that specific terms were negotiated.  Rather, as stated in our letter, we discussed Apotex's search term disclosure and agreed to "provide a list of additional search terms along with [Eagle's] expectation for where/how the search terms will be applied and run by Monday, September 24, 2024."  (Sep. 20, 2024 Ltr. from A. Grabowski to C. Ferenc).  Consistent with that, please see below for our additional terms.  We expect that the full set of terms will be run over relevant non-custodial ESI sources, as well as email and other ESI maintained by Apotex's custodians, as set out in ¶ 5(b) of the Delaware Default Standard on Electronic Discovery.

•      benda* AND (label* OR insert OR indicat*)
•      benda* AND (NaOH OR "sodium hydroxide")
•      (Bendeka OR Belrapzo OR Eagle) AND (substit* OR market* OR share* OR compet* OR trend* OR switch*)
•      Benda* AND (sale* w/10 (call* OR report* OR office OR visit OR site OR hospital OR clinic OR center))

To the extent there are any disputes, we are available to meet and confer.

Best,
Alex

**Alex Grabowski**

**LATHAM & WATKINS** LLP
330 North Wabash Avenue, Suite 2800 | Chicago, IL 60611
D: +1.312.876.6556

**From:** Ferenc, Christopher B. <[christopher.ferenc@katten.com](mailto:christopher.ferenc@katten.com)>
**Sent:** Friday, September 20, 2024 6:11 PM
**To:** Grabowski, Alex (CH) <[Alex.Grabowski@lw.com](mailto:Alex.Grabowski@lw.com)>; Schweers, Rachel <[rachel.schweers@katten.com](mailto:rachel.schweers@katten.com)>; Welsh, Kelly (DC) <[Kelly.Welsh@lw.com](mailto:Kelly.Welsh@lw.com)>; #C-M EAGLE BENDAMUSTINE LITIGATION - LW TEAM <[EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com](mailto:EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com)>; [EagleLitigation@McCarter.com](mailto:EagleLitigation@McCarter.com); [DSilver@McCarter.com](mailto:DSilver@McCarter.com); [amiller@mccarter.com](mailto:amiller@mccarter.com); [wproctor@McCarter.com](mailto:wproctor@McCarter.com); [ajoyce@mccarter.com](mailto:ajoyce@mccarter.com); [mzare@mccarter.com](mailto:mzare@mccarter.com)
**Cc:** Kenneth Dorsney <[kdorsney@morrisjames.com](mailto:kdorsney@morrisjames.com)>; Cortlan Hitch <[chitch@morrisjames.com](mailto:chitch@morrisjames.com)>; [ippara@morrisjames.com](mailto:ippara@morrisjames.com); El-Khoury, Dawn S. <[dawn.el-khoury@katten.com](mailto:dawn.el-khoury@katten.com)>; Soderstrom, Lance A.

<[lance.soderstrom@katten.com](mailto:lance.soderstrom@katten.com)>; Janusz, Joe <[joe.janusz@katten.com](mailto:joe.janusz@katten.com)>; Mukerjee, Deepro R. <[deepro.mukerjee@katten.com](mailto:deepro.mukerjee@katten.com)>; Malik, Jitty <[jitty.malik@katten.com](mailto:jitty.malik@katten.com)>
**Subject:** RE: Eagle Pharmaceuticals, Inc. v. Apotex Inc., et al., C.A. No. 24-64-JLH (D. Del)

Alex,

Your letter grossly mischaracterizes the substance of the parties' meet and confer yesterday. We will not endeavor to correct each of the numerous inaccuracies in your letter, but address some examples here:

**<u>Damages Documents</u>** - Your letter incorrectly states that Apotex indicated during the meet and confer that the date of first infringement "was the date of the issuance of the Asserted Patents." This is a false statement and misrepresents the parties' discussion on this issue. As I articulated on the call, Eagle has not provided any substance to support its far-ranging damages theories in the case. Thus, Apotex is unable to make any meaningful proportionality determination for the requested damages documents. As an example of the type of information Apotex lacks about Eagle's damages theories, I pointed out that Eagle has failed to identify its contention for the date of the hypothetical negotiation supporting its reasonable royalty claims. In response, Ms. Tull, counsel for Eagle, indicated that Eagle believes the date of first infringement by Apotex was the issue date of the patents. Thus, your letter wrongly attributes Eagle's representation to Apotex. As I represented during the call, we will discuss with our client the existence of any "profit and loss statements, pricing documents, projections/forecasts, and call reports" from the issue date of the patents specific to the Apotex liquid bendamustine product. Those conversations are ongoing.

**<u>Search Terms</u>** – you state throughout your letter that the parties discussed the search terms for the proposed ESI search. We did not. Rather, you indicated that Eagle would identify additional search terms today or Monday. Please let us know when we can expect to receive the additional search terms.

We are continuing to review your letter for additional mischaracterizations and reserve all rights.

Regards,
Chris

**Christopher B. Ferenc**
Partner

**Katten**

Katten Muchin Rosenman LLP
1919 Pennsylvania Ave., NW., Suite 800 | Washington, DC 20006
direct +1.202.625.3647
[christopher.ferenc@katten.com](mailto:christopher.ferenc@katten.com) | [katten.com](http://katten.com)

---

**From:** [Alex.Grabowski@lw.com](mailto:Alex.Grabowski@lw.com) <[Alex.Grabowski@lw.com](mailto:Alex.Grabowski@lw.com)>
**Sent:** Friday, September 20, 2024 2:00 PM
**To:** Schweers, Rachel <[rachel.schweers@katten.com](mailto:rachel.schweers@katten.com)>; [Kelly.Welsh@lw.com](mailto:Kelly.Welsh@lw.com);
[EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com](mailto:EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com); [EagleLitigation@McCarter.com](mailto:EagleLitigation@McCarter.com);

DSilver@McCarter.com; amiller@mccarter.com; wproctor@McCarter.com; ajoyce@mccarter.com; mzare@mccarter.com

**Cc:** Kenneth Dorsney <kdorsney@morrisjames.com>; Cortlan Hitch <chitch@morrisjames.com>; ippara@morrisjames.com; El-Khoury, Dawn S. <dawn.el-khoury@katten.com>; Soderstrom, Lance A. <lance.soderstrom@katten.com>; Janusz, Joe <joe.janusz@katten.com>; Ferenc, Christopher B. <christopher.ferenc@katten.com>; Mukerjee, Deepro R. <deepro.mukerjee@katten.com>; Malik, Jitty <jitty.malik@katten.com>

**Subject:** RE: Eagle Pharmaceuticals, Inc. v. Apotex Inc., et al., C.A. No. 24-64-JLH (D. Del)

*EXTERNAL EMAIL – EXERCISE CAUTION*

Counsel,

Please see the attached correspondence.

Best,
Alex

**Alex Grabowski**

**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800 | Chicago, IL 60611
D: +1.312.876.6556

**From:** Schweers, Rachel <rachel.schweers@katten.com>
**Sent:** Tuesday, September 17, 2024 12:53 PM
**To:** Grabowski, Alex (CH) <Alex.Grabowski@lw.com>; Welsh, Kelly (DC) <Kelly.Welsh@lw.com>; #C-M EAGLE BENDAMUSTINE LITIGATION - LW TEAM <EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com>; EagleLitigation@McCarter.com; DSilver@McCarter.com; amiller@mccarter.com; wproctor@McCarter.com; ajoyce@mccarter.com; mzare@mccarter.com
**Cc:** Kenneth Dorsney <kdorsney@morrisjames.com>; Cortlan Hitch <chitch@morrisjames.com>; ippara@morrisjames.com; El-Khoury, Dawn S. <dawn.el-khoury@katten.com>; Soderstrom, Lance A. <lance.soderstrom@katten.com>; Janusz, Joe <joe.janusz@katten.com>; Ferenc, Christopher B. <christopher.ferenc@katten.com>; Mukerjee, Deepro R. <deepro.mukerjee@katten.com>; Malik, Jitty <jitty.malik@katten.com>
**Subject:** RE: Eagle Pharmaceuticals, Inc. v. Apotex Inc., et al., C.A. No. 24-64-JLH (D. Del)

Thank you, Alex.

**Rachel Leininger Schweers, Ph.D.**
Counsel

**Katten**

Katten Muchin Rosenman LLP
525 W. Monroe Street | Chicago, IL 60661-3693
direct +1.312.902.5413
rachel.schweers@katten.com | katten.com

**From:** Alex.Grabowski@lw.com <Alex.Grabowski@lw.com>
**Sent:** Tuesday, September 17, 2024 12:44 PM
**To:** Schweers, Rachel <rachel.schweers@katten.com>; Kelly.Welsh@lw.com;
EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com; EagleLitigation@McCarter.com;
DSilver@McCarter.com; amiller@mccarter.com; wproctor@McCarter.com; ajoyce@mccarter.com;
mzare@mccarter.com
**Cc:** Kenneth Dorsney <kdorsney@morrisjames.com>; Cortlan Hitch <chitch@morrisjames.com>;
jppara@morrisjames.com; El-Khoury, Dawn S. <dawn.el-khoury@katten.com>; Soderstrom, Lance A.
<lance.soderstrom@katten.com>; Janusz, Joe <joe.janusz@katten.com>; Ferenc, Christopher B.
<christopher.ferenc@katten.com>; Mukerjee, Deepro R. <deepro.mukerjee@katten.com>; Malik,
Jitty <jitty.malik@katten.com>
**Subject:** RE: Eagle Pharmaceuticals, Inc. v. Apotex Inc., et al., C.A. No. 24-64-JLH (D. Del)

*EXTERNAL EMAIL – EXERCISE CAUTION*
Rachel,

We are available at 11 ET on Thursday.  We can use the dial in below.

Thanks,
Alex

---

# Microsoft Teams Need help?

## Join the meeting now

Meeting ID: 272 061 772 373

Passcode: hhtADf

---

### Dial in by phone

+1 323-694-0354,,343246802# United States, Los Angeles

Find a local number

Phone conference ID: 343 246 802#

For organizers: Meeting options | Reset dial-in PIN

Image removed by sender.

---

**Alex Grabowski**

**LATHAM & WATKINS** LLP
330 North Wabash Avenue, Suite 2800 | Chicago, IL 60611
D: +1.312.876.6556

---

**From:** Schweers, Rachel <rachel.schweers@katten.com>
**Sent:** Tuesday, September 17, 2024 12:11 PM
**To:** Grabowski, Alex (CH) <Alex.Grabowski@lw.com>; Welsh, Kelly (DC) <Kelly.Welsh@lw.com>; #C-M EAGLE BENDAMUSTINE LITIGATION - LW TEAM <EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com>; EagleLitigation@McCarter.com; DSilver@McCarter.com; amiller@mccarter.com; wproctor@McCarter.com; ajoyce@mccarter.com; mzare@mccarter.com
**Cc:** Kenneth Dorsney <kdorsney@morrisjames.com>; Cortlan Hitch <chitch@morrisjames.com>; ippara@morrisjames.com; El-Khoury, Dawn S. <dawn.el-khoury@katten.com>; Soderstrom, Lance A. <lance.soderstrom@katten.com>; Janusz, Joe <joe.janusz@katten.com>; Ferenc, Christopher B. <christopher.ferenc@katten.com>; Mukerjee, Deepro R. <deepro.mukerjee@katten.com>; Malik, Jitty <jitty.malik@katten.com>
**Subject:** RE: Eagle Pharmaceuticals, Inc. v. Apotex Inc., et al., C.A. No. 24-64-JLH (D. Del)

Alex,

Thank you for your response and providing availability to meet and confer. Unfortunately, our team is unavailable during your proposed timeframe. We are, however, available on Thursday between 9-12pm ET? Please let us know if there is a time in that window that works for you.

Kind regards,
Rachel

**Rachel Leininger Schweers, Ph.D.**
Counsel

# Katten

Katten Muchin Rosenman LLP
525 W. Monroe Street | Chicago, IL 60661-3693
direct +1.312.902.5413
rachel.schweers@katten.com | katten.com

---

**From:** Alex.Grabowski@lw.com <Alex.Grabowski@lw.com>
**Sent:** Tuesday, September 17, 2024 9:12 AM
**To:** Schweers, Rachel <rachel.schweers@katten.com>; Kelly.Welsh@lw.com; EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com; EagleLitigation@McCarter.com; DSilver@McCarter.com; amiller@mccarter.com; wproctor@McCarter.com; ajoyce@mccarter.com; mzare@mccarter.com
**Cc:** Kenneth Dorsney <kdorsney@morrisjames.com>; Cortlan Hitch <chitch@morrisjames.com>; ippara@morrisjames.com; El-Khoury, Dawn S. <dawn.el-khoury@katten.com>; Soderstrom, Lance A. <lance.soderstrom@katten.com>; Janusz, Joe <joe.janusz@katten.com>; Ferenc, Christopher B.

<christopher.ferenc@katten.com>; Mukerjee, Deepro R. <deepro.mukerjee@katten.com>; Malik, Jitty <jitty.malik@katten.com>
**Subject:** RE: Eagle Pharmaceuticals, Inc. v. Apotex Inc., et al., C.A. No. 24-64-JLH (D. Del)

*EXTERNAL EMAIL – EXERCISE CAUTION*
Counsel,

We write regarding the below disclosure of search terms, as well as your September 13th response to our August 26th discovery correspondence.  With respect to the below search terms, we are considering additional terms.  However, your arbitrary deadline of two business days to respond is not acceptable.  In particular, there are open issues in your response to our discovery correspondence, which took you almost three weeks to provide.  Those issues impact entire categories of requested documents that may be covered by search terms.  We are available Wednesday between 11-3 PT  to meet and confer regarding those issues.  Please let us know if there is a time in that window that you are available.  Assuming we are able to make sufficient progress regarding on the meet and confer, we will endeavor to provide additional search terms by the end of the week.

Best,
Alex

**Alex Grabowski**

**LATHAM & WATKINS** LLP
330 North Wabash Avenue, Suite 2800 | Chicago, IL 60611
D: +1.312.876.6556

**From:** Schweers, Rachel <rachel.schweers@katten.com>
**Sent:** Friday, September 13, 2024 2:46 PM
**To:** Welsh, Kelly (DC) <Kelly.Welsh@lw.com>; #C-M EAGLE BENDAMUSTINE LITIGATION - LW TEAM <EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com>; EagleLitigation@McCarter.com; DSilver@McCarter.com; amiller@mccarter.com; wproctor@McCarter.com; ajoyce@mccarter.com; mzare@mccarter.com
**Cc:** Kenneth Dorsney <kdorsney@morrisjames.com>; Cortlan Hitch <chitch@morrisjames.com>; jppara@morrisjames.com; El-Khoury, Dawn S. <dawn.el-khoury@katten.com>; Soderstrom, Lance A. <lance.soderstrom@katten.com>; Janusz, Joe <joe.janusz@katten.com>; Ferenc, Christopher B. <christopher.ferenc@katten.com>; Mukerjee, Deepro R. <deepro.mukerjee@katten.com>; Malik, Jitty <jitty.malik@katten.com>
**Subject:** RE: Eagle Pharmaceuticals, Inc. v. Apotex Inc., et al., C.A. No. 24-64-JLH (D. Del)

Counsel,

Pursuant to Paragraph 5 of the Default Standard ESI order in this District, Apotex proposes the following search terms to expedite and streamline the discovery of e-mails from the Apotex custodians identified in its Paragraph 3 disclosures. Please note that we are continuing to discuss these search terms with our client.  If Eagle intends to provide any additional terms, we request they

be provided no later than Tuesday, September 17, 2024.

| |
|---|
| ("bendamustine hydrochloride" w/3* "liquid") AND (promot* OR advertis* OR commercial* OR sale* OR sell* OR sold OR profit* OR demand* OR revenue* OR market* OR forecast*) |
| (Belrapzo) w/5* (promot* OR advertis* OR commercial* OR sale* OR sell* OR sold OR profit* OR demand* OR revenue* OR market* OR forecast*) |
| (11844783 OR "11,844,783") AND patent<br>(11872214 OR "11,872,214") AND patent |
| 783 w/2* patent<br>214 w/2* patent |

Apotex proposes date limiting the search to January 1, 2020, which is more than one year before the filing of Apotex's NDA and almost four years before the issuance of the Asserted Patents.

Kind regards,
Rachel

**Rachel Leininger Schweers, Ph.D.**
Counsel

**Katten**

Katten Muchin Rosenman LLP
525 W. Monroe Street | Chicago, IL 60661-3693
direct +1.312.902.5413
rachel.schweers@katten.com | katten.com

---

**From:** Schweers, Rachel
**Sent:** Friday, September 13, 2024 1:10 PM
**To:** 'Kelly.Welsh@lw.com' <Kelly.Welsh@lw.com>; Kenneth Dorsney <kdorsney@morrisjames.com>; Cortlan Hitch <chitch@morrisjames.com>; ippara@morrisjames.com; El-Khoury, Dawn S. <dawn.el-khoury@katten.com>; Soderstrom, Lance A. <lance.soderstrom@katten.com>; Janusz, Joe <joe.janusz@katten.com>; Ferenc, Christopher B. <christopher.ferenc@katten.com>; Mukerjee, Deepro R. <deepro.mukerjee@katten.com>; Malik, Jitty <jitty.malik@katten.com>
**Cc:** EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com; EagleLitigation@McCarter.com; DSilver@McCarter.com; amiller@mccarter.com; wproctor@McCarter.com; ajoyce@mccarter.com; mzare@mccarter.com
**Subject:** RE: Eagle Pharmaceuticals, Inc. v. Apotex Inc., et al., C.A. No. 24-64-JLH (D. Del)

Counsel,

Please see the attached correspondence.

Kind regards,
Rachel

**Rachel Leininger Schweers, Ph.D.**

Counsel

## Katten

Katten Muchin Rosenman LLP
525 W. Monroe Street | Chicago, IL 60661-3693
direct +1.312.902.5413
rachel.schweers@katten.com | katten.com

---

**From:** Kelly.Welsh@lw.com <Kelly.Welsh@lw.com>
**Sent:** Monday, August 26, 2024 3:57 PM
**To:** Kenneth Dorsney <kdorsney@morrisjames.com>; Cortlan Hitch <chitch@morrisjames.com>; ippara@morrisjames.com; El-Khoury, Dawn S. <dawn.el-khoury@katten.com>; Soderstrom, Lance A. <lance.soderstrom@katten.com>; Janusz, Joe <joe.janusz@katten.com>; Ferenc, Christopher B. <christopher.ferenc@katten.com>; Mukerjee, Deepro R. <deepro.mukerjee@katten.com>; Malik, Jitty <jitty.malik@katten.com>; Schweers, Rachel <rachel.schweers@katten.com>
**Cc:** EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com; EagleLitigation@McCarter.com; DSilver@McCarter.com; amiller@mccarter.com; wproctor@McCarter.com; ajoyce@mccarter.com; mzare@mccarter.com
**Subject:** Eagle Pharmaceuticals, Inc. v. Apotex Inc., et al., C.A. No. 24-64-JLH (D. Del)

*EXTERNAL EMAIL – EXERCISE CAUTION*

Counsel,

Please see the attached correspondence.

Regards,
Kelly

**Kelly A. Welsh**

**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Direct Dial: +1.202.350.5361
Email: kelly.welsh@lw.com
https://www.lw.com

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies

and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

```
===========================================================
CONFIDENTIALITY NOTICE:
This electronic mail message and any attached files contain information
intended for the exclusive
use of the individual or entity to whom it is addressed and may contain
information that is
proprietary, privileged, confidential and/or exempt from disclosure under
applicable law.  If you
are not the intended recipient, you are hereby notified that any viewing,
copying, disclosure or
distribution of this information may be subject to legal restriction or
sanction.  Please notify
the sender, by electronic mail or telephone, of any unintended recipients
and delete the original
message without making any copies.
===========================================================
NOTIFICATION:  Katten Muchin Rosenman LLP is an Illinois limited liability
partnership that has
elected to be governed by the Illinois Uniform Partnership Act (1997).
===========================================================
```

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., | |
| Plaintiff, | C.A. No. 24-64-JLH |
| v. | **JURY TRIAL DEMANDED** |
| APOTEX INC. and APOTEX CORP., | |
| Defendants. | |

**DEFENDANTS APOTEX INC.'S AND APOTEX CORP.'S**
**INITIAL DISCLOSURES PURSUANT TO PARAGRAPH 3**
**OF THE DELAWARE DEFAULT STANDARD FOR DISCOVERY**

Pursuant to Paragraph 3 of the Default Standard for Discovery, Defendants Apotex Inc. and Apotex Corp. (collectively, "Defendants" or "Apotex") hereby make the following initial disclosures to Plaintiff Eagle Pharmaceutical, Inc. ("Plaintiff" or "Eagle").

These disclosures are made based on information reasonably available to Apotex at this time. Given the early stage of this proceeding, Apotex reserves the right to supplement or correct these disclosures, and to present witnesses, documents, defenses, claims and evidence in addition to that which is disclosed herein and to object to any witnesses or the admissibility of any evidence, and/or take discovery in accordance with the Federal Rules of Civil Procedure.

Apotex makes these initial disclosures without waiving any claim that it may have regarding the attorney-client or attorney work product privileges, or any other applicable privilege, objection or defense. By making these disclosures, Apotex does not admit that any subject matter identified with respect to any particular individual document or category of documents is relevant to this matter, nor likely to lead to the discovery of admissible evidence.

1

### A. Custodians

Based upon currently available information, Apotex identifies the following individuals most likely to have discoverable information. The subject matter of the information relates to Apotex's products that are the subject of NDA No. 215033.

| Individual | Title/Role | General Subject Matter of the Information |
|---|---|---|
| Bhupesh Singh | Director, Regulatory Affairs US | Information regarding the correspondence with the FDA and regulatory filings for NDA No. 215033. |
| Ripen Misri, PhD | Director, Co-Development R&D | Information regarding composition and production of the product as described in NDA No. 215033. |
| Claire Walton | Manager, Pre-Submission Portfolio | Information regarding potential product commercialization |
| Michael Bohling | Vice President of Sales and Marketing | Information regarding products sales of the product as described in NDA No. 215033 |
| David Link | Director, Associate Commercial Operations | Information regarding pricing of the product as described in NDA No. 215033 |
| Patricia Walden | Senior Marketing Director | Information regarding marketing and promotion of product as described in NDA No. 215033 |

Apotex and its counsel do not consent to Plaintiff (including Plaintiff's outside counsel) contacting any of the above-listed individuals directly.  These persons may only be contacted through Apotex's outside counsel of record in this case.

Apotex reserves the right to supplement these disclosures if additional individuals with relevant knowledge or information are identified.

### B. Non-custodial data sources

Apotex's investigation of the existence of non-custodial data sources that are likely to contain non-duplicative discoverable information for preservation and production consideration

is continuing. Apotex states that hard copy repositories may contain discoverable information. Apotex reserves the right to supplement these disclosures as needed.

### C. Notice

At this early stage of this proceeding, Apotex is presently unaware of (i) any ESI that is not reasonably accessible under Fed. R. Civ. P. 26(b)(2)(C)(i); (ii) any third-party discovery under Fed. R. Civ. P. 45 that will be necessary in this matter; or (iii) any information that is subject to privacy protections that may need to be produced from outside of the United States and subject to foreign laws. Apotex reserves the right to supplement this disclosure as discovery or its own investigation proceeds and depending on Plaintiff's Initial Disclosures Pursuant to Paragraph 3 of the Default Standard for Discovery.

Dated:  June 17, 2024

OF COUNSEL:
Deepro R. Mukerjee
Lance A. Soderstrom
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Plaza
New York, NY 10020
(212) 940-8800
deepro.mukerjee@katten.com
lance.soderstrom@katten.com

Jitendra Malik, Ph.D.
Joseph M. Janusz
KATTEN MUCHIN ROSENMAN LLP
550 South Tryon Street, Suite 2900
Charlotte, NC 28202
(704) 444-2000
jitty.malik@katten.com
joseph.janusz@katten.com

Christopher B. Ferenc
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Ave., NW., Suite 800 |
Washington, DC 20006
(202) 625-3500
christopher.ferenc@katten.com

Rachel L. Schweers
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, IL 60661-3693
(312) 902-5200
rachel.schweers@katten.com

   */s/ Kenneth L. Dorsney*
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendants*
*Apotex Inc. and Apotex Corp.*

4

# EXHIBIT E

Highly Confidential Outside Counsel's Eyes Only

APOBENDA64_039680

Highly Confidential Outside Counsel's Eyes Only

APOBENDA64_039681

# EXHIBIT F

# EXHIBIT G

## Ast-Gmoser, Robyn

| | |
|---|---|
| **From:** | Ramya.Vallabhaneni@lw.com |
| **Sent:** | Wednesday, April 2, 2025 3:41 PM |
| **To:** | Ast-Gmoser, Robyn; Alex.Grabowski@lw.com; Sydney.Hancock@lw.com; Lief, Jason A.; Kelly.Welsh@lw.com; Miller, Andrew; Huttner, Constance; dtaylor@skjlaw.com; mdaughton@skjlaw.com; nbelgam@skjlaw.com; vkm@skjlaw.com |
| **Cc:** | EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com; EagleLitigation@McCarter.com |
| **Subject:** | RE: Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC, C.A. No. 24-65-JLH (D. Del.) |

This message has originated from an External Source. Please use caution when opening attachments, clicking links, or responding to this email.

Robyn:

Thank you for the productive meet and confer today.

We understand that Slayback will provide and/or update its responses to the following issues by **Wednesday, April 9**:

- Rule 26(a)(1) and Paragraph 3 Disclosures: Slayback will provide updated Rule 26(a)(1) and Paragraph 3 Disclosures, and in particular, will provide the names of custodians relevant to damages, sales, and marketing.
- Azurity: Slayback will confirm whether it will accept service of any deposition notices to relevant Azurity employees. Slayback will also confirm its position on adding Azurity as a party to the case.
- RFP Nos. 73-79: Slayback stated that it understood these requests were tied to willful infringement. After Eagle explained that RFP Nos. 73-79 were relevant to damages, Slayback agreed to review its responses to RFP Nos. 73-79 and provide any updates.
- March 4, 2025 Letter: Eagle stated that it did not waive the remaining issues outlined in its March 4, 2025 letter and still expected a response from Slayback. Slayback stated that it understood and would respond to the remaining issues (e.g., RFP Nos. 5-6, 13, 27-31, 25, 33, 34, 37, and 48).
- Samples: Slayback explained that any current samples it had were commercial batches, and that fifty batches would be too burdensome to produce. Eagle stated that it would be amenable to receiving fewer commercial batches from Slayback to the extent that Slayback would stipulate that every commercial batch was representative of its product. Slayback further agreed to review the stipulation in the 2021 litigation regarding infringement of the 223 nanometer limitation and provide its position on whether it agreed that the stipulation still stands, which would reduce the number of samples Eagle needed for testing. Slayback also agreed to get back to Eagle regarding the number of samples it would be willing to produce.

We further understand that Slayback has already produced any relevant, non-privileged documents in response to RFP No. 32. We also understand that Slayback is working with a third party to produce lab notebooks that are responsive to RFP Nos. 5-6.

Regards,
Ramya

**Ramya Sri Vallabhaneni**
*Pronouns: she/her/hers*

**LATHAM & WATKINS** LLP
1271 Avenue of the Americas | New York, NY 10020
D: +1.212.906.2931