# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC,** | |
| **Plaintiffs,** | **C.A. No. 24-65-JLH** |
| **v.** | **JURY TRIAL DEMANDED** |
| **SLAYBACK PHARMA LLC and AZURITY PHARMACEUTICALS, INC.,** | |
| **Defendants.** | |

**SLAYBACK PHARMA LLC AND AZURITY PHARMACEUTICALS, INC.'s
AMENDED RESPONSES TO SECOND AMENDED COMPLAINT**

Slayback Pharma LLC ("Slayback") and Azurity Pharmaceuticals, Inc. ("Azurity")

(collectively "Defendants") responds to Plaintiffs Eagle Pharmaceuticals, Inc. and Eagle Sub1

LLC (collectively "Eagle" or "Plaintiffs"), attorneys, Second Amended Complaint, alleges as

follows:

1.      This is an action for patent infringement under the patent laws of the United States, Title
35, United States Code, to enjoin, and obtain damages resulting from, Slayback Pharma LLC
("Slayback") and Azurity Pharmaceuticals, Inc.'s ("Azurity") (collectively "Defendants")
unauthorized importation into the United States, and use, sale, and/or offer for sale of products in
the United States, that infringe at least one claim of Eagle's United States Patent Nos. 11,844,783
(the "'783 patent") and 11,872,214 (the "'214 patent") (collectively, the "Patent-in-Suit").

**ANSWER:**

Slayback admits that Complaint states that this is an action for patent infringement under

the patent laws of the United States, Title 35, United States Code that arises out of Defendants'

importation into the United States, and use, sale, and/or offer for sale of Defendants'

Bendamustine Hydrochloride Injection product ("Defendants' Product") prior to the expiration

of Eagle's U.S. Patent Nos 11,844,783 (the "'783 patent"), 11,872,214 (the "'214 patent")

(collectively, the "Patents-in-Suit"). Defendants deny that Plaintiffs are entitled to any relief, including but not limited to the pled injunction or damages. Defendants deny all remaining allegations in paragraph 1.

2.      Slayback submitted New Drug Application ("NDA") No. 212209 to the United States Food and Drug Administration ("FDA"), seeking approval to manufacture and sell a product that relies on data from bioavailability and/or bioequivalence studies contained in the Approved Labeling for Eagle's BELRAPZO®, 100 mg/4 mL (25 mg/mL) Bendamustine Hydrochloride Injection product, prior to the expiration of the Patents-in-Suit.

**ANSWER:**

Slayback denies the allegations of paragraph 2.

3.      On information and belief, the FDA granted approval of NDA No. 212209 on December 7, 2022. Following said approval, Slayback began to import into the United States, and/or use, sell, and/or offer to sell in the United States, its NDA Product, VIVIMUSTA® (bendamustine hydrochloride injection) 100 mg/4 mL (25 mg/mL) (the "Azurity NDA Product"), along with the Approved Labeling for the same.

**ANSWER:**

Slayback admits that it received approval on or about December 7, 2022. Slayback admits

that it later began to offer for sale and sell the currently marketed version of the VIVIMUSTA®

product in the United States. Slayback denies that it later began to "use" the currently marketed

version of VIVIMUSTA® in the United States. Slayback denies the remaining allegations of

Paragraph 3.

4.      On information and belief, Slayback was acquired by Azurity after the filing of the Complaint.

**ANSWER:**

Defendants deny the allegations of paragraph 4.

5.      On information and belief, at some time after the filing of the Complaint, Azurity became the NDA holder for NDA No. 212209.

**ANSWER:**

Defendants admit the allegations of paragraph 5.

2

6.      On information and belief, Azurity is the current NDA hold for NDA No. 212209. *See* https://www.accessdata.fda.gov/scripts/cder/ob/results_product.cfm?Appl_Type=N&Appl_No=2 12209#42297 (last visited June 6, 2025).

**ANSWER:**

Azurity admits that it is the current NDA holder for NDA No. 212209.

7.      On information and belief, Azurity continues to import into the United States, and/or use, sell, and/or offer to sell in the United States, the Azurity NDA Product, VIVIMUSTA® (bendamustine hydrochloride injection) 100 mg/4 mL (25 mg/mL), along with the Approved Labeling for the same.

**ANSWER:**

Azurity admits that it sells and/or offers to sell the currently marketed version of VIVIMUSTA® in the United States. Azurity denies that it "continues to … use …VIVIMUSTA®" in the United States. Azurity denies the remaining allegations of paragraph 7.

**PARTIES**

8.      Plaintiff Eagle Pharmaceuticals, Inc. is a corporation organized and existing under the laws of Delaware, with its corporate offices and principal place of business at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677.

**ANSWER:**

On information and belief, Defendants admit that Plaintiff Eagle Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware, having corporate offices at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677. Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 8 of the Second Amended Complaint and therefore deny same.

9.      Plaintiff Eagle Sub1 LLC is a limited liability company organized and existing under the laws of Delaware, with its corporate offices and principal place of business at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677. Eagle Sub1 LLC is a wholly owned subsidiary of Eagle Pharmaceuticals, Inc.

**ANSWER:**

Defendants are without knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 9 of the Second Amended Complaint and therefore deny same.

10.     On information and belief, Defendant Slayback is a company organized and existing under the laws of Delaware, with its principal place of business at 301 Carnegie Center, #303, Princeton, New Jersey 08540.

**ANSWER:**

Slayback admits that it is a company organized and existing under the laws of Delaware.

Slayback denies that its principal place of business is at the stated address.

11.     On information and belief, Slayback is a wholly-owned subsidiary of Azurity.

**ANSWER:**

Defendants admit that Slayback is a wholly-owned subsidiary of Azurity.

12.     On information and belief, Defendant Azurity is a company organized and existing under the laws of Delaware, with its principal place of business at 8 Cabot Road, Suite 2000 Woburn, MA 01801.

**ANSWER:**

Azurity admits that it is a company organized and existing under the laws of Delaware.

Azurity admits that its principal place of business is at the stated address.

13.     On information and belief, Azurity is a generic pharmaceutical company that develops and manufactures generic versions of branded pharmaceutical products that it markets and distributes throughout the United States in concert with its subsidiary, Slayback.

**ANSWER:**

Paragraph 13 contains conclusions of law to which no response is required. To the extent

a response is required, Defendants deny the allegations of paragraph 13.

14.     On information and belief, Slayback and Azurity act in concert to import the Azurity NDA Product into the United States for sale, offer for sale, and use.

**ANSWER:**

Paragraph 14 contains conclusions of law to which no response is required. To the extent

a response is required, Defendants deny the allegations of paragraph 14.

15.     On information and belief, Slayback and Azurity are agents of each other, and/or operate in concert as integrated part of the same business group, and enter into agreements with each other that are nearer than arm's length, including with respect to the development, regulatory approval, marketing, sale, offer for sale, and distribution of pharmaceutical products throughout the United States, including in Delaware, and including with respect to the Azurity NDA Product.

**ANSWER:**

Paragraph 15 contains conclusions of law to which no response is required. To the extent

a response is required, Defendants deny the allegations of paragraph 15.

16.     The Approved Labeling for VIVIMUSTA® recites that it is "Manufactured at: Latina Pharma S.p.A. 04013 Sermoneta (LT), Italy" and "Manufactured for: Slayback Pharma LLC Princeton, NJ 08540." Approved Labeling for VIVIMUSTA®, (the "Approved Labeling"), available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2024/212209s005lbl.pdf (last visited June 6, 2025) at 22. On information and belief, Slayback directly or indirectly markets, sells, and distributes VIVIMUSTA® throughout the United States, including in Delaware.

**ANSWER:**

Slayback admits that its approved labeling includes the recited language. Slayback admits

that the currently marketed version of VIVIMUSTA® is available in multiple states in the United

States. Slayback denies all remaining allegations in paragraph 16.

17.     On information and belief, following FDA approval of NDA No. 212209 and the acquisition of Slayback by Azurity, Slayback and Azurity acted and continue to act, in concert to market, distribute, offer for sale, and sell the Azurity NDA Product throughout the United States and within Delaware.

**ANSWER:**

Paragraph 17 contains conclusions of law to which no response is required. To the extent a

response is required, Defendants deny the allegations of paragraph 17.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

**ANSWER:**

Paragraph 18 contains conclusions of law to which no response is required. To the extent a response is required, Defendants admit that this Court has subject matter jurisdiction solely for the limited purposes of this particular action.

19.    Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400(b), at least because Slayback and Azurity are incorporated in Delaware and therefore reside there for purposes of venue.

**ANSWER:**

Paragraph 19 contains conclusions of law to which no response is required. To the extent a response is required, Defendants deny that venue is appropriate under 28 U.S.C. § 1391, but does not contest venue solely for the limited purposes of this particular action.

20.    Based on the facts and causes alleged herein, and for additional reasons to be further developed through discovery if necessary, this Court has personal jurisdiction over Slayback and Azurity.

**ANSWER:**

Paragraph 20 contains conclusions of law to which no response is required. To the extent a response is required, Defendants do not contest personal jurisdiction solely for the limited purposes of this particular action.

21.    This Court has personal jurisdiction over Slayback because, on information and belief, Slayback is a company organized and existing under the laws of Delaware and maintains a registered agent for service of process in Delaware, at 1209 Orange Street, Wilmington, Delaware, 19801. This Court has personal jurisdiction over Slayback for the additional reasons set forth below and for other reasons that will be presented to the Court if such jurisdiction is challenged.

**ANSWER:**

Paragraph 21 contains conclusions of law to which no response is required. To the extent a response is required, Slayback does not contest personal jurisdiction solely for the limited purposes of this particular action.

22.    This Court has personal jurisdiction over Azurity because, on information and belief, Azurity is a company organized and existing under the laws of Delaware and maintains a registered agent for service of process in Delaware, at 1209 Orange Street, Wilmington, Delaware, 19801.

This Court has personal jurisdiction over Azurity for the additional reasons set forth below and for other reasons that will be presented to the Court if such jurisdiction is challenged.

**ANSWER:**

Paragraph 22 contains conclusions of law to which no response is required. To the extent a response is required, Azurity does not contest personal jurisdiction solely for the limited purposes of this particular action.

23.    In addition, this Court has personal jurisdiction over Slayback and Azurity because, on information and belief, Slayback and Azurity have engaged in a persistent course of conduct within Delaware by continuously and systematically placing goods into the stream of commerce for distribution throughout the United States, including Delaware.

**ANSWER:**

Defendants deny the allegations of paragraph 23, but does not contest personal jurisdiction solely for the limited purposes of this particular action.

24.    Further, this Court also has personal jurisdiction over Slayback and Azurity because, among other things, on information and belief: (1) Slayback filed NDA No. 212209 for the purpose of seeking approval to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of the product described in NDA No. 212209 in the United States, including in Delaware; (2) Azurity acquired Slayback and became the NDA Holder for NDA No. 212209; and (3) since NDA No. 212209 was approved, the product described in NDA No. 212209, VIVIMUSTA®, has been and continues to be imported, marketed, distributed, offered for sale, and/or sold in the United States, including in Delaware.

**ANSWER:**

Defendants admit that Slayback had filed NDA No. 212209 in the United States for the purposes described in NDA No. 212209 in the United States, that Azurity acquired Slayback and became the NDA Holder for NDA No. 212209, and that following approval Slayback launched the currently marketed version of VIVIMUSTA® which has been offered for sale and sold that product in multiple states in the United States. The remaining allegations of paragraph 24 contain conclusions of law as to which no response is required. To the extent a response is required,

Defendants does not contest personal jurisdiction solely for the limited purposes of this particular action. Defendants deny the remaining allegations of paragraph 24.

25.    The Court also has personal jurisdiction over Slayback and Azurity because they have committed, aided, abetted, induced, contributed to, or participated in the commission of the tortious act of patent infringement that has harmed and injured Eagle, which is a Delaware corporation.

**ANSWER:**

Defendants admit that Eagle is a Delaware corporation. Defendants do not contest personal jurisdiction solely for the limited purposes of this particular action. Defendants deny all other allegations of paragraph 25.

26.    Slayback has previously consented to jurisdiction in Delaware in many prior cases arising out of the filing of its drug applications, including the application for the product at issue in this litigation, and it has asserted counterclaims in such cases. *See, e.g., Cephalon, Inc. & Eagle Pharm., Inc. v. Slayback Pharma LLC*, No. 17-1154-CFC, D.I. 11 (D. Del. Sep. 29, 2017); *Teva Pharma. Int'l GmbH, Cephalon, Inc. & Eagle Pharma., Inc. v. Slayback Pharma LLC*, No. 18-117-CFC, D.I. 9 (D. Del. Feb. 12, 2018); *Eagle Pharm., Inc. v. Slayback Pharma LLC*, No. 18-1459-CFC, D.I. 9 (D. Del. Oct. 10, 2018); *Eagle Pharm., Inc. v. Slayback Pharma LLC*, No. 18-1953-CFC, D.I. 12 (D. Del. Jan. 3, 2019); *Eagle Pharm. Inc. v. Slayback Pharma LLC*, No. 21-1256-CFC, D.I. 9 (D. Del. Sept. 22, 2021).

**ANSWER:**

Slayback admits that it did not contest personal jurisdiction solely for the limited purposes of the particular identified actions and that it asserted counterclaims in certain of the identified cases.

27.    Azurity has previously consented to jurisdiction in Delaware in many prior cases, arising out of its manufacture, use, offer for sale, sale and/or importation of pharmaceutical products, including cases that it initiated as plaintiff. *See, e.g., Azurity Pharms., Inc. v. Hetero Laby's Ltd.*, C.A. No. 24-396-MN, D.I. 1 (D. Del. Mar. 28, 2024); *Azurity Pharms., Inc. v. Zydus Pharms (USA) Inc.*, C.A. No. 23-833-MN, D.I. 1 (D. Del. Aug. 2, 2023); *Azurity Pharms., Inc. v. Teva Pharms., Inc.*, C.A. No. 23-1080-MN, D.I. 1 (D. Del. Sept. 29, 2023); *Azurity Pharms., Inc. v. Accord Healthcare, Inc.*, C.A. No. 23-373-CFC, D.I. 1 (D. Del. Mar. 31, 2023); *Azurity Pharms., Inc. v. Novitium Pharma, LLC*, C.A. No. 23-163-MSG, D.I. 1 (D. Del. Feb. 14, 2023); *Azurity Pharms., Inc. v. Glenmark Pharms., Inc.*, C.A. No. 22-1604- MN, D.I. 1 (D. Del. Dec. 16, 2022); *Azurity Pharms., Inc. v. Aurobindo Pharma Ltd.*, C.A. No. 21-1707-MSG, D.I. 1 (D. Del. Dec. 2, 2021); *Azurity Pharms., Inc. v. CoreRx, Inc.*, C.A. No. 21-1522-LPS, D.I. 1 (D. Del. Oct. 27, 2021); *Azurity Pharms., Inc. v. Bionpharma Inc.*, C.A. No. 21-1455-MSG, D.I. 1 (D. Del. Oct. 15, 2021);

*Heron Therapeutics, Inc. v. Azurity Pharms., Inc.*, C.A. No. 24-1363-WCB, D.I. 22 (D. Del. Jan. 10, 2025).

**ANSWER:**

Azurity admits that it did not contest personal jurisdiction solely for the limited purposes of the particular identified actions and that it asserted counterclaims in certain of the identified cases.

28.    For at least the above reasons, it would not be unfair or unreasonable for Slayback and Azurity to litigate this action in this District, and there is personal jurisdiction over Slayback and Azurity for purposes of this action.

**ANSWER:**

Paragraph 28 contains conclusions of law to which no response is required. To the extent a response is required, Defendants do not contest personal jurisdiction solely for the limited purposes of this particular action. Defendants deny all other allegations of paragraph 28.

## BACKGROUND

29.    BELRAPZO®, which contains bendamustine hydrochloride, is an alkylating drug that is indicated for the treatment of patients with chronic lymphocytic leukemia, as well as for the treatment of patients with indolent B-cell non-Hodgkin lymphoma that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen.

**ANSWER:**

Upon information and belief, Defendants admit that BELRAPZO® contains bendamustine hydrochloride. Upon information and belief, Defendants admit that the prescribing information for BELRAPZO® provides that BELRAPZO® is "an alkylating drug indicated for treatment of patients with: Chronic lymphocytic leukemia (CLL)" and "Indolent B-cell non-Hodgkin Lymphoma (NHL) that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen." Defendants deny all remaining allegations in paragraph 29.

30.    Eagle Pharmaceuticals, Inc. is the holder of NDA No. 205580 for BELRAPZO®, which has been approved by the FDA.

**ANSWER:**

Upon information and belief, Defendants admit that Eagle Pharmaceuticals Inc. is the holder of NDA 205580 for BELRAPZO®. Upon information and belief, the FDA approved NDA No. 205580.

31.    The '783 patent, entitled "Formulations of Bendamustine" (Exhibit A hereto), was duly and legally issued on December 19, 2023. Eagle Sub1 LLC is the owner and assignee of the '783 patent. Eagle Pharmaceuticals, Inc. has an exclusive license to the '783 patent to develop, manufacture, use, offer to sell, sell, promote, distribute, export and import, enforce, and otherwise exploit the '783 patent with respect to BELRAPZO®.

**ANSWER:**

Defendants admit that the '783 patent is entitled "Formulations of Bendamustine" and that the '783 patent states on its face that it was issued on December 19, 2023. Defendants also admit that what is purported to be a copy of the '783 patent is attached to the Second Amended Complaint as Exhibit A. Defendants deny that the '783 patent is valid and enforceable. Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 31 of the Second Amended Complaint and therefore deny same. Defendants deny any other allegations of paragraph 31.

32.    Eagle Pharmaceuticals, Inc. timely submitted the '783 patent to be listed in connection with BELRAPZO® in the FDA's publication *Approved Drug Products with Therapeutic Equivalence Evaluations*, also known as the "Orange Book."

**ANSWER:**

On information and belief, Defendants admit that the '783 patent is listed in connection with BELRAPZO® in the FDA's publication "Approved Drug Products with Therapeutic Equivalence Evaluations," also known as the "Orange Book," but Defendants deny that the listing is appropriate. Defendants deny any other allegations of paragraph 32.

33.    Claim 1 of the '783 patent recites:

A method of treating leukemia in a human in need thereof comprising providing a liquid bendamustine-containing composition comprising

10

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the
bendamustine concentration in the composition is from about 20
mg/mL to about 60 mg/mL,
a pharmaceutically acceptable fluid consisting of polyethylene glycol and
optionally one or more of propylene glycol, ethanol, benzyl alcohol
and glycofurol; and
a stabilizing amount of an antioxidant
wherein the total impurities in the liquid bendamustine-containing composition
resulting from the degradation of the bendamustine is less than about
5% peak area response, as determined by HPLC at a wavelength of 223
nm after at least about 15 months at a temperature of about 5 °C. to
about 25 °C.;
diluting the liquid bendamustine containing composition;
and intravenously administering the diluted composition to
the human.

**ANSWER:**

Admitted.

34.    BELRAPZO® is a product that falls within the ambit of at least claim 1 of the '783 patent.

**ANSWER:**

Denied.

35.    The '783 patent is also listed in the Orange Book for the drug product BENDEKA®, which is marketed by Teva Pharmaceuticals ("Teva") under a license from Eagle to Teva. BENDEKA® likewise is a drug product that falls within the ambit of at least claim 1 of the '783 patent.

**ANSWER:**

On information and belief, Defendants admit that the '783 patent is listed in connection with BENDEKA® in the Orange Book, but Defendants deny that the listing is appropriate. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding Teva in paragraph 35 of the Second Amended Complaint and therefore denies same. Paragraph 35 contains conclusions of law regarding BENDEKA® to which no response is required. To the extent a response is required, Defendants deny any other allegations of paragraph 35.

36.    The '214 patent, entitled "Formulations of Bendamustine" (Exhibit B hereto), was duly and legally issued on January 16, 2024. Eagle Sub1 LLC is the owner and assignee of the '214 patent. Eagle Pharmaceuticals, Inc. has an exclusive license to develop, manufacture, use, offer to sell, sell, promote, distribute, export and import, enforce, and otherwise exploit the '214 patent with respect to BELRAPZO®.

**ANSWER:**

Defendants admit that the '214 patent is entitled "Formulations of Bendamustine" and that the '214 patent states on its face that it was issued on January 16, 2024. Defendants also admit that what is purported to be a copy of the '214 patent is attached to the Second Amended Complaint as Exhibit B. Defendants deny that the '214 patent is valid and enforceable. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding Eagle Sub1 LLC in paragraph 36 of the Second Amended Complaint and therefore deny same.

37.    Eagle Pharmaceuticals, Inc. timely submitted the '214 patent to be listed in connection with BELRAPZO® in the Orange Book.

**ANSWER:**

On information and belief, Defendants admit that the '214 patent is listed in connection with BELRAPZO® in the Orange Book, but Defendants deny that the listing is appropriate. Defendants deny any other allegations of paragraph 37.

38.    Claim 1 of the '214 patent recites: A sterile vial containing a liquid bendamustine-containing composition comprising

about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 25 mg/mL;

a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

a stabilizing amount of antioxidant,

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C. to about 25 °C.

**ANSWER:**

Admitted.

39.    BELRAPZO® is a product that falls within the ambit of at least claim 1 of the '214 patent.

**ANSWER:**

Denied.

40.    The '214 patent is also listed in the Orange Book for BENDEKA®. BENDEKA® likewise is a drug product that falls within the ambit of at least claim 1 of the '214 patent.

**ANSWER:**

On information and belief, Defendants admit that the '214 patent is listed in connection with BENDEKA® in the Orange Book, but Defendants deny that the listing is appropriate. Paragraph 40 contains conclusions of law regarding BENDEKA® to which no response is required. To the extent a response is required, Defendants deny any other allegations of paragraph 40.

## INFRINGEMENT BY DEFENDANTS

41.    On information and belief, the Azurity NDA Product, marketed and sold as VIVIMUSTA®, received final approval from the FDA on December 7, 2022. *See* Drugs@FDA, Vivimusta, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm? event=overview.process &ApplNo=212209 (last visited June 6, 2025).

**ANSWER:**

Slayback admits that it received approval on or about December 7, 2022. Slayback admits that it later began to offer for sale and sell the currently marketed version of the VIVIMUSTA® product in the United States. Defendants deny the remaining allegations of paragraph 41.

42.    On information and belief, since the approval of VIVIMUSTA®, Defendants have been importing VIVIMUSTA® into the United States, using VIVIMUSTA® in the United States, offering VIVIMUSTA® for sale in the United States, and selling VIVIMUSTA® in the United States. VIVIMUSTA® is prominently listed as a product for sale by Defendants on their website. See https://vivimusta.com (last visited June 6, 2025).

**ANSWER:**

Slayback admits that it has offered for sale, and sold the currently marketed version of VIVIMUSTA® in the United States. Azurity admits that it has offered for sale and sold the currently marketed version of VIVIMUSTA® in the United States. Defendants deny that they have been "using VIVIMUSTA® in the United States." Defendants deny the remaining allegations of paragraph 42.

43.    On information and belief, since Azurity acquired Slayback and became the NDA holder for NDA No. 212209, Azurity has become responsible for advertising, marketing, promoting, offering for sale, selling and/or importing the Azurity NDA Product, VIVIMUSTA®, in the United States.  *See*  https://azurity.com/azurity-pharmaceuticals-acquires-slayback-pharma  (last  visited February 25, 2025).

**ANSWER:**

Paragraph 43 contains conclusions of law to which no response is required. To the extent a response is required, Azurity denies the allegations of paragraph 43.

44.    Azurity's websites include promotional materials directed to the marketing, promotion, and sale of the Azurity NDA Product, VIVIMUSTA®, including the Approved Labeling.. *See*. e,g, https://azurity.com/products       (last       visited       June       6,       2025); https://www.vivimustaconnect.com/doctor_cases/new (last visited June 6, 2025).

**ANSWER:**

Paragraph 44 contains conclusions of law to which no response is required. Defendants admit that the website https://vivimusta.com/ provides information regarding the currently marketed version of VIVIMUSTA®. Defendants deny all other allegations in paragraph 44 to the extent they are in contradiction to the statements contained on that website and denies all remaining allegations of paragraph 44.

45.    On information and belief, VIVIMUSTA® relies on data from bioavailability and/or bioequivalence studies contained in the Approved Labeling for BELRAPZO®. BELRAPZO® is approved for a 24-month shelf life. The Approved Labeling for VIVIMUSTA® does not identify any difference in stability between VIVIMUSTA® and BELRAPZO® and, on information and belief, VIVIMUSTA® has the same or substantially similar stability as BELRAPZO® and/or as recited in the claims of the Patents-in-Suit.

**ANSWER:**

Defendants admit that the currently marketed version of VIVIMUSTA® has an approved labeling and refer Plaintiffs to that labeling for the content therein. Defendants deny the remaining allegations of paragraph 45.

46.    Publicly-available materials from the FDA's review of Azurity's NDA No. 212209 indicate that "in the September 16, 2019 CRL, [Slayback] provided updated stability data for the finished product in support of the proposed **24-month** expiry. Based on the information provided, Slayback Pharma LLC. proposed and the FDA accepts the expiration dating period of 24 months for the drug product when stored at [sic] between 2–8 °C." Product Quality Review(s), Application No.                    212209Orig1s000,                    available                    at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2023/212209Orig1s000ChemR.pdf    (last visited June 6, 2025) (the "Product Quality Review") at p. 37. Thus, on information and belief, VIVIMUSTA®, as sold, used, or offered for sale in the United States, satisfies the stability limitations set forth in the claims of the Patents-in-Suit.

**ANSWER:**

Defendants admit that the document accessible at the identified URL relates to Defendants' NDA No. 212209 and refer Plaintiffs to that document for the content therein. The stability criteria for the currently marketed version of the VIVIMUSTA® product is set forth in NDA No. 212209. Defendants denies all remaining allegations of paragraph 46.

47.    The Approved Labeling for VIVIMUSTA® states that the active ingredient is bendamustine hydrochloride. *See* Approved Labeling at 1; *see also Eagle Pharm., Inc. v. Slayback Pharma LLC*, 958 F.3d 1171, 1173 (Fed. Cir. 2020).

**ANSWER:**

Defendants admit that the currently marketed version of VIVIMUSTA® has an approved labeling and refer Plaintiffs to that labeling for the content therein.

48.    The Approved Labeling for VIVIMUSTA® states that the dosage strength is 25 mg/mL. *See id*.

**ANSWER:**

Defendants admit that the currently marketed version of VIVIMUSTA® has an approved labeling and refer Plaintiffs to that labeling for the content therein.

49.    The Approved Labeling for VIVIMUSTA® states that it contains polyethylene glycol ("PEG"), which is described and claimed as a pharmaceutically acceptable fluid in the Patents-in-Suit. *See id.* at 15. The Approved Labeling for VIVIMUSTA® further states that it contains "absolute alcohol," which is a known, commercially available grade of ethanol, which is likewise described and claimed as a pharmaceutically acceptable fluid in the Patents-in-Suit. *See id*. Thus, Defendants' VIVIMUSTA® contains "a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally . . . ethanol," consistent with claim 1 of each of the Patents-in-Suit.

**ANSWER:**

Defendants admit that the currently marketed version of VIVIMUSTA® has an approved labeling and refer Plaintiffs to that labeling for the content therein. Defendants deny the remaining allegations of paragraph 49.

50.    The Approved Labeling for VIVIMUSTA® also recites that "[e]ach milliliter contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, 39.45 mg (5% v/v) of absolute alcohol, and q.s. to 1 mL polyethylene glycol 400." *Id*. at 15. The Approved Labeling then states: "Sodium hydroxide is used to adjust [the] pH of polyethylene glycol 400." Id. Sodium hydroxide is not a pharmaceutically acceptable fluid as that term is used in the specification of the '783 and '214 patents, nor is it a component of the pharmaceutically acceptable fluid in VIVIMUSTA®. Thus, it is not pertinent to the "pharmaceutically acceptable fluid" limitation of claim 1 of each of the Patents-in-Suit.

**ANSWER:**

Defendants admit that the currently marketed version of VIVIMUSTA® has an approved labeling and refer Plaintiffs to that labeling for the content therein. Defendants deny the remaining allegations of paragraph 50.

51.    Indeed, in referring to the use of sodium hydroxide, the Approved Labeling does not describe sodium hydroxide as a component of VIVIMUSTA®, but rather notes that "sodium hydroxide is used to adjust [the] pH ***of polyethylene glycol 400***" used to manufacture VIVIMUSTA®. Id. at 15. Thus, that fluid remains "***polyethylene glycol 400***" and is not taken outside the confines of being a "pharmaceutically acceptable fluid" by any use of sodium hydroxide during its preparation.

**ANSWER:**

16

Defendants admit that the currently marketed version of VIVIMUSTA® has an approved labeling and refer Plaintiffs to that labeling for the content therein. Defendants deny the remaining allegations of paragraph 51.

52.    The Approved Labeling notes that VIVIMUSTA® is "Manufactured at: Latina Pharma S.p.A." in "Sermoneta (LT), Italy." *Id.* at 22. In certain instances, on information and belief, Defendants' Italian manufacturer uses sodium hydroxide in batches of PEG that have an pH too low to be utilized as "polyethylene glycol 400" and/or PEG 400 qualified to be utilized for pharmaceutical purposes. In those instances, the addition of sodium hydroxide renders said batch compliant with the monograph and/or specification for PEG and thus a "pharmaceutically acceptable fluid."

**ANSWER:**

Defendants admit that the currently marketed version of VIVIMUSTA® has an approved labeling and refer Plaintiffs to that labeling for the content therein. Defendants deny the remaining allegations of paragraph 52.

53.    Publicly-available materials from the FDA's review of Azurity's NDA No. 212209 indicate that sodium hydroxide is only used in a "quantity sufficient" to "adjust [the] pH of polyethylene glycol 400." Product Quality Review at p. 6, 67.

**ANSWER:**

The referenced document "Product Quality Review" is not sufficiently identified to determine the accuracy of the alleged quotation and therefore Defendants deny the allegations of paragraph 53.

54.    The Approved Labeling similarly does not list a specific amount of sodium hydroxide or indicate that it is necessary in all instances. Rather, the Approved Labeling for VIVIMUSTA® recites that "[e]ach milliliter contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, 39.45 mg (5% v/v) of absolute alcohol, and q.s. to 1 mL polyethylene glycol 400." *Id.* at 15. Therefore, on information and belief, while the Approved Labeling states that "[s]odium hydroxide is used to adjust [the] pH of polyethylene glycol 400" in VIVIMUSTA® (Approved Labeling at 15), sodium hydroxide is not used for each batch of the PEG used in the manufacture of VIVIMUSTA®.

**ANSWER:**

Defendants admit that the currently marketed version of VIVIMUSTA® has an approved labeling and refer Plaintiffs to that labeling for the content therein. Defendants deny the remaining allegations of paragraph 54.

55.    Even in an instance where sodium hydroxide is used to adjust the pH of batches of PEG used to manufacture VIVIMUSTA®, on information and belief, sodium hydroxide is not a component of the product that is imported into the United States, sold and/or offered for sale in the United States, and/or used in the United States. Thus, the Approved Labeling for VIVIMUSTA® recites that "[e]ach milliliter contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, 39.45 mg (5% v/v) of absolute alcohol, and q.s. to 1 mL polyethylene glycol 400." *Id*. at 15. As explained on Defendants' Approved Labeling, sodium hydroxide is used as a pH adjuster and, on information and belief, is consumed by such use and/or is otherwise not a component of VIVIMUSTA®.

**ANSWER:**

Defendants admit that the currently marketed version of VIVIMUSTA® has an approved labeling and refer Plaintiffs to that labeling for the content therein. Defendants deny the remaining allegations of paragraph 55.

56.    Additionally, the use of sodium hydroxide is well known to those of skill in the art to adjust the pH of both pharmaceutical formulations generally, and of PEG specifically. Sodium Hydroxide, National Library of Medicine, https://pubchem.ncbi.nlm.nih.gov/compound/Sodium-Hydroxide, (last visited June 6, 2025). Thus, even if Defendants' Italian manufacturer uses sodium hydroxide to adjust the pH of PEG in the manufacturing process, a person of ordinary skill in the art would not consider any such use to take VIVIMUSTA® outside the scope of the claim element "a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol." *See, e.g.,* '783 patent at claim 1; '214 patent at claim 1. Further, by the time of important, offer for sale use, and/or sale, VIVIMUSTA® has a pharmaceutically acceptable fluid as part of its liquid bendamustine-containing formulation given that Defendants promote that it is pharmaceutically acceptable for administration to humans. "VIVIMUSTA is an alkylating drug indicated for the treatment of adult patients . . . ." https://vivimusta.com (last visited June 6, 2025).

**ANSWER:**

Denied.

57.    The Approved Labeling for VIVIMUSTA® also recites that "[e]ach milliliter contains 25 mg of bendamustine hydrochloride [and] . . . 5 mg of monothioglycerol." Approved Labeling at 15. The shared specification for the Patents-in-Suit indicates that monothioglycerol is an antioxidant and that 5 mg/mL is a stabilizing amount of an antioxidant.

**ANSWER:**

Defendants admit that the currently marketed version of VIVIMUSTA® has an approved labeling and refer Plaintiffs to that labeling for the content therein. Defendants deny the remaining allegations of paragraph 57.

58.    On information and belief, VIVIMUSTA® has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of from about 5 °C to about 25 °C. Further, Defendants have conceded that VIVIMUSTA® meets an identical limitation in U.S. Patent No. 9,572,796, which is related to the Patents-in-Suit and shares a specification with them. *Eagle Pharmaceuticals Inc. v. Slayback Pharma LLC*, 958 F.3d 1171, 1173 (Fed. Cir. 2020).

**ANSWER:**

Defendants refer Plaintiffs to the published decision *Eagle Pharmaceuticals Inc. v. Slayback Pharma LLC,* 958 F.3d 1171 (Fed. Cir. 2020) for the content therein. Defendants deny the remaining allegations of paragraph 58.

59.    The Approved Labeling for VIVIMUSTA® encourages, recommends, instructs, and/or promotes administration to patients with chronic lymphocytic leukemia. *See* Approved Labeling.

**ANSWER:**

Defendants admit that the currently marketed version of VIVIMUSTA® has an approved labeling and refer Plaintiffs to that labeling for the content therein. Defendants deny the remaining allegations of paragraph 59.

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. 11,844,783

60.    Eagle incorporates each of the preceding paragraphs as if fully set forth herein.

**ANSWER:**

Defendants incorporate by reference their responses to paragraphs 1-59 as if fully set forth herein.

61.    As set forth herein, Defendants have offered VIVIMUSTA® for sale in the United States, sold VIVIMUSTA® in the United States, used VIVIMUSTA® in the United States, and/or imported VIVIMUSTA® into the United States.

**ANSWER:**

Defendants deny that they have "used VIVIMUSTA® in the United States." Defendants

admit the remaining allegations of paragraph 61 with regard to their currently marketed version of

the VIVIMUSTA® product.

62.     On information and belief, the importation, sale, offer for sale, and/or use of
VIVIMUSTA® in conjunction with its Approved Labeling infringes one or more claims, including
at least claim 1, of the '783 patent under 35 U.S.C. § 271(a), either literally and/or under the
doctrine of equivalents, and/or Defendants induce or contribute to the inducement of the
infringement of one or more claims, including at least claim 1, of the '783 patent under 35 U.S.C.
§ 271(b) and/or (c).

**ANSWER:**

Defendants deny the allegations of paragraph 62.

63.     The Approved Labeling for VIVIMUSTA® recommends, instructs, and/or encourages
health care professionals to utilize the product in accordance with said Approved Labeling. Section
2 of the Approved Labeling for VIVIMUSTA® contains specific instructions for "Intravenous
Infusion," and specifically recommends, instructs, and/or encourages as follows: "Aseptically
withdraw the volume needed for the required dose from the 25 mg/mL solution as per Table 1
below and immediately transfer to a 250 mL infusion bag of one of the following diluents: 0.9%
Sodium Chloride Injection, USP; or 2.5% Dextrose/0.45% Sodium Chloride Injection,
USP."Approved Labeling at 3. The Approved Labeling for VIVIMUSTA® also recommends,
instructs,and/or encourages health care professionals to administer said product for purposes of
treating chronic lymphocytic leukemia (CLL) by reciting that "The recommended dosage is 100
mg/m2 administered intravenously over 20 minutes on Days 1 and 2 of a 28-day cycle for up to 6
cycles." *Id.* at 2.

**ANSWER:**

Defendants admit that the currently marketed version of VIVIMUSTA® has an approved

labeling and refer Plaintiffs to that labeling for the content therein. Defendants deny all other

allegations in paragraph 63.

64.     As reflected in that Approved Labeling, each milliliter of VIVIMUSTA® "contains 25 mg
of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol,
39.45 mg (5% v/v) absolute alcohol, and q.s. to 1 mL polyethylene glycol 400." Approved
Labeling at 15. That Approved Labeling further directs healthcare providers to prescribe and
administer VIVIMUSTA® for the treatment of leukemia.

**ANSWER:**

Defendants admit that the currently marketed version of VIVIMUSTA® has an approved labeling and refer Plaintiffs to that labeling for the content therein. Defendants deny that the list contained in paragraph 64 is the full list of ingredients in the currently marketed version of VIVIMUSTA® product. Defendants deny all allegations in paragraph 64 to the extent they are in contradiction to the statements contained in the referenced document and denies all remaining allegations of paragraph 64.

65.    Defendants operate a website, https://vivimusta.com, to market VIVIMUSTA® and encourage infringement. The website encourages healthcare providers to administer VIVIMUSTA® intravenously for treatment of chronic lymphocytic leukemia (CLL) and indolent B-cell non-Hodgkin lymphoma (NHL). The website provides "Ordering Information," and lists several wholesalers and specialty distributors as well as "Vivimusta® Product Codes." The website also lists several "Patient Access & Reimbursement Services," such as co-pay assistance, benefit verification and coverage determination, precertification and prior authorization support. field access and reimbursement support, support through the claims and appeals process, templates for letters of medical necessity, product access through the Patient Assistance Program, and claims denial vial replacement.

**ANSWER:**

Defendants admit that the website https://vivimusta.com/ provides information regarding the currently marketed version of VIVIMUSTA®. Defendants deny all other allegations in paragraph 65 to the extent they are in contradiction to the statements contained on that website and deny all remaining allegations of paragraph 65.

66.    Defendants have actively induced infringement, and will continue to actively induce infringement of at least claim 1 of the '783 patent by way of the substance of its Approved Labeling and/or by way of its marketing of VIVIMUSTA®.

**ANSWER:**

Defendants deny the allegations of paragraph 66.

67.    Defendants' infringement and/or inducement is willful. On information and belief, Defendants are aware of the '783 patent at least because Slayback is aware of Eagle's patent portfolio and has previously been involved in litigation concerning other patents related to the '783 patent. *See, e.g., Eagle Pharm. Inc. v. Slayback Pharma LLC*, No. 21-1256-CFC, D.I. 9 (D. Del. Sept. 22, 2021). Further, Defendants have been aware of the '783 patent and their related infringement at least since Eagle Pharmaceuticals, Inc. sent a letter to Slayback dated December

20, 2023, informing Slayback that the '783 patent had issued and that the importation, sale, offer for sale, and/or use of VIVIMUSTA® in conjunction with its Approved Labeling, infringed the '783 patent. Moreover, on information and belief, Defendants have regularly monitored Eagle's patent filings and developments in the '783 patent family.

**ANSWER:**

Defendants deny the allegations of paragraph 67.

68.    On information and belief, Defendants have acted with full knowledge of the '783 patent and/or the application leading to the '783 patent, Application No. 18/081,238, and without a reasonable basis for believing that it would not be liable for infringing the '783 patent, actively inducing infringement of the '783 patent, and contributing to the infringement by others of the '783 patent.

**ANSWER:**

Defendants deny the allegations of paragraph 68.

69.    Unless Defendants are enjoined from infringing the '783 patent, actively inducing infringement of the '783 patent, and contributing to the infringement by others of the '783 patent, Eagle will suffer irreparable injury. Eagle has no adequate remedy at law.

**ANSWER:**

Defendants deny the allegations of paragraph 69.

70.    Eagle has suffered monetary damages, including but not limited to lost profits, as a result of Defendants' infringement of the '783 patent.

**ANSWER:**

Defendants deny the allegations of paragraph 70.

## COUNT II – INFRINGEMENT OF U.S. PATENT NO. 11,872,214

71.    Eagle incorporates each of the preceding paragraphs as if fully set forth herein.

**ANSWER:**

Defendants incorporate by reference their responses to paragraphs 1-70 as if fully set

forth herein.

72.    As set forth herein, Defendants have offered VIVIMUSTA® for sale in the United States, sold VIVIMUSTA® in the United States, used VIVIMUSTA® in the United States, and/or imported VIVIMUSTA® into the United States.

**ANSWER:**

Defendants deny that they have "used" VIVIMUSTA® in the United States. Defendants admit the remaining allegations of paragraph 72 with regard to their currently marketed version of the VIVIMUSTA® product.

73.    On information and belief, the importation, manufacture, sale, offer for sale, and/or use of VIVIMUSTA® in conjunction with its Approved Labeling infringes one or more claims, including at least claim 1, of the '214 patent under 35 U.S.C. § 271(a), either literally and/or under the doctrine of equivalents, and/or Defendants induce or contribute to the inducement of the infringement of one or more claims, including at least claim 1, of the '214 patent under 35 U.S.C. § 271(b) and/or (c).

**ANSWER:**

Defendants deny the allegations of paragraph 73.

74.    As reflected in its Approved Labeling, each milliliter of VIVIMUSTA® "contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, 39.45 mg (5% v/v) absolute alcohol, and q.s. to 1 mL polyethylene glycol 400." Approved Labeling at 15. That Approved Labeling further indicates that VIVIMUSTA® is marketed in a 100 mg/4 mL vial. Id. at 20.

**ANSWER:**

Defendants admit that the currently marketed version of VIVIMUSTA® has an approved labeling and refer Plaintiffs to that labeling for the content therein. Defendants deny that the list contained in paragraph 74 is the full list of ingredients in the currently marketed version of the VIVIMUSTA® product. Defendants deny all allegations in paragraph 74 to the extent they are in contradiction to the statements contained in the referenced document and denies all remaining allegations of paragraph 74.

75.    The foregoing actions by Defendants constitute infringement of the '214 patent, active inducement of infringement of the '214 patent, and contribution to the infringement by others of the '214 patent.

**ANSWER:**

Defendants deny the allegations of paragraph 75.

23

76.    Defendants' infringement and/or inducement is willful. On information and belief, Defendants are aware of the '214 patent at least because Slayback is aware of Eagle's patent portfolio and has previously been involved in litigation concerning other patents related to the '214 patent. *See, e.g., Eagle Pharm. Inc. v. Slayback Pharma LLC*, No. 21-1256-CFC, D.I. 9 (D. Del. Sept. 22, 2021). Further, Defendants have been aware of the '214 patent and their related infringement at least since Eagle Pharmaceuticals, Inc. sent a letter to Slayback dated January 16, 2024, informing Slayback that the '214 patent had issued and the importation, sale, offer for sale, and/or use of VIVIMUSTA® in conjunction with its Approved Labeling infringed the '214 patent. Moreover, on information and belief, Defendants have regularly monitored Eagle's patent filings and developments in the '214 patent family.

**ANSWER:**

Defendants deny the allegations of paragraph 76.

77.    On information and belief, Defendants have acted with full knowledge of the '214 patent and/or the application leading to the '214 patent, Application No. 18/081,251, and without a reasonable basis for believing that it would not be liable for infringing the '214 patent, actively inducing infringement of the '214 patent, and contributing to the infringement by others of the '214 patent.

**ANSWER:**

Defendants deny the allegations of paragraph 77.

78.    Unless Defendants are enjoined from infringing the '214 patent, actively inducing infringement of the '214 patent, and contributing to the infringement by others of the '214 patent, Eagle will suffer irreparable injury. Eagle has no adequate remedy at law.

**ANSWER:**

Defendants deny the allegations of paragraph 78.

79.    Eagle has suffered monetary damages, including but not limited to lost profits, as a result of Defendants' infringement of the '214 patent.

**ANSWER:**

Defendants deny the allegations of paragraph 79.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Defendants hereby demand a trial by jury on all issues triable as such.

24

## PRAYER FOR RELIEF

Defendants deny that Plaintiffs are entitled to any relief. Defendants respectfully request that the Court dismiss Plaintiffs' Second Amended Complaint with prejudice, enter judgment in favor of Defendants, award Defendants their reasonable attorneys' fees and costs incurred in defending this suit, and award Defendants such other relief as the Court deems just and proper.

## SEPARATE ADDITIONAL DEFENSES

Further answering the Second Amended Complaint, and as additional defenses thereto, Defendants assert the following separate defenses without prejudice to the denials in this Answer, without admitting any allegations of the Second Amended Complaint not otherwise admitted. Defendants assert these additional defenses without conceding that they bear a burden of proof on them and reserve the right to assert additional defenses as warranted.

### First Separate Additional Defense

The claims of the Patents-in-Suit are invalid for failure to comply with one or more conditions of patentability set forth in one or more provisions of 35 U.S.C. § 101 *et seq.,* Including 35 U.S.C. §§ 101, 102, 103, 112 and/or 116, double patenting, or under other judicially- created bases for invalidation or unenforceability.

### Second Separate Additional Defense

Plaintiffs' Second Amended Complaint fails to state a claim upon which relief can be granted, and fails to state a claim for exceptional case. The Second Amended Complaint fails to provide the requisite detail to assert infringement, and does not provide a good faith basis for the claim that is being made.

### Third Separate Additional Defense

25

Plaintiffs are not entitled to relief because they have not adequately pled, shown, nor proven adequate standing for the relief sought.

### Fourth Separate Additional Defense

Plaintiffs' cause of action is barred, in whole or in part, by the doctrine of prosecution history estoppel and other doctrines that limit the application of the claims to the accused products. Plaintiffs are estopped from arguing and has waived arguments that its claims cover Defendants' Product by virtue of amendment, positions, and arguments made to the USPTO when obtaining the Patents-in-Suit.

### Fifth Separate Additional Defense

Plaintiffs are not entitled to injunctive relief because they have not and cannot prove the required elements to obtain such relief, including that: (1) they have suffered irreparable injury; (2) there is no adequate remedy at law; (3) a remedy in equity is warranted; and (4) the public interest warrants an injunction.

### Sixth Separate Additional Defense

The manufacture, use, importation, sale or offer for sale of the currently marketed version of the VIVIMUSTA® Product described in NDA No. 212209 has not infringed, contributed to the infringement of, or induced the infringement of any valid and/or enforceable claim of the Patents-in-Suit literally or under the doctrine of equivalents.

### Seventh Separate Additional Defense

The claims of the Second Amended Complaint are barred, in whole or in part, by the prior judgment in *Eagle Pharms., Inc. v. Slayback Pharma LLC,* Civil Action No. 21-1256-CFC-JLH, 2022 U.S. Dist. LEXIS 193941 (D. Del. Oct. 25, 2022) by the doctrines of estoppel, waiver, issue preclusion, claim preclusion or the Kessler doctrine.

### Reservation of Additional Defenses

26

Defendants reserve the right to assert additional defenses that may be developed through discovery, or otherwise, in this action.

## DEFENDANTS' COUNTERCLAIMS

1.      Eagle has filed complaints against Defendants' seeking, inter alia, a judgment that Defendants' has infringed claims of United States Patent Nos. 12,138,248 (the "'248 patent"), 11,844,783 (the "'783 patent"), and the 11,872,214 (the "'214 patent") (collectively, the "Patents-in-Suit") by making, using, selling, and/or offering for sale in the United States Defendants' Bendamustine Hydrochloride Injection product approved pursuant to NDA No. 212209 ("Defendants' Bendamustine Product"), and/or importing Defendants' Bendamustine Product into the United States. As a result of the filing of these complaints, an immediate and justiciable controversy exists between Eagle and Defendants' regarding the alleged infringement, validity, and enforceability of the Patents-in-Suit.

2.      The following Counterclaims arise under the patent laws of the United States, 35 U.S.C. § 1, seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

3.      Subject matter jurisdiction in this Court is proper under, inter alia, 28 U.S.C. §§ 1331 and 1338.

4.      Slayback Pharma LLC is a company organized and existing under the laws of Delaware, with its principal place of business at 8 Cabot Road, Suite 2000, Woburn, Massachusetts, 01801.

5.      Azurity Pharmaceuticals, Inc. is a company organized and existing under the laws of Delaware, with its principal place of business at 8 Cabot Road, Suite 2000, Woburn, Massachusetts, 01801.

27

6.     On information and belief, Eagle Pharmaceuticals is a Delaware corporation with its principal place of business at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677.

7.     On information and belief, Eagle Sub1 LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677.

8.     This Court has personal jurisdiction over Eagle because, inter alia, Eagle has submitted to the jurisdiction of this Court by filing its Complaint in C.A. No. 24-cv-65 and its Complaint in C.A. No. 25-cv-75 with this Court.

9.     Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400, and because, *inter alia,* Eagle has submitted to the jurisdiction of this Court and selected this venue by filing its First Amended Complaint and Second Amended Complaint with this Court.

## COUNTERCLAIM COUNT I

## (DECLARATION OF UNENFORCABILITY OF THE '783 PATENT, and THE '214 PATENT)

10.     Defendants' re-allege herein each of the foregoing paragraphs of its Counterclaims.

11.     The claims of the Patents-in-Suit are unenforceable due to inequitable conduct, including, upon information and belief, intentional failures to comply with the duty of candor and good faith through material omissions and misrepresentations to the Patent Office.

### I.     Prosecution History of the Patents-In-Suit

12.     The Patents-in-Suit, all titled "Formulations of Bendamustine," relate to liquid forms of bendamustine, an oncology drug that was first synthesized in the 1960s. The Patents-in-Suit claim liquid bendamustine-containing compositions that comprise (1) bendamustine, (2) a "pharmaceutically acceptable fluid" limited to five ingredients, (3) and a "stabilizing amount of

an antioxidant." Ex. 1 [783 Patent] at 13:57-67; Ex. 2 [214 Patent] at 14:2-10; Ex. 3 [248 Patent] at 13:23-31. The Patents-in-Suit purport to disclose "long term storage stable bendamustine-containing compositions," and identify "substantially improved long term stability" as one of the compositions' key "advantages." Ex. 1 [783 Patent] at 2:18-67; Ex. 2 [214 Patent] at 2:18-3:3; Ex. 3 [248 Patent] at 2:17-67.

13.    The listed inventors of the Patents-in-Suit are Nagesh R. Palepu and Phillip Christopher Buxton. The Patents-in-Suit were prosecuted by Stephanie Lodise (PTO Reg. No. 51,430) of Baker & Hostetler.

### A.    The Priorty Patents

14.    The Patents-in-Suit each claim priority to a chain of seven or eight patent applications, five of which matured into patents (collectively the "Priority Patents"). The first to issue of the Priority Patents was U.S. Patent No. 8,609,707 (the "'707 patent") (issuing 2013) and the most recent to issue was U.S. Patent No. 11,103,483 ("the '483 patent") (issuing 2021)[1]. The listed inventors of the Priority Patents are also Dr. Nagesh Palepu and Dr. Christopher Buxton.

15.    The specifications of the Priority Patents and the Patents-in-Suit are virtually identical. Among other things, the specifications include the same examples, same data, and same embodiments. *Compare* Ex. 4 ['707 patent] and Ex. 5 ['483 patent] with Ex. 1 ['783 Patent]; Ex. 2 ['214 Patent]; and Ex. 3 ['248 Patent].

---

[1] In 2020, this Court found that Defendants', Apotex, and Slayback products accused in this litigation and the pending Apotex and Slayback litigations (24-cv-64 and 24-cv-65) did not infringe the '483 patent. *See Eagle Pharm., Inc. v. Slayback Pharma LLC et. al.,* 21-cv-01256, ECF No. 117 (D. Del. Oct. 25, 2022); *Eagle Pharm., Inc. v. Celerity Pharm., LLC,* 22-cv-00042, ECF No. 107 (D. Del. Oct. 28, 2022). This finding was upheld on appeal. *Eagle Pharm., Inc. v. Slayback Pharma LLC,* 2023-1110, ECF No. 75 (Fed. Cir. Jan. 16, 2024).

16.     The Priority Patents (and the predecessor provisional application) were prosecuted by Michael N. Mercanti (PTO Reg. No. 33,966) of Lucas & Mercanti. For the '483 patent prosecution, the inventors were also represented by Dr. Lodise of Baker & Hostetler.

17.     Following the prosecution of the '707 patent, Mr. Mercanti and his firm filed and prosecuted all of the applications in the chain that preceded U.S. Patent Application No. 16/509,520 (the "'520 application"), which issued as the '483 patent. Mr. Mercanti and his firm also filed the '520 application, was counsel of record, and conducted prosecution of that application.

18.     Mr. Mercanti and his firm were counsel of record in the '483 patent prosecution until Dr. Lodise's firm was appointed by a power of attorney filed on July 23, 2021, less than a month before the '483 patent issued on August 21, 2021. Ex. 9 ['483 File History] at 69-71. Dr. Lodise first appears in the '483 patent prosecution as a participant in a March 11, 2021 applicant-initiated interview that was memorialized with a March 16, 2021 summary. *Id*. at 48-49.

**B.     The '100 Provisional Application**

19.     The applications that resulted in the Patents-in-Suit are continuation applications that claim an earliest priority to U.S. Provisional Application No. 61/299,100 that was filed on January 28, 2010 (the "'100 provisional application") and an initial non-provisional patent application (No. 13/016,473, filed on January 28, 2011 (the "'473 application")) that resulted in the '707 Patent.

20.     The relationship between the '100 provisional application, the Priority Patents and the Patents-in-Suit is set forth in the "Related U.S. Application Data" section on the front page of each of the Patents-in-Suit:

**Related U.S. Application Data**

(63) Continuation of application No. 17/412,623, filed on Aug. 26, 2021, which is a continuation of application No. 16/509,920, filed on Jul. 12, 2019, now Pat. No. 11,103,483, which is a continuation of application No. 16/015,656, filed on Jun. 22, 2018, now abandoned, which is a continuation of application No. 15/432,335, filed on Feb. 14, 2017, now Pat. No. 10,010,533, which is a continuation of application No. 15/013,436, filed on Feb. 2, 2016, now Pat. No. 9,572,797, which is a continuation of application No. 14/031,879, filed on Sep. 19, 2013, now Pat. No. 9,265,831, which is a continuation of application No. 13/016,473, filed on Jan. 28, 2011, now Pat. No. 8,609,707.

(60) Provisional application No. 61/299,100, filed on Jan. 28, 2010.

Ex. 1 ['783 Patent] at 1:

**Related U.S. Application Data**

(63) Continuation of application No. 17/412,623, filed on Aug. 26, 2021, which is a continuation of application No. 16/509,920, filed on Jul. 12, 2019, now Pat. No. 11,103,483, which is a continuation of application No. 16/015,656, filed on Jun. 22, 2018, now abandoned, which is a continuation of application No. 15/432,335, filed on Feb. 14, 2017, now Pat. No. 10,010,533, which is a continuation of application No. 15/013,436, filed on Feb. 2, 2016, now Pat. No. 9,572,797, which is a continuation of application No. 14/031,879, filed on Sep. 19, 2013, now Pat. No. 9,265,831, which is a continuation of application No. 13/016,473, filed on Jan. 28, 2011, now Pat. No. 8,609,707.

(60) Provisional application No. 61/299,100, filed on Jan. 28, 2010.

Ex. 2 ['214 Patent] at 1;

31

**Related U.S. Application Data**

(63)  Continuation of application No. 18/498,259, filed on Oct. 31, 2023, which is a continuation of application No. 17/412,623, filed on Aug. 26, 2021, now abandoned, which is a continuation of application No. 16/509,920, filed on Jul. 12, 2019, now Pat. No. 11,103,483, which is a continuation of application No. 16/015,656, filed on Jun. 22, 2018, now abandoned, which is a continuation of application No. 15/432,335, filed on Feb. 14, 2017, now Pat. No. 10,010,533, which is a continuation of application No. 15/013,436, filed on Feb. 2, 2016, now Pat. No. 9,572,797, which is a continuation of application No. 14/031,879, filed on Sep. 19, 2013, now Pat. No. 9,265,831, which is a continuation of application No. 13/016,473, filed on Jan. 28, 2011, now Pat. No. 8,609,707.

(60)  Provisional application No. 61/299,100, filed on Jan. 28, 2010.

Ex. 3 ['248 Patent] at 1.

21.    A s shown above, the '100 provisional application was the first application in the patent family. That application is similar, but not identical, to the first non-provisional application in the family, the '473 application. Each of the subsequent applications leading to the Patents-in-Suit are continuation applications of the parent '473 application and accordingly are substantially identical in content to that first non-provisional application.

22.    Thus, the differences between the specification of the '100 provisional application and any of the non-provisional applications or patents that claim priority to it, including the Priority Patents and the Patents-in-Suit, are essentially the same.

## II.    The Applicants Committed Inequitable Conduct by Intentionally Deleting Material N-Acetyl Cysteine Data from the Original Provisional Application

23.    On information and belief, at least Mr. Mercanti and Dr. Lodise[2] intentionally deceived the Patent Office by, for example, concealing highly material experimental data from the Examiner while prosecuting the Priority Patents and the Patents-in-Suit.

24.    On information and belief, when filing the '473 application—the first non-provisional application that claimed priority to the '100 provisional application—Mr. Mercanti and the inventors deleted crucial data from the '100 provisional application.

25.    Specifically, when prosecuting the cases that led to the Priority Patents and the Patents-in-Suit, the applicants deleted experimental data from Table 4 in the '100 provisional application, rewriting the table to exclude unfavorable data and then including the modified table as Table 3 in the Priority Patents and the issued Patents-in-Suit. This omission is highly unusual in prosecution practice and was both intentional and material. The original and modified table

---

[2] There may be others who were involved in the prosecution of the Priority Patents and the Patents-in-Suit, such as Eagle in-house counsel, that also owed a duty of candor to the Patent Office and may have been aware of, but similarly concealed, highly material experimental data from the Examiner. However, Eagle has obstructed Defendants''s efforts to take discovery as to the identity and actions of any such additional people and has indicated that Dr. Palepu is ill and unable to sit for deposition. Defendants' reserves the right to further amend its counterclaims to identify such additional people.

appears below, with the deleted data highlighted:



| 61/299,100 Provisional Application | Priority Patents/Patents-in-Suit |
|---|---|

Table 4: Stability of bendamustine (20mg/ml) in PEG 400 and antioxidants

| Antioxidant | T°C | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
| | 40 | 15 | 97.5 | 0.33 | 0.53 |
| N-acetyl cysteine 2mg/ml | 25 | 15 | 94.7 | 0.25 | 0.6 |
| | 40 | 15 | 86.4 | 4.83 | 11.7 |

<LD = Below Level of Detection

TABLE 3

Stability of Bendamustine (20 mg/ml) in PEG 400 and Antioxidants

| Antioxidant | T°C. | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
| | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

*See* Ex. 6 ['100 Provisional Application] at 9; Ex. 4 ['707 Patent] at Table 3; Ex. 5 ['483 Patent] at Table 3; Ex. 1 ['783 Patent] at Table 3; Ex. 2 ['214 Patent] at Table 3; Ex. 3 ['248 Patent] at Table 3.

26.    A parallel deletion was made to the text of the corresponding Example 3 in the Priority Patents and the Patents-in-Suit:



| 61/299,100 Provisional Application | Priority Patents/Patents-in-Suit |
|---|---|
| Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 20 mg/ml in polyethylene glycol 400 and 5 mg/ml of lipoic acid or 2 mg/ml of N-acetyl cysteine was added as a stabilizing antioxidant as indicated in Table 4 below. The samples were maintained at 40 °C or 25 °C and analyzed after 15 days for drug content and impurity profile. The results obtained are presented in Table 4. | Example 3

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 20 mg/ml in polyethylene glycol 400 and 5 mg/ml of lipoic acid was added as a stabilizing antioxidant as indicated in Table 3 below. The samples were maintained at 40° C. or 25° C. and analyzed after 15 days for drug content and impurities. The results obtained are presented in Table 3. |

*See* Ex. 6 ['100 Provisional Application] at 9; Ex. 4 ['707 Patent] at 7:42-48; Ex. 5 ['483 Patent] at 8:10-16; Ex. 1 ['783 Patent] at 8:6-12; Ex. 2 ['214 Patent] at 8:12-18; Ex. 3 ['248 Patent] at 8:12-18.

27.     What the deleted data show is that a bendamustine composition using the common antioxidant, N-acetyl-cysteine, and polyethylene glycol ("PEG") resulted in rapid degradation at 25C and 40C; and that at 40C, the degradation profile was *worse* than having no antioxidant at all. This was crucial information that the United States Patent and Trademark Office (the "PTO" or "Patent Office") needed to evaluate the applicants' broad claim to have conceived of formulations using the general class of antioxidants.

28.     Example 3 and corresponding Table 3 provide the only data and examples for a bendamustine composition where bendamustine is dissolved in PEG alone (the formulation being made with and without lipoic acid as an antioxidant).

29.     The remaining examples in the Priority Patents and the Patents-in-Suit where PEG is used in the bendamustine composition (Examples 4-8 and corresponding Tables 4-8) present data and examples for the use of a mixture of PEG and propylene glycol along with one of the following antioxidants: lipoic acid, dihydrolipoic acid, or thioglycerol. *See* Ex. 4 ['707 Patent] at 8:15-23, 8:58-67, 9:41-48, 11:32-38, 12:19-25; Ex. 5 ['483 Patent] at 8:47-55, 9:61-10:18, 10:60-67, 11:42-49, 12:42-48; Ex. 1 ['783 Patent] at 8:44-52, 10:10-18, 10:60-67, 12:42-49, 13:24-30; Ex. 2 ['214 Patent] at 8:58-67, 10:7-15, 10:60-67, 12:36-43, 13:15-21; Ex. 3 ['248 Patent] at 8:58- 67, 9:62-66, 10:60-67, 11:41-48, 12:41-48.

30.     No mention of a formulation with PEG and N-acetyl cysteine is made in the Priority Patents or the Patents-in-Suit. The applicants singled out the failed N-acetyl cysteine formulation for deletion. As explained below, the applicants would later claim formulations encompassing this very formulation anyway as part of their invention.

31.     The PTO does not examine provisional applications, and would not review the substance of a provisional application unless the applicant points to a provisional to overcome a prior art rejection by attempting to antedate the art. Accordingly, the deleted data from the '100

provisional application were never disclosed in an application that was examined by the Patent Office.

### A.    The Deleted N-Acetyl Cysteine Data Was But-For Material To The Priority Patents and The Patents-In-Suit

32.    The deleted N-Acetyl Cysteine data establish that numerous claims of the Priority Patents and Patents-in-Suit are not adequately described or enabled across their full scope. Had the omitted experimental data been provided to the Examiner, these claims would not have issued.

33.    The claimed compositions each require a "stabilizing amount of an antioxidant" and that "impurities . . . resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5º C. to about 25º C." The deleted data show that not all antioxidants are capable of stabilizing the claimed bendamustine compositions to achieve the claimed impurity levels after 15 months of storage.

34.    The applicants relied on the data in Examples 3-8 (and Tables 3-8) 3 to (purportedly) show that antioxidants have a stabilizing effect on the liquid bendamustine formulations of the purported invention sufficient to lead to the claimed stability profile.

35.    By comparing the experimental results using lipoic acid (which was presented to the Examiner) and N-acetyl cysteine (which was deleted and not considered by the Examiner) one can see that not all antioxidants are effective to provide the stability profile claimed in the Patents-in-Suit.

36.    The deleted data show that N-acetyl cysteine has a far smaller effect on the stability of the bendamustine in the liquid formulations described in the patent than lipoic acid. For example, at 40 degrees for 15 days, the percentage of total impurities is 41.9 with no

36

antioxidant as compared to 11.7 when N-acetyl cysteine is present and only 0.53 when lipoic acid is present.

37.    11.7% impurities after 15 days at 40 degrees indicates that this formulation (100% PEG plus 2 mg/ml N-acetyl cysteine) would not meet the claim limitation incorporated in each claim of the Patents-in-Suit requiring "the total impurities . . . resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5º C. to about 25º C."

38.    Indeed, the applicants knew that this data would not support a long term stable bendamustine formulation. Dr. Buxton, a co-inventor of the Asserted Patents, testified that based on the deleted data, he would not expect that the tested N-acetyl cysteine bendamustine formulation would meet the stability limitation of the claims. Ex. 7 [Buxton Tr. Aug 21] at 91:5-22. Moreover, Dr. Buxton (as well as Dr. Palepu, the other co-inventor of the Asserted Patents) affirmatively and repeatedly told the PTO in another patent publication prepared by Mr. Mercanti that formulations having lower levels of impurities than those in the deleted N-acetyl cysteine data "would not be long term storage stable." Ex. 8 [Buxton Ex. 9] at [138].

39.    Comparing the deleted data to the disclosed data, a person of ordinary skill in the art ("POSA") would readily see that different antioxidants have vastly different effects on bendamustine stability in the formulations described and claimed in the patent and that N-acetyl cysteine, and potentially many other antioxidants, would not work in the claimed formulation.

40.    All claims of the Priority Patents require an antioxidant. Claims 1-5 and 9-13 of the '707 patent each require "a stabilizing amount of an antioxidant" without specifying which of all possible antioxidants are permitted. Ex. 4 ['707 Patent] at 12:66-13:20, 13:35-14:6. The same goes for claims 1 and 3-16 of the '483 patent. Ex. 5 ['483 Patent] at 13:22-34, 13:41-48. Claims

6-8 and 14-22 of the '707 patent and Claim 2 of the '483 patent limit the antioxidant to specific examples, including thioglycerol, monothioglycerol, lipoic acid, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds and dihydrolipoic acid. Ex. 4 ['707 Patent] at 13:22-34, 14:7-44; Ex. 5 ['483 Patent] at 13:35-40.

41.    Accordingly, each of the claims of the Priority Patents except claims 1-5 and 9-13 of the '707 patent and claims 1 and 3-16 of the '483 patent permit N-acetyl cysteine as the antioxidant, and the Examiner would have found them unpatentable if the omitted N-acetyl cysteine data had been disclosed. Because these claims include within their scope numerous antioxidants that were never tested and have different chemical mechanisms of action, the deleted data would have been highly material to the patentability of those claims, and the Examiner would have rejected them as unpatentable under § 112 for lack of an adequate written description and/or lack of enablement. Accordingly, applicants' deletion of the N-acetyl cysteine data during the '707 patent prosecution was inequitable conduct that renders the Priority Patents unenforceable.

42.    Further, applicants' withholding of the deleted data during prosecution of the Priority Patents rendered the Patents-in-Suit unenforceable because this deleted data has an immediate and necessary relation to the claims of the Patents-in-Suit.

43.    As in the Priority Patents, all claims of the Patents-in-Suit require an antioxidant. Claims 1, 4, 5, 6, and 9 of the '214 patent each require "a stabilizing amount of an antioxidant" without specifying which of all possible antioxidants are permitted. Ex. 2 ['214 Patent] at 14:2-14, 14:19-38, 14:43-44. The same goes for claims 1-5 and 8-10 of the '783 patent, and claims 1, 4-7, 8, and 11-22 of the '248 patent. Ex. 1 ['783 Patent] at 13:54-14:33, 14:39-46; Ex. 3 ['248 Patent] at 13:24-36, 13:41-14:15, 14:20-53. Claims 2, 3, 7, and 8 of the '214 patent, claims 6, 7,

11, 12, 13, and 14 of the '783 patent, and claims 2-3 and 9-10 of the '248 patent limit the antioxidant to monothioglycerol. Ex. 1 ['783 Patent] at 14:34-38, 14:47-15:9; Ex. 2 ['214 Patent] at 14:15-18, 14:39-42; Ex. 3 ['248 Patent] at 13:38-41, 14:16-19.

44.    Accordingly, each of the claims of the Patents-in-Suit except 2, 3, 7, and 8 in the '214 patent, claims 6, 7, 11, 12, 13, and 14 of the '783 patent, and claims 2-3 and 9-10 of the '248 patent permit N-acetyl cysteine as the antioxidant, and the Examiner would have found them unpatentable if the deleted N-acetyl cysteine data had been disclosed. Because these claims include within their scope numerous antioxidants that were never tested and have different chemical mechanisms of action, the deleted data would have been highly material to the patentability of those claims, and the Examiner would have rejected them as unpatentable under § 112 for lack of an adequate written description and/or lack of enablement. Accordingly, applicants' inequitable conduct during the '707 patent and '483 patent prosecution renders all of the claims of the Patents-in-Suit unenforceable. *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1288-89 (Fed. Cir. 2011); *Consolidated Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 808–12 (Fed. Cir. 1990).

45.    Additionally, on information and belief, despite knowing that the deleted N-Acetyl data was material to the Patents-in-Suit, the applicants for the Patents-in-Suit—Dr. Lodise, the inventors, and Eagle's in-house counsel—deliberately omitted this information so that it would not be considered by the PTO. This inequitable conduct separately renders the Patents-in-Suit unenforceable.

       **B.**    **Applicants Continued to Deceive the PTO Regarding The N-Acetyl Cysteine Data During Prosecution of The Priority Patents and Patents-in-Suit**

46.    The applicants continued to deceive the PTO regarding the N-Acetyl cysteine data during the prosecution of the Priority Patents and the Patents-in-Suit. Despite knowing about the

non-working formulations that included N-acetyl cysteine, the applicants repeatedly implied that all antioxidants would have the desired stabilizing effect on bendamustine.

47.    During the prosecution of the Patents-in-Suit the applicants consistently argued to the PTO that the pending claims were patentable because compositions of bendamustine, PEG, and "an antioxidant" were "surprisingly stable" and suitable for storage for at least 15 months under refrigeration or at room temperature.

**Brief Description of the Claimed Inventions**

The pending claims are directed to, among other things, ready for dilution, liquid bendamustine-containing compositions having from about 20 mg/mL to about 60 mg/mL of bendamustine; polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol; and an antioxidant. The claimed compositions are not reconstituted lyophilized powders; they are concentrated, bendamustine-containing liquids for administration through infusion with an appropriate diluent. (*See, e.g.,* Specification at page 2). This avoids the multi-step reconstitution and preparation for administration required for the Brittain[2] products, including TREANDA®. These ready for dilution, liquid compositions are surprisingly stable and do not exhibit significant bendamustine degradation after storage for at least 15 months at refrigerated or room temperature conditions.

Ex. 13 ['783 File History] at 21; Ex. 14 ['214 File History] at 9; see also Ex. 15 ['248 File History] at 23.

48.    Likewise, relying on Table 3—from which they deleted the contradictory N-acetyl cysteine data—the applicants represented that "surprisingly, adding ***an antioxidant*** substantially eliminated the formation of degradation products":

Despite the poor stability of bendamustine/PEG, surprisingly, adding an antioxidant substantially eliminated the formation of degradation products. As show in the specification, and the Table above, a bendamustine/PEG composition including

40

antioxidant exhibited no substantial increase in degradants after storage for 15 days at either room temperature or 40°C. (Specification at Example 3, page 13, Table 3).

The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if an antioxidant is added. Such and unexpected result could not have been predicted. This result is particulary unexpected given the absence of any report in the literature of an oxidative degradation pathway for bendamustine. The claims are patentable for at least three reasons.

Ex. 13 ['783 File History] at 30; Ex. 14 ['214 File History] at 18; Ex. 15 ['248 File History] at 25.

49.    Finally, during the '783 and '214 patent prosecutions, the applicants represented that "adding *an antioxidant* to fix the degradation caused by PEG was not conventional." Ex. 13 ['783 File History] at 38; Ex. 14 ['214 File History] at 93; Ex. 15 ['248 File History] at 20.

50.    The applicants for the Patents-in-Suit knew that these statements could not be true given their knowledge of and the Examiner's statements (discussed below) about the contradictory N-acetyl cysteine data.

51.    During prosecution of the '483 patent, the applicants made similarly misleading arguments that using "an antioxidant" yielded "surprisingly stable" formulations. For example:

> **Brief Description of the Claimed Inventions**
>
> The pending claims are directed to, among other things, liquid bendamustine-containing compositions having from about 10 mg/mL to about 100 mg/mL of bendamustine, polyethylene glycol, and an antioxidant. These compositions are surprisingly stable and do not exhibit significant bendamustine degradation after storage for at least 15 months at refrigerated or room temperature conditions.

*Id*. ['483 prosecution 11/25/20 Applicant Arguments] at 5.

52.    Mr. Mercanti argued that this purported stability was an unexpected result that rendered the claims patentable over the art cited by the Examiner:

> polyethylene glycol (PEG), as claimed. Moreover, the stability achieved by the claimed compositions would have been unexpected in view of the cited art. Applicant requests reconsideration and withdrawal of the rejection.

*Id; see also id.* [5/20/21 Amendment] at 9, 10, 60-61 ("The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if an antioxidant is added. Such an unexpected result could not have been predicted. This result is particularly unexpected given the absence of any report in the literature of an oxidative degradation pathway.").

53.    By consistently referring to the indefinite article "***an*** antioxidant" or "antioxidants," plural, the applicants repeatedly implied throughout the '483 prosecution that ***all*** antioxidants would have the desired stabilizing effect on bendamustine. *Id.* ['483 File History 5/20/21 Response After Final Action] at 59:

> "Antioxidants are used to reduce the oxidation of active substances and excipients in the finished product." (Note for Guidance, European Agency for the Evaluation of Medicinal Products, page 8 of 9 (of record)) Since bendamustine was not known to degrade *via* an oxidative process, those of ordinary skill in the art would not have tried to reduce degradation by adding an antioxidant to a bendamustine composition.[11] The claims are non-obvious for at least this reason.

*See also id.* at 60-61:

> Despite the poor stability of bendamustine/PEG, surprisingly, adding an antioxidant substantially eliminated the formation of degradation products. As shown in the specification, and the Table above, a bendamustine/PEG composition including antioxidant exhibited no substantial increase in degradants after storage for 15 days at either room temperature or 40 °C. (Specification at Example 3, page 13, Table 3).
>
> The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if an antioxidant is added. Such an unexpected result could not have been predicted. This result is

particularly unexpected given the absence of any report in the literature of an oxidative degradation pathway. The claims are patentable for at least this reason.

54.    Moreover, during prosecution of the '483 patent, the applicants repeatedly relied on the table (Table 3) from which the N-acetyl cysteine data had been deleted to support the patentability of the pending claims:

> Despite the poor stability of bendamustine/PEG, surprisingly, adding an antioxidant substantially eliminated the formation of degradation products. As shown in the specification, and the Table above, a bendamustine/PEG composition including antioxidant exhibited no substantial increase in degradants after storage for 15 days at either room temperature or 40 °C. (Specification at Example 3, page 13, Table 3).
>
>   The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if an antioxidant is added. Such an unexpected result could not have been predicted. The claims are patentable for at least this reason.

*Id.* ['483 File History 11/25/20 Applicant Arguments] at 10.

55.    Most importantly, during the '483 patent prosecution the Examiner stated affirmatively that he was of the belief that the applicants had not compared the effects of lipoic acid versus N-acetyl cysteine, which he referred to as "acetylcysteine":

> these are expected results. It is noted that Brittain et al. does not specifically name lipoic acid but Applicant did not compare lipoic acid against any of the disclosed antioxidant species of Brittain including acetylcysteine, ascorbic acid and cysteine. Furthermore, even if Applicant can show that lipoic acid is superior compared to the species taught by Brittain, the instantly claimed subject matter is not commensurate in scope. "The

*Id.* ['483 Patent File History 12/21/20 Final Rejection] at 29 (underlining added).

56.    But, as discussed above, the applicants had in fact directly compared lipoic acid and N-acetyl cysteine and found that lipoic acid was considerably more effective at stabilizing

bendamustine. Dr. Buxton—one of the inventors of the Patents-in-Suit—confirmed that he and his team had done so. Ex. 7 [Buxton Aug. 21 Tr.] at 103:14-19; *see also id.* at 95:14-23.

57.     Despite having a duty to disclose material information to the PTO, applicants never notified the Examiner of this and did not provide the data showing the N-acetyl cysteine testing, and instead allowed the Examiner to remain under the misimpression that applicants had not conducted any comparative testing and that any antioxidant would work in the claimed invention. Eagle did not even tell Dr. Buxton that he had a duty to disclose material information to the PTO or that the Examiner mistakenly believed that applicants had not tested an N-acetyl cysteine formulation. *Id.* at 32:4-22, 105:7-17. Dr. Buxton testified that he was "not aware" that the Examiner had asked for this data, and that had he known, he "quite probably" would have pointed the examiner to the deleted data. *Id.* at 105:7-24.

58.     In their May 20, 2021 response to the Examiner's final action in the '483 patent prosecution, for example, the applicants again reproduced the Table 3 data for lipoic acid in PEG but made no mention of the deleted data testing N-acetyl cysteine under the same conditions. Instead, the applicants stated that "an antioxidant"—not "lipoic acid" or "selected antioxidants"—would provide "surprising storage stability":

> The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if an antioxidant is added. Such an unexpected result could not have been predicted. This result is

Ex. 9 ['483 patent File History 5/20/21 Response After Final Action] at 60.

59.     It is a longstanding principle that "the duty of square dealing and full disclosure . . . is not done by one who knowingly takes advantage of an error by the PTO." *KangaROOS U.S.A., Inc. v. Caldor, Inc.,* 778 F.2d 1571, 1576 (Fed. Cir. 1985); *see also Belcher Pharms., LLC v. Hospira, Inc.,* 11 F.4th 1345, 1350, 1353-54 (Fed. Cir. 2021). By representing that *any* antioxidant would yield "surprisingly stable" formulations—and by withholding the

contradictory N-acetyl cysteine data and allowing the Examiner to believe that no data regarding N-acetyl cysteine existed—the applicants breached this duty during the prosecutions of the Priority Patents and the Patents-in-Suit.

### C.    The Examiner's Statements Establish that the Deleted N-Acetyl Cysteine Data Was Highly Material To The Patentability of the Patents-in-Suit

60.    As established by the Examiner's own comments during the '483 patent prosecution, the deleted data concerning the effect of N-acetyl cysteine on the stability of bendamustine in liquid formulations was highly material to the patentability of the claims that eventually issued as the Priority Patents and the Patents-in-Suit. Had the Examiner been aware of these data, he would have had conclusive evidence of the overbreadth of the claims. No reference was made to the contents of the '100 provisional application during prosecution of the Priority Patents or the Patents-in-Suit.

61.    It is reasonable to assume that the Examiner had no knowledge of the deleted data, as the USPTO does not examine provisional applications, and would not review the substance of a provisional application unless the applicant points to a provisional to overcome a prior art rejection by attempting to antedate the art, which did not happen here.

62.    During prosecution of the '483 patent, the Examiner communicated to the applicants that he was concerned that the "antioxidant" limitation was overbroad.

63.    In a June 2, 2021 Advisory Action, for example, the Examiner noted that the claims were not allowable because, among other things, the scope of the claims was not commensurate with the experimental data in the specification because the only example with data is for "sulfur containing antioxidant lipoic [acid]" in Table 3. Ex. 9 ['483 File History June 2, 2021 Advisory Action] at 65.

some diluted concentration. In light of these issues as well as the claims not being commensurate in scope with the data where only sulfur containing antioxidant lipoic is shown (table 3), (tables 4-8 require the addition of propylene glycol) the application is not in immediate condition for allowance.

The Examiner further noted that Tables 4–8 included propylene glycol. *Id.* In other words, the only data for a PEG-only formulation is in Table 3, and the only data provided in Table 3 is for a single antioxidant, lipoic acid. *See also id.* ("Applicant's results appear unexpected but the claimed subject matter is not necessarily commensurate in scope with the data.")

64.     The Examiner later capitulated because he concluded that he "**does not have evidence that other antioxidants would not also work in the invention.**" *Id.* ['483 File History July 16, 2021 Interview Summary] at 67 (emphasis added):

because it is ready for lyophilization. The Examiner noted that while only sulfur based antioxidants were used as the antioxidant, the Examiner does not have any evidence that other antioxidants would not also work in the invention. Also the Examiner noted that t-butyl alcohol used by Brittain has a high vapor

The Examiner's statement makes clear that but for the Applicants' choice to delete and then not to provide the deleted N-acetyl cysteine data, the Examiner would have rejected the claims under § 112.

### D.     The Applicants' Intent To Deceive Is The Single Most Reasonable Inference

65.     Given the Examiner' statements, the prosecuting attorneys (both Mercanti, who was of record, and Lodise, who attended the interview), and possibly the inventors and in-house counsel at Eagle (*see* note 3 above ), were on notice that data concerning additional antioxidants was material to the patentability of the pending claims.

66.     Mercanti at least was plainly knowledgeable about the N-acetyl cysteine data, having submitted the '100 provisional application. Nonetheless, according to Dr. Buxton, neither Mercanti nor Lodise advised Dr. Buxton of his duty of candor. Ex. 7 [Buxton Aug. 21 Tr.] at 32:4-22. And neither notified Dr. Buxton of the Examiner's statement regarding N-acetyl

46

cysteine, nor that the Examiner was under the impression that no testing of formulations containing N-acetyl cysteine had been conducted. *Id.* at 105:7-24.

67.     Given the express statements by the Examiner that further data would be materialto prosecution and that the Examiner lacked evidence that antioxidants other than sulfur based antioxidants would not work, and the prosecutors' and inventors' knowledge of the negative N-acetyl cysteine data, the only reasonable inference is that the prosecuting attorneys, and possibly the inventors and in-house counsel at Eagle, had an intent to deceive the Patent Office by withholding material experimental results.

## III.   The Applicants Committed Inequitable Conduct by Intentionally Deleting Material Data Relevant To Other Non-Working Examples

68.     The Patents-in-Suit claim liquid bendamustine compositions comprising a "pharmaceutically acceptable fluid" "consisting of" polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol. Given well-settled principles of patent law, therefore, the "pharmaceutically acceptable fluid" can include *only* those five ingredients, and no others.

69.     Defying these well-settled legal principles, Eagle argued during claim construction that the claimed "pharmaceutically acceptable fluid" could include excipients other than the five ingredients explicitly listed in the claims. D.I. 75 at 17-22. While Defendants' strongly disagree with Eagle's construction, Eagle's contention that the "pharmaceutically acceptable fluid" can include other excipients puts Eagle in a quandary because the applicants deleted additional information relevant to formulations with additional excipients. The deletions directly impact the patentability of the Patents-in-Suit and the Priority Patents under Eagle's construction of the claims.

70.    When filing the '473 application, the applicants and Mr. Mercanti deleted data from the '100 provisional application showing that bendamustine formulations that would satisfy the claims under Eagle's erroneous interpretation of the "consisting of" limitation would not be long term storage stable.

71.    Specifically, the '100 provisional application included data showing that formulations with (1) bendamustine and lactic acid (88%), with or without 10 mg/mL choline chloride, and (2) bendamustine and glycerol, with or without choline chloride, had high levels of impurities after 7 days storage at 40ºC:

Table 1 – Stability of Bendamustine HCl in Non-aqueous Solvents I

| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
|---|---|---|---|---|
| BDM 10mg/mL. Lactic acid (88% (w/w)) qs to 1mL. | | Initial | 10.01 | 0.35 |
| | 40°C | 48 hrs | 9.35 | 3.78 |
| | | 7 day | 8.56 | 9.64 |
| BDM - 10mg/mL. Choline Chloride - 215mg/mL. Lactic acid(88% (w/w)) qs to 1mL. | | Initial | 9.78 | 0.46 |
| | 40°C | 48 hrs | 9.25 | 4.22 |
| | | 7 day | 8.65 | 7.88 |
| BDM - 10mg/mL. Ethanol qs to 1mL. | | Initial | 10.55 | 0.27 |
| | 40°C | 48 hrs | 10.30 | 2.39 |
| | | 7 day | 9.55 | 6.66 |
| BDM - 10mg/mL. Choline chloride - 215mg/mL. Ethanol qs to 1mL. | | Initial | 10.43 | 0.27 |
| | 40°C | 48 hrs | 10.48 | 1.27 |
| | | 7 day | 10.26 | 2.11 |

<LD = Below Level of Detection

Table 2 - Stability of Bendamustine HCl in Non-aqueous Solvents II

| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
|---|---|---|---|---|
| BDM - 10mg/mL. Choline chloride - 215mg/mL. Propylene glycol qs to 1mL. | | Initial | 9.99 | 0.21 |
| | 40°C | 48 hrs | 9.95 | 0.60 |
| | | 7 day | 9.43 | 2.31 |
| BDM - 10mg/mL. Propylene glycol qs to 1mL. | | Initial | 9.68 | 0.21 |
| | 40°C | 48 hrs | 9.45 | 0.88 |
| | | 7 day | 9.00 | 3.44 |
| BDM - 10mg/mL. Choline chloride - 215mg/mL. Glycerol qs to 1mL. | | Initial | 9.86 | 0.80 |
| | 40°C | 48 hrs | 9.20 | 2.58 |
| | | 7 day | 6.34 | 33.9 |
| BDM - 10mg/mL. Glycerol qs to 1mL. | | Initial | 10.13 | 0.28 |
| | 40°C | 48 hrs | 8.42 | 10.8 |
| | | 7 day | 3.00 | 64.6 |

<LD = Below Level of Detection

Ex. 6 ['100 Provisional Application] at 7.

72.    However, the applicants deleted this data in the '473 non-provisional application:

Table 1 – Stability of Bendamustine HCl

| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
|---|---|---|---|---|
| BDM - 10mg/mL Choline chloride - 215mg/mL. Ethanol qs to 1mL | | Initial | 10.43 | 0.27 |
| | 40°C | 48 hrs | 10.48 | 1.27 |
| | | 7 day | 10.26 | 2.11 |
| BDM - 10mg/mL Ethanol qs to 1mL | | Initial | 10.55 | 0.27 |
| | 40°C | 48 hrs | 10.30 | 2.39 |
| | | 7 day | 9.55 | 6.66 |
| BDM - 10mg/mL Choline chloride - 215mg/mL Propylene glycol qs to 1mL | | Initial | 9.99 | 0.21 |
| | 40°C | 48 hrs | 9.95 | 0.60 |
| | | 7 day | 9.43 | 2.31 |
| BDM - 10mg/mL Propylene glycol qs to 1mL | | Initial | 9.68 | 0.21 |
| | 40°C | 48 hrs | 9.45 | 0.88 |
| | | 7 day | 9.00 | 3.44 |
| BDM - 10mg/mL Choline Chloride - 215mg/mL Benzyl alcohol qs to 1mL | | Initial | 9.95 | 1.19 |
| | 40°C | 48 hrs | 9.89 | 3.51 |
| | | 7 day | 8.97 | 4.24 |
| BDM - 10mg/mL Benzyl alcohol qs to 1mL | | Initial | 9.52 | 0.33 |
| | 40°C | 48 hrs | 8.67 | 4.18 |
| | | 7 day | 7.49 | 7.84 |

Ex. 12 ['473 Application Table 1] at 12. The deleted data show the following high levels of impurities after just seven days of storage:

| Formulation | Impurities after 7 days storage at 40°C |
|---|---|
| Bendamustine Lactic acid | 9.64% |
| Bendamustine Lactic acid + Choline chloride | 7.88% |
| Bendamustine Glycerol | 64.6% |
| Bendamustine Glycerol + Choline Chloride | 33.9% |

73.    The specification of the '100 provisional application states that formulations with degradants above 3.5% after 7 days storage at 40ºC are "not suitable for long term storage":

> As shown in Tables 1 and 2, for example, control samples 3 and 6, which were dissolved in ethanol and propylene glycol, respectively, did not provide such stabilizing effects. Sample 3 exhibited more than 6.5 total degradants after 7 days storage at 40 °C. Sample 6 exhibited almost 3.5% total degradants after 7 days storage at 40 °C. Bendamustine-containing compositions with such high levels of degradation would not be suitable for long-term storage.

Ex. 6 ['100 Provisional Application] at 9. Because the impurity levels for the deleted formulations are at or above 3.5%, a POSA would conclude that neither lactic acid nor glycerol (with or without choline chloride) are suitable solvents for stable formulations of bendamustine.

74.    The specifications of the Priority Patents and the Patents-in-Suit tell a different story. There, based on the data that was not deleted, the applicants state that formulations with up to *5%* impurities after 7 days storage at 40ºC would be "very stable" and adequate for a 15-month shelf life at 25º:

> As shown in Table 1, the bendamustine formulations are very stable in solutions containing solvent and chloride salt. Table 1 shows that bendamustine, when dissolved at a concentration of about 10 mg/mL, in a pharmaceutically acceptable fluid, such as ethanol and propylene glycol, and containing a stabilizing amount of a chloride salt, such as choline chloride, had less than about 5% after at least 7 days storage at 40 °C.
>
> The data presented in Table 1 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of a chloride salt having a shelf life of at least about 15 months at 5 °C and 25 °C.

Ex. 12 ['473 Non-provisional Application ] at 12. And at least one formulation that the '473 non-provisional application describes as "stabiliz[ed]" has 4.24% total impurities after seven days, making it not stable under the '100 provisional application's definition of stability. *Id.*

50

75.    The data that the applicants and Mr. Mercanti deleted from the '100 provisional application were highly material to the patentability of the claims of the Patents-in-Suit and the Priority Patents under Eagle's erroneous understanding of the claim scope. The applicants relied almost entirely on the data presented in Table 3 to show that the claimed invention provided unexpected results compared to the prior art, but the data in Table 3 is limited to bendamustine dissolved in a single solvent, 100% PEG 400, and containing a single excipient, the antioxidant lipoic acid. There are no data in the Priority Patents or Patents-in-Suit for the stability of a formulation of bendamustine, PEG, antioxidant, and either lactic acid, glycerol, or a chloride salt—formulations that Eagle says would satisfy the claim scope.

76.    As 35 U.S.C. § 112 requires that the patent specification adequately describe and enable the full scope of the patent claims, the deleted data show that certain of Eagle's liquid bendamustine formulations that Eagle argues would satisfy the claim limitations would not satisfy the 15-month stability limitation of the claims, and would thereby render the claims invalid under § 112. Thus, the deleted data is highly material to the patentability of the claims under Eagle's construction.

77.    Mr. Mercanti's and the applicants' deletion of only the data that was inconsistent with their argument that a "bendamustine-containing composition including a pharmaceutically acceptable fluid and a stabilizing amount of a chloride salt" would have a shelf life of at least about 15 months at 5ºC and 25ºC demonstrates that the most reasonable inference is that the deletion was made with an intent to deceive the Patent Office.

**IV.    The Applicants Committed Inequitable Conduct By First Failing to Disclose, and Later Deceiving the Examiner About, Material Formulations that are Unstable Over Time**

78.    The applicants also committed inequitable conduct during the prosecution of the '473 application by filing unrelated patent applications—U.S. Provisional Application No.

61/598,729 (the "'729 provisional application") and U.S. Pat. App. No. 13/767,672 ("the '672 application")—that contained data and statements that were inconsistent with the applicants' representations to the PTO in the '473 application. While the Examiner of the '672 application noted that the data in the '672 application was inconsistent with the data in the '473 application, the applicants never disclosed this contradictory data during the prosecution of the '473 application. Further, during prosecution of the subsequent applications in the priority chain, the applicants never disclosed the Examiner's comments regarding the contradictory data to the PTO.

### A.    The '707 Patent and the '672 Application/'879 Publication

79.    As explained above, Mr. Mercanti filed the '473 application on January 28, 2011. That application resulted in the '707 patent, which issued on December 17, 2013.

80.    Ten months before the '707 patent issued, Mr. Mercanti filed the '672 application, which related to liquid bendamustine compositions whose pH was adjusted with various compounds, including sodium hydroxide. The '672 application claimed priority to the '729 provisional application, which was filed on February 14, 2012. The '672 application named Drs. Palepu and Buxton as inventors, as well as Srikanth Sundaram, and was assigned to Eagle. The '672 application was examined by examiners different from the Examiner who examined the '707 Patent and the Patents-in-Suit.

81.    The '672 application published as U.S. Patent Application Publication No. 2013/0210879 (the "'879 publication") on August 15, 2013—nearly four months before the '707 Patent issued.

**B.    The Applicants Failed to Disclose the '879 Publication and its Contradictory Data during the Prosecution of the '707 Patent, Infecting the Patents-In-Suit**

82.    The '672 application and '879 publication disclose data contradicting the '707 patent applicants' allegations that the formulations claimed in the '707 patent are "long term storage stable."

83.    Claim 1 of the '707 patent claims:

A [l]ong term storage stable non-aqueous liquid bendamustine-containing composition, comprising:
a) bendamustine or a pharmaceutically acceptable salt thereof, and
b) a pharmaceutically acceptable fluid comprising i) about 90% polyethylene glycol and about 10% propylene glycol; and ii) a stabilizing amount of an antioxidant.

Ex. 4 ['707 Patent] at 12:66-13:6.

84.    The '707 patent specification discloses that the total impurities associated with long term stability of such a composition would be less than 5% peak area response ("PAR") after at least about 15 months storage at a temperature of from about 5°C. to about 25°C:

The total impurities in the inventive compositions resulting from the degradation of the bendamustine in the compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of from about 5° C. to about 25° C., and thus have long term stability for at least the same period of time or longer.

*Id.* at 2:57-63; *see also id.* at 4:22-26.

85.    The '672 application and '879 publication disclose information and examples showing that compositions within the scope of the claims in the '707 patent would not be "long term storage stable." Table 1 of the '729 application reports that a composition (the first of the two formulations shown) that would otherwise fall within the scope of the claims of the '707 patent—because it includes bendamustine, 90% polyethylene glycol and about 10% propylene glycol, and an antioxidant (thioglycerol)—was found to have 5.62% total impurities after one month's storage at 25°C and thus would fail to provide a "long term stable" formulation:

**Table 1**

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Total Imp. |
|---|---|---|---|---|---|
| BDM - 25mg/mL Thioglycerol - 5mg/mL PEG 400:PG (90:10) qs to 1mL | Initial | | 24.1 | 100.0 | 0.05 |
| | 40°C | 15 d | 18.2 | 75.5 | 24.40 |
| | 25°C | 15 d | 23.2 | 96.3 | 1.48 |
| | | 1 M | 22.3 | 92.5 | 5.62 |
| BDM - 25mg/mL Thioglycerol - 5mg/mL PEG 400:PG (90:10) qs to 1mL (PEG 400 Treated with NaOH) | Initial | | 23.9 | 100.0 | 0.00 |
| | 40°C | 15 d | 23.8 | 99.6 | 0.77 |
| | | 1 M | 23.0 | 96.2 | 2.03 |
| | 25°C | 15 d | 23.8 | 99.6 | 0.10 |
| | | 1 M | 23.8 | 99.6 | 0.37 |
| | | 3M | 23.7 | 99.2 | 0.62 |

Ex. 10 ['729 Application] at 13.

86.    This result is but one example that clearly shows that not all preparations meeting the '707 patent claims' formulation limitations will satisfy the stability requirement of the claims. Accordingly, during prosecution of the '707 patent and previous patent applications in the same patent family, at least Mr. Mercanti and the '707 patent inventors had in their possession test data showing that compositions otherwise within the scope of the claims of the '707 patent could be expected to have more than 5% total impurities over storage periods of less than 15 months at 25°C, and thus not satisfy the "long term stable storage stable" requirement.

87.    The existence of non-working examples is evidence that the claims of the '707 patent are unpatentable because the inventors were not in possession of the claimed invention across the full scope of the claims and because the claims were not enabled across their full scope, as required by 35 U.S.C. § 112. *See, e.g., In re Wands,* 858 F.2d 731, 736–37 (Fed. Cir. 1988).

88.    As described above, the '672 application was filed one year after the '729 provisional and claimed priority to it. *See* Ex. 11 at 8 ['672 application]. The specification of the

54

'672 application is significantly different from the '729 provisional, including the addition of six examples and corresponding data tables. The specification explains that degradation of the disclosed bendamustine compositions is "typically" due to the accumulation of PEG-esters of bendamustine impurities. *Id.* at 9. In the '672 application, the data tables provide measurements for "% of Initial" (which refers to the bendamustine remaining after storage) and percentages of various esters of bendamustine and PG or PEG, as well as a total esters percentage.

89.     In the '672 application, there are numerous instances of 90:10 PEG:PG formulations that after only 14 or 15 days at 40°C have total esters in excess of 5%:

| Sample | Total Ester Impurities |
|---|---|
| Fig. 1 | 16.51% |
| Fig. 3, Sample 1 | 26.55% |
| Fig. 5B, Sample 13 | 6.48% |
| Fig. 5B, Sample 14 | 10.00% |
| Fig. 5B, Sample 15 | 17.07 |
| Fig. 5B, Sample 16 | 17.86% |
| Fig. 5B, Sample 17 | 20.35% |
| Fig. 5B, Sample 18 | 22.63% |

*Id.* at 31, 33, 37.

90.     These samples each contain bendamustine, 90% polyethylene glycol and about 10% propylene glycol, and the antioxidant thioglycerol and thus meet the component limitations of the '707 patent claims. The inventors affirmatively told the PTO that each of these formulations "would not be suitable for long term storage" or "would not be long term storage stable." Ex. 11 ['672 Application] at 23, 25, 27, 28. Moreover, Dr. Buxton agreed that the samples with 16.51% and 26.55% total ester impurities would not provide long-term storage

stability, and that he could not be "confident" that any samples with over 4% total ester impurities would be long term storage stable. Ex. 7 [Buxon Tr.] at 38-62.

91.    The '672 application also provides data for storage at 25°C for some of the same formulations. These data also show impurities in excess of those permitted by the '707 patent claims.

92.    Figure 3 at Sample 1 of the '672 application, for example, reports that a composition otherwise within the scope of the claims of the '707 patent was found to have 8.71% ester impurities after 2 months storage at 25°C and 18.90% ester impurities after 3 months storage at 25°C. Total impurities are not reported, but must have been not less than 8.71% and 18.90% respectively.

93.    Similarly, Figure 4A at Sample 4 of the '672 application reports that a composition that satisfies the formulation limitations of the '707 patent claims was found to have 6.11% ester impurities after 2 months storage at 25°C, 6.42% ester impurities after 3 months storage at 25°C, and 28.71% ester impurities after 6 months storage at 25°C. Total impurities are not reported, but must have been not less than 6.11%, 6.42% and 28.71%, respectively.

94.    The '672 application explained that "there is significant variability in the [] stability" of PEG, which "negatively impacts the expected shelf life of [certain parenteral] formulations." Ex. 11 ['672 Application] at 9. The '672 application disclosed including a "compound…in an amount sufficient to obtain a pH" that would stabilize the liquid bendamustine composition's PEG. Ex. 11 ['672 Application] at 9-10.

95.    In other words, at the same time that the applicants were telling the Examiner in the '473 application prosecution that that the examples showed "substantially improved long term stability," the applicants were telling the Examiner in the '672 application prosecution that these formulations were not stable without a pH adjuster.

96.    Given the high levels of impurities found in the '672 application's samples after a very short period of stability testing, it is clear that none of the examples discussed above would meet the stability requirement of the '707 patent claims. These data were therefore highly material to the Examiner's evaluation of the patentability of the '707 patent claims, and had the Examiner been aware of such data, he would not have allowed the '707 patent to issue.

### C.    The Applicants Intentionally Withheld the '672 Application and '879 Publication During The '707 Patent Prosecution

97.    At no time during the prosecution of the '707 patent did Mr. Mercanti or Drs. Palepu or Buxton disclose to that Examiner the '672 application or the '879 publication. Nor did they disclose the contradictory data cited above or otherwise point out to the Examiner the multiple data points in the '672 application or '879 publication that show the instability of compositions that satisfy the component limitations of the '707 patent claims.

98.    On August 31, 2016, during prosecution of the '672 application, an Office Action specifically pointed out that the data in the '672 application could not be reconciled with the data in the '707 patent. The '672 Examiner pointed out that while Palepu WO 2011/094565 (the international publication of the application that issued in the U.S. as the '483 patent) reports formulations containing bendamustine, thioglycerol, and PEG400:PG as "very stable," the '672 application asserts the same composition "results in a lot of impurities":

> This uncertainty is amplified by the fact that the prior art's compositions while closely resembling applicant's control (solution 1) and should have similar or lower pH values than solution 1 yet they have the stability of solution 2 or 3.   While Table 3 and applicant's specification asserts that the composition with only BDM, thioglycerol, and PEG400:PG results in a lot of impurities, Palepu (WO 2011/094565, already of record and discussed in the obviousness rejection below) measures the stability of compositions that are very similar to that of solution 1 and yet reports them as being very stable. Palepu is drawn to compositions that comprise bendamustine, an antioxidant and PEG400:PG, however they do not teach an alkalinity adjustor such as sodium hydroxide as applicant claims and they do not discuss the pH of the compositions.  However they tested very similar compositions to that of solution 1 in applicant's table 3.  In table 6 of Palepu (see page 16, Palepu) they measured stability of solutions that contained BDM at 50 mg/mL (2x as much as applicant's table 3) and

Ex. 11 ['672 File History, 8/31/2016 Office Action] at 37; *see also id.* at 38 (WO '565 "describes the total impurities as being much lower than applicant's table 3."), 40 ("[I]t is clearly seen that the solutions in Palepu [WO '565] which are very similar to that of solution 1 in applicants table 3 do not have the high impurities that solution 1 has.").

99.     During prosecution of the '672 application, Mr. Mercanti and the '672 applicants (which include Drs. Palepu and Buxton, the inventors of the '707 patent and the Patents-in-Suit) offered no explanation for the contradictory data. In a subsequent Advisory Action of December 15, 2016, the Examiner stated that "applicant has also failed to address the issue raised in the previous office action that the stability information presented in the specification is inconsistent with stability results in the prior art [WO '565]."

100.    Ultimately, Mr. Mercanti and the '672 applicants abandoned the '672 application without Mr. Mercanti or the '672 applicants ever addressing the problem of the contradictory

data. Further, they never disclosed the Examiner's comments about the contradictory data to the PTO during the '473 application prosecution.

101.    The only logical inference is that Mr. Mercanti and Drs. Palepu and Buxton knew that the contradictions in the data could not be explained away, and so they avoided the issue when it was raised during the prosecution of the '672 application by abandoning that application.

### D.    The Applicants Perpetuated their False Claims of Stability, and Failed to Disclose the '672 Examiner's Recognition of Instability, During the Prosecution of the Priority Patents and the Patents-In-Suit

102.    The applicants continued to perpetuate the false narrative that the full scope of their claimed liquid bendamustine formulations were long-term stable during prosecution of subsequent patents in the priority chain, including the Patents-in-Suit. They never attempted to reconcile the contradictory data in the '672 application with the data in the '473 application specification. Instead, ignoring the '672 application Examiner's identification of contradictory data, they continued to reuse the '473 application specification for subsequent patents in the priority chain and to deceive the Examiner of the Patents-in-Suit by telling the PTO, without qualification, that the formulations covered by their claims were stable. That was untruthful.

103.    While the applicants disclosed the '672 application and '879 publication during prosecution of the Patents-in-Suit, they did so by burying the '672 application and '879 publication among hundreds of other references. Further, the applicants never disclosed the prosecution history of the '672 application, particularly the observation by the Examiner of the '672 application that certain data in the '672 application could not be reconciled with the data in the '473 application (and, by extension, the Patents-in-Suit).

104.    Further, despite knowing about the contradictory data and the '672 application Examiner's statement highlighting this data, applicants continued to misrepresent the stability of the claimed liquid bendamustine formulations throughout the prosecution of subsequent

applications in the priority chain, including those that matured into the Patents-in-Suit. For example, during prosecution of the Patents-in-Suit, the applicants represented that the claimed compositions were "surprisingly" stable. Ex. 13 ['783 File History] at 21; Ex. 14 ['214 File History] at 9; Ex. 15 ['248 File History] at 23. Likewise, during the '783 patent prosecution, the applicants further represented that "the recited compositions exhibit a stability profile that is significantly improved over [prior art] formulations," because they "include less than about 5% peak area response (by HPLC) of ***total impurities.***" Ex. 13 ['783 File History] at 12 (emphasis added). Finally, during the '783 and '214 patent prosecutions, the applicants represented that "adding an antioxidant to ***fix the degradation*** caused by PEG was not conventional." Ex. 13 ['783 File History] at 38 (emphasis added); Ex. 14 ['214 File History] at 93 (emphasis added); Ex. 15 ['248 File History] at 20 (emphasis added). The applicants knew that these statements could not be true given their knowledge of and the Examiner's statements about the contradictory data in the 672 application.[3]

105.    The applicants were under a duty to disclose "information material to patentability," which includes information that "refutes, or is inconsistent with a position that applicant takes in [o]pposing an argument of unpatentability [] or [a]sserting an argument of patentability." 37 C.F.R. § 1.56. As a result, the applicants were obligated to disclose the '672

---

[3] Eagle's litigation conduct here, in obtaining newly issued patents based on continuations of the Priority Patents in order to pursue a case of infringement against formulations for which it knowingly abandoned protection, forms yet another basis for inequitable conduct. The '879 publication (of the '672 application) reveals that the stability of PEG-containing bendamustine formulations requires the addition of a compound capable of adjusting pH, like sodium hydroxide or sodium acetate (*see* Examples 2-7 of the '879 publication; *see also* independent Claims 30 and 31 requiring sodium hydroxide or sodium acetate, and independent Claims 1 and 32 that more generally require a compound to adjust pH). Applicants abandoned any attempt to obtain such claims when they dropped the '672 application. Such claims are wholly unsupported by the specifications of the Priority Patents and the Patents-in-Suit, which nowhere mention the use of sodium hydroxide, sodium acetate or any pH adjustors.

application Examiner's discussion of the contradictory data, which they knew was inconsistent with—and thus material to—the claims of the Patents-in-Suit. *Mckesson Information Sols, Inc. v. Bridge Med. Inc.,* 487 F.3d 897, 924-25 (Fed. Cir. 2007). Rather than risk a final rejection of the pending claims in the Patents-in-Suit, the applicants did not disclose the '672 Examiner's comments.

106.    Moreover, the applicants' subsequent disclosure of the '672 application and '879 publication does not cure the applicants' inequitable conduct during the prosecution of the '707 patent. At no point during prosecution of the subsequent continuation applications did the applicants specifically advise the PTO they had withheld this information and establish the patentability of claims in the subsequent applications over that information. *See Rohm & Haas Co. v. Crystal Chem. Co.,* 722 F.2d 1556, 1571-73 (Fed. Cir. 1983). As a result, the applicants' inequitable conduct during the '707 patent prosecution has infected every subsequent patent in the priority chain, including the Patents-in-Suit. *Id.*

107.    Further, applicants' withholding of data related to the non-working formulations in the '672 application and '879 publication during prosecution of the '707 patent rendered the Patents-in-Suit unenforceable because this withheld data has an immediate and necessary relation to the claims of the Patents-in-Suit. The '672 application's and '879 publication's non-working formulations show that certain of Eagle's liquid bendamustine formulations that include 25 mg/mL of bendamustine, an antioxidant, PEG and PG are not long-term storage stable.

**V.    Eagle Has Obstructed Relevant Discovery On Inequitable Conduct**

Eagle has blocked Defendants''s efforts to take discovery concerning the applicants' inequitable conduct. Defendants' subpoenaed Mr. Mercanti and Dr. Lodise (the attorneys who prosecuted Eagle's liquid bendamustine patents) and Eagle accepted service of those subpoenas, but Eagle refused to make Mr. Mercanti and Dr. Lodise available for a deposition. Likewise, Defendants'

served a 30(b)(6) deposition request related to the prosecution of the applications relating to the Patents-in-Suit, but Eagle has refused to produce a witness on this topic. Eagle has also represented that Dr. Palepu is not fit to sit for deposition. The unavailability of this individual makes the availability of the other witnesses involved in the prosecution of the Priority Patents and the Patents-in-Suit all the more necessary.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Defendants hereby demand a trial by jury on all issues triable as such.

## DEFENDANTS' PRAYER FOR RELIEF

WHEREFORE, Defendants' respectfully requests that the Court enter a Judgment and Order:

a)    Dismissing the Second Amended Complaint in C.A. No. 24-cv-65, and each claim of relief contained therein, with prejudice;

b)    Declaring that Defendants' have not infringed, is not infringing, and will not infringe, directly or indirectly, literally or under the doctrine of equivalents, any valid and enforceable claim of the Patents-in-Suit;

c)    Declaring that the '783 patent is unenforceable due to inequitable conduct committed during prosecution before the U.S. Patent and Trademark Office;

d)    Declaring that the '214 patent is unenforceable due to inequitable conduct committed during prosecution before the U.S. Patent and Trademark Office;

e)    A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding Defendants' there costs and reasonable attorneys' fees; and

f)      Granting Defendants' such other and further relief as this Court deems just and

proper.

Dated: October __, 2025

<table>
<tr><td></td><td>**SMITH KATZENSTEIN & JENKINS LLP**</td></tr>
</table>

*Of Counsel:*                          <u>*/s/ Daniel A. Taylor*</u>
                                        Neal C. Belgam (No. 2721)
Connie Huttner                          Daniel A. Taylor (No. 6934)
Alan Pollack                            1000 West Street, Suite 1501
Jason A. Lief                           Wilmington, DE 19801
Robyn Ast-Gmoser                        (302) 652-8400
WINDELS MARX LANE & MITTENDORF,         nbelgam@skjlaw.com
LLP                                     dtaylor@skjlaw.com
One Giralda Farms
Madison, NJ 07940                       *Attorneys for Defendants Slayback Pharma LLC*
(973) 966-3200                          *and Azurity Pharmaceuticals, Inc.*

156 West 56th Street
New York, NY 10019
(212) 237-1000

chuttner@windelsmarx.com
apollack@windelsmarx.com
jlief@windelsmarx.com
rast-gmoser@windelsmarx.com