# EXHIBIT 1



# THE UNITED STATES OF AMERICA

### TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

April 12, 2024

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *11,844,783*
ISSUE DATE: *December 19, 2023*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

John Burson
Certifying Officer

EAGLEBEN-SA_00001063

US011844783B2

(12) **United States Patent**
Palepu et al.

(10) Patent No.: **US 11,844,783 B2**
(45) Date of Patent: **\*Dec. 19, 2023**

(54) **FORMULATIONS OF BENDAMUSTINE**

(71) Applicant: **Eagle Pharmaceuticals, Inc.**, Woodcliff Lake, NJ (US)

(72) Inventors: **Nagesh R. Palepu**, Southampton, PA (US); **Philip Christopher Buxton**, Uxbridge (GB)

(73) Assignee: **Eagle Pharmaceuticals, Inc.**, Woodcliff Lake, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **18/081,238**

(22) Filed: **Dec. 14, 2022**

(65) **Prior Publication Data**

US 2023/0115164 A1    Apr. 13, 2023

**Related U.S. Application Data**

(63) Continuation of application No. 17/412,623, filed on Aug. 26, 2021, which is a continuation of application No. 16/509,920, filed on Jul. 12, 2019, now Pat. No. 11,103,483, which is a continuation of application No. 16/015,656, filed on Jun. 22, 2018, now abandoned, which is a continuation of application No. 15/432,335, filed on Feb. 14, 2017, now Pat. No. 10,010,533, which is a continuation of application No. 15/013,436, filed on Feb. 2, 2016, now Pat. No. 9,572,797, which is a continuation of application No. 14/031,879, filed on Sep. 19, 2013, now Pat. No. 9,265,831, which is a continuation of application No. 13/016,473, filed on Jan. 28, 2011, now Pat. No. 8,609,707.

(60) Provisional application No. 61/299,100, filed on Jan. 28, 2010.

(51) **Int. Cl.**
| | |
|---|---|
| *A61K 47/10* | (2017.01) |
| *A61K 47/18* | (2017.01) |
| *A61K 9/08* | (2006.01) |
| *A61P 35/00* | (2006.01) |
| *A61K 31/4184* | (2006.01) |
| *A61K 47/20* | (2006.01) |
| *A61K 47/12* | (2006.01) |
| *A61K 47/22* | (2006.01) |
| *A61K 9/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ............ *A61K 31/4184* (2013.01); *A61K 9/08* (2013.01); *A61K 47/10* (2013.01); *A61K 47/12* (2013.01); *A61K 47/18* (2013.01); *A61K 47/20* (2013.01); *A61K 47/22* (2013.01); *A61K 9/0019* (2013.01)

(58) **Field of Classification Search**
CPC ...... A61K 31/4184; A61K 9/08; A61K 47/10; A61K 47/12; A61K 47/18; A61K 47/20; A61K 47/22; A61K 9/0019
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,071,620 A | 1/1978 | Sklar |
| 4,711,906 A | 12/1987 | Von et al. |
| 4,879,286 A | 11/1989 | Alam et al. |
| 5,204,335 A | 4/1993 | Sanerbier et al. |
| 5,223,515 A | 6/1993 | Mikura et al. |
| 5,741,523 A | 4/1998 | Teagarden et al. |
| 7,252,799 B2 | 8/2007 | Miekka et al. |
| 7,772,274 B1 | 8/2010 | Palepu |
| 8,076,366 B2 | 12/2011 | Courvoisier et al. |
| 8,344,006 B2 | 1/2013 | Drager et al. |
| 8,389,558 B2 | 3/2013 | Alakhov et al. |
| 8,609,707 B2 | 12/2013 | Palepu et al. |
| 8,791,270 B2 | 7/2014 | Brittain et al. |
| 9,000,021 B2 | 4/2015 | Sundaram et al. |
| 9,034,908 B2 | 5/2015 | Sundaram |
| 9,144,568 B1 | 9/2015 | Sundaram |
| 9,265,831 B2 | 2/2016 | Palepu et al. |
| 9,572,796 B2 | 2/2017 | Palepu et al. |
| 9,572,797 B2 | 2/2017 | Palepu et al. |
| 9,572,887 B2 | 2/2017 | Sundaram |
| 9,572,888 B2 | 2/2017 | Sundaram |
| 9,579,384 B2 | 2/2017 | Sundaram et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1850048 A | 10/2006 |
| CN | 101584668 A | 11/2009 |

(Continued)

OTHER PUBLICATIONS

Kumar et al. (AAPS PharmSciTech 2006;7(3):E1-E7) (Year: 2006).*

(Continued)

*Primary Examiner* — Ernst V Arnold

(74) *Attorney, Agent, or Firm* — BakerHostetler

(57) **ABSTRACT**

Long term storage stable bendamustine-containing compositions are disclosed. The compositions can include bendamustine or a pharmaceutically acceptable salt thereof, and a pharmaceutically acceptable fluid which can include in some embodiments PEG, PG or mixtures thereof and an antioxidant or chloride ion source. The bendamustine-containing compositions have less than about 5% total impurities, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

**14 Claims, No Drawings**

EAGLEBEN-SA_00001064

## US 11,844,783 B2

Page 2

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,597,397 B2 | 3/2017 | Sundaram | |
| 9,597,398 B2 | 3/2017 | Sundaram | |
| 9,597,399 B2 | 3/2017 | Sundaram | |
| 10,010,533 B2 | 7/2018 | Palepu et al. | |
| 11,707,450 B1 * | 7/2023 | Chinnari | A61K 47/10 |
| | | | 514/394 |
| 2002/0102215 A1 | 8/2002 | Klaveness et al. | |
| 2002/0122768 A1 | 9/2002 | Liu et al. | |
| 2004/0014964 A1 | 1/2004 | Cheesman et al. | |
| 2004/0043069 A1 | 3/2004 | Vanderbist et al. | |
| 2005/0025702 A1 | 2/2005 | Decicco et al. | |
| 2005/0042285 A1 | 2/2005 | Ukai et al. | |
| 2006/0035945 A1 | 2/2006 | Attardo et al. | |
| 2006/0128777 A1 | 6/2006 | Bendall et al. | |
| 2006/0159713 A1 | 7/2006 | Brittain et al. | |
| 2006/0205694 A1 | 9/2006 | Alonso et al. | |
| 2007/0116729 A1 | 5/2007 | Palepu | |
| 2008/0118544 A1 | 5/2008 | Wang | |
| 2009/0082416 A1 | 3/2009 | Czarnik | |
| 2009/0209606 A1 | 8/2009 | Bendall et al. | |
| 2009/0264488 A1 | 10/2009 | Cooper et al. | |
| 2009/0325978 A1 | 12/2009 | Onai et al. | |
| 2010/0092474 A1 | 4/2010 | Gallagher et al. | |
| 2010/0145266 A1 | 6/2010 | Orlowski | |
| 2010/0216858 A1 | 8/2010 | Popek et al. | |
| 2010/0247669 A1 | 9/2010 | Eliasof et al. | |
| 2010/0273730 A1 | 10/2010 | Hsu et al. | |
| 2011/0015244 A1 | 1/2011 | Alakhov et al. | |
| 2011/0015245 A1 | 1/2011 | Alakhov et al. | |
| 2011/0184036 A1 | 7/2011 | Palepu et al. | |
| 2011/0190363 A1 | 8/2011 | Drager et al. | |
| 2012/0059000 A1 | 3/2012 | Ren et al. | |
| 2012/0071532 A1 | 3/2012 | Cooper et al. | |
| 2012/0157505 A1 | 6/2012 | Labell et al. | |
| 2012/0308516 A1 | 12/2012 | Hlavinka et al. | |
| 2013/0041003 A1 | 2/2013 | Brittain et al. | |
| 2013/0041004 A1 | 2/2013 | Drager et al. | |
| 2013/0210878 A1 | 8/2013 | Soppimath et al. | |
| 2013/0210879 A1 | 8/2013 | Palepu et al. | |
| 2013/0217888 A1 | 8/2013 | Shrawat et al. | |
| 2013/0253025 A1 | 9/2013 | Sundaram | |
| 2014/0094496 A1 | 4/2014 | Sundaram | |
| 2014/0275196 A1 | 9/2014 | Sundaram | |
| 2018/0000789 A1 | 1/2018 | Palepu et al. | |
| 2018/0000938 A1 | 1/2018 | Sundaram | |
| 2018/0185488 A1 | 7/2018 | Sundaram | |
| 2018/0296535 A1 | 10/2018 | Palepu et al. | |
| 2018/0296536 A1 | 10/2018 | Palepu et al. | |
| 2018/0369383 A1 | 12/2018 | Sundaram | |
| 2019/0192659 A1 | 6/2019 | Sundaram | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 102164579 A | 8/2011 | |
| DE | 80967 A | 1/1970 | |
| DE | 159289 A1 | 3/1983 | |
| JP | 09-508128 A | 8/1997 | |
| JP | 2005-537285 A | 12/2005 | |
| JP | 2008-526991 A | 7/2008 | |
| JP | 2012-503666 A | 2/2012 | |
| JP | 2012-525387 A | 10/2012 | |
| JP | 2015-501814 A | 1/2015 | |
| WO | 99/01118 A2 | 1/1999 | |
| WO | 2001/097860 A1 | 12/2001 | |
| WO | 2001/097861 A2 | 12/2001 | |
| WO | 2001/098294 A2 | 12/2001 | |
| WO | 02/02125 A1 | 1/2002 | |
| WO | 2006/054315 A1 | 5/2006 | |
| WO | 2006/110551 A2 | 10/2006 | |
| WO | 2010/036702 A1 | 4/2010 | |
| WO | 2010/126676 A1 | 11/2010 | |
| WO | 2010/148288 A2 | 12/2010 | |
| WO | 2011/094565 A1 | 8/2011 | |
| WO | 2011/103150 A2 | 8/2011 | |
| WO | 2012/015810 A2 | 2/2012 | |
| WO | 2013/142358 A1 | 9/2013 | |

OTHER PUBLICATIONS

McGinity et al. (Journal of Pharmaceutical Sciences 1975;64(2):356-357) (Year: 1975).*

Wasylaschuk et al. (Journal of Pharmaceutical Sciences, vol. 96, No. 1, Jan. 2007:106-116). (Year: 2007).*

"Draft Note for Guidance on Excipients, Antioxidants and Antimicrobial Preservatives In the Dossier for Application for Marketing Authorisation of Medicinal Product", EMEA, 2003, pp. 1-10.

American Heart Association, "Living With Heart Failure" (https://www.heart.org/idc/groups/heart-public/@wcm/@hcm/@gwtg/documents/downloadable/ucm_309068.pdf) (2001).

American Society of Hospital Pharmacists. ASHP Technical Assistance Bulletin On Hospital Drug Distribution and Control. Am J. Hosp. Pharm. 1980, 37:1097-103.

Armstrong et al., Separation of Drug Stereoisomers by the Formation of . . . beta-Cyclodextrin Inclusion Complexes, Science, vol. 232, pp. 1132-1135, May 30, 1986.

Baldi et al., Statistical Procedures for Optimizing the Freeze-Drying of a Model Drug in Tert-Butyl Alcohol: Water Mixtures, Eur. J. of Pharm. & Biopharm. 40(3):138-41 (1994).

Bergsagel et al., Effect of cyclophosphamide on Advanced Lung Cancer and the Hematological Toxicity of Large, Intermittent Intravenous Doses, Canad. Med. Ass. J., 98, 532-538 (1968).

Biewenga et al. "The Pharmacology of the Antioxidant Lipoic Acid," Gen. Pharmac., 1997, 29, 3, 315-331.

Boylan et al., Parenteral Products, Chapter 12 in Banker, et al., Modern Pharmaceutics, Fourth Ed. (2002).

Brigitte C. Scott, et al., Lipoic and Dihydrolipoic Acids . . . , Free Rad. Res., vol. 20, No. 2, pp. 119-133, 1994.

Broadhead, Pharmaceutical Preformulation and Formulation, Chapter 9 in "Parenteral Dosage Forms," (Interpharm) 2001.

Canadian Society of Hospital Pharmacists: Guidelines for Drug-Use Control, 2008.

Center for Drug Evaluation and Research, Andrew Dmytrijuk, FDA Medical Review for the Approval of Bendeka (2015).

*Cephalon, Inc., et al., v. Slayback Pharma Limited Liability Company*—Civil Action No. 1:17-cv-01154: Joint Status Report (Document 164), dated Oct. 19, 2018.

*Cerhalon, Inc, et al. v. Slayback Pharma Limited Liability Company*—Civil Action No. 1:17-cv-01154: Complaint (Document 1), dated Aug. 16, 2017.

*Cerhalon, Inc., et al. v. Slayback Pharma Limited Liability Company, et al.*—Civil Action No. 1:17-cv-01154: Answer to Slayback Pharma Limited Liability Company's Counterclaims (Document 56), dated Mar. 5, 2018.

*Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.*—Civil Action No. 1:17-cv-01154: Joint Claim Construction Chart (Document 94), dated Jul. 24, 2018.

*Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.*—Civil Action No. 1:17-cv-01154: Answer to Apotex Inc. and Apotex Corp.'s Counterclaims (Document 22), dated Dec. 18, 2017.

*Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.*—Civil Action No. 1:17-cv-01154: Answer to Slayback Pharma Limited Liability Company's Counterclaims, dated Oct. 20, 2017.

*Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company*—Civil Action No. 1:17-cv-01154: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint and Counterclaims (Document 11), dated Sep. 29, 2017.

Charles P. Carpenter, et al., A Study of the Polyethylene Glycols as Vehicles . . . , Journal of the American Pharmaceutical Association, vol. XII, No. 1.

Cheson et al., Bendamustine: Rebirth of an Old Drug, J. Clin. Oncol. 27.1492-1501 (2009).

Cheung et al., Safety and Pharmacokinetics of Bendamustine Rapid-Infusion Formulation, J. of Clinical Pharmacology 2017.00(0)1-11.

## US 11,844,783 B2

Page 3

**(56)**          **References Cited**

OTHER PUBLICATIONS

Chu et al., Common Chemotherapy Regimens in Clinical Practice, Physicians' Cancer Chemotherapy Drug Manual 2009.
Cyclobond(Registered) Handbook, A Guide to Using Cyclodextrin Bonded Phases for Chiral LC Separations, 6th ed., 2002, Advanced Separation Technologies, Inc., pp. 1-58, pp. 42-45.
Derry E. Wilman, Application of 15N Nuclear Magnetic Resonance . . . , J. Med. Chem., vol. 38, pp. 2256-2258, 1995.
E. Santacesaria, et al., Thermal Stability of Nonionic Polyoxyalkylene . . . , Journal of Applied Polymer Science, vol. 42, pp. 2053-2061, 1991.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01459: Answer to Slayback Pharma LLC's Counterclaims (Document 13), dated Oct. 31, 2018.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01459: Complaint (Document 1), dated Sep. 20, 2018.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01459: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses, and Counterclaims (Document 9), dated Oct. 10, 2018.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Answer to Slayback Pharma LLC's Counterclaims (Document 12), dated Jan. 3, 2019.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Complaint (Document 1), dated Dec. 11, 2018.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses, and Counterclaims(Document 11), public version dated Dec. 20, 2018.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Eagle Pharmaceuticals' Opposition to Slayback Pharma's Motion for Judgment on the Pleadings (Document 23), redacted-public version dated Feb. 12, 2019.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Opening Brief in Support of Slayback Pharma Limited Liability Company's Motion for Judgment on the Pleadings (Document 17), public version dated Jan. 11, 2019.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Reply Brief in Further Support of Slayback Pharma Limited Liability Company's Motion for Judgment on the Pleadings (Document 27), public verison dated Mar. 1, 2019.
*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Exhibit Index-Includes Confidential Information (Document 21), public version dated Sep. 7, 2018.
*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Complaint (Document 1), dated Jul. 19, 2018.
*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Defendant Hospira, Inc's Motion to Dismiss (Document 13), dated Aug. 31, 2018.
*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Hospira's Reply Brief in Support of its Motion to Dismiss Plaintiffs' Complaint (Document 29), public version dated Nov. 26, 2018.
*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Hospira, Inc's Brief in Support of its rule 12(b)(6) Motion to Dismiss Plaintiffs' Complain (Document 20), public version dated Sep. 7, 2018.
*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Plaintiffs' Opposition to Motion to Dismiss (Document 26), redacted-public version dated Nov. 2, 2018.
EC Safety Data Sheet: Ribomustin(Registered) 2007.
Eric Watson, et al., Kinetics of Phosphoramide Mustard . . . , Journal of Pharmaceutical Sciences, vol. 74, No. 12, pp. 1283-1292, 1985.
Eugene C. Corbett, Jr., Intravenous Fluids: It's More Than Just 'Fill 'Er Up!', Series #52 Practical Gastroenterology 44-60 (2007).
Excipient-Drug Interactions in Parenteral Formulations', Akers et al., Journal of Pharmaceutical Sciences, vol. 91, issue 11, pp. 2283-2300, Nov. 2002.

Flamberg et al., Low Temperature Vacuum Drying of Sterile Parenterals From Ethanol, Bulletin of the Parenteral Drug Association, 24(5):209-17 (1970).
Floss et al., Intravenous fluids principles of treatment, Clinical Pharmacist, 3:274-283 (Oct. 2011).
Friedberg et al., Bendamustine in Patients with Rituximab-Refractory Indolent and Transformed Non-Hodgkin's Lymphoma: Results from a Phase II Multicenter, Single-Agent Study, J. Clin. Oncol., 26(2):204-210 (2008).
Galacid Excel 88 fact sheet (lactic acid 88%).
Gandhi & Burger, Bendamustine in B cell malignancies: the new, 46-year old kid on the block, Clin Cancer Res. Dec. 15, 2009; 15(24):7456-7461.
Gibson et al., "Pharmaceutical preformulation and formulation: A practical guide from candidate drug selection to commercial dosage form", Informa Healthcare USA, 2009, vol. 199, 2d ed, pp. 1-559.
Glimelius et al., Bolus-Injection (2-4 min) Versus Short-term (10-20 min) Infusion of 5-Fluorouracil in Patients with Advanced Colorectal Cancer: a Prospective Randomised Trial, Eur J. Cancer, 34, 674-678 (1998).
Gust and Krauser, Investigations on the Stability of Bendamustin, a Cytostatic Agent of the Nitrogen Mustard Type I. Synthesis, Isolation, and Characterization of Reference Substances, in Monatshefte fur Chemie, 128:291-99 (1997).
Heider et al., Efficacy and Toxicity of Bendamustine in Patients with Relapsed Low-Grade non-Hodgkin's Lymphomas, Anticancer Drugs, 12, 725-729 (2001).
HFSA Guidelines, Journal of Cardiac Failure vol. 16 No. 6 (2010).
ICH Harmonised Tripartite Guideline, Stability testing of New Drug Substances and Products Q1A(R2), dated Feb. 6, 2003.
Interlocutory decision in Opposition proceedings of EP 2528602 issued Apr. 8, 2019.
International Conference on Harmonisation in Guideline on Impurities in New Drug Products: Availability, 62 Fed. Reg. 27, 454-27,461 (May 19, 1997).
International Search Report and Written Opinion for No. PCT/US2013/032289 dated Jun. 6, 2013. (5 Pages).
International Search Report and Written Opinion issued in counterpart PCT/US2013/032295 dated Jun. 2013 (4 pages).
International Search Report and Written Opinion issued in counterpart PCT/US2013/26187.
International Search Report and Written Opinion of International application based on PCT/US2011/022958, dated Apr. 2011 (8 pages).
Jay S. Trivedi, et al., Water-Insoluble Drug Formulation, 7. Solubilization Using CoSolvent Approach, pp. 141-168, 2000.
Jay S. Trivedi, Water-Insoluble Drug Formulation, Second Edition, 9 Solubilization Using Cosolvent Approach, pp. 161-194, 2008.
JC Price. Handbook of Pharm. Excipients, 5th Edition, Polyethylene Glycol, pp. 545-550, Aug. 9, 2005.
Jerry March, Advanced Organic Chemistry (4th ed., John Wiley & Sons, Inc. 1992).
John D. Roberts & Marjorie C. Caserio, Basic Principles of Organic Chemistry 612-13, 615-16, 617-18 (W. A. Benjamin, Inc., 2d ed. 1977).
Jonkman-de Vries et al., Pharmaceutical Development of (Investigational) Anticancer Agents for Parental Use—A Review, Drug Dev Ind Pharm. 22(6):475-494 (1996).
Julia A. Barman Balfour, et al., "Bendamustine", Drugs, vol. 61, No. 5, pp. 631-638, 2001.
Kalaycio. M., Clinical Experience With Bendamustine: A New Treatment for Patients With Chronic Lymphocytic Leukemia; Clin Leukemia. 2008; 2(4): 223-229.
Kenneth E. Avis, et al., Remington, Parenteral Preparations, Chapter 41, pp. 780-786, 2000.
Knauf et al., Bendamustine Versus Chlorambucil in Treatment-Naive Patients with B-Cell Chronic Lymphocytic Leukemia (B-CLL): Results of an International Phase III Study, Blood, 110(11), 609a (abstract 2043) (2007).
Koomans et al., Sodium Balance in Renal Failure: A Comparison of Patients with Normal Subjects Under Extremes of Sodium Intake, Hypertension 7:714-721 (1985).

EAGLEBEN-SA_00001066

**US 11,844,783 B2**

Page 4

(56)         **References Cited**

OTHER PUBLICATIONS

Kurt H. Bauer, et al., Pharmazeutische Technologies, pp. 225-228, HW9, 1993.

Kurt H. Bauer, et al., Pharmazeutische Technologies, pp. 424-425, HW10, 1993.

Leonard & Jann, A New Synthesis of Aziridinium Salts. 2,2-Pentamethylene-1,1-tetramethyleneaziridinium Perchlorate A Prototype. 82 J. Am. Chemistry Soc'y 6418-6419 (1960).

Leoni et al., SDX-105 (Bendamustine), a Clinically Active Antineoplastic Agent Possesses a Unique Mechanism of Action, Abstract, 102(11) Blood, Abstract #2363 (Nov. 16, 2003).

Lissitchkov et al., Phase-I/II study to Evaluate Dose Limiting Toxicity, Maximum Tolerated Dose, and Tolerability of Bendamustine HCl in Pre-treated Patients With B-Chronic Lymphocytic Leukaemia (Binet stages B and C) Requiring Therapy. J. Cancer Res. Clin. Oncol. 132:99-104 (2006).

Liu (ed). Water-Insoluble Drug Formulation, 1st ed., CRC Press, Chapters 7 and 9, 2000.

Liu (ed). Water-Insoluble Drug Formulation, 2nd ed., CRC Press, Chapters 7 and 9, 2008.

Lyondell Tebol(Registered) 99, Tertiary Butyl Alcohol in Freeze-Drying Applications.(Lyondell Chemical Co., 2003).

Lyophilization Of Biopharmaceuticals (Henry R. Costantino & Michael K. Pikal eds., Association of Pharmaceutical Scientists 2004).

Maas et al., "Stabilitat von Bendamustinhydrochlorid in Infusionslosungen," Die Pharmazie, Govi Verlag Pharmazeutischer Verlag Gmbh, vol. 49. No. 10 pp. 775-777 (1994). (Abstract Only).

Margolin et al., Shortening the Infusion Time of Anticancer Drugs: Who Will Benefit?, J. of Clinical Oncology, 25(19):2642-2643 (2007).

McGinity et al., Journal of Pharmaceutical Sciences, Influence of Peroxide Impurities in Polyethylene Glycols . . . , vol. 64, No. 2 pp. 356-357, 1975.

Michael J. Akers, Remington, The Science and Practice of Pharmacy 21st Edition, Parenteral preparation, chapter 41, pp. 802-835, 2005.

Michael P. Gamcsik, et al., NMR Studies of the Conjugation . . . , J. Med. Chem., vol. 33, pp. 1009-1014, 1990.

National Kidney Foundation, "Clinical Practice Guidelines and Clinical Practice Recommendations" (http://kidneyfoundation.cachefly.net/professionals/KDOQI/guideline_upHD_PD_VA/hd_guide5.htm) (2006).

Neelam Seedher, et al., Solubilization of Nimesulide; Use of Co-solvents, Indian J. Pharm. Sci., vol. 65, No. 1, pp. 58-61, 2003.

Nema et al., Excipients and Their Use in Injectable Products, PDA J. Pharma. Sci. & Tech., 51(4):166-171 (Jul.-Aug. 1997).

Ni et al., Stabilization and Preformulation of Anticancer Drug-SarCNU, Int'l J. of Pharma., 249:257-264 (2002).

Ni et al., Use of Pure t-Butanol as a Solvent for Freeze-Drying: A Case Study, Int'l. J. of Pharma., 226:39-46 (2001).

Nuijen et al., Pharmaceutical Development of a Parenteral Lyophilized Formulation of the Novel Antitumor Agent Aplidine, PDA J. Pharmaceut. Sci. and Technol. 54(3):193-208 (May-Jun. 2000).

O'Connor, Hydrolysis and Alkylating Reactivity of Aromatic Nitrogen Mustards, J.Chem. Soc. Perkin Trans. 2, 1933-1939(1991).

Ozegowski et al., IMET 3393, ?-[1-Methyl-5-bis-(Beta-chloroethyl)-amino-benzimidazolyl-(2)]-butyric acid hydrochloride, a new cytostatic agent from the benzimidazole mustard gas series, 110 Zbl Pharm. 1013-1019 (1971).

Paul J. Sheskey, Handbook of Pharmaceutical Excipients, 7th Edition, Propyl Gallate.

Pokorny et al., Antioxidants in Food: Practical Applications 2001, CRC Press, p. 324.

Poulsen, Introduction to Chemistry (2010).

Pramod K. Gupta, et al., "Injectable Drug Development Techniques to Reduce Pain and Irritation", pp. 183, Informa Healthcare, 2008, ISBN 13: 978-1-5749-1095-7.

Preiss et al., "Pharmacological and clinical date of Bendamustine", 17th International Cancer Congress, pp. 1637-1640 (1998).

Preiss et al., Studies on the Pharmacokinetics of Bendamustine (Cytostasan®) in Humans, Pharmazie, 40(11):782-784 (1985).

R.A. Pethrick et al., Excerpt from Polymer Yearbook 13, CRC Press, Oct. 1, 1996, Technology & Engineering Vinogradova et al.

Rassachaert et al., "A phase 1 study of bendamustine hydrochloride administered once every 3 weeks in patients with solid tumors," Anti-Cancer Drugs, vol. 18 No. 5 pp. 587-595 (2007).

Remington's Pharmaceutical Sciences, 18th edition, (1990), p. 1322.

Remington's Pharmaceutical Sciences, 18th edition, (1990), pp. 1286-1288.

Remington's Pharmaceutical Sciences 1990 (Eighteenth Edition), Mack Publishing Company, Chapter 85, 1570-1580.

Renu Chadha, et al., Drug Carrier Systems for Anticancer Agents: A Review, Journal of Scientific & Industrial Reasearch, vol. 67, pp. 185-197, 2008.

Ribomustin Monograph (Updated Aug. 2005).

Ribomustin Monograph (Updated Jan. 2002).

Ribomustin Product Information, Janssen-Cilag Pty Ltd (Updated Sep. 15, 2016).

Rote Liste 1996 for Ribomustin (86 023).

Rote Liste 2003 for Ribomustin (86 045).

Rowe et al. Handbook of Pharmaceutical Excipients, 6th edition, 2009, pp. 454-455.

Rowe et al., "Handbook of Pharmaceutical Excipients," Pharmaceutical Press, 6th edition pp. 857 (extract from index) (2009).

Rowe, et al., (ed) Handbook of Pharmaceutical Excipients, 5th ed., Pharmaceutical Press, pp. 545-550, Polyethylene Glycol, 2006.

Safety Data Sheet, Lactic Acid, 88%, Columbus Chemical Industries, 2013.

Scasnar at al., Radiochemical Assay of Stability of 14C-Cytostasan Solutions During Preparation and Storage, Journal of Radioanalytical and Nuclear Chemistry, Articles 121(2):489-497 (1988).

Schoffski et al., "Weekly administration of bendamustine: A phase 1 study in patients with advanced progressive solid tumors," Annals of Oncology II, pp. 729-734 (2000).

Schoffski et al., Repeated administration of short infusions of bendamustine: a phase 1 study in patients with advanced progressive solid tumours, J. Cancer Res Clin Oncol, vol. 126 No. 1 pp. 41-47 (2000).

Schwanen et al., In vitro evaluation of bendamustine induced apoptosis in B-chronic lymphocytic leukemia, Leukemia 16:2096-2105 (2002).

Scifinder, Hydrolytic degradation of IMET 3393, American Chemical Society, 2018.

Seager et al., Structure of Products Prepared by Freeze-Drying Solutions Containing Organic Solvents, PDA Journal oi Pharmaceutical Science and Technology, 39(4): 161-179 (1985).

Search History issued in connection with PCT/US2013/32295 dated May 10, 2013.

Shah et al., Physical, Chemical, and Bioavailability Studies of Parenteral Diazepam Formulations Containing Propylene Glycol and Polyethylene Glycol 400, Drug Development and Industrial Pharm.), 17:12, 1635-1654 (Oct. 20, 2008).

Sigma-Aldrich, Webpage Catalog for poly(ethylene glycol), http://www.sigmaaldrich.com/catalog/product/aldrich/202398?lang=en&ion=US#, accessed Nov. 15, 2015 (2 pages).

Sikora, "Cancer drug development in the post-genomic age," Current Science, vol. 81 No. 5 pp. 549-554 (2001).

Spectra Analysis, Inc., Oxidative Degradation of Polyethyleneglycol . . . , Application Note 016, Mar. 2008.

Spiegel et al., "Use of Nonaqueous Solvents in Parenteral Products," Journal of Pharmaceutical Sciences, vol. 52, No. 10 pp. 917-927 (1963).

Strickley, Solubilizing Excipients in Oral and Injectable Formulations, Pharmaceutical Research 21(2):201-230 (Feb. 2004).

Supplemental European Search Report issued in connection with PCT/US2011/022958 dated Dec. 16, 2013.

T. W. Graham Solomons, Organic Chemistry (John Wiley & Sons, 3d ed. 1984).

Tageja, Bendamustine: Safety and Efficacy in the Management of Indolent Non-Hodgkins Lymphoma, Clinical Medicine Insights: Oncology 2011:5 145-156.

EAGLEBEN-SA_00001067

**US 11,844,783 B2**

Page 5

(56)          **References Cited**

OTHER PUBLICATIONS

Teagarden & Baker, Practical Aspects of Freeze-Drying of Pharmaceutical and Biological Products Using Non-Aqueous Co-Solvent Systems, Chapter 8 in Freeze-Drying/Lyophilization of Pharmaceutical and Biological Products, 239-76 (2nd Edition. Edited by Rey, L. & May, J., Marcel Dekker, New York) (2004).

Teagarden & Baker, Practical Aspects of Lyophilization Using Non-Aqueous Co-Solvent Systems, 15 Eur. J. Pharma. Sciences, 115-33 (2002).

*Teva Pharmaceuticals International GMBH, et al.* v. *Apotex Inc., et al*—Civil Action 1:17-cv-01164: Defendants Apotex Inc. and Apotex Corp.'s Answer to Complaint, Defenses and Counterclaims (Document 17), dated Nov. 27, 2017.

*Teva Pharmaceuticals International GMBH, et al.* v. *Fresenius Kabi USA, LLC.*—Civil Action No. 1:17-cv-01201: Answer to Complaint, Separate Defenses, and Counterclaims (Document 10), dated Sep. 15, 2017.

*Teva Pharmaceuticals International GMBH, et al.* v. *Fresenius Kabi USA, LLC.*—Civil Action No. 1:17-cv-01201: Counterclaims (Document 14), dated Oct. 6, 2017.

*Teva Pharmaceuticals International GMBH, et al.* v. *Fresenius Kabi USA, LLC.*—Civil Action No. 1:17-cv-01201: Complaint (Document 1), dated Aug. 24, 2017.

*Teva Pharmaceuticals International GMBH, et al.* v. *Fresenius Kabi, LLC., et al*—Civil Action No. 1:18-cv-01586: Answer to Fresenius Kabi USA, LLC's Counterclaims (Document 13), dated Nov. 27, 2018.

*Teva Pharmaceuticals International GMBH, et al.* v. *Fresenius Kabi, LLC., et al*—Civil Action No. 1:18-cv-01586: Complaint (Document 1), dated Oct. 15, 2018.

*Teva Pharmaceuticals International GMBH, et al.* v. *Fresenius Kabi, LLC., et al*—Civil Action No. 1:18-cv-01586: Defendant Mylan Laboratories LTD.'s Answer to Complaint for Patent Infringement (Document 11), dated Nov. 9, 2018.

*Teva Pharmaceuticals International GMBH, et al.* v. *Fresenius Kabi, LLC., et al.*—Civil Action No. 1:18-cv-01586: Defendant Fresenius Kabi USA, LLC's Answer to Complaint, Separate Defenses, and Counterclaims (Document 9), dated Nov. 6, 2018.

*Teva Pharmaceuticals International GMBH, et al.* v. *Mylan Laboratories Limited*—Civil Action No. 1:17-cv-01790: Complaint (Document 1), dated Dec. 12, 2017.

*Teva Pharmaceuticals International GMBH, et al.* v. *Slayback Pharma Limited Liability Company*—Civil Action No. 1:18-cv-00117: Complaint (Document 1), dated Jan. 19, 2018.

*Teva Pharmaceuticals International GMBH, et al.* v. *Slayback Pharma Limited Liability Company*—Civil Action No. 1:18-cv-00117: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses and Counterclaims (Document 9), dated Feb. 12, 2018.

U.S. Appl. No. 17/412,623, filed Aug. 26, 2021.
U.S. Appl. No. 16/509,920, filed Jul. 12, 2019.
U.S. Appl. No. 16/015,656, filed Jun. 22, 2018.
U.S. Appl. No. 15/432,335, filed Feb. 14, 2017.
U.S. Appl. No. 15/013,436, filed Feb. 2, 2016.
U.S. Appl. No. 14/031,879, filed Sep. 19, 2013.
U.S. Appl. No. 13/016,473, filed Jan. 28, 2011.

*Teva Pharmaceuticals International GMBH, etal.* v. *Apotex Inc., etal*—Civil Action No. 1:17-cv-01164: Complaint (Document 1), dated Aug. 18, 2017.

Thiesen, "Bendamustine, a well-tollerated cytotoxic agent used in Germany for may years, is soon to be marketed in the rest of Europe for a range of indicatons including chronic lymphocytic leukaemia," pp. 1-4 (2010). Available at http://www.hospitalpharmacyeurope.com/featured-articles/bendamustine.

Third Party Submission in related EP2528602 based on PCT/US2011/022958 dated Nov. 19, 2013 (9 pages).

Thomas A. Jennings, Lyophilization, Introduction and Basic Principles (2006)(original copyright 1999).

Treanda (Highlights of prescribing information 2008) (Year: 2008).

Treanda, "Highlights of Prescribing Information," Treanda ( bendamustine hydrochloride) for Injection, for intravenous infusion, pp. 1-13 (2010).

Treanda, "Highlights Of Prescribing Information," Treanda ( bendamustine hydrochloride) for Injection, for intravenous infusion, pp. 1-6 (2008).

U.S. Pharmacopeia 32-NF-27-General Notices and Requirements (2009).

USP 24/NF 19 (2000) entry for Propylene Glycol (USP).

V.G. Vinogradova, et al., Polymer Yearbook 13. New Metal Chelates as Antioxidant Stabilizers for Polymers . . . , pp. 87-111, 1996.

V.M. Mikhal'chuk, et al., Antioxidative Stabilization of Polyethylene . . . , Russian Journal of Applied Chemistry, vol. 77, No. 1, pp. 131-135, 2004.

Vlok, Manual of Nursing, vol. 1 (9th edition), 1988.

W. Furst, et al., "About the Hydrolytic Decomposition of IMET 3393," Pharmazeutische Zentralhalle, vol. 108, Issue 9, pp. 608-614, 1969 (English translation and the original article).

Wayne P. Olson, Volatile Solvents for Drying and Microbial Kill in the Final Container, Pharmaceutical Engineering, 110-118(1997).

Weide et al., Bendamustine Mitoxantrome and Rituximab (BMR): A New Effective Regimen for Refractory or Relapsed Indolent Lymphomas, Leukemia & Lymphoma, 43(2):327-331 (2002).

Werner et al., Hydrolysis Products of Cancerostatic Cytostasan(Registered) (Bendamustine), 42 (4) Die Pharmazie, Govi Verlag Pharmazeutischer Verlag GMBH, Eschborn, DE, 272-73.

William H. Brown, Organic Chemistry 5th Edition, pp. 358-360, 2009.

Wittaya-Areekul and Nail, Freeze-Drying of tert-Butyl Alcohol/ Water Cosolvent Systems: Effects of Formulation and Process Variables on Residual Solvents, Journal of Pharmaceutical Sciences 87(4):491-495 (1998).

Written Opinion issued in counterpart PCT/US2013/032289 dated Jun. 6, 2013.

Written Opinion issued in counterpart PCT/US2013/032295 dated Jun. 3, 2013.

Zimmerman et al., Elements of Organic Chemistry (1977).

Zips et al., "New Anticancer Agents: In Vitro and In Vivo Evaluation," In Vivo, vol. 19 pp. 1-8 (2005).

Zumdahl et al., Chemistry, 7th Ed. (2007).

*Cephalon, Inc., et al.*, v. *Slayback Pharma Limited Liability Company, et al.*, Civil Action No. 1:17-cv-01154: Responsive Expert Report of Juergen Siepmann, Ph.D., 525 pages.

*Cephalon, Inc., et al.*, v. *Slayback Pharma Limited Liability Company, et al.*, Civil Action No. 1:17-cv-01154: Opinion, dated Apr. 27, 2020, 70 pages.

* cited by examiner

US 11,844,783 B2

1

# FORMULATIONS OF BENDAMUSTINE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 17/412,623, filed Aug. 26, 2021, which is a continuation of application Ser. No. 16/509,920, filed Jul. 12, 2019, now U.S. Pat. No. 11,103,483, which is a continuation of application Ser. No. 16/015,656, filed Jun. 22, 2018, now abandoned, which is a continuation of application Ser. No. 15/432,335, filed Feb. 14, 2017, now U.S. Pat. No. 10,010,533, issued Jul. 3, 2018, which is a continuation of application Ser. No. 15/013,436, filed Feb. 2, 2016, now U.S. Pat. No. 9,572,797, issued Feb. 21, 2017, which is a continuation of application Ser. No. 14/031,879, filed Sep. 19, 2013, now U.S. Pat. No. 9,265,831, issued Feb. 23, 2016, which is a continuation of application Ser. No. 13/016,473, filed Jan. 28, 2011, now U.S. Pat. No. 8,609,707, issued Dec. 17, 2013, which claims the benefit of U.S. Provisional Patent Application No. 61/299,100, filed Jan. 28, 2010, the contents of each of which are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

Bendamustine free base is represented by the following structural formula (I)



(I)

Bendamustine is used in the treatment of a number of cancers including leukemias, Hodgkins disease and multiple myelomas. Bendamustine is the active ingredient of the commercial product Treanda™, a lyophilized powder for reconstitution.

Bendamustine exhibits rapid degradation upon reconstitution of the lyophilized product. Bendamustine undergoes hydrolysis by direct substitution rather than an addition elimination process due to the presence of the highly labile aliphatic chlorine atoms. Some of the main degradants of bendamustine are the monohydroxy compound known as HP1 (hydrolysis product 1) and dihydroxy compound HP2 (hydrolysis product 2). The monohydroxy compound appears as the main impurity at Relative Retention Time (RRT) 0.6 and the dihydroxy compound appears as the main impurity at RRT 0.27. Minor peaks appear at RRT 1.2, which are presently unknown.

The stability of bendamustine in water is measured in hours, and is therefore, not suitable for long-term storage in liquid form. The lyophile possesses good chemical stability. However, reconstitution of the lyophile is clinically inconvenient, taking 15-30 mins with implications of chemical instability. There is a need for ready to use (RTU) bendamustine formulations having enhanced stability.

2

## SUMMARY OF THE INVENTION

In other aspects of the invention, the bendamustine-containing compositions include a) a pharmaceutically acceptable fluid which contains one or more of propylene glycol, ethanol, polyethylene glycol, benzyl alcohol and glycofurol, and b) a stabilizing amount of a chloride salt. In other aspects of the invention, the bendamustine-containing compositions include DMSO (dimethyl sulfoxide) as part of the pharmaceutically acceptable fluid included therein. Regardless of the pharmaceutically acceptable fluid included, the amount of bendamustine included in the composition is preferably from about 20 mg/mL to about 60 mg/mL. Still further aspects of the invention include methods of treatment using bendamustine-containing compositions and kits containing the same.

One of the advantages of the inventive liquid compositions is that they have substantially improved long term stability when compared to currently available formulations. For example, the inventive bendamustine compositions are substantially free of impurities after at least about 15 months at a temperature of from about 5° C. to about 25° C. The inventive formulations are advantageously ready to use or ready for further dilution. Reconstitution of lyophilized powders is not required.

## DETAILED DESCRIPTION OF THE INVENTION

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art to which this invention belongs. In the event that there is a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

As used herein, RRT is calculated by dividing the retention time of the peak of interest by the retention time of the main peak. Any peak with an RRT<1 elutes before the main peak, and any peak with an RRT>1 elutes after the main peak.

For purposes of the present invention, "substantially free of impurities" shall be understood to include bendamustine-containing compositions in which the amount of total impurities is less than about 5%, as calculated on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after a period of about 15 months at a temperature of from about 5° C. to about 25° C. The amount of impurities is further calculated as being based upon the original amount bendamustine (or salt thereof) being present in the composition or formulation.

For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.

Preferably, the amount of any individual degradant in the inventive compositions does not exceed 2% PAR as determined by HPLC at a wavelength of 223 nm after storage periods of at least about 15 months at a temperature of from about 5° C. to about 25° C. In some aspects, the amount of time the inventive compositions demonstrate long term storage stability is at least about 18 months and preferably at least about 2 years when stored under the conditions described herein.

In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions including:

US 11,844,783 B2

3

a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including
  i) PEG, PG or mixtures thereof; and
  ii) a stabilizing amount of an antioxidant.

The total impurities in the inventive compositions resulting from the degradation of the bendamustine in the compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of from about 5° C. to about 25° C., and thus have long term stability for at least the same period of time or longer. Preferably, the bendamustine-containing compositions demonstrate long term storage stability for at least about 2 years, especially when stored at the lower (refrigerated) temperatures. In one embodiment, the amount of total impurities in the inventive compositions resulting from the degradation of the bendamustine is less than about 3% PAR as determined by HPLC at a wavelength of 223 nm after at least about 2 years at a temperature of from about 5° C. to about 25° C.

In some aspects of the invention, the bendamustine concentration in the inventive compositions is from about 10 mg/mL to about 100 mg/mL, preferably 20 mg/mL to about 60 mg/mL. Preferably the bendamustine concentration in the inventive compositions is from about 25 mg/mL to about 50 mg/mL, and more preferably from about 30 mg/mL to about 50 mg/mL. It will be understood that compositions containing any useful concentration within the ranges, i.e. 10, 20, 25, 30, 35, 40, 45, 50, 55, 60 . . . 100 are contemplated. In other embodiments, the bendamustine concentration in the composition is about 50 mg/mL. In alternative aspects, the amount of bendamustine is outside these ranges but the amounts will be sufficient for single or multiple administrations of dosages generally regarded as effective amounts.

In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof. Within this aspect, the pharmaceutically acceptable fluid is propylene glycol (PG) or polyethylene glycol (PEG). In other embodiments of the invention however, the pharmaceutically acceptable fluid is a mixture of PEG and PG. For example, the pharmaceutically acceptable fluid can include about 50% PEG and about 50% PG. Alternatively, pharmaceutically acceptable fluid includes about 95% PEG and about 5% PG. The amount of PEG and PG can also be varied within the ranges, i.e. the ratio of PEG:PG in the pharmaceutically acceptable fluid can range from about 95:5 to about 50:50. Within this range, is a pharmaceutically acceptable fluid containing about 75% PEG and about 25% PG, and preferably 80% PEG and 20% PG. In another embodiment, a pharmaceutically acceptable fluid can include about 85% PEG and about 15% PG while another preferred pharmaceutically acceptable fluid includes about 90% PEG and about 10% PG. The molecular weight of the PEG will be within the range of pharmaceutically acceptable weights although PEG 400 is preferred in many aspects of the invention.

Without meaning to be bound by any theory or hypothesis, the hydroxide of the polyethylene glycol molecule is less reactive than the hydroxides of propylene glycol. As a result, the ester forms at a slower rate in polyethylene glycol than propylene glycol and the resulting bendamustine degradants are unexpectedly and substantially reduced over extended periods of time when PEG is a substantial part of the pharmaceutically acceptable fluid.

The bendamustine-containing compositions according to several preferred aspects of the invention include a stabiliz-

4

ing amount of an antioxidant. For purposes of the present invention, "stabilizing amount" shall be understood to include those amounts which increase or enhance the stability of the bendamustine in the compositions described herein. The presence of one or more antioxidants described herein thus contributes, at least in part to the long term stability of the composition. Within this guideline, suitable antioxidant concentrations in the compositions can range from about 2.5 mg/mL to about 35 mg/mL, and preferably from about 5 mg/mL to about 20 mg/mL or from about 10 mg/mL to about 15 mg/mL. In some other embodiments, the concentration of the antioxidant in the bendamustine-containing composition is about 5 mg/mL.

Suitable antioxidants for inclusion include those which are pharmaceutically acceptable for use in human and veterinary formulations although not limited to those currently regarded as safe by any regulatory authority. For example, the antioxidant can be selected from among lipoic acid, thioglycerol (also known as monothioglycerol) and analogs thereof, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds, dihydrolipoic acid and mixtures of the foregoing. Preferably, the antioxidant is thioglycerol, lipoic acid or a mixture thereof. Some particularly preferred embodiments of the invention include thioglycerol.

In view of the foregoing, some preferred long term storage stable bendamustine-containing compositions in accordance with the invention compositions include:

  I. a) bendamustine or a pharmaceutically acceptable salt thereof; and
    b) a pharmaceutically acceptable fluid including
      i) polyethylene glycol and propylene glycol; and
      ii) a stabilizing amount of thioglycerol; or
  II. a) about 50 mg/mL bendamustine or a pharmaceutically acceptable salt thereof; and
    b) a pharmaceutically acceptable fluid including
      i) about 90% PEG and about 10% PG; and
      ii) about 2.5 mg/mL thioglycerol.

Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total impurities, PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

In accordance with other aspects of the invention, there are provided long term storage stable bendamustine-containing compositions, including:

  a) bendamustine or a pharmaceutically acceptable salt thereof;
  b) a pharmaceutically acceptable fluid including one or more of the following: PG, ethanol, PEG, benzyl alcohol and glycofurol; and
  c) a stabilizing amount of a chloride salt.

These compositions also have the low levels of impurities and long term stability mentioned herein. Preferred pharmaceutically acceptable fluids include PG, PEG or ethanol in this embodiment of the invention. Preferably, the PEG is PEG 400. If desired, glycerin and/or 88% (w/w) lactic acid can be added to the pharmaceutically acceptable fluid.

Suitable chloride salts include but are not limited to organic chloride salts, sodium chloride, choline chloride, hydrochloride salts of amino acids and mixtures thereof. Thus, as will be appreciated by those of ordinary skill, one can select from among a number of suitable chloride salts and it is Applicants' intention that the scope of the invention includes all such chloride salts that are capable of being included in bendamustine-containing formulations for

EAGLEBEN-SA_00001070

US 11,844,783 B2

5

extended periods without having a deleterious effect on the drug. In one embodiment of the invention, the chloride salt concentration is from about 10 to about 300 mg/mL. In another embodiment, the chloride salt concentration is from about 50 to about 215 mg/mL. In one preferred embodiment, the chloride salt concentration is about 215 mg/mL.

In accordance with another aspect of the invention, there is provided long term storage stable bendamustine-containing compositions, including:

    a) bendamustine or a pharmaceutically acceptable salt thereof; and

    b) a pharmaceutically acceptable fluid including DMSO.

These compositions also have the low levels of impurities and long term stability mentioned herein. In some aspects, the bendamustine concentration in these compositions is from about 10 mg/mL to about 100 mg/mL. Preferably, the bendamustine concentration is from about 20 mg/mL to about 50 mg/mL, more preferably from about 25 mg/mL to about 50 mg/mL. In an alternative embodiment, the bendamustine concentration is about 50 mg/mL.

Another embodiment of the invention provides methods of treating cancer in mammals. The methods include administering to a mammal in need thereof an effective amount of one of the bendamustine-containing compositions described herein. Since the active ingredient portion of the inventive composition is an FDA-approved drug, those of ordinary skill will recognize that the doses of bendamustine employed in this aspect of the invention will be similar to those employed in any treatment regimens designed for bendamustine as marketed under the trade name TRE-ANDA. The patient package insert containing dosing information is incorporated herein by reference. The methods of treatment also include administering the inventive formulations for any purpose or physical condition for which bendamustine has been indicated as being useful.

Another embodiment of the invention includes methods of preparing bendamustine-containing compositions described herein. The methods include reconstituting lyophilized bendamustine in a pharmaceutically acceptable fluid containing one of the following:

    A) i) PEG, PG or mixtures thereof; and
        ii) a stabilizing amount of an antioxidant;
    B) i) one or more of PG, ethanol, PEG, benzyl alcohol and glycofurol; and
        ii) a stabilizing amount of a chloride salt; or
    C) DMSO.

The steps are carried out under pharmaceutically acceptable conditions for sterility and manufacturing.

In a further aspect of the invention, there are provided methods of controlling or preventing the formation of impurities in bendamustine-containing compositions during long term storage. The methods include combining an amount of bendamustine or a pharmaceutically acceptable salt thereof with a sufficient amount of a pharmaceutically acceptable fluid containing one of the following:

    A) i) PEG, PG or mixtures thereof; and
        ii) a stabilizing amount of an antioxidant;
    B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and
        ii) a stabilizing amount of a chloride salt; or
    C) DMSO.

Further optional steps in accordance therewith include transferring one or more pharmaceutically acceptable doses of the formulations into a suitable sealable container and storing the sealed container at a temperature of from about 5° C. to about 25° C. As a result of carrying out these steps, it is possible to control or substantially prevent the formation

6

of impurities which otherwise occur with bendamustine-containing compositions during long term storage so that the artisan is provided with bendamustine-containing formulations having less than about 5% total impurities PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

The compositions of the present invention can be packaged in any suitable sterile vial or container fit for the sterile storage of a pharmaceutical such as bendamustine. Suitable containers can be glass vials, polypropylene or polyethylene vials or other special purpose containers and be of a size sufficient to hold one or more doses of bendamustine.

A further aspect of the invention includes kits containing lyophilized bendamustine or a pharmaceutically acceptable salt thereof in a first container or vial; and, in a second container, a sufficient amount of a pharmaceutically acceptable fluid such as those described herein, i.e. one of the following:

    A) i) PEG, PG or mixtures thereof; and
        ii) a stabilizing amount of an antioxidant;
    B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and
        ii) a stabilizing amount of a chloride salt; or
    C) DMSO.

For purposes of this embodiment, the amount of fluid which is sufficient is an amount which allows the bendamustine to be dissolved or dispersed to a degree which renders the liquid composition ready for use.

As will be appreciated by those of ordinary skill, the kit will contain other pharmaceutically necessary materials for storing and/or administering the drug, including instructions for storage and use, additional diluents, if desired, etc.

Examples

The following examples serve to provide further appreciation of the invention but are not meant in any way to restrict the effective scope of the invention.

Example 1

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10 mg/ml in one of ethanol, propylene glycol and benzyl alcohol as indicated in Table 1 below. 215 mg/ml of choline chloride was added in half of the samples as a source of soluble chloride ions. The samples were maintained at 40° C. and analyzed periodically for drug content and total impurities. The results obtained are presented in Table 1.

TABLE 1

| Stability of Bendamustine HCl | | | | |
| --- | --- | --- | --- | --- |
| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
| BDM - 10 mg/mL | | Initial | 10.43 | 0.27 |
| Choline chloride - | 40° C. | 48 hrs | 10.48 | 1.27 |
| 215 mg/mL | | 7 day | 10.26 | 2.11 |
| Ethanol qs to 1 mL | | | | |
| BDM - 10 mg/mL | | Initial | 10.55 | 0.27 |
| Ethanol qs to 1mL | 40° C. | 48 hrs | 10.30 | 2.39 |
| | | 7 day | 9.55 | 6.66 |

EAGLEBEN-SA_00001071

US 11,844,783 B2

7

TABLE 1-continued

Stability of Bendamustine HCl

| Formulation | Temp | Time | BDM mg/mL | % Total Impurities |
|---|---|---|---|---|
| BDM - 10 mg/mL Choline chloride - 215 mg/mL Propylene glycol qs to 1 mL | 40° C. | Initial 48 hrs 7 day | 9.99 9.95 9.43 | 0.21 0.60 2.31 |
| BDM - 10 mg/mL Propylene glycol qs to 1 mL | 40° C. | Initial 48 hrs 7 day | 9.68 9.45 9.00 | 0.21 0.88 3.44 |
| BDM - 10 mg/mL Choline Chloride - 215 mg/mL Benzyl alcohol qs to 1 mL | 40° C. | Initial 48 hrs 7 day | 9.95 9.89 8.97 | 3.51 4.24 |
| BDM - 10 mg/mL Benzyl alcohol qs to 1 mL | 40° C. | Initial 48 hrs 7 day | 9.52 8.67 7.49 | 0.33 4.18 7.84 |

Note:
In Table 1 the total % impurities include total contributions from peaks at various RRTs.

As shown in Table 1, the bendamustine formulations are very stable in solutions containing solvent and chloride salt. Table 1 shows that bendamustine, when dissolved at a concentration of about 10 mg/mL., in a pharmaceutically acceptable fluid, such as ethanol and propylene glycol, and containing a stabilizing amount of a chloride salt, such as choline chloride, had less than about 5% after at least 7 days storage at 40° C.

The data presented in Table 1 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of a chloride salt having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including ethanol alone exhibited more than 6.5 total degradants after 7 days storage at 40° C. The sample including benzyl alcohol alone exhibited more than 7.5% total degradants after 7 days storage at 40° C. Bendamustine-containing compositions with such high levels of degradation would not be suitable for long-term storage.

Example 2

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10 mg/ml in DMSO. The samples were maintained at 40° C. and analyzed periodically for drug content and impurity profile. The results obtained are presented in Table 2.

TABLE 2

Stability of Bendamustine HCl in DMSO

| Formulation | Temp | Time | Content (mg/mL.) | % Total Imp |
|---|---|---|---|---|
| BDM - 10 mg/mL DMSO qs to 1 mL | 40° C. | Initial 48 hrs 1 week | 10.2 9.80 10.0 | 0.23 0.30 0.56 |

Note:
In Table 2 the total % impurities include total contributions from peaks at various RRTs

Table 2 shows that bendamustine, when dissolved in DMSO, had substantially no increase in total degradants. The data presented in Table 2 translates to bendamustine-containing compositions including DMSO having a shelf life of at least about 15 months at 5° C. and 25° C. In fact,

8

such compositions are expected to have long term stability for periods beyond 15 months, i.e. up to 2 years or greater.

Example 3

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 20 mg/ml in polyethylene glycol 400 and 5 mg/ml of lipoic acid was added as a stabilizing antioxidant as indicated in Table 3 below. The samples were maintained at 40° C. or 25° C. and analyzed after 15 days for drug content and impurities. The results obtained are presented in Table 3.

TABLE 3

Stability of Bendamustine (20 mg/ml) in PEG 400 and Antioxidants

| Antioxidant | T ° C. | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
| | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

As shown in Table 3, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as polyethylene glycol, in the presence of a stabilizing amount of an antioxidant, such as lipoic acid, had substantially no increase in total degradants after a period of 15 days. The data presented in Table 3 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of an antioxidant having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including PEG alone, on the other hand, which did not contain an antioxidant, did not exhibit stabilizing effects at 40° C. This sample had more than 40% more total impurities than the sample including lipoic acid. Bendamustine-containing compositions with such high levels of total impurities would not be suitable for long-term storage.

Example 4

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 5 mg/ml of thioglycerol, α-lipoic acid or dihydro-lipoic acid was added as a stabilizing antioxidant as indicated in Table 4 below. The samples were maintained at 40° C. and analyzed after 15 days or one month for drug content and impurity profile as indicated in Table 4 below. The results obtained are presented in Table 4.

TABLE 4

Stability of Bendamustine (50 mg/ml) in 90% PEG 400, 10% Propylene Glycol and Antioxidant

| Antioxidant | T (° C.) | Time | Content (mg/mL) | % Initial | % Impurities RRT HP1 0.59 | PG ester 1.10 | % Total Imps |
|---|---|---|---|---|---|---|---|
| Thioglycerol | 40 | initial | 48.8 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 48.5 | 99.4 | 0.06 | 0.20 | 0.71 |
| α-lipoic acid | 40 | initial | 49 | 100 | <LD | <LD | 0 |
| | 40 | 15 days | 48.8 | 99.6 | 0.19 | 0.13 | 0.32 |
| | 40 | 1 month | 48.7 | 99.4 | 0.34 | 0.26 | 0.79 |

EAGLEBEN-SA_00001072

US 11,844,783 B2

9

TABLE 4-continued

Stability of Bendamustine (50 mg/ml) in 90% PEG 400, 10% Propylene Glycol and Antioxidant

| Anti-oxidant | T (° C.) | Time | Content (mg/mL) | % Initial | % Impurities RRT | | % Total Imps |
|---|---|---|---|---|---|---|---|
| | | | | | HPI 0.59 | PG ester 1.10 | |
| Dihydro-lipoic acid | 40 40 | initial 1 month | 49.3 47.7 | 100 97.4 | <LD 0.63 | <LD 0.12 | 0 1.84 |

<LD = Below Level of Detection

As shown in Table 4, bendamustine. when dissolved in a pharmaceutically acceptable fluid, such as a combination of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of an antioxidant, such as thioglycerol,

10

α-lipoic acid or dihydrolipoic acid, had substantially no increase in total degradants after a period of 1 month. This data supports the position that bendamustine-containing compositions according to the invention have a shelf life of at least about 2 years when stored at temperatures between 5° C. and 25° C.

## Example 5

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in a mixture of polyethylene glycol 400 and propylene glycol as indicated in Table 5 below. 5 mg/ml of lipoic acid was added as a stabilizing antioxidant. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed after 1 week, 15 days or one month for drug content and impurity profile as indicated in Table 5 below. The results obtained are presented in Table 5.

TABLE 5

Stability of Bendamustine (50 mg/ml) and Lipoic Acid (5 mg/ml) in PEG400 and Propylene glycol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Area of degradants | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|
| | | | | | HPI 0.58 | PG ester 1.10 | PG ester 1.13 | |
| BDM-50 mg/mL Lipoic acid-5 mg/mL PEG 400:PG (75:25) qs to 1 mL | | Initial | 49.6 | 100 | BDL | BDL | BDL | 0.18 |
| | 40° C. | 1 W | 49.0 | 98.8 | 0.05 | 0.13 | BDL | 0.38 |
| | | 15 d | 48.3 | 97.4 | 0.08 | 0.26 | BDL | 0.55 |
| | | 1 M | 48.0 | 96.8 | 0.11 | 0.43 | 0.13 | 1.03 |
| | 25° C. | 15 d | 49.6 | 100.0 | BDL | 0.10 | BDL | 0.30 |
| | | 1 M | 48.4 | 97.6 | 0.05 | 0.19 | BDL | 0.43 |
| | 5° C. | 1 M | 49.6 | 100.0 | BDL | 0.07 | BDL | 0.30 |
| BDM-50 mg/mL Lipoic acid-5 mg/mL PEG 400:PG (50:50) qs to 1 mL | | Initial | 50.2 | 100 | BDL | BDL | BDL | 0.21 |
| | 40° C. | 1 W | 49.9 | 99.4 | BDL | 0.15 | BDL | 0.30 |
| | | 15 d | 49.1 | 97.8 | 0.06 | 0.35 | BDL | 0.73 |
| | | 1 M | 49.0 | 97.6 | 0.09 | 0.90 | 0.25 | 1.82 |
| | 25° C. | 15 d | 49.9 | 99.4 | BDL | 0.12 | BDL | 0.32 |
| | | 1 M | 49.7 | 99.0 | BDL | 0.25 | BDL | 0.59 |
| | 5° C. | 1 M | 50.0 | 99.6 | BDL | 0.11 | BDL | 0.33 |
| BDM-50 mg/mL Lipoic acid-5 mg/mL PEG 400:PG (90:10) qs to 1 mL | | Initial | 50.8 | 100 | BDL | BDL | BDL | 0.21 |
| | 40° C. | 1 W | 50.4 | 99.2 | BDL | 0.11 | BDL | 0.30 |
| | | 15 d | 49.7 | 97.8 | 0.07 | 0.17 | BDL | 0.43 |
| | | 1 M | 49.7 | 97.8 | 0.13 | 0.27 | 0.09 | 0.84 |
| | 25° C. | 15 d | 50.8 | 100.0 | BDL | 0.10 | BDL | 0.26 |
| | | 1 M | 50.8 | 100.0 | 0.05 | 0.14 | BDL | 0.39 |
| | 5° C. | 1 M | 50.8 | 100.0 | BDL | 0.06 | BDL | 0.34 |

BDL = Below Detectable Limit

As shown in Table 5, bendamustine, when dissolved in certain mixtures of polyethylene glycol and propylene glycol and a stabilizing amount of lipoic acid, had substantially no increase in total degradants after a period of 1 month. The data presented in Table 5 translates to bendamustine-containing compositions having a shelf life of at least about 2 years when stored at temperatures between 5° C. and at 25° C.

## Example 6

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol and α-lipoic acid was added as a stabilizing antioxidant as indicated in Table 6 below. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed for drug content and impurity profile as indicated in Table 6 below. The results obtained are presented in Table 6.

EAGLEBEN-SA_00001073

US 11,844,783 B2

11

12

TABLE 6

Stability of Bendamustine in 90% PEG 400, 10% PG and α-lipoic acid

| Formulation | Temp | Time Per. | Amt. mg/ml | % of Initial | % Area of degradants | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0.59 | 1.10 | 1.13 | 1.15 | 1.17 | 1.20 | 1.22 | 1.30 | |
| BDM-50 mg/mL α-lipoic acid- 10 mg/mL PEG 400:PG (90:10) qs to 1 mL | Initial | | 51.0 | 100 | 0.20 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.26 |
| | 40° C. | 1 M | 50.5 | 99.0 | 0.21 | 0.31 | 0.13 | 0.07 | 0.13 | 0.10 | <LD | <LD | 0.95 |
| | | 2 M | 49.7 | 97.5 | 0.22 | 0.71 | 0.28 | 0.14 | 0.12 | 0.21 | 0.12 | <LD | 2.02 |
| | | 3 M | 48.7 | 95.5 | 0.22 | 1.01 | 0.45 | 0.21 | 0.14 | 0.37 | 0.16 | 0.05 | 2.96 |
| | 25° C. | 3 M | 50.5 | 99.0 | 0.20 | 0.36 | 0.07 | <LD | <LD | 0.10 | <LD | <LD | 0.73 |
| | | 6 M | 50.4 | 98.8 | 0.22 | 0.60 | 0.17 | 0.06 | 0.06 | 0.09 | 0.10 | 0.08 | 1.44 |
| | 5° C. | 6 M | 50.9 | 99.8 | 0.16 | 0.05 | <LD | <LD | <LD | <LD | <LD | <LD | 0.21 |
| | | 12 M | 50.6 | 99.2 | 0.20 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | 0.38 |
| BDM-50 mg/mL α-lipoic acid- 15 mg/mL PEG 400:PG (90:10) qs to 1 mL | Initial | | 50.3 | 100 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | <LD | 0.18 |
| | 40° C. | 1 M | 50.0 | 99.4 | 0.19 | 0.32 | 0.08 | 0.06 | 0.08 | 0.06 | 0.06 | <LD | 0.85 |
| | | 2 M | 49.8 | 99.0 | 0.19 | 0.65 | 0.21 | 0.12 | 0.13 | 0.23 | 0.14 | 0.06 | 1.85 |
| | | 3 M | 49.5 | 98.4 | 0.15 | 0.89 | 0.37 | 0.17 | 0.13 | 0.32 | 0.10 | <LD | 2.40 |
| | | 6 M | 47.0 | 93.4 | 0.20 | 1.76 | 0.66 | 0.19 | 0.31 | 0.47 | 0.33 | 0.17 | 4.93 |
| | 25° C. | 3 M | 50.0 | 99.4 | 0.20 | 0.35 | 0.08 | <LD | <LD | <LD | 0.11 | <LD | 0.79 |
| | | 6 M | 49.5 | 98.4 | 0.19 | 0.58 | 0.15 | 0.06 | 0.07 | 0.09 | 0.08 | 0.10 | 1.38 |
| | 5° C. | 6 M | 50.3 | 100 | 0.17 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.23 |
| | | 12 M | 50.2 | 99.8 | 0.19 | 0.15 | <LD | <LD | <LD | <LD | <LD | <LD | 0.34 |

<LD = Below Level of Detection

The data reported in Table 6 along with the data in Table 5 demonstrates that bendamustine solutions are stable when dissolved in mixtures of PEG and PG and 5-15 mg/mL α-lipoic acid. As shown in Table 6, bendamustine, when dissolved in combinations of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of lipoic acid, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6-12 months at 5° C. and 25° C. The data corresponds to bendamustine solutions being stable under ambient or refrigerated storage conditions for well in excess of 2 years, and thus long term stable.

Example 7

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 2.5 mg/ml of thioglycerol was added as an antioxidizing agent. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table 7 below. The results obtained are presented in Table 7.

TABLE 7

Stability of Bendamustine in 90% PEG 400, 10% PG and Thioglycerol

| Formulation | Temp | Time Per. | Amt mg/ml | % of Initial | RRTs of degradants | | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0.15 | 0.37 | 1.10 | 1.13 | 1.15 | 1.17 | 1.18 | 1.20 | 1.22 | |
| BDM-50 mg/mL Thioglycerol- 2.5 mg/mL PEG 400:PG (90:10) qs to 1 mL | Initial | | 50.3 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | 40° C. | 15 d | 50.2 | 99.8 | BDL | BDL | 0.18 | BDL | BDL | BDL | 0.05 | 0.08 | BDL | 0.31 |
| | | 1 M | 49.9 | 99.2 | BDL | 0.12 | 0.32 | 0.07 | BDL | BDL | 0.09 | 0.08 | BDL | 0.75 |
| | | 2 M | 49.1 | 97.6 | BDL | 0.18 | 0.56 | 0.24 | 0.09 | 0.17 | 0.19 | 0.12 | 0.11 | 1.76 |
| | | 3 M | 48.8 | 97.0 | BDL | 0.23 | 0.85 | 0.34 | 0.16 | 0.30 | 0.34 | 0.29 | 0.19 | 2.94 |
| | 25° C. | 3 M | 49.9 | 99.2 | 0.06 | 0.12 | 0.23 | 0.07 | BDL | 0.06 | 0.07 | 0.06 | BDL | 0.67 |
| | | 6 M | 49.3 | 98.0 | BDL | 0.23 | 0.53 | 0.22 | 0.11 | BDL | 0.21 | 0.22 | 0.20 | 2.07 |

EAGLEBEN-SA_00001074

US 11,844,783 B2

| 13 | | | | | | | | | | | | | | 14 |

#### TABLE 7-continued

Stability of Bendamustine in 90% PEG 400, 10% PG and Thioglycerol

| Formu-lation | Temp | Time Per. | Amt mg/ml | % of Ini-tial | RRIs of degradants | | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0.15 | 0.37 | 1.10 | 1.13 | 1.15 | 1.17 | 1.18 | 1.20 | 1.22 | |

BDL = Below Detectable Limit

The stability is similar to that of α-lipoic acid samples in Example 6 above. As shown in Table 7, bendamustine, when dissolved in a combination of polyethylene glycol and propylene glycol, and a stabilizing amount of thioglycerol, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6 months at 25° C. The data reported supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for about 2 years.

Example 8

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 85% PEG 400 and 15% PG in the presence of 5 mg/ml of thioglycerol. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table 8 below. The results obtained are presented in Table 8.

#### TABLE 8

Stability of Bendamustine in 85% PEG 400, 15% PG and Thioglycerol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Total Imp. |
|---|---|---|---|---|---|
| BDM - 50 mg/mL | Initial | | 51.5 | 100 | 0.12 |
| Thioglycerol - 5 mg/mL | 40° C. | 1 M | 50.4 | 97.9 | 1.18 |
| PEG 400:PG (85:15) qs to | 25° C. | 1 M | 51.4 | 99.8 | 0.41 |
| 1 mL | | 3 M | 50.4 | 97.9 | 1.21 |
| | 5° C. | 3 M | 51.0 | 99.0 | 0.26 |

The stability is similar to that of thioglycerol samples in Example 7 above. As reported in Table 8, total impurities did not exceed 2% at 40° C. or 25° C. storage over one month, or at 25° C. and 5° C. storage after three months. The data reported in Table 8 supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for at least about 2 years if not longer.

We claim:

1. A method of treating leukemia in a human in need thereof comprising

providing a liquid bendamustine-containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL,

a pharmaceutically acceptable fluid consisting of poly-ethylene glycol and optionally one or more of pro-pylene glycol, ethanol, benzyl alcohol and glycofu-rol; and

a stabilizing amount of an antioxidant

wherein the total impurities in the liquid bendamustine-containing composition resulting from the degrada-tion of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wave-length of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.;

diluting the liquid bendamustine containing composition; and

intravenously administering the diluted composition to the human.

2. The method of claim 1, wherein the liquid bendamus-tine containing composition is diluted with about 50 mL of a diluent.

3. The method of claim 1, wherein the concentration of bendamustine in the liquid bendamustine-containing com-positions is about 25 mg/ml.

4. The method of claim 1, wherein the concentration of bendamustine in the liquid bendamustine-containing com-position is 25 mg/ml.

5. The method of claim 1, wherein the liquid bendamus-tine-containing composition includes 100 mg of bendamus-tine at a concentration of 25 mg/mL.

6. The method of claims 1, wherein the antioxidant is monothioglycerol.

7. The method of claim 1, wherein the antioxidant in the liquid bendamustine containing composition is monothio-glycerol in a concentration of about 5 mg/mL.

8. The method of claim 1, wherein the liquid bendamus-tine-containing composition is stable for at least about 15 months at 5° C. or for at least about 15 months at 25° C. prior to dilution.

9. The method of claim 1, wherein the liquid bendamus-tine-containing composition further comprises ethanol.

10. The method of claims 1, wherein the liquid benda-mustine-containing composition is packages in a sterile vial.

11. A method of treating leukemia in a human in need thereof comprising providing a liquid bendamustine-con-taining composition packaged in a sterile vial and compris-ing

100 mg of bendamustine, or a pharmaceutically accept-able salt thereof, at a concentration of about 25 mg/mL;

a pharmaceutically acceptable fluid consisting of polyeth-ylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

a stabilizing amount of an antioxidant that is monothio-glycerol;

wherein the total impurities in the liquid bendamustine-containing composition resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm at least about 15 months at a temperature of about 5° C. or for at least about 15 months at 25° C.;

diluting the liquid bendamustine containing composition with about 50 mL of a diluent;

and intravenously administering the diluted composition to the human.

US 11,844,783 B2

15

16

**12**. The method of claim **11**, wherein the liquid bendamustine-containing composition comprises 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, at a concentration of 25 mg/mL.

**13**. The method of claim **12**, wherein the liquid bendamustine-containing composition further comprises ethanol.

**14**. The method of claim **12**, wherein the liquid bendamustine containing composition is diluted with about 50 mL of a diluent.

\* \* \* \* \*

EAGLEBEN-SA_00001076



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

April 12, 2024

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *11,872,214*
ISSUE DATE: *January 16, 2024*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

Paula Smith
Certifying Officer

EAGLEBEN-SA_00002115

# EXHIBIT 2

US011872214B2

(12) **United States Patent**
Palepu et al.

(10) Patent No.: **US 11,872,214 B2**
(45) Date of Patent: **\*Jan. 16, 2024**

(54) **FORMULATIONS OF BENDAMUSTINE**

(71) Applicant: **Eagle Pharmaceuticals, Inc.**, Woodcliff Lake, NJ (US)

(72) Inventors: **Nagesh R. Palepu**, Southampton, PA (US); **Philip Christopher Buxton**, Uxbridge (GB)

(73) Assignee: **Eagle Pharmaceuticals, Inc.**, Woodcliff Lake, NJ (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **18/081,251**

(22) Filed: **Dec. 14, 2022**

(65) **Prior Publication Data**

US 2023/0115693 A1      Apr. 13, 2023

**Related U.S. Application Data**

(63) Continuation of application No. 17/412,623, filed on Aug. 26, 2021, which is a continuation of application No. 16/509,920, filed on Jul. 12, 2019, now Pat. No. 11,103,483, which is a continuation of application No. 16/015,656, filed on Jun. 22, 2018, now abandoned, which is a continuation of application No. 15/432,335, filed on Feb. 14, 2017, now Pat. No. 10,010,533, which is a continuation of application No. 15/013,436, filed on Feb. 2, 2016, now Pat. No. 9,572,797, which is a continuation of application No. 14/031,879, filed on Sep. 19, 2013, now Pat. No. 9,265,831, which is a continuation of application No. 13/016,473, filed on Jan. 28, 2011, now Pat. No. 8,609,707.

(60) Provisional application No. 61/299,100, filed on Jan. 28, 2010.

(51) **Int. Cl.**
| | |
|---|---|
| *A61K 9/08* | (2006.01) |
| *A61K 47/10* | (2017.01) |
| *A61K 47/18* | (2017.01) |
| *A61P 35/00* | (2006.01) |
| *A61K 31/4184* | (2006.01) |
| *A61K 47/20* | (2006.01) |
| *A61K 47/12* | (2006.01) |
| *A61K 47/22* | (2006.01) |
| *A61K 9/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ............ *A61K 31/4184* (2013.01); *A61K 9/08* (2013.01); *A61K 47/10* (2013.01); *A61K 47/12* (2013.01); *A61K 47/18* (2013.01); *A61K 47/20* (2013.01); *A61K 47/22* (2013.01); *A61K 9/0019* (2013.01)

(58) **Field of Classification Search**
CPC ...... A61K 31/4184; A61K 9/08; A61K 47/10; A61K 47/12; A61K 47/18; A61K 47/20; A61K 47/22; A61K 9/0019
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,071,620 | A | 1/1978 | Sklar |
| 4,711,906 | A | 12/1987 | Von et al. |
| 4,879,286 | A | 11/1989 | Alam et al. |
| 5,204,335 | A | 4/1993 | Sauerbier et al. |
| 5,223,515 | A | 6/1993 | Mikura et al. |
| 5,741,523 | A | 4/1998 | Teagarden et al. |
| 7,252,799 | B2 | 8/2007 | Miekka et al. |
| 7,772,274 | B1 | 8/2010 | Palepu |
| 8,076,366 | B2 | 12/2011 | Courvoisier et al. |
| 8,344,006 | B2 | 1/2013 | Drager et al. |
| 8,389,558 | B2 | 3/2013 | Alakhov et al. |
| 8,609,707 | B2 | 12/2013 | Palepu et al. |
| 8,791,270 | B2 | 7/2014 | Brittain et al. |
| 9,000,021 | B2 | 4/2015 | Sundaram et al. |
| 9,034,908 | B2 | 5/2015 | Sundaram |
| 9,144,568 | B1 | 9/2015 | Sundaram |
| 9,265,831 | B2 | 2/2016 | Palepu et al. |
| 9,572,796 | B2 | 2/2017 | Palepu et al. |
| 9,572,797 | B2 | 2/2017 | Palepu et al. |
| 9,572,887 | B2 | 2/2017 | Sundaram |
| 9,572,888 | B2 | 2/2017 | Sundaram |
| 9,579,384 | B2 | 2/2017 | Sundaram et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1850048 A | 10/2006 |
| CN | 101584668 A | 11/2009 |

(Continued)

OTHER PUBLICATIONS

Kumar et al. (AAPS PharmSciTech 2006;7(3):E1-E7) (Year: 2006).\*
McGinity et al. (Journal of Pharmaceutical Sciences 1975;64(2):356-357) (Year: 1975).\*

(Continued)

*Primary Examiner* — Ernst V Arnold
(74) *Attorney, Agent, or Firm* — BakerHostetler

(57) **ABSTRACT**

Long term storage stable bendamustine-containing compositions are disclosed. The compositions can include bendamustine or a pharmaceutically acceptable salt thereof, and a pharmaceutically acceptable fluid which can include in some embodiments PEG, PG or mixtures thereof and an antioxidant or chloride ion source. The bendamustine-containing compositions have less than about 5% total impurities, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

**9 Claims, No Drawings**

US 11,872,214 B2

Page 2

(56)         **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,597,397 | B2 | 3/2017 | Sundaram |
| 9,597,398 | B2 | 3/2017 | Sundaram |
| 9,597,399 | B2 | 3/2017 | Sundaram |
| 10,010,533 | B2 | 7/2018 | Palepu et al. |
| 2002/0102215 | A1 | 8/2002 | Klaveness et al. |
| 2002/0122768 | A1 | 9/2002 | Liu et al. |
| 2004/0014964 | A1 | 1/2004 | Cheesman et al. |
| 2004/0043069 | A1 | 3/2004 | Vanderbist et al. |
| 2005/0025702 | A1 | 2/2005 | Decicco et al. |
| 2005/0042285 | A1 | 2/2005 | Ukai et al. |
| 2006/0035945 | A1 | 2/2006 | Attardo et al. |
| 2006/0128777 | A1 | 6/2006 | Bendall et al. |
| 2006/0159713 | A1 | 7/2006 | Brittain et al. |
| 2006/0205694 | A1 | 9/2006 | Alonso et al. |
| 2007/0116729 | A1 | 5/2007 | Palepu |
| 2008/0118544 | A1 | 5/2008 | Wang |
| 2009/0082416 | A1 | 3/2009 | Czarnik |
| 2009/0209606 | A1 | 8/2009 | Bendall et al. |
| 2009/0264488 | A1 | 10/2009 | Cooper et al. |
| 2009/0325978 | A1 | 12/2009 | Onai et al. |
| 2010/0092474 | A1 | 4/2010 | Gallagher et al. |
| 2010/0145266 | A1 | 6/2010 | Orlowski |
| 2010/0216858 | A1 | 8/2010 | Popek et al. |
| 2010/0247669 | A1 | 9/2010 | Eliasof et al. |
| 2010/0273730 | A1 | 10/2010 | Hsu et al. |
| 2011/0015244 | A1 | 1/2011 | Alakhov et al. |
| 2011/0015245 | A1 | 1/2011 | Alakhov et al. |
| 2011/0184036 | A1 | 7/2011 | Palepu et al. |
| 2011/0190363 | A1 | 8/2011 | Drager et al. |
| 2012/0059000 | A1 | 3/2012 | Ren et al. |
| 2012/0071532 | A1 | 3/2012 | Cooper et al. |
| 2012/0157505 | A1 | 6/2012 | Labell et al. |
| 2012/0308516 | A1 | 12/2012 | Hlavinka et al. |
| 2013/0041003 | A1 | 2/2013 | Brittain et al. |
| 2013/0041004 | A1 | 2/2013 | Drager et al. |
| 2013/0210878 | A1 | 8/2013 | Soppimath et al. |
| 2013/0210879 | A1 | 8/2013 | Palepu et al. |
| 2013/0217888 | A1 | 8/2013 | Shrawat et al. |
| 2013/0253025 | A1 | 9/2013 | Sundaram |
| 2014/0094496 | A1 | 4/2014 | Sundaram |
| 2014/0275196 | A1 | 9/2014 | Sundaram |
| 2018/0000789 | A1 | 1/2018 | Palepu et al. |
| 2018/0000938 | A1 | 1/2018 | Sundaram |
| 2018/0185488 | A1 | 7/2018 | Sundaram |
| 2018/0296535 | A1 | 10/2018 | Palepu et al. |
| 2018/0296536 | A1 | 10/2018 | Palepu et al. |
| 2018/0369383 | A1 | 12/2018 | Sundaram |
| 2019/0192659 | A1 | 6/2019 | Sundaram |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 102164579 | A | 8/2011 |
| DE | 80967 | A | 1/1970 |
| DE | 159289 | A1 | 3/1983 |
| JP | 09-508128 | A | 8/1997 |
| JP | 2005-537285 | A | 12/2005 |
| JP | 2008-526991 | A | 7/2008 |
| JP | 2012-503666 | A | 2/2012 |
| JP | 2012-525387 | A | 10/2012 |
| JP | 2015-501814 | A | 1/2015 |
| WO | 99/01118 | A2 | 1/1999 |
| WO | 2001/097860 | | 12/2001 |
| WO | 2001/097861 | | 12/2001 |
| WO | 2001/098294 | | 12/2001 |
| WO | 02/02125 | A1 | 1/2002 |
| WO | 2006/054315 | A1 | 5/2006 |
| WO | 2006/110551 | A2 | 10/2006 |
| WO | 2010/036702 | A1 | 4/2010 |
| WO | 2010/126676 | A1 | 11/2010 |
| WO | 2010/148288 | A2 | 12/2010 |
| WO | 2011/094565 | A1 | 8/2011 |
| WO | 2011/103150 | A2 | 8/2011 |
| WO | 2012/015810 | A2 | 2/2012 |
| WO | 2013/142358 | A1 | 9/2013 |

OTHER PUBLICATIONS

Wasylaschuk et al. (Journal of Pharmaceutical Sciences, vol. 96, No. 1, Jan. 2007:106-116). (Year: 2007).*

Pokorny et al., Antioxidants in Food: Practical Applications 2001, CRC Press, p. 324.

Poulsen, Introduction to Chemistry (2010).

Pramod K. Gupta, et al., "Injectable Drug Development Techniques to Reduce Pain and Irritation", pp. 183, Informa Healthcare, 2008, ISBN 13: 978-1-5749-1095-7.

Preiss et al., "Pharmacological and clinical date of Bendamustine," 17th International Cancer Congress, pp. 1637-1640 (1998).

Preiss et al., Studies on the Pharmacokinetics of Bendamustine (Cytostasan®) in Humans, Pharmazie, 40(11):782-784 (1985).

R.A. Pethrick et al., Excerpt from Polymer Yearbook 13, CRC Press, Oct. 1, 1996, Technology & Engineering Vinogradova et al.

Rassachaert et al., "A phase 1 study of bendamustine hydrochloride administered once every 3 weeks in patients with solid tumors," Anti-Cancer Drugs, vol. 18 No. 5 pp. 587-595 (2007).

Remington's Pharmaceutical Sciences, 18th edition, (1990), p. 1322.

Remington's Pharmaceutical Sciences, 18th edition, (1990), pp. 1286-1288.

Remington's Pharmaceutical Sciences 1990 (Eighteenth Edition), Mack Publishing Company, Chapter 85, 1570-1580.

Renu Chadha, et al., Drug Carrier Systems for Anticancer Agents: A Review, Journal of Scientific & Industrial Reasearch, vol. 67, pp. 185-197, 2008.

Ribomustin Monograph (Updated Aug. 2005).

Ribomustin Monograph (Updated Jan. 2002).

Ribomustin Product Information, Janssen-Cilag Pty Ltd (Updated Sep. 15, 2016).

Rote Liste 1996 for Ribomustin (86 023).

Rote Liste 2003 for Ribomustin (86 045).

Rowe et al. Handbook of Pharmaceutical Excipients, 6th edition, 2009, pp. 454-455.

Rowe et al., "Handbook of Pharmaceutical Excipients," Pharmaceutical Press, 6th edition pp. 857 (extract from index) (2009).

Rowe, et al., (ed) Handbook of Pharmaceutical Excipients, 5th ed., Pharmaceutical Press, pp. 545-550, Polyethylene Glycol, 2006.

Safety Data Sheet, Lactic Acid, 88%, Columbus Chemical Industries, 2013.

Scasnar at al., Radiochemical Assay of Stability of 14C-Cytostasan Solutions During Preparation and Storage, Journal of Radioanalytical and Nuclear Chemistry, Articles 121(2):489-497 (1988).

Schofski et al., "Weekly administration of bendamustine: A phase 1 study in patients with advanced progressive solid tumors," Annals of Oncology II, pp. 729-734 (2000).

Schoffski et al., Repeated administration of short infusions of bendamustine: a phase 1 study in patients with advanced progressive solid tumours, J. Cancer Res Clin Oncol, vol. 126 No. 1 pp. 41-47 (2000).

Schwanen et al., In vitro evaluation of bendamustine induced apoptosis in B-chronic lymphocytic leukemia, Leukemia 16:2096-2105 (2002).

SciFinder, Hydrolytic degradation of IMET 3393, American Chemical Society, 2018.

Seager et al., Structure of Products Prepared by Freeze-Drying Solutions Containing Organic Solvents, PDA Journal oi Pharmaceutical Science and Technology, 39(4):161-179 (1985).

Search History issued in connection with PCT/US2013/32295 dated May 10, 2013.

Shah et al., Physical, Chemical, and Bioavailability Studies of Parenteral Diazepam Formulations Containing Propylene Glycol and Polyethylene Glycol 400, Drug Development and Industrial Pharm.), 17:12, 1635-1654 (Oct. 20, 2008).

Sigma-Aldrich, Webpage Catalog for poly(ethylene glycol), http://www.sigmaaldrich.com/catalog/product/aldrich/202398?lang=en&ion=US#, accessed Nov. 15, 2015 (2 pages).

Sikora, "Cancer drug development in the post-genomic age," Current Science, vol. 81 No. 5 pp. 549-554 (2001).

Spectra Analysis, Inc., Oxidative Degradation of Polyethyleneglycol . . . , Application Note 016, Mar. 2008.

**US 11,872,214 B2**

Page 3

(56)            **References Cited**

OTHER PUBLICATIONS

Spiegel et al., "Use of Nonaqueous Solvents in Parenteral Products," Journal of Pharmaceutical Sciences, vol. 52, No. 10 pp. 917-927 (1963).
Strickley, Solubilizing Excipients in Oral and Injectable Formulations, Pharmaceutical Research 21(2):201-230 (Feb. 2004).
Supplemental European Search Report issued in connection with PCT/US2011/022958 dated Dec. 16, 2013.
T. W. Graham Solomons, Organic Chemistry (John Wiley & Sons, 3d ed. 1984).
Tageja, Bendamustine: Safety and Efficacy in the Management of Indolent Non-Hodgkins Lymphoma, Clinical Medicine Insights: Oncology 2011:5 145-156.
Teagarden & Baker, Practical Aspects of Freeze-Drying of Pharmaceutical and Biological Products Using Non-Aqueous Co-Solvent Systems, Chapter 8 in Freeze-Drying/Lyophilization of Pharmaceutical and Biological Products, 239-76 (2nd Edition, Edited by Rey, L. & May, J., Marcel Dekker, New York) (2004).
Teagarden & Baker, Practical Aspects of Lyophilization Using Non-Aqueous Co-Solvent Systems, 15 Eur. J. Pharma. Sciences, 115-33 (2002).
Teva Pharmaceuticals International GMBH, et al. v. Apotex Inc., et al—Civil Action 1:17-cv-01164: Defendants Apotex Inc. and Apotex Corp.'s Answer to Complaint, Defenses and Counterclaims (Document 17), dated Nov. 27, 2017.
Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi USA, LLC.—Civil Action No. 1:17-cv-01201: Answer to Complaint, Separate Defenses, and Counterclaims (Document 10), dated Sep. 15, 2017.
Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi USA, LLC.—Civil Action No. 1:17-cv-01201: Answer to Fresenius Kabi USA, LLC's Counterclaims (Document 14), dated Oct. 6, 2017.
Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi USA, LLC.—Civil Action No. 1:17-cv-01201: Complaint (Document 1), dated Aug. 24, 2017.
Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al—Civil Action No. 1:18-cv-01586: Answer to Fresenius Kabi USA, LLC's Counterclaims (Document 13), dated Nov. 27, 2018.
Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al—Civil Action No. 1:18-cv-01586: Complaint (Document 1), dated Oct. 15, 2018.
Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al—Civil Action No. 1:18-cv-01586: Defendant Mylan Laboratories LTD.'s Answer to Complaint for Patent Infringement (Document 11), dated Nov. 9, 2018.
Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al.—Civil Action No. 1:18-cv-01586: Defendant Fresenius Kabi USA, LLC's Answer to Complaint, Separate Defenses, and Counterclaims (Document 9), dated Nov. 6, 2018.
Teva Pharmaceuticals International GMBH, et al. v. Mylan Laboratories Limited—Civil Action No. 1:17-cv-01790: Complaint (Document 1), dated Dec. 12. 2017.
Teva Pharmaceuticals International GMBH, et al. v. Slayback Pharma Limited Liability Company—Civil Action No. 1:18-cv-00117: Complaint (Document 1), dated Jan. 19, 2018.
Teva Pharmaceuticals International GMBH, et al. v. Slayback Pharma Limited Liability Company—Civil Action No. 1:18-cv-00117: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses and Counterclaims (Document 9), dated Feb. 12, 2018.
Teva Pharmaceuticals International GMBH, et al. v. Apotex Inc., etal—Civil Action No. 1:17-cv-01164: Complaint (Document 1), dated Aug. 18, 2017.
Thiesen, "Bendamustine, a well-tollerated cytotoxic agent used in Germany for may years, is soon to be marketed in the rest of Europe for a range of indicatons including chronic lymphocytic leukaemia," pp. 1-4 (2010). Available at http://www.hospitalpharmacyeurope.com/featured-articles/bendamustine.

Third Party Submission in related EP2528602 based on PCT/US2011/022958 dated Nov. 19, 2013 (9 pages).
Thomas A. Jennings, Lyophilization, Introduction and Basic Principles (2006)(original copyright 1999).
Treanda (Highlights of prescribing information 2008) (Year: 2008).
Treanda, "Highlights of Prescribing Information," Treanda ( bendamustine hydrochloride) for Injection, for intravenous infusion, pp. 1-13 (2010).
Treanda, "Highlights of Prescribing Information," Treanda ( bendamustine hydrochloride) for Injection, for intravenous infusion, pp. 1-6 (2008).
U.S. Pharmacopeia 32-NF-27-General Notices and Requirements (2009).
USP 24/NF 19 (2000) entry for Propylene Glycol (USP).
V.G. Vinogradova, et al., Polymer Yearbook 13, New Metal Chelates as Antioxidant Stabilizers for Polymers . . . , pp. 87-111, 1996.
V.M. Mikhal'chuk, et al., Antioxidative Stabilization of Polyethylene . . . , Russian Journal of Applied Chemistry, vol. 77, No. 1, pp. 131-135, 2004.
Vlok, Manual of Nursing, vol. 1 (9th edition), 1988.
W. Emken et al., "About the Hydrolytic Decomposition of IMET 3393," Pharmazeutische Zentralhalle, vol. 108, Issue 9, pp. 608-614, 1969 (English translation and the original article).
Wayne P. Olson, Volatile Solvents for Drying and Microbial Kill in the Final Container, Pharmaceutical Engineering, 110-118(1997).
Weide et al., Bendamustine Mitoxantrone and Rituximab (BMR): A New Effective Regimen for Refractory or Relapsed Indolent Lymphomas, Leukemia & Lymphoma, 43(2):327-331 (2002).
Werner et al., Hydrolysis Products of Cancerostatic Cytostasan(Registered) (Bendamustine), 42 (4) Die Pharmazie, Govi Verlag Pharmazeutischer Verlag GMBH, Eschborn, DE, 272-73.
William H. Brown, Organic Chemistry 5th Edition, pp. 358-360, 2009.
Wittaya-Areekul and Nail, Freeze-Drying of tert-Butyl Alcohol/Water Cosolvent Systems: Effects of Formulation and Process Variables on Residual Solvents, Journal of Pharmaceutical Sciences 87(4):491-495 (1998).
Written Opinion issued in counterpart PCT/US2013/032288 dated Jun. 6, 2013.
Written Opinion issued in counterpart PCT/US2013/032295 dated Jun. 3, 2013.
Zimmerman et al., Elements of Organic Chemistry (1977).
Zips et al., "New Anticancer Agents: In Vitro and In Vivo Evaluation," In Vivo,vol. 19 pp. 1-8 (2005).
Zumdahl et al., Chemistry, 7th Ed. (2007).
Gandhi & Burger, Bendamustine in B cell malignancies: the new, 46-year old kid on the block, Clin Cancer Res. Dec. 15, 2009; 15(24):7456-7461.
Gibson et al., "Pharmaceutical preformulation and formulation: A practical guide from candidate drug selection to commercial dosage form", Informa Healthcare USA, 2009, vol. 199, 2d ed, pp. 1-559.
Glimelius et al., Bolus-Injection (2-4 min) Versus Short-term (10-20 min) Infusion of 5-Fluorouracil in Patients with Advanced Colorectal Cancer: a Prospective Randomised Trial, Eur J. Cancer, 34, 674-678 (1998).
Gust and Krauser, Investigations on the Stability of Bendamustin, a Cytostatic Agent of the Nitrogen Mustard Type I. Synthesis, Isolation, and Characterization of Reference Substances, in Monatshefte fur Chemie, 128:291-99 (1997).
Heider et al., Efficacy and Toxicity of Bendamustine in Patients with Relapsed Low-Grade non-Hodgkin's Lymphomas, Anticancer Drugs, 12, 725-729 (2001).
HFSA Guidelines, Journal of Cardiac Failure vol. 16 No. 6 (2010).
ICH Harmonised Tripartite Guideline, Stability testing of New Drug Substances and Products Q1A(R2), dated Feb. 6, 2003.
Interlocutory decision in Opposition proceedings of EP 2528602 issued Apr. 8, 2019.
International Conference on Harmonisation in Guideline on Impurities in New Drug Products: Availability, 62 Fed. Reg. 27, 454-27,461 (May 19, 1997).
International Search Report and Written Opinion for No. PCT/US2013/032289 dated Jun. 6, 2013. (5 Pages).

EAGLEBEN-SA_00002118

## US 11,872,214 B2

Page 4

(56)            **References Cited**

OTHER PUBLICATIONS

International Search Report and Written Opinion issued in counterpart PCT/US2013/032295 dated Jun. 2013 (4 pages).
International Search Report and Written Opinion of International application based on PCT/US2011/022958. dated Apr. 2011 (8 pages).
Jay S. Trivedi, et al., Water-Insoluble Drug Formulation, 7. Solubilization Using CoSolvent Approach, pp. 141-168, 2000.
Jay S. Trivedi, Water-Insoluble Drug Formulation, Second Edition, 9 Solubilization Using Cosolvent Approach, pp. 161-194, 2008.
JC Price, Handbook of Pharm. Excipients, 5th Edition, Polyethylene Glycol, pp. 545-550, Aug. 9, 2005.
Jerry March, Advanced Organic Chemistry (4th ed., John Wiley & Sons, Inc. 1992).
John D. Roberts & Marjorie C. Caserio, Basic Principles of Organic Chemistry 612-13, 615-16, 617-18 (W. A. Benjamin, Inc., 2d ed. 1977).
Jonkman-de Vries et al., Pharmaceutical Development of (Investigational) Anticancer Agents for Parental Use—A Review, Drug Dev Ind Pharm. 22(6):475-494 (1996).
Julia A. Barman Balfour, et al., "Bendamustine", Drugs, vol. 61, No. 5, pp. 631-638, 2001.
Kalaycio. M., Clinical Experience With Bendamustine: A New Treatment for Patients With Chronic Lymphocytic Leukemia; Clin Leukemia. 2008; 2(4): 223-229.
Kenneth E. Avis, et al., Remington, Parenteral Preparations, Chapter 41, pp. 780-786, 2000.
Knauf et al., Bendamustine Versus Chlorambucil in Treatment-Naive Patients with B-Cell Chronic Lymphocytic Leukemia (B-CLL): Results of an International Phase III Study, Blood, 110(11), 609a (abstract 2043) (2007).
Koomans et al., Sodium Balance in Renal Failure: A Comparison of Patients with Normal Subjects Under Extremes of Sodium Intake, Hypertension 7:714-721 (1985).
Kurt H. Bauer, et al., Pharmazeutische Technologies, pp. 225-228, HW9, 1993.
Kurt H. Bauer, et al., Pharmazeutische Technologies, pp. 424-425, HW10, 1993.
Larry A. Gatlin, et al., Injectable Drug Development, 17. Formulation and Administration . . . Products, pp. 401-420.
Leonard & Jann, A New Synthesis of Aziridinium Salts. 2,2-Pentamethylene-1,1-tetramethyleneaziridinium Perchlorate A Prototype, 82 J. Am. Chemistry Soc'y 6418-6419 (1960).
Leoni et al., SDX-105 (Bendamustine), a Clinically Active Antineoplastic Agent Possesses a Unique Mechanism of Action, Abstract, 102(11) Blood, Abstract #2363 (Nov. 16, 2003).
Lian-Feng Huang, et al., Water-Insoluble Drug Formulation, Second Edition, Ch. 7. Formulation Strategies and Practice . . . Support, pp. 113-132.
Lissitchkov et al., Phase-I/II study to Evaluate Dose Limiting Toxicity, Maximum Tolerated Dose, and Tolerability of Bendamustine HCl in Pre-treated Patients With B-Chronic Lymphocytic Leukaemia (Binet stages B and C) Requiring Therapy, J. Cancer Res. Clin. Oncol. 132:99-104 (2006).
Liu (ed). Water-Insoluble Drug Formulation, 1st ed., CRC Press, Chapters 7 and 9, 2000.
Liu (ed). Water-Insoluble Drug Formulation, 2nd ed., CRC Press, Chapters 7 and 9, 2008.
Lyondell Tebol(Registered) 99, Tertiary Butyl Alcohol in Freeze-Drying Applications,(Lyondell Chemical Co., 2003).
Lyophilization of Biopharmaceuticals (Henry R. Costantino & Michael K. Pikal eds., Association of Pharmaceutical Scientists 2004).
Maas et al., "Stabilitat von Bendamustinhydrochlorid in Infusionslosungen," Die Pharmazie, Govi Verlag Pharmazeutischer Verlag Gmbh, vol. 49. No. 10 pp. 775-777 (1994). (Abstract Only).
Margolin et al., Shortening the Infusion Time of Anticancer Drugs: Who Will Benefit?, J. of Clinical Oncology, 25(19):2642-2643 (2007).

McGinity, et al., Journal of Pharmaceutical Sciences, Influence of Peroxide Impurities in Polyethylene Glycols . . . , vol. 64, No. 2 pp. 356-357, 1975.
Michael J. Akers, Remington, The Science and Practice of Pharmacy 21st Edition, Parenteral preparation, chapter 41, pp. 802-835, 2005.
Michael P. Gamcsik, et al., NMR Studies of the Conjugation . . . , J. Med. Chem., vol. 33, pp. 1009-1014, 1990.
National Kidney Foundation, "Clinical Practice Guidelines and Clinical Practice Recommendations" (http://kidneyfoundation.cachefly.net/professionals/KDOQI/guideline_upHD_PD_VA/hd_guide5.htm) (2006).
Neelam Seedher, et al., Solubilization of Nimesulide; Use of Co-solvents, Indian J. Pharm. Sci., vol. 65, No. 1, pp. 58-61, 2003.
Nema et al., Excipients and Their Use in Injectable Products, PDA J. Pharma. Sci. & Tech., 51(4):166-171 (Jul.-Aug. 1997).
Ni et al., Stabilization and Preformulation of Anticancer Drug-SarCNU, Int'l J. of Pharma., 249:257-264 (2002).
Ni et al., Use of Pure t-Butanol as a Solvent for Freeze-Drying: A Case Study, Int'l J. of Pharma., 226:39-46 (2001).
Nuijen et al., Pharmaceutical Development of a Parenteral Lyophilized Formulation of the Novel Antitumor Agent Aplidine, PDA J. Pharmaceut. Sci. and Technol. 54(3):193-208 (May-Jun. 2000).
O'Connor, Hydrolysis and Alkylating Reactivity of Aromatic Nitrogen Mustards, J.Chem. Soc. Perkin Trans. 2, 1933-1939(1991).
Orrie M. Friedman, et al., Colorimetric Estimation of Nitrogen . . . , Analytical Chemistry, pp. 906-910.
Ozegowski et al., IMET 3393, ?-[1-Methyl-5-bis-(Beta-chloroethyl)-amino-benzimidazolyl-(2)]-butyric acid hydrochloride, a new cytostatic agent from the benzimidazole mustard gas series, 110 Zbl Pharm. 1013-1019 (1971).
"Draft Note for Guidance on Excipients, Antioxidants and Antimicrobial Preservatives in the Dossier for Application for Marketing Authorisation of Medicinal Product", EMEA, 2003, pp. 1-10.
American Heart Association, "Living With Heart Failure" (https://www.heart.org/idc/groups/heart-public/@wcm/@hcm/@gwtg/documents/downloadable/ucm_309068.pdf) (2001).
American Society of Hospital Pharmacists. ASHP Technical Assistance Bulletin on Hospital Distribution and Control. Am J. Hosp. Pharm. 1980, 37:1097-103.
Armstrong et al., Separation of Drug Stereoisomers by the Formation of . . . beta-Cyclodextrin Inclusion Complexes, Science, vol. 232, pp. 1132-1135, May 30, 1986.
Baldi et al., Statistical Procedures for Optimizing the Freeze-Drying of a Model Drug in Tert-Butyl Alcohol: Water Mixtures, Eur. J. of Pharm. & Biopharm. 40(3):138-41 (1994).
Bergsagel et al., Effect of cyclophosphamide on Advanced Lung Cancer and the Hematological Toxicity of Large, Intermittent Intravenous Doses, Canad. Med. Ass. J., 98, 532-538 (1968).
Bernard Testa, et al., Hydrolysis in Drug and Prodrug Metabolism, pp. 681-684.
Biewenga et al. "The Pharmacology of the Antioxidant Lipoic Acid," Gen. Pharmac., 1997, 29, 3, 315-331.
Boylan et al., Parenteral Products. Chapter 12 in Banker, et al., Modern Pharmaceutics, Fourth Ed. (2002).
Brigitte C. Scott, et al., Lipoic and Dihydrolipoic Acids . . . , Free Rad. Res., vol. 20, No. 2, pp. 119-133, 1994.
Broadhead, Pharmaceutical Preformulation and Formulation, Chapter 9 in "Parenteral Dosage Forms," (Interpharm) 2001.
Canadian Society of Hospital Pharmacists: Guidelines for Drug-Use Control, 2008.
Center for Drug Evaluation and Research, Andrew Dmytrijuk, FDA Medical Review for the Approval of Bendeka (2015).
*Cephalon, Inc., et al., v. Slayback Pharma Limited Liability Company*—Civil Action No. 1:17-cv-01154: Joint Status Report (Document 164), dated Oct. 19, 2018.
*Cerhalon, Inc, et al. v. Slayback Pharma Limited Liability Company*—Civil Action No. 1:17-cv-01154: Complaint (Document 1), dated Aug. 16, 2017.
*Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.*—Civil Action No. 1:17-cv-01154: Answer to Slayback Pharma Limited Liability Company's Counterclaims (Document 56), dated Mar. 5, 2018.

## US 11,872,214 B2

Page 5

(56)        **References Cited**

OTHER PUBLICATIONS

*Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.*—Civil Action No. 1:17-cv-01154: Joint Claim Construction Chart (Document 94), dated Jul. 24, 2018.
*Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.*—Civil Action No. 1:17-cv-01154: Answer to Apotex Inc. and Apotex Corp.'s Counterclaims (Document 22), dated Dec. 18, 2017.
*Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.*—Civil Action No. 1:17-cv-01154: Answer to Slayback Pharma Limited Liability Company's Counterclaims, dated Oct. 20, 2017.
*Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company*—Civil Action No. 1:17-cv-00154: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint and Counterclaims (Document 11), dated Sep. 29, 2017.
Charles P. Carpenter, et al., A Study of the Polyethylene Glycols as Vehicles . . . , Journal of the American Pharmaceutical Association, vol. XII, No. 1.
Cheson et al., Bendamustine: Rebirth of an Old Drug, J. Clin. Oncol. 27,1492-1501 (2009).
Cheung et al., Safety and Pharmacokinetics of Bendamustine Rapid-Infusion Formulation, J. of Clinical Pharmacology 2017.00(0)1-11.
Chu et al., Common Chemotherapy Regimens in Clinical Practice, Physicians' Cancer Chemotherapy Drug Manual 2009.
Cyclobond(Registered) Handbook, A Guide to Using Cyclodextrin Bonded Phases for Chiral LC Separations, 6th ed., 2002, Advanced Separation Technologies, Inc., pp. 1-58, pp. 42-45.
Derry E. Wilman, Application of 15N Nuclear Magnetic Resonance . . . , J. Med. Chem., vol. 38, pp. 2256-2258, 1995.
E. Santacesaria, et al., Thermal Stability of Nonionic Polyoxyalkylene . . . , Journal of Applied Polymer Science, vol. 42, pp. 2053-2061, 1991.
*Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC*—Civil Action No. 1:18-cv-01459: Answer to Slayback Pharma LLC's Counterclaims (Document 13), dated Oct. 31, 2018.
*Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC*—Civil Action No. 1:18-cv-01459: Complaint (Document 1), dated Sep. 20, 2018.
*Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC*—Civil Action No. 1:18-cv-01459: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses, and Counterclaims (Document 9), dated Oct. 10, 2018.
*Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Answer to Slayback Pharma LLC's Counterclaims (Document 12), dated Jan. 3, 2019.
*Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Complaint (Document 1), dated Dec. 11, 2018.
*Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses, and Counterclaims(Document 11), public version dated Dec. 20, 2018.
*Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Eagle Pharmaceuticals' Opposition to Slayback

Pharma's Motion for Judgment on the Pleadings (Document 23), redacted-public version dated Feb. 12, 2019.
*Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Opening Brief in Support of Slayback Pharma Limited Liability Company's Motion for Judgment on the Pleadings (Document 17), public version dated Jan. 11, 2019.
*Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Reply Brief in Further Support of Slayback Pharma Limited Liability Company's Motion for Judgment on the Pleadings (Document 27), public verison dated Mar. 1, 2019.
*Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc*—Civil Action No. 1:18-cv-01074: Exhibit Index—Includes Confidential Information (Document 21), public version dated Sep. 7, 2018.
*Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc*—Civil Action No. 1:18-cv-01074: Complaint (Document 1), dated Jul. 19, 2018.
*Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc*—Civil Action No. 1:18-cv-01074: Defendant Hospira. Inc's Motion to Dismiss (Document 13), dated Aug. 31, 2018.
*Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc*—Civil Action No. 1:18-cv-01074: Hospira's Reply Brief in Support of its Motion to Dismiss Plaintiffs' Complaint (Document 29), public version dated Nov. 26, 2018.
*Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc*—Civil Action No. 1:18-cv-01074: Hospira. Inc's Brief in Support of its rule 12(b)(6) Motion to Dismiss Plaintiffs' Complain (Document 20), public version dated Sep. 7, 2018.
*Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc*—Civil Action No. 1:18-cv-01074: Plaintiffs' Opposition to Motion to Dismiss (Document 26). redacted-public version dated Nov. 2, 2018.
EC Safety Data Sheet: Ribomustin(Registered) 2007.
Eric Watson, et al., Kinetics of Phosphoramide Mustard . . . , Journal of Pharmaceutical Sciences, vol. 74, No. 12, pp. 1283-1292, 1985.
Eugene C. Corbett, Jr., Intravenous Fluids: It's More Than Just 'Fill 'Er up!', Series #52 Practical Gastroenterology 44-60 (2007).
Excipient—Drug Interactions in Parenteral Formulations', Akers et. al., Journal of Pharmaceutical Sciences, vol. 91, issue 11, pp. 2283-2300, Nov. 2002.
Flamberg et al., Low Temperature Vacuum Drying of Sterile Parenterals From Ethanol, Bulletin of the Parenteral Drug Association, 24(5):209-17 (1970).
Floss et al., Intravenous fluids principles of treatment, Clinical Pharmacist, 3:274-283 (Oct. 2011).
Friedberg et al., Bendamustine in Patients with Rituximab-Refractory Indolent and Transformed Non-Hodgkin's Lymphoma: Results from a Phase II Multicenter, Single-Agent Study, J. Clin. Oncol., 26(2):204-210 (2008).
Fujisawa Deutschland GmbH Ribomustin(Registered) Products and Technical Specifications.
*Cephalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.*, Civil Action No. 1:17-cv-01154: Responsive Expert Report of Juergen Siepmann, Ph.D., 525 pages.
*Cephalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.*, Civil Action No. 1:17-cv-01154: Opinion, dated Apr. 27, 2020, 70 pages.

* cited by examiner

US 11,872,214 B2

1

# FORMULATIONS OF BENDAMUSTINE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 17/412,623, filed Aug. 26, 2021, which is a continuation of application Ser. No. 16/509,920, filed Jul. 12, 2019, now U.S. Pat. No. 11,103,483, which is a continuation of application Ser. No. 16/015,656, filed Jun. 22, 2018, now abandoned, which is a continuation of application Ser. No. 15/432,335, filed Feb. 14, 2017, now U.S. Pat. No. 10,010, 533, issued Jul. 3, 2018, which is a continuation of application Ser. No. 15/013,436, filed Feb. 2, 2016, now U.S. Pat. No. 9,572,797, issued Feb. 21, 2017, which is a continuation of application Ser. No. 14/031,879, filed Sep. 19, 2013, now U.S. Pat. No. 9,265,831, issued Feb. 23, 2016, which is a continuation of application Ser. No. 13/016,473, filed Jan. 28, 2011, now U.S. Pat. No. 8,609,707, issued Dec. 17, 2013, which claims the benefit of U.S. Provisional Patent Application No. 61/299,100, filed Jan. 28, 2010, the contents of each of which are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

Bendamustine free base is represented by the following structural formula (I)



(I)

Bendamustine is used in the treatment of a number of cancers including leukemias, Hodgkins disease and multiple myelomas. Bendamustine is the active ingredient of the commercial product Treanda™, a lyophilized powder for reconstitution.

Bendamustine exhibits rapid degradation upon reconstitution of the lyophilized product. Bendamustine undergoes hydrolysis by direct substitution rather than an addition elimination process due to the presence of the highly labile aliphatic chlorine atoms. Some of the main degradants of bendamustine are the monohydroxy compound known as HP1 (hydrolysis product 1) and dihydroxy compound HP2 (hydrolysis product 2). The monohydroxy compound appears as the main impurity at Relative Retention Time (RRT) 0.6 and the dihydroxy compound appears as the main impurity at RRT 0.27. Minor peaks appear at RRT 1.2, which are presently unknown.

The stability of bendamustine in water is measured in hours, and is therefore, not suitable for long-term storage in liquid form. The lyophile possesses good chemical stability. However, reconstitution of the lyophile is clinically inconvenient, taking 15-30 mins with implications of chemical instability. There is a need for ready to use (RTU) bendamustine formulations having enhanced stability.

2

## SUMMARY OF THE INVENTION

In other aspects of the invention, the bendamustine-containing compositions include a) a pharmaceutically acceptable fluid which contains one or more of propylene glycol, ethanol, polyethylene glycol, benzyl alcohol and glycofurol, and b) a stabilizing amount of a chloride salt. In other aspects of the invention, the bendamustine-containing compositions include DMSO (dimethyl sulfoxide) as part of the pharmaceutically acceptable fluid included therein. Regardless of the pharmaceutically acceptable fluid included, the amount of bendamustine included in the composition is preferably from about 20 mg/mL to about 60 mg/mL. Still further aspects of the invention include methods of treatment using bendamustine-containing compositions and kits containing the same.

One of the advantages of the inventive liquid compositions is that they have substantially improved long term stability when compared to currently available formulations. For example, the inventive bendamustine compositions are substantially free of impurities after at least about 15 months at a temperature of from about 5° C. to about 25° C. The inventive formulations are advantageously ready to use or ready for further dilution. Reconstitution of lyophilized powders is not required.

## DETAILED DESCRIPTION OF THE INVENTION

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art to which this invention belongs. In the event that there is a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

As used herein, RRT is calculated by dividing the retention time of the peak of interest by the retention time of the main peak. Any peak with an RRT<1 elutes before the main peak, and any peak with an RRT>1 elutes after the main peak.

For purposes of the present invention, "substantially free of impurities" shall be understood to include bendamustine-containing compositions in which the amount of total impurities is less than about 5%, as calculated on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after a period of about 15 months at a temperature of from about 5° C. to about 25° C. The amount of impurities is further calculated as being based upon the original amount bendamustine (or salt thereof) being present in the composition or formulation.

For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.

Preferably, the amount of any individual degradant in the inventive compositions does not exceed 2% PAR as determined by HPLC at a wavelength of 223 nm after storage periods of at least about 15 months at a temperature of from about 5° C. to about 25° C. In some aspects, the amount of time the inventive compositions demonstrate long term storage stability is at least about 18 months and preferably at least about 2 years when stored under the conditions described herein.

US 11,872,214 B2

3

In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions including:

a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including
   i) PEG, PG or mixtures thereof; and
   ii) a stabilizing amount of an antioxidant.

The total impurities in the inventive compositions resulting from the degradation of the bendamustine in the compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of from about 5° C. to about 25° C., and thus have long term stability for at least the same period of time or longer. Preferably, the bendamustine-containing compositions demonstrate long term storage stability for at least about 2 years, especially when stored at the lower (refrigerated) temperatures. In one embodiment, the amount of total impurities in the inventive compositions resulting from the degradation of the bendamustine is less than about 3% PAR as determined by HPLC at a wavelength of 223 nm after at least about 2 years at a temperature of from about 5° C. to about 25° C.

In some aspects of the invention, the bendamustine concentration in the inventive compositions is from about 10 mg/mL to about 100 mg/mL, preferably 20 mg/mL to about 60 mg/mL. Preferably the bendamustine concentration in the inventive compositions is from about 25 mg/mL to about 50 mg/mL, and more preferably from about 30 mg/mL to about 50 mg/mL. It will be understood that compositions containing any useful concentration within the ranges, i.e. 10, 20, 25, 30, 35, 40, 45, 50, 55, 60 . . . 100 are contemplated. In other embodiments, the bendamustine concentration in the composition is about 50 mg/mL. In alternative aspects, the amount of bendamustine is outside these ranges but the amounts will be sufficient for single or multiple administrations of dosages generally regarded as effective amounts.

In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof. Within this aspect, the pharmaceutically acceptable fluid is propylene glycol (PG) or polyethylene glycol (PEG). In other embodiments of the invention however, the pharmaceutically acceptable fluid is a mixture of PEG and PG. For example, the pharmaceutically acceptable fluid can include about 50% PEG and about 50% PG. Alternatively, pharmaceutically acceptable fluid includes about 95% PEG and about 5% PG. The amount of PEG and PG can also be varied within the ranges, i.e. the ratio of PEG:PG in the pharmaceutically acceptable fluid can range from about 95:5 to about 50:50. Within this range, is a pharmaceutically acceptable fluid containing about 75% PEG and about 25% PG, and preferably 80% PEG and 20% PG. In another embodiment, a pharmaceutically acceptable fluid can include about 85% PEG and about 15% PG while another preferred pharmaceutically acceptable fluid includes about 90% PEG and about 10% PG. The molecular weight of the PEG will be within the range of pharmaceutically acceptable weights although PEG 400 is preferred in many aspects of the invention.

Without meaning to be bound by any theory or hypothesis, the hydroxide of the polyethylene glycol molecule is less reactive than the hydroxides of propylene glycol. As a result, the ester forms at a slower rate in polyethylene glycol than propylene glycol and the resulting bendamustine degradants are unexpectedly and substantially reduced over

4

extended periods of time when PEG is a substantial part of the pharmaceutically acceptable fluid.

The bendamustine-containing compositions according to several preferred aspects of the invention include a stabilizing amount of an antioxidant. For purposes of the present invention, "stabilizing amount" shall be understood to include those amounts which increase or enhance the stability of the bendamustine in the compositions described herein. The presence of one or more antioxidants described herein thus contributes, at least in part to the long term stability of the composition. Within this guideline, suitable antioxidant concentrations in the compositions can range from about 2.5 mg/mL to about 35 mg/mL, and preferably from about 5 mg/mL to about 20 mg/mL or from about 10 mg/mL to about 15 mg/mL. In some other embodiments, the concentration of the antioxidant in the bendamustine-containing composition is about 5 mg/mL.

Suitable antioxidants for inclusion include those which are pharmaceutically acceptable for use in human and veterinary formulations although not limited to those currently regarded as safe by any regulatory authority. For example, the antioxidant can be selected from among lipoic acid, thioglycerol (also known as monothioglycerol) and analogs thereof, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds, dihydrolipoic acid and mixtures of the foregoing. Preferably, the antioxidant is thioglycerol, lipoic acid or a mixture thereof. Some particularly preferred embodiments of the invention include thioglycerol.

In view of the foregoing, some preferred long term storage stable bendamustine-containing compositions in accordance with the invention compositions include:

I. a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including
   i) polyethylene glycol and propylene glycol; and
   ii) a stabilizing amount of thioglycerol; or

II. a) about 50 mg/mL bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including
   i) about 90% PEG and about 10% PG; and
   ii) about 2.5 mg/mL thioglycerol.

Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total impurities, PAR as determined by HPLC at a wavelength of 223 nm. after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

In accordance with other aspects of the invention, there are provided long term storage stable bendamustine-containing compositions, including:

a) bendamustine or a pharmaceutically acceptable salt thereof;

b) a pharmaceutically acceptable fluid including one or more of the following: PG, ethanol, PEG, benzyl alcohol and glycofurol; and

c) a stabilizing amount of a chloride salt.

These compositions also have the low levels of impurities and long term stability mentioned herein. Preferred pharmaceutically acceptable fluids include PG, PEG or ethanol in this embodiment of the invention. Preferably, the PEG is PEG 400. If desired, glycerin and/or 88% (w/w) lactic acid can be added to the pharmaceutically acceptable fluid.

Suitable chloride salts include but are not limited to organic chloride salts, sodium chloride, choline chloride, hydrochloride salts of amino acids and mixtures thereof. Thus, as will be appreciated by those of ordinary skill, one

EAGLEBEN-SA_00002122

US 11,872,214 B2

5

can select from among a number of suitable chloride salts and it is Applicants' intention that the scope of the invention includes all such chloride salts that are capable of being included in bendamustine-containing formulations for extended periods without having a deleterious effect on the drug. In one embodiment of the invention, the chloride salt concentration is from about 10 to about 300 mg/mL. In another embodiment, the chloride salt concentration is from about 50 to about 215 mg/mL. In one preferred embodiment, the chloride salt concentration is about 215 mg/mL.

In accordance with another aspect of the invention, there is provided long term storage stable bendamustine-containing compositions, including:

   a) bendamustine or a pharmaceutically acceptable salt thereof; and

   b) a pharmaceutically acceptable fluid including DMSO.

These compositions also have the low levels of impurities and long term stability mentioned herein. In some aspects, the bendamustine concentration in these compositions is from about 10 mg/mL to about 100 mg/mL. Preferably, the bendamustine concentration is from about 20 mg/mL to about 50 mg/mL, more preferably from about 25 mg/mL to about 50 mg/mL. In an alternative embodiment, the bendamustine concentration is about 50 mg/mL.

Another embodiment of the invention provides methods of treating cancer in mammals. The methods include administering to a mammal in need thereof an effective amount of one of the bendamustine-containing compositions described herein. Since the active ingredient portion of the inventive composition is an FDA-approved drug, those of ordinary skill will recognize that the doses of bendamustine employed in this aspect of the invention will be similar to those employed in any treatment regimens designed for bendamustine as marketed under the trade name TRE-ANDA. The patient package insert containing dosing information is incorporated herein by reference. The methods of treatment also include administering the inventive formulations for any purpose or physical condition for which bendamustine has been indicated as being useful.

Another embodiment of the invention includes methods of preparing bendamustine-containing compositions described herein. The methods include reconstituting lyophilized bendamustine in a pharmaceutically acceptable fluid containing one of the following:

   A) i) PEG, PG or mixtures thereof; and

      ii) a stabilizing amount of an antioxidant;

   B) i) one or more of PG, ethanol, PEG, benzyl alcohol and glycofurol; and

      ii) a stabilizing amount of a chloride salt; or

   C) DMSO.

The steps are carried out under pharmaceutically acceptable conditions for sterility and manufacturing.

In a further aspect of the invention, there are provided methods of controlling or preventing the formation of impurities in bendamustine-containing compositions during long term storage. The methods include combining an amount of bendamustine or a pharmaceutically acceptable salt thereof with a sufficient amount of a pharmaceutically acceptable fluid containing one of the following:

   A) i) PEG, PG or mixtures thereof; and

      ii) a stabilizing amount of an antioxidant;

   B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol;

      ii) a stabilizing amount of a chloride salt; or

   C) DMSO.

Further optional steps in accordance therewith include transferring one or more pharmaceutically acceptable doses

6

of the formulations into a suitable sealable container and storing the sealed container at a temperature of from about 5° C. to about 25° C. As a result of carrying out these steps, it is possible to control or substantially prevent the formation of impurities which otherwise occur with bendamustine-containing compositions during long term storage so that the artisan is provided with bendamustine-containing formulations having less than about 5% total impurities PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

The compositions of the present invention can be packaged in any suitable sterile vial or container fit for the sterile storage of a pharmaceutical such as bendamustine. Suitable containers can be glass vials, polypropylene or polyethylene vials or other special purpose containers and be of a size sufficient to hold one or more doses of bendamustine.

A further aspect of the invention includes kits containing lyophilized bendamustine or a pharmaceutically acceptable salt thereof in a first container or vial; and, in a second container, a sufficient amount of a pharmaceutically acceptable fluid such as those described herein, i.e. one of the following:

   A) i) PEG, PG or mixtures thereof; and

      ii) a stabilizing amount of an antioxidant;

   B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and

      ii) a stabilizing amount of a chloride salt; or

   C) DMSO.

For purposes of this embodiment, the amount of fluid which is sufficient is an amount which allows the bendamustine to be dissolved or dispersed to a degree which renders the liquid composition ready for use.

As will be appreciated by those of ordinary skill, the kit will contain other pharmaceutically necessary materials for storing and/or administering the drug, including instructions for storage and use, additional diluents, if desired, etc.

EXAMPLES

The following examples serve to provide further appreciation of the invention but are not meant in any way to restrict the effective scope of the invention.

Example 1

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10 mg/ml in one of ethanol, propylene glycol and benzyl alcohol as indicated in Table 1 below. 215 mg/ml of choline chloride was added in half of the samples as a source of soluble chloride ions. The samples were maintained at 40° C. and analyzed periodically for drug content and total impurities. The results obtained are presented in Table 1.

TABLE 1

| | | | | |
|---|---|---|---|---|
| Stability of Bendamustine HCl | | | | |
| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
| BDM - 10 mg/mL Choline chloride - 215 mg/mL | | Initial | 10.43 | 0.27 |
| | 40° C. | 48 hrs | 10.48 | 1.27 |
| | | 7 day | 10.26 | 2.11 |
| BDM - 10 mg/mL Ethanol qs to 1 mL | | Initial | 10.55 | 0.27 |
| | 40° C. | 48 hrs | 10.30 | 2.39 |
| | | 7 day | 9.55 | 6.66 |

US 11,872,214 B2

7

TABLE 1-continued

Stability of Bendamustine HCl

| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
|---|---|---|---|---|
| BDM - 10 mg/mL | | Initial | 9.99 | 0.21 |
| Choline chloride - 215 mg/mL | 40° C. | 48 hrs | 9.95 | 0.60 |
| Propylene glycol qs to 1 mL | | 7 day | 9.43 | 2.31 |
| BDM - 10 mg/mL | | Initial | 9.68 | 0.21 |
| Propylene glycol qs to 1 mL | 40° C. | 48 hrs | 9.45 | 0.88 |
| | | 7 day | 9.00 | 3.44 |
| BDM - 10 mg/mL | | Initial | 9.95 | 1.19 |
| Choline Chloride - 215 mg/mL | 40° C. | 48 hrs | 9.89 | 3.51 |
| Benzyl alcohol qs to 1 mL | | 7 day | 8.97 | 4.24 |
| BDM - 10 mg/mL | | Initial | 9.52 | 0.33 |
| Benzyl alcohol qs to 1 mL | 40° C. | 48 hrs | 8.67 | 4.18 |
| | | 7 day | 7.49 | 7.84 |

Note:
In Table 1 the total % impurities include total contributions from peaks at various RRTs.

As shown in Table 1, the bendamustine formulations are very stable in solutions containing solvent and chloride salt. Table 1 shows that bendamustine, when dissolved in a concentration of about 10 mg/mL., in a pharmaceutically acceptable fluid, such as ethanol and propylene glycol, and containing a stabilizing amount of a chloride salt, such as choline chloride, had less than about 5% after at least 7 days storage at 40° C.

The data presented in Table 1 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of a chloride salt having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including ethanol alone exhibited more than 6.5 total degradants after 7 days storage at 40° C. The sample including benzyl alcohol alone exhibited more than 7.5% total degradants after 7 days storage at 40° C. Bendamustine-containing compositions with such high levels of degradation would not be suitable for long-term storage.

Example 2

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10 mg/ml in DMSO. The samples were maintained at 40° C. and analyzed periodically for drug content and impurity profile. The results obtained are presented in Table 2.

TABLE 2

Stability of Bendamustine HCl in DMSO

| Formulation | Temp | Time | Content (mg/mL.) | % Total Imp |
|---|---|---|---|---|
| BDM - 10 mg/mL | | Initial | 10.2 | 0.23 |
| DMSO qs to 1 mL | 40° C. | 48 hrs | 9.80 | 0.30 |
| | | 1 week | 10.0 | 0.56 |

Note:
In Table 2 the total % impurities include total contributions from peaks at various RRTs

8

Table 2 shows that bendamustine, when dissolved in DMSO, had substantially no increase in total degradants. The data presented in Table 2 translates to bendamustine-containing compositions including DMSO having a shelf life of at least about 15 months at 5° C. and 25° C. In fact, such compositions are expected to have long term stability for periods beyond 15 months, i.e. up to 2 years or greater.

Example 3

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 20 mg/ml in polyethylene glycol 400 and 5 mg/ml of lipoic acid was added as a stabilizing antioxidant as indicated in Table 3 below. The samples were maintained at 40° C. or 25° C. and analyzed after 15 days for drug content and impurities. The results obtained are presented in Table 3.

TABLE 3

Stability of Bendamustine (20 mg/ml) in PEG 400 and Antioxidants

| Antioxidant | T ° C. | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid | 25 | 15 | 98.5 | <LD | 0.23 |
| 5 mg/ml | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

As shown in Table 3, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as polyethylene glycol, in the presence of a stabilizing amount of an anti-oxidant, such as lipoic acid, had substantially no increase in total degradants after a period of 15 days. The data presented in Table 3 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of an antioxidant having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including PEG alone, on the other hand, which did not contain an antioxidant, did not exhibit stabilizing effects at 40° C. This sample had more than 40% more total impurities than the sample including lipoic acid. Bendamustine-containing compositions with such high levels of total impurities would not be suitable for long-term storage.

Example 4

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 5 mg/ml of thioglycerol, α-lipoic acid or dihydro-lipoic acid was added as a stabilizing antioxidant as indicated in Table 4 below. The samples were maintained at 40° C. and analyzed after 15 days or one month for drug content and impurity profile as indicated in Table 4 below. The results obtained are presented in Table 4.

EAGLEBEN-SA_00002124

US 11,872,214 B2

**9**

### TABLE 4

Stability of Bendamustine (50 mg/mL) in 90% PEG 400, 10% Propylene Glycol and Antioxidant

| Antioxidant | T (° C.) | Time | Content (mg/mL) | % Initial | % Impurities RRT HP1 0.59 | PG ester 1.10 | % Total Imps |
|---|---|---|---|---|---|---|---|
| Thioglycerol | 40 | initial | 48.8 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 48.5 | 99.4 | 0.06 | 0.20 | 0.71 |
| α-lipoic acid | 40 | initial | 49 | 100 | <LD | <LD | 0 |
| | 40 | 15 days | 48.8 | 99.6 | 0.19 | 0.13 | 0.32 |
| | 40 | 1 month | 48.7 | 99.4 | 0.34 | 0.26 | 0.79 |

### TABLE 4-continued

Stability of Bendamustine (50 mg/mL) in 90% PEG 400, 10% Propylene Glycol and Antioxidant

| Antioxidant | T (° C.) | Time | Content (mg/mL) | % Initial | % Impurities RRT HP1 0.59 | PG ester 1.10 | % Total Imps |
|---|---|---|---|---|---|---|---|
| Dihydrolipoic acid | 40 | initial | 49.3 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 47.7 | 97.4 | 0.63 | 0.12 | 1.84 |

<LD = Below Level of Detection

As shown in Table 4, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as a combination of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of an antioxidant, such as thioglycerol, α-lipoic acid or dihydrolipoic acid, had substantially no increase in total degradants after a period of 1 month. This data supports the position that bendamustine-containing

**10**

compositions according to the invention have a shelf life of at least about 2 years when stored at temperatures between 5° C. and 25° C.

### Example 5

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in a mixture of polyethylene glycol 400 and propylene glycol as indicated in Table 5 below. 5 mg/ml of lipoic acid was added as a stabilizing antioxidant. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed after 1 week, 15 days or one month for drug content and impurity profile as indicated in Table 5 below. The results obtained are presented in Table 5.

### TABLE 5

Stability of Bendamustine (50 mg/ml) and Lipoic Acid (5 mg/ml) in PEG400 and Propylene glycol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Area of degradants HP1 0.58 | PG ester 1.10 | PG ester 1.13 | % Total Imp. |
|---|---|---|---|---|---|---|---|---|
| BDM— | | Initial | 49.6 | 100 | BDL | BDL | BDL | 0.18 |
| 50 mg/mL | 40° C. | 1 W | 49.0 | 98.8 | 0.05 | 0.13 | BDL | 0.38 |
| Lipoic acid— | | 15 d | 48.3 | 97.4 | 0.08 | 0.26 | BDL | 0.55 |
| 5 mg/mL | | 1 M | 48.0 | 96.8 | 0.11 | 0.43 | 0.13 | 1.03 |
| PEG | 25° C. | 15 d | 49.6 | 100.0 | BDL | 0.10 | BDL | 0.30 |
| 400:PG | | 1 M | 48.4 | 97.6 | 0.05 | 0.19 | BDL | 0.43 |
| (75:25) qs | 5° C. | 1 M | 49.6 | 100.0 | BDL | 0.07 | BDL | 0.27 |
| to 1 mL | | | | | | | | |
| BDM— | | Initial | 50.2 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/mL | 40° C. | 1 W | 49.9 | 99.4 | BDL | 0.15 | BDL | 0.30 |
| Lipoic acid— | | 15 d | 49.1 | 97.8 | 0.06 | 0.35 | BDL | 0.73 |
| 5 mg/mL | | 1 M | 49.0 | 97.6 | 0.09 | 0.90 | 0.25 | 1.82 |
| PEG | 25° C. | 15 d | 49.9 | 99.4 | BDL | 0.12 | BDL | 0.32 |
| 400:PG | | 1 M | 49.7 | 99.0 | BDL | 0.25 | BDL | 0.59 |
| (50:50) qs | 5° C. | 1 M | 50.0 | 99.6 | BDL | 0.11 | BDL | 0.33 |
| to 1 mL | | | | | | | | |
| BDM— | | Initial | 50.8 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/mL | 40° C. | 1 W | 50.4 | 99.2 | BDL | 0.11 | BDL | 0.30 |
| Lipoic acid— | | 15 d | 49.7 | 97.8 | 0.07 | 0.17 | BDL | 0.43 |
| 5 mg/mL | | 1 M | 49.7 | 97.8 | 0.13 | 0.27 | 0.09 | 0.84 |
| PEG | 25° C. | 15 d | 50.8 | 100.0 | BDL | 0.10 | BDL | 0.26 |
| 400:PG | | 1 M | 50.8 | 100.0 | 0.05 | 0.14 | BDL | 0.39 |
| (90:10) qs | 5° C. | 1 M | 50.8 | 100.0 | BDL | 0.06 | BDL | 0.34 |
| to 1 mL | | | | | | | | |

BDL = Below Detectable Limit

As shown in Table 5, bendamustine, when dissolved in certain mixtures of polyethylene glycol and propylene glycol and a stabilizing amount of lipoic acid, had substantially no increase in total degradants after a period of 1 month. The data presented in Table 5 translates to bendamustine-containing compositions having a shelf life of at least about 2 years when stored at temperatures between 5° C. and at 25° C.

### Example 6

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol and α-lipoic acid was added as a stabilizing antioxidant as indicated in Table 6 below. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed for drug content and impurity profile as indicated in Table 6 below. The results obtained are presented in Table 6.

US 11,872,214 B2

11  12

TABLE 6

Stability of Bendamustine in 90% PEG 400, 10% PG and α-lipoic acid

| Formulation | Temp | Time Per. | Amt. mg/mL | % of Initial | 0.59 | 1.10 | 1.13 | 1.15 | 1.17 | 1.20 | 1.22 | 1.30 | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | % Area of degradants | | | | | |
| BDM— | Initial | | 51.0 | 100 | 0.20 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.26 |
| 50 mg/mL | 40° C. | 1 M | 50.5 | 99.0 | 0.21 | 0.31 | 0.13 | 0.07 | 0.13 | 0.10 | <LD | | 0.95 |
| α-lipoic | | 2 M | 49.7 | 97.5 | 0.22 | 0.71 | 0.28 | 0.14 | 0.12 | 0.21 | 0.12 | <LD | 2.02 |
| acid— | | 3 M | 48.7 | 95.5 | 0.22 | 1.01 | 0.45 | 0.21 | 0.14 | 0.37 | 0.16 | 0.05 | 2.96 |
| 10 mg/mL | 25° C. | 3 M | 50.5 | 99.0 | 0.20 | 0.36 | 0.07 | <LD | <LD | 0.10 | <LD | <LD | 0.73 |
| PEG | | 6 M | 50.4 | 98.8 | 0.22 | 0.60 | 0.17 | 0.06 | 0.06 | 0.09 | 0.10 | 0.08 | 1.44 |
| 400:PG | 5° C. | 6 M | 50.9 | 99.8 | 0.16 | 0.05 | <LD | <LD | <LD | <LD | <LD | <LD | 0.21 |
| (90:10) qs | | 12 M | 50.6 | 99.2 | 0.20 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | 0.38 |
| to 1 mL | | | | | | | | | | | | | |
| BDM— | Initial | | 50.3 | 100 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | <LD | 0.18 |
| 50 mg/mL | 40° C. | 1 M | 50.0 | 99.4 | 0.19 | 0.32 | 0.08 | 0.06 | 0.08 | 0.06 | 0.06 | <LD | 0.85 |
| α-lipoic | | 2 M | 49.8 | 99.0 | 0.19 | 0.65 | 0.21 | 0.12 | 0.13 | 0.23 | 0.14 | 0.06 | 1.85 |
| acid— | | 3 M | 49.5 | 98.4 | 0.15 | 0.89 | 0.37 | 0.17 | 0.13 | 0.32 | 0.10 | <LD | 2.40 |
| 15 mg/mL | | 6 M | 47.0 | 93.4 | 0.20 | 1.76 | 0.66 | 0.19 | 0.31 | 0.47 | 0.33 | 0.17 | 4.93 |
| PEG | 25° C. | 3 M | 50.0 | 99.4 | 0.20 | 0.35 | 0.08 | <LD | <LD | 0.11 | <LD | <LD | 0.79 |
| 400:PG | | 6 M | 49.5 | 98.4 | 0.19 | 0.58 | 0.15 | 0.06 | 0.07 | 0.09 | 0.08 | 0.10 | 1.38 |
| (90:10) qs | 5° C. | 6 M | 50.3 | 100 | 0.17 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.23 |
| to 1 mL | | 12 M | 50.2 | 99.8 | 0.19 | 0.15 | <LD | <LD | <LD | <LD | <LD | <LD | 0.34 |

<LD = Below Level of Detection

The data reported in Table 6 along with the data in Table 5 demonstrates that bendamustine solutions are stable when dissolved in mixtures of PEG and PG and 5-15 mg/mL α-lipoic acid. As shown in Table 6, bendamustine, when dissolved in combinations of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of lipoic acid, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6-12 months at 5° C. and 25° C. The data corresponds to bendamustine solutions being stable under ambient or refrigerated storage conditions for well in excess of 2 years, and thus long term stable.

Example 7

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 2.5 mg/ml of thioglycerol was added as an antioxidizing agent. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table 7 below. The results obtained are presented in Table 7.

TABLE 7

Stability of Bendamustine in 90% PEG 400, 10% PG and Thioglycerol

| Formulation | Temp | Time Per. | Amt mg/ml | % of Initial | 0.15 | 0.37 | 1.10 | 1.13 | 1.15 | 1.17 | 1.18 | 1.20 | 1.22 | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | RRTs of degradants | | | | | |
| BDM— | Initial | | 50.3 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| 50 mg/mL | 40° C. | 15 d | 50.2 | 99.8 | BDL | BDL | 0.18 | BDL | BDL | BDL | 0.05 | 0.08 | BDL | 0.31 |
| Thio | | 1 M | 49.9 | 99.2 | BDL | 0.12 | 0.32 | 0.07 | BDL | BDL | 0.09 | 0.08 | BDL | 0.75 |
| glycerol— | | 2 M | 49.1 | 97.6 | BDL | 0.18 | 0.56 | 0.24 | 0.09 | 0.17 | 0.19 | 0.12 | 0.11 | 1.76 |
| 2.5 mg/mL | | 3 M | 48.8 | 97.0 | BDL | 0.23 | 0.85 | 0.34 | 0.16 | 0.30 | 0.34 | 0.29 | 0.19 | 2.94 |
| PEG | 25° C. | 3 M | 49.9 | 99.2 | 0.06 | 0.12 | 0.23 | 0.07 | BDL | 0.06 | 0.07 | 0.06 | BDL | 0.67 |
| 400:PG | | 6 M | 49.3 | 98.0 | BDL | 0.23 | 0.53 | 0.22 | 0.11 | BDL | 0.21 | 0.22 | 0.20 | 2.07 |
| (90:10) qs | | | | | | | | | | | | | | |
| to 1 mL | | | | | | | | | | | | | | |

BDL = Below Detectable Limit

US 11,872,214 B2

13

The stability is similar to that of α-lipoic acid samples in Example 6 above. As shown in Table 7, bendamustine, when dissolved in a combination of polyethylene glycol and propylene glycol, and a stabilizing amount of thioglycerol, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6 months at 25° C. The data reported supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for about 2 years.

Example 8

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 85% PEG 400 and 15% PG in the presence of 5 mg/ml of thioglycerol. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table 8 below. The results obtained are presented in Table 8.

TABLE 8

Stability of Bendamustine in 85% PEG 400, 15% PG and Thioglycerol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Total Imp. |
|---|---|---|---|---|---|
| BDM - 50 mg/mL | Initial | | 51.5 | 100 | 0.12 |
| Thioglycerol - 5 mg/mL | 40° C. | 1 M | 50.4 | 97.9 | 1.18 |
| PEG 400:PG (85:15) qs | 25° C. | 1 M | 51.4 | 99.8 | 0.41 |
| to 1 mL | | 3 M | 50.4 | 97.9 | 1.21 |
| | 5° C. | 3 M | 51.0 | 99.0 | 0.26 |

The stability is similar to that of thioglycerol samples in Example 7 above. As reported in Table 8, total impurities did not exceed 2% at 40° C. or 25° C. storage over one month, or at 25° C. and 5° C. storage after three months. The data reported in Table 8 supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for at least about 2 years if not longer.

14

We claim:

1. A sterile vial containing a liquid bendamustine-containing composition comprising
   about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 25 mg/mL;
   a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
   a stabilizing amount of an antioxidant,
   wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

2. The sterile vial of claim 1, wherein the antioxidant is monothioglycerol.

3. The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

4. The composition of claim 1, wherein the composition is stable for at least about 15 months at 5° C. or for at least about 15 months at 25° C.

5. The sterile vial of claim 1, wherein the liquid bendamustine-containing composition further comprises ethanol.

6. A liquid bendamustine-containing composition comprising
   100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid;
   wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
   wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 25 mg/mL,
   wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

7. The composition of claim 6, wherein the antioxidant is monothioglycerol.

8. The composition of claim 6, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

9. The composition of claim 6, further comprising ethanol.

* * * * *

# EXHIBIT 3

US012138248B2

(12) **United States Patent**
Palepu et al.

(10) Patent No.: **US 12,138,248 B2**
(45) Date of Patent: ***Nov. 12, 2024**

(54) **FORMULATIONS OF BENDAMUSTINE**

(71) Applicant: **Eagle Pharmaceuticals, Inc.**, Woodcliff Lake, NJ (US)

(72) Inventors: **Nagesh R. Palepu**, Southampton, PA (US); **Philip Christopher Buxton**, Uxbridge (GB)

(73) Assignee: **Eagle Pharmaceuticals, Inc.**, Woodcliff Lake, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **18/646,171**

(22) Filed: **Apr. 25, 2024**

(65) **Prior Publication Data**
US 2024/0293372 A1 Sep. 5, 2024

**Related U.S. Application Data**

(63) Continuation of application No. 18/498,259, filed on Oct. 31, 2023, which is a continuation of application No. 17/412,623, filed on Aug. 26, 2021, now abandoned, which is a continuation of application No. 16/509,920, filed on Jul. 12, 2019, now Pat. No. 11,103,483, which is a continuation of application No. 16/015,656, filed on Jun. 22, 2018, now abandoned, which is a continuation of application No. 15/432,335, filed on Feb. 14, 2017, now Pat. No. 10,010,533, which is a continuation of application No. 15/013,436, filed on Feb. 2, 2016, now Pat. No. 9,572,797, which is a continuation of application No. 14/031,879, filed on Sep. 19, 2013, now Pat. No. 9,265,831, which is a continuation of application No. 13/016,473, filed on Jan. 28, 2011, now Pat. No. 8,609,707.

(60) Provisional application No. 61/299,100, filed on Jan. 28, 2010.

(51) **Int. Cl.**

| | |
|---|---|
| *A61K 9/08* | (2006.01) |
| *A61K 31/41* | (2006.01) |
| *A61K 31/4184* | (2006.01) |
| *A61K 47/10* | (2017.01) |
| *A61K 47/12* | (2006.01) |
| *A61K 47/18* | (2017.01) |
| *A61K 47/20* | (2006.01) |
| *A61K 47/22* | (2006.01) |
| *A61K 9/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ............ *A61K 31/4184* (2013.01); *A61K 9/08* (2013.01); *A61K 47/10* (2013.01); *A61K 47/12* (2013.01); *A61K 47/18* (2013.01); *A61K 47/20* (2013.01); *A61K 47/22* (2013.01); *A61K 9/0019* (2013.01)

(58) **Field of Classification Search**
CPC ...... A61K 31/4184; A61K 9/08; A61K 47/10; A61K 47/12; A61K 47/18; A61K 47/20; A61K 47/22; A61K 9/0019
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,071,620 A | 1/1978 | Sklar | |
| 4,711,906 A | 12/1987 | Von et al. | |
| 4,879,286 A | 11/1989 | Alam et al. | |
| 5,204,335 A | 4/1993 | Sauerbier et al. | |
| 5,223,515 A | 6/1993 | Mikura et al. | |
| 5,741,523 A | 4/1998 | Teagarden et al. | |
| 6,686,365 B2 * | 2/2004 | Riebesehl .............. | A61K 45/06 |
| | | | 514/262.1 |
| 7,252,799 B2 | 8/2007 | Miekka et al. | |
| 7,772,274 B1 | 8/2010 | Palepu | |
| 8,076,366 B2 | 12/2011 | Courvoisier et al. | |
| 8,344,006 B2 | 1/2013 | Drager et al. | |
| 8,389,558 B2 | 3/2013 | Alakhov et al. | |
| 8,609,707 B2 | 12/2013 | Palepu et al. | |
| 8,791,270 B2 | 7/2014 | Brittain et al. | |
| 9,000,021 B2 | 4/2015 | Sundaram et al. | |
| 9,034,908 B2 | 5/2015 | Sundaram | |
| 9,144,568 B1 | 9/2015 | Sundaram | |
| 9,265,831 B2 | 2/2016 | Palepu et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2787568 A1 | 8/2011 |
| CA | 2867295 A1 | 9/2013 |

(Continued)

OTHER PUBLICATIONS

Scifinder, Hydrolytic degradation of IMET 3393, American Chemical Society, 2018.

(Continued)

*Primary Examiner* — Ernst V Arnold

(74) *Attorney, Agent, or Firm* — BakerHostetler

(57) **ABSTRACT**

Long term storage stable bendamustine-containing compositions are disclosed. The compositions can include bendamustine or a pharmaceutically acceptable salt thereof, and a pharmaceutically acceptable fluid which can include in some embodiments PEG, PG or mixtures thereof and an antioxidant or chloride ion source. The bendamustine-containing compositions have less than about 5% total impurities, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

**22 Claims, No Drawings**

US 12,138,248 B2

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,572,796 | B2 | 2/2017 | Palepu et al. |
| 9,572,797 | B2 | 2/2017 | Palepu et al. |
| 9,572,887 | B2 | 2/2017 | Sundaram |
| 9,572,888 | B2 | 2/2017 | Sundaram |
| 9,579,384 | B2 | 2/2017 | Sundaram et al. |
| 9,597,397 | B2 | 3/2017 | Sundaram |
| 9,597,398 | B2 | 3/2017 | Sundaram |
| 9,597,399 | B2 | 3/2017 | Sundaram |
| 10,010,533 | B2 | 7/2018 | Palepu et al. |
| 10,052,385 | B2 | 8/2018 | Sundaram |
| 11,103,483 | B2 | 8/2021 | Palepu et al. |
| 11,707,450 | B1 | 7/2023 | Chinnari et al. |
| 2002/0102215 | A1 | 8/2002 | Klaveness et al. |
| 2002/0122768 | A1 | 9/2002 | Liu et al. |
| 2004/0014964 | A1 | 1/2004 | Cheesman et al. |
| 2004/0043069 | A1 | 3/2004 | Vanderbist et al. |
| 2004/0167152 | A1 | 8/2004 | Rubino et al. |
| 2005/0025702 | A1 | 2/2005 | Decicco et al. |
| 2005/0042285 | A1 | 2/2005 | Ukai et al. |
| 2006/0001597 | A1 | 1/2006 | Han |
| 2006/0035945 | A1 | 2/2006 | Attardo et al. |
| 2006/0128777 | A1 | 6/2006 | Bendall et al. |
| 2006/0159713 | A1 | 7/2006 | Brittain et al. |
| 2006/0205694 | A1 | 9/2006 | Alonso et al. |
| 2007/0116729 | A1 | 5/2007 | Palepu |
| 2008/0118544 | A1 | 5/2008 | Wang |
| 2009/0082416 | A1 | 3/2009 | Czarnik |
| 2009/0209606 | A1 | 8/2009 | Bendall et al. |
| 2009/0264488 | A1 | 10/2009 | Cooper et al. |
| 2009/0325978 | A1 | 12/2009 | Onai et al. |
| 2010/0092474 | A1 | 4/2010 | Gallagher et al. |
| 2010/0145266 | A1 | 6/2010 | Orlowski |
| 2010/0216858 | A1 | 8/2010 | Popek et al. |
| 2010/0247669 | A1 | 9/2010 | Eliasof et al. |
| 2010/0273730 | A1 | 10/2010 | Hsu et al. |
| 2011/0015245 | A1 | 1/2011 | Alakhov et al. |
| 2011/0190363 | A1 | 8/2011 | Drager et al. |
| 2012/0059000 | A1 | 3/2012 | Ren et al. |
| 2012/0071532 | A1 | 3/2012 | Cooper et al. |
| 2012/0157505 | A1 | 6/2012 | Labell et al. |
| 2012/0308516 | A1 | 12/2012 | Hlavinka et al. |
| 2013/0041003 | A1 | 2/2013 | Brittain et al. |
| 2013/0041004 | A1 | 2/2013 | Drager et al. |
| 2013/0177572 | A1 | 7/2013 | Chen et al. |
| 2013/0210878 | A1 | 8/2013 | Soppimath et al. |
| 2013/0210879 | A1 | 8/2013 | Palepu et al. |
| 2013/0217888 | A1 | 8/2013 | Shrawat et al. |
| 2013/0288274 | A1 | 10/2013 | Walker et al. |
| 2014/0094496 | A1 | 4/2014 | Sundaram |
| 2014/0275196 | A1 | 9/2014 | Sundaram |
| 2015/0080444 | A1 | 3/2015 | Sundaram et al. |
| 2018/0185488 | A1 | 7/2018 | Sundaram |
| 2018/0296535 | A1 | 10/2018 | Palepu et al. |
| 2018/0296536 | A1 | 10/2018 | Palepu et al. |
| 2018/0369383 | A1 | 12/2018 | Sundaram |
| 2019/0192659 | A1 | 6/2019 | Sundaram |
| 2021/0393594 | A1 | 12/2021 | Palepu et al. |
| 2023/0115164 | A1 | 4/2023 | Palepu et al. |
| 2023/0115693 | A1 | 4/2023 | Palepu et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2867343 A1 | 9/2013 |
| CN | 1850048 A | 10/2006 |
| CN | 101584668 A | 11/2009 |
| CN | 102164579 A | 8/2011 |
| CN | 104302291 A | 1/2015 |
| DE | 80967 A | 1/1970 |
| DE | 152989 A1 | 12/1981 |
| DE | 159289 A1 | 3/1983 |
| EP | 2326306 A1 | 6/2011 |
| EP | 2528602 A1 | 12/2012 |
| EP | 2827862 A1 | 1/2015 |
| EP | 2827863 A1 | 1/2015 |
| JP | 2015-160351 A | 9/2015 |

| | | |
|---|---|---|
| WO | 95/19759 A1 | 7/1995 |
| WO | 99/01118 A2 | 1/1999 |
| WO | 2001/097860 A1 | 12/2001 |
| WO | 2001/097861 A1 | 12/2001 |
| WO | 2001/098294 A1 | 12/2001 |
| WO | 02/02125 A1 | 1/2002 |
| WO | 2006/054315 A1 | 5/2006 |
| WO | 2006/110551 A2 | 10/2006 |
| WO | 2010/036702 A1 | 4/2010 |
| WO | 2010/126676 A1 | 11/2010 |
| WO | 2010/148288 A2 | 12/2010 |
| WO | 2011/094565 A1 | 8/2011 |
| WO | 2011/103150 A2 | 8/2011 |
| WO | 2012/015810 A2 | 2/2012 |
| WO | 2013/142358 A1 | 9/2013 |

OTHER PUBLICATIONS

Seager et al., "Structure of Products Prepared by Freeze-Drying Solutions Containing Organic Solvents", PDA Journal oi Pharmaceutical Science and Technology, 1985, vol. 39, No. 4, pp. 161-179.
Search History issued in connection with PCT/US2013/32295 dated May 10, 2013.
Search History: Limited Classification Search dated May 10, 2013, PCT/US2013/032295.
Seedher et al., "Solubilization of Nimesulide—Use of Co-solvents", Indian J. Pharm. Sci., 2003, vol. 65, No. 1, pp. 58-61.
Shah et al., "Physical, Chemical and Bioavailability Studies of Parenteral Diazepam Formulations Containing Propylene Glycol and Polyethylene Glycol 400", Drug Development and Industrial Pharm., 2008, vol. 17, No. 12,pp. 1635-1654.
Shah et al., Physical, Chemical and Bioavailability Studies of Parenteral Diazepam Formulations Containing 3ropylene Glycol and Polyethylene Glycol 400, Drug Development and Industrial Pharm.), 17:12, 1635-1654 (Oct. 20, 2008).
Sheskey, Handbook of Pharmaceutical Excipients, 7th Edition, Propyl Gallate, 2012.
Sigma-Aldrich, Webpage Catalog for poly(ethylene glycol), http://www.sigmaaldrich.com/catalog/product/aldrich/202398?lang=en@ion-=US#, accessed Nov. 15, 2015, pp. 1-2.
Sikora, "Cancer drug development in the post-genomic age", Current Science, 2001, vol. 81 No. 5 pp. 549-554.
Spectra Analysis, Inc., "Oxidative Degradation of Polyethyleneglycol (PEG) studied by LC-IR", Application Note 016, Mar. 2008.
Spiegel et al. ("Spiegel", J. Pharma. Sci., 1963, 52(10), 917-927).
Spiegel et al., "Use of Nonaqueous Solvents in Parenteral Products," Journal of Pharmaceutical Sciences, 1963, vol. 52, No. 10 pp. 917-927.
Spiegel, et al., "Use of Nonaqueous Solvents in Parenteral Products," J. Pharmac. Sciences, vol. 52, No. 10, pp. 917-927 (1963).
Strickley, "Solubilizing Excipients in Oral and Injectable Formulations", Pharmaceutical Research 2004, vol. 21, No. 2, pp. 201-230.
Supplemental European Search Report issued in connection with PCT/US2011/022958 dated Dec. 16, 2013.
Supplementary European Search Report in related EP 2528602 dated Jan. 2014.
Tageja, "Bendamustine: Safety and Efficacy in the Management of Indolent Non-Hodgkin's Lymphoma", Clinical Medicine Insights: Oncology, 2011, vol. 5, pp. 145-156.
Tageja, Bendamustine: Safety and Efficacy in the Management of Indolent Non-Hodgkins Lymphoma, Clinical Medicine Insights: Oncology 2011:5 145-156.
Teagarden et al., "Practical Aspects of Freeze-Drying of Pharmaceutical and Biological Products Using Non-Aqueous Co-Solvent Systems", Chapter 8 in Freeze-Drying/Lyophilization of Pharmaceutical and Biological Products, 2004, pp. 239-276.
Teagarden et al., "Practical Aspects of Lyophilization Using Non-Aqueous Co-Solvent Systems", Eur. J. Pharma. Sciences, 2002, vol. 15, pp. 115-133.
*Teva Pharmaceuticals International GMBH*, et al. v. *Apotex Inc.*, et al—Civil Action 1:17-cv-01164: Defendants Apotex Inc. and Apotex Corp.'s Answer to Complaint, Defenses and Counterclaims (Document 17), dated Nov. 27, 17.

(56)            **References Cited**

OTHER PUBLICATIONS

*Teva Pharmaceuticals International GMBH*, et al. v. *Fresenius Kabi USA, LLC.*—Civil Action No. 1:17-cv-01201: Answer to Complaint, Separate Defenses, and Counterclaims (Document 10), dated Sep. 15, 2017.
*Teva Pharmaceuticals International GMBH*, et al. v. *Fresenius Kabi USA, LLC.*—Civil Action No. 1:17-cv-01201: Answer to Fresenius Kabi USA, LLC's Counterclaims (Document 14), dated Oct. 6, 2017.
*Teva Pharmaceuticals International GMBH*, et al. v. *Fresenius Kabi USA, LLC.*—Civil Action No. 1:17-cv-01201: Complaint (Document 1), dated Aug. 24, 2017.
*Teva Pharmaceuticals International GMBH*, et al. v. *Fresenius Kabi, LLC.*, et al—Civil Action No. 1:18-cv-01586: Answer to Fresenius Kabi USA, LLC's Counterclaims (Document 13), dated Nov. 27, 2018.
*Teva Pharmaceuticals International GMBH*, et al. v. *Fresenius Kabi, LLC.*, et al—Civil Action No. 1:18-cv-01586: Complaint (Document 1), dated Oct. 15, 2018.
*Teva Pharmaceuticals International GMBH*, et al. v. *Fresenius Kabi, LLC.*, et al—Civil Action No. 1:18-cv-01586: Defendant Mylan Laboratories LTD.'s Answer to Complaint for Patent Infringement (Document 11), dated Nov. 9, 2018.
*Teva Pharmaceuticals International GMBH*, et al. v. *Fresenius Kabi, LLC.*, et al—Civil Action No. 1:18-cv-01586: Defendant Fresenius Kabi USA, LLC's Answer to Complaint, Separate Defenses, and Counterclaims (Document 9), dated Nov. 6, 2018.
*Teva Pharmaceuticals International GMBH*, et al. v. *Mylan Laboratories Limited*—Civil Action No. 1:17-cv-01790: Complaint (Document 1), dated Dec. 12, 2017.
*Teva Pharmaceuticals International GMBH*, et al. v. *Mylan Laboratories Limited*—Civil Action No. 1:17-cv-01790: Defendant Mylan Laboratories Limited's Answer to Complaint for Patent Infringement (Document 12), dated Feb. 14, 2018.
*Teva Pharmaceuticals International GMBH*, et al. v. *Slayback Pharma Limited Liability Company*—Civil Action No. 1:18-cv-00117: Complaint (Document 1), dated Jan. 19, 2018.
*Teva Pharmaceuticals International GMBH*, et al. v. *Slayback Pharma Limited Liability Company*—Civil Action No. 1:18-cv-00117: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Addtional Defenses and Counterclaims (Document 9), dated Feb. 12, 2018.
*Teva Pharmaceuticals International GMBH*, et al. v. *Apotex Inc.*, etal—Civil Action No. 1:17-cv-01164: Complaint (Document 1), dated Aug. 18, 2017.
Thiesen, "Bendamustine, a well-tollerated cytotoxic agent used in Germany for may years, is soon to be marketed in the rest of Europe for a range of indicatons including chronic lymphocytic leukaemia," 2010, pp. 1-4. Available at http://www.hospitalpharmacyeurope.com/featured-articles/bendamustine.
Third Party Observation in related EP2528602 based on PCT/US2011/022958 dated Mar. 21, 2016.
Third Party Submission in related EP2528602 based on PCT/US2011/022958 dated Nov. 2013.
Third Party Submission in related EP2528602 based on PCT/US2011/022958 dated Nov. 19, 2013 (9 pages).
Third Party Submission in related EP2528602 dated Nov. 19, 2013.
Treanda label, 2008.
Treanda, "Highlights Of Prescribing Information," Treanda bendamustine hydrochloride for Injection, for intravenous infusion, 2008, pp. 1-6.
Treanda, "Highlights of Prescribing Information," Treanda bendamustine hydrochloride for Injection, for intravenous infusion, 2010, pp. 1-13.
Treanda, "Highlights of prescribing information", 2008.
Trivedi et al., "Water-Insoluble Drug Formulation", 7. Solubilization Using CoSolvent Approach, 2000, pp. 141-168.
Trivedi, "Water-Insoluble Drug Formulation", Second Edition, 9 Solubilization Using Cosolvent Approach, 2008, pp. 161-194.

Akers et al., "Excipient-Drug Interactions in Parenteral Formulations", Journal of Pharmaceutical Sciences, Nov. 2002, vol. 91, Issue 11, pp. 2283-2300.
Akers, Remington, The Science and Practice of Pharmacy 21st Edition, Parenteral preparation, chapter 41, 2005, pp. 802-835.
Amdahl et al., Chemistry, 7th Ed., 2007.
American Heart Association, "Living With Heart Failure" (https://www.heart.org/idc/groups/heart-public/@wcm/@hcm/@gwtg/documents/downloadable/ucm_309068.pdf) (2001).
American Society of Hospital Pharmacists. ASHP Technical Assistance Bulletin On Hospital Distribution and Control. Am J. Hosp. Pharm. 1980, 37:1097-103.
Amin et al., "Lyophilization of Polyethylene Glycol Mixtures", Journal of Pharmaceutical Sciences 2004, vol. 93, No. 9, pp. 2244-2249.
Armstrong et al., "Separation of Drug Stereoisomers by the Formation of . . . beta-Cyclodextrin Inclusion Complexes", Science, May 1986, vol. 232, pp. 1132-1135.
Baldi et al., "Statistical Procedures for Optimizing the Freeze-Drying of a Model Drug in Tert-Butyl Alcohol: Water Mixtures", Eur. J. of Pharm. & Biopharm., 1994, vol. 40, No. 3, pp. 138-141.
Balfour et al., "Bendamustine", Drugs, 2001, vol. 61, No. 5, pp. 631-638.
Bauer et al., Pharmazeutische Technologies, pp. 225-228, HW9, 1993.
Bauer et al., Pharmazeutische Technologies, pp. 424-425, HW10, 1993.
Bergsagel et al., "Effect of cyclophosphamide on Advanced Lung Cancer and the Hematological Toxicity of Large, Intermittent Intravenous Doses", Canad. Med. Ass. J., 1968, vol. 98, pp. 532-538.
Bernard Testa et al., Hydrolysis in Drug and Prodrug Metabolism, pp. 681-684.
Bernard Testa et al., "Hydrolysis in Drug and Prodrug Metabolism", Verlag Helvetica Chimica Acta, pp. 681-684, 2003, ISBN 3-906390-25-X.
Biedermann et al., "SciFinder(r) Hydrolytic degradation of IMET", 1969, 3393, vol. 108, pp. 1-2.
Biewenga et al., "The Pharmacology of the Antioxidant Lipoic Acid", Gen. Pharmac., 1997, vol. 29, No. 3, pp. 315-331.
Boylan et al., "Parenteral Products, Chapter 12", Modern Pharmaceutics, Fourth Ed., 2002, pp. 1-34.
Brigitte et al., "Lipoic and Dihydrolipoic Acids . . . , Free Rad". Res., 1994, vol. 20, No. 2, pp. 119-133.
Broadhead et al., "Pharmaceutical Preformulation and Formulation, Chapter 9 in Parenteral Dosage Forms", Interpharm., 2001, pp. 325-347.
Brown, Organic Chemistry 5th Edition, 2009, pp. 358-360.
Canadian Society of Hospital Pharmacists: Guidelines for Drug-Use Control, 2008, pp. 1-28.
Carpenter et al., "A Study of the Polyethylene Glycols as Vehicles for Intramuscular and Subcutaneous Injection", Journal of the American Pharmaceutical Association, 1952, vol. 41, No. 1, pp. 27-29.
Center for Drug Evaluation and Research, Andrew Dmytrijuk, FDA Medical Review for the Approval of Bendeka, 2015, pp. 1-35.
*Cephalon, Inc.*, et al., v. *Slayback Pharma Limited Liability Company*, et al., Civil Action No. 1:17-cv-01154: Opinion, dated Apr. 27, 2020, 70 pages.
*Cephalon, Inc.*, et al., v. *Slayback Pharma Limited Liability Company*, et al.—Civil Action No. 1: 17-cv-01154: Answer to Slayback Pharma Limited Liability Company's Counterclaims, dated Oct. 20, 2017.
*Cephalon, Inc.*, et al., v. *Slayback Pharma Limited Liability Company*— Civil Action No. 1:17-cv-01154: Joint Status Report (Document 164), dated Oct. 19, 2018.
*Cerhalon, Inc*, et al. v. *Slayback Pharma Limited Liability Company*— Civil Action No. 1:17-cv-01154: Complaint (Document 1), dated Aug. 16, 2017.
*Cerhalon, Inc.*, et al., v. *Slayback Pharma Limited Liability Company*— Civil Action No. 1:17-cv-01154: Answer to Slayback Pharma Limited Liability Company's Counterclaims (Document 56), dated Mar. 5, 2018.

**US 12,138,248 B2**

Page 4

(56)        **References Cited**

OTHER PUBLICATIONS

*Cerhalon, Inc.*, et al., v. *Slayback Pharma Limited Liability Company*, etal.—Civil Action No. 1:17-cv-01154: Answer to Apotex Inc. and Apotex Corp.'s Counterclaims (Document 22), dated Dec. 18, 2017.

*Cerhalon, Inc.*, et al., v. *Slayback Pharma Limited Liability Company*—Civil Action No. 1:17-cv-00154: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint and Counterclaims (Document 11), dated Sep. 29, 2017.

*Cerhalon, Inc.*, et al., v. *Slayback Pharma Limited Liability Company*—Civil Action No. 1:17-cv-01154: Joint Claim Construction Chart (Document 94), dated Jul. 24, 2018.

Chadha et al., "Drug Carrier Systems For Anticancer Agents: A Review", Journal of Scientific & Industrial Reasearch, 2008, vol. 67, pp. 185-197.

Cheson et al., "Bendamustine: Rebirth of an Old Drug", J. Clin. Oncol., 2009, vol. 27, pp. 1492-1501.

Cheung et al., "Safety and Pharmacokinetics of Bendamustine Rapid-Infusion Formulation", J. of Clinical Pharmacology, 2017, vol. 57, No. 11, pp. 1400-1408.

Chu et al., Common Chemotherapy Regimens in Clinical Practice, Physicians' Cancer Chemotherapy Drug Manual 2009.

Corbett, Intravenous Fluids: It's More Than Just 'Fill 'Er Up!', Series #52 Practical Gastroenterology, 2007, pp. 44-60.

Costantino, "Lyophilization Of Biopharmaceuticals", Association of Pharmaceutical Scientists, 2004.

Cyclobond(R) Handbook, A Guide to Using Cyclodextrin Bonded Phases for Chiral LC Separations, 6th ed., 2002, Advanced Separation Technologies, Inc., pp. 1-58.

Derry et al., "Application of 15N Nuclear Magnetic Resonance Spectroscopy to the Determination of the Stability of Aryl Nitrogen Mustards", J. Med. Chem., 1995, vol. 38, pp. 2256-2258.

Draft Note for Guidance on Excipients, Antioxidants and Antimicrobial Preservatives In the Dossier for Application for Marketing Authorisation of Medicinal Product, EMEA, 2003, pp. 1-10.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01459: Answer to Slayback Pharma LLC's Counterclaims (Document 13), dated Oct. 31, 2018.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01459: Complaint (Document 1), dated Sep. 20, 2018.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01459: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses, and Counterclaims (Document 9), dated Oct. 10, 2018.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Answer to Slayback Pharma LLC's Counterclaims (Document 12), dated Jan. 3, 2019.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Complaint (Document 1), dated Dec. 11, 2018.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses, and Counterclaims(Document 11), public version dated Dec. 20, 2018.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Opening Brief in Support of Slayback Pharma Limited Liability Company's Motion for Judgment on the Pleadings (Document 17), public version dated Jan. 11, 2019.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Eagle Pharmaceuticals' Opposition to Slayback Pharma's Motion for Judgment on the Pleadings (Document 23), redacted—public version dated Feb. 12, 2019.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Reply Brief in Further Support of Slayback Pharma Limited Liability Company's Motion for Judgment on the Pleadings (Document 27), public version dated Mar. 1, 2019.

*Eagle Pharmaceuticals, Inc.*, et al. v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Exhibit Index—Includes Confidential Information (Document 21), public version dated Sep. 7, 2018.

*Eagle Pharmaceuticals, Inc.*, et al. v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Complaint (Document 1), dated Jul. 19, 2018.

*Eagle Pharmaceuticals, Inc.*, et al. v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Hospira's Reply Brief in Support of its Motion to Dismiss Plaintiffs' Complaint (Document 29), public version dated Nov. 26, 2018.

*Eagle Pharmaceuticals, Inc.*, et al. v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Plaintiffs' Opposition to Motion to Dismiss (Document 26), redacted—public version dated Nov. 2, 2018.

EC Safety Data Sheet: Ribomustin(Registered) 2007.

Eric Watson, et al., Kinetics of Phosphoramide Mustard . . . , Journal of Pharmaceutical Sciences, vol. 74, No. 12, pp. 1283-1292, 1985.

Flamberg et al., "Low Temperature Vacuum Drying of Sterile Parenterals From Ethanol", Bulletin of the Parenteral Drug Association, 1970, vol. 24, No. 5, pp. 209-217.

Floss et al., "Intravenous fluids principles of treatment", Clinical Pharmacist, 2011, vol. 3, pp. 274-283.

Friedberg et al., "Bendamustine in Patients with Rituximab-Refractory Indolent and Transformed Non-Hodgkin's Lymphoma: Results from a Phase II Multicenter, Single-Agent Study", J. Clin. Oncol., 2008, vol. 26, No. 2, pp. 204-210.

Friedman et al., "Colorimetric Estimation of Nitrogen Mustards in Aqueous Media. Hydrolytic Behavior of Bis-(β-chloroethyl)amine, nor HN2", Analytical Chemistry, 1961, vol. 33, No. 7, pp. 906-910.

Fujisawa Deutschland GmbH Ribomustin(Registered) Products and Technical Specifications, 2002.

Furst et al., "About the Hydrolytic Decomposition of IMET 3393," Pharmazeutische Zentralhalle, 1969, vol. 108, Issue 9, pp. 608-614 (English translation and the original article).

Galacid Excel 88 fact sheet (lactic acid 88%), 2012.

Gamcsik et al., "NMR Studies of the Conjugation", J. Med. Chem., 1990, vol. 33, pp. 1009-1014.

Gandhi et al., "Bendamustine in B cell malignancies: the new, 46-year old kid on the block", Clin Cancer Res., 2009, vol. 15, No. 24, pp. 7456-7461.

Gatlin et al., "Injectable Drug Development", 17. Formulation and Administration Products, pp. 401-420.

Gibson et al., "Pharmaceutical Preformulation And Formulation: A practical guide from candidate drug selection to commercial dosage form", Informa Healthcare USA, 2009, vol. 199, 2nd ed, pp. 1-559.

Glimelius et al., "Bolus-Injection (2-4 min) Versus Short-term (10-20 min) Infusion of 5-Fluorouracil in Patients with Advanced Colorectal Cancer: a Prospective Randomised Trial", Eur J. Cancer, 1998, vol. 34, pp. 674-678.

Graham Solomons, Organic Chemistry, John Wiley & Sons, 3d ed. 1984.

Gupta et al., "Injectable Drug Development Techniques to Reduce Pain and Irritation", Informa Healthcare, 2008, pp. 183.

Gust et al., "Investigations on the Stability of Bendamustin, a Cytostatic Agent of the Nitrogen Mustard Type I", Synthesis, Isolation, and Characterization of Reference Substances, in Monatshefte fur Chemie, 1997, vol. 128, pp. 291-299.

Handbook of Pharmaceutical Excipients, Seventh edition 2012, Pharmaceutical Press.

Handbook of Pharmaceutical Excipients, Sixth edition, 2009; Rowe; p. 857 (extract from index).

Heider et al., "Efficacy and Toxicity of Bendamustine in Patients with Relapsed Low-Grade non-Hodgkin's Lymphomas", Anticancer Drugs, 2001, vol. 12, pp. 725-729.

HFSA 2010 Comprehensive Heart Failure Practice Guideline, Journal of Cardiac Failure, 2010, vol. 16 No. 6.

Hsu et al., Reactions of N-Ethyl-(HN-1), N-Methyl-Bis(2-Chloroethyl)amine (HN-2), and Tris(2-Chloroethyl)amine (HN-3) with Peroxides, 2002, pp. 1-15.

ICH Harmonised Tripartite Guideline, Stability testing of New Drug Substances and Products Q1A(R2), dated Feb. 6, 2003.

Interlocutory decision in Opposition proceedings of EP 2528602 issued Apr. 8, 2019.

International Conference on Harmonisation in Guideline on Impurities in New Drug Products: Availability, 1997, 62 Fed. Reg. 27, pp. 454-27, p. 461.

International Search Report and Written Opinion for No. PCT/US2013/032289 dated Jun. 2013.

International Search Report and Written Opinion issued in counterpart PCT/US2013/032295 dated Jun. 2013 (4 pages).

US 12,138,248 B2

Page 5

(56)          References Cited

OTHER PUBLICATIONS

International Search Report and Written Opinion issued in counterpart PCT/US2013/26187.
International Search Report and Written Opinion of International application based on PCT/US2011/022958, dated Apr. 2011 (8 pages).
International Search Report of International Appln. No. PCT/US2013/032289 mailing date Jun. 6, 2013.
International Search Report PCT/US2011/022958 dated Apr. 12, 2011.
Jennings, "Lyophilization, Introduction and Basic Principles", 2006, original copyright 1999.
Jerry, Advanced Organic Chemistry, 4th ed., John Wiley & Sons, Inc. 1992.
Jones, "Applications of Hydrogen Peroxide and Derivatives", Royal Society of Chemistry, 1999, 1 page.
Jonkman-De Vries et al., "Pharmaceutical Development of (Investigational) Anticancer Agents for Parental Use—A Review", Drug Dev Ind Pharm. 1996, vol. 22, No. 6, pp. 475-494.
Kalaycio, "Clinical Experience With Bendamustine: A New Treatment for Patients With Chronic Lymphocytic Leukemia", Clin Leukemia., 2008, vol. 2, No. 4, pp. 223-229.
Kenneth et al., "Remington, Parenteral Preparations", Chapter 41, 2000, pp. 780-786.
Knauf et al., "Bendamustine Versus Chlorambucil in Treatment-Naive Patients with B-Cell Chronic Lymphocytic Leukemia (B-CLL): Results of an International Phase III Study", Blood, 2007, vol. 110, No. 11, 609a.
Koomans et al., "Sodium Balance in Renal Failure: A Comparison of Patients with Normal Subjects Under Extremes of Sodium Intake", Hypertension, 1985, vol. 7, pp. 714-721.
Kumar et al., AAPS Pharm Sci Tech., 2006, vol. 7, No. 3, pp. E1-E7.
Leonard et al., A New Synthesis of Aziridinium Salts. 2,2-Pentamethylene-1,1-tetramethyleneaziridinium Perchlorate A Prototype, J. Am. Chemistry Soc'y, 1960, vol. 82, pp. 6418-6419.
Leoni et al., "SDX-105 (Bendamustine), a Clinically Active Antineoplastic Agent Possesses a Unique Mechanism of Action", Blood, 2003, vol. 102, No. 11, Abstract #2363.
Lian-Feng et al., "Water-Insoluble Drug Formulation", Second Edition, Ch. 7. Formulation Strategies and Practice. Support, pp. 113-132.
Lissitchkov et al., Phase-I/II study to Evaluate Dose Limiting Toxicity, Maximum Tolerated Dose, and Tolerability of Bendamustine HCl in Pre-treated Patients With B-Chronic Lymphocytic Leukaemia (Binet stages B and C) Requiring Therapy, J. Cancer Res. Clin. Oncol. 2006, vol. 132, pp. 99-104.
Liu (ed). Water-Insoluble Drug Formulation, 1st ed., CRC Press, Chapters 7 and 9, 2000.
Liu (ed). Water-Insoluble Drug Formulation, 2nd ed., CRC Press, Chapters 7 and 9, 2000.
Lyondell Tebol (Registered) 99, Tertiary Butyl Alcohol in Freeze-Drying Applications,(Lyondell Chemical Co., 2003.
Maas B: "Stabilitaet von Bendamustinhydrochlorid in Infusionsloesungen" Die Pharmazie, Govi Verlag Pharmazeutischer Verlag Gmbh, Eschborn, DE, vol. 49, No. 10, Jan. 1, 1994.
Maas et al., "Stabilitat von Bendamustinhydrochlorid in Infusionslosungen," Die Pharmazie, Govi Verlag Pharmazeutischer Verlag Gmbh, vol. 49. No. 10 pp 775-777 (1994). (Abstract Only).
Maas, "Stabilitat von Bendamustinhydrochlorid in Infusionslosungen", Die Pharmazie, Govi Verlag Pharmazeutischer Verlag Gmbh, Eschborn, DE, 1994, vol. 49, No. 10, pp. 775-777.
Margolin et al., "Shortening the Infusion Time of Anticancer Drugs: Who Will Benefit?", J. Clinical Oncology, 2007, vol. 25 No. 19, pp. 2642-2643.
Mcginity et al., "Influence of Peroxide Impurities in Polyethylene Glycols", Journal of Pharmaceutical Sciences, 1975, vol. 64, No. 2, pp. 356-357.
Mikhal'chuk et al., "Antioxidative Stabilization of Polyethylene . . . ", Russian Journal of Applied Chemistry, 2004, vol. 77, No. 1, pp. 131-135.

National Kidney Foundation, "Clinical Practice Guidelines and Clinical Practice Recommendations" http://kidneyfoundation.cachefly.net/professionals/KDOQI/guideline_upHD_PD_VA/hd_guide5.htm, 2006.
Nema et al., "Excipients and Their Use in Injectable Products", PDA J. Pharma. Sci. & Tech., 1997, vol. 51, No. 4, pp. 166-171.
Nema et al., "Excipients and Their Use in Injectable Products", PDA Journal of Pharmaceutical Science & Technology, May 16, 1997.
Ni et al., "Stabilization and Preformulation of Anticancer Drug-SarCNU", Int'l J. of Pharma., 2002, vol. 249, No. 257-264.
Ni et al., "Use of pure t-butanol as a solvent for freeze-drying: a case study", International Journal of Pharmaceutics, 2001, vol. 226, pp. 39-46.
Ni et al., Use of Pure t-Butanol as a Solvent for Freeze-Drying: A Case Study, Int'l 1. J. of Pharma., 226:39-46 (2001).
Nuijen et al., "Pharmaceutical Development of a Parenteral Lyophilized Formulation of the Novel Antitumor Agent Aplidine", PDA J. Pharmaceut. Sci. and Technol., 2000, vol. 54, No. 3, pp. 193-208.
O'Connor, "Hydrolysis and Alkylating Reactivity of Aromatic Nitrogen Mustards", J.Chem. Soc. Perkin Trans., 1991, vol. 2, pp. 1933-1939.
Olson, "Volatile Solvents for Drying and Microbial Kill in the Final Container", Pharmaceutical Engineering, 1997, pp. 110-118.
Olthoff et al., OlthofT, DD 159289, cited in IDS filed Jan. 24, 2014.
Ozegowski et al., "IMET 3393, ?-[1-Methyl-5-bis-(Beta-chloroethyl)-amino-benzimidazolyl-(2)]-butyric acid hydrochloride, a new cytostatic agent from the benzimidazole mustard gas series", 110 Zbl Pharm. 1971, vol. 110, pp. 1013-1019.
PCT Notification of Transmittal of International Search Report and Written Opinion for PCT/US2013/032295.
PCT Written Opinion of International Search Authority for PCT/US2013/032295.
Pethrick et al., Excerpt from Polymer Yearbook 13, CRC Press, Oct. 1, 1996, Technology & Engineering Vinogradova et al.
Pokorny et al., "Antioxidants in Food: Practical Applications", CRC Press, 2001, p. 324.
Poulsen, Introduction to Chemistry (2010).
Pramod K. Gupta Injectable Drug Development Techniques to Reduce pain and irritation.
Preiss et al., "Pharmacological and clinical date of Bendamustine," 17th International Cancer Congress, 1998, pp. 1637-1640.
Preiss et al., "Studies on the Pharmacokinetics of Bendamustine (Cytostasan®) in Humans", Pharmazie, 1985, vol. 40, No. 11, pp. 782-784.
Price, Handbook of Pharm. Excipients, 5th Edition, "Polyethylene Glycol", Aug. 2005, pp. 545-550.
Qin et al., "Oxidative degradation of oligo(ethylene glycol)-terminated monolayers", Chem. Commun. 2009, pp. 5112-5114.
Rassachaert et al., "A phase 1 study of bendamustine hydrochloride administered once every 3 weeks in patients with solid tumors," Anti-Cancer Drugs, 2007, vol. 18 No. 5, pp. 587-595.
Ready-to-Use [online] retrieved on May 27, 2021 from: https://medical-dictionary.thefreedictionary.com/ready-to-use; 2021, 1 page.
Remington's Pharmaceutical Sciences, 18th edition, (1990), p. 1322.
Remington's Pharmaceutical Sciences, 18th edition, (1990), pp. 1286-1288.
Remington's Pharmaceutical Sciences 1990 (Eighteenth Edition), Mack Publishing Company, Chapter 85, pp. 1570-1580.
Ribomustin Monograph (Updated Aug. 2005).
Ribomustin Monograph (Updated Jan. 2002).
Ribomustin Product Information, Janssen-Cilag Pty Ltd (Updated Sep. 15, 2016).
Roberts et al., Basic Principles Of Organic Chemistry, W. A. Benjamin, Inc., 2d ed. 1977, pp. 612-618.
Rote Liste 1996 for Ribomustin (86 023).
Rote Liste 2003 for Ribomustin (86 045).
Rowe et al. Handbook of Pharmaceutical Excipients, 6th edition, 2009, pp. 454-455.
Rowe et al., "Handbook of Pharmaceutical Excipients," Pharmaceutical Press, 6th edition pp. 857 (extract from index) (2009).

US 12,138,248 B2

Page 6

(56)        **References Cited**

OTHER PUBLICATIONS

Rowe et al., Handbook of Pharmaceutical Excipients, 5th ed., Pharmaceutical Press, pp. 545-550, Polyethylene Glycol, 2006.
Safety Data Sheet, Lactic Acid, 88%, Colu{acute over (m)}bus Chemical Industries, 2013.
Safety Data Sheet, Lactic Acid, 88%, Columbus Chemical Industries, 2013.
Santacesaria et al., "Thermal Stability Of Nonionic Polyoxyalkylene Surfactants", Journal of Applied Polymer Science, 1991, vol. 42, pp. 2053-2061.
Scasnar et al., "Radiochemical Assay of Stability of 14C-Cytostasan Solutions During Preparation and Storage", Journal of Radioanalytical and Nuclear Chemistry, Articles, 1988, vol. 121, No. 2, pp. 489-497.
Schoffski et al., "Weekly Administration of Bendamustine: A phase 1 study in patients with advanced progressive solid tumors", Annals of Oncology II, 2000, pp. 729-734.
Schoffski et al., "Repeated administration of short infusions of bendamustine: a phase 1 study in patients with advanced progressive solid tumours", J. Cancer Res Clin Oncol, 2000, vol. 126 No. 1 pp. 41-47.
Schwanen et al., "In vitro evaluation of bendamustine induced apoptosis in B-chronic lymphocytic leukemia", Leukemia, 2002, vol. 16, pp. 2096-2105.
U.S. Appl. filed Dec. 5, 2013, U.S. Appl. No. 14/097,904.
U.S. Appl. filed Dec. 5, 2013, U.S. Appl. No. 14/098,094.
U.S. Appl. filed Feb. 14, 2013, U.S. Appl. No. 13/767,672.
U.S. Appl. filed Nov. 26, 2014, U.S. Appl. No. 14/554,269.
U.S. Appl. filed Oct. 23, 2014, U.S. Appl. No. 14/522,581.
U.S. Appl. filed Sep. 19, 2013, U.S. Appl. No. 14/031,879.
U.S. Pharmacopeia 32-NF-27-General Notices and Requirements, 2009.
U.S. Appl. No. 10/010,533, filed Dec. 7, 2001.
U.S. Appl. No. 10/052,385, filed Jan. 18, 2002.
U.S. Appl. No. 16/015,656, filed Jun. 22, 2018.

USP 24/NF 19 (2000) entry for Propylene Glycol (USP).
Vinogradova et al., "New Metal Chelates as Antioxidant Stabilizers for Polymers . . . ", Polymer Yearbook 13, pp. 87-111, 1996.
Vlok, Manual of Nursing, 1988m vol. 1, 9th edition.
Wasylaschuk et al., Journal Of Pharmaceutical Sciences, 2007, vol. 96, No. 1, pp. 106-116.
Waterman et al., "Stabilization of Pharmaceuticals to Oxidative Degradation", Pharmaceutical Development and Technology, 2002, vol. 7, No. 1, pp. 1-32.
Watson et al., "Kinetics of phosphoramide mustard hydrolysis in aqueous solution", Journal of Pharmaceutical Sciences, 1985, vol. 74, Issue 12, pp. 1283-1292.
Weide et al., "Bendamustine Mitoxantrome and Rituximab (BMR): A New Effective Regimen for Refractory or Relapsed Indolent Lymphomas", Leukemia & Lymphoma, 2002, vol. 43, No. 2, pp. 327-331.
Werner et al., Hydrolysis Products of Cancerostatic Cytostasan(Registered) (Bendamustine), 42 (4) Die Pharmazie, Govi Verlag Pharmazeutischer Verlag GMBH, Eschborn, DE, 272-73.
Wittaya-Areekul et al., "Freeze-Drying of tert-Butyl Alcohol/Water Cosolvent Systems: Effects of Formulation and Process Variables on Residual Solvents", Journal of Pharmaceutical Sciences, 1998, vol. 87, No. 4, pp. 491-495.
Written Opinion issued in counterpart PCT/US2013/032289 dated Jun. 6, 2013.
Written Opinion issued in counterpart PCT/US2013/032295 dated Jun. 3, 2013.
Written Opinion of the International Searching Authority re: International Appln. No. PCT/US2013/032289 mailing date Jun. 6, 2013.
Zimmerman et al., Elements of Organic Chemistry, 1977.
Zips et al., "New Anticancer Agents: In Vitro and In Vivo Evaluation," In Vivo, 2005, vol. 19, pp. 1-8.
Zumdahl et al., Chemistry, 7th Ed., 2007.

* cited by examiner

US 12,138,248 B2

1

# FORMULATIONS OF BENDAMUSTINE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 18/498,259, filed Oct. 31, 2023, which is a continuation of application Ser. No. 16/509,920, filed Jul. 12, 2019, now U.S. Pat. No. 11,103,483, which is a continuation of application Ser. No. 16/015,656, filed Jun. 22, 2018, which is a continuation of application Ser. No. 15/432,335, filed Feb. 14, 2017, now U.S. Pat. No. 10,010,533, issued Jul. 3, 2018, which is a continuation of application Ser. No. 15/013,436, filed Feb. 2, 2016, now U.S. Pat. No. 9,572,797, issued Feb. 21, 2017, which is a continuation of application Ser. No. 14/031,879, filed Sep. 19, 2013, now U.S. Pat. No. 9,265, 831, issued Feb. 23, 2016, which is a continuation of application Ser. No. 13/016,473, filed Jan. 28, 2011, now U.S. Pat. No. 8,609,707, issued Dec. 17, 2013, which claims the benefit of U.S. Provisional Patent Application No. 61/299,100, filed Jan. 28, 2010, the contents of each of which are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

Bendamustine free base is represented by the following structural formula (I)

(I)



Bendamustine is used in the treatment of a number of cancers including leukemias, Hodgkins disease and multiple myelomas. Bendamustine is the active ingredient of the commercial product Treanda™, a lyophilized powder for reconstitution.

Bendamustine exhibits rapid degradation upon reconstitution of the lyophilized product. Bendamustine undergoes hydrolysis by direct substitution rather than an addition elimination process due to the presence of the highly labile aliphatic chlorine atoms. Some of the main degradants of bendamustine are the monohydroxy compound known as HP1 (hydrolysis product 1) and dihydroxy compound HP2 (hydrolysis product 2). The monohydroxy compound appears as the main impurity at Relative Retention Time (RRT) 0.6 and the dihydroxy compound appears as the main impurity at RRT 0.27. Minor peaks appear at RRT 1.2, which are presently unknown.

The stability of bendamustine in water is measured in hours, and is therefore, not suitable for long-term storage in liquid form. The lyophile possesses good chemical stability. However, reconstitution of the lyophile is clinically inconvenient, taking 15-30 mins with implications of chemical instability. There is a need for ready to use (RTU) bendamustine formulations having enhanced stability.

2

## SUMMARY OF THE INVENTION

In other aspects of the invention, the bendamustine-containing compositions include a) a pharmaceutically acceptable fluid which contains one or more of propylene glycol, ethanol, polyethylene glycol, benzyl alcohol and glycofurol, and b) a stabilizing amount of a chloride salt. In other aspects of the invention, the bendamustine-containing compositions include DMSO (dimethyl sulfoxide) as part of the pharmaceutically acceptable fluid included therein. Regardless of the pharmaceutically acceptable fluid included, the amount of bendamustine included in the composition is preferably from about 20 mg/mL to about 60 mg/mL. Still further aspects of the invention include methods of treatment using bendamustine-containing compositions and kits containing the same.

One of the advantages of the inventive liquid compositions is that they have substantially improved long term stability when compared to currently available formulations. For example, the inventive bendamustine compositions are substantially free of impurities after at least about 15 months at a temperature of from about 5° C. to about 25° C. The inventive formulations are advantageously ready to use or ready for further dilution. Reconstitution of lyophilized powders is not required.

## DETAILED DESCRIPTION OF THE INVENTION

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art to which this invention belongs. In the event that there is a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

As used herein, RRT is calculated by dividing the retention time of the peak of interest by the retention time of the main peak. Any peak with an RRT<1 elutes before the main peak, and any peak with an RRT>1 elutes after the main peak.

For purposes of the present invention, "substantially free of impurities" shall be understood to include bendamustine-containing compositions in which the amount of total impurities is less than about 5%, as calculated on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after a period of about 15 months at a temperature of from about 5° C. to about 25° C. The amount of impurities is further calculated as being based upon the original amount bendamustine (or salt thereof) being present in the composition or formulation.

For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.

Preferably, the amount of any individual degradant in the inventive compositions does not exceed 2% PAR as determined by HPLC at a wavelength of 223 nm after storage periods of at least about 15 months at a temperature of from about 5° C. to about 25° C. In some aspects, the amount of time the inventive compositions demonstrate long term storage stability is at least about 18 months and preferably at least about 2 years when stored under the conditions described herein.

In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions including:

US 12,138,248 B2

3

a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including

i) PEG, PG or mixtures thereof; and

ii) a stabilizing amount of an antioxidant.

The total impurities in the inventive compositions resulting from the degradation of the bendamustine in the compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of from about 5° C. to about 25° C., and thus have long term stability for at least the same period of time or longer. Preferably, the bendamustine-containing compositions demonstrate long term storage stability for at least about 2 years, especially when stored at the lower (refrigerated) temperatures. In one embodiment, the amount of total impurities in the inventive compositions resulting from the degradation of the bendamustine is less than about 3% PAR as determined by HPLC at a wavelength of 223 nm after at least about 2 years at a temperature of from about 5° C. to about 25° C.

In some aspects of the invention, the bendamustine concentration in the inventive compositions is from about 10 mg/mL to about 100 mg/mL, preferably 20 mg/mL to about 60 mg/mL. Preferably the bendamustine concentration in the inventive compositions is from about 25 mg/mL to about 50 mg/mL, and more preferably from about 30 mg/mL to about 50 mg/mL. It will be understood that compositions containing any useful concentration within the ranges, i.e. 10, 20, 25, 30, 35, 40, 45, 50, 55, 60 . . . 100 are contemplated. In other embodiments, the bendamustine concentration in the composition is about 50 mg/mL. In alternative aspects, the amount of bendamustine is outside these ranges but the amounts will be sufficient for single or multiple administrations of dosages generally regarded as effective amounts.

In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof. Within this aspect, the pharmaceutically acceptable fluid is propylene glycol (PG) or polyethylene glycol (PEG). In other embodiments of the invention however, the pharmaceutically acceptable fluid is a mixture of PEG and PG. For example, the pharmaceutically acceptable fluid can include about 50% PEG and about 50% PG. Alternatively, pharmaceutically acceptable fluid includes about 95% PEG and about 5% PG. The amount of PEG and PG can also be varied within the ranges, i.e. the ratio of PEG:PG in the pharmaceutically acceptable fluid can range from about 95:5 to about 50:50. Within this range, is a pharmaceutically acceptable fluid containing about 75% PEG and about 25% PG, and preferably 80% PEG and 20% PG. In another embodiment, a pharmaceutically acceptable fluid can include about 85% PEG and about 15% PG while another preferred pharmaceutically acceptable fluid includes about 90% PEG and about 10% PG. The molecular weight of the PEG will be within the range of pharmaceutically acceptable weights although PEG 400 is preferred in many aspects of the invention.

Without meaning to be bound by any theory or hypothesis, the hydroxide of the polyethylene glycol molecule is less reactive than the hydroxides of propylene glycol. As a result, the ester forms at a slower rate in polyethylene glycol than propylene glycol and the resulting bendamustine degradants are unexpectedly and substantially reduced over extended periods of time when PEG is a substantial part of the pharmaceutically acceptable fluid.

The bendamustine-containing compositions according to several preferred aspects of the invention include a stabiliz-

4

ing amount of an antioxidant. For purposes of the present invention, "stabilizing amount" shall be understood to include those amounts which increase or enhance the stability of the bendamustine in the compositions described herein. The presence of one or more antioxidants described herein thus contributes, at least in part to the long term stability of the composition. Within this guideline, suitable antioxidant concentrations in the compositions can range from about 2.5 mg/mL to about 35 mg/mL, and preferably from about 5 mg/mL to about 20 mg/mL or from about 10 mg/mL to about 15 mg/mL. In some other embodiments, the concentration of the antioxidant in the bendamustine-containing composition is about 5 mg/mL.

Suitable antioxidants for inclusion include those which are pharmaceutically acceptable for use in human and veterinary formulations although not limited to those currently regarded as safe by any regulatory authority. For example, the antioxidant can be selected from among lipoic acid, thioglycerol (also known as monothioglycerol) and analogs thereof, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds, dihydrolipoic acid and mixtures of the foregoing. Preferably, the antioxidant is thioglycerol, lipoic acid or a mixture thereof. Some particularly preferred embodiments of the invention include thioglycerol.

In view of the foregoing, some preferred long term storage stable bendamustine-containing compositions in accordance with the invention compositions include:

I. a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including

i) polyethylene glycol and propylene glycol; and

ii) a stabilizing amount of thioglycerol; or

II. a) about 50 mg/mL bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including

i) about 90% PEG and about 10% PG; and

ii) about 2.5 mg/mL thioglycerol.

Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total impurities, PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

In accordance with other aspects of the invention, there are provided long term storage stable bendamustine-containing compositions, including:

a) bendamustine or a pharmaceutically acceptable salt thereof;

b) a pharmaceutically acceptable fluid including one or more of the following: PG, ethanol, PEG, benzyl alcohol and glycofurol; and

c) a stabilizing amount of a chloride salt.

These compositions also have the low levels of impurities and long term stability mentioned herein. Preferred pharmaceutically acceptable fluids include PG, PEG or ethanol in this embodiment of the invention. Preferably, the PEG is PEG 400. If desired, glycerin and/or 88% (w/w) lactic acid can be added to the pharmaceutically acceptable fluid.

Suitable chloride salts include but are not limited to organic chloride salts, sodium chloride, choline chloride, hydrochloride salts of amino acids and mixtures thereof. Thus, as will be appreciated by those of ordinary skill, one can select from among a number of suitable chloride salts and it is Applicants' intention that the scope of the invention includes all such chloride salts that are capable of being included in bendamustine-containing formulations for

US 12,138,248 B2

5

extended periods without having a deleterious effect on the drug. In one embodiment of the invention, the chloride salt concentration is from about 10 to about 300 mg/mL. In another embodiment, the chloride salt concentration is from about 50 to about 215 mg/mL. In one preferred embodiment, the chloride salt concentration is about 215 mg/mL.

In accordance with another aspect of the invention, there is provided long term storage stable bendamustine-containing compositions, including:

a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including DMSO.

These compositions also have the low levels of impurities and long term stability mentioned herein. In some aspects, the bendamustine concentration in these compositions is from about 10 mg/mL to about 100 mg/mL. Preferably, the bendamustine concentration is from about 20 mg/mL to about 50 mg/mL, more preferably from about 25 mg/mL to about 50 mg/mL. In an alternative embodiment, the bendamustine concentration is about 50 mg/mL.

Another embodiment of the invention provides methods of treating cancer in mammals. The methods include administering to a mammal in need thereof an effective amount of one of the bendamustine-containing compositions described herein. Since the active ingredient portion of the inventive composition is an FDA-approved drug, those of ordinary skill will recognize that the doses of bendamustine employed in this aspect of the invention will be similar to those employed in any treatment regimens designed for bendamustine as marketed under the trade name TRE-ANDA. The patient package insert containing dosing information is incorporated herein by reference. The methods of treatment also include administering the inventive formulations for any purpose or physical condition for which bendamustine has been indicated as being useful.

Another embodiment of the invention includes methods of preparing bendamustine-containing compositions described herein. The methods include reconstituting lyophilized bendamustine in a pharmaceutically acceptable fluid containing one of the following:

A) i) PEG, PG or mixtures thereof; and

ii) a stabilizing amount of an antioxidant;

B) i) one or more of PG, ethanol, PEG, benzyl alcohol and glycofurol; and

ii) a stabilizing amount of a chloride salt; or

C) DMSO.

The steps are carried out under pharmaceutically acceptable conditions for sterility and manufacturing.

In a further aspect of the invention, there are provided methods of controlling or preventing the formation of impurities in bendamustine-containing compositions during long term storage. The methods include combining an amount of bendamustine or a pharmaceutically acceptable salt thereof with a sufficient amount of a pharmaceutically acceptable fluid containing one of the following:

A) i) PEG, PG or mixtures thereof; and

ii) a stabilizing amount of an antioxidant;

B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and

ii) a stabilizing amount of a chloride salt; or

C) DMSO.

Further optional steps in accordance therewith include transferring one or more pharmaceutically acceptable doses of the formulations into a suitable sealable container and storing the sealed container at a temperature of from about 5° C. to about 25° C. As a result of carrying out these steps, it is possible to control or substantially prevent the formation

6

of impurities which otherwise occur with bendamustine-containing compositions during long term storage so that the artisan is provided with bendamustine-containing formulations having less than about 5% total impurities PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

The compositions of the present invention can be packaged in any suitable sterile vial or container fit for the sterile storage of a pharmaceutical such as bendamustine. Suitable containers can be glass vials, polypropylene or polyethylene vials or other special purpose containers and be of a size sufficient to hold one or more doses of bendamustine.

A further aspect of the invention includes kits containing lyophilized bendamustine or a pharmaceutically acceptable salt thereof in a first container or vial; and, in a second container, a sufficient amount of a pharmaceutically acceptable fluid such as those described herein, i.e. one of the following:

A) i) PEG, PG or mixtures thereof; and

ii) a stabilizing amount of an antioxidant;

B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and

ii) a stabilizing amount of a chloride salt; or

C) DMSO.

For purposes of this embodiment, the amount of fluid which is sufficient is an amount which allows the bendamustine to be dissolved or dispersed to a degree which renders the liquid composition ready for use.

As will be appreciated by those of ordinary skill, the kit will contain other pharmaceutically necessary materials for storing and/or administering the drug, including instructions for storage and use, additional diluents, if desired, etc.

EXAMPLES

The following examples serve to provide further appreciation of the invention but are not meant in any way to restrict the effective scope of the invention.

Example 1

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10 mg/ml in one of ethanol, propylene glycol and benzyl alcohol as indicated in Table 1 below. 215 mg/ml of choline chloride was added in half of the samples as a source of soluble chloride ions. The samples were maintained at 40° C. and analyzed periodically for drug content and total impurities. The results obtained are presented in Table 1.

TABLE 1

| Stability of Bendamustine HCl | | | | |
|---|---|---|---|---|
| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
| BDM - 10 mg/mL | Initial | | 10.43 | 0.27 |
| Choline chloride - | 40° C. | 48 hrs | 10.48 | 1.27 |
| 215 mg/ml | | 7 day | 10.26 | 2.11 |
| Ethanol qs to 1 mL | | | | |
| BDM - 10 mg/mL | Initial | | 10.55 | 0.27 |
| Ethanol qs to 1 mL | 40° C. | 48 hrs | 10.30 | 2.39 |
| | | 7 day | 9.55 | 6.66 |
| BDM - 10 mg/mL | Initial | | 9.99 | 0.21 |
| Choline chloride - | 40° C. | 48 hrs | 9.95 | 0.60 |
| 215 mg/ml | | 7 day | 9.43 | 2.31 |
| Propylene glycol qs | | | | |

US 12,138,248 B2

7

TABLE 1-continued

Stability of Bendamustine HCl

| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
|---|---|---|---|---|
| to 1 mL | | | | |
| BDM - 10 mg/mL | | Initial | 9.68 | 0.21 |
| Propylene glycol qs | 40° C. | 48 hrs | 9.00 | 0.88 |
| to 1 mL | | 7 day | 9.00 | 3.44 |
| BDM - 10 mg/mL | | Initial | 9.95 | 1.19 |
| Choline Chloride - | 40° C. | 48 hrs | 9.89 | 3.51 |
| 215 mg/mL | | 7 day | 8.97 | 4.24 |
| Benzyl alcohol qs | | | | |
| to 1 mL | | | | |
| BDM - 10 mg/mL | | Initial | 9.52 | 0.33 |
| Benzyl alcohol qs | 40° C. | 48 hrs | 8.67 | 4.18 |
| to 1 mL | | 7 day | 7.49 | 7.84 |

Note:
In Table 1 the total % impurities include total contributions from peaks at various RRTs.

As shown in Table 1, the bendamustine formulations are very stable in solutions containing solvent and chloride salt. Table 1 shows that bendamustine, when dissolved at a concentration of about 10 mg/mL, in a pharmaceutically acceptable fluid, such as ethanol and propylene glycol, and containing a stabilizing amount of a chloride salt, such as choline chloride, had less than about 5% after at least 7 days storage at 40° C.

The data presented in Table 1 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of a chloride salt having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including ethanol alone exhibited more than 6.5 total degradants after 7 days storage at 40° C. The sample including benzyl alcohol alone exhibited more than 7.5% total degradants after 7 days storage at 40° C. Bendamustine-containing compositions with such high levels of degradation would not be suitable for long-term storage.

Example 2

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10 mg/ml in DMSO. The samples were maintained at 40° C. and analyzed periodically for drug content and impurity profile. The results obtained are presented in Table 2.

TABLE 2

Stability of Bendamustine HCl in DMSO

| Formulation | Temp | Time | Content (mg/mL) | % Total Imp |
|---|---|---|---|---|
| BDM - 10 mg/mL | | Initial | 10.2 | 0.23 |
| DMSO qs to 1 mL | 40° C. | 48 hrs | 9.80 | 0.30 |
| | | 1 week | 10.0 | 0.56 |

Note:
In Table 2 the total % impurities include total contributions from peaks at various RRTs.

8

Table 2 shows that bendamustine, when dissolved in DMSO, had substantially no increase in total degradants. The data presented in Table 2 translates to bendamustine-containing compositions including DMSO having a shelf life of at least about 15 months at 5° C. and 25° C. In fact, such compositions are expected to have long term stability for periods beyond 15 months, i.e. up to 2 years or greater.

Example 3

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 20 mg/ml in polyethylene glycol 400 and 5 mg/ml of lipoic acid was added as a stabilizing antioxidant as indicated in Table 3 below. The samples were maintained at 40° C. or 25° C. and analyzed after 15 days for drug content and impurities. The results obtained are presented in Table 3.

TABLE 3

Stability of Bendamustine (20 mg/ml) in PEG 400 and Antioxidants

| Antioxidant | T ° C. | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid | 25 | 15 | 98.5 | <LD | 0.23 |
| 5 mg/ml | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

As shown in Table 3, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as polyethylene glycol, in the presence of a stabilizing amount of an antioxidant, such as lipoic acid, had substantially no increase in total degradants after a period of 15 days. The data presented in Table 3 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of an antioxidant having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including PEG alone, on the other hand, which did not contain an antioxidant, did not exhibit stabilizing effects at 40° C. This sample had more than 40% more total impurities than the sample including lipoic acid. Bendamustine-containing compositions with such high levels of total impurities would not be suitable for long-term storage.

Example 4

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 5 mg/ml of thioglycerol, α-lipoic acid or dihydro-lipoic acid was added as a stabilizing antioxidant as indicated in Table 4 below. The samples were maintained at 40° C. and analyzed after 15 days or one month for drug content and impurity profile as indicated in Table 4 below. The results obtained are presented in Table 4.

US 12,138,248 B2

9

10

#### TABLE 4

Stability of Bendamustine (50 mg/ml) in 90% PEG 400, 10% Propylene Glycol and Antioxidant

| | | | | | % Impurities RRT | | % |
| | | | | | HP1 | PG ester | Total |
| Antioxidant | T (° C.) | Time | Content (mg/mL) | % Initial | 0.59 | 1.10 | Imps |
|---|---|---|---|---|---|---|---|
| Thioglycerol | 40 | initial | 48.8 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 48.5 | 99.4 | 0.06 | 0.20 | 0.71 |
| α-lipoic acid | 40 | initial | 49 | 100 | <LD | <LD | 0 |
| | 40 | 15 days | 48.8 | 99.6 | 0.19 | 0.13 | 0.32 |
| | 40 | 1 month | 48.7 | 99.4 | 0.34 | 0.26 | 0.79 |
| Dihydrolipoic acid | 40 | initial | 49.3 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 47.7 | 97.4 | 0.63 | 0.12 | 1.84 |

<LD = Below Level of Detection

As shown in Table 4, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as a combination of polyethylene glycol and propylene glycol, in the presence of after 1 week, 15 days or one month for drug content and impurity profile as indicated in Table 5 below. The results obtained are presented in Table 5.

#### TABLE 5

Stability of Bendamustine (50 mg/ml) and Lipoic Acid (5 mg/ml) in PEG400 and Propylene glycol

| | | | | | % Area of degradants | | | % |
| | | Time | Content | % of | HP1 | PG ester | PG ester | Total |
| Formulation | Temp. | Period | (mg/mL) | Initial | 0.58 | 1.10 | 1.13 | Imp. |
|---|---|---|---|---|---|---|---|---|
| BDM - | | Initial | 49.6 | 100 | BDL | BDL | BDL | 0.18 |
| 50 mg/mL | 40° C. | 1 W | 49.0 | 98.8 | 0.05 | 0.13 | BDL | 0.38 |
| Lipoic acid- | | 15 d | 48.3 | 97.4 | 0.08 | 0.26 | BDL | 0.55 |
| 5 mg/mL | | 1 M | 48.0 | 96.8 | 0.11 | 0.43 | 0.13 | 1.03 |
| PEG | 25° C. | 15 d | 49.6 | 100.0 | BDL | 0.10 | BDL | 0.30 |
| 400:PG | 5° C. | 1 M | 48.4 | 97.6 | 0.05 | 0.19 | BDL | 0.43 |
| (75:25) qs | | 1 M | 49.6 | 100.0 | BDL | 0.07 | BDL | 0.27 |
| to 1 mL | | | | | | | | |
| BDM- | | Initial | 50.2 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/mL | 40° C. | 1 W | 49.9 | 99.4 | BDL | 0.15 | BDL | 0.30 |
| Lipoic acid- | | 15 d | 49.1 | 97.8 | 0.06 | 0.35 | BDL | 0.73 |
| 5 mg/mL | | 1 M | 49.1 | 97.6 | 0.09 | 0.90 | 0.25 | 1.82 |
| PEG | 25° C. | 15 d | 49.9 | 99.4 | BDL | 0.12 | BDL | 0.32 |
| 400:PG | | 1 M | 49.7 | 99.0 | BDL | 0.25 | BDL | 0.59 |
| (50:50) qs | 5° C. | 1 M | 50.0 | 100.0 | BDL | 0.11 | BDL | 0.33 |
| to 1 mL | | | | | | | | |
| BDM- | | Initial | 50.8 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/mL | 40° C. | 1 W | 50.4 | 99.2 | BDL | 0.11 | BDL | 0.30 |
| Lipoic acid- | | 15 d | 49.7 | 97.8 | 0.07 | 0.17 | BDL | 0.43 |
| 5 mg/mL | | 1 M | 49.7 | 97.8 | 0.13 | 0.27 | 0.09 | 0.84 |
| PEG | 25° C. | 15 d | 50.8 | 100.0 | BDL | 0.10 | BDL | 0.26 |
| 400:PG | | 1 M | 50.8 | 100.0 | BDL | 0.05 | 0.14 | 0.39 |
| (90:10) qs | 5° C. | 1 M | 50.8 | 100.0 | BDL | 0.06 | BDL | 0.34 |
| to 1 mL | | | | | | | | |

BDL = Below Detectable Limit

a stabilizing amount of an antioxidant, such as thioglycerol, α-lipoic acid or dihydrolipoic acid, had substantially no increase in total degradants after a period of 1 month. This data supports the position that bendamustine-containing compositions according to the invention have a shelf life of at least about 2 years when stored at temperatures between 5° C. and 25° C.

As shown in Table 5, bendamustine, when dissolved in certain mixtures of polyethylene glycol and propylene glycol and a stabilizing amount of lipoic acid, had substantially no increase in total degradants after a period of 1 month. The data presented in Table 5 translates to bendamustine-containing compositions having a shelf life of at least about 2 years when stored at temperatures between 5° C. and at 25° C.

#### Example 5

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in a mixture of polyethylene glycol 400 and propylene glycol as indicated in Table 5 below. 5 mg/ml of lipoic acid was added as a stabilizing antioxidant. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed

#### Example 6

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol and α-lipoic acid was added as a stabilizing antioxidant as indicated in Table 6 below. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed for drug content and impurity profile as indicated in Table 6 below. The results obtained are presented in Table 6.

US 12,138,248 B2

11      12

### TABLE 6

Stability of Bendamustine in 90% PEG 400, 10% PG and α-lipoic acid

| Formu-lation | Temp | Time Per. | Amt. mg/ml | % of Initial | % Area of degradants | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0.59 | 1.10 | 1.13 | 1.15 | 1.17 | 1.20 | 1.22 | 1.30 | |
| BDM- | | Initial | 51.0 | 100 | 0.20 | 0.06 | <LD | <LD | <LD | <LD | <LD | LD | 0.26 |
| 50 mg/mL | 40° C. | 1 M | 50.5 | 99.0 | 0.21 | 0.31 | 0.13 | 0.07 | 0.13 | 0.10 | <LD | <LD | 0.95 |
| α-lipoic | | 2 M | 49.7 | 97.5 | 0.22 | 0.71 | 0.28 | 0.14 | 0.12 | 0.21 | 0.12 | <LD | 2.02 |
| acid- | | 3 M | 48.7 | 95.5 | 0.22 | 1.01 | 0.45 | 0.21 | 0.14 | 0.37 | 0.16 | 0.05 | 2.96 |
| 10 mg/mL | 25° C. | 3 M | 50.5 | 99.0 | 0.20 | 0.36 | 0.07 | <LD | <LD | 0.10 | <LD | <LD | 0.73 |
| PEG | | 6 M | 50.4 | 98.8 | 0.22 | 0.60 | 0.17 | 0.06 | 0.06 | 0.09 | 0.10 | 0.08 | 1.44 |
| 400:PG | 5° C. | 6 M | 50.9 | 99.8 | 0.16 | 0.05 | <LD | <LD | <LD | <LD | <LD | <LD | 0.21 |
| (90:10) qs | | 12 M | 50.6 | 99.2 | 0.20 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | 0.38 |
| to 1 mL | | Initial | 50.3 | 100 | 0.18 | 0.15 | <LD | <LD | <LD | <LD | <LD | <LD | 0.33 |
| BDM- | 40° C. | 1 M | 50.0 | 99.4 | 0.19 | 0.32 | 0.08 | 0.06 | 0.08 | 0.06 | 0.06 | <LD | 0.85 |
| 50 mg/mL | | 2 M | 49.8 | 99.0 | 0.19 | 0.65 | 0.21 | 0.12 | 0.13 | 0.23 | 0.14 | 0.06 | 1.85 |
| α-lipoic | | 3 M | 49.5 | 98.4 | 0.15 | 0.89 | 0.37 | 0.17 | 0.13 | 0.32 | 0.10 | <LD | 2.40 |
| acid- | | 6 M | 47.0 | 93.4 | 0.20 | 1.76 | 0.66 | 0.19 | 0.31 | 0.47 | 0.33 | 0.17 | 4.93 |
| 15 mg/mL | 25° C. | 3 M | 50.0 | 99.4 | 0.20 | 0.35 | 0.08 | <LD | <LD | 0.11 | <LD | <LD | 0.79 |
| PEG | | 6 M | 49.5 | 98.4 | 0.19 | 0.58 | 0.15 | 0.06 | 0.07 | 0.09 | 0.08 | 0.10 | 1.38 |
| 400:PG | 5° C. | 6 M | 50.3 | 100 | 0.17 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.23 |
| (90:10) qs | | 12 M | 50.2 | 99.8 | 0.19 | 0.15 | <LD | <LD | <LD | <LD | <LD | <LD | 0.34 |
| to 1 mL | | | | | | | | | | | | | |

<LD = Below Level of Detection

The data reported in Table 6 along with the data in Table 5 demonstrates that bendamustine solutions are stable when dissolved in mixtures of PEG and PG and 5-15 mg/mL α-lipoic acid. As shown in Table 6, bendamustine, when dissolved in combinations of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of lipoic acid, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6-12 months at 5° C. and 25° C. The data corresponds to bendamustine solutions being stable under ambient or refrigerated storage conditions for well in excess of 2 years, and thus long term stable.

### Example 7

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 2.5 mg/ml of thioglycerol was added as an antioxidizing agent. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table 7 below. The results obtained are presented in Table 7.

The stability is similar to that of α-lipoic acid samples in Example 6 above. As shown in Table 7, bendamustine, when dissolved in a combination of polyethylene glycol and propylene glycol, and a stabilizing amount of thioglycerol, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6 months at 25° C. The data reported supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for about 2 years.

### Example 8

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 85% PEG 400 and 15% PG in the presence of 5 mg/ml of thioglycerol. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table 8 below. The results obtained are presented in Table 8.

### TABLE 7

Stability of Bendamustine in 90% PEG 400, 10% PG and Thioglycerol

| Formu-lation | Temp | Time Per. | Amt mg/ml | % of Initial | RRTs of degradants | | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0.15 | 0.37 | 1.10 | 1.13 | 1.15 | 1.17 | 1.18 | 1.20 | 1.22 | |
| BDM - | | Initial | 50.3 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| 50 mg/mL | 40° C. | 15 d | 50.2 | 99.8 | BDL | BDL | 0.18 | BDL | BDL | BDL | BDL | 0.05 | 0.08 | 0.31 |
| Thio | | 1 M | 49.9 | 99.2 | BDL | 0.12 | 0.32 | 0.07 | BDL | BDL | 0.09 | 0.08 | BDL | 0.75 |
| glycerol- | | 2 M | 49.1 | 97.6 | BDL | 0.18 | 0.56 | 0.24 | 0.09 | 0.17 | 0.19 | 0.12 | 0.11 | 1.76 |
| 2.5 mg/mL | | 3 M | 48.8 | 97.0 | BDL | 0.23 | 0.85 | 0.34 | 0.16 | 0.30 | 0.34 | 0.29 | 0.19 | 2.94 |
| PEG | 25° C. | 3 M | 49.9 | 99.2 | 0.06 | 0.12 | 0.23 | 0.07 | BDL | 0.06 | 0.07 | 0.06 | BDL | 0.67 |
| 400:PG | | 6 M | 49.3 | 98.0 | BDL | 0.23 | 0.53 | 0.22 | 0.11 | BDL | 0.21 | 0.22 | 0.20 | 2.07 |
| (90:10) qs | | | | | | | | | | | | | | |
| to 1 mL | | | | | | | | | | | | | | |

BDL = Below Detectable Limit

US 12,138,248 B2

13

14

TABLE 8

| Stability of Bendamustine in 85% PEG 400, 15% PG and Thioglycerol | | | | | |
|---|---|---|---|---|---|
| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Total Imp. |
| BDM - 50 mg/mL | Initial | | 51.5 | 100 | 0.12 |
| Thioglycerol - 5 mg/mL | 40° C. | 1 M | 50.4 | 97.9 | 1.18 |
| PEG 400:PG (85:15) | 25° C. | 1 M | 51.4 | 99.8 | 0.41 |
| qs to 1 mL | | 3 M | 50.4 | 97.9 | 1.21 |
| | 5° C. | 3 M | 51.0 | 99.0 | 0.26 |

The stability is similar to that of thioglycerol samples in Example 7 above. As reported in Table 8, total impurities did not exceed 2% at 40° C. or 25° C. storage over one month, or at 25° C. and 5° C. storage after three months. The data reported in Table 8 supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for at least about 2 years if not longer.

We claim:

1. A sterile container containing a liquid bendamustine-containing composition comprising
    bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is about 25 mg/ml;
    a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
    a stabilizing amount of an antioxidant,
    wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

2. The sterile container of claim 1, wherein the antioxidant is monothioglycerol.

3. The sterile container of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

4. The sterile container of claim 1, wherein the composition is stable for at least about 15 months at 5° C. or for at least about 15 months at 25° C.

5. The sterile container of claim 1, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol.

6. The sterile container of claim 1, wherein the liquid bendamustine-containing composition comprises about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof.

7. The sterile container of claim 1, wherein the liquid bendamustine-containing composition comprises about 100 mg of bendamustine.

8. A liquid bendamustine-containing composition comprising
    bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid;
    wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
    wherein the bendamustine concentration in the pharmaceutically acceptable fluid is about 25 mg/mL,
    wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

9. The composition of claim 8, wherein the antioxidant is monothioglycerol.

10. The composition of claim 8, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

11. The composition of claim 8, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol.

12. The composition of claim 8, wherein the bendamustine concentration in the composition is 25 mg/mL.

13. The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol.

14. The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and propylene glycol.

15. The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and ethanol.

16. The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and benzyl alcohol.

17. The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and glycofurol.

18. The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol.

19. The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and propylene glycol.

20. The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and ethanol.

21. The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and benzyl alcohol.

22. The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and glycofurol.

*    *    *    *    *

# EXHIBIT 4

US008609707B2

(12) **United States Patent**
Palepu et al.

(10) Patent No.: **US 8,609,707 B2**
(45) Date of Patent: **\*Dec. 17, 2013**

(54) **FORMULATIONS OF BENDAMUSTINE**

(75) Inventors: **Nagesh R. Palepu**, Southampton, PA (US); **Philip Christopher Buxton**, Great Dunmow (GB)

(73) Assignee: **Eagle Pharmaceuticals, Inc.**, Woodcliff Lake, NJ (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 152 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/016,473**

(22) Filed: **Jan. 28, 2011**

(65) **Prior Publication Data**

US 2011/0184036 A1     Jul. 28, 2011

**Related U.S. Application Data**

(60) Provisional application No. 61/299,100, filed on Jan. 28, 2010.

(51) **Int. Cl.**
 *A61K 31/4184* (2006.01)
 *A61K 31/095* (2006.01)
(52) **U.S. Cl.**
 USPC .......................................... **514/394**; 514/127
(58) **Field of Classification Search**
 USPC ............................... 514/300, 394, 127
 See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,711,906 | A | \* | 12/1987 | von Stetten et al. .......... 514/561 |
| 7,772,274 | B1 | \* | 8/2010 | Palepu ......................... 514/449 |
| 8,076,366 | B2 | | 12/2011 | Courvoisier et al. |
| 8,344,006 | B2 | | 1/2013 | Drager et al. |
| 8,389,558 | B2 | | 3/2013 | Alakhov et al. |

| | | | |
|---|---|---|---|
| 2004/0043069 | A1 | 3/2004 | Vanderbist et al. |
| 2005/0042285 | A1 | 2/2005 | Ukai et al. |
| 2006/0159713 | A1 | 7/2006 | Brittain et al. |
| 2009/0209606 | A1 | 8/2009 | Bendall et al. |
| 2009/0264488 | A1 | 10/2009 | Cooper et al. |
| 2010/0216858 | A1 | 8/2010 | Popek et al. |
| 2011/0015245 | A1 | 1/2011 | Alkhov et al. |
| 2011/0190363 | A1 | 8/2011 | Drager et al. |
| 2012/0071532 | A1 | 3/2012 | Cooper et al. |
| 2012/0157505 | A1 | 6/2012 | La Bell et al. |
| 2013/0041003 | A1 | 2/2013 | Brittain et al. |
| 2013/0041004 | A1 | 2/2013 | Drager et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 1592 89 | 3/1983 |
| WO | 2010/148288 A2 | 12/2010 |

OTHER PUBLICATIONS

Rowe et al. Handbook of Pharmaceutical Excipients, 6th edition, 2009, pp. 454-455.\*
Biewenga et al. "The Pharmacology of the Antioxidant Lipoic Acid," Gen. Pharmac., 1997, 29, 3, 315-331.\*
Spiegel et al. ("Spiegel", J. Pharma. Sci., 1963, 52(10), 917-927).\*
International Search Report PCT/US2011/022958 dated Apr. 12, 2011.

\* cited by examiner

*Primary Examiner* — Blessing M. Fubara
*Assistant Examiner* — Kauser M Akhoon
(74) *Attorney, Agent, or Firm* — Lucas & Mercanti, LLP

(57) **ABSTRACT**

Long term storage stable bendamustine-containing compositions are disclosed. The compositions can include bendamustine or a pharmaceutically acceptable salt thereof, and a pharmaceutically acceptable fluid which can include in some embodiments PEG, PG or mixtures thereof and an antioxidant or chloride ion source. The bendamustine-containing compositions have less than about 5% total impurities, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

**22 Claims, No Drawings**

US 8,609,707 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# FORMULATIONS OF BENDAMUSTINE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims priority under 35 U.S.C. §119(e) to U.S. Provisional Patent Application No. 61/299,100, filed Jan. 28, 2010, entitled "FORMULATIONS OF BENDA-MUSTINE", the disclosure of which is incorporated by reference herein in its entirety.

## BACKGROUND OF THE INVENTION

Bendamustine free base is represented by the following structural formula (I)



Bendamustine is used in the treatment of a number of cancers including leukemias, Hodgkins disease and multiple myelomas. Bendamustine is the active ingredient of the commercial product Treanda™, a lyophilized powder for reconstitution.

Bendamustine exhibits rapid degradation upon reconstitution of the lyophilized product. Bendamustine undergoes hydrolysis by direct substitution rather than an addition elimination process due to the presence of the highly labile aliphatic chlorine atoms. Some of the main degradants of bendamustine are the monohydroxy compound known as HP1 (hydrolysis product 1) and dihydroxy compound HP2 (hydrolysis product 2). The monohydroxy compound appears as the main impurity at Relative Retention Time (RRT) 0.6 and the dihydroxy compound appears as the main impurity at RRT 0.27. Minor peaks appear at RRT 1.2, which are presently unknown.

The stability of bendamustine in water is measured in hours, and is therefore, not suitable for long-term storage in liquid form. The lyophile possesses good chemical stability. However, reconstitution of the lyophile is clinically inconvenient, taking 15-30 mins with implications of chemical instability. There is a need for ready to use (RTU) bendamustine formulations having enhanced stability.

## SUMMARY OF THE INVENTION

In other aspects of the invention, the bendamustine-containing compositions include a) a pharmaceutically acceptable fluid which contains one or more of propylene glycol, ethanol, polyethylene glycol, benzyl alcohol and glycoforol, and b) a stabilizing amount of a chloride salt. In other aspects of the invention, the bendamustine-containing compositions include DMSO (dimethyl sulfoxide) as part of the pharmaceutically acceptable fluid included therein. Regardless of the pharmaceutically acceptable fluid included, the amount of bendamustine included in the composition is preferably from about 20 mg/mL to about 60 mg/mL. Still further aspects of the invention include methods of treatment using bendamustine-containing compositions and kits containing the same.

One of the advantages of the inventive liquid compositions is that they have substantially improved long term stability when compared to currently available formulations. For example, the inventive bendamustine compositions are substantially free of impurities after at least about 15 months at a temperature of from about 5° C. to about 25° C. The inventive formulations are advantageously ready to use or ready for further dilution. Reconstitution of lyophilized powders is not required.

## DETAILED DESCRIPTION OF THE INVENTION

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art to which this invention belongs. In the event that there is a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

As used herein, RRT is calculated by dividing the retention time of the peak of interest by the retention time of the main peak. Any peak with an RRT<1 elutes before the main peak, and any peak with an RRT>1 elutes after the main peak.

For purposes of the present invention, "substantially free of impurities" shall be understood to include bendamustine-containing compositions in which the amount of total impurities is less than about 5%, as calculated on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after a period of about 15 months at a temperature of from about 5° C. to about 25° C. The amount of impurities is further calculated as being based upon the original amount bendamustine (or salt thereof) being present in the composition or formulation.

For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.

Preferably, the amount of any individual degradant in the inventive compositions does not exceed 2% PAR as determined by HPLC at a wavelength of 223 nm after storage periods of at least about 15 months at a temperature of from about 5° C. to about 25° C. In some aspects, the amount of time the inventive compositions demonstrate long term storage stability is at least about 18 months and preferably at least about 2 years when stored under the conditions described herein.

In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions including:
   a) bendamustine or a pharmaceutically acceptable salt thereof; and
   b) a pharmaceutically acceptable fluid including
      i) PEG, PG or mixtures thereof; and
      ii) a stabilizing amount of an antioxidant.

The total impurities in the inventive compositions resulting from the degradation of the bendamustine in the compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of from about 5° C. to about 25° C., and thus have long term stability for at least the same period of time or longer. Preferably, the bendamustine-containing compositions demonstrate long term storage stability for at least about 2 years, especially when stored at the lower (refrigerated) temperatures. In one embodiment, the amount of total impurities in the inventive compositions resulting from the degra-

US 8,609,707 B2

3                                                                                                      4

dation of the bendamustine is less than about 3% PAR as determined by HPLC at a wavelength of 223 nm after at least about 2 years at a temperature of from about 5° C. to about 25° C.

In some aspects of the invention, the bendamustine concentration in the inventive compositions is from about 10 mg/mL to about 100 mg/mL, preferably 20 mg/mL to about 60 mg/mL. Preferably the bendamustine concentration in the inventive compositions is from about 25 mg/mL to about 50 mg/mL, and more preferably from about 30 mg/mL to about 50 mg/mL. It will be understood that compositions containing any useful concentration within the ranges, i.e. 10, 20, 25, 30, 35, 40, 45, 50, 55, 60 . . . 100 are contemplated. In other embodiments, the bendamustine concentration in the composition is about 50 mg/mL. In alternative aspects, the amount of bendamustine is outside these ranges but the amounts will be sufficient for single or multiple administrations of dosages generally regarded as effective amounts.

In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof. Within this aspect, the pharmaceutically acceptable fluid is propylene glycol (PG) or polyethylene glycol (PEG). In other embodiments of the invention however, the pharmaceutically acceptable fluid is a mixture of PEG and PG. For example, the pharmaceutically acceptable fluid can include about 50% PEG and about 50% PG. Alternatively, pharmaceutically acceptable fluid includes about 95% PEG and about 5% PG. The amount of PEG and PG can also be varied within the ranges, i.e. the ratio of PEG:PG in the pharmaceutically acceptable fluid can range from about 95:5 to about 50:50. Within this range, is a pharmaceutically acceptable fluid containing about 75% PEG and about 25% PG, and preferably 80% PEG and 20% PG. In another embodiment, a pharmaceutically acceptable fluid can include about 85% PEG and about 15% PG while another preferred pharmaceutically acceptable fluid includes about 90% PEG and about 10% PG. The molecular weight of the PEG will be within the range of pharmaceutically acceptable weights although PEG 400 is preferred in many aspects of the invention.

Without meaning to be bound by any theory or hypothesis, the hydroxide of the polyethylene glycol molecule is less reactive than the hydroxides of propylene glycol. As a result, the ester forms at a slower rate in polyethylene glycol than propylene glycol and the resulting bendamustine degradants are unexpectedly and substantially reduced over extended periods of time when PEG is a substantial part of the pharmaceutically acceptable fluid.

The bendamustine-containing compositions according to several preferred aspects of the invention include a stabilizing amount of an antioxidant. For purposes of the present invention, "stabilizing amount" shall be understood to include those amounts which increase or enhance the stability of the bendamustine in the compositions described herein. The presence of one or more antioxidants described herein thus contributes, at least in part to the long term stability of the composition. Within this guideline, suitable antioxidant concentrations in the compositions can range from about 2.5 mg/mL to about 35 mg/mL, and preferably from about 5 mg/mL to about 20 mg/mL or from about 10 mg/mL to about 15 mg/mL. In some other embodiments, the concentration of the antioxidant in the bendamustine-containing composition is about 5 mg/mL.

Suitable antioxidants for inclusion include those which are pharmaceutically acceptable for use in human and veterinary formulations although not limited to those currently regarded as safe by any regulatory authority. For example, the antioxi-

dant can be selected from among lipoic acid, thioglycerol (also known as monothioglycerol) and analogs thereof, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds, dihydrolipoic acid and mixtures of the foregoing. Preferably, the antioxidant is thioglycerol, lipoic acid or a mixture thereof. Some particularly preferred embodiments of the invention include thioglycerol.

In view of the foregoing, some preferred long term storage stable bendamustine-containing compositions in accordance with the invention compositions include:

I. a) bendamustine or a pharmaceutically acceptable salt thereof; and
   b) a pharmaceutically acceptable fluid including
      i) polyethylene glycol and propylene glycol; and
      ii) a stabilizing amount of thioglycerol; or
II. a) about 50 mg/mL bendamustine or a pharmaceutically acceptable salt thereof; and
   b) a pharmaceutically acceptable fluid including
      i) about 90% PEG and about 10% PG; and
      ii) about 2.5 mg/mL thioglycerol.

Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total impurities, PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

In accordance with other aspects of the invention, there are provided long term storage stable bendamustine-containing compositions, including:

   a) bendamustine or a pharmaceutically acceptable salt thereof;
   b) a pharmaceutically acceptable fluid including one or more of the following: PG, ethanol, PEG, benzyl alcohol and glycofurol; and
   c) a stabilizing amount of a chloride salt.

These compositions also have the low levels of impurities and long term stability mentioned herein. Preferred pharmaceutically acceptable fluids include PG, PEG or ethanol in this embodiment of the invention. Preferably, the PEG is PEG 400. If desired, glycerin and/or 88% (w/w) lactic acid can be added to the pharmaceutically acceptable fluid.

Suitable chloride salts include but are not limited to organic chloride salts, sodium chloride, choline chloride, hydrochloride salts of amino acids and mixtures thereof. Thus, as will be appreciated by those of ordinary skill, one can select from among a number of suitable chloride salts and it is Applicants' intention that the scope of the invention includes all such chloride salts that are capable of being included in bendamustine-containing formulations for extended periods without having a deleterious effect on the drug. In one embodiment of the invention, the chloride salt concentration is from about 10 to about 300 mg/mL. In another embodiment, the chloride salt concentration is from about 50 to about 215 mg/mL. In one preferred embodiment, the chloride salt concentration is about 215 mg/mL.

In accordance with another aspect of the invention, there is provided long term storage stable bendamustine-containing compositions, including:

   a) bendamustine or a pharmaceutically acceptable salt thereof; and
   b) a pharmaceutically acceptable fluid including DMSO.

These compositions also have the low levels of impurities and long term stability mentioned herein. In some aspects, the bendamustine concentration in these compositions is from about 10 mg/mL to about 100 mg/mL. Preferably, the bendamustine concentration is from about 20 mg/mL to about 50 mg/mL, more preferably from about 25 mg/mL to about 50

US 8,609,707 B2

5

mg/mL. In an alternative embodiment, the bendamustine concentration is about 50 mg/mL.

Another embodiment of the invention provides methods of treating cancer in mammals. The methods include administering to a mammal in need thereof an effective amount of one of the bendamustine-containing compositions described herein. Since the active ingredient portion of the inventive composition is an FDA-approved drug, those of ordinary skill will recognize that the doses of bendamustine employed in this aspect of the invention will be similar to those employed in any treatment regimens designed for bendamustine as marketed under the trade name TREANDA. The patient package insert containing dosing information is incorporated herein by reference. The methods of treatment also include administering the inventive formulations for any purpose or physical condition for which bendamustine has been indicated as being useful.

Another embodiment of the invention includes methods of preparing bendamustine-containing compositions described herein. The methods include reconstituting lyophilized bendamustine in a pharmaceutically acceptable fluid containing one of the following:

A) i) PEG, PG or mixtures thereof; and
  ii) a stabilizing amount of an antioxidant;
B) i) one or more of PG, ethanol, PEG, benzyl alcohol and glycofurol; and
  ii) a stabilizing amount of a chloride salt; or
C) DMSO.

The steps are carried out under pharmaceutically acceptable conditions for sterility and manufacturing.

In a further aspect of the invention, there are provided methods of controlling or preventing the formation of impurities in bendamustine-containing compositions during long term storage. The methods include combining an amount of bendamustine or a pharmaceutically acceptable salt thereof with a sufficient amount of a pharmaceutically acceptable fluid containing one of the following:

A) i) PEG, PG or mixtures thereof; and
  ii) a stabilizing amount of an antioxidant;
B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and
  ii) a stabilizing amount of a chloride salt; or
C) DMSO.

Further optional steps in accordance therewith include transferring one or more pharmaceutically acceptable doses of the formulations into a suitable sealable container and storing the sealed container at a temperature of from about 5° C. to about 25° C. As a result of carrying out these steps, it is possible to control or substantially prevent the formation of impurities which otherwise occur with bendamustine-containing compositions during long term storage so that the artisan is provided with bendamustine-containing formulations having less than about 5% total impurities PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

The compositions of the present invention can be packaged in any suitable sterile vial or container fit for the sterile storage of a pharmaceutical such as bendamustine. Suitable containers can be glass vials, polypropylene or polyethylene vials or other special purpose containers and be of a size sufficient to hold one or more doses of bendamustine.

A further aspect of the invention includes kits containing lyophilized bendamustine or a pharmaceutically acceptable salt thereof in a first container or vial; and, in a second container, a sufficient amount of a pharmaceutically acceptable fluid such as those described herein, i.e. one of the following:

6

A) i) PEG, PG or mixtures thereof; and
  ii) a stabilizing amount of an antioxidant;
B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and
  ii) a stabilizing amount of a chloride salt; or
C) DMSO.

For purposes of this embodiment, the amount of fluid which is sufficient is an amount which allows the bendamustine to be dissolved or dispersed to a degree which renders the liquid composition ready for use.

As will be appreciated by those of ordinary skill, the kit will contain other pharmaceutically necessary materials for storing and/or administering the drug, including instructions for storage and use, additional diluents, if desired, etc.

EXAMPLES

The following examples serve to provide further appreciation of the invention but are not meant in any way to restrict the effective scope of the invention.

Example 1

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10 mg/ml in one of ethanol, propylene glycol and benzyl alcohol as indicated in Table 1 below. 215 mg/ml of choline chloride was added in half of the samples as a source of soluble chloride ions. The samples were maintained at 40° C. and analyzed periodically for drug content and total impurities. The results obtained are presented in Table 1.

TABLE 1

| | | | | |
|---|---|---|---|---|
| Stability of Bendamustine HCl | | | | |
| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
| BDM - 10 mg/mL | | Initial | 10.43 | 0.27 |
| Choline chloride - | 40° C. | 48 hrs | 10.48 | 1.27 |
| 215 mg/mL | | 7 day | 10.26 | 2.11 |
| Ethanol qs to 1 mL | | | | |
| BDM - 10 mg/mL | | Initial | 10.55 | 0.27 |
| Ethanol qs to 1 mL | 40° C. | 48 hrs | 10.30 | 2.39 |
| | | 7 day | 9.55 | 6.66 |
| BDM - 10 mg/mL | | Initial | 9.99 | 0.21 |
| Choline chloride - | 40° C. | 48 hrs | 9.95 | 0.60 |
| 215 mg/mL | | 7 day | 9.43 | 2.31 |
| Propylene glycol qs to 1 mL | | | | |
| BDM - 10 mg/mL | | Initial | 9.68 | 0.21 |
| Propylene glycol qs | 40° C. | 48 hrs | 9.45 | 0.88 |
| to 1 mL | | 7 day | 9.00 | 3.44 |
| BDM - 10 mg/mL | | Initial | 9.95 | 1.19 |
| Choline Chloride - | 40° C. | 48 hrs | 9.89 | 3.51 |
| 215 mg/mL | | 7 day | 8.97 | 4.24 |
| Benzyl alcohol qs to 1 mL | | | | |
| BDM - 10 mg/mL | | Initial | 9.52 | 0.33 |
| Benzyl alcohol qs | 40° C. | 48 hrs | 8.67 | 4.18 |
| to 1 mL | | 7 day | 7.49 | 7.84 |

Note:
In Table 1 the total % impurities include total contributions from peaks at various RRTs.

As shown in Table 1, the bendamustine formulations are very stable in solutions containing solvent and chloride salt. Table 1 shows that bendamustine, when dissolved at a concentration of about 10 mg/mL, in a pharmaceutically acceptable fluid, such as ethanol and propylene glycol, and containing a stabilizing amount of a chloride salt, such as choline chloride, had less than about 5% after at least 7 days storage at 40° C.

US 8,609,707 B2

7

The data presented in Table 1 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of a chloride salt having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including ethanol alone exhibited more than 6.5 total degradants after 7 days storage at 40° C. The sample including benzyl alcohol alone exhibited more than 7.5% total degradants after 7 days storage at 40° C. Bendamustine-containing compositions with such high levels of degradation would not be suitable for long-term storage.

Example 2

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10 mg/ml in DMSO. The samples were maintained at 40° C. and analyzed periodically for drug content and impurity profile. The results obtained are presented in Table 2.

TABLE 2

| Stability of Bendamustine HCl in DMSO | | | | |
|---|---|---|---|---|
| Formulation | Temp | Time | Content (mg/mL) | % Total Imp |
| BDM - 10 mg/mL DMSO qs to 1 mL | 40° C. | Initial | 10.2 | 0.23 |
| | | 48 hrs | 9.80 | 0.30 |
| | | 1 week | 10.0 | 0.56 |

Note:
In Table 2 the total % impurities include total contributions from peaks at various RRTs.

Table 2 shows that bendamustine, when dissolved in DMSO, had substantially no increase in total degradants. The data presented in Table 2 translates to bendamustine-containing compositions including DMSO having a shelf life of at least about 15 months at 5° C. and 25° C. In fact, such compositions are expected to have long term stability for periods beyond 15 months, i.e. up to 2 years or greater.

Example 3

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 20 mg/ml in polyethylene glycol 400 and 5 mg/ml of lipoic acid was added as a stabilizing antioxidant as indicated in Table 3 below. The samples were maintained at 40° C. or 25° C. and analyzed after 15 days for drug content and impurities. The results obtained are presented in Table 3.

TABLE 3

| Stability of Bendamustine (20 mg/ml) in PEG 400 and Antioxidants | | | | |
|---|---|---|---|---|
| Antioxidant | T ° C. | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid | 25 | 15 | 98.5 | <LD | 0.23 |
| 5 mg/ml | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

As shown in Table 3, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as polyethylene glycol, in the presence of a stabilizing amount of an antioxidant, such as lipoic acid, had substantially no increase in total degradants after a period of 15 days. The data presented in Table 3 translates to bendamustine-containing compositions

8

including a pharmaceutically acceptable fluid and a stabilizing amount of an antioxidant having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including PEG alone, on the other hand, which did not contain an antioxidant, did not exhibit stabilizing effects at 40° C. This sample had more than 40% more total impurities than the sample including lipoic acid. Bendamustine-containing compositions with such high levels of total impurities would not be suitable for long-term storage.

Example 4

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 5 mg/ml of thioglycerol, α-lipoic acid or dihydrolipoic acid was added as a stabilizing antioxidant as indicated in Table 4 below. The samples were maintained at 40° C. and analyzed after 15 days or one month for drug content and impurity profile as indicated in Table 4 below. The results obtained are presented in Table 4.

TABLE 4

| Stability of Bendamustine (50 mg/ml) in 90% PEG 400, 10% Propylene Glycol and Antioxidant | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | % Impurities RRT | | |
| Antioxidant | T (° C.) | Time | Content (mg/mL) | % Initial | HP1 0.59 | PG ester 1.10 | % Total Imps |
| Thioglycerol | 40 | initial | 48.8 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 48.5 | 99.4 | 0.06 | 0.20 | 0.71 |
| α-lipoic acid | 40 | initial | 49 | 100 | <LD | <LD | 0 |
| | 40 | 15 days | 48.8 | 99.6 | 0.19 | 0.13 | 0.32 |
| | 40 | 1 month | 48.7 | 99.4 | 0.34 | 0.26 | 0.79 |
| Dihydrolipoic acid | 40 | initial | 49.3 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 47.7 | 97.4 | 0.63 | 0.12 | 1.84 |

<LD = Below Level of Detection

As shown in Table 4, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as a combination of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of an antioxidant, such as thioglycerol, α-lipoic acid or dihydrolipoic acid, had substantially no increase in total degradants after a period of 1 month. This data supports the position that bendamustine-containing compositions according to the invention have a shelf life of at least about 2 years when stored at temperatures between 5° C. and 25° C.

Example 5

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in a mixture of polyethylene glycol 400 and propylene glycol as indicated in Table 5 below. 5 mg/ml of lipoic acid was added as a stabilizing antioxidant. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed after 1 week, 15 days or one month for drug content and impurity profile as indicated in Table 5 below. The results obtained are presented in Table 5.

US 8,609,707 B2

9        10

TABLE 5

Stability of Bendamustine (50 mg/ml) and Lipoic Acid (5 mg/ml) in PEG400 and Propylene glycol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | HP1 0.58 | PG ester 1.10 | PG ester 1.13 | % Total Imp. |
|---|---|---|---|---|---|---|---|---|
| | | | | | | % Area of degradants | | |
| BDM - | | Initial | 49.6 | 100 | BDL | BDL | BDL | 0.18 |
| 50 mg/ml | 40° C. | 1 W | 49.0 | 98.8 | 0.05 | 0.13 | BDL | 0.38 |
| Lipoic acid - | | 15 d | 48.3 | 97.4 | 0.08 | 0.26 | BDL | 0.55 |
| 5 mg/mL | | 1 M | 48.0 | 96.8 | 0.11 | 0.43 | 0.13 | 1.03 |
| PEG | 25° C. | 15 d | 49.6 | 100.0 | BDL | 0.10 | BDL | 0.30 |
| 400:PG | | 1 M | 48.4 | 97.6 | 0.05 | 0.19 | BDL | 0.43 |
| (75:25) qs to 1 mL | 5° C. | 1 M | 49.6 | 100.0 | BDL | 0.07 | BDL | 0.27 |
| BDM - | | Initial | 50.2 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/ml | 40° C. | 1 W | 49.9 | 99.4 | BDL | 0.15 | BDL | 0.30 |
| Lipoic acid - | | 15 d | 49.1 | 97.8 | 0.06 | 0.35 | BDL | 0.73 |
| 5 mg/mL | | 1 M | 49.0 | 97.6 | 0.09 | 0.90 | 0.25 | 1.82 |
| PEG | 25° C. | 15 d | 49.9 | 99.4 | BDL | 0.12 | BDL | 0.32 |
| 400:PG | | 1 M | 49.7 | 99.0 | BDL | 0.25 | BDL | 0.59 |
| (50:50) qs to 1 mL | 5° C. | 1 M | 50.0 | 99.6 | BDL | 0.11 | BDL | 0.33 |
| BDM - | | Initial | 50.8 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/ml | 40° C. | 1 W | 50.4 | 99.2 | BDL | 0.11 | BDL | 0.30 |
| Lipoic acid - | | 15 d | 49.7 | 97.8 | 0.07 | 0.17 | BDL | 0.43 |
| 5 mg/mL | | 1 M | 49.7 | 97.8 | 0.13 | 0.27 | 0.09 | 0.84 |
| PEG | 25° C. | 15 d | 50.8 | 100.0 | BDL | 0.10 | BDL | 0.26 |
| 400:PG | | 1 M | 50.8 | 100.0 | 0.05 | 0.14 | BDL | 0.39 |
| (90:10) qs to 1 mL | 5° C. | 1 M | 50.8 | 100.0 | BDL | 0.06 | BDL | 0.34 |

BDL = Below Detectable Limit

As shown in Table 5, bendamustine, when dissolved in certain mixtures of polyethylene glycol and propylene glycol and a stabilizing amount of lipoic acid, had substantially no increase in total degradants after a period of 1 month. The data presented in Table 5 translates to bendamustine-containing compositions having a shelf life of at least about 2 years when stored at temperatures between 5° C. and at 25° C.

Example 6

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol and α-lipoic acid was added as a stabilizing antioxidant as indicated in Table 6 below. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed for drug content and impurity profile as indicated in Table 6 below. The results obtained are presented in Table 6.

TABLE 6

Stability of Bendamustine in 90% PEG 400, 10% PG and α-lipoic acid

| Formulation | Temp | Time Per. | Amt. mg/ml | % of Initial | 0.59 | 1.10 | 1.13 | 1.15 | 1.17 | 1.20 | 1.22 | 1.30 | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | % Area of degradants | | | | | |
| BDM - | | Initial | 51.0 | 100 | 0.20 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.26 |
| 50 mg/mL | 40° C. | 1 M | 50.5 | 99.0 | 0.21 | 0.31 | 0.13 | 0.07 | 0.13 | 0.10 | <LD | <LD | 0.95 |
| α-lipoic | | 2 M | 49.7 | 97.5 | 0.22 | 0.71 | 0.28 | 0.14 | 0.12 | 0.21 | 0.12 | <LD | 2.02 |
| acid - | | 3 M | 48.7 | 95.5 | 0.22 | 1.01 | 0.45 | 0.21 | 0.14 | 0.37 | 0.16 | 0.05 | 2.96 |
| 10 mg/mL | 25° C. | 3 M | 50.5 | 99.0 | 0.20 | 0.36 | 0.07 | <LD | <LD | 0.10 | <LD | <LD | 0.73 |
| PEG | | 6 M | 50.4 | 98.8 | 0.22 | 0.60 | 0.17 | 0.06 | 0.06 | 0.09 | 0.10 | 0.08 | 1.44 |
| 400:PG | 5° C. | 6 M | 50.9 | 99.8 | 0.16 | 0.05 | <LD | <LD | <LD | <LD | <LD | <LD | 0.21 |
| (90:10) qs to 1 mL | | 12 M | 50.6 | 99.2 | 0.20 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | 0.38 |
| BDM - | | Initial | 50.3 | 100 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | <LD | 0.18 |
| 50 mg/mL | 40° C. | 1 M | 50.0 | 99.4 | 0.19 | 0.32 | 0.08 | 0.06 | 0.08 | 0.06 | 0.06 | <LD | 0.85 |
| α-lipoic | | 2 M | 49.8 | 99.0 | 0.19 | 0.65 | 0.21 | 0.12 | 0.13 | 0.23 | 0.14 | 0.06 | 1.85 |

US 8,609,707 B2

| 11 | | | | | | | | | | | | | | 12 |

### TABLE 6-continued

Stability of Bendamustine in 90% PEG 400, 10% PG and α-lipoic acid

| Formulation | Temp | Time Per. | Amt. mg/ml | % of Initial | % Area of degradants | | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0.59 | 1.10 | 1.13 | 1.15 | 1.17 | 1.20 | 1.22 | 1.30 | |
| acid - | - | 3 M | 49.5 | 98.4 | 0.15 | 0.89 | 0.37 | 0.17 | 0.13 | 0.32 | 0.10 | <LD | 2.40 |
| 15 mg/ml | | 6 M | 47.0 | 93.4 | 0.20 | 1.76 | 0.66 | 0.19 | 0.31 | 0.47 | 0.33 | 0.17 | 4.93 |
| PEG | 25° C. | 3 M | 50.0 | 99.4 | 0.20 | 0.35 | 0.08 | <LD | <LD | <LD | 0.11 | <LD | 0.79 |
| 400:PG | | 6 M | 49.5 | 98.4 | 0.19 | 0.58 | 0.15 | 0.06 | 0.07 | 0.09 | 0.08 | 0.10 | 1.38 |
| (90:10) qs | 5° C. | 6 M | 50.3 | 100 | 0.17 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.23 |
| to 1 mL | | 12 M | 50.2 | 99.8 | 0.19 | 0.15 | <LD | <LD | <LD | <LD | <LD | <LD | 0.34 |

<LD = Below Level of Detection

The data reported in Table 6 along with the data in Table 5 demonstrates that bendamustine solutions are stable when dissolved in mixtures of PEG and PG and 5-15 mg/mL α-lipoic acid. As shown in Table 6, bendamustine, when dissolved in combinations of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of lipoic acid, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6-12 months at 5° C. and 25° C. The data corresponds to bendamustine solutions being stable under ambient or refrigerated storage conditions for well in excess of 2 years, and thus long term stable.

### Example 7

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 2.5 mg/ml of thioglycerol was added as an antioxidizing agent. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table 7 below. The results obtained are presented in Table 7.

### TABLE 7

Stability of Bendamustine in 90% PEG 400, 10% PG and Thioglycerol

| Formulation | Temp | Time Per. | Amt mg/ml | % of Initial | RRTs of degradants | | | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0.15 | 0.37 | 1.10 | 1.13 | 1.15 | 1.17 | 1.18 | 1.20 | 1.22 | |
| BDM - | | Initial | 50.3 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| 50 mg/mL | 40° C. | 15 d | 50.2 | 99.8 | BDL | BDL | 0.18 | BDL | BDL | BDL | 0.05 | 0.08 | BDL | 0.31 |
| Thioglycerol - | | 1 M | 49.9 | 99.2 | BDL | 0.12 | 0.32 | 0.07 | BDL | BDL | 0.08 | 0.08 | BDL | 0.75 |
| 2.5 mg/mL | | 2 M | 49.1 | 97.6 | BDL | 0.18 | 0.56 | 0.24 | 0.09 | 0.17 | 0.19 | 0.12 | 0.11 | 1.76 |
| PEG | | 3 M | 48.8 | 97.0 | BDL | 0.23 | 0.85 | 0.34 | 0.16 | 0.30 | 0.34 | 0.29 | 0.19 | 2.94 |
| 400:PG | 25° C. | 3 M | 49.9 | 99.2 | 0.06 | 0.12 | 0.23 | 0.07 | BDL | 0.06 | 0.07 | 0.06 | BDL | 0.67 |
| (90:10) qs | | 6 M | 49.3 | 98.0 | BDL | 0.23 | 0.53 | 0.22 | 0.11 | BDL | 0.21 | 0.22 | 0.20 | 2.07 |
| to 1 mL | | | | | | | | | | | | | | |

BDL = Below Detectable Limit

The stability is similar to that of a-lipoic acid samples in Example 6 above. As shown in Table 7, bendamustine, when dissolved in a combination of polyethylene glycol and propylene glycol, and a stabilizing amount of thioglycerol, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6 months at 25° C. The data reported supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for about 2 years.

### Example 8

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 85% PEG 400 and 15% PG in the presence of 5 mg/ml of thioglycerol. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table 8 below. The results obtained are presented in Table 8.

### TABLE 8

Stability of Bendamustine in 85% PEG 400, 15% PG and Thioglycerol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Total Imp. |
|---|---|---|---|---|---|
| BDM - 50 mg/mL | Initial | | 51.5 | 100 | 0.12 |
| Thioglycerol - 5 mg/mL | 40° C. | 1 M | 50.4 | 97.9 | 1.18 |
| PEG 400:PG (85:15) qs | 25° C. | 1 M | 51.4 | 99.8 | 0.41 |
| to 1 mL | | 3 M | 50.4 | 97.9 | 1.21 |
| | 5° C. | 3 M | 51.0 | 99.0 | 0.26 |

The stability is similar to that of thioglycerol samples in Example 7 above. As reported in Table 8, total impurities did not exceed 2% at 40° C. or 25° C. storage over one month, or at 25° C. and 5° C. storage after three months. The data reported in Table 8 supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for at least about 2 years if not longer.

We claim:

1. A tong term storage stable non-aqueous liquid bendamustine-containing composition, comprising:

US 8,609,707 B2

13

a) bendamustine or a pharmaceutically acceptable salt thereof, and

b) a pharmaceutically acceptable fluid comprising
   i) about 90% polyethylene glycol and about 10% propylene glycol; and
   ii) a stabilizing amount of an antioxidant.

**2**. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim **1**, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

**3**. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim **2**, wherein the bendamustine concentration is from about 25 mg/mL to about 50 mg/mL.

**4**. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim **3**, wherein the bendamustine concentration is from about 30 mg/mL to about 50 mg/mL.

**5**. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim **4**, wherein the bendamustine concentration is about 50 mg/mL.

**6**. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim **1**, wherein the antioxidant is selected from the group consisting of thioglycerol, monothioglycerol, lipoic acid, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds and dihydrolipoic acid.

**7**. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim **6**, wherein the antioxidant is thioglycerol or monothioglycerol.

**8**. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim **6**, wherein the antioxidant is lipoic acid.

**9**. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim **1**, wherein the stabilizing amount of the antioxidant is from about 2.5 mg/mL to about 35 mg/mL.

**10**. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim **9**, wherein the stabilizing amount of the antioxidant is from about 5 mg/mL to about 20 mg/mL.

**11**. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim **10**, wherein the stabilizing amount of the antioxidant is from about 10 mg/mL to about 15 mg/mL.

14

**12**. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim **10**, wherein the stabilizing amount of the antioxidant is about 5 mg/mL.

**13**. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim **1**, wherein said long term storage is at least 2 years.

**14**. A long term storage stable non-aqueous liquid bendamustine-containing composition, comprising:

a) bendamustine or a pharmaceutically acceptable salt thereof, and

b) a pharmaceutically acceptable fluid comprising
   i) about 90% polyethylene glycol and about 10% propylene glycol; and
   ii) a stabilizing amount of thioglycerol.

**15**. A long term storage stable non-aqueous liquid bendamustine-containing composition, comprising:

a) bendamustine or a pharmaceutically acceptable salt thereof, and

b) a pharmaceutically acceptable fluid comprising
   i) about 90% polyethylene glycol and about 10% propylene glycol; and
   ii) a stabilizing amount of 2.5 mg/mL thioglycerol.

**16**. A method of treating cancer in mammals, comprising administering an effective amount of a long term storage stable non-aqueous liquid bendamustine-containing composition of claim **1** to a mammal in need thereof.

**17**. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim **14**, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

**18**. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim **17**, wherein the bendamustine concentration is from about 25 mg/mL to about 50 mg/mL.

**19**. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim **18**, wherein the bendamustine concentration is about 50 mg/mL.

**20**. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim **14**, wherein said long term storage is at least 2 years.

**21**. The method of treating cancer in mammals of claim **16**, wherein the cancer is leukemia.

**22**. The method of treating cancer in mammals of claim **16**, wherein the cancer is Hodgkin's disease.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

| | | |
|---|---|---|
| PATENT NO. | : 8,609,707 B2 | Page 1 of 1 |
| APPLICATION NO. | : 13/016473 | |
| DATED | : December 17, 2013 | |
| INVENTOR(S) | : Palepu et al. | |

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:

The first or sole Notice should read --

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 195 days.

Signed and Sealed this
Fourteenth Day of April, 2015

Michelle K. Lee
*Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.            : 8,609,707 B2                                    Page 1 of 1
APPLICATION NO.   : 13/016473
DATED                    : December 17, 2013
INVENTOR(S)         : Nagesh R. Palepu et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

**In the Claims:**

Claims 1, 14 and 15 on columns 12 and 14 should read as follows:

Column 12, lines 65-67 and column 13, lines 1-6
--1. A long term storage stable non-aqueous liquid bendamustine-containing composition, comprising: a) bendamustine or a pharmaceutically acceptable salt thereof, and b) a pharmaceutically acceptable fluid comprising i) about 90% polyethylene glycol and about 10% propylene glycol; and ii) a stabilizing amount of an antioxidant.--

Column 14, lines 7-14
--14. A long term storage stable non-aqueous liquid bendamustine-containing composition, comprising: a) bendamustine or a pharmaceutically acceptable salt thereof, and b) a pharmaceutically acceptable fluid comprising i) about 90% polyethylene glycol and about 10% propylene glycol; and ii) a stabilizing amount of thioglycerol.--

Column 14, lines 15-22
--15. A long term storage stable non-aqueous liquid bendamustine-containing composition, comprising: a) bendamustine or a pharmaceutically acceptable salt thereof, and b) a pharmaceutically acceptable fluid comprising i) about 90% polyethylene glycol and about 10% propylene glycol; and ii) a stabilizing amount of 2.5 mg/mL thioglycerol.--

Signed and Sealed this
Third Day of May, 2016

*Michelle K. Lee*

Michelle K. Lee
*Director of the United States Patent and Trademark Office*

# EXHIBIT 5

US011103483B2

(12) **United States Patent**    (10) **Patent No.:**    **US 11,103,483 B2**
Palepu et al.    (45) **Date of Patent:**    **\*Aug. 31, 2021**

(54) **FORMULATIONS OF BENDAMUSTINE**

(71) Applicant: **Eagle Pharmaceuticals, Inc.**, Woodcliff Lake, NJ (US)

(72) Inventors: **Nagesh R. Palepu**, Southampton, PA (US); **Philip Christopher Buxton**, Uxbridge (GB)

(73) Assignee: **Eagle Pharmaceuticals, Inc.**, Woodcliff Lake, NJ (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/509,920**

(22) Filed: **Jul. 12, 2019**

(65) **Prior Publication Data**

US 2019/0350904 A1    Nov. 21, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 16/015,656, filed on Jun. 22, 2018, now abandoned, which is a continuation of application No. 15/432,335, filed on Feb. 14, 2017, now Pat. No. 10,010,533, which is a continuation of application No. 15/013,436, filed on Feb. 2, 2016, now Pat. No. 9,572,797, which is a continuation of application No. 14/031,879, filed on Sep. 19, 2013, now Pat. No. 9,265,831, which is a continuation of application No. 13/016,473, filed on Jan. 28, 2011, now Pat. No. 8,609,707.

(60) Provisional application No. 61/299,100, filed on Jan. 28, 2010.

(51) **Int. Cl.**

| *A61K 9/08* | (2006.01) |
| *A61P 35/00* | (2006.01) |
| *A61K 31/4184* | (2006.01) |
| *A61K 47/10* | (2017.01) |
| *A61K 47/20* | (2006.01) |
| *A61K 47/12* | (2006.01) |
| *A61K 47/18* | (2017.01) |
| *A61K 47/22* | (2006.01) |
| *A61K 9/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ............ *A61K 31/4184* (2013.01); *A61K 9/08* (2013.01); *A61K 47/10* (2013.01); *A61K 47/12* (2013.01); *A61K 47/18* (2013.01); *A61K 47/20* (2013.01); *A61K 47/22* (2013.01); *A61K 9/0019* (2013.01)

(58) **Field of Classification Search**
CPC .... A61K 31/4184; A61K 47/10; A61K 47/12; A61K 47/18; A61K 47/186; A61K 47/20; A61K 47/22; A61K 9/0019; A61K 9/08
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 4,071,620 | A | 1/1978 | Sklar |
| 4,711,906 | A * | 12/1987 | von Stetten ............ A61K 47/10 514/561 |
| 4,879,286 | A | 11/1989 | Alam |
| 5,204,335 | A | 4/1993 | Sauerbier |
| 5,223,515 | A | 6/1993 | Mikura |
| 5,741,523 | A | 4/1998 | Teagarden |
| 7,252,799 | B2 * | 8/2007 | Miekka ................. A61L 2/0058 422/22 |
| 7,772,274 | B1 | 8/2010 | Palepu |
| 8,076,366 | B2 | 12/2011 | Courvoisier |
| 8,344,006 | B2 | 1/2013 | Drager |
| 8,389,558 | B2 | 3/2013 | Alakhov |
| 8,609,707 | B2 * | 12/2013 | Palepu ................... A61K 47/22 514/394 |
| 8,791,270 | B2 | 7/2014 | Brittain |
| 9,000,021 | B2 | 4/2015 | Sundaram |
| 9,034,908 | B2 * | 5/2015 | Sundaram .......... A61K 31/4184 514/394 |
| 9,144,568 | B1 * | 9/2015 | Sundaram ............ A61K 47/22 |
| 9,265,831 | B2 * | 2/2016 | Palepu .................. A61K 47/18 |
| 9,572,796 | B2 * | 2/2017 | Palepu .................. A61K 9/08 |
| 9,572,797 | B2 * | 2/2017 | Palepu .................. A61K 47/12 |
| 9,572,887 | B2 * | 2/2017 | Sundaram .......... A61K 47/20 |
| 9,572,888 | B2 | 2/2017 | Sundaram |

(Continued)

FOREIGN PATENT DOCUMENTS

| CN | 1850048 A | 10/2006 |
| CN | 101584668 | 11/2009 |

(Continued)

OTHER PUBLICATIONS

Treanda (Highlights of prescribing information 2008) (Year: 2008).*
Rowe et al. ("Rowe", Handbook of Pharmaceutical Excipients, 6th edition, 2009, pp. 454-455) (Year: 2009).*
Qin et al. (Chem Commun. 2009;5112-5114). (Year: 2009).*
Hsu et al. Reactions of N-Ethyl-(HN-1), N-Methyl-Bis(2-Chloroethyl)Amine (HN-2), and Tris(2-Chloroethyl)Amine (HN-3) With Peroxides; 2002; 13 pages. (Year: 2002).*
Jones, C.W. Applications of Hydrogen Peroxide and Derivatives 1999 Royal Society of Chemistry). (Year: 1999).*
Waterman et al. (2002) Stabilization of Pharmaceuticals to Oxidative Degradation, Pharmaceutical Development and Technology, 7:1, 1-32, DOI: 10.1081/PDT-120002237). (Year: 2002).*

(Continued)

*Primary Examiner* — Ernst V Arnold
(74) *Attorney, Agent, or Firm* — BakerHostetler

(57) **ABSTRACT**

Long term storage stable bendamustine-containing compositions are disclosed. The compositions can include bendamustine or a pharmaceutically acceptable salt thereof, and a pharmaceutically acceptable fluid which can include in some embodiments PEG, PG or mixtures thereof and an antioxidant or chloride ion source. The bendamustine-containing compositions have less than about 5% total impurities, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

**16 Claims, No Drawings**

## US 11,103,483 B2
Page 2

(56)            **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,579,384 B2 | 2/2017 | Sundaram | |
| 9,597,397 B2 * | 3/2017 | Sundaram | A61K 47/22 |
| 9,597,398 B2 | 3/2017 | Sundaram | |
| 9,597,399 B2 * | 3/2017 | Sundaram | A61K 47/22 |
| 10,010,533 B2 * | 7/2018 | Palepu | A61K 9/08 |
| 2002/0102215 A1 | 8/2002 | Klaveness | |
| 2002/0122768 A1 | 9/2002 | Liu | |
| 2004/0014964 A1 | 1/2004 | Cheesman | |
| 2004/0043069 A1 | 3/2004 | Vanderbist | |
| 2005/0025702 A1 | 2/2005 | Decicco | |
| 2005/0042285 A1 | 2/2005 | Ukai | |
| 2006/0035945 A1 | 2/2006 | Attardo | |
| 2006/0128777 A1 | 6/2006 | Bendall | |
| 2006/0159713 A1 * | 7/2006 | Brittain | A61P 35/00 424/400 |
| 2006/0205694 A1 | 9/2006 | Alonso | |
| 2007/0116729 A1 | 5/2007 | Palepu | |
| 2008/0118544 A1 | 5/2008 | Wang | |
| 2009/0082416 A1 | 3/2009 | Czarnik | |
| 2009/0209606 A1 | 8/2009 | Bendall | |
| 2009/0264488 A1 | 10/2009 | Cooper | |
| 2009/0325978 A1 | 12/2009 | Onai | |
| 2010/0092474 A1 | 4/2010 | Gallagher | |
| 2010/0145266 A1 | 6/2010 | Orlowski | |
| 2010/0216858 A1 | 8/2010 | Popek | |
| 2010/0247669 A1 | 9/2010 | Eliasof | |
| 2010/0273730 A1 | 10/2010 | Hsu | |
| 2011/0015244 A1 | 1/2011 | Alakhov | |
| 2011/0015245 A1 | 1/2011 | Alakhov | |
| 2011/0184036 A1 | 7/2011 | Palepu | |
| 2011/0190363 A1 | 8/2011 | Drager | |
| 2012/0059000 A1 | 3/2012 | Ren | |
| 2012/0071532 A1 | 3/2012 | Cooper | |
| 2012/0157505 A1 | 6/2012 | Labell | |
| 2012/0308516 A1 | 12/2012 | Hlavinka | |
| 2013/0041003 A1 | 2/2013 | Brittain | |
| 2013/0041004 A1 | 2/2013 | Drager | |
| 2013/0210878 A1 | 8/2013 | Soppimath | |
| 2013/0210879 A1 | 8/2013 | Palepu | |
| 2013/0217888 A1 | 8/2013 | Shrawat | |
| 2013/0253025 A1 | 9/2013 | Sundaram | |
| 2014/0094496 A1 | 4/2014 | Sundaram | |
| 2014/0275196 A1 | 9/2014 | Sundaram | |
| 2018/0000789 A1 | 1/2018 | Palepu | |
| 2018/0000938 A1 | 1/2018 | Sundaram | |
| 2018/0185488 A1 | 7/2018 | Sundaram | |
| 2018/0296535 A1 | 10/2018 | Palepu | |
| 2018/0296536 A1 | 10/2018 | Palepu | |
| 2018/0369383 A1 | 12/2018 | Sundaram | |
| 2019/0192659 A1 | 6/2019 | Sundaram | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 102164579 | 8/2011 |
| DE | 80967 | 1/1970 |
| DE | 159289 | 3/1983 |
| JP | H09508128 | 8/1997 |
| JP | 2005537285 | 12/2005 |
| JP | 2008526991 | 7/2008 |
| JP | 2012503666 | 2/2012 |
| JP | 2012525387 | 10/2012 |
| JP | 2015501814 | 1/2015 |
| WO | 9901118 | 1/1999 |
| WO | 2001097860 | 12/2001 |
| WO | 2001097861 | 12/2001 |
| WO | 2001098294 | 12/2001 |
| WO | 0202125 | 1/2002 |
| WO | 2006054315 | 5/2006 |
| WO | 2006110551 | 10/2006 |
| WO | 2010036702 | 4/2010 |
| WO | 2010126676 | 11/2010 |
| WO | 2010148288 | 12/2010 |
| WO | 2011094565 | 8/2011 |
| WO | 2011103150 A2 | 8/2011 |
| WO | 2012015810 | 2/2012 |
| WO | 2013142358 | 9/2013 |

OTHER PUBLICATIONS

Amin et al. (Journal of Pharmaceutical Sciences 2004;93(9):2244-2249). (Year: 2004).*
Ni et al. (international Journal of Pharmaceutics 2001;226:39-46) (Year: 2001).*
"Ready-to-use" [online] retrieved on May 27, 2021 from: https://medical-dictionary.thefreedictionary.com/ready-to-use; 1 page). (Year: 2021).*
Sigma-Aldrich, Webpage Catalog for poly(ethylen glycol), http://www.sigmaaldrich.com/catalog/product/aldrich/202398?lang=en&ion= =US#, accessed Nov. 15, 2015 (2 pages).
Sikora, "Cancer drug development in the post-genomic age," Current Science, vol. 81 No. 5 pp. 549-554 (2001).
Spectra Analysis, Inc., "Oxidative Degradation of Polyethyleneglycol (PEG) studied by LC-IR", Application Note 016, Mar. 2008.
Spiegel et al., "Use of Nonaqueous Solvents in Parenteral Products," Journal of Pharmaceutical Sciences, vol. 52, No. 10 pp. 917-927 (1963).
Strickley, Solubilizing Excipients in Oral and Injectable Formulations, Pharmaceutical Research 21(2):201-230 (Feb. 2004).
Supplemental European Search Report issued in connection with PCT/US2011/022958 dated Dec. 16, 2013.
T. W. Graham Solomons, Organic Chemistry (John Wiley & Sons, 3d ed. 1984).
Tageja, Bendamustine: Safety and Efficacy in the Management of Indolent Non-Hodgkins Lymphoma, Clinical Medicine Insights: Oncology 2011:5 145-156.
Teagarden & Baker, Practical Aspects of Freeze-Drying of Pharmaceutical and Biological Products Using Non-Aqueous Co-Solvent Systems, Chapter 8 in Freeze-Drying/Lyophilization of Pharmaceutical and Biological Products, 239-76 (2nd Edition, Edited by Rey, L. & May, J., Marcel Dekker, New York) (2004).
Teagarden & Baker, Practical Aspects of Lyophilization Using Non-Aqueous Co-Solvent Systems, 15 Eur. J. Pharma. Sciences, 115-33 (2002).
Thiesen, "Bendamustine, a well-tollerated cytotoxic agent used in Germany for may years, is soon to be marketed in the rest of Europe for a range of indicatons including chronic lymphocytic leukaemia," pp. 1-4 (2010).
Third Party Submission in related EP2528602 based on PCT/US2011/022958 dated Nov. 19, 2013 (9 pages).
Thomas A. Jennings, Lyophilization, Introduction and Basic Principles (2006)(original copyright 1999).
Treanda, "Highlights of Prescribing Information," Treanda ( bendamustine hydrochloride) for Injection, for intravenous infusion, pp. 1-13 (2010).
Treanda, "Highlights of Prescribing Information," Treanda ( bendamustine hydrochloride) for Injection, for intravenous infusion, pp. 1-6 (2008).
USP 24/NF 19 (2000) entry for Propylene Glycol (USP).
V.G. Vinogradova, et al., Polymer Yearbook 13, New Metal Chelates as Antioxidant Stabilizers for Polymers . . . , pp. 87-111, 1996.
V.M. Mikhal'chuk, et al., Antioxidative Stabilization of Polyethylene . . . , Russian Journal of Applied Chemistry, vol. 77, No. 1, pp. 131-135, 2004.
Vlok, Manual of Nursing, vol. 1 (9th edition), 1988.
W. Fürst, et al., "About the Hydrolytic Decomposition of IMET 3393," Pharmazeutische Zentralhalle, vol. 108, Issue 9, pp. 608-614, 1969 (English translation and the original article).
Wayne P. Olson, Volatile Solvents for Drying and Microbial Kill in the Final Container, Pharmaceutical Engineering, 110-118 (1997).
Weide et al., Bendamustine Mitoxantrome and Rituximab (BMR): A New Effective Regimen for Refractory or Relapsed Indolent Lymphomas, Leukemia & Lymphoma, 43(2):327-331 (2002).
Werner et al., Hydrolysis Products of Cancerostatic Cytostasan® (Bendamustine), 42 (4) Die Pharmazie, Govi Verlag Pharmazeutischer Verlag GMBH, Eschborn, DE, 272-73.

## US 11,103,483 B2

Page 3

(56)                    References Cited

OTHER PUBLICATIONS

William H. Brown, Organic Chemistry 5th Edition, pp. 358-360, 2009.
Wittaya-Areekul and Nail, Freeze-Drying of tert-Butyl Alcohol/ Water Cosolvent Systems: Effects of Formulation and Process Variables on Residual Solvents, Journal of Pharmaceutical Sciences 87(4):491-495 (1998).
Written Opinion issued in counterpart PCT/US2013/032289 dated Jun. 6, 2013.
Written Opinion issued in counterpart PCT/US2013/032295 dated Jun. 3, 2013.
Zimmerman et al., Elements of Organic Chemistry (1977).
Zips et al., "New Anticancer Agents: In Vitro and In Vivo Evaluation," In Vivo,vol. 19 pp. 1-8 (2005).
Zumdahl et al., Chemistry, 7th Ed. (2007).
Pokorny et al., Antioxidants in Food: Practical Applications 2001 CRC Press p. 324 (2004).
Cyclobond® Handbook, A Guide to Using Cyclodextrin Bonded Phases for Chiral LC Separations, 6th ed., 2002, Advanced Separation Technologies, Inc., pp. 1-58, pp. 42-45.
Armstrong et al., Separation of Drug Stereoisomers by the Formation of . . . beta-Cyclodextrin Inclusion Complexes, Science, vol. 232, pp. 1132-1135, May 30, 1986.
Cerhalon, Inc., et al. v. Slayback Pharma Limited Liability Company—Civil Action No. 1:17-cv-01154: Complaint (Document 1), dated Aug. 16, 2017.
Cephalon, Inc., et al., v. Slayback Pharma Limited Liability Company—Civil Action No. 00-00154: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint and Counterclaims (Document 11), dated Sep. 29, 2017.
Cephalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.—Civil Action No. 1: 17-cv-01154: Answer to Slayback Pharma Limited Liability Company's Counterclaims, dated Oct. 20, 2017.
Cephalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.—Civil Action No. 1:17-cv-01154: Answer to Apotex Inc. and Apotex Corp.'s Counterclaims (Document 22), dated Dec. 18, 2017.
Cephalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.—Civil Action No. 1:17-cv-01154: Answer to Slayback Pharma Limited Liability Company's Counterclaims (Document 56), dated Mar. 5, 2018.
Cephalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.—Civil Action No. 1:17-cv-01154: Joint Claim Construction Chart (Document 94), dated Jul. 24, 2018.
Cephalon, Inc., et al., v. Slayback Pharma Limited Liability Company—Civil Action No. 1:17-cv-01154: Joint Status Report (Document 164), dated Oct. 19, 2018.
Teva Pharmaceuticals International GMBH, et al. v. Apotex Inc., et al.—Civil Action No. 1:17-cv-01164: Complaint (Document 1), dated Aug. 18, 2017.
Teva Pharmaceuticals International GMBH, et al. v. Apotex Inc., et al.—Civil Action 1:17-cv-01164: Defendants Apotex Inc. and Apotex Corp.'s Answer to Complaint, Defenses and Counterclaims (Document 17), dated Nov. 27, 2017.
Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi USA, LLC.—Civil Action No. 1:17-cv-01201: Complaint (Document 1), dated Aug. 24, 2017.
Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi USA, LLC.—Civil Action No. 1:17-cv-01201: Answer to Complaint, Separate Defenses, and Counterclaims (Document 10), dated Sep. 15, 2017.
Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi USA, LLC.—Civil Action No. 1:17-cv-01201: Answer to Fresenius Kabi USA, LLC's Counterclaims (Document 14), dated Oct. 6, 2017.
Teva Pharmaceuticals International GMBH, et al. v. Mylan Laboratories Limited—Civil Action No. 1:17-cv-01790: Complaint (Document 1), dated Dec. 12, 2017.

Teva Pharmaceuticals International GMBH, et al. v. Mylan Laboratories Limited—Civil Action No. 1:17-cv-01790: Defendant Mylan Laboratories Limited's Answer to Complaint for Patent Infringement (Document 12), dated Feb. 14, 2018.
Teva Pharmaceuticals International GMBH, et al. v. Slayback Pharma Limited Liability Company—Civil Action No. 1:18-cv-00117: Complaint (Document 1), dated Jan. 19, 2018.
Teva Pharmaceuticals International GMBH, et al. v. Slayback Pharma Limited Liability Company—Civil Action No. 1:18-cv-00117: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses and Counterclaims (Document 9), dated Feb. 12, 2018.
Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc.—Civil Action No. 1:18-cv-01074: Complaint (Document 1), dated Jul. 19, 2018.
Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc.—Civil Action No. 1:18-cv-01074: Defendant Hospira, Inc's Motion to Dismiss (Document 13), dated Aug. 31, 2018.
Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc.—Civil Action No. 1:18-cv-01074: Hospira, Inc's Brief in Support of its Rule 12(b)(6) Motion to Dismiss Plaintiffs' Complain (Document 20), public version dated Sep. 7, 2018.
Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc.—Civil Action No. 1:18-cv-01074: Exhibit Index—Includes Confidential Information (Document 21), public version dated Sep. 7, 2018.
Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc.—Civil Action No. 1:18-cv-01074: Plaintiffs' Opposition to Motion to Dismiss (Document 26), redacted—public version dated Nov. 2, 2018.
Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc.—Civil Action No. 1:18-cv-01074: Hospira's Reply Brief in Support of its Motion to Dismiss Plaintiffs' Complaint (Document 29), public version dated Nov. 26, 2018.
Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC—Civil Action No. 1:18-cv-01459: Complaint (Document 1), dated Sep. 20, 2018.
Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC—Civil Action No. 1:18-cv-01459: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses, and Counterclaims (Document 9), dated Oct. 10, 2018.
Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC—Civil Action No. 1:18-cv-01459: Answer to Slayback Pharma LLC's Counterclaims (Document 13), dated Oct. 31, 2018.
Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al.—Civil Action No. 1:18-cv-01586: Complaint (Document 1), dated Oct. 15, 2018.
Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al.—Civil Action No. 1:18-cv-01586: Defendant Fresenius Kabi USA, LLC's Answer to Complaint, Separate Defenses, and Counterclaims (Document 9), dated Nov. 6, 2018.
Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al.—Civil Action No. 1:18-cv-01586: Defendant Mylan Laboratories LTD.'s Answer to Complaint for Patent Infringement (Document 11), dated Nov. 9, 2018.
Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al.—Civil Action No. 1:18-cv-01586: Answer to Fresenius Kabi USA, LLC's Counterclaims (Document 13), dated Nov. 27, 2018.
Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC—Civil Action No. 1:18-cv-01953: Complaint (Document 1), dated Dec. 11, 2018.
Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC—Civil Action No. 1:18-cv-01953: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses, and Counterclaims(Document 11), public version dated Dec. 20, 2018.
Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC—Civil Action No. 1:18-cv-01953: Answer to Slayback Pharma LLC's Counterclaims (Document 12), dated Jan. 3, 2019.
Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC—Civil Action No. 1:18-cv-01953: Opening Brief in Support of Slayback Pharma Limited Liability Company's Motion for Judgment on the Pleadings (Document 17), public version dated Jan. 11, 2019.
Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC—Civil Action No. 1:18-cv-01953: Eagle Pharmaceuticals' Opposition to Slayback Pharma's Motion for Judgment on the Pleadings (Document 23), redacted—public version dated Feb. 12, 2019.

# US 11,103,483 B2

Page 4

(56)                    References Cited

OTHER PUBLICATIONS

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Reply Brief in Further Support of Slayback Pharma Limited Liability Company's Motion for Judgment on the Pleadings (Document 27), public verison dated Mar. 1, 2019.
Interlocutory decision in Opposition proceedings of EP 2528602 issued Apr. 8, 2019.
Remington's Pharmaceutical Sciences, 18th edition, (1990), p. 1322.
U.S. Pharmacopeia 32-NF-27—General Notices and Requirements (2009).
Renu Chadha, et al., "Drug Carrier Systems for Anticancer Agents: a Review", Journal of Scientific & Industrial Reasearch, vol. 67, pp. 185-197, 2008.
American Heart Association, "Living With Heart Failure" (https://www.heart.org/idc/groups/heart-public/@wcm/@hcm/@gwtg/documents/downloadable/ucm_309068.pdf) (2001).
American Society of Hospital Pharmacists. ASHP Technical Assistance Bulletin on Hospital Distribution and Control. Am J. Hosp. Pharm. 1980, 37:1097-103.
Baldi et al., Statistical Procedures for Optimizing the Freeze-Drying of a Model Drug in Tert-Butyl Alcohol: Water Mixtures, Eur. J. of Pharm. & Biopharm. 40(3):138-41 (1994).
Bergsagel et al., Effect of cyclophosphamide on Advanced Lung Cancer and the Hematological Toxicity of Large, Intermittent Intravenous Doses, Canad. Med. Ass. J., 98, 532-538 (1968).
Bernard Testa, et al., "Hydrolysis in Drug and Prodrug Metabolism", Verlag Helvetica Chimica Acta, pp. 681-684, 2003, ISBN 3-906390-25-X.
Biewenga et al., "The Pharmacology of the Antioxidant Lipoic Acid," Gen. Pharmac., vol. 39, No. 3, pp. 315-331 (1997).
Boylan et al., Parenteral Products, Chapter 12 in Banker, et al., Modern Pharmaceutics, Fourth Ed. (2002).
Brigitte C. Scott, et al., Lipoic and Dihydrolipoic Acids . . . , Free Rad. Res., vol. 20, No. 2, pp. 119-133, 1994.
Broadhead, Pharmaceutical Preformulation and Formulation, Chapter 9 in "Parenteral Dosage Forms," (Interpharm) 2001.
Canadian Society of Hospital Pharmacists: Guidelines for Drug-Use Control, 2008.
Center for Drug Evaluation and Research, Andrew Dmytrijuk, FDA Medical Review for the Approval of Bendeka (2015).
Charles P. Carpenter, et al., "A Study of the Polyethylene Glycols as Vehicles for Intramuscular and Subcutaneous Injections", Journal of the American Pharmaceutical Association, vol. XII, No. 1, pp. 27-29, 1952.
Cheson et al., Bendamustine: Rebirth of an Old Drug, J. Clin. Oncol. 27, 1492-1501 (2009).
Cheung et al., Safety and Pharmacokinetics of Bendamustine Rapid-Infusion Formulation, J. of Clinical Pharmacology 2017.00(0) 1-11.
Chu et al., Common Chemotherapy Regimens in Clinical Practice, Physicians' Cancer Chemotherapy Drug Manual 2009.
Derry E. Wilman, Application of 15N Nuclear Magnetic Resonance . . . , J. Med. Chem., vol. 38, pp. 2256-2258, 1995.
E. Santacesaria, et al., "Thermal Stability of Nonionic Polyoxyalkylene Surfactants", Journal of Applied Polymer Science, vol. 42, pp. 2053-2061, 1991.
EC Safety Data Sheet: Ribomustin® 2007.
Eric Watson, et al., Kinetics of Phosphoramide Mustard . . . , Journal of Pharmaceutical Sciences, vol. 74, No. 12, pp. 1283-1292, 1985.
Eugene C. Corbett, Jr., Intravenous Fluids: It's More Than Just 'Fill 'Er Up!', Series #52 Practical Gastroenterology 44-60 (2007).
Flamberg et al., Low Temperature Vacuum Drying of Sterile Parenterals From Ethanol, Bulletin of the Parenteral Drug Association, 24(5):209-17 (1970).
Floss et al., Intravenous fluids principles of treatment, Clinical Pharmacist, 3:274-283 (Oct. 2011).
Friedberg et al., Bendamustine in Patients with Rituximab-Refractory Indolent and Transformed Non-Hodgkin's Lymphoma: Results from a Phase II Multicenter, Single-Agent Study, J. Clin. Oncol., 26(2):204-210 (2008).

Fujisawa Deutschland GmbH Ribomustin® Products and Technical Specifications.
Galacid Excel 88 fact sheet (lactic acid 88%), www.lactic.com, 2012.
Gandhi & Burger, Bendamustine in B cell malignancies: the new, 46-year old kid on the block, Clin Cancer Res. Dec. 15, 2009; 15(24):7456-7461.
Glimelius et al., Bolus-Injection (2-4 min) Versus Short-term (10-20 min) Infusion of 5-Fluorouracil in Patients with Advanced Colorectal Cancer: a Prospective Randomised Trial, Eur J. Cancer, 34, 674-678 (1998).
Gust and Krauser, Investigations on the Stability of Bendamustin, a Cytostatic Agent of the Nitrogen Mustard Type I. Synthesis, Isolation, and Characterization of Reference Substances, in Monatshefte für Chemie, 128:291-99 (1997).
Heider et al., Efficacy and Toxicity of Bendamustine in Patients with Relapsed Low-Grade non-Hodgkin's Lymphomas, Anticancer Drugs, 12, 725-729 (2001).
HFSA Guidelines, Journal of Cardiac Failure vol. 16 No. 6 (2010).
ICH Harmonised Tripartite Guideline, Stability testing of New Drug Substances and Products Q1A(R2), dated Feb. 6, 2003.
International Conference on Harmonisation in Guideline on Impurities in New Drug Products: Availability, 62 Fed. Reg. 27,454-27,461 (May 19, 1997).
International Search Report and Written Opinion for No. PCT/US2013/032289 dated Jun. 6, 2013. (5 Pages).
International Search Report and Written Opinion issued in counterpart PCT/US2013/032295 dated Jun. 3, 2013 (4 pages).
International Search Report and Written Opinion issued in counterpart PCT/US2013/26187 dated May 6, 2013 (2 pages).
International Search Report and Written Opinion of International application based on PCT/US2011/022958, dated Apr. 12, 2011 (8 pages).
Jay S. Trivedi, et al., Water-Insoluble Drug Formulation, 7. Solubilization Using CoSolvent Approach, pp. 141-168, 2000.
Jay S. Trivedi, Water-Insoluble Drug Formulation, Second Edition, 9 Solubilization Using Cosolvent Approach, pp. 161-194, 2008.
JC Price, Handbook of Pharm. Excipients, 5th Edition, Polyethylene Glycol, pp. 545-550, Aug. 9, 2005.
Jerry March, Advanced Organic Chemistry (4th ed., John Wiley & Sons, Inc. 1992).
John D. Roberts & Marjorie C. Caserio, Basic Principles of Organic Chemistry 612-13, 615-16, 617-18 (W. A. Benjamin, Inc., 2d ed. 1977).
Jonkman-de Vries et al., Pharmaceutical Development of (Investigational) Anticancer Agents for Parental Use—A Review, Drug Dev Ind Pharm. 22(6):475-494 (1996).
Julia A. Barman Balfour, et al., "Bendamustine", Drugs, vol. 61, No. 5, pp. 631-638, 2001.
Kalaycio. M., Clinical Experience With Bendamustine: A New Treatment for Patients With Chronic Lymphocytic Leukemia; Clin Leukemia. 2008; 2(4): 223-229.
Kenneth E. Avis, et al., Remington, Parenteral Preparations, Chapter 41, pp. 780-786, 2000.
Knauf et al., Bendamustine Versus Chlorambucil in Treatment-Naive Patients with B-Cell Chronic Lymphocytic Leukemia (B-CLL): Results of an International Phase III Study, Blood, 110 (11), 609a (abstract 2043) (2007).
Koomans et al., Sodium Balance in Renal Failure: A Comparison of Patients with Normal Subjects Under Extremes of Sodium Intake, Hypertension 7:714-721 (1985).
Kurt H. Bauer, et al., Pharmazeutische Technologies, pp. 225-228, HW9, 1993.
Kurt H. Bauer, et al., Pharmazeutische Technologies, pp. 424-425, HW10, 1993.
Larry A. Gatlin, et al., Injectable Drug Development, 17. Formulation and Administration . . . Products, pp. 401-420, Informa Healthcare, 2008, ISBN 13: 978-1-5749-1095-7.
Gibson et al., "Pharmaceutical preformulation and formulation: A practical guide from candidate drug selection to commercial dosage form", Informa Healthcare USA, 2009, vol. 199, 2d ed, pp. 1-559.

US 11,103,483 B2

Page 5

(56)        References Cited

OTHER PUBLICATIONS

"Draft Note for Guidance on Excipients, Antioxidants and Antimicrobial Preservatives in the Dossier for Application for Marketing Authorisation of Medicinal Product", EMEA, 2003, pp. 1-10.
Leonard & Jann, A New Synthesis of Aziridinium Salts. 2,2-Pentamethylene-1,1-tetramethyleneaziridinium Perchlorate, A Prototype, 82 J. Am. Chemistry Soc'y 6418-6419 (1960).
Leoni et al., SDX-105 (Bendamustine), a Clinically Active Antineoplastic Agent Possesses a Unique Mechanism of Action, Abstract, 102(11) Blood, Abstract #2363 (Nov. 16, 2003).
Lian-Feng Huang, et al., Water-Insoluble Drug Formulation, Second Edition, Ch. 7. Formulation Strategies and Practice . . . Support, pp. 113-132, 2008, ISBN 13: 978-0-8493-9644-1.
Lissitchkov et al., Phase-I/II study to Evaluate Dose Limiting Toxicity, Maximum Tolerated Dose, and Tolerability of Bendamustine HCl in Pre-treated Patients With B-Chronic Lymphocytic Leukaemia (Binet stages B and C) Requiring Therapy, J. Cancer Res. Clin. Oncol. 132:99-104 (2006).
Liu (ed). Water-Insoluble Drug Formulation, 1st ed., CRC Press, Chapters 7 and 9, 2000.
Liu (ed). Water-Insoluble Drug Formulation, 2nd ed., CRC Press, Chapters 7 and 9, 2000.
Lyondell Tebol® 99, Tertiary Butyl Alcohol in Freeze-Drying Applications,(Lyondell Chemical Co., 2003).
Lyophilization of Biopharmaceuticals (Henry R. Costantino & Michael K. Pikal eds., Association of Pharmaceutical Scientists 2004).
Maas et al., "Stabilitat von Bendamustinhydrochlorid in Infusionslosungen," Die Pharmazie, Govi Verlag Pharmazeutischer Verlag GMBH, vol. 49, No. 10 pp. 775-777 (1994). (Abstract Only).
Margolin et al., Shortening the Infusion Time of Anticancer Drugs: Who Will Benefit?, J. of Clinical Oncology, 25(19):2642-2643 (2007).
McGinity, et al., Journal of Pharmaceutical Sciences, Influence of Peroxide Impurities in Polyethylene Glycols . . . , vol. 64, No. 2 pp. 356-357, 1975.
Michael J. Akers, "Excipient-Drug Interactions in Parenteral Formulations," Journal of Pharmaceutical Sciences, vol. 91, Issue 11, pp. 2283-2300, 2002.
Michael J. Akers, Remington, The Science and Practice of Pharmacy 21st Edition,Parenteral preparation, chapter 41, pp. 802-835, 2005.
Michael P. Gamcsik, et al., NMR Studies of the Conjugation . . . , J. Med. Chem., vol. 33, pp. 1009-1014, 1990.
National Kidney Foundation, "Clinical Practice Guidelines and Clinical Practice Recommendations" (http://kidneyfoundation. cachefly.net/professionals/KDOQI/guideline_upHD_PD _VA/hd_ guide5.htm) (2006).
Neelam Seedher, et al., Solubilization of Nimesulide; Use of Co-solvents, Indian J. Pharm. Sci., vol. 65, No. 1, pp. 58-61, 2003.
Nema et al., Excipients and Their Use in Injectable Products, PDA J. Pharma. Sci. & Tech., 51(4):166-171 (Jul.-Aug. 1997).
Ni et al., Stabilization and Preformulation of Anticancer Drug—SarCNU, Int'1 J. of Pharma., 249:257-264 (2002).
Ni et al., Use of Pure t-Butanol as a Solvent for Freeze-Drying: A Case Study, Int'1 J. of Pharma., 226:39-46 (2001).
Nuijen et al., Pharmaceutical Development of a Parenteral Lyophilized Formulation of the Novel Antitumor Agent Aplidine, PDA J. Pharmaceut. Sci. and Technol. 54(3):193-208 (May-Jun. 2000).
O'Connor, Hydrolysis and Alkylating Reactivity of Aromatic Nitrogen Mustards, J.Chem. Soc. Perkin Trans. 2, 1933-1939 (1991).
Orrie M. Friedman, et al., "Colorimetric Estimation of Nitrogen Mustards in Aqueous Media", Analytical Chemistry, vol. 33, No. 7, pp. 906-910, 1961.

Ozegowski et al., IMET 3393, ?-[1-Methyl-5-bis-(β-chloroethyl)-amino-benzimidazolyl-(2)]-butyric acid hydrochloride, a new cytostatic agent from the benzimidazole mustard gas series, 110 Zbl Pharm. 1013-1019 (1971).
Paul J. Sheskey, Handbook of Pharmaceutical Excipients, 7th Edition, Propyl Gallate, 2012.
Poulsen, Introduction to Chemistry (2010).
Pramod K. Gupta, et al., "Injectable Drug Development Techniques to Reduce Pain and Irritation", pp. 183, Informa Healthcare, 2008, ISBN 13: 978-1-5749-1095-7.
Preiss et al., "Pharmacological and clinical date of Bendamustine," 17th International Cancer Congress, pp. 1637-1640 (1998).
Preiss et al., Studies on the Pharmacokinetics of Bendamustine (Cytostasan®) in Humans, Pharmazie, 40(11):782-784 (1985).
R.A. Pethrick et al., Excerpt from Polymer Yearbook 13, CRC Press, Oct. 1, 1996, Technology & Engineering Vinogradova et al.
Rassachaert et al., "A phase 1 study of bendamustine hydrochloride administered once every 3 weeks in patients with solid tumors," Anti-Cancer Drugs, vol. 18 No. 5 pp. 587-595 (2007).
Remington's Pharmaceutical Sciences, 18th edition, (1990), pp. 1286-1288.
Remington's Pharmaceutical Sciences 1990 (Eighteenth Edition), Mack Publishing Company, chapter 85, 1570-1580.
Ribomustin Monograph (Updated Aug. 2005).
Ribomustin Monograph (Updated Jan. 2002).
Ribomustin Product Information, Janssen-Cilag Pty Ltd (Updated Sep. 15, 2016).
Rote Liste 1996 for Ribomustin (86 023).
Rote Liste 2003 for Ribomustin (86 045).
Rowe et al., "Handbook of Pharmaceutical Excipients," Pharmaceutical Press, 6th edition pp. 857 (extract from index) (2009).
Rowe et al., "Handbook of Pharmaceutical Excipients," Pharmaceutical Press, 6th edition, pp. 454-455 (2009).
Raymond C. Rowe and Paul J. Sheskey, et al., Handbook of Pharmaceutical Excipients, 7th Edition, Pharmaceutical Press, Propyl Gallate, pp. 668-669.
Rowe, et al., "Handbook of Pharmaceutical Excipients," Pharmaceutical Press, 5th edition, pp. 545-550, Polyethylene Glycol, (2006).
Safety Data Sheet, Lactic Acid, 88%, Columbus Chemical Industries, 2013.
Scasnar at al., Radiochemical Assay of Stability of 14C-Cytostasan Solutions During Preparation and Storage, Journal of Radioanalytical and Nuclear Chemistry, Articles 121(2):489-497 (1988).
Schoffski et al., "Weekly administration of bendamustine: A phase 1 study in patients with advanced progressive solid tumors," Annals of Oncology II, pp. 729-734 (2000).
Schoffski et al., Repeated administration of short infusions of bendamustine: a phase 1 study in patients with advanced progressive solid tumors, J. Cancer Res Clin Oncol, vol. 126 No. 1 pp. 41-47 (2000).
Schwänen et al., In vitro evaluation of bendamustine induced apoptosis in B-chronic lymphocytic leukemia, Leukemia 16:2096-2105 (2002).
SciFinder, Hydrolytic degradation of IMET 3393, American Chemical Society, 2018.
Seager et al., Structure of Products Prepared by Freeze-Drying Solutions Containing Organic Solvents, PDA Journal of Pharmaceutical Science and Technology, 39(4):161-179 (1985).
Search History issued in connection with PCT/US2013/32295 dated May 10, 2013.
Shah et al., Physical, Chemical, and Bioavailability Studies of Parenteral Diazepam Formulations Containing Propylene Glycol and Polyethylene Glycol 400, Drug Development and Industrial Pharm.), 17:12, 1635-1654 (Oct. 20, 2008).

* cited by examiner

US 11,103,483 B2

1

# FORMULATIONS OF BENDAMUSTINE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 16/015,656, filed Jun. 22, 2018, which is a continuation of application Ser. No. 15/432,335, filed Feb. 14, 2017, now U.S. Pat. No. 10,010,533, issued Jul. 3, 2018, which is a continuation of application Ser. No. 15/013,436, filed Feb. 2, 2016, now U.S. Pat. No. 9,572,797, issued Feb. 21, 2017, which is a continuation of application Ser. No. 14/031,879, filed Sep. 19, 2013, now U.S. Pat. No. 9,265,831, issued Feb. 23, 2016, which is a continuation of application Ser. No. 13/016,473, filed Jan. 28, 2011, now U.S. Pat. No. 8,609,707, issued Dec. 17, 2013, which claims the benefit of U.S. Provisional Patent Application No. 61/299,100, filed Jan. 28, 2010, the contents of each of which are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

Bendamustine free base is represented by the following structural formula (I)



(I)

Bendamustine is used in the treatment of a number of cancers including leukemias, Hodgkins disease and multiple myelomas. Bendamustine is the active ingredient of the commercial product Treanda™, a lyophilized powder for reconstitution.

Bendamustine exhibits rapid degradation upon reconstitution of the lyophilized product. Bendamustine undergoes hydrolysis by direct substitution rather than an addition elimination process due to the presence of the highly labile aliphatic chlorine atoms. Some of the main degradants of bendamustine are the monohydroxy compound known as HP1 (hydrolysis product 1) and dihydroxy compound HP2 (hydrolysis product 2). The monohydroxy compound appears as the main impurity at Relative Retention Time (RRT) 0.6 and the dihydroxy compound appears as the main impurity at RRT 0.27. Minor peaks appear at RRT 1.2, which are presently unknown.

The stability of bendamustine in water is measured in hours, and is therefore, not suitable for long-term storage in liquid form. The lyophile possesses good chemical stability. However, reconstitution of the lyophile is clinically inconvenient, taking 15-30 mins with implications of chemical instability. There is a need for ready to use (RTU) bendamustine formulations having enhanced stability.

## SUMMARY OF THE INVENTION

In other aspects of the invention, the bendamustine-containing compositions include a) a pharmaceutically

2

acceptable fluid which contains one or more of propylene glycol, ethanol, polyethylene glycol, benzyl alcohol and glycofurol, and b) a stabilizing amount of a chloride salt. In other aspects of the invention, the bendamustine-containing compositions include DMSO (dimethyl sulfoxide) as part of the pharmaceutically acceptable fluid included therein. Regardless of the pharmaceutically acceptable fluid included, the amount of bendamustine included in the composition is preferably from about 20 mg/mL to about 60 mg/mL. Still further aspects of the invention include methods of treatment using bendamustine-containing compositions and kits containing the same.

One of the advantages of the inventive liquid compositions is that they have substantially improved long term stability when compared to currently available formulations. For example, the inventive bendamustine compositions are substantially free of impurities after at least about 15 months at a temperature of from about 5° C. to about 25° C. The inventive formulations are advantageously ready to use or ready for further dilution. Reconstitution of lyophilized powders is not required.

## DETAILED DESCRIPTION OF THE INVENTION

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art to which this invention belongs. In the event that there is a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

As used herein, RRT is calculated by dividing the retention time of the peak of interest by the retention time of the main peak. Any peak with an RRT<1 elutes before the main peak, and any peak with an RRT>1 elutes after the main peak.

For purposes of the present invention, "substantially free of impurities" shall be understood to include bendamustine-containing compositions in which the amount of total impurities is less than about 5%, as calculated on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after a period of about 15 months at a temperature of from about 5° C. to about 25° C. The amount of impurities is further calculated as being based upon the original amount bendamustine (or salt thereof) being present in the composition or formulation.

For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.

Preferably, the amount of any individual degradant in the inventive compositions does not exceed 2% PAR as determined by HPLC at a wavelength of 223 nm after storage periods of at least about 15 months at a temperature of from about 5° C. to about 25° C. In some aspects, the amount of time the inventive compositions demonstrate long term storage stability is at least about 18 months and preferably at least about 2 years when stored under the conditions described herein.

In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions including:
    a) bendamustine or a pharmaceutically acceptable salt thereof; and
    b) a pharmaceutically acceptable fluid including
        i) PEG, PG or mixtures thereof; and
        ii) a stabilizing amount of an antioxidant.

EAGLEBEN-SA_00013015

US 11,103,483 B2

3

The total impurities in the inventive compositions resulting from the degradation of the bendamustine in the compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of from about 5° C. to about 25° C., and thus have long term stability for at least the same period of time or longer. Preferably, the bendamustine-containing compositions demonstrate long term storage stability for at least about 2 years, especially when stored at the lower (refrigerated) temperatures. In one embodiment, the amount of total impurities in the inventive compositions resulting from the degradation of the bendamustine is less than about 3% PAR as determined by HPLC at a wavelength of 223 nm after at least about 2 years at a temperature of from about 5° C. to about 25° C.

In some aspects of the invention, the bendamustine concentration in the inventive compositions is from about 10 mg/mL to about 100 mg/mL, preferably 20 mg/mL to about 60 mg/mL. Preferably the bendamustine concentration in the inventive compositions is from about 25 mg/mL to about 50 mg/mL, and more preferably from about 30 mg/mL to about 50 mg/mL. It will be understood that compositions containing any useful concentration within the ranges, i.e. 10, 20, 25, 30, 35, 40, 45, 50, 55, 60 . . . 100 are contemplated. In other embodiments, the bendamustine concentration in the composition is about 50 mg/mL. In alternative aspects, the amount of bendamustine is outside these ranges but the amounts will be sufficient for single or multiple administrations of dosages generally regarded as effective amounts.

In several embodiments of the invention, the pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof. Within this aspect, the pharmaceutically acceptable fluid is propylene glycol (PG) or polyethylene glycol (PEG). In other embodiments of the invention however, the pharmaceutically acceptable fluid is a mixture of PEG and PG. For example, the pharmaceutically acceptable fluid can include about 50% PEG and about 50% PG. Alternatively, pharmaceutically acceptable fluid includes about 95% PEG and about 5% PG. The amount of PEG and PG can also be varied within the ranges, i.e. the ratio of PEG:PG in the pharmaceutically acceptable fluid can range from about 95:5 to about 50:50. Within this range, is a pharmaceutically acceptable fluid containing about 75% PEG and about 25% PG, and preferably 80% PEG and 20% PG. In another embodiment, a pharmaceutically acceptable fluid can include about 85% PEG and about 15% PG while another preferred pharmaceutically acceptable fluid includes about 90% PEG and about 10% PG. The molecular weight of the PEG will be within the range of pharmaceutically acceptable weights although PEG 400 is preferred in many aspects of the invention.

Without meaning to be bound by any theory or hypothesis, the hydroxide of the polyethylene glycol molecule is less reactive than the hydroxides of propylene glycol. As a result, the ester forms at a slower rate in polyethylene glycol than propylene glycol and the resulting bendamustine degradants are unexpectedly and substantially reduced over extended periods of time when PEG is a substantial part of the pharmaceutically acceptable fluid.

The bendamustine-containing compositions according to several preferred aspects of the invention include a stabilizing amount of an antioxidant. For purposes of the present invention, "stabilizing amount" shall be understood to include those amounts which increase or enhance the stability of the bendamustine in the compositions described herein. The presence of one or more antioxidants described

4

herein thus contributes, at least in part to the long term stability of the composition. Within this guideline, suitable antioxidant concentrations in the compositions can range from about 2.5 mg/mL to about 35 mg/mL, and preferably from about 5 mg/mL to about 20 mg/mL or from about 10 mg/mL to about 15 mg/mL. In some other embodiments, the concentration of the antioxidant in the bendamustine-containing composition is about 5 mg/mL.

Suitable antioxidants for inclusion include those which are pharmaceutically acceptable for use in human and veterinary formulations although not limited to those currently regarded as safe by any regulatory authority. For example, the antioxidant can be selected from among lipoic acid, thioglycerol (also known as monothioglycerol) and analogs thereof, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds, dihydrolipoic acid and mixtures of the foregoing. Preferably, the antioxidant is thioglycerol, lipoic acid or a mixture thereof. Some particularly preferred embodiments of the invention include thioglycerol.

In view of the foregoing, some preferred long term storage stable bendamustine-containing compositions in accordance with the invention compositions include:
I. a) bendamustine or a pharmaceutically acceptable salt thereof; and
  b) a pharmaceutically acceptable fluid including
    i) polyethylene glycol and propylene glycol; and
    ii) a stabilizing amount of thioglycerol; or
II. a) about 50 mg/mL bendamustine or a pharmaceutically acceptable salt thereof; and
  b) a pharmaceutically acceptable fluid including
    i) about 90% PEG and about 10% PG; and
    ii) about 2.5 mg/mL thioglycerol.
Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total impurities, PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

In accordance with other aspects of the invention, there are provided long term storage stable bendamustine-containing compositions, including:
  a) bendamustine or a pharmaceutically acceptable salt thereof;
  b) a pharmaceutically acceptable fluid including one or more of the following: PG, ethanol, PEG, benzyl alcohol and glycofurol; and
  c) a stabilizing amount of a chloride salt.
These compositions also have the low levels of impurities and long term stability mentioned herein. Preferred pharmaceutically acceptable fluids include PG, PEG or ethanol in this embodiment of the invention. Preferably, the PEG is PEG 400. If desired, glycerin and/or 88% (w/w) lactic acid can be added to the pharmaceutically acceptable fluid.

Suitable chloride salts include but are not limited to organic chloride salts, sodium chloride, choline chloride, hydrochloride salts of amino acids and mixtures thereof. Thus, as will be appreciated by those of ordinary skill, one can select from among a number of suitable chloride salts and it is Applicants' intention that the scope of the invention includes all such chloride salts that are capable of being included in bendamustine-containing formulations for extended periods without having a deleterious effect on the drug. In one embodiment of the invention, the chloride salt concentration is from about 10 to about 300 mg/mL. In another embodiment, the chloride salt concentration is from

EAGLEBEN-SA_00013016

US 11,103,483 B2

5

about 50 to about 215 mg/mL. In one preferred embodiment, the chloride salt concentration is about 215 mg/mL.

In accordance with another aspect of the invention, there is provided long term storage stable bendamustine-containing compositions, including:

a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including DMSO.

These compositions also have the low levels of impurities and long term stability mentioned herein. In some aspects, the bendamustine concentration in these compositions is from about 10 mg/mL to about 100 mg/mL. Preferably, the bendamustine concentration is from about 20 mg/mL to about 50 mg/mL, more preferably from about 25 mg/mL to about 50 mg/mL. In an alternative embodiment, the bendamustine concentration is about 50 mg/mL.

Another embodiment of the invention provides methods of treating cancer in mammals. The methods include administering to a mammal in need thereof an effective amount of one of the bendamustine-containing compositions described herein. Since the active ingredient portion of the inventive composition is an FDA-approved drug, those of ordinary skill will recognize that the doses of bendamustine employed in this aspect of the invention will be similar to those employed in any treatment regimens designed for bendamustine as marketed under the trade name TRE-ANDA. The patient package insert containing dosing information is incorporated herein by reference. The methods of treatment also include administering the inventive formulations for any purpose or physical condition for which bendamustine has been indicated as being useful.

Another embodiment of the invention includes methods of preparing bendamustine-containing compositions described herein. The methods include reconstituting lyophilized bendamustine in a pharmaceutically acceptable fluid containing one of the following:

A) i) PEG, PG or mixtures thereof; and
ii) a stabilizing amount of an antioxidant;
B) i) one or more of PG, ethanol, PEG, benzyl alcohol and glycofurol; and
ii) a stabilizing amount of a chloride salt; or
C) DMSO.

The steps are carried out under pharmaceutically acceptable conditions for sterility and manufacturing.

In a further aspect of the invention, there are provided methods of controlling or preventing the formation of impurities in bendamustine-containing compositions during long term storage. The methods include combining an amount of bendamustine or a pharmaceutically acceptable salt thereof with a sufficient amount of a pharmaceutically acceptable fluid containing one of the following:

A) i) PEG, PG or mixtures thereof; and
ii) a stabilizing amount of an antioxidant;
B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and
ii) a stabilizing amount of a chloride salt; or
C) DMSO.

Further optional steps in accordance therewith include transferring one or more pharmaceutically acceptable doses of the formulations into a suitable sealable container and storing the sealed container at a temperature of from about 5° C. to about 25° C. As a result of carrying out these steps, it is possible to control or substantially prevent the formation of impurities which otherwise occur with bendamustine-containing compositions during long term storage so that the artisan is provided with bendamustine-containing formulations having less than about 5% total impurities PAR as

6

determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

The compositions of the present invention can be packaged in any suitable sterile vial or container fit for the sterile storage of a pharmaceutical such as bendamustine. Suitable containers can be glass vials, polypropylene or polyethylene vials or other special purpose containers and be of a size sufficient to hold one or more doses of bendamustine.

A further aspect of the invention includes kits containing lyophilized bendamustine or a pharmaceutically acceptable salt thereof in a first container or vial; and, in a second container, a sufficient amount of a pharmaceutically acceptable fluid such as those described herein, i.e. one of the following:

A) i) PEG, PG or mixtures thereof; and
ii) a stabilizing amount of an antioxidant;
B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and
ii) a stabilizing amount of a chloride salt; or
C) DMSO.

For purposes of this embodiment, the amount of fluid which is sufficient is an amount which allows the bendamustine to be dissolved or dispersed to a degree which renders the liquid composition ready for use.

As will be appreciated by those of ordinary skill, the kit will contain other pharmaceutically necessary materials for storing and/or administering the drug, including instructions for storage and use, additional diluents, if desired, etc.

EXAMPLES

The following examples serve to provide further appreciation of the invention but are not meant in any way to restrict the effective scope of the invention.

Example 1

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10 mg/ml in one of ethanol, propylene glycol and benzyl alcohol as indicated in Table 1 below. 215 mg/ml of choline chloride was added in half of the samples as a source of soluble chloride ions. The samples were maintained at 40° C. and analyzed periodically for drug content and total impurities. The results obtained are presented in Table 1.

TABLE 1

| Stability of Bendamustine HCl | | | | |
|---|---|---|---|---|
| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
| BDM—10 mg/mL | | Initial | 10.43 | 0.27 |
| Choline chloride— | 40° C. | 48 hrs | 10.48 | 1.27 |
| 215 mg/mL | | 7 day | 10.26 | 2.11 |
| Ethanol qs to 1 mL | | | | |
| BDM—10 mg/mL | | Initial | 10.55 | 0.27 |
| Ethanol qs to 1 mL | 40° C. | 48 hrs | 10.30 | 2.39 |
| | | 7 day | 9.55 | 6.66 |
| BDM—10 mg/mL | | Initial | 9.99 | 0.21 |
| Choline chloride— | 40° C. | 48 hrs | 9.95 | 0.60 |
| 215 mg/mL | | 7 day | 9.43 | 2.31 |
| Propylene glycol qs | | | | |
| to 1 mL | | | | |
| BDM—10 mg/mL | | Initial | 9.68 | 0.21 |
| Propylene glycol qs | 40° C. | 48 hrs | 9.45 | 0.88 |
| to 1 mL | | 7 day | 9.00 | 3.44 |
| BDM—10 mg/mL | | Initial | 9.95 | 1.19 |

US 11,103,483 B2

7

#### TABLE 1-continued

Stability of Bendamustine HCl

| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
|---|---|---|---|---|
| Choline Chloride— 215 mg/mL Benzyl alcohol qs to 1 mL | 40° C. | 48 hrs 7 day | 9.89 8.97 | 3.51 4.24 |
| BDM—10 mg/mL Benzyl alcohol qs to 1 mL | 40° C. | Initial 48 hrs 7 day | 9.52 8.67 7.49 | 0.33 4.18 7.84 |

Note:
In Table 1 the total % impurities include total contributions from peaks at various RRTs.

As shown in Table 1, the bendamustine formulations are very stable in solutions containing solvent and chloride salt. Table 1 shows that bendamustine, when dissolved at a concentration of about 10 mg/mL, in a pharmaceutically acceptable fluid, such as ethanol and propylene glycol, and containing a stabilizing amount of a chloride salt, such as choline chloride, had less than about 5% after at least 7 days storage at 40° C.

The data presented in Table 1 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of a chloride salt having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including ethanol alone exhibited more than 6.5 total degradants after 7 days storage at 40° C. The sample including benzyl alcohol alone exhibited more than 7.5% total degradants after 7 days storage at 40° C. Bendamustine-containing compositions with such high levels of degradation would not be suitable for long-term storage.

### Example 2

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10 mg/ml in DMSO. The samples were maintained at 40° C. and analyzed periodically for drug content and impurity profile. The results obtained are presented in Table 2.

#### TABLE 2

Stability of Bendamustine HCl in DMSO

| Formulation | Temp | Time | Content (mg/mL) | % Total Imp |
|---|---|---|---|---|
| BDM—10 mg/mL DMSO qs to 1 mL | 40° C. | Initial 48 hrs 1 week | 10.2 9.80 10.0 | 0.23 0.30 0.56 |

Note:
In Table 2 the total % impurities include total contributions from peaks at various RRTs.

8

Table 2 shows that bendamustine, when dissolved in DMSO, had substantially no increase in total degradants. The data presented in Table 2 translates to bendamustine-containing compositions including DMSO having a shelf life of at least about 15 months at 5° C. and 25° C. In fact, such compositions are expected to have long term stability for periods beyond 15 months, i.e. up to 2 years or greater.

### Example 3

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 20 mg/ml in polyethylene glycol 400 and 5 mg/ml of lipoic acid was added as a stabilizing antioxidant as indicated in Table 3 below. The samples were maintained at 40° C. or 25° C. and analyzed after 15 days for drug content and impurities. The results obtained are presented in Table 3.

#### TABLE 3

Stability of Bendamustine (20 mg/ml) in PEG 400 and Antioxidants

| Antioxidant | T ° C. | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 40 | 15 15 | 97.6 56.3 | 2.08 2.17 | 2.28 41.9 |
| Lipoic Acid 5 mg/ml | 25 40 | 15 15 | 98.5 97.5 | <LD 0.33 | 0.23 0.53 |

<LD = Below Level of Detetion

As shown in Table 3, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as polyethylene glycol, in the presence of a stabilizing amount of an anti-oxidant, such as lipoic acid, had substantially no increase in total degradants after a period of 15 days. The data presented in Table 3 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of an antioxidant having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including PEG alone, on the other hand, which did not contain an antioxidant, did not exhibit stabilizing effects at 40° C. This sample had more than 40% more total impurities than the sample including lipoic acid. Bendamustine-containing compositions with such high levels of total impurities would not be suitable for long-term storage.

### Example 4

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 5 mg/ml of thioglycerol, α-lipoic acid or dihydro-lipoic acid was added as a stabilizing antioxidant as indicated in Table 4 below. The samples were maintained at 40° C. and analyzed after 15 days or one month for drug content and impurity profile as indicated in Table 4 below. The results obtained are presented in Table 4.

#### TABLE 4

Stability of Bendamustine (50 mg/ml) in 90% PEG 400, 10% Propylene Glycol and Antioxidant

| Antioxidant | T (° C.) | Time | Content (mg/mL) | % Initial | % Impurities RRT | | % Total Imps |
|---|---|---|---|---|---|---|---|
| | | | | | HP1 0.59 | PG ester 1.10 | |
| Thioglycerol | 40 40 | initial 1 month | 48.8 48.5 | 100 99.4 | <LD 0.06 | <LD 0.20 | 0 0.71 |

US 11,103,483 B2

9

10

TABLE 4-continued

| | | | | | % Impurities RRT | | % |
|---|---|---|---|---|---|---|---|
| Antioxidant | T (° C.) | Time | Content (mg/mL) | % Initial | HP1 0.59 | PG ester 1.10 | Total Imps |
| α-lipoic acid | 40 | initial | 49 | 100 | <LD | <LD | 0 |
| | 40 | 15 days | 48.8 | 99.6 | 0.19 | 0.13 | 0.32 |
| | 40 | 1 month | 48.7 | 99.4 | 0.34 | 0.26 | 0.79 |
| Dihydrolipoic acid | 40 | initial | 49.3 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 47.7 | 97.4 | 0.63 | 0.12 | 1.84 |

Stability of Bendamustine (50 mg/ml) in 90% PEG 400, 10% Propylene Glycol and Antioxidant

<LD = Below Level of Detection

As shown in Table 4, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as a combination of polyethylene glycol and propylene glycol, in the presence of

after 1 week, 15 days or one month for drug content and impurity profile as indicated in Table 5 below. The results obtained are presented in Table 5.

TABLE 5

Stability of Bendamustine (50 mg/ml) and Lipoic Acid (5 mg/ml) in PEG400 and Propylene glycol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | HP1 0.58 | PG ester 1.10 | PG ester 1.13 | % Total Imp. |
|---|---|---|---|---|---|---|---|---|
| BDM - | | Initial | 49.6 | 100 | BDL | BDL | BDL | 0.18 |
| 50 mg/mL | 40° C. | 1 W | 49.0 | 98.8 | 0.05 | 0.13 | BDL | 0.38 |
| Lipoic acid - | | 15 d | 48.3 | 97.4 | 0.08 | 0.26 | BDL | 0.55 |
| 5 mg/mL | | 1 M | 48.0 | 96.8 | 0.11 | 0.43 | 0.13 | 1.03 |
| PEG | 25° C. | 15 d | 49.6 | 100.0 | BDL | 0.10 | BDL | 0.30 |
| 400:PG | | 1 M | 48.4 | 97.6 | 0.05 | 0.19 | BDL | 0.43 |
| (75:25) qs to 1 mL | 5° C. | 1 M | 49.6 | 100.0 | BDL | 0.07 | BDL | 0.27 |
| BDM - | | Initial | 50.2 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/mL | 40° C. | 1 W | 49.9 | 99.4 | BDL | 0.15 | BDL | 0.30 |
| Lipoic acid - | | 15 d | 49.1 | 97.8 | 0.06 | 0.35 | BDL | 0.43 |
| 5 mg/mL | | 1 M | 49.0 | 97.6 | 0.09 | 0.90 | 0.25 | 1.82 |
| PEG | 25° C. | 15 d | 49.9 | 99.4 | BDL | 0.12 | BDL | 0.32 |
| 400:PG | | 1 M | 49.7 | 99.0 | BDL | 0.25 | BDL | 0.59 |
| (50:50) qs to 1 mL | 5° C. | 1 M | 50.0 | 99.6 | BDL | 0.11 | BDL | 0.33 |
| BDM - | | Initial | 50.8 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/mL | 40° C. | 1 W | 50.4 | 99.2 | BDL | 0.11 | BDL | 0.30 |
| Lipoic acid - | | 15 d | 49.7 | 97.8 | 0.07 | 0.17 | BDL | 0.43 |
| 5 mg/mL | | 1 M | 49.7 | 97.8 | 0.13 | 0.27 | 0.09 | 0.84 |
| PEG | 25° C. | 15 d | 50.8 | 100.0 | BDL | 0.10 | BDL | 0.26 |
| 400:PG | | 1 M | 50.8 | 100.0 | BDL | 0.14 | BDL | 0.39 |
| (90:10) qs to 1 mL | 5° C. | 1 M | 50.8 | 100.0 | BDL | 0.06 | BDL | 0.34 |

BDL = Below Detectable Limit

a stabilizing amount of an antioxidant, such as thioglycerol, α-lipoic acid or dihydrolipoic acid, had substantially no increase in total degradants after a period of 1 month. This data supports the position that bendamustine-containing compositions according to the invention have a shelf life of at least about 2 years when stored at temperatures between 5° C. and 25° C.

Example 5

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in a mixture of polyethylene glycol 400 and propylene glycol as indicated in Table 5 below. 5 mg/ml of lipoic acid was added as a stabilizing antioxidant. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed

As shown in Table 5, bendamustine, when dissolved in certain mixtures of polyethylene glycol and propylene glycol and a stabilizing amount of lipoic acid, had substantially no increase in total degradants after a period of 1 month. The data presented in Table 5 translates to bendamustine-containing compositions having a shelf life of at least about 2 years when stored at temperatures between 5° C. and at 25° C.

Example 6

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol and α-lipoic acid was added as a stabilizing antioxidant as indicated in Table 6 below. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed for drug content and impurity profile as indicated in Table 6 below. The results obtained are presented in Table 6.

US 11,103,483 B2

11

12

TABLE 6

| | | Time Per. | Amt. mg/ml | % of Initial | % Area of degradants | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Formulation | Temp | | | | 0.59 | 1.10 | 1.13 | 1.15 | 1.17 | 1.20 | 1.22 | 1.30 | |
| BDM - | Initial | | 51.0 | 100 | 0.20 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.26 |
| 50 mg/mL | 40° C. | 1 M | 50.5 | 99.0 | 0.21 | 0.31 | 0.13 | 0.07 | 0.13 | 0.10 | <LD | | 0.95 |
| α-lipoic | | 2 M | 49.7 | 97.5 | 0.22 | 0.71 | 0.28 | 0.14 | 0.21 | 0.21 | 0.12 | <LD | 2.02 |
| acid - | | 3 M | 48.7 | 95.5 | 0.22 | 1.01 | 0.45 | 0.21 | 0.14 | 0.37 | 0.16 | 0.05 | 2.96 |
| 10 mg/mL | 25° C. | 3 M | 50.5 | 99.0 | 0.20 | 0.36 | 0.07 | <LD | <LD | 0.10 | <LD | <LD | 0.73 |
| PEG | | 6 M | 50.4 | 98.8 | 0.22 | 0.60 | 0.17 | 0.06 | 0.06 | 0.09 | 0.10 | 0.08 | 1.44 |
| 400:PG | 5° C. | 6 M | 50.9 | 99.8 | 0.16 | 0.05 | <LD | <LD | <LD | <LD | <LD | <LD | 0.21 |
| (90:10) qs | | 12 M | 50.6 | 99.2 | 0.20 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | 0.38 |
| to 1 mL | | | | | | | | | | | | | |
| BDM - | Initial | | 50.3 | 100 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | <LD | 0.18 |
| 50 mg/mL | 40° C. | 1 M | 50.0 | 99.4 | 0.19 | 0.32 | 0.08 | 0.06 | 0.08 | 0.06 | 0.06 | <LD | 0.85 |
| α-lipoic | | 2 M | 49.8 | 99.0 | 0.19 | 0.65 | 0.21 | 0.12 | 0.13 | 0.23 | 0.14 | 0.06 | 1.85 |
| acid - | | 3 M | 49.5 | 98.4 | 0.15 | 0.89 | 0.37 | 0.17 | 0.13 | 0.32 | 0.10 | <LD | 2.40 |
| 15 mg/mL | | 6 M | 47.0 | 93.4 | 0.20 | 1.76 | 0.66 | 0.19 | 0.31 | 0.47 | 0.33 | 0.17 | 4.93 |
| PEG | 25° C. | 3 M | 50.0 | 99.4 | 0.20 | 0.35 | 0.08 | <LD | <LD | <LD | 0.11 | <LD | 0.79 |
| 400:PG | | 6 M | 49.5 | 98.4 | 0.19 | 0.58 | 0.15 | 0.06 | 0.07 | 0.09 | 0.08 | 0.10 | 1.38 |
| (90:10) qs | 5° C. | 6 M | 50.3 | 100 | 0.17 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.23 |
| to 1 mL | | 12 M | 50.2 | 99.8 | 0.19 | 0.15 | <LD | <LD | <LD | <LD | <LD | <LD | 0.34 |

<LD = Below Level of Detection

The data reported in Table 6 along with the data in Table 5 demonstrates that bendamustine solutions are stable when dissolved in mixtures of PEG and PG and 5-15 mg/mL α-lipoic acid. As shown in Table 6, bendamustine, when dissolved in combinations of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of lipoic acid, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6-12 months at 5° C. and 25° C. The data corresponds to bendamustine solutions being stable under ambient or refrigerated storage conditions for well in excess of 2 years, and thus long term stable.

Example 7

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 2.5 mg/ml of thioglycerol was added as an antioxidizing agent. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table 7 below. The results obtained are presented in Table 7.

The stability is similar to that of α-lipoic acid samples in Example 6 above. As shown in Table 7, bendamustine, when dissolved in a combination of polyethylene glycol and propylene glycol, and a stabilizing amount of thioglycerol, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6 months at 25° C. The data reported supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for about 2 years.

Example 8

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 85% PEG 400 and 15% PG in the presence of 5 mg/ml of thioglycerol. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table 8 below. The results obtained are presented in Table 8.

TABLE 7

| | | Time Per. | Amt mg/ml | % of Initial | RRTs of degradants | | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Formulation | Temp | | | | 0.15 | 0.37 | 1.10 | 1.13 | 1.15 | 1.17 | 1.18 | 1.20 | 1.22 | |
| BDM - | Initial | | 50.3 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| 50 mg/mL | 40° C. | 15 d | 50.2 | 99.8 | BDL | BDL | 0.18 | BDL | BDL | BDL | BDL | 0.05 | 0.08 | 0.31 |
| Thioglycerol | | 1 M | 49.9 | 99.2 | BDL | 0.12 | 0.32 | 0.07 | BDL | BDL | 0.09 | 0.08 | BDL | 0.75 |
| 2.5 mg/mL | | 2 M | 49.1 | 97.6 | BDL | 0.18 | 0.56 | 0.24 | 0.09 | 0.17 | 0.19 | 0.12 | 0.11 | 1.76 |
| PEG | | 3 M | 48.8 | 97.0 | BDL | 0.23 | 0.85 | 0.34 | 0.16 | 0.30 | 0.34 | 0.29 | 0.19 | 2.94 |
| 400:PG | 25° C. | 3 M | 49.9 | 99.2 | 0.06 | 0.12 | 0.23 | 0.07 | BDL | 0.06 | 0.07 | 0.06 | BDL | 0.67 |
| (90:10) qs | | 6 M | 49.3 | 98.0 | BDL | 0.23 | 0.53 | 0.22 | 0.11 | BDL | 0.21 | 0.22 | 0.20 | 2.07 |
| to 1 mL | | | | | | | | | | | | | | |

BDL = Below Detectable Limit

US 11,103,483 B2

13

TABLE 8

Stability of Bendamustine in 85% PEG 400, 15% PG and Thioglycerol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Total Imp. |
|---|---|---|---|---|---|
| BDM—50 mg/mL | Initial | | 51.5 | 100 | 0.12 |
| Thioglycerol—5 mg/mL | 40° C. | 1 M | 50.4 | 97.9 | 1.18 |
| PEG 400:PG (85:15) qs to | 25° C. | 1 M | 51.4 | 99.8 | 0.41 |
| 1 mL | | 3 M | 50.4 | 97.9 | 1.21 |
| | 5° C. | 3 M | 51.0 | 99.0 | 0.26 |

The stability is similar to that of thioglycerol samples in Example 7 above. As reported in Table 8, total impurities did not exceed 2% at 40° C. or 25° C. storage over one month, or at 25° C. and 5° C. storage after three months. The data reported in Table 8 supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for at least about 2 years if not longer.

We claim:

1. A ready to use liquid bendamustine-containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 10 mg/mL to about 100 mg/mL;

polyethylene glycol; and

a stabilizing amount of an antioxidant;

the composition having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from about 5° C. to about 25° C.

2. The ready to use liquid bendamustine-containing composition of claim 1, wherein the antioxidant is lipoic acid, thioglycerol, propyl gallate, methionine, cysteine, a metabisulfite, sodium formaldehyde sulfoxylate, a phenol-containing aromatic compound, a phenol-containing aliphatic compound, dihydrolipoic acid, or a mixture thereof.

3. The ready to use liquid bendamustine-containing composition of claim 1, having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about 5° C.

4. The ready to use liquid bendamustine-containing composition of claim 1, having less than about 5% peak area response of total impurities resulting from the degradation of

14

the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about 25° C.

5. The ready to use liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

6. The ready to use liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is about 25 mg/mL.

7. The ready to use liquid bendamustine-containing composition of claim 1, comprising bendamustine hydrochloride.

8. A method of treating cancer in a mammal, comprising administering an effective amount of the ready to use liquid bendamustine-containing composition of claim 1 to the mammal.

9. The method of claim 8, wherein the cancer is leukemia.

10. The method of claim 8, wherein the cancer is Hodgkin's disease.

11. The method of claim 8, wherein the antioxidant is lipoic acid, thioglycerol, propyl gallate, methionine, cysteine, a metabisulfite, sodium formaldehyde sulfoxylate, a phenol-containing aromatic compound, a phenol-containing aliphatic compound, dihydrolipoic acid, or a mixture thereof.

12. The method of claim 8, wherein the ready to use liquid bendamustine-containing composition has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about 5° C.

13. The method of claim 8, wherein the ready to use liquid bendamustine-containing composition has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about 25° C.

14. The method of claim 8, wherein the bendamustine concentration in the ready to use liquid bendamustine-containing composition is from about 20 mg/mL to about 60 mg/mL.

15. The method of claim 8, wherein the bendamustine concentration in the ready to use liquid bendamustine-containing composition is about 25 mg/mL.

16. The method of claim 8, wherein the ready to use liquid bendamustine-containing composition comprises bendamustine hydrochloride.

*    *    *    *    *

EAGLEBEN-SA_00013021

# EXHIBIT 6

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 61/299,100 | 01/28/2010 | | 110 | 820.1041 | | |

**CONFIRMATION NO. 8168**

20311
LUCAS & MERCANTI, LLP
475 PARK AVENUE SOUTH
15TH FLOOR
NEW YORK, NY 10016

**FILING RECEIPT**

*OC000000040066780*

Date Mailed: 02/17/2010

Receipt is acknowledged of this provisional patent application. It will not be examined for patentability and will become abandoned not later than twelve months after its filing date. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please submit a written request for a Filing Receipt Correction. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Applicant(s)**
        Nagesh R. Palepu, Southampton, PA;
        Philip Christopher Buxton, Harlow, UNITED KINGDOM;
**Power of Attorney:**
Christina Jordan--61098

**If Required, Foreign Filing License Granted:** 02/05/2010
The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 61/299,100**
**Projected Publication Date:** None, application is not eligible for pre-grant publication
**Non-Publication Request:** No
**Early Publication Request:** No
** SMALL ENTITY **
**Title**

        FORMULATIONS OF BENDAMUSTINE

## PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international

patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4158).

# LICENSE FOR FOREIGN FILING UNDER

## Title 35, United States Code, Section 184

## Title 37, Code of Federal Regulations, 5.11 & 5.15

**GRANTED**

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and

Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

**<u>NOT GRANTED</u>**

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

# FORMULATIONS OF BENDAMUSTINE

## BACKGROUND OF THE INVENTION

Bendamustine free base is represented by the following structural formula (I)



(I).

Bendamustine is used in the treatment of a number of cancers including leukemias, Hodgkins disease and multiple myelomas.  Bendamustine is the active ingredient of the commercial product Treanda™, a lyophilized powder for reconstitution.

Bendamustine exhibits rapid degradation upon reconstitution of the lyophilized product. Bendamustine undergoes hydrolysis by direct substitution rather than an addition elimination process due to the presence of the highly labile aliphatic chlorine atoms. Some of the main degradants of bendamustine are the monohydroxy compound known as HP1 (hydrolysis product 1) and dihydroxy compound HP2 (hydrolysis product 2).  The monohydroxy compound appears as the main impurity at Relative Retention Time (RRT) 0.6 and the dihydroxy compound appears as the main impurity at RRT 0.27.  Minor peaks appear at RRT 1.2, which are presently unknown.

The stability in water is measured in hours, and is therefore, not suitable for long-term storage in liquid form.  The lyophile possesses good chemical stability.  However, reconstitution of the lyophile is clinically inconvenient, taking 15 – 30 mins with

implications of chemical instability.  There is a need for ready to use (RTU) bendamustine formulations having enhanced stability.

**SUMMARY OF THE INVENTION**

The invention is generally directed to bendamustine-containing compositions that are long term storage stable, i.e. for at least about 15 months at 5 ºC or longer.  In several aspects of the invention, the compositions include a solvent selected from the group consisting of propylene glycol, ethanol, polyethylene glycol, glycofurol, glycerin and 88% (w/w) lactic acid, and a stabilizing amount of a chloride salt.  In other aspects of the invention, the compositions include a solvent selected from the group consisting of polyethylene glycol, propylene glycol and or mixtures thereof and a stabilizing amount of an antioxidant.  In other aspects of the invention, the compositions include DMSO.  Still further aspects of the invention include methods of treatment and kits.

One of the advantages of the inventive liquid compositions is that they are substantially free of impurities after at least about 15 months at 5 ºC.  Substantially free of impurities refers to bendamustine-containing compositions in which the amount of total impurities is less than about 5% after a period of about 15 months.  The formulations are ready to use or further dilution.

**DETAILED DESCRIPTION OF THE INVENTION**

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art to which this invention belongs.  In the event that there are a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

As used herein, substantially free of impurities refers to bendamustine-containing compositions in which there is less than about 5 % of total impurities after a period of at least about 15 months, and preferably after a period of at least about 18 months.

3

In accordance with one aspect of the invention, there are provided bendamustine-containing compositions with improved stability, including:

a) bendamustine or a pharmaceutically acceptable salt thereof;

b) a pharmacologically suitable fluid comprising a solvent selected from propylene glycol, ethanol, polyethylene glycol, glycofurol, glycerin and 88% (w/w) lactic acid; and

c) a stabilizing amount of a chloride salt, wherein the amount of total impurities in the compositions resulting from the degradation of the bendamustine is less than about 5% after at least about 15 months at 5 °C, i.e. after at least about 18 months or more.

In some aspects of the invention, the bendamustine concentration is from about 10 to about 100 mg/mL, preferably from about 20 to about 50 mg/mL, and more preferably about 50 mg/mL.

In some aspects of the invention, the chloride salt is selected from organic chloride salts, sodium chloride, choline chloride and hydrochloride salts of amino acids. In one embodiment of the invention, the chloride salt concentration is from about 10 to about 220 mg/mL. In another embodiment, the chloride salt concentration is from about 50 to about 215 mg/mL. Preferably, the chloride salt concentration is about 215 mg/mL.

Without meaning to be bound to any theory or hypothesis, it is thought that the chloride ions from the saline have a greater nucleophilicity than the solvent water and will take part in the substitution process more readily.

In one embodiment of the invention, the solvent is propylene glycol. In another embodiment of the invention, the solvent is ethanol. In yet another embodiment of the invention, the solvent is polyethylene glycol.

4

Another embodiment of the invention provides methods of treating cancer in mammals by administering, to a mammal in need thereof, an effective amount of a bendamustine-containing composition with improved stability, including:

    a) bendamustine or a pharmaceutically acceptable salt thereof;

    b) a pharmacologically suitable fluid comprising a solvent selected from propylene glycol, ethanol, polyethylene glycol, glycofurol, glycerin and 88% (w/w) lactic acid; and

    c) a stabilizing amount of a chloride salt, wherein the amount of total impurities in the compositions resulting from the degradation of the bendamustine is less than about 5% after at least about 15 months at 5 °C, i.e. after at least about 18 months or more.

Another embodiment provides kits including lyophilized bendamustine or a pharmaceutically acceptable salt thereof; and a pharmacologically suitable fluid with a solvent selected from propylene glycol, ethanol, polyethylene glycol, glycofurol, glycerin and 88% (w/w) lactic acid, and a stabilizing amount of a chloride salt.

In accordance with another aspect of the invention there are provided bendamustine-containing compositions with improved stability, including:

    a) bendamustine or a pharmaceutically acceptable salt thereof; and

    b) a pharmacologically suitable fluid including

        i) a solvent selected from polyethylene glycol, propylene glycol and mixtures thereof; and

        ii) a stabilizing amount of an antioxidant, wherein: the amount of total impurities in said composition resulting from the degradation of said bendamustine is less than about 3% after at least about 2 years at about 5 °C.

In some aspects of the invention, the bendamustine concentration is from about 20 to about 60 mg/mL, preferably from about 30 to about 50 mg/mL, and more preferably about 50 mg/mL.

In one embodiment of the invention, the solvent is propylene glycol. In another embodiment of the invention, the solvent is polyethylene glycol. In another embodiment of the invention, the solvent is a mixture of polyethylene glycol and propylene glycol. Preferably, the solvent mixture includes 90% polyethylene glycol and 10% propylene glycol.

In another embodiment of the invention, the antioxidant is selected from lipoic acid, thioglycerol and analogs thereof, propyl gallate, monothioglycerols, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds and dihydrolipoic acid. Preferably, the antioxidant is selected from thioglycerol and lipoic acid. In one aspect of the invention, the antioxidant concentration is from about 2.5 to about 35 mg/mL. Preferably, the antioxidant concentration is from about 5 to about 20 mg/mL. More preferably, the antioxidant concentration is about 5 mg/mL.

Another embodiment of the invention provides methods of treating cancer in mammals, comprising administering to a mammal in need thereof an effective amount of a bendamustine-containing compositions with improved stability, including:

    a) bendamustine or a pharmaceutically acceptable salt thereof; and

    b) a pharmacologically suitable fluid including

        i) a solvent selected from polyethylene glycol, propylene glycol and mixtures thereof; and

        ii) a stabilizing amount of an antioxidant, wherein:

the amount of total impurities in the composition resulting from the degradation of the bendamustine is less than about 3% after at least 2 years at about 5 °C.

Another embodiment provides kits including lyophilized bendamustine or a pharmaceutically acceptable salt thereof; and a pharmacologically suitable fluid including a solvent selected from polyethylene glycol, propylene glycol and mixtures thereof; and a stabilizing amount of an antioxidant.

6

In accordance with another aspect of the invention, there is provided bendamustine-containing compositions with improved stability, including:

      a) bendamustine or a pharmaceutically acceptable salt thereof; and

      b) a pharmacologically suitable fluid including DMSO, wherein:

the amount of total impurities in the composition resulting from the degradation of the bendamustine is less than about 3% after at least 2 years at 5 °C.

In some aspects of the invention, the bendamustine concentration is from about 10 to about 100 mg/mL. Preferably, the bendamustine concentration is from about 20 to about 50 mg/mL. More preferably, the bendamustine concentration is about 50 mg/mL.

**EXAMPLES**

The following examples serve to provide further appreciation of the invention but are not meant in any way to restrict the effective scope of the invention.

**Example 1**

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10mg/ml in ethanol, propylene glycol, glycerol, and 88% (w/w) lactic acid. 215 mg/ml of choline chloride was added in half of the samples as a source of soluble chloride ions. The samples were maintained at 40 °C and analyzed periodically for drug content and impurity profile. The results obtained are presented in Tables 1 and 2. Additional solvents benzyl alcohol and dimethyl sulphoxide were subsequently evaluated and these results appear in Table 3. Choline chloride was not sufficiently soluble in DMSO resulting in the omission of this combination from the test schedule.

Table 1 – Stability of Bendamustine HCl in Non-aqueous Solvents I

| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
|---|---|---|---|---|
| **BDM 10mg/mL Lactic acid (88% (w/w)) qs to 1mL** | | Initial | 10.01 | **0.35** |
| | **40°C** | 48 hrs | 9.35 | **3.78** |
| | | 7 day | 8.56 | **9.64** |
| **BDM - 10mg/mL Choline Chloride - 215mg/mL Lactic acid(88% (w/w)) qs to 1mL** | | Initial | 9.78 | **0.46** |
| | **40°C** | 48 hrs | 9.25 | **4.22** |
| | | 7 day | 8.65 | **7.88** |
| **BDM - 10mg/mL Ethanol qs to 1mL** | | Initial | 10.55 | **0.27** |
| | **40°C** | 48 hrs | 10.30 | **2.39** |
| | | 7 day | 9.55 | **6.66** |
| **BDM - 10mg/mL Choline chloride - 215mg/mL Ethanol qs to 1mL** | | Initial | 10.43 | **0.27** |
| | **40°C** | 48 hrs | 10.48 | **1.27** |
| | | 7 day | 10.26 | **2.11** |

<LD = Below Level of Detection

Table 2 - Stability of Bendamustine HCl in Non-aqueous Solvents II

| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
|---|---|---|---|---|
| **BDM - 10mg/mL Choline chloride - 215mg/mL Propylene glycol qs to 1mL** | | Initial | 9.99 | **0.21** |
| | **40°C** | 48 hrs | 9.95 | **0.60** |
| | | 7 day | 9.43 | **2.31** |
| **BDM - 10mg/mL Propylene glycol qs to 1mL** | | Initial | 9.68 | **0.21** |
| | **40°C** | 48 hrs | 9.45 | **0.88** |
| | | 7 day | 9.00 | **3.44** |
| **BDM - 10mg/mL Choline chloride - 215mg/mL Glycerol qs to 1mL** | | Initial | 9.86 | **0.80** |
| | **40°C** | 48 hrs | 9.20 | **2.58** |
| | | 7 day | 6.34 | **33.9** |
| **BDM - 10mg/mL Glycerol qs to 1mL** | | Initial | 10.13 | **0.28** |
| | **40°C** | 48 hrs | 8.42 | **10.8** |
| | | 7 day | 3.00 | **64.6** |

<LD = Below Level of Detection

Table 3 - Stability of Bendamustine HCl in Non-aqueous Solvents III

| Formulation | Temp | Time | Content (mg/mL) | % Total Imp |
|---|---|---|---|---|
| **BDM - 10mg/mL Choline Chloride - 215mg/mL Benzyl alcohol qs to 1mL** | **40°C** | Initial | 9.95 | **1.19** |
| | | 48 hrs | 9.89 | **3.51** |
| | | 1 week | 8.97 | **4.24** |
| **BDM - 10mg/mL Benzyl alcohol qs to 1mL** | **40°C** | Initial | 9.52 | **0.33** |
| | | 48 hrs | 8.67 | **4.18** |
| | | 1 week | 7.49 | **7.84** |
| **BDM - 10mg/mL DMSO qs to 1mL** | **40°C** | Initial | 10.2 | **0.23** |
| | | 48 hrs | 9.80 | **0.30** |
| | | 1 week | 10.0 | **0.56** |

<LD = Below Level of Detection

Note:  In Tables 1, 2 and 3 after the 7 day time point at 40 $^{o}$C, the total % impurities include total contributions from peaks at various RRTs.

As shown in Tables 1 and 2, the bendamustine formulations are very stable in solutions containing solvent and chloride salt.  Tables 1 and 2 show that bendamustine, when dissolved at a concentration of about 10 mg/mL, in a solvent, such as ethanol and propylene glycol, and containing a stabilizing amount of a chloride salt, such as choline chloride, had less than about 5% after at least 7 days storage at 40 $^{o}$C.

Table 3 shows that bendamustine, when dissolved in DMSO, had substantially no increase in total degradants.

The data presented in Tables 1, 2 and 3 translated to bendamustine-containing compositions having a shelf life of at least about 15 months at 5 $^{o}$C, i.e. at least about 18 months.

As shown in Tables 1 and 2, for example, control samples 3 and 6, which were dissolved in ethanol and propylene glycol, respectively, did not provide such stabilizing effects. Sample 3 exhibited more than 6.5 total degradants after 7 days storage at 40 $^{\circ}$C. Sample 6 exhibited almost 3.5% total degradants after 7 days storage at 40 $^{\circ}$C. Bendamustine-containing compositions with such high levels of degradation would not be suitable for long-term storage.

**Example 2**

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 20 mg/ml in polyethylene glycol 400 and 5 mg/ml of lipoic acid or 2 mg/ml of N-acetyl cysteine was added as a stabilizing antioxidant as indicated in Table 4 below. The samples were maintained at 40 $^{\circ}$C or 25 $^{\circ}$C and analyzed after 15 days for drug content and impurity profile. The results obtained are presented in Table 4.

Table 4: Stability of bendamustine (20mg/ml) in PEG 400 and antioxidants

| Antioxidant | T $^{\circ}$C | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
| | 40 | 15 | 97.5 | 0.33 | 0.53 |
| N-acetyl cysteine 2mg/ml | 25 | 15 | 94.7 | 0.25 | 0.6 |
| | 40 | 15 | 86.4 | 4.83 | 11.7 |

<LD = Below Level of Detection

As shown in Table 4, bendamustine, when dissolved in a solvent, such as polyethylene glycol, in the presence of a stabilizing amount of an antioxidant, such as lipoic acid, had substantially no increase in total degradants after a period of 15 days. The data presented in Table 4 translates to bendamustine-containing compositions having a shelf life of at least about 2 years at 5 $^{\circ}$C.

The control sample, on the other hand, which did not contain an antioxidant, did not exhibit stabilizing effects.  The sample stored at 25 ºC for 15 days had 2% more total impurities, and the sample stored at 40 ºC for 15 days had more than 40% more total impurities.  Bendamustine-containing compositions with such high levels of total impurities would not be suitable for long-term storage.

### Example 3

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol.  5 mg/ml of thioglycerol, α-lipoic acid or dihydrolipoic acid was added as a stabilizing antioxidant as indicated in Table 5 below.  The samples were maintained at 40 ºC and analyzed after 15 days or one month for drug content and impurity profile as indicated in Table 5 below.  The results obtained are presented in Table 5.

Table 5: Stability of bendamustine (50mg/ml) in 90% PEG 400, 10% propylene glycol and antioxidants

| Antioxidant | T (ºC) | Time | Content (mg/mL) | % Initial | % Impurities RRT | | % Total Imps |
|---|---|---|---|---|---|---|---|
| | | | | | HP1 | PG ester | |
| | | | | | 0.59 | 1.10 | |
| Thioglycerol | 40 | initial | 48.8 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 48.5 | 99.4 | 0.06 | 0.20 | 0.71 |
| α-lipoic acid | 40 | initial | 49 | 100 | <LD | <LD | 0 |
| | 40 | 15 days | 48.8 | 99.6 | 0.19 | 0.13 | 0.32 |
| | 40 | 1 month | 48.7 | 99.4 | 0.34 | 0.26 | 0.79 |
| Dihydrolipoic acid | 40 | initial | 49.3 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 47.7 | 97.4 | 0.63 | 0.12 | 1.84 |

<LD = Below Level of Detection

As shown in Table 5, bendamustine, when dissolved in a solvent, such as a combination of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of an antioxidant, such as thioglycerol, α-lipoic acid or dihydrolipoic acid, had substantially no increase in total degradants after a period of 1 month. The data presented in Table 5 translates to bendamustine-containing compositions having a shelf life of at least about 2 years at 5 °C.

# EXHIBIT 7

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------
EAGLE PHARMACEUTICALS, INC. )
and )
EAGLE SUB1 LLC )
     Plaintiffs, ) C.A.No.24-64-JLH
     ) JURY TRIAL DEMANDED
v. )
     )
APOTEX INC. and APOTEX CORP. )
     )
     Defendants. )
-----------------------------------
EAGLE PHARMACEUTICALS, INC. )
and )
EAGLE SUB1 LLC )
     Plaintiffs, ) C.A.No.24-65-JLH
     ) JURY TRIAL DEMANDED
v. )
     )
Slayback Pharma LLC and )
Azurity )
     Defendants. )
-----------------------------------
EAGLE PHARMACEUTICALS, INC. )
and )
EAGLE SUB1 LLC )
     Plaintiffs, )
     )
v. ) C.A.No.24-66-JLH
     ) JURY TRIAL DEMANDED
     )
Baxter Healthcare Corp, )
     )
     Defendants. )
-----------------------------------

DEPOSITION OF: PHILIP BUXTON (DAY ONE)
Taken on:
Thursday, 21st August 2025
at 11.30 A.M.
Taken at:
LATHAM & WATKINS LLP,
99 Bishopsgate,
London, EC2M 3XF

Court Reporter: Amy Coley

## Page 2

APPEARANCES

In Person:

MCCARTER & ENGLISH LLP
Renaissance Centre
405 N. King St., 8th Floor
Wilmington, DE 19801
(Attorneys for Plaintiff, Eagle, and the witness)

    BY: DAN SILVER
    dsilver@mccarter.com

    Marc Zubick (marc.zubick@lw.com)
    Latham & Watkins LLP
    And
    Alex Grabowski (alex.grabowski@lw.com)
    Latham & Watkins LLP (for Eagle in the
    Apotex and Slayback cases)

DECHERT LLP
Three Bryant Park,
1095 Avenue of the Americas,
New York, NY 10036-6797
(Attorneys for Defendants, Baxter Healthcare Corp)

    BY: NOAH LEIBOWITZ - Dechert LLP
    noah.leibowitz@dechert.com

WINDELS MARX LANE & MITTENDORF, LLP
156 West 56th Street
New York, NY 10019
(Attorneys for Defendants Slayback and Azurity)
    BY: JASON LIEF - Windels Marx Lane &
    Mittendorf, LLP
    jlief@windelsmarx.com

## Page 3

Remote via Zoom:
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Ave., N.W.
Suite 800
Washington, DC 20006-3404
(Attorneys for Apotex defendants)
    BY: CHRISTOPHER FERENC -
    Katten Muchin Rosenman LLP
    christopher.ferenc@katten.com

    Judah Bellin - Dechert LLP
    judah.bellin@dechert.com

    Robyn Ast-Gmoser - Windels Marx Lane &
    Mittendorf, LLP
    rast-gmoser@windelsmarx.com

    Lauren Eiten - Katten Muchin Rosenman LLP
    lauren.eiten@katten.com

Also present:

    Wendy Viner - Videographer

    Amy Coley - Court reporter

## Page 4

INDEX
PAGE

PHILIP CHRISTOPHER BUXTON      8

    Questions by Mr. Leibowitz    8
    Questions by Mr. Lief    109

1 (Pages 1 to 4)

EAGLE PHARMACEUTICALS vs. SLAYBACK PHARMA   AUGUST 21ST, 2025   DEPOSITION OF PHILIP BUXTON (DAY ONE)

Page 29

BUXTON - LEIBOWITZ

1
2  Office sent regarding these patents and -- strike
3  the "and".
4          MR. SILVER: Do not reveal the
5  substance of any attorney/client privilege
6  communications, but with that guidance you can
7  answer.
8          A.  ███████████████
   ███████████████████████
10 BY MR. LEIBOWITZ:
11         Q.  Did you speak to -- strike that.
12 Without revealing the substance of any
13 communications you may have had with counsel, did
14 you speak to anyone about the prosecution of these
15 three patents?
16         MR. SILVER: You can answer that
17 "yes" or "no", and do not reveal the substance of
18 any communication with counsel.
19         A.  ██████████████████████
   ███████████████████████████
   ██████████████████████
23 ████████
24 BY MR. LEIBOWITZ:
25         Q.  ███████████████

Page 30

BUXTON - LEIBOWITZ

1
2          A.  ████████████████.
3          Q.  Let me mark as Buxton 5 an inventor
4  declaration from the 783 patent. This is tab 4.
5  (Exhibit 5 marked for identification)
6          Q.  We will also mark as Buxton 6 an
7  inventor declaration from the 214 patent.
8  (Exhibit 6 marked for identification)
9          Q.  That was tab 5.
10 (Exhibit 7 marked for identification)
11         Q.  We will mark as Exhibit 7 an
12 inventor declaration from the 248 patent and that
13 is tab 6.
14         Dr. Buxton you see I have put in
15 front of you what has been marked as Buxton
16 Exhibits 5, 6, and 7, and I will represent to you
17 these are the declarations that were made in
18 filing the three patents that you have in front of
19 you, the 783, 214 and 248 patents. If you refer
20 to Buxton Exhibit 5, they are all substantively
21 identical, if you see?
22         A.  Yes.
23         Q.  If you refer to Buxton Exhibit 5,
24 you will see there is a statement that says: "I
25 believe that I am the original inventor or an

Page 31

BUXTON - LEIBOWITZ

1
2  original joint inventor of a claimed invention in
3  the application." Do you see that?
4          A.  Yes.
5          Q.  Above that it says: "The
6  above-identified application was made or
7  authorized to be made by me." Do you see that?
8          A.  Yes.
9          Q.  And then at the bottom of the page
10 is that your signature under your name
11 Philip Christopher Buxton?
12         A.  Yes, that is indeed my signature.
13         Q.  Can you confirm that is your
14 signature both on Buxton Exhibit 5, Buxton
15 Exhibit 6 and Buxton Exhibit 7?
16         A.  Yes, I can.
17         Q.  Do you understand that as a named
18 inventor of a patent before the US Patent and
19 Trademark Office you have certain duties and
20 responsibilities to the Patent and Trademark
21 Office?
22         MR. SILVER: Objection to form.
23 I will caution you not to reveal the substance of
24 any attorney/client privilege communications.
25         A.  Do you have any specific

Page 32

BUXTON - LEIBOWITZ

1
2  responsibilities you are referring to?
3  BY MR. LEIBOWITZ:
4  █  ██████████████████████
   █  █████████████████████████████
   █  █████████████████████████████
   █  ████████████████████████
   █  ████████████████████
   █  █████████████████████████
   █  █████████████████████████
   █  ██████████████████
   █  ████████████████████
   █  ████████████████████████████
   █  █████████████████████████████
   █  ████████████████████████████
   █  ██████████████████████████████
   █  ████████████████████
   █  ███████████████████████████
   █  ████████████████████
21 █         A.  ████████████
   █  ██████████████
23 BY MR. LEIBOWITZ:
24 █         Q.  █████████████████████
   ████████████████████████████



MARTEN WALSH CHERER LTD          2ND FLOOR, 6-9 QUALITY COURT, CHANCERY LANE          LONDON, WC2A 1HP
TEL: (020) 7067 2900                    E-MAIL: info@martenwalshcherer.com

EAGLE PHARMACEUTICALS vs. SLAYBACK PHARMA    AUGUST 21ST, 2025    DEPOSITION OF PHILIP BUXTON (DAY ONE)



Page 37

1    BUXTON - LEIBOWITZ
2    Q. [redacted]
23    MR. SILVER: Objection to form. I
24    just remind you to give me a chance to object.
25    BY MR. LEIBOWITZ:

Page 38

1    BUXTON - LEIBOWITZ
2    Q. [redacted]
9    Q. [redacted]
18    MR. SILVER: Objection to form.
19    A. [redacted]
20    BY MR. LEIBOWITZ:
21    Q.    Let me mark as Buxton Exhibit 9 a
22    copy of a patent publication US 2013/0210879.
23    (Exhibit 9 marked for identification)
24    Q.    Tab 12. Do you recognise this
25    patent publication?

Page 39

1    BUXTON - LEIBOWITZ
2    A.    This is August 15th, 2013. Yes,
3    I recognise the subject matter of it.
4    Q.    And do you see you are listed as
5    one of the inventors on this patent publication?
6    A.    Yes.
7    Q.    If you flip past all of the figures
8    and tables to the page of this patent publication
9    which has a 1 at the top?
10    A.    Way near the back.
11    Q.    Yes, half way through?
12    A.    Yes.
13    Q.    If you look down at paragraph [006]
14    on the left, it discusses: "Some parenteral
15    formulations containing lower molecular weight
16    PEG's have significant variations in long term
17    product stability from batch to batch." Do you see
18    where I am reading?
19    A.    Yes can I stop you one minute.
20    I need a bathroom break. I will only be ----
21    THE VIDEOGRAPHER: We are going off
22    the record. The time is 11.53.
23    (A short recess from 11.53 to 12.05)
24    THE VIDEOGRAPHER: We are back on
25    the record. The time is 12.05.

Page 40

1    BUXTON - LEIBOWITZ
2    BY MR. LEIBOWITZ:
3    Q.    Welcome back Dr. Buxton.
4    A.    Sorry about that.
5    Q.    No problem at all. Dr. Buxton,
6    during the break did you have any substantive
7    discussions with counsel about the questioning?
8    A.    No.
9    Q.    Before the break, Dr. Buxton, I was
10    directing you to paragraph [0006] of the 879
11    publication, which on page 1 towards the bottom
12    left you will see a paragraph number [0006].
13    A.    Yes.
14    Q.    And do you see it says: "Some
15    parenteral formulations containing lower molecular
16    weight PEG's have significant variations in long
17    term product stability from batch to batch. It has
18    been determined that at least Some and perhaps all
19    of this unacceptable property is attributable to
20    the PEG included therein." Do you see that?
21    A.    Yes.
22    Q.    And is this discussing the
23    variability in PEG and the pH of the PEG issue
24    that we were just talking about?
25    A.    Yes, it is.

10 (Pages 37 to 40)

EAGLE PHARMACEUTICALS vs. SLAYBACK PHARMA    AUGUST 21ST, 2025          DEPOSITION OF PHILIP BUXTON (DAY ONE)



Page 41

BUXTON - LEIBOWITZ

2    Q.    And if you see over in paragraph
3  [0008] there is a summary of the invention, and in
4  paragraph [0008] one of the -- strike that.  In
5  paragraph [0008] if you see, Dr. Buxton, it talks
6  about a summary of the invention and a liquid
7  bendamustine-containing composition that includes
8  in (b): "... an organic compound or an inorganic
9  compound in an amount Sufficient to obtain a pH of
10  from about 6.0 to about 11 for the polyethylene
11  glycol ..." and it continues from there.  Do you
12  see that.
13    A.    Yes, I see the paragraph, yes.
14    Q.    ████████████████████████
     ██████████████████████████████████
17          MR. SILVER: Objection to form.
18    A.    Let me read this a minute.  Can you
19  repeat the question again.
20    Q.    Sure, Dr. Buxton if you see in
21  paragraph [0008] there is a reference to in (b):
22  "an organic compound or an inorganic compound in
23  an amount sufficient to obtain a pH from about 6.0
24  to about 11 for the polyethylene glycol ...", that
25  is part of that liquid bendamustine containing

Page 42

BUXTON - LEIBOWITZ

2  composition.  Do you see that?
3    A.    Yes.
4    Q.    ████████████████████████
     ██████████████████████████████████
7          MR. SILVER: Objection to the form.
8     ████████████
9  BY MR. LEIBOWITZ:
10    Q.    In paragraph [0009] continuing down
11  it says that: "One of the advantages of the
12  inventive liquid compositions is that they have
13  substantially improved long term stability."  Do
14  you see that?
15    A.    Yes.
16    Q.    It goes on to talk about: "... the
17  inventive bendamustine compositions are
18  substantially free of impurities after at least
19  about 15 months at a temperature of from about 5
20  C. to about 25°C."  Do you see that in
21  paragraph [0009]?
22    A.    Yes.
23    Q.    ████████████████████████
     ██████████████████
25          MR. SILVER:  Objection to form.

Page 43

BUXTON - LEIBOWITZ

2    A.    ████████████████████████████
     ████████████████████████
4  BY MR. LEIBOWITZ:
5    Q.    ████████████████████████████
     ████████████████████████████████████████
     ████████████████████████████████████████
     ████████████████
10          MR. SILVER: Objection to form.
11    A.    ████████████████████████
13  BY MR. LEIBOWITZ:
14    Q.    In this patent publication there is
15  a series of data with respect to certain liquid
16  bendamustine formulations; right?
17    A.    Yes, quite a bit actually.
18    Q.    And were you involved in reviewing
19  that data when it was produced by SciDose?
20    A.    Again, are you speaking about a
21  specific piece of data here or the whole lot in
22  general.
23    Q.    Sure.  Why don't we start, we can
24  look at Table 1, it is actually going to be the
25  second page of the publication there is as a

Page 44

BUXTON - LEIBOWITZ

2  table.  Do you see Table 1?
3    A.    Yes.
4    Q.    This Table 1 which is Figure 1 of
5  the 879 publication, reports some analysis that
6  was done with respect to a formulation, a liquid
7  bendamustine formulation; is that right?
8    A.    That is correct.
9    Q.    And in particular the formulation
10  that was here discussed in Table 1 is a
11  formulation that had bendamustine at 25 milligrams
12  per millilitre, Thioglycerol at 5 milligrams per
13  millilitre and a PEG 400-PG solvent at a ratio of
14  90:10 up to 1 millilitre; is that right?
15    A.    That is correct.
16    Q.    This Table 1 reports the analysis
17  that was done at 40°C at a 15-day time period;
18  right?
19    A.    Yes, correct.
20          ████████████████████████████
     ████████████████████████████████████████
     ████████████████████████████████
     ████████████████████████████

MARTEN WALSH CHERER LTD          2ND FLOOR, 6-9 QUALITY COURT, CHANCERY LANE          LONDON, WC2A 1HP
TEL: (020) 7067 2900                    E-MAIL: info@martenwalshcherer.com



Page 45

1          BUXTON - LEIBOWITZ
2
3
5          Q.
8               MR. SILVER:  Objection to form.
9
10   BY MR. LEIBOWITZ:
11        Q.    If we take a look, if you flip
12   ahead in the document to page 5, I apologise we
13   will be flipping back and forth in for a little
14   bit.  You will see on page 5 there is a heading
15   that says "EXAMPLES".
16               MR. SILVER:  You are going to back
17   to the specification, you are no longer in the
18   figures.
19               MR. LEIBOWITZ: That is right.
20               MR. SILVER:  Thank you.
21   BY MR. LEIBOWITZ:
22        Q.    Do you see where I am on page 5
23   paragraph [0125]?
24        A.    [0125]:  "The following examples
25   serve to provide further appreciation ...", that

Page 46

1          BUXTON - LEIBOWITZ
2    is the paragraph you are looking at?
3         Q.    Exactly and the heading "EXAMPLES"
4    that is right above that.
5         A.    Yes.
6         Q.    If you see in paragraphs [0126] and
7    [0127] it is discussing the analysis that we were
8    just looking at in Figure 1, Table 1; is that
9    right?
10        A.    Yes.  Does it refer to the Table 1
11   here?
12        Q.    Yes, it is toward the bottom of the
13   page 5 and over on to page 6.
14        A.    Yes, in Figure 1 which is Table 1,
15   yes, okay.
16        Q.    If you flip over to page 6
17   paragraph [0127], do you see it says: "As shown in
18   FIG.1 (Table 1), the sample, which did not include
19   NaOH, did not provide long term storage
20   stability."  Do you see that?
21        A.    Yes.
22        Q.
25               MR. SILVER:  Objection to form.

Page 47

1          BUXTON - LEIBOWITZ
2    BY MR. LEIBOWITZ:
3         Q.
10               MR. SILVER:  Objection to form.
11        A.
15   BY MR. LEIBOWITZ:
16        Q.    Well, let us be clear.  You are an
17   inventor on this patent publication; correct?
18        A.    Hmm.
19        Q.    Is that a "yes"?
20        A.    Yes, sorry.
21        Q.

Page 48

1          BUXTON - LEIBOWITZ
2
3               MR. SILVER:  Objection to form.
4         A.
6    BY MR. LEIBOWITZ:
7         Q.    Well, I believe you ----
8         A.    Or ----
9         Q.    Go ahead, I am sorry, doctor,
10   finish your answer.
11        A.
20               MR. SILVER:  Objection to form.
21

12  (Pages 45 to 48)



Page 49

1     BUXTON - LEIBOWITZ
2
6     BY MR. LEIBOWITZ:
7         Q.
14            MR. SILVER:  Objection to form, you
15    can answer.
16        A.
17    BY MR. LEIBOWITZ:
18

Page 50

1     BUXTON - LEIBOWITZ
2
11        Q.
14
15        A.
17
18

Page 51

1     BUXTON - LEIBOWITZ
2
10        Q.    Okay.
14            MR. SILVER:  Hold on a second.  Let
15    him ask his question, give me a chance to object
16    and then you answer, okay.   The court reporter
17    has to write this all down.  We cannot be
18    interrupting each other.
19    BY MR. LEIBOWITZ:
20        Q.    That is fair and I will try not to
21    talk over you, I have a bad habit of doing the
22    same thing, Dr. Buxton, I apologise.
23            Let me ask it again.  Dr. Buxton,
24

Page 52

1     BUXTON - LEIBOWITZ
2
6             MR. SILVER:  Objection to form.
7
9     BY MR. LEIBOWITZ:
10        Q.    If we could take a look, flipping
11    back in this document to Table 3, which is
12    Figure 3.  Do you see, Dr. Buxton, that in
13    Figure 3 there is a series of different liquid
14    bendamustine formulations that are set out and
15    some analysis that was done on them; is that
16    right?
17        A.    Yes, that is correct.
18        Q.    With respect to the formulation
19    labelled Formulation 1 in Figure 3, that is a
20    liquid bendamustine formulation that had
21    bendamustine at 25 milligrams, Thioglycerol at
22    5 milligrams and a ratio of PEG-400-PG at 90:10.
23    Do you see that?
24        A.    That is correct, yes.
25        Q.    Do you understand that to be the

13  (Pages 49 to 52)

Case 1:24-cv-00065-JLH    Document 248    Filed 11/25/25    Page 90 of 486 PageID #: 3735

EAGLE PHARMACEUTICALS vs. SLAYBACK PHARMA    AUGUST 21ST, 2025    DEPOSITION OF PHILIP BUXTON (DAY ONE)



Page 53

BUXTON - LEIBOWITZ

1  concentrations meaning that bendamustine was 25
2  milligrams per millilitre and Thioglycerol was 5
3  milligrams per millilitre?
4      A.    That is correct.
5      Q.    If we take a look at the data for
6  that formulation at 40°C for 15 days all the way
7  on the right it shows 26.55% impurity; correct?
8      A.    Yes.
9      Q. ███████████████████████
10 ███████████████████████████
11 ███████████████████████████
12 ████
13          MR. SILVER:  Objection to form.
14     A.   ████████████
15 BY MR. LEIBOWITZ:
16     Q.    And if we flip back to
17 paragraph [0132], which is on page 6 where we were
18 before, you will see in paragraph [0132]
19 discussing Figure 3, Table 3, talking about the
20 control sample, that was that number 1 we were
21 looking at; right?
22     A.    Yes.
23     Q.    And it says:  "... the control
24 sample, which did not include NaOH did not provide

Page 54

BUXTON - LEIBOWITZ

1  long term storage stability."  Continuing:  "This
2  sample exhibited more than 26% total esters
3  compared to initial after only 15 days at 40°C
4  ...".  Do you see that?
5      A.    Yes.
6      Q.    The last sentence:  "Bendamustine
7  containing compositions with such high levels of
8  degradation would not be long term storage
9  stable".
10     A.    Yes.
11     Q. ███████████████████████
12 ███████████████████████████
13 ███████████████████████████
14 ███████████████████████████
15 ████████
16          MR. SILVER:  Objection to form.
17     A.   ████████████████████
18 ████
19 BY MR. LEIBOWITZ:
20     Q.    Take a look at -- sorry.  Take a
21 look at Table 5 and actually it is Table 5A, and
22 in Table 5A there is some additional liquid
23 bendamustine formulations and some data and

Page 55

BUXTON - LEIBOWITZ

1  analysis with respect to those formulations; is
2  that right?
3      A.    Yes.
4      Q.    Dr. Buxton, I will refer you to
5  the formulation 8, the first formulation?
6      A.    At the top, yes.
7      Q.    In Table 5A, are you with me?
8      A.    Yes.
9      Q.    This discusses a bendamustine
10 formulation, liquid bendamustine formulation with
11 bendamustine at 25 milligrams per millilitre,
12 Thioglycerol at 5 milligrams per millilitre and
13 again a ratio of PEG-400:PG at 90:10 up to a
14 millilitre; is that right?
15     A.    Yes, that is correct.
16     Q.    This reports data of analysis of 14
17 days storage at 40°C and if you look at the right,
18 the second from the right, the percent total ester
19 degradation is 4.73%?
20     A.    Correct.
21     Q.    Do you see that?  If we turn to
22 paragraph [0138], which is on page 7, you will see
23 it says paragraph [0138]:  "Also shown in FIGS. 5A
24 and 5B ... the control sample ...", that was the

Page 56

BUXTON - LEIBOWITZ

1  one we were just looking at, number 8 in figure
2  5A; is that right?
3      A.    That is correct.
4      Q.    "The control sample, which did not
5  include NaOH, did not provide long term storage
6  stability."  That is right; right?
7      A.    Yes.
8      Q.    It says: "This sample exhibited
9  more than 4% total esters after 14 days at 40°C.
10 These bendamustine-containing compositions with
11 such high levels of degradation would not be long
12 term storage stable."  Do you see that?
13     A.    Yes.
14     Q. ████████████████████
15          MR. SILVER:  Objection to form.
16     A.   ████████████
17 ███████████████████████████
18 ███████████████████████████
19 ███████████████████████████
20 ███████████████████████████
21 ███████████████████████████
22 ███████████████████████████

MARTEN WALSH CHERER LTD        2ND FLOOR, 6-9 QUALITY COURT, CHANCERY LANE        LONDON, WC2A 1HP
TEL: (020) 7067 2900              E-MAIL: info@martenwalshcherer.com



Case 1:24-cv-00065-JLH    Document 248    Filed 11/25/25    Page 92 of 486 PageID #: 3737

EAGLE PHARMACEUTICALS vs. SLAYBACK PHARMA    AUGUST 21ST, 2025    DEPOSITION OF PHILIP BUXTON (DAY ONE)



Page 61

BUXTON - LEIBOWITZ

1
2
3    BY MR. LEIBOWITZ:
4        Q.    That is fair there are other
5    examples in Table 5A, as well.  In fact if you
6    look back at Table 5A you can see the testing that
7    was done there and over to Table 5B as well.  Some
8    of these formulations do have sodium hydroxide in
9    them.  The one that I pointed you to is the one
10    that did not.
11        A.    Just the control batch at the top,
12    yes.
13        Q.    Correct.
14
15
16
17
18
19
20
21
22
23
24

Page 62

BUXTON - LEIBOWITZ

1
2
5        MR. SILVER:  Objection to form.
6
7
8
9
10
11
12
13
14
15    BY MR. LEIBOWITZ:
16        Q.
17
18
19        MR. SILVER:  Objection to form.
20        A.
21
22
23
24    BY MR. LEIBOWITZ:
25        Q.    It is referring to the control

Page 63

BUXTON - LEIBOWITZ

1
2    sample, right, it says: "... the control sample,
3    which did not include NaOH ..." I will represent
4    to you that is the only one in Figures 5A and 5B
5    that did not include NaOH: "... did not provide
6    long term storage stability."
7
8
9
10
11
12
13
14
15        MR. SILVER:  Hold on.  Is that a
16    question?
17        MR. LEIBOWITZ: I was trying to help
18    Dr. Buxton understand where we were going.  I can
19    ----
20        MR. SILVER:  Let us stick with the
21    question and answer format if that is okay so
22    I know when to object.
23    BY MR. LEIBOWITZ:
24        Q.    Dr. Buxton,
25

Page 64

BUXTON - LEIBOWITZ

1
2
3
4
5
6
7
8        MR. SILVER:  Objection to form.
9        A.    Hang on.
10
11    BY MR. LEIBOWITZ:
12        Q.
13
14
15
16
17
18
19
20
21
22
23
24        In the first sentence of paragraph
25    [0138] it refers to: "... the control sample,

16 (Pages 61 to 64)

EAGLE PHARMACEUTICALS vs. SLAYBACK PHARMA   AUGUST 21ST, 2025   DEPOSITION OF PHILIP BUXTON (DAY ONE)



Page 89

1                BUXTON - LEIBOWITZ

2       Q.

9       Q.   Okay, if we go back to Buxton 12,

10 which is the December 2009 progress report.  If we

11 can turn to ----

12       A.   Which one are we on now?

13       Q.   Sorry, it is the December 2009

14 progress report, which is Buxton 12.  If we can

15 turn to page 23 of Buxton 12, you will see

16 Table 18 of Buxton 12?

17       A.   Yes.

Page 90

1                BUXTON - LEIBOWITZ

Page 91

1                BUXTON - LEIBOWITZ

2 days shows total degradants of 11.7%; do you see

3 that?

4       A.   Yes, that is correct.

5       Q.

9          MR. SILVER:  Objection to form.

10       A.

11 BY MR. LEIBOWITZ:

12       Q.

18          MR. SILVER:  Objection to form.

19

23 BY MR. LEIBOWITZ:

24       Q.

Page 92

1                BUXTON - LEIBOWITZ

2

4          MR. SILVER:  Objection to form.

5       A.

12 BY MR. LEIBOWITZ:

13       Q.   Just to be clear,

19          MR. SILVER:  Objection to form.

20       A.

MARTEN WALSH CHERER LTD     2ND FLOOR, 6-9 QUALITY COURT, CHANCERY LANE     LONDON, WC2A 1HP
TEL: (020) 7067 2900          E-MAIL: info@martenwalshcherer.com

EAGLE PHARMACEUTICALS vs. SLAYBACK PHARMA    AUGUST 21ST, 2025    DEPOSITION OF PHILIP BUXTON (DAY ONE)



Page 93

```
 1              BUXTON - LEIBOWITZ
 2    BY MR. LEIBOWITZ:
 3         Q.
 4
 5
 6
 7
 8
 9
10
11
12
13         MR. SILVER:  Objection to form.
14         A.
15    BY MR. LEIBOWITZ:
16         Q.
17
18         MR. SILVER:  Objection to form.
19         A.
20
21    BY MR. LEIBOWITZ:
22
23
24
25
```

Page 94

```
 1              BUXTON - LEIBOWITZ
 2
 3
 4         MR. SILVER:  Objection to form.  Go
 5    ahead.
 6         A.
 7
 8
 9
10    BY MR. LEIBOWITZ:
11         Q.
12
13
14
15         MR. SILVER:  Objection to form.
16         A.
17
18
19
20
21
22
23
24
25
```

Page 95

```
 1              BUXTON - LEIBOWITZ
 2
 3
 4         MR. SILVER:  Objection to form.
 5         A.
 6    BY MR. LEIBOWITZ:
 7         Q.
 8
 9
10         MR. SILVER:  Objection to form.
11    BY MR. LEIBOWITZ:
12         Q.   Is that ----
13         A.
14         Q.
15
16
17
18
19         MR. SILVER:  Objection to form.
20         A.
21
22
23
24    BY MR. LEIBOWITZ:
25         Q.   Okay.
```

Page 96

```
 1              BUXTON - LEIBOWITZ
 2
 3         MR. SILVER:  Objection to form.
 4         A.
 5
 6    BY MR. LEIBOWITZ:
 7         Q.
 8         MR. SILVER:  Same objection.
 9         A.
10
11
12    BY MR. LEIBOWITZ:
13         Q.
14
15
16
17
18
19
20
21         MR. SILVER:  Objection to form.
22         A.
23
24
25    BY MR. LEIBOWITZ:
```

24  (Pages 93 to 96)

Case 1:24-cv-00065-JLH     Document 248     Filed 11/25/25     Page 95 of 486 PageID #: 3740

EAGLE PHARMACEUTICALS vs. SLAYBACK PHARMA     AUGUST 21ST, 2025     DEPOSITION OF PHILIP BUXTON (DAY ONE)



Page 101

BUXTON - LEIBOWITZ

1    BUXTON - LEIBOWITZ
2    designation: "Attorney, Agent, or Firm -
3    BakerHostetler"?
4        A.    I see it, yes.
5        Q.    Are you familiar with
6    BakerHostetler?
7        A.    No.
8        Q.    I take it from that, and again I am
9    not asking for anything that you may have said to
10   them or that they may have said to you, have you
11   had any communications with anyone at
12   BakerHostetler?
13       A.    No.
14       Q.    Back to Buxton 14, which was the
15   document we were looking at a minute ago.  If you
16   turn to page 17 of Buxton 14, do you see there is
17   a centre paragraph, the second paragraph on the
18   page that starts:  "Applicant alleges ...", do you
19   see that paragraph?
20       A.    "Applicant alleges unexpected
21   storage stability ..."?
22       Q.    Yes.  Do you see that?
23       A.    Yes.
24       Q.    And just to explain where we are,
25   Dr. Buxton, these are remarks that the patent

Page 102

BUXTON - LEIBOWITZ

1    BUXTON - LEIBOWITZ
2    examiner sent with respect to examining the patent
3    that was at issue here which was a precursor to
4    the ones that are at issue in this case?
5        A.    Yes.
6        Q.    And I will refer you to the middle
7    of that paragraph, the sentence that says:  "It is
8    noted that Brittain et al. ..."; do you see where
9    I am?
10       A.    In the middle of the second
11   paragraph?
12       Q.    Correct.
13       A.    "Thus it would appear", is that
14   where you are?
15       Q.    "It is noted that Brittain ...",
16   right at the next sentence after the one you were
17   at.  Do you see where I am, Dr. Buxton?
18       A.    No, I still cannot find it.
19       Q.    Sorry: "It is noted"?
20       A.    "It is noted"?
21       MR. SILVER:  Would you like me to
22   point him to it?
23       MR. LEIBOWITZ:  Yes.  Oh, have you
24   found it now?
25       A.    Draw it in pencil.

Page 103

BUXTON - LEIBOWITZ

1    BUXTON - LEIBOWITZ
2        MR. SILVER:  I just drew a line
3    under "It", so you can start where the line is.
4        A.    Okay.
5    BY MR. LEIBOWITZ:
6        Q.    Do you see the sentence there says:
7    "It is noted that Brittain et al. does not
8    specifically name lipoic acid but Applicant did
9    not compare lipoic acid against any of the
10   disclosed antioxidant species of Brittain
11   including acetylcysteine, ascorbic acid and
12   cysteine."  Do you see that, Dr. Buxton?
13       A.    Yes.
14       Q.    ███████████████████████
15   ████████████████████
16   ████████████████████████████
17   ███████████████████
18       MR. SILVER:  Objection to form.
19       A.    ███
20   BY MR. LEIBOWITZ:
21       Q.    ██████████████████████
22   █████████████████████████████████
23   ███████████████████████████
24   █████████████████████████
25   ███   █████

Page 104

BUXTON - LEIBOWITZ

1    BUXTON - LEIBOWITZ
2        MR. SILVER:  Objection to form.
3        A.    ████████████████████
4    ███
5    BY MR. LEIBOWITZ:
6        Q.    Sure, this document is a ----
7        A.    ███████████████████
8    ███
9        Q.    This is the Patent Office
10   responding to the patent, like I say, one of the
11   precursor patents in this family, that include the
12   patents that are at issue in this case?
13       A.    Who is Brittain.
14       Q.    Fair, Brittain is one of the pieces
15   of prior art that the examiner was discussing.
16       A.    Okay.  I am not familiar with that
17   prior art to be honest.
18       Q.    Understood.  I understand you have
19   never seen this document before; correct, nobody
20   showed this to you?
21       A.    No.
22       Q.    Am I right ----
23       MR. SILVER:  Was that a question?
24   BY MR. LEIBOWITZ:
25       Q.    Yes, I thought I had an answer, am

26  (Pages 101 to 104)



**Page 105**

BUXTON - LEIBOWITZ

1
2  I right?
3          MR. SILVER:  Sorry, I missed it.
4      A.   Yes, I have never seen it before,
5  that is the upshot of what you are asking.
6  BY MR. LEIBOWITZ:
7      Q.
8
9
10
11
12
13          MR. SILVER:  I am going to object
14  to form and I am going to instruct you not to
15  disclose the substance of any communications you
16  had with counsel.
17      A.
18  BY MR. LEIBOWITZ:
19      Q.
20
21
22
23          MR. SILVER:  Objection to form.
24      A.
25  BY MR. LEIBOWITZ:

**Page 106**

BUXTON - LEIBOWITZ

1
2      Q.   Okay.  Put that aside.
3      A.   What does it conclude from that,
4  can I ask that, following this discussion?
5      Q.   It went on for quite a while,
6  Dr. Buxton, but I am happy to talk to you about it
7  later if you like.  Okay.
8          Let me change gears briefly.
9  Actually, if we go back to Buxton 2 one more time.
10  Do you know what, forget it.  We don't need to do
11  that.  I will mark a new document.
12      A.   Forget about Buxton 2 for a bit.
13      Q.   Yes.
14      (Exhibit 15 marked for identification)
15      Q.   Let me mark as Buxton 15 a document
16  that has Bates Stamp EAGLE-BEN00022023-22030.  It
17  is tab 13.

**Page 107**

BUXTON - LEIBOWITZ

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 108**

BUXTON - LEIBOWITZ

1
2      A.
3
4
5
6      Q.
7
8
9
10          MR. SILVER:  Objection to form.
11      A.
12
13
14
15  BY MR. LEIBOWITZ:
16      Q.   Okay.
17
18
19
20
21
22          MR. SILVER:  Objection to form.
23      A.
24
25

EAGLE PHARMACEUTICALS vs. SLAYBACK PHARMA    AUGUST 21ST, 2025      DEPOSITION OF PHILIP BUXTON (DAY ONE)

Page 141

1    BUXTON - LIEF
2    �— .
3    THE VIDEOGRAPHER:  We are going off
4    the record.  The time is 3.44.
5    (Deposition concluded for the day at 3.44)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 143

1
2    CERTIFICATE OF COURT REPORTER
3
4    I, AMY COLEY, Court Reporter,
5    do hereby certify:
6    That PHILIP BUXTON the witness
7    whose deposition is hereinbefore set forth, was
8    duly sworn by me and that such deposition is a
9    true record of the testimony given by the witness.
10    I further certify that I am not
11    related to any of the parties to this action by
12    blood or marriage, and that I am in no way
13    interested in the outcome of this matter.
14
15
16
17
18
19
20
21    .....................
22    AMY COLEY
23
24
25

Page 142

1
2    CERTIFICATE OF WITNESS
3    I HEREBY CERTIFY that having been
4    first duly sworn to testify to the truth, I gave
5    the above testimony.
6    I FURTHER CERTIFY that the
7    foregoing transcript is a true and correct
8    transcript of the testimony given by me at the
9    time and place specified hereinbefore.
10
11
12
13
14
15
16
17
18
19
20    _____
    PHILIP BUXTON
21
22    Subscribed and sworn to before me
23
24    this_____day of_____20___
25

Page 144

1
2    ERRATA SHEET
3    EAGLE PHARMACEUTICALS, INC
    DATE OF DEPOSITION: 21ST AUGUST, 2025
4    WITNESS: PHILIP BUXTON
5    PAGE LINE   FROM        TO
6    ___|___|_____|_____
7
8    ___|___|_____|_____
9
    ___|___|_____|_____
10
11    ___|___|_____|_____
12
13    ___|___|_____|_____
14
15    ___|___|_____|_____
16
17    ___|___|_____|_____
18
    ___|___|_____|_____
19
20    ___|___|_____|_____
21
22    ___|___|_____|_____
23
24    ___|___|_____|_____
25

MARTEN WALSH CHERER LTD          2ND FLOOR, 6-9 QUALITY COURT, CHANCERY LANE              LONDON, WC2A 1HP
TEL: (020) 7067 2900                    E-MAIL: info@martenwalshcherer.com

# EXHIBIT 8

US 20130210879A1

(19) **United States**

(12) **Patent Application Publication**     (10) Pub. No.: **US 2013/0210879 A1**

Palepu et al.     (43) Pub. Date:     **Aug. 15, 2013**

(54) **FORMULATIONS OF BENDAMUSTINE**

(71) Applicant: **Eagle Pharmaceuticals, Inc.**, (US)

(72) Inventors: **Nagesh R. Palepu**, Southampton, PA (US); **Philip Christopher Buxton**, Great Dunmow (GB); **Srikanth Sundaram**, Somerset, NJ (US)

(73) Assignee: **EAGLE PHARMACEUTICALS, INC.**, Woodcliff Lake, NJ (US)

(21) Appl. No.: **13/767,672**

(22) Filed:     **Feb. 14, 2013**

**Related U.S. Application Data**

(60) Provisional application No. 61/598,729, filed on Feb. 14, 2012.

**Publication Classification**

(51) Int. Cl.
    *A61K 47/10*     (2006.01)
    *A61K 31/4184*     (2006.01)

(52) **U.S. Cl.**
    CPC ............. *A61K 47/10* (2013.01); *A61K 31/4184* (2013.01)
    USPC ........................................................ **514/394**

(57)     **ABSTRACT**

Long term storage stable bendamustine-containing compositions are disclosed. The compositions can include bendamustine or a pharmaceutically acceptable salt thereof, and a pharmaceutically acceptable fluid contains a mixture of PEG and PG; an organic or inorganic compound in an amount sufficient to obtain a pH of from about 6.0 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol; and optionally an antioxidant. The bendamustine-containing compositions have less than about 5% total esters, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

Patent Application Publication    Aug. 15, 2013  Sheet 1 of 10    US 2013/0210879 A1

**FIG. 1**

**Table 1**

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | Area % of Degradants | | | | | | | | | | | | | % Total Esters |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | PG Esters | | PEG Esters | | | | | | | | | | | |
| | | | | | 1.13 | 1.14 | 1.15 | 1.17 | 1.18 | 1.19 | 1.21 | 1.22 | 1.236 | 1.24 | 1.25 | 1.26 | 1.40 | |
| BDM - 25mg/mL Thioglycerol - 5mg/mL PEG 400:PG (90:10) qs to 1mL | Initial | | 24.1 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | 40°C | 15 d | 18.2 | 75.5 | 3.63 | BDL | 1.14 | 2.45 | BDL | 2.54 | 2.48 | 1.87 | 1.23 | 0.66 | 0.38 | 0.13 | BDL | 16.51 |
| | 25°C | 15 d | 23.2 | 96.3 | 0.16 | BDL | 0.07 | 0.14 | BDL | 0.08 | 0.16 | 0.12 | BDL | 0.07 | BDL | BDL | BDL | 0.8 |
| | | 1 M | 22.3 | 92.5 | 0.66 | BDL | 0.30 | 0.49 | BDL | BDL | 0.67 | 0.57 | 0.45 | 0.28 | 0.18 | 0.07 | 0.06 | 3.73 |

Patent Application Publication    Aug. 15, 2013  Sheet 2 of 10    US 2013/0210879 A1

FIG. 2

Table 2

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | Area % of degradants | | | | | | | | % Total Esters | pH value (as per USP) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | PG Esters | | PEG Esters | | | | | | | |
| | | | | | PG Ester1 | PG Ester2 | 1.17 | 1.19 | 1.21 | 1.22 | 1.23 | 1.24 | | |
| BDM - 25mg Thioglycerol - 5mg PEG 400:PG (90:10) qs to 1mL (NaOH- 0.001 molarity) | Initial | | 25.0 | 100.0 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.08 | 0.08 | 3.44 |
| | 25°C | 15 days | 24.9 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.43 |
| | | 1M | 24.9 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.42 |
| | | 3M | 24.8 | 99.2 | 0.12 | BDL | BDL | BDL | BDL | BDL | BDL | 0.05 | 0.17 | 3.43 |
| | | 6M | 24.7 | 98.8 | 0.39 | 0.12 | 0.06 | 0.15 | 0.18 | 0.14 | 0.12 | 0.07 | 1.23 | 3.42 |
| | 5°C | 3M | 24.9 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.45 |
| | | 6M | 24.9 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.45 |

Patent Application Publication    Aug. 15, 2013  Sheet 3 of 10    US 2013/0210879 A1

**FIG. 3**

**Table 3**

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Area of degradants | | | | | | | | | | | % Total Esters |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | PG Esters | | PEG Esters | | | | | | | | | |
| | | | | | 1.11 | 1.14 | 1.17 | 1.19 | 1.21 | 1.22 | 1.23 | 1.24 | 1.25 | 1.26 | 1.27 | |
| 1. BDM - 25mg Thioglycerol - 5mg PEG 400:PG (90:10 v/v) qs to 1mL. (As per USP pH 3.12) | Initial | | 25.0 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | 40°C | 15d | 18.4 | 73.6 | 7.22 | 4.74 | 1.92 | 3.01 | 3.12 | 2.64 | 1.86 | 1.06 | 0.62 | 0.25 | 0.11 | 26.55 |
| | 25°C | 15d | 24.7 | 98.8 | 0.55 | 0.15 | 0.06 | 0.20 | 0.19 | 0.16 | 0.13 | 0.06 | BDL | BDL | BDL | 1.50 |
| | | 1M | 24.1 | 96.4 | 0.80 | 0.36 | 0.20 | 0.31 | 0.28 | 0.44 | 0.40 | 0.21 | 0.16 | BDL | 0.05 | 3.21 |
| | | 2M | 22.6 | 90.4 | 2.62 | 1.31 | 0.63 | 0.90 | 0.95 | 0.81 | 0.60 | 0.43 | 0.30 | 0.11 | 0.05 | 8.71 |
| | | 3M | 20.1 | 80.4 | 4.81 | 2.85 | 1.36 | 2.06 | 2.27 | 1.99 | 1.58 | 1.03 | 0.55 | 0.28 | 0.12 | 18.90 |
| 2. BDM - 25mg Thioglycerol - 5mg NaOH - 0.4mg (0.01 molarity) WFI - 10µL PEG 400:PG (90:10 v/v) qs to 1mL. (As per USP pH 3.54) | Initial | | 23.2 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | 40°C | 15d | 23.0 | 99.1 | 0.11 | BDL | BDL | BDL | 0.07 | BDL | BDL | BDL | BDL | BDL | 0.15 | 0.33 |
| | 25°C | 15d | 23.1 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | | 1M | 23.0 | 99.1 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | | 2M | 22.7 | 97.8 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.07 | | 0.07 |
| | | 3M | 22.7 | 97.8 | 0.11 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.10 | | 0.21 |
| 3. BDM - 25mg Thioglycerol - 5mg NaOH -1.2mg (0.03 molarity) WFI - 10µL PEG 400:PG (90:10 v/v) qs to 1mL. (As per USP pH 4.05) | Initial | | 24.0 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | 40°C | 15d | 22.8 | 95.0 | BDL | BDL | BDL | BDL | 0.06 | BDL | BDL | BDL | BDL | 1.20 | | 1.26 |
| | 25°C | 15d | 23.9 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.15 | | 0.15 |
| | | 1M | 23.6 | 98.3 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.27 | | 0.27 |
| | | 2M | 23.5 | 97.9 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.53 | | 0.53 |
| | | 3M | 23.4 | 97.5 | 0.09 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.79 | | 0.88 |

Patent Application Publication    Aug. 15, 2013    Sheet 4 of 10    US 2013/0210879 A1

**FIG. 4A**

Table 4A

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | PG Ester-1 | PG Ester-2 | 1.16 | 1.18 | 1.21 | 1.22 | 1.23 | 1.24 | 1.25 | 1.26 | 1.27 | 1.28 | % Total Esters | pH value (as per USP) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4. BDM - 25mg Thioglycerol - 5mg PEG 400:PG (90:10) qs to 1mL | Initial | | 24.8 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.10 | BDL | BDL | BDL | | 0.10 | 3.21 |
| | 40°C | 15 d | 23.8 | 96.0 | 1.08 | 0.46 | 0.24 | 0.41 | 0.43 | BDL | BDL | 0.38 | 0.33 | 0.21 | 0.10 | 0.06 | 3.70 | 3.18 |
| | | 15d | 23.7 | 95.6 | 1.27 | 0.56 | 0.29 | 0.44 | 0.50 | BDL | BDL | 0.52 | 0.39 | 0.23 | 0.13 | 0.07 | 4.40 | 3.20 |
| | | 1 M | 22.8 | 91.9 | 1.99 | 0.95 | 0.46 | 0.80 | 0.80 | BDL | BDL | 0.78 | 0.60 | 0.37 | 0.21 | 0.11 | 7.07 | 3.17 |
| | 25°C | 15 d | 24.7 | 99.6 | 0.26 | 0.09 | BDL | 0.10 | 0.08 | BDL | BDL | 0.06 | BDL | 0.06 | BDL | BDL | 0.65 | 3.25 |
| | | 1 M | 24.6 | 99.2 | 0.29 | 0.12 | 0.06 | 0.08 | 0.09 | BDL | BDL | 0.09 | BDL | 0.06 | BDL | BDL | 0.79 | 3.20 |
| | | 2 M | 23.3 | 94.0 | 1.71 | 0.78 | 0.41 | 0.67 | 0.64 | BDL | BDL | 0.68 | 0.52 | 0.37 | 0.23 | 0.10 | 6.11 | 3.22 |
| | | 3 M | 23.2 | 93.5 | 1.37 | 0.69 | 0.43 | 0.47 | 0.86 | BDL | BDL | 0.85 | 0.68 | 0.56 | 0.35 | 0.16 | 6.42 | 3.21 |
| | | 6 M | 17.5 | 70.6 | 6.37 | 4.09 | 1.80 | 3.15 | 3.54 | 3.27 | 2.59 | 1.84 | 1.17 | 0.56 | 0.25 | 0.08 | 28.71 | 3.20 |
| | 5°C | 1 M | 24.7 | 99.6 | 0.08 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.08 | 3.21 |
| | | 3 M | 24.6 | 99.2 | 0.08 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.08 | 3.20 |
| | | 6 M | 24.5 | 98.8 | 0.11 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.11 | 3.19 |
| 5. BDM - 25mg Thioglycerol - 5mg PEG 400:PG (90:10) qs to 1mL (NaOH- 0.0005 molarity) | Initial | | 25.5 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.09 | BDL | BDL | BDL | BDL | 0.09 | 3.34 |
| | 40°C | 15 d | 25.6 | 100.4 | 0.12 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.12 | 3.27 |
| | | 1 M | 25.3 | 99.2 | 0.23 | 0.10 | BDL | 0.08 | 0.05 | BDL | BDL | 0.06 | 0.05 | 0.05 | BDL | BDL | 0.57 | 3.25 |
| | 25°C | 15 d | 25.5 | 100 | 0.06 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.06 | 3.33 |
| | | 1 M | 25.4 | 99.6 | 0.09 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.09 | 3.31 |
| | | 2 M | 25.3 | 99.2 | 0.17 | 0.07 | BDL | 0.07 | 0.05 | BDL | BDL | 0.09 | BDL | BDL | BDL | BDL | 0.45 | 3.30 |
| | | 3 M | 25.2 | 98.8 | 0.27 | 0.09 | BDL | 0.10 | 0.07 | BDL | BDL | 0.07 | 0.05 | BDL | BDL | BDL | 0.65 | 3.30 |
| | | 6 M | 24.5 | 96.1 | 0.62 | 0.26 | 0.10 | 0.25 | 0.29 | 0.32 | 0.28 | 0.15 | 0.08 | BDL | BDL | BDL | 2.35 | 3.31 |
| | 5°C | 1 M | 25.5 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.34 |
| | | 3 M | 25.4 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.35 |
| | | 6 M | 25.4 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.34 |

**FIG. 4B**

**Table 4B**

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | PG Esters | | PEG Esters | | | | | | | | | | | % Total Esters | pH value (as per USP) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | PG Ester-1 | PG Ester-2 | 1.16 | 1.18 | 1.21 | 1.22 | 1.23 | 1.24 | 1.25 | 1.26 | 1.27 | 1.28 | | |
| 6.

BDM - 25mg

Thioglycerol - 5mg

PEG 400:PG (90:10) qs to 1mL

(NaOH-0.001 molarity) | Initial | | 24.8 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.08 | BDL | BDL | BDL | BDL | 0.08 | 3.45 |
| | 40°C | 15 d | 24.5 | 98.8 | 0.09 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.09 | 3.38 |
| | | 1 M | 24.5 | 98.8 | 0.14 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.14 | 3.36 |
| | 25°C | 15 d | 24.8 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.41 |
| | | 1 M | 24.7 | 99.6 | 0.05 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.05 | 3.40 |
| | | 2 M | 24.7 | 99.6 | 0.15 | BDL | BDL | BDL | BDL | BDL | BDL | 0.08 | BDL | BDL | BDL | BDL | 0.23 | 3.42 |
| | | 3 M | 24.5 | 98.8 | 0.24 | 0.08 | 0.06 | 0.08 | BDL | BDL | BDL | 0.08 | 0.06 | BDL | BDL | BDL | 0.60 | 3.41 |
| | | 6 M | 24.1 | 97.2 | 0.38 | 0.16 | BDL | 0.17 | 0.20 | 0.23 | 0.19 | 0.08 | BDL | BDL | BDL | BDL | 1.41 | 3.40 |
| | 5°C | 1 M | 24.8 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.42 |
| | | 3 M | 24.8 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.41 |
| | | 6 M | 24.8 | 100.0 | 0.05 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.05 | 3.41 |
| 7.

BDM - 25mg

Thioglycerol - 5mg

PEG 400:PG (90:10) qs to 1mL

(NaOH-0.0015 molarity) | Initial | | 25.2 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.07 | BDL | BDL | BDL | BDL | 0.07 | 3.55 |
| | 40°C | 15 d | 25.2 | 100 | 0.09 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.09 | 3.47 |
| | | 1 M | 25.2 | 100 | 0.11 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.11 | 3.48 |
| | 25°C | 15 d | 25.2 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.53 |
| | | 1 M | 25.2 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.50 |
| | | 2 M | 25.1 | 99.6 | 0.11 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.11 | 3.52 |
| | | 3 M | 25.0 | 99.2 | 0.17 | 0.06 | BDL | BDL | BDL | BDL | BDL | 0.06 | BDL | BDL | BDL | BDL | 0.29 | 3.51 |
| | | 6 M | 24.4 | 96.8 | 0.31 | 0.10 | BDL | 0.14 | 0.18 | 0.22 | 0.18 | 0.08 | BDL | BDL | BDL | BDL | 1.21 | 3.5 |
| | 5°C | 1 M | 25.2 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.55 |
| | | 3 M | 25.1 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.50 |
| | | 6 M | 24.9 | 98.8 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.49 |

Patent Application Publication    Aug. 15, 2013  Sheet 6 of 10    US 2013/0210879 A1

**FIG. 5A**

Table 5A

| Formulation | Temp | Time period | Content (mg/ml) | % of Initial | PG Esters 1.11 | PG Esters 1.14 | PEG Esters 1.28 | PEG Esters 1.40 | % Total Esters | pH |
|---|---|---|---|---|---|---|---|---|---|---|
| 8. BDM - 25mg/mL  Thioglycerol - 5mg/mL  PEG 400:PG (90:10) qs to 1mL | 40°C | 14 Days | 21.6 | 100 | 3.03 | 1.65 | BDL | 0.05 | 4.73 | 3.43 |
| 9. BDM - 25mg/mL  Thioglycerol - 5mg/mL  NaOH – 0.01 molarity  PEG 400:PG (90:10) qs to 1mL | 40°C | 14Days | 22.9 | 100 | 0.06 | BDL | 0.17 | BDL | 0.23 | 3.56 |
| 10. BDM - 25mg/mL  Thioglycerol - 5mg/mL  NaOH – 0.02 molarity  PEG 400:PG (90:10) qs to 1mL | 40°C | 14 Days | 21.2 | 100 | 0.38 | BDL | 0.79 | BDL | 1.17 | 3.71 |
| 11. BDM - 25mg/mL  Thioglycerol - 5mg/mL  NaOH  0.03 molarity  PEG 400:PG (90:10) qs to 1mL | 40°C | 14 Days | 19.6 | 100 | 0.91 | BDL | 1.82 | BDL | 2.73 | 4.01 |
| 12. BDM - 25mg/mL  Thioglycerol - 5mg/mL  NaOH – 0.04 molarity  PEG 400:PG (90:10) qs to 1mL | 40°C | 14 Days | 21.6 | 100 | 0.97 | BDL | 1.94 | BDL | 2.91 | 4.15 |

Area% of Degradants

Patent Application Publication    Aug. 15, 2013  Sheet 7 of 10    US 2013/0210879 A1

**FIG. 5B**

Table 5B

| Formulation | Temp | Time period | Content (mg/ml) | % of Initial | Area% of Degradants | | | | % Total Esters | pH |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | PG Esters | | PEG Esters | | | |
| | | | | | 1.11 | 1.14 | 1.28 | 1.40 | | |
| 13. BDM - 25mg/mL<br>Thioglycerol - 5mg/mL<br>NaOH  0.05 molarity<br>PEG 400:PG (90:10) qs to 1mL | 40°C | 14 Days | 20.8 | 100 | 1.75 | BDL | 4.62 | 0.11 | 6.48 | 4.31 |
| 14. BDM - 25mg/mL<br>Thioglycerol - 5mg/mL<br>NaOH – 0.06 molarity<br>PEG 400:PG (90:10) qs to 1mL | 40°C | 14 Days | 16.5 | 100 | 0.08 | BDL | 9.22 | 0.70 | 10.00 | 5.06 |
| 15. BDM - 25mg/mL<br>Thioglycerol - 5mg/mL<br>NaOH - 0.07 molarity<br>PEG 400:PG (90:10) qs to 1mL | 40°C | 14 Days | 13.2 | 100 | 2.13 | BDL | 11.39 | 1.25 | 17.07 | 5.70 |
| 16. BDM - 25mg/mL<br>Thioglycerol - 5mg/mL<br>NaOH -0.08 molarity<br>PEG 400:PG (90:10)  qs to 1mL | 40°C | 14 Days | 10.5 | 100 | 1.84 | BDL | 13.98 | 2.04 | 17.86 | 6.01 |
| 17. BDM - 25mg/mL<br>Thioglycerol - 5mg/mL<br>NaOH - 0.09 molarity<br>PEG 400:PG (90:10) qs to 1mL | 40°C | 14 Days | 8.21 | 100 | 1.40 | BDL | 15.85 | 3.10 | 20.35 | 6.26 |
| 18. BDM - 25mg/mL<br>Thioglycerol -5mg/mL<br>NaOH – 0.1 molarity<br>PEG 400:PG (90:10) qs to 1mL | 40°C | 14 Days | 5.65 | 100 | 1.13 | BDL | 17.26 | 4.24 | 22.63 | 6.56 |

Patent Application Publication    Aug. 15, 2013    Sheet 8 of 10    US 2013/0210879 A1

FIG. 6

Table 6

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | Area % of degradants | | | | | % Total Esters |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | PG Esters | PEG Esters | | | | |
| | | | | | 1.11 | 1.22 | 1.23 | 1.29 | 1.37 | |
| 19. BDM - 25mg Thioglycerol - 5mg Sodium acetate trihydrate - 0.01M PEG 400:PG (90:10 v/v) qs to 1mL | Initial | | 25.1 | 100.0 | BDL | BDL | BDL | BDL | 0.06 | 0.06 |
| | 40°C | 15d | 24.8 | 98.8 | 0.10 | BDL | BDL | 0.10 | 0.05 | 0.25 |
| | | 1M | 24.7 | 98.4 | 0.25 | 0.06 | 0.05 | 0.15 | 0.06 | 0.57 |
| | 25°C | 15d | 24.9 | 99.2 | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | | 1M | 24.8 | 98.8 | BDL | BDL | BDL | 0.05 | BDL | 0.05 |
| | | 3M | 24.7 | 98.4 | 0.14 | BDL | 0.05 | 0.11 | 0.07 | 0.37 |
| | 5°C | 3 M | 24.9 | 99.2 | BDL | BDL | BDL | BDL | 0.07 | 0.07 |

Patent Application Publication    Aug. 15, 2013  Sheet 9 of 10    US 2013/0210879 A1

**FIG. 7**

**Table 7**

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | PG Esters | | PEG Esters | | | | | | | | | | % Total Esters |
| | | | | | 1.11 | 1.14 | 1.16 | 1.20 | 1.22 | 1.23 | 1.25 | 1.26 | 1.27 | 1.28 | 1.29 | 1.37 | |
| 20. BDM - 25mg Thioglycerol - 5mg Sodium acetate (anhydrous)– 0.01M PEG 400:PG (90:10 v/v) qs to 1mL | Initial | | 24.6 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | 40°C | 15d | 24.3 | 98.8 | 0.11 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.11 | 0.05 | 0.27 |
| | | 1M | 24.2 | 98.4 | 0.23 | 0.12 | BDL | 0.11 | 0.10 | 0.06 | BDL | BDL | BDL | 0.16 | BDL | BDL | 0.78 |
| | | 2M | 24.0 | 97.6 | 0.35 | 0.20 | 0.09 | 0.13 | 0.17 | 0.09 | 0.08 | 0.08 | BDL | 0.22 | BDL | 0.05 | 1.46 |
| | | 3M | 23.6 | 95.9 | 0.59 | 0.34 | 0.15 | 0.22 | 0.23 | 0.27 | 0.19 | 0.12 | 0.06 | 0.33 | BDL | 0.07 | 2.57 |
| | 25°C | 15d | 24.5 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | | 1M | 24.4 | 99.2 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.05 | BDL | 0.05 | 0.10 |
| | | 3M | 24.2 | 98.4 | 0.14 | BDL | BDL | 0.06 | BDL | BDL | BDL | BDL | BDL | 0.11 | BDL | 0.06 | 0.37 |
| | 5°C | 3 M | 24.4 | 99.2 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.05 | | 0.05 |

Patent Application Publication    Aug. 15, 2013   Sheet 10 of 10    US 2013/0210879 A1

FIG. 8

Table 8

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | PG Esters | | PEG Esters | | | | | | | | % Total Esters | pH value (as per USP) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | PG Ester 1 | PG Ester 2 | 1.16 | 1.19 | 1.21 | 1.23 | 1.24 | 1.26 | 1.27 | 1.30 | | |
| 21. BDM - 25mg Sodium acetate trihydrate – 0.01M Thioglycerol - 5mg PEG 400:PG (90:10 v/v) qs to 1mL. | | Initial | 26.2 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.64 |
| | 40°C | 15d | 26.1 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.07 | 0.29 | 3.57 |
| | | 1M | 26.0 | 99.2 | 0.10 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.10 | 0.20 | 3.54 |
| | | 2M | 25.4 | 96.9 | 0.26 | 0.14 | 0.06 | 0.08 | 0.09 | 0.12 | 0.10 | 0.07 | BDL | 0.22 | 1.14 | 3.50 |
| | | 3M | 25.3 | 96.6 | 0.41 | 0.24 | 0.09 | 0.08 | 0.18 | 0.16 | 0.11 | 0.08 | 0.06 | 0.28 | 1.69 | 3.61 |
| | | 6M | 24.1 | 92.0 | 0.81 | 0.55 | 0.18 | 0.36 | 0.42 | 0.40 | 0.35 | 0.20 | 0.12 | 0.50 | 3.89 | 3.6 |
| | 25°C | 15d | 26.2 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.62 |
| | | 1M | 26.1 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.05 | 0.05 | 3.60 |
| | | 3M | 25.8 | 98.5 | 0.15 | 0.05 | BDL | 0.06 | BDL | BDL | BDL | BDL | BDL | 0.12 | 0.38 | 3.61 |
| | | 6M | 25.3 | 96.6 | 0.26 | 0.14 | BDL | 0.13 | 0.16 | 0.18 | 0.17 | 0.07 | BDL | 0.20 | 1.31 | 3.60 |
| | 5°C | 3M | 26.0 | 99.2 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.59 |
| | | 6M | 26.0 | 99.2 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.59 |

US 2013/0210879 A1

Aug. 15, 2013

1

## FORMULATIONS OF BENDAMUSTINE

### CROSS-REFERENCE TO RELATED APPLICATION

[0001] This patent application claims priority under 35 U.S.C. §119(e) to U.S. Provisional Patent Application No. 61/598,729, filed Feb. 14, 2012, entitled "FORMULATIONS OF BENDAMUSTINE", the contents of which are incorporated by reference herein in its entirety.

### BACKGROUND OF THE INVENTION

[0002] Bendamustine free base is represented by the following structural formula (I)



(I)

[0003] Bendamustine is used in the treatment of a number of cancers including leukemias, Hodgkin's disease and multiple myelomas. Bendamustine is the active ingredient of the commercial product Treanda™, a lyophilized powder for reconstitution.

[0004] Bendamustine exhibits rapid degradation upon reconstitution of the lyophilized product. Bendamustine undergoes hydrolysis by direct substitution rather than an addition elimination process due to the presence of the highly labile aliphatic chlorine atoms. Some of the main degradants of bendamustine are the monohydroxy compound known as HP1 (hydrolysis product 1) and dihydroxy compound HP2 (hydrolysis product 2). The monohydroxy compound appears as the main impurity at Relative Retention Time (RRT) 0.6 and the dihydroxy compound appears as the main impurity at RRT 0.27. Minor peaks appear at RRT 1.2, which are presently unknown.

[0005] The stability of bendamustine in water is measured in hours, and is therefore, not suitable for long-term storage in liquid form. The lyophile possesses good chemical stability. However, reconstitution of the lyophile is clinically inconvenient, taking 15-30 minutes with implications of chemical instability. There is a need for ready to use (RTU) bendamustine formulations having enhanced stability.

[0006] Some parenteral formulations containing lower molecular weight PEG's have significant variations in long term product stability from batch to batch. It has been determined that at least some and perhaps all of this unacceptable property is attributable to the PEG included therein. The amount of degradation observed in such formulations, typically in the form of PEG-esters of bendamustine, negatively impacts the expected shelf life of the formulations. Reproducibility of batch to batch stability assures consistent product potency and reduces the need for premature product recall and destruction.

[0007] Lower molecular weight polyethylene glycols (PEG's) such as liquid PEG's having molecular weights from 200 to 600, PEG 400 most commonly, have been included in pharmaceutical formulations for decades. They are available from a number of suppliers globally. It has been found that there is significant variability in the excipient's stability depending upon the supplier, storage conditions, handling conditions, etc. Sometimes, batches including the PEG as received from the supplier have the performance specifications expected. Other times, they do not. This even occurs in some situations when an initial batch made with a certain supplier's PEG met performance requirements. Preventing or counteracting the deleterious of effects of some PEG's in liquid formulations would be an advance in the art. The present invention addresses this need.

### SUMMARY OF THE INVENTION

[0008] In some aspects of the invention, the liquid bendamustine-containing compositions include a) a pharmaceutically acceptable fluid which contains a mixture of propylene glycol and polyethylene glycol, b) an organic compound or an inorganic compound in an amount sufficient to obtain a pH of from about 6.0 to about 11 for the polyethylene glycol as measured using United States Pharmacopeia (USP) official monograph for polyethylene glycol, and c) a stabilizing amount of an antioxidant. The amount of bendamustine as calculated on the basis of the HCl salt included in the composition is preferably from about 20 mg/mL to about 60 mg/mL. Still further aspects of the invention include methods of treatment using bendamustine-containing compositions and kits containing the same.

[0009] One of the advantages of the inventive liquid compositions is that they have substantially improved long term stability. The batch to batch variability in stability attributable to the PEG included therein has been overcome. For example, the inventive bendamustine compositions are substantially free of impurities after at least about 15 months at a temperature of from about 5° C. to about 25° C. The inventive formulations are advantageously ready to use or ready for further dilution. Reconstitution of lyophilized powders when therapy is desired is not required.

### BRIEF DESCRIPTION OF THE DRAWINGS

[0010] FIGS. 1-8 are data tables corresponding to Examples 1-7.

[0011] FIG. 1 is data Table 1 corresponding to Comparative Example 1.

[0012] FIG. 2 is data Table 2 corresponding to Example 2.

[0013] FIG. 3 is data Table 3 corresponding to Example 3.

[0014] FIG. 4A is data Table 4A corresponding to Example 4.

[0015] FIG. 4B is data Table 4B corresponding to Example 4.

[0016] FIG. 5A is data Table 5A corresponding to Example 5.

[0017] FIG. 5B is data Table 5B corresponding to Example 5.

[0018] FIG. 6 is data Table 6 corresponding to Example 6.

[0019] FIG. 7 is data Table 7 corresponding to Example 6.

[0020] FIG. 8 is data Table 8 corresponding to Example 7.

US 2013/0210879 A1

Aug. 15, 2013

2

## DETAILED DESCRIPTION OF THE INVENTION

[0021] Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art to which this invention belongs. In the event that there is a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

[0022] As used herein, RRT is calculated by dividing the retention time of the peak of interest by the retention time of the main peak. Any peak with an RRT <1 elutes before the main peak, and any peak with an RRT >1 elutes after the main peak.

[0023] For purposes of the present invention, "substantially free of impurities" shall be understood to include bendamustine-containing compositions in which the amount of total polyethylene glycol esters and propylene glycol esters is less than about 5%, as calculated on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after a period of about 15 months at a temperature of from about 5° C. to about 25° C. The amount of impurities is further calculated as being based upon the original amount bendamustine (or salt thereof) being present in the composition or formulation. In one embodiment, the amount of total impurities in the inventive compositions resulting from the degradation of the bendamustine as evidenced by e.g. PEG-bendamustine esters and PG esters thereof, is less than about 3%, and more preferably less than about 2.4%, PAR as determined by HPLC at a wavelength of 223 nm after at least about 2 years at a temperature of from about 5° C. to about 25° C.

[0024] For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.

[0025] Preferably, in the inventive compositions, the amount of any individual polyethylene glycol esters does not exceed 0.2% and the amount of any individual propylene glycol esters does not exceed 1.5% PAR as determined by HPLC at a wavelength of 223 nm after storage periods of at least about 15 months at a temperature of from about 5° C. to about 25° C. Preferably, the amount of total polyethylene glycol esters is less than about 2%. Preferably, the total amount of total propylene glycol esters is less than about 3%. In some aspects, the amount of time the inventive compositions demonstrate long term storage stability is at least about 18 months and preferably at least about 2 years when stored under the conditions described herein.

[0026] In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions including:
  [0027]  a) bendamustine or a pharmaceutically acceptable salt thereof; and
  [0028]  b) a pharmaceutically acceptable fluid including
    [0029]  i) a mixture of PEG and PG;
    [0030]  ii) an organic compound or inorganic compound, or mixtures thereof in an amount sufficient to obtain an apparent pH of from about 6.0 to about 11 for the polyethylene glycol, as measured using USP official monograph for polyethylene glycol; and
    [0031]  iii) a stabilizing amount of an antioxidant.

[0032] The total impurities in the inventive compositions resulting from the degradation of the bendamustine in the compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of from about 5° C. to about 25° C.,

and thus have long term stability for at least the same period of time or longer. Preferably, the bendamustine-containing compositions demonstrate long term storage stability for at least about 2 years, especially when stored at the lower (refrigerated) temperatures.

[0033] In some aspects of the invention, the bendamustine is preferably present in the formulation as the HCl salt.

[0034] In some aspects of the invention, the bendamustine concentration calculated on the basis of the HCl salt in the inventive compositions is from about 10 mg/mL to about 100 mg/mL, preferably 20 mg/mL to about 60 mg/mL. Preferably the bendamustine concentration in the inventive compositions is from about 25 mg/mL to about 50 mg/mL, and more preferably from about 30 mg/mL to about 50 mg/mL. It will be understood that compositions containing any useful concentration within the ranges, i.e. 10, 20, 25, 30, 35, 40, 45, 50, 55, 60 . . . 100 are contemplated. In other embodiments, the bendamustine concentration in the composition is about 25 mg/mL. In alternative aspects, the amount of bendamustine is outside these ranges but the amounts will be sufficient for single or multiple administrations of dosages generally regarded as effective amounts.

[0035] In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof. Within this aspect, the pharmaceutically acceptable fluid is a mixture of propylene glycol (PG) and polyethylene glycol (PEG). For example, the pharmaceutically acceptable fluid can include about 50% PEG and about 50% PG. Alternatively, pharmaceutically acceptable fluid includes about 95% PEG and about 5% PG. The amount of PEG and PG can also be varied within the ranges, i.e. the ratio of PEG:PG in the pharmaceutically acceptable fluid can range from about 95:5 to about 50:50. Within this range, is a pharmaceutically acceptable fluid containing about 75% PEG and about 25% PG, and preferably 80% PEG and 20% PG. In another embodiment, a pharmaceutically acceptable fluid can include about 85% PEG and about 15% PG while another preferred pharmaceutically acceptable fluid includes about 90% PEG and about 10% PG. The molecular weight of the PEG is within the range of pharmaceutically acceptable weights although PEG 400 is preferred in many aspects of the invention.

[0036] In accordance with the USP official monograph for polyethylene glycol, see USP 35-NF30, the contents of which are incorporated by reference herein, the PEG pH is determined as follows: 5 g of PEG is dissolved into 100 ml carbon dioxide free water, and 0.3 ml of saturated KCl solution is added. The pH is then measured. This value is sometimes referred to as the apparent pH. Different amounts of organic or inorganic compounds can be added to the PEG in order to arrive at a pH of from about 6.0 to about 11. Preferably, the pH of the PEG is from about 6.0 to about 11. More preferably, the pH of the PEG is from about 6.5 to about 8. In other preferred aspects, the pH is about 8.

[0037] The pH of the PEG is not the same as the pH of the final bendamustine HCl formulation. Preferably, the pH of the final bendamustine-containing formulation is from about 3.3 to about 4. More preferably, the pH of the final bendamustine-containing formulation is about 3.5. The pH of the final bendamustine-containing formulation is measured in accordance with the USP official monograph for polyethylene glycol. Preferably, a 5 g aliquot of the final bendamustine-containing formulation is added to 100 ml carbon dioxide free

US 2013/0210879 A1

Aug. 15, 2013

3

water, and 0.3 ml of saturated KCl solution is added. The pH is then measured and adjusted if necessary to the preferred range.

[0038] Without meaning to be bound by any theory or hypothesis, polyethylene glycol quality can vary from batch to batch, manufacturer to manufacturer, over product lifetime and as a result of handling. Such variation has made it difficult to make reproducible long term storage stable bendamustine-containing formulations with high amounts of polyethylene glycol and propylene glycol, as the formation of PEG and PG esters is high. In order to obtain reproducible formulations, PEG is treated with an organic or inorganic compound to achieve the desired USP apparent pH. This treatment results in reproducible long-term storage stable bendamustine-containing compositions, with substantially no PEG or PG ester formation.

[0039] The bendamustine-containing compositions according to several preferred aspects of the invention include a stabilizing amount of an antioxidant. For purposes of the present invention, "stabilizing amount" shall be understood to include those amounts which increase or enhance the stability of the bendamustine in the compositions described herein. The presence of one or more antioxidants described herein thus contributes, at least in part to the long term stability of the composition. Within this guideline, suitable antioxidant concentrations in the compositions can range from about 2.5 mg/mL to about 35 mg/mL, and preferably from about 5 mg/mL to about 20 mg/mL or from about 10 mg/mL to about 15 mg/mL. In some other embodiments, the concentration of the antioxidant in the bendamustine-containing composition is about 5 mg/mL.

[0040] Suitable antioxidants for inclusion include those which are pharmaceutically acceptable for use in human and veterinary formulations although not limited to those currently regarded as safe by any regulatory authority. For example, the antioxidant can be selected from among lipoic acid, thioglycerol (also known as monothioglycerol) and analogs thereof, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds, dihydrolipoic acid and mixtures of the foregoing. Preferably, the antioxidant is thioglycerol, lipoic acid or a mixture thereof. Some particularly preferred embodiments of the invention include thioglycerol.

[0041] In some aspects of the invention, organic compounds, inorganic compounds, and mixtures thereof are suitable acidity/alkalinity adjustors. Organic compounds include carboxylic compounds, nitrogenous compounds, carbonates, bicarbonates, and salts thereof. Preferably, the organic compounds are selected from monoethanolamine, diethanolamine, ethylenediaminetetraacetic acid (EDTA) phospholipid salts, ascorbate, ascorbic acid, sodium citrate, sodium sulfonic acid, sodium lauryl sulfate, quaternary amines, quaternary ammonium salts, and sodium acetate. Preferably, the organic compounds are selected from inorganic salts of organic acids. More preferably, the organic compound is sodium acetate. Inorganic compounds include compounds known to those of skill in the art, including, but not limited to, salts of hydroxides and salts of phosphates, sodium formate, sodium phosphate, potassium hydroxide, and phosphoric acid. Most preferably, the inorganic compound is sodium hydroxide.

[0042] In some embodiments of the invention, the amount of the organic compound or inorganic compound functioning as the acidity/alkalinity adjustor is provided in an amount sufficient to obtain a pH of from about 6.0 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol. In some aspects of the invention, about 0.5 µL to about 50 µL of a 1N acidity/alkalinity adjustor solution is provided per 1 mL of a bendamustine-containing composition. Preferably, about 1 µL to about 10 µL of a 1N acidity/alkalinity adjustor solution is provided per 1 mL of a bendamustine-containing composition. In some aspects of the invention, the acidity/alkalinity adjustor is added to the polyethylene glycol prior to the addition of the other materials in the formulation. In other aspects the acidity/alkalinity adjustor is added to the pharmaceutically acceptable fluid after the addition of the other materials to adjust the acidity or alkalinity as needed. In some aspects of the invention, the concentration of the organic compound in the final formulation is from about 0.005M (molarity) to about 0.1M (molarity), and more preferably, about 0.01M. In some aspects of the invention, the concentration of the inorganic compound in the final formulation is from about 0.0005M (molarity) to about 0.04M (molarity). It will be understood that any useful concentration within the ranges, i.e. 0.001, 0.0015, 0.005, 0.01, 0.02, 0.03, 0.04 are contemplated. Preferably, the concentration of the inorganic compound in the final formulation is about 0.01 molarity.

[0043] In view of the foregoing, some preferred non-aqueous, liquid, long term storage stable bendamustine-containing compositions in accordance with the invention include:

[0044]   I. a) bendamustine or a pharmaceutically acceptable salt thereof; and

[0045]   b) a pharmaceutically acceptable fluid including

[0046]   i) polyethylene glycol and propylene glycol;

[0047]   ii) an organic compound or inorganic compound, or mixtures thereof in an amount sufficient to obtain a pH of from about 6.0 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol; and

[0048]   iii) a stabilizing amount of thioglycerol; or

[0049]   II. a) about 25 mg/mL bendamustine or a pharmaceutically acceptable salt thereof; and

[0050]   b) a pharmaceutically acceptable fluid including

[0051]   i) about 90% PEG and about 10% PG;

[0052]   ii) an organic compound or inorganic compound, or mixtures thereof in an amount sufficient to obtain a pH of from about 6.0 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol; and

[0053]   iii) about 2.5 mg/mL thioglycerol.

[0054] Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total esters, PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

[0055] Some more preferred formulations include:

I. a) bendamustine or a pharmaceutically acceptable salt thereof; and

[0056]   b) a pharmaceutically acceptable fluid including

[0057]   i) polyethylene glycol and propylene glycol;

[0058]   ii) sodium hydroxide in an amount sufficient to obtain a pH of from about 6.5 to about 11 for the

US 2013/0210879 A1

Aug. 15, 2013

4

polyethylene glycol, as measured using USP monograph for polyethylene glycol; and

[0059]   iii) a stabilizing amount of thioglycerol; or

II. a) bendamustine or a pharmaceutically acceptable salt thereof at a concentration of about 25 mg/mL; and

[0060]   b) a pharmaceutically acceptable fluid including

[0061]   i) 90% polyethylene glycol and 10% propylene glycol;

[0062]   ii) sodium hydroxide in an amount sufficient to obtain a pH of from about 6.5 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol; and

[0063]   iii) thioglycerol at a concentration of about 5 mg/mL; or

III. a) bendamustine or a pharmaceutically acceptable salt thereof at a concentration of about 25 mg/mL; and

[0064]   b) a pharmaceutically acceptable fluid including

[0065]   i) 85% polyethylene glycol and 15% propylene glycol;

[0066]   ii) sodium hydroxide in an amount sufficient to obtain a pH of from about 6.5 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol; and

[0067]   iii) thioglycerol at a concentration of about 5 mg/mL; or

IV. a) bendamustine or a pharmaceutically acceptable salt thereof; and

[0068]   b) a pharmaceutically acceptable fluid including

[0069]   i) polyethylene glycol and propylene glycol;

[0070]   ii) sodium acetate in an amount sufficient to obtain a pH of from about 6.5 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol; and

[0071]   iii) a stabilizing amount of thioglycerol; or

V. a) bendamustine or a pharmaceutically acceptable salt thereof at a concentration of about 25 mg/mL; and

[0072]   b) a pharmaceutically acceptable fluid including

[0073]   i) 90% polyethylene glycol and 10% propylene glycol;

[0074]   ii) sodium acetate in an amount sufficient to obtain a pH of from about 6.5 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol; and

[0075]   iii) thioglycerol at a concentration of about 5 mg/mL; or

VI. a) bendamustine or a pharmaceutically acceptable salt thereof at a concentration of about 25 mg/mL; and

[0076]   b) a pharmaceutically acceptable fluid including

[0077]   i) 85% polyethylene glycol and 15% propylene glycol;

[0078]   ii) sodium acetate in an amount sufficient to obtain a pH of from about 6.5 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol; and

[0079]   iii) thioglycerol at a concentration of about 5 mg/mL.

[0080]   Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total esters, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

[0081]   In other aspects of the invention, preferred long term storage stable bendamustine-containing compositions in accordance with the invention include:

I. a) bendamustine or a pharmaceutically acceptable salt thereof; and

[0082]   b) a pharmaceutically acceptable fluid including

[0083]   i) polyethylene glycol and propylene glycol;

[0084]   ii) sodium hydroxide in an amount sufficient to obtain a pH of from about 3.3 to about 4.2 for the long term storage stable bendamustine-containing composition, as measured using USP monograph for polyethylene glycol; and

[0085]   iii) a stabilizing amount of thioglycerol; or

II. a) bendamustine or a pharmaceutically acceptable salt thereof at a concentration of about 25 mg/mL; and

[0086]   b) a pharmaceutically acceptable fluid including

[0087]   i) 90% polyethylene glycol and 10% propylene glycol;

[0088]   ii) sodium hydroxide in an amount sufficient to obtain a pH of from about 3.3 to about 4.2 for the long term storage stable bendamustine-containing composition, as measured using USP monograph for polyethylene glycol; and

[0089]   iii) thioglycerol at a concentration of about 5 mg/mL; or

III. a) bendamustine or a pharmaceutically acceptable salt thereof at a concentration of about 25 mg/mL; and

[0090]   b) a pharmaceutically acceptable fluid including

[0091]   i) 85% polyethylene glycol and 15% propylene glycol;

[0092]   ii) sodium hydroxide in an amount sufficient to obtain a pH of from about 3.3 to about 4.2 for the long term storage stable bendamustine-containing composition, as measured using USP monograph for polyethylene glycol; and

[0093]   iii) thioglycerol at a concentration of about 5 mg/mL; or

IV. a) bendamustine or a pharmaceutically acceptable salt thereof; and

[0094]   b) a pharmaceutically acceptable fluid including

[0095]   i) polyethylene glycol and propylene glycol;

[0096]   ii) sodium acetate in an amount sufficient to obtain a pH of from about 3.3 to about 4.2 for the long term storage stable bendamustine-containing composition, as measured using USP monograph for polyethylene glycol; and

[0097]   iii) a stabilizing amount of thioglycerol; or

V. a) bendamustine or a pharmaceutically acceptable salt thereof at a concentration of about 25 mg/mL; and

[0098]   b) a pharmaceutically acceptable fluid including

[0099]   i) 90% polyethylene glycol and 10% propylene glycol;

[0100]   ii) sodium acetate in an amount sufficient to obtain a pH of from about 3.3 to about 4.2 for the long term storage stable bendamustine-containing composition, as measured using USP monograph for polyethylene glycol; and

[0101]   iii) thioglycerol at a concentration of about 5 mg/mL; or

VI. a) bendamustine or a pharmaceutically acceptable salt thereof at a concentration of about 25 mg/mL; and

[0102]   b) a pharmaceutically acceptable fluid including

[0103]   i) 85% polyethylene glycol and 15% propylene glycol;

5

[0104] ii) sodium acetate in an amount sufficient to obtain a pH of from about 3.3 to about 4.2 for the long term storage stable bendamustine-containing composition, as measured using USP monograph for polyethylene glycol; and

[0105] iii) thioglycerol at a concentration of about 5 mg/mL.

[0106] Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total esters, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

[0107] Another embodiment of the invention provides methods of treating cancer in mammals. The methods include administering to a mammal in need thereof an effective amount of one of the bendamustine-containing compositions described herein. Since the active ingredient portion of the inventive composition is an FDA-approved drug, those of ordinary skill will recognize that the doses of bendamustine employed in this aspect of the invention will be similar to those employed in any treatment regimens designed for bendamustine as marketed under the trade name TREANDA. The patient package insert containing dosing information is incorporated herein by reference. The methods of treatment also include administering the inventive formulations for any purpose or physical condition for which bendamustine has been indicated as being useful.

[0108] Another embodiment of the invention includes methods of preparing bendamustine-containing compositions described herein. The methods include combining lyophilized bendamustine preferably as the HCl salt in a pharmaceutically acceptable fluid:

[0109] A) i) a mixture of PEG and PG within the desired ratios described herein, e.g. 90:10, etc.;

[0110] ii) an organic compound or an inorganic compound in an amount sufficient to obtain a pH of from about 6.5 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol; and

[0111] iii) a stabilizing amount of an antioxidant.

[0112] The steps are carried out under pharmaceutically acceptable conditions for sterility and manufacturing.

[0113] In a further aspect of the invention, there are provided methods of controlling or preventing the formation of polyethylene glycol esters and propylene glycol esters in bendamustine-containing compositions during long term storage. The methods include combining an amount of bendamustine or a pharmaceutically acceptable salt thereof with a sufficient amount of a pharmaceutically acceptable fluid containing:

[0114] i) a mixture of PEG and PG in the ratios described herein;

[0115] ii) an organic compound or an inorganic compound in an amount sufficient to obtain a pH of from about 6.5 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol; and

[0116] iii) a stabilizing amount of an antioxidant.

[0117] Further optional steps in accordance therewith include transferring one or more pharmaceutically acceptable doses of the formulations into a suitable sealable container and storing the sealed container at a temperature of from

about 5° C. to about 25° C. As a result of carrying out these steps, it is possible to control or substantially prevent the formation of impurities which otherwise occur with bendamustine-containing compositions during long term storage so that the artisan is provided with bendamustine-containing formulations having less than about 5% total esters PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

[0118] The compositions of the present invention can be packaged in any suitable sterile vial or container fit for the sterile storage of a pharmaceutical such as bendamustine. Preferably, the vials containing the formulation are sparged with nitrogen under seal before storage. Suitable containers can be glass vials, polypropylene or polyethylene vials or other special purpose containers and be of a size sufficient to hold one or more doses of bendamustine.

[0119] A further aspect of the invention includes kits containing lyophilized bendamustine or a pharmaceutically acceptable salt thereof in a first container and, in a second container, a sufficient amount of a pharmaceutically acceptable fluid such as those described herein:

[0120] i) a mixture of PEG and PG;

[0121] ii) an organic compound or an inorganic compound in an amount sufficient to obtain a pH of from about 6.5 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol; and

[0122] iii) a stabilizing amount of an antioxidant.

[0123] For purposes of this embodiment, the amount of fluid which is sufficient is an amount which allows the bendamustine to be dissolved or dispersed to a degree which renders the liquid composition ready for use, i.e. to administer to a patient in need thereof directly, or for dilution into a larger volume infusion at point of delivery.

[0124] As will be appreciated by those of ordinary skill, the kit will contain other pharmaceutically necessary materials for storing and/or administering the drug, including instructions for storage and use, additional diluents, if desired, etc.

EXAMPLES

[0125] The following examples serve to provide further appreciation of the invention but are not meant in any way to restrict the effective scope of the invention.

Comparative Example 1

[0126] A mixture of PEG:PG (90:10) was prepared by combining 10 ml of PG with PEG 400 qs 100 ml. Thioglycerol at a concentration of 5 mg/ml was added to 80 ml of the PEG:PG (90:10) mixture and mixed well. The PEG:PG (90:10) and thioglycerol mixture was sparged with $N_2$. Bendamustine HCl at a concentration of 25 mg/ml was then added to 40 ml of the PEG:PG (90:10) and thioglycerol mixture, and mixed well. The volume of the bendamustine-containing formulation was made up to 50 ml with the PEG:PG (90:10) mixture, and then sparged with $N_2$. The bendamustine-containing formulation was then filtered and transferred to 5 cc vials, with each vial containing 4 ml. The vials were sparged with $N_2$, stoppered, crimped with aluminum seals. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed after 15 days, three months or five months for drug content and impurity profile as indicated in FIG. 1 (Table 1). The results obtained are presented in FIG. 1

US 2013/0210879 A1

6

Aug. 15, 2013

(Table 1). At 14 days at 40° C., the pH of the bendamustine-containing formulation was taken in accordance with the USP official monograph. 5 g of the final bendamustine-containing formulation was added to 100 ml carbon dioxide free water, and 0.3 ml of saturated KCl solution was added. The pH was measured to be 3.38.

[0127]  As shown in FIG. 1 (Table 1), the sample, which did not include NaOH, did not provide long term storage stability. This sample exhibited more than 16% total esters compared to initial after only 15 days at 40° C. It was determined that bendamustine-containing compositions with such high ester formation would not be suitable for long term storage. It was determined that the cause of the excess ester formation was the PEG.

Example 2

[0128]  A mixture of PEG 400 treated with NaOH was prepared by combining 200 μl of 1N NaOH to a concentration of 0.001 molarity and PEG qs to 200 ml, and mixing well. The pH of the PEG 400 and NaOH mixture was taken in accordance with the USP official monograph. 5 g of the PEG 400 and NaOH mixture was added to 100 ml carbon dioxide free water, and 0.3 ml of saturated KCl solution was added. The pH was then measured to be 7.30, which is within the preferred range. A PEG:PG (90:10) mixture was prepared by combining 20 ml of PG and the PEG 400 and NaOH mixture qs 200 ml. Thioglycerol at a concentration of 5 mg/ml was added to 60 ml of the PEG:PG (90:10) mixture and mixed well. Bendamustine HCl at a concentration of 25 mg/ml was then added to 40 ml of the PEG:PG (90:10) and thioglycerol mixture, and mixed well. The volume of the bendamustine-containing formulation was made up to 75 ml with the PEG:PG (90:10) solution. The bendamustine-containing formulation was then filtered and transferred to 5 cc vials, with each vial containing 4 ml. The pH of the bendamustine-containing formulations was taken in accordance with the USP official monograph. 5 g of the final bendamustine-containing formulation was added to 100 ml carbon dioxide free water, and 0.3 ml of saturated KCl solution was added. The pH was then measured and recorded in FIG. 2 (Table 2). The vials were sparged with N₂, stoppered, crimped with aluminum seals. The samples were maintained at 25° C. and 5° C. and analyzed after 15 days, one month, three months, or six months for drug content, pH and impurity profile as indicated in FIG. 2 (Table 2). The results obtained are presented in FIG. 2 (Table 2).

[0129]  As shown in FIG. 2 (Table 2), even without "pre" sparging steps, bendamustine, when dissolved in polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of thioglycerol, and NaOH at a concentration of 0.001 molarity, had substantially no increase in total degradants after a period of at least six months at 25° C. The bendamustine-containing compositions had about 1.23% total esters after 6 months analysis at 25° C. Additionally, the pH of the compositions was maintained at about 3.4 throughout the duration of the long term storage. The data presented in FIG. 2 (Table 2) translates into bendamustine-containing compositions including PEG and PG, an antioxidant, and NaOH having a shelf life of at least about 15 months of storage at a temperature of from 5° C. to about 25° C. with levels of impurities within the levels required herein.

Example 3

[0130]  PEG:PG (90:10) mixtures were prepared by combining 10 ml of PG with PEG 400 qs 100 ml. Thioglycerol at

a concentration of 5 mg/ml was added to 80 ml of the PEG:PG (90:10) mixture and mixed well. Bendamustine HCl at a concentration of 25 mg/ml was then added to 40 ml of the PEG:PG (90:10) and thioglycerol mixture, and mixed well. In addition to a sample, in which no NaOH was added (Sample 1), two samples were made in which a 1N NaOH solution was added to the PEG:PG (90:10) mixture to a concentration of 0.01 or 0.03 molarity (Samples 2 and 3, respectively), as indicated in FIG. 3 (Table 3), and mixed. The 0.01 and 0.03 molarity samples are unlike the samples in Examples 1 and 2, where the concentration of NaOH was 0.001 molarity. The volume of the bendamustine-containing solution was made up to 50 ml with the PEG:PG (90:10) mixture. The bendamustine-containing formulation was then filtered and transferred to 5 cc vials, with each vial containing 4 ml. The initial pH of the bendamustine-containing formulations was taken in accordance with the USP official monograph. 5 g of the final bendamustine-containing formulation was added to 100 ml carbon dioxide free water, and 0.3 ml of saturated KCl solution was added. The pH was then measured and recorded in FIG. 3 (Table 3). The vials were sparged with N₂, stoppered, crimped with aluminum seals. The samples were maintained at 40° C. and 25° C. and analyzed after 15 days, one month, two months, or three months for drug content and impurity profile as indicated in FIG. 3 (Table 3). The results obtained are presented in FIG. 3 (Table 3).

[0131]  As shown in FIG. 3 (Table 3), bendamustine, when dissolved in polyethylene glycol and propylene glycol, in the presence of thioglycerol and NaOH at a concentration of 0.01 molarity or 0.03 molarity, has a pH of about 3.5 to about 4, which is within the preferred pH range. The bendamustine-containing samples according to the invention had substantially no increase in total degradants after a period of at least three months at 25° C. The bendamustine-containing compositions with NaOH concentration of 0.01 molarity and 0.03 molarity had about 0.33% and 1.26% total esters, respectively, after 15 days analysis at 40° C. This data supports the position that bendamustine-containing compositions according to the invention have a shelf life of at least about 2 years, if not longer, when stored under ambient or refrigerated storage conditions with levels of impurities within the levels required herein.

[0132]  Also shown in FIG. 3 (Table 3), the control sample, which did not include NaOH did not provide long term storage stability. The pH of the control sample was 3.12. This sample exhibited more than 26% total esters compared to initial after only 15 days at 40° C., and almost 19% total esters compared to initial after 3 months at 25° C. Bendamustine-containing compositions with such high levels of degradation would not be long term storage stable.

Example 4

[0133]  Mixtures of PEG 400 with NaOH were prepared by combining 0.1 ml, 0.2 ml or 0.3 ml (Samples 5, 6 and 7, respectively) of 1N NaOH and PEG qs to 200 ml, and mixing well. The pH of the PEG 400 and NaOH mixtures was taken in accordance with the USP official monograph. 5 g of the PEG 400 and NaOH mixtures were added to 100 ml carbon dioxide free water, and 0.3 ml of saturated KCl solution was added. The pH was then measured. The pH of the PEG 400 and NaOH mixture for Sample 5 was 6.32. The pH of the PEG 400 and NaOH mixture for Sample 6 was 7.30. The pH of the PEG 400 and NaOH mixture for Sample 7 was 7.89. The pH for the PEG 400 and NaOH mixtures for each of Samples 5,

US 2013/0210879 A1

7

Aug. 15, 2013

6 and 7 were within the preferred range. Mixtures of PEG:PG (90:10) were prepared by combining 20 ml of PG with PEG 400 qs 200 ml, without NaOH (Sample 4) or with NaOH at a concentration of 0.0005, 0.001, or 0.0015 molarity (Samples 5, 6 and 7, respectively), as indicated in FIGS. **4A** and **4B** (Tables 4A and 4B). Thioglycerol at a concentration of 5 mg/ml was added to 80 ml of the PEG:PG (90:10) mixture and mixed well. Bendamustine HCl at a concentration of 25 mg/ml was then added to 80 ml of the PEG:PG (90:10) and thioglycerol mixture, and mixed well. The volume of the bendamustine-containing formulation was made up to 100 ml with the PEG:PG (90:10) mixture, and mixed. The bendamustine-containing formulation was then filtered and transferred to 5 cc vials, with each vial containing 4 ml. The vials were sparged with $N_2$, stopped, crimped with aluminum seals. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed after 15 days, one month, two months, three months or six months for drug content, impurity profile and pH as indicated in FIGS. **4A** and **4B** (Tables 4A and 4B). The pH was evaluated as per the USP official monograph. 5 g of the final bendamustine-containing formulation was added to 100 ml carbon dioxide free water, and 0.3 ml of saturated KCl solution was added. The pH was then measured. The results obtained are presented in FIGS. **4A** and **4B** (Tables 4A and 4B).

[0134]    As shown in FIGS. **4A** and **4B** (Tables 4A and 4B), bendamustine, when dissolved in polyethylene glycol and propylene glycol, in the presence of thioglycerol and NaOH at a concentration of 0.0005 molarity, 0.001 molarity or 0.0015 molarity, the bendamustine-containing samples according to the invention have a pH of about 3.3 to about 3.6. This is within the preferred pH range. The bendamustine-containing samples according to the invention had no or substantially no increase in total degradants after a period of at least six months at 5° C. The bendamustine-containing compositions with NaOH concentration of 0.005 molarity had about 2.35% total esters after six months analysis at 25° C. The bendamustine-containing compositions with NaOH concentration of 0.001 molarity had about 1.41% total esters after six months analysis at 25° C. The bendamustine-containing compositions with NaOH concentration of 0.0015 molarity had about 1.21% total esters after six months analysis at 25° C. This data projects a shelf life of at least about 2 years, if not longer, when stored under ambient or refrigerated storage conditions with levels of impurities within the levels required herein.

[0135]    Also shown in FIGS. **4A** and **4B** (Tables 4A and 4B), the control sample, which did not include NaOH, did not provide long term storage stability. The pH of the control sample is ranges from 3.17 to 3.25. This sample exhibited more than 28% total esters compared to initial after six months at 25° C. Bendamustine-containing compositions with such high levels of degradation would not be long term storage stable.

## Example 5

[0136]    PEG:PG (90:10) mixtures were prepared by combining 10 ml of PG and PEG 400 qs 100 ml. Thioglycerol at a concentration of 5 mg/ml was added to 50 ml of the PEG:PG (90:10) mixture and mixed well. Bendamustine HCl at a concentration of 25 mg/ml was then added to 50 ml of the PEG:PG (90:10) and thioglycerol mixture, and mixed well. The volume of the bendamustine-containing formulation was made up to 60 ml with the PEG:PG (90:10) solution. The

bendamustine-containing formulation was transferred to 5 cc vials, with each vial containing 5 ml. Unlike in previous Examples, to each vial, except the control which was without NaOH (Sample 8), a 1N NaOH solution was added, yielding a final NaOH concentration of 0.01, 0.02, 0.03, 0.04, 0.05, 0.06, 0.07, 0.08, 0.09 or 0.1 molarity (Samples 9, 10, 11, 12, 13, 14, 15, 16, 17 and 18, respectively), as indicated in FIGS. **5A** and **5B** (Tables 5A and 5B). The vials were sparged with $N_2$, stoppered, crimped with aluminum seals. The samples were maintained at 40° C. and analyzed after 14 days for drug content and impurity profile as indicated in FIGS. **5A** and **5B** (Tables 5A and 5B). The results obtained are presented in FIGS. **5A** and **5B** (Tables 5A and 5B).

[0137]    As shown in FIGS. **5A** and **5B** (Tables 5A and 5B), bendamustine, when dissolved in polyethylene glycol and propylene glycol, in the presence of thioglycerol and NaOH at a concentration of 0.01 molarity, 0.02 molarity, 0.03 molarity, or 0.04 molarity, the bendamustine-containing samples according to the invention have a substantially low amount of total degradants after a period of about 14 days at 40° C. compared to bendamustine-containing samples having no NaOH and NaOH at a concentration 0.05 molarity or greater. The bendamustine-containing compositions with NaOH concentration from 0.01 to 0.04 molarity had from 0.23% to 2.91% total esters after 14 days analysis at 40° C. This data projects a shelf life of at least about 2 years, if not longer, when stored under ambient or refrigerated storage conditions with levels of impurities within the levels required herein.

[0138]    Also shown in FIGS. **5A** and **5B** (Tables 5A and 5B), the control sample, which did not include NaOH, did not provide long term storage stability. This sample exhibited more than 4% total esters after 14 days at 40° C. These bendamustine-containing compositions with such high levels of degradation would not be long term storage stable.

[0139]    The bendamustine-containing compositions with NaOH concentration of 0.05 molarity or greater had more than 6% total esters after 14 days analysis at 40° C. These bendamustine-containing compositions with such high levels of degradation would not be long term storage stable.

## Example 6

[0140]    PEG and sodium acetate mixtures were prepared by adding sodium acetate (sodium acetate trihydrate (Sample 19) in FIG. **6** (Table 6) and sodium acetate anhydrous (Sample 20) in FIG. **7** (Table 7)) at a concentration of 0.01 molarity to 81 mL PEG 400 and mixing. The pH was evaluated as per the USP official monograph. 5 g of the PEG and sodium acetate mixture was added to 100 ml carbon dioxide free water, and 0.3 ml of saturated KCl solution was added. The pH was then measured. The PEG and sodium acetate mixture of Sample 19 had a pH of 3.74 and the PEG and sodium acetate mixture of Sample 20 had a pH of 3.67. The PEG and sodium acetate mixtures of both Samples 19 and 20 are within the preferred range. PEG:PG (90:10) and sodium acetate mixtures were prepared by combining 10 ml of PG with the PEG 400 sodium acetate mixture and mixing. Thioglycerol at a concentration of 5 mg/ml was added to the PEG:PG (90:10) sodium acetate solution and mixed. Bendamustine HCl at a concentration of 25 mg/ml was then added to the PEG:PG (90:10) sodium acetate and thioglycerol mixture, and mixed. The volume of the bendamustine-containing formulation was made up to 100 ml with PEG 400. The bendamustine-containing formulation was then filtered and transferred to 5 cc vials, with each vial containing 4 ml. The vials were sparged with $N_2$, stop-

8

pered, crimped with aluminum seals. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed after 15 days, one month, or three months for drug content and impurity profile as indicated in FIGS. **6** and **7** (Tables 6 and 7). The results obtained are presented in FIGS. **6** and **7** (Tables 6 and 7).

[0141] As shown in FIGS. **6** and **7** (Tables 6 and 7), bendamustine, when dissolved in polyethylene glycol and propylene glycol, in the presence of thioglycerol and sodium acetate at a concentration of 0.01M, the bendamustine-containing samples according to the invention have substantially low amount of total degradants after a period of about 15 days at 40° C. The bendamustine-containing compositions with sodium acetate concentration of 0.01M also had substantially no degradants after three months analysis at 25° C. This data projects a shelf life of at least about 2 years, if not longer, when stored under ambient or refrigerated storage conditions with levels of impurities within the levels required herein.

### Example 7

[0142] A PEG sodium acetate mixture was prepared by adding sodium acetate trihydrate at a concentration of 0.01 molarity to 81 mL PEG 400, mixing. The pH was evaluated as per the USP official monograph. 5 g of the PEG and sodium acetate mixture was added to 100 ml carbon dioxide free water, and 0.3 ml of saturated KCl solution was added. The pH was then measured. The PEG and sodium acetate mixture had a pH of 3.74, which is within the preferred range. A PEG:PG (90:10) sodium acetate mixture was prepared by combining 10 ml of PG with the PEG 400 sodium acetate mixture and mixing. Thioglycerol at a concentration of 5 mg/ml was added to the PEG:PG (90:10) sodium acetate mixture and mixed. Bendamustine HCl at a concentration of 25 mg/ml was then added to the PEG:PG (90:10) sodium acetate and thioglycerol mixture, and mixed. The volume of the bendamustine-containing formulation was made up to 100 ml with PEG 400. The bendamustine-containing formulation (Sample 21) was then filtered and transferred to 5 cc vials, with each vial containing 4 ml. The vials were sparged with N₂, stoppered, crimped with aluminum seals. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed after 15 days, one month, or three months for drug content, impurity profile and pH as indicated in FIG. 8 (Table 8). The pH was evaluated as per the USP official monograph. 5 g of the final bendamustine-containing formulation was added to 100 ml carbon dioxide free water, and 0.3 ml of saturated KCl solution was added. The pH was then measured. The results obtained are presented in FIG. 8 (Table 8).

[0143] As shown in FIG. 8 (Table 8), bendamustine, when dissolved in polyethylene glycol and propylene glycol, in the presence of thioglycerol and sodium acetate at a concentration of 0.01M, the bendamustine-containing samples according to the invention have a pH of about 3.5 to about 3.64. This is within the preferred pH range. The bendamustine-containing samples according to the invention have substantially low amount of total degradants after a period of about six months at 25° C. The bendamustine-containing compositions with sodium acetate concentration of 0.01M also had substantially no degradants after six months analysis at 5° C.

[0144] The area % of the total esters increased about 1.31% over six months storage at 25° C. Such an increase projects a shelf life of at least 2 years, if not longer, when stored under ambient or refrigerated storage conditions with levels of impurities within the levels required herein.

We claim:

1. A long term storage stable bendamustine-containing composition, comprising:
   a) bendamustine or a pharmaceutically acceptable salt thereof; and
   b) a pharmaceutically acceptable fluid comprising
      i) a mixture of polyethylene glycol, and propylene glycol;
      ii) an organic compound or an inorganic compound in an amount sufficient to obtain a pH of from about 6.0 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol; and
      iii) a stabilizing amount of an antioxidant;
   said bendamustine-containing composition having less than about 5% total polyethylene glycol esters and propylene glycol esters, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

2. The long term storage stable bendamustine-containing composition of claim **1**, wherein the amount of the organic compound or an inorganic compound is provided in an amount sufficient to obtain a pH of from about 6.5 to about 8 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol.

3. The long term storage stable bendamustine-containing composition of claim **1**, wherein the pharmaceutically acceptable fluid comprises an inorganic compound selected from the group consisting of salts of hydroxides and salts of phosphates.

4. The long term storage stable bendamustine-containing composition of claim **3**, wherein the inorganic compound is sodium hydroxide.

5. The long term storage stable bendamustine-containing composition of claim **1**, wherein the pharmaceutically acceptable fluid comprises an organic compound selected from the group consisting of carboxylic compounds, nitrogenous compounds, carbonates, and salts thereof.

6. The long term storage stable bendamustine-containing composition of claim **5**, wherein the organic compound is sodium acetate or is diethanolamine.

7. The long term storage stable bendamustine-containing composition of claim **1**, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL..

8. The long term storage stable bendamustine-containing composition of claim **7**, wherein the bendamustine concentration is from about 25 mg/mL to about 50 mg/mL.

9. The long term storage stable bendamustine-containing composition of claim **8**, wherein the bendamustine concentration is about 25 mg/mL.

10. The long term storage stable bendamustine-containing composition of claim **1**, wherein the pharmaceutically acceptable fluid comprises about 90% polyethylene glycol and about 10% propylene glycol.

11. The long term storage stable bendamustine-containing composition of claim **1**, wherein the pharmaceutically acceptable fluid comprises about 85% polyethylene glycol and about 15% propylene glycol.

12. The long term storage stable bendamustine-containing composition of claim **1**, wherein the antioxidant is selected from the group consisting of thioglycerol, monothioglycerol, lipoic acid, propyl gallate, methionine, cysteine, met-

US 2013/0210879 A1

9

Aug. 15, 2013

abisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds and dihydrolipoic acid.

**13**. The long term storage stable bendamustine-containing composition of claim **12**, wherein the antioxidant is thioglycerol or monothioglycerol.

**14**. The long term storage stable bendamustine-containing composition of claim **1**, wherein the stabilizing amount of the antioxidant is from about 2.5 mg/mL to about 35 mg/mL.

**15**. The long term storage stable bendamustine-containing composition of claim **14**, wherein the stabilizing amount of the antioxidant is from about 5 mg/mL to about 20 mg/mL.

**16**. The long term storage stable bendamustine-containing composition of claim **15**, wherein the stabilizing amount of the antioxidant is about 5 mg/mL.

**17**. The long term storage stable bendamustine-containing composition of claim **1**, wherein the concentration of the inorganic compound is from about 0.0005 molarity to about 0.04 molarity.

**18**. The long term storage stable bendamustine-containing composition of claim **17**, wherein the concentration of the inorganic compound is about 0.01 molarity.

**19**. The long term storage stable bendamustine-containing composition of claim **1**, wherein the concentration of the organic compound is from about 0.005M to about 0.1M.

**20**. The long term storage stable bendamustine-containing composition of claim **19**, wherein the concentration of the organic compound is about 0.01M.

**21**. The long term storage stable bendamustine-containing composition of claim **1**, wherein the pH of the polyethylene glycol, as measured using the USP monograph for polyethylene glycol, is about 6.5 or about 8.

**22**. The long term storage stable bendamustine-containing composition of claim **1**, wherein the pH of the long term storage stable bendamustine-containing composition, as measured using the USP monograph for polyethylene glycol, is from about 3.3 to about 4.

**23**. The long term storage stable bendamustine-containing composition of claim **22**, wherein the pH of the long term storage stable bendamustine-containing composition, as measured using the USP monograph for polyethylene glycol, is about 3.5.

**24**. The long term storage stable bendamustine-containing composition of claim **1**, wherein the amount of total polyethylene glycol esters and propylene glycol esters is less than about 3%.

**25**. The long term storage stable bendamustine-containing composition of claim **1**, wherein the amount of total polyethylene glycol esters and propylene glycol esters is less than about 2.4%.

**26**. The long term storage stable bendamustine-containing composition of claim **1**, wherein the amount of individual polyethylene glycol esters less than about 0.2% and individual propylene glycol esters is less than about 1.5%.

**27**. The long term storage stable bendamustine-containing composition of claim **1**, wherein the amount of total polyethylene glycol esters is less than about 2%.

**28**. The long term storage stable bendamustine-containing composition of claim **1**, wherein the amount of total propylene glycol esters is less than about 3%.

**29**. The long term storage stable bendamustine-containing composition of claim **1**, wherein said long term storage is at least about 2 years.

**30**. A long term storage stable bendamustine-containing composition, comprising:

a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid comprising

i) 90% polyethylene glycol and 10% propylene glycol;

ii) sodium hydroxide in an amount sufficient to obtain a pH of from about 6.5 for the polyethylene glycol, as measured using the USP monograph for polyethylene glycol; and

iii) thioglycerol at a concentration of about 5 mg/mL; said bendamustine-containing composition having less than about 5% total polyethylene glycol esters and propylene glycol esters, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

**31**. A long term storage stable bendamustine-containing composition, comprising:

a) bendamustine or a pharmaceutically acceptable salt thereof at a concentration of about 25 mg/mL; and

b) a pharmaceutically acceptable fluid comprising

i) 90% polyethylene glycol and 10% propylene glycol;

ii) sodium acetate in an amount sufficient to obtain a pH of about 6.5 for the polyethylene glycol, as measured using the USP monograph for polyethylene glycol; and

iii) thioglycerol at a concentration of about 5 mg/mL; said bendamustine-containing composition having less than about 5% total polyethylene glycol esters and propylene glycol esters, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

**32**. A long term storage stable bendamustine-containing composition, comprising:

a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid comprising

i) a mixture of polyethylene glycol, and propylene glycol;

ii) an organic compound or an inorganic compound in an amount sufficient to obtain a pH of from about 3.3 to about 4.2 for the long term storage stable bendamustine-containing composition, as measured using the USP monograph for polyethylene glycol; and

iii) a stabilizing amount of an antioxidant; said bendamustine-containing composition having less than about 5% total polyethylene glycol esters and propylene glycol esters, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

**33**. A method of treating cancer in mammals, comprising administering an effective amount of a long term storage stable bendamustine-containing composition of claim **1** to a mammal in need thereof.

* * * * *

# EXHIBIT 9



## UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 16/509,920 | 07/12/2019 | | 1720 | 820-1041-US-CON7 | 16 | 1 |

**CONFIRMATION NO. 7527**

20311
LUCAS & MERCANTI, LLP
30 BROAD STREET
21st FLOOR
NEW YORK, NY 10004

**FILING RECEIPT**


OC000006110314384

Date Mailed: 08/13/2019

Receipt is acknowledged of this non-provisional utility patent application. The application will be taken up for examination in due course. Applicant will be notified as to the results of the examination. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF FIRST INVENTOR, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection.

**Please verify the accuracy of the data presented on this receipt.** If an error is noted on this Filing Receipt, please submit a written request for a corrected Filing Receipt, including a properly marked-up ADS showing the changes with strike-through for deletions and underlining for additions. If you received a "Notice to File Missing Parts" or other Notice requiring a response for this application, please submit any request for correction to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections provided that the request is grantable.

**Inventor(s)**
Nagesh R. Palepu, Southampton, PA;
Philip Christopher Buxton, Denham, UNITED KINGDOM;

**Applicant(s)**
Eagle Pharmaceuticals, Inc, Woodcliff Lake, NJ;

**Power of Attorney:** The patent practitioners associated with Customer Number 20311

**Domestic Priority data as claimed by applicant**
This application is a CON of 16/015,656 06/22/2018
which is a CON of 15/432,335 02/14/2017 PAT 10010533
which is a CON of 15/013,436 02/02/2016 PAT 9572797
which is a CON of 14/031,879 09/19/2013 PAT 9265831
which is a CON of 13/016,473 01/28/2011 PAT 8609707
which claims benefit of 61/299,100 01/28/2010

**Foreign Applications** for which priority is claimed  (You may be eligible to benefit from the **Patent Prosecution Highway** program at the USPTO. Please see http://www.uspto.gov for more information.)  - None.
*Foreign application information must be provided in an Application Data Sheet in order to constitute a claim to foreign priority. See 37 CFR 1.55 and 1.76.*

**Permission to Access Application via Priority Document Exchange: Yes**

page 1 of 4

**Permission to Access Search Results:** Yes

Applicant may provide or rescind an authorization for access using Form PTO/SB/39 or Form PTO/SB/69 as appropriate.

**If Required, Foreign Filing License Granted:** 08/09/2019

The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 16/509,920**

**Projected Publication Date:** 11/21/2019

**Non-Publication Request:** No

**Early Publication Request:** No
**Title**

FORMULATIONS OF BENDAMUSTINE

**Preliminary Class**

**Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications:** No

# PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific

countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4258).

# LICENSE FOR FOREIGN FILING UNDER

## Title 35, United States Code, Section 184

## Title 37, Code of Federal Regulations, 5.11 & 5.15

**GRANTED**

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

**NOT GRANTED**

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

---

## *SelectUSA*

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The U.S. offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to promote and facilitate business investment. SelectUSA provides information assistance to the international investor community; serves as an ombudsman for existing and potential investors; advocates on behalf of U.S. cities, states, and regions competing for global investment; and counsels U.S. economic development organizations on investment attraction best practices. To learn more about why the United States is the best country in the world to develop

technology, manufacture products, deliver services, and grow your business, visit http://www.SelectUSA.gov or call +1-202-482-6800.

## REMARKS

Claims 1-16 are pending.  Claims 1, 3, 4, 12, and 13 have been amended to correct minor typographical errors

### Brief Description of the Claimed Inventions

The pending claims are directed to, among other things, liquid bendamustine-containing compositions having from about 10 mg/mL to about 100 mg/mL of bendamustine, polyethylene glycol, and an antioxidant.  These compositions are surprisingly stable and do not exhibit significant bendamustine degradation after storage for at least 15 months at refrigerated or room temperature conditions.

### 35 U.S.C. § 103

The Examiner alleges that claims 1-16 would have been obvious over Brittain,[1] Treanda,[2] Von Stetten,[3] and Miekka.[4]  At the time of the invention, one of ordinary skill in the art would not have added an antioxidant to a liquid bendamustine-containing composition including polyethylene glycol (PEG), as claimed.  Moreover, the stability achieved by the claimed compositions would have been unexpected in view of the cited art.  Applicant requests reconsideration and withdrawal of the rejection.

### Those of Ordinary Skill in the Art Would Not Have Included an Antioxidant in Any Liquid Bendamustine Composition

Despite the Examiner's assertions, Brittain does not suggest that an antioxidant should be added to a liquid bendamustine/PEG composition.  In fact, those of ordinary skill in the art would not have expected the addition of an antioxidant to be beneficial to bendamustine's storage stability because no reference had suggested that bendamustine degraded *via* an oxidative

---

[1] U.S. Published Application No. 2006/0159713
[2] TREANDA, Highlights of prescribing information, 2008
[3] U.S. 4,711,906.  Von Stetten is cited merely for a disclosure of diclofenac in PEG and propylene glycol.  (Action at 8).  Diclogenac and bendamustine are chemically distinct compounds and there is no evidence of record that those of ordinary skill in the art would have considered a diclofenac formulation to be informative in preparing a storage-stable liquid bendamustine composition.
[4] U.S. 7,252,799.  Miekka is merely cited for its purported disclosure that lipoic acid, methionine, cystein, thiols, propyl gallate, dihydrolipoic acid, BHA, BHT, and sodium formaldehyde sufloxylate are antioxidant stabilizers.

5

mechanism. Moreover, industry guidance discouraged the use of antioxidants, recommending other methods for reducing oxidation. The claims are patentable for at least these reasons.

***Brittain does not teach that an antioxidant should be added to a liquid bendamustine composition***

The Examiner alleges that Brittain teaches lyophilizing bendamustine with an antioxidant. (Action at 6). Brittain provides no such disclosure. None of Brittain's exemplified compositions includes an antioxidant. Moreover, the paragraph relied upon by the Examiner merely states that an antioxidant could be used as a lyophilization excipient only "if desired." (Brittain at paragraph [0088]; Action at 6). This statement hardly provides the "clear and unambiguous" instruction to include an antioxidant in every bendamustine composition, as the Examiner appears to imply. The Examiner has not articulated how Brittain would have suggested to one of ordinary skill in the art that an antioxidant should be included in a liquid bendamustine/PEG composition and the rejection should be withdrawn for at least this reason.

***The art does not teach that bendamustine can degrade via an oxidative mechanism***

Bendamustine rapidly degrades in water *via* several pathways, none of which are oxidative. (*See, e.g.,* Specification at page 2). One pathway by which bendamustine degrades is *via* aziridinium ring hydrolysis, which produces HP1 and HP2:



6

(Brittain at paragraph [0022]; Maas,[5] Studies and Results, Scheme;  U.S. 8,344,066 (Drager)[6] at col. 1, lines 50-65; col. 4, lines 33-45).

Bendamustine also degrades *via* dimer formation, which occurs when a molecule of bendamustine attacks the aziridinium ring:



(Brittain at paragraph [0027]; Drager at col. 4, lines 50-67).

Another pathway for bendamustine degradation is esterification of the -COOH with mono- and poly-hydroxy-containing compounds.  Various bendamustine ester degradation products have been reported in the art:

---

[5] Maas is of record in this application. A copy of Maas, along with an English translation, accompanies this response.
[6] Drager is of record in this application.

(Brittain at paragraph [0111]; Drager at col. 5, lines 13-44).

　　While many bendamustine degradation mechanisms have been reported, the art did *not* teach that bendamustine degrades *via* any oxidative pathway.

　　"Antioxidants are used to reduce the oxidation of active substances and excipients in the finished product."  (Note for Guidance, European Agency for the Evaluation of Medicinal Products, page 8 of 9.)  Since bendamustine was not known to degrade *via* an oxidative process, those of ordinary skill in the art would not have tried to reduce degradation by adding an antioxidant to a bendamustine composition.[7]  The claims are non-obvious for at least this reason.

### Industry Guidance Discouraged Using Antioxidants in Parenteral Formulations

　　Even if those skilled in the art sought to discourage oxidation in a particular bendamustine composition, the guidance to the industry at the time of the invention was to ***not*** include an antioxidant.  Instead, industry guidance encouraged addressing oxidation by ***other*** means.  For example, the European Agency for the Evaluation of Medicinal Products (EMEA) stated that "Antioxidants should only be included in a formulation if it has been proven [t]hat their use cannot be avoided."  (EMEA Guidance at 8 of 9).  Indeed, it had been suggested at the

---

[7] Noteworthy is that the TREANDA lyophilized product does not include any antioxidant – it contains only bendamustine HCl and mannitol. (Treanda at Section 11).

time of the invention that the use of antioxidants in parenteral formulations was "now in decline" and that a "preferred method of preventing oxidation is simply to exclude oxygen." (Broadhead[8] at 334).

Even if oxidation of a liquid bendamustine composition was for some reason a concern,[9] industry guidance discouraged adding antioxidants and recommended other means for preventing oxidation. Those of ordinary skill in the art, therefore, would have been dissuaded from including antioxidants in any liquid bendamustine composition and the rejection should be withdrawn for at least this reason.

**The Claimed Compositions Are Surprisingly and Unexpectedly Stable During Storage**

As reported in the specification, a composition including bendamustine in PEG exhibited 2.28% of impurities after storage at room temperature for 15 days and 41.9% impurities after storage for 15 days at 40 °C. (Specification at Example 3, page 13, Table 3, reproduced below).

| Antioxidant | T$^{o}$C | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
| | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

Based on these poor stability results, a person would have forsaken development of a liquid bendamustine/PEG composition. A composition presenting such a poor initial stability profile would have been deemed unsuitable as a starting point to create a storage-stable composition.

---

[8] J. Broadhead & M. Gibson, Chapter 9, Parental Dosage Forms in Pharmaceutical preformulation and formulation: A practical guide from candidate drug selection to commercial dosage form, 2d ed., Informa Healthcare USA, Inc. (2009)

[9] As discussed *supra*, Applicant does not concede this point.

9

Despite the poor stability of bendamustine/PEG, surprisingly, adding an antioxidant substantially eliminated the formation of degradation products. As shown in the specification, and the Table above, a bendamustine/PEG composition including antioxidant exhibited no substantial increase in degradants after storage for 15 days at either room temperature or 40 °C. (Specification at Example 3, page 13, Table 3).

The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if an antioxidant is added. Such an unexpected result could not have been predicted. The claims are patentable for at least this reason.

**Obviousness-type double patenting**

The Examiner alleges that claim 1-16 are not patentable on the ground of nonstatutory double patenting over:

claims 1-6 of U.S. 9,265,831;

claims 1-27 of U.S. 9,572,797;

claims 1-26 of U.S. 9,572,796;

claims 1-22 of U.S. 8,609,707;

claims 1-23 of U.S. 9,579,384;

claims 1-24 of U.S. 9,034,908;

claims 1-17 of U.S. 9,597,399;

claims 1-23 of U.S. 9,144,568;

claims 1-29 of U.S. 9,572,887;

claims 1-7 of U.S. 9,597,397; and

claims 1-26 of U.S. 10,010,533.

Applicant will consider filing terminal disclaimers once otherwise allowable subject matter has been acknowledged.

\* \* \*

Claims 1-16 are non-obvious over the combination of cited art. An early notice to that effect is earnestly solicited.

**FEES**

      This response is being filed with a three-month extension of time and the requisite fee.  No further fees are believed to be due.  If, on the other hand, it is determined that any further fees are due or any overpayment has been made, the Assistant Commissioner is hereby authorized to debit or credit such sum to Deposit Account No. 02-2275.

      Pursuant to 37 C.F.R. 1.136(a)(3), please treat this and any concurrent or future reply in this application that requires a petition for an extension of time for its timely submission as incorporating a petition for extension of time for the appropriate length of time.  The fee associated therewith is to be charged to Deposit Account No. 02-2275.

**CONCLUSION**

      In view of the amendments and remarks contained above, it is respectfully submitted that each of the matters raised by the Examiner has been addressed by the present amendment and that the present application is now in condition for allowance.

      If for any reason the present application is not deemed in condition for allowance, the Examiner is respectfully requested to contact the undersigned attorney so that additional amendments may be entered as needed.

                              Respectfully submitted,

                              LUCAS & MERCANTI, LLP

             By:   /Michael N. Mercanti/
                     Michael N. Mercanti
                     Registration No. 33,966

LUCAS & MERCANTI, LLP
30 Broad Street, 21st Floor
New York, New York 10004
Phone: 212-661-8000
Fax: 212-661-8002

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/509,920 | 07/12/2019 | Nagesh R. Palepu | 820-1041-US-CON7 | 7527 |

20311        7590        12/21/2020

LUCAS & MERCANTI, LLP
30 BROAD STREET
21st FLOOR
NEW YORK, NY 10004

| EXAMINER |
|---|
| ARNOLD, ERNST V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1613 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 12/21/2020 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

info@lmiplaw.com

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 16/509,920 | Palepu et al. |
| | **Examiner** | **Art Unit** | **AIA (FITF) Status** |
| | ERNST V ARNOLD | 1613 | No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE **3** MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☑ Responsive to communication(s) filed on 11/25/20.
    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☑ This action is **FINAL.**    2b) ☐ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5)  ☑ Claim(s)  1-16 is/are pending in the application.
    5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)  ☐ Claim(s) _____ is/are allowed.

7)  ☑ Claim(s) 1-16 is/are rejected.

8)  ☐ Claim(s) _____ is/are objected to.

9)  ☐ Claim(s) _____ are subject to restriction and/or election requirement

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☐ The drawing(s) filed on _____ is/are:  a)☐ accepted or  b)☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
     a)☐ All   b)☐ Some**   c)☐ None of the:
      1.☐ Certified copies of the priority documents have been received.
      2.☐ Certified copies of the priority documents have been received in Application No. _____.
      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

| | | | |
|---|---|---|---|
| 1) ☑ Notice of References Cited (PTO-892) | | 3) ☐ Interview Summary (PTO-413) | |
| | |     Paper No(s)/Mail Date _____. | |
| 2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) | | 4) ☐ Other: _____. | |
|     Paper No(s)/Mail Date _____. | | | |

Application/Control Number: 16/509,920                                                Page 2
Art Unit: 1613

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent provisions.

### **Claim Status:**

Claims 1-16 are pending.

### *Information Disclosure Statement*

The information disclosure statements (IDSs) submitted on 11/25/20 are in compliance with the provisions of 37 CFR 1.97.  Accordingly, the information disclosure statements are being considered by the examiner.

### **Withdrawn rejections**

Applicant's amendments and arguments filed 11/25/20 are acknowledged and have been fully considered.  The Examiner has re-weighed all the evidence of record. Any rejection and/or objection not specifically addressed below is herein withdrawn.

The following rejections and/or objections are either reiterated or newly applied. They constitute the complete set of rejections and/or objections presently being applied to the instant application.

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

Application/Control Number: 16/509,920                                                 Page 3
Art Unit: 1613

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

The factual inquiries set forth in *Graham* **v.** *John Deere Co.*, 383 U.S. 1, 148 USPQ 459 (1966), that are applied for establishing a background for determining obviousness under 35 U.S.C. 103(a) are summarized as follows:

1.    Determining the scope and contents of the prior art.
2.    Ascertaining the differences between the prior art and the claims at issue.
3.    Resolving the level of ordinary skill in the pertinent art.
4.    Considering objective evidence present in the application indicating obviousness or nonobviousness.

Claims 1-16 are rejected under 35 U.S.C. 103(a) as being unpatentable over Brittain et al. (US 20060159713) and TREANDA (Highlights of prescribing information 2008) and Von Stetten et al. (US 4711906) and Miekka et al. (US 7252799).

This application currently names joint inventors. In considering patentability of the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g) prior art under 35 U.S.C. 103(a).

Applicant claims, for example:

Application/Control Number: 16/509,920                                    Page 4
Art Unit: 1613

1.  (Currently Amended)  A liquid bendamustine-containing composition comprising
        bendamustine, or a pharmaceutically acceptable salt thereof, wherein the
    bendamustine concentration in the composition is from about 10 mg/mL to about 100
    mg/mL;
        polyethylene glycol; and
        a stabilizing amount of an antioxidant;
    the composition having less than about 5% peak area response of total impurities
    resulting from the degradation of the bendamustine, as determined by HPLC [[as]]at a
    wavelength of 223 nm after at least 15 months at a temperature of from about 5 °C to
    about 25 °C.

**Claim interpretation:** Applicant is claiming a concentrated liquid bendamustine composition with PEG and a stabilizing amount of an antioxidant and functional language related to the degradation.

**Determination of the scope and content of the prior art**

**(MPEP 2141.01)**

With regard to instant claim 1, Brittain et al. teaches that (Examiner added emphasis): "The invention provides stable, pharmaceutically acceptable compositions prepared from bendamustine…the lyophilized products of the present invention have a better impurity profile than Ribomustin® with respect to certain impurities, in particular HPI, bendamustine dimer, and bendamustine ethylester, prior to reconstitution, upon storage of the lyophilate, or ***following reconstitution and admixture***." [0074] Thus Brittain et al. contemplate stable bendamustine formulations following reconstitution and admixture and even shelf storage [0076].

Brittain et al. also teach in [0008]: "Currently bendamustine is formulated as a lyophilized powder for injection with 100 mg of drug per 50 mL vial or 25 mg of drug per

20 mL vial. The vials are opened and reconstituted as close to the time of patient administration as possible. The product is reconstituted with 40 mL (for the 100 mg presentation) or 10 mL (for the 25 mg presentation) of Sterile Water for Injection. The reconstituted product is further diluted into 500 mL, q.s., 0.9% Sodium Chloride for Injection." *Thus it is well known in this art to first make a concentrated solution of bendamustine which is subsequently further diluted for administration*.

Brittain et al. teach that bendamustine is unstable in aqueous solution due to hydrolysis and that reconstitution is difficult due to reconstitution time and lengthy exposure to water which can cause hydrolysis and formation of impurities [0009-0010, 0109].

Brittain et al. teach treating a medical condition such as Hodgkin's disease by administering a therapeutically effective amount of the pharmaceutical composition of the invention [0042]. *This means that the artisan takes the lyophilized bendamustine of Brittain et al, reconstitutes it in a first reconstitution solution and then further dilutes it for administration at the desired concentration*. Indeed, Brittain et al. teach in [0046]: "The invention also encompasses a pharmaceutical dosage form of bendamustine containing not more than about 0.5% to about 0.9%, preferably 0.5%, HPI (area percent of bendamustine) wherein said dosage form comprises a vial or other pharmaceutically acceptable container, wherein said HPI is the amount of HPI present pre-reconstitution or at time zero after reconstitution of said dosage form. Preferred concentrations of bendamustine include about 10 to about 500 mg/container, about 100 mg/container, about 5 mg to about 2 g/container and about 170 mg/container."

Brittain et al. further teach in [0055]: "the terms "formulate" refers to the

preparation of a drug, e.g., bendamustine, in a form suitable for administration to a

mammalian patient, preferably a human. Thus, "formulation" can include the addition of

pharmaceutically acceptable excipients, diluents, or carriers." Clearly, Brittain et al.

contemplate solutions of bendamustine for administration and Brittain et al. teach

therapeutically effective amounts [0060].

　　　With regard to the functional language of claim 1, Brittain et al. teach in [0057]:

"Preferably, a stable pharmaceutical composition is one which has minimal degradation

of the active ingredient, e.g., it retains at least about 85% of un-degraded active,

preferably at least about 90%, and more preferably at least about 95%, after storage at

2-30° C. for a 2-3 year period of time."

　　　With regard to instant claim 1, Brittain et al. teach in [0067]: "a "pharmaceutical

dosage form" as used herein means a lyophilized pharmaceutical composition disclosed

herein in a container and in an amount suitable for reconstitution and delivery of one or

more doses, typically about 1-2, 1-3, 1-4, 1-5, 1-6, 1-10, or about 1-20 doses." Thus the

amount of lyophilized bendamustine in the vial can be adjusted to the desired number of

doses which means that different concentrations of bendamustine can be optimized by

the artisan by simply adjusting the amount of bendamustine present. Indeed, Brittain et

al. teach putting about 10-500 mg bendamustine HCl per vial ([0099] and claims 11 and

13).

　　　With regard to instant claims 1, 2, 11, Brittain et al. teach adding antioxidants

excipients such as cysteine, butyl-hydroxytoluene (BHT) and ascorbic acid [0088].

　　　With regard to instant claim 1, Brittain et al. clearly teach alone or in mixture

liquid polyethylene glycols as well as propylene glycol as a liquid carrier(s) [0067] and

teaches reconstitution with suitable carriers [0090, 0100] thus rendering obvious reconstitution with liquid polyethylene glycols following further dilution into an appropriate intravenous admixture container [0100].

### So, Brittain et al. clearly and unambiguously set forth:

1. lyophilizing an enough bendamustine, about 10-500 mg, and an antioxidant for 1-20 doses;

2. reconstituting in liquid polyethylene glycols or mixtures thereof; and

3. further dilution into an appropriate intravenous admixture for administration to treat the condition.

With regard to instant claim 1, Brittain et al. teach in [0069]: "As used herein "a stabilizing concentration of an organic solvent" or "a stabilizing concentration of an alcohol" means that amount of an organic solvent or alcohol that reduces the level of degradation of bendamustine to achieve a specified level of degradants in the final drug product. For example, with respect to the degradant HPI, a stabilizing concentration of an organic solvent is that amount which results in an HPI concentration (area percent o fbendamustine) of less than about 0.5%, preferably less than 0.45%, preferably less than 0.40%, more preferably less than 0.35%, more preferably less than 0.30%, and even more preferably less than 0.25%."

With regard to instant claims 1-4, 13 and 14, Brittain et al. teach using HPLC with dual wavelength detector at 230 nm and 254 nm [0123, 0133].

With regard to instant claims 1, 7 and 16, Brittain et al. teach methods of making the solution or dispersion by adding an excipient (about 0-50 mg/mL), mixing with water (about 65% of total volume), adding organic solvent 0.5-99.9% v/v) and adding

bendamustine HCl to the desired concentration where the artisan can change the quantities needed [0091].

With regard to instant claims 8-11, Brittain et al. teach treating Hodgkin's lymphoma and leukemia ([0042, 0060] and claim 63) in a mammalian patient such as a human [0055].

Brittain et al. is aware of bendamustine degrading rapidly in water [0107, 0109].

TREANDA teaches that each 100 mg vial of TREANDA is reconstituted with 20 ml of sterile water for injection to make a 5 mg/ml solution which is then further diluted by aseptically withdrawing the volume needed for the required dose and transfer to a 500 ml infusion bag with normal saline or normal saline and dextrose (page 2, 2.4). _Thus TREANDA teaches that a bendamustine concentrate is made first and then the desired volume needed is taken from the concentrate and further diluted by the artisan._

Miekka et al. teach antioxidant stabilizers include lipoic acid, methionine, cysteine, thiols, propyl gallate, dihydrolipoic acid, BHA, BHT and sodium formaldehyde sufloxylate (column 8, line 50 through column 9, line 37; and claim 22).

Von Stetten et al. teach parenteral formulations of diclofenac in polyethylene glycol and propylene glycol compositions (claims 1-19). Von Stetten et al. teach that diclofenac is unstable in aqueous solution (column 1, lines 16-19) and that propylene glycol and polyethylene glycol have been known in the art as solubilizers (column 1, lines 43-45). Von Stetten et al. teach that highly concentrated active ingredient solutions can be obtained with a solvent system of propylene glycol and polyethylene glycol (column 1, lines 52-57). Von Stetten et al. teach that concentrated diclofenac solutions

of 7500 mg/200 ml (37.5 mg/ml) in aqueous PEG400 and propylene glycol are stable for

3 years (Examples 1; see also example 1-5).

### Ascertainment of the difference between the prior art and the claims

### (MPEP 2141.02)

1. The difference between the instant application and Brittain et al. is that Brittain

et al. do not expressly teach in a single disclosed embodiment a liquid composition

comprising about 10-100 mg/ml or about 20-60 mg/ml or about 25 mg/ml bendamustine,

polyethylene glycol and an antioxidant as instantly claimed. This deficiency in Brittain et

al. is cured by the teachings of Brittain et al., TREANDA, Von Stetten et al. and Miekka

et al.

2.  The difference between the instant application and Brittain et al. is that Brittain

et al. do not expressly teach the HPLC wavelength used for determining the total

impurities of less than about 5% peak area at the periods of time and temperature

instantly claimed.


### Level of Ordinary Skill in the Art

### (MPEP 2141.03)

The "hypothetical 'person having ordinary skill in the art' to which the claimed

subject matter pertains would, of necessity have the capability of understanding the

scientific and engineering principles applicable to the pertinent art." *Ex parte Hiyamizu*,

10 USPQ2d 1393, 1394 (Bd. Pat. App. & Inter. 1988). The examiner must ascertain

what would have been obvious to one of ordinary skill in the art at the time the invention

was made, and not to the inventor, a judge, a layman, those skilled in remote arts, or to

geniuses in the art at hand. *Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693,

218 USPQ 865 (Fed. Cir. 1983), cert. denied, 464 U.S. 1043 (1984).

The level of ordinary skill will often predetermine whether an implicit suggestion

exists to modify the prior art. Persons of varying degrees of skill not only possess

varying bases of knowledge, they also possess varying levels of imagination and

ingenuity in the relevant field, particularly with respect to problem-solving abilities. If the

level of skill is low, for example that of a mere technician, then it may be rational to

assume that such an artisan would not think to combine references absent explicit

direction in a prior art reference. If, however, the level of skill is that of a

medical/pharmaceutical research scientist, as is the case here, then one can assume

comfortably that such an educated artisan will draw conventional ideas from medicine,

pharmacy, physiology and chemistry— without being told to do so.

Indeed, MPEP 2141.03 (I) states: "The "hypothetical 'person having ordinary skill

in the art' to which the claimed subject matter pertains would, of necessity have the

capability of understanding the scientific and engineering principles applicable to the

pertinent art." *Ex parte Hiyamizu*, 10 USPQ2d 1393, 1394 (Bd. Pat. App. & Inter. 1988).

This is because "The person of ordinary skill in the art is a hypothetical person who is

presumed to have known the relevant art at the time of the invention." (MPEP

2141.03(I)) and an artisan must be presumed to know something about the art apart

from what the references disclose. See *In re Jacoby*, 309 F.2d 513, 516 (CCPA 1962).

"A person of ordinary skill in the art is also a person of ordinary creativity, not an

automaton." *KSR*, 550 U.S. at 421, 82 USPQ2d at 1397. "[I]n many cases a person of

ordinary skill will be able to fit the teachings of multiple patents together like pieces of a

puzzle." Id. at 420, 82 USPQ2d at 1397. Office personnel may also take into account

"the inferences and creative steps that a person of ordinary skill in the art would

employ." Id. at 418, 82 USPQ2d at 1396. (MPEP 2141.03 (I)). "It is to be presumed also

that skilled workers would as a matter of course, if they do not immediately obtain

desired results, make certain experiments and adaptations, within the skill of the

competent worker." (MPEP 716.07).

In addition, the prior art itself reflects an appropriate level (MPEP 2141.03(II)).

## Finding of prima facie obviousness

## Rational and Motivation (MPEP 2142-2143)

1. It would have been obvious to one of ordinary skill in the art at the time the

claimed invention was made to modify the disclosure of Brittain et al. and make a single

disclosed embodiment a liquid composition comprising about 10-100 mg/ml or about 20-

60 mg/ml or about 25 mg/ml bendamustine, polyethylene glycol and an antioxidant as

instantly claimed, as suggested by Brittain et al., TREANDA, Von Stetten et al. and

Miekka et al., and produce the instant invention.

One of ordinary skill in the art would have been motivated to do this because

Brittain et al. directs the artisan to add alone or in a mixture liquid polyethylene glycol as

the liquid carrier/vehicle for reconstitution of the pharmaceutical dosage form of

bendamustine in a vial in an amount of about 1-20 doses [0067] as well as to add

antioxidants [0088] to the bendamustine liquid composition. Brittain et al. also alert the

artisan to the instability of bendamustine in water. The artisan would be motivated to

select liquid polyethylene glycol because in looking to the art for similar solvent systems

for water unstable compounds, the artisan would find, for example Von Stetten et al.

who guides the artisan to using polyethylene glycol admixed with propylene glycol for use with water sensitive compound diclofenac. The desirable benefit of doing so is an expectation of long shelf life stability of 3 years as taught by Von Stetten et al. With regard to the amount of about 10-100 mg/ml, Brittain et al. teach and suggest about 2-80 mg/ml solutions of bendamustine [0097] and Brittain et al. teach filling vials with about 5-500 mg of bendamustine (claim 13) which would then be obvious to dilute back to 2-80 mg/ml to make a concentrated solution in the liquid polyethylene glycol. Alternatively, TREANDA teaches that lyophilized bendamustine compositions are reconstituted with 20 ml of solvent. Thus, dissolution of about 5-500 mg of bendamustine in 20 ml of solvent would provide about 0.25 mg/ml to about 25 mg/ml. Furthermore, it is merely optimization of the amount of solvent to make more concentrated compositions of bendamustine such that having a formulation with about 10-100 mg/ml bendamustine by diluting a vial with about 5-500 mg of lyophilized bendamustine is routine and conventional to the ordinary artisan with a reasonable expectation of success. Indeed, Brittain et al. teach using 10 ml and 40 ml of reconstitution solvent [0008].  MPEP 2144.05 (II)(A): Generally, differences in concentration or temperature will not support the patentability of subject matter encompassed by the prior art unless there is evidence indicating such concentration or temperature is critical. "[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." *In re Aller*, 220 F.2d 454, 456, 105 USPQ 233, 235 (CCPA 1955).

With regard to the species of antioxidants, Brittain et al. instruct the artisan to add antioxidants and the art of Miekka et al. renders obvious the various antioxidants

Application/Control Number: 16/509,920                                    Page 13
Art Unit: 1613

claimed. The principle of law states: "The combination of familiar elements according to

known methods is likely to be obvious when it does no more than yield predictable

results." [KSR] at 416. Moreover, an "[e]xpress suggestion to substitute one equivalent

for another need not be present to render such substitution obvious." *In re Fout*, 675

F.2d 297, 301 (CCPA 1982). Therefore, the ordinary artisan would have had a

reasonable expectation of success in combining bendamustine, polyethylene glycol and

the antioxidants claimed into a liquid composition with less than about 5% peak area

response total impurities after at least 15 months at the temperatures claimed. The

expectation is reasonable because the same components claimed are taught in the

prior art and the prior art of Brittain et al. is aware of the hydrolysis of bendamustine and

acts to limit the total impurities. Furthermore, Von Stetten et al. provide an expectation

of stability of 3 years with the solvent system where precipitation does not occur even

after months of storage and is further reduced in the presence of the antioxidant N-

acetyl-cysteine (column 2, lines 48-53). Thus the addition of an antioxidant is expected

to further stabilize the composition.

    2. It would have been obvious to one of ordinary skill in the art at the time the

claimed invention was made to use HPLC with a wavelength of 223 nm to determine the

total impurities from the degradation of bendamustine and produce the instant invention.

    One of ordinary skill in the art would have been motivated to do this because it is

merely setting the HPLC device to monitor a particular wavelength is not inventive

without more and Brittain et al. already teach and suggest using HPLC with dual

wavelength detectors as discussed above which the artisan has to set at some

wavelength to operate the machine. Thus the artisan would have a reasonable

Application/Control Number: 16/509,920                                    Page 14
Art Unit: 1613

expectation of success in using HPLC with a wavelength of 223 nm in the absence of

evidence to the contrary especially when Brittain et al. teach in one example 230 nm

(Example 1) which is virtually the same as 223 nm.

This rejection is based on the well-established proposition of patent law that no

invention resides in combining old ingredients of known properties where the results

obtained thereby are no more than the additive effect of the ingredients, *In re Sussman*,

1943 C.D. 518.  From MPEP 2143 A: "…all the claimed elements were known in the

prior art and one skilled in the art could have combined the elements as claimed by

known methods with no change in their respective functions, and the combination

yielded nothing more than predictable results to one of ordinary skill in the art. *KSR*, 550

U.S. at ___, 82 USPQ2d at 1395; *Sakraida v. AG Pro, Inc.*, 425 U.S. 273, 282, 189

USPQ 449, 453 (1976); *Anderson 's-Black Rock, Inc. v. Pavement Salvage Co.*, 396

U.S. 57, 62-63, 163 USPQ 673, 675 (1969); *Great Atlantic  & P. Tea Co. v.

Supermarket Equipment Corp.*, 340 U.S. 147, 152, 87 USPQ 303, 306 (1950)."

In light of the forgoing discussion, the Examiner concludes that the subject matter

defined by the instant claims would have been obvious within the meaning of 35 USC

103(a).

From the combined teachings of the references, it is apparent that one of

ordinary skill in the art would have had a reasonable expectation of success in

producing the claimed invention. Therefore, the invention as a whole was *prima facie*

obvious to one of ordinary skill in the art at the time the invention was made, as

evidenced by the combined references, especially in the absence of evidence to the

contrary.

**Response to Arguments:**

Applicant asserts that: "Despite the Examiner's assertions, Brittain does not suggest that an antioxidant should be added to a liquid bendamustine/PEG composition." Respectfully, the Examiner cannot agree because in [0088] in the same paragraph that Brittain discusses adding excipient antioxidants, Brittain states: "A pharmaceutically acceptable lyophilization excipient can be dissolved in the aqueous phase." The Examiner properly interprets "dissolved in the aqueous phase" to mean that the antioxidant is added to the liquid bendamustine/PEG composition.

Applicant next asserts that: "those of ordinary skill in the art would not have expected the addition of an antioxidant to be beneficial to bendamustine's storage stability because no reference had suggested that bendamustine degraded via an oxidative mechanism." Respectfully, the Examiner cannot agree with Applicant's logic. Frist of all, the ordinary medical/pharmaceutical research scientist is well versed in the components that make up pharmaceutical compositions. In this art, it is well known in the art that commercial polyethylene glycol contains hydrogen peroxide impurity (page 10, left column Peroxides and Other Oxidizing Agents; page 18, left column Excipient Impurities of: Waterman et al. (2002) Stabilization of Pharmaceuticals to Oxidative Degradation, Pharmaceutical Development and Technology, 7:1, 1-32, DOI: 10.1081/PDT-120002237). It is also well known that hydrogen peroxide is about $10^4$ times more nucleophilic than water (Page 39 of: Jones, C.W. Applications of Hydrogen Peroxide and Derivatives 1999 Royal Society of Chemistry). Furthermore, it is well known in the art that nitrogen mustards are chemically reactive species where the chloride moiety reacts readily with nucleophilic centers (page 7, Introduction of: Hsu et

al. REACTIONS OF N-ETHYL- (HN-1), N-METHYL-BIS(2-CHLOROETHYL)AMINE

(HN-2), AND TRIS(2-CHLOROETHYL)AMINE (HN-3) WITH PEROXIDES; 2002; 13

pages. Accordingly, it is obvious to the ordinary artisan in this art to add antioxidants to

pharmaceutical compositions containing PEG due to the presence of hydrogen peroxide

impurity which can readily degrade bendamustine via reaction with the chloroethylamine

functional group. A further motivation to add antioxidants to PEG compositions is to

prevent the autoxidation of PEG as taught by Qin et al. (Introduction and Scheme 1 of:

Chem Commun. 2009;5112-5114).

Applicant asserts that: "The Examiner has not articulated how Brittain would have

suggested to one of ordinary skill in the art that an antioxidant should be included in a

liquid bendamustine/PEG composition and the rejection should be withdrawn for at least

this reason." Respectfully, the Examiner has specifically pointed out where in Brittain

directs the artisan to add antioxidants to aqueous compositions.

Applicant asserts that: "The art does not teach that bendamustine can degrade

via an oxidative mechanism". However, the Examiner has shown above how the art

recognizes that the chloroethylamine functional group of bendamustine is susceptible to

nucleophiles and that hydrogen peroxide is orders of magnitude more nucleophilic than

water and therefore is susceptible to degradation from hydrogen peroxide which is

known as an oxidant as well.

Applicant's discussion on mechanisms of bendamustine degradation has been

considered but is not persuasive because bendamustine is susceptible to nucleophiles

like water and the oxidant hydrogen peroxide is orders of magnitude stronger

nucleophile than water.

Applicant's discussion on industry guidance is noted but not persuasive. The Examiner has shown with evidence and articulated reasoning why the artisan would be motivated to add antioxidants. Brittain advised the addition of antioxidants and specifically names particular antioxidants to use with a reasonable expectation of success. The industry guidance cited by Applicant is not controlling here.

Applicant alleges unexpected storage stability with lipoic acid and asserts that: "Based on these poor stability results, a person would have forsaken development of a liquid bendamustine/PEG composition. A composition presenting such a poor initial stability profile would have been deemed unsuitable as a starting point to create a storage-stable composition." Respectfully, the Examiner cannot agree. The ordinary artisan in the pharmaceutical arts would have recognized that an antioxidant is required to prevent PEG autoxidation and/or to counteract any hydrogen peroxide impurities in the PEG that would serve to degrade the bendamustine. Thus it would appear that these are expected results. It is noted that Brittain et al. does not specifically name lipoic acid but Applicant did not compare lipoic acid against any of the disclosed antioxidant species of Brittain including acetylcysteine, ascorbic acid and cysteine. Furthermore, even if Applicant can show that lipoic acid is superior compared to the species taught by Brittain, the instantly claimed subject matter is not commensurate in scope. "The evidence presented to rebut a prima facie case of obviousness must be commensurate in scope with the claims to which it pertains." *In re Dill*, 604 F.2d 1356, 1361 (CCPA 1979).

In summary with the instant case, Applicant fails to provide any comparison showing an unexpected result compared with the closest prior art. See *In re Baxter*

Application/Control Number: 16/509,920                                              Page 18
Art Unit: 1613

*Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991) ("[W]hen unexpected results are

used as evidence of nonobviousness, the results must be shown to be unexpected

compared with the closest prior art."). And unexpected results must be "commensurate

in scope with the degree of protection sought by the claimed subject matter." *In re*

*Harris*, 409 F.3d 1339, 1344 (Fed. Cir. 2005). For at least these reasons, the claims

remain rejected at this time.


### Double Patenting


        The nonstatutory double patenting rejection is based on a judicially created

doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the

unjustified or improper timewise extension of the "right to exclude" granted by a patent

and to prevent possible harassment by multiple assignees. A nonstatutory double

patenting rejection is appropriate where the conflicting claims are not identical, but at

least one examined application claim is not patentably distinct from the reference

claim(s) because the examined application claim is either anticipated by, or would have

been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46

USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed.

Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*,

686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619

(CCPA 1970); *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

        A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d)

may be used to overcome an actual or provisional rejection based on nonstatutory

double patenting provided the reference application or patent either is shown to be

commonly owned with the examined application, or claims an invention made as a

result of activities undertaken within the scope of a joint research agreement. See

MPEP § 717.02 for applications subject to examination under the first inventor to file

provisions of the AIA as explained in MPEP § 2159.  See MPEP §§ 706.02(I)(1) -

706.02(I)(3) for applications not subject to examination under the first inventor to file

provisions of the AIA. A terminal disclaimer must be signed in compliance with 37 CFR

1.321(b).

The USPTO Internet website contains terminal disclaimer forms which may be

used. Please visit www.uspto.gov/patent/patents-forms. The filing date of the application

in which the form is filed determines what form (e.g., PTO/SB/25, PTO/SB/26,

PTO/AIA/25, or PTO/AIA/26) should be used. A web-based eTerminal Disclaimer may

be filled out completely online using web-screens. An eTerminal Disclaimer that meets

all requirements is auto-processed and approved immediately upon submission. For

more information about eTerminal Disclaimers, refer to

www.uspto.gov/patents/process/file/efs/guidance/eTD-info-I.jsp.

1. Claims 1-16 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-6 of U.S. Patent No. 9265831. Although the claims at

issue are not identical, they are not patentably distinct from each other because the

Application/Control Number: 16/509,920                                    Page 20
Art Unit: 1613

patent is directed to:

US 9,265,831 B2

**13**

TABLE 8

Stability of Bendamustine in 85%
PEG 400, 15% PG and Thioglycerol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Total Imp. |
|---|---|---|---|---|---|
| BDM—50 mg/mL | Initial | | 51.5 | 100 | 0.12 |
| Thioglycerol—5 mg/mL | 40° C. | 1 M | 50.4 | 97.9 | 1.18 |
| PEG 400:PG (85:15) qs to | 25° C. | 1 M | 51.4 | 99.8 | 0.61 |
| 1 mL | | 3 M | 50.4 | 97.9 | 1.21 |
| | 5° C. | 3 M | 51.0 | 99.0 | 0.26 |

The stability is similar to that of thioglycerol samples in Example 7 above. As reported in Table 8, total impurities did not exceed 2% at 40° C. or 25° C. storage over one month, or at 25° C. and 5° C. storage after three months. The data reported in Table 8 supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for at least about 2 years if not longer.

We claim:

1. A non-aqueous liquid bendamustine-containing composition, comprising:
   a) bendamustine or a pharmaceutically acceptable salt thereof; and
   b) a pharmaceutically acceptable fluid comprising,
      i) about 5% to about 10% by volume propylene glycol,
      ii) polyethylene glycol, and

**14**

iii) a stabilizing amount of an antioxidant selected from the group consisting of thioglycerol, monothioglycerol, lipoic acid, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds and dihydrolipoic acid;

the bendamustine-containing composition having less than or equal to 0.11% total PG esters at about 1 month of storage at a temperature of about 5° C.;

wherein the ratio of polyethylene glycol to propylene glycol is selected from the group consisting of: about 95:5, about 90:10, about 85:15, about 80:20 and about 75:25.

2. The liquid bendamustine-containing composition of claim 1, wherein said bendamustine-containing composition has less than or equal to 0.18% total PG esters at about 12 months of storage at a temperature of about 5° C.

3. The liquid bendamustine-containing composition of claim 1, wherein the amount of propylene glycol in the pharmaceutically acceptable fluid is about 10%.

4. The liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

5. The liquid bendamustine-containing composition of claim 4, wherein the bendamustine concentration is from about 25 mg/mL to about 50 mg/mL.

6. The liquid bendamustine-containing composition of claim 5, wherein the bendamustine concentration is about 50 mg/mL.

*   *   *   *   *

The patent does not expressly less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm to determine the total impurities from the degradation of bendamustine at the period of time or temperatures instantly claimed. However, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)." The patent does not expressly teach treating cancer such as leukemia or Hodgkin's disease but that is the medical intended use of the bendamustine composition and thus the composition is for treating such conditions which renders methods of treatment obvious. Therefore, the ordinary

Application/Control Number: 16/509,920                                      Page 21
Art Unit: 1613

artisan would have recognized the obvious variation of the instantly claimed subject

matter over the patented subject matter.

2. Claims 1-16 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-27 of U.S. Patent No. 9572797.

Although the claims at issue are not identical, they are not patentably distinct

from each other because the patent is directed to using the instantly claimed

compositions in a method of treating, for example leukemia as shown in claim 1, with

the same amounts of bendamustine and PG esters:

We claim:
1. A method of treating leukemia, Hodgkin's disease, or
multiple myeloma in a mammal, comprising administering
to the mammal, a liquid bendamustine-containing compo-
sition comprising:
a) bendamustine or a pharmaceutically acceptable salt
thereof; and
b) a non-aqueous pharmaceutically acceptable fluid com-
prising
about 5% to about 10%, based on the volume of the
pharmaceutically acceptable fluid, of propylene gly-
col,
polyethylene glycol,
and a stabilizing amount of an antioxidant selected
from the group consisting of thioglycerol, monoth-
ioglycerol, lipoic acid, propyl gallate, methionine,
cysteine, metabisulfites, sodium formaldehyde sul-
foxylate, phenol-containing aromatic and aliphatic
compounds and dihydrolipoic acid;
the bendamustine-containing composition having less
than or equal to 0.11% total PG esters at about 1 month
of storage at a temperature of about 5° C.;
wherein the ratio of polyethylene glycol to propylene
glycol is selected from the group consisting of: about
95:5, about 90:10, about 85:15, about 80:20, and about
75:25.

13. The method of claim 1, for the treatment of leukemia.
14. The method of claim 1, for the treatment of Hodgkin's
disease.

The patent does not expressly less than about 5% peak area response of total

impurities as determined using HPLC with a wavelength of 223 nm to determine the

total impurities from the degradation of bendamustine at the period of time or

Application/Control Number: 16/509,920                                          Page 22
Art Unit: 1613

temperatures instantly claimed. However, such would be inherent in the composition

comprising the same components. See MPEP 2112.01(II): "Products of identical

chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d

705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)." Therefore, the ordinary artisan

would have recognized the obvious variation of the instantly claimed subject matter over

the patented subject matter.

      3. Claims 1-16 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-26 of U.S. Patent No. 9572796 in view of Rowe et al.

("Rowe", Handbook of Pharmaceutical Excipients, 6th edition, 2009, pages 454-455,

cited in IDS filed 01/24/2014 in parent 15432335). Although the claims at issue are not

identical, they are not patentably distinct from each other because the patent is directed

to:

Application/Control Number: 16/509,920                                    Page 23
Art Unit: 1613

1. A non-aqueous liquid composition comprising:
   bendamustine, or a pharmaceutically acceptable salt
   thereof;
   a pharmaceutically acceptable fluid comprising a mixture
   of polyethylene glycol and propylene glycol, wherein
   the ratio of polyethylene glycol to propylene glycol in
   the pharmaceutically acceptable fluid is from about
   95:5 to about 50:50; and
   a stabilizing amount of an antioxidant;
   wherein the composition has less than about 5% total
   impurities after 15 months of storage at about 5° C., as
   calculated on a normalized peak area response basis as
   determined by high performance liquid chromatogra-
   phy at a wavelength of 223 nm.

2. The non-aqueous liquid composition of claim 1,
   wherein the bendamustine concentration is from about 10
   mg/mL to about 100 mg/mL.

3. The non-aqueous liquid composition of claim 1,
   wherein the bendamustine concentration is from about 20
   mg/mL to about 60 mg/mL.

4. The non-aqueous liquid composition of claim 1,
   wherein the bendamustine concentration is from about 25
   mg/mL to about 50 mg/mL.

5. The non-aqueous liquid composition of claim 1,
   wherein the bendamustine concentration is about 25 mg/mL.

6. The non-aqueous liquid composition of claim 1,
   wherein the concentration of the antioxidant is from about
   2.5 mg/mL to about 35 mg/mL.

7. The non-aqueous liquid composition of claim 1,
   wherein the concentration of the antioxidant is from about 5
   mg/mL to about 20 mg/mL.

8. The non-aqueous liquid composition of claim 1,
   wherein the concentration of the antioxidant is from about
   10 mg/mL to about 15 mg/mL.

10. A method of treating leukemia, Hodgkin's disease, or
    multiple myeloma in a mammal comprising administering to
    the mammal an effective amount of the composition of claim
    1.

11. The method of claim 10, for the treatment of leukemia.

12. The method of claim 10, for the treatment of Hodg-
    kin's disease.

The patent does not expressly less than about 5% peak area response of total

impurities as determined using HPLC with a wavelength of 223 nm to determine the

total impurities from the degradation of bendamustine at the period of time or

temperatures instantly claimed. However, such would be inherent in the composition

comprising the same components. See MPEP 2112.01(II): "Products of identical

Application/Control Number: 16/509,920                                      Page 24
Art Unit: 1613

chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d

705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

The patent does not expressly teach the instantly claimed antioxidants. However,

thioglycerols are known antioxidants used in pharmaceutical formulations (Rowe).

Rowe is a comprehensive guide to the uses, properties and safety of pharmaceutical

excipients and used in the art as a reference for those involved in the development,

production, control or regulation of pharmaceutical preparations.  Rowe teaches

thioglycerol, also known as monothioglycerol, are "used as antioxidant in

pharmaceutical formulations" (pages 454-455).   Thus it is merely judicious selection of

known materials for their intended purpose to function as an antioxidant.

Therefore, the ordinary artisan would have recognized the obvious variation of

the instantly claimed subject matter over the patented subject matter.

4. Claims 1-16 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-22 of U.S. Patent No. 8609707. Although the claims

at issue are not identical, they are not patentably distinct from each other because the

patent is directed to:

> We claim:
>     1. A long term storage stable non-aqueous liquid benda-
> mustine-containing composition, comprising:

US 8,609,707 B2

13

a) bendamustine or a pharmaceutically acceptable salt thereof, and
b) a pharmaceutically acceptable fluid comprising
   i) about 90% polyethylene glycol and about 10% propylene glycol; and
   ii) a stabilizing amount of an antioxidant.

2. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

3. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim 2, wherein the bendamustine concentration is from about 25 mg/mL to about 50 mg/mL.

4. The long term storage stable non-aqueous liquid benda-

16. A method of treating cancer in mammals, comprising administering an effective amount of a long term storage stable non-aqueous liquid bendamustine-containing composition of claim 1 to a mammal in need thereof.

17. The long term storage stable non-aqueous liquid ben-

21. The method of treating cancer in mammals of claim 16, wherein the cancer is leukemia.

22. The method of treating cancer in mammals of claim 16, wherein the cancer is Hodgkin's disease.

14

12. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim 10, wherein the stabilizing amount of the antioxidant is about 5 mg/mL.

13. The long term storage stable non-aqueous liquid bendamustine-containing composition of claim 1, wherein said long term storage is at least 2 years.

14. A long term storage stable non-aqueous liquid bendamustine-containing composition, comprising:
a) bendamustine or a pharmaceutically acceptable salt thereof, and
b) a pharmaceutically acceptable fluid comprising
   i) about 90% polyethylene glycol and about 10% propylene glycol; and
   ii) a stabilizing amount of thioglycerol.

The patent does not expressly less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm to determine the total impurities from the degradation of bendamustine at the period of time or temperatures instantly claimed. However, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)." Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

5. Claims 1-16 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-23 of U.S. Patent No. 9579384. Although the claims

Application/Control Number: 16/509,920                                    Page 26
Art Unit: 1613

at issue are not identical, they are not patentably distinct from each other because the

patent is directed to the same composition used in the following method:

1. A method of treating chronic lymphocytic leukemia or indolent B cell non-Hodgkin lymphoma in a subject comprising:
parenterally administering to the subject, over a period of less than or equal to about 15 minutes, a dose of from about 25 mg/m$^2$ to about 120 mg/m$^2$ of bendamustine or a pharmaceutically acceptable salt thereof, wherein said dose of bendamustine or pharmaceutically acceptable salt thereof is provided in a liquid composition comprising:
a total volume of about 100 ml or less;
bendamustine or a pharmaceutically acceptable salt thereof, at a concentration of from about 0.5 to about 5.6 mg/ml;
a solubilizer comprising polyethylene glycol and propylene glycol, wherein the amount of solubilizer is from about 0.5 to about 26.5% by volume;
a parenterally acceptable diluent; and optionally, an antioxidant.
2. The method of claim 1, wherein the subject is human.
3. The method of claim 1, wherein the amount of solubilizer is from about 2.0 to about 22.4% vol.
4. The method of claim 1, where the polyethylene glycol is PEG 400.
5. The method of claim 1, wherein the concentration of bendamustine, or pharmaceutically acceptable salt thereof, in said liquid composition is from about 0.1 to about 3.2 mg/ml.
6. The method of claim 1, wherein the weight ratio of polyethylene glycol to propylene glycol is about 90:10.
7. The method of claim 6, wherein the volume of the liquid composition is about 50 ml.
8. The method of claim 1, wherein the antioxidant is monothioglycerol.

The patent does not expressly teach the instantly claimed higher concentration of

bendamustine. However, that is merely a more concentrated solution of the drug which

the artisan can make as a stock solution for future dilution and therefore is not inventive

without more.

The patent does not expressly less than about 5% peak area response of total

impurities as determined using HPLC with a wavelength of 223 nm to determine the

total impurities from the degradation of bendamustine at the period of time or

temperatures instantly claimed. However, such would be inherent in the composition

comprising the same components. See MPEP 2112.01(II): "Products of identical

chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d

705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)." Therefore, the ordinary artisan

would have recognized the obvious variation of the instantly claimed subject matter over

the patented subject matter.

6. Claims 1-16 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-24 of U.S. Patent No. 9034908. Although the claims

at issue are not identical, they are not patentably distinct from each other because the

patent is directed to: methods of treating cancer or malignant disease using a

composition comprising bendamustine with a PEG/propylene glycol solubilizer and an

antioxidant (claim 1) where the antioxidant can be monothioglyceroal (claim 13) and the

ratio of PEG:propylene glycol is about 90:10 (claim 10) to treat cancer or malignant

disease in a subject (claim 1). The patent does not expressly teach the instantly claimed

higher concentration of bendamustine or treating Hodgkin's or leukemia. However,

Hodgkin's and leukemia are well known cancer/malignant diseases and that is merely a

more concentrated solution of the drug which the artisan can make as a stock solution

for future dilution and therefore is not inventive without more. The patent does not

expressly less than about 5% peak area response of total impurities as determined

using HPLC with a wavelength of 223 nm to determine the total impurities from the

degradation of bendamustine at the period of time or temperatures instantly claimed.

However, such would be inherent in the composition comprising the same components.

See MPEP 2112.01(II): "Products of identical chemical composition cannot have

Application/Control Number: 16/509,920                                    Page 28
Art Unit: 1613

mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658

(Fed. Cir. 1990)." Therefore, the ordinary artisan would have recognized the obvious

variation of the instantly claimed subject matter over the patented subject matter.

7. Claims 1-16 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-17 of U.S. Patent No. 9597399 in view of Rowe et al.

("Rowe", Handbook of Pharmaceutical Excipients, 6th edition, 2009, pages 454-455,

cited in IDS filed 01/24/2014 filed in parent 15432335). Although the claims at issue are

not identical, they are not patentably distinct from each other because the patent is

directed to a method of treating cancer or malignant disease using a composition

comprising bendamustine, propylene glycol, PEG and an antioxidant (claims 1-17). The

patent does not expressly teach treating Hodgkin's or leukemia. However, Hodgkin's

and leukemia are well known cancer/malignant diseases and obvious to treat with

bendamustine. The patent does not expressly teach the instantly claimed higher

concentration of bendamustine. However, that is merely a more concentrated solution of

the drug which the artisan can make as a stock solution for future dilution and therefore

is not inventive without more. The patent does not expressly identify the antioxidant.

However, thioglycerols are known antioxidants used in pharmaceutical formulations

(Rowe). Rowe is a comprehensive guide to the uses, properties and safety of

pharmaceutical excipients and used in the art as a reference for those involved in the

development, production, control or regulation of pharmaceutical preparations. Rowe

teaches thioglycerol, also known as monothioglycerol, are "used as antioxidant in

pharmaceutical formulations" (pages 454-455). Thus it is merely judicious selection of

known materials for their intended purpose to function as an antioxidant. The patent

does not expressly less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm to determine the total impurities from the degradation of bendamustine at the period of time or temperatures instantly claimed. However, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)." Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

8. Claims 1-16 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-23 of U.S. Patent No. 9144568. Although the claims at issue are not identical, they are not patentably distinct from each other because the patent is directed to a method of treating leukemia and indolent B cell non-Hodgkin's lymphoma using a composition comprising bendamustine, a solubilizer comprising PEG and propylene glycol in a ratio of about 90:10 (claims 1-5, 9 and 16) and the antioxidant monothioglycerol (claim 7). The patent does not expressly teach the instantly claimed higher concentration of bendamustine. However, that is merely a more concentrated solution of the drug which the artisan can make as a stock solution for future dilution and therefore is not inventive without more. The patent does not expressly less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm to determine the total impurities from the degradation of bendamustine at the period of time or temperatures instantly claimed. However, such would be inherent in the composition comprising the same components. See MPEP

Application/Control Number: 16/509,920                                        Page 30
Art Unit: 1613

2112.01(II): "Products of identical chemical composition cannot have mutually exclusive

properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

Therefore, the ordinary artisan would have recognized the obvious variation of the

instantly claimed subject matter over the patented subject matter.

9. Claims 1-16 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-29 of U.S. Patent No. 9572887. Although the claims

at issue are not identical, they are not patentably distinct from each other because the

patent is directed to a 10-100 mg/ml bendamustine composition (claim 1) with propylene

glycol and PEG (claims 2 and 3) and stabilizing antioxidants (claim 14) such as

monothioglycerol (claim 15) and treating leukemia and indolent B cell non-Hodgkin's

lymphoma (claim 1).

The patent does not expressly less than about 5% peak area response of total

impurities as determined using HPLC with a wavelength of 223 nm to determine the

total impurities from the degradation of bendamustine at the period of time or

temperatures instantly claimed. However, such would be inherent in the composition

comprising the same components. See MPEP 2112.01(II): "Products of identical

chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d

705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)." Therefore, the ordinary artisan

would have recognized the obvious variation of the instantly claimed subject matter over

the patented subject matter.

10. Claims 1-16 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-7 of U.S. Patent No. 9597397. Although the claims at

issue are not identical, they are not patentably distinct from each other because the

patent is directed to a method of treating cancer or malignant disease employing a

bendamustine composition comprising PEG, propylene glycol and the antioxidant

monothioglycerol in a PEG:propylene glycol ratio of about 90:10 (claims 1-7).

The patent does not expressly teach treating Hodgkin's or leukemia. However,

Hodgkin's and leukemia are well known cancer/malignant diseases and obvious to treat

with bendamustine. The patent does not expressly teach the instantly claimed higher

concentration of bendamustine. However, that is merely a more concentrated solution of

the drug which the artisan can make as a stock solution for future dilution and therefore

is not inventive without more. The patent does not expressly less than about 5% peak

area response of total impurities as determined using HPLC with a wavelength of 223

nm to determine the total impurities from the degradation of bendamustine at the period

of time or temperatures instantly claimed. However, such would be inherent in the

composition comprising the same components. See MPEP 2112.01(II): "Products of

identical chemical composition cannot have mutually exclusive properties." *In re Spada*,

911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)." Therefore, the ordinary

artisan would have recognized the obvious variation of the instantly claimed subject

matter over the patented subject matter.

11. Claims 1-16 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-26 of U.S. Patent No. 10010533. Although the claims

at issue are not identical, they are not patentably distinct from each other because the

patent is directed to:

1. A liquid bendamustine-containing composition, comprising:

   a) bendamustine or a pharmaceutically acceptable salt thereof; and

   b) a pharmaceutically acceptable fluid comprising about 5% to about 10% propylene glycol, polyethylene glycol and a stabilizing amount of an antioxidant selected from the group consisting of thioglycerol, monothioglycerol, lipoic acid, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds and dihydrolipoic acid;

the bendamustine-containing composition having less than or equal to 0.11% total PG esters at about 1 month of storage at a temperature of about 5° C.;

wherein the ratio of polyethylene glycol to propylene glycol is selected from the group consisting of: about 95:5, about 90:10, about 85:15, about 80:20 and about 75:25.

pharmaceutically acceptable fluid is about 10%.

4. The liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

5. The liquid bendamustine-containing composition of

The patent does not expressly teach treating Hodgkin's or leukemia. However, Hodgkin's and leukemia are well known cancer/malignant diseases and obvious to treat with bendamustine. The patent does not expressly less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm to determine the total impurities from the degradation of bendamustine at the period of time or temperatures instantly claimed. However, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)." Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

Application/Control Number: 16/509,920                                    Page 33
Art Unit: 1613

### Response to Arguments:

Applicant will consider filing terminal disclaimers once otherwise allowable subject matter is determined.

### *Conclusion*

No claims are allowed.

**THIS ACTION IS MADE FINAL.**  Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE MONTHS from the mailing date of this action.  In the event a first reply is filed within TWO MONTHS of the mailing date of this final action and the advisory action is not mailed until after the end of the THREE-MONTH shortened statutory period, then the shortened statutory period will expire on the date the advisory action is mailed, and any extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of the advisory action.  In no event, however, will the statutory period for reply expire later than SIX MONTHS from the mailing date of this final action.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to ERNST V ARNOLD whose telephone number is (571)272-8509.  The examiner can normally be reached on M-F 7-3:30.

Examiner interviews are available via telephone and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

Application/Control Number: 16/509,920                                    Page 34
Art Unit: 1613

      If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Brian Y Kwon can be reached on 571-272-0581.  The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

      Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/ERNST V ARNOLD/

Primary Examiner, Art Unit 1613

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/509,920 | 07/12/2019 | Nagesh R. Palepu | 820-1041-US-CON7 | 7527 |

20311          7590          03/16/2021
LUCAS & MERCANTI, LLP
30 BROAD STREET
21st FLOOR
NEW YORK, NY 10004

| EXAMINER |
|---|
| ARNOLD, ERNST V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1613 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 03/16/2021 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

info@lmiplaw.com

PTOL-90A (Rev. 04/07)

| *Applicant-Initiated Interview Summary* | Application No.<br>16/509,920 | | Applicant(s)<br>Palepu et al. | |
|---|---|---|---|---|
| | Examiner<br>ERNST V ARNOLD | Art<br>Unit<br>1613 | AIA (First Inventor<br>to File) Status<br>No | Page<br>1 of 2 |

| All Participants (applicant, applicants representative, PTO personnel) | Title | Type |
|---|---|---|
| ERNST V ARNOLD | Primary Examiner | Telephonic |
| Stephanie Lodise | Attorney | |
| Michael Mercanti | Attorney of Record | |

**Date of Interview:** 11 March 2021

**Issues Discussed:**

**35 U.S.C. 103**

Applicant sent a detailed agenda. The reference of Brittain US 20060159713 was discussed in detail with focus on Brittain teaching two different compositions: one for making a lyophilized cake and the other for administration and where the artisan would not add PEG to be lyophilized. Applicant also noted litigation of related patent where the question of PEG and antioxidants was thoroughly hashed with the judge holding the patent valid which the instant Examiner had issued. Applicant asked if it would be helpful to have all or parts of that decision on record here. The Examiner thought that such evidence would carry strong weight and would be considered thoughtfully. The Examiner suggested filing any claim amendments, evidence and arguments in the AFCP2.0 program for the Examiner to consider.

**Proposed Amendment(s)**

The Examiner suggested amending the claim preamble to a "for administration" to differentiate the composition from other compositions which are not for administration.

**Non-statutory Double Patenting**

The Examiner asked if allowable subject matter could be determined after FINAL would terminal disclaimers be filed in order to let the application issue. Applicant's thought that would be no problem.

**Other**

The Examiner suggested the AFCP2.0 program for consideration of their response.

| | /ERNST V ARNOLD/<br>Primary Examiner, Art Unit 1613 |
|---|---|

**Applicant is reminded that a complete written statement as to the substance of the interview must be made of record in the application file. It is the applicants responsibility to provide the written statement, unless the interview was initiated by the Examiner and the Examiner has indicated that a written summary will be provided. See MPEP 713.04**
Please further see:
MPEP 713.04
Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews, paragraph (b)
37 CFR § 1.2 Business to be transacted in writing

| *Applicant-Initiated Interview Summary* | Application No. 16/509,920 | | Applicant(s) Palepu et al. | |
|---|---|---|---|---|
| | Examiner ERNST V ARNOLD | Art Unit 1613 | AIA (First Inventor to File) Status No | Page 2 of 2 |

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview.

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

DOCKET NO.: 820-1041-US-CON7

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

|     |     |     |
|-----|-----|-----|
|     | Examiner: Ernst V. Arnold | Art Unit: 1613 |
| Re: | Application of: | Nagesh R. Palepu |
|     | Serial No.: | 16/509,920 |
|     | Filed: | July 12, 2019 |
|     | For: | **FORMULATIONS OF BENDAMUSTINE** |
|     | Confirmation No.: | 7527 |

## AMENDMENT

Mail Stop Amendment                                                      May 20, 2021
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sirs:

In response to the Final Office Action of December 21, 2020, please amend the above-identified patent application as follows:

**Amendments to the Claims** begin on page **2** of this paper.

**Remarks/Arguments** begin on page **5** of this paper.

CERTIFICATE OF ELECTRONIC TRANSMISSION
I hereby certify that this document is being electronically transmitted to the Commissioner for Patents via EFS-Web on May 20, 2021.

LUCAS & MERCANTI, LLP

BY: /Carla Curado /
     Carla Curado

{00592392 }

DOCKET NO.: 820-1041-US-CON7

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims:**

1. (Currently Amended) A <u>ready to use</u> liquid bendamustine-containing composition comprising

> bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 10 mg/mL to about 100 mg/mL;

> polyethylene glycol; and

> a stabilizing amount of an antioxidant;

the composition having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of from about 5 °C to about 25 °C.

2. (Currently Amended) The <u>ready to use</u> liquid bendamustine-containing composition of claim 1, wherein the antioxidant is lipoic acid, thioglycerol, propyl gallate, methionine, cysteine, a metabisulfite, sodium formaldehyde sulfoxylate, a phenol-containing aromatic compound, a phenol-containing aliphatic compound, dihydrolipoic acid, or a mixture thereof.

3. (Currently Amended) The <u>ready to use</u> liquid bendamustine-containing composition of claim 1, having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of about 5 °C.

4. Currently Amended)  The <u>ready to use</u> liquid bendamustine-containing composition of claim 1, having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of about 25 °C.

{00592392 }

DOCKET NO.: 820-1041-US-CON7

5.  (Currently Amended) The <u>ready to use</u> liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

6.  (Currently Amended) The <u>ready to use</u> liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is about 25 mg/mL.

7.  (Currently Amended) The <u>ready to use</u> liquid bendamustine-containing composition of claim 1, comprising bendamustine hydrochloride.

8.  (Currently Amended) A method of treating cancer in a mammal, comprising administering an effective amount of the <u>ready to use</u> liquid bendamustine-containing composition of claim 1 to the mammal.

9.  (Original)      The method of claim 8, wherein the cancer is leukemia.

10. (Original)      The method of claim 8, wherein the cancer is Hodgkin's disease.

11. (Original)      The method of claim 8, wherein the antioxidant is lipoic acid, thioglycerol, propyl gallate, methionine, cysteine, a metabisulfite, sodium formaldehyde sulfoxylate, a phenol-containing aromatic compound, a phenol-containing aliphatic compound, dihydrolipoic acid, or a mixture thereof.

12. (Currently Amended) The method of claim 8, wherein the <u>ready to use</u> liquid bendamustine-containing composition has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of about 5 °C.

13. (Currently Amended) The method of claim 8, wherein the <u>ready to use</u> liquid bendamustine-containing composition has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of about 25 °C.

{00592392 }

DOCKET NO.: 820-1041-US-CON7

14. (Currently Amended) The method of claim 8, wherein the bendamustine concentration <u>in the ready to use liquid bendamustine-containing composition</u> is from about 20 mg/mL to about 60 mg/mL.

15. (Currently Amended) The method of claim 8, wherein the bendamustine concentration <u>in the ready to use liquid bendamustine-containing composition</u> is about 25 mg/mL.

16. (Currently Amended) The method of claim 8, wherein the <u>ready to use </u>liquid bendamustine-containing composition comprises bendamustine hydrochloride.

{00592392 }

DOCKET NO.:  820-1041-US-CON7

## REMARKS

A Certification and Request for Consideration Under the After Final Consideration Pilot Program 2.0 accompanies this response.

The undersigned thanks Examiner Arnold for the courtesy of the telephonic interview conducted on March 11, 2021, with the undersigned and Stephanie Lodise (Reg. No. 51,430). The pending claims and Brittain[1] were discussed, as well as District of Delaware Civil Action No. 17-1154-CFC regarding U.S. Patent Nos. 9,265,831 and 9,572,797.[2]  Examiner Arnold suggested that amending the claims to recite that the liquid bendamustine-containing compositions are "ready to use" would distinguish the claimed compositions over Brittain's compositions.  This response and AFCP are filed in response to that interview.

Claims 1-16 are pending.  The claims have been amended to recite that the compositions are "ready to use."  The amendments are supported by the specification at, for example, pages 2 and 9.  No new matter has been added.

**Brief Description of the Claimed Inventions**

The pending claims are directed to, among other things, "ready to use," liquid bendamustine-containing compositions having from about 10 mg/mL to about 100 mg/mL of bendamustine, polyethylene glycol, and an antioxidant.  The claimed compositions are not reconstituted lyophilized powders; they are concentrated, bendamustine-containing liquids for administration through infusion with an appropriate diluent.  (*See, e.g.,* Specification at page 2). This avoids the multi-step reconstitution and preparation for administration required for the Brittain products, including TREANDA®.  These ready to use, liquid compositions are surprisingly stable and do not exhibit significant bendamustine degradation after storage for at least 15 months at refrigerated or room temperature conditions.

---

[1] U.S. Published Application No. 2006/0159713
[2] A copy of the District Court's decision is attached hereto as Exhibit A.  U.S. Patent Nos. 9,265,831 and 9,572,797 are parents of the present application.

{00592392 }

Page 5 of 13

DOCKET NO.:  820-1041-US-CON7

**35 U.S.C. § 103**

The Examiner alleges that claims 1-16 would have been obvious over Brittain,[3] Treanda,[4] Von Stetten,[5] and Miekka.[6]  At the time of the invention, one of ordinary skill in the art would not have been motivated to make a liquid bendamustine-containing composition incorporating polyethylene glycol (PEG) and an antioxidant, as claimed.  Moreover, the stability achieved by the claimed compositions would have been unexpected in view of the cited art.  Applicant requests reconsideration and withdrawal of the rejection.

**Those of Ordinary Skill in the Art Would Not Have Had Any Reason to Prepare a Ready to Use, Bendamustine-Containing Liquid Having a Concentration of 10 mg/ml to about 100 mg/mL**

Brittain in combination with Treanda fails to motivate anyone of skill in the art to prepare a liquid composition having a bendamustine concentration of 10 mg/mL to about 100 mg/mL, or any amount within that range.

The Prescribing Information for Treanda instructs that lyophilized bendamustine should be reconstituted with water to a concentration of no more than 5 mg/mL, before being added to a 500 mL infusion bag of aqueous dextrose/sodium chloride to achieve further dilution to 0.2 – 0.6 mg/mL for patient administration:

**2.3  Reconstitution/Preparation for Intravenous Administration**
Aseptically reconstitute each TREANDA vial as follows:
○   25 mg TREANDA vial: Add 5 mL of only Sterile Water for Injection, USP.
○   100 mg TREANDA vial: Add 20 mL of only Sterile Water for Injection, USP.

Shake well to yield a clear, colorless to a pale yellow solution with a bendamustine HCl concentration of 5 mg/mL.  The lyophilized powder should completely dissolve in 5 minutes.  If particulate matter is observed, the reconstituted product should not be used.

Aseptically withdraw the volume needed for the required dose (based on 5 mg/mL concentration) and immediately transfer to a 500 mL infusion bag of 0.9% Sodium Chloride Injection, USP (normal saline).  As an alternative to 0.9% Sodium Chloride Injection, USP (normal saline), a 500

mL infusion bag of 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, may be considered.  The resulting final concentration of bendamustine HCl in the infusion bag should be within 0.2 – 0.6 mg/mL.  The reconstituted solution must be transferred to the infusion bag within 30 minutes of reconstitution.  After transferring, thoroughly mix the contents of the infusion bag.  The admixture should be a clear and colorless to slightly yellow solution.

---

[3] U.S. Published Application No. 2006/0159713
[4] TREANDA, Highlights of prescribing information, 2008
[5] U.S. 4,711,906.  Von Stetten is cited merely for a disclosure of diclofenac in PEG and propylene glycol.  (Action at 8).  Diclofenac and bendamustine are chemically distinct compounds and there is no evidence of record that those of ordinary skill in the art would have considered a diclofenac formulation to be informative in preparing a storage-stable liquid bendamustine composition.
[6] U.S. 7,252,799.  Miekka is merely cited for its purported disclosure that lipoic acid, methionine, cysteine, thiols, propyl gallate, dihydrolipoic acid, BHA, BHT, and sodium formaldehyde sulfoxylate are antioxidant stabilizers.

{00592392 }

Page 6 of 13

DOCKET NO.: 820-1041-US-CON7

(Treanda at Section 2.3; *see also*, Brittain at paragraph [0100] (stating that Brittain's lyophilized formulations are reconstituted with water and then further diluted with, *e.g.*, saline)). Brittain refers to polyethylene glycol as an example of a "liquid carrier or vehicle" for preparing the ultimate dosage form. (Brittain at paragraph [0067]). Brittain does not suggest, however, that the skilled person should deviate from the concentrations specified by Treanda.

While Treanda refers to a "concentrated solution of bendamustine which is subsequently further diluted for administration" (Action at 5), it is clear that Treanda refers to 5 mg/mL (bendamustine in water), which is much more dilute than presently claimed. Treanda then instructs that this concentration should be "immediately" transferred to an infusion bag to provide the 0.2-0.6 mg/mL concentration for administration. Without Applicant's disclosure, those skilled in the art would have had no reason to prepare more concentrated bendamustine liquids, *e.g.*, 10 mg/mL to 100 mg/mL. Nor would they have had any expectation that those more concentrated liquids would have had the claimed stability characteristics. The rejection should be withdrawn for at least these reasons.

**Those of Ordinary Skill in the Art Would Not Have Included an Antioxidant in Any Liquid Bendamustine Composition**

Despite the Examiner's assertions, Brittain does not suggest that an antioxidant should be added to a liquid bendamustine/PEG composition. In fact, those of ordinary skill in the art would not have expected the addition of an antioxidant to be beneficial to bendamustine's storage stability because no reference had suggested that bendamustine degraded *via* an oxidative mechanism.[7,8] Moreover, industry guidance discouraged the use of antioxidants, recommending other methods for reducing oxidation. The claims are patentable for at least these reasons.

***Brittain does not teach that an antioxidant should be added to a liquid bendamustine composition***

The Examiner alleges that Brittain teaches lyophilizing bendamustine with an antioxidant. (Action at 6). Brittain provides no such disclosure. None of Brittain's exemplified compositions includes an antioxidant. Moreover, the paragraph relied upon by the Examiner

---

[7] *See, e.g.,* Exhibit B, Excerpts from the *Responsive Expert Report of Juergen Siepmann, Ph.D.* ("Siepmann Report"). A redacted version of the entirety of the Siepmann Report is attached hereto as Exhibit C.
[8] *See also,* Exhibit A, pages 25-26 (finding that "Defendants did not establish by clear and convincing evidence that [the prior art] would have motivated a POSITA to use an antioxidant" to curb PEG oxidation).

{00592392 }

DOCKET NO.: 820-1041-US-CON7

merely states that an antioxidant could be used as a lyophilization excipient only "if desired." (Brittain at paragraph [0088]; Action at 6). This statement hardly provides the "clear and unambiguous" instruction to include an antioxidant, as the Examiner appears to imply. The Examiner has not articulated how Brittain would have suggested to one of ordinary skill in the art that an antioxidant should be included in a ready to use bendamustine/PEG composition and the rejection should be withdrawn for at least this reason.

***The art does not teach that bendamustine can degrade via an oxidative mechanism***

Bendamustine rapidly degrades in water *via* several pathways, none of which are oxidative. (*See, e.g.,* Specification at page 2). One pathway by which bendamustine degrades is *via* aziridinium ring hydrolysis, which produces HP1 and HP2:



(Brittain at paragraph [0022]; Maas,[9] Studies and Results, Scheme; U.S. 8,344,066 (Drager)[10] at col. 1, lines 50-65; col. 4, lines 33-45).

Bendamustine also degrades *via* dimer formation, which occurs when a molecule of bendamustine attacks the aziridinium ring:

---

[9] Maas is of record in this application. A copy of Maas, along with an English translation, accompanies this response.
[10] Drager is of record in this application.

DOCKET NO.: 820-1041-US-CON7



(Brittain at paragraph [0027]; Drager at col. 4, lines 50-67).

Another pathway for bendamustine degradation is esterification of the -COOH with mono- and poly-hydroxy-containing compounds. Various bendamustine ester degradation products have been reported in the art:



(Brittain at paragraph [0111]; Drager at col. 5, lines 13-44).

DOCKET NO.: 820-1041-US-CON7

While many bendamustine degradation mechanisms have been reported, the art did *not* teach that bendamustine degrades *via* any oxidative pathway.

"Antioxidants are used to reduce the oxidation of active substances and excipients in the finished product." (Note for Guidance, European Agency for the Evaluation of Medicinal Products, page 8 of 9 (of record))  Since bendamustine was not known to degrade *via* an oxidative process, those of ordinary skill in the art would not have tried to reduce degradation by adding an antioxidant to a bendamustine composition.[11]  The claims are non-obvious for at least this reason.

### Industry Guidance Discouraged Using Antioxidants in Parenteral Formulations

Even if those skilled in the art sought to discourage oxidation in a particular bendamustine composition, the guidance to the industry at the time of the invention was to ***not*** include an antioxidant.  Instead, industry guidance encouraged addressing oxidation by ***other*** means.  For example, the European Agency for the Evaluation of Medicinal Products (EMEA) stated that:

> Antioxidants should only be included in a formulation if it has been proven hat their use cannot be avoided. This applies to cases where the manufacturing process is optimised to minimise the potential for oxidation.

(EMEA Guidance at 8 of 9).  Indeed, it had been suggested at the time of the invention that the use of antioxidants in parenteral formulations was "now in decline" and that a "preferred method of preventing oxidation is simply to exclude oxygen."  (Broadhead at 334)[12].

Even if oxidation of a liquid bendamustine composition was for some reason a concern,[13] industry guidance discouraged adding antioxidants and recommended other means for preventing

---

[11] Noteworthy is that the TREANDA lyophilized product does not include any antioxidant – it contains only bendamustine HCl and mannitol. (Treanda at Section 11).

[12]

**Use of Excipients**

Excipients may be useful in preventing chemical and physical instability. Antioxidants are included in parenteral formulations, although their use is now in decline, and EU guidelines discourage their use unless no other alternative exists (see sect. "Parenteral Products and the

[13] As discussed *supra*, Applicant does not concede this point.

{00592392 }

DOCKET NO.: 820-1041-US-CON7

oxidation.[14]  Those of ordinary skill in the art, therefore, would have been dissuaded from including antioxidants in any liquid bendamustine composition and the rejection should be withdrawn for at least this reason.

**The Claimed Compositions Are Surprisingly and Unexpectedly Stable During Storage**

As reported in the specification, a composition including bendamustine in PEG exhibited 2.28% of impurities after storage at room temperature for 15 days and 41.9% impurities after storage for 15 days at 40 °C.  (Specification at Example 3, page 13, Table 3, reproduced below).

| Antioxidant | $T^{\circ}C$ | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
| | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

Based on these poor stability results, a person would have forsaken development of a liquid bendamustine/PEG composition.  A composition presenting such a poor initial stability profile would have been deemed unsuitable as a starting point to create a storage-stable composition.  (*See* Appendix A, attached hereto, Siepmann Report at ¶¶ 359, 469-71)

Despite the poor stability of bendamustine/PEG, surprisingly, adding an antioxidant substantially eliminated the formation of degradation products.  As shown in the specification, and the Table above, a bendamustine/PEG composition including antioxidant exhibited no substantial increase in degradants after storage for 15 days at either room temperature or 40 °C. (Specification at Example 3, page 13, Table 3).

The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if an antioxidant is added.  Such an unexpected result could not have been predicted.  This result is

---

[14] There were four marketed PEG-containing parenteral formulations available in the United States as of this application's priority date and none of them contained an antioxidant.  (*See* Appendix A, attached hereto, Siepmann Report at ¶¶355-358 (discussing Ativan®, Busulfex®, Robaxin®, and VePesid®))

{00592392 }

DOCKET NO.: 820-1041-US-CON7

particularly unexpected given the absence of any report in the literature of an oxidative degradation pathway. The claims are patentable for at least this reason.

**Obviousness-type double patenting**

The Examiner alleges that claim 1-16 are not patentable on the ground of nonstatutory double patenting over:

claims 1-6 of U.S. 9,265,831;

claims 1-27 of U.S. 9,572,797;

claims 1-26 of U.S. 9,572,796;

claims 1-22 of U.S. 8,609,707;

claims 1-23 of U.S. 9,579,384;

claims 1-24 of U.S. 9,034,908;

claims 1-17 of U.S. 9,597,399;

claims 1-23 of U.S. 9,144,568;

claims 1-29 of U.S. 9,572,887;

claims 1-7 of U.S. 9,597,397; and

claims 1-26 of U.S. 10,010,533.

Applicant will consider filing terminal disclaimers once otherwise allowable subject matter has been acknowledged.

\* \* \*

Claims 1-16 are non-obvious over the combination of cited art. An early notice to that effect is earnestly solicited.

**Fees**

This response is being filed with a two-month extension of time and the requisite fee. No further fees are believed to be due. If, on the other hand, it is determined that any further fees are due or any overpayment has been made, the Assistant Commissioner is hereby authorized to debit or credit such sum to Deposit Account No. 02-2275.

Pursuant to 37 C.F.R. 1.136(a)(3), please treat this and any concurrent or future reply in this application that requires a petition for an extension of time for its timely submission as

{00592392 }

Page 12 of 13

DOCKET NO.: 820-1041-US-CON7

incorporating a petition for extension of time for the appropriate length of time. The fee associated therewith is to be charged to Deposit Account No. 02-2275.

**Conclusion**

      In view of the amendments and remarks contained above, it is respectfully submitted that each of the matters raised by the Examiner has been addressed by the present amendment and that the present application is now in condition for allowance.

      If for any reason the present application is not deemed in condition for allowance, the Examiner is respectfully requested to contact the undersigned attorney.

Respectfully submitted,

LUCAS & MERCANTI, LLP

By:    /Michael N. Mercanti/
       Michael N. Mercanti
       Registration No. 33,966

LUCAS & MERCANTI, LLP
30 Broad Street, 21st Floor
New York, New York 10004
Phone: 212-661-8000

{00592392 }

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/509,920 | 07/12/2019 | Nagesh R. Palepu | 820-1041-US-CON7 | 7527 |

20311        7590        06/02/2021
LUCAS & MERCANTI, LLP
30 BROAD STREET
21st FLOOR
NEW YORK, NY 10004

| EXAMINER |
|---|
| ARNOLD, ERNST V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1613 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 06/02/2021 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

info@lmiplaw.com

PTOL-90A (Rev. 04/07)

| Advisory Action<br>*Before the Filing of an Appeal Brief* | Application No.<br>16/509,920 | Applicant(s)<br>Palepu et al. | | |
|---|---|---|---|---|
| | Examiner<br>ERNST V ARNOLD | Art Unit<br>1613 | AIA (FITF) Status<br>No | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

THE REPLY FILED <u>20 May 2021</u> FAILS TO PLACE THIS APPLICATION IN CONDITION FOR ALLOWANCE.

<u>NO NOTICE OF APPEAL FILED</u>

1. ☑ The reply was filed after a final rejection. No Notice of Appeal has been filed. To avoid abandonment of this application, applicant must timely file one of the following replies: (1) an amendment, affidavit, or other evidence, which places the application in condition for allowance; (2) a Notice of Appeal (with appeal fee) in compliance with 37 CFR 41.31; or (3) a Request for Continued Examination (RCE) in compliance with 37 CFR 1.114 if this is a utility or plant application. Note that RCEs are not permitted in design applications. The reply must be filed within one of the following time periods:

    a) ☑ The period for reply expires <u>5</u> months from the mailing date of the final rejection.

    b) ☐ The period for reply expires on: (1) the mailing date of this Advisory Action; or (2) the date set forth in the final rejection, whichever is later. In no event, however, will the statutory period for reply expire later than SIX MONTHS from the mailing date of the final rejection.

    c) ☐ A prior Advisory Action was mailed more than 3 months after the mailing date of the final rejection in response to a first after-final reply filed within 2 months of the mailing date of the final rejection.The current period for reply expires _____ months from the mailing date of *the prior Advisory Action* or SIX MONTHS from the mailing date of the final rejection, whichever is earlier.

    *Examiner Note:* If box 1 is checked, check either box (a), (b) or (c). ONLY CHECK BOX (b) WHEN THIS ADVISORY ACTION IS THE <u>FIRST</u> RESPONSE TO APPLICANTS <u>FIRST</u> AFTER-FINAL REPLY WHICH WAS FILED WITHIN TWO MONTHS OF THE FINAL REJECTION. ONLY CHECK BOX (c) IN THE LIMITED SITUATION SET FORTH UNDER BOX (c). See MPEP 706.07(f).

Extensions of time may be obtained under 37 CFR 1.136(a). The date on which the petition under 37 CFR 1.136(a) and the appropriate extension fee have been filed is the date for purposes of determining the period of extension and the corresponding amount of the fee. The appropriate extension fee under 37 CFR 1.17(a) is calculated from: (1) the expiration date of the shortened statutory period for reply originally set in the final Office action; or (2) as set forth in (b) or (c) above, if checked. Any reply received by the Office later than three months after the mailing date of the final rejection, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

<u>NOTICE OF APPEAL</u>

2. ☐ The Notice of Appeal was filed on _____. A brief in compliance with 37 CFR 41.37 must be filed within two months of the date of filing the Notice of Appeal (37 CFR 41.37(a)), or any extension thereof (37 CFR 41.37(e)), to avoid dismissal of the appeal. Since a Notice of Appeal has been filed, any reply must be filed within the time period set forth in 37CFR 41.37(a).

<u>AMENDMENTS</u>

3. ☑ The proposed amendments filed after a final rejection, but prior to the date of filing a brief, will <u>not</u> be entered because

    a) ☑ They raise new issues that would require further consideration and/or search (see NOTE below);

    b) ☐ They raise the issue of new matter (see NOTE below);

    c) ☑ They are not deemed to place the application in better form for appeal by materially reducing or simplifying the issues for appeal; and/or

    d) ☐ They present additional claims without canceling a corresponding number of finally rejected claims.

    NOTE: <u>See Continuation Sheet</u> (See 37CFR 1.116 and 41.33(a)).

4. ☐ The amendments are not in compliance with 37CFR 1.121. See attached Notice of Non-Compliant Amendment (PTOL-324).

5. ☐ Applicants reply has overcome the following rejection(s): _____.

6. ☐ Newly proposed or amended claim(s) _____ would be allowable if submitted in a separate, timely filed amendment canceling the non-allowable claim(s).

7. ☐ For purposes of appeal, the proposed amendment(s):(a)☐ will not be entered, or (b)☐ will be entered, and an explanation of how the new or amended claims would be rejected is provided below or appended.

<u>AFFIDAVIT OR OTHER EVIDENCE</u>

8. ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

9. ☐ The affidavit or other evidence filed after a final action, but before or on the date of filing a Notice of Appeal will <u>not</u> be entered because applicant failed to provide a showing of good and sufficient reasons why the affidavit or other evidence is necessary and was not earlier presented. See 37 CFR 1.116(e).

10. ☐ The affidavit or other evidence filed after the date of filing the Notice of Appeal, but prior to the date of filing a brief, will <u>not</u> be entered because the affidavit or other evidence failed to overcome <u>all</u> rejections under appeal and/or appellant fails to provide a showing of good and sufficient reasons why it is necessary and was not earlier presented. See 37 CFR 41.33(d)(1).

11. ☐ The affidavit or other evidence is entered. An explanation of the status of the claims after entry is below or attached.

<u>REQUEST FOR RECONSIDERATION/OTHER</u>

12. ☑ The request for reconsideration has been considered but does NOT place the application in condition for allowance because: <u>See Continuation Sheet</u>.

13. ☐ Note the attached Information *Disclosure Statement*(s). (PTO/SB/08) Paper No(s). _____.

14. ☑ Other: <u>2323</u>.

<u>STATUS OF CLAIMS</u>

15. The status of the claim(s) is (or will be) as follows:

    Claim(s) allowed: _____.

    Claim(s) objected to: _____.

    Claim(s) rejected: <u>1-16</u>.

    Claim(s) withdrawn from consideration: _____.

| | |
|---|---|
| | /ERNST V ARNOLD/<br>Primary Examiner, Art Unit 1613 |

**Continuation Sheet (PTOL-303)**                                                          **Application No.** 16/509,920

Continuation of 3. NOTE: The limitation of "ready to use" has not been searched and requires further search and consideration. The AFCP2.0 program does not provide enough time to also skim through the 600+ pages filed. Applicant's results appear unexpected but the claimed subject matter is not necessarily commensurate in scope with the data. The double patenting rejections remain because such results are implicit in those patents.

Continuation of REQUEST FOR RECONSIDERATION/OTHER 12. The request for reconsideration has been considered but does NOT place the application in condition for allowance because: While the instant specification has support for "ready to use" (page 2, second to last line) this term raises issues. First of all, the Examiner did not suggest this term at all during the interview of 3/16/21. Rather the Examiner suggested "for administration" to differentiate the composition from other compositions that are not for administration. Second of all, the instant specification does not define "ready to use". It is reasonable to presume that "ready for use" could mean ready to be administered without any further dilution/preparation but the instant claim does not define the use such as ready for use without further dilution. And the instant specification read as a whole suggests that the doses of bendamustine administered to treat cancer in a mammal is similar to those employed any treatment regimen designed for bendamustine as marketed under the trade name TREANDA (instant specification, bottom of page 7 bridging page 8). Since the package insert of TREANDA teaches dilution to 5 mg/ml and then further dilution to 500 ml to a final concentration of 0.2-0.6 mg/mL, the "ready to use" appears to infer "ready for further dilution", which is also disclosed in the instant specification (page 2, second to last line), in order to administer the proper dosage amount of bendamustine as taught by TREANDA. Consequently, it appears the term "ready for use" appears indefinite because there are two or more ways of interpreting it. "When a claim is amenable to two or more plausible constructions, applicant is required to amend the claim to more precisely define the metes and bounds of the claimed invention, or the claim remains indefinite under § 112. Ex parte Miyazaki, 89 USPQ2d 1207 (BPAI 2008). Instant claim 8 does not clarify the issue because the ready to use liquid composition is not necessarily the about 10 mg/ml to about 100 mg/ml concentration but rather some diluted concentration. In light of these issues as well as the claims not being commensurate in scope with the data where only sulfur containing antioxidant lipoic is shown (table 3), (tables 4-8 require the addition of propylene glycol) the application is not in immediate condition for allowance.

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/509,920 | 07/12/2019 | Nagesh R. Palepu | 820-1041-US-CON7 | 7527 |

20311          7590          07/16/2021

LUCAS & MERCANTI, LLP
30 BROAD STREET
21st FLOOR
NEW YORK, NY 10004

| EXAMINER |
|---|
| ARNOLD, ERNST V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1613 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 07/16/2021 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

info@lmiplaw.com

PTOL-90A (Rev. 04/07)

| *Applicant-Initiated Interview Summary* | Application No. 16/509,920 | | Applicant(s) Palepu et al. | |
|---|---|---|---|---|
| | Examiner ERNST V ARNOLD | Art Unit 1613 | AIA (First Inventor to File) Status No | Page 1 of 2 |

| All Participants (applicant, applicants representative, PTO personnel) | Title | Type |
|---|---|---|
| ERNST V ARNOLD | Primary Examiner | Telephonic |
| Stephanie Lodise | Attorney | |

**Date of Interview:** 12 July 2021

**Issues Discussed:**

**35 U.S.C. 103**

The art of Brittain 20050159713 was discussed. See below.

**Proposed Amendment(s)**

See attached. The Examiner noted that the instant claims are directed to liquid bendamustine compositions and the proposed amendment is "ready for further dilution". In contrast, Brittain US 20060159713 teaches liquid compositions ready for further concentration via lyophilization ( pre-lyophilization). See claim 77 of Brittain. The Examiner also researched the term "ready for use" which in the medical arts has a specific meaning that is not ambiguous. See attached Medical Dictionary definition for example. The pre-lyophilized solution of Britttain is not "ready for use" in this context because it is ready for lyophilization. The Examiner noted that while only sulfur based antioxidants were used as the antioxidant, the Examiner does not have any evidence that other antioxidants would not also work in the invention. Also the Examiner noted that t-butyl alcohol used by Brittain has a high vapor pressure and is thus an excellent freeze-drying medium (Abstract of: Ni et al. (international Journal of Pharmaceutics 2001;226:39-46) whereas PEG does not sublime under practical and common lyophilization conditions (left column page 2245 of: Amin et al. (Journal of Pharmaceutical Sciences 2004;93(9):2244-2249). As a result, in view of the prosecution history and art of record, the Examiner left it to Applicants to decide whether "ready to use" or "ready for further dilution" in the claim preamble was appropriate because either would work in terms of patentable subject matter. Applicant thought "ready to use" as per the claims filed 5/20/21 would be best and would file terminal disclaimers.

**Non-statutory Double Patenting**

Applicant would file terminal disclaimers.

| | /ERNST V ARNOLD/ Primary Examiner, Art Unit 1613 |
|---|---|

Applicant is reminded that a complete written statement as to the substance of the interview must be made of record in the application file. It is the applicants responsibility to provide the written statement, unless the interview was initiated by the Examiner and the Examiner has indicated that a written summary will be provided. See MPEP 713.04
Please further see:
MPEP 713.04
Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews, paragraph (b)
37 CFR § 1.2 Business to be transacted in writing

| *Applicant-Initiated Interview Summary* | Application No. 16/509,920 | | Applicant(s) Palepu et al. | |
|---|---|---|---|---|
| | Examiner ERNST V ARNOLD | Art Unit 1613 | AIA (First Inventor to File) Status No | Page 2 of 2 |

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview.

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

PTO/AIA/80 (07-12)
Approved for use through 11/30/2014. OMB 0651-0035
U.S. Patent and Trademark Office; U.S DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## POWER OF ATTORNEY TO PROSECUTE APPLICATIONS BEFORE THE USPTO

I hereby revoke all previous powers of attorney given in the application identified in the attached statement under 37 CFR 3.73(c).

I hereby appoint:

☑ Practitioners associated with Customer Number: **23377**

**OR**

☐ Practitioner(s) named below (if more than ten patent practitioners are to be named, then a customer number must be used):

| Name | Registration Number | | Name | Registration Number |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

As attorney(s) or agent(s) to represent the undersigned before the United States Patent and Trademark Office (USPTO) in connection with any and all patent applications assigned only to the undersigned according to the USPTO assignment records or assignments documents attached to this form in accordance with 37 CFR 3.73(c).

Please change the correspondence address for the application identified in the attached statement under 37 CFR 3.73(c) to:

☑ The address associated with Customer Number: **23377**

**OR**

☐

| Firm or Individual Name | | | |
|---|---|---|---|
| Address | | | |
| City | | State | Zip |
| Country | | | |
| Telephone | | Email | |

Assignee Name and Address: **EAGLE PHARMACEUTICALS, INC.**
50 Tice Blvd., Suite 315
Woodcliff Lake, New Jersey 07677

A copy of this form, together with a statement under 37 CFR 3.73(c) (Form PTO/AIA/96 or equivalent) is required to be Filed in each application in which this form is used. The statement under 37 CFR 3.73(c) may be completed by one of The practitioners appointed in this form, and must identify the application in which this Power of Attorney is to be filed.

### SIGNATURE of Assignee of Record
The individual whose signature and title is supplied below is authorized to act on behalf of the assignee

| Signature | *[signature]* | Date **November 6, 2018** |
|---|---|---|
| Name | **Pearl T.L. Siew** | Telephone |
| Title | **Senior Vice President, Intellectual Property** | |

This collection of information is required by 37 CFR 1.31, 1.32 and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 16/509,920 | 07/12/2019 | Nagesh R. Palepu | 820-1041-US-CON7 |

**CONFIRMATION NO. 7527**

20311
LUCAS & MERCANTI, LLP
30 BROAD STREET
21st FLOOR
NEW YORK, NY 10004

**POWER OF ATTORNEY NOTICE**


*OC000000127249337*

Date Mailed: 07/28/2021

## NOTICE REGARDING CHANGE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 07/23/2021.

• The Power of Attorney to you in this application has been revoked by the applicant. Future correspondence will be mailed to the new address of record(37 CFR 1.33).

Questions about the contents of this notice and the
requirements it sets forth should be directed to the Office
of Data Management, Application Assistance Unit, at
**(571) 272-4000** or **(571) 272-4200** or **1-888-786-0101**.

/mmasfaw/

_____

page 1 of 1

 UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 16/509,920 | 07/12/2019 | Nagesh R. Palepu | 820-1041-US-CON7 |

**CONFIRMATION NO. 7527**

23377
BakerHostetler
2929 Arch Street
Cira Centre, 12th Floor
Philadelphia, PA 19104-2891

**POA ACCEPTANCE LETTER**

*OC000000127249358*

Date Mailed: 07/28/2021

## NOTICE OF ACCEPTANCE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 07/23/2021.

The Power of Attorney in this application is accepted. Correspondence in this application will be mailed to the above address as provided by 37 CFR 1.33.

Questions about the contents of this notice and the
requirements it sets forth should be directed to the Office
of Data Management, Application Assistance Unit, at
**(571) 272-4000** or **(571) 272-4200** or **1-888-786-0101**.

/mmasfaw/

page 1 of 1

# EXHIBIT 10

Doc Code: TR.PROV
Document Description: Provisional Cover Sheet (SB16)

PTO/SB/16 (04-07)
Approved for use through 06/30/2010 OMB 0651-0032
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

## Provisional Application for Patent Cover Sheet
This is a request for filing a PROVISIONAL APPLICATION FOR PATENT under 37 CFR 1.53(c)

### Inventor(s)

Inventor 1                                                          Remove

| Given Name | Middle Name | Family Name | City | State | Country ᵢ |
|---|---|---|---|---|---|
| Nagesh | R. | Palepu | Southampton | PA | US |

Inventor 2                                                          Remove

| Given Name | Middle Name | Family Name | City | State | Country ᵢ |
|---|---|---|---|---|---|
| Philip | Christopher | Buxton | Harlow, Essex | | GB |

All Inventors Must Be Listed – Additional Inventor Information blocks may be generated within this form by selecting the **Add** button.    | Add |

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
|---|---|
| Attorney Docket Number (if applicable) | 820.1041 |

### Correspondence Address

Direct all correspondence to (select one):

| ⦿ The address corresponding to Customer Number | ◯ Firm or Individual Name |
|---|---|
| Customer Number | 20311 |

| The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government. |
|---|
| ⦿ No. |
| ◯ Yes, the name of the U.S. Government agency and the Government contract number are: |

Doc Code: TR.PROV
Document Description: Provisional Cover Sheet (SB16)

PTO/SB/16 (04-07)
Approved for use through 06/30/2010 OMB 0651-0032
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

## Entity Status

Applicant claims small entity status under 37 CFR 1.27

◉ Yes, applicant qualifies for small entity status under 37 CFR 1.27

○ No

## Warning

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

## Signature

Please see 37 CFR 1.4(d) for the form of the signature.

| Signature | /Christina M. Jordan/ | | | Date (YYYY-MM-DD) | 2011-02-14 |
|---|---|---|---|---|---|
| First Name | Christina M. | Last Name | Jordan | Registration Number (If appropriate) | 61098 |

This collection of information is required by 37 CFR 1.51. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 8 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **This form can only be used when in conjunction with EFS-Web. If this form is mailed to the USPTO, it may cause delays in handling the provisional application.**

# Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or paten.  Accordingly, pursuant to the requirements of the Act, please be advised that :  (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent.  If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.      The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.

2.      A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.      A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.      A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.      A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.      A record in this system of records may be disclosed, as a routine use, t o a n other federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.      A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.      A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.

9.      A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

!

# FORMULATIONS OF BENDAMUSTINE

## BACKGROUND OF THE INVENTION

Bendamustine free base is represented by the following structural formula (I)



(I).

Bendamustine is used in the treatment of a number of cancers including leukemias, Hodgkins disease and multiple myelomas. Bendamustine is the active ingredient of the commercial product Treanda™, a lyophilized powder for reconstitution.

Bendamustine exhibits rapid degradation upon reconstitution of the lyophilized product. Bendamustine undergoes hydrolysis by direct substitution rather than an addition elimination process due to the presence of the highly labile aliphatic chlorine atoms. Some of the main degradants of bendamustine are the monohydroxy compound known as HP1 (hydrolysis product 1) and dihydroxy compound HP2 (hydrolysis product 2). The monohydroxy compound appears as the main impurity at Relative Retention Time (RRT) 0.6 and the dihydroxy compound appears as the main impurity at RRT 0.27. Minor peaks appear at RRT 1.2, which are presently unknown.

The stability of bendamustine in water is measured in hours, and is therefore, not suitable for long-term storage in liquid form. The lyophile possesses good chemical stability. However, reconstitution of the lyophile is clinically inconvenient, taking 15 – 30 minutes with implications of chemical instability. There is a need for ready to use (RTU) bendamustine formulations having enhanced stability.

## SUMMARY OF THE INVENTION

In some aspects of the invention, the bendamustine-containing compositions include a) a pharmaceutically acceptable fluid which contains one or more of propylene glycol, ethanol, polyethylene glycol, benzyl alcohol and glycofurol, and b) a stabilizing amount of a chloride salt. In other aspects of the invention, the bendamustine-containing compositions include DMSO (dimethyl sulfoxide) as part of the pharmaceutically acceptable fluid included therein. In other aspects of the invention, the bendamustine-containing compositions include an organic compound or an inorganic compound, or mixtures thereof, in an amount sufficient to obtain an apparent pH of greater than or equal to about 6.0 in the pharmaceutically acceptable fluid, as measured using United States Pharmacopeia (USP) monograph for polyethylene glycol. The USP monograph is incorporated herein by reference. Regardless of the pharmaceutically acceptable fluid included, the amount of bendamustine included in the composition is preferably from about 20 mg/mL to about 60 mg/mL. Still further aspects of the invention include methods of treatment using bendamustine-containing compositions and kits containing the same.

One of the advantages of the inventive liquid compositions is that they have substantially improved long term stability when compared to currently available formulations. For example, the inventive bendamustine compositions are substantially free of impurities after at least about 15 months at a temperature of from about 5 °C to about 25 °C. The inventive formulations are advantageously ready to use or ready for further dilution. Reconstitution of lyophilized powders is not required.

## DETAILED DESCRIPTION OF THE INVENTION

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art to which this invention belongs. In the event that there is a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

3

As used herein, RRT is calculated by dividing the retention time of the peak of interest by the retention time of the main peak. Any peak with an RRT <1 elutes before the main peak, and any peak with an RRT >1 elutes after the main peak.

For purposes of the present invention, "substantially free of impurities" shall be understood to include bendamustine-containing compositions in which the amount of total impurities is less than about 5%, as calculated on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223nm, after a period of about 15 months at a temperature of from about 5°C to about 25°C. The amount of impurities is further calculated as being based upon the original amount bendamustine (or salt thereof) being present in the composition or formulation.

For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.

Preferably, the amount of any individual degradant in the inventive compositions does not exceed 2% PAR as determined by HPLC at a wavelength of 223nm after storage periods of at least about 15 months at a temperature of from about 5°C to about 25°C. In some aspects, the amount of time the inventive compositions demonstrate long term storage stability is at least about 18 months and preferably at least about 2 years when stored under the conditions described herein.

In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions including:
  a) bendamustine or a pharmaceutically acceptable salt thereof; and
  b) a pharmaceutically acceptable fluid including
      i) PEG, PG or mixtures thereof; and
      ii) a stabilizing amount of an antioxidant.

The total impurities in the inventive compositions resulting from the degradation of the bendamustine in the compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223nm after at least about 15 months at a temperature of from about 5 °C to about 25 °C, and thus have long term stability for at least the same

4

period of time or longer. Preferably, the bendamustine-containing compositions demonstrate long term storage stability for at least about 2 years, especially when stored at the lower (refrigerated) temperatures. In one embodiment, the amount of total impurities in the inventive compositions resulting from the degradation of the bendamustine is less than about 3% PAR as determined by HPLC at a wavelength of 223nm after at least about 2 years at a temperature of from about 5 °C to about 25 °C.

In some aspects of the invention, the bendamustine concentration in the inventive compositions is from about 1 mg/mL to about 100 mg/mL, preferably 20 mg/mL to about 60 mg/mL. Preferably the bendamustine concentration in the inventive compositions is from about 25 mg/mL to about 50 mg/mL, and more preferably from about 30 mg/mL to about 50 mg/mL. It will be understood that compositions containing any useful concentration within the ranges, i.e. 1, 5 10, 20, 25, 30, 35, 40, 45, 50, 55, 60 . . . 100 are contemplated. In other embodiments, the bendamustine concentration in the composition is about 50 mg/mL. In alternative aspects, the amount of bendamustine is outside these ranges but the amounts will be sufficient for single or multiple administrations of dosages generally regarded as effective amounts.

In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof. Within this aspect, the pharmaceutically acceptable fluid is propylene glycol (PG) or polyethylene glycol (PEG). In other embodiments of the invention however, the pharmaceutically acceptable fluid is a mixture of PEG and PG. For example, the pharmaceutically acceptable fluid can include about 50% PEG and about 50% PG. Alternatively, pharmaceutically acceptable fluid includes about 95% PEG and about 5% PG. The amount of PEG and PG can also be varied within the ranges, i.e. the ratio of PEG:PG in the pharmaceutically acceptable fluid can range from about 95:5 to about 50:50. Within this range, is a pharmaceutically acceptable fluid containing about 75% PEG and about 25% PG, and preferably 80% PEG and 20% PG. In another embodiment, a pharmaceutically acceptable fluid can include about 85% PEG and about 15% PG while another preferred pharmaceutically acceptable fluid includes about 90% PEG and about 10% PG. The molecular weight of the PEG will be within the range of pharmaceutically acceptable weights although PEG 400 is preferred in many aspects of the invention.

5

Without meaning to be bound by any theory or hypothesis, the hydroxy groups of the polyethylene glycol molecule are less reactive than those of propylene glycol. As a result, the esters form at a slower rate in polyethylene glycol than propylene glycol and the resulting bendamustine degradants are unexpectedly and substantially reduced over extended periods of time when PEG is a substantial part of the pharmaceutically acceptable fluid.

The bendamustine-containing compositions according to several preferred aspects of the invention include a stabilizing amount of an antioxidant. For purposes of the present invention, "stabilizing amount" shall be understood to include those amounts which increase or enhance the stability of the bendamustine in the compositions described herein. The presence of one or more antioxidants described herein thus contributes, at least in part to the long term stability of the composition. Within this guideline, suitable antioxidant concentrations in the compositions can range from about 2.5 mg/mL to about 35 mg/mL, and preferably from about 5 mg/mL to about 20 mg/mL or from about 10 mg/mL to about 15 mg/mL. In some other embodiments, the concentration of the antioxidant in the bendamustine-containing composition is about 5 mg/mL.

Suitable antioxidants for inclusion include those which are pharmaceutically acceptable for use in human and veterinary formulations although not limited to those currently regarded as safe by any regulatory authority. For example, the antioxidant can be selected from among lipoic acid, thioglycerol (also known as monothioglycerol) and analogs thereof, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds, dihydrolipoic acid and mixtures of the foregoing. Preferably, the antioxidant is thioglycerol, lipoic acid or a mixture thereof. Some particularly preferred embodiments of the invention include thioglycerol.

In view of the foregoing, some preferred long term storage stable bendamustine-containing compositions in accordance with the invention include:

      I.      a)  bendamustine or a pharmaceutically acceptable salt thereof; and

               b)  a pharmaceutically acceptable fluid including

6

        i) polyethylene glycol and propylene glycol; and

        ii) a stabilizing amount of thioglycerol; or

II.    a) about 50 mg/mL bendamustine or a pharmaceutically acceptable salt thereof; and

        b) a pharmaceutically acceptable fluid including

          i) about 90% PEG and about 10% PG; and

          ii) about 2.5 mg/mL thioglycerol.

Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total impurities, PAR as determined by HPLC at a wavelength of 223nm, after at least about 15 months of storage at a temperature of from about 5 °C to about 25 °C.

In accordance with other aspects of the invention, there are provided long term storage stable bendamustine-containing compositions, including:

    a) bendamustine or a pharmaceutically acceptable salt thereof;

    b) a pharmaceutically acceptable fluid including one or more of the following: PG, ethanol, PEG, benzyl alcohol and glycofurol; and

    c) a stabilizing amount of a chloride salt.

These compositions also have the low levels of impurities and long term stability mentioned herein. Preferred pharmaceutically acceptable fluids include PG, PEG or ethanol in this embodiment of the invention. Preferably, the PEG is PEG 400. If desired, glycerin and/or 88% (w/w) lactic acid can be added to the pharmaceutically acceptable fluid.

Suitable chloride salts include but are not limited to organic chloride salts, sodium chloride, choline chloride, hydrochloride salts of amino acids and mixtures thereof. Thus, as will be appreciated by those of ordinary skill, one can select from among a number of suitable chloride salts and it is Applicants' intention that the scope of the invention includes all such chloride salts that are capable of being included in bendamustine-containing formulations for extended periods without having a deleterious effect on the drug. In one embodiment of the invention, the chloride salt concentration is from about 10 to about 300 mg/mL. In another embodiment, the

chloride salt concentration is from about 50 to about 215 mg/mL. In one preferred embodiment, the chloride salt concentration is about 215 mg/mL.

In accordance with another aspect of the invention, there is provided long term storage stable bendamustine-containing compositions, including:

    a) bendamustine or a pharmaceutically acceptable salt thereof; and

    b) a pharmaceutically acceptable fluid including DMSO.

These compositions also have the low levels of impurities and long term stability mentioned herein. In some aspects, the bendamustine concentration in these compositions is from about 10 mg/mL to about 100 mg/mL. Preferably, the bendamustine concentration is from about 20 mg/mL to about 50 mg/mL, more preferably from about 25 mg/mL to about 50 mg/mL. In an alternative embodiment, the bendamustine concentration is about 50 mg/mL.

In accordance with another aspect of the invention there are provided long term storage stable bendamustine-containing compositions including:

    a) bendamustine or a pharmaceutically acceptable salt thereof; and

    b) a pharmaceutically acceptable fluid including

        i) PEG, PG or mixtures thereof; and

        ii) an acidity/alkalinity adjustor in an amount sufficient to obtain an apparent pH of greater than or equal to about 6.0 in the pharmaceutically acceptable fluid, as measured using USP monograph for polyethylene glycol; and

        iii) a stabilizing amount of an antioxidant.

Suitable acidity/alkalinity adjustors are organic compounds, inorganic compounds, and mixtures thereof. Organic compounds include carboxylic compounds, nitrogenous compounds, carbonates, bicarbonates, and salts thereof. Preferably, the organic compounds are selected from monoethanolamine, diethanolamine, ethylenediaminetetraacetic acid (EDTA), phospholipid salts, ascorbate, ascorbic acid, sodium citrate, sodium sulfonic acid, sodium lauryl sulfate, quaternary amines, quaternary ammonium salts, sodium formate and sodium acetate. More preferably, the organic compound is sodium acetate. Inorganic compounds include compounds known to those of skill in the art, including, but not limited to, salts of hydroxides and

8

salts of phosphates, sodium phosphate, potassium hydroxide, and phosphoric acid. Most preferably, the inorganic compound is sodium hydroxide.

In some embodiments of the invention, the amount of the acidity/alkalinity adjustor is provided in an amount sufficient to obtain an apparent pH of greater than or equal to about 6.5 in the pharmaceutically acceptable fluid, as measured using USP monograph for polyethylene glycol. In some aspects of the invention, about 5 μL to about 20 μL of a 1N acidity/alkalinity adjustor solution is provided per 1 mL of a bendamustine-containing composition. Preferably, about 10 μL of a 1N acidity/alkalinity adjustor solution is provided per 1 mL of a bendamustine-containing composition. In some aspects of the invention, the acidity/alkalinity adjustor is added to the pharmaceutically acceptable fluid prior to the addition of the other materials. In other aspects the acidity/alkalinity adjustor is added to the pharmaceutically acceptable fluid after the addition of the other materials to adjust the acidity or alkalinity as needed.

In view of the foregoing, some preferred long term storage stable bendamustine-containing compositions in accordance with the invention include:

I.      a) bendamustine or a pharmaceutically acceptable salt thereof; and

      b) a pharmaceutically acceptable fluid including

          i) polyethylene glycol and propylene glycol;

          ii) sodium hydroxide in an amount sufficient to obtain an apparent pH of greater than or equal to about 6.5 in the pharmaceutically acceptable fluid, as measured using USP monograph for polyethylene glycol; and

          iii) a stabilizing amount of thioglycerol; or

II.     a) bendamustine or a pharmaceutically acceptable salt thereof at a concentration of about 25 mg/mL; and

      b) a pharmaceutically acceptable fluid including

          i) 90% polyethylene glycol and 10% propylene glycol;

          ii) sodium hydroxide in an amount sufficient to obtain an apparent pH of greater than or equal to about 6.5 in the pharmaceutically acceptable fluid, as measured using USP monograph for polyethylene glycol; and

          iii) thioglycerol at a concentration of about5 mg/mL.

Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total impurities, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223nm, after at least about 15 months of storage at a temperature of from about 5 °C to about 25 °C.

Another embodiment of the invention provides methods of treating cancer in mammals. The methods include administering to a mammal in need thereof an effective amount of one of the bendamustine-containing compositions described herein. Since the active ingredient portion of the inventive composition is an FDA-approved drug, those of ordinary skill will recognize that the doses of bendamustine employed in this aspect of the invention will be similar to those employed in any treatment regimens designed for bendamustine as marketed under the trade name TREANDA. The patient package insert containing dosing information is incorporated herein by reference. The methods of treatment also include administering the inventive formulations for any purpose or physical condition for which bendamustine has been indicated as being useful.

Another embodiment of the invention includes methods of preparing bendamustine-containing compositions described herein. The methods include reconstituting lyophilized bendamustine in a pharmaceutically acceptable fluid containing one of the following:

A)   i) PEG, PG or mixtures thereof; and
      ii) a stabilizing amount of an antioxidant;

B)   i) one or more of PG, ethanol, PEG, benzyl alcohol and glycofurol; and
      ii) a stabilizing amount of a chloride salt;

C)   i) PEG, PG or mixtures thereof;
      ii) an organic compound or an inorganic compound in an amount sufficient to obtain an apparent pH of greater than or equal to about 6.5 in the pharmaceutically acceptable fluid, as measured using USP monograph for polyethylene glycol; and
      iii) a stabilizing amount of an antioxidant; or

D)   DMSO.

10

The steps are carried out under pharmaceutically acceptable conditions for sterility and manufacturing.

In a further aspect of the invention, there are provided methods of controlling or preventing the formation of impurities in bendamustine-containing compositions during long term storage. The methods include combining an amount of bendamustine or a pharmaceutically acceptable salt thereof with a sufficient amount of a pharmaceutically acceptable fluid containing one of the following:

    A)    i) PEG, PG or mixtures thereof; and

           ii) a stabilizing amount of an antioxidant;

    B)    i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and

           ii) a stabilizing amount of a chloride salt;

    C)    i) PEG, PG or mixtures thereof;

           ii) an organic compound or an inorganic compound in an amount sufficient to obtain an apparent pH of greater than or equal to about 6.5 in the pharmaceutically acceptable fluid, as measured using USP monograph for polyethylene glycol; and

           iii) a stabilizing amount of an antioxidant; or

    D)    DMSO.

In a preferred aspect of the invention, the methods of controlling or preventing the formation of impurities in bendamustine-containing compositions during long term storage include combining an amount of bendamustine or a pharmaceutically acceptable salt thereof with a sufficient amount of a pharmaceutically acceptable fluid containing:

    a) bendamustine or a pharmaceutically acceptable salt thereof; and

    b) a pharmaceutically acceptable fluid including

           i) polyethylene glycol and propylene glycol;

           ii) sodium hydroxide in an amount sufficient to obtain an apparent pH of greater than or equal to about 6.5 in the pharmaceutically acceptable fluid, as measured using USP monograph for polyethylene glycol; and

           iii) a stabilizing amount of thioglycerol.

Further optional steps in accordance therewith include transferring one or more pharmaceutically acceptable doses of the formulations into a suitable sealable container and storing the sealed container at a temperature of from about 5 °C to about 25 °C. As a result of carrying out these steps, it is possible to control or substantially prevent the formation of impurities which otherwise occur with bendamustine-containing compositions during long term storage so that the artisan is provided with bendamustine-containing formulations having less than about 5 % total impurities PAR as determined by HPLC at a wavelength of 223nm, after at least about 15 months of storage at a temperature of from about 5 °C to about 25 °C.

The compositions of the present invention can be packaged in any suitable sterile vial or container fit for the sterile storage of a pharmaceutical such as bendamustine. Suitable containers can be glass vials, polypropylene or polyethylene vials or other special purpose containers and be of a size sufficient to hold one or more doses of bendamustine.

A further aspect of the invention includes kits containing lyophilized bendamustine or a pharmaceutically acceptable salt thereof in a first container or vial; and, in a second container, a sufficient amount of a pharmaceutically acceptable fluid such as those described herein, i.e. one of the following:

A)    i) PEG, PG or mixtures thereof; and
      ii) a stabilizing amount of an antioxidant;

B)    i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and
      ii) a stabilizing amount of a chloride salt;

C)    i) PEG, PG or mixtures thereof;
      ii) an organic compound or an inorganic compound in an amount sufficient to obtain an apparent pH of greater than or equal to about 6.5 in the pharmaceutically acceptable fluid, as measured using USP monograph for polyethylene glycol; and
      iii) a stabilizing amount of an antioxidant; or

D)    DMSO.

12

In a preferred aspect of the invention, the kits contain lyophilized bendamustine or a pharmaceutically acceptable salt thereof in a first container or vial; and, in a second container, a sufficient amount of a pharmaceutically acceptable fluid such as:

    a) bendamustine or a pharmaceutically acceptable salt thereof; and

    b) a pharmaceutically acceptable fluid including

        i) polyethylene glycol and propylene glycol;

        ii) sodium hydroxide in an amount sufficient to obtain an apparent pH of greater than or equal to about 6.5 in the pharmaceutically acceptable fluid, as measured using USP monograph for polyethylene glycol; and

        iii) a stabilizing amount of thioglycerol.

For purposes of this embodiment, the amount of fluid which is sufficient is an amount which allows the bendamustine to be dissolved or dispersed to a degree which renders the liquid composition ready for use.

As will be appreciated by those of ordinary skill, the kit will contain other pharmaceutically necessary materials for storing and/or administering the drug, including instructions for storage and use, additional diluents, if desired, etc.

**EXAMPLES**

The following examples serve to provide further appreciation of the invention but are not meant in any way to restrict the effective scope of the invention.

**Example 1**

Bendamustine-containing compositions were prepared by adding 5 mg/ml of thioglycerol to 90% polyethylene glycol 400 and 10% propylene glycol. As indicated in the Table 1 below, NaOH was added in an amount sufficient to get apparent pH of greater than equal to 6.5 as measured using the pH method outlined in the USP monograph for polyethylene glycol (PEG). Bendamustine was then added to the sample to a concentration of 25 mg/ml. The samples were maintained at 40 °C and 25 °C and analyzed after 15 days, one month, or three months for drug content and impurity profile as indicated in Table 1 below. The results obtained are presented in Table 1.

13

**Table 1**

| Formulation | Temp. | | Time Period | Content (mg/mL) | % of Initial | % Total Imp. |
|---|---|---|---|---|---|---|
| BDM - 25mg/mL Thioglycerol - 5mg/mL PEG 400:PG (90:10) qs to 1mL | Initial | | | 24.1 | 100.0 | 0.05 |
| | 40°C | | 15 d | 18.2 | 75.5 | 24.40 |
| | 25°C | | 15 d | 23.2 | 96.3 | 1.48 |
| | | | 1 M | 22.3 | 92.5 | 5.62 |
| BDM - 25mg/mL Thioglycerol - 5mg/mL PEG 400:PG (90:10) qs to 1mL (PEG 400 Treated with NaOH) | Initial | | | 23.9 | 100.0 | 0.00 |
| | 40°C | | 15 d | 23.8 | 99.6 | 0.77 |
| | | | 1 M | 23.0 | 96.2 | 2.03 |
| | 25°C | | 15 d | 23.8 | 99.6 | 0.10 |
| | | | 1 M | 23.8 | 99.6 | 0.37 |
| | | | 3M | 23.7 | 99.2 | 0.62 |

As shown in Table 1, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as a combination of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of an antioxidant, such as thioglycerol, and an organic or inorganic compound in sufficient quantity to obtain an apparent pH of greater than or equal to about 6.5, had substantially no increase in total degradants after a period of at least three months at 25 °C. This data supports the position that bendamustine-containing compositions according to the invention have a shelf life of at least about 2 years, if not longer, when stored under ambient or refrigerated storage conditions.

# EXHIBIT 11

PTO/AIA/14 (08-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 820.1041-U2 |
|---|---|---|
| | Application Number | |

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
|---|---|

The application data sheet is part of the provisional or nonprovisional application for which it is being submitted. The following form contains the bibliographic data arranged in a format specified by the United States Patent and Trademark Office as outlined in 37 CFR 1.76.
This document may be completed electronically and submitted to the Office in electronic format using the Electronic Filing System (EFS) or the document may be printed and included in a paper filed application.

## Secrecy Order 37 CFR 5.2

☐ Portions or all of the application associated with this Application Data Sheet may fall under a Secrecy Order pursuant to 37 CFR 5.2 (Paper filers only. Applications that fall under Secrecy Order may not be filed electronically.)

## Inventor Information:

| Inventor | 1 | | Remove |
|---|---|---|---|

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Nagesh | R. | Palepu | |

| **Residence Information (Select One)** | ⦿ US Residency | ◯ Non US Residency | ◯ Active US Military Service |
|---|---|---|---|

| City | Southampton | State/Province | PA | Country of Residence i | US |
|---|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 30 Addis Drive | | |
|---|---|---|---|
| Address 2 | | | |
| City | Southampton | State/Province | PA |
| Postal Code | 18966-1166 | Country i | US |

| Inventor | 2 | | Remove |
|---|---|---|---|

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Philip | Christopher | Buxton | |

| **Residence Information (Select One)** | ◯ US Residency | ⦿ Non US Residency | ◯ Active US Military Service |
|---|---|---|---|

| City | Great Dunmow, Essex | Country of Residence i | | GB |
|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 11 Bradley Close | | |
|---|---|---|---|
| Address 2 | | | |
| City | Great Dunmow, Essex | State/Province | |
| Postal Code | CM6 2PB | Country i | GB |

| Inventor | 3 | | Remove |
|---|---|---|---|

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Srikanth | | Sundaram | |

PTO/AIA/14 (08-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | **Attorney Docket Number** | 820.1041-U2 |
|---|---|---|
| | **Application Number** | |

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
|---|---|

**Residence Information (Select One)** ● US Residency ○ Non US Residency ○ Active US Military Service

| City | Somerset | **State/Province** | NJ | **Country of Residence** i | US |
|---|---|---|---|---|---|

**Mailing Address of Inventor:**

| **Address 1** | 138 Emerson Road | | |
|---|---|---|---|
| **Address 2** | | | |
| **City** | Somerset | **State/Province** | NJ |
| **Postal Code** | 08873 | **Country** i | US |

| All Inventors Must Be Listed - Additional Inventor Information blocks may be generated within this form by selecting the **Add** button. | Add |
|---|---|

## Correspondence Information:

| Enter either Customer Number or complete the Correspondence Information section below. For further information see 37 CFR 1.33(a). |
|---|
| ☐ An Address is being provided for the correspondence Information of this application. |

| **Customer Number** | 20311 | | |
|---|---|---|---|
| **Email Address** | info@lmiplaw.com | Add Email | Remove Email |

## Application Information:

| **Title of the Invention** | FORMULATIONS OF BENDAMUSTINE | | |
|---|---|---|---|
| **Attorney Docket Number** | 820.1041-U2 | **Small Entity Status Claimed** | ☒ |
| **Application Type** | Nonprovisional | | |
| **Subject Matter** | Utility | | |
| **Suggested Class (if any)** | | **Sub Class (if any)** | |
| **Suggested Technology Center (if any)** | | | |
| **Total Number of Drawing Sheets (if any)** | 10 | **Suggested Figure for Publication (if any)** | |

## Publication Information:

| ☐ | Request Early Publication (Fee required at time of Request 37 CFR 1.219) |
|---|---|
| ☐ | **Request Not to Publish.** I hereby request that the attached application not be published under 35 U.S.C. 122(b) and certify that the invention disclosed in the attached application **has not and will not** be the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing. |

## Representative Information:

PTO/AIA/14 (08-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 820.1041-U2 |
|---|---|---|
| | Application Number | |

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
|---|---|

Representative information should be provided for all practitioners having a power of attorney in the application. Providing this information in the Application Data Sheet does not constitute a power of attorney in the application (see 37 CFR 1.32).
Either enter Customer Number or complete the Representative Name section below. If both sections are completed the customer Number will be used for the Representative Information during processing.

| Please Select One: | ⦿ Customer Number | ○ US Patent Practitioner | ○ Limited Recognition (37 CFR 11.9) |
|---|---|---|---|
| Customer Number | 20311 | | |

# Domestic Benefit/National Stage Information:

This section allows for the applicant to either claim benefit under 35 U.S.C. 119(e), 120, 121, or 365(c) or indicate National Stage entry from a PCT application. Providing this information in the application data sheet constitutes the specific reference required by 35 U.S.C. 119(e) or 120, and 37 CFR 1.78.

| Prior Application Status | Pending | | Remove |
|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing Date (YYYY-MM-DD) |
| | non provisional of | 61598729 | 2012-02-14 |

Additional Domestic Benefit/National Stage Data may be generated within this form by selecting the **Add** button.    [Add]

# Foreign Priority Information:

This section allows for the applicant to claim benefit of foreign priority and to identify any prior foreign application for which priority is not claimed. Providing this information in the application data sheet constitutes the claim for priority as required by 35 U.S.C. 119(b) and 37 CFR 1.55(a).

| | | | Remove |
|---|---|---|---|
| Application Number | Country i | Filing Date (YYYY-MM-DD) | Priority Claimed |
| | | | ○ Yes ⦿ No |

Additional Foreign Priority Data may be generated within this form by selecting the **Add** button.    [Add]

# Authorization to Permit Access:

| ☐ | Authorization to Permit Access to the Instant Application by the Participating Offices |
|---|---|

PTO/AIA/14 (08-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 820.1041-U2 |
|---|---|---|
| | Application Number | |

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
|---|---|

If checked, the undersigned hereby grants the USPTO authority to provide the European Patent Office (EPO), the Japan Patent Office (JPO), the Korean Intellectual Property Office (KIPO), the World Intellectual Property Office (WIPO), and any other intellectual property offices in which a foreign application claiming priority to the instant patent application is filed access to the instant patent application. See 37 CFR 1.14(c) and (h). This box should not be checked if the applicant does not wish the EPO, JPO, KIPO, WIPO, or other intellectual property office in which a foreign application claiming priority to the instant patent application is filed to have access to the instant patent application.

In accordance with 37 CFR 1.14(h)(3), access will be provided to a copy of the instant patent application with respect to: 1) the instant patent application-as-filed; 2) any foreign application to which the instant patent application claims priority under 35 U.S.C. 119(a)-(d) if a copy of the foreign application that satisfies the certified copy requirement of 37 CFR 1.55 has been filed in the instant patent application; and 3) any U.S. application-as-filed from which benefit is sought in the instant patent application.

In accordance with 37 CFR 1.14(c), access may be provided to information concerning the date of filing this Authorization.

# Applicant Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

**Applicant 1**    [Remove]

If the applicant is the inventor (or the remaining joint inventor or inventors under 37 CFR 1.45), this section should not be completed. The information to be provided in this section is the name and address of the legal representative who is the applicant under 37 CFR 1.43; or the name and address of the assignee, person to whom the inventor is under an obligation to assign the invention, or person who otherwise shows sufficient proprietary interest in the matter who is the applicant under 37 CFR 1.46. If the applicant is an applicant under 37 CFR 1.46 (assignee, person to whom the inventor is obligated to assign, or person who otherwise shows sufficient proprietary interest) together with one or more joint inventors, then the joint inventor or inventors who are also the applicant should be identified in this section.

[Clear]

| ● Assignee | ○ Legal Representative under 35 U.S.C. 117 | ○ Joint Inventor |
|---|---|---|
| ○ Person to whom the inventor is obligated to assign. | | ○ Person who shows sufficient proprietary interest |

If applicant is the legal representative, indicate the authority to file the patent application, the inventor is:

Name of the Deceased or Legally Incapacitated Inventor :

If the Applicant is an Organization check here.    [X]

| Organization Name | Eagle Pharmaceuticals, Inc. |
|---|---|

**Mailing Address Information:**

| Address 1 | 470 Chestnut Ridge Road | | |
|---|---|---|---|
| Address 2 | | | |
| City | Woodcliff Lake | State/Province | NJ |
| Country i | US | Postal Code | 07677 |
| Phone Number | | Fax Number | |

PTO/AIA/14 (08-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 820.1041-U2 |
|---|---|---|
| | Application Number | |

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
|---|---|

| Email Address | |
|---|---|

Additional Applicant Data may be generated within this form by selecting the Add button.    [ Add ]

## Non-Applicant Assignee Information:

Providing assignment information in this section does not subsitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

### Assignee    1

Complete this section only if non-applicant assignee information is desired to be included on the patent application publication in accordance with 37 CFR 1.215(b). Do not include in this section an applicant under 37 CFR 1.46 (assignee, person to whom the inventor is obligated to assign, or person who otherwise shows sufficient proprietary interest), as the patent application publication will include the name of the applicant(s).

[ Remove ]

If the Assignee is an Organization check here.    ☐

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | | | | |

**Mailing Address Information:**

| Address 1 | |
|---|---|
| Address 2 | |

| City | | State/Province | |
|---|---|---|---|
| Country  i | | Postal Code | |
| Phone Number | | Fax Number | |
| Email Address | | | |

Additional Assignee Data may be generated within this form by selecting the Add button.    [ Add ]

## Signature:

[ Remove ]

NOTE:  This form must be signed in accordance with 37 CFR 1.33.  See 37 CFR 1.4 for signature requirements and certifications

| Signature | /Christina M. Jordan/ | | | Date  (YYYY-MM-DD) | 2013-02-14 |
|---|---|---|---|---|---|
| First Name | Christina M. | Last Name | Jordan | Registration Number | 61098 |

Additional Signature may be generated within this form by selecting the Add button.    [ Add ]

PTO/AIA/14 (08-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 820.1041-U2 |
| | Application Number | |
| Title of Invention | FORMULATIONS OF BENDAMUSTINE | |

This collection of information is required by 37 CFR 1.76. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 23 minutes to complete, including gathering, preparing, and submitting the completed application data sheet form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.  The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2.  A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.  A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.  A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.  A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.  A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.  A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.  A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.  A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

1

# FORMULATIONS OF BENDAMUSTINE

## CROSS-REFERENCE TO RELATED APPLICATION

5

This patent application claims priority under 35 U.S.C. §119(e) to U.S. Provisional Patent Application No. 61/598,729, filed February 14, 2012, entitled "FORMULATIONS OF BENDAMUSTINE", the contents of which are incorporated by reference herein in its entirety.

10

## BACKGROUND OF THE INVENTION

Bendamustine free base is represented by the following structural formula (I)



(I).

15

Bendamustine is used in the treatment of a number of cancers including leukemias, Hodgkin's disease and multiple myelomas. Bendamustine is the active ingredient of the commercial product Treanda™, a lyophilized powder for reconstitution.

20 Bendamustine exhibits rapid degradation upon reconstitution of the lyophilized product. Bendamustine undergoes hydrolysis by direct substitution rather than an addition elimination process due to the presence of the highly labile aliphatic chlorine atoms. Some of the main degradants of bendamustine are the monohydroxy compound known as HP1 (hydrolysis product 1) and dihydroxy compound HP2

25 (hydrolysis product 2). The monohydroxy compound appears as the main impurity at Relative Retention Time (RRT) 0.6 and the dihydroxy compound appears as the main impurity at RRT 0.27. Minor peaks appear at RRT 1.2, which are presently unknown.

The stability of bendamustine in water is measured in hours, and is therefore, not suitable for long-term storage in liquid form.  The lyophile possesses good chemical stability.  However, reconstitution of the lyophile is clinically inconvenient, taking 15
5   – 30 minutes with implications of chemical instability.  There is a need for ready to use (RTU) bendamustine formulations having enhanced stability.

Some parenteral formulations containing lower molecular weight PEG's have significant variations in long term product stability from batch to batch.  It has been
10   determined that at least some and perhaps all of this unacceptable property is attributable to the PEG included therein.  The amount of degradation observed in such formulations, typically in the form of PEG-esters of bendamustine, negatively impacts the expected shelf life of the formulations.  Reproducibility of batch to batch stability assures consistent product potency and reduces the need for premature product recall
15   and destruction.

Lower molecular weight polyethylene glycols (PEG's) such as liquid PEG's having molecular weights from 200 to 600, PEG 400 most commonly, have been included in pharmaceutical formulations for decades.  They are available from a number of
20   suppliers globally.  It has been found that there is significant variability in the excipient's stability depending upon the supplier, storage conditions, handling conditions, etc.  Sometimes, batches including the PEG as received from the supplier have the performance specifications expected.  Other times, they do not. This even occurs in some situations when an initial batch made with a certain supplier's PEG
25   met performance requirements.  Preventing or counteracting the deleterious of effects of some PEG's in liquid formulations would be an advance in the art.  The present invention addresses this need.

**SUMMARY OF THE INVENTION**

30

In some aspects of the invention, the liquid bendamustine-containing compositions include a) a pharmaceutically acceptable fluid which contains a mixture of propylene glycol and polyethylene glycol, b) an organic compound or an inorganic compound in an amount sufficient to obtain a pH of from about 6.0 to about 11 for the polyethylene

glycol as measured using United States Pharmacopeia (USP) official monograph for polyethylene glycol, and c) a stabilizing amount of an antioxidant. The amount of bendamustine as calculated on the basis of the HCl salt included in the composition is preferably from about 20 mg/mL to about 60 mg/mL. Still further aspects of the invention include methods of treatment using bendamustine-containing compositions and kits containing the same.

One of the advantages of the inventive liquid compositions is that they have substantially improved long term stability. The batch to batch variability in stability attributable to the PEG included therein has been overcome. For example, the inventive bendamustine compositions are substantially free of impurities after at least about 15 months at a temperature of from about 5 ºC to about 25 ºC. The inventive formulations are advantageously ready to use or ready for further dilution. Reconstitution of lyophilized powders when therapy is desired is not required.

**BRIEF DESCRIPTION OF THE DRAWINGS**

Figures 1-8 are data tables corresponding to Examples 1-7.

FIG. 1 is data Table 1 corresponding to Comparative Example 1.

FIG. 2 is data Table 2 corresponding to Example 2.

FIG. 3 is data Table 3 corresponding to Example 3.

FIG. 4A is data Table 4A corresponding to Example 4.

FIG. 4B is data Table 4B corresponding to Example 4.

FIG. 5A is data Table 5A corresponding to Example 5.

FIG. 5B is data Table 5B corresponding to Example 5.

FIG. 6 is data Table 6 corresponding to Example 6.

FIG. 7 is data Table 7 corresponding to Example 6.

FIG. 8 is data Table 8 corresponding to Example 7.

5

**DETAILED DESCRIPTION OF THE INVENTION**

Unless defined otherwise, all technical and scientific terms used herein have the same

10    meaning as is commonly understood by one of ordinary skill in the art to which this

invention belongs.  In the event that there is a plurality of definitions for a term

herein, those in this section prevail unless stated otherwise.

As used herein, RRT is calculated by dividing the retention time of the peak of

15    interest by the retention time of the main peak.  Any peak with an RRT <1 elutes

before the main peak, and any peak with an RRT >1 elutes after the main peak.

For purposes of the present invention, "substantially free of impurities" shall be

understood to include bendamustine-containing compositions in which the amount of

20    total polyethylene glycol esters and propylene glycol esters is less than about 5%, as

calculated on a normalized peak area response ("PAR") basis as determined by high

performance liquid chromatography ("HPLC") at a wavelength of 223nm, after a

period of about 15 months at a temperature of from about 5ºC to about 25ºC.  The

amount of impurities is further calculated as being based upon the original amount

25    bendamustine (or salt thereof) being present in the composition or formulation.  In

one embodiment, the amount of total impurities in the inventive compositions

resulting from the degradation of the bendamustine as evidenced by e.g. PEG-

bendamustine esters and PG esters thereof, is less than about 3%, and more preferably

less than about 2.4%, PAR as determined by HPLC at a wavelength of 223nm after at

30    least about 2 years at a temperature of from about 5 ºC to about 25 ºC.

For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid

which is suitable for pharmaceutical use.

Preferably, in the inventive compositions, the amount of any individual polyethylene glycol esters does not exceed 0.2% and the amount of any individual propylene glycol esters does not exceed 1.5% PAR as determined by HPLC at a wavelength of 223nm after storage periods of at least about 15 months at a temperature of from about 5°C to about 25ºC.  Preferably, the amount of total polyethylene glycol esters is less than about 2%.  Preferably, the amount of total propylene glycol esters is less than about 3%.  In some aspects, the amount of time the inventive compositions demonstrate long term storage stability is at least about 18 months and preferably at least about 2 years when stored under the conditions described herein.

In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions including:

a)  bendamustine or a pharmaceutically acceptable salt thereof; and

b)  a pharmaceutically acceptable fluid including

i)  a mixture of PEG and PG;

ii) an organic compound or inorganic compound, or mixtures thereof in an amount sufficient to obtain an apparent pH of from about 6.0 to about 11 for the polyethylene glycol, as measured using USP official monograph for polyethylene glycol; and

iii)  a stabilizing amount of an antioxidant.

The total impurities in the inventive compositions resulting from the degradation of the bendamustine in the compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223nm after at least about 15 months at a temperature of from about 5 ºC to about 25 ºC, and thus have long term stability for at least the same period of time or longer. Preferably, the bendamustine-containing compositions demonstrate long term storage stability for at least about 2 years, especially when stored at the lower (refrigerated) temperatures.

In some aspects of the invention, the bendamustine is preferably present in the formulation as the HCl salt.

In some aspects of the invention, the bendamustine concentration calculated on the basis of the HCl salt in the inventive compositions is from about 10 mg/mL to about 100 mg/mL, preferably 20 mg/mL to about 60 mg/mL.  Preferably the bendamustine concentration in the inventive compositions is from about 25 mg/mL to about 50

5    mg/mL, and more preferably from about 30 mg/mL to about 50 mg/mL.  It will be understood that compositions containing any useful concentration within the ranges, i.e. 10, 20, 25, 30, 35, 40, 45, 50, 55, 60 . . . 100 are contemplated.  In other embodiments, the bendamustine concentration in the composition is about 25 mg/mL. In alternative aspects, the amount of bendamustine is outside these ranges but the

10    amounts will be sufficient for single or multiple administrations of dosages generally regarded as effective amounts.

In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt

15    thereof.  Within this aspect, the pharmaceutically acceptable fluid is a mixture of propylene glycol (PG) and polyethylene glycol (PEG).  For example, the pharmaceutically acceptable fluid can include about 50% PEG and about 50% PG. Alternatively, pharmaceutically acceptable fluid includes about 95% PEG and about 5% PG.  The amount of PEG and PG can also be varied within the ranges, i.e. the

20    ratio of PEG:PG in the pharmaceutically acceptable fluid can range from about 95:5 to about 50:50.  Within this range, is a pharmaceutically acceptable fluid containing about 75% PEG and about 25% PG, and preferably 80% PEG and 20% PG.  In another embodiment, a pharmaceutically acceptable fluid can include about 85% PEG and about 15% PG while another preferred pharmaceutically acceptable fluid includes

25    about 90% PEG and about 10% PG.  The molecular weight of the PEG is within the range of pharmaceutically acceptable weights although PEG 400 is preferred in many aspects of the invention.

In accordance with the USP official monograph for polyethylene glycol, see USP 35-

30    NF30, the contents of which are incorporated by reference herein, the PEG pH is determined as follows: 5 g of PEG is dissolved into 100 ml carbon dioxide free water, and 0.3 ml of saturated KCl solution is added.  The pH is then measured.  This value is sometimes referred to as the apparent pH.  Different amounts of organic or inorganic compounds can be added to the PEG in order to arrive at a pH of from

about 6.0 to about 11.  Preferably, the pH of the PEG is from about 6.0 to about 11. More preferably, the pH of the PEG is from about 6.5 to about 8.  In other preferred aspects, the pH is about 8.

5    The pH of the PEG is not the same as the pH of the final bendamustine HCl formulation.  Preferably, the pH of the final bendamustine-containing formulation is from about 3.3 to about 4.  More preferably, the pH of the final bendamustine-containing formulation is about 3.5.  The pH of the final bendamustine-containing formulation is measured in accordance with the USP official monograph for

10    polyethylene glycol.  Preferably, a 5 g aliquot of the final bendamustine-containing formulation is added to 100 ml carbon dioxide free water, and 0.3 ml of saturated KCl solution is added.  The pH is then measured and adjusted if necessary to the preferred range.

15    Without meaning to be bound by any theory or hypothesis, polyethylene glycol quality can vary from batch to batch, manufacturer to manufacturer, over product lifetime and as a result of handling.  Such variation has made it difficult to make reproducible long term storage stable bendamustine-containing formulations with high amounts of polyethylene glycol and propylene glycol, as the formation of PEG

20    and PG esters is high.  In order to obtain reproducible formulations, PEG is treated with an organic or inorganic compound to achieve the desired USP apparent pH.  This treatment results in reproducible long-term storage stable bendamustine-containing compositions, with substantially no PEG or PG ester formation.

25    The bendamustine-containing compositions according to several preferred aspects of the invention include a stabilizing amount of an antioxidant.  For purposes of the present invention, "stabilizing amount" shall be understood to include those amounts which increase or enhance the stability of the bendamustine in the compositions described herein.  The presence of one or more antioxidants described herein thus

30    contributes, at least in part to the long term stability of the composition.  Within this guideline, suitable antioxidant concentrations in the compositions can range from about 2.5 mg/mL to about 35 mg/mL, and preferably from about 5 mg/mL to about 20 mg/mL or from about 10 mg/mL to about 15 mg/mL. In some other embodiments, the

concentration of the antioxidant in the bendamustine-containing composition is about 5 mg/mL.

Suitable antioxidants for inclusion include those which are pharmaceutically
5    acceptable for use in human and veterinary formulations although not limited to those currently regarded as safe by any regulatory authority.  For example, the antioxidant can be selected from among lipoic acid, thioglycerol (also known as monothioglycerol) and analogs thereof, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and
10    aliphatic compounds, dihydrolipoic acid and mixtures of the foregoing.  Preferably, the antioxidant is thioglycerol, lipoic acid or a mixture thereof. Some particularly preferred embodiments of the invention include thioglycerol.

In some aspects of the invention, organic compounds, inorganic compounds, and
15    mixtures thereof are suitable acidity/alkalinity adjustors.  Organic compounds include carboxylic compounds, nitrogenous compounds, carbonates, bicarbonates, and salts thereof.  Preferably, the organic compounds are selected from monoethanolamine, diethanolamine, ethylenediaminetetraacetic acid (EDTA) phospholipid salts, ascorbate, ascorbic acid, sodium citrate, sodium sulfonic acid, sodium lauryl sulfate,
20    quaternary amines, quaternary ammonium salts, and sodium acetate.  Preferably, the organic compounds are selected from inorganic salts of organic acids.  More preferably, the organic compound is sodium acetate.  Inorganic compounds include compounds known to those of skill in the art, including, but not limited to, salts of hydroxides and salts of phosphates, sodium formate, sodium phosphate, potassium
25    hydroxide, and phosphoric acid.  Most preferably, the inorganic compound is sodium hydroxide.

In some embodiments of the invention, the amount of the organic compound or inorganic compound functioning as the acidity/alkalinity adjustor is provided in an
30    amount sufficient to obtain a pH of from about 6.0 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol.  In some aspects of the invention, about 0.5 µL to about 50 µL of a 1N acidity/alkalinity adjustor solution is provided per 1 mL of a bendamustine-containing composition.  Preferably, about 1 µL to about 10 µL of a 1N acidity/alkalinity adjustor solution is provided per

1 mL of a bendamustine-containing composition.  In some aspects of the invention, the acidity/alkalinity adjustor is added to the polyethylene glycol prior to the addition of the other materials in the formulation.  In other aspects the acidity/alkalinity adjustor is added to the pharmaceutically acceptable fluid after the addition of the

5   other materials to adjust the acidity or alkalinity as needed.  In some aspects of the invention, the concentration of the organic compound in the final formulation is from about 0.005M (molarity) to about 0.1M (molarity), and more preferably, about 0.01M. In some aspects of the invention, the concentration of the inorganic compound in the final formulation is from about 0.0005M (molarity) to about 0.04M (molarity).  It will

10   be understood that any useful concentration within the ranges, i.e. 0.001, 0.0015, 0.005, 0.01, 0.02, 0.03, 0.04 are contemplated.  Preferably, the concentration of the inorganic compound in the final formulation is about 0.01 molarity.

In view of the foregoing, some preferred non-aqueous, liquid, long term storage stable

15   bendamustine-containing compositions in accordance with the invention include:

I.      a)  bendamustine or a pharmaceutically acceptable salt thereof; and

b)  a pharmaceutically acceptable fluid including

i)  polyethylene glycol and propylene glycol;

ii) an organic compound or inorganic compound, or mixtures

20   thereof in an amount sufficient to obtain a pH of from about 6.0 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol; and

iii)  a stabilizing amount of thioglycerol; or

II.     a)  about 25 mg/mL bendamustine or a pharmaceutically acceptable

25   salt thereof; and

b)  a pharmaceutically acceptable fluid including

i)  about 90% PEG and about 10% PG;

ii) an organic compound or inorganic compound, or mixtures thereof in an amount sufficient to obtain a pH of from about 6.0 to

30   about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol; and

iii)  about 2.5 mg/mL thioglycerol.

Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total esters, PAR as determined by HPLC at a wavelength

of 223nm, after at least about 15 months of storage at a temperature of from about 5 °C to about 25 °C.

Some more preferred formulations include:

5    I.    a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including

i) polyethylene glycol and propylene glycol;

ii) sodium hydroxide in an amount sufficient to obtain a pH of from about 6.5 to about 11 for the polyethylene glycol, as measured using USP

10    monograph for polyethylene glycol; and

iii) a stabilizing amount of thioglycerol; or

II.    a) bendamustine or a pharmaceutically acceptable salt thereof at a concentration of about 25 mg/mL; and

b) a pharmaceutically acceptable fluid including

15    i) 90% polyethylene glycol and 10% propylene glycol;

ii) sodium hydroxide in an amount sufficient to obtain a pH of from about 6.5 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol; and

iii) thioglycerol at a concentration of about 5 mg/mL; or

20    III.    a) bendamustine or a pharmaceutically acceptable salt thereof at a concentration of about 25 mg/mL; and

b) a pharmaceutically acceptable fluid including

i) 85% polyethylene glycol and 15% propylene glycol;

ii) sodium hydroxide in an amount sufficient to obtain a pH of from about 6.5 to about 11 for the polyethylene glycol, as measured using USP

25    monograph for polyethylene glycol; and

iii) thioglycerol at a concentration of about 5 mg/mL; or

IV.    a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including

30    i) polyethylene glycol and propylene glycol;

ii) sodium acetate in an amount sufficient to obtain a pH of from about 6.5 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol; and

iii) a stabilizing amount of thioglycerol; or

V.  a) bendamustine or a pharmaceutically acceptable salt thereof at a concentration of about 25 mg/mL; and

b) a pharmaceutically acceptable fluid including

i) 90% polyethylene glycol and 10% propylene glycol;

ii) sodium acetate in an amount sufficient to obtain a pH of from about 6.5 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol; and

iii) thioglycerol at a concentration of about 5 mg/mL; or

VI.  a) bendamustine or a pharmaceutically acceptable salt thereof at a concentration of about 25 mg/mL; and

b) a pharmaceutically acceptable fluid including

i) 85% polyethylene glycol and 15% propylene glycol;

ii) sodium acetate in an amount sufficient to obtain a pH of from about 6.5 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol; and

iii) thioglycerol at a concentration of about 5 mg/mL.

Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total esters, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223nm, after at least about 15 months of storage at a temperature of from about 5 °C to about 25 °C.

In other aspects of the invention, preferred long term storage stable bendamustine-containing compositions in accordance with the invention include:

I.  a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including

i) polyethylene glycol and propylene glycol;

ii) sodium hydroxide in an amount sufficient to obtain a pH of from about 3.3 to about 4.2 for the long term storage stable bendamustine-containing composition, as measured using USP monograph for polyethylene glycol; and

iii) a stabilizing amount of thioglycerol; or

    II.    a) bendamustine or a pharmaceutically acceptable salt thereof at a concentration of about 25 mg/mL; and

        b) a pharmaceutically acceptable fluid including

            i) 90% polyethylene glycol and 10% propylene glycol;

5             ii) sodium hydroxide in an amount sufficient to obtain a pH of from about 3.3 to about 4.2 for the long term storage stable bendamustine-containing composition, as measured using USP monograph for polyethylene glycol; and

            iii) thioglycerol at a concentration of about 5 mg/mL; or

10  III.    a) bendamustine or a pharmaceutically acceptable salt thereof at a concentration of about 25 mg/mL; and

        b) a pharmaceutically acceptable fluid including

            i) 85% polyethylene glycol and 15% propylene glycol;

            ii) sodium hydroxide in an amount sufficient to obtain a pH of from

15 about 3.3 to about 4.2 for the long term storage stable bendamustine-containing composition, as measured using USP monograph for polyethylene glycol; and

            iii) thioglycerol at a concentration of about 5 mg/mL; or

    IV.    a) bendamustine or a pharmaceutically acceptable salt thereof; and

20         b) a pharmaceutically acceptable fluid including

            i) polyethylene glycol and propylene glycol;

            ii) sodium acetate in an amount sufficient to obtain a pH of from about 3.3 to about 4.2 for the long term storage stable bendamustine-containing composition, as measured using USP monograph for polyethylene glycol; and

25             iii) a stabilizing amount of thioglycerol; or

    V.    a) bendamustine or a pharmaceutically acceptable salt thereof at a concentration of about 25 mg/mL; and

        b) a pharmaceutically acceptable fluid including

            i) 90% polyethylene glycol and 10% propylene glycol;

30             ii) sodium acetate in an amount sufficient to obtain a pH of from about 3.3 to about 4.2 for the long term storage stable bendamustine-containing composition, as measured using USP monograph for polyethylene glycol; and

            iii) thioglycerol at a concentration of about 5 mg/mL; or

VI. a) bendamustine or a pharmaceutically acceptable salt thereof at a concentration of about 25 mg/mL; and

 b) a pharmaceutically acceptable fluid including

  i) 85% polyethylene glycol and 15% propylene glycol;

5   ii) sodium acetate in an amount sufficient to obtain a pH of from about 3.3 to about 4.2 for the long term storage stable bendamustine-containing composition, as measured using USP monograph for polyethylene glycol; and

   iii) thioglycerol at a concentration of about 5 mg/mL.

Each of these compositions have the same stability profiles already described, i.e.

10 having less than about 5% total esters, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223nm, after at least about 15 months of storage at a temperature of from about 5 °C to about 25 °C.

15 Another embodiment of the invention provides methods of treating cancer in mammals.  The methods include administering to a mammal in need thereof an effective amount of one of the bendamustine-containing compositions described herein.  Since the active ingredient portion of the inventive composition is an FDA-approved drug, those of ordinary skill will recognize that the doses of bendamustine

20 employed in this aspect of the invention will be similar to those employed in any treatment regimens designed for bendamustine as marketed under the trade name TREANDA.  The patient package insert containing dosing information is incorporated herein by reference.  The methods of treatment also include administering the inventive formulations for any purpose or physical condition for

25 which bendamustine has been indicated as being useful.

Another embodiment of the invention includes methods of preparing bendamustine-containing compositions described herein.  The methods include combining lyophilized bendamustine preferably as the HCl salt in a pharmaceutically acceptable

30 fluid:

  A) i) a mixture of PEG and PG within the desired ratios described herein, e.g. 90:10, etc.;

ii) an organic compound or an inorganic compound in an amount sufficient to obtain a pH of from about 6.5 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol; and

iii) a stabilizing amount of an antioxidant.

5

The steps are carried out under pharmaceutically acceptable conditions for sterility and manufacturing.

In a further aspect of the invention, there are provided methods of controlling or

10    preventing the formation of polyethylene glycol esters and propylene glycol esters in bendamustine-containing compositions during long term storage. The methods include combining an amount of bendamustine or a pharmaceutically acceptable salt thereof with a sufficient amount of a pharmaceutically acceptable fluid containing:

i) a mixture of PEG and PG in the ratios described herein;

15    ii) an organic compound or an inorganic compound in an amount sufficient to obtain a pH of from about 6.5 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol; and

iii) a stabilizing amount of an antioxidant.

20    Further optional steps in accordance therewith include transferring one or more pharmaceutically acceptable doses of the formulations into a suitable sealable container and storing the sealed container at a temperature of from about 5 °C to about 25 °C. As a result of carrying out these steps, it is possible to control or substantially prevent the formation of impurities which otherwise occur with

25    bendamustine-containing compositions during long term storage so that the artisan is provided with bendamustine-containing formulations having less than about 5 % total esters PAR as determined by HPLC at a wavelength of 223nm, after at least about 15 months of storage at a temperature of from about 5 °C to about 25 °C.

30    The compositions of the present invention can be packaged in any suitable sterile vial or container fit for the sterile storage of a pharmaceutical such as bendamustine. Preferably, the vials containing the formulation are sparged with nitrogen under seal before storage. Suitable containers can be glass vials, polypropylene or polyethylene

vials or other special purpose containers and be of a size sufficient to hold one or more doses of bendamustine.

A further aspect of the invention includes kits containing lyophilized bendamustine or
5    a pharmaceutically acceptable salt thereof in a first container or vial; and, in a second container, a sufficient amount of a pharmaceutically acceptable fluid such as those described herein:

      i)  a mixture of PEG and PG;

      ii) an organic compound or an inorganic compound in an amount sufficient to
10    obtain a pH of from about 6.5 to about 11 for the polyethylene glycol, as measured using USP monograph for polyethylene glycol; and

      iii)  a stabilizing amount of an antioxidant.

For purposes of this embodiment, the amount of fluid which is sufficient is an amount
15    which allows the bendamustine to be dissolved or dispersed to a degree which renders the liquid composition ready for use, i.e. to administer to a patient in need thereof directly, or for dilution into a larger volume infusion at point of delivery.

As will be appreciated by those of ordinary skill, the kit will contain other
20    pharmaceutically necessary materials for storing and/or administering the drug, including instructions for storage and use, additional diluents, if desired, etc.

## EXAMPLES

The following examples serve to provide further appreciation of the invention but are
25    not meant in any way to restrict the effective scope of the invention.

### Comparative Example 1

A mixture of PEG:PG (90:10) was prepared by combining 10 ml of PG with PEG 400
30    qs 100 ml.  Thioglycerol at a concentration of 5 mg/ml was added to 80 ml of the PEG:PG (90:10) mixture and mixed well.  The PEG:PG (90:10) and thioglycerol mixture was sparged with $N_2$.  Bendamustine HCl at a concentration of 25 mg/ml was then added to 40 ml of the PEG:PG (90:10) and thioglycerol mixture, and mixed well. The volume of the bendamustine-containing formulation was made up to 50 ml with

the PEG:PG (90:10) mixture, and then sparged with $N_2$. The bendamustine-containing formulation was then filtered and transferred to 5cc vials, with each vial containing 4 ml. The vials were sparged with $N_2$, stoppered, crimped with aluminum seals. The samples were maintained at 40 °C, 25 °C and 5 °C and analyzed after 15 days, one month, three months or five months for drug content and impurity profile as indicated in FIG. 1 (Table 1). The results obtained are presented in FIG. 1 (Table 1). At 14 days at 40 °C, the pH of the bendamustine-containing formulation was taken in accordance with the USP official monograph. 5 g of the final bendamustine-containing formulation was added to 100 ml carbon dioxide free water, and 0.3 ml of saturated KCl solution was added. The pH was measured to be 3.38.

As shown in FIG. 1 (Table 1), the sample, which did not include NaOH, did not provide long term storage stability. This sample exhibited more than 16% total esters compared to initial after only 15 days at 40 °C. It was determined that bendamustine-containing compositions with such high ester formation would not be suitable for long term storage. It was determined that the cause of the excess ester formation was the PEG.

## Example 2

A mixture of PEG 400 treated with NaOH was prepared by combining 200 μl of 1N NaOH to a concentration of 0.001 molarity and PEG qs to 200 ml, and mixing well. The pH of the PEG 400 and NaOH mixture was taken in accordance with the USP official monograph. 5 g of the PEG 400 and NaOH mixture was added to 100 ml carbon dioxide free water, and 0.3 ml of saturated KCl solution was added. The pH was then measured to be 7.30, which is within the preferred range. A PEG:PG (90:10) mixture was prepared by combining 20 ml of PG and the PEG 400 and NaOH mixture qs 200 ml. Thioglycerol at a concentration of 5 mg/ml was added to 60 ml of the PEG:PG (90:10) mixture and mixed well. Bendamustine HCl at a concentration of 25 mg/ml was then added to 40 ml of the PEG:PG (90:10) and thioglycerol mixture, and mixed well. The volume of the bendamustine-containing formulation was made up to 75 ml with the PEG:PG (90:10) solution. The bendamustine-containing formulation was then filtered and transferred to 5cc vials, with each vial containing 4 ml. The pH of the bendamustine-containing formulations was taken in

accordance with the USP official monograph.  5 g of the final bendamustine-containing formulation was added to 100 ml carbon dioxide free water, and 0.3 ml of saturated KCl solution was added.   The pH was then measured and recorded in FIG. 2 (Table 2).    The vials were sparged with $N_2$, stoppered, crimped with aluminum seals.  The samples were maintained at 25 °C and 5 °C and analyzed after 15 days, one month, three months, or six months for drug content, pH and impurity profile as indicated in FIG. 2 (Table 2).  The results obtained are presented in FIG. 2 (Table 2).

As shown in FIG. 2 (Table 2), even without "pre" sparging steps, bendamustine, when dissolved in polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of thioglycerol, and NaOH at a concentration of 0.001 molarity, had substantially no increase in total degradants after a period of at least six months at 25 °C.  The bendamustine-containing compositions had about 1.23% total esters after 6 months analysis at 25 °C.  Additionally, the pH of the compositions was maintained at about 3.4 throughout the duration of the long term storage.  The data presented in FIG. 2 (Table 2) translates into bendamustine-containing compositions including PEG and PG, an antioxidant, and NaOH having a shelf life of at least about 15 months of storage at a temperature of from 5 °C to about 25 °C with levels of impurities within the levels required herein.

**Example 3**

PEG:PG (90:10) mixtures were prepared by combining 10 ml of PG with PEG 400 qs 100 ml.  Thioglycerol at a concentration of 5 mg/ml was added to 80 ml of the PEG:PG (90:10) mixture and mixed well.  Bendamustine HCl at a concentration of 25 mg/ml was then added to 40 ml of the PEG:PG (90:10) and thioglycerol mixture, and mixed well.  In addition to a sample, in which no NaOH was added (Sample 1), two samples were made in which a 1N NaOH solution was added to the PEG:PG (90:10) mixture to a concentration of 0.01 or 0.03 molarity (Samples 2 and 3, respectively), as indicated in FIG. 3 (Table 3), and mixed. The 0.01 and 0.03 molarity samples are unlike the samples in Examples 1 and 2, where the concentration of NaOH was 0.001 molarity.  The volume of the bendamustine-containing solution was made up to 50 ml with the PEG:PG (90:10) mixture.  The bendamustine-containing formulation was then filtered and transferred to 5cc vials, with each vial containing 4 ml.  The initial

pH of the bendamustine-containing formulations was taken in accordance with the USP official monograph.  5 g of the final bendamustine-containing formulation was added to 100 ml carbon dioxide free water, and 0.3 ml of saturated KCl solution was added.   The pH was then measured and recorded in FIG. 3 (Table 3).    The vials

5    were sparged with $N_2$, stoppered, crimped with aluminum seals.  The samples were maintained at 40 °C and 25 °C and analyzed after 15 days, one month, two months, or three months for drug content and impurity profile as indicated in FIG. 3 (Table 3). The results obtained are presented in FIG. 3 (Table 3).

10    As shown in FIG. 3 (Table 3), bendamustine, when dissolved in polyethylene glycol and propylene glycol, in the presence of thioglycerol and NaOH at a concentration of 0.01 molarity or 0.03 molarity, has a pH of about 3.5 to about 4, which is within the preferred pH range.  The bendamustine-containing samples according to the invention had substantially no increase in total degradants after a period of at least three months

15    at 25 °C.  The bendamustine-containing compositions with NaOH concentration of 0.01 molarity and 0.03 molarity had about 0.33% and 1.26% total esters, respectively, after 15 days analysis at 40 °C.  This data supports the position that bendamustine-containing compositions according to the invention have a shelf life of at least about 2 years, if not longer, when stored under ambient or refrigerated storage conditions with

20    levels of impurities within the levels required herein.

Also shown in FIG. 3 (Table 3), the control sample, which did not include NaOH did not provide long term storage stability.  The pH of the control sample was 3.12.  This sample exhibited more than 26% total esters compared to initial after only 15 days at

25    40 °C, and almost 19% total esters compared to initial after 3 months at 25 °C. Bendamustine-containing compositions with such high levels of degradation would not be long term storage stable.

**Example 4**

30

Mixtures of PEG 400 with NaOH were prepared by combining 0.1 ml, 0.2 ml or 0.3 ml (Samples 5, 6 and 7, respectively) of 1N NaOH and PEG qs to 200 ml, and mixing well.  The pH of the PEG 400 and NaOH mixtures was taken in accordance with the USP official monograph.  5 g of the PEG 400 and NaOH mixtures were added to 100

ml carbon dioxide free water, and 0.3 ml of saturated KCl solution was added.   The
pH was then measured.  The pH of the PEG 400 and NaOH mixture for Sample 5 was
6.32.  The pH of the PEG 400 and NaOH mixture for Sample 6 was 7.30. The pH of
the PEG 400 and NaOH mixture for Sample 7 was 7.89.  The pH for the PEG 400 and

5      NaOH mixtures for each of Samples 5, 6 and 7 were within the preferred range.
Mixtures of PEG:PG (90:10) were prepared by combining 20 ml of PG with PEG 400
qs 200 ml, without NaOH (Sample 4) or with NaOH at a concentration of 0.0005,
0.001, or 0.0015 molarity (Samples 5, 6 and 7, respectively), as indicated in FIGS. 4A
and 4B (Tables 4A and 4B).  Thioglycerol at a concentration of 5 mg/ml was added to

10     80 ml of the PEG:PG (90:10) mixture and mixed well.  Bendamustine HCl at a
concentration of 25 mg/ml was then added to 80 ml of the PEG:PG (90:10) and
thioglycerol mixture, and mixed well.  The volume of the bendamustine-containing
formulation was made up to 100 ml with the PEG:PG (90:10) mixture, and mixed.
The bendamustine-containing formulation was then filtered and transferred to 5cc

15     vials, with each vial containing 4 ml.  The vials were sparged with $N_2$, stoppered,
crimped with aluminum seals.  The samples were maintained at 40 °C, 25 °C and 5 °C
and analyzed after 15 days, one month, two months, three months or six months for
drug content, impurity profile and pH as indicated in FIGS. 4A and 4B (Tables 4A
and 4B).  The pH was evaluated as per the USP official monograph.  5 g of the final

20     bendamustine-containing formulation was added to 100 ml carbon dioxide free water,
and 0.3 ml of saturated KCl solution was added.   The pH was then measured.  The
results obtained are presented in FIGS. 4A and 4B (Tables 4A and 4B).


As shown in FIGS. 4A and 4B (Tables 4A and 4B), bendamustine, when dissolved in

25     polyethylene glycol and propylene glycol, in the presence of thioglycerol and NaOH
at a concentration of 0.0005 molarity, 0.001 molarity or 0.0015 molarity, the
bendamustine-containing samples according to the invention have a pH of about 3.3
to about 3.6.  This is within the preferred pH range.  The bendamustine-containing
samples according to the invention had no or substantially no increase in total

30     degradants after a period of at least six months at 5 °C.  The bendamustine-containing
compositions with NaOH concentration of 0.005 molarity had about 2.35% total
esters after six months analysis at 25 °C.  The bendamustine-containing compositions
with NaOH concentration of 0.001 molarity had about 1.41% total esters after six
months analysis at 25 °C.  The bendamustine-containing compositions with NaOH

concentration of 0.0015 molarity had about 1.21% total esters after six months analysis at 25 °C. This data projects a shelf life of at least about 2 years, if not longer, when stored under ambient or refrigerated storage conditions with levels of impurities within the levels required herein.

5

Also shown in FIGS. 4A and 4B (Tables 4A and 4B), the control sample, which did not include NaOH, did not provide long term storage stability. The pH of the control sample is ranges from 3.17 to 3.25. This sample exhibited more than 28% total esters compared to initial after six months at 25 °C. Bendamustine-containing compositions

10    with such high levels of degradation would not be long term storage stable.


## Example 5


PEG:PG (90:10) mixtures were prepared by combining 10 ml of PG and PEG 400 qs

15    100 ml. Thioglycerol at a concentration of 5 mg/ml was added to 50 ml of the PEG:PG (90:10) mixture and mixed well. Bendamustine HCl at a concentration of 25 mg/ml was then added to 50 ml of the PEG:PG (90:10) and thioglycerol mixture, and mixed well. The volume of the bendamustine-containing formulation was made up to 60 ml with the PEG:PG (90:10) solution. The bendamustine-containing formulation

20    was transferred to 5cc vials, with each vial containing 5 ml. Unlike in previous Examples, to each vial, except the control which was without NaOH (Sample 8), a 1N NaOH solution was added, yielding a final NaOH concentration of 0.01, 0.02, 0.03, 0.04, 0.05, 0.06, 0.07, 0.08, 0.09 or 0.1 molarity (Samples 9, 10, 11, 12, 13, 14, 15, 16, 17 and 18, respectively), as indicated in FIGS. 5A and 5B (Tables 5A and 5B).

25    The vials were sparged with $N_2$, stoppered, crimped with aluminum seals. The samples were maintained at 40 °C and analyzed after 14 days for drug content and impurity profile as indicated in FIGS. 5A and 5B (Tables 5A and 5B). The results obtained are presented in FIGS. 5A and 5B (Tables 5A and 5B).

30    As shown in FIGS. 5A and 5B (Tables 5A and 5B), bendamustine, when dissolved in polyethylene glycol and propylene glycol, in the presence of thioglycerol and NaOH at a concentration of 0.01 molarity, 0.02 molarity, 0.03 molarity, or 0.04 molarity, the bendamustine-containing samples according to the invention have substantially low amount of total degradants after a period of about 14 days at 40 °C compared to

bendamustine-containing samples having no NaOH and NaOH at a concentration 0.05 molarity or greater.  The bendamustine-containing compositions with NaOH concentration from 0.01 to 0.04 molarity had from 0.23% to 2.91% total esters after 14 days analysis at 40 °C.  This data projects a shelf life of at least about 2 years, if

5    not longer, when stored under ambient or refrigerated storage conditions with levels of impurities within the levels required herein.

Also shown in FIGS. 5A and 5B (Tables 5A and 5B), the control sample, which did not include NaOH, did not provide long term storage stability.  This sample exhibited

10    more than 4% total esters after 14 days at 40 °C.  These bendamustine-containing compositions with such high levels of degradation would not be long term storage stable.

The bendamustine-containing compositions with NaOH concentration of 0.05

15    molarity or greater had more than 6% total esters after 14 days analysis at 40 °C. These bendamustine-containing compositions with such high levels of degradation would not be long term storage stable.

**Example 6**

20

PEG and sodium acetate mixtures were prepared by adding sodium acetate (sodium acetate trihydrate (Sample 19) in FIG. 6 (Table 6) and sodium acetate anhydrous (Sample 20) in FIG. 7 (Table 7)) at a concentration of 0.01 molarity to 81 mL PEG 400 and mixing.  The pH was evaluated as per the USP official monograph.  5 g of the

25    PEG and sodium acetate mixture was added to 100 ml carbon dioxide free water, and 0.3 ml of saturated KCl solution was added.   The pH was then measured.  The PEG and sodium acetate mixture of Sample 19 had a pH of 3.74 and the PEG and sodium acetate mixture of Sample 20 had a pH of 3.67.  The PEG and sodium acetate mixtures of both Samples 19 and 20 are within the preferred range.  PEG:PG (90:10)

30    and sodium acetate mixtures were prepared by combining 10 ml of PG with the PEG 400 sodium acetate mixture and mixing.  Thioglycerol at a concentration of 5 mg/ml was added to the PEG:PG (90:10) sodium acetate solution and mixed.  Bendamustine HCl at a concentration of 25 mg/ml was then added to the PEG:PG (90:10) sodium acetate and thioglycerol mixture, and mixed.  The volume of the bendamustine-

containing formulation was made up to 100 ml with PEG 400. The bendamustine-containing formulation was then filtered and transferred to 5cc vials, with each vial containing 4 ml. The vials were sparged with $N_2$, stoppered, crimped with aluminum seals. The samples were maintained at 40 °C, 25 °C and 5 °C and analyzed after 15 days, one month, or three months for drug content and impurity profile as indicated in FIGS. 6 and 7 (Tables 6 and 7). The results obtained are presented in FIGS. 6 and 7 (Tables 6 and 7).

As shown in FIGS. 6 and 7 (Tables 6 and 7), bendamustine, when dissolved in polyethylene glycol and propylene glycol, in the presence of thioglycerol and sodium acetate at a concentration of 0.01M, the bendamustine-containing samples according to the invention have substantially low amount of total degradants after a period of about 15 days at 40 °C. The bendamustine-containing compositions with sodium acetate concentration of 0.01M also had substantially no degradants after three months analysis at 25 °C. This data projects a shelf life of at least about 2 years, if not longer, when stored under ambient or refrigerated storage conditions with levels of impurities within the levels required herein.

### Example 7

A PEG sodium acetate mixture was prepared by adding sodium acetate trihydrate at a concentration of 0.01 molarity to 81 mL PEG 400, mixing. The pH was evaluated as per the USP official monograph. 5 g of the PEG and sodium acetate mixture was added to 100 ml carbon dioxide free water, and 0.3 ml of saturated KCl solution was added. The pH was then measured. The PEG and sodium acetate mixture had a pH of 3.74, which is within the preferred range. A PEG:PG (90:10) sodium acetate mixture was prepared by combining 10 ml of PG with the PEG 400 sodium acetate mixture and mixing. Thioglycerol at a concentration of 5 mg/ml was added to the PEG:PG (90:10) sodium acetate mixture and mixed. Bendamustine HCl at a concentration of 25 mg/ml was then added to the PEG:PG (90:10) sodium acetate and thioglycerol mixture, and mixed. The volume of the bendamustine-containing formulation was made up to 100 ml with PEG 400. The bendamustine-containing formulation (Sample 21) was then filtered and transferred to 5cc vials, with each vial containing 4 ml. The vials were sparged with $N_2$, stoppered, crimped with aluminum

seals.  The samples were maintained at 40 °C, 25 °C and 5 °C and analyzed after 15 days, one month, or three months for drug content, impurity profile and pH as indicated in FIG. 8 (Table 8).  The pH was evaluated as per the USP official monograph.  5 g of the final bendamustine-containing formulation was added to 100 ml carbon dioxide free water, and 0.3 ml of saturated KCl solution was added.  The pH was then measured.  The results obtained are presented in FIG. 8 (Table 8).

As shown in FIG. 8 (Table 8), bendamustine, when dissolved in polyethylene glycol and propylene glycol, in the presence of thioglycerol and sodium acetate at a concentration of 0.01M, the bendamustine-containing samples according to the invention have a pH of about 3.5 to about 3.64.  This is within the preferred pH range.  The bendamustine-containing samples according to the invention have substantially low amount of total degradants after a period of about six months at 25 °C.  The bendamustine-containing compositions with sodium acetate concentration of 0.01M also had substantially no degradants after six months analysis at 5 °C.

The area % of the total esters increased about 1.31% over six months storage at 25 °C.  Such an increase projects a shelf life of at least about 2 years, if not longer, when stored under ambient or refrigerated storage conditions with levels of impurities within the levels required herein.

**FIG. 1**

**Table 1**

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | Area % of Degradants | | | | | | | | | | | | | % Total Esters |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | PG Esters | | PEG Esters | | | | | | | | | | | |
| | | | | | **1.13** | **1.14** | **1.15** | **1.17** | **1.18** | **1.19** | **1.21** | **1.22** | **1.236** | **1.24** | **1.25** | **1.26** | **1.40** | |
| BDM - 25mg/mL  Thioglycerol - 5mg/mL  PEG 400:PG (90:10) qs to 1mL | Initial | | 24.1 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | 40°C | 15 d | 18.2 | 75.5 | 3.63 | BDL | 1.14 | 2.45 | BDL | 2.54 | 2.48 | 1.87 | 1.23 | 0.66 | 0.38 | 0.13 | BDL | 16.51 |
| | 25°C | 15 d | 23.2 | 96.3 | 0.16 | BDL | 0.07 | 0.14 | BDL | 0.08 | 0.16 | 0.12 | BDL | 0.07 | BDL | BDL | BDL | 0.8 |
| | | 1 M | 22.3 | 92.5 | 0.66 | BDL | 0.30 | 0.49 | BDL | BDL | 0.67 | 0.57 | 0.45 | 0.28 | 0.18 | 0.07 | 0.06 | 3.73 |

1/10

FIG. 2

**Table 2**

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | Area % of degradants | | | | | | | | | % Total Esters | pH value (as per USP) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | PG Esters | | PEG Esters | | | | | | | | |
| | | | | | PG Ester1 | PG Ester2 | 1.17 | 1.19 | 1.21 | 1.22 | 1.23 | 1.24 | | |
| BDM - 25mg Thioglycerol - 5mg PEG 400:PG (90:10) qs to 1mL (NaOH- 0.001 molarity) | Initial | | 25.0 | 100.0 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.08 | 0.08 | 3.44 |
| | 25℃ | 15 days | 24.9 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.43 |
| | | 1M | 24.9 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.42 |
| | | 3M | 24.8 | 99.2 | 0.12 | BDL | BDL | BDL | BDL | BDL | BDL | 0.05 | 0.17 | 3.43 |
| | | 6M | 24.7 | 98.8 | 0.39 | 0.12 | 0.06 | 0.15 | 0.18 | 0.14 | 0.12 | 0.07 | 1.23 | 3.42 |
| | 5℃ | 3M | 24.9 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.45 |
| | | 6M | 24.9 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.45 |

2/10

**FIG. 3**

**Table 3**

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | PG Esters 1.11 | 1.14 | PEG Esters 1.17 | 1.19 | 1.21 | 1.22 | 1.23 | 1.24 | 1.25 | 1.26 | 1.27 | % Total Esters |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. BDM - 25mg Thioglycerol - 5mg PEG 400:PG (90:10 v/v) qs to 1mL (As per USP pH 3.12) | Initial | | 25.0 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | 40°C | 15d | 18.4 | 73.6 | 7.22 | 4.74 | 1.92 | 3.01 | 3.12 | 2.64 | 1.86 | 1.06 | 0.62 | 0.25 | 0.11 | 26.55 |
| | 25°C | 15d | 24.7 | 98.8 | 0.55 | 0.15 | 0.06 | 0.20 | 0.19 | 0.16 | 0.13 | 0.06 | BDL | BDL | BDL | 1.50 |
| | 25°C | 1M | 24.1 | 96.4 | 0.80 | 0.36 | 0.20 | 0.31 | 0.28 | 0.44 | 0.40 | 0.21 | 0.16 | BDL | 0.05 | 3.21 |
| | 25°C | 2M | 22.6 | 90.4 | 2.62 | 1.31 | 0.63 | 0.90 | 0.95 | 0.81 | 0.60 | 0.43 | 0.30 | 0.11 | 0.05 | 8.71 |
| | 25°C | 3M | 20.1 | 80.4 | 4.81 | 2.85 | 1.36 | 2.06 | 2.27 | 1.99 | 1.58 | 1.03 | 0.55 | 0.28 | 0.12 | 18.90 |
| 2. BDM - 25mg Thioglycerol - 5mg NaOH - 0.4mg (0.01 molarity) WFI - 10µL PEG 400:PG (90:10 v/v) qs to 1mL (As per USP pH 3.54) | Initial | | 23.2 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | 40°C | 15d | 23.0 | 99.1 | 0.11 | BDL | BDL | BDL | 0.07 | BDL | BDL | BDL | BDL | BDL | 0.15 | 0.33 |
| | 25°C | 15d | 23.1 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | 25°C | 1M | 23.0 | 99.1 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | 25°C | 2M | 22.7 | 97.8 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.07 | 0.07 |
| | 25°C | 3M | 22.7 | 97.8 | 0.11 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.10 | 0.21 |
| 3. BDM - 25mg Thioglycerol - 5mg NaOH -1.2mg (0.03 molarity) WFI - 10µL PEG 400:PG (90:10 v/v) qs to 1mL (As per USP pH 4.05) | Initial | | 24.0 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | 40°C | 15d | 22.8 | 95.0 | BDL | BDL | BDL | BDL | 0.06 | BDL | BDL | BDL | BDL | 1.20 | BDL | 1.26 |
| | 25°C | 15d | 23.9 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.15 | BDL | 0.15 |
| | 25°C | 1M | 23.6 | 98.3 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.27 | BDL | 0.27 |
| | 25°C | 2M | 23.5 | 97.9 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.53 | BDL | 0.53 |
| | 25°C | 3M | 23.4 | 97.5 | 0.09 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.79 | BDL | 0.88 |

3/10

**FIG. 4A**

**Table 4A**

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | PG Ester-1 | PG Ester-2 | 1.16 | 1.18 | 1.21 | 1.22 | 1.23 | 1.24 | 1.25 | 1.26 | 1.27 | 1.28 | % Total Esters | pH value (as per USP) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4. BDM - 25mg  Thioglycerol - 5mg  PEG 400:PG (90:10) qs to 1mL | Initial | | 24.8 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.10 | BDL | BDL | BDL | BDL | 0.10 | 3.21 |
| | 40°C | 15 d | 23.8 | 96.0 | 1.08 | 0.46 | 0.24 | 0.41 | 0.43 | BDL | BDL | 0.38 | 0.33 | 0.21 | 0.10 | 0.06 | 3.70 | 3.18 |
| | | 15d | 23.7 | 95.6 | 1.27 | 0.56 | 0.29 | 0.44 | 0.50 | BDL | BDL | 0.52 | 0.39 | 0.23 | 0.13 | 0.07 | 4.40 | 3.20 |
| | | 1 M | 22.8 | 91.9 | 1.99 | 0.95 | 0.46 | 0.80 | 0.80 | BDL | BDL | 0.78 | 0.60 | 0.37 | 0.21 | 0.11 | 7.07 | 3.17 |
| | 25°C | 15 d | 24.7 | 99.6 | 0.26 | 0.09 | BDL | 0.10 | 0.08 | BDL | BDL | 0.06 | BDL | 0.06 | BDL | BDL | 0.65 | 3.25 |
| | | 1 M | 24.6 | 99.2 | 0.29 | 0.12 | 0.06 | 0.08 | 0.09 | BDL | BDL | 0.09 | BDL | 0.06 | BDL | BDL | 0.79 | 3.20 |
| | | 2 M | 23.3 | 94.0 | 1.71 | 0.78 | 0.41 | 0.67 | 0.64 | BDL | BDL | 0.68 | 0.52 | 0.37 | 0.23 | 0.10 | 6.11 | 3.22 |
| | | 3 M | 23.2 | 93.5 | 1.37 | 0.69 | 0.43 | 0.47 | 0.86 | BDL | BDL | 0.85 | 0.68 | 0.56 | 0.35 | 0.16 | 6.42 | 3.21 |
| | | 6 M | 17.5 | 70.6 | 6.37 | 4.09 | 1.80 | 3.15 | 3.54 | 3.27 | 2.59 | 1.84 | 1.17 | 0.56 | 0.25 | 0.08 | 28.71 | 3.20 |
| | 5°C | 1 M | 24.7 | 99.6 | 0.08 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.08 | 3.21 |
| | | 3 M | 24.6 | 99.2 | 0.08 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.08 | 3.20 |
| | | 6 M | 24.5 | 98.8 | 0.11 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.11 | 3.19 |
| 5. BDM - 25mg  Thioglycerol - 5mg  PEG 400:PG (90:10) qs to 1mL  (NaOH- 0.0005 molarity) | Initial | | 25.5 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.09 | BDL | BDL | BDL | BDL | 0.09 | 3.34 |
| | 40°C | 15 d | 25.6 | 100.4 | 0.12 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.12 | 3.27 |
| | | 1 M | 25.3 | 99.2 | 0.23 | 0.10 | BDL | 0.08 | 0.05 | BDL | BDL | 0.06 | 0.05 | 0.05 | BDL | BDL | 0.57 | 3.25 |
| | 25°C | 15 d | 25.5 | 100 | 0.06 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.06 | 3.33 |
| | | 1 M | 25.4 | 99.6 | 0.09 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.09 | 3.31 |
| | | 2 M | 25.3 | 99.2 | 0.17 | 0.07 | BDL | 0.07 | 0.05 | BDL | BDL | 0.09 | BDL | BDL | BDL | BDL | 0.45 | 3.30 |
| | | 3 M | 25.2 | 98.8 | 0.27 | 0.09 | BDL | 0.10 | 0.07 | BDL | BDL | 0.07 | 0.05 | BDL | BDL | BDL | 0.65 | 3.30 |
| | | 6 M | 24.5 | 96.1 | 0.62 | 0.26 | 0.10 | 0.25 | 0.29 | 0.32 | 0.28 | 0.15 | 0.08 | BDL | BDL | BDL | 2.35 | 3.31 |
| | 5°C | 1 M | 25.5 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.34 |
| | | 3 M | 25.4 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.35 |
| | | 6 M | 25.4 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.34 |

4/10

**FIG. 4B**

**Table 4B**

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | Area % of degradants | | | | | | | | | | | | | % Total Esters | pH value (as per USP) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | PG Esters | | PEG Esters | | | | | | | | | | | | |
| | | | | | PG Ester-1 | PG Ester-2 | 1.16 | 1.18 | 1.21 | 1.22 | 1.23 | 1.24 | 1.25 | 1.26 | 1.27 | 1.28 | | |
| 6.<br><br>BDM - 25mg<br><br>Thioglycerol - 5mg<br><br>PEG 400:PG (90:10) qs to 1mL<br><br>(NaOH- 0.001 molarity) | Initial | | 24.8 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.08 | BDL | BDL | BDL | BDL | 0.08 | 3.45 |
| | 40°C | 15 d | 24.5 | 98.8 | 0.09 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.09 | 3.38 |
| | | 1 M | 24.5 | 98.8 | 0.14 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.14 | 3.36 |
| | 25°C | 15 d | 24.8 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.41 |
| | | 1 M | 24.7 | 99.6 | 0.05 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.05 | 3.40 |
| | | 2 M | 24.7 | 99.6 | 0.15 | BDL | BDL | BDL | BDL | BDL | BDL | 0.08 | BDL | BDL | BDL | BDL | 0.23 | 3.42 |
| | | 3 M | 24.5 | 98.8 | 0.24 | 0.08 | 0.06 | 0.08 | BDL | BDL | BDL | 0.08 | 0.06 | BDL | BDL | BDL | 0.60 | 3.41 |
| | | 6 M | 24.1 | 97.2 | 0.38 | 0.16 | BDL | 0.17 | 0.20 | 0.23 | 0.19 | 0.08 | BDL | BDL | BDL | BDL | 1.41 | 3.40 |
| | 5°C | 1 M | 24.8 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.42 |
| | | 3 M | 24.8 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.41 |
| | | 6 M | 24.8 | 100.0 | 0.05 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.05 | 3.41 |
| 7.<br><br>BDM - 25mg<br><br>Thioglycerol - 5mg<br><br>PEG 400:PG (90:10) qs to 1mL<br><br>(NaOH- 0.0015 molarity) | Initial | | 25.2 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.07 | BDL | BDL | BDL | BDL | 0.07 | 3.55 |
| | 40°C | 15 d | 25.2 | 100 | 0.09 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.09 | 3.47 |
| | | 1 M | 25.2 | 100 | 0.11 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.11 | 3.48 |
| | 25°C | 15 d | 25.2 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.53 |
| | | 1 M | 25.2 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.50 |
| | | 2 M | 25.1 | 99.6 | 0.11 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.11 | 3.52 |
| | | 3 M | 25.0 | 99.2 | 0.17 | 0.06 | BDL | BDL | BDL | BDL | BDL | 0.06 | BDL | BDL | BDL | BDL | 0.29 | 3.51 |
| | | 6 M | 24.4 | 96.8 | 0.31 | 0.10 | BDL | 0.14 | 0.18 | 0.22 | 0.18 | 0.08 | BDL | BDL | BDL | BDL | 1.21 | 3.5 |
| | 5°C | 1 M | 25.2 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.55 |
| | | 3 M | 25.1 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.50 |
| | | 6 M | 24.9 | 98.8 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.49 |

FIG. 5A

**Table 5A**

| Formulation | Temp | Time period | Content (mg/ml) | % of Initial | Area% of Degradants | | | | % Total Esters | pH |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | PG Esters | | PEG Esters | | | |
| | | | | | 1.11 | 1.14 | 1.28 | 1.40 | | |
| 8.<br>BDM - 25mg/mL<br>Thioglycerol - 5mg/mL<br>PEG 400:PG (90:10) qs to 1mL | 40℃ | 14 Days | 21.6 | 100 | 3.03 | 1.65 | BDL | 0.05 | 4.73 | 3.43 |
| 9.<br>BDM - 25mg/mL<br>Thioglycerol - 5mg/mL<br>NaOH – 0.01 molarity<br>PEG 400:PG (90:10) qs to 1mL | 40℃ | 14Days | 22.9 | 100 | 0.06 | BDL | 0.17 | BDL | 0.23 | 3.56 |
| 10.<br>BDM - 25mg/mL<br>Thioglycerol - 5mg/mL<br>NaOH – 0.02 molarity<br>PEG 400:PG (90:10) qs to 1mL | 40℃ | 14 Days | 21.2 | 100 | 0.38 | BDL | 0.79 | BDL | 1.17 | 3.71 |
| 11.<br>BDM - 25mg/mL<br>Thioglycerol - 5mg/mL<br>NaOH – 0.03 molarity<br>PEG 400:PG (90:10) qs to 1mL | 40℃ | 14 Days | 19.6 | 100 | 0.91 | BDL | 1.82 | BDL | 2.73 | 4.01 |
| 12.<br>BDM - 25mg/mL<br>Thioglycerol - 5mg/mL<br>NaOH – 0.04 molarity<br>PEG 400:PG (90:10) qs to 1mL | 40℃ | 14 Days | 21.6 | 100 | 0.97 | BDL | 1.94 | BDL | 2.91 | 4.15 |

6/10

FIG. 5B

**Table 5B**

| Formulation | Temp | Time period | Content (mg/ml) | % of Initial | PG Esters | | PEG Esters | | % Total Esters | pH |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 1.11 | 1.14 | 1.28 | 1.40 | | |
| 13. BDM - 25mg/mL Thioglycerol - 5mg/mL NaOH – 0.05 molarity PEG 400:PG (90:10) qs to 1mL | 40°C | 14 Days | 20.8 | 100 | 1.75 | BDL | 4.62 | 0.11 | 6.48 | 4.31 |
| 14. BDM - 25mg/mL Thioglycerol - 5mg/mL NaOH – 0.06 molarity PEG 400:PG (90:10) qs to 1mL | 40°C | 14 Days | 16.5 | 100 | 0.08 | BDL | 9.22 | 0.70 | 10.00 | 5.06 |
| 15. BDM - 25mg/mL Thioglycerol - 5mg/mL NaOH – 0.07 molarity PEG 400:PG (90:10) qs to 1mL | 40°C | 14 Days | 13.2 | 100 | 2.13 | BDL | 11.39 | 1.25 | 17.07 | 5.70 |
| 16. BDM - 25mg/mL Thioglycerol - 5mg/mL NaOH -0.08 molarity PEG 400:PG (90:10) qs to 1mL | 40°C | 14 Days | 10.5 | 100 | 1.84 | BDL | 13.98 | 2.04 | 17.86 | 6.01 |
| 17. BDM - 25mg/mL Thioglycerol - 5mg/mL NaOH – 0.09 molarity PEG 400:PG (90:10) qs to 1mL | 40°C | 14 Days | 8.21 | 100 | 1.40 | BDL | 15.85 | 3.10 | 20.35 | 6.26 |
| 18. BDM - 25mg/mL Thioglycerol -5mg/mL NaOH – 0.1 molarity PEG 400:PG (90:10) qs to 1mL | 40°C | 14 Days | 5.65 | 100 | 1.13 | BDL | 17.26 | 4.24 | 22.63 | 6.56 |

7/10

**FIG. 6**

**Table 6**

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | PG Esters | PEG Esters | | | | % Total Esters |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **1.11** | **1.22** | **1.23** | **1.29** | **1.37** | |
| 19. BDM - 25mg Thioglycerol - 5mg Sodium acetate trihydrate - 0.01M PEG 400:PG (90:10 v/v) qs to 1mL | Initial | | 25.1 | 100.0 | BDL | BDL | BDL | BDL | 0.06 | 0.06 |
| | 40℃ | 15d | 24.8 | 98.8 | 0.10 | BDL | BDL | 0.10 | 0.05 | 0.25 |
| | | 1M | 24.7 | 98.4 | 0.25 | 0.06 | 0.05 | 0.15 | 0.06 | 0.57 |
| | 25℃ | 15d | 24.9 | 99.2 | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | | 1M | 24.8 | 98.8 | BDL | BDL | BDL | 0.05 | BDL | 0.05 |
| | | 3M | 24.7 | 98.4 | 0.14 | BDL | 0.05 | 0.11 | 0.07 | 0.37 |
| | 5℃ | 3 M | 24.9 | 99.2 | BDL | BDL | BDL | BDL | 0.07 | 0.07 |

The header "Area % of degradants" spans the columns 1.11, 1.22, 1.23, 1.29, 1.37.

8/10

FIG. 7

**Table 7**

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | PG Esters | | PEG Esters | | | | | | | | | | % Total Esters |
| | | | | | 1.11 | 1.14 | 1.16 | 1.20 | 1.22 | 1.23 | 1.25 | 1.26 | 1.27 | 1.28 | 1.29 | 1.37 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20. BDM - 25mg Thioglycerol - 5mg Sodium acetate (anhydrous)- 0.01M PEG 400:PG (90:10 v/v) qs to 1mL | Initial | | 24.6 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | 40°C | 15d | 24.3 | 98.8 | 0.11 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.11 | 0.05 | 0.27 |
| | | 1M | 24.2 | 98.4 | 0.23 | 0.12 | BDL | 0.11 | 0.10 | 0.06 | BDL | BDL | BDL | 0.16 | BDL | BDL | 0.78 |
| | | 2M | 24.0 | 97.6 | 0.35 | 0.20 | 0.09 | 0.13 | 0.17 | 0.09 | 0.08 | 0.08 | BDL | 0.22 | BDL | 0.05 | 1.46 |
| | | 3M | 23.6 | 95.9 | 0.59 | 0.34 | 0.15 | 0.22 | 0.23 | 0.27 | 0.19 | 0.12 | 0.06 | 0.33 | BDL | 0.07 | 2.57 |
| | 25°C | 15d | 24.5 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | | 1M | 24.4 | 99.2 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.05 | BDL | 0.05 | 0.10 |
| | | 3M | 24.2 | 98.4 | 0.14 | BDL | BDL | 0.06 | BDL | BDL | BDL | BDL | BDL | 0.11 | BDL | 0.06 | 0.37 |
| | 5°C | 3 M | 24.4 | 99.2 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.05 | 0.05 |

9/10

**FIG. 8**

**Table 8**

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | Area % of degradants | | | | | | | | | | | % Total Esters | pH value (as per USP) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | PG Esters | | PEG Esters | | | | | | | | | | |
| | | | | | PG Ester 1 | PG Ester 2 | 1.16 | 1.19 | 1.21 | 1.23 | 1.24 | 1.26 | 1.27 | 1.30 | | | |
| 21. BDM - 25mg Sodium acetate trihydrate – 0.01M Thioglycerol - 5mg PEG 400:PG (90:10 v/v) qs to 1mL | Initial | | 26.2 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.64 |
| | 40°C | 15d | 26.1 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.07 | 0.29 | 3.57 |
| | | 1M | 26.0 | 99.2 | 0.10 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.10 | 0.20 | 3.54 |
| | | 2M | 25.4 | 96.9 | 0.26 | 0.14 | 0.06 | 0.08 | 0.09 | 0.12 | 0.10 | 0.07 | BDL | 0.22 | 1.14 | 3.50 |
| | | 3M | 25.3 | 96.6 | 0.41 | 0.24 | 0.09 | 0.08 | 0.18 | 0.16 | 0.11 | 0.08 | 0.06 | 0.28 | 1.69 | 3.61 |
| | | 6M | 24.1 | 92.0 | 0.81 | 0.55 | 0.18 | 0.36 | 0.42 | 0.40 | 0.35 | 0.20 | 0.12 | 0.50 | 3.89 | 3.6 |
| | 25°C | 15d | 26.2 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.62 |
| | | 1M | 26.1 | 99.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.05 | 0.05 | 3.60 |
| | | 3M | 25.8 | 98.5 | 0.15 | 0.05 | BDL | 0.06 | BDL | BDL | BDL | BDL | BDL | 0.12 | 0.38 | 3.61 |
| | | 6M | 25.3 | 96.6 | 0.26 | 0.14 | BDL | 0.13 | 0.16 | 0.18 | 0.17 | 0.07 | BDL | 0.20 | 1.31 | 3.60 |
| | 5°C | 3M | 26.0 | 99.2 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.59 |
| | | 6M | 26.0 | 99.2 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 | 3.59 |

10/10

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/767,672 | 02/14/2013 | Nagesh R. Palepu | 820.1041-U2 | 2482 |

20311         7590          08/31/2016
LUCAS & MERCANTI, LLP
30 BROAD STREET
21st FLOOR
NEW YORK, NY 10004

| EXAMINER |
|---|
| FINN, MEGHAN R |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1629 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 08/31/2016 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

info@lmiplaw.com

PTOL-90A (Rev. 04/07)

|  | **Application No.** | **Applicant(s)** |
|---|---|---|
| **Office Action Summary** | 13/767,672 | PALEPU ET AL. |
|  | **Examiner** | **Art Unit** | **AIA (First Inventor to File) Status** |
|  | MEGHAN FINN | 1629 | No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on <u>4/11/16</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a) ☒ This action is **FINAL**.          2b) ☐ This action is non-final.

3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☒ Claim(s) <u>1,3-13,15-19,23-29 and 32-38</u> is/are pending in the application.
   5a) Of the above claim(s) <u>5,6,32 and 33</u> is/are withdrawn from consideration.

6) ☐ Claim(s) _____ is/are allowed.

7) ☒ Claim(s) <u>1,3,4,7-13,15-19,23-29 and 34-38</u> is/are rejected.

8) ☐ Claim(s) _____ is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10) ☐ The specification is objected to by the Examiner.

11) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
      a) ☐ All   b) ☐ Some** c) ☐ None of the:
         1. ☐ Certified copies of the priority documents have been received.
         2. ☐ Certified copies of the priority documents have been received in Application No. _____.
         3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)

2) ☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date <u>4/11/16</u>.

3) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.

4) ☐ Other: _____.

Application/Control Number: 13/767,672                                      Page 2
Art Unit: 1629

## DETAILED ACTION

The present application is being examined under the pre-AIA first to invent provisions.

Applicant's Amendment filed April 11, 2016 has been received and entered into present application. Claims 2, 14, 20-22, 30-31 were canceled and claims 34-38 were added by applicant. Claims 19 and 23 have been rejoined due to the amendment[1] and claims 5-6 and 32-33 remain withdrawn, thus claims 1, 3-4, 7-13, 15-19, 23-29, and 34-38 are currently under examination.

Applicants' arguments, filed April 11, 2016, have been fully considered but they are not deemed to be persuasive. Rejections and/or objections not reiterated from previous office actions are hereby withdrawn. The following rejections and/or objections are either reiterated or newly applied. They constitute the complete set presently being applied to the instant application.

### *(New Rejection, necessitated by amendment)*
### *Claim Rejections - 35 USC § 112, 2nd paragraph*

The following is a quotation of the second paragraph of 35 U.S.C. 112:

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

---

[1] Claim 19 was previously withdrawn because it recited an organic compound and applicant had elected an inorganic compound (sodium hydroxide), however since the claim has been amended to recite an acidity/alkalinity adjustor (similar to claim 1) it now encompasses the elected species. Claim 23 has been amended to depend from claim 1 rather than claim 22 and since it depends on claim 1 it is now drawn to the elected species and is rejoined.

**Claims 1, 3-4, 7-13, 15-19, 21, 23-30, and 34-38 are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.**


In claim 1 applicant has amended the claim to recite that the bendamustine-containing composition contains an "acidity/alkalinity adjustor" and that it has a pH of from "about 3.3 to about 4" as measured by the USP monograph for polyethylene glycol. Applicant has no definition or disclosure for what the scope of the term "about" encompasses. Typically this term is not considered indefinite but is considered to be broad when not defined however in the instant case applicant appears to be arguing there is a substantial difference in stability from a small change in pH and thus the term "about" and the range encompassed becomes critical.  Applicant does describe a preferred process for measuring the pH involving mixing a 5g aliquot of the composition with water and saturated KCl (See page 7, 2nd paragraph of specification as filed). However they also compare different compositions in Table 3, which demonstrate that there is only a small difference in pH between applicant's compositions and their "control" composition.

Application/Control Number: 13/767,672

Art Unit: 1629

Page 4

Table 3

| Formulation | Temp | Time Period | Content (mg/mL) | % of Initial | % Area of degradants | | | | | | | | | | | % Total Related |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | PEG Esters | | | PEG Esters | | | | | | | | |
| | | | | | 1.11 | 1.14 | 1.17 | 1.19 | 1.21 | 1.22 | 1.25 | 1.34 | 1.24 | 1.26 | 1.27 | |
| 1. | initial | | 25.0 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| BDM - 25mg Thioglycerol - 5mg PEG 400:PG (90:10) 0.93 up to 1mL (As per USP pH 3.12) | 40°C | 13d | 19.6 | 78.6 | 7.72 | 4.74 | 1.92 | 3.61 | 3.72 | 2.84 | 1.86 | 3.56 | 0.62 | 0.21 | 0.11 | 20.75 |
| | 25°C | 12d | 24.7 | 98.6 | 0.25 | 0.32 | 9.20 | 6.19 | 0.36 | 0.25 | 0.46 | BDL | BDL | BDL | BDL | 1.58 |
| | | 13d | 24.1 | 96.4 | 0.80 | 0.36 | 0.20 | 0.31 | 0.28 | 0.34 | 0.30 | 0.31 | 0.36 | BDL | 0.62 | 3.21 |
| | | 2M | 24.0 | 96.0 | 1.62 | 1.31 | 0.65 | 6.09 | 0.95 | 0.91 | 0.60 | 0.33 | 0.30 | 0.11 | 0.05 | 8.77 |
| | | 3M | 24.2 | 96.8 | 4.01 | 2.80 | 1.36 | 2.00 | 2.27 | 1.39 | 1.58 | 1.33 | 0.35 | 0.88 | 0.34 | 18.90 |
| 2. | initial | | 23.0 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| BDM - 25mg Thioglycerol - 5mg NaOH 0.1 - 0.4mg (0.01 moles/kg) WFI - 10μL PEG 400:PG (90:10) 0.93 up to 1mL (As per USP pH 3.54) | 40°C | 13d | 23.0 | 96.1 | 0.31 | BDL | BDL | BDL | 0.91 | BDL | BDL | BDL | BDL | 0.15 | 0.33 |
| | 25°C | 12d | 22.2 | 98.6 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.68 |
| | | 13d | 23.0 | 98.1 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.58 |
| | | 2M | 22.7 | 97.8 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.02 | 3.27 |
| | | 3M | 22.5 | 97.8 | 0.34 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.10 | 0.21 |
| 3. | initial | | 26.0 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| BDM - 25mg Thioglycerol - 5mg NaOH 0.1 - 1.2mg (0.03 moles/kg) WFI - 30μL PEG 400:PG (90:10) 0.93 up to 1mL (As per USP pH 4.05) | 40°C | 13d | 22.6 | 95.6 | BDL | BDL | BDL | BDL | 0.98 | BDL | BDL | BDL | BDL | 1.29 | 1.36 |
| | 25°C | 13d | 23.0 | 95.8 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.18 | 0.59 |
| | | 13d | 25.6 | 98.5 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.37 | 0.37 |
| | | 2M | 23.5 | 95.9 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.53 | 0.55 |
| | | 3M | 23.3 | 97.2 | 0.00 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.78 | 0.86 |

(See drawings, figure 3, table 3 in the originally filed disclosure)

Table 3 represents the results of Example 3 (See pages 17-18 of specification as filed) and they compare 2 solutions of their invention with a control solution with no sodium hydroxide. As seen above the first solution and the 2nd solution contain the same amount of bendamustine (BDM), the same amount of thioglycerol, and the same 90:10 PEG400:PG with a total volume of 1mL. The only difference between these is that the 2nd solution contains 0.4mg of NaOH and 10μL of water. This results in a pH difference of 3.12 (solution 1) versus 3.54 (solution 2). Solution 3 contains 1.2mg NaOH and has a pH of 4.05 (See Table 3) and thus also differs from control only by amount of NaOH and pH. However, a pH of 3.12 could reasonably be considered to be "about 3.3" and yet they report very different stability measurements for these and clearly indicate that

Application/Control Number: 13/767,672                                      Page 5
Art Unit: 1629

the solution 1 would not meet the stability requirements in claim 1.  For instance, at 40 degrees, they measured both solutions at 15 days (2nd line in each section) and found that the control (solution 1) had 26.55% of ester byproducts (See last column on right) while the solution 2 had 0.33% which is a very large difference.  The difference was less dramatic at 25 degrees, with 1.50% in the control to 0% in solution 2, however it was still significant.  At 25C and 3 months, the control solution had reached 18.90% esters while the solution 2 had only 0.21%. The only difference is the presence of a small amount of NaOH which results in a pH difference from 3.12 to 3.54. Thus clearly the pH of the composition is critical and it is unclear from the data and guidance provided by applicant if a pH of 3.3 would be more like solution 1 or solution 2 (it is closer in pH to solution 1) and further it is unclear how far "about 3.3" would encompass compositions that meet the stability parameters required by the claim.  It is worth noting that solution 3, which has a higher pH of 4.05 is actually less stable than solution 2, with 1.26% at 40 degrees (versus 0.33% in solution 2) but is still far better than the solution 1 at 26.55%. Since the stability is however going down as the pH rises it is similarly unclear what the scope of "about 4" encompasses that would still be considered to meet the stability parameters recited in claim 1.

MPEP 2173.05(b) specifically addresses the term "about":

"**In determining the range encompassed by the term "about" , one must consider the context of the term as it is used in the specification and claims of the application**. *Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Labs., Ltd.,* 476 F.3d 1321, 1326, 81 USPQ2d 1427, 1432 (Fed. Cir. 2007). In *W.L. Gore & Associates, Inc. v. Garlock, Inc.,* 721 F.2d 1540, 220 USPQ 303 (Fed. Cir. 1983), the court held that a limitation defining the stretch rate of a plastic as "exceeding about 10% per second" is definite because infringement could clearly be assessed through the use of a stopwatch. However, in another case, **the court held that claims reciting "at least about" were invalid for indefiniteness <u>where there was close prior art</u> and there was nothing in the specification, prosecution history, or the prior art to provide any indication <u>as to what range of specific activity is covered by the</u>**

Application/Control Number: 13/767,672                                   Page 6
Art Unit: 1629

**term "about."** *Amgen, Inc. v. Chugai Pharmaceutical Co.,* 927 F.2d 1200, 18 USPQ2d 1016 (Fed. Cir. 1991)." MPEP 2173.05(b)

In this case there is close prior art with the only difference between Palepu and applicant's claims is the presence of an acidity/alkalinity adjustor (sodium hydroxide) and that presence results in the pH range of "about 3.3" to "about 4", thus the pH is a critical element with respect to the prior art.

   This uncertainty is amplified by the fact that the prior art's compositions while closely resembling applicant's control (solution 1) and should have similar or lower pH values than solution 1 yet they have the stability of solution 2 or 3.    While Table 3 and applicant's specification asserts that the composition with only BDM, thioglycerol, and PEG400:PG results in a lot of impurities, Palepu (WO 2011/094565, already of record and discussed in the obviousness rejection below) measures the stability of compositions that are very similar to that of solution 1 and yet reports them as being very stable. Palepu is drawn to compositions that comprise bendamustine, an antioxidant and PEG400:PG, however they do not teach an alkalinity adjustor such as sodium hydroxide as applicant claims and they do not discuss the pH of the compositions.  However they tested very similar compositions to that of solution 1 in applicant's table 3.  In table 6 of Palepu (see page 16, Palepu) they measured stability of solutions that contained BDM at 50 mg/mL (2x as much as applicant's table 3) and alpha-lipoic acid at 10mg/mL (which is also an antioxidant but different from the thioglycerol of table 3) and the same PEG400:PG up to 1mL.  They do not measure the

Application/Control Number: 13/767,672                                    Page 7

Art Unit: 1629

pH, however if anything the alpha-lipoic acid should result in a lower pH than

thioglycerol and theoretically the composition should be even more unstable.  The

higher BDM should also result in a lower pH value (if it affects it at all). Yet Palepu

describes the total impurities as being much lower than applicant's table 3.



Table 6: Stability of Bendamustine in 90% PEG 400, 10% PG and α-lipoic acid

(Palepu, table 6, page 16)

Further, in table 7 – they tested compositions with 2.5mg/mL of thioglycerol and thus

contained the same compounds as in applicant's solution 1 (although there is 2x more

BDM and ½ as much antioxidant). Again they teach that these compositions are stable

Application/Control Number: 13/767,672                                   Page 8
Art Unit: 1629

despite not having any NaOH:

Table 7: Stability of Bendamustine in 90% PEG 400, 10% PG and Thioglycerol



(Palepu, Table 7, page 18)

These are also much more stable than the solution 1 despite having more active agent and less antioxidant.  In this table the data from table is compared (Table #3 is applicant's data while Tables 6 and 7 are Palepu):

Table A (all solutions had total volume of 1 mL, T3=table 3, S1=solution1)  - all data from 40C

| Table & Solution | Amount of BDM | Antioxidant | pH | Temp /Days | PEG ester 1.17 | PEG ester 1.22 | Total impurities or total esters |
|---|---|---|---|---|---|---|---|
| T3, S1 | 25mg | Thioglycerol 5mg | 3.12 | 15d | 1.92 | 2.64 | 26.55 |
| T3, S2 | 25mg | Thioglycerol 5mg | 3.54 | 15d | Below Detection | Below Detection | 0.33 |
| T3, S3 | 25mg | Thioglycerol 5mg | 4.05 | 15d | Below Detection | Below Detection | 1.26 |
| T6, S1 | 50mg | α-Lipoic acid, 10mg | -- | 30d | 0.13 | <LD | 0.95 |
| **T7** | **50** | **Thioglycerol, 2.5mg** | **--** | **15d** | **Below Detection** | **Below Detection** | **0.31** |
| T7 | 50 | Thioglycerol, 2.5mg | -- | 30d | Below Detection | Below Detection | 0.75 |
| | | | | | | | |

As seen above, the examiner compares two of the specific PEG esters measured by both applicant and Palepu as well as the total amount. In the case of the 40 degree

Application/Control Number: 13/767,672                                    Page 9
Art Unit: 1629

testing, the Palepu solutions in table 6 were not tested till 30 days which is 2x as long as

the solution's in applicants table 3, however the stability should have been at least that

(or possibly less impurities) at 15 days and the solution in table 7 is tested at both as

seen above.   In each case it is clearly seen that the solutions in Palepu which are very

similar to that of solution 1 in applicants table 3 do not have the high impurities that

solution 1 has but are rather comparable to the solutions 2 or 3 which do meet the claim

limitations.  Table 7 compares the same antioxidant and at the same 15 days has a total

impurities level that is much closer to the solution 2 of applicant's invention than the

solution 1 which does not have any sodium hydroxide. More bendamustine should lower

the overall pH if any effect because the pH of bendamustine (3-4, see Maas and Furst

in rejection below) is lower than that of polyethylene glycol (4.5-7, discussed previously)

and alpha-lipoic acid should lower the pH if it has any effect thus there is no reason to

believe that the solutions in Palepu had a pH higher than that of solution 1, yet they

have the stability claimed and appear more similar to the solutions 2 or 3 that recite the

sodium hydroxide.

Table B – at 25C and 3 months

| Table & Solution | Amount of BDM | Antioxidant | pH | PEG ester 1.17 | PEG ester 1.22 | Total impurities or total esters |
|---|---|---|---|---|---|---|
| T3, S1 | 25mg | Thioglycerol 5mg | 3.12 | 1.36 | 1.99 | 18.90 |
| T3, S2 | 25mg | Thioglycerol 5mg | 3.54 | Below Detection | Below Detection | 0.21 |
| T3, S3 | 25mg | Thioglycerol 5mg | 4.05 | Below Detection | Below Detection | 0.88 |
| T6, S1 | 50mg | α-Lipoic acid, 10mg | -- | <LD | <LD | 0.73 |
| T7 | 50 | Thioglycerol, 2.5mg | -- | 0.06 | Below Detection | 0.67 |

Table B compares those solutions at 25 degrees Celsius and at 3 months, for which all examples have data.  As seen in table B, the impurity levels are similar to Table A in that the solutions of Palepu, despite having more BDM and less antioxidant, still have low levels of impurities, comparable to solution 3.

It is acknowledged that the pH of polyethylene glycol can vary, as demonstrated in the previous office action it can have a pH between 4.5 and 7 and it would appear that either there is an error with one or more data sets or perhaps it is a difference in the pH of the PEG400:PG (both 90:10) solutions (which appear to be the same) which results in a different overall pH and different effects.  If that were the case then it is the pH of the PEG:PG solution rather than the presence of an alkalinity adjustor is the critical element. However, in any case it remains true that a pH of 3.12, which is closer to 3.3 than it is to 3.54 is indicated by applicant as not reading upon the invention (lacks the stability required) but one cannot reasonably determine what level would meet this, or if even 3.3 would.

All of this is shown to highlight that the term "about" with respect to pH of the solution is critical and one of skill in the art cannot reasonably determine what pH values would be encompassed by this term and still have the stability required by the claim. Thus, the metes and bounds of the claimed composition are unclear and claims 1, 3-4, 7-13, 15-19, 23-29, 34-38 are rejected for failing to point out and distinctly claim the subject matter which applicant regards as the invention.

**This is a new rejection, necessitated by applicant's amendments.**

Application/Control Number: 13/767,672                                          Page 11
Art Unit: 1629

## (New Rejection, necessitated by amendment)
## Claim Rejections - 35 USC § 103

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

This application currently names joint inventors.  In considering patentability of

the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of

the various claims was commonly owned at the time any inventions covered therein

were made absent any evidence to the contrary.  Applicant is advised of the obligation

under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was

not commonly owned at the time a later invention was made in order for the examiner to

consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g)

prior art under 35 U.S.C. 103(a).


**Claims 1, 3-4, 7-13, 15-19, 21, 23-30, and 34-38 are rejected under pre-AIA 35**

**U.S.C. 103(a) as obvious over Palepu et al. (WO 2011/094565, already of record) in**

**view of Furst et al. ("About the hydrolytic decomposition of IMET 3393", cited on**

**applicant's IDS submitted 4/11/16) and Maas et al. ("Stability of Bendamustine**

**Hydrochloride in Infusion Solutions", cited on IDS 4/11/16) in further view of**

**Mikura et al. (US 5,223,515, already of record).**

Note:  This is a new rejection due to applicant's claim amendments, specifically reciting a different pH range (claim 1) and also due to the submission of Furst and Maas on the IDS. Additionally claims 19 and 23 were rejoined and claims 34-38 were added, both due to amendment.

In claim 1, applicant has amended such that it now recites a bendamustine-containing composition comprising:

    Bendamustine
    Polyethylene glycol
    Propylene glycol
    <u>An acidity/alkalinity adjustor</u>
    <u>And about 2.5 mg/mL to about 35 mg/mL of an antioxidant.</u>

They further recite that <u>the composition has a pH from about 3.3 to about 4</u> and has less than about 5% total polyethylene/propylene glycol esters.

The new portions are underlined. As indicated previously, the purity data claimed is a physical property of the composition and must necessarily result from the combination of claimed components.

The pH range now recited is different from that previously present and is drawn to the entire composition, thus necessitating a new rejection, however the teachings of Palepu are still relevant to the new claims.

Claims 3-4 recite the sodium hydroxide as the alkalinity adjustor, and claims 12-13 recite thioglycerol as the antioxidant, thus claims 1, 3-4 and 12-13 read upon a composition comprising bendamustine, polyethylene glycol and propylene glycol, about

Application/Control Number: 13/767,672                                    Page 13
Art Unit: 1629

2.5-35 mg/mL of thioglycerol and sodium hydroxide where the pH of the composition is from about 3.3 to about 4.

Overview

      Palepu et al. teaches a very similar composition to that claimed, including teaching bendamustine compositions comprising polyethylene glycol (PEG) and propylene glycol (PG) together with antioxidants including thioglycerol as a preferred antioxidant, however they do not mention sodium hydroxide and they do not mention what the pH of their compositions were.

      Maas and Furst are both similar to Palepu in that they both are drawn to bendamustine compositions. It was well known in the art at the time of the invention that bendamustine has stability problems in aqueous solutions. In Furst, they teach that bendamustine has a problem with *hydrolysis in weakly acid, neutral and alkaline solutions*.  They made a solution with bendamustine hydrochloride and water diluted with saline (0.9% sodium chloride) and that the pH of their solution was 4. <u>They specifically teach that all of their solutions had a pH of 4 which they indicate was a stability promoting pH</u>. They also teach that bendamustine has good stability in pure water.

      Similarly, Maas also studied the stability of bendamustine, which they refer to as IMET 3393 (which refers to the hydrochloride salt of bendamustine).  They similarly teach that the drug has problems with hydrolysis and that *the forming of hydrolysis is dependent upon pH*.  They teach that in a purely aqueous solution the pH of benamustine is approximately 3 and they teach more degradation byproducts are

present at pH 5-10. <u>They indicated that a pH value of 4 resulted in the least movement during electrophoresis tests suggesting lower reactivity to water and better stability at a pH of 4</u>. It would be obvious, based on the teachings of Furst and Maas to measure the pH of the solutions in Palepu and to adjust the pH of those solutions to be about 4 or within a range of 3-4 for maximum stability.

Applicant's claims recite both acidity or alkalinity adjustors and it would be obvious to use the appropriate one to adjust pH, for pH above 4, it would be obvious to select an acidic compound and for pH below 4 it would be obvious to select a basic compound. This is well within the skill of the ordinary artisan at the time of the invention, as part of routine optimization of a formulation. Palepu did not measure pH, however applicant's solution 1 (Table 3, see above or Table 3 of disclosure) is similar to the solutions in Palepu, both reciting bendamustine, thioglycerol as the antioxidant and a 90:10 solvent of PEG400:PG. As discussed above, the only differences being a higher amount of bendamustine, or in some examples a more acidic antioxidant of alpha-lipoic acid, both of which would reduce the pH if there was any difference.  The pH of the solution 1 in applicant's table 3 was 3.12, thus it would be reasonable to expect that the pH of Palepu would be similar and thus a base would be needed to achieve a pH of about 4. Sodium hydroxide is a well-known base, including specifically for use in adjusting pH of solutions and Mikura, which was already of record in the previous office action, is relied upon as evidence that using sodium hydroxide to adjust pH for infusion solutions was well known (column 3, lines ~51-55, Mikura). While Mikura does also teach that a neutral pH is desired for infusion solutions, it would have been obvious to

Application/Control Number: 13/767,672                                    Page 15
Art Unit: 1629

the ordinary artisan that the solutions in Palepu are ready-to-dilute and not administered

directly, thus allowing for the pH to be adjusted at the time of administration.  Since it

was known that pH at 5 or higher resulted in greater instability it would be obvious to

keep the pH in the 3-4 range taught by the prior art as achieving stability for

bendamustine solutions, with the possibility of dilution at the time of administration to

raise the pH to a desirable range.   There is a reasonable expectation of success since

Palepu already teaches all of the elements except adjusting the pH, which is a routine

optimization of a solution and it was already known that the desired pH for the entire

solution would be between 3-4.  Both 3 and 4 are reasonably within the range of "about

3.3" or "about 4" and a pH of 4 is explicitly recited in applicant's claims.


Detailed explanation of all claims

Palepu teaches bendamustine compositions that are long term storage stable

and even teaches the same purity measures as having less than 5% total impurities

after at least 15 months of storage:

> **(57) Abstract:** Long term storage stable bendamustine-containing compositions are disclosed. The compositions can include bendamustine or a pharmaceutically acceptable salt thereof, and a pharmaceutically acceptable fluid which can include in some embodiments PEG, PG or mixtures thereof and an antioxidant or chloride ion source. The bendamustine-containing compositions have less than about 5% total impurities, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223nm, after at least about 15 months of storage at a temperature of from about 5 °C to about 25 °C.

(Abstract, Palepu)

They also teach specific formulations that read upon the claimed compositions,

such as in example 4 where they combine the bendamustine in a 90% polyethylene

glycol and 10% propylene glycol solution and add 5 mg/ml of thioglycerol:

Application/Control Number: 13/767,672                                    Page 16
Art Unit: 1629

> Bendamustine-containing compositions were prepared by dissolving bendamustine
> HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10%
> propylene glycol. 5 mg/ml of thioglycerol, α-lipoic acid or dihydrolipoic acid was
> added as a stabilizing antioxidant as indicated in Table 4 below. The samples were (Page 13, first ¶, Palepu)

Thus as clearly seen in the paragraph above, they teach solutions comprising bendamustine, polyethylene glycol and propylene glycol plus thioglycerol and they even teach the thioglycerol as being the best for stability (lowest impurities at 1 month) in table 4 (see page 13). They specifically indicate that these compositions are stable for at least about 2 years (see last paragraph on page 13). They did not test the pH of their compositions.

Furst studied the decomposition of bendamustine hcl (also referred to as IMET 3393, see structure on page 1 of Furst translation). They teach that the formation of hydrolysis products depends greatly on pH and that in a purely aqueous solution it would have a pH of approximately 3:

> The speed of the Cl splitting both in purely aqueous solution and buffer solution of
> different pH values is multiple times that of cyclophosphamide. The forming of the hydrolysis
> products depends greatly on the pH value and further components in the solution. In the purely
> aqueous solution of the substance, which has a pH value of approximately 3, it is possible, by (Furst, English Translation, page 1, last paragraph)

Furst studied the effect of pH on the solutions via electrophoresis and found additional degradation products when the pH was between 5-10:

> If the hydrolysis is executed in buffer solutions with pH values between 5 and 10, a number
> of further compounds with significantly lower $R_F$ values are detectable in the reaction product in
> addition to the aforementioned compounds II and III. Particularly the compounds IV, V, and VI,
> when observed with a UV lamp, show strong fluorescence. In addition, a number of further
> compounds can also be detected, but at significantly smaller quantities. In 0.1 n lye, only the two (Furst, page 4 of translation, middle paragraph)

Application/Control Number: 13/767,672                                      Page 17
Art Unit: 1629

Furst further measured the migration of the bendamustine and several

degradation products at various pH values and found at 4 there was the least migration:

During electrophoresis, the compounds I, III, and VI showed the same behavior with regard to
the isoelectric point. At pH value 4, all three substances did not migrate in the electric field,
while at a lower pH value, they flowed as cation, and at a higher pH value, they flowed as anion.
Contrary to paper chromatographic separation, whereby VI has a significantly lower $R_f$ value
than I and III, the migration speed of VI in the electric field is higher. It can be assumed that the
aziridines present are instrumental in forming the substances IV-VI which are also present in
IMET—similar to formula 1. For them, such conditions are only present within a specific pH
range, which allow for a reaction with each other or with I itself and subsequently lead to the
compounds IV, V, and VI.                                            (Furst, English
Translation, page 5, end of 1st paragraph)

Similarly to Furst, Maas also studied bendamustine solutions and stability.  Maas

teaches that bendamustine has good stability in pure water but that it is unstable in

aqueous solutions at weakly acidic, neutral and alkaline pHs due to hydrolysis:

Bendamustine is very unstable in an aqueous solution.  In a weakly acid, neutral and
alkaline solution, there is hydrolysis of the bis-2-chlorethylamino function.  As in the
hydrolysis of melphalane, monohydroxy bendamustine presumably develops first, via an
aziridium cation, and then the dihydroxy derivative (diagram) [4].  In a highly acidic
                                                                       (Maas, page
1, first part of last paragraph)

Bendamustine has good solubility in pure water.  It is therefore recommended to
dissolve it in a small amount of water for injection purposes and to dilute it immediately
with an isotonic sodium chloride solution.
                                                                       (Page 1, end
of last paragraph)

They teach they made solutions with just bendamustine hydrochloride, water and

sodium chloride and that the solutions had a pH of 4:

Based on corresponding preliminary tests, the following conditions were selected for the
stability tests:  25 mg bendamustine hydrochloride (= 1 ampoule of Ribomustin®) were
dissolved first in 10 ml water and then diluted with 0.9% sodium chloride solution to 100
ml.  The concentration thereby produced of 0.25 mg/ml corresponds to therapeutic
requirements.  The stability test was performed at temperatures of 4°C and 23°C.  The
(Maas, page 2, first paragraph)

Application/Control Number: 13/767,672                                    Page 18
Art Unit: 1629

Before the beginning of the tests, the freshly made up test solution had a pH of 4. The decomposition of bendamustine hydrochloride infusion solutions was determined first at 4°C. The measurement results are given in Table I. The rate constant ('k) and the time
(Maas, page 2, last paragraph)

Maas further indicates that all of their solutions studied had a pH of 4, which they

indicate is a stability-promoting pH, which is consistent with the teachings of Furst:

The measurements show that, both at 4°C and at 23°C, the hydrolytic decomposition of aqueous bendamustine hydrochloride solutions has a linear course in the range measured. A pseudo-first-order kinetics is described for melphalane [8] which can also be assumed for the structurally related bendamustine due to the identical mechanism of hydrolysis. The coefficients of correlation calculated by exponential regression support this assumption. The latest studies of the kinetics of the hydrolysis of bendamustine in water at room temperature verify the pseudo-first-order decomposition kinetics [7]. All study solutions have the stability-promoting pH of 4. In preliminary tests, the hydrolysis of bendamustine hydrochloride was tested in water for injection purposes and it was shown that in this chloride-free medium the extent of hydrolysis is substantially greater despite the same pH value. For solutions of the initial 0.25 mg/ml concentration, a $t_{90}$ of
(Maas, page 4, first paragraph in section 3)

Thus while Palepu did not measure the pH of their solutions, it was already well

known in the art that bendamustine solutions were more stable with a pH of about 4 and

that just bendamustine + water yielded a pH of about 3-4. It would have been obvious to

the ordinary artisan to test the pH of the solutions in Palepu and adjust the pH to

approximately 4, with appropriate pH adjusting agents such as sodium hydroxide.

Sodium hydroxide is extremely well known in the art as a compound to increase pH of

solutions and Mikura has been relied upon as evidence that sodium hydroxide was

known in the art to adjust the pH of infusion solutions including ones that had propylene

glycol and polyethylene glycol as the solvents (see column 2, line 5 thru column 3, line

4, Mikura). Thus it would be obvious to test and adjust the pH of the solutions in Palepu

to a range of 3-4, more preferably about 4, and it would be obvious to use a base such

Application/Control Number: 13/767,672                                    Page 19
Art Unit: 1629

as sodium hydroxide if the pH needed to be increased.  There is a reasonable

expectation of success because the basic elements of the composition are already

taught in Palepu and the only modification needed is to optimize the pH to the range the

prior art already taught was ideal for stability of bendamustine solutions. Furthermore,

since the pH of bendamustine + water is about 3 and the pH of polyethylene glycol is

about 4.5-7 there is a reasonable expectation that the pH of the solutions in Palepu

would be already close to the pH 4 desired and only a small adjustment to the pH would

be needed.

Thus claim 1, 3-4 and 12-13 are unpatentable over Palepu in view of Furst and

Maas in further view of Mikura.


In claims 7-9 applicant claims the bendamustine is in a concentration of from

about 20-60 mg/ml (claim 7) with the narrowest limitation being about 25 mg/ml (claim

9).  They also recite the thioglycerol from about 2.5-35 mg/ml (claim 14) with the

narrowest limitation being about 5 mg/mL (claim 16). As seen above, the example

above on page 13 teaches both of those concentrations and Palepu even explicitly

teaches 25 mg/mL for the bendamustine (page 4, 1st full paragraph). Thus claims 8-9

and 14-16 are also unpatentable over Palepu in view of Furst and Maas in further view

of Mikura.


In claims 10-11 applicant recites that the polyethylene glycol (PEG) and

propylene glycol (PG) are in a ratio of about 90% PEG and 10% PG (Claim 10) or

Application/Control Number: 13/767,672                                    Page 20
Art Unit: 1629

85%/15% (claim 11).  As shown above, Palepu explicitly teaches using 90% PEG and

10% PG (see above or page 13) and they even disclose 85% PEG and 15% PG as a

suitable fluid for the bendamustine (see page 4, last paragraph). Thus claims 10-11 are

also unpatentable over Palepu in view of Furst and Maas in further view of Mikura.


     In claims 17-19 applicant recites that the composition of claim 1, wherein the

inorganic compound is from about 0.0005 molarity to 0.04 molarity (claim 17) or about

0.01 molarity (claim 18) or about 0.005 to about 0.1 molarity (claim 19).  Mikura teaches

using sodium hydroxide at a concentration of 0.01N (see table 2, column 6, last

composition of the table, Mikura), this is equivalent to 0.005 molarity and reads upon all

claims. Further, it would have been obvious to the ordinary artisan how much sodium

hydroxide to use to achieve a desired pH and the molarity of the sodium hydroxide can

be easily adjusted by changing the total volume added. Thus claims 17-19 are also

unpatentable over Palepu in view of Furst and Maas in further view of Mikura.


     Claim 23, which is now rejoined applicant recites the composition of claim 1,

where the pH of the composition is about 3.5.  As discussed above, the prior art teaches

that the pH of bendamustine alone in water is about 3 (Furst) or benadmustine in water

and sodium chloride was about 4.  The prior art teaches that in pure water the stability

was good and that the pH 4 promoted stability, thus it would be obvious to adjust the pH

within a range of 3-4. As mentioned above, applicant did not define the term "about" and

a pH of 3.5 is precisely in the middle of that range suggested by the prior art and a pH

of "about 4" can be reasonably considered to be a pH of "about 3.5" as well. Thus claim

23 is also unpatentable over Palepu in view of Furst and Maas in further view of Mikura.


In claims 24-29, applicant recites various properties or results of the

compositions in claim 1, such as wherein the total amount of polyethylene glycol esters

and propylene glycol esters is less than about 3% (claim 24) or wherein the total

amount of polyethylene glycol esters is less than about 2% (claim 27) or wherein the

composition is stable for at least about 2 years (claim 29). These are all properties of

the composition defined by the limitations in claim 1 and must necessarily result from

the composition in claim 1. They do not further limit the claims but instead recite a

property of the composition which cannot be separated from the composition itself

because the same composition must necessarily have the same properties and claims

24-29 are also unpatentable over Palepu in view of Furst and Maas in further view of

Mikura.

Applicant has added new claims 34-38, which recite limitations already

addressed previously and above.  In claim 34 they recite the alkalinity adjustor is

sodium hydroxide (same as claim 4), in claim 35 they recite the amount of

bendamustine is about 25 mg/mL (same as claim 9). In claim 36 they recite the

PEG:PG ratio is about 9:1 (same as claim 10).  In claims 37-38 they recite the

antioxidant is thioglycerol and in an amount of 5 mg/mL (See claims 13, 16).  Palepu

teaches the same concentrations and ratios and as discussed above it would be

obvious to adjust the pH to the desired range using a well-known base such as sodium

Application/Control Number: 13/767,672                    Page 22
Art Unit: 1629

hydroxide.  Thus claims 34-38 are also unpatentable over Palepu in view of Furst and

Maas in further view of Mikura.

**This is a new rejection based on applicant's amendments and the citation**

**of Furst and Mass on the IDS.**

### Double Patenting

The nonstatutory double patenting rejection is based on a judicially created doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the unjustified or improper timewise extension of the "right to exclude" granted by a patent and to prevent possible harassment by multiple assignees.   A nonstatutory obviousness-type double patenting rejection is appropriate where the conflicting claims are not identical, but at least one examined application claim is not patentably distinct from the reference claim(s) because the examined application claim is either anticipated by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970); and  *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d) may be used to overcome an actual or provisional rejection based on a nonstatutory double patenting ground provided the conflicting application or patent either is shown to be commonly owned with this application, or claims an invention made as a result of activities undertaken within the scope of a joint research agreement.

Effective January 1, 1994, a registered attorney or agent of record may sign a terminal disclaimer. A terminal disclaimer signed by the assignee must fully comply with 37 CFR 3.73(b).

### New Rejection, based on amendments

**Claims 1-, 3-4, 7-13, 15-19, 23-29, and 34-38 are provisionally rejected on**

**the ground of nonstatutory obviousness-type double patenting as being**

**unpatentable over claims 1-15 of U.S. Patent No. 8,609,707 in view of Furst et al.**

**("About the hydrolytic decomposition of IMET 3393", cited on applicant's IDS submitted 4/11/16) and Maas et al. ("Stability of Bendamustine Hydrochloride in Infusion Solutions", cited on IDS 4/11/16) in further view of Mikura et al. (US 5,223,515, already of record).**

Although the conflicting claims are not identical, they are not patentably distinct from each other because they both recite compositions comprising bendamustine, with polyethylene glycol and propylene glycol and an antioxidant.  They even both recite the same concentrations for these components and the ratio of 90% polyethylene glycol to 10% propylene glycol (see claim 1 of the *707 patent for example). The *707 patent does not specify sodium hydroxide or other compound to adjust the pH of the polyethylene glycol, however as discussed above it would have been obvious to measure and adjust the pH of the solutions in Palepu, including those of the *707 patent, to be within a range of about 4 and to use sodium hydroxide in order to adjust the pH to that desired range.  This is well within the skill of the ordinary artisan during routine optimization and thus the instant claims are unpatentable over the *707 patent for the reasons discussed in detail above in the obviousness rejection.

**This rejection is new due to applicant's amendments and citation of Mass and Furst on the IDS.**

Application/Control Number: 13/767,672                                    Page 24
Art Unit: 1629

### *Maintained*

Claims 1, 3-4, 7-13, 15-19, 23-29, and 34-38 are provisionally rejected on the ground of nonstatutory obviousness-type double patenting as being unpatentable over claims 1-23 of U.S. Patent No. 9,144,568 and claims 1-24 of US Patent 9,034,908[2], already of record in pages 17-18 of the previous office action, dated January 14, 2016, the reasons of which are herein incorporated by reference.

This rejection is maintained, although the application to claims 19, 23 and 34-38 is new due to the rejoining/addition of those claims and applicant's amendment.  The reasoning however remains the same as summarized below.

Although the conflicting claims are not identical, they are not patentably distinct from each other because they both encompass the same composition, comprising bendamustine, with polyethylene glycol and propylene glycol and an antioxidant.  The patents of 9,144,568 and 9,034,908 claim methods of treating however those methods recite a liquid composition which reads upon applicant's claimed compositions.  For example in claim 1 of the *568 patent, they recite a method comprising parenterally administering a liquid composition with bendamustine, polyethylene glycol and propylene glycol, a diluent and an antioxidant. Furthermore, while the claims do not explicitly state it, **the compositions of their invention even encompass sodium hydroxide**. Almost all, if not all, of the example compositions disclosed in the specification of the patent read upon applicant's claimed composition.  For example:

---

[2] Patent 9,144,568 is a continuation of the application 13/838,090 which is patent 9,034,908 and they both encompass essentially the same subject matter already have a terminal disclaimer between these patents, thus they are rejected together.

Application/Control Number: 13/767,672                                    Page 25
Art Unit: 1629

| Ingredient | Concentration Range (mg/ml) |
|---|---|
| Bendamustine HCl | 0.05 to 1.6 |
| Solubilizer 1 propylene glycol | 0.30 to 6.5 |
| Solubilizer 2 PEG 400 | 3.3 to 65 |
| Monothioglycerol | 0.02 to 0.35 |
| NaOH | 0.0 to 0.03 |

(see column 2, lines ~16-25)

As seen above, this composition comprises each of the claimed elements, including the sodium hydroxide and the thioglycerol (monothioglycerol is the same as thioglycerol). Thus the compositions of the instant application are encompassed by the methods in the patents and the composition is not patentable over these methods.

These patents are drawn to methods of treating but have not been subject to a restriction requirement with the instant application and are not thus excluded from an ODP rejection.

Applicant did not make any arguments with respect to this rejection and it is **maintained.**

*Conclusion*

Rejection of claims 1, 3-4, 7-13, 15-19, 23-30 and 34-38 is deemed proper.

No Claims of the present application are allowed.

Applicant's amendment necessitated the new ground(s) of rejection presented in this Office action. Accordingly, **THIS ACTION IS MADE FINAL.** See MPEP § 706.07(a). Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

Application/Control Number: 13/767,672                                Page 26
Art Unit: 1629

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action.  In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the date of this final action.


Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Meghan Finn whose telephone number is (571) 270-

3281. The fax phone number to send a fax directly to Meghan Finn is (571) 270-4281.

The examiner can normally be reached on 10:30am-7pm Mon-Friday (EST).

Application/Control Number: 13/767,672                                      Page 27
Art Unit: 1629

      If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Jeffrey Lundgren can be reached on 571-272-5541. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

/MEGHAN  FINN/
Examiner, Art Unit 1629

/JAMES D ANDERSON/
Primary Examiner, Art Unit 1629

# EXHIBIT 12

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 9332950 |
| **Application Number:** | 13016473 |
| **International Application Number:** | |
| **Confirmation Number:** | 4639 |
| **Title of Invention:** | FORMULATIONS OF BENDAMUSTINE |
| **First Named Inventor/Applicant Name:** | Nagesh R. Palepu |
| **Customer Number:** | 20311 |
| **Filer:** | Michael Nicholas Mercanti |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | 820.1041-US |
| **Receipt Date:** | 28-JAN-2011 |
| **Filing Date:** | |
| **Time Stamp:** | 16:35:46 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $715 |
| RAM confirmation Number | 3854 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

| 1 | Application Data Sheet | ADS_Form_SB14.pdf | 1031573<br>115f1777f5d596856013bf6d404cbd400814ff | no | 4 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 2 | Specification | Specification.pdf | 523982<br>2eec2db4fd5d74a607bdf7973dd86e26a80ea20b | no | 18 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 3 | Claims | Claims.pdf | 101218<br>d6b03a843db35562e064369c4539c552455 84ad7 | no | 4 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 4 | Abstract | Abstract.pdf | 15766<br>e1600be36812f1b145ffeccca22b1e91cfbae 14f | no | 1 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 5 | Fee Worksheet (PTO-875) | fee-info.pdf | 39393<br>d518bd3149c2c96382a1cbaf357d091f4a7 1e5a1 | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| | Total Files Size (in bytes): | 1711932 |
|---|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

1

# FORMULATIONS OF BENDAMUSTINE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims priority under under 35 U.S.C. §119(e) to U.S. Provisional Patent Application No. 61/299,100, filed January 28, 2010, entitled "FORMULATIONS OF BENDAMUSTINE", the disclosure of which is incorporated by reference herein in its entirety.

## BACKGROUND OF THE INVENTION

Bendamustine free base is represented by the following structural formula (I)



(I).

Bendamustine is used in the treatment of a number of cancers including leukemias, Hodgkins disease and multiple myelomas. Bendamustine is the active ingredient of the commercial product Treanda™, a lyophilized powder for reconstitution.

Bendamustine exhibits rapid degradation upon reconstitution of the lyophilized product. Bendamustine undergoes hydrolysis by direct substitution rather than an addition elimination process due to the presence of the highly labile aliphatic chlorine atoms. Some of the main degradants of bendamustine are the monohydroxy compound known as HP1 (hydrolysis product 1) and dihydroxy compound HP2 (hydrolysis product 2). The monohydroxy compound appears as the main impurity at Relative Retention Time (RRT) 0.6 and the dihydroxy compound appears as the main impurity at RRT 0.27. Minor peaks appear at RRT 1.2, which are presently unknown.

2

The stability of bendamustine in water is measured in hours, and is therefore, not suitable for long-term storage in liquid form. The lyophile possesses good chemical stability. However, reconstitution of the lyophile is clinically inconvenient, taking 15 – 30 mins with implications of chemical instability. There is a need for ready to use (RTU) bendamustine formulations having enhanced stability.

### SUMMARY OF THE INVENTION

In other aspects of the invention, the bendamustine-containing compositions include a) a pharmaceutically acceptable fluid which contains one or more of propylene glycol, ethanol, polyethylene glycol, benzyl alcohol and glycofurol, and b) a stabilizing amount of a chloride salt. In other aspects of the invention, the bendamustine-containing compositions include DMSO (dimethyl sulfoxide) as part of the pharmaceutically acceptable fluid included therein. Regardless of the pharmaceutically acceptable fluid included, the amount of bendamustine included in the composition is preferably from about 20 mg/mL to about 60 mg/mL. Still further aspects of the invention include methods of treatment using bendamustine-containing compositions and kits containing the same.

One of the advantages of the inventive liquid compositions is that they have substantially improved long term stability when compared to currently available formulations. For example, the inventive bendamustine compositions are substantially free of impurities after at least about 15 months at a temperature of from about 5 ℃ to about 25 ℃. The inventive formulations are advantageously ready to use or ready for further dilution. Reconstitution of lyophilized powders is not required.

### DETAILED DESCRIPTION OF THE INVENTION

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art to which this invention belongs. In the event that there is a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

3

As used herein, RRT is calculated by dividing the retention time of the peak of interest by the retention time of the main peak. Any peak with an RRT <1 elutes before the main peak, and any peak with an RRT >1 elutes after the main peak.

For purposes of the present invention, "substantially free of impurities" shall be understood to include bendamustine-containing compositions in which the amount of total impurities is less than about 5%, as calculated on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223nm, after a period of about 15 months at a temperature of from about 5°C to about 25°C. The amount of impurities is further calculated as being based upon the original amount bendamustine (or salt thereof) being present in the composition or formulation.

For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.

Preferably, the amount of any individual degradant in the inventive compositions does not exceed 2% PAR as determined by HPLC at a wavelength of 223nm after storage periods of at least about 15 months at a temperature of from about 5°C to about 25°C. In some aspects, the amount of time the inventive compositions demonstrate long term storage stability is at least about 18 months and preferably at least about 2 years when stored under the conditions described herein.

In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions including:

    a) bendamustine or a pharmaceutically acceptable salt thereof; and

    b) a pharmaceutically acceptable fluid including

        i) PEG, PG or mixtures thereof; and

        ii) a stabilizing amount of an antioxidant.

The total impurities in the inventive compositions resulting from the degradation of the bendamustine in the compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223nm after at least about 15 months at a temperature of from about 5 °C to about 25 °C, and thus have long term stability for at least the same

4

period of time or longer. Preferably, the bendamustine-containing compositions demonstrate long term storage stability for at least about 2 years, especially when stored at the lower (refrigerated) temperatures. In one embodiment, the amount of total impurities in the inventive compositions resulting from the degradation of the bendamustine is less than about 3% PAR as determined by HPLC at a wavelength of 223nm after at least about 2 years at a temperature of from about 5 °C to about 25 °C.

In some aspects of the invention, the bendamustine concentration in the inventive compositions is from about 10 mg/mL to about 100 mg/mL, preferably 20 mg/mL to about 60 mg/mL. Preferably the bendamustine concentration in the inventive compositions is from about 25 mg/mL to about 50 mg/mL, and more preferably from about 30 mg/mL to about 50 mg/mL. It will be understood that compositions containing any useful concentration within the ranges, i.e. 10, 20, 25, 30, 35, 40, 45, 50, 55, 60 . . . 100 are contemplated. In other embodiments, the bendamustine concentration in the composition is about 50 mg/mL. In alternative aspects, the amount of bendamustine is outside these ranges but the amounts will be sufficient for single or multiple administrations of dosages generally regarded as effective amounts.

In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof. Within this aspect, the pharmaceutically acceptable fluid is propylene glycol (PG) or polyethylene glycol (PEG). In other embodiments of the invention however, the pharmaceutically acceptable fluid is a mixture of PEG and PG. For example, the pharmaceutically acceptable fluid can include about 50% PEG and about 50% PG. Alternatively, pharmaceutically acceptable fluid includes about 95% PEG and about 5% PG. The amount of PEG and PG can also be varied within the ranges, i.e. the ratio of PEG:PG in the pharmaceutically acceptable fluid can range from about 95:5 to about 50:50. Within this range, is a pharmaceutically acceptable fluid containing about 75% PEG and about 25% PG, and preferably 80% PEG and 20% PG. In another embodiment, a pharmaceutically acceptable fluid can include about 85% PEG and about 15% PG while another preferred pharmaceutically acceptable fluid includes about 90% PEG and about 10% PG. The molecular weight of the PEG will be within the range of pharmaceutically acceptable weights although PEG 400 is preferred in many aspects of the invention.

5

Without meaning to be bound by any theory or hypothesis, the hydroxide of the polyethylene glycol molecule is less reactive than the hydroxides of propylene glycol. As a result, the ester forms at a slower rate in polyethylene glycol than propylene glycol and the resulting bendamustine degradants are unexpectedly and substantially reduced over extended periods of time when PEG is a substantial part of the pharmaceutically acceptable fluid.

The bendamustine-containing compositions according to several preferred aspects of the invention include a stabilizing amount of an antioxidant. For purposes of the present invention, "stabilizing amount" shall be understood to include those amounts which increase or enhance the stability of the bendamustine in the compositions described herein. The presence of one or more antioxidants described herein thus contributes, at least in part to the long term stability of the composition. Within this guideline, suitable antioxidant concentrations in the compositions can range from about 2.5 mg/mL to about 35 mg/mL, and preferably from about 5 mg/mL to about 20 mg/mL or from about 10 mg/mL to about 15 mg/mL. In some other embodiments, the concentration of the antioxidant in the bendamustine-containing composition is about 5 mg/mL.

Suitable antioxidants for inclusion include those which are pharmaceutically acceptable for use in human and veterinary formulations although not limited to those currently regarded as safe by any regulatory authority. For example, the antioxidant can be selected from among lipoic acid, thioglycerol (also known as monothioglycerol) and analogs thereof, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds, dihydrolipoic acid and mixtures of the foregoing. Preferably, the antioxidant is thioglycerol, lipoic acid or a mixture thereof. Some particularly preferred embodiments of the invention include thioglycerol.

In view of the foregoing, some preferred long term storage stable bendamustine-containing compositions in accordance with the invention compositions include:

        I.        a) bendamustine or a pharmaceutically acceptable salt thereof; and

                  b) a pharmaceutically acceptable fluid including

6

                i) polyethylene glycol and propylene glycol; and

                ii) a stabilizing amount of thioglycerol; or

II.     a) about 50 mg/mL bendamustine or a pharmaceutically acceptable salt thereof; and

          b) a pharmaceutically acceptable fluid including

                i) about 90% PEG and about 10% PG; and

                ii) about 2.5 mg/mL thioglycerol.

Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total impurities, PAR as determined by HPLC at a wavelength of 223nm, after at least about 15 months of storage at a temperature of from about 5 °C to about 25 °C.

In accordance with other aspects of the invention, there are provided long term storage stable bendamustine-containing compositions, including:

        a) bendamustine or a pharmaceutically acceptable salt thereof;

        b) a pharmaceutically acceptable fluid including one or more of the following: PG, ethanol, PEG, benzyl alcohol and glycofurol; and

        c) a stabilizing amount of a chloride salt.

These compositions also have the low levels of impurities and long term stability mentioned herein. Preferred pharmaceutically acceptable fluids include PG, PEG or ethanol in this embodiment of the invention. Preferably, the PEG is PEG 400. If desired, glycerin and/or 88% (w/w) lactic acid can be added to the pharmaceutically acceptable fluid.

Suitable chloride salts include but are not limited to organic chloride salts, sodium chloride, choline chloride, hydrochloride salts of amino acids and mixtures thereof. Thus, as will be appreciated by those of ordinary skill, one can select from among a number of suitable chloride salts and it is Applicants' intention that the scope of the invention includes all such chloride salts that are capable of being included in bendamustine-containing formulations for extended periods without having a deleterious effect on the drug.  In one embodiment of the invention, the chloride salt concentration is from about 10 to about 300 mg/mL. In another embodiment, the

7

chloride salt concentration is from about 50 to about 215 mg/mL. In one preferred embodiment, the chloride salt concentration is about 215 mg/mL.

In accordance with another aspect of the invention, there is provided long term storage stable bendamustine-containing compositions, including:

      a) bendamustine or a pharmaceutically acceptable salt thereof; and

      b) a pharmaceutically acceptable fluid including DMSO.

These compositions also have the low levels of impurities and long term stability mentioned herein. In some aspects, the bendamustine concentration in these compositions is from about 10 mg/mL to about 100 mg/mL. Preferably, the bendamustine concentration is from about 20 mg/mL to about 50 mg/mL, more preferably from about 25 mg/mL to about 50 mg/mL. In an alternative embodiment, the bendamustine concentration is about 50 mg/mL.

Another embodiment of the invention provides methods of treating cancer in mammals. The methods include administering to a mammal in need thereof an effective amount of one of the bendamustine-containing compositions described herein. Since the active ingredient portion of the inventive composition is an FDA-approved drug, those of ordinary skill will recognize that the doses of bendamustine employed in this aspect of the invention will be similar to those employed in any treatment regimens designed for bendamustine as marketed under the trade name TREANDA. The patient package insert containing dosing information is incorporated herein by reference. The methods of treatment also include administering the inventive formulations for any purpose or physical condition for which bendamustine has been indicated as being useful.

Another embodiment of the invention includes methods of preparing bendamustine-containing compositions described herein. The methods include reconstituting lyophilized bendamustine in a pharmaceutically acceptable fluid containing one of the following:

      A)    i) PEG, PG or mixtures thereof; and

              ii) a stabilizing amount of an antioxidant;

      B)    i) one or more of PG, ethanol, PEG, benzyl alcohol and glycofurol; and

              ii) a stabilizing amount of a chloride salt; or

8

    C)    DMSO.

The steps are carried out under pharmaceutically acceptable conditions for sterility and manufacturing.

In a further aspect of the invention, there are provided methods of controlling or preventing the formation of impurities in bendamustine-containing compositions during long term storage. The methods include combining an amount of bendamustine or a pharmaceutically acceptable salt thereof with a sufficient amount of a pharmaceutically acceptable fluid containing one of the following:

    A)    i) PEG, PG or mixtures thereof; and

              ii) a stabilizing amount of an antioxidant;

    B)    i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and

              ii) a stabilizing amount of a chloride salt; or

    C)    DMSO.

Further optional steps in accordance therewith include transferring one or more pharmaceutically acceptable doses of the formulations into a suitable sealable container and storing the sealed container at a temperature of from about 5 °C to about 25 °C. As a result of carrying out these steps, it is possible to control or substantially prevent the formation of impurities which otherwise occur with bendamustine-containing compositions during long term storage so that the artisan is provided with bendamustine-containing formulations having less than about 5 % total impurities PAR as determined by HPLC at a wavelength of 223nm, after at least about 15 months of storage at a temperature of from about 5 °C to about 25 °C.

The compositions of the present invention can be packaged in any suitable sterile vial or container fit for the sterile storage of a pharmaceutical such as bendamustine. Suitable containers can be glass vials, polypropylene or polyethylene vials or other special purpose containers and be of a size sufficient to hold one or more doses of bendamustine.

A further aspect of the invention includes kits containing lyophilized bendamustine or a pharmaceutically acceptable salt thereof in a first container or vial; and, in a second

9

container, a sufficient amount of a pharmaceutically acceptable fluid such as those described herein, i.e. one of the following:

A)   i)  PEG, PG or mixtures thereof; and

   ii)  a stabilizing amount of an antioxidant;

B)   i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and

   ii)  a stabilizing amount of a chloride salt; or

C)   DMSO.

For purposes of this embodiment, the amount of fluid which is sufficient is an amount which allows the bendamustine to be dissolved or dispersed to a degree which renders the liquid composition ready for use.

As will be appreciated by those of ordinary skill, the kit will contain other pharmaceutically necessary materials for storing and/or administering the drug, including instructions for storage and use, additional diluents, if desired, etc.

**EXAMPLES**

The following examples serve to provide further appreciation of the invention but are not meant in any way to restrict the effective scope of the invention.

**Example 1**

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10mg/ml in one of ethanol, propylene glycol and benzyl alcohol as indicated in Table 1 below. 215 mg/ml of choline chloride was added in half of the samples as a source of soluble chloride ions. The samples were maintained at 40 °C and analyzed periodically for drug content and total impurities. The results obtained are presented in Table 1.

10

Table 1 – Stability of Bendamustine HCl

| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
|---|---|---|---|---|
| BDM - 10mg/mL Choline chloride - 215mg/mL Ethanol qs to 1mL | Initial | | 10.43 | 0.27 |
| | 40°C | 48 hrs | 10.48 | 1.27 |
| | | 7 day | 10.26 | 2.11 |
| BDM - 10mg/mL Ethanol qs to 1mL | Initial | | 10.55 | 0.27 |
| | 40°C | 48 hrs | 10.30 | 2.39 |
| | | 7 day | 9.55 | 6.66 |
| BDM - 10mg/mL Choline chloride - 215mg/mL Propylene glycol qs to 1mL | Initial | | 9.99 | 0.21 |
| | 40°C | 48 hrs | 9.95 | 0.60 |
| | | 7 day | 9.43 | 2.31 |
| BDM - 10mg/mL Propylene glycol qs to 1mL | Initial | | 9.68 | 0.21 |
| | 40°C | 48 hrs | 9.45 | 0.88 |
| | | 7 day | 9.00 | 3.44 |
| BDM - 10mg/mL Choline Chloride - 215mg/mL Benzyl alcohol qs to 1mL | Initial | | 9.95 | 1.19 |
| | 40°C | 48 hrs | 9.89 | 3.51 |
| | | 7 day | 8.97 | 4.24 |
| BDM - 10mg/mL Benzyl alcohol qs to 1mL | Initial | | 9.52 | 0.33 |
| | 40°C | 48 hrs | 8.67 | 4.18 |
| | | 7 day | 7.49 | 7.84 |

Note: In Table 1 the total % impurities include total contributions from peaks at various RRTs.

As shown in Table 1, the bendamustine formulations are very stable in solutions containing solvent and chloride salt. Table 1 shows that bendamustine, when dissolved at a concentration of about 10 mg/mL, in a pharmaceutically acceptable fluid, such as ethanol and propylene glycol, and containing a stabilizing amount of a chloride salt, such as choline chloride, had less than about 5% after at least 7 days storage at 40 °C.

The data presented in Table 1 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of a chloride salt having a shelf life of at least about 15 months at 5 °C and 25 °C.

11

The sample including ethanol alone exhibited more than 6.5 total degradants after 7 days storage at 40 °C. The sample including benzyl alcohol alone exhibited more than 7.5% total degradants after 7 days storage at 40 °C. Bendamustine-containing compositions with such high levels of degradation would not be suitable for long-term storage.

**Example 2**

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10mg/ml in DMSO. The samples were maintained at 40 °C and analyzed periodically for drug content and impurity profile. The results obtained are presented in Table 2.

Table 2 - Stability of Bendamustine HCl in DMSO

| Formulation | Temp | Time | Content (mg/mL) | % Total Imp |
|---|---|---|---|---|
| BDM - 10mg/mL DMSO qs to 1mL | | Initial | 10.2 | **0.23** |
| | 40°C | 48 hrs | 9.80 | **0.30** |
| | | 1 week | 10.0 | **0.56** |

Note: In Table 2 the total % impurities include total contributions from peaks at various RRTs.

Table 2 shows that bendamustine, when dissolved in DMSO, had substantially no increase in total degradants. The data presented in Table 2 translates to bendamustine-containing compositions including DMSO having a shelf life of at least about 15 months at 5 °C and 25 °C. In fact, such compositions are expected to have long term stability for periods beyond 15 months, i.e. up to 2 years or greater.

12

**Example 3**

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 20 mg/ml in polyethylene glycol 400 and 5 mg/ml of lipoic acid was added as a stabilizing antioxidant as indicated in Table 3 below. The samples were maintained at 40 $^{\circ}$C or 25 $^{\circ}$C and analyzed after 15 days for drug content and impurities. The results obtained are presented in Table 3.

Table 3: Stability of Bendamustine (20mg/ml) in PEG 400 and Antioxidants

| Antioxidant | T $^{\circ}$C | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
|  | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
|  | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

As shown in Table 3, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as polyethylene glycol, in the presence of a stabilizing amount of an antioxidant, such as lipoic acid, had substantially no increase in total degradants after a period of 15 days. The data presented in Table 3 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of an antioxidant having a shelf life of at least about 15 months at 5 $^{\circ}$C and 25 $^{\circ}$C.

The sample including PEG alone, on the other hand, which did not contain an antioxidant, did not exhibit stabilizing effects at 40 $^{\circ}$C. This sample had more than 40% more total impurities than the sample including lipoic acid. Bendamustine-containing compositions with such high levels of total impurities would not be suitable for long-term storage.

13

**Example 4**

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol.  5 mg/ml of thioglycerol, α-lipoic acid or dihydrolipoic acid was added as a stabilizing antioxidant as indicated in Table 4 below.  The samples were maintained at 40 °C and analyzed after 15 days or one month for drug content and impurity profile as indicated in Table 4 below.  The results obtained are presented in Table 4.

Table 4: Stability of Bendamustine (50mg/ml) in 90% PEG 400,
10% Propylene Glycol and Antioxidant

| Antioxidant | T (°C) | Time | Content (mg/mL) | % Initial | % Impurities RRT | | % Total Imps |
|---|---|---|---|---|---|---|---|
| | | | | | HP1 | PG ester | |
| | | | | | 0.59 | 1.10 | |
| Thioglycerol | 40 | initial | 48.8 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 48.5 | 99.4 | 0.06 | 0.20 | 0.71 |
| α-lipoic acid | 40 | initial | 49 | 100 | <LD | <LD | 0 |
| | 40 | 15 days | 48.8 | 99.6 | 0.19 | 0.13 | 0.32 |
| | 40 | 1 month | 48.7 | 99.4 | 0.34 | 0.26 | 0.79 |
| Dihydrolipoic acid | 40 | initial | 49.3 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 47.7 | 97.4 | 0.63 | 0.12 | 1.84 |

<LD = Below Level of Detection

As shown in Table 4, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as a combination of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of an antioxidant, such as thioglycerol, α-lipoic acid or dihydrolipoic acid, had substantially no increase in total degradants after a period of 1 month. This data supports the position that bendamustine-containing compositions according to the invention have a shelf life of at least about 2 years when stored at temperatures between 5 °C and 25 °C.

14

**Example 5**

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in a mixture of polyethylene glycol 400 and propylene glycol as indicated in Table 5 below. 5 mg/ml of lipoic acid was added as a stabilizing antioxidant. The samples were maintained at 40 °C, 25 °C and 5 °C and analyzed after 1 week, 15 days or one month for drug content and impurity profile as indicated in Table 5 below. The results obtained are presented in Table 5.

Table 5: Stability of Bendamustine (50 mg/ml) and Lipoic Acid (5 mg/ml) in PEG400 and Propylene glycol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | %Area of degradants | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|
| | | | | | HP1 0.58 | PG ester 1.10 | PG ester 1.13 | |
| BDM - 50mg/mL Lipoic acid - 5mg/mL PEG 400:PG (75:25) qs to 1mL | Initial | | 49.6 | 100 | BDL | BDL | BDL | 0.18 |
| | 40 °C | 1 W | 49.0 | 98.8 | 0.05 | 0.13 | BDL | 0.38 |
| | | 15 d | 48.3 | 97.4 | 0.08 | 0.26 | BDL | 0.55 |
| | | 1 M | 48.0 | 96.8 | 0.11 | 0.43 | 0.13 | 1.03 |
| | 25°C | 15 d | 49.6 | 100.0 | BDL | 0.10 | BDL | 0.30 |
| | | 1 M | 48.4 | 97.6 | 0.05 | 0.19 | BDL | 0.43 |
| | 5°C | 1 M | 49.6 | 100.0 | BDL | 0.07 | BDL | 0.27 |
| BDM - 50mg/mL Lipoic acid - 5mg/mL PEG 400:PG (50:50) qs to 1mL | Initial | | 50.2 | 100 | BDL | BDL | BDL | 0.21 |
| | 40 °C | 1 W | 49.9 | 99.4 | BDL | 0.15 | BDL | 0.30 |
| | | 15 d | 49.1 | 97.8 | 0.06 | 0.35 | BDL | 0.73 |
| | | 1 M | 49.0 | 97.6 | 0.09 | 0.90 | 0.25 | 1.82 |
| | 25°C | 15 d | 49.9 | 99.4 | BDL | 0.12 | BDL | 0.32 |
| | | 1 M | 49.7 | 99.0 | BDL | 0.25 | BDL | 0.59 |
| | 5°C | 1 M | 50.0 | 99.6 | BDL | 0.11 | BDL | 0.33 |
| BDM - 50mg/mL Lipoic acid - 5mg/mL PEG 400:PG (90:10) qs to 1mL | Initial | | 50.8 | 100 | BDL | BDL | BDL | 0.21 |
| | 40 °C | 1 W | 50.4 | 99.2 | BDL | 0.11 | BDL | 0.30 |
| | | 15 d | 49.7 | 97.8 | 0.07 | 0.17 | BDL | 0.43 |
| | | 1 M | 49.7 | 97.8 | 0.13 | 0.27 | 0.09 | 0.84 |
| | 25°C | 15 d | 50.8 | 100.0 | BDL | 0.10 | BDL | 0.26 |
| | | 1 M | 50.8 | 100.0 | 0.05 | 0.14 | BDL | 0.39 |
| | 5°C | 1 M | 50.8 | 100.0 | BDL | 0.06 | BDL | 0.34 |

BDL = Below Detectable Limit

As shown in Table 5, bendamustine, when dissolved in certain mixtures of polyethylene glycol and propylene glycol and a stabilizing amount of lipoic acid, had substantially no increase in total degradants after a period of 1 month. The data

15

presented in Table 5 translates to bendamustine-containing compositions having a shelf life of at least about 2 years when stored at temperatures between 5 °C and at 25 °C.

**Example 6**

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol and α-lipoic acid was added as a stabilizing antioxidant as indicated in Table 6 below. The samples were maintained at 40 °C, 25 °C and 5 °C and analyzed for drug content and impurity profile as indicated in Table 6 below. The results obtained are presented in Table 6.

Table 6: Stability of Bendamustine in 90% PEG 400, 10% PG and α-lipoic acid

| Formulation | Temp | Time Per. | Amt. mg/ml | % of Initial | %Area of degradants | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0.59 | 1.10 | 1.13 | 1.15 | 1.17 | 1.20 | 1.22 | 1.30 | |
| BDM - 50mg/mL α-lipoic acid - 10mg/mL PEG 400:PG (90:10) qs to 1mL | Initial | | 51.0 | 100 | 0.20 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.26 |
| | 40°C | 1 M | 50.5 | 99.0 | 0.21 | 0.31 | 0.13 | 0.07 | 0.13 | 0.10 | <LD | <LD | 0.95 |
| | | 2 M | 49.7 | 97.5 | 0.22 | 0.71 | 0.28 | 0.14 | 0.12 | 0.21 | 0.12 | <LD | 2.02 |
| | | 3 M | 48.7 | 95.5 | 0.22 | 1.01 | 0.45 | 0.21 | 0.14 | 0.37 | 0.16 | 0.05 | 2.96 |
| | 25°C | 3 M | 50.5 | 99.0 | 0.20 | 0.36 | 0.07 | <LD | <LD | 0.10 | <LD | <LD | 0.73 |
| | | 6 M | 50.4 | 98.8 | 0.22 | 0.60 | 0.17 | 0.06 | 0.06 | 0.09 | 0.10 | 0.08 | 1.44 |
| | 5°C | 6 M | 50.9 | 99.8 | 0.16 | 0.05 | <LD | <LD | <LD | <LD | <LD | <LD | 0.21 |
| | | 12 M | 50.6 | 99.2 | 0.20 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | 0.38 |
| BDM - 50mg/mL α-lipoic acid - 15mg/mL PEG 400:PG (90:10) qs to 1mL | Initial | | 50.3 | 100 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | <LD | 0.18 |
| | 40°C | 1 M | 50.0 | 99.4 | 0.19 | 0.32 | 0.08 | 0.06 | 0.08 | 0.06 | 0.06 | <LD | 0.85 |
| | | 2 M | 49.8 | 99.0 | 0.19 | 0.65 | 0.21 | 0.12 | 0.13 | 0.23 | 0.14 | 0.06 | 1.85 |
| | | 3 M | 49.5 | 98.4 | 0.15 | 0.89 | 0.37 | 0.17 | 0.13 | 0.32 | 0.10 | <LD | 2.40 |
| | | 6 M | 47.0 | 93.4 | 0.20 | 1.76 | 0.66 | 0.19 | 0.31 | 0.47 | 0.33 | 0.17 | 4.93 |
| | 25°C | 3 M | 50.0 | 99.4 | 0.20 | 0.35 | 0.08 | <LD | <LD | <LD | 0.11 | <LD | 0.79 |
| | | 6 M | 49.5 | 98.4 | 0.19 | 0.58 | 0.15 | 0.06 | 0.07 | 0.09 | 0.08 | 0.10 | 1.38 |
| | 5°C | 6 M | 50.3 | 100 | 0.17 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.23 |
| | | 12 M | 50.2 | 99.8 | 0.19 | 0.15 | <LD | <LD | <LD | <LD | <LD | <LD | 0.34 |

<LD = Below Level of Detection

The data reported in Table 6 along with the data in Table 5 demonstrates that bendamustine solutions are stable when dissolved in mixtures of PEG and PG and 5-15mg/mL α-lipoic acid. As shown in Table 6, bendamustine, when dissolved in combinations of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of lipoic acid, had less than 3% increase in total degradants after a period of 3 months at 40 ºC. Additionally, the same compounds had substantially no increase in total degradants after a period of 6-12 months at 5 ºC and 25 ºC. The data corresponds to bendamustine solutions being stable under ambient or refrigerated storage conditions for well in excess of 2 years, and thus long term stable.

17

**Example 7**

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 2.5 mg/ml of thioglycerol was added as an antioxidizing agent. The samples were maintained at 40 °C and 25 °C and analyzed for drug content and impurity profile as indicated in Table 7 below. The results obtained are presented in Table 7.

Table 7: Stability of Bendamustine in 90% PEG 400, 10% PG and Thioglycerol

| Formu-lation | Temp | Time Per. | Amt mg/ml | % of Ini-tial | RRTs of degradants | | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0.15 | 0.37 | 1.10 | 1.13 | 1.15 | 1.17 | 1.18 | 1.20 | 1.22 | |
| BDM - 50mg/mL Thio glycerol - 2.5mg/mL PEG 400:PG (90:10) qs to 1mL | Initial | | 50.3 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | 40°C | 15 d | 50.2 | 99.8 | BDL | BDL | BDL | 0.18 | BDL | BDL | 0.05 | 0.08 | BDL | 0.31 |
| | | 1 M | 49.9 | 99.2 | BDL | 0.12 | 0.32 | 0.07 | BDL | BDL | 0.09 | 0.08 | BDL | 0.75 |
| | | 2 M | 49.1 | 97.6 | BDL | 0.18 | 0.56 | 0.24 | 0.09 | 0.17 | 0.19 | 0.12 | 0.11 | 1.76 |
| | | 3 M | 48.8 | 97.0 | BDL | 0.23 | 0.85 | 0.34 | 0.16 | 0.30 | 0.34 | 0.29 | 0.19 | 2.94 |
| | 25°C | 3 M | 49.9 | 99.2 | 0.06 | 0.12 | 0.23 | 0.07 | BDL | 0.06 | 0.07 | 0.06 | BDL | 0.67 |
| | | 6 M | 49.3 | 98.0 | BDL | 0.23 | 0.53 | 0.22 | 0.11 | BDL | 0.21 | 0.22 | 0.20 | 2.07 |

BDL = Below Detectable Limit

The stability is similar to that of α-lipoic acid samples in Example 6 above. As shown in Table 7, bendamustine, when dissolved in a combination of polyethylene glycol and propylene glycol, and a stabilizing amount of thioglycerol, had less than 3% increase in total degradants after a period of 3 months at 40 °C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6 months at 25 °C. The data reported supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for about 2 years.

**Example 8**

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 85% PEG 400 and 15% PG in the presence of

18

5 mg/ml of thioglycerol. The samples were maintained at 40 °C and 25 °C and analyzed for drug content and impurity profile as indicated in Table 8 below. The results obtained are presented in Table 8.

Table 8: Stability of Bendamustine in 85% PEG 400, 15% PG and Thioglycerol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Total Imp. |
|---|---|---|---|---|---|
| BDM - 50mg/mL Thioglycerol - 5mg/mL PEG 400:PG (85:15) qs to 1mL | Initial | | 51.5 | 100 | 0.12 |
| | 40°C | 1 M | 50.4 | 97.9 | 1.18 |
| | 25°C | 1 M | 51.4 | 99.8 | 0.41 |
| | | 3 M | 50.4 | 97.9 | 1.21 |
| | 5°C | 3 M | 51.0 | 99.0 | 0.26 |

The stability is similar to that of thioglycerol samples in Example 7 above. As reported in Table 8, total impurities did not exceed 2% at 40 °C or 25°C storage over one month, or at 25 °C and 5 °C storage after three months. The data reported in Table 8 supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for at least about 2 years if not longer.

# EXHIBIT 13

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 47207612 |
| **Application Number:** | 18081238 |
| **International Application Number:** | |
| **Confirmation Number:** | 5922 |
| **Title of Invention:** | FORMULATIONS OF BENDAMUSTINE |
| **First Named Inventor/Applicant Name:** | Nagesh R. Palepu |
| **Customer Number:** | 23377 |
| **Filer:** | Stephanie A. Lodise/VeAndra Luckett |
| **Filer Authorized By:** | Stephanie A. Lodise |
| **Attorney Docket Number:** | 107071.000582 |
| **Receipt Date:** | 14-DEC-2022 |
| **Filing Date:** | |
| **Time Stamp:** | 15:49:48 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | DA |
| Payment was successfully received in RAM | $7540 |
| RAM confirmation Number | E2022BDF50403031 |
| Deposit Account | 233050 |
| Authorized User | VeAndra Luckett |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |

     37 CFR 1.16 (National application filing, search, and examination fees)

     37 CFR 1.17 (Patent application and reexamination processing fees)

37 CFR 1.19 (Document supply fees)

37 CFR 1.20 (Post Issuance fees)

37 CFR 1.21 (Miscellaneous fees and charges)

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Track One Request | 107071-582_Certification_and_RequestforPrioritizedExamination.pdf | 118780<br>beb09ca4484a38cbbbecf2978dcbbbc988aac1723 | no | 2 |

| Warnings: |
|---|

| Information: |
|---|

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 2 | Application Data Sheet | 107071-582_ADS.pdf | 1256896<br>e538f0986c3b03ecd9e11443d8196760170 31be8 | no | 9 |

| Warnings: |
|---|

| Information: |
|---|

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 3 | | 107071-582_fasttrack_BEND01-US-CON9application.pdf | 214341<br>b6145edd859445e0554559l331bbc27899 b6d351 | yes | 20 |

| Multipart Description/PDF files in .zip description | | |
|---|---|---|
| Document Description | Start | End |
| Specification | 1 | 16 |
| Claims | 17 | 19 |
| Abstract | 20 | 20 |

| Warnings: |
|---|

| Information: |
|---|

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 4 | Oath or Declaration filed | 107071-582_Declarations.pdf | 379006<br>18e4319c1c20dae69d767104673a3b54692 b073e | no | 3 |

| Warnings: |
|---|

| Information: |
|---|

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 5 | Transmittal Letter | 107071-582_ContentofIDS.pdf | 120890<br>bf269c46f98ef2dda788a44e1d0f43d16a93 beb2 | no | 1 |

| Warnings: | | | | |
|---|---|---|---|---|
| **Information:** | | | | |
| 6 | Information Disclosure Statement (IDS) Form (SB08) | 107071-582_IDS_1.pdf | 99928 <br><br> e69a39d6e7d4c46db3727edd955be938ef4b1483 | no | 17 |
| **Warnings:** | | | | |
| **Information:** | | | | |
| This is not an USPTO supplied IDS fillable form | | | | |
| 7 | Information Disclosure Statement (IDS) Form (SB08) | 107071-582_IDS_2.pdf | 81906 <br><br> f8e689c5c1039c69f31e04fb496fc2f33d460790 | no | 8 |
| **Warnings:** | | | | |
| **Information:** | | | | |
| This is not an USPTO supplied IDS fillable form | | | | |
| 8 | Information Disclosure Statement (IDS) Form (SB08) | 107071-582_IDS_3.pdf | 80473 <br><br> 88377c0a18430a972457466d2651869c63cce842c | no | 8 |
| **Warnings:** | | | | |
| **Information:** | | | | |
| This is not an USPTO supplied IDS fillable form | | | | |
| 9 | Information Disclosure Statement (IDS) Form (SB08) | 107071-582_IDS_4.pdf | 73951 <br><br> 04f0fefaaadb86a83002c52c2cadcf127d798aba | no | 6 |
| **Warnings:** | | | | |
| **Information:** | | | | |
| This is not an USPTO supplied IDS fillable form | | | | |
| 10 | Fee Worksheet (SB06) | fee-info.pdf | 55058 <br><br> 9ee65ad6z8a88e29478c350099ffd3625d8d1b62e | no | 2 |
| **Warnings:** | | | | |
| **Information:** | | | | |
| | | **Total Files Size (in bytes):** | 2481229 | | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

DOCKET NO.: 107071.000582                                              **PATENT**
Application No.: 18/081,238
Office Action Dated:  March 21, 2023

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

    **Nagesh R. Palepu et al.**           **Confirmation No.: 5922**

Application No.:  18/081,238          **Group Art Unit: 1613**

Filing Date: December 14, 2022        **Examiner:  ERNST V ARNOLD**

For:    **FORMULATIONS OF BENDAMUSTINE**

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

### REPLY PURSUANT TO 37 CFR § 1.111

In response to the Official Action dated March 21, 2023, reconsideration is respectfully requested in view of the amendments and/or remarks as indicated below:

☐    **Amendments to the Specification** begin on page of this paper.

☐    **Amendments to the Abstract** begin on page of this paper.

☒    **Amendments to the Claims** are reflected in the listing of the claims which begins on page 2 of this paper.

☐    **Amendments to the Drawings** begin on page of this paper and include an attached replacement sheet.

☒    **Remarks** begin on page 6 of this paper.

☒    The Commissioner is hereby authorized to charge any fee deficiency, charge any additional fees, or credit any overpayment of fees, associated with this application in connection with this filing, or any future filing, submitted to the U.S. Patent and Trademark Office during the pendency of this application, to Deposit Account No. 23-3050.

DOCKET NO.: 107071.000582                                                              **PATENT**
Application No.: 18/081,238
Office Action Dated: **March 21, 2023**

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims:**

1.      (currently amended) A ready for dilution, liquid bendamustine-containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL;

a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

a stabilizing amount of an antioxidant;

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

2.      (Original) The composition of claim 1, comprising 100 mg of bendamustine.

3.      (Original) The composition of claim 1, wherein the bendamustine concentration is about 25 mg/mL.

4.      (Original) The composition of claim 1, wherein the antioxidant is monothioglycerol.

5.      (Original) The composition of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

6.      (Original) The composition of claim 1, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.

7.      (Cancelled)

DOCKET NO.:  107071.000582                                                    **PATENT**
Application No.:  18/081,238
Office Action Dated:  March 21, 2023

8.      (Original) The composition of claim 1, further comprising ethanol.


9.      (Original) The composition of claim 1, wherein the liquid bendamustine-containing

        composition is packaged in a sterile vial.


10.     (currently amended) A liquid bendamustine-containing composition comprising

        bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine

                concentration in the composition is from about 20 mg/mL to about 60 mg/mL and

                wherein the bendamustine has not been reconstituted from a lyophilized powder;

        a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one

        or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

        a stabilizing amount of an antioxidant;

        wherein the total impurities resulting from the degradation of the bendamustine is less

                than about 5% peak area response, as determined by HPLC at a wavelength of

                223 nm after at least about 15 months at a temperature of about 5 °C to about 25

                °C.


11.     (Original) The composition of claim 10, comprising 100 mg of bendamustine.


12.     (Original) The composition of claim 10, wherein the bendamustine concentration is about

        25 mg/mL.


13.     (Original) The composition of claim 10, wherein the antioxidant is monothioglycerol.


14.     (Original) The composition of claim 10, wherein the antioxidant is monothioglycerol in a

        concentration of about 5 mg/mL.


15.     (Original) The composition of claim 10, wherein the composition is stable for at least

        about 15 months at 5 °C or for at least about 15 months at 25 °C.

DOCKET NO.:  107071.000582                                                                PATENT
Application No.:  18/081,238
Office Action Dated:  March 21, 2023

16.     (Cancelled)

17.     (Original) The composition of claim 10, further comprising ethanol.

18.     (Original) The composition of claim 10, wherein the liquid bendamustine-containing composition is packaged in a sterile vial.

19.     (currently amended) A bendamustine-containing composition comprising
one or more doses of bendamustine, or a pharmaceutically acceptable salt thereof, and a
        stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid that is
        polyethylene glycol;
wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from
        about 20 mg/mL to about 60 mg/mL; and
wherein the total impurities resulting from the degradation of the bendamustine is less
        than about 5% peak area response, as determined by HPLC at a wavelength of 223
        nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

20.     (Original) The composition of claim 19, comprising 100 mg of bendamustine.

21.     (Original) The composition of claim 19, wherein the bendamustine concentration is about 25 mg/mL.

22.     (Original) The composition of claim 19, wherein the antioxidant is monothioglycerol.

23.     (Original) The composition of claim 19, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

24.     (Original) The composition of claim 19, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.

4876-2014-3961.2

**DOCKET NO.:** 107071.000582                                                                 **PATENT**
**Application No.:** 18/081,238
**Office Action Dated:  March 21, 2023**

25.     (Cancelled)


26.     (Original) The composition of claim 19, further comprising ethanol.


27.     (Original) The composition of claim 19, wherein the liquid bendamustine-containing
composition is packaged in a sterile vial.


28.     (Currently Amended) A method of treating leukemia in a human in need thereof
comprising
providing a liquid bendamustine-containing composition <u>according to claim 3</u> ~~comprising~~
~~about 25 mg/ml of bendamustine~~;
diluting the liquid bendamustine containing composition; and
intravenously administering the diluted composition to the human.


29.     (Original) The method of claim 28, wherein the liquid bendamustine containing
composition is diluted with about 50 mL of a diluent.

4876-2014-3961.2

DOCKET NO.: 107071.000582                                                    PATENT
Application No.: 18/081,238
Office Action Dated: March 21, 2023

## REMARKS

Claims 1, 10, 19, and 28 have been amended. Claims 7, 16, and 25 are cancelled without prejudice. The amendments are supported by the original specification and claims and no new subject matter has been added.

### Claim Rejections – 35 U.S.C. § 103

Claims 1-3, 5-12, 15-21 and 24-27 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over U.S. Publication No. 2011/0190363 (hereinafter "Drager"). *Office Action*, at 4. Applicant request reconsideration and withdrawal of the rejection.

The claims are directed to, *e.g.,* liquid, bendamustine-containing compositions comprising 20 mg/mL to about 60 mg/mL of bendamustine, along with a stabilizing amount of an antioxidant, in polyethylene glycol. Polyethylene glycol is "protic" and has the following general formula:



Drager's composition must comprise a polar "aprotic" solvent, for example, dimethylacetamide, dimethyl sulfoxide, dimethylformamide, or 1-methyl-2-pyrrolidinone. Drager at *e.g.,* paragraphs [0014], [0017]. Drager explains that polar, aprotic solvents are sufficiently non-nucleophilic towards bendamustine such that polar aprotic solvent-bendamustine adducts do not form over the course of typical commercial storage conditions. Drager at paragraph [0015].

Drager teaches that each of its formulations must include some amount of polar aprotic solvent. While Drager references that polar protic solvent may be used, that is only **in addition to**, **not instead of**, the polar aprotic solvent. Drager fails to disclose or suggest any bendamustine formulations with solvent systems composed of protic solvent in the absence of any aprotic solvent. Indeed, Drager teaches away from the use of formulations including only polar protic solvents, stating that "while nonaqueous polar protic solvents are of sufficient nucleophilicity to form potentially undesirable polar protic solvent-bendamustine adducts, such adducts will not form during typical commercial storage if the concentration of the polar protic solvent is kept

DOCKET NO.:  107071.000582                                                    PATENT
Application No.:  18/081,238
Office Action Dated:  March 21, 2023

within the scope of the present invention." Drager at paragraph [0019]. Drager's Figure 3 depicts

bendamustine degradation in protic solvent (99% propylene glycol) at 5 °C and 25 °C:



*See also,* Drager at paragraph [0036], stating "As can be seen in FIG. 3, bendamustine

(BM1) in 99% propylene glycol degrades significantly when stored at 25 °C for less than 100

days. After storage at 5 °C for about 365 days, the purity of the bendamustine is about 80% or

less."

Even if the person of ordinary skill in the art were motivated to include a polar protic

solvent in a bendamustine formulation, Drager provides no motivation or reason to use

polyethylene glycol, specifically. Rather, polyethylene glycol is included – without emphasis or

differentiation – in a laundry list of pharmaceutically acceptable nonaqueous polar protic

solvents.  Polyethylene glycol is not otherwise mentioned in Drager, nor is its use exemplified.

The generic list of nonaqueous polar protic ingredients would not have motivated a person of

ordinary skill to use polyethylene glycol in a bendamustine formulation.  *See, e.g.,* Expert Report

of Dr. Siepmann at page 23 *et seq.*[1] *See also, Cephalon, Inc. v. Slayback Pharma Limited*

*Liability Co.,* CA 17-1154-CFC, Opinion (D. Del. April 27, 2020) at 14-15 (court determining

that "Drager also taught that protic solvents-i.e., solvents including PEG and PG, that have OH

groups-are acceptable to use with bendamustine but only when combined with aprotic

solvents."); at 19-20, 21-22 (court determining that Drager teaches away from using polyols such

---

[1] Dr. Siepmann's expert report was submitted in *Cephalon, Inc. v. Slayback Pharma Limited Liability Co.*, C.A. No. 17-01154-CFC (D. Del). Trade secret information has been redacted from the submitted report.

DOCKET NO.: 107071.000582                                                    **PATENT**
Application No.: 18/081,238
Office Action Dated: **March 21, 2023**

as PEG with bendamustine); at 22-23 (court determining that a person of ordinary skill would have followed Drager's teaching not to use protic solvents such as PEG).

In order to arrive at any claimed composition, the person of ordinary skill in the art would have had to modify Drager's formulations to remove polar aprotic solvent. This proposed modification would have changed the principle of operation of Drager and a *prima facie* case of obviousness cannot be supported. *See* MPEP 2143(VI). Moreover, even if the person of ordinary skill in the art considered removing Drager's required polar aprotic solvent, they would not have had any reasonable expectation of successfully producing a stable liquid formulation of bendamustine in view of Drager's evidence that bendamustine degrades without the polar aprotic solvent. The claims are patentable over Drager and Applicant requests reconsideration and withdrawal of the rejection.

Moreover, the recited compositions exhibit a stability profile that is significantly improved over Drager's formulations. Independent claims 1, 10, and 19 recite that the compositions include less than about 5% peak area response (by HPLC) of **total impurities** resulting from the degradation of bendamustine. *See, also,* original claims 7, 16, and 25, now cancelled. The Examiner alleges that Drager's formulations exhibit a similar stability profile. Action at 7. To the contrary, the data reported in Drager establishes that those formulations are significantly **_less_** stable than any claimed composition.

The present claims recite that the bendamustine-containing compositions will exhibit less than 5% of **_total_** bendamustine degradation impurities (by HPLC) after at least 15 months at about 5-25 °C. Drager's paragraphs [0022] and [0023], cited by the Examiner, do not refer to **_total impurities_**; rather, Drager reports separately on levels of **_only five individual impurities_** after storage under only refrigerated conditions:

DOCKET NO.: 107071.000582                                                         PATENT
Application No.: 18/081,238
Office Action Dated: March 21, 2023

TABLE II

Impurity profile of certain liquid formulations of Bendamustine
HCl after storage at 5° C. for about 12 months

| Formulation | DCE (Area %) | HP1 (Area %) | BM1 dimer (Area %) | PG-1 (Area %) | PG-2 (Area %) |
|---|---|---|---|---|---|
| Niacinamide/ DMA | 1.40 | 0.08 | 0.06 | ND | ND |
| DMA | 1.10 | 0.08 | 0.05 | ND | ND |
| 66% DMA/ 34% PG | 0.12 | 0.08 | 0.06 | 1.09 | 0.27 |
| DMF | 0.07 | 0.11 | 0.07 | ND | ND |
| NMP | 0.90 | 0.10 | ND | ND | ND |
| DMSO | 0.04 | 0.38 | 0.79 | ND | ND |

ND = not detected

Significantly, none of Drager's tested formulations included polyethylene glycol, as recited in the pending claims. Moreover, Drager's 66% dimethylformamide/34% propylene glycol (a polar protic solvent) was the least stable of all formulations tested, producing each of the five identified impurities, even under refrigerated conditions. Noteworthy is that Drager considers a "stable" formulation to be one that includes up to 10% of bendamustine impurities. Drager at paragraph [0020] ("As used herein, "stable" is defined as no more than about a 10% loss of bendamustine under typical commercial storage conditions.")

One of ordinary skill in the art would not have predicted that polyethylene glycol-containing, bendamustine compositions, having the recited stability profile, would have been achievable, based on Drager's disclosure that polar protic solvent formulations had poor stability. The claims are patentable over Drager and Applicant requests reconsideration and withdrawal of the rejection.

Claims 4, 5, 13, 14, 22 and 23 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Drager in view of WO Publication No. 0202125 (hereinafter "Tait"). *Office Action*, at 9. As discussed above, Drager does not describe or suggest any claimed composition. Tait does not cure Drager's deficiencies, nor is it alleged to. Tait is cited merely for its general description of antioxidants. Applicant requests reconsideration and withdrawal of the rejection.

DOCKET NO.: 107071.000582                                                    **PATENT**
Application No.: 18/081,238
Office Action Dated: **March 21, 2023**

Claims 28 and 29 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Drager. *Office Action*, at 12. Claim 28 has been amended to refer to the composition of claim 3, which is not described or suggested by Drager, as discussed. Applicant requests reconsideration and withdrawal of the rejection.

## Claim Rejections – Double Patenting

Claims 1-27 stand rejected for non-statutory double patenting as being unpatentable over claims 1-16 of U.S. Patent No. 9,265,831. *Office Action*, at 16.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-27 of U.S. Patent No. 9,572,797. *Office Action*, at 18.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-26 of U.S. Patent No. 9,572,796 in view of Tait. *Office Action*, at 21.

Claims 1-18 stand rejected for non-statutory double patenting as being unpatentable over claims 1-22 of U.S. Patent No. 8,609,707. *Office Action*, at 23.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-23 of U.S. Patent No. 9,579,384. *Office Action*, at 26.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-24 of U.S. Patent No. 9,034,908. *Office Action*, at 28.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-17 of U.S. Patent No. 9,597,399 in view of Tait. *Office Action*, at 29.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-23 of U.S. Patent No. 9,144,568. *Office Action*, at 31.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-29 of U.S. Patent No. 9,572,887. *Office Action*, at 33.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-7 of U.S. Patent No. 9,597,397. *Office Action*, at 34.

Claims 1-27 stand rejected for non-statutory double patenting as being unpatentable over claims 1-26 of U.S. Patent No. 10,010,533. *Office Action*, at 36.

DOCKET NO.:  107071.000582                                               **PATENT**
Application No.:  18/081,238
Office Action Dated:  March 21, 2023

Claims 1-29 stand provisionally rejected for non-statutory double patenting as being unpatentable over claims 1-18 of copending U.S. Application No. 18,081,251. *Office Action*, at 38.

Claims 1-29 stand provisionally rejected for non-statutory double patenting as being unpatentable over claims 1-16 of copending U.S. Application No. 17,412,623. *Office Action*, at 39.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-16 of U.S. Patent No. 11,103,483. *Office Action*, at 40.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-9 of U.S. Patent No. 10,052,385. *Office Action*, at 42.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-10 of U.S. Patent No. 9,597,398 in view of Tait. *Office Action*, at 44.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-18 of U.S. Patent No. 9,572,888 in view of Tait. *Office Action*, at 46.

While not conceding to the propriety of the rejections, and solely to advance this application to allowance, terminal disclaimers are filed herewith to obviate the rejections.

## CONCLUSION

Applicant respectfully submits that the present application is in condition for allowance. Reconsideration of the application and an early Notice of Allowance are respectfully requested. In the event that the Examiner cannot allow the application for any reason, the Examiner is encouraged to contact Applicant's representative.

Date: June 16, 2023                          /Stephanie A. Lodise/
                                             Stephanie A. Lodise
                                             Registration No. 51430

BakerHostetler
312 Walnut Street
Suite 3200
Cincinnati, OH 45202
Telephone: 513.929.3400
Facsimile:  513.929.0303

4876-2014-3961.2

DOCKET NO.: 107071.000582                                                      **PATENT**
Application No.: 18/081,238
Office Action Dated: July 11, 2023

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

    **Nagesh R. Palepu et al.**                Confirmation No.: 5922

Application No.: **18/081,238**                     Group Art Unit: 1613

Filing Date: **December 14, 2022**                  Examiner: **ERNST V ARNOLD**

For:   **FORMULATIONS OF BENDAMUSTINE**

Mail Stop AF
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

### REPLY PURSUANT TO 37 CFR § 1.116

    In response to the Official Action dated July 11, 2023, reconsideration is respectfully requested in view of the amendments and/or remarks as indicated below:

    ☐   **Amendments to the Specification** begin on page of this paper.

    ☐   **Amendments to the Abstract** begin on page of this paper.

    ☒   **Amendments to the Claims** are reflected in the listing of the claims which begins on page 2 of this paper.

    ☐   **Amendments to the Drawings** begin on page of this paper and include an attached replacement sheet.

    ☒   **Remarks** begin on page 6 of this paper.

    ☒   The Commissioner is hereby authorized to charge any fee deficiency, charge any additional fees, or credit any overpayment of fees, associated with this application in connection with this filing, or any future filing, submitted to the U.S. Patent and Trademark Office during the pendency of this application, to Deposit Account No. 23-3050.

DOCKET NO.:  107071.000582                                                PATENT
Application No.:  18/081,238
Office Action Dated:  July 11, 2023

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims:**

1.      (Previously Presented) A ready for dilution, liquid bendamustine-containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL;

a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

a stabilizing amount of an antioxidant;

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

2.      (Original) The composition of claim 1, comprising 100 mg of bendamustine.

3.      (Original) The composition of claim 1, wherein the bendamustine concentration is about 25 mg/mL.

4.      (Original) The composition of claim 1, wherein the antioxidant is monothioglycerol.

5.      (Original) The composition of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

6.      (Original) The composition of claim 1, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.

7.      (Cancelled)

DOCKET NO.:  107071.000582                                                    **PATENT**
Application No.:  18/081,238
Office Action Dated:  July 11, 2023

8.      (Original) The composition of claim 1, further comprising ethanol.

9.      (Original) The composition of claim 1, wherein the liquid bendamustine-containing composition is packaged in a sterile vial.

10.     (Previously Presented) A liquid bendamustine-containing composition comprising bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL and wherein the bendamustine has not been reconstituted from a lyophilized powder; a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and a stabilizing amount of an antioxidant; wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

11.     (Original) The composition of claim 10, comprising 100 mg of bendamustine.

12.     (Original) The composition of claim 10, wherein the bendamustine concentration is about 25 mg/mL.

13.     (Original) The composition of claim 10, wherein the antioxidant is monothioglycerol.

14.     (Original) The composition of claim 10, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

15.     (Original) The composition of claim 10, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.

DOCKET NO.:  107071.000582                                              **PATENT**
Application No.:  18/081,238
Office Action Dated:  July 11, 2023

16.    (Cancelled)

17.    (Original) The composition of claim 10, further comprising ethanol.

18.    (Original) The composition of claim 10, wherein the liquid bendamustine-containing composition is packaged in a sterile vial.

19.    (Previously Presented) A bendamustine-containing composition comprising
         one or more doses of bendamustine, or a pharmaceutically acceptable salt thereof, and a
              stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid that is
              polyethylene glycol;
         wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from
              about 20 mg/mL to about 60 mg/mL; and
         wherein the total impurities resulting from the degradation of the bendamustine is less
              than about 5% peak area response, as determined by HPLC at a wavelength of 223
              nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

20.    (Original) The composition of claim 19, comprising 100 mg of bendamustine.

21.    (Original) The composition of claim 19, wherein the bendamustine concentration is about 25 mg/mL.

22.    (Original) The composition of claim 19, wherein the antioxidant is monothioglycerol.

23.    (Original) The composition of claim 19, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

24.    (Original) The composition of claim 19, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.

**DOCKET NO.:** 107071.000582                                                                                 **PATENT**
**Application No.:** 18/081,238
**Office Action Dated: July 11, 2023**

25.     (Cancelled)


26.     (Original) The composition of claim 19, further comprising ethanol.


27.     (Original) The composition of claim 19, wherein the liquid bendamustine-containing
        composition is packaged in a sterile vial.


28.     (Previously Presented) A method of treating leukemia in a human in need thereof
        comprising
        providing a liquid bendamustine-containing composition according to claim 3;
        diluting the liquid bendamustine containing composition; and
        intravenously administering the diluted composition to the human.


29.     (Original) The method of claim 28, wherein the liquid bendamustine containing
        composition is diluted with about 50 mL of a diluent.

4854-0198-3088.4

**DOCKET NO.:** 107071.000582                                             **PATENT**
**Application No.:** 18/081,238
**Office Action Dated:  July 11, 2023**

**REMARKS**

No claim amendments have been made. Applicant requests consideration of these remarks because they place the application in condition for allowance or in better form for appeal.

Applicant's representative thanks Examiner Arnold for the courtesy of the telephone conference conducted on July 12, 2023. The office action and cited art were discussed, as well as arguments and evidence submitted and found persuasive in U.S. 11,103,483. Agreement was reached that those arguments and evidence can be submitted for further consideration in this application. This response is submitted as a result of that teleconference.

**Withdrawn Rejections**

Applicant thanks Examiner Arnold for his comments that the rejections over Drager[1] have been withdrawn and that the terminal disclaimers Applicant filed have been accepted.

**Brief Description of the Claimed Inventions**

The pending claims are directed to, among other things, ready for dilution, liquid bendamustine-containing compositions having from about 20 mg/mL to about 60 mg/mL of bendamustine; polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol; and an antioxidant. The claimed compositions are not reconstituted lyophilized powders; they are concentrated, bendamustine-containing liquids for administration through infusion with an appropriate diluent.  (*See, e.g.,* Specification at page 2). This avoids the multi-step reconstitution and preparation for administration required for the Brittain[2] products, including TREANDA®.  These ready for dilution, liquid compositions are surprisingly stable and do not exhibit significant bendamustine degradation after storage for at least 15 months at refrigerated or room temperature conditions.

**Claim Rejections – 35 U.S.C. § 103**

The Examiner alleges that claims 1-3, 6, 8-12, 15, 17-21, 24, 26, and 27 would have been obvious over Brittain.[3] At the time of the invention, one of ordinary skill in the art would not

---

[1] US20110190363
[2] US 2006159713
[3] US 2006159713

Page 6 of 16

DOCKET NO.: 107071.000582                                          PATENT
Application No.: 18/081,238
Office Action Dated: July 11, 2023

have been motivated to make a liquid bendamustine-containing composition incorporating

polyethylene glycol (PEG) and an antioxidant, as claimed. Moreover, the stability achieved by

the claimed compositions would have been unexpected in view of the cited art. Applicant

requests reconsideration and withdrawal of the rejection.

**Those of Ordinary Skill in the Art Would Not Have Had Any Reason to Prepare a Ready to Dilute, Bendamustine-Containing Liquid Having a Concentration of 20 mg/ml to about 60 mg/mL**

Brittain fails to motivate anyone of skill in the art to prepare a liquid composition having

a bendamustine concentration of 20 mg/mL to about 60 mg/mL, or any amount within that range.

Prior to Applicant's invention, Treanda® (lyophilized bendamustine hydrochloride) was

commercially available and would have informed those of ordinary skill about administering

bendamustine to a human. In view of that information, the skilled person would not have

arbitrarily deviated from those Treanda® administration instructions, as the Examiner suggests.

Action at 9.

The Prescribing Information for Treanda®, which is of record in this application,

instructs that lyophilized bendamustine should be reconstituted with water to a concentration of

no more than 5 mg/mL, before being added to a 500 mL infusion bag of aqueous

dextrose/sodium chloride to achieve further dilution to 0.2 – 0.6 mg/mL for patient

administration:

2.3  Reconstitution/Preparation for Intravenous Administration
Aseptically reconstitute each TREANDA vial as follows:
○    25 mg TREANDA vial: Add 5 mL of only Sterile Water for Injection, USP.
○    100 mg TREANDA vial: Add 20 mL of only Sterile Water for Injection, USP

Shake well to yield a clear, colorless to a pale yellow solution with a bendamustine HCl concentration of 5 mg/mL. The lyophilized powder
should completely dissolve in 5 minutes. If particulate matter is observed, the reconstituted product should not be used.

Aseptically withdraw the volume needed for the required dose (based on 5 mg/mL concentration) and immediately transfer to a 500 mL infusion
bag of 0.9% Sodium Chloride Injection, USP (normal saline). As an alternative to 0.9% Sodium Chloride Injection, USP (normal saline), a 500

mL infusion bag of 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, may be considered. The resulting final concentration of
bendamustine HCl in the infusion bag should be within 0.2 – 0.6 mg/mL. The reconstituted solution must be transferred to the infusion bag
within 30 minutes of reconstitution. After transferring, thoroughly mix the contents of the infusion bag. The admixture should be a clear and
colorless to slightly yellow solution.

(Treanda at Section 2.3; *see also*, Brittain at paragraph [0100] (stating that Brittain's lyophilized

formulations are reconstituted with water and then further diluted with, *e.g.,* saline). Brittain

refers to polyethylene glycol as an example of a "liquid carrier or vehicle" for preparing the

DOCKET NO.: 107071.000582                                          PATENT
Application No.: 18/081,238
Office Action Dated: July 11, 2023

ultimate dosage form.  (Brittain at paragraph [0067]).  Brittain does not suggest, however, that the skilled person should deviate from the concentrations specified by Treanda®.

While Treanda® refers to a concentrated solution of bendamustine which is subsequently further diluted for administration, it is clear that Treanda® refers to 5 mg/mL (bendamustine in water), which is much more dilute than presently claimed.  Treanda® then instructs that this concentration should be "immediately" transferred to an infusion bag to provide the 0.2-0.6 mg/mL concentration for administration.  Without Applicant's disclosure, those skilled in the art would have had no reason to prepare more concentrated bendamustine liquids, *e.g.,* 20 mg/mL to 60 mg/mL.  Nor would they have had any expectation that those more concentrated liquids would have had the claimed stability characteristics.  The rejection should be withdrawn for at least these reasons.

**Those of Ordinary Skill in the Art Would Not Have Included an Antioxidant in Any Liquid Bendamustine Composition**

Despite the Examiner's assertions, Brittain does not suggest that an antioxidant should be added to a liquid bendamustine/PEG composition.  In fact, those of ordinary skill in the art would not have expected the addition of an antioxidant to be beneficial to bendamustine's storage stability because no reference had suggested that bendamustine degraded *via* an oxidative mechanism.[4,5]  Moreover, industry guidance discouraged the use of antioxidants, recommending other methods for reducing oxidation.

***Brittain does not teach that an antioxidant should be added to a liquid bendamustine composition***

The Examiner alleges that Brittain teaches lyophilizing bendamustine with an antioxidant.  (Action at 9).  Brittain provides no such disclosure.  None of Brittain's exemplified compositions includes an antioxidant.  Moreover, the paragraph relied upon by the Examiner merely states that an antioxidant could be used as a lyophilization excipient only "if desired." (Brittain at paragraph [0088]; Action at 9).  This statement hardly provides the "clear and unambiguous" instruction to include an antioxidant, as the Examiner appears to imply.  The

---

[4] *See, e.g.,* Exhibit B, Excerpts from the *Responsive Expert Report of Juergen Siepmann, Ph.D.* ("Siepmann Report").
[5] *See also,* Exhibit A, pages 25-26 (finding that "Defendants did not establish by clear and convincing evidence that [the prior art] would have motivated a POSITA to use an antioxidant" to curb PEG oxidation).

DOCKET NO.: 107071.000582                                      **PATENT**
Application No.: 18/081,238
Office Action Dated: July 11, 2023

Examiner has not articulated how Brittain would have suggested to one of ordinary skill in the art that an antioxidant should be included in a ready to dilute, liquid bendamustine/PEG composition and the rejection should be withdrawn for at least this reason.

***The art does not teach that bendamustine can degrade via an oxidative mechanism***

Bendamustine rapidly degrades in water *via* several pathways, none of which are oxidative. (*See, e.g.,* Specification at page 2). One pathway by which bendamustine degrades is *via* aziridinium ring hydrolysis, which produces HP1 and HP2:



(Brittain at paragraph [0022]; Maas,[6] Studies and Results, Scheme; U.S. 8,344,066 (the 066 patent)[7] at col. 1, lines 50-65; col. 4, lines 33-45).

Bendamustine also degrades *via* dimer formation, which occurs when a molecule of bendamustine attacks the aziridinium ring:

---

[6] Maas is of record in this application. A copy of Maas, along with an English translation, accompanies this response.

[7] The 066 patent is of record in this application.

4854-0198-3088.4

DOCKET NO.:  107071.000582                                                    **PATENT**
Application No.:  18/081,238
Office Action Dated:  July 11, 2023



(Brittain at paragraph [0027]; the 066 patent at col. 4, lines 50-67).

Another pathway for bendamustine degradation is esterification of the -COOH with mono- and poly-hydroxy-containing compounds.  Various bendamustine ester degradation products have been reported in the art:



(Brittain at paragraph [0111]; the 066 patent at col. 5, lines 13-44).

While many bendamustine degradation mechanisms have been reported, the art did *not* teach that bendamustine degrades *via* any oxidative pathway.

DOCKET NO.:   107071.000582                                                                 **PATENT**
Application No.:   18/081,238
Office Action Dated:  July 11, 2023

"Antioxidants are used to reduce the oxidation of active substances and excipients in the finished product." (Note for Guidance, European Agency for the Evaluation of Medicinal Products, page 8 of 9 (of record)). Since bendamustine was not known to degrade *via* an oxidative process, those of ordinary skill in the art would not have tried to reduce degradation by adding an antioxidant to a bendamustine composition.[8] The claims are non-obvious for at least this reason.

### *Industry Guidance Discouraged Using Antioxidants in Parenteral Formulations*

Even if those skilled in the art sought to discourage oxidation in a particular bendamustine composition, the guidance to the industry at the time of the invention was to ***not*** include an antioxidant. Instead, industry guidance encouraged addressing oxidation by ***other*** means. For example, the European Agency for the Evaluation of Medicinal Products (EMEA) stated that:

Antioxidants should only be included in a formulation if it has been proven hat their use cannot be avoided. This applies to cases where the manufacturing process is optimised to minimise the potential for oxidation.

(EMEA Guidance at 8 of 9). Indeed, it had been suggested at the time of the invention that the use of antioxidants in parenteral formulations was "now in decline" and that a "preferred method of preventing oxidation is simply to exclude oxygen." (Broadhead at 334)[9].

Even if oxidation of a liquid bendamustine composition was for some reason a concern,[10] industry guidance discouraged adding antioxidants and recommended other means for preventing oxidation.[11] Those of ordinary skill in the art, therefore, would have been dissuaded from including antioxidants in any liquid bendamustine composition and the rejection should be

---

[8] Noteworthy is that the Treanda® lyophilized product does not include any antioxidant – it contains only bendamustine HCl and mannitol. (Treanda® at Section 11).
[9]

**Use of Excipients**

Excipients may be useful in preventing chemical and physical instability. Antioxidants are included in parenteral formulations, although their use is now in decline, and EU guidelines discourage their use unless no other alternative exists (see sect. "Parenteral Products and the

[10] As discussed *supra*, Applicant does not concede this point.
[11] There were four marketed PEG-containing parenteral formulations available in the United States as of this application's priority date and none of them contained an antioxidant. (*See* Appendix A, attached hereto, Siepmann Report at ¶¶355-358 (discussing Ativan®, Busulfex®, Robaxin®, and VePesid®))

**DOCKET NO.:** 107071.000582                                          **PATENT**
**Application No.:** 18/081,238
**Office Action Dated: July 11, 2023**

withdrawn for at least this reason. *See, e.g.,* Exhibit A, Opinion of J. Connelly at pages 26, reproduced, below:

> Other prior art references, however, teach away from the use of antioxidants. *See* Tr. 1452:20–53:21; *Note for Guidance*, European Agency for the Evaluation of Medicinal Products, PTX-0629 at TEVABEND00290713, TEVABEND00290720 ("Antioxidants should only be included in a formulation if it has been proven [t]hat their use cannot be avoided."); *Pharmaceutical Preformulation and Formulation*, Interpharm, PTX-0391 at JDG_BENDA_00000415 (stating that antioxidant use "is now in decline" and that "[a] preferred method of preventing oxidation [over antioxidants] is simply to exclude oxygen"). Moreover, none of the four approved injectable products in the prior art that contained PEG included an antioxidant. Tr. 600:4–6, 1454:24–55:17, PTX-0722 (Ativan); PTX-0718 (Busulfex); PTX-0720 (Robaxin); PTX-0569 at JDG_BENDA_00003308 (VePesid). In addition, the

**The Claimed Compositions Are Surprisingly and Unexpectedly Stable During Storage**

As reported in the specification, a composition including bendamustine in PEG exhibited 2.28% of impurities after storage at room temperature for 15 days and 41.9% impurities after storage for 15 days at 40 °C. (Specification at Example 3, page 13, Table 3, reproduced below).

DOCKET NO.:  107071.000582                                                      PATENT
Application No.:  18/081,238
Office Action Dated:  July 11, 2023

| Antioxidant | T°C | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
| | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

Based on these poor stability results, a person would have forsaken development of a liquid bendamustine/PEG composition.  A composition presenting such a poor initial stability profile would have been deemed unsuitable as a starting point to create a storage-stable composition.  *See, e.g.*, Exhibit B, attached hereto, Siepmann Report at ¶¶ 359, 469-71, reproduced, below:

359.    The POSA likewise would have understood that Dr. Pinal's suggested

formulation approach—to add PEG to the formulation and also to add an antioxidant to fix the

degradation caused by the PEG—was not conventional.  Rather, in view of the small number of

marketed parenteral drugs containing PEG, and the fact that none of those drugs contained an

antioxidant, the POSA would have inferred that formulators simply did not use PEG with drugs

that might be susceptible to degradation via PEG's oxidation products.  In my opinion, and based

on my experience as a formulator, the POSA would not have been motivated or had reason to

add PEG to a formulation if she or he believed that doing so would have necessitated also adding

an antioxidant.

DOCKET NO.: 107071.000582                                                                PATENT
Application No.: 18/081,238
Office Action Dated: July 11, 2023

469.    I further agree with Dr. Pinal that it was known that PEG could form various degradation products. As I explain above, the POSA would have viewed the degradation products of PEG as a disadvantage that would have discouraged the use of that solvent. *See, e.g.,* ¶¶ 339–360.

470.    I disagree, however, with Dr. Pinal that PEG's known sensitivity to oxidation would have motivated or provided reason for the POSA to use an antioxidant with PEG. I likewise disagree that the POSA would have been motivated or had reason to use an antioxidant in conjunction with PG and bendamustine.

471.    As I explain in detail above, the POSA would have been strongly motivated to avoid using an antioxidant in the formulation. *See* ¶¶ 344–360. The POSA would have preferred to keep the formulation as simple as possible; adding an antioxidant would have introduced substantial complexity into the formulation, including increasing the risk of unwanted interactions between the excipients and bendamustine. *See* ¶¶ 344–345. The POSA would have understood that antioxidants are particularly reactive and likely to cause unwanted interactions in the formulation. *See* ¶ 346. Adding an antioxidant would also have been undesirable because the concentration of the antioxidant would have to be maintained throughout the shelf life of the product—in effect, the stability of the product would become dependent on the antioxidant. *See* ¶ 347. The POSA also would have understood that an antioxidant might not completely solve any potential oxidation problem and that finding an appropriate antioxidant would, in the first instance, be an unpredictable research effort. *See* ¶¶ 349–352.

Despite the poor stability of bendamustine/PEG, surprisingly, adding an antioxidant substantially eliminated the formation of degradation products. As shown in the specification, and the Table above, a bendamustine/PEG composition including antioxidant exhibited no

DOCKET NO.:  107071.000582                                                    **PATENT**
Application No.:  18/081,238
Office Action Dated:  July 11, 2023

substantial increase in degradants after storage for 15 days at either room temperature or 40 °C. (Specification at Example 3, page 13, Table 3).

The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if an antioxidant is added.  Such an unexpected result could not have been predicted.  This result is particularly unexpected given the absence of any report in the literature of an oxidative degradation pathway.  The claims are patentable for at least this reason.

The Examiner alleges that claims 4, 5, 13, 14, 22, and 23 would have been obvious over Brittain in view of Tait.[12] As discussed above, Brittain fails to disclose or suggest a liquid bendamustine composition in PEG, with an antioxidant. Tait does not cure Brittain's deficiencies, nor is it alleged to. Tait is merely cited for its purported disclosure that antioxidants like BHA, BHT, and monothioglycerol might be used in ifosfamide formulations. Action at 11-12. The claims are patentable over the combination of Brittain and Tait and Applicant requests withdrawal of the rejection.

### Claim Rejections – Double Patenting

The Examiner alleges that should claims 1-6, 8, and 9 be found allowable, claims 10-15, 17-24, 26, and 27 would be considered substantial duplicates. Applicant will consider the rejection, as well as whether it can be obviated by cancelling claims without prejudice, upon an indication of allowable subject matter.

### CONCLUSION

Applicant respectfully submits that the present application is in condition for allowance. Reconsideration of the application and an early Notice of Allowance are respectfully requested. In the event that the Examiner cannot allow the application for any reason, the Examiner is encouraged to contact Applicant's representative.

---

[12] WO200202125

4854-0198-3088.4

**DOCKET NO.:**  107071.000582                                               **PATENT**
**Application No.:**  18/081,238
**Office Action Dated:  July 11, 2023**

Date: July 28, 2023                          /Stephanie A. Lodise/
                                             Stephanie A. Lodise
                                             Registration No. 51,430


Baker & Hostetler LLP
1735 Market Street, Suite 3300
Philadelphia, PA  19103
(215)-568-3100

4854-0198-3088.4

DOCKET NO.: 107071.000582                                                **PATENT**
Application No.: 18/081,238
Office Action Dated: August 21, 2023

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

    **Nagesh R. Palepu et al.**         Confirmation No.: 5922

Application No.: 18/081,238         Group Art Unit: 1613

Filing Date: December 14, 2022         Examiner: ERNST V ARNOLD

For:    **FORMULATIONS OF BENDAMUSTINE**

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

### REPLY PURSUANT TO 37 CFR § 1.111

    In response to the Official Action dated August 21, 2023, reconsideration is respectfully requested in view of the amendments and/or remarks as indicated below:

☐    **Amendments to the Specification** begin on page of this paper.

☐    **Amendments to the Abstract** begin on page of this paper.

☒    **Amendments to the Claims** are reflected in the listing of the claims which begins on page 2 of this paper.

☐    **Amendments to the Drawings** begin on page of this paper and include an attached replacement sheet.

☒    **Remarks** begin on page 5 of this paper.

☒    The Commissioner is hereby authorized to charge any fee deficiency, charge any additional fees, or credit any overpayment of fees, associated with this application in connection with this filing, or any future filing, submitted to the U.S. Patent and Trademark Office during the pendency of this application, to Deposit Account No. 23-3050.

**DOCKET NO.:** 107071.000582                                                                 **PATENT**
**Application No.:** 18/081,238
**Office Action Dated: August 21, 2023**

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims:**

Claims 1-27 (Cancelled)

28.     (Currently Amended) A method of treating leukemia in a human in need thereof
        comprising

        providing a liquid bendamustine-containing composition comprising~~according to claim 3~~

                bendamustine, or a pharmaceutically acceptable salt thereof, wherein the
                        bendamustine concentration in the composition is from about 20 mg/mL to
                        about 60 mg/mL;

                a pharmaceutically acceptable fluid consisting of polyethylene glycol and
                        optionally one or more of propylene glycol, ethanol, benzyl alcohol and
                        glycofurol; and

                a stabilizing amount of an antioxidant;

                wherein the total impurities in the liquid bendamustine-containing composition
                        resulting from the degradation of the bendamustine is less than about 5% peak
                        area response, as determined by HPLC at a wavelength of 223 nm after at
                        least about 15 months at a temperature of about 5 °C to about 25 °C;

        diluting the liquid bendamustine containing composition; and

        intravenously administering the diluted composition to the human.


29.     (Original) The method of claim 28, wherein the liquid bendamustine containing
        composition is diluted with about 50 mL of a diluent.

30.     (New) The method of claim 28, wherein the concentration of bendamustine in the liquid
        bendamustine-containing compositions is about 25 mg/ml.

31.     (New) The method of claim 28, wherein the concentration of bendamustine in the liquid
        bendamustine-containing composition is 25 mg/ml.

DOCKET NO.: 107071.000582                                                    **PATENT**
Application No.: 18/081,238
Office Action Dated: **August 21, 2023**

32.     (New) The method of claim 28, wherein the liquid bendamustine-containing composition includes 100 mg of bendamustine at a concentration of 25 mg/mL.

33.     (New) The method of claims 28, wherein the antioxidant is monothioglycerol.

34.     (New) The method of claim 28, wherein the antioxidant in the liquid bendamustine containing composition is monothioglycerol in a concentration of about 5 mg/mL.

35.     (New) The method of claim 28, wherein the liquid bendamustine-containing composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C, prior to dilution.

36.     (New) The method of claim 28, wherein the liquid bendamustine-containing composition further comprises ethanol.

37.     (New) The method of claims 28, wherein the liquid bendamustine-containing composition is packages in a sterile vial.

38.     (New) A method of treating leukemia in a human in need thereof comprising providing a liquid bendamustine-containing composition packaged in a sterile vial and comprising

> 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, at a
> concentration of about 25 mg/mL;
>
> a pharmaceutically acceptable fluid consisting of polyethylene glycol and
> optionally one or more of propylene glycol, ethanol, benzyl alcohol and
> glycofurol; and
>
> a stabilizing amount of an antioxidant that is monothioglycerol;
>
> wherein the total impurities in the liquid bendamustine-containing composition
> resulting from the degradation of the bendamustine is less than about 5% peak
> area response, as determined by HPLC at a wavelength of 223 nm after at
> least about 15 months at a temperature of about 5 °C or for at least about 15
> months at 25 °C;

DOCKET NO.:  107071.000582                                                    PATENT
Application No.:  18/081,238
Office Action Dated:  August 21, 2023

diluting the liquid bendamustine containing composition with about 50 mL of a diluent; and

intravenously administering the diluted composition to the human.

39.    (New) The method of claim 38, wherein the liquid bendamustine-containing composition comprises 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, at a concentration of 25 mg/mL.

40.    (New) The method of claim 39, wherein the liquid bendamustine-containing composition further comprises ethanol.

41.    (New) The method of claim 39, wherein the liquid bendamustine containing composition is diluted with about 50 mL of a diluent.

DOCKET NO.: 107071.000582                                            **PATENT**
Application No.: 18/081,238
Office Action Dated: August 21, 2023

## REMARKS

Applicant thanks Examiner Arnold for the courtesy of the telephonic interview conducted with the undersigned on September 8, 2023. Claims 28 and 29 were discussed, including the patentable distinctions of those claims over the prior art and in view of expert testimony. No agreement was reached, but the Examiner requested that Applicant provide the arguments and supporting expert testimony in a response to the August 21, 2023, Office Action.

Claims 1-6, 8-15, 17-24, 26, and 27 have been cancelled without prejudice. Claim 28 has been amended to include features from claim 1. Claims 30-41 are new and are supported by the specification and original claims. No new matter has been added.

### Claim Rejections – 35 U.S.C. § 103

The Examiner alleges that claims 1-3, 6, 8-12, 15, 17-21, 24, 26 and 27 would have been obvious Brittain[1] in view of Kumar,[2] McGinity,[3] and Wasylaschuk.[4] *Office Action*, at 4. The Examiner alleges that claims 4, 5, 13, 14, 22, and 23 would have been obvious over Brittain, Kumar, McGinty, Wasylaschuk, and Tait.[5] *Office Action*, at 15. Without conceding to the propriety of the rejections, and solely to advance prosecution, claims 1-6, 8-15, 17-24, 26, and 27 have been cancelled to advance the application to allowance.

The Examiner alleges that claims 28 and 29 would have been obvious over Brittain, Kumar, McGinty, and Wasylaschuk. *Office Action*, at 17. Without the benefit of Applicant's specification, those of ordinary skill in the art would not have arrived at any leukemia treatment method that provides a 20 mg/mL to 60 mg/mL bendamustine-containing liquid composition comprising an antioxidant; diluting that liquid composition; and intravenously administering the diluted composition to a human afflicted with leukemia and in need of treatment. Applicant respectfully requests reconsideration and withdrawal of the rejection.

---

[1] U.S. Publication No. 2006/0159713
[2] Kumar et al. AAPS PharmSciTech 2006;7(3):E1-E7
[3] McGinty et al. Journal of Pharmaceutical Sciences 1975;64(2):356-357
[4] Wasylaschuk et al. Journal of Pharmaceutical Sciences, vol. 96, no. 1, January 2007:106-116
[5] WO Publication No. 2002002125

4887-6707-9546.2

DOCKET NO.: 107071.000582                                        PATENT
Application No.: 18/081,238
Office Action Dated: August 21, 2023

**Those of Ordinary Skill in the Art Would Not Have Included Polyethylene Glycol and an Antioxidant in Any Liquid Bendamustine Composition**

The Examiner notes that those of ordinary skill in the art would have understood that polyethylene glycol (PEG) was susceptible to oxidation by peroxides. Office Action at 8. The Examiner also notes that the peroxide issue could be particularly troublesome and that studies were conducted to investigate polyethylene glycol's stability. *Id.* (citing to McGinity and Kumar). The Examiner believes that Wasylaschuk solved the PEG oxidation issue by referencing that antioxidants might be helpful. *Id.* It appears to be the Examiner's position that a person of ordinary skill in the art would have reconstituted Brittain's lyophilized formulations with PEG that has been stabilized with an antioxidant, eventually arriving at a claimed invention. The evidence of record establishes that the Examiner's scenario would not have been undertaken by any person of skill in the art.

The rejection relies on a person of ordinary skill picking one of Britain's lyophilized compositions and selecting PEG as a reconstitution vehicle, prior to intravenous administration. Office Action at 7. The rejection notes that PEG's use as an excipient was impeded by its oxidative liabilities. *Id.* at 8. The rejection supposes that, rather than selecting a less troublesome reconstitution vehicle, *e.g.* water, the person of ordinary skill would have proceeded with PEG because the oxidative problem can be "cured" by adding an antioxidant. The cited art, as well as expert testimony presented during district court litigation, demonstrates that this series of events would not have taken place.

Industry guidance at the time of the invention discouraged antioxidant use in pharmaceuticals, instructing that antioxidants should only be used when there is no other way to avoid oxidation. For example, the European Agency for the Evaluation of Medicinal Product (EMEA) stated:

> Antioxidants should only be included in a formulation if it has been proven hat their use cannot be avoided. This applies to cases where the manufacturing process is optimised to minimise the potential for oxidation.

(EMEA Guidance at 8 of 9). Indeed, it had been suggested at the time of the invention that the use of antioxidants in parenteral formulations was "now in decline" and that a "preferred method of preventing oxidation is simply to exclude oxygen":

4887-6707-9546.2

DOCKET NO.: 107071.000582                                                                PATENT
Application No.: 18/081,238
Office Action Dated: August 21, 2023

**Use of Excipients**

Excipients may be useful in preventing chemical and physical instability. Antioxidants are included in parenteral formulations, although their use is now in decline, and EU guidelines discourage their use unless no other alternative exists (see sect. "Parenteral Products and the

Broadhead at 334.

The Office Action relies on a person of ordinary skill not only selecting the troublesome PEG for lyophilizate dissolution, it requires that the person of ordinary skill also try to address PEG's known oxidative liabilities by pre-emptively including an antioxidant. Expert testimony clearly explains why a person of ordinary skill in the art would not have selected an antioxidant-containing PEG excipient to prepare bendamustine for intravenous administration to a human.

A similar antioxidant-PEG excipient hypothesis was alleged during district court litigation. There, the court found Dr. Siepmann's testimony persuasive. Dr. Siepmann testified that a person of ordinary skill in the art would not have chosen PEG as a bendamustine excipient. Dr. Siepmann explained that none of the four marketed PEG-containing parenteral formulations available in the United States as of this application's priority date contained an antioxidant. In addition, a person of skill in the art would have understood that antioxidants were not routinely added to parenteral formulations containing PEG. In fact, adding an antioxidant to fix the degradation caused by PEG was not conventional, so a person of skill in the art would not have used PEG if it necessitated using an antioxidant. And finally, a person of skill in the art would not have used PEG with a drug that was subject to degradation *via* PEG's oxidation products.

As Dr. Siepmann's testified:

355. A review of the marketed parenteral formulations available in the United States as of the priority date that contained PEG indicates that those formulations do not have antioxidants:

- Ativan® (lorazepam) contains "0.18 mL polyethylene glycol 400 in propylene glycol with 2.0% benzyl alcohol as preservative." Ativan® Label at 1 (2006), JDG_BENDA_00005945 at 5948.

- Busulfex™ (busulfan) contains "N-N-dimethylacetamide (DMA) 33% wt/wt and polyethylene glycol 400, 67% wt/wt." Busulfex™ Label at 1 (1999), JDG_BENDA_00005643 at 5643.

DOCKET NO.: 107071.000582                                                PATENT
Application No.: 18/081,238
Office Action Dated: August 21, 2023

- Robaxin® (methocarbamol) contains "polyethylene glycol 300, NF 0.5 mL, Water for Injection, USP q.s." Robaxin® Label at 1 (2003), JDG_BENDA_00005854 at 5854.

- VePesid® (etoposide) contains 60% PEG 300, 30% ethanol, 8.0% Tween 80, 3% benzyl alcohol, and 2 mg/mL citric acid. Strickley 2004 at 219, JDG_BENDA_00003290 at 3308.

356.    Of the four formulations listed above containing PEG, none of them contain

excipients that are listed in Nema 1997's list of Antioxidants/Reducing Agents (Table IV).

Nema 1997 at 167, JDG_BENDA_00002272 at 2273. This state of the art refutes clearly Dr.

Pinal's opinion that the POSA would have used PEG and then added an antioxidant to avoid the

oxidation of PEG.

358.    From the above information, the POSA would have understood that, as of the

priority date, none of the four commercially available parenteral formulations that contained

PEG 300 or PEG 400 also contained an antioxidant. This would have taught the POSA that

antioxidants were not routinely added to parenteral formulations containing PEG. ████████

████████████████████                                    REDACTED

359.    The POSA likewise would have understood that Dr. Pinal's suggested

formulation approach—to add PEG to the formulation and also to add an antioxidant to fix the

degradation caused by the PEG—was not conventional. Rather, in view of the small number of

marketed parenteral drugs containing PEG, and the fact that none of those drugs contained an

antioxidant, the POSA would have inferred that formulators simply did not use PEG with drugs

that might be susceptible to degradation via PEG's oxidation products. In my opinion, and based

on my experience as a formulator, the POSA would not have been motivated or had reason to

add PEG to a formulation if she or he believed that doing so would have necessitated also adding

an antioxidant.

DOCKET NO.:   107071.000582                                            **PATENT**
Application No.:   18/081,238
Office Action Dated:  **August 21, 2023**

360.    In view of the lack of any marketed parenteral drugs containing PEG and an antioxidant, the POSA likely would have hypothesized that PEG was only used with drugs that were not subject to degradation by PEG oxidation products (for example, acid-catalyzed esterification).  To test that hypothesis, the POSA could have reviewed the molecular structures of the four APIs listed above.  I have depicted those structures below.  Most notably, none of those molecules contain a carboxylic acid moiety.  As such, none of those molecules would have been prone to esterification via the PEG molecule, which is the only degradation pathway that Dr. Pinal has identified as motivating the use of an antioxidant in formulations of the claimed inventions.  This would have bolstered the POSA's understanding that PEG was only used in liquid parenteral formulations where the active ingredients were not susceptible to degradation via PEG's oxidation products.  Because bendamustine plainly is a drug molecule whose degradation is accelerated by such oxidation products—as Dr. Pinal acknowledges—the POSA would have avoided using PEG with bendamustine.

Siepmann Report at ¶¶355-356, 358-360, of record in this application.

Indeed, not even Wasylaschuk recommends adding antioxidant to PEG-containing parenteral formulations.  Instead, Wasylaschuk's refers to antioxidant use only in ***solid dosage forms***:

Controlling HPO-drug reactions in solid dosage forms can be achieved by selecting excipients with low HPO levels, controlling crystallinity of the drug substance, and by adding antioxidants to stop HPO propagation and single-electron degradation processes.

Waslylaschuk at page 113, left column.

No evidence in the cited art supports the sequence of steps that the Office Action alleges would have been taken by a person of ordinary skill in the art. PEG would not have been selected for bendamustine's dissolution, but even if it was, antioxidants would have been excluded, not added. Applicant respectfully requests reconsideration and withdrawal of the rejection.

DOCKET NO.: 107071.000582                                              **PATENT**
Application No.: 18/081,238
Office Action Dated: **August 21, 2023**

**Those of Ordinary Skill in the Art Would Not Have Had Any Reason to Prepare a Liquid Composition Having a Bendamustine Concentration of about 20 mg/ml to 60 mg/mL**

The Examiner alleges that reconstituting Brittain's lyophilized bendamustine with PEG to a concentration of about 20-60 mg/mL or about 25 mg/mL would have been obvious because "it is merely adding an appropriate amount of a pharmaceutically acceptable fluid. . . to a concentration of about 20-60 mg/mL or about 25 mg/mL bendamustine prior to administration. . . . It is a simple dilution and calculation any pharmaceutical artisan can perform with no inventive skill." Office Action at 9. But the obviousness inquiry does not ask whether a person of ordinary skill *could have* dissolved Brittain's lyophilized compositions to a concentration of about 20-60 mg/mL. Significantly, obviousness requires that the Examiner establish *why* a person of ordinary skill *would have*.

At the time of this application's filing, a lyophilized bendamustine product had been approved for use in the United States - Treanda®. The prescribing information for Treanda® would have been considered by a person of ordinary skill in the art seeking to treat leukemia patients with an alternative bendamustine formulation. The Prescribing Information for Treanda® instructs that lyophilized bendamustine should be reconstituted with water to a concentration of *no more than 5 mg/mL* before being further diluted to 0.2 – 0.5 mg/mL:

2.3  Reconstitution/Preparation for Intravenous Administration
Aseptically reconstitute each TREANDA vial as follows:
○   25 mg TREANDA vial: Add 5 mL of only Sterile Water for Injection, USP.
○   100 mg TREANDA vial: Add 20 mL of only Sterile Water for Injection, USP.

Shake well to yield a clear, colorless to a pale yellow solution with a bendamustine HCl concentration of 5 mg/mL. The lyophilized powder should completely dissolve in 5 minutes. If particulate matter is observed, the reconstituted product should not be used.

Aseptically withdraw the volume needed for the required dose (based on 5 mg/mL concentration) and immediately transfer to a 500 mL infusion bag of 0.9% Sodium Chloride Injection, USP (normal saline). As an alternative to 0.9% Sodium Chloride Injection, USP (normal saline), a 500

mL infusion bag of 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, may be considered. The resulting final concentration of bendamustine HCl in the infusion bag should be within 0.2 – 0.6 mg/mL. The reconstituted solution must be transferred to the infusion bag within 30 minutes of reconstitution. After transferring, thoroughly mix the contents of the infusion bag. The admixture should be a clear and colorless to slightly yellow solution.

(Treanda® Prescribing Information at Section 2.3; *see also,* Brittain at paragraph [0100] (stating that Brittain's lyophilized formulations are reconstituted with water and then further diluted)). Brittain refers to polyethylene glycol as an example of a "liquid carrier or vehicle" for preparing the ultimate dosage form.  (Brittain at paragraph [0067]). Brittain does not suggest, however, that the skilled person should deviate from the concentrations specified by Treanda®.

4887-6707-9546.2

DOCKET NO.:  107071.000582                                                    **PATENT**
**Application No.:**  18/081,238
**Office Action Dated:  August 21, 2023**

While Treanda® refers to a "concentrated solution of bendamustine which is subsequently further diluted for administration," it is clear that Treanda® refers to 5 mg/mL (bendamustine in water), which is much more dilute than presently claimed.  Treanda® then instructs that this concentration should be "immediately" transferred to an infusion bag to provide the 0.2-0.6 mg/mL concentration for administration.  Without Applicant's disclosure, those skilled in the art would have had no reason to prepare more concentrated bendamustine liquids, *e.g.,* 20 mg/mL to 60 mg/mL, when preparing bendamustine, especially when the drug product is being prepared for administration to a human patient.

Brittain does not suggest that the skilled person should deviate from the concentrations specified by Treanda®. Without the benefit of Applicant's specification, they would have had no reason to prepare a 20-60 mg/ml or a 25 mg/ml concentration, as claimed, when treating a patient for leukemia. Applicant respectfully requests reconsideration and withdrawal of the rejection.

**Those of Ordinary Skill in the Art Would Not Have Included an Antioxidant in Any Bendamustine Composition**

Industry guidance discouraged antioxidant use, suggesting that it be reserved when no other means to protect the active pharmaceutical ingredient or drug product can be established. Those of ordinary skill in the art would not have expected the addition of an antioxidant to be beneficial to bendamustine's storage stability because no reference had suggested that bendamustine degraded *via* an oxidative mechanism.

***Brittain does not teach that an antioxidant should be added to a bendamustine composition***

Brittain does not suggest that lyophilized bendamustine requires an antioxidant. None of Brittain's exemplified compositions includes an antioxidant and the publication states that an antioxidant could be used as a lyophilization excipient only "if desired."  (Brittain at paragraph [0088]).

***The art does not teach that bendamustine can degrade via an oxidative mechanism***

Bendamustine rapidly degrades in water *via* several pathways, none of which are oxidative.  (*See, e.g.,* Specification at page 2).  One pathway by which bendamustine degrades is *via* aziridinium ring hydrolysis, which produces HP1 and HP2:

Page 11 of 16

**DOCKET NO.:** 107071.000582                                                    **PATENT**
**Application No.:** 18/081,238
**Office Action Dated: August 21, 2023**



(Brittain at paragraph [0022]; Maas,[6] Studies and Results, Scheme; U.S. 8,344,066 (the 066 patent)[7] at col. 1, lines 50-65; col. 4, lines 33-45).

Bendamustine also degrades *via* dimer formation, which occurs when a molecule of bendamustine attacks the aziridinium ring:



(Brittain at paragraph [0027]; the 066 patent at col. 4, lines 50-67).

---

[6] Maas is of record in this application.

[7] The 066 patent is of record in this application.

DOCKET NO.: 107071.000582                                                                    **PATENT**
Application No.: 18/081,238
Office Action Dated: **August 21, 2023**

Another pathway for bendamustine degradation is esterification of the -COOH with mono- and poly-hydroxy-containing compounds. Various bendamustine ester degradation products have been reported in the art:



(Brittain at paragraph [0111]; the 066 patent at col. 5, lines 13-44).

While many bendamustine degradation mechanisms have been reported, the art did *not* teach that bendamustine degrades *via* any oxidative pathway.

"Antioxidants are used to reduce the oxidation of active substances and excipients in the finished product." (Note for Guidance, European Agency for the Evaluation of Medicinal Products, page 8 of 9 (of record)). Since bendamustine was not known to degrade *via* an oxidative process, those of ordinary skill in the art would not have tried adding an antioxidant to a bendamustine composition.[8]

---

[8] Noteworthy is that the Treanda® lyophilized product does not include any antioxidant – it contains only bendamustine HCl and mannitol. (Treanda® at Section 11).

Page 13 of 16

DOCKET NO.:  107071.000582                                    **PATENT**
Application No.:  18/081,238
Office Action Dated:  **August 21, 2023**

**The Recited Bendamustine-Containing Liquid Compositions are Surprisingly and Unexpectedly Stable During Storage**

As reported in the specification, a composition including bendamustine in PEG exhibited 2.28% of impurities after storage at room temperature for 15 days and 41.9% impurities after storage for 15 days at 40 °C.  (Specification at Example 3, page 13, Table 3, reproduced below).

| Antioxidant | T°C | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
|  | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
|  | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

As Dr. Siepmann has testified, based on these poor stability results, a person would have forsaken development of a liquid bendamustine/PEG composition.

359.    The POSA likewise would have understood that Dr. Pinal's suggested formulation approach—to add PEG to the formulation and also to add an antioxidant to fix the degradation caused by the PEG—was not conventional.  Rather, in view of the small number of marketed parenteral drugs containing PEG, and the fact that none of those drugs contained an antioxidant, the POSA would have inferred that formulators simply did not use PEG with drugs that might be susceptible to degradation via PEG's oxidation products.  In my opinion, and based on my experience as a formulator, the POSA would not have been motivated or had reason to add PEG to a formulation if she or he believed that doing so would have necessitated also adding an antioxidant.

DOCKET NO.:  107071.000582                                                    **PATENT**
Application No.:  18/081,238
Office Action Dated:  August 21, 2023

469.    I further agree with Dr. Pinal that it was known that PEG could form various degradation products.  As I explain above, the POSA would have viewed the degradation products of PEG as a disadvantage that would have discouraged the use of that solvent.  *See, e.g.,* ¶¶ 339–360.

470.    I disagree, however, with Dr. Pinal that PEG's known sensitivity to oxidation would have motivated or provided reason for the POSA to use an antioxidant with PEG.  I likewise disagree that the POSA would have been motivated or had reason to use an antioxidant in conjunction with PG and bendamustine.

471.    As I explain in detail above, the POSA would have been strongly motivated to avoid using an antioxidant in the formulation.  *See* ¶¶ 344–360.  The POSA would have preferred to keep the formulation as simple as possible; adding an antioxidant would have introduced substantial complexity into the formulation, including increasing the risk of unwanted interactions between the excipients and bendamustine.  *See* ¶¶ 344–345.  The POSA would have understood that antioxidants are particularly reactive and likely to cause unwanted interactions in the formulation.  *See* ¶ 346.  Adding an antioxidant would also have been undesirable because the concentration of the antioxidant would have to be maintained throughout the shelf life of the product—in effect, the stability of the product would become dependent on the antioxidant.  *See* ¶ 347.  The POSA also would have understood that an antioxidant might not completely solve any potential oxidation problem and that finding an appropriate antioxidant would, in the first instance, be an unpredictable research effort.  *See* ¶¶ 349–352.

(*See* Siepmann Report at ¶¶ 359, 469-71, of record in this application)

A composition presenting such a poor initial stability profile would have been deemed unsuitable as a starting point to create a storage-stable composition. Despite the poor stability of bendamustine/PEG, surprisingly, adding an antioxidant substantially eliminated the formation of degradation products.  As shown in the specification, and Table 3 (above), a bendamustine/PEG

DOCKET NO.:  107071.000582                                              **PATENT**
Application No.:  18/081,238
Office Action Dated:  August 21, 2023

composition including antioxidant exhibited no substantial increase in degradants after storage

for 15 days at either room temperature or 40 °C.  (Specification at Example 3, page 13, Table 3).

The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if

an antioxidant is added.  Such an unexpected result could not have been predicted.  This result is

particularly unexpected given the absence of any report in the literature of an oxidative

degradation pathway for bendamustine.  The claims are patentable for at least this reason and

Applicant respectfully requests reconsideration and withdrawal of the rejection.

### CONCLUSION

Applicant respectfully submits that the present application is in condition for allowance.

Reconsideration of the application and an early Notice of Allowance are respectfully requested.

In the event that the Examiner cannot allow the application for any reason, the Examiner is

encouraged to contact Applicant's representative.

Date: September 19, 2023                        /Stephanie A. Lodise/
                                                Stephanie A. Lodise
                                                Registration No. 51430

BakerHostetler
312 Walnut Street
Suite 3200
Cincinnati, OH 45202
Telephone: 513.929.3400
Facsimile:  513.929.0303

4887-6707-9546.2

# EXHIBIT 14

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 47207301 |
| **Application Number:** | 18081251 |
| **International Application Number:** | |
| **Confirmation Number:** | 8743 |
| **Title of Invention:** | FORMULATIONS OF BENDAMUSTINE |
| **First Named Inventor/Applicant Name:** | Nagesh R. Palepu |
| **Customer Number:** | 23377 |
| **Filer:** | Stephanie A. Lodise/VeAndra Luckett |
| **Filer Authorized By:** | Stephanie A. Lodise |
| **Attorney Docket Number:** | 107071.000583 |
| **Receipt Date:** | 14-DEC-2022 |
| **Filing Date:** | |
| **Time Stamp:** | 15:58:30 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | DA |
| Payment was successfully received in RAM | $6160 |
| RAM confirmation Number | E2022BDF58583235 |
| Deposit Account | 233050 |
| Authorized User | VeAndra Luckett |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |
| 37 CFR 1.16 (National application filing, search, and examination fees) | |
| 37 CFR 1.17 (Patent application and reexamination processing fees) | |

37 CFR 1.19 (Document supply fees)

37 CFR 1.20 (Post Issuance fees)

37 CFR 1.21 (Miscellaneous fees and charges)

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Track One Request | 107071-583_Certification-RequestforPrioritizedExamination.pdf | 118788 <br> 0ca059cea2d078e6b0894f5b4369064bed87f5ca | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 2 | Application Data Sheet | 107071-583_ADS.pdf | 1256830 <br> 7d87b67550174135624c37d7ea298656bd94776 | no | 9 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 3 | | 107071-583_BEND01-US-CON10_application.pdf | 212839 <br> dc95981115e0b4214742abe7c8edd60073e27f0d | yes | 19 |

| Multipart Description/PDF files in .zip description | | |
|---|---|---|
| Document Description | Start | End |
| Specification | 1 | 16 |
| Claims | 17 | 18 |
| Abstract | 19 | 19 |

| | | | | | |
|---|---|---|---|---|---|
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 4 | Oath or Declaration filed | 107071-583_Declarations.pdf | 379006 <br> 647acf26e47b6daed47253a89306af0ac4d59e6c | no | 3 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 5 | Transmittal Letter | 107071-583_ContentofIDS.pdf | 120897 <br> 7ae3809fe2666018f27429 7d7d318c8ed83b52d | no | 1 |

| Warnings: | | | | | |
|---|---|---|---|---|---|
| **Information:** | | | | | |
| 6 | Information Disclosure Statement (IDS) Form (SB08) | 107071-583_IDS_1.pdf | 99930<br>8b8119cf68c7e79e7c732f5ca67cfbeba78c2af3 | no | 17 |
| Warnings: | | | | | |
| **Information:** | | | | | |
| This is not an USPTO supplied IDS fillable form | | | | | |
| 7 | Information Disclosure Statement (IDS) Form (SB08) | 107071-583_IDS_2.pdf | 81904<br>aaf0ca7a9eccf8906f7a1d69ac81bbf9d5d56380 | no | 8 |
| Warnings: | | | | | |
| **Information:** | | | | | |
| This is not an USPTO supplied IDS fillable form | | | | | |
| 8 | Information Disclosure Statement (IDS) Form (SB08) | 107071-583_IDS_3.pdf | 80474<br>a5f4133ee7b46f4d4d0b75f3238c5ce7ff44d7cd | no | 8 |
| Warnings: | | | | | |
| **Information:** | | | | | |
| This is not an USPTO supplied IDS fillable form | | | | | |
| 9 | Information Disclosure Statement (IDS) Form (SB08) | 107071-583_IDS_4.pdf | 73950<br>31519fd4a2c3ffcbc9e45b3238e7d9b00fb8fc0f | no | 6 |
| Warnings: | | | | | |
| **Information:** | | | | | |
| This is not an USPTO supplied IDS fillable form | | | | | |
| 10 | Fee Worksheet (SB06) | fee-info.pdf | 50693<br>17ba11b7086129f6ebe9ec3c4be40ee4fd926fc6 | no | 2 |
| Warnings: | | | | | |
| **Information:** | | | | | |
| | | **Total Files Size (in bytes):** | | 2475311 | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

**DOCKET NO.:** 107071.000583                                                                 **PATENT**
**Application No.:** 18/081,251
**Office Action Dated: July 11, 2023**

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

**In re Application of:**

    **Nagesh R. Palepu et al.**                          **Confirmation No.: 8743**

**Application No.: 18/081,251**                               **Group Art Unit: 1613**

**Filing Date: December 14, 2022**                           **Examiner: ERNST V ARNOLD**

**For:    FORMULATIONS OF BENDAMUSTINE**

Mail Stop AF
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

### REPLY PURSUANT TO 37 CFR § 1.116

    In response to the Official Action dated July 11, 2023, reconsideration is respectfully requested in view of the amendments and/or remarks as indicated below:

☐    **Amendments to the Specification** begin on page of this paper.

☐    **Amendments to the Abstract** begin on page of this paper.

☒    **Amendments to the Claims** are reflected in the listing of the claims which begins on page 2 of this paper.

☐    **Amendments to the Drawings** begin on page of this paper and include an attached replacement sheet.

☒    **Remarks** begin on page 5 of this paper.

☒    The Commissioner is hereby authorized to charge any fee deficiency, charge any additional fees, or credit any overpayment of fees, associated with this application in connection with this filing, or any future filing, submitted to the U.S. Patent and Trademark Office during the pendency of this application, to Deposit Account No. 23-3050.

DOCKET NO.:  107071.000583                                                    PATENT
Application No.:  18/081,251
Office Action Dated:  July 11, 2023

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims:**

1.      (currently amended) A sterile vial containing a liquid bendamustine-containing composition comprising

   bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL;

   a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

   a stabilizing amount of an antioxidant,

   wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

2.      (Original) The sterile vial of claim 1, wherein the composition comprises about 100 mg of bendamustine.

3.      (Original) The sterile vial of claim 1, wherein the bendamustine concentration in the composition is about 25 mg/mL.

4.      (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol.

5.      (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

6.      (Original) The composition of claim 1, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.

7.      (cancelled)

DOCKET NO.: 107071.000583                                    **PATENT**
Application No.: 18/081,251
Office Action Dated: July 11, 2023

8.      (Original) The sterile vial of claim 1, wherein the liquid bendamustine-containing
        composition further comprises ethanol.

9.      (Cancelled)

10.     (Cancelled)

11.     (currently amended) A <u>liquid</u> bendamustine-containing composition comprising
        bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of
                an antioxidant, in a pharmaceutically acceptable fluid;
        wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and
                optionally one or more of propylene glycol, ethanol, benzyl alcohol and
                glycofurol; and
        wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from
                about 20 mg/mL to about 60 mg/mL<u>,</u>
        <u>wherein the total impurities resulting from the degradation of the bendamustine is less</u>
                <u>than about 5% peak area response, as determined by HPLC at a wavelength of</u>
                <u>223 nm after at least about 15 months at a temperature of about 5 °C to about 25</u>
                <u>°C.</u>

12.     (Original) The composition of claim 11, comprising 100 mg of bendamustine.

13.     (Original) The composition of claim 11, wherein the bendamustine concentration is about
        25 mg/mL.

14.     (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol.

15.     (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol in a
        concentration of about 5 mg/mL.

4877-8133-8480.2

**DOCKET NO.:** 107071.000583                                                    **PATENT**
**Application No.:** 18/081,251
**Office Action Dated: July 11, 2023**

16.    (cancelled)


17.    (cancelled)


18.    (Previously Presented) The composition of claim 11, further comprising ethanol.

4877-8133-8480.2

**DOCKET NO.:** 107071.000583                                                    **PATENT**
**Application No.:** 18/081,251
**Office Action Dated:  July 11, 2023**

**REMARKS**

Claims 1-6, 8, 11-15, and 17-18 are pending, with claims 1 and 11 being independent. Claims 1 and 11 have been amended to incorporate subject matter of claims 7 and 17, respectively. No new subject matter has been added.  A Request for Consideration Under AFCP 2.0 accompanies this response.

Applicant's representative thanks Examiner Arnold for the courtesy of the telephone conference conducted on July 12, 2023, for the related 18/081,238. The office action and cited art were discussed, as well as arguments and evidence submitted and found persuasive in U.S. 11,103,483.

**Withdrawn Rejections**

Applicant thanks Examiner Arnold for his comments that the rejections over Drager[1] have been withdrawn and that the terminal disclaimers Applicant filed have been accepted.

**Brief Description of the Claimed Inventions**

The pending claims recite, among other things, liquid bendamustine-containing compositions having from about 20 mg/mL to about 60 mg/mL of bendamustine; polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol; and an antioxidant. The recited compositions are not reconstituted lyophilized powders; they are concentrated, bendamustine-containing liquids for administration through infusion with an appropriate diluent.  (*See, e.g.,* Specification at page 2).  This avoids the multi-step reconstitution and preparation for administration required for the Brittain[2] products, including TREANDA®. These liquid compositions, which only need to be diluted prior to patient administration, are surprisingly stable and do not exhibit significant bendamustine degradation after storage for at least 15 months at refrigerated or room temperature conditions.

**Claim Rejections – 35 U.S.C. § 103**

The Examiner alleges that claims 1-3, 8, 11-13 and 16-18 would have been obvious Brittain.[3] At the time of the invention, one of ordinary skill in the art would not have been

---

[1] US20110190363
[2] US 2006159713
[3] US 2006/0159713

Page 5 of 14

motivated to make a liquid bendamustine-containing composition incorporating polyethylene glycol (PEG) and an antioxidant, as claimed.  Moreover, the stability achieved by the claimed compositions would have been unexpected in view of the cited art.  Applicant requests reconsideration and withdrawal of the rejection.

### Those of Ordinary Skill in the Art Would Not Have Had Any Reason to Prepare a Bendamustine-Containing Liquid Having a Concentration of 20 mg/ml to about 60 mg/mL

Brittain fails to motivate anyone of skill in the art to prepare a liquid composition having a bendamustine concentration of 20 mg/mL to about 60 mg/mL, or any amount within that range. Prior to Applicant's invention, Treanda® (lyophilized bendamustine hydrochloride) was commercially available and would have informed those of ordinary skill about administering bendamustine to a human.  In view of that information, the skilled person would not have arbitrarily deviated from those Treanda® administration instructions, as the Examiner suggests. Action at 8-9.

The Prescribing Information for Treanda®, which is of record in this application, instructs that lyophilized bendamustine should be reconstituted with water to a concentration of no more than 5 mg/mL, before being added to a 500 mL infusion bag of aqueous dextrose/sodium chloride to achieve further dilution to 0.2 – 0.6 mg/mL for patient administration:

2.3 **Reconstitution/Preparation for Intravenous Administration**
Aseptically reconstitute each TREANDA vial as follows:
- 25 mg TREANDA vial: Add 5 mL of only **Sterile Water for Injection, USP**.
- 100 mg TREANDA vial: Add 20 mL of only **Sterile Water for Injection, USP**.

Shake well to yield a clear, colorless to a pale yellow solution with a bendamustine HCl concentration of 5 mg/mL.  The lyophilized powder should completely dissolve in 5 minutes.  If particulate matter is observed, the reconstituted product should not be used.

Aseptically withdraw the volume needed for the required dose (based on 5 mg/mL concentration) and immediately transfer to a 500 mL infusion bag of 0.9% Sodium Chloride Injection, USP (normal saline). As an alternative to 0.9% Sodium Chloride Injection, USP (normal saline), a 500

mL infusion bag of 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, may be considered.  The resulting final concentration of bendamustine HCl in the infusion bag should be within 0.2 – 0.6 mg/mL. The reconstituted solution must be transferred to the infusion bag within 30 minutes of reconstitution. After transferring, thoroughly mix the contents of the infusion bag.  The admixture should be a clear and colorless to slightly yellow solution.

(Treanda at Section 2.3;  *see also,* Brittain at paragraph [0100] (stating that Brittain's lyophilized formulations are reconstituted with water and then further diluted with, *e.g.,* saline).  Brittain refers to polyethylene glycol as an example of a "liquid carrier or vehicle" for preparing the ultimate dosage form.  (Brittain at paragraph [0067]). Brittain does not suggest, however, that the skilled person should deviate from the concentrations specified by Treanda®.

DOCKET NO.: 107071.000583                                      PATENT
Application No.: 18/081,251
Office Action Dated: July 11, 2023

While Treanda® refers to a concentrated solution of bendamustine which is subsequently further diluted for administration, it is clear that Treanda® refers to 5 mg/mL (bendamustine in water), which is much more dilute than presently claimed. Treanda® then instructs that this concentration should be "immediately" transferred to an infusion bag to provide the 0.2-0.6 mg/mL concentration for administration. Without Applicant's disclosure, those skilled in the art would have had no reason to prepare more concentrated bendamustine liquids, *e.g.,* 20 mg/mL to 60 mg/mL. Nor would they have had any expectation that those more concentrated liquids would have had the claimed stability characteristics. The rejection should be withdrawn for at least these reasons.

**Those of Ordinary Skill in the Art Would Not Have Included an Antioxidant in Any Liquid Bendamustine Composition**

Despite the Examiner's assertions, Brittain does not suggest that an antioxidant should be added to a liquid bendamustine/PEG composition. In fact, those of ordinary skill in the art would not have expected the addition of an antioxidant to be beneficial to bendamustine's storage stability because no reference had suggested that bendamustine degraded *via* an oxidative mechanism.[4,5] Moreover, industry guidance discouraged the use of antioxidants, recommending other methods for reducing oxidation.

*Brittain does not teach that an antioxidant should be added to a liquid bendamustine composition*

The Examiner alleges that Brittain teaches lyophilizing bendamustine with an antioxidant. (Action at 7). Brittain provides no such disclosure. None of Brittain's exemplified compositions includes an antioxidant. Moreover, the paragraph relied upon by the Examiner merely states that an antioxidant could be used as a lyophilization excipient only "if desired." (Brittain at paragraph [0088]; Action at 7). This statement hardly provides the "clear and unambiguous" instruction to include an antioxidant, as the Examiner appears to imply. The Examiner has not articulated how Brittain would have suggested to one of ordinary skill in the

---

[4] *See, e.g.,* Exhibit B, Excerpts from the *Responsive Expert Report of Juergen Siepmann, Ph.D.* ("Siepmann Report").
[5] *See also,* Exhibit A, pages 25-26 (finding that "Defendants did not establish by clear and convincing evidence that [the prior art] would have motivated a POSITA to use an antioxidant" to curb PEG oxidation).

4877-8133-8480.2

DOCKET NO.:   107071.000583                                                    PATENT
Application No.:   18/081,251
Office Action Dated:  July 11, 2023

art that an antioxidant should be included in a liquid bendamustine/PEG composition and the

rejection should be withdrawn for at least this reason.

### The art does not teach that bendamustine can degrade via an oxidative mechanism

Bendamustine rapidly degrades in water *via* several pathways, none of which are

oxidative.  (*See, e.g.,* Specification at page 2)  One pathway by which bendamustine degrades is

*via* aziridinium ring hydrolysis, which produces HP1 and HP2:



(Brittain at paragraph [0022]; Maas,[6] Studies and Results, Scheme; U.S. 8,344,066 (the 066

patent)[7] at col. 1, lines 50-65; col. 4, lines 33-45).

Bendamustine also degrades *via* dimer formation, which occurs when a molecule of

bendamustine attacks the aziridinium ring:

---

[6] Maas is of record in this application. A copy of Maas, along with an English translation, accompanies this response.

[7] The 066 patent is of record in this application.

4877-8133-8480.2

DOCKET NO.: 107071.000583                                                      PATENT
Application No.: 18/081,251
Office Action Dated: July 11, 2023



(Brittain at paragraph [0027]; the 066 patent at col. 4, lines 50-67).

Another pathway for bendamustine degradation is esterification of the -COOH with mono- and poly-hydroxy-containing compounds. Various bendamustine ester degradation products have been reported in the art:



(Brittain at paragraph [0111]; the 066 patent at col. 5, lines 13-44).

While many bendamustine degradation mechanisms have been reported, the art did *not* teach that bendamustine degrades *via* any oxidative pathway.

Page 9 of 14

DOCKET NO.: 107071.000583                                                    PATENT
Application No.: 18/081,251
Office Action Dated: July 11, 2023

"Antioxidants are used to reduce the oxidation of active substances and excipients in the finished product." (Note for Guidance, European Agency for the Evaluation of Medicinal Products, page 8 of 9 (of record)). Since bendamustine was not known to degrade *via* an oxidative process, those of ordinary skill in the art would not have tried to reduce degradation by adding an antioxidant to a bendamustine composition.[8] The claims are non-obvious for at least this reason.

### *Industry Guidance Discouraged Using Antioxidants in Parenteral Formulations*

Even if those skilled in the art sought to discourage oxidation in a particular bendamustine composition, the guidance to the industry at the time of the invention was to ***not*** include an antioxidant. Instead, industry guidance encouraged addressing oxidation by ***other*** means. For example, the European Agency for the Evaluation of Medicinal Products (EMEA) stated that:

Antioxidants should only be included in a formulation if it has been proven hat their use cannot be avoided. This applies to cases where the manufacturing process is optimised to minimise the potential for oxidation.

(EMEA Guidance at 8 of 9). Indeed, it had been suggested at the time of the invention that the use of antioxidants in parenteral formulations was "now in decline" and that a "preferred method of preventing oxidation is simply to exclude oxygen." (Broadhead at 334)[9].

Even if oxidation of a liquid bendamustine composition was for some reason a concern,[10] industry guidance discouraged adding antioxidants and recommended other means for preventing oxidation.[11] Those of ordinary skill in the art, therefore, would have been dissuaded from including antioxidants in any liquid bendamustine composition and the rejection should be

---

[8] Noteworthy is that the Treanda® lyophilized product does not include any antioxidant – it contains only bendamustine HCl and mannitol. (Treanda® at Section 11).

[9]

**Use of Excipients**
Excipients may be useful in preventing chemical and physical instability. Antioxidants are included in parenteral formulations, although their use is now in decline, and EU guidelines discourage their use unless no other alternative exists (see sect. "Parenteral Products and the

[10] As discussed *supra*, Applicant does not concede this point.
[11] There were four marketed PEG-containing parenteral formulations available in the United States as of this application's priority date and none of them contained an antioxidant. (*See* Appendix A, attached hereto, Siepmann Report at ¶¶355-358 (discussing Ativan®, Busulfex®, Robaxin®, and VePesid®))

**DOCKET NO.:** 107071.000583                                                      **PATENT**
**Application No.:** 18/081,251
**Office Action Dated: July 11, 2023**

withdrawn for at least this reason. *See, e.g.,* Exhibit A, Opinion of J. Connelly at pages 26, reproduced, below:

> Other prior art references, however, teach away from the use of antioxidants. *See* Tr. 1452:20–53:21; *Note for Guidance*, European Agency for the Evaluation of Medicinal Products, PTX-0629 at TEVABEND00290713, TEVABEND00290720 ("Antioxidants should only be included in a formulation if it has been proven [t]hat their use cannot be avoided."); *Pharmaceutical Preformulation and Formulation*, Interpharm, PTX-0391 at JDG_BENDA_00000415 (stating that antioxidant use "is now in decline" and that "[a] preferred method of preventing oxidation [over antioxidants] is simply to exclude oxygen"). Moreover, none of the four approved injectable products in the prior art that contained PEG included an antioxidant. Tr. 600:4–6, 1454:24–55:17; PTX-0722 (Ativan); PTX-0718 (Busulfex); PTX-0720 (Robaxin); PTX-0569 at JDG_BENDA_00003308 (VePesid). In addition, the

**The Claimed Compositions Are Surprisingly and Unexpectedly Stable During Storage**

As reported in the specification, a composition including bendamustine in PEG exhibited 2.28% of impurities after storage at room temperature for 15 days and 41.9% impurities after storage for 15 days at 40 °C. (Specification at Example 3, page 13, Table 3, reproduced below).

Page 11 of 14

DOCKET NO.: 107071.000583                                                    PATENT
Application No.: 18/081,251
Office Action Dated: July 11, 2023

| Antioxidant | $T^{o}C$ | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
| | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

Based on these poor stability results, a person would have forsaken development of a liquid bendamustine/PEG composition. A composition presenting such a poor initial stability profile would have been deemed unsuitable as a starting point to create a storage-stable composition. *See, e.g.,* Exhibit B, attached hereto, Siepmann Report at ¶¶ 359, 469-71, reproduced, below:

359. The POSA likewise would have understood that Dr. Pinal's suggested formulation approach—to add PEG to the formulation and also to add an antioxidant to fix the degradation caused by the PEG—was not conventional. Rather, in view of the small number of marketed parenteral drugs containing PEG, and the fact that none of those drugs contained an antioxidant, the POSA would have inferred that formulators simply did not use PEG with drugs that might be susceptible to degradation via PEG's oxidation products. In my opinion, and based on my experience as a formulator, the POSA would not have been motivated or had reason to add PEG to a formulation if she or he believed that doing so would have necessitated also adding an antioxidant.

4877-8133-8480.2

**DOCKET NO.:** 107071.000583                                                                  **PATENT**
**Application No.:** 18/081,251
**Office Action Dated: July 11, 2023**

469.    I further agree with Dr. Pinal that it was known that PEG could form various degradation products. As I explain above, the POSA would have viewed the degradation products of PEG as a disadvantage that would have discouraged the use of that solvent. *See, e.g.,* ¶¶ 339–360.

470.    I disagree, however, with Dr. Pinal that PEG's known sensitivity to oxidation would have motivated or provided reason for the POSA to use an antioxidant with PEG. I likewise disagree that the POSA would have been motivated or had reason to use an antioxidant in conjunction with PG and bendamustine.

471.    As I explain in detail above, the POSA would have been strongly motivated to avoid using an antioxidant in the formulation. *See* ¶¶ 344–360. The POSA would have preferred to keep the formulation as simple as possible; adding an antioxidant would have introduced substantial complexity into the formulation, including increasing the risk of unwanted interactions between the excipients and bendamustine. *See* ¶¶ 344–345. The POSA would have understood that antioxidants are particularly reactive and likely to cause unwanted interactions in the formulation. *See* ¶ 346. Adding an antioxidant would also have been undesirable because the concentration of the antioxidant would have to be maintained throughout the shelf life of the product—in effect, the stability of the product would become dependent on the antioxidant. *See* ¶ 347. The POSA also would have understood that an antioxidant might not completely solve any potential oxidation problem and that finding an appropriate antioxidant would, in the first instance, be an unpredictable research effort. *See* ¶¶ 349–352.

Despite the poor stability of bendamustine/PEG, surprisingly, adding an antioxidant substantially eliminated the formation of degradation products. As shown in the specification, and the Table above, a bendamustine/PEG composition including antioxidant exhibited no

**DOCKET NO.:**  107071.000583                                                                                           **PATENT**
**Application No.:**  18/081,251
**Office Action Dated:  July 11, 2023**

substantial increase in degradants after storage for 15 days at either room temperature or 40 °C. (Specification at Example 3, page 13, Table 3).

The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if an antioxidant is added.  Such an unexpected result could not have been predicted.  This result is particularly unexpected given the absence of any report in the literature of an oxidative degradation pathway.  The claims are patentable for at least this reason.

Claims 4, 5, 14 and 15 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Brittain in view of Tait.[12] As discussed above, Brittain fails to disclose or suggest a liquid bendamustine composition in PEG, with an antioxidant. Tait does not cure Brittain's deficiencies, nor is it alleged to. Tait is merely cited for its purported disclosure that antioxidants like BHA, BHT, and monothioglycerol might be used in ifosfamide formulations. Action at 11-12. The claims are patentable over the combination of Brittain and Tait and Applicant requests withdrawal of the rejection.

## CONCLUSION

Applicant respectfully submits that the present application is in condition for allowance. Reconsideration of the application and an early Notice of Allowance are respectfully requested. In the event that the Examiner cannot allow the application for any reason, the Examiner is encouraged to contact Applicant's representative.

Date: July 28, 2023                                          /Stephanie A. Lodise/
                                                             Stephanie A. Lodise
                                                             Registration No. 51,430

Baker & Hostetler LLP
1735 Market Street, Suite 3300
Philadelphia, PA  19103
(215)-568-3100

---

[12] WO 200202125

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CEPHALON, INC., *et al.*,

Plaintiffs,

v.

SLAYBACK PHARMA LIMITED
LIABILITY CO., *et al.*,

Defendants.

Civil Action No. 17-1154-CFC
**CONSOLIDATED**

---

John Shaw, Karen Keller, Nathan Hoeschen, SHAW KELLER LLP, Wilmington, Delaware; David Berl, Adam Harber, Elise Baumgarten, Shaun Mahaffy, Ben Picozzi, Matthew Lachman, WILLIAMS & CONNOLLY LLP, Washington, District of Columbia

*Counsel for Cephalon, Inc.*

John Shaw, Karen Keller, Nathan Hoeschen, SHAW KELLER LLP, Wilmington, Delaware; Alex Grabowski, Kenneth Schuler, Marc Zubick, LATHAM & WATKINS LLP, Chicago, Illinois, Daniel Brown, Michelle Ernst, LATHAM & WATKINS LLP, New York, New York

*Counsel for Eagle Pharmaceuticals, Inc.*

John Shaw, Karen Keller, Nathan Hoeschen, SHAW KELLER LLP, Wilmington, Delaware; Elise Baumgarten, Matthew Lachman, WILLIAMS & CONNOLLY LLP, Washington, District of Columbia

*Counsel for Teva Pharmaceuticals International GmbH*

Eve Ormerod, Neal Belgam, SMITH, KATZENSTEIN, & JENKINS LLP, Wilmington, Delaware; Beth Finkelstein, Constance Huttner, Frank Rodriguez,

James Barabas, BUDD LARNER, P.C., Short Hills, New Jersey

*Counsel for Slayback Pharma Limited Liability Company*

Jeremy Cole, Damien Tancredi, Jeffrey Cohen, FLASTER GREENBURG, P.C., Wilmington, Delaware; John Cravero, Sherry Rollo, Steven Feldman, HAHN LOESER & PARKS LLP, Chicago, Illinois

*Counsel for Apotex Inc.*

Brian Farnan, Michael Farnan, FARNAN LLP, Wilmington, Delaware; Arun Mohan, SCHIFF HARDIN LLP, New York, New York; Helen Ji, Kevin Nelson, Imron Aly, SCHIFF HARDIN LLP, Chicago, Illinois

*Counsel for Fresenius Kabi USA, LLC*

James Lennon, DEVLIN LAW FIRM LLC, Wilmington, Delaware; David Steuer, Nicole Stafford, Shyamkrishna Palaiyanur, WILSON SONSINI GOODRICH & ROSATI, Austin, Texas; Rhyea Malik WILSON SONSINI GOODRICH & ROSATI, San Diego, California

*Counsel for Mylan Laboratories Limited*

## OPINION

April 27, 2020
Wilmington, Delaware

ii

COLM F. CONNOLLY
UNITED STATES DISTRICT JUDGE

Plaintiffs Teva Pharmaceuticals International GmbH, Cephalon, Inc., and

Eagle Pharmaceuticals, Inc. have sued Defendants Apotex Inc. and Apotex Corp.,

Fresenius Kabi USA, LLC, Mylan Laboratories Ltd., and Slayback Pharma LLC

under the Hatch-Waxman Act, 35 U.S.C. § 271(e)(2)(A). Defendants seek to bring

to market generic versions of Plaintiffs' Bendeka®, a drug indicated for the

treatment of chronic lymphocytic leukemia (CLL) and indolent B-cell non-

Hodgkin lymphoma (NHL). D.I. 1 ¶¶ 1, 12.[1] Plaintiffs allege infringement of U.S.

Patent Nos. 9,265,831 (the #831 patent), 9,572,797 (the #797 patent), 9,144,568

(the #568 patent) and 9,597,399 (the #399 patent) by all defendants and

infringement of U.S. Patent No. 9,572,887 (the #887 patent) by Slayback.

Defendants have stipulated to infringement of the asserted claims with two

exceptions outlined below. Defendants argue that all asserted claims of the

asserted patents are invalid.

I held a seven-day bench trial, and, as required by Federal Rule of Civil

Procedure 52(a)(1), I have set forth separately below my findings of fact and

conclusions of law.

---

[1] All docket citations are to the docket for C.A. No. 17-1154 unless stated
otherwise.

## I.  BACKGROUND

Plaintiffs sell Bendeka® under New Drug Application No. 208194.  D.I. 1 ¶ 13.  Eagle is the owner and assignee of the asserted patents and has listed them in connection with Bendeka® in the Orange Book maintained by the Food and Drug Administration (FDA).  *Teva Pharms. Int'l GmbH v. Apotex Inc.*, No. 17-1164 (D. Del. 2017), D.I. 1 ¶¶ 27–35.  Cephalon holds an exclusive license to the asserted patents and has assigned to Teva its rights under the license, including the right to sue for infringement.  *Id.*, D.I. 1 ¶¶ 38–39.

Bendeka®'s active ingredient is bendamustine hydrochloride (referred to by the parties as bendamustine), a nitrogen mustard chemotherapy drug that was first developed in East Germany in the 1960s.  D.I. 334 at 2; D.I. 364 ¶ 1.

In 2008, Cephalon launched the first U.S. bendamustine product, Treanda®. Tr. 403:18–22.  Cephalon initially sold Treanda® in a lyophilized, or freeze-dried, form.  Tr. 404:7–11, 1357:13–19.  Lyophilized drugs must be reconstituted into an injectable liquid before they can be administered to patients.  Tr. 404:7–18, 405:8–06:4.  Aware that bendamustine's toxicity makes it potentially dangerous for medical staff to reconstitute the drug, Eagle began in 2009 to develop a liquid bendamustine formulation that ultimately became Bendeka®.  Tr. 83:7–84:13, 86:3–19.

2

In November 2014, Cephalon launched its own liquid version of Treanda®. Tr. 981:25–82:2, 1657:10–11.

In 2015, Teva acquired Cephalon, Tr. 1660:10–14, and Cephalon thereafter commercialized Bendeka® as permitted by its exclusive license agreement with Eagle, PTX-0408; Tr. 1660:10–24, 1795:4–9.

On December 7, 2015, the FDA approved Bendeka®, D.I. 307-1 ¶ 152, and on January 27, 2016, Teva launched Bendeka®, DTX-0500; Tr. 984:17–85:23, 1006:6–07:5. Bendeka® subsequently received orphan drug exclusivity, a seven-year period during which the FDA is precluded from approving any other manufacturer's application to market the same drug to treat the same rare disease. *Eagle Pharm., Inc. v. Azar*, 2018 WL 3838265, at *1 (D.D.C. June 8, 2018), *aff'd*, 952 F.3d 323 (D.C. Cir. 2020); Tr. 1725:15–19.

In March of 2016, Teva stopped selling liquid Treanda®. DTX-0500_0001; Tr. 1623:7–8.

In July and August of 2017, Defendants each filed an Abbreviated New Drug Application (ANDA) with Paragraph IV certifications under § 505(j) of the Federal Food, Drug and Cosmetic Act to gain FDA-approval for the commercial manufacture, use, and sale of a generic version of Bendeka®. *E.g.*, D.I. 1 ¶ 15. In August of 2017, Plaintiffs filed these suits alleging that Defendants' ANDA filings with Paragraph IV certifications constituted acts of infringement. *E.g.*, D.I. 1.

3

These cases were consolidated for all purposes. *See* December 13, 2017 Order.

At trial, Plaintiffs accused all Defendants other than Slayback of infringing six formulation claims in two of the asserted patents: claims 2, 3, and 5 of the #831 patent; and claims 9 and 11 of the #797 patent. Plaintiffs also alleged infringement of six administration claims in four of the asserted patents: claims 11, 18, and 22 of the #568 patent and claim 15 of the #399 patent (by all Defendants); claim 13 of the #399 patent (by Apotex only); and claim 13 of the #887 patent (by Slayback only). Defendants countered that (1) the asserted formulation and administration claims are invalid for obviousness under 35 U.S.C. § 103; (2) the asserted formulation claims are invalid for indefiniteness under 35 U.S.C. § 112; (3) the asserted formulation claims are invalid for lack of enablement under 35 U.S.C. § 112; and (4) claim 9 of the #797 patent is invalid for lack of written description. Defendants stipulated that they infringe or induce infringement of each of the asserted claims with two exceptions: Apotex, Fresenius Kabi, and Mylan argue that (1) their ANDA products do not contain "a stabilizing amount of an antioxidant" as the asserted formulation claims require; and (2) they do not induce infringement of claim 9 of the #797 patent.

## II. OBVIOUSNESS

### A. Legal Standards for Obviousness

Under § 103 of the Patent Act, codified at 35 U.S.C. § 1 *et seq.*, a patent

4

"may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art [POSITA] to which said subject matter pertains." 35 U.S.C. § 103. As the Supreme Court explained in the seminal case, *Graham v. John Deere Co.*, 383 U.S. 1 (1966), under § 103, "[a]n invention which has been made, and which is new in the sense that the same thing has not been made before, may still not be patentable if the difference between the new thing and what was known before is not considered sufficiently great to warrant a patent." *Id.* at 14. Section 103 ensures that "the results of ordinary innovation are not the subject of exclusive rights under the patent laws." *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007). "Were it otherwise patents might stifle rather than promote, the progress of useful arts." *Id.* (citing U.S. Const. art. I, § 8, cl. 8).

The Court reaffirmed in *KSR* that the "framework" set out in the following paragraph from *Graham* governs the application of § 103, *id.* at 406:

> While the ultimate question of patent validity is one of
> law, the [§] 103 condition [of patentability], . . . lends
> itself to several basic factual inquiries. Under [§] 103,
> the scope and content of the prior art are to be
> determined; differences between the prior art and the
> claims at issue are to be ascertained; and the level of
> ordinary skill in the pertinent art resolved. Against this
> background, the obviousness or nonobviousness of the
> subject matter is determined. Such secondary
> considerations as commercial success, long felt but

5

> unsolved needs, failure of others, etc., might be utilized
> to give light to the circumstances surrounding the origin
> of the subject matter sought to be patented. As indicia of
> obviousness or nonobviousness, these inquiries may have
> relevancy.

*Graham*, 383 U.S. at 14–15 (citations omitted).

It is clear that under this framework, a district court must consider in an obviousness inquiry the three primary factors identified by the Court in *Graham*: (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, and (3) the level of ordinary skill in the pertinent art. Less clear is the role, if any, secondary considerations should play in the analysis.

The logical—some would say necessary—implication of the Court's use of the word "secondary" in *Graham* and its holding that the secondary considerations "*might* be utilized" and "*may* have relevancy" is that a district court is permitted—but not required in all cases—to examine such considerations in evaluating an obviousness-based invalidity challenge. The Court seemed to confirm as much in *KSR*, when it noted that "*Graham* set forth a broad inquiry and *invited* courts, *where appropriate*, to look at any *secondary considerations* that would prove instructive." *KSR*, 550 U.S. at 415 (emphasis added).

But a district court ignores *Graham*'s "invitation" to examine secondary considerations at its peril. One legal scholar, Harmon, has observed that under Federal Circuit law "[w]e are able now safely to strike the 'may' in the . . .

6

sentence" in *Graham* in which the Court stated that secondary "indicia of obviousness and nonobviousness . . . may have relevancy." Robert Harmon, Cynthia Homan, Laura Lydigsen, *Patents and the Federal Circuit* 245 (13th ed. 2017). Harmon correctly notes that "[t]he Federal Circuit has emphatically and repeatedly held that objective evidence of non-obviousness [i.e., the "secondary considerations" identified in *Graham*] must be taken into account always and not just when the decisionmaker is in doubt." *Id.* In *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530 (Fed. Cir. 1983), for example, the Federal Circuit held that "evidence rising out of the so-called 'secondary considerations' must always when present be considered en route to a determination of obviousness." *Id.* at 1538. And in *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litigation*, 676 F.3d 1063 (Fed. Cir. 2012), the Federal Circuit reaffirmed that holding, *id.* at 1079, and went on to say that the Supreme Court in *Graham* "did not relegate . . . to 'secondary status'" the "objective factors" the Supreme Court had explicitly identified in *Graham* as "secondary considerations," *id.* at 1078.

It is true that less than a month after *In re Cyclobenzaprine*, a different Federal Circuit panel held in *Otsuka Pharmaceutical Co. v. Sandoz, Inc.*, 678 F.3d 1280 (Fed. Cir. 2012) that because it found that the defendants had "failed to prove that [the challenged patent claim] would have been *prima facie* obvious over the asserted prior art," it "need not address" the "objective evidence" of commercial

7

success, long-felt need, and the failure of others. *Id.* at 1296. But the safer course for a district court faced with an obviousness challenge (and looking to avoid reversal by the Federal Circuit) is to treat *Graham*'s "invitation" to look at secondary considerations like a subpoena.

Obviousness is assessed based on the perspective of a POSITA at the time of the invention. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). The court therefore needs to guard against "hindsight bias" that infers from the inventor's success in making the patented invention that the invention was obvious. *In re Cyclobenzaprine*, 676 F.3d at 1079. The ultimate question in the obviousness analysis is "whether there was an apparent reason [for a POSITA] to combine [at the time of the invention] the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418. "The analysis is objective." *Id.* at 406. Thus, a court must determine whether a POSITA "would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and . . . would have had a reasonable expectation of success from doing so." *In re Cyclobenzaprine*, 676 F.3d at 1069.

The party challenging the patent's validity bears the burden of proving obviousness by clear and convincing evidence. *Id.* at 1068–69. In weighing the *Graham* factors to decide whether the party has met that burden, the district court must be guided by common sense. *Wyers v. Master Lock Co.*, 616 F.3d 1231,

1238 (Fed. Cir. 2010).  Indeed, "the legal determination of obviousness may

include recourse to logic, judgment, and common sense, in lieu of expert

testimony." *Id*. at 1239.  In *KSR*, the Supreme Court warned lower courts to avoid

"[r]igid preventative rules that deny factfinders common sense" and to employ

instead "an expansive and flexible approach" under the *Graham* framework.  *KSR*,

550 U.S. at 415.  Thus, the district court may "reorder[ ] in any particular case" the

"sequence" in which it considers the *Graham* factors.  *Id*. at 407.  And although a

court should consider carefully the published prior art, "[t]he obviousness analysis

cannot be confined by . . . overemphasis on the importance of published articles

and the explicit content of patents." *Id*. at 419.

"[A]ny need or problem known in the field of endeavor at the time of the

invention and addressed by the patent can provide a reason for combining the

elements in the manner claimed." *KSR*, 550 U.S. at 420.  And "[t]he combination

of familiar elements according to known methods is likely to be obvious when it

does no more than yield predictable results." *Id*. at 416.  "[T]he fact that a

combination was obvious to try might show that it was obvious under § 103." *Id*.

at 421.  But a combination is obvious to try only "[w]hen there is a design need or

market pressure to solve a problem and there are a finite number of identified,

predictable solutions" in the prior art at the time of the invention. *Id*.  And the

court must also be mindful that "when the prior art teaches away from combing

9

certain known elements, discovery of a successful means of combining them is
more likely to be nonobvious." *Id.* at 416.

### B.    Obviousness of the Asserted Formulation Claims

#### 1.    Findings of Fact

##### a.    The Priority Date

The parties agree that the date of invention (i.e., the priority date) for the
asserted formulation claims is January 28, 2010. Tr. 403:4−6, 1352:16−21,
2015:3−16; #831 patent at (60); #797 patent at (60).

##### b.    Definition of the Relevant POSITA

The parties agree that a POSITA would have had the skills, education, and
expertise of a team of individuals working together to formulate a liquid injectable
drug product. Such a team would have included individuals with doctoral degrees
in chemistry, biochemistry, pharmaceutics, pharmaceutical sciences, chemical
engineering, biochemical engineering or related fields, with at least two years of
post-graduate experience in developing liquid injectable drug products, or master's
or bachelor's degrees in similar fields of study, with a commensurate increase in
their years of postgraduate experience. Such a team also would have been familiar
with a variety of issues relevant to developing liquid injectable drug formulations,
including, among other things, solubility, stability, pharmacokinetics,
pharmacodynamics, and other pharmaceutical characteristics. Such a team also

10

would have included persons with expertise in analytical chemistry, including the detection and measurement of chemical degradants. The team also would have had access to an individual with a medical degree with experience in treating patients with CLL and NHL. PDX-4-2; Tr. 562:1−63:6, 1036:7−37:11, 1353:6−20, 2014:22−15:2.

### c.    Content of the Asserted Formulation Claims

The asserted formulation claims teach a non-aqueous liquid composition that contains (1) bendamustine (or a pharmaceutically acceptable salt thereof); (2) about 5% to about 10% by volume of the solvent propylene glycol (PG); (3) the solvent polyethylene glycol (PEG); (4) one of the following ratios of PEG to PG: about 95:5, about 90:10, about 85:15, about 80:20, and about 75:25; and (5) a stabilizing amount of an antioxidant. #831 patent at claims 2, 3, 5; #797 patent at claims 9, 11. Two claims also specify components and quantities: (1) claim 11 of the #797 patent requires that "the antioxidant is thioglycerol or monothioglycerol,"[2] and (2) claim 5 of the #831 patent requires that "the bendamustine concentration is from about 25 mg/mL to about 50 mg/mL." Certain claims also recite stability limitations such as "less than or equal to 0.11% PG esters at about 1 month of storage at about 5°C." #831 patent at claims 2, 3, 5; #797 patent at claims 9, 11.

---

[2] Thioglycerol or monothioglycerol are used synonymously. Tr. 519:10−15.

11

### d.   Bendamustine, PEG, and PG

Bendamustine has two relevant functional groups at opposing ends of its chemical structure: a nitrogen mustard group and a carboxylic acid group.  Tr. 422:23–23:13, 430:19–31:6, 1038:5–7.

Nucleophiles—such as water, PG, and PEG—degrade bendamustine at its nitrogen mustard group through reactions in which an aziridinium ring forms.  Tr. 407:12–19, 564:10–66:12, 1038:13–21, 1043:23–46:12, 1381:11–18; DTX-0073 at 4:33–37; PTX-1010 at TEVABEND00296748.  Compounds like PEG and PG that have hydroxyl (OH) groups also degrade bendamustine at its carboxylic acid group through a process called esterification where the carboxylic acid group reacts with the OH groups to form degradants called esters.  Tr. 431:4–13.

When PEG is combined with bendamustine, a process called PEG oxidation accelerates the esterification reaction.  Tr. 484:15–85:11, 1416:11–18:12; PTX-0669 at TEVABEND00294275; PTX-0623 at TEVABEND00289470.  PEG thus causes more degradation at bendamustine's carboxylic acid group than the same amount of PG would cause.  Tr. 1054:5–59:11; PTX-0999 at TEVAVEND00292131; PTX-0997 at TEVABEND00291955.

Because water causes bendamustine to degrade at its nitrogen mustard group, the prior art bendamustine formulations used a lyophilized (freeze-dried) form of bendamustine that required a human operator to reconstitute it using water

12

shortly before administering it to a patient. DTX-0094_0010; Tr. 404:7−18, 405:8−06:4, 408:17−09:1, 410:4−5, 1357:13−19. Reconstitution by human manipulation had two known disadvantages in 2010: it increased the risk of contamination, Tr. 406:16−20; and, because bendamustine is a cytotoxic compound, it posed a potential danger to the operator, Tr. 84:2–13, 406:23−07:3; DTX-0056_0001; DTX-0056 at 2:33−67; DTX-0094_0011.

### e.    Content of the Prior Art

Defendants argue that five prior art references would have motivated a POSITA to arrive at the asserted formulation claims with a reasonable expectation of success: Olthoff, Drager, Alam, Rowe, and Boylan. D.I. 378 at 31.

### 1)    Olthoff (DTX-0094)

Olthoff, a 1983 East German patent, claimed a stable, non-aqueous liquid injection solution of between 25 and 100 mg/mL bendamustine dissolved in a solvent consisting of 100% PG. DTX-0094_0016; Tr. 448:20−25. Olthoff's objective was to "produce a stable and ready-to-use injection solution out of N[itrogen]-mustard compounds, avoiding the technical solution of a dry ampoule [i.e., lyophilization]." DTX-0094_0012; Tr. 409:18−10:5. Olthoff disclosed that bendamustine has "a[n] extraordinarily high chemical stability for the production of injection solutions in" monovalent alcohols, glycols and polyols. DTX-0094_0012; Tr. 410:6−11:8. Olthoff specifically proposed dissolving

13

bendamustine in "polyols, particularly 1,2-propylene glycol [i.e., PG]." DTX-0094_0014; Tr. 412:6−14. Polyols are another name for compounds that have multiple OH groups. Tr. 412:17−18, 413:11−13. Both PEG and PG are polyols. *Id.*

Olthoff's examples did not use an antioxidant. DTX-0094_0013, _0015; Tr. 1457:5−12.

In the decades between Olthoff's publication and the priority date, its formulations were never used. DTX-0073 at 2:19−29.

### 2)    Drager (DTX-0073)

About 30 years after Olthoff was published, Drager, a U.S. patent, issued in 2013. Tr. 434:6−20; D.I. 307-1 ¶ 223. (Drager's priority date is September 25, 2008 making it prior art to the asserted formulation claims.) Like Olthoff, Drager described stable "liquid pharmaceutical formulations comprising bendamustine." DTX-0073 at 2:33−35, Abstract; Tr. 433:23−25. But Drager determined that the "results described in [Olthoff] were not reproducible." DTX-0073 at 2:62−64. Drager's data showed that bendamustine in 99% PG degraded almost completely after eight weeks at 25°C and more than 20% at 5°C after one year. DTX-0073 at Fig. 3; Tr. 1378:9−80:5. The reason for that degradation, according to Drager, was that (1) PG causes bendamustine to degrade at the nitrogen mustard group, DTX-0073 at 4:19−24, 4:33−37; Tr. 602:13−15, and (2) PG's OH groups cause

14

bendamustine to degrade at the carboxylic acid group through esterification, DTX-0073 at 5:12–14; Tr. 602:3–6.

As a solution to the degradation problem, Drager disclosed the use of aprotic solvents, i.e., solvents containing no OH groups, in a liquid bendamustine formulation. DTX-0073 at 3:21–25; Tr. 581:19–82:12. Drager showed that dissolving bendamustine in 100% DMA, an aprotic solvent, results in no degradation of bendamustine at the carboxylic acid group. DTX-0073 at Table II; Tr. 432:22–33:7, 435:11–36:9.

Drager also taught that protic solvents—i.e., solvents, including PEG and PG, that have OH groups—are acceptable to use with bendamustine but only when combined with aprotic solvents. DTX-0073 at 3:3–10, 3:36–48, 4:18–24; Tr. 601:11–17. Drager showed that the formulation containing 66% DMA and 34% PG is stable. DTX-0073 at Table II; Tr. 436:16–37:15.

### 3) Alam (DTX-0056)

Alam, a U.S. Patent issued on November 7, 1989, disclosed stable liquid formulations of cyclophosphamide, a compound that, like bendamustine, has a nitrogen mustard group. DTX-0056 at Abstract, 1:5–8; Tr. 422:3–9, 424:6–12. Alam tested cyclophosphamide's stability in mixtures of three polyols—PG, PEG and glycerol—and found that the formulation containing PEG and PG had "less degradation than the others." Tr. 424:2–25:5, 428:6–12, 1421:18–24; DTX-0056

15

at Tables 1−5.  Alam disclosed using PG at a ratio of from about 10% to about 90% and PEG at a ratio of from about 90% to about 10%.  DTX-0056 at 4:6−12; Tr. 425:6−14.

Bendamustine and cyclophosphamide have two structural differences that bear on how they degrade when they are mixed with PEG and PG.  First, because cyclophosphamide does not have a carboxylic acid group, cyclophosphamide does not experience esterification, i.e., it does not react with compounds such as PEG and PG that have OH groups to form esters.  Tr. 430:22−31:1, 1077:25−78:6.  Second, in bendamustine, the nitrogen mustard group is attached to a benzene ring, while in cyclophosphamide, the group is attached to a phosphoramide.  Tr. 1075:4−25.  Because it is attached to a benzene ring in bendamustine, a POSITA would have expected nucleophiles such as PEG and PG to accelerate degradation at the nitrogen mustard group via the formation of an unstable aziridinium ring.  Tr. 1037:19−41:16, 1058:12−17, 1060:2−9; PTX-0376 at JDG_BENDA_00002265; PTX-1010 at TEVABEND00296748.  But in cyclophosphamide, the phosphoramide deactivates the nitrogen mustard group and cyclophosphamide consequently does not degrade by forming the aziridinium ring in a liquid formulation before administration.  Tr. 1076:1−77:24; PTX-0991 at TEVABEND00290978; PTX-0993 at TEVABEND00291516.

Neither Alam nor Drager used an antioxidant in their exemplary or preferred

16

formulations. Tr. 1458:2–58:23.

### 4) Rowe, Handbook of Pharmaceutical Excipients (DTX-0160)

Rowe's Handbook of Pharmaceutical Excipients disclosed that PEG is susceptible to oxidation and that one can use an antioxidant to prevent such oxidation. DTX-0160_0011; Tr. 486:7–24.

### 5) Boylan (DTX-0063)

Boylan disclosed a list of "some of the most commonly used antioxidants in pharmaceutical injectable formulations" including monothioglycerol. DTX-0063_0019, 0020; Tr. 487:12–18. Boylan also disclosed usual concentrations for each of the listed antioxidants. DTX-0063_0020; Tr. 487:18–19. Monothioglycerol is FDA-approved. Tr. 340:20–23.

### 2. Conclusions of Law

I find that Defendants have not established by clear and convincing evidence that a POSITA would have had reason to combine the limitations recited in the asserted patents' formulation claims. Although Defendants persuaded me that a POSITA would have had reason to try to develop a non-aqueous liquid bendamustine formulation, they failed to establish by clear and convincing evidence that a POSITA would have used in that formulation the PEG and PG solvents, PEG:PG ratios, antioxidant, concentrations of bendamustine, or PG ester stability limitations recited in the asserted claims. I do not find Plaintiffs' evidence

17

of secondary considerations to establish nonobviousness, but I find Defendants'

failure of proof with respect to *Graham*'s primary factors in this case to be

dispositive and that therefore the formulation claims are not invalid under § 103.

### a.  Non-Aqueous Liquid Bendamustine Formulation

Every asserted formulation claim requires a non-aqueous liquid formulation.

Due to bendamustine's instability in water, the prior art used a lyophilized form of

bendamustine.  Tr. 404:9−18, 1357:13−19.  But, as discussed above, lyophilization

had known disadvantages.  To avoid lyophilization while still avoiding the use of

water, a POSITA would have been motivated to create a non-aqueous liquid

bendamustine product.  In fact, as can be seen in Olthoff and Drager, other

inventors sought to create non-aqueous liquid bendamustine formulations before

the priority date.

### b.  Use of PEG and PG

The claimed non-aqueous liquid bendamustine formulations contain the

solvents PEG and PG.  Defendants argue that Olthoff, Drager, and Alam would

have motivated a POSITA to use PEG and PG with bendamustine.  D.I. 378 at 13,

16.

### 1)  Olthoff and Drager

Viewed in isolation, Olthoff would have led a POSITA to use PEG and PG

in a liquid bendamustine formulation.  D.I. 378 at 13; DTX-0094_0014; Tr.

18

412:3–18, 413:4–13.  Olthoff provided a short, finite list of solvent options that included PEG and PG.  Specifically, Olthoff reported that bendamustine is stable in monovalent alcohols and polyols, DTX-0094_0012–13; Tr. 410:6–11:8, 1084:13–86:11; and the disclosure of "polyols" would have given a POSITA just three polyol options: PEG, PG, and glycerol, Tr. 413:4–13.  Plaintiffs dispute that assertion, D.I. 371 at 20–23, but Plaintiffs' expert himself limited polyols to those three options in a patent application that he submitted in 2009, *see* DTX-0764_0011 ("Preferably the water soluble plasticizer is selected from the group consisting of polyols (glycerin [i.e., glycerol], propylene glycol, polyethylene glycols) . . . .").  His response when confronted with that disclosure at trial was: "Yes, but I didn't -- at that time I didn't know that I would be sitting here today." Tr. 1575:2–76:1.  Moreover, while I agree with Plaintiffs that Olthoff would have taught a POSITA also to consider monovalent alcohols, D.I. 371 at 21, Plaintiffs only list four monovalent alcohols that a POSITA would have considered using with bendamustine, D.I. 361 ¶ 73.  Olthoff thus would have left a POSITA with three polyols and four monovalent alcohols as options.  By providing a finite list, Olthoff would have made using PEG and PG obvious to try because a POSITA would face only "a finite number of identified, predictable solutions." *KSR*, 550 U.S. 398 at 421.

Drager, however, teaches away from Olthoff's teaching of using polyols

19

such as PEG and PG alone with bendamustine. As noted, Drager determined that the "results described in [Olthoff] were not reproducible." DTX-0073 at 2:62–64, 3:1–2. And Drager's data showed that bendamustine in 99% PG degraded almost completely after eight weeks at 25°C and more than 20% at 5°C after one year. DTX-0073 at Fig. 3; Tr. 1378:9–80:5. As Plaintiffs' expert, Dr. Siepmann, credibly testified, a POSITA would have considered 20% degradation after just one year at 5°C to be "not good." Tr. 1379:25–80:5.

Drager disclosed combining bendamustine with aprotic solvents as a means of reducing such degradation. DTX-0073 at 3:3–10, 3:21–25; Tr. 581:19–82:12. Drager also allowed for combining bendamustine with a mixture of aprotic solvents and protic solvents, including PEG and PG. DTX-0073 at 3:3–10, 3:36–48, 4:18–24; Tr. 601:11–17. But Drager stated that the concentration of protic solvents should be kept at 90%—and preferably lower—to limit degradation. DTX-0073 at 3:49–4:25; Tr. 1393:3–22. Drager specifically showed that a formulation containing 66% DMA and 34% PG is stable. DTX-0073 at Table II; Tr. 436:16–37:15.

Defendants assert that Drager taught the use of aprotic solvents because they have no OH groups and that, therefore, Drager would have motivated a POSITA to use solvents with a low number of OH-groups. Tr. 431:20–23, 437:8–15. They argue that "[w]hile Drager claimed a formulation containing a polar aprotic solvent

20

(DMA) and a polar protic solvent (PG), a POS[IT]A would be motivated to remove DMA from the formulation because DMA has been known to cause problems in formulations." D.I. 379 ¶ 65; D.I. 378 at 14–15. According to Defendants, because DMA was the only aprotic solvent listed by Drager that is "used in FDA products," D.I. 378 at 15, a POSITA would turn to protic solvents like PEG that have a relatively low number of OH groups. D.I. 379 ¶ 67; D.I. 378 at 21.

Drager, however, teaches away from the use of only protic solvents. Therefore, Drager would not have motivated a POSITA to replace DMA with a low-OH protic solvent. Defendants and their expert conceded that neither Drager's disclosures nor its examples taught using exclusively protic solvents. Tr. 583:1–83:10, 1886:17–19. Instead, Drager taught the use of an *aprotic* solvent with bendamustine to avoid degradation by nucleophiles like PEG and PG. Moreover, Drager disclosed numerous alternative aprotic solvents that could potentially replace DMA. DTX-0073 at 3:9–14; Tr. 1395:7–14. And DMA was *not* the only aprotic solvent in an FDA-approved product. The prior art reference Strickley, for example, disclosed that the aprotic solvents NMP and DMSO had been commercially used. PTX-0569 at JDG_BENDA_00003311–14; Tr. 1390:19−24.

A POSITA in 2010 reading Olthoff and Drager thus would have found that Olthoff taught combining bendamustine with polyols including PEG and PG, but

21

that Drager taught away from using protic solvents, such as PEG and PG, alone

with bendamustine. "Where the prior art contains apparently conflicting teachings

(i.e., where some references teach the combination and others teach away from it)

each reference must be considered for its power to suggest solutions to an artisan

of ordinary skill . . . consider[ing] the degree to which one reference might

accurately discredit another." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157,

1165 (Fed. Cir. 2006) (internal quotation marks and citation omitted).

    After considering the two references, I find that a POSITA would have

credited Drager's data and conclusions over those in Olthoff. Drager expressly

asserted that the "results described in [Olthoff] were not reproducible." DTX-0073

at 2:62–64. And Drager used high-performance liquid chromatography (HPLC) to

make its determinations while Olthoff used thin-layer-chromatography (TLC).

Plaintiffs assert, and Defendants do not dispute, that HPLC is more reliable than

TLC because of its superior sensitivity and ability to resolve impurities. Tr.

1074:4–75:3, 1086:17–20, 1380:14–25, 1511:5–11. Moreover, in the decades

between Olthoff's publication in 1983 and the priority date in 2010, Olthoff's

formulations were never used, suggesting that POSITAs generally did not rely on

Olthoff. DTX-0073 at 2:19–29. "The elapsed time between [Olthoff] and the

[asserted] patent's filing date evinces that the [asserted] patent's claimed invention

was not obvious to try." *Leo Pharm. Prod., Ltd. v. Rea*, 726 F.3d 1346, 1356 (Fed.

22

Cir. 2013). Thus, a POSITA looking at Olthoff and Drager would have followed Drager's teaching not to use protic solvents such as PG and PEG alone with bendamustine.

### 2) Alam

Defendants also argue that Alam's disclosure of mixing cyclophosphamide with PEG and PG would have motivated a POSITA to use those solvents with bendamustine because both bendamustine and cyclophosphamide have nitrogen mustard groups. D.I. 378 at 16. But two structural differences between cyclophosphamide and bendamustine that effect how they degrade when they are combined with PEG and PG would have discouraged a POSITA from relying on Alam in formulating bendamustine. First, unlike bendamustine, cyclophosphamide does not have a carboxylic acid group and thus does not undergo an esterification reaction when it is combined with PEG or PG. Tr. 1077:25–78:6, 1421:1–5. Second, because the nitrogen mustard group in bendamustine is attached to a benzene ring, while in cyclophosphamide it is attached to a phosphoramide, cyclophosphamide degrades differently at the nitrogen mustard group than bendamustine does. Tr. 1077:4-1077:24; PTX-0991 at TEVABEND00290978; PTX-0993 at TEVABEND00291516. Defendants' expert, Dr. Pinal, did not point to any prior art references to support his contrary conclusion that "the nitrogen group in the two molecules are exactly the same." Tr. 423:7–13, 504:21–05:5.

23

I find therefore that a POSITA in 2010 would not have viewed cyclophosphamide as a relevant comparator for bendamustine reactions, Tr. 1078:7–11, and would not have considered Alam in formulating a stable bendamustine formulation, Tr. 1420:10–21:5.

\* \* \* \*

In sum, Defendants have not proven by clear and convincing evidence that Olthoff, Drager, and Alam would have motivated a POSITA to use PEG and PG to create a non-aqueous liquid bendamustine formulation. Although Olthoff taught using polyols such as PEG and PG with bendamustine, Drager teaches away from the use of protic solvents such as PEG and PG alone with bendamustine and a POSITA would credit Drager's teaching over Olthoff's. Moreover, a POSITA looking to solve the degradation problem in bendamustine would not have considered Alam in formulating a liquid bendamustine product because Alam concerned a compound that degrades differently than bendamustine when combined with PEG and PG.

### c.     Use of Claimed PEG:PG Ratios

Every asserted formulation claim requires a PEG:PG ratio that falls between 95:5 and 75:25. Defendants argue that the claimed PEG:PG ratios would have been obvious "in light of Alam's express disclosure of the entire range from 10:90 to 90:10." D.I. 378 at 19–20. But as explained above, the prior art would not have

24

motivated a POSITA to use PEG and PG in the first place.  Also, even if a

POSITA had chosen to use PEG and PG, it would not have relied on Alam because

Alam concerned a compound that degrades differently than bendamustine in

reaction to PEG and PG.  Finally, the claimed formulations use more PEG than PG

whereas Alam preferred using more PG than PEG, DTX-0056 at 4:6–12, and a

POSITA in 2010 would have known that PEG would cause more degradation at

bendamustine's nitrogen mustard group than PG due to PEG oxidation.  Tr.

1054:5–59:11; PTX-0999 at TEVAVEND00292131; PTX-0997 at

TEVABEND00291955.  Thus, Alam did not make obvious the PEG:PG ratios

recited in the asserted formulation claims.

### d.    Use of An Antioxidant

Every asserted claim requires an antioxidant and one asserted claim requires

that the antioxidant be monothioglycerol.  Assuming a POSITA had chosen to use

a 90% PEG and 10% PG bendamustine formulation, that POSITA would have

been motivated to curb PEG oxidation: a process in which PEG accelerates the

esterification reaction.  Tr. 484:15–85:11, 1416:11–18:12; PTX-0669 at

TEVABEND00294275; PTX-0623 at TEVABEND00289470.

Defendants argue that Boylan and Rowe would have motivated a POSITA to

solve the oxidation problem with an antioxidant.  D.I. 378 at 22–23.  They assert

that Rowe taught a POSITA to inhibit the oxidation of PEG with the inclusion of a

suitable antioxidant and that Boylan taught using specific antioxidants, including

monothioglycerol.  D.I. 378 at 23; Tr. 486:7–24, 488:7–9, 505:11–06:7, 543:2–5;

DTX-0160_0011; DTX-0063_0020.  Defendants also note that monothioglycerol

is "very commonly used," and is FDA-approved for injectable products.  D.I. 378

at 23.[3]

Other prior art references, however, teach away from the use of antioxidants.

*See* Tr. 1452:20–53:21; *Note for Guidance*, European Agency for the Evaluation of

Medicinal Products, PTX-0629 at TEVABEND00290713, TEVABEND00290720

("Antioxidants should only be included in a formulation if it has been proven [t]hat

their use cannot be avoided."); *Pharmaceutical Preformulation and Formulation*,

Interpharm, PTX-0391 at JDG_BENDA_00000415 (stating that antioxidant use "is

now in decline" and that "[a] preferred method of preventing oxidation [over

antioxidants] is simply to exclude oxygen").  Moreover, none of the four approved

injectable products in the prior art that contained PEG included an antioxidant.  Tr.

600:4–6, 1454:24–55:17; PTX-0722 (Ativan); PTX-0718 (Busulfex); PTX-0720

(Robaxin); PTX-0569 at JDG_BENDA_00003308 (VePesid).  In addition, the

---

[3] Defendants also assert that Drager taught "the use of antioxidants in the
formulation."  D.I. 378 at 22.  They did not, however, request a finding of fact on
this point and none of Drager's preferred or exemplary formulations contained an
antioxidant.  Drager mentioned that the invention may include other excipients
such as an antioxidant, DTX-0073 at 7:1–18, claim 5, but it did not encourage a
POSITA to use an antioxidant.

26

liquid bendamustine examples in Defendants' prior art references do not include antioxidants: Olthoff's liquid bendamustine formulation with PG had no antioxidant, DTX-0094 at JDG_BENDA_00002313; Tr. 1457:5–12, and neither Alam nor Drager used an antioxidant in their exemplary formulations, Tr. 1458:2–58:23.  Accordingly, I find that Defendants did not establish by clear and convincing evidence that the combination of Boylan and Rowe would have motivated a POSITA to use an antioxidant.

### e.   Use of the Claimed Bendamustine Concentrations

Claim 5 of the #831 patent requires a bendamustine concentration of "from about 25 mg/mL to about 50 mg/mL."  DTX-0006_0009.  Defendants argue that "[t]here was nothing special or unobvious about [that] concentration range" in view of the Treanda® Label and Olthoff.  D.I. 378 at 25.

First, Defendants assert that the lyophilized Treanda® Label would have motivated a POSITA to use the claimed concentrations because a POSITA would have multiplied the 120 mg/m$^2$ dose for NHL patients disclosed in the lyophilized Treanda® Label, DTX-0848_0001, by the average body-surface-area of a human, 2.0 m$^2$, to get a 240 mg total dosage, D.I. 378 at 25–26.  According to Defendants, the POSITA then would have placed that dose in a common vial size of either 5 mL or 10 mL to arrive at a concentration of either 24 or 48 mg/mL.  D.I. 378 at 26.  Defendants, however, offered no evidence establishing why a POSITA would have

27

combined a dosage for a lyophilized bendamustine formulation with a particular vial size when making a liquid bendamustine formulation.

Second, Defendants argue that Olthoff would have motivated a POSITA to reach the claimed concentration because "Olthoff disclosed and claimed [PG-only] liquid bendamustine formulations containing 'concentrations of 25 mg/m[L] to 100 mg/m[L],'" D.I. 378 at 25, and Olthoff disclosed that bendamustine's solubility in PG was very high, 125 mg/mL, D.I. 378 at 26. Defendants assert that "[w]hile the prior art did not disclose bendamustine's solubility in PEG, . . . solubility is an inherent (i.e. intrinsic) property" that can be discovered through routine testing, and given the high 125 mg/mL solubility in PG, a POSITA "would understand that by adding PEG to PG, the solubility would drop from 125 to a lower value, and that at ten percent PG and 90 percent PEG, it would be possible to make a solution with a concentration of 25 milligrams per milliliter." D.I. 378 at 26–27.

But as explained above, Defendants have not established a motivation to use PEG and PG in the first place. Thus, even assuming that a POSITA could have found bendamustine's solubility in PEG through routine testing, Defendants did not establish by clear and convincing evidence that a POSITA would have been motivated to conduct such testing. As Plaintiffs note, Defendants' expert "testified only that the POS[IT]A would have considered it 'possible' to dissolve 25 mg/mL bendamustine in 90:10 PEG:PG at room temperature, far short of establishing

28

motivation" to use PEG.  D.I. 371 at 43.

Moreover, Defendants fail to explain why a POSITA would believe that bendamustine would have a lower solubility in PEG and PG as opposed to in PG alone based only on bendamustine's high solubility in PG.  In choosing a concentration, a POSITA would have required that the bendamustine concentration remain below the formulation's bendamustine solubility limit so that the bendamustine would completely dissolve and dangerous precipitation would not occur.  Tr. 591:19–92:7, 593:23–94:4, 1434:13–35:9, 1435:10–25, 1472:12–14; PTX-0667 at TEVABEND00293319.  Because a POSITA would want to avoid such precipitation, it would likely not combine bendamustine with a 90% PEG and 10% PG formulation based on bendamustine's solubility in PG alone.

### f.   PG Ester Stability Limitations

Finally, certain asserted formulation claims contain a stability limitation, i.e., a maximum amount of degradants called PG esters that the composition can have after storage for a set time period at a set temperature.  For example, claims 2, 3, and 5 of the #831 patent recite compositions having "less than or equal to 0.11% PG esters at about 1 month of storage at about 5°C."  #831 patent at claims 2, 3, 5.

Defendants argue that the stability limitations are an inherent property because at least one obvious formulation in the asserted claims would naturally result in the required PG ester levels.  D.I. 378 at 27.  But "[t]o prove that a claim

29

limitation is inherent in the prior art, [the challenger] must show . . . [not only] that the limitation at issue is necessarily present, or the natural result of the combination of elements," but also that the combination of elements that naturally result in the limitation is *explicitly disclosed by the prior art.*" *Par Pharm., Inc. v. Twi Pharm., Inc.*, 120 F. Supp. 3d 468, 473 (D. Md.), *aff'd*, 624 F. App'x 756 (Fed. Cir. 2015) (emphasis added) (internal quotation marks omitted); *see also* D.I. 378 at 28 ("*Once an embodiment is shown to be obvious*, any corresponding data can be used to show that the stability property is inherent." (emphasis added)). Because I find that the combination of elements that Defendants allege inherently result in the stability limitations is not obvious, such limitations are not obvious through inherency.

### g.    Secondary Considerations

The parties adduced at trial evidence of only one secondary consideration that bears on the formulation claims—commercial success. D.I. 371 at 79–80. Plaintiffs argue that "[s]ales of Bendeka® exceed $2 billion," and that "Bendeka® halted the downward trend in bendamustine sales, despite increasing competition." D.I. 371 at 79. But such evidence does not support a finding of nonobviousness. First, Bendeka® sells at a lower price than the prior art lyophilized Treanda® product. Tr. 1641:25–42:3, 1680:2–12, 1798:8–99:2. Second, Plaintiffs' cluster

30

of exclusivities has blocked others from entering the market.[4]  Tr. 1723:24–26:1,

1730:3–7.  "Where market entry by others was precluded . . . the inference of

nonobviousness of the asserted claims, from evidence of commercial success, is

weak."  *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 740 (Fed. Cir. 2013)

(internal quotation marks, alterations, and citations omitted).

* * * *

Although the evidence of commercial success does not support a finding of

nonobviousness, I still find that Defendants have not shown by clear and

convincing evidence that the prior art they cited would have motivated a POSITA

to reach the claimed formulations.  As discussed above, a POSITA would have

credited Drager over Olthoff, and Drager teaches away from the use of protic

solvents such as PG and PEG alone with bendamustine.  Moreover, a POSITA

would not have relied on Alam in formulating bendamustine.  Finally, clear and

convincing evidence does not show that a POSITA would have relied on Boylan

and Rowe as motivation to use an antioxidant because of the references that teach

---

[4] Cephalon had an exclusive license from Fujisawa to develop bendamustine in the U.S.  DTX-1230_0001, _0002, _0019; Tr. 1226:24–27:1, 1263:21–25, 1233:18–34:25.  Also, in 2008, lyophilized Treanda® obtained seven years of orphan drug exclusivity (ODE) and an additional six months of pediatric exclusivity.  Tr. 1723:24–26:1.  Bendeka® also received ODE.  *Eagle Pharm.*, 2018 WL 3838265, at *1.  Thus, Bendeka® received seven years of exclusivity that would prevent generics from entering the market until 2022.  Tr. 1723:24–26:1.

31

away from the use of antioxidants in injectable formulations.  And the Treanda®

Label and Olthoff would not have motivated a POSITA to reach the claimed

concentrations.

### C.    Obviousness of the Asserted Administration Claims

#### 1.    Findings of Fact

##### a.    The Priority Date

The parties agree that the priority dates for the asserted administrations

claims are (1) March 20, 2012 for claim 22 of the #568 patent, and (2) July 10,

2012 for the remaining administration claims.  D.I. 332; Tr. 2015:10-16.

##### b.    Definition of the Relevant POSITA

The parties agree that a POSITA would have had the skills, education, and

expertise of a team of individuals working together to develop a safe and effective

administration protocol for a cytotoxic parenteral[5] drug product.  Such a team

would have included individuals with doctoral degrees in pharmaceutics,

pharmaceutical sciences, pharmacology, pharmacokinetics, pharmacodynamics, or

related fields, with at least two years of post-graduate experience in developing

protocols for pharmaceutical administration, or master's or bachelor's degrees in

similar fields of study, with a commensurate increase in their years of post-

---

[5] In the pharmaceutical field, "parenteral" typically refers to products that are
administered by injection.  Tr. 407:6–8.

32

graduate experience.  Such a team would have been familiar with a variety of issues relevant to administering liquid injectable drug products, including, among other things, toxicity, solubility, pharmacokinetics, and pharmacodynamics.  Such a team would have included at least one individual with a medical degree with experience in treating patients with CLL and NHL.  PDX-2-4; Tr. 1112:4-20, 1293:22–94:9, 1233:1–17, 2014:22–15:2.

### c.   Content of the Asserted Administration Claims

The asserted administration claims recite methods of treating CLL or NHL[6] with a liquid bendamustine composition.  #568 patent at claims 11, 18, 22; #887 patent at claim 13.  Certain claims require administering the bendamustine composition on days one and two of a 21-day cycle for NHL, #568 patent at claim 18, or on days one and two of a 28-day cycle for CLL, #568 patent at claim 11.  One claim requires a bendamustine dose of "about 25 $mg/m^2$ to about 120 $mg/m^2$." #887 patent at claim 13.

The asserted administration claims also specify administration times, the longest time being "about 15 minutes or less."  *See e.g.,* #568 patent at claim 22; #887 patent at claim 13.  They also specify administration volumes that are all 100 mL or less.  *See e.g.,* #399 patent at claim 13.  Finally, certain claims specify post-

---

[6] Two claims recite, more generally, a "method of treating cancer or malignant disease." #399 patent at claims 13, 15.

33

dilution bendamustine concentrations ranging from 0.05 mg/mL to 12.5 mg/mL.

*See e.g.*, #568 patent at claims 11, 18.

### d.    Content of the Prior Art

Defendants argue that eight prior art references would have motivated a

POSITA to combine the elements of the claimed administration with a reasonable

expectation of success: Palepu 2011, the Treanda® Label, Preiss 1985, Preiss

1998, Schöffski 2000a, Schöffski 2000b, Barth, and Glimelius.[7]  D.I. 378 at 53.

### 1)    Palepu 2011 (DTX-0984)

Palepu 2011 is the published application that led to the asserted formulation

patents.  Tr. 546:25–47:17.  The parties have stipulated that Palepu 2011 disclosed

the formulations claimed in the asserted formulation and administration claims.

D.I. 320 ¶ 6.

### 2)    Treanda® Label (DTX-0993 and DTX-1202)

The Treanda® Label, published in April 2009, D.I. 307-1 ¶ 247, disclosed

two FDA-approved liquid bendamustine composition dosing schedules: (1) for

CLL, intravenous (IV) infusion at a dose of 100 mg/m² over 30 minutes on days

---

[7] Defendants also cite Olthoff to argue that the asserted administration claims were obvious, but the arguments regarding Olthoff were advanced only by Dr. Yates, an admitted non-formulator, and an expert that all Defendants but Apotex rejected. Tr. 918:11–17, 920:19–22:13.  Dr. Yates is a professional witness with limited relevant experience who has testified repeatedly for Apotex.  Tr. 908:17–13:12.  I did not find his testimony credible and do not rely on it.

34

one and two of a 28-day cycle for up to six cycles, Tr. 648:3−9; DTX-0993_0001;

DTX-1202_001; and (2) for NHL, IV infusion at a dose of 120 mg/m² over 60

minutes on days one and two of a 21-day cycle for up to eight cycles, DTX-

0993_0001; DTX-1202_001; Tr. 648:3−9.

The Treanda® Label required the administration of Treanda® in a volume

of 500 mL, Tr. 652:13−16; DTX-1202_002, with a post-dilution bendamustine

concentration of 0.2–0.6 mg/mL bendamustine, DTX-0993_0002; DTX-1202_003;

Tr. 652:21−23.

### 3) Preiss 1985 (DTX-0320; DTX-0985)

Preiss 1985 disclosed the results of a pharmacokinetic analysis of

bendamustine. DTX-0320_0002; Tr. 658:25−59:2, 1119:18−20. A

pharmacokinetic analysis is a preliminary study in which a new drug is

administered to a small number of patients to determine the Cmax and area under

the curve (AUC). The Cmax is the peak concentration of the drug in the

bloodstream; the AUC is the patient's total exposure to the drug. Tr. 659:3−15,

847:8−24, 1114:2−7, 1120:18−25. Pharmacokinetic studies are not designed to

assess a drug's safety. Tr. 724:7−12, 1120:8−25.

Preiss 1985 administered bendamustine intravenously for three minutes to

seven patients with various cancers. DTX-0320_0002; Tr. 659:23−60:2,

723:16−24:3. Preiss 1985 administered an average total dose of 280 to 375 mg.

35

Preiss 1985 reported "only rather mild side effects" at those doses. DTX-
0320_0006; Tr. 664:6–20, 1123:9–22.

### 4)  Preiss 1998 (DTX-0991)

Preiss 1998 investigated bendamustine's clinical pharmacology and defined
bendamustine's maximum tolerated dose (MTD) and dose limiting toxicities
(DLT). DTX-0991_0002; Tr. 674:16–25. The MTD of a drug is a tolerable dose
without severe or life-threatening toxicities; it differs from a recommended dose
for clinical use. Tr. 1126: 9–11. DLTs are severe or life-threatening side effects.
Tr. 674:23–75:1, 1126:12–23. Preiss 1998 administered bendamustine to more
than 50 patients with various cancers. DTX-0991_002. Preiss 1998 was not
designed to evaluate the safety of an infusion protocol. Tr. 730:22–31:1,
731:8–21.

Preiss 1998 administered three-to-ten-minute one-time infusions of
bendamustine in doses ranging from 54 to 226 mg/m². It also administered three-
to-ten-minute infusions on four consecutive days in doses ranging from 20 to 88
mg/m². DTX-0987_005. Preiss 1998 concluded that "only mild toxicity occurred
even at high doses (> 200mg/m² b-hydrochloride per cycle)." DTX-0991_0004;
Tr. 676:19–25. Preiss 1998 reported "disorientation" and a "vegetative neurotoxic
effect" after the one-time infusions of 175 mg/m² and 215 mg/m² doses. DTX-
991_0004, _0005.

36

### 5)   Schöffski 2000a (DTX-0987)

Schöffski 2000a administered bendamustine over 30 minutes and compared its results to the three-to-ten-minute infusions disclosed in Preiss 1998. DTX-0987_0002,_0005; Tr. 678:4–14. Schöffski 2000a reported that some side effects from its 30-minute infusions were comparable to those observed with the three-to-ten-minute infusions in Preiss 1998. DTX-0987_0005,_0006; Tr. 678:10–79:5.

### 6)   Schöffski 2000b (DTX-0988)

Schöffski 2000b administered 60 to 80 mg/m$^2$ of bendamustine in 30 minutes. DTX-0988_0001–03; Tr. 679:20–22. Schöffski 2000b observed side effects that were comparable to those observed in Schöffski 2000a. DTX-0988_0005. Schöffski 2000b's authors did not "observe confusion or other signs of neurotoxicity when giving the drug as a repeated 30-min i.v. infusion." DTX-0988_0005.

### 7)   Barth 2010 (DTX-1004)

Barth suggested administering bendamustine in a solvent volume of 100 to 250 mL. DTX-1004_0005; Tr. 658:12–20, 681:21–83:8. Barth explained that

> [t]he 30-minute short infusion [of bendamustine] that is practiced in Germany can be readily achieved with infusion volumes of 100 to 250 m[L] 0.9% NaCl.
> It is unclear why the American prescribing information specifies 500 m[L] 0.9% NaCl or a final concentration of 0.2-0.6 mg/m[L] . . . . A short infusion with such volume is difficult to implement.

37

DTX-1004_0005; Tr. 682:9−83:2.  Barth did not disclose any study or data.  DTX-1004_0005; Tr. 1157:22−59:18.

### 8)   Glimelius (DTX-0079)

Glimelius disclosed the administration of 5-Fluorouracil to treat colorectal cancer as an infusion lasting ten to 20 minutes using a 50 to 100 mL mini-bag. DTX-0079_0001, _0002.  Mini-bags are small standard size bags.  Tr. 554:2−9.

### 2.   Conclusions of Law

Defendants did not establish by clear and convincing evidence that a POSITA would have been motivated to combine the prior art references to arrive at the claimed administrations with a reasonable expectation of success.  Although the prior art would have motivated a POSITA to reach the claimed formulation, dose, and dosing schedule, and although Plaintiffs' proffered secondary indicia of nonobviousness were of little or no probative value, I find that the prior art would not have motivated a POSITA to reach the remaining claim limitations, and thus the claims as a whole are not obvious.

### a.   Formulation, Dose, and Dosing Schedule

The parties agree that Palepu 2011, the published application that led to the asserted formulation patents, disclosed before the priority date the formulations found in the asserted administration claims.  D.I. 320 ¶ 6.  But Plaintiffs argue that Defendants have not shown that a POSITA would have been motivated to select

38

Palepu 2011's formulations for the administrations recited in the asserted claims.
D.I. 371 at 48.  Palepu 2011 itself, however, established a motivation to use its
formulations: it touted advantages of its disclosed formulations including "that
they have substantially improved long term stability when compared to currently
available formulations" and that they "are advantageously ready to use or ready for
further dilution" and thus "[r]econstitution of lyophilized powder is not required."
DTX-0984_0002 at [0007]; Tr. 889:8−90:3.  It is undisputed that a POSITA would
have wanted to use a stable and ready-to-use formulation as part of an improved
administration method.

A POSITA also would have been motivated to combine Palepu 2011 with
the Treanda® Label to come up with the claimed doses and dosing schedule.
Palepu 2011 instructed administering its formulations in accordance with the
Treanda® dosing schedule.  DTX-0984_0004 at [0044]; Tr. 856:8−9.  And the
Treanda® Label taught similar doses and the same dosing schedules as those in the
asserted administration claims.  DTX-0993_0001; DTX-1202_0001; Tr.
654:18−21, 695:10−20.  The required dose found in the claims is about 25 mg/m$^2$
to about 120 mg/m$^2$ and the Treanda® Label requires doses of 100 mg/m$^2$ or 120
mg/m$^2$.  #887 patent at claim 13; DTX-0993_0001; DTX-1202_0001.  Also, the
dosing schedule recited in the claims is the same as the Treanda® Label's
schedule: (1) for CLL, infusion on days one and two of a 28-day cycle, #568 patent

39

at claim 18; DTX-0993_0001; DTX-1202_001; Tr. 648:3−9; and (2) for NHL, IV infusion on days one and two of a 21-day cycle, #568 patent at claim 11; DTX-0993_0001; DTX-1202_001; Tr. 648:3−9.

That said, the asserted administration claims require administering each bendamustine dose in faster times, in lower volumes, and at higher post-dilution concentrations than the Treanda® Label requires. The question thus remains whether a POSITA would have been motivated to reach the claimed administration times, volumes, and concentrations.

### b. Administration Times, Volumes, and Post-Dilution Concentrations

All asserted claims require administering bendamustine in 15 minutes or less, with some requiring ten minutes or less. All asserted claims also require administering bendamustine in a volume of 100 mL or less, with some claims requiring about 50 mL. Finally, all but one of the asserted administration claims require post-dilution bendamustine concentrations ranging from 0.05 to 12.5 mg/mL.[8]

Defendants argue that the claimed administration times were obvious under the Preiss and Schöffski studies; that the claimed administration volumes are

---

[8] Claim 13 of the #887 patent, the only claim asserted against Slayback, does not have a concentration limitation. D.I. 362 at 3.

40

obvious under the Preiss studies, Barth, and Glimelius;[9] and that the claimed post-dilution concentrations are obvious under the Preiss studies and the Treanda® Label.  Defendants also contend that Eagle's post-invention statements corroborate Defendants' assertion that the Preiss studies would have motivated a POSITA to use shorter administration times, lower volumes, and higher concentrations.

### 1)      The Preiss Studies

Defendants argue that the Preiss studies support a finding that the claimed administration times, volumes, and concentrations are obvious.  First, Defendants argue that a POSITA would have been motivated to administer bendamustine in 15 minutes or less because Preiss 1985 and Preiss 1998 disclosed that administration of bendamustine in three-to-ten minutes was well-tolerated in humans and Schöffski 2000a and 2000b disclosed that the safety results of 30-minute bendamustine administrations were consistent with Preiss's three-to-ten-minute infusions.  D.I. 378 at 39–40.  Second, Defendants assert that the Preiss studies render the claimed volumes of 100 mL or less obvious because, although the Preiss references did not disclose a volume, a POSITA would have known based on Preiss's three-to-ten-minute time constraint and typical infusion rates that the

---

[9] Relying on the testimony of Dr. Yates, Defendants also cite Olthoff to argue that the claimed volumes were obvious.  D.I. 378 at 43.  As noted above, I did not find Dr. Yates's testimony to be credible and will not rely on it.  Moreover, Olthoff's example bendamustine formulation did not use PEG and, as explained above, Drager discredited Olthoff's data.  DTX-0094_0015; Tr. 923:14–24.

studies infused similar volumes.  D.I. 378 at 42.  Third, Defendants contend that Preiss rendered the claimed concentrations of 0.05 to 12.5 mg/mL obvious because Preiss 1985 likely used a concentration of 5.6 mg/mL.  D.I. 378 at 46.

I find, however, that the Preiss studies would not have motivated a POSITA to reach the claimed administration times, volumes, or concentrations because (1) a POSITA would not have relied on the Preiss studies to determine a safe and effective infusion time, volume, or concentration for bendamustine, (2) subsequent prior art taught away from Preiss's three-to-ten-minute infusions, and (3) Defendants only hypothesize that the Preiss studies used volumes and concentrations similar to those in the claimed administrations.

> ### a)   A POSITA would not have relied on the Preiss studies to determine a safe administration.

As an initial matter, Preiss 1985 and Preiss 1988 were not designed to evaluate safety, and thus a POSITA would not have relied on the Preiss studies to determine a safe infusion time, volume, or concentration.  Tr. 724:7–12, 730:22–31:1, 731:8–21.  Moreover, the Preiss studies did not provide enough data points or information to allow a POSITA to rely on them for safety information. Preiss 1985 tested only seven patients with various cancers, DTX-320_0002; Tr. 723:16–24:3, 1122:20–22; it did not discuss how it collected side effect information, including the number or timing of observations, the side effects being

42

observed, or a grading system, Tr. 724:14–28:16; and it neither specified which of the seven patients in the study had side effects nor distinguished between IV and oral side effects, Tr. 728:8–20.  A POSITA would not have concluded that side effects would not be present in a larger population, Tr. 1121:1–5, let alone the relevant population, Tr. 1122:20–23:8, based on a study that covered only seven patients with various cancers and offered no explanation of how the side effects were studied or which patients experienced the side effects.  Preiss 1998 similarly tested patients with various cancers, Tr. 1125:24–26:1, and it did not disclose when the side effects it reported were monitored or how many times side effect information was collected from patients.  Thus, a POSITA would not have relied on either Preiss study to determine the safety of a short bendamustine infusion.  Tr. 1122:14–19, 1123:9–22.

In addition, the parties agree that the claimed administrations require repeated cycles, D.I. 378 at 38; D.I. 371 at 59, but the Preiss studies did not administer bendamustine in repeated cycles.[10]  And according to Defendants' expert, "bendamustine therapy side effects result from . . . the number of cycles given" and "these side effects are typically more severe in subsequent cycles

---

[10] Defendants cited no reference that administered bendamustine in ten minutes or less in repeated cycles.  Tellingly, Defendants' references that did administer bendamustine in repeated cycles all used 30-minute infusions.  DTX-0987_0001; DTX-0988_0001; DTX-1004_0002, _0005; DTX-0848; PTX-0268.

43

because there are cumulative effects on bone marrow." Tr. 736:11–37:20.  A

POSITA would therefore not have relied on the Preiss studies to determine the

safety of a short infusion of bendamustine administered in multiple cycles.  Tr.

1133:7–11.  Moreover, neither Preiss study administered bendamustine over two

consecutive days as the claims require.  Tr. 1129:12–20.

    The Schöffski articles also would not have motivated a POSITA to rely on

the Preiss studies to determine the safety of a short infusion time, lower infusion

volume, or higher infusion concentration.  Schöffski 2000a reported that it

observed *some* side effects like those in Preiss 1998, but did not compare the

overall incidence or severity of side effects in the two infusion protocols.

DTX_0987_0006,_0007; Tr. 1138:21–39:19.  Also, Schöffski 2000b stated that it

observed similar side effects to those observed in Schöffski 2000a, not that it

observed the same side effects as Preiss.  And Schöffski 2000b stated that it did not

"observe confusion or other signs of neurotoxicity when giving the drug as a

repeated 30-min i.v. infusion," DTX-0988_005, while Preiss 1998 reported

"disorientation" and a "vegetative neurotoxic effect," DTX-0991 at

JDG_BENDA_00006920–21.

                    **b)    Subsequent prior art taught away from
                            the Preiss infusions.**

    Subsequent prior art also would have dissuaded a POSITA from relying on

the Preiss studies.  A POSITA would not have stopped with Preiss 1985 and Preiss

44

1998; instead, it would have also considered later prior art references that used 30 to 60 minute infusions and a 500 mL volume. "Too often the obviousness analysis is framed as an inquiry into whether a person of skill, with two (and only two) references sitting on the table in front of him, would have been motivated to combine . . . the references in a way that renders the claimed invention obvious. The real question is whether that skilled artisan would have plucked [those references] out of the sea of prior art and combined [them]." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016).

The Preiss researchers themselves conducted later studies and recommended in subsequent papers an infusion of at least 30 minutes in 500 mL. DTX-0987_0001; DTX-0988_0001; PTX-0268; DTX-0982_0009; Tr. 1145:13−46:7. Preiss 2003—conducted by the same research group as Preiss 1985 and 1998— reported administration over 30 minutes in repeated cycles. PTX-0268; Tr. 1141:21−43:15. Moreover, the Ribomustin Monograph—which set forth the prescription information for the German bendamustine product Ribomustin and was developed by a company that employed scientists involved in the Preiss and Schöffski studies—recommended a 30 to 60 minute infusion in 500 mL because of local toxicity concerns. DTX-0982_009; Tr. 1143:17−44:13, 1144:14−45:5, 1146:8−54:4.

45

### c) Defendants only hypothesize that the Preiss studies used the claimed volumes and concentrations.

Finally, Defendants only hypothesize that the Preiss studies used similar volumes and concentrations as those recited in the asserted claims.  With respect to volume, Defendants assert that although the Preiss references did not disclose a volume, "[b]ecause administration time and volume are related," a POSITA would have known based on Preiss's three-to-ten-minute time constraint and typical infusion rates that the studies infused small volumes.  D.I. 378 at 42 (citations omitted).  With respect to concentration, Defendants contend that "Preiss 1985 administered bendamustine in a dose of 280-375 mg in a bolus, [i.e., a volume that the] evidence showed likely meant 50 or 100 mL," and diluting 280 mg in 50 mL would result in a concentration of 5.6 mg/mL.  D.I. 378 at 46.  Such speculations about Preiss's infusion rate and volume, however, are only based on "conclusory and unsupported expert testimony" and they do not support a finding of obviousness by clear and convincing evidence.  *See TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1361 (Fed. Cir. 2019) ("In cases like *InTouch*, *ActiveVideo*, and *DSS*, we rejected obviousness determinations based on conclusory and unsupported expert testimony.").

Defendants have thus failed to establish by clear and convincing evidence that the Preiss studies support a finding that the claimed infusion times, volumes,

46

and concentrations were obvious.  "Whether a skilled artisan would be motivated

to make a combination includes whether he would select particular references in

order to combine their elements," *WBIP*, 829 F.3d at 1337, and a POSITA in 2010

would not have selected the Preiss studies to determine a safe and effective

infusion for a bendamustine formulation.

### 2)   Barth and Glimelius

Defendants also argue that the administration volumes are obvious under

Barth and Glimelius.  They note that Barth recommended a 100 to 250 mL

bendamustine infusion, D.I. 378 at 43, and that a "POS[IT]A would have known

from Glimelius (DTX-0079) that minibags, [standard infusion bag sizes of 50 or

100 mL], were typically used for infusions of 10-20 min," D.I. 378 at 44 (citations

omitted).

Barth and Glimelius, however, would not have motivated a POSITA to use

the claimed volumes.  First, Barth did not disclose any study or data; it only

suggested hypothetical smaller volumes.  DTX-1004_0005; Tr. 1159:10–18.  And

Barth's 100 to 250 mL suggestion did not cover the claimed volumes (all claims

require 100 mL or less).  DTX-1004_0005; Tr. 1159:3–16.  Second, Glimelius did

not disclose any bendamustine administration, Tr. 841:3–42:22, and the mere

availability of a standard IV bag would not have given a POSITA motivation to

use a bag that size.  IV bags of 50 mL were available before the priority date, but

47

had never been used to deliver bendamustine.  D.I. 371 at 58.

### 3)    The Treanda® Label

Defendants also assert that the Treanda® Label would have motivated a

POSITA to use the claimed post-dilution concentrations.  They argue that the

claimed concentrations are obvious as inherent because diluting the claimed doses

disclosed in the Treanda® Label in the claimed volume of liquid necessarily would

have resulted in the claimed concentrations of bendamustine, PG, and PEG.  D.I.

378 at 44.  But because I find that the claimed volumes are not obvious, it does not

follow that the claimed concentrations are obvious as inherent.   Defendants also

state that "on the lower end of the spectrum, the [claimed] concentration falls

within the 0.2-0.6 mg/mL concentration of the Treanda® Label."  D.I. 378 at 45.

But the Treanda® concentrations only cover a small portion of the claimed range

of 0.05 to 12.5 mg/mL and thus they do not render the claimed concentrations

obvious.

### 4)    Eagle's Post-Invention Statements

Defendants further argue that, through post-invention statements, Plaintiffs

admitted that the prior art taught that short infusions in lower volumes were safe

and effective.  Defendants point to the fact that Eagle relied on the conclusions

from the Preiss studies when it told the FDA that its Bendeka® protocol was safe.

D.I. 378 at 51.

It is true that, in support of its request for permission to test Bendeka®, Eagle submitted to the FDA a Detailed Review of Literature that relied in part on data from the Preiss and Schöffski references. DTX-1041_0175. The literature review stated: "Thus, the short duration infusion of bendamustine appears to be well tolerated in this study and a dose of 215 milligrams has been reported in the literature as the clinically tolerated dose for bolus administration of bendamustine." DTX-1041_0175. Later, Eagle made similar statements to the FDA when drafting its Investigator's Brochure to support its requested study that required administering the Bendeka® formulation in ten minutes. DTX-1061 at 14.

Eagle's submissions to the FDA, however, also contained non-public, non-prior-art tests and analysis Eagle had conducted to show those short-infusion protocols were safe to test in humans. DTX-1041_0025–26. And I find that Eagle's post-invention discussion of the prior art that is intermingled with its own non-public data that it developed in inventing the claimed administration does not show that a POSITA who did not have Eagle's non-public data would have relied on the Preiss studies. Conclusions drawn from a patentee's "disclosures to the FDA" risk being "distorted by hind-sight bias," especially here where the FDA submission was dated after the priority dates and thus was written "through the lens of what [the inventor] had invented." *Neptune Generics, LLC v. Eli Lilly & Co.*, 921 F.3d 1372, 1377 (Fed. Cir. 2019).

49

In sum, Defendants failed to prove by clear and convincing evidence that a POSITA reading the Preiss and Schöffski studies, Barth, Glimelius, and the Treanda® Label would have found the claimed infusion times, volumes, and concentrations obvious.

### c.   Secondary Considerations

Plaintiffs offered at trial evidence of four secondary considerations that bear on the administration claims: skepticism, long-felt need, commercial success, and industry praise. I did not, however, find this evidence to be probative indicia of nonobviousness for the following reasons.

### 1)   Skepticism

Plaintiffs argue that "industry participants" were skeptical of the claimed invention. D.I. 371 at 77. But the skepticism they cite was apparently held by a "couple of nurses, a pharmacist[,] and an oncology medical resident," DTX-0959_0001, and investors, D.I. 371 at 78. Such "lack of enthusiasm by a few is not equivalent to skepticism." *BTG Int'l Ltd. v. Amneal Pharm. LLC*, 923 F.3d 1063, 1076 (Fed. Cir. 2019).

Plaintiffs also contend that the FDA declined to allow testing of Eagle's IV push method of administration because of safety concerns. D.I. 371 at 78. But the IV push method is not the claimed invention; the invention is the ten-minute infusion and the FDA told Eagle to proceed with its ten-minute infusion study.

50

PTX-0746 at EGL-BENDEKA_00146354; Tr. 1691:3–14; *see also* PTX-0747 at EGL-BENDEKA_00146355 ("[Eagle] stated that they have decided not to evaluate the IV push method administration. [Eagle] will use 120 mg/m$^2$ over 10 minutes in their bridging study.").

### 2)   Long-Felt Need

Plaintiffs also argue that Bendeka®'s shorter infusion addressed a "long-felt need to reduce chair time for chemotherapy, improving patient experience and allowing more patients to be treated." D.I. 371 at 79. The parties offered competing expert testimony on this point. I found credible only Defendant's expert, Dr. Thirman, who testified that Bendeka® does not meaningfully reduce chair time because patients receive IV fluids and other drugs simultaneously with the administration of Bendeka® and the administration of those fluids and other drugs lasts for much longer than 15 minutes. Tr. 188:20–89:9, 189:22–24, 1744:14–51:20, 1745:20–46:6, 1751:3–51:8, 1765:18–66:6, 1779:11–18; DTX-0968_0001. For example, Bendamustine is frequently administered with a drug called Rituxan that has an administration time of four to eight hours. Tr. 190:24–91:6, 191:2–6, 713:14–22, 1746:11–17, 1781:14–22.[11]

---

[11] Plaintiffs' expert, Dr. Agarwal, was not credible. He testified that, based on his experience in a "community-based cancer center," Tr. 1288:19, there were "always issues with the chair time" in the oncology field and that Bendeka® resolved the chair time need, Tr. 1304:7–05:19. My assessment of his lack of credibility was informed by the logic and credible nature of Dr. Thirman's testimony and also by

<hr />

Dr. Agarwal's dissembling with respect to his billing practices (which might explain why he favored shorter chair times). Dr. Agarwal initially denied having any idea how his patients are billed for his work: "I mean, I'm not, I'm not the biller and I don't get paid by the amount I bill or anything. . . . My only concern is the patient's safety and that's all I care about. . . . I have no clue honestly about billing, billing procedures." Tr. 1339:15–21. He volunteered that "billing, which is a totally different department, I have no clue how they do it and I don't take a look at it. I don't even know how to look at it." Tr. 1340:15–17. And when asked how billing relates to infusion time, Dr. Agarwal claimed to have "no idea how the billing codes work with the infusion." Tr. 1344:13–17. But when asked by the Court if he was "paid by salary," Dr. Agarwal responded: "So the way it works is, what they [his practice group] wanted is eat what you kill. Basically, if I see more patients, I get paid more. If I work harder, I get more. If I work less, I get paid less." Tr. 1345:7–11. He then continued to explain the billing process in detail:

> So the way it works is, so we have like repeated billing codes for repeated business, which are from level one to level four, and that's very small. You just mark what billing code you want to put. These are being audited by McKesson and auditors, that you are not -- they look at our notes. They decide if the doctor is overbilling or underbilling with the code. We have another code for the new patient.
>
>              \* \* \* \*
>
> So they have like one to four levels of visit. Depending on how much time I spend with a patient, either from 15 minutes to 30 minutes, I can go from a level one visit to a level four visit and that's what I mark on that. I think it's level one to level five. Level five is a very complex visit where I spend an hour or more with a patient, and most of the visits are about level three or level four, but these patients that are going to see me, I just bill level 3 or 4 and then I submit the payment and that is taken care of by the billing and coding department.

Tr. 1345:19–46:1, 1346:13–23. Also, when Dr. Agarwal was asked if he was "familiar with a term called infusion billing," he responded "Yes." Tr. 1338:2–4.

52

### 3) Commercial Success

Plaintiffs further argue that Bendeka®'s commercial success is demonstrated by (1) the fact that "Bendeka® halted the downward trend in bendamustine sales, despite increasing competition," D.I. 371 at 79, and (2) "Teva's choice to license Bendeka® and pay Eagle a portion of the profit for each Bendeka® sale, when it could keep all profits from Treanda®," D.I. 361 ¶ 222. But such evidence does not support a finding of nonobviousness.  Plaintiffs have not provided evidence to establish that Bendeka®'s sales and Teva's decision to license Bendeka® were linked to Bendeka®'s patented advantages as opposed to Bendeka®'s exclusivities.  *See* D.I. 371 at 80 ("Eagle's patents expire shortly after Teva's pre-existing patents."); Tr. 1725:25–26:2 (stating that with the Bendeka® license, Teva has FDA exclusivity until 2022).  Also, the "competition" that Plaintiffs cite consists only of Eagle's Belrapzo®—a drug that shares Bendeka®'s formulation, but lacks the short-infusion protocol.  D.I. 361 ¶ 219.  Because Eagle benefits from the sales of both Belrapzo® and Bendeka®, it may have an incentive to market Bendeka® over Belrapzo®, Tr. 1652:19−53:2, and thus any evidence that Bendeka® has higher sales has little if any probative value.

### 4) Praise

Finally, Plaintiffs argue that "Bendeka®'s patented advantages . . . have received industry praise." D.I. 371 at 81.  In support of this assertion, they cite (1) a

53

Veteran's Administration (VA) newsletter that highlighted the advantages of

Bendeka® as compared to Treanda®, (2) a study that noted attributes of Bendeka®

that drive Bendeka®'s usage, and (3) Fresenius Kabi's pre-litigation statement that

Bendeka® reduced "[p]atient chair time" and that Bendeka® could "have higher

pricing and still retain volume due to the benefits it offers." D.I. 371 at 81; D.I.

361 ¶ 226. Here again, I find such evidence to have at best marginal probative

value. As an initial matter, the VA does not even use Bendeka®. Tr.

1777:1–78:16. Second, the study Plaintiffs cite was funded by Teva and provides

no connection between the claimed limitations and industry praise. Tr.

1305:25–07:4. Third, Fresenius Kabi's statement merely lists reduced chair time

as a fact and does not exhibit any praise related to the asserted claims.

* * * *

In sum, the secondary consideration evidence does not support a finding of

nonobviousness. I still find, however, that the asserted administration claims are

not obvious. Defendants have not shown by clear and convincing evidence that

Palepu 2011, the Treanda® Label, Preiss 1985, Preiss 1998, Schöffski 2000a,

Schöffski 2000b, Barth, and Glimelius would have motivated a POSITA to arrive

at the claimed administrations with a reasonable expectation of success. A

POSITA would not have been motivated to follow Preiss's three-to-ten-minute

(and potentially lower volume and higher concentration) infusions because (1) a

54

POSITA would not have relied on the Preiss studies to determine a safe

bendamustine infusion protocol, (2) subsequent prior art taught away from the

three-to-ten-minute infusions, and (3) Defendants only guess that Preiss used

similar volumes and concentrations to those claimed.  Moreover, Barth and

Glimelius would not have motivated a POSITA to administer bendamustine at

lower volumes because (1) Barth only disclosed hypothetical volumes that did not

even include the claimed volumes of 100 mL or less and (2) Glimelius did not

involve bendamustine.  Finally, the claimed concentrations are not obvious as

inherent or under the prior art.

## III.   INDEFINITENESS

Defendants argue that the asserted formulation claims are invalid because

they each require "a stabilizing amount of antioxidant"—a requirement Defendants

contend is indefinite.  D.I. 371 at 2.

### A.   Legal Standards for Indefiniteness

 "[A] patent is invalid for indefiniteness if its claims, read in light of the

specification delineating the patent, and the prosecution history, fail to inform,

with reasonable certainty, those skilled in the art about the scope of the invention."

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

"Indefiniteness is a matter of claim construction, and the same principles that

generally govern claim construction are applicable to determining whether

55

allegedly indefinite claim language is subject to construction." *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008), *abrogated on other grounds by Nautilus*, 572 U.S. at 901 (rejecting Federal Circuit's "insolubly ambiguous" standard for indefiniteness). As in claim construction, in making an indefiniteness determination, the district court may make "any factual findings about extrinsic evidence relevant to the question, such as evidence about knowledge of those skilled in the art." *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017). "Any fact critical to a holding on indefiniteness . . . must be proven by the challenger by clear and convincing evidence." *Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*, 838 F.3d 1224, 1228 (Fed. Cir. 2016) (alteration in original)).

### B. Discussion

Defendants argue that "the claims recite a 'stabilizing amount' [of antioxidant] with no guidance, functional or otherwise, on what degree of stability is required to obtain some unnamed objective." D.I. 380 at 3. But this argument conflates (1) whether a given antioxidant amount improves bendamustine's stability with (2) the extent to which that given antioxidant amount improves stability. The written description defines a "stabilizing amount of antioxidant" as an amount that "increase[s] or enhance[s] the stability of the bendamustine in the compositions described herein," #831 patent at 3:49−54; Tr. 370:25−71:9. Thus,

56

the "objective" of the antioxidant amount is not "unnamed" but is instead "to increase or enhance the stability of the bendamustine in the compositions" described in the specification.[12]

Defendants argue that the term is indefinite because "[t]he specification does not explain how to determine whether stability has been 'increased' or 'enhanced.'" D.I. 378 at 3. But as Plaintiffs' expert, Dr. Siepmann, credibly testified, a POSITA would understand that a stabilizing amount of an antioxidant includes any amount that decreases the amount of bendamustine degradation after any time period and at any temperature. Tr. 1485:4−87:10, 1502:8−12. And the patents provide a POSITA with a method for measuring stability: using HPLC to compare the amount of overall bendamustine degradation with and without the antioxidant. Tr. 1485:14−86:11. Example 3 demonstrates that a POSITA would compare the amount of bendamustine remaining in the same formulation, stored under the same conditions, with and without the antioxidant, #831 patent at

---

[12] Section 112(b) of Title 35 provides that "[t]he specification shall conclude with one or more claims[.]" This language makes clear that the specification includes the claims asserted in the patent, and the Federal Circuit has so held. *See Markman*, 52 F.3d at 979 ("Claims must be read in view of the specification, of which they are part"). The Federal Circuit and other courts, however, have also used "specification" on occasion to refer to the written description of the patent as distinct from the claims. *See, e.g., id.* ("To ascertain the meaning of claims, we consider three sources: The claims, the specification, and the prosecution history."). To avoid confusion, I refer to the portions of the specification that are not claims as "the written description."

57

7:59–8:27; and the specifications describe measuring the remaining bendamustine using HPLC, *id.* at 2:26–44, 2:57–3:4, 4:22–26; Tr. 1487:11–89:11. In addition to providing exemplary test methods, the specification also lists "suitable antioxidant amounts" and "antioxidants," and provides examples of "stabilizing" amounts. #831 patent at 3:57–4:8, 7:59–9:2; Tr. 371:15–72:18, 1489:23–90:4.

In *BASF*, the Federal Circuit held the term "composition . . . effective to catalyze" not indefinite, even though the patent did not "recite a minimum level of function needed to meet this 'effective' limitation" or "a particular measurement method," because tests for determining whether a composition was catalyzing were well-known. 875 F.3d at 1366–68. Here, the term "stabilizing amount of antioxidant" is like the term "composition . . . effective to catalyze" and Plaintiffs' expert, like the expert in *BASF*, persuasively testified that a POSITA would know how to determine whether an amount of antioxidant is stabilizing. Moreover, unlike in *BASF*, the asserted patents here provide a test method.

Finally, Defendants cite the patentee's removal of antioxidant and stability limitations during prosecution as support for their indefiniteness argument. D.I. 378 at 5–6. But the removal of those limitations undercuts Defendants' argument because it confirms that the "examiner understood" the claims without those limitations. *See Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1379–80 (Fed. Cir. 2017).

58

I thus find that the term "stabilizing amount of antioxidant" is not indefinite and I construe it as: any amount of an antioxidant that decreases the amount of bendamustine degradation after any time period and at any temperature.

## IV.   ENABLEMENT

Defendants assert that the asserted formulation claims are invalid for lack of enablement because the formulation patents disclosed neither the use of sodium hydroxide (NaOH) or of "other undisclosed variables." D.I. 378 at 59.

### A.   Legal Standards for Enablement

"Claims are not enabled when, at the effective filing date of the patent, one of ordinary skill in the art could not practice their full scope without undue experimentation." *Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380, 1384 (Fed. Cir. 2013) (citation omitted). "That some experimentation is necessary does not preclude enablement; the amount of experimentation, however, must not be unduly extensive." *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1576 (Fed. Cir. 1984) (citations omitted). A challenger must prove invalidity based on non-enablement by clear and convincing evidence. *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012). Enablement is a question of law based on underlying facts. *Abbott Labs.*, 720 F.3d at 1384 (citations omitted).

59

### B.    Discussion

Defendants argue that the asserted formulation claims are not enabled

because the claims do not contain NaOH and "a pH adjuster like NaOH is

necessary to obtain the PG ester levels claimed in the [a]sserted [f]ormulation

[c]laims." D.I. 378 at 59.  Defendants note that "Eagle's later-filed [#]879

application . . . explains [that] 'the control samples, which did not include NaOH

did not provide long term storage stability,' and 'exhibited more than 28% total

esters compared to initial after six months of storage at 25° C.'" D.I. 378 at 60

(citation omitted).

Evidence that some claimed formulations did not result in the PG ester

limitations, however, does not establish that the claims are not enabled.

Defendants have not presented any evidence to show that a POSITA would have

had to undertake undue experimentation to alter the formulation to obtain the PG

ester limitations.  That some formulations with the claimed ingredients do not

satisfy the PG ester limitations does not support non-enablement unless the number

of such formulations is significant enough to have required a POSITA to

experiment unduly. *See Atlas Powder*, 750 F.2d at 1576–77 ("Even if some of the

claimed combinations were inoperative, the claims are not necessarily invalid. . . .

Of course, if the number of inoperative combinations becomes significant, and in

effect forces one of ordinary skill in the art to experiment unduly in order to

60

practice the claimed invention, the claims might indeed be invalid. That, however, has not been shown to be the case here." (citations omitted)). Defendants presented no evidence showing that the number of unsuccessful formulations is significant enough to require undue experimentation. Accordingly, they failed to establish by clear and convincing evidence that the asserted claims are invalid for lack of enablement.

## V.   WRITTEN DESCRIPTION

Apotex argues that claim 9 of the #797 patent is invalid for lack of written description. D.I. 378 at 60. It asserts that "the absence of any mention of a pH adjuster like NaOH in the [#]797 patent demonstrates that the inventors did not have possession of it at that time, as confirmed by their later filing of another patent application that discloses and claims it." D.I. 378 at 61 (citations omitted). "But written description is about whether the skilled reader of the patent disclosure can recognize that what was claimed corresponds to what was described . . . ." *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1191 (Fed. Cir. 2014). And Apotex never cites the intrinsic record to show that the asserted formulation patents claim something that they do not describe in their written descriptions. Instead, Apotex improperly cites extrinsic evidence—the later-filed Eagle patent application. Apotex has thus failed to establish that claim 9 is invalid for lack of written description.

61

## VI.   INFRINGEMENT

Defendants stipulated to infringement of the asserted claims with two exceptions.  Apotex, Fresenius Kabi, and Mylan argue that (1) they do not infringe the asserted formulation claims because their ANDA products do not contain "a stabilizing amount of an antioxidant" as the asserted formulation claims require, D.I. 369 at 2; and (2) they do not directly infringe or induce infringement of claim 9 of the #797 patent, which requires that the "bendamustine-containing composition ha[ve] less than or equal to 0.43 % total PG esters at about 3 months of storage at a temperature of about 25°C," because their proposed labeling does not direct physicians to store their ANDA products for about 3 months at about 25°C, D.I. 369 at 4–5.

### A.   Legal Standards for Infringement

A defendant is liable for patent infringement if it files an ANDA "for a drug claimed in a patent or the use of which is claimed in a patent."  35 U.S.C. § 271(e)(2)(A).  To establish infringement based on the filing of an ANDA under § 271(e)(2)(A), a patentee must show that "if the drug were approved based upon the ANDA, the manufacture, use, or sale of that drug would infringe the patent in the conventional sense."  *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir. 1997).

"Conventional" infringement includes direct infringement and inducement.

62

35 U.S.C. § 271 (a), (b).  Direct infringement requires that "every limitation set forth in a claim . . . be found in an accused product, exactly." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995) (citation omitted). Inducement requires a showing "that the accused inducer took an affirmative act to encourage infringement with the knowledge that the induced acts constitute patent infringement." *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 904 (Fed. Cir. 2014) (citation omitted).  A plaintiff can prevail on a claim of inducement only if it establishes direct infringement. *See Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014) ("[I]nducement liability may arise if, but only if, there is direct infringement." (internal quotation marks, alterations, and citation omitted)).

A patentee must prove infringement by a preponderance of the evidence. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed. Cir. 1984).  "A patentee may prove infringement by any method of analysis that is probative of the fact of infringement, and circumstantial evidence may be sufficient." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009) (internal quotation marks and citations omitted).

### B.    Direct Infringement of the "Stabilizing Amount of Antioxidant" Limitation

The asserted formulation claims require a "stabilizing amount of an antioxidant," a term that I construed as any amount of an antioxidant that decreases

63

the amount of bendamustine degradation after any time period and at any temperature.

Defendants' ANDA products each contain 5 mg/mL of the antioxidant monothioglycerol, *see* PTX-0474 at APOLIQBENDA_ANDA_0005427 (Apotex); PTX-0486 at FK_BENDA_00003243, 3245 (Fresenius Kabi); PTX-0007 at MYLBEN_000248 (Mylan); Tr. 372:19−74:13, and the formulation patents' written description shows that 5 mg/mL of monothioglycerol is a stabilizing amount. The written description identifies "5 mg/mL to about 20 mg/mL" as a "preferable" stabilizing amount of antioxidant. #831 patent at 3:49−68; #797 patent at 3:55–66. The written description also identifies "thioglycerol (also known as monothioglycerol)" as a preferred antioxidant. #831 patent at 4:1–8; #797 patent at 4:6–16. Moreover, Example 3 demonstrates that adding "5 mg/m[L] of lipoic acid . . . as a stabilizing antioxidant" to 20 mg/mL of bendamustine in PEG decreased the amount of bendamustine degradation after 15 days at 25℃ and 40℃ as compared to the same formulation without an antioxidant. #831 patent at 7:59−8:27; #797 patent at 7:61–8:29; Tr. 371:15−72:18. Example 4 recites dissolving 50 mg/mL bendamustine in 90% PEG and 10% PG, and adding "5 mg/m[L] of [mono]thioglycerol, α-lipoic acid or dihydrolipoic acid," an amount that it describes as "a stabilizing amount of an antioxidant." #831 patent at 8:29−65; #797 patent at 8:32–66.

64

Circumstantial evidence can establish infringement; and here, the asserted

formulation patents' disclosures that 5 mg/mL of an antioxidant (and specifically

monothioglycerol) is stabilizing shows that the 5 mg/mL of monothioglycerol that

Defendants use in their ANDA products decreases the amount of bendamustine

degradation as compared to the same formulation without an antioxidant.

Finally, Fresenius Kabi and Mylan represented to the FDA that 5 mg/mL

monothioglycerol was sufficient to ensure that the amount of bendamustine in their

ANDA products did not fall below specification limits. *See* PTX-0054 at

FK_BENDA_00000543 (Fresenius Kabi); PTX-0201 at MYL-BEN_005258

(Mylan); Tr. 374:14–77:1.

### C.     Direct and Induced Infringement of Claim 9 of the #797 Patent

Claim 1 of the #797 patent recites a "method of treating leukemia,

Hodgkin's disease, or multiple myeloma" comprising "administering" the specified

"liquid bendamustine-containing composition." #797 patent at 12:43–46 (claim 1).

Claim 9 recites the method of claim 1, wherein the "bendamustine-containing

composition has less than or equal to 0.43% total PG esters at about 3 months of

storage at a temperature of about 25° C." #797 patent at claim 9.  Defendants

stipulate that their ANDA Products have "less than or equal to 0.43% total PG

esters at about 3 months of storage at a temperature of about 25° C," but contend

that they do not directly infringe or induce infringement of claim 9 because their

65

proposed labeling does not recommend storing their ANDA Products for "about 3 months" at "a temperature of about 25° C." D.I. 307-4 ¶ I.a; D.I. 320 ¶ 3.

I find, however, that even though Defendants' labeling does not mention storage, Defendants' ANDA products directly and indirectly infringe claim 9 because the PG ester limitation does not require the user to store the products for three months at 25°C. Claim 9's PG ester limitation describes a characteristic of the claimed formula; it is not a method step and thus, does not require action to infringe. The claim does not recite testing for the PG ester limitation; it just describes a composition that would have less than 0.43% PG esters if one were to test for them after storing the composition for three months at 25°C.

Defendants' proposal to construe the PG ester limitation as a method step that requires actual storage under the specified conditions also fails because it "renders [claim 9] nonsensical." *See Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010) ("A claim construction that renders asserted claims facially nonsensical cannot be correct." (internal quotation marks and citations omitted)). Although claim 1 of the #797 patent requires the composition to have "less than or equal to 0.11% total PG esters at about 1 month of storage *at a temperature of about 5° C*," claim 9 requires the same composition to have "less than or equal to 0.43% total PG esters at about 3 months of storage *at a temperature of about 25° C*." #797 patent at 12:61–63 (claim 1), 13:22–25

66

(claim 9).  Under Defendants' proposed construction, to infringe, the user would need to store the composition simultaneously at different temperatures, which is impossible.

Defendants therefore directly infringe and induce infringement of claim 9 of the #797 patent.  With respect to direct infringement, Defendants agree that their products have less than or equal to 0.43% total PG esters after storing them for three months at a temperature of about 25°C and, other than with respect to a stabilizing amount of an antioxidant, they stipulated to direct infringement of the remaining limitations.  D.I. 320 ¶ 3.  With respect to induced infringement, Defendants will encourage others to administer their ANDA products through their proposed labels.  Although Defendants' proposed labeling does not mention the claimed PG ester limitations, Defendants know "that [their ANDA products] meet all of the claim limitations and, through [their] proposed label[s], encourage[] patients to administer [their ANDA products] in a manner that infringes the claimed method." *Orexigen Therapeutics, Inc. v. Actavis Labs. FL, Inc.*, 282 F. Supp. 3d 793, 816 (D. Del. 2017), *rev'd in part on other grounds sub nom. Nalpropion Pharm., Inc. v. Actavis Labs. FL, Inc.*, 934 F.3d 1334 (Fed. Cir. 2019). "Whether the [user] who performs the method by administering the [products] knows that the [products] meet the [PG ester limitations] is irrelevant for the purposes of infringement." *Id.*

67

## VII.  CONCLUSION

For the foregoing reasons, I find that all asserted claims of the asserted patents are not invalid and that Defendants infringe and induce infringement of each of the asserted claims.

The parties will be directed to submit a proposed order by which the Court may enter final judgment consistent with this Opinion.

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CEPHALON, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 17-01154-CFC |
| | ) | (Consolidated) |
| SLAYBACK PHARMA LIMITED | ) | |
| LIABILITY CO., *et al.*, | ) | Highly Confidential |
| | ) | |
| Defendants. | ) | |
| | ) | |

**RESPONSIVE EXPERT REPORT OF JUERGEN SIEPMANN, PH.D.**

solubilizing capabilities and safety." Strickley 2004 at 221, JDG_BENDA_00003290 at 3310.

Notwithstanding these positive attributes, with respect to the relevant context of clinical use,

Strickley 2004 notes that "[t]here are some commercial injectable formulations with PEG 300,

but far fewer compared to propylene glycol and/or ethanol." *Id.* Likewise, Strickley 2004 states

that although "PEG 400 . . . [is a] very effective solubilizing excipient[], [it is] currently in only a

few marketed products." *Id.* As these reviews of marketed FDA products make clear, PEG is

not a particularly common choice to use as a solvent in a marketed parenteral product, and one of

the principal reasons that PEG is not used in more pharmaceutical products is the presence or

generation of peroxides in PEGs, which can cause undesired oxidation.

355.    A review of the marketed parenteral formulations available in the United States as

of the priority date that contained PEG indicates that those formulations do not have

antioxidants:

- Ativan® (lorazepam) contains "0.18 mL polyethylene glycol 400 in propylene glycol with 2.0% benzyl alcohol as preservative." Ativan® Label at 1 (2006), JDG_BENDA_00005945 at 5948.

- Busulfex™ (busulfan) contains "N-N-dimethylacetamide (DMA) 33% wt/wt and polyethylene glycol 400, 67% wt/wt." Busulfex™ Label at 1 (1999), JDG_BENDA_00005643 at 5643.

- Robaxin® (methocarbamol) contains "polyethylene glycol 300, NF 0.5 mL, Water for Injection, USP q.s." Robaxin® Label at 1 (2003), JDG_BENDA_00005854 at 5854.

- VePesid® (etoposide) contains 60% PEG 300, 30% ethanol, 8.0% Tween 80, 3% benzyl alcohol, and 2 mg/mL citric acid. Strickley 2004 at 219, JDG_BENDA_00003290 at 3308.

356.    Of the four formulations listed above containing PEG, none of them contain

excipients that are listed in Nema 1997's list of Antioxidants/Reducing Agents (Table IV).

Nema 1997 at 167, JDG_BENDA_00002272 at 2273. This state of the art refutes clearly Dr.

Pinal's opinion that the POSA would have used PEG and then added an antioxidant to avoid the oxidation of PEG.

357.    I understand that citric acid (which is in VePesid®) may potentially act synergistically in conjunction with other antioxidants. *See, e.g.,* Akers 1982 at 227, JDG_BENDA_00006113 at 6119 (listing citric acid as an "antioxidant synergist," which is a compound that has "no capability of protecting oxygen-sensitive drugs, but, when combined with antioxidants, do serve to increase the maintenance of oxidative stability of the drug" either by "complexing trace amounts of metal," "lowering the solution pH," or "decreasing the oxygen stability in the solution"); Rowe 2009 at 181 ("Citric acid monohydrate is used as a sequestering agent and antioxidant synergist."). However, citric acid is principally a pH adjustor. *See* Rowe 2009 at 181. A publication discussing the VePesid® formulation states that the citric acid in that formulation is for pH adjustment. *See* Jonkman-de Vries at 479, JDG_BENDA_00002062 at 2066 ("The commercial formulation of etoposide (Vepesid®) contains . . . 2 mg citric acid (for pH adjustment) . . . .").

358.    From the above information, the POSA would have understood that, as of the priority date, none of the four commercially available parenteral formulations that contained PEG 300 or PEG 400 also contained an antioxidant. This would have taught the POSA that antioxidants were not routinely added to parenteral formulations containing PEG. ▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓                                REDACTED


359.    The POSA likewise would have understood that Dr. Pinal's suggested formulation approach—to add PEG to the formulation and also to add an antioxidant to fix the degradation caused by the PEG—was not conventional. Rather, in view of the small number of

marketed parenteral drugs containing PEG, and the fact that none of those drugs contained an antioxidant, the POSA would have inferred that formulators simply did not use PEG with drugs that might be susceptible to degradation via PEG's oxidation products. In my opinion, and based on my experience as a formulator, the POSA would not have been motivated or had reason to add PEG to a formulation if she or he believed that doing so would have necessitated also adding an antioxidant.

360.    In view of the lack of any marketed parenteral drugs containing PEG and an antioxidant, the POSA likely would have hypothesized that PEG was only used with drugs that were not subject to degradation by PEG oxidation products (for example, acid-catalyzed esterification). To test that hypothesis, the POSA could have reviewed the molecular structures of the four APIs listed above. I have depicted those structures below. Most notably, none of those molecules contain a carboxylic acid moiety. As such, none of those molecules would have been prone to esterification via the PEG molecule, which is the only degradation pathway that Dr. Pinal has identified as motivating the use of an antioxidant in formulations of the claimed inventions. This would have bolstered the POSA's understanding that PEG was only used in liquid parenteral formulations where the active ingredients were not susceptible to degradation via PEG's oxidation products. Because bendamustine plainly is a drug molecule whose degradation is accelerated by such oxidation products—as Dr. Pinal acknowledges—the POSA would have avoided using PEG with bendamustine.

168

468.    I agree with certain aspects of Dr. Pinal's opinions, as I described them in the previous paragraph.  In particular, I agree that it was known that PEG and PG could esterify with bendamustine.  As I explain above, in my opinion this would have motivated the POSA to use aprotic solvents that could not form these ester degradation products, and would have taught away from using PEG and PG in bedamustine formulations.  *See, e.g.*, ¶¶ 221, 245.

469.    I further agree with Dr. Pinal that it was known that PEG could form various degradation products.  As I explain above, the POSA would have viewed the degradation products of PEG as a disadvantage that would have discouraged the use of that solvent.  *See, e.g.*, ¶¶ 339–360.

470.    I disagree, however, with Dr. Pinal that PEG's known sensitivity to oxidation would have motivated or provided reason for the POSA to use an antioxidant with PEG.  I likewise disagree that the POSA would have been motivated or had reason to use an antioxidant in conjunction with PG and bendamustine.

471.    As I explain in detail above, the POSA would have been strongly motivated to avoid using an antioxidant in the formulation.  *See* ¶¶ 344–360.  The POSA would have preferred to keep the formulation as simple as possible; adding an antioxidant would have introduced substantial complexity into the formulation, including increasing the risk of unwanted interactions between the excipients and bendamustine.  *See* ¶¶ 344–345.  The POSA would have understood that antioxidants are particularly reactive and likely to cause unwanted interactions in the formulation.  *See* ¶ 346.  Adding an antioxidant would also have been undesirable because the concentration of the antioxidant would have to be maintained throughout the shelf life of the product—in effect, the stability of the product would become dependent on the antioxidant.  *See* ¶ 347.  The POSA also would have understood that an antioxidant might not completely solve

any potential oxidation problem and that finding an appropriate antioxidant would, in the first instance, be an unpredictable research effort. *See* ¶¶ 349–352.

472.    The undesirability of using antioxidants in pharmaceutical products has been recognized by regulatory bodies. *See* ¶ 348. The European Union's guidance document about antioxidants states that antioxidants "should only be used once it has been shown that their use cannot be avoided." EU Antioxidant Guidance at 2. Moreover, in order to include an antioxidant in a formulation, the EU regulatory body requires a demonstration of "the necessity to add an antioxidant . . . to the finished product at the chosen level" and "the physical and chemical compatibility of the antioxidant . . . with other constituents of the finished product, the container and the closures." *Id.*

473.    Because of these disadvantages, the use of antioxidants in parenteral formulations was on the decline as of the priority date, *see* Broadhead 2001 at 341, JDG_BENDA_00000404 at 415, and the POSA would likewise have been strongly dissuaded from using an antioxidant in creating a new bendamustine formulation.

474.    In view of the disadvantages of using an antioxidant in a parenteral composition, the POSA would not have been motivated or had reason to add an antioxidant based on mere speculation about potential oxidative degradants. Dr. Pinal's opinions on this topic are based on precisely such speculation. *See, e.g.*, Pinal Rep. ¶ 77 ("The POSA would recognize a <u>potential</u> self-propagating problem . . . ." (emphasis added)). As an initial matter, Dr. Pinal seems to be suggesting that his proposed degradation mechanism is "self-propagating." *See* Pinal Rep. ¶ 77. But Dr. Pinal has not described what about his proposed reaction mechanism is self-propagating. For example, Dr. Pinal has not opined that the formation of acidic species from PEG or PG would cause additional degradative breakdown of the PEG or PG to form additional acidic

**DOCKET NO.:** 107071.000583                                              **PATENT**
**Application No.:** 18/081,251
**Office Action Dated: August 21, 2023**

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

    Nagesh R. Palepu et al.                    Confirmation No.: 8743

Application No.: 18/081,251                Group Art Unit: 1613

Filing Date: December 14, 2022           Examiner: ERNST V ARNOLD

For:    FORMULATIONS OF BENDAMUSTINE

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

### REPLY PURSUANT TO 37 CFR § 1.111

      In response to the Official Action dated August 21, 2023, reconsideration is respectfully requested in view of the amendments and/or remarks as indicated below:

      ☐    **Amendments to the Specification** begin on page of this paper.

      ☐    **Amendments to the Abstract** begin on page of this paper.

      ☒    **Amendments to the Claims** are reflected in the listing of the claims which begins on page 2 of this paper.

      ☐    **Amendments to the Drawings** begin on page of this paper and include an attached replacement sheet.

      ☒    **Remarks** begin on page 4 of this paper.

      ☒    The Commissioner is hereby authorized to charge any fee deficiency, charge any additional fees, or credit any overpayment of fees, associated with this application in connection with this filing, or any future filing, submitted to the U.S. Patent and Trademark Office during the pendency of this application, to Deposit Account No. 23-3050.

**DOCKET NO.:** 107071.000583                                                                    **PATENT**
**Application No.:** 18/081,251
**Office Action Dated: August 21, 2023**

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims:**

1.    (Currently Amended) A sterile vial containing a liquid bendamustine-containing
        composition comprising

        about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, wherein the
                bendamustine concentration in the composition is from about 25 mg/mL 20
                mg/mL to about 60 mg/mL;

        a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one
                or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

        a stabilizing amount of an antioxidant,

        wherein the total impurities resulting from the degradation of the bendamustine is less
                than about 5% peak area response, as determined by HPLC at a wavelength of 223
                nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.


2-3.    (Cancelled)


4.    (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol.


5.    (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a
        concentration of about 5 mg/mL.


6.    (Original) The composition of claim 1, wherein the composition is stable for at least
        about 15 months at 5 °C or for at least about 15 months at 25 °C.


7.    (cancelled)


8.    (Original) The sterile vial of claim 1, wherein the liquid bendamustine-containing
        composition further comprises ethanol.


9-10.    (Cancelled)


Page 2 of 15

**DOCKET NO.:**  107071.000583                                         **PATENT**
**Application No.:**  18/081,251
**Office Action Dated:  August 21, 2023**

11.     (Currently Amended) A liquid bendamustine-containing composition comprising
<u>100 mg of</u> bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing
amount of an antioxidant, in a pharmaceutically acceptable fluid;

wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and
optionally one or more of propylene glycol, ethanol, benzyl alcohol and
glycofurol; and

wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from
about 25 mg/mL ~~20 mg/mL to about 60 mg/mL~~,

wherein the total impurities resulting from the degradation of the bendamustine is less
than about 5% peak area response, as determined by HPLC at a wavelength of 223
nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

12-13.  (Cancelled)

14.     (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol.

15.     (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol in a
concentration of about 5 mg/mL.

16-17.  (cancelled)

18.     (Previously Presented) The composition of claim 11, further comprising ethanol.

DOCKET NO.: 107071.000583                                                      PATENT
Application No.: 18/081,251
Office Action Dated: August 21, 2023

## REMARKS

Claim 1 has been amended to include subject matter of claims 2 and 3, now cancelled. Claim 11 has been amended to include subject matter of claims 12 and 13. No new matter has been added. Applicant reserves the right to file the cancelled claims in one or more continuing applications.

## Claim Rejections – 35 U.S.C. § 103

The Examiner alleges that claims 1-3, 6, 8, 11-13 and 18 would have been obvious over Brittain[1] in view of Kumar,[2] McGinity,[3] and Wasylaschuk.[4] Without the benefit of Applicant's specification, those of ordinary skill in the art would not have produced a composition including ~100 mg of bendamustine (or a salt thereof) at a concentration of ~25 mg/mL, along with an antioxidant and any of the recited fluids, nor would they have considered containing such a composition is a sterile vial, as claimed. Moreover, the person of ordinary skill in the art would not have predicted that any recited composition would have exhibited the stability presently claimed. Applicant respectfully requests reconsideration and withdrawal of the rejection.

### Those of Ordinary Skill in the Art Would Not Have Included Polyethylene Glycol and an Antioxidant in Any Liquid Bendamustine Composition

The Examiner alleges that a person skilled in the art would have prepared a bendamustine composition with polyethylene glycol (PEG). Action at 11. The Examiner further contends that since PEG was known to produce hydrogen peroxide, the skilled person would have added an antioxidant to the liquid to prevent that from happening. Action at 12. The evidence of record establishes that this proposed scenario would not have been undertaken by anyone skilled in the art.

The rejection relies on a person of ordinary skill picking one of Britain's lyophilized compositions and selecting PEG as a reconstitution vehicle, prior to intravenous administration. Office Action at 11. The rejection notes that PEG's use as an excipient was impeded by its oxidative liabilities. *Id.* at 12. The rejection supposes that, rather than selecting a less troublesome reconstitution vehicle, *e.g.* water, the person of ordinary skill would have proceeded

---

[1] U.S. Publication No. 2006/0159713
[2] AAPS PharmSciTech 2006;7(3):E1-E7
[3] Journal of Pharmaceutical Sciences 1975;64(2):356-357
[4] Journal of Pharmaceutical Sciences, vol. 96, no. 1, January 2007:106-116

4894-0848-0634.1

DOCKET NO.: 107071.000583                                                                    **PATENT**
Application No.: 18/081,251
Office Action Dated: **August 21, 2023**

with PEG because the oxidative problem can be "cured" by adding an antioxidant. The cited art, as well as expert testimony presented during district court litigation, demonstrates that this series of events would not have taken place.

Industry guidance at the time of the invention discouraged antioxidant use in pharmaceuticals, instructing that antioxidants should only be used when there is no other way to avoid oxidation.  For example, the European Agency for the Evaluation of Medicinal Product (EMEA) stated:

> Antioxidants should only be included in a formulation if it has been proven hat their use cannot be avoided. This applies to cases where the manufacturing process is optimised to minimise the potential for oxidation.

(EMEA Guidance at 8 of 9).  Indeed, it had been suggested at the time of the invention that the use of antioxidants in liquid formulations intended for parenteral administration was "now in decline" and that a "preferred method of preventing oxidation is simply to exclude oxygen":

> **Use of Excipients**
> Excipients may be useful in preventing chemical and physical instability. Antioxidants are included in parenteral formulations, although their use is now in decline, and EU guidelines discourage their use unless no other alternative exists (see sect. "Parenteral Products and the

Broadhead at 334.

The Office Action relies on a person of ordinary skill not only selecting the troublesome PEG for lyophilizate dissolution, it requires that the person of ordinary skill also try to address PEG's known oxidative liabilities by pre-emptively including an antioxidant. Expert testimony clearly explains why a person of ordinary skill in the art would not have selected an antioxidant-containing PEG excipient to prepare a liquid bendamustine product, especially since the only known therapeutic use of such a product would have been for parenteral administration.

During district court litigation, an antioxidant-PEG excipient hypothesis, similar to the one proposed by the Examiner, was alleged. There, the court found Dr. Siepmann's testimony persuasive. Dr. Siepmann testified that a person of ordinary skill in the art would not have chosen PEG as a bendamustine excipient. Dr. Siepmann explained that none of the four marketed PEG-containing parenteral formulations available in the United States as of this application's priority date contained an antioxidant.  In addition, a person of skill in the art would have understood that antioxidants were not routinely added to any PEG-containing formulation that

DOCKET NO.: 107071.000583                                                          **PATENT**
Application No.: 18/081,251
Office Action Dated: **August 21, 2023**

would have been parenterally administered. In fact, adding an antioxidant to fix the degradation

caused by PEG was not conventional, so a person of skill in the art would not have used PEG if

it necessitated using an antioxidant. And finally, a person of skill in the art would not have used

PEG with a drug that was subject to degradation *via* PEG's oxidation products.

As Dr. Siepmann's testified:

355.    A review of the marketed parenteral formulations available in the United States as

of the priority date that contained PEG indicates that those formulations do not have

antioxidants:

- Ativan® (lorazepam) contains "0.18 mL polyethylene glycol 400 in propylene
  glycol with 2.0% benzyl alcohol as preservative." Ativan® Label at 1 (2006),
  JDG_BENDA_00005945 at 5948.

- Busulfex™ (busulfan) contains "N-N-dimethylacetamide (DMA) 33% wt/wt
  and polyethylene glycol 400, 67% wt/wt." Busulfex™ Label at 1 (1999),
  JDG_BENDA_00005643 at 5643.

- Robaxin® (methocarbamol) contains "polyethylene glycol 300, NF 0.5 mL,
  Water for Injection, USP q.s." Robaxin® Label at 1 (2003),
  JDG_BENDA_00005854 at 5854.

- VePesid® (etoposide) contains 60% PEG 300, 30% ethanol, 8.0% Tween 80,
  3% benzyl alcohol, and 2 mg/mL citric acid. Strickley 2004 at 219,
  JDG_BENDA_00003290 at 3308.

356.    Of the four formulations listed above containing PEG, none of them contain

excipients that are listed in Nema 1997's list of Antioxidants/Reducing Agents (Table IV).

Nema 1997 at 167, JDG_BENDA_00002272 at 2273. This state of the art refutes clearly Dr.

Pinal's opinion that the POSA would have used PEG and then added an antioxidant to avoid the

oxidation of PEG.

358.    From the above information, the POSA would have understood that, as of the

priority date, none of the four commercially available parenteral formulations that contained

PEG 300 or PEG 400 also contained an antioxidant. This would have taught the POSA that

antioxidants were not routinely added to parenteral formulations containing PEG. ███████

███████████████████████                                    REDACTED

4894-0848-0634.1

DOCKET NO.: 107071.000583                                          PATENT
Application No.: 18/081,251
Office Action Dated: August 21, 2023

359.    The POSA likewise would have understood that Dr. Pinal's suggested

formulation approach—to add PEG to the formulation and also to add an antioxidant to fix the

degradation caused by the PEG—was not conventional. Rather, in view of the small number of

marketed parenteral drugs containing PEG, and the fact that none of those drugs contained an

antioxidant, the POSA would have inferred that formulators simply did not use PEG with drugs

that might be susceptible to degradation via PEG's oxidation products. In my opinion, and based

on my experience as a formulator, the POSA would not have been motivated or had reason to

add PEG to a formulation if she or he believed that doing so would have necessitated also adding

an antioxidant.

360.    In view of the lack of any marketed parenteral drugs containing PEG and an

antioxidant, the POSA likely would have hypothesized that PEG was only used with drugs that

were not subject to degradation by PEG oxidation products (for example, acid-catalyzed

esterification). To test that hypothesis, the POSA could have reviewed the molecular structures

of the four APIs listed above. I have depicted those structures below. Most notably, none of

those molecules contain a carboxylic acid moiety. As such, none of those molecules would have

been prone to esterification via the PEG molecule, which is the only degradation pathway that

Dr. Pinal has identified as motivating the use of an antioxidant in formulations of the claimed

inventions. This would have bolstered the POSA's understanding that PEG was only used in

liquid parenteral formulations where the active ingredients were not susceptible to degradation

via PEG's oxidation products. Because bendamustine plainly is a drug molecule whose

degradation is accelerated by such oxidation products—as Dr. Pinal acknowledges—the POSA

would have avoided using PEG with bendamustine.

Siepmann Report at ¶¶355-356, 358-360, of record in this application.

4894-0848-0634.1

Indeed, not even Wasylaschuk recommends adding antioxidant to liquid formulations.

Instead, Wasylaschuk's refers to antioxidant use only in **solid dosage forms**:

> Controlling HPO-drug reactions in solid dosage forms can be achieved by selecting excipients with low HPO levels, controlling crystallinity of the drug substance, and by adding antioxidants to stop HPO propagation and single-electron degradation processes.

Waslylaschuk at page 113, left column.

No evidence in the cited art supports the sequence of steps that the Office Action alleges would have been taken by a person of ordinary skill in the art. PEG would not have been selected for bendamustine's dissolution, but even if it was, antioxidants would have been excluded, not added. Applicant respectfully requests reconsideration and withdrawal of the rejection.

**Those of Ordinary Skill in the Art Would Not Have Had Any Reason to Prepare a Liquid Composition Having a Bendamustine Concentration of about 20 mg/ml to 60 mg/mL**

The Examiner alleges that reconstituting Brittain's lyophilized bendamustine with PEG to a concentration of about 25 mg/mL would have been obvious because "it is merely adding an appropriate amount of a pharmaceutically acceptable fluid. . . to a concentration of about . . . about 25 mg/mL bendamustine prior to administration. . . . It is a simple dilution and calculation any pharmaceutical artisan can perform with no inventive skill." Office Action at 12. But the obviousness inquiry does not ask whether a person of ordinary skill **could have** dissolved Brittain's lyophilized compositions to a concentration of about 25 mg/mL - it requires that the Examiner establish **why** a person of ordinary skill **would have**.

That bendamustine could *theoretically* be diluted to a concentration of about 25 mg/mL fails to establish a *prima facie* case of obviousness. The obviousness inquiry requires that the Examiner explain why a person of ordinary skill in the art would have selected ~25 mg/mL as a suitable bendamustine concentration. Here, the evidence establishes that the skilled person would have prepared much more dilute bendamustine concentrations.

At the time of this application's filing, a lyophilized bendamustine product had been approved for use in the United States - Treanda®. The prescribing information for Treanda® would have been considered by a person of ordinary skill in the art seeking to use any bendamustine formulation. The Prescribing Information for Treanda® instructs that lyophilized bendamustine should be reconstituted with water to a concentration of **no more than 5 mg/mL** before being further diluted to 0.2 – 0.5 mg/mL:

DOCKET NO.: 107071.000583                                                    PATENT
Application No.: 18/081,251
Office Action Dated: August 21, 2023

2.3  Reconstitution/Preparation for Intravenous Administration
Aseptically reconstitute each TREANDA vial as follows:
○   25 mg TREANDA vial: Add 5 mL of only Sterile Water for Injection, USP.
○   100 mg TREANDA vial: Add 20 mL of only Sterile Water for Injection, USP.

Shake well to yield a clear, colorless to a pale yellow solution with a bendamustine HCl concentration of 5 mg/mL. The lyophilized powder should completely dissolve in 5 minutes. If particulate matter is observed, the reconstituted product should not be used.

Aseptically withdraw the volume needed for the required dose (based on 5 mg/mL concentration) and immediately transfer to a 500 mL infusion bag of 0.9% Sodium Chloride Injection, USP (normal saline). As an alternative to 0.9% Sodium Chloride Injection, USP (normal saline), a 500

mL infusion bag of 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, may be considered. The resulting final concentration of bendamustine HCl in the infusion bag should be within 0.2 – 0.6 mg/mL. The reconstituted solution must be transferred to the infusion bag within 30 minutes of reconstitution. After transferring, thoroughly mix the contents of the infusion bag. The admixture should be a clear and colorless to slightly yellow solution.

(Treanda® Prescribing Information at Section 2.3; *see also,* Brittain at paragraph [0100] (stating that Brittain's lyophilized formulations are reconstituted with water and then further diluted)). Brittain refers to polyethylene glycol as an example of a "liquid carrier or vehicle" for preparing the ultimate dosage form. (Brittain at paragraph [0067]). Brittain does not suggest, however, that the skilled person should deviate from the concentrations specified by Treanda®.

While Treanda® refers to a "concentrated solution of bendamustine which is subsequently further diluted for administration," it is clear that Treanda® refers to 5 mg/mL (bendamustine in water), which is much more dilute than presently claimed. Treanda® then instructs that this concentration should be "immediately" transferred to an infusion bag to provide the 0.2-0.6 mg/mL concentration for administration. Without Applicant's disclosure, those skilled in the art would have had no reason to prepare more concentrated bendamustine liquids, *e.g.,* 25 mg/mL, when preparing bendamustine.

Brittain does not suggest that the skilled person should deviate from the concentrations specified by Treanda®. Without the benefit of Applicant's specification, they would have had no reason to prepare ~100 mg of bendamustine at a 25 mg/ml concentration, as claimed. Applicant respectfully requests reconsideration and withdrawal of the rejection.

**Those of Ordinary Skill in the Art Would Not Have Included an Antioxidant in Any Bendamustine Composition**

Industry guidance discouraged antioxidant use, suggesting that it be reserved when no other means to protect the active pharmaceutical ingredient or drug product can be established. Those of ordinary skill in the art would not have expected the addition of an antioxidant to be beneficial to bendamustine's storage stability because no reference had suggested that bendamustine degraded *via* an oxidative mechanism.

4894-0848-0634.1

DOCKET NO.: 107071.000583                                                    **PATENT**
**Application No.:** 18/081,251
**Office Action Dated: August 21, 2023**

***Brittain does not teach that an antioxidant should be added to a bendamustine composition***

Brittain does not suggest that lyophilized bendamustine requires an antioxidant. None of Brittain's exemplified compositions includes an antioxidant and the publication states that an antioxidant could be used as a lyophilization excipient only "if desired." (Brittain at paragraph [0088]).

***The art does not teach that bendamustine can degrade via an oxidative mechanism***

Bendamustine rapidly degrades in water *via* several pathways, none of which are oxidative. (*See, e.g.,* Specification at page 2). One pathway by which bendamustine degrades is *via* aziridinium ring hydrolysis, which produces HP1 and HP2:



(Brittain at paragraph [0022]; Maas,[5] Studies and Results, Scheme; U.S. 8,344,066 (the 066 patent)[6] at col. 1, lines 50-65; col. 4, lines 33-45).

Bendamustine also degrades *via* dimer formation, which occurs when a molecule of bendamustine attacks the aziridinium ring:

---

[5] Maas is of record in this application.
[6] The 066 patent is of record in this application.

DOCKET NO.:  107071.000583                                    PATENT
Application No.:  18/081,251
Office Action Dated:  August 21, 2023



(Brittain at paragraph [0027]; the 066 patent at col. 4, lines 50-67).

Another pathway for bendamustine degradation is esterification of the -COOH with mono- and poly-hydroxy-containing compounds.  Various bendamustine ester degradation products have been reported in the art:



(Brittain at paragraph [0111]; the 066 patent at col. 5, lines 13-44).

While many bendamustine degradation mechanisms have been reported, the art did *not* teach that bendamustine degrades *via* any oxidative pathway.

DOCKET NO.: 107071.000583                **PATENT**
Application No.: 18/081,251
Office Action Dated: **August 21, 2023**

"Antioxidants are used to reduce the oxidation of active substances and excipients in the finished product." (Note for Guidance, European Agency for the Evaluation of Medicinal Products, page 8 of 9 (of record)). Since bendamustine was not known to degrade *via* an oxidative process, those of ordinary skill in the art would not have tried adding an antioxidant to a bendamustine composition.[7]

**The Recited Bendamustine-Containing Liquid Compositions are Surprisingly and Unexpectedly Stable During Storage**

As reported in the specification, a composition including bendamustine in PEG exhibited 2.28% of impurities after storage at room temperature for 15 days and 41.9% impurities after storage for 15 days at 40 °C. (Specification at Example 3, page 13, Table 3, reproduced below).

| Antioxidant | T°C | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
| | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

As Dr. Siepmann has testified, based on these poor stability results, a person would have forsaken development of a liquid bendamustine/PEG composition.

359. The POSA likewise would have understood that Dr. Pinal's suggested formulation approach—to add PEG to the formulation and also to add an antioxidant to fix the degradation caused by the PEG—was not conventional. Rather, in view of the small number of

---

[7] Noteworthy is that the Treanda® lyophilized product does not include any antioxidant – it contains only bendamustine HCl and mannitol. (Treanda® at Section 11).

4894-0848-0634.1

DOCKET NO.: 107071.000583                                                    **PATENT**
Application No.: 18/081,251
Office Action Dated: August 21, 2023

marketed parenteral drugs containing PEG, and the fact that none of those drugs contained an

antioxidant, the POSA would have inferred that formulators simply did not use PEG with drugs

that might be susceptible to degradation via PEG's oxidation products. In my opinion, and based

on my experience as a formulator, the POSA would not have been motivated or had reason to

add PEG to a formulation if she or he believed that doing so would have necessitated also adding

an antioxidant.

469.    I further agree with Dr. Pinal that it was known that PEG could form various

degradation products. As I explain above, the POSA would have viewed the degradation

products of PEG as a disadvantage that would have discouraged the use of that solvent. *See, e.g.,*

¶¶ 339–360.

470.    I disagree, however, with Dr. Pinal that PEG's known sensitivity to oxidation

would have motivated or provided reason for the POSA to use an antioxidant with PEG. I

likewise disagree that the POSA would have been motivated or had reason to use an antioxidant

in conjunction with PG and bendamustine.

471.    As I explain in detail above, the POSA would have been strongly motivated to

avoid using an antioxidant in the formulation. *See* ¶¶ 344–360. The POSA would have

preferred to keep the formulation as simple as possible; adding an antioxidant would have

introduced substantial complexity into the formulation, including increasing the risk of unwanted

interactions between the excipients and bendamustine. *See* ¶¶ 344–345. The POSA would have

understood that antioxidants are particularly reactive and likely to cause unwanted interactions in

the formulation. *See* ¶ 346. Adding an antioxidant would also have been undesirable because

the concentration of the antioxidant would have to be maintained throughout the shelf life of the

product—in effect, the stability of the product would become dependent on the antioxidant. *See*

¶ 347. The POSA also would have understood that an antioxidant might not completely solve

any potential oxidation problem and that finding an appropriate antioxidant would, in the first

instance, be an unpredictable research effort. *See* ¶¶ 349–352.

Page 13 of 15

**DOCKET NO.:** 107071.000583                                    **PATENT**
**Application No.:** 18/081,251
**Office Action Dated: August 21, 2023**

(*See* Siepmann Report at ¶¶ 359, 469-71, of record in this application)

A composition presenting such a poor initial stability profile would have been deemed unsuitable as a starting point to create a storage-stable composition. Despite the poor stability of bendamustine/PEG, surprisingly, adding an antioxidant substantially eliminated the formation of degradation products. As shown in the specification, and Table 3 (above), a bendamustine/PEG composition including antioxidant exhibited no substantial increase in degradants after storage for 15 days at either room temperature or 40 °C. (Specification at Example 3, page 13, Table 3).

The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if an antioxidant is added. Such an unexpected result could not have been predicted. This result is particularly unexpected given the absence of any report in the literature of an oxidative degradation pathway for bendamustine. The claims are patentable for at least this reason and Applicant respectfully requests reconsideration and withdrawal of the rejection.

The Examiner alleges that claims 4, 5, 14, and 15 would have been obvious over the Brittain, Kumar, McGinity, and Wasylaschuck, in further view of Tait.[8] As discussed above, the combination of Brittain, Kumar, McGinity, and Wasylaschuck fails to render any of claim 1-3, 6, 8, 11-13, or 18 unpatentable. Tait does not cure those deficiencies, nor is it allege to. Tait is merely cited for its purported disclosure of antioxidants. Claims 4, 5, 14, and 15 are patentable and applicant requests withdrawal of the rejection.

## CONCLUSION

Applicant respectfully submits that the present application is in condition for allowance. Reconsideration of the application and an early Notice of Allowance are respectfully requested. In the event that the Examiner cannot allow the application for any reason, the Examiner is encouraged to contact Applicant's representative.

---

[8] WO Publication No. 200202125

Page 14 of 15

**DOCKET NO.:**  107071.000583                                             **PATENT**
**Application No.:**  18/081,251
**Office Action Dated:  August 21, 2023**

Date: November 8, 2023                           / Scott R. Conley / _____

                                                 Scott R. Conley
                                                 Registration No. 57289


BakerHostetler
312 Walnut Street
Suite 3200
Cincinnati, OH 45202
Telephone: 513.929.3400
Facsimile:  513.929.0303

4894-0848-0634.1

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD  Substitute for Form PTO-875 | Application or Docket Number 18/081,251 | Filing Date 12/14/2022 | ☐ To be Mailed |
|---|---|---|---|

**ENTITY:** ☑ LARGE  ☐ SMALL  ☐ MICRO

### APPLICATION AS FILED - PART I

| FOR | (Column 1) NUMBER FILED | (Column 2) NUMBER EXTRA | RATE ($) | FEE ($) |
|---|---|---|---|---|
| ☐ BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | |
| ☐ SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | |
| ☐ EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | |
| TOTAL CLAIMS (37 CFR 1.16(i)) | minus 20 = | * | x $100 = | |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | minus 3 = | * | x $480 = | |
| ☐ APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | |

### APPLICATION AS AMENDED - PART II

| AMENDMENT | 11/08/2023 | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|
| | Total (37 CFR 1.16(i)) | * 9 | Minus | ** 20 | = 0 | x $100 = | 0 |
| | Independent (37 CFR 1.16(h)) | * 2 | Minus | *** 3 | = 0 | x $480 = | 0 |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | |
| | | | | | | TOTAL ADD'L FEE | 0 |

| AMENDMENT | | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|
| | Total (37 CFR 1.16(i)) | * | Minus | ** | = | x $0 = | |
| | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | x $0 = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | |
| | | | | | | TOTAL ADD'L FEE | |

| * If the entry in column 1 is less than the entry in column 2, write "0" in column 3. | LIE |
|---|---|
| ** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20". | /CHRISTINE V MOORE/ |
| *** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3". | |
| The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1. | |

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

# EXHIBIT 15

PTO/AIA/14 (02-18)
Approved for use through 11/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 107071.001394 |
|---|---|---|
| | Application Number | |

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
|---|---|

The application data sheet is part of the provisional or nonprovisional application for which it is being submitted. The following form contains the bibliographic data arranged in a format specified by the United States Patent and Trademark Office as outlined in 37 CFR 1.76.
This document may be completed electronically and submitted to the Office in electronic format using the Electronic Filing System (EFS) or the document may be printed and included in a paper filed application.

## Secrecy Order 37 CFR 5.2:

☐ Portions or all of the application associated with this Application Data Sheet may fall under a Secrecy Order pursuant to 37 CFR 5.2 (Paper filers only. Applications that fall under Secrecy Order may not be filed electronically.)

## Inventor Information:

**Inventor    1**     [Remove]

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Nagesh | R. | Palepu | |

**Residence Information (Select One)**  ⦿ US Residency   ◯ Non US Residency   ◯ Active US Military Service

| City | Southampton | State/Province | PA | Country of Residence [i] | US |
|---|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 30 Addis Drive |
|---|---|
| Address 2 | |

| City | Southampton | State/Province | PA |
|---|---|---|---|
| Postal Code | 18966-1166 | Country [i] | US |

**Inventor    2**     [Remove]

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Philip | Christopher | Buxton | |

**Residence Information (Select One)**  ◯ US Residency   ⦿ Non US Residency   ◯ Active US Military Service

| City | Denham, Uxbridge | Country of Residence [i] | | UK |
|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 4 Ford End |
|---|---|
| Address 2 | |

| City | Denham, Uxbridge | State/Province | |
|---|---|---|---|
| Postal Code | UB9 5AL | Country [i] | UK |

All Inventors Must Be Listed - Additional Inventor Information blocks may be generated within this form by selecting the **Add** button.     [Add]

## Correspondence Information:

EFS Web 2.2.13

PTO/AIA/14 (02-18)
Approved for use through 11/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 107071.001394 |
|---|---|---|
| | Application Number | |

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
|---|---|

**Enter either Customer Number or complete the Correspondence Information section below.**
**For further information see 37 CFR 1.33(a).**

☐ **An Address is being provided for the correspondence Information of this application.**

| Customer Number | 23377 |
|---|---|
| Email Address | patents@bakerlaw.com    [Add Email]  [Remove Email] |

## Application Information:

| Title of the Invention | FORMULATIONS OF BENDAMUSTINE | |
|---|---|---|
| Attorney Docket Number | 107071.001394 | Small Entity Status Claimed ☐ |
| Application Type | Nonprovisional | |
| Subject Matter | Utility | |
| Total Number of Drawing Sheets (if any) | | Suggested Figure for Publication (if any) | |

## Filing By Reference:

Only complete this section when filing an application by reference under 35 U.S.C. 111(c) and 37 CFR 1.57(a). Do not complete this section if application papers including a specification and any drawings are being filed. Any domestic benefit or foreign priority information must be provided in the appropriate section(s) below (i.e., "Domestic Benefit/National Stage Information" and "Foreign Priority Information").

For the purposes of a filing date under 37 CFR 1.53(b), the description and any drawings of the present application are replaced by this reference to the previously filed application, subject to conditions and requirements of 37 CFR 1.57(a).

| Application number of the previously filed application | Filing date (YYYY-MM-DD) | Intellectual Property Authority or Country |
|---|---|---|
| | | |

## Publication Information:

☐ Request Early Publication (Fee required at time of Request 37 CFR 1.219)

☐ **Request Not to Publish.** I hereby request that the attached application not be published under 35 U.S.C. 122(b) and certify that the invention disclosed in the attached application **has not and will not** be the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing.

## Representative Information:

Representative information should be provided for all practitioners having a power of attorney in the application. Providing this information in the Application Data Sheet does not constitute a power of attorney in the application (see 37 CFR 1.32). Either enter Customer Number or complete the Representative Name section below. If both sections are completed the customer Number will be used for the Representative Information during processing.

| Please Select One: | ⦿ Customer Number | ◯ US Patent Practitioner | ◯ Limited Recognition (37 CFR 11.9) |
|---|---|---|---|
| Customer Number | 23377 | | |

EFS Web 2.2.13

PTO/AIA/14 (02-18)
Approved for use through 11/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 107071.001394 |
|---|---|---|
| | Application Number | |

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
|---|---|

# Domestic Benefit/National Stage Information:

This section allows for the applicant to either claim benefit under 35 U.S.C. 119(e), 120, 121, 365(c), or 386(c) or indicate National Stage entry from a PCT application. Providing benefit claim information in the Application Data Sheet constitutes the specific reference required by 35 U.S.C. 119(e) or 120, and 37 CFR 1.78.
When referring to the current application, please leave the "Application Number" field blank.

| Prior Application Status | Pending | | Remove |
|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing or 371(c) Date (YYYY-MM-DD) |
| | Continuation of | 18498259 | 2023-10-31 |

| Prior Application Status | Abandoned | | Remove |
|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing or 371(c) Date (YYYY-MM-DD) |
| 18498259 | Continuation of | 17412623 | 2021-08-26 |

| Prior Application Status | Patented | | Remove | | |
|---|---|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing Date (YYYY-MM-DD) | Patent Number | Issue Date (YYYY-MM-DD) |
| 17412623 | Continuation of | 16509920 | 2019-07-12 | 11103483 | 2021-08-31 |

| Prior Application Status | Abandoned | | Remove |
|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing or 371(c) Date (YYYY-MM-DD) |
| 16509920 | Continuation of | 16015656 | 2018-06-22 |

| Prior Application Status | Patented | | Remove | | |
|---|---|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing Date (YYYY-MM-DD) | Patent Number | Issue Date (YYYY-MM-DD) |
| 16015656 | Continuation of | 15432335 | 2017-02-14 | 10010533 | 2018-07-03 |

| Prior Application Status | Patented | | Remove | | |
|---|---|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing Date (YYYY-MM-DD) | Patent Number | Issue Date (YYYY-MM-DD) |
| 15432335 | Continuation of | 15013436 | 2016-02-02 | 9572797 | 2017-02-21 |

| Prior Application Status | Patented | | Remove | | |
|---|---|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing Date (YYYY-MM-DD) | Patent Number | Issue Date (YYYY-MM-DD) |
| 15013436 | Continuation of | 14031879 | 2013-09-19 | 9265831 | 2016-02-23 |

| Prior Application Status | Patented | | Remove | | |
|---|---|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing Date (YYYY-MM-DD) | Patent Number | Issue Date (YYYY-MM-DD) |
| 14031879 | Continuation of | 13016473 | 2011-01-28 | 8609707 | 2013-12-17 |

PTO/AIA/14 (02-18)
Approved for use through 11/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 107071.001394 |
|---|---|---|
| | Application Number | |

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
|---|---|

| Prior Application Status | Expired | | Remove |
|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing or 371(c) Date (YYYY-MM-DD) |
| 13016473 | Claims benefit of provisional | 61299100 | 2010-01-28 |

| Additional Domestic Benefit/National Stage Data may be generated within this form by selecting the **Add** button. | Add |
|---|---|

## Foreign Priority Information:

This section allows for the applicant to claim priority to a foreign application. Providing this information in the application data sheet constitutes the claim for priority as required by 35 U.S.C. 119(b) and 37 CFR 1.55. When priority is claimed to a foreign application that is eligible for retrieval under the priority document exchange program (PDX)[i] the information will be used by the Office to automatically attempt retrieval pursuant to 37 CFR 1.55(i)(1) and (2). Under the PDX program, applicant bears the ultimate responsibility for ensuring that a copy of the foreign application is received by the Office from the participating foreign intellectual property office, or a certified copy of the foreign priority application is filed, within the time period specified in 37 CFR 1.55(g)(1).

| | | | Remove |
|---|---|---|---|
| Application Number | Country[i] | Filing Date (YYYY-MM-DD) | Access Code[i] (if applicable) |
| | | | |

| Additional Foreign Priority Data may be generated within this form by selecting the **Add** button. | Add |
|---|---|

## Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications

| ☐ | This application (1) claims priority to or the benefit of an application filed before March 16, 2013 and (2) also contains, or contained at any time, a claim to a claimed invention that has an effective filing date on or after March 16, 2013.<br>NOTE: By providing this statement under 37 CFR 1.55 or 1.78, this application, with a filing date on or after March 16, 2013, will be examined under the first inventor to file provisions of the AIA. |
|---|---|

PTO/AIA/14 (02-18)
Approved for use through 11/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 107071.001394 |
|---|---|---|
| | Application Number | |

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
|---|---|

# Authorization or Opt-Out of Authorization to Permit Access:

When this Application Data Sheet is properly signed and filed with the application, applicant has provided written authority to permit a participating foreign intellectual property (IP) office access to the instant application-as-filed (see paragraph A in subsection 1 below) and the European Patent Office (EPO) access to any search results from the instant application (see paragraph B in subsection 1 below).

Should applicant choose not to provide an authorization identified in subsection 1 below, applicant **must opt-out** of the authorization by checking the corresponding box A or B or both in subsection 2 below.

**NOTE**:  This section of the Application Data Sheet is **ONLY** reviewed and processed with the **INITIAL** filing of an application.  After the initial filing of an application, an Application Data Sheet cannot be used to provide or rescind authorization for access by a foreign IP office(s).  Instead, Form PTO/SB/39 or PTO/SB/69 must be used as appropriate.

**1.  Authorization to Permit Access by a Foreign Intellectual Property Office(s)**

**A.  Priority Document Exchange (PDX)** - Unless box A in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the European Patent Office (EPO), the Japan Patent Office (JPO), the Korean Intellectual Property Office (KIPO), the State Intellectual Property Office of the People's Republic of China (SIPO), the World Intellectual Property Organization (WIPO), and any other foreign intellectual property office participating with the USPTO in a bilateral or multilateral priority document exchange agreement in which a foreign application claiming priority to the instant patent application is filed, access to: (1) the instant patent application-as-filed and its related bibliographic data, (2)  any foreign or domestic application to which priority or benefit is claimed by the instant application and its related bibliographic data, and (3) the date of filing of this Authorization. See 37 CFR 1.14(h)(1).

**B.  Search Results from U.S. Application to EPO** - Unless box B in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the EPO access to the bibliographic data and search results from the instant patent application when a European patent application claiming priority to the instant patent application is filed. See 37 CFR 1.14(h)(2).

The applicant is reminded that the EPO's Rule 141(1) EPC (European Patent Convention) requires applicants to submit a copy of search results from the instant application without delay in a European patent application that claims priority to the instant application.

**2.  Opt-Out of Authorizations to Permit Access by a Foreign Intellectual Property Office(s)**

☐    A.  Applicant **DOES NOT** authorize the USPTO to permit a participating foreign IP office access to the instant application-as-filed.  If this box is checked, the USPTO will not be providing a participating foreign IP office with any documents and information identified in subsection 1A above.

☐    B.  Applicant **DOES NOT** authorize the USPTO to transmit to the EPO any search results from the instant patent application. If this box is checked, the USPTO will not be providing the EPO with search results from the instant application.

**NOTE**:  Once the application has published or is otherwise publicly available, the USPTO may provide access to the application in accordance with 37 CFR 1.14.

PTO/AIA/14 (02-18)
Approved for use through 11/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 107071.001394 |
|---|---|---|
| | Application Number | |
| Title of Invention | FORMULATIONS OF BENDAMUSTINE | |

# Applicant Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

**Applicant    1**                                                                              [Remove]

If the applicant is the inventor (or the remaining joint inventor or inventors under 37 CFR 1.45), this section should not be completed. The information to be provided in this section is the name and address of the legal representative who is the applicant under 37 CFR 1.43; or the name and address of the assignee, person to whom the inventor is under an obligation to assign the invention, or person who otherwise shows sufficient proprietary interest in the matter who is the applicant under 37 CFR 1.46. If the applicant is an applicant under 37 CFR 1.46 (assignee, person to whom the inventor is obligated to assign, or person who otherwise shows sufficient proprietary interest) together with one or more joint inventors, then the joint inventor or inventors who are also the applicant should be identified in this section.

[Clear]

| ◉ Assignee | ○ Legal Representative under 35 U.S.C. 117 | ○ Joint Inventor |
|---|---|---|
| ○ Person to whom the inventor is obligated to assign. | | ○ Person who shows sufficient proprietary interest |

If applicant is the legal representative, indicate the authority to file the patent application, the inventor is:

| Name of the Deceased or Legally Incapacitated Inventor: | |
|---|---|

| If the Applicant is an Organization check here. | ☒ |
|---|---|

| Organization Name | Eagle Pharmaceuticals, Inc. |
|---|---|

**Mailing Address Information For Applicant:**

| Address 1 | 50 Tice Boulevard, Suite 315 | | |
|---|---|---|---|
| Address 2 | | | |
| City | Woodcliff Lake | State/Province | NJ |
| Country | US | Postal Code | 07677 |
| Phone Number | | Fax Number | |
| Email Address | | | |

Additional Applicant Data may be generated within this form by selecting the Add button.        [Add]

# Assignee Information including Non-Applicant Assignee Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

PTO/AIA/14 (02-18)
Approved for use through 11/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 107071.001394 |
|---|---|---|
| | Application Number | |

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
|---|---|

---

**Assignee    1**

Complete this section if assignee information, including non-applicant assignee information, is desired to be included on the patent application publication. An assignee-applicant identified in the "Applicant Information" section will appear on the patent application publication as an applicant. For an assignee-applicant, complete this section only if identification as an assignee is also desired on the patent application publication.

Remove

| If the Assignee or Non-Applicant Assignee is an Organization check here. | ☐ |
|---|---|

| Prefix | Given Name | Middle Name | **Family Name** | Suffix |
|---|---|---|---|---|
| | | | | |

**Mailing Address Information For Assignee including Non-Applicant Assignee:**

| **Address 1** | |
|---|---|
| Address 2 | |

| **City** | | **State/Province** | |
|---|---|---|---|
| **Country** i | | Postal Code | |
| Phone Number | | Fax Number | |
| Email Address | | | |

Additional Assignee or Non-Applicant Assignee Data may be generated within this form by selecting the Add button.    Add

---

# Signature:    Remove

NOTE: This Application Data Sheet must be signed in accordance with 37 CFR 1.33(b). **However, if this Application Data Sheet is submitted with the <u>INITIAL</u> filing of the application <u>and</u> either box A or B is <u>not</u> checked in subsection 2 of the "Authorization or Opt-Out of Authorization to Permit Access" section, then this form must also be signed in accordance with 37 CFR 1.14(c).**

    This Application Data Sheet **must** be signed by a patent practitioner if one or more of the applicants is a **juristic entity** (e.g., corporation or association). If the applicant is two or more joint inventors, this form must be signed by a patent practitioner, <u>all</u> joint inventors who are the applicant, or one or more joint inventor-applicants who have been given power of attorney (e.g., see USPTO Form PTO/AIA/81) on behalf of <u>all</u> joint inventor-applicants.

    See 37 CFR 1.4(d) for the manner of making signatures and certifications.

| **Signature** | /Stephanie A. Lodise/ | | Date (YYYY-MM-DD) | 2024-04-25 |
|---|---|---|---|---|
| First Name | Stephanie A. | Last Name    Lodise | Registration Number | 51,430 |

Additional Signature may be generated within this form by selecting the Add button.    Add

PTO/AIA/14 (02-18)
Approved for use through 11/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 107071.001394 |
|---|---|---|
| | Application Number | |

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
|---|---|

This collection of information is required by 37 CFR 1.76.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 23 minutes to complete, including gathering, preparing, and submitting the completed application data sheet form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS.  **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

**DOCKET NO.:** 107071.001394                                                                                     **PATENT**
**Application No.:** 18/646,171
**Office Action Dated:** July 09, 2024

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

    **Nagesh R. Palepu et al.**                             **Confirmation No.:  3701**

**Application No.:  18/646,171**                              **Group Art Unit:  1613**

**Filing Date:  April 25, 2024**                             **Examiner:  ERNST V ARNOLD**

For:  **FORMULATIONS OF BENDAMUSTINE**

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

### REPLY PURSUANT TO 37 CFR § 1.111

    In response to the Official Action dated July 09, 2024, reconsideration is respectfully requested in view of the amendments and/or remarks as indicated below:

    **Amendments to the Specification** begin on page of this paper.

    **Amendments to the Abstract** begin on page of this paper.

    **Amendments to the Claims** are reflected in the listing of the claims which begins on page 2 of this paper.

    **Amendments to the Drawings** begin on page of this paper and include an attached replacement sheet.

    **Remarks** begin on page 5 of this paper.

    The Commissioner is hereby authorized to charge any fee deficiency, charge any additional fees, or credit any overpayment of fees, associated with this application in connection with this filing, or any future filing, submitted to the U.S. Patent and Trademark Office during the pendency of this application, to Deposit Account No. 50-2036.

DOCKET NO.: 107071.001394                                                          **PATENT**
**Application No.:** 18/646,171
**Office Action Dated: July 09, 2024**

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims:**

1. (Original) A sterile container containing a liquid bendamustine-containing composition comprising

   bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is about 25 mg/mL;

   a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

   a stabilizing amount of an antioxidant,

   wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C to about 25° C.

2. (Original) The sterile container of claim 1, wherein the antioxidant is monothioglycerol.

3. (Original) The sterile container of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

4. (Original) The sterile container of claim 1, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.

5. (Currently Amended) The sterile container of claim 1, wherein the ~~liquid bendamustine-containing composition comprises ethanol~~ pharmaceutically acceptable fluid consists of polyethylene glycol and one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol.

6. (Original) The sterile container of claim 1, wherein the liquid bendamustine-containing composition comprises about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof.

DOCKET NO.: 107071.001394                                         PATENT
Application No.: 18/646,171
Office Action Dated: July 09, 2024

7. (Original) The sterile container of claim 1, wherein the liquid bendamustine-containing composition comprises about 100 mg of bendamustine.

8. (Original) A liquid bendamustine-containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid;

wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

wherein the bendamustine concentration in the pharmaceutically acceptable fluid is about 25 mg/mL,

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C to about 25 °C.

9. (Original) The composition of claim 8, wherein the antioxidant is monothioglycerol.

10. (Original) The composition of claim 8, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

11. (Currently Amended) The composition of claim 8, <u>wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol</u><s>comprising ethanol</s>.

12.    (Original) The composition of claim 8, wherein the bendamustine concentration in the composition is 25 mg/mL.

13.    (New) The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol.

DOCKET NO.:  107071.001394                                                        **PATENT**
**Application No.:**  18/646,171
**Office Action Dated:  July 09, 2024**

14.      (New) The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and propylene glycol.

15.      (New) The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and ethanol.

16.      (New) The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and benzyl alcohol.

17.      (New) The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and glycofurol.

18.      (New) The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol.

19.      (New) The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and propylene glycol.

20.      (New) The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and ethanol.

21.      (New) The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and benzyl alcohol.

22.      (New) The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and glycofurol.

## REMARKS

Claims 5 and 11 have been amended.  Claims 13-22 are new and are supported by the specification. No new subject matter has been added.

## Claim Rejections – 35 U.S.C. § 112

The Examiner alleges that claim 5 and 11 are indefinite for reciting "comprises." Claims 5 and 11 have been amended to recite that the pharmaceutically acceptable fluid "consists of" polyethylene glycol and one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol, which should obviate the rejection. Claims 13-17 and 18-22 are new and further limit claims 5 and 11, respectively. No new matter has been added.

## Claim Rejections – 35 U.S.C. § 103

The Examiner alleges that claims 1-12 would have been obvious over Brittain,[1] Riebesehl,[2] Olthoff,[3] and Kumar.[4] At the time of the invention, one of ordinary skill in the art would not have been motivated to make a liquid bendamustine-containing composition incorporating polyethylene glycol (PEG) and an antioxidant, as claimed.  Without the benefit of Applicant's specification, those of ordinary skill in the art would not have produced a composition including bendamustine (or a salt thereof) at a concentration of ~25 mg/mL, along with an antioxidant and any of the recited fluids, nor would they have considered putting such a composition in a sterile container, as claimed. Moreover, the person of ordinary skill in the art would not have predicted that any recited composition would have exhibited the stability presently claimed. Applicant respectfully requests reconsideration and withdrawal of the rejection.

---

[1] U.S. Publication No. 2006/0159713
[2] U.S. Patent No. 6,686,365
[3] DE Publication No. 159289
[4] AAPS PharmSCiTech 2006;7(3):7. Kumar is cited merely for its purported description that "PEG is susceptible to degradation *via* autooxidation." As discussed *infra*, PEG's susceptibility to degradation would have dissuaded the person of ordinary skill in the art from using PEG in a bendamustine formulation. Kumar further evidences the patentability of the inventions.

**DOCKET NO.:** 107071.001394                                        **PATENT**
**Application No.:** 18/646,171
**Office Action Dated: July 09, 2024**

**Those of Ordinary Skill in the Art Would Not Have Had Any Reason to Prepare a Bendamustine-Containing Liquid Having a Concentration of About 25 mg/ml**

Brittain fails to motivate anyone of skill in the art to prepare a liquid composition having a bendamustine concentration of about 25 mg/mL. Prior to Applicant's invention, Treanda® (lyophilized bendamustine hydrochloride) was commercially available and would have informed those of ordinary skill about administering bendamustine to a human.  In view of that information, the skilled person would not have arbitrarily deviated from those Treanda® administration instructions.

The Prescribing Information for Treanda®, which is of record in this application, instructs that lyophilized bendamustine should be reconstituted with water to a concentration of no more than 5 mg/mL, before being added to a 500 mL infusion bag of aqueous dextrose/sodium chloride to achieve further dilution to 0.2 – 0.6 mg/mL for patient administration:

**2.3   Reconstitution/Preparation for Intravenous Administration**
Aseptically reconstitute each TREANDA vial as follows:
○   25 mg TREANDA vial: Add 5 mL of only **Sterile Water for Injection, USP**.
○   100 mg TREANDA vial: Add 20 mL of only **Sterile Water for Injection, USP**.

Shake well to yield a clear, colorless to a pale yellow solution with a bendamustine HCl concentration of 5 mg/mL.  The lyophilized powder should completely dissolve in 5 minutes.  If particulate matter is observed, the reconstituted product should not be used.

Aseptically withdraw the volume needed for the required dose (based on 5 mg/mL concentration) and immediately transfer to a 500 mL infusion bag of 0.9% Sodium Chloride Injection, USP (normal saline). As an alternative to 0.9% Sodium Chloride Injection, USP (normal saline), a 500

mL infusion bag of 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, may be considered.  The resulting final concentration of bendamustine HCl in the infusion bag should be within 0.2 – 0.6 mg/mL.  The reconstituted solution must be transferred to the infusion bag within 30 minutes of reconstitution. After transferring, thoroughly mix the contents of the infusion bag.  The admixture should be a clear and colorless to slightly yellow solution.

(Treanda at Section 2.3; *see also,* Brittain at paragraph [0100] (stating that Brittain's lyophilized formulations are reconstituted with water and then further diluted with, *e.g.,* saline).  Brittain refers to polyethylene glycol as an example of a "liquid carrier or vehicle" for preparing the ultimate dosage form.  (Brittain at paragraph [0067]). Brittain does not suggest, however, that the skilled person should deviate from the concentrations specified by Treanda®.

While Treanda® refers to a concentrated solution of bendamustine which is subsequently further diluted for administration, it is clear that Treanda® refers to 5 mg/mL (bendamustine in water), which is much more dilute than presently claimed.  Treanda® then instructs that this concentration should be "immediately" transferred to an infusion bag to provide the 0.2-0.6 mg/mL concentration for administration.  Without Applicant's disclosure, those skilled in the art

**DOCKET NO.:** 107071.001394                                                          **PATENT**
**Application No.:** 18/646,171
**Office Action Dated: July 09, 2024**

would have had no reason to prepare more concentrated bendamustine liquids, *e.g.,* about 25 mg/mL. Nor would they have had any expectation that more concentrated liquids would have had the claimed stability characteristics. The rejection should be withdrawn for at least these reasons.

That bendamustine could *theoretically* be diluted to a concentration of about 25 mg/mL also fails to establish a *prima facie* case of obviousness. The obviousness inquiry requires that the Examiner explain why a person of ordinary skill in the art would have selected ~25 mg/mL as a suitable bendamustine concentration. Here, the evidence establishes that the skilled person would have prepared much more dilute bendamustine concentrations.

Brittain does not suggest that the skilled person should deviate from the concentrations specified by Treanda®. Without the benefit of Applicant's specification, they would have had no reason to prepare bendamustine at a ~25 mg/ml concentration, as claimed. Applicant respectfully requests reconsideration and withdrawal of the rejection.

**Those of Ordinary Skill in the Art Would Not Have Included an Antioxidant in Any Liquid Bendamustine Composition**

Brittain does not suggest that an antioxidant should be added to a liquid bendamustine/PEG composition. In fact, those of ordinary skill in the art would not have expected the addition of an antioxidant to be beneficial to bendamustine's storage stability because no reference had suggested that bendamustine degraded *via* an oxidative mechanism.[5,6] Moreover, industry guidance discouraged the use of antioxidants, recommending other methods for reducing oxidation.

***Brittain does not teach that an antioxidant should be added to a liquid bendamustine composition***

The Examiner alleges that Brittain teaches lyophilizing bendamustine with an antioxidant. (Action at 7). Brittain provides no such disclosure. None of Brittain's exemplified compositions includes an antioxidant. Moreover, the paragraph relied upon by the Examiner merely states that an antioxidant could be used as a lyophilization excipient only "if desired."

---

[5] *See, e.g.,* Exhibit B, Excerpts from the *Responsive Expert Report of Juergen Siepmann, Ph.D.* ("Siepmann Report").
[6] *See also,* Exhibit A, pages 25-26 (finding that "Defendants did not establish by clear and convincing evidence that [the prior art] would have motivated a POSITA to use an antioxidant" to curb PEG oxidation).

DOCKET NO.:  107071.001394                                                    PATENT
Application No.:  18/646,171
Office Action Dated:  July 09, 2024

(Brittain at paragraph [0088]; Action at 7).  This statement hardly provides the "clear and unambiguous" instruction to include an antioxidant, as the Examiner appears to imply.  The Examiner has not articulated how Brittain would have suggested to one of ordinary skill in the art that an antioxidant should be included in a liquid bendamustine/PEG composition and the rejection should be withdrawn for at least this reason.

***The art does not teach that bendamustine can degrade via an oxidative mechanism***

Bendamustine rapidly degrades in water *via* several pathways, none of which are oxidative.  (*See, e.g.,* Specification at page 2).  One pathway by which bendamustine degrades is *via* aziridinium ring hydrolysis, which produces HP1 and HP2:



(Brittain at paragraph [0022]; Maas,[7] Studies and Results, Scheme; U.S. 8,344,066 (the 066 patent)[8] at col. 1, lines 50-65; col. 4, lines 33-45).

Bendamustine also degrades *via* dimer formation, which occurs when a molecule of bendamustine attacks the aziridinium ring:

---

[7] Maas is of record in this application.
[8] The 066 patent is of record in this application.

DOCKET NO.: 107071.001394                                                    PATENT
Application No.: 18/646,171
Office Action Dated: July 09, 2024



(Brittain at paragraph [0027]; the 066 patent at col. 4, lines 50-67).

Another pathway for bendamustine degradation is esterification of the -COOH with mono- and poly-hydroxy-containing compounds. Various bendamustine ester degradation products have been reported in the art:



(Brittain at paragraph [0111]; the 066 patent at col. 5, lines 13-44).

While many bendamustine degradation mechanisms have been reported, the art did *not* teach that bendamustine degrades *via* any oxidative pathway.

Page 9 of 18

DOCKET NO.:  107071.001394                                      **PATENT**
Application No.:  18/646,171
Office Action Dated:  July 09, 2024

"Antioxidants are used to reduce the oxidation of active substances and excipients in the finished product."  (Note for Guidance, European Agency for the Evaluation of Medicinal Products, page 8 of 9 (of record)).  Since bendamustine was not known to degrade *via* an oxidative process, those of ordinary skill in the art would not have tried to reduce degradation by adding an antioxidant to a bendamustine composition.[9]  The claims are non-obvious for at least this reason.

***Those of Ordinary Skill in the Art Would Not Have Included Polyethylene Glycol and an Antioxidant in Any Liquid Bendamustine Composition***

The Examiner alleges that a person skilled in the art would have prepared a bendamustine composition with polyethylene glycol (PEG). Action at 9. The Examiner further contends that since PEG was known to produce peroxides, the skilled person would have added an antioxidant to the liquid to prevent that from happening. Action at 9-10. The evidence of record establishes that this proposed scenario would not have been undertaken by anyone skilled in the art.

The rejection relies on a person of ordinary skill picking one of Britain's lyophilized compositions and selecting PEG as a reconstitution vehicle, prior to intravenous administration. Office Action at 9. The rejection notes that PEG's use as an excipient was impeded by its oxidative liabilities. *Id.* at 9-10. The rejection supposes that, rather than selecting a less troublesome reconstitution vehicle, *e.g.* water, the person of ordinary skill would have proceeded with PEG because the oxidative problem can be "cured" by adding an antioxidant. The cited art, as well as expert testimony presented during district court litigation, demonstrates that this series of events would not have taken place.

Industry guidance at the time of the invention discouraged antioxidant use in pharmaceuticals, instructing that antioxidants should only be used when there is no other way to avoid oxidation.  For example, the European Agency for the Evaluation of Medicinal Product (EMEA) stated:

Antioxidants should only be included in a formulation if it has been proven hat their use cannot be avoided. This applies to cases where the manufacturing process is optimised to minimise the potential for oxidation.

---

[9] Noteworthy is that the Treanda® lyophilized product does not include any antioxidant – it contains only bendamustine HCl and mannitol. (Treanda® at Section 11).

**DOCKET NO.:** 107071.001394                                                **PATENT**
**Application No.:** 18/646,171
**Office Action Dated:  July 09, 2024**

(EMEA Guidance at 8 of 9).  Indeed, it had been suggested at the time of the invention that the

use of antioxidants in liquid formulations intended for parenteral administration was "now in

decline" and that a "preferred method of preventing oxidation is simply to exclude oxygen":

**Use of Excipients**
Excipients may be useful in preventing chemical and physical instability. Antioxidants are
included in parenteral formulations, although their use is now in decline, and EU guidelines
discourage their use unless no other alternative exists (see sect. "Parenteral Products and the

Broadhead at 334.

> The Office Action relies on a person of ordinary skill not only selecting the troublesome
PEG for lyophilizate dissolution, it requires that the person of ordinary skill also try to address
PEG's known oxidative liabilities by pre-emptively including an antioxidant. Expert testimony
clearly explains why a person of ordinary skill in the art would not have selected an antioxidant-
containing PEG excipient to prepare a liquid bendamustine product, especially since the only
known therapeutic use of such a product would have been for parenteral administration.

> During district court litigation, an antioxidant-PEG excipient hypothesis, similar to the
one proposed by the Examiner, was alleged. There, the court found Dr. Siepmann's testimony
persuasive. Dr. Siepmann testified that a person of ordinary skill in the art would not have
chosen PEG as a bendamustine excipient. Dr. Siepmann explained that none of the four marketed
PEG-containing parenteral formulations available in the United States as of this application's
priority date contained an antioxidant.  In addition, a person of skill in the art would have
understood that antioxidants were not routinely added to any PEG-containing formulation that
would have been parenterally administered. In fact, adding an antioxidant to fix the degradation
caused by PEG was not conventional, so a person of skill in the art would not have used PEG if
it necessitated using an antioxidant.  And finally, a person of skill in the art would not have used
PEG with a drug that was subject to degradation *via* PEG's oxidation products.

> As Dr. Siepmann's testified:

> 355.    A review of the marketed parenteral formulations available in the United States as
of the priority date that contained PEG indicates that those formulations do not have
antioxidants:

**DOCKET NO.:** 107071.001394                                    **PATENT**
**Application No.:** 18/646,171
**Office Action Dated: July 09, 2024**

- Ativan® (lorazepam) contains "0.18 mL polyethylene glycol 400 in propylene glycol with 2.0% benzyl alcohol as preservative." Ativan® Label at 1 (2006), JDG_BENDA_00005945 at 5948.

- Busulfex™ (busulfan) contains "N-N-dimethylacetamide (DMA) 33% wt/wt and polyethylene glycol 400, 67% wt/wt." Busulfex™ Label at 1 (1999), JDG_BENDA_00005643 at 5643.

- Robaxin® (methocarbamol) contains "polyethylene glycol 300, NF 0.5 mL, Water for Injection, USP q.s." Robaxin® Label at 1 (2003), JDG_BENDA_00005854 at 5854.

- VePesid® (etoposide) contains 60% PEG 300, 30% ethanol, 8.0% Tween 80, 3% benzyl alcohol, and 2 mg/mL citric acid. Strickley 2004 at 219, JDG_BENDA_00003290 at 3308.

356.    Of the four formulations listed above containing PEG, none of them contain

excipients that are listed in Nema 1997's list of Antioxidants/Reducing Agents (Table IV).

Nema 1997 at 167, JDG_BENDA_00002272 at 2273. This state of the art refutes clearly Dr.

Pinal's opinion that the POSA would have used PEG and then added an antioxidant to avoid the

oxidation of PEG.

358.    From the above information, the POSA would have understood that, as of the

priority date, none of the four commercially available parenteral formulations that contained

PEG 300 or PEG 400 also contained an antioxidant. This would have taught the POSA that

antioxidants were not routinely added to parenteral formulations containing PEG. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮                                    REDACTED

359.    The POSA likewise would have understood that Dr. Pinal's suggested

formulation approach—to add PEG to the formulation and also to add an antioxidant to fix the

degradation caused by the PEG—was not conventional. Rather, in view of the small number of

**DOCKET NO.:** 107071.001394                                           **PATENT**
**Application No.:** 18/646,171
**Office Action Dated: July 09, 2024**

marketed parenteral drugs containing PEG, and the fact that none of those drugs contained an antioxidant, the POSA would have inferred that formulators simply did not use PEG with drugs that might be susceptible to degradation via PEG's oxidation products. In my opinion, and based on my experience as a formulator, the POSA would not have been motivated or had reason to add PEG to a formulation if she or he believed that doing so would have necessitated also adding an antioxidant.

360.    In view of the lack of any marketed parenteral drugs containing PEG and an antioxidant, the POSA likely would have hypothesized that PEG was only used with drugs that were not subject to degradation by PEG oxidation products (for example, acid-catalyzed esterification). To test that hypothesis, the POSA could have reviewed the molecular structures of the four APIs listed above. I have depicted those structures below. Most notably, none of those molecules contain a carboxylic acid moiety. As such, none of those molecules would have been prone to esterification via the PEG molecule, which is the only degradation pathway that Dr. Pinal has identified as motivating the use of an antioxidant in formulations of the claimed inventions. This would have bolstered the POSA's understanding that PEG was only used in liquid parenteral formulations where the active ingredients were not susceptible to degradation via PEG's oxidation products. Because bendamustine plainly is a drug molecule whose degradation is accelerated by such oxidation products—as Dr. Pinal acknowledges—the POSA would have avoided using PEG with bendamustine.

Siepmann Report at ¶¶355-356, 358-360, of record in this application.

No evidence in the cited art supports the sequence of steps that the Office Action alleges would have been taken by a person of ordinary skill in the art. PEG would not have been selected for bendamustine's dissolution, but even if it was, antioxidants would have been excluded, not added. Applicant respectfully requests reconsideration and withdrawal of the rejection.

**DOCKET NO.:** 107071.001394                                        **PATENT**
**Application No.:** 18/646,171
**Office Action Dated: July 09, 2024**

**The Claimed Compositions Are Surprisingly and Unexpectedly Stable During Storage**

As reported in the specification, a composition including bendamustine in PEG exhibited 2.28% of impurities after storage at room temperature for 15 days and 41.9% impurities after storage for 15 days at 40 °C.  (Specification at Example 3, page 13, Table 3, reproduced below).

| Antioxidant | $T^o$C | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
|  | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
|  | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

Based on these poor stability results, a person would have forsaken development of a liquid bendamustine/PEG composition.  A composition presenting such a poor initial stability profile would have been deemed unsuitable as a starting point to create a storage-stable composition.  *See, e.g.,* Exhibit B, attached hereto, Siepmann Report at ¶¶ 359, 469-71, reproduced, below:

359.    The POSA likewise would have understood that Dr. Pinal's suggested formulation approach—to add PEG to the formulation and also to add an antioxidant to fix the degradation caused by the PEG—was not conventional.  Rather, in view of the small number of marketed parenteral drugs containing PEG, and the fact that none of those drugs contained an antioxidant, the POSA would have inferred that formulators simply did not use PEG with drugs that might be susceptible to degradation via PEG's oxidation products.  In my opinion, and based on my experience as a formulator, the POSA would not have been motivated or had reason to add PEG to a formulation if she or he believed that doing so would have necessitated also adding an antioxidant.

Page 14 of 18

469.    I further agree with Dr. Pinal that it was known that PEG could form various degradation products. As I explain above, the POSA would have viewed the degradation products of PEG as a disadvantage that would have discouraged the use of that solvent. *See, e.g.*, ¶¶ 339–360.

470.    I disagree, however, with Dr. Pinal that PEG's known sensitivity to oxidation would have motivated or provided reason for the POSA to use an antioxidant with PEG. I likewise disagree that the POSA would have been motivated or had reason to use an antioxidant in conjunction with PG and bendamustine.

471.    As I explain in detail above, the POSA would have been strongly motivated to avoid using an antioxidant in the formulation. *See* ¶¶ 344–360. The POSA would have preferred to keep the formulation as simple as possible; adding an antioxidant would have introduced substantial complexity into the formulation, including increasing the risk of unwanted interactions between the excipients and bendamustine. *See* ¶¶ 344–345. The POSA would have understood that antioxidants are particularly reactive and likely to cause unwanted interactions in the formulation. *See* ¶ 346. Adding an antioxidant would also have been undesirable because the concentration of the antioxidant would have to be maintained throughout the shelf life of the product—in effect, the stability of the product would become dependent on the antioxidant. *See* ¶ 347. The POSA also would have understood that an antioxidant might not completely solve any potential oxidation problem and that finding an appropriate antioxidant would, in the first instance, be an unpredictable research effort. *See* ¶¶ 349–352.

Despite the poor stability of bendamustine/PEG, surprisingly, adding an antioxidant substantially eliminated the formation of degradation products. As shown in the specification, and the Table above, a bendamustine/PEG composition including antioxidant exhibited no

DOCKET NO.: 107071.001394                                                    **PATENT**
**Application No.:** 18/646,171
**Office Action Dated:  July 09, 2024**

substantial increase in degradants after storage for 15 days at either room temperature or 40 °C. (Specification at Example 3, page 13, Table 3).

The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if an antioxidant is added.  Such an unexpected result could not have been predicted.  This result is particularly unexpected given the absence of any report in the literature of an oxidative degradation pathway for bendamustine.  The claims are patentable for at least these reasons.

**None of the Secondary References Cure Brittain's Deficiencies**

Applicant submits, *per arguendo*, that even if those skilled in the art would have been motivated to arrive at the claimed subject matter based on a modification of Brittain (which Applicant does not stipulate to), the disclosures of the secondary references would not have led to the claimed subject matter.

With respect to Riebesehl, the Examiner alleges:

"[w]hile Brittain et al. suggest cysteine as an antioxidant [0088], Riebeshehl et al. guide the artisan to the functionally equivalent monothioglycerol in the same amounts instant claimed. The ordinary artisan is motivated to select monothioglycerol because of the desirable property of enhanced safety for caregiver handling of the cytotoxic materials of which bendamustine is cytotoxic. Accordingly it is obvious to the ordinary artisan to use polyethylene glycol as a carrier but when so doing to add an antioxidant such as monothioglycerol to prevent any autooxidation of the polyethyelene glycol to undesirable side products. Therefore, the ordinary artisan would have had a reasonable expectation of success in combining bendamustine, polyethylene glycol and the antioxidants claimed into a liquid composition with less than about 5% peak area response total impurities after at least 15 months at the temperatures claimed. The expectation is reasonable because the same components claimed are taught in the prior art and the prior art of Brittain et al. acts to limit the total impurities."

Action at 10.

Those of ordinary skill in the art would not have combined the disclosures of Brittain and Riebesehl.  Riebesehl does not describe any bendamustine formulations; instead, it refers to a very different drug, pemetrexed.



pemetrexed

DOCKET NO.: 107071.001394                                                          PATENT
Application No.: 18/646,171
Office Action Dated: July 09, 2024



bendamustine

Pemetrexed and bendamustine are structurally dissimilar chemotherapeutic agents and the Examiner has provided no evidence that the aforementioned challenges of producing pharmaceutically usable formulations of bendamustine are the same (or even remotely similar) to the challenges of producing pharmaceutically usable formulations of pemetrexed. A thorough reading of Brittain and Riebesehl informs those skilled in the art that such an equivalence cannot be established. The claims are non-obvious over Riebesehl's disclosure, whether considered alone or in combination with any other cited reference.

The Examiner alleges that Olthoff is relevant for its disclosure of "monovalent alcohols, glycols, and other polyvalent alcohols" for use with bendamustine. Action at 9. The Examiner acknowledges that Olthoff fails to exemplify any bendamustine formulation including PEG. *Id.* As discussed *supra*, Applicant discovered that bendamustine/PEG compositions ***degrade*** and expert testimony confirms that a person of ordinary skill in the art would ***not*** have developed a bendamustine formulation that included PEG. The claims are non-obvious over Olthoff's disclosure, whether considered alone or in combination with any other cited reference.

Kumar is cited for its purported disclosure that PEG is subject to autoxidation, which the Examiner alleges would have suggested to the person of ordinary skill that an antioxidant should be added to PEG to prevent the autoxidation. Action at 9-10. As the expert testimony establishes (*see supra*), PEG would not have been selected for bendamustine's dissolution. But even if it was, antioxidants would have been ***excluded*** from a bendamustine formulation intended to be intravenously administered to humans (*see supra*). The claims are non-obvious over Kumar's disclosure, whether considered alone or in combination with any other cited reference.

For at least the reasons provided herein, Applicant submits that the Examiner has failed to establish *prima facie* obviousness over the claimed subject matter. Applicant asks the Examiner to withdraw these rejections.

DOCKET NO.: 107071.001394                                            **PATENT**
**Application No.:** 18/646,171
**Office Action Dated:** July 09, 2024

### Claim Rejections – Double Patenting

Claims 1-12 stand rejected for non-statutory double patenting as being unpatentable over claims 1-6 of U.S. Patent No. 9,265,831; claims 1-27 of U.S. Patent No. 9,572,797; claims 1-26 of U.S. Patent No. 9,572,796; claims 1-22 of U.S. Patent No. 8,609,707; claims 1-23 of U.S. Patent No. 9,579,384; claims 1-24 of U.S. Patent No. 9,034,908; claims 1-17 of U.S. Patent No. 9,597,399; claims 1-23 of U.S. Patent No. 9,144,568; claims 1-29 of U.S. Patent No. 9,572,887; claims 1-7 of U.S. Patent No. 9,597,397; claims 1-26 of U.S. Patent No. 10,010,533; claims 1-16 of U.S. Patent No. 11,103,483; claims 1-9 of U.S. Patent No. 11,872,214; claims 1-14 of U.S. Patent No. 11,844,783; 1-12 of copending U.S. Application No. 18/498,259; and claims 1-14 of copending U.S. Application No. 18/646,329.

Without conceding to the propriety of the rejections, terminal disclaimers have been filed in this application on July 19, 2024, to obviate the rejections.

### CONCLUSION

Applicant respectfully submits that the present application is in condition for allowance. Reconsideration of the application and an early Notice of Allowance are respectfully requested. In the event the Examiner cannot allow the application for any reason, the Examiner is encouraged to contact Applicant's representative.

Date: July 31, 2024                             /Stephanie A. Lodise/
                                                Stephanie A. Lodise
                                                Registration No. 51430

BakerHostetler
1050 Connecticut Avenue
NW, Suite 1100
Washington, D.C. 20036
Telephone: 202.861.1500
Facsimile:  202.861.1783