## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS, INC. and
EAGLE SUB1 LLC,

        Plaintiffs,

    v.

SLAYBACK PHARMA LLC and
AZURITY PHARMACEUTICALS, INC.,

        Defendants.

C.A. No. 24-65-JLH

**JURY TRIAL DEMANDED**

███████████████

REDACTED PUBLIC VERSION
FILED DECEMBER 10, 2025

## EAGLE PHARMACEUTICALS INC. AND EAGLE SUB1 LLC'S ANSWER TO SLAYBACK PHARMA LLC AND AZURITY PHARMACEUTICALS, INC.'S AMENDED RESPONSES TO SECOND AMENDED COMPLAINT IN C.A. NO. 25-75-JLH (D.I. 22)

Plaintiffs and Counterclaim-Defendants Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC (collectively, "Plaintiffs" or "Eagle") answer the Counterclaims in Defendants and Counterclaim-Plaintiffs Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s (collectively, "Slayback" or "Defendants") Amended Responses to Second Amended Complaint (D.I. 210) as follows:

### ANSWER TO AMENDED COUNTERCLAIMS

1. Eagle has filed complaints against Defendants' seeking, *inter alia*, a judgment that Defendants' has infringed claims of United States Patent Nos. 12,138,248 (the "'248 patent"), 11,844,783 (the "'783 patent"), and the 11,872,214 (the "'214 patent") (collectively, the "Patents-in-Suit") by making, using, selling, and/or offering for sale in the United States Defendants' Bendamustine Hydrochloride Injection product approved pursuant to NDA No. 212209 ("Defendants' Bendamustine Product"), and/or importing Defendants' Bendamustine Product into the United States. As a result of the filing of these complaints, an immediate and justiciable controversy exists between Eagle and Defendants' regarding the alleged infringement, validity, and enforceability of the Patents-in-Suit.

**ANSWER**: Eagle incorporates by reference each of the paragraphs of its Complaint as if fully set forth herein. Eagle admits that there is an actual case or controversy between Eagle and Defendants over the infringement, validity, and enforceability of certain claims of the '248 patent,

the '783 patent, and the '214 patent.

2.   The following Counterclaims arise under the patent laws of the United States, 35 U.S.C. § 1, seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

**ANSWER**: The allegations in paragraph 2 state legal conclusions to which no response is required.  To the extent a response is required, Eagle admits that Defendants' Counterclaims purport to allege actions arising under the Patent Laws of the United States and the Declaratory Judgment Act.

3.   Subject matter jurisdiction in this Court is proper under, *inter alia*, 28 U.S.C. §§ 1331 and 1338.

**ANSWER**: The allegations in paragraph 3 state legal conclusions to which no response is required.  To the extent a response is required, Eagle admits that this Court has subject matter jurisdiction over Defendants' Counterclaims..

4.   Slayback Pharma LLC is a company organized and existing under the laws of Delaware, with its principal place of business at 8 Cabot Road, Suite 2000, Woburn, Massachusetts 01801.

**ANSWER**: On information and belief, Eagle admits the allegations in paragraph 4.

5.   Azurity Pharmaceuticals, Inc. is a company organized and existing under the laws of Delaware, with its principal place of business at 8 Cabot Road, Suite 2000, Woburn, Massachusetts 01801.

**ANSWER**: On information and belief, Eagle admits the allegations in paragraph 5.

6.   On information and belief, Eagle Pharmaceuticals is a Delaware corporation with its principal place of business at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677.

**ANSWER**: Eagle admits that Eagle Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677.

7.   On information and belief, Eagle Sub1 LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677.

**ANSWER**: Admitted.

8.    This Court has personal jurisdiction over Eagle because, *inter alia*, Eagle has submitted to the jurisdiction of this Court by filing its Complaint in C.A. No. 24-cv-65 and its Complaint in C.A. No. 25-cv-75 with this Court.

**ANSWER**: The allegations in paragraph 8 state legal conclusions to which no response is

required.  To the extent a response is required, Eagle states that it does not dispute that Plaintiffs

are subject to personal jurisdiction in Delaware for purposes of this action only.

9.    Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400, and because, *inter alia*, Eagle has submitted to the jurisdiction of this Court and selected this venue by filing its First Amended Complaint and Second Amended Complaint with this Court.

**ANSWER**: The allegations in paragraph 9 state legal conclusions to which no response is

required.  To the extent a response is required, Eagle states that it does not dispute that venue is

proper in this Court for purposes of this action only.

### COUNTERCLAIM COUNT I:
### (DECLARATION OF UNENFORCEABILITY OF THE '783 PATENT, AND THE '214 PATENT)

10.  Defendants' re-allege herein each of the foregoing paragraphs of its Counterclaims.

**ANSWER**: Eagle incorporates by reference all preceding paragraphs of this Answer as if

fully set forth herein.  Furthermore, Eagle utilizes the same headings as used in Defendants'

Counterclaims for readability and organization only.  To the extent the headers are interpreted to

include allegations, Eagle denies all allegations contained in the headings used in Defendants'

Counterclaims.

11.  The claims of the Patents-in-Suit are unenforceable due to inequitable conduct, including, upon information and belief, intentional failures to comply with the duty of candor and good faith through material omissions and misrepresentations to the Patent Office.

**ANSWER**: Denied.  Eagle states that Defendants' Counterclaims (D.I. 210) seek only a

declaration of unenforceability for the '248 patent, despite the above heading only identifying the

'783 patent and the '214 patent.  Defendants have separately filed Counterclaims seeking a

declaration of unenforceability for the '783 patent and the '214 patent (D.I. 210).

I.    **Prosecution History of the Patents-In-Suit**

12.    The Patents-in-Suit, all titled "Formulations of Bendamustine," relate to liquid forms of bendamustine, an oncology drug that was first synthesized in the 1960s.  The Patents-in-Suit claim liquid bendamustine-containing compositions that comprise (1) bendamustine, (2) a "pharmaceutically acceptable fluid" limited to five ingredients, (3) and a "stabilizing amount of an antioxidant."  Ex. 1 [783 Patent] at 13:57-67; Ex. 2 [214 Patent] at 14:2-10; Ex. 3 [248 Patent] at 13:23-31.  The Patents-in-Suit purport to disclose "long term storage stable bendamustine-containing compositions," and identify "substantially improved long term stability" as one of the compositions' key "advantages."  Ex. 1 [783 Patent] at 2:18-67; Ex. 2 [214 Patent] at 2:18-3:3; Ex. 3 [248 Patent] at 2:17-67.

**ANSWER**: Eagle refers to United States Patent Nos. 12,138,248 (the "'248 patent"), 11,844,783 (the "'783 patent"), and 11,872,214 (the "'214 patent") (collectively, the "Patents-in-Suit") for their content and denies any allegations inconsistent with that content.  Eagle admits that the Patents-in-Suit claim liquid bendamustine-containing compositions and refers to the specific claims of the Patents-in-Suit for their content.  Except as expressly admitted, Eagle denies all other allegations in paragraph 12.

13.    The listed inventors of the Patents-in-Suit are Nagesh R. Palepu and Phillip Christopher Buxton.  The Patents-in-Suit were prosecuted by Stephanie Lodise (PTO Reg. No. 51,430) of Baker & Hostetler.

**ANSWER**: Admitted.

A.    **The Priority Patents**

14.    The Patents-in-Suit each claim priority to a chain of seven or eight patent applications, five of which matured into patents (collectively the "Priority Patents").  The first to issue of the Priority Patents was U.S. Patent No. 8,609,707 (the "'707 patent") (issuing 2013) and the most recent to issue was U.S. Patent No. 11,103,483 ("the '483 patent") (issuing 2021)[2].  The inventors

---

[2] In 2020 this Court found that Defendants', Apotex, and Slayback products accused in this litigation and the pending Apotex and Slayback litigations (24-cv-64 and 24-cv-65) did not infringe the '483 patent.  *See Eagle Pharm., Inc. v. Slayback Pharma LLC et. al.*, 21-cv-01256, ECF No. 117 (D. Del. Oct. 25, 2022); *Eagle Pharm., Inc. v. Celerity Pharm., LLC*, 22-cv-00042, ECF No. 107 (D. Del. Oct. 28, 2022).  This finding was upheld on appeal.  *Eagle Pharm., Inc. v. Slayback Pharma LLC*, 2023-1110, ECF No. 75 (Fed. Cir. Jan. 16, 2024).

listed of the Priority Patents are also Dr. Nagesh Palepu and Dr. Christopher Buxton.

**ANSWER**: Eagle refers to the Priority Patents and the Patents-in-Suit for their content and

denies any allegations inconsistent with that content.  Eagle understand the "Priority Patents" to

include U.S. Patent Nos. 8,609,707 (the "'707 patent"), 9,265,831 (the "'831 patent"), 9,572,797

(the "'797 patent"), 10,010,533 (the "'533 patent"), 11,103,483 (the "'483 patent).  Eagle admits

that the '707 patent issued in 2013, the '483 patent issued in 2021, and that Dr. Nagesh Palepu and

Dr. Christopher Buxton are listed as inventors on the Priority Patents.  Defendants have only

provided allegations specific to the '707 and '483 patents.  To the extent Defendants intend these

allegations to apply to each of the "Priority Patents," Eagle denies any allegations related to these

unspecified patents.  Except as expressly admitted, Eagle denies all other allegations in paragraph

14.

15.  The specifications of the Priority Patents and the Patents-in-Suit are virtually identical.
Among other things, the specifications include the same examples, same data, and same
embodiments.  *Compare* Ex. 4 ['707 patent] and Ex. 5 ['483 patent] *with* Ex. 1 ['783 Patent]; Ex.
2 ['214 Patent]; and Ex. 3 ['248 Patent].

**ANSWER**: Eagle refers to the Priority Patents and the Patents-in-Suit for their content and

denies any allegations inconsistent with that content.  Except as expressly admitted, Eagle denies

all other allegations in paragraph 15.

16.  The Priority Patents (and the predecessor provisional application) were prosecuted by
Michael N. Mercanti (PTO Reg. No. 33,966) of Lucas & Mercanti.  For the '483 patent
prosecution, the inventors were also represented by Dr. Lodise of Baker & Hostetler.

**ANSWER**: Eagle admits that Michael N. Mercanti was prosecution counsel of record for

the filing of the '100 provisional application and during the prosecution of the '707 patent, the

'831 patent, the '797 patent, the '533 patent, and the '483 patent.  Eagle also admits that Dr. Lodise

---

**ANSWER**: Eagle refers to the cited opinions for their rulings and denies any allegations
inconsistent with those rulings.  Eagle denies the remaining allegations in this footnote.

was prosecution counsel of record during the prosecution of the '483 patent, and the Patents-in-Suit.  Except as expressly admitted, Eagle denies all other allegations in paragraph 16.

17.  Following the prosecution of the '707 patent, Mr. Mercanti and his firm filed and prosecuted all of the applications in the chain that preceded U.S. Patent Application No. 16/509,520 (the "'520 application"), which issued as the '483 patent.  Mr. Mercanti and his firm also filed the '520 application, was counsel of record, and conducted prosecution of that application.

**ANSWER**: Eagle refers to the respective prosecution histories of the '707 and '483 patents, and the prosecution histories of the Patents-in-Suit for their content and denies any allegations inconsistent with that content.  Eagle admits that Mr. Mercanti was prosecution counsel of record during the prosecution of the '520 application.  Except as expressly admitted, Eagle denies all other allegations in paragraph 17.

18.  Mr. Mercanti and his firm were counsel of record in the '483 patent prosecution until Dr. Lodise's firm was appointed by a power of attorney filed on July 23, 2021, less than a month before the '483 patent issued on August 21, 2021.  Ex. 9 ['483 File History] at 69-71.  Dr. Lodise first appears in the '483 patent prosecution as a participant in a March 11, 2021 applicant-initiated interview that was memorialized with a March 16, 2021 summary.  *Id.* at 48-49.

**ANSWER**: Eagle refers to the prosecution history of the '483 patent for its content and denies any allegations inconsistent with that content.  Except as expressly admitted, Eagle denies all other allegations in paragraph 18.

### B. The '100 Provisional Application

19.  The applications that resulted in the Patents-in-Suit are continuation applications that claim an earliest priority to U.S. Provisional Application No. 61/299,100 that was filed on January 28, 2010 (the "'100 provisional application") and an initial non-provisional patent application (No. 13/016,473, filed on January 28, 2011 (the "'473 application")) that resulted in the '707 Patent.

**ANSWER**: Admitted.

20.  The relationship between the '100 provisional application, the Priority Patents and the Patents-in-Suit is set forth in the "Related U.S. Application Data" section on the front page of each of the Patents-in-Suit:

**Related U.S. Application Data**

(63)  Continuation of application No. 17/412,623, filed on
Aug. 26, 2021, which is a continuation of application
No. 16/509,920, filed on Jul. 12, 2019, now Pat. No.
11,103,483, which is a continuation of application
No. 16/015,656, filed on Jun. 22, 2018, now
abandoned, which is a continuation of application No.
15/432,335, filed on Feb. 14, 2017, now Pat. No.
10,010,533, which is a continuation of application
No. 15/013,436, filed on Feb. 2, 2016, now Pat. No.
9,572,797, which is a continuation of application No.
14/031,879, filed on Sep. 19, 2013, now Pat. No.
9,265,831, which is a continuation of application No.
13/016,473, filed on Jan. 28, 2011, now Pat. No.
8,609,707.

(60)  Provisional application No. 61/299,100, filed on Jan.
28, 2010.

Ex. 1 ['783 Patent] at 1:

**Related U.S. Application Data**

(63)  Continuation of application No. 17/412,623, filed on
Aug. 26, 2021, which is a continuation of application
No. 16/509,920, filed on Jul. 12, 2019, now Pat. No.
11,103,483, which is a continuation of application
No. 16/015,656, filed on Jun. 22, 2018, now
abandoned, which is a continuation of application No.
15/432,335, filed on Feb. 14, 2017, now Pat. No.
10,010,533, which is a continuation of application
No. 15/013,436, filed on Feb. 2, 2016, now Pat. No.
9,572,797, which is a continuation of application No.
14/031,879, filed on Sep. 19, 2013, now Pat. No.
9,265,831, which is a continuation of application No.
13/016,473, filed on Jan. 28, 2011, now Pat. No.
8,609,707.

(60)  Provisional application No. 61/299,100, filed on Jan.
28, 2010.

Ex. 2 ['214 Patent] at 1;

**Related U.S. Application Data**

(63)  Continuation of application No. 18/498,259, filed on
      Oct. 31, 2023, which is a continuation of application
      No. 17/412,623, filed on Aug. 26, 2021, now
      abandoned, which is a continuation of application
      16/509,920, filed on Jul. 12, 2019, now Pat. No.
      11,103,483, which is a continuation of application
      No. 16/015,656, filed on Jun. 22, 2018, now
      abandoned, which is a continuation of application No.
      15/432,335, filed on Feb. 14, 2017, now Pat. No.
      10,010,533, which is a continuation of application
      No. 15/013,436, filed on Feb. 2, 2016, now Pat. No.
      9,572,797, which is a continuation of application No.
      14/031,879, filed on Sep. 19, 2013, now Pat. No.
      9,265,831, which is a continuation of application No.
      13/016,473, filed on Jan. 28, 2011, now Pat. No.
      8,609,707.

(60)  Provisional application No. 61/299,100, filed on Jan.
      28, 2010.

Ex. 3 ['248 Patent] at 1.

**ANSWER**: Eagle refers to the Patents-in-Suit for their content and denies any allegations

inconsistent with that content.  Eagle further states that the foregoing affirmatively shows that the

'100 provisional application and its contents were cited to, and available to, the PTO during

examination of each of the recited applications.  Except as expressly admitted, Eagle denies all

other allegations in paragraph 20.

21.   As shown above, the '100 provisional application was the first application in the patent

family.  That application is similar, but not identical, to the first non-provisional application in the

family, the '473 application.  Each of the subsequent applications leading to the Patents-in-Suit

are continuation applications of the parent '473 application and accordingly are substantially

identical in content to that first non-provisional application.

**ANSWER**: Eagle refers to the '100 provisional application, the '473 application, and each

of the subsequent applications leading to the Patents-in-Suit for their content and denies any

allegations inconsistent with that content.  Paragraph 21 also states a legal conclusion to which no

response is required.  To the extent a response is required, Eagle denies all remaining allegations

in paragraph 21.

22.   Thus, the differences between the specification of the '100 provisional application and any of the non-provisional applications or patents that claim priority to it, including the Priority Patents and the Patents-in-Suit, are essentially the same.

**ANSWER**: Eagle refers to the specification of the '100 provisional application and the respective specifications of the non-provisional applications or patents for their content and denies any allegations inconsistent with that content.  Paragraph 22 also states a legal conclusion to which no response is required.  To the extent a response is required, Eagle denies all remaining allegations in paragraph 22.

## II.    The Applicants Committed Inequitable Conduct by Intentionally Deleting Material N- Acetyl Cysteine Data from the Original Provisional Application

23.   On information and belief, at least Mr. Mercanti and Dr. Lodise[3] intentionally deceived the Patent Office by, for example, concealing highly material experimental data from the Examiner while prosecuting the Priority Patents and the Patents-in-Suit.

**ANSWER**: Denied.

24.   On information and belief, when filing the '473 application—the first non-provisional application that claimed priority to the '100 provisional application—Mr. Mercanti and the inventors deleted crucial data from the '100 provisional application.

**ANSWER**: Eagle refers to the specification of the '100 provisional application and the specification of the '473 application for their content and denies any allegations inconsistent with that content.  Except as expressly admitted, Eagle denies all other allegations in paragraph 24.

25.   Specifically, when prosecuting the cases that led to the Priority Patents and the Patents-in-Suit, the applicants deleted experimental data from Table 4 in the '100 provisional application, rewriting the table to exclude unfavorable data and then including the modified table

---

[3] There may be others who were involved in the prosecution of the Priority Patents and the Patents-in-Suit, such as Eagle in-house counsel, that also owed a duty of candor to the Patent Office and may have been aware of, but similarly concealed, highly material experimental data from the Examiner.  However, Eagle has obstructed Defendants's [*sic*] efforts to take discovery as to the identity and actions of any such additional people and has indicated that Dr. Palepu is ill and unable to sit for deposition.  Defendants' reserves the right to further amend its counterclaims to identify such additional people.

**ANSWER**: Eagle admits that Dr. Palepu is unable to sit for a deposition, and denies each and every remaining allegation and/or legal conclusion contained in footnote 2.

as Table 3 in the Priority Patents and the issued Patents-in-Suit. This omission is highly unusual in prosecution practice and was both intentional and material. The original and modified table appears below, with the deleted data highlighted:



*See* Ex. 6 ['100 Provisional Application] at 9; Ex. 4 ['707 Patent] at Table 3; Ex. 5 ['483 Patent] at Table 3; Ex. 1 ['783 Patent] at Table 3; Ex. 2 ['214 Patent] at Table 3; Ex. 3 ['248 Patent] at Table 3.

**ANSWER**: Eagle refers to the '100 provisional application, the Priority Patents, and the Patents-in-Suit for their content and denies any allegations inconsistent with that content. Except as expressly admitted, Eagle denies all other allegations in paragraph 25.

26. A parallel deletion was made to the text of the corresponding Example 3 in the Priority Patents and the Patents-in-Suit:



*See* Ex. 6 ['100 Provisional Application] at 9; Ex. 4 ['707 Patent] at 7:42-48; Ex. 5 ['483 Patent] at 8:10-16; Ex. 1 ['783 Patent] at 8:6-12; Ex. 2 ['214 Patent] at 8:12-18; Ex. 3 ['248 Patent] at 8:12-18.

**ANSWER**: Eagle refers to the '100 provisional application, the Priority Patents, and the Patents-in-Suit for their content and denies any allegations inconsistent with that content. Except

Patents-in-Suit for their content and denies any allegations inconsistent with that content. Except

as expressly admitted, Eagle denies all other allegations in paragraph 26.

27. What the deleted data show is that a bendamustine composition using the common antioxidant, N-acetyl cysteine, and polyethylene glycol ("PEG") resulted in rapid degradation at 25C and 40C; and that at 40C, the degradation profile was worse than having no antioxidant at all. This was crucial information that the United States Patent and Trademark Office (the "PTO" or "Patent Office") needed to evaluate the applicants' broad claim to have conceived of formulations using the general class of antioxidants.

**ANSWER**: Denied.  In a previous litigation between the parties, the Court construed "stabilizing amount of an antioxidant" as "an amount that increase[s] or enhance[s] the stability of the bendamustine in the compositions described herein." *Cephalon, Inc. v. Slayback Pharma LLC*, 456 F. Supp. 3d 594, 622 (D. Del. 2020), *aff'd sub nom*, 856 F. App'x 309 (Fed. Cir. 2021) (original alterations) (internal quotations omitted).  The Court specifically explained that the purpose of the antioxidant is "to increase or enhance the stability of the bendamustine in the compositions described in the specification." *Id.* (internal quotations omitted).  Contrary to the allegations in paragraph 27, the data presented in Table 4 of the '100 provisional application shows there is an improvement in the stability of bendamustine at temperatures between 25°C-40°C when compared to the control group without an antioxidant. *See* '100 provisional application at 9. Specifically, the data shows that N-acetyl cysteine at 2 mg/mL reduces the total percentage of impurities at 25°C from 2.28% for PEG + bendamustine with no antioxidant added, to 0.6% with N-acetyl cysteine added. *Id.* Similarly, at 40°C, the total impurities of PEG + bendamustine were 41.9% without an antioxidant, but only 11.7% with N-acetyl cysteine. *Id.*

28. Example 3 and corresponding Table 3 provide the only data and examples for a bendamustine composition where bendamustine is dissolved in PEG alone (the formulation being made with and without lipoic acid as an antioxidant).

**ANSWER**: Eagle refers to the '100 provisional application, the Priority Patents, and the Patents-in-Suit for their content and denies any allegations inconsistent with that content.  Except as expressly admitted, Eagle denies all other allegations in paragraph 28.

11

29.    The remaining examples in the Priority Patents and the Patents-in-Suit where PEG is used in the bendamustine composition (Examples 4-8 and corresponding Tables 4-8) present data and examples for the use of a mixture of PEG and propylene glycol along with one of the following antioxidants: lipoic acid, dihydrolipoic acid, or thioglycerol.  *See* Ex. 4 ['707 Patent] at 8:15-23, 8:58-67, 9:41-48, 11:32-38, 12:19-25; Ex. 5 ['483 Patent] at 8:47-55, 9:61-10:18, 10:60-67, 11:42-49, 12:42-48; Ex. 1 ['783 Patent] at 8:44-52, 10:10-18, 10:60-67, 12:42-49, 13:24-30; Ex. 2 ['214 Patent] at 8:58-67, 10:7-15, 10:60-67, 12:36-43, 13:15-21; Ex. 3 ['248 Patent] at 8:58- 67, 9:62-66, 10:60-67, 11:41-48, 12:41-48.

**ANSWER**: Eagle refers to the Priority Patents and the Patents-in-Suit for their content and denies any allegations inconsistent with that content.  Except as expressly admitted, Eagle denies all other allegations in paragraph 29.

30.    No mention of a formulation with PEG and N-acetyl cysteine is made in the Priority Patents or the Patents-in-Suit.  The applicants singled out the failed N-acetyl cysteine formulation for deletion.  As explained below, the applicants would later claim formulations encompassing this very formulation anyway as part of their invention.

**ANSWER**: Eagle refers to the Priority Patents and the Patents-in-Suit for their content and denies any allegations inconsistent with that content.  Eagle denies that experiments involving N-acetyl cysteine are "failed formulation[s]."  Contemporaneous experimental data shows that N-acetyl cysteine was an effective antioxidant and that certain data in the '100 provisional application was not reflective of the full extent of its effectiveness as an antioxidant given the underlying raw data. *See, e.g*., EAGLEBEN-SA_00006378 at -738 (TherDose Pharma Laboratory Notebook 049, Sample Name: BDM-060).  The contemporaneous conclusion was that "N-Acetyl cysteine . . . reduced the overall level of degradants from 42% (BDM-047) to under 12% after 15 days at 40ºC." *See* EAGLEBEN-SA_00010134 at -156 (Bendamustine Infusion Cumulative Progress Report October 2009); EAGLEBEN-SA_00010159 at -181 (Bendamustine Infusion Cumulative Progress Report December 2009).  Except as expressly admitted, Eagle denies all other allegations in paragraph 30.

31. The PTO does not examine provisional applications, and would not review the substance of a provisional application unless the applicant points to a provisional to overcome a prior art rejection by attempting to antedate the art.  Accordingly, the deleted data from the '100

provisional application were never disclosed in an application that was examined by the Patent Office.

**ANSWER**: Denied.  The '100 provisional application was incorporated by reference into each of the Priority Patents and the Patents-in-Suit and was therefore before the PTO during the prosecution of the Priority Patents and the Patents-in-Suit.  '248 patent at 1:5-23 ("U.S. Provisional Patent Application No. 61/299,100, filed Jan. 28, 2010, the contents of each of which are incorporated herein by reference"); '214 patent at 1:5-23 (same); '783 patent at 1:5-23 (same); '707 patent at 1:5-10 (same); '483 patent at 1:5-18 (same).  Further, MPEP § 2136 states that "[o]ffice personnel should adhere to the following procedures when reviewing patent applications for compliance with the written description requirement of 35 U.S.C. 112(a)" and describes a three step process that involves (1) "read[ing] and analyz[ing] the specification for compliance with 35 U.S.C. 112(a)," (2) "review[ing] the entire application to understand how applicant provides support for the claimed invention including each element and/or step," and (3) "determining whether there is sufficient written description to inform a skilled artisan that inventor was in possession of the claimed invention as a whole at the time the application was filed."  MPEP § 2136.  Here, the Examiner made specific findings regarding priority during the prosecution of the Patents-in-Suit and the Priority Patents.  '783 File History, Mar. 21, 2023 Non-Final Office Action at 2; '214 File History, Mar. 14, 2023 Non-Final Office Action at -2; '248 File History, July 9, 2024 Non-Final Office Action at 2; '707 File History, Oct. 9, 2012 Non-Final Office Action at 2.  Therefore, the Examiner considered the contents of the '100 provisional application during examination of the '783 and '214 patents.

### A.    The Deleted N-Acetyl Cysteine Data Was But-For Material To The Priority Patents and the Patents-In-Suit

32.  The deleted N-Acetyl Cysteine data establish that numerous claims of the Priority Patents and Patents-in-Suit are not adequately described or enabled across their full scope.  Had the omitted experimental data been provided to the Examiner, these claims would not have issued.

**ANSWER**: Denied.  As stated in the Answer to Paragraph 31, the '100 provisional application was incorporated by reference into each of the Patents-in-Suit and the Priority Patents. Therefore, the N-acetyl cysteine data in Table 4 of the '100 provisional application was before the Examiner during the prosecution of the Priority Patents and the Patents-in-Suit because of this incorporation by reference.  This data provides adequate written description and enablement across the full scope of the term, "stabilizing amount of antioxidant," which the Court in a prior litigation construed to mean "any amount of an antioxidant that decreases the amount of bendamustine degradation after any time period and at any temperature." *Cephalon*, 456 F. Supp. 3d at 622-23. Further, the Examiner allowed the subject claims after having been made aware of the N-acetyl cysteine data contained in the '100 provisional application, which entirely refutes Defendants' conclusory allegation of but-for materiality in both Heading A, and paragraph 32.

33.  The claimed compositions each require a "stabilizing amount of an antioxidant" and that "impurities . . . resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5º C. to about 25º C."  The deleted data show that not all antioxidants are capable of stabilizing the claimed bendamustine compositions to achieve the claimed impurity levels after 15 months of storage.

**ANSWER**: Denied.  As the inventors recognized, the data for formulations with PEG and N-acetyl cysteine showed an improved impurity profile at temperatures from 25°C-40°C as compared to the formulations containing no antioxidant.  Contemporaneous laboratory notebooks and inventor reports provide corroborating evidence that N-acetyl cysteine was an effective antioxidant.  *See* EAGLEBEN-SA_00010134 at -156 (Bendamustine Infusion Cumulative Progress Report October 2009); EAGLEBEN-SA_00010159 at -181 (Bendamustine Infusion Cumulative Progress Report December 2009); EAGLEBEN-SA_00006378 at -738 (TherDose Pharma Laboratory Notebook 049, Sample Name: BDM-060).  Specifically, contemporaneous inventor reports note that "N-Acetyl cysteine, which has a limiting solubility in PEG400 of

14

2mg/mL reduced the overall level of degradants from 42% (BDM-047) to under 12% after 15 days at 40°C." EAGLEBEN-SA_00010134 at -156 (Bendamustine Infusion Cumulative Progress Report October 2009); EAGLEBEN-SA_00010159 at -181 (Bendamustine Infusion Cumulative Progress Report December 2009). Therefore, both the data incorporated into the Priority Patents and the Patents-in-Suit, and contemporaneous laboratory notebook and inventor reports demonstrate that N-acetyl cysteine is an effective antioxidant.

34. The applicants relied on the data in Examples 3-8 (and Tables 3-8) 3 [*sic*] to (purportedly) show that antioxidants have a stabilizing effect on the liquid bendamustine formulations of the purported invention sufficient to lead to the claimed stability profile.

**ANSWER**: Eagle refers to the prosecution histories of the Priority Patents and the Patents-in-Suit for their content and denies any allegations inconsistent with that content. Except as expressly admitted, Eagle denies all other allegations in paragraph 34.

35. By comparing the experimental results using lipoic acid (which was presented to the Examiner) and N-acetyl cysteine (which was deleted and not considered by the Examiner) one can see that not all antioxidants are effective to provide the stability profile claimed in the Patents-in-Suit.

**ANSWER**: Denied. As stated in the Answer to Paragraph 31, the '100 provisional application was incorporated by reference into each of the Patents-in-Suit and the Priority Patents. Therefore, the data in Table 4 of the '100 provisional application comparing lipoic acid and N-acetyl cysteine was before the Examiner during the prosecution of the Priority Patents and the Patents-in-Suit because of this incorporation by reference. Furthermore, contemporaneous laboratory notebooks and inventor reports provide corroborating evidence that N-acetyl cysteine was an effective antioxidant. *See* EAGLEBEN-SA_00010134 at -156 (Bendamustine Infusion Cumulative Progress Report October 2009); EAGLEBEN-SA_00010159 at -181 (Bendamustine Infusion Cumulative Progress Report December 2009); EAGLEBEN-SA_00006378 at -738 (TherDose Pharma Laboratory Notebook 049, Sample Name: BDM-060). Specifically,

15

contemporaneous inventor reports note that "N-Acetyl cysteine, which has a limiting solubility in PEG400 of 2mg/mL reduced the overall level of degradants from 42% (BDM-047) to under 12% after 15 days at 40°C." *See* EAGLEBEN-SA_00010134 at -156 (Bendamustine Infusion Cumulative Progress Report October 2009); EAGLEBEN-SA_00010159 at -181 (Bendamustine Infusion Cumulative Progress Report December 2009). Therefore, both the data incorporated into the Priority Patents and the Patents-in-Suit, and contemporaneous laboratory notebooks and inventor reports demonstrate that N-acetyl cysteine is an effective antioxidant.

36. The deleted data show that N-acetyl cysteine has a far smaller effect on the stability of bendamustine in the liquid formulations described in the patent than lipoic acid. For example, at 40 degrees for 15 days, the percentage of total impurities is 41.9 with no antioxidant as compared to 11.7 when N-acetyl cysteine is present and only 0.53 when lipoic acid is present.

**ANSWER**: Eagle refers to the specification of the Priority Patents and the Patents-in-Suit with respect to its contents and denies any allegations inconsistent with that content. Eagle further denies the allegations in paragraph 36 of Defendants' Counterclaims because they conflate "(1) whether a given antioxidant amount improves bendamustine's stability with (2) the extent to which that given antioxidant amount improves the stability." *Cephalon, Inc.*, 456 F. Supp. 3d at 622.

37. 11.7% impurities after 15 days at 40 degrees indicates that this formulation (100% PEG plus 2 mg/ml N-acetyl cysteine) would not meet the claim limitation incorporated in each claim of the Patents-in-Suit requiring "the total impurities . . . resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C."

**ANSWER**: Denied.

38. Indeed, the applicants knew that this data would not support a long term stable bendamustine formulation. ██████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██ Moreover, Dr. Buxton (as well as Dr. Palepu, the other co-inventor of the Asserted Patents) affirmatively and repeatedly told the PTO in another patent publication prepared by Mr. Mercanti that formulations having lower levels of impurities than those in the deleted N-acetyl cysteine data "would not be long term storage stable." Ex. 8 [Buxton Ex. 9] at [138].

**ANSWER**: Denied.  Dr. Buxton stated no such expectation about whether the tested N-acetyl cysteine bendamustine formulation would meet the stability limitation of the claims.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

Finally, to the extent it is found that the N-acetyl cysteine data was not before the Examiner, Eagle denies that the N-acetyl cysteine data was omitted with the intent to prevent the PTO from considering the data.  Rather, review of contemporaneous experimentation data from the time of the '100 provisional application demonstrates that the data was likely removed due to a potential error.  For example, Table 4 of the '100 provisional application states that the initial amount of bendamustine was 94.7%, which is at least 2.9% lower than the initial amounts of bendamustine at 25°C for 15 days in the other experiments.  Laboratory Notebook 49, however, shows that

99.41% of the bendamustine in the BDM-060 sample at 25°C for 15 days did not degrade.  Upon

viewing this data, a POSA would readily assume that there was some error in either the sample

handling, dilution, or other experimentation causing the initial value listed in Table 4 of the '100

provisional application to be lower than actual, which the chromatogram data confirms.  *See*

EAGLEBEN-SA_00006378 at -738 (TherDose Pharma Laboratory Notebook 049, Sample Name:

BDM-060).   There is sufficient evidence to support a reasonable inference that the N-acetyl

cysteine data was removed because of a potential error, which negates an inference that the data

was removed with the intent to deceive the PTO.  *See Novozymes A/S v. Genencor Int'l, Inc.*, 446

F. Supp. 2d 297, 332 (D. Del. 2006).

     39.   Comparing the deleted data to the disclosed data, a person of ordinary skill in the art
("POSA") would readily see that different antioxidants have vastly different effects on
bendamustine stability in the formulations described and claimed in the patent and that N-acetyl
cysteine, and potentially many other antioxidants, would not work in the claimed formulation.

     **ANSWER**: Paragraph 39 calls for expert testimony and, therefore, no response is needed

at this time.  To the extent a response is required, Eagle denies the allegations in paragraph 39.

     40.   All claims of the Priority Patents require an antioxidant.  Claims 1-5 and 9-13 of the
'707 patent each require "a stabilizing amount of an antioxidant" without specifying which of all
possible antioxidants are permitted.  Ex. 4 ['707 Patent] at 12:66-13:20, 13:35-14:6.  The same
goes for claims 1 and 3-16 of the '483 patent.  Ex. 5 ['483 Patent] at 13:22-34, 13:41-48.  Claims
6-8 and 14-22 of the '707 patent and Claim 2 of the '483 patent limit the antioxidant to specific
examples, including thioglycerol, monothioglycerol, lipoic acid, propyl gallate, methionine,
cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and
aliphatic compounds and dihydrolipoic acid.  Ex. 4 ['707 Patent] at 13:22-34, 14:7-44; Ex. 5 ['483
Patent] at 13:35-40.

     **ANSWER**: Eagle refers to the Priority Patents for their content and denies any allegations

inconsistent with that content.  Except as expressly admitted, Eagle denies all other allegations in

paragraph 40.

     41.   Accordingly, each of the claims of the Priority Patents except claims 1-5 and 9-13 of
the '707 patent and claims 1 and 3-16 of the '483 patent permit N-acetyl cysteine as the antioxidant,
and the Examiner would have found them unpatentable if the omitted N-acetyl cysteine data had
been disclosed.  Because these claims include within their scope numerous antioxidants that were

18

never tested and have different chemical mechanisms of action, the deleted data would have been highly material to the patentability of those claims, and the Examiner would have rejected them as unpatentable under § 112 for lack of an adequate written description and/or lack of enablement. Accordingly, applicants' deletion of the N-acetyl cysteine data during the '707 patent prosecution was inequitable conduct that renders the Priority Patents unenforceable.

**ANSWER**: Denied.  As stated in the Answer to Paragraph 31, the '100 provisional application was incorporated by reference into each of the Patents-in-Suit and the Priority Patents. Therefore, the N-acetyl cysteine data in Table 4 of the '100 provisional application was before the Examiner during the prosecution of the Priority Patents and the Patents-in-Suit because of this incorporation by reference.  Further, the Examiner allowed the subject claims after having been made aware of the N-acetyl cysteine data contained in the '100 provisional application.  Moreover, contrary to the allegations in paragraph 41, the N-acetyl cysteine data provides additional examples of "a stabilizing amount of antioxidant."  In *Cephalon*, Chief Judge Connolly construed the term "stabilizing amount of antioxidant" to mean "any amount of an antioxidant that decreases the amount of bendamustine degradation after any time period and at any temperature."  456 F. Supp. 3d at 622-23.  The N-acetyl cysteine data shows that N-acetyl cysteine qualifies because it reduces the percentage of total impurities over formulations with PEG 400 and no antioxidant.

The specification also identifies preferred antioxidant classes and amounts (*e.g.*, monothioglycerol/α-lipoic acid at about 5–15 mg/mL), and provides working examples.  *See, e.g.*, '214 patent at 4:21–30.  Additionally, several claims are limited to specific antioxidants.  *See, e.g.*, '214 patent at cls. 2-3, 7-8.  During prosecution, Eagle explained that adding "an antioxidant" to PEG-based systems adds stability.  *See, e.g.*, '483 File History, Nov. 25, 2020 Response to Non-Final Office Action at 5-11.

42.  Further, applicants' withholding of the deleted data during prosecution of the Priority Patents rendered the Patents-in-Suit unenforceable because this deleted data has an immediate and necessary relation to the claims of the Patents-in-Suit.

**ANSWER**: Denied.  As stated in the Answer to Paragraph 31, the '100 provisional application was incorporated by reference into each of the Patents-in-Suit and the Priority Patents. Therefore, the N-acetyl cysteine data in Table 4 of the '100 provisional application was before the Examiner during the prosecution of the Priority Patents and the Patents-in-Suit because of this incorporation by reference.  Moreover, as explained in the Answers to Paragraphs 27 and 41, the N-acetyl cysteine data shows enhanced stability and, thus, is consistent with the Court's construction of "a stabilizing amount of an antioxidant" from *Cephalon*.  456 F. Supp. 3d at 622-23.  Further, the Examiner allowed the subject claims after having been made aware of the N-acetyl cysteine data contained in the '100 provisional application, which entirely refutes Defendants' conclusory allegation of but-for materiality in paragraph 42.

43.  As in the Priority Patents, all claims of the Patents-in-Suit require an antioxidant. Claims 1, 4, 5, 6, and 9 of the '214 patent each require "a stabilizing amount of an antioxidant" without specifying which of all possible antioxidants are permitted.  Ex. 2 ['214 Patent] at 14:2-14, 14:19-38, 14:43-44.  The same goes for claims 1-5 and 8-10 of the '783 patent, and claims 1,4-7, 8, and 11-22 of the '248 patent.  Ex. 1 ['783 Patent] at 13:54-14:33, 14:39-46; Ex. 3 ['248 Patent] at 13:24-36, 13:41-14:15, 14:20-53.  Claims 2, 3, 7, and 8 of the '214 patent, claims 6, 7, 11, 12, 13, and 14 of the '783 patent, and claims 2-3 and 9-10 of the '248 patent limit the antioxidant to monothioglycerol.  Ex. 1 ['783 Patent] at 14:34-38, 14:47-15:9; Ex. 2 ['214 Patent] at 14:15-18, 14:39-42; Ex. 3 ['248 Patent] at 13:38-41, 14:16-19.

**ANSWER**: Eagle refers to the Patents-in-Suit for their contents and denies any allegations inconsistent with that content.  Except as expressly admitted, Eagle denies all other allegations in paragraph 43.

44.  Accordingly, each of the claims of the Patents-in-Suit except 2, 3, 7, and 8 in the '214 patent, claims 6, 7, 11, 12, 13, and 14 of the '783 patent, and claims 2-3 and 9-10 of the '248 patent permit N-acetyl cysteine as the antioxidant, and the Examiner would have found them unpatentable if the deleted N-acetyl cysteine data had been disclosed.  Because these claims include within their scope numerous antioxidants that were never tested and have different chemical mechanisms of action, the deleted data would have been highly material to the patentability of those claims, and the Examiner would have rejected them as unpatentable under § 112 for lack of an adequate written description and/or lack of enablement.  Accordingly, applicants' inequitable conduct during the '707 patent and '483 patent prosecution renders all of the claims of the Patents-in-Suit unenforceable.  *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1288-89 (Fed. Cir. 2011); *Consolidated Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 808–12 (Fed. Cir. 1990).

**ANSWER**: Denied.  As stated in the Answer to Paragraph 31, the '100 provisional application was incorporated by reference into each of the Patents-in-Suit and the Priority Patents. Therefore, the N-acetyl cysteine data in Table 4 of the '100 provisional application was before the Examiner during the prosecution of the Priority Patents and the Patents-in-Suit because of this incorporation by reference.  Moreover, contrary to the allegations in paragraph 44, the N-acetyl cysteine data provides additional examples of "a stabilizing amount of antioxidant."  In *Cephalon*, Chief Judge Connolly construed the term "stabilizing amount of antioxidant" to mean "any amount of an antioxidant that decreases the amount of bendamustine degradation after any time period and at any temperature."  456 F. Supp. 3d at 622-23.  The N-acetyl cysteine data would fulfill this limitation, since the data shows that N-acetyl cysteine, an antioxidant, reduces the percentage of total impurities over formulations with PEG 400 and no antioxidant.  Further, the Examiner allowed the subject claims after having been made aware of the N-acetyl cysteine data contained in the '100 provisional application, which entirely refutes Defendants' conclusory allegation of but-for materiality in paragraph 44.

The specification also identifies preferred antioxidant classes and amounts (*e.g.*, monothioglycerol/α-lipoic acid at about 5–15 mg/mL), and provides working examples.  *See, e.g.*, '214 patent at 4:21–30.  Additionally, several claims are limited to specific antioxidants.  *See, e.g.*, '214 patent at claims 2-3, 7-8.  During prosecution, Eagle explained that adding "an antioxidant" to PEG-based systems adds stability.  *See, e.g.*, '483 File History, Nov. 25, 2020 Response to Non-Final Office Action at 5-11.

45.  Additionally, on information and belief, despite knowing that the deleted N-Acetyl data was material to the Patents-in-Suit, the applicants for the Patents-in-Suit—Dr. Lodise, the inventors, and Eagle's in-house counsel—deliberately omitted this information so that it would not be considered by the PTO.  This inequitable conduct separately renders the Patents-in-Suit unenforceable.

**ANSWER**: Denied.  As stated in the Answer to Paragraph 31, the '100 provisional application was incorporated by reference into each of the Patents-in-Suit and the Priority Patents. Therefore, the N-acetyl cysteine data in Table 4 of the '100 provisional application was before the Examiner during the prosecution of the Priority Patents and the Patents-in-Suit because of this incorporation by reference.  Further, the Examiner allowed the subject claims after having been made aware of the N-acetyl cysteine data contained in the '100 provisional application, which entirely refutes the conclusory allegation of but-for materiality.

To the extent it is found that the N-acetyl cysteine data was not before the Examiner, Eagle denies that the N-acetyl cysteine data was omitted with the intent to prevent the PTO from considering the data.  Rather, review of contemporaneous experimentation data from the time of the '100 provisional application demonstrates that the data was likely removed due to potential error.  For example, Table 4 of the '100 provisional application states that the initial amount of bendamustine was 94.7%, which is at least 2.9% lower than the initial amounts of bendamustine at 25°C for 15 days in the other experiments.  Laboratory Notebook 049, however, shows that 99.41% of the bendamustine in the BDM-060 sample at 25°C for 15 days did not degrade.  Upon viewing this data, a POSA would conclude that there was a potential error in either the sample handling, dilution, or other experimentation causing the initial value listed in Table 4 of the '100 provisional application to be lower than actual, which the chromatogram data confirms.  *See* EAGLEBEN-SA_00006378 at -738 (TherDose Pharma Laboratory Notebook 049, Sample Name: BDM-060).  There is sufficient evidence to support a reasonable inference that the N-acetyl cysteine data was removed because of potential error, which negates an inference that the data was removed with the intent to deceive the PTO.  *See Novozymes A/S*, 446 F. Supp. 2d at 332.

**B.      Applicants Continued to Deceive the PTO Regarding The N-Acetyl Cysteine Data During Prosecution of The Priority Patents and Patents-in-Suit**

46.   The applicants continued to deceive the PTO regarding the N-Acetyl cysteine data during the prosecution of the Priority Patents and the Patents-in-Suit.  Despite knowing about the non-working formulations that included N-acetyl cysteine, the applicants repeatedly implied that all antioxidants would have the desired stabilizing effect on bendamustine.

**ANSWER**: Denied.

47.   During the prosecution of the Patents-in-Suit the applicants consistently argued to the PTO that the pending claims were patentable because compositions of bendamustine, PEG, and "an antioxidant" were "surprisingly stable" and suitable for storage for at least 15 months under refrigeration or at room temperature.

**Brief Description of the Claimed Inventions**

The pending claims are directed to, among other things, ready for dilution, liquid bendamustine-containing compositions having from about 20 mg/mL to about 60 mg/mL of bendamustine; polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol; and an antioxidant. The claimed compositions are not reconstituted lyophilized powders; they are concentrated, bendamustine-containing liquids for administration through infusion with an appropriate diluent.  (*See, e.g.*, Specification at page 2). This avoids the multi-step reconstitution and preparation for administration required for the Brittain[2] products, including TREANDA®.  These ready for dilution, liquid compositions are surprisingly stable and do not exhibit significant bendamustine degradation after storage for at least 15 months at refrigerated or room temperature conditions.

Ex. 13 ['783 File History] at 21; Ex. 14 ['214 File History] at 9; see also Ex. 15 ['248 File History] at 23.

**ANSWER**: Eagle refers to the prosecution histories of the Patents-in-Suit with respect to

their content and denies any allegations inconsistent with that content.  Except as expressly

admitted, Eagle denies all other allegations in paragraph 47.

48.   Likewise, relying on Table 3—from which they deleted the contradictory N-acetyl cysteine data—the applicants represented that "surprisingly, adding an antioxidant substantially eliminated the formation of degradation products":

Despite the poor stability of bendamustine/PEG, surprisingly, adding an

antioxidant substantially eliminated the formation of degradation products. As show in the specification, and the Table above, a bendamustine/PEG composition including antioxidant exhibited no substantial increase in degradants after storage for 15 days at either room temperature or 40°C. (Specification at Example 3, page 13, Table 3).

The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if an antioxidant is added. Such and unexpected result could not have been predicted. This result is particularly unexpected given the absence of any report in the literature of an oxidative degradation pathway for bendamustine. The claims are patentable for at least three reasons.

Ex. 13 ['783 File History] at 30; Ex. 14 ['214 File History] at 18; Ex. 15 ['248 File History] at 25.

**ANSWER**: Eagle refers to the prosecution histories of the Patents-in-Suit with respect to their content and denies any allegations inconsistent with that content. Except as expressly admitted, Eagle denies all other allegations in paragraph 48.

49. Finally, during the '783 and '214 patent prosecutions, the applicants represented that "adding an antioxidant to fix the degradation caused by PEG was not conventional." Ex. 13 ['783 File History] at 38; Ex. 14 ['214 File History] at 93; Ex. 15 ['248 File History] at 20.

**ANSWER**: Eagle refers to the prosecution histories of the Patents-in-Suit with respect to their content and denies any allegations inconsistent with that content. Except as expressly admitted, Eagle denies all other allegations in paragraph 49.

50. The applicants for the Patents-in-Suit knew that these statements could not be true given their knowledge of and the Examiner's statements (discussed below) about the contradictory N-acetyl cysteine data.

**ANSWER**: Denied. As explained in the Answers to Paragraphs 27 and 41, the N-acetyl cysteine data is not contradictory as it shows enhanced stability, and thus, is consistent with the Court's construction of "a stabilizing amount of an antioxidant" from *Cephalon*. 456 F. Supp. 3d at 622-23. Further, contemporaneous inventor reports note that "N-Acetyl cysteine, which has a limiting solubility in PEG400 of 2mg/mL reduced the overall level of degradants from 42% (BDM-047) to under 12% after 15 days at 40°C." *See* EAGLEBEN-SA_00010134 at -156 (Bendamustine Infusion Cumulative Progress Report October 2009); EAGLEBEN-

SA_00010159 at -181 (Bendamustine Infusion Cumulative Progress Report December 2009).

51. During prosecution of the '483 patent, the applicants made similarly misleading arguments that using "an antioxidant" yielded "surprisingly stable" formulations.  For example:

> **Brief Description of the Claimed Inventions**
>
> The pending claims are directed to, among other things, liquid bendamustine-containing compositions having from about 10 mg/mL to about 100 mg/mL of bendamustine, polyethylene glycol, and an antioxidant.  These compositions are surprisingly stable and do not exhibit significant bendamustine degradation after storage for at least 15 months at refrigerated or room temperature conditions.

*Id*. ['483 prosecution 11/25/20 Applicant Arguments] at 5.

**ANSWER**: Eagle refers to the prosecution history of the '483 patent for its content and

denies any allegations inconsistent with that content.  Except as expressly admitted, Eagle denies

all other allegations in paragraph 51.

52. Mr. Mercanti argued that this purported stability was an unexpected result that rendered the claims patentable over the art cited by the Examiner:

> polyethylene glycol (PEG), as claimed.  Moreover, the stability achieved by the claimed compositions would have been unexpected in view of the cited art.  Applicant requests reconsideration and withdrawal of the rejection.

*Id; see also id.* [5/20/21 Amendment] at 9, 10, 60-61 ("The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if an antioxidant is added.  Such an unexpected result could not have been predicted.  This result is particularly unexpected given the absence of any report in the literature of an oxidative degradation pathway.").

**ANSWER**: Eagle refers to the prosecution history of the '483 patent for its content and

denies any allegations inconsistent with that content.  Except as expressly admitted, Eagle denies

all other allegations in paragraph 52.

53. By consistently referring to the indefinite article "an antioxidant" or "antioxidants," plural, the applicants repeatedly implied throughout the '483 prosecution that all antioxidants would have the desired stabilizing effect on bendamustine.  *Id.* ['483 File History 5/20/21 Response After Final Action] at 59:

"Antioxidants are used to reduce the oxidation of active substances and excipients in the finished product." (Note for Guidance, European Agency for the Evaluation of Medicinal Products, page 8 of 9 (of record)) Since bendamustine was not known to degrade *via* an oxidative process, those of ordinary skill in the art would not have tried to reduce degradation by adding an antioxidant to a bendamustine composition.[11] The claims are non-obvious for at least this reason.

*See also id.* at 60-61:

Despite the poor stability of bendamustine/PEG, surprisingly, adding an antioxidant substantially eliminated the formation of degradation products. As shown in the specification, and the Table above, a bendamustine/PEG composition including antioxidant exhibited no substantial increase in degradants after storage for 15 days at either room temperature or 40 °C. (Specification at Example 3, page 13, Table 3).

The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if an antioxidant is added. Such an unexpected result could not have been predicted. This result is particularly unexpected given the absence of any report in the literature of an oxidative degradation pathway. The claims are patentable for at least this reason.

**ANSWER**: Eagle refers to the prosecution history of the '483 patent for its content and denies any allegations inconsistent with that content. Except as expressly admitted, Eagle denies all other allegations in paragraph 53.

54. Moreover, during prosecution of the '483 patent, the applicants repeatedly relied on the table (Table 3) from which the N-acetyl cysteine data had been deleted to support the patentability of the pending claims:

Despite the poor stability of bendamustine/PEG, surprisingly, adding an antioxidant substantially eliminated the formation of degradation products. As shown in the specification, and the Table above, a bendamustine/PEG composition including antioxidant exhibited no substantial increase in degradants after storage for 15 days at either room temperature or 40 °C. (Specification at Example 3, page 13, Table 3).

The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if an antioxidant is added. Such an unexpected result could not have been predicted. The claims are patentable for at least this reason.

*Id.* ['483 File History 11/25/20 Applicant Arguments] at 10.

**ANSWER**: Eagle refers to the prosecution history of the '483 patent for its content and denies any allegations inconsistent with that content. Except as expressly admitted, Eagle denies

all other allegations in paragraph 54.

55. Most importantly, during the '483 patent prosecution the Examiner stated affirmatively that he was of the belief that the applicants had not compared the effects of lipoic acid versus N-acetyl cysteine, which he referred to as "acetylcysteine":

> these are expected results. It is noted that Brittain et al. does not specifically name lipoic acid but Applicant did not compare lipoic acid against any of the disclosed antioxidant species of Brittain including acetylcysteine, ascorbic acid and cysteine. Furthermore, even if Applicant can show that lipoic acid is superior compared to the species taught by Brittain, the instantly claimed subject matter is not commensurate in scope. "The

*Id.* ['483 Patent File History 12/21/20 Final Rejection] at 29 (underlining added).

**ANSWER**: Eagle refers to the prosecution history of the '483 patent for its content and denies any allegations inconsistent with that content.  Except as expressly admitted, Eagle denies all other allegations in paragraph 55.

56.  But, as discussed above, the applicants had in fact directly compared lipoic acid and N-acetyl cysteine and found that lipoic acid was considerably more effective at stabilizing— ███████████████████████████████████████████████████████████████

**ANSWER**: Denied.  Contemporaneous data demonstrates that the inventors found that N-acetyl cysteine did work to stabilize bendamustine in PEG, but its use was limited by its solubility in PEG 400.  *See* EAGLEBEN-SA_00010159 at -181 (Bendamustine Infusion Cumulative Progress Report December 2009).  Lipoic acid, on the other hand, was freely soluble in PEG 400 and demonstrated a stabilizing effect on bendamustine.  *Id.* ("However, the most impressive gain in stability came from the use of lipoic acid, which is freely soluble in PEG400, where the total degradation was limited to approximately 0.5% under the same conditions.").  In addition, as explained in Eagle's Answer to Paragraph 45, the facts support a reasonable inference that the N-acetyl cysteine data was removed because of potential error, which negates an inference that the data was removed with the intent to deceive the PTO.  *See Novozymes A/S,*

446 F. Supp. 2d at 332.

57.  Despite having a duty to disclose material information to the PTO, applicants never notified the Examiner of this and did not provide the data showing the N-acetyl cysteine testing, and instead allowed the Examiner to remain under the misimpression that applicants had not conducted any comparative testing and that any antioxidant would work in the claimed invention.

**ANSWER**: Denied.  As previously stated in the Answer to Paragraph 31, the applicants

incorporated by reference the '100 provisional application into the specifications of each of the

Priority Patents and the Patents-in-Suit.

58.  In their May 20, 2021 response to the Examiner's final action in the '483 patent prosecution, for example, the applicants again reproduced the Table 3 data for lipoic acid in PEG but made no mention of the deleted data testing N-acetyl cysteine under the same conditions. Instead, the applicants stated that "an antioxidant"—not "lipoic acid" or "selected antioxidants"— would provide "surprising storage stability":

> The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if an antioxidant is added.  Such an unexpected result could not have been predicted.  This result is

Ex. 9 ['483 patent File History 5/20/21 Response After Final Action] at 60.

**ANSWER**: Eagle refers to the prosecution history of the '483 patent for its content and

denies any allegations inconsistent with that content.  Except as expressly admitted, Eagle denies

all other allegations in paragraph 58.

59.  It is a longstanding principle that "the duty of square dealing and full disclosure . . . is not done by one who knowingly takes advantage of an error by the PTO."  *KangaROOS U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1576 (Fed. Cir. 1985); *see also Belcher Pharms., LLC v. Hospira, Inc.*, 11 F.4th 1345, 1350, 1353-54 (Fed. Cir. 2021).  By representing that any antioxidant would yield "surprisingly stable" formulations—and by withholding the contradictory N-acetyl cysteine data and allowing the Examiner to believe that no data regarding N-acetyl cysteine existed—the applicants breached this duty during the prosecutions of the Priority Patents and the Patents-in-Suit.

**ANSWER**: The allegations in paragraph 59 state legal conclusions to which no response

is required.  To the extent a response is required, Eagle refers to the cited opinions for their

holdings and denies that the holdings of either *KangaROOS U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d

1571, 1576 (Fed. Cir. 1985) or *Belcher Pharms., LLC v. Hospira, Inc.*, 11 F.4th 1345, 1350,

1353-54 (Fed. Cir. 2021) apply to the facts here.

### C.    The Examiner's Statements Establish that the Deleted N-Acetyl Cysteine Data Was Highly Material To The Patentability of the Patents-in-Suit

60.    As established by the Examiner's own comments during the '483 patent prosecution, the deleted data concerning the effect of N-acetyl cysteine on the stability of bendamustine in liquid formulations was highly material to the patentability of the claims that eventually issued as the Priority Patents and the Patents-in-Suit.  Had the Examiner been aware of these data, he would have had conclusive evidence of the overbreadth of the claims.  No reference was made to the contents of the '100 provisional application during prosecution of the Priority Patents or the Patents-in-Suit.

**ANSWER**: Denied.  As previously stated in the Answer to Paragraph 31, the '100

provisional application was incorporated by reference into each of the Patents-in-Suit and the

Priority Patents.  Therefore, the N-acetyl cysteine data in Table 4 of the '100 provisional

application was before the Examiner during the prosecution of the Priority Patents and the Patents-

in-Suit because of this incorporation by reference.  Further, the Examiner allowed the subject

claims after having been made aware of the N-acetyl cysteine data contained in the '100

provisional application, which refutes Defendants' conclusory allegation of but-for materiality in

paragraph 60.

61.    It is reasonable to assume that the Examiner had no knowledge of the deleted data, as the USPTO does not examine provisional applications, and would not review the substance of a provisional application unless the applicant points to a provisional to overcome a prior art rejection by attempting to antedate the art, which did not happen here.

**ANSWER**: Denied.  MPEP § 2136 states that "[o]ffice personnel should adhere to the

following procedures when reviewing patent applications for compliance with the written

description requirement of 35 U.S.C. 112(a)" and describes a three step process that involves (1)

"read[ing] and analyz[ing] the specification for compliance with 35 U.S.C. 112(a)," (2)

"review[ing] the entire application to understand how applicant provides support for the claimed invention including each element and/or step," and (3) "determining whether there is sufficient written description to inform a skilled artisan that inventor was in possession of the claimed invention as a whole at the time the application was filed." Here, the Examiner made specific findings regarding priority during the prosecution of the Patents-in-Suit and the Priority Patents. '783 File History (EAGLEBEN-SA_00000001) at -093; '214 File History (EAGLEBEN-SA_00001077) at -168; '248 File History at p. 220; '707 File History (EAGLEBEN-SA_00304142) at -225. Further, the '100 provisional application was incorporated by reference into each of the Patents-in-Suit and the Priority Patents. Therefore, the N-acetyl cysteine data in Table 4 of the '100 provisional application was before the Examiner during the prosecution of the Priority Patents and the Patents-in-Suit because of this incorporation by reference. Therefore, the Examiner considered the contents of the '100 provisional application during examination of the Patents-in-Suit.

62. During prosecution of the '483 patent, the Examiner communicated to the applicants that he was concerned that the "antioxidant" limitation was overbroad.

**ANSWER**: Denied. Defendants misrepresent the basis of the Examiner's rejection. In a Final Office Action issued on December 12, 2020, the Examiner found that the applicant did not adequately support its "unexpected results" argument offered to distinguish the closest prior art, Brittain. '483 File History, Final Office Action December 12, 2020 at 17. Specifically, the Examiner pointed to the applicant's alleged failure to "compare lipoic acid against any of the disclosed antioxidant species of Brittain including acetylcysteine, ascorbic acid and cysteine." *Id.* Thus, the Examiner never stated that the claims were overly broad; rather, the Examiner merely found that the applicant did not offer enough support for its argument. *See id.* Applicant subsequently discussed the Examiner's finding during an interview, after which, the Examiner

withdrew its rejection.  '473 File History, Notice of Allowance.

　　63.  In a June 2, 2021 Advisory Action, for example, the Examiner noted that the claims were not allowable because, among other things, the scope of the claims was not commensurate with the experimental data in the specification because the only example with data is for "sulfur containing antioxidant lipoic [acid]" in Table 3. Ex. 9 ['483 File History June 2, 2021 Advisory Action] at 65.

> some diluted concentration. In light of these issues as well as the claims not being commensurate in scope with the data where only sulfur containing antioxidant lipoic is shown (table 3), (tables 4-8 require the addition of propylene glycol) the application is not in immediate condition for allowance,

The Examiner further noted that Tables 4–8 included propylene glycol.  *Id.*  In other words, the only data for a PEG-only formulation is in Table 3, and the only data provided in Table 3 is for a single antioxidant, lipoic acid.  *See also id.* ("Applicant's results appear unexpected but the claimed subject matter is not necessarily commensurate in scope with the data.")

　　**ANSWER**: Eagle refers to the prosecution history of the '483 patent for its content and denies any allegations inconsistent with that content.  Except as expressly admitted, Eagle denies all other allegations in paragraph 63.

　　64.  The Examiner later capitulated because he concluded that he "does not have evidence that other antioxidants would not also work in the invention."  *Id.* ['483 File History July 16, 2021 Interview Summary] at 67 (emphasis added):

> because it is ready for lyophilization. The Examiner noted that while only sulfur based antioxidants were used as the antioxidant, the Examiner does not have any evidence that other antioxidants would not also work in the invention. Also the Examiner noted that t-butyl alcohol used by Brittain has a high vapor

The Examiner's statement makes clear that but for the Applicants' choice to delete and then not to provide the deleted N-acetyl cysteine data, the Examiner would have rejected the claims under § 112.

　　**ANSWER**: Denied.  Eagle refers to the prosecution history of the '483 patent for its content and denies any allegations inconsistent with that content.  Furthermore, as stated in the Answer to Paragraph 31, the '100 provisional application was incorporated by reference into each of the Priority Patents and the Patents-in-Suit.  Therefore, data comparing lipoic acid and N-acetyl cysteine was before the Examiner during the prosecution of the Patents-in-Suit and the Priority Patents because of this incorporation by reference.  Both Table 4 of the '100 provisional application and contemporaneous laboratory notebooks and inventor reports provide corroborating

evidence that N-acetyl cysteine was an effective antioxidant. *See* EAGLEBEN-SA_00010134 at -156 (Bendamustine Infusion Cumulative Progress Report October 2009); EAGLEBEN-SA_00010159 at -181 (Bendamustine Infusion Cumulative Progress Report December 2009); EAGLEBEN-SA_00006378 at -738 (TherDose Pharma Laboratory Notebook 049, Sample Name: BDM-060). Finally, the Examiner's statements in the interview summary provide further evidence that the Examiner considered the N-acetyl cysteine data. And a POSA would have known that N-Acetyl-Cysteine is a sulfur based antioxidant, like lipoic acid. Ezerina, et al., *N-acetyl cysteine functions as a fast-acting antioxidant by triggering intracellular H2S and sulfane sulfur production*, 25 CELL CHEM BIO 447. Contrary to the allegations in paragraph 64, the Examiner would not have rejected the claims under § 112 in light of the N-acetyl cysteine data given that the Examiner was made aware of that data and allowed the issued claims.

### D.     The Applicants' Intent To Deceive Is The Single Most Reasonable Inference

65.  Given the Examiner' statements, the prosecuting attorneys (both Mercanti, who was of record, and Lodise, who attended the interview), and possibly the inventors and in-house counsel at Eagle (see note 3 above ), were on notice that data concerning additional antioxidants was material to the patentability of the pending claims.

**ANSWER**: Denied.

66.  Mercanti at least was plainly knowledgeable about the N-acetyl cysteine data, having submitted the '100 provisional application.

**ANSWER**: Eagle admits that Mr. Mercanti submitted the '100 provisional application.

Except as expressly admitted, Eagle denies all other allegations in paragraph 66.

67.  Given the express statements by the Examiner that further data would be material to prosecution and that the Examiner lacked evidence that antioxidants other than sulfur based antioxidants would not work, and the prosecutors' and inventors' knowledge of the negative N-acetyl cysteine data, the only reasonable inference is that the prosecuting attorneys, and possibly

the inventors and in-house counsel at Eagle, had an intent to deceive the Patent Office by withholding material experimental results.

**ANSWER**: Denied.  As stated in the Answer to Paragraph 31, the '100 provisional application was incorporated by reference into each of the Patents-in-Suit and the Priority Patents, which refutes any allegation of intent to deceive.  Further, the Examiner allowed the subject claims after having been made aware of the N-acetyl cysteine data contained in the '100 provisional application, which refutes Defendants' conclusory allegation of but-for materiality in paragraph 67.

To the extent it is found that the N-acetyl cysteine data was not before the Examiner, Eagle denies that the N-acetyl cysteine data was omitted with the intent to deceive the Patent Office.  Rather, review of contemporaneous experimentation data from the time of '100 provisional application demonstrates that the data was likely removed due to potential error. Table 4 of the '100 provisional application states that the initial amount of bendamustine was 94.7%, which is at least 2.9% lower than the initial amounts of bendamustine at 25°C for 15 days in the other experiments.  Laboratory Notebook 049, however, shows that 99.41% of the bendamustine in the BDM-060 sample at 25°C for 15 days did not degrade.  Upon viewing this data, a POSA would conclude that there was a potential error in either the sample handling, dilution, or other experimentation causing the initial value listed in Table 4 of the '100 provisional application to be lower than actual, which the chromatogram data confirms.  *See* EAGLEBEN-SA_00006378 at -738 (TherDose Pharma Laboratory Notebook 049, Sample Name: BDM-060).  There is sufficient evidence to support a reasonable inference that the N-acetyl cysteine data was removed because of potential error, which negates an inference that the data was removed with the intent to deceive the PTO.  *See Novozymes A/S*, 446 F. Supp. 2d at 332.  Finally, the Examiner's statements in the interview summary provide further evidence that

the Examiner considered the N-acetyl cysteine data: the interview summary says the "Examiner noted that while *only sulfur based antioxidants* were used as the antioxidant, the Examiner does not have any evidence that other antioxidants would not also work in the invention." EAGLEBEN-SA_00078099 at -592 (emphasis added).  N-acetyl cysteine is a sulfur based antioxidant, like lipoic acid.  Ezerina, et al., *N-acetyl cysteine functions as a fast-acting antioxidant by triggering intracellular H2S and sulfane sulfur production*, 25 CELL CHEM BIO 447.

### III.   The Applicants Committed Inequitable Conduct by Intentionally Deleting Material Data Relevant To Other Non-Working Examples

68. The Patents-in-Suit claim liquid bendamustine compositions comprising a "pharmaceutically acceptable fluid" "consisting of" polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol.  Given well-settled principles of patent law, therefore, the "pharmaceutically acceptable fluid" can include only those five ingredients, and no others.

**ANSWER**: Paragraph 68 includes misstatements of the law as the Federal Circuit has recognized that the "pharmaceutically acceptable fluid consisting of" limitation may contain "additional components" in the form of impurities (*see Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1360 (Fed. Cir. 2006)) and substances unrelated to the pharmaceutical fluid element. *See Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1333 (Fed. Cir. 2004).  Paragraph 68 also states a legal conclusion to which no response is required.  To the extent a response is required, Eagle admits that Claim 1 of the '783 patent claims:

> A method of treating leukemia in a human in need thereof comprising:
> providing a liquid bendamustine-containing composition comprising
>   bendamustine, or a pharmaceutically acceptable salt thereof, wherein the
>     bendamustine concentration in the composition is from about 20 mg/mL to
>     about 60 mg/mL,
>   a pharmaceutically acceptable fluid consisting of polyethylene glycol and
>     optionally one or more of propylene glycol, ethanol, benzyl alcohol and
>     glycofurol; and
>   a stabilizing amount of an antioxidant,
>   wherein the total impurities in the liquid bendamustine-containing composition

resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.;

diluting the liquid bendamustine containing composition; and

intravenously administering the diluted composition to the human.

Claim 1 of the '214 patent claims:

A sterile vial containing a liquid bendamustine-containing composition comprising:

about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 25 mg/mL;

a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

a stabilizing amount of an antioxidant,

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

Claim 1 of the '248 patent claims:

A sterile container containing a liquid bendamustine-containing composition comprising:

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is about 25 mg/ml;

a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

a stabilizing amount of an antioxidant,

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

Eagle denies all remaining allegations in paragraph 68.

69. Defying these well-settled legal principles, Eagle argued during claim construction that the claimed "pharmaceutically acceptable fluid" could include excipients other than the five ingredients explicitly listed in the claims. D.I. 75 at 17-22. While Defendants' strongly disagree with Eagle's construction, Eagle's contention that the "pharmaceutically acceptable fluid" can include other excipients puts Eagle in a quandry because the applicants deleted additional information relevant to formulations with additional excipients. The deletions directly impact the patentability of the Patents-in-Suit and the Priority Patents under Eagle's construction of the claims.

35

**ANSWER**: Eagle refers to the claim construction briefing and oral argument (D.I. 79, 95) with respect to the arguments it presented and denies any allegations inconsistent with that briefing and oral argument.  Except as expressly admitted, Eagle denies all other allegations in paragraph 69.

70.  When filing the '473 application, the applicants and Mr. Mercanti deleted data from the '100 provisional application showing that bendamustine formulations that would satisfy the claims under Eagle's erroneous interpretation of the "consisting of" limitation would not be long term storage stable.

**ANSWER**: Denied.

71.  Specifically, the '100 provisional application included data showing that formulations with (1) bendamustine and lactic acid (88%), with or without 10 mg/mL choline chloride, and (2) bendamustine and glycerol, with or without choline chloride, had high levels of impurities after 7 days storage at 40ºC:

Table 1 – Stability of Bendamustine HCl in Non-aqueous Solvents I

| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
|---|---|---|---|---|
| BDM 10mg/mL. Lactic acid (88% (w/w)) qs to 1mL. | 40°C | Initial | 10.01 | 0.35 |
| | | 48 hrs | 9.35 | 3.78 |
| | | 7 day | 8.56 | 9.64 |
| BDM - 10mg/mL. Choline Chloride - 215mg/mL. Lactic acid(88% (w/w) qs to 1mL. | 40°C | Initial | 9.78 | 0.46 |
| | | 48 hrs | 9.25 | 4.22 |
| | | 7 day | 8.65 | 7.88 |
| BDM - 10mg/mL. Ethanol qs to 1mL. | 40°C | Initial | 10.55 | 0.27 |
| | | 48 hrs | 10.30 | 2.39 |
| | | 7 day | 9.55 | 6.66 |
| BDM - 10mg/mL. Choline chloride - 215mg/mL. Ethanol qs to 1mL. | 40°C | Initial | 10.43 | 0.27 |
| | | 48 hrs | 10.48 | 1.27 |
| | | 7 day | 10.26 | 2.11 |

<LD = Below Level of Detection

Table 2 - Stability of Bendamustine HCl in Non-aqueous Solvents II

| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
|---|---|---|---|---|
| BDM - 10mg/mL. Choline chloride - 215mg/mL. Propylene glycol qs to 1mL. | 40°C | Initial | 9.99 | 0.21 |
| | | 48 hrs | 9.95 | 0.60 |
| | | 7 day | 9.43 | 2.31 |
| BDM - 10mg/mL. Propylene glycol qs to 1mL. | 40°C | Initial | 9.68 | 0.21 |
| | | 48 hrs | 9.45 | 0.88 |
| | | 7 day | 9.00 | 3.44 |
| BDM - 10mg/mL. Choline chloride - 215mg/mL. Glycerol qs to 1mL. | 40°C | Initial | 9.86 | 0.80 |
| | | 48 hrs | 9.20 | 2.58 |
| | | 7 day | 6.34 | 33.9 |
| BDM - 10mg/mL. Glycerol qs to 1mL. | 40°C | Initial | 10.13 | 0.28 |
| | | 48 hrs | 8.42 | 10.8 |
| | | 7 day | 3.00 | 64.6 |

<LD = Below Level of Detection

Ex. 6 ['100 Provisional Application] at 7.

**ANSWER**: Eagle refers to the '100 provisional application for its content and denies any allegations inconsistent with that content.  Except as expressly admitted, Eagle denies all other allegations in paragraph 71.

72.   However, the applicants deleted this data in the '473 non-provisional application:

Table 1 – Stability of Bendamustine HCl

| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
|---|---|---|---|---|
| BDM - 10mg/mL Choline chloride - 215mg/mL Ethanol qs to 1mL | 40°C | Initial | 10.43 | 0.27 |
| | | 48 hrs | 10.48 | 1.27 |
| | | 7 day | 10.26 | 2.11 |
| BDM - 10mg/mL Ethanol qs to 1mL | 40°C | Initial | 10.55 | 0.27 |
| | | 48 hrs | 10.30 | 2.39 |
| | | 7 day | 9.55 | 6.66 |
| BDM - 10mg/mL Choline chloride - 215mg/mL Propylene glycol qs to 1mL | 40°C | Initial | 9.99 | 0.21 |
| | | 48 hrs | 9.95 | 0.60 |
| | | 7 day | 9.43 | 2.31 |
| BDM - 10mg/mL Propylene glycol qs to 1mL | 40°C | Initial | 9.68 | 0.21 |
| | | 48 hrs | 9.45 | 0.88 |
| | | 7 day | 9.00 | 3.44 |
| BDM - 10mg/mL Choline Chloride - 215mg/mL Benzyl alcohol qs to 1mL | 40°C | Initial | 9.95 | 1.19 |
| | | 48 hrs | 9.89 | 3.51 |
| | | 7 day | 8.97 | 4.24 |
| BDM - 10mg/mL Benzyl alcohol qs to 1mL | 40°C | Initial | 9.52 | 0.33 |
| | | 48 hrs | 8.67 | 4.18 |
| | | 7 day | 7.49 | 7.84 |

Ex. 12 ['473 Application Table 1] at 12.  The deleted data show the following high levels of impurities after just seven days of storage:

| Formulation | Impurities after 7 days storage at 40°C |
|---|---|
| Bendamustine Lactic acid | 9.64% |
| Bendamustine Lactic acid + Choline chloride | 7.88% |
| Bendamustine Glycerol | 64.6% |
| Bendamustine Glycerol + Choline Chloride | 33.9% |

**ANSWER**: Eagle refers to the '473 non-provisional application for its content and denies

any allegations inconsistent with that content.  Except as expressly admitted, Eagle denies all other allegations in paragraph 72.

73.  The specification of the '100 provisional application states that formulations with degradants above 3.5% after 7 days storage at 40ºC are "not suitable for long term storage":

> As shown in Tables 1 and 2, for example, control samples 3 and 6, which were dissolved in ethanol and propylene glycol, respectively, did not provide such stabilizing effects.  Sample 3 exhibited more than 6.5 total degradants after 7 days storage at 40 ºC.  Sample 6 exhibited almost 3.5% total degradants after 7 days storage at 40 ºC.  Bendamustine-containing compositions with such high levels of degradation would not be suitable for long-term storage.

Ex. 6 ['100 Provisional Application] at 9.  Because the impurity levels for the deleted formulations are at or above 3.5%, a POSA would conclude that neither lactic acid nor glycerol (with or without choline chloride) are suitable solvents for stable formulations of bendamustine.

**ANSWER**: Eagle refers to the '100 provisional application for its content and denies any allegations inconsistent with that content.  Except as expressly admitted, Eagle denies all other allegations in paragraph 73.

74.  The specifications of the Priority Patents and the Patents-in-Suit tell a different story.  There, based on the data that was not deleted, the applicants state that formulations with up to 5% impurities after 7 days storage at 40ºC would be "very stable" and adequate for a 15- month shelf life at 25º:

> As shown in Table 1, the bendamustine formulations are very stable in solutions containing solvent and chloride salt.  Table 1 shows that bendamustine, when dissolved at a concentration of about 10 mg/mL, in a pharmaceutically acceptable fluid, such as ethanol and propylene glycol, and containing a stabilizing amount of a chloride salt, such as choline chloride, had less than about 5% after at least 7 days storage at 40 ºC.

> The data presented in Table 1 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of a chloride salt having a shelf life of at least about 15 months at 5 ºC and 25 ºC.

Ex. 12 ['473 Non-provisional Application] at 12.  And at least one formulation that the '473 non-provisional application describes as "stabiliz[ed]" has 4.24% total impurities after seven days,

making it not stable under the '100 provisional application's definition of stability. *Id.*

**ANSWER**: Eagle refers to the '473 non-provisional application for its content and denies any allegations inconsistent with that content. Except as expressly admitted, Eagle denies all other allegations in paragraph 74.

75. The data that the applicants and Mr. Mercanti deleted from the '100 provisional application were highly material to the patentability of the claims of the Patents-in-Suit and the Priority Patents under Eagle's erroneous understanding of the claim scope. The applicants relied almost entirely on the data presented in Table 3 to show that the claimed invention provided unexpected results compared to the prior art, but the data in Table 3 is limited to bendamustine dissolved in a single solvent, 100% PEG 400, and containing a single excipient, the antioxidant lipoic acid. There are no data in the Priority Patents or Patents-in-Suit for the stability of a formulation of bendamustine, PEG, antioxidant, and either lactic acid, glycerol, or a chloride salt—formulations that Eagle says would satisfy the claim scope.

**ANSWER**: Denied. The data identified by Defendants from Tables 1 and 2 of the '100 provisional application were not highly material to the patentability of the claims of the Patents-in-Suit and the Priority Patents because each of the Patents-in-Suit require that the bendamustine-containing composition comprise "a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally . . . ." '781 patent at cl. 1; '214 patent at cl. 1; '248 patent at cl. 1. Tables 1 and 2 of the '100 provisional application contain the results of impurity analyses for bendamustine-containing compositions "prepared by dissolving bendamustine HCl to a concentration of 10mg/ml in ethanol, propylene glycol, glycerol, and 88% (w/w) lactic acid." '100 provisional application at 6. None of these compositions contain PEG 400, as required by the Patents-in-Suit. *Id.* Therefore, the data identified by Defendants from Tables 1 and 2 of the '100 provisional application has no bearing on the patentability of the claims of the Patents-in-Suit. Further, as stated *supra*, the '100 provisional application was incorporated by reference into each of the Priority Patents and the Patents-in-Suit. The Examiner allowed the issued claims after being made aware of the subject data, which refutes the conclusory allegation of but-for materiality.

39

76. As 35 U.S.C. § 112 requires that the patent specification adequately describe and enable the full scope of the patent claims, the deleted data show that certain of Eagle's liquid bendamustine formulations that Eagle argues would satisfy the claim limitations would not satisfy the 15-month stability limitation of the claims, and would thereby render the claims invalid under § 112. Thus, the deleted data is highly material to the patentability of the claims under Eagle's construction.

**ANSWER**: Denied. The allegations in paragraph 76 are factually incorrect, as explained in the Answer to Paragraph 75. The data identified by Defendants from Tables 1 and 2 of the '100 provisional application does not meet the claim limitations of the asserted claims of the Patents-in-Suit because the experimental compositions did not contain PEG400 as required by the claims at issue in this litigation. Although lactic acid and glycerol were evaluated as solvents, those experimental results are irrelevant to the asserted claims as each of the asserted claims require "a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol." Further, as stated in the Answer to Paragraph 31, the '100 provisional application was incorporated by reference into each of the Priority Patents and the Patents-in-Suit. The Examiner allowed the issued claims after being made aware of the subject data, which refutes the conclusory allegation of but-for materiality.

77. Mr. Mercanti's and the applicants' deletion of only the data that was inconsistent with their argument that a "bendamustine-containing composition including a pharmaceutically acceptable fluid and a stabilizing amount of a chloride salt" would have a shelf life of at least about 15 months at 5ºC and 25ºC demonstrates that the most reasonable inference is that the deletion was made with an intent to deceive the Patent Office.

**ANSWER**: Denied. The allegations in paragraph 77 are factually incorrect, as explained in the Answer to Paragraph 75. Furthermore, statements related to a "a stabilizing amount of a chloride salt" are not relevant to the asserted claims as each asserted claim requires "a stabilizing amount of an antioxidant," not "a chloride salt." And the data identified by Defendants from Tables 1 and 2 does not meet the claim limitations of the asserted claims of the Patents-in-Suit

40

because the experimental compositions did not involve PEG400 as required by the asserted claims. Those equally plausible explanations refute any alleged intent to deceive. Further, as stated in the Answer to Paragraph 31, the '100 provisional application was incorporated by reference into each of the Priority Patents and the Patents-in-Suit, refuting the conclusory assertion of intent to deceive.

## IV. The Applicants Committed Inequitable Conduct By First Failing to Disclose, and Later Deceiving the Examiner About, Material Formulations that are Unstable Over Time

78. The applicants also committed inequitable conduct during the prosecution of the '473 application by filing unrelated patent applications—U.S. Provisional Application No. 61/598,729 (the "'729 provisional application") and U.S. Pat. App. No. 13/767,672 ("the '672 application")— that contained data and statements that were inconsistent with the applicants' representations to the PTO in the '473 application. While the Examiner of the '672 application noted that the data in the '672 application was inconsistent with the data in the '473 application, the applicants never disclosed this contradictory data during the prosecution of the '473 application. Further, during prosecution of the subsequent applications in the priority chain, the applicants never disclosed the Examiner's comments regarding the contradictory data to the PTO.

**ANSWER**: Denied. The Examiner of the '473 application, which ultimately issued as the '707 patent, was aware of and familiar with the '672 application. The Examiner stated during an interview that she was aware of the provisional non-statutory obviousness-type double patenting rejections in light of various co-pending applications, among them the '672 application. '473 File History, Examiner-Initiated Interview Summary at 1.

> Examiner expressed to Ms.Jordan (Attorney of record) that it has come to her attention that the only remaining issues are provisional nonstatutory obviousness-type double patenting to co-pending application nos. 14/031,879, 13/767,672, 13/838,090 and 13/3838,267. Co-pending application nos. 13/767,672, 13/838,090 and 13/3838,267 are later filed applications. If "provisional" ODP rejections in two applications are the only rejections remaining in those applications, the examiner should withdraw the ODP rejection in the earlier filed application thereby permitting that application to issue without need of a terminal disclaimer. A terminal disclaimer must be required in the later-filed application before the ODP rejection can be withdrawn and the application permitted to issue. Therefore, the Examiner is not requiring a terminal disclaimer for the co-pending applications. MPEP §804.
> A terminal disclaimer was needed for co-pending application no. 14/031,879
>
> Ms. Jordan state a terminal disclaimer would be filed forthwith..

The Examiner again identified the '672 application in the notice of allowance. '473 File History, Notice of Allowance at 4-5.

41

The only remaining issues are provisional nonstatutory obviousness-type double patenting to co-pending application nos. 14/031,879, 13/767,672, 13/838,090 and 13/3838,267. Co-pending application nos. 13/767,672, 13/838,090 and 13/3838,267 are later filed applications. If "provisional" ODP rejections in two applications are the only rejections remaining in those applications, the examiner should withdraw the ODP rejection in the earlier filed application thereby permitting that application to issue without need of a terminal disclaimer. A terminal disclaimer must be required in the later-filed application before the ODP rejection can be withdrawn and the application permitted to issue. Therefore, the Examiner is not requiring a terminal disclaimer for the co-pending applications. MPEP §804.

Finally, the '672 application published as U.S. Patent Publication 2013/0210879, which is listed under "References Cited" on each of the Patents-in-Suit. *Compare* '879 patent publication, *with* Patents-in-Suit. Thus, the '672 application was disclosed and considered during prosecution of the Patents-in-Suit.

### A. The '707 Patent and the '672 Application/'879 Publication

79. As explained above, Mr. Mercanti filed the '473 application on January 28, 2011. That application resulted in the '707 patent, which issued on December 17, 2013.

**ANSWER**: Admitted.

80. Ten months before the '707 patent issued, Mr. Mercanti filed the '672 application, which related to liquid bendamustine compositions whose pH was adjusted with various compounds, including sodium hydroxide. The '672 application claimed priority to the '729 provisional application, which was filed on February 14, 2012. The '672 application named Drs. Palepu and Buxton as inventors, as well as Srikanth Sundaram, and was assigned to Eagle. The '672 application was examined by examiners different from the Examiner who examined the '707 Patent and the Patents-in-Suit.

**ANSWER**: Admitted.

81. The '672 application published as U.S. Patent Application Publication No. 2013/0210879 (the "'879 publication") on August 15, 2013—nearly four months before the '707 Patent issued.

**ANSWER**: Admitted.

### B.    The Applicants Failed to Disclose the '879 Publication and its

**Contradictory Data during the Prosecution of the '707 Patent, Infecting the Patents-In-Suit**

82.  The '672 application and '879 publication disclose data contradicting the '707 patent applicants' allegations that the formulations claimed in the '707 patent are "long term storage stable."

    **ANSWER**:  Denied.  ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████  The data in the '672 application shows certain data for one outlier

batch of PEG.  *See* '672 application.  "A claim does not lack an enabling disclosure just because

some of the possible embodiments within the scope of the claimed invention may be

inoperative."  *Atlas Powder Co. v. E.I. du Pont De Nemours & Co*., 750 F.2d 1569, 1576–77

(Fed. Cir. 1984).   Critically, both the '672 application and the '707 patent disclose stable

bendamustine compositions using PEG as a solvent.  Thus, contrary to Defendants' allegations,

the data in the '672 application reinforces that using PEG as a solvent can create a stable

bendamustine composition.  And as set forth to the Answer to Paragraph 78, the '672 application

and '879 publication were disclosed during prosecution in any event.

83.  Claim 1 of the '707 patent claims:

    A [l]ong term storage stable non-aqueous liquid bendamustine-containing composition, comprising:

    a) bendamustine or a pharmaceutically acceptable salt thereof, and

    b) a pharmaceutically acceptable fluid comprising i) about 90% polyethylene glycol and about 10% propylene glycol; and ii) a stabilizing amount of an antioxidant.

Ex. 4 ['707 Patent] at 12:66-13:6.

    **ANSWER**: Admitted.

84.  The '707 patent specification discloses that the total impurities associated with long

term stability of such a composition would be less than 5% peak area response ("PAR") after at least about 15 months storage at a temperature of from about 5°C. to about 25°C:

> The total impurities in the inventive compositions resulting from the degradation of the bendamustine in the compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of from about 5° C. to about 25° C., and thus have long term stability for at least the same period of time or longer.

*Id.* at 2:57-63; *see also id.* at 4:22-26.

**ANSWER**: Admitted.

85.  The '672 application and '879 publication disclose information and examples showing that compositions within the scope of the claims in the '707 patent would not be "long term storage stable."  Table 1 of the '729 application reports that a composition (the first of the two formulations shown) that would otherwise fall within the scope of the claims of the '707 patent—because it includes bendamustine, 90% polyethylene glycol and about 10% propylene glycol, and an antioxidant (thioglycerol)—was found to have 5.62% total impurities after one month's storage at 25°C and thus would fail to provide a "long term stable" formulation:

**Table 1**

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Total Imp. |
|---|---|---|---|---|---|
| BDM - 25mg/mL Thioglycerol - 5mg/mL PEG 400:PG (90:10) qs to 1mL | | Initial | 24.1 | 100.0 | 0.05 |
| | 40°C | 15 d | 18.2 | 75.5 | 24.40 |
| | 25°C | 15 d | 23.2 | 96.3 | 1.48 |
| | | 1 M | 22.3 | 92.5 | 5.62 |
| BDM - 25mg/mL Thioglycerol - 5mg/mL PEG 400:PG (90:10) qs to 1mL (PEG 400 Treated with NaOH) | | Initial | 23.9 | 100.0 | 0.00 |
| | 40°C | 15 d | 23.8 | 99.6 | 0.77 |
| | | 1 M | 23.0 | 96.2 | 2.03 |
| | 25°C | 15 d | 23.8 | 99.6 | 0.10 |
| | | 1 M | 23.8 | 99.6 | 0.37 |
| | | 3M | 23.7 | 99.2 | 0.62 |

Ex. 10 ['729 Application] at 13.

**ANSWER**: Eagle refers to the '729 provisional application for its content and denies any allegations inconsistent with that content.  Except as expressly admitted, Eagle denies all other allegations in paragraph 85.

86.  This result is but one example that clearly shows that not all preparations meeting the '707 patent claims' formulation limitations will satisfy the stability requirement of the claims. Accordingly, during prosecution of the '707 patent and previous patent applications in the same patent family, at least Mr. Mercanti and the '707 patent inventors had in their possession test data showing that compositions otherwise within the scope of the claims of the '707 patent could be expected to have more than 5% total impurities over storage periods of less than 15 months at 25°C, and thus not satisfy the "long term stable storage stable" requirement.

**ANSWER**: Denied.

87.   The existence of non-working examples is evidence that the claims of the '707 patent are unpatentable because the inventors were not in possession of the claimed invention across the full scope of the claims and because the claims were not enabled across their full scope, as required by 35 U.S.C. § 112.  *See, e.g.*, *In re Wands*, 858 F.2d 731, 736–37 (Fed. Cir. 1988).

**ANSWER**: Denied.  Chief Judge Connolly previously rejected such an assertion.  *See Cephalon*, 456 F.Supp.3d at 623 (rejecting § 112 defense and explaining that defendants would need to present evidence "to show that a POSITA would have had to undertake undue experimentation to alter the formulation to obtain the PG ester limitations.").  Further, as stated in the Answer to Paragraph 78, the '672 application and '879 publication were disclosed during prosecution.  The Examiner allowed the issued claims after being made aware of the subject data, which refutes the conclusory allegation of but-for materiality.  Moreover, as determined by the Examiner in the prosecution of '672 application and '879 publication, it would have been obvious to a POSA working with bendamustine-containing compositions containing PEG400 to include a pH adjuster to obtain PEG 400 with an optimal pH, and an applicant need not disclose what is within the knowledge of a POSA.

88.   As described above, the '672 application was filed one year after the '729 provisional and claimed priority to it.  See Ex. 11 at 8 ['672 application].  The specification of the '672 application is significantly different from the '729 provisional, including the addition of six examples and corresponding data tables.  The specification explains that degradation of the disclosed bendamustine compositions is "typically" due to the accumulation of PEG-esters of bendamustine impurities.  *Id.* at 9.  In the '672 application, the data tables provide measurements for "% of Initial" (which refers to the bendamustine remaining after storage) and percentages of various esters of bendamustine and PG or PEG, as well as a total esters percentage.

**ANSWER**: Eagle refers to the '672 application for its content and denies any allegations inconsistent with that content.  Except as expressly admitted, Eagle denies all other allegations in paragraph 88.

89.   In the '672 application, there are numerous instances of 90:10 PEG:PG formulations that after only 14 or 15 days at 40°C have total esters in excess of 5%:

| Sample | Total Ester Impurities |
|---|---|
| Fig. 1 | 16.51% |
| Fig. 3, Sample 1 | 26.55% |
| Fig. 5B, Sample 13 | 6.48% |
| Fig. 5B, Sample 14 | 10.00% |
| Fig. 5B, Sample 15 | 17.07 |
| Fig. 5B, Sample 16 | 17.86% |
| Fig. 5B, Sample 17 | 20.35% |
| Fig. 5B, Sample 18 | 22.63% |

*Id.* at 31, 33, 37.

**ANSWER**: Eagle refers to the '672 application for its content and denies any allegations inconsistent with that content. Except as expressly admitted, Eagle denies all other allegations in paragraph 89.

90. These samples each contain bendamustine, 90% polyethylene glycol and about 10% propylene glycol, and the antioxidant thioglycerol and thus meet the component limitations of the '707 patent claims. The inventors affirmatively told the PTO that each of these formulations "would not be suitable for long term storage" or "would not be long term storage stable." Ex. 11 ['672 Application] at 23, 25, 27, 28. ███████████████████████████████████████
███████████████████████████████████████████████████████████████
████████████████████████████████

**ANSWER**: Denied. Eagle refers to the '672 application for its content and denies any allegations inconsistent with that content. ██████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

46

███████████████████████████████████████████████  And the examples in the '672 application attribute observed impurity variability to PEG quality and propose a process-level remediation: pre-conditioning PEG to an apparent pH using a conventional pH adjuster to reduce the amount of observed impurities.  EAGLEBEN-SA_00248700 at -105-13.  That is a commercial manufacturing-control improvement, not a contradiction of stability as claimed in the Priority Patents or the Patents-in-Suit.

91.  The '672 application also provides data for storage at 25°C for some of the same formulations.  These data also show impurities in excess of those permitted by the '707 patent claims.

**ANSWER**: Eagle refers to the '672 application for its content and denies any allegations inconsistent with that content.  Except as expressly admitted, Eagle denies all other allegations in paragraph 91.

92.  Figure 3 at Sample 1 of the '672 application, for example, reports that a composition otherwise within the scope of the claims of the '707 patent was found to have 8.71% ester impurities after 2 months storage at 25°C and 18.90% ester impurities after 3 months storage at 25°C.  Total impurities are not reported, but must have been not less than 8.71% and 18.90% respectively.

**ANSWER**: Eagle refers to the '672 application for its content and denies any allegations inconsistent with that content.  Except as expressly admitted, Eagle denies all other allegations in paragraph 92.

93.  Similarly, Figure 4A at Sample 4 of the '672 application reports that a composition that satisfies the formulation limitations of the '707 patent claims was found to have 6.11% ester impurities after 2 months storage at 25°C, 6.42% ester impurities after 3 months storage at 25°C, and 28.71% ester impurities after 6 months storage at 25°C.  Total impurities are not reported, but must have been not less than 6.11%, 6.42% and 28.71%, respectively.

**ANSWER**: Eagle refers to the '672 application for its content and denies any allegations inconsistent with that content.  Except as expressly admitted, Eagle denies all other allegations in paragraph 93.

94.  The '672 application explained that "there is significant variability in the [] stability"

of PEG, which "negatively impacts the expected shelf life of [certain parenteral] formulations." Ex. 11 ['672 Application] at 9. The '672 application disclosed including a "compound…in an amount sufficient to obtain a pH" that would stabilize the liquid bendamustine composition's PEG. Ex. 11 ['672 Application] at 9-10.

**ANSWER**: Eagle refers to the '672 application for its content and denies any allegations

inconsistent with that content. Except as expressly admitted, Eagle denies all other allegations

in paragraph 94.

95. In other words, at the same time that the applicants were telling the Examiner in the '473 application prosecution that that the examples showed "substantially improved long term stability," the applicants were telling the Examiner in the '672 application prosecution that these formulations were not stable without a pH adjuster.

**ANSWER**: Denied.

96. Given the high levels of impurities found in the '672 application's samples after a very short period of stability testing, it is clear that none of the examples discussed above would meet the stability requirement of the '707 patent claims. These data were therefore highly material to the Examiner's evaluation of the patentability of the '707 patent claims, and had the Examiner been aware of such data, he would not have allowed the '707 patent to issue.

**ANSWER**: Denied.

### C.    The Applicants Intentionally Withheld the '672 Application and '879 Publication During The '707 Patent Prosecution

97. At no time during the prosecution of the '707 patent did Mr. Mercanti or Drs. Palepu or Buxton disclose to that Examiner the '672 application or the '879 publication. Nor did they disclose the contradictory data cited above or otherwise point out to the Examiner the multiple data points in the '672 application or '879 publication that show the instability of compositions that satisfy the component limitations of the '707 patent claims.

**ANSWER**: Denied. The Examiner of the '473 application, which ultimately issued as

the '707 patent, was aware of and familiar with the '672 application. The Examiner stated during

an interview that she was aware of the provisional non-statutory obviousness-type double

patenting rejections in light of various co-pending applications, among them the '672 application.

'473 File History, Examiner-Initiated Interview Summary at 1.

*Examiner expressed to Ms.Jordan (Attorney of record) that it has come to her attention that the only remaining issues are provisional nonstatutory obviousness-type double patenting to co-pending application nos. 14/031,879, 13/767,672, 13/838,090 and 13/3838,267. Co-pending application nos. 13/767,672, 13/838,090 and 13/3838,267 are later filed applications. If "provisional" ODP rejections in two applications are the only rejections remaining in those applications, the examiner should withdraw the ODP rejection in the earlier filed application thereby permitting that application to issue without need of a terminal disclaimer. A terminal disclaimer must be required in the later-filed application before the ODP rejection can be withdrawn and the application permitted to issue. Therefore, the Examiner is not requiring a terminal disclaimer for the co-pending applications. MPEP §804.*
*A terminal disclaimer was needed for co-pending application no. 14/031,879*

*Ms. Jordan state a terminal disclaimer would be filed forthwith..*

The Examiner again identified the '672 application in the notice of allowance.  '473 File History, Notice of Allowance at 4-5.

> The only remaining issues are provisional nonstatutory obviousness-type double patenting to co-pending application nos. 14/031,879, 13/767,672, 13/838,090 and 13/3838,267. Co-pending application nos. 13/767,672, 13/838,090 and 13/3838,267 are later filed applications. If "provisional" ODP rejections in two applications are the only rejections remaining in those applications, the examiner should withdraw the ODP rejection in the earlier filed application thereby permitting that application to issue without need of a terminal disclaimer. A terminal disclaimer must be required in the later-filed application before the ODP rejection can be withdrawn and the application permitted to issue. Therefore, the Examiner is not requiring a terminal disclaimer for the co-pending applications. MPEP §804.

Finally, the '672 application published as U.S. Patent Publication 2013/0210879, which is listed under "References Cited" on each of the Patents-in-Suit.  *Compare* '879 patent publication, *with* Patents-in-Suit.  This is further proof that the '672 application was disclosed and considered during prosecution of the Patents-in-Suit.

98.  On August 31, 2016, during prosecution of the '672 application, an Office Action specifically pointed out that the data in the '672 application could not be reconciled with the data in the '707 patent.  The '672 Examiner pointed out that while Palepu WO 2011/094565 (the international publication of the application that issued in the U.S. as the '483 patent) reports formulations containing bendamustine, thioglycerol, and PEG400:PG as "very stable," the '672 application asserts the same composition "results in a lot of impurities":

> This uncertainty is amplified by the fact that the prior art's compositions while closely
> resembling applicant's control (solution 1) and should have similar or lower pH values
> than solution 1 yet they have the stability of solution 2 or 3.    While Table 3 and
> applicant's specification asserts that the composition with only BDM, thioglycerol, and
> PEG400:PG results in a lot of impurities, Palepu (WO 2011/094565, already of record
> and discussed in the obviousness rejection below) measures the stability of
> compositions that are very similar to that of solution 1 and yet reports them as being
> very stable. Palepu is drawn to compositions that comprise bendamustine, an
> antioxidant and PEG400:PG, however they do not teach an alkalinity adjustor such as
> sodium hydroxide as applicant claims and they do not discuss the pH of the
> compositions.  However they tested very similar compositions to that of solution 1 in
> applicant's table 3.  In table 6 of Palepu (see page 16, Palepu) they measured stability
> of solutions that contained BDM at 50 mg/mL (2x as much as applicant's table 3) and

Ex. 11 ['672 File History, 8/31/2016 Office Action] at 37; *see also id.* at 38 (WO '565 "describes the total impurities as being much lower than applicant's table 3."), 40 ("[I]t is clearly seen that the solutions in Palepu [WO '565] which are very similar to that of solution 1 in applicants table 3 do not have the high impurities that solution 1 has.").

    **ANSWER**: Eagle refers to the prosecution history of the '672 application for its content

and denies any allegations inconsistent with that content.  Except as expressly admitted, Eagle

denies all other allegations in paragraph 98.

    99.  During prosecution of the '672 application, Mr. Mercanti and the '672 applicants (which include Drs. Palepu and Buxton, the inventors of the '707 patent and the Patents-in-Suit) offered no explanation for the contradictory data.  In a subsequent Advisory Action of December 15, 2016, the Examiner stated that "applicant has also failed to address the issue raised in the previous office action that the stability information presented in the specification is in-consistent with stability results in the prior art [WO '565]."

    **ANSWER**: Eagle refers to the prosecution history of the '672 application for its content

and denies any allegations inconsistent with that content.  Except as expressly admitted, Eagle

denies all other allegations in paragraph 99.

    100. Ultimately, Mr. Mercanti and the '672 applicants abandoned the '672 application without Mr. Mercanti or the '672 applicants ever addressing the problem of the contradictory data. Further, they never disclosed the Examiner's comments about the contradictory data to the PTO during the '473 application prosecution.

    **ANSWER**: Eagle refers to the prosecution history of the '672 application for its content

and denies any allegations inconsistent with that content.  Except as expressly admitted, Eagle

denies all other allegations in paragraph 100.

101. The only logical inference is that Mr. Mercanti and Drs. Palepu and Buxton knew that the contradictions in the data could not be explained away, and so they avoided the issue when it was raised during the prosecution of the '672 application by abandoning that application.

**ANSWER**: Denied.  Initially, the '672 application published as U.S. Patent Publication

2013/0210879, which is listed under "References Cited" on each of the Patents-in-Suit, c*ompare*

'879 patent publication, *with*  Patents-in-Suit, and refutes any implication set forth in Paragraph

101.  Further, the Examiner of the '672 application rejected the pending claims as obvious,

providing a straightforward explanation for the decision to cease prosecution.

### D. The Applicants Perpetuated their False Claims of Stability, and Failed to Disclose the '672 Examiner's Recognition of Instability, During the Prosecution of the Priority Patents and the Patents-In-Suit

102. The applicants continued to perpetuate the false narrative that the full scope of their claimed liquid bendamustine formulations were long-term stable during prosecution of subsequent patents in the priority chain, including the Patents-in-Suit.  They never attempted to reconcile the contradictory data in the '672 application with the data in the '473 application specification. Instead, ignoring the '672 application Examiner's identification of contradictory data, they continued to reuse the '473 application specification for subsequent patents in the priority chain and to deceive the Examiner of the Patents-in-Suit by telling the PTO, without qualification, that the formulations covered by their claims were stable.  That was untruthful.

**ANSWER**: Denied. As explained in the Answer to Paragraph 95, there is no

contradiction to explain.  Moreover, as explained in the Answer to Paragraph 97, the Examiner

was aware of the '672 application.  '473 File History, Examiner-Initiated Interview Summary at

1; '473 File History, Notice of Allowance at 4-5.  The '672 application published as U.S. Patent

Publication 2013/0210879, which is listed under "References Cited" on each of the Patents-in-

Suit, *compare* '879 patent publication, *with* Patents-in-Suit, and refutes any implication set forth

in paragraph 102.  Further, the Examiner of the '672 application rejected the pending claims as

obvious, providing a straightforward explanation for the decision to cease prosecution.

103. While the applicants disclosed the '672 application and '879 publication during prosecution of the Patents-in-Suit, they did so by burying the '672 application and '879 publication among hundreds of other references. Further, the applicants never disclosed the prosecution history of the '672 application, particularly the observation by the Examiner of the '672 application that certain data in the '672 application could not be reconciled with the data in the '473 application (and, by extension, the Patents-in-Suit).

**ANSWER**: Denied. Courts reject "burying" theories where the reference is before an examiner and cumulative of what the record already shows. *See, e.g.*, *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 61 F.3d 1407, 1412–13 (Fed. Cir. 1995) (references cumulative of those before the Examiner are not material). References listed on the face of the patents are presumed considered by the Examiner, further undercutting any burying narrative. *See BlephEx, LLC v. Myco Indus., Inc.*, 24 F.4th 1391, 1402 (Fed. Cir. 2022) ("[W]hen prior art 'is listed on the face' of a patent, 'the examiner is presumed to have considered it."). The '672 application published as U.S. Patent Publication 2013/0210879, which is listed under "References Cited" on each of the Patents-in-Suit, *compare* '879 patent publication, *with* Patents-in-Suit, and refutes any implication set forth in paragraph 103. Further, the Examiner of the '672 application rejected the pending claims as obvious, providing a straightforward explanation for the decision to cease prosecution.

104. Further, despite knowing about the contradictory data and the '672 application Examiner's statement highlighting this data, applicants continued to misrepresent the stability of the claimed liquid bendamustine formulations throughout the prosecution of subsequent applications in the priority chain, including those that matured into the Patents-in-Suit. For example, during prosecution of the Patents-in-Suit, the applicants represented that the claimed compositions were "surprisingly" stable. Ex. 13 ['783 File History] at 21; Ex. 14 ['214 File History] at 9; Ex. 15 ['248 File History] at 23. Likewise, during the '783 patent prosecution, the applicants further represented that "the recited compositions exhibit a stability profile that is significantly improved over [prior art] formulations," because they "include less than about 5% peak area response (by HPLC) of total impurities." Ex. 13 ['783 File History] at 12 (emphasis added). Finally, during the '783 and '214 patent prosecutions, the applicants represented that "adding an antioxidant to fix the degradation caused by PEG was not conventional." Ex. 13 ['783 File History] at 38 (emphasis added); Ex. 14 ['214 File History] at 93 (emphasis added); Ex. 15 ['248 File History] at 20 (emphasis added). The applicants knew that these statements could not be true given their knowledge of and the Examiner's statements about the contradictory data in the

672 application.[4]

**ANSWER**: Eagle refers to prosecution histories of the Priority Patents and the Patents-in-Suit for their content and denies any allegations inconsistent with that content. Except as expressly admitted, Eagle denies all other allegations in paragraph 104.

105. The applicants were under a duty to disclose "information material to patentability," which includes information that "refutes, or is inconsistent with a position that applicant takes in [o]pposing an argument of unpatentability [] or [a]sserting an argument of patentability." 37 C.F.R. § 1.56. As a result, the applicants were obligated to disclose the '672 application Examiner's discussion of the contradictory data, which they knew was inconsistent with—and thus material to—the claims of the Patents-in-Suit. *Mckesson Information Sols, Inc. v. Bridge Med. Inc.*, 487 F.3d 897, 924-25 (Fed. Cir. 2007). Rather than risk a final rejection of the pending claims in the Patents-in-Suit, the applicants did not disclose the '672 Examiner's comments.

**ANSWER**: The allegations in paragraph 105 state legal conclusions to which no response is required. To the extent a response is required, Eagle denies all remaining allegations in paragraph 105.

106. Moreover, the applicants' subsequent disclosure of the '672 application and '879 publication does not cure the applicants' inequitable conduct during the prosecution of the '707 patent. At no point during prosecution of the subsequent continuation applications did the applicants specifically advise the PTO they had withheld this information and establish the patentability of claims in the subsequent applications over that information. *See Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571-73 (Fed. Cir. 1983). As a result, the applicants' inequitable conduct during the '707 patent prosecution has infected every subsequent patent in the priority chain, including the Patents-in-Suit. *Id.*

---

[4] Eagle's litigation conduct here, in obtaining newly issued patents based on continuations of the Priority Patents in order to pursue a case of infringement against formulations for which it knowingly abandoned protection, forms yet another basis for inequitable conduct. The '879 publication (of the '672 application) reveals that the stability of PEG-containing bendamustine formulations requires the addition of a compound capable of adjusting pH, like sodium hydroxide or sodium acetate (*see* Examples 2-7 of the '879 publication; *see also* independent Claims 30 and 31 requiring sodium hydroxide or sodium acetate, and independent Claims 1 and 32 that more generally require a compound to adjust pH). Applicants abandoned any attempt to obtain such claims when they dropped the '672 application. Such claims are wholly unsupported by the specifications of the Priority Patents and the Patents-in-Suit, which nowhere mention the use of sodium hydroxide, sodium acetate or any pH adjustors.

**ANSWER**: Denied.

**ANSWER**: Denied.  The Examiner of the '473 application, which ultimately issued as the '707 patent, was aware of and familiar with the '672 application.  The Examiner stated during an interview that she was aware of the provisional non-statutory obviousness-type double patenting rejections in light of various co-pending applications, among them the '672 application. '473 File History, Examiner-Initiated Interview Summary at 1.

*Examiner expressed to Ms.Jordan (Attorney of record) that it has come to her attention that the only remaining issues are provisional nonstatutory obviousness-type double patenting to co-pending application nos. 14/031,879, 13/767,672, 13/838,090 and 13/3838,267.  Co-pending application nos. 13/767,672, 13/838,090 and 13/3838,267 are later filed applications. If "provisional" ODP rejections in two applications are the only rejections remaining in those applications, the examiner should withdraw the ODP rejection in the earlier filed application thereby permitting that application to issue without need of a terminal disclaimer. A terminal disclaimer must be required in the later-filed application before the ODP rejection can be withdrawn and the application permitted to issue. Therefore, the Examiner is not requiring a terminal disclaimer for the co-pending applications. MPEP §804.*
*A terminal disclaimer was needed for co-pending application no. 14/031,879*

*Ms. Jordan state a terminal disclaimer would be filed forthwith.*

The Examiner again identified the '672 application in the notice of allowance.  '473 File History, Notice of Allowance at 4-5.

> The only remaining issues are provisional nonstatutory obviousness-type double patenting to co-pending application nos. 14/031,879, 13/767,672, 13/838,090 and 13/3838,267. Co-pending application nos. 13/767,672, 13/838,090 and 13/3838,267 are later filed applications. If "provisional" ODP rejections in two applications are the only rejections remaining in those applications, the examiner should withdraw the ODP rejection in the earlier filed application thereby permitting that application to issue without need of a terminal disclaimer. A terminal disclaimer must be required in the later-filed application before the ODP rejection can be withdrawn and the application permitted to issue. Therefore, the Examiner is not requiring a terminal disclaimer for the co-pending applications. MPEP §804.

Finally, the '672 application published as U.S. Patent Publication 2013/0210879, which is listed under "References Cited" on each of the Patents-in-Suit.  *Compare* '879 patent publication, *with*  Patents-in-Suit.  This is further proof that the '672 application was disclosed and considered during prosecution of the Patents-in-Suit.

107. Further, applicants' withholding of data related to the non-working formulations in the '672 application and '879 publication during prosecution of the '707 patent rendered the Patents-in-Suit unenforceable because this withheld data has an immediate and necessary relation to the claims of the Patents-in-Suit. The '672 application's and '879 publication's non-working formulations show that certain of Eagle's liquid bendamustine formulations that include 25 mg/mL of bendamustine, an antioxidant, PEG and PG are not long-term storage stable.

**ANSWER**: Denied.

## V.    Eagle Has Obstructed Relevant Discovery On Inequitable Conduct

Eagle has blocked Defendants''s efforts to take discovery concerning the applicants' inequitable conduct. Defendants' subpoenaed Mr. Mercanti and Dr. Lodise (the attorneys who prosecuted Eagle's liquid bendamustine patents) and Eagle accepted service of those subpoenas, but Eagle refused to make Mr. Mercanti and Dr. Lodise available for a deposition. Likewise, Defendants' served a 30(b)(6) deposition request related to the prosecution of the applications relating to the Patents-in-Suit, but Eagle has refused to produce a witness on this topic. Eagle has also represented that Dr. Palepu is not fit to sit for deposition. The unavailability of this individual makes the availability of the other witnesses involved in the prosecution of the Priority Patents and the Patents-in-Suit all the more necessary.

**ANSWER**: Eagle admits that Dr. Palepu is unable to sit for a deposition. However, Eagle

denies that it has obstructed Defendants' efforts to take discovery as the parties have scheduled

the depositions of Mr. Mercanti and Dr. Lodise. To the extent further response is required to the

allegations contained in Section V, Eagle denies all other allegations.

## JURY DEMAND

The "JURY DEMAND" paragraph following Defendants' allegations offered in support

of its Counterclaims states a demand to a trial by jury to which no response is required. To the

extent a response is required, Eagle denies that Slayback is entitled to any relief requested therein,

or to any relief whatsoever.

## PRAYER FOR RELIEF

The "WHEREFORE" paragraph following Defendants' "JURY DEMAND" states a

prayer for relief to which no response is required. To the extent a response is required, Eagle

denies the allegations of the "WHEREFORE" paragraph and denies that Defendants are entitled

to any relief requested therein, or to any relief whatsoever.

* * *

To the extent that a further answer is required to any paragraph of Defendants' Counterclaims, Eagle denies all further allegations.  Any allegation of Defendants' Counterclaims not expressly admitted herein is hereby denied.

### AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
**(Failure to State a Claim)**

Defendants' Counterclaims fail to allege facts sufficient to state a cause of action and fails to state a claim on which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE
**(Estoppel)**

Some or all of the relief requested by Defendants' Counterclaims are barred by the doctrine of estoppel, including collateral estoppel and/or issue preclusion based on one or more orders in *Cephalon, Inc. v. Slayback Pharma LLC*, C.A. No. 17-1154-CFC (D. Del.); 456 F. Supp. 3d 594 (D. Del. 2020), *aff'd*, 856 F. App'x 309 (Fed. Cir. 2021) or *Eagle Pharms., Inc. v. Slayback Pharma LLC*, No. 21-1256-CFC-JLH, 2022 WL 14460937 (D. Del. Oct. 25, 2022).

### THIRD AFFIRMATIVE DEFENSE
**(Failure to Plead Inequitable Conduct with Particularity)**

Defendants' Counterclaims fail to satisfy Federal Rule of Civil Procedure 9(b). Defendants do not plead with particularity the who, what, when, where, and how of any alleged material omission or misrepresentation for each Patent-in-Suit and claim, nor do they link any specific individual's knowledge and intent to any specific piece of information or PTO interaction.  The Counterclaims rely on broad generalizations about prosecution and conclusory assertions of misconduct rather than the particularized facts Rule 9(b) requires.

56

### FOURTH AFFIRMATIVE DEFENSE
**(No But For Materiality)**

Defendants fail to allege facts showing that any purportedly withheld or misstated information was but for material to patentability under the governing standard. The record demonstrates that the PTO had before it the core information at issue, through incorporation by reference and disclosing the '672 application, and the Examiner nonetheless allowed the claims. Where the PTO knew of the pertinent subject matter and still allowed the claims, Defendants cannot plausibly allege but-for materiality.

### FIFTH AFFIRMATIVE DEFENSE
**(No Specific Intent to Deceive the PTO)**

Defendants fail to allege facts from which specific intent to deceive the PTO is the single most reasonable inference to be drawn. Their allegations at most suggest advocacy disputes or disclosure practice disagreements, not deliberate deception. The facts as pled do not plausibly establish that any individual acted with the specific intent to mislead the PTO.

### SIXTH AFFIRMATIVE DEFENSE
**(Cumulativeness and Presumed PTO Consideration)**

Any allegedly withheld information was cumulative of materials that were before and considered by the Examiner, including materials incorporated by reference and references listed on the face of the patents. References appearing on the face of the patents are presumed to have been considered by the Examiner, defeating any claim of material omission or a "burying" theory.

### SEVENTH AFFIRMATIVE DEFENSE
**(Disclosure via Incorporation by Reference and IDS)**

To the extent Defendants' allegations rest on supposed nondisclosure, the relevant information was disclosed to the PTO through incorporation by reference and/or identification in information disclosure statements. These disclosures satisfied the duty of candor and negate any

claim that the PTO was deprived of material information.

### EIGHTH AFFIRMATIVE DEFENSE
**(No Viable "Burying" Theory)**

Defendants' "burying" theory fails as a matter of law and fact. Submission of an IDS containing multiple references, without more, does not constitute inequitable conduct. Where the references were before the Examiner and are cumulative of other record materials, alleged burying cannot establish materiality or intent to deceive.

### NINTH AFFIRMATIVE DEFENSE
**(No Immediate and Necessary Relation; Scope Limitation)**

Defendants fail to allege an immediate and necessary relation between any alleged misconduct and each asserted claim of each patent. Inequitable conduct, even if proven, cannot be extended to claims lacking such a nexus. Any equitable remedy must be limited on a claim by claim basis and cannot sweep more broadly than the conduct proven.

### TENTH AFFIRMATIVE DEFENSE
**(Overbroad Declaratory Relief)**

Defendants' requests for patent- or family-wide unenforceability are overbroad and improper. Equity requires tailoring any remedy to claims actually shown to have an immediate and necessary relation to any proven misconduct, which Defendants have not plausibly alleged.

### ELEVENTH AFFIRMATIVE DEFENSE
**(Issue Preclusion/Collateral Estoppel)**

Defendants' Counterclaims improperly relitigate issues that have been resolved in prior proceedings between overlapping parties concerning these bendamustine formulations, including issues relating to claim scope, enablement, written description, and prosecution record contentions. Those adjudications preclude re-litigation of such issues through inequitable conduct pleadings.

### TWELFTH AFFIRMATIVE DEFENSE
### (Judicial Estoppel)

Defendants are judicially estopped from asserting positions in their Counterclaims that are inconsistent with positions they previously and successfully advanced in related proceedings concerning bendamustine formulations, claim scope, and prosecution record issues.

### THIRTEENTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

Defendants' claims are barred, in whole or in part, by the doctrine of unclean hands. Defendants' own conduct—including selective quotation of materials, omission of contrary information, and litigation driven reframing of the technical record—renders inequitable the extraordinary relief they seek.

### FOURTEENTH AFFIRMATIVE DEFENSE
### (Lack of Standing/Ripeness as to Non Asserted Claims)

To the extent Defendants seek unenforceability findings as to claims not at issue in this case, or patents or applications outside the live controversy, their Counterclaims are unripe and non-justiciable.

### FIFTEENTH AFFIRMATIVE DEFENSE
### (Attorney–Client Privilege and Work Product)

Defendants may not base any inference of deceptive intent on privileged or work product protected communications. Any adverse inference from assertion of privilege is improper. Eagle's preservation of privilege cannot supply the missing elements of Defendants' claims.

### SIXTEENTH AFFIRMATIVE DEFENSE
### (Good Faith Adherence to PTO Practice)

The prosecution conduct at issue was consistent with PTO practice and guidance, including the use of incorporation by reference, IDS submissions, examiner interviews, which demonstrates good faith and negates any inference of deceptive intent.

## SEVENTEENTH AFFIRMATIVE DEFENSE
### (Failure of Infectious Unenforceability Theory)

Defendants' attempt to extend alleged inequitable conduct beyond any claim directly implicated by the alleged conduct fails. Defendants have not and cannot plead facts establishing the required immediate and necessary relation between the alleged misconduct and each claim they seek to render unenforceable.

## EIGHTEENTH AFFIRMATIVE DEFENSE
### (Waiver)

Defendants' inequitable conduct Counterclaims and the relief sought are barred, in whole or in part, by waiver. Through their conduct and omissions, Defendants knowingly and intentionally relinquished any right to pursue the pleaded theories, including by: (i) failing to timely raise or preserve the alleged grounds despite access to the prosecution histories and patent file records for years; (ii) taking litigation and administrative positions inconsistent with the counterclaims and proceeding as if no such claims existed; and (iii) entering into stipulations and case-management positions that foreclose or materially narrow the challenges they now advance. Having proceeded in a manner inconsistent with asserting these counterclaims, Defendants cannot revive them now.

## NINETEENTH AFFIRMATIVE DEFENSE
### (Laches)

Defendants' claims for equitable relief are barred, in whole or in part, by laches. Defendants unreasonably and inexcusably delayed asserting their inequitable conduct theories despite having, at a minimum, constructive knowledge of the underlying facts from the public record (including the patents, their prosecution histories, and published applications). Eagle has suffered material prejudice from that delay, including evidentiary prejudice (faded memories,

unavailable witnesses, and burdens associated with stale records) and economic prejudice (litigation costs and reliance expenditures). Equity therefore bars or limits the counterclaims and any requested equitable relief.

### TWENTIETH AFFIRMATIVE DEFENSE
**(Other Equitable Doctrines)**

Defendants' Counterclaims and demanded relief are barred, in whole or in part, by other equitable doctrines, including acquiescence, ratification, equitable estoppel, and the balance of equities. Among other things, Defendants' conduct—such as their prior positions concerning the patents and prosecution record, their selective use of materials, and their litigation tactics—renders the sweeping equitable relief they seek inequitable. Equity requires that any relief be denied or, at minimum, narrowly tailored to avoid undue prejudice to Eagle and to protect the public interest.

### TWENTY-FIRST AFFIRMATIVE DEFENSE
**(Reservation of Rights)**

Eagle reserves the right to assert additional affirmative defenses that may become known during discovery or further proceedings, without prejudice to or waiver of any defenses asserted herein.

### PRAYER FOR RELIEF

WHEREFORE, Eagle respectfully requests the following relief:

(a) An order finding Slayback's Counterclaims without merit and dismissing it with prejudice;

(b) Costs and expenses in this action;

(c) A declaration that this is an exceptional case and an award of attorneys' fees to Eagle pursuant to 35 U.S.C. § 285; and

(d) Such further relief as this Court may deem just and proper.

Dated: November 26, 2025

OF COUNSEL:

Daniel G. Brown
Kelly A. Welsh
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200
daniel.brown@lw.com
kelly.welsh@lw.com

Kenneth G. Schuler
Marc N. Zubick
Alex Grabowski
Michelle Chin
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
kenneth.schuler@lw.com
marc.zubick@lw.com
alex.grabowski@lw.com
michelle.chin@lw.com

Brett M. Sandford
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 9411
(415) 391-0600
brett.sandford@lw.com

Ramya Sri Vallabhaneni
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
ramya.vallabhaneni@lw.com

**MCCARTER & ENGLISH, LLP**

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Maliheh Zare (#7133)
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com
mzare@mccarter.com

*Attorneys for Plaintiffs*