**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., and EAGLE SUB1 LLC,<br><br>      Plaintiffs,<br><br>      v.<br><br>SLAYBACK PHARMA LLC and AZURITY PHARMACEUTICALS, INC.,<br><br>      Defendants. | C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br><br><br>PUBLIC VERSION FILED: April 27, 2026 |

**LETTER TO THE HONORABLE JENNIFER L. HALL
FROM PLAINTIFFS EAGLE PHARMACEUTICALS, INC.
AND EAGLE SUB1 LLC REGARDING DISCOVERY DISPUTE**

Dear Judge Hall:

Pursuant to the Court's Order (D.I. 322), Eagle requests the Court strike Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s ("Slayback") reliance on eight third-party license agreements ("Licenses") that were disclosed for the first time in the March 16, 2026 rebuttal report of Slayback's damages expert, James Malackowski, and produced on April 1, 2026.  Slayback's untimely disclosure violates Rule 26(e) because the Licenses should have been identified in response to Interrogatory No. 7 and produced in response to RFPs 28 and 40, respectively.  Further, as Slayback's untimely disclosure is not substantially justified or harmless, they should be struck.

In May 2024, Eagle served RFPs 40 and 53, seeking "[a]ll documents referring or relating to any patent license agreement," and to damages.  Ex. 4.  Eagle also served Interrogatory No. 7 asking Slayback to "[d]escribe with particularity the complete factual and legal bases for Your contentions regarding the amount of damages owed," including identifying "any license agreements … You contend may be relevant to the calculation of damages."  Ex. 1 at 3.  Slayback served a one-paragraph response that did not identify any license.  *Id*. at 3-4.  Slayback supplemented five times, but never identified any of the Licenses.  *Id*., *passim*.  Fact discovery closed on December 5, 2025.

On March 16, Slayback served Mr. Malackowski's report.  He opines a reasonable royalty of ▮▮ is appropriate based on the cost of an alleged non-infringing alternative, a license between Eagle and Cephalon, and the *Georgia-Pacific* Factors.  Ex. 2 at 6; Ex. 3 at 148:1-14.  He also summarizes the Licenses and relies on royalty rates in two of them—



—to "corroborate" his ▮▮▮▮.  Ex. 2 at App. 12.1, 62-66, 73; Ex. 3 at 199:17-200:13.  Mr. Malackowski located these Licenses in "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Ex. 3 at 200:16-203:2.

Rule 26 "imposes a continuing obligation to timely supplement" interrogatory responses after a party learns they are "incomplete or incorrect."  *Integra Lifesciences Corp. v. Hyperbranch Med. Tech., Inc*., No. 15-cv-819, 2017 WL 11558096, at *4 (D. Del. Dec. 11, 2017).  A party that "fails to provide information" required by Rule 26 "is not allowed to use that information" at trial unless it shows that the failure was substantially justified or harmless under Rule 37(c)(1).  *Id*.  To apply this test, the Court considers: (1) the prejudice or surprise to Eagle; (2) Eagle's ability to cure; (3) the likelihood of disrupting trial; (4) bad faith or willfulness in the non-disclosure; and (5) the importance of the evidence withheld.  *Meyers v. Pennypack*, 559 F.2d 894, 904-05 (3d Cir. 1977).

*Oasis Tooling Inc. v. GlobalFoundries US Inc.* is on all fours.  There, Judge Burke held the plaintiff violated Rule 26(e) by relying on five licenses in expert reports because they "were publicly available … prior to and during the entirety of this case," yet they were not disclosed in response to a damages contention interrogatory until "four days before the close of fact discovery."  Ex. 6.  Judge Burke reasoned that where a party "disclosed a theory based solely on publicly-available information approximately 17 months after filing suit, approximately 15 months after first being asked to articulate its damages theories, after the deadline for serving written discovery, after all [] depositions ended and four days prior to the close of fact discovery, that disclosure was untimely pursuant to Rule 26."  *Id*. (cleaned up).  Judge Burke also found the *Pennypack* factors "will not save Plaintiff" as defendant "would have been surprised by these late disclosures at the fact discovery deadline" and was "prejudiced … since discovery had closed."  *Id*.  He explained "there is no understandable reason" why the licenses were not disclosed earlier, as they were "publicly

1

available," and the evidence was not important as plaintiff has "other theories relevant to damages still available." *Id.* "In short, if you disclose information many, many months late that prejudices your opponent, if you have no good reason for doing so, and if the information isn't all that important to your case, then a motion to strike like this one will likely be granted." *Id.*

Slayback's violation is more egregious than the one in *Oasis*. Slayback was obligated to identify all licenses that "may be relevant" to damages in response to Interrogatory 7, and produce them in response to RFPs 40 and 53. *Supra* at 1. It did neither. Instead, Slayback first disclosed these Licenses in its rebuttal damages report on March 16, 2026, over three months after fact discovery closed. *Id.* Slayback had all of the necessary information to disclose this theory and produce these Licenses early in this case, as each was executed before Eagle filed suit and, according to Slayback, are "publicly available." Ex. 5. Slayback's belated disclosure violates Rule 26. *See Oasis*, Ex. 6.

Slayback cannot show that its untimely disclosure is justified or harmless, as "[a] majority of the *Pennypack* factors" favor Eagle. *Integra*, 2017 WL 11558096, at *12. Thus, they should be struck.

First, the Licenses are not important to Slayback. Striking them "would not foreclose [Slayback's] damages case entirely." *Integra*, 2017 WL 11558096, at *12. Just like the expert in *Oasis*, Mr. Malackowski only relies on two licenses to "corroborate" his ▮▮ royalty rate; he does not rely on the other six. Ex. 3 at 167:23-170:5; *compare* Ex. 6. Thus, this factor favors Eagle.

Second, Slayback's disclosure of the Licenses in rebuttal reports, four months after fact discovery closed, surprised and unfairly prejudiced Eagle. "It is undoubtably surprising and prejudicial when a party springs a new theory in the middle of expert discovery without any prior hint that it might do so." Ex. 7. If allowed, Eagle must address the Licenses without the benefit of fact discovery, including third-party discovery to understand the meaning of the terms, how they were negotiated, or why one was eventually terminated. Ex. 3 at 225:15-17; *cf.* Ex. 6 (finding party prejudiced due to lack of third-party discovery). Thus, as in *Oasis*, this factor "strongly favors" Eagle. Ex. 6.

Third and fourth, the prejudice to Eagle cannot be cured. Fact discovery is closed, expert reports have been served, and expert depositions are well underway. Supplemental fact discovery would disrupt the schedule, which may impact the trial date. Ex. 8 at 25 (finding disruption to trial where "no trial date has been scheduled," as "remaining expert discovery deadlines would need to be stayed to allow for … fact discovery"). Slayback argued during meet and confer that Eagle's expert could simply address the Licenses in his reply report, but that he was "able to provide some response … does not replace the months of analysis and discovery" Eagle "would have conducted had it known [Slayback's] true damages theories." *Integra*, 2017 WL 11558096, at *11.

Finally, Slayback has no legitimate explanation for its belated disclosure, which shows it "may take lightly or not recognize the importance of its obligations to supplement in a timely manner." Ex. 8 at 26. Slayback previously argued that the Licenses were "publicly available," but that is not correct according to its damages expert, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 3 at 200:16-203:2. Even if true, "there is no understandable reason why" Slayback "did not earlier disclose these theories (information about which … was publicly available)," "suggesting at least some negligence in its failure to follow the rules." Ex. 6.

Eagle requests the Court strike Slayback's reliance on the third-party licenses (Ex. 2, App. 12.1).

2

Dated: April 20, 2026

OF COUNSEL:

Kenneth G. Schuler
Marc N. Zubick
Alex Grabowski
Michelle Chin
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
kenneth.schuler@lw.com
marc.zubick@lw.com
alex.grabowski@lw.com
michelle.chin@lw.com

Kelly A. Welsh
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
kelly.welsh@lw.com

Brett M. Sandford
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 9411
(415) 391-0600
brett.sandford@lw.com

Ramya Sri Vallabhaneni
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
ramya.vallabhaneni@lw.com

MCCARTER & ENGLISH, LLP

*/s/ Alexandra M. Joyce*

Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Attorneys for Plaintiffs*

ME1\60724593.v1

# Exhibit 1
# Filed Under Seal

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

EAGLE PHARMACEUTICALS, INC. and
EAGLE SUB1 LLC,

        Plaintiffs,

    v.

SLAYBACK PHARMA LLC and AZURITY
PHARMACEUTICALS, INC.,

        Defendants.

C.A. No. 24-65-JLH

**HIGHLY CONFIDENTIAL**

**DEFENDANTS SLAYBACK PHARMA LLC
AND AZURITY PHARMACEUTICALS, INC.'S
FIFTH SUPPLEMENTAL RESPONSE
TO PLAINTIFFS' COMMON INTERROGATORIES (NO. 7)**

Pursuant to Federal Rules of Civil Procedure 26 and 33, Defendants Slayback Pharma

LLC ("Slayback") and Azurity Pharmaceuticals, Inc. ("Azurity") (collectively Defendants")

responds to Eagle Pharmaceuticals, Inc.'s ("Eagle") and Eagle Sub1 LLC's ("Sub1")

(collectively "Plaintiffs") "First Set of Common Interrogatories No. 7" (regarding damages) with

Defendants' Fourth Supplemental Response herein as follows:

The general and specific objections and the responses set forth below are made based on

the best information presently available to Slayback.  Slayback reserves the right to amend,

supplement, or change any responses and objections if and when additional, different or more

accurate information becomes available and/or facts are discovered.  In making the following

objections and responses, Slayback does not waive any objections that may be applicable to

(a) the use, for any purpose, of any information provided in response to Plaintiff's

Interrogatories, or (b) the admissibility, relevance, or materiality of any such information to any

issue in this case.

on any ground to any interrogatory for further responses to these or other discovery request; and

any and all other objections and grounds that would or could require or permit the exclusion of

any information, document or statement therein from evidence, all of which objections and

grounds are reserved and may be interposed at a hearing in this litigation.

4.      Slayback objects to any request to the extent it seeks responses, information or

documents that are attorney-client privileged, or attorney work product privileged, or subject to

any other privileged recognized by law.

5.      Slayback objects to any request to the extent that it seeks expert discovery before

the court-ordered time for such discovery in the schedule.

6.      Slayback objects to any request that seeks information beyond what is required in

discovery under the Federal Rules of Civil Procedure, including, but not limited to, requests that

are irrelevant, unduly burdensome, and/or disproportionate to the needs of the case.

## INTERROGATORY NO. 7:

Describe with particularity the complete factual and legal bases for Your contentions regarding the amount of damages owed, including (a) the damages amount for past infringement and future infringement; (b) the methodology of calculating damages (e.g., reasonably royalty, lost profits, or some other measure); (c) whether Plaintiff is entitled to lost profits and, if not, why not; (d) the nature and amount of the royalty base (including all products and acts that comprise the royalty base); (e) the date(s) of the hypothetical negotiation that should be used for evaluating a reasonable royalty; (f) the nature of and basis for any alleged apportionment methodology for calculating damages; (g) the royalty rate for calculating damages in the form of a reasonable royalty, including Your position on each of the factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp 1116, 1120 (S.D.N.Y. 1970); (h) any license agreements, crosslicenses, settlement agreements, covenants-not-to-sue, other agreements, license proposals, offers to license, or negotiations that You contend may be relevant to the calculation of damages; and identify the five persons employed or otherwise associated with You with knowledge of facts supporting the contentions.

**RESPONSE:**

Slayback objects to this Interrogatory as premature under the Federal Rules of Civil Procedure, the Local Rules, and any other orders of the Court. In particular, this Interrogatory seeks information that will be the subject of expert reports and expert depositions. Slayback further objects to this Interrogatory as overly broad and unduly burdensome because Plaintiff has not set forth any detailed damages theory as to Slayback's NDA Product. Slayback also objects to this Interrogatory as seeking information protected by the attorney-client, joint defense, and common interest privileges, work-product immunity, or any other applicable privilege or immunity.

Slayback will provide its expert reports in accordance with the Federal Rules of Civil Procedure, the Local Rules, and orders of the Court. Pursuant to Fed. R. Civ. P. 33(d), Slayback will produce non-privileged, responsive documents at the appropriate time in accordance with the Federal Rules of Civil Procedure, the Local Rules, and the orders of the Court, from which the information sought by this Interrogatory may be derived or ascertained, to the extent such documents exist and can be located after a reasonable search.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7 (February 3, 2025):**

The factual and legal bases for Slayback's contentions regarding the amount of damages owed, including (a) the damages amount for past infringement and future infringement; (b) the methodology of calculating damages (e.g., reasonable royalty, lost profits, or some other measure); (c) whether Plaintiff is entitled to lost profits and, if not, why not; (d) the nature and amount of the royalty base (including all products and acts that comprise the royalty base); (e) the date(s) of the hypothetical negotiation that should be used for evaluating a reasonable royalty; (f) the nature of and basis for any alleged apportionment methodology for calculating damages; (g) the royalty rate for calculating damages in the form of a reasonable royalty,

4

Dated: December 5, 2025

*Of Counsel:*

Constance S. Huttner
Alan Pollack
Jason A. Lief
Robyn Ast-Gmoser

**WINDELS MARX LANE & MITTENDORF LLC**
1 Giralda Farms
Madison, NJ 07940
(973) 966-3200

156 West 56th Street
New York, NY 10019
(212) 237-1000

chuttner@windelsmarx.com
apollack@windelsmarx.com
jlief@windelsmarx.com
rast-gmoser@windelsmarx.com

**SMITH KATZENSTEIN & JENKINS LLP**

*/s/ Daniel A. Taylor*
Neal C. Belgam (No. 2721)
Daniel A. Taylor (No. 6934)
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
dtaylor@skjlaw.com

*Attorneys for Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*

52

# Exhibit 2
# Filed Under Seal



OCEAN TOMO®

A PART OF JS|HELD

**EAGLE PHARMACEUTICALS, INC, AND EAGLE SUB1 LLC.**

**V.**

**SLAYBACK PHARMA LLC AND AZURITY PHARMACEUTICALS, INC.**

Civil Action No. 1:24-cv-00065-JLH

United States District Court for the District of Delaware

---

# EXPERT REPORT OF JAMES MALACKOWSKI

**March 16, 2026**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**INTELLECTUAL CAPITAL EQUITY**

### 3.1.2    Reasonable Royalty

Slayback's cost relating to the Slayback PAS NDA Product as a percentage of Vivimusta® net revenue during the damages period, the per-patent royalty rate indicated by the 2015 Eagle – Cephalon Agreement, and my evaluation of the *Georgia-Pacific* factors indicate a hypothetically negotiated royalty rate of 3.0 percent of Vivimusta® net revenues.

**Figure 3** summarizes the reasonable royalty due Plaintiffs at a royalty rate of 3.0 percent of Vivimusta® net revenue during the damages period of January 16, 2024 through September 30, 2025.

**Figure 3**
**Reasonable Royalty for Sales of Vivimusta® During the Damages Period[11]**

|  | Q1 2024 | Q2 2024 | Q3 2024 | Q4 2024 | Q1 2025 | Q2 2025 | Q3 2025 | Total |
|---|---|---|---|---|---|---|---|---|
| Vivimusta® Revenue | $12,414,994 | $425,594 | $8,990,004 | -$501,801 | $8,368,802 | $1,760,355 | $4,461,858 | $35,919,807 |
| Royalty Rate | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |
| Reasonable Royalty | $372,450 | $12,768 | $269,700 | -$15,054 | $251,064 | $52,811 | $133,856 | $1,077,594 |

As **Figure 3** illustrates, assuming the Asserted Patents are found to be valid and infringed, the reasonable royalty due Eagle is $1,077,594.[12]

### 3.2    Evaluation of the Vellturo Report

Dr. Vellturo contends that the Plaintiffs sustained lost profits of $20.3 million or, alternatively, is due a reasonable royalty in the range of $9.0 million to $12.1 million.[13]  Dr. Vellturo's opinions are defective and unreliable for at least the following reasons:

- Dr. Vellturo improperly excludes powder bendamustine products from his definition of the relevant market.[14]

- Dr. Vellturo's lost profits analyses are based on false premises and defective analyses which render his opinions unreliable.[15]

- Dr. Vellturo's price erosion opinions are defective and unreliable.[16]

- Dr. Vellturo's opinions concerning the Blue Owl Transaction are defective and unreliable.[17]

---

[11] Appendix 3.3.

[12] Appendix 3.3.  In the event only the '248 patent is found to be valid and infringed, the reasonable royalty is $429,549.

[13] Vellturo Report, February 6, 2026, pp. 5 – 6.

[14] Vellturo Report, February 6, 2026, p. 18.

[15] Vellturo Report, February 6, 2026, Exhibit 21.

[16] Vellturo Report, February 6, 2026, pp. 60 – 65.

[17] Vellturo Report, February 6, 2026, pp. 65 – 67.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

### 10.3.3   Comparabilty Evauations of Third-Party License Agreements

Ocean Tomo identified potentially comparable third-party licenses through searches of publicly available license databases such as RoyaltyStat® and ktMINE.  RoyaltyStat® is a subscription database of more than 23,000 license and service agreements.[442]  ktMINE was founded by industry practitioners and technologists who were set to provide data and insights for royalty benchmarking.  According to ktMINE, it "offers the most comprehensive royalty rate data, offering over 86,000 royalty rates across various industries coming from over 26,000 license agreements – the largest repository on the market."[443]

Comparable license agreements were identified through searches of the RoyaltyStat® and ktMINE databases using keyword and combination-of-keyword searches.  The keywords and combinations included, for example, "Oncology," "Formulation," "Chronic Lymphocytic Leukemia," and "Non-Hodgkin's Lymphoma." Through searches of the RoyaltyStat® and ktMINE databases and other industry sources conducted at my direction, eight third-party license agreements were identified for further review and evaluation.

**Appendix 10.2** contains summary information concerning the eight identified license agreements.  As **Appendix 10.2** illustrates, these agreements are between third parties involved in the life sciences industry, involve transfers of cancer and/or formulation technologies, and typically have running royalties based on percentages of revenues from future sales of products.  Upon further review of the agreements summarized in **Appendix 10.2**, the following two licenses were evaluated for comparability to a hypothetically negotiated license based in part on the Sedona Commentary License Comparability factors set forth in **Figure 13**.  Both of these licenses concern formulation related technology for cancer treatments.

### 10.3.3.1  The 2006 Chen – Bridgetech Holdings Int'l Agreement

<u>The Parties</u> – The parties to the 2006 Chen – Bridgetech Agreement ("2006 Bridgetech Agreement") are Mr. Andrew Xian Chen ("Chen") as the licensor, and Bridgetech Holdings International, Inc. ("Bridgetech") as the licensee.[444]  In or about 2006, Mr. Chen was the President of Latitude Pharmaceuticals, Inc. ("Latitude"). Latitude is a drug formulation development company based in San Diego, California.[445]  In 2006, Bridgetech was a Florida corporation focused primarily on the business of facilitating the transfer of medical drugs, devices and diagnostics from the U.S. to China and other international locations.[446]

<u>The Nature of the Agreement</u> - The 2006 Bridgetech Agreement granted Bridgetech an exclusive license to technology to develop, manufacture, sell and otherwise commercialize lyophilized docetaxel intravenous

---

[442] https://royaltystat.com/.

[443] https://www.ktmine.com/why-ktmine/our-data/royalty-rates/.

[444] The 2006 Chen – Bridgetech Agreement, April 29, 2006, p. 1.

[445] https://www.latitudepharma.com/formulation.

[446] Bridgetech Holdings Int'l Inc. Form 10-SB, July 2006, F-44.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

emulsion formulations[447] and lyophilized paclitaxel intravenous emulsion formulations[448] for cancer treatment in the People's Republic of China, Hong Kong, Macau, and Taiwan.[449]  The 2006 Bridgetech Agreement also granted Bridgetech rights to lyophilized formulations of vancomycin and clarithromycin for the treatment of infectious diseases in the People's Republic of China, Hong Kong, Macau, and Taiwan.[450]  Under the agreement, Bridgetech was responsible for all regulatory and patent related costs.[451]

The Technology – As of the date of the 2006 Bridgetech Agreement, the cancer-related patented technology included U.S. Patent Application No. 11/192,439, WO Patent Application No. US2005/026783, both filed on July 28, 2005,[452] and two U.S. provisional patent applications filed in February 2006.[453]  Know-how is defined as including all knowledge, ideas, inventions, data, instructions, tangible or intangible materials, processes, formulas, expert opinions and information.[454]

Economic Consideration – In exchange for the exclusive rights to the licensed technology, Bridgetech agreed to pay Mr. Chen a running royalty of 4.0 percent of net revenue from sales of licensed products.  Bridgetech also agreed to pay Mr. Chen an upfront payment of $500,000 and regulatory and other milestone payments of up to $2.0 million, depending in part on the number of and timing of clinical trials.[455]

Observations and Inferences -

- Points of Similarity: Like the hypothetical negotiation, the 2006 Bridgetech Agreement involves rights to formulations of cancer treatments with APIs that were FDA approved years earlier.  Like the hypothetical negotiation, both parties are involved with the development and/or commercialization of drug products – Mr. Chen representing a willing licensor, and Bridgetech representing a willing licensee.  There is no indication that the parties' relative bargaining positions were unequal.  In addition, like the hypothetical negotiation, the 2006 Bridgetech Agreement grants rights to a limited number of formulation-related technologies.

---

[447] The 2006 Chen – Bridgetech Agreement, April 29, 2006, Appendix A.  Docetaxel was first FDA approved in 1996. It is currently approved to treat such cancers as breast cancer, lung cancer, prostate cancer, and stomach cancer. https://www.mayoclinic.org/drugs-supplements/docetaxel-intravenous-route/description/drg-20068305; https://www.accessdata.fda.gov/drugsatfda_docs/nda/2014/202356Orig1s000OtherR.pdf.

[448] The 2006 Chen – Bridgetech Agreement, April 29, 2006, Appendix A.  Paclitaxel was first FDA approved in 1992.  It is currently approved to treat such cancers as ovarian cancer, breast cancer, lung cancer and pancreatic cancer. https://www.mayoclinic.org/drugs-supplements/paclitaxel-intravenous-route/description/drg-20065247; https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/020262Orig1s048.pdf.

[449] The 2006 Chen – Bridgetech Agreement, April 29, 2006, pp. 2 – 3.

[450] The 2006 Chen – Bridgetech Agreement, April 29, 2006, pp. 2, 15.

[451] The 2006 Chen – Bridgetech Agreement, April 29, 2006, p. 5.

[452] U.S. Patent Application No. 11/192,439 was published as U.S. Patent Application Publication No. 2006/0024360 and WO Patent Application No. US2005/026783 was published as WO 2006/015120.

[453] The 2006 Chen – Bridgetech Agreement, April 29, 2006, Appendix A.

[454] The 2006 Chen – Bridgetech Agreement, April 29, 2006, p 1.

[455] The 2006 Chen – Bridgetech Agreement, April 29, 2006, p 3.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- <u>Differences that place upward pressure on the royalty:</u> Unlike the hypothetical negotiation, the consideration of the 2006 Bridgetech Agreement included an upfront payment and milestone payments totaling as much as $2.0 million. Also, unlike the hypothetical negotiation, the licensed products to which Bridgetech received rights had not been commercialized at the time of the license. In addition, the licensed patent rights were to applications, and Bridgetech was responsible for the cost of future prosecution in the territory as well as for all future regulatory costs - including for clinical trials.[456] Furthermore, although the parties to the 2006 Bridgetech agreement were involved in the pharmaceutical industry, unlike the parties to the hypothetical negotiation, they were not competing in the same product segment. These factors would place upward pressure on the royalty rate of the hypothetical negotiation compared to the royalty rate of the 2006 Bridgetech Agreement.

- <u>Differences that place downward pressure on the royalty:</u> The exclusive nature of the 2006 Bridgetech Agreement places downward pressure on the hypothetically negotiated royalty rate for non-exclusive rights to the Asserted Patents. The 2006 Bridgetech Agreement also includes rights to Mr. Chen's know-how.[457] These factors would place downward pressure on the royalty rate of the hypothetical negotiation compared to the royalty rate of the 2006 Bridgetech Agreement.

- <u>Conclusions:</u> On balance, these considerations indicate that the 2006 Bridgetech Agreement is comparable to the hypothetically negotiated license, and that the parties to the hypothetical negotiation would consider its exclusive nature, the scope of granted IP rights, and Bridgetech's requirement to finance future patent and regulatory costs in determining its influence on the hypothetically negotiated royalty rate for rights to the Asserted Patents.

### 10.3.3.2 The 2013 John Hopkins - Signpath Agreement

<u>The Parties</u> – The parties to the 2013 John Hopkins – Signpath Agreement ("the 2013 John Hopkins Agreement") are John Hopkins University as the licensor and Signpath Pharma as the licensee.[458] John Hopkins University is a highly-ranked, private medical research university located in Baltimore, Maryland. According to its Form S-1 dated January 2015, Signpath Pharma was a clinical stage biotechnology company founded in May 2006 to develop synthesized proprietary formulations of curcumin, a naturally occurring compound found in the root of the Curcuma longa Linn plant, for applications in human diseases.[459]

<u>The Nature of the Agreement</u> – The 2013 John Hopkins Agreement granted Signpath exclusive rights to an invention that was developed by the parties through a previous license agreement in 2007.[460] Through the 2013 John Hopkins Agreement, John Hopkins granted Signpath an exclusive worldwide license to use "a

---

[456] The 2006 Chen – Bridgetech Agreement, April 29, 2006, Appendix B.

[457] The 2006 Chen – Bridgetech Agreement, April 29, 2006, p. 1.

[458] 2013 John Hopkins Agreement, June 5, 2013, p. 1.

[459] Signpath Pharma Inc. Form S – 1, January 27, 2015, p. 3.

[460] Signpath Pharma Inc. Form S – 1, January 27, 2015, p. 46.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

composite polymeric nanoparticle for overcoming multidrug resistance to cancer chemotherapeutics and treatment-related systemic toxicity."[461]

The Technology – As set forth in Exhibit A of the 2013 John Hopkins Agreement, the licensed technology consisted of one U.S. Provisional Patent Application 61/421,709 and Int'l Patent Application PCT/US2011/063870.[462]  The invention is described as "[a] composite polymeric nanoparticle for overcoming multidrug resistance to cancer chemotherapeutics and treatment-related systemic toxicity."[463]

Economic Consideration – The 2013 John Hopkins Agreement required Signpath to pay an initial license fee of $10,000, $15,000 within one year, with minimum annual royalties of $10,000 in year three, $20,000 in year four, and $30,000 in year five.  Signpath was also required to pay a royalty of 3.0 percent of revenue from sales of the licensed product for a minimum of 10 years from the first commercial sale of the licensed product.  The 2013 John Hopkins Agreement required Signpath to pay milestone payments based on the first patent dosing in Phases I, II and III clinical trials and then upon regulatory approval, increasing from $25,000 to $150,000.[464]  The term of the Agreement ended with the last to expire patent in each country, or if no patents are issued then 20 years from June 5, 2013, subject to earlier termination.[465]

- Points of Similarity: Like the hypothetical negotiation, the 2013 John Hopkins Agreement involves rights to formulations of cancer treatments.  Like the hypothetical negotiation, both parties are involved with the research, development and/or commercialization of drug products – John Hopkins representing a willing licensor, and Signpath representing a willing licensee.  There is no indication that the parties' relative bargaining positions were unequal.  In addition, like the hypothetical negotiation, the 2013 John Hopkins Agreement grant rights to a limited number of formulation-related technologies.

- Differences that place upward pressure on the royalty: Unlike the hypothetical negotiation, the consideration of the 2013 John Hopkins Agreement included an upfront payment and milestone payments.  Also, unlike the hypothetical negotiation, the licensed product to which Signpath received rights had not been commercialized at the time of the license and Signpath was responsible for developing the product.  In addition, the licensed patent rights were to patent applications.  Furthermore, although the parties to the 2013 John Hopkins Agreement were involved in the pharmaceutical industry, unlike the parties to the hypothetical negotiation, they were not competing in the same product segment.  These factors would place upward pressure on the royalty rate of the hypothetical negotiation compared to the royalty rate of the 2013 John Hopkins Agreement.

---

[461] Signpath Pharma Inc. Form S – 1, January 27, 2015, p. 47.

[462] 2013 John Hopkins Agreement, June 5, 2013, Exhibit A.  U.S. Provisional Patent Application 61/421,709 and Int'l Patent Application PCT/US2011/063870 were published as U.S. Patent Application Publication No. 2013/0330412.

[463] 2013 John Hopkins Agreement, June 5, 2013, Exhibit A.

[464] 2013 John Hopkins Agreement, June 5, 2013, Exhibit A.

[465] Signpath Pharma Inc. Form S – 1, January 27, 2015, p. 46.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

- <u>Differences that place downward pressure on the royalty:</u> The exclusive nature of the 2013 John Hopkins Agreement places downward pressure on the hypothetically negotiated royalty rate for non-exclusive rights to the Asserted Patents.  This factor would place downward pressure on the royalty rate of the hypothetical negotiation compared to the royalty rate of the 2013 John Hopkins Agreement.

- <u>Conclusions:</u> On balance, these considerations indicate that the 2013 John Hopkins Agreement is comparable to the hypothetically negotiated license, and that the parties to the hypothetical negotiation would consider its exclusive nature, and Signpath's requirement to finance future product development and regulatory costs, in determining its influence on the hypothetically negotiated royalty rate for rights to the Asserted Patents.

### 10.3.3.3  Conclusions Concerning Comparability of Third-Party Agreements

Given the indicated similarities of these licenses, I consider these third-party agreements to be informative of the royalty to which Eagle and Slayback would have agreed during the hypothetical negotiation for rights to the Asserted Patents.  My summary of observations and inferences of these agreements explains the basis for any upward or downward influence at the hypothetical negotiation. **Figure 15** is a summary of the Sedona Commentary factors for the third-party agreements evaluated above.

**Figure 15**
**Sedona Commentary Factors Considered for Third-Paty Agreements**

| | Sedona Conference Factors | Bridge | JHU | Condusion |
|---|---|---|---|---|
| 1 | Cross-license provisions | ✓ | ✓ | No cross licenses: more comparable |
| 2 | Agreements licensing patents (also 3 and 5) | ✓ | ✓ | Benchmarks for formulation/cancer patents: more comparable |
| 4 | Other technology, property, or "know-how" | ✓ | ✓ | Form & Bridge include know-how; Bridge includes milestones |
| 6 | Any business relationship between the parties | ✓ | ✓ | Unrelated parties: more comparable |
| 7 | The scope of the patent rights granted | ✓ | ✓ | Scope of granted patent rights similar: more comparable |
| 8 | The product or service of the patents | ✓ | ✓ | Involve fromulation/cancer technology: more comparable |
| 9 | The royalty base used in the agreement | ✓ | ✓ | Royalties structured as % of net revenue: more comparable |
| 10 | Parties relative bargaining positions (also 15) | ✓ | ✓ | Between willing licensors and licensees: more comparable |
| 11 | Bona fide agreement and royalties paid | ✓ | ✓ | Are bona fide agreements: more comparable |
| 12 | The royalty structure | X | ✓ | Running royalty % of sales; Bridge upfront fee + milestones |
| 13 | The date and term of the agreement | ✓ | ✓ | Dates within 5 to 18 years of hypothetical negotiation |
| 14 | Validity and infringement assumptions | X | X | As discussed in Georgia-Pacific factors |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

**14    SIGNATURE**

Respectfully submitted,

_____

James E. Malackowski

March 16, 2026

_____

Date

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix 12

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

*Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC. v. Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*

**SUMMARY OF THIRD PARTY LICENSE AGREEMENTS**

Appendix 12.1

| | Title | Licensor | Licensee | Effective Date | Term | License Grant | Licensed Technology | Payment & Royalty |
|---|---|---|---|---|---|---|---|---|
| | **1998 Albert Einstein College - Pain Therapeutics Agreement** | | | | | | | |
| [1] | License Agreement | Albert Einstein College of Medicine of Yeshiva University | Pain Therapeutics, Inc. | 5/5/1998 | This Agreement shall continue in effect on a country-by-country basis until expiration date of the last obligation of licensee to pay royalty to university for the sale of a Licensed Product in that country. | An exclusive license, with right to grant sublicenses, under the Patent Rights and Know-How to make, have made, use, sell, offer for sale and import Licensed Products in the entire world. | - U.S. Patent No. 5,472,943; U.S. Patent No. 5,512,578, U.S. Patent No. 5,580,876; U.S. Patent No. 5,765,125; U.S. Patent No. 5,585,348. <br> - 4 United States patent applications <br> - 1 International Patent <br> - 9 International patent applications <br><br> "Know-How" means all information and materials, including but not limited to, technology, experience, discoveries, improvements, processes, formulae, data (including but not limited to all preclinical, clinical, toxicological, and pharmacological data) and inventions, trade secrets, patentable or otherwise, developed by the university through Drs. Crain and Shen. | License Fee: $100,000 <br> Research Funding: $600,000 <br> Milestones Payments: Up to $4,000,000 <br><br> Royalty: 4% of the total aggregate Net Sales of Licensed Products in all countries in the Territory in which the sale of the Licensed Product is covered by a Valid Patent Claim; <br><br> A royalty of 2% as a Know-How royalty, for each country in the Territory in which the sale of the Licensed product is not covered by a Valid Patent Claim but involves the use of Know-How. |
| | **2000 Molecular Medicine Research Institute - Amarillo Biosciences Inc. Agreement** | | | | | | | |
| [2] | License Agreement | Molecular Medicine Research Institute | Amarillo Biosciences, Inc. | 2/1/2000 | This Agreement and all rights licensed here under shall terminate upon the expiration of the Patent, or if there should be one or more foreign counterparts, upon the expiration of the last expiring Patent. | A royalty-bearing, exclusive license under the Patent and under MMRI Technical Information to make, have made, or use Licensed Product labeled for testing or trials, and upon proper regulatory approval, for use and sale to treat humans or animals in the United States. | United States Patent Application No. 60/156,480, dated September 28, 1999, relating to a method for using interferon-g ("IFN-g") orally, and which, along with all modifications, revisions, continuations, continuations-in-part, divisions, re-issues, extensions, or foreign counterparts thereof. | A royalty of 10% of all amounts received by ABI or an ABI Affiliate from a Sublicensee or Sublicensee Affiliate, which amounts are based on sales of Licensed Product. |

*Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC. v. Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*

**SUMMARY OF THIRD PARTY LICENSE AGREEMENTS**

Appendix 12.1

| | Title | Licensor | Licensee | Effective Date | Term | License Grant | Licensed Technology | Payment & Royalty |
|---|---|---|---|---|---|---|---|---|
| **2001 Wayne State - SafeScience Agreement** | | | | | | | | |
| [3] | License Agreement | Wayne State University and Barbara Ann Karmanos Cancer Institute | SafeScience, Inc. | 1/26/2001 | The Agreement shall remain in effect until the later of the expiration of the term of the last to expire of the Licensed Patents, or on a Territory-by-Territory basis, twelve years following the first commercial sale of Licensed Products. | Wayne State and Barbara Ann Karmanos hereby grant to SafeScience an exclusive, worldwide, royalty-bearing license under the Licensed Patents and Licensed Technology, including the right to grant sublicenses and the right to make, have made, use, lease and sell Licensed Products. | 1. European National Phase PCT Application No. 95 925 253.7 2. Norwegian Patent Application No. 19970039 3. Australian Patent No. 695677 4. Brazilian Patent Application No. PI 9508245 5. Singapore Patent No. 36374 6. Japanese National Phase PCT Application No. 8-504302 7. Mexican National Stage Application No. 970118 8. Canadian Patent Application No. 2,194,586 9. Chinese National Stage Application No. 95194958.6 10. Finnish Patent Application No. 965269 11. U.S. Patent No. 5,834,442 12. U.S. Patent No. 5,895,784 | On the Effective Date, SafeScience shall pay Licensors a license fee of $300,000. SafeScience, Inc. shall pay to Licensors royalties in respect of the most recent three-month period then ended equal to (i) 2% of Net Revenue in respect of Licensed Products. (ii) 1.5% of Net Revenue in respect of Licensed Products that are not covered by an issued claim of any Licensed Patents. |
| **2005 Trustees of Columbia University - Omnimmune Corp Agreement** | | | | | | | | |
| [4] | License Agreement | The Trustees of Columbia University | Omnimmune Corp. | 2/1/2005 | The term of the exclusive license granted under the Licensed Patents shall extend until the expiration of the last to expire of the Licensed Patents or ten years from the date of the first sale, whichever is later, on a product by product basis. | (i) A worldwide exclusive license to develop, manufacture, use, sell, have sold, rent, or lease Licensed Products in the Therapeutic Subfield and the Animal Subfield; (ii) With respect to any right, title or interest Columbia may have in the Licensed Patents, and/or Licensed Material, a worldwide non-exclusive license to develop, manufacture, use, sell, have sold, rent, or lease Licensed Products in the Diagnostic Subfield, except that no license is granted in the Licensed Patents and/or Licensed Materials with respect to B152 as listed on Attachment A in the Diagnostic Subfield. | 1) Methods of Using Antibodies Against Human Chorionic Gonadotropin-Related Determinants to Lyse, Quantitatively Measure and Enrich Human Malignant Cells. European Patent No. 0636171 issued 6/7/00. 2) Methods of Using Antibodies Against Human Luteinizing Hormone-Related Determinants to Detect and Enrich Human Malignant Cells. U.S. Serial No. 10/164,914 and any continuation, or divisional continuation thereof; Patent No. 6,403,326 issued 6/11/02. 3) Method of Using Antibodies against Hormone-Related Determinants. U.S. Patent number 6,339,143 issued January 15, 2002. Licensed Materials: Antibodies and Cell Lines: A) A501, A502, A201, A202, B) B109, B201, B204, B205, B151, B152 , B405, B406, B407, B408, B409, B411, B412, B413, C) CTP-101, CTP-102, CTP-103, CTP 104, CTP 105. | Nonrefundable and non-creditable license fee of $30,000. A royalty of 1% of Net Sales of all Licensed Products that involve use of Licensed Material or Licensed Information but are not covered by a Claim of a Licensed Patent for a term of ten (10) years from the date of the first sale of each product. A royalty of 2% of Net Sales of all Licensed Products covered by a Claim of a Licensed Patent exclusively licensed to the Company hereunder, for a period of ten (10) years from the date of First Sale of each new Licensed Product in a territory or the last to expire Licensed Patent in such territory, whichever is longer. |

*Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC. v. Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*

**SUMMARY OF THIRD PARTY LICENSE AGREEMENTS**

Appendix 12.1

| | Title | Licensor | Licensee | Effective Date | Term | License Grant | Licensed Technology | Payment & Royalty |
|---|---|---|---|---|---|---|---|---|
| | **2006 Andrew Chen - Bridgetech Agreement** | | | | | | | |
| [5] | Agreement for Purchase and Sale | Andrew Xian Chen | Bridgetech Holdings International, Inc. | 4/29/2006 | The longer of (i) the life of the last to expire of the patents included in the Intellectual Property, and (ii) a period of ten years; unless this Agreement is terminated earlier. | Agreement granted Bridgetech an exclusive license to technology to develop, manufacture, sell and otherwise commercialize lyophilized docetaxel intravenous emulsion formulations and lyophilized paclitaxel intravenous emulsion formulations for cancer treatment in the People's Republic of China, Hong Kong, Macau, and Taiwan.  The 2006 Bridgetech Agreement also granted Bridgetech rights to lyophilized formulations of vancomycin and clarithromycin for the treatment of infectious diseases in the People's Republic of China, Hong Kong, Macau, and Taiwan. | The Bridgetech Agreement cancer-related patented technology included U.S. Patent Application No. 11/192439, WO Patent Application No. US2005/026783 both filed on July 28, 2005, and two U.S. provisional patent applications filed in February 2006.<br><br>Know-how is defined as including all knowledge, ideas, inventions, data, instructions, tangible or intangible materials, processes, formulas, expert opinions and information. | A running royalty of 4.0 percent of net revenue from sales of licensed products. Bridgetech also agreed to pay Mr. Chen an upfront payment of $500,000 and regulatory and other milestone payments of up to $2.0 million, depending in part on the number of and timing of clinical trials.<br><br>Under the agreement, Bridgetech was responsible for all regulatory and patent related costs. |
| | **2011 SCOLR Pharma Inc. - Syntrix Biosystems Agreement** | | | | | | | |
| [6] | Drug "X" Exclusive License Agreement | SCOLR Pharma Inc. | Syntrix Biosystems, Inc. | 6/2/2011 | Royalty Term means the period commencing on the date of the first commercial sale and ending on the earlier of (i) July 19, 2017, and (ii) Syntrix's aggregate payment of the maximum cap amount of US $20 million. | SCOLR grants Syntrix an exclusive, perpetual, royalty-bearing, assignable license in the worldwide Territory under the Patents and Licensed Know-How for the sole purpose of developing, manufacturing, commercializing, making, having made, using, selling, offering for sale and importing Products. | U.S. Patent Application 09/037,096, U.S. Patent 6,090,411, PCT Application PCT/US99/04508, European Patent Application No. 99 909 726.4, Canadian Patent CA 2323102, and Mexican Patent 220625 which relate to controlled-release pharmaceutical compositions and associated methods.<br><br>Licensed Know-how: SCOLR must provide, within 30 days of the Effective Date, all information listed in Annex B of the Agreement, including formulation data, analytical data, and manufacturing data. | Upfront Payment: $18,000 (non-refundable, non-recoupable) paid as of the Effective Date.<br><br>Running Royalties: 4% of Net Sales and 4% of Sublicense Sales Royalties actually received by Syntrix. |

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

*Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC. v. Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*

**SUMMARY OF THIRD PARTY LICENSE AGREEMENTS**

Appendix 12.1

| | Title | Licensor | Licensee | Effective Date | Term | License Grant | Licensed Technology | Payment & Royalty |
|---|---|---|---|---|---|---|---|---|
| **2013 John Hopkins - Signpath Pharma Agreement** | | | | | | | | |
| [7] | Exclusive License Agreement | John Hopkins | Signpath Pharma | 6/5/2013 | The term of the Agreement ended with the last to expire patent in each country, or if no patents are issued then 20 years from June 5, 2013, subject to earlier termination. | Granted Signpath exclusive rights to an invention that was developed by the parties through a previous license agreement in 2017. Through the 2013 John Hopkins Agreement, John Hopkins granted Signpath an exclusive worldwide license to use "a composite polymeric nanoparticle for overcoming multidrug resistance to cancer chemotherapeutics and treatment-related systemic toxicity." | The licensed technology consisted of one U.S. Provisional Patent Application 61/421,709 and Int'l Patent Application PCT/US2011/063870. | John Hopkins Agreement required Signpath to pay an initial license fee of $10,000, $15,000 within one year, with minimum annual royalties of $10,000 in year three, $20,000 in year four, and $30,000 in year five.<br><br>Signpath was also required to pay an earned royalty of 3.0 percent of revenue from sales of the licensed product for a minimum of 10 years from the first commercial sale of the licensed product.<br><br>The 2013 John Hopkins Agreement required Signpath to pay milestone payments based on the first patent dosing in Phases I, II and III clinical trials and then upon regulatory approval, increasing from $25,000 to $150,000. |
| **2019 Formulex Pharma Innovations - Nasus Pharma License Agreement** | | | | | | | | |
| [8] | License Agreement | Formulex Pharma Innovations Ltd. | Nasus Pharma Ltd. | 5/1/2019 | Until the expiration of all payment obligations of the Company pursuant to this Agreement. | The 2019 Formulex Agreement granted Nasus an exclusive, worldwide, irrevocable, transferable, sub-licensable, royalty-bearing license to Formulex technology for the purpose of developing, manufacturing, and otherwise commercializing the licensed technology and/or related products. | The Formulex technology ultimately included at least three U.S. patents, one international patent application, and Formulex know-how. Licensed know-how is described as being in the fields of intranasal and inhales formulations, combination products, and particle engineering.<br><br>With respect to patented technology, Exhibit B to the 2019 Formulex Agreement identifies only International Patent Application WO 2019 038756 – titled: Dry Powder Compositions for Intranasal Delivery. However, this international patent application led to the issuance of three United States patents. | 0.5% of Net Sales of Products which are capped by the aggregate amount to be paid to Formulex not to exceed $100,000.<br><br>The royalties are payable for the longer of 15 years from first commercial sale in each country or until the last to expire licensed patent in each country. |

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

*Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC. v. Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*

**SUMMARY OF THIRD PARTY LICENSE AGREEMENTS**

Appendix 12.1

| Title | Licensor | Licensee | Effective Date | Term | License Grant | Licensed Technology | Payment & Royalty |
|-------|----------|----------|----------------|------|---------------|---------------------|-------------------|
|       |          |          |                |      |               |                     |                   |

**Notes:**

[1] The 1998 Albert Einstein College and Pain Therapeutics Agreement, May 5, 1998.

[2] The 2000 Molecular Medicine Research Institute and Amarillo Biosciences Inc. Agreement, February 1, 2000.

[3] The 2001 Wayne State and SafeScience Agreement, January 1, 2001.

[4] The 2005 Trustees of Columbia University and Omnimmune Corp Agreement, February 1, 2005.

[5] The 2006 Andrew Chen and Bridgetech Agreement, April 29, 2006.

[6] The 2011 SCOLR Pharma Inc. and Syntrix Biosystems Agreement, June 2, 2011.

[7] The 2013 John Hopkins and Signpath Pharma Agreement, June 5, 2013.

[8] The 2019 Formulex Pharma Innovations and Nasus Pharma License Agreement, May 1, 2019.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

# Exhibit 3
# Filed Under Seal

**HIGHLY CONFIDENTIAL**

1

ROUGH DRAFT

N O T I C E

This transcript is an UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY.  It contains the raw output from the court reporter's stenotype machine translated into English by the court reporter's computer, without the benefit of proofreading.  It will contain untranslated steno outlines, mistranslations (wrong words), and misspellings.  These and any other errors will be corrected in the final transcript.  Since this rough draft transcript has not been proofread, the court reporter cannot assume responsibility for any errors.

This rough draft transcript is intended to assist attorneys in their case preparation and is not to be construed as the final transcript.  It is not to be read by the witness or quoted in any pleading or for any other purpose and may not be filed with any

court.

2

THE VIDEOGRAPHER:  Today's date is April 14, 2026.  The time on the video monitor is 8:41.  Here begins Media Number 1 in the videotaped deposition of James Malackowski in the matter of Eagle Pharmaceuticals Incorporated, et al., versus Slayback Pharma/Azurity Pharma in the United States District Court for the District of Delaware, Cause Number 1:24-CV-00065-JLH.

The videographer today is Erin Schuppert, representing Planet Depos, headquartered at

co-extensive single patent like an API formulation, the Edgeworth Box is inappropriate for the analysis.

Q. Dr. Vellturo's reasonable royalty does not equate to Eagle's profits on the sales of its products, as I think you just suggested; right?

A. No, it does.

Q. His ultimate reasonable royalty rate?

A. Yes.  His ultimate reasonable royalty is the bottom of the Edgeworth Box, which is their profitability or, in the alternative, a 25 percent rate, which is completely distinct and separate.

Q. Okay.  Well, let's talk about this a little bit.

148

In your opinion, setting aside Dr. Vellturo's, at the hypothetical negotiation,

Eagle and Slayback would agree to a reasonable royalty of 3 percent of Vivimusta net sales; right?

A. True.

Q. Okay.  And as I read your report, that 3 percent royalty rate is based on the costs of Slayback's PAS NDA product expressed as a percentage of net revenue under the cost approach, your evaluation of the per patent royalty rate indicated by the Eagle-Cephalon agreement under the market approach, and then, third, your application of the Georgia-Pacific factors; is that fair?

A. I think that's fair.

Q. Okay.  And so your indicated royalty rates under both the cost and market approach form starting points or benchmarks for your ultimate 3 percent royalty; fair?

A. I don't use the term "starting point," but I think a "benchmark" is a fair term.

Q. Okay.  And so if you cannot rely on either the royalty indicated under your cost approach or your market approach, your ultimate reasonable royalty rate would change; correct, sir?

A. Well, it depends.  If you simply eliminated

of patent license agreements; right?

A. Correct.

Q. Okay.  And you say -- you quote the Sedona Conference Working Group on patent damages and remedies, specifically the statement "Any proposed comparable license offered as comparable to the hypothetical license must be evaluated for its similarities to and differences from the hypothetical license"; right?

A. Yes.

Q. And you agree with that statement, sir?

A. Yes.

167

Q. Okay.  And then you go on, in block quote, two more sentences from the Sedona Conference

Working Group; correct?

A. Yes.

Q. And the second sentence that you quoted states, "Rigorously analyzing and adjusting for any material differences between a benchmark license and the hypothetical license, based upon evidence presented, provides a rational and justifiable basis for determining what royalty would result from the hypothetical negotiation."

Do you see that?

A. Yes.

Q. You agree with this as well; correct, sir?

A. Yes.

Q. And it's important, when assessing comparable license, to adjust for any material differences between the benchmark and the hypothetical license when you're determining what the ultimate royalty rate will be; right?

A. Yes, recognizing the adjustments may go both directions and even net out, but I agree.

Q. Okay.  And in addition to the Eagle-Cephalon agreement under the market approach, you also analyzed, I believe it's eight third-party

168

agreements.

A. More specifically, those are considered under Georgia-Pacific factor 12, but yes, there are eight other agreements that I've considered, two of which I relied upon.

Q. You ultimately rely on, just for shorthand, we'll call them the -- well, specifically, you relied on a 2006 agreement between Andrew Chen and Bridgetech Holdings International Incorporated, as well as a 2013 agreement between Johns Hopkins University and Signpath Pharma; correct?

A. Correct.

Q. Okay.  And you concluded that both the Bridgetech and Johns Hopkins agreements were economically comparable to the hypothetical license; right?

A. With potential consideration of adjustments,

yes.

Q. Okay.  And there are -- the other six third-party agreements that are identified in the appendices to your report, you did not rely on those to quantify the ultimate royalty rate that you're advancing in this case; fair?

A. Correct.

Q. Did you conclude that any of those six

169

agreements were economically comparable to the hypothetical license?

A. I did not.

Q. Okay.  And just -- so just so we have a clear record -- and you can look at your appendix if you want.  It's Appendix 12.

The six third-party agreements that were just referenced in your prior testimony and my question are -- which are identified in Appendix 12, are the 1998 Albert Einstein Agreement, the 2000 Molecular Medicine Research Institute Agreement, the 2001 Wayne State Agreement, the 2005 Trustees of Columbia Agreement, 2011 SCOLR, all upper case, Pharma Inc. Agreement, and a 2019 Formulex Pharma Innovations Agreement.

A. Correct.

Q. Okay.  And so you concluded that those six agreements are not economically comparable and therefore not informative to determining the reasonable royalty in this case; correct?

A. Including consideration of business technical comparability, i.e., whether or not they relate to certain formulations for cancer treatments.

Q. And you did -- yeah, okay.  Fair enough.

170

But you ultimately concluded they are not sufficiently comparable to be informative of the reasonable royalty for the hypothetical license; right?

A. Correct.

Q. Okay.  Let's revert back to the Eagle-Cephalon agreement.

Now, you and Dr. Vellturo agree that the Eagle-Cephalon agreement is both economically and technically comparable to the hypothetical license for the asserted patents; correct?

A. If properly considered, yes.

Q. When you say "if properly considered," what are you referring to?

A. Well, we draw different conclusions --

Q. Correct.

A. -- from that agreement, so it's not a blanket endorsement without understanding the context.

Q. Setting aside the interpretation of the agreement itself, as to comparability, you and

Dr. Vellturo agree that the Eagle-Cephalon agreement is both economically and technically comparable to the hypothetical license; correct?

A. Correct.

171

Q. And you and Dr. Vellturo both agree that the Eagle-Cephalon agreement would be informative as to what the ultimate reasonable royalty rate would be agreed on at the hypothetical negotiation; correct?

A. Correct for me.  Correct in part for Dr. Vellturo.  It depends which analysis you're referring to.

Q. And what are the similarities between the Eagle-Cephalon agreement and the hypothetical license that led you to conclude that it's a

199

there was no quantitative impact from your
considerations of these two settlement agreements
into your ultimate royalty rate; correct?

A. It would be part of the qualitative
assessment under Georgia-Pacific, in particular, the
licensor's policy for exclusivity, but it did not
have a direct arithmetic effect.

Q. Okay.  Let's -- you have two exhibits in
front of you.

(Exhibit 10 was marked for identification
and is attached to the transcript.)

(Exhibit 11 was marked for identification
and is attached to the transcript.)

(Exhibit 12 was marked for identification
and is attached to the transcript.)

BY MR. SANDFORD:

Q. As discussed earlier, you analyzed eight third-party agreements as part of your Georgia-Pacific Factor 12 analysis; right?

A. Correct.

Q. Okay. And I believe you concluded that these third-party agreements would support your opinion that Georgia-Pacific Factor 12 would favor the licensee Slayback at the hypothetical negotiation.

200

A. Correct.

Q. And you also relied on the royalty rates in the Bridgetech and Johns Hopkins agreements to corroborate or confirm your ultimate 3 percent royalty rate; fair?

A. Fair.

Q. The royalty rates in the Bridgetech and Johns Hopkins agreements do not actually form the basis from a quantitative perspective of your ultimate royalty rate; is that fair?

A. That's fair.  They would fall into the category of qualitative assessments under Georgia-Pacific.

Q. Okay.  And you found, at least as reported by your report, these databases -- withdrawn.

You located these eight third-party agreements by doing searches on RoyaltyStat and ktMINE which are both databases; correct?

A. Correct.

Q. Okay.  Did you do the searching, or did your team do it?

A. My team.

Q. And RoyaltyStat is a subscription database; is that right?

A. I believe so.

201

Q. And you have to pay to get that subscription?

A. Yes.

Q. Do you know how much or approximately how much?

A. I don't.  I know we've been subscribing for a very long time.  I don't think it's hugely significant.

Q. I should ask him.

A. He probably knows.

Q. But we agree that you have to pay some amount of money on a recurring basis to have access to search RoyaltyStat for potentially comparable licenses; correct?

A. Correct.

Q. And ktMINE, is that also a subscription database?

A. It is also a fee-based database, yes.

Q. Okay.  And do you have a sense of what the fee is that you need to pay to have access to the

ktMINE database?

A. No.  It's, again, relatively minor.

Q. Okay.

When did your team conduct these searches?

A. I don't know the calendar date, but I would

202

say kind of the -- two-thirds of the way through our

process, maybe, as we were starting to compile the

detailed Georgia-Pacific analysis and looking for

our own independent validations outside of the

context of this record.

Q. And when you say two-thirds through your

process, do you have, like, a month or ...

A. No.  So early March, late February,

something like that.

Q. Okay.  So you -- all right.

Your team began searching for these third-party agreements in late February, early March of 2026; fair?

A. Sounds about right.  I don't have a particular date in mind.

Q. Yeah, okay.

And in your report, you state that the search terms that were used were oncology, formulation, CLL, and NHL; is that right?

A. Correct.

Q. Do you recall using any other search terms, either you or your team, to locate potentially comparable third-party licenses?

A. No.

Q. Did you use -- your team use bendamustine as

203

a search term?

A. No.

Q. Why not?

A. Because it's my understanding from the balance of this record that there are no other such licenses.  If there were bendamustine licenses, I would have expected them to be produced or revealed by the parties.

Q. Well, there could be third-party licenses between -- involving or relating to bendamustine; fair?

A. Theoretically.

Q. That the parties would not produce?

A. I suppose.  But bendamustine has been around since the 1960s, so I wouldn't expect to see any licensing activity unless it related to some of these formulation indications, and then we would see that in the Orange Book, for example.  And I don't believe there are.

Q. But to be clear, your team did not even search bendamustine or liquid bendamustine to try to locate potentially comparable third-party licenses; right?

A. They did not.  But factually speaking, I

don't believe there are such, so it's kind of a moot

204

point.

Q. Do you know one way or the other if you search bendamustine whether you get the Johns Hopkins or Chen-Bridgetech agreement as results?

A. I wouldn't expect that you would because the word "bendamustine" does not show in either of those two agreements.

Q. Okay.  Let's talk about those agreements a little bit.  Now, you rely on the 4 percent royalty in the Bridgetech agreement and the 3 percent royalty in the Johns Hopkins agreements to confirm your implied 1 percent per patent royalty from the Eagle-Cephalon agreement; correct?

A. Fair.

225

Q. And the running royalty rate stated in this agreement is 3 percent of the net sales, and there's some minimum royalties and upfront payments as well; right?

A. Correct.

Q. Okay.  And, again, you did not make any quantitative adjustment to the 3 percent of net sales rate in the Johns Hopkins agreement before using it to corroborate or confirm your ultimate royalty rate; correct?

A. Although I considered the need for such, with respect to points of similarity and differences, ultimately, I concluded there would be no adjustment.

Q. The Johns Hopkins agreement was terminated in December 2014; correct?

A. I don't recall the date, but eventually, it was, yes.

Q. Let's just --

MR. SANDFORD:  Let's make that 13.

(Exhibit 13 was marked for identification and is attached to the transcript.)

MR. SANDFORD:  We've marked as Exhibit 13 a document bearing Bates numbers EAGLEBEN-SA_00376322 through 401.

226

BY MR. SANDFORD:

Q. Do you recognize this document, Mr. Malackowski?

A. Yes.  This is one of the SEC reports I've reviewed for Signpath.

Q. Okay.  And did you review this SEC report -- and I believe it's from fiscal year 2015 -- before you submitted your rebuttal report in this case?

# Exhibit 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SLAYBACK PHARMA LLC,<br><br>Defendant. | C.A. No. 24-65-JLH |

**DEFENDANT SLAYBACK PHARMA LLC'S ANSWER TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION (NOS. 1-68) TO DEFENDANTS APOTEX, INC., APOTEX CORP., SLAYBACK PHARMA LLC, AND BAXTER HEALTHCARE CORP**

Pursuant to Federal Rule of Civil Procedure 26 and 34 and the Local Rules of the District Court for the District of Delaware ("Local Rules"), Defendant Slayback Pharma LLC ("Slayback") hereby objects and responds to Plaintiff Eagle Pharmaceuticals, Inc.'s ("Plaintiff" or "Eagle") First Set of Requests for Production to Defendants Apotex, Inc., Apotex Corp., Slayback Pharma LLC, and Baxter Healthcare Corp., dated May 21, 2024 ("Requests," each, a "Request").

The general and specific objections and the responses set forth below are made based on the best information presently available to Slayback. Slayback reserves the right to amend, supplement, or change any responses and objections if and when additional, different, or more accurate information becomes available and/or facts are discovered.

**GENERAL OBJECTIONS**

1. Slayback makes the following General Objections to each Request and expressly incorporates each of them into each specific response set forth below. Nothing contained in Slayback's objections shall be construed or interpreted as, or shall work, operate, or be urged or deemed as a waiver by Slayback of any applicable right or objection, nor shall Slayback's

In addition to its General Responses and Objections, Defendant objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all documents" relating to the subject matter of the Request and is not limited to the Slayback NDA.  Defendant further objects to this Request to the extent it seeks documents or things outside of Defendant's possession, custody, or control.  Defendant further objects to this Request to the extent it seeks documents or things subject to any judicial order, protective order, stipulation of confidentiality, non-disclosure agreement, joint defense agreement, or confidentiality agreement with any third party restricting disclosure of such information. Defendant further objects to this Request to the extent it seeks documents or things protected by the attorney-client privilege and/or the work-product immunity.  Defendant further objects to this Request as cumulative or duplicative of other Requests, including Request No. 38.

Subject to and without waiving the foregoing objections and the General Objections, Defendant will search for and produce non-privileged, relevant, and reasonably obtainable any agreements related to the Slayback NDA Product in Slayback's custody and control, that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 40:**

All documents referring or relating to any patent license agreement or technology transfer agreement relating to or covering Your NDA Product.

**RESPONSE:**

In addition to its General Responses and Objections, Defendant objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all documents referring or relating to any . . . agreement."  Defendant further objects to

33

this Request to the extent it seeks documents or things outside of Defendant's possession, custody, or control.  Defendant further objects to this Request to the extent it seeks documents or things subject to any judicial order, protective order, stipulation of confidentiality, non-disclosure agreement, joint defense agreement, or confidentiality agreement with any third party restricting disclosure of such information.  Defendant further objects to this Request to the extent it seeks documents or things protected by the attorney-client privilege and/or the work-product immunity.  Defendant further objects to this Request as cumulative or duplicative of other Requests, including Request No. 41.

Subject to and without waiving the foregoing objections and the General Objections, Defendant will search for and produce non-privileged, relevant, and reasonably obtainable any agreements related to the Slayback NDA Product in Slayback's custody and control, that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 41:**

All documents referring or relating to any current, former, or planned agreements, partnerships, or other relationships You have with any entity, including any agreements between You and those entities, relating to the design, development, marketing, sale, or distribution of the Your NDA Product.

**RESPONSE:**

In addition to its General Responses and Objections, Defendant objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all documents referring or relating to any . . . agreements, partnerships, or other relationships."  Defendant further objects to this Request to the extent it seeks documents or things outside of Defendant's possession, custody, or control.  Defendant further objects to this Request to the extent it seeks documents or things subject to any judicial order, protective order, stipulation of confidentiality, non-disclosure agreement, joint defense agreement, or

34

Subject to and without waiving the foregoing objections and the General Objections, Defendant will search for and produce non-privileged, relevant, and reasonably obtainable documents in Slayback's custody and control, to the extent such documents exist regarding the Slayback NDA Product that are responsive to this Request and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 53:**

All documents constituting, referring to, or relating to damages in this case, including lost profits by Plaintiff and/or the royalty rate(s) that You contend would constitute a reasonable royalty under 35 U.S.C. § 284, assuming infringement of the Asserted Patents, including, for example, documents relating to any facts, circumstances, legal contentions, and other factors upon which You base Your contention, including any or all factors to be considered under a *Georgia-Pacific* analysis.

**RESPONSE:**

In addition to its General Responses and Objections, Defendant objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all documents" relating to the subject matter of the Request. Defendant further objects to this Request to the extent it seeks documents or things outside of Defendant's possession, custody, or control. Defendant further objects to this Request to the extent it seeks documents or things subject to any judicial order, protective order, stipulation of confidentiality, non-disclosure agreement, joint defense agreement, or confidentiality agreement with any third party restricting disclosure of such information. Defendant further objects to this Request to the extent it seeks documents or things protected by the attorney-client privilege and/or the work-product immunity. Defendant further objects to this Request to the extent it calls for a legal conclusion, including whether a document tends to support or disprove anything in relation to the damages position in This Litigation.

44

Subject to and without waiving the foregoing objections and the General Objections, Defendant will produce, at the appropriate time in accordance with the Court's schedule and the Local Rules, any documents upon which Defendant intends to rely on to defend against Plaintiff's assertion of damages in This Litigation. .

**REQUEST FOR PRODUCTION NO. 54:**

All documents, things, and communications between You and any third party concerning the marketing, distribution, or sale of Your NDA Product.

**RESPONSE:**

In addition to its General Responses and Objections, Defendant objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all documents" relating to the subject matter of the Request. Defendant further objects to this Request to the extent it seeks documents or things outside of Defendant's possession, custody, or control. Defendant further objects to this Request to the extent it seeks documents or things subject to any judicial order, protective order, stipulation of confidentiality, non-disclosure agreement, joint defense agreement, or confidentiality agreement with any third party restricting disclosure of such information. Defendant further objects to this Request to the extent it seeks documents or things protected by the attorney-client privilege and/or the work-product immunity. Defendant further objects to this Request as cumulative or duplicative of other Requests, including Request Nos. 15, 16, 52, 56, and 57.

Subject to and without waiving the foregoing objections and the General Objections, Defendant will search for and produce non-privileged, relevant, and reasonably obtainable documents in Slayback's custody and control, to the extent such documents exist regarding the Slayback NDA Product that are responsive to this Request and are located after a reasonable search.

45

Dated: June 20, 2024

*Of Counsel:*

Andrew Miller
Ajay Kayal
Connie Huttner
Robyn Ast-Gmoser
WINDELS MARX LANE & MITTENDORF, LLP
One Giralda Farms
Madison, NJ 07940
(973) 966-3200
amiller@windelsmarx.com
akayal@windelsmarx.com
chuttner@windelsmarx.com
rast-gmoser@windelsmarx.com

**SMITH KATZENSTEIN & JENKINS LLP**

*/s/ Daniel A. Taylor*
Neal C. Belgam (No. 2721)
Daniel A. Taylor (No. 6934)
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
dtaylor@skjlaw.com

*Attorneys for Defendant Slayback Pharma LC*

58

# Exhibit 5

| | |
|---|---|
| **From:** | Forchheimer, Daniel E. <dforchheimer@windelsmarx.com> |
| **Sent:** | Wednesday, April 1, 2026 4:35 PM |
| **To:** | Sandford, Brett (Bay Area); Ast-Gmoser, Robyn; Sparschu, Audrey R.; Huttner, Constance; DAT@skjlaw.com; NCB@skjlaw.com; Rivera Jr., Eddie; mdaughton@skjlaw.com; SlayBend; Lief, Jason A.; amiller@mccarter.com |
| **Cc:** | #C-M EAGLE BENDAMUSTINE LITIGATION - LW TEAM; EagleLitigation@McCarter.com |
| **Subject:** | RE: Eagle v. Slayback - Undisclosed Evidence, Opinions, Theories |

Brett,

As previously noted, the third-party agreements are publicly available and not within the unique possession.  Nevertheless, as a courtesy, please see the link below for access to the agreements.  A password will follow separately.

https://intrepidx.sharefile.com/d-s37731117d8c9406392951209545c2e55

Dan

**From:** Brett.Sandford@lw.com <Brett.Sandford@lw.com>
**Sent:** Wednesday, April 1, 2026 1:46 PM
**To:** Ast-Gmoser, Robyn <rast-gmoser@windelsmarx.com>; Sparschu, Audrey R. <asparschu@windelsmarx.com>; Huttner, Constance <chuttner@windelsmarx.com>; DAT@skjlaw.com; NCB@skjlaw.com; Rivera Jr., Eddie <erivera@windelsmarx.com>; mdaughton@skjlaw.com; SlayBend <SlayBend@windelsmarx.com>; Lief, Jason A. <jlief@windelsmarx.com>; amiller@mccarter.com; Forchheimer, Daniel E. <dforchheimer@windelsmarx.com>
**Cc:** EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com; EagleLitigation@McCarter.com
**Subject:** RE: Eagle v. Slayback - Undisclosed Evidence, Opinions, Theories

This message has originated from an **External Source**. Please use caution when opening attachments, clicking links, or responding to this email.

Robyn,

Thank you.  In addition, based on our review, the eight third-party agreements still have not been produced in this case.  Please produce them as soon as possible.

Regards,

**Brett M. Sandford**

**LATHAM & WATKINS LLP**
505 Montgomery Street | Suite 2000 | San Francisco, CA 94111-6538
D: +1.415.395.8150 | M: +1.805.705.7486

**From:** Ast-Gmoser, Robyn <rast-gmoser@windelsmarx.com>
**Sent:** Wednesday, April 1, 2026 10:35 AM
**To:** Sandford, Brett (Bay Area) <Brett.Sandford@lw.com>; Sparschu, Audrey R. <asparschu@windelsmarx.com>; Huttner, Constance <chuttner@windelsmarx.com>; DAT@skjlaw.com; NCB@skjlaw.com; Rivera Jr., Eddie

<erivera@windelsmarx.com>; mdaughton@skjlaw.com; SlayBend <SlayBend@windelsmarx.com>; Lief, Jason A. <jlief@windelsmarx.com>; amiller@mccarter.com; Forchheimer, Daniel E. <dforchheimer@windelsmarx.com>
**Cc:** #C-M EAGLE BENDAMUSTINE LITIGATION - LW TEAM <EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com>; EagleLitigation@McCarter.com
**Subject:** Re: Eagle v. Slayback - Undisclosed Evidence, Opinions, Theories


Brett,

We are coordinating schedules during this holiday week, but anticipate being able to have the relevant individuals for a call on April 2. I'll follow up ASAP.

Robyn

---

**From:** Brett.Sandford@lw.com <Brett.Sandford@lw.com>
**Sent:** Wednesday, April 1, 2026 1:17 AM
**To:** Ast-Gmoser, Robyn; Sparschu, Audrey R.; Huttner, Constance; DAT@skjlaw.com; NCB@skjlaw.com; Rivera Jr., Eddie; mdaughton@skjlaw.com; SlayBend; Lief, Jason A.; amiller@mccarter.com; Forchheimer, Daniel E.
**Cc:** EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com; EagleLitigation@McCarter.com
**Subject:** RE: Eagle v. Slayback - Undisclosed Evidence, Opinions, Theories

> This message has originated from an **External Source**. Please use caution when opening attachments, clicking links, or responding to this email.

Robyn,


We disagree with Slayback's position that these undisputedly newly-disclosed theories and evidence are timely or not prejudicial.  Can you please provide your availability to confer on April 1 or 2, which I requested in my March 28 email?  If Slayback does not confirm that it will not rely on the subject untimely-disclosed evidence and theories, Eagle intends to seek relief from the Court.


First, Slayback and Mr. Malackowski's reliance on 8 third-party licenses is untimely and neither substantially justified nor harmless.  You concede Slayback was required to identify these agreements in response to Eagle's Interrogatory No. 7 and produce them in response to Eagle's RFP Nos. 40 and/or 53.  You also concede that Slayback did not produce or otherwise identify these agreements during fact discovery (or at any point before serving Mr. Malackowski's report on March 16, 2026).  While you cite pages 24 and 33 of Slayback's December 5, 2025 supplemental response to Interrogatory No. 7, none of the 8 subject third-party agreements are identified on those pages (or anywhere else in Slayback's Interrogatory No. 7 response).  That these agreements were allegedly publicly available simply confirms that Slayback could have (and should have) identified them during fact discovery had its expert wanted to rely on them.  *Compare Oasis Tooling, Inc. v. GlobalFoundries U.S., Inc.*, No. 1:22-cv-00312-CJB, Dkt. 428 (D. Del. Mar. 4, 2024).

Your contention that Mr. Malackowski's reliance on these new agreements is proper rebuttal is wrong. To be clear, Mr. Malackowski cherry picked these third-party agreements to corroborate his unreasonably low royalty rate, not to rebut anything Dr. Vellturo said. You claim he "relied on those additional third party license agreements to directly rebut Dr. Vellturo's assertion that the Cephalon agreement was an appropriate comparator license," but that is incorrect and nonsensical because Mr. Malackowski himself opined "the 2015 Eagle - Cephalon Agreement is comparable to the hypothetically negotiated license." Malackowski Rbt. Rpt. at 61. To be sure, Mr. Malackowski considered these third-party agreements under *Georgia Pacific* Factor 12, which is distinct from the *Georgia Pacific* Factor 1 analysis where both he and Dr. Vellturo discuss the 2015 Eagle-Cephalon Agreement. Even if Mr. Malackowski did rely on these eight third-party agreements to rebut a specific opinion offered by Dr. Vellturo (he did not), that does not excuse Slayback from identifying or producing them during fact discovery. There is no dispute that Slayback did neither.

Your assertion that Eagle has not been "prejudiced" by Slayback's untimely disclosure is wrong. As an initial matter, you apply the wrong standard: the burden is on Slayback to show that its untimely disclosure was substantially justified or harmless under the *Pennypack* factors. *See Oasis Tooling*, No. 1:22-cv-00312-CJB, Dkt. 428. It was not. Eagle was surprised by Mr. Malackowski's reliance on these 8 third-party agreements, as they were never mentioned or produced in this case before service of his report. You concede that Eagle had no opportunity to take fact discovery on these agreements, and Eagle cannot cure that prejudice now because fact discovery is closed and reply reports are due in about two weeks. The prejudice is particularly acute here because Eagle would need to take third-party discovery to, for example, understand the circumstances underlying these agreements, which is necessary to assess economic comparability. This is exactly what the *Oasis Tooling* court held under almost identical circumstances. *See id.* ("[Defendant] surely would have been surprised by these late disclosures at the fact discovery deadline, in light of how long it had been seeking such information, and (b) it was prejudiced by the late disclosure, since discovery had closed and it no longer had the ability to propound discovery regarding the pricing models or licenses at issue (the latter of which would have required third-party discovery) … The 'bad faith or willfulness of the non-disclosure' factor also slightly favors Defendant (or at best for Plaintiff is neutral) in that … there is no understandable reason why Plaintiff did not earlier disclose these theories (information about which was in its own possession for years or was publicly available)—suggesting at least some negligence in its failure to follow the rules. … The 'importance of the evidence' factor also favors Defendant, as it appears that Plaintiff has many other theories relevant to damages still available to it, and that Plaintiff's damages expert did not heavily rely (or rely at all) on the materials at issue in his opening report. … In short, if you disclose information many, many months late that prejudices your opponent, if you have no good reason for doing so, and if the information isn't all that important to your case, then a motion to strike like this one will likely be granted (as it has been here)."). None of the cases you cite (some of which are not patent cases) are remotely as close to the facts here as the *Oasis Tooling* case, which struck the damages expert's reliance on publicly-available licenses not timely disclosed during fact discovery.

Second, you admit that Slayback did not produce SLBEND-REV0000128075.0066 in fact discovery, or even concurrently with Mr. Malackowski's report. While you represent this was an "oversight," that does not excuse the discovery violation or make it harmless or substantially justified. This document is responsive to RFPs that Eagle served both during the initial discovery period and the supplemental discovery period focusing specifically on the PAS NDA product (e.g., RFP No. 85). After Slayback completed its document production during the supplemental discovery period, Eagle followed up to confirm all documents had been produced. Slayback represented: "we believe that we have completed our supplemental document production." 2/9/26 Slayback Ltr. at 1. Eagle then proceeded to depose Slayback's 30(b)(6) designee on the PAS NDA product, Dr. Chinnari. Eagle was therefore surprised when Mr. Malackowski relied on SLBEND-REV0000128075.0066 to calculate the costs associated with the PAS NDA product, particularly given that (1) this is the only document that Mr. Malackowski cites to support his calculation of these costs; and (2) Slayback's response to Interrogatory No. 10 identifies the purported costs to develop the PAS NDA product, but cites no documents. Slayback's production of this new document, after all fact discovery was complete and rebuttal reports were served, is prejudicial because Eagle had no opportunity to take fact discovery on it and Mr. Malackowski is relying on the purported costs of

the PAS NDA product as a basis for his reasonable royalty rate.  And, as discussed above, this prejudice cannot be cured given the current case schedule.  Indeed, Eagle already agreed to a supplemental discovery period to attempt to cure the prejudice from Slayback's untimely disclosure of the PAS NDA product as a non-infringing alternative, yet Slayback did not even produce this document during that period.  Slayback has no basis for a third bite at the apple.

Third, you admit that Slayback did not produce or otherwise disclose the four Slayback patents that Mr. Malackowski relies on.  Here, again, the mere fact that these patents are publicly available misses the point.  If Slayback wanted to rely on its own patents to support its damages position in this case, Slayback was required to disclose this argument in response to Interrogatory No. 7 and produce the patents during fact discovery so that Eagle could take the appropriate fact discovery.  Slayback did neither.  Instead, Slayback withheld this argument and the supporting evidence until service of Mr. Malackowski's March 16, 2026 rebuttal report.  For the same reasons discussed above, that is improper and not substantially justified or harmless.

We again reiterate our request for Slayback to withdraw the untimely evidence and theories discussed above.  If Slayback will not, please provide your availability to meet and confer on April 1 or 2 as requested in my March 28 email (and above).

Regards,

**Brett M. Sandford**

**LATHAM & WATKINS LLP**

505 Montgomery Street | Suite 2000 | San Francisco, CA 94111-6538

D: +1.415.395.8150 | M: +1.805.705.7486

---

**From:** Sandford, Brett (Bay Area) <Brett.Sandford@lw.com>
**Sent:** Tuesday, March 31, 2026 6:34 PM
**To:** Ast-Gmoser, Robyn <rast-gmoser@windelsmarx.com>; Sparschu, Audrey R. <asparschu@windelsmarx.com>; Huttner, Constance <chuttner@windelsmarx.com>; DAT@skjlaw.com; NCB@skjlaw.com; Rivera Jr., Eddie <erivera@windelsmarx.com>; mdaughton@skjlaw.com; SlayBend <SlayBend@windelsmarx.com>; Lief, Jason A. <jlief@windelsmarx.com>; amiller@mccarter.com; Forchheimer, Daniel E. <dforchheimer@windelsmarx.com>
**Cc:** #C-M EAGLE BENDAMUSTINE LITIGATION - LW TEAM <EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com>; EagleLitigation@McCarter.com
**Subject:** RE: Eagle v. Slayback - Undisclosed Evidence, Opinions, Theories

Robyn,

Mr. Malackowski's deposition will be in person. Slayback does not get to choose how Eagle proceeds with taking expert depositions; we intend to proceed in person. Please confirm.

We will respond to the rest of your email separately.

Regards

Brett

---

**From:** Ast-Gmoser, Robyn <rast-gmoser@windelsmarx.com>

**Date:** Tuesday, Mar 31, 2026 at 6:23 PM

**To:** Sandford, Brett (Bay Area) <Brett.Sandford@lw.com>, Sparschu, Audrey R. <asparschu@windelsmarx.com>, Huttner, Constance <chuttner@windelsmarx.com>, DAT@skjlaw.com <DAT@skjlaw.com>, NCB@skjlaw.com <NCB@skjlaw.com>, Rivera Jr., Eddie <erivera@windelsmarx.com>, mdaughton@skjlaw.com <mdaughton@skjlaw.com>, SlayBend <SlayBend@windelsmarx.com>, Lief, Jason A. <jlief@windelsmarx.com>, amiller@mccarter.com <amiller@mccarter.com>, Forchheimer, Daniel E. <dforchheimer@windelsmarx.com>

**Cc:** #C-M EAGLE BENDAMUSTINE LITIGATION - LW TEAM <EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com>, EagleLitigation@McCarter.com <EagleLitigation@McCarter.com>

**Subject:** Re: Eagle v. Slayback - Undisclosed Evidence, Opinions, Theories

Brett,

We write in response to your March 27 and March 28, 2026 e-mails concerning the deposition logistics and expert opinions of Mr. Malackowksi.

With respect to the Mr. Malackowksi's deposition, thank you for confirming that you will proceed on April 15th.  At this time, we intend to move forward with the deposition virtually, and thus will not need the use of Latham's Chicago office.  Should that change, we will promptly inform you.  We will also follow up with information concerning start time, as the date nears.

5

Although largely mooted by your agreement to proceed on April 15th, we flatly reject Eagle's claims of prejudice due to our offer of April 15 for his deposition.  The schedule for expert discovery has been set for many months, and has been known to the parties.  You have had Mr. Malackowski's report since March 16th, and the April 15th date – approximately a full month after service of his report -- falls squarely within the designated period for expert depositions. Further, we notified you of this deposition date on March 20th  providing more than three weeks notice. Given the large number of depositions that need to be completed in a short time frame, it was inevitable that certain depositions would have to occur shortly after the service of the final round of reports.  In Mr. Malackowski's case, where his availability is very limited, we gave Eagle substantial advance notice, and thus there is no plausible claim of prejudice.

As to the schedules for remaining depositions, we will make our best effort to work around the schedules of the various interested parties, including the attorneys and experts.  However, Slayback rejects the notion that it should be "expected" to proceed with depositions on unworkable dates based on Eagle's false claims of "prejudice" with respect to Mr. Malackowski.

We also reject Eagle's claim that Mr. Malackowski's report contains improper and/or untimely opinions.[1]  As an initial matter, you are conflating the disclosure requirements of fact and expert discovery.  Fact discovery develops the evidentiary record, while expert discovery, governed by Rule 26(a)(2), permits experts to analyze that record and disclose "the facts or data considered" and the bases for their opinions in a written report. Fed. R. Civ. P. 26(a)(2)(B). These principles reflect the well-settled understanding that expert discovery is the stage at which such analyses—and the materials underlying them—are disclosed.

Here, Eagle's complaints appear to stem from Mr. Malackowski's citation and discussion of publicly accessible license agreements, which were equally available to both parties, and not uniquely in the possession of either party.  Despite Eagle's suggestion to the contrary, Slayback provided ample notice of its intent to rely on third party license agreements as part of its damages analyses.  *See* Slayback's Dec. 5, 2025 Resp. to Interrog. No. 7 at 24, 33.   At no point did Eagle object to this disclosure or seek additional information.

Moreover, publicly accessible materials—patents, publications, licenses, financial data, or other records equally available to all parties—do not fall within the category of information a party must "produce" during fact discovery, because they are not in any one party's exclusive control. Courts in the Third Circuit have repeatedly recognized this principle. *See, e.g., Midwest Energy Emissions Corp. v. Arthur J. Gallagher &* Co., 19-1334-CJB (D. Del. Dec. 2022) (declining to strike reliance on publicly available license agreement); *TQ Delta, LLC v. ADTRAN, Inc.*, No. 14-954-RGA (D. Del. Sept. 12, 2019) (permitting an invalidity expert to rely on newly cited prior-art references in his report because they were "publicly available" and served only as "background" or "foundational" material illustrating the state of the art).

6

Critically, Eagle can make no showing of prejudice from any alleged "untimely" disclosure of the pertinent license agreements. First, Mr. Malackowski was providing a rebuttal to Dr. Vellturo's report, which necessarily required addressing the full scope of those opinions, including those not fleshed out fully by either party during fact discovery. "While a rebuttal expert report must address the same subject matter as the report it contradicts, limiting its analysis only to those methods proposed by the first expert 'would impose an additional restriction on parties that is not included in the Rules.'" *Deseret Mgmt. Corp. v. U.S.*, 97 Fed. Cl. 272, 274 (2011). "Rather, 'an expert may introduce new methods of analysis in a rebuttal report if they are offered to contradict or rebut another party's expert.'" *Id*. (citations omitted). In this case, Mr. Malackowski relied on those additional third party license agreements to directly rebut Dr. Vellturo's assertion that the Cephalon agreement was an appropriate comparator license. Furthermore, Dr. Vellturo has the opportunity to respond to Mr. Malackowski's analyses, and Eagle will soon have the opportunity to take Mr. Malackowski's deposition. It therefore strains credulity that Eagle is prejudiced in some way. *See, e.g.*, *Harmony Biosciences, LLC v. Lupin Ltd.*, Civil Action No. 23-1286-JLH-SRF (D. Del. Dec. 12, 2025) (declining to exclude expert's opinions where objecting party had ample opportunity to respond and failed to articulate what additional discovery it would need).

With respect to the document cited with respect to the PAS Product cost, that was an oversight and we produce the document shortly via separate cover, which was just a roll-up summary of already-produced invoices.

As to the Appendix 9.2 listing the Slayback patents, these patents are all publicly available, as Eagle well knows. Thus, any objection is meritless for the same reasons discussed above.

We trust this resolves your objection and that you will proceed accordingly with the remainder of expert discovery.

Regards,

Robyn

---

[1] For ease of discussion, we limit this response to Mr. Malackowski's expert report, but the analysis applies equally to Dr. Brandt's discussion of the same issues.

**From:** Brett.Sandford@lw.com <Brett.Sandford@lw.com>
**Sent:** Tuesday, March 31, 2026 7:51 PM
**To:** Ast-Gmoser, Robyn; Sparschu, Audrey R.; Huttner, Constance; DAT@skjlaw.com; NCB@skjlaw.com; Rivera Jr., Eddie; mdaughton@skjlaw.com; SlayBend; Lief, Jason A.; amiller@mccarter.com; Forchheimer, Daniel E.; Sparschu, Audrey R.
**Cc:** EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com; EagleLitigation@McCarter.com
**Subject:** RE: Eagle v. Slayback - Undisclosed Evidence, Opinions, Theories

This message has originated from an External Source. Please use caution when opening attachments, clicking links, or responding to this email.

Counsel,

Following up on my email below, can you please provide Slayback's position and your availability to confer tomorrow or Thursday?

Thanks,

Brett

**Brett M. Sandford**

**LATHAM & WATKINS LLP**

505 Montgomery Street | Suite 2000 | San Francisco, CA 94111-6538

D: +1.415.395.8150 | M: +1.805.705.7486

---

**From:** Sandford, Brett (Bay Area) <Brett.Sandford@lw.com>
**Sent:** Saturday, March 28, 2026 11:29 AM
**To:** Ast-Gmoser, Robyn <rast-gmoser@windelsmarx.com>; Sparschu, Audrey R. <asparschu@windelsmarx.com>; Huttner, Constance <chuttner@windelsmarx.com>; Daniel A. Taylor <DAT@skjlaw.com>; Neal C. Belgam <NCB@skjlaw.com>; Rivera Jr., Eddie <erivera@windelsmarx.com>; Morgan M. Daughton <mdaughton@skjlaw.com>; SlayBend <SlayBend@windelsmarx.com>; Lief, Jason A. <jlief@windelsmarx.com>; Miller, Amanda <amiller@mccarter.com>; Forchheimer, Daniel E. <dforchheimer@windelsmarx.com>; Sparschu, Audrey R. <asparschu@windelsmarx.com>
**Cc:** #C-M EAGLE BENDAMUSTINE LITIGATION - LW TEAM <EAGLEBENDAMUSTINELITIGATION.LWTEAM@lw.com>; EagleLitigation@McCarter.com
**Subject:** Eagle v. Slayback - Undisclosed Evidence, Opinions, Theories

Counsel,

We write regarding new evidence, opinions, and theories in the rebuttal reports of Mr. Malackowski and Dr. Brandt that was not disclosed in fact discovery.  Please confirm by March 31 that Slayback will withdraw these untimely opinions and theories.  Otherwise, please provide your availability to meet and confer on April 1 or 2.

*First*, Slayback's damages expert, James Malackowski analyzes "eight third-party license agreements" as part of his reasonable royalty analysis, concluding that two of them are "comparable" to the hypothetical negotiation license: (1) 2006 Chen – Bridgetech Holdings Int'l Agreement; and (2) 2013 John Hopkins – Signpath Agreement.  *See, e.g.*, Malackowski Rbt. at 62-66, 73, App. 10.2 (providing summary information for these agreements).  Mr. Malackowski relies on the royalty rates from these two agreements to conclude that Georgia Pacific Factor 12 favors Slayback, and to corroborate his own royalty rate.  *Id.* at 73.  Slayback's technical expert, Dr. Brandt, also discusses and relies on these same agreements.  *See, e.g.*, Brandt Rbt. ¶¶ 95-109.  None of these agreements were produced or otherwise disclosed during fact discovery, even though Eagle's Common Interrogatory No. 7 expressly sought this information.  *See, e.g.*, Eagle's Common Interr. No. 7 ("Describe with particularity the complete factual and legal bases for Your contentions regarding the amount of damages owed, including … (h) any license agreements … that You contend may be relevant to the calculation of damages"); Eagle's RFPs 40, 53.  Slayback's experts' reliance on these untimely produced third-party agreements is improper, surprising, and highly prejudicial because, for example, Eagle had no opportunity to take fact discovery on them.  Courts in this District have stricken expert opinions relying on untimely-disclosed publicly-available license agreements under very similar—albeit less egregious—circumstances than those that exist here.  *See, e.g.*, *Oasis Tooling, Inc. v. GlobalFoundries U.S., Inc.*, No. 1:22-cv-00312-CJB, Dkt. 428 (D. Del. Mar. 4, 2024) (striking plaintiff's reliance on five licenses and finding that plaintiff violated Rule 26 because they "were publicly available to Plaintiff prior to and during the entirety of the case," yet were not disclosed until four days before fact discovery closed, and further finding that this untimely disclose was not substantially justified or harmless because the defendant was surprised by the late disclosure and had no ability to take fact discovery on the licenses).  Please confirm that Slayback will neither rely on these eight third-party agreements nor solicit any opinions about them from any witness (including Mr. Malackowski and Dr. Brandt) at trial.

*Second*, Mr. Malackowski opines that Slayback incurred costs totaling $1.4M related to the PAS NDA Product between Q4 2021 and Q2 2025, relying in part on a document (SLBEND-REV0000128075.0066) that does not appear to have been produced.  Appendix 9.2, p. 54, 76, App. 9.1.  Please promptly produce this document and confirm that Slayback and its experts will not rely on this document for any purpose in this case.  Indeed, this is the exact conclusion reached by the *Oasis Tooling* court under very similar facts.  You notably ignored this case.

*Third*, Mr. Malackowski's report includes a list of four Slayback/Azurity patents related to Vivamusta.  *See* App. 9.2.  None of these patents were produced, referenced, or otherwise disclosed during fact discovery, even though they issued before fact discovery closed (e.g., in Aug. 2022, Dec. 2023, and Jan. 2025).  Please confirm that Slayback will not rely on these patents for any purpose in this case and will not solicit any opinions from its fact or expert witnesses about these patents at trial.

Regards,

**Brett M. Sandford**

**LATHAM & WATKINS** LLP

505 Montgomery Street

Suite 2000

San Francisco, CA 94111-6538

Direct Dial: +1.415.395.8150

Email: brett.sandford@lw.com

https://www.lw.com

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

Robyn Ast-Gmoser
Admitted to practice in Illinois and Missouri
Windels Marx Lane & Mittendorf, LLP
180 Park Ave, Florham Park, NJ 07932
Direct Dial: 973.966.3239 |

General Fax: 973.966.3250
rast-gmoser@windelsmarx.com
| www.windelsmarx.com



This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, regardless of whether you are a named recipient, please notify the sender by reply e-mail and delete the message and any attachments.

Robyn Ast-Gmoser
Admitted to practice in Illinois and Missouri
Windels Marx Lane & Mittendorf, LLP
180 Park Ave, Florham Park, NJ 07932
Direct Dial: 973.966.3239 |
General Fax: 973.966.3250
rast-gmoser@windelsmarx.com
| www.windelsmarx.com



This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, regardless of whether you are a named recipient, please notify the sender by reply e-mail and delete the message and any attachments.

Daniel E. Forchheimer
Windels Marx Lane & Mittendorf, LLP
180 Park Ave, Florham Park, NJ 07932
Direct Dial: 973.966.3284 |
General Fax: 973.966.3250
dforchheimer@windelsmarx.com
| www.windelsmarx.com

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, regardless of whether you are a named recipient, please notify the sender by reply e-mail and delete the message and any attachments.

# Exhibit 6

ORAL ORDER: The Court, having reviewed Defendant's motion to strike certain of Plaintiff's damages theories ("Motion"), (D.I. 272 ), and the briefing related thereto, (D.I. 273; D.I. 291; D.I. 297), hereby ORDERS that the Motion is GRANTED-IN-PART and DENIED-IN-PART as follows: (1) The Motion is DENIED as to the one Siemens license that is asserted to amount to a comparable license. (D.I. 273 at 2) Plaintiff only learned about that license during the related Siemens litigation, and it has been disclosing its intention to possibly rely on that license in this case since April and May 2023, (id., ex. 7 at 90-91; D.I. 291, ex. F at 16)--well before the close of fact discovery on July 28, 2023. Plaintiff also diligently sought Siemens' permission to disclose the document in this case, (id.); which was later granted by the Court, (Civil Action No. 22-151, D.I. 198). So there has been no untimely disclosure there.; (2) The Motion is GRANTED as to the two "pricing models" and the five publicly-available license agreements (the "five agreements") at issue, however. (D.I. 273 at 2) Despite Defendant asking Plaintiff in discovery as early as May 2022 to disclose the factual and legal bases for Plaintiff's damages theories, (id. at 1; D.I. 297 at 1), Plaintiff did not disclose its intent to rely on either of these theories/licenses until July 24, 2023, four days before the close of fact discovery, (D.I. 273, ex. 11 at 50, 53). This was despite the fact that Plaintiff could have and should have known of the basis for these theories and the need to rely on them for many, many months before the disclosure was made.; (3) With regard to the pricing models, Plaintiff asserts that they were timely disclosed because: (a) they were referenced in a business document that was produced in December 2022; (b) it disclosed its intention to rely on those models in a June 16, 2023 interrogatory ("ROG") response; and (c) the inventor, Mr. Grebinski, made reference to these models during his June 23, 2023 deposition. (D.I. 291 at 2) As to the first point, the fact that a model may have been referenced in a stray discovery document is not the same thing as advising one's opponent that one will be relying on that model as evidence regarding damages. As to the second point, the text of the June 2023 ROG response does not facially refer to these pricing models, (id., ex. B at 41-42), and Plaintiff has not shown the Court how any Bates-numbered discovery documents referred to in that response otherwise did so (or how such a reference clearly disclosed Plaintiff's intention to rely on such models as part of its damages theory in the case), (D.I. 273 at 2). And as to the third point, Mr. Grebinski's brief, vague comments about the pricing models at the deposition (made in a few pages of deposition transcript, without specifying the actual price per chip/royalty rate at issue) is hardly a fulsome disclosure. So the July 24, 2023 disclosure of these models was untimely pursuant to Fed. R. Civ. P. 26.; (4) With regard to the five license agreements, Plaintiff states that they are not "documents that [Plaintiff] had in its possession prior to the litigation[.]" (D.I. 291 at 3) Yet there is no dispute that these licenses were publicly available to Plaintiff prior to and during the entirety of this case, which was filed in March 2022. (D.I. 297 at 1-2) The Court agrees with Defendant that where Plaintiff "disclosed a theory based solely on publicly-available information [approximately] 17 months after filing suit[, approximately 15 months after first being asked to articulate its damages theories,] after the deadline for serving written discovery, [] after all [Plaintiff] depositions ended" and four days prior to the close of fact discovery, that disclosure was untimely pursuant to Rule 26. (Id. at 1); cf. Barry v. Stryker Corp., Civil Action No. 20-1787-RGA-SRF, 2023 WL 2733652, at *7 (D. Del. Mar. 20, 2023) (concluding that a plaintiff had not shown diligence in seeking to amend its complaint, where it could have pleaded the theory at issue in the original complaint

based on publicly-available information but did not, and did not move to amend until "nearly a year and a half after the operative complaint was filed").; (5) Application of the Pennypack factors (some number of which Plaintiff does not even address in its briefing) will not save Plaintiff here. The "surprise or prejudice" factor strongly favors Defendant, as (a) it surely would have been surprised by these late disclosures at the fact discovery deadline, in light of how long it had been seeking such information, and (b) it was prejudiced by the late disclosure, since discovery had closed and it no longer had the ability to propound discovery regarding the pricing models or licenses at issue (the latter of which would have required third-party discovery). (D.I. 273 at 2-3; D.I. 297 at 2); NexStep, Inc. v. Comcast Cable Commc'ns, LLC, Civil Action No. 19-1031-RGA, 2021 WL 5356293, at *3 (D. Del. Nov. 17, 2023). The "bad faith or willfulness of the non-disclosure" factor also slightly favors Defendant (or at best for Plaintiff is neutral), in that while the Court cannot use the "bad faith" label here, there is no understandable reason why Plaintiff did not earlier disclose these theories (information about which was in its own possession for years or was publicly available)--suggesting at least some negligence in its failure to follow the rules. (D.I. 273 at 3; D.I. 297 at 2); see also Integra LifeScis. Corp. v. HyperBranch Med. Tech., Inc., Civil Action No. 15-819-LPS-CJB, 2017 WL 11558096, at *11-12 (D. Del. Dec. 11, 2017). The "importance of the evidence" factor also favors Defendant, as it appears that Plaintiff has many other theories relevant to damages still available to it, and that Plaintiff's damages expert did not heavily rely (or rely at all) on the materials at issue in his opening report. (D.I. 273 at 3; see also D.I. 297 at 1 n.1) It is harder to say how the remaining "ability to cure" and "likelihood of disrupting trial" factors would have come out (in that it is unclear whether the magnitude of the additional discovery needed would have unduly interrupted the process of keeping expert discovery, summary judgment briefing and trial on track), cf. Integra, 2017 WL 11558096, at *11. But regardless of that outcome, the impact of the other Pennypack factors would militate in favor of exclusion. Cf. Natera, Inc. v. CareDx, Inc., C.A. 20-38-CFC-CJB, D.I. 392 (D. Del. Oct. 6, 2023). In short, if you disclose information many, many months late that prejudices your opponent, if you have no good reason for doing so, and if the information isn't all that important to your case, then a motion to strike like this one will likely be granted (as it has been here).Ordered by Judge Christopher J. Burke on 3/4/2024. (mlc) (Entered: 03/04/2024)

As of March 5, 2024, PACER did not contain a publicly available document associated with this docket entry. The text of the docket entry is shown above.

*Oasis Tooling, Inc. v. GlobalFoundries US Inc.*
1-22-cv-00312 (DDE), 3/4/2024, docket entry 428

# Exhibit 7

ORAL ORDER: The Court, having reviewed Plaintiff's motion to strike certain opinions of Dr. Brian Van Ness and Mr. Brian Napper, (the "Motion"), (D.I. 232 ), the parties' letter briefs relating thereto, (D.I. 233; D.I. 274; D.I. 301), having heard argument on October 2, 2023, and having considered Federal Rules of Civil Procedure 26(e)(1) and 37(c)(1), hereby GRANTS the remaining pending portion of the Motion, via which Plaintiff requests that the Court strike references to a new purported non-infringing alternative ("NIA"), for the reasons that follow: (1) Defendant makes no attempt to demonstrate that it timely disclosed the NIA. Instead, in its briefing, it moved straight to an analysis of the Pennypack factors. (D.I. 274 at 5) So there can be no doubt that the opinions at issue relating to the NIA are untimely.; (2) In assessing the Pennypack factors, the Court again notes that it has to be mindful that "exclusion of critical evidence is an extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 791-92 (3d Cir. 1994) (internal quotation marks and citations omitted). Nevertheless, while "the Pennypack factors may be very forgiving, they are not a sieve." Guardant Health, Inc. v. Found. Med., Inc., Civil Action No. 17-1616-LPS-CJB, (D.I. 423) (D. Del. Apr. 28, 2020). The Court begins with the second and third Pennypack factors. Because Plaintiff waited two months after receiving Dr. Van Ness' June 12, 2023 report before filing the instant Motion, the proper inquiry is whether any prejudice could have been cured between mid-June 2023 and the upcoming January 2024 trial. Plaintiff contends that, had it earlier learned of the NIA, it would have sought discovery to uncover the facts relating to the NIA, such as how long it would have taken to implement, how costly that process would have been, whether the NIA-related process would have differed from the accused process, and other issues relating to the feasibility of the change. (D.I. 233 at 4) And in support, Plaintiff cites to portions of its expert's report, which explains these areas of inquiry, and allows the Court to understand that the discovery at issue would have been more than de minimis. (Id. (citing id., ex. J at paras. 126-28)) While it is difficult for the Court to know precisely how long such discovery would have taken to complete (and thus how much of the relevant seven-month window it might have occupied), it is at least possible that even had Plaintiff started the discovery process in mid-June or shortly thereafter, the pre-trial process would have been thrown off track. Thus, the second and third factors slightly favor Plaintiff or (at best for Defendant) are neutral. The remaining factors all go Plaintiff's way. The first Pennypack factor, which considers surprise or prejudice, would clearly favor Plaintiff. It is undoubtedly surprising and prejudicial when a party springs a new theory in the middle of expert discovery without any prior hint that it might do so. With respect to the fourth Pennypack factor, it at least slightly favors Plaintiff. While the Court would not use the term "bad faith" to describe this late disclosure, the circumstances here do seem to get closer to the "flagrant disregard" of Defendant's discovery obligations. In re Paoli R.R. Yard PCB Litig., 35 F.3d at 791-92. That is because in its briefing, as noted above, Defendant made absolutely no effort to explain why it did not earlier disclose the NIA at issue. The Court cannot countenance a world where, for no good reason at all, parties simply wait until middle of expert discovery to disclose new theories. The fifth Pennypack factor also goes Plaintiff's way, or at best for Defendant is neutral. While Defendant argues that this factor strongly weighs against exclusion because it has since successfully implemented the NIA at issue, offering clear evidence of its viability, (D.I. 274 at 5), the lateness and vagueness of the disclosure

suggests that it may not be so critical, (D.I. 233 at 4). Moreover, Defendant appears to have identified many other NIAs in its interrogatory responses. (Id., ex. F at 11-16) Thus, taken together, the Pennypack factors support a grant of Plaintiff's Motion.; (3) For these reasons, the Court hereby STRIKES paragraphs 315-17 of Dr. Van Ness' rebuttal report and paragraph 110 of Mr. Napper's rebuttal report. Ordered by Judge Christopher J. Burke on 10/6/2023. (mlc) (Entered: 10/06/2023)

As of October 10, 2023, PACER did not contain a publicly available document associated with this docket entry. The text of the docket entry is shown above.

*Natera, Inc. v. CareDx, Inc.*
1-20-cv-00038 (DDE), 10/6/2023, docket entry 392

# Exhibit 8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TQ DELTA, LLC,

                Plaintiff,

      v.

COMCAST CABLE COMMUNICATIONS LLC,

                Defendant.

Civil Action No. 15-611 (RGA)

**FILED UNDER SEAL**

---

TQ DELTA, LLC,

                Plaintiff,

      v.

COXCOM LLC and
COX COMMUNICATIONS INC.,

                Defendants.

Civil Action No. 15-612 (RGA)

**FILED UNDER SEAL**

---

TQ DELTA, LLC,

                Plaintiff,

      v.

DISH NETWORK CORPORATION, *et al.*,

                Defendants.

Civil Action No. 15-614 (RGA)

**FILED UNDER SEAL**

---

TQ DELTA, LLC,

                Plaintiff,

      v.

TIME WARNER CABLE INC. and TIME
WARNER CABLE ENTERPRISES LLC,

                Defendants.

Civil Action No. 15-615 (RGA)

**FILED UNDER SEAL**

TQ DELTA, LLC,

           Plaintiff,

    v.

VERIZON SERVICES CORP.,

           Defendant.

:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 15-616 (RGA)

**FILED UNDER SEAL**

## SPECIAL MASTER ORDER #21 – RULING ON DEFENDANTS' MOTION TO STRIKE AND EXCLUDE PLAINTIFF TQ DELTA, LLC'S [ALLEGEDLY] UNTIMELY DISCLOSED DAMAGES THEORIES

## I.    INTRODUCTION

Pending before the Court is Defendants'[1] Motion to Strike and Exclude Plaintiff TQ Delta LLC's [Allegedly] Untimely Disclosed Damages Theories (the "Motion").[2] Defendants contend that Plaintiff TQ Delta ("Plaintiff" or "TQ Delta") improperly supplemented interrogatory responses and Rule 26 disclosures on May 7, 2022 (defined below as the "May Supplements"), ten weeks after the close of fact discovery, to introduce new damages theories and new evidence. According to Defendants, the new theories and new evidence were "the foundation for certain damages opinion" in the Expert Report of Catharine M. Lawton (the "Lawton Report") served by TQ Delta on May 12, 2022. OB at 1. Defendants also contend that TQ Delta's introduction of new damages theories and new evidence through the May Supplements violated Special Master Order No. 6, which required TQ Delta to provide a complete disclosure of its damages theories

---

[1] "Defendants" refer collectively to Defendants DISH Network Corporation, et al. ("DISH Defendants"), Comcast Cable Communications Inc. ("Defendant Comcast"), CoxCom LLC, Cox Communications Inc. (collectively with CoxCom LLC, "Cox Defendants"), Time Warner Cable, Inc., Time Warner Cable Enterprises LLC (collectively, with Time Warner Cable, Inc., the "TWC Defendants"), and Verizon Services Corp. ("Defendant Verizon").

[2] C.A. No. 15-611 (RGA), D.I. 476; C.A. No. 15-612 (RGA), D.I. 460; C.A. No. 15-614 (RGA), D.I. 431; C.A. No. 15-615 (RGA), D.I. 459; C.A. No. 15-616 (RGA), D.I. 481. Unless otherwise noted, all docket citations are to C.A. No. 15-611 (RGA).

2

and supporting evidence. For this reason, Defendants seek to strike the May Supplements and all portions of the Lawton Report that reflect these alleged new theories and new evidence disclosed in the May Supplements.

TQ Delta opposes the Motion, asserting that it fully complied with Special Master Order No. 6 by properly and timely supplementing its damages disclosures to include an initial computation of damages and information regarding alternative forms of royalty base, royalty rate, comparable licenses, relevant recurring revenue, and an assessment of the *Georgia-Pacific* factors. TQ Delta asserts that its May Supplements did not disclose new theories or new evidence. Rather, TQ Delta asserts that the May Supplements "appropriately refined and supplemented" its prior damages disclosures in anticipation of the Lawton Report, and in accordance with Federal Rule of Civil Procedure 26. AB at 1.

After considering the written submissions of the parties and oral argument of the parties' respective counsel on July 27, 2022, for the reasons set forth below, IT IS HEREBY ORDERED that the Motion is GRANTED IN PART and DENIED IN PART.

## II. BACKGROUND AND RELEVANT PROCEDURAL POSTURE

TQ Delta filed these lawsuits against Defendants alleging infringement of U.S. Patent Nos. 8,718,158 ("the '158 patent") and 9,014,243 ("the '243 patent") (collectively, with the '158 patent, the "Asserted Patents") by making, using, selling, offering to sell and/or importing products that implement communications standards established by the Multimedia over Coax Alliance ("Accused MoCA Products"). The adequacy of Plaintiff's damages disclosures was a source of contention through fact discovery in the DISH action (C.A. No. 15-614 (RGA)), and first came before the Special Master on October 1, 2021 through DISH's Motion to Compel Plaintiff TQ Delta to provide a more complete disclosure under Federal Rule of Civil Procedure 26(a)(1)(A)(iii)

3

and a more complete response to DISH's Interrogatory No. 1 ("DISH's Damages Disclosure Motion").[3]  C.A. No. 15-614 (RGA), D.I. 317.  On October 19, 2021, the Special Master issued Special Master Order No. 6, which granted DISH's Damages Disclosure Motion and ordered TQ Delta to supplement its damages disclosures to include (among other things) the factual bases upon which TQ Delta damages are based, and an identification of any documents that TQ Delta intended to rely on in support of its damages claims.  C.A. No. 15-614 (RGA), D.I. 326 ("SMO No. 6") at 11-14.  In SMO No. 6, the Special Master noted that it was not his expectation that TQ Delta's supplemental damages disclosures would include TQ Delta's final calculation of damages.  Rather, SMO No. 6 contemplated "that TQ Delta's damages calculation will be updated, further refined and/or supplemented by an expert report and testimony consistent with the applicable deadlines of the scheduling order." *Id.* at 10; *see also id.* at 16-17 ("It should be understood by all that TQ Delta may specify or make clear that its damages computation is initial or preliminary based on

---

[3] DISH served TQ Delta with DISH's First Set of Interrogatories to TQ Delta, which included Interrogatory No. 1, on May 6, 2016. (D.I. 73). Interrogatory No. 1 specifically sought:

> For each Asserted Patent, describe the full factual and legal bases for TQ Delta's damages claims against DISH, including but not limited to: (1) the amount of damages sought as to each Accused Product; (2) the methodology and calculation of such damages, including the royalty rate, royalty base (including whether TQ Delta intends to rely on the entire market value for the Accused Products), relevant time period, and lump-sum amount, if any; (3) the type of damages sought (e.g., lost profits, established royalty, reasonable royalty, etc.); (4) all allegedly comparable licenses or settlement agreements and the factual circumstances related to each such license or settlement agreement; (5) the date of the purported hypothetical negotiation, if any; (6) all factors, including those described under *Georgia-Pacific Corp. v. U.S Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), that TQ Delta contends support its damages claims and a description of how each such factor allegedly supports its claims; and (7) all evidence allegedly supporting TQ Delta's contentions with respect to the above.

4

the information reasonably available to it at the current time and that its damages computation, the factual bases on which it is based, and the documents and/or other evidence identified in support of its claimed damages, may be further refined, updated and supplemented as discovery continues and/or by expert report consistent with Rule 26."). At the same time, SMO No. 6 was clear that, although the law allowed and the Special Master expected some updating, further refinement and/or supplementation by TQ Delta of its initial damages computation, "TQ [could not] simply punt its obligation under Rule 26 to adequately disclose its computation of damages." *Id.* at 10-11.

Pursuant to SMO No. 6 (and a subsequent stipulation between the parties to extend the deadline set by SMO No. 6), TQ Delta served upon the DISH Defendants its (Corrected) Second Supplemental Rule 26(a)(1) Initial Disclosures and its (Corrected) Fourth Supplemental Objection and Response to Defendants' Interrogatory No. 1 on November 24, 2021. AB, Ex. BA; OB, Ex. A. TQ Delta subsequently served its Second Supplemental Rule 26(a)(1) Initial Disclosures upon Defendant Comcast on December 3, 2021; served them upon the Cox Defendants on December 7, 2021; served them upon the TWC Defendants on December 10, 2021; and served them upon Defendant Verizon on December 17, 2021 (collectively, the "November-December Disclosures"). AB, Exs. CA, DA, EA, and FA.

Relevant to the Motion, the November-December Disclosures provided that TQ Delta intended to "seek damages measured based on a reasonable royalty (plus applicable enhancement) for Defendant's acts of infringement." AB, Ex. BA at 15; *see also* Ex. CA at 15 (same); Ex. DA at 14 (same); Ex. EA at 14 (same); Ex. FA at 15(same). TQ Delta disclosed to Defendants that it "may rely upon Defendant's financial performance associated with sale/rental/lease/deployment and/or other benefits or consideration derived directly or indirectly from the Accused Products

and/or the services employing the same." AB, Ex. BA at 15-16; Ex. CA at 15-16 (same); Ex. DA at 15 (same); Ex. EA at 14-15 (same); Ex. FA at 16 (same). TQ Delta further disclosed that it "expect[ed] its damages expert to provide expert opinions regarding three methodologies for assessing patent damages: Income Approach, Market Approach, and Cost Approach." AB, Ex. BA at 82; *see also* Ex. CA at 94; Ex. DA at 83; Ex. EA at 91-92; Ex. FA at 88. The November-December Disclosures then addressed and analyzed each of these three methodologies. With regard to the Income Approach, the November-December Disclosures assessed the matter of recurring revenue to develop a gross margin attributable to Whole Home DVR. *See* AB, Ex. BA at 103-107; Ex. CA at 115-121; Ex. DA at 101-106; Ex. EA at 109-113; and Ex. FA at 107-114. Specifically, the November-December Disclosures estimated the gross profitability for each of the accused-products, and determined each product's incremental gross revenue, and incremental gross margin. *Id.* That analysis was based upon each Defendant's own service fees and average useful life of products. *Id.*

With regard to the Market Approach, the November-December Disclosures disclosed that TQ Delta intended to estimate a reasonable royalty for the Asserted Patents. AB, Ex. BA at 83; Ex. CA at 95; Ex. DA at 84; Ex. EA at 92; and Ex. FA at 89. Within this discussion, TQ Delta indicated that it would be relying on license agreements pertaining to the *TiVo v. DirecTV/EchoStar* litigation, and specifically identified the April 2011 Confidential Settlement and Patent License Agreement between TiVo, DISH and EchoStar (the "TiVO-DISH/EchoStar License"). AB, Ex. BA at 84-88; Ex. CA at 95-100; Ex. DA at 84-88; Ex. EA at 93-96; and Ex. FA at 89-93. TQ Delta discussed substantively the DISH-TiVo litigation, setting forth details about the $41.3 million jury award. AB, Ex. BA at 85-87; Ex. CA at 97-99; Ex. DA at 85-87; Ex. EA at 94-96; and Ex. FA at 91-93. TQ Delta stated that "[t]he jury's reasonable royalty award of

6

$41.3 million matched the reasonable royalty opinion offered by TiVo's damages expert of $41.3 million." AB, Ex. BA at 85; Ex. CA at 97; Ex. DA at 86; Ex. EA at 94; and Ex. FA at 91. TQ Delta further provided details behind TiVo's expert damages calculation, including that "TiVo's damages expert converted the approximately 4.1 million infringing units to an equivalent monthly subscriber number that was used as the royalty base" (AB, Ex. BA at 85-86; Ex. CA at 95; Ex. DA at 84; Ex. EA at 92; and Ex. FA at 89) and that "[t]he expert applied a royalty rate of $1.25 per subscriber per month to the royalty base" which was based on a 2002 Development Agreement between DirecTV and TiVo (the "DirecTV-TiVo Development Agreement") "where the 'DirecTV explicit rate' was $1.00 per subscriber per month." AB, Ex. BA at 86; Ex. CA at 98; Ex. DA at 86; Ex. EA at 95; and Ex. FA at 92. This discussion referenced and cited the trial transcript from the *TiVo v. EchoStar* litigation. *See* AB, Ex. BA at 83-95; Ex. CA at 95-107; Ex. DA at 84-95; Ex. EA at 92-102; and Ex. FA at 89-101. TQ Delta further engaged in a discussion regarding the TiVo-DISH/EchoStar License. AB, Ex. BA at 87-88; Ex. CA at 99-100; Ex. DA at 87-88; Ex. EA at 96; and Ex. FA at 93.

Fact discovery closed on February 25, 2022. D.I. 398.

On May 7, 2022, TQ Delta served its Third Supplemental Rule 26(a)(1) Initial Disclosures on Defendants. AB, Exs. BC, CC, DC, EC, and FC. On the same day, TQ Delta served upon the DISH Defendants its Sixth Supplemental Objection and Response to Defendants' Interrogatory No. 1 (OB, Ex. G), and served upon the other Defendants its Fifth Supplemental Objection and Response to Defendants' Interrogatory No. 1. OB, Exs. B-E.[4]

Through the May Supplements, TQ Delta sought to supplement and further refine its

---

[4] The Third Supplemental Rule 26(a)(1) Initial Disclosures and the supplemental responses to Interrogatory No. 1 served upon the Defendants are collectively referred to as the "May Supplements."

valuation analysis. Specifically, the May Supplements set forth additional analysis concerning the Income Approach, and detailed four different analyses within the Income Approach that TQ Delta would rely on to calculate its damages: (1) Splitting of Differential Revenue Attributable to Whole-Home DVR ARPU per Month; (2) Excess Profits Associated with the Higher Return on Investment in Lower Cost Client Hardware; (3) Increased ROI Generated by Whole-Home DVR; and (4) Working Capital Cost Savings Associated with Whole-Home DVR. AB, Ex. BC at 152-159; Ex. CC at 179-185; Ex. DC at 169-173; Ex. EC at 177-181; and Ex. FC at 178-183. Through these analyses, TQ Delta relied upon DirecTV's fee service rates per subscriber per month for its DVR and Whole-Home DVR services, as well as Defendants' own financial data. *Id.* The May Supplements also provided additional analysis on TQ Delta's valuation under the Market Approach, stating that TQ Delta would consider "the evidence presented at the *TiVo v. EchoStar* trial and statements after the trial as to the commercial royalty paid by DirecTV of $1.00 per subscriber per month." AB, Ex. BC at 159-161; Ex. CC at 186-187; Ex. DC at 174-175; Ex. EC at 181-182; and Ex. FC at 183-184. Within this analysis, TQ Delta further identified that DirecTV's service fee revenue was $5.00 per subscriber per month"; thus, the "DirecTV royalty represents 20% of DirecTV's DVR service fee based on an ARPU revenue split." AB, Ex. BC at 159-60; Ex. CC at 186-187; Ex. DC at 174; Ex. EC at 181-182; and Ex. FC at 183.

On May 11, 2022, counsel for Defendants wrote to TQ Delta's counsel objecting to the May Supplements on grounds that they disclosed new damages theories and relied upon new evidence. Thus, the May Supplements were untimely according to Defendants. On May 16, 2022, TQ Delta served the Lawton Report. AB, Exs. BB, CB, DB, EB, and FB.

The Lawton Report seeks reasonable royalty damages implementing a royalty structure based on a per subscriber per month fee. AB, Ex. BB at 915; Ex. CB at 938; Ex. DB at 915; Ex.

8

EB at 881; and Ex. FB at 1012. Relevant to this Motion, the Lawton Report engages in analysis to apply the Income Approach to the facts of the present actions through the four different analyses disclosed in the May Supplements. AB, Ex. BB at 800-827; Ex. CB at 820-848; Ex. DB at 800-827; Ex. EB at 765-788; and Ex. FB at 877-907. With regard to the Market Approach, the Lawton Report reveals that "the only agreement that the parties to the hypothetical negotiation would have considered is the *TiVo v. EchoStar* Trial, April 2006 jury verdict, and April 29, 2011 Confidential Settlement and License Agreement." AB, Ex. BB at 845; Ex. CB at 866; Ex. DB at 846; Ex. EB at 806; and Ex. FB at 925. Ms. Lawton relies upon the TiVo April 2006 jury verdict, which set forth a reasonable royalty rate of $1.25 per subscriber per month, that was based on the DirecTV rate of $1.00 per subscriber per month plus $0.25 per subscriber month related to advertising. AB, Ex. BB at 848; Ex. CB at 869; Ex. DB at 849; Ex. EB at 810; and Ex. FB at 928. The Lawton Report opines that "the evidence presented at the *TiVo EchoStar* trial and statements after the trial provides certain data that is useful to determining the reasonable royalty in this case." AB, Ex. BB at 852; Ex. CB at 873; Ex. DB at 853; Ex. EB at 815; and Ex. FB at 932. Ms. Lawton continues her opinion applying the commercial royalty rate paid by DirecTV of $1.00 per subscriber per month to DirecTV's DVR service fee revenue of $5.00 per subscriber per month, and opining that the TiVo-DirecTV royalty represents 20% of DirecTV's DVR service fee revenue. AB, Ex. BB at 852; Ex. CB at 873; Ex. DB at 853; Ex. EB at 815; and Ex. FB at 932.

Pursuant to the current Scheduling Order, rebuttal expert reports are due on August 12, 2022, and reply expert reports are due on September 16, 2022. D.I. 490. Expert discovery closes on October 14, 2022. *Id.* No trial date has been scheduled in this action to date. Rather, following the close of discovery, the parties are required to jointly submit a status report proposing a schedule going forward. *Id.*

9

On June 17, 2022, Defendants filed the Motion, and simultaneously lodged upon the Special Master their opening brief in support of the Motion. *See* Defendants' Opening Brief In Support of Their Motion to Strike and Exclude Plaintiff TQ Delta, LLC's Undisclosed Damages Theories ("Opening Brief" or "OB"). On July 1, 2022, TQ Delta opposed the Motion. *See* Plaintiff's Opposition to Defendants' Motion to Strike and Exclude Plaintiff TQ Delta, LLC's Allegedly Undisclosed Damages Theories ("Answering Brief" or "AB"). On July 8, 2022, Defendants served their Reply Brief. On July 15, 2022, TQ Delta served its Sur-Reply. *See* Defendants' Reply In Support of Their Motion to Strike and Exclude Plaintiff TQ Delta, LLC's Undisclosed Damages Theories ("Reply" or "RB"); Plaintiff's Sur-Reply to Defendants' Motion to Strike and Exclude Plaintiff TQ Delta, LLC's Allegedly Undisclosed Damages Theories ("Sur-Reply" or "SRB"). The Special Master heard argument on the Motion on July 27, 2022.[5]

The issue for the Special Master to decide is whether the May Supplements and the corresponding theories from the Lawton Report should be stricken.

## III.    LEGAL STANDARDS

Rule 26(a)(1)(A)(iii) of the Federal Rules of Civil Procedure requires that a party disclose to all other parties "a computation of each category of damages claimed by the disclosing party— who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material . . . on which each computation is based, including materials bearing on the nature and extent of injuries suffered[.]" Fed. R. Civ. P. 26(a)(1)(A)(iii).

"A party must make its initial disclosures based on the information then reasonably available to it . . . [and] is not excused from making its disclosures because it has not fully

_____

[5] On July 27 and 28, 2022, after oral argument on the Motion and upon the request of the Special Master, TQ Delta lodged upon the Special Master a "summary chart" which purportedly identified the specific quote and location cites for each contributing component of the damages calculation set forth by the Lawton Report.

10

investigated the case . . ." Fed. R. Civ. Pro. 26(a)(1)(E) (emphasis added). Through Rule 26 disclosures, "a party [is not] expected to provide a calculation of damages . . . [that] depends on information in the possession of another party or person." Fed. R. Civ. P. 26 advisory committee notes (1993). "The purpose of the initial disclosures provided for in Rule 26 is to prevent a party from being unfairly surprised by the presentation of new evidence." *Alza Corp. v. Andrx Pharms., LLC*, 2008 WL 1886042, at *2 (D. Del. Apr. 28, 2008) (citation omitted). Parties are under a continuing obligation to supplement their Rule 26 disclosures, as well as their interrogatory responses. Fed. R. Civ. P. 26(e)(1)(A)-(B). "The law recognizes that experts will elaborate on their opinions, particularly when calculating damages." *Acceleration Bay LLC. v. Activision Blizzard, Inc.*, 2017 WL 11517421, at *4 (D. Del. Nov. 7, 2017).

"If a party fails to provide information . . . as required by Rule 26(a) . . ., the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The decision to exclude testimony at trial is within the Court's discretion. *NexStep, Inc. v. Comcast Cable Commc'ns, LLC*, 2021 WL 5356293, at *1 (D. Del. Nov. 17, 2021). In the Third Circuit, courts consider the following factors which are known as the *Pennypack* factors to determine whether a failure to disclose was substantially justified or is harmless: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the possibility of curing the prejudice; (3) the potential disruption of an orderly and efficient trial; (4) the presence of bad faith or willfulness in not disclosing the evidence; and (5) the importance of the information withheld. *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904-905 (3d Cir. 1977); *TQ Delta, LLC v. Adtran, Inc.*, 2020 WL 4529865, at *1 (D. Del. July 31, 2020) (citing *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997).

11

## IV. ANALYSIS

The Special Master first examines whether TQ Delta disclosed to Defendants each of the alleged new damages theories and the evidence TQ Delta relies upon in support of its damages theories prior to the May Supplements and/or the Lawton Report. To the extent the Special Master finds that some or all of TQ Delta's damages theories or the underlying evidence to TQ Delta's damages theories were not disclosed to Defendants, the Special Master will then examine whether the non-disclosure was justified or harmless under the *Pennypack* factors.

### A. TQ Delta's Disclosure of the Alleged New Damages Theories and Evidence

Defendants assert, that through the May Supplements and the Lawton Report, TQ Delta abandoned its previously disclosed damages theories and claims damages based upon five new theories with new supporting evidence that were not disclosed to Defendants during fact discovery or at any time prior to the May Supplements. OB at 5-6. Specifically, according to Defendants, the November-December Disclosures set forth a single Income Approach – the "Gross Margin Theory" – under which TQ Delta "considered the revenues received by Defendants for whole-home DVR service of the useful life of each of the Accused Products . . . then determined the alleged gross margin for each accused product and computed a per device royalty by multiplying the gross margin percentage by the revenues received for the whole-home DVR service of the lifetime of the Accused Products." OB at 5. Further, according to Defendants, the November-December Disclosures also identified a Market Approach theory that "alleged technical and economic comparability to the TiVo-DISH/EchoStar License and used that analysis to determine a royalty." *Id.*

Defendants contend that, in the May Supplements, these theories are abandoned and

12

instead TQ Delta relies upon the TiVo-DirecTV Development Agreement and DirecTV's service fees to assert a new Market Approach analysis and two new Income Approach theories: (1) Splitting of Differential Revenue Attributable to Whole-Home DVR ARPU per Month, and (2) Increased ROI Generated by Whole Home-DVR. OB at 5-6. Defendants also contend that TQ Delta relies upon Defendants' own financial data such as subscriber acquisition costs, capital cost savings, hardware lease fees, and customer premises equipment costs to assert two additional new Income Approach theories: (1) Excess Profits Associated with the Higher Return on Investment in Lower Cost Client Hardware, and (2) Working Capital Cost Savings Associated with Whole-Home DVR. OB at 7-8. Defendants argue that TQ Delta's reliance upon this evidence to support these alleged new damages theories is improper because TQ Delta never disclosed that such evidence would be relied upon. *Id.* at 8. Finally, Defendants argue that TQ Delta relies upon these alleged new damages theories to "seek damages utilizing a completely different structure," shifting TQ Delta's damages from a per-device basis to a per-subscriber-per-month basis. *Id.* at 2.

TQ Delta disputes Defendants' contentions, asserting that its damages theories set forth in the November-December Disclosures are not as limited at Defendants suggest, and that the May Supplements and the Lawton Report simply reflect an "appropriate[ ] refine[ment] and supplement[ation]" of the November-December Disclosures. AB at 1.

As stated above, Rule 26 requires a party to disclose "a computation of any category of damages claimed." Fed. R. Civ. P. 26(a)(1)(A)(iii). SMO No. 6 set forth the Federal and Third Circuit's interpretation of the requirements of Rule 26, and required TQ Delta to (1) provide an initial computation of its damages; (2) disclose the factual bases upon which its damages are based, "including, but not limited to, identifying the royalty base, the appropriate royalty rate, identifying any relevant convoyed or collateral sales that are or may be incorporated in the damages analysis,

13

and identifying any relevant recurring or subscription revenue that is or may be incorporated in the damages analysis[,]" the factual bases supporting the application of the *Georgia-Pacific* factors, and the factual bases supporting damages under the income approach, the market approach and the Cost Approach; and (3) identify any documents it intends to rely on in support of its damages claims.  SMO No. 6 at 10-15.  Nonetheless, consistent with the precedent in the District, SMO No. 6 expressly recognized that "a party's damages are dependent upon expert opinion to some extent."  SMO No. 6 at 10; *Acceleration Bay LLC.*, 2017 WL 11517421, at *4.  Further, the Special Master indicated that he did not "expect[ ] [or] require[ ] TQ Delta to set forth a *final* calculation of its damages at this stage of the action. . . .  However, TQ Delta [could not] simply punt its obligation under Rule 26 to adequately disclose its computation of damages."  SMO No. 6 at 10-11 (emphasis in original).

Thus, the Special Master must determine whether each of the alleged five new damages theories is a new theory or based upon new evidence being disclosed for the first time through the May Supplements, or whether the May Supplements merely refine and supplement TQ Delta's previously disclosed damages theories.  Based on the analysis that follows, the Special Master finds that some of TQ Delta's alleged new theories and the evidence supporting the theories were timely disclosed by TQ Delta prior to the May Supplements or the Lawton Report.  However, some of the alleged new damage theories and the evidence supporting the theories were not previously disclosed by TQ Delta to Defendants prior to the May Supplements or the Lawton Report.

### 1.    TQ Delta's Valuation Under the Income Approach

Defendants object to two of TQ Delta's alleged new Income Approach analyses – (1) Splitting of Differential Revenue Attributable to Whole-Home DVR ARPU Per Month, and (2)

14

Increased ROI Generated by Whole-Home DVR theory – on the basis that "front and center" to these theories is the TiVo-DirecTV Development Agreement as well as the allegedly undisclosed DirecTV service fees. OB at 7.

### a) Splitting of Differential Revenue Attributable to Whole-Home DVR ARPU Per Month

In the May Supplements, TQ Delta set forth its Splitting of Differential Revenue Attributable to Whole-Home DVR ARPU Per Month analysis, considering whole-home DVR incremental ARPU. AB, Ex. BC at 153; Ex. CC at 180-181; Ex. DC at 169-171; Ex. EC at 177-178; and Ex. FC at 178-180. The analysis indicates that "[i]n order to determine a benchmark metric starting point for how TQ Delta and DISH would split the revenue attributable to whole-home DVR incremental ARPU, TQ Delta's expert may consider the TiVo-DirecTV revenue split of 20% (*i.e.*, DirecTV's DVR revenue was $5.00 per subscriber per month and DirecTV paid TiVO a royalty of $1.00 per subscriber per month), or $0.60 per subscriber per month (*i.e.*, ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ The $1.00 royalty paid by DirecTV to TiVo reflects a benchmark that is publicly available." AB, Ex. BC at 153; *see also* AB, Ex. CC at 180-181 (relevant information for Comcast); Ex. DC at 169-170 (relevant information for Cox); Ex. EC at 177-178 (relevant information for TWC); and Ex. FC at 178-179 (relevant information for Verizon). The Lawton Report does indeed consider the TiVo-DirecTV DVR ARPU revenue split of 20%. *See e.g.,* AB, Ex. BB at 810-819; CB at 831-841; Ex. DB at 811-821; Ex. EB at 774-783; and Ex. FB at 886-895.

In evaluating Defendants' contention that this analysis presents a new damages theory, the Special Master examines whether TQ Delta disclosed to Defendants the factual underpinnings of this analysis in the November-December Disclosures. First, the Special Master considers whether TQ Delta disclosed the $1.00 royalty rate derived from the TiVo-DirecTV Development

15

Agreement to Defendants and finds that TQ Delta sufficiently disclosed its reliance upon the DirecTV-TiVo Development Agreement. Although the TiVo-DirecTV Agreement was not "front and center" to the November-December Disclosures, TQ Delta referenced the agreement, discussed the underlying pertinent information in detail and cited to the publicly available trial transcript. Specifically, the November-December Disclosures set forth that TQ Delta expected to estimate a reasonable royalty for the Accused MoCA Products. AB, Ex. BA at 83; Ex. CA at 96; Ex. DA at 84; Ex. EA at 92; and Ex. FA at 89. TQ Delta specifically discussed the litigation brought by TiVO against DISH/EchoStar in 2004 and, within that discussion, TQ Delta specifically identified the royalty rate used by the DirecTV-TiVo Development Agreement. *See* AB, Ex. BA at 86 ("[t]he expert applied a royalty rate of $1.25 per subscriber per month to the royalty base. The $1.25 per subscriber per month rate was based on a TiVo-DirecTV 2001 agreement where the 'DirecTV explicit rate' was $1.00 per subscriber per month."); Ex. CA at 98 (same); Ex. DA at 86 (same); Ex. EA at 95 (same); and Ex. FA at 92 (same).[6] The fact that this discussion was located within TQ Delta's analysis of its Market Approach valuation analysis does not preclude TQ Delta from relying upon it as part of a separate valuation analysis. Defendants had (or should have had) adequate notice that the TiVo-DirecTV Development Agreement may serve as a comparable license and may form the basis of a reasonable royalty in TQ Delta's damages calculation.

The Special Master further finds that TQ Delta's failure to produce a copy of the DirecTV-TiVo Development Agreement is not fatal to TQ Delta's ability to rely upon it in the Lawton Report. Indeed, during oral argument, both parties conceded that (1) the DirecTV-TiVO

---

[6] The November-December Disclosures refer to a "TiVo-DirecTV 2001 agreement." *Id.* The Special Master believes that this merely reflects a typographical error by TQ Delta – 2001 should say 2002. Had Defendants referred to the trial transcript, which was cited to repletely by TQ Delta, the Defendants would have discovered the DirecTV-TiVo Development Agreement.

Development Agreement is publicly available in redacted form; and (2) such redacted form does not contain the applicable royalty rate.[7] Significantly, the $1.00 royalty rate relied upon by TQ Delta is set forth in the *TiVO v. EchoStar* trial transcript, which was cited to by TQ Delta in the November-December Disclosures, and is publicly available to Defendants. While Defendants complain that they only possess a redacted copy of the DirecTV-TiVo Development Agreement, TQ Delta confirmed that it also does not possess an unredacted copy of the DirecTV-TiVo Development Agreement. SRB at 2. Therefore, the Special Master concludes that the DirecTV-TiVo Development Agreement and the $1.00 reasonable royalty rate were sufficiently disclosed by TQ Delta prior to the May Supplements.

The Special Master must next examine whether TQ Delta disclosed to Defendant the "relative to what" portion of the revenue split prior to the May Supplements. During oral argument on the Motion, counsel for TQ Delta represented that the November-December Disclosures did disclose the "relative to what" portion of the revenue split to Defendants.[8] However, as set forth in the November-December Disclosures, TQ Delta applied the royalty rate only to Defendants' DVR service fees. *See e.g.,* AB, Ex. BA at 94. The November-December disclosures did not apply the royalty rate to DirecTV's services fees, nor did they make any reference to DirecTV's service fees whatsoever. The Lawton Report makes clear that TQ Delta abandoned its reliance on Defendants' own DVR service fees and instead based its damages calculations solely upon DirecTV's service fees. *See e.g.,* AB, Ex. BB at 805-807; Ex. CB at 826-828; Ex. DB at 806-808; Ex. EB at 768-771; and Ex. FB at 881-883.

TQ Delta should have, but failed to, provide a timely supplement to disclose its reliance upon the DirecTV monthly service fees for DVR and whole-home DVR as opposed to its reliance

---

[7] *See* Transcript of July 27, 2022 Oral Argument.
[8] *See* Transcript of July 27, 2022 Oral Argument.

17

on Defendants' own DVR service fees. Without such supplementation to the November-December Disclosures prior to the May Supplements, TQ Delta failed to timely disclose to Defendants that TQ Delta would rely specifically on DirecTV's service fees or, even more generally, the fact that TQ Delta may consider such service fees as a proxy for Defendants' service fees. Therefore, the Special Master concludes that TQ Delta failed to disclose to Defendants the Splitting of Differential Revenue Attributable to Whole-Home DVR ARPU Per Month theory prior to the May Supplements and the Lawton Report. *See MLC Intellectual Property, LLC v. Micron Tech., Inc.*, 10 F.4th 1358 (2021) (affirming the district court's decision to exclude plaintiff's expert testimony regarding the royalty base based upon the district court's conclusion that plaintiff failed to disclose the factual underpinnings of its royalty rate).[9]

### b)       Increased ROI Generated by Whole-Home DVR

TQ Delta's failure to disclose to Defendants its reliance upon DirecTV's service fees is similarly unfavorable to TQ Delta's Increased ROI Generated by Whole-Home DVR theory. The May Supplements indicate that TQ Delta's Increased ROI Generated by Whole-Home DVR analysis was "directed to estimating the magnitude of the increase in [Defendant's] ROI, as a result of increased ARPU and reduced customer premises equipment costs [ ], that is reasonably attributable to Whole-Home DVR." AB, Ex. BC at 158; Ex. CC at 184; Ex. DC at 172; Ex. EC at

---

[9] The Special Master notes that, in *MLC*, the Federal Circuit affirmed the district court's decision on the basis that the district court did not abuse its discretion in requiring the disclosure of certain facts underlying its damages theories. Indeed, *MLC* contains no clear standard of what is required to be disclosed under Rule 26. Nonetheless, the Special Master agrees with the district court that a party should disclose the factual underpinnings of its claims. *See MLC Intell. Prop., LLC v. Micron Tech., Inc.*, No. 14-CV-03657-SI, 2019 WL 2863585, at *14 (N.D. Cal. July 2, 2019), *aff'd*, 10 F.4th 1358 (Fed. Cir. 2021) ("The Court also concludes that MLC never disclosed the factual underpinnings of its claim that the Hynix and Toshiba licenses 'reflect' a 0.25% royalty rate, and that pursuant to Rule 37(c)(1), this failure is a separate and independent basis for excluding evidence and argument that those licenses contain such a rate.")

180; and Ex. FC at 181. In the Lawton Report, the analysis under this methodology utilized the ARPU calculated using DirecTV's monthly service fees. AB, Ex. BC at 823-824; Ex. CB at 844-85; Ex. DB at 824; Ex. EB at 785-786; and Ex. FB at 899-902. Thus, because the Special Master has already concluded that the evidence underlying the calculation of the ARPU was not timely disclosed by TQ Delta to Defendants, the Special Master also concludes that the Increased ROI Generated by Whole-Home DVR relies upon the Direct TV monthly service fees that were not timely disclosed by TQ Delta to Defendants.

### c) Excess Profits Associated with the Higher Return on Investment in Lower Cost Client Hardware and Working Capital Cost Savings Associated with Whole-Home DVR

Defendants also object to TQ Delta's Excess Profits Associated with the Higher Return on Investment in Lower Cost Client Hardware analysis and Working Capital Cost Savings Associated with Whole-Home DVR analysis because TQ Delta bases these analyses upon Defendants' own financial data that was not specifically identified by TQ Delta in the November-December Disclosures. OB at 2.

The May Supplements provide that TQ Delta's Excess Profits Associated with the Higher Return on Investment in Lower Cost Client Hardware analysis will consider "excess profit associated with the lease fees on the lower cost client boxes when compared to the higher cost DVR boxes." AB, Ex. BC at 154; Ex. CC at 181; Ex. DC at 171; Ex. EC at 178; and Ex. FC at 180. This analysis specifically examines both the costs of a client box and lease rates, and specifically examines the financials of each respective Defendant. AB, Ex. BC at 154-155; Ex. CC at 181-184; Ex. DC at 171-172 Ex. EC at 178-180; and Ex. FC at 180-181. With regard to TQ Delta's Working Capital Cost Savings Associated with Whole-Home DVR analysis, the May Supplements indicate that such analysis will "consider the cost savings associated with the lower

19

cost of the client boxes when compared to the higher cost DVR boxes with a hard drive." AB, Ex. BC at 158; Ex. CC at 184; Ex. DC at 172; Ex. EC at 180; and Ex. FC at 181. Again, this analysis looks at the costs of the client hardware boxes specific to each respective Defendant. AB, Ex. BC at 158-159; Ex. CC at 184-185; Ex. DC at 172-173; Ex. EC at 180-181; and Ex. FC at 181-182.

After considering both the November-December Disclosures and the May Supplements, the Special Master finds that both of these theories were adequately disclosed by TQ Delta in the November-December Disclosures. Although the November-December Disclosures did not specifically identify these exact analyses in the precise manner the May Supplements did, the November-December Disclosures referenced Defendants' pricing, and discussed the costs of Defendants' devices, including equipment costs and subscriber acquisition costs. Moreover, both analyses are based upon Defendants' own financial information, which TQ Delta indicated may be relied on. *See* AB, Ex. BA at 15-16 (disclosing that TQ Delta "may rely upon Defendant's financial performance associated with sale/rental/lease/deployment and/or other benefits or consideration derived directly or indirectly from the Accused Products and/or the services employing the same."; Ex. CA at 15-16 (same); Ex. DA at 15 (same); Ex. EA at 14-15 (same); and Ex. FA at 16 (same). Thus, the November-December Disclosures disclosed to Defendants that TQ Delta would be considering Defendants' financial data to analyze the Asserted Patents' economic value to each Defendant. The May Supplements were an appropriate supplementation and refinement of the November-December Disclosures. Also, to the extent any specific financial data of a defendant was not specifically disclosed in the November-December Disclosures, the Special Master does not find this prejudicial to Defendants given that such data is Defendants' own financial information already in Defendants' possession.

### 2.    TQ Delta's Valuation Under the Market Approach

Defendants similarly object to the Market Approach analysis disclosed by TQ Delta in the May Supplements because Defendants contend that the analysis relies upon the DirecTV Development Agreement and DirecTV's monthly service fees. The Special Master's analysis here mirrors the analysis of Section IV.A.1.a., *supra*. Specifically, the Special Master finds that TQ Delta's reliance on the TiVo-DirecTV Development Agreement was previously disclosed to Defendants through the November-December Disclosures. Thus, to the extent the Market Approach analysis of the Lawton report relies upon the TiVo-DirecTV Development Agreement to calculate the applicable royalty rate, the analysis does not represent a new theory. However, the Special Master finds that TQ Delta never disclosed its reliance on DirecTV as a proxy for Defendants or its intention to rely upon DirecTV's service fees in lieu of Defendants' own monthly service fees prior to the May Supplement. Thus, to the extent the Market Approach analysis set forth in the May Supplement and the Lawton Report relies on DirecTV's service fees, those portions of the Market Approach analysis represent new theories that were not timely disclosed.

### 3.    TQ Delta's Calculation of Damages Using Royalty Based Upon Per-Subscriber-Per-Month

Finally, Defendants argue that TQ Delta relies upon its alleged new damages theories and evidence to "advance an entirely different royalty structure" calculated on a per-subscriber-per-month basis, rather than the per-device theory detailed in the November-December Disclosures. OB at 6.

While the Special Master finds that the November-December Disclosures did disclose TQ Delta's potential reliance upon a per-subscriber-per-month royalty calculation, the Special Master observes that this disclosure expressly contemplated that Defendants' own information would be considered in calculating the royalty base. *See* AB, Ex. BA at 143 ("notwithstanding the

21

expectation of the use of infringing devices as the royalty base, upon full consideration of the fact record, the damages expert may use subscriber-months as the royalty base. In such circumstances, the damages expert would express the royalty rate on a per subscriber-month basis."); Ex. CA at 157 (same); Ex. DA at 140 (same); Ex. EA at 148 (same); and Ex. FA at 151 (same). While the November-December Disclosures also include other instances of disclosure of the potential reliance upon a per-subscriber-per-month royalty calculation, in these instances, the per subscriber per month disclosure is based upon Defendants' own financial data. *See e.g.,* AB, Ex. BA at 149; Ex. CA at 166; Ex. DA at 148; Ex. EA at 157; and Ex. FA at 158.

The Lawton Report, however, opines that the reasonable royalty adequate to compensate TQ Delta for Defendants' alleged infringement should be based on a per subscriber per month running royalty applied to Defendants' whole home DVR subscribers, and in calculating this, Ms. Lawton relies on DirecTV's Whole-Home DVR premium, and 20% revenue split to ultimately arrive at a subscriber per month rate. AB, Ex. BB at 915; Ex. CB at 939; Ex. DB at 916; Ex. EB at 881; Ex. FB at 1012. Although the Special Master recognizes that SMO No. 6 did allow for some refinement or supplementing of TQ Delta's initial damages computation, the Special Master finds that establishing a damages theory upon a third-party's DVR and Whole-Home DVR service fees as opposed to Defendants' own information, without any prior indication that such third party's fees may be considered or relied upon, goes beyond merely supplementing or refining a theory.

For these reasons, the Special Master concludes that the per-month-per-subscriber royalty base, to the extent it is based upon DirecTV's monthly fee services, is a new damages theory not disclosed in the November-December Disclosures.

## B.     Application of the *Pennypack* Factors

The Special Master next considers whether TQ Delta's failure to timely disclose the Undisclosed Damages Theories[10] of certain of TQ Delta damages theories and/or factual underpinnings was justified or harmless under the *Pennypack* factors. "Courts applying the *Pennypack* factors in the case of sophisticated, complex litigation involving parties represented by competent counsel have been less indulgent in their application and more willing to exclude evidence without a strict showing that each of the *Pennypack* factors has been satisfied." *Bridgestone Sports Co. v. Acushnet Co.*, 2007 WL 521894, at *4 (D. Del. Feb. 15, 2007) (citing *Astrazeneca AB v. Mutual Pharm. Co.*, 278 F.Supp.2d 491 (E.D.Pa.2003)). The Special Master specifically finds that this litigation is "sophisticated [and] complex" and that the parties to this action are represented by "competent counsel." Also, the Special Master recognizes the Third Circuit's and this Court's reluctance to exclude an expert report, "absent a showing of bad faith or other deceptive conduct that puts the moving party under extreme prejudice if exclusion is not granted." *Acceleration Bay LLC.*, 2017 WL 11517421, at *2.

### 1.     The Prejudice to the Party Against Whom the Evidence is Offered.

The first *Pennypack* factor is the prejudice or surprise to the party against whom the evidence is offered. In determining whether Defendants will be prejudiced by TQ Delta's Undisclosed Damages Theories, the Special Master considers the factual underpinnings of such theories, and whether TQ Delta relies upon Defendants' own financial data or upon DirecTV's pricing. Certainly, TQ Delta's expert can rely upon Defendants' own financial data to supplement and/or refine its damages analysis. However, the Special Master finds that Defendants will be

---

[10] "Undisclosed Damages Theories" collectively refer to the theories the Special Master concluded were not disclosed by TQ Delta to Defendants through the November-December Disclosures and prior to the May Supplements.

prejudiced by TQ Delta's failure to disclose to Defendants its intention to rely upon DirecTV's monthly fee rates for DVR and Whole-Home DVR. Had TQ Delta at least disclosed to Defendants that it would use DirectTV as a proxy, Defendants would have been on notice that DirecTV's service fees were at issue. But TQ Delta did not even disclose that it would use DirecTV as a proxy. Indeed, this was the exact situation the Special Master attempted to avoid when he ordered TQ Delta to "provide a complete listing of the documents and/or other evidence it contends supports it claims for damages" or to supplement its disclosures with such information "as soon as it is able to do so." SMO No. 6 at 15-16; *see also Alza Corp. v. Andrx Pharms., LLC*, 2008 WL 1886042, at *2 (D. Del. Apr. 28, 2008) ("The purpose of the initial disclosures provided for in Rule 26 is to prevent a party from being unfairly surprised by the presentation of new evidence.").

Defendants are prejudiced because TQ Delta's intent to rely upon DirecTV's service fees was not disclosed to Defendants before the end of fact discovery. Therefore, Defendants did not have the appropriate opportunity to explore DirecTV's service fees or take discovery regarding whether DirecTV's service fees are relevant or applicable. For these reasons, the Special Master finds that Defendants are prejudiced by the Undisclosed Damages Theories that rely upon DirecTV's financials.

## 2.    The Possibility of Curing the Prejudice.

The prejudice caused to Defendants by the Undisclosed Damages Theories that rely upon DirecTV's financials cannot be cured at the present time. The fact discovery deadline passed more than five (5) months ago. Even if fact discovery was reopened, the necessary discovery to further explore DirecTV's pricing, whether DirecTV's pricing is applicable here, and/or whether Defendants are similarly situated to DirecTV would need to come, at least in part, from DirecTV – a non-party to these actions. Although expert discovery does not close until October 14, 2022,

24

the additional expert discovery time does not eliminate the prejudice the Defendants face concerning TQ Delta's reliance upon DirecTV's financials. Moreover, the additional expense and delay that would result if fact discovery was reopened to explore DirecTV's financials would further harm Defendants under the circumstances. Thus, this factor favors striking the Undisclosed Damages Theories that rely upon DirecTV's financials.

### 3.    The Likelihood of Disruption of the Trial.

Allowing TQ Delta to continue to pursue the Undisclosed Damages Theories that rely upon DirecTV's financials would cause delay and would disrupt trial in this action. Although no trial date has been scheduled in this matter to date, the remaining expert discovery deadlines would need to be stayed to allow for any necessary fact discovery regarding DirecTV's financials and/or the applicability of DirecTV's financials. Thus, this factor favors striking the Undisclosed Damages Theories that rely upon DirecTV's financials.

### 4.    The Presence of Bad Faith or Willfulness In Not Timely Disclosing Its Damages Theories.

In considering whether TQ Delta's failure to timely disclose the Undisclosed Damages Theories was in bad faith or willful, the Special Master recognizes TQ Delta's obligations to supplement the November-December Disclosures imposed by both Rule 26 and SMO No. 6. Fed. R. Civ. P. 26(e)(1)(A) (requiring a party to "timely" supplement its Rule 26 disclosures if "additional or corrective information has not otherwise been made known to the other parties during the discovery process"); SMO No. 6 at 16 ("TQ Delta should supplement its Damages Disclosures as soon as it is able to do so in accordance with its duty to supplement its disclosures and discovery responses as required by Rule 26"). Here, TQ Delta waited more than ten (10) weeks after the close of fact discovery to disclose or refine its new damages theories to Defendants. Particularly troubling to the Special Master is TQ Delta's reliance upon DirecTV's pricing as a

25

proxy for Defendants' own pricing. TQ Delta contends that its reliance upon DirecTV's pricing as a proxy is a result of Ms. Lawton's "independent research to identify contemporaneous evidence on pricing for whole home DVR subscription fees by others in the marketplace" following Mr. Gelston's testimony ███████████████████████████████████ AB at 10. However, Mr. Gelston's deposition occurred on December 21, 2021. TQ Delta had at least an additional two months after Mr. Gelston's deposition and before the close of fact discovery to disclose to Defendants that it intended to rely upon DirecTV's pricing as a proxy. Yet, TQ Delta failed to do so in a timely manner. Instead, TQ Delta delayed another ten (10) weeks after the close of fact discovery and disclosed its reliance upon DirecTV's pricing only days before issuing the Lawton Report. Such conduct suggests that TQ Delta may take lightly or not recognize the importance of its obligations to supplement in a timely manner as required by Rule 26 and SMO No. 6. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 792 (3d Cir. 1994). Indeed, this is not the first instance in these actions that TQ Delta has failed to honor disclosure deadlines set by the Court. *See* C.A. No. 15-614 RGA, D.I. 427 (Special Master Order No. 17 – Ruling on DISH's Motion to Strike/Exclude Plaintiff TQ Delta's Doctrine of Equivalents Infringement Theories Under Rule 37) at 15. Therefore, this factor favors striking the Undisclosed Damages Theories that rely upon DirecTV's pricing.

### 5.     The Importance of the New Damages Theories.

Finally, the Special Master finds that TQ Delta's Undisclosed Damages Theories are not so important as to excuse their untimely disclosure. Although TQ Delta's damages expert opinions are important in these actions, the Motion seeks to strike only those portions of the Lawton Report that were not timely disclosed by Defendants. Further, the Lawton Report sets forth and contemplates alternative damages that are not subject to the Motion and that TQ Delta can rely

26

upon. Therefore, this factor favors striking the Undisclosed Damages Theories.

Given the analysis of the *Pennypack* factors set forth above, the Special Master finds that all portions of TQ Delta's damages theories in the May Supplements and/or the Lawton Report that rely upon or are based upon DirecTV's financial data (and more specifically, DirecTV's monthly service fees) are stricken and excluded. On the other hand, to the extent TQ Delta's damages theories rely upon the DirecTV-TiVo Development Agreement and/or Defendants' own financial data (and do not rely on DirecTV's monthly service fees) the Special Master finds that those theories are not stricken and/or excluded and will remain in the case.

## V.    CONCLUSION

For all the foregoing reasons, IT IS HEREBY ORDERED that the Motion is GRANTED IN PART and DENIED IN PART. The parties shall confer and identify the exact provisions of the May Supplements and the Lawton Report that rely upon or are based upon DirecTV's monthly service fees and, within seven (7) days of this Order, the parties shall submit a proposed form of Order identifying the exact provisions of the May Supplements and the Lawton Report that are stricken consistent with the findings of this Order.

ENTERED this \_\_11\_\_ th day of August, 2022.

Gregory B. Williams (#4195)
Special Master

SO ORDERED this _____ day of _____, 2022.

_____
UNITED STATES DISTRICT COURT JUDGE

27

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that true and correct copies of the foregoing documents were caused to be served on April 20, 2026, on the following counsel in the manner indicated:

### <u>VIA EMAIL:</u>

Daniel A. Taylor
Neal C. Belgam
SMITH KATZENSTEIN & JENKINS LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
Dtaylor@skjlaw.com
Nbelgam@skjlaw.com

Andrew Miller
Ajay Kayal
Connie Huttner
Robyn Ast-Gmoser
WINDELS MARX LANE & MITTENDORF, LLP
One Giralda Farms
Madison, NJ 07940
amiller@windelsmarx.com
akayal@windelsmarx.com
chuttner@windelsmarx.com
rast-gmoser@windelsmarx.com

*Attorneys for Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*

*/s/ Alexandra M. Joyce*
Alexandra M. Joyce (#6423)

ME1\60041184.v1