# Exhibit 47 (Part 1)

8460068

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

*February 16, 2024*

**THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF THE FILE WRAPPER AND CONTENTS OF:**

**APPLICATION NUMBER:** *18/081,238*
**FILING DATE:** *December 14, 2022*
**PATENT NUMBER:** *11844783*
**ISSUE DATE:** *December 19, 2023*

Certified by



Kathi

Performing the Functions and Duties of the
Under Secretary of Commerce
for Intellectual Property
and Director of the United States
Patent and Trademark Office

EAGLEBEN-SA_00000001

**Doc Code: TRACK1.REQ**
**Document Description**: **TrackOne Request**

PTO/AIA/424 (04-14)

## CERTIFICATION AND REQUEST FOR PRIORITIZED EXAMINATION
## UNDER 37 CFR 1.102(e) (Page 1 of 1)

| First Named Inventor: | Nagesh R. Palepu | Nonprovisional Application Number (if known): | |
|---|---|---|---|
| Title of Invention: | FORMULATIONS OF BENDAMUSTINE | | |

**APPLICANT HEREBY CERTIFIES THE FOLLOWING AND REQUESTS PRIORITIZED EXAMINATION FOR THE ABOVE-IDENTIFIED APPLICATION.**

1. The processing fee set forth in 37 CFR 1.17(i)(1) and the prioritized examination fee set forth in 37 CFR 1.17(c) have been filed with the request.  The publication fee requirement is met because that fee, set forth in 37 CFR 1.18(d), is currently $0.  The basic filing fee, search fee, and examination fee are filed with the request or have been already been paid.  I understand that any required excess claims fees or application size fee must be paid for the application.

2. I understand that the application may not contain, or be amended to contain, more than four independent claims, more than thirty total claims, or any multiple dependent claims, and that any request for an extension of time will cause an outstanding Track I request to be dismissed.

3. The applicable box is checked below:

   I.    ☑ **Original Application (Track One) - Prioritized Examination under § 1.102(e)(1)**

   i.    (a) The application is an original nonprovisional utility application filed under 35 U.S.C. 111(a). This certification and request is being filed with the utility application via EFS-Web.
   ---OR---
   (b) The application is an original nonprovisional plant application filed under 35 U.S.C. 111(a). This certification and request is being filed with the plant application in paper.

   ii.   An executed inventor's oath or declaration under 37 CFR 1.63 or 37 CFR 1.64 for each inventor, **or** the application data sheet meeting the conditions specified in 37 CFR 1.53(f)(3)(i) is filed with the application.

   II.   ☐ **Request for Continued Examination - Prioritized Examination under § 1.102(e)(2)**

   i.    A request for continued examination has been filed with, or prior to, this form.
   ii.   If the application is a utility application, this certification and request is being filed via EFS-Web.
   iii.  The application is an original nonprovisional utility application filed under 35 U.S.C. 111(a), or is a national stage entry under 35 U.S.C. 371.
   iv.   This certification and request is being filed prior to the mailing of a first Office action responsive to the request for continued examination.
   v.    No prior request for continued examination has been granted prioritized examination status under 37 CFR 1.102(e)(2).

| Signature /Stephanie A. Lodise/ | Date December 14, 2022 |
|---|---|
| Name (Print/Typed) Stephanie Lodise | Practitioner Registration Number 51430 |

***Note:*** *This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4(d) for signature requirements and certifications. Submit multiple forms if more than one signature is required.* *

☑ *Total of ___1___ forms are submitted.

EAGLEBEN-SA_00000002

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EAGLEBEN-SA_00000003

PTO/AIA/14 (02-18)
Approved for use through 01/30/2019. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 107071.000582 |
|---|---|---|
| | Application Number | |

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
|---|---|

The application data sheet is part of the provisional or nonprovisional application for which it is being submitted. The following form contains the bibliographic data arranged in a format specified by the United States Patent and Trademark Office as outlined in 37 CFR 1.76.
This document may be completed electronically and submitted to the Office in electronic format using the Electronic Filing System (EFS) or the document may be printed and included in a paper filed application.

## Secrecy Order 37 CFR 5.2:

☐ Portions or all of the application associated with this Application Data Sheet may fall under a Secrecy Order pursuant to 37 CFR 5.2 (Paper filers only. Applications that fall under Secrecy Order may not be filed electronically.)

## Inventor Information:

| Inventor | 1 | | Remove |
|---|---|---|---|

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Nagesh | R. | Palepu | |

**Residence Information (Select One)**  ● US Residency    Non US Residency    Active US Military Service

| City | Southampton | State/Province | PA | Country of Residence | US |
|---|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 30 Addis Drive | | |
|---|---|---|---|
| Address 2 | | | |
| City | Southampton | State/Province | PA |
| Postal Code | 18966-1166 | Country i | US |

| Inventor | 2 | | Remove |
|---|---|---|---|

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Philip | Christopher | Buxton | |

**Residence Information (Select One)**  ○ US Residency    ● Non US Residency    Active US Military Service

| City | Denham, Uxbridge | Country of Residence i | | UK |
|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 4 Ford End | | |
|---|---|---|---|
| Address 2 | | | |
| City | Denham, Uxbridge | State/Province | |
| Postal Code | UB9 5AL | Country i | UK |

All Inventors Must Be Listed - Additional Inventor Information blocks may be generated within this form by selecting the **Add** button.

| Add |
|---|

## Correspondence Information:

EFS Web 2.2.13

EAGLEBEN-SA_00000004

PTO/AIA/14 (02-18)
Approved for use through 01/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 107071.000582 |
|---|---|---|
| | Application Number | |

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
|---|---|

**Enter either Customer Number or complete the Correspondence Information section below.**
**For further information see 37 CFR 1.33(a).**

☐ **An Address is being provided for the correspondence Information of this application.**

| Customer Number | 23377 | | |
|---|---|---|---|
| Email Address | patents@bakerlaw.com | Add Email | Remove Email |

## Application Information:

| Title of the Invention | FORMULATIONS OF BENDAMUSTINE | | |
|---|---|---|---|
| Attorney Docket Number | 107071.000582 | Small Entity Status Claimed | ☐ |
| Application Type | Nonprovisional | | ▾ |
| Subject Matter | Utility | | ▾ |
| Total Number of Drawing Sheets (if any) | | Suggested Figure for Publication (if any) | |

## Filing By Reference:

Only complete this section when filing an application by reference under 35 U.S.C. 111(c) and 37 CFR 1.57(a). Do not complete this section if application papers including a specification and any drawings are being filed. Any domestic benefit or foreign priority information must be provided in the appropriate section(s) below (i.e., "Domestic Benefit/National Stage Information" and "Foreign Priority Information").

For the purposes of a filing date under 37 CFR 1.53(b), the description and any drawings of the present application are replaced by this reference to the previously filed application, subject to conditions and requirements of 37 CFR 1.57(a).

| Application number of the previously filed application | Filing date (YYYY-MM-DD) | Intellectual Property Authority or Country |
|---|---|---|
| | | |

## Publication Information:

☐ Request Early Publication (Fee required at time of Request 37 CFR 1.219)

☐ **Request Not to Publish.** I hereby request that the attached application not be published under 35 U.S.C. 122(b) and certify that the invention disclosed in the attached application **has not and will not** be the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing.

## Representative Information:

Representative information should be provided for all practitioners having a power of attorney in the application. Providing this information in the Application Data Sheet does not constitute a power of attorney in the application (see 37 CFR 1.32).
Either enter Customer Number or complete the Representative Name section below. If both sections are completed the customer Number will be used for the Representative Information during processing.

| | | | |
|---|---|---|---|
| Please Select One: | ● Customer Number | US Patent Practitioner | ○ Limited Recognition (37 CFR 11.9) |
| Customer Number | 23377 | | |

EFS Web 2.2.13

EAGLEBEN-SA_00000005

PTO/AIA/14 (02-18)
Approved for use through 01/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 107071.000582 |
|---|---|---|
| | Application Number | |

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
|---|---|

# Domestic Benefit/National Stage Information:

This section allows for the applicant to either claim benefit under 35 U.S.C. 119(e), 120, 121, 365(c), or 386(c) or indicate National Stage entry from a PCT application. Providing benefit claim information in the Application Data Sheet constitutes the specific reference required by 35 U.S.C. 119(e) or 120, and 37 CFR 1.78.
When referring to the current application, please leave the "Application Number" field blank.

| Prior Application Status | Pending | | Remove | |
|---|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing or 371(c) Date (YYYY-MM-DD) | |
| | Continuation of | 17412623 | 2021-08-26 | |

| Prior Application Status | Patented | | | Remove | |
|---|---|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing Date (YYYY-MM-DD) | Patent Number | Issue Date (YYYY-MM-DD) |
| 17412623 | Continuation of | 16509920 | 2019-07-12 | 11103483 | 2021-08-31 |

| Prior Application Status | Abandoned | | Remove | |
|---|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing or 371(c) Date (YYYY-MM-DD) | |
| 16509920 | Continuation of | 16015656 | 2018-06-22 | |

| Prior Application Status | Patented | | | Remove | |
|---|---|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing Date (YYYY-MM-DD) | Patent Number | Issue Date (YYYY-MM-DD) |
| 16015656 | Continuation of | 15432335 | 2017-02-14 | 10010533 | 2018-07-03 |

| Prior Application Status | Patented | | | Remove | |
|---|---|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing Date (YYYY-MM-DD) | Patent Number | Issue Date (YYYY-MM-DD) |
| 15432335 | Continuation of | 15013436 | 2016-02-02 | 9572797 | 2017-02-21 |

| Prior Application Status | Patented | | | Remove | |
|---|---|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing Date (YYYY-MM-DD) | Patent Number | Issue Date (YYYY-MM-DD) |
| 15013436 | Continuation of | 14031879 | 2013-09-19 | 9265831 | 2016-02-23 |

| Prior Application Status | Patented | | | Remove | |
|---|---|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing Date (YYYY-MM-DD) | Patent Number | Issue Date (YYYY-MM-DD) |
| 14031879 | Continuation of | 13016473 | 2011-01-28 | 8609707 | 2013-12-17 |

| Prior Application Status | Expired | | Remove | |
|---|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing or 371(c) Date (YYYY-MM-DD) | |
| 13016473 | Claims benefit of provisional | 61299100 | 2010-01-28 | |

| Additional Domestic Benefit/National Stage Data may be generated within this form by selecting the **Add** button. | Add |
|---|---|

EFS Web 2.2.13

EAGLEBEN-SA_00000006

PTO/AIA/14 (02-18)
Approved for use through 01/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 107071.000582 |
| --- | --- | --- |
| | Application Number | |

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
| --- | --- |

# Foreign Priority Information:

This section allows for the applicant to claim priority to a foreign application. Providing this information in the application data sheet constitutes the claim for priority as required by 35 U.S.C. 119(b) and 37 CFR 1.55. When priority is claimed to a foreign application that is eligible for retrieval under the priority document exchange program (PDX)[i] the information will be used by the Office to automatically attempt retrieval pursuant to 37 CFR 1.55(i)(1) and (2). Under the PDX program, applicant bears the ultimate responsibility for ensuring that a copy of the foreign application is received by the Office from the participating foreign intellectual property office, or a certified copy of the foreign priority application is filed, within the time period specified in 37 CFR 1.55(g)(1).

| Application Number | Country[i] | Filing Date (YYYY-MM-DD) | Remove<br>Access Code[i] (if applicable) |
| --- | --- | --- | --- |
| | | | |

Additional Foreign Priority Data may be generated within this form by selecting the **Add** button.   [Add]

# Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications

☐ This application (1) claims priority to or the benefit of an application filed before March 16, 2013 and (2) also contains, or contained at any time, a claim to a claimed invention that has an effective filing date on or after March 16, 2013.
NOTE: By providing this statement under 37 CFR 1.55 or 1.78, this application, with a filing date on or after March 16, 2013, will be examined under the first inventor to file provisions of the AIA.

EFS Web 2.2.13

EAGLEBEN-SA_00000007

PTO/AIA/14 (02-18)
Approved for use through 01/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 107071.000582 |
|---|---|---|
| | Application Number | |

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
|---|---|

# Authorization or Opt-Out of Authorization to Permit Access:

When this Application Data Sheet is properly signed and filed with the application, applicant has provided written authority to permit a participating foreign intellectual property (IP) office access to the instant application-as-filed (see paragraph A in subsection 1 below) and the European Patent Office (EPO) access to any search results from the instant application (see paragraph B in subsection 1 below).

Should applicant choose not to provide an authorization identified in subsection 1 below, applicant **must opt-out** of the authorization by checking the corresponding box A or B or both in subsection 2 below.

**NOTE:** This section of the Application Data Sheet is **ONLY** reviewed and processed with the **INITIAL** filing of an application. After the initial filing of an application, an Application Data Sheet cannot be used to provide or rescind authorization for access by a foreign IP office(s). Instead, Form PTO/SB/39 or PTO/SB/69 must be used as appropriate.

**1. Authorization to Permit Access by a Foreign Intellectual Property Office(s)**

**A. Priority Document Exchange (PDX)** - Unless box A in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the European Patent Office (EPO), the Japan Patent Office (JPO), the Korean Intellectual Property Office (KIPO), the State Intellectual Property Office of the People's Republic of China (SIPO), the World Intellectual Property Organization (WIPO), and any other foreign intellectual property office participating with the USPTO in a bilateral or multilateral priority document exchange agreement in which a foreign application claiming priority to the instant patent application is filed, access to: (1) the instant patent application-as-filed and its related bibliographic data, (2) any foreign or domestic application to which priority or benefit is claimed by the instant application and its related bibliographic data, and (3) the date of filing of this Authorization. See 37 CFR 1.14(h)(1).

**B. Search Results from U.S. Application to EPO** - Unless box B in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the EPO access to the bibliographic data and search results from the instant patent application when a European patent application claiming priority to the instant patent application is filed. See 37 CFR 1.14(h)(2).

The applicant is reminded that the EPO's Rule 141(1) EPC (European Patent Convention) requires applicants to submit a copy of search results from the instant application without delay in a European patent application that claims priority to the instant application.

**2. Opt-Out of Authorizations to Permit Access by a Foreign Intellectual Property Office(s)**

☐ A. Applicant **DOES NOT** authorize the USPTO to permit a participating foreign IP office access to the instant application-as-filed. If this box is checked, the USPTO will not be providing a participating foreign IP office with any documents and information identified in subsection 1A above.

☐ B. Applicant **DOES NOT** authorize the USPTO to transmit to the EPO any search results from the instant patent application. If this box is checked, the USPTO will not be providing the EPO with search results from the instant application.

**NOTE:** Once the application has published or is otherwise publicly available, the USPTO may provide access to the application in accordance with 37 CFR 1.14.

EAGLEBEN-SA_00000008

PTO/AIA/14 (02-18)
Approved for use through 11/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 107071.000582 |
|---|---|---|
|  | Application Number |  |
| Title of Invention | FORMULATIONS OF BENDAMUSTINE | |

# Applicant Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

| **Applicant** | 1 | Remove |
|---|---|---|

If the applicant is the inventor (or the remaining joint inventor or inventors under 37 CFR 1.45), this section should not be completed. The information to be provided in this section is the name and address of the legal representative who is the applicant under 37 CFR 1.43; or the name and address of the assignee, person to whom the inventor is under an obligation to assign the invention, or person who otherwise shows sufficient proprietary interest in the matter who is the applicant under 37 CFR 1.46. If the applicant is an applicant under 37 CFR 1.46 (assignee, person to whom the inventor is obligated to assign, or person who otherwise shows sufficient proprietary interest) together with one or more joint inventors, then the joint inventor or inventors who are also the applicant should be identified in this section.

Clear

| ● Assignee | Legal Representative under 35 U.S.C. 117 | Joint Inventor |
|---|---|---|
| Person to whom the inventor is obligated to assign. | | Person who shows sufficient proprietary interest |

If applicant is the legal representative, indicate the authority to file the patent application, the inventor is:

Name of the Deceased or Legally Incapacitated Inventor:

If the Applicant is an Organization check here. ☒

| Organization Name | Eagle Pharmaceuticals, Inc. |
|---|---|

**Mailing Address Information For Applicant:**

| **Address 1** | 50 Tice Boulevard, Suite 315 | | |
|---|---|---|---|
| Address 2 | | | |
| **City** | Woodcliff Lake | **State/Province** | NJ |
| **Country** | US | Postal Code | 07677 |
| Phone Number | | Fax Number | |
| Email Address | | | |

Additional Applicant Data may be generated within this form by selecting the Add button.    Add

# Assignee Information including Non-Applicant Assignee Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

EAGLEBEN-SA_00000009

PTO/AIA/14 (02-18)
Approved for use through 11/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 107071.000582 |
|---|---|---|
| | Application Number | |

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
|---|---|

## Assignee 1

Complete this section if assignee information, including non-applicant assignee information, is desired to be included on the patent application publication. An assignee-applicant identified in the "Applicant Information" section will appear on the patent application publication as an applicant. For an assignee-applicant, complete this section only if identification as an assignee is also desired on the patent application publication.

Remove

If the Assignee or Non-Applicant Assignee is an Organization check here.  ☐

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | | | | |

**Mailing Address Information For Assignee including Non-Applicant Assignee:**

| Address 1 | |
|---|---|
| Address 2 | |

| City | | State/Province | |
|---|---|---|---|
| Country i | | Postal Code | |
| Phone Number | | Fax Number | |
| Email Address | | | |

Additional Assignee or Non-Applicant Assignee Data may be generated within this form by selecting the Add button.

Add

## Signature:

Remove

NOTE: This Application Data Sheet must be signed in accordance with 37 CFR 1.33(b). **However, if this Application Data Sheet is submitted with the INITIAL filing of the application and either box A or B is not checked in subsection 2 of the "Authorization or Opt-Out of Authorization to Permit Access" section, then this form must also be signed in accordance with 37 CFR 1.14(c).**

This Application Data Sheet **must** be signed by a patent practitioner if one or more of the applicants is a **juristic entity** (e.g., corporation or association). If the applicant is two or more joint inventors, this form must be signed by a patent practitioner, **all** joint inventors who are the applicant, or one or more joint inventor-applicants who have been given power of attorney (e.g., see USPTO Form PTO/AIA/81) on behalf of **all** joint inventor-applicants.

See 37 CFR 1.4(d) for the manner of making signatures and certifications.

| Signature | /Stephanie A. Lodise/ | | | Date (YYYY-MM-DD) | 2022-12-14 |
|---|---|---|---|---|---|
| First Name | Stephanie | Last Name | Lodise | Registration Number | 51,430 |

Additional Signature may be generated within this form by selecting the Add button.  Add

EAGLEBEN-SA_00000010

PTO/AIA/14 (02-18)
Approved for use through 11/30/2020. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 107071.000582 |
|---|---|---|
| | Application Number | |

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
|---|---|

This collection of information is required by 37 CFR 1.76. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 23 minutes to complete, including gathering, preparing, and submitting the completed application data sheet form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.2.13

EAGLEBEN-SA_00000011

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent CooperationTreaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS Web 2.2.13

EAGLEBEN-SA_00000012

## FORMULATIONS OF BENDAMUSTINE

## CROSS-REFERENCE TO RELATED APPLICATIONS

[0001]    This application is a continuation of Application Serial No. 17/412,623, filed August 26, 2021, which is a continuation of Application Serial No. 16/509,920, filed July 12, 2019, now U.S. Patent No. 11,103,483, which is a continuation of Application Serial No. 16/015,656, filed June 22, 2018, now abandoned, which is a continuation of Application Serial No. 15/432,335, filed February 14, 2017, now U.S. Patent No. 10,010,533, issued July 3, 2018, which is a continuation of Application Serial No. 15/013,436, filed February 2, 2016, now U.S. Patent No. 9,572,797, issued February 21, 2017, which is a continuation of Application Serial No. 14/031,879, filed September 19, 2013, now U.S. Patent No. 9,265,831, issued February 23, 2016, which is a continuation of Application Serial No. 13/016,473, filed January 28, 2011, now U.S. Patent No. 8,609,707, issued December 17, 2013, which claims the benefit of U.S. Provisional Patent Application No. 61/299,100, filed January 28, 2010, the contents of each of which are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

[0002]    Bendamustine free base is represented by the following structural formula (I)

(I).

[0003]    Bendamustine is used in the treatment of a number of cancers including leukemias, Hodgkins disease and multiple myelomas.  Bendamustine is the active ingredient of the commercial product Treanda™, a lyophilized powder for reconstitution.

[0004]    Bendamustine exhibits rapid degradation upon reconstitution of the lyophilized product. Bendamustine undergoes hydrolysis by direct substitution rather than an addition elimination process due

EAGLEBEN-SA_00000013

107071.000582

to the presence of the highly labile aliphatic chlorine atoms. Some of the main degradants of bendamustine are the monohydroxy compound known as HP1 (hydrolysis product 1) and dihydroxy compound HP2 (hydrolysis product 2). The monohydroxy compound appears as the main impurity at Relative Retention Time (RRT) 0.6 and the dihydroxy compound appears as the main impurity at RRT 0.27. Minor peaks appear at RRT 1.2, which are presently unknown.

[0005]    The stability of bendamustine in water is measured in hours, and is therefore, not suitable for long-term storage in liquid form. The lyophile possesses good chemical stability. However, reconstitution of the lyophile is clinically inconvenient, taking 15 – 30 mins with implications of chemical instability. There is a need for ready to use (RTU) bendamustine formulations having enhanced stability.

## SUMMARY OF THE INVENTION

[0006]    In other aspects of the invention, the bendamustine-containing compositions include a) a pharmaceutically acceptable fluid which contains one or more of propylene glycol, ethanol, polyethylene glycol, benzyl alcohol and glycofurol, and b) a stabilizing amount of a chloride salt. In other aspects of the invention, the bendamustine-containing compositions include DMSO (dimethyl sulfoxide) as part of the pharmaceutically acceptable fluid included therein. Regardless of the pharmaceutically acceptable fluid included, the amount of bendamustine included in the composition is preferably from about 20 mg/mL to about 60 mg/mL. Still further aspects of the invention include methods of treatment using bendamustine-containing compositions and kits containing the same.

[0007]    One of the advantages of the inventive liquid compositions is that they have substantially improved long term stability when compared to currently available formulations. For example, the inventive bendamustine compositions are substantially free of impurities after at least about 15 months at a temperature of from about 5 °C to about 25 °C. The inventive formulations are advantageously ready to use or ready for further dilution. Reconstitution of lyophilized powders is not required.

## DETAILED DESCRIPTION OF THE INVENTION

[0008]    Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art to which this invention belongs. In the event that there is a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

2

EAGLEBEN-SA_00000014

107071.000582

[0009]    As used herein, RRT is calculated by dividing the retention time of the peak of interest by the retention time of the main peak.  Any peak with an RRT <1 elutes before the main peak, and any peak with an RRT >1 elutes after the main peak.

[0010]    For purposes of the present invention, "substantially free of impurities" shall be understood to include bendamustine-containing compositions in which the amount of total impurities is less than about 5%, as calculated on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223nm, after a period of about 15 months at a temperature of from about 5°C to about 25°C.  The amount of impurities is further calculated as being based upon the original amount bendamustine (or salt thereof) being present in the composition or formulation.

[0011]    For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.

[0012]    Preferably, the amount of any individual degradant in the inventive compositions does not exceed 2% PAR as determined by HPLC at a wavelength of 223nm after storage periods of at least about 15 months at a temperature of from about 5°C to about 25°C.  In some aspects, the amount of time the inventive compositions demonstrate long term storage stability is at least about 18 months and preferably at least about 2 years when stored under the conditions described herein.

[0013]    In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions including:

a)  bendamustine or a pharmaceutically acceptable salt thereof; and

b)  a pharmaceutically acceptable fluid including

i)  PEG, PG or mixtures thereof; and

ii)  a stabilizing amount of an antioxidant.

[0014]    The total impurities in the inventive compositions resulting from the degradation of the bendamustine in the compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223nm after at least about 15 months at a temperature of from about 5 °C to about 25 °C, and thus have long term stability for at least the same period of time or longer. Preferably, the bendamustine-containing compositions demonstrate long term storage stability for at least about 2 years, especially when stored at the lower (refrigerated) temperatures.  In one embodiment, the amount of total impurities in the inventive compositions resulting from the degradation of the  bendamustine is less than about 3% PAR as determined by HPLC at a wavelength of 223nm after at least about 2 years at a temperature of from about 5 °C to about 25 °C.

[0015]    In some aspects of the invention, the bendamustine concentration in the inventive compositions is from about 10 mg/mL to about 100 mg/mL, preferably 20 mg/mL to about 60 mg/mL.

3

4894-3816-6595.1

EAGLEBEN-SA_00000015

107071.000582

Preferably the bendamustine concentration in the inventive compositions is from about 25 mg/mL to about 50 mg/mL, and more preferably from about 30 mg/mL to about 50 mg/mL.  It will be understood that compositions containing any useful concentration within the ranges, i.e. 10, 20, 25, 30, 35, 40, 45, 50, 55, 60 . . . 100 are contemplated.  In other embodiments, the bendamustine concentration in the composition is about 50 mg/mL.  In alternative aspects, the amount of bendamustine is outside these ranges but the amounts will be sufficient for single or multiple administrations of dosages generally regarded as effective amounts.

[0016]    In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof.  Within this aspect, the pharmaceutically acceptable fluid is propylene glycol (PG) or polyethylene glycol (PEG).  In other embodiments of the invention however, the pharmaceutically acceptable fluid is a mixture of PEG and PG.  For example, the pharmaceutically acceptable fluid can include about 50% PEG and about 50% PG.  Alternatively, pharmaceutically acceptable fluid includes about 95% PEG and about 5% PG.  The amount of PEG and PG can also be varied within the ranges, i.e. the ratio of PEG:PG in the pharmaceutically acceptable fluid can range from about 95:5 to about 50:50.  Within this range, is a pharmaceutically acceptable fluid containing about 75% PEG and about 25% PG, and preferably 80% PEG and 20% PG.  In another embodiment, a pharmaceutically acceptable fluid can include about 85% PEG and about 15% PG while another preferred pharmaceutically acceptable fluid includes about 90% PEG and about 10% PG.  The molecular weight of the PEG will be within the range of pharmaceutically acceptable weights although PEG 400 is preferred in many aspects of the invention.

[0017]    Without meaning to be bound by any theory or hypothesis, the hydroxide of the polyethylene glycol molecule is less reactive than the hydroxides of propylene glycol.  As a result, the ester forms at a slower rate in polyethylene glycol than propylene glycol and the resulting bendamustine degradants are unexpectedly and substantially reduced over extended periods of time when PEG is a substantial part of the pharmaceutically acceptable fluid.

[0018]    The bendamustine-containing compositions according to several preferred aspects of the invention include a stabilizing amount of an antioxidant.  For purposes of the present invention, "stabilizing amount" shall be understood to include those amounts which increase or enhance the stability of the bendamustine in the compositions described herein.  The presence of one or more antioxidants described herein thus contributes, at least in part to the long term stability of the composition.  Within this guideline, suitable antioxidant concentrations in the compositions can range from about 2.5 mg/mL to about 35 mg/mL, and preferably from about 5 mg/mL to about 20 mg/mL or from about 10 mg/mL to about 15 mg/mL. In some other embodiments, the concentration of the antioxidant in the bendamustine-containing composition is about 5 mg/mL.

4

4894-3816-6595.1

EAGLEBEN-SA_00000016

107071.000582

[0019]    Suitable antioxidants for inclusion include those which are pharmaceutically acceptable for use in human and veterinary formulations although not limited to those currently regarded as safe by any regulatory authority.  For example, the antioxidant can be selected from among lipoic acid, thioglycerol (also known as monothioglycerol) and analogs thereof, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds, dihydrolipoic acid and mixtures of the foregoing.  Preferably, the antioxidant is thioglycerol, lipoic acid or a mixture thereof. Some particularly preferred embodiments of the invention include thioglycerol.

[0020]    In view of the foregoing, some preferred long term storage stable bendamustine-containing compositions in accordance with the invention compositions include:

I.      a)  bendamustine or a pharmaceutically acceptable salt thereof; and

        b)  a pharmaceutically acceptable fluid including

            i)  polyethylene glycol and propylene glycol; and

            ii)  a stabilizing amount of thioglycerol; or

II.     a)  about 50 mg/mL bendamustine or a pharmaceutically acceptable salt thereof; and

        b)  a pharmaceutically acceptable fluid including

            i)  about 90% PEG and about 10% PG; and

            ii)  about 2.5 mg/mL thioglycerol.

[0021]    Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total impurities, PAR as determined by HPLC at a wavelength of 223nm, after at least about 15 months of storage at a temperature of from about 5 °C to about 25 °C.

[0022]    In accordance with other aspects of the invention, there are provided long term storage stable bendamustine-containing compositions, including:

a)  bendamustine or a pharmaceutically acceptable salt thereof;

b)  a pharmaceutically acceptable fluid including one or more of the following: PG, ethanol, PEG, benzyl alcohol and glycofurol; and

c)  a stabilizing amount of a chloride salt.

[0023]    These compositions also have the low levels of impurities and long term stability mentioned herein. Preferred pharmaceutically acceptable fluids include PG, PEG or ethanol in this embodiment of the invention.  Preferably, the PEG is PEG 400.  If desired, glycerin and/or 88% (w/w) lactic acid can be added to the pharmaceutically acceptable fluid.

5

EAGLEBEN-SA_00000017

107071.000582

[0024]    Suitable chloride salts include but are not limited to organic chloride salts, sodium chloride, choline chloride, hydrochloride salts of amino acids and mixtures thereof.  Thus, as will be appreciated by those of ordinary skill, one can select from among a number of suitable chloride salts and it is Applicants' intention that the scope of the invention includes all such chloride salts that are capable of being included in bendamustine-containing formulations for extended periods without having a deleterious effect on the drug.   In one embodiment of the invention, the chloride salt concentration is from about 10 to about 300 mg/mL. In another embodiment, the chloride salt concentration is from about 50 to about 215 mg/mL.  In one preferred embodiment, the chloride salt concentration is about 215 mg/mL.

[0025]    In accordance with another aspect of the invention, there is provided long term storage stable bendamustine-containing compositions, including:

a)  bendamustine or a pharmaceutically acceptable salt thereof; and

b)  a pharmaceutically acceptable fluid including DMSO.

[0026]    These compositions also have the low levels of impurities and long term stability mentioned herein.  In some aspects, the bendamustine concentration in these compositions is from about 10 mg/mL to about 100 mg/mL.  Preferably, the bendamustine concentration is from about 20 mg/mL to about 50 mg/mL, more preferably from about 25 mg/mL to about 50 mg/mL.  In an alternative embodiment, the bendamustine concentration is about 50 mg/mL.

[0027]    Another embodiment of the invention provides methods of treating cancer in mammals. The methods include administering to a mammal in need thereof an effective amount of one of the bendamustine-containing compositions described herein.  Since the active ingredient portion of the inventive composition is an FDA-approved drug, those of ordinary skill will recognize that the doses of bendamustine employed in this aspect of the invention will be similar to those employed in any treatment regimens designed for bendamustine as marketed under the trade name TREANDA.  The patient package insert containing dosing information is incorporated herein by reference.  The methods of treatment also include administering the inventive formulations for any purpose or physical condition for which bendamustine has been indicated as being useful.

[0028]    Another embodiment of the invention includes methods of preparing bendamustine-containing compositions described herein.  The methods include reconstituting lyophilized bendamustine in a pharmaceutically acceptable fluid containing one of the following:

A)     i)  PEG, PG or mixtures thereof; and

ii)  a stabilizing amount of an antioxidant;

B)     i) one or more of PG, ethanol, PEG, benzyl alcohol and glycofurol; and

4894-3816-6595.1

EAGLEBEN-SA_00000018

107071.000582

ii) a stabilizing amount of a chloride salt; or

C)    DMSO.

[0029]    The steps are carried out under pharmaceutically acceptable conditions for sterility and manufacturing.

[0030]    In a further aspect of the invention, there are provided methods of controlling or preventing the formation of impurities in bendamustine-containing compositions during long term storage. The methods include combining an amount of bendamustine or a pharmaceutically acceptable salt thereof with a sufficient amount of a pharmaceutically acceptable fluid containing one of the following:

A)    i) PEG, PG or mixtures thereof; and

ii) a stabilizing amount of an antioxidant;

B)    i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and

ii) a stabilizing amount of a chloride salt; or

C)    DMSO.

[0031]    Further optional steps in accordance therewith include transferring one or more pharmaceutically acceptable doses of the formulations into a suitable sealable container and storing the sealed container at a temperature of from about 5 °C to about 25 °C. As a result of carrying out these steps, it is possible to control or substantially prevent the formation of impurities which otherwise occur with bendamustine-containing compositions during long term storage so that the artisan is provided with bendamustine-containing formulations having less than about 5 % total impurities PAR as determined by HPLC at a wavelength of 223nm, after at least about 15 months of storage at a temperature of from about 5 °C to about 25 °C.

[0032]    The compositions of the present invention can be packaged in any suitable sterile vial or container fit for the sterile storage of a pharmaceutical such as bendamustine. Suitable containers can be glass vials, polypropylene or polyethylene vials or other special purpose containers and be of a size sufficient to hold one or more doses of bendamustine.

[0033]    A further aspect of the invention includes kits containing lyophilized bendamustine or a pharmaceutically acceptable salt thereof in a first container or vial; and, in a second container, a sufficient amount of a pharmaceutically acceptable fluid such as those described herein, i.e. one of the following:

A)    i) PEG, PG or mixtures thereof; and

ii) a stabilizing amount of an antioxidant;

B)    i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and

ii) a stabilizing amount of a chloride salt; or

4894-3816-6595.1

EAGLEBEN-SA_00000019

107071.000582

C)      DMSO.

[0034]    For purposes of this embodiment, the amount of fluid which is sufficient is an amount which allows the bendamustine to be dissolved or dispersed to a degree which renders the liquid composition ready for use.

[0035]    As will be appreciated by those of ordinary skill, the kit will contain other pharmaceutically necessary materials for storing and/or administering the drug, including instructions for storage and use, additional diluents, if desired, etc.

## EXAMPLES

[0036]    The following examples serve to provide further appreciation of the invention but are not meant in any way to restrict the effective scope of the invention.

## Example 1

[0037]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10mg/ml in one of ethanol, propylene glycol and benzyl alcohol as indicated in Table 1 below.  215 mg/ml of choline chloride was added in half of the samples as a source of soluble chloride ions.  The samples were maintained at 40 °C and analyzed periodically for drug content and total impurities.  The results obtained are presented in Table 1.

Table 1 – Stability of Bendamustine HCl

| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
|---|---|---|---|---|
| BDM - 10mg/mL Choline chloride - 215mg/mL Ethanol qs to 1mL | | Initial | 10.43 | 0.27 |
| | 40°C | 48 hrs | 10.48 | 1.27 |
| | | 7 day | 10.26 | 2.11 |
| BDM - 10mg/mL Ethanol qs to 1mL | | Initial | 10.55 | 0.27 |
| | 40°C | 48 hrs | 10.30 | 2.39 |
| | | 7 day | 9.55 | 6.66 |
| BDM - 10mg/mL Choline chloride - 215mg/mL | | Initial | 9.99 | 0.21 |
| | 40°C | 48 hrs | 9.95 | 0.60 |

8

4894-3816-6595.1

EAGLEBEN-SA_00000020

107071.000582

| | | | | |
|---|---|---|---|---|
| Propylene glycol qs to 1mL | | 7 day | 9.43 | 2.31 |
| BDM - 10mg/mL Propylene glycol qs to 1mL | Initial | | 9.68 | 0.21 |
| | 40°C | 48 hrs | 9.45 | 0.88 |
| | | 7 day | 9.00 | 3.44 |
| BDM - 10mg/mL Choline Chloride - 215mg/mL Benzyl alcohol qs to 1mL | Initial | | 9.95 | 1.19 |
| | 40°C | 48 hrs | 9.89 | 3.51 |
| | | 7 day | 8.97 | 4.24 |
| BDM - 10mg/mL Benzyl alcohol qs to 1mL | Initial | | 9.52 | 0.33 |
| | 40°C | 48 hrs | 8.67 | 4.18 |
| | | 7 day | 7.49 | 7.84 |

[0038]    Note:  In Table 1 the total % impurities include total contributions from peaks at various RRTs.

[0039]    As shown in Table 1, the bendamustine formulations are very stable in solutions containing solvent and chloride salt.  Table 1 shows that bendamustine, when dissolved at a concentration of about 10 mg/mL, in a pharmaceutically acceptable fluid, such as ethanol and propylene glycol, and containing a stabilizing amount of a chloride salt, such as choline chloride, had less than about 5% after at least 7 days storage at 40 °C.

[0040]    The data presented in Table 1 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of a chloride salt having a shelf life of at least about 15 months at 5 °C and 25 °C.

[0041]    The sample including ethanol alone exhibited more than 6.5 total degradants after 7 days storage at 40 °C.  The sample including benzyl alcohol alone exhibited more than 7.5% total degradants after 7 days storage at 40 °C.  Bendamustine-containing compositions with such high levels of degradation would not be suitable for long-term storage.

## Example 2

[0042]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10mg/ml in DMSO.  The samples were maintained at 40 °C and analyzed periodically for drug content and impurity profile.  The results obtained are presented in Table 2.

9

EAGLEBEN-SA_00000021

107071.000582

Table 2 - Stability of Bendamustine HCl in DMSO

| Formulation | Temp | Time | Content (mg/mL) | % Total Imp |
|---|---|---|---|---|
| **BDM - 10mg/mL DMSO qs to 1mL** | | Initial | 10.2 | **0.23** |
| | **40°C** | 48 hrs | 9.80 | **0.30** |
| | | 1 week | 10.0 | **0.56** |

Note:  In Table 2 the total % impurities include total contributions from peaks at various RRTs.

[0043]    Table 2 shows that bendamustine, when dissolved in DMSO, had substantially no increase in total degradants.  The data presented in Table 2 translates to bendamustine-containing compositions including DMSO having a shelf life of at least about 15 months at 5 °C and 25 °C.  In fact, such compositions are expected to have long term stability for periods beyond 15 months, i.e. up to 2 years or greater.

**Example 3**

[0044]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 20 mg/ml in polyethylene glycol 400 and 5 mg/ml of lipoic acid was added as a stabilizing antioxidant as indicated in Table 3 below.  The samples were maintained at 40 °C or 25 °C and analyzed after 15 days for drug content and impurities.  The results obtained are presented in Table 3.

Table 3: Stability of Bendamustine (20mg/ml) in PEG 400 and Antioxidants

| Antioxidant | $T\,^{o}C$ | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
| | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

10

4894-3816-6595.1

EAGLEBEN-SA_00000022

107071.000582

[0045]    As shown in Table 3, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as polyethylene glycol, in the presence of a stabilizing amount of an antioxidant, such as lipoic acid, had substantially no increase in total degradants after a period of 15 days.  The data presented in Table 3 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of an antioxidant having a shelf life of at least about 15 months at 5 °C and 25 °C.

[0046]    The sample including PEG alone, on the other hand, which did not contain an antioxidant, did not exhibit stabilizing effects at 40 °C.  This sample had more than 40% more total impurities than the sample including lipoic acid.  Bendamustine-containing compositions with such high levels of total impurities would not be suitable for long-term storage.


## Example 4

[0047]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol.  5 mg/ml of thioglycerol, α-lipoic acid or dihydrolipoic acid was added as a stabilizing antioxidant as indicated in Table 4 below.  The samples were maintained at 40 °C and analyzed after 15 days or one month for drug content and impurity profile as indicated in Table 4 below.  The results obtained are presented in Table 4.

Table 4: Stability of Bendamustine (50mg/ml) in 90% PEG 400,
10% Propylene Glycol and Antioxidant

| Antioxidant | T (°C) | Time | Content (mg/mL) | % Initial | % Impurities RRT | | % Total Imps |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | HP1 | PG ester | |
| | | | | | 0.59 | 1.10 | |
| Thioglycerol | 40 | initial | 48.8 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 48.5 | 99.4 | 0.06 | 0.20 | 0.71 |
| α-lipoic acid | 40 | initial | 49 | 100 | <LD | <LD | 0 |
| | 40 | 15 days | 48.8 | 99.6 | 0.19 | 0.13 | 0.32 |
| | 40 | 1 month | 48.7 | 99.4 | 0.34 | 0.26 | 0.79 |
| Dihydrolipoic acid | 40 | initial | 49.3 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 47.7 | 97.4 | 0.63 | 0.12 | 1.84 |

11

4894-3816-6595.1

EAGLEBEN-SA_00000023

107071.000582

<LD = Below Level of Detection

[0048]    As shown in Table 4, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as a combination of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of an antioxidant, such as thioglycerol, α-lipoic acid or dihydrolipoic acid, had substantially no increase in total degradants after a period of 1 month.  This data supports the position that bendamustine-containing compositions according to the invention have a shelf life of at least about 2 years when stored at temperatures between 5 ºC and 25 ºC.

**Example 5**

[0049]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in a mixture of polyethylene glycol 400 and propylene glycol as indicated in Table 5 below.  5 mg/ml of lipoic acid was added as a stabilizing antioxidant.  The samples were maintained at 40 ºC, 25 ºC and 5 ºC and analyzed after 1 week, 15 days or one month for drug content and impurity profile as indicated in Table 5 below.  The results obtained are presented in Table 5.

Table 5: Stability of Bendamustine (50 mg/ml) and Lipoic Acid (5 mg/ml) in PEG400 and Propylene glycol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | %Area of degradants | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|
| | | | | | HP1 0.58 | PG ester 1.10 | PG ester 1.13 | |
| BDM - 50mg/mL Lipoic acid - 5mg/mL PEG 400:PG (75:25) qs to 1mL | Initial | | 49.6 | 100 | BDL | BDL | BDL | 0.18 |
| | 40 ºC | 1 W | 49.0 | 98.8 | 0.05 | 0.13 | BDL | 0.38 |
| | | 15 d | 48.3 | 97.4 | 0.08 | 0.26 | BDL | 0.55 |
| | | 1 M | 48.0 | 96.8 | 0.11 | 0.43 | 0.13 | 1.03 |
| | 25ºC | 15 d | 49.6 | 100.0 | BDL | 0.10 | BDL | 0.30 |
| | | 1 M | 48.4 | 97.6 | 0.05 | 0.19 | BDL | 0.43 |
| | 5ºC | 1 M | 49.6 | 100.0 | BDL | 0.07 | BDL | 0.27 |
| BDM - 50mg/mL Lipoic acid - 5mg/mL PEG 400:PG (50:50) qs to 1mL | Initial | | 50.2 | 100 | BDL | BDL | BDL | 0.21 |
| | 40 ºC | 1 W | 49.9 | 99.4 | BDL | 0.15 | BDL | 0.30 |
| | | 15 d | 49.1 | 97.8 | 0.06 | 0.35 | BDL | 0.73 |
| | | 1 M | 49.0 | 97.6 | 0.09 | 0.90 | 0.25 | 1.82 |
| | 25ºC | 15 d | 49.9 | 99.4 | BDL | 0.12 | BDL | 0.32 |
| | | 1 M | 49.7 | 99.0 | BDL | 0.25 | BDL | 0.59 |
| | 5ºC | 1 M | 50.0 | 99.6 | BDL | 0.11 | BDL | 0.33 |
| BDM - 50mg/mL | Initial | | 50.8 | 100 | BDL | BDL | BDL | 0.21 |
| | 40 ºC | 1 W | 50.4 | 99.2 | BDL | 0.11 | BDL | 0.30 |

12

4894-3816-6595.1

EAGLEBEN-SA_00000024

107071.000582

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Lipoic acid - 5mg/mL PEG 400:PG (90:10) qs to 1mL | | 15 d | 49.7 | 97.8 | 0.07 | 0.17 | BDL | 0.43 |
| | | 1 M | 49.7 | 97.8 | 0.13 | 0.27 | 0.09 | 0.84 |
| | 25°C | 15 d | 50.8 | 100.0 | BDL | 0.10 | BDL | 0.26 |
| | 25°C | 1 M | 50.8 | 100.0 | 0.05 | 0.14 | BDL | 0.39 |
| | 5°C | 1 M | 50.8 | 100.0 | BDL | 0.06 | BDL | 0.34 |

BDL = Below Detectable Limit

[0050]    As shown in Table 5, bendamustine, when dissolved in certain mixtures of polyethylene glycol and propylene glycol and a stabilizing amount of lipoic acid, had substantially no increase in total degradants after a period of 1 month.  The data presented in Table 5 translates to bendamustine-containing compositions having a shelf life of at least about 2 years when stored at temperatures between 5 °C and at 25 °C.

## Example 6

[0051]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol and α-lipoic acid was added as a stabilizing antioxidant as indicated in Table 6 below.  The samples were maintained at 40 °C, 25 °C and 5 °C and analyzed for drug content and impurity profile as indicated in Table 6 below.  The results obtained are presented in Table 6.

Table 6: Stability of Bendamustine in 90% PEG 400, 10% PG and α-lipoic acid

| Formu-lation | Temp | Time Per. | Amt. mg/ml | % of Ini-tial | %Area of degradants | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0.59 | 1.10 | 1.13 | 1.15 | 1.17 | 1.20 | 1.22 | 1.30 | |
| BDM - 50mg/mL α-lipoic acid - 10mg/mL PEG 400:PG (90:10) qs to 1mL | Initial | | 51.0 | 100 | 0.20 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.26 |
| | 40°C | 1 M | 50.5 | 99.0 | 0.21 | 0.31 | 0.13 | 0.07 | 0.13 | 0.10 | <LD | <LD | 0.95 |
| | 40°C | 2 M | 49.7 | 97.5 | 0.22 | 0.71 | 0.28 | 0.14 | 0.12 | 0.21 | 0.12 | <LD | 2.02 |
| | 40°C | 3 M | 48.7 | 95.5 | 0.22 | 1.01 | 0.45 | 0.21 | 0.14 | 0.37 | 0.16 | 0.05 | 2.96 |
| | 25°C | 3 M | 50.5 | 99.0 | 0.20 | 0.36 | 0.07 | <LD | <LD | 0.10 | <LD | <LD | 0.73 |
| | 25°C | 6 M | 50.4 | 98.8 | 0.22 | 0.60 | 0.17 | 0.06 | 0.06 | 0.09 | 0.10 | 0.08 | 1.44 |
| | 5°C | 6 M | 50.9 | 99.8 | 0.16 | 0.05 | <LD | <LD | <LD | <LD | <LD | <LD | 0.21 |
| | 5°C | 12 M | 50.6 | 99.2 | 0.20 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | 0.38 |

13

4894-3816-6595.1

EAGLEBEN-SA_00000025

107071.000582

| Formulation | Temp | Time Per. | Amt mg/ml | % of Initial | | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BDM - 50mg/mL α-lipoic acid - 15mg/mL PEG 400:PG (90:10) qs to 1mL | | Initial | 50.3 | 100 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | <LD | 0.18 |
| | 40°C | 1 M | 50.0 | 99.4 | 0.19 | 0.32 | 0.08 | 0.06 | 0.08 | 0.06 | 0.06 | <LD | 0.85 |
| | | 2 M | 49.8 | 99.0 | 0.19 | 0.65 | 0.21 | 0.12 | 0.13 | 0.23 | 0.14 | 0.06 | 1.85 |
| | | 3 M | 49.5 | 98.4 | 0.15 | 0.89 | 0.37 | 0.17 | 0.13 | 0.32 | 0.10 | <LD | 2.40 |
| | | 6 M | 47.0 | 93.4 | 0.20 | 1.76 | 0.66 | 0.19 | 0.31 | 0.47 | 0.33 | 0.17 | 4.93 |
| | 25°C | 3 M | 50.0 | 99.4 | 0.20 | 0.35 | 0.08 | <LD | <LD | <LD | 0.11 | <LD | 0.79 |
| | | 6 M | 49.5 | 98.4 | 0.19 | 0.58 | 0.15 | 0.06 | 0.07 | 0.09 | 0.08 | 0.10 | 1.38 |
| | 5°C | 6 M | 50.3 | 100 | 0.17 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.23 |
| | | 12 M | 50.2 | 99.8 | 0.19 | 0.15 | <LD | <LD | <LD | <LD | <LD | <LD | 0.34 |

<LD = Below Level of Detection

[0052]    The data reported in Table 6 along with the data in Table 5 demonstrates that bendamustine solutions are stable when dissolved in mixtures of PEG and PG and 5-15mg/mL α-lipoic acid.  As shown in Table 6, bendamustine, when dissolved in combinations of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of lipoic acid, had less than 3% increase in total degradants after a period of 3 months at 40 °C.  Additionally, the same compounds had substantially no increase in total degradants after a period of 6-12 months at 5 °C and 25 °C.  The data corresponds to bendamustine solutions being stable under ambient or refrigerated storage conditions for well in excess of 2 years, and thus long term stable.

**Example 7**

[0053]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol.  2.5 mg/ml of thioglycerol was added as an antioxidizing agent.  The samples were maintained at 40 °C and 25 °C and analyzed for drug content and impurity profile as indicated in Table7 below.  The results obtained are presented in Table 7.

Table 7: Stability of Bendamustine in 90% PEG 400, 10% PG and Thioglycerol

| Formu- lation | Temp | Time Per. | Amt mg/ml | % of Ini- tial | RRTs  of degradants | | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0.15 | 0.37 | 1.10 | 1.13 | 1.15 | 1.17 | 1.18 | 1.20 | 1.22 | |

14

4894-3816-6595.1

EAGLEBEN-SA_00000026

107071.000582

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | | | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BDM - 50mg/mL Thio glycerol - 2.5mg/mL PEG 400:PG (90:10) qs to 1mL | | Initial | 50.3 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| | 40°C | 15 d | 50.2 | 99.8 | BDL | BDL | 0.18 | BDL | BDL | BDL | 0.05 | 0.08 | BDL | 0.31 |
| | | 1 M | 49.9 | 99.2 | BDL | 0.12 | 0.32 | 0.07 | BDL | BDL | 0.09 | 0.08 | BDL | 0.75 |
| | | 2 M | 49.1 | 97.6 | BDL | 0.18 | 0.56 | 0.24 | 0.09 | 0.17 | 0.19 | 0.12 | 0.11 | 1.76 |
| | | 3 M | 48.8 | 97.0 | BDL | 0.23 | 0.85 | 0.34 | 0.16 | 0.30 | 0.34 | 0.29 | 0.19 | 2.94 |
| | 25°C | 3 M | 49.9 | 99.2 | 0.06 | 0.12 | 0.23 | 0.07 | BDL | 0.06 | 0.07 | 0.06 | BDL | 0.67 |
| | | 6 M | 49.3 | 98.0 | BDL | 0.23 | 0.53 | 0.22 | 0.11 | BDL | 0.21 | 0.22 | 0.20 | 2.07 |

BDL = Below Detectable Limit

[0054]    The stability is similar to that of α-lipoic acid samples in Example 6 above.  As shown in Table 7, bendamustine, when dissolved in a combination of polyethylene glycol and propylene glycol, and a stabilizing amount of thioglycerol, had less than 3% increase in total degradants after a period of 3 months at 40 ºC.  Additionally, the same compounds had substantially no increase in total degradants after a period of 6 months at 25 ºC.  The data reported supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for about 2 years.

## Example 8

[0055]    Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 85% PEG 400 and 15% PG in the presence of 5 mg/ml of thioglycerol. The samples were maintained at 40 ºC and 25 ºC and analyzed for drug content and impurity profile as indicated in Table 8 below.  The results obtained are presented in Table 8.

Table 8: Stability of Bendamustine in 85% PEG 400, 15% PG and Thioglycerol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Total Imp. |
|---|---|---|---|---|---|
| BDM - 50mg/mL Thioglycerol - 5mg/mL PEG 400:PG (85:15) qs to 1mL | Initial | | 51.5 | 100 | 0.12 |
| | 40°C | 1 M | 50.4 | 97.9 | 1.18 |
| | 25°C | 1 M | 51.4 | 99.8 | 0.41 |
| | | 3 M | 50.4 | 97.9 | 1.21 |
| | 5°C | 3 M | 51.0 | 99.0 | 0.26 |

15

EAGLEBEN-SA_00000027

107071.000582

[0056]    The stability is similar to that of thioglycerol samples in Example 7 above.  As reported in Table 8, total impurities did not exceed 2% at 40 ºC or 25°C storage over one month, or at 25 ºC and 5 ºC storage after three months.  The data reported in Table 8 supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for at least about 2 years if not longer.

16

4894-3816-6595.1

EAGLEBEN-SA_00000028

107071.000582

## CLAIMS

We claim:

1.      A ready for dilution, liquid bendamustine-containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine

        concentration in the composition is from about 20 mg/mL to about 60 mg/mL;

polyethylene glycol; and

a stabilizing amount of an antioxidant.

2.      The composition of claim 1, comprising 100 mg of bendamustine.

3.      The composition of claim 1, wherein the bendamustine concentration is about 25 mg/mL.

4.      The composition of claim 1, wherein the antioxidant is monothioglycerol.

5.      The composition of claim 1, wherein the antioxidant is monothioglycerol in a
concentration of about 5 mg/mL.

6.      The composition of claim 1, wherein the composition is stable for at least about 15
months at 5 °C or for at least about 15 months at 25 °C.

7.      The composition of claim 1, wherein the total impurities resulting from the degradation
of the bendamustine is less than about 5% peak area response, as determined by HPLC at
a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to
about 25 °C.

8.      The composition of claim 1, further comprising ethanol.

9.      The composition of claim 1, wherein the liquid bendamustine-containing composition is
packaged in a sterile vial.

10.     A liquid bendamustine-containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine

        concentration in the composition is from about 20 mg/mL to about 60 mg/mL and

        wherein the bendamustine has not been reconstituted from a lyophilized powder;

17

4894-3816-6595.1

EAGLEBEN-SA_00000029

107071.000582

polyethylene glycol; and

a stabilizing amount of an antioxidant.

11. The composition of claim 10, comprising 100 mg of bendamustine.

12. The composition of claim 10, wherein the bendamustine concentration is about 25 mg/mL.

13. The composition of claim 10, wherein the antioxidant is monothioglycerol.

14. The composition of claim 10, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

15. The composition of claim 10, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.

16. The composition of claim 10, wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

17. The composition of claim 10, further comprising ethanol.

18. The composition of claim 10, wherein the liquid bendamustine-containing composition is packaged in a sterile vial.

19. A bendamustine-containing composition comprising

one or more doses of bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid that is polyethylene glycol;

wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 20 mg/mL to about 60 mg/mL.

20. The composition of claim 19, comprising 100 mg of bendamustine.

18

4894-3816-6595.1

EAGLEBEN-SA_00000030

107071.000582

21.    The composition of claim 19, wherein the bendamustine concentration is about 25 mg/mL.

22.    The composition of claim 19, wherein the antioxidant is monothioglycerol.

23.    The composition of claim 19, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

24.    The composition of claim 19, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.

25.    The composition of claim 19, wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

26.    The composition of claim 19, further comprising ethanol.

27.    The composition of claim 19, wherein the liquid bendamustine-containing composition is packaged in a sterile vial.

28.    A method of treating leukemia in a human in need thereof comprising
       providing a liquid bendamustine-containing composition comprising about 25 mg/ml of
              bendamustine;
       diluting the liquid bendamustine containing composition; and
       intravenously administering the diluted composition to the human.

29.    The method of claim 28, wherein the liquid bendamustine containing composition is diluted with about 50 mL of a diluent.

19

4894-3816-6595.1

EAGLEBEN-SA_00000031

107071.000582

# ABSTRACT

Long term storage stable bendamustine-containing compositions are disclosed. The compositions can include bendamustine or a pharmaceutically acceptable salt thereof, and a pharmaceutically acceptable fluid which can include in some embodiments PEG, PG or mixtures thereof and an antioxidant or chloride ion source. The bendamustine-containing compositions have less than about 5% total impurities, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223nm, after at least about 15 months of storage at a temperature of from about 5 °C to about 25 °C.

4894-3816-6595.1

EAGLEBEN-SA_00000032

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
|---|---|

As the below named inventor, I hereby declare that:

This declaration is directed to:

☑ The attached application, or

☐ United States application or PCT international application number _____

filed on _____

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

### WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

LEGAL NAME OF INVENTOR

Inventor: Philip Christopher Buxton                    Date (Optional): 18 SEP 2013

Signature: P. C. Buxton

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed. Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

EAGLEBEN-SA_00000033

PTO/AIA/01 (06-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

| Title of Invention | FORMULATIONS OF BENDAMUSTINE |
|---|---|

As the below named inventor, I hereby declare that:

This declaration is directed to:

☒ The attached application, or

☐ United States application or PCT international application number _____

filed on _____ .

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

### WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

LEGAL NAME OF INVENTOR

Inventor: Nagesh R. Palepu    Date (Optional) : 19 SEP 2013

Signature: _____

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed. Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

EAGLEBEN-SA_00000034

Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EAGLEBEN-SA_00000035

DOCKET NO.: 107071.000582

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application of: Nagesh R. Palepu

Application No.: Con of US 17/412,623

Filing Date: concurrently herewith

For:    **FORMULATIONS OF BENDAMUSTINE**

Confirmation No.: Not Yet Assigned

Group Art Unit: Not Yet Assigned

Examiner: Not Yet Assigned

### CONTENT OF IDS PURSUANT TO 37 C.F.R. § 1.98(d)

Copies of various references are not being submitted because they were previously cited by or submitted to the U.S. Patent and Trademark Office in the following patent application(s) for which a claim for priority under 35 U.S.C. § 120 has been made in the instant application. *See* MPEP § 609.02(II)(B)(2) *stating* "[p]ursuant to 37 CFR 1.98(d), if the IDS submitted in the parent application complies with 37 CFR 1.98(a) to (c), copies of the patents, publications, pending U.S. applications, or other information submitted in the parent application need not be resubmitted in the continuing application."

| Patent Application | Filing Date |
|---|---|
| 17/412,623 | 8/26/2021 |
| 16/509,920 | 7/12/2019 |
| 16/015,656 | 6/22/2018 |
| 15/432,335 | 2/14/2017 |
| 15/013,436 | 2/2/2016 |
| 14/031,879 | 9/19/2013 |
| 13/016,473 | 1/28/2011 |

Please charge any deficiency or credit any overpayment to Deposit Account No. 23-3050.

| Signature:  /Stephanie A. Lodise/ | Date: 12/14/2022 |
|---|---|
| Name (Print/Typed): Stephanie Lodise | Practitioner Registration Number (If applicable):  51430 |
| ☒   *Total of  1  form is submitted. | |

BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501
Telephone: 215.568.3100
Facsimile:  215.568.3439

1

EAGLEBEN-SA_00000036

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (02-18)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2022-12-14 | |
| First Named Inventor | Nagesh R. Palepu | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 107071.000582 | |

| U.S.PATENTS | | | | | | |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | 4071620 | | 1978-01-31 | SKLAR STANLEY | |
| | 2 | 4711906 | | 1987-12-08 | VON et al. | |
| | 3 | 4879286 | | 1989-11-07 | ALAM et al. | |
| | 4 | 5204335 | A | 1993-04-20 | SAUERBIER et al. | |
| | 5 | 5223515 | A | 1993-06-29 | MIKURA et al. | |
| | 6 | 5741523 | A | 1998-04-21 | TEAGARDEN et al. | |
| | 7 | 7252799 | B2 | 2007-08-07 | MIEKKA et al. | |
| | 8 | 7772274 | B1 | 2010-08-10 | PALEPU NAGESH | |

EFS Web 2.1.18

EAGLEBEN-SA_00000037

<table>
<tr><td rowspan="2"><strong>INFORMATION DISCLOSURE STATEMENT BY APPLICANT</strong><br>( Not for submission under 37 CFR 1.99)</td><td colspan="2">Application Number</td></tr>
</table>

| | |
|---|---|
| Filing Date | 2022-12-14 |
| First Named Inventor | Nagesh R. Palepu |
| Art Unit | |
| Examiner Name | |
| Attorney Docket  Number | 107071.000582 |

| | | | | | |
|---|---|---|---|---|---|
| 9 | 8076366 | B2 | 2011-12-13 | COURVOISIER et al. | |
| 10 | 8344006 | B2 | 2013-01-01 | DRAGER et al. | |
| 11 | 8389558 | B2 | 2013-03-05 | ALAKHOV et al. | |
| 12 | 8609707 | B2 | 2013-12-17 | PALEPU et al. | |
| 13 | 8791270 | | 2014-07-29 | BRITTAIN et al. | |
| 14 | 9000021 | B2 | 2015-04-07 | SUNDARAM et al. | |
| 15 | 9034908 | B2 | 2015-05-19 | SUNDARAM SRIKANTH | |
| 16 | 9144568 | B1 | 2015-09-29 | SUNDARAM SRIKANTH | |
| 17 | 9265831 | B2 | 2016-02-23 | PALEPU et al. | |
| 18 | 9572796 | | 2017-02-21 | PALEPU et al. | |
| 19 | 9572797 | | 2017-02-21 | PALEPU et al. | |

EFS Web 2.1.18

EAGLEBEN-SA_00000038

| | | Application Number | | 19491 |
|---|---|---|---|---|
| | | Filing Date | | 2022-12-14 |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | | First Named Inventor | | Nagesh R. Palepu |
| | | Art Unit | | |
| | | Examiner Name | | |
| | | Attorney Docket  Number | | 107071.000582 |

| | 20 | 9572887 | | 2017-02-21 | SUNDARAM SRIKANTH | |
|---|---|---|---|---|---|---|
| | 21 | 9572888 | | 2017-02-21 | SUNDARAM SRIKANTH | |
| | 22 | 9579384 | | 2017-02-28 | SUNDARAM et al. | |
| | 23 | 9597397 | | 2017-03-21 | SUNDARAM SRIKANTH | |
| | 24 | 9597398 | | 2017-03-21 | SUNDARAM SRIKANTH | |
| | 25 | 9597399 | | 2017-03-21 | SUNDARAM SRIKANTH | |
| | 26 | 10010533 | B2 | 2018-07-03 | PALEPU et al. | |

| If you wish to add additional U.S. Patent citation information please click the Add button. |
|---|

| **U.S.PATENT APPLICATION PUBLICATIONS** |
|---|

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 20020102215 | A1 | 2002-08-01 | KLAVENESS et al. | |
| | 2 | 20020122768 | A1 | 2002-09-05 | LIU et al. | |

EFS Web 2.1.18

EAGLEBEN-SA_00000039

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | Application Number | |
|---|---|---|---|
| | | Filing Date | 2022-12-14 |
| | | First Named Inventor | Nagesh R. Palepu |
| | | Art Unit | |
| | | Examiner Name | |
| | | Attorney Docket Number | 107071.000582 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 3 | 20040014964 | A1 | 2004-01-22 | CHEESMAN et al. | |
| | 4 | 20040043069 | A1 | 2004-03-04 | VANDERBIST et al. | |
| | 5 | 20050025702 | A1 | 2005-02-03 | DECICCO et al. | |
| | 6 | 20050042285 | A1 | 2005-02-24 | UKAI et al. | |
| | 7 | 20060035945 | A1 | 2006-02-16 | ATTARDO et al. | |
| | 8 | 20060128777 | A1 | 2006-06-15 | BENDALL et al. | |
| | 9 | 20060159713 | A1 | 2006-07-20 | BRITTAIN et al. | |
| | 10 | 20060205694 | A1 | 2006-09-14 | ALONSO et al. | |
| | 11 | 20070116729 | A1 | 2007-05-24 | PALEPU NAGESWARA R | |
| | 12 | 20080118544 | A1 | 2008-05-22 | WANG LIXIAO | |
| | 13 | 20090082416 | A1 | 2009-03-26 | CZARNIK ANTHONY W | |

EFS Web 2.1.18

EAGLEBEN-SA_00000040

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | Application Number | | |
|---|---|---|---|---|
| | | Filing Date | 2022-12-14 | |
| | | First Named Inventor | Nagesh R. Palepu | |
| | | Art Unit | | |
| | | Examiner Name | | |
| | | Attorney Docket Number | 107071.000582 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 14 | 20090209606 | A1 | 2009-08-20 | BENDALL et al. | |
| 15 | 20090264488 | A1 | 2009-10-22 | COOPER et al. | |
| 16 | 20090325978 | A1 | 2009-12-31 | ONAI et al. | |
| 17 | 20100092474 | A1 | 2010-04-15 | GALLAGHER et al. | |
| 18 | 20100145266 | A1 | 2010-06-10 | ORLOWSKI MICHAEL | |
| 19 | 20100216858 | A1 | 2010-08-26 | POPEK et al. | |
| 20 | 20100247669 | A1 | 2010-09-30 | ELIASOF et al. | |
| 21 | 20100273730 | A1 | 2010-10-28 | HSU et al. | |
| 22 | 20110015244 | A1 | 2011-01-20 | ALAKHOV et al. | |
| 23 | 20110015245 | A1 | 2011-01-20 | ALAKHOV et al. | |
| 24 | 20110184036 | A1 | 2011-07-28 | PALEPU et al. | |

EFS Web 2.1.18

EAGLEBEN-SA_00000041

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | | Application Number | |
|---|---|---|---|---|
| | | | Filing Date | 2022-12-14 |
| | | | First Named Inventor | Nagesh R. Palepu |
| | | | Art Unit | |
| | | | Examiner Name | |
| | | | Attorney Docket  Number | 107071.000582 |

| | | | | | |
|---|---|---|---|---|---|
| 25 | 20110190363 | A1 | 2011-08-04 | DRAGER et al. | |
| 26 | 20120059000 | A1 | 2012-03-08 | REN et al. | |
| 27 | 20120071532 | A1 | 2012-03-22 | COOPER et al. | |
| 28 | 20120157505 | A1 | 2012-06-21 | LABELL et al. | |
| 29 | 20120308516 | A1 | 2012-12-06 | HLAVINKA et al. | |
| 30 | 20130041003 | A1 | 2013-02-14 | BRITTAIN et al. | |
| 31 | 20130041004 | A1 | 2013-02-14 | DRAGER et al. | |
| 32 | 20130210878 | A1 | 2013-08-15 | SOPPIMATH et al. | |
| 33 | 20130210879 | A1 | 2013-08-15 | PALEPU et al. | |
| 34 | 20130217888 | A1 | 2013-08-22 | SHRAWAT et al. | |
| 35 | 20130253025 | A1 | 2013-09-26 | SUNDARAM SRIKANTH | |

EFS Web 2.1.18

EAGLEBEN-SA_00000042

| | | | | Application Number | |
|---|---|---|---|---|---|

**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**
( Not for submission under 37 CFR 1.99)

| Application Number | |
|---|---|
| Filing Date | 2022-12-14 |
| First Named Inventor | Nagesh R. Palepu |
| Art Unit | |
| Examiner Name | |
| Attorney Docket  Number | 107071.000582 |

| | 36 | 20140094496 | A1 | 2014-04-03 | SUNDARAM SRIKANTH | |
|---|---|---|---|---|---|---|
| | 37 | 20140275196 | A1 | 2014-09-18 | SUNDARAM SRIKANTH | |
| | 38 | 20180000789 | A1 | 2018-01-04 | PALEPU et al. | |
| | 39 | 20180000938 | A1 | 2018-01-04 | SUNDARAM SRIKANTH | |
| | 40 | 20180185488 | A1 | 2018-07-05 | SUNDARAM SRIKANTH | |
| | 41 | 20180296535 | A1 | 2018-10-18 | PALEPU et al. | |
| | 42 | 20180296536 | A1 | 2018-10-18 | PALEPU et al. | |
| | 43 | 20180369383 | A1 | 2018-12-27 | SUNDARAM SRIKANTH | |
| | 44 | 20190192659 | A1 | 2019-06-27 | SUNDARAM SRIKANTH | |

If you wish to add additional U.S. Published Application citation information please click the Add button.

**FOREIGN PATENT DOCUMENTS**

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2][i] | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|

EFS Web 2.1.18

EAGLEBEN-SA_00000043

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|

**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**
( Not for submission under 37 CFR 1.99)

| | |
|---|---|
| Application Number | 19496 |
| Filing Date | 2022-12-14 |
| First Named Inventor | Nagesh R. Palepu |
| Art Unit | |
| Examiner Name | |
| Attorney Docket Number | 107071.000582 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | 1850048 | CN | A | 2006-10-25 | SHANDONG LANJIN BIOENGINEERING | English Abstract Submitted | ☐ |
| 2 | 101584668 | CN | A | 2009-11-25 | JIANGSU AOSAIKANG PHARMACEUTIC | English Abstract Submitted | ☐ |
| 3 | 102164579 | CN | A | 2011-08-24 | CEPHALON INC | English Abstract Submitted | ☐ |
| 4 | 80967 | DD | A | 1970-01-19 | RICHTER | | ☐ |
| 5 | 159289 | DD | A1 | 1983-03-02 | OLTHOFF UWE | | ☐ |
| 6 | 09-508128 | JP | A | 1997-08-19 | PROCTER & GAMBLE | | ☐ |
| 7 | 2005-537285 | JP | A | 2005-12-08 | WYETH CORP | Corresponds to US 20040167152 A1 | ☐ |
| 8 | 2008-526991 | JP | A | 2008-07-24 | CEPHALON INC | Corresponds to US 20060159713 A1 | ☐ |
| 9 | 2012-503666 | JP | A | 2012-02-09 | CEPHALON INC | Corresponds to US 20110190363 A1 | ☐ |
| 10 | 2012-525387 | JP | A | 2012-10-22 | LABELL RACHEL Y | Corresponds to US 20120157505 A1 | ☐ |
| 11 | 2015-501814 | JP | A | 2015-01-19 | CHEN YAN | Corresponds to US 20130177572 A1 | ☐ |

EFS Web 2.1.18

EAGLEBEN-SA_00000044

<table>
<tr>
<td colspan="2">INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT<br>( Not for submission under 37 CFR 1.99)</td>
<td colspan="2">Application Number</td>
<td colspan="2"></td>
</tr>
</table>

| | INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|---|
| Application Number | | | |
| Filing Date | 2022-12-14 | | |
| First Named Inventor | Nagesh R. Palepu | | |
| Art Unit | | | |
| Examiner Name | | | |
| Attorney Docket Number | 107071.000582 | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 12 | 99/01118 | WO | A2 | 1999-01-14 | ATHEROGENICS INC | ☐ |
| 13 | 2001/097860 | WO | | 2001-12-27 | DU PONT PHARM CO | ☐ |
| 14 | 2001/097861 | WO | | 2001-12-27 | DU PONT PHARM CO | ☐ |
| 15 | 2001/098294 | WO | | 2001-12-27 | DU PONT PHARM CO | ☐ |
| 16 | 02/02125 | WO | A1 | 2002-01-10 | YE YUERONG | ☐ |
| 17 | 2006/054315 | WO | A1 | 2006-05-26 | VENUS REMEDIES LTD | ☐ |
| 18 | 2006/110551 | WO | A2 | 2006-10-19 | AMYLIN PHARMACEUTICALS INC | ☐ |
| 19 | 2010/036702 | WO | A1 | 2010-04-01 | PATEL PIYUSH R | ☐ |
| 20 | 2010/126676 | WO | A1 | 2010-11-04 | PATEL PIYUSH R | ☐ |
| 21 | 2010/148288 | WO | A2 | 2010-12-23 | ANDERSON DAVID M | ☐ |
| 22 | 2011/094565 | WO | A1 | 2011-08-04 | BUXTON PHILIP CHRISTOPHER | ☐ |

EFS Web 2.1.18

EAGLEBEN-SA_00000045

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2022-12-14 | |
| First Named Inventor | Nagesh R. Palepu | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket  Number | 107071.000582 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 23 | 2011/103150 | WO | A2 | 2011-08-25 | CEPHALON INC | | | ☐ |
| 24 | 2012/015810 | WO | A2 | 2012-02-02 | BUXTON PHILIP CHRISTOPHER | | | ☐ |
| 25 | 2013/142358 | WO | A1 | 2013-09-26 | EAGLE PHARMACEUTICALS INC | | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button

## NON-PATENT LITERATURE DOCUMENTS

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|
| | 1 | "Draft Note for Guidance on Excipients, Antioxidants and Antimicrobial Preservatives In the Dossier for Application for Marketing Authorisation of Medicinal Product", EMEA, 2003, pp. 1-10. | ☐ |
| | 2 | American Heart Association, "Living With Heart Failure" (https://www.heart.org/idc/groups/heart-public/@wcm/@hcm/@gwtg/documents/downloadable/ucm_309068.pdf) (2001) | ☐ |
| | 3 | American Society of Hospital Pharmacists. ASHP Technical Assistance Bulletin On Hospital Distribution and Control. Am J. Hosp. Pharm. 1980, 37:1097-103 | ☐ |
| | 4 | Armstrong et al., Separation of Drug Stereoisomers by the Formation of...beta-Cyclodextrin Inclusion Complexes, Science, vol. 232, pp 1132-1135, 30 May 1986. | ☐ |
| | 5 | Baldi et al., Statistical Procedures for Optimizing the Freeze-Drying of a Model Drug in Tert-Butyl Alcohol: Water Mixtures, Eur. J. of Pharm. & Biopharm. 40(3):138-41 (1994) | ☐ |
| | 6 | Bergsagel et al., Effect of cyclophosphamide on Advanced Lung Cancer and the Hematological Toxicity of Large, Intermittent Intravenous Doses, Canad. Med. Ass. J., 98, 532-538 (1968) | ☐ |

EAGLEBEN-SA_00000046

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 19499 |
| --- | --- | --- |
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 107071.000582 |

| | | | |
| --- | --- | --- | --- |
| | 7 | Bernard TESTA, et al., Hydrolysis in Drug and Prodrug Metabolism, pp. 681-684. | ☐ |
| | 8 | Biewenga et al. "The Pharmacology of the Antioxidant Lipoic Acid," Gen. Pharmac., 1997, 29, 3, 315-331 | ☐ |
| | 9 | Boylan et al., Parenteral Products, Chapter 12 in Banker, et al., Modern Pharmaceutics, Fourth Ed. (2002) | ☐ |
| | 10 | Brigitte C. Scott, et al., Lipoic and Dihydrolipoic Acids..., Free Rad. Res., Vol. 20, No. 2, pp. 119-133, 1994 | ☐ |
| | 11 | Broadhead, Pharmaceutical Preformulation and Formulation, Chapter 9 in "Parenteral Dosage Forms," (Interpharm) 2001 | ☐ |
| | 12 | Canadian Society of Hospital Pharmacists: Guidelines for Drug-Use Control, 2008 | ☐ |
| | 13 | Center for Drug Evaluation and Research, Andrew Dmytrijuk, FDA Medical Review for the Approval of Bendeka (2015) | ☐ |
| | 14 | Cephalon, Inc., et al., v. Slayback Pharma Limited Liability Company- Civil Action No. 1:17-cv-01154: Joint Status Report (Document 164), dated 10/19/18. | ☐ |
| | 15 | Cerhalon, Inc, et al. v. Slayback Pharma Limited Liability Company- Civil Action No. 1:17-cv-01154: Complaint (Document 1), dated 08/16/17. | ☐ |
| | 16 | Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al. - Civil Action No. 1:17-cv-01154: Answer to Slayback Pharma Limited Liability Company's Counterclaims (Document 56), dated 03/05/18. | ☐ |
| | 17 | Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al. - Civil Action No. 1:17-cv-01154: Joint Claim Construction Chart (Document 94), dated 07/24/18. | ☐ |

EFS Web 2.1.18

EAGLEBEN-SA_00000047

| | | | |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Application Number | | |
| | Filing Date | 2022-12-14 | |
| | First Named Inventor | Nagesh R. Palepu | |
| | Art Unit | | |
| | Examiner Name | | |
| | Attorney Docket Number | 107071.000582 | |

| | | | |
|---|---|---|---|
| | 18 | Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.- Civil Action No. 1:17-cv-01154: Answer to Apotex Inc. and Apotex Corp.'s Counterclaims (Document 22), dated 12/18/17. | ☐ |
| | 19 | Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.- Civil Action No. 1:17-cv-01154: Answer to Slayback Pharma Limited Liability Company's Counterclaims, dated 10/20/17. | ☐ |
| | 20 | Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company- Civil Action No. 1:17-cv-00154: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint and Counterclaims (Document 11), dated 09/29/17. | ☐ |
| | 21 | Charles P. CARPENTER, et al., "A Study of the Polyethylene Glycols as Vehicles..., Journal of the American Pharmaceutical Association, Vol. XII, No. 1 | ☐ |
| | 22 | Cheson et al., Bendamustine: Rebirth of an Old Drug, J. Clin. Oncol. 27,1492-1501 (2009) | ☐ |
| | 23 | Cheung et al., Safety and Pharmacokinetics of Bendamustine Rapid-Infusion Formulation, J. of Clinical Pharmacology 2017.00(0)1-11 | ☐ |
| | 24 | Chu et al., Common Chemotherapy Regimens in Clinical Practice, Physicians' Cancer Chemotherapy Drug Manual 2009 | ☐ |
| | 25 | Cyclobond(Registered) Handbook, A Guide to Using Cyclodextrin Bonded Phases for Chiral LC Separations, 6th ed., 2002, Advanced Separation Technologies, Inc., pp 1-58, pp 42-45. | ☐ |
| | 26 | Derry E. WILMAN, Application of 15N Nuclear Magnetic Resonance..., J. Med. Chem., Vol. 38, pp. 2256-2258, 1995 | ☐ |
| | 27 | E. SANTACESARIA, et al., Thermal Stability of Nonionic Polyoxyalkylene..., Journal of Applied Polymer Science, Vol. 42, pp. 2053-2061, 1991 | ☐ |
| | 28 | Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC- Civil Action No. 1:18-cv-01459: Answer to Slayback Pharma LLC's Counterclaims (Document 13), dated 10/31/18. | ☐ |

EFS Web 2.1.18

| | INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|---|
| | Application Number | 19501 | |
| | Filing Date | 2022-12-14 | |
| | First Named Inventor | Nagesh R. Palepu | |
| | Art Unit | | |
| | Examiner Name | | |
| | Attorney Docket  Number | 107071.000582 | |

| | | | |
|---|---|---|---|
| | 29 | Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC- Civil Action No. 1:18-cv-01459: Complaint (Document 1), dated 09/20/18. | ☐ |
| | 30 | Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC- Civil Action No. 1:18-cv-01459: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses, and Counterclaims (Document 9), dated 10/10/18. | ☐ |
| | 31 | Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC- Civil Action No. 1:18-cv-01953: Answer to Slayback Pharma LLC's Counterclaims (Document 12), dated 01/03/19. | ☐ |
| | 32 | Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC- Civil Action No. 1:18-cv-01953: Complaint (Document 1), dated 12/11/18. | ☐ |
| | 33 | Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC- Civil Action No. 1:18-cv-01953: Defendant Slayback Pharma .imited Liability Company's Answer to Complaint, Additional Defenses, and Counterclaims(Document 11), public version dated 12/20/18. | ☐ |
| | 34 | Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC- Civil Action No. 1:18-cv-01953: Eagle Pharmaceuticals' Opposition to Slayback Pharma's Motion for Judgment on the Pleadings (Document 23), redacted-public version dated 02/12/19. | ☐ |
| | 35 | Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC- Civil Action No. 1:18-cv-01953: Opening Brief in Support of Slayback Pharma Limited Liability Company's Motion for Judgment on the Pleadings (Document 17), public version dated 01/11/19. | ☐ |
| | 36 | Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC- Civil Action No. 1:18-cv-01953: Reply Brief in Further Support of Slayback Pharma Limited Liability Company's Motion for Judgment on the Pleadings (Document 27), public verison dated 03/01/19. | ☐ |
| | 37 | Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc - Civil Action No. 1:18-cv-01074: Exhibit Index-Includes Confidential Information (Document 21), public version dated 09/07/18. | ☐ |
| | 38 | Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc- Civil Action No. 1:18-cv-01074: Complaint (Document 1), dated 07/19/18. | ☐ |
| | 39 | Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc- Civil Action No. 1:18-cv-01074: Defendant Hospira, Inc's Motion to Dismiss (Document 13), dated 08/31/18. | ☐ |

EAGLEBEN-SA_00000049

| | | | |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Application Number | | |
| | Filing Date | 2022-12-14 | |
| | First Named Inventor | Nagesh R. Palepu | |
| | Art Unit | | |
| | Examiner Name | | |
| | Attorney Docket  Number | 107071.000582 | |

| | | | |
|---|---|---|---|
| | 40 | Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc- Civil Action No. 1:18-cv-01074: Hospira's Reply Brief in Support of its Motion to Dismiss Plaintiffs' Complaint (Document 29), public version dated 11/26/18. | ☐ |
| | 41 | Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc- Civil Action No. 1:18-cv-01074: Hospira, Inc's Brief in Support of its rule 12(b)(6) Motion to Dismiss Plaintiffs' Complain (Document 20), public version dated 09/07/18. | ☐ |
| | 42 | Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc- Civil Action No. 1:18-cv-01074: Plaintiffs' Opposition to Motion to Dismiss (Document 26), redacted-public version dated 11/02/18. | ☐ |
| | 43 | EC Safety Data Sheet: Ribomustin(Registered) 2007 | ☐ |
| | 44 | Eric WATSON, et al., Kinetics of Phosphoramide Mustard..., Journal of Pharmaceutical Sciences, Vol. 74, No. 12, pp. 1283-1292, 1985 | ☐ |
| | 45 | Eugene C. Corbett, Jr., Intravenous Fluids: It's More Than Just 'Fill 'Er Up!', Series #52 PRACTICAL GASTROENTEROLOGY 44-60 (2007) | ☐ |
| | 46 | Excipient-Drug Interactions in Parenteral Formulations', Akers et. al., Journal of Pharmaceutical Sciences, volume 91, issue 11, pages 2283 - 2300, November 2002 | ☐ |
| | 47 | Flamberg et al., Low Temperature Vacuum Drying of Sterile Parenterals From Ethanol, Bulletin of the Parenteral Drug Association, 24(5):209-17 (1970) | ☐ |
| | 48 | Floss et al., Intravenous fluids principles of treatment, Clinical Pharmacist, 3:274-283 (Oct 2011) | ☐ |
| | 49 | Friedberg et al., Bendamustine in Patients with Rituximab-Refractory Indolent and Transformed Non-Hodgkin's Lymphoma: Results from a Phase II Multicenter, Single-Agent Study, J. Clin. Oncol., 26(2):204-210 (2008) | ☐ |
| | 50 | Fujisawa Deutschland GmbH Ribomustin(Registered) Products and Technical Specifications | ☐ |

EAGLEBEN-SA_00000050

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 107071.000582 |

| If you wish to add additional non-patent literature document citation information please click the Add button |
|---|
| **EXAMINER SIGNATURE** |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

EFS Web 2.1.18

EAGLEBEN-SA_00000051

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 107071.000582 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

☐ That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

☐ See attached certification statement.

☐ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

### SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Stephanie A. Lodise/ | Date (YYYY-MM-DD) | 2022-12-14 |
|---|---|---|---|
| Name/Print | Stephanie Lodise | Registration Number | 51430 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.1.18

EAGLEBEN-SA_00000052

**Privacy Act Statement**

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.   The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.   A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.   A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.   A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.   A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.   A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.   A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.   A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.   A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EAGLEBEN-SA_00000053

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (02-18)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | |
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 107071.000582 |

### U.S.PATENTS

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button.

### U.S.PATENT APPLICATION PUBLICATIONS

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button.

### FOREIGN PATENT DOCUMENTS

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button

### NON-PATENT LITERATURE DOCUMENTS

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|

EFS Web 2.1.18

EAGLEBEN-SA_00000054

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 107071.000582 |

| | | | |
|---|---|---|---|
| | 1 | Galacid Excel 88 fact sheet (lactic acid 88%). | ☐ |
| | 2 | Gandhi & Burger, Bendamustine in B cell malignancies: the new, 46-year old kid on the block, Clin Cancer Res. 2009 December 15; 15(24):7456-7461 | ☐ |
| | 3 | GIBSON et al., "Pharmaceutical preformulation and formulation: A practical guide from candidate drug selection to commercial dosage form", Informa Healthcare USA, 2009, Vol. 199, 2d ed, pp. 1-559. | ☐ |
| | 4 | Glimelius et al., Bolus-Injection (2-4 min) Versus Short-term (10-20 min) Infusion of 5-Fluorouracil in Patients with Advanced Colorectal Cancer: a Prospective Randomised Trial, Eur J. Cancer, 34, 674-678 (1998) | ☐ |
| | 5 | Gust and Krauser, Investigations on the Stability of Bendamustin, a Cytostatic Agent of the Nitrogen Mustard Type I. Synthesis, Isolation, and Characterization of Reference Substances, in Monatshefte fur Chemie, 128:291-99 (1997) | ☐ |
| | 6 | Heider et al., Efficacy and Toxicity of Bendamustine in Patients with Relapsed Low-Grade non-Hodgkin's Lymphomas, Anticancer Drugs, 12, 725-729 (2001) | ☐ |
| | 7 | HFSA Guidelines, Journal of Cardiac Failure Vol. 16 No. 6 (2010) | ☐ |
| | 8 | ICH Harmonised Tripartite Guideline, Stability testing of New Drug Substances and Products Q1A(R2), dated February 6, 2003 | ☐ |
| | 9 | Interlocutory decision in Opposition proceedings of EP 2528602 issued April 8, 2019. | ☐ |
| | 10 | International Conference on Harmonisation in Guideline on Impurities in New Drug Products: Availability, 62 Fed. Reg. 27, 454 - 27,461 (May 19, 1997) | ☐ |
| | 11 | International Search Report and Written Opinion for No. PCT/US2013/032289 dated June 6, 2013. (5 Pages) | ☐ |

EFS Web 2.1.18

EAGLEBEN-SA_00000055

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 107071.000582 |

| | | | |
|---|---|---|---|
| | 12 | International Search Report and Written Opinion issued in counterpart PCT/US2013/032295 dated Jun. 2013 (4 pages). | ☐ |
| | 13 | International Search Report and Written Opinion issued in counterpart PCT/US2013/26187. | ☐ |
| | 14 | International Search Report and Written Opinion of International application based on PCT/US2011/022958, dated Apr. 2011 (8 pages). | ☐ |
| | 15 | Jay S. Trivedi, et al., Water-Insoluble Drug Formulation, 7. Solubilization Using CoSolvent Approach, pp. 141-168, 2000 | ☐ |
| | 16 | Jay S. TRIVEDI, Water-Insoluble Drug Formulation, Second Edition, 9 Solubilization Using Cosolvent Approach, pp. 161-194, 2008 | ☐ |
| | 17 | JC Price, Handbook of Pharm. Excipients, 5th Edition, Polyethylene Glycol, pp. 545-550, August 9, 2005 | ☐ |
| | 18 | JERRY MARCH, ADVANCED ORGANIC CHEMISTRY (4th ed., John Wiley & Sons, Inc. 1992) | ☐ |
| | 19 | JOHN D. ROBERTS & MARJORIE C. CASERIO, BASIC PRINCIPLES OF ORGANIC CHEMISTRY 612-13, 615-16, 617-18 (W. A. Benjamin, Inc., 2d ed. 1977) | ☐ |
| | 20 | Jonkman-de Vries et al., Pharmaceutical Development of (Investigational) Anticancer Agents for Parental Use-A Review, DRUG DEV IND PHARM. 22(6):475-494 (1996) | ☐ |
| | 21 | Julia A. Barman Balfour, et al., "Bendamustine", Drugs, Vol. 61, No. 5, pp. 631-638, 2001 | ☐ |
| | 22 | Kalaycio. M., Clinical Experience With Bendamustine: A New Treatment for Patients With Chronic Lymphocytic Leukemia; Clin Leukemia. 2008; 2(4): 223-229 | ☐ |

EAGLEBEN-SA_00000056

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 107071.000582 |

| | | | |
|---|---|---|---|
| | 23 | Kenneth E. Avis, et al., Remington, Parenteral Preparations, Chapter 41, pp. 780-786, 2000 | ☐ |
| | 24 | Knauf et al., Bendamustine Versus Chlorambucil in Treatment-Naive Patients with B-Cell Chronic Lymphocytic Leukemia (B-CLL): Results of an International Phase III Study, Blood, 110(11), 609a (abstract 2043) (2007) | ☐ |
| | 25 | Koomans et al., Sodium Balance in Renal Failure: A Comparison of Patients with Normal Subjects Under Extremes of Sodium Intake, Hypertension 7:714-721 (1985) | ☐ |
| | 26 | Kurt H. BAUER, et al., Pharmazeutische Technologies, pp. 225-228, HW9, 1993 | ☐ |
| | 27 | Kurt H. Bauer, et al., Pharmazeutische Technologies, pp. 424-425, HW10, 1993 | ☐ |
| | 28 | Larry A. Gatlin, et al., Injectable Drug Development, 17. Formulation and Administration...Products, pp. 401-420 | ☐ |
| | 29 | Leonard & Jann, A New Synthesis of Aziridinium Salts. 2,2-Pentamethylene-1,1-tetramethyleneaziridinium Perchlorate A Prototype, 82 J. AM. CHEMISTRY SOC'Y 6418-6419 (1960) | ☐ |
| | 30 | Leoni et al., SDX-105 (Bendamustine), a Clinically Active Antineoplastic Agent Possesses a Unique Mechanism of Action, Abstract, 102(11) Blood, Abstract #2363 (Nov. 16, 2003) | ☐ |
| | 31 | Lian-Feng Huang, et al., Water-Insoluble Drug Formulation, Second Edition, Ch. 7. Formulation Strategies and Practice... Support, pp. 113-132 | ☐ |
| | 32 | Lissitchkov et al., Phase-I/II study to Evaluate Dose Limiting Toxicity, Maximum Tolerated Dose, and Tolerability of Bendamustine HCl in Pre-treated Patients With B-Chronic Lymphocytic Leukaemia (Binet stages B and C) Requiring Therapy, J. Cancer Res. Clin. Oncol. 132:99-104 (2006) | ☐ |
| | 33 | Liu (ed). Water-Insoluble Drug Formulation, 1st ed., CRC Press, Chapters 7 and 9, 2000. | ☐ |

EFS Web 2.1.18

EAGLEBEN-SA_00000057

| | | | |
|---|---|---|---|
| | | Application Number | |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | Filing Date | 2022-12-14 |
| | | First Named Inventor | Nagesh R. Palepu |
| | | Art Unit | |
| | | Examiner Name | |
| | | Attorney Docket  Number | 107071.000582 |

| | | | |
|---|---|---|---|
| | 34 | Liu (ed). Water-Insoluble Drug Formulation, 2nd ed., CRC Press, Chapters 7 and 9, 2008. | ☐ |
| | 35 | Lyondell Tebol(Registered) 99, Tertiary Butyl Alcohol in Freeze-Drying  Applications,(Lyondell Chemical Co., 2003) | ☐ |
| | 36 | Lyophilization Of Biopharmaceuticals (Henry R. Costantino & Michael K. Pikal eds., Association of Pharmaceutical Scientists 2004) | ☐ |
| | 37 | Maas et al., "Stabilitat von Bendamustinhydrochlorid in Infusionslosungen," Die Pharmazie, Govi Verlag Pharmazeutischer Verlag Gmbh, vol. 49. No. 10 pp. 775-777 (1994). (Abstract Only). | ☐ |
| | 38 | Margolin et al., Shortening the Infusion Time of Anticancer Drugs: Who Will Benefit?, J. of Clinical Oncology, 25 (19):2642-2643 (2007) | ☐ |
| | 39 | McGinity, et al., Journal of Pharmaceutical Sciences, Influence of Peroxide Impurities in Polyethylene Glycols..., Vol. 64, No. 2 pp. 356-357, 1975 | ☐ |
| | 40 | Michael J. Akers, Remington, The Science and Practice of Pharmacy 21st Edition, Parenteral preparation, chapter 41, pp. 802-835, 2005 | ☐ |
| | 41 | Michael P. GAMCSIK, et al., NMR Studies of the Conjugation..., J. Med. Chem., Vol. 33, pp. 1009-1014, 1990 | ☐ |
| | 42 | National Kidney Foundation, "Clinical Practice Guidelines and Clinical Practice Recommendations" (http://kidneyfoundation.cachefly.net/professionals/KDOQI/guideline_upHD_PD_VA/hd_guide5.htm) (2006) | ☐ |
| | 43 | Neelam SEEDHER, et al., Solubilization of Nimesulide; Use of Co-solvents, Indian J. Pharm. Sci., Vol. 65, No. 1, pp. 58-61, 2003 | ☐ |
| | 44 | Nema et al., Excipients and Their Use in Injectable Products, PDA J. Pharma. Sci. & Tech., 51(4):166-171 (Jul.-Aug. 1997) | ☐ |

EFS Web 2.1.18

EAGLEBEN-SA_00000058

| | | Application Number | |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | Filing Date | 2022-12-14 |
| | | First Named Inventor | Nagesh R. Palepu |
| | | Art Unit | |
| | | Examiner Name | |
| | | Attorney Docket  Number | 107071.000582 |

| | | | |
|---|---|---|---|
| | 45 | Ni et al., Stabilization and Preformulation of Anticancer Drug-SarCNU, Int'1 J. of Pharma., 249:257-264 (2002) | ☐ |
| | 46 | Ni et al., Use of Pure t-Butanol as a Solvent for Freeze-Drying: A Case Study, Int'1. J. of Pharma., 226:39-46 (2001) | ☐ |
| | 47 | Nuijen et al., Pharmaceutical Development of a Parenteral Lyophilized Formulation of the Novel Antitumor Agent Aplidine, PDA J. Pharmaceut. Sci. and Technol. 54(3):193-208 (2000 May-Jun) | ☐ |
| | 48 | O'Connor, Hydrolysis and Alkylating Reactivity of Aromatic Nitrogen Mustards, J.CHEM. SOC. PERKIN TRANS. 2, 1933-1939(1991) | ☐ |
| | 49 | Orrie M. FRIEDMAN, et al., Colorimetric Estimation of Nitrogen..., Analytical Chemistry, pp. 906-910 | ☐ |
| | 50 | Ozegowski et al., IMET 3393, ?-[1-Methyl-5-bis-(Beta-chloroethyl)-amino-benzimidazolyl-(2)]-butyric acid hydrochloride, a new cytostatic agent from the benzimidazole mustard gas series, 110 Zbl Pharm. 1013-1019 (1971) | ☐ |

If you wish to add additional non-patent literature document citation information please click the Add button

**EXAMINER SIGNATURE**

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through a citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [5] Applicant is to place a check mark here if English language translation is attached.

EAGLEBEN-SA_00000059

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 107071.000582 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

☐ That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

☐ See attached certification statement.

☐ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

## SIGNATURE

 A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Stephanie A. Lodise/ | Date (YYYY-MM-DD) | 2022-12-14 |
|---|---|---|---|
| Name/Print | Stephanie Lodise | Registration Number | 51430 |

This collection of information is required by 37 CFR 1.97 and 1.98.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.1.18

EAGLEBEN-SA_00000060

**Privacy Act Statement**

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.     The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.     A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.     A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.     A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.     A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.     A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.     A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.     A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.     A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS Web 2.1.18

EAGLEBEN-SA_00000061

Doc code: IDS

Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (02-18)

Approved for use through 11/30/2020. OMB 0651-0031

U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
| --- | --- | --- |
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 107071.000582 |

### U.S.PATENTS

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| --- | --- | --- | --- | --- | --- | --- |
| | 1 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button.

### U.S.PATENT APPLICATION PUBLICATIONS

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| --- | --- | --- | --- | --- | --- | --- |
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button.

### FOREIGN PATENT DOCUMENTS

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 1 | | | | | | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button

### NON-PATENT LITERATURE DOCUMENTS

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
| --- | --- | --- | --- |

EFS Web 2.1.18

EAGLEBEN-SA_00000062

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 107071.000582 |

| | | | |
|---|---|---|---|
| | 1 | Paul J. SHESKEY, Handbook of Pharmaceutical Excipients, 7th Edition, Propyl Gallate | ☐ |
| | 2 | Pokorny et al., Antioxidants in Food: Practical Applications 2001, CRC Press, page 324 | ☐ |
| | 3 | Poulsen, Introduction to Chemistry (2010) | ☐ |
| | 4 | Pramod K. Gupta, et al.. "Injectable Drug Development Techniques to Reduce Pain and Irritation", pp 183, Informa Healthcare, 2008, ISBN 13: 978-1-5749-1095-7. | ☐ |
| | 5 | Preiss et al., "Pharmacological and clinical date of Bendamustine," 17th International Cancer Congress, pp. 1637-1640 (1998). | ☐ |
| | 6 | Preiss et al., Studies on the Pharmacokinetics of Bendamustine (Cytostasan®) in Humans, Pharmazie, 40(11):782-784 (1985) | ☐ |
| | 7 | R.A. Pethrick et al., Excerpt from Polymer Yearbook 13, CRC Press, 01 Oct 1996, Technology & Engineering Vinogradova et al. | ☐ |
| | 8 | Rassachaert et al., "A phase 1 study of bendamustine hydrochloride administered once every 3 weeks in patients with solid tumors," Anti-Cancer Drugs, vol. 18 No. 5 pp. 587-595 (2007). | ☐ |
| | 9 | Remington's Pharmaceutical Sciences, 18th edition, (1990), page 1322. | ☐ |
| | 10 | Remington's Pharmaceutical Sciences, 18th edition, (1990), pp. 1286-1288. | ☐ |
| | 11 | Remington's Pharmaceutical Sciences 1990 (Eighteenth Edition), Mack Publishing Company, Chapter 85, 1570-1580 | ☐ |

EFS Web 2.1.18

EAGLEBEN-SA_00000063

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 107071.000582 |

| | | | |
|---|---|---|---|
| 12 | Renu CHADHA, et al., "DRUG CARRIER SYSTEMS FOR ANTICANCER AGENTS: A REVIEW", Journal of Scientific & Industrial Reasearch, vol. 67, pp. 185-197, 2008. | | ☐ |
| 13 | Ribomustin Monograph (Updated August 2005) | | ☐ |
| 14 | Ribomustin Monograph (Updated January 2002) | | ☐ |
| 15 | Ribomustin Product Information, Janssen-Cilag Pty Ltd (Updated September 15, 2016) | | ☐ |
| 16 | Rote Liste 1996 for Ribomustin (86 023) | | ☐ |
| 17 | Rote Liste 2003 for Ribomustin (86 045) | | ☐ |
| 18 | Rowe et al. Handbook of Pharmaceutical Excipients, 6th edition, 2009, pages 454-455 | | ☐ |
| 19 | Rowe et al., "Handbook of Pharmaceutical Excipients," Pharmaceutical Press, 6th edition pp. 857 (extract from index) (2009). | | ☐ |
| 20 | Rowe, et al., (ed) Handbook of Pharmaceutical Excipients, 5th ed., Pharmaceutical Press, pp. 545-550, Polyethylene Glycol, 2006. | | ☐ |
| 21 | Safety Data Sheet, Lactic Acid, 88%, Columbus Chemical Industries, 2013 | | ☐ |
| 22 | Scasnar at al., Radiochemical Assay of Stability of 14C-Cytostasan Solutions During Preparation and Storage, Journal of Radioanalytical and Nuclear Chemistry, Articles 121(2):489-497 (1988) | | ☐ |

EFS Web 2.1.18

EAGLEBEN-SA_00000064

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 107071.000582 |

| | | | |
|---|---|---|---|
| | 23 | Schoffski et al., "Weekly administration of bendamustine: A phase 1 study in patients with advanced progressive solid tumors," Annals of Oncology II, pp. 729-734 (2000). | ☐ |
| | 24 | Schoffski et al., Repeated administration of short infusions of bendamustine: a phase 1 study in patients with advanced progressive solid tumours, J. Cancer Res Clin Oncol, vol. 126 No. 1 pp. 41-47 (2000). | ☐ |
| | 25 | Schwanen et al., In vitro evaluation of bendamustine induced apoptosis in B-chronic lymphocytic leukemia, LEUKEMIA 16:2096-2105 (2002) | ☐ |
| | 26 | SciFinder, Hydrolytic degradation of IMET 3393, American Chemical Society, 2018 | ☐ |
| | 27 | Seager et al., Structure of Products Prepared by Freeze-Drying Solutions Containing Organic Solvents, PDA Journal oi Pharmaceutical Science and Technology, 39(4):161-179 (1985) | ☐ |
| | 28 | Search History issued in connection with PCT/US2013/32295 dated May 10,2013. | ☐ |
| | 29 | Shah et al., Physical, Chemical, and Bioavailability Studies of Parenteral Diazepam Formulations Containing Propylene Glycol and Polyethylene Glycol 400, Drug Development and Industrial Pharm.), 17:12,1635-1654 (Oct. 20, 2008) | ☐ |
| | 30 | Sigma-Aldrich, Webpage Catalog for poly(ethylene glycol), http://www.sigmaaldrich.com/catalog/product/aldrich/202398?lang=en®ion- =US#, accessed Nov. 15, 2015 (2 pages). | ☐ |
| | 31 | Sikora, "Cancer drug development in the post-genomic age," Current Science, vol. 81 No. 5 pp. 549-554 (2001). | ☐ |
| | 32 | Spectra Analysis, Inc., Oxidative Degradation of Polyethyleneglycol..., Application Note 016, March 2008 | ☐ |
| | 33 | SPIEGEL et al., "Use of Nonaqueous Solvents in Parenteral Products," Journal of Pharmaceutical Sciences, Vol. 52, No. 10 pp. 917-927 (1963). | ☐ |

EFS Web 2.1.18

EAGLEBEN-SA_00000065

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 107071.000582 |

| | | | |
|---|---|---|---|
| | 34 | Strickley, Solubilizing Excipients in Oral and Injectable Formulations, Pharmaceutical Research 21(2):201-230 (Feb 2004) | ☐ |
| | 35 | Supplemental European Search Report issued in connection with PCT/US2011/022958 dated December 16, 2013. | ☐ |
| | 36 | T. W. GRAHAM SOLOMONS, ORGANIC CHEMISTRY (John Wiley & Sons, 3d ed. 1984) | ☐ |
| | 37 | Tageja, Bendamustine: Safety and Efficacy in the Management of Indolent Non-Hodgkins Lymphoma, Clinical Medicine Insights: Oncology 2011:5 145-156 | ☐ |
| | 38 | Teagarden & Baker, Practical Aspects of Freeze-Drying of Pharmaceutical and Biological Products Using Non-Aqueous Co-Solvent Systems, Chapter 8 in Freeze-Drying/Lyophilization of Pharmaceutical and Biological Products, 239-76 (2nd Edition, Edited by Rey, L. & May, J., Marcel Dekker, New York) (2004) | ☐ |
| | 39 | Teagarden & Baker, Practical Aspects of Lyophilization Using Non-Aqueous Co-Solvent Systems, 15 Eur. J. Pharma. Sciences, 115-33 (2002) | ☐ |
| | 40 | Teva Pharmaceuticals International GMBH, et al. v. Apotex Inc., et al - Civil Action 1:17-cv-01164: Defendants Apotex Inc. and Apotex Corp.'s Answer to Complaint, Defenses and Counterclaims (Document 17), dated 11/27/17 | ☐ |
| | 41 | Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi USA, LLC.- Civil Action No. 1:17-cv-01201: Answer to Complaint, Separate Defenses, and Counterclaims (Document 10), dated 09/15/17. | ☐ |
| | 42 | Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi USA, LLC.- Civil Action No. 1:17-cv-01201: Answer to Fresenius Kabi USA, LLC'S Counterclaims (Document 14), dated 10/06/17. | ☐ |
| | 43 | Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi USA, LLC.- Civil Action No. 1:17-cv-01201: Complaint (Document 1), dated 08/24/17. | ☐ |
| | 44 | Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al - Civil Action No. 1:18-cv-01586: Answer to Fresenius Kabi USA, LLC's Counterclaims (Document 13), dated 11/27/18. | ☐ |

EAGLEBEN-SA_00000066

| | | | |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99**) | Application Number | | |
| | Filing Date | 2022-12-14 | |
| | First Named Inventor | Nagesh R. Palepu | |
| | Art Unit | | |
| | Examiner Name | | |
| | Attorney Docket  Number | 107071.000582 | |

| | | | |
|---|---|---|---|
| | 45 | Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al - Civil Action No. 1:18-cv-01586: Complaint (Document 1), dated 10/15/18. | ☐ |
| | 46 | Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al - Civil Action No. 1:18-cv-01586: Defendant Mylan Laboratories LTD.'s Answer to Complaint for Patent Infringement (Document 11), dated 11/09/18. | ☐ |
| | 47 | Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al.- Civil Action No. 1:18-cv-01586: Defendant Fresenius Kabi USA, LLC's Answer to Complaint, Separate Defenses, and Counterclaims (Document 9), dated 11/06/18. | ☐ |
| | 48 | Teva Pharmaceuticals International GMBH, et al. v. Mylan Laboratories Limited- Civil Action No. 1:17-cv-01790: Complaint (Document 1), dated 12/12/17. | ☐ |
| | 49 | Teva Pharmaceuticals International GMBH, et al. v. Slayback Pharma Limited Liability Company- Civil Action No. 1:18-cv-00117: Complaint (Document 1), dated 01/19/18. | ☐ |
| | 50 | Teva Pharmaceuticals International GMBH, et al. v. Slayback Pharma Limited Liability Company- Civil Action No. 1:18-cv-00117: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Addtional Defenses and Counterclaims (Document 9), dated 02/12/18. | ☐ |

If you wish to add additional non-patent literature document citation information please click the Add button

### EXAMINER SIGNATURE

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through a citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [5] Applicant is to place a check mark here if English language translation is attached.

EFS Web 2.1.18

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 107071.000582 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

☐ That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

☐ See attached certification statement.

☐ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

## SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Stephanie A. Lodise/ | Date (YYYY-MM-DD) | 2022-12-14 |
|---|---|---|---|
| Name/Print | Stephanie Lodise | Registration Number | 51430 |

This collection of information is required by 37 CFR 1.97 and 1.98.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.1.18

EAGLEBEN-SA_00000068

**Privacy Act Statement**

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.      The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.      A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.      A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.      A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.      A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.      A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.      A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.      A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.      A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS Web 2.1.18

EAGLEBEN-SA_00000069

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (02-18)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | |
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 107071.000582 |

### U.S.PATENTS

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button.

### U.S.PATENT APPLICATION PUBLICATIONS

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button.

### FOREIGN PATENT DOCUMENTS

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button

### NON-PATENT LITERATURE DOCUMENTS

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|

EFS Web 2.1.18

EAGLEBEN-SA_00000070

| | | | |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99**) | Application Number | | |
| | Filing Date | 2022-12-14 | |
| | First Named Inventor | Nagesh R. Palepu | |
| | Art Unit | | |
| | Examiner Name | | |
| | Attorney Docket  Number | 107071.000582 | |

| | | | |
|---|---|---|---|
| 1 | Teva Pharmaceuticals International GMBH, etal. v. Apotex Inc., etal - Civil Action No. 1:17-cv-01164: Complaint (Document 1), dated 08/18/17. | ☐ |
| 2 | Thiesen, "Bendamustine, a well-tollerated cytotoxic agent used in Germany for may years, is soon to be marketed in the rest of Europe for a range of indicatons including chronic lymphocytic leukaemia," pp. 1-4 (2010). Available at http://www.hospitalpharmacyeurope.com/featured-articles/bendamustine. | ☐ |
| 3 | Third Party Submission in related EP2528602 based on PCT/US2011/022958 dated November 19,2013 (9 pages). | ☐ |
| 4 | Thomas A. Jennings, Lyophilization, Introduction and Basic Principles (2006)(original copyright 1999) | ☐ |
| 5 | TREANDA (Highlights of prescribing information 2008) (Year: 2008) | ☐ |
| 6 | Treanda, "Highlights of Prescribing Information," TREANDA ( bendamustine hydrochloride) for Injection, for intravenous infusion, pp. 1-13 (2010). | ☐ |
| 7 | Treanda, "Highlights Of Prescribing Information," TREANDA ( bendamustine hydrochloride) for Injection, for intravenous infusion, pp. 1-6 (2008) | ☐ |
| 8 | U.S. Pharmacopeia 32-NF-27-General Notices and Requirements (2009). | ☐ |
| 9 | USP 24/NF 19 (2000) entry for Propylene Glycol (USP) | ☐ |
| 10 | V.G. Vinogradova, et al., Polymer Yearbook 13, New Metal Chelates as Antioxidant Stabilizers for Polymers..., pp. 87-111, 1996 | ☐ |
| 11 | V.M. Mikhal'chuk, et al., Antioxidative Stabilization of Polyethylene..., Russian Journal of Applied Chemistry, Vol. 77, No. 1, pp. 131-135, 2004 | ☐ |

EAGLEBEN-SA_00000071

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 107071.000582 |

| | | | |
|---|---|---|---|
| | 12 | Vlok, Manual of Nursing, Volume 1 (9th edition), 1988 | ☐ |
| | 13 | W. Furst, et al., "About the Hydrolytic Decomposition of IMET 3393," Pharmazeutische Zentralhalle, Vol. 108, Issue 9, pp. 608-614, 1969 (English translation and the original article) | ☐ |
| | 14 | Wayne P. Olson, Volatile Solvents for Drying and Microbial Kill in the Final Container, Pharmaceutical Engineering, 110-118(1997) | ☐ |
| | 15 | Weide et al., Bendamustine Mitoxantrome and Rituximab (BMR): A New Effective Regimen for Refractory or Relapsed Indolent Lymphomas, Leukemia & Lymphoma, 43(2):327-331 (2002) | ☐ |
| | 16 | Werner et al., Hydrolysis Products of Cancerostatic Cytostasan(Registered) (Bendamustine), 42 (4) DIE PHARMAZIE, GOVI VERLAG PHARMAZEUTISCHER VERLAG GMBH, ESCHBORN, DE, 272-73 | ☐ |
| | 17 | William H. Brown, Organic Chemistry 5th Edition, pp. 358-360, 2009 | ☐ |
| | 18 | Wittaya-Areekul and Nail, Freeze-Drying of tert-Butyl Alcohol/Water Cosolvent Systems: Effects of Formulation and Process Variables on Residual Solvents, Journal of Pharmaceutical Sciences 87(4):491-495 (1998) | ☐ |
| | 19 | Written Opinion issued in counterpart PCT/US2013/032289 dated June 6,2013. | ☐ |
| | 20 | Written Opinion issued in counterpart PCT/US2013/032295 dated June 3,2013. | ☐ |
| | 21 | Zimmerman et al., Elements of Organic Chemistry (1977) | ☐ |
| | 22 | Zips et al., "New Anticancer Agents: In Vitro and In Vivo Evaluation," In Vivo,vol. 19 pp. 1-8 (2005). | ☐ |

EAGLEBEN-SA_00000072

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 107071.000582 |

| | 23 | Zumdahl et al., Chemistry, 7th Ed. (2007) | ☐ |
|---|---|---|---|

If you wish to add additional non-patent literature document citation information please click the Add button

**EXAMINER SIGNATURE**

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through a citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [5] Applicant is to place a check mark here if English language translation is attached.

EFS Web 2.1.18

EAGLEBEN-SA_00000073

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 107071.000582 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

☐ That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

☐ See attached certification statement.

☐ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

## SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Stephanie A. Lodise/ | Date (YYYY-MM-DD) | 2022-12-14 |
|---|---|---|---|
| Name/Print | Stephanie Lodise | Registration Number | 51430 |

This collection of information is required by 37 CFR 1.97 and 1.98.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.1.18

EAGLEBEN-SA_00000074

**Privacy Act Statement**

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS Web 2.1.18

EAGLEBEN-SA_00000075

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | |
| **Filing Date:** | |
| **Title of Invention:** | FORMULATIONS OF BENDAMUSTINE |
| **First Named Inventor/Applicant Name:** | Nagesh R. Palepu |
| **Filer:** | Stephanie A. Lodise/VeAndra Luckett |
| **Attorney Docket Number:** | 107071.000582 |

Filed as Large Entity

**Filing Fees for** **Track I Prioritized Examination - Nonprovisional Application under 35 USC 111(a)**

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| UTILITY APPLICATION FILING | 1011 | 1 | 320 | 320 |
| UTILITY SEARCH FEE | 1111 | 1 | 700 | 700 |
| UTILITY EXAMINATION FEE | 1311 | 1 | 800 | 800 |
| REQUEST FOR PRIORITIZED EXAMINATION | 1817 | 1 | 4200 | 4200 |
| **Pages:** | | | | |
| **Claims:** | | | | |
| CLAIMS IN EXCESS OF 20 | 1202 | 9 | 100 | 900 |
| INDEPENDENT CLAIMS IN EXCESS OF 3 | 1201 | 1 | 480 | 480 |

EAGLEBEN-SA_00000076

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous-Filing:** | | | | |
| PUBL. FEE- EARLY, VOLUNTARY, OR NORMAL | 1504 | 1 | 0 | 0 |
| PROCESSING FEE,  EXCEPT PROV. APPLS. | 1830 | 1 | 140 | 140 |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |
| **Miscellaneous:** | | | | |
| | **Total in USD ($)** | | | **7540** |

EAGLEBEN-SA_00000077

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 47207612 |
| **Application Number:** | 18081238 |
| **International Application Number:** | |
| **Confirmation Number:** | 5922 |
| **Title of Invention:** | FORMULATIONS OF BENDAMUSTINE |
| **First Named Inventor/Applicant Name:** | Nagesh R. Palepu |
| **Customer Number:** | 23377 |
| **Filer:** | Stephanie A. Lodise/VeAndra Luckett |
| **Filer Authorized By:** | Stephanie A. Lodise |
| **Attorney Docket Number:** | 107071.000582 |
| **Receipt Date:** | 14-DEC-2022 |
| **Filing Date:** | |
| **Time Stamp:** | 15:49:48 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | DA |
| Payment was successfully received in RAM | $7540 |
| RAM confirmation Number | E2022BDF50403031 |
| Deposit Account | 233050 |
| Authorized User | VeAndra Luckett |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |
| 37 CFR 1.16 (National application filing, search, and examination fees) | |
| 37 CFR 1.17 (Patent application and reexamination processing fees) | |

EAGLEBEN-SA_00000078

37 CFR 1.19 (Document supply fees)

37 CFR 1.20 (Post Issuance fees)

37 CFR 1.21 (Miscellaneous fees and charges)

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Track One Request | 107071-582_Certification_and_RequestforPrioritizedExamination.pdf | 118780 <br><br> beb09ca4484a38cbbbecf2978dcbbbc988ac1723 | no | 2 |

| **Warnings:** |
|---|
| **Information:** |

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 2 | Application Data Sheet | 107071-582_ADS.pdf | 1256896 <br><br> e538f0986c3b03ecd9e11443d819676017031be8 | no | 9 |

| **Warnings:** |
|---|
| **Information:** |

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 3 | | 107071-582_fasttrack_BEND01-US-CON9application.pdf | 214341 <br><br> b6145edd859445e05545591331bbc27899b6d351 | yes | 20 |

| Multipart Description/PDF files in .zip description | | |
|---|---|---|
| Document Description | Start | End |
| Specification | 1 | 16 |
| Claims | 17 | 19 |
| Abstract | 20 | 20 |

| **Warnings:** |
|---|
| **Information:** |

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 4 | Oath or Declaration filed | 107071-582_Declarations.pdf | 379006 <br><br> 18e4319c1c20dae69d767104673a3b54692b073e | no | 3 |

| **Warnings:** |
|---|
| **Information:** |

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 5 | Transmittal Letter | 107071-582_ContentofIDS.pdf | 120890 <br><br> bf269c46f98e42dda788a44e1d0f43d16a93beb2 | no | 1 |

EAGLEBEN-SA_00000079

| | | | | | |
|---|---|---|---|---|---|
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 6 | Information Disclosure Statement (IDS) Form (SB08) | 107071-582_IDS_1.pdf | 99928 / e69a39d6e7d4c46db3727edd955be938ef4b1483 | no | 17 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| This is not an USPTO supplied IDS fillable form | | | | | |
| 7 | Information Disclosure Statement (IDS) Form (SB08) | 107071-582_IDS_2.pdf | 81906 / f8e689c5c1039c69f31e04fb496fc2f33d460790 | no | 8 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| This is not an USPTO supplied IDS fillable form | | | | | |
| 8 | Information Disclosure Statement (IDS) Form (SB08) | 107071-582_IDS_3.pdf | 80473 / 88377c0a18430a972457466d2651869c63ce842c | no | 8 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| This is not an USPTO supplied IDS fillable form | | | | | |
| 9 | Information Disclosure Statement (IDS) Form (SB08) | 107071-582_IDS_4.pdf | 73951 / 04f0fefaaadb86a83002c52c2cadcf127d798aba | no | 6 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| This is not an USPTO supplied IDS fillable form | | | | | |
| 10 | Fee Worksheet (SB06) | fee-info.pdf | 55058 / 9ee65ad6b8a88e29478c350099ffd3625d8db62e | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| | | **Total Files Size (in bytes):** | 2481229 | | |

EAGLEBEN-SA_00000080

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.
**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.
**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

EAGLEBEN-SA_00000081



# UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 18/081,238 | 12/14/2022 | | 3200 | 107071.000582 | 29 | 4 |

**CONFIRMATION NO. 5922**

23377
BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501

**FILING RECEIPT**

*OC000000052390185*

Date Mailed: 01/06/2023

Receipt is acknowledged of this non-provisional utility patent application. The application will be taken up for examination in due course. Applicant will be notified as to the results of the examination. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF FIRST INVENTOR, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection.

**Please verify the accuracy of the data presented on this receipt.** If an error is noted on this Filing Receipt, please submit a written request for a corrected Filing Receipt, including a properly marked-up ADS showing the changes with strike-through for deletions and underlining for additions. If you received a "Notice to File Missing Parts" or other Notice requiring a response for this application, please submit any request for correction to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections provided that the request is grantable.

**Inventor(s)**

Nagesh R. Palepu, Southampton, PA;
Philip Christopher Buxton, Denham, UNITED KINGDOM;

**Applicant(s)**

Eagle Pharmaceuticals, Inc., Woodcliff Lake, NJ;

**Power of Attorney:** None

**Domestic Priority data as claimed by applicant**

This application is a CON of 17/412,623 08/26/2021
    which is a CON of 16/509,920 07/12/2019 PAT 11,103,483
    which is a CON of 16/015,656 06/22/2018 ABN
    which is a CON of 15/432,335 02/14/2017 PAT 10,010,533
    which is a CON of 15/013,436 02/02/2016 PAT 9,572,797
    which is a CON of 14/031,879 09/19/2013 PAT 9,265,831
    which is a CON of 13/016,473 01/28/2011 PAT 8,609,707
    which claims benefit of 61/299,100 01/28/2010

**Foreign Applications** for which priority is claimed (You may be eligible to benefit from the **Patent Prosecution Highway** program at the USPTO. Please see http://www.uspto.gov for more information.)  - None.
*Foreign application information must be provided in an Application Data Sheet in order to constitute a claim to foreign priority. See 37 CFR 1.55 and 1.76.*

EAGLEBEN-SA_00000082

**Permission to Access Application via Priority Document Exchange:** Yes

**Permission to Access Search Results:** Yes

Applicant may provide or rescind an authorization for access using Form PTO/SB/39 or Form PTO/SB/69 as appropriate.

**If Required, Foreign Filing License Granted:** 01/05/2023
The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 18/081,238**
**Projected Publication Date:** 04/13/2023
**Non-Publication Request:** No
**Early Publication Request:** No
**Title**

FORMULATIONS OF BENDAMUSTINE

**Preliminary Class**

**Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications:** No

# PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative,

EAGLEBEN-SA_00000083

this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4258).

# LICENSE FOR FOREIGN FILING UNDER

## Title 35, United States Code, Section 184

## Title 37, Code of Federal Regulations, 5.11 & 5.15

### GRANTED

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

### NOT GRANTED

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

---

## *SelectUSA*

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The U.S. offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to promote and facilitate business investment. SelectUSA provides information assistance to the international investor community; serves as an ombudsman for existing and potential investors; advocates on behalf of U.S. cities, states, and regions competing for global investment; and counsels U.S. economic development organizations on investment attraction best practices. To learn more about why the United States is the best country in the world to develop

EAGLEBEN-SA_00000084

technology, manufacture products, deliver services, and grow your business, visit http://www.SelectUSA.gov or call +1-202-482-6800.

EAGLEBEN-SA_00000085

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | | | | | Application or Docket Number<br>18/081,238 | |

## APPLICATION AS FILED - PART I

| FOR | (Column 1)<br>NUMBER FILED | (Column 2)<br>NUMBER EXTRA | SMALL ENTITY<br>RATE($) | SMALL ENTITY<br>FEE($) | OR | OTHER THAN<br>SMALL ENTITY<br>RATE($) | OTHER THAN<br>SMALL ENTITY<br>FEE($) |
|---|---|---|---|---|---|---|---|
| BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | | | N/A | 320 |
| SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | | | N/A | 700 |
| EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | | | N/A | 800 |
| TOTAL CLAIMS (37 CFR 1.16(i)) | 29 minus 20 = | * 9 | | | OR | x 100 = | 900 |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | 4 minus 3 = | * 1 | | | | x 480 = | 480 |
| APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | | | | 0 |
| MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | | | | 0 |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | | | TOTAL | 2300 |

## APPLICATION AS AMENDED - PART II

| AMENDMENT A | (Column 1)<br>CLAIMS REMAINING AFTER AMENDMENT | | (Column 2)<br>HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3)<br>PRESENT EXTRA | SMALL ENTITY<br>RATE($) | SMALL ENTITY<br>ADDITIONAL FEE($) | OR | OTHER THAN SMALL ENTITY<br>RATE($) | OTHER THAN SMALL ENTITY<br>ADDITIONAL FEE($) |
|---|---|---|---|---|---|---|---|---|---|
| Total (37 CFR 1.16(i)) | * | Minus | ** | = | x = | | OR | x = | |
| Independent (37 CFR 1.16(h)) | * | Minus | *** | = | x = | | OR | x = | |
| Application Size Fee (37 CFR 1.16(s)) | | | | | | | | | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | | OR | | |
| | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

| AMENDMENT B | (Column 1)<br>CLAIMS REMAINING AFTER AMENDMENT | | (Column 2)<br>HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3)<br>PRESENT EXTRA | SMALL ENTITY<br>RATE($) | SMALL ENTITY<br>ADDITIONAL FEE($) | OR | OTHER THAN SMALL ENTITY<br>RATE($) | OTHER THAN SMALL ENTITY<br>ADDITIONAL FEE($) |
|---|---|---|---|---|---|---|---|---|---|
| Total (37 CFR 1.16(i)) | * | Minus | ** | = | x = | | OR | x = | |
| Independent (37 CFR 1.16(h)) | * | Minus | *** | = | x = | | OR | x = | |
| Application Size Fee (37 CFR 1.16(s)) | | | | | | | | | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | | OR | | |
| | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

  \* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
 \*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
\*\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest found in the appropriate box in column 1.

EAGLEBEN-SA_00000086

**To:**               eofficemonitor@bakerlaw.com,,
**From:**            PAIR_eOfficeAction@uspto.gov
**Cc:**               PAIR_eOfficeAction@uspto.gov
**Subject:**       Private PAIR Correspondence Notification for Customer Number 23377

Jan 06, 2023 03:29:03 AM

Dear PAIR Customer:

BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501
UNITED STATES

The following USPTO patent application(s) associated with your Customer Number, 23377 , have new outgoing correspondence. This correspondence is now available for viewing in Private PAIR.

The official date of notification of the outgoing correspondence will be indicated on the form PTOL-90 accompanying the correspondence.

Disclaimer:
The list of documents shown below is provided as a courtesy and is not part of the official file wrapper. The content of the images shown in PAIR is the official record.

| Application | Document | Mailroom Date | Attorney Docket No. |
|---|---|---|---|
| 18081238 | APP.FILE.REC | 01/06/2023 | 107071.000582 |

To view your correspondence online or update your email addresses, please visit us anytime at https://sportal.uspto.gov/secure/myportal/privatepair.

If you have any questions, please email the Electronic Business Center (EBC) at EBC@uspto.gov with 'e-Office Action' on the subject line or call 1-866-217-9197 during the following hours:

     Monday - Friday 6:00 a.m. to 12:00 a.m.

Thank you for prompt attention to this notice,

UNITED STATES PATENT AND TRADEMARK OFFICE

PATENT APPLICATION INFORMATION RETRIEVAL SYSTEM

EAGLEBEN-SA_00000087

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/081,238 | 12/14/2022 | Nagesh R. Palepu | 107071.000582 | 5922 |

23377        7590        02/08/2023
BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501

| EXAMINER |
|---|
| CENTRAL, DOCKET |

| ART UNIT | PAPER NUMBER |
|---|---|
| OPAP | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 02/08/2023 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

eofficemonitor@bakerlaw.com

PTOL-90A (Rev. 04/07)

EAGLEBEN-SA_00000088

| **Decision Granting Request for Prioritized Examination (Track I)** | **Application No.** 18/081,238 | | **Applicant(s)** Palepu et al. | |
|---|---|---|---|---|
| | **Examiner** FIKIRTE A GEREMEW | **Art Unit** OMBL | | **AIA (FITF) Status** No |

1.  THE REQUEST FILED <u>14 December 2022</u> IS **GRANTED** .

The above-identified application has met the requirements for prioritized examination
   A.  ☑ for an original nonprovisional application (Track I).
   B.  ☐ for an application undergoing continued examination (RCE).


2.  **The above-identified application will undergo prioritized examination**. The application will be accorded special status throughout its entire course of prosecution until one of the following occurs:

   A.  filing a **petition for extension of time** to extend the time period for filing a reply;

   B.  filing an **amendment to amend the application to contain more than four independent claims, more than thirty total claims** , or a multiple dependent claim;

   C.  filing a **request for continued examination** ;

   D.  filing a notice of appeal;

   E.  filing a request for suspension of action;

   F.  mailing of a notice of allowance;

   G.   mailing of a final Office action;

   H.   completion of examination as defined in 37 CFR 41.102; or

   I.  abandonment of the application.

Telephone inquiries with regard to this decision should be directed to FIKIRTE GEREMEW at (703) 756-1930. In his/her absence, calls may be directed to Petition Help Desk at (571) 272-3282.

| /FIKIRTE A GEREMEW/ PROGRAM SUPPORT ASSISTANT, OMBL | |
|---|---|

U.S. Patent and Trademark Office
PTO-2298 (Rev. 02-2012)

EAGLEBEN-SA_00000089

**To:**          eofficemonitor@bakerlaw.com,,
**From:**        PAIR_eOfficeAction@uspto.gov
**Cc:**          PAIR_eOfficeAction@uspto.gov
**Subject:**     Private PAIR Correspondence Notification for Customer Number 23377

Feb 28, 2023 10:14:47 AM

Dear PAIR Customer:

BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501
UNITED STATES

The following USPTO patent application(s) associated with your Customer Number, 23377 , have new outgoing correspondence. This correspondence is now available for viewing in Private PAIR.

The official date of notification of the outgoing correspondence will be indicated on the form PTOL-90 accompanying the correspondence.

Disclaimer:
The list of documents shown below is provided as a courtesy and is not part of the official file wrapper. The content of the images shown in PAIR is the official record.

| Application | Document | Mailroom Date | Attorney Docket No. |
|---|---|---|---|
| 18081238 | TRACK1.GRANT | 02/08/2023 | 107071.000582 |

To view your correspondence online or update your email addresses, please visit us anytime at https://sportal.uspto.gov/secure/myportal/privatepair.

If you have any questions, please email the Electronic Business Center (EBC) at EBC@uspto.gov with 'e-Office Action' on the subject line or call 1-866-217-9197 during the following hours:

    Monday - Friday 6:00 a.m. to 12:00 a.m.

Thank you for prompt attention to this notice,

UNITED STATES PATENT AND TRADEMARK OFFICE

PATENT APPLICATION INFORMATION RETRIEVAL SYSTEM

EAGLEBEN-SA_00000090

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/081,238 | 12/14/2022 | Nagesh R. Palepu | 107071.000582 | 5922 |

| | | | |
|---|---|---|---|
| 23377 | 7590 | 03/21/2023 | |

BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501

| EXAMINER |
|---|
| ARNOLD, ERNST V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1613 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 03/21/2023 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

eofficemonitor@bakerlaw.com

PTOL-90A (Rev. 04/07)

EAGLEBEN-SA_00000091

| *Office Action Summary* | Application No.<br>18/081,238 | Applicant(s)<br>Palepu et al. |
|---|---|---|
| | Examiner<br>ERNST V ARNOLD | Art Unit<br>1613 | AIA (FITF) Status<br>No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE 3 MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☐ Responsive to communication(s) filed on _____.
    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a)☐ This action is **FINAL.**          2b)☑ This action is non-final.
3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5)☑ Claim(s)     1-29 is/are pending in the application.
    5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6)☐ Claim(s) _____ is/are allowed.
7)☑ Claim(s) 1-29 is/are rejected.
8)☐ Claim(s) _____ is/are objected to.
9)☐ Claim(s) _____ are subject to restriction and/or election requirement

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10)☐ The specification is objected to by the Examiner.
11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    **Certified copies:**
        a)☐ All      b)☐ Some**      c)☐ None of the:
        1.☐ Certified copies of the priority documents have been received.
        2.☐ Certified copies of the priority documents have been received in Application No. _____.
        3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)

2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
    Paper No(s)/Mail Date _____.

3) ☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date _____.

4) ☐ Other: _____.

EAGLEBEN-SA_00000092

Application/Control Number: 18/081,238                                                                    Page 2
Art Unit: 1613

## *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent

provisions.

## *Claim Status*

Claims 1-29 are pending.

## *Priority*

## Continuity/Reexam Information for 18/081238

Parent Data

18081238, filed 12/14/2022 is a continuation of 17412623, filed 08/26/2021

17412623 is a continuation of 16509920, filed 07/12/2019 ,now U.S. Patent #11103483 and having 1 RCE-type filing therein

16509920 is a continuation of 16015656, filed 06/22/2018 ,now abandoned

16015656 is a continuation of 15432335, filed 02/14/2017 ,now U.S. Patent #10010533

15432335 is a continuation of 15013436, filed 02/02/2016 ,now U.S. Patent #9572797

15013436 is a continuation of 14031879, filed 09/19/2013 ,now U.S. Patent #9265831 and having 1 RCE-type filing therein

14031879 is a continuation of 13016473, filed 01/28/2011 ,now U.S. Patent #8609707 and having 1 RCE-type filing therein

13016473 Claims Priority from Provisional Application 61299100, filed 01/28/2010

## *Information Disclosure Statement*

The information disclosure statement (IDS) submitted on 12/14/22 are mostly in

compliance with the provisions of 37 CFR 1.97. Some references lack a date and a line

has been drawn through the reference as being not considered. Accordingly, the

information disclosure statement is being considered to that extent by the examiner.

EAGLEBEN-SA_00000093

Application/Control Number: 18/081,238                                                  Page 3
Art Unit: 1613

## Double Patenting

Applicant is advised that should claims 1-9 be found allowable, claims 10-27 will

be objected to under 37 CFR 1.75 as being a substantial duplicates thereof. When two

claims in an application are duplicates or else are so close in content that they both

cover the same thing, despite a slight difference in wording, it is proper after allowing

one claim to object to the other as being a substantial duplicate of the allowed claim.

See MPEP § 608.01(m). Independent claims 10 and 19 also comprise about 20 mg/mL

to about 60 mg/mL bendamustine or a pharmaceutical acceptable salt thereof,

polyethylene glycol and a stabilizing amount of an antioxidant. Thus, they are inherently

"ready for dilution" and the independent claim anticipate one another as there are no

other structural changes to the other independent claims.


## Claim Rejections - 35 USC § 103

In the event the determination of the status of the application as subject to AIA 35

U.S.C. 102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any

correction of the statutory basis for the rejection will not be considered a new ground of

rejection if the prior art relied upon, and the rationale supporting the rejection, would be

the same under either status.

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or
> described as set forth in section 102 of this title, if the differences between the
> subject matter sought to be patented and the prior art are such that the subject
> matter as a whole would have been obvious at the time the invention was made to a
> person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

EAGLEBEN-SA_00000094

Application/Control Number: 18/081,238                                    Page 4
Art Unit: 1613

The factual inquiries set forth in *Graham* **v.** *John Deere Co.*, 383 U.S. 1, 148

USPQ 459 (1966), that are applied for establishing a background for determining

obviousness under 35 U.S.C. 103(a) are summarized as follows:

1.    Determining the scope and contents of the prior art.
2.    Ascertaining the differences between the prior art and the claims at issue.
3.    Resolving the level of ordinary skill in the pertinent art.
4.    Considering objective evidence present in the application indicating obviousness or nonobviousness.

This application currently names joint inventors.  In considering patentability of the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary.  Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g) prior art under 35 U.S.C. 103(a).

**Claims 1-3, 5-12,15-21 and 24-27** are rejected under 35 U.S.C. 103(a) as being

unpatentable over Drager et al. (US 20110190363, of record, with benefit of

PCT/US09/58023 filed September 23, 2009, which claims priority form provisional

61100074 filed September 25, 2008).

Applicant claims:

1.    A ready for dilution, liquid bendamustine-containing composition comprising
        bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine
                concentration in the composition is from about 20 mg/mL to about 60 mg/mL;
        polyethylene glycol; and
        a stabilizing amount of an antioxidant.

EAGLEBEN-SA_00000095

Application/Control Number: 18/081,238                                           Page 5
Art Unit: 1613

10.    A liquid bendamustine-containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine

concentration in the composition is from about 20 mg/mL to about 60 mg/mL and

wherein the bendamustine has not been reconstituted from a lyophilized powder;

polyethylene glycol; and

a stabilizing amount of an antioxidant.

19.    A bendamustine-containing composition comprising

one or more doses of bendamustine, or a pharmaceutically acceptable salt thereof, and a

stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid that is

polyethylene glycol;

wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from

about 20 mg/mL to about 60 mg/mL.

## Level of Ordinary Skill in the Art

## (MPEP 2141.03)

MPEP 2141.03 (I) states: "The "hypothetical 'person having ordinary skill in the

art' to which the claimed subject matter pertains would, of necessity have the capability

of understanding the scientific and engineering principles applicable to the pertinent art."

*Ex parte Hiyamizu*, 10 USPQ2d 1393, 1394 (Bd. Pat. App. & Inter. 1988). The level of

skill is that of a ***medical/pharmaceutical cancer*** research scientist, as is the case here,

then one can assume comfortably that such an educated artisan will draw conventional

ideas from oncology medicine, oncology pharmacy and chemistry— without being told

to do so.

In addition, the prior art itself reflects an appropriate level (MPEP 2141.03(II)).

EAGLEBEN-SA_00000096

Application/Control Number: 18/081,238                                              Page 6
Art Unit: 1613

## Determination of the scope and content of the prior art

## (MPEP 2141.01)

Regarding claims 1, 3, 10, 12, 19 and 21, Drager et al. teach stable liquid formulations of bendamustine (Abstract) and that bendamustine comes in vial, diluted just before dose administration to the saphenous vein [0037]. Drager et al. teach that the bendamustine concentration can range from about 5 mg/mL to about 200 mg/mL (claim 12) with preferred concentrations of, for example, about 20 mg/mL and about 60 mg/mL [0028], which embraces the range of from about 20 mg/mL to about 60 mg/mL as well as the claimed amount of about 25 mg/mL and reads on one or more doses. See MPEP 2144.05(I): In the case where the claimed ranges "overlap or lie inside ranges disclosed by the prior art" a *prima facie* case of obviousness exists. *In re Wertheim*, 541 F.2d 257, 191 USPQ 90 (CCPA 1976). Regarding claims 1 and 10, the liquid bendamustine composition of Drager et al. is ready for dilution because diluting the liquid bendamustine composition is the next step in the method of treating cancer (claim 47) and the bendamustine is not reconstituted from lyophilized powder ([0037] formulations 2 and 3).

Regarding claims 1, 10 and 19, Drager et al. teach that it has been discovered that stable formulation of bendamustine or a pharmaceutical salt thereof can be obtained by mixing with a polar aprotic solvent such as polyethylene glycol ([0016]; claims 1, 3, 4) such as PEG300 or PEG400 [0030] as well as antioxidants such as vitamin E, ascorbic acid, BHA, BHT, propyl gallate ([0030]; claim 11), which naturally stabilizes the composition.

EAGLEBEN-SA_00000097

Application/Control Number: 18/081,238                                         Page 7

Art Unit: 1613

Regarding claims 2, 11 and 20, Drager et al. teach embodiments with about 100

mg/mL bendamustine [0028], which renders obvious a composition with 100 mg

bendamustine in 1 mL.

Regarding claims 6-7, 15, 16 and 24-25, Drager et al. teach:

[0022]   In preferred embodiments of the present invention, analysis of formulations of the present invention will exhibit 1.50% or less of DCE, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C. More preferably, the formulations will exhibit 1.0% or less of DCE, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C. Even more preferably, the formulations will exhibit 0.5% or less of DCE, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C. Most preferably, the formulations will exhibit about 0.1% or less of DCE, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C.

[0023]   In other embodiments of the present invention, analysis of the formulations will exhibit about 0.4% or less of HP1, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C. Preferably, the formulations will exhibit about 0.10% or less of HP1, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5° C.

Regarding claims 8, 17 and 26, Drager et al. teach adding mixtures of

polyalkylene glycol and an alcohol (claim 4) and name ethanol [0016].


**Ascertainment of the difference between the prior art and the claims**

**(MPEP 2141.02) and Finding of prima facie obviousness**

**Rational and Motivation (MPEP 2142-2143)**

The difference between the instant application and Drager et al. is that Drager et

al. do not expressly teach providing a sterile vial and the limitation of 15 month stable at

5 °C or 25 °C wherein the total impurities resulting from the degradation of the

bendamustine is less than about 5% peak area response, as determined by HPLC at a

EAGLEBEN-SA_00000098

Application/Control Number: 18/081,238                                                          Page 8
Art Unit: 1613

wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

It would have been obvious to one of ordinary skill in the art at the time of the claimed invention to perform the method of Drager et al. by providing a sterile vial containing the bendamustine liquid composition and achieve the 15 month stable at 5 °C or 25 °C wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C and produce the instant invention.

One of ordinary skill in the art would have been motivated to do this because the ordinary medical artisan understands that the vial must be sterile otherwise not only does it defeat the purpose of using sterile water for injection [0004] but also the patient runs the risk of infection from a dirty vial. Thus, the ordinary artisan is motivated to do so for at least for the welfare of the patient with a reasonable expectation of success. Drager et al. teach that the compositions are stable to about 365 days, which is about a year and teach less than 0.1% or less degradation products ([0022-0024]). Accordingly, the ordinary artisan can extrapolate out to 15 months and be reasonably certain that the compositions will be stable with less than about 5% peak area response as determined by HPLC for total impurities. Especially when the compositions comprise the same polyethylene glycol and antioxidants as claimed and would have a reasonable expectation of success of having a stable composition for at least about 15 months at 5 °C to about 25 °C.

EAGLEBEN-SA_00000099

Application/Control Number: 18/081,238                                                    Page 9
Art Unit: 1613

In light of the forgoing discussion, the Examiner concludes that the subject matter defined by the instant claims would have been obvious within the meaning of 35 USC 103(a).

From the combined teachings of the references, it is apparent that one of ordinary skill in the art would have had a reasonable expectation of success in producing the claimed invention. Therefore, the invention as a whole was *prima facie* obvious to one of ordinary skill in the art at the time the invention was made, as evidenced by the combined references, especially in the absence of evidence to the contrary.

**Claims 4, 5, 13, 14, 22 and 23** are rejected under 35 U.S.C. 103(a) as being unpatentable over Drager et al. (US 20110190363), as applied to claims 1-3, 5-12,15-21 and 24-27 above, in further view of Tait et al. (WO 0202125), of record.

Applicant claims:

4.      The composition of claim 1, wherein the antioxidant is monothioglycerol.

5.      The composition of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

13.     The composition of claim 10, wherein the antioxidant is monothioglycerol.

14.     The composition of claim 10, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

EAGLEBEN-SA_00000100

Application/Control Number: 18/081,238                                    Page 10

Art Unit: 1613

22.    The composition of claim 19, wherein the antioxidant is monothioglycerol.

23.    The composition of claim 19, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

## Level of Ordinary Skill in the Art

### (MPEP 2141.03)

MPEP 2141.03 (I) states: "The "hypothetical 'person having ordinary skill in the art' to which the claimed subject matter pertains would, of necessity have the capability of understanding the scientific and engineering principles applicable to the pertinent art." *Ex parte Hiyamizu*, 10 USPQ2d 1393, 1394 (Bd. Pat. App. & Inter. 1988). The level of skill is that of a ***medical/pharmaceutical cancer*** research scientist, as is the case here, then one can assume comfortably that such an educated artisan will draw conventional ideas from oncology medicine, oncology pharmacy and chemistry— without being told to do so.

In addition, the prior art itself reflects an appropriate level (MPEP 2141.03(II)).

## Determination of the scope and content of the prior art

### (MPEP 2141.01)

Drager et al. is discussed above and that discussion is incorporated by reference.

Regarding claims 4, 5, 13, 14, 22 and 23, Tait et al. teach stabilized injectable compositions of the alkylating agent ifosfamide (Abstract; page 1, line 7) comprising PEG200-600, ethanol (page 6, lines 16-24; page 9, lines 15-21; claims 4-6) and

EAGLEBEN-SA_00000101

Application/Control Number: 18/081,238                                Page 11
Art Unit: 1613

antioxidants such as BHA, BHT and up to 5% monothioglycerol (page 9, lies 11-14; page 14, line 6) that are stable for at least 180 days (page 6, lines 25-26).

**Ascertainment of the difference between the prior art and the claims**

**(MPEP 2141.02) and Finding of prima facie obviousness**

**Rational and Motivation (MPEP 2142-2143)**

The difference between the instant application and Drager et al. is that Drager et al. do not expressly teach about 5 mg/mL of monothioglycerol antioxidant. This deficiency in Drager et al. is cured by the teachings of Tait et al.

It would have been obvious to one of ordinary skill in the art at the time of the claimed invention to add about 5 mg/mL of monothioglycerol antioxidant to the composition of Drager et al., as suggested by Tait et al., produce the instant invention.

One of ordinary skill in the art would have been motivated to do this because as noted above Drager et al. suggest adding an antioxidant and name, for example BHA and BHT. Tait et al. teach the equivalence of monothioglycerol, BHA and BHT as antioxidants to stabilize alkylating agents and thus have interchangeable function. "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007). Moreover, "Where two known alternatives are interchangeable for a desired function, an express suggestion to substitute one for the other is not needed to render a substitution obvious." *In re Fout*, 675 F.2d 297, 301 (CCPA 1982). Accordingly, the ordinary artisan would select the antioxidant monothioglycerol and

EAGLEBEN-SA_00000102

Application/Control Number: 18/081,238                                      Page 12
Art Unit: 1613

optimize the amount to about 5 mg/mL to achieve the desired degree of stability with a

reasonable expectation of success especially when Tait et al. teach using from 0-5%.

In light of the forgoing discussion, the Examiner concludes that the subject matter

defined by the instant claims would have been obvious within the meaning of 35 USC

103(a).

From the combined teachings of the references, it is apparent that one of

ordinary skill in the art would have had a reasonable expectation of success in

producing the claimed invention. Therefore, the invention as a whole was *prima facie*

obvious to one of ordinary skill in the art at the time the invention was made, as

evidenced by the combined references, especially in the absence of evidence to the

contrary.


**Claims 28 and 29** are rejected under 35 U.S.C. 103(a) as being unpatentable

over Drager et al. (US 20110190363 with benefit of PCT/US09/58023 filed September

23, 2009, which claims priority form provisional 61100074 filed September 25, 2008).

Applicant claims:

28.    A method of treating leukemia in a human in need thereof comprising
        providing a liquid bendamustine-containing composition comprising about 25 mg/ml of
              bendamustine;
        diluting the liquid bendamustine containing composition; and
        intravenously administering the diluted composition to the human.

29.    The method of claim 28, wherein the liquid bendamustine containing composition is
        diluted with about 50 mL of a diluent.


**Level of Ordinary Skill in the Art**

EAGLEBEN-SA_00000103

Application/Control Number: 18/081,238                                        Page 13

Art Unit: 1613

**(MPEP 2141.03)**

MPEP 2141.03 (I) states: "The "hypothetical 'person having ordinary skill in the art' to which the claimed subject matter pertains would, of necessity have the capability of understanding the scientific and engineering principles applicable to the pertinent art." *Ex parte Hiyamizu*, 10 USPQ2d 1393, 1394 (Bd. Pat. App. & Inter. 1988). The level of skill is that of a ***medical/pharmaceutical cancer*** research scientist, as is the case here, then one can assume comfortably that such an educated artisan will draw conventional ideas from oncology medicine, oncology pharmacy and chemistry— without being told to do so.

In addition, the prior art itself reflects an appropriate level (MPEP 2141.03(II)).

**Determination of the scope and content of the prior art**

**(MPEP 2141.01)**

Regarding claims 28 and 29, Drager et al. teach a method of treating cancer comprising:

- providing a liquid pharmaceutical composition comprising a therapeutically effective amount of bendamustine or pharmaceutically acceptable salt thereof and non-aqueous solvent;

- diluting the liquid pharmaceutical formulation with a pharmaceutically acceptable injectable diluent to form a pharmaceutical preparation; and

- administering the pharmaceutical preparation to the patient in need of treatment (claim 47) intravenously [0032].

EAGLEBEN-SA_00000104

Application/Control Number: 18/081,238                                      Page 14
Art Unit: 1613

Drager et al. teach that bendamustine comes in vial, diluted just before dose administration to the saphenous vein, hence intravenous administration [0037]. Drager et al. teach that the cancer includes leukemia [0031]. Drager et al. teach that the bendamustine concentration can range from about 5 mg/mL to about 200 mg/mL with preferred concentrations of about 20 mg/mL, about 30 mg/mL [0028], thereby creating a range of about 20-30 mg/mL, which embraces the claimed amount of about 25 mg/mL. See MPEP 2144.05(I): In the case where the claimed ranges "overlap or lie inside ranges disclosed by the prior art" a *prima facie* case of obviousness exists. *In re Wertheim*, 541 F.2d 257, 191 USPQ 90 (CCPA 1976).

**Ascertainment of the difference between the prior art and the claims (MPEP 2141.02) and Finding of prima facie obviousness Rational and Motivation (MPEP 2142-2143)**

The difference between the instant application and Drager et al. is that Drager et al. do not expressly teach providing a sterile vial and diluting with about 50 mL of a diluent.

It would have been obvious to one of ordinary skill in the art at the time of the claimed invention to perform the method of Drager et al. by providing a sterile vial containing the bendamustine liquid composition and dilute it with about 50 mL of a diluent and produce the instant invention.

One of ordinary skill in the art would have been motivated to do this because the ordinary medical artisan understands that the vial must be sterile otherwise not only does it defeat the purpose of using sterile water for injection [0004] but also the patient

EAGLEBEN-SA_00000105

Application/Control Number: 18/081,238                                                    Page 15
Art Unit: 1613

runs the risk of infection from a dirty vial. Thus, the ordinary artisan is motivated to do so

for at least for the welfare of the patient with a reasonable expectation of success. The

amount of diluent is a result effect variable routinely optimized by the ordinary artisan to

provide the proper concentration of bendamustine to the patient from the concentrated

formulation. Thus, absent any criticality of "about 50 mL of a diluent", such is readily

determined by the ordinary artisan in this art with no inventive skill required.

In light of the forgoing discussion, the Examiner concludes that the subject matter

defined by the instant claims would have been obvious within the meaning of 35 USC

103(a).

From the combined teachings of the references, it is apparent that one of

ordinary skill in the art would have had a reasonable expectation of success in

producing the claimed invention. Therefore, the invention as a whole was *prima facie*

obvious to one of ordinary skill in the art at the time the invention was made, as

evidenced by the combined references, especially in the absence of evidence to the

contrary.

### Double Patenting

The nonstatutory double patenting rejection is based on a judicially created
doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the
unjustified or improper timewise extension of the "right to exclude" granted by a patent
and to prevent possible harassment by multiple assignees. A nonstatutory double
patenting rejection is appropriate where the conflicting claims are not identical, but at
least one examined application claim is not patentably distinct from the reference
claim(s) because the examined application claim is either anticipated by, or would have
been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46
USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed.
Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*,
686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619
(CCPA 1970); *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).
       A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d)
may be used to overcome an actual or provisional rejection based on nonstatutory

Application/Control Number: 18/081,238                                         Page 16
Art Unit: 1613

double patenting provided the reference application or patent either is shown to be commonly owned with the examined application, or claims an invention made as a result of activities undertaken within the scope of a joint research agreement. See MPEP § 717.02 for applications subject to examination under the first inventor to file provisions of the AIA as explained in MPEP § 2159. See MPEP § 2146 *et seq.* for applications not subject to examination under the first inventor to file provisions of the AIA. A terminal disclaimer must be signed in compliance with 37 CFR 1.321(b).

The USPTO Internet website contains terminal disclaimer forms which may be used. Please visit www.uspto.gov/patent/patents-forms. The filing date of the application in which the form is filed determines what form (e.g., PTO/SB/25, PTO/SB/26, PTO/AIA/25, or PTO/AIA/26) should be used. A web-based eTerminal Disclaimer may be filled out completely online using web-screens. An eTerminal Disclaimer that meets all requirements is auto-processed and approved immediately upon submission. For more information about eTerminal Disclaimers, refer to www.uspto.gov/patents/process/file/efs/guidance/eTD-info-I.jsp.


1. Claims 1-27 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-6 of U.S. Patent No. 9265831. Although the claims at issue are not identical, they are not patentably distinct from each other because the

EAGLEBEN-SA_00000107

Application/Control Number: 18/081,238                                    Page 17
Art Unit: 1613

patent is directed to:

US 9,265,831 B2

**13**

TABLE 8

Stability of Bendamustine in 85% PEG 400, 15% PG and Thioglycerol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of total | % Total Imp. |
|---|---|---|---|---|---|
| BDM—50 mg/mL, | | Initial | 51.5 | 100 | 0.12 |
| Thioglycerol—5 mg/mL, | 40° C. | 1 M | 50.4 | 97.9 | 1.18 |
| PEG 400:PG (85:15) qs to | 25° C. | 1 M | 51.4 | 99.8 | 0.41 |
| 1 mL. | | 3 M | 50.4 | 97.9 | 1.23 |
| | 5° C. | 3 M | 51.9 | 99.0 | 0.28 |

The stability is similar to that of thioglycerol samples in Example 7 above. As reported in Table 8, total impurities did not exceed 2% at 40° C. or 25° C. storage over one month, or at 25° C. and 5° C. storage after three months. The data reported in Table 8 supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for at least about 2 years if not longer.

We claim:

1. A non-aqueous liquid bendamustine-containing composition, comprising:
   a) bendamustine or a pharmaceutically acceptable salt thereof; and
   b) a pharmaceutically acceptable fluid comprising,
      i) about 5% to about 10% by volume propylene glycol,
      ii) polyethylene glycol, and

**14**

      iii) a stabilizing amount of an antioxidant selected from the group consisting of thioglycerol, monothioglycerol, lipoic acid, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds and dihydrolipoic acid;

the bendamustine-containing composition having less than or equal to 0.11% total PG esters at about 1 month of storage at a temperature of about 5° C.;

wherein the ratio of polyethylene glycol to propylene glycol is selected from the group consisting of: about 95:5, about 90:10, about 85:15, about 80:20 and about 75:25.

2. The liquid bendamustine-containing composition of claim 1, wherein said bendamustine-containing composition has less than or equal to 0.18% total PG esters at about 12 months of storage at a temperature of about 5° C.

3. The liquid bendamustine-containing composition of claim 1, wherein the amount of propylene glycol in the pharmaceutically acceptable fluid is about 10%.

4. The liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

5. The liquid bendamustine-containing composition of claim 4, wherein the bendamustine concentration is from about 25 mg/mL to about 50 mg/mL.

6. The liquid bendamustine-containing composition of claim 5, wherein the bendamustine concentration is about 50 mg/mL.

*    *    *    *    *

The bendamustine has not been reconstituted form a lyophilized powder, has same concentration range which indicates that the composition is ready for dilution and contains one or more doses of bendamustine. The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 100 mg of bendamustine. However, if the concentration is 25 mg/mL (claim 5) then in 4 mL the artisan would have 100 mg bendamustine present with a reasonable expectation of success.

EAGLEBEN-SA_00000108

Application/Control Number: 18/081,238                                          Page 18
Art Unit: 1613

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches a stabilizing amount of antioxidant and it is merely routine optimization to determine how much monothioglycerol (thioglycerol) to have to achieve the desired stabilization by the ordinary artisan.

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

The patent does not expressly the claimed stability at about 15 months at about 5-25 C or less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at about 5-25 C to determine the total impurities from the degradation of bendamustine at the period of time or temperatures instantly claimed. However, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

2. Claims 1-29 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-27 of U.S. Patent No. 9572797.

Although the claims at issue are not identical, they are not patentably distinct from each other because the patented method is directed to using the instantly claimed compositions of about 20-60 mg/mL bendamustine (claims 1, 4-6), polyethylene glycol

EAGLEBEN-SA_00000109

Application/Control Number: 18/081,238                                      Page 19
Art Unit: 1613

and about 2.5-35 mg/mL monothioglycerol antioxidant (claims 1, 11, 12) in a method of

treating, for example leukemia (claims 13, 25) with similar stability (claims 2, 7-10, 16-

20).

We claim:

1. A method of treating leukemia, Hodgkin's disease, or multiple myeloma in a mammal, comprising administering to the mammal, a liquid bendamustine-containing composition comprising:

a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a non-aqueous pharmaceutically acceptable fluid comprising

about 5% to about 10%, based on the volume of the pharmaceutically acceptable fluid, of propylene glycol,

polyethylene glycol,

and a stabilizing amount of an antioxidant selected from the group consisting of thioglycerol, monothioglycerol, lipoic acid, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds and dihydrolipoic acid;

the bendamustine-containing composition having less than or equal to 0.11% total PG esters at about 1 month of storage at a temperature of about 5° C.;

wherein the ratio of polyethylene glycol to propylene glycol is selected from the group consisting of: about 95:5, about 90:10, about 85:15, about 80:20, and about 75:25.

13. The method of claim 1, for the treatment of leukemia.

14. The method of claim 1, for the treatment of Hodgkin's disease.

The bendamustine has not been reconstituted form a lyophilized powder, has

same concentration range which indicates that the composition is ready for dilution and

contains one or more doses of bendamustine.

The patent does not expressly teach a sterile vial. However, the ordinary artisan

in the pharmaceutical arts would place the bendamustine composition in a sterile vial to

avoid microbiological contamination, which would ruin the pharmaceutical product, with

a reasonable expectation of success.

EAGLEBEN-SA_00000110

Application/Control Number: 18/081,238                                      Page 20
Art Unit: 1613

The patent does not expressly teach about 100 mg of bendamustine. However, if the concentration is 25 mg/mL (claim 5) then in 4 mL the artisan would have 100 mg bendamustine present with a reasonable expectation of success.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches a stabilizing amount of antioxidant and it is merely routine optimization to determine how much monothioglycerol (thioglycerol) to have to achieve the desired stabilization by the ordinary artisan.

The patent does not expressly teach a step in the method of diluting with about 50 mL of diluent. However, the ordinary artisan understands that the concentrated solution needs dilution prior to administration and dilution with 50 mL is just an arbitrary amount to achieve the desired therapeutic concentration. The ordinary artisan can do so with a reasonable expectation of success.

The patent does not expressly teach intravenous administration but intravenous administration is a common method to administer liquid compositions well-known to the ordinary artisan.

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

The patent does not expressly the claimed stability at about 15 months at about 5-25 C or less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at about 5-25 C to determine the total impurities from the degradation of bendamustine at the period of

EAGLEBEN-SA_00000111

Application/Control Number: 18/081,238                                    Page 21
Art Unit: 1613

time or temperatures instantly claimed. However, such would be inherent in the

composition comprising the same components. See MPEP 2112.01(II): "Products of

identical chemical composition cannot have mutually exclusive properties." *In re Spada*,

911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

Therefore, the ordinary artisan would have recognized the obvious variation of

the instantly claimed subject matter over the patented subject matter.

3. Claims 1-29 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-26 of U.S. Patent No. 9572796 in view of Tait et al.

(WO 0202125). Although the claims at issue are not identical, they are not patentably

distinct from each other because the patent is directed to:

1. A non-aqueous liquid composition comprising:
bendamustine, or a pharmaceutically acceptable salt thereof;
a pharmaceutically acceptable fluid comprising a mixture of polyethylene glycol and propylene glycol, wherein the ratio of polyethylene glycol to propylene glycol in the pharmaceutically acceptable fluid is from about 95:5 to about 50:50; and
a stabilizing amount of an antioxidant;
wherein the composition has less than about 5% total impurities after 15 months of storage at about 5° C., as calculated on a normalized peak area response basis as determined by high performance liquid chromatography at a wavelength of 223 nm.

2. The non-aqueous liquid composition of claim 1, wherein the bendamustine concentration is from about 10 mg/mL to about 100 mg/mL.

3. The non-aqueous liquid composition of claim 1, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

4. The non-aqueous liquid composition of claim 1, wherein the bendamustine concentration is from about 25 mg/mL to about 50 mg/mL.

5. The non-aqueous liquid composition of claim 1, wherein the bendamustine concentration is about 25 mg/mL.

6. The non-aqueous liquid composition of claim 1, wherein the concentration of the antioxidant is from about 2.5 mg/mL to about 35 mg/mL.

7. The non-aqueous liquid composition of claim 1, wherein the concentration of the antioxidant is from about 5 mg/mL to about 20 mg/mL.

8. The non-aqueous liquid composition of claim 1, wherein the concentration of the antioxidant is from about 10 mg/mL to about 15 mg/mL.

9. The non-aqueous liquid composition of claim 1, com

EAGLEBEN-SA_00000112

Application/Control Number: 18/081,238                                   Page 22
Art Unit: 1613

10. A method of treating leukemia, Hodgkin's disease, or multiple myeloma in a mammal comprising administering to the mammal an effective amount of the composition of claim 1.

11. The method of claim 10, for the treatment of leukemia.

12. The method of claim 10, for the treatment of Hodgkin's disease.

The bendamustine has not been reconstituted form a lyophilized powder, has same concentration range which indicates that the composition is ready for dilution and contains one or more doses of bendamustine.

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at a temperature of about 5-25 C to determine the total impurities from the degradation of bendamustine or is stable at 25 C for at least about 15 months. However, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches a stabilizing amount of antioxidant (claim 1) and Tait et al. teach stabilized injectable compositions of the nitrogen mustard alkylating agent ifosfamide (Abstract; page 1, line 7) comprising PEG200-600, ethanol (page 6, lines 16-24; page 9, lines 15-21; claims 4-6) and antioxidants such as BHA, BHT and up to 5%

EAGLEBEN-SA_00000113

Application/Control Number: 18/081,238                                                         Page 23
Art Unit: 1613

monothioglycerol (page 9, lies 11-14; page 14, line 6) that are stable for at least 180

days (page 6, lines 25-26). Thus, it is merely judicious selection and routine optimization

of the amount of monothioglycerol to achieve the desired stabilization of the nitrogen

mustard alkylating agent bendamustine by the ordinary artisan with a reasonable

expectation of success.

The patent does not expressly teach a step in the method of diluting with about

50 mL of diluent. However, the ordinary artisan understands that the concentrated

solution needs dilution prior to administration and dilution with 50 mL is just an arbitrary

amount to achieve the desired therapeutic concentration. The ordinary artisan can do so

with a reasonable expectation of success.

The patent does not expressly teach intravenous administration but intravenous

administration is a common method to administer liquid compositions well-known to the

ordinary artisan.

The patent does not expressly teach adding ethanol. However, ethanol is a well-

known pharmaceutical solvent in which bendamustine is soluble. The artisan would add

ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable

expectation of success.

Therefore, the ordinary artisan would have recognized the obvious variation of

the instantly claimed subject matter over the patented subject matter.

4. Claims 1-18 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-22 of U.S. Patent No. 8609707. Although the claims

at issue are not identical, they are not patentably distinct from each other because the

Application/Control Number: 18/081,238                                        Page 24
Art Unit: 1613

patent is also directed to bendamustine compositions and methods of treating leukemia

as shown, for example, claims:

We claim:
1. A long term storage stable non-aqueous liquid benda-
mustine-containing composition, comprising:

US 8,609,707 B2

13

a) bendamustine or a pharmaceutically acceptable salt
thereof, and
b) a pharmaceutically acceptable fluid comprising
i) about 90% polyethylene glycol and about 10% propy-
lene glycol; and
ii) a stabilizing amount of an antioxidant.
2. The long term storage stable non-aqueous liquid benda-
mustine-containing composition of claim 1, wherein the ben-
damustine concentration is from about 20 mg/mL to about 60
mg/mL.
3. The long term storage stable non-aqueous liquid benda-
mustine-containing composition of claim 2, wherein the ben-
damustine concentration is from about 25 mg/mL to about 50
mg/mL.

16. A method of treating cancer in mammals, comprising
administering an effective amount of a long term storage
stable non-aqueous liquid bendamustine-containing compo-
sition of claim 1 to a mammal in need thereof.

long term storage is at least 2 years.
21. The method of treating cancer in mammals of claim 16,
wherein the cancer is leukemia.
22. The method of treating cancer in mammals of claim 16,
wherein the cancer is Hodgkin's disease.

14

12. The long term storage stable non-aqueous liquid ben-
damustine-containing composition of claim 10, wherein the
stabilizing amount of the antioxidant is about 5 mg/mL.
13. The long term storage stable non-aqueous liquid ben-
damustine-containing composition of claim 1, wherein said
long term storage is at least 2 years.
14. A long term storage stable non-aqueous liquid benda-
mustine-containing composition, comprising:
a) bendamustine or a pharmaceutically acceptable salt
thereof, and
b) a pharmaceutically acceptable fluid comprising
i) about 90% polyethylene glycol and about 10% propy-
lene glycol; and
ii) a stabilizing amount of thioglycerol.

Thus, the patent teaches long term storage of at least 2 years (claims 13, 20),

thereby implicitly meeting the instantly claimed stability parameters, of a composition

comprising about 20-60 mg/mL or about 25-50 mg/mL bendamustine and polyethyelene

glycol (claims 1-5, 15, 17-19) with about 5mg/mL monothioglycerol antioxidant (claims

6, 7, 10, 12, 14-15) for treating leukemia (claims 16, 21).  The bendamustine has not

been reconstituted form a lyophilized powder, has same concentration range which

EAGLEBEN-SA_00000115

Application/Control Number: 18/081,238                                                     Page 25
Art Unit: 1613

indicates that the composition is ready for dilution and contains one or more doses of

bendamustine.

The patent does not expressly less than about 5% peak area response of total

impurities as determined using HPLC with a wavelength of 223 nm at least about 15

months at a temperature of about 5-25 C to determine the total impurities from the

degradation of bendamustine or is stable at 5 C or 25 C for at least about 15 months.

However, as stated above, such would be inherent in the composition comprising the

same components. See MPEP 2112.01(II): "Products of identical chemical composition

cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15

USPQ2d 1655, 1658 (Fed. Cir. 1990)."

The patent does not expressly teach a sterile vial. However, the ordinary artisan

in the pharmaceutical arts would place the bendamustine composition in a sterile vial to

avoid microbiological contamination, which would ruin the pharmaceutical product, with

a reasonable expectation of success.

The patent does not expressly teach adding ethanol. However, ethanol is a well-

known pharmaceutical solvent in which bendamustine is soluble. The artisan would add

ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable

expectation of success.

The patent does not expressly teach a step in the method of diluting with about

50 mL of diluent. However, the ordinary artisan understands that the concentrated

solution needs dilution prior to administration and dilution with 50 mL is just an arbitrary

amount to achieve the desired therapeutic concentration. The ordinary artisan can do so

with a reasonable expectation of success.

EAGLEBEN-SA_00000116

Application/Control Number: 18/081,238                                               Page 26
Art Unit: 1613

The patent does not expressly teach intravenous administration but intravenous administration is a common method to administer liquid compositions well-known to the ordinary artisan.

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

5. Claims 1-29 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-23 of U.S. Patent No. 9579384. Although the claims at issue are not identical, they are not patentably distinct from each other because the patent is directed to a liquid bendamustine, polyethylene glycol and antioxidant composition (claims 1, 4) where the antioxidant is monothioglycerol (claim 8) used in the method of treating leukemia (claim 1 and 10) where the volume is 50 mL (claims 7, 9) administered intravenously (claims 17-19).

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 25 mg/mL bendamustine for use in the method of treating leukemia. However, the patent teaches a parenterally acceptable diluent (claim 1) and a volume of about 50 mL (claims 7 and 9) to arrive at about 0.5-5.6 mg/mL bendamustine to administer in a total volume of 100 mL or less. Thus, having a stock solution of about 25 mg/mL to be diluted with about 50 mL diluent to achieve the desired therapeutic concentration prior to administration is obvious to the ordinary artisan.  Because about 25 mg/mL is obvious, then that renders obvious the claimed

EAGLEBEN-SA_00000117

Application/Control Number: 18/081,238                                     Page 27
Art Unit: 1613

composition claims where, for example, a 4 mL volume would have 100 mg bendamustine. The bendamustine has not been reconstituted form a lyophilized powder, is within same concentration range which indicates that the composition is ready for dilution and contains one or more doses of bendamustine.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches an antioxidant (claim 1) and names monothioglycerol (claim 8). Thus, it is merely judicious selection and routine optimization of the amount of monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating agent bendamustine by the ordinary artisan with a reasonable expectation of success.

The patent does not expressly less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at a temperature of about 5-25 C to determine the total impurities from the degradation of bendamustine or is stable at 5 C or 25 C for at least about 15 months. However, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

EAGLEBEN-SA_00000118

Application/Control Number: 18/081,238                                          Page 28
Art Unit: 1613

6. Claims 1-29 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-24 of U.S. Patent No. 9034908. Although the claims at issue are not identical, they are not patentably distinct from each other because the patent is directed to: methods of treating cancer or malignant disease such as leukemia (claim 15) using a composition comprising bendamustine with a PEG/propylene glycol solubilizer and an antioxidant (claims 1, 24) where the antioxidant can be monothioglycerol (claim 13) and the ratio of PEG:propylene glycol is about 90:10 (claim 10) to treat cancer or malignant disease in a subject (claims 1 and 15) by intravenous administration (claims 16, 17, 21).

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 25 mg/mL bendamustine. However, the patent teaches using a parenterally acceptable diluent to arrive at about 0.05-12.5 mg/mL bendamustine to administer in a total volume of 100 mL or less. The purpose of a diluent is to dilute a stock solution. Thus, having a stock solution of about 25 mg/mL to be diluted with 50 mL diluent to achieve the desired therapeutic concentration prior to administration is merely the routine optimization by the ordinary artisan practicing the patented method.  Because about 25 mg/mL is obvious, then that renders obvious the claimed composition claims where, for example, a 4 mL volume would have 100 mg bendamustine. The bendamustine has not been reconstituted form a lyophilized

Application/Control Number: 18/081,238                                    Page 29
Art Unit: 1613

powder, is within same concentration range which indicates that the composition is ready for dilution and contains one or more doses of bendamustine.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches an antioxidant (claim 1) and names monothioglycerol (claim 8). Thus, it is merely judicious selection and routine optimization of the amount of monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating agent bendamustine by the ordinary artisan with a reasonable expectation of success.

The patent does not expressly less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at a temperature of about 5-25 C to determine the total impurities from the degradation of bendamustine or is stable at 5 C or 25 C for at least about 15 months. However, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

7. Claims 1-29 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-17 of U.S. Patent No. 9597399 in view of Tait et al.

Application/Control Number: 18/081,238                                          Page 30
Art Unit: 1613

(WO 0202125). Although the claims at issue are not identical, they are not patentably distinct from each other because the patent is directed to a method of treating cancer or malignant disease using a composition comprising bendamustine, propylene glycol, PEG, a parenterally acceptable diluent and an antioxidant by intravenous administration (claims 1-17) where the volume administered is about 50 mL (claims 3-4).

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach treating leukemia. However, leukemia is well-known cancer/malignant diseases and obvious to treat with bendamustine by the ordinary artisan in this art.

The patent does not expressly teach about 25 mg/mL bendamustine. However, the patent teaches using a parenterally acceptable diluent to arrive at about 0.05-12.5 mg/mL bendamustine to administer in a total volume of 100 mL or less. The purpose of a diluent is to dilute a stock solution. Thus, having a stock solution of about 25 mg/mL to be diluted with 50 mL diluent to achieve the desired therapeutic concentration prior to administration is merely the routine optimization by the ordinary artisan practicing the patented method.  Because about 25 mg/mL is obvious, then that renders obvious the claimed composition claims where, for example, a 4 mL volume would have 100 mg bendamustine. The bendamustine has not been reconstituted form a lyophilized powder, is within same concentration range which indicates that the composition is ready for dilution and contains one or more doses of bendamustine.

EAGLEBEN-SA_00000121

Application/Control Number: 18/081,238                                              Page 31
Art Unit: 1613

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches an antioxidant (claim 1) and Tait et al. teach stabilized injectable compositions of the nitrogen mustard alkylating agent ifosfamide (Abstract; page 1, line 7) comprising PEG200-600, ethanol (page 6, lines 16-24; page 9, lines 15-21; claims 4-6) and antioxidants such up to 5% monothioglycerol (page 9, lies 11-14; page 14, line 6) that are stable for at least 180 days (page 6, lines 25-26). Thus, it is merely judicious selection and routine optimization of the amount of monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating agent bendamustine by the ordinary artisan with a reasonable expectation of success.

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

8. Claims 1-29 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-23 of U.S. Patent No. 9144568. Although the claims at issue are not identical, they are not patentably distinct from each other because the patent is directed to a method of treating leukemia by intravenously administering a composition comprising bendamustine, a parenterally acceptable diluent, a solubilizer comprising PEG and propylene glycol in a ratio of about 90:10 a parenterally acceptable diluent (claims 1-5, 9-10, 16, 23) and the antioxidant monothioglycerol (claim 7) where the volume administered is 50 ml (claims 6 and 8).

EAGLEBEN-SA_00000122

Application/Control Number: 18/081,238                                Page 32
Art Unit: 1613

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 25 mg/mL bendamustine. However, the patent teaches using a parenterally acceptable diluent to arrive at about 0.05-12.5 mg/mL bendamustine to administer in a total volume of 100 mL or less. The purpose of a diluent is to dilute a stock solution. Thus, having a stock solution of about 25 mg/mL to be diluted with 50 mL diluent to achieve the desired therapeutic concentration prior to administration is merely the routine optimization by the ordinary artisan practicing the patented method.  Because about 25 mg/mL is obvious, then that renders obvious the claimed composition claims where, for example, a 4 mL volume would have 100 mg bendamustine. The bendamustine has not been reconstituted form a lyophilized powder, is within same concentration range which indicates that the composition is ready for dilution and contains one or more doses of bendamustine.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches an antioxidant (claim 1) and names monothioglycerol (claim 7). Thus, it is merely judicious selection and routine optimization of the amount of monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating agent bendamustine by the ordinary artisan with a reasonable expectation of success.

The patent does not expressly less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at a temperature of about 5-25 C to determine the total impurities from the

EAGLEBEN-SA_00000123

Application/Control Number: 18/081,238                                            Page 33
Art Unit: 1613

degradation of bendamustine or is stable at 5 C or 25 C for at least about 15 months.

However, such would be inherent in the composition comprising the same components.

See MPEP 2112.01(II): "Products of identical chemical composition cannot have

mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658

(Fed. Cir. 1990)."

The patent does not expressly teach adding ethanol. However, ethanol is a well-

known pharmaceutical solvent in which bendamustine is soluble. The artisan would add

ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable

expectation of success.

Therefore, the ordinary artisan would have recognized the obvious variation of

the instantly claimed subject matter over the patented subject matter.

9. Claims 1-29 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-29 of U.S. Patent No. 9572887. Although the claims

at issue are not identical, they are not patentably distinct from each other because the

patent is directed to a method of treating leukemia by providing a composition of liquid

about 10-100 mg/ml bendamustine with the same stability parameters (claim 1) with

propylene glycol and PEG (claims 2 and 3), and ethanol (claim 5) and stabilizing

antioxidants (claim 14) such as monothioglycerol (claim 15) and diluting the composition

to a volume of about 50 mL prior to administering it intravenously to a patient (claims 1,

13, 17). The bendamustine has not been reconstituted form a lyophilized powder, has

same concentration range which indicates that the composition is ready for dilution and

contains one or more doses of bendamustine.

Application/Control Number: 18/081,238                                        Page 34
Art Unit: 1613

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, it is merely judicious selection and routine optimization of the amount of monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating agent bendamustine by the ordinary artisan with a reasonable expectation of success.

The patent does not expressly teach a step in the method of diluting with about 50 mL of diluent. However, the patent teaches using a diluent the ordinary artisan understands that the concentrated solution needs dilution prior to administration and dilution with 50 mL is just an arbitrary amount to achieve the desired therapeutic concentration. The ordinary artisan can do so with a reasonable expectation of success.

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

10. Claims 1-29 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-7 of U.S. Patent No. 9597397. Although the claims at issue are not identical, they are not patentably distinct from each other because the patent is directed to a method of treating cancer or malignant disease employing a bendamustine composition comprising PEG, propylene glycol and the antioxidant monothioglycerol in a PEG: propylene glycol ratio of about 90:10 (claims 1-7).

EAGLEBEN-SA_00000125

Application/Control Number: 18/081,238                                          Page 35
Art Unit: 1613

The patent does not expressly teach treating Hodgkin's or leukemia. However, Hodgkin's and leukemia are well known cancer/malignant diseases and obvious to treat with bendamustine.

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 25 mg/mL bendamustine. However, the patent teaches using a parenterally acceptable diluent to arrive at about 0.05-12.5 mg/mL bendamustine to administer in a total volume of 100 mL or less. The purpose of a diluent is to dilute a stock solution. Thus, having a stock solution of about 25 mg/mL to be diluted with about 50 mL diluent to achieve the desired therapeutic concentration prior to administration is merely the routine optimization by the ordinary artisan practicing the patented method.  Because about 25 mg/mL is obvious, then that renders obvious the claimed composition claims where, for example, a 4 mL volume would have 100 mg bendamustine. The bendamustine has not been reconstituted form a lyophilized powder, is within same concentration range which indicates that the composition is ready for dilution and contains one or more doses of bendamustine.

The patent does not expressly the claimed stability at about 15 months at about 5-25 C or less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at about 5-25 C to determine the total impurities from the degradation of bendamustine at the period of time or temperatures instantly claimed. However, such would be inherent in the

EAGLEBEN-SA_00000126

Application/Control Number: 18/081,238                                          Page 36
Art Unit: 1613

composition comprising the same components. See MPEP 2112.01(II): "Products of

identical chemical composition cannot have mutually exclusive properties." *In re Spada*,

911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

The patent does not expressly teach intravenous administration but intravenous

administration is a common method to administer liquid compositions well-known to the

ordinary artisan.

Therefore, the ordinary artisan would have recognized the obvious variation of

the instantly claimed subject matter over the patented subject matter.

11. Claims 1-27 are rejected on the ground of nonstatutory double patenting as

being unpatentable over claims 1-26 of U.S. Patent No. 10010533. Although the claims

at issue are not identical, they are not patentably distinct from each other because the

patent is directed to:

EAGLEBEN-SA_00000127

Application/Control Number: 18/081,238                                           Page 37
Art Unit: 1613

> 1. A liquid bendamustine-containing composition, comprising:
>    a) bendamustine or a pharmaceutically acceptable salt thereof; and
>    b) a pharmaceutically acceptable fluid comprising about 5% to about 10% propylene glycol, polyethylene glycol and a stabilizing amount of an antioxidant selected from the group consisting of thioglycerol, monothioglycerol, lipoic acid, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds and dihydrolipoic acid;
>    the bendamustine-containing composition having less than or equal to 0.11% total PG esters at about 1 month of storage at a temperature of about 5° C.;
>    wherein the ratio of polyethylene glycol to propylene glycol is selected from the group consisting of: about 95:5, about 90:10, about 85:15, about 80:20 and about 75:25.

> pharmaceutically acceptable fluid is about 10%.

> 4. The liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

> 5. The liquid bendamustine-containing composition of

The bendamustine has not been reconstituted form a lyophilized powder, has same concentration range which indicates that the composition is ready for dilution and contains one or more doses of bendamustine.

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 100 mg of bendamustine. However, if the concentration is 25 mg/mL (claim 5) then in 4 mL the artisan would have 100 mg bendamustine present with a reasonable expectation of success.

EAGLEBEN-SA_00000128

Application/Control Number: 18/081,238                                                Page 38
Art Unit: 1613

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches a stabilizing amount of antioxidant monothioglycerol and it is merely routine optimization to determine how much monothioglycerol (thioglycerol) to have to achieve the desired stabilization by the ordinary artisan.

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

The patent does not expressly the claimed stability at about 15 months at about 5-25 C or less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at about 5-25 C to determine the total impurities from the degradation of bendamustine at the period of time or temperatures instantly claimed. However, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

12. Claims 1-29 are provisionally rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-18 of copending Application No. 18081251. Although the claims at issue are not identical, they are not patentably distinct from each other because the copending application also teaches a bendamustine liquid composition comprising about 20-60 mg/mL bendamustine or 25 mg/mL, antioxidant

EAGLEBEN-SA_00000129

Application/Control Number: 18/081,238                                                    Page 39
Art Unit: 1613

and polyethyelene glycol in a sterile vial (claims 1, 3, 11-13) where there can be 100 mg

of bendamustine (claims 2, 12) with about 5 mg/mL monothioglycerol (claims 4-5, 14-

15) with the same stability (claims 6, 7, 16-17) and further comprising ethanol (claims 8,

18). Methods of treating leukemia by providing, diluting and intravenously administering

with about 50 ml of diluent are taught (claims 9 and 10). The bendamustine has not

been reconstituted form a lyophilized powder, has same concentration range which

indicates that the composition is ready for dilution and contains one or more doses of

bendamustine.

Accordingly, the ordinary artisan would have recognized the obvious variation of

the instantly claimed subject matter over the copending subject matter.

This is a provisional nonstatutory double patenting rejection because the

patentably indistinct claims have not in fact been patented.

13. Claims 1-29 are provisionally rejected on the ground of nonstatutory double

patenting as being unpatentable over claims 1-16 of copending Application No.

17412623. Although the claims at issue are not identical, they are not patentably distinct

from each other because the copending application also teaches a liquid bendamustine

HCl composition from about 10-100 mg/mL or about 20-100 mg/mL or about 25 mg/mL,

polyethylene glycol and antioxidant with the same stability at 15 months (claims 1, 3-7)

where the antioxidant is thioglycerol, which his synonymous with monothioglycerol

(claim 2). A method of treating leukemia is taught (claims 8-16). The bendamustine has

not been reconstituted form a lyophilized powder, has same concentration range which

indicates that the composition is ready for dilution and contains one or more doses of

bendamustine.

EAGLEBEN-SA_00000130

Application/Control Number: 18/081,238                                                Page 40
Art Unit: 1613

The copending does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The copending does not expressly teach a step in the method of diluting with about 50 mL of diluent. However, the ordinary artisan understands that the concentrated solution needs dilution prior to administration and dilution with 50 mL is just an arbitrary amount to achieve the desired therapeutic concentration. The ordinary artisan can do so with a reasonable expectation of success.

The copending does not expressly teach intravenous administration but intravenous administration is a common method to administer liquid compositions well-known to the ordinary artisan.

The copending does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

Accordingly, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the copending subject matter.

This is a provisional nonstatutory double patenting rejection because the patentably indistinct claims have not in fact been patented.

14. Claims 1-29 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-16 of U.S. Patent No. 11103483. Although the claims at issue are not identical, they are not patentably distinct from each other because the

EAGLEBEN-SA_00000131

Application/Control Number: 18/081,238                                    Page 41
Art Unit: 1613

patent is directed to liquid bendamustine compositions (claims 1-7) and methods of

treating cancer (claims 8-16) such as leukemia (claim 9) where there is about 10-100

mg/mL or about 20-60 mg/mL or 25 mg/mL bendamustine, polyethylene glycol and a

stabilizing amount of thioglycerol (claims 1, 2 and 5-6) with the same stability over at

least 15 months (claims 1, 3-4, 12, 13). The bendamustine has not been reconstituted

form a lyophilized powder, has same concentration range which indicates that the

composition is ready for dilution and contains one or more doses of bendamustine.

The patent does not expressly teach a sterile vial. However, the ordinary artisan

in the pharmaceutical arts would place the bendamustine composition in a sterile vial to

avoid microbiological contamination, which would ruin the pharmaceutical product, with

a reasonable expectation of success.

The patent does not expressly teach about 100 mg of bendamustine. However, if

the concentration is 25 mg/mL (claims 6 and 15) then in 4 mL the artisan would have

100 mg bendamustine present with a reasonable expectation of success.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However,

the patent teaches a stabilizing amount of antioxidant monothioglycerol and it is merely

routine optimization to determine how much monothioglycerol (thioglycerol) to have to

achieve the desired stabilization by the ordinary artisan.

The patent does not expressly teach a step in the method of diluting with about

50 mL of diluent. However, the ordinary artisan understands that the concentrated

solution needs dilution prior to administration and dilution with 50 mL is just an arbitrary

amount to achieve the desired therapeutic concentration. The ordinary artisan can do so

with a reasonable expectation of success.

Application/Control Number: 18/081,238                                                     Page 42
Art Unit: 1613

The patent does not expressly teach intravenous administration but intravenous administration is a common method to administer liquid compositions well-known to the ordinary artisan.

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

Accordingly, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

15. Claims 1-29 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-9 of U.S. Patent No. 10052385. Although the claims at issue are not identical, they are not patentably distinct from each other because the patent is directed to methods of treating leukemia by parenterally administering liquid bendamustine compositions (claims 1-8) comprising bendamustine, polyethylene glycol, a parenterally acceptable diluent and an antioxidant monothioglycerol (claims 1 and 7).

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 25 mg/mL bendamustine. However, the patent teaches using a parenterally acceptable diluent to arrive at the concentration of bendamustine to administer in a total volume of 100 mL or less. The purpose of a diluent is to dilute a stock solution. Thus, having a stock solution of about 25 mg/mL to

EAGLEBEN-SA_00000133

Application/Control Number: 18/081,238                                    Page 43
Art Unit: 1613

be diluted with 50 mL diluent to achieve the desired therapeutic concentration prior to administration is merely the routine optimization by the ordinary artisan practicing the patented method.  Because about 25 mg/mL is obvious, then that renders obvious the claimed composition claims where, for example, a 4 mL volume would have 100 mg bendamustine. The bendamustine has not been reconstituted form a lyophilized powder, is within same concentration range which indicates that the composition is ready for dilution and contains one or more doses of bendamustine.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, it is merely judicious selection and routine optimization of the amount of monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating agent bendamustine by the ordinary artisan with a reasonable expectation of success.

The patent does not expressly the claimed stability at about 15 months at about 5-25 C or less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at about 5-25 C to determine the total impurities from the degradation of bendamustine at the period of time or temperatures instantly claimed. However, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

EAGLEBEN-SA_00000134

Application/Control Number: 18/081,238                                                    Page 44
Art Unit: 1613

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

16. Claims 1-29 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-10 of U.S. Patent No. 9597398 in view of Tait et al. (WO 0202125). Although the claims at issue are not identical, they are not patentably distinct from each other because the patent is directed to methods of treating cancer by parenterally administering liquid bendamustine compositions (claims 1-10) comprising bendamustine, polyethylene glycol, a parenterally acceptable diluent and an antioxidant with an administered volume of about 50 ml (claim 3).

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 25 mg/mL bendamustine. However, the patent teaches using a parenterally acceptable diluent to arrive at the concentration of bendamustine to administer in a total volume of 100 mL or less. The purpose of a diluent is to dilute a stock solution. Thus, having a stock solution of about 25 mg/mL to be diluted with 50 mL diluent to achieve the desired therapeutic concentration prior to administration is merely the routine optimization by the ordinary artisan practicing the patented method.  Because about 25 mg/mL is obvious, then that renders obvious the claimed composition claims where, for example, a 4 mL volume would have 100 mg bendamustine. The bendamustine has not been reconstituted form a lyophilized

EAGLEBEN-SA_00000135

Application/Control Number: 18/081,238                                    Page 45
Art Unit: 1613

powder, is within same concentration range which indicates that the composition is ready for dilution and contains one or more doses of bendamustine.

The patent does not expressly teach intravenous administration but intravenous administration is a common method to administer liquid compositions well-known to the ordinary artisan.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However, the patent teaches an antioxidant (claim 1) and Tait et al. teach stabilized injectable compositions of the nitrogen mustard alkylating agent ifosfamide (Abstract; page 1, line 7) comprising PEG200-600, ethanol (page 6, lines 16-24; page 9, lines 15-21; claims 4-6) and antioxidants such up to 5% monothioglycerol (page 9, lies 11-14; page 14, line 6) that are stable for at least 180 days (page 6, lines 25-26). Thus, it is merely judicious selection and routine optimization of the amount of monothioglycerol to achieve the desired stabilization of the nitrogen mustard alkylating agent bendamustine by the ordinary artisan with a reasonable expectation of success.

The patent does not expressly the claimed stability at about 15 months at about 5-25 C or less than about 5% peak area response of total impurities as determined using HPLC with a wavelength of 223 nm at least about 15 months at about 5-25 C to determine the total impurities from the degradation of bendamustine at the period of time or temperatures instantly claimed. However, such would be inherent in the composition comprising the same components. See MPEP 2112.01(II): "Products of identical chemical composition cannot have mutually exclusive properties." *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

Application/Control Number: 18/081,238                                    Page 46
Art Unit: 1613

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

17. Claims 1-29 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-18 of U.S. Patent No. 9572888 in view of Tait et al. (WO 0202125). Although the claims at issue are not identical, they are not patentably distinct from each other because the patent is directed to methods of treating leukemia by intravenously administering liquid bendamustine compositions (claims 1-28) comprising bendamustine, polyethylene glycol, a parenterally acceptable diluent and an antioxidant (claims 1 and 27) and an administered volume of about 50 ml (claim 7).

The patent does not expressly teach a sterile vial. However, the ordinary artisan in the pharmaceutical arts would place the bendamustine composition in a sterile vial to avoid microbiological contamination, which would ruin the pharmaceutical product, with a reasonable expectation of success.

The patent does not expressly teach about 25 mg/mL bendamustine. However, the patent teaches using a parenterally acceptable diluent to arrive at the concentration of bendamustine to administer in a total volume of 100 mL or less. The purpose of a diluent is to dilute a stock solution. Thus, having a stock solution of about 25 mg/mL to be diluted with 50 mL diluent to achieve the desired therapeutic concentration prior to administration is merely the routine optimization by the ordinary artisan practicing the

EAGLEBEN-SA_00000137

Application/Control Number: 18/081,238                                      Page 47
Art Unit: 1613

patented method.  Because about 25 mg/mL is obvious, then that renders obvious the

claimed composition claims where, for example, a 4 mL volume would have 100 mg

bendamustine. The bendamustine has not been reconstituted form a lyophilized

powder, is within same concentration range which indicates that the composition is

ready for dilution and contains one or more doses of bendamustine.

The patent does not expressly teach about 5 mg/mL monothioglycerol. However,

the patent teaches an antioxidant (claim 27) and Tait et al. teach stabilized injectable

compositions of the nitrogen mustard alkylating agent ifosfamide (Abstract; page 1, line

7) comprising PEG200-600, ethanol (page 6, lines 16-24; page 9, lines 15-21; claims 4-

6) and antioxidants such up to 5% monothioglycerol (page 9, lies 11-14; page 14, line 6)

that are stable for at least 180 days (page 6, lines 25-26). Thus, it is merely judicious

selection and routine optimization of the amount of monothioglycerol to achieve the

desired stabilization of the nitrogen mustard alkylating agent bendamustine by the

ordinary artisan with a reasonable expectation of success.

The patent does not expressly the claimed stability at about 15 months at about

5-25 C or less than about 5% peak area response of total impurities as determined

using HPLC with a wavelength of 223 nm at least about 15 months at about 5-25 C to

determine the total impurities from the degradation of bendamustine at the period of

time or temperatures instantly claimed. However, such would be inherent in the

composition comprising the same components. See MPEP 2112.01(II): "Products of

identical chemical composition cannot have mutually exclusive properties." *In re Spada*,

911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990)."

Application/Control Number: 18/081,238                                              Page 48
Art Unit: 1613

The patent does not expressly teach adding ethanol. However, ethanol is a well-known pharmaceutical solvent in which bendamustine is soluble. The artisan would add ethanol to assist in solubilizing bendamustine in polyethylene glycol with a reasonable expectation of success.

Therefore, the ordinary artisan would have recognized the obvious variation of the instantly claimed subject matter over the patented subject matter.

### *Conclusion*

No claims are allowed.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to ERNST V ARNOLD whose telephone number is (571)272-8509. The examiner can normally be reached M-F 7-3:30.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Brian Y Kwon can be reached on 571-272-0581. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of published or unpublished applications may be obtained from Patent Center. Unpublished application information in Patent Center is available to registered users. To file and manage patent submissions in Patent Center, visit: https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-center for more information about Patent Center and

EAGLEBEN-SA_00000139

Application/Control Number: 18/081,238                                    Page 49
Art Unit: 1613

https://www.uspto.gov/patents/docx for information about filing in DOCX format. For

additional questions, contact the Electronic Business Center (EBC) at 866-217-9197

(toll-free). If you would like assistance from a USPTO Customer Service

Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/ERNST V ARNOLD/
Primary Examiner, Art Unit 1613

EAGLEBEN-SA_00000140

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 18/081,238 | Palepu et al. |
| | **Examiner** | **Art Unit** |
| | ERNST V ARNOLD | 1613 |

**CPC - Searched\***

| Symbol | Date | Examiner |
|---|---|---|
| (A61K31/4184 OR A61K9/08 OR A61K47/10 OR A61K47/12 OR A61K47/18 OR A61K47/20 OR A61K47/22 OR A61K9/0019).cpc. AND ((bendamustine OR (nitrogen ADJ mustard) OR (alkylating WITH agent)) AND antioxidant AND (PEG OR (polyalkylene ADJ glycol) OR (polyethylene ADJ glycol))) | 03/13/2023 | eva |

**CPC Combination Sets - Searched\***

| Symbol | Date | Examiner |
|---|---|---|
| | | |

**US Classification - Searched\***

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |

\* See search history printout included with this form or the SEARCH NOTES box below to determine the scope of the search.

**Search Notes**

| Search Notes | Date | Examiner |
|---|---|---|
| inventor/assignee name PALM/PE2E | 03/13/2023 | eva |
| PE2E | 03/13/2023 | eva |
| GOOGLE | 03/13/2023 | eva |

**Interference Search**

| US Class/CPC Symbol | US Subclass/CPC Group | Date | Examiner |
|---|---|---|---|
| | | | |

| | |
|---|---|
| | |

EAGLEBEN-SA_00000141

# Bibliographic Data

Application No:    18/081,238

Foreign Priority claimed:         ○ Yes    ● No

35 USC 119 (a-d) conditions met:    ☐ Yes    ☑ No         ☐ Met After Allowance

Verified and Acknowledged:    /ERNST V ARNOLD/

Examiner's Signature         Initials

Title:    FORMULATIONS OF BENDAMUSTINE

| FILING or 371(c) DATE | CLASS | GROUP ART UNIT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 12/14/2022 | 514 | 1613 | 107071.000582 |
| RULE | | | |

## APPLICANTS

Eagle Pharmaceuticals, Inc.,

## INVENTORS

Nagesh R. Palepu, Southampton, PA, UNITED STATES

Philip Christopher Buxton, Denham, Uxbridge,

## CONTINUING DATA

This application is a CON of 17412623 08/26/2021

17412623 is a CON of 16509920 07/12/2019 PAT 11103483

16509920 is a CON of 16015656 06/22/2018ABN

16015656 is a CON of 15432335 02/14/2017 PAT 10010533

15432335 is a CON of 15013436 02/02/2016 PAT 9572797

15013436 is a CON of 14031879 09/19/2013 PAT 9265831

14031879 is a CON of 13016473 01/28/2011 PAT 8609707

13016473 has PRO of 61299100 01/28/2010

## FOREIGN APPLICATIONS

## IF REQUIRED, FOREIGN LICENSE GRANTED**

01/05/2023

## STATE OR COUNTRY

UNITED STATES

## ADDRESS

BakerHostetler

1735 Market Street

Suite 3300

Philadelphia, PA 19103-7501

EAGLEBEN-SA_00000142

UNITED STATES

**FILING FEE RECEIVED**

$7,540

EAGLEBEN-SA_00000143

3/13/23, 4:34 PM
bendamustine polyethylene glycol antioxidant - Google Search
Case 1:24-cv-00065-JLH    Document 427-1    Filed 07/01/26    Page 145 of 573 PageID #: 19596



EAGLEBEN-SA_00000144

3/13/23, 4:34 PM
Case 1:24-cv-00065-JLH    Document 427-1    Filed 07/01/26 — Page 146 of 573 PageID
#: 19597
bendamustine polyethylene glycol antioxidant - Google Search

**Banner Health**
https://www.bannerhealth.com › patients-visitors XLS

## Sheet1 - Banner Health

Jan 1, 1997 — ... 250, PHARMACY HOSPITAL, 6859227, BENDAMUSTINE HCL BENDEKA/1MG
INJ, 63.80 ... 250, PHARMACY HOSPITAL, 6818173, POLYETHYLENE GLYCOL 3350 17GM PWD,...

**googleapis.com**
https://patentimages.storage.googleapis.com › ... PDF

## WO 2009/132050 A2

Oct 29, 2009 — described herein comprise antioxidants that are non-irritating and/or non-toxic to
... acetate copolymer (S-630), polyethylene glycol e.g., the polyethylene.

**ndclist.com**
https://ndclist.com › active-ingredients

## NDC Active Ingredients Index

Apr 3, 1999 — It exhibits antioxidant activity by virtue of the phenolic hydrogen on the ... Ethylene
glycol is the most important glycol commercially available and is ...

**Goethe-Universität Frankfurt**
https://www.uni-frankfurt.de › ... PDF

## Fachbereich Medizin - Goethe-Universität Frankfurt

Jun 15, 2003 — bovine seminal ribonuclease to polyethylene glycol chains increases its
systemic efficacy in ... In vitro studies with bendamustine: Enhanced activity in.

**greengazette.co.za**
https://www.greengazette.co.za › documents › p... PDF

## Patent Journal No 9 of 01-Sep-2008, Volume 41 (Part 2 of 2)

Sep 1, 2008 — lary useful for the production of polyethylene glycol with molecular ... 57: The
invention relates to a method of extracting antioxidants,.

**徳島大学**
http://pub2.db.tokushima-u.ac.jp › person › work-ja

## 徳島大学 / 教育研究者総覧 — 安倍 正博

Dec 15, 2006 — Development of a novel antioxidant based on a dimeric dihydroisocoumarin
derivative, ... オキサリプラチン封入PEG修飾リポソームの悪性リンパ腫治療への展開,

*In order to show you the most relevant results, we have omitted some entries very similar to
the 12 already displayed.*
*If you like, you can repeat the search with the omitted results included.*

22314, Alexandria, VA - From your IP address - Update location

Help    Send feedback    Privacy    Terms

EAGLEBEN-SA_00000145

## PE2E SEARCH - Search History (Prior Art)

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | British Equivalents | Time Stamp |
|---|---|---|---|---|---|---|---|
| L1 | 5 | "2011019363".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/04 09:21 AM |
| L2 | 3 | "20110019363".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/04 09:21 AM |
| L3 | 4 | "4879286".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/04 09:22 AM |
| L4 | 4 | "2002002125".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/04 09:22 AM |
| L5 | 398 | "159289" | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/04 09:23 AM |
| L6 | 2 | "20130210878".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/04 09:31 AM |
| L7 | 2 | "20110184036".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/04 09:36 AM |
| L8 | 4 | "11103483".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/07 10:56 AM |
| L9 | 2 | "9572797".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/07 10:57 AM |
| L10 | 8 | "10110533".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/07 10:58 AM |
| L11 | 8 | "10010533".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/07 10:58 AM |
| L12 | 4 | "11103483".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/07 10:59 AM |
| L13 | 2 | "9265831".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/07 10:59 AM |
| L14 | 5 | "8609707".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/07 11:00 AM |
| L15 | 2 | "20110190363".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/07 11:22 AM |
| L16 | 0 | "8609707".pn. AND (intravenous OR | (US-PGPUB; USPAT; USOCR; FPRS; EPO; | OR | ON | ON | 2023/03/08 09:56 AM |

EAGLEBEN-SA_00000146

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | intravenously) | JPO; DERWENT) | | | | |
| L17 | 0 | "9265831".pn. AND (intravenous OR intravenously) | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/08 09:57 AM |
| L18 | 1 | "9572797".pn. AND (intravenous OR intravenously) | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/08 09:57 AM |
| L19 | 1 | "10010533".pn. AND (intravenous OR intravenously) | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/08 09:58 AM |
| L20 | 1 | "11103483".pn. AND (intravenous OR intravenously) | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/08 09:58 AM |
| L21 | 0 | "20210393594" .pn. AND (intravenous OR intravenously) | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/08 09:59 AM |
| L22 | 2 | "20210393594" .pn. AND ((intravenous OR intravenously) OR bendamustine) | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/08 10:00 AM |
| L23 | 1 | "8609707".pn. AND (vial WITH (sterile OR sterilized)) | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/08 10:14 AM |
| L24 | 3941 | (A61K31/4184 OR A61K9/08 OR A61K47/10 OR A61K47/12 OR A61K47/18 OR A61K47/20 OR A61K47/22 OR A61K9/0019).cpc. AND ((bendamustine OR (nitrogen ADJ mustard) OR (alkylating WITH agent)) AND antioxidant AND (PEG OR (polyalkylene ADJ glycol) OR (polyethylene ADJ glycol))) | (US-PGPUB; USPAT; FPRS; EPO; JPO; DERWENT; IBM_TDB) | OR | ON | ON | 2023/03/09 06:34 AM |
| L25 | 632 | L24 AND @ad<"20100128" | (US-PGPUB; USPAT; FPRS; EPO; JPO; DERWENT; IBM_TDB) | OR | ON | ON | 2023/03/09 06:56 AM |
| L26 | 5 | L25 AND ((bendamustine OR (nitrogen ADJ mustard) OR (alkylating WITH agent)) AND antioxidant AND (PEG OR (polyalkylene ADJ glycol) OR (polyethylene ADJ glycol))).clm. | (US-PGPUB; USPAT; FPRS; EPO; JPO; DERWENT; IBM_TDB) | OR | ON | ON | 2023/03/09 06:56 AM |

EAGLEBEN-SA_00000147

| L27 | 41 | (((palepu WITH nagesh) OR (buxton WITH philip)).in. OR eagle.as.) AND ((bendamustine OR (nitrogen ADJ mustard) OR (alkylating WITH agent)) AND antioxidant AND (PEG OR (polyalkylene ADJ glycol) OR (polyethylene ADJ glycol))).clm. | (US-PGPUB; USPAT; FPRS; EPO; JPO; DERWENT; IBM_TDB) | OR | ON | ON | 2023/03/09 10:54 AM |
| L28 | 11 | (((palepu WITH nagesh) OR (buxton WITH philip)).in. OR eagle.as.) AND ((bendamustine OR (nitrogen ADJ mustard) OR (alkylating WITH agent)) AND antioxidant AND (PEG OR (polyalkylene ADJ glycol) OR (polyethylene ADJ glycol))).clm. | (US-PGPUB) | OR | ON | ON | 2023/03/09 10:56 AM |
| L29 | 15 | (((palepu WITH nagesh) OR (buxton WITH philip)).in. OR eagle.as.) AND ((bendamustine OR (nitrogen ADJ mustard) OR (alkylating WITH agent)) AND antioxidant AND (PEG OR (polyalkylene ADJ glycol) OR (polyethylene ADJ glycol))).clm. | (USPAT) | OR | ON | ON | 2023/03/09 10:56 AM |

## PE2E SEARCH – Search History (Interference)

There are no Interference searches to show.

EAGLEBEN-SA_00000148

Doc code: IDS                                                                          PTO/SB/08a (02-18)
Doc description: Information Disclosure Statement (IDS) Filed          Approved for use through 11/30/2020. OMB 0651-0031
                                                                      U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
                Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| | |
|---|---|
| | **Application Number** 18/081,238 - GAU: 1613 |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99**) | **Filing Date** 2022-12-14 |
| | **First Named Inventor** Nagesh R. Palepu |
| | **Art Unit** 18/081,238 - GAU: 1613 |
| | **Examiner Name** /ERNST V ARNOLD/ |
| | **Attorney Docket Number** 107071.000582 |

| U.S.PATENTS | | | | | |
|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | 4071620 | | 1978-01-31 | SKLAR STANLEY | |
| | 2 | 4711906 | | 1987-12-08 | VON et al. | |
| | 3 | 4879286 | | 1989-11-07 | ALAM et al. | |
| | 4 | 5204335 | A | 1993-04-20 | SAUERBIER et al. | |
| | 5 | 5223515 | A | 1993-06-29 | MIKURA et al. | |
| | 6 | 5741523 | A | 1998-04-21 | TEAGARDEN et al. | |
| | 7 | 7252799 | B2 | 2007-08-07 | MIEKKA et al. | |
| | 8 | 7772274 | B1 | 2010-08-10 | PALEPU NAGESH | |

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000149

Receipt date: 12/14/2022 18/081,238 - GAU: 1613

| | | INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|---|---|

**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**
( Not for submission under 37 CFR 1.99)

| Application Number | 18081238 |
|---|---|
| Filing Date | 2022-12-14 |
| First Named Inventor | Nagesh R. Palepu |
| Art Unit | |
| Examiner Name | |
| Attorney Docket  Number | 107071.000582 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 9 | 8076366 | B2 | 2011-12-13 | COURVOISIER et al. | |
| 10 | 8344006 | B2 | 2013-01-01 | DRAGER et al. | |
| 11 | 8389558 | B2 | 2013-03-05 | ALAKHOV et al. | |
| 12 | 8609707 | B2 | 2013-12-17 | PALEPU et al. | |
| 13 | 8791270 | | 2014-07-29 | BRITTAIN et al. | |
| 14 | 9000021 | B2 | 2015-04-07 | SUNDARAM et al. | |
| 15 | 9034908 | B2 | 2015-05-19 | SUNDARAM SRIKANTH | |
| 16 | 9144568 | B1 | 2015-09-29 | SUNDARAM SRIKANTH | |
| 17 | 9265831 | B2 | 2016-02-23 | PALEPU et al. | |
| 18 | 9572796 | | 2017-02-21 | PALEPU et al. | |
| 19 | 9572797 | | 2017-02-21 | PALEPU et al. | |

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000150

Case 1:24-cv-00065-JLH    Document 427-1    Filed 07/01/26    Page 152 of 573 PageID #: 19603

| | | | | Application Number | | |
|---|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | | | Filing Date | 2022-12-14 | |
| | | | | First Named Inventor | Nagesh R. Palepu | |
| | | | | Art Unit | | |
| | | | | Examiner Name | | |
| | | | | Attorney Docket  Number | 107071.000582 | |

| | 20 | 9572887 | | 2017-02-21 | SUNDARAM SRIKANTH | |
|---|---|---|---|---|---|---|
| | 21 | 9572888 | | 2017-02-21 | SUNDARAM SRIKANTH | |
| | 22 | 9579384 | | 2017-02-28 | SUNDARAM et al. | |
| | 23 | 9597397 | | 2017-03-21 | SUNDARAM SRIKANTH | |
| | 24 | 9597398 | | 2017-03-21 | SUNDARAM SRIKANTH | |
| | 25 | 9597399 | | 2017-03-21 | SUNDARAM SRIKANTH | |
| | 26 | 10010533 | B2 | 2018-07-03 | PALEPU et al. | |

If you wish to add additional U.S. Patent citation information please click the Add button.

### U.S.PATENT APPLICATION PUBLICATIONS

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 20020102215 | A1 | 2002-08-01 | KLAVENESS et al. | |
| | 2 | 20020122768 | A1 | 2002-09-05 | LIU et al. | |

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000151

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 18081238 |
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 107071.000582 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 3 | 20040014964 | A1 | 2004-01-22 | CHEESMAN et al. | |
| | 4 | 20040043069 | A1 | 2004-03-04 | VANDERBIST et al. | |
| | 5 | 20050025702 | A1 | 2005-02-03 | DECICCO et al. | |
| | 6 | 20050042285 | A1 | 2005-02-24 | UKAI et al. | |
| | 7 | 20060035945 | A1 | 2006-02-16 | ATTARDO et al. | |
| | 8 | 20060128777 | A1 | 2006-06-15 | BENDALL et al. | |
| | 9 | 20060159713 | A1 | 2006-07-20 | BRITTAIN et al. | |
| | 10 | 20060205694 | A1 | 2006-09-14 | ALONSO et al. | |
| | 11 | 20070116729 | A1 | 2007-05-24 | PALEPU NAGESWARA R | |
| | 12 | 20080118544 | A1 | 2008-05-22 | WANG LIXIAO | |
| | 13 | 20090082416 | A1 | 2009-03-26 | CZARNIK ANTHONY W | |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000152

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2022-12-14 | |
| First Named Inventor | Nagesh R. Palepu | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 107071.000582 | |

| | | | | | |
|---|---|---|---|---|---|
| 14 | 20090209606 | A1 | 2009-08-20 | BENDALL et al. | |
| 15 | 20090264488 | A1 | 2009-10-22 | COOPER et al. | |
| 16 | 20090325978 | A1 | 2009-12-31 | ONAI et al. | |
| 17 | 20100092474 | A1 | 2010-04-15 | GALLAGHER et al. | |
| 18 | 20100145266 | A1 | 2010-06-10 | ORLOWSKI MICHAEL | |
| 19 | 20100216858 | A1 | 2010-08-26 | POPEK et al. | |
| 20 | 20100247669 | A1 | 2010-09-30 | ELIASOF et al. | |
| 21 | 20100273730 | A1 | 2010-10-28 | HSU et al. | |
| 22 | 20110015244 | A1 | 2011-01-20 | ALAKHOV et al. | |
| 23 | 20110015245 | A1 | 2011-01-20 | ALAKHOV et al. | |
| 24 | 20110184036 | A1 | 2011-07-28 | PALEPU et al. | |

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000153

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 18/081,238 |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 107071.000582 |

| | 25 | 20110190363 | A1 | 2011-08-04 | DRAGER et al. | |
|---|---|---|---|---|---|---|
| | 26 | 20120059000 | A1 | 2012-03-08 | REN et al. | |
| | 27 | 20120071532 | A1 | 2012-03-22 | COOPER et al. | |
| | 28 | 20120157505 | A1 | 2012-06-21 | LABELL et al. | |
| | 29 | 20120308516 | A1 | 2012-12-06 | HLAVINKA et al. | |
| | 30 | 20130041003 | A1 | 2013-02-14 | BRITTAIN et al. | |
| | 31 | 20130041004 | A1 | 2013-02-14 | DRAGER et al. | |
| | 32 | 20130210878 | A1 | 2013-08-15 | SOPPIMATH et al. | |
| | 33 | 20130210879 | A1 | 2013-08-15 | PALEPU et al. | |
| | 34 | 20130217888 | A1 | 2013-08-22 | SHRAWAT et al. | |
| | 35 | 20130253025 | A1 | 2013-09-26 | SUNDARAM SRIKANTH | |

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000154

| | | | | Application Number | | 18/081,238 |
|---|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | | | Filing Date | | 2022-12-14 |
| | | | | First Named Inventor | | Nagesh R. Palepu |
| | | | | Art Unit | | |
| | | | | Examiner Name | | |
| | | | | Attorney Docket  Number | | 107071.000582 |

| | 36 | 20140094496 | A1 | 2014-04-03 | SUNDARAM SRIKANTH | |
|---|---|---|---|---|---|---|
| | 37 | 20140275196 | A1 | 2014-09-18 | SUNDARAM SRIKANTH | |
| | 38 | 20180000789 | A1 | 2018-01-04 | PALEPU et al. | |
| | 39 | 20180000938 | A1 | 2018-01-04 | SUNDARAM SRIKANTH | |
| | 40 | 20180185488 | A1 | 2018-07-05 | SUNDARAM SRIKANTH | |
| | 41 | 20180296535 | A1 | 2018-10-18 | PALEPU et al. | |
| | 42 | 20180296536 | A1 | 2018-10-18 | PALEPU et al. | |
| | 43 | 20180369383 | A1 | 2018-12-27 | SUNDARAM SRIKANTH | |
| | 44 | 20190192659 | A1 | 2019-06-27 | SUNDARAM SRIKANTH | |

If you wish to add additional U.S. Published Application citation information please click the Add button.

**FOREIGN PATENT DOCUMENTS**

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000155

| | | INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) |
|---|---|---|

| Application Number | 18081238 |
|---|---|
| Filing Date | 2022-12-14 |
| First Named Inventor | Nagesh R. Palepu |
| Art Unit | |
| Examiner Name | |
| Attorney Docket Number | 107071.000582 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | 1850048 | CN | A | 2006-10-25 | SHANDONG LANJIN BIOENGINEERING | English Abstract Submitted | ☐ |
| 2 | 101584668 | CN | A | 2009-11-25 | JIANGSU AOSAIKANG PHARMACEUTIC | English Abstract Submitted | ☐ |
| 3 | 102164579 | CN | A | 2011-08-24 | CEPHALON INC | English Abstract Submitted | ☐ |
| 4 | 80967 | DD | A | 1970-01-19 | RICHTER | | ☐ |
| 5 | 159289 | DD | A1 | 1983-03-02 | OLTHOFF UWE | | ☐ |
| 6 | 09-508128 | JP | A | 1997-08-19 | PROCTER & GAMBLE | | ☐ |
| 7 | 2005-537285 | JP | A | 2005-12-08 | WYETH CORP | Corresponds to US 20040167152 A1 | ☐ |
| 8 | 2008-526991 | JP | A | 2008-07-24 | CEPHALON INC | Corresponds to US 20060159713 A1 | ☐ |
| 9 | 2012-503666 | JP | A | 2012-02-09 | CEPHALON INC | Corresponds to US 20110190363 A1 | ☐ |
| 10 | 2012-525387 | JP | A | 2012-10-22 | LABELL RACHEL Y | Corresponds to US 20120157505 A1 | ☐ |
| 11 | 2015-501814 | JP | A | 2015-01-19 | CHEN YAN | Corresponds to US 20130177572 A1 | ☐ |

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000156

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | Application Number | | | | | |
| | | | Filing Date | | 2022-12-14 | | | |
| | | | First Named Inventor | | Nagesh R. Palepu | | | |
| | | | Art Unit | | | | | |
| | | | Examiner Name | | | | | |
| | | | Attorney Docket  Number | | 107071.000582 | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 12 | 99/01118 | WO | A2 | 1999-01-14 | ATHEROGENICS INC | | ☐ |
| 13 | 2001/097860 | WO | | 2001-12-27 | DU PONT PHARM CO | | ☐ |
| 14 | 2001/097861 | WO | | 2001-12-27 | DU PONT PHARM CO | | ☐ |
| 15 | 2001/098294 | WO | | 2001-12-27 | DU PONT PHARM CO | | ☐ |
| 16 | 02/02125 | WO | A1 | 2002-01-10 | YE YUERONG | | ☐ |
| 17 | 2006/054315 | WO | A1 | 2006-05-26 | VENUS REMEDIES LTD | | ☐ |
| 18 | 2006/110551 | WO | A2 | 2006-10-19 | AMYLIN PHARMACEUTICALS INC | | ☐ |
| 19 | 2010/036702 | WO | A1 | 2010-04-01 | PATEL PIYUSH R | | ☐ |
| 20 | 2010/126676 | WO | A1 | 2010-11-04 | PATEL PIYUSH R | | ☐ |
| 21 | 2010/148288 | WO | A2 | 2010-12-23 | ANDERSON DAVID M | | ☐ |
| 22 | 2011/094565 | WO | A1 | 2011-08-04 | BUXTON PHILIP CHRISTOPHER | | ☐ |

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000157

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 107071.000582 |

| | 23 | 2011/103150 | WO | A2 | 2011-08-25 | CEPHALON INC | | ☐ |
|---|---|---|---|---|---|---|---|---|
| | 24 | 2012/015810 | WO | A2 | 2012-02-02 | BUXTON PHILIP CHRISTOPHER | | ☐ |
| | 25 | 2013/142358 | WO | A1 | 2013-09-26 | EAGLE PHARMACEUTICALS INC | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button

## NON-PATENT LITERATURE DOCUMENTS

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|
| | 1 | "Draft Note for Guidance on Excipients, Antioxidants and Antimicrobial Preservatives In the Dossier for Application for Marketing Authorisation of Medicinal Product", EMEA, 2003, pp. 1-10. | ☐ |
| | 2 | American Heart Association, "Living With Heart Failure" (https://www.heart.org/idc/groups/heart-public/@wcm/@hcm/@gwtg/documents/downloadable/ucm_309068.pdf) (2001) | ☐ |
| | 3 | American Society of Hospital Pharmacists. ASHP Technical Assistance Bulletin On Hospital Distribution and Control. Am J. Hosp. Pharm. 1980, 37:1097-103 | ☐ |
| | 4 | Armstrong et al., Separation of Drug Stereoisomers by the Formation of...beta-Cyclodextrin Inclusion Complexes, Science, vol. 232, pp 1132-1135, 30 May 1986. | ☐ |
| | 5 | Baldi et al., Statistical Procedures for Optimizing the Freeze-Drying of a Model Drug in Tert-Butyl Alcohol: Water Mixtures, Eur. J. of Pharm. & Biopharm. 40(3):138-41 (1994) | ☐ |
| | 6 | Bergsagel et al., Effect of cyclophosphamide on Advanced Lung Cancer and the Hematological Toxicity of Large, Intermittent Intravenous Doses, Canad. Med. Ass. J., 98, 532-538 (1968) | ☐ |

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000158

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT

( Not for submission under 37 CFR 1.99)

| Application Number | |
|---|---|
| Filing Date | 2022-12-14 |
| First Named Inventor | Nagesh R. Palepu |
| Art Unit | |
| Examiner Name | |
| Attorney Docket  Number | 107071.000582 |

| | | | |
|---|---|---|---|
| | 7 | Bernard TESTA, et al., Hydrolysis in Drug and Prodrug Metabolism, pp. 681-684. | ☐ |
| | 8 | Biewenga et al. "The Pharmacology of the Antioxidant Lipoic Acid," Gen. Pharmac., 1997, 29, 3, 315-331 | ☐ |
| | 9 | Boylan et al., Parenteral Products, Chapter 12 in Banker, et al., Modern Pharmaceutics, Fourth Ed. (2002) | ☐ |
| | 10 | Brigitte C. Scott, et al., Lipoic and Dihydrolipoic Acids..., Free Rad. Res., Vol. 20, No. 2, pp. 119-133, 1994 | ☐ |
| | 11 | Broadhead, Pharmaceutical Preformulation and Formulation, Chapter 9 in "Parenteral Dosage Forms," (Interpharm) 2001 | ☐ |
| | 12 | Canadian Society of Hospital Pharmacists: Guidelines for Drug-Use Control, 2008 | ☐ |
| | 13 | Center for Drug Evaluation and Research, Andrew Dmytrijuk, FDA Medical Review for the Approval of Bendeka (2015) | ☐ |
| | 14 | Cephalon, Inc., et al., v. Slayback Pharma Limited Liability Company- Civil Action No. 1:17-cv-01154: Joint Status Report (Document 164), dated 10/19/18. | ☐ |
| | 15 | Cerhalon, Inc, et al. v. Slayback Pharma Limited Liability Company- Civil Action No. 1:17-cv-01154: Complaint (Document 1), dated 08/16/17. | ☐ |
| | 16 | Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al. - Civil Action No. 1:17-cv-01154: Answer to Slayback Pharma Limited Liability Company's Counterclaims (Document 56), dated 03/05/18. | ☐ |
| | 17 | Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al. - Civil Action No. 1:17-cv-01154: Joint Claim Construction Chart (Document 94), dated 07/24/18. | ☐ |

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000159

| | | Application Number | |
|---|---|---|---|
| | | Filing Date | 2022-12-14 |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | First Named Inventor | Nagesh R. Palepu |
| | | Art Unit | |
| | | Examiner Name | |
| | | Attorney Docket Number | 107071.000582 |

| | | | |
|---|---|---|---|
| | 18 | Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.- Civil Action No. 1:17-cv-01154: Answer to Apotex Inc. and Apotex Corp.'s Counterclaims (Document 22), dated 12/18/17. | ☐ |
| | 19 | Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.- Civil Action No. 1:17-cv-01154: Answer to Slayback Pharma Limited Liability Company's Counterclaims, dated 10/20/17. | ☐ |
| | 20 | Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company- Civil Action No. 1:17-cv-00154: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint and Counterclaims (Document 11), dated 09/29/17. | ☐ |
| | 21 | Charles P. CARPENTER, et al., "A Study of the Polyethylene Glycols as Vehicles..., Journal of the American Pharmaceutical Association, Vol. XII, No. 1 | ☐ |
| | 22 | Cheson et al., Bendamustine: Rebirth of an Old Drug, J. Clin. Oncol. 27,1492-1501 (2009) | ☐ |
| | 23 | Cheung et al., Safety and Pharmacokinetics of Bendamustine Rapid-Infusion Formulation, J. of Clinical Pharmacology 2017.00(0)1-11 | ☐ |
| | 24 | Chu et al., Common Chemotherapy Regimens in Clinical Practice, Physicians' Cancer Chemotherapy Drug Manual 2009 | ☐ |
| | 25 | Cyclobond(Registered) Handbook, A Guide to Using Cyclodextrin Bonded Phases for Chiral LC Separations, 6th ed., 2002, Advanced Separation Technologies, Inc., pp 1-58, pp 42-45. | ☐ |
| | 26 | Derry E. WILMAN, Application of 15N Nuclear Magnetic Resonance..., J. Med. Chem., Vol. 38, pp. 2256-2258, 1995 | ☐ |
| | 27 | E. SANTACESARIA, et al., Thermal Stability of Nonionic Polyoxyalkylene..., Journal of Applied Polymer Science, Vol. 42, pp. 2053-2061, 1991 | ☐ |
| | 28 | Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC- Civil Action No. 1:18-cv-01459: Answer to Slayback Pharma LLC's Counterclaims (Document 13), dated 10/31/18. | ☐ |

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000160

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 18/081,238 |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 107071.000582 |

| | | | |
|---|---|---|---|
| | 29 | Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC- Civil Action No. 1:18-cv-01459: Complaint (Document 1), dated 09/20/18. | ☐ |
| | 30 | Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC- Civil Action No. 1:18-cv-01459: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses, and Counterclaims (Document 9), dated 10/10/18. | ☐ |
| | 31 | Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC- Civil Action No. 1:18-cv-01953: Answer to Slayback Pharma LLC's Counterclaims (Document 12), dated 01/03/19. | ☐ |
| | 32 | Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC- Civil Action No. 1:18-cv-01953: Complaint (Document 1), dated 12/11/18. | ☐ |
| | 33 | Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC- Civil Action No. 1:18-cv-01953: Defendant Slayback Pharma .imited Liability Company's Answer to Complaint, Additional Defenses, and Counterclaims(Document 11), public version dated 12/20/18. | ☐ |
| | 34 | Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC- Civil Action No. 1:18-cv-01953: Eagle Pharmaceuticals' Opposition to Slayback Pharma's Motion for Judgment on the Pleadings (Document 23), redacted-public version dated 02/12/19. | ☐ |
| | 35 | Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC- Civil Action No. 1:18-cv-01953: Opening Brief in Support of Slayback Pharma Limited Liability Company's Motion for Judgment on the Pleadings (Document 17), public version dated 01/11/19. | ☐ |
| | 36 | Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC- Civil Action No. 1:18-cv-01953: Reply Brief in Further Support of Slayback Pharma Limited Liability Company's Motion for Judgment on the Pleadings (Document 27), public verison dated 03/01/19. | ☐ |
| | 37 | Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc - Civil Action No. 1:18-cv-01074: Exhibit Index-Includes Confidential Information (Document 21), public version dated 09/07/18. | ☐ |
| | 38 | Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc- Civil Action No. 1:18-cv-01074: Complaint (Document 1), dated 07/19/18. | ☐ |
| | 39 | Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc- Civil Action No. 1:18-cv-01074: Defendant Hospira, Inc's Motion to Dismiss (Document 13), dated 08/31/18. | ☐ |

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000161

| | | Application Number | 18/081,238 |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | Filing Date | 2022-12-14 |
| | | First Named Inventor | Nagesh R. Palepu |
| | | Art Unit | |
| | | Examiner Name | |
| | | Attorney Docket  Number | 107071.000582 |

| | | | |
|---|---|---|---|
| | 40 | Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc- Civil Action No. 1:18-cv-01074: Hospira's Reply Brief in Support of its Motion to Dismiss Plaintiffs' Complaint (Document 29), public version dated 11/26/18. | ☐ |
| | 41 | Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc- Civil Action No. 1:18-cv-01074: Hospira, Inc's Brief in Support of its rule 12(b)(6) Motion to Dismiss Plaintiffs' Complain (Document 20), public version dated 09/07/18. | ☐ |
| | 42 | Eagle Pharmaceuticals, Inc., et al. v. Hospira, Inc- Civil Action No. 1:18-cv-01074: Plaintiffs' Opposition to Motion to Dismiss (Document 26), redacted-public version dated 11/02/18. | ☐ |
| | 43 | EC Safety Data Sheet: Ribomustin(Registered) 2007 | ☐ |
| | 44 | Eric WATSON, et al., Kinetics of Phosphoramide Mustard..., Journal of Pharmaceutical Sciences, Vol. 74, No. 12, pp. 1283-1292, 1985 | ☐ |
| | 45 | Eugene C. Corbett, Jr., Intravenous Fluids: It's More Than Just 'Fill 'Er Up!', Series #52 PRACTICAL GASTROENTEROLOGY 44-60 (2007) | ☐ |
| | 46 | Excipient-Drug Interactions in Parenteral Formulations', Akers et. al., Journal of Pharmaceutical Sciences, volume 91, issue 11, pages 2283 - 2300, November 2002 | ☐ |
| | 47 | Flamberg et al., Low Temperature Vacuum Drying of Sterile Parenterals From Ethanol, Bulletin of the Parenteral Drug Association, 24(5):209-17 (1970) | ☐ |
| | 48 | Floss et al., Intravenous fluids principles of treatment, Clinical Pharmacist, 3:274-283 (Oct 2011) | ☐ |
| | 49 | Friedberg et al., Bendamustine in Patients with Rituximab-Refractory Indolent and Transformed Non-Hodgkin's Lymphoma: Results from a Phase II Multicenter, Single-Agent Study, J. Clin. Oncol., 26(2):204-210 (2008) | ☐ |
| | 50 | Fujisawa Deutschland GmbH Ribomustin(Registered) Products and Technical Specifications | ☐ |

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000162

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 107071.000582 |

| If you wish to add additional non-patent literature document citation information please click the Add button | | | |
|---|---|---|---|
| **EXAMINER SIGNATURE** | | | |
| Examiner Signature | /ERNST V ARNOLD/ | Date Considered | 03/13/2023 |
| *EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through a citation if not in conformance and not considered.  Include copy of this form with next communication to applicant. | | | |

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [5] Applicant is to place a check mark here if English language translation is attached.

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000163

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 107071.000582 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

☐ That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

☐ See attached certification statement.

☐ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

## SIGNATURE

 A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Stephanie A. Lodise/ | Date (YYYY-MM-DD) | 2022-12-14 |
|---|---|---|---|
| Name/Print | Stephanie Lodise | Registration Number | 51430 |

This collection of information is required by 37 CFR 1.97 and 1.98.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000164

Receipt date: 12/14/2022                                                                18/081,238 - GAU: 1613

**Privacy Act Statement**

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000165

Case 1:24-cv-00065-JLH     Document 427-1     Filed 07/01/26     Page 167 of 573 PageID #: 19618

## Inventor Information for 18/081238

| Inventor Name | City | State/Country |
|---|---|---|
| PALEPU, NAGESH R. | SOUTHAMPTON | PENNSYLVANIA |
| BUXTON, PHILIP CHRISTOPHER | DENHAM | GB |

Appln Info   Contents   Petition Info   Atty/Agent Info   Continuity Data   Foreign Data   **Inventors**   Applicants   Address   Fees   Post Info   Pre Gra

**Search Another: Application #** [ ] Search **or Patent #** [ ] Search **or International Registration #** [ ] Search

**PCT /** [ ] / [ ] Search **or PG PUBS #** [ ] Search

**Attorney Docket #** [ ] Search

**Bar Code #** [ ] Search

To Go BACK Use BACK Button on Your BROWSER Tool Bar
Back to   PALM | ASSIGNMENT | OASIS | Home page

EAGLEBEN-SA_00000166

Doc code: IDS                                                                     PTO/SB/08a (02-18)
Doc description: Information Disclosure Statement (IDS) Filed                       Approved for use through 11/30/2020. OMB 0651-0031
                                                                                  U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 107071.000582 |

| U.S.PATENTS | | | | | | |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button.

| U.S.PATENT APPLICATION PUBLICATIONS | | | | | | |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button.

| FOREIGN PATENT DOCUMENTS | | | | | | | |
|---|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
| | 1 | | | | | | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button

| NON-PATENT LITERATURE DOCUMENTS | | | |
|---|---|---|---|
| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000167

| | | INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|---|---|
| | | | Filing Date | 2022-12-14 |
| | | | First Named Inventor | Nagesh R. Palepu |
| | | | Art Unit | |
| | | | Examiner Name | |
| | | | Attorney Docket Number | 107071.000582 |

| | | | |
|---|---|---|---|
| | 1 | Galacid Excel 88 fact sheet (lactic acid 88%). | ☐ |
| | 2 | Gandhi & Burger, Bendamustine in B cell malignancies: the new, 46-year old kid on the block, Clin Cancer Res. 2009 December 15; 15(24):7456-7461 | ☐ |
| | 3 | GIBSON et al., "Pharmaceutical preformulation and formulation: A practical guide from candidate drug selection to commercial dosage form", Informa Healthcare USA, 2009, Vol. 199, 2d ed, pp. 1-559. | ☐ |
| | 4 | Glimelius et al., Bolus-Injection (2-4 min) Versus Short-term (10-20 min) Infusion of 5-Fluorouracil in Patients with Advanced Colorectal Cancer: a Prospective Randomised Trial, Eur J. Cancer, 34, 674-678 (1998) | ☐ |
| | 5 | Gust and Krauser, Investigations on the Stability of Bendamustin, a Cytostatic Agent of the Nitrogen Mustard Type I. Synthesis, Isolation, and Characterization of Reference Substances, in Monatshefte fur Chemie, 128:291-99 (1997) | ☐ |
| | 6 | Heider et al., Efficacy and Toxicity of Bendamustine in Patients with Relapsed Low-Grade non-Hodgkin's Lymphomas, Anticancer Drugs, 12, 725-729 (2001) | ☐ |
| | 7 | HFSA Guidelines, Journal of Cardiac Failure Vol. 16 No. 6 (2010) | ☐ |
| | 8 | ICH Harmonised Tripartite Guideline, Stability testing of New Drug Substances and Products Q1A(R2), dated February 6, 2003 | ☐ |
| | 9 | Interlocutory decision in Opposition proceedings of EP 2528602 issued April 8, 2019. | ☐ |
| | 10 | International Conference on Harmonisation in Guideline on Impurities in New Drug Products: Availability, 62 Fed. Reg. 27, 454 - 27,461 (May 19, 1997) | ☐ |
| | 11 | International Search Report and Written Opinion for No. PCT/US2013/032289 dated June 6, 2013. (5 Pages) | ☐ |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000168

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 107071.000582 |

| | | | |
|---|---|---|---|
| | 12 | International Search Report and Written Opinion issued in counterpart PCT/US2013/032295 dated Jun. 2013 (4 pages). | ☐ |
| | 13 | International Search Report and Written Opinion issued in counterpart PCT/US2013/26187. | ☐ |
| | 14 | International Search Report and Written Opinion of International application based on PCT/US2011/022958, dated Apr. 2011 (8 pages). | ☐ |
| | 15 | Jay S. Trivedi, et al., Water-Insoluble Drug Formulation, 7. Solubilization Using CoSolvent Approach, pp. 141-168, 2000 | ☐ |
| | 16 | Jay S. TRIVEDI, Water-Insoluble Drug Formulation, Second Edition, 9 Solubilization Using Cosolvent Approach, pp. 161-194, 2008 | ☐ |
| | 17 | JC Price, Handbook of Pharm. Excipients, 5th Edition, Polyethylene Glycol, pp. 545-550, August 9, 2005 | ☐ |
| | 18 | JERRY MARCH, ADVANCED ORGANIC CHEMISTRY (4th ed., John Wiley & Sons, Inc. 1992) | ☐ |
| | 19 | JOHN D. ROBERTS & MARJORIE C. CASERIO, BASIC PRINCIPLES OF ORGANIC CHEMISTRY 612-13, 615-16, 617-18 (W. A. Benjamin, Inc., 2d ed. 1977) | ☐ |
| | 20 | Jonkman-de Vries et al., Pharmaceutical Development of (Investigational) Anticancer Agents for Parental Use-A Review, DRUG DEV IND PHARM. 22(6):475-494 (1996) | ☐ |
| | 21 | Julia A. Barman Balfour, et al., "Bendamustine", Drugs, Vol. 61, No. 5, pp. 631-638, 2001 | ☐ |
| | 22 | Kalaycio. M., Clinical Experience With Bendamustine: A New Treatment for Patients With Chronic Lymphocytic Leukemia; Clin Leukemia. 2008; 2(4): 223-229 | ☐ |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000169

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 107071.000582 |

| | | | |
|---|---|---|---|
| | 23 | Kenneth E. Avis, et al., Remington, Parenteral Preparations, Chapter 41, pp. 780-786, 2000 | ☐ |
| | 24 | Knauf et al., Bendamustine Versus Chlorambucil in Treatment-Naive Patients with B-Cell Chronic Lymphocytic Leukemia (B-CLL): Results of an International Phase III Study, Blood, 110(11), 609a (abstract 2043) (2007) | ☐ |
| | 25 | Koomans et al., Sodium Balance in Renal Failure: A Comparison of Patients with Normal Subjects Under Extremes of Sodium Intake, Hypertension 7:714-721 (1985) | ☐ |
| | 26 | Kurt H. BAUER, et al., Pharmazeutische Technologies, pp. 225-228, HW9, 1993 | ☐ |
| | 27 | Kurt H. Bauer, et al., Pharmazeutische Technologies, pp. 424-425, HW10, 1993 | ☐ |
| | 28 | Larry A. Gatlin, et al., Injectable Drug Development, 17. Formulation and Administration...Products, pp. 401-420 | ☐ |
| | 29 | Leonard & Jann, A New Synthesis of Aziridinium Salts. 2,2-Pentamethylene-1,1-tetramethyleneaziridinium Perchlorate A Prototype, 82 J. AM. CHEMISTRY SOC'Y 6418-6419 (1960) | ☐ |
| | 30 | Leoni et al., SDX-105 (Bendamustine), a Clinically Active Antineoplastic Agent Possesses a Unique Mechanism of Action, Abstract, 102(11) Blood, Abstract #2363 (Nov. 16, 2003) | ☐ |
| | 31 | Lian-Feng Huang, et al., Water-Insoluble Drug Formulation, Second Edition, Ch. 7. Formulation Strategies and Practice... Support, pp. 113-132 | ☐ |
| | 32 | Lissitchkov et al., Phase-I/II study to Evaluate Dose Limiting Toxicity, Maximum Tolerated Dose, and Tolerability of Bendamustine HCl in Pre-treated Patients With B-Chronic Lymphocytic Leukaemia (Binet stages B and C) Requiring Therapy, J. Cancer Res. Clin. Oncol. 132:99-104 (2006) | ☐ |
| | 33 | Liu (ed). Water-Insoluble Drug Formulation, 1st ed., CRC Press, Chapters 7 and 9, 2000. | ☐ |

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000170

| | | | |
|---|---|---|---|
| | Application Number | 18081238 | |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Filing Date | 2022-12-14 | |
| | First Named Inventor | Nagesh R. Palepu | |
| | Art Unit | | |
| | Examiner Name | | |
| | Attorney Docket Number | 107071.000582 | |

| | | | |
|---|---|---|---|
| 34 | Liu (ed). Water-Insoluble Drug Formulation, 2nd ed., CRC Press, Chapters 7 and 9, 2008. | | ☐ |
| 35 | Lyondell Tebol(Registered) 99, Tertiary Butyl Alcohol in Freeze-Drying Applications,(Lyondell Chemical Co., 2003) | | ☐ |
| 36 | Lyophilization Of Biopharmaceuticals (Henry R. Costantino & Michael K. Pikal eds., Association of Pharmaceutical Scientists 2004) | | ☐ |
| 37 | Maas et al., "Stabilitat von Bendamustinhydrochlorid in Infusionslosungen," Die Pharmazie, Govi Verlag Pharmazeutischer Verlag Gmbh, vol. 49. No. 10 pp. 775-777 (1994). (Abstract Only). | | ☐ |
| 38 | Margolin et al., Shortening the Infusion Time of Anticancer Drugs: Who Will Benefit?, J. of Clinical Oncology, 25 (19):2642-2643 (2007) | | ☐ |
| 39 | McGinity, et al., Journal of Pharmaceutical Sciences, Influence of Peroxide Impurities in Polyethylene Glycols..., Vol. 64, No. 2 pp. 356-357, 1975 | | ☐ |
| 40 | Michael J. Akers, Remington, The Science and Practice of Pharmacy 21st Edition, Parenteral preparation, chapter 41, pp. 802-835, 2005 | | ☐ |
| 41 | Michael P. GAMCSIK, et al., NMR Studies of the Conjugation..., J. Med. Chem., Vol. 33, pp. 1009-1014, 1990 | | ☐ |
| 42 | National Kidney Foundation, "Clinical Practice Guidelines and Clinical Practice Recommendations" (http://kidneyfoundation.cachefly.net/professionals/KDOQI/guideline_upHD_PD_VA/hd_guide5.htm) (2006) | | ☐ |
| 43 | Neelam SEEDHER, et al., Solubilization of Nimesulide; Use of Co-solvents, Indian J. Pharm. Sci., Vol. 65, No. 1, pp. 58-61, 2003 | | ☐ |
| 44 | Nema et al., Excipients and Their Use in Injectable Products, PDA J. Pharma. Sci. & Tech., 51(4):166-171 (Jul.-Aug. 1997) | | ☐ |

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000171

| | | | |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Application Number | | |
| | Filing Date | 2022-12-14 | |
| | First Named Inventor | Nagesh R. Palepu | |
| | Art Unit | | |
| | Examiner Name | | |
| | Attorney Docket  Number | 107071.000582 | |

| | | | |
|---|---|---|---|
| | 45 | Ni et al., Stabilization and Preformulation of Anticancer Drug-SarCNU, Int'1 J. of Pharma., 249:257-264 (2002) | ☐ |
| | 46 | Ni et al., Use of Pure t-Butanol as a Solvent for Freeze-Drying: A Case Study, Int'1. J. of Pharma., 226:39-46 (2001) | ☐ |
| | 47 | Nuijen et al., Pharmaceutical Development of a Parenteral Lyophilized Formulation of the Novel Antitumor Agent Aplidine, PDA J. Pharmaceut. Sci. and Technol. 54(3):193-208 (2000 May-Jun) | ☐ |
| | 48 | O'Connor, Hydrolysis and Alkylating Reactivity of Aromatic Nitrogen Mustards, J.CHEM. SOC. PERKIN TRANS. 2, 1933-1939(1991) | ☐ |
| | ~~49~~ | ~~Orrie M. FRIEDMAN, et al., Colorimetric Estimation of Nitrogen..., Analytical Chemistry, pp. 906-910~~ | ☐ |
| | 50 | Ozegowski et al., IMET 3393, ?-[1-Methyl-5-bis-(Beta-chloroethyl)-amino-benzimidazolyl-(2)]-butyric acid hydrochloride, a new cytostatic agent from the benzimidazole mustard gas series, 110 Zbl Pharm. 1013-1019 (1971) | ☐ |

If you wish to add additional non-patent literature document citation information please click the Add button

**EXAMINER SIGNATURE**

| | | | |
|---|---|---|---|
| Examiner Signature | /ERNST V ARNOLD/ | Date Considered | 03/13/2023 |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through a citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [5] Applicant is to place a check mark here if English language translation is attached.

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000172

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 107071.000582 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

☐ That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

☐ See attached certification statement.

☐ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

## SIGNATURE

 A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Stephanie A. Lodise/ | Date (YYYY-MM-DD) | 2022-12-14 |
|---|---|---|---|
| Name/Print | Stephanie Lodise | Registration Number | 51430 |

This collection of information is required by 37 CFR 1.97 and 1.98.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000173

Receipt date: 12/14/2022

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent.  Accordingly, pursuant to the requirements of the Act, please be advised that:  (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent.  If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a).  Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.    A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract.  Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906.  Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive.  Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151.  Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000174

Doc code: IDS                                                                    PTO/SB/08a (02-18)
Doc description: Information Disclosure Statement (IDS) Filed          Approved for use through 11/30/2020. OMB 0651-0031
                                                                     U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
| --- | --- | --- |
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 107071.000582 |

| U.S.PATENTS | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button.

| U.S.PATENT APPLICATION PUBLICATIONS | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button.

| FOREIGN PATENT DOCUMENTS | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
| | 1 | | | | | | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button

| NON-PATENT LITERATURE DOCUMENTS | | | |
| --- | --- | --- | --- |
| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000175

Case 1:24-cv-00065-JLH    Document 427-1    Filed 07/01/26    Page 177 of 573 PageID #: 19628

| | | | |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Application Number | 18081238 | |
| | Filing Date | 2022-12-14 | |
| | First Named Inventor | Nagesh R. Palepu | |
| | Art Unit | | |
| | Examiner Name | | |
| | Attorney Docket Number | 107071.000582 | |

| | | | |
|---|---|---|---|
| | 1 | Paul J. SHESKEY, Handbook of Pharmaceutical Excipients, 7th Edition, Propyl Gallate | ☐ |
| | 2 | Pokorny et al., Antioxidants in Food: Practical Applications 2001, CRC Press, page 324 | ☐ |
| | 3 | Poulsen, Introduction to Chemistry (2010) | ☐ |
| | 4 | Pramod K. Gupta, et al.. "Injectable Drug Development Techniques to Reduce Pain and Irritation", pp 183, Informa Healthcare, 2008, ISBN 13: 978-1-5749-1095-7. | ☐ |
| | 5 | Preiss et al., "Pharmacological and clinical date of Bendamustine," 17th International Cancer Congress, pp. 1637-1640 (1998). | ☐ |
| | 6 | Preiss et al., Studies on the Pharmacokinetics of Bendamustine (Cytostasan®) in Humans, Pharmazie, 40(11):782-784 (1985) | ☐ |
| | 7 | R.A. Pethrick et al., Excerpt from Polymer Yearbook 13, CRC Press, 01 Oct 1996, Technology & Engineering Vinogradova et al. | ☐ |
| | 8 | Rassachaert et al., "A phase 1 study of bendamustine hydrochloride administered once every 3 weeks in patients with solid tumors," Anti-Cancer Drugs, vol. 18 No. 5 pp. 587-595 (2007). | ☐ |
| | 9 | Remington's Pharmaceutical Sciences, 18th edition, (1990), page 1322. | ☐ |
| | 10 | Remington's Pharmaceutical Sciences, 18th edition, (1990), pp. 1286-1288. | ☐ |
| | 11 | Remington's Pharmaceutical Sciences 1990 (Eighteenth Edition), Mack Publishing Company, Chapter 85, 1570-1580 | ☐ |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000176

Case 1:24-cv-00065-JLH    Document 427-1    Filed 07/01/26    Page 178 of 573 PageID #: 19629

| | | | |
|---|---|---|---|
| | | Application Number | |
| | | Filing Date | 2022-12-14 |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | First Named Inventor | Nagesh R. Palepu |
| | | Art Unit | |
| | | Examiner Name | |
| | | Attorney Docket  Number | 107071.000582 |

| | | | |
|---|---|---|---|
| | 12 | Renu CHADHA, et al., "DRUG CARRIER SYSTEMS FOR ANTICANCER AGENTS: A REVIEW', Journal of Scientific & Industrial Reasearch, vol. 67, pp. 185-197, 2008. | ☐ |
| | 13 | Ribomustin Monograph (Updated August 2005) | ☐ |
| | 14 | Ribomustin Monograph (Updated January 2002) | ☐ |
| | 15 | Ribomustin Product Information, Janssen-Cilag Pty Ltd (Updated September 15, 2016) | ☐ |
| | 16 | Rote Liste 1996 for Ribomustin (86 023) | ☐ |
| | 17 | Rote Liste 2003 for Ribomustin (86 045) | ☐ |
| | 18 | Rowe et al. Handbook of Pharmaceutical Excipients, 6th edition, 2009, pages 454-455 | ☐ |
| | 19 | Rowe et al., "Handbook of Pharmaceutical Excipients," Pharmaceutical Press, 6th edition pp. 857 (extract from index) (2009). | ☐ |
| | 20 | Rowe, et al., (ed) Handbook of Pharmaceutical Excipients, 5th ed., Pharmaceutical Press, pp. 545-550, Polyethylene Glycol, 2006. | ☐ |
| | 21 | Safety Data Sheet, Lactic Acid, 88%, Columbus Chemical Industries, 2013 | ☐ |
| | 22 | Scasnar at al., Radiochemical Assay of Stability of 14C-Cytostasan Solutions During Preparation and Storage, Journal of Radioanalytical and Nuclear Chemistry, Articles 121(2):489-497 (1988) | ☐ |

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000177

Case 1:24-cv-00065-JLH    Document 427-1    Filed 07/01/26    Page 179 of 573 PageID #: 19630

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 107071.000582 |

| | | | |
|---|---|---|---|
| | 23 | Schoffski et al., "Weekly administration of bendamustine: A phase 1 study in patients with advanced progressive solid tumors," Annals of Oncology II, pp. 729-734 (2000). | ☐ |
| | 24 | Schoffski et al., Repeated administration of short infusions of bendamustine: a phase 1 study in patients with advanced progressive solid tumours, J. Cancer Res Clin Oncol, vol. 126 No. 1 pp. 41-47 (2000). | ☐ |
| | 25 | Schwanen et al., In vitro evaluation of bendamustine induced apoptosis in B-chronic lymphocytic leukemia, LEUKEMIA 16:2096-2105 (2002) | ☐ |
| | 26 | SciFinder, Hydrolytic degradation of IMET 3393, American Chemical Society, 2018 | ☐ |
| | 27 | Seager et al., Structure of Products Prepared by Freeze-Drying Solutions Containing Organic Solvents, PDA Journal oi Pharmaceutical Science and Technology, 39(4):161-179 (1985) | ☐ |
| | 28 | Search History issued in connection with PCT/US2013/32295 dated May 10,2013. | ☐ |
| | 29 | Shah et al., Physical, Chemical, and Bioavailability Studies of Parenteral Diazepam Formulations Containing Propylene Glycol and Polyethylene Glycol 400, Drug Development and Industrial Pharm.), 17:12,1635-1654 (Oct. 20, 2008) | ☐ |
| | 30 | Sigma-Aldrich, Webpage Catalog for poly(ethylene glycol), http://www.sigmaaldrich.com/catalog/product/aldrich/202398?lang=en®ion- =US#, accessed Nov. 15, 2015 (2 pages). | ☐ |
| | 31 | Sikora, "Cancer drug development in the post-genomic age," Current Science, vol. 81 No. 5 pp. 549-554 (2001). | ☐ |
| | 32 | Spectra Analysis, Inc., Oxidative Degradation of Polyethyleneglycol..., Application Note 016, March 2008 | ☐ |
| | 33 | SPIEGEL et al., "Use of Nonaqueous Solvents in Parenteral Products," Journal of Pharmaceutical Sciences, Vol. 52, No. 10 pp. 917-927 (1963). | ☐ |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000178

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 107071.000582 |

| | | | |
|---|---|---|---|
| | 34 | Strickley, Solubilizing Excipients in Oral and Injectable Formulations, Pharmaceutical Research 21(2):201-230 (Feb 2004) | ☐ |
| | 35 | Supplemental European Search Report issued in connection with PCT/US2011/022958 dated December 16, 2013. | ☐ |
| | 36 | T. W. GRAHAM SOLOMONS, ORGANIC CHEMISTRY (John Wiley & Sons, 3d ed. 1984) | ☐ |
| | 37 | Tageja, Bendamustine: Safety and Efficacy in the Management of Indolent Non-Hodgkins Lymphoma, Clinical Medicine Insights: Oncology 2011:5 145-156 | ☐ |
| | 38 | Teagarden & Baker, Practical Aspects of Freeze-Drying of Pharmaceutical and Biological Products Using Non-Aqueous Co-Solvent Systems, Chapter 8 in Freeze-Drying/Lyophilization of Pharmaceutical and Biological Products, 239-76 (2nd Edition, Edited by Rey, L. & May, J., Marcel Dekker, New York) (2004) | ☐ |
| | 39 | Teagarden & Baker, Practical Aspects of Lyophilization Using Non-Aqueous Co-Solvent Systems, 15 Eur. J. Pharma. Sciences, 115-33 (2002) | ☐ |
| | 40 | Teva Pharmaceuticals International GMBH, et al. v. Apotex Inc., et al - Civil Action 1:17-cv-01164: Defendants Apotex Inc. and Apotex Corp.'s Answer to Complaint, Defenses and Counterclaims (Document 17), dated 11/27/17 | ☐ |
| | 41 | Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi USA, LLC.- Civil Action No. 1:17-cv-01201: Answer to Complaint, Separate Defenses, and Counterclaims (Document 10), dated 09/15/17. | ☐ |
| | 42 | Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi USA, LLC.- Civil Action No. 1:17-cv-01201: Answer to Fresenius Kabi USA, LLC'S Counterclaims (Document 14), dated 10/06/17. | ☐ |
| | 43 | Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi USA, LLC.- Civil Action No. 1:17-cv-01201: Complaint (Document 1), dated 08/24/17. | ☐ |
| | 44 | Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al - Civil Action No. 1:18-cv-01586: Answer to Fresenius Kabi USA, LLC's Counterclaims (Document 13), dated 11/27/18. | ☐ |

EFS Web 2.1.18

Case 1:24-cv-00065-JLH    Document 427-1    Filed 07/01/26    Page 181 of 573 PageID #: 19632

| | | | |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT**<br><br>( Not for submission under 37 CFR 1.99) | Application Number | | |
| | Filing Date | 2022-12-14 | |
| | First Named Inventor | Nagesh R. Palepu | |
| | Art Unit | | |
| | Examiner Name | | |
| | Attorney Docket  Number | 107071.000582 | |

| | | | |
|---|---|---|---|
| | 45 | Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al - Civil Action No. 1:18-cv-01586: Complaint (Document 1), dated 10/15/18. | ☐ |
| | 46 | Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al - Civil Action No. 1:18-cv-01586: Defendant Mylan Laboratories LTD.'s Answer to Complaint for Patent Infringement (Document 11), dated 11/09/18. | ☐ |
| | 47 | Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al.- Civil Action No. 1:18-cv-01586: Defendant Fresenius Kabi USA, LLC's Answer to Complaint, Separate Defenses, and Counterclaims (Document 9), dated 11/06/18. | ☐ |
| | 48 | Teva Pharmaceuticals International GMBH, et al. v. Mylan Laboratories Limited- Civil Action No. 1:17-cv-01790: Complaint (Document 1), dated 12/12/17. | ☐ |
| | 49 | Teva Pharmaceuticals International GMBH, et al. v. Slayback Pharma Limited Liability Company- Civil Action No. 1:18-cv-00117: Complaint (Document 1), dated 01/19/18. | ☐ |
| | 50 | Teva Pharmaceuticals International GMBH, et al. v. Slayback Pharma Limited Liability Company- Civil Action No. 1:18-cv-00117: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Addtional Defenses and Counterclaims (Document 9), dated 02/12/18. | ☐ |

| If you wish to add additional non-patent literature document citation information please click the Add button | | |
|---|---|---|
| **EXAMINER SIGNATURE** | | |
| Examiner Signature | /ERNST V ARNOLD/ | Date Considered | 03/13/2023 |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through a citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [5] Applicant is to place a check mark here if English language translation is attached.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000180

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | | |
|---|---|---|---|
| | Filing Date | 2022-12-14 | |
| | First Named Inventor | Nagesh R. Palepu | |
| | Art Unit | | |
| | Examiner Name | | |
| | Attorney Docket  Number | 107071.000582 | |

---

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

☐ That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

☐ See attached certification statement.

☐ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

## SIGNATURE

 A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Stephanie A. Lodise/ | Date (YYYY-MM-DD) | 2022-12-14 |
|---|---|---|---|
| Name/Print | Stephanie Lodise | Registration Number | 51430 |

This collection of information is required by 37 CFR 1.97 and 1.98.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000181

**Privacy Act Statement**

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.  The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.  A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.  A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.  A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.  A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.  A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.  A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.  A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.  A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000182

Receipt date: 12/14/2022                                                18/081,238 - GAU: 1613

DOCKET NO.: 107071.000582

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application of: Nagesh R. Palepu    Confirmation No.: Not Yet Assigned

Application No.: Con of US 17/412,623    Group Art Unit: Not Yet Assigned

Filing Date: concurrently herewith    Examiner: Not Yet Assigned

For:    **FORMULATIONS OF BENDAMUSTINE**

## CONTENT OF IDS PURSUANT TO 37 C.F.R. § 1.98(d)

Copies of various references are not being submitted because they were previously cited by or submitted to the U.S. Patent and Trademark Office in the following patent application(s) for which a claim for priority under 35 U.S.C. § 120 has been made in the instant application. *See* MPEP § 609.02(II)(B)(2) *stating* "[p]ursuant to 37 CFR 1.98(d), if the IDS submitted in the parent application complies with 37 CFR 1.98(a) to (c), copies of the patents, publications, pending U.S. applications, or other information submitted in the parent application need not be resubmitted in the continuing application."

| Patent Application | Filing Date |
|---|---|
| 17/412,623 | 8/26/2021 |
| 16/509,920 | 7/12/2019 |
| 16/015,656 | 6/22/2018 |
| 15/432,335 | 2/14/2017 |
| 15/013,436 | 2/2/2016 |
| 14/031,879 | 9/19/2013 |
| 13/016,473 | 1/28/2011 |

Please charge any deficiency or credit any overpayment to Deposit Account No. 23-3050.

| Signature:  /Stephanie A. Lodise/ | Date: 12/14/2022 |
|---|---|
| **Name (Print/Typed): Stephanie Lodise** | **Practitioner Registration Number (If applicable):  51430** |
| ☒   *Total of  1  form is submitted. | |

BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501
Telephone: 215.568.3100
Facsimile: 215.568.3439

/ERNST V ARNOLD/        1        03/13/2023

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000183

Doc code: IDS                                                                                    PTO/SB/08a (02-18)
Doc description: Information Disclosure Statement (IDS) Filed                    Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 107071.000582 |

### U.S.PATENTS

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button.

### U.S.PATENT APPLICATION PUBLICATIONS

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button.

### FOREIGN PATENT DOCUMENTS

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button

### NON-PATENT LITERATURE DOCUMENTS

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000184

Case 1:24-cv-00065-JLH    Document 427-1    Filed 07/01/26    Page 186 of 573 PageID #: 19637

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 18081238 |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 107071.000582 |

| | | | |
|---|---|---|---|
| | 1 | Teva Pharmaceuticals International GMBH, etal. v. Apotex Inc., etal - Civil Action No. 1:17-cv-01164: Complaint (Document 1), dated 08/18/17. | ☐ |
| | 2 | Thiesen, "Bendamustine, a well-tollerated cytotoxic agent used in Germany for may years, is soon to be marketed in the rest of Europe for a range of indicatons including chronic lymphocytic leukaemia," pp. 1-4 (2010). Available at http://www.hospitalpharmacyeurope.com/featured-articles/bendamustine. | ☐ |
| | 3 | Third Party Submission in related EP2528602 based on PCT/US2011/022958 dated November 19,2013 (9 pages). | ☐ |
| | 4 | Thomas A. Jennings, Lyophilization, Introduction and Basic Principles (2006)(original copyright 1999) | ☐ |
| | 5 | TREANDA (Highlights of prescribing information 2008) (Year: 2008) | ☐ |
| | 6 | Treanda, "Highlights of Prescribing Information," TREANDA ( bendamustine hydrochloride) for Injection, for intravenous infusion, pp. 1-13 (2010). | ☐ |
| | 7 | Treanda, "Highlights Of Prescribing Information," TREANDA ( bendamustine hydrochloride) for Injection, for intravenous infusion, pp. 1-6 (2008) | ☐ |
| | 8 | U.S. Pharmacopeia 32-NF-27-General Notices and Requirements (2009). | ☐ |
| | 9 | USP 24/NF 19 (2000) entry for Propylene Glycol (USP) | ☐ |
| | 10 | V.G. Vinogradova, et al., Polymer Yearbook 13, New Metal Chelates as Antioxidant Stabilizers for Polymers..., pp. 87-111, 1996 | ☐ |
| | 11 | V.M. Mikhal'chuk, et al., Antioxidative Stabilization of Polyethylene..., Russian Journal of Applied Chemistry, Vol. 77, No. 1, pp. 131-135, 2004 | ☐ |

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000185

| | | Application Number | |
|---|---|---|---|
| | | Filing Date | 2022-12-14 |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | First Named Inventor | Nagesh R. Palepu |
| | | Art Unit | |
| | | Examiner Name | |
| | | Attorney Docket  Number | 107071.000582 |

| | | | |
|---|---|---|---|
| | 12 | Vlok, Manual of Nursing, Volume 1 (9th edition), 1988 | ☐ |
| | 13 | W. Furst, et al., "About the Hydrolytic Decomposition of IMET 3393," Pharmazeutische Zentralhalle, Vol. 108, Issue 9, pp. 608-614, 1969 (English translation and the original article) | ☐ |
| | 14 | Wayne P. Olson, Volatile Solvents for Drying and Microbial Kill in the Final Container, Pharmaceutical Engineering, 110-118(1997) | ☐ |
| | 15 | Weide et al., Bendamustine Mitoxantrome and Rituximab (BMR): A New Effective Regimen for Refractory or Relapsed Indolent Lymphomas, Leukemia & Lymphoma, 43(2):327-331 (2002) | ☐ |
| | 16 | Werner et al., Hydrolysis Products of Cancerostatic Cytostasan(Registered) (Bendamustine), 42 (4) DIE PHARMAZIE, GOVI VERLAG PHARMAZEUTISCHER VERLAG GMBH, ESCHBORN, DE, 272-73 | ☐ |
| | 17 | William H. Brown, Organic Chemistry 5th Edition, pp. 358-360, 2009 | ☐ |
| | 18 | Wittaya-Areekul and Nail, Freeze-Drying of tert-Butyl Alcohol/Water Cosolvent Systems: Effects of Formulation and Process Variables on Residual Solvents, Journal of Pharmaceutical Sciences 87(4):491-495 (1998) | ☐ |
| | 19 | Written Opinion issued in counterpart PCT/US2013/032289 dated June 6,2013. | ☐ |
| | 20 | Written Opinion issued in counterpart PCT/US2013/032295 dated June 3,2013. | ☐ |
| | 21 | Zimmerman et al., Elements of Organic Chemistry (1977) | ☐ |
| | 22 | Zips et al., "New Anticancer Agents: In Vitro and In Vivo Evaluation," In Vivo,vol. 19 pp. 1-8 (2005). | ☐ |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000186

| | | | |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Application Number | | |
| | Filing Date | 2022-12-14 | |
| | First Named Inventor | Nagesh R. Palepu | |
| | Art Unit | | |
| | Examiner Name | | |
| | Attorney Docket Number | 107071.000582 | |

| | 23 | Zumdahl et al., Chemistry, 7th Ed. (2007) | ☐ |
|---|---|---|---|

If you wish to add additional non-patent literature document citation information please click the Add button

## EXAMINER SIGNATURE

| Examiner Signature | /ERNST V ARNOLD/ | Date Considered | 03/13/2023 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through a citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [5] Applicant is to place a check mark here if English language translation is attached.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000187

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | |
|---|---|---|
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 107071.000582 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

☐ That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

☐ See attached certification statement.

☐ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

## SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Stephanie A. Lodise/ | Date (YYYY-MM-DD) | 2022-12-14 |
|---|---|---|---|
| Name/Print | Stephanie Lodise | Registration Number | 51430 |

This collection of information is required by 37 CFR 1.97 and 1.98.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000188

Receipt date: 12/14/2022                                                                18/081,238 - GAU: 1613

**Privacy Act Statement**

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.    A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00000189

**To:**       eofficemonitor@bakerlaw.com,,
**From:**     PAIR_eOfficeAction@uspto.gov
**Cc:**       PAIR_eOfficeAction@uspto.gov
**Subject:**  Private PAIR Correspondence Notification for Customer Number 23377

Mar 21, 2023 03:27:35 AM

Dear PAIR Customer:

BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501
UNITED STATES

The following USPTO patent application(s) associated with your Customer Number, 23377 , have new outgoing correspondence. This correspondence is now available for viewing in Private PAIR.

The official date of notification of the outgoing correspondence will be indicated on the form PTOL-90 accompanying the correspondence.

Disclaimer:
The list of documents shown below is provided as a courtesy and is not part of the official file wrapper. The content of the images shown in PAIR is the official record.

| Application | Document | Mailroom Date | Attorney Docket No. |
|---|---|---|---|
| 18081238 | CTNF | 03/21/2023 | 107071.000582 |
| | 1449 | 03/21/2023 | 107071.000582 |
| | 1449 | 03/21/2023 | 107071.000582 |
| | 1449 | 03/21/2023 | 107071.000582 |
| | 1449 | 03/21/2023 | 107071.000582 |
| | 1449 | 03/21/2023 | 107071.000582 |

To view your correspondence online or update your email addresses, please visit us anytime at https://sportal.uspto.gov/secure/myportal/privatepair.

If you have any questions, please email the Electronic Business Center (EBC) at EBC@uspto.gov with 'e-Office Action' on the subject line or call 1-866-217-9197 during the following hours:

    Monday - Friday 6:00 a.m. to 12:00 a.m.

Thank you for prompt attention to this notice,

UNITED STATES PATENT AND TRADEMARK OFFICE

PATENT APPLICATION INFORMATION RETRIEVAL SYSTEM

EAGLEBEN-SA_00000190



# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 18/081,238 | 12/14/2022 | Nagesh R. Palepu | 107071.000582 |

**CONFIRMATION NO. 5922**

23377
BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501

**PUBLICATION NOTICE**

*OC000000137755882*

**Title:** FORMULATIONS OF BENDAMUSTINE

**Publication No.** US-2023-0115164-A1
**Publication Date:** 04/13/2023

## NOTICE OF PUBLICATION OF APPLICATION

The above-identified application will be electronically published as a patent application publication pursuant to 37 CFR 1.211, et seq. The patent application publication number and publication date are set forth above.

The publication may be accessed through the USPTO's publically available Searchable Databases via the Internet at www.uspto.gov. The direct link to access the publication is currently http://www.uspto.gov/patft/.

The publication process established by the Office does not provide for mailing a copy of the publication to applicant. A copy of the publication may be obtained from the Office upon payment of the appropriate fee set forth in 37 CFR 1.19(a)(1). Orders for copies of patent application publications are handled by the USPTO's Public Records Division. The Public Records Division can be reached by telephone at (571) 272-3150 or (800) 972-6382, by facsimile at (571) 273-3250, by mail addressed to the United States Patent and Trademark Office, Public Records Division, Alexandria, VA 22313-1450 or via the Internet.

In addition, information on the status of the application, including the mailing date of Office actions and the dates of receipt of correspondence filed in the Office, may also be accessed via the Internet through the Patent Electronic Business Center at www.uspto.gov using the public side of the Patent Application Information and Retrieval (PAIR) system. The direct link to access this status information is currently https://portal.uspto.gov/pair/PublicPair. Prior to publication, such status information is confidential and may only be obtained by applicant using the private side of PAIR.

Further assistance in electronically accessing the publication, or about PAIR, is available by calling the Patent Electronic Business Center at 1-866-217-9197.

---

Office of Data Managment, Application Assistance Unit (571) 272-4000, or (571) 272-4200, or 1-888-786-0101

EAGLEBEN-SA_00000191

TO:      eofficemonitor@bakerlaw.com
FROM:    noreply@uspto.gov
CC:      PatentCenter_eOfficeAction@uspto.gov
SUBJECT: USPTO: Patent Electronic System - Correspondence Notification for Customer Number 23377

Fri Apr 14 05:38:37 EDT 2023

Dear Patent Center Customer:

Correspondence Address:

BakerHostetler
1735 Market Street
Suite 3300
Philadelphia,PENNSYLVANIA,19103-7501
UNITED STATES

This is a courtesy notification regarding the following USPTO patent application(s) associated with your Customer Number, 23377, that have new outgoing correspondence. This correspondence is now available for viewing in Patent Center.

The official date of notification of the outgoing correspondence will be indicated on the form (e.g., PTOL-90) accompanying the correspondence.

Disclaimer:

The list of documents shown below are provided as a courtesy and is not part of the official file wrapper. The content of the images shown in the Image File Wrapper is the official record.

| Application | Document | Mailroom Date | Attorney Docket No. |
|---|---|---|---|
| 18081238 | NTC.PUB | 04/13/2023 | 107071.000582 |

To view your correspondence online, please sign in to Patent Center and then select Workbench/View correspondence. To update your email address(es), select Manage/Manage customer numbers.

If you have any questions, please contact the Patent Electronic Business Center (EBC) at ebc@uspto.gov or 866-217-9197 Monday – Friday, 6 a.m. to midnight ET.

Please do not reply to this email as it was sent from an unmonitored mailbox.

Sincerely,

The Patent Center Team

EAGLEBEN-SA_00000192

**To:**         eofficemonitor@bakerlaw.com,,
**From:**       PAIR_eOfficeAction@uspto.gov
**Cc:**         PAIR_eOfficeAction@uspto.gov
**Subject:**    Private PAIR Correspondence Notification for Customer Number 23377

Apr 14, 2023 03:31:13 AM

Dear PAIR Customer:

BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501
UNITED STATES


The following USPTO patent application(s) associated with your Customer Number, 23377 , have new outgoing correspondence. This correspondence is now available for viewing in Private PAIR.


The official date of notification of the outgoing correspondence will be indicated on the form PTOL-90 accompanying the correspondence.


Disclaimer:
The list of documents shown below is provided as a courtesy and is not part of the official file wrapper. The content of the images shown in PAIR is the official record.

| Application | Document | Mailroom Date | Attorney Docket No. |
|---|---|---|---|
| 18081238 | NTC.PUB | 04/13/2023 | 107071.000582 |

To view your correspondence online or update your email addresses, please visit us anytime at https://sportal.uspto.gov/secure/myportal/privatepair.

If you have any questions, please email the Electronic Business Center (EBC) at EBC@uspto.gov with 'e-Office Action' on the subject line or call 1-866-217-9197 during the following hours:

        Monday - Friday 6:00 a.m. to 12:00 a.m.

Thank you for prompt attention to this notice,

UNITED STATES PATENT AND TRADEMARK OFFICE

PATENT APPLICATION INFORMATION RETRIEVAL SYSTEM

EAGLEBEN-SA_00000193

412:3–18, 413:4–13.  Olthoff provided a short, finite list of solvent options that included PEG and PG.  Specifically, Olthoff reported that bendamustine is stable in monovalent alcohols and polyols, DTX-0094_0012–13; Tr. 410:6–11:8, 1084:13–86:11; and the disclosure of "polyols" would have given a POSITA just three polyol options: PEG, PG, and glycerol, Tr. 413:4–13.  Plaintiffs dispute that assertion, D.I. 371 at 20–23, but Plaintiffs' expert himself limited polyols to those three options in a patent application that he submitted in 2009, *see* DTX-0764_0011 ("Preferably the water soluble plasticizer is selected from the group consisting of polyols (glycerin [i.e., glycerol], propylene glycol, polyethylene glycols) . . . .").  His response when confronted with that disclosure at trial was: "Yes, but I didn't –- at that time I didn't know that I would be sitting here today."  Tr. 1575:2–76:1.  Moreover, while I agree with Plaintiffs that Olthoff would have taught a POSITA also to consider monovalent alcohols, D.I. 371 at 21, Plaintiffs only list four monovalent alcohols that a POSITA would have considered using with bendamustine, D.I. 361 ¶ 73.  Olthoff thus would have left a POSITA with three polyols and four monovalent alcohols as options.  By providing a finite list, Olthoff would have made using PEG and PG obvious to try because a POSITA would face only "a finite number of identified, predictable solutions."  *KSR*, 550 U.S. 398 at 421.

Drager, however, teaches away from Olthoff's teaching of using polyols

19

EAGLEBEN-SA_00000194

such as PEG and PG alone with bendamustine. As noted, Drager determined that the "results described in [Olthoff] were not reproducible." DTX-0073 at 2:62–64, 3:1–2. And Drager's data showed that bendamustine in 99% PG degraded almost completely after eight weeks at 25°C and more than 20% at 5°C after one year. DTX-0073 at Fig. 3; Tr. 1378:9–80:5. As Plaintiffs' expert, Dr. Siepmann, credibly testified, a POSITA would have considered 20% degradation after just one year at 5°C to be "not good." Tr. 1379:25–80:5.

Drager disclosed combining bendamustine with aprotic solvents as a means of reducing such degradation. DTX-0073 at 3:3–10, 3:21–25; Tr. 581:19–82:12. Drager also allowed for combining bendamustine with a mixture of aprotic solvents and protic solvents, including PEG and PG. DTX-0073 at 3:3–10, 3:36–48, 4:18–24; Tr. 601:11–17. But Drager stated that the concentration of protic solvents should be kept at 90%—and preferably lower—to limit degradation. DTX-0073 at 3:49–4:25; Tr. 1393:3–22. Drager specifically showed that a formulation containing 66% DMA and 34% PG is stable. DTX-0073 at Table II; Tr. 436:16–37:15.

Defendants assert that Drager taught the use of aprotic solvents because they have no OH groups and that, therefore, Drager would have motivated a POSITA to use solvents with a low number of OH-groups. Tr. 431:20–23, 437:8–15. They argue that "[w]hile Drager claimed a formulation containing a polar aprotic solvent

20

EAGLEBEN-SA_00000195

(DMA) and a polar protic solvent (PG), a POS[IT]A would be motivated to remove DMA from the formulation because DMA has been known to cause problems in formulations." D.I. 379 ¶ 65; D.I. 378 at 14–15. According to Defendants, because DMA was the only aprotic solvent listed by Drager that is "used in FDA products," D.I. 378 at 15, a POSITA would turn to protic solvents like PEG that have a relatively low number of OH groups. D.I. 379 ¶ 67; D.I. 378 at 21.

Drager, however, teaches away from the use of only protic solvents. Therefore, Drager would not have motivated a POSITA to replace DMA with a low-OH protic solvent. Defendants and their expert conceded that neither Drager's disclosures nor its examples taught using exclusively protic solvents. Tr. 583:1–83:10, 1886:17–19. Instead, Drager taught the use of an *aprotic* solvent with bendamustine to avoid degradation by nucleophiles like PEG and PG. Moreover, Drager disclosed numerous alternative aprotic solvents that could potentially replace DMA. DTX-0073 at 3:9–14; Tr. 1395:7–14. And DMA was *not* the only aprotic solvent in an FDA-approved product. The prior art reference Strickley, for example, disclosed that the aprotic solvents NMP and DMSO had been commercially used. PTX-0569 at JDG_BENDA_00003311–14; Tr. 1390:19–24.

A POSITA in 2010 reading Olthoff and Drager thus would have found that Olthoff taught combining bendamustine with polyols including PEG and PG, but

21

that Drager taught away from using protic solvents, such as PEG and PG, alone with bendamustine. "Where the prior art contains apparently conflicting teachings (i.e., where some references teach the combination and others teach away from it) each reference must be considered for its power to suggest solutions to an artisan of ordinary skill . . . consider[ing] the degree to which one reference might accurately discredit another." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) (internal quotation marks and citation omitted).

After considering the two references, I find that a POSITA would have credited Drager's data and conclusions over those in Olthoff. Drager expressly asserted that the "results described in [Olthoff] were not reproducible." DTX-0073 at 2:62–64. And Drager used high-performance liquid chromatography (HPLC) to make its determinations while Olthoff used thin-layer-chromatography (TLC). Plaintiffs assert, and Defendants do not dispute, that HPLC is more reliable than TLC because of its superior sensitivity and ability to resolve impurities. Tr. 1074:4–75:3, 1086:17–20, 1380:14–25, 1511:5–11. Moreover, in the decades between Olthoff's publication in 1983 and the priority date in 2010, Olthoff's formulations were never used, suggesting that POSITAs generally did not rely on Olthoff. DTX-0073 at 2:19–29. "The elapsed time between [Olthoff] and the [asserted] patent's filing date evinces that the [asserted] patent's claimed invention was not obvious to try." *Leo Pharm. Prod., Ltd. v. Rea*, 726 F.3d 1346, 1356 (Fed.

22

EAGLEBEN-SA_00000197

Cir. 2013). Thus, a POSITA looking at Olthoff and Drager would have followed Drager's teaching not to use protic solvents such as PG and PEG alone with bendamustine.

## 2)    Alam

Defendants also argue that Alam's disclosure of mixing cyclophosphamide with PEG and PG would have motivated a POSITA to use those solvents with bendamustine because both bendamustine and cyclophosphamide have nitrogen mustard groups. D.I. 378 at 16. But two structural differences between cyclophosphamide and bendamustine that effect how they degrade when they are combined with PEG and PG would have discouraged a POSITA from relying on Alam in formulating bendamustine. First, unlike bendamustine, cyclophosphamide does not have a carboxylic acid group and thus does not undergo an esterification reaction when it is combined with PEG or PG. Tr. 1077:25–78:6, 1421:1–5. Second, because the nitrogen mustard group in bendamustine is attached to a benzene ring, while in cyclophosphamide it is attached to a phosphoramide, cyclophosphamide degrades differently at the nitrogen mustard group than bendamustine does. Tr. 1077:4-1077:24; PTX-0991 at TEVABEND00290978; PTX-0993 at TEVABEND00291516. Defendants' expert, Dr. Pinal, did not point to any prior art references to support his contrary conclusion that "the nitrogen group in the two molecules are exactly the same." Tr. 423:7–13, 504:21–05:5.

23

EAGLEBEN-SA_00000198

I find therefore that a POSITA in 2010 would not have viewed cyclophosphamide as a relevant comparator for bendamustine reactions, Tr. 1078:7–11, and would not have considered Alam in formulating a stable bendamustine formulation, Tr. 1420:10–21:5.

* * * *

In sum, Defendants have not proven by clear and convincing evidence that Olthoff, Drager, and Alam would have motivated a POSITA to use PEG and PG to create a non-aqueous liquid bendamustine formulation. Although Olthoff taught using polyols such as PEG and PG with bendamustine, Drager teaches away from the use of protic solvents such as PEG and PG alone with bendamustine and a POSITA would credit Drager's teaching over Olthoff's. Moreover, a POSITA looking to solve the degradation problem in bendamustine would not have considered Alam in formulating a liquid bendamustine product because Alam concerned a compound that degrades differently than bendamustine when combined with PEG and PG.

### c.   Use of Claimed PEG:PG Ratios

Every asserted formulation claim requires a PEG:PG ratio that falls between 95:5 and 75:25. Defendants argue that the claimed PEG:PG ratios would have been obvious "in light of Alam's express disclosure of the entire range from 10:90 to 90:10." D.I. 378 at 19–20. But as explained above, the prior art would not have

24

motivated a POSITA to use PEG and PG in the first place. Also, even if a POSITA had chosen to use PEG and PG, it would not have relied on Alam because Alam concerned a compound that degrades differently than bendamustine in reaction to PEG and PG. Finally, the claimed formulations use more PEG than PG whereas Alam preferred using more PG than PEG, DTX-0056 at 4:6–12, and a POSITA in 2010 would have known that PEG would cause more degradation at bendamustine's nitrogen mustard group than PG due to PEG oxidation. Tr. 1054:5–59:11; PTX-0999 at TEVAVEND00292131; PTX-0997 at TEVABEND00291955. Thus, Alam did not make obvious the PEG:PG ratios recited in the asserted formulation claims.

### d.    Use of An Antioxidant

Every asserted claim requires an antioxidant and one asserted claim requires that the antioxidant be monothioglycerol. Assuming a POSITA had chosen to use a 90% PEG and 10% PG bendamustine formulation, that POSITA would have been motivated to curb PEG oxidation: a process in which PEG accelerates the esterification reaction. Tr. 484:15–85:11, 1416:11–18:12; PTX-0669 at TEVABEND00294275; PTX-0623 at TEVABEND00289470.

Defendants argue that Boylan and Rowe would have motivated a POSITA to solve the oxidation problem with an antioxidant. D.I. 378 at 22–23. They assert that Rowe taught a POSITA to inhibit the oxidation of PEG with the inclusion of a

25

EAGLEBEN-SA_00000200

suitable antioxidant and that Boylan taught using specific antioxidants, including monothioglycerol. D.I. 378 at 23; Tr. 486:7–24, 488:7–9, 505:11–06:7, 543:2–5; DTX-0160_0011; DTX-0063_0020. Defendants also note that monothioglycerol is "very commonly used," and is FDA-approved for injectable products. D.I. 378 at 23.[3]

Other prior art references, however, teach away from the use of antioxidants. *See* Tr. 1452:20–53:21; *Note for Guidance*, European Agency for the Evaluation of Medicinal Products, PTX-0629 at TEVABEND00290713, TEVABEND00290720 ("Antioxidants should only be included in a formulation if it has been proven [t]hat their use cannot be avoided."); *Pharmaceutical Preformulation and Formulation*, Interpharm, PTX-0391 at JDG_BENDA_00000415 (stating that antioxidant use "is now in decline" and that "[a] preferred method of preventing oxidation [over antioxidants] is simply to exclude oxygen"). Moreover, none of the four approved injectable products in the prior art that contained PEG included an antioxidant. Tr. 600:4–6, 1454:24–55:17; PTX-0722 (Ativan); PTX-0718 (Busulfex); PTX-0720 (Robaxin); PTX-0569 at JDG_BENDA_00003308 (VePesid). In addition, the

---

[3] Defendants also assert that Drager taught "the use of antioxidants in the formulation." D.I. 378 at 22. They did not, however, request a finding of fact on this point and none of Drager's preferred or exemplary formulations contained an antioxidant. Drager mentioned that the invention may include other excipients such as an antioxidant, DTX-0073 at 7:1–18, claim 5, but it did not encourage a POSITA to use an antioxidant.

26

EAGLEBEN-SA_00000201

liquid bendamustine examples in Defendants' prior art references do not include antioxidants: Olthoff's liquid bendamustine formulation with PG had no antioxidant, DTX-0094 at JDG_BENDA_00002313; Tr. 1457:5–12, and neither Alam nor Drager used an antioxidant in their exemplary formulations, Tr. 1458:2–58:23. Accordingly, I find that Defendants did not establish by clear and convincing evidence that the combination of Boylan and Rowe would have motivated a POSITA to use an antioxidant.

e.    **Use of the Claimed Bendamustine Concentrations**

Claim 5 of the #831 patent requires a bendamustine concentration of "from about 25 mg/mL to about 50 mg/mL." DTX-0006_0009. Defendants argue that "[t]here was nothing special or unobvious about [that] concentration range" in view of the Treanda® Label and Olthoff. D.I. 378 at 25.

First, Defendants assert that the lyophilized Treanda® Label would have motivated a POSITA to use the claimed concentrations because a POSITA would have multiplied the 120 mg/m$^2$ dose for NHL patients disclosed in the lyophilized Treanda® Label, DTX-0848_0001, by the average body-surface-area of a human, 2.0 m$^2$, to get a 240 mg total dosage, D.I. 378 at 25–26. According to Defendants, the POSITA then would have placed that dose in a common vial size of either 5 mL or 10 mL to arrive at a concentration of either 24 or 48 mg/mL. D.I. 378 at 26. Defendants, however, offered no evidence establishing why a POSITA would have

27

combined a dosage for a lyophilized bendamustine formulation with a particular

vial size when making a liquid bendamustine formulation.

Second, Defendants argue that Olthoff would have motivated a POSITA to

reach the claimed concentration because "Olthoff disclosed and claimed [PG-only]

liquid bendamustine formulations containing 'concentrations of 25 mg/m[L] to 100

mg/m[L],'" D.I. 378 at 25, and Olthoff disclosed that bendamustine's solubility in

PG was very high, 125 mg/mL, D.I. 378 at 26. Defendants assert that "[w]hile the

prior art did not disclose bendamustine's solubility in PEG, . . . solubility is an

inherent (i.e. intrinsic) property" that can be discovered through routine testing,

and given the high 125 mg/mL solubility in PG, a POSITA "would understand that

by adding PEG to PG, the solubility would drop from 125 to a lower value, and

that at ten percent PG and 90 percent PEG, it would be possible to make a solution

with a concentration of 25 milligrams per milliliter." D.I. 378 at 26–27.

But as explained above, Defendants have not established a motivation to use

PEG and PG in the first place. Thus, even assuming that a POSITA could have

found bendamustine's solubility in PEG through routine testing, Defendants did

not establish by clear and convincing evidence that a POSITA would have been

motivated to conduct such testing. As Plaintiffs note, Defendants' expert "testified

only that the POS[IT]A would have considered it 'possible' to dissolve 25 mg/mL

bendamustine in 90:10 PEG:PG at room temperature, far short of establishing

28

motivation" to use PEG.  D.I. 371 at 43.

Moreover, Defendants fail to explain why a POSITA would believe that bendamustine would have a lower solubility in PEG and PG as opposed to in PG alone based only on bendamustine's high solubility in PG.  In choosing a concentration, a POSITA would have required that the bendamustine concentration remain below the formulation's bendamustine solubility limit so that the bendamustine would completely dissolve and dangerous precipitation would not occur.  Tr. 591:19–92:7, 593:23–94:4, 1434:13–35:9, 1435:10–25, 1472:12–14; PTX-0667 at TEVABEND00293319.  Because a POSITA would want to avoid such precipitation, it would likely not combine bendamustine with a 90% PEG and 10% PG formulation based on bendamustine's solubility in PG alone.

### f.   PG Ester Stability Limitations

Finally, certain asserted formulation claims contain a stability limitation, i.e., a maximum amount of degradants called PG esters that the composition can have after storage for a set time period at a set temperature.  For example, claims 2, 3, and 5 of the #831 patent recite compositions having "less than or equal to 0.11% PG esters at about 1 month of storage at about 5°C."  #831 patent at claims 2, 3, 5.

Defendants argue that the stability limitations are an inherent property because at least one obvious formulation in the asserted claims would naturally result in the required PG ester levels.  D.I. 378 at 27.  But "[t]o prove that a claim

29

EAGLEBEN-SA_00000204

limitation is inherent in the prior art, [the challenger] must show . . . [not only] that the limitation at issue is necessarily present, or the natural result of the combination of elements," but also that the combination of elements that naturally result in the limitation is *explicitly disclosed by the prior art*." *Par Pharm., Inc. v. Twi Pharm., Inc.*, 120 F. Supp. 3d 468, 473 (D. Md.), *aff'd*, 624 F. App'x 756 (Fed. Cir. 2015) (emphasis added) (internal quotation marks omitted); *see also* D.I. 378 at 28 ("*Once an embodiment is shown to be obvious*, any corresponding data can be used to show that the stability property is inherent." (emphasis added)). Because I find that the combination of elements that Defendants allege inherently result in the stability limitations is not obvious, such limitations are not obvious through inherency.

### g.    Secondary Considerations

The parties adduced at trial evidence of only one secondary consideration that bears on the formulation claims—commercial success. D.I. 371 at 79–80. Plaintiffs argue that "[s]ales of Bendeka® exceed $2 billion," and that "Bendeka® halted the downward trend in bendamustine sales, despite increasing competition." D.I. 371 at 79. But such evidence does not support a finding of nonobviousness. First, Bendeka® sells at a lower price than the prior art lyophilized Treanda® product. Tr. 1641:25–42:3, 1680:2–12, 1798:8–99:2. Second, Plaintiffs' cluster

EAGLEBEN-SA_00000205

of exclusivities has blocked others from entering the market.[4]  Tr. 1723:24–26:1, 1730:3–7.  "Where market entry by others was precluded . . . the inference of nonobviousness of the asserted claims, from evidence of commercial success, is weak."  *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 740 (Fed. Cir. 2013) (internal quotation marks, alterations, and citations omitted).

\* \* \* \*

Although the evidence of commercial success does not support a finding of nonobviousness, I still find that Defendants have not shown by clear and convincing evidence that the prior art they cited would have motivated a POSITA to reach the claimed formulations.  As discussed above, a POSITA would have credited Drager over Olthoff, and Drager teaches away from the use of protic solvents such as PG and PEG alone with bendamustine.  Moreover, a POSITA would not have relied on Alam in formulating bendamustine.  Finally, clear and convincing evidence does not show that a POSITA would have relied on Boylan and Rowe as motivation to use an antioxidant because of the references that teach

---

[4] Cephalon had an exclusive license from Fujisawa to develop bendamustine in the U.S. DTX-1230_0001, _0002, _0019; Tr. 1226:24–27:1, 1263:21–25, 1233:18–34:25.  Also, in 2008, lyophilized Treanda® obtained seven years of orphan drug exclusivity (ODE) and an additional six months of pediatric exclusivity. Tr. 1723:24–26:1.  Bendeka® also received ODE. *Eagle Pharm.*, 2018 WL 3838265, at \*1.  Thus, Bendeka® received seven years of exclusivity that would prevent generics from entering the market until 2022. Tr. 1723:24–26:1.

31

EAGLEBEN-SA_00000206

away from the use of antioxidants in injectable formulations. And the Treanda® Label and Olthoff would not have motivated a POSITA to reach the claimed concentrations.

### C.    Obviousness of the Asserted Administration Claims

#### 1.    Findings of Fact

##### a.    The Priority Date

The parties agree that the priority dates for the asserted administrations claims are (1) March 20, 2012 for claim 22 of the #568 patent, and (2) July 10, 2012 for the remaining administration claims. D.I. 332; Tr. 2015:10-16.

##### b.    Definition of the Relevant POSITA

The parties agree that a POSITA would have had the skills, education, and expertise of a team of individuals working together to develop a safe and effective administration protocol for a cytotoxic parenteral[5] drug product. Such a team would have included individuals with doctoral degrees in pharmaceutics, pharmaceutical sciences, pharmacology, pharmacokinetics, pharmacodynamics, or related fields, with at least two years of post-graduate experience in developing protocols for pharmaceutical administration, or master's or bachelor's degrees in similar fields of study, with a commensurate increase in their years of post-

---

[5] In the pharmaceutical field, "parenteral" typically refers to products that are administered by injection. Tr. 407:6–8.

32

EAGLEBEN-SA_00000207

graduate experience.  Such a team would have been familiar with a variety of issues relevant to administering liquid injectable drug products, including, among other things, toxicity, solubility, pharmacokinetics, and pharmacodynamics.  Such a team would have included at least one individual with a medical degree with experience in treating patients with CLL and NHL.  PDX-2-4; Tr. 1112:4-20, 1293:22–94:9, 1233:1–17, 2014:22–15:2.

### c.    Content of the Asserted Administration Claims

The asserted administration claims recite methods of treating CLL or NHL[6] with a liquid bendamustine composition.  #568 patent at claims 11, 18, 22; #887 patent at claim 13.  Certain claims require administering the bendamustine composition on days one and two of a 21-day cycle for NHL, #568 patent at claim 18, or on days one and two of a 28-day cycle for CLL, #568 patent at claim 11.  One claim requires a bendamustine dose of "about 25 mg/m$^2$ to about 120 mg/m$^2$."  #887 patent at claim 13.

The asserted administration claims also specify administration times, the longest time being "about 15 minutes or less."  *See e.g.,* #568 patent at claim 22; #887 patent at claim 13.  They also specify administration volumes that are all 100 mL or less.  *See e.g.,* #399 patent at claim 13.  Finally, certain claims specify post-

---

[6] Two claims recite, more generally, a "method of treating cancer or malignant disease."  #399 patent at claims 13, 15.

33

EAGLEBEN-SA_00000208

dilution bendamustine concentrations ranging from 0.05 mg/mL to 12.5 mg/mL. *See e.g.,* #568 patent at claims 11, 18.

### d.    Content of the Prior Art

Defendants argue that eight prior art references would have motivated a POSITA to combine the elements of the claimed administration with a reasonable expectation of success: Palepu 2011, the Treanda® Label, Preiss 1985, Preiss 1998, Schöffski 2000a, Schöffski 2000b, Barth, and Glimelius.[7]  D.I. 378 at 53.

### 1)    Palepu 2011 (DTX-0984)

Palepu 2011 is the published application that led to the asserted formulation patents.  Tr. 546:25–47:17.  The parties have stipulated that Palepu 2011 disclosed the formulations claimed in the asserted formulation and administration claims. D.I. 320 ¶ 6.

### 2)    Treanda® Label (DTX-0993 and DTX-1202)

The Treanda® Label, published in April 2009, D.I. 307-1 ¶ 247, disclosed two FDA-approved liquid bendamustine composition dosing schedules: (1) for CLL, intravenous (IV) infusion at a dose of 100 mg/m$^2$ over 30 minutes on days

---

[7] Defendants also cite Olthoff to argue that the asserted administration claims were obvious, but the arguments regarding Olthoff were advanced only by Dr. Yates, an admitted non-formulator, and an expert that all Defendants but Apotex rejected. Tr. 918:11–17, 920:19–22:13.  Dr. Yates is a professional witness with limited relevant experience who has testified repeatedly for Apotex. Tr. 908:17–13:12.  I did not find his testimony credible and do not rely on it.

34

one and two of a 28-day cycle for up to six cycles, Tr. 648:3–9; DTX-0993_0001; DTX-1202_001; and (2) for NHL, IV infusion at a dose of 120 mg/m$^2$ over 60 minutes on days one and two of a 21-day cycle for up to eight cycles, DTX-0993_0001; DTX-1202_001; Tr. 648:3–9.

The Treanda® Label required the administration of Treanda® in a volume of 500 mL, Tr. 652:13–16; DTX-1202_002, with a post-dilution bendamustine concentration of 0.2–0.6 mg/mL bendamustine, DTX-0993_0002; DTX-1202_003; Tr. 652:21–23.

### 3)    Preiss 1985 (DTX-0320; DTX-0985)

Preiss 1985 disclosed the results of a pharmacokinetic analysis of bendamustine. DTX-0320_0002; Tr. 658:25–59:2, 1119:18–20. A pharmacokinetic analysis is a preliminary study in which a new drug is administered to a small number of patients to determine the Cmax and area under the curve (AUC). The Cmax is the peak concentration of the drug in the bloodstream; the AUC is the patient's total exposure to the drug. Tr. 659:3–15, 847:8–24, 1114:2–7, 1120:18–25. Pharmacokinetic studies are not designed to assess a drug's safety. Tr. 724:7–12, 1120:8–25.

Preiss 1985 administered bendamustine intravenously for three minutes to seven patients with various cancers. DTX-0320_0002; Tr. 659:23–60:2, 723:16–24:3. Preiss 1985 administered an average total dose of 280 to 375 mg.

EAGLEBEN-SA_00000210

Preiss 1985 reported "only rather mild side effects" at those doses. DTX-0320_0006; Tr. 664:6–20, 1123:9–22.

### 4)    Preiss 1998 (DTX-0991)

Preiss 1998 investigated bendamustine's clinical pharmacology and defined bendamustine's maximum tolerated dose (MTD) and dose limiting toxicities (DLT). DTX-0991_0002; Tr. 674:16–25. The MTD of a drug is a tolerable dose without severe or life-threatening toxicities; it differs from a recommended dose for clinical use. Tr. 1126: 9–11. DLTs are severe or life-threatening side effects. Tr. 674:23–75:1, 1126:12–23. Preiss 1998 administered bendamustine to more than 50 patients with various cancers. DTX-0991_002. Preiss 1998 was not designed to evaluate the safety of an infusion protocol. Tr. 730:22–31:1, 731:8–21.

Preiss 1998 administered three-to-ten-minute one-time infusions of bendamustine in doses ranging from 54 to 226 mg/m$^2$. It also administered three-to-ten-minute infusions on four consecutive days in doses ranging from 20 to 88 mg/m$^2$. DTX-0987_005. Preiss 1998 concluded that "only mild toxicity occurred even at high doses (> 200mg/m$^2$ b-hydrochloride per cycle)." DTX-0991_0004; Tr. 676:19–25. Preiss 1998 reported "disorientation" and a "vegetative neurotoxic effect" after the one-time infusions of 175 mg/m$^2$ and 215 mg/m$^2$ doses. DTX-991_0004, _0005.

EAGLEBEN-SA_00000211

### 5)    Schöffski 2000a (DTX-0987)

Schöffski 2000a administered bendamustine over 30 minutes and compared its results to the three-to-ten-minute infusions disclosed in Preiss 1998.  DTX-0987_0002,_0005; Tr. 678:4–14.  Schöffski 2000a reported that some side effects from its 30-minute infusions were comparable to those observed with the three-to-ten-minute infusions in Preiss 1998.  DTX-0987_0005,_0006; Tr. 678:10–79:5.

### 6)    Schöffski 2000b (DTX-0988)

Schöffski 2000b administered 60 to 80 mg/m$^2$ of bendamustine in 30 minutes.  DTX-0988_0001–03; Tr. 679:20–22.  Schöffski 2000b observed side effects that were comparable to those observed in Schöffski 2000a.  DTX-0988_0005.  Schöffski 2000b's authors did not "observe confusion or other signs of neurotoxicity when giving the drug as a repeated 30-min i.v. infusion."  DTX-0988_0005.

### 7)    Barth 2010 (DTX-1004)

Barth suggested administering bendamustine in a solvent volume of 100 to 250 mL.  DTX-1004_0005; Tr. 658:12–20, 681:21–83:8.  Barth explained that

> [t]he 30-minute short infusion [of bendamustine] that is practiced in Germany can be readily achieved with infusion volumes of 100 to 250 m[L] 0.9% NaCl.
> It is unclear why the American prescribing information specifies 500 m[L] 0.9% NaCl or a final concentration of 0.2-0.6 mg/m[L] . . . .  A short infusion with such volume is difficult to implement.

37

EAGLEBEN-SA_00000212

DTX-1004_0005; Tr. 682:9–83:2. Barth did not disclose any study or data. DTX-1004_0005; Tr. 1157:22–59:18.

### 8)    Glimelius (DTX-0079)

Glimelius disclosed the administration of 5-Fluorouracil to treat colorectal cancer as an infusion lasting ten to 20 minutes using a 50 to 100 mL mini-bag. DTX-0079_0001, _0002. Mini-bags are small standard size bags. Tr. 554:2–9.

### 2.    Conclusions of Law

Defendants did not establish by clear and convincing evidence that a POSITA would have been motivated to combine the prior art references to arrive at the claimed administrations with a reasonable expectation of success. Although the prior art would have motivated a POSITA to reach the claimed formulation, dose, and dosing schedule, and although Plaintiffs' proffered secondary indicia of nonobviousness were of little or no probative value, I find that the prior art would not have motivated a POSITA to reach the remaining claim limitations, and thus the claims as a whole are not obvious.

### a.    Formulation, Dose, and Dosing Schedule

The parties agree that Palepu 2011, the published application that led to the asserted formulation patents, disclosed before the priority date the formulations found in the asserted administration claims. D.I. 320 ¶ 6. But Plaintiffs argue that Defendants have not shown that a POSITA would have been motivated to select

38

EAGLEBEN-SA_00000213

PTO/AIA/26 (04-14)
Approved for use through 05/31/2024. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| TERMINAL DISCLAIMER TO OBVIATE A DOUBLE PATENTING REJECTION OVER A "PRIOR" PATENT | Docket Number (Optional) 107071.000582 |
|---|---|

In re Application of: Nagesh R. Palepu, et al.

Application No.: 18/081,238

Filed: December 14, 2022

For: FORMULATIONS OF BENDAMUSTINE

The applicant, _Eagle Pharmaceuticals, Inc._____, owner of _____100_____ percent interest in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term of **prior patent** No. _see attached_____ as the term of said **prior patent** is presently shortened by any terminal disclaimer. The applicant hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the **prior patent** are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the applicant does not disclaim the terminal part of the term of any patent granted on the instant application that would extend to the expiration date of the full statutory term of the **prior patent**, "as the term of said **prior patent** is presently shortened by any terminal disclaimer," in the event that said **prior patent** later:
    expires for failure to pay a maintenance fee;
    is held unenforceable;
    is found invalid by a court of competent jurisdiction;
    is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321;
    has all claims canceled by a reexamination certificate;
    is reissued; or
    is in any manner terminated prior to the expiration of its full statutory term as presently shortened by any terminal disclaimer.

Check either box 1 or 2 below, if appropriate.

1. [ ]    The undersigned is the applicant. If the applicant is an assignee, the undersigned is authorized to act on behalf of the assignee.

I hereby acknowledge that any willful false statements made are punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

2. [✓]    The undersigned is an attorney or agent of record. Reg. No. _51430_____

| /Stephanie A. Lodise/ | June 16, 2023 |
|---|---|
| Signature | Date |

| Stephanie A. Lodise | |
|---|---|
| Typed or printed name | |

| Attorney of record | 513.929.3400 |
|---|---|
| Title | Telephone Number |

[✓] Terminal disclaimer fee under 37 CFR 1.20(d) included.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

A Federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with an information collection subject to the requirements of the Paperwork Reduction Act of 1995, unless the information collection has a currently valid OMB Control Number. The OMB Control Number for this information collection is 0651-0031. Public burden for this form is estimated to average 12 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the information collection. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden to the Chief Administrative Officer, United States Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450 or email InformationCollection@uspto.gov. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **If filing this completed form by mail, send to: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

EAGLEBEN-SA_00000214

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. The United States Patent and Trademark Office (USPTO) collects the information in this record under authority of 35 U.S.C. 2. The USPTO's system of records is used to manage all applicant and owner information including name, citizenship, residence, post office address, and other information with respect to inventors and their legal representatives pertaining to the applicant's/owner's activities in connection with the invention for which a patent is sought or has been granted. The applicable Privacy Act System of Records Notice for the information collected in this form is COMMERCE/PAT-TM-7 Patent Application Files, available in the Federal Register at 78 FR 19243 (March 29, 2013). https://www.govinfo.gov/content/pkg/FR-2013-03-29/pdf/2013-07341.pdf

Routine uses of the information in this record may include disclosure to: 1) law enforcement, in the event that the system of records indicates a violation or potential violation of law; 2) a Federal, state, local, or international agency, in response to its request; 3) a contractor of the USPTO having need for the information in order to perform a contract; 4) the Department of Justice for determination of whether the Freedom of Information Act (FOIA) requires disclosure of the record; 5) a Member of Congress submitting a request involving an individual to whom the record pertains, when the individual has requested the Member's assistance with respect to the subject matter of the record; 6) a court, magistrate, or administrative tribunal, in the course of presenting evidence, including disclosures to opposing counsel in the course of settlement negotiations; 7) the Administrator, General Services Administration (GSA), or their designee, during an inspection of records conducted by GSA under authority of 44 U.S.C. 2904 and 2906, in accordance with the GSA regulations and any other relevant (i.e., GSA or Commerce) directive, where such disclosure shall not be used to make determinations about individuals; 8) another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)); 9) the Office of Personnel Management (OPM) for personnel research purposes; and 9) the Office of Management and Budget (OMB) for legislative coordination and clearance.

If you do not furnish the information requested on this form, the USPTO may not be able to process and/or examine your submission, which may result in termination of proceedings, abandonment of the application, and/or expiration of the patent.

## Additional Uses

Additional USPTO uses of the information in this record may include disclosure to: 1) the International Bureau of the World Intellectual Property Organization, if the record is related to an international application filed under the Patent Cooperation Treaty; 2) the public i) after publication of the application pursuant to 35 U.S.C. 122(b), ii) after issuance of a patent pursuant to 35 U.S.C. 151, iii) if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections, or an issued patent, or iv) without publication of the application or patent under the specific circumstances provided for by 37 CFR 1.14(a)(1)(v)-(vii); and/or 3) the National Archives and Records Administration, for inspection of records.

EAGLEBEN-SA_00000215

**DOCKET NO.: 107071.000582**                                              **PATENT**
**Application No.: 18/081,238**

## TERMINAL DISCLAIMER ATTACHMENT SHEET FOR LISTING MULTIPLE DOUBLE PATENTING REFERENCES

In accordance with the Manual of Patenting Examining Procedure (MPEP) § 804.02, a single terminal disclaimer form is hereby filed in which the term disclaimed is based on all the references listed below:

9,572,797

9,265,831

9,572,888

9,597,398

10,052,385

11,103,483

A relevant excerpt from Manual of Patenting Examining Procedure (MPEP) § 804.02 is shown below:

## IV.   DISCLAIMING MULTIPLE DOUBLE PATENTING REFERENCES

If multiple conflicting patents and/or pending applications are applied in nonstatutory double patenting rejections made in a single application, then prior to issuance of that application, it is necessary to disclaim the terminal part of any patent granted on the application which would extend beyond the expiration date of each one of the conflicting patents and/or applications. A terminal disclaimer fee is required for each terminal disclaimer filed. **To avoid paying multiple terminal disclaimer fees, a single terminal disclaimer based on common ownership may be filed, for example, in which the term disclaimed is based on all the conflicting, commonly owned nonstatutory double patenting references**. Similarly, a single terminal disclaimer based on a joint research agreement may be filed, in which the term disclaimed is based on all the conflicting nonstatutory double patenting references.

EAGLEBEN-SA_00000216

**DOCKET NO.: 107071.000582**                                                    **PATENT**
**Application No.: 18/081,238**

### TERMINAL DISCLAIMER ATTACHMENT SHEET FOR LISTING MULTIPLE DOUBLE PATENTING REFERENCES

In accordance with the Manual of Patenting Examining Procedure (MPEP) § 804.02, a single terminal disclaimer form is hereby filed in which the term disclaimed is based on all the references listed below:

10,010,533

9,597,397

9,572,796

8,609,707

9,579,384

A relevant excerpt from Manual of Patenting Examining Procedure (MPEP) § 804.02 is shown below:

### IV.   DISCLAIMING MULTIPLE DOUBLE PATENTING REFERENCES

If multiple conflicting patents and/or pending applications are applied in nonstatutory double patenting rejections made in a single application, then prior to issuance of that application, it is necessary to disclaim the terminal part of any patent granted on the application which would extend beyond the expiration date of each one of the conflicting patents and/or applications. A terminal disclaimer fee is required for each terminal disclaimer filed. **To avoid paying multiple terminal disclaimer fees, a single terminal disclaimer based on common ownership may be filed, for example, in which the term disclaimed is based on all the conflicting, commonly owned nonstatutory double patenting references**. Similarly, a single terminal disclaimer based on a joint research agreement may be filed, in which the term disclaimed is based on all the conflicting nonstatutory double patenting references.

EAGLEBEN-SA_00000217

**DOCKET NO.: 107071.000582**                                          **PATENT**
**Application No.: 18/081,238**

**TERMINAL DISCLAIMER ATTACHMENT SHEET FOR LISTING MULTIPLE DOUBLE PATENTING REFERENCES**

In accordance with the Manual of Patenting Examining Procedure (MPEP) § 804.02, a single terminal disclaimer form is hereby filed in which the term disclaimed is based on all the references listed below:

9,597,399

9,034,908

9,144,568

9,572,887

A relevant excerpt from Manual of Patenting Examining Procedure (MPEP) § 804.02 is shown below:

**IV.   DISCLAIMING MULTIPLE DOUBLE PATENTING REFERENCES**

If multiple conflicting patents and/or pending applications are applied in nonstatutory double patenting rejections made in a single application, then prior to issuance of that application, it is necessary to disclaim the terminal part of any patent granted on the application which would extend beyond the expiration date of each one of the conflicting patents and/or applications. A terminal disclaimer fee is required for each terminal disclaimer filed. **To avoid paying multiple terminal disclaimer fees, a single terminal disclaimer based on common ownership may be filed, for example, in which the term disclaimed is based on all the conflicting, commonly owned nonstatutory double patenting references**. Similarly, a single terminal disclaimer based on a joint research agreement may be filed, in which the term disclaimed is based on all the conflicting nonstatutory double patenting references.

EAGLEBEN-SA_00000218

Palepu 2011's formulations for the administrations recited in the asserted claims. D.I. 371 at 48. Palepu 2011 itself, however, established a motivation to use its formulations: it touted advantages of its disclosed formulations including "that they have substantially improved long term stability when compared to currently available formulations" and that they "are advantageously ready to use or ready for further dilution" and thus "[r]econstitution of lyophilized powder is not required." DTX-0984_0002 at [0007]; Tr. 889:8–90:3. It is undisputed that a POSITA would have wanted to use a stable and ready-to-use formulation as part of an improved administration method.

A POSITA also would have been motivated to combine Palepu 2011 with the Treanda® Label to come up with the claimed doses and dosing schedule. Palepu 2011 instructed administering its formulations in accordance with the Treanda® dosing schedule. DTX-0984_0004 at [0044]; Tr. 856:8–9. And the Treanda® Label taught similar doses and the same dosing schedules as those in the asserted administration claims. DTX-0993_0001; DTX-1202_0001; Tr. 654:18–21, 695:10–20. The required dose found in the claims is about 25 mg/m$^2$ to about 120 mg/m$^2$ and the Treanda® Label requires doses of 100 mg/m$^2$ or 120 mg/m$^2$. #887 patent at claim 13; DTX-0993_0001; DTX-1202_0001. Also, the dosing schedule recited in the claims is the same as the Treanda® Label's schedule: (1) for CLL, infusion on days one and two of a 28-day cycle, #568 patent

39

EAGLEBEN-SA_00000219

at claim 18; DTX-0993_0001; DTX-1202_001; Tr. 648:3–9; and (2) for NHL, IV infusion on days one and two of a 21-day cycle, #568 patent at claim 11; DTX-0993_0001; DTX-1202_001; Tr. 648:3–9.

That said, the asserted administration claims require administering each bendamustine dose in faster times, in lower volumes, and at higher post-dilution concentrations than the Treanda® Label requires. The question thus remains whether a POSITA would have been motivated to reach the claimed administration times, volumes, and concentrations.

### b.     Administration Times, Volumes, and Post-Dilution Concentrations

All asserted claims require administering bendamustine in 15 minutes or less, with some requiring ten minutes or less. All asserted claims also require administering bendamustine in a volume of 100 mL or less, with some claims requiring about 50 mL. Finally, all but one of the asserted administration claims require post-dilution bendamustine concentrations ranging from 0.05 to 12.5 mg/mL.[8]

Defendants argue that the claimed administration times were obvious under the Preiss and Schöffski studies; that the claimed administration volumes are

---

[8] Claim 13 of the #887 patent, the only claim asserted against Slayback, does not have a concentration limitation. D.I. 362 at 3.

EAGLEBEN-SA_00000220

obvious under the Preiss studies, Barth, and Glimelius;[9] and that the claimed post-dilution concentrations are obvious under the Preiss studies and the Treanda® Label.  Defendants also contend that Eagle's post-invention statements corroborate Defendants' assertion that the Preiss studies would have motivated a POSITA to use shorter administration times, lower volumes, and higher concentrations.

### 1)    The Preiss Studies

Defendants argue that the Preiss studies support a finding that the claimed administration times, volumes, and concentrations are obvious.  First, Defendants argue that a POSITA would have been motivated to administer bendamustine in 15 minutes or less because Preiss 1985 and Preiss 1998 disclosed that administration of bendamustine in three-to-ten minutes was well-tolerated in humans and Schöffski 2000a and 2000b disclosed that the safety results of 30-minute bendamustine administrations were consistent with Preiss's three-to-ten-minute infusions.  D.I. 378 at 39–40.  Second, Defendants assert that the Preiss studies render the claimed volumes of 100 mL or less obvious because, although the Preiss references did not disclose a volume, a POSITA would have known based on Preiss's three-to-ten-minute time constraint and typical infusion rates that the

---

[9] Relying on the testimony of Dr. Yates, Defendants also cite Olthoff to argue that the claimed volumes were obvious.  D.I. 378 at 43.  As noted above, I did not find Dr. Yates's testimony to be credible and will not rely on it.  Moreover, Olthoff's example bendamustine formulation did not use PEG and, as explained above, Drager discredited Olthoff's data.  DTX-0094_0015; Tr. 923:14–24.

EAGLEBEN-SA_00000221

studies infused similar volumes. D.I. 378 at 42. Third, Defendants contend that Preiss rendered the claimed concentrations of 0.05 to 12.5 mg/mL obvious because Preiss 1985 likely used a concentration of 5.6 mg/mL. D.I. 378 at 46.

I find, however, that the Preiss studies would not have motivated a POSITA to reach the claimed administration times, volumes, or concentrations because (1) a POSITA would not have relied on the Preiss studies to determine a safe and effective infusion time, volume, or concentration for bendamustine, (2) subsequent prior art taught away from Preiss's three-to-ten-minute infusions, and (3) Defendants only hypothesize that the Preiss studies used volumes and concentrations similar to those in the claimed administrations.

### a) A POSITA would not have relied on the Preiss studies to determine a safe administration.

As an initial matter, Preiss 1985 and Preiss 1988 were not designed to evaluate safety, and thus a POSITA would not have relied on the Preiss studies to determine a safe infusion time, volume, or concentration. Tr. 724:7–12, 730:22–31:1, 731:8–21. Moreover, the Preiss studies did not provide enough data points or information to allow a POSITA to rely on them for safety information. Preiss 1985 tested only seven patients with various cancers, DTX-320_0002; Tr. 723:16–24:3, 1122:20–22; it did not discuss how it collected side effect information, including the number or timing of observations, the side effects being

42

observed, or a grading system, Tr. 724:14–28:16; and it neither specified which of the seven patients in the study had side effects nor distinguished between IV and oral side effects, Tr. 728:8–20. A POSITA would not have concluded that side effects would not be present in a larger population, Tr. 1121:1–5, let alone the relevant population, Tr. 1122:20–23:8, based on a study that covered only seven patients with various cancers and offered no explanation of how the side effects were studied or which patients experienced the side effects. Preiss 1998 similarly tested patients with various cancers, Tr. 1125:24–26:1, and it did not disclose when the side effects it reported were monitored or how many times side effect information was collected from patients. Thus, a POSITA would not have relied on either Preiss study to determine the safety of a short bendamustine infusion. Tr. 1122:14–19, 1123:9–22.

In addition, the parties agree that the claimed administrations require repeated cycles, D.I. 378 at 38; D.I. 371 at 59, but the Preiss studies did not administer bendamustine in repeated cycles.[10] And according to Defendants' expert, "bendamustine therapy side effects result from . . . the number of cycles given" and "these side effects are typically more severe in subsequent cycles

---

[10] Defendants cited no reference that administered bendamustine in ten minutes or less in repeated cycles. Tellingly, Defendants' references that did administer bendamustine in repeated cycles all used 30-minute infusions. DTX-0987_0001; DTX-0988_0001; DTX-1004_0002, _0005; DTX-0848; PTX-0268.

43

EAGLEBEN-SA_00000223

because there are cumulative effects on bone marrow." Tr. 736:11–37:20. A

POSITA would therefore not have relied on the Preiss studies to determine the

safety of a short infusion of bendamustine administered in multiple cycles. Tr.

1133:7–11. Moreover, neither Preiss study administered bendamustine over two

consecutive days as the claims require. Tr. 1129:12–20.

The Schöffski articles also would not have motivated a POSITA to rely on

the Preiss studies to determine the safety of a short infusion time, lower infusion

volume, or higher infusion concentration. Schöffski 2000a reported that it

observed *some* side effects like those in Preiss 1998, but did not compare the

overall incidence or severity of side effects in the two infusion protocols.

DTX_0987_0006,_0007; Tr. 1138:21–39:19. Also, Schöffski 2000b stated that it

observed similar side effects to those observed in Schöffski 2000a, not that it

observed the same side effects as Preiss. And Schöffski 2000b stated that it did not

"observe confusion or other signs of neurotoxicity when giving the drug as a

repeated 30-min i.v. infusion," DTX-0988_005, while Preiss 1998 reported

"disorientation" and a "vegetative neurotoxic effect," DTX-0991 at

JDG_BENDA_00006920–21.

### b) Subsequent prior art taught away from the Preiss infusions.

Subsequent prior art also would have dissuaded a POSITA from relying on

the Preiss studies. A POSITA would not have stopped with Preiss 1985 and Preiss

44

1998; instead, it would have also considered later prior art references that used 30 to 60 minute infusions and a 500 mL volume. "Too often the obviousness analysis is framed as an inquiry into whether a person of skill, with two (and only two) references sitting on the table in front of him, would have been motivated to combine . . . the references in a way that renders the claimed invention obvious. The real question is whether that skilled artisan would have plucked [those references] out of the sea of prior art and combined [them]." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016).

The Preiss researchers themselves conducted later studies and recommended in subsequent papers an infusion of at least 30 minutes in 500 mL. DTX-0987_0001; DTX-0988_0001; PTX-0268; DTX-0982_0009; Tr. 1145:13–46:7. Preiss 2003——conducted by the same research group as Preiss 1985 and 1998—— reported administration over 30 minutes in repeated cycles. PTX-0268; Tr. 1141:21–43:15. Moreover, the Ribomustin Monograph——which set forth the prescription information for the German bendamustine product Ribomustin and was developed by a company that employed scientists involved in the Preiss and Schöffski studies——recommended a 30 to 60 minute infusion in 500 mL because of local toxicity concerns. DTX-0982_009; Tr. 1143:17–44:13, 1144:14–45:5, 1146:8–54:4.

45

      **c)     Defendants only hypothesize that the
Preiss studies used the claimed volumes
and concentrations.**

Finally, Defendants only hypothesize that the Preiss studies used similar

volumes and concentrations as those recited in the asserted claims. With respect to

volume, Defendants assert that although the Preiss references did not disclose a

volume, "[b]ecause administration time and volume are related," a POSITA would

have known based on Preiss's three-to-ten-minute time constraint and typical

infusion rates that the studies infused small volumes. D.I. 378 at 42 (citations

omitted). With respect to concentration, Defendants contend that "Preiss 1985

administered bendamustine in a dose of 280-375 mg in a bolus, [i.e., a volume that

the] evidence showed likely meant 50 or 100 mL," and diluting 280 mg in 50 mL

would result in a concentration of 5.6 mg/mL. D.I. 378 at 46. Such speculations

about Preiss's infusion rate and volume, however, are only based on "conclusory

and unsupported expert testimony" and they do not support a finding of

obviousness by clear and convincing evidence. *See TQ Delta, LLC v. CISCO Sys.,

Inc.*, 942 F.3d 1352, 1361 (Fed. Cir. 2019) ("In cases like *InTouch*, *ActiveVideo*,

and *DSS*, we rejected obviousness determinations based on conclusory and

unsupported expert testimony.").

Defendants have thus failed to establish by clear and convincing evidence

that the Preiss studies support a finding that the claimed infusion times, volumes,

46

EAGLEBEN-SA_00000226

and concentrations were obvious. "Whether a skilled artisan would be motivated to make a combination includes whether he would select particular references in order to combine their elements," *WBIP*, 829 F.3d at 1337, and a POSITA in 2010 would not have selected the Preiss studies to determine a safe and effective infusion for a bendamustine formulation.

### 2) Barth and Glimelius

Defendants also argue that the administration volumes are obvious under Barth and Glimelius. They note that Barth recommended a 100 to 250 mL bendamustine infusion, D.I. 378 at 43, and that a "POS[IT]A would have known from Glimelius (DTX-0079) that minibags, [standard infusion bag sizes of 50 or 100 mL], were typically used for infusions of 10-20 min," D.I. 378 at 44 (citations omitted).

Barth and Glimelius, however, would not have motivated a POSITA to use the claimed volumes. First, Barth did not disclose any study or data; it only suggested hypothetical smaller volumes. DTX-1004_0005; Tr. 1159:10–18. And Barth's 100 to 250 mL suggestion did not cover the claimed volumes (all claims require 100 mL or less). DTX-1004_0005; Tr. 1159:3–16. Second, Glimelius did not disclose any bendamustine administration, Tr. 841:3–42:22, and the mere availability of a standard IV bag would not have given a POSITA motivation to use a bag that size. IV bags of 50 mL were available before the priority date, but

47

had never been used to deliver bendamustine.  D.I. 371 at 58.

### 3)      The Treanda® Label

Defendants also assert that the Treanda® Label would have motivated a POSITA to use the claimed post-dilution concentrations.  They argue that the claimed concentrations are obvious as inherent because diluting the claimed doses disclosed in the Treanda® Label in the claimed volume of liquid necessarily would have resulted in the claimed concentrations of bendamustine, PG, and PEG.  D.I. 378 at 44.  But because I find that the claimed volumes are not obvious, it does not follow that the claimed concentrations are obvious as inherent.   Defendants also state that "on the lower end of the spectrum, the [claimed] concentration falls within the 0.2-0.6 mg/mL concentration of the Treanda® Label."  D.I. 378 at 45. But the Treanda® concentrations only cover a small portion of the claimed range of 0.05 to 12.5 mg/mL and thus they do not render the claimed concentrations obvious.

### 4)      Eagle's Post-Invention Statements

Defendants further argue that, through post-invention statements, Plaintiffs admitted that the prior art taught that short infusions in lower volumes were safe and effective.  Defendants point to the fact that Eagle relied on the conclusions from the Preiss studies when it told the FDA that its Bendeka® protocol was safe. D.I. 378 at 51.

48

It is true that, in support of its request for permission to test Bendeka®, Eagle submitted to the FDA a Detailed Review of Literature that relied in part on data from the Preiss and Schöffski references. DTX-1041_0175. The literature review stated: "Thus, the short duration infusion of bendamustine appears to be well tolerated in this study and a dose of 215 milligrams has been reported in the literature as the clinically tolerated dose for bolus administration of bendamustine." DTX-1041_0175. Later, Eagle made similar statements to the FDA when drafting its Investigator's Brochure to support its requested study that required administering the Bendeka® formulation in ten minutes. DTX-1061 at 14.

Eagle's submissions to the FDA, however, also contained non-public, non-prior-art tests and analysis Eagle had conducted to show those short-infusion protocols were safe to test in humans. DTX-1041_0025–26. And I find that Eagle's post-invention discussion of the prior art that is intermingled with its own non-public data that it developed in inventing the claimed administration does not show that a POSITA who did not have Eagle's non-public data would have relied on the Preiss studies. Conclusions drawn from a patentee's "disclosures to the FDA" risk being "distorted by hind-sight bias," especially here where the FDA submission was dated after the priority dates and thus was written "through the lens of what [the inventor] had invented." *Neptune Generics, LLC v. Eli Lilly & Co.*, 921 F.3d 1372, 1377 (Fed. Cir. 2019).

49

In sum, Defendants failed to prove by clear and convincing evidence that a POSITA reading the Preiss and Schöffski studies, Barth, Glimelius, and the Treanda® Label would have found the claimed infusion times, volumes, and concentrations obvious.

### c.    Secondary Considerations

Plaintiffs offered at trial evidence of four secondary considerations that bear on the administration claims: skepticism, long-felt need, commercial success, and industry praise. I did not, however, find this evidence to be probative indicia of nonobviousness for the following reasons.

### 1)    Skepticism

Plaintiffs argue that "industry participants" were skeptical of the claimed invention. D.I. 371 at 77. But the skepticism they cite was apparently held by a "couple of nurses, a pharmacist[,] and an oncology medical resident," DTX-0959_0001, and investors, D.I. 371 at 78. Such "lack of enthusiasm by a few is not equivalent to skepticism." *BTG Int'l Ltd. v. Amneal Pharm. LLC*, 923 F.3d 1063, 1076 (Fed. Cir. 2019).

Plaintiffs also contend that the FDA declined to allow testing of Eagle's IV push method of administration because of safety concerns. D.I. 371 at 78. But the IV push method is not the claimed invention; the invention is the ten-minute infusion and the FDA told Eagle to proceed with its ten-minute infusion study.

50

EAGLEBEN-SA_00000230

PTX-0746 at EGL-BENDEKA_00146354; Tr. 1691:3–14; *see also* PTX-0747 at

EGL-BENDEKA_00146355 ("[Eagle] stated that they have decided not to

evaluate the IV push method administration. [Eagle] will use 120 mg/m² over 10

minutes in their bridging study.").

### 2) Long-Felt Need

Plaintiffs also argue that Bendeka®'s shorter infusion addressed a "long-felt

need to reduce chair time for chemotherapy, improving patient experience and

allowing more patients to be treated." D.I. 371 at 79. The parties offered

competing expert testimony on this point. I found credible only Defendant's

expert, Dr. Thirman, who testified that Bendeka® does not meaningfully reduce

chair time because patients receive IV fluids and other drugs simultaneously with

the administration of Bendeka® and the administration of those fluids and other

drugs lasts for much longer than 15 minutes. Tr. 188:20–89:9, 189:22–24,

1744:14–51:20, 1745:20–46:6, 1751:3–51:8, 1765:18–66:6, 1779:11–18; DTX-

0968_0001. For example, Bendamustine is frequently administered with a drug

called Rituxan that has an administration time of four to eight hours. Tr.

190:24–91:6, 191:2–6, 713:14–22, 1746:11–17, 1781:14–22.[11]

---

[11] Plaintiffs' expert, Dr. Agarwal, was not credible. He testified that, based on his experience in a "community-based cancer center," Tr. 1288:19, there were "always issues with the chair time" in the oncology field and that Bendeka® resolved the chair time need, Tr. 1304:7–05:19. My assessment of his lack of credibility was informed by the logic and credible nature of Dr. Thirman's testimony and also by

EAGLEBEN-SA_00000231

Dr. Agarwal's dissembling with respect to his billing practices (which might explain why he favored shorter chair times). Dr. Agarwal initially denied having any idea how his patients are billed for his work: "I mean, I'm not, I'm not the biller and I don't get paid by the amount I bill or anything. . . . My only concern is the patient's safety and that's all I care about. . . . I have no clue honestly about billing, billing procedures." Tr. 1339:15–21. He volunteered that "billing, which is a totally different department, I have no clue how they do it and I don't take a look at it. I don't even know how to look at it." Tr. 1340:15–17. And when asked how billing relates to infusion time, Dr. Agarwal claimed to have "no idea how the billing codes work with the infusion." Tr. 1344:13–17. But when asked by the Court if he was "paid by salary," Dr. Agarwal responded: "So the way it works is, what they [his practice group] wanted is eat what you kill. Basically, if I see more patients, I get paid more. If I work harder, I get more. If I work less, I get paid less." Tr. 1345:7–11. He then continued to explain the billing process in detail:

> So the way it works is, so we have like repeated billing codes for repeated business, which are from level one to level four, and that's very small. You just mark what billing code you want to put. These are being audited by McKesson and auditors, that you are not -- they look at our notes. They decide if the doctor is overbilling or underbilling with the code. We have another code for the new patient.
>
> * * * *
>
> So they have like one to four levels of visit. Depending on how much time I spend with a patient, either from 15 minutes to 30 minutes, I can go from a level one visit to a level four visit and that's what I mark on that. I think it's level one to level five. Level five is a very complex visit where I spend an hour or more with a patient, and most of the visits are about level three or level four, but these patients that are going to see me, I just bill level 3 or 4 and then I submit the payment and that is taken care of by the billing and coding department.

Tr. 1345:19–46:1, 1346:13–23. Also, when Dr. Agarwal was asked if he was "familiar with a term called infusion billing," he responded "Yes." Tr. 1338:2–4.

52

EAGLEBEN-SA_00000232

### 3)    Commercial Success

Plaintiffs further argue that Bendeka®'s commercial success is demonstrated by (1) the fact that "Bendeka® halted the downward trend in bendamustine sales, despite increasing competition," D.I. 371 at 79, and (2) "Teva's choice to license Bendeka® and pay Eagle a portion of the profit for each Bendeka® sale, when it could keep all profits from Treanda®," D.I. 361 ¶ 222. But such evidence does not support a finding of nonobviousness.  Plaintiffs have not provided evidence to establish that Bendeka®'s sales and Teva's decision to license Bendeka® were linked to Bendeka®'s patented advantages as opposed to Bendeka®'s exclusivities.  *See* D.I. 371 at 80 ("Eagle's patents expire shortly after Teva's pre-existing patents."); Tr. 1725:25–26:2 (stating that with the Bendeka® license, Teva has FDA exclusivity until 2022).  Also, the "competition" that Plaintiffs cite consists only of Eagle's Belrapzo®—a drug that shares Bendeka®'s formulation, but lacks the short-infusion protocol.  D.I. 361 ¶ 219.  Because Eagle benefits from the sales of both Belrapzo® and Bendeka®, it may have an incentive to market Bendeka® over Belrapzo®, Tr. 1652:19–53:2, and thus any evidence that Bendeka® has higher sales has little if any probative value.

### 4)    Praise

Finally, Plaintiffs argue that "Bendeka®'s patented advantages . . . have received industry praise."  D.I. 371 at 81.  In support of this assertion, they cite (1)

53

EAGLEBEN-SA_00000233

Veteran's Administration (VA) newsletter that highlighted the advantages of Bendeka® as compared to Treanda®, (2) a study that noted attributes of Bendeka® that drive Bendeka®'s usage, and (3) Fresenius Kabi's pre-litigation statement that Bendeka® reduced "[p]atient chair time" and that Bendeka® could "have higher pricing and still retain volume due to the benefits it offers." D.I. 371 at 81; D.I. 361 ¶ 226. Here again, I find such evidence to have at best marginal probative value. As an initial matter, the VA does not even use Bendeka®. Tr. 1777:1–78:16. Second, the study Plaintiffs cite was funded by Teva and provides no connection between the claimed limitations and industry praise. Tr. 1305:25–07:4. Third, Fresenius Kabi's statement merely lists reduced chair time as a fact and does not exhibit any praise related to the asserted claims.

\* \* \* \*

In sum, the secondary consideration evidence does not support a finding of nonobviousness. I still find, however, that the asserted administration claims are not obvious. Defendants have not shown by clear and convincing evidence that Palepu 2011, the Treanda® Label, Preiss 1985, Preiss 1998, Schöffski 2000a, Schöffski 2000b, Barth, and Glimelius would have motivated a POSITA to arrive at the claimed administrations with a reasonable expectation of success. A POSITA would not have been motivated to follow Preiss's three-to-ten-minute (and potentially lower volume and higher concentration) infusions because (1) a

54

EAGLEBEN-SA_00000234

POSITA would not have relied on the Preiss studies to determine a safe bendamustine infusion protocol, (2) subsequent prior art taught away from the three-to-ten-minute infusions, and (3) Defendants only guess that Preiss used similar volumes and concentrations to those claimed. Moreover, Barth and Glimelius would not have motivated a POSITA to administer bendamustine at lower volumes because (1) Barth only disclosed hypothetical volumes that did not even include the claimed volumes of 100 mL or less and (2) Glimelius did not involve bendamustine. Finally, the claimed concentrations are not obvious as inherent or under the prior art.

## III. INDEFINITENESS

Defendants argue that the asserted formulation claims are invalid because they each require "a stabilizing amount of antioxidant"—a requirement Defendants contend is indefinite. D.I. 371 at 2.

### A. Legal Standards for Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). "Indefiniteness is a matter of claim construction, and the same principles that generally govern claim construction are applicable to determining whether

55

EAGLEBEN-SA_00000235

allegedly indefinite claim language is subject to construction." *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008), *abrogated on other grounds by Nautilus*, 572 U.S. at 901 (rejecting Federal Circuit's "insolubly ambiguous" standard for indefiniteness). As in claim construction, in making an indefiniteness determination, the district court may make "any factual findings about extrinsic evidence relevant to the question, such as evidence about knowledge of those skilled in the art." *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017). "Any fact critical to a holding on indefiniteness . . . must be proven by the challenger by clear and convincing evidence." *Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*, 838 F.3d 1224, 1228 (Fed. Cir. 2016) (alteration in original)).

## B.    Discussion

Defendants argue that "the claims recite a 'stabilizing amount' [of antioxidant] with no guidance, functional or otherwise, on what degree of stability is required to obtain some unnamed objective." D.I. 380 at 3. But this argument conflates (1) whether a given antioxidant amount improves bendamustine's stability with (2) the extent to which that given antioxidant amount improves stability. The written description defines a "stabilizing amount of antioxidant" as an amount that "increase[s] or enhance[s] the stability of the bendamustine in the compositions described herein," #831 patent at 3:49–54; Tr. 370:25–71:9. Thus,

56

EAGLEBEN-SA_00000236

the "objective" of the antioxidant amount is not "unnamed" but is instead "to increase or enhance the stability of the bendamustine in the compositions" described in the specification.[12]

Defendants argue that the term is indefinite because "[t]he specification does not explain how to determine whether stability has been 'increased' or 'enhanced.'" D.I. 378 at 3. But as Plaintiffs' expert, Dr. Siepmann, credibly testified, a POSITA would understand that a stabilizing amount of an antioxidant includes any amount that decreases the amount of bendamustine degradation after any time period and at any temperature. Tr. 1485:4–87:10, 1502:8–12. And the patents provide a POSITA with a method for measuring stability: using HPLC to compare the amount of overall bendamustine degradation with and without the antioxidant. Tr. 1485:14–86:11. Example 3 demonstrates that a POSITA would compare the amount of bendamustine remaining in the same formulation, stored under the same conditions, with and without the antioxidant, #831 patent at

---

[12] Section 112(b) of Title 35 provides that "[t]he specification shall conclude with one or more claims[.]" This language makes clear that the specification includes the claims asserted in the patent, and the Federal Circuit has so held. *See Markman*, 52 F.3d at 979 ("Claims must be read in view of the specification, of which they are part"). The Federal Circuit and other courts, however, have also used "specification" on occasion to refer to the written description of the patent as distinct from the claims. *See, e.g., id.* ("To ascertain the meaning of claims, we consider three sources: The claims, the specification, and the prosecution history."). To avoid confusion, I refer to the portions of the specification that are not claims as "the written description."

57

EAGLEBEN-SA_00000237

7:59–8:27; and the specifications describe measuring the remaining bendamustine using HPLC, *id.* at 2:26–44, 2:57–3:4, 4:22–26; Tr. 1487:11–89:11. In addition to providing exemplary test methods, the specification also lists "suitable antioxidant amounts" and "antioxidants," and provides examples of "stabilizing" amounts. #831 patent at 3:57–4:8, 7:59–9:2; Tr. 371:15–72:18, 1489:23–90:4.

In *BASF*, the Federal Circuit held the term "composition . . . effective to catalyze" not indefinite, even though the patent did not "recite a minimum level of function needed to meet this 'effective' limitation" or "a particular measurement method," because tests for determining whether a composition was catalyzing were well-known. 875 F.3d at 1366–68. Here, the term "stabilizing amount of antioxidant" is like the term "composition . . . effective to catalyze" and Plaintiffs' expert, like the expert in *BASF*, persuasively testified that a POSITA would know how to determine whether an amount of antioxidant is stabilizing. Moreover, unlike in *BASF*, the asserted patents here provide a test method.

Finally, Defendants cite the patentee's removal of antioxidant and stability limitations during prosecution as support for their indefiniteness argument. D.I. 378 at 5–6. But the removal of those limitations undercuts Defendants' argument because it confirms that the "examiner understood" the claims without those limitations. *See Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1379–80 (Fed. Cir. 2017).

58

EAGLEBEN-SA_00000238

PTO/AIA/25 (04-13)
Approved for use through 05/31/2024. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| TERMINAL DISCLAIMER TO OBVIATE A PROVISIONAL DOUBLE PATENTING REJECTION OVER A PENDING "REFERENCE" APPLICATION | Docket Number (Optional) 107071.000582 |
|---|---|

In re Application of: Nagesh R. Palepu, et al.

Application No.: 18/081,238

Filed: December 14, 2022

For: FORMULATIONS OF BENDAMUSTINE

The applicant, Eagle Pharmaceuticals, Inc. _____, owner of ___100___ percent interest in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term of any patent granted on pending **reference** Application Number 18/081251, 17/412623 , filed, 12/14/2022,8/26/2021 , as the term of any patent granted on said **reference** application may be shortened by any terminal disclaimer filed prior to the grant of any patent on the pending **reference** application. The applicant hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and any patent granted on the **reference** application are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the applicant does not disclaim the terminal part of any patent granted on the instant application that would extend to the expiration date of the full statutory term of any patent granted on said **reference** application, "as the term of any patent granted on said **reference** application may be shortened by any terminal disclaimer filed prior to the grant of any patent on the pending **reference** application," in the event that: any such patent granted on the pending **reference** application expires for failure to pay a maintenance fee, is held unenforceable, is found invalid by a court of competent jurisdiction, is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321, has all claims canceled by a reexamination certificate, is reissued, or is in any manner terminated prior to the expiration of its full statutory term as shortened by any terminal disclaimer filed prior to its grant.

Check either box 1 or 2 below, if appropriate.

1. ☐    The undersigned is the applicant. If the applicant is an assignee, the undersigned is authorized to act on behalf of the assignee.

I hereby acknowledge that any willful false statements made are punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

2. ☑    The undersigned is an attorney or agent of record.   Reg. No. _51,430_____

| /Stephanie A. Lodise/ | June 16, 2023 |
|---|---|
| Signature | Date |

Stephanie A. Lodise
Typed or printed name

| Attorney of record | 513.929.3400 |
|---|---|
| Title | Telephone Number |

☑ Terminal disclaimer fee under 37 CFR 1.20(d) is included.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

A Federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with an information collection subject to the requirements of the Paperwork Reduction Act of 1995, unless the information collection has a currently valid OMB Control Number. The OMB Control Number for this information collection is 0651-0031. Public burden for this form is estimated to average 12 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the information collection. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden to the Chief Administrative Officer, United States Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450 or email InformationCollection@uspto.gov. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **If filing this completed form by mail, send to: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

EAGLEBEN-SA_00000239

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. The United States Patent and Trademark Office (USPTO) collects the information in this record under authority of 35 U.S.C. 2. The USPTO's system of records is used to manage all applicant and owner information including name, citizenship, residence, post office address, and other information with respect to inventors and their legal representatives pertaining to the applicant's/owner's activities in connection with the invention for which a patent is sought or has been granted. The applicable Privacy Act System of Records Notice for the information collected in this form is COMMERCE/PAT-TM-7 Patent Application Files, available in the Federal Register at 78 FR 19243 (March 29, 2013). https://www.govinfo.gov/content/pkg/FR-2013-03-29/pdf/2013-07341.pdf

Routine uses of the information in this record may include disclosure to: 1) law enforcement, in the event that the system of records indicates a violation or potential violation of law; 2) a Federal, state, local, or international agency, in response to its request; 3) a contractor of the USPTO having need for the information in order to perform a contract; 4) the Department of Justice for determination of whether the Freedom of Information Act (FOIA) requires disclosure of the record; 5) a Member of Congress submitting a request involving an individual to whom the record pertains, when the individual has requested the Member's assistance with respect to the subject matter of the record; 6) a court, magistrate, or administrative tribunal, in the course of presenting evidence, including disclosures to opposing counsel in the course of settlement negotiations; 7) the Administrator, General Services Administration (GSA), or their designee, during an inspection of records conducted by GSA under authority of 44 U.S.C. 2904 and 2906, in accordance with the GSA regulations and any other relevant (i.e., GSA or Commerce) directive, where such disclosure shall not be used to make determinations about individuals; 8) another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)); 9) the Office of Personnel Management (OPM) for personnel research purposes; and 9) the Office of Management and Budget (OMB) for legislative coordination and clearance.

If you do not furnish the information requested on this form, the USPTO may not be able to process and/or examine your submission, which may result in termination of proceedings, abandonment of the application, and/or expiration of the patent.

## Additional Uses

Additional USPTO uses of the information in this record may include disclosure to: 1) the International Bureau of the World Intellectual Property Organization, if the record is related to an international application filed under the Patent Cooperation Treaty;  2) the public i) after publication of the application pursuant to 35 U.S.C. 122(b), ii) after issuance of a patent pursuant to 35 U.S.C. 151, iii) if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections, or an issued patent, or iv) without publication of the application or patent under the specific circumstances provided for by 37 CFR 1.14(a)(1)(v)-(vii); and/or 3) the National Archives and Records Administration, for inspection of records.

EAGLEBEN-SA_00000240

DOCKET NO.: 107071.000582                                          PATENT
Application No.: 18/081,238
Office Action Dated: March 21, 2023

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:
    Nagesh R. Palepu et al.         Confirmation No.: 5922

Application No.: 18/081,238         Group Art Unit: 1613

Filing Date: December 14, 2022        Examiner: ERNST V ARNOLD

For:    FORMULATIONS OF BENDAMUSTINE

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

### REPLY PURSUANT TO 37 CFR § 1.111

In response to the Official Action dated March 21, 2023, reconsideration is respectfully requested in view of the amendments and/or remarks as indicated below:

☐    **Amendments to the Specification** begin on page of this paper.

☐    **Amendments to the Abstract** begin on page of this paper.

☒    **Amendments to the Claims** are reflected in the listing of the claims which begins on page 2 of this paper.

☐    **Amendments to the Drawings** begin on page of this paper and include an attached replacement sheet.

☒    **Remarks** begin on page 6 of this paper.

☒    The Commissioner is hereby authorized to charge any fee deficiency, charge any additional fees, or credit any overpayment of fees, associated with this application in connection with this filing, or any future filing, submitted to the U.S. Patent and Trademark Office during the pendency of this application, to Deposit Account No. 23-3050.

DOCKET NO.:  107071.000582                                          PATENT
Application No.:  18/081,238
Office Action Dated:  **March 21, 2023**

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims:**

1.      (currently amended) A ready for dilution, liquid bendamustine-containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL;

a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

a stabilizing amount of an antioxidant;

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

2.      (Original) The composition of claim 1, comprising 100 mg of bendamustine.

3.      (Original) The composition of claim 1, wherein the bendamustine concentration is about 25 mg/mL.

4.      (Original) The composition of claim 1, wherein the antioxidant is monothioglycerol.

5.      (Original) The composition of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

6.      (Original) The composition of claim 1, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.

7.      (Cancelled)

4876-2014-3961.2

EAGLEBEN-SA_00000242

DOCKET NO.: 107071.000582                                              **PATENT**
Application No.: 18/081,238
Office Action Dated: **March 21, 2023**

8.      (Original) The composition of claim 1, further comprising ethanol.


9.      (Original) The composition of claim 1, wherein the liquid bendamustine-containing composition is packaged in a sterile vial.


10.     (currently amended) A liquid bendamustine-containing composition comprising bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL and wherein the bendamustine has not been reconstituted from a lyophilized powder; a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and a stabilizing amount of an antioxidant; wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.


11.     (Original) The composition of claim 10, comprising 100 mg of bendamustine.


12.     (Original) The composition of claim 10, wherein the bendamustine concentration is about 25 mg/mL.


13.     (Original) The composition of claim 10, wherein the antioxidant is monothioglycerol.


14.     (Original) The composition of claim 10, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.


15.     (Original) The composition of claim 10, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.


Page 3 of 11

4876-2014-3961.2

DOCKET NO.: 107071.000582                                                PATENT
Application No.: 18/081,238
Office Action Dated: March 21, 2023

16.      (Cancelled)

17.      (Original) The composition of claim 10, further comprising ethanol.

18.      (Original) The composition of claim 10, wherein the liquid bendamustine-containing composition is packaged in a sterile vial.

19.      (currently amended) A bendamustine-containing composition comprising
one or more doses of bendamustine, or a pharmaceutically acceptable salt thereof, and a
         stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid that is
         polyethylene glycol;
wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from
         about 20 mg/mL to about 60 mg/mL; and
wherein the total impurities resulting from the degradation of the bendamustine is less
         than about 5% peak area response, as determined by HPLC at a wavelength of 223
         nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

20.      (Original) The composition of claim 19, comprising 100 mg of bendamustine.

21.      (Original) The composition of claim 19, wherein the bendamustine concentration is about 25 mg/mL.

22.      (Original) The composition of claim 19, wherein the antioxidant is monothioglycerol.

23.      (Original) The composition of claim 19, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

24.      (Original) The composition of claim 19, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.

4876-2014-3961.2

EAGLEBEN-SA_00000244

DOCKET NO.: 107071.000582                                                                PATENT
Application No.: 18/081,238
Office Action Dated: March 21, 2023

25.    (Cancelled)


26.    (Original) The composition of claim 19, further comprising ethanol.


27.    (Original) The composition of claim 19, wherein the liquid bendamustine-containing composition is packaged in a sterile vial.


28.    (Currently Amended) A method of treating leukemia in a human in need thereof comprising

       providing a liquid bendamustine-containing composition according to claim 3 ~~comprising about 25 mg/ml of bendamustine~~;

       diluting the liquid bendamustine containing composition; and

       intravenously administering the diluted composition to the human.


29.    (Original) The method of claim 28, wherein the liquid bendamustine containing composition is diluted with about 50 mL of a diluent.

Page 5 of 11

4876-2014-3961.2

EAGLEBEN-SA_00000245

**DOCKET NO.:** 107071.000582                                        **PATENT**
**Application No.:** 18/081,238
**Office Action Dated: March 21, 2023**

**REMARKS**

Claims 1, 10, 19, and 28 have been amended. Claims 7, 16, and 25 are cancelled without prejudice. The amendments are supported by the original specification and claims and no new subject matter has been added.

**Claim Rejections – 35 U.S.C. § 103**

Claims 1-3, 5-12, 15-21 and 24-27 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over U.S. Publication No. 2011/0190363 (hereinafter "Drager"). *Office Action*, at 4. Applicant request reconsideration and withdrawal of the rejection.

The claims are directed to, *e.g.*, liquid, bendamustine-containing compositions comprising 20 mg/mL to about 60 mg/mL of bendamustine, along with a stabilizing amount of an antioxidant, in polyethylene glycol. Polyethylene glycol is "protic" and has the following general formula:

$$H{-}\left[\!O\!-\!CH_2CH_2\right]_n{-}O{-}H$$

Drager's composition must comprise a polar "aprotic" solvent, for example, dimethylacetamide, dimethyl sulfoxide, dimethylformamide, or 1-methyl-2-pyrrolidinone. Drager at *e.g.,* paragraphs [0014], [0017]. Drager explains that polar, aprotic solvents are sufficiently non-nucleophilic towards bendamustine such that polar aprotic solvent-bendamustine adducts do not form over the course of typical commercial storage conditions. Drager at paragraph [0015].

Drager teaches that each of its formulations must include some amount of polar aprotic solvent. While Drager references that polar protic solvent may be used, that is only ***in addition to***, ***not instead of***, the polar aprotic solvent. Drager fails to disclose or suggest any bendamustine formulations with solvent systems composed of protic solvent in the absence of any aprotic solvent. Indeed, Drager teaches away from the use of formulations including only polar protic solvents, stating that "while nonaqueous polar protic solvents are of sufficient nucleophilicity to form potentially undesirable polar protic solvent-bendamustine adducts, such adducts will not form during typical commercial storage if the concentration of the polar protic solvent is kept

Page 6 of 11

EAGLEBEN-SA_00000246

DOCKET NO.:  107071.000582                                                      **PATENT**
Application No.:  18/081,238
Office Action Dated:  March 21, 2023

within the scope of the present invention." Drager at paragraph [0019]. Drager's Figure 3 depicts bendamustine degradation in protic solvent (99% propylene glycol) at 5 °C and 25 °C:



*See also,* Drager at paragraph [0036], stating "As can be seen in FIG. 3, bendamustine (BM1) in 99% propylene glycol degrades significantly when stored at 25 °C for less than 100 days. After storage at 5 °C for about 365 days, the purity of the bendamustine is about 80% or less."

Even if the person of ordinary skill in the art were motivated to include a polar protic solvent in a bendamustine formulation, Drager provides no motivation or reason to use polyethylene glycol, specifically. Rather, polyethylene glycol is included – without emphasis or differentiation – in a laundry list of pharmaceutically acceptable nonaqueous polar protic solvents.  Polyethylene glycol is not otherwise mentioned in Drager, nor is its use exemplified. The generic list of nonaqueous polar protic ingredients would not have motivated a person of ordinary skill to use polyethylene glycol in a bendamustine formulation.  *See, e.g.,* Expert Report of Dr. Siepmann at page 23 *et seq.*[1] *See also, Cephalon, Inc. v. Slayback Pharma Limited Liability Co.,* CA 17-1154-CFC, Opinion (D. Del. April 27, 2020) at 14-15 (court determining that "Drager also taught that protic solvents-i.e., solvents including PEG and PG, that have OH groups-are acceptable to use with bendamustine but only when combined with aprotic solvents."); at 19-20, 21-22 (court determining that Drager teaches away from using polyols such

---

[1] Dr. Siepmann's expert report was submitted in *Cephalon, Inc. v. Slayback Pharma Limited Liability Co.,* C.A. No. 17-01154-CFC (D. Del). Trade secret information has been redacted from the submitted report.

4876-2014-3961.2

EAGLEBEN-SA_00000247

DOCKET NO.: 107071.000582                                                                  PATENT
Application No.: 18/081,238
Office Action Dated: March 21, 2023

as PEG with bendamustine); at 22-23 (court determining that a person of ordinary skill would have followed Drager's teaching not to use protic solvents such as PEG).

In order to arrive at any claimed composition, the person of ordinary skill in the art would have had to modify Drager's formulations to remove polar aprotic solvent. This proposed modification would have changed the principle of operation of Drager and a *prima facie* case of obviousness cannot be supported. *See* MPEP 2143(VI). Moreover, even if the person of ordinary skill in the art considered removing Drager's required polar aprotic solvent, they would not have had any reasonable expectation of successfully producing a stable liquid formulation of bendamustine in view of Drager's evidence that bendamustine degrades without the polar aprotic solvent. The claims are patentable over Drager and Applicant requests reconsideration and withdrawal of the rejection.

Moreover, the recited compositions exhibit a stability profile that is significantly improved over Drager's formulations. Independent claims 1, 10, and 19 recite that the compositions include less than about 5% peak area response (by HPLC) of *total impurities* resulting from the degradation of bendamustine. *See, also,* original claims 7, 16, and 25, now cancelled. The Examiner alleges that Drager's formulations exhibit a similar stability profile. Action at 7. To the contrary, the data reported in Drager establishes that those formulations are significantly *less* stable than any claimed composition.

The present claims recite that the bendamustine-containing compositions will exhibit less than 5% of *total* bendamustine degradation impurities (by HPLC) after at least 15 months at about 5-25 °C. Drager's paragraphs [0022] and [0023], cited by the Examiner, do not refer to *total impurities*; rather, Drager reports separately on levels of *only five individual impurities* after storage under only refrigerated conditions:

4876-2014-3961.2

EAGLEBEN-SA_00000248

DOCKET NO.: 107071.000582                                           PATENT
Application No.: 18/081,238
Office Action Dated: March 21, 2023

TABLE II

| Formulation | DCE (Area %) | HP1 (Area %) | BM1 dimer (Area %) | PG-1 (Area %) | PG-2 (Area %) |
|---|---|---|---|---|---|
| Niacinamide/ DMA | 1.40 | 0.08 | 0.06 | ND | ND |
| DMA | 1.10 | 0.08 | 0.05 | ND | ND |
| 66% DMA/ 34% PG | 0.12 | 0.08 | 0.06 | 1.09 | 0.27 |
| DMF | 0.07 | 0.11 | 0.07 | ND | ND |
| NMP | 0.90 | 0.10 | ND | ND | ND |
| DMSO | 0.04 | 0.38 | 0.70 | ND | ND |

Impurity profile of certain liquid formulations of Bendamustine HCl after storage at 5° C. for about 12 months

ND = not detected

Significantly, none of Drager's tested formulations included polyethylene glycol, as recited in the pending claims. Moreover, Drager's 66% dimethylformamide/34% propylene glycol (a polar protic solvent) was the least stable of all formulations tested, producing each of the five identified impurities, even under refrigerated conditions. Noteworthy is that Drager considers a "stable" formulation to be one that includes up to 10% of bendamustine impurities. Drager at paragraph [0020] ("As used herein, "stable" is defined as no more than about a 10% loss of bendamustine under typical commercial storage conditions.")

One of ordinary skill in the art would not have predicted that polyethylene glycol-containing, bendamustine compositions, having the recited stability profile, would have been achievable, based on Drager's disclosure that polar protic solvent formulations had poor stability. The claims are patentable over Drager and Applicant requests reconsideration and withdrawal of the rejection.

Claims 4, 5, 13, 14, 22 and 23 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Drager in view of WO Publication No. 0202125 (hereinafter "Tait"). *Office Action*, at 9. As discussed above, Drager does not describe or suggest any claimed composition. Tait does not cure Drager's deficiencies, nor is it alleged to. Tait is cited merely for its general description of antioxidants. Applicant requests reconsideration and withdrawal of the rejection.

4876-2014-3961.2

EAGLEBEN-SA_00000249

DOCKET NO.: 107071.000582                                                              **PATENT**
Application No.: 18/081,238
Office Action Dated: **March 21, 2023**

Claims 28 and 29 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Drager. *Office Action*, at 12. Claim 28 has been amended to refer to the composition of claim 3, which is not described or suggested by Drager, as discussed. Applicant requests reconsideration and withdrawal of the rejection.

## Claim Rejections – Double Patenting

Claims 1-27 stand rejected for non-statutory double patenting as being unpatentable over claims 1-16 of U.S. Patent No. 9,265,831. *Office Action*, at 16.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-27 of U.S. Patent No. 9,572,797. *Office Action*, at 18.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-26 of U.S. Patent No. 9,572,796 in view of Tait. *Office Action*, at 21.

Claims 1-18 stand rejected for non-statutory double patenting as being unpatentable over claims 1-22 of U.S. Patent No. 8,609,707. *Office Action*, at 23.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-23 of U.S. Patent No. 9,579,384. *Office Action*, at 26.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-24 of U.S. Patent No. 9,034,908. *Office Action*, at 28.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-17 of U.S. Patent No. 9,597,399 in view of Tait. *Office Action*, at 29.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-23 of U.S. Patent No. 9,144,568. *Office Action*, at 31.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-29 of U.S. Patent No. 9,572,887. *Office Action*, at 33.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-7 of U.S. Patent No. 9,597,397. *Office Action*, at 34.

Claims 1-27 stand rejected for non-statutory double patenting as being unpatentable over claims 1-26 of U.S. Patent No. 10,010,533. *Office Action*, at 36.

Page 10 of 11

4876-2014-3961.2

EAGLEBEN-SA_00000250

DOCKET NO.: 107071.000582                                                      PATENT
Application No.: 18/081,238
Office Action Dated: March 21, 2023

Claims 1-29 stand provisionally rejected for non-statutory double patenting as being unpatentable over claims 1-18 of copending U.S. Application No. 18,081,251. *Office Action*, at 38.

Claims 1-29 stand provisionally rejected for non-statutory double patenting as being unpatentable over claims 1-16 of copending U.S. Application No. 17,412,623. *Office Action*, at 39.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-16 of U.S. Patent No. 11,103,483. *Office Action*, at 40.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-9 of U.S. Patent No. 10,052,385. *Office Action*, at 42.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-10 of U.S. Patent No. 9,597,398 in view of Tait. *Office Action*, at 44.

Claims 1-29 stand rejected for non-statutory double patenting as being unpatentable over claims 1-18 of U.S. Patent No. 9,572,888 in view of Tait. *Office Action*, at 46.

While not conceding to the propriety of the rejections, and solely to advance this application to allowance, terminal disclaimers are filed herewith to obviate the rejections.

## CONCLUSION

Applicant respectfully submits that the present application is in condition for allowance. Reconsideration of the application and an early Notice of Allowance are respectfully requested. In the event that the Examiner cannot allow the application for any reason, the Examiner is encouraged to contact Applicant's representative.

Date: June 16, 2023                         /Stephanie A. Lodise/
                                            Stephanie A. Lodise
                                            Registration No. 51430

BakerHostetler
312 Walnut Street
Suite 3200
Cincinnati, OH 45202
Telephone: 513.929.3400
Facsimile: 513.929.0303

Page 11 of 11

4876-2014-3961.2

EAGLEBEN-SA_00000251

**UNITED STATES PATENT AND TRADEMARK OFFICE**

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC ACKNOWLEDGEMENT RECEIPT

| APPLICATION # | RECEIPT DATE / TIME | ATTORNEY DOCKET # |
|---|---|---|
| **18/081,238** | **06/16/2023 03:44:14 PM ET** | **107071.000582** |

## Title of Invention

FORMULATIONS OF BENDAMUSTINE

## Application Information

| | | | |
|---|---|---|---|
| APPLICATION TYPE | Utility - Nonprovisional Application under 35 USC 111(a) | PATENT # | - |
| CONFIRMATION # | 5922 | FILED BY | VeAndra Luckett |
| PATENT CENTER # | 62287459 | FILING DATE | 12/14/2022 |
| CUSTOMER # | 23377 | FIRST NAMED INVENTOR | Nagesh R. Palepu |
| CORRESPONDENCE ADDRESS | - | AUTHORIZED BY | Stephanie Lodise |

## Documents

# TOTAL DOCUMENTS: 11

| DOCUMENT | PAGES | | DESCRIPTION | SIZE (KB) |
|---|---|---|---|---|
| 107071.000582 Response NFOA 3-21-2023.pdf | | 11 | - | 209 KB |
| 107071.000582 Response NFOA 3-21-2023-A....pdf | (1-1) | 1 | Amendment/Request for Reconsideration-After Non-Final Rejection | 83 KB |
| 107071.000582 Response NFOA 3-21-2023-CLM.pdf | (2-5) | 4 | Claims | 93 KB |
| 107071.000582 Response NFOA 3-21-2023-REM.pdf | (6-11) | 6 | Applicant Arguments/Remarks Made in an Amendment | 190 KB |
| Terminal Disclaimer - | | 2 | Terminal Disclaimer Filed | 242 KB |

EAGLEBEN-SA_00000252

Applications.pdf

| | | | |
|---|---|---|---|
| Terminal Disclaimer - Patents.pdf | 5 | Terminal Disclaimer Filed | 297 KB |
| 107071.000582 NPL - Siepmann Responsive Expert Report.pdf | 525 | Non Patent Literature | 20735 KB |
| NPL - Opinion_Part1.pdf | 20 | Non Patent Literature | 18225 KB |
| NPL - Opinion_Part2.pdf | 20 | Non Patent Literature | 19226 KB |
| NPL - Opinion_Part3.pdf | 20 | Non Patent Literature | 19815 KB |
| NPL - Opinion_Part4.pdf | 10 | Non Patent Literature | 8900 KB |
| 107071.000582 IDS.pdf | 4 | Information Disclosure Statement (IDS) Form (SB08) | 1029 KB |

## Digest

| DOCUMENT | MESSAGE DIGEST(SHA-512) |
|---|---|
| 107071.000582 Response NFOA 3-21-2023.pdf | 9762C04AE011A114E02FBF0328FB8F51C97FB67767A1FEE2F9 92AAA9D98D65562E765045BAD39EB84CE0CF158F85CE5BB5 A5AA5DB8A054F88514AF6BEA8512F5 |
| 107071.000582 Response NFOA 3-21-2023-A....pdf | D32311F42D6D239081D916A3FF82CAAE48124DBEFF855881D 7191AE3712A8E86A0B5CFCEC13CBDA0B09B99245578ED33A C69BDE8BD43E33D6BA61E83A0607F3C |
| 107071.000582 Response NFOA 3-21-2023-CLM.pdf | CD90C87A2C0C8D3FAEB2AB39F24F828C96F532BC7D47D310 0D0E35E739E14A1DF4FC06DEBE6D4AFCAC16F5CCC0FD763 D879F00834CCC6A172E9340015D9267E0 |
| 107071.000582 Response NFOA 3-21-2023-REM.pdf | A4568B444B46089858A2612C53BF065745C0DA7F1493F1B4AE 5B4A3DFAE0585BDA11A59E60F7C8EF7FEE68BA8EEEC160AA |

EAGLEBEN-SA_00000253

5BFBB2583161A085DF1E4112892F14

| | |
|---|---|
| Terminal Disclaimer - Applications.pdf | 11646E43FBE4C61179053046BF44976F68E173524652CAAB7D 9B6FA96624F51E3A1CA8CB5FA7619BB0FFDF61A64F61C0FBF 089CFFE21FE5A3B54E5B45B1C9F54 |
| Terminal Disclaimer - Patents.pdf | C6036B9503ED729A6C54AEC713746C2AC393AB7627E1C9AB1 C9B4785EEB450B96EF771A82BDF02956328F81F64B42BD4FB EE029658EA7CF3DB5F82A70BF21B31 |
| 107071.000582 NPL - Siepmann Responsive Expert Report.pdf | A231C9BB0C699D62F012733CA40204061704ADB40248CC7306 31E36B454A7F7209276E4B539BF721FDD642B891EB988D9D3 AB8192232F3653FBC7EA383DBB882 |
| NPL - Opinion_Part1.pdf | 71BAB33B3E13EA51274D61369808A2BBAD9E8620649180D2C 94F94E3355AE0C2E81349CE3AB1A47E380485A56953663A1CB CFC9D9759F89E09F745173F0FE37E |
| NPL - Opinion_Part2.pdf | 8C79788A307960CFC33A9397FDA39B24A1ED9267A913D971A B41A95A7046F9DF5F9E49E968E943B72549BDCAF64786365D8 9DA3BD498649FC074692AD1CC003E |
| NPL - Opinion_Part3.pdf | 061F7E6168E4CB9B943923FE25A6610ADBBDF1E38CCDD5A3 D7E1D0D1FD49FC3A5CE404E95AAB583B2343D9C94B84A105 2FBDFD1BED9A3519072F794B228B2B78 |
| NPL - Opinion_Part4.pdf | AEDBA9496075F20E089853F861A808ABE80035F39F22F88E65 74A87D77235E2FF95B2D5CD058340DE8BE0653A27FCC327E8 CEE55D403D9D7E8E4699D7D349A12 |
| 107071.000582 IDS.pdf | 8AC23AC98361892407ED6CE70A861CE1B1EA4EA0E6C11035 D1227FCD311E4D98450CA93CAB65472419908CB2B3FC9C0C0 C79B57C79BC92DB221FF88EBA53A42E |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**

If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application

EAGLEBEN-SA_00000254

**National Stage of an International Application under 35 U.S.C. 371**

If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**

If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

EAGLEBEN-SA_00000255

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (02-18)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 18081238 |
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | 1613 |
| | Examiner Name | Arnold, Ernst V. |
| | Attorney Docket Number | 107071.000582 |

**U.S.PATENTS**                                                                  Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button.    Add

**U.S.PATENT APPLICATION PUBLICATIONS**                                          Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button.    Add

**FOREIGN PATENT DOCUMENTS**                                                     Remove

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button    Add

**NON-PATENT LITERATURE DOCUMENTS**                                              Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|

EFS Web 2.1.18

EAGLEBEN-SA_00000256

| | | | |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | Application Number | 18081238 | |
| | Filing Date | 2022-12-14 | |
| | First Named Inventor | Nagesh R. Palepu | |
| | Art Unit | 1613 | |
| | Examiner Name | Arnold, Ernst V. | |
| | Attorney Docket Number | 107071.000582 | |

| | | | |
|---|---|---|---|
| | 1 | Cephalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al., Civil Action No. 1:17-cv-01154: Responsive Expert Report of Juergen Siepmann, Ph.D., 525 pages. | ☐ |
| | 2 | Cephalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al., Civil Action No. 1:17-cv-01154: Opinion, dated 04/27/20, 70 pages. | ☐ |

If you wish to add additional non-patent literature document citation information please click the Add button [ Add ]

**EXAMINER SIGNATURE**

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through a citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [5] Applicant is to place a check mark here if English language translation is attached.

EAGLEBEN-SA_00000257

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( **Not for submission under 37 CFR 1.99**) | Application Number | 18081238 |
| --- | --- | --- |
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | 1613 |
| | Examiner Name | Arnold, Ernst V. |
| | Attorney Docket  Number | 107071.000582 |

---

### CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

☐ That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

☐ See attached certification statement.

☒ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

### SIGNATURE

 A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Stephanie A. Lodise/ | Date (YYYY-MM-DD) | 2023-06-16 |
| --- | --- | --- | --- |
| Name/Print | Stephanie A. Lodise | Registration Number | 51430 |

This collection of information is required by 37 CFR 1.97 and 1.98.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EAGLEBEN-SA_00000258

**Privacy Act Statement**

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent.  Accordingly, pursuant to the requirements of the Act, please be advised that:  (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent.  If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a).  Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.    A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract.  Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906.  Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive.  Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151.  Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS Web 2.1.18

EAGLEBEN-SA_00000259

I thus find that the term "stabilizing amount of antioxidant" is not indefinite and I construe it as: any amount of an antioxidant that decreases the amount of bendamustine degradation after any time period and at any temperature.

## IV.   ENABLEMENT

Defendants assert that the asserted formulation claims are invalid for lack of enablement because the formulation patents disclosed neither the use of sodium hydroxide (NaOH) or of "other undisclosed variables." D.I. 378 at 59.

### A.   Legal Standards for Enablement

"Claims are not enabled when, at the effective filing date of the patent, one of ordinary skill in the art could not practice their full scope without undue experimentation." *Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380, 1384 (Fed. Cir. 2013) (citation omitted). "That some experimentation is necessary does not preclude enablement; the amount of experimentation, however, must not be unduly extensive." *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1576 (Fed. Cir. 1984) (citations omitted). A challenger must prove invalidity based on non-enablement by clear and convincing evidence. *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012). Enablement is a question of law based on underlying facts. *Abbott Labs.*, 720 F.3d at 1384 (citations omitted).

EAGLEBEN-SA_00000260

**B.    Discussion**

Defendants argue that the asserted formulation claims are not enabled because the claims do not contain NaOH and "a pH adjuster like NaOH is necessary to obtain the PG ester levels claimed in the [a]sserted [f]ormulation [c]laims." D.I. 378 at 59. Defendants note that "Eagle's later-filed [#]879 application . . . explains [that] 'the control samples, which did not include NaOH did not provide long term storage stability,' and 'exhibited more than 28% total esters compared to initial after six months of storage at 25° C.'" D.I. 378 at 60 (citation omitted).

Evidence that some claimed formulations did not result in the PG ester limitations, however, does not establish that the claims are not enabled. Defendants have not presented any evidence to show that a POSITA would have had to undertake undue experimentation to alter the formulation to obtain the PG ester limitations. That some formulations with the claimed ingredients do not satisfy the PG ester limitations does not support non-enablement unless the number of such formulations is significant enough to have required a POSITA to experiment unduly. *See Atlas Powder*, 750 F.2d at 1576–77 ("Even if some of the claimed combinations were inoperative, the claims are not necessarily invalid. . . . Of course, if the number of inoperative combinations becomes significant, and in effect forces one of ordinary skill in the art to experiment unduly in order to

60

EAGLEBEN-SA_00000261

practice the claimed invention, the claims might indeed be invalid.  That, however, has not been shown to be the case here." (citations omitted)).  Defendants presented no evidence showing that the number of unsuccessful formulations is significant enough to require undue experimentation.  Accordingly, they failed to establish by clear and convincing evidence that the asserted claims are invalid for lack of enablement.

## V.    WRITTEN DESCRIPTION

Apotex argues that claim 9 of the #797 patent is invalid for lack of written description.  D.I. 378 at 60.  It asserts that "the absence of any mention of a pH adjuster like NaOH in the [#]797 patent demonstrates that the inventors did not have possession of it at that time, as confirmed by their later filing of another patent application that discloses and claims it."  D.I. 378 at 61 (citations omitted).  "But written description is about whether the skilled reader of the patent disclosure can recognize that what was claimed corresponds to what was described . . . ." *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1191 (Fed. Cir. 2014).  And Apotex never cites the intrinsic record to show that the asserted formulation patents claim something that they do not describe in their written descriptions.  Instead, Apotex improperly cites extrinsic evidence—the later-filed Eagle patent application.  Apotex has thus failed to establish that claim 9 is invalid for lack of written description.

61

EAGLEBEN-SA_00000262

## VI.    INFRINGEMENT

Defendants stipulated to infringement of the asserted claims with two exceptions. Apotex, Fresenius Kabi, and Mylan argue that (1) they do not infringe the asserted formulation claims because their ANDA products do not contain "a stabilizing amount of an antioxidant" as the asserted formulation claims require, D.I. 369 at 2; and (2) they do not directly infringe or induce infringement of claim 9 of the #797 patent, which requires that the "bendamustine-containing composition ha[ve] less than or equal to 0.43 % total PG esters at about 3 months of storage at a temperature of about 25°C," because their proposed labeling does not direct physicians to store their ANDA products for about 3 months at about 25°C, D.I. 369 at 4–5.

### A.    Legal Standards for Infringement

A defendant is liable for patent infringement if it files an ANDA "for a drug claimed in a patent or the use of which is claimed in a patent." 35 U.S.C. § 271(e)(2)(A). To establish infringement based on the filing of an ANDA under § 271(e)(2)(A), a patentee must show that "if the drug were approved based upon the ANDA, the manufacture, use, or sale of that drug would infringe the patent in the conventional sense." *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir. 1997).

"Conventional" infringement includes direct infringement and inducement.

62

EAGLEBEN-SA_00000263

35 U.S.C. § 271 (a), (b). Direct infringement requires that "every limitation set forth in a claim . . . be found in an accused product, exactly." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995) (citation omitted). Inducement requires a showing "that the accused inducer took an affirmative act to encourage infringement with the knowledge that the induced acts constitute patent infringement." *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 904 (Fed. Cir. 2014) (citation omitted). A plaintiff can prevail on a claim of inducement only if it establishes direct infringement. *See Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014) ("[I]nducement liability may arise if, but only if, there is direct infringement." (internal quotation marks, alterations, and citation omitted)).

A patentee must prove infringement by a preponderance of the evidence. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed. Cir. 1984). "A patentee may prove infringement by any method of analysis that is probative of the fact of infringement, and circumstantial evidence may be sufficient." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009) (internal quotation marks and citations omitted).

**B.    Direct Infringement of the "Stabilizing Amount of Antioxidant" Limitation**

The asserted formulation claims require a "stabilizing amount of an antioxidant," a term that I construed as any amount of an antioxidant that decreases

63

EAGLEBEN-SA_00000264

the amount of bendamustine degradation after any time period and at any temperature.

Defendants' ANDA products each contain 5 mg/mL of the antioxidant monothioglycerol, *see* PTX-0474 at APOLIQBENDA_ANDA_0005427 (Apotex); PTX-0486 at FK_BENDA_00003243, 3245 (Fresenius Kabi); PTX-0007 at MYLBEN_000248 (Mylan); Tr. 372:19–74:13, and the formulation patents' written description shows that 5 mg/mL of monothioglycerol is a stabilizing amount. The written description identifies "5 mg/mL to about 20 mg/mL" as a "preferable" stabilizing amount of antioxidant. #831 patent at 3:49–68; #797 patent at 3:55–66. The written description also identifies "thioglycerol (also known as monothioglycerol)" as a preferred antioxidant. #831 patent at 4:1–8; #797 patent at 4:6–16. Moreover, Example 3 demonstrates that adding "5 mg/m[L] of lipoic acid . . . as a stabilizing antioxidant" to 20 mg/mL of bendamustine in PEG decreased the amount of bendamustine degradation after 15 days at 25°C and 40°C as compared to the same formulation without an antioxidant. #831 patent at 7:59–8:27; #797 patent at 7:61–8:29; Tr. 371:15–72:18. Example 4 recites dissolving 50 mg/mL bendamustine in 90% PEG and 10% PG, and adding "5 mg/m[L] of [mono]thioglycerol, α-lipoic acid or dihydrolipoic acid," an amount that it describes as "a stabilizing amount of an antioxidant." #831 patent at 8:29–65; #797 patent at 8:32–66.

64

Circumstantial evidence can establish infringement; and here, the asserted formulation patents' disclosures that 5 mg/mL of an antioxidant (and specifically monothioglycerol) is stabilizing shows that the 5 mg/mL of monothioglycerol that Defendants use in their ANDA products decreases the amount of bendamustine degradation as compared to the same formulation without an antioxidant. Finally, Fresenius Kabi and Mylan represented to the FDA that 5 mg/mL monothioglycerol was sufficient to ensure that the amount of bendamustine in their ANDA products did not fall below specification limits. *See* PTX-0054 at FK_BENDA_00000543 (Fresenius Kabi); PTX-0201 at MYL-BEN_005258 (Mylan); Tr. 374:14–77:1.

## C.    Direct and Induced Infringement of Claim 9 of the #797 Patent

Claim 1 of the #797 patent recites a "method of treating leukemia, Hodgkin's disease, or multiple myeloma" comprising "administering" the specified "liquid bendamustine-containing composition." #797 patent at 12:43–46 (claim 1). Claim 9 recites the method of claim 1, wherein the "bendamustine-containing composition has less than or equal to 0.43% total PG esters at about 3 months of storage at a temperature of about 25° C." #797 patent at claim 9. Defendants stipulate that their ANDA Products have "less than or equal to 0.43% total PG esters at about 3 months of storage at a temperature of about 25° C," but contend that they do not directly infringe or induce infringement of claim 9 because their

65

EAGLEBEN-SA_00000266

proposed labeling does not recommend storing their ANDA Products for "about 3 months" at "a temperature of about 25° C."  D.I. 307-4 ¶ I.a; D.I. 320 ¶ 3.

I find, however, that even though Defendants' labeling does not mention storage, Defendants' ANDA products directly and indirectly infringe claim 9 because the PG ester limitation does not require the user to store the products for three months at 25°C.  Claim 9's PG ester limitation describes a characteristic of the claimed formula; it is not a method step and thus, does not require action to infringe.  The claim does not recite testing for the PG ester limitation; it just describes a composition that would have less than 0.43% PG esters if one were to test for them after storing the composition for three months at 25°C.

Defendants' proposal to construe the PG ester limitation as a method step that requires actual storage under the specified conditions also fails because it "renders [claim 9] nonsensical." *See Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010) ("A claim construction that renders asserted claims facially nonsensical cannot be correct." (internal quotation marks and citations omitted)).  Although claim 1 of the #797 patent requires the composition to have "less than or equal to 0.11% total PG esters at about 1 month of storage *at a temperature of about 5° C*," claim 9 requires the same composition to have "less than or equal to 0.43% total PG esters at about 3 months of storage *at a temperature of about 25° C*." #797 patent at 12:61–63 (claim 1), 13:22–25

66

EAGLEBEN-SA_00000267

(claim 9).  Under Defendants' proposed construction, to infringe, the user would need to store the composition simultaneously at different temperatures, which is impossible.

Defendants therefore directly infringe and induce infringement of claim 9 of the #797 patent.  With respect to direct infringement, Defendants agree that their products have less than or equal to 0.43% total PG esters after storing them for three months at a temperature of about 25°C and, other than with respect to a stabilizing amount of an antioxidant, they stipulated to direct infringement of the remaining limitations.  D.I. 320 ¶ 3.  With respect to induced infringement, Defendants will encourage others to administer their ANDA products through their proposed labels.  Although Defendants' proposed labeling does not mention the claimed PG ester limitations, Defendants know "that [their ANDA products] meet all of the claim limitations and, through [their] proposed label[s], encourage[] patients to administer [their ANDA products] in a manner that infringes the claimed method."  *Orexigen Therapeutics, Inc. v. Actavis Labs. FL, Inc.*, 282 F. Supp. 3d 793, 816 (D. Del. 2017), *rev'd in part on other grounds sub nom. Nalpropion Pharm., Inc. v. Actavis Labs. FL, Inc.*, 934 F.3d 1334 (Fed. Cir. 2019). "Whether the [user] who performs the method by administering the [products] knows that the [products] meet the [PG ester limitations] is irrelevant for the purposes of infringement."  *Id.*

EAGLEBEN-SA_00000268

## VII.  CONCLUSION

For the foregoing reasons, I find that all asserted claims of the asserted patents are not invalid and that Defendants infringe and induce infringement of each of the asserted claims.

The parties will be directed to submit a proposed order by which the Court may enter final judgment consistent with this Opinion.

EAGLEBEN-SA_00000269

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CEPHALON, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 17-01154-CFC |
| | ) | (Consolidated) |
| SLAYBACK PHARMA LIMITED | ) | |
| LIABILITY CO., *et al.*, | ) | Highly Confidential |
| | ) | |
| Defendants. | ) | |
| | ) | |

**RESPONSIVE EXPERT REPORT OF JUERGEN SIEPMANN, PH.D.**

EAGLEBEN-SA_00000270

## TABLE OF CONTENTS

I.      BACKGROUND AND QUALIFICATIONS ...................................................................1

II.     ASSIGNMENT ...............................................................................................................1

III.    LEGAL PRINCIPLES .....................................................................................................3

    A.      Non-Obviousness ..................................................................................................3

    B.      Obviousness-Type Double Patenting ....................................................................7

    C.      Written Description ...............................................................................................7

    D.      Enablement ............................................................................................................8

    E.      Definiteness ...........................................................................................................9

IV.     THE PATENTS-IN-SUIT ..............................................................................................10

V.      THE PERSON OF ORDINARY SKILL IN THE ART .................................................11

VI.     SUMMARY OF CERTAIN REFERENCES ..................................................................14

    A.      Alam '286 ............................................................................................................15

    B.      Brittain 2006 ........................................................................................................18

    C.      Drager '006 ..........................................................................................................23

    D.      Nema 1997 ...........................................................................................................33

    E.      Olthoff 1983 .........................................................................................................39

    F.      Powell 1998 .........................................................................................................43

    G.      Rowe 2009 ...........................................................................................................45

    H.      Seedher 2003 .......................................................................................................46

    I.      Soppimath 2013 ...................................................................................................49

    J.      Zimmerman 1977 .................................................................................................50

    K.      Zumdahl 2007 ......................................................................................................53

VII.    THE ASSERTED CLAIMS OF THE '707 PATENT FAMILY WOULD NOT
    HAVE BEEN OBVIOUS TO THE POSA .....................................................................53

i

EAGLEBEN-SA_00000271

A.    Dr. Pinal's and Dr. Yates's Analysis Is Fundamentally Flawed.............................53

B.    The POSA Would Not Have Been Motivated To Use a Liquid
      Composition in Formulating Bendamustine.........................................................58

C.    The POSA Would Not Have Been Motivated To Use a Non-Aqueous
      Composition in Formulating Bendamustine.........................................................75

D.    The POSA Would Not Have Been Motivated To Use Polyethylene Glycol
      and Propylene Glycol in Formulating Bendamustine..........................................88

      1.    Olthoff 1983 Would Not Have Motivated the POSA To Use
            Polyethylene Glycol and Propylene Glycol in Bendamustine
            Formulations. ...........................................................................................89

      2.    Drager '006 Would Not Have Motivated the POSA To Use
            Polyethylene Glycol and Propylene Glycol in Bendamustine
            Formulations. ...........................................................................................97

      3.    Alam '286 Would Not Have Motivated the POSA To Use
            Polyethylene Glycol and Propylene Glycol in Bendamustine
            Formulations. .........................................................................................124

      4.    The Other References Cited by Dr. Pinal and Dr. Yates Would Not
            Have Motivated the POSA To Use Polyethylene Glycol and
            Propylene Glycol in Bendamustine Formulations. ................................131

      5.    The Prior Art As a Whole Would Have Taught the POSA Away
            from Using Polyethylene Glycol and Propylene Glycol with
            Bendamustine..........................................................................................151

E.    The POSA Would Not Have Been Motivated To Use a 90:10 Ratio of
      Polyethylene Glycol to Propylene Glycol in Formulating Bendamustine..........204

F.    The POSA Would Not Have Been Motivated To Use an Antioxidant.................213

G.    The POSA Would Not Have Been Motivated To Use Monothioglycerol..........228

H.    The POSA Would Not Have Had a Reasonable Expectation of Success of
      Obtaining the Claimed Inventions. ....................................................................263

      1.    The POSA Would Not Have Had a Reasonable Expectation of
            Success in Obtaining the Claimed Compositions with "Long Term
            Storage Stability" or "Less Than About 5% Total Impurities After
            15 Months of Storage at about 5° C."....................................................263

      2.    The POSA Would Not Have Had a Reasonable Expectation of
            Success in Obtaining the Claimed Compositions Having "Less

ii

EAGLEBEN-SA_00000272

Than or Equal to 0.18% Total PG Esters at About 12 Months of Storage at a Temperature of about 5° C." ................................................269

3. The POSA Would Not Have Had a Reasonable Expectation of Success of Obtaining the Claimed Compositions Having the Claimed PG Ester Amounts at 25° C. ................................................273

4. The POSA Would Not Have Had a Reasonable Expectation of Success of Obtaining a Stabilizing Amount of Monothioglycerol. .........278

5. The POSA Would Not Have Had a Reasonable Expectation of Success of Obtaining a Composition with a Bendamustine Concentration of 25 mg/mL and a Pharmaceutically Acceptable Fluid. ...........................................................................................280

I. The POSA Would Have Had Numerous Other Options Available in Formulating Bendamustine. ...........................................................284

1. Lyophilization ...........................................................290

2. pH Adjustment ...........................................................293

3. Chloride Concentration ................................................295

4. Complexing Agents ....................................................297

5. Dendrimers ...............................................................299

6. Emulsions .................................................................301

7. Liposomes .................................................................303

8. Polymeric Implants/Microparticles ...............................306

9. Prodrugs ...................................................................308

10. Nanoparticles ............................................................310

11. Oral Dosage Forms .....................................................312

12. Surfactants ...............................................................315

13. Solvents ...................................................................316

a. Benzyl Alcohol .................................................323

b. Butylene Glycol ...............................................325

c. Cremophor EL .................................................326

iii

EAGLEBEN-SA_00000273

d.      Cremophor RH ...................................................................329

e.      Dimethylacetamide ...........................................................331

f.      Dimethylformamide ...........................................................333

g.      Dimethylsulfoxide .............................................................335

h.      Dimethyl Isosorbide ..........................................................337

i.      Ethanol ................................................................................339

j.      Ethyl Lactate ......................................................................341

k.      Glycerol ..............................................................................343

l.      Glycerol Formal .................................................................346

m.      Glycofurol ..........................................................................347

n.      N-methyl-2-pyrrolidone .....................................................349

o.      Polypropylene Glycol ........................................................350

p.      Polysorbates .......................................................................351

q.      Solketal ...............................................................................354

r.      Solutol HS 15 .....................................................................355

J.      Objective Indicia Support the Non-Obviousness of the '707 Patent Family .......357

1.      Embodiment ...............................................................................358

a.      U.S. Patent No. 8,609,707 ...............................................359

b.      U.S. Patent No. 9,265,831 ...............................................363

c.      U.S. Patent No. 9,572,796 ...............................................365

d.      U.S. Patent No. 9,572,797 ...............................................368

e.      U.S. Patent No. 9,034,908 ...............................................371

f.      U.S. Patent No. 9,144,568 ...............................................373

g.      U.S. Patent No. 9,572,887 ...............................................375

h.      U.S. Patent No. 9,597,397 ...............................................377

EAGLEBEN-SA_00000274

i.    U.S. Patent No. 9,597,399................................................378

j.    U.S. Patent No. 9,000,021................................................380

2.    Failure of Others................................................382

    a.    Jenapharm................................................382

    b.    Salmedix................................................383

    c.    Cephalon................................................385

3.    Commercial Success................................................388

VIII.    THE ASSERTED CLAIMS OF THE '707 PATENT FAMILY ARE NOT INVALID UNDER § 112................................................394

    A.    The Term "Long Term Storage Stable" Is Not Indefinite.................................................394

    B.    The Term "Long Term Storage Stable" Is Enabled.................................................402

    C.    The Total PG Ester Limitations Are Enabled.................................................406

    D.    The Term "Stabilizing Amount" Is Not Indefinite.................................................406

    E.    The Term "Stabilizing Amount" Is Enabled.................................................410

IX.    THE ASSERTED CLAIMS OF THE '908 AND '021 PATENT FAMILIES WOULD NOT HAVE BEEN OBVIOUS TO THE POSA.................................................411

    A.    The POSA Would Not Have Been Motivated To Use the Claimed Administration Volumes.................................................411

        1.    Soppimath 2013 Would Not Have Motivated the POSA To Use the Claimed Administration Volumes.................................................411

        2.    The POSA Would Not Have Been Motivated To Use the Claimed Administration Volumes Because of Solubility Concerns.................................................416

    B.    The POSA Would Not Have Been Motivated To Use the Claimed Excipients.................................................430

    C.    The POSA Would Not Have Had a Reasonable Expectation of Success that the Claimed Bendamustine Concentrations Could Be Dissolved in the Claimed Diluted Compositions.................................................437

X.    THE '908 PATENT AND THE '568 PATENT ARE NOT INVALID FOR OBVIOUS TYPE DOUBLE PATENTING IN VIEW OF THE '707 PATENT...........440

v

EAGLEBEN-SA_00000275

A.    Claim 14 of the '908 Patent Is Not Invalid for Obviousness-Type Double
Patenting in View of the '707 Patent. ...................................................................440

B.    Claims 11, 15, 18, and 22 of the '568 Patent Are Not Invalid for
Obviousness-Type Double Patenting in View of the '707 Patent. ......................442

EAGLEBEN-SA_00000276

## I.    BACKGROUND AND QUALIFICATIONS

1.    I am a Professor of Pharmaceutical Technology in the College of Pharmacy at the University of Lille in Lille, France. I submitted an opening expert report in the above captioned matter on February 27, 2019. I incorporate the Background and Qualifications section of that report by reference.

2.    My background and qualifications are more fully set forth in my curriculum vitae, attached as Exhibit A, which contains my list of publications.

3.    Within the past four years, I have testified in the following cases as an expert at trial or by deposition: *In re Asacol Antitrust Litig.*, C.A. No. 15-12730-DJC (D. Mass.); *Recro Gainesville LLC v. Actavis Labs. FL, Inc.*, C.A. No. 14-1118-GMS (D. Del.); *Valeant Can. LP v. Minister of Health*, No. T-1805-12 (Fed. Ct.) (Can.).

## II.    ASSIGNMENT

4.    Counsel for Teva Pharmaceuticals International GmbH have engaged me in this case. I have been compensated at a rate of $550.00 per hour, plus expenses, for my consulting work, and $5,500 per day spent traveling. My compensation is not contingent upon the outcome of this case. I am submitting this report on behalf of Teva Pharmaceuticals International GmbH, Cephalon, Inc. (collectively, "Teva"), and Eagle Pharmaceuticals, Inc. ("Eagle") (collectively, "Plaintiffs").

5.    I understand that this litigation is related to Plaintiffs' Bendeka® drug product. Specifically, I understand that four Defendant Groups, including Apotex Corp. and Apotex Inc. (collectively, "Apotex"), Fresenius Kabi USA, LLC ("Fresenius Kabi"), Mylan Laboratories Ltd. ("Mylan"), and Slayback Pharma Limited Liability Co. ("Slayback") (collectively, "Defendants"), have filed Abbreviated New Drug Applications ("ANDAs") with the U.S. Food and Drug Administration ("FDA") seeking approval to market generic versions of Bendeka®.

1

EAGLEBEN-SA_00000277

6.      I have been informed that Plaintiffs are currently asserting the following claims against one or more of the Defendants:  claims 12, 18, and 20 of U.S. Patent No. 8,609,707 (the "'707 patent"), claims 2, 3, and 5 of U.S. Patent No. 9,265,831 (the "'831 patent"), claims 5 and 18 of U.S. Patent No. 9,572,796 (the "'796 patent"), claims 9–11, and 21 of U.S. Patent No. 9,572,797 (the "'797 patent"), claim 14 of U.S. Patent No. 9,034,908 (the "'908 patent"), claims 11, 15, 18, and 22 of U.S. Patent No. 9,144,568 (the "'568 patent"), claim 13 of U.S. Patent No. 9,572,887 (the "'887 patent"), claim 3 of U.S. Patent No. 9,597,397 (the "'397 patent"), claims 13 and 15 of U.S. Patent No. 9,597,399 (the "'399 patent"), and claims 3, 4, 14 and 15 of U.S. Patent No. 9,000,021 (the "'021 patent").

7.      I have been asked to provide expert opinions in this matter concerning whether the inventions recited in the asserted claims would have been obvious at the time that those inventions were made to the person having ordinary skill in the art ("POSA").  Specifically, I have been asked whether the POSA would have had been motivated or had reason to make, and would have had a reasonable expectation of success in making, the claimed formulations.  I have also been asked whether the POSA would have been motivated or had reason to perform, and would have had a reasonable expectation of success in performing, the claimed methods.  I describe these concepts more fully below.

8.      In formulating the opinions contained in this report, I have considered my training, knowledge, basic texts and principles, and experience in the relevant scientific disciplines, as well as the materials cited in the expert reports of Dr. Rudolfo Pinal, Dr. Michael Thirman, and Dr. John Yates to which I am responding, and the materials cited herein.

9.      If asked, I will be prepared to present a basic tutorial to explain the terms and concepts related to the opinions set forth in my expert report, as well as to provide further

2

EAGLEBEN-SA_00000278

background on the state of the art and the level of skill in the art as of the priority date. My testimony may include demonstrative exhibits and models, including models generated by software.

10.    In addition to the opinions and bases set forth in this report, my testimony may include responses to facts, arguments, allegations, or references raised by Defendants or their experts relating to this litigation. I reserve the right to supplement my conclusions if additional information is provided to me, or if additional research leads me to conclude that supplementation is necessary, including in the event Defendants amend or supplement their ANDAs or make changes to their proposed generic products or the processes for manufacturing them.

## III.    LEGAL PRINCIPLES

### A.    Non-Obviousness

11.    I understand that a patent claim would have been "obvious," and thus invalid, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to the POSA to which said subject matter pertains. I understand that analysis of whether a claim would have been obvious depends on (a) the scope and content of the prior art, (b) the differences between the claimed invention and the prior art, (c) the level of ordinary skill in the art, and (d) any secondary considerations of non-obviousness. I understand that the use of hindsight must be avoided because the obviousness of an invention is evaluated from the perspective of the POSA at the time the invention was made. Thus, in conducting an obviousness inquiry, one must be aware of the distortion caused by hindsight bias and must be cautious to avoid reading into the prior art the teachings of the claimed invention at issue.

3

EAGLEBEN-SA_00000279

12.      I understand that to be relevant, a prior-art reference must be analogous.  Under that standard, a prior-art reference is relevant only if (a) it comes from the same field of the inventor's endeavor, or (b) it is reasonably pertinent to the particular problem with which the inventor is involved.  I understand that a reference is reasonably pertinent if it is one that, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering her or his problem.  I define the boundaries of the corpus of knowledge, or "the art," pertinent to the subject matter of the patents, accordingly.

13.      I understand that, when a party challenging a patent relies on multiple references to demonstrate that an invention would have been obvious to the POSA, the challenger must prove not only that the prior art taught or suggested the invention, but also that the POSA would have had a reason to combine the teachings of the prior art references to achieve the claimed invention.  In other words, there needs to be a reason to combine the known elements in the way claimed by the patent at issue.  I also understand that references that "teach away" from the invention—in other words, references that would lead the POSA in a different direction from that taken by the patentee and that would lead the POSA to believe that the direction taken by the patentee was unsuitable—must be considered.  In determining whether the invention would have been obvious, one must consider the prior art as a whole.

14.      I understand that, in addition to having a reason to combine the teachings of the prior art references, the POSA must have a reasonable expectation of success.  I understand that to have a reasonable expectation of success, one must be motivated to do more than merely vary all parameters or try each of numerous possible choices until one possibly arrived at a successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful.

4

EAGLEBEN-SA_00000280

15.     I understand that in evaluating the issue of obviousness, one factor to be evaluated is the passage of time from the publication of the allegedly invalidating references, as advances that are purportedly routine and relatively easy should prompt the development of the subject matter at issue in a relatively short period of time (as opposed to the passage of years). I understand that a prior art reference that recites success in achieving a particular result may itself indicate a lack of motivation to modify the reference in the manner required to achieve the claimed subject matter.

16.     I understand that Dr. Pinal, Dr. Thirman, and Dr. Yates resort in many instances to the alleged background knowledge of one of ordinary skill in the art. I understand that the passage of time since the publication of references concerning such background knowledge should be considered, and that the passage of a significant period of time between such prior art publication and the priority date for the patent claims at issue may be indicative that such purported background knowledge may be being utilized with impermissible hindsight. As discussed below, I do not consider much of the information that the Defendants' experts categorize as "background information" to fit this label.

17.     I understand that, in certain circumstances, a patent may be non-obvious where the inventors recognized and solved a problem that the prior art did not recognize. I understand that without knowledge of the problem, it would not have been obvious to undertake efforts to solve that problem. I understand that even an obvious solution does not render an invention obvious if the problem solved was previously unknown.

18.     I understand that, in certain circumstances, a prior-art reference may "inherently" disclose a particular claim limitation if the limitation in question is necessarily present in, or is the natural result of the combination of elements expressly disclosed by, that reference. I

5

understand that inherency cannot be established by probabilities or possibilities. If a result may or may not result from practice of that reference or teaching, inherency is not established. I further understand that a party must meet a high standard in order to rely on inherency to establish the existence of a claim limitation in an obviousness analysis—the limitation at issue necessarily must be present, or the natural result of the combination of elements explicitly disclosed by the prior art. I understand that inherency requires an analysis of what would have been expected in light of disclosures in the prior art. Thus, when considering whether a particular claim limitation would have been inherently disclosed for the purposes of an obviousness analysis, the person conducting the inquiry must consider unpredictability and unexpectedness.

19.    I understand that, in certain circumstances, a combination of elements may have been "obvious to try." Accordingly, when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, the POSA has good reason to pursue the known options within her or his technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. Conversely, where the prior art at best gives only general guidance as to the particular form of the claimed invention or how to achieve it, the combination would not have been obvious to try. I further understand that where the options do not behave predictably, this principle of obvious to try does not apply.

20.    I understand that, where the general conditions of a claim are disclosed in the prior art, a particular claimed parameter may have been obvious if the POSA would have arrived at that parameter by routine experimentation. However, I understand that even where the prior art discloses a range that overlaps with the claimed parameter, the parameter might not have been

6

EAGLEBEN-SA_00000282

obvious if, among other things, (a) the prior art taught away from the claimed range; (b) the prior art did not recognize that the parameter was result-effective (i.e., the prior art did not recognize that the parameter affected the relevant property or result of the invention); or (c) the prior art discloses very broad ranges.

**B.    Obviousness-Type Double Patenting**

21.     I understand that a patent claim is invalid for obviousness-type double patenting if the POSA would have concluded that invention defined by that claim is an obvious variation of the invention claimed in a commonly assigned "reference" patent or patent application.  I understand that analysis of whether a claim is invalid for obviousness-type double patenting is similar to the analysis of whether a claim would have been obvious.  In particular, I understand that the analysis of whether a claim is invalid for obviousness-type double patenting depends on (a) the scope and content of patent claim relative to the reference claim, (b) the differences between the patent claim and reference claim, (c) the level of ordinary skill in the art, and (d) any secondary considerations of non-obviousness.  I understand that an obviousness-type double patenting analysis cannot be based on the specification of a commonly owned patent or patent application, but may rely on the specification in interpreting the scope of the reference claim.

**C.    Written Description**

22.     I understand that a patent's specification must satisfy the written description requirement, meaning that it allows the POSA to recognize that the inventor actually possessed the invention that is claimed.

23.     I understand that the patent's specification does not have to provide word-for-word support for the claimed subject matter at issue, but must sufficiently describe the claimed invention such that the POSA would have recognized that, as of the filing date of the patent application, the patentee was in possession of the claimed invention.  I understand that

7

EAGLEBEN-SA_00000283

possession in this context is assessed in terms of the overall disclosure in the specification and what the POSA would have understood from that disclosure. I understand that a patent does not need to contain specific examples in order to satisfy the written description requirement. If it does contain examples, I understand that a patent does not need a specific example for every possible embodiment of the invention, so long as the POSA would have recognized the identity of the members of a substantial portion of the claimed genus. Nor must the inventor have actually reduced the invention to practice, or be in physical possession of the invention, in order to satisfy the written description requirement.

24.    I understand that the written description requirement does not require a patent to persuade the POSA that the invention works as described. Rather, it requires only that the POSA would have been able to visualize or recognize the identity of the subject matter described as the claimed compositions, such that the POSA would have concluded that the inventor had conceived of and described the invention at the time of filing. I further understand that the written description requirement only applies to claim limitations. Thus, I understand that when a claim uses the word "comprising" to indicate that it is open-ended—meaning it permits the use of additional, unrecited elements in combination with the claimed invention—and the patent is not required to provide written-description support for those additional, unrecited elements.

**D.    Enablement**

25.    I understand that a patent must satisfy the enablement requirement. This requirement, as I understand it, is met when, at the time of filing the application, the POSA, having read the specification, could practice the full scope of the invention without undue experimentation based on the specification combined with her or his knowledge. I understand that the enablement requirement does not require the patent specification to contain actual

8

EAGLEBEN-SA_00000284

working examples or data. I understand that to practice the full scope of the invention, the scope of enablement need only bear a reasonable correlation to the scope of the claims.

26. Rather, the requirement is met if the POSA would have been able, without undue experimentation, to practice the invention—in this context, make the claimed compositions with the requirements recited in the claims—based on the combination of the information presented in the specification and the knowledge of the art that the POSA would possess. I also understand that the fact that some experimentation may be required does not preclude enablement of an invention so long as the experimentation required is not undue.

27. I understand that the following illustrative, non-mandatory factors may be considered when determining if undue experimentation is required: (a) the quantity of experimentation necessary, (b) the amount of direction or guidance presented, (c) the presence or absence of working examples, (d) the nature of the invention, (e) the state of the prior art, (f) the relative skill of those in the art, (g) the predictability or unpredictability of the art, and (h) the breadth of the claims. I have considered and applied those factors in reaching my conclusions regarding enablement.

**E.    Definiteness**

28. I understand that each claim must satisfy the definiteness requirement. I understand that a claim is sufficiently definite if the language of the claim, when read in light of the specification and the prosecution history, informs the POSA of the scope of the invention with reasonable certainty.

29. I understand that, although the claim must describe the scope of the invention with reasonable clarity, some modicum of uncertainty is acceptable. I further understand that the definiteness requirement takes into account the inherent limitations of language, and is not addressed to lawyers or to laypersons, but to the POSA.

9

## IV.    THE PATENTS-IN-SUIT

30.    As stated above, the asserted claims include the following: claims 12, 18, and 20 of the '707 patent; claims 2, 3, and 5 of the '831 patent; claims 5 and 18 of the '796 patent; and claims 9–11, and 21 of the '797 patent; claim 14 of the '908 patent, claims 11, 15, 18, and 22 of the '568 patent, claim 13 of the '887 patent; claim 3 of the '397 patent; claims 13 and 15 of the '399 patent; and claims 3, 4, 14 and 15 of the '021. I describe the asserted claims in greater detail in my opening report. *See* Siepmann Opening Rep. ¶¶ 21–26.

31.    As a general matter, the '707 patent family (which includes the '707, '831, '796, and '797 patents) claims liquid formulations comprising bendamustine or a pharmaceutically acceptable salt thereof, polyethylene glycol ("PEG"), propylene glycol ("PG"), and an antioxidant, such as monothioglycerol. Certain claims require the formulations to comprise specified amounts of ingredients, for example, about 90% PEG and about 10% PG. Various claims also specify the amounts of impurities present in the compositions after storage for certain time periods at certain temperatures.

32.    As a general matter, the '908 patent family (which includes the '908, '568, '887, '397, and '399 patents) claims methods of treating cancer comprising administering liquid bendamustine formulations in volumes of 150 mL or less over time periods of 30 minutes or less. Certain claims require the formulations to be administered in even smaller volumes or over even shorter time periods, for example, in volumes of 50 mL or less or over time periods of 10 minutes or less. As with the '707 patent family, various claims of the '887 patent also specify the total amount of impurities present in the compositions after storage for certain time periods at certain temperatures.

33.    As a general matter, the '021 patent family (which includes the '021 patent) claims methods of treating cancer comprising administering liquid bendamustine formulations to

10

EAGLEBEN-SA_00000286

patients with restricted sodium or fluid intake. As with the '908 family, certain claims require the formulations to be administered in relatively small volumes or over relatively short time periods, for example, in volumes of 50 mL or less or over time periods of 10 minutes or less.

## V.    THE PERSON OF ORDINARY SKILL IN THE ART

34.    For purposes of this report, I have been asked to assume that the priority date for the asserted claims of the '707 patent family is January 28, 2010, which I have been informed is the filing date of the provisional application to which the '707 patent family claims priority. However, my analysis and opinions would not change if, instead, the date used were January 28, 2011, which I have been informed is the filing date of the '707 patent's non-provisional application.

35.    For purposes of this report, I have been asked to assume that the priority date for claims 15 and 22 of the '568 patent is March 20, 2012, which I have been informed is the filing date of the first provisional application to which the '908 patent family claims priority. However, my analysis and opinions would not change if, instead, the date used were July 10, 2012, which I have been informed is the filing date of the second provisional application to which the '908 patent family claims priority, or March 15, 2013, which I have been informed is the filing date of the '908 patent's non-provisional application.

36.    For the purposes of this report, I have been asked to assume that the priority date for the remaining asserted claims of the '908 patent family is July 10, 2012, which I have been informed is the filing date of the second provisional application to which the '908 patent family claims priority. However, my analysis and opinions would not change if, instead, the date used were March 15, 2013, which I have been informed is the filing date of the '908 patent's non-provisional application.

11

EAGLEBEN-SA_00000287

37.    For the purposes of this report, I have been asked to assume that the priority date for the asserted claims of the '021 patent is August 2, 2012, which I have been informed is the filing date of the third provisional application to which the '021 patent family claims priority. However, my analysis and opinions, would not change if, instead, the date used were March 15, 2013, which I have been informed is the filing date of the '021 patent's non-provisional application.

38.    I have been informed that factors for determining ordinary skill in the art may include one or more of the following: (1) the educational level of the inventor; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) the sophistication of the relevant technology; and (6) the educational level of workers active in the field.  I have considered these factors in my analysis.

39.    In my opening report, I opined that the POSA for the '707 patent family, as of those patents' priority dates, would have had the skills, education, and expertise of a team of individuals working together to formulate a liquid injectable drug product.  Such a team would have included individuals with doctoral degrees in chemistry, biochemistry, pharmaceutics, pharmaceutical sciences, chemical engineering, biochemical engineering or related fields, with at least two years of post-graduate experience in developing liquid injectable drug products, or master's or bachelor's degrees in similar fields of study, with a commensurate increase in their years of postgraduate experience.  Such a team also would have been familiar with a variety of issues relevant to developing liquid injectable drug formulations, including, among other things, solubility, stability, pharmacokinetics, pharmacodynamics, and other pharmaceutical characteristics.  Such a team also would have included persons with expertise in analytical chemistry, including the detection and measurement of chemical degradants.  The team also

12

EAGLEBEN-SA_00000288

would have had access to an individual with a medical degree with experience in treating patients with chronic lymphocytic leukemia and indolent B-cell non-Hodgkin lymphoma. I continue to hold that opinion. The analysis and opinions that I offer in this report reflect the knowledge and understanding of the pharmacist who would have been part of this team.

40.     In my opening report, I opined that the POSA for the '908 and '021 patent families, as of those patents' priority dates, would have had the skills, education, and expertise of a team of individuals working together to develop a safe and effective administration protocol for a cytotoxic parenteral drug product. Such a team would have included individuals with doctoral degrees in pharmaceutics, pharmaceutical sciences, pharmacology, pharmacokinetics, pharmacodynamics, or related fields, with at least two years of post-graduate experience in developing protocols for pharmaceutical administration, or master's or bachelor's degrees in similar fields of study, with a commensurate increase in their years of post-graduate experience. Such a team would have been familiar with a variety of issues relevant to administering liquid injectable drug products, including, among other things, toxicity, solubility, pharmacokinetics, and pharmacodynamics. Such a team would have included at least one individual with a medical degree with experience in treating patients with chronic lymphocytic leukemia and indolent B-cell non-Hodgkin lymphoma. I continue to hold that opinion. The analysis and opinions that I offer in this report reflect the knowledge and understanding of the pharmacist who would have been part of this team.

41.     I understand that Dr. Pinal, Dr. Thirman, and Dr. Yates have proposed several, alternative definitions of the POSA, each of which include a formulator with an advanced degree in pharmaceutics, chemistry, or a related field. *See* Pinal Rep. ¶¶ 37–39. I note that Dr. Pinal, Dr. Thirman, and Dr. Yates do not identify which of those definitions apply to which patents. To

13

the extent that Dr. Pinal, Dr. Thirman, and Dr. Yates suggest that the POSA may not have included someone with an advanced degree in chemistry, who would have had knowledge and experience regarding chemical reaction mechanisms, kinetics of reactions, and techniques for monitoring impurities, I disagree. For example, as noted in my opening report, Nageshwara R. Palepu and Phillip Christopher Buxton, the named inventors for the '707 patent family, have doctoral degrees in pharmaceutical chemistry and organic chemistry, respectively. *See* Palepu Dep. Tr. 17:17–19:18 (Nov. 29, 2018); Buxton Dep. Tr. 11:3–19 (Jan. 17, 2019); Siepmann Opening Rep. ¶ 33. I also understand that Dr. Eric Anslyn has opined that the problem of stabilizing bendamustine requires a level of knowledge about chemical reaction mechanisms and kinetics that would accompany a doctoral degree in chemistry. *See* Anslyn Rep. ¶ 31. However, my analysis and opinions would not change if I were to adopt any one of Dr. Pinal, Dr. Thirman, and Dr. Yates's definitions.

## VI.    SUMMARY OF CERTAIN REFERENCES

42.    In his report, Dr. Pinal provides brief descriptions of certain references that he asserts are prior art to the '707 patent family. *See* Pinal Rep. ¶¶ 80–145. I have reviewed the references discussed by Dr. Pinal, and I found that his descriptions of those references are incomplete. In addition, Dr. Pinal's list of references does not accurately characterize the state of the art at the time of the priority date of the '707 patent family.

43.    In this section of my report, I provide summaries of those references cited by Dr. Pinal in paragraphs 80 through 145 of his report, which concern the formulation aspects of the '707 patent family. I also provide a summary of U.S. Patent Publication No. 2013/0210878, which Dr. Pinal cites in connection with certain arguments concerning the '908 and '021 patent families. Further details about those references, and my opinions regarding the references, can be found throughout this report.

14

EAGLEBEN-SA_00000290

44.    In addition, I understand that Dr. Ashwani Agarwal, Dr. Hartmut Derendorf, and Dr. Lorenzo Leoni will discuss the references that Dr. Pinal asserts are relevant to the '908 and '021 patent families.

**A.    Alam '286**

45.    U.S. Patent No. 4,879,286 ("Alam '286"), JDG_BENDA_00000184, is a patent entitled "Cyclophosphamide" that issued on November 7, 1989.  Alam '286 is a continuation of an application purportedly filed on January 28, 1987.

46.    Cyclophosphamide is a nitrogen mustard with the following molecular structure:

47.    Cyclophosphamide lacks a carboxylic acid functional group ($-COOH$).  As such, unlike bendamustine, cyclophosphamide is unable to form esters with alcohols.  *See* Anslyn Rep. ¶¶ 213–217; Pinal Rep. ¶ 358.  I understand that Dr. Anslyn is providing the opinion that the degradation of cyclophoshphamide at the nitrogen mustard moiety differs, from a chemical and and mechanistic perspective, from the degradation of bendamustine at the nitrogen mustard moiety.

15

EAGLEBEN-SA_00000291

48.    Alam '286 explains that existing cyclophosphamide products were lyophilized for stability reasons. *See* Alam '286 at 2:13–68, JDG_BENDA_00000184 at 185. Alam '286 discloses liquid formulations of cyclophosphamide that purportedly have "improved stability and shelf-life." *Id.* at 3:13–26, JDG_BENDA_00000184 at 185. Specifically, Alam '286 discloses formulations having about 50 to 100% of an "organic polyol" and about 0 to 50% water. *Id.* at 3:13–18, JDG_BENDA_00000184 at 185. Alam '286 discloses that "organic polyols which are useful in the present invention include propylene glycol, polyethylene glycol, glycerol, and mixtures thereof." *Id.* at 3:56–62, JDG_BENDA_00000184 at 185.

49.    Alam '286 explicitly includes substantial amounts of water in its formulations, despite cyclophosphamide's susceptibility to hydrolysis:

> As is well known in the art, the presence of water in a carrier vehicle for cyclophosphamide provides a ready means for the degradation through hydrolysis of the cyclophosphamide. However, it has been discovered that through the use of the present invention, water may be present in amounts up to about 50% based on the total weight of the liquid carrier, and one may still obtain formulations with useful stability, in comparison to a purely aqueous solution.

Alam '286 at 3:64–4:4, JDG_BENDA_00000184 at 185.

50.    Alam '286 discloses a most preferred formulation containing 80% PG and 20% PEG. *See, e.g.,* Alam '286 at 4:5–17, JDG_BENDA_00000184 at 185.

51.    Alam '286 also discloses a series of stability experiments with cyclophosphamide formulations containing PG, PEG, glycerol, and/or water. *See* Alam '286 at 5:1–6:60, JDG_BENDA_00000184 at 187. Alam '286 does not report the identity of the individual degradants of cyclophosphamide; rather, Alam '286 reports the total amount of cyclophosphamide remainining in the composition. The POSA would not have known from the disclosure in Alam '286 the identities of the degradants in the various compositions. Overall, the formulations of cyclophosphamide tested by Alam '286—even its best formulations with 80%

16

EAGLEBEN-SA_00000292

PG and 20% PEG----were relatively unstable, particularly at room temperature and higher.  I have

reproduced the Alam '286 formulation chart and the stability data for 4° C, room temperature,

and 30° C below:

### CYCLOPHOSPHAMIDE FORMULATIONS

| Example | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Propylene Glycol | 25% | | 25% | | 25% | | 25% | | 50% | 80% | 80% |
| Polyethylene Glycol | | | | | | | | | | 20% | 20% |
| Glycerol | | 25% | 25% | | | 25% | 25% | | 50% | | |
| Water for Injection | 75% | 75% | 50% | 100% | 75% | 75% | 50% | 100% | | | |
| Cyclophosphamide (mg/ml) | 5 | 5 | 5 | 5 | 20 | 20 | 20 | 20 | 20 | 20 | 100 |

### PERCENT CYCLOPHOSPHAMIDE (4° C.)

| Example | Zero Time | 1 Week | 2 Weeks | 9 Weeks | 11 Weeks | 15 Weeks |
|---|---|---|---|---|---|---|
| 1 | 100 | 96.0 | 93.8 | | | |
| 2 | 100 | 96.8 | 93.7 | | | |
| 3 | 100 | 96.8 | 92.5 | | | |
| 4 | 100 | 97.2 | 94.8 | | | |
| 5 | 100 | 99.4 | 96.4 | | 73.1 | |
| 6 | 100 | 97.8 | 94.7 | | 71.0 | |
| 7 | 100 | 99.1 | 96.8 | | 73.4 | |
| 8 | 100 | 97.7 | 95.0 | | 87.0 | 70.8 |
| 9 | 100 | 99.4 | 99.3 | | 96.2 | |
| 10 | 100 | 99.2 | 98.5 | | 98.7 | |
| 11 | 100 | | 99.4 | 97.3 | | |

17

EAGLEBEN-SA_00000293

PERCENT CYCLOPHOSPHAMIDE (ROOM TEMPERATURE)

| Example | Zero Time | 1 Week | 2 Weeks | 9 Weeks | 11 Weeks |
|---------|-----------|--------|---------|---------|----------|
| 1 | 100 | 83.5 | 71.7 | | |
| 2 | 100 | 80.8 | 70.2 | | |
| 3 | 100 | 84.8 | 73.7 | | |
| 4 | 100 | 81.4 | 69.6 | | |
| 5 | 100 | 83.3 | 72.2 | | |
| 6 | 100 | 81.5 | 70.8 | | |
| 7 | 100 | 85.6 | 76.1 | | |
| 8 | 100 | 81.8 | 70.5 | 0.1 | |
| 9 | 100 | 97.6 | 94.1 | 74.4 | |
| 10 | 100 | 98.9 | 97.1 | 86.6 | |
| 11 | 100 | 96.7 | 88.0 | | |

PERCENT CYCLOPHOSPHAMIDE (30° C.)

| Example | Zero Time | 1 Week | 2 Weeks | 9 Weeks | 11 Weeks |
|---------|-----------|--------|---------|---------|----------|
| 1 | 100 | 60.0 | 36.3 | | |
| 2 | 100 | 56.8 | 32.9 | | |
| 3 | 100 | 64.4 | 43.2 | | |
| 4 | 100 | 56.5 | 32.4 | | |
| 5 | 100 | 61.9 | 40.8 | | |
| 6 | 100 | 57.8 | 36.2 | | |
| 7 | 100 | 65.7 | 46.5 | | |
| 8 | 100 | 55.9 | 33.1 | | |
| 9 | 100 | 90.9 | 89.4 | 22.2 | |
| 10 | 100 | 95.2 | 89.4 | 54.1 | |
| 11 | 100 | 91.1 | 58.6 | | |

**B.      Brittain 2006**

52.      U.S. Patent Publication No. 2006/0159713 ("Brittain 2006"), JDG_BENDA_00000375, is a patent application entitled "Bendamustine Pharmaceutical Compositions" that published on July 20, 2006. The named inventors are Jason Edward Brittain and Joe Craig Franklin, and the assignee of the application is Cephalon, Inc. Brittain 2006 claims priority to a provisional application that was filed on January 14, 2005.

18

EAGLEBEN-SA_00000294

53. Brittain 2006 was submitted to the Examiner during the prosecution of the '707 patent family, the '908 patent family, and the '021 patent family.

54. Brittain 2006 describes "stable pharmaceutical compositions of nitrogen mustards, in particular lyophilized bendamustine." Brittain 2006 ¶ 21, JDG_BENDA_00000375 at 383. Brittain 2006 states that "the lyophilized products of the present invention have a better impurity profile than Ribomustin® with respect to certain impurities." *Id.* ¶ 74, JDG_BENDA_00000375 at 388. Ribomustin was the bendamustine containing lyophilized product previously marketed in Germany.

55. Brittain 2006 explains that lyophilized formulations of the invention are "achieved following removal of an organic solvent in water," and the "most typical example of the solvent used to prepare this formulation is tertiary butanol." *Id.* ¶ 87, JDG_BENDA_00000375 at 388. Brittain 2006 also lists a variety of other organic solvents that can be used to prepare the lyophilized formulation. *Id.*

56. Brittain 2006 discloses several solubility-related experiments for bendamustine compositions. *See* Brittain 2006 ¶¶ 101–105, JDG_BENDA_00000375 at 391–92. In the first experiment, the inventors prepared formulations containing 15 mg/mL bendamustine hydrochloride and 25.5 mg/mL mannitol in mixtures of water and an organic solvent. These solutions were then refrigerated at 5° C and inspected for precipitation. *See id.* ¶ 102, JDG_BENDA_00000375 at 391–92. The results of that experiment are reproduced below:

19

TABLE 1

Bendamustine solubility over a 24 hour period in various alcohols
when stored at 5° C.

| | Zero Time | 3 Hours | 6 Hours | 24 Hours |
|---|---|---|---|---|
| **Methanol (v/v)** | | | | |
| 0% (Water Only) | CCS | CCS | Precipitate | Precipitate |
| 5% | CCS | CCS | Precipitate | Precipitate |
| 10% | CCS | CCS | CCS | Precipitate |
| 20% | CCS | CCS | CCS | Precipitate |
| 30% | CCS | CCS | CCS | CCS |
| **Ethanol (v/v)** | | | | |
| 1.9% | CCS | CCS | Precipitate | Precipitate |
| 5% | CCS | CCS | Precipitate | Precipitate |
| 10% | CCS | CCS | CCS | Precipitate |
| 20% | CCS | CCS | CCS | CCS |
| 30% | CCS | CCS | CCS | CCS |
| **n-Propanol (v/v)** | | | | |
| 5% | CCS | CCS | CCS | Precipitate |
| 10% | CCS | CCS | CCS | CCS |
| 20% | CCS | CCS | CCS | CCS |
| 30% | CCS | CCS | CCS | CCS |
| **Iso-propanol (v/v)** | | | | |
| 5% | CCS | Precipitate | Precipitate | Precipitate |
| 10% | CCS | CCS | CCS | CCS |
| 20% | CCS | CCS | CCS | CCS |
| 30% | CCS | CCS | CCS | CCS |
| **n-Butanol (v/v)** | | | | |
| 5% | CCS | CCS | CCS | CCS |
| 10% | CCS | CCS | CCS | CCS |
| 20% | 2 layers | 2 layers | 2 layers | 2 layers |
| 30% | 2 layers | 2 layers | 2 layers | 2 layers |
| **Tert-Butanol (v/v)** | | | | |
| 5% | CCS | CCS | CCS | Precipitate |
| 10% | CCS | CCS | CCS | Precipitate |
| 20% | CCS | CCS | CCS | CCS |
| 30% | CCS | CCS | CCS | CCS |

CCS stands for clear colorless solution

*Id.* ¶¶ 103–104, JDG_BENDA_00000375 at 392.

57.     The Brittain 2006 inventors conducted additional, quantitative solubility experiments on solutions of tertiary butanol and water. They found that "the solubility of bendamustine [hydrochloride] decreased linearly with temperatures from 25° C. to 0° C." Brittain 2006 ¶ 105, JDG_BENDA_00000375 at 392. The results of those experiments are reproduced below:

20

EAGLEBEN-SA_00000296

TABLE 2

Solubility of bendamustine in TBA

|  | −8° C. | 0° C. | 5° C. | 25° C. |
|---|---|---|---|---|
| 20% (v/v) TBA | | | | |
| 25.5 mg/mL mannitol Water, q.s. to desired volume | 14 mg/mL | 11 mg/mL | 17 mg/mL | 47 mg/mL |
| 30% (v/v) TBA | | | | |
| 25.5 mg/mL mannitol Water, q.s. to desired volume | 20 mg/mL | 18 mg/mL | 27 mg/mL | 65 mg/mL |

58.     The Brittain 2006 inventors also tested the stability of bendamustine hydrochloride in water.  The inventors observed that "[b]endamustine degrades rapidly [when dissolved] in water alone and forms predominantly the hydrolysis product, HP1 (monohydroxy bendamustine)."  Brittain 2006 ¶ 109, JDG_BENDA_00000375 at 392–93.  The results of that experiment are illustrated in Table 3 of Brittain 2006 and show a bendamustine purity of 95.67% in water after 24 hours at 5 °C, with a measured HP1 content of 3.81%.  *Id.*

59.     The Brittain 2006 inventors also tested the stability of bendamustine hydrochloride in mixtures comprising water and an organic solvent.  Generally speaking, the inventors found that adding an organic solvent improved the stability of bendamustine in aqueous solutions, with formulations of 30% (v/v) tertiary butanol in water providing the best stability of the tested formulations.  *See* Brittain 2006 ¶¶ 110–119, JDG_BENDA_00000375 at 393–95.  The results of these stability experiments are illustrated in Figures 2 through 4, *see* JDG_BENDA_00000375 at 377–79.

60.     The Brittain 2006 inventors conducted several experiments to assess whether tertiary butanol would form an ester with bendamustine.  *See* Brittain 2006 ¶¶ 157–159,

21

EAGLEBEN-SA_00000297

JDG_BENDA_00000375 at 399. The first such experiment involved heating a solution of bendamustine hydrochloride, tertiary butanol, and hydrochloric acid to a temperature of 60° C for 20 hours. This experiment failed to yield a tertiary butanol ester of bendamustine. *See id.* ¶ 158, JDG_BENDA_00000375 at 399. The second experiment involved reacting an acyl chloride of bendamustine with tertiary butanol. *See id.* ¶ 159, JDG_BENDA_00000375 at 399. Reactions of acyl chlorides and alcohols are known to form esters. *See* Zimmerman 1977 at 432, JDG_BENDA_00003450 at 3454. This experiment also failed to yield the tertiary butanol ester of bendamustine. *See* Brittain 2006 ¶ 159, JDG_BENDA_00000375 at 399. In view of these experiments, the Brittain 2006 inventors concluded that tertiary butanol "has an additional benefit of not forming the ester from the alcohol." *Id.*

61.    As part of its discussion of the term "pharmaceutical dosage form," Brittain 2006 states the following:

> In all cases, the ultimate dosage form should be sterile, fluid and stable under the conditions of manufacture and storage. The liquid carrier or vehicle can be a solvent or liquid dispersion medium comprising, for example, water, ethanol, a polyol such as glycerol, propylene glycol, or liquid polyethylene glycols and the like, vegetable oils, nontoxic glyceryl esters, and suitable mixtures thereof.

Brittain 2006 ¶ 67, JDG_BENDA_00000375 at 387. Citing this paragraph, Dr. Pinal has opined that "Brittain 2006 at [0067] additionally teaches that bendamustine is soluble in PEG." Pinal Rep. ¶ 94. I disagree with this characterization. Brittain 2006 does not discuss or otherwise disclose the solubility of bendamustine in PEG, much less provide any experimental solubility measurements of bendamustine in PEG. Indeed, Dr. Pinal appears to agree that the solubility of bendamustine in PEG was not disclosed in the prior art. *See* Pinal Rep. ¶ 194. Rather, PEG is one of many examples from Brittain 2006 of a component of a potential "liquid carrier" for bendamustine hydrochloride, which could be used alongside other solvents or liquid dispersion

22

EAGLEBEN-SA_00000298

media, such as water. Brittain 2006's discussion of liquid carriers in this paragraph does not appear to be based on any actual experiments, and certainly no such experiments or results are disclosed. Brittain 2006 focuses on, and teaches the POSA to make and use, lyophilized bendamustine formulations, and Brittain 2006 does not disclose any examples in which bendamustine was admixed into a liquid carrier suitable to be used as an ultimate dosage form, other than the administration directions for the previously marketed Ribomustin® product (that is, dilution into 500 mL of saline). *See* Brittain 2006 ¶¶ 7–9, JDG_BENDA_00000375 at 382.

**C.    Drager '006**

62.    U.S. Patent No. 8,344,006 ("Drager '006"), JDG_BENDA_00000990, is a patent entitled "Liquid Formulations of Bendamustine" that issued on January 1, 2013. The named inventors are Anthony S. Drager, Rachel Y. Labell, and Piyush R. Patel, and the assignee of the patent is Cephalon, Inc. The patent claims priority to a provisional application that was filed on September 25, 2008. I understand that Drager '006 is prior art in this case.

63.    Drager '006 was submitted to the Examiner during the prosecution of the '707 patent family, the '908 patent family, and the '021 patent family.

64.    In a section titled "BACKGROUND OF THE INVENTION," Drager '006 explains that, "[i]n light of its instability in aqueous solution, bendamustine is currently supplied as a lyophilized powder for injection." Drager '006, 1:66–67, JDG_BENDA_00000990 at 996. Drager '006 also provides the following background commentary on Olthoff 1983 (GDR Patent 15289), a reference that is discussed further below:

> Solutions of bendamustine hydrochloride in anhydrous propylene glycol, prepared under an inert gas atmosphere, have been reported (GDR Patent 15289). It was reported that analysis of these solutions using thin-layer chromatography, eluting with butanol/acetic acid/water (4:1:5) and detection with Dragendorff reagent and UV (360 nm) did not suggest any decomposition. Curiously, however,

23

commercial development of propylene glycol formulations have heretofore not been reported.

*Id.* at 2:19–28, JDG_BENDA_00000990 at 996.

65.    Drager '006 reports that the inventors prepared the "pure" PG formulation disclosed in Olthoff 1983 and performed testing to determine its stability using the more modern technique of HPLC. Drager '006 reported the following:

> Experiments to produce commercially viable propylene glycol preparations have been performed. Unfortunately, the results described in GDR Patent 159289 were not reproducible. Solutions of bendamustine in 99% propylene glycol degraded to non-bendamustine products over a time equivalent to commercial storage. Two of the impurities were identified as propylene glycol esters of bendamustine. As such, a 100% propylene glycol commercial formulation of bendamustine is not feasible for pharmaceutical purposes.

Drager '006, 2:61–3:2, JDG_BENDA_00000990 at 996–97. Drager '006 illustrates the data from these experiments in Figure 3, *see* JDG_BENDA_00000990 at 994:



24

66.     As discussed in more detail below, Drager '006 discloses, and the POSA would have understood, that these data show that Olthoff 1983's PG formulation is unsuitable and undesirable. Accordingly, Drager '006 proposed a solution to modify the formulation of the prior art to produce desirable, liquid bendamustine formulations. In particular, the formulations disclosed by the inventors of the Drager '006 patent contain "a polar aprotic solvent or mixture of polar aprotic solvents." Drager '006, 3:3–3:8, JDG_BENDA_00000990 at 997; *see also* Anslyn Rep. ¶¶ 82–83 (discussing protic and aprotic solvents and solvent polarity). Drager '006 provided a number of examples of polar aprotic solvents, including "1-methyl-2-pyrrolidone, 1,3,-dimethyl-2-imidazolidinone, dimethylacetamide, dimethyl sulfoxide, acetone, tetrahydrofuran, 1,4-dioxane, acetonitrile, dimethyl formamide, [and] propylene carbonate." *Id.*, 3:10–3:18, JDG_BENDA_00000990 at 997. Drager '006 also cites an article, Mott et al., *Organic Solvents for Pharmaceutical Parenterals and Embolic Liquids: A Review of Toxicity Data*, 54 PDA J. PHARM. SCI. & TECH. 456 (2000), on this point. *Id.* Drager discloses that dimethylacetamide and dimethyl sulfoxide, and mixtures thereof, were "[p]articularly preferred polar aprotic solvents" of the invention. *Id.* at 3:19–20, JDG_BENDA_00000990 at 997.

67.     Drager '006 states that "it is believed that polar, aprotic solvents are sufficiently non-nucleophilic towards bendamustine such that polar aprotic solvent-bendamustine adducts do not form over the course of typical commercial storage conditions." Drager '006, 3:21–3:26, JDG_BENDA_00000990 at 997.

68.     Drager '006 also discloses that "stable formulations of bendamustine can be obtained by mixing a polar aprotic solvent, or a mixture of polar aprotic solvents, with a non-aqueous polar protic solvent or mixture of nonaqueous polar protic solvents." Drager '006, 3:37–3:41, JDG_BENDA_00000990 at 997. Drager '006 provides the following list of

25

EAGLEBEN-SA_00000301

nonaqueous polar protic solvents: "alkyl alcohols, for example, ethanol, ethylene glycol, propylene glycol, butylene glycol, glycerin, polysorbates, for example TWEEN 20, TWEEN 40, and TWEEN 80, and cyclodextrins (such as hydroxypropyl-β-cyclodextrin), polyalkylene glycols, such as polyethylene glycol, polypropylene glycol, and polybutylene glycol, and primary amides such as niacinamide." *Id.* at 3:41-48, JDG_BENDA_00000990 at 997.

69.　　Drager '006 teaches that all of its formulations must include some amount of polar aprotic solvent, and most preferably that the formulations contain no more than 80% of the nonaqueous polar protic solvent.  In particular, Drager '006 states:

> [Formulations of the invention] will typically comprise 90% or less, by volume of the formulation, of the nonaqueous polar protic solvent.  In other preferred embodiments, formulations will comprise between about 20% and about 85% by volume of the formulation, of the nonaqueous polar protic solvent.  In still other embodiments, formulations will comprise between about 30% and about 70%, by volume of the formulation, of the nonaqueous polar protic solvent.  In most preferred embodiments, formulations will comprise about 80%, about 67% or about 34%, by volume of the formulation, of the nonaqueous polar protic solvent.

Drager '006, 3:48-4:7, JDG_BENDA_00000990 at 997.

70.　　Drager '006 discloses that "it is believed that while nonaqueous polar protic solvents are of sufficient nucleophilicity to form potentially undesirable polar protic solvent-bendamustine adducts, such adducts will not form during typical commercial storage if the concentration of the polar protic solvent is kept within the scope of the present invention." Drager '006, 4:18-24, JDG_BENDA_00000990 at 997.  This language clearly discloses to the POSA that the concentration of polar protic solvents should be kept within the scope of the present invention, preferably about 80%, about 67%, or about 34% of the volume of the formulation.

26

EAGLEBEN-SA_00000302

71.     Nowhere does Drager '006 disclose formulations with solvent systems that are composed entirely of nonaqueous polar protic solvents. And in fact, Drager '006 teaches away from the use of such formulations with bendamustine by emphasizing the inclusion of a polar aprotic solvent and the consequences of using too much polar protic solvent (*i.e.*, the formation of "undesirable polar protic solvent-bendamustine adducts"). Drager '006 does not disclose formulations without a polar aprotic solvent; the only such formulation addressed in Drager '006 is the prior art Ohltoff 1983 formulation that was tested and disclosed to be unsuitable and unstable and then modified, by use of polar aprotic solvents, to prepare the formulations of the invention.

72.     Drager '006 explains that bendamustine degrades "upon exposure to certain nucleophiles, for example, water and alky[l]ene glycols such as propylene glycol." Drager '006, 4:33-36, JDG_BENDA_00000990 at 997. One such degradant is referred to by Drager '006 as "HP1," which Drager '006 states is produced by "[e]xposure of bendamustine to water" and has the following structure:

(HP1)

*Id.* at 4:36-50, JDG_BENDA_00000990 at 997.

73.     Drager '006 also discloses that a "BM1 dimer" can form, with the following structure:

27

EAGLEBEN-SA_00000303

(BM1 dimer)

Drager '006 at 4:50–60, JDG_BENDA_00000990 at 997. Drager '006 does not disclose a mechanism by which BM1 dimer forms.

74.    Drager also discloses a degradant called "DCE" with the following structure:

(DCE)

Drager '006, 4:65–5:10, JDG_BENDA_00000990 at 997–98. Drager '006 does not disclose a mechanism by which DCE forms.

75.    Drager '006 also discloses that, "[u]pon exposure to an alkylene glycol, for example, propylene glycol, esters of bendamustine can form, e.g., PG-1 and PG-2," which have the following structures:

28

Drager '006, 5:13–43, JDG_BENDA_00000990 at 998.

76.    Drager '006 discloses that, in "addition to comprising a polar aprotic solvent, or mixture of polar aprotic solvents, and optionally, a nonaqueous polar protic solvent, or mixture of solvents, formulations of the present invention may further comprise other pharmaceutically acceptable excipients." Drager '006, 7:1–5, JDG_BENDA_00000990 at 999. Drager '006 lists the following examples of such pharmaceutically acceptable excipients:

> [A]ntioxidants (e.g., tocopherol (Vitamin E), ascorbic acid, methyl paraben, buthylhydroxyanisole (BHA), butylhydroxytoluene (BHT), and propyl gallate), surfactants, (e.g., polysorbates (TWEEN 20, TWEEN 40, TWEEN 80)), lipids (e.g., dimyristoylphophatidylcholine (DMPC), Dimyristoylphosphatidylglycerol (DMPG),

29

EAGLEBEN-SA_00000305

distearoylphophatidylglycerol (DSPG), fillers (e.g., mannitol), organic acids (e.g., citric acid, lactic acid, benzoic acid), hydrophilic polymers (e.g., polyethylene glycols (PEG 300, PEG 400), complexing agents (e.g., niacinamide, nicotinic acid, creatine, cyclodextrins), and preservatives (e.g., benzyl alcohol).

Drager '006, 7:5–18, JDG_BENDA_00000990 at 999.

77.    The Drager '006 inventors measured the solubility of bendamustine hydrochloride in the following solvents: 1-methyl-2-pyrrolidone ("NMP"), 1,3,-dimethyl-2-imidazolidinone ("DMI"), dimethylacetamide ("DMA"), dimethyl sulfoxide ("DMSO"), acetone, tetrahydrofuran ("THF"), dimethylformamide ("DMF"), and propylene carbonate ("PC"), as well as solutions of 25 mg/mL niacinamide in DMA and 66% DMA/34% PG.  The solubility results are reproduced below:

TABLE I

| Sample* | % Purity | Assay (mg/mL) |
|---|---|---|
| NMP | 99.1 | 104.0 |
| DMI | 98.5 | 75.8 |
| DMSO | 99.5 | 311.7 |
| DMF | 99.6 | 71.8 |
| 66% DMA/34% PG | 99.5 | 110.1 |
| DMA | 99.4 | 56.2 |
| PC | 98.7 | 7.7 |
| Niacinamide/DMA | 99.2 | 61.3 |

*acetone and THF have no measurable solubility of bendamustine.

Drager '006, 8:5–40, JDG_BENDA_00000990 at 999.

78.    Drager '006 reports that the solubility samples were tested for stability at 25° C and 5° C.  Figure 1 reports the overall bendamustine hydrochloride purity results at 25° C through about one year, see JDG_BENDA_00000990 at 992:

30

EAGLEBEN-SA_00000306



The 66% DMA/34% PG formulation was not included in Figure 1.

79. Figure 2 reports the overall bendamustine hydrochloride purity results at 5° C through about one year, *see* JDG_BENDA_00000990 at 993:

31

EAGLEBEN-SA_00000307



Although there is a "66% DMA" entry in the legend of Table 2, it is unclear whether those data are included in the graph itself. Drager '006 reports that at 5° C, "all solutions had a purity greater than 90%." Drager '006, 8:5–40, JDG_BENDA_00000990 at 999.

80.    To measure the impurities in the bendamustine formulations, the Drager '006 inventors used reverse phase high performance liquid chromatography (HPLC) with a mobile phase of 50% NMP/50% 0.1% trifluoroacetic acid in water. *See* Drager '006, 9:1–3, JDG_BENDA_00000990 at 1000.

81.    In addition to the overall purity data, Drager '006 also reports data regarding the concentrations of particular, identified impurities in the samples stored at 5° C after about one year:

32

EAGLEBEN-SA_00000308

TABLE II

Impurity profile of certain liquid formulations of Bendamustine
HCl after storage at 5° C. for about 12 months

| Formulation | DCE (Area %) | HP1 (Area %) | BMI dimer (Area %) | PG-1 (Area %) | PG-2 (Area %) |
|---|---|---|---|---|---|
| Niacinamide/ DMA | 1.40 | 0.08 | 0.06 | ND | ND |
| DMA | 1.10 | 0.08 | 0.05 | ND | ND |
| 66% DMA/ 34% PG | 0.12 | 0.08 | 0.06 | 1.09 | 0.27 |
| DMF | 0.07 | 0.11 | 0.07 | ND | ND |
| NMP | 0.90 | 0.10 | ND | ND | ND |
| DMSO | 0.04 | 0.38 | 0.70 | ND | ND |

ND = not detected

Drager '006, 8:50–68, JDG_BENDA_00000990 at 999.

82.    Drager '006 also reports the results of in-use studies with several of the formulations.  The Drager '006 inventors added 4 mL of the 66% DMA/34% PG formulation, which had a bendamustine hydrochloride concentration of 90 mg/mL, to a 500 mL bag of saline. After 8 hours at room temperature, the remaining bendamustine purity was 95.4%.  *See* Drager '006, 10:47–55, JDG_BENDA_00000990 at 1000.

83.    The claims of Drager '006 are directed to a "stable, non-aqueous liquid" bendamustine formulation comprising about 66% dimethylacetamide and about 34% PG.  *See, e.g.*, Drager '006, claim 1, JDG_BENDA_00000990 at 1001.

**D.    Nema 1997**

84.    Nema et al., *Excipients and Their Use in Injectable Products*, 51 J. PHARM. SCI. & TECH. 166 (1997) ("Nema 1997"), JDG_BENDA_00002272, is a review article that was purportedly published in 1997.  As the article explains, the "purpose of this paper is to present the various excipients that have been included in the formulation of injectable products marketed in the USA." *Id.* at 166, JDG_BENDA_00002272 at 2272.  The paper explicitly excludes from

33

EAGLEBEN-SA_00000309

consideration "[p]roducts approved outside the US" and "sterile dosage forms not administered parenterally." *Id.* The POSA would not have been so constrained.

85. In conducting the review, the authors collected information about injectable drugs that were marked in the United States disclosed in the Physicians' Desk Reference published in 1994 and 1996 and the Handbook on Injectable Drugs, which was published in 1994. Nema 1997 at 166, JDG_BENDA_00002272 at 2272. As such, this reference does not include information about excipients in drug products that came to market after 1996 (or anywhere outside the United States at any time).

86. Table I of Nema 1997 lists "Solvents and Co-Solvents" that had been used in marketed injectable products in the United States as of 1996:

**TABLE I**
Solvents and Co-solvents

| Excipient | Frequency | Range | Example |
|---|---|---|---|
| Benzyl Benzoate | 2 | 20% w/v | Depo-Testosterone® (Upjohn) 20% v/v |
| Cottonseed Oil | 1 | 73.6% w/v | Depo-Testosterone® (Upjohn) 73.6% w/v |
| N,N Dimethylacetamide | 1 | 6% w/v | Vumon® (Bristol Myers) 6% w/v |
| Ethanol | 24 | 0.6–80% | Prograf® (Fujisawa) 80% v/v |
| Glycerin (Glycerol) | 9 | 1.6–70% w/v | Multitest CMI® (Connaught) 70% w/v |
| Peanut oil | 1 | * | Bal in Oil® (Becton Dickinson) |
| Polyethylene glycol | | | |
| PEG | 4 | 0.15–50% | Secobarbital sodium (Wyeth-Ayerst) 50% |
| PEG 300 | 2 | 36–65% | VePesid® (Bristol Myers) 65% w/v |
| PEG 400 | 2 | * | Ativan® (Wyeth-Ayerst) |
| PEG 3350 | 5 | 0.3–3% | Depo-Medrol® (Upjohn) 2.95% w/v |
| Poppyseed oil | 1 | 1% | Ethiodol® (Savage) 1% |
| Propylene Glycol | 25 | 0.2–75.2% | Terramycin Solution (Roerig) 75.2% |
| Safflower oil | 2 | 5–10% | Liposyn II® (Abbott) 10% |
| Sesame oil | 6 | * | Solganal Inj.® (Schering) |
| Soybean oil | 4 | 5–20% w/v | Intralipid® (Clintec) 20% |
| Vegetable oil | 2 | * | Virilon IM Inj.® (Star Pharmaceuticals) |

* No data available.

Nema 1997 at 167, JDG_BENDA_00002272 at 2273. Commenting on the information set forth in Table I, Nema 1997 states the following:

> Ethanol and propylene glycol are used, either alone or in combination with other solvents, in more than 50% of parenteral co-solvent systems. It is surprising to see propylene glycol used more often than polyethylene glycols (PEGs) in spite of its higher myotoxicity and hemolyzing effects. Probably, the presence or generation of peroxides in PEGs is a major limitation.

34

*Id.* (citations omitted).

87.    Table II of Nema 1997 lists "Solubilizing, Wetting, Suspending, Emulsifying or Thickening Agents" that had been used in marketed injectable products in the United States as of 1996:

**TABLE II**
Solubilizing, Wetting, Suspending, Emulsifying or Thickening Agents

| Excipient | Frequency | Range | Example |
|---|---|---|---|
| Acacia | 2 | 7% | Tuberculin Old Test® (Lederle) 7% |
| Aluminum monostearate | 1 | 2% | Solganal Inj.® (Schering) 2% |
| Carboxy methyl cellulose | 4 | 1% | Bicillin® (Wyeth-Ayerst) 0.55% |
| Carboxy methyl cellulose, sodium | 9 | 0.1–0.75% | Lupron Depot® (TAP) 0.75% w/v |
| Cremophore EL* | 3 | 50–65% w/v | Sandimmune® (Sandoz) 65% w/v |
| Desoxycholate sodium | 1 | 0.4% w/v | Fungizone® (Bristol Myers) 0.41% w/v |
| Egg yolk phospholipid | 3 | 1.2% | Intralipid® (Clintec) 1.2% |
| Gelatin, Hydrolzyed | 1 | 16% w/v | Cortone® (Merck) 16% w/v |
| Lecithin | 7 | 0.4–1.2% w/v | Diprivan® (Zeneca) 1.2% w/v |
| Polyoxyethylated fatty acid | 1 | 7% w/v | AquaMephyton® (Merck) 7% w/v |
| Polysorbate 80 (Tween 80) | 31 | 0.01–12% | Cordarone X I.v.® (Wyeth-Ayerst) 10% |
| Polysorbate 20 (Tween 20) | 5 | 0.01–0.4% | Calcijex® (Abbott) 0.4% w/v |
| PEG 40 castor oil** | 1 | 11.5% v/v | Monistat® (Janssen) 11.5% v/v |
| PEG 60 castor oil*** | 1 | 20% w/v | Prograf® (Fujisawa) 20% w/v |
| Povidone (Polyvinyl pyrrolidone) | 6 | 0.5–0.6% w/v | Bicillin® (Wyeth-Ayerst) 0.6% w/v |
| Sodium dodecyl sulfate (Na lauryl sulfate) | 1 | 0.018% w/v | Proleukin® (Cetus) 0.018% w/v |
| Sorbitol | 3 | 25–50% | Aristospan® (Fujisawa) 50% v/v |

† Cremophor EL: Etocas 35, polyethoxylated castor oil, polyoxyethylene 35 castor oil.
** PEG 40 castor oil: polyoxyl 40 castor oil, castor oil POE-40, Croduret 40, polyoxyethylene 40 castor oil, Protachem CA-40.
*** PEG 60 hydrogenated castor oil: Cremophor RH 60, hydrogenated castor oil POE-60, Protachem CAH-60.

Nema 1997 at 167, JDG_BENDA_00002272 at 2273. The authors of Nema 1997 clarify that they consider the following excipients in Table II to be "[s]olubilizing, wetting or emulsifying agents": "Cremophore EL, sodium desoxycholate, Polysorbate 20 or 80, PEG 40 castor oil, PEG 60 castor oil, sodium dodecyl sulfate, lecithin [and] egg yolk phospholipid." *Id.* They further state that "Polysorbate 80 is the most common and versatile solubilizing, wetting and emulsifying agent." *Id.*

88.    Table IV of Nema 1997 lists "Antioxidants and Reducing Agents" that had been used in marketed injectable products in the United States as of 1996:

35

**TABLE IV**
Antioxidants and Reducing Agents

| Excipient | Frequency | Range | Example |
|---|---|---|---|
| Acetone sodium bisulfite | 4 | 0.2–0.4% w/v | Novocaine® (Sanofi-Winthrop) 0.4% w/v |
| Ascorbate (sodium/acid) | 7 | 0.1–4.8% w/v | Vibramycin® (Roerig) 4.8% w/v |
| Bisulfite sodium | 28 | 0.02–0.66% w/v | Amikin® (Bristol Myers) 0.66% w/v |
| Butylated hydroxy anisole (BHA) | 3 | 0.00028–0.03% w/v | Aquasol® (Astra) 0.03% |
| Butylated hydroxy toluene (BHT) | 3 | 0.00116–0.03% w/v | Aquasol® (Astra) 0.03% |
| Cystein/Cysteinate HCl | 2 | 0.07–0.10% w/v | Acthar Gel® (Rhone-Poulanc) 0.1% w/v |
| Dithionite sodium (Na hydrosulfite, Na sulf-oxylate) | 1 | 0.10% | Numorphan® (DuPont) 0.10% |
| Gentisic acid | 1 | 0.02% w/v | OctreoScan® (Mallinckrodt) |
| Gentisic acid ethanolamine | 1 | 2% | M.V.I. 12® (Astra) 2% |
| Glutamate monosodium | 2 | 0.1% w/v | Varivax® (Merck) 0.1% w/v |
| Formaldehyde sulfoxylate sodium | 9 | 0.075–0.5% w/v | Terramycin Solution (Roerig) 0.5% w/v |
| Metabisulfite potassium | 1 | 0.10% | Vasoxyl® (Glaxo-Wellcome) 0.10% |
| Metabisulfite sodium | 29 | 0.02–1% w/v | Intropin® (DuPont) 1% w/v |
| Monothioglycerol (Thioglycerol) | 6 | 0.1–1% | Terramycin Solution (Roerig) 1% |
| Propyl gallate | 2 | 0.02% | Navane® (Roerig) |
| Sulfite sodium | 7 | 0.05–0.2% w/v | Enlon® (Ohmeda) 0.2% w/v |
| Thioglycolate sodium | 1 | 0.66% w/v | Sus-Phrine® (Forest) 0.66% w/v |

Nema 1997 at 168, JDG_BENDA_00002272 at 2274. Nema 1997 provides the following commentary about Table IV:

> Sulfite, bisulfite, and metabisulfite constitute the majority of antioxidants used in parenteral products despite several reports of incompatibilities and toxicity. Butylated hydroxyl anisole, butylated hydroxyl toluene and propyl gallate are primarily used in semi/non-aqueous vehicles because of their low aqueous solubility. Ascorbic acid/sodium ascorbate may serve as an antioxidant, buffer, and chelating agent in the same formulation.

*Id.* (citations omitted).

89.    Nema 1997 includes a list of "Special Additives" (Table VIII) that had been used in marketed injectable products in the United States as of 1996:

36

EAGLEBEN-SA_00000312

**TABLE VIII**
Special Additives

| Excipient | Example |
| --- | --- |
| Acetyl tryptophanate | Human Albumin (American Red Cross) |
| Aluminum hydroxide | Recombinant HB® (Merck) |
| Aluminum phosphate | Tetanus Toxoid Adsorbed® (Lederle) |
| Aluminum potassium sulfate | TD Adsorbed Adult® (Connaught) |
| E-Aminocaproic acid | Eminase® (Roberts) |
| Calcium d-saccharate | Calcium Gluconate (American Regent) |
| Caprylate sodium | Human Albumin (American Red Cross) |
| 8-Chlorotheophylline | Dimenhydrinate (Steris) |
| Creatine | Dalalone DP® (Forest) |
| Creatinine | Hydrocortone Phosphate (Merck) |
| Diatrizoic acid | Conray (Mallinckrodt) |
| Gamma Cyclodextrin | Cardiotec (Squibb) |
| Ethyl lactate | Ergotrate maleate® (Lilly) |
| Ethylenediamine | Aminophylline® (Abbott) |
| L-Glutamate sodium | Kabikinase® (Pharmacia) |
| Iron ammonium citrate | Tice BCG® (Organon) |
| Lactic acid | Cipro IV® (Bayer) |
| D,L-Lactic and Glycolic acid copolymer | Zoladex® (Zeneca) |
| Maltose | Gamimune® (Bayer) |
| Meglumine | Magnevist® (Berlex) |
| Niacinamide | Estradurin® (Wyeth-Ayerst) |
| Paraben methyl | Adriamycin RDF® (Pharmacia) |
| Protamine | Insulatard NPH® (Novo Nordisk) |
| Simethicone | Premarin Injection® (Wyeth-Ayerst) |
| Sodium saccharin | Compazine Injection® (Smith-Kline Beecham) |
| Tri-n-butyl phosphate | Venoglobulin® (Alpha Therapeutic) |
| von Willebrand factor | Bioclate® (Arco) |
| Zinc | Lente Insulin® (Novo Nordisk) |

Nema 1997 at 170, JDG_BENDA_00002272 at 2276. Nema 1997 comments on a number of

these "Special Additives." For example, Nema 1997 explains that "Cipro IV® (Ciprofloxacin,

Bayer) contains lactic acid as a solubilizing agent for the antibiotic"; "Ergotrate maleate

(Ergonovine maleate, Lilly) contains 0.1% ethyl lactate as a solubilizing agent"; "Estradurin

Injection® (Polyestradiol phosphate, Wyeth-Ayerst Labs) uses Niacinamide (12.5 mg/ml) as a

solubilizing agent. Hydeltrasol® (Merck) also contains niacinamide"; "Gamma cyclodextrin is

37

EAGLEBEN-SA_00000313

used as a stabilizer in Cardiotec® at a concentration of 50 mg/ml"; "Sodium caprylate (sodium octoate) has antifungal properties, but it is also used to improve the stability of albumin solution against effects of heat"; "Maltose serves as a tonicity adjuster and stabilizer in immune globulin formulation (Gamimune N®)"; "Epsilon amino caproic acid (6-amino hexanoic acid) is used as a stabilizer in anistreplase (Eminase injection®)." *Id.* at 170–71, JDG_BENDA_00002272 at 2276–77.

90.     Nema 1997 also discloses a list of excipients that were included on the FDA's "Inactive Ingredient Guide," but that did "not appear in PDR or Handbook on Injectable Drugs" (Table IX). *See* Nema 1997 at 171, JDG_BENDA_00002272 at 2277:

EAGLEBEN-SA_00000314

**TABLE IX**
List of Excipient from 1996 FDA 'Inactive Ingredient Guide'

| | |
|---|---|
| Ammonium sulfate | Pentetate (DTPA) calcium |
| Benzyl chloride | trisodium |
| Butyl paraben | Poloxamer 165 |
| Caldiamide sodium | PEG 4000 |
| Calteridol calcium | PEG 600 |
| Castor oil | Polyglactin |
| Cellulose (microcrystalline) | Polylactide |
| Cholesterol | Polyoxyethlene fatty acid |
| Deoxycholic acid | esters |
| Diatrizoic acid | Polyoxyethylene sorbitan |
| Dicyclohexyl carbodiimide | monosterate |
| Diethyl amine | Polyoxyl 35 Castor oil |
| Dimyristoyl lecithin | Polysorbate 40 |
| Dimyristoyl phosphatidyl- | Polysorbate 85 |
| glycerol | Potassium hydroxide |
| Disofenin | Potassium phosphate, dibasic |
| Doctusate sodium | Sodium bisulfate |
| Edamine | Sodium chlorate |
| Exametazime | Sodium hypochloride |
| Gluceptate sodium | Sodium iodide |
| Gluceptate calcium | Sodium pyrophosphate |
| Glucuronic acid | Sodium thiosulfate, anhydrous |
| Guanidine HCl | Sodium trimetaphosphate |
| Iofetamine HCl | Sorbitan monopalmitate |
| Lactobionic acid | Stannous chloride |
| Lecithin hydrogenated soy | Stannous fluoride |
| Lidofenin | Stannous tartrate |
| Medrofenin | Starch |
| Medronate disodium | Succimer |
| Medronic acid | Succinic acid |
| Methyl boronic acid | Sulfurous acid |
| Methyl cellulose | Tetrakis (1-isocyano-2-me- |
| Methylene blue | thoxy-2,methyl-propane) |
| N-(carbamoyl-methoxy poly- | copper (I) Te |
| ethylene-glycol 2000)-1,2- | Thiazoximic acid |
| distearoyl | Trithiazoximic acid |
| N-2-hydroxyethyl piperazine | Urea |
| N'-2' ethane sulphonic acid | Zinc acetate |
| Nioxime | Zinc chloride |
| Nitric acid | Zinc oxide |
| Oxyquinoline | 2-ethyl hexanoic acid |
| | PEG vegetable oil |

## E.    Olthoff 1983

91.    DD 159289 ("Olthoff 1983"), JDG_BENDA_00002301, is a patent that purportedly issued in 1983 in the German Democratic Republic (the former East Germany). The assignee of the patent is VEB Jenapharm ("Jenapharm").

92.    Olthoff 1983 was submitted to the Examiner during the prosecution of the '707 patent family, the '908 patent family, and the '021 patent family. On the faces of those patents,

39

it is listed as "DE 1592 89" under "Foreign Patent Documents." It is also listed as "Olthoff et al." under "Other Publications" for the '797 patent, and it was cited by the Examiner during prosecution of the application that gave rise to that patent.

93.    Olthoff 1983 originally published in German. I am a native German speaker, and I have reviewed the original complete German patent, East German Patent No. DD 159289, to confirm that my opinions accurately reflect Olthoff 1983's disclosure. For purposes of this report, I cite to the incomplete English translation on which Dr. Pinal relies.

94.    Olthoff 1983 explains that "[b]endamustine hydrochloride is a relatively unstable compound" and that its "mustard-halogen groups are almost completely hydrolyzed in aqueous solutions after a short period of time." Olthoff 1983 at 2, JDG_BENDA_00002301 at 2310.

95.    Olthoff 1983 discusses a previous patent from the German Democratic Republic—DD 80967—that prepared a powder mixture of bendamustine hydrochloride and ascorbic acid. Olthoff 1983 at 3, JDG_BENDA_00002301 at 2310. Olthoff 1983 reports that the "hydrolysis rate is not influenced by the addition of the ascorbic acid." *Id.* Olthoff 1983 also reports that, "[a]fter a certain storage period, solid bendamustine hydrochloride shows a pink to brown-red discoloration, which starts at the surface of the substance and which, after a longer period of time, renders the whole substance unsuitable for the production of pharmaceutical preparations." *Id.* Olthoff 1983 found that the "mixture with ascorbic acid shows the same discoloration." *Id.*

96.    Olthoff 1983 discloses a stability experiment in which 25 mg/mL of bendamustine hydrochloride was dissolved in either ethanol or PG. Olthoff 1983 at 5, Olthoff 1983 at 5, JDG_BENDA_00002301 at 2313. The Olthoff 1983 inventors conducted stability

40

testing of these compositions for up to 8 weeks at temperatures ranging from 25° C to 130° C. *See* Olthoff 1983 at 5, JDG_BENDA_00002301 at 2313.

97.    To detect degradants in these formulations, Olthoff 1983 used a technique called thin layer chromatography. I understand that Dr. Anslyn has opined that the POSA would have understood that conventional thin layer chromatography ("TLC") techniques—including the particular technique used in Olthoff 1983—are less capable of resolving and quantitating related chemicals (such as a compound and certain of its degradants) than more modern analytical techniques, such as high performance liquid chromatography ("HPLC"). *See* Anslyn Rep. ¶¶ 203–206. Dr. Anslyn's opinions reflect my experience as well, which is that HPLC measurements are more reliable, more sensitive, and more accurate than TLC measurements. *See* ¶¶ 209–213. A POSA at the priority date would have been aware of that fact. At the priority date, HPLC was the standard technique used by scientists to detect impurities or degradants in this context.

98.    At 25° C, the Olthoff 1983 inventors reported that there were no impurities in either the ethanol or PG bendamustine formulations after eight weeks of storage. *See* Olthoff 1983 at 5, JDG_BENDA_00002301 at 2313. The full results are reproduced below:

41

EAGLEBEN-SA_00000317

Formation of decomposition products in:

| time | ethanol solution | | propylene glycol solution | | |
| --- | --- | --- | --- | --- | --- |
| | 25° C | 50° C | 25° C | 75° C | 130° C |
| 0.5 h | - | - | - | - | (traces) |
| 1 h | - | - | - | none | - |
| 1.5 h | - | - | - | - | (traces) |
| 2 h | - | - | - | none | minor decomposition |
| 5 h | none | none | - | none | - |
| 7 h | none | none | - | - | - |
| 24 h | none | - | - | - | - |
| 8 weeks | none | - | none | - | - |

99.      As described above, *see* ¶¶ 64–65, the Drager '006 inventors obtained very different data, showing pronounced degradation, when they tested Olthoff 1983's PG formulation. In particular, the Drager '006 inventors found that bendamustine hydrochloride dissolved in PG formed PG esters and degraded almost completely at room temperature in less than eight weeks. *See* ¶ 65. The Drager '006 inventors used HPLC to detect bendamustine impurities, which as Dr. Anslyn has explained, is more reliable than Olthoff 1983's TLC technique. *See* Anslyn Rep. ¶¶ 203–206. In view of the data disclosed in Drager '006, the POSA would have concluded that the stability results in Olthoff 1983 were incomplete and inaccurate. In particular, the POSA would have concluded that Olthoff 1983's stability experiments, which were conducted using an older and less accurate technique than was standard by the priority date, failed to detect, among other impurities, bendamustine esters of ethanol and PG. To the extent that Defendants consider the data in Olthoff 1983 reliable, and that the PG formulation was free from impurities, my understanding is that they could seek FDA approval to

42

EAGLEBEN-SA_00000318

market Olthoff's PG formulation without infringing the patents in suit. I understand that they have not done so.

100.    Olthoff 1983 also reports solubility measurements of bendamustine hydrochloride in ethanol, PG, and glycerol at 25°C of about 50 mg/mL, 125 mg/mL, and 50 mg/mL, respectively. Olthoff 1983 at 6, JDG_BENDA_00002301 at 2314.

101.    Although Olthoff 1983 several times discusses the advantages of the broad category of "monovalent alcohols, glycols and other polyvalent alcohols" generally, *see, e.g.,* Olthoff 1983 at 4, JDG_BENDA_00002301 at 2312, the only solvents explicitly named or exemplified in Olthoff 1983 are PG, ethanol, and glycerol. In particular, Olthoff 1983 does not mention PEG as a potential solvent for bendamustine, and Olthoff 1983 does not describe any experiments or formulations containing PEG. Olthoff 1983 likewise does not disclose any formulations containing multiple solvents.

**F.    Powell 1998**

102.    Powell et al., *Compendium of Excipients for Parenteral Formulations*, 52 PDA J. PHARM. SCI. & TECH. 238 (1998) ("Powell 1998"), JDG_BENDA_00006374, is a review article purportedly published in 1998.

103.    Powell 1998 purports to list "the excipients found in most of the approved and marketed parenteral formulations." Powell 1998 at 238, JDG_BENDA_00006374 at 6374. The authors' sources for this article were the 1997 version of the Physicians' Desk Reference and "personal correspondence from the companies supplying the products." *Id.* From this disclosure, as well as from the list of products in the article, the POSA would have understood that Powell 1998 only discloses excipients in parenteral products marketed in the United States as of 1997.

EAGLEBEN-SA_00000319

104.    Despite this limitation, Powell 1998 discloses over 150 unique excipients that had previously been used in parenteral products as of that time. I have collected many of those excipients in the below table to illustrate the breadth of options available just in approved parenteral products in the United States in 1997. I note that the below table is incomplete, because many of the entries of Powell 1998 are cut off, meaning that an excipient was being disclosed, but the identity of the excipient may not have been discernable to the POSA. *See, e.g.,* Powell 1998 at 268, JDG_BENDA_00006374 at 6405 (listing "methyl & propyl" as an excipient). I have excluded those excipients, unless their identity was unambiguous.

| | | | |
|---|---|---|---|
| Acacia | Dimethylsulfoxide | Methylparaben | Sodium |
| Acetate | Disodium edetate | Monobasic sodium | Sodium acetate |
| Acetic acid | Disodium hydrogen | Monoethanolamine | Sodium bicarbonate |
| Acetone sodium | Disodium phosphate | Monosodium | Sodium biphosphate |
| Alanine | E-aminocaproic acid | Monothioglycerol | Sodium bisulfite |
| Albumin | Edetate calcium | Mouse serum protein | Sodium caprylate |
| Alcohol | Egg lecithin | Myristyl-gamma-picolinium chloride | Sodium carbonate |
| Aluminum | Ethanol | N,N-dimethylacetamide | Sodium chloride |
| Aluminum phosphate | Fetal bovine serum | Neomycin | Sodium citrate |
| Amino acid | Formaldehyde | Neomycin sulfate | Sodium dihydrogen |
| Ammonia | Fractioned egg yolk | Niacinamide | Sodium dithionite |
| Ammonium acetate | Fractioned soybean | Nitrogen | Sodium dodecyl |
| Ammonium hydroxide | Gelatin | Octoxynol 9 | Sodium formaldehyde |
| Arginine | Glacial acetic acid | Parabens | Sodium hydrogen |
| Ascorbic acid | Glucose | Phenol | Sodium hydroxide |
| Asparagine | Glycerin | Phenol red | Sodium L-glutamate |
| Benzalkonium | Glycerol | Phenoxyethanol | Sodium lactate |
| Benzenesulfonic acid | Glycine | Phosphate | Sodium metabisulfite |
| Benzethonium | Heparin | Phosphate buffer | Sodium metasulfite |
| Benzyl alcohol | Histidine | Phosphoric acid | Sodium phosphate |
| Bovine serum | Hydrochloric acid | Polyethylene glycol | Sodium saccharin |
| Buffered sodium | Hydrolized gelatin | Polyethlene | Sodium succinate |
| Calcium | Hydrous sodium | Polylactic acid | Sodium sulfate |
| Calcium chloride | Imidazole | Polymyxin | Sodium sulfite |
| Carbon dioxide | Iron ammonium | Polyoxyl 60 | Sodium tartrate |
| Carboxymethylcellulose | Isotonic sodium | Polysorbate 20 | Sorbitol |
| Chloride | L-arginine | Polysorbate 80 | Soybean oil |
| Chlorobutanol | L-aspartic acid | Poppyseed | Streptomycin |

44

EAGLEBEN-SA_00000320

| Citrate | L-cysteine | Potassium | Sucrose |
|---|---|---|---|
| Citric acid | L-lysine | Potassium chloride | Sulfuric acid |
| Colloidal silicon | Lactic acid | Potassium phosphate | Tartaric acid ACS |
| Creatine | Lactose | Povidone | Thimerosal |
| Cremophor ® EL | Lactose monohydrate | Propyl gallate | Thioglycolic acid |
| Crosslinked gelatin | Lecithin | Propylene glycol | Tri(n-butyl) |
| D,L-lactic + glycolic | M-cresol | Propylparaben | Tri-n-butyl phosphate |
| d-mannitol | Magnesium chloride | Protamine | Triacetin |
| d-sorbital | Magnesium sulfate | Protamine sulfate | Tribasic sodium |
| Dextrose | Maleic acid | Purified gelatin | Trisodium citrate |
| Diabasic sodium | Maltose | Saline | Tromethamine |
| Dibasic potassium | Mannitol | Sesame oil | Water |
| Diethanolamine | Methanesulfonic acid | Simethicone | Zinc |

### G.    Rowe 2009

105.    The HANDBOOK OF PHARMACEUTICAL EXCIPIENTS (Rowe et al., eds., 2009) ("Rowe 2009"), JDG_BENDA_000006557, is a book that was published in 2009. The version relied on by Dr. Pinal, produced at JDG_BENDA_000006557, includes excerpts from that book concerning monothioglycerol, PEG, PG, and sodium hydroxide. I have relied on additional excerpts from that book throughout this report.

106.    Portions of Rowe 2009 were before Examiner during the prosecution of the '707 patent family, the '908 patent family, and the '021 patent family. Rowe 2009 was cited by the Examiner during the prosecution of several of the applications of the '707 patent family.

107.    In its entry for PEG, Rowe 2009 discloses that PEG 300 and PEG 400 "have been used as the vehicle for parenteral dosage forms" "[i]n concentrations up to approximately 30% v/v." Rowe 2009 at 518, JDG_BENDA_000006557 at 6565.

108.    Rowe 2009 discloses that "[s]terilization of solid grades by dry heat at 150°C for 1 hour may induce oxidation, darkening, and the formation of acidic degradant products." Rowe 2009 at 520, JDG_BENDA_000006557 at 6567. To avoid these sterilization-related issues, Rowe 2009 provides the following guidance: "Ideally, sterilization should be carried out in an

45

inert atmosphere.  Oxidation of PEGs may also be inhibited by the inclusion of a suitable antioxidant." *Id.*

109.    In a section entitled "Incompatibilities," Rowe 2009 states the following:

> The chemical reactivity of polyethylene glycols is mainly confined to the two terminal hydroxyl groups, which can either be esterified or etherified.  However, all grades can exhibit some oxidizing activity owing to the presence of peroxide impurities and secondary products formed by autoxidation.

Rowe 2009 at 520, JDG_BENDA_000006557 at 6567.

110.    Also in the "Incompatibilities" section, Rowe 2009 discloses that "[p]lastics, such as polyethylene, phenolformaldehyde, polyvinyl chloride, and cellulose-ester membranes (in filters) may be softened or dissolved by polyethylene glycols."  Rowe 2009 at 520–21, JDG_BENDA_000006557 at 6567–68.

111.    In its entry for PG, Rowe 2009 discloses that, "[a]t cool temperatures, PG is stable in a well-closed container, but at high temperatures, in the open, it tends to oxidize, giving rise to products such as propionaldehyde, lactic acid, pyruvic acid, and acetic acid."  Rowe 2009 at 592, JDG_BENDA_000006557 at 6570.

**H.    Seedher 2003**

112.    Seedher et al., *Solubilization of Nimesulide; Use of Co-Solvents*, 65 INDIAN J. PHARM. SCI. 58 (2003) ("Seedher 2003"), JDG_BENDA_00003225, is an article that was purportedly published in 2003.

113.    Seedher 2003 concerns the solubilization of nimesulide, a non-steroidal anti-inflammatory drug, with the following chemical structure:

EAGLEBEN-SA_00000322

114. Dr. Pinal has not opined that the chemical structure of nimesulide is related in any way and/or is similar to the chemical structure of bendamustine. Dr. Pinal likewise has not opined that nimesulide and bendamustine would undergo similar chemical reactions, would be subject to similar rates or types of degradation, or would have comparable solubilities in various solvent systems.

115. I have compared the chemical structures of nimesulide and bendamustine, and in my opinion the POSA would have considered them to be dissimilar. For example, nimesulide does not contain a nitrogen mustard moiety. Nimesulide likewise does not contain a carboxylic acid moiety. The prior art discloses that both of those moieties are relevant to the degradation of bendamustine. By contrast, nimesulide does contain several chemical moieties (including a nitro group and a sulfonamide group) that are not present in bendamustine. In light of these chemical differences, the POSA would expect nimesulide and bendamustine to undergo different chemical reactions and degrade by different pathways. To just give one example, the POSA would not expect nimesulide to form esters with solvents containing alcohol groups. *See* ¶¶ 126–127 (discussing Zimmerman 1977). The prior art discloses that bendamustine does so. *See* ¶¶ 75–81; *see also* Anslyn Rep. ¶¶ 243–244 (comparing bendamustine and nimesulide). There is no reason that the POSA would have looked to Seedher 2003 in attempting to make stable liquid formulations of bendamustine.

47

EAGLEBEN-SA_00000323

116.    Based on the differences in chemical structures, the POSA would also not be able to make any predictions about the solubility of bendamustine in various solvents based on solubility measurements of nimesulide.

117.    Seedher 2003 reports that nimesulide has poor solubility in water and that a variety of approaches have been attempted to increase its solubility, including "crystallization by solvent change," "preparation of inclusion complexes with β-cyclodextrin," and the use of "nimesulide-L-lysine cyclodextrin complexes." Seedher 2003 at 58, JDG_BENDA_00003225 at 3225. The Seedher 2003 authors attempted to "increase the solubility of nimesulide using a series of solvents and solvent-co-solvent mixtures." *Id.*

118.    Seedher 2003 reports solubility measurements in a variety of solvents and other excipients, including in water, saline, phosphate buffer, polyoxyethylene (20) sorbitan monooleate ("Tween 80"), lauryl ether ("Brij 30"), ethanol, PG, polyethylene glycol 300 ("PEG 300"), polyethylene glycol 400 ("PEG 400"), benzyl alcohol, as well as over a dozen permutations of the aforementioned excipients. *See* Seedher 2003 at 59–61, JDG_BENDA_00003225 at 3226–28.

119.    The solubility measurements of Seedher 2003 highlight some of the many differences between nimesulide and bendamustine. The authors of Seedher 2003 measured the solubility of nimesulide in PG and ethanol to be about 5.9 mg/mL and 5.4 mg/mL, respectively, at 30° C. *See* Seedher 2003 at 59, JDG_BENDA_00003225 at 3226. In contrast, as explained above, Olthoff discloses solubilities of bendamustine in PG and ethanol of 125 mg/mL and 50 mg/mL, respectively, at 25° C. *See* ¶ 100. The POSA would have concluded from these differences—including both the absolute solubility differences (5.9 vs. 125 mg/mL in PG and 5.4 vs. 50 mg/mL in ethanol) and the relative differences in solubilities (5.9 ÷ 5.4 = 1.1 vs. 125 ÷ 50

48

EAGLEBEN-SA_00000324

= 2.5) of the drugs in PG versus ethanol—that the solubility measurements of nimesulide in Seedher 2003 were irrelevant to the solubility of bendamustine in those and other solvents.

120.    The Seedher 2003 authors were attempting to create a nimesulide formulation that would allow for the delivery of "a 100 mg dose of nimesulide in a convenient 2 mL volume," and that therefore "the solubility of the drug should be greater than 50 mg/mL." *See* Seedher 2003 at 60, JDG_BENDA_00003225 at 3227. However, to "account [for] the change in solubility of drug due to temperature fluctuations . . . , the solubility of the drug should be much higher than 50 mg/mL." *Id.* at 61, JDG_BENDA_00003225 at 3228. As such, the Seedher 2003 authors targeted a solubility of at least 65 mg/mL. *See id.* (recommending several formulations "with solubility greater than 65 mg/mL").

121.    Seedher 2003 does not disclose any data regarding the stability of nimesulide. Seedher 2003 does not discuss or measure the impurities that might form from the interaction of nimesulide with the tested excipients. In this report, I use the term "excipients" to refer to ingredients other than the active pharmaceutical ingredient(s) in a drug formulation, including solvents. *See* Rowe 2009 at x ("Pharmaceutical dosage forms contain both pharmacologically active compounds and excipients added to aid the formulation and manufacture of the subsequent dosage form for administration to patients.").

### I.    Soppimath 2013

122.    U.S. Patent Publication No. 2013/0210878 ("Soppimath 2013"), JDG_BENDA_00003277, is a patent application that purportedly published on August 15, 2013. Soppimath 2013 was submitted to the Examiner during the prosecution of the '707 patent family, the '908 patent family, and the '021 patent family. Soppimath 2013 was cited during the prosecutions of several applications in the '908 and '021 patent families.

49

EAGLEBEN-SA_00000325

123. Soppimath 2013 describes and claims various liquid bendamustine formulations, reconstitution solutions, pharmaceutical kits, and methods for stabilizing bendamustine. In particular, Soppimath 2013 discloses aqueous bendamustine formulations comprising "a non-aqueous vehicle in combination with an aqueous phase that contains significant amounts of chloride." *See, e.g.*, Soppimath 2013 ¶ 10, JDG_BENDA_00003277 at 3283. According to Soppimath 2013, the purported inventions have "significantly improved stability," "even over extended periods of time." Soppimath 2013 ¶ 10, JDG_BENDA_00003277 at 3283. Soppimath 2013 acknowledges other attempts to stabilize bendamustine using non-aqueous solvent systems, including the solvent systems disclosed in U.S. Patent No. 8,344,006 ("Drager"), but states that the "tolerability of the solvents by the patient is in at least some cases less than desirable." Soppimath 2013 ¶ 6, JDG_BENDA_00003277 at 3283.

124. Soppimath 2013 claims priority to U.S. Provisional Application No. 61/589,975 ("Soppimath Provisional Application"), which was purportedly filed on January 24, 2012. For the reasons explained in the prosecution history of the asserted patents and below, the examples and statements in Soppimath 2013 that the Defendants' experts rely upon are not prior art to any of the asserted patent families. Rather, the POSA would not have understood the Soppimath 2013 inventors to have been in possession of the asserted formulations, administration volumes, or administration times as of the date of its provisional application. *See* ¶¶ 885–892.

**J.    Zimmerman 1977**

125. Zimmerman et al., ELEMENTS OF ORGANIC CHEMISTRY (1977) ("Zimmerman 1977"), JDG_BENDA_00003450, is a book that was purportedly published in 1977. The version relied on by Dr. Pinal, produced at JDG_BENDA_00003450, is an excerpt of a chapter titled "Carboxylic Acid Derivatives" and concerns various chemical reactions involving esters.

50

EAGLEBEN-SA_00000326

126.    Zimmerman 1977 discloses that esters can be prepared "by heating a mixture of an alcohol and a carboxylic acid in the presence of a strong mineral acid catalyst." Zimmerman 1977 at 430, JDG_BENDA_00003450 at 3453. This reaction, which is referred to as Fischer esterification, is illustrated as follows:

127.    As illustrated by the bidirectional arrows in the figure in the previous paragraph, the esterification reaction is reversible. As Zimmerman 1977 explains, the addition of water would "push the equilibrium point in the direction of the reactants"—that is, the alcohol and the carboxylic acid—in a process called "hydrolysis." Zimmerman 1977 at 430, JDG_BENDA_00003450 at 3453.

128.    Zimmerman 1977 also explains that the "structures of both the alcohol and the acid are important in affecting the rate of esterification." Zimmerman 1977 at 430, JDG_BENDA_00003450 at 3453. In particular, Zimmerman explains that the reactivity of the alcohol decreases as the number of substituents that are attached to the alcohol increases. So primary alcohols are more reactive in esterification reactions than secondary alcohols, which are more reactive than tertiary alcohols. This same relationship also holds true for the acid in the reaction. Zimmerman 1977, on page 430, illustrates these relationships as follows:

51

EAGLEBEN-SA_00000327

Acids:    $HCOOH > CH_3COOH > RCH_2COOH >$

$R_2CHCOOH > R_3CCOOH$

$\xrightarrow{\hspace{10cm}}$

Reactivity toward esterification decreases

Alcohols:    $CH_3OH > R—CH_2OH > R_2CHOH > R_3COH$

1°                    2°                3°

129.    Zimmerman 1977 explains the chemical mechanism for this structure-reactivity relationship, stating that the "decrease in reactivity is due to the bulkiness of the molecules, which prevents the reactants from approaching each other. Interaction of this type is referred to as *steric hindrance*." Zimmerman 1977 at 431, JDG_BENDA_00003450 at 3453.

130.    Zimmerman 1977 also illustrates the four-step reaction mechanism for Fischer esterification, which begins with the protonation of the carboxyl group. *See* Zimmerman 1977 at 431, JDG_BENDA_00003450 at 3453.

131.    Zimmerman 1977 discloses that esters may be further involved in various types of reactions, including nucleophilic substitution reactions such as "hydrolysis, alcoholysis or transesterification, [and] ammonolysis." Zimmerman 1977 at 434, JDG_BENDA_00003450 at 3455. These reactions are "usually catalyzed with strong mineral acid" and differ based on the identity of the nucleophilic molecule involved in the reaction. *Id.* Alcoholysis (which is also known as transesterification) and ammonolysis are further described on page 437, *see* JDG_BENDA_00003450 at 3456.

132.    Zimmerman 1977 discloses that the ester bond can be hydrolyzed via different mechanisms. For example, esters can undergo "acid-catalyzed hydrolysis," which occurs in the presence of an acid and water. Zimmerman 1977 at 435–36, JDG_BENDA_00003450 at 3455–56 (illustrating mechanism). This "is the reverse of the esterification mechanism" illustrated

52

EAGLEBEN-SA_00000328

above, *see* ¶ 126, and the reaction product is the original carboxylic acid and an alcohol. Zimmerman 1977 at 435–36, JDG_BENDA_00003450 at 3455–56.

### K.    Zumdahl 2007

133.    Zumdahl et al., CHEMISTRY (2007) ("Zumdahl 2007"), JDG_BENDA_00003458, is a book that was purportedly published in 2007. The version relied on by Dr. Pinal, produced at JDG_BENDA_00003458, is an excerpt from a chapter titled "Types of Chemical Reactions and Solution Stoichiometry" and concerns acid-base reactions.

134.    Zumdahl 2007 discloses that sodium hydroxide is a strong base that disassociates in water. Zumdahl 2007 at 149, JDG_BENDA_00003458 at 3467. It likewise discloses that the hydroxide ion from disassociated sodium hydroxide "is such a strong base that for purposes of stoichiometric calculations it can be assumed to react completely with any weak acid" as well as "with the $H^+$ ions in solutions of strong acids." *Id.* (emphasis removed).

## VII.    THE ASSERTED CLAIMS OF THE '707 PATENT FAMILY WOULD NOT HAVE BEEN OBVIOUS TO THE POSA

### A.    Dr. Pinal's and Dr. Yates's Analysis Is Fundamentally Flawed.

135.    Having reviewed Dr. Pinal's and Dr. Yates's reports in detail, I have concluded that their opinions are predicated on a number of fundamental analytical flaws. I disagree with their conclusions for the reasons set forth throughout my report, including in this section.

136.    First, Dr. Pinal and Dr. Yates fail to consider the prior art as a whole in their obviousness analysis. Instead, Dr. Pinal and Dr. Yates limit their analysis to a handful of references even though Dr. Pinal acknowledges that bendamustine was "initially synthesized in 1963 in the German Democratic Republic" and "has been widely used in the prior art." Pinal Rep. ¶ 62. I understand that the POSA would have considered all of the pertinent prior art and that the issue of obviousness must involve a consideration of the prior art as a whole.

53

EAGLEBEN-SA_00000329

137.    Second, Dr. Pinal and Dr. Yates appear to have chosen the few references that they rely upon not because those references constitute or represent the art as a whole, but because they are using hindsight to cherry-pick aspects of certain references to compare them to the claimed inventions. In short, Dr. Pinal and Dr. Yates appear to read into their framing and use of prior art references the teachings of the claimed inventions themselves. Such analysis is predicated on hindsight, which I understand to be impermissible. Without hindsight, the POSA would not have selected the particular references Dr. Pinal and Dr. Yates have relied on, would not have selected the disclosures within those references that Dr. Pinal and Dr. Yates have selected, and would not have interpreted the references in the manner that Dr. Pinal and Yates have interpreted them.

138.    Third, Dr. Pinal and Dr. Yates provide no meaningful analysis as to why the POSA would have been motivated or had reason to combine the references they rely upon to arrive at the claimed inventions, much less to combine only the specific portions of those references that would be required to arrive at various claim limitations. By way of example, Dr. Pinal and Dr. Yates seize upon certain statements in Olthoff 1983, Drager '006, and Alam '286 regarding solvents, but proceed to disregard the teachings of those references, including the specific formulations preferred by those references, to conclude that the claimed inventions would have been obvious. I describe these criticisms in greater detail below. *See* ¶¶ 199–293.

139.    Fourth, many of the foundational references utilized by Dr. Pinal and/or Dr. Yates, including Olthoff 1983 and Alam '286, were published decades before the priority date for the '707 patent family (which is January 28, 2010). During this very long period of time, many scientists at various pharmaceutical companies worldwide were researching bendamustine formulations without arriving at the claimed inventions. That passage of time contradicts Dr.

54

EAGLEBEN-SA_00000330

Pinal's and Dr. Yates's opinions that the claimed subject matter would have been arrived at by way of routine optimization and indicates that Dr. Pinal's and Dr. Yates's analysis is predicated on hindsight.

140.    Fifth, Dr. Pinal and Dr. Yates understate the efforts and ingenuity that the POSA would have needed to take and use to arrive at the claimed inventions.  As described below in more detail, to arrive at the claimed inventions, the POSA would have needed to develop a liquid bendamustine composition (and method of administering such a composition), comprising specific co-solvents, at specific concentrations, with an antioxidant (and in many cases, a specific antioxidant), at specific concentrations.  To succeed, the formulation would need to have specific characteristics, such as sufficient solubility for the drug and stability, including the specific stability characteristics recited in the claims.  Making each decision regarding whether and how to attempt developing a liquid formulation with these characteristics would have involved careful analysis and consideration of tradeoffs and alternative approaches and possibilities.  Dr. Pinal and Dr. Yates assert that the prior art would have led the POSA to make each decision precisely in a manner that results in the claimed inventions.  However, as discussed below in greater detail, that assertion is not credible and appears to rely on hindsight.  And that is even before one considers the questions of whether the prior art as a whole, including the prior art that teaches away from the invention, would have motivated or provided reason for the POSA to make such decisions or would have provided the POSA with a reasonable expectation of success.

141.    Dr. Pinal implies that much of the work underlying the claimed inventions would have been "standard pre-formulation studies" that are "routinely" conducted. *E.g.*, Pinal Rep. ¶ 61.  As an initial matter, to the extent Dr. Pinal is suggesting that the results of such studies would have been part of the knowledge of the POSA, I disagree.  My understanding is that the

55

EAGLEBEN-SA_00000331

results of such experimental work are not within the POSA's knowledge. Moreover, Dr. Pinal substantially understates the complexity of the studies that he briefly describes. For example, Dr. Pinal states that "POSA would also run a number of tests on antioxidants to determine what antioxidants would be most effective in protecting the API from oxidation." Pinal Rep. ¶ 59. However, as I explain at length below, an appropriate antioxidant selection (if possible at all) is unpredictable, and adding an antioxidant to a formulation can cause other, unwanted interactions and problems. *See* ¶¶ 344–346, 350–352. The selection of an appropriate solvent system is likewise complex. *See* ¶¶ 400–421, 702–716. Dr. Pinal also ignores the breadth of options that would have been available to the POSA in developing an improved bendamustine formulation. *See* ¶¶ 625–811. I therefore disagree with Dr. Pinal's oversimplified characterization of the formulation development process, and I disagree that the development of the claimed inventions would have been a matter of "routine" experimentation.

142. I note that Dr. Pinal and Dr. Yates do not clearly identify the specific reasons why they cite particular references and the function of each of those particular references in their obviousness analysis and conclusions. For instance, Dr. Pinal asserts that the '707 patent family would have been obvious over Olthoff 1983 "in view of the knowledge of a POSA." Pinal Rep. ¶ 50. However, Dr. Pinal proceeds to cite approximately 20 additional references in that section analyzing various aspects of the claimed inventions. Similarly, Dr. Yates suggests that certain, unidentified aspects of the claimed inventions (including, apparently, aspects of the inventions claimed by the '707, '908, and '021 patent families), would have been obvious based on various cited references and other supposed, known facts. *See* Yates Rep. ¶¶ 47–80.

143. To the extent that Dr. Pinal and Dr. Yates believe that these references comprise "background" knowledge that the POSA would have brought to bear, I disagree. It is

56

EAGLEBEN-SA_00000332

exceedingly unlikely that the POSA would have combined the particular teachings of the various references cited in Dr. Pinal's and Dr. Yates's reports in order to arrive at the claimed inventions despite the fact that various pharmaceutical companies had been working with bendamustine for decades without arriving at the claimed inventions. Moreover, the POSA would not have considered the cited references and facts to be part of the POSA's background knowledge. They do not provide fundamental principles of science or other basic facts (such as the structure of bendamustine) relevant to the POSA's consideration. Although it is not possible to understand from Dr. Pinal's and Dr. Yates's reports how the POSA would have combined references and facts, or whether and to what extent the POSA would have considered them to comprise "background" knowledge, it does not appear that Dr. Pinal's and Dr. Yates's reliance on them is limited to basic, "background" principles or facts. The same is true for Dr. Pinal's remaining asserted combinations and what Dr. Pinal and Dr. Yates characterize to be the "knowledge of a POSA."

144.    Dr. Pinal and Dr. Yates do not expressly state whether their opinions concern bendamustine hydrochloride or some other form(s) of the drug bendamustine. Consistent with their disclosures and opinions (to the extent I can understand them), I have assumed that throughout their reports, Dr. Pinal and Dr. Yates express their opinions with respect to the hydrochloride salt of bendamustine—that is, bendamustine hydrochloride—unless explicitly noted otherwise. I note that bendamustine hydrochloride is the only form of bendamustine that has ever been marketed commercially. *See* Ribomustin® Product Monograph at 8 (2005), JDG_BENDA_00000001 at 8; Treanda® Label at 1 (2008), JDG_BENDA_00003382 at 3382; Pinal Rep. ¶ 62. Bendamustine hydrochloride is likewise used in many of the references on which Dr. Pinal and Dr. Yates rely. *E.g.*, Olthoff 1983 at 2, JDG_BENDA_00002301 at 2310;

57

Drager '006, 8:5–67, JDG_BENDA_00000990 at 999. Neither Dr. Pinal nor Dr. Yates have opined that the POSA would have been motivated or had reason to use bendamustine free base or a different bendamustine salt. Moreover, despite referring to "bendamustine" or "BDM" (an abbreviation that Dr. Pinal uses for "bendamustine") throughout his report, Dr. Pinal appears to assume that the POSA would have used the hydrochloride salt. *E.g.*, Pinal Rep. ¶ 135 (discussing "salting-out" of "Bendamustine" with sodium chloride), ¶¶ 135–136 (suggesting that "bendamustine" or "BDM" is equivalent to the hydrochloride salt). As such, for purposes of this report, I have assumed that Dr. Pinal and Dr. Yates express their opinions about motivation and reasonable expectation of success with respect to bendamustine hydrochloride, unless they have explicitly noted otherwise. Although I may refer to both "bendamustine" and "bendamustine hydrochloride" in this report, I likewise use them interchangeably and conclude that the POSA would have used bendamustine hydrochloride, unless I specify otherwise.

**B.    The POSA Would Not Have Been Motivated To Use a Liquid Composition in Formulating Bendamustine.**

145.    All of the asserted claims of the '707 patent family require the claimed composition to be a "liquid." For example, independent claim 14 of the '707 patent—from which asserted claims 18 and 20 depend—claims a "long term storage stable non-aqueous liquid bendamustine-containing composition." Similarly, independent claim 1 of the '797 patent— from which asserted claims 10 and 11 depend—is directed to a "method of treating leukemia, Hodgkin's disease, or multiple myeloma in a mammal, comprising administering to the mammal, a liquid bendamustine-containing composition." This liquid composition is distinguished from, among other options, lyophilized compositions.

146.    Dr. Pinal opines that the POSA would have been motivated to develop a "liquid shelf-stable [bendamustine] formulation." Pinal Rep. ¶ 153. Dr. Yates likewise opines that

EAGLEBEN-SA_00000334

lyophilized formulations pose certain disadvantages, as compared to liquid formulations. *See* Yates Rep. ¶ 48. I agree with Dr. Pinal and Dr. Yates that the POSA would have understood that a liquid bendamustine formulation would have had certain advantages over a lyophilized bendamustine formulation, including avoiding the step of reconstitution.

147. In providing the opinion that the POSA would have been motivated to develop a liquid shelf-stable bendamustine formulation, however, Dr. Pinal and Dr. Yates ignore the substantial difficulties associated with developing a liquid bendamustine formulation and what the prior art taught about the unlikelihood of succeeding in making such a formulation. I disagree with Dr. Pinal that the POSA would have exclusively considered liquid bendamustine formulations. Indeed, I note that Dr. Yates, by contrast, has opined that the POSA would have considered lyophilized bendamustine formulations. *See* Yates Rep. ¶ 60 ("[T]he lyophilized powder formulation remains a viable alternative to the non-aqueous liquid formulation."). In this regard, I agree with Dr. Yates and disagree with Dr. Pinal.

148. The POSA would have understood that developing a liquid bendamustine formulation would present significant challenges that could be avoided by lyophilization. In particular, the POSA would have understood that lyophilization tends to increase drug stability, particularly for drugs, such as bendamustine, that are subject to hydrolysis. As explained by Broadhead, for drugs that are subject to hydrolysis, "[f]requently, the only formulation strategy which will result in adequate stability is water removal," which is "usually . . . achieved by means of lyophilization." Broadhead 2001 at 340, JDG_BENDA_0000404 at 414. As Dr. Pinal acknowledges, the POSA would have been aware that bendamustine is highly susceptible to hydrolysis. *See* Pinal Rep. ¶ 68; *see also* Brittain 2006 ¶¶ 4, 7, 9, 107, JDG_BENDA_00000375 at 382, 392 ("Because of its instability in aqueous solutions due to hydrolysis with water,

EAGLEBEN-SA_00000335

bendamustine requires lyophilization in order to make a product suitable for pharmaceutical use.").

149.    Dr. Pinal cites Broadhead for the proposition that "if a medicament is to be administered by infusion, the simplest approach is to formulate it as a concentrate." Pinal Rep. ¶ 153 (citing Broadhead at 332). Dr. Pinal's citation to Broadhead is inapt to the bendamustine issue facing the POSA. The section of Broadhead quoted by Dr. Pinal is titled "Selection of Injection Volume" and relates to the choice of whether to develop a formulation that is ready-to-dilute or that is ready-to-administer. *See* Broadhead 2001 at 332, JDG_BENDA_0000404 at 414. The sentence quoted by Dr. Pinal from Broadhead 2001 suggests that ready-to-dilute formulations are simpler than ready-to-administer formulations; it does not speak to the choice between a liquid versus lyophilized formulation. To the contrary, as explained above, Broadhead's primary suggestion for stabilizing drugs that are subject to hydrolysis reactions is to lyophilize them; indeed, this is characterized by Broadhead as the usual approach. *See* ¶ 148.

150.    The POSA would have considered lyophilization to be the most promising approach for obtaining a stable bendamustine formulation. Without the benefit of hindsight, the POSA would have considered lyophilization to be preferable to the approach ultimately taken by the inventors and reflected in the asserted claims, as explained below. *See* ¶¶ 639–644. The POSA would have been aware that bendamustine was originally synthesized in 1963 in the German Democratic Republic. *See* Pinal Rep. ¶ 62; Brittain 2006 ¶ 6, JDG_BENDA_00000375 at 382. The POSA also would have been aware that, in the ensuing more than four and a half decades, bendamustine had never been marketed as a liquid formulation. (I understand that Liquid Treanda®, which I understand to be an embodiment of the Drager '006 patent, was not approved until September 2013, which post-dates the applicable priority date for the '707 patent

60

family of January 28, 2010.)  Rather, in the decades in which bendamustine was researched and used, at least two different lyophilized formulations had been marketed in Germany (since 1971) and the United States (since 2008).  *See* Brittain 2006 ¶¶ 7–8, JDG_BENDA_00000375 at 382 (describing Ribomustin®); Ribomustin® Product Monograph (2005), JDG_BENDA_00000001; Treanda® Label (2008), JDG_BENDA_00003382.  The failure of others to bring a liquid bendamustine product to market would have indicated to the POSA that the search for a suitable liquid formulation had not been fruitful and would have motivated the POSA to prefer lyophilization as the most promising approach for obtaining a stable bendamustine formulation.

151.    Dr. Pinal opines that the "POSA also would have recognized from the prior art that liquid formulations of [bendamustine] were possible," citing Olthoff 1983 and Drager '006 Pinal Rep. ¶ 154.  As an initial matter, it is unclear what Dr. Pinal means by his statement that liquid bendamustine formulations would have been considered "possible" by the POSA.  I agree with Dr. Pinal that Olthoff 1983 and Drager '006 purport to disclose liquid bendamustine formulations.  However, I disagree that the POSA would have been motivated or had reason to pursue a liquid bendamustine formulation simply because it might have been "possible" to make such a formulation.  As I explain above, the POSA would have viewed lyophilization as the more promising option for developing an improved bendamustine formulation, such as a bendamustine formulation with an improved stability and/or impurity profile or shorter reconstitution procedure over existing formulations.

152.    Dr. Pinal appears to assume that the POSA would have pursued a liquid bendamustine formulation.  *See* Pinal Rep. ¶¶ 153–154.  In my opinion, this reasoning is based on hindsight, in view of the success of the inventions claimed by the '707 patent family.  This opinion also results from Dr. Pinal's apparent failure to consider the prior art as a whole.  As I

61

EAGLEBEN-SA_00000337

explain at length below, the POSA would have evaluated many different formulation options and dosage forms in attempting to develop an improved bendamustine formulation. *See* ¶¶ 625–701. Dr. Pinal offers no justification for ignoring these myriad other options and focusing exclusively on liquid bendamustine formulations.

153.    Dr. Pinal opines that Olthoff 1983 would have motivated or provided reason for the POSA to make a liquid bendamustine formulation because "Olthoff taught a liquid BDM formulation with low impurities." Pinal Rep. ¶ 154; *see also* Yates Rep. ¶ 49 (opining that Olthoff 1983 offers a "simpler approach" that "would save time and could improve convenience"). I disagree that Olthoff 1983 would have motivated or provided reason for the POSA to pursue a liquid bendamustine formulation or prefer this approach over a lyophilized bendamustine formulation or the other approaches discussed below. The POSA would have known that Olthoff 1983 was published approximately 27 years before the priority date. Nevertheless, no company had ever brought a liquid bendamustine product to market as of the priority date, much less a liquid bendamustine product using the Olthoff 1983 formulation. Drager '006 calls this out explicitly: "Curiously, however, commercial development of propylene glycol formulations have heretofore not been reported." Drager '006, 2:25–28, JDG_BENDA_00000990 at 996. The only liquid formulation that appeared on the market prior to Bendeka® (but after the priority date) utilized a fundamentally different solvent system than the one taught by Olthoff 1983. As I explain in more detail above and below, *see* ¶¶ 204–213, the POSA would not have believed that the Olthoff 1983 formulations were stable. As such, Olthoff 1983 would not have motivated or provided reason for the POSA to pursue a liquid bendamustine formulation.

62

EAGLEBEN-SA_00000338

154.    Dr. Pinal also appears to rely on Drager '006 to support his opinion that the POSA would have been motivated to pursue liquid bendamustine formulations. *See* Pinal Rep. ¶ 154. All that Dr. Pinal says about Drager '006 in this regard, however, is that "Drager '006 (which eventually was commercialized as Liquid Treanda®) sought to further improve on Olthoff's formulations" and that "Drager disclosed a liquid [bendamustine] formulation using DMA and PG as a co-solvent system." Pinal Rep. ¶ 154 (citing Drager '006, 2:61–3:9, claim 1). Dr. Pinal does not otherwise explain how Drager '006 would have motivated or provided reason for the POSA to pursue a liquid bendamustine formulation. As I explained above, however, the mere fact that a liquid bendamustine formulation had been referenced in the prior art would not have motivated or provided reason for the POSA to pursue that option. *See* ¶ 151. To the extent that this is the proper analysis, the POSA would have known that there existed many other bendamustine formulations and dosage forms in the prior art that the POSA also would have considered and preferred to pursue, all of which Dr. Pinal ignores. *See* ¶¶ 625–701.

155.    I disagree that Drager '006 would have motivated or provided reason for the POSA to pursue a liquid bendamustine formulation. Dr. Pinal parenthetically notes that the Drager '006 formulation "eventually was commercialized as liquid Treanda." Pinal Rep. ¶ 154. This statement, however, illustrates the hindsight-driven nature of Dr. Pinal's analysis. Liquid Treanda® was not approved until September 2013, more than 3 years after the priority date for the '707 patent family. The POSA would have had no idea whether any of the formulations disclosed by Drager '006 would eventually be used in a pharmaceutical product approved by the FDA. As of the priority date, the POSA would have only been aware of lyophilized bendamustine products that had been brought to market. *See* ¶ 150.

63

EAGLEBEN-SA_00000339

156.    The stability information in Drager '006, moreover, would have dissuaded the POSA from pursuing a liquid bendamustine product.  Drager '006 only discloses stability data for its bendamustine formulations out to one year.  *See* Drager '006, 5:44–6:49, Figs. 1–2, JDG_BENDA_00000990 at 992–93, 998.  Nowhere does Drager '006 teach or suggest that its formulations were stable for over one year.  The POSA would have considered a shelf life of one year to be suboptimal, with a two-year shelf life generally considered to be the lower limit to be a "commercially viable" pharmaceutical product. *See* REMINGTON: THE SCIENCE AND PRACTICE OF PHARMACY 1032 (21st ed. 2006) ("Remington 2006") ("The shelf life of a commercial drug product must be determined in the commercial container closure at the defined storage conditions. . . . Most products require at least 24 months to be commercially viable.").  Given that two years is the typical lower limit for an acceptable shelf life of commercial pharmaceutical products (the type of product that the Defendants' experts and I agree the POSA would have had reason to make), the POSA would have desired evidence that the Drager '006 formulations were stable for two years or more.

157.    The stability data that Drager '006 does disclose would have further dissuaded the POSA from pursuing liquid bendamustine formulations.  For example, in Figure 1, four of the six formulations—NMP, DMI, DMA, and Niacinamide, which I understand to refer to the Niacinamide/DMA formulation as described in column 8—had less than 90% purity after about one year of storage at 25°C.

64

EAGLEBEN-SA_00000340



Bendamustine Purity at 25°C

Drager '006, Fig. 1, JDG_BENDA_00000990 at 992. The POSA would have viewed that

amount of degradation to be disqualifying for a product to be stored at room temperature.

Pharmaceutical products almost always must retain at least 90% of their drug content over their

shelf life. *See* Remington 2006 at 1025 ("Although there are exceptions, 90% of labeled potency

generally is recognized as the minimum acceptable potency level."). Moreover, at about six

months of storage at room temperature, three of the six formulations (DMI, DMA, and

Niacinamide, which I understand to refer to the Niacinamide/DMA formulation as described in

column 8) showed less than 85% purity, and an additional two formulations (NMP and DMF)

had about 95% purity. *See* Drager '006, Fig. 1, JDG_BENDA_00000990 at 992. The POSA

would have viewed the levels of degradation in these formulations unfavorably, even if the

product were intended for storage at refrigerated conditions, including because they would

qualify as "significant changes" in the assay value (defined by ICH guidelines as 5% or more in

assay value), which would require that the shelf life of the product be based on the real time data

65

EAGLEBEN-SA_00000341

available from the long-term storage condition. *See* Int'l Conference on Harmonization, ICH Harmonised Tripartite Guideline: Stability Testing of New Drug Substances and Products Q1A(R2) ("ICH Guidelines") at 9, 11, JDG_BENDA00003751 at 3765, 3767.

158.    The stability data in Figure 2 of Drager '006 would likewise not have been encouraging to the POSA.



The lines corresponding to the formulations labeled "DMF" and "66% DMA" are not readily apparent at the one year mark of Figure 2 of Drager '006. *See* JDG_BENDA_00000990 at 993. The figure provides no basis to believe that they showed favorable or suitable stability at that time point in 5°C storage. Three of the five formulations for which data are disclosed out to one year (NMP, DMA, and DMI) at 5°C showed 95% or less purity at one year. *See* Drager '006, Fig. 2, JDG_BENDA_00000990 at 993. The POSA would have considered these stability results suboptimal for a pharmaceutical product with a highly potent drug and a one-year shelf

66

EAGLEBEN-SA_00000342

life and potentially disqualifying for a product with a two-year shelf life. The POSA would have likewise deemed discouraging the stability results for the DMA/Niacinamide formulation in Figure 2—which appears to have a purity that is slightly higher than 95% at one year—predicting that its purity could potentially fall close to 90% over a two-year shelf life. The DMSO formulation of Drager '006 exhibited a purity level at 5°C that the POSA would have considered to be promising for a product with a two-year shelf life. As I explain below, in my opinion the POSA would have considered DMSO to be a solvent that the POSA would have considered in formulating a composition of liquid bendamustine, and the stability results of Drager '006 would have motivated the POSA to prefer DMSO to other solvents, including PEG. *See* ¶¶ 747–753. To the extent Dr. Pinal disagrees that DMSO would have been an acceptable solvent for use in a parenteral formulation, then the DMSO data would not have provided the POSA with a motivation or reason to pursue a liquid bendamustine formulation.

159.   Drager '006 discloses impurity profiles for several formulations in Table II, which I reproduce below:

## TABLE II

Impurity profile of certain liquid formulations of Bendamustine HCl after storage at 5° C. for about 12 months

| Formulation | DCE (Area %) | HP1 (Area %) | BM1 dimer (Area %) | PG-1 (Area %) | PG-2 (Area %) |
|---|---|---|---|---|---|
| Niacinamide/ DMA | 1.40 | 0.08 | 0.06 | ND | ND |
| DMA | 1.10 | 0.08 | 0.05 | ND | ND |
| 66% DMA/ 34% PG | 0.12 | 0.08 | 0.06 | 1.09 | 0.27 |
| DMF | 0.07 | 0.11 | 0.07 | ND | ND |
| NMP | 0.90 | 0.10 | ND | ND | ND |
| DMSO | 0.04 | 0.38 | 0.70 | ND | ND |

ND = not detected

67

EAGLEBEN-SA_00000343

Drager '006, 8:50–68, JDG_BENDA_00000990 at 999. The impurity profiles in Table II, in conjunction with the data in Figure 2, would have raised concerns for the POSA that would have dissuaded him from pursuing a liquid bendamustine formulation. The POSA would have concluded that the impurity profiles in Table II were incomplete, due to mass balance principles. In particular, the sums of the impurities disclosed in Table II do not fully account for the total amounts of degradation illustrated in Figure 2. For example, the graph in Figure 2 discloses a bendamustine purity in the DMA formulation of less than 95%, which corresponds to more than 5% total impurities. Drager '006, Fig. 2, JDG_BENDA_00000990 at 993. But Table II only discloses individual impurity amounts totaling about 1.23% (1.10 + 0.08 + 0.05). *Id.*, 8:50–68, JDG_BENDA_00000990 at 999. Although the POSA would have expected some degree of experimental error, based on the differences between the individual impurities and total bendamustine purity levels reported in Drager '006, the POSA would have understood that the formulations gave rise to additional degradants that the Drager '006 inventors had not identified in Table II. *See also* Anslyn Rep. ¶¶ 69–70 (agreeing that the POSA would have understood that other degradants that are not identified in Table II are formed in the tested formluations, based in part on the Drager '006 data).

160. Even focusing on the data that is disclosed in Table II, however, would have given the POSA reason for concern. As part of the drug approval process in the United States, when an impurity exceeds a particular level (called the "Qualification Threshold"), the impurity must be qualified. As explained by the ICH guidelines, "[q]ualification is the process of acquiring and evaluating data that establishes the biological safety of an individual degradation product or a given degradation profile at the level(s) specified." Int'l Conference on Harmonization, ICH Harmonised Tripartite Guideline: Impurities in New Drug Products

68

EAGLEBEN-SA_00000344

Q3B(R2) (June 2, 2006) ("ICH Q3B(R2)") at 4. Although the POSA would not necessarily have discarded a formulation that required some impurities to be qualified, the POSA would have known that such qualification could be costly and time-consuming. *See id.* at 5 (noting that "additional safety testing should be considered" if the impurity is not described in the scientific literature). For bendamustine, which was indicated on the Treanda® label for a dosage up to 120 mg/m$^2$, *see* Treanda® Label (Apr. 2009), JDG_BENDA_00006932 at 6932, the qualification threshold would have been 0.2%. *See* ICH Q3B(R2) at 7.

161. Of the six formulations disclosed in Table II of Drager '006, five (Niacinamide/DMA, DMA, 66% DMA/34% PG, NMP, and DMSO) contained impurities in amounts greater than 0.2% at refrigerated conditions after one year. Drager '006, 8:50–68, JDG_BENDA_00000990 at 999. Two of those formulations (66% DMA/34% PG and DMSO) had two different impurities in amounts greater than 0.2%. Three of the formulations (Niacinamide/DMA, DMA, and 66% DMA/34% PG) had impurities over 1.0%. These levels of individual impurities in the Drager '006 formulations would have been viewed as a disadvantage by the POSA in evaluating whether to pursue a liquid bendamustine formulation.

162. The POSA also would have been concerned about the number of impurities with high levels disclosed by Table II of Drager '006. All five of the degradants identified in that patent (DCE, HP1, BM1 dimer, PG-1, and PG-2) rise above the level of qualification in at least one of the six formulations in Table II of Drager '006. Drager '006, 8:50–68, JDG_BENDA_00000990 at 999. This range of impurities would have demonstrated to the POSA the complexity of working with liquid bendamustine formulations. For example, the Drager '006 formulation with 66% DMA and 34% PG contained 1.36% PG esters (PG-1 + PG-2). Switching to a 100% DMA formulation eliminated the PG esters but increased the amount of

69

EAGLEBEN-SA_00000345

DCE impurity from 0.12% to 1.10% after storage for about 12 months at 5°C. These impurities involve degradation of different parts of the bendamustine molecule. *See* ¶¶ 74–75. The POSA would have understood that stabilizing multiple distinct chemical degradation pathways simultaneously can be quite challenging. Moreover, as discussed above, the POSA would have understood that the Drager '006 formulations contained additional impurities that the inventors had not characterized. *See* ¶ 159. The data in Table II and Figure 2 of Drager '006 therefore would have motivated the POSA not to consider liquid bendamustine formulations, especially in view of the solvents used by Drager '006. *See* ¶ 163.

163.    The types of solvents tested by Drager '006 also would have signaled to the POSA the difficulty of formulating liquid compositions of bendamustine. The Drager '006 inventors measured the solubility of bendamustine in ten different formulations: NMP, DMI, DMSO, DMF, 66% DMA/34% PG, DMA, PC, Niacinamide/DMA, acetone, and THF. *See* ¶ 77. The inventors disclosed tests of the stability of bendamustine in seven of those formulations: Niacinamide/DMA, DMA, 66% DMA/34% PG, DMF, NMP, DMSO, and DMI. *See* ¶ 78–81. (Stability data for DMI bendamustine formulations are reported in Figures 1 and 2, but not Table II.) The POSA would have recognized that many of the solvents tested by the Drager '006 inventors were uncommon in parenteral applications and that not all of them had been used for intravenous administration. For example, the POSA would have known that NMP was only listed in the Inactive Ingredient Database for subcutaneous injections and periodontal drug delivery systems. *See* U.S. Food & Drug Admin., Inactive Ingredient Database (Dec. 31, 2009), TEVABEND00288118.[1] Acetone was only listed in the Inactive Ingredient Database for oral,

---

[1] The FDA provides links to historical versions of the Inactive Ingredient Database on its website. To access the December 2009 version of the database, I identified the appropriate link

EAGLEBEN-SA_00000346

topical, and implantation dosage forms. PC was only listed in the Inactive Ingredient Database for topical administration. DMI, THF, and DMF were not listed in the Inactive Ingredient Database. DMSO was listed in the Inactive Ingredient Database for intravenous infusion, but several studies had reported that it produced dose-dependent toxicity in certain animal models. *See* Mottu et al., *Organic Solvents for Pharmaceutical Parenterals and Embolic Liquids: A Review of Toxicity Data*, 54 PDA J. PHARM. SCI. & TECH. 456, 460 (2000) ("Mottu 2000"), JDG_BENDA_00005839 at 5843 (reviewing DMSO toxicity literature).

164.    DMA was likewise listed in the Inactive Ingredient Database for intramuscular injections and intravenous infusions. Inactive Ingredient Database (Dec. 31, 2009), TEVABEND00288118 at 288209. However, as Dr. Pinal observes, DMA is incompatible with certain substances that are sometimes used in intravenous infusions. *See* Pinal Rep. ¶ 154. In particular, it had been understood for decades that DMA could interact with the thermoplastic polymer acrylonitrile butadiene styrene ("ABS"). *See* Berman et al., *Complications of Organic Solvents in Synthetic Drug Application*, 9 AM. J. CLIN. ONCOL. 173 (1986), JDG_BENDA_00005968. For that reason, parenteral drug products containing DMA typically included instructions related to what administration equipment to use. *See, e.g.*, Amsidine® Label at 7–8 (2004), JDG_BENDA_00005937 at 5943–44 (noting DMA incompatibilities and

---

from the FDA website and downloaded the corresponding file from the Internet Archive. *See Drug Approvals and Databases*, INTERNET ARCHIVE, http://wayback.archive-it.org/7993/20170112022245/http:/www.fda.gov/Drugs/InformationOnDrugs/ucm113978.htm (archived Jan. 12, 2017). The filename ("IIGZIP_2009_12-31.zip") indicates that it contains the December 31, 2009 version of the database. I note that the FDA recommends using the Internet Archive for accessing pages and files that are no longer located on the FDA website. *See FDA.gov Archive*, U.S. FOOD & DRUG ADMIN, https://www.fda.gov/about-fda/about-website/fdagov-archive.

71

EAGLEBEN-SA_00000347

directing that the product should be administered from "PVC or polythene infusion bags and PVC administration sets").

165.    I do not mean to suggest that, in the event that the POSA did choose to pursue a liquid bendamustine formulation, the POSA would have ignored the solvents disclosed in Drager '006. The POSA would have considered solvents and other excipients that were not included in the Inactive Ingredient Database. *See* ¶¶ 707–716. Indeed, Drager '006 provides the most thorough testing and analysis of liquid bendamustine formulations in the prior art, and the POSA would have heeded its teachings as to what solvents should be used, and in what amounts. The notion that the POSA would have rejected the solvents Drager '006 disclosed and suggested, when it is clear that Drager '006 had studied the stability problems and concluded that the solvents and ratios proposed were preferable and optimal, is implausible. To the extent that there are recognized shortcomings or disadvantages associated with certain of the solvents suggested by Drager '006, the POSA would have understood that Drager was proposing and suggesting the use of those solvents notwithstanding those shortcomings or disadvantages. The POSA also would have understood that Drager '006 considered the well known solvents that lacked those shortcomings or disadvantages and found them (or their use at certain concentrations) unsuitable in the context of bendamustine formulations. By way of example, Drager '006 tested a formulation containing very high levels (such as 99%) of propylene glycol and determined that it was unacceptably unstable. And more generally, Drager '006 teaches explicitly that the use of polar protic solvents, without substantial amounts of polar aprotic solvents, should be avoided. The fact that the Drager '006 inventors chose to use the solvents discussed in the preceding paragraphs—despite their limited use in marketed intravenous formulations and their known limitations—would have suggested to the POSA that creating liquid bendamustine formulations

72

EAGLEBEN-SA_00000348

with acceptable properties (including adequate solubility and stability) was a serious challenge, particularly with the solvents that are not included in the Drager '006 formulations. As noted below, the Drager '006 inventors included a very experienced formulation scientist and chemist, who had worked on numerous pharmaceutical products for multiple companies at the time that they conducted their development work. *See* ¶ 829. The POSA would have understood from the disclosure of Drager '006 that "simpler" liquid formulations—for example, Olthoff 1983's formulations of 100% ethanol or 100% PG—would have been unworkable. The data disclosed in Drager '006 showing bendamustine's rapid degradation in PG would have confirmed the POSA's understanding in this regard. *See* Drager '006, 2:61–3:2, Fig. 3, JDG_BENDA_00000990 at 994, 996–97 ("Solutions of bendamustine in 99% propylene glycol degraded to non-bendamustine products over a time equivalent to commercial storage. . . . As such, a 100% propylene glycol commercial formulation of bendamustine is not feasible for pharmaceutical purposes."). This would have motivated the POSA to consider options other than liquid formulations, including lyophilization.

166.                                    REDACTED

This opinion aligns with my own opinion that Drager '006's use

73

EAGLEBEN-SA_00000349

of DMA would have signaled to the POSA that creating a liquid bendamustine formulation was a serious challenge and that more commonly used solvents were not workable.

167.    In sum, Dr. Pinal has failed to demonstrate that the POSA would have been motivated or had reason to make and use a liquid bendamustine formulation. Although the POSA would have recognized that liquid formulations confer certain advantages over lyophilized formulations, the POSA nevertheless would have understood that some drugs are extremely difficult to formulate as liquid compositions and that lyophilization is often a more promising option for obtaining a desirable, stable formulation for these drugs. In fact, the ability to make a stable formulation of certain drugs is the main benefit of lyophilization. The lack of any marketed liquid bendamustine formulation, at any time during the more than forty years since bendamustine's discovery, and long after its introduction to the marketplace, would have suggested to the POSA that bendamustine was just such a drug. Neither Olthoff 1983 nor Drager '006 would have changed the POSA's mind on that topic. To the contrary, the disclosures in Drager '006 would have taught the POSA that bendamustine is a challenging molecule to stabilize with a complex degradation profile. For such a molecule, the POSA would have considered lyophilization to be a more promising option for obtaining a desirable, stable formulation of bendamustine. At a minimum, lyophilization would have been one of the many options that the POSA would have contemplated when designing a new bendamustine formulation. I discuss these alternatives in greater details below. *See* ¶¶ 625–701.

168.    Dr. Yates has opined that the POSA would have "understood that a liquid formulation would have some advantages over a lyophilized powder, including greater convenience for patients and staff and lower fluid and sodium levels." Yates Rep. ¶ 60. As an initial matter, Dr. Yates has not opined that these concerns would have caused the POSA to

EAGLEBEN-SA_00000350

ignore lyophilized bendamustine formulations; to the contrary, Dr. Yates has opined that the

POSA would have considered lyophilized bendamustine formulations to be a viable approach.

*See id.* ("However, for most patients and infusion centers none of these advantages, either

individually or collectively, is overwhelming, and the lyophilized powder formulation remains a

viable alternative to the non-aqueous liquid formulation.").

169.    Dr. Yates fails to explain the basis for his opinion that a liquid bendamustine

formulation would have provided the patient with "lower fluid and sodium levels." Yates Rep.

¶ 60.  Neither Dr. Yates nor Dr. Pinal have offered an opinion, let alone the basis for an opinion,

that the POSA would have expected that a liquid formulation would have allowed for a lower

infusion volume.  For example, Dr. Pinal offers no evidence that it would have been possible to

predict whether a particular amount of diluent could solubilize a particular concentration of

bendamustine in combination with a non-aqueous solvent system, without conducting the actual

experiments.  *See* Pinal Rep. ¶ 477.  And Dr. Yates himself opines that certain lyophilized

formulations had been administered in infusion volumes of 100 to 250 mL (an opinion that I

understand other experts to be addressing).  *See* Yates Rep. ¶ 57.  As such, neither Dr. Yates nor

Dr. Pinal have offered any rationale for why the POSA would have been motivated or had reason

to use a liquid bendamustine formulation in order to "lower fluid and sodium levels." Yates Rep.

¶ 60.  I disagree that the POSA would have been motivated or had reason to do so.

**C.    The POSA Would Not Have Been Motivated To Use a Non-Aqueous
Composition in Formulating Bendamustine.**

170.    All of the asserted claims from the '707 patent family require that the claimed

composition or the pharmaceutically acceptable fluid of that composition be "non-aqueous." For

example, independent claim 14 of the '707 patent––from which asserted claims 18 and 20

depend––claims a "long term storage stable <u>non-aqueous</u> liquid bendamustine-containing

75

composition." Similarly, independent claim 1 of the '797 patent—from which asserted claims 10 and 11 depend—claims a "method of treating leukemia, Hodgkin's disease, or multiple myeloma in a mammal, comprising administering to the mammal, a liquid bendamustine-containing composition comprising . . . a <u>non-aqueous</u> pharmaceutically acceptable fluid."

171.    Dr. Pinal and Dr. Yates opine that the POSA would have been motivated to create a non-aqeous liquid bendamustine formulation. *E.g.*, Pinal Rep. ¶¶ 152–156. I disagree. As an initial matter, in my opinion, the POSA would not have been motivated or had reason to pursue a liquid formulation. *See* ¶¶ 145–169. However, even if the POSA were motivated to pursue a liquid formulation, the POSA would not have been motivated or had reason to pursue a non-aqueous formulation.

172.    For purposes of this report, I have not been asked to opine on the precise definition of "non-aqueous," as that term is used in the '707 patent family; I will use the term in the same way as Dr. Pinal. I understand that Dr. Pinal has only opined that the POSA would have been motivated to create a non-aqueous formulation "by using nonaqueous solvents." Pinal Rep. ¶ 155. I agree with Dr. Pinal that exclusively using non-aqueous solvents would yield a non-aqueous composition (or a pharmaceutically acceptable fluid). Dr. Yates does not provide an alternative definition of "non-aqueous" that contradicts Dr. Pinal's usage. *See* Yates Rep. ¶¶ 47–62.

173.    To be clear, I do not mean to suggest that a "non-aqueous" composition is completely without water. Many solvents have some residual water content. I do not express an opinion in this report as to whether a composition could be "non-aqueous" notwithstanding the addition of a small amount of water, as Dr. Pinal has not opined that the POSA would have been motivated or had reason to create such a composition.

76

EAGLEBEN-SA_00000352

174. Assuming that the POSA would have been motivated or had reason to formulate a liquid bendamustine formulation, in my opinion the POSA's most preferred solvent would have been water. Water "is the most widely used solvent for parenteral preparations." Boylan, *Parenteral Products, in* MODERN PHARMACEUTICS (4th ed. 2002) ("Boylan 2002"), JDG_BENDA_00000330 at JDG_BENDA_00000352; *see also* Spiegel et al., *Use of Nonaqueous Solvents in Parenteral Products*, 52 J. PHARM. SCI. 917, 917 (1963) ("Spiegel 1963"), JDG_BENDA_00003835 at 3837 ("Water is always the solvent of choice."). This is because water offers a number of advantages over non-aqueous solvents. For example, water is non-toxic and well tolerated at all commonly used concentrations and amounts in intravenous formulations. Water is compatible with a large number of excipients commonly used in parenteral formulations, whereas non-aqueous solvents can present compatibility and precipitation/solubility challenges. *See* Pinal Rep. ¶ 212 n.8 (opining that many antioxidant salts would have been insoluble and thus unusable in non-aqueous solvents). For example, sodium chloride, a common ingredient in liquid formulations administered to patients, is insoluble in most organic solvents. In addition, aqueous formulations can be administered directly to the patient, whereas compositions with only non-aqueous solvents typically require dilution into water prior to administration. *See* Strickley 2004 at 222, JDG_BENDA_00003290 at 3311.

175. REDACTED

77

EAGLEBEN-SA_00000353

REDACTED

176.    Dr. Pinal has opined that the POSA would have looked to non-aqueous solvents because "bendamustine, a nitrogen mustard, has poor aqueous solubility." Pinal Rep. ¶ 55. But Dr. Pinal has not cited to any disclosure reporting the numerical aqueous solubility of bendamustine; rather, the single reference he quotes refers generally to "the poor solubility of many aromatic mustards in purely aqueous media." *Id.* (quoting Williamson 1967 at 37). Even if Dr. Pinal had offered evidence that water alone would not provide sufficient solubility for a suitable bendamustine composition (which he has not), he has not provided any opinion (or basis for an opinion) that water could not be combined with an organic solvent in a co-solvent system that could dissolve bendamustine. The POSA would have been aware of multiple organic solvents—including glycerol, ethanol, and PG, *see* ¶ 100—that were miscible with water that could be used to increase the solubility of bendamustine in an aqueous:organic co-solvent formulation.

177.    Dr. Pinal has opined that the "POSA would have known that non-aqueous solvents were necessary in view of BDM's known instability in water, and prior formulation work established with nonaqueous solvents." Pinal Rep. ¶ 155. For that proposition, Dr. Pinal cites Olthoff 1983, Alam '286, Brittain 2006, and Stout et al., *The Hydrolysis of L-phenylalanine Mustard (Melphalan)*, 24 INT'L J. PHARM. 193 (1985). I disagree with Dr. Pinal's opinion that these references would have motivated or provided reason for the POSA to make a formulation composed entirely of non-aqueous solvents.

178.    Dr. Pinal cites page 2 of Olthoff 1983 to support his suggestion that the POSA would have used non-aqueous solvents. *See* Pinal Rep. ¶ 155. The page of Olthoff 1983 cited

78

EAGLEBEN-SA_00000354

by Dr. Pinal simply discusses the hydrolytic instability of bendamustine. *See* Olthoff 1983, JDG_BENDA_00002301 at 2310. In my opinion, that page from Olthoff 1983 would not have motivated or provided reason for the POSA to make a formulation composed entirely of non-aqueous solvents. The POSA would have known that there were many options for stabilizing hydrolytically unstable drugs in aqueous formulations. I discuss many of these options below. *See* ¶¶ 625–701. For example, the POSA would have known, based on explicit prior art disclosures, that the hydrolysis of bendamustine is pH dependent and is inhibited in acidic conditions. *See* Maas et al., *Stabilität von Bendamustinhydrochlorid in Infusionslösungen*, 49 Pharmazie 775 (1994) ("Maas 1994 Translation") (English translation at 1), JDG_BENDA_00002261 at 2264 ("In a highly acidic solution, hydrolysis is made difficult by protonation of the free electron pair on the nitrogen."). As such, the POSA would have experimented with adjusting the pH of the aqueous bendamustine formulation.

179. The POSA also would have known that bendamustine is stabilized in aqueous formulations in the presence of chloride ions. Maas 1994 Translation at 1, JDG_BENDA_00002261 at 2264 ("In addition to the pH value, the chloride ion concentration has a significant impact on the hydrolysis equilibrium. It is preferred that the bendamustine hydrochloride be regenerated as the chloride ion concentration increases, which suppresses the formation of the hydroxyl derivative."). The POSA would therefore have been motivated or had reason to experiment with adding chloride ions to aqueous bendamustine formulations, such as by adding sodium chloride and/or another source of chloride ions to the formulation, as the inventors did. *See, e.g.*, Palepu Dep. Ex. 20, at 2, EGL-BENDEKA_00139311 at 139315.

180. The POSA also would have known that aqueous solutions of bendamustine could be stabilized by the addition of an organic solvent. For example, the POSA would have known

79

from the prior art that formulations of water plus 30% (v/v) of an organic solvent could substantially slow bendamustine hydrolysis. *See* Brittain 2006, Fig. 3, JDG_BENDA_00000375 at 378.

181.   And the POSA would have been aware of other formulation options that were available for stabilizing hydrolytically unstable drugs in aqueous formulations. For example, the POSA would have considered using a complexing agent—such as a cyclodextrin—to inhibit hydrolysis. *See* ¶¶ 656–661. All of these approaches would have been preferable to Dr. Pinal's approach of using a formulation based on non-aqueous solvent systems. *See* Strickley 2004 at 225–26, JDG_BENDA_000003290 at 3314–15 (explaining that pH adjustment of aqueous formulations, aqueous-organic co-solvent formulations, complexation, and combinations thereof are all simpler and preferable to compositions with only non-aqueous solvents).

182.                                REDACTED

183.                                REDACTED

EAGLEBEN-SA_00000356

184.    The POSA would have been aware of many examples in the literature in which hydrolytically unstable drugs had been stabilized in aqueous formulations. For example, U.S. Patent Publication No. 2004/0186074 discloses a formulation of ifosfamide in 80% water and 20% 2-hydroxypropyl-B-cyclodextrin with 99.12% potency after two years at refrigerated conditions. *See* U.S. Patent Publication No. 2004/0186074 at ¶¶ 60–64. As that patent application explains, ifosfamide—which is a nitrogen mustard derivative—is hydrolytically unstable. *Id.* ¶ 7;                                    REDACTED

Thus, although, as discussed above and below, the POSA would have understood that different drug molecules are subject to different degradation pathways, *see, e.g.*, ¶ 186; Anslyn Rep. ¶¶ 228–233 (discussing differences between bendamustine and ifosfamide), I disagree with Dr. Pinal's blanket conclusion that the POSA would avoid aqueous formulations because of bendamustine's instability in water. Pinal Rep. ¶ 155.

185.    In paragraph 157 of his report, Dr. Pinal opines the "POSA would have been encouraged by Olthoff's reporting of high stability for its formulations in propylene glycol to test formulations containing non-aqueous solvents like PG in the POSA's own formulation." Pinal Rep. ¶ 157. It is not clear to me if Dr. Pinal, in that paragraph, is opining that the stability data in Olthoff 1983 would have motivated or provided reason for the POSA to use a formulation with only non-aqueous solvents. To the extent Dr. Pinal is expressing that opinion, I disagree. The POSA would not have trusted the stability results described in Olthoff 1983, particularly in view of the contradictory evidence regarding testing of the same formulation, using more modern and reliable techniques, reported in Drager '006. *See* ¶¶ 204–213. Moreover, Olthoff 1983 does not describe any aqueous bendamustine formulations for long term-storage, much less provide any

81

EAGLEBEN-SA_00000357

data showing that aqueous bendamustine formulations would have been impossible to stabilize. As such, Olthoff 1983 would not have motivated or provided reason for the POSA to exclusively use non-aqueous solvents and would not have taught away from the POSA's strong preference to use aqueous solutions.

186.    Dr. Pinal also cites Alam '286 for the proposition that the POSA would have been motivated to use non-aqueous solvents. *See* Pinal Rep. ¶ 155.  Dr. Pinal provides no explanation for why Alam '286 would have motivated or provided reason for the POSA to use only non-aqueous solvents in a bendamustine formulation.  This makes it difficult to respond to whatever opinion Dr. Pinal is expressing.  Indeed, Dr. Pinal does not even cite to a particular page of Alam '286 in expressing this opinion.  In my opinion, Alam '286 would not have motivated or provided reason for the POSA to use exclusively non-aqueous solvents in making a bendamustine formulation.  As I explain in detail below, Alam '286 is directed to a cyclophosphamide formulation.  *See* ¶¶ 281–287.  Cyclophosphamide is subject to different degradation pathways than bendamustine.  In particular, cyclophosphamide does not have a carboxylic acid moiety and thus is not subject to esterification.  As such, to the extent that Alam '286 teaches toward cyclophosphamide formulations with organic solvents (many of which would have been capable of esterifying with bendamustine, but not cyclophosphamide), the POSA would not have applied that teaching to bendamustine formulations.  I also understand from Dr. Anslyn that the hydrolysis of cyclophosphamide occurs via a different chemical reaction than the hydrolysis of bendamustine.  *See* Anslyn Rep. ¶¶ 218–222.

187.    Moreover, Alam '286 does not exclusively teach formulations that only use non-aqueous solvents.  To the contrary, one of the disclosures of Alam '286 is that large amounts of water could be used in cyclophosphamide formulations.  *See* Alam '286, 3:63–4:4,

82

EAGLEBEN-SA_00000358

JDG_BENDA_00000184 at 186 ("As is well known in the art, the presence of water in a carrier vehicle for cyclophosphamide provides a ready means for the degradation through hydrolysis of the cyclophosphamide. However, it has been discovered that through the use of the present invention, water may be present in amounts up to about 50% based on the total weight of the liquid carrier, and one may still obtain formulations with useful stability, in comparison to a purely aqueous solution."). And the data in Alam '286 indicate that water-organic co-solvent formulations yielded improved stability compared to purely aqueous formulations. For example, formulation 7 (50% water, 25% PG, 25% glycerol) showed 14% less degradation after 2 weeks at 30° C than formulation 4 (100% water). *Id.*, 4:25–40, JDG_BENDA_00000184 at 187. To be sure, the formulations of Alam '286 with only non-aqueous solvents generally yielded better purity than the formulations with 50% water. However, to the extent the POSA would have followed the teachings of Alam '286 in formulating bendamustine, as Dr. Pinal appears to believe, Alam '286 would have suggested that an aqueous-organic co-solvent could be one viable formulation option.

188. Alam '286 also illustrates the general approach that the POSA would have taken in formulating parenteral products by trying to use and experiment with aqueous solvents before resorting to systems using only non-aqueous solvents. Dr. Pinal acknowledges that cyclophosphamide "is unstable in water." Pinal Rep. ¶ 456; *see also* Alam '286, 3:1–4, JDG_BENDA_00000184 at 186 ("[I]t has generally been recognized that liquid formulations of cyclophosphamide would not be possible due to the inherent instability of cyclophosphamide in water."). Nevertheless, knowing of this instability, the Alam '286 inventors attempted to create formulations of cyclophosphamide containing up to 50% water. In my opinion, the POSA

83

EAGLEBEN-SA_00000359

attempting to formulate bendamustine would have done the same and pursued other lines of research to attempt to create stable aqueous formulations.

189.    Dr. Pinal also cites Stout 1985 for the proposition that the POSA would have been motivated to use only non-aqueous solvents. *See* Pinal Rep. ¶ 155.  Dr. Pinal provides no explanation for why Stout 1985 would have motivated or provided reason for the POSA to use only non-aqueous solvents in a bendamustine formulation, and Dr. Pinal does not provide a citation to a particular line or page within this reference.  This lack of explanation makes it difficult for me to respond to Dr. Pinal's opinions.  In my opinion, Stout 1985 would not have motivated or provided reason for the POSA to use only non-aqueous solvents in formulating bendamustine.  Stout 1985 is a publication that measures the kinetics of degradation of the molecule melphalan as a function of pH, temperature, chloride concentration, and ionic strength.  Stout 1985 at 193, JDG_BENDA_00006757 at 6757.

190.    In his report, Dr. Pinal has not offered any analysis of the chemical structure or degradation mechanisms of melphalan.  Dr. Pinal has not opined that the POSA would have considered the degradation of melphalan to be comparable to the degradation of bendamustine.  Dr. Pinal has not offered the opinion that the POSA would look to publications concerning melphalan in formulating bendamustine.

191.    I have reviewed the chemical structure of melphalan, and I understand that it is a nitrogen mustard with a different chemical structure than bendamustine:

84

EAGLEBEN-SA_00000360

192.     Assuming that the POSA would have even considered Stout 1985 in formulating

bendamustine, my opinion is that that reference would not have taught the POSA to use

bendamustine formulations composed entirely of non-aqueous solvents.  Nowhere in Stout 1985

is there any suggestion of using non-aqueous solvents, much less a suggestion that a formulation

composed entirely of non-aqueous solvents was necessary to stabilize melphalan.  To the

contrary, Stout 1985 discloses a variety of ways to stabilize melphalan in aqueous formulations.

For example, Stout 1985 discloses that the hydrolysis of melphalan could be slowed by lowering

the pH of the formulation, a strategy that the POSA would have considered worthy of pursuit for

bendamustine.  *See* Stout 1985 at 198–99, 207, JDG_BENDA_00006757 at 6762–63, 6771

("[S]ince the drug is more stable in acidic media and in the presence of added chloride (pH <

2.5) it would appear advantageous to acidify biological samples containing melphalan by the

addition of hydrochloric acid.").  Stout 1985 likewise discloses that melphalan could be

stabilized by the addition of chloride ions, another strategy that the POSA would have

considered applicable to bendamustine.  *See id.* at 200–02, 207, JDG_BENDA_00006757 at

6764–67, 6771 ("The addition of chloride has a stabilizing effect because it can compete with the

water for the ethyleneimmonium ion.").

85

EAGLEBEN-SA_00000361

193.    Dr. Pinal also cites Brittain 2006 for the proposition that the POSA would have been motivated to use only non-aqueous solvents. *See* Pinal Rep. ¶ 155. The only portion of Brittain 2006 that Dr. Pinal relies on is the data in Table 3 of Brittain 2006 showing that bendamustine in pure water degraded by over 4% in 24 hours at 5° C. *Id.* As I explained above, however, the POSA would have been aware of numerous options for improving the stability of hydrolytically unstable molecules in water. *See* ¶¶ 178–184. Indeed, as noted above, Brittain 2006 discloses just such an approach. For example, the addition of 30% ethanol lowered the amount of hydrolysis from about 3.6% to about 0.5%. *See* Brittain 2006, Fig. 3, JDG_BENDA_00000375 at 378. The data in Figure 3 demonstrate that aqueous-organic cosolvent formulations are highly effective in reducing bendamustine degradation. The POSA would have suspected that further formulation modifications (for example, pH adjustment or the addition of sodium chloride or complexing agents) could have provided further stability improvements. Dr. Pinal appears to ignore this issue and accompanying disclosure.

194.    Dr. Yates opines that the POSA would have been motivated to pursue a "non-aqueous" bendamustine formulation because non-aqueous formulations (including formulations containing PG) can be expected to have bacteriostatic (and potentially bacteriocidal) properties. *See* Yates Rep. ¶¶ 61–62. I disagree that this would have motivated or provided reason for the POSA to pursue a "non-aqueous" bendamustine formulation. In my opinion, the POSA would not have considered any bacteriostatic or bacteriocidal properties possessed by certain non-aqueous solvents to be a significant advantage in selecting a delivery vehicle. As discussed above in greater detail, as of the priority date, water was the most commonly used solvent, demonstrating that the ability of certain bacteria to grow in water would not have been a serious concern. *See* ¶ 174. Dr. Yates does not opine, moreover, that an aqueous-organic co-solvent

86

system would have insufficient bacteriostatic properties.  Moreover, as Dr. Pinal acknowledges, the asserted patents "do not even mention any antibacterial properties," Pinal Rep. ¶ 61, suggesting that the inventors themselves did not consider this to be an advantage of the claimed inventions over alternative, aqueous formulations.

195.    In sum, Dr. Pinal and Dr. Yates have failed to demonstrate that the POSA would have been motivated or had reason to make a "non-aqueous" bendamustine composition, in view of the other options available, which they largely have ignored.  To the contrary, in my opinion, if the POSA were motivated or had reason to experiment with liquid bendamustine formulations, the POSA would have been motivated or had reason to start her/his formulation efforts with aqueous compositions of bendamustine.  The POSA would have pursued a wide variety of approaches—and combinations of approaches—in attempting to stabilize bendamustine in aqueous formulations.  Only if those efforts all failed would the POSA have considered trying formulations composed entirely of non-aqueous solvents.

196.                                    REDACTED

87

REDACTED

**D.      The POSA Would Not Have Been Motivated To Use Polyethylene Glycol and Propylene Glycol in Formulating Bendamustine.**

197.    All of the asserted claims of the '707 patent family require that the formulation contain PEG and PG. For example, claim 14 of the '707 patent—from which asserted claims 18 and 20 depend—requires that the pharmaceutically acceptable fluid comprise "about 90% polyethylene glycol and about 10% propylene glycol." Claim 1 of the '831 patent—from which asserted claims 2, 3, and 4 depend—requires that the pharmaceutically acceptable fluid contain "polyethylene glycol," "about 5% to about 10% by volume propylene glycol," and that the ratio of PEG to PG be selected from the group consisting of about 95:5, about 90:10, about 85:15, about 80:20, and about 75:25.

198.    I understand that Dr. Pinal has opined that various combinations of Olthoff 1983, Drager '006, Alam '286, and the knowledge of the POSA would have rendered the claims of the '707 patent family obvious. I disagree. In my opinion, none of those references—alone or together—would have motivated or provided reason for the POSA to use PEG and PG as recited in the claimed formulations. Moreover, in my opinion the prior art as a whole would have taught the POSA away from using PEG and PG in formulations with bendamustine. I discuss these opinions in more detail below.

88

EAGLEBEN-SA_00000364

### 1.    Olthoff 1983 Would Not Have Motivated the POSA To Use Polyethylene Glycol and Propylene Glycol in Bendamustine Formulations.

199.    I describe the Olthoff 1983 reference in detail above and incorporate the opinions regarding that reference set forth above. *See* ¶¶ 91–101.

200.    Dr. Pinal has opined that Olthoff 1983 would have motivated the POSA to formulate bendamustine in "polyols." Pinal Rep. ¶ 169; *see also* Yates Rep. ¶ 65 (opining that "the use of polyols to enhance the stability of bendamustine had been taught for decades"). Dr. Pinal further interprets Olthoff 1983's teaching about "polyols" to be limited to "glycerol, PEG, and PG," from which the POSA would have preferred PEG and PG. Pinal Rep. ¶ 171. Dr. Pinal appears to arrive at this narrowed list through the teachings of various other references, which are not recited in his combinations of references. I address those references below.

201.    I disagree with Dr. Pinal and Dr. Yates that Olthoff 1983 would have motivated or provided reason for the POSA to use PEG in bendamustine formulations. As an initial matter, Olthoff 1983 does not mention PEG, much less describe any formulations containing bendamustine and PEG. Although Olthoff 1983 discusses "monovalent alcohols, glycols and other polyvalent alcohols," *see* Olthoff 1983 at 4, JDG_BENDA_00002301 at 2312, the only specific solvents (other than water) that are mentioned by Olthoff 1983 are ethanol, PG, and glycerol. *See id.* at 6, JDG_BENDA_00002301 at 2314. Of those, only ethanol and PG are included in Olthoff 1983's stability study. *See id.* at 5, JDG_BENDA_00002301 at 2313. The disclosures in Olthoff 1983 would not have motivated or provided reason for the POSA to use PEG.

202.    I note that almost 30 years passed between the publication of Olthoff 1983 and the priority date, and that no product had been marketed with PEG and bendamustine. That passage of time indicates that the POSA would not have been motivated or had reason to use PEG, as Dr.

89

EAGLEBEN-SA_00000365

Pinal contends. It further indicates that the inventors' work in achieving the claimed subject matter was far from routine and that Dr. Pinal's reliance on Olthoff 1983 is predicated on hindsight.

203.    In my opinion, even if the POSA were to credit the stability data disclosed in Olthoff 1983 as Dr. Pinal asserts (which, for reasons explained above and below, the POSA would not have), the POSA would have been taught away from using PEG. Olthoff 1983 discloses stability data purporting to show no bendamustine degradants in formulations of ethanol and PG at elevated temperatures. *See* Olthoff 1983 at 5, JDG_BENDA_00002301 at 2313. Assuming these data were accurate, if the POSA in 2010 were looking for a stable, liquid, non-aqueous bendamustine formulation, she or he simply could have used Olthoff 1983's formulations. Dr. Pinal fails to explain why—if the POSA believed Olthoff 1983's data, as Dr. Pinal asserts, and concluded that the disclosed formulations were free of impurities—the POSA would have been motivated to look any further, let alone look to use solvents that were not even disclosed in Olthoff 1983.

204.    In my opinion, the POSA would not have credited the Olthoff 1983 stability data.

205.    The POSA's first reason for disbelieving the Olthoff 1983 stability data would have been the POSA's understanding of esterification reactions. The POSA would have understood that the alcohol groups in ethanol and PG could form ester bonds with the carboxylic acid in bendamustine. This reaction is disclosed, for example in Zimmerman 1977, which I describe above. *See* ¶¶ 125–132. The POSA would have been surprised that Olthoff 1983 did not report the presence of bendamustine esters in its stability experiments. Indeed, Olthoff 1983 does not mention the possibility of ethanol and PG esterifying with bendamustine—the only degradation mechanism discussed in Olthoff 1983 is with respect to the nitrogen mustard moiety.

90

EAGLEBEN-SA_00000366

*See* Olthoff 1983 at 4–5, JDG_BENDA_00002301 at 2312–13 (discussing hydrolysis and alcoholysis). The POSA would therefore have understood that the inferior analytical method used by Olthoff 1983 to detect impurities was not detecting bendamustine esters. *See* ¶¶ 97, 208–212.

206. Dr. Pinal acknowledges that the POSA would have expected alcohols to esterify with bendamustine. *See* Pinal Rep. ¶ 171 ("The POSA would have known that the higher content of –OH groups in the solvent of the formulation would result in faster degradation of BDM via the esterification reaction . . . ."). This understanding is contrary to the disclosure of Olthoff 1983, and would have provided reason for the POSA not to credit its data.

207. The POSA's second reason for disbelieving the Olthoff 1983 stability data would have been the disclosures in Drager '006. As explained in detail above, the Drager '006 inventors attempted to replicate the Olthoff 1983 results in PG, using a more modern analytical technique (HPLC). *See* ¶¶ 64–65. The Drager '006 inventors found that the Olthoff 1983 results "were not reproducible." Drager '006, 2:63–64, JDG_BENDA_00000990 at 996. Whereas Olthoff 1983 reports no bendamustine impurities at 25° C after eight weeks, Drager '006 reports that bendamustine purity fell to around 5% after about sixty days at 25° C (corresponding to 95% degradation). *Id.*, Fig. 3, JDG_BENDA_00000990 at 994. These results are directly contradictory.

208. Dr. Pinal opines that the "POSA would have understood Drager '006 (figure 3) as confirming Olthoff's essential finding of stability in at least one polyol by showing good stability of [bendamustine] at 5 °C in 99% propylene glycol over 180 days, although some degradation was seen at 1 year." Pinal Rep. ¶ 158; *see also* Yates Rep. ¶ 67 ("Drager confirmed Olthoff's essential finding of stability in at least one glycol by showing good stability of bendamustine at 5

91

°C in 99% propylene glycol over 180 days, although some degradation was seen at 1 year."). It is unclear to me what Dr. Pinal and Dr. Yates mean by "Olthoff's essential finding of stability." In any event, I disagree with Dr. Pinal and Dr. Yates that the Drager '006 data would have corroborated the data in Olthoff 1983 in any respect. As I explained in the previous paragraph, the 25° C data from Drager '006 directly contradict the 25° C data from Olthoff 1983, and Drager '006 was explicit that its data conflicted with the Olthoff 1983 data. Drager '006, 2:63–64, JDG_BENDA_00000990 at 996 ("Experiments to produce commercially viable propylene glycol preparations have been performed. Unfortunately, the results described in GDR Patent 159289 were not reproducible."). The 5° C data from Drager '006 could not have provided any confirmation of the Olthoff 1983 data because Olthoff 1983 did not run any experiments at 5° C. Moreover, the Drager '006 data in Figure 3 at 5° C would have taught the POSA that a 99% PG formulation had an unacceptable stability profile. That formulation degrades to a purity level of less than 80% over the course of a year. The POSA would have considered this to be an unacceptable purity profile. *See* Remington 2006 at 1025 ("Although there are exceptions, 90% of labeled potency generally is recognized as the minimum acceptable potency level."). Moreover, the POSA would have deemed the formulation's stability profile at 180 days to be unacceptably short. *Id.* at 1032 ("Most products require at least 24 months to be commercially viable."). The Drager '006 inventors explicitly came to the same conclusion about this formulation. *See* Drager '006, 2:68–3:2, JDG_BENDA_00000990 at 996–97 ("[A] 100% propylene glycol commercial formulation of bendamustine is not feasible for pharmaceutical purposes."). In sum, the POSA would not have viewed the Drager '006 data as confirmatory of the Olthoff 1983 data; to the contrary, the POSA would have viewed the Drager '006 data as directly conflicting with the Olthoff 1983 data, as Drager '006 discloses clearly.

92

209.    In considering the conflict between the Drager '006 data and the Olthoff 1983 data, the POSA would have credited the Drager '006 data over the Olthoff 1983 data.  For example, the Drager '006 inventors reported that two of the impurities found in the Olthoff 1983 formulations were PG esters of bendamustine.  *Id.*, 2:64–65, JDG_BENDA_00000990 at 996.  This result would have been in accord with the POSA's expectation with respect to the esterification between alcohols and carboxylic acids and would have lent credence to the Drager '006 results.  *See* ¶ 205.

210.    As explained above, based on Dr. Anslyn's opinions and my experience, the POSA also would have viewed the analytical technique used by Drager '006 to detect impurities as more reliable than the analytical technique used by Olthoff 1983.  In particular, Drager '006 used high performance liquid chromatography (HPLC) to detect degradants, whereas Olthoff 1983 used thin layer chromatography (TLC).  *See* ¶ 97.

211.    I agree with Dr. Pinal that "HPLC is by far, the analytical technique most widely used in the pharmaceutical industry to determine the drug content, as well as to detect and quantify impurities and degradation products in formulations."  Pinal Rep. ¶ 269.  By contrast, based on Dr. Anslyn's opinion and in my experience, TLC is rarely used to detect and measure impurities in pharmaceutical formulations.  *See* ¶ 97.  Although TLC is a simple and inexpensive technique, my understanding is that it is inferior to HPLC at resolving and quantifying impurities.  *See* McMaster, HPLC: A PRACTICAL USER'S GUIDE at 12 (2d ed. 2007) ("Advantages of TLC include very inexpensive equipment and reagents, fairly rapid separations, a wide variety of separating media and visualizing chemicals, and use of solvents and mobile phase modifiers, such as ammonia, not applicable to column separations. Disadvantages include

93

poor resolving power and difficulty in quantitative recovery of separated compounds from the media and binder.").

212.                                    REDACTED

213.    For these reasons, the POSA would not have credited the stability results reported by Olthoff 1983. The POSA would have concluded that Olthoff 1983 failed to detect the PG ester impurities, whereas Drager '006 detected those impurities properly. The POSA would not have concluded that Drager '006 was reporting impurities improperly (for example, that Drager '006 was reporting PG ester impurities that were not actually in the tested compositions). Dr. Pinal has not offered any opinion to that effect, and the POSA would have considered that possibility to be unlikely.

214.    Because the POSA would have given little or no weight to the stability results reported in Olthoff 1983, Olthoff 1983's recommendation to use alcohols or polyols in bendamustine formulations would not have motivated or provided reason for the POSA to do so. Those recommendations were closely tied to, and premised on, Olthoff 1983's unreliable and later (before the priority date) discredited stability data. *See, e.g.*, Olthoff 1983 at 6,

94

EAGLEBEN-SA_00000370

JDG_BENDA_00002301 at 2314 ("It is now proposed to dissolve the active substance in polyols, particularly in 1,2-propylene glycol in order to ensure a more simple production technology, an improved stability of the active substance during the production and storing of the solutions, as well as a simplified handling during the production of the ready to inject solution . . . ." (emphasis added)).

215.    Dr. Pinal and Dr. Yates also opine that Olthoff 1983 teaches away from using ethanol. *See* Pinal Rep. ¶ 170; Yates Rep. ¶ 66. For this proposition, Dr. Pinal and Dr. Yates both cite the following statement from Olthoff 1983: "For pharmacological reasons and for reasons concerning the production, monovalent alcohols are of limited use for the production of injection solutions." Olthoff 1983 at 6, JDG_BENDA_00002301 at 2314. I disagree that this statement from Olthoff 1983 would have caused the POSA to ignore ethanol as a potential solvent in formulating a liquid bendamustine composition. As I discuss at length below, ethanol would have been one of the many solvents that the POSA would have considered, if she or he had wanted to create a liquid bendamustine formulation. *See* ¶¶ 758–764. The single sentence that Dr. Pinal and Dr. Yates quote from Olthoff 1983 gives no rationale for ignoring ethanol as a solvent, and the POSA would therefore have given this off-handed remark little credence. The POSA would have been aware that, as of 1997, ethanol had been used in over 24 marketed parenteral products in the United States. Nema 1997 at 167, JDG_BENDA_00002272 at 2273; *see also* Strickley at 218, JDG_BENDA_00003290–307 (calling ethanol a "common solubilizing excipient" in injectable formulations and describing formulations containing ethanol); Mottu 2000 at 459, JDG_BENDA_00005839 at 5844 ("[Ethanol] is a well-known parenteral solvent, the most frequently reported in the literature."). In view of this evidence, the POSA would not have credited Olthoff 1983's statement that ethanol (and other monovalent alcohols) are of

95

EAGLEBEN-SA_00000371

"limited use" in injection solutions; the statement is not an accurate characterization of the POSA's thinking decades later, at the priority date. As such, Olthoff 1983 would not have taught the POSA away from using ethanol in bendamustine formulations.

216.    Dr. Yates has opined that, in view of the teachings of Olthoff 1983, the POSA would have selected "a satisfactory single glycol, multiple glycols, other polyvalent alcohol(s) or mixtures thereof" through "routine experimentation." Yates Rep. ¶ 66. I disagree that the selection of a solvent system for a liquid bendamustine composition would have constituted "routine experimentation," in view of Olthoff 1983 or any of the other art cited by either Dr. Yates or Dr. Pinal.

217.    First, as I discuss throughout this section and elsewhere in the report, the POSA would have been taught away from the claimed solvent system, for a variety of reasons. For example, the POSA would have had serious doubts about the solubility and stability of bendamustine in PEG formulations, among other concerns related to that solvent. *See, e.g.,* ¶¶ 330–399. Drager '006, moreover, explicitly teaches away from a solvent system composed entirely of protic solvents, such as PG and PEG. *See* ¶¶ 220–222. Second, selecting the proper solvent system would not have been a matter of "routine experimentation." As an initial matter, the POSA would have understood that the universe of reasonable formulation options was not limited to co-solvent systems. Testing all of these options would have required the POSA to go far beyond "routine optimization." *See* ¶¶ 625–701. Further, even focusing narrowly on co-solvent approaches, the POSA would have been aware of many additional solvents and solvent combinations that Dr. Yates and Dr. Pinal ignore. The prior art did not disclose bendamustine's solubility or stability in any PEG formulations, much less a formulation with 90% PEG and 10% PG. Indeed, Dr. Yates does not even attempt to identify any teaching in the prior art that

96

EAGLEBEN-SA_00000372

discloses a narrow range of solvent or co-solvent systems for bendamustine that the POSA could have experimented with. Contrary to Dr. Pinal's and Dr. Yates's contentions, the POSA would have understood that bendamustine was a complex molecule with many degradation pathways and unknown solubility in various solvents and solvent combinations, and balancing these mechanisms would not have led the POSA towards the claimed inventions. *See* ¶¶ 156–167. For at least these reasons, the POSA would not have arrived at the claimed solvents through "routine experimentation" in view of Olthoff 1983 or any other reference. Indeed, in a real-world test of this routine experimentation theory proposed by the Defendants' experts, Olthoff 1983 was available for more than a quarter century before the priority date, during which many scientists at multiple companies researched bendamustine formulations. Yet before the priority date, not one of them published or suggested the formulations of the asserted claims, and many of those scientists published very different approaches, including lyophilized formulations (Brittain 2006) and formulations including substantial amounts of polar aprotic solvents (Drager '006).

218.    For the above reasons, it is my opinion that Olthoff 1983, alone or in view of the knowledge of the POSA, would not have motivated or provided reason for the POSA to use PEG and PG in bendamustine formulations.

### 2. Drager '006 Would Not Have Motivated the POSA To Use Polyethylene Glycol and Propylene Glycol in Bendamustine Formulations.

219.    I describe Drager '006 in detail above and incorporate the opinions regarding that reference set forth above. *See* ¶¶ 62–83.

220.    Dr. Pinal has opined that Drager would have motivated the POSA "to select a co-solvent system of 90:10 PEG:PG for a liquid [bendamustine] formulation." Pinal Rep. ¶ 349. In paragraph 349, Dr. Pinal provides little explanation for how Drager '006 would supply this

97

motivation, except to observe that "Drager '006 disclosed the use of a co-solvent system for a liquid [bendamustine] formulation" and to cite the paragraph of Drager '006 listing PG and PEG as polar protic solvents. I disagree that these disclosures—or any other disclosure in Drager '006—would have motivated or provided reason for the POSA to use PEG and PG, much less a 90:10 PEG:PG ratio, which I address below. *See* ¶¶ 423–444.

221. The POSA would have understood Drager '006's core teaching to be to use an aprotic solvent to stabilize a bendamustine. For example, the first sentence of the "Summary of the Invention" of Drager '006 states, "The present invention is directed to liquid pharmaceutical formulations comprising bendamustine, or a pharmaceutically acceptable salt or prodrug thereof, and a polar aprotic solvent." Drager '006, 2:33–38, JDG_BENDA_00000990 at 996 (emphasis added). Drager '006 explains that the advantage of using a polar aprotic solvent is that they "are sufficiently non-nucleophilic towards bendamustine such that polar aprotic solvent-bendamustine adducts do not form over the course of typical commercial storage conditions." *Id.*, 3:21–25, JDG_BENDA_00000990 at 997. These potential "adducts" include bendamustine degradants formed via the nitrogen mustard moiety. *See id.*, 4:33–50, JDG_BENDA_00000990 at 997 (describing degradation of bendamustine in the presence of nucleophiles, including water). Every formulation that the Drager '006 inventors tested for either solubility or stability contained a polar aprotic solvent. *See id.*, Tables I-II, JDG_BENDA_00000990 at 999. These disclosures of Drager '006 would have taught the POSA that the key to stabilizing bendamustine formulations is to use a polar aprotic solvent.

222. To be sure, Drager '006 discloses that a polar protic solvent may be used in addition to, but not instead of, a polar aprotic solvent in some embodiments. For example, the Summary of the Invention states, "Certain preferred embodiments include liquid pharmaceutical

98

EAGLEBEN-SA_00000374

formulations comprising bendamustine, or a pharmaceutically acceptable salt or prodrug thereof, a polar aprotic solvent, and a non-aqueous polar protic solvent." Drager '006, 2:36–38, JDG_BENDA_00000990 at 996. But Drager '006 is explicit that the volume of polar protic solvent must be kept low to avoid unwanted degradation, and substantial amounts of polar aprotic solvent must be present. *See id.*, 3:50–4:24, JDG_BENDA_00000990 at 997. And only one of the ten formulations in Drager '006 (66% DMA/34% PG) actually uses a polar protic solvent. *See id.*, Tables I-II, JDG_BENDA_00000990 at 999. These disclosures would not have motivated or provided reason for the POSA to use a solvent system composed entirely of protic solvents in a bendamustine formulation. Drager '006 teaches exactly the opposite.

223. I note that Drager '006 lists niacinamide as both a polar protic solvent and a complexing agent. Drager '006, 3:47–48, 7:16–17, JDG_BENDA_00000990 at 997, 999. In view of the quantity added to the tested formulations in Tables I and II (25 mg/mL), the POSA would have understood the niacinamide to be acting as a complexing agent, rather than as a solvent. However, my opinions would not change if the "DMA/Niacinamide" formulations disclosed by Drager '006 were interpreted as including a polar protic solvent. The overriding lesson of Drager '006 would still be to use a polar aprotic solvent, not a polar protic solvent.

224.                                        REDACTED

EAGLEBEN-SA_00000375

REDACTED

225.    The stability data disclosed in Drager '006 would likewise not have motivated or provided reason for the POSA to use polar protic solvents in bendamustine formulations. In particular, as noted above, Drager '006 only discloses a single exemplary formulation (66% DMA/34% PG) that included a polar protic solvent. The stability data for that formulation were not especially promising. Indeed, Drager '006 did not report any purity data for the 66% DMA/34% PG formulation at room temperature, and it does not appear that Drager '006 reports the purity data for the 66% DMA/34% PG formulation out to 12 months at the refrigerated condition. *See id.*, Figs. 1–2, JDG_BENDA_00000990 at 992–93. The stability data reported for the 66% DMA/34% PG formulation in Table II of Drager '006 are likewise not markedly better than the stability data for the other formulations. To the contrary, Table II of Drager '006 reports more impurities in the 66% DMA/34% PG formulation than in any of the other formulations tested. *See id.*, Table II, JDG_BENDA_00000990 at 992–999. I have summed up the impurities reported in Table II of Drager '006 and reproduced those summations below:

| Formulation | Sum of the impurities reported in Table II |
|---|---|
| Niacinamide/DMA | 1.54% |
| DMA | 1.23% |
| 66% DMA/34% PG | 1.62% |
| DMF | 0.25% |
| NMP | 1.00% |

100

EAGLEBEN-SA_00000376

| DMSO | 1.12% |
|------|-------|

In sum, the stability data reported in Drager '006 would not have provided any motivation or reason for the POSA to use polar protic solvents with bendamustine.

226.    Even if the POSA were motivated to include a polar protic solvent in bendamustine formulations, Drager '006 provides no motivation or reason to use PEG specifically.  Rather, PEG is included, without emphasis or differentiation, on a laundry list of pharmaceutically acceptable nonaqueous polar protic solvents from Drager '006:

> Pharmaceutically acceptable nonaqueous polar protic solvents are known in the art and include alkyl alcohols, for example, ethanol, ethylene glycol, propylene glycol, butylene glycol, glycerin, polysorbates, for example TWEEN 20, TWEEN 40, and TWEEN 80, and cyclodextrins (such as hydroxypropyl-β-cyclodextrin), polyalkylene glycols, such as polyethylene glycol, polypropylene glycol, and polybutylene glycol, and primary amides such as niacinamide.

*Id.* at 3:40–48, JDG_BENDA_00000990 at 997.  PEG is not otherwise mentioned in Drager '006, nor is its use exemplified, and Dr. Pinal has not articulated any motivation or reason that the POSA would have had for singling PEG out of this broad disclosure.  In my opinion, this generic list of "nonaqueous polar protic" ingredients would not have motivated the POSA to use PEG in bendamustine formulations.

227.    Dr. Pinal next opines that the POSA would have been motivated to modify the 66% DMA/34% PG formulation in Drager '006 to use PEG instead of DMA.  *See* Pinal Rep. ¶¶ 350–354.  The only reason that Dr. Pinal articulates for why the POSA would have switched away from DMA in this formulation is its purported "harmful effects on the IV infusion sets and stoppers in vials."  Pinal Rep. ¶ 351 (citing Pinal Rep. ¶ 154).

228.    As an initial matter, Dr. Pinal has failed to provide any reason for why the POSA would have used the formulation in Drager '006 containing 66% DMA and 34% PG as a starting

101

point for her/his formulation efforts.  As I explained above, the overall stability results for that formulation appear to have been omitted from Figures 1 and 2 of Drager '006 and the stability results in Table II—which report individual impurities—demonstrate that the 66% DMA/34% PG formulation had the highest sum of impurities out of the six formulations described in that Table.  *See* ¶ 225.  In view of these data, contrary to the assumption in Dr. Pinal's report, the POSA would not have been motivated or had reason to use the 66% DMA/34% PG formulation as a starting point in her/his formulation efforts.

229.    Dr. Pinal implicitly suggests that the POSA would have started with the 66% DMA/34% PG formulation in Drager '006 because that formulation is claimed in the patent.  *See* Pinal Rep. ¶ 350.  Dr. Pinal provides no rationale for why this would have motivated or provided reason for the POSA to begin with this formulation.  In any event, Dr. Pinal ignores the claims of the other, related applications in the Drager '006 family.  For example, U.S. Patent Publication No. 2012/0129904—which is the published patent application that gave rise to the Drager '006 patent—claims formulations that are far broader than are claimed in the Drager '006 patent.  *See* U.S. Patent Publication No. 2012/0129904, JDG_BENDA_00008165 at 8175.  For example, that published patent application includes claims that do not require polar protic solvents (for example, claims 1–3), claims in which the polar protic solvent is limited only to an "alcohol, a polyalkylene glycol, an amide, or a mixture thereof" (for example, claim 6), and claims in which the "polar protic solvent" is an alcohol or, more specifically, a cyclodextrin (for example, claims 7 and 8).  *Id.*  Dr. Pinal purports to rely on U.S. Patent Publication No. 2012/0129904 in forming his opinions.  *See* Pinal Rep. ¶ 95, n.3.  However, Dr. Pinal fails to mention the substantial differences between the claims of Drager '006 and that patent publication or explain why the POSA would have followed the claims of Drager '006 rather than the broader claims of the

102

EAGLEBEN-SA_00000378

patent publication. The POSA—a scientist, not a patent lawyer—would have looked to the disclosure and data in the Drager '006 patent, not the claims, to determine which (if any) formulation to use as a starting point and how it should be modified. But even if the POSA had looked to the claims for guidance, the POSA would not have selected the particular DMA/PG formulation used by Dr. Pinal.

230. I note that Dr. Pinal has opined that he is not relying on "Figure 4 in Drager '006 . . . or upon the written description that appears after column 9, line 7 of Drager '006." Pinal Rep. ¶ 95, n.3. In other words, Dr. Pinal has stated that he is not relying on the pharmacokinetic study or the admixture study reported in Drager '006 for any of the opinions stated in his report.

231. Even if (contrary to my opinion) the POSA would have been motivated to start her/his formulation efforts with a formulation of 66% DMA/34% PG, I disagree with Dr. Pinal that the POSA would have been motivated or had reason to substitute out DMA from the formulation. To support his argument on this front, Dr. Pinal cites to paragraph 154 of his report. *See* Pinal Rep. ¶ 351. In paragraph 154 of his report, Dr. Pinal cites two references on this point: a 1986 article from Berman and colleagues and a 2004 label for the product Amsidine. *See* Pinal Rep. ¶ 154; *see also* Pinal Rep. ¶ 452 (citing same references). Dr. Yates cites the same references in support of the same opinion. *See* Yates Rep. ¶ 72. In my opinion, neither of these references would have motivated or provided reason for the POSA to substitute out DMA from the 66% DMA/34% PG Drager '006 formulation.

232. The first reference that Dr. Pinal and Dr. Yates cite, *see* Pinal Rep. ¶¶ 154, 452; Yates Rep. ¶ 72, is Berman et al., *Complications of Organic Solvents in Synthetic Drug Application*, 9 AM. J. CLIN. ONCOL. 173 (1986) ("Berman 1986"), JDG_BENDA_00005968. I note that Dr. Pinal has not included this reference in the list of references that he purports would

103

have motivated the POSA to practice the inventions claimed in the '707 patent family. I also note that Dr. Pinal and Dr. Yates have not opined on why the POSA would have been motivated or had reason to combine the teachings of Berman 1986 with the teachings of any of the other references that they cite, including Drager '006, and they likewise have provided no opinion as to why the POSA would have had an expectation of success in practicing the claimed invention upon combining those references. Dr. Pinal and Dr. Yates have provided no explanation for what teaching of Berman 1986 would have motivated or provided reason for the POSA to avoid DMA, except (in Dr. Pinal's report) for a citation to page 173 of that reference. Pinal Rep. ¶ 154.

233. In my opinion, Berman 1986 would not have motivated or provided reason for the POSA to avoid DMA altogether. Berman 1986 discloses that there had been reports of decomposition of infusion devices using solutions that included DMA. *See* Berman 1986 at 173–74, JDG_BENDA_00005968 at 5968–69. The Berman 1986 authors therefore undertook a study to evaluate the interaction between DMA and the material that was used in those infusion devices, a thermoplastic polymer named acrylonitrile butadiene styrene ("ABS"). *Id.* The authors used mass spectrometry (an analytical chemistry tool) to analyze pure DMA, a 50% DMA solution in water, and a 10% DMA solution in water, that had been in contact with ABS tubing for 5, 15, and 30 minutes. *Id.* The authors found that mass spectrometry signals indicated that the DMA could interact with ABS. *See id.* at 175, tbl. 1, JDG_BENDA_00005968 at 5970. The higher concentrations of DMA and longer exposure times led to more ABS "dissolution." *See id.* at 175–76, JDG_BENDA_00005968 at 5970–71 ("Our data support the conclusion that higher concentrations of DMA or longer exposure times leads to a greater abundance of materials in the solutions that can be attributed to dissolution of the ABS thermoplastic."). By

104

contrast, lower concentrations of DMA and shorter exposure times led to little or no decomposition. *See id.* ("Furthermore, we have demonstrated that DMA concentrations less than 10% with ABS exposure times less than 15 minutes are associated with minimal thermoplastic decomposition.").

234.    To be sure, the POSA would have viewed DMA's potential interaction with ABS as a disadvantage of using that solvent at the concentrations and exposure times where Berman 1986 found significant interactions between DMA and ABS. However, that would not have disqualified DMA from consideration as a potential solvent for formulating parenteral products. As will be discussed below, the POSA would have been well aware of alternative infusion materials that would have been compatible with DMA.

235.    The POSA also would have understood from the Berman 1986 results and disclosure that the interaction of DMA with ABS was concentration dependent. At a concentration of 10% (in an aqueous solution), DMA produced minimal decomposition of ABS over time periods of 15 minutes or less. The POSA would have been aware that bendamustine formulations were typically diluted into 500mL of saline. *See, e.g.*, Ribomustin® Product Monograph (2005) at 9, JDG_BENDA_00000001 at 9; Treanda® Label (2009) at 2, JDG_BENDA_00006932 at 6933. The POSA would have further understood that typical bendamustine dosages are no more than 120 mg/m$^2$, which corresponds to a dosage of 240 mg for a patient with a body surface area of 2.0 m$^2$. *See* Pinal Rep. ¶ 180 (considering 2.0m$^2$ to be a standard (average) body surface area, which would yield a dosage of 240 mg). The POSA would have further understood, from Drager '006, that the formulation with 66% DMA and 34% PG yielded a bendamustine hydrochloride solubility of 110.1 mg/mL at room temperature. *See* Drager '006, Table I, JDG_BENDA_00000990 at 999. Based on this reported solubility, the

105

EAGLEBEN-SA_00000381

POSA would have assumed that this bendamustine hydrochloride formulation could contain about 85 mg/mL of bendamustine hydrochloride, which would ensure a 30% solubility margin. *See* ¶¶ 381–384 (discussing solubility margin). At this concentration, about 2.82 mL of the concentrate (which contains 0.66 mL of DMA per mL of the concentrate) would need to be added to 500 mL of saline to achieve a total dosage of 240 mg. That extent of dilution would yield a DMA concentration in the infusion bag of about 0.37% ((2.82mL/502.82mL)*0.66*100).

236. The data in Berman 1983 do not suggest that a DMA concentration of 0.37% would be likely to interact with ABS to a significant extent within the relevant time frames. To the contrary, Berman 1983 makes clear that the interaction between DMA and ABS is concentration dependent, and that at concentrations of 10% there was only minimal decomposition of ABS. *See* Berman 1986 at 175–76, JDG_BENDA_00005968 at 5970–71. Indeed, Berman 1986 reports, for example, an approximately 200-fold decrease in the intensitiy of the key ion m/z 129 measured by mass spectrometric analysis, when the concentration of DMA was reduced from 100% to 10% in the 30-minute exposure condition. *See id.* The concentration of DMA in the infusion bag using the "Drager '006 66% DMA formulation" (0.37%) would have been more than twenty times less than the lowest concentrations used in Berman 1986. Based on the disclosures in Berman 1986, the POSA would not have expected an aqueous solution containing only 0.37% DMA to cause substantial or relevant decomposition of ABS. As such, Berman 1986 would not have motivated or provided reason for the POSA to substitute out DMA from the Drager '006 formulation.

237. The other reference that Dr. Pinal and Dr. Yates cite, *see* Pinal Rep. ¶¶ 154, 452; Yates Rep. ¶ 72, to support their opinion that the POSA would have been motivated to substitute out the DMA in Drager '006's 66% DMA formulation is a 2004 label for Amsidine®, an

106

intravenous infusion product containing amsacrine as the active ingredient. *See* Amsidine® Label (2004), JDG_BENDA_00005937. Dr. Pinal and Dr. Yates do not explain how the Amsidine® label would have provided any motivation or reason for the POSA to combine it with any other reference, including Drager '006, nor do the Defendants' experts provide any basis for the POSA to have an expectation of success in making the claimed invention upon combining references. Rather, Dr. Pinal's report cites page 7 of that label. Pinal Rep. ¶ 154.

238. The Amsidine® label discloses that the active ingredient "is dissolved in dimethylacetamide (DMA)." *Id.* at 7, JDG_BENDA_00005937 at 5943. The label warns that, because "DMA can interact with plastic and rubber, glass syringes should be used in preparing an intravenous solution." *Id.* The label further directs that the solution should be "diluted in 500 ml 5 % glucose solution and infused over 60 to 90 minutes in PVC or polythene infusion bags and PVC administration sets." *Id.* at 8, JDG_BENDA_00005937 at 5944.

239. I disagree with Dr. Pinal and Dr. Yates that the Amsidine® label would have taught the POSA away from using DMA in a formulation intended for intravenous use. To the contrary, the Amisidine® label would have taught the POSA precisely what sort of intravenous infusion equipment was appropriate and safe to use with a DMA-based formulation. As such, the Amisidine® label would have confirmed to the POSA that the Drager '006 formulation with 66% DMA could safely be delivered via intravenous infusion with respect to any potential concerns regarding DMA-infusion equipment interactions.

240. Other literature would have confirmed to the POSA that DMA was a suitable solvent for intravenous administration. For example, Strickley 2004 discloses that DMA is present at a concentration of 6% in "Teniposide, an antineoplastic agent used to treat leukemia," and "is administered by IV infusion after a 10-fold or a 100-fold dilution." Strickley 2004 at

107

EAGLEBEN-SA_00000383

222, JDG_BENDA_00003290 at 3311. The administered concentration of DMA in Teniposide (0.6% to 0.06%), includes the concentration that would have been administered in the Drager '006 formulation (0.37%). The POSA also would have been aware that DMA was present in the drug product Busulfex® at a concentration of 33%. *See* Busulfex® Label at 1 (1999), JDG_BENDA_00005643 at 5643. The active ingredient in Busulfex® is busulfan, which is an alkylating agent, and Busulfex® is indicated for the treatment of chronic myelogenous leukemia. *See id.* at 1, 8, JDG_BENDA_00005643 at 5643, 5650; *see also* Lindsey, *UH, MDACC Researchers Earn Inventor Award for Pre-Transplant Drug* (Nov. 2, 2009) ("Lindsey 2009"), *available at* https://www.uh.edu/news-events/stories/2009articles/november2009/1102UCOPAward.php (noting that "more than 65 percent of all myeloid leukemia patients transplanted in North America receive an intravenous Busulfan-based pre-transplant regimen" and that "Busulfex® has generated more than $40 million in sales"). The Busulfex® label directs that the product should be diluted by a factor of ten with saline or 5% dextrose solution prior to intravenous administration, for an administered DMA concentration of 3.3%. *See* Busulfex® Label at 25(1999), JDG_BENDA_00005643 at 5667. These disclosures would have confirmed the POSA's expectation before the priority date that DMA was safe to deliver via intravenous administration at low concentrations, and in fact at substantially higher concentrations than administered following Drager '006's use of DMA. As such, the POSA would not have been motivated or had reason to substitute out DMA from the Drager '006 formulation for the reasons stated by Dr. Pinal and Dr. Yates.

241. I also disagree with Dr. Pinal's opinion—that the "POSA would have been motivated to remove DMA from the liquid formulation due to issues with degradation of the rubber stoppers in vials and plastics used in IV infusion sets," Pinal Rep. ¶ 452—including

108

EAGLEBEN-SA_00000384

because that opinion runs counter to industry practice as of the priority date. As explained above, at least three IV products that contained DMA were marketed before the priority date. The single article that Dr. Pinal cites that recounts problems with DMA, Berman 1986, was published many years before those drugs came to market. Plainly, the disclosures of Berman 1986 did not dissuade the makers of Busulfex™, Teniposide®, or Amsidine® from bringing those products to market, and it did not dissuade the relevant regulatory bodies from approving those drugs. Dr. Pinal does not address this evidence at all. By the time of the priority date, the POSA would not have had reason to avoid DMA as the Defendants' experts assert.

242. The disclosures of Berman 1986 likewise did not dissuade the Drager '006 inventors from using DMA in their bendamustine formulations. The Drager '006 patent is assigned to Cephalon, Inc. *See* Drager '006, JDG_BENDA_00000990 at 990. The POSA would have known that Cephalon was a sophisticated pharmaceutical company with substantial experience in developing and commercializing oncology products. In particular, the POSA would have known that Cephalon owned and distributed TREANDA®, the only bendamustine drug product ever to be sold in the United States before the priority date. *See* Treanda® Label (Apr. 2009) at 14, JDG_BENDA_00006932 at 6945. The POSA would have expected that Cephalon and the Drager '006 inventors were aware of DMA's potential incompatibilities and nevertheless chose to use DMA in several bendamustine formulations, despite the availability of other possible solvents. And although not prior art, Cephalon in fact decided to market that formulation, despite the inclusion of DMA.

243. In addition, Dr. Pinal opines that "Drager disclosed that a formulation containing 34% PG and 66% DMA contained approximately 1.6% impurities after 1 year at 5 °C," which Dr. Pinal cites as an example of a formulation "contain[ing] almost no impurities." *See* Pinal

109

EAGLEBEN-SA_00000385

Rep. ¶ 219. As discussed above, I do not think the POSA would have reached this conclusion from the data disclosed for this formulation in Drager. Assuming (contrary to my opinion) that Dr. Pinal is correct that the POSA would have viewed these stability results favorably, however, this interpretation would have further dissuaded the POSA from modifying the 66% DMA/34% PG formulation in the manner Dr. Pinal suggests. Put another way, if the POSA had believed that Drager '006's 66% DMA/34% PG formulation had provided the solution to the problem of finding a stable liquid formulation of bendamustine, the POSA would not have proceeded to change the formulation by substituting out the predominant solvent, and the POSA certainly would not have done so to avoid a potential incompatibility issue that was both irrelevant to Drager '006's use of the formulation and effectively solved in the years before the priority date.

244. For these reasons, the POSA would not have been motivated or had reason to substitute DMA out of the bendamustine formulations described in Drager '006 to avoid potential incompatibilities with infusion materials.

245. Even if (contrary to my opinion) the POSA would have been motivated or had reason to start with Drager '006's 66% DMA/34% PG formulation, and even if (again, contrary to my opinion) the POSA would have been further motivated or had reason to substitute the DMA in that formulation with another solvent, in my opinion the POSA would not have been motivated or had reason to substitute PEG for DMA. As I explain above, the principal teaching of Drager '006 is to use a polar aprotic solvent to stabilize bendamustine. *See* ¶¶ 66–71; Drager '006, 3:48–4:24, JDG_BENDA_00000990 at 997. Drager '006 plainly teaches that PEG is a polar protic solvent, not a polar aprotic solvent. *See* ¶ 68; Drager '006, 3:41–48, JDG_BENDA_00000990 at 997. Substituting PEG for DMA in the Drager '006 formulation would have yielded a solvent system composed entirely of protic solvents, which contravenes

110

EAGLEBEN-SA_00000386

Drager '006's explicit teachings to limit the total amount of protic solvents in bendamustine formulations. *See* Drager '006, 3:48–4:8, JDG_BENDA_00000990 at 997.

246. As such, if the POSA wanted to discard DMA and choose a different solvent, she or he would have chosen a polar aprotic solvent other than DMA based on Drager '006's repeated teachings. Drager '006 provides a variety of examples of such solvents, including "1-methyl-2-pyrrolidone, 1,3,-dimethyl-2-imidazolidinone, . . . dimethyl sulfoxide, acetone, tetrahydrofuran, 1,4-dioxane, acetonitrile, dimethyl formamide, [and] propylene carbonate." Drager '006, 3:10–3:18, JDG_BENDA_00000990 at 997. Dr. Pinal does not mention these solvents in his report. In particular, Dr. Pinal has not offered any rationale for why the POSA would have ignored these or other polar aprotic solvents disclosed explicitly in Drager '006 when considering alternatives to DMA in the Drager '006 formulation. In my opinion, although these solvents are not the most common options for parenteral formulations, they would have been the POSA's first choice to replace DMA, in view of the teachings of Drager '006.

247. Dr. Pinal's opinion that the POSA would have been motivated by Drager '006 to choose PEG appears to be based on various calculations that Dr. Pinal has performed regarding the "concentrations" of hydroxyl groups in various solvents. In particular, Dr. Pinal opines that the POSA would have recognized that the formulation in Drager '006 with 34% PG "contained 66% less –OH groups per unit volume, than a solution made with PG alone" and that the "POSA would have known that this reduction in –OH groups would reduce the likelihood of Fischer esterification reactions, which would lead to fewer ester impurities." Pinal Rep. ¶ 350. Dr. Pinal further opines that, when looking to replace DMA in the formulation of Drager '006, the POSA would "have thought of other ways to achieve a similar reduction of the abundance (concentration) of the –OH groups, relative to that of PG, but without using DMA." Pinal Rep.

111

¶ 351.  Dr. Pinal opines that the POSA would have "calculate[d] the concentration of –OH groups in different solvents and solvent mixtures." *Id.* Dr. Pinal further opines that "the POSA would have been able to calculate the –OH 'burden' of the different solvents of interest," and he provides a table with calculations of "–OH groups % wt." for water, glycerol, PG, ethanol, PEG (300), PEG (400), and DMA. *Id.* ¶ 352.  After conducting these calculations for those solvents alone, Dr. Pinal calculates the concentration of –OH groups in Drager '006's 34% PG formulation to be 15.19%. *Id.*

248.     I disagree with Dr. Pinal's opinions discussed in the previous paragraph, which have a number of serious deficiencies.

249.     First, Dr. Pinal has failed to cite any piece of prior art or any other reference available to the POSA as of the priority date that teaches that a "reduction in –OH groups would reduce the likelihood of Fischer esterification reactions." Pinal Rep. ¶ 350.  For example, Drager '006 does not teach such a relationship or direct the POSA to change the formulation based on the "concentration" of hydroxyl groups.  I am aware that the '707 patent family discloses that the "hydroxide of the polyethylene glycol molecule is less reactive than the hydroxides of propylene glycol." *See, e.g.,* '707 patent, 3:41–48.  However, I understand that in conducting an obviousness analysis, reliance on the patent's teachings is impermissible.  As I explain below, Dr. Pinal's opinion—that the POSA would have been motivated to use PEG to reduce the "concentration" of hydroxyl groups in the formulation—appears to be driven entirely by hindsight.

250.     As stated above, I understand that a proper obviousness analysis must consider whether a claimed invention would have been obvious to the POSA at the time the invention was made.  In conducting this analysis, the use of hindsight is not permitted.  Thus, the person

112

EAGLEBEN-SA_00000388

conducting the analysis may not rely on an inventor's post-invention explanations of the invention to conclude that the invention would have been obvious. In my opinion, Dr. Pinal's opinion that the POSA would have been motivated to use PEG to reduce the "concentration" of hydroxyl groups relies on such an explanation by the inventors.

251. I further understand that the Defendants were required to disclose their invalidity theories in their Notice Letters, Interrogatory Responses, and/or Invalidity Contentions.

252. I understand that when a generic applicant applies to market a generic version of a drug product before the expiration of the patents listed with the FDA in connection with that product, the generic applicant may file a certification that, in the opinion of the applicant and to the best of its knowledge, those patents are invalid and/or will not be infringed. I understand that when a generic applicant files such a certification, the applicant must notify any patent owners of that statement. The generic applicant must also include a detailed statement of the factual and legal bases for the applicant's opinion that the patents are invalid or will not be infringed.

253. I understand that the Defendants sent Notice Letters to the Plaintiffs between July 6, 2017, and September 28, 2018. However, although several of Defendants' Notice Letters purport to address the validity of the '707 patent family, none of those letters discloses an obviousness theory or motivation theory relating to the "concentration" of hydroxyl groups in the claimed solvents. *See* Apotex Notice Letter (July 7, 2017); Fresenius Kabi Notice Letter (July 14, 2017); Fresenius Kabi Notice Letter (Aug. 6, 2018); Mylan Notice Letter (Oct. 30, 2017); Mylan Notice Letter (Aug. 30, 2018); Slayback Notice Letter (Dec. 8, 2017).

254. I understand that an interrogatory is a discovery instrument that a party may use in litigation to obtain information from another party.

113

EAGLEBEN-SA_00000389

255.    I understand that the Plaintiffs served interrogatories on the Defendants on March 30, 2018, asking, among other things, that the Defendants identify all facts, documents, and circumstances on which the Defendants relied, or intended to rely, upon for their contentions that the claims were invalid, including the bases for those contentions.  I understand that the Defendants responded to those interrogatories on April 30, 2018 and June 29, 2018.  I understand that those interrogatory responses did not disclose an obviousness theory or motivation theory based on the "concentration" of hydroxyl groups in the claimed formulations.  *See* Apotex's Resp. to Pls.' Interrog. No. 9 (Apr. 30, 2018); Fresenius Kabi's Resp. to Pls.' Interrog. No. 9 (Apr. 30, 2018); Mylan's Resp. to Pls.' Interrog. No. 9 (Apr. 30, 2018); Slayback's Resp. to Pls.' Interrog. No. 9 (Apr. 30, 2018); Mylan's Suppl. Resps. to Pls.' Interrogs. (June 29, 2018).

256.    I understand that an invalidity contention is a discovery instrument that requires a party to a patent litigation who asserts that a patent is invalid to disclose its bases for asserting that a patent is invalid at the time that it serves those contentions.  I understand that a party's final invalidity contentions must include any additional bases that the party becomes aware of between the time that it serves its initial invalidity contentions and the time that it serves its final invalidity contentions.

257.    I understand that the Defendants served their Initial Invalidity Contentions on February 23, 2018.  I understand that the Defendants' Initial Invalidity Contentions do not disclose an obviousness theory or motivation theory based on the "concentration" of hydroxyl groups in the claimed formulations.  *See* Defs.' Initial Invalidity Contentions (Feb. 23, 2018).  I understand that the Defendants' served their Final Invalidity Contentions on February 8, 2019.  The Defendants' Final Invalidity Contentions state that the claims would have been obvious

114

EAGLEBEN-SA_00000390

based on the "concentration" of hydroxyl groups in the claimed solvents. *See* Defs.' Final Invalidity Contentions 111–14 (Feb. 8. 2019).

258. The timing of the Defendants' disclosure, described below, supports my view that Dr. Pinal's opinion improperly relies on the inventors' post-invention explanations. Although Dr. Pinal's report and the Defendants' Final Invalidity Contentions purport to rely on Drager '006 as the basis for their contentions that the POSA would have been motivated to use PEG to reduce the "concentration" of hydroxyl groups, *see* Pinal Rep. ¶¶ 349–357; Defendants' Final Invalidity Contentions 111–14 (Feb. 8. 2019), the Defendants had been aware of Drager '006 since at least July 7, 2017, when the Defendants first identified Drager '006 in their Notice Letters. *See* Apotex Notice Letter 35 (July 7, 2017); Fresenius Kabi Notice Letter 22 (July 14, 2017); Slayback Notice Letter 13 (Dec. 8, 2017). Thus, Drager '006 is unlikely to be the cause for the Defendants' newly disclosed belief, in February 2019, that the POSA would have been motivated to use PEG to reduce the "concentration" of hydroxyl groups.

259. I understand that on July 7, 2018, after the Defendants served or supplemented their Interrogatory Responses, but before the Defendants served their Final Invalidity Contentions, Eagle produced documents relating to the inventors' development of the claimed formulations. At the time the Defendants received those documents, the Defendants had not yet identified an obviousness theory or motivation theory relating to the "concentration" of hydroxyl groups.

260. REDACTED

115

EAGLEBEN-SA_00000391

REDACTED

261.    I note that Dr. Pinal considered the same material in formulating his opinions. *See* Pinal Ex. 2, at 15 (citing Palepu Ex. 20, EGL-BENDEKA__00139314–139339).

262.    The timing of the Defendants' disclosure suggests that the Defendants became aware of theory associating bendamustine esterification and the "concentration" of hydroxyl groups solely based on the inventors' discussions.  As noted above, the Defendants first identified an obviousness theory based on the number of hydroxyl groups in the claimed solvents in their Final Invalidity Contentions.  I understand that the Defendants must have become aware of this theory between June 29, 2018, and February 8, 2019.  Otherwise, the Defendants would have included this information in their Notice Letters, Initial Invalidity Contentions, and/or Interrogatory Responses, as they were required to do.  The period between June 29, 2018, and February 8, 2019, corresponds to the period during which the Defendants received documents describing the inventors' discussions about the "concentration" of hydroxyl groups and had the opportunity to ask the inventors about those discussions.  Thus, the most likely explanation for the timing of the Defendants' disclosure is that the Defendants became aware of the significance

116

of the "concentration" of hydroxyl only because of their access to the inventors' discussions. I understand that is not permitted in an obviousness analysis.

263.    The Defendants' efforts to justify the timing of their disclosure further confirm that Dr. Pinal's opinions and the Defendants' contentions rely on hindsight. I understand that when the Defendants were asked to justify their failure to identify certain invalidity theories, including their theory that the POSA would have used PEG to reduce the "concentration" of hydroxyl groups, in their Notice Letters, Interrogatory Responses, and Initial Invalidity Contentions, the Defendants stated that such theories were timely because they were based on information that became available to the Defendants based on Plaintiffs' production of documents and the depositions of the named inventors. *See, e.g.*, Letter from Chad Watson 4 (Feb. 22, 2019) ("For example, Defendants' argument relating to solvent selection, OH groups, etc. is simply further detail on the invalidity positions already provided in Defendants initial contentions. To be sure, Defendants did learn additional information regarding these issues during the testimony of the inventors of the asserted patents, which allowed Defendants to provide more detail about these defenses."). That admission provides further evidence that Dr. Pinal's opinions and the Defendants' contentions rely on hindsight.

264.    In sum, Dr. Pinal's opinion that the POSA would have been motivated to use PEG based on the hydroxyl group "concentration" of that solvent does not appear to be grounded in any prior art teaching that he cites, but rather is based on hindsight in view of the inventors' own work and speculation.

265.    Second, Dr. Pinal fails to provide any explanation as to why his table of solvents in paragraph 352 is limited to water, glycerol, PG, ethanol, PEG 300, PEG 400, and DMA. Dr. Pinal merely states that these would have been "solvents of interest." For example, Dr. Pinal

117

provides no explanation for his omission of the aprotic solvents disclosed by Drager '006, among other possible and available solvents that the POSA, without hindsight, would have considered. *See* Drager '006, 3:3–3:8, JDG_BENDA_00000990 at 997. These aprotic solvents do not have hydroxyl groups. Using Dr. Pinal's phrasing, they have a hydroxyl group "concentration of zero." As explained in detail below, *see* ¶¶ 702–811, the POSA would have considered many more solvents than the ones that Dr. Pinal has arbitrarily selected for his table in paragraph 352.

266.    Third, Dr. Pinal uses the improper average molecular weights of PEG 300 and PEG 400. Dr. Pinal does not cite to any reference for the molecular weights that he has used. I understand that Dr. Anslyn has opined that the average molecular weights of PEG 300 and PEG 400 are 300 Da and 400 Da, respectively. Anslyn Rep. ¶ 145; *see also* Yates Rep. ¶ 73 (noting that PEG 400 and 300 have average molecular weights of 400 Da and 300 Da, respectively). I agree with Dr. Anslyn's opinion. As their names suggest, the POSA would have understood that PEG 300 and PEG 400 have average molecular weights of 300 Da and 400 Da. *See* Rowe 2009 at 517, JDG_BENDA_00006557 at 6564 ("Note that the number that follows PEG indicates the average molecular weight of the polymer."). Those average molecular weights are also consistent with the reported ranges for those molecules. *See* Rowe 2009 at 517, JDG_BENDA_00006557 at 6564 (PEG 300: 285–315 Da, PEG 400: 380–420 Da). Recalculating the hydroxyl group "concentration" of PEG 300 and PEG 400, using the correct molecular weights, yields values of 11.33% and 8.5%, respectively. For comparison, Dr. Pinal's erroneous calculations yield values of 11.03% and 8.21%, respectively. *See* Pinal Rep. ¶ 352.

267.    Fourth, Dr. Pinal fails to account for the difference in reactivities between primary and secondary alcohols in esterification reactions. I understand that Dr. Anslyn has opined that secondary alcohols are less reactive in esterification reactions due to steric hindrance. *See*

118

EAGLEBEN-SA_00000394

Anslyn Rep. ¶¶ 147–148. I agree with Dr. Anslyn's opinions, inasmuch as they accord with references that Dr. Pinal relies on. *See* Zimmerman 1977 at 431–32, JDG_BENDA_00003450 at 3453. I further understand that Dr. Anslyn has opined that the data in Drager '006 reveal that the secondary alcohol in PG is only about 25% as reactive as the primary alcohol in PG. *See* Anslyn Rep. ¶ 148. I have reviewed the portions of Drager '006 cited by Dr. Anslyn, and I agree with his interpretation of that reference. I further understand that Dr. Anslyn has recalculated the weighted –OH group "concentration" of PG to account for the fact that the secondary alcohol of that molecule is only 25% as reactive as the primary alcohol. I understand that this recalculated, weighted –OH group "concentration" is 27.88%, as compared to the value of 44.68% recited in paragraph 352 of Dr. Pinal's report. *See* Anslyn Rep. ¶ 149.

268.    I further understand that Dr. Anslyn has recalculated the weighted –OH "concentration" of the "Drager '006 66% DMA/34% PG formulation" to be 9.48%, as compared to the 15.19% recited in paragraph 352 of Dr. Pinal's report. *See* Anslyn Rep. ¶ 149. I agree with Dr. Anslyn's opinions and calculations and I disagree with Dr. Pinal's opinions and calculations.

269.    For convenience, I have set forth a table with Dr. Anslyn's recalculated, weighted hydroxyl group "concentrations" that I have relied on:

| Solvents | Weighted –OH groups % wt. | –OH groups % wt., Pinal Rep. ¶ 352 |
|---|---|---|
| PG | 27.88 | 44.68 |
| PEG 300 | 11.33 | 11.03 |
| PEG 400 | 8.5 | 8.21 |
| 34% PG/66% DMA (Drager '006) | 9.48 | 15.19 |

270.    I do not understand Dr. Pinal to assert that the POSA would have been motivated or had reason to use PEG if Dr. Anslyn's calculations are correct.

119

EAGLEBEN-SA_00000395

271.    Fifth, I disagree with Dr. Pinal's assumption that the POSA would have been motivated to choose solvents based solely on the desire to reduce Fischer esterification. Esterification is just one pathway by which bendamustine degrades. The prior art identifies other, non-ester degradants of bendamustine, and I understand Dr. Anslyn has opined that the POSA would have understood that bendamustine degrades by multiple reaction mechanisms. *See* Anslyn Rep. ¶¶ 44–71. Based on my experience, the POSA would not have been motivated or had reason to reduce only one of many degradation pathways. Rather, the POSA would have considered many different aspects of the formulation, including the stability of the molecule as a whole (with regard to all of the reaction mechanisms by which it is degraded) and its solubility in various solvents. The notion that the POSA would have considered Fischer esterification as the sole basis for selecting potential solvents is contrary to the goals of the POSA (including providing a sufficiently stable and soluble formulation) and my experience.

272.    Dr. Pinal next opines that "the POSA would have set to establish if it was possible to achieve Drager's 15.19% concentration of –OH groups in a suitable organic solvent system, but without using DMA." Pinal Rep. ¶ 353. Dr. Pinal further opines that the "POSA would have been motivated to once again consider the PEG:PG combination, since the combination was known to be effective in dealing with the hydrolysis of [bendamustine]." *Id.* I disagree with Dr. Pinal that the combination of PEG and PG was known to be effective in "dealing with the hydrolysis" of bendamustine. Dr. Pinal cites nothing for his opinion, and he cites no example anywhere in his report of bendamustine being used in a solvent containing PEG, much less PEG and PG. Thus, Dr. Pinal's opinion appears to be based on hindsight. Further, as I discuss below, Dr. Anslyn has opined that PEG would have been expected to increase the rate of degradation of

120

EAGLEBEN-SA_00000396

the <u>nitrogen mustard moiety</u> in bendamustine as compared to other solvents, including PG. *See* ¶¶ 361–366.

273.    To the extent that Dr. Pinal is simply suggesting that a PEG/PG formulation would be expected to decrease hydrolysis in bendamustine because such a formulation is largely free of water, I disagree that such a consideration would have led the POSA to use PEG. As I discuss below, there were many non-aqueous solvents available to the POSA as of the priority date. Dr. Pinal has identified no reason why the POSA would have chosen PEG out of those solvents if the goal was simply to decrease the hydrolysis of bendamustine. Moreover, as I discuss below, Dr. Anslyn has opined that using PEG would have been expected to increase the rate of aziridinium ring formation in bendamustine as compared to other solvents, including PG. *See* ¶¶ 362, 365. This is the rate-determining step for the formation of the hydrolysis degradation product. *See* Anslyn Rep. ¶ 52. To the extent there is residual water in the formulation (which there will always be), PEG would thus have been expected to increase the rate of hydrolysis of bendamustine compared to other solvents. *See* ¶¶ 362, 365. In addition, I understand that Dr. Anslyn has opined that other degradants may form as a result of this aziridinium ring formation at the nitrogen mustard moiety. *See* Anslyn Rep. ¶¶ 57–59. Dr. Pinal does not dispute that the POSA would not have pursued a solvent system containing PEG and PG if the POSA expected it to enhance degradation at the nitrogen mustard moiety; the POSA certainly would not have pursued that solvent combination in those circumstances.

274.    Dr. Pinal next contends that the "POSA would have been able to determine the ideal ratio of PEG:PG by calculating the –OH 'burden' of various ratios and information regarding the –OH concentration." Pinal Rep. ¶ 354. Dr. Pinal then sets forth a table with calculations of "OH Groups % wt" as a function of PG and PEG percentage. I understand that

121

Dr. Anslyn has recalculated the "Weighted OH Groups % wt," using the properly weighted –OH group "concentration" for PG. I agree with Dr. Anslyn's weighted calculations, and I disagree with Dr. Pinal's calculations and opinions. For reference, I reproduce below Dr. Anslyn's recalculated values:

| PEG 400 % wt | PG % wt | Weighted –OH groups % wt. |
| --- | --- | --- |
| 0 | 100 | 27.88 |
| 10 | 90 | 25.94 |
| 20 | 80 | 24.00 |
| 30 | 70 | 22.07 |
| 40 | 60 | 20.13 |
| 50 | 50 | 18.19 |
| 60 | 40 | 16.25 |
| 66 | 34 | 15.09 |
| 70 | 30 | 14.31 |
| 80 | 20 | 12.38 |
| 90 | 10 | 10.44 |
| 95 | 5 | 9.47 |
| 100 | 0 | 8.5 |

275.    Dr. Pinal opines that the "POSA would have found that a 80:20 PEG:PG mixture would had a weight percentage of –OH groups similar to that of Drager's DMA:PG." Pinal Rep. ¶ 354. Dr. Pinal further opines that his results "would have further strengthened the motivation of the POSA to go with the 90:10 PEG:PG formulation, since at 11.86% it has an even lower –OH group concentration than Drager's." *Id.* I disagree with Dr. Pinal's opinions, in part because they rest on his faulty calculations that fail to take into account the reduced esterification rates of the secondary alcohol of PG, as discussed above.

276.    As an initial matter, Dr. Pinal ignores the simple fact that substituting PEG for DMA—at the same ratios—would have necessarily increased the hydroxyl group "concentration" of the formulation, since DMA has no hydroxyl groups. For example, using Dr. Anslyn's recalculated values, a formulation with 66% PEG and 34% PG would have had a weighted hydroxyl group "concentration" of 15.09%. This is more than a 50% increase over the

122

EAGLEBEN-SA_00000398

9.48% hydroxyl group "concentration" of the Drager '006 formulation with 66% DMA and 34% PG. By contrast, if the POSA were to substitute in one of Drager '006's polar aprotic solvents, like DMSO, in place of DMA, the hydroxyl group "concentration" would remain unchanged. As such, if the POSA were to focus on the hydroxyl group "concentration" of the solvents as Dr. Pinal suggests, the POSA would be motivated to avoid PEG.

277.    As noted above, Dr. Pinal avoids this issue by opining that the POSA would have been motivated to use PEG and change the ratio of PEG to PG. Dr. Pinal provides no explanation as to why the POSA would prefer to make this more complex change instead of simply using a different polar aprotic solvent (assuming, again contrary to my opinion that the POSA would have used the particular Drager '006 formulation Dr. Pinal assumes and wanted to replace DMA). In view of Dr. Anslyn's updated calculations, though, even this argument from Dr. Pinal is not tenable. Plainly, and contrary to Dr. Pinal's opinion, a formulation with 80% PEG and 20% PG would have a weighted hydroxyl group "concentration" greater than the Drager '006 34% PG formulation hydroxyl group "concentration" (12.38% versus 9.48%). A "90% PEG and 10% PG" formulation that Dr. Pinal asserts would have been obvious would still have a greater weighted hydroxyl group "concentration" than the Drager '006 34% PG formulation (10.44% versus 9.48%). In other words, by moving from a 66% DMA and 34% PG formulation to a 90% PEG and 10% PG formulation, the POSA would be increasing the weighted hydroxyl group "concentration" of the formulation. Dr. Pinal has opined (albeit without any supporting evidence) that the rate of esterification is tied to the hydroxyl group "concentration" of the formulation. Pinal Rep. ¶ 350. Assuming that Dr. Pinal is correct that the rate of esterification is tied to the hydroxyl group "concentration" of the formulation and that this would have been the basis for the POSA's selection of a solvent, in view of Dr. Anslyn's

123

EAGLEBEN-SA_00000399

recalculated values, the POSA would have been taught away from switching to a formulation with 90% PEG and 10% PG, since such a formulation would have been expected to increase the amount of degradation via esterification. Again, the foregoing indicates that Dr. Pinal's opinions are based on impermissible hindsight.

278. In view of Dr. Anslyn's updated calculations, the only way for the POSA to achieve a hydroxyl group "concentration" with PEG and PG similar to the Drager '006 66% DMA/34% PG formulation would have been to use 95% PEG or more, with the remainder being PG. Even those formulations, however, have hydroxyl group "concentrations" that are only slightly lower than Drager '006's 66% DMA and 34% PG formulation—9.47% vs. 9.48%--and the POSA would not have selected a solvent on that basis (Dr. Pinal does not assert otherwise). In any event, Dr. Pinal has not opined that the POSA would have been motivated or had reason to make such a formulation with a PEG:PG ratio of 95:5 or that such a formulation would have been obvious. As I explain below, the POSA would have had serious solubility concerns with a "90% PEG and 10% PG" formulation, and these concerns would have been exacerbated by using even less PG. *See* ¶¶ 367–399.

279. For the above reasons, it is my opinion that Drager '006, alone or in view of the knowledge of the POSA, would not have motivated or provided reason for the POSA to use PEG and PG in bendamustine formulations. It is also my opinion that Olthoff 1983 in view of Drager '006, alone or in view of the knowledge of the POSA, would not have motivated or provided reason for the POSA to use PEG and PG in bendamustine formulations.

### 3. Alam '286 Would Not Have Motivated the POSA To Use Polyethylene Glycol and Propylene Glycol in Bendamustine Formulations.

280. I described Alam '286 above and incorporate the opinions regarding that reference set forth above. *See* ¶¶ 45–51.

124

EAGLEBEN-SA_00000400

281.    Dr. Pinal has opined that Alam '286 would have motivated the POSA to use PEG and PG in bendamustine formulations. *See, e.g.*, Pinal Rep. ¶ 185 ("The POSA would also have been motivated by Alam '286 to use PEG and PG as a co-solvent system."); *id.* ¶ 190 (citing Alam '286 claim 1 for the proposition that "PEG was often mixed with PG to provide a more biocompatible solvent system"); *id.* ¶ 349 ("Alam '286 specifically discloses the use of 90:10 PEG:PG in a co-solvent system with a nitrogen mustard."); *id.* ¶ 456–459 ("Alam '286 discloses the use of a PEG:PG ratio with the nitrogen mustard cyclophosphamide."). Dr. Yates similarly opines that the "POSA would have also looked to Alam (1989)" for its teachings related to PEG and PG. *See* Yates Rep. ¶ 79. I disagree with Dr. Pinal and Dr. Yates that Alam '286 would have motivated or provided reason for the POSA to use PEG (or a combination of PEG and PG) with bendamustine.

282.    Dr. Pinal provides practically no explanation of why the POSA would have looked to formulations of cyclophosphamide when formulating bendamustine. His only statement on this issue appears to be the following: "Like [bendamustine], cyclophosphamide is in the nitrogen mustard family of compounds used to treat cancers. Also, like [bendamustine], cyclophosphamide is unstable in water." Pinal Rep. ¶ 456 (citations omitted). Dr. Pinal never explains why these characteristics of cyclophosphamide would have caused the POSA to consider the formulations disclosed in Alam '286 in formulating bendamustine.

283.    Dr. Yates similarly comments on the "strong analogies between cyclophosphamide and bendamustine." Yates Rep. ¶ 79. He does not explain what those "strong analogies" are, except to state that both bendamustine and cyclophosphamide are nitrogen mustards that are "hydrolyzed in aqueous media." Yates Rep. ¶ 79.

125

EAGLEBEN-SA_00000401

284.    The POSA attempting to prepare a stable formulation of bendamustine would not have been interested in the clinical similarities of bendamustine and cyclophosphamide (an issue on which I express no opinion); rather, the formulator would have been interested in the characteristics of the compounds relevant to their formulation, including their stability profiles, the pathways by which they degrade, and their solubility in various solvents.

285.    In my opinion, Alam '286's cyclophosphamide formulations containing PEG and/or PG would not have motivated or provided reason for the POSA to use those excipients with bendamustine.  I understand that esterification reactions involve a reaction between an alcohol group and a carboxylic acid.  *See* Zimmerman 1977 at 430, JDG_BENDA_00003450 at 3453.  I have reviewed the chemical structure of cyclophosphamide, *see* ¶ 46, and it does not contain a carboxylic acid.  As such, the POSA would have understood that cyclophosphamide could not react with alcohol groups----such as the alcohol groups in PG or PEG----to form esters. I understand that Dr. Anslyn has likewise opined that cyclophosphamide could not esterify with alcohol-containing solvents.  *See* Anslyn Rep. ¶¶ 213–217.  Dr. Pinal has acknowledged that cyclophosphamide cannot form esters with PEG and PG.  Pinal Rep. ¶ 358 ("As is shown below in the below chemical structure of cyclophosphamide, the compound is not susceptible to Fischer esterification because it does not have a carboxylic acid group that would react with an --OH group from PEG or PG.").

286.    Because of cyclophosphamide's inability to form esters, the POSA would not have followed Alam '286 in its use of PEG or PG.  The POSA would have understood that PEG and PG could be used in formulations of cyclophosphamide without the risk of degradation via esterification.  By contrast, the POSA would have understood—including from the chemical structure of bendamustine and from Drager '006, which discloses PG esters of bendamustine—

126

EAGLEBEN-SA_00000402

that bendamustine would be subject to esterification reactions with PEG and PG.  Dr. Pinal acknowledges this fact.  *See* Pinal Rep. ¶ 77 ("[P]olyols (like PG and PEG) can degrade [bendamustine] by forming esters with it.").  In view of this key difference between bendamustine and cyclophosphamide, Alam '286 would not have motivated or provided reason for the POSA to use PEG and PG in bendamustine formulations.

287.    The POSA also would have understood that the degradation pathways of cyclophosphamide and bendamustine differed at the nitrogen mustard moiety.  I understand that Dr. Anslyn has opined that—unlike bendamustine—cyclophosphamide is a prodrug that is not itself reactive.  *See* Anslyn Rep. ¶¶ 219–220.  Moreover, I understand that Dr. Anslyn has opined that the hydrolysis of bendamustine is unrelated to the hydrolysis of cyclophosphamide and that cyclophosphamide and bendamustine are otherwise susceptible to very different degradation pathways.  *See* Anslyn Rep. ¶ 222.  In view of these additional differences between bendamustine and cyclophosphamide, Alam '286 would not have motivated or provided reason for the POSA to use PEG and PG in bendamustine formulations.

288.    Even if the POSA were somehow motivated or had reason to consider cyclophosphamide formulations in formulating bendamustine, Alam '286's results would not have provided the POSA with motivation or reason to make or use the inventions of the asserted claim.  At room temperature, Alam '286's formulation 10 (with 80% PG and 20% PEG) exhibited a purity level of only 86.6% after 9 weeks.  Alam '286, Table 3, JDG_BENDA_00000184 at 187.  For purposes of comparison, this is much worse than all but one of the formulations with aprotic solvents in Drager '006 at 25° C.  *See* Drager '006, Fig. 1, JDG_BENDA_00000990 at 992.  To the extent that the POSA considered the Alam '286 formulations and data relevant to the attempt to prepare a formulation of bendamustine, it would

127

EAGLEBEN-SA_00000403

have pointed the POSA away from the use of a PG/PEG solvent system. At refrigerated conditions, formulation 10 of Alam '286 exhibited a purity level of 98.7% after 11 weeks. Alam '286, Table 2, JDG_BENDA_00000184 at 187. If this rate remained constant, it is likely that the total purity would fall below 90% after two years, which would have been unacceptable in a commercial product with such a shelf life. Moreover, the POSA would have been suspicious about the lack of longer-term data in Alam '286, particularly because some of the data in Alam '286 exhibited non-linear stability profiles. For example, formulation 8 in Table 2 of Alam '286 exhibited a drop in purity from 100% to 87.0% over the first 11 weeks and a subsequent drop in purity to 70.8% at week 15. *See id.* As such, the impurity profiles of the PEG-PG formulations in Alam '286 would not have motivated or provided reason for the POSA to use PEG and PG in bendamustine formulations.

289.    Moreover, Alam '286 expresses a preference for PG over PEG. In particular, although Alam '286 discloses a broad range of concentrations of PG:PEG (10:90 to 90:10), Alam '286's most preferred ratio is "80% propylene glycol and about 20% polyethylene glycol." *See* Alam '286, 4:6–17, JDG_BENDA_00000184 at 186. Indeed, none of Alam '286's exemplary formulations uses PEG at a concentration higher than 20%. *See id.*, Table 1, JDG_BENDA_00000184 at 187. As such, even if the POSA were motivated or had reason to follow Alam '286, that reference would not have motivated or provided reason for the POSA to use PEG as the primary solvent in the composition and would not have motivated or provided reason for the POSA to use the 90% PEG/10% PG formulation that Dr. Pinal asserts to be obvious.

290.    The POSA also would have been aware of subsequent literature, published before the priority date, casting doubt on the results in Alam '286. International Patent Publication No.

128

WO02/02125 ("Tait '125")[2] concerns formulations of ifosfamide. *See* Tait '125, abstract, JDG_BENDA_00003332 at 3332. In that publication, the inventors re-tested the formulations of Alam '286 (which Tait '125 refers to as the "Lyphomed patent"). *See id.* at 4, JDG_BENDA_00003332 at 3332 (describing U.S. Patent No. 4,879,286 and noting that it is assigned to Lyphomed); *id.* at 13, JDG_BENDA_00003332 at 3345. Tait '125 provides the following description of its testing of Alam '286:

> The Lyphomed patent teaches cyclophosphamide systems based on polyols which may contain up to 50% water and 30% ethanol. It is not reported that these solutions develop colour over time. Experiments however show that colour develops in Lyphomed formulations. Those that do contain water develop colour more slowly, but discolouration is not inhibited.

*Id.* at 13, JDG_BENDA_00003332 at 3345. Tait '125 then discloses the following data:

| Lyphomed System: | 60°C |
|---|---|
| PEG 400 20% w/w in PG (Lyphomed most preferred) | orange colour develops (3-6 hours) |
| PEG 400 20%, ethanol 10% w/w in PG (Lyphomed) | orange colour develops (6 hours+) |
| PEG 400 20% ethanol 30% w/w in PG (Lyphomed) | orange colour develops (6 hours+) |

*Id.*

291.    The data in Tait '125 would have taught the POSA away from using the formulations from Alam '286. The POSA would have understood the discoloration described in Tait '125 to render the formulations undesirable and unsuitable; the POSA would have understood discoloration to reflect the degradation or instability of the formulation. In particular,

---

[2] I note that, although Tait '125 is on Dr. Pinal's list of materials considered, he did not cite Tait '125 in his report or provide any opinions regarding that reference. Dr. Pinal has likewise not opined that Tait '125 would have rendered obvious any of the patents-in-suit.

129

EAGLEBEN-SA_00000405

the POSA would have been taught away from using Alam '286's 20% PEG and 80% PG formulation, which exhibited the most rapid discoloration of any of the formulations tested. The POSA also would have been taught away from using Alam '286's formulations composed entirely of non-aqueous solvents, in view of Tait '125's teaching that water slowed down the discoloration in the Alam '286 formulations. The POSA, unlike Dr. Pinal, would not have looked to Alam '286 in isolation, without looking at the discussion and data regarding its formulations in Tait '125 (a reference that Dr. Pinal considered but chose not to address). I understand that the POSA reaches conclusions based on the prior art as a whole, rather than particular portions of the prior art selected with the aid of hindsight.

292.    Further, as Dr. Pinal notes, Alam '286 was published in November 1989, which is over 20 years prior to the priority date. No product had been marketed containing PEG and bendamustine—much less a 90:10 PEG:PG mixture—as Dr. Pinal contends a POSA would have been motivated to pursue, based on the purported teachings of Alam '286. That passage of time indicates that the inventors' work in achieving the claimed subject matter was far from routine and that Dr. Pinal's view of Alam '286 is predicated on hindsight.

293.    For the above reasons, it is my opinion that Alam '286, alone or in view of the knowledge of the POSA, would not have motivated or provided reason for the POSA to use PEG and PG in bendamustine formulations, including in the 90:10 ratio Dr. Pinal asserts to have been obvious. It is also my opinion that Olthoff 1983 in view of Drager '006 and/or Alam '286, alone or in view of the knowledge of the POSA, would not have motivated or provided reason for the POSA to use PEG and PG in bendamustine formulations. And it is my opinion that Drager '006 and Alam '286, alone or in view of the knowledge of the POSA, would not have motivated or

130

EAGLEBEN-SA_00000406

provided reason for the POSA to use PEG and PG in bendamustine formulations, including in the 90:10 ratio Dr. Pinal asserts to have been obvious.

>  **4.    The Other References Cited by Dr. Pinal and Dr. Yates Would Not Have Motivated the POSA To Use Polyethylene Glycol and Propylene Glycol in Bendamustine Formulations.**

294.    Throughout their reports, Dr. Pinal and Dr. Yates appear to rely on other references—in addition to Olthoff 1983, Drager '006, and Alam '286—for the proposition that the POSA would have been motivated to use PEG and PG in bendamustine formulations. Dr. Pinal and Dr. Yates do not articulate how or why the POSA would have combined these references, or why the POSA would have had a reasonable expectation of success in making and using the claimed inventions upon combining the references, and it is unclear to me what combinations of these references Dr. Pinal and Dr. Yates are actually relying on. Moreover, to the extent that Dr. Pinal and Dr. Yates believe any of these references to be part of the "background" knowledge that the POSA would possess, they do not identify which of those references, and what information within the references, comprise that "background" or why the POSA would have known the information contained within those references without the aid of their disclosures. Indeed, as my analysis of Dr. Pinal's and Dr. Yates's arguments demonstrates, Dr. Pinal and Dr. Yates appear to rely on those references as evidence that the POSA would have had specific knowledge or motivations regarding certain claim elements, rather than relying on them for background information. Nevertheless, despite the difficulty of understanding the relevance of those references to the obviousness opinions that Dr. Pinal and Dr. Yates provide, in this section I will attempt to address the other references cited in Dr. Pinal's and Dr. Yates's reports. In my opinion, none of the references that Dr. Pinal or Dr. Yates cite—alone or in combination with any of the other references, including in view of the knowledge of the POSA— would have motivated or provided reason for the POSA to use PEG and PG in formulations with

131

bendamustine. In my opinion, those references would also not have provided the POSA with a reasonable expectation of success in making and using the claimed inventions.

295.    In paragraph 169 of his report, Dr. Pinal opines that the POSA would have "understood that the use of 'polyols' as used in Olthoff was functionally limited to only three types of compounds: (1) Glycerin (a/k/a glycerol), (2) polyethylene glycol (PEG), and (3) propylene glycol (PG)." Pinal Rep. ¶ 169. Apparently to support this opinion, Dr. Pinal cites Nema 1997 (Table 1) and Strickley 2004 (Table IV) for the proposition that "[e]ach of these had previously been approved by the FDA for use in injectable products and as explained above, a formulator would have been focused on such FDA-approved excipients." *Id.* Dr. Yates relies on Strickley 2004 for a similar teaching. *See* Yates Rep. ¶ 76.

296.    I disagree with Dr. Pinal's opinion that Nema 1997 and/or Strickley 2004—even if combined with Olthoff 1983, for some reason that the Defendants' experts do not provide or explain—would have somehow reduced the scope of solvents that the POSA would have considered to just glycerol, PEG, and PG.

297.    First, as I discuss in detail below, the POSA would have considered a wide range of solvents in formulating bendamustine. *See* ¶¶ 702–811. In particular, the POSA would not have been restricted to solvents that had previously been used in injectable products that had been approved by the FDA. *See* ¶¶ 707–716. In addition, the POSA would not have limited her or his consideration to the solvents disclosed in Nema 1997 and/or Strickley 2004, for the reasons discussed above with respect to those references.

298.    Second, as I discuss above, the POSA would not have followed the teachings of Olthoff 1983 for the reasons Dr. Pinal suggests. *See* ¶¶ 199–218. In particular, Olthoff 1983 would not have motivated or provided reason for the POSA to consider only polyols (and

132

exclude, for example, monovalent alcohols like ethanol). *See* ¶ 215. Indeed, in view of the unreliability of the Olthoff 1983 data and methods, and in light of the subsequent Drager '006 disclosures and methods, the POSA would not have followed such teachings. *See* ¶¶ 204–213.

299. Third, Dr. Pinal inexplicably ignores multiple polyols disclosed in both Nema 1997 and Strickley 2004. For example, Strickley 2004 discloses that Cremophor EL had been used in concentrations up to 65% in marketed intravenous infusions. *See* Strickley 2004 at 222, Table VI, JDG_BENDA_00003290 at 3311. Strickley 2004 likewise discloses that Cremophor RH 60 had been used in concentrations up to 20% in marketed intravenous infusions. *Id.* Cremophor EL and Cremophor RH 60 are both polyoexyethylene castor oil derivatives containing three hydroxyl groups per molecule and, as such, are polyols. *See id.* at 211, Table III, JDG_BENDA_00003290 at 3300.[3] Strickley 2004 also discloses that Polysorbate 80 (also known as Tween 80) had been used at a concentration of 100% in a concentrate formulation for intravenous infusion upon dilution. *See id.* at 222–23, Table III, JDG_BENDA_00003290 at 3311–12. Polysorbate 80 is a polyol. *See id.* at 210, Table III, JDG_BENDA_00003290 at 3299. Strickley 2004 also discloses that Solutol HS 15 had been used in intravenous infusions up to a concentration of 50%. *See id.* at 222, Table III, JDG_BENDA_00003290 at 3311. Solutol HS 15 is a polyol. *See id.* at 210, Table III, JDG_BENDA_00003290 at 3299. Nema 1997 lists many of the same excipients as acceptable for use in intravenous administration. *See* Nema 1997 at 167, JDG_BENDA_00002272 at 2273 (listing Tween 80, Tween 20, PEG 40

---

[3] I note that Table III in Strickley 2004 provides the molecular formula for Cremophor RH 40, rather than Cremophor RH 60. The only differences between these compounds is the number of moles of ethyleneoxide (40 versus 60) that are used in the reaction to create the compound. *See* Strickley 2004 at 212, JDG_BENDA_00003290 at 3301 (describing reaction to create Cremophor RH 40). Nema 1997 discloses that Cremophor RH 40 (which is also known as PEG 40 castor oil) had been previously used in a parenteral product at a concentration of 11.5%. *See* Nema 1997 at 167, JDG_BENDA_00002272 at 2273.

133

EAGLEBEN-SA_00000409

castor oil, and PEG 60 castor oil). Dr. Pinal fails to address these and many other excipients anywhere in his report. Dr. Pinal has not opined, for example, that the POSA would have ignored these excipients because they are sometimes classified as "surfactants" rather than "solvents." In my opinion, although these "classifications" can be helpful to the POSA in explaining how an excipient might function in a formulation, they would not have dissuaded the POSA from considering them in formulating bendamustine. It was well known that excipients could have multiple functions in a formulation, and the relevant references disclose explicitly that the excipients discussed in this paragraph could serve as both a surfactant and solvent. *E.g.*, Strickley 2004 at 222, Table VI, JDG_BENDA_00003290 at 3311; *id.* at 209, JDG_BENDA_00003290 at 3298 ("Thus, surfactants can solubilize drug molecules by either a direct cosolvent effect or by uptake into micelles."); Akers, *Excipient-Drug Interactions in Parenteral Formulations*, 91 J. PHARM. SCI. 2283, 2285 (2002) ("Akers 2002"), JDG_BENDA_00000166 at 168. Even if (contrary to my opinion) Olthoff 1983 somehow motivated or provided reason for the POSA to look for "polyols" in Nema 1997 and Strickley 2004, those references would have revealed many more polyols than Dr. Pinal discusses.

300. Fourth, Nema 1997 and Strickley 2004 disclose additional solvents that the POSA would have considered when formulating bendamustine, in addition to those solvents discussed in the previous paragraph. For example, Strickley 2004 notes that DMA, NMP, and DMSO had previously been used in commercially available injectable formulations. *See* Strickly 2004 at 214, JDG_BENDA_00003290 at 3303 ("The water-soluble organic solvents and surfactants used in commercially available injectable formulations are listed in Table VI and include propylene glycol, ethanol, polyethylene glycol 300, polyethylene glycol 400, glycerin, dimethylacetamide (DMA), N-methyl-2-pyrrolidone (NMP; Pharmasolve), dimethylsulfoxide (DMSO), Solutol HS

134

EAGLEBEN-SA_00000410

15, Cremophor EL, Cremophor RH 60, and polysorbate 80."). The POSA would have found these solvents particularly relevant in view of Drager '006, which uses three of those solvents in bendamustine formulations. *See* ¶¶ 77–81. Nema 1997 also discloses that benzyl benzoate—an aprotic solvent—had been used in two injectable products at a concentration of 20%. Nema 1997 at 167, JDG_BENDA_00002272 at 2273. Dr. Pinal fails to explain why the POSA would have followed the teaching of Olthoff 1983 to use "polyols," which, as discussed above, had been discredited by the later disclosures and data in Drager '006, and ignored these other, aprotic solvents, including many of which are specifically recommended by Drager '006. In my opinion, the POSA would have considered these solvents for use in bendamustine formulations.

301. Fifth, Dr. Pinal ignores the teachings of Nema 1997 and Strickley 2004 related to other formulation approaches for intravenous drug products. For example, Strickley 2004 makes clear that aqueous formulations are preferred in intravenous formulations and that techniques such as making pH adjustments or using buffers, co-solvents, and/or complexation agents are all preferred over formulations composed of only non-aqueous solvents. *See* Strickley 2004 at 225–26, JDG_BENDA_000003290 at 3314–15. The POSA would have agreed with this teaching, as I discuss above. Strickley 2004 also discloses many additional formulation approaches that Dr. Pinal ignores, including emulsions, cyclodextrins, and liposomes. *See id.* at 223–24, JDG_BENDA_000003290 at 3312–13. Nema 1997 likewise discusses many "special additives" that had been used to stabilize or solubilize various marketed formulations as of 1997. Nema 1997 at 170–71, JDG_BENDA_00002272 at 2276–77. I discuss many of these formulations approaches in detail below. *See* ¶¶ 625–701. The POSA would not have ignored these approaches, as the Defendants' experts do.

135

302.    Sixth, Dr. Pinal ignores teachings in both Nema 1997 and Strickley 2004 discouraging the use of PEG in commercial products. Nema 1997, for example, states that PEG is less frequently used than would be expected, surmising that "the presence or generation of peroxides in PEGs is a major limitation." Nema 1997 at 167, JDG_BENDA_00002272 at 2273 ("It is surprising to see propylene glycol used more often than polyethylene glycols (PEGs) in spite of its higher myotoxicity and hemolyzing effects. Probably, the presence or generation of peroxides in PEGs is a major limitation." (citations omitted)). Strickley 2004 likewise observes that PEG 300 and 400 are infrequently used in commercial formulations, despite being common in preclinical pharmacokinetic and efficacy studies. Strickley 2004 at 221, JDG_BENDA_00003290 at 3310. For that reason, I also disagree with Dr. Yates's opinion that "Strickley noted in particular that polyethylene glycol and propylene glycol were used frequently." Yates Rep. ¶ 76 (quoting Strickley 2004 at 221). Dr. Yates ignores the distinction drawn by Strickley 2004 that, although PEG 300 and 400 had been "very commonly" used in preclinical pharmacokinetic and efficacy studies, they were rarely included in marketed products. Strickley 2004 at 221, JDG_BENDA_00003290 at 3310. The POSA would have focused on the latter, as reflected by the asserted method of treatment claims and the context of the asserted patents.

303.    For these reasons, I disagree with Dr. Pinal's opinion that Strickley 2004 and Nema 1997, in combination with Olthoff 1983, would have narrowed the POSA's list of solvent choices to glycerol, PG, and PEG.

304.    To support his argument that the POSA would have confined herself or himself to PG, PEG, and glycerol, Dr. Pinal also cites to paragraph 67 of Brittain 2006. *See* Pinal Rep. ¶ 169. I discuss this paragraph above. *See* ¶ 61. That paragraph in Brittain 2006 would not have

136

caused the POSA to limit her or his consideration of solvents to PG, PEG, and glycerol. First, the list of solvents in that paragraph of Brittain 2006 is explicitly exemplary. *See* Brittain 2006 ¶ 67, JDG_BENDA_00000375 at 387 ("The liquid carrier or vehicle can be a solvent or liquid dispersion medium comprising, for example, water, ethanol, a polyol such as glycerol, propylene glycol, or liquid polyethylene glycols and the like, vegetable oils, nontoxic glyceryl esters, and suitable mixtures thereof."). Second, the discussion in Brittain 2006 concerns the "ultimate dosage form," which the POSA would have understood to be the solution to be infused in the patient. The POSA would not have viewed this discussion in Brittain 2006 to be related to shelf-stable, liquid bendamustine formulations. The POSA would have found the disclosures of other references—for example, Drager '006—to be more relevant in this regard. Third, the discussion in paragraph 67 of Brittain 2006 does not appear to be based on any actual experiments that were conducted; for example, Brittain 2006 does not disclose any examples in which bendamustine was admixed into a liquid carrier suitable to be used as an ultimate dosage form, other than the administration directions for Ribomustin® (that is, dilution into 500 mL of saline). *See* Brittain 2006 ¶¶ 7–9, JDG_BENDA_00000375 at 382. For these reasons, the POSA would not have viewed the combination of Olthoff 1983 and Brittain 2006 as limiting the choice of solvents to simply PG, PEG, and glycerol.

305. Elsewhere in his report, Dr. Pinal cites to Brittain 2006 for the proposition that paragraph 67 teaches that "[bendamustine] was already known to be soluble in PEG." Pinal Rep. ¶ 187 (citing Brittain 2006 ¶ 67). I disagree with Dr. Pinal's reading of paragraph 67 of Brittain 2006. That paragraph says nothing about the solubility of bendamustine in PEG. Indeed, elsewhere in his report, Dr. Pinal appears to acknowledge that neither Brittain 2006 nor any other prior art discloses the solubility of bendamustine in PEG. *See* Pinal Rep. ¶ 194 ("The degree of

137

solubility of [bendamustine] in PEG 400 was not reported in Olthoff or other prior art."). As I explain in the previous paragraph, Brittain 2006 never discloses any examples in which a bendamustine formulation was ever admixed in anything other than saline. The POSA would not have assumed or understood that Brittain 2006 had actually performed any experiments to determine the solubility of bendamustine in formulations containing any PEG, much less in solutions of 100% PEG. Indeed, as I explained in the previous paragraph, the POSA would have understood that paragraph 67 of Brittain 2006 was referring to the ultimate dosage form to be delivered to the patient. The POSA would have known that every marketed bendamustine formulation as of the priority date for the '707 patent family involved dilution into 500 mL. *See, e.g.*, Ribomustin® Product Monograph (2005) at 9, JDG_BENDA_00000001 at 9; Treanda® Label (2009) at 2, JDG_BENDA_00006932 at 6933. As such, Brittain 2006's discussion of an ultimate dosage form does not suggest that bendamustine is particularly soluble in any of the listed solvents (including PEG), given the substantial dilution that would likely precede such an administration.

306. Dr. Pinal also cites paragraph 67 of Brittain 2006 for the proposition that the "POSA would have particularly noted that the PEG + PG combination had already been suggested for use in nonaqueous solvent formulations for the injection of [bendamustine]." Pinal Rep. ¶ 187. Notably, Dr. Pinal does not actually opine that paragraph 67 of Brittain 2006 would have motivated or provided reason for the POSA to use a combination of PEG and PG in bendamustine formulations. In my opinion, paragraph 67 of Brittain 2006 would not have provided the POSA with such a motivation or reason. The teachings of Brittain 2006 that Dr. Pinal cites are entirely focused on <u>lyophilized</u> bendamustine formulations, not <u>liquid</u> bendamustine formulations. *See, e.g.*, Brittain 2006, abstract, JDG_BENDA_00000375 at 375

138

("The present invention provides pharmaceutical formulations of lyophilized bendamustine suitable for pharmaceutical use."). As such, to the extent the POSA would have followed Brittain 2006, it would have taught the POSA to use lyophilized bendamustine formulations, not liquid bendamustine formulations. Moreover, despite using a number of organic solvents in pre-lyophilization solutions of bendamustine, Brittain 2006 does not use any co-solvent systems of multiple organic solvents and does not use PEG in any capacity. *See, e.g.*, Brittain 2006, Figures 2–4, JDG_BENDA_00000375 at 377–379. In short, nothing in Brittain 2006 would have guided the POSA toward using a combination of PEG and PG. Paragraph 67 of Brittain 2006 is no different. Although the paragraph mentions "suitable mixtures thereof," the POSA would have viewed this as mere "boilerplate," rather than an explicit teaching to use particular combinations of solvents. *See* Brittain 2006 ¶ 67, JDG_BENDA_00000375 at 387 ("The liquid carrier or vehicle can be a solvent or liquid dispersion medium comprising, for example, water, ethanol, a polyol such as glycerol, propylene glycol, or liquid polyethylene glycols and the like, vegetable oils, nontoxic glyceryl esters, and suitable mixtures thereof."). There is no disclosure that any particular mixture is "suitable," let alone the unexemplified, undisclosed, and untested mixture of PEG and PG. Brittain 2006 does not exemplify any combinations of solvents in that list or disclose any of them as preferred, much less combinations of PEG and PG. Moreover, as explained above, the POSA would have interpreted this paragraph as referring to the ultimate dosage form to be administered to the patient, rather than as referring to the pre-dilution formulation. Dr. Pinal appears to acknowledge this fact. *See* Pinal Rep. ¶ 187 ("The POSA would have particularly noted that the PEG + PG combination had already been suggested for use in nonaqueous solvent formulations for the <u>injection</u> of [bendamustine]." (emphasis added)). The POSA would have likewise known that every marketed bendamustine formulation at the

139

priority date for the '707 patent family was administered with 500 mL of saline. *See, e.g.,* Ribomustin® Product Monograph (2005) at 9, JDG_BENDA_00000001 at 9; Treanda® Label (2009) at 2, JDG_BENDA_00006932 at 6933. As such, to the extent paragraph 67 of Brittain 2006 teaches mixtures at all, the POSA would have assumed that the mixture would contain large amounts of water. Moreover, since the relevant disclosure in paragraph 67 of Brittain 2006 is referring to the ultimate dosage form—rather than a formulation intended to be stored for the shelf life of the product—the POSA would not have been motivated or had reason to follow this disclosure in formulating a shelf-stable bendamustine product.

307.    In various places throughout his report, Dr. Pinal opines that the POSA would have been motivated to use PEG for biocompatibility reasons. For example, Dr. Pinal opines that the "POSA would have been motivated to use PEG as a solvent, based on the effect of PEG (or rather the lack of one) on the human body when selecting a solvent system." Pinal Rep. ¶ 174. As with other arguments I attempt to address, Dr. Pinal does not present this opinion as part of a combination of references that he asserts would have rendered the asserted claims obvious, and he does not provide any opinion or explain why the POSA operating in the context of bendamustine formulations would have been motivated or had reason to modify (for example) the formulation he improperly selected from Drager '006 on the basis of the effect of PEG on the human body.

308.    Dr. Pinal cites Mottu 2000 for the proposition that PEGs are "very low toxicity compounds" that can be "used for intravenous administration up to a concentration of 50%." Pinal Rep. ¶ 175 (citing Mottu 2000 at 459). Dr. Pinal also cites Strickley 2004 for the proposition that "PEG was often mixed with PG to provide a more biocompatible solvent system" and Akers 2002 for the proposition that the "hemolytic effects of propylene glycol can

EAGLEBEN-SA_00000416

be alleviated by the addition of either a tonicifying agent or polyethylene glycol 400." Pinal Rep. ¶ 186; *see also* Pinal Rep. ¶ 188 ("among the organic solvents used in injectable products, PEG is the one with the higher local tolerability [than PG]").  As with other arguments I attempt to address, Dr. Pinal does not present this argument as part of a combination of references that he asserts would have rendered the asserted claims obvious, and he does not provide any opinion or explain why the POSA operating in the context of bendamustine formulations would have been motivated or had reason to modify—for example, the formulation he improperly selected from Drager '006 on the basis of the effect of PEG on the human body.

309.    I disagree with Dr. Pinal that the POSA would have been motivated by biocompatibility or hemolysis concerns to choose PEG over PG as a solvent.  The POSA would have been aware that every marketed bendamustine formulation at the priority date for the '707 patent family was diluted into 500 mL of saline.  *See, e.g.*, Ribomustin® Product Monograph (2005) at 9, JDG_BENDA_00000001 at 9; Treanda® Label (2009) at 2, JDG_BENDA_00006932 at 6933.  The POSA would have further understood that the Drager '006 inventors envisioned dilution into 500 mL of saline, as evidenced by their admixture study. *See* Drager '006, 10:38–63, JDG_BENDA_00000990 at 1000.  As such, when creating a new bendamustine formulation, the POSA would have likewise expected it to be diluted into 500 mL of saline.  At that level of dilution, hemolysis and biocompatibility would not have been a serious concern for the POSA.  Assuming (as Dr. Pinal does, *see* Pinal Rep. ¶ 180) a bendamustine concentration in the liquid concentrate of 25 mg/mL, a dosage of 120 mg/m$^2$, and a standard body surface area of 2.0m$^2$, the POSA would only have needed to add about 10 mL of the liquid concentrate to the 500 mL infusion bag.  Even if the liquid concentrate were composed entirely of PG, the concentration of PG in the diluted bag would only be about 2%.

141

EAGLEBEN-SA_00000417

310.    Dr. Pinal cites no evidence suggesting that a concentration of 2% PG would have posed biocompatibility or hemolysis risks to the patient.  To the contrary, in my opinion, at that level of dilution, the POSA would not have been seriously concerned about biocompatibility or hemolysis problems.  Given the difficulty in preparing a stable liquid formulation of bendamustine, and given these dilution levels, the biocompatibility concerns cited by Dr. Pinal would not have been a significant reason or motivation for the POSA to choose a particular solvent.  For example, Strickley 2004 discloses an $LD_{50}$ (which Strickley 2004 defines as the solvent concentration that induces hemolysis in 50% of healthy red blood cells) for PG of 5.7%.  *See* Strickley 2004 at 214, JDG_BENDA_00003290 at 3303.  Indeed, as described by Fu and colleagues, "a 2.0% propylene glycol solution in water is iso-osmotic to human red blood cells."  Fu et al., *The Biocompatibility of Parenteral Vehicles—In Vitro/In Vivo Screening Comparison and the Effect of Excipients on Hemolysis*, 41 J. PARENTERAL SCI. & TECH. 164, 166 (1987), JDG_BENDA_00005789 at 5791 ("Fu 1987").  The POSA would have been aware of marketed pharmaceutical products with infusion concentrations of PG well over 2.0%.  *See, e.g.*, Strickley 2004 at 221, JDG_BENDA_00003290 at 3310 (describing infusion of Alkeran with a concentration of about 6% PG); *id.* at 216, JDG_BENDA_00003290 at 3305 (describing infusion of Diazepam with a concentration of about 40% PG); *id.* at 214, JDG_BENDA_00003290 at 3303 (describing bolus injection of phenobarbitol with a concentration of about 68% PG).  For these reasons, the POSA would have had no motivation or reason to add PEG to Olthoff 1983's PG formulation—or any other bendamustine formulation—based on considerations of hemolysis or biocompatibility.

142

EAGLEBEN-SA_00000418

311.    On this point, I agree with Dr. Yates. He has similarly opined that the POSA would have not have been concerned about infusing PG at concentrations above 2.0%. *See* Yates Rep. ¶¶ 96–97, 103–104.

312.    Biocompatibility concerns also would not have motivated or provided reason for the POSA to use PEG because the POSA would have expected the liquid concentrate to be diluted into saline. Every marketed bendamustine formulation as of the priority date for the '707 patent family had been diluted into 500 mL of either 0.9% sodium chloride or 2.5% Dextrose/0.45% sodium chloride. *See, e.g.*, Ribomustin® Product Monograph (2005) at 9, JDG_BENDA_00000001 at 9; Treanda® Label (2009) at 2, JDG_BENDA_00006932 at 6933. In other words, every marketed bendamustine formulation had been infused in a diluent that contained sodium chloride. The POSA would have been aware that the addition of tonicifying agents, such as sodium chloride, could alleviate potential hemolysis issues in formulations of PG. *See* Mottu 2000 at 458, JDG_BENDA_00005839 at 5841 ("Addition of sodium chloride prevented the haemolysis of human red blood cells (RBCs) in solutions containing up to 45% propylene glycol."); Strickley 2004 at 214, JDG_BENDA_00003290 at 3303; Fu 1987 at 167, JDG_BENDA_00005789 at 5792 (plotting decrease in hemolysis as a function of sodium chloride concentration in a 15% PG formulation). Dr. Pinal has not opined on the effect of sodium chloride on hemolysis in the claimed formulations. To the extent that his opinion is that the PEG/PG formulation he asserts to be obvious would not have been diluted before administration to patients, I disagree, given the asserted method of treatment claims and context of the asserted patents. In my opinion, the expected dilution of the formulations into saline would have further diminished any concerns the POSA might have had about hemolysis using

143

EAGLEBEN-SA_00000419

solvents such as PG.  As such, the POSA would not have been motivated or had reason to use PEG to partially replace PG based on considerations of hemolysis or biocompatibility.

313.    Even if (contrary to my opinion) the POSA were concerned about biocompatibility or hemolysis issues with respect to using PG in highly diluted bendamustine formulations, the POSA would have known that there were many options other than PEG for improving biocompatibility.  For example, Strickley 2004 discloses that the $LD_{50}$ of DMA is higher than the $LD_{50}$ of PEG 400 with respect to hemolysis, indicating that DMA is the more biocompatible solvent in this respect.  *See* Strickley 2004 at 214, JDG_BENDA_00003290 at 3303 ("Using the hemolysis method, the following $LD_{50}$s were measured: 37% DMA, 30% PEG 400 . . . . Therefore, although propylene glycol is the most common organic solvent in injectable formulations, it is clearly not as biocompatible as PEG 400, ethanol, or DMA.").  As such, even if the POSA were motivated or had reason to modify the Olthoff 1983 formulation to make it more biocompatible (which the POSA would not have been), the POSA would have known that solvents other than PEG, including DMA, would have been suitable alternatives.  Moreover, to the extent the POSA would have been motivated or had reason to start with the Drager '006 formulation containing 66% DMA and 34% PG, the POSA would have had no hemolysis-based reasons for substituting PEG 400 for DMA.  To the contrary, the POSA, motivated by this concern, would have been dissuaded from replacing DMA with PEG in the Drager '006 formulation, given that PEG 400 has a lower $LD_{50}$ for hemolysis compared to DMA.

314.    Dr. Pinal also cites Strickley 2004 for its discussion of a formulation for melphalan.  *See* Pinal Rep. ¶ 186.  In particular, Dr. Pinal states that "Strickley 2004 discloses the use of 60% propylene glycol as a solubilizer for the nitrogen mustard melphalan hydrochloride, and taught that a co-solvent solubilization technique is beneficial and sufficient

144

for this nitrogen mustard." Pinal Rep. ¶ 186.  I disagree with Dr. Pinal that the POSA would have been motivated or had reason to follow that melphalan formulation in any respect, and I disagree with Dr. Pinal that that melphalan formulation would have motivated or provided reason for the POSA to use a combination of PEG and PG.

315.    The formulation that Dr. Pinal appears to be referring to is for the product Alkeran®. *See* Strickley 2004 at 217, JDG_BENDA_00003290 at 3306.  However, as Strickley 2004 explains, the Alkeran® formulation is not a liquid concentrate.  Rather, it is a lyophilized powder, and the liquid containing 60% PG—which Dr. Pinal refers to—is the diluent that is used to reconstitute the lyophilized powder. *See id.* at 221, JDG_BENDA_00003290 at 3310 ("Melphalan hydrochloride . . . is formulated in Alkeran as a lyophilized powder that is reconstituted to 5 mg/ml with a supplied diluent of water, 60% propylene glycol, and 5% ethanol which is further diluted 10-fold with saline and then administered by IV infusion.").  Strickley 2004 does not suggest that this diluent is an appropriate liquid for preparing a stable liquid bendamustine formulation, and the POSA would have had no reason to rely on it for that purpose.  As such, the POSA would not have been guided by the Alkeran® formulation to use PG, much less PEG and PG together, in a shelf-stable liquid concentrate.  Rather, to the extent it is relevant at all, the Alkeran® formulation would have encouraged the POSA to make a lyophilized version of bendamustine.

316.    Moreover, the POSA would have understood that there were salient chemical differences between melphalan and bendamustine.  In particular, whereas bendamustine contains a carboxylic acid moiety, melphalan contains an amino acid moiety.  That difference is depicted below:

145

EAGLEBEN-SA_00000421

| Bendamustine | Melphalan |
|---|---|
| | |

317.    I understand that Dr. Anslyn has opined that POSA would have understood that the amino acid moiety in melphalan would have been less reactive than the carboxylic acid moiety in bendamustine with respect to esterification. *See* Anslyn Rep. ¶¶ 237–240.

318.    In view of this difference between bendamustine and melphalan, the use of PG (or ethanol) in the Alkeran® diluent would not have motivated or provided a reason for the POSA to use PEG, PG, or any other organic solvent in a bendamustine formulation. The POSA would have understood that, even if the melphalan molecule might be stable for a short period of time in the context of reconstitution with a PG-based diluent, the difference in chemical reactivity between bendamustine and melphalan would mean that bendamustine might not be similarly stable, even for the purpose of dilution. As such, I disagree with Dr. Pinal that the Alkeran® diluent disclosed in Strickley 2004 would have provided any motivation or reason for the POSA to choose a particular solvent in a liquid bendamustine formulation.

319.    Dr. Yates has opined that the POSA would have noted that PG and PEG had been used as co-solvents in a diclofenac formulation. *See* Yates Rep. ¶ 74. For that proposition, Dr. Yates cites U.S. Patent No. 4,711,906. *See* JDG_BENDA_00003439 ("Von Stetten 1987"). Von Stetten 1987 concerns liquid compositions of diclofenac. Von Stetten 1987, abstract, JDG_BENDA_00003439 at 3439. Von Stetten 1987 was submitted to the Examiner during

146

EAGLEBEN-SA_00000422

prosecution of the '707 patent family, and the Examiner cited that reference during the prosecution of some of the patents in that family.

320.    I have illustrated the molecular structures of bendamustine versus diclofenac below.

| Bendamustine | Diclofenac |
| --- | --- |
| | |

321.    As Dr. Yates acknowledges, diclofenac is a non-steroidal anti-inflammatory drug. Yates Rep. ¶ 74.  Dr. Yates does not offer any rationale for why the POSA would have consulted Von Stetten 1987 when formulating compositions of bendamustine.  In my opinion, given the chemical differences between bendamustine and diclofenac, the POSA would not have believed that diclofenac formulations would provide much information about the stability of bendamustine in PEG or PG.  In particular, diclofenac lacks a nitrogen mustard moiety.  As such, the POSA would not have expected diclofenac to behave similarly to bendamustine in formulations.  There is no reason, other than hindsight, for the POSA to have relied on this formulation of diclofenac, amongst the thousands of formulations disclosed in the prior art, in selecting a solvent system to use for a liquid bendamustine formulation.

322.    Dr. Yates points out that the compositions disclosed in Von Stetten 1987 include PEG and PG.  Yates Rep. ¶ 74.  Dr. Yates fails to note, however, that the compositions of Von

147

EAGLEBEN-SA_00000423

Stetten 1987 also contain substantial amounts of water. Von Stetten 1987, 16:28, JDG_BENDA_00003439 at 3440 (disclosing that the formulations of the invention include "10–70 weight %, preferably 20–50 weight % of a mixture of (a) propylene glycol and (b) polyethylene glycol and 90–30 weight %, preferably 80–50 weight % of water" (emphasis added)). All of the examples in Von Stetten 1987 likewise contain water. *See id.*, 3:10–4:18, JDG_BENDA_00003439 at 3441. If the POSA would have been motivated or had reason to follow Von Stetten 1987 in formulating bendamustine (which the POSA would not have been), that reference therefore would have motivated the POSA to make compositions with at least 50% water. Moreover, the POSA would have understood that the substantial amount of water in the compositions of Von Stetten 1987 would have significantly impeded the esterification of diclofenac by PEG or PG. *See* ¶ 127 (explaining that water hydrolyzes ester bonds). The POSA would have expected substantially more esterification to occur in a formulation composed entirely of PEG and PG, with no water. As such, Von Stetten 1987's aqueous-based diclofenac formulation would not have motivated or provided reason for the POSA to make a liquid composition of bendamustine, PEG, and PG. Having chosen to rely on the diclofenac formulation rather than any other formulation in the prior art, as Dr. Yates assumes, the POSA would not have then chosen to change that formulation. Had the POSA found the diclofenac formulation irrelevant and/or unsuitable for bendamustine—and the POSA would have considered the formulation both irrelevant and unsuitable—the POSA would not have used it.

323. Finally, the POSA would have noted that Von Stetten 1987 provides very little information about stability or solubility. The Von Stetten 1987 inventors only tested the stability of the formulations for 14 days, and only qualitative stability results were provided. *See* Von Stetten 1987, 3:10–4:18, JDG_BENDA_00003439 at 3441. These results would not have

148

provided the POSA any basis to believe that a PEG, PG, and bendamustine formulation would have been stable or that the bendamustine would be sufficiently soluble in such a formulation.

324.    Dr. Yates also opines that the POSA would have been motivated to use a combination of PEG and PG based on Shah et al., *Physical, Chemical, and Bioavailability Studies of Parenteral Diazepam Formulations Containing Propylene Glycol and Polyethylene Glycol 400*, 17 DRUG DEV. & INDUS. PHARM. 1635 (1995) ("Shah 1991"), JDG_BENDA_00003229. *See* Yates Rep. ¶ 1991. Similar to his citation of the Von Stetten 1987 patent, Dr. Yates does not provide any rationale for why the POSA would have looked to Shah 1991 in formulating liquid compositions of bendamustine. Rather, Dr. Yates's citation of these papers appears to be a hindsight-based selection due to their use of PEG and PG. As I explain at length below, there were many additional solvents and other formulation options that would have been available to the POSA, which Dr. Yates ignores entirely. *See* ¶¶ 625–811.

325.    In any event, Shah 1991 would not have motivated or provided reason for the POSA to use the claimed bendamustine formulations. The POSA would have understood that the chemical structures of diazepam and bendamustine are substantially different, and the POSA would not have expected the stability or solubility of bendamustine in PEG and/or PG to bear any relation to the stability or solubility of diazepam in those solvents:

| Bendamustine | Diazepam |
|---|---|
| | |

149

326.    As the above illustrations make clear, diazepam does not contain either a carboxylic acid or a nitrogen mustard moiety. As such, the POSA would not have expected the degradation of diazepam to resemble, or be relevant to, that of bendamustine. Dr. Yates has not offered an opinion to the contrary.

327.    Similar to Von Stetten 1987, the formulations in Shah 1991 contained substantial amounts of water. Shah 1991 at 1639, JDG_BENDA_00003229 at 3234. If the POSA were motivated to follow Shah 1991 (which the POSA would not have been), that reference would have encouraged the POSA to use aqueous-organic co-solvent systems. Having chosen (for no reason other than hindsight) the Shah 1991 formulation amongst the thousands of formulations disclosed by the prior art as the basis to select a solvent system for liquid formulations of bendamustine (contrary to my opinion), the POSA would have used the aqueous-organic co-solvent disclosed in Shah 1991. If the POSA would have considered the formulations of Shah 1991 to be irrelevant and/or unsuitable for liquid bendamustine formulations (and the POSA would have considered them irrelevant and unsuitable), the POSA would not have used the formulations. The POSA, without the benefit of hindsight, would not have used the formulations and then changed them.

328.    The formulations in Shah 1991 replaced some or all of the PG in a marketed diazepam formulation with PEG 400. *See* Shah 1991 at 1639, JDG_BENDA_00003229 at 3234. The authors found that this substitution appeared to <u>increase</u> the degradation of the formulation. *See id.* at 1650, JDG_BENDA_00003229 at 3245 (calculating a shelf life of less than 180 days for the PEG formulation and noting that the marketed product has a shelf life of 2 years). If the POSA thought that the stability of diazepam and bendamustine were related (which Dr. Yates

150

EAGLEBEN-SA_00000426

has not opined on, but appears to assume without basis), this result would have taught the POSA away from using PEG in liquid bendamustine formulations. In sum, to the extent that Shah 1991 is relevant at all, Shah 1991 would not have motivated or provided reason for the POSA to practice the claimed formulations of bendamustine, PEG, and PG.

329. For the above reasons, it is my opinion that none of the references cited by Dr. Pinal or Dr. Yates—alone or in combination with any other reference, including the knowledge of the POSA—would have motivated or provided reason for the POSA to use PEG and PG in bendamustine formulations.

**5.    The Prior Art As a Whole Would Have Taught the POSA Away from Using Polyethylene Glycol and Propylene Glycol with Bendamustine.**

330. In my opinion, the prior art as a whole would have dissuaded the POSA from using PEG—and/or a combination of PEG and PG—in bendamustine formulations.

331. The POSA would have understood that PEG could form an ester with bendamustine. In particular, the POSA would have understood that bendamustine contains a carboxylic acid that could form an ester bond with the two primary alcohol groups in PEG. *See* Zimmerman 1977 at 430, JDG_BENDA_00003450 at 3453 (discussing the mechanism of esterification); Rowe 2009 at 520, JDG_BENDA_000006557 at 6567 ("The chemical reactivity of polyethylene glycols is mainly confined to the two terminal hydroxyl groups, which can either be esterified or etherified."). Dr. Pinal has acknowledged that the POSA would have understood that PEG could form an ester with bendamustine. *See* Pinal Rep. ¶ 77 ("[P]olyols (like PG and PEG) can degrade [bendamustine] by forming esters with it.").

332. Drager '006 would have taught the POSA, in the context of attempting to prepare stable liquid bendamustine formulations, to avoid solvent systems composed principally of protic solvents containing –OH groups, which are the type of solvents capable of forming esters with

151

EAGLEBEN-SA_00000427

bendamustine. Drager '006, 3:21–4:24, JDG_BENDA_00000990 at 997. Dr. Pinal acknowledges that the POSA would have tried to minimize ester formation when choosing a solvent. *See, e.g.*, Pinal Rep. ¶ 172 ("[T]he POSA would know that on a per molecule basis, the choice of glycerol would increase by 50% the exposure of [bendamustine] to –OH groups. This fact alone would give the POSA strong motive to select PG over glycerol."); *id.* ¶ 175 ("For the purposes of providing a [bendamustine] liquid formulation, the POSA would have preferred PEG 400 to PEG 300 because PEG 400 has a lower weight percentage of the –OH groups, which are involved in the esterification of [bendamustine].").

333. The POSA's understanding that PEG could esterify with bendamustine would have dissuaded the POSA from using that solvent. The POSA would have understood from Drager '006 that there were multiple other –OH-free solvents that were not capable of forming these esters, which would have been preferred over using a solvent like PEG that could form esters with bendamustine. I discuss those and other solvents that the POSA would have considered below. *See* ¶¶ 702–811. The POSA also would have understood that there were many formulation options—other than using a liquid composition of non-aqueous, organic solvents—that would have been expected to be more successful. I discuss many of those other options below. *See* ¶¶ 625–701.

334. The POSA also would have been particularly concerned about the possibility of forming PEG esters of bendamustine. The POSA would have been aware that a bendamustine molecule with a PEG molecule attached to it could exhibit substantially different properties— and have a different fate *in vivo*—than the native bendamustine molecule. The POSA would have understood a bendamustine-PEG degradant to be akin to a PEGylated form of bendamustine. *See* Bailon et al., *PEG-Modified Biopharmaceuticals*, 6 EXPERT OPINION DRUG.

152

EAGLEBEN-SA_00000428

DELIVERY 1, 1 (2009) ("Bailon 2009") ("PEGylation is a process in which one or more units of chemically activated polyethylene glycol reacts with a biomolecule, usually a protein, peptide, small molecule or oligonucleotide, creating a putative new molecular entity possessing physiochemical and physiological characteristics that are distinct from its predecessor molecules."). Indeed, PEGylated molecules can be created by reacting the alcohol group in the PEG with the carboxylic acid group in a molecule. *See id.* at 2 ("[S]mall molecules may contain functional groups such as carboxylic acid (-COOH) or hydroxyl (-OH) or sulfhydryl (-SH) or amine (-NH2) suitable for PEGylation."); Haverstick et al., *Conjugation To Increase Treatment Volume During Local Therapy: A Case Study with PEGylated Camptothecin,* 18 BIOCONJUGATE CHEM. 2115, 2115–16 (2007) ("Haverstick 2007") ("In the third case, the drug is coupled by an ester bond, which hydrolyzes under physiological conditions with a half-life of 1 to 3 days.").

335.    PEGylated molecules tend to remain in the patient's body for a longer period of time, increasing their biological effect. *See* Bailon 2009 at 1 ("Pegylated biomolecules distinguish themselves from their predecessor molecules by possessing more useful clinical properties, such as increased stability and solubility, reduced renal clearance, longer circulating half-life, reduced immonogenicity and antigenicity, as well as protection from proteolytic degradation; all of which contribute to the increased potency compared to the unmodified native molecule."). In addition to a longer circulating half-life, PEGylated molecules can also be expected to be more likely to accumulate in tissues and organs. *See id.* at 6 ("PEG accumulates in tissues/organ (muscles, skin, bone and to a higher extent in the liver), irrespective of [molecular weight]."). This property has led some groups to try to use PEGylated molecules to preferentially target solid tumors. *See id.* at 7 ("PEG promotes accumulation of PEG-modified drugs (e.g., anticancer agents) into permeable hypervasculature of tumors via [the enhanced

153

EAGLEBEN-SA_00000429

permeability and retention] effect. Maeda also observed that accumulation of polymer-based drug is > 1000x in tumor than in plasma." (citations omitted)). Furthermore, Haverstick and colleagues found that PEGylated camptothecin could substantially increase the penetration of the drug into the brain, particularly using a so-called "case 3 conjugate," which corresponds to PEGylation via ester linkage. Haverstick 2007 at 2120 (noting an 11-fold increase with the "case 3 conjugate" versus the unconjugated drug).

336. The POSA would have been concerned about PEGylated bendamustine molecules. Although PEGylation can be a useful tool to create new molecules with improved properties in certain circumstances, the presence of an unpredictable amount of PEGylated bendamustine in a bendamustine product would be undesirable in the present context. The PEGylated bendamustine molecules could have longer half-lives, effectively increasing the total exposure of the patient to bendamustine. The POSA would have been concerned that this could cause an increase in exposure-related side effects. Also, the PEGylated bendamustine could enter different tissues than the native bendamustine. This could cause changes in efficacy, for example, by decreasing the amount of bendamustine in the bloodstream. It could also cause changes in toxicity, for example by increasing the amount of bendamustine in certain tissues where the POSA would not want bendamustine to be present or accumulate, such as the brain. I understand that there were reports in the literature of bendamustine-related neurotoxicity. *See* Derendorf Rep. ¶¶ 128–131. The POSA's concern about such toxicities would have been magnified by the possibility of creating PEGylated bendamustine during long term storage. Penetration into different tissues could also affect the degradation and eliminate rates of bendamustine. For example, the POSA would have understood that bendamustine in tissue might hydrolyze more slowly than bendamustine in the blood. The POSA also would have been

154

concerned that the target cells for bendamustine are in the blood, rather than the tissue, and so PEGylated bendamustine could yield differences in efficacy and other properties that would have been considered undesirable. *See* Treanda® Label at 1 (Apr. 2009), JDG_BENDA_00006932 at 6932. I do not understand the Defendants' experts to contend otherwise.

337. The POSA would have understood that the bond between the bendamustine molecule and the PEG molecule was cleavable. In particular, the POSA would have understood that the PEG-bendamustine ester bond could be hydrolyzed in the presence of water. *See* ¶ 127; Zimmerman 1977 at 430, JDG_BENDA_00003450 at 3453. Moreover, the POSA would have understood that blood is composed mainly of water, and thus would have expected PEGylated bendamustine to eventually hydrolyze and release the bendamustine molecule. This would not have allayed the POSA's concerns, however, because the POSA would not have known the rate at which the PEGylated bendamustine molecule would hydrolyze. For example, the camptothecin molecules PEGylated via an ester bond in Haverstick 2007 hydrolyzed over the course of 1 to 3 days. *See* Haverstick 2007 at 2115 ("In the third case, the drug is coupled by an ester bond, which hydrolyzes under physiological conditions with a half-life of 1 to 3 days."). This time course of hydrolysis is substantially longer than the elimination rate of bendamustine, which has been reported to have a half-life of less than an hour in patients. *See* Treanda® Label at 10 (Apr. 2009), JDG_BENDA_00006932 at 6941 ("Bendamustine clearance in humans is approximately 700 mL/minute. After a single dose of 120 mg/m$^2$ bendamustine IV over 1-hour the intermediate $t_{1/2}$ of the parent compound is approximately 40 minutes."); Derendorf Rep. ¶ 48. As such, the POSA would have feared that the hydrolysis of the PEG-bendamustine bond would be too slow to prevent the potential changes in pharmacokinetics, penetration, and toxicity caused by the PEGylated forms of bendamustine. This was precisely the result reported by the

155

Haverstick 2007 authors, who found that the conjugate of camptothecin that was PEGylated via a hydrolysable ester bond yielded a substantial increase in tissue penetration. *See* Haverstick 2007 at 2120 (observing that case 3 conjugate could increase "volume of treatment" by a factor of 11). The POSA would have understood that, even after the bendamustine-PEG bond is hydrolyzed, the bendamustine itself would remain active. In the present context, in which the POSA sought to modify the formulation of an existing approved, effective product (Treanda®), the POSA would have considered these potential changes to the pharmacokinetics, tissue distribution, toxicity, and efficacy of bendamustine that PEG had the capacity to introduce to be very problematic and another reason that PEG would have been unsuitable in these circumstances.

338.    For the above reasons, the POSA would have been dissuaded from using PEG as a solvent for fear of creating PEG esters of bendamustine.

339.    The POSA also would have been dissuaded from using PEG because of its tendency to form degradants via oxidative breakdown. Dr. Pinal cites various materials that he opines demonstrate PEG's tendency to oxidize. *See, e.g.*, Pinal Rep. ¶¶ 77–78, 117, 210, 236 (citing Lloyd 1956, Horie 1990, Rowe 2009); Lloyd, *The Low Temperature Autoxidation of Diethylene Glycol*, 78 J. AM. CHEM. SOC. 72, 72 (1956) ("Lloyd 1956"), JDG_BENDA_00005809 at 5810 (discussing the oxidation of diethylene glycol and the resultant formation of formic acid);  Horie, MATERIALS FOR CONSERVATION: ORGANIC CONSOLIDANTS, ADHESIVES AND COATINGS at 118 (1987) ("Horie 1987"), JDG_BENDA_00008080 at 8087 ("PEG oxidizes rapidly with a severe drop in molecular weight once exposed to air, a process accelerated by light."); Rowe 2009 at 520, JDG_BENDA_00006557 at 6567 ("The chemical reactivity of polyethylene glycols is mainly confined to the two terminal hydroxyl groups, which

156

EAGLEBEN-SA_00000432

can be either esterified or etherified. However, all grades can exhibit some oxidizing activity

owing to the presence of peroxide impurities and secondary products formed by autoxidation.").

340.    I understand that, in discussing antioxidants and PEG, Dr. Pinal has also cited Wu

et al., *Reactive Impurities in Excipients: Profiling, Identification and Mitigation of Drug-*

*Excipient Incompatibility*, 12 AAPS PHARMSCITECH 1248 (2011) ("Wu 2011"),

JDG_BENDA_00005875. *See* Pinal Rep. ¶ 236.  According to its front-page information, Wu

2011 was first published online on September 27, 2011, which is after the filing of the non-

provisional application of the '707 patent family.  My understanding is that Wu 2011 is thus not

prior art to the '707 patent family under any of the priority dates discussed above. *See* ¶ 34.

341.    Dr. Pinal has opined that PEG (as well as PG) would have been prone to

autoxidation and that the oxidation products of PG and PEG would have increased the

degradation of bendamustine by acidifying the formulation and accelerating the Fischer

esterification reaction. *See, e.g.*, Pinal Rep. ¶ 77 ("The generation of acids as a result of

oxidation of PG was well known. . . . Moreover, PEG also produces formic acid when it

oxidizes. . . . The POSA would recognize a potential self-propagating problem: polyols (like PG

and PEG) can degrade [bendamustine] by forming esters with it.  Polyols themselves degrade

(oxidize) over time, which produces acidic products.  In turn, the acidic products from the

degradation of the solvents accelerates their reaction with (degradation of) [bendamustine].  The

presence of these acids would catalyze the Fischer esterification reaction producing the PG esters

of [bendamustine] more rapidly.").

342.    In sum, Dr. Pinal has opined that adding PEG to a bendamustine formulation

would have been expected to accelerate the degradation of bendamustine via PEG autoxidation.

Dr. Pinal has opined that the POSA would nevertheless have been motivated to use PEG in

157

EAGLEBEN-SA_00000433

bendamustine formulations and included an antioxidant in an attempt to cure the expected oxidation and stability problems associated with PEG. *See, e.g.*, Pinal Rep. ¶ 211 ("So, the POSA would have been motivated to include an antioxidant to inhibit the production of the formic acid resulting from the oxidation of PEG."). I will address in a subsequent section Dr. Pinal's opinion that it would have been obvious to use an antioxidant in formulations of the claimed inventions. In this section, I discuss only Dr. Pinal's opinion related to the choice of PEG.

343. I disagree with Dr. Pinal's opinion that the POSA would have been motivated or had reason to use PEG plus an antioxidant to address PEG-related oxidation issues. If the POSA were concerned that PEG would oxidize and thereby accelerate the degradation of bendamustine, the POSA simply would not have used PEG. The POSA would not have been motivated or had reason to formulate bendamustine with PEG with the expectation that it would cause degradation that would then make it necessary to use an antioxidant to attempt to solve that degradation problem. Put another way, the POSA would not have opted to use PEG expecting that doing so would introduce a new problem into the formulation (*i.e.*, PEG oxidation products) that would need to be solved by adding yet another excipient to the formulation. The much simpler approach, which formulators in general and the POSA in this circumstance would have preferred and chosen, would have been to use a solvent that was not prone to oxidation.

344. There are many reasons why the POSA would have preferred to simply avoid PEG, rather than adding PEG plus an antioxidant. The first is that the POSA would have preferred to keep the formulation as simple as possible. This is a basic principle that formulators understand and follow. Every additional excipient that is added to the formulation has the potential to interact with every other excipient in the formulation, as well as the active ingredient

158

EAGLEBEN-SA_00000434

and the physical container in which the formulation is stored (for example, the glass vial, the rubber stopper, etc.), which multiplicatively increases the complexity of the formulation and the risk that it will fail. *See, e.g.*, Narang et al., *Anticancer Drug Development: Unique Aspects of Pharmaceutical Development*, PHARM. PERSP. CANCER THERAPEUTICS 49, 77 (2009) ("Narang 2009") ("Another important consideration is to minimize the possibility of compromising the therapeutic efficacy of the drug. Thus, preservatives are avoided and excipients are minimized to reduce the possibilities of potential incompatibilities, such as physical adsorption or chemical complexation."). Adding excipients also increases the risk of toxicities from the formulation, both from the excipients themselves and from potential degradant products produced from the interaction of the new excipients and either the active ingredient or the other excipients in the formulation. *See, e.g.*, Jonkman-de Vries, *Pharmaceutical Development of (Investigational) Anticancer Agents for Parenteral Use—A Review*, 22 DRUG DEV. & INDUS. PHARM. 475, 476–77 (1996) ("Jonkman-de Vries 1996"), JDG_BENDA_00002062 at 2063–64 ("Since any component of the formulation may contribute to or modify the toxicity, it should be the formulator's goal to keep the formulation as simple as possible.").

345.                                          REDACTED

159

EAGLEBEN-SA_00000435

REDACTED

346.    The POSA would have further understood that—beyond the complexity

associated with adding any excipient to a pharmaceutical formulation—adding an antioxidant

EAGLEBEN-SA_00000436

can be particularly challenging. Antioxidants are often highly reactive compounds. This is because antioxidants often function by preferentially reacting with oxidizing species (such as peroxides) to prevent those species from oxidizing other materials in the formulation (such as other excipients or the active pharmaceutical ingredient). As such, the POSA would have preferred to avoid using an antioxidant for fear that the antioxidant might be especially likely to react with one or more ingredients in the formulation or materials in the container closure system. For example, as I discuss below and as Dr. Anslyn discusses in his report, it was known that the thiol group in monothioglycerol (which allows that molecule to serve as an antioxidant) was highly nucleophilic and would have been expected to preferentially react with electrophiles, which would have given the POSA significant concern about using that antioxidant with bendamustine. *See* ¶¶ 559.

347.    Another disadvantage of using an antioxidant is that the concentration of the antioxidant must be maintained throughout the shelf life of the product. In essence, the stability of the formulation is dependent on the presence of the antioxidant, and so the concentration of the antioxidant must be monitored and maintained in order to ensure the product remains stable. For example, the FDA has explained that stability studies should test for "preservative content (e.g., antioxidant, antimicrobial preservative)." Ctr. for Drug Evaluation & Research & Ctr. for Biologics Evaluation & Research, U.S. Food & Drug Admin., *Guidance for Industry: Q1A(R2) Stability Testing of New Drug Substances and Products* at 9 (Nov. 2003) ("FDA Stability Guidelines"). European regulations are in accord. Eur. Agency for the Evaluation of Med. Prods., *Notes for Guidance on Excipients, Antioxidants, and Antimicrobial Preservatives in the Dossier for Application for Marketing Authorisation of a Medicinal Product* at 5 (Feb. 20, 2003) ("EU Antioxidant Guidance") ("Where antioxidants are used up during the manufacture of the

161

product, the release limits should be justified by batch data. The adequacy of specified limits should be justified on the basis of controlled conditions and in-use stability testing to ensure that sufficient antioxidant remains to protect the product throughout its entire shelf-life and during the proposed in-use period."). REDACTED

This requirement—that the concentration of the antioxidant must be maintained throughout the shelf life of the product—would have been considered by the POSA to be a disadvantage because it would have presented another possible avenue by which a formulation might fail during stability testing. The POSA would have much preferred to develop a formulation that was not dependent on an antioxidant to remain stable. That is another reason that formulators do not use antioxidants unless they are necessary, and the POSA would have followed this conventional wisdom.

348.    The disadvantages of using antioxidants have been recognized by formulators and regulatory bodies. As explained by Joanne Broadhead in a 2001 chapter about parenteral dosage forms, although antioxidants are sometimes used in parenteral products, "their use is now in decline" and that "EU guidelines discourage their use unless no other alternative exists." Broadhead 2001 at 341, JDG_BENDA_00000404 at 415. Those EU guidelines state that antioxidants "should only be used once it has been shown that their use cannot be avoided." EU Antioxidant Guidance at 2. Moreover, in order to include an antioxidant in a formulation, the

162

EAGLEBEN-SA_00000438

EU regulatory body requires a demonstration of "the necessity to add an antioxidant . . . to the finished product at the chosen level" and "the physical and chemical compatibility of the antioxidant . . . with other constituents of the finished product, the container and the closures." *Id.* These required showings are in accord with my opinion, explained above, that the POSA would have been concerned that the antioxidant could react with other excipients in the formulation and with the container system.

349.    Another reason why the POSA would have been disinclined to pursue Dr. Pinal's recommended path—to add both PEG and an antioxidant to fix the problems the POSA would have expected PEG to cause—is that antioxidants do not completely prevent oxidation. This point is made explicitly in a review of antioxidants by Michael Akers, from Eli Lilly:

> [A]ntioxidants do not totally prevent oxidation. In fact, unless other procedures are employed to minimize oxidation, such as appropriate packaging and minimal exposure to light, heat, and metals during product manufacture the incorporation of an antioxidant will offer little, if any, protection for the drug for a relatively long period of time. Thus, a basic limitation of antioxidant ingredients is their inability to prevent completely the oxidative degradation of a drug and this is especially true if other precautions toward minimizing the oxidation process have been disregarded.

*See* Akers, *Antioxidants in Pharmaceutical Products*, 36 J. PARENTERAL SCI. & TECH. 222, 227 (1982) ("Akers 1982"), JDG_BENDA_00006113 at 6119. Indeed, there are many examples from the literature of antioxidants failing to provide any stabilization effect. *See, e.g.*, ¶¶ 552, 555. Moreover, as the above-recited block quote makes clear, the use of solvents (such as PEG) that are sensitive to oxidation creates additional risks in the formulation. Exposure to light, heat, or metals can exacerbate oxidative degradation, even in the presence of an antioxidant.

350.    Another limitation of formulating a pharmaceutical product with an antioxidant is that the efficacy of an antioxidant in a specific formulation is unpredictable. Again, Akers addresses this issue directly, stating that "there is no reliable method of evaluating and predicting

163

the effectiveness of antioxidant activity in pharmaceutical products" and that "prediction of antioxidant protection of a specific drug product cannot be done easily." Akers 1982 at 227, JDG_BENDA_00006113 at 6119. Likewise, in a review of excipients used in marketed products, it was disclosed that "[s]election of an antioxidant is the most difficult task for a formulator. Not only is preformulation screening of antioxidant efficacy often misleading, but other factors such as interaction with the stopper, effectiveness of nitrogen purge, and stability of the antioxidant itself could complicate the entire picture." Wang et al., *Review of Excipients and pH's for Parenteral Products Used in the United States*, 34 J. PARENTERAL DRUG ASS'N 452, 459 (1980) ("Wang 1980").

351.    Wu 2011 states that the "choice of an antioxidant for a given formulation is usually empirical" and that there "is a general lack of a consensus approach on the relative prioritization and basis for the selection of antioxidants." Wu 2011 at 1259, JDG_BENDA_00005875 at 5886. My understanding is that Wu 2011 is not prior art to the '707 patent family, and I have reached the opinions set forth in this section without reliance on its disclosure. *See* ¶ 340. Nevertheless, Wu 2011 makes clear that—even after the priority date, as before the priority date—the POSA would have had no good way to predict which antioxidant to use in formulations of the claimed inventions.

352.                                    REDACTED




                                    The POSA would have understood that identifying an acceptable antioxidant to slow the oxidative degradation of PEG in a

164

EAGLEBEN-SA_00000440

bendamustine formulation would likely have been an extensive research effort without any certainty of success. The POSA would have preferred to simply avoid PEG altogether rather than adding PEG and conducting a research program in the hopes of identifying a suitable antioxidant to add to the formulation with PEG.

353. For the above reasons, it is my opinion that the POSA would have avoided using PEG in bendamustine formulations in view of, among other reasons, its known contributions to esterification and susceptibility to oxidation, which the POSA would have expected to accelerate the degradation of bendamustine. It is, moreover, my opinion that the POSA would not have been motivated or had reason to add PEG to a bendamustine formulation and also to add an antioxidant to the formulation to solve the problems the POSA would have expected PEG to create.

354. Nema 1997 and Strickley 2004 confirm that the POSA would likely have avoided PEG in view of its known oxidation problems. In cataloging the frequency that various solvents were used in marketed parenteral products in the United States, Nema 1997 notes that there are only 2 marketed products that list PEG 300 as an excipient and 2 marketed products that list PEG 400 as an excipient, whereas there are 25 products that list PG as an excipient. *See* ¶ 86 (reproducing table); Nema 1997 at 167, JDG_BENDA_00002272 at 2273. Reflecting on this discrepancy, Nema 1997 remarks that "[i]t is surprising to see propylene glycol used more often than polyethylene glycols (PEGs) in spite of its higher myotoxicity and hemolyzing effects. Probably, the presence or generation of peroxides in PEGs is a major limitation." Nema 1997 at 167, JDG_BENDA_00002272 at 2273. Similarly, Strickley 2004 observes that PEG 300 and PEG 400 "are generally considered to be among the safest organic cosolvents and are very commonly used in preclinical *in vivo* pharmacokinetic and efficacy studies due to their

165

solubilizing capabilities and safety." Strickley 2004 at 221, JDG_BENDA_00003290 at 3310.

Notwithstanding these positive attributes, with respect to the relevant context of clinical use, Strickley 2004 notes that "[t]here are some commercial injectable formulations with PEG 300, but far fewer compared to propylene glycol and/or ethanol." *Id.* Likewise, Strickley 2004 states that although "PEG 400 . . . [is a] very effective solubilizing excipient[], [it is] currently in only a few marketed products." *Id.* As these reviews of marketed FDA products make clear, PEG is not a particularly common choice to use as a solvent in a marketed parenteral product, and one of the principal reasons that PEG is not used in more pharmaceutical products is the presence or generation of peroxides in PEGs, which can cause undesired oxidation.

355.    A review of the marketed parenteral formulations available in the United States as of the priority date that contained PEG indicates that those formulations do not have antioxidants:

- Ativan® (lorazepam) contains "0.18 mL polyethylene glycol 400 in propylene glycol with 2.0% benzyl alcohol as preservative." Ativan® Label at 1 (2006), JDG_BENDA_00005945 at 5948.

- Busulfex™ (busulfan) contains "N-N-dimethylacetamide (DMA) 33% wt/wt and polyethylene glycol 400, 67% wt/wt." Busulfex™ Label at 1 (1999), JDG_BENDA_00005643 at 5643.

- Robaxin® (methocarbamol) contains "polyethylene glycol 300, NF 0.5 mL, Water for Injection, USP q.s." Robaxin® Label at 1 (2003), JDG_BENDA_00005854 at 5854.

- VePesid® (etoposide) contains 60% PEG 300, 30% ethanol, 8.0% Tween 80, 3% benzyl alcohol, and 2 mg/mL citric acid. Strickley 2004 at 219, JDG_BENDA_00003290 at 3308.

356.    Of the four formulations listed above containing PEG, none of them contain excipients that are listed in Nema 1997's list of Antioxidants/Reducing Agents (Table IV). Nema 1997 at 167, JDG_BENDA_00002272 at 2273. This state of the art refutes clearly Dr.

166

EAGLEBEN-SA_00000442

Pinal's opinion that the POSA would have used PEG and then added an antioxidant to avoid the oxidation of PEG.

357.    I understand that citric acid (which is in VePesid®) may potentially act synergistically in conjunction with other antioxidants. *See, e.g.*, Akers 1982 at 227, JDG_BENDA_00006113 at 6119 (listing citric acid as an "antioxidant synergist," which is a compound that has "no capability of protecting oxygen-sensitive drugs, but, when combined with antioxidants, do serve to increase the maintenance of oxidative stability of the drug" either by "complexing trace amounts of metal," "lowering the solution pH," or "decreasing the oxygen stability in the solution"); Rowe 2009 at 181 ("Citric acid monohydrate is used as a sequestering agent and antioxidant synergist."). However, citric acid is principally a pH adjustor. *See* Rowe 2009 at 181. A publication discussing the VePesid® formulation states that the citric acid in that formulation is for pH adjustment. *See* Jonkman-de Vries at 479, JDG_BENDA_00002062 at 2066 ("The commercial formulation of etoposide (Vepesid®) contains . . . 2 mg citric acid (for pH adjustment) . . . .").

358.    From the above information, the POSA would have understood that, as of the priority date, none of the four commercially available parenteral formulations that contained PEG 300 or PEG 400 also contained an antioxidant. This would have taught the POSA that antioxidants were not routinely added to parenteral formulations containing PEG. REDACTED

359.    The POSA likewise would have understood that Dr. Pinal's suggested formulation approach—to add PEG to the formulation and also to add an antioxidant to fix the degradation caused by the PEG—was not conventional. Rather, in view of the small number of

167

marketed parenteral drugs containing PEG, and the fact that none of those drugs contained an antioxidant, the POSA would have inferred that formulators simply did not use PEG with drugs that might be susceptible to degradation via PEG's oxidation products. In my opinion, and based on my experience as a formulator, the POSA would not have been motivated or had reason to add PEG to a formulation if she or he believed that doing so would have necessitated also adding an antioxidant.

360. In view of the lack of any marketed parenteral drugs containing PEG and an antioxidant, the POSA likely would have hypothesized that PEG was only used with drugs that were not subject to degradation by PEG oxidation products (for example, acid-catalyzed esterification). To test that hypothesis, the POSA could have reviewed the molecular structures of the four APIs listed above. I have depicted those structures below. Most notably, none of those molecules contain a carboxylic acid moiety. As such, none of those molecules would have been prone to esterification via the PEG molecule, which is the only degradation pathway that Dr. Pinal has identified as motivating the use of an antioxidant in formulations of the claimed inventions. This would have bolstered the POSA's understanding that PEG was only used in liquid parenteral formulations where the active ingredients were not susceptible to degradation via PEG's oxidation products. Because bendamustine plainly is a drug molecule whose degradation is accelerated by such oxidation products—as Dr. Pinal acknowledges—the POSA would have avoided using PEG with bendamustine.

168

EAGLEBEN-SA_00000444

| Lorazepam | Busulfan |
|---|---|
| | |

| Etoposide | Methocarbamol |
|---|---|
| | |

361.    The POSA also would have avoided PEG in formulating bendamustine because the POSA would have expected PEG to accelerate the degradation of bendamustine at the nitrogen mustard moiety.  Dr. Pinal ignores the nitrogen mustard side of bendamustine almost entirely, without justification or explanation.  His only statement on the issue appears to be that using a non-aqueous solvent system would eliminate hydrolysis at the nitrogen mustard moiety. *See* Pinal Rep. ¶ 189 ("PEG and PG are organic solvents, which alone or in combination address the instability issue related to hydrolysis issue [sic] (common to all mustard compounds) of [bendamustine]."); *id.* ¶ 353 ("The POSA would have been motivated to once again consider the PEG:PG combination, since the combination was known to be effective in dealing with hydrolysis of [bendamustine].").  Dr. Pinal instead focuses his attention entirely on the

169

EAGLEBEN-SA_00000445

carboxylic acid moiety of bendamustine. *See, e.g.*, Pinal Rep. ¶¶ 350–357 (discussing formulation options that would putatively reduce the esterification of bendamustine).

362.    In my opinion, Dr. Pinal errs by ignoring the potential for degradation of bendamustine at the nitrogen mustard moiety. As an initial matter, the data from Drager '006 is clear that degradation occurs at the nitrogen mustard moiety even when all of the solvents used are non-aqueous. I understand that Dr. Anslyn has opined that the POSA would have understood that both HP1 (the hydrolysis product) and BM1 dimer can be formed via the same aziridinium intermediate at the nitrogen mustard moiety. *See* Anslyn Rep. ¶¶ 56–59. In Table II of Drager '006, all six of the formulations—which contain only non-aqueous solvents—exhibited at least some formation of at least one of these degradants. *See* ¶ 81 (reproducing table). One of those solvents (DMSO) produced over 1% of those two degradants, taken together. *Id.* Moreover, all of the formulations exhibited some of the DCE degradant, which also involves degradation of the nitrogen mustard moiety. *See* ¶ 74 (depicting DCE structure). Two of the formulations (Niacinamide/DMA and DMA) exhibited over 1% of the DCE degradant. *See* ¶ 81. As such, based on the data in Drager '006, the POSA would have understood that degradation via the nitrogen mustard moiety remained an issue that must be accounted for and addressed, notwithstanding the use of non-aqueous solvents.

363.    The POSA would further have understood that the data in Table II of Drager '006 was missing impurities that were present in the formulations. As I have explained above, Figure 2 of Drager '006 reports that the Drager '006 formulations exhibited much more substantial decreases in purity than are accounted for in Table II. *See* ¶ 159; *see also* Anslyn Rep. ¶¶ 69–70. For example, Figure 2 discloses that the purity of the DMA bendamustine formulation decreased to below 95% over one year at refrigerated conditions, which corresponds to more than 5% total

170

EAGLEBEN-SA_00000446

impurities. Drager '006, Figure 2, JDG_BENDA_00000990 at 993. But Table II only discloses individual impurity amounts totaling about 1.23% for the DMA formulation. *Id.*, 8:50–68, JDG_BENDA_00000990 at 999. This discrepancy would have indicated to the POSA that the Drager '006 inventors were not reporting all of impurities in Table II; rather, they were reporting the impurities they had characterized. Indeed, Drager '006 never purports to be documenting every impurity in Table II.

364.    The POSA would have understood that at least some of these missing degradants were likely due to degradation via the nitrogen mustard moiety of bendamustine. For example, the POSA would have hypothesized that the Drager '006 formulations might contain additional dimer impurities, beyond the dimer that was quantified by the Drager '006 inventors. *See* Anslyn Report ¶ 58. One of those dimers is illustrated in Brittain 2006. *Compare* Brittain 2006 ¶ 110, JDG_BENDA_00000375 at 393 (depicting dimer with three hydroxyl groups), *with* Drager '006, 4:50–65, JDG_BENDA_00000990 at 997 (depicting dimer with two hydroxyl groups).

365.    Beyond the data in Drager '006, the POSA would have understood that the nitrogen mustard moiety in bendamustine was susceptible to degradation. In particular, I understand that Dr. Anslyn has opined that the POSA would have understood that the nitrogen mustard moiety in bendamustine is capable of forming a highly unstable, charged aziridinium ring, which can degrade via a reaction with nucleophiles, including hydroxyl groups and thiol groups. *See* Anslyn Rep. ¶¶ 44–49. I understand that Dr. Anslyn has further opined that the POSA would have understood that PEG is likely to promote the formation of the aziridinium ring, and is thus likely to promote the degradation of bendamustine at the nitrogen mustard moiety. *See* Anslyn Rep. ¶¶ 93–136.

171

EAGLEBEN-SA_00000447

366.    Based on Dr. Anslyn's opinions described above—and at paragraphs 88 through 143 of his report—it is my opinion that the POSA would have been motivated to avoid PEG as a solvent in bendamustine formulations, since that solvent would have been expected to accelerate degradation at the nitrogen mustard moiety via formation of the aziridinium ring.

367.    The POSA also would have been concerned about using PEG in compositions of bendamustine for solubility reasons. My understanding is that the solubility of bendamustine in PEG was not known as of the priority date. I understand that Dr. Pinal has come to the same conclusion. *See* Pinal Rep. ¶ 194 ("The degree of solubility of [bendamustine] in PEG 400 was not reported in Olthoff or other prior art."). I further understand that Dr. Pinal has not opined that the POSA would have been able to predict the solubility of bendamustine in PEG without experimentation; rather, Dr. Pinal has opined that the POSA would have measured the solubility of bendamustine experimentally. *See id.* My understanding is that such experimental results, which were not publicly disclosed before the priority date, are not properly considered within the scope of the knowledge of the POSA.

368.    I understand that Dr. Pinal has opined that the POSA would have been motivated to achieve a bendamustine concentration of 25 mg/mL. *See* Pinal Rep. ¶ 180 ("Based on this information, the POSA would have been motivated to create a formulation that is 25 mg/mL in concentration."). Moreover, I understand that Dr. Pinal has opined that the POSA would have been motivated to create a formulation in which the 25 mg/mL of bendamustine was fully solubilized in the formulation. *See* Pinal Rep. ¶ 181 ("In selecting a solvent system, the POSA would want to . . . ensure that 25 mg/mL of [bendamustine] would be soluble in the solvent system . . . ."). I agree that the POSA would have been motivated to ensure that any bendamustine in the composition was fully dissolved. And I will assume for purposes of this

172

EAGLEBEN-SA_00000448

report Dr. Pinal's assertion that the POSA would have been motivated to achieve a bendamustine concentration of 25 mg/mL.

369.    Although the solubility of bendamustine in PEG was not known as of the priority date, the solubility of bendamustine in several other solvents had been disclosed. In particular, Olthoff 1983 discloses the solubility of bendamustine in ethanol (50 mg/mL), glycerol (50 mg/mL), and PG (125 mg/mL). *See* ¶ 100; Olthoff 1983 at 6, JDG_BENDA_00002301 at 2314. Drager '006 likewise discloses the solubility of bendamustine in NMP, DMI, DMSO, DMF, DMA, and PC as 104.0 mg/mL, 75.8 mg/mL, 311.7 mg/mL, 71.8 mg/mL, 56.2 mg/mL, and 7.7 mg/mL, respectively. *See* ¶ 77; Drager '006, 8:5–40, JDG_BENDA_00000990 at 999. Apart from propyl carbonate—which only provides a solubility of bendamustine of about 7.7 mg/mL—the POSA would have considered the solubility values of all of the other solvents in Drager '006 to be quite promising for developing a formulation containing 25 mg/mL of bendamustine. By contrast, the POSA had no information about the solubility of bendamustine in PEG and no reason to expect that using PEG—alone or in mixtures with other solvents—would have yielded a formulation that could solubilize 25 mg/mL of bendamustine. This would have caused the POSA to prefer other solvents—such as those listed in Olthoff 1983 and Drager '006—over PEG.

370.    I understand that Dr. Pinal has opined that the POSA would have been able to measure the solubility of bendamustine in PEG, and that the performance of and results from such hypothetical experiments should be considered to be within the knowledge of the POSA. *See, e.g.*, Pinal Rep. ¶¶ 56–57, 196–201. I further understand that Dr. Pinal has opined that the POSA would have experimentally determined the solubility of bendamustine hydrochloride in PEG to be 23.5 mg/mL. *See* Pinal Rep. ¶¶ 198–199.                    REDACTED

173

REDACTED

371.    I understand that Dr. Pinal has opined that the experimentally determined solubility measurement for PEG of 23.5 mg/mL (as well as the experimentally determined solubility measurement for PG of 221.9 mg/mL) "would have given great confidence to the POSA in expecting that it would be possible to get a successful formulation using a PEG:PG mixture that consisted mostly of PEG, along with some PG to boost the solubility." Pinal Rep. ¶ 198. In particular, I understand that Dr. Pinal has opined that the POSA would have estimated the solubility in combinations of PEG and PG by using a "log-linear cosolvency model." Pinal Rep. ¶ 199. I further understand that—using solubilities of 23.5 mg/mL for PEG and 221.9 mg/mL for PG—Dr. Pinal has estimated that a 90:10 ratio of PEG:PG would yield a solubility of 29.4 mg/mL. I understand that Dr. Pinal has opined that these estimates "would have given the POSA great confidence that a solvent mixture containing more PEG than PG would be successful in dissolving 25 mg/mL of [bendamustine]" and that the POSA would have a "high level of confidence that a solvent composition with as little as 10% PG (90:10 PEG:PG) would work for that purpose." Pinal Rep. ¶ 200.

174

EAGLEBEN-SA_00000450

372.    I discuss Dr. Pinal's opinions regarding the claimed solvent ratio—in particular, the 90:10 ratio of PEG to PG—below. *See* ¶¶ 423–444. In this section, I confine my opinions on the POSA's motivation or reason to use PEG and PG as solvents, without respect to the particular concentrations of solvents used.

373.    As an initial matter—even assuming that the POSA would have been motivated to measure the solubility of bendamustine hydrochloride in PEG 400 and been motivated by the experimental result unknown to the POSA to estimate the solubility of bendamustine hydrochloride in co-solvent systems comprising PEG 400 and PG (and I disagree that a POSA before the priority date would have been so motivated)—I disagree with Dr. Pinal that the POSA would have also relied on an experimentally determined value for the solubility of bendamustine hydrochloride in PG. As Dr. Pinal has acknowledged, the solubility of bendamustine in PG at room temperature had already been disclosed in Olthoff 1983 as 125 mg/mL. *See* Pinal Rep. ¶ 201; Olthoff 1983 at 6, JDG_BENDA_00002301 at 2314. To my knowledge, that is the only solubility value of bendamustine hydrochloride in PG disclosed by the prior art. In my opinion, the POSA would have been motivated to use that solubility value for PG, rather than performing the same experiment as Olthoff 1983.

374.    Dr. Pinal has opined that his estimated solubilities "would be similar" if the POSA would have used the solubility value from Olthoff 1983 for PG. Pinal Rep. ¶ 201. However, Dr. Pinal does not actually report the estimated solubility values obtained when using Olthoff 1983's solubility value for PG (125 mg/mL, instead of 221 mg/mL). I have conducted that calculation, using the same method as Dr. Pinal, and I have set forth those results below. I have also reproduced Dr. Pinal's solubility estimates for purposes of comparison. As the below table reflects, the estimated solubility for a 90:10 mixture of PEG and PG (assuming that the

175

EAGLEBEN-SA_00000451

POSA were to use the experimentally determined value for PEG 400 and the prior art Olthoff 1983 value for PG) would be 27.8 mg/mL.

| PEG 400:PG Proportions | Solubility Estimate (mg/mL) (Pinal Rep. ¶ 199) | Solubility Estimate (mg/mL) (using Olthoff 1983 data) |
|---|---|---|
| 100:0 | 23.5 | 23.5 |
| **90:10** | **29.4** | **27.8** |
| 80:20 | 36.8 | 32.8 |
| 70:30 | 46.1 | 38.8 |
| 60:40 | 57.7 | 45.9 |
| 50:50 | 72.2 | 54.2 |
| 40:60 | 90.4 | 64.1 |
| 30:70 | 113.1 | 75.7 |
| 20:80 | 141.6 | 89.5 |
| 10:90 | 177.3 | 105.8 |
| 0:100 | 221.9 | 125 |

375.     In my opinion—assuming the POSA would have had access to the experimental information that Dr. Pinal relies on, and assuming that the POSA would have been capable and motivated to conduct the solubility estimations that Dr. Pinal has opined on (and I disagree with both points)—the POSA would have been dissuaded from using PEG as a solvent for bendamustine.  In particular, I disagree with Dr. Pinal that the experimental data and estimations that he has provided would have motivated or provided reason for the POSA to use PEG or a combination of PEG and PG.

376.     The POSA would have known the solubility of bendamustine in the formulation would need to be higher than the target concentration in order to prevent the bendamustine from precipitating out of solution.  If the concentration of bendamustine were to exceed the solubility of bendamustine in the formulation, then the bendamustine would likely precipitate out as a solid, yielding a suspension and not a solution.  In a solution, the drug molecules (or ions) are individualized, whereas in a suspension drug particles (consisting of numerous drug molecules/ions) are dispersed in a liquid.  The POSA would have understood that suspensions

176

EAGLEBEN-SA_00000452

present a host of additional complications, such as potential agglomeration, lack of dosage uniformity, sedimentation, and caking. *See, e.g.*, Spiegel 1963 at 917, JDG_BENDA_00003835 at 3837 ("A parenteral solution avoids the disadvantages inherent in suspensions, such as nonuniform dosage, caking, and possible slow release of the medicament when it is not desired."). I do not understand the Defendants' experts to have provided any opinion that the POSA would have been motivated or had reason to make a formulation that is not fully solubilized.

377. Moreover, the POSA would have understood that the presence of solid particles in the diluted infusion solution would present a serious health concern. *See* 1 U.S. PHARMACOPEIA <1> Injections 37 (33d ed. released Nov. 1, 2009, official May 1, 2010) ("USP 33") ("All articles intended for parenteral administration shall be prepared in a manner designed to exclude particulate matter as defined in Particulate Matter in Injections <788> and other foreign matter."); 1 U.S. PHARMACOPEIA <1> Injections 34 (32d ed. official May 1, 2009) ("USP 32"); Remington 2006 at 832 ("Today, it is recognized that the presence of particles in solution, particularly if injected intravenously, can be harmful. While the data defining the extent of risk and the effects produced are still limited, it has been shown that particles of lint, rubber, insoluble chemicals, and other foreign matter can produce emboli in the vital organs of animals and man. Further, it has been shown that the development of infusion phlebitis may be related to the presence of particulate matter in the intravenous fluids."). For that reason, intravenous products may not be formulated as suspensions. *See* Boylan 2002, JDG_BENDA_00000330 at 343 (listing acceptable dosage forms). The POSA would therefore have considered a risk of solid particles in the liquid concentrate formulation to be undesirable, since such particles could fail to dissolve completely in the admixed solution for infusion. *See, e.g.*, Remington 2006 at

177

EAGLEBEN-SA_00000453

802 (noting that parenteral products "must be free from visible particulate matter" and that "freedom from . . . visible particulate contamination must be maintained throughout the shelflife of the product").

378.    Maas 1994 notes that the dissolution of bendamustine in sodium chloride is "time-consuming." Mass 1994 Translation at 1, JDG_BENDA_00002261 at 2264. This teaching would have heightened the POSA's concern that any bendamustine hydrochloride particles that had precipitated in the liquid concentrate might not fully dissolve in the diluent prior to administration to the patient.

379.                                              REDACTED

This requirement is in accord with my opinion that the bendamustine should be completely dissolved in the liquid concentrate formulation.

380.    Dr. Pinal has likewise agreed that the POSA would have been motivated to fully dissolve the bendamustine at a concentration of 25 mg/mL. *See* Pinal Rep. ¶ 181 ("In selecting a solvent system, the POSA would want to . . . ensure that 25 mg/mL of [bendamustine] would be soluble in the solvent system . . . .").

381.    I disagree, however, with Dr. Pinal's assumption that the POSA would simply need to achieve a formulation with a bendamustine hydrochloride solubility of greater than 25 mg/mL. *See, e.g.,* Pinal Rep. ¶ 200. If the POSA wanted to keep 25 mg/mL of bendamustine hydrochloride dissolved in a liquid formulation, the POSA would have known that the

178

EAGLEBEN-SA_00000454

bendamustine hydrochloride <u>concentration</u> and the bendamustine hydrochloride <u>solubility</u> must be kept sufficiently far apart. Such a "solubility margin" is necessary to account for typical fluctuations that can occur that would be expected to change the solubility of bendamustine hydrochloride in the formulation.

382.    For example, the POSA would have known that a solubility margin was necessary to account for temperature fluctuations. The POSA would have known that the solubility of a drug in a formulation generally varies as a function of temperature. Increases in temperature tend to increase solubility, whereas decreases in temperature tend to decrease solubility. *See* Remington 2006 at 213 ("As is evident from Equation 4, the solubility of a solid in a liquid depends on the temperature. In the process of solution, if heat is absorbed (as evidenced by a reduction in temperature), $\Delta H$ is by convention positive and the solubility of the solute will increase with increasing temperature. Such is the case for most salts . . . ."); Remington 2006 at 1028 ("Solutions should remain clear over a relatively wide temperature range such as 4 to 47°C. <u>At the lower range an ingredient may precipitate due to its lower solubility at that temperature</u> . . . ." (emphasis added));                    REDACTED

As noted by Remington 2006 in the previous quote, salts tend to be more soluble at higher temperatures. The POSA would have understood that bendamustine hydrochloride was the hydrochloride salt of bendamustine and thus would have expected the solubility of that compound to increase with increases in temperatures and vice versa.

383.    I note that studies with other drugs have found that, in conformity with the usual rule, solubilities in PG and PEG tend to vary as a function of temperature. For example, Liu and colleagues found that the solubility of valdecoxib in pure glycerol, pure PG, and pure PEG 400

179

EAGLEBEN-SA_00000455

increased as a function of temperature from 298.15 Kelvin to 308.15 Kelvin (i.e., from 25° C to 35° C). *See* Liu et al., *Solubility of Valdecoxib in the Presence of Glycerol, Propylene Glycol, and Poly(ethylene glycol) 400 at (298.15, 303.15, and 308.15) K*, 50 J. CHEM. ENG. 1736, 1737 (2005). Haddadin and colleagues likewise report that solubilities of five different drugs increased as a function temperature in PEG 400. *See* Haddadin et al., *Estimation of Drug Solubility in Polymers Via Differential Scanning Calorimetry and Utilization of the Fox Equation*, 14 PHARM. DEV. & TECH. 19, 23 (2009).

384.    Brittain 2006 also observed that the solubility of bendamustine decreases as a function of temperature, both in water alone and when dissolved in an aqueous-alcohol co-solvent systems. *See* Brittain 2006 ¶ 146, JDG_BENDA_00000375 at 398 ("As indicated in FIG. 1, the solubility of bendamustine decreased linearly with temperature (25° C. to 0° C.). The solubility of bendamustine was temperature dependent whether it was dissolved in water alone or with an alcohol."); *see also id.* Figure 1, ¶¶ 103, 105 & Table 2, JDG_BENDA_00000375 at 376, 392.

385.    The POSA would have desired to have a solubility well above 25 mg/mL to account for temperature fluctuations, which the POSA would have known would be common in the storage and handling of drug products, irrespective of instructions and labeling. For example, the authors of Seedher 2003 were attempting to create a nimesulide formulation with a concentration of 50 mg/mL. *See* Seedher 2003 at 60, JDG_BENDA_00003225 at 3227 ("In order to inject a 100 mg dose of nimesulide in a convenient 2 ml volume, the solubility of drug should be greater than 50 mg/ml."). However, the authors made clear that a solubility barely higher than 50 mg/mL would be insufficient, due to temperature fluctuations. Rather, the Seedher 2003 authors only recommended formulations with "solubility greater than 65 mg/mL."

180

EAGLEBEN-SA_00000456

*See id.* at 60–61, JDG_BENDA_00003225 at 3227–28.  In other words, the Seedher 2003 authors recommended a solubility margin of at least 30% to account for temperature fluctuations. Applying that same solubility margin in the context of a 25 mg/mL bendamustine solution would yield a desired solubility of at least 32.5 mg/mL.  Applying the solubility estimation procedure that Dr. Pinal has advocated for (regardless of which PG solubility measurement is used), the POSA would have understood that it would have been necessary to use at least about 20% PG to achieve a solubility of greater than 32.5 mg/mL.  The solvent system with a 90:10 ratio of PEG:PG, which is the solvent system used in the formulation Dr. Pinal asserts to be obvious, would have been considered unsuitable with respect to the solubility of bendamustine, even using the experimental results that Dr. Pinal introduces into the prior art.

386.    The POSA also would have been motivated to maintain a robust "solubility margin" to account for pH differences between batches.  The POSA would have understood—– based both on the molecular structure of bendamustine and the fact that it is typically supplied as a salt of hydrochloric acid—that bendamustine contains ionizable moieties.  As such, the POSA would have understood that bendamustine's solubility could vary as a function of pH.  *See* Strickley 2004 at 202, JDG_BENDA_00003290 at 3291 ("If the molecule is ionizable, then pH adjustment can be used to increase water solubility because the ionized molecular species has higher water solubility than its neutral species.");            REDACTED

The POSA would have expected pH variations between batches, even for commercially produced batches.            REDACTED

181

EAGLEBEN-SA_00000457

387.    Moreover, the POSA would not have considered even a room temperature solubility of 32.5 mg/mL to be sufficient.  My understanding is that Dr. Pinal has only opined that it would have been obvious to make a <u>refrigerated</u> liquid bendamustine product.  *See* Pinal Rep. ¶¶ 13 ("This Exemplary POSA Formulation would have been expected to exhibit long term stability when stored under refrigeration conditions . . . ."), 159 ("The POSA would also have expected his formulation to be stable when refrigerated."), 217 ("The claimed formulation would have been inherently stable at refrigerated temperatures . . . .").  I agree that—if the POSA decided to formulate a liquid bendamustine formulation—the POSA would have thought that it likely would have been necessary to keep the product refrigerated during its shelf life.  The data in Drager '006, for example, would have taught the POSA that various bendamustine formulations in non-aqueous solvents were much less stable at room temperature than at refrigerated conditions.  *See* Drager '006, Figures 1–2, JDG_BENDA_00000992 at 992–993.

388.    Since the POSA would have expected the bendamustine formulation to be stored in a refrigerator (consistent with Dr. Pinal's opinion), the POSA would have wanted to ensure that the formulation could keep 25 mg/mL of bendamustine dissolved at refrigerated conditions, accounting for the temperature and pH fluctuations and variability discussed above, over the course of the product's shelf life.  This requirement is reflected, for example, in Remington 2006, which explains—in a section titled "General Guidance for Developing Formulations of Parenteral Drugs"—that "[i]f a product must be refrigerated, then the . . . formulation components must be soluble and stable at colder conditions."  Remington 2006 at 804.  Likewise, when discussing stability requirements for solutions, Remington 2006 explains that "[s]olutions should remain clear over a relatively wide temperature range such as 4 to 47°C."  Remington 2006 at 1028.  Additionally, the U.S. Pharmacopoeia defines "controlled cold

182

EAGLEBEN-SA_00000458

temperature" to include a temperature of 2° C to 8° C with excursions between 0° C to 15° C and transient spikes of up to 25° C. USP 33 § 10.30.40 ("'Controlled cold temperature' is defined as temperature maintained thermostatically between 2° and 8° (36° and 46° F), that allows for excursions in temperature between 0° and 15° (32° and 59° F) that may be experienced during storage, shipping, and distribution such that the allowable calculated mean kinetic temperature is not more than 8° (46° F). Transient spikes up to 25° (77° F) may be permitted if the manufacturer so instructs and provided that such spikes do not exceed 24 hours unless supported by stability data or the manufacturer instructs otherwise."); USP 32 § 10.30.40. REDACTED

389.    The POSA would have had no reason to expect that using PEG—particularly at a high concentration—would have yielded a formulation with sufficient bendamustine solubility above 25 mg/mL at refrigerated conditions. As explained above, it was well known that many compounds, particularly salts like bendamustine hydrochloride, tend to be less soluble at lower temperatures. *See* ¶ 382. Moreover, the POSA would have been aware of multiple literature examples of compositions with PEG that exhibited lower solubilities at lower temperatures. *See* ¶ 383. This would have caused the POSA to expect that a room temperature solubility of bendamustine hydrochloride in PEG—which according to Dr. Pinal, the POSA would have

EAGLEBEN-SA_00000459

understood to be 23.5 mg/mL——would have been insufficient to adequately solubilize bendamustine hydrochloride, with a requisite solubility margin, at refrigerated conditions. This concern further would have led the POSA away from using PEG as the predominant solvent in bendamustine formulations.

390.    U.S. Patent Publication No. 2003/0082229 (the "'229 publication") describes solubility experiments in which the inventors dissolved chlorambucil in DMSO, ethanol, PEG, and PG. *See* '229 publication ¶ 78. After discovering that chlorambucil exhibited poor solubility in PEG and PG, the '229 publication inventors discontinued experiments using PEG and PG as primary solvents. *See* '229 publication ¶ 79. Dr. Pinal has opined that, when formulating a bendamustine drug product, the POSA would have considered publications relating to other nitrogen mustards. Assuming, for the sake of argument, that Dr. Pinal is correct, then the solubility results in the '229 publication would have reinforced the POSA's conclusion that a PEG formulation, including a 90% PEG formulation, would not have been viable for solubility reasons.

391.    The POSA also would have been concerned about PEG potentially freezing in the refrigerator. I understand that Dr. Pinal has opined that the POSA would have used a formulation that "would consist mostly of PEG, which freezes when refrigerated at 2-8°C." Pinal Rep. ¶ 218. Assuming that Dr. Pinal is correct, the POSA would have viewed this as a serious disadvantage to using PEG in a liquid bendamustine formulation. The POSA would have understood that, if some or all of the PEG in the formulation were to freeze, the bendamustine would become more concentrated in the remaining liquid formulation. For example, if all of the PEG in the formulation froze, then the bendamustine (which previously was dissolved at a concentration of 25 mg/mL, *see* Pinal Rep. ¶ 180) would be much more concentrated, given that

184

EAGLEBEN-SA_00000460

the remaining solvent would consist essentially of 100% PG, which would otherwise comprise only 10% of the formulation. The bendamustine would thus be at a concentration of about 250 mg/mL. The POSA would have expected bendamustine hydrochloride to precipitate at this concentration, given Olthoff 1983's bendamustine solubility disclosure for PG of 125 mg/mL at 25°C. *See* Olthoff 1983 at 6, JDG_BENDA_00002301 at 2314. The POSA would thus have avoided using PEG for fear that it would freeze in the refrigerator and cause drug precipitation.

392.                                                            REDACTED

393.    The POSA also would have expected the bendamustine degradation profile to change if the PEG partially or completely froze. I understand that Dr. Pinal has opined that "a POSA would know that a formulation with pure PG would likely be problematic, due [to] an increased change of esterification as compared to PEG." Pinal Rep. ¶ 183. For reasons stated throughout this section, I disagree with Dr. Pinal that the POSA would have predicted bendamustine to degrade faster in a PG-based formulation than in a PEG-based formulation. However, if that were the POSA's expectation, then the POSA would have expected PEG freezing to accelerate the degradation of bendamustine, since the bendamustine would become concentrated in a PG-based formulation. In any event, I agree with Dr. Pinal that a formulation comprising 100% (or any high concentration of) PG would have been considered problematic from a stability standpoint, per the disclosure in Drager '006.

394.    For these reasons, the possibility of PEG freezing at refrigerated conditions would have dissuaded the POSA from using PEG in liquid bendamustine compositions.

185

EAGLEBEN-SA_00000461

395.     I understand that Dr. Pinal has opined that the POSA knew that combinations of PEG and PG produced "positive deviations from log-linearity." Pinal Rep. ¶ 205. To support his opinion, Dr. Pinal cites a page from Rubino et al., *Solubilization by Cosolvents II: Phenytoin in Binary and Ternary Solvents*, 38 PDA J. PHARM. SCI. & TECH. 215, 220 (1984) ("Rubino 1984"), JDG_BENDA_00005863 at 5869. Dr. Pinal ignores several important aspects of this study. For example, Dr. Pinal fails to mention that all but four of the data points in Table V of Rubino 1984 are actually PEG-PG-water formulations. The four formulations containing only PEG and PG actually yield some of the smallest deviations from the log-linear prediction. *See id.* (reporting "residuals" of only 0.20, 0.16, 0.13 and 0.11 for compositions with PEG:PG amounts of 0.4:0.6, 0.6:0.4, 0.2:0.8 and 0.8:0.2, respectively). As noted in the previous parenthetical, the formulation with 80% PEG and 20% PG—the highest ratio of PEG:PG for which data are reported—yielded a residual of only 0.11, which was the lowest residual of any solvent combination reported in Table V of the paper. *See id.*

396.     Moreover, Dr. Pinal does not explain why the POSA would have expected any positive deviations from log-linearity in a PEG-PG-bendamustine formulation based on data from a PEG-PG-phenytoin formulation. As explained by Miyako and colleagues in an article that Dr. Pinal co-authored and cited in his report, "Deviations from the predicted solubility profile . . . arise from two main sources. One is the effect of water-cosolvent interactions present in the mixed solvent. . . . Another source of deviation . . . is the effect of specific interactions between the solute and the mixed solvent that are not present when the solute is dissolved on either of the two neat solvents." Miyako et al., *Solubility of Hydrophobic Compounds in Water-Cosolvent Mixtures: Relation of Solubility with Water-Cosolvent Interactions*, 99 J. PHARM. SCIS. 293, 293–94 (2009) ("Miyako 2009"), JDG_BENDA_00005823 at 5823–24; *accord* Rubino et

EAGLEBEN-SA_00000462

al., *Cosolvency and Deviations from Log-Linear Solubilization*, 4 PHARM. RES. 231, 231 (1987) ("Rubino 1987"), JDG_BENDA_00006575 at 6575 ("Deviations from the predicted solubilities . . . can result from interactions involving cosolvent-water, solute-solute, or solute-water-cosolvent."). As these references make clear, deviations from predicted log-linear solubilities frequently depend on particular interactions between the solute (that is, the drug molecule/ion) and the solvents at issue. This is well illustrated by the data in Figure 2 of Rubino 1987, which shows positive deviations from log-linearity for phenytoin and benzocaine in PEG 400-water mixtures at certain ratios, but some negative deviations from log-linearity for diazepam. *See* Rubino 1987 at 232, JDG_BENDA_00006575 at 6576.

397.    Dr. Pinal does not offer any opinion as to why the POSA would have looked to any solubility data from a phenytoin experiment to predict the solubility of bendamustine in a PEG-PG system. However, Rubino 1984 (an article relied on by Dr. Pinal) states the following: "Although it is not strictly a nonelectrolyte, phenytoin is largely unionized at pH 7 (i.e., about 96% unionized). In addition, the $pK_a$ increases fairly rapidly as the polarity of the solution decreases. Therefore, <u>phenytoin would be expected to behave largely as a nonelectrolyte in water-cosolvent mixtures</u>." Rubino 1984 at 216, JDG_BENDA_00005863 at 5684 (citation omitted and emphasis added). By contrast, bendamustine hydrochloride is a salt that is expected to behave as an electrolyte in such mixtures. Thus, in my opinion, the POSA would not have looked at solubilities of *phenytoin* in making solubility predictions about *bendamustine hydrochloride*. And consistent with the literature cited above, the POSA would not have formed an expectation as to the solubility of bendamustine hydrochloride in certain solvent systems on the basis of studies and data regarding phenytoin.

187

EAGLEBEN-SA_00000463

398.    Furthermore, Dr. Pinal does not explain why the log-linear model is appropriate given the composition of the system.  For example, Dr. Pinal assumes that the solid state form of bendamustine hydrochloride is always the same in different solvent systems, e.g., that the crystal structure of the (potentially precipitating) bendamustine hydrochloride does not change. However, it is well known that many molecules exhibit "polymorphism," i.e., can convert between different crystal structures.  As Rubino 1984 recognizes, the log-linear model assumes that the solid state form of the molecule does not change depending on the co-solvent mixture. *See* Rubino 1984 at 219, JDG_BENDA_00005863 at 5868 ("Note that the terms involving $\Delta S_f$ and $MP$ do not appear in Eq. 9.  This assumes that the energy required to destroy the crystal structure of the solute is the same in both water and cosolvent. This would not be true if a different polymorph or solvate were to recrystallize from the cosolvent-water mixture (24).").  Dr. Pinal provides no evidence that the solid state form of the bendamustine hydrochloride remains constant across different co-solvent ratios.

399.    For the above reasons, the POSA would not have had a reasonable expectation that PEG and PG mixtures would provide any positive solubility deviation above log-linearity for bendamustine hydrochloride.  Even if the POSA did have such an expectation, the POSA would not have been able to quantify the expected deviation from log-linearity.  Dr. Pinal does not attempt to offer such a quantification.  As such, the POSA would have remained concerned that compositions with PEG as the principal solvent would not be able to keep bendamustine hydrochloride in solution, especially at refrigerated conditions and given the temperature and pH fluctuations and variability.  These solubility-related concerns would have further motivated the POSA to avoid PEG as a solvent for bendamustine hydrochloride.

188

EAGLEBEN-SA_00000464

400.    Finally, I disagree with Dr. Pinal that the POSA would have chosen PEG and PG as a matter of routine experimentation, in view of the small list of potential solvents. *See* Pinal Rep. ¶ 177 ("Even without this direction, the choices presented to a POSA were still very few and very focused: either use glycerin or PG, and then use either PEG 300 or 400. This is a very narrow set in the context of formulation development, and it would thus have been routine to look for a workable solution."). The POSA would have had many additional potential solvents as options, most of which Dr. Pinal ignores without explanation. *See* ¶¶ 702–811811. The set of options is not limited, and adding the potential for combining multiple solvents (as in the claimed invention) in different ratios makes the set of options essentially unlimited. As I explain in the relevant sections below, the POSA would have preferred many of those solvents over PEG or PG. For example, many of those solvents (unlike PEG and unlike a PEG/PG solvent system) had bendamustine hydrochloride solubilities disclosed in the literature. Many of the solvents have lower hydroxyl group "concentrations" than PEG. And as I understand from Dr. Anslyn, the POSA would have expected many of the solvents to degrade bendamustine more slowly at the nitrogen mustard moiety than PEG. *See* Anslyn Rep. ¶¶ 133–136. Moreover, as I discuss throughout this section, the POSA would have had numerous reasons for avoiding PEG in compositions of bendamustine. As such, I disagree with Dr. Pinal that the POSA's set of available solvents would have been small, and—whatever the set of solvents—I disagree that the POSA would have been motivated or had reason to select PEG to use with bendamustine.

401.    Moreover, it is my understanding that selecting an option from a finite list is non-obvious if it would have been unpredictable whether the option would succeed. It is a well-accepted principle of formulation science that in the present circumstances, where solubility and stability are important issues, solvents and mixtures of solvents often behave unpredictably.

EAGLEBEN-SA_00000465

Selecting a solvent system is an unpredictable endeavor, and the POSA would have had no expectation that a mixture of PEG and PG would have yielded a desirable, soluble, and stable liquid bendamustine formulation. For example, the POSA would not have been able to predict whether a formulation of PEG and PG would have adequately solubilized bendamustine, given that there were no prior art disclosures of the solubility of bendamustine in PEG. *See* ¶¶ 367–369. The POSA also would not have been able to predict whether a formulation of PEG and PG would have stabilized bendamustine sufficiently to provide a desirable product. The prior art did not disclose any information about the stability of bendamustine in PEG, which would have made predictions about bendamustine's stability in a composition of PEG and PG more difficult. I understand that Dr. Anslyn has opined that—based on similar chemical reactions—the POSA would have expected that formulations composed principally of PEG would have accelerated the degradation of bendamustine at the nitrogen mustard moiety of bendamustine. *See* Anslyn Rep. ¶¶ 93–142. To the extent the POSA would not have shared the expectations expressed by Dr. Anslyn, the POSA would not have been able to make any prediction about the stability of bendamustine in a PEG-PG formulation, in view of the lack of prior art disclosures about bendamustine in PEG. I understand that Dr. Anslyn shares this view. *See* Anslyn Rep. ¶ 143.

402.    The unpredictability of choosing a solvent system for bendamustine would have been exacerbated by the degradation pattern of bendamustine. The POSA would have understood that bendamustine could degrade into many different impurities via several different mechanisms. *See* ¶¶ 162, 634. The existence of multiple degradation pathways, both known and unknown, would have made it less predictable how a particular solvent system would affect the stability of bendamustine. The POSA also would have recognized that there were likely additional bendamustine impurities that had not been characterized. *See* ¶ 159. The POSA could

190

not have predicted how a solvent system would affect the formation of a degradant whose identity was unknown.

403.                              REDACTED

.

404.    Dr. Pinal focuses almost entirely on the degradation of bendamustine at the carboxylic acid moiety via esterification. Because of this narrow focus, Dr. Pinal opines that the POSA would have ignored certain solvents and other excipients. *E.g.*, Pinal Rep. ¶ 171 (opining that the POSA would have discarded glycerol due to its three –OH groups). In my opinion, in attempting to obtain a stable formulation of bendamustine, the POSA would have been motivated to minimize all of bendamustine's degradation products, rather than just its esters. The POSA would not have oversimplified the problem in the manner asserted by Dr. Pinal. This is a much more complicated project than simply minimizing bendamustine esters. For example, I understand from Dr. Anslyn that the POSA would have expected glycerol to degrade the nitrogen mustard moiety of bendamustine more slowly than PEG or PG. *See* Anslyn Rep. ¶¶ 133–136. Moreover, the POSA would not have known whether using glycerol (or PEG) might introduce other, heretofore unreported impurities.

405.    The discussion of glycerol in the previous paragraph is exemplary. Every solvent could affect a formulation differently. In addition, the POSA would have understood that each solvent could have other, unanticipated effects on bendamustine's stability. This could occur, for example, by reacting with bendamustine directly; by reacting with another excipient in the composition to form a new degradation product that could react with bendamustine; by

191

EAGLEBEN-SA_00000467

192

degrading into a chemical species that could react with bendamustine (or another excipient in the composition); or by affecting the properties of the formulation in such a way that another reaction with bendamustine is changed.

406.    The inventors' work confirms what the prior art teaches—the difficulty and unpredictability of developing a solvent system for bendamustine.      REDACTED

# REDACTED

EAGLEBEN-SA_00000468

407.                                    REDACTED

408.                                    REDACTED

193

EAGLEBEN-SA_00000469

409.                              REDACTED

410.    I                        REDACTED

411.                             REDACTED

# REDACTED

194

EAGLEBEN-SA_00000470

REDACTED

412.                    REDACTED

# REDACTED

195

EAGLEBEN-SA_00000471

# REDACTED

REDACTED

196

EAGLEBEN-SA_00000472

REDACTED

413.                              REDACTED

# REDACTED

197

EAGLEBEN-SA_00000473

# REDACTED

REDACTED

Dr. Pinal has opined that both ethanol and glycerol have higher hydroxyl group "concentrations" than PEG 400 and that the POSA therefore would have avoided glycerol. *See* Pinal Rep. ¶¶ 171, 352 ("[G]lycerol has the highest –OH groups among the three polyols. As explained above . . ., an increased number of –OH groups increases the chances for more

198

EAGLEBEN-SA_00000474

impurities in a [bendamustine] formulation.").                    REDACTED

414.                              REDACTED

415.                              REDACTED

199

EAGLEBEN-SA_00000475

REDACTED

416.                                    REDACTED

:

# REDACTED

200

EAGLEBEN-SA_00000476

# REDACTED

REDACTED

417.                    REDACTED

201

EAGLEBEN-SA_00000477

REDACTED

418.                                    REDACTED


419.                                    REDACTED

Dr. Pinal has opined that the POSA would have calculated the hydroxyl group

"concentrations" of PG and PEG 400 as 44.68% and 8.21%, respectively. *See* Pinal Rep. ¶ 352.

Dr. Anslyn has opined that—if the POSA were motivated to conduct the calculations articulated

202

EAGLEBEN-SA_00000478

by Dr. Pinal—the POSA actually would have obtained a weighted hydroxyl group "concentration" 27.88% for PG and a hydroxyl group "concentration" of 8.5% for PEG 400. *See* ¶ 269. In either case, the hydroxyl group "concentration" of PG is higher than that of PEG 400. According to Dr. Pinal's logic, based on this difference in hydroxyl group "concentration," the formulation with PEG 400 would have been expected to lead to less degradation than the formulation with PG. Pinal Rep. ¶ 171 ("[A The POSA would have known that the higher content of –OH groups in the solvent of the formulation would result in faster degradation of BDM via the esterification reaction, and would have looked to limit degradation by seeking excipients having fewer –OH groups."). The POSA would have had no such expectation based on the prior art, for the reasons discussed above.         REDACTED

420.                    REDACTED

EAGLEBEN-SA_00000479

REDACTED

421.    As such, even if the POSA were limited to a small list of solvents (which would not have been the case), the choice of PEG and PG would nevertheless have been non-obviousness in view of the unpredictable nature of appropriate solvent selection, including in bendamustine formulations.

422.    In various of the preceding paragraphs, as well as elsewhere in this report, I describe experimental results from the inventors and other entities        REDACTED
that occurred after the priority date of the '707 patent family and/or were not published before the priority date of the '707 patent family.  I understand that these results are not considered part of the POSA's knowledge—and would not have motivated or provided reason for the POSA or provided the POSA with a reasonable expectation of success—and my opinions about the obviousness of the asserted patents were formed independently of, and do not depend on those results.  However, I include them to further demonstrate various additional flaws in Dr. Pinal's hindsight-driven analysis.

**E.    The POSA Would Not Have Been Motivated To Use a 90:10 Ratio of Polyethylene Glycol to Propylene Glycol in Formulating Bendamustine.**

423.    All of the asserted claims of the '707 patent family encompass combinations of PEG and PG at a ratio of about 90:10.  For example, claim 14 of the '707 patent, from which asserted claims 18 and 20 depend, requires that the composition contain a pharmaceutically acceptable fluid comprising "about 90% polyethylene glycol and about 10% propylene glycol."

204

EAGLEBEN-SA_00000480

Other claims, such as claim 16 of the '797 patent, on which asserted claim 21 depends, requires that the ratio of PEG to PG be selected from a set that includes 90:10.

424.    I understand that Dr. Pinal and Dr. Yates have opined that the POSA would have been motivated to make a liquid bendamustine composition having a PEG to PG ratio of 90:10 (or, alternatively, a liquid bendamustine formulation with 90% PEG and 10% PG). *See, e.g.,* Pinal Rep. ¶¶ 13, 165, 178–206, 257, 265, 294, 323; Yates Rep. ¶¶ 75, 79. The sections above contain my opinions that a POSA at the priority date would not have been motivated or had reason to use PEG and PG at all in a liquid bendamustine formulation. My opinions in this section are focused on Dr. Pinal's and Dr. Yates's opinions regarding the 90:10 ratio limitations, assuming—contrary to my opinions—that the POSA would have been motivated to use those excipients.

425.    I understand that Dr. Pinal has not opined that the POSA would have been motivated or had reason to make a composition with any other ratio of PEG to PG or that such a formulation would have been obvious to the POSA. For example, Dr. Pinal has not opined that the POSA would have been motivated or had reason to make a bendamustine formulation based on 75% PEG and 25% PG or that such a formulation would have been obvious. For that reason, I confine my opinions to the question of whether the POSA would have been motivated or had reason to make a formulation containing 90% PEG and 10% PEG, and whether such a formulation would have been obvious to the POSA.

426.    Dr. Pinal has opined that the POSA would have been motivated use multiple different solvents to minimize the side effects of any single solvent. *See* Pinal Rep. ¶ 184 (discussing solvent "splitting"). I disagree that this consideration would have motivated or provided reason for the POSA to use a "90% PEG 10% PG" formulation. As I describe above,

EAGLEBEN-SA_00000481

the POSA would not have had serious concerns about the side effects of even a 100% PG formulation, in view of the large dilution volume (500 mL) that the POSA would have expected would be used to deliver bendamustine to the patient. *See* ¶ 309. Moreover, Dr. Pinal does not explain how a motivation to "split" the solvents would have led the POSA to use 90% PEG and 10% PG. Dr. Pinal also does not explain why—if he is right—the POSA would not be further motivated or had reason to use three or more solvents. In view of the many different solvents that would have been at the POSA's disposal, *see* ¶¶ 702–811, Dr. Pinal's opinion that the POSA would have preferred multiple different solvents would simply mean that there were more options to choose from.

427. Dr. Pinal has opined that the POSA would have been motivated to use a "higher proportion of PEG than PG" because that would "result in a solvent environment with lower concentration of hydroxyl (–OH) groups, which helps slow the degradation of [bendamustine] via esterification." Pinal Rep. ¶ 189. Elsewhere in his report, Dr. Pinal calculates the "–OH 'burden'" of various formulations and opines that these calculations would have "strengthen[ed] the motivation of the POSA to go with the 90:10 PEG:PG ratio." Pinal Rep. ¶ 354. I disagree.

428. First, Dr. Pinal's opinion on this issue erroneously calculates the hydroxyl group "concentrations" of PEG and PG based on the assumption that PEG's primary alcohols are equally reactive as PG's primary and secondary alcohols. *See* ¶¶ 267–278. Dr. Pinal also uses the wrong molecular weights for PEG 300 and PEG 400 in performing that calculation. *See* Rowe 2009 at 517, JDG_BENDA_00006557 at 6564 (PEG 400: 380–420 Da; PEG 300: 285–315 Da); ¶ 266. After these errors are corrected, it is clear that a composition with a 90:10 ratio of PEG:PG would actually yield a <u>higher</u> weighted hydroxyl group "concentration" than the Drager '006 formulation with "66% DMA and 34% PG." *See* ¶ 277. As such, even assuming

206

the POSA were motivated by the hydroxyl group "concentration" as Dr. Pinal suggests, the POSA would have been dissuaded from using a composition with 90% PEG and 10% PG, as such a composition would have a higher weighted hydroxyl group "concentration" than the formulations in Drager '006 and thus would have been expected to yield higher esterification rates than the Drager '006 formulation with "66% DMA and 34% PG."

429.    Second, Dr. Pinal's opinion fails to take into account other potential degradation pathways.  As I discuss above, the Drager '006 data demonstrate that are many other pathways by which bendamustine can degrade in non-aqueous, liquid environments other than via esterification.  *See* ¶¶ 157–162, 362–363.  For example, in Drager '006, switching from a composition based on "66% DMA/34% PG" to a composition based on "100% DMA" eliminated PG esters but substantially increased the amount of DCE degradant (from 0.12% to 1.10% after storage for about 12 months at 5°C).  Drager '006, 8:50–68, JDG_BENDA_00000990 at 999.  Moreover, as I discuss above, the POSA would have further suspected that Table II of Drager '006 does not report all of the individual impurities present in the formulations.  *See* ¶ 159. In particular, the POSA would have suspected that moving to a high concentration of PEG, such as 90%, would have accelerated degradation at the nitrogen mustard moiety.  *See* ¶¶ 361–366.

430.    In sum, I disagree with Dr. Pinal that concerns about esterification would have motivated or provided reason the POSA to use "90% PEG and 10% PG" in liquid bendamustine compositions.  To the contrary, the POSA would have expected that such a composition would have yielded higher degradation rates than other published liquid bendamustine formulations.

431.    Dr. Pinal argues that the POSA would have been motivated to use "at least some nominal amount of PG" because of "the high viscosity of PEG."  Pinal Rep. ¶ 192.  For this

207

opinion, Dr. Pinal cites to Seedher 2003 for the proposition that "solutions prepared in 100% PEG are highly viscous." Pinal Rep. ¶ 192 (citing Seedher 2003 at 60–61); *see also* Yates Rep. ¶ 75 (noting same viscosity disclosure of Seedher 2003). Dr. Pinal's citation of Seedher 2003 on this point is misleading. As the complete quotation makes clear, Seedher 2003 was dubious of using a 100% PEG formulation for direct injection into a patient. *See* Seedher 2003 at 60, JDG_BENDA_00003225 at 3227 ("Although solubility of drug was high in 100% PEG, it was not recommended as solvent for parenteral formulations. This is because the solutions prepared in 100% PEG are highly viscous and viscosity may pose a problem in dissolution rate of drug from tissues. However, there is a need to explore the use of 100% PEG in controlled release parenteral formulations." (emphasis added)). The POSA would have understood that this concern did not apply to a liquid bendamustine formulation intended to be administered intravenously, where the "dissolution rate of drug from tissues" would not be a factor. In addition, the POSA would have understood that any potential viscosity concern would be ameliorated because the viscosity of the formulation would have been substantially reduced upon dilution into saline. In sum, Seedher 2003 provides no support for Dr. Pinal's contention that the POSA would have used PG to alleviate viscosity concerns in a liquid bendamustine formulation.

432.    Even if Dr. Pinal were right that a 100% PEG formulation would be unacceptably viscous, Dr. Pinal does not explain why PG at a concentration of 10% would solve this problem. The simplest co-solvent that the POSA could have chosen to use with PEG would have been water. Moreover, if the POSA did want to use a non-aqueous solvent, the POSA would have had a wide range of solvents to choose from. *See* ¶¶ 702–811. Dr. Pinal also does not even opine that 10% of the co-solvent would be necessary to lower the viscosity of PEG to an acceptable level. *See* Pinal Rep. ¶ 192 ("at least some nominal amount of PG").

EAGLEBEN-SA_00000484

433.    In sum, Dr. Pinal has failed to demonstrate that the POSA would have been motivated or had reason to use a 90% PEG, 10% PG formulation in view of potential viscosity concerns.

434.    I understand that Dr. Pinal has opined that once "the POSA knew that the formulation should contain more PEG than PG, it would take nothing more than routine testing and optimization to arrive at a 90:10 PEG:PG ratio." Pinal Rep. ¶ 193. I disagree. First, as I discuss throughout this section, the POSA would have been taught away from the claimed 90:10 range in view of concerns about the stability and solubility of bendamustine in a formulation with that ratio. *See, e.g.,* ¶¶ 429, 439–442. Second, the POSA would not have been able to predict the effect of altering the concentrations of PEG and PG in bendamustine formulations. The POSA would have been especially uncertain about the effect of altering the concentration of PEG in bendamustine formulations, given the lack of any prior art examples combining PEG and bendamustine. The POSA would have had no guidance about how altering the concentration of PEG would affect either the stability or the solubility of bendamustine. Third, Dr. Pinal has failed to point to any prior art disclosure that specifically teaches a 90:10 PEG:PG ratio. To the extent that Dr. Pinal has offered any opinion about a range of PEG:PG ratios—for example, by stating that the "formulation should contain more PEG than PG," *see* Pinal Rep. ¶ 193—that range is broad and not amenable to routine optimization. For these reasons, the POSA would not have arrived at the 90:10 ratio by way of "routine optimization."

435.    Dr. Pinal has opined that Alam '286 would have motivated the POSA to use a 90:10 ratio of PEG:PG. *See* Pinal Rep. ¶ 457; *see also* Yates Rep. ¶ 79. I disagree. As I explain above, Alam '286 would not have motivated or provided reason for the POSA to use PEG or PG in compositions of bendamustine. *See* ¶ 280–293. In particular, the POSA would have

EAGLEBEN-SA_00000485

understood that there were substantial differences between the molecular structures of cyclophosphamide (the molecule described in Alam '286) and bendamustine. *Id.* In view of these differences, the POSA would not have expected the properties of cyclophosphamide in PEG:PG compositions (for example, stability or solubility) to translate to a bendamustine composition.

436. Additionally, as I describe above, Alam '286 expressed a preference for a ratio of PEG:PG of 20:80. *See* ¶ 289. Alam '286 never uses a formulation composed principally of PEG, much less a formulation with 90% PEG. To the extent the POSA would have been motivated or had reason to follow Alam '286 (which the POSA would not have been), that reference's preference for an 80% PG composition would have taught the POSA away from the claimed range of 90% PEG to 10% PG.

437. Dr. Pinal has opined that it "would have been no more than routine experimentation to arrive at a liquid [bendamustine] formulation with 90:10 PEG:PG" in view of the disclosure of Alam '286. Pinal Rep. ¶ 457. I disagree. First, as I discuss above, the prior art as a whole taught away from a 90:10 ratio of PEG:PG. *See* ¶ 434. Second, the POSA would not have been able to predict the effect of altering the PEG and PG concentrations in bendamustine formulations. *See* ¶ 434. Third, the disclosures of Alam '286 that Dr. Pinal relies on as a starting point for his "routine optimization"—"about 10 to about 90%" PG and "about 90% to about 10%" PEG, *see* Pinal Rep. ¶ 457—are so broad as to be encompass practically any combination of PEG and PG. Such a broad range is not amenable to routine optimization. Fourth, Alam '286 was published in 1983, decades before the discovery of the claimed inventions. The fact that no formulator performed the allegedly "routine testing and optimization" based on Alam '286 or any other reference cited in Dr. Pinal's report to arrive at a

210

EAGLEBEN-SA_00000486

90:10 PEG:PG ratio shows that obtaining such a ratio was not, in fact, a matter of routine optimization. Rather, Dr. Pinal's citation of Alam '286 appears to be a hindsight-based selection due to Alam '286's use of PEG and PG. For these reasons, the POSA would not have arrived at the 90:10 ratio by way of "routine optimization" in view of Alam '286.

438.    Dr. Pinal has opined that the POSA would have made certain calculations related to the solubility of bendamustine hydrochloride in a composition of 90% PEG and 10% PG. *See* Pinal Rep. ¶¶ 194–203. It is not clear to me if Dr. Pinal is opining that these solubility estimates would have motivated the POSA to use a composition with 90% PEG and 10% PG. Rather, Dr. Pinal only notes that these measurements would have given the POSA an "expectation of success in using a solvent mixture with 10 parts of PG per 90 parts of PEG." Pinal Rep. ¶ 206.

439.    I have already opined on the POSA's concerns about the solubility of bendamustine in PEG, including addressing many of Dr. Pinal's related opinions, and I incorporate that discussion herein. *See* ¶¶ 367–399. For similar reasons, the POSA would have been especially concerned about the solubility of bendamustine in a composition with 90% PEG and 10% PG.

440.    I understand that Dr. Pinal has opined that the POSA would have estimated the solubility of bendamustine hydrochloride in a composition based on "90% PEG and 10% PG" to be 29.4 mg/mL at room temperature. *See* Pinal Rep. ¶¶ 199, 203, 206. However, as I explain above, the POSA would have had access to a solubility measurement from Olthoff 1983 for PG, and using that value (in combination with the experimentally determined PEG solubility value that was not available to the POSA) would have yielded a bendamustine hydrochloride solubility in a "90:10 PEG:PG" formulation of 27.8 mg/mL. *See* ¶ 374. Using the solubility value calculated based on Olthoff 1983's disclosure would have made the POSA even more concerned

211

EAGLEBEN-SA_00000487

about the solubility of bendamustine hydrochloride in a 90:10 PEG:PG formulation.  However, considering either solubility calculation, in my opinion the POSA would have been dissuaded from using a PEG:PG ratio of 90:10.

441.    The POSA would have been strongly motivated to create a formulation in which the bendamustine did not precipitate at any time, including under refrigerated conditions.  *See* ¶¶ 387–394.  In order to achieve that goal, the POSA would have needed to create a formulation with a substantially higher solubility than the concentration of bendamustine (in this case, 25 mg/mL).  This is because the solubility of bendamustine hydrochloride in a particular formulation can vary.  For example, temperature fluctuations can lead to substantial solubility changes.  *See* ¶¶ 381–385.  The POSA would have wanted to account for such solubility fluctuations by creating a margin between the solubility of the bendamustine hydrochloride in the formulation at room temperature and the concentration of bendamustine hydrochloride.  The Seedher 2003 authors recommend a solubility margin of 30%, which would translate to a minimum solubility of 32.5 mg/mL for a 25 mg/mL bendamustine composition.  *See* ¶ 385.  Based on Dr. Pinal's calculations, attaining such a solubility would require a PG concentration of at least 20%.  *See* ¶ 385.  As such, the POSA would have been dissuaded from creating a formulation with 90% PEG and 10% PG.

442.    The POSA also would have been motivated to create a formulation in which the bendamustine was soluble under refrigerated conditions.  *See* ¶¶ 387–394.  The POSA would have expected that the solubility of the bendamustine hydrochloride would likely decrease at refrigerated conditions.  *See* ¶¶ 382–383, 389.  This would have further dissuaded the POSA from using 90% PEG and 10% PG in a liquid bendamustine composition, particularly in view of Dr. Pinal's room temperature solubility calculations.

212

EAGLEBEN-SA_00000488

443.    I understand that Dr. Pinal has opined that the POSA would have known of one literature example in which combinations of PEG and PG yielded slightly higher solubilities than would have been predicted by a log-linear solubility model. *See* Pinal Rep. ¶¶ 204–205. As I explain above, this single literature example would not have allayed the POSA's fears about the solubility of bendamustine hydrochloride in a 90:10 PEG:PG formulation. *See* ¶¶ 395–399. In particular, the literature example that Dr. Pinal cites actually shows only very small deviations from the predicted solubility in the formulations of just PEG and PG, without water, and Dr. Pinal does not opine on what degree of solubility enhancement the POSA would have predicted in a PEG:PG system for bendamustine hydrochloride. *Id.* Moreover, Dr. Pinal does not explain why the POSA would have predicted positive deviations in the solubility of bendamustine hydrochloride from log-linearity in a PEG:PG formulation based on data from a phenytoin formulation. *See* ¶ 396. Deviations from log-linear solubility predictions depend on the identity of the drug, and bendamustine hydrochloride and phenytoin exhibit substantial differences, including that bendamustine hydrochloride is a salt and phenytoin is not. *See* ¶ 397.

444.    For the foregoing reasons, the POSA would not have been motivated or had reason to make a liquid bendamustine formulation containing 90% PEG and 10% PG.

**F.    The POSA Would Not Have Been Motivated To Use an Antioxidant.**

445.    All of the asserted claims of the '707 patent family require the use of an antioxidant. Some of those claims do not specify which antioxidant is required. For example, claim 1 of the '707 patent family, on which asserted claim 12 ultimately depends, merely requires "a stabilizing amount of an antioxidant." Other of the asserted claims provide a list of antioxidants that can be selected. For example, claim 1 of the '831 patent, on which asserted claims 2, 3, and 5 depend, requires "a stabilizing amount of an antioxidant selected from the group consisting of thioglycerol, monothioglycerol, lipoic acid, propyl gallate, methionine,

213

EAGLEBEN-SA_00000489

cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds and dihydrolipoic acid." Finally, several of the asserted claims specify one particular antioxidant, thioglycerol (which is synonymous with monothioglycerol in the '707 patent family, *see* '707 patent, 4:2). For example, claim 14 of the '707 patent, on which claims 18 and 20 depend, requires "a stabilizing amount of thioglycerol."

446. I discuss the non-obviousness of thioglycerol specifically in the following section. In this section, I explain why the POSA would not have been motivated or had reason to use an antioxidant in formulations of the claimed inventions.

447. As an initial matter, it is not clear to me which references or combinations of references Dr. Pinal is opining would have motivated the POSA to use an antioxidant in bendamustine formulations. I understand that Dr. Pinal has opined that the asserted claims would have been obvious in view of (1) Olthoff 1983; (2) Olthoff 1983, Drager '006, and/or Alam '286; and (3) Drager '006 and/or Alam '286. Dr. Pinal's report provides scant explanation, however, of why those references would have motivated or provided reason for the POSA to use an antioxidant when formulating bendamustine. In my opinion, those references would not have motivated or provided reason for the POSA to use an antioxidant when formulating bendamustine, much less motivated or provided reason for the POSA to use monothioglycerol, as discussed in the section below.

448. In paragraphs 207 through 209 of his report, Dr. Pinal suggests that Olthoff 1983 somehow teaches the use of an antioxidant in liquid bendamustine formulations. *E.g.*, Pinal Rep. ¶ 207 ("Olthoff teaches that a POSA would use an antioxidant to create a stable [bendamustine] formulation disclosed in the '707 patent or the like . . ."). Dr. Pinal does not provide any citation to the sentences or pages in Olthoff 1983 that putatively teach the use of an antioxidant. I have

214

EAGLEBEN-SA_00000490

reviewed Olthoff 1983, and in my opinion that reference does not disclose the use of an antioxidant in its liquid bendamustine formulations, and the one instance in which Olthoff 1983 does mention the use of an antioxidant is only to state that the antioxidant (ascorbic acid) failed to prevent color change in solid bendamustine hydrochloride powder. *See* ¶¶ 450–451. To the contrary, Olthoff 1983 suggests using an inert gas overlay to prevent degradation caused by light and air. *See* ¶ 452.

449.    Dr. Pinal also cites to Olthoff 1983's statement about bendamustine being "'a relatively instable compound' in water that is 'almost completely hydrolyzed in aqueous solutions after a short period of time.'" Pinal Rep. ¶ 209 (citing Olthoff 1983 at 2). Based on that sentence, Dr. Pinal asserts that the "POSA would have known that [bendamustine] was susceptible to Fischer esterification" and that the POSA "would have appreciated that [bendamustine], which has a carboxylic group in its molecular structure, may undergo an esterification process if used with a solvent with a high number of –OH groups." Pinal Rep. ¶ 209. Dr. Pinal's statements in paragraph 209 appear to confuse the various degradation mechanisms of bendamustine. The hydrolysis reaction that Olthoff 1983 is referring to on page 2 is not a degradation of the carboxylic acid group on that molecule; rather, as the entire quote from Olthoff 1983 makes clear, the hydrolysis is referring to degradation of the "mustard-halogen groups" of the molecule. *See* Olthoff 1983 at 2, JDG_BENDA_00002301 at 2310 ("Bendamustine hydrochloride is a relatively instable compound. Its mustard-halogen groups are almost completely hydrolyzed in aqueous solutions after a short period of time." (emphasis added)). Below, I recreate an illustration from Dr. Pinal's report in which Dr. Pinal identifies these groups within the molecule:

215

EAGLEBEN-SA_00000491



*See* Pinal Rep. ¶ 67. As Dr. Pinal acknowledges elsewhere in his report, hydrolysis of the

mustard groups and esterification of the carboxylic acid group are different reactions that involve

distinct mechanisms. *See, e.g.,* Pinal Rep. ¶¶ 68–76. In sum, Olthoff 1983's statement about the

hydrolysis of bendamustine has nothing to do with esterification of the carboxylic acid group of

that molecule, and Dr. Pinal has provided no opinion as to why an antioxidant would have any

effect on the hydrolysis of the nitrogen mustard moiety in bendamustine.

450.    Contrary to Dr. Pinal's assertion, Olthoff 1983 does not recommend using an

antioxidant with bendamustine. Neither of Olthoff 1983's exemplary formulations (with pure

ethanol and pure PG) include an antioxidant. *See* Olthoff 1983 at 5–6, JDG_BENDA_00002301

at 2312–13. I understand that Dr. Pinal has opined that the POSA would have been motivated to

use an antioxidant in formulations of PEG or PG and bendamustine to prevent the PEG and PG

from degrading into acidic components that would accelerate esterification of bendamustine. *See*

Pinal Rep. ¶¶ 77–78, 210 ("Thus, a POSA would have sought to add an excipient to counteract

the oxidation of both PG and PEG. One such excipient would be an antioxidant."). To support

that opinion, Dr. Pinal relies, in part, on an article from 1923. *See id.* (citing Evans, *The*

*Oxidation of Propylene Glycol with Potassium Permanganate*, 45 J. AM. CHEM. SOC. 171 (1923)

("Evans 1923"), JDG_BENDA_00006251). Dr. Pinal's opinion that the POSA would have been

216

EAGLEBEN-SA_00000492

motivated to use an antioxidant in conjunction with bendamustine-PG formulations, including based on Evans 1923, is inconsistent with the formulations prepared by actual researchers. If Dr. Pinal were correct, then the Olthoff 1983 inventors would have been motivated to use an antioxidant. In my opinion, the Olthoff 1983 inventors' failure to use an antioxidant in their pure PG formulation undercuts Dr. Pinal's argument that the POSA would have been motivated or had reason to use an antioxidant in formulations of PG and bendamustine.

451.    Olthoff 1983 further discloses that the addition of an antioxidant to powdered bendamustine was ineffective. In particular, Olthoff 1983 discloses that "solid bendamustine hydrochloride shows a pink to brown-red discoloration, which starts at the surface of the substance and which, after a longer period of time, renders the whole substance unsuitable for the production of pharmaceutical preparations." Olthoff 1983 at 3, JDG_BENDA_00002301 at 2311. Olthoff 1983 does not disclose the reason for this discoloration, but the POSA would have assumed that it was likely produced by bendamustine degradation of some kind. Olthoff 1983 further reports that the addition of ascorbic acid did not prevent this degradation. *See id.* ("The mixture with ascorbic acid shows the same discoloration."). The POSA would have understood that ascorbic acid is an antioxidant. *See, e.g.*, Drager '006, 7:7, JDG_BENDA_00000990 at 999 (listing "ascorbic acid" as an antioxidant); Rowe 2009 at 43–46 (describing ascorbic acid as an antioxidant). As I explain elsewhere in this report, the appropriate selection of an antioxidant is unpredictable. *See* ¶ 350. However, to the extent Dr. Pinal opines that antioxidants generally act similarly, then Olthoff 1983's disclosure that ascorbic acid failed to ameliorate the degradation of bendamustine hydrochloride would have suggested to the POSA that an antioxidant might not be effective in stabilizing bendamustine.

217

EAGLEBEN-SA_00000493

452.    Olthoff 1983, moreover, discloses an alternative solution for preventing potential oxidative degradation of liquid bendamustine formulations. Olthoff 1983 states that, in addition to bendamustine's sensitivity to hydrolysis, "other stability factors which have to be considered are the influence of light and atmospheric oxygen." Olthoff 1983 at 6, JDG_BENDA_00002301 at 2314. After mentioning again that solid bendamustine could become discolored, Olthoff 1983 discloses the following: "As far as the solutions in alcohols and polyols which are stored in closed ampoules and under exclusion of light are concerned, no discoloration was observed. It is, however, recommended that the solutions are produced, filled and stored under an inert gas, such as argon or nitrogen." *Id.* In other words, Olthoff 1983 recommends that potential oxidative degradation in liquid bendamustine formulations could be avoided by using sealed ampoules, excluding light, and/or using an inert gas overlay, rather than adding an antioxidant. I understand that Dr. Pinal has acknowledged that the POSA would have considered these measures in attempting to stabilize bendamustine. Pinal Rep. ¶ 241.

453.    In sum, Olthoff 1983 would have taught the POSA away from using an antioxidant. To the extent the POSA was worried about oxidative degradation of any component of the formulation, Olthoff 1983 teaches alternative solutions, other than using an antioxidant, to address the problem.

454.    Drager '006 likewise would not have motivated the POSA to use an antioxidant in the claimed formulations. Dr. Pinal has stated the following: "Drager '006 discloses the use of antioxidants, including propyl gallate, when formulating a liquid [bendamustine] formulation." Pinal Rep. ¶ 358.

455.    In my opinion, this disclosure in Drager '006 would not have motivated or provided reason for the POSA to use an antioxidant as recited in the claimed formulations.

218

EAGLEBEN-SA_00000494

Drager '006 includes antioxidants on a long list of potential excipients that could be added to formulations of the invention:

> In addition to comprising a polar aprotic solvent, or mixture of polar aprotic solvents, and optionally, a nonaqueous polar protic solvent, or mixture of solvents, formulations of the present invention may further comprise other pharmaceutically acceptable excipients. Pharmaceutically acceptable excipients are known in the art and include, for example, antioxidants (e.g., tocopherol (Vitamin E), ascorbic acid, methyl paraben, buthylhydroxyanisole (BHA), butylhydroxytoluene (BHT), and propyl gallate), surfactants, (e.g., polysorbates (TWEEN 20, TWEEN 40, TWEEN 80)), lipids (e.g., dimyristoylphophatidylcholine (DMPC), Dimyristoylphosphatidylglycerol (DMPG), distearoylphophatidylglycerol (DSPG), fillers (e.g., mannitol), organic acids (e.g., citric acid, lactic acid, benzoic acid), hydrophilic polymers (e.g., polyethylene glycols (PEG 300, PEG 400), complexing agents (e.g., niacinamide, nicotinic acid, creatine, cyclodextrins), and preservatives (e.g., benzyl alcohol).

Drager '006, 7:1–18, JDG_BENDA_00000990 at 999. Dr. Pinal does not explain why this disclosure of Drager '006 would have motivated or provided reason for the POSA to use an antioxidant, as opposed to one of the multiple other categories of excipients discussed in this list. In my opinion, the POSA would have viewed this list as a "boilerplate" disclosure of pharmaceutically acceptable excipients.

456.   The POSA also would have noticed that none of Drager '006's exemplary formulations contains an antioxidant. *See* Drager '006, 8:5–67, JDG_BENDA_00000990 at 999. This would have reinforced the POSA's belief that Drager '006's statement related to an antioxidant was mere "boilerplate," rather than a particularized teaching that an antioxidant would stabilize liquid bendamustine formulations.

457.   The POSA would have further noticed that one of Drager '006's exemplary formulations contained 34% PG. *See, e.g.*, Drager '006, 8:5–67, JDG_BENDA_00000990 at 999. Moreover, the POSA would have seen that the Drager '006 inventors knew that the use of

219

EAGLEBEN-SA_00000495

PG in bendamustine formulations could cause the formation of bendamustine esters. *See, e.g., id.*, 5:13–43, JDG_BENDA_00000990 at 998 ("Upon exposure to alkylene glycol, for example, propylene glycol, esters of bendamustine can form, e.g., PG-1 and PG-2."). Notwithstanding Drager '006's awareness of PG esters, Drager '006 does not recommend using an antioxidant in formulations with PG or describe an exemplary formulation that uses an antioxidant with PG. This undercuts Dr. Pinal's argument that the POSA would have been motivated or had reason to use an antioxidant in formulations of PG and bendamustine.

458.    I understand that Dr. Pinal has opined that Figure 3 of Drager '006 would have motivated the POSA to use an antioxidant in formulations of the claimed inventions. *See* Pinal Rep. ¶¶ 356–357. In particular, I understand that Dr. Pinal has opined that the POSA would have viewed the stability results of the refrigerated formulation containing 99% PG in Figure 3 of Drager '006 "as the signature of an autocatalytic reaction," since the degradation in the first six months appears to be slower than the degradation in the second six months of the one-year stability profile. *See* Pinal Rep. ¶ 356. Dr. Pinal further opines that the POSA would have deduced that a "deleterious 'something'" is building up for the first 6 months, which "has to be the result of excipient degradation." Pinal Rep. ¶ 357. Dr. Pinal further opines that the POSA would therefore "have known that including an ingredient that protects the excipients (PEG and PG) from degradation, would give him a way to significantly extend[] the 6 month period of stability." Pinal Rep. ¶ 357. Dr. Pinal then concludes (without explanation) that "the POSA would have known that PEG and PG are prone to oxidation," so "in order to protect [bendamustine] in the long term, the obvious thing to do would be to protect PEG and PG from oxidation. In other words, the formulation would need to include an antioxidant." Pinal Rep. ¶ 357.

EAGLEBEN-SA_00000496

459.     I disagree that the POSA would have followed the line of reasoning that Dr. Pinal espouses in paragraphs 356 and 357 of his report.  First, as I note above, the Drager '006 inventors did not, in fact, arrive at Dr. Pinal's "obvious" conclusion of using an antioxidant in formulations of the claimed inventions containing PG, despite the fact that they were aware of the potential for esterification between bendamustine and PG.  *See* ¶ 457.  This fact alone casts serious doubt on Dr. Pinal's reasoning.

460.     Second, Dr. Pinal fails to cite any literature to support his suggestion that the impurity profile in Figure 3 of Drager '006 is indicative of autocatalysis, much less any literature to demonstrate that any such autocatalysis must be the result of an oxidative breakdown.  For example, Dr. Pinal does not explain how an esterification reaction (which produces water and removes a carboxylic acid) would catalyze further esterification.  To the contrary, the POSA would have expected that an increase in the number of water molecules (which hydrolyze ester bonds) and a decrease in the number of carboxylic acid groups might well slow an esterification reaction.  *See* ¶¶ 126–127 (explaining that the presence of water hydrolyzes ester bonds).

461.     Third, the POSA would have understood that other mechanisms could explain any differences in degradation kinetics illustrated in Figure 3.  For example, the POSA would have understood that a byproduct of an esterification reaction is water, *see* ¶ 126, which can in turn degrade bendamustine via hydrolysis at the nitrogen-mustard group.

462.     Fourth, even if the POSA were to have followed Dr. Pinal's chain of reasoning with respect to the chemical reactions in Figure 3, the POSA would not have been motivated or had reason to use an antioxidant.  The POSA would have understood that there were other, preferable ways of dealing with oxidation reactions, including using a sealed ampoule and/or an overlay of inert gas.  *See, e.g.*, Olthoff 1983 at 6, JDG_BENDA_00002301 at 2314.  Dr. Pinal

221

EAGLEBEN-SA_00000497

does not explain why the POSA would have ignored these options and instead would have added an antioxidant. In my opinion, for the reasons I discuss in more detail below, the POSA would have preferred these simpler options over adding an antioxidant to a parenteral formulation. *See* ¶¶ 476–480.

463.    In sum, Drager '006 would not have motivated or provided reason for the POSA to use an antioxidant in liquid bendamustine formulations, including in liquid bendamustine formulations containing PG.

464.    Alam '286 likewise would not have motivated or provided reason for the POSA to use an antioxidant in the claimed formulations. As Dr. Pinal acknowledges, Alam '286 does not include any disclosures about antioxidants. *See* Pinal Rep. ¶ 358. For example, Alam '286 does not use an antioxidant in any of its exemplary formulations, which concern cyclophosphamide. In particular, Alam '286 does not use an antioxidant even in formulations containing PEG and PG. This would have confirmed the POSA's understanding that it was not a routine formulation practice to include an antioxidant simply because a formulation contained PEG or PG. *See* ¶¶ 355–360 (noting that none of the marketed parenteral formulations containing PEG also contained an antioxidant).

465.    I understand that Dr. Pinal has opined that the POSA would have understood that cyclophosphamide "is not susceptible to Fischer esterification" and thus "an antioxidant would not be needed to reduce the possibility of a Fischer esterification for this particular drug." Pinal Rep. ¶ 358. I agree with Dr. Pinal that cyclophosphamide could not undergo an esterification reaction; as I explain above, that is one of the reasons the POSA would not have consulted Alam '286 in choosing a solvent for bendamustine. *See* ¶¶ 280–293. In view of Dr. Pinal's statements, I understand that Dr. Pinal's opinion is that the only reason the POSA would have chosen to use

222

EAGLEBEN-SA_00000498

an antioxidant in the claimed formulations would have been to prevent accelerated esterification via the acidification of the formulation due to the oxidative breakdown of PEG and PG. *See also* Pinal Rep. ¶ 77 ("A formulator would understand that using PG and PEG would also mean likely using an antioxidant, to help address Fischer esterification."). In other words, my understanding is that Dr. Pinal is <u>not</u> opining that the POSA would have been motivated or had reason to use an antioxidant (for example) to prevent any sort of direct oxidative degradation of bendamustine or any degradation of bendamustine due to other potential degradation products of PEG or PG, other than those products that would acidify the solution and accelerate esterification.

466.    As I will explain below, my opinion is that the POSA would not have included an antioxidant for the limited purpose stated by Dr. Pinal; that is, to avoid accelerating the esterification of bendamustine due to the degradation of PEG and/or PG. In my opinion, the POSA would have preferred other solutions to that potential problem. *See* ¶¶ 476–480.

467.    Instead of relying on any teachings from Olthoff 1983, Drager '006, or Alam '286, Dr. Pinal appears to be relying on a variety of other references—such as Horie 1990, Zimmerman 1977, Evans 1923, Lloyd 1956, and Rowe 2009—to explain why the POSA would have been motivated to use an antioxidant in the claimed bendamustine formulations. *See, e.g.,* Pinal Rep. ¶¶ 77–78, 210–215. (Dr. Pinal does not explain how or why these references would have been combined by a POSA with other references on which he is relying.) In short, Dr. Pinal appears to be arguing that the POSA would have known that PEG and PG could be oxidized, generating various acids, which would catalyze the esterification of those solvents with the carboxylic acid group of bendamustine. *See* Pinal Rep. ¶ 210. Dr. Pinal argues that the POSA would have been motivated to add an antioxidant to the formulation to "inhibit the oxidation of PEG." Pinal Rep. ¶ 211.

223

EAGLEBEN-SA_00000499

468.    I agree with certain aspects of Dr. Pinal's opinions, as I described them in the previous paragraph. In particular, I agree that it was known that PEG and PG could esterify with bendamustine. As I explain above, in my opinion this would have motivated the POSA to use aprotic solvents that could not form these ester degradation products, and would have taught away from using PEG and PG in bedamustine formulations. *See, e.g.,* ¶¶ 221, 245.

469.    I further agree with Dr. Pinal that it was known that PEG could form various degradation products. As I explain above, the POSA would have viewed the degradation products of PEG as a disadvantage that would have discouraged the use of that solvent. *See, e.g.,* ¶¶ 339–360.

470.    I disagree, however, with Dr. Pinal that PEG's known sensitivity to oxidation would have motivated or provided reason for the POSA to use an antioxidant with PEG. I likewise disagree that the POSA would have been motivated or had reason to use an antioxidant in conjunction with PG and bendamustine.

471.    As I explain in detail above, the POSA would have been strongly motivated to avoid using an antioxidant in the formulation. *See* ¶¶ 344–360. The POSA would have preferred to keep the formulation as simple as possible; adding an antioxidant would have introduced substantial complexity into the formulation, including increasing the risk of unwanted interactions between the excipients and bendamustine. *See* ¶¶ 344–345. The POSA would have understood that antioxidants are particularly reactive and likely to cause unwanted interactions in the formulation. *See* ¶ 346. Adding an antioxidant would also have been undesirable because the concentration of the antioxidant would have to be maintained throughout the shelf life of the product—in effect, the stability of the product would become dependent on the antioxidant. *See* ¶ 347. The POSA also would have understood that an antioxidant might not completely solve

224

EAGLEBEN-SA_00000500

any potential oxidation problem and that finding an appropriate antioxidant would, in the first instance, be an unpredictable research effort. *See* ¶¶ 349–352.

472.    The undesirability of using antioxidants in pharmaceutical products has been recognized by regulatory bodies. *See* ¶ 348. The European Union's guidance document about antioxidants states that antioxidants "should only be used once it has been shown that their use cannot be avoided." EU Antioxidant Guidance at 2. Moreover, in order to include an antioxidant in a formulation, the EU regulatory body requires a demonstration of "the necessity to add an antioxidant . . . to the finished product at the chosen level" and "the physical and chemical compatibility of the antioxidant . . . with other constituents of the finished product, the container and the closures." *Id.*

473.    Because of these disadvantages, the use of antioxidants in parenteral formulations was on the decline as of the priority date, *see* Broadhead 2001 at 341, JDG_BENDA_00000404 at 415, and the POSA would likewise have been strongly dissuaded from using an antioxidant in creating a new bendamustine formulation.

474.    In view of the disadvantages of using an antioxidant in a parenteral composition, the POSA would not have been motivated or had reason to add an antioxidant based on mere speculation about potential oxidative degradants. Dr. Pinal's opinions on this topic are based on precisely such speculation. *See, e.g.*, Pinal Rep. ¶ 77 ("The POSA would recognize a <u>potential</u> self-propagating problem . . . ." (emphasis added)). As an initial matter, Dr. Pinal seems to be suggesting that his proposed degradation mechanism is "self-propagating." *See* Pinal Rep. ¶ 77. But Dr. Pinal has not described what about his proposed reaction mechanism is self-propagating. For example, Dr. Pinal has not opined that the formation of acidic species from PEG or PG would cause additional degradative breakdown of the PEG or PG to form additional acidic

225

species. If anything, the esterification of bendamustine would be self-inhibiting, since each ester bond formation produces a water molecule and eliminates a carboxylic acid moiety.

475. Moreover, contrary to Dr. Pinal's predictions, neither Olthoff 1983 nor Drager '006 disclose any oxidative degradation issues with their liquid bendamustine formulations. Even if the POSA credited Dr. Pinal's opinions that PEG or PG might be oxidized and form degradation products that would accelerate esterification, this process could turn out to be too slow or too insubstantial to warrant a change to the formulation. The POSA would not have added an antioxidant based on mere speculation about a potential oxidation issue.

476. Even if the POSA were concerned about PEG or PG destabilizing the formulation due to oxidation, the POSA's solution would not have been to use an antioxidant. Rather, the POSA would have simply have avoided the problematic solvent. A review of marketed formulations confirms that this would have been the POSA's preferred option. As noted by Nema 1997, there were relatively few PEG-based formulations on the market, which was likely due to PEG's oxidative instability. *See* ¶ 354; Nema 1997 at 167, JDG_BENDA_00002272 at 2273. Moreover, a review of marketed parenteral products as of the priority date demonstrates that formulations containing PEG do not contain antioxidants. *See* ¶¶ 355–360. This would have suggested to the POSA that formulations that are sensitive to oxidation simply do not contain PEG; the practice is not, as Dr. Pinal implies, to add PEG and also to add an antioxidant. As described in detail below, the POSA would have had a plethora of alternative solvents to experiment with, other than PEG. *See* ¶¶ 702–811.

477. Even if the POSA for some reason insisted on using PEG and PG, and even if the POSA were motivated or had reason to minimize any oxidative breakdown of those excipients, the POSA's solution would not have been to add an antioxidant. Rather, the POSA's first choice

226

EAGLEBEN-SA_00000502

would have been to minimize the formulation's exposure to oxygen. Two ways of minimizing oxygen exposure are to use well-sealed containers and to overlay the formulation with an inert gas, such as nitrogen. These are the procedures that are recommended by Olthoff 1983, for example. *See* Olthoff 1983 at 6, JDG_BENDA_00002301 at 2314. Indeed, European regulations only allowed the use of an antioxidant if these measures fail:

> In the case of antioxidants, these should only be used once it has been shown that their use cannot be avoided, even if the manufacturing process is optimized to minimize the potential for oxidation, for instance by manufacturing and filling products under an inert headspace.

*See* EU Antioxidant Guidance at 2; *see also* Kasraian et al., *Developing an Injectable Formula Containing an Oxygen-Sensitive Drug: A Case Study of Danofloxacin Injectable*, 4 PHARM. DEV. & TECH. 475, 478–49 (1999) ("Kasraian 1999") (explaining that an antioxidant was only added to a danofloxacin formulation after experiments showed that "control of processing operations (e.g., use of nitrogen sparging to reduce dissolved oxygen, control of filled vial headspace composition, and thermal effect of terminal sterilization) alone did not completely eliminate product oxidation/color change on stability").

478. Dr. Pinal has not opined that processing measures—such as manufacturing and/or filling the product under a nitrogen overlay—would have been insufficient to prevent any potential oxidation of PEG and PG. Absent such a showing, the POSA would not have been motivated or had reason to add an antioxidant to a parenteral formulation.

479. Even if the POSA were to find that these processing measures were insufficient to prevent oxidative breakdown of the PEG and PG, the POSA still would have known that there were other options available that would have been preferable to using an antioxidant. As I noted above, the only consequence that Dr. Pinal has identified of the oxidative breakdown of PEG and PG in compositions of bendamustine is the formation of acidic degradation products that would

227

EAGLEBEN-SA_00000503

have accelerated esterification. *See* ¶ 465. The POSA would have known that there were ways of potentially addressing this issue, other than adding an antioxidant. For example, Dr. Pinal has opined that the POSA could have increased the pH of the formulation with a strong base, such as NaOH, to inhibit acid-catalyzed esterification. *See, e.g.*, Pinal Rep. ¶ 78 ("The addition of pH-adjusters such as NaOH (a widely used alkaline substance) was a well-known way to inhibit acid-catalyzed reactions. Addition of sufficient NaOH can even reverse the process of acid-catalyzed esterification." (citations omitted)).

480.    The POSA would have preferred to address esterification via pH adjustment over adding an antioxidant. The POSA would have understood that pH adjustment of a parenteral product is generally a relatively simple formulation option, at least compared to adding an antioxidant. *See, e.g.*, Strickley 2004 at 202, 214, 225, JDG_BENDA_00003290 at 3291, 3303, 3314 ("Adjusting solution pH is the simplest and most common method to increase water solubility . . . ."). The POSA would have had a number of pH adjustment options available for use in a parenteral product, such as a strong base, like NaOH, or a buffer. *See* Strickley 2004 at 214, JDG_BENDA_00003290 at 3303; Nema 1997 at 168–169, JDG_BENDA_00002272 at 2274–75.

481.    For the above reasons, the POSA would not have been motivated or had reason to use an antioxidant in the claimed formulations.

**G.    The POSA Would Not Have Been Motivated To Use Monothioglycerol.**

482.    Several of the asserted claims specifically require monothioglycerol (which the patents also refer to as "thioglycerol") as the antioxidant. Claims 18 and 20 of the '707 patent depend from claim 14, which requires a "stabilizing amount of thioglycerol." And claim 11 of the '797 patent requires that "the antioxidant is thioglycerol or monothioglycerol."

228

EAGLEBEN-SA_00000504

483.    The '707 patent family's specification explicitly refers to monothioglycerol as thioglycerol. *See* '707 patent, 4:2 ("thioglycerol (also known as monothioglycerol)"). In my opinion, the POSA would have interpreted "monothioglycerol" and "thioglycerol" to be the same in view of the '707 patent specification. Dr. Pinal does not opine otherwise. For convenience, I will use the term "monothioglycerol" throughout this report.

484.    Dr. Pinal has opined that the POSA would have been motivated to use monothioglycerol in liquid bendamustine formulations. *See, e.g.*, Pinal Rep. ¶¶ 13, 212–213, 233–236. I disagree.

485.    As an initial matter, in my opinion the POSA would not have been motivated or had reason to use <u>any</u> antioxidant in the claimed bendamustine formulations. I set forth my reasons for that opinion above. *See* ¶¶ 445–481. All of those reasons apply fully in the specific context of monothioglycerol.

486.    With respect to monothioglycerol specifically, it is not clear to me which references or combinations of references Dr. Pinal believes would have motivated the POSA to use monothioglycerol in bendamustine formulations. I understand that Dr. Pinal has opined that the asserted claims would have been obvious in view of (1) Olthoff 1983; (2) Olthoff 1983, Drager '006, and/or Alam '286; and (3) Drager '006 and/or Alam '286. Dr. Pinal's report provides scant explanation, however, of why those references would have motivated or provided reason for the POSA to use monothioglycerol when formulating bendamustine. In my opinion, those references would not have motivated or provided reason for the POSA to use an antioxidant when formulating bendamustine.

487.    Neither Olthoff 1983 nor Alam '286 mention monothioglycerol. I do not understand Dr. Pinal to be opining that either of those references would have motivated or

229

EAGLEBEN-SA_00000505

provided reason for the POSA to use monothioglycerol specifically in liquid bendamustine formulations.

488.    Drager '006 does mention several antioxidants as part of a generic list of pharmaceutically acceptable excipients.  Dr. Pinal has opined that this disclosure would have motivated the POSA to use an antioxidant in liquid bendamustine formulations.  *See* Pinal Rep. ¶ 358.  As I explain above, I disagree that this disclosure from Drager '006 would have motivated or provided reason for the POSA to use an antioxidant.  *See* ¶ 455.  I note, however, that the list of antioxidants in Drager '006 does not include monothioglycerol.  Rather, the antioxidants listed by Drager '006 are tocopherol, ascorbic acid, methyl paraben, buthylhydroxyanisole ("BHA"), butylhydroxytoluene ("BHT"), and propyl gallate.  Drager '006, 7:7–9, JDG_BENDA_00000990 at 999.  I provide the molecular structures for those antioxidants below:

230

EAGLEBEN-SA_00000506

| Tocopherol[4] | |
|---|---|
| Ascorbic acid | |
| Methyl paraben | |
| Buthylhydroxyanisole (BHA)[5] | |
| Butylhydroxytoluene (BHT) | |
| Propyl gallate | |

489.    The POSA would have appreciated that the antioxidants disclosed by Drager '006 share common features. In particular, other than ascorbic acid, all of the antioxidants listed in

---

[4] Several different forms of tocopherol exist, which differ in the number and location of methyl groups attached to the aromatic ring. The version I have depicted, α-tocopherol, had previously been used in parenteral formulations. *See, e.g.*, Strickley 2004 at 215, JDG_BENDA_0003290 at 3304. My opinions would remain the same for the other forms of tocopherol.

[5] BHA exists as a mixture of the two depicted isomers.

231

EAGLEBEN-SA_00000507

Drager '006 are phenol derivatives—that is, they include one or more hydroxyl groups attached to a six-membered, aromatic ring. Ascorbic acid similarly includes two hydroxyl groups attached to a conjugated ring system. Notably, none of the exemplary antioxidants in Drager '006 contain a sulfur atom or a thiol group (that is, an –SH group). In particular, monothioglycerol is not on the list of antioxidants disclosed by Drager '006. To the extent the POSA would have consulted the list of antioxidants in Drager '006, that list would have guided the POSA to other antioxidants to use in liquid bendamustine compositions, both by its omission of monothioglycerol specifically as well as its exclusion of compounds that share its structure generally.

490.    Rather than rely on Olthoff 1983, Drager '006, or Alam '286 for any motivation to use monothioglycerol, Dr. Pinal appears to be opining that the POSA would have been motivated by a variety of other references—specifically, Nema 1997, Boylan 2002, and Rowe 2009—to add that excipient. *See* Pinal Rep. ¶¶ 212–213, 233. Dr. Pinal does not identify the particular combinations of references that he is relying on for his opinion that the POSA would have been motivated or had reason to use monothioglycerol in liquid bendamustine compositions. Nor does he provide any rationale why the POSA would have combined the precise teachings of such references in the manner required to arrive at the claimed inventions.

491.    Dr. Pinal has not explained why the POSA would have been motivated or had reason to consult these additional references (that is, Nema 1997, Boylan 2002, and Rowe 2009) in choosing an antioxidant for a liquid bendamustine composition rather than—for example— Drager '006. In my opinion, if the POSA were motivated or had reason to add an antioxidant to a liquid bendamustine composition (which, in my opinion, the POSA would not have been), the most natural source to consult would have been a list of antioxidants provided in a patent related

232

EAGLEBEN-SA_00000508

to liquid bendamustine formulations. Dr. Pinal provides no explanation for why the POSA would have ignored Drager '006's list of antioxidants and consulted generic lists of antioxidants, such as that in Nema 1997.

492. I disagree with Dr. Pinal that Nema 1997 would have motivated or provided reason for the POSA to use monothioglycerol as an antioxidant in liquid bendamustine formulations. Dr. Pinal cites Nema 1997 for the proposition that monothioglycerol "was a well-known prior art antioxidant used in injectable formulations." Pinal Rep. ¶¶ 53, 213 (citing Nema 1997 at Table IV). I agree with Dr. Pinal that monothioglycerol had previously been used in marketed injectable products. I disagree, however, that this would have provided the POSA with a particularized motivation or reason to use monothioglycerol in liquid bendamustine formulations. Nema 1997 lists seventeen different antioxidants that had previously been used in injectable products. *See* ¶ 88; Nema 1997 at 168, JDG_BENDA_00002272 at 2274. In its text, Nema 1997 notes that "sulfite, bisulfite, and metabisulfite constitute the majority of antioxidants." *Id.* Nema 1997 also notes that BHA, BHT, and propyl gallate may be used in "semi/non-aqueous vehicles." *Id.* Finally, Nema 1997 notes that ascorbic acid (or the salt form, sodium ascorbate) "may serve as an antioxidant, buffer, and chelating agent in the same formulation." *Id.* Nema 1997 makes no textual mention of monothioglycerol. If the POSA were motivated or had reason to consult Nema 1997 in choosing an antioxidant, the most logical places to start would have been the more frequently used antioxidants listed in Table IV or those specifically mentioned in the text, such as sulfite, bisulfite, metabisulfite, BHA, BHT, propyl gallate, or ascorbic acid. BHA, BHT, and propyl gallate in particular would have been reasonable choices, given that Dr. Pinal has only opined that the POSA would have been motivated or had reason to select an antioxidant to deal with the oxidation of the non-aqueous

233

EAGLEBEN-SA_00000509

solvents PEG and PG. *See* Nema 1997 at 168, JDG_BENDA_00002272 at 2274 ("Butylated hydroxyl anisole, butylated hydroxyl toluene and propyl gallate are primarily used in semi/non-aqueous vehicles because of their low aqueous solubility.").

493.    In sum, Nema 1997 would have provided the POSA with no motivation or reason to select monothioglycerol specifically over any other antioxidant contained in a previously approved drug product. To the contrary, Nema 1997 would have guided the POSA to alternative antioxidants as more preferred.

494.    I disagree with Dr. Pinal that Boylan 2002 would have motivated or provided reason for the POSA to use monothioglycerol as an antioxidant in liquid bendamustine formulations. Dr. Pinal includes Boylan 2002 in his string cites to support the proposition that monothioglycerol "was a well-known prior art antioxidant used in injectable formulations." *E.g.*, Pinal Rep. ¶¶ 53, 213 (citing Boylan 2002 at Table 2). But Dr. Pinal does not provide any explanation for how Boylan 2002 would have guided the POSA to use monothioglycerol, except to cite Table 2 of that publication. Table 2 of Boylan 2002 merely is titled "Classes and Examples of Parenteral Additives," and lists ascorbic acid, cysteine, monothioglycerol, sodium bisulfite, sodium metabisulfite, and tocopherols as exemplary antioxidants. Boylan 2002, JDG_BENDA_00000330 at 349. In other words, Boylan 2002 is not even purporting to list all of the antioxidants that had been used in approved parenteral products. Boylan 2002 provides no other teaching that would have directed the POSA to use monothioglycerol specifically. To the contrary, Boylan notes that "[s]alts of sulfur dioxide, including bisulfite, metasulfite, and sulfite, are the most common antioxidants used in aqueous parenterals." Boylan 2002, JDG_BENDA_00000330 at 349. This teaching does not apply to monothioglycerol (which is

234

EAGLEBEN-SA_00000510

not a salt of sulfur dioxide) and would not have motivated or provided reason for the POSA to select monothioglycerol in liquid bendamustine formulations.

495.    I disagree with Dr. Pinal that Rowe 2009 would have motivated or provided reason for the POSA to use monothioglycerol as an antioxidant in liquid bendamustine formulations.  Dr. Pinal cites Rowe 2009 (i.e., *The Handbook of Pharmaceutical Excipients*) for the statement that "Monothioglycerol is used as [an] antioxidant in pharmaceutical formulations, mainly in parenteral preparations."  Pinal Rep. ¶ 213 (quoting Rowe 2009 at 454).  This disclosure is cumulative with Nema 1997, which likewise taught that monothioglycerol had been used in parenteral pharmaceutical formulations.  *See* ¶ 492.  The sentence quoted by Dr. Pinal from Rowe 2009 would not have provided the POSA with any additional information or motivation or reason to use monothioglycerol in the claimed bendamustine formulations.

496.    Dr. Pinal also cites Rowe 2009 for its statement that monothioglycerol is "[i]ncluded in the FDA Inactive Ingredients Database."  Pinal Rep. ¶ 214 (quoting Rowe 2009 at 454).  This statement from Rowe 2009 is also cumulative with Nema 1997's list of antioxidants present in approved parenteral products.  As the FDA's website explains, "The Inactive Ingredient Database provides information on inactive ingredients present in FDA-approved drug products."  *See* U.S. Food & Drug Admin., *Inactive Ingredient Search for Approved Drug Products: Frequently Asked Questions* (last updated October 29, 2018), https://www.fda.gov/Drugs/InformationOnDrugs/ucm080123.htm.  As such, the inclusion of monothioglycerol in the Inactive Ingredient Database would not have provided the POSA with any additional information, motivation, or reason beyond the disclosure of Nema 1997, which I address above.  *See* ¶ 492.

235

EAGLEBEN-SA_00000511

497. In sum, none of the references that Dr. Pinal cites—Nema 1997, Boylan 2002, or Rowe 2009—provide any particularized motivation or reason for the POSA to use monothioglycerol in the claimed formulations. These are all simply generic disclosures of antioxidants that had been used before in parenteral products.

498. Dr. Pinal has also opined that Wu 2011 discloses that PEG is susceptible to oxidation and teaches thioglycerol "as one of the antioxidants of choice." Pinal Rep. ¶ 236. As I explain above, however, Wu 2011 is not prior art to the '707 patent family. *See* ¶ 340. Moreover, Dr. Pinal's citation of Wu 2011 on this issue is misleading. The antioxidant that Wu 2011 mentions in conjunction with PEG is not monothioglycerol, but BHT. *See* Wu 2011 at 1258, JDG_BENDA_00005875 at 5885. As such, even if Wu 2011 were prior art (which it is not) it would not have motivated or provided reason for the POSA to use monothioglycerol in combination with PEG.

499. Dr. Pinal opines that the POSA "would have run antioxidant studies to explore which one(s) would be useful for a liquid [bendamustine] formulation." Pinal Rep. ¶ 212. It is unclear to me if Dr. Pinal is opining that the monothioglycerol claims of the '707 patent family are rendered obvious by the potential for such a study. To the extent that Dr. Pinal is offering such an opinion, I disagree. As I explain throughout this section, even if the POSA had been motivated or had reason to use an antioxidant, the POSA would have known that there were a substantial number of potential antioxidants that could be suitable for use in a liquid parenteral composition—including antioxidants that had previously been used in marketed parenteral products and antioxidants that had not been so used. *See, e.g.,* ¶¶ 501–532. Choosing an appropriate antioxidant is an unpredictable research project with no certainty of success. *See, e.g.,* ¶¶ 349–350; Wang 1980 at 459 ("Selection of an antioxidant is the most difficult task for a

236

EAGLEBEN-SA_00000512

formulator."). Moreover, the POSA would have had particular reasons for suspecting that monothioglycerol would be ineffective in bendamustine compositions. *See* ¶¶ 552–556. And the POSA would have suspected that bendamustine and monothioglycerol could react with each other in a variety of ways. *See* ¶¶ 557–564. These concerns would have motivated the POSA away from experimenting with monothioglycerol in compositions of bendamustine. For all these reasons, it is my opinion that the potential for an "antioxidant stud[y]" by the POSA would not have rendered obvious the monothioglycerol limitations of the asserted claims.

500.    Dr. Pinal opines that the "POSA would not have chosen any salts in Table 4 [of Nema 1997] because the salt would not be ionized, hence it would not dissolve, in a nonaqueous solvent system." Pinal Rep. ¶ 213 n.8; *see also* Pinal Rep. ¶ 235 ("The POSA would also have shied away from using salts as an antioxidant because they are poorly soluble in nonaqueous solvents."). As an initial matter, if Dr. Pinal were right that salts could not dissolve in a "90% PEG:10% PG" formulation, this would have taught the POSA away from using those solvents, since bendamustine <u>hydrochloride</u> is a salt. Both Treanda® and Ribomustin® contained bendamustine hydrochloride. *See* Ribomustin® Product Monograph at 8 (2005), JDG_BENDA_00000001 at 8; Treanda® Label at 1 (2008), JDG_BENDA_00003382 at 3382. In addition, the experiments described in Olthoff 1983 and Drager '006 (which used bendamustine hydrochloride) demonstrate that salt forms of bendamustine can dissolve in non-aqueous solvent systems. *See* Olthoff 1983 at 6, JDG_BENDA_00002301 at 2314; Drager '006, 8:5–40, JDG_BENDA_00000990 at 999. This fact undercuts Dr. Pinal's sweeping conclusion that salts cannot dissolve in non-aqueous solvents. In any event, I disagree that the POSA would have ignored the salts in Table IV of Nema 1997.

237

EAGLEBEN-SA_00000513

501.    First, even if Dr. Pinal were correct that many of the antioxidants in Nema 1997 would have been unavailable to the POSA because of limited antioxidant solubilities in non-aqueous solvent systems, that fact would have motivated the POSA to avoid using a formulation made entirely of non-aqueous solvents.  As I explain above, one of the advantages of using an aqueous formulation is the compatibility of water with a large number of excipients commonly used in parenteral formulations.  *See* ¶ 174.  If Dr. Pinal were right that certain antioxidants were "incompatible" with a non-aqueous solvent system, this fact would have dissuaded the POSA from using such a system.  Alternatively, if the POSA were to use a non-aqueous solvent system, this fact would have dissuaded the POSA from using an antioxidant.

502.    Second, even if the POSA were to use a formulation made up entirely of non-aqueous solvents, the POSA would have expected to add only a very small amount of any antioxidant to the formulation.  *See, e.g.,* ¶ 88; Nema 1997 at 168, JDG_BENDA_00002272 at 2274 (listing antioxidant amounts in approved products).  For example, the range of antioxidant concentrations of sodium bisulfite (called "bisulfite sodium") listed in Nema 1997 is 0.02–0.66%.  *Id.*  As such, the POSA would have understood that the formulation would only need to provide a minimal solubility for the antioxidant.

503.    Third, Dr. Pinal is incorrect that the salts in Table IV of Nema 1997 are all insoluble in non-aqueous solvent systems.  The *Handbook of Pharmaceutical Excipients* discloses the following solubility information for some of the salts listed in Table IV of Nema 1997:

- Ascorbate sodium: Practically insoluble in chloroform; very slightly soluble in ethanol (95%); practically insoluble in ether; soluble 1 in 1.6 parts of water, 1 in 1.3 parts of water at 75°C.  Rowe 2009 at 626.

- Glutamate monosodium: Soluble in water; sparingly soluble in ethanol (95%). Rowe 2009 at 452.

238

- Formaldehyde sulfoxylate sodium: Freely soluble in water; slightly soluble in ethanol, chloroform, ether and benzene. Rowe 2009 at 645.

- Metabisulfite potassium: Soluble 1 in 2.2 of water; practically insoluble in ethanol (96%). Rowe 2009 at 578.

- Metabisulfite sodium: Slightly soluble in ethanol (95%); freely soluble in glycerin; soluble 1 in 1.9 parts of water, 1 in 1.2 parts water at 100°C. Rowe 2009 at 654.

- Sulfite sodium: Soluble 1 in 3.2 parts of water; soluble in glycerin; practically insoluble in ethanol (95%). Rowe 2009 at 669.

504. As the list in the previous paragraph makes clear, many of the antioxidant salts listed in Nema 1997 are soluble to some extent in one or more organic solvents. For example, both sodium metabisulfite and sodium sulfite are soluble in glycerin. Likewise, many of the antioxidant salts disclosed in Nema 1997 have some solubility in ethanol. For example, formaldehyde sulfoxylate sodium is slightly soluble in ethanol. The POSA would have understood that "slightly soluble" was a term of art, meaning 1 part of the solute is soluble in 100–1000 parts of the solvent. *See* USP 32 § 5.30; USP 33 § 5.30; Rowe 2009 at xi. The full table of solubility definitions is reproduced below:

| Very soluble | 1 part in less than 1 |
|---|---|
| Freely soluble | 1 part in 1–10 |
| Soluble | 1 part in 10–30 |
| Sparingly soluble | 1 part in 30–100 |
| Slightly soluble | 1 part in 100–1000 |
| Very slightly soluble | 1 part in 1000–10 000 |
| Practically insoluble or insoluble | 1 part in more than 10 000 |

*See* USP 32 § 5.30; USP 33 § 5.30; Rowe 2009 at xi. An antioxidant that was "slightly soluble" in ethanol would have a solubility of between approximately 1% and 0.1% in that solvent. That would have been sufficiently high for the POSA to consider using the antioxidant in a formulation based on ethanol. *See* Nema 1997 at 168, JDG_BENDA_00002272 at 2274 (disclosing the use of formaldehyde sulfoxylate sodium at concentrations of 0.075% to 0.5%).

239

EAGLEBEN-SA_00000515

505.    In view of the above solubility information, the POSA would have considered adding one of the solvents in which the particular antioxidant was soluble.  For example, the POSA could have added a small amount of glycerin to the formulation to allow for the use of these sulfite salts.  The POSA could even have added a small amount of water, which would help solubilize the vast majority of the antioxidants listed above.  Although this would pose some risk of increasing the hydrolysis of bendamustine, the POSA would need to actually conduct the experiment to see if the benefit of the antioxidant outweighed any instability caused by the addition of a small amount of water.                    REDACTED

506.    I note that the *Handbook of Pharmaceutical Excipients* does not disclose the solubilities of any of the antioxidant salts listed above in PG or PEG or combinations of those excipients.  Assuming the POSA chose PEG and PG, the POSA would have had to actually run the experiments to see if each antioxidant was soluble in a combination of PEG and PG.  Knowing the solubility of many of the antioxidants in other organic solvents would have motivated the POSA to try those antioxidants in PEG and PG.

507.                         REDACTED

240

EAGLEBEN-SA_00000516

508.    In sum, Dr. Pinal has cited no evidence to suggest that the antioxidant salts listed in Nema 1997 would have been insoluble in any organic solvent, much less in the claimed PEG and PG formulations. The POSA would have understood that those antioxidants are soluble, to some extent, in many organic solvents, and the POSA would not have ignored those antioxidants in formulating liquid bendamustine compositions. The POSA would have understood that she or he could add a small amount of one of the solvents in which the antioxidant was soluble to sufficiently solubilize it.

509.    Dr. Pinal has also opined that the "POSA would not have chosen any antioxidants that are acids, because the addition of acids to the formulation increases the risk of esterification." Pinal Rep. ¶ 212 n.8; *see also* Pinal Rep. ¶ 234 (similar). I disagree that the POSA would have ignored the "acids" on the list from Nema 1997 for this reason.

510.    First, Dr. Pinal does not explain which of the antioxidants in Nema 1997 he considers to be "acids." For example, I note that one of the antioxidants on the Nema 1997 list— cysteine—does not have the word "acid" in it, but is an amino acid. Moreover, the POSA would have known that each of the excipients on the Nema 1997 list with an acidic moiety would affect the formulation differently (for example, due to differences in the pKas of the acidic moieties). Dr. Pinal fails to account for these differences or to provide any opinion about the individual acidic excipients.

511.    Second, the POSA would have understood that acidifying a bendamustine composition could potentially stabilize the composition. It was known that acidifying a bendamustine formulation would increase the likelihood of protonation of the nitrogen in the nitrogen mustard moiety, which could slow degradation of that moiety. *See, e.g.,* Maas 1994 Translation at 1, JDG_BENDA_00002261 at 2264 ("In a highly acidic solution, hydrolysis is

241

EAGLEBEN-SA_00000517

made difficult by protonation of the free electron pair on the nitrogen."). The POSA would have hypothesized that adding an acidic antioxidant might therefore stabilize a bendamustine formulation—even a formulation with only non-aqueous solvents—by preventing the formation of the aziridinium ring and the subsequent degradation of that moiety via nucleophilic attack.

512.                           REDACTED

513.    Third, even if the POSA did expect that acidification of the bendamustine formulation would be problematic, Dr. Pinal does not opine that the amount of antioxidant to be added would cause any appreciable effect on the pH of the bendamustine formulation. For example, Nema 2007 reports that gentisic acid had previously been used as an antioxidant at a concentration of 0.02%. Nema 2007 at 168, JDG_BENDA_00002272 at 2274. Dr. Pinal has not opined that adding 0.02% of gentisic acid would change the pH of a bendamustine hydrochloride

242

EAGLEBEN-SA_00000518

formulation, much less that it would cause a sufficiently large change in pH to accelerate the esterification of bendamustine to any noteworthy extent.

514.    Fourth, compositions of bendamustine hydrochloride (which is the hydrochloric acid salt of bendamustine) are already quite acidic, and Olthoff 1983 reports that the addition of ascorbic acid (one of the antioxidants on the Nema 1997 list) did not change the pH of the solution.  *See* Olthoff 1983 at 3, JDG_BENDA_00002301 at 2311 ("The pH value of a bendamustine hydrochloride solution, which is within the range of 2.4 to 3.0, is not significantly altered by the addition of the ascorbic acid.").

515.    In sum, I disagree that the POSA would have avoided acidic antioxidants for fear of accelerating an esterification reaction.

516.    Dr. Pinal has opined that the POSA would not have chosen to use propyl gallate or gentisic acid because "each carries 3 –OH groups in its molecular structure."  Pinal Rep. ¶ 212 n.8.

517.    As an initial matter, as Dr. Pinal acknowledges, monothioglycerol has two –OH groups in its molecular structure.  *See* Pinal Rep. ¶ 213 (illustrating monothioglycerol structure). Dr. Pinal provides no explanation as to why the POSA would have been motivated or had reason to use an antioxidant with two hydroxyl groups, but would have avoided antioxidants with three hydroxyl groups.  If anything, Dr. Pinal's argument would have motivated the POSA to an antioxidant with a single hydroxyl group, such as BHT or BHA, or an antioxidant with no hydroxyl groups, such as sodium metabisulfite.

518.    Moreover, Dr. Pinal's cursory treatment of the molecular structures of propyl gallate and gentisic acid overlook several important points.  Below, I reproduce the chemical structures for propyl gallate, gentisic acid, and monothioglycerol.

243

EAGLEBEN-SA_00000519

| Propyl Gallate | |
| Gentisic Acid | |
| Monothioglycerol | |

As the above structures make clear, propyl gallate has three hydroxyl groups attached to an aromatic ring. Gentisic acid has two hydroxyl groups attached to an aromatic ring, with another --OH group that is part of a carboxylic acid moiety. Dr. Pinal has not opined that two carboxylic acids can esterify with each other. Rather, I understand from Dr. Anslyn that the POSA would have understood that the reaction of two carboxylic acids (which would form an anhydride) is energetically unfavorable and would not be expected to occur under standard conditions. *See* Anslyn Rep. ¶ 169. Moreover, I understand from Dr. Anslyn that the POSA would have understood that a hydroxyl group attached to an aromatic ring (that is, a phenol) is much less reactive than a hydroxyl group attached to an aliphatic carbon (that is, an alcohol). *See* Anslyn Rep. ¶¶ 165–168. I understand that the POSA would have understood that, under typical conditions, a phenol would be much less prone to form an ester with a carboxylic acid than an alcohol group. *See* Anslyn Rep. ¶ 168. As such, contrary to Dr. Pinal's opinion, the POSA would have been motivated to use antioxidants such as propyl gallate and gentisic acid, instead of monothioglycerol, to avoid esterification problems.

244

EAGLEBEN-SA_00000520

519. Dr. Pinal has opined that—after eliminating the salts and acids in Nema 1997, as well as propyl gallate—the POSA would just have been left with BHT, BHA, and monothioglycerol. Pinal Rep. ¶ 212. Dr. Pinal opines that, of "these three antioxidants, the list is so small and they all could work, so the selection of any one of them is obvious." *Id.* I disagree with this opinion.

520. First, as I explain above, Dr. Pinal is wrong that the POSA would have ignored any of the antioxidants on the Nema 1997 list. In particular, the POSA would not have ignored salts, acids, or propyl gallate. *See* ¶¶ 500–518.

521. Moreover, Dr. Pinal is wrong that the POSA would have been confined to the list of antioxidants in Nema 1997. The POSA in 2010 would have understood that that list was thirteen years old. Other antioxidants had been used in approved parenteral products since then. For example, alpha-tocopherol is listed in the Inactive Ingredient Database for both lyophilized and solution IV products. *See* Inactive Ingredient Database (Dec. 31, 2009), TEVABEND00288118 at 288123; Rowe 2009 at 31–33 (noting that alpha-tocopherol was included in the FDA Inactive Ingredients Database for IV injections). The *Handbook of Pharmaceutical Excipients* states that alpha-tocopherol (also referred to as "vitamin E") "is unlikely to pose any hazard to human health" when used as an antioxidant. *See* Rowe 2009 at 31–33 ("The use of tocopherols as antioxidants in pharmaceuticals and food products is unlikely to pose any hazard to human health since the daily intake from such uses is small compared with the intake of naturally occurring tocopherols in the diet."). The *Handbook of Pharmaceutical Excipients* further states that alpha-tocopherol is freely soluble in ethanol. *See* Rowe 2009 at 32. Alpha-tocopherol also only contains a single hydroxyl group attached to an aromatic ring, which the POSA would have understood would have been much less reactive than the hydroxyl groups

245

EAGLEBEN-SA_00000521

in monothioglycerol. *See* Anslyn Rep. ¶¶ 165–168. This would have caused the POSA to prefer alpha-tocopherol over monothioglycerol as an antioxidant in bendamustine compositions.

522.    Sulfur dioxide was also listed on the Inactive Ingredient Database for intravenous infusion and is characterized as an antioxidant in the *Handbook of Pharmaceutical Excipients*. *See* Inactive Ingredient Database (Dec. 31, 2009), TEVABEND00288118 at 288290; Rowe 2009 at 718–719. The POSA would have noted that sulfur dioxide is soluble in water, ethanol, and ether. Rowe 2009 at 718–719. Sulfur dioxide contains no hydroxyl groups and thus could not form esters with bendamustine.

523.    Methionine was also listed on the Inactive Ingredient Database for intravenous infusion and is characterized as an antioxidant in the *Handbook of Pharmaceutical Excipients*. *See* Inactive Ingredient Database (Dec. 31, 2009), TEVABEND00288118 at 288205; Rowe 2009 at 436–437. The *Handbook of Pharmaceutical Excipients* also notes that methionine had been used in parenteral products in the UK. Rowe 2009 at 436–437. Methionine contains only a single hydroxyl group, which is part of a carboxyl group in an amino acid moiety. I understand, based on Dr. Anslyn's report, that the POSA would have understood that such a carboxyl group would not be expected to react with the carboxylic acid in bendamustine. *See* Anslyn Rep. ¶¶ 237–240.

524.    Sodium thiosulfate was also listed on the Inactive Ingredient Database for intravenous administration and is characterized as an antioxidant in the *Handbook of Pharmaceutical Excipients*. *See* Inactive Ingredient Database (Dec. 31, 2009), TEVABEND00288118 at 288281; Rowe 2009 at 671–672.

246

EAGLEBEN-SA_00000522

525. Malic acid is characterized as an antioxidant in the *Handbook of Pharmaceutical Excipients*, which discloses that it had been used in parenteral medicines in the UK. *See* Rowe 2009 at 671–672.

526. The POSA would have considered the above-listed antioxidants for use in bendamustine formulations, given that they had previously been used in marketed parenteral products.

527. In addition to antioxidants that had previously been used in approved parenteral products, the POSA also would have looked to the pharmaceutical literature to identify other antioxidant candidates that had not previously been used in approved parenteral formulations. There is a wide range of such antioxidants. For example, although alpha-tocopherol had previously been used in intravenous infusion products, the *Handbook of Pharmaceutical Excipients* explains that "beta, delta, and gamma tocopherols are considered to be more effective as antioxidants" than alpha tocopherol. Rowe 2009 at 31–33. Another molecule that might have been of interest to the POSA was Vitamin E polyethylene glycol succinate, which is an ester of tocopherol and PEG that had both solubilizing and antioxidant properties and had been used in parenteral formulations reported in the literature. Rowe 2009 at 764–765.

528.                    REDACTED

247

EAGLEBEN-SA_00000523

REDACTED

529.                                        REDACTED

530.    Dr. Pinal also wrongly assumes that the POSA would have been limited to trying

single antioxidants.  To the contrary, the POSA would have known that antioxidants could exert

synergistic effects, which would have motivated the POSA to try combinations of antioxidants.

*See* Akers 1982 at 227, JDG_BENDA_00006113 at 6119 ("It is well known that combinations of

antioxidants in the same formulation produce a synergistic effect on the anti-oxygenic behavior

of one or both antioxidant compounds.").  Moreover, the POSA would have been aware of an

entire category of compounds—antioxidant synergists—that "in themselves, have no capability

of protecting oxygen-sensitive drugs, but when combined with antioxidants, do serve to increase

the maintenance of oxidative stability of the drug." *Id.*  Antioxidant synergists can act by

"complexing trace amounts of metal," "lowering the solution pH," or "decreasing the oxygen

stability in the solution." *Id.*

531.                                        REDACTED

---------------------------------------------------------------------
REDACTED

248

EAGLEBEN-SA_00000524

REDACTED

532.    For all of these reasons, I disagree with Dr. Pinal's opinions that the POSA would have been limited to just monothioglycerol, BHA, and BHT in choosing an antioxidant. The POSA would have understood that there were many additional antioxidants available to try, including antioxidants that both had and had not previously been used in parenteral products, many of which Dr. Pinal has offered no opinion about. The POSA also would have understood that antioxidants could be used in combination with each other or in combination with an antioxidant synergist. These options substantially expand the range of possibilities at the POSA's disposal in choosing an antioxidant system, and I disagree that it would have been obvious for the POSA to settle on monothioglycerol in light of these possibilities.

533.    Even if Dr. Pinal is right—that the POSA would have been limited to just BHA, BHT, and monothioglycerol—I disagree with Dr. Pinal's opinion that the selection of monothioglycerol would therefore have been obvious. As I explain at length below, the POSA would have had serious concerns about monothioglycerol that would not apply to BHA or BHT, including monothioglycerol's effectiveness as an antioxidant in bendamustine hydrochloride formulations and monothioglycerol's likelihood of reacting with bendamustine. *See* ¶¶ 552–560. These concerns would have motivated the POSA to choose BHA or BHT over monothioglycerol. Because the POSA would not have been motivated or had reason to select monothioglycerol, my

249

EAGLEBEN-SA_00000525

understanding is that limitations requiring that excipient would not have been obvious to the POSA.

534.    Moreover, I do not share Dr. Pinal's understanding that a particular excipient is obvious simply because it is one of a finite list of options. In particular, it is my understanding that selecting an option from a finite list can be non-obvious if it would have been unpredictable whether the options would succeed. As the relevant literature makes clear, the choice of an antioxidant is an unpredictable endeavor. *See, e.g.*, Akers 1982 at 227, JDG_BENDA_00006113 at 6119 ("Currently, there is no reliable method of evaluating and predicting the effectiveness of antioxidant activity in pharmaceutical products."); Wang 1980 at 459 ("Selection of an antioxidant is the most difficult task for a formulator. Not only is preformulation screening of antioxidant efficacy often misleading, but other factors such as interaction with the stopper, effectiveness of nitrogen purge, and stability of the antioxidant itself could complicate the entire picture."). Dr. Pinal has offered no opinion to the contrary. As such, even if the POSA were limited to a choice of just three antioxidants (which would not have been the case), the choice of monothioglycerol would nevertheless have been non-obviousness in view of the unpredictable nature of appropriate antioxidant selection, including in bendamustine formulations.

535.    Dr. Pinal has opined that the "POSA would have felt confident using monothioglycerol" because of "its already demonstrated effectiveness to protect a nitrogen mustard drug (*i.e.*, one in the same chemical class as [bendamustine])." Pinal Rep. ¶ 213. Dr. Pinal offers no citation for this statement or any further explanation as to which "nitrogen mustard drug" monothioglycerol had been demonstrated to protect.

536.    Even if Dr. Pinal had cited an example in which monothioglycerol had been demonstrated to protect a nitrogen mustard molecule (which Dr. Pinal has not), that would not

250

EAGLEBEN-SA_00000526

have motivated or provided reason for the POSA to use monothioglycerol in this instance. This is because Dr. Pinal has not opined that the POSA would have added monothioglycerol to prevent the oxidation of bendamustine itself. Rather, Dr. Pinal's only proposed motivation for the POSA choosing monothioglycerol (or any antioxidant) is to prevent the degradation of PEG and PG, because that degradation would accelerate the esterification of bendamustine. Nowhere in Dr. Pinal's report does he opine that the POSA would have been motivated or had reason to add an antioxidant to the claimed compositions to prevent the oxidation of bendamustine itself. *See* ¶ 465. As such, a prior art example of monothioglycerol protecting a different nitrogen mustard molecule from being oxidized would have been irrelevant to the POSA, since that is not the purpose for which the POSA would have been using monothioglycerol in this instance (according to Dr. Pinal).

537. Even if Dr. Pinal had pointed to a particular example of monothioglycerol protecting a different nitrogen mustard compound (which he has not), he offers no opinion that the mechanism of oxidation in that hypothetical molecule would have also occurred in bendamustine. He likewise has offered no opinion that—even if monothioglycerol worked in protecting that unknown molecule—it would have offered similar protection to bendamustine.

538. In sum, Dr. Pinal has failed to offer any evidence of monothioglycerol stabilizing any nitrogen mustard, much less bendamustine. Dr. Pinal has likewise failed to point to any evidence suggesting that monothioglycerol would have been effective at stabilizing PEG and/or PG, including in bendamustine formulations.

539. I understand that monothioglycerol was used in a composition of ifosfamide in Tait '125. *See* Tait '125 at 14, JDG_BENDA_00003332 at 3346. In my opinion, the disclosures

251

EAGLEBEN-SA_00000527

in Tait '125 would not have motivated or provided reason for the POSA to use monothioglycerol in compositions of bendamustine.

540.    First, the data in Tait '125 do not suggest that monothioglycerol was an effective antioxidant with ifosfamide. Tait '125's disclosure is difficult to discern with respect to the potential efficacy of monothioglycerol as an antioxidant in the described formulations, but appears to suggest that using a combination of glycerol (25%–65%) with ethanol plus either sodium metabisulfite (saturated), sodium formaldehyde sulfoxylate (saturated), or monothioglycerol (0–5%) yielded a composition with a color from "colourless to very pale straw color." Tait '125 at 14, JDG_BENDA_00003332 at 3346 (emphasis added). Tait '125's failure to provide data for each of sodium metabisulphite, sodium formaldehyde sulphoxylte, and monothioglycerol would have reduced the POSA's confidence in the effect of any one of those excipients. Moreover, the range disclosed for monothioglycerol—which includes 0%—suggests that the addition of monothioglycerol was not critical to ensuring the stability of the formulations. In other words, the effect of adding no monothioglycerol at all ("0%") or adding up to 5% monothioglycerol was similar (or at least not distinguished by the Tait '125 inventors), casting doubt on monothioglycerol's efficacy in the described formulations. Moreover, any improvement that the Tait '125 inventors obtained by using an antioxidant was not quantified. See id. (noting that the addition of an antixodant altered the color change from "pale straw color" (without antioxidant) to "colourless to very pale straw colour" (with antioxidant)). Rather, the most significant effect in Tait '125 in avoiding discoloration was observed with the use of ethanol ("Solutions colourless"). Id. at 13–14, JDG_BENDA_00003332 at 3345–46. The POSA also would have noted the Tait '125 inventors did not use monothioglycerol in their "Stability trials." See id. at 15, JDG_BENDA_00003332 at 3347. In sum, the scant data about

252

EAGLEBEN-SA_00000528

monothioglycerol in Tait '125 would not have motivated or provided reason for the POSA to use that antioxidant, including in compositions of bendamustine.

541.    Second, the POSA would have understood that ifosfamide undergoes very different chemical reactions than bendamustine. I illustrate the relevant chemical structures below:

| Bendamustine | Ifosfamide |
| --- | --- |
| | |

542.    As is plain from the above illustration, ifosfamide lacks a carboxylic acid moiety. As such, the POSA would not have been concerned about ifosfamide undergoing an esterification reaction. As I explain above, the only motivation or reason that Dr. Pinal has articulated for the POSA using an antioxidant in the claimed formulations is to prevent bendamustine from degrading via esterification. *See* ¶ 465. Since ifosfamide cannot degrade via esterification, Tait '125's use of antioxidants would not have motivated or provided reason for the POSA to add monothioglycerol or any other antioxidant to bendamustine formulations. Indeed, I note that Dr. Pinal himself opined that Alam '286's failure to use an antioxidant was irrelevant precisely because cyclophosphamide (a structurally similar compound to ifosfamide) could not esterify. *See* Pinal Rep. ¶ 358.

543.    Dr. Pinal, moreover, has not opined that any potential oxidation occurring in ifosfamide would also occur in bendamustine. Tait '125 does not disclose detailed information

253

EAGLEBEN-SA_00000529

about the degradation products of that molecule. In particular, Tait '125 does not disclose any mechanism by which ifosfamide degrades via oxidation or how the antioxidant affects that reaction. The POSA would thus not have assumed that bendamustine—which has a very different chemical structure than ifosfamide—would undergo similar oxidative degradation as ifosfamide. Indeed, given the substantial differences in molecular structure, the POSA would have highly doubted that any hypothetical oxidative degradation of ifosfamide would occur in bendamustine. As such, the use of an antioxidant in an ifosfamide composition would not have been relevant to a formulator when making a bendamustine composition. For that reason as well, Tait '125 would not have motivated or provided reason for the POSA to use monothioglycerol or any other antioxidant in bendamustine formulations.

544. I opine elsewhere in this section that the POSA would have had concerns about monothioglycerol reacting with bendamustine to form degradation products. *See, e.g.,* ¶¶ 557–560. The use of monothioglycerol in compositions of ifosfamide in Tait '125 would not have alleviated those concerns of the POSA. First, Tait '125 fails to provide details about the degradation products in an ifosfamide-monothioglycerol composition. As such, Tait '125 does not provide any mechanistic information about any potential reactions involving ifosfamide or monothioglycerol. Second, the POSA would have understood that ifosfamide does not contain a carboxylic acid moiety. *See* ¶¶ 541–542. As such, the POSA would not have been concerned about monothioglycerol esterifying with ifosfamide, whereas the POSA would have expected such a reaction to occur between monothioglycerol and bendamustine. *See* ¶ 542. Third, I understand from Dr. Anslyn that the POSA would have understood that ifosfamide was a less reactive prodrug that did not form an aziridinium ring until undergoing enzymatic transformation in the body. *See* Anslyn Rep. ¶¶ 218–221. As such, the POSA would not have been concerned

254

EAGLEBEN-SA_00000530

about the thiol group in monothioglycerol attacking an aziridinium ring in ifosfamide, whereas the POSA would have expected such a reaction to occur between monothioglycerol and bendamustine (because of the aziridinium ring that can form at the nitrogen mustard group). *See* ¶¶ 559–560. For these reasons, the use of monothioglycerol in Tait '125 would not have motivated or provided reason for the POSA to use monothioglycerol in bendamustine formulations, and it would not have allayed any of the POSA's concerns about undesired chemical reactions between bendamustine and monothioglycerol.

545. Dr. Pinal has opined that the POSA would have selected monothioglycerol because "the chemical structure of monothioglycerol can be sketched starting with the molecule of PG and simply adding a thiol (–SH) group to it, giving the POSA confidence on the compatibility of monothioglycerol with PG." Pinal Rep. ¶ 213. I disagree that the POSA would have been motivated or had reason to select monothioglycerol on this basis.

546. First, I am uncertain what Dr. Pinal means by "compatibility" in this context. Dr. Pinal provides no clarification of his opinion on this issue. My best guess is that Dr. Pinal is referring to potential chemical reactions that could occur between the two excipients. *See, e.g.,* Rowe 2009 at 454, JDG_BENDA_00006557 at 6562 (for monothioglycerol, listing under "Incompatibilities" that monothioglycerol "can react with oxidizing materials"). However, Dr. Pinal has not suggested that any of the other antioxidants available to the POSA would have yielded such an incompatibility with PG. As such, I disagree that monotioglycerol's theoretical "compatibility" with PG would motivated or provided reason for the POSA to use monothioglycerol in a bendamustine formulation.

547. Second, whatever Dr. Pinal means by "compatibility," I disagree that the relevant comparison would have been between PG and monothioglycerol. Dr. Pinal has opined that the

255

EAGLEBEN-SA_00000531

POSA would have arrived at a formulation with 90% PEG and only 10% PG. *See, e.g.*, Pinal Rep. ¶¶ 13, 193, 257. As such, any "compatibility" should first be assessed with respect to the principal solvent, PEG. Dr. Pinal has not offered any opinion that monothioglycerol would have been "compatible" with PEG. Indeed, Dr. Pinal does not cite a single example of a formulation in which monothioglycerol had ever been used to stabilize a formulation comprising PEG.

548.   As part of the formulation development process, the POSA would actually have ensured that all of the ingredients were compatible with all of the other ingredients, as well as the container closure system. As I explain above, adding an antioxidant to a formulation substantially increases the difficulty of that exercise, because the antioxidant must be compatible with (that is, must not react with) the other formulation components or the container closure system. *See* ¶ 344. Dr. Pinal has not opined that any of the other antioxidants available to the POSA would have been expected to be incompatible with PEG, PG, or the intended container closure system.

549.   Third, I disagree with Dr. Pinal's suggested method of assessing "compatibility." The POSA would have known that at thiol can be a highly reactive moiety. *See* Anslyn Rep. ¶¶ 171–184. The POSA would not have assumed that two excipients would have been "compatible" simply because they shared some portions of their molecular structure. Rather, absent any literature precedent (which Dr. Pinal does not provide), the POSA would have needed to experimentally assess the compatibility between every potential antioxidant, including monothioglycerol, and every other ingredient in the formulation, including PG, as well as the container closure system.

550.   Fourth, even if Dr. Pinal were right that the POSA were motivated to choose an antioxidant based on structural similarity to the solvent (which I disagree with), a more

256

promising choice would have been Vitamin E polyethylene glycol succinate, which is an ester of tocopherol and PEG. In a 90:10 PEG:PG mixture, PEG clearly dominates. Rowe 2009 at 764–765.

551.    In sum, the POSA would not have chosen monothioglycerol because it shares some structural similarities with PG.

552.    By contrast, the POSA would have had reasons for avoiding monothioglycerol in the claimed formulations. In particular, the POSA would have been concerned that monothioglycerol might not be effective at low formulation pHs. This is well demonstrated by a publication by Kasraian and colleagues concerning the development of a danofloxacin formulation. *See* Kasraian 1999. The authors explain that they decided to add an antioxidant to the danofloxacin formulation after "processing operations (e.g., use of nitrogen sparing to reduce dissolved oxygen, control of filled vial headspace composition, and thermal effect of terminal sterilization) alone did not completely eliminate the product oxidation." *Id.* at 477–78. They therefore conducted an antioxidant screen and eventually chose monothioglycerol. *Id.* However, they found that the efficacy of monothioglycerol was pH sensitive. In particular, at a pH of 7.5, monothioglycerol improved the stability of the formulation. By contrast, the authors found that "at pH 6.0 there was no apparent effect of monothioglycerol on the stability of danofloxacin." *Id.* at 479. By measuring the oxidation potential for monothioglycerol as a function of pH, the authors determined that "the oxidation potential for [monothioglycerol] changes as the pH is lowered, making [monothioglycerol] less likely to be oxidized at lower pH," and, consequently, act as an antioxidant. *Id.* Ultimately, the authors found that "[monothioglycerol] is more effective as an antioxidant at pH 7.5 than at pH 6.0." *Id.*

257

EAGLEBEN-SA_00000533



**Figure 3.** The effect of MTG on danofloxacin stability at pH 7.5 (drug concentration of 0.1 mg/ml; storage temperature of 70°C).



*Id.*

553.   Kasraian 1999 would have strongly dissuaded the POSA from using monothioglycerol in the claimed formulations. The POSA would have known that bendamustine hydrochloride solutions tend to be acidic. For example, Olthoff 1983 reports that bendamustine hydrochloride solutions have a pH between 2.4 and 3.0, which is well below the pH of 6.0 at which the Kasrian 1999 authors found that monothioglycerol was completely ineffective. The POSA would have concluded that monothioglycerol was therefore a poor choice for bendamustine hydrochloride formulations, which were likely to be quite acidic.

554.   I understand that Dr. Pinal has opined that the POSA would have been motivated to make non-aqueous bendamustine formulations. I understand that there are procedures for

258

EAGLEBEN-SA_00000534

assessing the "apparent pH value" of non-aqueous formulations. *See* USP 33 <791>; USP 32 <791>.                                        REDACTED

555.    The POSA also would have been aware of literature examples where monothioglycerol proved inferior to other antioxidants.  One such example involved the development of a formulation for an anticancer drug, AG2034, that was oxygen sensitive. *See* Li et al., *Degradation Mechanism and Kinetic Studies of a Novel Anticancer Agent*, AG2034, 167 INT'L J. PHARM. 49 (1998).  The authors screened a number of antioxidants (monothioglycerol, sodium thiosulfate, cysteine, and sodium sulfite), and found that sodium thiosulfate "was the only stabilizing agent which could slightly slow down the oxidation process." *Id.* at 55.  In the stability experiment, monothioglycerol more than doubled the oxidation products compared to control (29% versus 13%) and led to lower purity measurements (72% versus 87%). *Id.*  Thus,

259

EAGLEBEN-SA_00000535

not only did monothioglycerol perform more poorly than other tested antioxidants, it actually increased oxidative degradation.

556.    Another example is Strickley et al., *Solubilization and Stabilization of an Anti-HIV Thiocarbamate, NSC 629243, for Parenteral Delivery, Using Extemporaneous Emulsions*, 10 PHARM. RES. 1076 (1993) ("Strickley 1993").  That study involved the development of a formulation for a highly lipophilic drug, NSC 629243.  *Id.* at 1076.  The authors opted to use a non-aqueous sesame oil formulation to solubilize the drug, but found that the drug molecule was subject to oxidation.  *See id.* at 1080.  The authors experimented with a number of antioxidants, including BHA, BHT, vitamin E, cysteine, thioglycerol, N-acetylcysteine, and thioglycolic acid.  *See id.* at 1081.  Thioglycerol was one of the worst performing antioxidants, yielding a substantial decrease in stability compared to a control formulation without an antioxidant.  *Id.* (control: 76% remaining; 0.1% thioglycerol: 61% remaining).  The POSA would have considered this study to be especially notable, since it showed that monothioglycerol was not effective in stabilizing a non-aqueous formulation.

557.    The POSA also would have been concerned that monothioglycerol could form esters with bendamustine.  Like PG, monothioglycerol contains two alcohol groups: a primary alcohol and a secondary alcohol.  *See* Pinal Rep. ¶ 213.  As such, based on Dr. Anslyn's report, I understand that the POSA would have expected the alcohol groups in monothioglycerol to form esters with bendamustine at a similar rate as PG.  *See* Anslyn Rep. ¶¶ 158–170.  This would have dissuaded the POSA from using monothioglycerol in formulations with bendamustine.

558.    The POSA would have been aware that there were many antioxidants that would not form esters with bendamustine.  In particular, many of the antioxidants noted by Drager '006 contain phenols, rather than alkyl alcohols.  *See* ¶¶ 488–489.  For example, alpha-tocopherol,

260

EAGLEBEN-SA_00000536

BHA, BHT, and propyl gallate all are phenol-based antioxidants. As Dr. Anslyn has opined, phenols would be expected to esterify with bendamustine much less readily than aliphatic alcohols, such as in monothioglycerol. *See* ¶ 489; Anslyn Rep. ¶¶ 165–168. The POSA would have preferred these antioxidants because they would have decreased the risk of esterification problems with bendamustine. Dr. Pinal agrees that the POSA would have been motivated to avoid esterification when choosing an antioxidant. *See* Pinal Rep. ¶ 212 n.8 (opining that the POSA would have avoided certain antioxidants on the basis of the numbers of hydroxyl groups in their chemical structures).

559.    The POSA also would have been concerned that the thiol group in monothioglycerol could react with the nitrogen mustard moiety in bendamustine. I understand that Dr. Anslyn has opined that the POSA would have understood that the nitrogen mustard moiety in bendamustine can form a highly strained aziridinium ring. *See* Anslyn Rep. ¶¶ 44–49; *accord* Pinal Rep. ¶ 72. I further understand that Dr. Anslyn has opined that this strained ring is positively charged and quite reactive. *See* Anslyn Rep. ¶ 45. I further understand that Dr. Anslyn has opined that nucleophiles can "attack" the aziridinium ring to re-open it, in which case the nucleophile will be attached to the bendamustine molecule. *See* Anslyn Rep. ¶ 45. I understand that the hydrolysis of bendamustine is an example of such a reaction, where water is the nucleophile. *See* Anslyn Rep. ¶ 46. Moreover, I understand that more nucleophilic molecules will preferentially react with the aziridinium ring. *See* Anslyn Rep. ¶ 55. I further understand that thiol moieties are highly nucleophilic. *See* Anslyn Rep. ¶¶ 172–173. As such, I understand that the POSA would have expected that thiol-based antioxidants would have been highly like to react with bendamustine via the thiol moiety. *See* Anslyn Rep. ¶¶ 171–184. Finally, I understand that monothioglycerol would be much less effective as an antioxidant once it formed

261

EAGLEBEN-SA_00000537

a thioether bond with bendamustine (that is, the thiol group bound to the carbon in the nitrogen mustard moiety of bendamustine). *See* Anslyn Rep. ¶¶ 180–181.

560.    The POSA's expectation that the thiol moiety in monothioglycerol would react with bendamustine would have dissuaded the POSA from using that antioxidant. First, such a reaction would decrease the purity of the bendamustine in the composition (that is, it would increase the total impurities). Second, a reaction between bendamustine and monothioglycerol at the thiol moiety would decrease the amount of monothioglycerol available to serve as an antioxidant. Assuming there were actually an oxidation problem with the formulation, the degradation of the antioxidant would be a major concern, because it would make the formulation more susceptible to oxidative breakdown.

561.    As I explain above, the EU regulatory body requires that the level of antioxidant to be monitored across the shelf life of the product. *See* ¶ 471. The POSA would have understood that both of the reactions that I describe above (the esterification of monothioglycerol with bendamustine and the reaction between the thiol of monothioglycerol and bendamustine) would have resulted in lower levels of monothioglycerol in the composition, risking failure of the batch during stability testing. For this reason as well, the POSA would have been motivated to avoid using any antioxidant that would interact with bendamustine.

562.    The POSA would have understood that there were other antioxidants available that would not have posed this same problem. As I discuss above, the POSA would have been aware of multiple phenol-based antioxidants, which do not contain a thiol moiety. *See* ¶ 558. The POSA would have understood that phenol groups are much less nucleophilic than both thiols and aliphatic alcohols. *See* Anslyn Rep. ¶¶ 182–184. As such, phenol-based antioxidants—like BHA, BHT, propyl gallate, and alpha-tocopherol—would have been less like to react with the

262

EAGLEBEN-SA_00000538

nitrogen mustard group of bendamustine than any aliphatic alcohol or polyol in the formulation, such as PEG or PG. The POSA would have strongly preferred to use such phenol-based antioxidants on this basis.

563.    Even if Dr. Pinal is correct that the POSA would have been motivated to attempt to add an antioxidant, Drager '006 would have motivated the POSA to use a phenol-based antioxidant. As I noted above, none of the exemplary antioxidants recited by Drager '006 contained a thiol. *See* ¶¶ 488–489. Many, by contrast, were phenol derivatives. These exemplary antioxidants from Drager '006 would have been in accord with the POSA's understanding that highly nucleophilic antioxidants should be avoided with bendamustine.

564.    For the above reasons, the POSA would not have been motivated or had reason to use monothioglycerol in the claimed compositions of bendamustine.

## H.    The POSA Would Not Have Had a Reasonable Expectation of Success of Obtaining the Claimed Inventions.

### 1.    The POSA Would Not Have Had a Reasonable Expectation of Success in Obtaining the Claimed Compositions with "Long Term Storage Stability" or "Less Than About 5% Total Impurities After 15 Months of Storage at about 5° C."

565.    The asserted claims of the '707 patent require the formulations to be "long term storage stable." As I explain below, the POSA would have understood this limitation to require the formulations to have less than about 5% total impurities, on a normalized peak area response basis as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C to about 25° C. Claim 13 of the '707 patent further requires that the claimed formulations be long-term storage stable, "wherein said long term storage is at least 2 years." The POSA would have understood this claim to require the formulation to have less than about 5% total impurities for at least 2 years of storage at a temperature of from about 5° C to about 25° C.

263

EAGLEBEN-SA_00000539

566.    Several of the asserted claims of the '796 patent, including asserted claim 5, which depends from claim 1, require that the composition have "less than about 5% total impurities after 15 months of storage at about 5° C., as calculated on a normalized peak area response basis as determined by high performance liquid chromatography at a wavelength of 223 nm."

567.    I understand that Dr. Pinal has opined that the POSA would have had a reasonable expectation of success of obtaining the claimed formulations with these stability profiles. *See* Pinal Rep. ¶¶ 216–229; 267–269. I disagree.

568.    Dr. Pinal fails to cite to any disclosure in the prior art describing the stability profile of a liquid bendamustine composition containing any amount of PEG, much less 90% PEG. The POSA would have understood that bendamustine could undergo many different degradation pathways, including at both the carboxylic acid moiety and at the nitrogen mustard moiety. *See, e.g.,* ¶¶ 331–338, 361–366. Absent any data regarding the degradation of bendamustine in PEG, the POSA would not have been able to reasonably expect success in obtaining a liquid bendamustine composition containing 90% PEG and 10% PG with less than 5% total degradants at 5° C over 15 months or 2 years.

569.    The data in Drager '006 would have confirmed to the POSA that liquid bendamustine compositions could yield more than 5% total degradants at 5°C over 15 months or 2 years. The data in Figure 2 of that patent demonstrate that three of the formulations of aprotic solvents (NMP, DMA, and DMI) showed 95% or less purity at one year. *See* Drager '006, Figure 2, JDG_BENDA_00000990 at 993. In other words, all three bendamustine formulations containing those solvents yielded 5% or more total impurities at 12 months, even though none of those solvents were capable of forming esters with bendamustine. In view of these data, the

264

EAGLEBEN-SA_00000540

POSA would have considered it entirely possible that a 90% PEG and 10% PG formulation could yield more than 5% total impurities over the longer timeframes of 15 months and 2 years. The data in Drager '006 would therefore have undermined the POSA's expectation of success of achieving the claimed stability profiles with the claimed formulations.

570.    The POSA, moreover, would have understood that PEG was particularly likely to accelerate degradation at the nitrogen mustard moiety of bendamustine. *See* ¶¶ 361–366. This would have undermined the POSA's expectation of success of achieving the claimed stability profiles with the claimed formulations.

571.    I understand that Dr. Pinal has opined that, since the formulation "would consist mostly of PEG, which freezes when refrigerated at 2°–8°C, the PEG would be viscous," which would have caused the formulation to be "inherently stable." Pinal Rep. ¶ 218. I disagree. As an initial matter, I note that the relevant formulation also contains 10% PG. PG has a melting point of -59°C and is commonly used in compositions of anti-freeze. *See* Rowe 2009 at 592, JDG_BENDA_00006557 at 6590. Indeed, Dr. Pinal has opined elsewhere that PG would have been added to the formulation to decrease its viscosity. Pinal Rep. ¶ 192. Dr. Pinal does not opine on what the expected viscosity of a 90:10 PEG:PG formulation would be or the extent to which the viscosity of such a formulation would affect the stability of the formulation.

572.    Moreover, I disagree that the formulation would be "inherently stable" even if it were highly viscous or frozen. Dr. Pinal has cited to no teaching in the prior art stating that stability varies as a function of viscosity.             REDACTED

265

573.    Dr. Pinal has opined that "the prior art discloses that similar formulations contain almost no impurities," citing to Olthoff 1983 and Drager '006. Pinal Rep. ¶ 219. I disagree with Dr. Pinal's opinion. First, neither Olthoff 1983 nor Drager '006 would have provided the POSA with any expectation of success of obtaining a stable formulation containing 90% PEG, as none of those documents disclose any specific formulations containing PEG. Second, as explained above, the POSA would not have credited the stability results in Olthoff 1983. *See* ¶¶ 204–213. Third, with respect to Drager '006, as I explain above the POSA would have observed that many of the aprotic formulations in that patent contained 5% or more impurities at refrigerated conditions after twelve months. *See* ¶ 569. Dr. Pinal cites to the stability results for the 34% PG/66% DMA formulation in Table II of that patent, but that table does not purport to report total impurity levels, and the POSA would have understood from Figures 1 and 2 that Table II does not in fact report total impurities. *See, e.g.,* ¶ 159. The POSA would have noted that Figure 2 of Drager '006 does not appear to include a total purity measurement for the 66% DMA formulation at twelve months. *See* Drager '006, Fig. 2, JDG_BENDA_00000990 at 993. Even if it did, Dr. Pinal does not explain how the POSA would have been able to predict the purity profile of a formulation based on a mixture of "90% PEG and 10% PG" in view of data from a formulation based on a mixture of "66% DMA and 34% PG," much less have a reasonable expectation of success that such a formulation would possess the claimed stability profiles. In other words, I disagree that either Drager '006 or Olthoff 1983 contains any stability data for "similar formulations" to the claimed invention.

574.    Dr. Pinal has opined that the POSA would have expected the use of NaOH and an antioxidant to "further decrease the amount of impurities." Pinal Rep. ¶ 220; *see also* Pinal Rep. ¶ 224. I disagree that as of the priority date, the use of either an antioxidant or NaOH would

266

have provided the POSA with a reasonable expectation that the claimed formulations would yield less than 5% total impurities at refrigerated conditions over 15 or 24 months.

575.    With respect to the antioxidant, the claims recite only that the formulation contain a "stabilizing amount," which is an amount that increases or enhances the stability of the claimed bendamustine compositions, as I explain below. *See* ¶¶ 869–879. Even though the claims require that the antioxidant increase or enhance the stability of the formulation, however, Dr. Pinal has not explained how this translates into an expectation that the formulation would yield less than 5% total impurities at refrigerated conditions over 15 or 24 months. For example, the antioxidant could decrease the total amount of impurities from 15% to 7.5%. Although this would be a stabilizing amount of antioxidant, it would not yield a formulation with the required stability profile. Dr. Pinal does not state what the POSA would have expected the stability profile of the composition to be if it did not contain an antioxidant. As such, the mere presence of a stabilizing amount of antioxidant would not have provided a reasonable expectation of success that the claimed formulations would contain less than about 5% total impurities at 5°C after 15 or 24 months.

576.    With respect to NaOH, Dr. Pinal does not specifically opine that using sodium hydroxide would have yielded the claimed formulations that have less than about 5% total impurities at 5°C after 15 or 24 months. To the contrary, Dr. Pinal has only opined that NaOH could be added to mitigate esterification to some extent. *See, e.g.*, Pinal Rep. ¶¶ 13, 78. But this opinion ignores the potential for degradation elsewhere on the bendamustine molecule. *See, e.g.*, ¶¶ 361–366. For example, the POSA would have been aware that increasing the pH of the formulation by adding NaOH could produce instability at the nitrogen mustard moiety. *See* ¶¶ 511–512. In other words, trying to solve the degradation problems on the carboxylic acid side

267

of the bendamustine molecule could cause additional degradation problems elsewhere on the molecule, including on the nitrogen mustard moiety. For that reason, I disagree with Dr. Pinal that the POSA would have expected to simply add NaOH to obtain the claimed formulations with less than 5% total impurities at refrigerated conditions over 15 or 24 months.

577.    Dr. Pinal has opined that formulations of the claimed inventions would inherently have the claimed stability profile. *See* Pinal Rep. ¶¶ 221–225. I disagree that the claimed formulations inherently have the claimed stability profile.

578.    First, the claimed formulations do not necessarily have less than about 5% total impurities after storage for 15 or 24 months of storage at a temperature of about 5° C. Although, for the reasons stated below, I disagree with Dr. Pinal's conclusion that the asserted claims are not enabled,                                        REDACTED

Collectively, those studies cast doubt on Dr. Pinal's conclusion that the claimed formulations would necessarily have the claimed stability profile.

579.    Second, in my opinion, the claimed stability profile would not have been predictable or expected. As I explain above, in my opinion the POSA would not have expected

268

EAGLEBEN-SA_00000544

the claimed formulations to exhibit less than 5% total impurities at refrigerated conditions over 15 or 24 months. To the contrary, the prior art gives no evidence about the stability of bendamustine in liquid bendamustine formulations containing PEG and PG, and Drager '006 discloses several formulations with aprotic solvents that would not have yielded the claimed stability profile. Moreover, the POSA would have had reason to believe that PEG would have accelerated the degradation of bendamustine. As such, I disagree with Dr. Pinal that the inherent properties of the claimed formulations support the obviousness of this claim limitation.

580. For the above reasons, it is my opinion that the POSA would not have had a reasonable expectation of success in obtaining the claimed formulations with the claimed stability profile.

### 2. The POSA Would Not Have Had a Reasonable Expectation of Success in Obtaining the Claimed Compositions Having "Less Than or Equal to 0.18% Total PG Esters at About 12 Months of Storage at a Temperature of about 5° C."

581. Claim 2 of the '797 patent requires that the "bendamustine-containing composition [have] less than or equal to 0.18% total PG esters at about 12 months of storage at a temperature of about 5° C."

582. I understand that Dr. Pinal has only opined about the obviousness of a formulation with a 90:10 PEG:PG ratio. *See* Pinal Rep. ¶ 258 ("As explained above in claim 1 of the '707 patent (paras. 216–229), the formulation containing 90:10 PEG:PG and a stabilizing amount of antioxidant would inherently contain less than 0.18% total PG esters at about 12 months at 5 °C, and a POSA would also have reasonably expected the formulation to have this low level of impurity."). As such, I confine my analysis to a formulation with this composition.

583. The POSA would not have had a reasonable expectation that a formulation with a 90:10 PEG:PG ratio would have had "less than 0.18% total PG esters at about 12 months at 5

269

EAGLEBEN-SA_00000545

°C." I understand that Dr. Pinal has opined that the POSA would have expected the level of degradation in the claimed formulations to vary as a function of the hydroxyl group "concentrations" present. *See, e.g.*, Pinal Rep. ¶¶ 189, 350 ("The POSA would have known that this reduction in –OH groups would reduce the likelihood of Fischer esterification reactions, which would lead to fewer ester impurities."). I further understand that Dr. Anslyn has opined that esterification is a first-order reaction with respect to the alcoholic reactant, such that a decrease in the concentration of that reactant would be expected to linearly decrease the rate of formation of the ester product. *See* Anslyn Rep. ¶ 66.

584.    The POSA would have known from Drager '006 that a formulation with 34% PG yielded a total PG ester concentration of 1.36% over twelve months at 5 °C. *See* ¶ 81; Drager '006, 8:50–680, JDG_BENDA_00000990 at 999 (1.09% PG-1 + 0.27% PG-2). Since the POSA would have expected that the amount of PG esters would be linearly related to the amount of PG in the formulation, the POSA could have made a prediction about the amount of PG esters in a formulation with 10% PG by dividing the amount of PG esters in the Drager '006 formulation by 3.4. Performing that calculation yields a predicted level of PG esters in a "10% PG composition" of 0.4%. In other words, based on the disclosures in Drager '006 and simple arithmetic, the POSA would have expected that a composition with 10% PG would have yielded 0.4% total PG esters at 12 months of storage at a temperature of 5° C. This level of degradation is more than double the amount of PG esters required by claim 2 of the '797 patent of 0.18%.

585.    For the above reasons, the POSA would not have had a reasonable expectation of success in obtaining the claimed formulations with less than or equal to 0.18% total PG esters at about 12 months of storage at a temperature of about 5° C.

270

586.    I understand that Dr. Pinal has opined that the "claimed formulation could be optimized to contain enough NaOH to inhibit the catalysis of the esterification of the bendamustine by the glycols." Pinal Rep. ¶ 258.  However, Dr. Pinal has offered no evidence that the addition of NaOH could decrease the amount of esterification by a factor of more than two at refrigerated conditions over a time period of twelve months.  In particular, Dr. Pinal has not offered the opinion that adding NaOH or otherwise changing the pH of the claimed formulations would predictably affect the esterification of bendamustine in the claimed formulations.  Dr. Pinal has likewise not offered any evidence that the POSA would have reasonably expected that adding NaOH would decrease esterification to this degree.  In addition, the POSA would have been aware that increasing the pH of the formulation could risk additional instability at the nitrogen mustard moiety.  *See* ¶¶ 511–512.

587.    Dr. Pinal also mentions the "stabilizing amount of antioxidant" in the claimed formulations.  *See* Pinal Rep. ¶ 258.  Dr. Pinal has not opined that the presence of an antioxidant could decrease the amount of esterification by a factor of more than two at refrigerated conditions over a time period of twelve months or that the POSA would reasonably have expected such an effect.  In particular, Dr. Pinal has not offered any evidence that the presence of an antioxidant would predictably affect the esterification of bendamustine in the claimed formulations.  To the contrary, as I explain above, the efficacy of an antioxidant is unpredictable. *See* ¶¶ 350–352, 534.  Even assuming that the antioxidant is present in a "stabilizing amount" (that is, it is enhancing the stability of the formulation), Dr. Pinal has offered no rationale for predicting that the presence of the antioxidant would yield a formulation with the claimed stability profile.

271

EAGLEBEN-SA_00000547

588.    I understand that Dr. Pinal has opined that the claimed formulations would inherently yield the claimed stability profile. *See* Pinal Rep. ¶ 259. I disagree that the inherent properties of the claimed formulations provide a reasonable expectation that those formulations would have less than or equal to 0.18% total PG esters at about 12 months of storage at a temperature of about 5° C.

589.    First, the claimed formulations do not necessarily have less than or equal to 0.18% total PG esters at about 12 months of storage at a temperature of about 5° C. Although, for the reasons stated below, I disagree with Dr. Pinal's conclusion that the asserted claims are not enabled,                                                    REDACTED

. Collectively, those studies cast doubt on Dr. Pinal's conclusion that the claimed formulations would necessarily have the claimed stability profile.

590.    Second, in my opinion, the claimed stability profile would not have been predictable or expected. As I explain above, in my opinion the POSA would not have expected the claimed formulations to contain less than or equal to 0.18% total PG esters at about 12 months of storage at a temperature of about 5° C. To the contrary, the POSA would have expected more than double that amount of PG esters in the claimed formulations. As such, I disagree with Dr. Pinal that the inherent properties of the claimed formulations support the obviousness of this claim limitation.

272

591.    For the above reasons, it is my opinion that the POSA would not have had a reasonable expectation of success in obtaining the claimed formulations with less than or equal to 0.18% total PG esters at about 12 months of storage at a temperature of about 5° C.

### 3.    The POSA Would Not Have Had a Reasonable Expectation of Success of Obtaining the Claimed Compositions Having the Claimed PG Ester Amounts at 25° C.

592.    Several of the asserted claims require that the claimed formulations exhibit less than a specified amount of total PG esters after stored for certain periods of time at about 25° C. For example, claim 10 of the '797 patent requires that the claimed formulations have "less than or equal to 0.77% total PG esters at about 6 months of storage at a temperature of about 25° C." Claim 9 of the '797 patent requires that the claimed formulations have "less than or equal to 0.43% total PG esters at about 3 months of storage at a temperature of about 25° C."

593.    I understand that Dr. Pinal has only opined about the obviousness of a formulation with a 90:10 PEG:PG ratio. *See* Pinal Rep. ¶¶ 299–301 ("As explained above in claim 1 of the '707 patent (paras. 216-229), the formulation containing 90:10 PEG:PG and a stabilizing amount of antioxidant would inherently contain less than the levels of PG esters in claims 7-10, and a POSA would also have reasonably expected the formulation to have these low levels of impurity"). As such, I confine my analysis to a formulation with this composition.

594.    The POSA would not reasonably have expected the claimed formulations to exhibit the claimed PG ester stability profiles when stored at about 25° C. The data that would have been the most relevant to the POSA in assessing the stability of a formulation containing PG at about 25° C would have been Figure 3 of Drager '006, which illustrates the stability of a 99% PG formulation at 25° C. *See* ¶ 65. As I explain above, the POSA would have credited the Drager '006 data over the similar Olthoff 1983 data. *See* ¶¶ 204–213.

273

EAGLEBEN-SA_00000549

595.    The POSA would have learned from Figure 3 of Drager '006 that PG-containing formulations were highly unstable at about 25° C. The Drager '006 formulation exhibited almost 40% degradation at 30 days and nearly complete degradation between 50 and 100 days. *See* Drager '006, Figure 3, JDG_BENDA_00000990 at 994. Drager '006 does not disclose how much of this degradation consists of PG esters, but Drager '006 does disclose that PG esters were detected in this formulation. Drager '006, 2:61–3:2, JDG_BENDA_00000990 at 996–97. As such, based on Drager '006, the POSA would have expected that PG-only formulations would exhibit substantial degradation at about 25° C and that some component of this degradation would be PG esterification.

596.    The POSA would have expected that reducing the concentration of PG from 99% to 10% would have decreased the total concentration of PG esters. However, since the POSA would not have known the total concentration of PG esters in Drager '006's "99% PG formulation," the POSA would not have been able to predict with any reasonable certainty which quantities of PG esters would be present in a composition with 10% PG. Moreover, because Drager '006's "99% PG formulation" degraded almost entirely after just 3 months, the POSA would have had difficulty predicting how a 10% PG formulation would degrade after being stored at about 25° C for 6 months.

597.    Notwithstanding this uncertainty, the data in Figure 3 of Drager '006 would have led the POSA to suspect that a formulation with 10% PG might well yield substantial amounts of PG esters after storage at about 25° C. After 3 months of stability testing at 25°C, the bendamustine in Drager '006's "99% PG" formulation degraded more than 95%, as depicted in Figure 3. Assuming that the amount of PG esters is directly related to the amount of PG in the compositions—an assumption that Dr. Pinal appears to endorse, *see* ¶ 583—then a 10% PG

274

formulation would reasonably be expected to yield 9.9 times fewer PG esters than the formulation in Figure 3 of Drager '006. Claim 9 of the '797 patent requires less than or equal to 0.43% total PG esters at 3 months at about 25°C. If any more than 4.49% of the total degradants in Figure 3 of Drager '006 are PG esters, then a 10% PG formulation would reasonably be expected to have more than 0.43% total PG esters.[7] Claim 10 requires less than or equal to 0.77% total PG esters at 6 months at about 25°C. If any more than 8.03% of the total degradants in Figure 3 of Drager '006 are PG esters, then a 10% PG formulation would reasonably be expected to have more than 0.77% total PG esters.[8] The calculation in the previous sentence is almost certainly an underestimation, as it assumes that no additional degradation would take place between 3 and 6 months. In reality, the POSA would reasonably have expected there to be additional degradation in this time period, which would have increased the reasonable likelihood of crossing the 0.77% total PG ester threshold of claim 10.

598.    The POSA would have assumed that the compositions of Figure 3 of Drager '006 likely contained more than 8.03% or 4.49% total PG esters. The Drager '006 patent notes explicitly that those two ester products were found in the compositions in Figure 3. *See* Drager '006, 2:66–67, JDG_BENDA_00000990 at 996. The POSA would have assumed that this likely meant that those were two of the most significant degradants in the formulation. As such, the POSA would have expected that a formulation with 10% PG would likely yield amounts of PG esters during the relevant stability period in excess of the amounts required by the asserted claims. For that reason, the POSA would not have had a reasonable expectation of success in obtaining the claimed PG ester amounts in the claimed formulations when stored at about 25° C.

---

[7] PG ester cutoff = $(0.43 \times 9.9) \div (0.95)$.

[8] PG ester cutoff = $(0.77 \times 9.9) \div (0.95)$.

275

EAGLEBEN-SA_00000551

599.    To the extent that the POSA would not have relied on the data in Figure 3 of Drager '006, then my opinion is that the POSA would have no reliable data about the rate of PG esterification in liquid bendamustine formulations stored at about 25° C.  In the absence of any reliable data, the POSA would not have had a reasonable expectation of success in obtaining the claimed PG ester amounts in the claimed formulations when stored at about 25° C.

600.    I understand that Dr. Pinal has opined that the claimed PG ester stability limitations are inherent in the claimed formulations.  *See* Pinal Rep. ¶¶ 300–301.  I disagree that the inherent properties of the claimed formulations would have provided the POSA with a reasonable expectation that those formulations would have the claimed PG ester amounts when stored at about 25° C.

601.    First, the claimed formulations do not necessarily have less than or equal to the claimed PG ester amounts after storage for the claimed time periods at a temperature of about 25° C.  Although, for the reasons stated below, I disagree with Dr. Pinal's conclusion that the asserted claims are not enabled,                          REDACTED

276

REDACTED    Collectively, those studies cast doubt on Dr. Pinal's conclusion that the claimed formulations would necessarily have the claimed stability profile.

602.    Second, in my opinion, the claimed stability profile would not have been predictable or expected.  As I explain above, in my opinion the POSA would not have expected the claimed formulations to have the claimed PG ester amounts when stored at about 25° C.  To the contrary, the available data from Drager '006 would have suggested to the POSA that PG-containing formulations would exhibit higher levels of degradation when stored at room temperatures.  The POSA would not otherwise have been able to make a prediction about the amount of PG esters in the claimed formulations when stored at about 25° C.  As such, I disagree with Dr. Pinal that the inherent properties of the claimed formulations support the obviousness of this claim limitation.

603.    I understand that Dr. Pinal has opined that the "claimed formulation could be optimized to contain enough NaOH to inhibit the catalysis of the esterification of the bendamustine by the glycols."  Pinal Rep. ¶ 300.  However, Dr. Pinal has offered no evidence in the prior art that would have taught the POSA that the addition of NaOH could have decreased esterification to such an extent that the claimed formulations would yield the claimed amount of PG esters when stored at 25° C.  In particular, Dr. Pinal has not offered the opinion that adding NaOH or otherwise changing the pH of the claimed formulations would predictably affect the esterification of bendamustine in the claimed formulations.  Dr. Pinal has likewise not offered any evidence that the POSA would have been motivated or had reason to add an amount of NaOH that would be necessary to reduce esterification to reach the claimed amounts of PG esters.  For example, the POSA would have been aware that increasing the pH of the formulation could risk additional instability at the nitrogen mustard moiety.  *See* ¶¶ 511–512.

277

604.    Dr. Pinal also mentions the "stabilizing amount of antioxidant" in the claimed formulations. *See* Pinal Rep. ¶ 300. Dr. Pinal has not opined that the presence of an antioxidant could decrease the amount of esterification to such an extent that the claimed formulations would yield the claimed amount of PG esters when stored at about 25° C. In particular, Dr. Pinal has not offered any evidence that the presence of an antioxidant would predictably affect the esterification of bendamustine in the claimed formulations. To the contrary, as I explain above, the efficacy of an antioxidant is unpredictable. *See* ¶¶ 350–352, 534. Even assuming that the antioxidant is present in a "stabilizing amount" (that is, it is enhancing the stability of the formulation), Dr. Pinal has offered no rationale for predicting that the presence of the antioxidant would yield a formulation with the claimed stability profile.

### 4.    The POSA Would Not Have Had a Reasonable Expectation of Success of Obtaining a Stabilizing Amount of Monothioglycerol.

605.    Several of the asserted claims require that the formulation contain a "stabilizing amount" of thioglycerol/monothioglycerol. Claims 18 and 20 of the '707 patent depend on claim 14, which requires a "stabilizing amount of thioglycerol." Claim 1 of the '797 patent requires a "stabilizing amount of an antioxidant" selected from a list, and claim 11 of the '797 patent depends on claim 1 and specifies that "the antioxidant is thioglycerol or monothioglycerol."

606.    As I explain below, the POSA would have understood that a "stabilizing amount" of an antioxidant is one that increases or enhances the stability of the claimed bendamustine compositions. *See* ¶¶ 869–879.

607.    Dr. Pinal does not opine that the POSA would have expected that monothioglycerol would increase or enhance the stability of the claimed bendamustine formulations to the required extent. Rather, Dr. Pinal has only offered an opinion that the POSA would have been motivated to use that antioxidant. *See, e.g.*, Pinal Rep. ¶¶ 232–237, 242, 302.

278

608.    As I explain above, antioxidant performance is unpredictable. *See, e.g.,* ¶¶ 350–352, 534.  As such, even if Dr. Pinal had provided evidence that monothioglycerol had worked with related formulations or molecules (which he has not), that would not have provided the POSA with a reasonable expectation of success that monothioglycerol would enhance the stability in the claimed formulations.

609.    As I explain above, there were different literature examples in which the use of monothioglycerol failed to enhance the stability of formulations, even though those formulations were prone to oxidative degradation. *See* ¶ 555–556.  In view of these examples and the general unpredictability of antioxidant performance, the POSA would not have had a reasonable expectation that monothioglycerol would enhance the stability of the claimed formulations.

610.    The POSA would have had specific reasons for doubting whether monothioglycerol would enhance the stability of bendamustine hydrochloride formulations in particular.  The POSA would have been aware that such formulations were likely to be acidic, and there was evidence in the literature that monothioglycerol failed to provide any stability enhancement in formulations with an acidic pH. *See* ¶¶ 552–553.  Given this, the POSA would not have reasonably expected that monothioglycerol would enhance the stability of the claimed formulations.

611.    The POSA also would have suspected that monothioglycerol could react with bendamustine, both via esterification and by way of nucleophilic attack of the thiol at the nitrogen mustard moiety of bendamustine. *See* ¶¶ 557–560.  Both of these reactions would have created bendamustine degradants, decreasing the stability of the formulation.  Knowledge of these reactions would have caused the POSA to fear that monothioglycerol would worsen the stability of the claimed formulations.

279

EAGLEBEN-SA_00000555

612.     Moreover, I understand that Dr. Pinal has opined that the POSA would have expected monothioglycerol to stabilize bendamustine by decreasing the formation of acids from the oxidative degradation PEG and PG, which Dr. Pinal has opined would have been expected to accelerate bendamustine esterification. *See* ¶ 465; Pinal Rep. ¶ 77. However, the POSA also would have understood that higher pHs are associated with more degradation at the nitrogen mustard moiety of the molecule. *See* ¶¶ 645–649. This would have been a concern for the POSA. *See* Anslyn Rep. ¶¶ 59–44 (discussing degradation issues at the nitrogen mustard moiety of bendamustine). Thus, decreasing the pH of bendamustine compositions would have been expected to <u>accelerate</u> degradation at the carboxylic acid moiety of bendamustine, but <u>decelerate</u> degradation at the nitrogen mustard moiety of bendamustine. The POSA would not have been able to predict which of these effects would have dominated in a formulation of PEG, PG, and monothioglycerol.

613.     For these reasons, the POSA would not have had a reasonable expectation of success of obtaining a "stabilizing amount" of monothioglycerol in the claimed formulations.

**5.     The POSA Would Not Have Had a Reasonable Expectation of Success of Obtaining a Composition with a Bendamustine Concentration of 25 mg/mL and a Pharmaceutically Acceptable Fluid.**

614.     Several of the asserted claims require that the composition have a bendamustine concentration of at least 25 mg/mL. For example, claim 18 of the '707 patent requires a "bendamustine concentration . . . from about 25 mg/mL to about 50 mg/mL." Claims 5 and 18 of the '796 patent require a "bendamustine concentration [of] about 25 mg/mL."

615.     Additionally, all of the asserted claims require that the composition contain a "pharmaceutically acceptable fluid." The patents-in-suit explain that "a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use." *See* '707 patent, 2:37–39.

280

EAGLEBEN-SA_00000556

616.    In order for the fluid in the composition to be suitable for pharmaceutical use, the bendamustine would need to be fully dissolved in the fluid. *See* ¶¶ 376–394. Dr. Pinal agrees that the POSA would have required that the 25 mg/mL of bendamustine in the formulation be fully solubilized. *See, e.g.*, Pinal Rep. ¶¶ 55–57, 173, 181 (opining that the POSA "would want to . . . ensure that 25 mg/mL of [bendamustine] would be soluble in the solvent system").

617.    I understand that Dr. Pinal has only opined about the obviousness of a formulation with a 90:10 PEG:PG ratio. *See, e.g.*, Pinal Rep. ¶¶ 178–206 (opining that the POSA would have had an "expectation of success in using a solvent mixture with 10 parts of PG per 90 parts of PEG"). As such, I confine my analysis to a formulation with this composition.

618.    Dr. Pinal's opinion about the POSA's reasonable expectation of success in obtaining a formulation with a bendamustine solubility of 25 mg/mL with 90% PEG and 10% is premised on hypothetical experiments that the POSA would have conducted, including measuring the solubility of bendamustine in pure PEG. *See, e.g.*, Pinal Rep. ¶¶ 194–195. Dr. Pinal does not opine that the POSA would have been able to predict the solubility of bendamustine hydrochloride in PEG—or a mixture of 90% PEG and 10% PG—without running such experiments. To the contrary, Dr. Pinal concedes that there was no prior art disclosing the solubility of bendamustine in PEG. *See* Pinal Rep. ¶ 194.

619.    My understanding is that the performance of and results from of the hypothetical experiments that Dr. Pinal has described—in particular, solubility testing of bendamustine hydrochloride in PEG or mixtures of PEG and PG—are not properly considered within the scope of the knowledge of the POSA.

620.    If the POSA would not have had access to Dr. Pinal's hypothetical solubility experiments of bendamustine hydrochloride in PEG—or bendamustine hydrochloride in PEG

281

EAGLEBEN-SA_00000557

and PG—then in my opinion the POSA would not have had a reasonable expectation of success in obtaining the claimed formulations of 25 mg/mL bendamustine and a pharmaceutically acceptable fluid. Dr. Pinal has not offered any rationale for how the POSA would have predicted the solubility of bendamustine hydrochloride in PEG, absent experimentation. In my opinion, the POSA would not have been able to determine or predict the solubility of bendamustine hydrochloride in PEG, much less the solubility of bendamustine hydrochloride in a "90% PEG and 10% PG" mixture, without conducting solubility experiments. The POSA would have had no way of predicting that a mixture of 90% PEG and 10% PG would solubilize 25 mg/mL of bendamustine hydrochloride at any temperature. For that reason, the POSA would not have had a reasonable expectation of success of obtaining a concentration 25 mg/mL of dissolved bendamustine hydrochloride in the claimed formulations.

621. Even if the POSA would have conducted Dr. Pinal's hypothesized experiment measuring the solubility of bendamustine hydrochloride in PEG, and succeeded in doing so, the POSA still would not have had a reasonable expectation of success in practicing the claimed inventions. In stating his opinion about what solubility values the POSA would have obtained for bendamustine hydrochloride in PEG and PG, Dr. Pinal relies on certain measurements from Eagle's Pharmaceutical Development Report. *See* Pinal Rep. ¶ 196 (citing EGL-BENDEKA_00002615). These measurements were performed at ambient temperature. Bendeka® Pharmaceutical Development Report at 8, EGL_BENDEKA_00002608 at 2615. As such, I understand Dr. Pinal to be opining that the POSA would have performed solubility measurements for bendamustine hydrochloride in PEG and PG at <u>room temperature</u> (which is usually about 25°C).

282

622. In my opinion, even if Dr. Pinal were right that the POSA would have conducted his proposed room-temperature solubility experiments of bendamustine hydrochloride in PEG and PG, those experiments would not have provided the POSA with a reasonable expectation of success in obtaining a composition with a bendamustine hydrochloride concentration of 25 mg/mL in a pharmaceutically acceptable liquid, as recited by the asserted claims. In particular, as I explain above, the POSA would have wanted to ensure that the bendamustine was sufficiently soluble in the formulation even under refrigerated conditions, which are typically about 2° C to 8° C, with excursions as low as 0° C. *See* USP 33 § 10.30.40; USP 32 § 10.30.40; ¶ 388. Additionally, several of the asserted claims requiring at least 25 mg/mL bendamustine explicitly require storage at refrigerated conditions. Claim 1 of the '796 patent—on which asserted claims 5 and 18 rely—requires that "the composition has less than about 5% total impurities after 15 months of storage at about 5°C."

623. Dr. Pinal, however, has not opined that the POSA would have expected a formulation comprising 90% PEG and 10% PG to solubilize 25 mg/mL of bendamustine hydrochloride at refrigerated conditions, including at about 5°C. As I explain above, the POSA would have expected that the solubility of bendamustine hydrochloride might well decrease at lower temperatures, raising the possibility of precipitation. *See* ¶¶ 382–389. In particular, the POSA would have been concerned that the bendamustine hydrochloride would precipitate under "controlled cold conditions," which permit excursions as low as 0° C. *See* USP 33 § 10.30.40; USP 32 § 10.30.40; ¶ 370. Such precipitation might occur if (1) the solubility of the bendamustine hydrochloride fell below its concentration in the formulation because of the decrease in temperature or (2) some or all of the PEG in the composition froze. If the latter were to occur, the composition of the remaining liquid in the formulation would change, and the

283

solubility of the bendamustine hydrochloride in this remaining liquid might fall below its concentration in this liquid. *See* ¶ 391.

624.    For these reasons, the POSA would not have had a reasonable expectation of success of obtaining a composition with 25 mg/mL of bendamustine and a pharmaceutically acceptable liquid, as recited by the asserted claims.

## I.    The POSA Would Have Had Numerous Other Options Available in Formulating Bendamustine.

625.    Dr. Pinal and Dr. Yates opine that it would have been obvious for the POSA to make a liquid, non-aqueous formulation of 25 mg/mL bendamustine, 90% PEG, 10% PG, and a stabilizing amount of monothioglycerol, having certain stability properties. *E.g.*, Pinal Rep. ¶ 13; Yates Rep. ¶ 35. As I explain at length in the preceding sections, the POSA would not have been motivated or had reason to make such a composition. The POSA also would not have had a reasonable expectation of success that such a composition would have the stability and solubility limitations that are recited in many of the asserted claims.

626.    Although Dr. Pinal and Dr. Yates do not clearly define the POSA's motivations and reasons, Dr. Pinal opines that the POSA would, at a minimum, have been motivated to pursue an improved bendamustine formulation that was sufficiently soluble, stable, and tolerable. *See, e.g.*, Pinal Rep. §§ X.A.2 ("A POSA would have been motivated to obtain a storage stable liquid formulation"), X.A.3 ("The POSA would have been motivated to create a tolerable formulation"), ¶ 181 ("In selecting a solvent system, the POSA would want to both (1) ensure that 25 mg/mL of BDM would be soluble in the solvent system; and (2) ensure that formulation was stable and did not degrade rapidly."). I agree that the POSA would have considered stability, tolerability, and, to the extent applicable, solubility. However, I disagree with Dr. Pinal and Dr. Yates's conclusion that the POSA's consideration of those factors would have motivated

284

EAGLEBEN-SA_00000560

or provided reason for the POSA to pursue a liquid formulation. Instead, as explained below in greater detail, the POSA's consideration of those factors, as a whole, would have motivated the POSA to other formulation options, including lyophilized formulations. Moreover, even if Dr. Pinal and Dr. Yates are correct that the POSA would have been motivated or had reason to pursue a liquid formulation, the POSA would not have limited her or his pursuit to non-aqueous co-solvent formulations, much less the particular non-aqueous co-solvent formulations discussed in Dr. Pinal's and Dr. Yates's reports.

627. A fundamental mistake that Dr. Pinal and Dr. Yates make throughout their reports is that they fail to consider the prior art as a whole. In particular, they fail to consider the many alternative options that would have been available to the POSA in making an improved bendamustine formulation. As explained below in greater detail, the pharmaceutical literature as of the priority date was replete with options for achieving improved bendamustine formulations—including formulations with improved solubility, stability, and/or tolerability—other than the ones discussed by Dr. Pinal and Dr. Yates.

628. The POSA would have understood that bendamustine was a very challenging molecule to formulate. The POSA would have known that bendamustine was initially synthesized in 1963. *See* Pinal Rep. ¶ 62; Brittain 2006 ¶ 6, JDG_BENDA_00000375 at 382. Despite its age, bendamustine had never been marketed as a liquid formulation. Rather, it had only ever been marketed as a lyophilized formulation. *See* Brittain 2006 ¶¶ 7–8, JDG_BENDA_00000375 at 382 (describing Ribomustin®); Ribomustin® Product Monograph (2005), JDG_BENDA_00000001; Treanda® Label (2008), JDG_BENDA_00003382.

629. Several liquid formulations of bendamustine had been disclosed in the literature before the priority date, including in Olthoff 1983 and Drager '006. Dr. Pinal has opined that

285

EAGLEBEN-SA_00000561

some those formulations exhibited commercially viable stability. *E.g.*, Pinal Rep. ¶ 158 ("The POSA would have understood Drager '006 (figure 3) as confirming Olthoff's essential finding of stability in at least one polyol . . . ."), *id.* ("Drager '006 found that 99% propylene glycol was associated with a formulation that can be regarded as commercially stable under refrigerated conditions."). I disagree with Dr. Pinal's opinion on this issue. *See* ¶¶ 205–213. However, if Dr. Pinal were right that the POSA would have considered Olthoff 1983's 100% PG formulation to be commercially viable, then the POSA looking for a liquid bendamustine formulation would simply have been used that formulation, rather than develop a new bendamustine formulation containing PEG, PG, and monothioglycerol. The POSA could likewise have used the other liquid bendamustine formulations disclosed by Drager '006. For example, Dr. Pinal has failed to offer any opinion as to why the POSA would not have used the DMSO formulation disclosed by Drager '006. *See* Drager '006, Figure 2, JDG_BENDA_00000990 at 993 (stability data).

630.   To the extent the POSA considered the formulations of Olthoff 1983 and Drager '006 to be unacceptable for some reason (and thus would not have been motivated or had reason to use those formulations), then those references would have taught the POSA that formulating liquid bendamustine compositions was difficult. Despite Olthoff 1983's professing to have obtained a stable liquid bendamustine formulation in PG, Jenapharm (the assignee of the patent and the company that marketed bendamustine in Germany from 1971–92) never brought a liquid bendamustine product to market, and subsequent experimentation revealed Olthoff 1983's PG formulation to be unstable and unsuitable for commercialization. *See* ¶¶ 64–65, 91; Ribomustin® Product Monograph (2005) at 7, JDG_BENDA_00000001 at 7.

631.   The Drager '006 formulations were more stable than Olthoff 1983's PG formulation, but they included more uncommon solvents, some of which had not been used

286

before in parenteral formulations. *See* ¶¶ 163–165. Moreover, notwithstanding Drager '006's use of aprotic solvents to avoid bendamustine esterification, many of the formulations in that patent still exhibited substantial degradation. *See* ¶¶ 157–162. And the Drager '006 data suggested the presence of additional, uncharacterized degradants. *See* ¶ 159. Drager '006 thus would have affirmed to the POSA the difficulty and unpredictability of formulating liquid bendamustine compositions.

632.    In addition to pursuing a broad range of liquid solvents, scientists as of the priority date were already exploring alternative formulation options for bendamustine. I discuss many of these approaches below. For example, researchers had experimented with a variety of complexing agents—including cyclodextrins—to try to improve the stability of bendamustine. *See* ¶ 659. Scientists had also attempted to stabilize bendamustine against hydrolysis by using liposomal preparations. *See* ¶ 674. And attempts had been made to avoid intravenous infusion entirely by creating oral dosage forms of bendamustine. *See* ¶ 695. Similar efforts were being undertaken for other nitrogen mustard compounds, like melphalan and chlorambucil. *See, e.g.,* ¶¶ 661 (complexing agents), 665 (dendrimers), 669 (emulsions), 676 (liposomes) 686 (prodrugs), 692 (nanoparticles), 697 (oral dosage forms). These wide-ranging formulation efforts would have further affirmed to the POSA the substantial difficulty of formulating bendamustine and would have motivated the POSA to consider a broad range of options in developing an improved bendamustine composition—options which are ignored completely by Dr. Pinal and Dr. Yates in their obviousness analysis.

633.    The POSA, moreover, would not have been able to predict which of these many formulations options would have succeeded.

287

EAGLEBEN-SA_00000563

634.    As of the priority date, the POSA would have understood that bendamustine was an especially unpredictable and difficult molecule to work with.  The POSA would have known that bendamustine was subject to hydrolysis.  *See* Maas 1994 Translation at 1, JDG_BENDA_00002261 at 2264.  The POSA would have known that the degradation of bendamustine depended on temperature, pH, and chloride-ion concentration, among other factors.  *See id.* at 1, 4, JDG_BENDA_00002261 at 2264, 2267.  The POSA would have been aware of reports of bendamustine instability upon exposure to light.  *E.g.*, Brittain 2006 ¶ 7, JDG_BENDA_00000375 at 382.  The POSA would have been aware of multiple different degradation products of bendamustine.  *See* ¶ 162.  The POSA would not have understood the mechanism by which some of those degradation products, such as the DCE degradant (which lacks one of the chloroethyl groups at the nitrogen mustard moiety), formed.  *See* ¶ 634; Anslyn Rep. ¶ 68.  The POSA also would have suspected that there were additional, uncharacterized impurities of bendamustine that formed in liquid formulations.  *See* ¶ 159.  All of these issues would have made it difficult, if not impossible, for the POSA to predict how any particular formulation approach would affect the stability or other properties of bendamustine compositions.

635.                                   REDACTED

288

EAGLEBEN-SA_00000564

REDACTED

636.                              REDACTED

289

EAGLEBEN-SA_00000565

637.                                    REDACTED

638.    In sum, the POSA would have considered the formulation of bendamustine to be a major challenge.  The POSA would have considered a wide range of options in developing an improved bendamustine formulation, which I discuss below.  The POSA would not have been able to predict which of these many different approaches—or combinations of approaches—would have been successful.

### 1.    Lyophilization

639.    Dr. Pinal and Dr. Yates opine that, when pursuing an improved bendamustine product, the POSA would have been motivated to pursue a liquid formulation because liquid formulations are more "convient" than lyophilized formulations, including because liquid formulations do not require reconstitution.  *See* Pinal Rep. ¶ 153; Yates Rep. 47–51.  I disagree.  In my opinion, before considering pursuing a liquid bendamustine formulation, the POSA would likely have considered pursuing an improved lyophilized formulation instead.

640.    As explained above, Dr. Pinal acknowledges that, as with any pharmaceutical product, the POSA would have been motivated to pursue a "stable liquid formulation with few impurities."  *See* Pinal ¶ 157–159; ¶ 626.  In my opinion, the POSA's motivation to create a stable formulation would point the POSA away from liquid formulations and towards lyophilized formulations.  As explained above, the POSA would have understood that lyophilized

290

EAGLEBEN-SA_00000566

formulations provide greater stability than liquid formulations given bendamustine's susceptibility to hydrolysis and other chemical reactions. Because the mobility of the molecules or ions in lyophilized formulations is much more limited than the mobility of the molecules or ions in liquid formulations, such reactions would be less likely to occur. *See* ¶¶ 148–149. Indeed, Dr. Pinal admits that the POSA would have expected that reducing the mobility of the molecules in the formulation would reduce the rate of such chemical reactions in arguing that the POSA would have expected refrigeration to decrease reaction rates. *See* Pinal Rep. ¶ 159.

641.    Furthermore, the prior art would have discouraged the POSA from pursuing a non-lyophilized bendamustine formulation. As of the priority date, at least two different lyophilized formulations had been marketed in Germany (since 1971) and the United States (since 2008). *See* Brittain 2006; ¶ 150. The failure of others to successfully market a non-lyophilized bendamustine product would have motivated the POSA to prefer lyophilization. *See* ¶ 150. Olthoff 1983 and Drager '006, the sources of the only prior-art non-lyophilized bendamustine formulations that Dr. Pinal cites, would not have motivated or provided reason for the POSA to pursue a liquid formulation in the face of this knowledge. *See* ¶¶ 151–167, 199–279.

642.    Accordingly, in my opinion, the POSA would likey have continued to pursue an improved lyophilized formulation—as many researchers continued to do after the priority date—in an effort to address the factors that Dr. Pinal and Dr. Yates opine would have motivated or provided reason for the POSA to pursue a liquid formulation (i.e., convenience). *See* U.S. Patent Publication No. 2014/0142153; Bairu & Dundigalla, *Formulation and In-Vitro Evaluation of Cancer Formulation Using Lyophilization Technique with Cyclodextrin Derivative*, 6 WORLD J. PHARM. & PHARM. SCI. 2534, 2547–49 (2017); Pinal Rep. ¶ 153.

291

643.                                              REDACTED

644.    In addition to lyophilization, the POSA would have considered other methods for preparing dehydrated bendamustine drug products.  For example, as of the priority date, researchers had demonstrated that evaporative foam drying could be used as an alternative to lyophilization.  *See, e.g.*, International Patent Publication No. WO/2008/143782 ("Vehring 2008").  Researchers subsequently applied evaporative foam drying to develop improved bendamustine formulations that were easier to produce and more stable than comparable lyophilized formulations.  *See* Hajare et al., *Foam Dried Composite Glass: An Alternative to*

292

*Lyophilization for Stability Enhancement of Bendamustine Hydrochloride*, 10 RES. J. PHARM. & TECH. 1602, 1603, 1607, 1609 (2016) (citing Vehring 2008) ("Hajare 2016"). I understand that Hajare 2016 is not prior art. However, such references provide further evidence that the POSA would have considered evaporative foam drying, or other alternatives to lyophilization, based on the publications that were available as of the priority date.

### 2.    pH Adjustment

645.    I disagree with Dr. Pinal's and Dr. Yates's opinion that the POSA would have been motivated to pursue a non-lyophilized bendamustine formulation in the first instance. However, to the extent that the POSA would have been motivated or had reason to pursue a non-lyophilized formulation, the POSA would have considered pH adjustment to be a promising option for increasing the solubility and stability of bendamustine.

646.    As of the priority date, the POSA would have understood pH adjustment to be a promising option for increasing the solubility of bendamustine in the formulation. In general, the POSA would have understood that pH adjustment can be used to increase the solubility of ionizable molecules. *See* Strickley 2004 at 202, JDG_BENDA_00003290 at 3291 ("If the molecule is ionizable, then pH adjustment can be used to increase water solubility because the ionized molecular species has higher water solubility than its neutral species."). The POSA would have further understood that bendamustine is a weak base and ionizable, for example, because both commercially available bendamustine formulations, Ribomustin® and Treanda®, contained bendamustine in the form of the hydrochloride salt. *See* Ribomustin® Product Monograph at 8 (2005), JDG_BENDA_00000001 at 8; Treanda® Label at 1 (2008), JDG_BENDA_00003382 at 3382. This would have motivated the POSA to pursue pH adjustment.

293

EAGLEBEN-SA_00000569

647.    Additionally, the POSA would have understood pH adjustment to be a promising option for increasing the stability of the formulation.  In particular, the POSA would have known that the hydrolysis of the nitrogen mustard group of bendamustine is pH dependent and is inhibited in acidic conditions.  *See* Maas 1994 Translation at 1, JDG_BENDA_00002261 at 2264 ("In a highly acidic solution, hydrolysis is made difficult by protonation of the free electron pair on the nitrogen.").  This would have further motivated the POSA to pursue pH adjustment.

648.    To the extent that the POSA believed pH adjustment to be insufficient, the POSA would have understood that this option could be used in combination with the other approaches discussed below, such as the use of a co-solvent system or complexing agents.  *See, e.g.,* Strickley 2004 at 225, JDG_BENDA_00003290 at 3314 ("If complexation alone is insufficient, then a combination of complexation and pH modification . . . or/and cosolvent may be used.").  The POSA would have been motivated to try these options before using a co-solvent system composed entirely of non-aqueous solvents.  *See id.* at 225–26, JDG_BENDA_00003290 at 3314–15 ("If the drug is not solubilized by pH modification, cosolvents, complexation, or combinations of these, the drug is considered 'challenging.'  Surfactants are used to solubilize some of the most water-insoluble drugs, and the formulations are usually concentrated drug solutions in a completely organic solvent(s) that is diluted prior to intravenous administration . . . .").

649.                                  REDACTED

EAGLEBEN-SA_00000570

REDACTED

650.                              REDACTED

### 3.    Chloride Concentration

651.    I disagree with Dr. Pinal's and Dr. Yates's opinion that the POSA would have

been motivated to pursue a non-lyophilized bendamustine formulation in the first instance.

However, to the extent that the POSA would have been motivated or had reason to pursue a non-

lyophilized formulation, the POSA would have considered increasing the chloride ion

concentration to be a promising option for increasing the stability of bendamustine.

652.    As of the priority date, the POSA would have known that bendamustine was more

stable in aqueous formulations in the presence of chloride ions.  Maas 1994 Translation at 1,

JDG_BENDA_00002261 at 2264 ("In addition to the pH value, the chloride ion concentration

has a significant impact on the hydrolysis equilibrium. It is preferred that the bendamustine

hydrochloride be regenerated as the chloride ion concentration increases, which suppresses the

295

EAGLEBEN-SA_00000571

formation of the hydroxyl derivative."). This would have motivated the POSA to pursue increasing the chloride ion concentration.

653. To the extent that the POSA believed increasing the chloride ion concentration to be insufficient, the POSA would have understood that this approach could be used in combination with the other approaches discussed above and below, such as the use of pH adjustment, complexing agents, or co-solvent systems.

654. REDACTED

655. REDACTED

EAGLEBEN-SA_00000572