# EXHIBIT 1

# REDACTED PUBLIC VERSION

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| EAGLE PHARMACEUTICALS, INC., and EAGLE SUB1 LLC<br><br>      Plaintiffs,<br><br>  v.<br><br>SLAYBACK PHARMA LLC, and AZURITY PHARMACEUTICALS, INC.<br><br>      Defendants. | )<br>)<br>)<br>)  C.A. No. 24-65-JLH<br>)  **(CONSOLIDATED)**<br>)<br>)  **JURY TRIAL DEMANDED**<br>)<br>)  **HIGHLY CONFIDENTIAL**<br>)<br>)<br>)<br>) |

**PLAINTIFFS EAGLE PHARMACEUTICALS, INC. AND EAGLE SUB1 LLC'S**
**<u>FINAL INFRINGEMENT CONTENTIONS</u>**

Pursuant to the Court's Scheduling Order (D.I. 28), as modified by the parties Joint Order Regarding Case Consolidation and Coordination (C.A. 24-65, D.I. 156; C.A. 25-75, D.I. 28) as entered by the Court on June 27, 2025, Plaintiffs Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC ("Eagle" or "Plaintiffs") hereby provide to Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc. ("Slayback" or Defendants") its Final Infringement Contentions for the asserted claims of U.S. Patent Nos. 11,844,783 (the "'783 Patent"), 11,872,214 (the "'214 Patent"), and 12,138,248 (the "'248 Patent") (collectively the "Patents-in-Suit").

Eagle has prepared these contentions based on information and discovery currently available to it. Fact discovery remains open and expert discovery has not yet begun in this case. Further, Eagle's investigation into the infringement of the asserted claims of the Patents-in-Suit continues, and fact depositions have not yet begun. In addition, although Slayback has produced to Eagle its New Drug Application ("NDA") No. 212209 ("Slayback's NDA"), Slayback has yet to produce samples of its Bendamustine Hydrochloride Injection, 100 mg/4 mL product as

1

described in Slayback's NDA, commercially sold under the name VIVIMUSTA ("Slayback's NDA Product" or "VIVIMUSTA"). Eagle has been severely prejudiced in its preparation of its Final Infringement Contentions by Slayback's unreasonable delayed production of documents. Slayback still has not produced custodial documents from two individuals identified as have relevant information in Slayback's Third Supplemental Initial Disclosures served on July 23, 2025. Additionally, Slayback has yet to produce all additional documents relating to the marketing, promotion, sale, development, and testing of Slayback's NDA Product. Eagle reserves the right to rely on any additional discovery responses or documents served by Slayback in support of Eagle's infringement contentions, and to supplement or amend Eagle's infringement contentions as appropriate. Eagle intends to provide and rely upon further evidence, analysis, and opinion regarding Slayback's infringement with respect to any claim element in accordance with the schedule for fact discovery, expert discovery, and expert reports.

Eagle has provided its final infringement contentions based on the claim constructions set forth in the Court's January 31, 2025 Order (D.I. 92), and reserves its right to amend its contentions should the Court adopt any additional or alternative constructions.

Eagle reserves all rights to modify or supplement these contentions as it deems necessary and/or appropriate as discovery in this case progresses, and as provided in the Scheduling Order, the FEDERAL RULES OF CIVIL PROCEDURE, and the Local Rules of the U.S. District Court for the District of Delaware. In the event that a claim limitation is deemed to be missing under a literal infringement analysis, Eagle also reserves the right to demonstrate the presence of a substantial equivalent of such limitation and to pursue infringement under the doctrine of equivalents. Further, Eagle reserves the right to amend these contentions where appropriate, as discovery in this case continues and/or in light of Slayback's non-infringement positions and/or invalidity contentions.

2

ME1\58460452.v1

Eagle further reserves the right to assert additional or alternative claims. Eagle also reserves the right to rely on testing data to further demonstrate Slayback's infringement of any claim element. All citations are exemplary and non-exclusive and Eagle reserves the right to rely upon and respond to any evidence Slayback cites in its final non-infringement contentions.

These final infringement contentions and corresponding claim charts are provided without prejudice to Plaintiffs' right to introduce expert opinions and demonstratives as expert discovery progresses, and to produce and introduce at trial all evidence, whenever discovered, relating to the proof of currently known and subsequently discovered facts. In addition, the division of each claim into individual limitations below is for convenience only and is without prejudice to Plaintiffs' right to argue for a different division at a later date.

These contentions are made pursuant to Federal Rule of Evidence 502 and the Protective Order in this case. To the extent that they contain any information that may be protected from discovery under the attorney-client privilege, the work-product doctrine, the common-interest privilege, or any other applicable privilege or immunity, such disclosure is inadvertent and does not constitute a waiver of any such privilege or immunity.

The contentions set forth below are based on Eagle's current knowledge and belief, as based on the information concerning Slayback's NDA Product that is currently available to Eagle. All citations are exemplary and non-exclusive and Eagle explicitly reserves the right to rely upon and respond to any evidence that Slayback cites in its responsive non-infringement contentions.

As described herein, Slayback's NDA Product, including the methods of using Slayback's NDA Product as set forth in Slayback's NDA, the proposed package insert and proposed labeling for Slayback's NDA Product, and promotional materials associated with same literally or the by doctrine of equivalents infringes each of the asserted claims of the Patents-in-Suit.

3

## I.    SLAYBACK'S NDA PRODUCT INFRINGES THE ASSERTED CLAIMS OF THE PATENTS-IN-SUIT

As set forth in the claim charts below, Slayback's activities in connection with the manufacture, use, sale, offer for sale and/or importation of the drug product that is the subject of Slayback's NDA constitutes direct infringement under 35 U.S.C. § 271(a) and indirect infringement under 35 U.S.C. §§ 271(b) and (c) of the asserted claims (claims 1, 3, 6-10 of the '783 Patent, claims 1-9 of the '214 Patent, and claims 1-11, 15 and 20 of the '248 Patent).

Slayback's NDA Product (described in NDA No. 212209), and the manufacture, use, sale, offer for sale and/or importation thereof including in accordance with the methods of use as set forth in Slayback's NDA, the proposed package insert, proposed labeling for Slayback's NDA Product, and promotional materials associated with same contains each and every limitation of the asserted claims literally or under the doctrine of equivalents, and thus infringes those asserted claims as set forth herein.

Eagle reserves the right to base its infringement contentions on additional information in Slayback's production, deposition transcripts, interrogatory responses, responses to requests for admission, and/or any other pleadings, as well as expert discovery.  In particular, Eagle reserves the right to supplement these claim charts where appropriate if it discovers any additional evidence regarding Slayback's infringement.

### A.    Slayback's Non-Infringement Arguments Lack Merit

Slayback set forth its non-infringement position(s) in response to Eagle's Common Interrogatory No. 5, served by Eagle on May 21, 2024.  Slayback provided an initial response on June 20, 2024 and a supplemental response on October 7, 2024 (collectively, "Slayback's Non-Infringement Contentions").  Eagle confirmed that Slayback has no additional non-infringement

ME1\58460452.v1

positions on May 14, 2025.  5/14/2025 Ltr. from R. Vallabhaneni to R. Ast-Gmoser; 5/28/2025 Email from K. Welsh.

> **1.    Slayback Indirectly Infringes the Method Steps of the '783 Patent Including "Providing a Liquid Bendamustine Containing-Composition," "Diluting," and "Intravenously Administering"**

As Eagle set forth in its initial infringement contentions, Slayback indirectly infringes under 35 U.S.C. §§ 271(b) and/or 271(c) by, *inter alia*, inducing infringement through Slayback's marketing, promotion, public statements, and/or labeling for or regarding Slayback's NDA Product.

Slayback does not contend that there are no direct infringers.  Eagle identifies as direct infringers hospitals, cancer centers, and other medical organizations employing or contracting with physicians (typically an oncologist or hematologist) (collectively the "Healthcare Provider").

To the extent that multiple medical professionals perform steps of the claimed method, direct infringement exists because the actions of multiple people or entities can be attributed to a single person or entity when that single person or entity "directs or controls" the actions of the others. *See Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1023 (Fed. Cir. 2015). Such direction and control may be established under traditional agency or contract principles or "when an alleged infringer conditions participation in an activity or receipt of a benefit upon

5

performance of a step or steps of a patented method and establishes the manner or timing of that performance." *Id.* Under either test, if multiple medical professionals perform the steps of the methods of the Asserted Claims, their infringement would be attributable to the Healthcare Provider responsible for treating the patient in question.

In the context of Slayback's NDA Product, ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████    ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

With respect to contributory infringement under 35 U.S.C. § 271(c), ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

6

ME1\58460452.v1

████████████████████████████████████████████ Indeed, the Federal Circuit has held that, where, as here, the product being sold is "specifically labeled for use in a patented method" then, in addition to inducing infringement, it "usually is also contributory infringement." *Eli Lilly & Co. v. Actavis Elizabeth LLC*, 435 F. App'x 917, 926 (Fed. Cir. 2011).

████████████████████████████████████████████

████████████████████████████████████████ *Id*.; *see Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1357 (Fed. Cir. 2018) ("For purposes of contributory infringement, the inquiry focuses on whether the accused products can be used for purposes ***other than*** infringement.") (internal quotation marks omitted) (emphasis in original); *see also* Sept. 9, 2025 Slayback's Second Supp. Responses to Eagle's First Set of Common Interrogatories at Interrogatory Nos. 5, 7.

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████  ████████

████████████████████████████████████████

████  ███  ████  ███████████  ███  ████  ████  ███

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████  ██████████████  ██████  ████████  ███  ████  ███

████████████████████████████████████████

7

ME1\58460452.v1

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████

### 2.    Slayback Directly Infringes the "Pharmaceutically Acceptable Fluid" Limitation of the Asserted Patents

Slayback contends that the Slayback NDA Product does not "literally infringe the asserted claims" of the Asserted Patents because ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ Slayback contends

that ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████

    ████████████████████████████████████████████████

██████████

ME1\58460452.v1

**a.**

**b.**

The "pharmaceutically acceptable fluid" limitation at issue recites five specific solvents (one of which is required, and four of which are optional): "polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol." '214 Patent at claims 1, 6; '783 Patent at claim 1; '248 Patent at claims 1, 8. As the Federal Circuit explained in the prior litigation between these parties:

> the claim limitation-at-issue has only one stated purpose: that the fluid be "pharmaceutically acceptable." Unlike in *Pfizer*, the specification here repeatedly discloses ethanol as serving that purpose, *i.e.*, the specification expressly discloses ethanol as a "pharmaceutically acceptable fluid." *E.g.*, '796 patent at col. 1 ll. 60–64, col. ll. 34–42, 43–48. We therefore hold that the asserted patents dedicated ethanol to the public by disclosing, but not claiming, ethanol as an alternative to PG in the "***pharmaceutically acceptable solvent***" claim limitation.

*Eagle Pharms. Inc. v. Slayback Pharma LLC*, 958 F.3d 1171, 1176–77 (Fed. Cir. 2020) (emphasis added).

9

ME1\58460452.v1

████████████████████████████. During claim construction, the parties agreed that "pharmaceutically acceptable fluid" means "*a fluid* which is suitable for pharmaceutical use." D.I. 103-1, Ex. A at 4. Since sodium hydroxide is described as "white fused mass . . . available in small pellets, flakes, [and] sticks" with a "hard and brittle" "crystalline" structure, ███████████████████████████

████████████████████ EAGLBEN-SA_00315043 (2009 Pharmaceutical Handbook of Excipients) at -719-20.

████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████

████████████████████████████

████████████████████████████████

█████

**c.** ██████████████████

████████████████████████████

████████████████████████████████

████████████████████████ As the Federal Circuit has explained, "impurities that a person of ordinary skill in the relevant art would

ordinarily associate with a component on the 'consisting of' list do not exclude the accused product or process from infringement." *Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1360 (Fed. Cir. 2006). Notably, even if a component is added intentionally, that "does not change its status as an impurity ordinarily associated therewith." *Id.* (internal quotation marks omitted).

PEG is produced by the interaction of ethylene oxide with water, ethylene glycol, or ethylene glycol oligomers. Alfa Chemistry, *Preparation Method of Polyethylene Glycol*, https://www.alfa-chemistry.com/resources/preparation-method-of-polyethylene-glycol.html (last visited Oct. 8, 2025). The reaction is catalyzed by acidic or basic catalysts. *Id.* Basic or alkali catalysts such as sodium hydroxide (NaOH) are used to prepare low-molecular-weight polyethylene glycol. *Id.*

Additionally, formulators frequently use sodium hydroxide to adjust PEG's pH for pharmaceutical purposes. The Pharmaceutical Handbook states that "sodium hydroxide is widely used in pharmaceutical formulations to adjust the pH of solutions." EAGLBEN-SA_00315043 (2009 Pharmaceutical Handbook of Excipients) at -719-20; SLAY-VIVMUS0012597 (Sandeep Nema et al., Excipients and Their Use in Injectable Products, 51(4) PDA J. Pharm. Sci. Technol. 166, 169 (1997)) at -169 (identifying sodium hydroxide as a common "pH Adjusting Agent[]").

When NaOH dissolves in water for injection (WFI), it dissociates into $Na^+$ and $OH^-$ ions. *See* Haruo Gotoh, On the Organic Synthesis Related to the Sodium Industry , at page 55 (Textile Chemistry Laboratory, Faculty of Textile Science & Technology, Shinshu University, Sept. 10, 1962). ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ *See, e.g.*, Hanamanthsa

11

Shankarsa Bevinakatti, et al, U.S. Patent No. 8,722,814, col. 2, ll. 4–36 (issued May 13, 2014 (assigned to Croda Int'l PLC). ("Suitable catalysts include alkali metal, particularly sodium or potassium, bases e.g. hydroxides, particularly NaOH or KOH.").  As a result of this catalysis process, PEGs often contain trace (ppm) amounts of salt impurities.  J. Milton Harris, Laboratory Synthesis of Polyethylene Glycol Derivatives, 25 J. Macromol. Sci., Part C: Rev. Macromol. Chem. Phys. 325, 327 (1985).  ("PEG's are quite pure materials, having only trace (ppm) amounts of impurities such as dioxane, salts, aldehydes, and free ethylene oxide."). ██████████

██████████████

        Here, Slayback's PEG manufacturer, CRODA, uses a sodium containing catalyst or process aid to formulate its Super Refined PEG 400.  U.S. Patent No. 8,722,814 at 2:4-36 (Assigned to Croda International PLC) ("Suitable catalysts include alkali metal, particularly sodium or potassium, bases e.g. hydroxides, particularly NaOH or KOH.").  Indeed, Slayback's own documents ███████████████████████████████████████

███████████████████

        ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████.  This is wrong for several reasons.  First, as the Federal Circuit noted in *Conoco*, ██████████████████

██████████████████████  460 F.3d at 1360.  Second, ██████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████  In *Otsuka*, and *Glaxco*, the

12

ME1\58460452.v1

impurities at issue were those of the active ingredient, not impurities of an excipient as Eagle contends NaOH is here to PEG. *See Otsuka Pharm. Co.*, 2022 WL 2952759 at \*4 (citing *Glaxco Grp. Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1347 (Fed. Cir. 2004)). ████████████

████████████████████████████

████████████████████████████ Indeed, the Court in *Otsuka* goes so far as to say "[s]olvents also qualify as impurities to the extent that they are an 'unwanted reaction product.' Therefore, residual solvents are not excluded by '[consisting of].'" *Id.*

████████████████████████████

████████████████ To the extent Eagle relies on testing to support its infringement case, it will be disclosed in accordance with the expert discovery schedule as set forth in the Court's Scheduling Order.

**d.** ████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████

████████████████████████████

████████████████████████████

████████████ *Compare Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1331-32 (Fed. Cir. 2004) *with Shire Dev. Inc. v. Cadila Healthcare Ltd.*, No. 10-581-KAJ, 2015 WL 4596410, at \*6 (D. Del. July 28, 2015), *aff'd sub nom.*, 688 F. App'x 912 (Fed. Cir. 2017). ████████████████████████████

13



14

ME1\58460452.v1

15

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████        ███████████████████████████████████

███████████████████        █████████████████████████████████████████

██████████████████████████████████████████████████████        █████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████████████████████████████████████████        *See* 21 CFR

201.100(b)(5)(iii); U.S. Food & Drug Admin., Guidance for Industry: Content and Format of

Composition Statement and Corresponding Statement of Ingredients in Labeling in NDAs and

ANDAs, at 3–4 (Apr. 2024), https://www.fda.gov/media/178099/download. ████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████████████████████████████

      █████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████ All of the "pharmaceutically acceptable fluids" that follow

the "consisting of" term in the asserted claims function as solvents for the formulation into which

the bendamustine and antioxidants are dissolved. ██████████████████████████

ME1\58460452.v1

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

The provisional application to which this application claims priority reinforces that the purpose of the "pharmaceutically acceptable fluid" is as a solvent. *See* U.S. Provisional Patent Application No. 61/299,100, at 3 (filed Jan. 28, 2010) ("In one embodiment of the invention, the solvent is propylene glycol. In another embodiment of the invention, the solvent is ethanol. In yet another embodiment of the invention, the solvent is polyethylene glycol.").

**e.**

The reaction is catalyzed by acidic or basic catalysts. Alfa Chemistry, *Preparation Method of Polyethylene Glycol*, https://www.alfa-chemistry.com/resources/preparation-method-of-polyethylene-glycol.html (last visited Oct. 8, 2025). Basic or alkali catalysts, such as sodium hydroxide (NaOH), are used to prepare low-molecular-weight polyethylene glycol. *Id.* ████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████ PEG 400 NF is a low molecular weight grade of PEG. EAGLBEN-SA_00315043 (2009 Pharmaceutical Handbook of Excipients) at -588 (Average molecular weight of PEG 400 is 380-420 compared the molecular weight of PEG 8000 which is 7,000 to 9,000); http://www.pharmacopeia.cn/v29240/usp29nf24s0_m66430.html.

17

18



**f.**

Slayback plans to sell, offers to sell, or imports Slayback's NDA Product in the United States—each of which is an act of infringement under 35 U.S.C. §§ 271(a)-(c). The infringement inquiry does not rise and fall with Slayback's NDA. *See Bayer AG v. Biovail Corp.*, 279 F.3d 1340, 1350 (Fed. Cir. 2002) ("Infringement under § 271(e)(2)(A) by submission of an ANDA is not synonymous with infringement under § 271(a) by a commercial product. Evidence of actual infringement (contrasted with evidence of a 'hypothetical' infringement) may differ . . ."); *Amarin Pharma, Inc. v. Hikma Pharms. USA Inc.*, 104 F.4th 1370, 1377 (Fed. Cir. 2024).

To the extent Eagle relies on testing to support its infringement case, it will be disclosed in accordance with the expert discovery schedule as set forth in the Court's Scheduling Order.

**g.    Slayback Infringes Under Doctrine of Equivalents**

Slayback therefore still infringes under

19

ME1\58460452.v1

the doctrine of equivalents. *See Abraxis Bioscience, Inc. v. Mayne Pharma (USA) Inc.*, 467 F.3d 1370, 1382 (Fed. Cir. 2006).

PEG frequently contains sodium (Na) and hydroxy groups (OH) from the catalyst process used in its manufacture. *See, e.g.*, EAGLBEN-SA_00315043 (2009 Pharmaceutical Handbook of Excipients) at -592 ("Polyethylene glycol polymers are formed by the reaction of ethylene oxide and water under pressure in the presence of a catalyst."). Thus, any differences between PEG and PEG with NaOH are insubstantial. ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ *See Abraxis Bioscience, Inc.*, 467 F.3d at 1382 (affirming infringement under the doctrine of equivalents and noting that the district court "correctly determined that calcium trisodium DTPA performs substantially the same function in substantially the same way to achieve the same result as edetate"). Indeed, a POSA would recognize that PEG + NaOH is simply a modified form of PEG that performs the same function (*i.e.*, pharmaceutically acceptable carrier for bendamustine), the same way (*i.e.*, pharmaceutically acceptable solvent for bendamustine), to achieve the same result (*i.e.*, stable liquid bendamustine formulation). *See id.*

**h.**  ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████  ████

████████████████████████████████████████████████

20

ME1\58460452.v1

███████████████████████████████████████████████████████████

████████████████     The FDA regulations for parenteral drug products, like Slayback's NDA

Product, requires that "the names of all inactive ingredients" be listed on the "label of the drug."

*See* 21 CFR 201.100(b)(5)(iii); U.S. Food & Drug Admin., Guidance for Industry: Content and

Format of Composition Statement and Corresponding Statement of Ingredients in Labeling in

NDAs and ANDAs, at 3–4 (Apr. 2024), https://www.fda.gov/media/178099/download; *see also*

21 C.F.R. § 314.70 ("changes in the qualitative or quantitative formulation of the drug product,

including inactive ingredients, or in the specifications provided in the approved NDA" require a

supplemental submission to FDA "prior to distribution of the product made using the change").

There are just two exceptions to this rule.  The first, is that "ingredients added to adjust the pH …

may be declared by name and a statement of effect" without "the quantity or proportion," ███

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████ ██

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████

        ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

21

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

**i.**    ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████    This Court has already found that "non-aqueous" does not mean the complete absence of water. *Eagle Pharms., Inc. v. Hospira, Inc.*, 424 F. Supp. 3d 355, 358 (D. Del. 2019). Rather, this Court construed a "non-aqueous liquid composition" as "a solution in which water does not make up a substantial portion and is not a significant solvent." *Eagle Pharms., Inc. v. Hospira, Inc.*, No. 18-1074-CFC, D.I. No. 108 (D. Del. Dec. 28, 2020).

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████    However, as explained above, non-aqueous does not mean the complete absence of water. Indeed, a POSA would understand that there could be some percentage of water in a non-aqueous solvents. For example, even the purest form of ethanol, a "non-aqueous" solvent, contains some water, and standard "alcohol" or "ethanol" can contain as much as 4.9% water. EAGLEBEN-SA_00315043 (2009 Pharmaceutical Handbook of Excipients) at -088 (showing the term ethanol is used to describe "the material containing water and 95.1-96.9% v/v of [ethanol] at 20 C"). PEG, too, can contain residual water. *Id.* at -589 (showing national formularies specifying up to 2% water in PEG 400). As such, to the

22



**j.**

ME1\58460452.v1

████████████████████████████████████████████████

████████████████████

**B.      Slayback Infringes Each Asserted Claim of the '783, '214, and '248 Patents**

As set forth in the charts below, each element of each asserted claim is met by Slayback's

NDA Product and the methods of use as set forth in Slayback's NDA, the proposed package insert,

proposed labeling for Slayback's NDA Product, and promotional materials associated with same.

<table>
<tr>
<td>Dated: October 10, 2025</td>
<td>**MCCARTER & ENGLISH, LLP**</td>
</tr>
<tr>
<td></td>
<td>_/s/ Alexandra M. Joyce_</td>
</tr>
<tr>
<td>OF COUNSEL:</td>
<td>Daniel M. Silver (#4758)<br>Alexandra M. Joyce (#6423)</td>
</tr>
<tr>
<td>Daniel G. Brown<br>Kelly A. Welsh<br>LATHAM & WATKINS LLP<br>555 Eleventh Street, NW, Suite 1000<br>Washington, DC 20004<br>daniel.brown@lw.com<br>kelly.welsh@lw.com</td>
<td>Maliheh Zare (#7133)<br>405 N. King Street, 8th Floor<br>Wilmington, DE 19801<br>(302) 984-6300<br>dsilver@mccarter.com<br>ajoyce@mccarter.com<br>mzare@mccarter.com</td>
</tr>
<tr>
<td>Kenneth G. Schuler<br>Marc N. Zubick<br>Alex Grabowski<br>LATHAM & WATKINS LLP<br>330 North Wabash Avenue, Suite 2800<br>Chicago, IL 60611<br>(312) 876-7700<br>kenneth.schuler@lw.com<br>marc.zubick@lw.com<br>alex.grabowski@lw.com</td>
<td>_Attorneys for Plaintiffs_</td>
</tr>
<tr>
<td>Brett M. Sandford<br>LATHAM & WATKINS LLP<br>505 Montgomery Street, Suite 2000<br>San Francisco, CA 9411<br>(415) 391-0600<br>brett.sandford@lw.com</td>
<td></td>
</tr>
</table>

24

**EXHIBIT 1 U.S. PATENT NO. 11,844,783**

| U.S. Patent No. 11,844,783 | Slayback's VIVIMUSTA® Product |
|---|---|
| 1. A method of treating leukemia in a human in need thereof comprising |  |

1

ME1\58460452.v1



| | providing a liquid bendamustine-containing composition comprising | |

2

ME1\58460452.v1



ME1\58460452.v1



4

| | |
|---|---|
| bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL, |  |
| a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and | |

5

ME1\58460452.v1



| | |
|---|---|
| a stabilizing amount of an antioxidant | |
| wherein the total impurities in the liquid bendamustine-containing composition resulting from the degradation | |

6

ME1\58460452.v1

| | |
|---|---|
| of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.; |  |
| diluting the liquid bendamustine containing composition; and | |

7

ME1\58460452.v1



8

ME1\58460452.v1



ME1\58460452.v1

| | |
|---|---|
| intravenously administering the diluted composition to the human. |  |

10

ME1\58460452.v1



11

ME1\58460452.v1



| | 3. The method of claim 1, wherein the concentration of bendamustine in the liquid bendamustine-containing |
|---|---|

ME1\58460452.v1

compositions is about 25 mg/mL.



13

ME1\58460452.v1



| | |
|---|---|
| 6. The method of claims 1, wherein the antioxidant is monothioglycerol. | |



ME1\58460452.v1



| | |
|---|---|
| 7. The method of claim 1, wherein the antioxidant in the liquid bendamustine containing composition is monothioglycerol in a concentration of about 5 mg/mL. | |

16

ME1\58460452.v1



17

ME1\58460452.v1



8. The method of claim 1, wherein the liquid bendamustine-containing composition is stable for at least about 15 months at 5° C. or for at least about 15 months at 25° C., prior to dilution.

18

ME1\58460452.v1



19

| | |
|---|---|
| 9. The method of claim 1, wherein the liquid bendamustine-containing composition further comprises ethanol. |  |

20



10. The method of claims 1, wherein the

ME1\58460452.v1

| liquid bendamustine-containing composition is packages in a sterile vial. |  |

ME1\58460452.v1



23

ME1\58460452.v1

**EXHIBIT 2 U.S. PATENT NO. 11,872,214**

| U.S. Patent No. 11,872,214 | Slayback's VIVIMUSTA® Product |
|---|---|
| 1. A sterile vial containing a liquid bendamustine-containing composition comprising |  |
| about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 25 mg/mL; | |

1

ME1\58460452.v1

| | |
|---|---|
| a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and |  |
| a stabilizing amount of an antioxidant, | |

ME1\58460452.v1

| | |
|---|---|
| wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. |  |
| 2. The sterile vial of claim 1, wherein the antioxidant is monothioglycerol. | |

3

| | |
|---|---|
| 3. The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL. |  |
| 4. The composition of claim 1, wherein the composition is stable for at least about 15 months at 5° C. or for at least about 15 months at 25° C. | |

4

ME1\58460452.v1

| |  |
|---|---|
| 5. The sterile vial of claim 1, wherein the liquid bendamustine-containing composition further comprises ethanol. | |
| 6. A liquid bendamustine-containing composition comprising | |

| 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, |  |
| in a pharmaceutically acceptable fluid; wherein the pharmaceutically acceptable fluid consists of polyethylene glycol | |

6

ME1\58460452.v1

| | |
|---|---|
| and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and |  |
| wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 25 mg/mL, | |
| wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. | |

7

ME1\58460452.v1



| | |
|---|---|
| 7. The composition of claim 6, wherein the antioxidant is monothioglycerol. | |
| 8. The composition of claim 6, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL. | |

8

ME1\58460452.v1

| | |
|---|---|
| |  |
| 9. The composition of claim 6, further comprising ethanol. | |

9

**EXHIBIT 3 U.S. PATENT NO. 12,138,248**

| U.S. Patent No. 12,138,248 | Slayback's VIVIMUSTA® Product |
|---|---|
| 1. A sterile container containing a liquid bendamustine-containing composition comprising |  |
| bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is about 25 mg/mL; | |

10

ME1\58460452.v1

| | |
|---|---|
| a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and |  |
| a stabilizing amount of an antioxidant, | |

11



wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

12

ME1\58460452.v1



| | |
|---|---|
| 2. The sterile container of claim 1, wherein the antioxidant is monothioglycerol. | |
| 3. The sterile container of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL. | |

13

| | |
|---|---|
| 4. The sterile container of claim 1, wherein the composition is stable for at least about 15 months at 5° C. or for at least about 15 months at 25° C. |  |
| 5. The sterile container of claim 1, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol. | |

14

ME1\58460452.v1

| | |
|---|---|
| |  |
| 6. The sterile container of claim 1, wherein the liquid bendamustine-containing composition comprises about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof. | |
| 7. The sterile container of claim 1, wherein the liquid bendamustine-containing | |

15

ME1\58460452.v1

| composition comprises about 100 mg of bendamustine. |  |
| 8. A liquid bendamustine-containing composition comprising | |
| bendamustine, or a pharmaceutically | |

16

| | |
|---|---|
| acceptable salt thereof, and a stabilizing amount of an antioxidant, |  |
| in a pharmaceutically acceptable fluid; wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, | |

17

ME1\58460452.v1

| | |
|---|---|
| benzyl alcohol and glycofurol; and |  |
| wherein the bendamustine concentration in the pharmaceutically acceptable fluid is about 25 mg/mL, | |
| wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. | |

18



9. The composition of claim 8, wherein the antioxidant is monothioglycerol.

19

ME1\58460452.v1

| | |
|---|---|
| 10. The composition of claim 8, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL. |  |
| 11. The composition of claim 8, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol. | |

20

ME1\58460452.v1

| | |
|---|---|
| 15. The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and ethanol. |  |
| 20. The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and ethanol. | |

21

ME1\58460452.v1



22

ME1\58460452.v1