# EXHIBIT 5

# REDACTED PUBLIC VERSION

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

EAGLE PHARMACEUTICALS, INC. and
EAGLE SUB1 LLC,

      Plaintiffs,

    v.

SLAYBACK PHARMA LLC and AZURITY
PHARMACEUTICALS, INC.,

      Defendants.

C.A. No. 24-65-JLH

**EXPERT REPORT OF
DR. SINKO REGARDING NON-INFRINGEMENT**

**TABLE OF CONTENTS**

**Page**

I.     DR. SINKO'S BACKGROUND.................................................................................1

       A.     Education and Professional Background.................................................1

       B.     Prior Testimony .....................................................................................5

       C.     Compensation ........................................................................................6

II.    SCOPE OF WORK AND SUMMARY OF OPINIONS ....................................6

III.   LEGAL PRINCIPLES APPLIED .......................................................................7

IV.    SCIENTIFIC BACKGROUND .........................................................................11

       A.     States of Matter And The Definition of Solids, Liquids, and Fluids.....12

       B.     Pharmaceutical Dosage Forms as Solutions and Fluids ........................15

       C.     Stability and Stability Testing ...............................................................19

       D.     Acids, Bases and pH..............................................................................20

       E.     Conservation of Mass ...........................................................................22

       F.     PEG........................................................................................................23

V.     THE SLAYBACK NDA PRODUCT .................................................................23

VI.    THE ANTIOXIDANT-FREE FORMULATION ...............................................28

VII.   THE ASSERTED PATENTS..............................................................................29

       A.     History of Eagle Patent Applications ....................................................29

              1.     The '783 Patent Application – Appl. No.: 18/081,238..............32

              2.     Prosecution of the '214 Patent – Application 18/081,251.........37

              3.     Prosecution of the '248 Patent – Application No. 18/646,171 ...41

       B.     Claims Of The Patents-In-Suit .............................................................43

              1.     Claims of the '214 Patent .........................................................43

              2.     Claims of the '248 Patent .........................................................44

VIII.   NON-INFRINGEMENT OF THE SLAYBACK NDA PRODUCT ...............................47

    A.   ███████████████████████████████████████47

        1.   ██████████████████ ....................................47

        2.   ████████████████████████████████████

        █   ████████████████████████████████

        █   ████████████████████████████████

        █   ████████████████████████████████

        █   ████████████████████████████████

        █   ████████████████████████████████████64

        8.   Sodium Hydroxide is Not Subject to the "Comprising" Claim Language 74

        9.   There Is No Infringement by Equivalents .................................................75

    B.   There Is No Infringement – ████████████████
        "Pharmaceutically Acceptable Fluid Consisting Of" Limitation .........................81

IX.   NON-INFRINGEMENT BY ███████████████████
    OTHER PRODUCTS .................................................................................................84

    A.   ██████████████████████████ ........................84

    B.   There is No Infringement By Treanda® ................................................................90

    C.   There is No Infringement By Non-Bendamustine Cancer Drugs ........................91

X.   THE PATENTS-IN-SUIT ARE NOT "FOUNDATIONAL" .........................................93

XI.   OTHER PATENTS .......................................................................................................96

XII.   CONCLUSION .............................................................................................................98

## I. DR. SINKO'S BACKGROUND

### A. Education and Professional Background

1. My name is Dr. Patrick J. Sinko and I am a Distinguished Professor of Pharmaceutics and the Parke-Davis Endowed Chair in Pharmaceutics and Drug Delivery in the Ernest Mario School of Pharmacy at Rutgers, The State University of New Jersey. My current research focuses on biopharmaceutics, pharmaceutical formulations, and molecular-, nano-, and micro-scale drug delivery.

2. I was Chair of the Department of Pharmaceutics from 1998 to 2008. I also served as the Associate Vice President for Research at Rutgers from 2007 through 2019, providing executive-level oversight of Comparative Medicine Resources, Research Core Facilities, In Vivo Research Services, Biomedical Advisory Committees, and the Controlled Substances program across Rutgers' three regional campuses. Since 2003, I have held the Parke-Davis Endowed Chair in Pharmaceutics and Drug Delivery at Rutgers.

3. I received a Bachelor of Science in Pharmacy from Rutgers University in 1982 and completed my Ph.D. in Pharmaceutics at the University of Michigan in 1988. After completing my Ph.D., I continued as a Research Scientist at the University of Michigan until 1991.

4. In 1991, I joined the faculty at Rutgers in the Department of Pharmaceutics as an Assistant Professor. I was promoted to Associate Professor in 1997, Professor in 2000, and Distinguished Professor in 2007. As a professor at Rutgers, I have taught courses in several graduate and undergraduate subjects, including drug delivery, general toxicology, pharmacology, pharmacokinetics, and pharmaceutics.

5. At Rutgers, my research is generally directed to biopharmaceutics, drug delivery, and pharmaceutical formulations. I have numerous active and completed projects, sponsored by

1

the National Institutes of Health (NIH) and the pharmaceutical industry, focused on formulations and drug delivery systems. As such, I have extensive experience formulating and evaluating drug delivery systems, dosage forms and their respective components and processes.

6.      I have written and published extensively in pharmaceutics, including authoring or co-authoring more than 186 peer-reviewed publications, 70 book chapters and monographs, and 292 abstracts. I have also given over 175 lectures at scientific meetings and conferences, universities, and companies. I have been named as an inventor of 20 patents issued in the field of pharmaceutics.

7.      I have also served as a Visiting Professor, Department of Pharmaco-biodynamics, Faculty of Pharmacy, Kanazawa University, Kanazawa, Japan, during the time period of 1997 to 1998, and as a Research Scientist, College of Pharmacy, the University of Michigan and Therapeutic Systems Research Laboratories, Inc., Ann Arbor, Michigan, during the time period of 1988 to 1991.  I also have taught course work at the U.S. Food and Drug Administration ("FDA") on Drug Transporters in February of 2005.  The FDA audience included medical officers, scientists, and clinicians

8.      I am the Editor and Principal Author of the recent (5th through 7th) and current (8th, published in 2023) editions of Martin's Physical Pharmacy and Pharmaceutical Sciences (hereinafter referred to as "Martin's Pharmacy"), which has been a well-recognized textbook in the Pharmaceutical Sciences since 1960, and is used extensively worldwide.  The book has been published in several languages including Portuguese (2008), Complex Chinese (2009), German (2022), Indonesian (2009), Korean (2009, 2010), and Simplified Chinese (2010).

9.      I currently serve as Editor-in-Chief for the journal *Pharmaceutics*. I also serve or have served on the editorial advisory boards for Advanced Drug Delivery Reviews (2005-2010),

2

Applied Nano, Molecular Pharmaceutics, Therapy (2004-2011), Biomedical Materials (2006-2010), Pharmaceutics, Recent Patents on Drug Delivery & Formulation, Current Drug Discovery Technologies, Journal of Drug Delivery Science and Technology, Journal of Drug Delivery, Drug Delivery and Translational Research, and Scientia Pharmaceutica, and European Journal of Pharmaceutical Sciences (2004-2010) (Section Editor).

10.     In 2021, I was elected as President and a member of the Board of Directors of the American Association of Pharmaceutical Scientists (AAPS), serving for one three-year cycle. AAPS is a professional, scientific organization with approximately 8,000 individual members and over 12,000 actively participating stakeholders employed in academia, industry, government, and other pharmaceutical science-related institutes worldwide. The mission of the AAPS is to advance the capacity of pharmaceutical scientists to develop products and therapies that improve global health.

11.     I have received several awards, honors, and recognitions throughout my academic career. In 2003, I was elected a Fellow of the AAPS for being "internationally recognized as an expert in biopharmaceutics and drug delivery."  In 2006, I was awarded MERIT status for my NIH research grant titled "Enhancing Brain & Intestinal Uptake of Anti-AIDS Drugs."  MERIT status is awarded to a select number of NIH investigators (less than 5% of funded investigators) who have demonstrated superior competence, outstanding productivity, and are leaders in their fields with paradigm-shifting ideas.  In 2011, I was elected Fellow of the American Association for the Advancement of Science (AAAS) for distinguished contributions to biopharmaceutics and innovative approaches for drug delivery and targeting, as well as academic leadership at Rutgers.  In 2017, I was elected Fellow in the Controlled Release Society in recognition of "outstanding contributions to the field of delivery science and technology."  In 2023, I was

3

elected to the United States National Academy of Inventors as a Fellow in recognition of my "commitment to innovation and entrepreneurship and translation of intellectual property into patient cures." In 2024, I was awarded the International Science and Technology Cooperation Prize from the Fujian Provincial Government in China.

12.    I am extensively involved with the NIH as a grant reviewer, having served on over 70 review panels. I also served as a charter member of the Pharmacology Study Section, the Xenobiotic and Nutrient Disposition and Action Study Section, and the Developmental Therapeutics Study Section in the Center for Scientific Review. These study sections review research grant applications related to drugs and drug delivery systems.

13.    In addition to my academic work, I have been a consultant to numerous pharmaceutical and biotechnology companies including: Merck, Sharp and Dohme Corp., Alza Corporation, Wyeth Ayerst, Sandoz Pharmaceuticals Corp., Geneva, Ribi ImmunoChem Research, Inc., Biogen Corporation, Novo Nordisk A/S (Denmark), Uniroyal Chemical Company, Inc., Warner-Lambert Company, Glaxo-Wellcome PLC, Teva Pharmaceuticals, USA, Trega Biosciences, Inc., Merck & Co., Eli Lilly & Co., Nobex Corp., Affymax, Spherics, Inc., Lion Bioscience, Inc., Abbott Laboratories, Syntonix, and Genteric. I have served on advisory panels for Boehringer Ingelheim, Wyeth Ayerst, Lederle Laboratories, Novo Nordisk (US), and Abbott Laboratories. I served as a member of the Scientific Advisory Board for Metacrine Sciences and as Chair of the Scientific Advisory Board for TheraPort Biosciences.

14.    My work has included efforts with cancer drugs – including work on Non-Small Cell Lung Cancer, Breast Cancer, Colon cancer, Leukemia, Glioblastoma Multiforme cancer treatments.  I am a Full Member of the Cancer Institute of New Jersey (CINJ) and I am a member of the Cancer Pharmacology Program (https://cinj.org/researcher-

profiles?name=patrick-j-sinko-phd-rph).  I have also worked on projects related to cancer detection and prevention.  I have worked extensively with polyethylene glycol.  And I have done work with injectable drug delivery systems (including intravenous, intraductal, subcutaneous, intradermal, intraperitoneal injectable systems).

**15.** Attached as Exhibit 1 is a recent copy of my curriculum vitae.

### B. Prior Testimony

**16.** I have given testimony at trial or at deposition in the following cases within the last four years:

- *Novo Nordisk Inc. and Novo Nordisk A/S* v. *Apotex Inc.*, **Product**: Rybelsus. Case No. 24-9729 (RMB) (AMD) US District Court, District of New Jersey (2025 – current), D.

- *Mylan Pharmaceuticals, Inc. (Petitioner) v. Novo Nordisk A/S* (Patent Owner), **Product**: Ozempic, Case IPR2023-00724 (2023 – 2024), D.

- *Avalyn Pharma, Inc.* v. *Richard G. Vincent*, Seller Representative. Case no.: 3:20-cv-02267-JO-KSC, US District Court, Southern District of California (2022 - 2024), D.

- *Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica NV v. Tolmar Inc.* **Product**: Invega Sustenna, Civil Action no. 21-1784-RGA-SRF, US District Court, District of Delaware (2022 – 2023), D, T.

- *Supernus Pharmaceuticals, Inc.* v. *Apotex Inc. and Apotex Corp.* **Product:** Oxtellar XR, Civil Action No. 20-7870 (MAS)(TJB)(consolidated), US District Court, District of New Jersey (2022-2023), D.

- *Medexus Pharmaceuticals Inc., Medexus Inc. and Medac Gesellschaft Für Klinische Spezialpräparate MBH v. Accord Healthcare Inc. and Intas Pharmaceuticals Ltd*; **Product**: Metex and Methotrexat, Court File No. T-1007-20, Toronto, Canada. (2022-2023), T.

**(**D=deposition(s), M/A = Markman or Arbitration Hearing, T = Trial(s); Bold indicates retaining party).

## C. <u>Compensation</u>

**17.** I am being compensated at a rate of $ ████ per hour for my consulting services, including testimony at depositions, hearings, and at trial, and $ ██ per hour for travel. My compensation does not depend upon my opinions or the outcome of this case.

## II. <u>SCOPE OF WORK AND SUMMARY OF OPINIONS</u>

**18.** I have been retained by Defendants ("Slayback Pharma LLC" and "Azurity Pharmaceuticals, Inc.") as a technical expert in this matter to provide opinions regarding various issues relating to the United States Patent No. 11,872,214 ("the '214 patent") (Exh. 2), and United States Patent No. 12,138,248 ("the '248 patent") (Exh. 3) (collectively "patents-in-suit").[1]

**19.** For this Report, I have been asked by counsel for Defendants to provide my opinion on whether claims 1-9 of the '214 Patent and claims 1-11, 15, and 20 of the '248 Patent (hereinafter collectively "the Asserted Claims") are infringed or not infringed by Slayback's NDA Product.

**20.** As detailed below, it is my opinion that there is *no* infringement of the Asserted Claims by the accused Slayback NDA Product either literally or under the doctrine of equivalents, because:



---

[1] I have also analyzed United States Patent No. 11,844,783 ("the '783 Patent") (Exh. 4) and its file history, which I understand plaintiffs have withdrawn from this case. Nonetheless, the '783 Patent and its file history are relevant to understanding the patents-in-suit, and are therefore also discussed below.

21.     I have also been asked to provide my opinion as to whether ████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████ It is my understanding that this opinion of

non-infringement will be relied upon by the damages experts in this case.  However, beyond this

opinion of non-infringement, I am not offering any other opinions about ████████████

█████████ or any opinions regarding damages.

22.     I have also been asked to express my opinion as to whether the Treanda®

bendamustine product, and certain non-bendamustine cancer products would infringe the

patents-in-suit – again solely for purposes of damages issues in the case.  As detailed below,

Treanda® is a lyophilized product that is not in liquid form.  It does not infringe the claims-in-

suit because those claims require a liquid.  And, all cancer drugs that do not contain

bendamustine do not infringe because the claims-in-suit require bendamustine.

23.     The opinions expressed in this Report are based on the materials set forth in

Exhibit 5 ("Sinko Materials Considered for Non-Infringement Report"), and on my knowledge

and experience in the field as a POSA.  I reserve the right to consider additional materials and

express additional arguments in response to expert opinions submitted by Plaintiffs.

III.    **LEGAL PRINCIPLES APPLIED**

24.     In reaching my opinions, I have also applied certain legal concepts as explained to

me by the attorneys for Defendants.

7

25.     I have applied a definition of a POSA that I understand all of the parties have accepted, as follows:

> A POSA would have had the skills, education, and expertise of a team of individuals working together to formulate a liquid injectable drug product. Such a team would have included individuals with doctoral degrees in chemistry, biochemistry, pharmaceutics, pharmaceutical sciences, chemical engineering, biochemical engineering or related fields, with at least two years of post-graduate experience in developing liquid injectable drug products, or master's or bachelor's degrees in similar fields of study, with a commensurate increase in their years of postgraduate experience.  Such a team also would have been familiar with a variety of issues relevant to developing liquid injectable drug formulations, including, among other things, solubility, stability, pharmacokinetics, pharmacodynamics, and other pharmaceutical characteristics.  Such a team also would have included persons with expertise in analytical chemistry, including the detection and measurement of chemical degradants.  The team also would have had access to an individual with a medical degree with experience in treating patients with CLL and NHL.

26.     I understand that there is a dispute about the infringement or non-infringement of the patents-in-suit by Slayback's NDA Product.  And I further understand that the patentee has the burden of proving infringement by a preponderance of the evidence – meaning that the evidence shows that it is more likely than not that there is infringement.

27.     I understand that a patent's claims define the scope of the alleged invention and the exclusionary rights claimed by the patentee.  I have been informed that infringement occurs when, without authority, a patented invention is made, used, offered for sale, or sold within the United States or imported into the United States during the term of the patent therefor.  I have been informed that a patentee asserting infringement must present evidence showing that it is more likely than not – a preponderance of the evidence – that an accused product or method meets each limitation of an asserted claim, either literally or, if applicable, under the doctrine of equivalents.

8

28.    I understand that determining infringement is a two-step process.  First, the Court interprets the asserted claims through a process referred to as "claim construction," if necessary.  I have been advised that the claims of a patent must be interpreted from the perspective of a POSA at the time of filing the patent application.  Second, the accused product is compared to the claims, as construed by the Court, to determine whether there is infringement.

29.    I understand that infringement must be shown by comparing, on a limitation-by-limitation basis, the construed claims to the accused product.  In order to prove infringement, a patentee must show that the accused product contains every limitation of the claim either literally or, if applicable, as an equivalent.  If one claim limitation is not present in the accused product, there is no infringement of that claim.  Furthermore, when an independent claim is not infringed, all of the claims that depend from that claim are also not infringed.

30.    In the present context, I understand that the asserted claims are being compared to the proposed Slayback NDA Product.

31.    Literal infringement of a claim limitation means that the limitation is literally present in the accused product.  When an accused product does not literally contain a limitation, infringement may still be found under the doctrine of equivalents.  A component of an accused product can infringe under the doctrine of equivalents when it is "insubstantially different" from the claimed limitation.  One way to determine "insubstantial difference" is to assess whether the component in the accused product serves the same function, in the same way, to produce the same result.  This test of equivalents is known as the "function, way, result" (or the "FWR") test.

32.    I also understand that a patentee may not be allowed to use the doctrine of equivalents in certain circumstances.  One of those circumstances is called prosecution history estoppel.  Prosecution history estoppel prevents the patentee from arguing equivalents where the

9

claims proposed to the Patent Office were rejected by the Examiner as unpatentable and, in response, the applicant (future patentee) amended and narrowed their claims to overcome the rejection.  In that circumstance, there is a rebuttable presumption that the patentee is not allowed to use the doctrine of equivalents.

33.    I also understand that the presumption of estoppel (flowing from a narrowing amendment for a reason of patentability) can be rebutted in certain circumstances.  One such circumstance, which plaintiffs are arguing for here, is called the tangential exception.  If the reasons for the amendment are deemed tangential to the accused equivalent component then prosecution history estoppel does not apply – and thus the patentee could pursue arguments about equivalent infringement.

34.    I also understand that another limitation on the doctrine of equivalents is the doctrine of claim vitiation.  Under this doctrine, if the use of equivalents would make a claim limitation meaningless (*i.e.*, would vitiate the limitation), then the doctrine of equivalents is not appropriate.

35.    I also understand that the doctrine of equivalents cannot be applied to argue that a chemical disclosed in a patent specification, but not claimed in the claims, is an equivalent.  For instance, water is disclosed in the specification as a fluid that bendamustine can be dissolved in – although it is argued that such a fluid cannot be used to sustain stability over time.  However, water is not mentioned in the claims.  Thus, I am informed that it should be impermissible to argue that water is an equivalent of one of the listed fluids in the claims.

36.    In addition, I understand that the phrase "consisting of" in a patent claim narrows the scope of the claim.  In particular, "consisting of" is a closed phrase that requires the accused product to have _only_ what is listed after the words "consisting of" and nothing else.  The

10

presence of additional components in the accused product, beyond what is listed after "consisting of," means there is *no* infringement.

37.    When the "consisting of" phrase applies only to a particular claim limitation, it closes only that limitation.  Furthermore, I also understand that when a "consisting of" limitation is nested underneath an open-ended "comprising" phrase, the "consisting of" limitation itself remains closed as to that limitation.

38.    I understand that there are two exceptions to the closed nature of "consisting of." If either of these two exceptions apply, the "consisting of" language will not preclude a finding of infringement.  First, the presence of an impurity that is normally present in a product will not violate the "consisting of" language and thus will not avoid infringement.  However, an ingredient that is purposefully added and impacts the performance of the product is not an impurity.  The second exception is when the additional component in the accused product is unrelated to the invention.  For instance, a claim to a kit "consisting of" certain recited ingredients to be mixed together would not avoid infringement where the accused product contains the recited ingredients and also contains an added spatula that does not interact with the chemicals.

39.    I further understand that the doctrine of equivalents can be applied, in a general sense, to a "consisting of" limitation, as with any other limitation, subject to all the other limitations on the doctrine of equivalents.

## IV.    SCIENTIFIC BACKGROUND

40.    At trial, I may provide testimony regarding various aspects of pharmaceutical science including pharmaceutical formulation, pharmaceutical dosage forms, stability testing, HPLC techniques, validation, pharmaceutical degradation, and basic concepts from chemistry and organic chemistry, including the definitions of atoms, molecules, chemical bonds, chemical

11

reactions, reaction kinetics, states of matter (solids, liquids and gases), the definition of a "fluid," solutions, solutes, solvents, and co-solvents.

### A.    States of Matter And The Definition of Solids, Liquids, and Fluids

41.    I understand that a dispute exists between the parties regarding whether ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Thus, the definitions of solids and fluids are pertinent to the resolution of this case.

42.    The patents-in-suit do not provide any definition of the words "solid," "liquid," or "fluid" – let alone provide a unique definition that would depart from a POSA's understanding of the scientific and dictionary meaning of these words. (*See, e.g.*, Exh. 2, '214 Patent, *passim*; Exh. 3, '248 Patent, *passim*).

43.    A POSA chemist would understand that "solids", "liquids", and "gases" are the three most common "states of matter." (Exh. 6, Brown & LeMay, Chemistry: The Central Science, at pg. 304 (1981) ("matter exists in three states, gaseous, liquid, or solid.") (hereinafter "Brown & LeMay"). A fourth recognized state of matter – plasma – is not applicable to the formulations and products at issue in this case.

44.    A POSA would further understand that a solid material has a fixed shape and volume, does not fill the volume of the container it is placed in, and is not compressible to any degree. (Exh. 6, Brown & LeMay, at pg. 26 ("A solid has a firmness that is not associated with either gases or liquids. It has a fixed volume and shape."). Similarly, The American Heritage College Dictionary defines the noun "solid" as follows:

> – n.  1. A substance having a definite shape and volume;
> one that is neither liquid nor gaseous.

(Exh. 7, American Heritage College Dictionary (3rd. Ed. 1993) at pg. 1295).

12

45.    A POSA would further understand that solids maintain their fixed shape and volume because the particles that make up the solid (atoms or molecules) are tightly packed in a fixed arrangement and do not move significantly (beyond small vibrational movements).  Stated differently, the atoms or molecules within a solid do not flow.  (Exh. 6, <u>Brown & LeMay</u>, at pgs. 26, 305 (Table 11.1)).

46.    By contrast, a POSA would understand that a "liquid" is properly defined as:

> **1a.** A state of matter characterized by a readiness to flow, little or no tendency to disperse, and relatively high incompressibility, **b**. Matter or a specific body of matter in this state.

(Exh. 7, <u>The American Heritage College Dictionary</u> (3rd Ed. 1993), at pg. 791; *see also* Exh. 6, <u>Brown & LeMay</u>, at pgs. 26, 305, Table 11.1 (liquid "flows readily");  Exh. 8, <u>Oxford Paperback Dictionary and Thesaurus</u>, (3rd Ed. 2009) at pg. 542 ("**liquid** > **noun** a substance such as water or oil that flows freely");  Exh. 9, <u>Roget's 21st Century Thesaurus</u> (3rd Ed. 2005), at pg. 509 ("**liquid** [n] *fluid* aqua, aqueous material, broth, elixir, extract, flow, flux, goo*, goop*, juice, liquor, melted material, nectar, sap, secretion, slop*, solution, swill*; CONCEPT 467 — *Ant.* solid")).

47.    Although the patents-in-suit state: "For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use."  (Exh. 2, '214 Patent, Col. 2, lines 56-58; Exh. 3, '248 Patent, Col. 2, lines 53-55), they do not provide an actual definition of the word "fluid" itself.

48.    A POSA would understand a fluid to be a substance that flows, including liquids and gases.  As <u>The American Heritage College Dictionary</u> states, a fluid is:

> A continuous amorphous substance whose molecules move freely past one another and that assumes the shape of its container, a liquid or a gas.

13

(Exh. 7, <u>The American Heritage College Dictionary</u>, <u>Dictionary</u> (3rd Ed. 1993), at pg. 524).

Similarly, <u>The Oxford Thesaurus of English</u>'s entry for fluid states:

> **fluid noun** he designed instruments to measure the flow of fluids: flowing substance; liquid, water substance, moisture, solution, juice, sap; gas, gaseous substance, vapour.

(Exh. 10, <u>Oxford Thesaurus of English</u>, (3rd Ed. 2009) at pg. 341; *See also* Exh. 9, <u>Roget's 21st Century Thesaurus</u>, (3rd Ed. 2005), at pg. 356 ("**fluid** [n] liquid aqua, broth, chaser, cooler, goo*, goop*, juice, liquor, solution, vapor; CONCEPT 467 -Ant. solid"); Exh. 11, Sears, <u>College Physics</u>, 5th Ed. 1980, at pg. 193 ("The term 'fluid' means a substance that can flow; hence the term applies to both liquids and gases."); Exh. 12, Landau et al., <u>Fluid Mechanics</u>, 2d Ed. 2003, at pg. 1 ("Fluid dynamics concerns itself with the study of the motion of fluids (liquids and gases)."); Exh. 13, National Cancer Institute (NCI) Website at https://www.cancer.gov/publications/dictionaries/cancer-terms/search/fluid/?searchMode=Begins) defines a "fluid" as a "substance that flows smoothly and takes the shape of its container.  Liquids and gases are fluids."; Exh. 14, US 2009/0229671 A at [0020] ("sterile fluid transfer device, such as a flow-through connector or valve, wherein the fluids are liquids and/or gases.");  Exh. 15, U.S. Patent No. 5,304,432 at Col. 5, lines 58-63; Col. 8, lines 1-7; col. 8, lines 30-34; and claim 10 (aqueous NaOH is a fluid); *see also* Exh. 16, Sundaram Depo. at pg. 10, lines 10-22 ("A fluid is not a solid.  It's a liquid or a gas.") and at pg. 11, lines 18-22 ("Q. Above the melting point of a chemical, all liquids are fluids; correct?  THE WITNESS: That's my understanding."); Exh. 18, Buxton Depo. Day 2, Aug. 22, 2025 at pg. 36, line 11 to pg. 38, line 8 (admitting that PEG, identified as a fluid in the patent claims, is in fact both a liquid and a fluid).

49.     Thus, a POSA would understand that both liquids and gases are "fluids," and that all liquids are also fluids.

### B.  Pharmaceutical Dosage Forms as Solutions and Fluids

50.     There are different types of pharmaceutical dosage forms, including solid oral dosage forms (such as tablets or capsules) and liquid/fluid dosage forms (such as oral syrups and intravenous fluids).  Dosage forms that are liquids/fluids (*e.g.*, syrups and intravenous injections) are often solutions.[2]  This allows the drug to enter the body already dissolved, ready for absorption and/or able to deliver its pharmacological effect immediately.  By contrast, a tablet must first disintegrate into particles, which must then dissolve within the body to release the drug before it can be absorbed.  (Exh. 19, Martin's Pharmacy, at pg. 287 Table 12.1 ("Drug 'dissolution' occurs when a tablet is introduced into a solution and is usually accompanied by disintegration and deaggregation of the solid matrix followed by drug diffusion from the remaining small particles.").  Intravenous dosage forms are also preferred as solutions because the presence of suspended solids in the liquid/fluid can result in painful or difficult injections. (*See, e.g.*, Trout Opening Report at ¶ 219 ("Moreover, the POSA would have understood that the presence of solid particles in the diluted infusion solution would present a serious health concern.").

51.     A solution is a homogeneous mixture.  (Exh. 6, Brown & LeMay, at pg. 27;  Exh. 19, Martin's Pharmacy, at pg. 111 ("A true solution is a mixture of two or more components that

---

[2]   When the chemicals in the dosage form do not dissolve within each other, a solution is not possible.  In these instances, suspensions or emulsions may be used.  In contrast to solutions, a "suspension" exists when small particles of a solid are mixed throughout a liquid/fluid, but the particles themselves remain in the solid form.  Suspensions are two-phase fluids; whereas solutions are one-phase fluids.  As explained below, solutions involve a "phase change" where solid ingredients are dissolved and thereby converted into non-solid liquids/fluids.  (*See* Paragraphs 51-54, below).

form a homogeneous molecular dispersion, in other words, a one-phase system with consistent properties.")). Chemists use the term "solute" to refer to a chemical that gets dissolved into a "solvent" to form a solution. (Exh. 6, Brown & LeMay, at pg. 84 ("In discussing solutions, it is often convenient to call one component the solvent and the others solutes. The component of a solution whose physical state is preserved during solution formation is known as the solvent. For example, when sodium chloride (a solid) is mixed with water, the resultant solution is a liquid. If all components of a solution are in the same state, the one present in the greatest amount is called the solvent.")). Before it dissolves, a solute can be in the solid, liquid, or gaseous phase. Solvents are generally liquids/fluids – although in certain circumstances, solvents can be gases or solids. (Exh. 19, Martin's Pharmacy, at pgs. 111-12). As the Brown & LeMay textbook says at pg. 84, the distinction between solutes and solvents is often one of arbitrary linguistic "convenience," as the two chemicals are actually dissolving within each other to form a homogeneous mixture. (*See also* (Exh. 19, Martin's Pharmacy at pg. 111-12 ("The constituent present in the greater amount in a binary solution is *arbitrarily* designated as the solvent and the constituent in the lesser amount as the solute. When a solid is dissolved in a liquid, however, the liquid is usually taken as the solvent and the solid as the solute, irrespective of the relative amounts of the constituents. When water is one of the constituents of a liquid mixture, it is usually considered the solvent. When dealing with mixtures of liquids that are miscible in all proportions, such as alcohol and water, it is less meaningful to classify the constituents as solute and solvent.") (emphasis added)).

**52.**     The process of dissolving one or more chemicals into a solution (a homogeneous mixture) is known as "solvation" or "dissolution." During solvation, the atoms or molecules of the solute are separated and surrounded (or "solvated") by the atoms or molecules of the solvent.

16

(Exh. 6, Brown & LeMay, at pg. 350-51 ("Once removed from the crystal, the Na+ and Cl- ions [of previously solid sodium chloride] are surrounded by water molecules …. Such interactions between solute and solvent molecules are known as solvation.  When the solvent is water, it is known as hydration.").

53.    Thus, a POSA understands that when solids are dissolved in a liquid/fluid, they are no longer solids.  The process of dissolution, or solvation, separates a solid's constituent atoms or molecules that were previously fixed in place and molecularly disperses them within the solvent.  In solution, all of those atoms or molecules (of the solute and the solvent) move freely or flow – they are all fluids.  Thus, the solute has changed physical state from solid to liquid.  (Exh. 6, Brown & LeMay, at pg. 84 ("when sodium chloride (a solid) is mixed with water, the resultant solution is a liquid."); Exh. 20, Bancroft, "The Solute as Liquid," SCIENCE, Vol. 82, No. 2130, pgs. 388-89 at 389 (1935) ("*All liquid solutions are mixtures of liquids, regardless whether any or all of the pure components are solids* …") (emphases added) (hereinafter "Bancroft")).

54.    Indeed, some authors have described the dissolution of a solid as being akin to melting – wherein the fixed structure of the solid is changed into a flowing liquid/fluid.  (*See, e.g.*, Exh. 21, Goodwin, "Is Salt Melting When It Dissolves in Water?,"  J. Chem. Educ., Vol. 79, No. 3, pgs. 393-96 at 394 (March 1, 2002) ("both *melting* sodium chloride and *dissolving* it in water … *involve the separation* of sodium and chloride ions *into the liquid state*, where they are *relatively free to move*.") (emphases added)) (hereinafter "Goodwin"); Exh. 22, Goodwin, at Abstract (https://pubs.acs.org/doi/abs/10.1021/ed079p393: "Both melting and dissolving involve transition between the solid and liquid states and are controlled by analogous thermodynamic and kinetic principles.")).

17

55.    Thus, a saline solution – which is sodium chloride dissolved in water, a solution frequently used in intravenous injections – is understood to be a liquid/fluid.  (*See, e.g.*, Exh. 6, Brown & LeMay, at pg. 84 ("when sodium chloride (a solid) is mixed with water, the resultant solution is a liquid."); Exh. 23, Hoorn, E.J. "Intravenous fluids: balancing solutions," J Nephrol 30, 485–492 at 487 (2017) at https://doi.org/10.1007/s40620-016-0363-9  ("Normal *saline has long been the dominant type of IV fluid* both for replacement and maintenance. … Normal saline differs from other IV fluids in two regards: it does not contain a buffer, and it has a higher chloride concentration.") (emphases added)).  The fact that the sodium chloride (salt) in the fluid was a solid before it was dissolved does not mean that it is a solid after dissolution.  And no reasonable scientist would refer to a saline solution (at room temperature) as a solid.  When sodium chloride dissolves in water, it becomes a liquid/fluid.

56.    ██████████████████████████████████████████████

██████ (See Paragraphs 121-126, below).

57.    Co-solvents are mixtures of chemicals that together form a liquid/fluid that dissolves other chemicals (other solutes).  (*See* Exh. 24, Webster's Third New International Dictionary of the English Language Unabridged (2002) at pg. 514 ("Co-solvent: A solvent that in conjunction with another solvent can dissolve a solute.")).

58.    Thus, a POSA would recognize that a solute that is dissolved in a solvent can itself participate in dissolving other solutes – i.e., act as a cosolvent.  In a paper entitled "Solution in a Dissolved Solid," the authors state:

> … *a dissolved solid itself frequently acts as a solvent* or, if one prefers so to view it, alters the nature of the liquid in which it dissolves, the resultant solution becoming a true solvent with an entirely different freezing-point which is raised in the particular case under consideration.

18

(Exh. 25, Parsons, "Solution in a Dissolved Solid," <u>The Journal Of Physical Chemistry</u>, December 1, 1907, Volume 11, No. 9, Pages 659-680 (emphasis added)); *See also* Exh. 61, Yan, L., Gao, Z. "Dissolving of cellulose in PEG/NaOH aqueous solution," <u>Cellulose</u>, Vol. 15, pgs. 789–796 (2008) (https://doi.org/10.1007/s10570-008-9233-5) (Abstract: "Here, a new *solvent system* for cellulose is reported. *The solvent is a mixed aqueous solution of 1.0 wt.% poly(ethylene glycol) (PEG) and 9.0 wt.% of NaOH*.") (emphasis added)).

59.     A POSA would also recognize that  is identified as a pharmaceutically acceptable fluid, on its own, and also in combination with the fluid PG.  Propylene glycol is also identified as a fluid in the current patents-in-suit.  (Exh. 26, Buxton-Deposition-Exhibit-22, U.S. Pub. No.: US 2013/0231357 Al at para. [27] ("In several embodiments of the invention, the pharmaceutical compositions include ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  In other embodiments of the invention, however, the pharmaceutical compositions include a mixture of propylene glycol (PG) ▮▮▮▮▮▮▮

### C.  Stability and Stability Testing

60.     Once a formulation is created, it is tested for stability.  Stability involves a study of how the drug molecule degrades over time and loses its own potency, while degradants increase.  The FDA requires that drug products be tested for stability.  (Exh. 81, 21 CFR 211.137(a)).  This allows for assessment of drug strength and  degradant levels over time.

19

**61.**     Stability in drug formulations is often measured using an HPLC technique that separates and quantifies the drug molecule (also called the "active pharmaceutical ingredient" or "API") and its various degradants.

**62.**     From a POSA formulator's perspective, high accuracy is needed for measuring the amounts of an API and its degradants because those numbers are important to (1) the delivery of an appropriate and effective amount of the drug itself and (2) to the avoidance of delivering potentially toxic degradants.  Because exacting numbers are required, any HPLC method used must be properly validated.  A novel method must be validated.  Indeed, even a change of apparatus, while using the same method, requires validation on the new apparatus.  A POSA would not accept stability test results from an unvalidated methodology.  (Exh. 82, USP 621; Exh. 83, USP 1225).

### D.  Acids, Bases and pH

**63.**     Acids are generally understood, according to one standard definition in chemistry, as substances that release hydrogen ions into solution.  Bases are generally understood in chemistry as chemicals that release hydroxide ions into solution (or reduce hydrogen ion concentration).  (Exh. 6, Brown & LeMay, pg. 67-68).  While other definitions exist, these are most commonly used and appropriate for the purposes of this case.  Water can dissociate into equal amounts of hydrogen and hydroxide ions, so pure water is considered neutral.  (Exh. 6, Brown & LeMay, pg. 446).

**64.**     pH is a measure of the acidity or basicity of a solution.  In particular, pH is the negative logarithm of the concentration of hydrogen ions or protons [H+].  The pH scale ranges from 0 to 14.  A pH of 7 is considered neutral.  pH numbers below 7 are considered acidic, and pH numbers above 7 are considered basic or alkaline.  As hydrogen ion concentration increases,

20

pH decreases.  And vice versa – as the hydrogen ion concentration goes down, the pH goes up.  The concentration of hydrogen ions [H+] is inversely associated with the concentration of hydroxide ions [OH-].  Hydroxide ion concentration increases with increasing pH, as hydrogen ion concentration decreases.  Even at pHs below 7, hydroxide ions are present in solution.  (Exh. 6, Brown & LeMay, pg. 446-448).

65.    pH can be an important aspect of a pharmaceutical formulation.  pH can affect the solubility of drugs and other chemicals (excipients) in a pharmaceutical dosage form.  Excipients are all intentionally added substances in a formulation other than the Active Pharmaceutical Ingredient (API).  pH can also affect the stability of a pharmaceutical dosage form, with some pHs producing more degradant impurities and others producing less.  Bendamustine hydrochloride can be positively or negatively charged or neutral in various parts of its molecular structure.  Changes to bendamustine hydrochloride's charge structure can impact both its solubility and stability.  ██████████████████████████████████████ ████████████████████████████████████████████████████.  (Exh. 27, Buxton-Deposition-Exhibit-9, Abandoned Patent Publication, '879 Publication at [0038] ("Without meaning to be bound by any theory or hypothesis, polyethylene glycol quality can vary front batch to batch, manufacturer to manufacturer, over product lifetime and as a result of handling.  Such variation has made it difficult to make reproducible long term storage stable bendamustine-containing formulations with high amounts of polyethylene glycol and propylene glycol, as the formation of PEG and PG esters is high. In order to obtain reproducible formulations, PEG is treated with an organic or inorganic compound to achieve the desired USP apparent pH. This treatment results in reproducible long-term storage stable bendamustine-containing compositions, with substantially no PEG or PG ester formation")).

21

**66.** The addition of a hydroxide-containing excipient ( will raise the pH of a formulation above where it would have otherwise been.

**67.** When acids and bases react, they neutralize each other, forming water (H+ reacts with OH- to form $H_2O$) and salts.  As an example when hydrochloric acid (aqueous) reacts with the base



(Exh. 6, <u>Brown & LeMay</u>, pg. 69).  (*See also* Exh. 79, "Considerations for Waiver Requests for pH Adjusters in Generic Drug Products Intended for Parenteral, Ophthalmic, or Otic Use Guidance for Industry" (2025) at pg. 6 ("Thus, a pH adjuster can become an indistinguishable part of the buffer.  For example, an acetic acid (CH3COOH) sodium acetate (CH3COONa) buffer may be created by mixing a ratio of these two ingredients in solution or by adding a sodium hydroxide (NaOH) pH adjuster to acetic acid.")).

### E. **Conservation of Mass**

**68.** It is a fundamental law of nature that matter cannot be created or destroyed.  (Exh. 6, <u>Brown & LeMay</u>, at pg. 61).  An ionic chemical that is added to a solution does not disappear when it dissolves.  It is still there, but it becomes solvated – i.e., its constituent ions dissociate and are surrounded by solvent molecules.  A base that is added to a solution and then reacts with an acid does not disappear.  It only changes form to the extent it reacts.  This will be pertinent when addressing plaintiffs' assertion that sodium hydroxide is "consumed" or "neutralized" when it encounters acid.  A POSA would understand that all of the atoms that were part of the original acid or base remain in solution.  Furthermore, adding

22

████████████████████████████████████████████████████

████████████

### F. PEG

**69.** Polyethylene glycol ("PEG") is a polymer. Each "weight" of PEG (e.g., PEG-400) indicates a product that has polymers of varying lengths (and weights) that have an average molecular weight indicated in the name of the product. The heavier PEGs are solids (Mw >1000). However, PEGs with relatively lower molecular weights are liquids/fluids (Mw <1000). PEG-400 is a commonly used liquid/fluid version of PEG.

**70.** PEG is known to contain certain acidic impurities that develop during manufacture. Amongst these impurities are acetic acid and formic acid. These impurities can vary from one manufacturer to another. PEG is also known to have other oxidative impurities. (*See, e.g.*, Exh. 28, Mary-Anne del Barrio et al., "Simultaneous determination of formic acid and formaldehyde in pharmaceutical excipients using headspace GC/MS", Journal of Pharmaceutical and Biomedical Analysis, Volume 41, Issue 3, 7 June 2006, Pages 738-743; Exh. 80, Hemenway, "Reactive Impurities in PEG: A Case Study", in Excipient Applications in Formulation Design and Drug Delivery (2012); Exh. 29, McGinity, "Influence of Peroxide Impurities in Polyethylene Glycols on Drug Stability," Journal of Pharmaceutical Sciences, Vol. 64, No. 2, pgs. 356-57) ("Higher molecular weight polyethylene glycols and polyethylene glycol esters, i.e., polyethylene glycol 400 .... all contained peroxides as impurities.")).

## V. THE SLAYBACK NDA PRODUCT

**71.** Slayback's NDA Product Label states: "Each milliliter contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, 39.45 mg (5% v/v) of absolute alcohol, and q.s. to 1 mL polyethylene glycol 400." The Label

also identifies sodium hydroxide as an ingredient, stating: "Sodium hydroxide is used to adjust pH of polyethylene glycol 400."  (Exh. 30, Vivimusta® Slayback NDA Product Label).

72.

And indeed the FDA lists sodium hydroxide as an inactive ingredient in its "Inactive Ingredients Database," which is available online at: https://www.accessdata.fda.gov/scripts/cder/iig/index.cfm?event=BasicSearch.page.  Thus, the FDA recognized, as a POSA also would recognize, that sodium hydroxide is an "*inactive ingredient*" in the Slayback NDA Product.  The term "inactive ingredient" is used in the pharmaceutical field synonymously with "excipient" and refers to chemicals in a pharmaceutical formulation that are not the active drug substance but are nonetheless part of the formulation.  "Inactive ingredients" or "excipients" are not the same thing as degradants or impurities, which are unwanted chemicals in a formulation.  (*See* Paragraphs 150-152, below).

24

**73.** ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████



**74.**

---

[3] Normality (N) is a measure of the concentration of a solute (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛) in a solvent (⬛⬛⬛⬛⬛).  Normality represents the number of gram equivalents of a solute dissolved in one liter of a solution and is calculated by using the formula N = Number of Gram Equivalents/Volume of Solution (in liters).  To calculate Gram Equivalents, divide the actual mass of the solute (in grams) by the Equivalent Weight.  To calculate Equivalent Weight, divide



**75.**

**76.**

**77.**

. Both the Slayback Label and plaintiffs' expert Dr. Trout point this out:

> Like Belrapzo® and Bendeka®, Slayback's NDA Product is a sterile, liquid injectable anti-cancer drug product provided in a vial. Slayback's Label states that Slayback's NDA Product is "supplied as a *sterile, clear, and colorless to yellow solution* in a multiple-dose vial." EAGLEBEN-SA_00363932 (Slayback Label 12/2022) at -946-47;

---

the Molar Mass of the substance by its "n-factor". For acids and bases, the n-factor is the number of ions that it can donate. For example, ████████, it can donate one OH- so n = 1.

27

EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at -924.

(Trout Opening Report on Infringement at ¶ 179 quoting the Slayback Label (emphasis added)).

**78.** ████████████████████████████████████

████████ ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████

## VI.   THE ANTIOXIDANT-FREE FORMULATION

**79.** I have also reviewed Slayback's "Product Development Report" and related documents describing the Antioxidant-Free Formulation, which I understand is another formulation of bendamustine that Slayback has developed and the FDA has approved.

**80.** ████████████████████████████████████

████████████████████████████████████████

████████████████████████

████████████████████████



---

[4] (Exh. 38, Bricker Depo. at pg. 29, lines 8-10, and pg. 95, line 24 to pg. 96, line 2).



## VII.   THE ASSERTED PATENTS

### A.   History of Eagle Patent Applications

81.   I review here the history of some of plaintiffs' Eagle's many patent applications.

82.   The patent applications that directly led to the '214 patent-in-suit and United States Patent No. 11,844,783 ("the '783 Patent"), were first filed in December 2022.  That was some 12 years after the original provisional application was filed (January 2010), but mere months after plaintiff Eagle lost a patent litigation asserting that Slayback's NDA Product infringed United States Patent No. 11,103,483 ("the '483 Patent") (Exh. 42).  The '483 Patent had a limitation requiring a "ready to use" composition of liquid bendamustine product, which the Slayback NDA Product (the same product accused in this case) was found not to infringe.

29

83.     When plaintiffs went back to the Patent Office in December 2022 they attempted to obtain claims that did not have the "ready to use" limitation from the '483 Patent.  The initial attempted claims also did not have the "pharmaceutically acceptable fluid consisting of" limitation either, which would later be added to obtain allowance of the claims-in-suit.

84.     The '214 and '248 patents-in-suit and the '783 Patent are related.  Although I understand that plaintiffs have now withdrawn the '783 patent from this case, an understanding of the application leading to the '783 patent (Application 18/081,238 – the '238 Application" (Exh. 43)) is important to the remaining two patents-in-suit, given the common patent application family, the common specification, the common claim limitations, and the amendments made during the prosecution of the application that led to the '783 Patent.  The following chart illustrates the inter-relationships between these patents and their immediate applications:



85.     While the graphic above represents the patent applications and "file histories" that led directly to the patents-in-suit, those applications trace back through many additional

applications to a provisional application filed in January 2010.  The face of the '214 patent-in-

suit shows its lineage as follows:

(21)  Appl. No.: **18/081,251**

(22)  Filed:     **Dec. 14, 2022**

(65)                 **Prior Publication Data**
     US 2023/0115693 A1     Apr. 13, 2023

**Related U.S. Application Data**

(63)  Continuation of application No. 17/412,623, filed on Aug. 26, 2021, which is a continuation of application No. 16/509,920, filed on Jul. 12, 2019, now Pat. No. 11,103,483, which is a continuation of application No. 16/015,656, filed on Jun. 22, 2018, now abandoned, which is a continuation of application No. 15/432,335, filed on Feb. 14, 2017, now Pat. No. 10,010,533, which is a continuation of application No. 15/013,436, filed on Feb. 2, 2016, now Pat. No. 9,572,797, which is a continuation of application No. 14/031,879, filed on Sep. 19, 2013, now Pat. No. 9,265,831, which is a continuation of application No. 13/016,473, filed on Jan. 28, 2011, now Pat. No. 8,609,707.

(60)  Provisional application No. 61/299,100, filed on Jan. 28, 2010.

(Exh. 2, face of patent).

**86.**     In addition to the file histories discussed below, I have also reviewed what is

called in this Opinion the "Abandoned Patent Application Publication."  (Exh. 27, Buxton-

Deposition-Exhibit-9, Abandoned Patent Publication, U.S. Patent Publication No. 2013/

0210879), and its related file history (Exh. 44, Abandoned Patent Application File History, U.S.

Application 13/767,672 (filed February 14, 2013) ("the Abandoned Patent Application")).  This

Abandoned Patent Application does not claim priority to the 2010 original application from

which the patents-in-suit derive priority.  But it does relate to liquid bendamustine formulations,

and has the same applicant, Eagle Pharmaceuticals, Inc., and shares two of its three inventors

with the patents-in-suit.  Significantly, this patent application did attempt to patent the use of

aqueous sodium hydroxide in a bendamustine composition.  However, that attempt was

abandoned.  The current patents-in-suit do not claim or mention sodium hydroxide at all.

31

87.     I have also reviewed the file history (Exh. 45) for U.S. Patent Application No. 13 / 016,473 that led to U.S. Patent No. 8,609,707 ("the '707 Patent") – which is in the line of patent applications leading to the patents-in-suit.  During the prosecution of that patent, the applicants repeatedly explained that their inventions were "non-aqueous" and distinguished the prior art on that basis as well.  (*See, e.g.*, Exh. 45, Applicant's Response dated November 30, 2012, *passim*; Applicant Initiated Interview Summary, dated August 14, 2013; Applicant's Response dated September 4, 2013, *passim*).

88.     I have also reviewed another file history in the chain leading to the patents-in-suit – Application No. 14/031,879 ("the '879 Application") (Exh. 46), which became U.S. Patent Number 9,265,831 ("the '831 patent").  It was in that Application that antioxidant limitations were added as an amendment in response to a rejection.

### 1.   The '783 Patent Application – Appl. No.: 18/081,238

89.     The '783 patent derives from U.S. Application No. 18/081,238 ("the '238 patent"), which was filed on December 22, 2022.  The '238 Application (Exh. 43) initially presented 29 claims, including composition claims 1-27 and method of treatment claims 28-29.  Representative claim 1 recited:

**CLAIMS**

We claim:

1.      A ready for dilution, liquid bendamustine-containing composition comprising
        bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine
                concentration in the composition is from about 20 mg/mL to about 60 mg/mL;
        polyethylene glycol; and
        a stabilizing amount of an antioxidant.

Of note, this initial claim did not contain the "pharmaceutically acceptable fluid consisting of"

32

limitation.  And it attempted to substitute "ready for dilution" for the "ready to use" limitation that had led to a litigation loss for Eagle a few months earlier.

90.     Representative "method of treatment" claim 28 recited:

28.     A method of treating leukemia in a human in need thereof comprising
        providing a liquid bendamustine-containing composition comprising about 25 mg/ml of
            bendamustine;
        diluting the liquid bendamustine containing composition; and
        intravenously administering the diluted composition to the human.

Again, this claim did *not* include the "pharmaceutically acceptable fluid consisting of" limitation and shifted from "ready to use" to "diluting."

91.     In an Office Action dated March 21, 2023 the Patent Office rejected all of the claims for obviousness and obviousness-type double-patenting.  (Exh. 43, and EAGLEBEN-SA_00000091-140).  The obviousness rejections were premised on a reference called Drager.  The Patent Office explained, *inter alia*, that Drager disclosed stable liquid formulations of bendamustine and PEG.  (Exh. 43, at EAGLEBEN-SA_00000095-97).

92.     In a June 15, 2023, response and amendment, the applicants amended their composition claims, argued that Drager did not invalidate the claims, and provided a terminal disclaimer to overcome the double-patenting obviousness rejection.  Amended claim 1 recited:

33

DOCKET NO.:  107071.000582                                            **PATENT**
Application No.:  18/081,238
Office Action Dated:  March 21, 2023

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims:**

1.     (currently amended) A ready for dilution, liquid bendamustine-containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL;

a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

a stabilizing amount of an antioxidant;

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

(Exh. 43, '238 Application, June 15, 2023 Response, at EAGLEBEN-SA_00000242).  Thus, applicants introduced, for the first time, the phrase "consisting of" before a list of fluids.

93.     However, the June 15, 2023 response from applicants did not amend the method of treatment claims to also include the "consisting of" limitations.  For instance, Claim 28 was amended, instead, as follows:

28.     (Currently Amended) A method of treating leukemia in a human in need thereof comprising

providing a liquid bendamustine-containing composition according to claim 3 ~~comprising about 25 mg/ml of bendamustine~~;

diluting the liquid bendamustine containing composition; and

intravenously administering the diluted composition to the human.

(Exh. 43, '238 Application, June 15, 2023 Response, at EAGLEBEN-SA_00000245 (emphases in original)).

94.     In their remarks, applicants emphasized that their claims related to "total impurities," while the prior art Drager did not disclose all impurities, stating:

34

> The present claims recite that the bendamustine-containing compositions will exhibit less than 5% of ***total*** bendamustine degradation impurities (by HPLC) after at least 15 months at about 5-25 °C. Drager's paragraphs [0022] and [0023], cited by the Examiner, do not refer to ***total impurities***; rather, Drager reports separately on levels of ***only five individual impurities*** after storage under only refrigerated conditions. …
>
> Significantly, none of Drager's tested formulations included polyethylene glycol, as recited in the pending claims. Moreover, Drager's 66% dimethylformamide/34% propylene glycol (a polar protic solvent) was the least stable of all formulations tested, producing each of the five identified impurities, even under refrigerated conditions. Noteworthy is that Drager considers a "stable" formulation to be one that includes up to 10% of bendamustine impurities.

(Exh. 43, '238 Application, June 15, 2023 Response, at EAGLEBEN-SA_00000248-249 (emphases in original)).  Thus, the applicants emphasized (1) the need to account for all impurities ("total impurities"); (2) the importance of being below 5% impurities and not merely the 10% in the prior art; (3) supposed problems expressed in the prior art with stability when using polar protic solvents (which include PEG and PG as claimed in the patents-in-suit); (4) the fact that testing is needed to know whether a claimed formulation is stable, and (5) the idea that stability testing at refrigerated conditions is not sufficient.

95.    In a July 11, 2023 Office Action, the Examiner rejected the pending claims as obvious over another piece of prior art – the Brittain prior art reference.  However, the Examiner withdrew his obviousness rejections over Drager stating:  "Applicant's amendments and arguments are persuasive and the rejections are withdrawn."  (Exh. 43, '238 Applications, July 11, 2023 Office Action, at EAGLEBEN-SA_00000836).

96.    In a response dated July 28, 2023, the applicants made no claim amendments, acknowledged a telephone interview on July 12th with the Examiner, and argued that the Brittain

reference did not motivate the use of PEG or antioxidants to produce a stable liquid bendamustine formulation.  Thus, the applicants argued that their invention was premised on the recognition that antioxidants were beneficial to bendamustine stability – an insight supposedly not understood within the prior art.  (Exh. 43, '238 Applications, July 28, 2023 Response, at EAGLEBEN-SA_00000870-877 and *passim*).

97.	On August 21, 2023, the Examiner withdrew his prior rejections over Brittain and asserted new rejections against all pending claims based upon obviousness over Brittain in combination with other pieces of prior art.  (Exh. 43, '238 Applications, August 21, 2023 Office Action, at EAGLEBEN-SA_00000962-981).

98.	On September 14, 2023 the Examiner filed an "Applicant-Initiated Interview Summary."  The Examiner noted that during the Interview, there was a discussion of limiting the claims to methods of treatment claims with 25 mg/ml of bendamustine to distinguish over Brittain.  The Examiner invited the claim amendment and said it would be considered.  (Exh. 43, '238 Applications, Sep. 14, 2023 Interview Summary, at EAGLEBEN-SA_00001010-1011).

99.	In a September 19, 2023 submission, the applicants cancelled all claims that were not "method of treatment" claims.  In addition, they amended the method of treatment claims to include the "pharmaceutical acceptable fluid consisting of" limitations.  Applicants included expert opinions regarding non-obviousness as well.  (Exh. 43, '238 Applications, Sept. 19, 2023 Applicant Submission, at EAGLEBEN-SA_00001017-1028).

100.	On October 24, 2023, the Examiner issued a Notice of Allowance and Notice of Allowability.  (Exh. 43, '238 Applications, Notice of Allowance, at EAGLEBEN-SA_00001031-1038).  The Examiner acknowledged the importance of the amendments to the allowance, and stated: "Applicant's amendments and arguments, including expert opinions, are persuasive.  The

36

claims are allowed for the reasons of record.  The Examiner notes for the record that similar

method claims, albeit free of the required antioxidant in the present application, were allowed in

US 11707450."  (Exh. 43, '238 Applications, at EAGLEBEN-SA_1037).

## 2.  Prosecution of the '214 Patent – Application 18/081,251

101.    The '214 Patent derives from U.S. Application No. 18/081,251 ("the '251

Application") (Exh. 47), which was filed on Dec. 14, 2022.  The '251 Application was a

continuation application of U.S. Application No. 17/412,623 ("the '623 Patent Application") –

which was also the parent application of the '238 Application (discussed above) that led to the

'783 Patent.  (*See, .e.g.*, Exh. 2, '214 Patent at front page, "Related U.S. Application Data.").

102.    There were 16 original claims in the '251 Application.  Only one of the claims

had a stability limitation, and none of them had the "consisting of" language that ultimately

would be added by amendment.  (Exh. 47, '251 Application).  Representative original Claim 1

recited:

1.    A sterile vial containing a liquid bendamustine-containing composition comprising
bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine
concentration in the composition is from about 20 mg/mL to about 60 mg/mL;
polyethylene glycol; and
a stabilizing amount of an antioxidant.

103.    On March 14, 2023, the claims were rejected as indefinite and obvious. In part,

the Examiner cited Drager for the proposition that "it has been discovered that stable formulation

of bendamustine or a pharmaceutical salt thereof can be obtained by mixing with a polar aprotic

solvent such as polyethylene glycol such as PEG300 or PEG400 as well as antioxidants such as

vitamin E, ascorbic acid, BHA, BHT, propyl gallate, which naturally stabilizes the composition."

(Exh. 47, '251 Application, Mar. 14th 2023 Office Action, at 7 (citations omitted)).

37

104.    The applicant and Examiner participated in an interview on March 7, 2023 in which "Applicant explained that Eagle sought to improve the prior art by eliminating the reconstitution step thus making it easier to use and less commercial burden to manufacture and provide a liquid ready to use dosage form." (Exh. 47, '251 Application, "Applicant-Initiated Interview Summary" dated March 7, 2023 at 1).

105.    Subsequently, on June 14, 2023, the applicants amended the independent claims in an effort to overcome the Examiner's rejection, and explained that "[p]olyethylene glycol is 'protic'" while "Drager's composition must comprise a polar 'aprotic' solvent." (Exh. 47, '251 Application, Jun 14, 2023 Response at 5-6).  Applicants further stated that "Drager teaches that each of its formulations must include some amount of polar aprotic solvent. While Drager references that polar protic solvent may be used, that is only ***in addition to, not instead of***, the polar aprotic solvent.  Drager fails to disclose or suggest any bendamustine formulations with solvent systems composed of protic solvent in the absence of any aprotic solvent."  (Exh. 47, '251 Application, Jun 14, 2023 Response at 5-6).  Claim 1 was thus amended as shown below:

> 1.    (Currently Amended) A sterile vial containing a liquid bendamustine-containing composition comprising
>
> bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL;
>
> a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
>
> a stabilizing amount of an antioxidant.

(Exh. 47, '251 Application, Jun 14, 2023 Response at 2).  Thus, the applicants distinguished the prior art based on the nature of fluids in the prior art (stating that the prior art "must include" a polar aprotic fluid and may additionally have a polar protic fluids) from the claimed invention. At the same time applicants amended the claims to limit them to require only a protic fluid, PEG

(with other optional fluids possible) – and limited that entire group with the phrase "consisting of."

**106.** Claim 11 was amended as shown below:

> 11. (Currently Amended) A bendamustine-containing composition comprising bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid;
> wherein the pharmaceutically acceptable fluid ~~comprises~~ consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
> wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 20 mg/mL to about 60 mg/mL.

(Exh. 47, '251 Application, Jun 14, 2023 Response at 3).

**107.** On July 11, 2023, the claims were again rejected as obvious under 35 U.S.C. § 103 based on Brittain and Treanda.

**108.** The applicant replied on July 28, 2023. The applicant began by thanking the Examiner for a July 12th Interview regarding both the current application and the "related" '238 Application, stating:

> Applicant's representative thanks Examiner Arnold for the courtesy of the telephone conference conducted on July 12, 2023, for the related 18/081,238. The office action and cited art were discussed, as well as arguments and evidence submitted and found persuasive in U.S. 11,103,483.

(Exh. 47, '251 Application, Jul 28, 2023 Response at pg. 5).

**109.** The applicants argued that the prior art Treanda® contains 5 mg/mL. Applicants also argued that while "Brittain refers to polyethylene glycol as an example of a 'liquid carrier or vehicle' for preparing the ultimate dosage form," Brittain does not teach "that the skilled person should deviate from the concentrations specified by Treanda®." (Exh. 47, '251 Application, July 28, 2023 Response at 6-7). Nor did the art teach the addition of an antioxidant, or that bendamustine can degrade via an oxidative mechanism. (Exh. 47, '251 Application, July 28,

2023 Response at 7-8).  The applicants also argued for the surprising and unexpected stability of the claimed "composition including bendamustine in PEG" during storage – where PEG was the only required fluid after the "consisting of" language in amended claim 1.  (Exh. 47, '251 Application, July 28, 2023 Response at 11).

110.    Additionally, the applicants attached a U.S. District Court opinion finding a related patent not obvious, and also included excerpts of an expert opinion that the District Court relied on from Dr. Siepmann.  In particular, the applicants cited to Dr. Siepmann's Opinion at ¶¶ 359, and 469-471.  Siepmann paragraph 359 states in part:

> 359. … In view of the small number of marketed parenteral drugs containing PEG, and the fact that none of those drugs contained an antioxidant, the POSA would have inferred that formulators simply did not use PEG with drugs that might be susceptible to degradation via PEG's oxidation products.  In my opinion, and based on my experience as a formulator, the POSA would not have been motivated or had reason to add PEG to a formulation if she or he believed that doing so would have necessitated also adding an antioxidant.

(Exh. 47, '251 Application, "Exhibit B to the July 28, 2023 Response: Siepmann Excerpts" ¶ 359, EAGLEBEN-SA_00001478-79).  Siepmann paragraph 469 states:

> 469.  I further agree with Dr. Pinal that it was known that PEG could form various degradation products.  As I explain above. the POSA would have viewed the degradation products of PEG as a disadvantage that would have discouraged the use of that solvent. ….

(Exh. 47, '251 Application, "Exhibit B to the July 28, 2023 Response: Siepmann Excerpts" ¶ 469, EAGLEBEN-SA_00001535).  The focus of the Siepmann Opinion excerpts was on the non-obviousness of using PEG fluid, let alone using it with an antioxidant.

**111.**    On August 21, 2023, the Examiner withdrew the earlier rejections over Brittain, but entered new rejections over Brittain in light of other art.

**112.**    The applicants replied on November 8, 2023.  Applicants amended the claims to narrow the bendamustine concentration to "about 25mg/ml."  The applicants again argued that the combination of PEG and an antioxidant to produce a stable liquid bendamustine formulation was non-obvious.  And, again, the applicants cited, quoted, and relied upon the Siepmann Opinion in the District Court to argue for patentability.  (Exh. 47, '251 Application, November 8, 2023 Response at 5-8, and 12-15).

**113.**    A Notice of Allowance and Allowability was issued on November 22, 2023.  In the Notice of Allowability, the Examiner stated:

> Applicant's arguments, especially concerning the expert
> testimony of Dr. Siepmann which was found persuasive by
> the district court, carries more weight than the Examiner's
> position.  The rejections are withdrawn.

(Exh. 47, '251 Application, Notice of Allowability at 3).

### 3.    Prosecution of the '248 Patent – Application No. 18/646,171

**114.**    The '248 patent-in-suit was filed as U.S. Application No. 18/646,171 ("the '171 Application) (Exh. 48) on April 25, 2024.  The '171 Application derives from a long chain of continuation applications, including continuation Application 18/498,259 (filed on Oct. 31, 2023), which was a continuation of Application No. 17/412,623 (filed on Aug. 26, 2021, now abandoned), which was a continuation of Application No. 16/509,920 (filed on Jul. 12, 2019), which became U.S. Patent No. 11,103,483.  Additional applications in the chain are shown on the front page of the '248 patent.  (Exh. 3, '248 Patent at first page "Related U.S. Application Data").  (*See also* Exh. 48 ('171 file history)).

41

115.    The application leading to the '248 patent was filed with 23 claims, two of which were independent.  Initial Claim 1 recited:

**CLAIMS**

We claim:

1.  A sterile container containing a liquid bendamustine-containing composition comprising
    bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine
        concentration in the composition is about 25 mg/mL;
    a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one
        or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
    a stabilizing amount of an antioxidant,
    wherein the total impurities resulting from the degradation of the bendamustine is less
        than about 5% peak area response, as determined by HPLC at a wavelength of 223
        nm after at least about 15 months at a temperature of about 5° C to about 25° C.

(Exh. 48, '171 Application, at EAGLEBEN-SA_00353708).  Thus, by April 2024, the applicants submitted a claim containing the "pharmaceutically acceptable fluid consisting of" limitation from the outset.

116.    On July 9, 2024, the claims were rejected for at least indefiniteness and obviousness.

117.    The applicant replied on July 31, 2024, arguing that "one of ordinary skill in the art would not have been motivated to make a liquid bendamustine-containing composition incorporating polyethylene glycol (PEG) and an antioxidant, as claimed." (Exh. 48, '171 Application, July 31, 2024 Reply at 5).  Applicant also argued that a person of skill would not have deviated from Treanda® to prepare a liquid composition with 25 mg/mL of bendamustine. (Exh. 48, '171 Application, July 31, 2024 Reply at 6).  Applicant further argued that the prior art did not suggest adding an antioxidant to a liquid bendamustine and PEG composition, or that

42

bendamustine can degrade via an oxidative mechanism, or including PEG and an antioxidant in a

liquid bendamustine composition. (Exh. 48, '171 Application, July 31, 2024 Reply at 7-10).

**118.** A Notice of Allowance was issued on August 21, 2024.  As with the '214 Patent

Allowance, the Allowance here deferred to Dr. Siepmann's Opinion in the District Court, stating:

> Applicant persuasively argued that the Examiner's anti-oxidant-PEG excipient hypothesis had already been argued in district court litigation where the court found Dr. Seipmann's expert testimony persuasive. Since the Examiner is not in a position to contradict the expert testimony or challenge the court's findings, then the rejection is withdrawn and the claims are allowed.

(Exh. 48, '171 Application, Notice of Allowance at 4).

**B.    CLAIMS OF THE PATENTS-IN-SUIT**

### 1.  Claims of the '214 Patent

**119.** I have been told that claims 1-9 of the '214 patent are asserted in this case.

Those claims read as follows:

> 1.    A sterile vial containing a liquid bendamustine containing composition comprising
>
>> about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 25 mg/mL;
>>
>> a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
>>
>> a stabilizing amount of an antioxidant,
>>
>> wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C
>
> 2.    The sterile vial of claim 1, wherein the antioxidant is monothioglycerol.

43

3.      The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

4.      The composition of claim 1, wherein the composition is stable for at least about 15 months at 5° C. or for at least about 15 months at 25° C.

5.      The sterile vial of claim 1, wherein the liquid bendamustine containing composition further comprises ethanol.

6.      A liquid bendamustine containing composition comprising

100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid;

wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol;

and wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 25 mg/mL,

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

7.      The composition of claim 6, wherein the antioxidant is monothioglycerol.

8.      The composition of claim 6, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

9.      The composition of claim 6, further comprising ethanol.

### 2.  Claims of the '248 Patent

120.    I also understand that claims 1-11, 15, and 20 of the '248 patent are asserted in this case.  For completeness, I have reproduced _all_ of the claims of the '248 patent (asserted and unasserted) here:

1.  A sterile container containing a liquid bendamustine containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is about 25 mg,/m1;

a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

a stabilizing amount of an antioxidant,

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength 35 of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

2.    The sterile container of claim 1, wherein the antioxidant is monothioglycerol.

3.    The sterile container of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

4.    The sterile container of claim 1, wherein the composition is stable for at least about 15 months at 5° C. or for at least about 15 months at 25° C.

5.    The sterile container of claim 1, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol.

6.    The sterile container of claim 1, wherein the liquid bendamustine containing composition comprises about 100 50 mg of bendamustine, or a pharmaceutically acceptable salt thereof.

7.    The sterile container of claim 1, wherein the liquid bendamustine containing composition comprises about 100 mg of bendamustine.

8.    A liquid bendamustine containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, and

a stabilizing amount of an antioxidant,

45

in a pharmaceutically acceptable fluid; wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

wherein the bendamustine concentration in the pharmaceutically acceptable fluid is about 25 mg/mL,

wherein the total impurities resulting from the degrada¬tion of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

9.	The composition of claim 8, wherein the antioxidant is monothioglycerol.

10.	The composition of claim 8, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

11.	The composition of claim 8, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol.

12.	The composition of claim 8, wherein the bendamustine concentration in the composition is 25 mg/mL.

13.	The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol.

14.	The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and propylene glycol.

15.	The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and ethanol.

16.	The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and benzyl alcohol.

17.	The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and glycofurol.

18.	The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol.

19.    The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and propylene glycol.

20.    The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and ethanol.

21.    The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and benzyl alcohol.

22.    The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and glycofurol.

## VIII.    <u>NON-INFRINGEMENT OF THE SLAYBACK NDA PRODUCT</u>

**A. There Is No Infringement Because** ███████████████████████
████████████████████████████████████████████████████████████,

██████████████████████████████

**121.**    ███████████████████████████████████████████████



122.    Indeed, in the related "Abandoned Patent Application Publication" – that also involved liquid bendamustine formulations, and was filed by the same applicant and shared the same two inventors of the patents-in-suit – Eagle Pharmaceuticals, Inc., and sharing two of same inventors as the current patents-in-suit – ███████████████████████

██████████████████████

47

48





(*See, e.g.*, Exh. 27, Buxton-Deposition-Exhibit-9, '879 Abandoned Patent Publication at [0055] through [0067] and also Exh. 27, Buxton-Deposition-Exhibit-9, '879 Abandoned Patent Publication at Claim 30 (listing ██████████████████████████████████ in the context of bendamustine formulations)).

123.    ████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████ (Exh. 49, Buxton-Deposition-Exhibit-26, U.S. Patent Publication 2009/0221622 (entitled "Topotecan Ready to Use Solutions") at [18] ("*a pharmacologically suitable fluid* comprising an *aqueous hydrochloric acid* [a pH adjuster] diluent …") (emphases added); Exh. 18, ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

**124.**   ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

████   (*See, e.g.*, Exh. 26, Buxton-Deposition-Exhibit-22 (entitled "Pharmaceutical

Compositions Containing Pemetrexed Having Extended Storage Stability") at [0026] ████

███████████████████████████████████████████████████████████.

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████ ) (emphases added);

Exh. 18, ██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████

**125.**   The third inventor of the Abandoned Patent Application, ██████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████

**126.**    A POSA would clearly understand that ██████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

**2.**    ██████████████████████████████████████████████

███████████████████████████████████

**127.**    As noted above, all of the claims-in-suit recite, or depend from claims that recite, the phrase: "a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol."[5]  That "consisting of" limitation was added by amendment to overcome rejections for obviousness in several file histories leading to the patents-in-suit.

**128.**    And as noted above, I understand that, with rare exceptions, a "consisting of" limitation forecloses infringement where additional components are in the accused product, but are not recited after the claim's "consisting of" language. █████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

---

[5] Asserted Claim 9 of the '214 Patent and Asserted Claims 11 and 15 of the '248 Patent also require ethanol in addition to PEG.  And Asserted Claim 11 of the '248 Patent requires PEG and also requires "one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol."

129.    For these reasons, there is no literal infringement of any of the Asserted Claims.

130.    Dr. Trout posits several responses to non-infringement of the "consisting of" limitation.  I address those arguments below.

**3.**

---

6 *See, e.g.*, Trout Report on Infringement at pg. 18, ¶ 70, pg. 40-41 at ¶ 132; pg. 42, ¶ 135; pg. 68 ¶¶ 199-200; pg. 69 ¶ 202; pg. 70-71 ¶ 205; pg. 72 ¶ 207; pg. 75 ¶¶ 211-212; pg. 81 ¶ 224; pg. 95 ¶ 257; pg. 93 ¶ 258; pg. 102 ¶ 279; pg. 115 ¶ 318; pg. 118 ¶ 325; pg. 136 ¶ 383; pg. 139-140 ¶ 391.



**136.** ████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████ And, as such, it is subject to the "pharmaceutically acceptable fluid consisting of" limitation.  There is no infringement.

**4.** ████████████████████████████

████ █████████████████████████████████████

███████████████████████████████████████ and therefore is somehow not an ingredient in the Slayback NDA Product and is thus not to be considered in any non-infringement analysis.  This is incorrect.

---

[7] *See, e.g.*, Trout Opening Report on Infringement at pg. 18 ¶ 70; pgs. 19-20 ¶¶ 73-76; pg. 75 ¶ 212; pg. 77 ¶ 217; pgs. 89-90 ¶ 250; pg. 90 ¶ 251; pg. 90 ¶ 252; pg. 92 ¶ 257; pg. 102 ¶ 278; pg. 120 ¶¶ 334-335; etc.

**138.**    I am informed that there has been no claim construction argument that has been made by plaintiffs, and there is no ruling from the Court, that the ingredients must remain in the form they were added or they do not count for the claims.  Therefore I understand that this argument may not be allowed as untimely.  Furthermore, the claims do not use any terms like "unaltered" or "unchanged" or "unreacted" when they refer to various chemical components of the claimed formulations.  Regardless, I address the argument substantively below.

**139.**    A POSA would not adopt a claim construction that ignored deliberately added ingredients that subsequently undergo chemical reaction after being added.  ██████████████ ████████ is a purposefully added inactive ingredient in the Slayback NDA Product.  ████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████    More generally, the FDA identifies sodium hydroxide as an inactive ingredient in its "Inactive Ingredients Database" for intravenous injections and solutions, among other uses.

https://www.accessdata.fda.gov/scripts/cder/iig/index.cfm?event=BasicSearch.page:

| SODIUM HYDROXIDE | INTRAVENOUS | SOLUTION | 1310732 | 55X04QC32I | 2.78%w/v |
|---|---|---|---|---|---|

140.    The FDA's recognition of sodium hydroxide as an "inactive ingredient" is consistent with the understanding of a POSA that sodium hydroxide is routinely added to pharmaceutical compositions in solution as an excipient/ingredient. (Exh. 51, Handbook of Pharm'l Excipients for Sodium Hydroxide, at "18. Comments" ("Sodium hydroxide is most commonly used in solution ….").  Further, a POSA would understand that the fact that sodium hydroxide may react, partially or wholly, in an acid-base reaction – what Dr. Trout refers to as neutralization or "effective consumption" – does not change the fact that it is an added ingredient.  pH adjusters, like sodium hydroxide, are understood by a POSA (and the FDA) to both (1) react in acid-base reactions, but nonetheless (2) to be ingredients in pharmaceutical products.  (Exh. 79, "Considerations for Waiver Requests for pH Adjusters in Generic Drug Products Intended for Parenteral, Ophthalmic, or Otic Use Guidance for Industry" (2025) at pg. 6 (showing that sodium hydroxide will react with acids to form buffers, but still calling it an excipient or ingredient).

141.    In that regard, a POSA would understand the claims to be referring to the initial ingredients.  A POSA would understand that ingredients that are added to a formulation may change chemical form or react with other chemicals in the formulation, but are still considered to be part of the formulation.  And such ingredients would still be identified by a POSA as the material that was added at the outset regardless of subsequent chemical changes.  A pharmaceutical formulator identifies those chemicals that will be added to a formulation in the same way that a chef will list ingredients in a recipe.  The fact that those ingredients may chemically change over time, due to chemical reactions in a pharmaceutical formulation or chemical changes during cooking in a recipe, does not change their status as ingredients from a definitional standpoint.

**142.** pH adjusters like sodium hydroxide are understood to have long-lasting impacts on a formulation once added, again irrespective of subsequent chemical changes. As this applicant and these inventors themselves noted in the related Abandoned Patent Application Publication, the addition of sodium hydroxide to a PEG-containing bendamustine formulation improves the stability of the bendamustine, stating:

> [0038] Without meaning to be bound by any theory or hypothesis, polyethylene glycol quality can vary from batch to batch, manufacturer to manufacturer, over product lifetime and as a result of handling. Such variation has made it difficult to make reproducible long term storage stable bendamustine-containing formulations with high amounts of polyethylene glycol and propylene glycol, as the formation of PEG and PG esters is high. In order to obtain reproducible formulations, PEG is treated with an organic or inorganic compound to achieve the desired USP apparent pH. This treatment results in reproducible long-term storage stable bendamustine-containing compositions, with substantially no PEG or PG ester formation.

(Exh. 27, Buxton-Deposition-Exhibit-9, '879 Abandoned Publication at [0038]). ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████. As the

Abandoned Patent Application Publication states:

> Inorganic compounds include compounds known to those of skill in the art, including, but not limited to, salts of hydroxides and salts of phosphates, sodium formate, sodium phosphate, potassium hydroxide, and phosphoric acid. Most preferably, the inorganic compound is sodium hydroxide.

(Exh. 27, Buxton-Deposition-Exhibit-9, '879 Abandoned Publication at [0041]). Thus, the deliberate addition of sodium hydroxide as an inactive ingredient has a long-lasting, beneficial impact on the stability of the entire formulation.

**143.** ████████████████████████████████████████

████████████████████████████████████████████████████

██████████



████████████████████████████████   ██████████████

████████████████████████████████████████████████

██████████████████████████████   ████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

**144.** Additionally, as noted above, chemicals do not simply disappear during a chemical reaction. It is understood to be a law of nature that matter is neither created nor destroyed. This is known to chemists and scientists generally as the law of conservation of matter or mass. (*See, e.g.*, Exh. 6, <u>Brown & LeMay</u>, at pg. 61 ("More precisely, *atoms are neither created not destroyed during a chemical reaction*; they merely exchange partners or become otherwise rearranged."; Exh. 18, ████████████████████████████

███. For instance, sodium hydroxide is known to react with acetic acid to form a buffer system made of acetic acid and sodium acetate. (Exh. 79, Considerations for Waiver Requests for pH Adjusters in Generic Drug Products Intended for Parenteral, Ophthalmic, or Otic Use Guidance

for Industry" (2025) at pg. 6).  And, it is also known that acetic acid, and formic acid, are acidic impurities in PEG.  (Exh. 80, Hemenway, "Reactive Impurities in PEG: A Case Study", in Excipient Applications in Formulation Design and Drug Delivery (2012)).  And thus, a POSA would understand that the addition of sodium hydroxide to PEG would result in the formation of some amount of acetate and formate buffer systems.

145.  ███████████████████████████████████████████████████

████████████████████████████  As far as I can tell, Dr. Trout does not dispute that at all.

146.  Furthermore, even if one were to accept Dr. Trout's premise that sodium hydroxide should not be considered an ingredient after it reacts with an acid – which is incorrect – Dr. Trout nonetheless provides no evidence that the entirety of the added sodium hydroxide is, to use his words, "effectively consumed" in an acid-base reaction – i.e., that there is no excess sodium hydroxide in the Slayback NDA Product.  As any chemist knows, chemical reactions proceed in ratios of one reactant to another.  In this instance, each molecule of sodium hydroxide would, in theory, react with one molecule of an acid species that it encountered.  Because the amount of acid impurities will vary from one lot of PEG to another, there is no way to specifically know whether every molecule of sodium hydroxide that is added will have reacted with an equal amount of acid in the formulation.  As even inventor Dr. Buxton testified:

████████████████████████████████████████████
████████████████████████████████████

████████████████████████████████████

147.  ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████████

██████    Similarly, the plaintiff's inventor, Dr. Buxton, ██████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

██████████

148.    Furthermore, the long-term beneficial impacts of sodium hydroxide on stability indicate that it has not disappeared or been "effectively consumed," but rather continues to have a long-term impact (likely through its presence and pH effects) on the entire formulation, including after bendamustine is added.

149.    For all the above reasons, sodium hydroxide is an inactive ingredient of the Slayback NDA Product; it does not disappear when it reacts with unknown amounts of acid in the PEG formulation, it supports the overall formulation's performance with regard to stability and solubility, and it must be considered in the infringement analysis.

59

**5.** ██████████████████████████████

**150.** Dr. Trout also argues that sodium hydroxide is an impurity, or ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ This is also not correct.

**151.** ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ And, more generally, sodium hydroxide is also listed in the FDA

"Inactive Ingredient Database." In recognizing sodium hydroxide as an inactive ingredient, the

FDA necessarily also distinguished sodium hydroxide from impurities and contaminants. The

FDA, as well as a POSA, understands that "inactive ingredients" are not the same thing as

"contaminants" or "impurities." The FDA website (https://www.fda.gov/drugs/drug-approvals-

and-databases/inactive-ingredients-approved-drug-products-search-frequently-asked-questions),

states:

> **8. Does the Inactive Ingredient Database include contaminants found in approved drug products?**
>
> No. The Inactive Ingredients Database does not include contaminants found in approved drug products.

**152.** Other authorities also recognize – as a POSA would – that inactive ingredients

(excipients) are not impurities – and indeed the two are mutually exclusive categories. (Exh. 53,

Pilaniya *et al.*, "Recent trends in the impurity profile of pharmaceuticals," J. Adv. Pharm. Tech.

Res., Vol. 1, Issue 3 pgs. 302-310 at 302 (July-Sept 2010) (defining impurity as: "Any

component of the drug product which is not the chemical entity defined as the drug substance or

an excipient in the drug product") (quoting from the ICH)); Exh. 19, Martin's Pharmacy, at pg.

610 ("Process or product-related impurities such as degradation products, leachates, residual solvents, or extraneous contaminants in pharmaceutical dosage forms are not considered excipients. An excipient is a 'substance other than the active ingredient, which has been appropriately evaluated for safety and is included in a drug delivery system to: 1. Aid in the processing of the drug delivery system during its manufacture; 2. Protect, support, or enhance stability (formulation feasibility), bioavailability, or patient acceptability; 3. Aid in product identification; or 4. Enhance any other attribute of the overall safety and effectiveness of the drug during storage and use.'")).

**153.**



**154.**    Dr. Trout's argument that the reaction products resulting from any reaction between sodium hydroxide and an acid would be impurities is also incorrect. First, the ingredient added is ▮▮▮▮▮▮▮▮▮▮ Any subsequent reaction products are not the ingredient. A POSA would consider ▮▮▮▮▮▮▮▮ to be the ingredient of interest.



Thus, even if the resultant reaction products were deemed impurities (which they are not), there is no

evidence that some of the added sodium hydroxide does not remain present and unreacted as well.  Third, the reaction of the sodium hydroxide with any acids in the formulation provides a long-lasting change in the properties of the formulation – an improvement in stability.  Thus, a POSA would not consider the reaction products impurities, but rather functional components of the formulation that improve its performance.  Fourth, pH adjusters are considered inactive ingredients in pharmaceutical formulations, even though they are known to react with acids or bases to some degree and form other chemicals.

**6.** ██████████████████████████████

155.    Plaintiffs and Dr. Trout also argue that ████████████████████████ ███████████████████████    Thus, they assert that the "unrelated exception" to "consisting of" applies.  This is not correct.

156.    As a first matter, the "consisting of" limitation modifies the phrase "pharmaceutically acceptable fluids" in the claims-in-suit.  ████████████████ ████████████████████████████████████ ████████████████████████████ ████████████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████

157.    And the applicants for the patents-in-suit explained to the Patent Office during the application process that the "pharmaceutically acceptable fluids" are directly tied to improved

stability of the bendamustine formulations – a key focus of the claims-in-suit.  (*See* Paragraphs 142-143, above).

158.    Applicants have also acknowledged that

159.

160.    Thus, the addition of

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████ The

"unrelated exception" to "consisting of" does not apply.

### 7. "Fluids" are Not Limited to "Solvents" As a Matter of Claim Construction; ███████████████████████████████████████.

161.     Plaintiffs and Dr. Trout also argue that "fluids" are limited to solvents in the patents-in-suit.  Dr. Trout then posits that, ████████████████████████████

████████████████████████████ Neither of these propositions is correct.

162.     First, I am informed that plaintiffs did not raise the claim construction argument that "a fluid is a solvent" during the claim construction / Markman phase of this case.  As a result, I am informed that plaintiffs may not be permitted to argue this claim construction at all. Nonetheless, to the extent plaintiffs are allowed to pursue this definition of "fluid," there are substantive reasons why this construction is incorrect.

163.     The claims do not use the word "solvent" anywhere.  The specification only refers to "solvents" in Example 1, and does not define "fluids" to be "solvents" in that Example.  Nor does the patent provide a definition of the word "fluid" anywhere, and certainly not one that equates fluids with solvents.  The only definition of a "pharmaceutically acceptable fluid" in the patent merely states:

> For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.

64

(Exh. 2, '214 Patent, Col. 2, lines 56-58; Exh. 3, '248 Patent, Col. 2, lines 53-55).  This definition: (1) does not limit "pharmaceutically acceptable fluids" to solvents, and (2) does not define the word "fluid" at all, let alone as a solvent.

164.    To the contrary, the patents-in-suit say explicitly that "pharmaceutically acceptable fluids" may or may not be solvents, stating:

> In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, *but is not necessarily, a solvent* for the bendamustine or salt thereof.

(Exh. 2, '214 Patent, Col. 3, lines 39-41; Exh. 3, '248 Patent, Col. 3, lines 35-37 (emphasis added)).  This language makes clear that a "pharmaceutically acceptable fluid" need not be a solvent for bendamustine at all.

165.    In support of his argument, Dr. Trout points to the fact that all of the fluids listed in claims (after the "consisting of" language) are also solvents of bendamustine; that the specification supposedly points to fluids that are solvents; and that the file history contains statements that refer to PEG and other fluids as solvents.  And Dr. Trout repeatedly refers to fluids as solvents throughout his Opening Report.[8]  This does not change the fact that the specification clearly states that the required "pharmaceutically acceptable fluids" can include non-solvents as well.

166.    Dr. Trout attempts to get around this impediment to his argument by arguing in Paragraph 113 of the Trout's Opening Report on Infringement (at pg. 28), Dr. Trout attempts to limit the patent claims by observing that all of the recited fluids in the claims are solvents of

---

[8]  *See, e.g.*, Trout Opening Report on Infringement at pg. 15, ¶ 58; pg. pg. 24, ¶ 103; pg. 25, ¶¶ 105-106; pgs. 26-27, ¶¶ 109-111; pg. 28, ¶ 113; pg. 29, ¶ 116; pgs. 29-31, ¶¶ 117-119; pg. 40, ¶¶ 130-131; pg. 41, ¶¶ 133-134; pgs. 42-43, ¶¶ 135-136; pg. 145-47, ¶¶ 139-144; pgs. 47-50, ¶¶ 145-155 (regarding the file histories); etc.; *passim*.

bendamustine. From this, Dr. Trout concludes that the section of the specification stating that the fluids may or may *not* be solvents does not apply to the claims. This is not correct. As a first response, if the applicants wanted to limit the claims to only solvents, they could have used the word "solvent" in the claims. But the claims do not use that word and instead recite "pharmaceutically acceptable fluids." A POSA would not read the claims to impose a limitation of solvents on the word "fluid" where none exists in the claims, and the word "fluid" does not have that limited meaning to a POSA. (*See* Paragraphs 163-164, above).

167.    Moreover, there is no particular reason to characterize the specific fluids recited in the patent claim as "solvents" as opposed to "organic fluids" or "non-aqueous fluids" or "carriers" or "diluents" or "substances having melting points below room temperature." The claims give no indication of how to group them. A POSA would simply understand a "pharmaceutically acceptable fluid" to be a broad term encompassing fluids that are suitable – as the specification states. (Exh. 2, '214 Patent, Col. 2, lines 56-58; Exh. 3, '248 Patent, Col. 2, lines 53-55) ("For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.")). Nowhere in the patent claims or the specification does the term "fluid" get re-defined as "solvent" or as anything narrower than its general meaning to a POSA – a substance that flows freely.

168.    In paragraphs 117 and 137 of his Opening Report, Dr. Trout attempts to distinguish language in the patent that talks about what "is" the fluid (for certain very particular embodiments) from what is "included" in the fluid. Dr. Trout's apparent point is that things that are dissolved in the fluid may be "included" in the fluid, but nonetheless they are supposedly not the fluid itself. This appears to be a variant of the ████████████████████████████ (*See, e.g.*, Trout Opening Report at ¶ 135 mixing these arguments). As discussed above, ████████████

66



Dr. Trout's attempted linguistic distinction between what "is" the fluid and what is "included" in the fluid would not be accepted by a POSA who understands the definitions of fluids and dissolution from a chemical perspective.  Further belying Dr. Trout's linguistic distinction based upon the word "included," is the Abandoned Patent Application Publication.  That application – regarding liquid bendamustine formulations from the same applicants and two of the three same inventors – states that PEG and PG are "include[ed]" within the "pharmaceutically acceptable fluids" and sodium hydroxide is also "included":

> [0055]    Some more preferred formulations include:
> I. a) bendamustine or a pharmaceutically acceptable salt thereof; and
> [0056]    b) a pharmaceutically acceptable fluid including
> [0057]    i) polyethylene glycol and propylene glycol;
> [0058]    ii) sodium hydroxide in an amount sufficient to obtain a pH of from about 6.5 to about 11 for the

(Exh. 27, Buxton-Deposition-Exhibit-9, '879 Publication at [0056] to [0058]).  If Dr. Trout's linguistic distinction were correct – where the PEG (and PG) "is" the fluid, and the other ingredients (other than PEG or PG) are merely "included" in the fluid – the applicants would not have referred to PEG and PG as "included" in the fluid as well.  Cleary the applicants did not use the word "included" in the very particularized manner that Dr. Trout now posits.

67

169.    A POSA would not understand the word "fluid" or the phrase "pharmaceutically acceptable fluid" – taken on their own – to be limited to those fluids listed after "consisting of." While the overall claim is limited, the word "fluid" refers to a broader category of chemicals that are fluids. ██████████████████████████████████████████

██████████████████████████████████████████████████

170.    In Paragraph 119 (at least) of Dr. Trout's Opening Report he argues that the specification separates out discussions of solvents from discussions of other excipients that serve different purposes, like pH adjusters and other solutes. Of course, the passages in the patent specification that Dr. Trout cites as separating out "solvents" do not identify or define the fluids as solvents. Further, although Dr. Trout refers to ████████████████████████████ ████████████████████████████████████████████ And the patents-in-suit also do not refer to any "pH adjusters" – let alone distinguish them from (or separate them out into separate paragraphs from) either "fluids" or "solvents." Thus, Dr. Trout's assertion that the patent specification somehow separates different categories of excipients in different paragraphs, and in particular somehow separates solvents from sodium hydroxide and "pH adjusters" (where pH adjusters are not discussed anywhere in the patent) so as to define "fluids" as "solvents" is simply incorrect based upon examination of the patents-in-suit.

171.    In Paragraphs 119 and 142 of Dr. Trout's Opening Report, he argues that Example 1, Table 1 of the specifications of the patents-in-suit actually identifies a solvent of bendamustine. This is the only time in the entire specification of the patents-in-suit that any of the claimed fluids are also referred to as a solvent. Regardless, Example 1 does not say that all fluids are restricted to being a solvent. The "solvents" identified in Example 1 and Table 1 are

68

only ethanol and "PG".  Example 1 does not include PEG in its formulations, but all of the claims-in-suit require PEG.  Thus, the formulations of Example 1 and Table 1 do not fall within the claims at all because they do not have the required PEG fluid.  Moreover, several formulations in Table 1 containing ethanol and PG fail to meet stability requirements.  Thus, a POSA would not look to Example 1 to limit the meaning of the phrase "pharmaceutically acceptable fluid" in the claims, which involve other formulations.

172.    In Paragraphs 145-155, Dr. Trout argues that the file histories of the patents-in-suit support his view that fluids are limited to solvents.  However, he cites no place in the file history where applicants stated that "pharmaceutically acceptable fluids are limited to solvents" or any similar language that defined "pharmaceutically acceptable fluids" in that manner, or in any manner.  He cites no rejection of the Examiner that was overcome because of a distinction between a fluid that was a solvent (supposedly in the claim) and a fluid that was not a solvent (in the prior art).  And no allowance was based on this supposed distinction.  Dr. Trout cites nothing in the file histories that focuses on this supposed distinction between fluids that are solvents from those that are not.  And my review of the file histories reveals no such definitions or distinctions.  While the adjective "solvent" may be used occasionally to describe certain fluids, it is a passing mention of no apparent import to the outcome of the prosecution.

173.    In sum, to the extent that Eagle is permitted to pursue this claim construction argument, I would disagree with Dr. Trout's conclusion and do not believe that the claim term "pharmaceutically acceptable fluid" should be limited to solvents.  It is my understanding that the single most important aspect of any claim construction is the claim language itself.  The claims do not use the word "solvent" anywhere; they use the words "pharmaceutically acceptable fluid."  Clearly, the applicants were aware of the term "solvent," as they used it in Example 1.

69

But they chose not to include this word in the claims.  Additionally, the specification explicitly states that "pharmaceutically acceptable fluids" may or may not be solvents.  Thus, both the claim language and the specification strongly argue against Dr. Trout's proposed claim construction.  Furthermore, in the related Abandoned Patent Application and Publication, ██████████████████████████████████████████████████ Finally, any stray references to solvents in the file history do not constitute limiting language.  The file history references to solvents are simply places where particular fluids were described with the adjective solvent.  A POSA would not regard this as a reason to limit the clear language of the claims to solvents only.

174.  Even if "pharmaceutically acceptable fluid" is nevertheless construed to be limited to solvents of bendamustine, it still would not prove infringement.  As shown below,



176.  PEG is also known to be water soluble.  (Exh. 19, <u>Martin's Pharmacy</u>, at pg. 498-99 ("The synthetic water-soluble polymers have also found extensive applications in pharmaceutical industries, among them polyethylene glycol …").

70



other chemicals.[9]  And a POSA would also recognize that the combination of sodium hydroxide with PEG is also a known solvent system.[10]

178.    And, specifically for bendamustine hydrochloride solutions, the combination of sodium hydroxide with PEG-400 creates a solvent system with improved solubility compared to PEG-400 alone.  Using only PEG-400 as a solvent, bendamustine hydrochloride's solubility is limited to 20 mg/ml.

---

[9] *See, e.g.*, Exh. 62, Budtova, T., Navard, P. █████████████████████████ ██████ Cellulose 23, 5-55 (2016)████████████████████████ Exh. 63. Li, Z., Mumford, K. A., Smith, K. H., Wang, Y., & Stevens, G. W., "Extraction of Phenol by Toluene in the Presence of Sodium Hydroxide," Separation Science and Technology, 49(18), 2913–2920 (2014), https://doi.org/10.1080/01496395.2014.952748.

[10] *See,e.g.*, Exh. 61, Yan, L., Gao, Z. "█████████████████████████ ██████" Cellulose, Vol. 15, pgs. 789–796 (2008)████████████████████) (Abstract: "Here, ██████████████████████████████████████ ████████████████████████████████████████ (emphasis added).

And the patents themselves present only one Example of a PEG-only formulation which is limited to 20mg/ml.  (Exh. 2, '214 Patent, Col. 8, Example 3 ("Bendamustine-containing compositions were prepared by dissolving bendamustine HC1 to a concentration of 20 mg/ml in polyethylene glycol 400"); Exh. 3, '248 Patent, Col. 8, Example 3).

179.    However, when PEG is treated with sodium hydroxide, ███████████████



180.    ████████████████████████████████████████████



181. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

182. Further, as discussed above (Paragraphs 77-78), ▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆ That is to say, everything dissolves in everything else in these

formulations.  This shows that there is a solution where PEG ▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆

183. Finally, Dr. Trout appears to argue that because ▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆ That is not true.  A POSA would understand that an

excipient can have more than one functional role in a formulation.  (Exh. 19, <u>Martin's Pharmacy</u>,

at pg. 610-14 ("Excipients, however, can have multiple functions, and like drugs, they can exert

pharmacologic and toxic effects.").  Thus, a POSA would know that the fact that an excipient has

one role (e.g., pH adjuster or solute) does not mean it cannot have another role (like solvent or

co-solvent).  (*See, e.g.*, Exh. 61, Yan, L., Gao, Z. ▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆ Cellulose, Vol. 15, pgs. 789–796 (2008) ▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆ (Abstract: "Here, a ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (emphasis

added);  Exh. 62,  Budtova, T., Navard, P. ▆▆▆▆▆▆▆▆▆▆▆▆

Cellulose 23, 5-55 (2016), ███████████████████████████ Exh. 63, Li, Z., Mumford, K. A., Smith, K. H., Wang, Y., & Stevens, G. W., "Extraction of Phenol by Toluene in the Presence of Sodium Hydroxide," Separation Science and Technology, 49(18), 2913–2920 (2014), https://doi.org/10.1080/01496395.2014.952748).  And the evidence in this case shows that ███████████████████████████████████████████

### 8.  Sodium Hydroxide is Not Subject to the "Comprising" Claim Language

184.    Dr. Trout also argues that the addition of the inactive ingredient sodium hydroxide does not avoid infringement because sodium hydroxide is supposedly subject to the open-ended "comprising" claim language.  For instance, Dr. Trout states:

> Defendants list sodium hydroxide as an ingredient on their Label by name with a statement of effect, differentiating sodium hydroxide from the other components of their NDA Products, particularly the solvent system.  This separate treatment of sodium hydroxide on the label of each Defendant's NDA Product informs a POSA that *the sodium hydroxide* is not part of the pharmaceutically acceptable fluid, i.e. solvent, it *is a different component of the liquid bendamustine-containing composition that would be governed by the "comprising" in the preamble*.

(Trout Opening Report on Infringement at pgs. 75-76 at ¶ 213 (emphases added)).

185.    Dr. Trout's opinion emphasizes the arrangement of words in a Label over chemical fact. ████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████ (*See* Paragraphs 121-126, 47-48, and 51-56, above).

186.    Dr. Trout's opinion that sodium hydroxide should be "governed by" the "liquid comprising" language in the claim is also inconsistent with ██████████████

███████████████████████████████████████████████

74

███████████████████████████████████████████████████

████████████████████████████████████████ For this reason, Dr. Trout's arguments

do not make sense and I disagree with them.

187. ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████ Therefore, there is no infringement.

188. To the extent plaintiffs argue that ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████

189. Further, such an argument would illustrate a broader problem with the claims-in-

suit. ████████████████████████████████████ ██████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ the

claim is contradictory.

### 9. There Is No Infringement by Equivalents

190. Dr. Trout also argues that even if there is no literal infringement, there would

supposedly be infringement under the doctrine of equivalents. In arguing this theory, Dr. Trout:

(1) claims there is no estoppel despite the narrowing amendment that added "consisting of"; (2)

---

[11] ██████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████

claims that even if there is a presumption of estoppel, the amendment is tangential and estoppel does not apply.  And applying the doctrine of equivalents, Dr. Trout argues that a combination of PEG and NaOH should be considered an equivalent to PEG alone.[12]  I disagree with all of these assertions.

191.    With respect to estoppel, I am informed that a narrowing amendment made in response to a rejection for reasons of patentability leads to a rebuttable presumption of estoppel. I also understand that such narrowing amendments can lead to estoppel when made in the file histories that directly lead to the claims-in-suit or when made in related file histories in the chain of applications that lead ultimately to the claims-in-suit.  My review of the file histories of the patents-in-suit (the '251 application that led to the '214 patent-in-suit, and the '171 application that led to the '248 patent-in-suit), and the '283 application (which led to the '783 Patent) reveals that the "pharmaceutically acceptable fluid consisting of" limitation was added by amendment after rejections for patentability over prior art.  (*See* Paragraphs 92, 105, 106, above).  I thus conclude that a rebuttable presumption of estoppel should apply.

192.    With respect to Dr. Trout's assertion that any presumption of estoppel is rebutted because the amendments were supposedly only tangential to the accused equivalent, I disagree. Accepting for purposes of this argument that the accused equivalent is "PEG ████████████ ██████████ that accused equivalent is certainly related (not tangential) to the reasons for the amendment, which limited the claim to require PEG fluid.  At a basic level, all of these ("PEG █ ████████████████████ or PEG) are pharmaceutically acceptable fluids, and the amendment related to pharmaceutically acceptable fluids.  The alleged equivalent is not tangential to the amendment.

---

[12] *See, e.g.*, Trout Opening Report at pg. 111 ¶¶ 306-308.

193.    When PEG was found in the prior art with bendamustine, the applicants argued, *inter alia*, that the prior art did not disclose PEG alone but in combination with polar aprotic solvents.  (Exh. 47, '251 Application, Jun 14, 2023 Response at 5-6) ("Drager teaches that each of its formulations must include some amount of polar aprotic solvent.  While Drager references that polar protic solvent may be used, that is only *in addition to, not instead of*, the polar aprotic solvent.  Drager fails to disclose or suggest any bendamustine formulations with solvent systems composed of protic solvent in the absence of any aprotic solvent.").  Thus, supposedly to distinguish the prior art, applicants narrowed the claims with the "consisting of" language to only require PEG (and to only allow certain other recited optional other fluids).  The narrowing amendment related to limiting the fluids that can be combined to a single required fluid.  The alleged equivalent here ██████████████████████████████████████████ ██████████████████████████ it is not a fluid that is listed as either required or optional under the "consisting of" limitation.  It is related (and not tangential) to the amendment limiting those fluids.

194.    More generally, the amendment relates to which "pharmaceutically acceptable fluids" constitute the claimed invention.  Whether the accused equivalent is ████████████ ████████████████████████████████████████████████ both are "pharmaceutically acceptable fluids" and thus both relate to the focus of the amendment (what "pharmaceutically acceptable fluids" constitute the claimed invention).  Therefore, I do not believe that the tangentiality exception to estoppel applies and plaintiffs should not be allowed to argue doctrine of equivalents at all.

195.    Further, █████████████████████████████████████████████ █████████████████████████████████████████████████



).

196.    To the extent that plaintiffs are allowed to argue the doctrine of equivalents, I do not believe that there is infringement by equivalents on the merits.

197.    As a first matter, the comparison that Dr. Trout chooses to make seems to be the wrong comparison.  Instead of comparing the actual inactive ingredient that Slayback adds

---

[13] *See, e.g.*, Trout Opening Report at pg. 19, ¶ 76, and 92, ¶ 257.
[14] Trout Opening Report at pg. 104 ¶ 285 ("

).

██████████████████████████████████████████████████████████

████████ if anything.

198.    ████████████████████████████████████████

████████████████████████████████████

██    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████    ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

> As shown in FIG. 1 (Table 1), the sample, which did not include NaOH, did not provide long term storage stability. …
>
> It was determined that the cause of the excess ester formation was the PEG.

(Exh. 27, Buxton-Deposition-Exhibit-9, Abandoned Patent Publication, '879 Publication at [0127]).

200.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

**201.** Thus, even if one should compare "PEG + NaOH" with PEG alone for a doctrine of equivalents analysis – which I do not agree with – the two have a different "result" – stability versus instability. And thus there would be no equivalents under the "function way result" analysis, because the "result" is not the same.

**202.** Additionally, the "way" that "PEG + NaOH" contributes to stability is different from how "PEG" alone impacts stability. ███████████████████████

███████████████████████████████████████████████████

████████████████████    ████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████    ██████

██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

**203.** Additionally, "PEG + NaOH" is substantially different from PEG alone. ████████

████████████████████████████████████████████

█████████████████████████████████████████████████



There is no infringement under the doctrine of equivalents.

**B. There Is No Infringement –** ████████████████
**In The "Pharmaceutically Acceptable Fluid Consisting Of" Limitation**

206. ████████████████████████████████████

████████████████████████████████████████

207. ████████████████████ Dr. Sundaram (a co-inventor of the Abandoned Patent Application) ████████████████████████

████████████████████████████ *see also* Exh. 10, Oxford Thesaurus of English, (3rd Ed. 2009) at pg. 341 (████████████████████

████████████████████████████████" (emphasis added); Exh. 26, Buxton-Deposition-Exhibit-22 at pg. 2 [0027] (in a patent application from the same inventors for the patents-in-suit, but for a different drug pemetrexed, they state: ████

████████████████████████████████

████████████████ (emphasis added); Exh. 64, Buxton-Deposition-Exhibit-24, US Patent Application Publication 2014/0135299 Al ("Enema Composition For Treatment Of

Ulcerative Colitis Having Long Term Stability") ████████████████████████████

████████████████████████████████████████████████████████████

**208.** █████████████████████████████████████████████████████

██████████████████████████████████████████

██ ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

██ ██████████████████████████████████████████████████

██████████████████████ ████████████████████████████████

████████████████████████████████████████████████████. ████████

████████████████████████████



████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████

**211.** ███████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████

██      ████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████        There is no infringement, either

literally or under the doctrine of equivalents.

**213.**    The addition of ███████████████████████████████████

███████████████████████████████████████████████████████

███████████    Furthermore, the two exceptions to "consisting of" do not apply to ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████        And the use of ██████████████████        in a bendamustine liquid

formulation is certainly "related" to a claim limitation that recites fluids.

**214.**    Nor would there be infringement under the doctrine of equivalents.  As a first

matter, for all the reasons discussed above, the claims-in-suit were amended and narrowed

during prosecution to the "fluid consisting of …" limitation.  This creates an estoppel.  The use

of an ████████████████████████████████████████        is related to that amendment, and not

tangential.  On the merits of equivalents, █████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████

215.    In sum, the purposeful addition of ████████████████████████████████

████████████████████████ takes the Product out of the "consisting of" language and results in

non-infringement.

## IX.    NON-INFRINGEMENT BY ████ ██████████████████████████████████████████ **OTHER PRODUCTS**

### A.    ███████████████████████████████████████████████

██ ████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████

217.    ██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████





██████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████

**222.** ████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████



████████████████████████████████

██    ██████████████████████████████████████████████

█████████████████████████







227.

228.

██████████████████████ I reserve the right to supplement that opinion upon seeing plaintiffs' responses.  I am not offering any opinions regarding the significance of my non-infringement opinions to any other aspect of the case, including damages.

### B.  There is No Infringement By Treanda®

229.    I have also been asked to opine on whether the Treanda® lyophilized bendamustine product (and any generic versions of it that are also lyophilized) would infringe the patents-in-suit.  The patents-in-suit require a liquid composition.  A lyophilized product is a freeze-dried solid and, by definition, not a liquid.  Treanda® is lyophilized.  (Exh. 69, TREANDA® Label).  As a result, the Treanda® product cannot infringe the patents-in-suit, either literally or under the doctrine of equivalents.

230.    I reserve the right to further address any theory of equivalent infringement by Treanda® that plaintiffs may posit – although I do not believe the doctrine of equivalents should allow a claim to a liquid composition to cover a lyophilized product because it would entirely vitiate the claim limitation "liquid composition."  That is particularly true where the entire supposed purpose of the inventions in the claims-in-suit was to provide a stable liquid product as contrasted with the prior art lyophilized Treanda® product – and the patents-in-suit explicitly distinguish their invention from Treanda®.  (Exh. 2, '214 Patent at Col. 1, lines 46-48 and 63-67 ("Bendamustine is the active ingredient of the commercial product Treanda®, a lyophilized powder for reconstitution. … The lyophile possesses good chemical stability.  However, reconstitution of the lyophile is clinically inconvenient, taking 15-30 mins with implications of chemical 65 instability.  There is a need for ready to use (RTU) bendamustine formulations having enhanced stability."); Exh. 3, '248 Patent, at Col. 1, 46-48 and 63-67 (same)).

90

231.    For these reasons, it is my opinion that the Treanda® product (and any generic versions of it) do not infringe the patents-in-suit, either literally or under the doctrine of equivalents.  My opinion regarding non-infringement by Treanda® is strictly limited to the question of non-infringement.  I reserve the right to supplement my opinions upon seeing plaintiffs' responses.  I am not offering any opinions regarding the significance of my non-infringement opinions to any other aspect of the case, including damages.

### C.  There is No Infringement By Non-Bendamustine Cancer Drugs

232.    I understand that the infringement or non-infringement of certain other non-bendamustine cancer drugs is also potentially at issue in the case.  I further understand that this issue relates only to damages, which I understand will be addressed by a different expert.  These non-bendamustine drugs are:

| | |
|---|---|
| acalabrutinib maleate monohydrate | Jaypirca (pirtobrutinib) |
| alemtuzumab | Leukeran (chlorambucil) |
| Arzerra (ofatumumab) | lisocabtagene maraleucel |
| ofatumumab | obinutuzumab |
| Breyanzi (lisocabtagene maraleucel) | pirtobrutinib |
| Brukinsa (zanubrutinib) | prednisone |
| Calquence (acalabrutinib maleate monohydrate) | Riabni (rituximab) |
| Campath (alemtuzumab) | Rituxan (rituximab) |
| chlorambucil | Rituxan Hycela (rituximab and hyaluronidase human) |
| CHOP (cyclophosphamide, doxorubicin, vincristine, prednisone) | CVP (cyclophosphamide, vincristine, prednisone) |
| Copikfra (duvelisib) | rituximab |
| cyclophosphamide | rituximab and hyaluronidase human |
| dexamethasone | Ruxience (rituximab) |
| fludarabine phosphate | Truxima (rituximab) |
| Gazyva (obinutuzumab) | Venclexta (venetoclax) |
| ibrutinib | venetoclax |
| idelalisib | zanubrutinib |
| Imbruvica (ibrutinib) | Zydelig (idelalisib) |
| acalabrutinib maleate monohydrate | Monjuvi (tafasitamab-cxix) |
| Adcetris (brentuximab vedotin) | mosunetuzumab-axgb |
| Ananon (nelarabine) | Mozobil (plerixafor) |
| asparaginase erwinia chrysanthemi (recombinant)- rywn | nelarabine |
| axicabtagene ciloleucel | obinutuzumab |
| Beleodaq (belinostat) | Pemazyre (pemigatinib) |
| belinostat | pembrolizumab |

91

| BiCNU (cannustinc) | plerixafor |
|---|---|
| bleomycin sulfate | polatuzumab vedotin-piiq |
| bortezomib | Polivy (polatuzumab vedotin-piiq) |
| brentuximab vedotin | Poteligeo (mogamulizumab-kpkc) |
| brexucabtagene autoleucel | pralatrexate |
| Breyanzi (lisocabtagene maraleucel) | prednisone |
| Brukinsa (zanubrutinib) | recombinant interferon alfa-2b |
| Calquence (acalabrutinib maleate monohydrate) | Revlimid (lenalidomide) |
| carmustine | Riabni (rituximab) |
| chlorambucil | Rituxan (rituximab) |
| Columvi (glofitamab-gxbm) | Rituxan Hycela (rituximab and hyaluronidase human) |
| crizotinib | rituximab |
| cyclophosphamide | rituximab and hyaluronidase human |
| denileukin diftitox-cxdl | romidepsin |
| dexamethasone | Ruxience (rituximab) |
| doxorubicin hydrochloride | Rylaze (asparaginase erwinia chrysanthemi [recombinant]-rywn) |
| epcoritamab-bysp | selinexor |
| Epkinly (epcoritamab-bysp) | tafasitamab-cxix |
| Folotyn (pralatrexate) | tazemetostat hydrobromide |
| Gazyva (obinutuzumab) | Tazverik (tazemetostat hydrobromide) |
| glofitamab-gxbm | Tecartus (brexucabtagene autoleucel) |
| ibritumomab Tiuxetan | tisagenlecleucel |
| Imbruvica (ibrutinib) | Truxima (rituximab) |
| Intron A (recombinant interferon alfa-2b) | Velcade (bortezomib) |
| Istodax (romidepsin) | Venclexta (venetoclax) |
| Jaypirca (pirtobrutinib) | venetoclax |
| Keytruda (pembrolizumab) | vinblastine sulfate |
| Kymriah (tisagenlecleucel) | vincristine sulfate |
| lenalidomide | vorinostat |
| Leukeran (chiorambucil) | Xalkori (crizotinib) |
| lisocabtagene maraleucel | Xpovio (selinexor) |
| loncastuximab tesirine-lpyl | Yescarta (axicabtagene ciloleucel) |
| Lunsumio (mosunetuzumab-axgb) | aanubrutinib |
| Lymphir (denileukin diftitox-cxdl) | Zevalin (ibritumomab tiuxetan) |
| methotrexate sodium | Zolinza (vorinostat) |
| mogamulizumab-kpkc | Zynlonta (loncastuximab tesirine-lpyl) |

233. These drugs do not contain bendamustine. Thus, they do not literally infringe the claims-in-suit that require bendamustine. Nor do they infringe under the doctrine of equivalents when the entire focus of the claims-in-suit is bendamustine and stable formulations of the bendamustine. A doctrine of equivalents assertion would vitiate the "bendamustine" limitation in these claims. Further, these drugs act via different mechanism from bendamustine, have

92

different chemicals structures, some are biologics and not small molecules like bendamustine, have different formulations, and different stability profiles.

234.    For these reasons, it is my opinion that cancer drugs that do not include bendamustine do not infringe the patents-in-suit, either literally or under the doctrine of equivalents.  My opinion regarding non-infringement by the non-bendamustine products is strictly limited to the question of non-infringement.  I reserve the right to supplement that opinion upon seeing plaintiffs' responses.  I am not offering any opinions regarding the significance of my non-infringement opinions to any other aspect of the case, including damages.

## X.    THE PATENTS-IN-SUIT ARE NOT "FOUNDATIONAL"

235.    Dr. Trout also states in his report that the patents-in-suit are "foundational."  In particular, Dr. Trout states:

> In my opinion, for the reasons described throughout this report, the inventions claimed in the Asserted Patents— which, as noted, are part of the formulation family—are foundational and enabling patents. They disclose and claim the critical formulation components that makes a ready-to-dilute, long-term storage-stable liquid bendamustine feasible for commercial products like Belrapzo® and Bendeka®— namely, liquid bendamustine-containing compositions with less than about 5% total impurities after at least about 15 months at about 5-25°C using specific non-aqueous solvent systems and antioxidants at therapeutically relevant concentrations. Those are precisely the stability and formulation attributes that enable a commercially viable, refrigerator-stable ready-to-dilute product and obviate lyophilization and complicated reconstitution steps. A POSA would view the inventions claimed in the Asserted Patents as the technical bedrock, and thus as foundational and enabling relative to later innovations.

(Trout Opening Report on Infringement at pg. 151, ¶ 417 and also ¶¶ 409-420).

236.    I disagree that the patents-in-suit represent "foundational" patents.  These patents are formulation patents for a drug that has existed for a very long time.  ███████████

93



237.    There is nothing about the current claims-in-suit that represents a ground-breaking advance in cancer treatment.  The patents-in-suit claim stable liquid formulations of bendamustine.  In the absence of the bendamustine molecule itself – which arguably was foundational back in the 1960s – there would be nothing to formulate.  And without the bendamustine molecule there would be no cancer treatment.  By contrast, without the current claims-in-suit, there is still a treatment for Non-Hodgkins Lymphoma and leukemia – it is the bendamustine molecule.  For instance, Treanda® treats these diseases but does not employ a stable liquid formulation.  To the extent it is argued that these formulations provide some advantage in terms of convenience to the pharmacist preparing the infusion for the patient, I understand that in the prior trial the Court found that the Slayback NDA Product was not "ready-to-use" and required significant preparation and dilution anyway.  Any "advantage" from being a liquid, as opposed to a lyophilized, formulation can only be considered incremental and not foundational.

238.    The applicants here have pursued numerous variations of patent claims for liquid bendamustine formulations since 2010 – with an ever-shifting focus on the supposed key aspect of a liquid bendamustine formulation.  The original provisional application focused on stability provided by choline chloride.  Subsequent applications focused on PEG (and the other fluids) as providing stability.  Other patent applications focused on antioxidants as ingredients that provide

94

stability. Still other applications introduced the concept of "ready to use" into the claims and then removed it when the "ready to use" claims resulted in a litigation loss. And, the Abandoned Patent Application focused on the advantages of adding sodium hydroxide to stabilize the formulations.

239.    There is no evidence that the current claims-in-suit are foundational or pivotal in general, or as compared to the other variations of claims that have been pursued. If the stability of the formulations is foundational, that was covered in many prior applications and issued patents that are not in-suit here. (*See, e.g.*, Exh. 42, '483 Patent (reciting the same impurity limitations as the claims-in-suit); Exh. 52, U.S. Patent No. 8,609,707 (claims reciting "long term storage stable" liquid formulations of bendamustine); Exh. 70, U.S. Patent No. 9,265,831 (claims reciting: "the bendamustine-containing composition having less than or equal to 0.11% total PG esters at about 1 month of storage at a temperature of about 5° C."); Exh. 75, U.S. Patent No. 9,572,796 (reciting the same impurity limitations as the claims-in-suit); Exh. 76, U.S. Patent No. 10,010,533 ("less than or equal to 0.11% total PG esters at about 1 month of storage at a temperature of about 5° C."); Exh. 77, U.S. Patent No. 9,572,797 (same)).

240.    If the "ready to use" aspect of these formulations is foundational, that was claimed in the '483 Patent and the current Slayback NDA Product was found to not be "ready-to-use" by the the federal courts. (*See* Exh. 42, '483 Patent; Exh. 71, District Court Opinion; Exh. 72, Federal Circuit Opinion affirming). After that judicial determination, the claim limitation "ready-to-use" was removed from the applications that led to the current claims-in-suit – so "ready to use" it is not foundational to these claims.

241.    If the use of sodium hydroxide is key, plaintiffs abandoned the patent application that would have covered that. None of these are foundational inventions. At best they are

95

incremental improvements – to the extent not obvious – upon the basic invention of the drug. And, it is far from clear which of these particular claims obtained over the decade-and-a-half of applications is important or valuable.

## XI.    OTHER PATENTS

242.    I have also been asked to read several other patent documents and opine on their comparability to the patents-in-suit.  In reviewing these patents, I note that many are pharmaceutical formulation patents for pre-existing drugs as well – like the patents-in-suit. Further, some of these are solid dosage forms for controlled-release tablet structures or intranasal powders of exacting sizes of particles.

243.    For instance, U.S. Patent Application Publication No. 2006/0024360 (Exh. 73), entitled "Stable Injectable Composition Of Alphatocopheryl Succinate, Analogues And Salts Thereof"; and WO 2006/015120 (Exh. 74), entitled "Stable Injectable Composition Of Alpha Tocopheryl Succinate, Analogues And Salts Thereof" are, like the patents-in-suit, liquid formulations for cancer drugs that are delivered intravenously and are stable.  As the first paragraph in Exhs. 73 and 74 states:

> This invention relates to the field of compositions of alpha-tocopheryl Succinate, analogues or Salts thereof. In particular, this invention provides colloidal dispersion compositions of alpha-tocopheryl Succinate, analogues or salts thereof that are stable, safe and efficacious.

(Exh. 73 at [0003]; Exh. 74 at pg. 1, lines 5-8).

244.    The first claim of each of these patent documents (Exhs. 73 and 74) recites a "colloidal dispersion" (a liquid) as follows:

96

1.    A pharmaceutical composition, comprising alpha-tocopheryl succinate, an analogue or salt thereof; at least one component selected from the group consisting of an oil component, phospholipid, and antioxidant; and water; wherein the composition is a colloidal dispersion having an average particle size less than 200 nm in diameter, the alpha-tocopheryl succinate, the analogue or salt thereof is stable for at least 6 months at room temperature, and the alpha-tocopheryl succinate has the chemical structure:

wherein $R_1$ is $CH_3$, $R_2$ is $CH_3$, $R_3$ is $CH_3$, and R is $–OOC\text{-}(CH_2)_2\text{-}COOH$.

Other claims recite combination with anticancer drugs, including paclitaxel:

4.    The composition according to claim 1 or claim 2, further comprising an anticancer agent.

17.    The composition according to claim 4, wherein the anticancer agent is paclitaxel or docetaxel.

245.    As can be seen, these claims share features with the claims-in-suit. They recite liquid formulations for intravenous use of known cancer drugs that are stable. However, in certain respects these claims are broader than the claims-in-suit – encompassing more than one cancer drug ("an anticancer agent"). This means that these patent claims are applicable to a broader class of drugs than the claims-in-suit.

246.    United States Patent Application Publication 2013/0330412 (Exh. 78) is entitled "Smart Polymeric Nanoparticles Which Overcome Multidrug Resistance To Cancer Therapeutics And Treatment Related Systemic Toxcity." Like the patents-in-suit, this patent

97

publication claims formulations for cancer drugs.  And, like the patents-in-suit, these

formulations can be included in liquid intravenous compositions.  For instance, claim 13 in Exh.

78, recites:

> 13. An injectable formulation for systemic administration to a subject for providing chemotherapy to a subject comprising:
>
> a carrier fluid; and
>
> polymeric nanoparticles dispersed in said carrier fluid,
>
> said polymeric nanoparticles having a lower critical solution temperature (LCST) above 37 C, said polymeric nanoparticles including
>
> a polymeric substrate formed from monomers consisting of
>
> N-isopropylacrylamide (NIPAAM), acrylic acid (AA), and at least one vinyl monomer selected from the group consisting of vinyl acetate, 4-vinyl benzoic acid, methylmethacrylate, vinylmethacrylate, N-vinylpyrrolidone, N-vinyl piperidone, N-vinyl caprolacum, N-vinyl carbazole, and styrene,
>
> wherein said NIPAAM, said AA, and said vinyl monomer are present at molar ratios of 50-70:10-30:10-30 for NIPAAM:AA:vinyl monomer,
>
> wherein said polymeric substrate is in the form of a particle having a diameter of 50-100 nm or smaller,
>
> curcumin entrapped within said polymeric substrate, and
>
> one or more chemotherapeutic agents associated with said polymeric substrate, said one or more chemotherapeutics agents being selected from the group consisting of anthracyclines, taxanes, chemotherapeutic platinum compounds, and topoisomerase inhibitors.

247.    And, again of note, the claims in Exhibit 78 cover more than one cancer drug,

using broad language like "one or more chemotherapeutic agents."  Thus, these patent claims are

broader than claims that would only cover one drug (like the patents-in-suit that cover only

bendamustine).

## XII.    CONCLUSION

248.    For the foregoing reasons, it is my opinion that the Slayback NDA Product does

not infringe, either literally or under the doctrine of equivalents, the patents-in-suit.  In addition,

████████████████████████  Treanda®, and all non-bendamustine products also do not

infringe the patents-in-suit, literally or under the doctrine of equivalents.  And, finally, various

other patents and patent publications that I have been asked to look at are comparable to the

patents-in-suit technologically, or are broader.

Dated: March 16, 2026