# EXHIBIT 9

# REDACTED
# PUBLIC VERSION



**Planet Depos**
*We Make It Happen™*

## HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Transcript of Bernhardt L. Trout, Ph.D.

**Date:** May 8, 2026
**Case:** Eagle Pharmaceuticals, Inc., et al. -v- Apotex/Slayback/Baxter Healthcare

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

--------------------------------------x

EAGLE PHARMACEUTICALS, INC.
AND EAGLE SUB 1 LLC,
            Plaintiffs

v.                      CA No. 24-64-JLH

APOTEX INC., AND APOTEX CORP.,
            Defendants
_____

EAGLE PHARMACEUTICALS, INC. AND
EAGLE SUB 1 LLC.,
            Plaintiffs

v.                      CA No. 24-65-JLH

SLAYBACK PHARMA LLC AND AZURITY
PHARMACEUTICALS, INC.,
            Defendants
_____

     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEOTAPED DEPOSITION OF BERNHARDT L. TROUT, Ph.D.

            Friday, May 8, 2026 9:09 a.m.

                Latham & Watkins LLP

        200 Clarendon Street, Boston, MA 02116


Reported by:
Janet McHugh, RMR, CRR, CLR
JOB NO. 632511

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    2

May 8, 2026

9:09 a.m.

Videotaped deposition of BERNHARDT L. TROUT, Ph.D., held at the offices of Latham & Watkins LLP, 200 Clarendon Street, Boston, Massachusetts, pursuant to Agreement, before Janet McHugh, a Registered Merit Reporter, Certified Realtime Reporter, Certified LiveNote Reporter, and a Notary Public within and for the Commonwealth of Massachusetts.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                               3

APPEARANCES:


ON BEHALF OF PLAINTIFFS:

Kenneth Schuler, Esquire

Kelly Welsh, Esquire

LATHAM & WATKINS LLP

330 North Wabash Avenue, Suite 2800

Chicago, Illinois 60611

312.876.7700

kenneth.schuler@lw.com

kelly.welsh@lw.com



ON BEHALF OF THE APOTEX DEFENDANTS

Christopher Ferenc, Esquire (via Zoom)

KATTEN, MUCHIN, ROSENMAN, LLP

1919 Pennsylvania Avenue NW, Suite 800

Washington,DC 2006

202.625.3500

christopher.ferenc@katten.com



- Continued -

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    4

APPEARANCES:   (Continued)


ON BEHALF OF THE SLAYBACK DEFENDANT:

Jason Lief, Esquire

Audrey Sparschu, Esquire

WINDELS MARX

156 West 56th Street

New York, New York 10019

jlief@windelsmarx.com

asparschu@windelsmarx.com

212.237.1144


ALSO PRESENT:

Dimas Bardales, Videographer

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                         5

                    I N D E X

WITNESS                    DIRECT          CROSS

BERNHARDT L. TROUT, Ph.D.

By Mr. Lief                   15


                  E X H I B I T S

Number          Description                    Page

Exhibit 1  Curriculum vitae of Bernhardt

           Trout, Ph.D.                         18

Exhibit 2  Opening Expert Report of Dr.

           Bernhardt Trout, Ph.D.               45

Exhibit 3  Appendix B:  Slayback Additional

           Evidence of Infringement            45

Exhibit 4  Reply Report of Bernhardt

           Trout, Ph.D.                         46

Exhibit 5  Responsive Expert Report of

           Dr. Bernhardt Trout, Ph.D.          46

Exhibit 6  U.S. Patent No. 11,872,214          47

Exhibit 7  U.S. Patent No. 12,138,248          47

Exhibit 8  International Patent Application

           WO 2015/095533                       87

Exhibit 9  International Patent Application

           WO 2012/065082                      105

Exhibit 10 International Patent Application

           WO 2010/141902                      109

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    6

```
               E X H I B I T S

Number              Description                 Page

Exhibit 11 Excerpt from Handbook of

           Pharmaceutical Excipients relating

           to Polyethylene Glycol              174

Exhibit 12 Excerpt from Handbook of

           Pharmaceutical Excipients relating

           to Propylene Glycol                 178

Exhibit 13 Excerpt from Handbook of

           Pharmaceutical Excipients relating

           to Alcohol                          180

Exhibit 14 Excerpt from the Handbook or

           Pharmaceutical Excipients relating

           to Benzyl Alcohol                   190

Exhibit 15 Excerpt from the Handbook or

           Pharmaceutical Excipients relating

           to Glycofurol                       195

Exhibit 16  "Cellulose" article entitled

            "Dissolving of cellulose in PEG/NaOH

            aqueous solution"                  199

Exhibit 17 Document Bates-stamped

           EAGLEBEN-SA_00361489 through -1576  222

Exhibit 18 Document Bates-stamped

           EAGLEBEN-SA_00361465 through -1482  223

           - Continued -
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                          7

E X H I B I T S

Number            Description                        Page

Exhibit 19 Document Bates-stamped

            EAGLEBEN-SA_00361577

            through -1592                            228

Exhibit 20 Document Bates-stamped

            EAGLEBEN-SA_00361447 through

            -1456                                    230

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                            8

P R O C E E D I N G S

THE VIDEOGRAPHER:  Here begins                    09:09:54
Media No. 1 in the videotaped deposition of       09:09:55
Dr. Bernhardt Trout in the matter of Eagle        09:09:58
Pharmaceuticals, et al., versus                   09:10:01
Apotex/Slayback/Baxter Healthcare in the          09:10:03
United States District Court for the District of  09:10:07
Delaware, Case No. 1:24-CV-00065-JLH.             09:10:09

Today's date is May 8, 2026.  The time            09:10:21
on the video monitor is 9:10 a.m.  The            09:10:25
videographer today is Dimas Bardales,             09:10:28
representing Planet Depos, headquartered at 451   09:10:29
Hungerford Drive, Suite 400, Rockville, Maryland  09:10:34
20850.  This video deposition is taking place at  09:10:38
200 Clarendon Street, Boston, Massachusetts       09:10:41
02116.                                            09:10:44

Would counsel please voice identify               09:10:47
themselves and state whom they represent.         09:10:49

MR. SCHULER:  Ken Schuler for Eagle               09:10:51
Pharmaceuticals on behalf of the witness and      09:10:54
Eagle.  Along with me is my colleague, Kelly      09:10:55
Welsh.                                            09:10:58

MR. LIEF:  And Jason Lief from Windels            09:10:59
Marx on behalf of defendants Azurity and          09:11:04
Slayback.  And with me is my colleague, Audrey    09:11:08

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    9

Sparschu.

MR. FERENC:  Chris Ferenc of Katten Muchin Rosenman on behalf of the Apotex defendants.

I'd also like to note for the record that the caption should also include the Apotex case, which is Case No. 24-CV-64-JLH.

THE VIDEOGRAPHER:  The court reporter today is Janet McHugh, representing Planet Depos.

The witness will be sworn and we may proceed.

(Witness sworn.)

MR. SCHULER:  Just before we go, he read Baxter, but Baxter is no longer a party to any proceeding.

And then our understanding is that Slayback will be questioning today and then Apotex tomorrow, so he has focused his preparation, obviously, on Slayback for today.

I would prefer that we close out the transcript and then have another transcript, but I don't object to having one transcript as long as we can agree that the rule is suspended after today's session.

MR. LIEF:  Which rule?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    10

MR. SCHULER:  The witness -- I can't talk to the witness if he's on Cross-Examination.

MR. FERENC:  Yeah.  It's the same deposition.  I don't understand, because we've done this for three separate depositions where we agreed that this will be taken jointly under a single transcript.

THE COURT REPORTER:  I'm sorry, I can't hear.

MR. FERENC:  This is a new objection.  This is the first time at a deposition --

MR. SCHULER:  Chris.  Chris, the court reporter was having trouble hearing you.  I don't know if the volume is low or what it is.

MR. FERENC:  I have my mic on.  I don't know how I can raise the volume there.  I'm not there.

But from the perspective of the defendants, this is a single deposition that is occurring over the course of two days, so it's a single transcript.  It's a single examination.

This is the way that the parties have operated for the last three depositions, for Dr. Kittendorf, Dr. Topp, Dr. Ashraf, so I don't see the need to alter that structure today.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                    11

I think the objection is not timely.    09:13:21
So defendants intend to move forward in the same    09:13:22
manner we've been progressing on the other    09:13:25
depositions.    09:13:28
        MR. SCHULER:  We did not -- we did not    09:13:31
agree.  We said that it was two seven-hour days,    09:13:34
which is what the rule would provide for.  And if    09:13:37
this were proceeding at trial, obviously, there    09:13:43
are two separate trials.  I'd be able to talk to    09:13:45
my witness between the trials.  It's a simple    09:13:48
matter of fairness.    09:13:50
        As I said, I don't object to a single    09:13:51
transcript if we can agree that the rule is    09:13:53
suspended after the deposition session today.  I    09:13:55
think it's a reasonable request.    09:13:58
        There's no unfairness to you guys.  You    09:14:00
each get seven hours of deposition time.  It's    09:14:02
simply that the witness's request that we be able    09:14:05
to focus on his Apotex testimony tomorrow, since    09:14:08
he prepared for Slayback today.  I think that's    09:14:13
entirely reasonable.    09:14:15
        MR. LIEF:  I mean, I think I agree with    09:14:18
Chris, you know, and his view of it.  I think    09:14:23
that, you know, there are some differences in the    09:14:27
two cases that I'm probably not even aware of    09:14:39

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                12

because I don't fully know what Apotex's product is, exactly.

But there's also some commonality in issues, and to the extent that we cover some ground that is common and it's going to be a common transcript, and then you talk to the witness in the middle, and then Chris comes back to a question or doesn't come back to a question because he wants to just use what was, you know -- what was already said, and somehow the witness says something different the next day, it's kind of problematic, I think.

MR. SCHULER: There's two ways to proceed. Either we're having a Slayback transcript, and we're going to close it out and you guys have up to seven hours, and then tomorrow will be an Apotex transcript, up to seven hours, or we can agree to suspend the rule.

It's your choice. But we're not going to proceed with pretending this is one 14-hour deposition. We did not agree to that, and that's not how we're going to proceed. That's not how it would proceed at trial, and we're not going to proceed that way.

It's unfair to the witness.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                13

MR. FERENC:  I don't think it's unfair to the witness, Ken.  I think you guys agreed to a 14-hour deposition --

MR. SCHULER:  No.  We agreed to two seven-hour days.

MR. FERENC:  What's your basis for that?  I don't --

MR. SCHULER:  Our email.

MR. LIEF:  I don't think that was in your emails, is it?

MR. SCHULER:  Yes, it was.

So here's what we're going to do. We're going to do a Slayback transcript today. This is only in the Slayback case.  We will conclude after up to seven hours, and we will proceed tomorrow with the Apotex deposition.

MS. SPARSCHU:  I'll just say our counteroffer was no restrictions on how the defendants divide their time, and Kelly accepted that.

MR. SCHULER:  No, she said we'll provide him for two seven-hour --

MS. SPARSCHU:  She says -- it says, "Eagle will agree to defendants' proposal."  It doesn't say --

09:15:57
09:15:57
09:15:59
09:16:01
09:16:02
09:16:03
09:16:04
09:16:05
09:16:06
09:16:07
09:16:08
09:16:10
09:16:10
09:16:13
09:16:17
09:16:21
09:16:28
09:16:29
09:16:32
09:16:35
09:16:36
09:16:36
09:16:38
09:16:39
09:16:43

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026    14

MS. WELSH:  Read the entire email.    09:16:43

MS. SPARSCHU:  -- 14 hours for each of them, split across two days at seven hours per day.    09:16:43 09:16:43 09:16:47

MR. LIEF:  But it didn't say seven hours per defendant.    09:16:49 09:16:50

MS. SPARSCHU:  Right.  You didn't indicate this restriction --    09:16:50 09:16:50

MR. SCHULER:  I've chatted with local counsel on this, and this is how we're going to proceed.  You each get seven hours.  Today will be Slayback and Slayback, alone, and tomorrow will be Apotex.  You each get up to seven hours.    09:16:51 09:16:51 09:16:53 09:16:55 09:16:58

That's the way we will proceed.    09:17:01

MR. LIEF:  Well, I guess what I would say is to the extent there's some change in the testimony overnight, my view would be when Chris is questioning him, he would have a right to ask, What did you discuss to change your testimony?    09:17:04 09:17:05 09:17:07 09:17:12 09:17:14

So that would be my view of it.    09:17:18

MR. FERENC:  We're reserving rights.  This is new.  I don't think it's appropriate to continue to waste time here on the record.    09:17:23 09:17:23 09:17:29

We'll take a look at it, and we can discuss it at a break, if that makes sense, but I    09:17:31 09:17:34

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    15

think the record reflects and the emails that

this was going to be a 14-hour deposition shared

across both defending groups as a single

transcript.  And, you know, there certainly

wasn't an objection raised to the extent that two

separate depositions before this morning.

So we can proceed, and we can bring

this out on a break.

MR. LIEF:  Yeah.  And I would also ask

that whatever time we spent discussing this not

count in his seven hours today because this was

kind of just colloquy, completely.

All right.  May we begin?

BERNHARDT L. TROUT, Ph.D.,

having been duly sworn, after presenting

identification in the form of a driver's license,

deposes and says as follows:

DIRECT EXAMINATION

BY MR. LIEF:

Q    Would you state your full name for the

record.

A    Yes.  Bernhardt Levy Trout.

Q    Have you ever gone by any other name?

A    I mean, maybe just Bernhardt L. Trout

or Bernhardt Trout, but no changes in first or --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    16

no official changes in names.

Q    And are you currently employed?

A    Yes.

Q    And who is your employer?

A    It's Massachusetts Institute of Technology.

Q    And what is your current business address?

A    It's 77 Massachusetts Avenue, E19, so just E19, but E is capitalized -- -502b, Cambridge, Massachusetts 02139.

Q    And what is your current home address?

A    It's 20 Partridge Road, P-A-R-T-R-I-D-G-E, Lexington, Massachusetts 02420.

Q    Do you have any other residences?

A    No.

Q    Okay.  No property within 100 miles of Delaware?

A    No.

Q    Okay.  Have you been deposed before?

A    Yes.

Q    About how many times?

A    I'm guessing over 25-plus years, probably over 20 times, around that.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    17

Q    Okay.                                        09:20:16

A    Meaning a few over 20, maybe around 20.      09:20:17
Something like that.                              09:20:20

Q    Okay.  And have you given trial              09:20:21
testimony before?                                 09:20:25

A    Yes.                                         09:20:27

Q    And how many times have you given trial      09:20:29
testimony?                                        09:20:31

A    I think -- I think it's about nine           09:20:32
times, so I think just about ten.  Maybe it's     09:20:37
ten.  But around that number.                     09:20:42

Q    How long have you been doing expert          09:20:55
witness work?                                     09:20:57

A    I think -- you might recall better than      09:21:00
me, because I think you found some -- one of my    09:21:05
first cases, but over 20 years, anyway.  It may    09:21:09
be close to 25, but over 20.                      09:21:12

Q    In those 25 years or so, roughly, have       09:21:18
there been years in which your income from being   09:21:22
an expert witness exceeded your income as a       09:21:25
professor?                                        09:21:29

A    Yes, I think so.  Yes.                       09:21:35

MR. LIEF:  I'm going to hand you what             09:21:49
we've already marked as Trout Exhibit 1, which is  09:21:50
a copy, I believe, of your CV.  And that is this.  09:21:54

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                18

There's two copies.

(Curriculum vitae of Bernhardt Trout, Ph.D. marked Exhibit 1.)

BY MR. LIEF:

Q    And as a first matter, can you take a look at this document and tell me if it is a recent copy of your CV.

A    Yes, it does look to be recent.  I'm not sure if it's the exact most updated one.

Q    But fairly recent?

A    Yes.

Q    And any reason to believe anything in here is inaccurate?

A    No reason to believe.  I update it myself, so I could have missed something, but I try to make it accurate and intend for it to be accurate and don't know of anything that's not accurate.

Q    Good.  If we could turn to the Education section, which is on numbered page 2 at the top.  Are those all of the degrees and certificates you hold?

A    Well, yes, as far as academic degrees. I don't recall if I have other certificates, per se, but this is the substantive education.  I

mean, the certificate in University of Paris is less relevant, but it's -- the three degrees are the substantive degrees.  Like I said, I might have other certificates that don't come to mind now.

Q   Okay.  Just to put it to the side, the certificate from the University of Paris, what was the subject of that certificate?

A   The subject was language and civil -- French language and civilization.

Q   Unrelated to science?

A   Not directly related.  That's correct.

Q   Okay.  Your bachelor's degree, you obtained in 1990 from the Massachusetts Institute of Technology, correct?

A   Correct.

Q   And it was in chemical engineering?

A   Correct.  And I should qualify one thing about that.  It's a BS in chemical engineering.  Officially, for whatever historical reason, MIT calls it an SB.  It's the same thing. So if you ever see somewhere SB, it's the same. I put it this way because I think people are more familiar with that.

Q   And in your undergraduate studies

09:24:51
09:24:56
09:25:01
09:25:04
09:25:07
09:25:07
09:25:13
09:25:16
09:25:22
09:25:26
09:25:33
09:25:38
09:25:41
09:25:48
09:25:51
09:25:57
09:25:58
09:26:06
09:26:09
09:26:14
09:26:19
09:26:25
09:26:28
09:26:31
09:26:34

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026 20

towards chemical engineering, did you take any courses in pharmaceutical formulation?

A I took courses related to pharmaceutical formulation. There weren't -- it wasn't a specific course called "Pharmaceutical Formulation."

Q What courses would you have considered related to pharmaceutical formulation that you took as an undergraduate?

A So I -- well, I should -- okay. As you see, I got my bachelor's and my master's in the same year, so my coursework for the two degrees overlapped.

Q Okay.

A So I think I was officially an undergraduate, but technically the courses which I will relay to you were courses for -- I think they counted towards my master's degree, but I was officially an undergraduate.

And a couple courses come to mind. The graduate courses that I'm thinking of -- this is a while back, as you note -- I took like a biochemical engineering course. I took a -- I don't remember the exact titles of either of them, but I also took a drug product course.

Both of those were process focused but certainly had formulation aspects to them.

Also, I took -- now, these are undergraduate courses for which the fundamental subjects are related -- actually directly related to issues in this class. One of the first courses I took was a mass and energy balance course. I recall mass balance as one of the topics here that was brought up by Slayback.

I also took basic courses like thermodynamics and kinetics, which are related, you know, broadly to the issues here, and other courses in the chemical engineering construction column, chemistry course, et cetera. Biochemistry courses, those sort of things.

Q   And then you went on to get your Ph.D. in chemical engineering in 1996 from the University of California Berkeley, correct?

A   That's correct.

Q   And the title of your Ph.D. thesis was "Reaction Processes in ZSM-5 Zeolites Elucidated by Quantum Density Functional Theory and by Dynamic Monte Carlo." Is that correct?

A   Yes.

Q   And what was the subject of your thesis

dissertation?

A    Well, I guess in a sense, the title is the subject.  I can elaborate.  My -- so as an undergraduate -- you actually specifically asked me about courses, but I also -- I also did extensive research.  My research focused on -- my undergraduate research focused on pharmaceuticals processing, but also related to product formulation.  And I had an interest in theoretical methodology, and so I wanted to bring that into the pharmaceutical space, which I did when I began at MIT.

And so the reason I gave you that background is because the subject is these methods, density, functional theory, and dynamic Monte Carlo.  The application was ZSM-5 zeolites, so these are catalysts.  I'm happy to go into more depth --

Q    So --

A    -- as you'd like.

Q    The ZSM zeolite catalysts were, as I understand it, catalysts for converting nitrogen oxides into nitrogen and oxygen, correct?

A    Yes.  I mean, they could potentially convert other things, but that was the focus of the reactions in my thesis, correct.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    23

Q    And those are reactions that take place in a catalytic converter of an automobile exhaust, correct?

A    Well, those are reactions that take place in a catalytic converter, but the catalytic converter in automobiles are different than the application, the focus of my thesis.  As far as I know, these zeolites are not used in automobile applications.

But my focus wasn't so much the application, per se, as trying to elucidate, as I say there, the chemistry of the reaction processes.

Q    And what types of applications were you focused on for the ZSM-5 zeolites of your dissertation?

A    Oh, sorry.  I thought I answered that in the previous question.

So the -- there are a variety of applications of ZSM-5 zeolites.  My focus wasn't so much a direct practical application as elucidating the various chemical mechanisms that can occur.

Q    Okay.

A    In addition, again, to learning the methodology, which I did, and have applied since

09:31:44
09:31:46
09:31:50
09:31:55
09:31:58
09:32:03
09:32:08
09:32:13
09:32:18
09:32:20
09:32:25
09:32:29
09:32:32
09:32:37
09:32:42
09:32:48
09:32:53
09:32:54
09:32:59
09:33:05
09:33:09
09:33:13
09:33:15
09:33:15
09:33:19

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026 — 24

early in my independent career.

Q The reactions that you were studying in your dissertation were inorganic chemistry reactions?

A That's correct.

Q Okay. And am I correct to say that the reactions you were studying in your dissertation thesis were unrelated to pharmaceutical chemistry?

A That's, I think, correct. That's a fair statement. Again, the intention was learning the methodology, and these were the kind of applications in which one could learn the methodology. So my intention had been pharmaceuticals, but the application of those reactions -- and they could be related, but those applications were specifically inorganic. That's correct.

Q And your pharmaceutical -- strike that.

Your Ph.D. dissertation is unrelated to pharmaceutical formulation, correct?

A Well, again, I wouldn't say that's completely correct. I agree that the subject matter didn't have to do with pharmaceutical formulation. As I said, I wanted to learn the

methodology to bring them into the pharmaceutical space where they had not been applied, which is exactly what I did in my independent career with respect to formulation.

Q   But that followed your Ph.D. thesis? The thesis itself was unrelated to pharmaceutical work?

A   The application of the thesis, the elucidation of the various chemical mechanisms, agreed, was not a pharmaceutical application.

The methodology was, in my view, potentially applicable, which is how I used it.

Q   All right.  I take it as a professor -- your professorship at MIT, you teach courses?

A   Yes.

Q   And do you teach any courses in analytical chemistry?

A   Well, just to be clear, I teach in chemical engineering.  So certainly some of the courses involve analysis, but I don't teach a course with the rubric analytical chemistry, per se.  But certainly our courses involve the analytics of chemical systems.

Q   Okay.  But you don't teach a formal course in analytical chemistry with that title?

A    Correct.  I don't teach a course with the title "Analytical Chemistry."  Almost all of the courses I teach certainly involve analytical chemistry in various ways, applications of analytical chemistry and analysis, including a laboratory course that I've taught in the past.

Q    In terms of those courses that involve analytical chemistry, is that the major focus of those courses?

A    No.  I would say it's a focus.  I would say it's something that needs to be incorporated into understanding the material in various courses.  Analysis, analytical chemistry, per se, is core to -- well, pretty much everything that we do in -- directly or indirectly.

Q    Does MIT offer courses specifically about analytical chemistry?

A    I would have to check the course catalog.  I would expect, but I don't know if they would be undergraduate or graduate.  Maybe they don't have courses with exactly that title. We could check.

Again, analytical chemistry is something that's incorporated in pretty much all of our research and coursework.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    27

Q    And do you teach any courses on -- specifically on HPLC methodology?

A    I'm trying to remember.  I mean, we certainly have incorporated the results of HPLC methodology in courses, but if you're asking about a standalone course, I took a course as an undergraduate that involved HPLC, but I don't think I've actually taught a course that specifically used that methodology.

I'd have to think of the lab course that I taught.  Maybe it did.  It certainly used various analytical toxicology related to separations.

And, by the way, my laboratory, we've had -- we apply HPLC regularly and have for many years.

Q    And in your -- in this CV you have a listing of your scientific publications, which on page 4.  The most recent one listed, I assume, is No. 229.

Do you see that?

A    Yes.

Q    Does that sound about right as the total number of publications you've had over the years?

A    That sounds -- that's about right.  I'm trying to remember if -- what we may have

submitted.  Sometimes the order changes, what we
may have submitted recently.

I mean, I know that some of these that say
"submitted" or "in press" are now published.
There may have been another couple publications
since then.  But that's -- as -- you asked about,
right.  I think that's approximately correct.

Q    And in terms of these publications, am
I correct that you don't have any publications
that are specifically focused on HPLC techniques
and validation of such techniques?

A    I don't think that's correct.  I think
there are quite a few that involve HPLC
techniques, and we've validated the methodologies
that we've used.  I'm not -- I'd have to find --
but, you know, we have -- do quite a bit of work
using HPLCs.  We have to validate the
methodology.  At one point when I was running the
center, specifically in my lab, we had five HPLCs
running basically 24/7, so we needed to do lots
of analysis, and we needed to use validated
methods.

Q    Were you doing work that was geared
towards FDA approvals when you were validating
those methods?

09:39:44
09:39:48
09:39:50
09:39:52
09:39:58
09:40:00
09:40:04
09:40:07
09:40:11
09:40:14
09:40:23
09:40:31
09:40:34
09:40:39
09:40:44
09:40:54
09:40:58
09:41:02
09:41:05
09:41:09
09:41:15
09:41:18
09:41:20
09:41:23
09:41:26

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    29

A    No.  We were doing work on pilot scale, also laboratory scale work.  At MIT, we don't do FDA submissions, but a lot of this work was with companies, and so we work with companies.  And some -- it was the hope that some of these methods would be used, and, in fact, some of the methods have been used in commercial products by companies.

Q    Have you ever used an unvalidated HPLC method in your lab?

A    Let me be clear what you mean by "validated."  I want to make sure we're using the term the same way.

Q    Well, how have you been using it?  Let me ask it that way.  You've used the word "validated" several times.

What do you mean by that?

A    I mean a method that's appropriate for the application that's going to give accurate and precise results that are reasonable for the application.

Q    Have you ever used a method that you understood was inaccurate?

MR. SCHULER:  Object to the form.

A    I'm not quite -- using a method

intentionally that was inaccurate?

Q    Yeah.

A    Not as far as I know.  I mean, methods may have varying degrees of accuracy given the application.

I may not quite understand your premise.

Q    That's okay.

A    To the degree that we applied methods that were less accurate than maybe we wanted them to be, there might have been a reason for that. So in a certain sense, the inaccuracies related to the application and the degree of accuracy and precision -- we can focus on accuracy if you want.

Q    Have you ever used the methodology that -- well, strike that.  Let me ask you a different question.

Your use of HPLC, was it quantitative or just for purposes of separating different molecules?

MR. SCHULER:  Object to the form.

A    Well, I've used quantitative HPLC with the objective of analyzing actually degradation, degradation products, for example, in pharmaceuticals that we were working with.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026 31

Q Okay. 09:44:30

A If that's what you mean. 09:44:31

Q So in terms of the quantitative HPLC you've done, if you had results that you knew were underestimating a degradant by half, would you consider that accurate in any context? 09:44:32 09:44:35 09:44:39 09:44:47

MR. SCHULER: Object to the form. Incomplete hypothetical. 09:44:55 09:44:55

A I'm not sure what you're getting at. If you know the degree of underestimation and it seems like you have an understanding of the methodology, maybe you could explain a little more what you mean. I'm not quite following. 09:45:02 09:45:04 09:45:10 09:45:14 09:45:19

Q Let me ask that, then. 09:45:21

If you knew that a certain methodology was producing quantitative numbers that were underestimating by a half, would you seek to correct those numbers? 09:45:23 09:45:27 09:45:31 09:45:36

MR. SCHULER: Object to the form. Incomplete hypothetical. 09:45:40 09:45:40

A I'd have to look at the situation and understand. I mean, I would want to do whatever I did for appropriate reasons. But it depends on the situation, I guess. 09:45:44 09:45:48 09:45:51 09:45:57

Q Can you envision a situation where 09:46:00

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026　　　　32

reporting numbers that are off from true values
by half would be appropriate?

MR. SCHULER:  Same objection.

A    I'd have to understand the situation.
We strive for -- to report things correctly.
You're asking about my lab, I presume, so --

Q    Yes.

A    -- we strive to report things correctly
and, you know, applying appropriately methodology
with the degree of accuracy and precision needed
for the particular application.

Q    In your lab, would it ever be
acceptable to report a number that was -- varied
from what you knew to be the true value by half,
where you knew that the true value was twice as
high?

MR. SCHULER:  Object to the form.
Incomplete hypothetical.

A    I don't -- there might be reasons.  I
don't know.  I'd have to look at the specifics.
Again, I think I, myself, and expect of my
students, postdocs and other laboratory members,
to report what -- the results that they got,
using appropriate methodology and analyses.  But
I'd have to understand the specific situation.

09:46:03
09:46:07
09:46:12
09:46:16
09:46:19
09:46:25
09:46:27
09:46:28
09:46:33
09:46:38
09:46:43
09:46:48
09:46:52
09:46:59
09:47:05
09:47:08
09:47:10
09:47:11
09:47:14
09:47:18
09:47:21
09:47:30
09:47:33
09:47:40
09:47:45

Q    Would it be fair to say that you expect of your laboratory that the results reported be as close to accurate as you can get?

A    I'm not sure I understand exactly what you're asking.  I think I would say -- repeat what I said.  We would apply methodology with the degree of accuracy or precision intended and understand whether we're able to -- for the given application and understand whether we're able to make conclusions based on the results.

And, I mean, part of doing science and addressing a hypothesis is choosing a methodology that will hopefully be able to answer it.  Sometimes it's inconclusive.  Sometimes it's negative, sometimes positive.

Q    Is it fair to say that, as you sit here today, you wouldn't give an answer one way or the other as to whether a number that's half of the true value is appropriate in any particular application?

MR. SCHULER:  Object to the form.

A    I'm not understanding your hypothetical.  I would have to understand it better.  Again, if you're saying reporting -- falsifying numbers or reporting wrong numbers, I

| | |
|---|---|
| 09:47:48 | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                    34

wouldn't say that would be appropriate.

But there might be reasons -- I just don't know.  I'd have to understand -- I'm not quite sure -- your question is very vague, so I'm not quite sure what you're getting at.  But if you have something more specific, we could potentially discuss that.

Q    We could.  Well, with respect to your publications, is it fair to say that a lot of the work you've done relates to peptides and proteins in the pharmaceutical area?

A    I think that's correct.  As you've noted, I have over -- about 230 publications.  So many of them have to do with peptides and proteins.  Many of them have to do with small molecule pharmaceuticals.  I'm not sure what the ratio is.  Very roughly, half and half.  Well, some of them maybe not either, so 40/40 or something.  Something like that.  But quite a large number have to do with proteins and peptides and quite a large number have to do with small molecule pharmaceuticals.

Q    Okay. Have you ever worked with bendamustine in any way before this case?

A    And I guess I shouldn't assume.  You

mean before this case specifically?

Q    Before -- outside of litigation.  In your research, have you worked with bendamustine?

A    No, I have not specifically worked with bendamustine outside of these -- these types of cases.

Q    In terms of your research, have you ever worked with any nitrogen mustard?

A    I'd have to go back.  I think it's unlikely.  We've worked with quite a number of compounds even Class 3+ compounds.  I don't recall specifically having worked with nitrogen mustards in my laboratory.  I could go back and try to -- we've done quite a number of projects over the years.

Q    When you said class 3 -- I think you said class 3 compounds -- what were you referring to?

A    Oh, I'm sorry.  I said -- so Class 3+ is a designation for our laboratory.  We no longer have that designation because we're not working with such potential toxic compounds.  But you have certain ratings in your laboratory and you can work on certain compounds, and they have different potential levels that you have to

09:51:14
09:51:17
09:51:19
09:51:24
09:51:26
09:51:29
09:51:31
09:51:34
09:51:45
09:51:48
09:51:52
09:51:59
09:52:01
09:52:06
09:52:09
09:52:09
09:52:12
09:52:14
09:52:18
09:52:21
09:52:28
09:52:31
09:52:37
09:52:41
09:52:44

monitor, things like that.

Q   And I take it you viewed nitrogen mustards as -- they would fall within a Class 3+ category?

A   No, I don't know specifically.  I mean, I guess it depends on the type of compounds.  But generally, cancer compounds tend to have a pretty high level of rating, so one could designate that.

My point is that we've worked with compounds up to very high level of potential toxicity and require appropriate monitoring and personal protection and those sort of things.

Q   Your Ph.D. dissertation had nothing to do with bendamustine, correct?

A   Not specifically.  Again, I discussed the methodology, which is related -- methodology which we used for subsequent chemical analyses and reactions, including degradation, but not specifically that molecule.

Q   Nothing in your opinions in this case, I take it, relates to quantum density functional theory or dynamic Monte Carlo theory?

A   I mean, broadly speaking, these are methodologies to understand chemical systems,

| | |
|---|---|
| | 09:52:47 |
| | 09:52:49 |
| | 09:52:53 |
| | 09:52:57 |
| | 09:53:01 |
| | 09:53:03 |
| | 09:53:08 |
| | 09:53:14 |
| | 09:53:19 |
| | 09:53:20 |
| | 09:53:22 |
| | 09:53:28 |
| | 09:53:34 |
| | 09:54:17 |
| | 09:54:19 |
| | 09:54:27 |
| | 09:54:31 |
| | 09:54:35 |
| | 09:54:38 |
| | 09:54:42 |
| | 09:54:44 |
| | 09:54:48 |
| | 09:54:54 |
| | 09:55:06 |
| | 09:55:10 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                          37

including chemical reactions.  I don't think --
there may be -- there are so many references
here.  There may be references that employ those
sort of methods.

But as far as directly applying those
methods, I agree.  I don't think that your
witnesses or I have specifically applied them.
But they're related to broadly understanding
chemical reactions, including degradation, since
density functional theory is a way of
understanding -- as you correctly said, is a
quantum mechanical technique which is the way to
understand chemical reactive processes, also to
understand what processes aren't specifically
chemical reactive processes and differentiating
those.

Q    I guess the question is:  In the
specific opinions you present in your reports in
this case, I didn't see anything referring to any
form of quantum theory or Monte Carlo theory.  Am
I wrong about that?

A    No, that's correct.  I don't think I
referred to either of those explicitly in my
reports here.  Again, they might be in some of
the references.  But they're broadly related to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    38

understanding chemical processes, including --

well, I should have added thermodynamic

processes, but also, in particular, reactive

processes, quantum mechanical methods, as you

appropriately referred to it.

Q    And if we can -- again, going back to
your CV, you have a section that you call
"Philosophical Publications."

A    Which page?

Q    It's on page 24.  And -- do you see
that?

A    Yes.

Q    And --

A    I'm there.

Q    And the fifth one there is -- it looks
like a publication entitled "AI Ethics Education
in the AI Ethics Handbook."

I seem to recall you've also taught a course
in ethics.

A    Correct.

Q    In terms of ethics, would you agree
with me that when an author writes a paper, it's
important that they correctly quote from sources
they use when they're quoting?

MR. SCHULER:  Object to the form.

A    I mean, look, Counsel, there are people who write papers.  People can make mistakes.  In general, one, as I said, tries to be accurate. But that's the intention, to be accurate or should be the intention to be accurate.

Q    And that's true in terms of how one quotes from a source, correct?  It should accurately reflect words that you're quoting?

A    I mean, it can depend on certain reasons.  It might or may not be accurate.  I'm not sure what you have in mind, but broadly speaking, there are many authors who change even their own quotes, and part of understanding those authors' works is understanding the reason for those changes or quoting other people and making changes.  But if you have some -- something specific, we can certainly discuss that.

Q    If one were to quote from a source and leave out words without putting an ellipse in, is that appropriate from an academic integrity standpoint?

MR. SCHULER:  Object to the form. Incomplete hypothetical.

A    I guess it depends on the situation. Again, there might be reasons for it.  People can

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

40

make mistakes.  But the intention is -- it

depends, as I said.  There might be situations.

Q    Okay.  Would you agree there might be situations where that would be inappropriate, to quote from a source, leave out words, and not put an ellipse in?

A    I guess it could be appropriate or inappropriate.  It depends on the situation and the context.

Q    I take it in this case, you understand there are two patents-in-suit that I'll refer to, I guess, through the day as the '214 and the '248 patent?

A    Yes.  I think that's fine.

Q    And I take it you've read those patents?

A    Yes.

Q    Okay.  In overview, what is your understanding of the invention being claimed in those patents?

MR. SCHULER:  Object to the form.

A    I mean, I have a whole overview -- I'm on my opening expert report, starting on page 20 of the asserted claims.  I mean, I think the claims speak for themselves, but I have

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026 41

descriptions of them.  I can read them or go

through them.  I'm not sure -- the claims, I

think -- I've analyzed those claims throughout --

Q   In your report.  I know.

A   -- my reports and in responding to some

of Slayback's experts.

Q   I mean, how do you characterize those

claims, in summary?

What do you think has been invented here?

MR. SCHULER:  Objection.  Asked and

answered.

A   Well, again, I discuss those throughout

my reports.  I'm in my opening report on page 20.

I go through the claims.  I can -- I'm happy to

read them.  I'm sure you've read my report.  I go

through the claims in some detail.

I think the claims speak for themselves in

the context of the patents, and I have explained

that throughout in my reports and also responding

to Slayback's expert -- there might be others,

but the experts that I -- it was relevant for me

to respond to.

Q   Do you understand -- well, strike that.

In your own career, you are the inventor of

certain patents, correct?

10:01:55
10:01:58
10:02:01
10:02:05
10:02:06
10:02:09
10:02:16
10:02:18
10:02:21
10:02:24
10:02:25
10:02:28
10:02:32
10:02:38
10:02:42
10:02:45
10:02:49
10:02:53
10:02:56
10:03:00
10:03:05
10:03:07
10:03:09
10:03:22
10:03:27

A    I am an inventor in some patents.  I believe -- I can double-check.  It should -- all the inventors might not be in my CV, but I believe all of my patents have coinventors.

Q    And most of the litigations you've been involved in are also patent cases, correct?

A    I think that's fair.  Not all, but most.

Q    And do you have an understanding that in the pharmaceutical field, there are categories of patents that are called "new chemical entity patents"?

Have you ever heard that term?

A    I think I've heard that term.  I talk about claim types starting on page 13 of my opening report.  But I've had -- certainly have heard the term "new chemical entities."  I'll leave it to you as an attorney if that's a category, per se.

Q    And is it fair to say that the patents-in-suit here, the ones we talked about, you had reviewed the '214 and the '248 patent, do not claim a new chemical entity?

A    Well, I would just say, as I say here under this Section C, starting on page 13, that I

10:03:33
10:03:38
10:03:42
10:03:47
10:03:59
10:04:02
10:04:09
10:04:13
10:04:20
10:04:25
10:04:30
10:04:34
10:04:35
10:05:00
10:05:02
10:05:07
10:05:13
10:05:17
10:05:19
10:05:20
10:05:24
10:05:26
10:05:30
10:05:41
10:05:47

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                          43

was informed by counsel that the asserted claims of the '214 patent and '248 patent are "formulation" claims, also known as "composition" claims, which delineate specific components of the formulation.

So as I was informed by counsel, these are formulation claims, specifically not product-by-process claims.  I leave it to you if they can -- or counsel if they can be under different categories or not.  But that's -- they're not product-by-process claims.

Q    As you sit here today, do you know whether or not they should be considered new chemical entity patents?

A    Maybe you could help define "new chemical entity" in your -- because I think you're using it in a legal context.

Q    Well, I think historically, you would agree that bendamustine is a molecule that was created in 1963 or so, correct?

A    Yes.  I think we could figure out the exact year, but I think that's approximately correct, in the '60s, I believe.

Q    And, you know, at the time that was created as a new molecule, at least in theory,

10:05:54
10:05:57
10:06:01
10:06:07
10:06:11
10:06:15
10:06:19
10:06:22
10:06:29
10:06:33
10:06:36
10:06:38
10:06:40
10:06:43
10:06:52
10:06:55
10:06:58
10:07:01
10:07:04
10:07:08
10:07:16
10:07:18
10:07:21
10:07:24
10:07:28

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                44

one might get a patent on that molecule itself.

Do you understand?

A    Again, I leave it to you as the lawyer. I presume that's a possibility.  It seems reasonable.  It sounds like a legal question.  I don't know --

Q    Okay.

A    -- what the specifics were and if that was even a possibility.

Q    So that was sort of the question.  I think you've answered it, largely.  But the patents-in-suit are not claiming a new -- newly discovered molecule; they're claiming a formulation of an existing molecule, correct?

A    Again, I think that's fair.  They're -- as I say here, they're patent -- they're formulation claims, also known as "composition claims."

But I agree, bendamustine would have been known before the '214 and the '248 patents.

Q    And is it your understanding that the patents-in-suit are claiming a cure for cancer?

MR. SCHULER:  Object to the form.

A    If we're going to talk about the patents, maybe we should introduce them.

10:07:34
10:07:39
10:07:49
10:07:51
10:07:55
10:07:59
10:08:00
10:08:00
10:08:02
10:08:04
10:08:05
10:08:09
10:08:14
10:08:16
10:08:23
10:08:28
10:08:32
10:08:35
10:08:35
10:08:39
10:08:45
10:08:50
10:08:57
10:09:02
10:09:04

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    45

MR. LIEF:  If you want a copy.  Do we have those?                                             10:09:08 10:09:10

THE WITNESS:  Yes, please.                   10:09:12

MR. LIEF:  I'm sure we do somewhere.         10:09:13

But I'm also thinking we might as well -- you've got copies of them, and I'm going to assume they're complete, because our copies are -- have issues.                            10:09:18 10:09:21 10:09:22 10:09:25

MS. SPARSCHU:  No.  That's okay.             10:09:28

MR. LIEF:  But for your reports.  Maybe we should mark the opening report you're looking at as Trout Exhibit 2 instead of the print that I had that was a mess.                               10:09:31 10:09:32 10:09:36 10:09:41

The one you've been looking at could just be the deposition exhibit, if that's okay.        10:09:47 10:09:49

So make that 2.                              10:09:53

(Opening Expert Report of Dr. Bernhardt Trout, Ph.D. marked Exhibit 2.)        10:09:54 10:09:54

MR. LIEF:  All right.  So then -- we already marked what was Appendix B to your opening report, which was specific to Slayback, as Trout Exhibit 3.                               10:10:21 10:10:33 10:10:38 10:10:41

(Appendix B:  Slayback Additional Evidence of Infringement marked Exhibit 3.)    10:10:44 10:10:44

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026 46

BY MR. LIEF:

    Q   So I'll hand you that.

    A   Okay. Thank you.

    MR. SCHULER: Do you have one for me?

    MR. LIEF: Yeah, we should. I've got it. This is Appendix B., and that's Trout Exhibit 3.

    And then I'm going to hand you what we marked as Trout Exhibit 4, which was your reply report.

    (Reply Report of Bernhardt Trout, Ph.D. marked Exhibit 4.)

    THE WITNESS: Okay.

    MR. LIEF: And that is Trout Exhibit 4. We might as well just get them put away.

    That one is an issue. It didn't print well.

BY MR. LIEF:

    Q   Do you have a copy of your responsive expert report in the Slayback case?

    A   Yes.

    MR. LIEF: Okay. Maybe we'll just mark that as 5, because the one we have is also a misprint.

    (Responsive Expert Report of Dr.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                    47

Bernhardt Trout, Ph.D. marked Exhibit 5.)                                10:12:03

MR. LIEF:  If you could, for the                                10:12:10

responsive expert report in Slayback.                                10:12:10

And then we're going to mark as 6 --                                10:12:12

MR. SCHULER:  Wait.  So that's 5?                                10:12:13

MR. LIEF:  That's 5.  This is the                                10:12:21

responsive report.  That goes to the validity                                10:12:22

issue.                                10:12:24

MR. SCHULER:  Thanks.                                10:12:24

MR. LIEF:  Then we're going to mark as                                10:12:24

6 the '214 patent.                                10:12:26

(U.S. Patent No. 11,872,214 marked                                10:12:28

Exhibit 6.)                                10:12:28

MR. LIEF:  And we're going to mark as 7                                10:12:38

the '248 patent.                                10:12:41

(U.S. Patent No. 12,138,248 marked                                10:12:52

Exhibit 7.)                                10:12:52

BY MR. LIEF:                                10:12:52

Q    So that should give us some material to                                10:12:58

look at.  Some light reading material.                                10:13:00

So where were we?  On the '214 patent, I had                                10:13:10

asked you:  Do you understand that the claims to                                10:13:16

the '214 or, for that matter, the '248, represent                                10:13:22

a cure for cancer?                                10:13:27

A    My understanding is that these are                                10:14:19

formulation claims, as we've been discussing. 10:14:21

And I have, for example, on page 13 of my report, 10:14:26

that they're formulations that are intended and 10:14:35

actually are used to treat cancer, certain types 10:14:39

of cancer, if that's what you had in mind. 10:14:45

Q    Do the formulations set forth in the 10:14:49

claims of the '214 and the '248 patent represent 10:14:50

an advance in treating cancer over prior 10:14:58

compositions that contained bendamustine? 10:15:02

MR. SCHULER:  Object to the form. 10:15:06

A    Well, they are an advance.  And I 10:15:36

discuss this, I think, many places.  But for 10:15:38

example, in my section of my opening report, 10:15:42

Exhibit No. 2, Roman numeral capital V, 10:15:49

paragraph 57, where I state the advantages and 10:15:57

then -- I'm sure you've read it.  I don't have to 10:16:05

reread the whole thing. 10:16:08

But it says, the last sentence:  "The 10:16:10

inventors in the asserted patents address these 10:16:13

problems" -- that was discussed earlier in the 10:16:16

paragraph -- "by describing and claiming liquid 10:16:19

bendamustine compositions comprising novel 10:16:23

combinations of ingredients suitable for 10:16:26

long-term storage." 10:16:28

So it's an advance in that sense.  And I 10:16:31

elaborate further throughout, of course.

Q    Do you have any understanding that the use of the patented compositions results in better survival rates for patients as compared with, say, a lyophilized bendamustine formulation?

A    I'm not sure.  I haven't seen that data, as far as I recall.  If there's something in my reports, plural, I think we can go to that.

I think they're helpful in addressing the problems that I discuss and are therefore beneficial.  In particular, the aqueous formulations were not suitable for "long-term storage in liquid form."  And then the reconstitution of the formulations was "clinically inconvenient."

And those are from paragraph 57 of my opening report, Exhibit 2.  And they're both quotes from the '214 patent.

Q    Other than those benefits, are there any other benefits you're aware of that flow from the formulations claimed in the '214 and '248 patents?

MR. SCHULER:  Object to the form.

A    This is a summary.  I guess we can

10:16:37
10:16:41
10:16:42
10:16:49
10:16:51
10:16:54
10:17:15
10:17:19
10:17:23
10:17:27
10:17:34
10:17:39
10:17:42
10:17:47
10:17:51
10:17:53
10:17:56
10:18:00
10:18:04
10:18:09
10:18:12
10:18:16
10:18:20
10:18:23
10:18:44

discuss -- I think I discuss benefits throughout.

I think the key benefits from an application standpoint are summarized in 57.  I can go through -- sorry -- in paragraph 57 of my opening report.

I could go through.  I'm sure I discuss benefits broadly throughout.  I can do that. There's quite a few pages, if you'd like.  I would treat this as a summary.  It's at the very beginning of my opening report.

Q    From your perspective, is there any reason to believe that a patient treated with reconstituted bendamustine from a lyophilized product would do better or worse if they were treated with the formulations of the '214 and '248 claims?

MR. SCHULER:  Object to the form.

A    My understanding from my extensive experience over the years in pharmaceutical formulation and its application -- and you may have noticed that some of my recent work was on a new approach to lyophilization to make it more efficient, potentially make reconstitution more efficient -- is that reconstitution, consistent with what the '214 patent says, is "clinically

10:18:48
10:18:52
10:18:57
10:19:00
10:19:04
10:19:06
10:19:09
10:19:13
10:19:16
10:19:19
10:19:22
10:19:24
10:19:28
10:19:34
10:19:39
10:19:45
10:19:48
10:19:55
10:20:00
10:20:02
10:20:07
10:20:11
10:20:15
10:20:19
10:20:24

inconvenient," and so having a liquid composition like in the claims that's suitable for long-term storage is useful. It creates -- creating more clinical convenience, helps make clinicians more efficient, hospitals more efficient.

So it was well known to be an advancement, not necessarily easy to achieve, which is why we still, in 2026, work on lyophilization. But it's -- so -- so convenience, in the end, is good for patients.

Q Do you have any reason to believe that once the bendamustine drug is introduced intravenously to the patient that there's a difference in the clinical outcome if the original bendamustine product was lyophilized, meaning freeze-dried, or was a liquid composition, as called for in the claims of the '214 and '248 patent?

MR. SCHULER: Object to the form.

A Is there anything in my reports you're referring to or --

Q I don't think so. I mean, I think -- I don't think you have an opinion on this. I'm just trying to pin that down.

Like -- let me ask you this, before we come

back to that.

You're not a medical doctor, correct?

A    That's correct.

Q    And you -- have you been involved with clinical studies from the -- well, have you been involved with clinical studies?

MR. SCHULER:  Object to the form.

A    Yes, I've been involved with clinical studies, and I've certainly read about clinical study results in my over 20 years in the field.

Q    Right.  And are you aware of any clinical studies that say for the exact same drug molecule that the clinical outcome for a patient who is treated with a lyophilized formulation is better or worse than a patient who is treated with a liquid composition of the same drug?

MR. SCHULER:  Object to the form.

THE WITNESS:  Sorry.  Someone is knocking.

A    Do you mind just repeating that?

MR. LIEF:  Yes.  Can you read that back, because I won't get it exact.

MR. SCHULER:  Just remind me what his response report was.  No. 6?  5?

MR. LIEF:  I believe it's 5, yes.

MR. SCHULER:  Thank you.

(The question was read by the reporter, as requested.)

THE WITNESS:  Thank you.

A    I have not done that analysis, per se, because I've done the analysis that I've done, which shows the benefits.  I think -- it hasn't been an issue in the case.

Q    Okay.

A    But, again, I can tell you that going from a lyophilized to a liquid form, for the reasons that I've been mentioning and the patent mentions, is important.

Q    Okay.  And so is it fair to say that for purposes of this litigation, you will not present an opinion that the patented compositions of the '214 and '248 patents produce an improvement in cancer survival in patients as compared with a lyophilized bendamustine?

A    I don't intend to at this point, but things could change.  I'm not sure what might happen in litigation.  If it becomes appropriate, I might.  I haven't done that so far, as we've been discussing.

Q    As you sit here today, are you aware of

any evidence that the patented formulations from the '214 and '248 claims produce better cancer survival as compared with a lyophilized bendamustine product?

A    As I sit here, I don't have numbers on the cancer survival rates or I haven't done an analysis, per se.

Again, the advantages of the patents are addressing the problems that I've been mentioning, including this clinical inconvenience, which I'm now not directly quoting, because it would be an adverb, "clinically inconvenient," in the patent.  I know you want quotes to be accurate.

Q    Okay.  All right.  Good.

Just as a housekeeping thing, have we already marked the responsive report as Exhibit 5?  Do you have a marked copy of that already?  It might be your copy, but -- we do, it looks like.

MS. SPARSCHU:  We should.

A    Yes.

MR. LIEF:  This can sit to the side, then.  Okay.

10:25:39
10:25:43
10:25:50
10:25:54
10:26:04
10:26:08
10:26:16
10:26:17
10:26:21
10:26:23
10:26:26
10:26:29
10:26:31
10:26:35
10:26:39
10:26:44
10:26:47
10:26:50
10:26:53
10:26:59
10:27:01
10:27:02
10:27:03
10:27:04

BY MR. LIEF:

Q    In reviewing the patents-in-suit, I take it from your prior answer you came to an understanding that the compositions claimed here are nonaqueous formulations, correct?

MR. SCHULER:  Object to the form.

A    I would say, broadly speaking, from a chemistry standpoint, yes.  I know that that was part of a past litigation, which I refer to.  I can try to find that.

Again, as I discuss in my reports -- we can go to the sections -- there's going to be water present.  But if you want to refer to these as nonaqueous, with that understanding and the opinions in my reports on water, then that's fine with me.

Q    When you say "there will be water present," what do you mean by that?

THE WITNESS:  I apologize.  Is it possible to make this a little longer, just a little bit, so can I put it over the corner here?  Great.  Thank you.  Get it out of the way.

MR. SCHULER:  Just for my edification, do you have numbers on all of the things you're looking at?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    56

THE WITNESS:  Oh.

MR. SCHULER:  And if you don't, look at the one that does have a number.  If you only have ones that --

MR. LIEF:  Yeah, let's make sure we have because -- so the responsive report should be 5, and you should have a copy of that marked.

THE WITNESS:  Yes.

MR. LIEF:  The opening report is 2.

THE WITNESS:  Okay.

MR. LIEF:  And then there's a reply report, which I believe we've marked already.

THE WITNESS:  Yes.  I have the reply -- now I have -- thank you.  Okay.  Because these, I have not looked through to verify the Exhibits 3 and 4.  The others, I brought.  Exhibits --

MR. SCHULER:  I don't care if you put numbers on them yourself.  I just want to make sure that when you refer to something, you can tell counsel what number you're looking at.

THE WITNESS:  Okay.

MR. LIEF:  So if you prefer to look at the ones that are spiral bound, put your number on it.  Otherwise, please look at the one that counsel has put a sticker on.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                          57

Do you understand what I'm saying?                    10:30:43

THE WITNESS:  Yes.                                    10:30:45

MR. LIEF:  Let's try for the stickered               10:30:46
ones at this point, unless you find something --      10:30:47

MR. SCHULER:  Right.  That's fine.                    10:30:50

MR. LIEF:  -- wrong.                                  10:30:51

MR. SCHULER:  Okay.                                   10:30:53

     A    Okay.  So I discuss water throughout my     10:30:53
four reports.  But I have, I think, a good            10:31:53
discussion -- it's not the only one, but in my        10:31:59
reply report, which is Trout Exhibit No. 4.           10:32:05
Again, this is not the only place, but page 73,       10:32:12
starting on page 73.                                  10:32:20

     I'll wait until you get there.  It's             10:32:26
Exhibit 4.                                            10:32:37

     Q    Yeah. Go ahead.                             10:32:38

     A    Page 73, I can summarize what I mean.       10:32:41
For example, this is really page 74,                  10:32:49
paragraph 161.  I note "Water is entirely absent      10:32:53
from both labels," so Slayback's December 2022        10:33:01
label or its revised 2024 label.                      10:33:08

███████████████████████████████    I            10:33:14
discuss that, but I want to get -- I think that's     10:33:20
important, but I want to get to the point.            10:33:23

████████████████████████████████                      10:33:34

And I also note -- again, I have a lot of opinions on this.

And then I'm just -- and then starting at the bottom of page 79, I think I may as well just quote it, starting one line from the bottom, two lines up.

And then...

And I discuss at other points we can find

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    59

████████████████      ████████████████████      10:35:42

██████████████████████████████      10:35:44

██████████████████████      10:35:47

Q    Setting aside for the moment Slayback's product, I believe in the prior answer, before this discussion, when I said to you, you know, what did you mean when you said "There will be water in it," I was asking about the patents themselves.

What is your understanding of how much water the patents permit?

MR. SCHULER:  Object to the form. Incomplete hypothetical.

A    Oh, well, sorry if I wasn't clear. █

██████████████████████████████      10:36:30

████████████████████████      10:36:35

██████████████████████████████      10:36:38

████████████████████████████      10:36:44

██████████████████████████████████      10:36:49

██████████████████████████████      10:36:55

████████████████████████      10:37:00

██████████████████████████████████      10:37:03

██████████████████████████████      10:37:10

██████████████████████████████      10:37:13

████████████████████████      10:37:17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    60

Q    Okay.  And so in your understanding of the claims, your view of nonaqueous includes a certain level of water, nonetheless?          10:37:24 / 10:37:27 / 10:37:39

MR. SCHULER:  Object to the form. "Understanding of the claims."          10:37:46 / 10:37:46

I'll object to the extent that it misstates the claim language.          10:37:53 / 10:37:55

Do you need the question back?          10:37:58

MR. LIEF:          10:37:59

BY MR. LIEF:          10:37:59

Q    Well, I think we've agreed that you understand this invention as claimed to be for a nonaqueous formulation, correct?          10:38:00 / 10:38:02 / 10:38:06

MR. SCHULER:  Objection.  Asked and answered.          10:38:08 / 10:38:09

A    I don't think that's quite correct.  I think you asked me something like the formulation is nonaqueous, and I think I referred to previous litigation of that term in particular and said I can answer it just from a broad chemist's perspective, and then that, as we've just been discussing, a skilled person would understand that water is almost assuredly going to be present.          10:38:13 / 10:38:18 / 10:38:23 / 10:38:29 / 10:38:32 / 10:38:35 / 10:38:40 / 10:38:44 / 10:38:50

And I can go through again, but I just          10:38:50

discussed various specifications, ███████

█████████████████████████

███████████████████████████████

██████

Q    Does the past --

A    Excipients that allow water as a potential process aid.  I'm just summarizing the previous --

Q    No.  You said that already.

Does the patent define how much water is permissible in the claimed compositions?

MR. SCHULER:  Object to the form.

A    I believe that you said "the patent."

Q    Well, the patents-in-suit.  Excuse me. Do the patents-in-suit define how much water would be permissible in the claimed compositions?

MR. SCHULER:  Object to the form.

A    I certainly have read these patents many times, but I don't have them memorized.  If you want me to give you a fully accurate answer, I would want to go through these again.

███████████████████

████████████████████████

███████████████████████

█████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                62

Q    And, again, my question is:  Setting aside Slayback's specification or anyone else's specification, does the patent itself give a specific percentage of water that is permissible for the claimed compositions?

MR. SCHULER:  Same objection.  The patent speaks for itself.

A    So, again, I can go through these again, if you'd like me to.

Q    I will represent to you --

MR. SCHULER:  Hold.  Whoa, whoa, whoa. Let him finish.

MR. LIEF:  Well, he's giving very long answers, and I want to get to a certain concept here.

A    But -- I'm sorry.  Do you not want me to answer?

Q    Let me interject for a moment because I think this is -- you said this before.

MR. SCHULER:  Can you withdraw the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                              63

question?

      MR. LIEF: That's neither here nor there.

      MR. SCHULER: Whoa, whoa. He has to be able to finish his answer. In court, you don't get to say, I'm stopping the witness's answer.

      MR. LIEF: Okay. I don't know that I agree with that.

      MR. SCHULER: Were you finished?

      THE WITNESS: No, I wasn't finished.

BY MR. LIEF:

    Q   How is what you're about to say different than what you said in your prior answer, that you could go through the patent again?

    A   Well, I don't think that's a fair summary of my prior answer. I think I also referred to how the skilled person would understand the claims.

    And, again, I want to be clear, because I think you didn't quite present my answer clearly.

10:42:09
10:42:10
10:42:11
10:42:12
10:42:13
10:42:15
10:42:18
10:42:19
10:42:23
10:42:24
10:42:26
10:42:26
10:42:28
10:42:30
10:42:32
10:42:35
10:42:38
10:42:42
10:42:45
10:42:49
10:42:52
10:42:57
10:43:02
10:43:04
10:43:09

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                    64

[black redaction bar] — 10:43:14

[black redaction bar] — 10:43:17

[black redaction bar] — 10:43:20

[black redaction bar] — 10:43:24

[black redaction bar] — 10:43:28

Q    Given that, how would the skilled person -- what would the skilled person understand to be the limit of water permissible in the claimed compositions?

MR. SCHULER:  Object to the form. Incomplete hypothetical.

A    The skilled person would understand that water could be present, and as long as a particular -- well, as long as, I guess, looking at Claim 1 of the '214, the sterile vial contains the components here, as I've explained throughout my reports, a skilled person would understand that some water can be present.

And, again, I mentioned this earlier, but not in the context of this particular question. But we focused on the lyophilization.  But now I'm going back to my opening, Exhibit 2, the -- I lost the place.  Paragraph 57, where I noted "The reconstitution of water, which caused the bendamustine within to degrade rapidly," it's

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    65

well known that bendamustine can degrade if it's -- over time if it's in contact with enough water.  So the skilled person would understand that also.

Q    Now, in those answers, I believe you said that the skilled person would understand that some water can be present in the claimed compositions.

Can you put a number on what "some" means?

MR. SCHULER:  Object to the form. Incomplete hypothetical.

A    I mean, there's not a specific numerical amount.  It's a qualitative amount, as I've discussed in my reports.

Q    In a formulation where no aqueous ingredient or inactive ingredient is added, would there be water present as well?

MR. SCHULER:  Object to the form.

10:45:09
10:45:12
10:45:15
10:45:17
10:45:18
10:45:21
10:45:24
10:45:27
10:45:28
10:45:36
10:45:36
10:45:38
10:45:44
10:45:50
10:45:56
10:46:00
10:46:08
10:46:12
10:46:16
10:46:22
10:46:26
10:46:27
10:46:31
10:46:35
10:46:40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

66

Incomplete hypothetical.

A    I didn't understand, actually, let alone incomplete.

Q    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

MR. SCHULER:  Objection.  Misstates the prior testimony.

A    No.  That's not an accurate summary.

Q    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

MR. SCHULER:  Objection.  Misstates the label.

MR. LIEF:  Strike that.

BY MR. LIEF:

Q    Do you have an understanding that compositions can have what is called "adventitious" water in them in the pharmaceutical field?

MR. SCHULER:  Object to the form.

A    We can call it adventitious.  We can call it impurities.  We can call it residual.  I think I've been calling it impurities or a processing aid ▓▓▓▓▓▓▓▓▓▓ but -- so as I -- I mean, I won't go

back, but I discussed this already in

paragraph 165 and paragraphs 171 of my reply

report, Exhibit 4.  So I just want to note my

answer there.

Q    Okay.  So if I understand what you just
said, do you or do you not make a distinction
between small amounts of moisture that get into a
pharmaceutical from the environment as
differentiated from water that is deliberately
added as an ingredient?

MR. SCHULER:  Object to the form.
Incomplete hypothetical.

A    I'm trying to find the place where I
refer to this, but I specifically address this
point in surely the same section.  I'm trying to
find the exact statement on impurities.  I have
multiple times.  I don't know where.  I can find
it, though.

So I think the best place is still in that
section starting on page 73 of my reply report.
Again, Exhibit No. 4.  Starting out in
paragraph 158, I refer to █████████████████

10:47:53
10:47:55
10:48:04
10:48:09
10:48:11
10:48:14
10:48:19
10:48:25
10:48:29
10:48:33
10:48:36
10:48:36
10:49:45
10:49:48
10:49:50
10:49:58
10:50:03
10:50:10
10:50:58
10:51:02
10:51:08
10:51:13
10:51:17
10:51:23
10:51:26

██████████████████████████████     10:51:32

████████████████████     10:51:36

████████████████████████████     10:51:39

██████████████████████████████     10:51:44

█████████████████████████████     10:51:49

█████████████████████     10:51:52

Q    I want you to focus for this question solely on the patents-in-suit.

Am I correct that the patents-in-suit do not mention sodium hydroxide anywhere?

MR. SCHULER:  Object to the form.

A    Again, I know the patents pretty well. I don't have it memorized.  I can go through. Let me -- without going through line by line, let me see if I can... again, I just skimmed through this.  I could go through in more detail.

I don't think -- this can be confirmed.  If you'd like me to, I can go through it.  I don't think the patents specifically mention sodium hydroxide.  I think the skilled person would understand that pH is an aspect of pharmaceutical formulation.  I discuss this in places in my report, and certainly sodium hydroxide is one of the most prevalent pH-adjusting agents, and I discuss this in my reports.  We can find that

place too if you'd like.                                    10:54:20

          MR. LIEF:  I think we've been going for        10:54:22

a while.  It might be a good moment for a break.           10:54:23

          THE VIDEOGRAPHER:  We are going off the        10:54:28

record.  The time is 10:54.                                10:54:29

          (A recess was taken.)                           10:54:31

          THE VIDEOGRAPHER:  We are going back on        11:11:47

the record.  The time is 11:11.                            11:11:48

BY MR. LIEF:                                                11:11:51

     Q    Okay.  Dr. Trout, during the break, did       11:11:52

you have any conversations with your counsel?              11:11:58

          MR. SCHULER:  Object to the form.              11:12:03

     A    Just chatting.  I don't even remember.        11:12:04

Chatting about nothing important.                          11:12:08

     Q    Nothing substantive about your                11:12:13

testimony?                                                 11:12:15

     A    No, no.                                        11:12:16

     Q    So returning to the patents-in-suit,          11:12:19

the '214 and the '248, again, can you confirm for         11:12:21

me that there's no discussion in the                       11:12:26

patents-in-suit of a pH adjuster either?                   11:12:29

     A    I'm just refreshing my memory, flipping       11:13:53

through.  I don't see the term "pH adjuster," but         11:13:56

certainly there's -- as you know, I'm sure, pH is         11:14:02

a parameter, let's say, that's quite prevalent in         11:14:08

pharmaceutics. There's acids mentioned, lipoic acid, for example. I think we're all familiar with acids and bases as related to pH, so the skilled person would understand that pH could be relevant.

Q In the context of the patents-in-suit, lipoic acid is referred to as an antioxidant, correct?

A Well, for example, I'm in the '214 patent, column 8, line 15. It's referred to as a "stabilizing antioxidant."

Again, I'm just pointing out that pH is directly related to acid-base chemistry. The term "acid" is used, and the skilled person could understand that pH could be generally applicable in the pharmaceutical field.

Q In the context of the claimed compositions of the patents-in-suit, would you understand lipoic acid to have multiple functions as a pH adjuster and an antioxidant?

MR. SCHULER: Object to the form. Incomplete hypothetical.

A No. I think in the context -- we can look at Claim 1 of the '214, for example, lipoic acid would fall under a stabilizing amount of an

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                               71

antioxidant, as is stated in column 8.  It                    11:16:27

says -- explicitly refers to it as "a stabilizing            11:16:34

antioxidant."                                                11:16:39

    My point was that a skilled person would        11:16:41

think of pH as generally relevant to                         11:16:50

pharmaceuticals, and the term "acid" is directly             11:16:54

related to pH.  It's just an example.  It's not              11:16:58

pH, per se, of course.                                       11:17:02

    Q    Is there anything in the                       11:17:04

patents-in-suit that you would consider a pH                 11:17:06

adjuster?                                                    11:17:13

    A    Oh, that was -- sorry.  I didn't             11:17:20

understand that was the end of your question.                11:17:22

        MR. SCHULER:  Object to the form.          11:17:26

    A    Oh, and I should just mention at the        11:18:31

bottom of column 4 of the '214, this is what I               11:18:36

was looking for before.  Sodium is explicitly                11:18:40

mentioned here.  Of course, sodium chloride, not             11:18:43

sodium hydroxide, but just to indicate the                   11:18:48

prevalence of sodium.                                        11:18:51

    As far as a pH adjuster, again, I would          11:18:54

agree, I don't see an explicit mention to that.              11:19:04

I think the skilled person would understand that             11:19:09

it's part of pharmaceuticals, and to the extent             11:19:11

that one were needed or wanted to be introduced,            11:19:15

I can say this.  We can find in my reports.  But
that would fall under the "comprising" claim.
But that's a brief summary.

Again, I think the skilled person would
understand the pH adjusters are potentially part
of -- well, are part of pharmaceuticals and could
potentially be used in a given formulation.

Q    If you look at the claims of the '214
patent, to start with, am I correct that in those
claims, the word "solvent" does not appear?

A    So I agree that the word "solvent" is
not in the claim.  However, as I've discussed
extensively that the pharmaceutical acceptable
fluid consisting of polyethylene glycol and
optionally one or more of those other components
would be understood to be a solvent.  For
example, I'll just refer to Exhibit 2, my opening
report.  Paragraph 62 on page 16 talks about
solvents explicitly and the pharmaceutical
solvents, which are explicitly referred to in
that limitation in the claim.

I also talk about how the skilled person
would understand the claim structure and the
specific claims.  For example, on page 25, the
same report, paragraph 105, that each of those is

| | |
|---|---|
| | 11:19:19 |
| | 11:19:24 |
| | 11:19:27 |
| | 11:19:30 |
| | 11:19:32 |
| | 11:19:35 |
| | 11:19:39 |
| | 11:19:58 |
| | 11:20:03 |
| | 11:20:10 |
| | 11:21:32 |
| | 11:21:39 |
| | 11:21:43 |
| | 11:21:49 |
| | 11:21:54 |
| | 11:21:59 |
| | 11:22:02 |
| | 11:22:07 |
| | 11:22:14 |
| | 11:22:18 |
| | 11:22:21 |
| | 11:22:25 |
| | 11:22:28 |
| | 11:22:31 |
| | 11:22:38 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

73

a solvent and that the skilled person would
understand their function.

Again, I discussed this over many pages, but
that would be a summary at the beginning.

Q    And in the '248 patent, would you agree
with me, looking at that, that none of the claims
use the word "solvent"?

A    Again, I would give the same answer.
For the record, just looking at Claim 8, for
example, the top of Column 14 of the '248,
basically same is as Claim 1 of the -- same place
as Claim 1 of the '214.

I agree the word "solvent" is not explicitly
in there, but the skilled person would understand
the "wherein the pharmaceutically acceptable
fluid consists of polyethylene glycol and
optionally one or more of..." these other four
components, that that those are the solvents,
vehicle, carrier, and I think that explanation is
throughout my reports.

But, again, I would just refer, for example,
to paragraph 62, and the other paragraph is 105
of my opening report and the other discussion,
which explains that they would be understood to
function as solvents.

Q  To your understanding, apart from the patents and apart from the case, in science, has the definition of the word "fluid" changed between 2009 and the present?

MR. SCHULER:  Object to the form. Incomplete hypothetical.

A  So you're not talking about the patents?

Q  Correct.  Just in science, the standard, ordinary definition of the word "fluid," has it changed since 2009 to the present day?

A  Well, I would say that the term "fluid" has not changed since 2009.  The question is what is its meaning in a particular context; for example, whether it's aeronautics, physics, whether it's pharmaceuticals, whether it's specifically in the '214 or the '248 patents here.

And I have a feeling we'll discuss it a lot, so I can go to my reports, but you know I discuss the liquid and the fluid extensively in my reports.  We can go to that, if you have anything more specific.

Q  Well, it is fair to say, I think, that

11:24:37
11:24:41
11:24:46
11:24:50
11:24:56
11:24:58
11:25:02
11:25:03
11:25:04
11:25:07
11:25:10
11:25:13
11:25:19
11:25:28
11:25:33
11:25:38
11:25:43
11:25:46
11:25:49
11:25:52
11:25:57
11:26:00
11:26:02
11:26:05
11:26:06

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    75

your opinion in this case is that the word
"fluid" in these claims should be interpreted as
"solvent."

            MR. SCHULER:  Object to the form.
These reports speak for themselves.

     A    No, I don't think that's exactly
correct.  I don't -- that's not a quote.  I'm not
replacing words.  I'm explaining how the skilled
person would understand the claims in light of
the claim construction.

     And, again, I'm just referring to the
beginnings.  We can refer to other places, but in
that paragraph 110, I say that "Each
pharmaceutically acceptable fluid listed in the
claims, polyethylene glycol, polypropylene
glycol, ethanol, benzol alcohol, and glycofurol
are solvents for bendamustine used to dissolve
poorly soluble or unstable actives to form
injectable solutions."

     And then I explain this in many, many pages.
We can discuss the understanding.

     Q    Is it not your position in this case
that the word "fluid" in the claim should be
interpreted as meaning a solvent or a co-solvent
or a solvent system?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

76

MR. SCHULER: I'll object. The reports speak for themselves. If you have a particular paragraph, feel free to ask him about it.

A That's what I was going to ask. If you have a particular paragraph in mind or is there something you want to refer to?

Q Just -- and this is so fundamental to your opinions that I thought it was uncontroversial that your view is that the word "fluid" in the claim, according to your view, is that it means a solvent.

MR. SCHULER: Same objection. I think he's repeated his opinions multiple times. The reports speak for themselves.

MR. LIEF: I don't think I've heard an answer, Counsel.

BY MR. LIEF:

Q I mean, if that's not your view and you think "fluid" means other things than "solvent," I'd like to know about that, because I didn't perceive that in the report.

MR. SCHULER: Again, I'll object. I think he keeps referring you to the entire phrase at issue, and you keep trying to isolate it to the word "fluid."

| | |
|---|---|
| 11:27:43 |
| 11:27:44 |
| 11:27:47 |
| 11:27:49 |
| 11:27:50 |
| 11:27:53 |
| 11:27:55 |
| 11:27:55 |
| 11:27:59 |
| 11:28:03 |
| 11:28:06 |
| 11:28:11 |
| 11:28:12 |
| 11:28:16 |
| 11:28:18 |
| 11:28:19 |
| 11:28:20 |
| 11:28:21 |
| 11:28:23 |
| 11:28:27 |
| 11:28:29 |
| 11:28:37 |
| 11:28:38 |
| 11:28:40 |
| 11:28:43 |

MR. LIEF:  Well, I do want and our position is that the word "fluid" needs to be construed.  And so I want to know --

MR. SCHULER:  I think you waived any request -- you stipulated to the word "fluid."

MR. LIEF:  No, we didn't.

MR. SCHULER:  Yeah.

MR. LIEF:  That's not true.

MR. SCHULER:  Did we not reach -- I'm sorry.  I thought we submitted an agreed construction.

MR. LIEF:  No, that's not true.  The word "fluid" was never construed, and I want to know when has an opinion about what "fluid" means in the claim.

MR. SCHULER:  Where did you disclose this construction dispute?

MR. LIEF:  I don't think --

MR. SCHULER:  What contention or expert report?

MR. LIEF:  Well, number one, you're burning my time with the colloquy --

MR. SCHULER:  You just said there's a fundamental dispute, and I'm asking you where it is --

11:28:45
11:28:46
11:28:49
11:28:52
11:28:53
11:28:57
11:28:58
11:28:58
11:29:00
11:29:00
11:29:03
11:29:04
11:29:05
11:29:08
11:29:11
11:29:12
11:29:13
11:29:16
11:29:17
11:29:19
11:29:19
11:29:21
11:29:22
11:29:23
11:29:25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                78

MR. LIEF:  I think --

MR. SCHULER:  -- where it was raised.

MR. LIEF:  I think, quite clearly, it's developed throughout the case.  And I think that it was evidently clear to me that his position was that the word "fluid" means solvent.

MR. SCHULER:  Okay.  I'll take that at face value.  Could you just point me to a paragraph in his report where it says that?

MR. LIEF:  In his report.

MR. SCHULER:  Then find one paragraph.

MR. LIEF:  I don't need to do that.  I don't have it in front of me.  But he should know.

MR. SCHULER:  You have all the reports in front of you.

MR. LIEF:  I mean, is --

BY MR. LIEF:

Q    Let me ask you this:  Is it your view that the phrase "pharmaceutically acceptable fluid" must mean solvent?

A    I don't think that that is completely accurate, and that's why I'm going back and explaining.  The skilled person, how the skilled person would understand the whole limitation,

wherein the -- I'm looking at Claim 8 of the

'248 -- would understand when the

pharmaceutically acceptable fluid consists of

polyethylene glycol and optionally -- and the

other components that I already read those, I'm

not substituting words. I am explaining in those

paragraphs and other paragraphs -- for example,

now I've gone to paragraph 144, which is a

summary of that section, page 47 of my opening.

Taken as a whole, these disclosures show a

consistent and uniform disclosure: The

"pharmaceutically acceptable fluid" is the

solvent medium. And then those are specifically

referring to disclosures in the specification of

the patents.

So I'm explaining how the skilled person

would understand that limitation. I'm not just

substituting words.

Q So maybe you've expanded from the word

"fluid" to the phrase "pharmaceutically

acceptable fluid." But am I wrong to understand

your opinion to be that "pharmaceutically

acceptable fluids," for purposes of these claims,

are solvents?

MR. SCHULER: I'll object to the extent

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026            80

that you're misstating his prior testimony.                    11:32:01

A    I think that's just a bit off,                          11:32:05
Mr. Lief.  I am showing, explaining, let's say,                11:32:09
how the skilled person would understand that                   11:32:16
limitation, which certainly includes the words                 11:32:19
"pharmaceutically acceptable fluid," but it                     11:32:23
continues "consists of polyethylene glycol" and                11:32:27
then optionally the other components.  And                     11:32:31
I've --                                                         11:32:34

Well, you asked again, so I'm trying to                         11:32:36
clarify.  And then in those paragraphs that I                   11:32:38
refer to -- and I can keep going, because I talk                11:32:40
about this --                                                   11:32:42

Q    I understand --                                         11:32:44

A    -- throughout --                                        11:32:45

MR. SCHULER:  Don't interrupt him.                  11:32:45

MR. LIEF:  No.  No.                                 11:32:47

A    -- any explanation of how the skilled                  11:32:47
person would understand that limitation.                       11:32:49

Q    Is it your view that the                               11:32:53
"pharmaceutically acceptable fluid" phrase before              11:32:55
the words "consisting of" is defined by the words              11:33:00
that follow "consisting of"?                                   11:33:03

MR. SCHULER:  Object to the form.  And             11:33:08
also, repeat that his reports speaks for                       11:33:12

themselves. 11:33:16

THE WITNESS:  Yeah, I don't think I used -- and, again, it looks like you're not referring to anything specific.  I don't recall using the word "defined."  I think I've explained how I think the skilled person would understand this and why.  But if there's someplace where I use the word "defined," we should clarify. 11:33:17 11:33:17 11:33:20 11:33:22 11:33:28 11:33:32 11:33:36

Q   I think you just, in your prior answer, defined it that way. 11:33:39 11:33:41

But to ask it differently, do "pharmaceutically acceptable fluids" have any additional definition beyond "solvents," to your understanding, in this case? 11:33:42 11:33:46 11:33:53 11:34:00

MR. SCHULER:  Object to the form. 11:34:03

A    I mean, I use different terms.  I believe "carrier" is another term, "vehicle." But, I mean, it's really throughout my reports, I'm explaining how the skilled person would understand. 11:34:09 11:34:14 11:34:17 11:34:21 11:34:23

And, again, it's not just that -- those three words; it's the limitation.  And for all reasons I mentioned, I would just refer to my previous answer.  This is how the skilled person would understand.  They are solvents. 11:34:24 11:34:27 11:34:31 11:34:33 11:34:37

Q    Exactly.                                          11:34:44

A    No, those are solvents.                           11:34:44

Q    Exactly.                                          11:34:46

A    It's not a def- -- okay.                          11:34:48

Q    Okay.                                             11:34:49

A    Literally, that's --                              11:34:49

Q    That's your position, correct?                    11:34:53

A    I literally -- I literally said this              11:34:54
in -- where is it now?  Oh, sorry.                     11:34:58

Q    It's fine.                                        11:35:04

A    I literally said this in a previous               11:35:05
answer that those -- at the very beginning of my       11:35:06
report and throughout that those five components       11:35:10
are solvents for bendamustine, that one has to         11:35:14
understand the limitation in the context as a          11:35:18
whole and not pull apart words, per se.                11:35:23

Q    Okay.                                             11:35:27

A    If that answers your question,                    11:35:28
hopefully.                                             11:35:29

Q    I think it does explain your position.            11:35:30

A    Okay.                                             11:35:33

Q    Now, given that answer, isn't it fair             11:35:33
to say that your understanding of the three            11:35:37
words, "pharmaceutically acceptable fluid,"            11:35:42
depends on what follows the words "consisting         11:35:48

of"?                                                    11:35:51

          MR. SCHULER:  Objection to the form.          11:35:53

And you're continually misstating his prior            11:35:54

testimony.  It's -- but go ahead.                      11:35:56

     A    I would just answer again.                    11:36:04

     I looked at all the intrinsic evidence here,       11:36:08

including that specific limitation, the whole           11:36:15

limitation, which I've summarized.  I actually          11:36:18

didn't repeat the whole one, but I've summarized        11:36:22

it.  I think we know what we're talking about.          11:36:25

     I discuss it multiple places, starting             11:36:28

towards the beginning of my opening report.  And        11:36:30

we can go through all of that.  I have a lot --         11:36:32

lot of discussion.  It's an important aspect of         11:36:35

the case.                                               11:36:38

     Q    For purposes of this case, have you           11:36:39

formed any view of what the word "fluid" alone          11:36:43

means in the claim?                                     11:36:49

          MR. SCHULER:  Objection.  His reports         11:36:55

speak for themselves.                                   11:36:56

     A    Well, we can keep going.  I started at        11:37:25

the beginning, but we can keep going through my         11:37:27

opening report, Exhibit 2.                              11:37:30

     I have a whole section on "pharmaceutically        11:37:35

acceptable fluid," starting on page 67.  So you         11:37:38

asked specifically about the word "fluid." "Fluid" is part of that phrase, which is part of the whole limitation, which includes the specific five solvents in that limitation.

And, I mean, I can go through this, but it's basically what I said before.  It's understood as part of the limitation as the skilled person would understand it as I've elaborated.  Again, I think it's in each of my reports.

And I don't mean just to summarize.  If you'd like me to go through, I gather you don't. But that's a summary of what's in my reports.

Q    Would you agree with me that the ordinary meaning of the word "fluid" would not be "solvents" in science?

MR. SCHULER:  Object to the form.

A    What -- do you have a particular context in mind?

Q    In the pharmaceutical field.  You would agree that the word "fluid" means liquids or gases, right?

MR. SCHULER:  Object to the form.  You mean in the pharmaceutical field?

A    I --

MR. SCHULER:  Your question wasn't

11:37:42
11:37:44
11:37:49
11:37:54
11:37:59
11:38:03
11:38:05
11:38:10
11:38:13
11:38:16
11:38:18
11:38:23
11:38:27
11:38:35
11:38:39
11:38:45
11:38:48
11:38:49
11:38:53
11:38:55
11:39:00
11:39:04
11:39:05
11:39:09
11:39:12

clear.

But do you understand it?

A    I thought I understood your question was:  In the pharmaceutical fluid, does fluid --

Q    Pharmaceutical fluid?

A    In the pharmaceutical field --

Q    Let's start over.  Let's start over, because we're going around a little bit here.

In the pharmaceutical field, the ordinary definition of the word "fluid" would be liquids or gases, correct?

A    So I -- now I'm moving ahead to my responsive expert report, which is Exhibit No. 5, because I address this directly responding to Dr. Crowley.  I'll wait until you get there. It's page 21.

And I literally address this right here. Well, this is liquid equals fluid, and I address that.  And I can go through this.

Q    I'd rather you not.  It takes too long.

A    Okay.  But the point -- just the point is that the skilled person is going to understand this within the context, pharmaceutical context, the context of the patents as discussed, the specification and the file history, and not just

11:39:13
11:39:13
11:39:16
11:39:18
11:39:22
11:39:23
11:39:25
11:39:27
11:39:28
11:39:33
11:39:37
11:39:59
11:40:02
11:40:07
11:40:12
11:40:16
11:40:18
11:40:22
11:40:26
11:40:34
11:40:36
11:40:38
11:40:41
11:40:46
11:40:51

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    86

dictionary definitions or definitions from          11:40:56

physics, per se.  That's a summary, but I state     11:40:59

it in my report.                                    11:41:01

Q   But my question is different.  My           11:41:02

question is:  Stepping outside of these patents     11:41:04

for a moment, you would agree that the ordinary     11:41:07

meaning of "fluid" is a liquid or a gas, in         11:41:13

science?                                            11:41:18

MR. SCHULER:  Object to the form.           11:41:19

A   In the context of, for example,             11:41:26

physics, as referred to -- Dr. Crowley refers to    11:41:29

Landau and Lifshitz' volume on the subject.         11:41:37

There are dictionary definitions.  Well, I guess    11:41:41

in aeronautics it's probably primarily just a       11:41:46

gas, so I think it depends on the context.  And     11:41:49

whatever "ordinary" means, I mean, I think this     11:41:53

is the ordinary understanding within the context    11:41:57

of the patents.  If you have some other context,    11:42:00

we can discuss that.                                11:42:05

Q   Again, for this question, I'm asking        11:42:11

you to step outside of the patents-in-suit and      11:42:13

just in the pharmaceutical field, the ordinary      11:42:16

meaning of a "fluid" is a liquid or a gas.  You     11:42:22

would agree with that, right?                       11:42:24

A   I'm not sure I can agree with that.  If      11:42:30

you have some reference in mind, I think we can 11:42:33

discuss it. I think it depends on the context 11:42:35

also in pharmaceuticals or anywhere in science. 11:42:39

Q Is there any context in pharmaceutics 11:42:44
that you would agree that the ordinary meaning of 11:42:45
a "fluid" is a liquid or a gas? 11:42:48

A I would have to look into that. Maybe 11:42:55
references. My point is that this is what this 11:43:02
limitation means here, as I've explained 11:43:05
throughout my reports. We could go to any of 11:43:09
them. 11:43:11

Q And -- 11:43:11

MR. LIEF: Why don't we mark as Trout 11:43:21
Exhibit 8 an international published patent 11:43:25
application, WO2015/095533. 11:43:32

(International Patent Application 11:43:38
WO 2015/095533 marked Exhibit 8.) 11:43:38

MR. SCHULER: Did you say 8? 11:43:49

MS. SPARSCHU: Yes. 11:43:51

COURT REPORTER: Yes. 11:43:52

THE WITNESS: Thank you. 11:43:53

BY MR. LIEF: 11:43:54

Q With respect to Trout Exhibit 8, 11:43:55
Dr. Trout, have you seen this before? 11:43:56

A I've certainly seen the content of 11:45:03

this.  I'm not sure, sitting here, if I've actually seen this particular document, but certainly --

Q    Am I correct that on this patent application, you are listed as one of the coinventors?

A    Yes.

Q    Okay.  And the applicant is the Massachusetts Institute of Technology?

A    Yes.

Q    And when a patent application goes in with your name on it, I take it you review it?

A    Yes.

Q    And you wouldn't let something go through to the patent office that was false?

A    That's certainly not the intention. Mistakes can happen, as we've discussed earlier this morning.

Q    If we look at what is page 20 of this document, as a first matter, this -- the invention recited here is a pharmaceutical invention, correct?

A    So this is from over ten years ago. I'd have to refresh my memory.  I believe this is certainly intended to be in the pharmaceutical

11:45:05
11:45:09
11:45:13
11:45:14
11:45:18
11:45:21
11:45:29
11:45:30
11:45:32
11:45:37
11:45:38
11:45:41
11:45:51
11:45:53
11:45:56
11:46:01
11:46:06
11:46:09
11:46:10
11:46:14
11:46:20
11:46:24
11:47:12
11:47:15
11:47:26

area, at least related to it. But it's broader. It's for controlling crystallization, so it's more like for a process. I think we were developing this as -- again, I haven't refreshed myself, but just flipping through, I think we were developing this for a potentially process-type application, controlling crystallization.

Q    Any other industry other than the pharmaceutical industry that this would apply to?

A    Well, I mean, certainly chemicals, broadly. Doesn't have to be pharmaceutical chemicals. There are a lot of applications in fine chemicals, potentially die manufacturing.

Unfortunately, I'm not sure if this went anywhere in any industry, but it was, I thought, an interesting idea.

But, yeah, this can be generally applied. It's certainly not limited to the pharmaceuticals as a whole.

Q    Okay.

A    But I see now -- again, I'm refreshing myself. It looks like Claim 1 specifically does say "pharmaceutically active agent." But at least the technology could be more broadly

implied.                                                    11:48:55

But as I said, it's within the                          11:48:55
pharmaceutical field.  That was certainly our              11:48:58
intent.                                                     11:48:59

Q   And, again, if you go to page 20 of                  11:49:00
this document, and if you look around line 30,             11:49:02
there's a paragraph there.  I'll read it to you.           11:49:07
It will go over to the next page.                          11:49:10

"As used herein, a 'fluid' is given its                 11:49:13
ordinary meaning; i.e., a liquid or a gas.  A              11:49:18
fluid cannot maintain a defined shape and will             11:49:26
flow during an observable time frame to fill the           11:49:31
container in which it is put.  Thus, the fluid             11:49:36
may have any suitable viscosity that permits               11:49:40
flow."                                                      11:49:44

And it goes on.  But did I read that part of            11:49:46
page 20 correctly?                                         11:49:50

A    Yes, I believe so.                                  11:49:56

Q    And that's from the patent that you're             11:49:58
a coinventor on.                                           11:50:01

Do you disagree that that is the ordinary               11:50:04
meaning in science of the word "fluid"?                    11:50:06

A    Just to make sure I give you an                     11:50:23
accurate answer, to save some time, can you point          11:50:26
me to where "fluid" is referred to in here?                11:50:32

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    91

Because I just don't remember the specifics from 20 -- this was probably I saw it before -- well, 2014 at least.

Q    Well, I think that's where it's referred to, what I read you, is the most prominent place that I saw it.

A    But I would want to see where else it's referred to.

First of all, is it referred to anywhere else?  I can go through it, if you'd like.

Q    I mean, I think the question is more general.  It's -- you don't dispute that that's the ordinary meaning in science of the word "fluid"?

Why don't I point you to page 41.

A    Okay.  Thank you.

Q    And if you look at, for instance, as an example, Claim 47 on page 41.  You see -- I'm sorry.  46.  It says "A method comprising crystallizing a pharmaceutically active agent in a fluid droplet."

Do you see that?

A    Yes.  Give me a second to familiarize myself with this so I can accurately answer your question.

Okay.  So just flipping through, I think what we've done here is made droplets with polymers to help facilitate crystallization, and so the "fluid" here -- I don't dispute what's written here -- has the physics terminology.  The point is creating these droplets.  Frankly, I think it's primarily liquid, but best as I can remember.  But -- so it's referring to the physics definition, and that's what it means by ordinary meaning.

Q   It doesn't say the word "physics" definition.  It just says "ordinary meaning," right?

A    That's right.  But the point is why I said someone has to look at the context, so it's referring in the previous paragraph also to a droplet.  So the point is that these are droplets, which are not necessarily spherical. But that's what it's referring to as "fluid" droplet.  And there are different fluids.  So it's acting as a fluid, something that flows. That's the point here.

These are not -- in the '248 and the '214, as I said, these are not process claims, per se. And one has to understand the whole -- as I've

11:53:40
11:53:43
11:53:56
11:54:00
11:54:07
11:54:12
11:54:15
11:54:20
11:54:24
11:54:31
11:54:33
11:54:35
11:54:37
11:54:43
11:54:46
11:54:49
11:54:52
11:54:55
11:55:01
11:55:06
11:55:08
11:55:13
11:55:16
11:55:19
11:55:24

been saying, the whole limitation that we've been
discussion, not just pull out one word, but
understand the whole limitation in its context.

Q You don't disagree, though, that the
general definition of the word "fluid" is a
liquid or a gas?

A I don't disagree that that's a
definition, for example, in physics and
dictionaries we've discussed. I think the
skilled person has to understand what the
particular use is in the context, as I've been
saying, including in the '214 and the '248
patents, which is as I've been discussing in
answering your questions and throughout my
reports.

Q Now, in this patent that you are the
coinventor of, the fluids that -- where the
crystallization occurs are also solvents, aren't
they?

MR. SCHULER: Object to the form.

A I'm happy to answer your questions.
Like I said, I'm not familiar -- I just don't
remember the details from so long ago. As you
noted, it's a publication. I don't know its
status, but from close to 12 years ago. I think

| | |
|---|---|
| 11:55:29 | |
| 11:55:32 | |
| 11:55:35 | |
| 11:55:38 | |
| 11:55:41 | |
| 11:55:44 | |
| 11:55:50 | |
| 11:55:52 | |
| 11:55:55 | |
| 11:55:59 | |
| 11:56:01 | |
| 11:56:06 | |
| 11:56:10 | |
| 11:56:14 | |
| 11:56:17 | |
| 11:56:19 | |
| 11:56:22 | |
| 11:56:27 | |
| 11:56:30 | |
| 11:56:32 | |
| 11:56:36 | |
| 11:56:39 | |
| 11:56:43 | |
| 11:56:47 | |
| 11:56:52 | |

if we're going to talk about specifics, I'll have to review it in detail.

Q    That's okay.

A    I'm happy to do that, but I think I answered your question about the fluid and importance of context.

Q    Okay.

A    But I can go through it if you want me to in more detail.

Q    Not right now.

And I believe you also have said in your opinions that one of the reasons you assign the word "solvent" to the "pharmaceutically acceptable fluid" is because the examiner in the file histories for these patents used the word "carrier"?

MR. SCHULER:  Can you stop misrepresenting his testimony?

MR. LIEF:  Counsel --

MR. SCHULER:  He keeps having to answer the same question over and over again by saying --

MR. LIEF:  Counsel, you have to stop doing that.  You have to stop doing that.

MR. SCHULER:  I'm trying to facilitate

the deposition going forward.                    11:58:21

MR. LIEF:  You're not.  You're            11:58:22
disrupting.                                       11:58:23

MR. SCHULER:  You express frustration     11:58:24
because you say he keeps repeating his answers.   11:58:25
Because you misrepresent his testimony.  His      11:58:26
testimony is not that he's putting the word       11:58:26
"solvent" in the "pharmaceutically acceptable     11:58:28
fluid."  He keeps saying, "I'm construing the     11:58:30
entire phrase as a whole," and you keep forming   11:58:33
questions saying, "I believe one of the reasons   11:58:35
that you say that you substituted the word        11:58:37
'solvent'" --                                     11:58:39

MR. LIEF:  Counsel, if you have no        11:58:40
position on what "fluid" or "pharmaceutically     11:58:41
acceptable fluid" mean at all, then I assume that 11:58:43
our construction is the only construction on the  11:58:47
table.                                            11:58:50

MR. SCHULER:  We stipulated to the --     11:58:51

MR. LIEF:  Yeah, we stipulated to         11:58:54
something that didn't define the word "fluid."    11:58:55
And so we said a fluid is a fluid --              11:58:57

MR. SCHULER:  But even your definition    11:59:00
doesn't apply to sodium hydroxide, so it          11:59:01
doesn't -- I don't see how it's a live --         11:59:04

MR. LIEF: So says you, Counsel.

MR. SCHULER: What do you mean, so says me?

MR. LIEF: Exactly what I said.

MR. SCHULER: It's a solid.

MR. LIEF: We're going to get to that, which is also amusing.

But, you know, in a deposition, Counsel, you've done this now -- this is the third deposition you've done this, and I'm just noting it because --

MR. SCHULER: I'm noting your frustration at him repeating his answers.

MR. LIEF: I'm not frustrated. I'm asking questions.

MR. SCHULER: Okay. I'll let him repeat his answer, then.

MR. LIEF: I'm just asking questions.

BY MR. LIEF:

Q All right. For instance, why don't we take a look at your reply report.

Do you have that?

A I have to get the marked one. Hold on. Okay.

Q If you look at your reply report,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026          97

there's a paragraph 131 in there.

MR. SCHULER: 131?

MR. LIEF: Yeah.

BY MR. LIEF:

Q    And I'm going to read you roughly the first four lines of that.

A    Hold on.

Okay. I'm there.

Q    And it says: "The examiner's subsequent treatment of the amended claims further confirms this understanding. In evaluating the claims against the written prior art reference, the examiner -- who I understand is presumed to be a POSA -- characterized the pharmaceutically acceptable fluid as 'the liquid carrier for the ultimate dosage form'; i.e., the solvent."

Did I -- first, did I read that correctly from your reply report?

A    Yes.

Q    And there, am I incorrect in saying that you are equating the word "carrier" with being a solvent?

A    I don't think it's -- I mean, you could call it equating, but I'm not just equating one

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    98

word with another.

When I say the "pharmaceutically acceptable fluid," I am referring to it in the context of the full limitation in the patents that we've been discussing.  And this section -- and you did read those lines correctly, but they also refer to subsequent -- well, I guess both -- well, previous and subsequent paragraphs.

Q    Let's take a look at something else. Okay?

A    Okay.  But just to finish the answer.

So that's in this context.  It's in the context of the section as a whole and referring to the "pharmaceutically acceptable fluid" limitation, which also includes the five solvents there.

Q    Let's take a look at your rebuttal report, which is from round two, which also addresses this.

MR. SCHULER:  Exhibit 8?  7?

MR. LIEF:  Do you have that?

MS. WELSH:  5.

MR. LIEF:  5 is the rebuttal report.

BY MR. LIEF:

Q    Do you have that?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                    99

A    It says "responsive."  That's the same?    12:02:46

Q    Responsive.  Yes.  Responsive report.    12:02:48

A    Okay.  I have 5.    12:02:50

Q    Okay.  And if you look at paragraph 116 in that report, I'm going to read you this.    12:02:52  12:02:54

A    Just one second, please.    12:03:12

Okay.  Thank you.    12:03:16

Q    Okay.  In paragraph 116 in your responsive report, it states:    12:03:18  12:03:20

"As discussed supra paragraph 63, during prosecution, the examiner characterized the pharmaceutically acceptable fluid as 'the liquid carrier for the ultimate dosage form' and as 'suitable of the carriers to provide a liquid formulation of bendamustine,'" and there's a citation.    12:03:24  12:03:28  12:03:32  12:03:36  12:03:40  12:03:45  12:03:48

The next sentence reads:  "The examiner's use of 'carrier' terminology -- referring to the liquid medium that carries the active ingredient -- is standard pharmaceutical vocabulary for describing a solvent or vehicle."    12:03:49  12:03:53  12:03:59  12:04:03  12:04:06

Close quote from you.  Did I read that correctly?    12:04:13  12:04:15

A    Yes.    12:04:16

Q    And so, again, am I correct that you    12:04:17

are pointing to the examiner's use of the word "carrier" as evidence that the claims should be interpreted in the limitation "pharmaceutically acceptable fluid" to be specifically relating to solvents?

          MR. SCHULER:  I'll object to the form.

     A    I was following you until the specifically relating, the relating part.  Could you clarify.

     Q    You are pointing to the examiner's use of the word "carrier" as evidence that the "pharmaceutically acceptable fluid" limitation should be construed as relating to solvents?

          MR. SCHULER:  I'll object to the form. If by "the pharmaceutically acceptable fluid limitation," are you using that as shorthand for the whole limitation?

          MR. LIEF:  However he's using it.

          MR. SCHULER:  Okay.

     A    I think it's fine to use it for shorthand as long as we understand "pharmaceutically acceptable fluid" limitation is the full limitation, which includes those five solvents.

     And, again, here in paragraph 116 -- and

12:04:21
12:04:24
12:04:30
12:04:33
12:04:38
12:04:40
12:04:46
12:04:48
12:04:50
12:04:51
12:04:54
12:04:57
12:05:02
12:05:10
12:05:12
12:05:15
12:05:17
12:05:19
12:05:21
12:05:26
12:05:28
12:05:30
12:05:34
12:05:39
12:05:40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    101

this is one paragraph in a longer section, as you                    12:05:46

pointed out, is part of an analysis in the reply                    12:05:50

report and other places too.  And I'm looking at                    12:05:54

the whole and prosecution history and, in                    12:05:58

particular, the context and those -- that phrase                    12:06:05

in quotes, and I'm explaining what's being --                    12:06:12

what -- how the examiner is characterizing and                    12:06:17

what the examiner is referring to.                    12:06:21

Q    The examiner never used the word                    12:06:23

"solvent" in that passage you're referring to; he                    12:06:25

used the word "carrier," right?                    12:06:28

A    Well, certainly -- I have to look                    12:06:52

through this to see if he ever used "solvent."                    12:06:54

But certainly in this paragraph, I am explaining                    12:06:59

how the kit, the examiner and a POSA, examiner                    12:07:06

also being a POSA, would understand that                    12:07:13

"pharmaceutically acceptable fluid" limitation as                    12:07:16

the liquid carrier for the ultimate dosage form                    12:07:20

and the other one that you read.                    12:07:24

So that's -- I'm explaining how the skilled                    12:07:29

person would understand and how that's related to                    12:07:33

that "pharmaceutically acceptable" limitation.                    12:07:36

Q    You would agree that the word "carrier"                    12:07:39

itself, as used in the pharmaceutical field, is                    12:07:42

not limited to solvents?                    12:07:48

MR. SCHULER:  Is not limited?

Q    Is not limited to solvents.

A    Like most terms, the context might matter.  If you have some other context, we can discuss that.

Q    Again --

A    Here, these are -- remember, Mr. Lief, these are -- and I say this throughout -- we can go to my report.  But the point is these are five solvents for bendamustine, so one has to look -- and we look at the examples and the specification, and then this is the file history, which I understand we're also supposed to look at.

Q    The five -- the five chemicals that are listed after "consisting of" that you referred to as "solvents," they would also satisfy the ordinary meaning definition of "fluid" as a liquid or a gas, correct?

MR. SCHULER:  Object to the form.

A    As I wrote it throughout the whole section in this same report, responsive report, Exhibit 5, just to summarize what I say, end of paragraph 44 on page 13:

Thus, the "pharmaceutically acceptable

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026
103

fluid" -- where "fluid" is bold, underlined -- in these claims is the solvent and the "liquid" -- italics, bold, underlined, like fluid -- "bendamustine-containing composition" refers to the physical state of the composition as a whole. So the physical state --

Q    Different question.

A    Well, the physical state -- you have this very broad -- or you or your expert was putting forward very broad physical state definitions, and I refer to the physical state here.  So certainly the physical state, the whole as a liquid and the fluid is a liquid, and the composition is a liquid as a whole.  The point is specifically what these mean in the context here of the comprising and the consisting of and as I discuss throughout my reports.

So you have this very, very broad physics definition, and a substantial part of these significant number of pages in the reports is explaining, responding, but also explaining how the skilled person would understand this limitation.

Q    The word "carrier" in the pharmaceutical industry is not limited to

| 12:10:13 |
| 12:10:18 |
| 12:10:21 |
| 12:10:28 |
| 12:10:33 |
| 12:10:37 |
| 12:10:38 |
| 12:10:39 |
| 12:10:43 |
| 12:10:48 |
| 12:10:52 |
| 12:10:55 |
| 12:11:00 |
| 12:11:07 |
| 12:11:10 |
| 12:11:13 |
| 12:11:19 |
| 12:11:20 |
| 12:11:24 |
| 12:11:28 |
| 12:11:31 |
| 12:11:35 |
| 12:11:37 |
| 12:11:39 |
| 12:11:43 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    104

solvents, correct?

       MR. SCHULER:  Objection.  Asked and answered.

    A   If you have a specific example, we can turn to that.  Context certainly matters, and I'm explaining the meaning in the context here.

    Q   I'm asking a more general question about how the word "carrier" is understood, generally, in the pharmaceutical field.  And I think you will agree with me that generally it is understood that it includes solvents and to include other things as well?

       MR. SCHULER:  Object to the form.

    A   If you have some -- something specific, we can look at that and discuss that.  Context matters.  It might mean different things in different contexts.

    Q   Does the general --

    A   I think it's clear what's meant here and what I mean in this, in the context of the file history.

    Q   Does the general definition of a word change in different contexts?

    Is that your testimony?

    A   I don't think --

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

105

MR. SCHULER:  Object to the form.          12:13:01

A    I don't think that's what I said.  I          12:13:03
think you're not quoting me.  What I said is the          12:13:05
context matters.  And, frankly, I think it's --          12:13:08
and I also talk about Slayback's use of the term.          12:13:16
I think it's undisputed that these are all          12:13:19
solvents in this limitation and that it's a          12:13:22
solvent for bendamustine and it's a carrier, the          12:13:24
pharmaceutically acceptable fluid...          12:13:30

MR. LIEF:  Let's mark as, I believe          12:13:55
it's Trout Exhibit 9, a document which is an          12:13:57
international published patent application          12:14:01
WO2012/065082.          12:14:04

(International Patent Application          12:14:10
WO 2012/065082 marked Exhibit 9.)          12:14:10

MR. LIEF:  We'll mark that as 9.          12:14:14

THE WITNESS:  Thank you.          12:14:26

BY MR. LIEF:          12:14:27

Q    And with respect to Trout Exhibit 9,          12:14:28
Dr. Trout, am I correct that you are named as the          12:14:34
first inventor on this international patent          12:14:38
application?          12:14:41

A    I'm looking at the cover page.  That          12:14:54
looks like my name, yes.          12:14:56

Q    And I'd like you to turn to what is          12:15:03

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    106

page 15 of this document, and at around line 9,

do you see that begins "The phrase

'pharmaceutically acceptable carrier'"?

    Do you see that?

    A   Yes.

    Q   Okay.  And it reads, and I'll read you

the relevant part of this:

    "The phrase 'pharmaceutically acceptable

carrier' as used herein means a pharmaceutically

acceptable material, composition, or vehicle such

as a liquid or solid filler, diluent, excipient,

solvent, or encapsulating material involved in

carrying or transporting the subject chemical

from one organ or portion of the body to another

organ or portion of the body."

    Did I read that correctly?

    A   Yes, I think you did.

    Q   And so while a solvent is one part of

what a carrier can be, there are other things

that a carrier can be?

        MR. SCHULER:  Object to the form.

    A   Again, it's defined here very broadly.

I'm just trying to recall.  This is from 2010, so

this is even older.  This is specifically -- I'd

have to look through this, but -- more -- but

this specifically refers to transporting the chemical from one organ or portion of the body to another organ or portion of the body.  So I think it's a carrier in that sense, as opposed to a formulation carrier.

Q    You wouldn't -- you wouldn't call this relevant to an intravenous formulation?

MR. SCHULER:  Object to the form.

A    Sorry?

Q    You wouldn't say that what I just read you is a definition of "carrier" that would be relevant to an intravenous formulation?

MR. SCHULER:  Same objection.

A    I'd have to go through this.  I'm just -- I'm not sure.  But it's defined here in this context, and it's specifically talking about -- what you read is specifically talking about carrying or transporting the subject chemical from one organ or portion of the body to another organ or portion of the body.

And I'd have to review this document, but --

Q    The --

A    -- the carrier that I referred to in my reports with respect to the examiner is for the formulation.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    108

Q    For an intravenous drug?

A    Yes.  But my point is it's for the formulation, so it's a carrier with respect to the formulation, as opposed to carrying it from one organ or portion of the body to another organ or portion of the body.

But at any rate, I understand that a patent can define its own terms.

Q    Well, do you think the definition in Trout Exhibit 9 is a departure from the general meaning of the word "carrier"?

A    Again, it's coming back to me, but I don't remember the details.  If maybe you know where I -- where we actually have that -- use that term, it could help save some time and understanding, because I think it's really depending on this specific -- it's like a general definition specific to this context, but then in that general definition, it has that specific term, which means transporting from one organ to another.

Q    Let's set that one aside.  I have another one for you.

A    Okay.

MR. LIEF:  Why don't we mark as Trout

12:18:33
12:18:38
12:18:41
12:18:46
12:18:49
12:18:53
12:18:54
12:18:59
12:19:02
12:19:05
12:19:13
12:19:37
12:19:42
12:19:47
12:19:52
12:19:56
12:19:59
12:20:01
12:20:05
12:20:08
12:20:17
12:20:17
12:20:20
12:20:21
12:20:22

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

109

Exhibit 10 a document that is an international    12:20:23

patent application, WO2010/141902.  That will be    12:20:32

Trout 10.    12:20:43

(International Patent Application    12:20:46

WO 2010/141902 marked Exhibit 10.)    12:20:46

BY MR. LIEF:    12:20:55

Q    With respect to Trout 10, can you    12:20:55

confirm for me that you are listed as one of the    12:20:57

coinventors of this application?    12:21:01

A    Looking at the cover page, yes.    12:21:13

Q    Will you turn to page 51 of this    12:21:20

document.  There's a paragraph at the bottom    12:21:22

there, 00163.    12:21:33

Do you see that?    12:21:35

A    Yes.    12:21:40

Q    And it says:    12:21:42

"As used herein, 'pharmaceutically    12:21:43

acceptable carrier' includes any and all    12:21:46

solvents, dispersion media, coatings,    12:21:50

antibacterial and antifungal agents, isotonic and    12:21:54

absorption-delaying agents and the like that are    12:21:59

physiologically compatible.  Preferably, the    12:22:04

carrier is suitable for intravenous,    12:22:08

intramuscular, subcutaneous, parenteral, spinal,    12:22:12

or epidermal administration (e.g., by injection    12:22:16

Case 1:24-cv-00065-JLH Document 465-9 Filed 08/07/26 Page 112 of 308 PageID #: 25891
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

110

or infusion)."

Did I read that part of paragraph 00163 correctly?

A    Yes, noting that paragraph 163 continues, and depending on the route of administration, it continues there.  It's showing this is for immunoglobulins.

Q    And when it says "dispersion media" in there, it says a carrier "can include any and all of solvents, dispersion media," and it goes on with other categories.

Dispersion media are not solvents, correct?

A    Just for curiosity -- not for curiosity, but to understand how it's used, do you know how it's used?

Have you found its use in the actual rest of the patent?

Q    It's your patent.  Maybe you can tell me.

A    I can tell you, but it's from 2010, and I'd have to go through it.  But I can tell you this is -- looks to be a very general definition here.  I'm not sure if it's used at all.

Q    But --

A    But to understand it, it would be

important to understand how it's used.                   12:24:07

Q    I think the point is that the general            12:24:08
definition of "carrier" is not limited to               12:24:12
solvents?                                                12:24:16

MR. SCHULER:  Object to the form.             12:24:17

A    By "general," I mean a very broad               12:24:22
definition.  The patentees, me being one of them,       12:24:25
can define terms.  And as I've been saying all          12:24:31
along, the context matters.  And so all of these        12:24:36
patents -- World Intellectual Property                  12:24:46
Organization PCT applications are in their              12:24:49
specific context, which is different from the           12:24:53
'214 and the '248 patents.                              12:24:55

Q    This is in the context of intravenous           12:24:58
injections, though, correct?                            12:25:01

MR. SCHULER:  Object to the form.             12:25:04

A    The best as I can recall, which is kind         12:25:05
of looking through the claims again, I think the        12:26:19
focus is actually -- of this invention was              12:26:22
subcutaneous administration.  I understand --           12:26:28
that's why some of these background terms are           12:26:34
very broad.  I'm not sure if that term is used at       12:26:36
all.  I don't even see it used in the claims,           12:26:39
which look like they're all claims to a                 12:26:43
particular set of immunoglobulins.                      12:26:47

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    112

Q    It's for injections, though, right?

A    I think the administration would be subcutaneous injection, or that's the aim, which is certainly a type of injection.  It's not IV. The point of this is not to do IV, except really the point of this is claiming new classes of these biologic molecules.

Q    Now, when you make an intravenous injection, is it that -- is it your view that all intravenous injections must be solutions?

MR. SCHULER:  Object to the form.

A    I think that one doesn't want to make -- one should be careful, I should say, making broad generalizations, because there are often exceptions.  In general, and I think it's clear in the context of the patents, and as I'm speaking as a pharmaceutical scientist, one does not want to introduce anything but liquids in an intravenous delivery.  There can be exceptions to that.

But I think the context here of the '214 and '248 would be -- well, literally the beginning is that it's a liquid.  The beginning of the claims. Sorry.  That it's a liquid.

Q    Is it possible to have a liquid

composition that is not a solution?

MR. SCHULER: Object to the form.

A Again, I think it depends on the context and the ways in which certain terms are used. There are other types of formulations. There are solids, gases, mixtures thereof. These two patents, the '214 and the '248, are specific to liquids. The claims, I should say, are specific to liquids.

Q All right. I think we agree that they're specific to liquids. I think the question is: Can you have a liquid that, although it's a liquid, is nonetheless not a solution?

MR. SCHULER: Do you mean in the pharmaceutical context?

MR. LIEF: Yes.

A Again, there could be uses -- terms are used in particular contexts and mean particular things. If you have examples, we can talk about those contexts.

In general, a liquid is like the liquid here, which does not encompass physical mixtures of -- well, solids in particular. Probably not -- and not gases either. So generally, as a

formulation scientist, it's not what you want to inject by intravenous.

Q    Your view is that the invention here does not encompass dispersions.

MR. SCHULER:  Object to the form.

A    Do you mean solid dispersion, like they're solid particles?  I mean -- what do you mean by "dispersion," solid dispersion, you mean solid particles in the sterile -- for example, the sterile vial containing a liquid bendamustine-containing composition?

Q    Yeah.  As one example.  In your view, could the current claims in the patents-in-suit encompass that type of dispersion?

MR. SCHULER:  Object to the form. Incomplete hypothetical.

A    I don't think the intention is for, let's say, solid bendamustine material or extensive solid bendamustine material.  It's meant, as I said, as it says, as a liquid.  It doesn't say dispersion.

There can be particulates similar to impurities that we've discussed, and there are limits on particulates and whatnot, but it's going to be a liquid.  So the bendamustine is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    115

going to be dissolved in the context of the '214

and the '248 patents.

Q    And so you associate liquid with

solution, correct?

MR. SCHULER:  Object to the form.

A    Well, so I think it's important not to

oversimplify and say I'm associating one term

with another.

I have a -- just simply as such.  That's why

I've done the analysis here.  And I think I

already referred to the section on page 21 of my

responsive report, Exhibit 5, in which the header

is "The Relevant Inquiry is Function."

MR. SCHULER:  Which exhibit?

MR. LIEF:  5.

THE WITNESS:  I'm sorry.  Exhibit 5.

The responsive report, Exhibit 5.

A    And I talk about the liquid physical

state.  Page 21, paragraph 66.  And I discuss the

meaning of liquids here.  I can go through it.

And then also fluids.  I discuss the meaning of

the claims, the '214 and '248.

Q    But I believe that your view is that

the invention and the claims of the

patents-in-suit require that everything be

dissolved, that it not be dispersed, that it be    12:34:49

dissolved.    12:34:55

        MR. SCHULER:  Object to the form.    12:35:00

    A    As far as everything, it's intended to    12:35:06

be a solution.  And as opposed to having solid    12:35:11

particles, a significant number of solid    12:35:17

particles or components, a significant fraction    12:35:22

is -- the focus being on the solid particles.  So    12:35:25

it's meant to be a liquid.    12:35:29

    And, again, it doesn't mean there's going to    12:35:34

be a limitation on certain fraction of    12:35:36

particulates.  So it doesn't mean they're    12:35:40

completely absent, but like impurities, they're    12:35:43

not -- the key component is not the intention.    12:35:47

It's meant to be a liquid.    12:35:53

    Q    Now, in terms of dispersions, we've    12:35:55

talked about dispersions that have solid    12:35:58

particulates in them.    12:36:00

    It's also the case that a dispersion can be    12:36:02

two liquids that are not really dissolving in    12:36:06

each other.  Sort of a biphasic emulsion would be    12:36:10

a type of dispersion, correct?    12:36:16

        MR. SCHULER:  Object to the form.    12:36:18

    A    I guess it depends on the context and    12:36:23

how you want to define those.  I think I discuss    12:36:26

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

117

this in my reply report.  Oh, I'm sorry.  I keep going to the one that I brought as opposed to the one that's marked.

So Trout Exhibit 4.  If you have this marked, it may save some time in my finding this, but I certainly discuss this here in the context of the patents.

Q    Is this your reply report?

A    Yes, it's my reply report, Exhibit 4.

Anyway, maybe it's in the earlier one when I specifically talk about the liquid.  But the point is that I don't think that this encompasses an emulsion, per se, defined as two different liquids which are -- and I'm finding this, but -- for which there's macroscopic inhomogeneity.

Q    When you say "this" does not encompass, I take it what you're referring to is the claims in the patents-in-suit?

A    Yes.  I apologize.  To be more accurate, yes.  The claims in the '214 -- well, the claims in the '214 and the '248 patent that are being asserted.

Q    Okay.

A    So it's a liquid.  That's how it's defined at the beginning.  I think I discuss it

12:36:31
12:36:35
12:36:37
12:36:39
12:37:13
12:37:17
12:37:19
12:37:21
12:37:26
12:38:31
12:38:34
12:38:37
12:38:42
12:38:49
12:38:55
12:39:02
12:39:03
12:39:07
12:39:08
12:39:10
12:39:15
12:39:19
12:39:20
12:39:21
12:39:23

probably more in the responsive report.  We can find that, if you'd like.  But I refer to my discussion there.

Q   And that type of emulsion that you're thinking of that is not within the claims, that is its own type of dispersion, correct, in pharmaceutical language?

MR. SCHULER:  Object to the form.

A   Again, you're asking very broad questions.  You don't have a particular context?

Q   No.  It's just the general definitional question, that emulsions fall within a category of dispersions.  They're a type of dispersion, correct?

MR. SCHULER:  Object to the form.

A   I think it depends on the context.  If you have a particular context in mind, we can refer to that.  I'm thinking of emulsions as, again, having -- being liquid -- in liquid with macroscopic inhomogeneity.

Q   And whatever you call that, those liquids would not be dissolved in each other when you don't have macroscopic homogeneity between two liquids?

MR. SCHULER:  Object to the form.

A    Again, you're asking very high-level questions, but as I'm understanding you're asking about emulsions, they wouldn't be dissolved in each other.  They'd be individual droplets or whatever we want to call them.  This is to a liquid.

Again, it doesn't mean that there's not -- that the claims, the asserted -- the claims, all the claims of the '214 and the '248, wouldn't allow a small number of, you know, inhomogeneous droplets in there.  Again, there's going to be impurities.  Thinking of solid, liquid impurities, whatever.  But there's going to be a small number.

Q    And if you had an emulsion of two liquids that didn't dissolve in each other, they would still be liquids, though, right?

MR. SCHULER:  Object to the form.

A    Again, I think it depends on the context, how terms are used.  The term "liquid" here is referring to the compositions as I've been describing them, understanding clearly from the context, including the claims themselves, the specifications, and the file history.

Q    But outside of the context of the

patents, if you had an emulsion, both liquids would be considered liquids?

MR. SCHULER: Outside of the context -- object to the form. It's completely circular.

A    You're making a tautology.

Q    Let me rephrase.

A    Okay. Fine.

Q    Again, outside of the context of the patents but in the pharmaceutical field, when you say an emulsion of two liquids, the fact that they don't dissolve in each other doesn't change the fact that they're still considered liquids as a matter of the state of matter they're in?

MR. SCHULER: Same objection.

A    Again, when you ask questions about states of matter, that's at an extremely broad, very high level.

My point is I think people would generally call emulsions exactly as we've been calling them, emulsions. But we've talked about lots of contexts. Words are used with different meanings in different contexts, and they could be used -- it could be called a liquid in some contexts. If you have a specific in mind, we can discuss the context.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    121

Q    Let's take a look, to start, with your reply report at paragraph 24.  And I'll read that to you.

"As I explained in my main body of my opening report, a POSA would understand that the 'pharmaceutically acceptable fluid' recited in the asserted claims refers to the solvent/co-solvent system used to dissolve bendamustine and other excipients for stable liquid pharmaceutical compositions."  And there's a cite.

And then it continues:  "The specification expressly defines a 'pharmaceutically acceptable fluid' as 'a fluid which is suitable for pharmaceutical use' and further explains that the fluid to be --

MR. SCHULER:  "For the fluid."

Q    "And further explains that for the fluid to be 'sufficient' for use, it must contain the 'amount which allows the bendamustine to be dissolved.'"  And then there's a citation.

With counsel's correction, did I read that correctly?

A    Not quite.

Q    Okay.  What did I get wrong?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                122

A     Well, there's several citations at the            12:46:15
end both to my report and to the patent.  But           12:46:18
also, at line 5, the "pharmaceutically acceptable       12:46:24
fluid" term is in quotes.  I don't think you            12:46:33
included those quotes.                                  12:46:37

Q     True.  Okay.  So let me read that last            12:46:38
bit again, starting with the sentence "The              12:46:42
specification."  Right?                                 12:46:45

Do you see it?                                          12:46:46

A     Yes.                                              12:46:50

Q     In the middle of paragraph 24 there's a           12:46:50
sentence, and it reads, quoting you:                    12:46:52

"The specification expressly defines a                  12:46:54
'pharmaceutically acceptable fluid' as a"-- I'm         12:46:58
sorry -- "as 'a fluid which is suitable for             12:47:05
pharmaceutical use' and further explains that for       12:47:08
the fluid to be 'sufficient' for use, it must           12:47:12
contain the 'amount which allows the bendamustine       12:47:18
to be dissolved.'  Trout rebuttal report,               12:47:23
paragraph 44, '214 patent, at column 2, Lines 56        12:47:28
to 58, and column 6, lines 30 to 33," period.           12:47:36
And that ends the section I'm quoting from.             12:47:41

Did I read that correctly?                              12:47:44

A     Yes.                                              12:47:47

Q     Okay.  And if I understand what you're            12:47:48

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

123

saying here is that you're quoting a part of the

patent that says that "the amount which allows

the bendamustine to be dissolved," in that last

quote in the sentence I read.

Do you see that?

A    Yes.  That's a phrase from the patent.

Q    And you're pointing out that, in your

view, that passage from the patent supports the

idea that the claims are referring to a liquid

solution?

MR. SCHULER:  Object to the form.  And

his reports speak for themselves.

A    Okay.  Now, I've looked at the

citations.  Could you please state your question

again.

MR. LIEF:  Can you read that last

question back.

(The question was read by the

reporter, as requested.)

MR. SCHULER:  So I object.  The reports

speak for themselves.

A    Yeah.

Q    Let me ask --

A    You're changing -- I think you're

change the words a bit.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

124

Q    Let me ask it differently.

A    Okay.

Q    Is it your view that the passage you quote from column 6 of the '214 patent supports your view that a "pharmaceutically acceptable fluid" refers to the solvent or co-solvent system used to dissolve bendamustine and other excipients?

A    I would say that the quote in column 6 is -- and this is just in my technical background. I discuss this in many places and, as you rightly noted, refer to other reports, and there are other places in other reports -- this is a quote which talks about the embodiment in which the bendamustine is to be dissolved as opposed to dispersed.

But in particular, in column 6, it is referring to the liquid composition -- sorry -- liquid composition being ready for use. That's not a direct quote, but those words are in there.

So the point here -- it's not just pulling out an individual phrase from a sentence elsewhere. The point is understanding the claims in light of the patent as a whole and the file history, including the examples and the other

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                125

statements.

So that's just one phrase in the sentence in the section in the patent, which helps discuss that embodiment that's being claimed.

Q    But you do pull out that quote in your paragraph 24 in your reply report as support for the idea that the "pharmaceutically acceptable fluid" recited in the asserted claims refers to the solvent/co-solvent system used to dissolve bendamustine and other excipients, correct?

A    I think you're referring to the previous sentence.  I'm sorry.  I didn't quite follow if you read it correctly.  But I would refer to the sentence.  These are quotes from the patent and also references -- another reference to the patent and to my report related to the other sentence that you paraphrased or quoted part of in that paragraph.

Q    And the reason you quote from the paragraph -- strike that.

And the reason you quote from the patent is as support for your view of the definition of "pharmaceutically acceptable fluid"?

MR. SCHULER:  Sorry.  I object.  I don't understand the question at all.

12:53:07
12:53:07
12:53:12
12:53:17
12:53:19
12:53:21
12:53:26
12:53:29
12:53:33
12:53:37
12:53:42
12:53:48
12:53:51
12:53:54
12:53:59
12:54:03
12:54:08
12:54:13
12:54:15
12:54:17
12:54:20
12:54:25
12:54:29
12:54:35
12:54:41

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

126

MR. LIEF: I'm simply asking him what the purpose of quoting from column 6 is.

MR. SCHULER: That's a better question: What's the purpose.

MR. LIEF: How about that? I'll take your tutelage on that. How about that.

Q What is the purpose of quoting from column 6 in paragraph 24 of your reply report?

A So again, the purpose of these quotes, and I refer exactly to where in the patent I'm quoting them, are to -- this is the reply report, Exhibit 4. So this is the reply report, referring back to my opening report, where in paragraphs 131 and 132, I explain the "pharmaceutically acceptable fluid" limitation as we've been discussing, and the solvent or co-solvent system used to dissolve bendamustine and other excipients for stable liquid pharmaceutical compositions. That's from paragraph 131 of my opening report, Exhibit No. 2.

So it's just -- that's part of -- frankly, those are particular citations, but we have no doubt seen in the four documents that are my reports, I discuss this in many, many pages. So

12:54:42
12:54:46
12:54:49
12:54:50
12:54:51
12:54:53
12:54:56
12:54:58
12:55:36
12:55:42
12:55:45
12:55:57
12:56:04
12:56:09
12:56:15
12:56:18
12:56:26
12:56:28
12:56:31
12:56:34
12:56:38
12:56:41
12:56:48
12:56:54
12:56:59

we have to look at the discussion as a whole.

Q    I understand there are other arguments you make.  But am I correct that one of the arguments you make is that this quotation you have from column 6, which talks about bendamustine being dissolved, is support for the view that the fluids are solvents?

A    I think -- I wouldn't just pull apart -- I think it's indicative of a skilled person's understanding.  I don't think that quote by itself is particularly important.

I'm just saying here that the patent -- oh, sorry.  I lost it.

The patent -- yeah, sufficient -- fluid to be sufficient has to have a sufficient, which you quoted, put in quotes correctly, for use, and then it contains -- and then the phrase that you mentioned with dissolved.

I understand that it also talks about dispersion here, but it also talks about dissolved.  So that's the point.  And the claims are not to dispersions.  I think the term is "unclaimed embodiment" or something.  But the claims are not to dispersions; they're liquid. So --

Q   But dispersions can be all liquids, right?  They can be?

MR. SCHULER:  Object to the form.

A   Again, if you have a particular context.  I mean, you're asking very broadly.  I think I've explained -- we can go through my reports and evidence and the POSA's understanding that the liquid in the claim, however it's defined in other contexts or dispersions can be defined as liquids, that's not what's intended here.  It's intended that the bendamustine is dissolved, and those are solvents and I've explained why.  We can go back through.  We've been discussing it quite a bit, but happy to keep going through it, if you'd like.

Q   The way this is quoted in paragraph 24, where it says "amount which allows the bendamustine to be dissolved," period -- is a misquoting of column 6, isn't it?

MR. SCHULER:  Object to the form.

A   No, I don't think that's correct.  The point is that there's an example that allows it to be dissolved or dispersed.  So "dissolved" is one of the terms that's explicitly used.  I include 30 to 33 as the reference.  I include the

12:58:53
12:58:55
12:59:02
12:59:04
12:59:06
12:59:09
12:59:15
12:59:19
12:59:24
12:59:28
12:59:32
12:59:36
12:59:41
12:59:43
12:59:46
12:59:48
12:59:51
12:59:53
13:00:00
13:00:06
13:00:09
13:00:16
13:00:26
13:00:31
13:00:37

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    129

full paragraph.                                          13:00:45

But, again, the -- I don't think that the               13:00:48

claims, as such -- and again, I understand there         13:00:53

can be unclaimed embodiments discussed in the            13:00:57

specification, but that the claims refer to              13:01:00

dispersions.                                             13:01:02

Q    Dr. Trout, in quoting from column 6 at             13:01:07

around Lines 32 to 33, you put a period after the        13:01:12

word "dissolved," didn't you, in your reply             13:01:19

report, correct?                                         13:01:23

A    Yes.  That's the convention in the                 13:01:31

English language to put the quote after the              13:01:33

period, as I learned it.  And I refer to the full        13:01:36

citation, which anyone in the case can access,           13:01:42

which you did.  And the point here is the                13:01:47

dissolved, not the dispersed.                            13:01:51

Q    Wouldn't it be appropriate to have put             13:01:55

an ellipse, because you've removed from your             13:01:58

quote the word "dispersed," and you've also              13:02:01

removed -- it says -- the actual column 6 says           13:02:04

"dissolved or dispersed to a degree, which               13:02:09

renders the liquid composition ready for use."           13:02:15

You've removed the word "dispersed" and                 13:02:19

you've removed the words "to a degree" from your         13:02:22

quote without an ellipse; isn't that right?              13:02:24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

130

MR. SCHULER:  Object to the form.

A    No, that's not correct.  I haven't removed anything.  I have not removed -- I've put the quote as I put it.  There are lots of other quotes.  "Pharmaceutically acceptable fluid" in the same paragraph, which I've explained refers to the full limitation, and I didn't use ellipses there.  I didn't need to.  And I think it's quite common to quote specific parts of patents like this.  We could check.  I would -- I'm sure that some of Slayback's experts do similar things. But we can look at that.

But anyway, that's, I think, quite normal.

Q    Okay.

A    I mean, just above in paragraph 23, I quote "consisting of."  That's the sixth line of paragraph 23.  I think we all know what I'm referring to.  I don't have ellipses before or after.  I think this is quite normal when referring to patents.

But anyway, if there's any doubt, I reference the full paragraph, cite the full -- or reference the full paragraph.

Q    And the full paragraph includes both the concept of dissolving and also the concept of

dispersing?                                    13:04:02

A    Correct.  And here, in this context,   13:04:14
the skilled person would understand the claims,  13:04:17
for all the reasons that I've discussed in my   13:04:19
reports and have been discussing here, would    13:04:23
understand that it's dissolved, that they're    13:04:26
solvents.                                       13:04:31

Q    And another concept that comes out in   13:04:36
this paragraph 24 is --                          13:04:38

A    Oh, sorry.                              13:04:48

Q    --  another concept that comes out in   13:04:49
paragraph 24 is that the phrase "pharmaceutically  13:04:56
acceptable" is expressly defined as "suitable for  13:05:01
pharmaceutical use" by the patent.              13:05:09

Do you see that?                            13:05:11

A    I'm sorry.  You're talking about my     13:05:21
paragraph 24?                                    13:05:24

Q    In your reply report.                   13:05:25

A    Of my reply report, Exhibit 4?          13:05:26

Q    Correct.                                13:05:29

A    Well, I think you didn't include the    13:05:30
full quote, which I have in quotes there.  I    13:05:33
think you mean "a fluid which is suitable for   13:05:37
pharmaceutical use."                            13:05:41

Q    That's fine.  That's fine.             13:05:42

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    132

A    That's, I assume, what you're referring to.

Q    Yes.

A    Yes.

Q    So the patent does say that.  I agree with you.

And then you associate the phrase "pharmaceutically acceptable," I believe, with the concept that the fluid must be sufficient to dissolve, right?

MR. SCHULER:  I'm sorry.  Object to the form.  I thought you asked him why -- I'm sorry.  I thought he answered this.  And to the extent it was asked and answered, I also object.

A    I didn't -- I don't think you --

Q    This sentence that we've been looking at that begins "The specification expressly defines," right, it links two different parts of the patent.  It links something from column 2 that defines "pharmaceutically acceptable fluid" as a fluid sufficient -- a fluid suitable for pharmaceutical use, and it links that with "a fluid sufficient to dissolve" in column 6, right?

MR. SCHULER:  Object.  I think it says "an amount" as opposed to "a fluid."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    133

A    Yeah.  I think you're mixing the "sufficient" and the other phrase.

Q    Well, let me -- these are what I'm asking you, really.  Are you equating "suitable" with "a sufficient amount"?

MR. SCHULER:  Object to the form.

A    I'm not equating things.  I'm just quoting parts of the specification, but it's really the specification as a whole.  But "parts of the specification, including choices" -- there's an "or" in that citation -- "which help the skilled person to understand what the claims, as construed, mean."

And, again, this is one paragraph, second paragraph in my technical background of Exhibit 4.  I've got many pages on this.

Q    So you don't equate "pharmaceutically acceptable" with "an amount sufficient to dissolve"?

A    Maybe I don't understand what you mean by "equate."  I'm not equating things.  I'm giving an explanation over multiple pages of how the skilled person would understand the invention, as expressed in the claims, in light of the specification and the file history.  And

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

134

lots of examples throughout, many pages in this report and others.

Q    Well, would you explain the words "pharmaceutically acceptable" as being "an amount sufficient to dissolve"?

MR. SCHULER:  Object to the form.  I don't understand that one.

A    Just to be clear, you're still referring to paragraph 24 in my reply report, Exhibit 4?

Q    Sure.

A    But what I have here is "pharmaceutically acceptable fluid."

Q    Right.

A    Maybe pose your question again.  I think you may have asked it in a way you didn't mean to.

Q    Would you say that -- I'll ask it the way you want me to ask it.

Would you say that the "pharmaceutically acceptable fluid," for it to be pharmaceutically acceptable, it must be in an amount sufficient to dissolve the bendamustine and the other components?

MR. SCHULER:  Object to the form.

Incomplete hypothetical.

A     So paragraph 24 of my reply report, Exhibit 4, you mentioned the citation but didn't say what it was.  So it refers -- the first citation is "Trout, main body of opening report, 131 to 132" -- paragraphs, I should say, 131 to 132.  And if one just goes to paragraph 131, which, again, that is of Exhibit 2, which, again, is just one paragraph in a larger section within the bodies of all of my reports, I'm not sure -- now, if you want me to read the full sentence, it's a long sentence paragraph, but what I say here, after a dash, is:  "A POSA would conclude that the 'pharmaceutically acceptable fluid' recited in the asserted claims refers to the solvent or co-solvent system used to dissolve bendamustine and other excipients for stable liquid pharmaceutical compositions."

Dissolve.  So that's -- and I give the evidence throughout that that's what I mean, further mean in that paragraph 24.  By the way, this is my reply report, so I think I'm replying to Dr. Sinko.

MR. SCHULER:  We've been going for two hours.

Do you want to take a break? — 13:12:50

MR. LIEF:  It's sort of lunchtime. — 13:12:51

MR. SCHULER:  It's lunchtime. — 13:12:54

MR. LIEF:  That would be a good moment. — 13:12:55

THE VIDEOGRAPHER:  We are going off the record.  The time is 1:12. — 13:12:56 / 13:12:57

(Lunch recess was taken.) — 13:13:35

THE VIDEOGRAPHER:  We are going back on the record.  The time is 1:50. — 13:50:54 / 13:50:55

BY MR. LIEF: — 13:51:03

Q    Good afternoon. — 13:51:04

A    Good afternoon. — 13:51:10

Q    During the lunch break, did you have any substantive discussions about your testimony with counsel? — 13:51:14 / 13:51:15 / 13:51:19

A    No, no substantive conversations at all. — 13:51:20 / 13:51:23

Q    Okay.  And would you agree with me that in the pharmaceutical field, the term "pharmaceutically acceptable" is not generally used to -- is not generally used to refer to a sufficient amount of an excipient to dissolve things? — 13:51:24 / 13:51:38 / 13:51:41 / 13:51:51 / 13:52:03 / 13:52:08

MR. SCHULER:  Object to the form. Incomplete hypothetical. — 13:52:12 / 13:52:15

A    Your question started out very general, but then it sounded like you got very specific. Are we back to paragraph 24?  I'm not --

Q    I think it is, you know, a general question about the general usage of the phrase "pharmaceutically acceptable" in the pharmaceutical field.

Would you agree that "pharmaceutically acceptable," as a phrase in the pharmaceutical field, is not specific to amounts necessary to dissolve things?

MR. SCHULER:  Object to the form.  Also incomplete hypothetical.

A    I mean, as I've been quite clear, I hope, and it's really for each of the understanding of each term that you've been asking about, the context makes a difference.

And I think you're referring to what we've been discussing in paragraph 24.  At any rate, that sentence which you already read in, which includes the quote "pharmaceutically acceptable fluid" and what follows and, frankly, what is, I think, throughout my reports is an explanation of how the POSA would understand the claims of the '214 and the '248.  Different terms may mean

different things in different contexts.  But I'm          13:54:15

telling you for -- and it's not just asserting.          13:54:18

I have lots of reasons why that's the case in            13:54:22

this context.                                            13:54:26

    Q    And -- but I think you would agree with     13:54:28

me that in other contexts, the general meaning of        13:54:34

"pharmaceutically acceptable" is not linked to           13:54:39

being a good solvent?                                    13:54:45

        MR. SCHULER:  Object to the form.        13:54:50

    A    If you have another context in mind, I      13:54:55

know --                                                  13:54:58

    Q    Sure?                                       13:55:00

    A    -- you're not shy about bringing up        13:55:00

other contexts, so I'm happy to discuss that.            13:55:02

    Q    Sure.                                       13:55:05

    A    I emphasize that the full quote is          13:55:05

"pharmaceutically acceptable fluid," and I think         13:55:07

it's quite clear what it is.                             13:55:11

    Q    For instance, as one example, if we         13:55:14

could go back to -- I think it was Trout                 13:55:17

Exhibit 8.  This is the patent that you are a            13:55:19

coinventor on, right?                                    13:55:28

        MR. SCHULER:  Can you give me one        13:55:37

second.  This is the crystallization?                    13:55:38

        MR. LIEF:  This is WO2015/095533.        13:55:45

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    139

MR. SCHULER:  Thank you.                                    13:55:50

A    I think what you produced is an                       13:55:52
application, pretty much.  So you -- but --                 13:55:54

Q    The application, yes.                                  13:55:58

A    It's -- as I understand it, PCT                        13:56:00
application, published PCT application, as I                13:56:03
understand it.                                              13:56:07

Q    And you're a coinventor on this, right?               13:56:08

A    Yes.                                                   13:56:14

Q    Okay.  And so here, if you look at                     13:56:15
page 19, starting at around line 22, you'll see a           13:56:21
paragraph that begins, "The phrase                          13:56:38
'pharmaceutically acceptable.'"                             13:56:42

Do you see that?                                            13:56:47

A    Yes.  That's the beginning of that                     13:56:49
line.                                                       13:56:51

Q    And so this reads, "the" -- I'm sorry.                 13:56:52
"The phrase 'pharmaceutically acceptable' is                13:56:58
employed herein to refer to those structures,               13:57:02
materials, compositions, and/or dosage forms                13:57:05
which are, within the scope of sound medical                13:57:08
judgment, suitable for use in contact with the              13:57:11
tissues of human beings and animals without                 13:57:15
excessive toxicity, irritation, allergic                    13:57:18
response, or other problem or complication                  13:57:24

commensurate with a reasonable benefit-to-risk ratio."

Did I read that correctly?

A    Yes.

Q    Okay.  And that general definition of "pharmaceutically acceptable" is the way it's generally used in the pharmaceutical field, correct?

MR. SCHULER:  Object to the form.

A    It says "employed herein."  In other words, it's defining it explicitly in this -- in this document.  The "pharmaceutically acceptable fluid" is used in the '214 and the '248, and in my reports I've explained what that means in the context of the full limitation.

Q    In the context of the '214 and '248 patents, you apply a different definition of "pharmaceutically acceptable," correct?

MR. SCHULER:  Object to the form.

A    Tell me what you're referring to --

Q    Well --

A    -- point me to what you --

Q    -- as you were pointing to, you could look at your reply at paragraph 24.  There, you don't discuss, you know, compatibility with the

141

patient or compatibility with an animal or any of

these other descriptions in the patent that

you're a coinventor of.  You employ a different

definition of "pharmaceutically acceptable,"

right?

        MR. SCHULER:  I'll object.  It's not a

patent; it's an application.

        MR. LIEF:  Application.  Fair enough.

    A   I'm not sure that there's -- what the

differences are you're referring to.  The words

are different.  That one says "employed herein"

in the PCT application.  That, as you correctly

quoted, is "pharmaceutically acceptable," whereas

here, it's "pharmaceutically acceptable fluid."

    But, again, it would be important to see

where it's used.  I'm not sure if it's even used

in the PCT, the claims -- let me just

double-check at least the claims, because I don't

even think it's used.

    So I just skimmed through it.  I may have

missed it, but I don't see it in any of the

claims applied in this PCT application.  Maybe

it's used elsewhere in the specification.

    Q   Well, irrespective of whether it's in

the claim or not, the definition that's given for

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                    142

"pharmaceutically acceptable" in your PCT                    14:01:00

application, Trout Exhibit 8, does not talk about            14:01:07

sufficient amounts to dissolve, correct?                     14:01:19

    A    But -- you always want to pull things               14:01:31

apart instead of comparing what's there.  So this            14:01:37

is a pharmaceutically acceptable fluid which you             14:01:44

correctly quoted, for example, in paragraph 24 of            14:01:47

Exhibit 4, my reply report.  And then I also                 14:01:53

include the quote, same line, same paragraph, "a             14:01:59

fluid which is suitable for pharmaceutical use."             14:02:05

    But this is just "pharmaceutically                       14:02:11

acceptable," and as we discussed, it's generally             14:02:15

a pharmaceutical context, but it's quite                     14:02:17

different than the context here, and it's                    14:02:19

different wording.                                           14:02:23

        (Discussion off the record.)                         14:03:08

BY MR. LIEF:                                                 14:03:16

    Q    If you could go to 9, which we've                   14:03:19

marked, and if you look there at page 15, there's           14:03:21

a phrase that starts -- there's a paragraph that             14:03:46

starts at around line 9.                                     14:03:51

    Do you see that?  It says the phrase                     14:03:54

"pharmaceutically acceptable carrier."                       14:03:57

    Do you see that?                                         14:04:00

    A    Yes.                                                14:04:02

Q    Okay.

A    And "pharmaceutically acceptable carrier" is in quotes.

Q    Yes.  And so I'll read this.  And this reads:

"The phrase 'pharmaceutically acceptable carrier' as used herein means a pharmaceutically acceptable material, composition, or vehicle such as a liquid or solid, filler, diluent, excipient, solvent, or encapsulating material involved in carrying or transporting the subject chemical from one organ or portion of the body to another organ or portion of the body.  Each carrier must be 'acceptable' in the sense of being compatible with the other ingredients in the formulation, not injurious to the patient, and substantially nonpyrogenic."

I'll stop there.  The paragraph goes on. But did I read that portion of the paragraph correctly?

A    Yes.

Q    Okay.  And that usage of that word "acceptable" there with respect to these carriers is the general way people think about "pharmaceutically acceptable" in the

pharmaceutical field, correct?

MR. SCHULER:  Objection.  Lack of foundation.  Also object to the form.

A    Just so I'm absolutely clear to your question, you're just asking about the quote "acceptable"?

Q    Yup.  "Each carrier must be 'acceptable' in the sense of being compatible with the other ingredients of the formulation, not injurious to the patient, and substantially nonpyrogenic."

That's the general definition of "pharmaceutically acceptable," right?

MR. SCHULER:  Objection to the form.

A    That's in quotes, so that's under the definitions section, so that's the definition here.

Again, if we go to the claims, I'm not sure if it's even used at all.

Q    Is there any significance to that, going to the claims aspect of your testimony?

A    Well, yes, I would say so.  I think there's often many terms, many things in a specification, even just an application, that aren't necessarily reflected in the claims.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

145

With respect to my reports and the "pharmaceutically acceptable fluid" element for shorthand, that's literally an element in all of the claims, all the asserted claims. So that's what we're trying to understand. A term that's defined and not used -- there's a lot of things, a lot of terms. There are a lot of terms, but also a lot of claim embodiments, a lot of things discussed in a specification that may have varying degrees of relevance to a given claim.

As far as I see, there's no use of that term in the PCT application, but in the '214 and '248, that's what we're trying to understand, what it means, or actually, that's what the POSA understands what it means, as I've been discussing it.

Q    Are you saying that the definition that's given of an "acceptable carrier" in your PCT application is not a real definition in the pharmaceutical field?

MR. SCHULER:  Object to the form.

A    No, Mr. Lief.  I did not say that.

Q    It is a real definition, right?  That's a reasonable definition of what a "pharmaceutically acceptable carrier" is, right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

146

MR. SCHULER: Object to the form.

A I think it's certainly a reasonable definition within the context of this application. Again, I can look through it as a whole, but, you know, I remember it broadly, and it's used -- it's used here. I'm not sure if it's ever used again, if there's any particular context.

But I emphasize that the "pharmaceutically acceptable carrier" includes this: "Transporting the subject chemical from one organ or portion of the body to another organ or portion of the body." And I think that's quite a specific definition, specific to this document.

Q In terms of your understanding of the law of infringement, when it relates to a "consisting of" phrase in the current case, I think you would agree with me, but tell me if I'm wrong, that if one had an unrecited fluid in one's product that was not recited after "consisting of" and that fluid was not an impurity and was related to the invention, then one would not infringe?

MR. SCHULER: I'll object to the extent it calls for a legal conclusion. And his reports

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    147

speak for themselves.                                    14:10:53

A    I think I addressed this exactly in my             14:11:39
opening expert report, Exhibit No. 2, starting on        14:11:48
page 24, where I talk about exactly this point.          14:11:58
It's Section B, "Claim Structure."  And as I say         14:12:06
"comprising," that's the second line of                  14:12:13
paragraph 103, "comprising" -- that's in                 14:12:17
quotes -- "certain components; i.e., 'including          14:12:22
but not limited to' the components set forth in          14:12:26
each claim."                                             14:12:31

And then in paragraph 104, just below, I                14:12:32
address this and say, starting at the second --          14:12:41
it's all important, but I'm just giving you a            14:12:47
summary:                                                 14:12:50

"A POSA would understand that the                       14:12:50
pharmaceutically acceptable fluid is a solvent           14:12:53
system that is limited to polyethylene glycol and        14:12:55
optionally one or more of propylene glycol,              14:12:59
ethanol, benzol alcohol, and glycofurol, with the        14:13:02
legal exceptions for impurities and other                14:13:07
substances unrelated to the pharmaceutically             14:13:09
acceptable fluid element."                               14:13:12

Q    So my question, though, is a little                14:13:14
different.                                               14:13:16

MR. SCHULER:  I don't think he was                      14:13:17

done.

MR. LIEF:  I think he was done.

MR. SCHULER:  Were you done?

MR. LIEF:  He looked up at me.

THE WITNESS:  Yeah, yeah.  I was done.

MR. SCHULER:  Sorry.

BY MR. LIEF:

Q    As I was saying, my question is a little different.

If we were to agree that some substance is a pharmaceutically acceptable fluid, let's call it X, and we all agree that -- for purposes of the patents-in-suit, it is a "pharmaceutically acceptable fluid."  I'm asking you to take that as a given, as a hypothetical for this question. And X is not listed after "consisting of," "pharmaceutically fluids consisting of" five fluids, but not X, and we further were to agree that X is not an impurity and X is related to the limitation "pharmaceutically acceptable fluid," I think you would agree that the law says in that circumstance that the presence of X as a nonimpurity related to "pharmaceutically acceptable fluids" and a "pharmaceutically acceptable fluid" itself means that that product

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                           149

does not infringe.  That's your understanding of the law of "consisting of," correct?

MR. SCHULER:  Object to that question. It was hopelessly vague.

But if you understand it, you can answer.

And it's clearly an incomplete hypothetical.  You didn't explain what is in the product at all.  Then at the end you said "the product."

Q    Assume a product that, in every other way, infringes and it has PEG and it has maybe some PG and it has bendamustine at the right amount and it has an antioxidant at the right amount and it's stable, and it has this additional "pharmaceutically acceptable fluid" that we will assume is a "pharmaceutically acceptable fluid" and is not an impurity and is related to that limitation.

If all of that were the case and that X chemical was in a product, you would agree that that product does not infringe?

MR. SCHULER:  I'll object.  Still an incomplete hypothetical.  Are you saying X is in it and is listed as one of the ingredients in the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    150

label?

   MR. LIEF:  X is an ingredient in the label.  We can even say that.

 A I talk about infringement in my opening report.  I have some legal understandings starting on page 8.  If you want to go, it's Exhibit No. 2 still.

 And I understand, as I say in paragraph 30, that "when considering whether a person or entity infringes a patent, each asserted claim must be considered individually against an accused product."

 But also in paragraph 31, I understand that an accused product may still infringe an asserted claim under the "Doctrine of Equivalents," even if it does not literally infringe the asserted claim.  And then I continue.  Those are excerpts from this.

 So I think I would say to do an infringement analysis, one would have to just do the analysis and if, in the end, one concludes that the "pharmaceutically acceptable fluid" limitation or any other limitation, as far as I understand, is not infringed, then the claim -- therefore, the claim isn't infringed, and, therefore, it

wouldn't be infringed, except for this Doctrine of Equivalents.

But that's the analysis I did here for Slayback's products. But you're the lawyer. I'm not trying to make a legal analysis.

I talk about the infringement here, but for any other situation, one would have to do an analysis, and if one determines that it's not infringed literally or under the Doctrine of Equivalents -- there might be others -- then it wouldn't infringe.

Q    Okay. And so for literal infringement purposes only, if you had a formulation that had the right amount of bendamustine and it had PEG and it had maybe one of the optional fluids and it had an antioxidant and it was stable, as called for in the claim, and it had this additional ingredient X, and for this question, we'll assume that X meets whatever definition of "pharmaceutically acceptable fluid" we wish. And X is a "pharmaceutically acceptable fluid," but it is not listed after "consisting of," it is not an impurity and it is related to "pharmaceutically acceptable fluids."

In that scenario, I think you would agree

that the law concludes that that formulation does                    14:19:26

not literally infringe?                                              14:19:32

        MR. SCHULER:  Objection.  You're asking             14:19:33

an expert who's a scientist what the law                             14:19:34

concludes?                                                           14:19:36

        MR. LIEF:  Well, he's drawing a                     14:19:37

conclusion of infringement, and I want to --                         14:19:40

        MR. SCHULER:  You literally said "the               14:19:44

law concludes" as opposed to "a POSA would                           14:19:45

conclude."  I don't think he's capable of saying                     14:19:47

what the law concludes.  That's for the federal                      14:19:50

circuit.                                                             14:19:52

        MR. LIEF:  I think he should have some              14:19:53

sense of what the law is consisting of.                              14:19:54

        MR. SCHULER:  I have no objection if                14:19:58

you ask him a POSA would conclude.  I really                         14:19:59

don't.  I'm not trying to --                                         14:20:02

        MR. LIEF:  Well, it's just a long                   14:20:02

question, and now you're going to make me restate                    14:20:03

it again.  That's fine.  All right.  I'll do it.                     14:20:06

        MR. SCHULER:  If he --                              14:20:09

BY MR. LIEF:                                                         14:20:10

    Q   I want to know, really, what you                  14:20:11

conclude, and maybe that's the way to ask it.                        14:20:12

    Would it be your understanding with the                    14:20:15

claims in suit, the '214 and '248 patents, that if you had a formulation that met all the other limitations, it had the right amount of bendamustine, it had an antioxidant that was stabilizing, stabilizing amount, it had the PEG and/or an optional fluid that's listed, and it was satisfactorily stable, as called for in the claims, but it had an additional ingredient -- we'll call it X -- and that additional ingredient X, we would, for this question, understand X to be a "pharmaceutically acceptable fluid" that is not an impurity and that is related to the "pharmaceutically acceptable fluid" limitation, would you understand that that formulation, as I have described it, would not literally infringe?

MR. SCHULER:  It's still an incomplete hypothetical.

A    Okay.  I discuss infringement here, my understanding of it, and I did an extensive analysis over multiple reports.

So I would need the type of information that was in all of my reports to come up with a conclusion.  So I need to have -- do an analysis like I did here.

But, having said that, my understanding is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    154

if it were a given, because I know people

disagree on things, but if it were a given that

it had a sterile vial containing all these other

things, but it did not contain or does not -- did

not, subjunctive, contain a "pharmaceutically

acceptable fluid" consisting of polyethylene

glycol and optionally one or more of propylene

glycol, ethanol benzyl alcohol, and glycofurol,

then it would not infringe.

    Q   Thank you.

    All right.  As part of your noninfringement

analysis, if we could look in your opening

report, for instance, at paragraph 70.  This is

repeated in other places, but this is an example.

    Do you have that?

    A   Yes, I am there.

    Q   So paragraph 70, the first words of the

first sentence read:

    "Sodium hydroxide (NaOH), a solid," and it

goes on.

    Do you see that?  Do you see that?

    A   Yes.  The rest is important, though.

    Q   Well, I'm asking you about one thing at

a time.

    If you look then again at paragraph 199 in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

155

your opening report, paragraph 199 reads:     14:23:50

"As explained in Section Roman Numeral VII,     14:24:02

a POSA would understand the claimed     14:24:07

'pharmaceutically acceptable fluid' to be a     14:24:10

solvent for bendamustine."     14:24:13

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇     14:24:15

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇     14:24:19

▇▇▇▇▇▇▇▇▇▇     14:24:26

Q     Did I read that correctly?     14:24:30

A     Almost.     14:24:35

Q     What did I miss?     14:24:36

A     Well, you didn't include the quotes     14:24:37

around "pharmaceutically acceptable fluid."     14:24:39

Q     Okay.     14:24:43

A     And it's important to include those for     14:24:43

the reasons we discussed.     14:24:45

Q     That's fine.  That doesn't change my     14:24:48

question.     14:24:49

A     Okay.     14:24:51

Q     Other than that, I read that correctly?     14:24:51

A     Yes.     14:24:56

Q     ▇▇▇▇▇▇▇▇▇▇▇▇     14:24:57

▇▇▇▇▇▇▇▇▇▇▇▇▇▇     14:25:03

▇▇▇▇▇▇▇▇▇▇▇▇     14:25:08

▇▇▇▇▇▇▇▇▇▇▇▇▇▇     14:25:12

MR. SCHULER: Just as a matter of fact, we should now designate this Confidential -- Highly Confidential.

MR. LIEF: We should. I think this should be Highly Confidential - Attorneys' Eyes Only as we get into the Slayback product. And I would assume it would be the same tomorrow for the Apotex product.

MR. SCHULER: This is one transcript. That will be a separate one. That will be up to Mr. Ferenc to decide what he wants to designate that transcript.

MR. LIEF: I don't know that the defendants agree with that.

MR. FERENC: This is not going to be a separate transcript. We never agreed to that.

MR. SCHULER: You don't get to agree or not agree. The rule is --

MR. FERENC: The parties have agreed

to --

MR. SCHULER:  We haven't agreed to anything.

MR. FERENC:  -- earlier today.  We can talk about it again.

MR. SCHULER:  We're not going to.

MR. FERENC:  The notion there is going to be two separate transcripts is completely inefficient.  And we talked about this with respect to both parties examining Dr. Trout on his opinions and achieving efficiencies across issues common to the reports, including Dr. Trout's background.  We will be objecting on the timing.  We even contended that there were several issues that were overlapping and wanted to achieve efficiencies.  This notion we're having two separate depositions is simply not supported by the parties' agreement as evidenced by the emails and communications exchanged.

MR. SCHULER:  There's no such agreement.  The rule says a person shall be deposed once in an action.  He's getting deposed once in the Slayback action and once in the Apotex action.  You guys have made pains to say this is not consolidated; it's only coordinated.

They are two separate actions.  That's how we're going to proceed.

You have no basis to claim otherwise. The rules are the rules and that's that.  But we're not going to spend more time on the transcript.

(Simultaneous speaking.)

MR. SCHULER:  I agree with counsel. You're not being heard, because Mr. Lief and I are going to continue the deposition.

MR. FERENC:  -- depositions in this case.

MR. LIEF:  I do agree with counsel for Apotex, and we do object to it being split that way for the purpose of being able to avoid the rule that you don't speak during a deposition --

MR. SCHULER:  I'm not avoiding the rule.  The rule only applies if we were at trial or in a consolidated action.  We're not.  I offered that as a compromise to the fact that they are separate and we will have separate transcripts.  You guys didn't agree to it. Therefore, we're having separate transcripts.

MR. LIEF:  Well, again, we respectfully disagree.  But we should continue.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

159

MR. SCHULER:  But I also wanted to note that whatever -- when he's referring to "that," it wouldn't be in your opening report, because that's only the public information about the product.

MR. LIEF:  It would be in the appendix for Slayback.  If you want to look at something specific to the Slayback process --

MR. SCHULER:  We marked that as --

MR. LIEF:  We did.  I believe it's Appendix something.  It's one of the existing exhibits that is --

MR. SCHULER:  3.

MR. LIEF:  3.  There it is.  It's 3. Thank you.

BY MR. LIEF:

Q    So the pending question is:

14:30:44
14:30:50
14:30:53
14:30:58
14:31:02
14:31:02
14:31:05
14:31:05
14:31:10
14:31:15
14:32:13
14:32:25
14:32:28
14:32:34
14:32:39
14:32:43
14:32:48
14:32:51
14:32:55
14:33:04
14:33:09
14:33:11
14:33:16
14:33:19
14:33:24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

161

14:33:30
14:33:35
14:33:39
14:33:43
14:33:51
14:33:55
14:33:57
14:34:00
14:34:06
14:34:10
14:34:16
14:34:23
14:34:28
14:34:30
14:34:34
14:34:37
14:34:40
14:34:44
14:34:45
14:34:49
14:34:53
14:34:56
14:35:01
14:35:04
14:35:09

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    162

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                           163

14:36:38
14:36:41
14:36:46
14:36:49
14:36:54
14:36:56
14:36:58
14:37:01
14:37:13
14:37:18
14:37:22
14:37:26
14:37:30
14:37:35
14:37:39
14:37:42
14:37:45
14:37:47
14:37:50
14:37:57
14:37:59
14:38:01
14:38:10
14:38:17
14:38:22

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                         164

14:38:30

14:38:35

14:38:40

14:38:45

14:38:50

14:38:55

14:38:59

14:39:03

14:39:10

14:39:15

14:39:19

14:39:22

14:39:26

14:39:40

14:39:42

14:39:47

14:39:54

14:39:59

14:40:04

14:40:08

14:40:12

14:40:18

14:40:23

14:40:26

14:40:29

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    165

14:40:32

14:40:36

14:40:39

14:40:44

14:40:47

14:40:49

14:40:53

14:40:56

14:40:58

14:41:00

14:41:05

14:42:21

14:42:33

14:42:39

14:42:41

14:42:43

14:42:44

14:42:53

14:42:57

14:42:58

14:43:01

14:43:05

14:43:08

14:43:25

14:43:26

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    166

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

167

14:44:51

14:44:54

14:44:57

14:45:02

14:45:04

14:45:10

14:45:20

14:45:22

14:45:24

14:45:27

14:45:27

14:45:29

14:45:32

14:45:33

14:45:39

14:45:42

14:45:44

14:45:46

14:45:48

14:45:50

14:45:51

14:45:52

14:45:54

14:45:57

14:45:58

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    168

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                              169

14:47:42

14:47:47

14:47:47

14:48:02

14:48:05

14:48:12

14:48:19

14:48:23

14:48:36

14:48:37

14:48:46

14:48:49

14:48:52

14:49:02

14:49:05

14:49:10

14:49:13

14:49:14

14:49:21

14:49:25

14:49:30

14:49:34

14:49:34

14:49:41

14:49:42

170

14:49:44

14:49:44

14:49:46

14:49:50

14:49:53

14:49:55

14:50:01

14:50:07

14:50:09

14:50:14

14:50:20

14:51:00

14:51:03

14:51:09

14:51:14

14:51:17

14:51:22

14:51:30

14:51:34

14:51:39

14:51:45

14:51:49

14:51:55

14:52:03

14:52:08

14:52:12

14:52:14

14:52:19

14:52:22

14:52:26

14:52:29

14:52:34

14:52:37

14:52:38

14:52:41

14:52:44

14:52:51

14:52:56

14:52:59

14:52:59

14:53:03

14:53:07

14:53:11

14:53:16

14:53:18

14:53:18

14:53:21

14:53:24

14:53:26

14:53:27

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    172

14:53:30
14:53:32
14:53:37
14:53:40
14:53:48
14:53:50
14:53:58
14:54:03
14:54:12
14:54:18
14:54:22
14:54:27
14:54:30
14:54:38
14:54:45
14:54:51
14:54:57
14:55:00
14:55:03
14:55:07
14:55:10
14:55:16
14:55:17
14:55:33
14:55:36

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

173

14:55:41
14:55:44
14:55:47
14:55:52
14:55:54
14:55:59
14:56:03
14:56:06
14:56:08
14:56:11
14:56:16
14:56:18
14:56:23
14:56:27
14:56:36
14:56:37
14:56:38
14:56:43
14:56:49
14:56:54
14:57:00
14:57:07
14:57:09
14:57:12
14:57:18

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    174

Q    Thank you.

MR. LIEF:  Let me mark as Trout Exhibit 11 an excerpt from the Handbook of Pharmaceutical Excipients from 2006.

(Excerpt from Handbook of Pharmaceutical Excipients relating to Polyethylene Glycol marked Exhibit 11.)

BY MR. LIEF:

Q    Dr. Trout --

MR. SCHULER:  Oh, third page?

MR. LIEF:  Yeah.

Q    Dr. Trout, this is an excerpt from the 2006 Handbook of Pharmaceutical Excipients for its section on polyethylene glycol.

Have you seen this before?

A    I probably have.  I have exactly this edition in my bookshelf.  I certainly looked through it.

Q    Sure.

A    I'm probably familiar with it generally.

Q    Okay.  Now, PEG, itself, has multiple functional categories, correct?

MR. SCHULER: Object to the form.

A    Oh, sorry. You're referring to Section 6 on the right column, first page?

Q    Sure.

A    Yes. There are several listed.

Q    Okay. And, for instance, in Section 7, which is entitled "Applications in Pharmaceutical Formulation or Technology," if you look down to the fourth paragraph there, it states:

"Aqueous polyethylene glycol solutions can be used either as suspending agents or to adjust the viscosity and consistency of other suspending agents."

It should say "suspending vehicles."

Do you see that?

A    With that correction, there's a sentence there that says that.

Q    And in that role, the polyethylene glycol would not be a solvent, right?

MR. SCHULER: Object to the form.

A    I just want to ask, you're referring to aqueous polyethylene glycol solutions?

Q    Right.

A    Could you state your question, please, just so I have it.

Q    So those can be used not only as solvents, but they can be used in emulsions, correct?

MR. SCHULER:  Object to the form.

A    I mean, this is a high-level description which talks about suspending agents. But what's important from the standpoint of the analysis of the patent is how it's used in the patent.

But I agree there are ways of using polyethylene glycol that aren't relevant -- directly relevant to the '214, '248 patents.

Q    Okay.

A    I mean, it looks -- you mentioned functional category.  There's a tablet and capsule lubricant, suppository base.  So there are different functions that are not of direct relevance to the patents.

Q    But as a liquid, in its liquid state, the polyethylene glycols that are liquids can be solvents or they can be involved in suspensions and emulsions as well?

MR. SCHULER:  Object to the form.

A    That's a statement, but you're making it a question?

Case 1:24-cv-00065-JLH Document 465-9 Filed 08/07/26 Page 179 of 308 PageID #: 25958
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

177

Q   Well, you could add to the statement, "that's correct, isn't it?"

A   Well, this -- there are different uses outside of the '214 and '248 patents for polyethylene glycols.  This paragraph that you refer to specifically talks about aqueous polyethylene glycol solutions, which, first of all, that's not relevant to these patents, nor are suspending agents.

Q   Because you discount the word "disperse" in the patent specification and say it only involves dissolving, right?

MR. SCHULER:  Object to the form.

A   No.  That's highly oversimplified. I've done an analysis of the patents as a whole, in their context, with all the materials I've cited in my reports and my knowledge as a POSA -- well, applying my knowledge to what a POSA -- how a POSA would understand these claims.

Q   Okay.  And you do agree that PEG 400 is a liquid?

A   Generally, at room temperature, it's a liquid.  Or conditions of interest, I should say. Temperatures of interest and other conditions of interest, generally the case.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                178

MR. LIEF:  We'll mark as Trout Exhibit 12 another excerpt from the Handbook of Pharmaceutical Excipients for polyethylene glycol.

(Excerpt from Handbook of Pharmaceutical Excipients relating to Propylene Glycol marked Exhibit 12.)

THE WITNESS:  Thank you.

BY MR. LIEF:

Q    With respect to the polyethylene glycol section of the handbook, there are various functional categories at Topic 6, "Functional Category."

Do you see that?

A    Yes.

Q    And amongst them are antimicrobial preservative, disinfectant, humectant, plasticizer, solvent, stabilizer for vitamins, and water-miscible co-solvent.

Do you see that?

A    Yes.

Q    And so amongst the functions that polyethylene glycol can perform in a formulation, not all of them are solvents, right?

A    Yes.  But the question is what's

15:05:07
15:05:08
15:05:10
15:05:13
15:05:13
15:05:13
15:05:13
15:05:26
15:05:27
15:05:41
15:05:44
15:05:49
15:05:53
15:05:53
15:05:59
15:06:00
15:06:04
15:06:08
15:06:13
15:06:19
15:06:23
15:06:29
15:06:33
15:06:37
15:06:47

relevant, what's the function in the patents-in-suit, the '214 and the '248.  And I've done an analysis of this, including what specifically the specification says about polyethylene glycol.

Q    Okay.

A    And it's in my report.  We can find it, but it refers to the patent.

Q    I think we have your answer on that question.

And as we discussed with polyethylene glycol, if you look at the description part in the right-hand column for propylene glycol, it is "a clear, colorless, viscous, practically odorless liquid."

It's a liquid, correct, at room temperature?

A    Yes.  I mean, the description continues, but...

Q    "With a sweet, slightly acrid taste resembling that of glycerine," right?

A    Yes.

Q    But like PEG, polyethylene glycol, propylene glycol is also a liquid, correct?

MR. SCHULER:  Object to the form.

A    It's a liquid at the conditions of

180

interest.  That's the state of matter.

15:08:22

MR. LIEF:  Correct.

15:08:27

A    I want to be clear.  We're talking -- we're talking about the state of matter, and I know there's a lot of discussion of liquid and fluid, and I discuss this in my report.  So I want to be clear:  That's the state of matter and that's how in the patents one gets the liquid at the top.

Then there's the "pharmaceutically acceptable fluid" limitation, and it's important not to confound the two.  So I've been saying, yes, the state of the matter is liquid, not solid or gas.

MR. LIEF:  Okay.  We'll mark as -- I think it's Trout 13, another excerpt from the pharmaceutical -- the Handbook of Pharmaceutical Excipients.

(Excerpt from Handbook of Pharmaceutical Excipients relating to Alcohol marked Exhibit 13.)

MR. SCHULER:  One of my favorite substances.

BY MR. LIEF:

Q    And the substance that Mr. Schuler is

referring to has a heading of "Alcohol." But can you confirm for me, as a chemist, that alcohol here, in particular, is referring to ethanol?

A   Yes.  The reference is to ethyl alcohol or ethanol, noting that, depending on the grade, it has -- like the other excipients that we discussed, has some water in it.  But the reference here is focusing on ethanol.

Q   And amongst the functional categories for ethanol, it lists antimicrobial preservative, disinfectant, skin penetrant, and solvent, correct?

A   Yes.

Q   And so ethanol in a formulation could play one or more of those roles?

MR. SCHULER:  Object to the form. Incomplete hypothetical.

A   In broad terms, here, as I've discussed, it's used as -- optionally as part of the solvent.

Q   Okay.  Do you think that the ethanol in Slayback's product stops being an antimicrobial preservative because it's a solvent?

A   ███████████████████████████
████████████████████████████████

15:09:38
15:09:42
15:09:47
15:10:14
15:10:19
15:10:23
15:10:30
15:10:32
15:10:36
15:10:39
15:10:43
15:10:48
15:10:53
15:10:55
15:11:00
15:11:04
15:11:06
15:11:10
15:11:14
15:11:18
15:11:20
15:11:24
15:11:31
15:12:01
15:12:06

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

182

Q    In coming to your opinion --

MR. SCHULER:  Hang on one second.

Sorry.  I knocked it over.

BY MR. LIEF:

Q

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                183

MR. SCHULER:  Is this a good time for a break?

MR. LIEF:  One more question?

MR. SCHULER:  Sure.

BY MR. LIEF:

Q    So with respect to alcohol, am I also correct that in the description, we'll say at room temperature?

MR. SCHULER:  You're back at this.

MR. LIEF:  Yes.

BY MR. LIEF:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                184

Q    With respect to alcohol, again, at reinsurance it's described as being a liquid, correct?

MR. SCHULER:  Just so I'm following, which number?

MR. LIEF:  Right-hand column, under 8, which begins in the left-hand column.

MR. SCHULER:  Oh, the last part of 8?

MR. LIEF:  Yeah, the last part of 8.

BY MR. LIEF:

Q    It's described as a liquid, right?  And it is.

MR. SCHULER:  Every time I've used it.

I'll withdraw that.

Do you understand the question?

A    Yes.  It certainly says it's a volatile liquid, and I think there's no disagreement that it's in a liquid state.

MR. LIEF:  Okay.  That would be a good time for a break.

THE VIDEOGRAPHER:  We are going off the record.  The time is 3:16.

(A recess was taken.)

THE VIDEOGRAPHER:  We are going back on the record.  The time is 3:33.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

185

BY MR. LIEF:

Q    Okay.  Have you done any experiments at all for this litigation?

A    I have not done laboratory experiments.  I've used experimental results in all the analyses that I've reported here.

Q    Okay.  Other than Dr. Kittendorf's experiments, are you aware of any experiments that were done for this litigation?

A    Oh, you stopped?  Sounded like you were still going.

Well, I mean, aside from the Slayback data, I guess those experiments were related to this litigation.  Those are the only ones that come to mind.

Q    You didn't authorize any other laboratory beyond your own to do an experiment?

A    What do you mean, beyond my own?

Q    Yeah.  Like you said, you didn't do any experiments.

Did you tell someone else at some other laboratory to do an experiment for this case?

A    No.  I only used all the information that I report here.

Q    And other than what's in your reports

15:33:50
15:33:51
15:33:54
15:34:04
15:34:07
15:34:11
15:34:13
15:34:19
15:34:20
15:34:32
15:34:34
15:34:40
15:34:44
15:34:47
15:34:55
15:34:55
15:34:58
15:35:05
15:35:08
15:35:10
15:35:11
15:35:13
15:35:18
15:35:21
15:35:23

and Dr. Kittendorf's experiments, you're unaware of any other experiments that were done for this case?

A    I mean, just what I discuss in my reports.  I'm not aware of any others, sitting here.

Q    Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    187

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

188

15:39:21

15:39:23

15:39:26

15:39:36

15:39:39

15:39:44

15:39:47

15:39:47

15:39:53

15:39:59

15:40:11

15:40:17

15:40:24

15:40:27

15:40:40

15:40:45

15:40:52

15:41:02

15:41:07

15:41:15

15:41:16

15:41:28

15:41:33

15:41:40

15:41:43

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

189

15:41:53

15:42:01

15:42:07

15:42:10

15:42:13

15:42:14

15:42:17

15:42:24

15:42:25

15:42:26

15:42:28

15:42:29

15:42:31

15:42:34

15:42:38

15:42:41

15:42:46

15:42:53

15:42:57

15:43:10

15:43:14

15:43:20

15:43:22

15:43:26

15:43:31

MR. LIEF:  We'll mark as Trout 14 another excerpt from the pharmaceutical handbook from 2006.

(Excerpt from the Handbook or Pharmaceutical Excipients relating to Benzyl Alcohol marked Exhibit 14.)

BY MR. LIEF:

Q    And this excerpt is for another one of the recited fluids in the claim, benzyl alcohol.

Do you see that?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026          191

A    Yes.

Q    Okay.  And benzyl alcohol has several listed functions, correct?

MR. SCHULER:  Object to the form.

A    Again, you're talking about 6, "Functional Category"?

Q    Correct.

A    Yeah.  There are three listed there.

Q    And so it lists antimicrobial preservative, disinfectant, and solvent, correct?

A    Yes.

Q    Okay.  And so, again, fair to say that benzyl alcohol, while it may be a solvent, could also play other roles in the formulation?

MR. SCHULER:  Object to the form.

A    Now, by "the formulation," I think you're referring to the patents again or some other formulation?

Q    In the patented formulations, if you had benzyl alcohol, it could be a solvent.  It could also simultaneously be an antimicrobial preservative, correct?

MR. SCHULER:  Object to the form.  Incomplete hypothetical.

A    Again, as I, like the others, have --

15:45:57
15:45:59
15:46:05
15:46:09
15:46:19
15:46:20
15:46:23
15:46:26
15:46:29
15:46:31
15:46:35
15:46:39
15:46:43
15:46:47
15:46:55
15:46:57
15:47:00
15:47:02
15:47:04
15:47:06
15:47:12
15:47:16
15:47:18
15:47:18
15:48:09

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    192

for example on page 27, paragraph 110 of my      15:48:12

opening report, Exhibit 2:      15:48:19

"A POSA would also understand that each      15:48:21

pharmaceutically acceptable fluid listed in the      15:48:27

claims, polyethylene glycol, propylene glycol,      15:48:29

ethanol, benzyl alcohol, and glycofurol, are      15:48:33

solvents for bendamustine used to dissolve poorly      15:48:36

soluble or unstable actives to form injectable      15:48:40

solutions."      15:48:44

So the point -- and that's just a statement,      15:48:45

and I refer to the patent in various places      15:48:50

further on.  But the point of the benzyl alcohol      15:48:53

in the limitation that we're talking about is as      15:48:57

part of the pharmaceutically acceptable fluid      15:49:01

with PEG and then optionally, in this case,      15:49:08

benzyl alcohol.      15:49:12

So -- and that fluid has the function that      15:49:13

I've explained throughout my reports.      15:49:17

Q    But even if it's playing that function      15:49:21

as a solid, that doesn't preclude it from also      15:49:23

killing some bacteria, being an antimicrobial,      15:49:27

right?      15:49:32

A    I'd have to look at a specific      15:49:44

circumstance.  From the analysis of the claims,      15:49:47

specifically in light of the specification and      15:49:58

the file history and the knowledge of a POSA, as I've been discussing throughout my report, that's the point of benzyl alcohol here. I'd have to think about it if there's an actual formulation in which it purportedly has a different function. The function here is as a co-solvent.

Q I guess the question is a little different. It's not really about the claim. It's about the chemistry of, in this instance, benzyl alcohol.

Is it impossible that it could be doing two things in some formulation, that it could be both a solvent and an antimicrobial?

Is that, in your view, impossible for an excipient?

MR. SCHULER: Object to the form.

A No. You're talking about outside of the patents here. I agree. It can be used as an antimicrobial preservative. My point is how the POSA would understand the limitation here, which explicitly has benzyl alcohol in it.

Q Well, at the beginning, you agreed, but then the rest of your answer, I think, answered a different question. So let me try again.

Is it impossible for an excipient benzyl

alcohol to do two things in the same formulation, be a solvent and an antimicrobial also?  Is it relegated to only doing one thing in any particular formulation?

MR. SCHULER:  Object to the form.  It's multiple questions.

A    As far as the first one, I think I did answer your question.  To the extent that you're asking the same question, I would have the same answer, which is that, as the Handbook of Pharmaceutical Excipients states and my experience, benzyl alcohol could act as an antimicrobial preservative.  Here in the patent, it's clearly a solvent, co-solvent, whatever you want to call it, that goes with PEG.

If you have a specific -- something specific in mind, nothing is coming to my mind, but the function in the patent is specific to its function as a solvent, again, as I noted here in this paragraph 110 that I referenced before in Exhibit 2 and throughout my reports.

Q    Okay.  Benzyl alcohol, am I also correct, at room temperature is a liquid, as reported in the handbook?

A    Yes.  That's its state of matter at

15:51:43
15:51:46
15:51:53
15:51:55
15:51:58
15:52:00
15:52:06
15:52:13
15:52:16
15:52:18
15:52:22
15:52:26
15:52:32
15:52:35
15:52:40
15:52:44
15:52:46
15:52:51
15:52:56
15:53:01
15:53:04
15:53:14
15:53:18
15:53:22
15:53:32

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    195

room temperature.  Again, in the patents, it's     15:53:34
under the pharmaceutically acceptable fluid        15:53:37
limitation.                                        15:53:39

          MR. LIEF:  Okay.  And let me mark as --  15:53:41
is it 15?                                          15:53:44

          MR. SCHULER:  Yes.                       15:53:48

          MR. LIEF:  Trout Exhibit 15, another     15:53:48
excerpt from the handbook.  And this one is for    15:53:50
glycofurol.                                        15:54:07

          (Excerpt from the Handbook or            15:54:11

     Pharmaceutical Excipients relating to         15:54:11

     Glycofurol marked Exhibit 15.)                15:54:11

BY MR. LIEF:                                        15:54:11

     Q    And the functions listed for glycofurol  15:54:18
are penetration enhancer and solvent, correct?     15:54:23

     Do you see that?                               15:54:27

     A    Under 6, "Functional Category."  Yes,    15:54:33
those are there.                                   15:54:35

     Q    And glycofurol itself also, at room      15:54:46
temperature, is a liquid, correct?                 15:54:51

     A    Again, agreed.  That's the state of      15:54:57
matter.  In the patents it's clearly under the     15:54:59
pharmaceutically acceptable fluid limitation.      15:55:05

     Q    And with respect to all five of the      15:55:10
pharmaceutically acceptable fluids that we've      15:55:14

looked at in the handbook, I am correct that all five of those are also organic compounds?

A    Yes.  Using the general, very general definition of "organic compounds."

Q    And they're also all protic compounds, correct?

A    Yes.

Q    And would you agree that they're also all nonaqueous compounds?

A    Again, agree.  So "aqueous" means water, I think, in your question, H20.  These are not water.  As I have been emphasizing in all of these, there's going to be some percentage of water impurity.

Q    But the compound itself is nonaqueous, all five of them?

A    Those compounds are not water, as such. I only -- I'm not sure why you're using that term exactly.  I just want to be careful because I know it was a term of issue in the past, so I want to be careful.  But aqueous -- "nonaqueous" means not water, and these are not water, noting that they can have some amount of water with them as an impurity.

Q    In your experience in the

pharmaceutical field, have you ever seen more than one definition for the word "solvent"?

MR. SCHULER:  Object to the form.

A    As I've been saying, the use of the word "solvent" can depend on the context.  If you have something in mind, I'm not sure what you might be referring to, but I can look at it.

I think it's the solvent is -- with respect to the patents is, as I've been discussing, in my reports █████████████████████

Q    In your understanding of the word "solvent" in the patents, does it require that the solvent dissolve bendamustine only, or does it need to dissolve the other excipients in the product as well?

MR. SCHULER:  Object to the form.

Do you mean in the claims or in the specification, or both?

BY MR. LIEF:

Q    Let's start with the claims.

A    I mean, again, I think, as we've been saying, the term -- the word "solvent" is not part of the claims.  It's the pharmaceutically acceptable fluid consisting of, and the other components and, as I've discussed extensively in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

198

all my reports, how the skilled person would understand that function of that limitation. But maybe you're referring to the limitation. I'm not sure what you're referring to.

Q   In that regard, we'll take it that way. Does the pharmaceutically acceptable fluid in the claim need to dissolve just the bendamustine or everything in the formulation?

MR. SCHULER:  Object to the form.

A   Can I discuss how the skilled person, as we've been -- for example, as we've been referring to in paragraph 110, would -- I'll reread the sentence, but it's throughout my report, that are solvents for bendamustine. The header of the claim -- I'm not using that term in a legal sense, if that's legal, but the first part of the claim -- I'm looking at the '214, Claim 1:

"Sterile vial containing a liquid bendamustine-containing composition comprising."

So it's a liquid that we've been discussing, so it has to be dissolved as -- the components have to be dissolved to make it into a liquid, with the caveats as I've been explaining. There can be certain particulate amounts based on the

16:00:17
16:00:20
16:00:24
16:00:27
16:00:30
16:00:32
16:00:36
16:00:43
16:00:51
16:01:19
16:01:23
16:01:25
16:01:33
16:01:35
16:01:41
16:01:46
16:01:50
16:01:54
16:01:55
16:01:58
16:02:02
16:02:05
16:02:10
16:02:14
16:02:20

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                   199

specifications and guidelines.

MR. LIEF: Okay. I'm going to mark as Trout Exhibit 16 an article.

("Cellulose" article entitled "Dissolving of cellulose in ██████ ████████████ marked Exhibit 16.)

BY MR. LIEF:

Q    Have you seen this article before?

A    I think so, but I should check my materials considered. It looks familiar, but everything -- lots of things look familiar at this point. Oh, but my -- I think it might be in my reply report or in one of the others.

Q    Maybe. I will -- just to represent to you, this is an article that I believe both Dr. Sinko and Dr. Crowley had cited to and for the proposition that, in the past, people had referred to PEG and sodium hydroxide together as a solvent system, and I imagine that you disagree with that.

A    I'm pretty sure I've seen it. I think it's in my reply is what I said. The copy you gave me doesn't have my materials, but I'm sure -- given what you said, I'm sure I've seen it before.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

200

Q    Okay.  And, by the way, do you know if -- have you heard of the journal "Cellulose"? 16:05:49 16:05:54

A    As far as I recall, I had not heard of that journal before.  If I've come across papers, I don't have a recollection outside of this one.  I don't think it's the kind of journal that pharmaceutical scientists would typically refer to.  "Cellulose" is, of course, the main component in wood.  Well, and other plants, I should add. 16:06:08 16:06:12 16:06:22 16:06:24 16:06:30 16:06:33 16:06:38 16:06:45

Q    Do you know whether or not it's a peer-reviewed journal? 16:06:46 16:06:48

A    I don't know, sitting here.  I don't recall if Dr. Sinko or another witness said that it was and gave the reason.  I can find this in my report, but I don't know, sitting here. 16:07:36 16:07:41 16:07:45 16:07:49

Q    Okay.  If you would turn to what is page 791 in this article that we're looking at.  In the very last sentence on the right-hand column of that page, do you see that?  It begins "The results reveal..."? 16:07:53 16:08:01 16:08:16 16:08:20 16:08:24

A    Yes. 16:08:29

Q    It says:  "The results reveal that the 1 weight percent ▮▮▮▮▮▮▮▮▮▮ is a direct cellulose solvent 16:08:31 16:08:33 16:08:42

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                              201

rather than a ██████████████████████          16:08:48

system."                                        16:08:50

        ████████████████████████████           16:08:51

████████████████████████████████████           16:09:02

████████████████████████████                   16:09:07

████████████████████████████████████           16:09:10

████████████████████████████                   16:09:19

███████                                         16:09:23

         ██████████████████████                16:09:29

  ██    ████                                    16:09:32

         ████████████████████                  16:09:32

████████████████                               16:09:34

  ██    ████████████████████████               16:09:35

████████████████████████████                   16:09:40

███████████████████████                        16:09:43

        ████████████                           16:09:48

  ██    ████████                               16:09:50

  ██    ████████████████                       16:09:50

██████                                         16:09:52

  ██    ████████████████  ██                   16:09:53

████████████████████████████████               16:09:55

██████████                                     16:09:58

        ████████████████████                   16:10:00

████████████████████████████████               16:10:05

██████████████████████                         16:10:11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    202

16:10:14
16:10:23
16:10:29
16:10:34
16:10:38
16:10:41
16:10:50
16:10:57
16:11:00
16:11:05
16:11:08
16:11:12
16:11:15
16:11:17
16:11:24
16:11:28
16:11:37
16:11:39
16:11:44
16:11:45
16:11:50
16:11:51
16:11:54
16:11:57
16:12:00

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

203

16:12:06

16:12:11

16:12:11

16:12:17

16:12:18

16:12:21

16:12:28

16:12:30

16:12:33

16:12:37

16:12:40

16:12:46

16:12:47

16:13:43

16:13:50

16:13:53

16:13:55

16:14:03

16:14:11

16:14:17

16:14:21

16:14:24

16:14:28

16:14:32

16:14:36

██████████████████████████████          16:14:40
██████████████████████████          16:14:44
███████████████████████████          16:14:49
██████████████          16:14:51

Q    In your opinion, can a salt be part of a solvent system?

MR. SCHULER:  Object to the form.

A    Again, as we've been discussing today, people use different terms in different contexts, so I would want to look at a particular context, if you have one in mind.

In general, at very high level, as you asked, it is possible for a salt to be dissolved in a solvent.

Q    I know a salt can be dissolved in a solvent.  But when it's dissolved in a solvent, can it then become the solvent itself?  Can it become solvent?

MR. SCHULER:  Object to the form of the question.

If you understand it, you can answer.

A    Will you just repeat it, please.

Q    Salt dissolves in a solvent.  Can it then become part of the solvent system?

MR. SCHULER:  Object to the form.  Also

asked and answered.

A    What do you mean by "solvent system"?

Q    ████████████████████████████
████████████████████████████████
██████████████████████████████
███████████████████████████

Can a salt that dissolves in a solvent then participate itself in solvating other solutes?

MR. SCHULER:  Object to the form.  Also asked and answered.

A    ████████████████████████████
████████████████████████████████████
█ ████████████████████████████████
█ █████████████████████████████████████
████████████████████████████
█ ████████████████████████
█ ████████████████████████████████
██████████████████████████████
████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████████████
███████████████████████████████
██████████████████
█ █████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                          206

A    I happened to just have it open, so that was convenient.

Q    Okay.  And so when a salt dissolves in another solvent, can it be considered to be part of a solvent system?

MR. SCHULER:  Object to the form.  Asked and answered.

A    I think one has to look at the specific context.  And I've done the analysis here.  And the -- again, the claims, in particular the "pharmaceutically acceptable fluid" that we've talked about, and we talked about those exemptions of impurities and unrelated.

But, in general, the "pharmaceutically acceptable fluid" -- well, I apologize.  Not in general.  Specific to the patent as I've analyzed, the "pharmaceutically acceptable fluid" is as I've discussed.  There are the possibility of impurities and other components, but it's as I've discussed here in the context of the '214 and '248 patents.

Q    Again, as a matter of chemistry, not specific to the patents, but just as a matter of chemistry, what about a buffer that's dissolved in a solvent?

Can the buffer participate in the solvent system?

MR. SCHULER:  Object to the form. Incomplete hypothetical.

A    But the question here is not just a matter of chemistry.  It's a matter of usage of terms.  And so I'm explaining how the terms are used here in this context.  If there's a different context in mind, then we can discuss that.  But I think --

Q    It's a more -- it is a more general question in that as a matter of chemistry, can something that is dissolved, like a salt or a buffer, participate in being a solvent itself, in being part of a solvent system?

MR. SCHULER:  Object to the form.

Q    Do you disagree that that's impossible?

MR. SCHULER:  Multiple compound.

A    Do I disagree that that's impossible?

Q    Well, do you agree -- is it your view that that's impossible for a salt or a buffer to participate in a solvent system?

MR. SCHULER:  Object to the form. Incomplete hypothetical.

A    What do you mean by "participate"?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    208

Q   Well, I assume that, for instance, when you're talking about PEG and PG in the patented solvent system, they're each participating and solvating other solutes.  Fair?

A   Yeah.  They're -- they make up the solvent system or the solvent system, as such.

Q   And in that same way, but not talking about the patented formulations necessarily, is it possible for a salt or a buffer to be dissolved in another solvent and then participate as a co-solvent as part of a solvent system?

MR. SCHULER:  Object to the form. Incomplete hypothetical.

A   Could you -- I want to make sure I got all your terms exactly right.  Could you just repeat that.

MR. LIEF:  Can you read that one back, because I don't know that I can duplicate it.

(The question was read by the reporter, as requested.)

A   So you have a lot of different terms there, and as I've been emphasizing, context matters.  And I think, as you rightly pointed out earlier this morning, in addition to my work in small molecule pharma, I work in the field of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                      209

proteins and peptide pharmaceuticals.                          16:23:15

In that area, we do call -- maybe this is                 16:23:19
what you're thinking of -- we do often call --                 16:23:25
there are other terms, but we often call certain               16:23:31
additives in protein aqueous, so water solutions,              16:23:34
co-solutes, because what they do is -- it's a                  16:23:39
different -- slightly different use or somewhat                 16:23:46
different use because it doesn't change the                    16:23:50
thermodynamic solubility of the protein, per se,               16:23:55
but it hinders the protein from precipitating                  16:23:59
from solution.                                                 16:24:04

So that's an example that comes to mind in                 16:24:06
our field, broadly but in proteins in which we                 16:24:11
might call solids and solution co-solutes.                     16:24:14
That's different application from here.  So I'm                 16:24:18
thinking of different usage and application and I              16:24:23
have explained why it's different if that's --                 16:24:26

Q    Okay.                                                16:24:32

A    Maybe if you have something else in                  16:24:32
mind, I can certainly talk about some specific                 16:24:35
example.                                                       16:24:39

Again, in chemistry, often there are terms                16:24:39
that are used in different contexts somewhat                   16:24:44
differently.                                                   16:24:46

Q    In your view, whatever you're referring             16:24:47

to there, in I guess peptides?

A    What I'm thinking of is maybe the broader field of peptides and proteins, particularly in aqueous solution.

Q    Okay.

A    It would normally be in aqueous solutions.

Q    Same kind of linguistic usage that a salt or a buffer could dissolve and then become part of the co-solvent system, is that never used when it comes to small molecules?

MR. SCHULER:  Object to the form to the extent that it misstates his prior testimony.

A    I think you didn't ask the question as you intended.  I think you -- but it's your question.  I can --

Q    It is.

A    -- try to answer it.

Q    I'll try to make you happy.  I don't know what's wrong with it.

But I believe you recognized in your prior answers some view that in peptide and protein solutions, salts and buffers can be part of the solvent system.

Is that same language inapplicable to a

small molecule solution?                                16:26:27

     MR. SCHULER:  Again, object to the       16:26:32

extent it misstates his prior testimony.                16:26:33

  A    I think it's important not to sort of      16:26:40

mix up words.  And I said in that other field,          16:26:44

solids that are dissolved in aqueous solution --        16:26:51

there's some work in nonaqueous proteins and            16:26:56

peptides, but it's almost exclusively aqueous.          16:27:00

At least that's what my work has been.                  16:27:03

  We do use the term "co-solute" to describe      16:27:08

solids dissolved in aqueous solution that have          16:27:16

the kind of effects that I described, which are         16:27:20

different from the effects or functions here in         16:27:25

the patents-in-suit ███████████████████                16:27:34

██████████████████                                      16:27:39

  They also have other names, kosmotropes, for    16:27:40

example.  There might be uses, and we can talk          16:27:45

about those uses in other parts of                      16:27:53

pharmaceuticals.  Again, one has to look at the         16:27:58

context and the meaning of the term or terms            16:28:01

used, as I've done throughout my analysis here of       16:28:05

the claims ████████████████        and the other       16:28:12

issues here in this case.                               16:28:15

  Q    In your last answer, I think you used      16:28:17

the word "co-solute."                                   16:28:21

Did you mean "co-solvent"?

A    Oh, I thought that was the term you used.

Q    Okay.

A    But, again, different people might use different terms.  I thought I was following your term.  But maybe, if I misspoke, co-solvent.

Q    Would that equally apply to that prior answer?

MR. SCHULER:  Object to the form. Would what apply?

Q    Co-solvent?

MR. SCHULER:  Object to the form.

A    Again, if you have specific examples, we can talk about them, but yeah, I think I could -- in the protein field, which I've been involved for a long time, protein formulation, again, in an aqueous solution, which is what my work has been in, yes, that term is used, "co-solvent."

I thought you had said "co-solute."  I apologize.  Co-solvent.  And it's understood as I've explained.  I can explain again, but it's a different context than here and a different meaning and different function.

Again, there's a lot of terms in chemistry that are the same terms used in different contexts, and one has to understand the meaning in a given context and not mix up the contexts.

Q    Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

214

16:31:30
16:31:33
16:31:35
16:31:36
16:31:37
16:31:39
16:31:40
16:31:41
16:31:43
16:31:52
16:31:55
16:32:17
16:32:19
16:32:21
16:32:28
16:32:30
16:32:34
16:32:36
16:32:40
16:32:43
16:32:45
16:32:47
16:33:00
16:33:05
16:33:09

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    215

16:33:16

16:33:22

16:33:30

16:33:34

16:33:39

16:33:43

16:33:46

16:33:53

16:34:01

16:34:03

16:34:07

16:34:11

16:34:14

16:34:15

16:34:19

16:34:23

16:34:35

16:34:39

16:34:39

16:35:24

16:35:31

16:35:41

16:35:50

16:35:52

16:35:52

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

216

16:35:54

16:35:54

16:35:57

16:35:59

16:36:00

16:36:06

16:36:13

16:36:20

16:36:27

16:36:34

16:36:39

16:36:45

16:36:49

16:36:53

16:36:58

16:37:05

16:37:10

16:37:14

16:37:19

16:37:21

16:37:23

16:37:23

16:37:25

16:37:26

16:37:27

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                      217

16:37:27
16:37:27
16:37:29
16:37:30
16:37:30
16:37:32
16:37:35
16:37:43
16:37:50
16:37:58
16:38:02
16:38:09
16:38:16
16:38:22
16:38:25
16:38:31
16:38:37
16:38:39
16:38:46
16:38:53
16:38:57
16:38:59
16:39:05
16:39:08
16:39:24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

218

16:39:29

16:39:34

16:39:41

16:40:27

16:40:33

16:40:41

16:40:47

16:40:49

16:40:53

16:40:57

16:41:00

16:41:02

16:41:08

16:41:11

16:41:15

16:41:17

16:41:22

16:41:25

16:41:26

16:41:28

16:41:30

16:41:33

16:41:34

16:41:37

16:41:41

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

219

16:41:45

16:41:48

16:41:51

16:42:00

16:42:04

16:42:09

16:42:12

16:42:19

16:42:21

16:42:27

16:42:30

16:42:33

16:42:36

16:42:39

16:42:44

16:42:48

16:42:52

16:42:57

16:43:06

16:43:13

16:43:17

16:43:21

16:43:27

16:43:31

16:43:35

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                      220

Q    Do you also agree that the five listed
fluids in the claim after "consisting of" play a
role in improving the stability of the patented
formulations?

MR. SCHULER:  Objection to form.

A    Again, I just want to be absolutely
clear.  These are -- we can call them fluids, if
you want.  They're solvents, but together they
make up the "pharmaceutically acceptable fluid"
in that limitation.

And if you say "improve the stability," the
question is with respect to what?

Q    Well, for instance, with respect to
alternatives of fluids or solvents, for that
matter, like water?

A    Yes.  That's the point.  Again, it's a
relative thing.  And I know there's other types
of solvents that may have higher stability.  But

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    221

the point is solvents need to be compatible with          16:45:20

the various components, bendamustine in                   16:45:25

particular.  Bendamustine is known -- and I have          16:45:28

the chemistry in my report, some of the                   16:45:33

chemistry, we can go to -- to be degraded by              16:45:35

water.                                                    16:45:39

     And so if you want to make a relative                16:45:40

statement like that, it's, I think, correct, but          16:45:48

the question -- but the question is:  Does it              16:45:53

improve it with respect to lyophilized form or to         16:45:57

another solvent?  That's another story, because           16:46:02

by the time of the patent, there was this issue           16:46:05

that water degraded bendamustine.  It was not a           16:46:08

suitable solvent.                                         16:46:12

          (Discussion off the record.)                    16:46:52

          MR. SCHULER:  To you want to break now          16:47:28

or five more minutes?                                     16:47:29

          THE WITNESS:  I'm fine.  We can keep            16:47:31

going.                                                    16:47:33

          MR. LIEF:  I'm fine.                            16:47:33

          MR. SCHULER:  I need a break in like            16:47:34

three or four minutes.                                    16:47:36

          THE WITNESS:  You're very                       16:47:38

precise, Counsel.                                         16:47:38

          MR. LIEF:  So we're going to mark as            16:48:00

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                          222

Trout Exhibit 17 a document bearing Bates numbers                16:48:05

EAGLEBEN-SA00361489 through -00361576.                           16:48:10

        (Document Bates-stamped              16:48:24

   EAGLEBEN-SA_00361489 through -1576 marked           16:48:24

   Exhibit 17.)                                       16:48:24

BY MR. LIEF:                                                      16:48:24

   Q   And I'll ask you, have you seen this          16:48:41

document before?                                                 16:48:44

   A   I've certainly seen Q3 DR2 document.         16:49:13

I'm not sure if it's this specific one.                          16:50:51

   I realize my reports don't always have the           16:50:56

materials considered.  I mean, I'm generally                     16:50:59

familiar with these types of ICH documents.                     16:51:03

   If there's -- if it's in the case, this              16:51:08

specific one, let me know where it's referenced.                16:51:14

But anyway, I'm generally familiar, but I don't                 16:51:18

have my materials here in what we marked.                       16:51:22

     MR. LIEF:  I think your counsel said        16:51:26

this might be a good time for a break.                          16:51:27

     THE VIDEOGRAPHER:  We're going off the      16:51:34

record.  The time is 4:51.                                      16:51:35

     (A recess was taken.)                       16:51:38

     THE VIDEOGRAPHER:  We are going back on     17:10:26

the record.  The time is 5:10.                                  17:10:27

     MR. LIEF:  Okay.  I'd also like to mark     17:10:31

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                        223

as -- I guess it's Trout 18, a document bearing                17:10:34

Bates No. EAGLEBEN-SA00361465 through -1482.                   17:10:42

                    (Document Bates-stamped                     17:10:51

        EAGLEBEN-SA_00361465 through -1482 marked              17:10:51

        Exhibit 18.)                                            17:10:51

BY MR. LIEF:                                                    17:10:51

        Q    I'd like you to turn in your opening              17:11:20

report to paragraph 236, which spans, at least in             17:11:22

my copy, pages 84 to 85.  That may or may not be              17:11:28

right, the way these things printed.                           17:11:34

        MR. SCHULER:  No.  That's right.                       17:11:36

That's right.                                                  17:11:37

        Q    236.                                              17:11:38

        A    I'm sorry.  236.                                  17:11:39

        Q    Correct.                                          17:11:41

        A    Yes.  I am there.                                 17:11:42

        Q    Okay.  And so as a first matter, this            17:11:44

paragraph is a discussion about sodium --                      17:11:57

actually, go back a paragraph to 235.  This is a              17:12:01

discussion of sodium is an elemental impurity.                17:12:05

    Do you see that?                                           17:12:09

        A    Yes.                                              17:12:19

        Q    And you have a citation there.  Do you           17:12:20

see that?                                                      17:12:22

        A    Just to be clear, you're referring to           17:12:29

the second line of paragraph 235 of the opening?    17:12:30

Q    Correct.    17:12:35

A    Okay.  Thank you.  Yes, I see that.    17:12:35

Q    And am I correct that Trout 17 is what you're citing there?    17:12:42    17:12:45

A    If you said 17, yes, that looks like 17.  Yes.    17:13:27    17:13:29

Q    Yes.  And in this guideline, you cite page -496, Bates ending in -496.    17:13:31    17:13:40

Do you see that?    17:13:44

A    Yes.    17:13:52

Q    And on that page there's a list of element classifications.    17:13:52    17:13:55

Do you see that?    17:13:56

A    Yes.    17:14:02

Q    And the sodium that you talk about really doesn't fall into either Class 1, Class 2, Class 2(a), Class 2(b) or Class 3.    17:14:03    17:14:08    17:14:12

Do you see that?    17:14:16

A    Well, that's right.  It falls under --    17:14:28

Q    Other elements?    17:14:33

A    -- other elements.  That's right, which is why, if you look at the next line or next sentence of paragraph 235, I say, "The guidance document states that 'NA' is an elemental    17:14:33    17:14:35    17:14:40    17:14:45

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                          225

impurity that is not inherently toxic and thus          17:14:48

does not require a formal risk assessment for           17:14:52

toxicity but should still be evaluated and              17:14:55

controlled for other reasons, such as quality or        17:14:57

for specific high dose or parenteral                    17:15:01

administration routes, id."                             17:15:04

     Q    But this particular document, Trout 17,       17:15:10

actually says with respect to sodium that it does       17:15:12

not address that in this guideline.                     17:15:21

     Do you see that in that first sentence,            17:15:24

after "other elements"?                                 17:15:26

          MR. SCHULER:  I'm sorry.  The first           17:15:32

sentence?                                               17:15:33

          MR. LIEF:  Yeah, the first sentence           17:15:33

after "other elements," on page -361496 reads:          17:15:35

"Some elemental impurities for which PDAs have          17:15:40

not been established" --                                17:15:44

          MR. SCHULER:  I understand.  I didn't         17:15:45

need you to read it.  I just wanted to make sure        17:15:46

which sentence you were reading.                        17:15:48

          MR. LIEF:  Okay.                              17:15:49

BY MR. LIEF:                                            17:15:50

     Q    Do you see that?                              17:15:52

     A    The first line under "other elements,"        17:15:54

yes.                                                    17:15:57

Q    Okay.  Thank you.

A    I mean, therefore -- but I think if you keep reading that paragraph, then you understand what I wrote in paragraph 235 and elsewhere in this section.

Q    Okay.  And then paragraph 236, you cite this document again at the end of 236, correct?

A    Yes.  I cite, just to be precise, I cite three documents, and this is one of them.

Q    Correct.  And one of the other ones is what is Trout 18, correct?

A    Yes.

Q    And if you look at Trout 18, at page -- Bates page ending 361469.

Do you have that?

A    Yes.

Q    And the very first sentence at the top reads:  "This guidance addresses only those impurities in new drug products classified as degradation products of the drug substance or reaction products of the drug substance with an excipient and/or immediate container closure system (collectively referred to as 'degradation products' in this guidance)."

Did I read that correctly?

A    Oh, yes.  You read that correctly.    17:18:47
And, again, like the other one, the point of this    17:18:58
was not to use the guidance as -- for regulatory    17:19:02
purpose, per se.  It's to use it for    17:19:11
understanding what I discuss in this section with    17:19:14
respect to the impurity exception.    17:19:18

Q    I mean, Trout 18 is a guidance that    17:19:22
wouldn't apply to an impurity if it were an    17:19:24
impurity like sodium?    17:19:29

MR. SCHULER:  Object to the form.    17:19:39

A    I think the point, as I say, for    17:20:30
example, in the third line of paragraph 236 in    17:20:37
this document, "Any persistent inorganic residues    17:20:41
are not active ingredients or functional    17:20:45
excipients and they are not the solvent itself.    17:20:47
And a POSA would understand that under compendial    17:20:52
and ICH definitions, they are properly regarded    17:20:55
an inorganic impurities, the finished material,    17:20:59
consistent with the treatment of elemental and    17:21:03
inorganic residues that originate from reagents    17:21:05
and processing aids used during manufacture."    17:21:09

So the point of referring to these is how    17:21:11
they discuss them, and as we talked about, the    17:21:15
ICH document explicitly discussed sodium as an    17:21:18
elemental impurity.  So that's the point.    17:21:23

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    228

Q    The degradant of bendamustine would not    17:21:28

be inorganic, correct?    17:21:30

A    Sorry.  Could you repeat that?    17:21:35

Q    A degradant of bendamustine, which is    17:21:37

the drug product here, the drug substance here,    17:21:39

would not be inorganic?    17:21:43

A    Agreed.    17:21:48

Q    Okay.    17:21:49

MR. LIEF:  Let me mark as Trout    17:21:50

Exhibit 19 a document bearing Bates numbers    17:21:52

EAGLEBEN-SA_-361577 through -361592.    17:22:01

(Document Bates-stamped    17:22:06

EAGLEBEN-SA_00361577 through -1592 marked    17:22:06

Exhibit 19.)    17:22:06

BY MR. LIEF:    17:22:06

Q    And can you confirm for me that this    17:22:06

document is cited by you at paragraph 242?    17:22:19

MS. SPARSCHU:  242.    17:23:11

(Discussion off the record.)    17:23:14

BY MR. LIEF:    17:23:19

Q    Do you see that, that Trout 19 is cited    17:23:45

in your opening report at paragraph 242?    17:23:47

A    Yes.    17:23:53

Q    Okay.  And in Trout 19, if you could    17:24:18

turn to the first numbered page, which is Bates    17:24:25

page EAGLEBEN-SA_00361581.

A    Okay.

Q    And do you see there's a Section 1.3, "Scope of the Guideline"?

A    Yes.

Q    And that sentence reads -- the first sentence there reads:  "This guideline addresses only those impurities in new drug products classified as degradation products of the drug substance or reaction products of the drug substance with an excipient and/or immediate container closure system (collectively referred to as 'degradation products' in this guideline)."

Did I read that first sentence of Section 1.3 correctly?

A    Yes.  That's what the document says. And, again, the point here, like the others, is -- I mean, here, as I say in paragraph 242 under ICH/FDA practice, "The fact that a reagent's use was 'purposeful' upstream has no bearing on whether residual nonfunctional species or impurities at release.  Classification depends on persistence, role, and control in the final product."

It's kind of throughout, farther down in

this document.  So it's how all these documents, 17:26:08

I wanted to include how the regulatory bodies 17:26:13

would think about impurities like sodium. 17:26:17

MR. LIEF:  I'd like to mark as Trout 17:26:25

Exhibit 20 a document bearing Bates numbers 17:26:28

EAGLEBEN-SA_00361447 through -1456. 17:26:32

(Document Bates-stamped 17:26:42

EAGLEBEN-SA_00361447 through -1456 marked 17:26:42

Exhibit 20.) 17:26:42

BY MR. LIEF: 17:26:55

Q    And with respect to Trout 20, can you 17:26:55

confirm for me that you cite things, for 17:26:57

instance, at paragraph 237 of your opening 17:27:01

report? 17:27:09

A    Yes, I cite that. 17:27:43

Q    Okay.  And if you would turn to page -- 17:27:48

Bates page EAGLEBEN-SA_00361450, which is the 17:27:50

first substantive page after the Table of 17:27:57

Contents. 17:28:00

Do you see the introduction? 17:28:00

A    I see that, yes. 17:28:08

Q    And that first sentence of the 17:28:10

introduction reads:  "This guidance provides 17:28:13

recommendation on what chemistry and 17:28:15

manufacturing and controls (CMC) information 17:28:19

sponsors should include regarding the reporting, identification, and qualification of impurities that are classified as degradation products in drug products when submitting."

Did I read that correctly?

A    Yes.  It continues, but yes.

Q    Yes.  And if you go past the bullet points, it continues:  "The guidance also provides recommendations for establishing acceptance criteria for degradation products (specifically, degradation products of the active ingredient or reaction products of the active ingredient with an excipient(s) and/or immediate container/closure system) in generic drug products."

Did I read that correctly?

A    Yes.

Q    Okay.

A    Again, the point of these documents are for -- as I state in my report, and this one in particular, I'm looking at page 448.  As I say in paragraph 237, "recommending that 'degradation products' for a particular drug product be listed 'to predict the degradation profile for the commercial product' as a result of 'manufacture[]

by the proposed commercial process.'"

So again, I'm using these documents to give the general understanding that I've included here in this report.

Q   Dr. Trout, you also give an opinion in this case that Slayback is a willful infringer.

Are you aware of that?

MR. SCHULER:  Object to the form.

A   Oh, maybe it's in this.  Yes.  I have -- well, I used the words that I have in my report, but I have a section on willful infringement starting at page 65 of -- it's the opening report, but Appendix B for Slayback, which is Exhibit 3.  It's called "Willful Infringement."

Q   I apologize if I asked this before at the beginning, but you are not a lawyer, correct?

A   Correct.

Q   What is your understanding of what is required to have a finding of willful infringement?

A   So you don't want me to read all of this, but my understanding is based on my legal section, the infringement part, legal standard -- well, it really should start with the legal

17:30:03
17:30:08
17:30:11
17:30:14
17:30:24
17:30:26
17:30:32
17:30:38
17:31:08
17:31:22
17:31:27
17:31:32
17:31:38
17:31:42
17:31:46
17:31:54
17:31:55
17:32:01
17:32:03
17:32:11
17:32:14
17:32:39
17:32:41
17:32:48
17:32:55

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                233

standards on page 7 of my opening expert report,          17:32:58

Exhibit 2.  I think all of that section is                17:33:04

important, including an explicit section on               17:33:11

infringement.                                             17:33:15

     And then that Appendix B for Slayback that           17:33:16

we referred to, Exhibit 3, starting at page 65,           17:33:21

paragraph 197, in which I say ████████                    17:33:31

████████████████████████                                 17:33:37

███████████████████████████                              17:33:39

█████████████████████████████                            17:33:42

████████████████████████████                             17:33:45

████                                                     17:33:49

     I guess the rest of the section might be             17:33:50

relevant to that, but that's my broad                     17:33:52

understanding of willful infringement in the              17:33:56

legal context.                                            17:33:59

█ ███████████████████                                     17:34:01

█████████████████████████████                            17:34:05

████████                                                 17:34:08

█ ██████████████████████████                             17:35:38

███████████████████████                                  17:35:41

███████████████████████                                  17:35:47

█████████████████████████████                            17:35:52

████████████████████████████                             17:35:58

████████████████████████████                             17:36:03

17:36:14

17:36:17

17:36:20

17:36:23

17:36:29

17:36:32

17:36:34

17:36:39

17:36:40

17:36:43

17:36:55

17:36:59

17:37:05

17:37:09

17:37:14

17:37:18

17:37:22

17:37:25

17:37:31

17:37:35

17:37:38

17:37:40

17:37:43

17:37:47

17:37:55

17:38:44

17:38:48

17:38:52

17:38:59

17:39:04

17:39:09

17:39:10

17:39:12

17:39:14

17:39:15

17:39:19

17:39:21

17:39:22

17:39:28

17:39:34

17:39:40

17:39:43

17:39:46

17:39:49

17:39:54

17:39:59

17:40:01

17:40:03

17:40:07

17:40:11

17:40:12
17:40:17
17:40:26
17:40:31
17:40:32
17:40:34
17:40:40
17:40:41
17:40:45
17:40:49
17:40:57
17:41:00
17:41:06
17:41:09
17:41:17
17:41:21
17:41:37
17:41:45
17:41:50
17:41:52
17:41:55
17:41:59
17:42:01
17:42:03
17:42:11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                              237

17:42:26
17:42:31
17:42:34
17:42:38
17:42:40
17:42:42
17:42:47
17:43:04
17:43:06
17:43:08
17:43:15
17:43:18
17:43:26
17:43:29
17:43:32
17:43:45
17:43:47
17:43:50
17:43:54
17:44:02
17:44:05
17:44:09
17:44:11
17:44:16
17:44:17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    238

17:44:19

17:44:24

17:44:27

17:44:32

17:44:36

17:44:39

17:44:40

17:44:41

17:44:46

17:44:51

17:45:08

17:45:11

17:45:15

17:45:22

17:45:26

17:45:31

17:45:31

17:45:34

17:45:35

17:45:38

17:45:42

17:45:44

17:45:47

17:45:54

17:45:58

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

239

████████████████████████                                           17:46:02

  ████████████████████████                                         17:46:05

████████████████████████████████                                   17:46:09

████████████████████████████████                                   17:46:11

██████████████████████████                                         17:46:15

████████████████████████████████████                               17:46:18

██████████████████████████████                                     17:46:23

████████████████                                                   17:46:27

MR. SCHULER:  We've been going for                                 17:46:44
seven hours and ten minutes.                                       17:46:45

MR. LIEF:  No, we -- that doesn't                                  17:46:46
include a whole bunch of colloquy that we've had.                  17:46:48

MR. SCHULER:  Six or seven minutes'                                17:46:51
worth.  I've given you more than enough time.                      17:46:52

MR. LIEF:  But let me --                                           17:46:54

MR. SCHULER:  If you have two or three                             17:46:55
questions, I'll indulge.                                           17:46:57

MR. LIEF:  A couple of things.                                     17:46:58

The last category I have is a category which                       17:46:59
probably has only one question but is a category                   17:47:02
that I would ask Apotex to leave for.  Having                      17:47:06
said that, I know that Apotex's counsel does have                  17:47:10
a comment for the record, which, again, I don't                    17:47:14
want to counted against my time, and I will agree                  17:47:18
with what I believe he's going to say.  And so I                   17:47:20

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                        240

think he should say that now, and then we'll move      17:47:23

to finish up and that will be that.                    17:47:27

MR. FERENC:  Thank you, Jason.                          17:47:37

So for the record, we identified our                    17:47:37

objection to the treatment of this deposition as       17:47:41

two separate depositions, so we wanted to note         17:47:44

our objection for the record to the concerns           17:47:47

raised by counsel for Eagle this morning.              17:47:50

We believe that the parties should                      17:47:53

continue to operate under the same framework that      17:47:55

we've been operating under for other joint             17:47:58

depositions in treating this as one deposition         17:48:00

with a shared transcript that the parties can          17:48:03

rely on for the purpose of their joint summary         17:48:07

judgment motions and at trial.                         17:48:10

So I wanted to make that note for the                   17:48:12

record.  We feel that the local rules and general      17:48:16

Rules of Civil Procedure Rule 30 apply and that        17:48:19

the witness is not to discuss the substance of         17:48:23

his testimony and any anticipated testimony he         17:48:26

will provide tomorrow.                                 17:48:31

MR. SCHULER:  We entirely disagree.                     17:48:32

The Rule 30(d) especially says in an action that       17:48:34

a deponent shall be deposed only once for a            17:48:38

duration of seven hours.  The Slayback attorneys       17:48:41

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                241

have been questioning for over seven hours.                    17:48:43

They've had their deposition.  This transcript                 17:48:45

will be closed.  The Slayback action deposition                17:48:47

will be closed.  Apotex will get its deposition                17:48:50

tomorrow of up to seven hours.                                 17:48:53

The only thing you've suggested is that                        17:48:56

there's some alleged efficiencies associated with              17:48:57

a longer single deposition.  The only thing I can              17:49:01

think of is if you're willing to stipulate that                17:49:04

you will take no more than four hours tomorrow                 17:49:05

because there's a consolidated transcript and                  17:49:08

it's efficient, then maybe I'll consider that.                 17:49:09

MR. FERENC:  But --                                            17:49:15

MR. SCHULER:  But if you're reserving                          17:49:16

right to take seven hours --                                   17:49:17

MR. FERENC:  -- you agreed to provide                          17:49:19

Mr. -- Dr. Trout for 14 hours, so we're holding                17:49:22

you to that agreement.                                         17:49:25

Does Eagle have any objection to Apotex                        17:49:25

using any portion of Dr. Trout's testimony or                  17:49:27

transcript for any purpose?                                    17:49:30

MR. SCHULER:  No.  You guys can order                          17:49:32

the transcript from the Slayback proceeding.  I                17:49:33

have no problem with that.                                     17:49:35

I will note that Mr. Lief presumably                           17:49:36

will not want you to see at least one part of it, 17:49:41

which is the part he just talked about, so you 17:49:44

guys have to work that out.  Maybe he can be the 17:49:46

person that gets the transcript and delivers it 17:49:49

to you so that he can excise whatever.  But I 17:49:52

have no objection -- subject to his point about 17:49:54

the one subject matter, I have no problem with 17:49:57

Apotex ordering the Slayback deposition and using 17:50:00

it. 17:50:03

          MR. LIEF:  I guess, you know, I concur 17:50:04

with Apotex's counsel.  And maybe the concern is 17:50:06

a little different, having gone first, which is, 17:50:11

you know, there are undoubtedly some overlapping 17:50:17

concepts that exist as well as differences.  But 17:50:22

whatever he said today, if you speak to him about 17:50:30

it and tomorrow he says something different on 17:50:34

something that's the same issue, you know, that 17:50:39

would be problematic. 17:50:45

          MR. SCHULER:  It's called impeachment. 17:50:47

I don't think that's going to happen, but it's 17:50:48

called impeachment.  Right? 17:50:50

          MR. LIEF:  It could also be called 17:50:52

coaching the witness.  I mean, there's a lot 17:50:53

of -- this is an unusual circumstance.  I think 17:50:55

you agreed to something different is what I would 17:50:59

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    243

say.  And I agree with counsel for Apotex.

MR. SCHULER:  Well, no.  I mean, let's be very fair to the witness.  He's got like six reports for Slayback alone, right?  He's got to prepare himself to give accurate and precise answers.

When you alerted us that you guys were questioning today, that's what he did, and that's what any reasonable person would do.  Right?  So now he has to prepare for a second deposition. It's a separate deposition and it's a separate case.  It's a separate action.  And the Rule 30(d) provides for what it provides.  We can agree to disagree, but I think we should adjourn Mr. Ferenc, and then we can proceed with your couple of questions, hopefully, on this last subject, and I will leave it to you two to work out how you excise that part of the transcript.

MR. FERENC:  Thank you, Counsel.  Per Slayback's counsel's request, I will sign off from Zoom.  And it's our position that this deposition is continuing and that the federal and local rules apply.

We would request that the court reporter not provide any transcripts to any

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                    244

parties at the conclusion of today's portion of                 17:52:03

the deposition.                                                 17:52:06

MR. SCHULER:  I don't have a problem                17:52:06

with the court reporter not providing the                       17:52:08

transcript to the parties until they're ordered.                17:52:11

MR. LIEF:  Including a rough.                        17:52:14

MR. SCHULER:  Yeah.                                  17:52:15

MR. LIEF:  All right.  So, Chris, when               17:52:17

you're off, I'll do this last segment.                          17:52:19

MR. FERENC:  Sorry.  I just want to                 17:52:21

confirm that we are starting at 9:00 a.m.                        17:52:23

tomorrow.                                                       17:52:26

MR. SCHULER:  Yes.                                   17:52:27

MR. FERENC:  Jason, unless you have an              17:52:29

independent reason that I should come back on, I                17:52:30

don't know that that would be the case, but if                  17:52:33

there is a reason I should come back on, I am                    17:52:36

here.  Jason, you can just give me a call.                      17:52:39

MR. LIEF:  We'll contact you if there's              17:52:42

a reason.                                                       17:52:44

MR. FERENC:  Okay.  Thank you.                       17:52:46

MR. LIEF:  Let us know when he's off.                17:52:47

THE VIDEOGRAPHER:  He's off.                         17:52:55

BY MR. LIEF:                                                     17:52:55

█      ████████████████████████                                 17:52:56

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                              245

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    246

And thank you for your patience.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                    247

THE VIDEOGRAPHER:  This marks the end                    17:55:23

of the deposition of Dr. Bernhardt Trout.  We are        17:55:24

going off the record at 5:55.                            17:55:27

        (Deposition adjourned at 5:55 p.m.)              17:55:30

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    248

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

I, Janet M. McHugh, a Registered Merit Reporter
and a Notary Public within and for the Commonwealth
of Massachusetts do hereby certify:

THAT BERNHARDT L. TROUT, PH.D., the witness
whose testimony is hereinbefore set forth, was duly
sworn by me and that such testimony is a true and
accurate record of my stenotype notes taken in the
foregoing matter, to the best of my knowledge, skill
and ability; that before completion of the deposition
review of the transcript was not requested.

I further certify that I am not related to any
parties to this action by blood or marriage; and that
I am in no way interested in the outcome of this
matter.

IN WITNESS WHEREOF, I have hereunto set my hand
this 11th day of May, 2026.

_____
JANET M. MCHUGH
Notary Public
My Commission Expires:
July 16, 2028

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                            249

| A | | | |
|---|---|---|---|
| **a"-** | 39:4, 39:5, | **actions** | 225:9 |
| 122:14 | 39:10, 54:14, | 158:1 | **addressed** |
| **ability** | 61:20, 66:9, | **active** | 147:2 |
| 216:5, 248:12 | 78:23, 90:24, | 89:24, 91:20, | **addresses** |
| **able** | 117:20, 213:15, | 99:19, 227:14, | 98:19, 226:18, |
| 11:9, 11:18, | 243:5, 248:10 | 231:11, 231:12 | 229:7 |
| 33:8, 33:9, | **accurately** | **actives** | **addressing** |
| 33:13, 63:5, | 39:8, 91:24 | 75:18, 192:8 | 33:12, 49:10, |
| 158:15 | **accused** | **actual** | 54:9, 202:11, |
| **above** | 150:11, 150:14, | 58:23, 110:16, | 215:3, 218:5 |
| 130:15 | 186:22, 234:10, | 129:20, 193:4 | **adjourn** |
| **absent** | 236:6, 236:15 | **actually** | 243:14 |
| 57:19, 116:13 | **achieve** | 21:5, 22:4, | **adjourned** |
| **absolute** | 51:7, 157:16 | 27:8, 30:23, | 247:4 |
| 170:24, 182:1, | **achieving** | 48:4, 66:2, | **adjust** |
| 182:22, 188:18 | 157:11 | 83:8, 88:2, | 160:15, 171:4, |
| **absolutely** | **acid** | 108:14, 111:19, | 173:21, 175:11, |
| 144:4, 220:13, | 70:2, 70:7, | 145:14, 223:19, | 216:15, 217:11, |
| 238:21 | 70:14, 70:19, | 225:8, 239:2 | 217:12 |
| **absorption-delay-** | 70:25, 71:6, | **add** | **adjuster** |
| **ing** | 216:6, 217:15 | 65:15, 66:5, | 69:21, 69:23, |
| 109:21 | **acid-base** | 66:10, 177:1, | 70:20, 71:11, |
| **academic** | 70:13 | 200:10 | 71:21, 160:3, |
| 18:23, 39:20 | **acidic** | **added** | 170:10, 173:14 |
| **acceptance** | 215:9 | 38:2, 65:23, | **adjusters** |
| 231:10 | **acidity** | 67:10, 155:23, | 72:5 |
| **accepted** | 167:5, 168:3, | 155:24, 159:19, | **adjusting** |
| 13:19 | 168:17, 168:25, | 213:9, 215:6, | 217:14, 218:10, |
| **access** | 169:20, 172:19 | 215:15, 219:17 | 219:25 |
| 129:14 | **acids** | **adding** | **adjustment** |
| **according** | 70:1, 70:3, | 159:23 | 215:6, 218:8 |
| 76:10 | 213:23, 214:22, | **addition** | **administration** |
| **account** | 216:12, 217:23 | 23:24, 208:24, | 109:25, 110:6, |
| 169:15, 169:16, | **acrid** | 219:1, 237:2 | 111:20, 112:2, |
| 173:10, 183:2, | 179:19 | **additional** | 225:6 |
| 190:9, 202:9, | **across** | 5:12, 45:23, | **adopt** |
| 219:10 | 14:3, 15:3, | 81:13, 149:16, | 233:9, 236:20 |
| **accuracy** | 157:11, 188:5, | 151:18, 153:8, | **advance** |
| 30:4, 30:12, | 200:4 | 153:9, 203:20, | 48:8, 48:11, |
| 30:13, 32:10, | **act** | 218:23, 219:5, | 48:25 |
| 33:7 | 194:12 | 220:6 | **advancement** |
| **accurate** | **acting** | **additives** | 51:6 |
| 18:16, 18:17, | 92:21, 202:1 | 209:5 | **advantages** |
| 18:18, 29:19, | **action** | **address** | 48:15, 54:8 |
| 30:9, 31:6, | 157:22, 157:23, | 16:8, 16:12, | **adventitious** |
| 33:3, 39:3, | 157:24, 158:19, | 48:19, 67:14, | 66:18, 66:21 |
| | 240:23, 241:3, | 85:14, 85:17, | **adverb** |
| | 243:12, 248:15 | 85:18, 147:12, | 54:12 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    250

**aeronautics**
74:16, 86:14
**after**
9:23, 11:14,
13:15, 15:15,
102:16, 129:8,
129:12, 130:19,
135:13, 146:20,
148:16, 151:22,
220:9, 225:11,
225:15, 230:18,
237:6, 237:15,
238:14, 238:17,
238:25
**afternoon**
136:11, 136:12
**against**
97:12, 150:11,
239:24
**agent**
89:24, 91:20
**agents**
68:24, 109:20,
109:21, 175:11,
175:13, 176:6,
177:9
**ago**
88:23, 93:23,
93:25
**agree**
9:23, 11:6,
11:13, 11:22,
12:18, 12:21,
13:24, 24:23,
37:6, 38:21,
40:3, 43:19,
44:19, 63:8,
71:22, 72:11,
73:5, 73:13,
84:13, 84:20,
86:6, 86:24,
86:25, 87:5,
101:23, 104:10,
113:10, 132:5,
136:18, 137:8,
138:5, 146:18,
148:10, 148:12,
148:18, 148:21,

149:21, 151:25,
156:20, 156:23,
156:24, 158:8,
158:13, 158:22,
160:6, 169:11,
176:10, 177:20,
182:22, 193:18,
196:8, 196:10,
207:20, 217:24,
218:9, 219:25,
220:8, 239:24,
243:1, 243:14
**agreed**
10:6, 13:2,
13:4, 25:10,
60:11, 77:10,
156:22, 156:25,
157:2, 193:22,
195:21, 228:7,
241:16, 242:25
**agreement**
2:11, 157:18,
157:21, 241:18
**ahead**
57:16, 83:4,
85:12, 205:16
**ai**
38:16, 38:17
**aid**
58:4, 61:7,
62:4, 66:24
**aids**
227:21
**aim**
112:3
**al**
8:5
**alcohol**
6:11, 6:14,
75:16, 147:19,
154:8, 170:24,
180:21, 181:1,
181:2, 181:4,
182:2, 182:22,
183:20, 184:1,
187:9, 190:21,
190:24, 191:2,
191:13, 191:20,

192:6, 192:12,
192:16, 193:3,
193:10, 193:21,
194:1, 194:12,
194:22
**alerted**
243:7
**all**
15:13, 18:21,
25:13, 26:2,
26:24, 42:2,
42:4, 42:7,
45:19, 54:15,
55:24, 58:13,
70:2, 78:15,
81:22, 83:6,
83:13, 91:9,
95:16, 96:20,
105:6, 109:18,
110:9, 110:23,
111:8, 111:9,
111:23, 111:24,
112:9, 113:10,
119:8, 125:25,
128:1, 130:17,
131:4, 135:10,
136:17, 144:19,
145:3, 145:4,
147:13, 148:12,
149:9, 149:20,
152:20, 153:2,
153:22, 154:3,
154:11, 160:4,
160:11, 161:4,
163:4, 171:13,
172:3, 173:9,
173:10, 177:8,
177:16, 178:24,
182:19, 185:3,
185:5, 185:23,
186:10, 189:21,
189:25, 195:24,
196:1, 196:5,
196:9, 196:12,
196:16, 198:1,
202:9, 205:13,
208:15, 218:18,
230:1, 232:22,

233:2, 244:8,
245:10
**alleged**
241:7
**allergic**
139:24
**allow**
61:6, 119:10
**allows**
121:20, 122:18,
123:2, 128:17,
128:22
**almost**
26:2, 59:19,
60:23, 155:10,
211:8
**alone**
14:12, 66:3,
83:17, 243:4
**along**
8:21, 111:9
**already**
12:10, 17:24,
45:20, 54:17,
54:19, 56:12,
61:9, 67:1,
79:5, 115:11,
137:20, 183:5,
183:7, 213:7,
238:4, 238:24
**also**
4:13, 9:5, 9:6,
12:3, 15:9,
20:25, 21:3,
21:10, 22:5,
22:8, 29:2,
37:13, 38:3,
38:18, 41:19,
42:6, 43:3,
44:17, 45:5,
46:23, 57:22,
58:5, 58:11,
61:24, 63:17,
63:25, 65:4,
67:25, 72:22,
80:25, 87:3,
92:16, 93:18,
94:11, 96:7,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

251

98:6, 98:15, 98:18, 101:16, 102:13, 102:17, 103:21, 105:5, 115:21, 116:19, 122:3, 125:15, 127:19, 127:20, 129:19, 130:25, 132:14, 137:12, 142:8, 144:3, 145:8, 150:13, 155:6, 159:1, 165:6, 170:9, 171:11, 171:21, 173:5, 173:8, 173:23, 179:23, 183:20, 191:14, 191:21, 192:3, 192:20, 194:2, 194:22, 195:19, 196:2, 196:5, 196:8, 201:11, 202:15, 202:25, 204:25, 205:9, 211:16, 214:18, 216:17, 220:8, 222:25, 231:8, 232:5, 235:19, 242:22, 245:5

**alter**
10:25

**alternatives**
220:21

**although**
113:13

**always**
142:4, 165:9, 222:11

**amended**
97:10

**amongst**
178:16, 178:22, 181:9

**amount**
58:7, 59:1, 59:18, 65:13, 70:25, 121:20, 122:18, 123:2,

128:17, 132:25, 133:5, 133:18, 134:4, 134:22, 136:22, 149:14, 149:15, 151:14, 153:3, 153:5, 182:3, 182:16, 186:21, 186:23, 187:12, 187:15, 187:16, 196:23

**amounts**
65:15, 67:7, 137:10, 142:3, 198:25

**amusing**
96:7

**analyses**
32:24, 36:18, 58:9, 161:8, 166:13, 166:14, 171:13, 183:8, 185:6, 190:12

**analysis**
25:20, 26:5, 26:13, 28:21, 53:5, 53:6, 54:7, 101:2, 115:10, 150:20, 151:3, 151:5, 151:8, 153:20, 153:23, 154:12, 165:25, 167:3, 167:20, 169:17, 170:13, 172:4, 172:12, 173:8, 176:8, 177:15, 179:3, 189:23, 192:24, 204:3, 206:9, 211:21, 236:15

**analytical**
25:17, 25:21, 25:25, 26:2, 26:3, 26:5, 26:8, 26:13, 26:17, 26:23, 27:12

**analytics**
25:23

**analyzed**
41:3, 167:7, 204:1, 206:17, 215:22

**analyzing**
30:23

**animal**
141:1

**animals**
139:23

**another**
9:21, 28:5, 81:17, 98:1, 106:14, 107:3, 107:20, 108:5, 108:21, 108:23, 115:8, 125:15, 131:8, 131:11, 138:10, 143:12, 146:12, 178:2, 180:16, 190:17, 190:23, 195:7, 200:14, 206:4, 208:10, 221:11, 235:9, 245:2

**answer**
33:13, 33:17, 55:3, 59:5, 60:20, 61:20, 62:22, 63:5, 63:6, 63:14, 63:17, 63:21, 67:4, 73:8, 76:16, 81:9, 81:24, 82:12, 82:22, 83:5, 90:24, 91:24, 93:21, 94:20, 96:17, 98:11, 149:6, 162:22, 162:24, 163:16, 163:17, 163:18, 170:4, 179:9, 193:23, 194:8, 194:10, 202:23, 204:21, 210:18, 211:24, 212:9, 218:17, 218:21,

220:4

**answered**
23:16, 41:11, 44:11, 60:15, 94:5, 104:3, 132:13, 132:14, 173:16, 193:23, 205:1, 205:10, 206:7

**answering**
93:14, 216:24, 217:2

**answers**
62:19, 65:5, 82:18, 95:5, 96:13, 210:22, 243:6

**antibacterial**
109:20

**anticipated**
240:20

**antifungal**
109:20

**antimicrobial**
178:16, 181:10, 181:22, 182:5, 191:9, 191:21, 192:21, 193:13, 193:19, 194:2, 194:13

**antioxidant**
70:7, 70:11, 70:20, 71:1, 71:3, 149:14, 151:16, 153:4

**antioxidant-free**
245:4, 245:16, 245:25, 246:7

**any**
9:15, 15:23, 16:16, 18:12, 20:1, 25:16, 27:1, 28:9, 31:6, 33:19, 34:24, 35:8, 37:19, 49:2, 49:21, 50:11, 51:11, 52:11,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    252

54:1, 68:6, 69:11, 77:4, 80:18, 81:12, 83:17, 87:4, 87:10, 89:9, 89:16, 90:14, 108:7, 109:18, 110:9, 130:21, 136:14, 137:19, 141:1, 141:21, 144:20, 146:7, 150:23, 151:7, 160:9, 161:13, 161:18, 182:16, 185:2, 185:8, 185:16, 185:19, 186:2, 186:5, 194:3, 203:3, 203:20, 219:16, 227:13, 240:20, 241:19, 241:20, 241:21, 243:9, 243:25, 246:5, 248:14

**anyone**
62:7, 129:14, 246:14

**anything**
18:12, 18:17, 37:19, 51:20, 71:9, 74:23, 81:4, 112:18, 130:3, 157:3

**anyway**
17:16, 117:10, 130:13, 130:21, 222:16

**anywhere**
68:10, 87:3, 89:16, 91:9, 245:22

**apart**
74:1, 74:2, 82:16, 127:9, 142:5, 188:24, 190:5, 219:8

**apologies**
167:17

**apologize**
55:19, 117:19, 206:15, 212:22, 232:16, 238:19

**apotex**
1:9, 3:14, 8:6, 9:3, 9:6, 9:18, 11:19, 12:17, 13:16, 14:13, 156:14, 157:24, 158:14, 239:21, 241:4, 241:19, 242:8, 243:1

**apotex's**
12:1, 239:22, 242:11

**appear**
72:10

**appearances**
3:1, 4:1

**appendix**
5:12, 45:20, 45:23, 46:6, 159:6, 159:11, 159:21, 165:12, 232:13, 233:5, 236:17

**applicable**
25:12, 70:15

**applicant**
88:8

**application**
5:20, 5:22, 5:24, 22:16, 23:7, 23:10, 23:20, 24:15, 25:8, 25:10, 29:19, 29:21, 30:5, 30:12, 32:11, 33:9, 33:20, 50:2, 50:20, 87:15, 87:16, 88:5, 88:11, 89:7, 105:12, 105:14, 105:22, 109:2, 109:4, 109:9, 139:3, 139:4,

139:6, 141:7, 141:8, 141:12, 141:22, 142:2, 144:24, 145:12, 145:19, 146:4, 209:15, 209:16, 237:11

**applications**
23:9, 23:13, 23:19, 24:13, 24:17, 26:4, 89:13, 111:11, 175:7

**applied**
23:25, 25:2, 30:8, 37:7, 89:18, 141:22

**applies**
158:18

**apply**
27:14, 33:6, 89:10, 95:24, 140:17, 212:8, 212:11, 227:8, 240:18, 243:23

**applying**
32:9, 37:5, 177:18

**approach**
50:22, 63:25

**appropriate**
14:22, 29:18, 31:23, 32:2, 32:24, 33:19, 34:1, 36:12, 39:20, 40:7, 53:22, 129:17

**appropriately**
32:9, 38:5

**approvals**
28:24

**approving**
216:18

**approximately**
28:7, 43:22

**aqueous**
6:20, 49:12, 58:2, 65:22,

66:11, 67:23, 155:25, 159:19, 160:1, 160:2, 160:17, 160:21, 160:25, 175:10, 175:22, 177:6, 196:10, 196:21, 199:6, 200:25, 201:1, 201:4, 201:25, 209:5, 210:4, 210:6, 211:6, 211:8, 211:11, 212:18

**area**
34:11, 89:1, 209:2

**aren't**
37:14, 93:18, 144:25, 176:11

**argument**
161:3

**arguments**
127:2, 127:4

**around**
16:25, 17:2, 17:11, 85:8, 90:6, 106:1, 129:8, 139:11, 142:21, 155:13, 233:11, 233:24, 236:16, 236:22

**art**
97:13

**article**
6:18, 199:3, 199:4, 199:8, 199:15, 200:18

**articles**
201:6, 202:25

**ashraf**
10:24

**aside**
59:4, 62:7, 108:22, 185:12, 186:18

**asked**
22:4, 28:6, 41:10, 47:22,

60:14, 60:17,
80:10, 84:1,
104:2, 132:12,
132:14, 134:16,
173:15, 186:16,
204:13, 205:1,
205:10, 206:7,
232:16

**asking**
27:5, 32:6,
33:5, 59:8,
77:24, 86:20,
96:15, 96:18,
104:7, 118:9,
119:1, 119:2,
126:1, 128:5,
133:4, 137:17,
144:5, 148:14,
152:3, 154:23,
156:6, 162:8,
162:21, 167:9,
171:25, 187:24,
188:11, 188:16,
188:24, 194:9,
216:13, 219:20,
237:18

**asparschu@windel-
smarx**
4:10

**aspect**
68:2, 68:21,
83:14, 144:21,
170:12, 246:22

**aspects**
21:2, 234:19

**asserted**
40:24, 43:1,
48:19, 117:22,
119:8, 121:7,
125:8, 135:15,
145:4, 150:10,
150:14, 150:16,
233:11, 233:22,
236:21

**asserting**
138:2

**assessment**
225:2

**assign**
94:12

**associate**
115:3, 132:7

**associated**
241:7

**associating**
115:7

**assume**
27:17, 34:25,
45:7, 95:16,
132:1, 149:11,
149:17, 151:19,
156:13, 163:10,
186:20, 208:1,
217:19

**assuming**
186:25

**assumption**
163:12

**assuredly**
60:23

**attempted**
236:16

**attorney**
42:18

**attorneys**
1:21, 156:11,
240:25

**attributable**
188:13, 188:19

**attributing**
168:9

**audrey**
4:5, 8:25

**author**
38:22

**authorities**
161:22

**authorize**
185:16

**authors**
39:12, 39:14

**automatic**
66:5, 160:21

**automobile**
23:2, 23:8

**automobiles**
23:6

**availability**
246:18

**available**
215:9, 235:2

**avenue**
3:7, 3:17, 16:9

**avoid**
158:15

**avoiding**
158:17

**aware**
11:25, 49:21,
52:11, 53:25,
155:23, 185:8,
186:5, 202:14,
202:24, 232:7,
233:22, 233:25,
234:2, 234:4,
234:16, 234:18,
234:23, 235:3,
235:13, 235:24,
238:13, 238:22,
245:7, 245:14,
245:17

**awareness**
238:25

**away**
46:15

**azurity**
1:16, 8:24

**— B —**

**b**
5:12, 16:10,
45:23

**bachelor's**
19:13, 20:11

**back**
12:7, 12:8,
20:22, 35:9,
35:13, 38:6,
52:1, 52:22,
60:8, 64:22,
67:1, 69:7,
78:23, 108:12,
123:17, 126:13,
128:13, 136:8,
137:3, 138:20,

164:24, 182:19,
183:23, 184:24,
201:21, 208:17,
222:23, 223:19,
244:15, 244:17

**background**
22:13, 111:21,
124:11, 133:15,
157:13

**bacteria**
192:21

**balance**
21:7, 21:8

**bardales**
4:14, 8:11

**base**
176:16, 217:22

**based**
33:10, 163:12,
198:25, 232:23,
238:15

**bases**
70:3

**basic**
21:10

**basically**
28:20, 73:11,
84:6

**basis**
13:6, 158:3,
236:9

**batch**
58:23

**bates**
222:1, 223:2,
224:9, 226:14,
228:10, 228:25,
230:5, 230:17

**bates-stamped**
6:21, 6:23,
7:3, 7:6, 222:3,
223:3, 228:12,
230:7

**baxter**
8:6, 9:14

**beaker**
163:1

**bearing**
222:1, 223:1,

228:10, 229:21, 230:5

**became**
233:22, 234:16, 237:12, 238:13, 238:22

**because**
10:4, 12:1, 12:9, 15:11, 17:15, 19:23, 22:14, 35:21, 43:16, 45:7, 46:23, 52:22, 53:6, 54:12, 56:6, 56:14, 62:23, 63:20, 63:23, 76:20, 80:12, 85:8, 85:14, 91:1, 94:14, 95:5, 95:6, 96:11, 108:16, 112:14, 129:18, 141:18, 154:1, 158:9, 159:3, 160:23, 163:17, 170:9, 177:10, 181:23, 183:4, 187:21, 196:19, 203:21, 205:18, 208:18, 209:6, 209:8, 213:11, 213:14, 218:13, 219:23, 221:11, 237:22, 241:11

**become**
204:17, 204:18, 204:24, 210:9

**becomes**
53:22, 161:25

**been**
11:3, 15:15, 16:21, 17:12, 17:19, 24:14, 25:2, 28:5, 29:7, 29:14, 30:10, 41:9, 42:5, 44:19,

45:14, 48:1, 52:4, 52:5, 52:8, 53:8, 53:12, 53:24, 54:9, 60:21, 65:21, 66:23, 69:2, 93:1, 93:11, 93:13, 98:5, 111:8, 119:22, 120:19, 126:16, 128:14, 131:5, 132:16, 135:24, 137:14, 137:16, 137:19, 145:15, 164:24, 171:7, 180:12, 193:2, 196:12, 197:4, 197:9, 197:21, 198:11, 198:21, 198:24, 204:8, 208:22, 211:9, 212:16, 212:19, 216:15, 217:12, 219:12, 219:20, 225:17, 237:1, 237:20, 238:4, 238:9, 239:9, 240:11, 241:1

**before**
2:11, 9:13, 15:6, 16:21, 17:5, 34:24, 35:1, 35:2, 44:20, 51:25, 59:5, 62:24, 71:17, 80:21, 84:6, 87:24, 91:2, 130:18, 162:6, 174:17, 194:20, 199:8, 199:25, 200:4, 201:20, 215:17, 216:6, 222:8, 232:16, 234:3, 234:14, 236:13, 237:6, 237:14, 248:12

**beforehand**
234:19

**began**
22:12

**begin**
15:13

**beginning**
50:10, 73:4, 82:12, 83:12, 83:22, 112:22, 112:23, 117:25, 139:15, 193:22, 232:17

**beginnings**
75:12

**begins**
8:2, 106:2, 132:17, 139:12, 166:8, 168:15, 184:7, 200:20

**begun**
238:6

**behalf**
3:3, 3:14, 4:3, 8:20, 8:24, 9:3

**behavior**
215:16, 216:4

**being**
17:19, 40:19, 97:23, 101:6, 101:16, 111:7, 116:8, 117:22, 118:19, 124:19, 125:4, 127:6, 134:4, 138:8, 143:14, 144:8, 158:9, 158:14, 158:15, 181:22, 184:2, 188:13, 192:21, 207:14, 207:15, 236:5

**beings**
139:23

**believe**
17:25, 18:12, 18:14, 42:2, 42:4, 43:23, 50:12, 51:11,

52:25, 56:12, 59:5, 61:13, 65:5, 81:17, 88:24, 90:18, 94:11, 95:11, 105:10, 115:23, 132:8, 159:10, 161:22, 199:15, 201:14, 210:21, 239:25, 240:9, 246:15

**below**
58:24, 147:11

**belrapzo**
172:14, 235:3, 235:14, 235:23, 235:24, 236:1, 236:3

**belrapzo's**
236:24

**bendamustine**
34:24, 35:3, 35:5, 36:15, 43:19, 44:19, 48:9, 48:22, 49:5, 50:13, 51:12, 51:15, 53:19, 54:4, 58:12, 64:25, 65:1, 75:17, 82:14, 99:15, 102:10, 105:8, 114:18, 114:19, 114:25, 121:9, 121:20, 122:18, 123:3, 124:7, 124:15, 125:10, 126:17, 127:6, 128:11, 128:18, 134:23, 135:17, 149:13, 151:14, 153:4, 155:5, 170:21, 170:22, 182:10, 182:18, 183:6, 186:10, 186:23, 187:8, 187:13, 187:15, 188:2, 188:10,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    255

188:13, 189:19,
189:25, 192:7,
197:13, 198:7,
198:14, 218:11,
220:1, 221:2,
221:3, 221:13,
228:1, 228:4
**bendamustine-con-**
**taining**
103:4, 114:11,
198:20
**bendeka**
172:14
**beneficial**
49:12
**benefit-to-risk**
140:1
**benefits**
49:20, 49:21,
50:1, 50:2,
50:7, 53:7
**benzol**
75:16, 147:19
**benzyl**
6:14, 154:8,
190:21, 190:24,
191:2, 191:13,
191:20, 192:6,
192:12, 192:16,
193:3, 193:10,
193:21, 193:25,
194:12, 194:22
**berkeley**
21:18
**bernhardt**
1:23, 2:8, 5:3,
5:8, 5:11, 5:14,
5:17, 8:4,
15:14, 15:22,
15:24, 15:25,
18:2, 45:18,
46:11, 47:1,
247:2, 248:7
**best**
67:19, 92:7,
111:17, 238:9,
248:11
**better**
17:14, 33:24,

49:4, 50:14,
52:15, 54:2,
126:3
**between**
11:10, 67:7,
74:4, 118:23
**beyond**
81:13, 185:17,
185:18
**bio**
235:21, 235:24
**biochemical**
20:23
**biochemistry**
21:15
**biologic**
112:7
**biphasic**
116:21
**bit**
28:16, 55:21,
80:2, 85:8,
122:7, 123:25,
128:14, 163:3
**blood**
248:15
**bodies**
135:10, 230:2
**body**
106:14, 106:15,
107:2, 107:3,
107:19, 107:20,
108:5, 108:6,
121:4, 135:5,
143:12, 143:13,
146:12, 146:13
**bold**
103:1, 103:3
**bookshelf**
174:19
**boston**
1:26, 2:10,
8:15
**both**
15:3, 21:1,
49:18, 57:20,
98:7, 120:1,
122:2, 130:24,

157:10, 193:12,
197:18, 199:15
**bottom**
58:15, 58:16,
71:16, 109:12,
205:19
**bound**
56:23
**break**
14:25, 15:8,
69:3, 69:10,
136:1, 136:13,
183:16, 184:20,
221:16, 221:21,
222:19
**brief**
72:3
**bring**
15:7, 22:10,
25:1
**bringing**
138:13
**broad**
60:20, 103:9,
103:10, 103:18,
111:6, 111:22,
112:14, 118:9,
120:16, 181:18,
216:10, 217:18,
233:14
**broader**
89:1, 210:3
**broadly**
21:12, 36:24,
37:8, 37:25,
39:11, 50:7,
55:7, 89:12,
89:25, 106:22,
128:5, 146:5,
165:8, 169:14,
209:13
**brought**
21:9, 56:16,
117:2, 236:10
**bs**
19:19
**buffer**
206:24, 207:1,

207:14, 207:21,
208:9, 210:9
**buffers**
210:23
**bullet**
231:7
**bunch**
239:12
**burning**
77:22
**business**
16:7

--- C ---

**ca**
1:8, 1:15
**calculation**
182:16, 183:4,
183:11
**calculations**
189:4
**california**
21:18
**call**
38:7, 66:21,
66:22, 97:25,
107:6, 118:21,
119:5, 120:19,
148:11, 153:9,
194:15, 201:6,
209:2, 209:3,
209:4, 209:14,
220:14, 244:18,
245:3, 246:6
**called**
20:5, 42:11,
51:17, 66:17,
120:23, 151:17,
153:7, 164:3,
182:24, 232:14,
242:19, 242:21,
242:22, 245:3
**calling**
66:23, 120:19
**calls**
19:21, 146:25,
160:25
**cambridge**
16:11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                    256

| | | | |
|---|---|---|---|
| **came** 55:3 | 108:11, 109:18, 109:23, 110:9, 111:3, 142:23, 143:3, 143:7, 143:13, 144:7, 145:18, 145:25, 146:10 | 110:11, 174:25, 178:12, 181:9 | 170:12, 170:15, 171:10, 174:19, 183:2, 184:16, 186:16, 188:25, 202:6, 203:23, 204:1, 209:20, 222:9, 235:3, 235:13 |
| **can't** 10:1, 10:8, 235:7 | | **category** 36:4, 42:19, 118:12, 176:15, 178:13, 191:6, 195:17, 239:19, 239:20 | |
| **cancer** 36:7, 44:22, 47:24, 48:4, 48:5, 48:8, 53:18, 54:2, 54:6 | **carriers** 99:14, 143:23, 173:6 | **caused** 64:24 | **certificate** 19:1, 19:7, 19:8 |
| **cannot** 90:11, 170:9, 188:4 | **carries** 99:19 | **caveats** 198:24 | **certificates** 18:22, 18:24, 19:4, 58:9 |
| **capable** 152:10 | **carrying** 106:13, 107:18, 108:4, 143:11 | **cellulose** 6:18, 6:19, 199:5, 200:2, 200:8, 200:25 | **certified** 2:12 |
| **capital** 48:14 | **case** 8:8, 9:7, 13:14, 34:24, 35:1, 36:21, 37:19, 40:10, 46:20, 53:8, 59:23, 74:2, 75:1, 75:22, 78:4, 81:14, 83:15, 83:16, 116:19, 129:14, 138:3, 146:17, 149:20, 158:12, 160:7, 162:14, 169:14, 172:17, 173:11, 177:25, 182:16, 185:22, 186:3, 192:15, 201:3, 211:23, 217:21, 222:14, 232:6, 243:12, 244:16, 245:18 | **celsius** 164:6 | **certify** 248:6, 248:14 |
| **capitalized** 16:10 | | **center** 28:19 | **cetera** 21:14 |
| **capsule** 176:16 | | **central** 167:12 | **change** 14:16, 14:19, 39:12, 53:21, 104:23, 120:11, 123:25, 155:17, 161:24, 186:11, 209:8, 219:17 |
| **caption** 9:6 | | **certain** 30:11, 31:15, 35:23, 35:24, 39:9, 41:25, 48:4, 60:3, 62:19, 113:4, 116:11, 147:8, 198:25, 209:4, 217:19 | |
| **care** 56:17 | | | |
| **career** 24:1, 25:3, 41:24 | | | **changed** 74:3, 74:11, 74:14, 165:3 |
| **careful** 112:13, 196:19, 196:21 | | **certainly** 15:4, 21:1, 25:19, 25:22, 26:3, 27:4, 27:11, 39:17, 42:16, 52:9, 59:19, 61:18, 67:24, 68:23, 69:24, 80:5, 87:25, 88:3, 88:16, 88:25, 89:11, 89:19, 90:3, 101:12, 101:14, 103:12, 104:5, 112:4, 117:6, 146:2, 167:7, 169:15, | **changes** 15:25, 16:1, 28:1, 39:15, 39:16 |
| **carlo** 21:23, 22:15, 36:23, 37:20 | **cases** 11:25, 17:16, 35:6, 42:6 | | **changing** 123:24, 164:9 |
| **carrier** 73:19, 81:17, 94:16, 97:16, 97:22, 99:13, 99:18, 100:2, 100:11, 101:11, 101:18, 101:23, 103:24, 104:8, 105:8, 106:3, 106:9, 106:19, 106:20, 107:4, 107:5, 107:11, 107:23, 108:3, | **catalog** 26:19 | | **characterization** 171:21, 215:3 |
| | **catalysts** 22:17, 22:20, 22:21 | | **characterize** 41:7 |
| | **catalytic** 23:2, 23:5 | | **characterized** 97:14, 99:11, 219:6 |
| | **categories** 42:10, 43:10, | | **characterizing** 101:7 |
| | | | **chart** 166:22, 166:25, 167:11, 167:15, |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                             257

167:16, 167:22,
168:8
**chatted**
14:9
**chatting**
69:13, 69:14
**check**
26:18, 26:22,
130:10, 199:9,
237:23
**chemical**
19:17, 19:19,
20:1, 21:13,
21:17, 23:21,
25:9, 25:19,
25:23, 36:18,
36:25, 37:1,
37:9, 37:13,
37:15, 38:1,
42:11, 42:17,
42:23, 43:14,
43:16, 106:13,
107:2, 107:19,
143:11, 146:11,
149:21, 162:10,
164:24, 165:2,
165:6, 215:16,
216:4
**chemicals**
89:11, 89:13,
89:14, 102:15
**chemist**
181:2
**chemist's**
60:20
**chemistry**
21:14, 23:12,
24:3, 24:9,
25:17, 25:21,
25:25, 26:2,
26:4, 26:5,
26:8, 26:13,
26:17, 26:23,
55:8, 70:13,
162:2, 162:8,
162:9, 193:9,
206:22, 206:24,
207:6, 207:12,

209:22, 213:1,
221:4, 221:5,
230:24
**chicago**
3:8
**chloride**
71:18, 162:16,
163:8, 163:9,
163:11, 163:14,
164:4, 164:9,
164:17
**choice**
12:19
**choices**
133:10
**choosing**
33:12
**chris**
9:2, 10:12,
11:23, 12:7,
14:17, 244:8
**christopher**
3:15, 3:20
**circuit**
152:12
**circular**
120:4
**circumstance**
148:22, 192:24,
242:24
**citation**
99:16, 121:21,
129:14, 133:11,
135:3, 135:5,
223:23
**citations**
122:1, 123:14,
126:23
**cite**
121:11, 130:22,
224:8, 226:6,
226:8, 226:9,
230:12, 230:15
**cited**
161:23, 177:17,
199:16, 202:15,
228:17, 228:21
**citing**
224:5

**civil**
19:9, 240:18
**civilization**
19:10
**claim**
42:15, 42:23,
60:7, 64:15,
70:24, 72:2,
72:12, 72:21,
72:23, 73:9,
73:11, 73:12,
75:10, 75:23,
76:10, 77:15,
79:1, 83:18,
89:23, 91:18,
128:8, 141:25,
145:8, 145:10,
147:5, 147:10,
150:10, 150:15,
150:17, 150:24,
150:25, 151:17,
158:3, 171:18,
188:9, 190:24,
193:8, 198:7,
198:15, 198:17,
198:18, 218:17,
220:9, 238:2
**claimed**
40:19, 49:22,
55:4, 60:12,
61:11, 61:16,
62:10, 64:9,
65:7, 70:17,
125:4, 155:3
**claiming**
44:12, 44:13,
44:22, 48:21,
112:6
**claims**
40:24, 40:25,
41:2, 41:3,
41:8, 41:14,
41:16, 41:17,
43:1, 43:3,
43:4, 43:7,
43:8, 43:11,
44:17, 44:18,
47:22, 48:1,

48:7, 50:16,
51:2, 51:17,
54:2, 59:17,
60:2, 60:5,
63:19, 64:5,
72:8, 72:10,
72:24, 73:6,
75:2, 75:9,
75:15, 79:23,
92:24, 97:10,
97:12, 100:2,
103:2, 111:18,
111:23, 111:24,
112:23, 113:8,
114:13, 115:22,
115:24, 117:17,
117:20, 117:21,
118:5, 119:8,
119:9, 119:23,
121:7, 123:9,
124:23, 125:8,
127:21, 127:24,
129:3, 129:5,
131:3, 133:12,
133:24, 135:15,
137:24, 141:17,
141:18, 141:22,
144:18, 144:21,
144:25, 145:4,
153:1, 153:8,
177:19, 192:5,
192:24, 197:17,
197:20, 197:23,
206:10, 211:22,
233:11, 235:5,
236:21, 237:3,
237:6, 237:9,
237:11, 237:13,
238:14
**clarendon**
1:26, 2:10,
8:15
**clarify**
80:11, 81:8,
100:9, 205:23
**class**
21:6, 35:11,
35:16, 35:17,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                        258

35:19, 36:3,
224:17, 224:18
**classes**
112:6
**classification**
229:22
**classifications**
224:13
**classified**
226:19, 229:9,
231:3
**clear**
25:18, 29:11,
59:14, 63:20,
78:5, 85:1,
104:19, 112:16,
134:8, 137:14,
138:18, 144:4,
162:18, 179:14,
180:3, 180:7,
218:12, 218:13,
219:9, 219:21,
220:14, 223:25,
238:20
**clearly**
63:21, 78:3,
119:22, 149:7,
194:14, 195:22,
235:24
**clinical**
51:4, 51:14,
52:5, 52:6,
52:8, 52:9,
52:12, 52:13,
54:10
**clinically**
49:16, 50:25,
54:13
**clinicians**
51:4
**close**
9:20, 12:15,
17:17, 33:3,
93:25, 99:22
**closed**
241:3, 241:4
**closure**
226:22, 229:12,

231:14
**clr**
1:29
**cmc**
230:25
**co-solute**
211:10, 211:25,
212:21
**co-solutes**
209:6, 209:14
**co-solvent**
75:24, 121:8,
124:6, 125:9,
126:17, 135:16,
178:19, 182:8,
186:12, 187:1,
189:16, 190:2,
193:6, 194:14,
201:5, 208:11,
210:10, 212:1,
212:7, 212:12,
212:20, 212:22,
236:3
**co-solvents**
205:22
**coaching**
242:23
**coatings**
109:19
**coinventor**
90:20, 93:17,
138:22, 139:8,
141:3
**coinventors**
42:4, 88:6,
109:9
**colleague**
8:21, 8:25
**collectively**
226:23, 229:12
**colloquy**
15:12, 77:22,
239:12
**colorless**
179:14
**column**
21:14, 70:10,
71:1, 71:16,

73:10, 122:20,
122:21, 124:4,
124:9, 124:17,
126:2, 126:8,
127:5, 128:19,
129:7, 129:20,
132:19, 132:23,
166:3, 167:12,
175:3, 179:13,
184:6, 184:7,
200:20
**com**
3:10, 3:11,
3:20, 4:9, 4:10
**combination**
187:19, 201:7,
201:25
**combinations**
48:23
**combined**
171:12
**come**
12:8, 19:4,
20:20, 51:25,
153:22, 161:20,
165:20, 172:16,
185:14, 188:5,
200:4, 201:21,
244:15, 244:17
**comes**
12:7, 131:8,
131:11, 209:12,
210:11
**coming**
108:12, 182:11,
182:15, 194:17,
201:3
**commensurate**
140:1
**comment**
239:23
**commercial**
29:7, 231:25,
232:1
**commission**
248:24
**common**
12:5, 12:6,

130:9, 157:12
**commonality**
12:3
**commonwealth**
2:14, 248:2,
248:5
**communications**
157:19
**companies**
29:4, 29:8
**compared**
49:4, 53:19,
54:3
**comparing**
142:5
**compatibility**
140:25, 141:1
**compatible**
109:22, 143:14,
144:8, 221:1
**compendial**
58:19, 227:16
**complete**
45:7
**completely**
15:12, 24:23,
78:22, 116:13,
120:4, 157:8
**completion**
248:12
**complex**
165:10
**complication**
139:25
**component**
116:14, 189:24,
200:9
**components**
43:4, 58:11,
64:5, 64:16,
68:1, 72:15,
73:18, 79:5,
80:8, 82:13,
116:7, 134:24,
147:8, 147:9,
182:10, 188:17,
189:22, 190:1,
190:5, 197:25,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    259

198:22, 206:19,
221:2
**composition**
43:3, 44:17,
51:1, 51:17,
52:16, 103:4,
103:5, 103:14,
106:10, 113:1,
114:11, 124:18,
124:19, 129:22,
143:8, 164:13,
188:23, 198:20
**compositions**
48:9, 48:22,
49:3, 53:16,
55:4, 61:11,
61:16, 62:10,
64:9, 65:8,
66:17, 70:18,
119:21, 121:10,
126:19, 135:18,
139:20
**compound**
196:15, 207:18,
238:8
**compounds**
35:11, 35:17,
35:22, 35:24,
36:6, 36:7,
36:10, 196:2,
196:4, 196:5,
196:9, 196:17
**comprising**
48:22, 72:2,
91:19, 103:16,
147:6, 147:7,
198:20
**compromise**
158:20
**concept**
62:19, 130:25,
131:8, 131:11,
132:9
**concepts**
218:24, 242:14
**concern**
242:11
**concerns**
240:7

**conclude**
13:15, 135:13,
152:10, 152:16,
152:24, 164:13,
246:24
**concludes**
150:21, 152:1,
152:5, 152:9,
152:11, 202:16
**conclusion**
146:25, 152:7,
153:23, 244:1
**conclusions**
33:10, 172:16,
190:13, 204:4
**concur**
242:10
**conditions**
161:16, 163:11,
163:12, 164:5,
164:10, 164:18,
165:4, 177:23,
177:24, 179:25
**confidential**
1:21, 156:8,
156:9, 156:11,
202:4
**confirm**
69:19, 109:8,
181:2, 228:16,
230:12, 244:11
**confirmed**
68:17
**confirms**
97:11
**confound**
180:12
**confused**
171:23, 215:20,
219:8
**confusing**
167:18, 168:7,
168:12
**confusion**
218:6
**consider**
31:6, 71:10,
186:25, 190:2,

201:6, 236:23,
241:12
**considered**
20:7, 43:13,
120:2, 120:12,
150:11, 199:10,
206:4, 222:12
**considering**
150:9
**consistency**
175:12
**consistent**
50:24, 79:11,
171:11, 172:15,
227:19, 233:8,
236:19
**consisting**
72:14, 80:22,
80:23, 82:25,
102:16, 103:16,
130:16, 146:17,
146:21, 148:16,
148:17, 149:2,
151:22, 152:14,
154:6, 197:24,
220:9
**consists**
73:16, 79:3,
80:7
**consolidated**
157:25, 158:19,
241:11
**construction**
21:13, 75:10,
77:11, 77:17,
95:17, 218:17
**construed**
77:3, 77:13,
100:13, 133:13
**construing**
95:9
**consumed**
161:5, 161:20,
213:9, 213:20,
214:2, 214:16,
214:21, 215:10
**contact**
65:2, 139:22,

244:19
**contain**
121:19, 122:18,
154:4, 154:5,
239:4
**contained**
48:9
**container**
90:13, 226:22,
229:12, 231:14
**containing**
114:10, 154:3,
198:19
**contains**
64:15, 127:17,
170:20, 188:17
**contended**
157:14
**contends**
160:23
**content**
65:18, 87:25
**contention**
77:19, 233:17
**contents**
230:19
**context**
31:6, 40:9,
41:18, 43:17,
64:20, 70:6,
70:17, 70:23,
74:15, 82:15,
84:18, 85:23,
85:24, 86:10,
86:15, 86:17,
86:18, 87:2,
87:4, 92:15,
93:3, 93:11,
94:6, 98:3,
98:12, 98:13,
101:5, 102:3,
102:4, 103:15,
104:5, 104:6,
104:15, 104:20,
105:4, 107:16,
108:18, 111:9,
111:12, 111:14,
112:16, 112:21,

113:4, 113:16,
115:1, 116:24,
117:6, 118:10,
118:16, 118:17,
119:20, 119:23,
119:25, 120:3,
120:8, 120:25,
128:5, 131:2,
137:17, 138:4,
138:10, 140:15,
140:16, 142:13,
142:14, 146:3,
146:8, 177:16,
197:5, 204:10,
206:9, 206:20,
207:8, 207:9,
208:22, 211:20,
212:24, 213:4,
216:13, 217:18,
218:13, 219:12,
219:13, 233:16

**contexts**
104:17, 104:23,
113:19, 113:21,
120:21, 120:22,
120:23, 128:9,
138:1, 138:6,
138:14, 204:9,
209:23, 213:3,
213:4

**contiguous**
66:6

**continually**
83:3

**continue**
14:23, 150:17,
158:10, 158:25,
240:10

**continued**
3:23, 4:1, 6:25

**continues**
80:7, 110:5,
110:6, 121:12,
159:24, 173:3,
173:19, 179:18,
231:6, 231:8,
235:23

**continuing**
243:22

**contribute**
190:6

**contribution**
188:25, 189:18,
190:8

**control**
229:23

**controlled**
225:4

**controlling**
89:2, 89:7

**controls**
230:25

**convenience**
51:4, 51:9

**convenient**
206:2

**convention**
129:11

**conversations**
69:11, 136:16

**convert**
22:24

**converter**
23:2, 23:5,
23:6

**converting**
22:21

**coordinated**
157:25

**copied**
233:18

**copies**
18:1, 45:6,
45:7

**copy**
17:25, 18:7,
45:1, 46:19,
54:18, 54:19,
56:7, 199:22,
223:9

**copying**
234:1

**core**
26:14

**corner**
55:21

**corp**
1:9

**correction**
121:22, 160:12,
175:16

**correctly**
32:5, 32:8,
37:11, 38:23,
90:17, 97:18,
98:6, 99:23,
106:16, 110:3,
121:23, 122:23,
125:13, 127:16,
140:3, 141:12,
142:7, 143:20,
155:9, 155:20,
226:25, 227:1,
229:15, 231:5,
231:16

**could**
18:15, 18:19,
22:23, 24:13,
24:16, 26:22,
31:12, 34:6,
34:8, 35:13,
36:8, 40:7,
43:15, 43:21,
45:14, 47:2,
50:6, 53:21,
63:14, 64:13,
68:16, 70:4,
70:14, 70:15,
72:6, 78:8,
87:10, 89:25,
97:24, 100:8,
108:15, 113:18,
114:13, 120:22,
120:23, 123:14,
130:10, 138:20,
140:23, 142:18,
154:12, 161:11,
168:10, 175:24,
177:1, 181:14,
190:7, 191:13,
191:20, 191:21,
193:11, 193:12,
194:12, 208:14,
208:15, 210:9,
212:16, 216:22,
217:4, 217:22,

228:3, 228:24,
234:12, 242:22

**counsel**
8:17, 14:10,
39:1, 43:1,
43:6, 43:9,
56:20, 56:25,
69:11, 76:16,
94:19, 94:23,
95:14, 96:1,
96:9, 136:15,
158:8, 158:13,
221:24, 222:18,
239:22, 240:8,
242:11, 243:1,
243:19

**counsel's**
121:22, 243:20

**count**
15:11

**counted**
20:18, 239:24

**counteroffer**
13:18

**couple**
20:20, 28:5,
239:18, 243:16

**course**
10:20, 20:5,
20:23, 20:25,
21:7, 21:14,
25:21, 25:25,
26:1, 26:6,
26:18, 27:6,
27:8, 27:10,
38:18, 49:1,
71:8, 71:18,
200:8, 202:3

**courses**
20:2, 20:3,
20:7, 20:16,
20:17, 20:20,
20:21, 21:4,
21:6, 21:10,
21:13, 21:15,
22:5, 25:14,
25:16, 25:20,
25:22, 26:3,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    261

26:7, 26:9,
26:13, 26:16,
26:21, 27:1,
27:5
**coursework**
20:12, 26:25
**court**
1:1, 8:7, 9:8,
10:8, 10:12,
63:5, 87:20,
243:24, 244:4
**cover**
12:4, 105:23,
109:10
**created**
43:20, 43:25
**creates**
51:3
**creating**
51:3, 92:6
**criteria**
231:10
**cross**
5:2
**cross-examination**
10:2
**crowley**
85:15, 86:11,
161:23, 199:16
**crr**
1:29
**crystallization**
89:2, 89:8,
92:3, 93:18,
138:24
**crystallizing**
91:20
**cure**
44:22, 47:24
**curiosity**
110:13, 110:14
**current**
16:7, 16:12,
114:13, 146:17
**currently**
16:2, 234:10,
236:5
**curriculum**
5:8, 18:2

**cut**
246:3
**cv**
17:25, 18:7,
27:15, 38:7,
42:3
**cv--jlh**
9:7

---
**D**
---

**d**
240:23, 243:13
**damages**
246:16, 246:22
**dash**
135:13
**data**
49:8, 185:12,
189:5
**date**
8:9, 215:17,
215:22, 216:1,
216:2, 239:4
**dates**
234:1, 234:4,
234:11, 234:13,
234:14, 238:11,
238:24
**day**
12:11, 14:4,
40:12, 74:12,
205:13, 248:19
**days**
10:20, 11:6,
13:5, 14:3
**dc**
3:18
**december**
57:20
**decide**
156:17
**decision**
233:9, 236:19
**def**
82:4
**defendant**
4:3, 14:6
**defendants**
1:10, 1:18,

3:14, 8:24, 9:4,
10:19, 11:2,
13:19, 13:24,
156:20
**defending**
15:3
**define**
43:15, 61:10,
61:15, 95:21,
108:8, 111:8,
116:25
**defined**
80:22, 81:5,
81:8, 81:10,
90:11, 106:22,
107:15, 117:13,
117:25, 128:9,
128:10, 131:13,
145:6
**defines**
121:13, 122:13,
132:18, 132:20
**defining**
140:11
**definition**
74:3, 74:10,
81:13, 85:10,
92:9, 92:12,
93:5, 93:8,
95:23, 102:18,
103:19, 104:22,
107:11, 108:9,
108:18, 108:19,
110:22, 111:3,
111:7, 125:22,
140:5, 140:17,
141:4, 141:25,
144:12, 144:16,
145:17, 145:19,
145:23, 145:24,
146:3, 146:14,
151:19, 196:4,
197:2
**definitional**
118:11
**definitions**
86:1, 86:13,
103:11, 144:16,

227:17
**degradant**
31:5, 228:1,
228:4
**degradation**
30:23, 30:24,
36:19, 37:9,
226:20, 226:23,
229:9, 229:13,
231:3, 231:10,
231:11, 231:22,
231:24
**degrade**
64:25, 65:1
**degraded**
221:5, 221:13
**degree**
19:13, 20:18,
30:8, 30:12,
31:10, 32:10,
33:7, 129:21,
129:24
**degrees**
18:21, 18:23,
19:2, 19:3,
20:12, 30:4,
145:10, 161:16,
164:5
**delaware**
1:2, 8:8, 16:19
**deliberate**
233:9, 236:19
**deliberately**
67:9
**delineate**
43:4
**delivers**
242:4
**delivery**
112:19
**density**
21:22, 22:14,
36:22, 37:10
**departure**
108:10
**depend**
39:9, 197:5
**depending**
108:17, 110:5,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                              262

181:5, 202:7,
239:7
**depends**
31:23, 36:6,
39:24, 40:2,
40:8, 82:25,
86:15, 87:2,
113:3, 116:24,
118:16, 119:19,
229:22
**deponent**
240:24
**depos**
8:12, 9:9
**deposed**
16:21, 157:22,
240:24
**deposes**
15:17
**deposition**
1:23, 2:8, 8:3,
8:14, 10:4,
10:11, 10:19,
11:14, 11:17,
12:21, 13:3,
13:16, 15:2,
45:15, 95:1,
96:9, 96:10,
158:10, 158:16,
240:5, 240:12,
241:2, 241:3,
241:4, 241:8,
242:8, 243:10,
243:11, 243:22,
244:2, 247:2,
247:4, 248:12
**depositions**
10:5, 10:23,
11:4, 15:6,
157:17, 158:11,
240:6, 240:12
**depth**
22:17
**derivative**
201:1
**describe**
171:18, 211:10
**described**
153:15, 171:16,

183:7, 184:2,
184:11, 211:12
**describes**
168:16
**describing**
48:21, 99:21,
119:22
**description**
5:7, 6:2, 7:2,
170:19, 176:6,
179:12, 179:17,
183:21, 215:14
**descriptions**
41:1, 141:2
**design**
233:11, 236:16,
236:22
**design-around**
236:25
**designate**
36:8, 156:8,
156:17
**designation**
35:20, 35:21
**designed**
233:18
**detail**
41:16, 68:16,
94:2, 94:9
**details**
93:23, 108:13
**determine**
189:15
**determines**
151:8
**determining**
171:17, 172:20
**developed**
78:4, 234:10,
235:11, 237:7,
238:4, 238:15,
238:17, 238:18,
239:1
**developing**
89:4, 89:6,
234:22, 235:17
**development**
233:8, 234:14,

236:18, 237:15,
238:5
**dictionaries**
93:9
**dictionary**
86:1, 86:13
**die**
89:14
**difference**
51:14, 137:17
**differences**
11:24, 141:10,
242:14
**different**
12:11, 23:6,
30:17, 30:19,
35:25, 43:10,
63:13, 64:4,
81:16, 86:4,
92:20, 103:7,
104:16, 104:17,
104:23, 111:12,
117:13, 120:21,
120:22, 132:18,
137:25, 138:1,
140:17, 141:3,
141:11, 142:14,
142:15, 147:24,
148:9, 161:6,
161:7, 162:21,
176:17, 177:3,
186:19, 193:5,
193:8, 193:24,
201:21, 204:9,
207:9, 208:21,
209:7, 209:8,
209:15, 209:16,
209:17, 209:23,
211:13, 212:5,
212:6, 212:24,
212:25, 213:2,
218:7, 219:7,
242:12, 242:16,
242:25
**differentiate**
68:6
**differentiated**
67:9

**differentiating**
37:15
**differently**
81:11, 124:1,
209:24
**diluent**
106:11, 143:9
**dimas**
4:14, 8:11
**direct**
5:2, 15:18,
23:20, 124:20,
176:17, 200:25
**directly**
19:12, 21:5,
26:15, 37:5,
54:11, 70:13,
71:6, 85:14,
176:12, 215:2,
237:3
**disagree**
90:21, 93:4,
93:7, 154:2,
158:25, 199:19,
207:17, 207:19,
240:22, 243:14
**disagreement**
184:17
**disassociates**
215:7
**disclose**
77:16
**disclosure**
79:11
**disclosures**
79:10, 79:14
**discount**
177:10
**discovered**
44:13
**discuss**
14:19, 14:25,
34:7, 39:17,
41:12, 48:12,
49:11, 50:1,
50:6, 55:11,
57:8, 57:23,
58:6, 58:25,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

263

68:22, 68:25,
74:20, 74:21,
75:21, 83:11,
86:19, 87:2,
102:5, 103:17,
104:15, 115:19,
115:21, 116:25,
117:6, 117:25,
120:24, 124:11,
125:3, 126:25,
138:14, 140:25,
153:18, 161:5,
162:3, 166:1,
167:7, 173:17,
180:6, 186:4,
198:10, 201:14,
203:25, 207:9,
218:24, 227:5,
227:23, 234:7,
234:19, 235:4,
240:19, 245:11
**discussed**
36:16, 48:20,
61:1, 65:14,
67:1, 67:25,
72:12, 73:3,
85:24, 88:17,
93:9, 99:10,
114:23, 129:4,
131:4, 142:12,
145:9, 155:16,
172:25, 179:11,
181:7, 181:19,
182:21, 183:8,
189:22, 197:25,
206:18, 206:20,
227:24, 234:15,
239:3, 245:2,
245:18
**discussing**
15:10, 48:1,
53:24, 60:22,
93:13, 98:5,
126:16, 128:14,
131:5, 137:19,
145:16, 193:2,
197:9, 198:21,
204:8, 219:12,

237:1
**discussion**
57:10, 59:6,
69:20, 73:23,
83:14, 93:2,
118:3, 127:1,
142:16, 180:5,
213:5, 213:7,
221:15, 223:18,
223:20, 228:19
**discussions**
136:14
**disinfectant**
178:17, 181:11,
191:10
**disperse**
177:11
**dispersed**
116:1, 124:16,
128:23, 129:16,
129:19, 129:21,
129:23
**dispersing**
131:1
**dispersion**
109:19, 110:8,
110:10, 110:12,
114:6, 114:8,
114:14, 114:21,
116:19, 116:22,
118:6, 118:13,
127:20, 164:15
**dispersions**
114:4, 116:16,
116:17, 118:13,
127:22, 127:24,
128:1, 128:9,
129:6
**dispute**
77:17, 77:24,
91:12, 92:4,
161:18, 218:25,
239:8
**disrupting**
95:3
**dissertation**
22:1, 23:15,
24:3, 24:7,

24:20, 36:14
**dissolution**
58:3, 189:20
**dissolve**
75:17, 119:16,
120:11, 121:8,
124:7, 125:9,
126:17, 132:10,
132:23, 133:19,
134:5, 134:23,
135:16, 135:19,
136:22, 137:11,
142:3, 161:24,
164:1, 186:10,
186:23, 187:18,
192:7, 197:13,
197:14, 198:7,
210:9
**dissolved**
115:1, 116:1,
116:2, 118:22,
119:3, 121:21,
122:19, 123:3,
124:15, 127:6,
127:18, 127:21,
128:12, 128:18,
128:23, 129:9,
129:16, 129:21,
131:6, 161:14,
161:15, 163:8,
163:13, 163:24,
164:3, 164:12,
164:19, 164:20,
169:7, 188:10,
188:12, 198:22,
198:23, 204:13,
204:15, 204:16,
206:24, 207:13,
208:10, 211:6,
211:11, 215:11
**dissolves**
160:23, 162:16,
163:4, 182:9,
182:18, 204:23,
205:7, 206:3
**dissolving**
6:19, 116:20,
130:25, 163:23,

177:12, 189:18,
189:25, 199:5
**distinction**
67:6
**distinguishing**
68:2
**district**
1:1, 1:2, 8:7
**divide**
13:19
**doctor**
52:2
**doctrine**
150:15, 151:1,
151:9
**document**
6:21, 6:23,
7:3, 7:6, 18:6,
88:2, 88:20,
90:6, 105:11,
106:1, 107:21,
109:1, 109:12,
140:12, 146:14,
160:13, 165:13,
168:14, 189:11,
203:23, 222:1,
222:3, 222:8,
222:9, 223:1,
223:3, 224:25,
225:7, 226:7,
227:13, 227:24,
228:10, 228:12,
228:17, 229:16,
230:1, 230:5,
230:7
**documents**
58:13, 126:24,
188:6, 222:13,
226:9, 230:1,
231:19, 232:2
**doing**
17:12, 28:23,
29:1, 33:11,
94:24, 169:15,
169:16, 193:11,
194:3
**done**
10:5, 31:4,

34:10, 35:14,
53:5, 53:6,
53:23, 54:6,
92:2, 96:9,
96:10, 115:10,
148:1, 148:2,
148:3, 148:5,
171:14, 173:8,
177:15, 179:3,
185:2, 185:4,
185:9, 186:2,
189:2, 190:12,
206:9, 211:21,
217:21

**dosage**
97:16, 99:13,
101:18, 139:20

**dose**
225:5

**dosing**
58:20

**double**
169:22, 170:6

**double-check**
42:2, 141:18

**doubt**
126:24, 130:21

**down**
51:24, 58:1,
171:2, 175:8,
215:5, 229:25

**dr**
5:10, 5:17,
8:4, 10:23,
10:24, 45:17,
46:25, 69:10,
85:15, 86:11,
87:24, 105:20,
129:7, 135:23,
157:10, 157:13,
161:22, 161:23,
162:20, 174:11,
174:14, 185:7,
186:1, 199:16,
200:14, 202:11,
202:15, 203:15,
215:3, 218:5,
219:24, 232:5,

241:17, 241:20,
245:1, 245:9,
245:17, 246:5,
247:2

**dr2**
222:9

**drawing**
152:6

**drive**
8:13

**driver's**
15:16

**droplet**
91:21, 92:17,
92:20

**droplets**
92:2, 92:6,
92:18, 119:4,
119:11

**drug**
20:25, 51:12,
52:12, 52:16,
108:1, 169:12,
226:19, 226:20,
226:21, 228:5,
229:8, 229:9,
229:10, 231:4,
231:14, 231:23

**due**
190:8

**duly**
15:15, 248:8

**duplicate**
208:18

**duration**
240:25

**during**
69:10, 90:12,
99:10, 136:13,
158:16, 160:6,
160:25, 227:21,
237:10

**dynamic**
21:23, 22:15,
36:23

----
E
----

**e**
109:25

**each**
11:17, 14:2,
14:11, 14:13,
72:25, 75:13,
84:9, 116:21,
118:22, 119:4,
119:16, 120:11,
137:15, 137:16,
143:13, 144:7,
147:10, 150:10,
170:20, 192:3,
208:3

**eagle**
1:5, 1:6, 1:12,
1:13, 8:4, 8:19,
8:21, 13:24,
236:10, 237:19,
237:21, 238:1,
238:10, 238:15,
238:17, 240:8,
241:19

**eagle's**
233:9, 236:20

**eagleben-sa**
6:22, 6:24,
7:4, 7:7, 222:2,
222:4, 223:2,
223:4, 228:13,
229:1, 230:6,
230:8, 230:17

**eagleben-sa_**
228:11

**earlier**
48:20, 64:19,
88:17, 117:10,
157:4, 164:14,
173:6, 173:23,
208:24

**earliest**
237:25

**early**
24:1

**easily**
237:23

**easy**
51:7

**edification**
55:23

**edition**
174:19

**education**
18:20, 18:25,
38:16

**effectively**
213:20, 214:2,
214:15, 214:20,
215:10

**effects**
190:9, 211:12,
211:13

**efficiencies**
157:11, 157:16,
241:7

**efficient**
50:23, 50:24,
51:5, 241:12

**either**
12:14, 20:24,
34:18, 37:23,
69:21, 113:25,
175:11, 187:1,
224:17, 236:14,
245:3, 246:1

**elaborate**
22:3, 49:1

**elaborated**
84:8

**element**
145:2, 145:3,
147:22, 224:13

**elemental**
223:20, 224:25,
225:16, 227:19,
227:25

**elements**
224:21, 224:22,
225:11, 225:15,
225:24

**ellipse**
39:19, 40:6,
129:18, 129:25

**ellipses**
130:7, 130:18

**else**
91:7, 91:10,
98:9, 185:21,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    265

209:19, 246:14
**else's**
62:7
**elsewhere**
124:23, 141:23,
226:4
**elucidate**
23:11
**elucidated**
21:21
**elucidating**
23:21
**elucidation**
25:9
**email**
13:8, 14:1
**emails**
13:10, 15:1,
157:19
**embodiment**
124:14, 125:4,
127:23, 235:5,
235:15, 235:25
**embodiments**
129:4, 145:8
**emphasize**
138:16, 146:9,
183:12
**emphasizing**
196:12, 208:22
**employ**
37:3, 141:3
**employed**
16:2, 139:19,
140:10, 141:11
**employer**
16:4
**emulsion**
116:21, 117:13,
118:4, 119:15,
120:1, 120:10
**emulsions**
118:12, 118:18,
119:3, 120:19,
120:20, 176:2,
176:22
**encapsulating**
106:12, 143:10

**encompass**
113:23, 114:4,
114:14, 117:16
**encompasses**
117:12
**end**
51:9, 71:13,
102:23, 122:2,
149:9, 150:21,
171:3, 226:7,
247:1
**ending**
224:9, 226:14
**ends**
122:22
**energy**
21:7
**engineering**
19:17, 19:20,
20:1, 20:23,
21:13, 21:17,
25:19, 162:10
**english**
129:12
**enhancer**
195:15
**enough**
65:2, 141:8,
203:22, 239:14
**entire**
14:1, 76:23,
95:10
**entirely**
11:21, 57:19,
240:22
**entities**
42:17
**entitled**
6:18, 38:16,
175:7, 199:4
**entity**
42:11, 42:23,
43:14, 43:16,
150:9
**environment**
67:8
**envision**
31:25

**epidermal**
109:25
**equally**
212:8
**equals**
85:18
**equate**
133:17, 133:21
**equating**
97:22, 97:25,
133:4, 133:7,
133:21
**equilibrium**
215:11
**equivalence**
235:19, 235:22
**equivalent**
170:21
**equivalents**
150:15, 151:2,
151:10
**especially**
240:23
**esquire**
3:4, 3:5, 3:15,
4:4, 4:5
**established**
225:17
**establishing**
231:9
**et**
8:5, 21:14
**ethanol**
75:16, 147:19,
154:8, 169:8,
181:3, 181:5,
181:8, 181:10,
181:14, 181:21,
182:2, 182:17,
182:21, 182:23,
186:8, 186:12,
186:21, 187:1,
187:16, 187:18,
188:3, 188:13,
188:17, 188:19,
192:6, 205:5,
236:1, 236:4,
236:6, 236:8,

236:24, 237:1,
237:2, 237:5,
237:12, 238:3,
239:6
**ethics**
38:16, 38:17,
38:19, 38:21
**ethyl**
181:4
**evaluated**
225:3
**evaluating**
97:12
**evaporate**
164:23
**even**
11:25, 35:11,
39:12, 44:9,
69:13, 95:23,
106:24, 111:23,
141:16, 141:19,
144:19, 144:24,
150:3, 150:15,
155:8, 157:14,
164:6, 164:19,
172:5, 192:19,
234:2, 238:5,
239:6, 245:13
**ever**
15:23, 19:22,
29:9, 29:22,
30:15, 32:12,
34:23, 35:8,
42:13, 101:13,
146:7, 197:1
**every**
149:11, 184:13
**everyone**
164:21
**everything**
26:14, 115:25,
116:4, 172:11,
198:8, 199:11,
218:20
**evidence**
5:13, 45:24,
54:1, 83:6,
100:2, 100:11,

Case 1:24-cv-00065-JLH    Document 465-9    Filed 08/07/26    Page 268 of 308 PageID
#: 26047
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

266

128:7, 135:20,
172:7, 172:10,
186:8, 186:15,
186:18
**evidenced**
157:18
**evidently**
78:5
**exact**
18:9, 20:24,
43:22, 52:12,
52:22, 67:16,
234:13
**exactly**
12:2, 25:3,
26:21, 33:4,
75:6, 82:1,
82:3, 96:4,
120:19, 126:10,
147:2, 147:4,
174:18, 187:12,
196:19, 208:15
**examination**
10:21, 15:18
**examiner**
94:14, 97:13,
99:11, 101:7,
101:8, 101:9,
101:15, 107:24
**examiner's**
97:9, 99:17,
100:1, 100:10
**examining**
157:10
**example**
30:24, 48:2,
48:13, 57:18,
57:25, 59:20,
59:21, 59:23,
61:23, 63:23,
63:24, 64:2,
70:2, 70:9,
70:24, 71:7,
72:17, 72:24,
73:10, 73:21,
74:16, 79:7,
86:10, 91:18,
93:8, 104:4,

114:9, 114:12,
128:22, 138:19,
142:7, 154:14,
164:18, 166:14,
192:1, 198:11,
205:19, 209:12,
209:21, 211:17,
218:4, 227:12,
235:4, 235:14,
237:22
**examples**
102:11, 113:20,
124:25, 134:1,
212:14
**exceeded**
17:20
**except**
112:5, 151:1
**exception**
227:6
**exceptions**
112:15, 112:19,
147:20, 165:9
**excerpt**
6:3, 6:6, 6:9,
6:12, 6:15,
174:5, 174:7,
174:14, 178:2,
178:5, 180:16,
180:19, 190:17,
190:19, 190:23,
195:8, 195:10
**excerpts**
150:17
**excessive**
139:24
**exchanged**
157:19
**excipient**
58:19, 106:11,
136:22, 143:9,
169:12, 172:5,
193:15, 193:25,
226:22, 229:11
**excipient(s**
231:13
**excipients**
6:4, 6:7, 6:10,

6:13, 6:16,
61:6, 62:3,
121:9, 124:8,
125:10, 126:18,
135:17, 174:6,
174:8, 174:15,
178:3, 178:6,
180:18, 180:20,
181:6, 190:20,
194:11, 195:11,
197:14, 227:15
**excise**
242:5, 243:18
**exclusively**
211:8
**excuse**
61:14
**exemptions**
206:13
**exhaust**
23:3
**exhibits**
56:15, 56:16,
159:12
**exist**
242:14
**existing**
44:14, 159:11
**expanded**
79:19
**expect**
26:19, 32:21,
33:1
**experience**
50:19, 194:12,
196:25
**experiment**
185:17, 185:22
**experimental**
185:5
**experiments**
185:2, 185:4,
185:8, 185:13,
185:20, 186:1,
186:2
**expert**
5:10, 5:16,
17:12, 17:20,

40:23, 41:20,
45:17, 46:20,
46:25, 47:3,
77:19, 85:13,
103:9, 147:3,
152:4, 173:18,
181:24, 205:18,
233:1, 246:17
**expert's**
202:12
**experts**
41:6, 41:21,
130:11, 163:19
**expires**
248:24
**explain**
31:12, 75:20,
82:20, 126:14,
134:3, 149:8,
203:17, 212:23,
214:17, 218:18
**explained**
41:18, 64:16,
81:5, 87:9,
121:4, 128:6,
128:13, 130:6,
140:14, 155:2,
170:15, 192:18,
209:17, 212:23,
215:5
**explaining**
75:8, 78:24,
79:6, 79:16,
80:3, 81:19,
101:6, 101:14,
101:20, 103:21,
104:6, 198:24,
207:7
**explains**
73:24, 121:15,
121:18, 122:16
**explanation**
73:19, 80:18,
133:22, 137:23
**explicit**
71:22, 233:3
**explicitly**
37:23, 71:2,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

267

71:17, 72:19,
72:20, 73:13,
128:24, 140:11,
193:21, 227:24
**express**
95:4, 219:14
**expressed**
133:24, 219:15
**expressly**
121:13, 122:13,
131:13, 132:17
**extensive**
22:6, 50:18,
114:19, 153:19,
204:3
**extensively**
72:13, 74:22,
197:25
**extent**
12:4, 14:16,
15:5, 60:6,
71:24, 79:25,
132:13, 146:24,
161:10, 161:13,
194:8, 203:3,
210:13, 211:3
**extremely**
120:16
**eyes**
1:21, 156:11

**F**

**face**
78:8
**facilitate**
92:3, 94:25
**fact**
29:6, 66:5,
120:10, 120:12,
156:7, 158:20,
164:9, 166:15,
167:3, 168:1,
169:18, 183:5,
219:17, 229:19,
236:8, 245:2
**factor**
236:14
**factual**
156:6, 218:25

**fair**
24:11, 33:1,
33:16, 34:9,
42:7, 42:20,
44:15, 53:14,
63:16, 74:25,
82:22, 141:8,
191:12, 208:4,
243:3
**fairly**
18:10, 61:3
**fairness**
11:11
**fall**
36:3, 70:25,
72:2, 118:12,
224:17
**fallacy**
172:9
**falls**
224:20
**false**
88:15
**falsifying**
33:25
**familiar**
19:24, 70:2,
93:22, 174:22,
199:10, 199:11,
222:13, 222:16
**familiarize**
91:23
**far**
18:23, 23:7,
30:3, 37:5,
49:8, 53:23,
71:21, 116:4,
145:11, 150:23,
194:7, 200:3
**farther**
171:2, 229:25
**favorite**
180:22
**fda**
28:24, 29:3,
57:22, 171:16,
173:12, 173:20,
173:24, 216:18,

216:23, 217:9,
217:13, 217:20,
229:19
**federal**
152:11, 243:22
**feel**
76:3, 240:17
**feeling**
74:20, 217:17
**ferenc**
3:15, 9:2,
10:3, 10:10,
10:15, 13:1,
13:6, 14:21,
156:17, 156:21,
156:25, 157:4,
157:7, 158:11,
240:3, 241:13,
241:16, 243:15,
243:19, 244:10,
244:14, 244:21
**ferenc@katten**
3:20
**few**
17:2, 28:13,
50:8
**field**
42:10, 52:10,
66:19, 70:16,
84:19, 84:23,
85:6, 85:9,
86:22, 90:3,
101:24, 104:9,
120:9, 136:19,
137:7, 137:10,
140:7, 144:1,
145:20, 165:10,
197:1, 208:25,
209:13, 210:3,
211:5, 212:16,
217:19
**fifth**
38:15, 215:1
**figure**
43:21
**file**
85:25, 94:15,
102:12, 104:21,

119:24, 124:24,
133:25, 173:7,
193:1, 237:22,
237:23
**fill**
90:12
**filler**
106:11, 143:9
**final**
68:3, 68:5,
160:9, 160:10,
229:23
**find**
28:15, 55:10,
57:4, 58:25,
67:13, 67:16,
67:17, 68:25,
72:1, 78:11,
118:2, 159:25,
162:4, 179:7,
183:3, 188:7,
200:15, 201:14,
201:16, 202:2,
203:4, 203:6,
213:6, 213:11
**finding**
117:5, 117:14,
232:20, 236:9
**fine**
40:14, 55:15,
57:5, 82:10,
89:14, 100:20,
120:7, 131:25,
152:20, 155:17,
201:17, 202:23,
205:16, 205:25,
215:24, 221:18,
221:20
**finish**
62:17, 63:5,
98:11, 240:2
**finished**
58:22, 63:9,
63:10, 227:18
**first**
10:11, 15:25,
17:16, 18:5,
21:6, 88:20,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                                    268

91:9, 97:6,
97:18, 105:21,
135:4, 154:17,
154:18, 160:11,
161:4, 175:3,
177:7, 182:19,
194:7, 198:16,
213:21, 223:17,
225:10, 225:12,
225:14, 225:24,
226:17, 228:25,
229:6, 229:14,
230:18, 230:22,
242:12

**five**
28:19, 82:13,
84:4, 98:15,
100:23, 102:9,
102:15, 148:17,
195:24, 196:2,
196:16, 215:4,
220:8, 221:17

**flipping**
69:22, 89:5,
92:1

**flow**
49:21, 90:12,
90:15

**flows**
92:21

**fluids**
79:23, 81:12,
92:20, 93:17,
115:21, 127:7,
148:17, 148:18,
148:24, 151:15,
151:24, 190:24,
195:25, 220:9,
220:14, 220:21

**focus**
11:19, 22:24,
23:7, 23:10,
23:19, 26:8,
26:10, 30:13,
68:7, 111:19,
116:8, 163:22,
167:3, 167:20,
215:21

**focused**
9:18, 21:1,
22:6, 22:7,
23:14, 28:10,
64:21

**focusing**
181:8

**follow**
80:23, 125:13,
166:19

**followed**
25:5

**following**
31:13, 100:7,
184:4, 212:6

**follows**
15:17, 82:25,
137:22

**foregoing**
248:11

**forget**
187:12

**form'**
97:16

**formal**
25:24, 225:2

**formed**
83:17, 236:8

**forming**
95:10, 205:6

**forms**
139:20

**formulation**
20:2, 20:4,
20:6, 20:8,
21:2, 22:9,
24:21, 24:25,
25:4, 43:3,
43:5, 43:7,
44:14, 44:17,
48:1, 49:6,
50:20, 52:14,
58:22, 60:13,
60:17, 61:25,
65:22, 66:4,
68:22, 72:7,
99:15, 107:5,
107:7, 107:12,

107:25, 108:3,
108:4, 114:1,
143:15, 144:9,
151:13, 152:1,
153:2, 153:14,
164:11, 172:6,
175:8, 178:23,
181:14, 189:17,
191:14, 191:16,
191:18, 193:4,
193:12, 194:1,
194:4, 198:8,
212:17, 213:10,
218:11, 233:10,
235:18, 236:20,
245:3, 245:4,
245:5, 245:6,
245:15, 245:16,
246:1

**formulations**
48:3, 48:6,
49:13, 49:15,
49:22, 50:15,
54:1, 55:5,
113:5, 191:19,
208:8, 211:14,
220:2, 220:11,
246:6

**formulators**
235:10

**forth**
48:6, 147:9,
248:8

**forward**
11:2, 95:1,
103:10

**found**
17:15, 110:16,
159:20

**foundation**
144:3, 216:21

**four**
57:9, 73:17,
97:6, 126:24,
221:22, 241:10

**fourth**
175:9

**fraction**
116:7, 116:11

**frame**
90:12

**framework**
240:10

**frankly**
92:6, 105:4,
126:22, 137:22

**free**
76:3

**freeze-dried**
51:16

**french**
19:10

**friday**
1:24

**front**
78:13, 78:16

**frustrated**
96:14

**frustration**
95:4, 96:13

**full**
15:20, 98:4,
100:23, 129:1,
129:13, 130:7,
130:22, 130:23,
130:24, 131:22,
135:11, 138:16,
140:15, 161:3,
214:24

**fully**
12:1, 61:20

**function**
73:2, 73:25,
115:13, 166:3,
166:17, 167:4,
167:13, 168:2,
168:16, 168:23,
169:13, 169:19,
173:1, 173:13,
179:1, 182:6,
192:17, 192:19,
193:5, 193:6,
194:18, 194:19,
198:2, 212:25

**functional**
21:22, 22:15,
36:22, 37:10,

172:6, 174:25,
176:15, 178:12,
181:9, 191:6,
195:17, 214:16,
227:14

**functions**
70:19, 172:20,
176:17, 178:22,
191:3, 195:14,
211:13

**fundamental**
21:4, 76:7,
77:24

**further**
49:1, 97:11,
121:15, 121:18,
122:16, 135:21,
148:18, 192:12,
248:14

**furthermore**
220:5

**G**

**gas**
86:7, 86:15,
86:23, 87:6,
90:10, 93:6,
102:19, 180:14

**gases**
84:21, 85:11,
113:6, 113:25

**gather**
84:11

**gave**
22:13, 61:23,
199:23, 200:15

**geared**
28:23

**general**
39:3, 91:12,
93:5, 104:7,
104:18, 104:22,
108:10, 108:17,
108:19, 110:22,
111:2, 111:6,
112:15, 113:22,
118:11, 137:1,
137:4, 137:5,

138:6, 140:5,
143:24, 144:12,
162:1, 162:8,
162:14, 163:22,
171:12, 196:3,
204:12, 206:14,
206:16, 207:11,
216:16, 232:3,
240:17

**generalizations**
112:14

**generally**
36:7, 70:15,
71:5, 89:18,
104:9, 104:10,
113:25, 120:18,
136:20, 136:21,
140:7, 142:12,
165:10, 174:23,
177:22, 177:25,
222:12, 222:16

**generic**
231:14

**getting**
31:9, 34:5,
157:22

**give**
29:19, 33:17,
47:19, 61:20,
62:8, 73:8,
90:23, 91:23,
135:19, 138:23,
163:1, 232:2,
232:5, 243:5,
244:18, 245:19

**given**
17:4, 17:7,
30:4, 33:8,
64:6, 72:7,
82:22, 90:9,
141:25, 145:10,
145:18, 148:15,
154:1, 154:2,
168:23, 188:16,
199:24, 213:4,
239:14

**giving**
62:18, 133:22,

147:13

**glycerine**
179:20

**glycofurol**
6:17, 75:16,
147:19, 154:8,
192:6, 195:9,
195:12, 195:14,
195:19

**glycol**
6:5, 6:8,
72:14, 73:16,
75:15, 75:16,
79:4, 80:7,
147:17, 147:18,
154:7, 154:8,
160:16, 167:6,
168:4, 168:18,
170:25, 171:5,
173:22, 174:9,
174:16, 175:10,
175:19, 175:22,
176:11, 177:7,
178:4, 178:7,
178:10, 178:23,
179:5, 179:12,
179:13, 179:22,
179:23, 182:4,
182:25, 192:5,
236:24, 237:2

**glycols**
176:20, 177:5

**go**
9:13, 22:17,
35:9, 35:13,
41:1, 41:14,
41:15, 49:9,
50:3, 50:6,
55:12, 57:16,
58:13, 60:25,
61:2, 61:21,
62:1, 62:13,
63:14, 66:25,
68:13, 68:16,
68:18, 74:21,
74:23, 83:4,
83:13, 84:5,
84:11, 85:19,

87:10, 88:14,
90:5, 90:8,
91:10, 94:8,
102:9, 107:14,
110:21, 115:20,
128:6, 128:13,
138:20, 142:18,
144:18, 150:6,
160:3, 161:2,
162:6, 162:7,
163:18, 183:9,
202:19, 205:16,
213:6, 214:17,
221:5, 223:19,
231:7, 234:12,
236:13, 238:11

**goes**
47:7, 88:11,
90:16, 110:10,
135:7, 143:18,
154:20, 170:14,
194:15, 215:12

**going**
12:5, 12:15,
12:19, 12:22,
12:23, 13:12,
13:13, 14:10,
15:2, 17:23,
29:19, 38:6,
44:24, 45:6,
46:8, 47:4,
47:10, 47:14,
53:10, 55:12,
60:23, 64:22,
68:14, 69:2,
69:4, 69:7,
76:4, 78:23,
80:12, 83:21,
83:22, 85:8,
85:22, 94:1,
95:1, 96:6,
97:5, 99:5,
114:25, 115:1,
116:10, 117:2,
119:11, 119:13,
128:15, 135:24,
136:5, 136:8,
144:21, 152:19,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

270

156:21, 157:6,
157:7, 158:2,
158:5, 158:10,
161:20, 162:5,
162:11, 182:19,
184:21, 184:24,
185:11, 196:13,
199:2, 201:13,
202:20, 213:24,
221:19, 221:25,
222:20, 222:23,
239:9, 239:25,
242:20, 245:8,
245:12, 247:3
**gone**
15:23, 79:8,
242:12
**good**
18:19, 51:9,
54:15, 57:9,
69:3, 136:4,
136:11, 136:12,
138:8, 183:15,
184:19, 214:18,
222:19
**grade**
181:5
**graduate**
20:21, 26:20
**great**
55:22
**ground**
12:5
**groups**
15:3
**guess**
14:15, 22:2,
31:24, 34:25,
36:6, 37:17,
39:24, 40:7,
40:12, 49:25,
64:14, 86:13,
98:7, 116:24,
161:21, 166:9,
185:13, 188:11,
193:7, 210:1,
213:21, 223:1,
233:13, 242:10

**guessing**
16:24
**guidance**
224:24, 226:18,
226:24, 227:3,
227:7, 230:23,
231:8
**guideline**
224:8, 225:9,
229:4, 229:7,
229:13
**guidelines**
199:1
**guys**
11:16, 12:16,
13:2, 157:24,
158:22, 241:22,
242:3, 243:7

**H**

**half**
31:5, 31:17,
32:2, 32:14,
33:18, 34:17
**hand**
17:23, 46:2,
46:8, 248:18
**handbook**
6:3, 6:6, 6:9,
6:12, 6:15,
38:17, 174:5,
174:7, 174:15,
178:2, 178:5,
178:11, 180:17,
180:19, 190:17,
190:19, 194:10,
194:24, 195:8,
195:10, 196:1
**hang**
182:12
**happen**
53:22, 88:17,
203:5, 242:20
**happened**
206:1
**happy**
22:17, 41:14,
93:21, 94:4,

128:14, 138:14,
163:20, 210:19
**head**
235:8
**header**
115:12, 198:15,
214:13
**heading**
167:12, 181:1
**headquartered**
8:12
**healthcare**
8:6
**hear**
10:9
**heard**
42:13, 42:14,
42:17, 76:15,
158:9, 200:2,
200:3
**hearing**
10:13
**held**
2:9
**help**
43:15, 92:3,
108:15, 133:11
**helpful**
49:10, 59:22,
63:24
**helps**
51:4, 64:3,
125:3
**here's**
13:12, 160:20
**hereby**
248:6
**herein**
90:9, 106:9,
109:17, 139:19,
140:10, 141:11,
143:7
**hereinbefore**
248:8
**hereunto**
248:18
**high**
32:16, 36:8,

36:11, 120:17,
204:12, 225:5
**high-level**
119:1, 176:5
**higher**
220:25
**highly**
1:21, 156:9,
156:11, 177:14
**himself**
243:5
**hinders**
209:10
**historical**
19:20
**historically**
43:18
**histories**
94:15
**history**
85:25, 101:4,
102:12, 104:21,
119:24, 124:25,
133:25, 173:7,
193:1, 237:22,
237:23
**hold**
18:22, 62:16,
96:23, 97:7
**holding**
241:17
**home**
16:12
**homogeneity**
118:23
**hope**
29:5, 137:15
**hopefully**
33:13, 82:19,
243:16
**hopelessly**
149:4, 169:25
**hospitals**
51:5
**host**
170:16, 171:9
**hour**
12:20, 13:3,

15:2
**hours**
11:17, 12:16,
12:18, 13:15,
14:2, 14:3,
14:6, 14:11,
14:13, 15:11,
135:25, 239:10,
240:25, 241:1,
241:5, 241:10,
241:15, 241:17
**housekeeping**
54:16
**however**
72:12, 100:18,
128:8, 234:17
**hplc**
27:2, 27:4,
27:7, 27:14,
28:10, 28:13,
29:9, 30:18,
30:22, 31:3
**hplcs**
28:17, 28:19
**huh**
217:1
**human**
139:23
**humectant**
178:17
**hungerford**
8:13
**hydrochloride**
170:21, 187:9,
188:2
**hydroxide**
58:2, 58:20,
66:6, 66:11,
66:25, 67:23,
68:10, 68:20,
68:23, 71:19,
95:24, 154:19,
155:6, 155:23,
155:25, 159:19,
160:3, 160:10,
160:15, 160:18,
160:21, 160:24,
160:25, 161:4,

161:12, 161:17,
164:4, 166:1,
166:16, 167:5,
168:3, 168:17,
168:24, 169:6,
169:19, 170:8,
171:4, 171:16,
172:8, 172:18,
173:2, 173:5,
173:13, 173:21,
173:25, 199:18,
201:4, 201:7,
201:25, 202:16,
203:1, 213:8,
213:20, 214:2,
214:15, 215:6,
215:7, 215:8,
215:9, 215:15,
216:5, 216:10,
216:14, 217:10,
217:11, 217:14,
217:22, 217:25,
219:2, 219:17
**hypothesis**
33:12
**hypothetical**
31:8, 31:20,
32:18, 33:23,
39:23, 59:13,
64:11, 65:11,
66:1, 67:12,
70:22, 74:6,
114:16, 135:1,
136:25, 137:13,
148:15, 149:8,
149:24, 153:17,
181:17, 186:15,
186:20, 187:3,
187:5, 187:7,
187:22, 191:24,
207:4, 207:24,
208:13
**hypothetically**
187:7

---
**I**
---

**ich**
222:13, 227:17,

227:24, 229:19
**id**
225:6
**idea**
89:17, 123:9,
125:7
**identification**
15:16, 231:2
**identified**
240:4
**identify**
8:17
**illinois**
3:8
**illustrate**
64:3
**illustrative**
65:16
**imagine**
199:19
**immediate**
226:22, 229:11,
231:13
**immunoglobulins**
110:7, 111:25
**impact**
218:15, 220:3
**impeachment**
242:19, 242:21
**implied**
90:1
**implies**
160:2
**importance**
94:6
**important**
38:23, 53:13,
57:24, 69:14,
83:14, 111:1,
115:6, 127:11,
141:15, 147:13,
154:22, 155:15,
176:7, 180:11,
190:11, 202:19,
203:20, 211:4,
218:12, 219:13,
219:22, 219:23,
233:3

**impossible**
193:11, 193:14,
193:25, 207:17,
207:19, 207:21
**improve**
218:10, 220:1,
220:18, 221:10
**improvement**
53:18
**improves**
218:9, 219:18
**improving**
218:2, 219:3,
220:10
**impurities**
59:20, 66:22,
66:23, 67:16,
114:23, 116:13,
119:12, 119:13,
147:20, 206:13,
206:19, 225:16,
226:19, 227:18,
229:8, 229:22,
230:3, 231:2
**impurity**
65:16, 68:3,
146:22, 148:19,
149:18, 151:23,
153:12, 196:14,
196:24, 223:20,
225:1, 227:6,
227:8, 227:9,
227:25
**in-**
237:8
**inaccuracies**
30:11
**inaccurate**
18:13, 29:23,
30:1
**inactive**
65:23
**inapplicable**
210:25
**inappropriate**
40:4, 40:8
**inc**
1:5, 1:9, 1:12,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

272

1:17
**incapable**
189:25
**include**
9:6, 104:12,
110:9, 128:25,
131:21, 142:9,
155:12, 155:15,
190:10, 230:2,
231:1, 239:12
**included**
122:5, 172:1,
174:1, 202:3,
202:6, 232:3
**includes**
60:2, 80:5,
84:3, 98:15,
100:23, 104:11,
109:18, 130:24,
137:21, 146:10,
239:6
**including**
26:5, 36:19,
37:1, 37:9,
38:1, 54:10,
58:12, 61:23,
63:24, 83:7,
93:12, 119:23,
124:25, 133:10,
147:8, 157:12,
170:17, 172:10,
172:11, 179:3,
188:18, 202:11,
233:3, 244:6
**income**
17:19, 17:20
**incomplete**
31:8, 31:20,
32:18, 39:23,
59:13, 64:11,
65:11, 66:1,
66:3, 67:12,
70:22, 74:6,
114:16, 135:1,
136:25, 137:13,
149:7, 149:24,
153:16, 181:17,
187:2, 191:24,

207:4, 207:24,
208:13
**inconclusive**
33:14
**inconvenience**
54:11
**inconvenient**
49:16, 51:1,
54:13
**incorporated**
26:11, 26:24,
27:4
**incorrect**
97:21
**independent**
24:1, 25:3,
244:15
**indicate**
14:8, 71:19
**indicative**
59:16, 127:9
**indirectly**
26:15
**individual**
119:4, 124:22
**individually**
150:11
**indulge**
239:17
**industry**
89:9, 89:10,
89:16, 103:25
**inefficient**
157:9
**inform**
246:13
**information**
153:21, 159:4,
185:23, 202:4,
203:22, 230:25,
234:5, 234:7,
239:5
**informed**
43:1, 43:6
**infringe**
146:23, 149:1,
149:22, 150:14,
150:16, 151:11,

152:2, 153:15,
154:9, 161:2,
246:1
**infringed**
150:24, 150:25,
151:1, 151:9
**infringement**
5:13, 45:24,
146:16, 150:4,
150:19, 151:6,
151:12, 152:7,
153:18, 165:14,
165:25, 166:15,
167:2, 167:19,
167:23, 167:25,
215:21, 215:23,
232:12, 232:15,
232:21, 232:24,
233:4, 233:15,
234:8, 234:20,
246:20
**infringer**
232:6
**infringes**
149:12, 150:10,
246:1
**infusion**
110:1
**ingredient**
65:23, 66:6,
66:11, 67:10,
99:20, 150:2,
151:18, 153:8,
153:9, 214:17,
231:12, 231:13
**ingredient's**
218:15
**ingredients**
48:23, 143:15,
144:9, 149:25,
220:3, 227:14
**inherently**
225:1
**inhomogeneity**
117:15, 118:20
**inhomogeneous**
119:10, 164:15
**inject**
114:2

**injectable**
75:19, 192:8
**injection**
109:25, 112:3,
112:4, 112:9,
160:24
**injections**
111:15, 112:1,
112:10
**injurious**
143:16, 144:10
**inorganic**
24:3, 24:17,
227:13, 227:18,
227:20, 228:2,
228:6
**inquiry**
115:13
**instance**
91:17, 96:20,
138:19, 154:13,
175:6, 193:9,
208:1, 220:20,
230:13
**instead**
45:12, 142:5,
236:24
**institute**
16:5, 19:14,
88:9
**insufficient**
186:10, 186:22
**integrity**
39:20
**intellectual**
111:10
**intend**
11:2, 18:16,
53:20, 245:24
**intended**
33:7, 48:3,
88:25, 116:4,
128:10, 128:11,
210:15, 245:23
**intent**
90:4
**intention**
24:11, 24:14,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                             273

| | | | |
|---|---|---|---|
| 39:4, 39:5, 40:1, 88:16, 114:17, 116:14 | **invented** 41:9 | 21:12, 45:8, 157:12, 157:15, 202:8, 211:23, 219:7 | **keep** 76:24, 80:12, 83:21, 83:22, 95:10, 117:1, 128:14, 162:5, 167:18, 167:19, 221:18, 226:3 |
| **intentionally** 30:1 | **invention** 40:19, 60:12, 88:21, 88:22, 111:19, 114:3, 115:24, 133:24, 146:22 | **italics** 103:3 | |
| **interest** 22:9, 177:23, 177:24, 177:25, 180:1 | | **itself** 25:6, 44:1, 58:12, 62:8, 62:12, 101:24, 127:11, 148:25, 174:24, 195:19, 196:15, 204:17, 205:8, 207:14, 227:15 | **keeps** 76:23, 94:20, 95:5, 95:9 |
| **interested** 248:16 | **inventor** 41:24, 42:1, 105:21 | | **kelly** 3:5, 3:11, 8:21, 13:19 |
| **interesting** 89:17 | **inventors** 42:3, 48:19 | | **ken** 8:19, 13:2 |
| **interject** 62:23 | **invert** 170:6 | **iv** 112:4, 112:5 | **kenneth** 3:4, 3:10 |
| **international** 5:20, 5:22, 5:24, 87:14, 87:16, 105:12, 105:14, 105:21, 109:1, 109:4 | **involve** 25:20, 25:22, 26:3, 26:7, 28:13 | **J** | **key** 50:2, 116:14 |
| | **involved** 27:7, 42:6, 52:4, 52:6, 52:8, 106:12, 143:10, 176:21, 202:8, 212:17 | **janet** 1:29, 2:11, 9:9, 248:4, 248:22 | **killing** 192:21 |
| **interpreted** 75:2, 75:24, 100:3 | | **january** 233:23 | **kind** 12:12, 15:12, 24:12, 111:17, 200:6, 210:8, 211:12, 229:25, 245:21 |
| **interrupt** 80:16, 166:18, 205:15 | **involves** 177:12 | **jason** 4:4, 8:23, 240:3, 244:14, 244:18 | |
| **intramuscular** 109:24 | **ions** 161:10, 161:11, 215:8 | **jlief@windelsmarx** 4:9 | **kinetics** 21:11 |
| **intravenous** 107:7, 107:12, 108:1, 109:23, 111:14, 112:8, 112:10, 112:19, 114:2 | **irrelevant** 171:17, 172:1, 203:17, 204:2 | **job** 1:30 | **kit** 101:15 |
| | **irrespective** 141:24 | **joint** 240:11, 240:14 | **kittendorf** 10:24 |
| **intravenously** 51:13 | **irritation** 139:24 | **jointly** 10:6 | **kittendorf's** 185:7, 186:1 |
| **intrinsic** 83:6 | **isolate** 76:24 | **journal** 200:2, 200:4, 200:6, 200:12 | **knew** 31:4, 31:15, 32:14, 32:15, 238:2 |
| **introduce** 44:25, 112:18 | **isotonic** 109:20 | **judgment** 139:22, 240:15 | **knocked** 182:13 |
| **introduced** 51:12, 67:22, 71:25, 189:12, 237:6, 237:9, 237:19, 237:21 | **issue** 46:16, 47:8, 53:8, 76:24, 196:20, 221:12, 242:17, 246:12 | **july** 248:25 | **knocking** 52:19 |
| | | **K** | **know** 10:14, 10:16, 11:23, 11:24, 12:1, 12:10, 15:4, 18:17, |
| **introduction** 230:20, 230:23 | **issues** 12:4, 21:5, | **katten** 3:16, 9:2 | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

274

21:12, 23:8,
26:19, 28:3,
28:16, 30:3,
31:10, 32:9,
32:20, 34:3,
36:5, 41:4,
43:12, 43:24,
44:6, 54:13,
55:8, 59:6,
63:7, 67:17,
68:12, 69:24,
74:21, 76:20,
77:3, 77:14,
78:14, 83:10,
93:24, 96:8,
108:13, 110:15,
119:10, 130:17,
137:4, 138:11,
140:25, 146:5,
152:23, 154:1,
156:19, 162:7,
163:1, 167:8,
170:5, 180:5,
187:10, 188:1,
196:20, 200:1,
200:11, 200:13,
200:16, 201:18,
203:5, 204:15,
208:18, 210:20,
213:25, 216:10,
216:22, 218:24,
220:5, 220:24,
222:15, 234:9,
234:16, 235:9,
236:11, 237:5,
237:14, 238:3,
239:3, 239:22,
242:10, 242:13,
242:17, 244:16,
244:22, 246:16
**knowledge**
171:12, 177:17,
177:18, 193:1,
202:6, 248:11
**known**
43:3, 44:17,
44:20, 51:6,
65:1, 216:16,

216:17, 217:12,
217:13, 221:3
**knows**
164:21, 216:23
**kosmotropes**
211:16

**L**

**lab**
27:10, 28:19,
29:10, 32:6,
32:12
**label**
57:21, 61:24,
66:13, 67:24,
150:1, 150:3,
160:2, 160:14,
160:16, 170:19,
171:1, 171:2,
173:21, 182:7,
182:20
**labels**
57:20, 217:10
**laboratory**
26:6, 27:13,
29:2, 32:22,
33:2, 35:13,
35:20, 35:23,
185:4, 185:17,
185:22
**lack**
144:2, 189:21,
216:20
**landau**
86:12
**language**
19:9, 19:10,
60:7, 118:7,
129:12, 210:25
**large**
34:20, 34:21
**largely**
44:11
**larger**
135:9
**last**
10:23, 48:18,
122:6, 123:3,

123:16, 184:8,
184:9, 200:19,
211:24, 214:8,
239:19, 243:16,
244:9, 244:25
**later**
161:20, 168:10
**latham**
1:25, 2:9, 3:6
**law**
146:16, 148:21,
149:2, 152:1,
152:4, 152:9,
152:11, 152:14
**lawyer**
44:3, 151:4,
232:17
**leads**
172:15
**learn**
24:13, 24:25
**learned**
129:13
**learning**
23:24, 24:12
**least**
43:25, 89:1,
89:25, 91:3,
141:18, 190:7,
211:9, 223:8,
238:13, 238:25,
242:1
**leave**
39:19, 40:5,
42:18, 43:8,
44:3, 164:22,
239:21, 243:17
**leaving**
215:10
**left**
59:20, 65:16,
161:12, 161:13
**left-hand**
184:7
**legal**
43:17, 44:5,
146:25, 147:20,
150:5, 151:5,

198:16, 232:23,
232:24, 232:25,
233:16
**less**
19:2, 30:9,
59:2, 163:10
**let's**
56:5, 57:3,
69:25, 80:3,
85:7, 98:9,
98:17, 105:10,
108:22, 114:18,
121:1, 148:11,
197:20, 216:2,
237:25, 243:2
**level**
36:8, 36:11,
58:24, 60:3,
120:17, 164:17,
204:12
**levels**
35:25
**levy**
15:22
**lexington**
16:14
**license**
15:16
**lifshitz**
86:12
**light**
47:20, 75:9,
124:24, 133:24,
192:25
**limit**
64:8
**limitation**
72:21, 78:25,
79:17, 80:5,
80:19, 81:22,
82:15, 83:7,
83:8, 84:3,
84:4, 84:7,
87:9, 93:1,
93:3, 98:4,
98:15, 100:3,
100:12, 100:16,
100:17, 100:22,

100:23, 101:17,
101:22, 103:23,
105:7, 116:11,
126:15, 130:7,
140:15, 148:20,
149:19, 150:22,
150:23, 153:13,
171:18, 180:11,
192:13, 193:20,
195:3, 195:23,
198:2, 198:3,
220:17

**limitations**
153:3

**limited**
89:19, 101:25,
102:1, 102:2,
103:25, 111:3,
147:9, 147:17

**limits**
114:24

**line**
58:16, 68:14,
70:10, 90:6,
106:1, 122:3,
130:16, 139:11,
139:16, 142:9,
142:21, 147:6,
224:1, 224:23,
225:24, 227:12

**linearly**
190:6

**lines**
58:1, 58:17,
97:6, 98:6,
122:20, 122:21,
129:8, 215:4

**linguistic**
210:8

**linked**
138:7

**links**
132:18, 132:19,
132:22

**lipoic**
70:1, 70:7,
70:19, 70:24

**liquid**
48:21, 49:14,

51:1, 51:16,
52:16, 53:11,
74:22, 85:18,
86:7, 86:23,
87:6, 90:10,
92:7, 93:6,
97:15, 99:12,
99:14, 99:19,
101:18, 102:19,
103:2, 103:13,
103:14, 106:11,
112:23, 112:24,
112:25, 113:12,
113:13, 113:22,
114:10, 114:20,
114:25, 115:3,
115:18, 116:9,
116:15, 117:11,
117:24, 118:19,
119:6, 119:12,
119:20, 120:23,
121:10, 123:9,
124:18, 124:19,
126:18, 127:24,
128:8, 129:22,
135:18, 143:9,
161:25, 162:17,
163:13, 164:2,
176:19, 177:21,
177:23, 179:15,
179:16, 179:23,
179:25, 180:5,
180:8, 180:13,
184:2, 184:11,
184:17, 184:18,
188:9, 194:23,
195:20, 198:19,
198:21, 198:23

**liquids**
84:20, 85:10,
112:18, 113:8,
113:9, 113:11,
115:20, 116:20,
117:14, 118:22,
118:24, 119:16,
119:17, 120:1,
120:2, 120:10,
120:12, 128:1,

128:10, 176:20

**list**
224:12

**listed**
27:17, 75:14,
88:5, 102:16,
109:8, 148:16,
149:25, 151:22,
153:6, 167:4,
170:9, 171:7,
175:5, 191:3,
191:8, 192:4,
195:14, 205:22,
220:8, 231:23

**listing**
27:16

**lists**
168:2, 169:1,
181:10, 191:9

**literal**
151:12

**literally**
82:6, 82:8,
82:11, 85:17,
112:22, 145:3,
150:16, 151:9,
152:2, 152:8,
153:15, 159:25,
235:7, 235:10,
235:14

**literature**
201:23, 201:24,
202:2, 202:14

**litigation**
35:2, 53:15,
53:22, 55:9,
60:19, 185:3,
185:9, 185:14,
236:10

**litigations**
42:5

**little**
31:12, 55:20,
55:21, 85:8,
147:23, 148:9,
161:12, 163:3,
193:7, 215:10,
215:20, 242:12

**live**
95:25

**livenote**
2:13

**llc**
1:6, 1:13, 1:16

**llp**
1:25, 2:9, 3:6,
3:16

**local**
14:9, 240:17,
243:23

**logical**
172:9

**long**
9:22, 17:12,
62:18, 64:13,
64:14, 85:20,
93:23, 100:21,
135:12, 152:18,
212:17

**long-term**
48:24, 49:13,
51:2

**longer**
9:14, 35:21,
55:20, 101:1,
162:17, 163:4,
241:8

**look**
14:24, 18:6,
18:8, 31:21,
32:20, 39:1,
47:20, 56:2,
56:22, 56:24,
63:24, 70:24,
72:8, 87:7,
88:19, 90:6,
91:17, 92:15,
96:21, 96:25,
98:9, 98:17,
99:4, 101:12,
102:10, 102:11,
102:13, 104:15,
106:25, 111:24,
121:1, 127:1,
130:12, 139:10,
140:24, 142:19,

146:4, 154:12,
154:25, 159:7,
165:12, 165:17,
166:7, 168:13,
175:8, 179:12,
186:16, 192:23,
197:7, 199:11,
202:22, 203:23,
204:10, 206:8,
211:19, 213:16,
213:18, 224:23,
226:13, 245:9
**looked**
56:15, 83:6,
123:13, 148:4,
174:19, 196:1,
205:13
**looking**
45:11, 45:14,
55:25, 56:20,
64:14, 71:17,
73:6, 73:9,
79:1, 101:3,
105:23, 109:10,
111:18, 132:16,
166:2, 167:11,
198:17, 200:18,
214:5, 214:6,
231:21
**looks**
38:15, 54:20,
81:3, 89:23,
105:24, 110:22,
176:14, 199:10,
224:6
**lost**
64:23, 127:13
**lot**
29:3, 34:9,
58:5, 74:20,
83:13, 83:14,
89:13, 145:6,
145:7, 145:8,
161:8, 180:5,
208:21, 213:1,
214:6, 242:23
**lots**
28:20, 120:20,

130:4, 134:1,
138:3, 199:11
**low**
10:14
**lubricant**
176:16
**lunch**
136:7, 136:13
**lunchtime**
136:2, 136:3
**lyophilization**
50:22, 51:8,
64:21
**lyophilized**
49:5, 50:13,
51:15, 52:14,
53:11, 53:19,
54:3, 221:10

**M**

**ma**
1:26
**macroscopic**
117:15, 118:20,
118:23
**made**
92:2, 157:24
**main**
121:4, 135:5,
200:8
**maintain**
90:11
**major**
26:8
**make**
18:16, 29:12,
33:10, 39:2,
40:1, 45:16,
50:22, 50:23,
51:4, 55:20,
56:5, 56:18,
58:21, 67:6,
90:23, 112:8,
112:13, 127:3,
127:4, 151:5,
152:19, 198:23,
208:5, 208:14,
210:19, 218:13,

218:20, 220:16,
221:7, 225:19,
240:16
**makes**
14:25, 137:17,
189:18, 218:15,
220:3
**making**
39:15, 112:14,
120:5, 164:8,
172:9, 176:24,
219:21
**manner**
11:3
**manufacture**
227:21, 231:25
**manufacturing**
89:14, 161:1,
172:12, 173:9,
230:25
**many**
16:23, 17:7,
27:14, 34:14,
34:15, 37:2,
39:12, 48:12,
61:19, 73:3,
75:20, 124:11,
126:25, 133:16,
134:1, 144:23
**mark**
45:11, 46:22,
47:4, 47:10,
47:14, 87:13,
105:10, 105:16,
108:25, 174:4,
178:1, 180:15,
190:16, 195:4,
199:2, 221:25,
222:25, 228:9,
230:4
**marked**
17:24, 18:3,
45:18, 45:20,
45:24, 46:9,
46:12, 47:1,
47:12, 47:16,
54:17, 54:18,
56:7, 56:12,

87:17, 96:23,
105:15, 109:5,
117:3, 117:5,
142:19, 159:9,
174:9, 178:7,
180:21, 190:21,
195:12, 199:6,
222:4, 222:17,
223:4, 228:13,
230:8
**market**
216:7
**marks**
247:1
**marriage**
248:15
**marx**
4:6, 8:24
**maryland**
8:13
**mass**
21:7
**massachusetts**
2:10, 2:14,
8:15, 16:5,
16:9, 16:11,
16:14, 19:14,
88:9, 248:2,
248:6
**master's**
20:11, 20:18
**material**
26:12, 47:19,
47:20, 106:10,
106:12, 114:18,
114:19, 143:8,
143:10, 227:18
**materials**
139:20, 177:16,
199:10, 199:23,
222:12, 222:17
**matter**
8:4, 11:11,
18:5, 24:24,
47:23, 88:20,
102:4, 120:13,
120:16, 156:7,
174:1, 180:1,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                              277

180:4, 180:7,
180:13, 189:17,
194:25, 195:22,
206:22, 206:23,
207:6, 207:12,
219:1, 220:22,
223:17, 242:7,
244:25, 248:11,
248:17
**matters**
104:5, 104:16,
105:4, 111:9,
189:6, 189:21,
208:23, 218:16
**maybe**
15:24, 17:2,
17:10, 26:20,
27:11, 30:9,
31:12, 34:18,
43:15, 44:25,
45:10, 46:22,
79:19, 87:7,
108:13, 110:18,
117:10, 133:20,
134:15, 141:22,
149:12, 151:15,
152:24, 198:3,
199:14, 203:9,
203:11, 209:2,
209:19, 210:2,
212:7, 232:9,
241:12, 242:3,
242:11, 245:13
**mchugh**
1:29, 2:11,
9:9, 248:4,
248:22
**mean**
11:22, 15:24,
19:1, 22:23,
27:3, 28:3,
29:11, 29:17,
29:18, 30:3,
31:2, 31:13,
31:22, 33:11,
35:1, 36:5,
36:24, 39:1,
39:9, 40:22,

40:24, 41:7,
51:22, 55:18,
57:17, 59:7,
65:12, 66:25,
76:18, 78:17,
78:21, 81:16,
81:18, 84:5,
84:10, 84:23,
86:16, 89:11,
91:11, 95:16,
96:2, 97:24,
103:15, 104:16,
104:20, 111:6,
113:15, 113:19,
114:6, 114:7,
114:8, 116:10,
116:12, 119:7,
128:5, 130:15,
131:23, 133:13,
133:20, 134:17,
135:20, 135:21,
137:14, 137:25,
159:20, 165:8,
166:18, 176:5,
176:14, 179:17,
185:12, 185:18,
186:4, 188:22,
190:11, 197:17,
197:21, 202:2,
205:2, 205:13,
205:15, 207:25,
212:1, 213:22,
216:9, 216:14,
217:8, 218:4,
222:12, 226:2,
227:7, 229:18,
234:25, 237:8,
237:10, 242:23,
243:2
**meaning**
17:2, 51:16,
74:15, 75:24,
84:14, 86:7,
86:23, 87:5,
90:10, 90:22,
91:13, 92:10,
92:12, 102:18,
104:6, 108:11,

115:20, 115:21,
138:6, 211:20,
212:25, 213:3
**meanings**
120:21
**means**
65:9, 76:11,
76:19, 77:14,
78:6, 83:18,
84:20, 86:16,
87:9, 92:9,
106:9, 108:20,
140:14, 143:7,
145:14, 145:15,
148:25, 196:10,
196:22
**meant**
104:19, 114:20,
116:9, 116:15
**mechanical**
37:12, 38:4
**mechanisms**
23:21, 25:9
**media**
8:3, 109:19,
110:8, 110:10,
110:12
**medical**
52:2, 139:21
**medium**
79:13, 99:19
**meets**
151:19, 171:17
**melting**
165:5, 165:11
**members**
32:22
**memorized**
61:19, 68:13,
234:11
**memory**
69:22, 88:24
**mention**
61:25, 68:10,
68:19, 71:15,
71:22
**mentioned**
59:24, 64:19,

70:1, 71:18,
81:23, 127:18,
135:3, 176:14,
181:24, 213:8,
245:13
**mentioning**
53:12, 54:10
**mentions**
53:13
**mere**
169:18
**merit**
2:11, 248:4
**mess**
45:13
**met**
153:2
**method**
29:10, 29:18,
29:22, 29:25,
91:19
**methodologies**
28:14, 36:25
**methodology**
22:10, 23:25,
24:12, 24:14,
25:1, 25:11,
27:2, 27:5,
27:9, 28:18,
30:15, 31:12,
31:15, 32:9,
32:24, 33:6,
33:12, 36:17
**methods**
22:14, 28:22,
28:25, 29:6,
29:7, 30:3,
30:8, 37:4,
37:6, 38:4
**mic**
10:15
**middle**
12:7, 122:11
**might**
17:14, 19:3,
30:10, 32:19,
34:2, 37:24,
39:10, 39:25,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    278

40:2, 40:3,
41:20, 42:3,
44:1, 45:5,
46:15, 53:21,
53:23, 54:19,
69:3, 102:3,
104:16, 151:10,
161:10, 188:6,
197:7, 199:12,
209:14, 211:17,
212:5, 222:19,
233:13, 234:2,
239:7
**miles**
16:18
**milligrams**
170:20, 170:22,
170:23, 187:8,
187:9, 187:11
**milliliter**
170:20, 170:25,
182:3, 187:11
**mind**
19:4, 20:20,
39:11, 48:5,
52:20, 76:5,
84:18, 87:1,
118:17, 120:24,
138:10, 185:15,
194:17, 197:6,
204:11, 205:12,
205:24, 207:9,
209:12, 209:20
**minds**
235:10
**minus**
215:8
**minutes**
221:17, 221:22,
239:10, 239:13
**mischaracterizat-
ion**
215:4
**misprint**
46:24
**misquoting**
128:19
**misrepresent**
95:6

**misrepresenting**
94:18
**miss**
155:11
**missed**
18:15, 141:21
**misspoke**
212:7
**misstates**
60:7, 66:7,
66:12, 203:3,
210:13, 211:3
**misstating**
80:1, 83:3
**mistakes**
39:2, 40:1,
88:17
**mit**
19:21, 22:12,
25:14, 26:16,
29:2
**mix**
211:5, 213:4
**mixed**
159:23, 190:5
**mixing**
133:1
**mixture**
164:16, 169:8,
188:23, 189:1
**mixtures**
113:6, 113:23
**mm-hmm**
169:9
**modeling**
190:10
**moisture**
58:20, 67:7
**molecular**
164:16
**molecule**
34:16, 34:22,
36:20, 43:19,
43:25, 44:1,
44:13, 44:14,
52:13, 208:25,
211:1
**molecules**
30:20, 112:7,

210:11
**moltened**
163:11
**moment**
59:4, 62:23,
69:3, 86:6,
136:4, 237:25
**monitor**
8:10, 36:1
**monitoring**
36:12
**monothioglycerol**
170:23
**monte**
21:23, 22:15,
36:23, 37:20
**months**
238:12
**more**
19:23, 22:17,
31:13, 34:6,
50:22, 50:23,
51:3, 51:4,
51:5, 59:23,
68:16, 72:15,
73:17, 74:24,
89:3, 89:25,
91:11, 94:9,
104:7, 106:25,
117:19, 118:1,
147:18, 154:7,
158:5, 162:8,
163:10, 169:12,
172:6, 181:15,
183:17, 197:1,
203:10, 207:11,
221:17, 239:14,
241:10
**morning**
15:6, 88:18,
208:24, 240:8
**most**
18:9, 27:17,
42:5, 42:8,
68:24, 91:5,
102:3, 161:5
**motions**
240:15

**move**
11:2, 240:1
**moving**
85:12
**much**
23:10, 23:20,
26:14, 26:24,
59:10, 61:10,
61:15, 139:3,
182:17, 188:19
**muchin**
3:16, 9:3
**multiple**
67:17, 70:19,
76:13, 83:11,
133:22, 153:20,
169:4, 170:14,
174:24, 194:6,
207:18, 214:25
**must**
78:21, 112:10,
121:19, 122:17,
132:9, 134:22,
143:13, 144:7,
150:10
**mustard**
35:8
**mustards**
35:13, 36:3
**myself**
18:15, 32:21,
89:5, 89:23,
91:24, 183:4

**N**

**na**
215:7, 224:25
**name**
15:20, 15:23,
88:12, 105:24
**named**
105:20
**names**
16:1, 211:16
**naoh**
6:19, 154:19,
155:7, 159:23,
160:1, 199:5,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                          279

**nda**
58:18, 160:14, 160:17, 161:1, 165:21, 166:3, 166:10, 166:25, 168:16, 168:18, 169:7, 216:19, 218:1
**necessarily**
51:7, 92:18, 144:25, 190:6, 208:8, 237:19
**necessary**
137:10
**need**
10:25, 60:8, 78:12, 130:8, 153:21, 153:23, 183:11, 188:24, 189:8, 190:9, 197:14, 198:7, 213:6, 219:8, 221:1, 221:21, 225:19, 234:13
**needed**
28:20, 28:21, 32:10, 71:25, 190:1, 202:10
**needs**
26:11, 77:2
**negative**
33:15, 169:23, 170:6
**neither**
63:2
**neutralize**
168:25, 216:12, 217:23
**neutralized**
159:22, 167:5, 168:3, 168:17
**neutralizes**
172:19
**neutralizing**
169:20
**never**
77:13, 101:9,

156:22, 210:10
**new**
4:8, 10:10, 14:22, 42:11, 42:17, 42:23, 43:13, 43:15, 43:25, 44:12, 50:22, 112:6, 163:17, 226:19, 229:8
**newly**
44:12
**next**
12:11, 90:8, 99:17, 160:19, 160:20, 172:13, 189:14, 224:23
**nine**
17:9
**nitrogen**
22:21, 22:22, 35:8, 35:12, 36:2
**nmt**
58:23
**non-infringement**
236:9
**nonaqueous**
55:5, 55:14, 60:2, 60:13, 60:18, 196:9, 196:15, 196:21, 211:7
**none**
73:6
**nonetheless**
60:3, 113:13
**nonfunctional**
229:21
**nonimpurity**
148:23
**noninfringement**
154:11
**nonlinear**
190:9
**nonpyrogenic**
143:17, 144:11
**normal**
58:2, 130:13,

130:19, 159:23, 160:1, 163:10
**normally**
210:6
**north**
3:7
**notary**
2:13, 248:5, 248:23
**note**
9:5, 20:22, 57:19, 57:22, 58:5, 67:3, 68:4, 159:1, 240:6, 240:16, 241:25
**noted**
34:13, 64:23, 93:24, 124:12, 194:19
**notes**
248:10
**nothing**
36:14, 36:21, 69:14, 69:15, 194:17
**noticed**
50:21
**noting**
96:11, 96:12, 110:4, 181:5, 196:22
**notion**
157:7, 157:16
**novel**
48:22
**november**
233:25
**number**
5:7, 6:2, 7:2, 17:11, 27:22, 32:13, 33:18, 34:20, 34:21, 35:10, 35:14, 56:3, 56:20, 56:23, 65:9, 77:21, 103:20, 116:6, 119:10,

119:14, 184:5
**numbered**
18:20, 228:25
**numbers**
31:16, 31:18, 32:1, 33:25, 54:5, 55:24, 56:18, 222:1, 228:10, 230:5
**numeral**
48:14, 155:2
**numerical**
65:13
**numerically**
188:1
**nw**
3:17

**O**

**objecting**
157:13
**objection**
10:10, 11:1, 15:5, 32:3, 41:10, 60:14, 62:11, 66:7, 66:12, 76:12, 83:2, 83:19, 104:2, 107:13, 120:14, 144:2, 144:14, 152:3, 152:15, 168:5, 169:2, 169:22, 172:22, 216:20, 217:16, 220:12, 240:5, 240:7, 241:19, 242:6
**objective**
30:23
**observable**
90:12
**obtained**
19:14, 235:21
**obviously**
9:19, 11:8
**occur**
23:22
**occurred**
237:14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

280

**occurring**
10:20
**occurs**
93:18
**odorless**
179:15
**offense**
162:12
**offer**
26:16, 245:24,
246:5
**offered**
158:20
**offering**
246:4
**office**
88:15, 237:11
**offices**
2:9
**official**
16:1
**officially**
19:20, 20:15,
20:19
**often**
112:15, 144:23,
209:3, 209:4,
209:22
**oh**
23:16, 35:19,
56:1, 59:14,
71:12, 71:15,
82:9, 117:1,
127:12, 131:10,
161:11, 174:12,
175:2, 184:8,
185:10, 199:12,
212:2, 215:8,
216:3, 227:1,
232:9, 246:19
**older**
106:24
**once**
51:12, 157:22,
157:23, 240:24
**one's**
146:20
**ones**
42:21, 56:4,

56:23, 57:4,
185:14, 226:10
**only**
1:21, 13:14,
56:3, 57:10,
57:12, 59:22,
63:22, 95:17,
151:13, 156:12,
157:25, 158:18,
159:4, 170:12,
176:1, 177:12,
185:14, 185:23,
187:5, 194:3,
196:18, 197:13,
226:18, 229:8,
239:20, 240:24,
241:6, 241:8,
246:21
**open**
206:1
**opening**
5:10, 40:23,
41:13, 42:16,
45:11, 45:17,
45:21, 48:13,
49:18, 50:4,
50:10, 56:9,
64:22, 72:17,
73:23, 79:9,
83:12, 83:23,
121:5, 126:13,
126:20, 135:5,
147:3, 150:4,
154:12, 155:1,
159:3, 164:7,
170:17, 173:18,
181:24, 192:2,
203:18, 205:18,
223:7, 224:1,
228:22, 230:13,
232:13, 233:1
**operate**
233:10, 236:20,
240:10
**operated**
10:23
**operating**
240:11

**opinion**
51:23, 53:16,
75:1, 77:14,
79:22, 182:11,
204:5, 218:21,
219:16, 232:5,
233:20, 236:18,
245:24, 246:14
**opinions**
36:21, 37:18,
55:15, 58:6,
76:8, 76:13,
94:12, 157:11,
172:3, 182:15,
201:3, 219:5,
219:10, 219:15,
220:6, 245:19,
246:5
**opposed**
107:4, 108:4,
116:5, 117:2,
124:16, 132:25,
152:9, 156:4,
163:11
**option**
205:21
**optional**
151:15, 153:6
**optionally**
72:15, 73:17,
79:4, 80:8,
147:18, 154:7,
181:19, 192:15
**order**
28:1, 241:22
**ordered**
244:5
**ordering**
242:8
**ordinary**
74:10, 84:14,
85:9, 86:6,
86:16, 86:17,
86:22, 87:5,
90:10, 90:21,
91:13, 92:10,
92:12, 102:18
**organ**
106:14, 106:15,

107:2, 107:3,
107:19, 107:20,
108:5, 108:20,
143:12, 143:13,
146:11, 146:12
**organic**
196:2, 196:4
**organization**
111:11
**original**
51:15
**originate**
227:20
**others**
41:20, 56:16,
61:3, 134:2,
151:10, 162:21,
186:5, 191:25,
199:13, 229:17
**otherwise**
56:24, 158:3
**out**
9:20, 12:15,
15:8, 39:19,
40:5, 43:21,
55:22, 64:2,
67:21, 70:12,
93:2, 101:2,
123:7, 124:22,
125:5, 131:8,
131:11, 137:1,
171:10, 201:24,
203:24, 208:23,
219:11, 219:14,
242:3, 243:18,
246:11, 246:12
**outcome**
51:14, 52:13,
248:16
**outside**
35:2, 35:5,
86:5, 86:21,
119:25, 120:3,
120:8, 177:4,
193:17, 200:5,
215:19
**over**
10:20, 16:24,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

281

16:25, 17:2,
17:16, 17:17,
27:22, 34:13,
35:15, 48:8,
50:19, 52:10,
55:21, 59:20,
65:2, 65:16,
73:3, 85:7,
88:23, 90:8,
94:21, 133:22,
153:20, 170:14,
182:13, 241:1

**overlapped**
20:13
**overlapping**
157:15, 242:13
**overnight**
14:17
**oversimplified**
177:14
**oversimplify**
115:7
**overview**
40:18, 40:22
**own**
39:13, 41:24,
108:8, 118:6,
185:17, 185:18,
186:9, 186:24,
189:24, 235:19
**oxides**
22:22
**oxygen**
22:22

**P**

**p-a-r-t-r-i-d-g-e**
16:14
**page**
5:7, 6:2, 7:2,
18:20, 27:17,
38:9, 38:10,
40:23, 41:13,
42:15, 42:25,
48:2, 57:12,
57:13, 57:17,
57:18, 58:2,
58:15, 59:25,

67:20, 68:4,
72:18, 72:24,
79:9, 83:25,
85:16, 88:19,
90:5, 90:8,
90:17, 91:15,
91:18, 102:24,
105:23, 106:1,
109:10, 109:11,
115:11, 115:19,
139:11, 142:19,
147:4, 150:6,
159:21, 165:22,
165:23, 166:2,
166:8, 166:20,
168:13, 169:6,
170:18, 171:11,
173:2, 173:19,
173:20, 174:12,
175:3, 182:1,
182:7, 182:20,
182:24, 192:1,
200:18, 200:20,
214:1, 214:11,
214:14, 215:1,
218:5, 224:9,
224:12, 225:15,
226:13, 226:14,
228:25, 229:1,
230:16, 230:17,
230:18, 231:21,
232:12, 233:1,
233:6, 236:17
**pages**
50:8, 73:3,
75:20, 103:20,
126:25, 133:16,
133:22, 134:1,
165:17, 169:4,
170:14, 187:6,
214:25, 223:9
**pains**
157:24
**paper**
38:22
**papers**
39:2, 200:4,
202:15

**paragraphs**
67:2, 79:7,
80:11, 98:8,
126:14, 135:6
**parameter**
69:25
**paraphrased**
125:17
**paraphrasing**
218:8
**parenteral**
109:24, 225:5
**paris**
19:1, 19:7
**part**
33:11, 39:13,
55:9, 61:25,
67:23, 71:24,
72:5, 72:6,
84:2, 84:7,
90:16, 100:8,
101:2, 103:19,
106:7, 106:18,
110:2, 123:1,
125:18, 126:22,
154:11, 161:5,
161:9, 167:22,
167:25, 170:13,
171:6, 171:7,
172:4, 179:12,
181:19, 184:8,
184:9, 192:14,
197:23, 198:17,
204:5, 204:24,
205:20, 206:4,
207:15, 208:11,
210:10, 210:23,
214:23, 218:15,
219:11, 219:14,
219:16, 220:3,
232:24, 237:13,
242:1, 242:2,
243:18
**partial**
218:21
**participate**
205:8, 207:1,
207:14, 207:22,

207:25, 208:10
**participating**
208:3
**particles**
114:7, 114:9,
116:6, 116:7,
116:8
**particular**
32:11, 33:19,
38:3, 49:12,
60:19, 64:14,
64:20, 74:15,
76:2, 76:5,
84:17, 88:2,
93:11, 101:5,
111:25, 113:19,
113:24, 118:10,
118:17, 124:17,
126:23, 128:4,
146:7, 160:19,
166:1, 181:3,
189:3, 194:4,
204:10, 206:10,
216:13, 217:18,
217:21, 221:3,
225:7, 231:21,
231:23, 233:23
**particularly**
127:11, 210:4,
219:22
**particulate**
198:25
**particulates**
114:22, 114:24,
116:12, 116:18
**parties**
10:22, 156:25,
157:10, 157:18,
240:9, 240:13,
244:1, 244:5,
248:15
**partridge**
16:13
**parts**
130:9, 132:18,
133:8, 133:9,
211:18, 235:4
**party**
9:14, 236:16

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    282

**pas**
245:4, 246:7,
246:8
**passage**
101:10, 123:8,
124:3
**past**
26:6, 55:9,
61:5, 196:20,
199:17, 231:7
**patent**
5:18, 5:19,
5:20, 5:22,
5:24, 40:13,
42:6, 42:22,
43:2, 44:1,
44:16, 47:11,
47:12, 47:15,
47:16, 47:21,
48:7, 49:19,
50:25, 51:18,
53:12, 54:13,
61:10, 61:13,
62:8, 62:12,
63:14, 70:10,
72:9, 73:5,
87:14, 87:16,
88:4, 88:11,
88:15, 90:19,
93:16, 105:12,
105:14, 105:21,
108:7, 109:2,
109:4, 110:17,
110:18, 117:21,
122:2, 122:20,
123:2, 123:6,
123:8, 124:4,
124:24, 125:3,
125:15, 125:16,
125:21, 126:10,
127:12, 127:14,
131:14, 132:5,
132:19, 138:21,
141:2, 141:7,
150:10, 172:11,
176:8, 176:9,
177:11, 179:8,
192:11, 194:13,

194:18, 202:9,
206:16, 221:12,
233:9, 233:23,
233:24, 235:15,
237:11
**patented**
49:3, 53:16,
54:1, 191:19,
208:2, 208:8,
220:10, 236:20
**patentees**
111:7
**patents**
40:16, 40:20,
41:18, 41:25,
42:1, 42:4,
42:11, 42:12,
43:14, 44:20,
44:25, 48:19,
49:23, 53:17,
54:8, 59:8,
59:11, 59:17,
61:18, 68:12,
68:19, 74:2,
74:8, 74:18,
79:15, 85:24,
86:5, 86:18,
93:13, 94:15,
98:4, 111:10,
111:13, 112:16,
113:7, 115:2,
117:7, 120:1,
120:9, 130:9,
130:20, 140:17,
153:1, 176:12,
176:18, 177:4,
177:8, 177:15,
180:8, 191:17,
193:18, 195:1,
195:22, 197:9,
197:12, 206:21,
206:23, 215:17,
233:22, 234:6,
234:16, 234:18,
235:2, 236:16,
238:23, 239:2,
239:4
**patents-in-suit**
40:11, 42:21,

44:12, 44:22,
55:2, 61:14,
61:15, 68:8,
68:9, 69:18,
69:21, 70:6,
70:18, 71:10,
86:21, 114:13,
115:25, 117:18,
148:13, 179:2,
211:14, 233:18,
234:3, 234:17,
234:24, 237:12,
246:2
**patience**
246:25
**patient**
50:12, 51:13,
52:13, 52:15,
141:1, 143:16,
144:10
**patients**
49:4, 51:10,
53:18
**pct**
111:11, 139:5,
139:6, 141:12,
141:17, 141:22,
142:1, 145:12,
145:19
**pdas**
225:16
**pe3**
245:6, 246:8
**peer-reviewed**
200:12
**peg**
6:19, 58:10,
149:12, 151:14,
153:5, 155:24,
159:19, 159:22,
169:8, 169:20,
172:19, 174:24,
177:20, 179:22,
187:19, 188:17,
192:15, 194:15,
199:5, 199:18,
200:24, 201:5,
201:7, 201:24,

202:16, 202:25,
205:5, 205:21,
208:2, 213:23,
215:6, 218:10,
219:25
**pending**
159:17
**penetrant**
181:11
**penetration**
195:15
**pennsylvania**
3:17
**people**
19:23, 39:1,
39:2, 39:15,
39:25, 120:18,
143:24, 154:1,
199:17, 204:9,
212:5, 217:19
**peptide**
209:1, 210:22
**peptides**
34:10, 34:14,
34:21, 210:1,
210:3, 211:8
**perceive**
76:21
**percent**
58:11, 170:23,
182:1, 182:6,
182:21, 188:18,
200:24
**percentage**
62:9, 188:12,
196:13
**perform**
178:23
**performing**
189:3
**performs**
172:20
**perhaps**
169:5
**period**
122:21, 128:18,
129:8, 129:13,
238:24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

283

**permissible**
59:19, 61:11,
61:16, 62:9,
64:8
**permit**
59:11
**permits**
58:10, 90:14
**persist**
214:16
**persistence**
229:23
**persistent**
227:13
**person**
59:16, 60:22,
62:4, 63:18,
64:4, 64:7,
64:12, 64:17,
65:3, 65:6,
65:19, 68:20,
70:4, 70:14,
71:4, 71:23,
72:4, 72:22,
73:1, 73:14,
75:9, 78:24,
78:25, 79:16,
80:4, 80:19,
81:6, 81:19,
81:24, 84:7,
85:22, 93:10,
101:21, 103:22,
131:3, 133:12,
133:23, 150:9,
157:21, 198:1,
198:10, 242:4,
243:9
**person's**
127:10
**personal**
36:12
**perspective**
10:18, 50:11,
60:21
**pg**
149:13, 208:2
**ph**
1:23, 2:9, 5:3,

5:9, 5:11, 5:15,
5:17, 15:14,
18:3, 21:16,
21:20, 24:20,
25:5, 36:14,
45:18, 46:12,
47:1, 68:21,
69:21, 69:23,
69:24, 70:3,
70:4, 70:12,
70:15, 70:20,
71:5, 71:7,
71:8, 71:10,
71:21, 72:5,
160:3, 160:15,
162:9, 162:12,
170:10, 171:4,
173:14, 173:21,
215:6, 216:16,
217:11, 217:12,
217:14, 218:8,
218:10, 219:25,
248:7
**ph-adjusting**
68:24
**pharma**
1:16, 208:25
**pharmaceutical**
6:4, 6:7, 6:10,
6:13, 6:16,
20:2, 20:4,
20:5, 20:8,
22:11, 24:8,
24:19, 24:21,
24:24, 25:1,
25:6, 25:10,
34:11, 42:10,
50:19, 66:19,
67:8, 68:21,
70:16, 72:13,
72:19, 84:19,
84:23, 85:4,
85:5, 85:6,
85:9, 85:23,
86:22, 88:21,
88:25, 89:10,
89:12, 90:3,
99:20, 101:24,

103:25, 104:9,
112:17, 113:16,
118:7, 120:9,
121:10, 121:15,
122:16, 126:19,
131:14, 131:24,
132:22, 135:18,
136:19, 137:7,
137:9, 140:7,
142:10, 142:13,
144:1, 145:20,
166:3, 166:16,
167:4, 167:13,
168:2, 174:6,
174:8, 174:15,
175:7, 178:3,
178:6, 180:17,
180:20, 190:17,
190:20, 194:11,
195:11, 197:1,
200:7, 201:24,
235:22
**pharmaceuticals**
1:5, 1:12,
1:17, 8:5, 8:20,
22:7, 24:15,
30:25, 34:16,
34:22, 71:6,
71:24, 72:6,
74:17, 87:3,
89:19, 209:1,
211:19
**pharmaceutics**
70:1, 87:4
**phase**
161:24
**philosophical**
38:8
**phrase**
76:23, 78:20,
79:20, 80:21,
84:2, 95:10,
101:5, 106:2,
106:8, 123:6,
124:22, 125:2,
127:17, 131:12,
132:7, 133:2,
137:5, 137:9,

139:12, 139:18,
142:20, 142:22,
143:6, 146:17,
167:20, 213:21
**physical**
103:5, 103:6,
103:8, 103:10,
103:11, 103:12,
113:23, 115:18,
164:25, 165:1,
165:5, 165:11
**physics**
74:16, 86:2,
86:11, 92:5,
92:9, 92:11,
93:8, 103:18
**physiologically**
109:22
**picture**
164:6
**pilot**
29:1
**pin**
51:24
**place**
8:14, 23:1,
23:5, 57:12,
64:23, 67:13,
67:19, 69:1,
73:11, 91:6
**places**
48:12, 68:22,
75:12, 83:11,
101:3, 124:11,
124:13, 154:14,
159:21, 159:25,
183:9, 192:11
**plaintiffs**
1:7, 1:14, 3:3
**planet**
8:12, 9:9
**plants**
200:9
**plasticizer**
178:18
**play**
172:5, 181:15,
191:14, 220:9

**playing**
192:19
**plays**
189:18, 219:2
**please**
8:17, 45:3,
56:24, 99:6,
123:14, 175:24,
204:22
**plural**
49:9
**plus**
16:24, 215:7
**point**
28:18, 36:10,
53:20, 57:4,
57:24, 66:4,
67:15, 71:4,
78:8, 85:21,
87:8, 90:24,
91:15, 92:6,
92:14, 92:17,
92:22, 102:9,
103:14, 108:2,
111:2, 112:5,
112:6, 117:12,
120:18, 124:21,
124:23, 127:21,
128:22, 129:15,
140:22, 147:4,
161:3, 164:17,
166:2, 166:15,
168:1, 168:21,
168:22, 188:5,
188:8, 192:10,
192:12, 193:3,
193:19, 199:12,
203:24, 205:12,
214:25, 218:6,
220:2, 220:23,
221:1, 227:2,
227:11, 227:22,
227:25, 229:17,
231:19, 234:15,
237:10, 242:6
**pointed**
101:2, 208:23
**pointing**
70:12, 100:1,

100:10, 123:7,
140:23
**points**
58:25, 202:12,
231:8
**polyethylene**
6:5, 72:14,
73:16, 75:15,
79:4, 80:7,
147:17, 154:6,
160:16, 167:6,
168:3, 168:18,
170:25, 171:5,
173:22, 174:9,
174:16, 175:10,
175:18, 175:22,
176:11, 176:20,
177:5, 177:7,
178:3, 178:10,
178:23, 179:5,
179:11, 179:22,
182:4, 182:25,
192:5
**polymers**
92:3
**polypropylene**
75:15
**poorly**
75:18, 192:7
**portion**
58:21, 106:14,
106:15, 107:2,
107:3, 107:19,
107:20, 108:5,
108:6, 143:12,
143:13, 143:19,
146:11, 146:12,
241:20, 244:1
**posa**
97:14, 101:15,
101:16, 121:5,
135:13, 137:24,
145:14, 147:15,
152:9, 152:16,
155:3, 171:13,
177:17, 177:18,
177:19, 192:3,
193:1, 193:20,

202:7, 216:9,
217:8, 217:19,
217:20, 227:16
**posa's**
128:7
**posas**
215:16, 216:6
**pose**
134:15
**posed**
163:17
**position**
75:22, 77:2,
78:5, 82:7,
82:20, 95:15,
213:19, 219:24,
243:21
**positive**
33:15
**possibility**
44:4, 44:9,
169:16, 206:18
**possible**
55:20, 112:25,
204:13, 208:9
**postdocs**
32:22
**potential**
35:22, 35:25,
36:11, 61:7
**potentially**
22:23, 25:11,
34:7, 50:23,
72:5, 72:7,
89:6, 89:14,
189:3
**practical**
23:20
**practically**
179:14
**practice**
229:19
**precipitating**
209:10
**precise**
29:20, 221:24,
226:8, 243:5
**precision**
30:13, 32:10,

33:7
**preclude**
192:20
**predicated**
235:21
**predict**
231:24
**prefer**
9:20, 56:22
**preferably**
109:22
**preferred**
239:6
**premise**
30:6
**preparation**
9:19
**prepare**
243:5, 243:10
**prepared**
11:20
**presence**
148:22
**present**
4:13, 37:18,
53:16, 55:13,
55:18, 58:18,
59:19, 60:24,
62:5, 63:21,
64:13, 64:18,
65:7, 65:20,
65:24, 74:4,
74:11, 186:7,
186:21, 213:23,
217:15
**presenting**
15:15
**preservative**
178:17, 181:10,
181:23, 191:10,
191:22, 193:19,
194:13
**press**
28:4
**presumably**
241:25
**presume**
32:6, 44:4

| | | | |
|---|---|---|---|
| **presumed** | **problematic** | 58:19, 58:22, | 231:23 |
| 97:14 | 12:12, 242:18 | 59:5, 68:4, | **professor** |
| **pretending** | **problems** | 146:20, 148:25, | 17:21, 25:13 |
| 12:20 | 48:20, 49:11, | 149:9, 149:10, | **professorship** |
| **pretty** | 54:9, 203:24 | 149:11, 149:21, | 25:14 |
| 26:14, 26:24, | **procedure** | 149:22, 150:12, | **profile** |
| 36:7, 68:12, | 240:18 | 150:14, 155:22, | 231:24 |
| 139:3, 199:21, | **proceed** | 155:24, 156:4, | **progressing** |
| 234:12, 234:13 | 9:11, 12:14, | 156:12, 156:14, | 11:3 |
| **prevalence** | 12:20, 12:22, | 159:5, 160:9, | **projects** |
| 71:20 | 12:23, 12:24, | 160:10, 160:14, | 35:14 |
| **prevalent** | 13:16, 14:11, | 160:17, 161:1, | **prominent** |
| 68:24, 69:25 | 14:14, 15:7, | 168:18, 168:24, | 91:6 |
| **previous** | 158:2, 243:15 | 169:7, 169:12, | **proof** |
| 23:17, 60:18, | **proceeding** | 172:12, 181:22, | 169:20, 170:3 |
| 61:8, 81:24, | 9:15, 11:8, | 182:17, 186:9, | **proofs** |
| 82:11, 92:16, | 241:23 | 186:11, 186:22, | 167:23, 168:1 |
| 98:8, 125:12, | **process** | 186:24, 187:8, | **properly** |
| 162:19, 163:15, | 21:1, 58:3, | 187:13, 187:14, | 227:17 |
| 215:2 | 61:7, 62:3, | 187:18, 188:9, | **properties** |
| **primarily** | 89:3, 92:24, | 188:16, 197:15, | 182:6 |
| 86:14, 92:7 | 156:3, 159:8, | 201:6, 205:6, | **property** |
| **print** | 159:18, 160:6, | 213:10, 215:23, | 16:18, 111:10 |
| 45:12, 46:16 | 165:2, 165:5, | 216:7, 216:19, | **proposal** |
| **printed** | 165:6, 165:11, | 218:1, 218:2, | 13:24 |
| 223:10 | 172:13, 173:9, | 219:2, 219:18, | **propose** |
| **prior** | 232:1 | 228:5, 229:24, | 190:8 |
| 48:8, 55:3, | **process-type** | 231:23, 231:25, | **proposed** |
| 59:5, 63:13, | 89:7 | 233:19, 234:9, | 232:1 |
| 63:17, 66:8, | **processes** | 234:14, 234:22, | **proposition** |
| 80:1, 81:9, | 21:21, 23:12, | 235:11, 236:5, | 199:17 |
| 83:3, 97:12, | 37:13, 37:14, | 237:7, 237:15, | **propylene** |
| 171:21, 210:13, | 37:15, 38:1, | 238:4, 238:15, | 6:8, 147:18, |
| 210:21, 211:3, | 38:3, 38:4 | 239:1 | 154:7, 178:7, |
| 212:8, 236:10 | **processing** | **product-by-proce-** | 179:13, 179:23, |
| **priority** | 22:8, 58:4, | **ss** | 192:5, 236:24, |
| 215:17, 215:25, | 64:1, 66:24, | 43:8, 43:11 | 237:2 |
| 239:4 | 227:21 | **products** | **prosecution** |
| **probably** | **produce** | 29:7, 30:24, | 99:11, 101:4 |
| 11:25, 16:25, | 53:17, 54:2 | 58:8, 151:4, | **protection** |
| 86:14, 91:2, | **produced** | 172:13, 211:22, | 36:13 |
| 113:24, 118:1, | 139:2 | 226:19, 226:20, | **protein** |
| 166:7, 174:18, | **producing** | 226:21, 226:24, | 209:5, 209:9, |
| 174:22, 217:9, | 31:16 | 229:8, 229:9, | 209:10, 210:22, |
| 239:20 | **product** | 229:10, 229:13, | 212:16, 212:17 |
| **problem** | 12:1, 20:25, | 231:3, 231:4, | **proteins** |
| 139:25, 241:24, | 22:8, 50:14, | 231:10, 231:11, | 34:10, 34:15, |
| 242:7, 244:3 | 51:15, 54:4, | 231:12, 231:15, | 34:20, 209:1, |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    286

209:13, 210:3,
211:7
**protic**
196:5
**provide**
11:7, 13:22,
99:14, 240:21,
241:16, 243:25
**provides**
230:23, 231:9,
243:13
**providing**
244:4
**public**
2:13, 159:4,
237:20, 238:1,
238:2, 248:5,
248:23
**publication**
38:16, 93:24
**publications**
27:16, 27:22,
28:5, 28:8,
28:9, 34:9,
34:13, 38:8
**published**
28:4, 87:14,
105:12, 139:6
**pull**
82:16, 93:2,
125:5, 127:8,
142:4, 171:10,
188:24, 190:4,
219:14
**pulled**
219:8
**pulling**
124:21, 219:11
**purportedly**
193:5
**purpose**
126:2, 126:4,
126:7, 126:9,
158:15, 218:2,
227:4, 240:14,
241:21
**purposeful**
229:20

**purposes**
30:19, 53:15,
79:23, 83:16,
148:12, 151:13
**pursuant**
2:10
**put**
19:6, 19:23,
40:5, 46:15,
55:21, 56:17,
56:23, 56:25,
65:9, 90:13,
127:16, 129:8,
129:12, 129:17,
130:3, 130:4,
162:16, 163:3,
186:23, 188:24,
216:7
**putting**
39:19, 95:7,
103:10

### Q

**q3**
222:9
**qs**
170:25, 182:3
**qualification**
231:2
**qualify**
19:18, 219:4
**qualitative**
65:13
**quality**
225:4
**quantify**
188:12
**quantitative**
30:18, 30:22,
31:3, 31:16
**quantities**
189:9
**quantum**
21:22, 36:22,
37:12, 37:20,
38:4
**question**
12:8, 23:17,

30:17, 34:4,
37:17, 44:5,
44:10, 53:2,
60:8, 62:6,
63:1, 64:20,
68:7, 71:13,
74:14, 82:18,
84:25, 85:3,
86:4, 86:5,
86:20, 91:11,
91:25, 94:5,
94:21, 103:7,
104:7, 113:12,
118:12, 123:14,
123:17, 123:18,
125:25, 126:3,
134:15, 137:1,
137:5, 144:5,
147:23, 148:8,
148:15, 149:3,
151:18, 152:19,
153:10, 155:18,
156:6, 159:17,
161:6, 161:7,
161:9, 161:19,
161:21, 162:9,
162:19, 162:20,
162:21, 163:15,
163:17, 163:18,
170:2, 175:24,
176:25, 178:25,
179:10, 183:17,
184:15, 188:15,
189:14, 193:7,
193:24, 194:8,
194:9, 196:11,
201:21, 201:22,
204:20, 207:5,
207:12, 208:19,
210:14, 210:16,
213:22, 218:14,
220:19, 221:9,
237:17, 239:20,
245:22
**questioning**
9:17, 14:18,
241:1, 243:8
**questions**
93:14, 93:21,

95:11, 96:15,
96:18, 118:10,
119:2, 120:15,
189:7, 194:6,
218:7, 239:17,
243:16
**quite**
28:13, 28:16,
29:25, 30:6,
31:13, 34:3,
34:5, 34:19,
34:21, 35:10,
35:14, 50:8,
60:16, 63:21,
69:25, 78:3,
121:24, 125:12,
128:14, 130:8,
130:13, 130:19,
137:14, 138:18,
142:13, 146:13,
186:14
**quotation**
127:4
**quote**
38:23, 39:18,
40:5, 58:16,
75:7, 99:22,
123:4, 124:4,
124:9, 124:14,
124:20, 125:5,
125:19, 125:21,
127:10, 129:12,
129:19, 129:25,
130:4, 130:9,
130:16, 131:22,
137:21, 138:16,
142:9, 144:5,
171:3, 173:2
**quoted**
125:17, 127:16,
128:16, 141:13,
142:7, 171:3
**quotes**
39:7, 39:13,
49:19, 54:14,
101:6, 122:4,
122:5, 125:14,
126:9, 127:16,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                    287

130:5, 131:22,
143:3, 144:15,
147:8, 155:12
**quoting**
38:24, 39:8,
39:15, 54:12,
105:3, 122:12,
122:22, 123:1,
126:2, 126:7,
126:11, 129:7,
133:8

**R**

**raise**
10:16
**raised**
15:5, 78:2,
240:8
**rapidly**
64:25
**rate**
108:7, 137:19
**rates**
49:4, 54:6
**rather**
85:20, 201:1,
233:11, 236:21
**rating**
36:8
**ratings**
35:23
**ratio**
34:17, 140:2
**reach**
77:9, 190:13,
204:3
**reached**
190:14, 204:4
**react**
215:8, 216:5,
216:11, 217:15
**reacting**
214:22
**reaction**
21:21, 23:12,
226:21, 229:10,
231:12
**reactions**
22:25, 23:1,

23:4, 24:2,
24:4, 24:7,
24:16, 36:19,
37:1, 37:9
**reactive**
37:13, 37:15,
38:3
**reacts**
213:23
**read**
9:14, 14:1,
40:15, 41:1,
41:15, 48:16,
52:9, 52:21,
53:2, 61:18,
79:5, 90:7,
90:16, 91:5,
97:5, 97:18,
98:6, 99:5,
99:22, 101:19,
106:6, 106:16,
107:10, 107:17,
110:2, 121:2,
121:22, 122:6,
122:23, 123:4,
123:16, 123:18,
125:13, 135:11,
137:20, 140:3,
143:4, 143:19,
154:18, 155:9,
155:20, 208:17,
208:19, 225:19,
226:25, 227:1,
229:14, 231:5,
231:16, 232:22,
245:17
**reading**
47:20, 225:20,
226:3
**reads**
99:17, 106:6,
122:12, 139:17,
143:5, 155:1,
225:15, 226:18,
229:6, 229:7,
230:23
**ready**
124:19, 129:22

**reagent's**
229:20
**reagents**
227:20
**real**
145:19, 145:23
**realize**
222:11
**really**
57:18, 81:18,
108:16, 112:5,
116:20, 133:4,
133:9, 137:15,
152:16, 152:23,
173:3, 193:8,
213:6, 219:14,
224:17, 232:25,
233:20, 245:12,
245:21
**realtime**
2:12
**reason**
18:12, 18:14,
19:21, 22:13,
30:10, 39:14,
50:12, 51:11,
125:19, 125:21,
170:8, 182:9,
200:15, 244:15,
244:17, 244:20
**reasonable**
11:15, 11:21,
29:20, 44:5,
140:1, 145:24,
146:2, 243:9
**reasons**
31:23, 32:19,
34:2, 39:10,
39:25, 53:12,
65:20, 81:23,
94:12, 95:11,
131:4, 138:3,
155:16, 170:16,
171:9, 225:4
**rebuttal**
98:17, 98:23,
122:19, 203:15
**recall**
17:14, 18:24,

21:7, 35:12,
38:18, 49:8,
81:4, 106:23,
111:17, 200:3,
200:14, 213:19
**recent**
18:7, 18:8,
18:10, 27:17,
50:21
**recently**
28:2
**recess**
69:6, 136:7,
184:23, 222:22
**recited**
88:21, 121:6,
125:8, 135:15,
146:20, 190:24
**recognize**
166:24
**recognized**
210:21
**recollection**
200:5
**recommendation**
230:24
**recommendations**
231:9
**recommending**
231:22
**reconstituted**
50:13
**reconstitution**
49:15, 50:23,
50:24, 64:24
**record**
9:5, 14:23,
15:1, 15:21,
69:5, 69:8,
73:9, 136:6,
136:9, 142:16,
184:22, 184:25,
221:15, 222:21,
222:24, 228:19,
233:8, 236:19,
238:12, 239:23,
240:4, 240:7,
240:17, 247:3,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                              288

248:10
**refer**
40:11, 55:9,
55:13, 56:19,
58:9, 67:14,
67:22, 67:24,
72:17, 73:21,
75:12, 76:6,
80:12, 81:23,
98:6, 103:11,
118:2, 118:18,
124:12, 125:14,
126:10, 129:5,
129:13, 136:21,
139:19, 177:6,
192:11, 200:7,
202:25
**reference**
87:1, 97:13,
125:15, 128:25,
130:22, 130:23,
181:4, 181:8,
203:15, 203:25
**referenced**
194:20, 222:15
**references**
37:2, 37:3,
37:25, 87:8,
125:15, 163:19,
202:5, 202:21,
203:3, 203:16,
204:1
**referred**
37:23, 38:5,
59:2, 60:18,
63:18, 65:18,
70:7, 70:10,
72:20, 86:11,
90:25, 91:5,
91:8, 91:9,
102:16, 107:23,
115:11, 155:7,
173:3, 199:18,
205:11, 226:23,
229:12, 233:6,
245:6, 245:15
**referring**
35:17, 37:19,

51:21, 75:11,
76:23, 79:14,
81:4, 92:8,
92:16, 92:19,
98:3, 98:13,
99:18, 101:8,
101:10, 117:17,
119:21, 123:9,
124:18, 125:11,
126:13, 130:18,
130:20, 132:1,
134:9, 137:18,
140:20, 141:10,
159:2, 166:6,
167:8, 167:9,
167:16, 167:17,
169:5, 175:2,
175:21, 181:1,
181:3, 191:17,
197:7, 198:3,
198:4, 198:12,
203:13, 203:15,
209:25, 223:25,
227:22
**refers**
71:2, 86:11,
103:4, 107:1,
121:7, 124:6,
125:8, 130:6,
135:4, 135:15,
179:8
**reflect**
39:8
**reflected**
144:25
**reflects**
15:1
**refresh**
88:24
**refreshed**
89:4
**refreshing**
69:22, 89:22
**regard**
198:5, 218:24
**regarded**
227:17
**regarding**
163:15, 231:1

**registered**
2:11, 248:4
**regularly**
27:14
**regulatory**
227:3, 230:2
**reinsurance**
184:2
**reject**
161:21, 162:1
**related**
19:12, 20:3,
20:8, 21:5,
21:11, 22:8,
24:16, 27:12,
30:11, 36:17,
37:8, 37:25,
62:2, 70:3,
70:13, 71:7,
89:1, 101:21,
125:16, 146:22,
148:19, 148:23,
149:19, 151:23,
153:12, 162:20,
185:13, 248:14
**relates**
34:10, 36:22,
146:16
**relating**
6:4, 6:7, 6:10,
6:13, 6:16,
100:4, 100:8,
100:13, 174:8,
178:6, 180:20,
190:20, 195:11
**relative**
190:8, 220:24,
221:7
**relay**
20:17
**release**
229:22
**relegated**
194:3
**relevance**
145:10, 176:18
**relevant**
19:2, 41:21,

70:5, 71:5,
106:7, 107:7,
107:12, 115:13,
172:4, 172:19,
173:10, 173:12,
173:17, 174:2,
176:11, 176:12,
177:8, 179:1,
186:15, 233:14,
245:20
**rely**
240:14
**remains**
163:25
**remember**
20:24, 27:3,
27:25, 69:13,
91:1, 92:8,
93:23, 102:7,
108:13, 146:5,
188:4
**remind**
52:23, 236:11
**removed**
129:18, 129:20,
129:23, 129:24,
130:3
**renders**
129:22
**repeat**
33:5, 80:25,
83:9, 96:17,
204:22, 208:16,
228:3
**repeated**
76:13, 154:14
**repeating**
52:20, 95:5,
96:13
**rephrase**
120:6, 169:23
**replacing**
75:8
**replay**
214:4
**reply**
5:14, 46:9,
46:11, 56:11,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                289

56:13, 57:11,
59:25, 67:2,
67:20, 96:21,
96:25, 97:19,
101:2, 117:1,
117:8, 117:9,
121:2, 125:6,
126:8, 126:11,
126:12, 129:9,
131:18, 131:19,
134:9, 135:2,
135:22, 140:24,
142:8, 162:4,
162:6, 199:13,
199:22, 201:15,
203:12, 203:19,
214:14, 215:21
**replying**
135:22
**reported**
1:28, 33:2,
185:6, 194:24
**reporter**
2:12, 2:13,
9:8, 10:8,
10:13, 53:3,
87:20, 123:19,
208:20, 243:25,
244:4, 248:4
**reporting**
32:1, 33:24,
33:25, 231:1
**reports**
37:18, 37:24,
41:5, 41:13,
41:19, 45:10,
49:9, 51:20,
55:11, 55:15,
57:9, 64:17,
65:14, 68:25,
72:1, 73:20,
74:21, 74:23,
75:5, 76:1,
76:14, 78:15,
80:25, 81:18,
83:19, 84:9,
84:12, 87:10,
93:15, 103:17,

103:20, 107:24,
123:12, 123:20,
124:12, 124:13,
126:25, 128:7,
131:5, 135:10,
137:23, 140:14,
145:1, 146:25,
153:20, 153:22,
157:12, 161:23,
162:3, 168:5,
169:2, 172:11,
172:22, 177:17,
183:8, 185:25,
186:5, 189:23,
192:18, 194:21,
197:10, 198:1,
201:11, 202:3,
205:4, 214:7,
214:19, 220:6,
222:11, 243:4,
245:11, 245:19,
245:23
**represent**
8:18, 47:23,
48:7, 62:15,
199:14
**representations**
235:19
**representative**
61:2, 63:23
**representing**
8:12, 9:9
**reproducing**
168:8
**request**
11:15, 11:18,
77:5, 243:20,
243:24
**requested**
53:3, 123:19,
208:20, 235:20,
248:13
**require**
36:12, 115:25,
197:12, 225:2
**required**
232:20
**reread**
48:17, 198:13

**research**
22:6, 22:7,
26:25, 35:3,
35:7
**resembling**
179:20
**reserving**
14:21, 241:14
**residences**
16:16
**residual**
66:22, 161:10,
161:11, 229:21
**residues**
227:13, 227:20
**respect**
25:4, 34:8,
87:23, 105:19,
107:24, 108:3,
109:7, 143:23,
145:1, 157:10,
178:10, 183:20,
184:1, 195:24,
197:8, 205:4,
220:19, 220:20,
221:10, 225:8,
227:6, 230:11
**respectfully**
158:24
**respectively**
165:22
**respond**
41:22
**responding**
41:5, 41:19,
85:14, 103:21,
219:23
**response**
52:24, 139:25
**responsive**
5:16, 46:19,
46:25, 47:3,
47:7, 54:17,
56:6, 85:13,
99:1, 99:2,
99:9, 102:22,
115:12, 115:17,
118:1, 203:18

**rest**
110:16, 154:22,
182:23, 193:23,
233:13
**restate**
152:19
**restriction**
14:8
**restrictions**
13:18
**result**
163:22, 231:25
**results**
27:4, 29:20,
31:4, 32:23,
33:2, 33:10,
49:3, 52:10,
58:24, 59:15,
185:5, 200:21,
200:23
**returning**
69:18
**reveal**
200:21, 200:23
**review**
88:12, 94:2,
107:21, 248:13
**reviewed**
42:22, 217:20,
245:10
**reviewing**
55:2
**revised**
57:21
**right**
14:7, 14:18,
15:13, 25:13,
27:21, 27:24,
28:7, 45:19,
52:11, 54:15,
57:5, 66:6,
84:21, 85:17,
86:24, 92:13,
92:14, 94:10,
96:20, 101:11,
112:1, 113:10,
119:17, 122:8,
128:2, 129:25,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                                290

132:10, 132:18,
132:23, 134:14,
138:22, 139:8,
141:5, 144:13,
145:23, 145:25,
149:13, 149:14,
151:14, 152:20,
153:3, 154:11,
163:16, 167:6,
170:7, 170:10,
172:21, 175:3,
175:19, 175:23,
177:12, 178:24,
179:20, 184:11,
192:22, 208:15,
223:10, 223:11,
223:12, 224:20,
224:22, 241:15,
242:21, 243:4,
243:9, 244:8
**right-hand**
179:13, 184:6,
200:19
**rightly**
124:12, 208:23
**rights**
14:21
**risk**
225:2
**rmr**
1:29
**road**
16:13
**rockville**
8:13
**role**
172:6, 175:18,
189:17, 189:20,
219:2, 220:10,
229:23
**roles**
181:15, 191:14
**roman**
48:14, 155:2
**room**
164:5, 177:22,
179:16, 183:22,
194:23, 195:1,

195:19
**rosenman**
3:16, 9:3
**rough**
244:6
**roughly**
17:18, 34:17,
97:5
**round**
98:18
**route**
110:5
**routes**
225:6
**rubric**
25:21
**rule**
9:23, 9:25,
11:7, 11:13,
12:18, 156:24,
157:21, 158:16,
158:18, 240:18,
240:23, 243:13
**rules**
158:4, 240:17,
240:18, 243:23
**running**
28:18, 28:20

---
S
---

**s**
43:23
**said**
11:6, 11:12,
12:10, 13:21,
19:3, 24:25,
33:6, 35:16,
35:17, 35:19,
37:11, 39:3,
40:2, 59:6,
59:7, 60:19,
61:9, 61:13,
62:24, 63:13,
65:6, 67:6,
77:23, 82:8,
82:11, 84:6,
90:2, 92:15,
92:24, 93:22,

94:11, 95:22,
96:4, 105:2,
105:3, 114:20,
149:9, 152:8,
153:25, 168:23,
170:3, 171:3,
172:24, 173:23,
185:19, 199:22,
199:24, 200:14,
204:2, 211:5,
212:21, 216:15,
217:2, 222:18,
224:6, 239:22,
242:15
**salt**
162:15, 163:2,
163:3, 164:22,
164:23, 165:3,
165:4, 204:5,
204:13, 204:15,
204:23, 205:7,
206:3, 207:13,
207:21, 208:9,
210:9
**salts**
210:23
**same**
10:3, 11:2,
19:21, 19:22,
20:12, 29:13,
32:3, 52:12,
52:16, 62:11,
67:15, 72:25,
73:8, 73:11,
76:12, 94:21,
99:1, 102:22,
107:13, 120:14,
130:6, 142:9,
156:13, 160:12,
166:5, 169:6,
194:1, 194:9,
205:3, 208:7,
210:8, 210:25,
213:2, 214:4,
215:1, 217:16,
218:4, 240:10,
242:17
**satisfactorily**
153:7

**satisfy**
102:17
**save**
90:24, 108:15,
117:5, 201:18,
205:17
**saw**
91:2, 91:6
**say**
13:17, 13:25,
14:5, 14:16,
23:11, 24:6,
24:22, 26:10,
26:11, 28:3,
33:1, 33:5,
33:16, 34:1,
34:9, 42:20,
42:24, 44:16,
49:5, 52:12,
53:14, 55:7,
55:17, 61:22,
63:6, 63:12,
69:25, 72:1,
74:13, 74:25,
75:13, 80:3,
82:23, 87:18,
89:24, 92:11,
95:5, 95:12,
98:2, 102:8,
102:23, 107:10,
112:13, 113:8,
114:18, 114:21,
115:7, 117:16,
120:10, 124:9,
132:5, 134:18,
134:20, 135:4,
135:6, 135:12,
144:22, 145:22,
147:5, 147:12,
150:3, 150:8,
150:19, 155:6,
157:24, 160:11,
160:17, 160:20,
162:11, 162:15,
171:15, 172:7,
175:14, 177:11,
177:23, 183:21,
191:12, 201:13,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

291

203:13, 203:16,
205:20, 214:20,
215:4, 217:4,
217:8, 218:6,
218:8, 220:18,
224:24, 227:11,
229:18, 231:21,
233:7, 235:18,
236:17, 239:25,
240:1, 243:1

**saying**
33:24, 57:1,
65:21, 93:1,
93:12, 94:22,
95:9, 95:11,
97:21, 111:8,
123:1, 127:12,
145:17, 148:8,
149:24, 152:10,
167:19, 168:11,
171:25, 172:25,
180:12, 187:5,
197:4, 197:22,
238:10

**says**
12:11, 13:23,
15:17, 48:18,
50:25, 71:2,
78:9, 91:19,
92:12, 96:1,
96:2, 97:9,
99:1, 109:16,
110:8, 110:9,
114:20, 123:2,
128:17, 129:20,
132:24, 140:10,
141:11, 142:22,
148:21, 157:21,
160:1, 160:2,
166:16, 170:19,
172:11, 175:17,
179:4, 182:22,
184:16, 200:23,
225:8, 229:16,
240:23, 242:16

**sb**
19:21, 19:22

**scale**
29:1, 29:2

**scenario**
151:25

**schuler@lw**
3:10

**science**
19:11, 33:11,
74:2, 74:9,
84:15, 86:8,
87:3, 90:22,
91:13

**scientific**
27:16, 202:14

**scientist**
112:17, 114:1,
152:4

**scientists**
200:7

**scope**
139:21, 215:19,
229:4, 233:10,
236:21

**screenshot**
166:9

**se**
18:25, 23:11,
25:22, 26:13,
42:19, 53:5,
54:7, 62:1,
71:8, 82:16,
86:2, 92:24,
117:13, 161:12,
183:4, 209:9,
227:4

**search**
201:23

**searching**
203:20

**second**
91:23, 99:6,
133:14, 138:24,
147:6, 147:12,
182:12, 218:14,
224:1, 243:10

**section**
18:20, 38:7,
42:25, 48:13,
67:15, 67:20,
79:9, 83:24,

98:5, 98:13,
101:1, 102:22,
115:11, 122:22,
125:3, 135:9,
144:16, 147:5,
155:2, 160:19,
160:20, 173:4,
174:16, 175:3,
175:6, 178:11,
202:20, 214:15,
214:18, 226:5,
227:5, 229:3,
229:15, 232:11,
232:24, 233:2,
233:3, 233:13,
233:21, 234:8,
234:20, 245:1

**sections**
55:12

**see**
10:24, 19:22,
20:11, 27:19,
37:19, 38:10,
68:15, 69:23,
71:22, 89:22,
91:7, 91:18,
91:22, 95:25,
101:13, 106:2,
106:4, 109:14,
111:23, 122:9,
123:5, 131:15,
139:11, 139:14,
141:15, 141:21,
142:22, 142:24,
145:11, 154:21,
165:22, 166:11,
166:24, 167:14,
167:15, 168:19,
175:15, 178:14,
178:20, 190:25,
195:16, 200:20,
201:23, 223:21,
223:24, 224:3,
224:10, 224:14,
224:19, 225:10,
225:23, 228:21,
229:3, 230:20,
230:21, 242:1

**seek**
31:17

**seem**
38:18

**seems**
31:11, 44:4

**seen**
49:7, 87:24,
87:25, 88:2,
126:24, 174:17,
197:1, 199:8,
199:21, 199:24,
217:9, 222:7,
222:9

**segment**
244:9

**sense**
14:25, 22:2,
30:11, 48:25,
66:24, 107:4,
143:14, 144:8,
152:14, 162:15,
198:16

**sentence**
48:18, 99:17,
122:7, 122:12,
123:4, 124:22,
125:2, 125:12,
125:14, 125:17,
132:16, 135:11,
135:12, 137:20,
154:18, 175:17,
198:13, 200:19,
205:20, 215:2,
224:24, 225:10,
225:13, 225:14,
225:20, 226:17,
229:6, 229:7,
229:14, 230:22

**sentences**
215:2

**separate**
10:5, 11:9,
15:6, 156:16,
156:22, 157:8,
157:17, 158:1,
158:21, 158:23,
240:6, 243:11,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    292

**243:12**
**separately**
187:17
**separating**
30:19
**separations**
27:12
**serves**
169:19, 218:1
**session**
9:24, 11:14
**set**
48:6, 108:22,
111:25, 147:9,
186:18, 248:8,
248:18
**setting**
59:4, 62:6
**seven**
11:17, 12:16,
12:18, 13:15,
14:3, 14:5,
14:11, 14:13,
15:11, 58:1,
239:10, 239:13,
240:25, 241:1,
241:5, 241:15
**seven-hour**
11:6, 13:5,
13:22
**several**
29:16, 122:1,
157:15, 175:5,
191:2
**shall**
157:21, 240:24
**shape**
90:11
**shared**
15:2, 240:13
**short**
246:4
**shorthand**
100:16, 100:21,
145:3
**should**
9:6, 19:18,
20:10, 38:2,

39:5, 39:7,
42:2, 43:13,
44:25, 45:11,
46:5, 47:19,
54:21, 56:6,
56:7, 71:15,
75:2, 75:23,
78:13, 81:8,
100:2, 100:13,
112:13, 113:8,
135:6, 152:13,
156:8, 156:10,
156:11, 158:25,
171:3, 171:7,
175:14, 177:23,
199:9, 200:10,
201:14, 213:11,
225:3, 231:1,
232:25, 233:20,
240:1, 240:9,
243:14, 244:15,
244:17, 245:9
**shouldn't**
34:25, 245:13
**show**
79:10
**showing**
80:3, 110:6
**shows**
53:7, 182:7,
182:8
**shy**
138:13
**side**
19:6, 54:23
**sign**
243:20
**signature-p1kal**
248:20
**significance**
144:20, 168:9
**significant**
103:20, 116:6,
116:7
**significantly**
59:1
**similar**
61:4, 61:22,

114:22, 130:11
**simple**
11:10, 245:22
**simply**
11:18, 115:9,
126:1, 157:17
**simultaneous**
158:7
**simultaneously**
191:21
**since**
11:19, 23:25,
28:6, 37:9,
74:11, 74:14,
205:11
**single**
10:7, 10:19,
10:21, 11:12,
15:3, 241:8
**sinko**
135:23, 161:22,
162:20, 199:16,
200:14, 202:15
**sinko's**
202:11, 203:15,
215:3, 218:5,
219:24, 245:1,
245:9, 245:17
**sit**
33:16, 43:12,
53:25, 54:5,
54:23, 202:13
**sitting**
88:1, 162:25,
186:5, 188:4,
200:13, 200:16
**situation**
31:21, 31:24,
31:25, 32:4,
32:25, 39:24,
40:8, 151:7
**situations**
40:2, 40:4
**six**
58:1, 239:13,
243:3
**sixth**
130:16

**skill**
248:11
**skilled**
59:16, 60:22,
62:4, 63:18,
64:3, 64:6,
64:7, 64:12,
64:17, 65:3,
65:6, 65:19,
68:20, 70:4,
70:14, 71:4,
71:23, 72:4,
72:22, 73:1,
73:14, 75:8,
78:24, 79:16,
80:4, 80:18,
81:6, 81:19,
81:24, 84:7,
85:22, 93:10,
101:20, 103:22,
127:9, 131:3,
133:12, 133:23,
198:1, 198:10
**skimmed**
68:15, 141:20
**skin**
181:11
**slayback**
1:16, 4:3,
5:12, 8:6, 8:25,
9:17, 9:19,
11:20, 12:14,
13:13, 13:14,
14:12, 21:9,
45:21, 45:23,
46:20, 47:3,
57:25, 61:23,
63:22, 65:17,
68:5, 155:22,
155:24, 156:12,
157:23, 159:7,
159:8, 159:18,
160:22, 165:21,
166:15, 167:4,
168:1, 168:23,
169:1, 169:18,
173:12, 173:20,
173:24, 181:25,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                    293

| | | | |
|---|---|---|---|
| 182:17, 185:12, 186:22, 187:7, 189:16, 197:10, 201:5, 202:5, 205:5, 216:7, 219:2, 219:18, 232:6, 232:13, 233:5, 233:17, 233:21, 234:9, 234:16, 234:21, 235:3, 235:20, 237:7, 237:15, 238:10, 238:13, 238:17, 238:22, 239:1, 240:25, 241:3, 241:23, 242:8, 243:4, 245:15<br>**slayback's**<br>41:6, 41:20, 57:20, 58:9, 58:13, 58:18, 59:4, 59:15, 59:22, 61:2, 61:24, 62:7, 65:14, 66:4, 67:24, 105:5, 130:11, 151:4, 160:14, 160:16, 166:3, 166:25, 168:16, 168:18, 169:7, 170:19, 171:2, 172:12, 172:18, 181:22, 186:9, 188:8, 188:9, 188:16, 211:22, 213:10, 216:19, 218:1, 233:7, 235:10, 235:19, 236:18, 238:4, 243:20<br>**slayback-specific**<br>165:13<br>**slightly**<br>179:19, 209:7<br>**small**<br>34:15, 34:22, 58:7, 67:7, | 119:10, 119:14, 182:2, 208:25, 210:11, 211:1<br>**sodium**<br>58:2, 58:20, 66:6, 66:11, 66:24, 67:23, 68:10, 68:19, 68:23, 71:17, 71:18, 71:19, 71:20, 95:24, 154:19, 155:6, 155:23, 155:25, 159:19, 160:3, 160:9, 160:15, 160:18, 160:21, 160:23, 160:25, 161:4, 161:10, 161:12, 161:17, 162:15, 163:7, 163:9, 163:11, 163:14, 164:3, 164:4, 164:9, 164:17, 166:1, 166:16, 167:5, 168:2, 168:17, 168:24, 169:6, 169:19, 170:8, 171:4, 171:16, 172:8, 172:18, 173:2, 173:5, 173:13, 173:21, 173:25, 199:18, 201:4, 201:7, 201:25, 202:16, 202:25, 213:8, 213:19, 214:1, 214:15, 215:5, 215:7, 215:14, 216:5, 216:10, 216:14, 217:10, 217:11, 217:14, 217:22, 217:25, 219:1, 219:17, 223:18, 223:20, 224:16, 225:8, 227:9, 227:24, 230:3 | **solely**<br>68:8<br>**solid**<br>96:5, 106:11, 114:6, 114:7, 114:8, 114:9, 114:18, 114:19, 116:5, 116:6, 116:8, 116:17, 119:12, 143:9, 154:19, 155:8, 160:9, 161:14, 161:17, 161:24, 162:15, 162:17, 163:2, 163:4, 163:7, 163:9, 163:13, 163:14, 163:23, 163:25, 164:2, 164:4, 164:10, 164:15, 164:18, 165:4, 180:13, 192:20<br>**solids**<br>113:6, 113:24, 164:13, 209:14, 211:6, 211:11<br>**solubility**<br>188:2, 188:19, 188:25, 209:9<br>**solubilizing**<br>163:23<br>**soluble**<br>75:18, 192:8<br>**solute**<br>163:8, 164:3, 164:12, 164:20<br>**solutes**<br>205:8, 208:4<br>**solution**<br>6:20, 113:1, 113:14, 115:4, 116:5, 123:10, 155:25, 161:14, 163:7, 163:14, 164:8, 164:16, 164:22, 188:23, 189:1, 199:6, 200:25, 201:1, | 209:11, 209:14, 210:4, 211:1, 211:6, 211:11, 212:18<br>**solutions**<br>75:19, 112:10, 175:10, 175:22, 177:7, 192:9, 209:5, 210:7, 210:23<br>**solvate**<br>183:5, 183:6<br>**solvating**<br>205:8, 208:4<br>**solvation**<br>183:1<br>**solvents**<br>72:19, 72:20, 73:18, 73:25, 75:17, 79:24, 81:13, 81:25, 82:2, 82:14, 84:4, 84:15, 93:18, 98:15, 100:5, 100:13, 100:24, 101:25, 102:2, 102:10, 102:17, 104:1, 104:11, 105:7, 109:19, 110:10, 110:12, 111:4, 127:7, 128:12, 131:7, 169:1, 173:6, 173:25, 176:2, 176:21, 178:24, 192:7, 198:14, 220:15, 220:21, 220:25, 221:1<br>**some**<br>11:24, 12:3, 12:4, 14:16, 17:15, 25:19, 28:3, 29:5, 29:6, 34:18, 37:24, 39:16, 41:5, 41:16, 42:1, 47:19, |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

294

47:20, 50:21,
58:7, 59:18,
64:18, 65:7,
65:9, 86:18,
87:1, 90:24,
102:4, 104:14,
108:15, 111:21,
117:5, 120:23,
130:11, 148:10,
149:13, 150:5,
152:13, 163:1,
181:7, 185:21,
188:5, 191:17,
192:21, 193:12,
196:13, 196:23,
201:19, 203:8,
203:22, 205:17,
209:20, 210:22,
211:7, 213:12,
221:4, 225:16,
237:10, 239:7,
241:7, 242:13
**somehow**
12:10
**someone**
52:18, 92:15,
185:21, 246:15
**someplace**
81:7
**something**
12:11, 17:3,
18:15, 26:11,
26:23, 34:6,
34:19, 39:16,
49:8, 56:19,
57:4, 60:17,
76:6, 88:14,
92:21, 95:21,
98:9, 104:14,
127:23, 132:19,
159:7, 159:11,
189:15, 194:16,
197:6, 207:13,
209:19, 219:14,
242:16, 242:17,
242:25
**sometimes**
28:1, 33:14,

33:15, 245:5
**somewhat**
209:7, 209:23
**somewhere**
19:22, 45:4
**sorry**
10:8, 23:16,
35:19, 50:4,
52:18, 59:14,
62:21, 71:12,
77:10, 82:9,
91:19, 107:9,
112:24, 115:16,
117:1, 122:15,
124:18, 125:12,
125:24, 127:13,
131:10, 131:16,
132:11, 132:12,
139:17, 148:6,
162:5, 164:25,
166:18, 175:2,
182:13, 187:21,
205:14, 214:10,
223:14, 225:12,
228:3, 237:8,
238:10, 238:19,
244:10
**sort**
21:15, 36:13,
37:4, 44:10,
116:21, 136:2,
189:14, 202:23,
205:3, 211:4
**sound**
27:21, 139:21
**sounded**
137:2, 185:10
**sounds**
27:24, 44:5
**source**
39:7, 39:18,
40:5
**sources**
38:23
**space**
22:11, 25:2
**spans**
223:8

**sparschu**
4:5, 9:1,
13:17, 13:23,
14:2, 14:7,
45:9, 54:21,
87:19, 189:8,
189:11, 203:7,
203:10, 214:1,
214:4, 214:8,
214:11, 228:18
**speak**
40:25, 41:17,
75:5, 76:2,
76:14, 83:20,
123:12, 123:21,
147:1, 158:16,
168:6, 169:3,
172:23, 201:12,
242:15
**speaking**
36:24, 39:12,
55:7, 112:17,
158:7, 165:8,
169:14
**speaks**
62:12, 80:25
**spec**
68:5
**species**
215:9, 216:6,
217:15, 229:21
**specific**
20:5, 32:25,
34:6, 37:18,
39:17, 43:4,
45:21, 62:9,
65:12, 72:24,
74:24, 81:4,
83:7, 84:3,
104:4, 104:14,
108:17, 108:18,
108:19, 111:12,
113:7, 113:9,
113:11, 120:24,
130:9, 137:2,
137:10, 146:13,
146:14, 159:8,
163:18, 183:9,

192:23, 194:16,
194:18, 202:8,
202:21, 206:8,
206:16, 206:23,
209:20, 212:14,
219:21, 222:10,
222:15, 225:5,
234:3, 234:5,
238:13, 238:25
**specifically**
22:4, 24:17,
26:16, 27:2,
27:9, 28:10,
28:19, 35:1,
35:4, 35:12,
36:5, 36:16,
36:20, 37:7,
37:14, 43:7,
58:8, 67:14,
68:19, 74:18,
79:13, 84:1,
89:23, 100:4,
100:8, 103:15,
106:24, 107:1,
107:16, 107:17,
117:11, 162:20,
173:4, 173:11,
177:6, 179:4,
192:25, 231:11,
239:3
**specification**
58:23, 59:21,
62:7, 62:8,
65:17, 79:14,
85:25, 102:12,
121:12, 122:8,
122:13, 129:5,
132:17, 133:8,
133:9, 133:10,
133:25, 141:23,
144:24, 145:9,
173:7, 177:11,
179:4, 192:25,
197:18, 234:4,
234:6, 234:18,
234:23, 235:16,
235:17, 239:5
**specifications**
61:1, 62:2,

63:22, 63:25,
65:15, 119:24,
199:1, 235:2
**specifics**
32:20, 44:8,
91:1, 94:1,
187:23, 216:14
**speed**
58:3
**spend**
158:5
**spent**
15:10
**spherical**
92:18
**spinal**
109:24
**spiral**
56:23
**split**
14:3, 158:14
**sponsors**
231:1
**ss**
248:3
**stability**
218:2, 218:9,
218:11, 218:15,
219:3, 219:18,
220:1, 220:3,
220:10, 220:18,
220:25
**stabilizer**
178:18
**stabilizing**
70:11, 70:25,
71:2, 153:5
**stable**
121:9, 126:18,
135:17, 149:15,
151:16, 153:7
**standalone**
27:6
**standard**
74:10, 99:20,
232:24
**standards**
233:1

**standpoint**
39:21, 50:3,
55:8, 176:7
**start**
72:9, 85:7,
121:1, 197:20,
232:25, 238:20
**started**
83:21, 137:1
**starting**
40:23, 42:15,
42:25, 57:13,
58:10, 58:14,
58:16, 67:20,
67:21, 83:11,
83:25, 122:7,
139:11, 147:3,
147:12, 150:6,
170:18, 232:12,
233:6, 244:11
**starts**
142:20, 142:21,
173:19
**state**
8:18, 15:20,
48:15, 86:2,
103:5, 103:6,
103:8, 103:10,
103:11, 103:12,
115:19, 120:13,
123:14, 175:24,
176:19, 180:1,
180:4, 180:7,
180:13, 184:18,
187:22, 194:25,
195:21, 231:20
**stated**
71:1, 169:18,
187:24
**statement**
24:11, 67:16,
172:18, 176:24,
177:1, 192:10,
215:13, 221:8
**statements**
125:1
**states**
1:1, 8:7, 99:9,

120:16, 160:14,
175:9, 194:11,
224:25
**status**
93:25
**stenotype**
248:10
**step**
58:21, 86:21
**stepping**
86:5
**sterile**
64:15, 114:9,
114:10, 154:3,
198:19
**sticker**
56:25
**stickered**
57:3
**still**
51:8, 67:19,
119:17, 120:12,
134:8, 149:23,
150:7, 150:14,
153:16, 160:12,
161:13, 165:3,
172:7, 185:11,
186:25, 187:6,
190:2, 225:3,
238:5
**stipulate**
241:9, 246:4
**stipulated**
77:5, 95:19,
95:20
**stipulation**
246:23
**stop**
94:17, 94:23,
94:24, 143:18
**stopped**
185:10
**stopping**
63:6
**stops**
181:22
**storage**
48:24, 49:14,

51:3
**story**
214:24, 221:11
**street**
1:26, 2:10,
4:7, 8:15
**strike**
24:19, 30:16,
41:23, 66:14,
125:20
**strive**
32:5, 32:8
**structure**
10:25, 72:23,
147:5
**structures**
139:19
**students**
32:22
**studies**
19:25, 52:5,
52:6, 52:9,
52:12
**study**
52:10
**studying**
24:2, 24:7
**sub**
1:6, 1:13
**subcutaneous**
109:24, 111:20,
112:3
**subject**
19:8, 19:9,
21:25, 22:3,
22:14, 24:23,
86:12, 106:13,
107:18, 143:11,
146:11, 242:6,
242:7, 243:17,
244:25
**subjects**
21:4
**subjunctive**
154:5
**submissions**
29:3, 57:22
**submitted**
28:1, 28:2,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                          296

28:4, 77:10,
163:19
**submitting**
231:4
**subsequent**
36:18, 97:10,
98:7, 98:8
**substance**
148:10, 180:25,
226:20, 226:21,
228:5, 229:10,
229:11, 240:19
**substances**
147:21, 180:23
**substantial**
58:21, 103:19
**substantially**
143:16, 144:10
**substantive**
18:25, 19:3,
69:15, 136:14,
136:16, 230:18
**substituted**
95:12
**substituting**
79:6, 79:18
**sufficient**
121:19, 122:17,
127:14, 127:15,
132:9, 132:21,
132:23, 133:2,
133:5, 133:18,
134:5, 134:22,
136:22, 142:3,
202:11, 203:22
**suffolk**
248:3
**sugar**
164:22
**suggested**
241:6
**suit**
153:1
**suitable**
48:23, 49:13,
51:2, 90:14,
99:14, 109:23,
121:14, 122:15,

131:13, 131:23,
132:21, 133:4,
139:22, 142:10,
189:5, 190:13,
221:14
**suite**
3:7, 3:17, 8:13
**summarize**
57:17, 84:10,
102:23
**summarized**
50:3, 83:8,
83:9
**summarizing**
61:7
**summary**
41:8, 49:25,
50:9, 63:17,
66:9, 72:3,
73:4, 79:9,
84:12, 86:2,
147:14, 213:15,
240:14
**support**
125:6, 125:22,
127:6, 235:20
**supported**
157:18
**supports**
123:8, 124:4
**supposed**
102:13
**suppository**
176:16
**supra**
99:10
**sure**
18:9, 29:12,
31:9, 33:4,
34:4, 34:5,
34:16, 39:11,
41:2, 41:15,
45:4, 48:16,
49:7, 50:6,
53:21, 56:5,
56:19, 69:24,
86:25, 88:1,
89:15, 90:23,

107:15, 110:23,
111:22, 130:10,
134:11, 135:10,
138:12, 138:15,
141:9, 141:16,
144:18, 146:6,
174:21, 175:4,
182:5, 183:18,
186:14, 189:4,
189:6, 196:18,
197:6, 198:4,
199:21, 199:24,
208:14, 217:20,
217:25, 218:20,
219:21, 222:10,
225:19, 234:12,
234:13
**surely**
67:15
**survival**
49:4, 53:18,
54:3, 54:6
**suspend**
12:18
**suspended**
9:23, 11:14
**suspending**
175:11, 175:12,
175:14, 176:6,
177:9
**suspensions**
176:21
**sweet**
179:19
**sworn**
9:10, 9:12,
15:15, 248:9
**system**
75:25, 121:8,
124:6, 125:9,
126:17, 135:16,
147:17, 171:6,
171:8, 173:25,
183:1, 183:6,
183:12, 199:19,
201:2, 202:17,
203:1, 204:6,
204:24, 205:2,

205:6, 205:21,
206:5, 207:2,
207:15, 207:22,
208:3, 208:6,
208:11, 210:10,
210:24, 218:16,
220:4, 226:23,
229:12, 231:14
**systems**
25:23, 36:25

T

**table**
95:18, 163:2,
166:2, 171:11,
172:1, 182:7,
182:20, 182:24,
230:18
**tables**
165:20, 166:10
**tablet**
176:15
**take**
14:24, 18:5,
20:1, 23:1,
23:4, 25:13,
36:2, 36:22,
40:10, 40:15,
55:3, 78:7,
88:12, 96:21,
98:9, 98:17,
117:17, 121:1,
126:5, 136:1,
148:14, 155:22,
162:15, 163:2,
164:12, 168:13,
198:5, 213:22,
216:2, 241:10,
241:15
**taken**
10:6, 69:6,
79:10, 136:7,
173:9, 184:23,
187:17, 222:22,
248:10
**takes**
85:20, 219:9,
219:10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                          297

**taking**
8:14, 190:8
**talk**
10:2, 11:9, 12:6, 42:14, 44:24, 72:22, 80:12, 94:1, 105:5, 113:20, 115:18, 117:11, 142:2, 147:4, 150:4, 151:6, 157:5, 161:23, 202:20, 209:20, 211:17, 212:15, 213:24, 214:19, 218:7, 224:16, 245:8, 245:12
**talked**
42:21, 116:17, 120:20, 157:9, 164:14, 173:1, 173:5, 173:6, 173:7, 206:12, 227:23, 238:24, 242:2
**talking**
74:7, 83:10, 107:16, 107:17, 131:16, 156:3, 163:10, 180:3, 180:4, 191:5, 192:13, 193:17, 208:2, 208:7, 211:15, 214:21, 215:25, 217:17
**talks**
72:18, 124:14, 127:5, 127:19, 127:20, 176:6, 177:6
**taste**
179:19
**taught**
26:6, 27:8, 27:11, 38:18
**tautology**
120:5
**teach**
25:14, 25:16,

25:18, 25:20, 25:24, 26:1, 26:3, 27:1
**teachings**
235:16
**technical**
124:10, 133:15
**technically**
20:16
**technique**
37:12
**techniques**
28:10, 28:11, 28:14
**technology**
16:6, 19:15, 88:9, 89:25, 175:8
**tell**
18:6, 53:10, 56:20, 110:18, 110:20, 110:21, 140:20, 146:18, 185:21, 235:7
**telling**
138:2, 170:15, 171:12
**temperature**
164:5, 177:22, 179:16, 183:22, 194:23, 195:1, 195:20
**temperatures**
177:24
**ten**
17:10, 17:11, 88:23, 239:10
**tend**
36:7
**term**
29:13, 42:13, 42:14, 42:17, 60:19, 69:23, 70:14, 71:6, 74:13, 81:17, 105:5, 108:15, 108:20, 111:22, 115:7, 119:20,

122:4, 127:22, 136:19, 137:16, 145:5, 145:11, 196:18, 196:20, 197:10, 197:22, 198:15, 211:10, 211:20, 212:2, 212:7, 212:19, 216:11
**terminology**
92:5, 99:18
**terms**
26:7, 28:8, 31:3, 35:7, 38:21, 39:6, 81:16, 102:3, 108:8, 111:8, 111:21, 113:4, 113:18, 116:16, 119:20, 128:24, 137:25, 144:23, 145:7, 146:15, 181:18, 204:9, 207:7, 208:15, 208:21, 209:4, 209:22, 211:20, 212:6, 213:1, 213:2, 213:24, 216:10, 217:18
**testimony**
11:19, 14:17, 14:19, 17:5, 17:8, 66:8, 69:16, 80:1, 83:4, 94:18, 95:6, 95:7, 104:24, 136:14, 144:21, 171:22, 210:13, 211:3, 240:20, 241:20, 245:23, 248:8, 248:9
**textbooks**
162:2
**th**
4:7, 248:19
**thank**
46:3, 53:1,

53:4, 55:22, 56:14, 87:21, 91:16, 99:7, 105:17, 139:1, 154:10, 159:15, 174:3, 178:8, 189:10, 203:4, 214:9, 217:24, 224:3, 226:1, 238:19, 240:3, 243:19, 244:21, 246:24
**thanks**
47:9, 216:24, 217:2
**themselves**
8:18, 40:25, 41:17, 59:9, 75:5, 76:2, 76:14, 81:1, 83:20, 119:23, 123:12, 123:21, 147:1, 168:6, 169:3, 172:23, 201:12
**theoretical**
22:10
**theory**
21:22, 22:15, 36:23, 37:10, 37:20, 43:25
**therapeutic**
235:22
**thereby**
215:10
**therefore**
49:11, 150:24, 150:25, 158:23, 226:2
**thereof**
113:6, 189:21
**thermodynamic**
38:2, 189:4, 209:9
**thermodynamics**
21:11
**thesis**
21:20, 21:25,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    298

| | | | |
|---|---|---|---|
| 22:25, 23:7, 24:8, 25:5, 25:6, 25:8 | 19:2, 81:22, 82:23, 191:8, 202:15, 221:22, 226:9, 239:16, 246:6 | 192:18, 193:2, 194:21, 198:13, 211:21, 220:6, 229:25 | 53:25, 157:4, 204:8, 219:12, 219:20, 242:15, 243:8 |
| **they'd** 119:4 | | **time** 8:9, 10:11, | **today's** 8:9, 9:24, |
| **thing** 19:19, 19:21, 48:17, 54:16, 154:23, 194:3, 220:24, 241:6, 241:8 | **through** 6:22, 6:24, 7:5, 7:7, 40:12, 41:2, 41:14, 41:16, 50:4, 50:6, 56:15, | 11:17, 13:19, 14:23, 15:10, 43:24, 65:2, 69:5, 69:8, 77:22, 90:12, 90:24, 108:15, | 244:1 **together** 162:25, 190:5, 199:18, 220:15 **told** 173:12, 173:20, |
| **things** 21:15, 22:24, 32:5, 32:8, 36:1, 36:13, 53:21, 55:24, 76:19, 104:12, 104:16, 106:19, 113:20, 130:11, 133:7, 133:21, 136:23, 137:11, 138:1, 142:4, 144:23, 145:6, 145:8, 154:2, 154:4, 165:10, 169:1, 174:2, 187:17, 190:4, 193:12, 194:1, 199:11, 223:10, 230:12, 239:18 | 58:13, 59:15, 60:25, 61:21, 62:13, 63:14, 66:5, 68:13, 68:14, 68:15, 68:16, 68:18, 69:23, 83:13, 83:22, 84:5, 84:11, 85:19, 88:15, 89:5, 91:10, 92:1, 94:8, 101:13, 106:25, 107:14, 110:21, 111:18, 115:20, 128:6, 128:13, 128:15, 141:20, 146:4, 174:20, 222:2, 222:4, 223:2, | 117:5, 136:6, 136:9, 154:24, 158:5, 183:15, 184:13, 184:20, 184:22, 184:25, 201:19, 202:8, 205:17, 212:17, 216:18, 221:12, 222:19, 222:21, 222:24, 234:21, 238:23, 239:14, 239:24 **timely** 11:1 **times** 16:23, 16:25, 17:7, 17:10, 29:16, 61:19, 67:17, 76:13 | 173:24 **tomorrow** 9:18, 11:19, 12:17, 13:16, 14:12, 156:13, 240:21, 241:5, 241:10, 242:16, 244:12 **took** 20:3, 20:9, 20:22, 20:23, 20:25, 21:3, 21:6, 21:10, 27:6, 169:15, 183:2, 202:9 **top** 18:21, 59:24, 68:4, 73:10, |
| **thinking** 20:21, 45:5, 118:5, 118:18, 119:12, 209:3, 209:16, 210:2 | 223:4, 228:11, 228:13, 230:6, 230:8, 234:12, 235:23, 238:11 **throughout** | **timing** 157:14 **tissues** 139:23 | 166:22, 180:9, 181:25, 226:17 **topic** 178:12 **topics** |
| **third** 96:10, 174:12, 227:12 | 41:3, 41:12, 41:19, 49:1, 50:1, 50:7, | **title** 21:20, 22:2, 25:25, 26:2, | 21:8 **topp** 10:24 |
| **thought** 23:16, 76:8, 77:10, 85:3, 89:16, 132:12, 132:13, 167:15, 167:17, 202:10, 203:21, 212:2, 212:6, 212:21, 245:20 | 57:8, 64:16, 73:20, 78:4, 80:15, 81:18, 82:13, 87:10, 93:14, 102:8, 102:21, 103:17, 134:1, 135:20, 137:23, 167:10, 170:16, 173:4, | 26:21 **titles** 20:24 **today** 8:11, 9:9, 9:17, 9:19, 10:25, 11:14, 11:20, 13:13, | **total** 27:22, 59:24, 65:18, 186:23, 187:12, 187:15, 187:16 **totality** 172:15 **towards** |
| **three** 10:5, 10:23, | 183:8, 189:23, | 14:11, 15:11, 33:17, 43:12, | 20:1, 20:18, 28:24, 83:12 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                        299

**toxic**
35:22, 225:1
**toxicity**
36:11, 139:24,
225:3
**toxicology**
27:12
**trace**
58:18
**transcript**
9:21, 9:22,
10:7, 10:21,
11:13, 12:6,
12:15, 12:17,
13:13, 15:4,
156:15, 156:18,
156:22, 158:6,
240:13, 241:2,
241:11, 241:21,
241:23, 242:4,
243:18, 244:5,
248:13
**transcripts**
157:8, 158:22,
158:23, 243:25
**transformation**
164:24, 164:25
**transporting**
106:13, 107:1,
107:18, 108:20,
143:11, 146:10
**treat**
48:4, 50:9
**treated**
50:12, 50:15,
52:14, 52:15
**treating**
48:8, 240:12
**treatment**
97:10, 227:19,
240:5
**trial**
11:8, 12:23,
17:4, 17:7,
158:18, 240:15,
245:23
**trials**
11:9, 11:10

**tried**
187:22
**tries**
39:3
**trouble**
10:13
**trout**
1:23, 2:8, 5:3,
5:9, 5:11, 5:15,
5:17, 8:4,
15:14, 15:22,
15:24, 15:25,
17:24, 18:3,
45:12, 45:18,
45:22, 46:6,
46:9, 46:11,
46:14, 47:1,
57:11, 69:10,
87:13, 87:23,
87:24, 105:11,
105:19, 105:20,
108:10, 108:25,
109:3, 109:7,
117:4, 122:19,
129:7, 135:5,
138:20, 142:2,
157:10, 173:18,
174:4, 174:11,
174:14, 178:1,
180:16, 181:25,
190:16, 195:7,
199:3, 222:1,
223:1, 224:4,
225:7, 226:11,
226:13, 227:7,
228:9, 228:21,
228:24, 230:4,
230:11, 232:5,
241:17, 246:5,
247:2, 248:7
**trout's**
157:13, 241:20
**true**
32:1, 32:14,
32:15, 33:19,
39:6, 77:8,
77:12, 122:6,
168:10, 248:9

**try**
18:16, 35:14,
55:10, 57:3,
188:6, 193:24,
210:18, 210:19
**trying**
23:11, 27:3,
27:25, 51:24,
67:13, 67:15,
76:24, 80:10,
94:25, 106:23,
145:5, 145:13,
151:5, 152:17,
187:4, 190:4,
205:17
**turn**
18:19, 104:5,
105:25, 109:11,
200:17, 223:7,
228:25, 230:16
**tutelage**
126:6
**twice**
32:15
**two**
10:20, 11:6,
11:9, 11:25,
12:13, 13:4,
13:22, 14:3,
15:5, 18:1,
20:12, 40:11,
58:16, 98:18,
113:7, 116:20,
117:13, 118:24,
119:15, 120:10,
132:18, 135:24,
157:8, 157:17,
158:1, 165:20,
180:12, 187:17,
193:11, 194:1,
203:14, 218:7,
219:7, 239:16,
240:6, 243:17
**type**
36:6, 112:4,
114:14, 116:22,
118:4, 118:6,
118:13, 153:21

**types**
23:13, 35:5,
42:15, 48:4,
113:5, 220:24,
222:13
**typically**
200:7

|        U        |
| --- |

**u**
47:12, 47:16
**ultimate**
97:16, 99:13,
101:18
**unaware**
186:1
**unclaimed**
127:23, 129:4
**uncontested**
218:9
**uncontroversial**
76:9
**under**
10:6, 42:25,
43:9, 70:25,
72:2, 144:15,
150:15, 151:9,
184:6, 195:2,
195:17, 195:22,
224:20, 225:24,
227:16, 229:19,
240:10, 240:11
**underestimating**
31:5, 31:17
**underestimation**
31:10
**undergraduate**
19:25, 20:9,
20:16, 20:19,
21:3, 22:4,
22:7, 26:20,
27:7
**underlined**
103:1, 103:3
**understanding**
9:16, 26:12,
31:11, 33:22,
37:8, 37:11,

38:1, 39:13,
39:14, 40:19,
42:9, 44:21,
47:25, 49:2,
50:18, 55:4,
55:14, 59:10,
60:1, 60:5,
66:16, 74:1,
75:21, 81:14,
82:23, 86:17,
97:11, 108:16,
119:2, 119:22,
124:23, 127:10,
128:7, 137:16,
146:15, 149:1,
152:25, 153:19,
153:25, 163:22,
187:23, 197:11,
227:5, 232:3,
232:19, 232:23,
233:15, 234:22,
234:25, 236:14,
238:16, 238:22
**understandings**
150:5
**understands**
145:15
**understood**
29:23, 72:16,
73:24, 84:6,
85:3, 104:8,
104:11, 212:22,
218:23, 245:21
**undisputed**
105:6, 235:1
**undoubtedly**
242:13
**unfair**
12:25, 13:1
**unfairness**
11:16
**unfortunately**
89:15
**uniform**
79:11
**united**
1:1, 8:7
**university**
19:1, 19:7,

21:18
**unknown**
215:16, 216:6
**unless**
57:4, 244:14
**unlikely**
35:10
**unquote**
173:2
**unrecited**
146:19
**unrelated**
19:11, 24:8,
24:20, 25:6,
147:21, 206:13
**unstable**
75:18, 192:8
**until**
57:14, 85:15,
100:7, 244:5
**unusual**
242:24
**unvalidated**
29:9
**update**
18:14
**updated**
18:9
**upstream**
229:20
**usage**
137:5, 143:22,
205:12, 205:23,
207:6, 209:16,
210:8
**use**
12:9, 28:21,
30:18, 38:24,
49:3, 63:22,
73:7, 81:8,
81:16, 93:11,
99:18, 100:1,
100:10, 100:20,
105:5, 108:14,
110:16, 121:15,
121:19, 122:16,
122:17, 124:19,
127:16, 129:22,

130:7, 131:14,
131:24, 132:22,
139:22, 142:10,
145:11, 197:4,
204:9, 209:7,
209:8, 211:10,
212:5, 219:21,
227:3, 227:4,
229:20, 233:20,
236:8, 236:23
**useful**
51:3
**uses**
58:1, 62:3,
113:18, 177:3,
197:10, 211:17,
211:18
**using**
28:17, 29:12,
29:14, 29:25,
32:24, 43:17,
81:5, 100:16,
100:18, 176:10,
196:3, 196:18,
198:15, 205:3,
219:11, 232:2,
241:20, 242:8

---

**V**

**vague**
34:4, 149:4,
170:1
**validate**
28:17
**validated**
28:14, 28:21,
29:12, 29:16
**validating**
28:24
**validation**
28:11
**validity**
47:7
**value**
32:14, 32:15,
33:19, 78:8
**values**
32:1

**varied**
32:13
**variety**
23:18
**various**
23:21, 25:9,
26:4, 26:12,
27:11, 61:1,
62:3, 68:1,
159:21, 178:11,
192:11, 221:2,
238:12
**varying**
30:4, 145:10
**vehicle**
73:19, 81:17,
99:21, 106:10,
143:8, 182:24
**vehicles**
175:14
**verify**
56:15
**versus**
8:5
**via**
3:15
**vial**
64:15, 114:10,
154:3, 187:13,
187:14, 190:1,
198:19
**video**
8:10, 8:14
**videographer**
4:14, 8:2,
8:11, 9:8, 69:4,
69:7, 136:5,
136:8, 184:21,
184:24, 222:20,
222:23, 244:23,
247:1
**videotaped**
1:23, 2:8, 8:3
**view**
11:23, 14:17,
14:20, 25:11,
60:2, 76:9,
76:10, 76:18,

78:19, 80:20,
83:17, 112:9,
114:3, 114:12,
115:23, 123:8,
124:3, 124:5,
125:22, 127:7,
162:1, 163:24,
164:1, 172:17,
186:11, 189:15,
193:14, 207:20,
209:25, 210:22,
213:9
**viewed**
36:2
**vii**
155:2
**viscosity**
90:14, 175:12
**viscous**
179:14
**vitae**
5:8, 18:2
**vitamins**
178:18
**vocabulary**
99:21
**voice**
8:17
**volatile**
184:16
**volume**
10:14, 10:16,
86:12, 170:24,
182:1, 188:18

**W**

**wabash**
3:7
**wait**
47:5, 57:14,
85:15
**waived**
77:4
**waiver**
235:21, 235:24
**want**
29:12, 30:14,
31:22, 45:1,

54:14, 55:13,
56:18, 57:23,
57:24, 61:20,
61:21, 62:19,
62:21, 63:20,
67:3, 68:7,
76:6, 77:1,
77:3, 77:13,
91:7, 94:8,
112:12, 112:18,
114:1, 116:25,
119:5, 134:19,
135:11, 136:1,
142:4, 150:6,
152:7, 152:23,
159:7, 160:4,
162:18, 163:21,
166:19, 167:8,
175:21, 180:3,
180:7, 183:9,
186:20, 194:15,
196:19, 196:21,
202:22, 204:10,
208:14, 213:16,
213:18, 218:13,
218:20, 219:4,
219:9, 219:13,
220:13, 220:15,
221:7, 221:16,
232:22, 239:24,
242:1, 244:10,
246:6, 246:9
**wanted**
22:10, 24:25,
30:9, 71:25,
157:15, 159:1,
205:23, 225:19,
230:2, 240:6,
240:16
**wants**
12:9, 156:17
**washington**
3:18
**waste**
14:23
**water**
55:12, 55:15,
55:17, 57:8,

57:19, 58:7,
58:11, 58:18,
58:22, 59:1,
59:8, 59:10,
59:18, 60:3,
60:23, 61:6,
61:10, 61:15,
61:25, 62:5,
62:9, 64:1,
64:4, 64:8,
64:13, 64:18,
64:24, 65:3,
65:7, 65:16,
65:18, 65:20,
65:24, 66:5,
66:10, 66:18,
67:9, 67:22,
67:25, 68:6,
160:24, 162:16,
163:1, 163:3,
163:8, 164:23,
174:1, 181:7,
182:3, 196:11,
196:12, 196:14,
196:17, 196:22,
196:23, 209:5,
220:22, 221:6,
221:13
**water-miscible**
178:19
**watkins**
1:25, 2:9, 3:6
**way**
10:22, 12:24,
14:14, 19:23,
27:13, 29:13,
29:15, 33:17,
34:24, 37:10,
37:12, 55:22,
81:10, 128:16,
134:16, 134:19,
135:21, 140:6,
143:24, 149:12,
152:24, 158:15,
171:15, 186:19,
187:24, 189:3,
198:5, 200:1,
205:3, 208:7,

216:22, 219:6,
219:15, 223:10,
235:9, 245:24,
248:16
**ways**
12:13, 26:4,
113:4, 176:10,
190:7
**we'll**
13:21, 14:24,
46:22, 74:20,
105:16, 151:19,
153:9, 161:20,
178:1, 180:15,
183:21, 190:16,
198:5, 201:21,
240:1, 244:19,
246:4
**we're**
12:14, 12:15,
12:19, 12:22,
12:23, 13:12,
13:13, 14:10,
14:21, 29:12,
33:8, 33:9,
35:21, 44:24,
47:4, 47:10,
47:14, 70:2,
83:10, 85:8,
94:1, 96:6,
102:13, 145:5,
145:13, 157:6,
157:16, 158:1,
158:5, 158:19,
158:23, 162:25,
167:11, 180:3,
180:4, 192:13,
200:18, 202:20,
211:15, 213:24,
214:6, 215:25,
216:13, 219:21,
221:25, 222:20,
241:17, 245:8,
246:4
**we've**
10:4, 11:3,
17:24, 27:13,
28:14, 28:15,

35:10, 35:14,
36:10, 48:1,
53:23, 56:12,
60:11, 60:21,
69:2, 88:17,
92:2, 93:1,
93:9, 98:4,
114:23, 116:16,
120:19, 120:20,
126:16, 128:13,
132:16, 135:24,
137:18, 142:18,
173:1, 173:3,
195:25, 197:21,
198:11, 198:21,
204:8, 205:13,
206:11, 219:12,
237:1, 238:9,
239:9, 239:12,
240:11
**weight**
200:24
**welsh**
3:5, 8:22,
14:1, 98:22
**welsh@lw**
3:11
**went**
21:16, 59:15,
89:15
**weren't**
20:4
**west**
4:7
**whatever**
15:10, 19:20,
31:22, 86:16,
118:21, 119:5,
119:13, 151:19,
159:2, 162:22,
164:22, 187:12,
187:14, 187:16,
194:14, 202:3,
202:10, 209:25,
219:6, 242:5,
242:15, 245:18,
246:6, 246:9
**whatnot**
114:24

**whatsoever**
246:5
**whereas**
141:13
**wherein**
73:15, 79:1
**whereof**
248:18
**whether**
33:8, 33:9,
33:18, 43:13,
58:19, 74:16,
74:17, 141:24,
150:9, 171:17,
172:20, 189:15,
200:11, 202:24,
218:8, 218:14,
220:2, 229:21,
236:15, 237:5,
237:14, 238:1,
238:2, 238:3,
245:25, 246:14
**whoa**
62:16, 63:4
**whole**
40:22, 48:17,
78:25, 79:10,
82:16, 83:7,
83:9, 83:24,
84:3, 89:20,
92:25, 93:1,
93:3, 95:10,
98:13, 100:17,
101:4, 102:21,
103:5, 103:12,
103:14, 124:24,
127:1, 133:9,
146:5, 170:16,
171:9, 177:15,
183:2, 183:6,
183:13, 189:1,
233:21, 239:12
**willful**
232:6, 232:11,
232:14, 232:20,
233:15, 234:7,
234:20
**willfulness**
235:20, 236:15

**willing**
241:9
**windels**
4:6, 8:23
**wish**
151:20
**withdraw**
62:25, 162:23,
184:14
**withdrawing**
162:19
**within**
2:13, 16:18,
36:3, 64:25,
85:23, 86:17,
90:2, 118:5,
118:12, 135:9,
139:21, 146:3,
166:9, 233:10,
236:21, 248:5
**without**
39:19, 68:14,
129:25, 139:23,
219:11
**witness**
5:2, 8:20,
9:10, 9:12,
10:1, 10:2,
11:10, 12:7,
12:11, 12:25,
13:2, 17:13,
17:20, 45:3,
46:13, 52:18,
53:4, 55:19,
56:1, 56:8,
56:10, 56:13,
56:21, 57:2,
63:10, 81:2,
87:21, 105:17,
115:16, 148:5,
178:8, 200:14,
221:18, 221:23,
240:19, 242:23,
243:3, 248:7,
248:18
**witness's**
11:18, 63:6
**witnesses**
37:7

**wo**
5:21, 5:23,
5:25, 87:15,
87:17, 105:13,
105:15, 109:2,
109:5, 138:25
**wood**
200:9
**word**
29:15, 72:10,
72:11, 73:7,
73:13, 74:3,
74:10, 75:1,
75:23, 76:9,
76:25, 77:2,
77:5, 77:13,
78:6, 79:19,
81:5, 81:8,
83:17, 84:1,
84:14, 84:20,
85:10, 90:22,
91:13, 92:11,
93:2, 93:5,
94:13, 94:15,
95:7, 95:12,
95:21, 97:22,
98:1, 100:1,
100:11, 101:9,
101:11, 101:23,
103:24, 104:8,
104:22, 108:11,
129:9, 129:19,
129:23, 143:22,
177:10, 197:2,
197:5, 197:11,
197:22, 211:25
**wording**
142:15
**words**
39:8, 39:19,
40:5, 75:8,
79:6, 79:18,
80:5, 80:22,
81:22, 82:16,
82:24, 82:25,
120:21, 123:25,
124:20, 129:24,
134:3, 140:11,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                                    303

| | | | |
|---|---|---|---|
| 141:10, 154:17, 168:10, 186:18, 211:5, 219:22, 232:10 | 57:6, 79:21, 121:25, 146:19, 168:22, 210:20 | **zoom** 3:15, 243:21 | **02420** 16:15 |
| **work** 17:13, 25:7, 28:16, 28:23, 29:1, 29:2, 29:3, 29:4, 34:10, 35:24, 50:21, 51:8, 208:24, 208:25, 211:7, 211:9, 212:19, 242:3, 243:17 | **wrote** 102:21, 226:4, 238:1, 245:19 | **zsm** 22:20 | **065082** 5:23, 105:13, 105:15 |
| | **Y** | **zsm-5** 21:21, 22:16, 23:14, 23:19 | **09** 1:24, 2:5 |
| | **yan** 203:14, 203:25 | **"** | **095533** 5:21, 87:15, 87:17, 138:25 |
| **worked** 34:23, 35:3, 35:4, 35:8, 35:10, 35:12, 36:10 | **yeah** 10:3, 15:9, 30:2, 46:5, 56:5, 57:16, 77:7, 81:2, 89:18, 95:20, 97:3, 114:12, 123:22, 127:14, 133:1, 148:5, 167:18, 172:2, 174:13, 184:9, 185:19, 188:21, 191:8, 208:5, 212:15, 217:24, 225:14, 244:7 | **"cellulose** 199:4 | **1** |
| **working** 30:25, 35:22 | | **.** | **1** 136:6, 136:9, 198:18 |
| **works** 39:14 | | **.1144** 4:11 | **1.3** 229:3, 229:15 |
| **world** 111:10 | | **.3500** 3:19 | **10** 5:24, 8:10, 69:5, 109:1, 109:3, 109:5, 109:7, 222:24 |
| **worse** 50:14, 52:15 | | **.7700** 3:9 | **100** 16:18 |
| **worth** 239:14 | | **0** | **10019** 4:8 |
| **wouldn't** 24:22, 33:17, 34:1, 88:14, 107:6, 107:10, 119:3, 119:9, 127:8, 129:17, 151:1, 151:11, 159:3, 171:10, 171:15, 187:17, 227:8 | **year** 20:12, 43:22 | **00** 244:11 | **103** 147:7 |
| | **years** 16:24, 17:16, 17:18, 17:19, 27:14, 27:23, 35:15, 50:19, 52:10, 88:23, 93:25 | **00065** 8:8 | **104** 147:11 |
| | | **00163** 109:13, 110:2 | **105** 5:23, 72:25, 73:22, 160:13 |
| | **york** 4:8 | **00361447** 7:7, 230:6, 230:8 | **107** 160:22, 205:19 |
| | **yourself** 56:18 | **00361450** 230:17 | **109** 5:25 |
| | **yup** 144:7 | **00361465** 6:24, 223:2, 223:4 | **11** 6:3, 69:8, 174:5, 174:9, 248:19 |
| **write** 39:2 | **Z** | **00361489** 6:22, 222:2, 222:4 | **11,872,214** 5:18, 47:12 |
| **writes** 38:22 | **zeolite** 22:20 | **00361576** 222:2 | **110** 75:13, 192:1, 194:20, 198:12 |
| **written** 92:5, 97:12 | **zeolites** 21:21, 22:16, 23:8, 23:14, 23:19 | **00361577** 7:4, 228:13 | **116** 99:4, 99:8, |
| **wrong** 33:25, 37:21, | | **00361581** 229:1 | |
| | | **02116** 1:26, 8:16 | |
| | | **02139** 16:11 | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    304

| | | | |
|---|---|---|---|
| 100:25 | **156** | **190** | **2010** |
| **12** | 4:7 | 6:14 | 5:25, 106:23, |
| 6:6, 93:25, | **1576** | **1919** | 109:2, 109:5, |
| 136:6, 178:2, | 6:22, 222:4 | 3:17 | 110:20, 239:8 |
| 178:7, 233:25 | **158** | **195** | **2011** |
| **12,138,248** | 67:22 | 6:17 | 239:8 |
| 5:19, 47:16 | **1592** | **1963** | **2012** |
| **120** | 7:5, 228:13 | 43:20 | 5:23, 105:13, |
| 214:10 | **16** | **197** | 105:15 |
| **13** | 6:18, 72:18, | 233:7 | **2014** |
| 6:9, 42:15, | 159:21, 184:22, | **199** | 91:3 |
| 42:25, 48:2, | 199:3, 199:6, | 6:20, 154:25, | **2015** |
| 102:24, 168:13, | 233:23, 248:25 | 155:1 | 5:21, 87:15, |
| 173:2, 180:16, | **161** | **1990** | 87:17, 138:25 |
| 180:21 | 57:19, 67:25 | 19:14 | **202.625** |
| **131** | **163** | **1996** | 3:19 |
| 97:1, 97:2, | 110:4 | 21:17 | **2022** |
| 126:14, 126:20, | **165** | **1:-cv--jlh** | 57:20 |
| 135:6, 135:7 | 57:25, 67:2 | 8:8 | **2024** |
| **132** | **167** | | 57:21, 233:23, |
| 126:14, 135:6, | 58:6 | **2** | 233:25, 234:14, |
| 135:7 | **17** | **2** | 238:12, 238:23 |
| **14** | 6:21, 222:1, | 192:2 | **2026** |
| 6:12, 12:20, | 222:5, 224:4, | **2(a** | 1:24, 2:4, 8:9, |
| 13:3, 14:2, | 224:6, 224:7, | 224:18 | 51:8, 248:19 |
| 15:2, 73:10, | 225:7 | **2(b** | **2028** |
| 169:6, 190:16, | **171** | 224:18 | 248:25 |
| 190:21, 241:17 | 58:8, 67:2 | **20** | **203** |
| **141902** | **172** | 7:6, 16:13, | 235:18 |
| 5:25, 109:2, | 59:3 | 16:25, 17:2, | **205** |
| 109:5 | **174** | 17:16, 17:17, | 233:21 |
| **144** | 6:5 | 40:23, 41:13, | **20850** |
| 79:8 | **178** | 52:10, 88:19, | 8:14 |
| **1456** | 6:8, 173:19 | 90:5, 90:17, | **21** |
| 7:8, 230:6, | **179** | 91:2, 196:11, | 85:16, 115:11, |
| 230:8 | 172:13 | 230:5, 230:9, | 115:19 |
| **1482** | **18** | 230:11 | **212.237** |
| 6:24, 223:2, | 5:9, 6:23, | **200** | 4:11 |
| 223:4 | 223:1, 223:5, | 1:26, 2:10, | **214** |
| **15** | 226:11, 226:13, | 8:15 | 40:12, 42:22, |
| 5:4, 6:15, | 227:7 | **2000** | 43:2, 44:20, |
| 70:10, 106:1, | **180** | 200:24 | 47:11, 47:21, |
| 142:19, 166:8, | 6:11 | **2006** | 47:23, 48:7, |
| 195:5, 195:7, | **19** | 3:18, 174:6, | 49:19, 49:22, |
| 195:12 | 7:3, 16:9, | 174:15, 190:18 | 50:15, 50:25, |
| **151** | 16:10, 139:11, | **2009** | 51:18, 53:17, |
| 203:11, 203:13 | 228:10, 228:14, | 74:4, 74:11, | 54:2, 64:15, |
| **152** | 228:21, 228:24 | 74:14 | 69:19, 70:9, |
| 203:24 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

305

**70:24, 71:16,**
72:8, 73:12,
74:18, 92:23,
93:12, 111:13,
112:21, 113:7,
115:1, 115:22,
117:20, 117:21,
119:9, 122:20,
124:4, 137:25,
140:13, 140:16,
145:12, 153:1,
176:12, 177:4,
179:2, 198:17,
206:20, 233:23,
237:3, 238:14,
238:23
**22**
139:11
**22.7**
170:21
**222**
6:22
**223**
6:24
**228**
7:5
**229**
27:18
**23**
130:15, 130:17
**230**
7:8, 34:13
**235**
223:19, 224:1,
224:24, 226:4
**236**
223:8, 223:13,
223:14, 226:6,
226:7, 227:12
**237**
230:13, 231:22
**24**
1:8, 1:15, 8:8,
9:7, 28:20,
38:10, 121:2,
122:11, 125:6,
126:8, 128:16,
131:9, 131:12,

131:17, 134:9,
135:2, 135:21,
137:3, 137:19,
140:24, 142:7,
147:4
**242**
228:17, 228:18,
228:22, 229:18
**248**
40:12, 42:22,
43:2, 44:20,
47:15, 47:23,
48:7, 49:22,
50:16, 51:18,
53:17, 54:2,
69:19, 73:5,
73:10, 74:18,
79:2, 92:23,
93:12, 111:13,
112:22, 113:7,
115:2, 115:22,
117:21, 119:9,
137:25, 140:13,
140:16, 145:12,
153:1, 176:12,
177:4, 179:2,
206:21, 233:24,
237:4, 238:14,
238:23
**25**
16:24, 17:17,
17:18, 72:24,
161:16, 164:5,
170:20, 187:8,
187:11
**27**
192:1
**2800**
3:7

**3**

**3**
169:6, 184:22,
184:25
**3+**
35:11, 35:19,
36:3
**3.2**
159:22

**30**
90:6, 122:21,
128:25, 150:8,
240:18, 240:23,
243:13
**31**
150:13
**312.876**
3:9
**32**
129:8
**33**
122:21, 128:25,
129:8, 184:25
**330**
3:7
**361469**
226:14
**361496**
225:15
**361577**
228:11
**361592**
228:11
**38**
203:9
**39.45**
170:23, 187:9

**4**

**4**
222:21
**40**
34:18, 214:1,
214:11, 214:14,
215:1
**400**
8:13, 58:10,
159:22, 160:16,
169:8, 170:25,
171:5, 173:22,
177:20, 182:4,
182:25
**41**
91:15, 91:18
**42**
218:5
**44**
102:24, 122:20

**448**
231:21
**45**
5:11, 5:13
**451**
8:12
**46**
5:15, 5:17,
91:19
**47**
5:18, 5:19,
79:9, 91:18
**496**
224:9

**5**

**5**
170:23, 222:24,
247:3, 247:4
**50**
136:9
**502**
16:10
**51**
109:11, 222:21
**53**
168:14
**54**
69:5
**55**
182:1, 247:3,
247:4
**56**
4:7, 122:20
**57**
48:15, 49:17,
50:3, 50:4,
64:23, 169:5
**58**
122:21

**6**

**6**
58:2
**60**
43:23
**60611**
3:8

**61**
170:18, 173:19, 187:6
**62**
72:18, 73:22, 173:20, 182:1, 187:6
**63**
99:10
**632511**
1:30
**64**
1:8, 9:7
**65**
1:15, 232:12, 233:6, 236:17
**66**
115:19
**67**
83:25

**7**

**70**
154:13, 154:17
**73**
57:12, 57:13, 57:17, 67:20
**74**
57:18
**76**
58:2
**77**
16:9
**79**
58:15
**791**
200:18

**8**

**80**
59:25, 68:4
**800**
3:17
**84**
223:9
**85**
223:9
**87**
5:21

**9**

**9**
1:24, 2:5, 8:10, 244:11
**91**
214:11, 215:1