# EXHIBIT 12

# (PART 2)

# UNREDACTED PUBLIC VERSION

637.                                REDACTED

638.    In sum, the POSA would have considered the formulation of bendamustine to be a major challenge.  The POSA would have considered a wide range of options in developing an improved bendamustine formulation, which I discuss below.  The POSA would not have been able to predict which of these many different approaches—or combinations of approaches— would have been successful.

### 1.    Lyophilization

639.    Dr. Pinal and Dr. Yates opine that, when pursuing an improved bendamustine product, the POSA would have been motivated to pursue a liquid formulation because liquid formulations are more "convient" than lyophilized formulations, including because liquid formulations do not require reconstitution.  *See* Pinal Rep. ¶ 153; Yates Rep. 47–51.  I disagree. In my opinion, before considering pursuing a liquid bendamustine formulation, the POSA would likely have considered pursuing an improved lyophilized formulation instead.

640.    As explained above, Dr. Pinal acknowledges that, as with any pharmaceutical product, the POSA would have been motivated to pursue a "stable liquid formulation with few impurities." *See* Pinal ¶ 157–159; ¶ 626.  In my opinion, the POSA's motivation to create a stable formulation would point the POSA away from liquid formulations and towards lyophilized formulations.  As explained above, the POSA would have understood that lyophilized

290

EAGLEBEN-SA_00001601

formulations provide greater stability than liquid formulations given bendamustine's susceptibility to hydrolysis and other chemical reactions. Because the mobility of the molecules or ions in lyophilized formulations is much more limited than the mobility of the molecules or ions in liquid formulations, such reactions would be less likely to occur. *See* ¶¶ 148–149. Indeed, Dr. Pinal admits that the POSA would have expected that reducing the mobility of the molecules in the formulation would reduce the rate of such chemical reactions in arguing that the POSA would have expected refrigeration to decrease reaction rates. *See* Pinal Rep. ¶ 159.

641.    Furthermore, the prior art would have discouraged the POSA from pursuing a non-lyophilized bendamustine formulation. As of the priority date, at least two different lyophilized formulations had been marketed in Germany (since 1971) and the United States (since 2008). *See* Brittain 2006; ¶ 150. The failure of others to successfully market a non-lyophilized bendamustine product would have motivated the POSA to prefer lyophilization. *See* ¶ 150. Olthoff 1983 and Drager '006, the sources of the only prior-art non-lyophilized bendamustine formulations that Dr. Pinal cites, would not have motivated or provided reason for the POSA to pursue a liquid formulation in the face of this knowledge. *See* ¶¶ 151–167, 199–279.

642.    Accordingly, in my opinion, the POSA would likey have continued to pursue an improved lyophilized formulation—as many researchers continued to do after the priority date—in an effort to address the factors that Dr. Pinal and Dr. Yates opine would have motivated or provided reason for the POSA to pursue a liquid formulation (i.e., convenience). *See* U.S. Patent Publication No. 2014/0142153; Bairu & Dundigalla, *Formulation and In-Vitro Evaluation of Cancer Formulation Using Lyophilization Technique with Cyclodextrin Derivative*, 6 WORLD J. PHARM. & PHARM. SCI. 2534, 2547–49 (2017); Pinal Rep. ¶ 153.

EAGLEBEN-SA_00001602

643.    REDACTED

644.    In addition to lyophilization, the POSA would have considered other methods for preparing dehydrated bendamustine drug products.  For example, as of the priority date, researchers had demonstrated that evaporative foam drying could be used as an alternative to lyophilization.  *See, e.g.*, International Patent Publication No. WO/2008/143782 ("Vehring 2008").  Researchers subsequently applied evaporative foam drying to develop improved bendamustine formulations that were easier to produce and more stable than comparable lyophilized formulations.  *See* Hajare et al., *Foam Dried Composite Glass: An Alternative to*

EAGLEBEN-SA_00001603

*Lyophilization for Stability Enhancement of Bendamustine Hydrochloride*, 10 RES. J. PHARM. & TECH. 1602, 1603, 1607, 1609 (2016) (citing Vehring 2008) ("Hajare 2016"). I understand that Hajare 2016 is not prior art. However, such references provide further evidence that the POSA would have considered evaporative foam drying, or other alternatives to lyophilization, based on the publications that were available as of the priority date.

### 2.    pH Adjustment

645.    I disagree with Dr. Pinal's and Dr. Yates's opinion that the POSA would have been motivated to pursue a non-lyophilized bendamustine formulation in the first instance. However, to the extent that the POSA would have been motivated or had reason to pursue a non-lyophilized formulation, the POSA would have considered pH adjustment to be a promising option for increasing the solubility and stability of bendamustine.

646.    As of the priority date, the POSA would have understood pH adjustment to be a promising option for increasing the solubility of bendamustine in the formulation. In general, the POSA would have understood that pH adjustment can be used to increase the solubility of ionizable molecules. *See* Strickley 2004 at 202, JDG_BENDA_00003290 at 3291 ("If the molecule is ionizable, then pH adjustment can be used to increase water solubility because the ionized molecular species has higher water solubility than its neutral species."). The POSA would have further understood that bendamustine is a weak base and ionizable, for example, because both commercially available bendamustine formulations, Ribomustin® and Treanda®, contained bendamustine in the form of the hydrochloride salt. *See* Ribomustin® Product Monograph at 8 (2005), JDG_BENDA_00000001 at 8; Treanda® Label at 1 (2008), JDG_BENDA_00003382 at 3382. This would have motivated the POSA to pursue pH adjustment.

293

EAGLEBEN-SA_00001604

647.    Additionally, the POSA would have understood pH adjustment to be a promising option for increasing the stability of the formulation.  In particular, the POSA would have known that the hydrolysis of the nitrogen mustard group of bendamustine is pH dependent and is inhibited in acidic conditions.  *See* Maas 1994 Translation at 1, JDG_BENDA_00002261 at 2264 ("In a highly acidic solution, hydrolysis is made difficult by protonation of the free electron pair on the nitrogen.").  This would have further motivated the POSA to pursue pH adjustment.

648.    To the extent that the POSA believed pH adjustment to be insufficient, the POSA would have understood that this option could be used in combination with the other approaches discussed below, such as the use of a co-solvent system or complexing agents.  *See, e.g.,* Strickley 2004 at 225, JDG_BENDA_00003290 at 3314 ("If complexation alone is insufficient, then a combination of complexation and pH modification . . . or/and cosolvent may be used.").  The POSA would have been motivated to try these options before using a co-solvent system composed entirely of non-aqueous solvents.  *See id.* at 225–26, JDG_BENDA_00003290 at 3314–15 ("If the drug is not solubilized by pH modification, cosolvents, complexation, or combinations of these, the drug is considered 'challenging.'  Surfactants are used to solubilize some of the most water-insoluble drugs, and the formulations are usually concentrated drug solutions in a completely organic solvent(s) that is diluted prior to intravenous administration . . . .").

649.                        REDACTED

294

EAGLEBEN-SA_00001605

REDACTED

650.                          REDACTED

### 3.    Chloride Concentration

651.    I disagree with Dr. Pinal's and Dr. Yates's opinion that the POSA would have been motivated to pursue a non-lyophilized bendamustine formulation in the first instance. However, to the extent that the POSA would have been motivated or had reason to pursue a non-lyophilized formulation, the POSA would have considered increasing the chloride ion concentration to be a promising option for increasing the stability of bendamustine.

652.    As of the priority date, the POSA would have known that bendamustine was more stable in aqueous formulations in the presence of chloride ions. Maas 1994 Translation at 1, JDG_BENDA_00002261 at 2264 ("In addition to the pH value, the chloride ion concentration has a significant impact on the hydrolysis equilibrium. It is preferred that the bendamustine hydrochloride be regenerated as the chloride ion concentration increases, which suppresses the

295

EAGLEBEN-SA_00001606

formation of the hydroxyl derivative."). This would have motivated the POSA to pursue increasing the chloride ion concentration.

653. To the extent that the POSA believed increasing the chloride ion concentration to be insufficient, the POSA would have understood that this approach could be used in combination with the other approaches discussed above and below, such as the use of pH adjustment, complexing agents, or co-solvent systems.

654. REDACTED

655. REDACTED

296

EAGLEBEN-SA_00001607

REDACTED

### 4.    Complexing Agents

656.    I disagree with Dr. Pinal's and Dr. Yates's opinion that the POSA would have been motivated to pursue a non-lyophilized bendamustine formulation in the first instance. However, to the extent that the POSA would have been motivated or had reason to pursue a non-lyophilized formulation, the POSA would have considered complexing agents to be a promising option for increasing the solubility and stability of bendamustine.

657.    As of the priority date, the POSA would have understood complexing agents to be a promising option for increasing the solubility of bendamustine. Complexing agents are molecules that can form soluble complexes with insoluble drugs. *See* Broadhead 2001 at 339, JDG_BENDA_00000404 at 413. For example, cyclodextrins are cyclic oligosaccharides with a relatively hydrophobic central cavity and a hydrophilic outer surface. *See* Strickley 2004 at 213–14, 223–24, JDG_BENDA_00003290 at 3302–3303, 3312–3313; Broadhead 2001 at 339, JDG_BENDA_00000404 at 413; Akers 2002 at 2287, JDG_BENDA_00000166 at 170. "Cyclodextrins can increase the equilibrium solubility of some hydrophobic molecules by forming a noncovalent inclusion complex if the molecule, or a portion of the molecule (i.e., nonpolar sidechain or an aromatic or heterocyclic ring) is of the appropriate size to fit inside the central cavity." Strickley 2004 at 213–14, JDG_BENDA_00003290 at 330. This would have motivated the POSA to pursue complexing agents.

658.    The POSA would have understood that, as of the priority date, multiple cyclodextrin-containing drug products, including injectable drug products, such as Sporanox® (which contains hydroxylpropyl-β-cyclodextrin), had been approved in the United States and other countries. *See* Strickley 2004 at 214, JDG_BENDA_00003290 at 3303 ("In recent years,

297

there has been a tremendous amount of research and development devoted to cyclodextrin-based drug delivery . . . which has resulted in several commercial oral and injectable cyclodextrin-based products throughout the world."), 223–24, JDG_BENDA_00003290 at 3312–3313; Broadhead 2001 at 339, JDG_BENDA_00000404 at 413. Assuming that Dr. Pinal is correct that the POSA would have considered approved products in pursuing a non-lyophilized bendamustine formulation, the POSA would have been motivated by these examples to pursue complexing agents.

659.    Based on prior-art bendamustine formulations, the POSA would have understood that complexing agents were a promising option for increasing the solubility and stability of bendamustine. For example, as of the priority date, researchers had demonstrated that polysaccharides, including cyclodextrins, could be used to stabilize bendamustine. *See* U.S. Patent Publication No. 2011/0015245 ¶ 18 (U.S. Provisional Application No. 61/271366 (filed Jul. 20, 2009)) ("Alakhov 2011b") ("Preferred polycationic polymers include quaternized polysaccharides such as Polyduaternium 10 (Hydroxyethylcellulose ethoxylate quaternized), quaternized dextran, and quaternized cyclodextrin."); U.S. Patent Publication No. 2011/0015244 (U.S. Provisional Application No. 61/271365 (filed Jul. 20, 2009)) ("Alakhov 2011a"). Researchers had also stabilized bendamustine using various phosphoester carriers. *See* Pencheva et al., *HPLC Study on the Stability of Bendamustine Hydrochloride Immobilized onto Polyphosphoesters*, 48 J. PHARM. BIOMED. ANAL. 1143, 1145–49 (2008). These disclosures would have motivated the POSA to pursue complexing agents as a formulation option.

660.    The fact that researchers continued to experiment with complexing agents after the priority date provides further evidence that the POSA would have pursued complexing agents as an alternative to—or in combination with—co-solvent formulations. As discussed below,

298

EAGLEBEN-SA_00001609

Cephalon and SupraTek Pharma, Inc. ("Supratek") collaborated to develop cyclodextrin-based formulations. *See* U.S. Patent No. 8,383,663 ("Alakhov 2013"); International Patent Publication No. WO 2012/127277 ("Alakhov 2012"); International Patent Publication No. WO 2010/097700 ("Popek 2010"); ¶ 826. I understand that such post-priority date activities are not prior art. However, they provide additional evidence that the POSA would have pursued complexing agents at the time of the priority date.

661. Dr. Pinal opines that, when formulating a bendamustine drug product, the POSA would have considered publications relating to other nitrogen mustards. Assuming, for the sake of argument, that Dr. Pinal is correct, such publications would have further motivated the POSA to pursue complexing agents, including cyclodextrins. For example, as of the priority date, researchers had demonstrated that cyclodextrin carriers could be used to increase the solubility and/or stability of chlorambucil and melphalan. *See* Loftsson et al., *The Effects of 2-hydroxypropyl-fl-cyclodextrin on the Solubility and Stability of Chlorambucil and Melphalan in Aqueous Solution*, 57 INT'L J. PHARM. 63, 66–71 (1989); Salmaso et al., *New Cyclodextrin Bioconjugates for Active Tumour Targeting*, 6 J. DRUG TARGETING 379, 387–88 (2007). I understand that Dr. Anslyn has opined that the POSA would have understood that chlorambucil, melphalan, and bendamustine are aniline mustards, which would exhibit similar properties with respect to the reactions in their nitrogen mustard moieties. *See* Anslyn Rep. ¶ 51. Thus, these publications would have motivated the POSA to pursue complexing agents.

### 5.    Dendrimers

662. I disagree with Dr. Pinal's and Dr. Yates's opinion that the POSA would have been motivated to pursue a non-lyophilized bendamustine formulation in the first instance. However, to the extent that the POSA would have been motivated or had reason to pursue a non-

EAGLEBEN-SA_00001610

lyophilized formulation, the POSA would have considered dendrimers to be a promising option for increasing the solubility and stability of bendamustine.

663.    As of the priority date, the POSA would have understood dendrimers to be a promising option for increasing the solubility of bendamustine. Dendrimers are highly branched, synthetic macromolecules. *See* Cheng et al., *Dendrimers as Drug Carriers: Applications in Different Routes of Drug Administration*, 97 J. PHARM. SCI. 123, 123 (2008) ("Cheng 2008"). Dendrimers can increase the solubility of hydrophobic drug molecules, such as bendamustine, by encapsulating them inside their central cavities. Cheng 2008 at 123, 126. Dendrimers also have a high-density of functional groups, which can be used to improve solubility or reactivity. Cheng 2008 at 123–26. Dendrimers had been used in a wide variety of pharmaceutical contexts, including injectable anti-cancer drugs. *See id.* at 127–32; Fuchs et al., *A Surface-Modified Dendrimer Set for Potential Application as Drug Delivery Vehicles: Synthesis, In Vitro Toxicity, and Intracellular Localization*, 10 CHEM.-EUR. J. 1167, 1167–68 (2004). This would have motivated the POSA to pursue dendrimers.

664.    Based on prior-art bendamustine formulations, the POSA would have understood that dendrimers were a promising option for delivering bendamustine. As of the priority date, researchers had identified polyamidoamine dendrimers as a promising delivery vehicle for anti-cancer drugs and prodrugs. *See* Fuchs 2004 at 1167–68. Subsequently, researchers, including one of the Fuchs 2004 authors, demonstrated that the same dendrimeric structures could be used to deliver bendamustine. *See* Scutaru et al., *Optimization of the N-Lost Drugs Melphalan and Bendamustine: Synthesis and Cytotoxicity of a New Set of Dendrimer-Drug Conjugates as Tumor Therapeutic Agents*, 21 BIOCONJUGATE CHEM. 1728, 1728 (2010) ("Scutaru 2010") ("These positive results induced us to bind melphalan and bendamustine directly or through a

300

EAGLEBEN-SA_00001611

cleavable maleimide spacer to the dendrimers **G0** and **G1** (see Figure 1) synthesized in a former SAR study (17).""). I understand that Scutaru 2010 is not prior art. However, such references provide further evidence that the POSA would have pursued dendrimers based on the publications that were available as of the priority date.

665.    Dr. Pinal opines that, when formulating a bendamustine drug product, the POSA would have considered publications relating to other nitrogen mustards. Assuming, for the sake of argument, that Dr. Pinal is correct, such publications would have further motivated the POSA to pursue dendrimers. For example, as of the priority date, researchers had demonstrated that dendrimers could be used to deliver melphalan prodrugs. *See* Erez & Shabat, *Self-Immolative Dendrimers Based on Quinone Methides*, *in* QUINONE METHIDES 119, 126–32 (Steven E. Rotika ed., 2009). Thus, to the extent the POSA would have considered publications relating to other nitrogen mustards, those publications would have motivated the POSA to pursue dendrimers.

### 6.    Emulsions

666.    I disagree with Dr. Pinal's and Dr. Yates's opinion that the POSA would have been motivated to pursue a non-lyophilized bendamustine formulation in the first instance. However, to the extent that the POSA would have been motivated or had reason to pursue a non-lyophilized formulation, the POSA would have considered emulsions to be a promising option for increasing the solubility and stability of bendamustine.

667.    As of the priority date, the POSA would have understood emulsions to be a promising option for increasing the solubility and stability of bendamustine. An emulsion is a dosage form consisting of two liquid phases, typically an oily phase and an aqueous phase, in which the first phase (referred to as the internal phase) is dispersed in the form of droplets in the second phase (referred to as the continuous phase). *See* Strickley 2004 at 223, JDG_BENDA00003290 at 3322; Broadhead 2001 at 340, JDG_BENDA_00000404 at 414.

301

EAGLEBEN-SA_00001612

"Oil-in-water emulsions are useful for the parenteral administration of drugs which have significant delivery problems." Prankerd & Stella, *The Use of Oil-in-Water Emulsions as a Vehicle for Parenteral Drug Administration*, 44 PDA J. PHARM. SCI. & TECH. 139, 139 (1990). Among other benefits, emulsions can be used to increase solubility and hydrolytic stability, reduce irritation and toxicity, and direct drug delivery to specific organs. *See* Prankerd & Stella 1990 at 139–45. This would have motivated the POSA to pursue emulsions.

668. The POSA would have understood that, as of the priority date, multiple oil-in-water emulsion drug products, including injectable products, such as Diprivan®/Diazemuls®, Intralipid®, Liposyn®, and Lipofundid®, had been approved for use in the United States and other countries. *See* Strickley 2004 at 223, JDG_BENDA00003290 at 3322; Broadhead 2001 at 340, JDG_BENDA_00000404 at 414. Assuming that Dr. Pinal is correct that the POSA would have considered approved products in pursuing a non-lyophilized bendamustine formulation, the POSA would have been motivated by these examples to pursue emulsions.

669. Dr. Pinal opines that, when formulating a bendamustine drug product, the POSA would have considered publications relating to other nitrogen mustards. Assuming, for the sake of argument, that Dr. Pinal is correct, such publications would have further motivated the POSA to pursue parenteral emulsions. For example, as of the priority date, researchers had demonstrated that parenteral emulsions could be used to stabilize chlorambucil against water-based degradation. *See* '229 publication ¶ 85; Ganta et al., *Pharmacokinetics and Pharmacodynamics of Chlorambucil Delivered in Parenteral Emulsion*, 360 INT'L J. PHARM. 115, 120 (2008). I understand that Dr. Anslyn has opined that the POSA would have understood that chlorambucil and bendamustine are both aniline mustards, which would exhibit similar

302

EAGLEBEN-SA_00001613

properties with respect to the reactions in their nitrogen mustard moieties. *See* Anslyn Rep. ¶ 51. Thus, these publications would have further motivated the POSA to pursue parenteral emulsions.

670.    Dr. Pinal opines that the POSA would not have selected "vegetable oils" and "nontoxic glycerol esters" as possible solvents because they "are not miscible with water." Pinal Rep. ¶ 187 n.7.  However, the inventors of the '229 publication suggested that their alcohol-lipid emulsions could be diluted into an aqueous solution for administration (normal saline or 5% dextrose). *See* '229 publication ¶ 84.  As such, even if Dr. Pinal is correct that an entirely oil-based composition might be immiscible in water, *see* Pinal Rep. ¶ 187 n.7, the POSA would have understood that parenteral emulsions with droplet sizes allowing for intravenous administration could be used to incorporate an oily phase into formulations that were ultimately intended for intravenous administration.

### 7.    Liposomes

671.    I disagree with Dr. Pinal's and Dr. Yates's opinion that the POSA would have been motivated to pursue a non-lyophilized bendamustine formulation in the first instance. However, to the extent that the POSA would have been motivated or had reason to pursue a non-lyophilized formulation, the POSA would have considered liposomes to be a promising option for increasing the solubility and stability of bendamustine.

672.    As of the priority date, the POSA would have understood liposomes to be a promising option for increasing the solubility and stability of bendamustine.  In short, a liposome is an artificial vesicle composed of one or more phospholipid bilayers surrounding an aqueous core. *See* Strickley 2004 at 224, JDG_BENDA_00003290 at 3313; Broadhead 2001 at 343, JDG_BENDA_00000404 at 417.  Liposomes can act as carriers for either lipophilic drugs (which can reside among the hydrophobic "tails" of the phospholipids) or hydrophilic drugs (which can reside in the aqueous cavity or near the polar "heads" of the phospholipids).  *See*

303

EAGLEBEN-SA_00001614

Strickley 2004 at 224, JDG_BENDA_00003313. Liposomes can have multiple advantages over co-solvent liquid formulations, including potentially improved pharmacokinetics, enhanced efficacy, and reduced toxicity. *See* Strickley 2004 at 224, JDG_BENDA_00003290 at 3313 ("Liposomal formulations provide several therapeutic advantages over the native drug formulations, including improved pharmacokinetics (increased *in vivo* half-life of the drug), enhanced efficacy, and reduced toxicity."). This would have motivated the POSA to pursue liposomes.

673. The POSA would have understood that, as of the priority date, multiple liposomal drug products, including injectable anti-cancer drug products, had been approved for use in the United States. *See* Strickley 2004 at 224, JDG_BENDA_00003290 at 3313; Broadhead 2001 at 343, JDG_BENDA_00000404 at 417. Assuming that Dr. Pinal is correct that the POSA would have considered approved products in pursuing a non-lyophilized bendamustine formulation, the POSA would have been motivated by these examples to pursue liposomes.

674. Based on prior-art bendamustine formulations, the POSA would have known that liposomes were a promising option for increasing the solubility and stability of bendamustine. As of the priority date, researchers had demonstrated that liposomal formulations could be used to effectively deliver bendamustine. *See* U.S. Patent Publication No. 2008/0193511 ("Massing 2008"); T.J. Evjen, Development of Improved Bendamustin-Liposomes (Master's Thesis, University of Tromsø) (2007). For example, Massing 2008 describes methods for manufacturing bendamustine liposomes comprising hydrogenated egg phosphatidylcholine and cholesterol. *See* Massing 2008 at ¶¶ 129–130, 242. According to Massing 2008, such methods overcome hydrolysis problems associated with conventional bendamustine liposomes. *See* Massing 2008, at ¶¶ 129–130. Such disclosures would have motivated the POSA to pursue liposomes.

304

EAGLEBEN-SA_00001615

675. The fact that researchers continued to experiment with bendamustine liposomes after the priority date provides further evidence that the POSA would have pursued liposomal formulations. As discussed below, Cephalon and Celator Pharmaceuticals, Inc. ("Celator") collaborated to develop liposome formulations. *See* ¶ 826. Researchers relying on the above-cited references also continued to publish bendamustine liposome research. *See* International Patent Publication No. 2011/005714; Momekova et al., *Formulation of Bendamustine Hydrochloride in Long Circulating DPPC: CHOL Liposomes, Surface Modified with PEO-Based Co-Polymer Bearing Four Lipid Mimetic Units*, 59 PHARMACY 24, 28–30 (2012). I understand that such post-priority date activities are not prior art. However, they provide additional evidence that the POSA would have pursued liposomes at the time of the priority date.

676. Dr. Pinal opines that, when formulating a bendamustine drug product, the POSA would have considered publications relating to other nitrogen mustards. Assuming, for the sake of argument, that Dr. Pinal is correct, such publications would have further motivated the POSA to pursue liposomes. For example, as of the priority date, researchers had demonstrated that liposomal formulations could be used to increase the efficacy and/or reduce the toxicity melphalan, chlorambucil, and prodrugs of those molecules. *See* Khato et al., *Carrier Activity of Sonicated Small Liposomes Containing Melphalan to Regional Lymph Nodes of Rats*, 26 PHARMACOLOGY 230, 236–39 (1983); Kirby & Greoriadis, *The Effect of Lipid Composition of Small Unilamellar Liposomes Containing Melphalan and Vincristine on Drug Clearance After Injection into Mice*, 32 BIOCHEM. PHARM. 609, 610–14 (1983); Kunitsova et al., *Liposomes Loaded with Lipophilic Prodrugs of Methotrexate and Melphalan as Convenient Drug Delivery Vehicles*, 19 J. DRUG DELIVERY SCI. & TECH. 51, 56–58 (2009); Pederson, *Synthesis and Biophysical Characterization of Chlorambucil Anticancer Ether Lipid Prodrugs*, 52 J. MED.

EAGLEBEN-SA_00001616

CHEM. 3408, 3410–11 (2009).  I understand that Dr. Anslyn has opined that the POSA would have understood that chlorambucil and bendamustine are both aniline mustards, which would exhibit similar properties with respect to the reactions in their nitrogen mustard moieties.  *See* Anslyn Rep. ¶ 51.  Thus, these publications would have further motivated the POSA to pursue liposomes.

### 8.    Polymeric Implants/Microparticles

677.    I disagree with Dr. Pinal's and Dr. Yates's opinion that the POSA would have been motivated to pursue a non-lyophilized bendamustine formulation in the first instance.  However, to the extent that the POSA would have been motivated or had reason to pursue a non-lyophilized formulation, the POSA would have considered polymeric implants and microparticles to be a promising option for increasing the stability of bendamustine.

678.    As of the priority date, the POSA would have understood polymeric implants and microparticles to be a promising option for stabilizing bendamustine formulations during storage.[9]  Polymeric implants and microparticles may be based on a variety of biodegradable and non-biodegradable matrix formers, including, often, polymeric excipients.  Such systems may be implanted or injected into the body to provide a controlled, sustained release of a drug over time, especially as anti-cancer drug treatments.  *See* Fung & Saltzman, *Polymeric Implants for Cancer Chemotherapy*, 26 Advanced Drug Delivery Rev. 209, 211–14 (1997).  Because such systems are stored in a dry state, any chemical reactions occur substantially more slowly than in liquid formulations.  *See* ¶ 640.  In addition, by trapping or encapsulating the drug molecule within a network of macromolecules (i.e., the polymeric matrix), such systems can help protect the drug

---

[9] In contrast with "implants," microparticles are much smaller, typically, about 1–100 μm.  Their small size facilitates administration.  *See* Fung & Saltzman 1997 at 213–14.

306

EAGLEBEN-SA_00001617

molecule from degradation upon administration. *See* Fung & Saltzman 1997 at 209 ("When anticancer drugs are encapsulated in polymers, they can be protected from degradation."). This would have motivated the POSA to pursue polymeric implants and microparticles.

679.    The POSA would have understood that, as of the priority date, multiple polymeric anti-cancer drug products (including Decapeptyl®, Gliadel®, Lupron Depot®, Zoladex®) had been approved for use in the United States and other countries. *See* Fung & Saltzman 1997 at 215. For example, Gliadel® is an alkylating anti-cancer drug that was supplied in the form of a polymeric wafer and surgically implanted. *See* Fung & Saltzman 1997 at 215. Gliadel® Label 2 (2003). To the extent that the POSA would have been motivated to pursue a non-lyophilized formulation, the POSA would have found such a delivery system to especially attractive, given that it would permit the bendamustine to be stored in a dry state, where it would be less susceptible to hydrolysis and other forms of degradation. *See* ¶¶ 59, 678. The POSA would also know that such a system would avoid the precipitation concerns that the POSA would face in the event that she or he were to pursue a formulation for parenteral administration. In addition, researchers had demonstrated that many other types of injectable polymeric drug delivery systems could be used to deliver a broad variety of anti-cancer drugs. *See* Fung & Saltzman 1997 at 216. Assuming that Dr. Pinal is correct that the POSA would have considered approved products in pursuing a non-lyophilized bendamustine formulation, the POSA would have been motivated by the above-mentioned examples to pursue polymeric implants and microparticles.

680.    In developing a bendamustine polymeric implant or microparticle formulation, the POSA would have had numerous formulation options, including the administration route (surgical implantation, intramuscular injection, subcutaneous injection), type of polymeric matrix former (e.g., polyesters, polyanhydrides, poly(ortho esters), silicone elastomers, poly(ethylene-

307

co-vinyl acetate), polyacrylates, proteins, polysaccharides), type of manufacturing process (e.g., compression, extrusion, solvent evaporation, spray drying), and composition (e.g., drug:polymer ratio, addition of other excipients, etc.). *See* Fung & Saltzman 1997 at 216.

### 9. Prodrugs

681. I disagree with Dr. Pinal's and Dr. Yates's opinion that the POSA would have been motivated to pursue a non-lyophilized bendamustine formulation in the first instance. However, to the extent that the POSA would have been motivated or had reason to pursue a non-lyophilized formulation, the POSA would have considered prodrugs to be a promising option for increasing the solubility and stability of bendamustine.

682. As of the priority date, the POSA would have understood prodrugs to be a promising option for increasing the solubility and stability of bendamustine. A prodrug is a pharmaceutically inactive drug derivative that converts into the active drug in the patient's body. *See* Stella, *A Case for Prodrugs, in* PRODRUGS CHALLENGES AND REWARDS 3, 5 (Stella et al. eds., 2007). Prodrugs can be used to improve the solubility, stability, and pharmacokinetic properties of the parent drug. *See* Stella 2007 at 2–23; Stella, *Prodrugs as Therapeutics*, 3 EXPERT OPINION ON THERAPEUTIC PATENTS 277, 277 (2004). This would have motivated the POSA to pursue prodrugs.

683. The POSA would have understood that, as of the priority date, numerous, commercially successful prodrugs had been approved for use in the United States and other countries. *See* Stella 2007 at 6–7, 16–23; Stella 2004 at 280. For example, between 2001 and 2002, approximately 20–22% of all new chemical entities approved in the United States were prodrugs. *See* Stella 2007 at 6. Assuming that Dr. Pinal is correct that the POSA would have considered approved products in pursuing a non-lyophilized bendamustine formulation, the POSA would have been motivated by these examples to pursue prodrugs.

EAGLEBEN-SA_00001619

684.    Prior-art bendamustine formulations would have further motivated the POSA to pursue prodrugs.  As of the priority date, researchers had suggested the use of bendamustine prodrugs in liquid formulations.  *See, e.g.*, Drager '006, 2:32–35, JDG_BENDA_00000990 at 996 ("The present invention is directed to liquid pharmaceutical formulations comprising bendamustine, or a pharmaceutically acceptable salt or prodrug thereof, and a polar aprotic solvent."); International Patent Publication No. WO 2007/002931 ¶ 359 ("In one embodiment, the present invention provides a method of treating cancer by administering a phosphoramidate alkylator produg of the invention with a cancer treatment regimen using at least the alkylator Melphalan, Chlorambucil, or Bendamustine.").  Such disclosures would have motivated the POSA to consider prodrugs.

685.    The fact that researchers continued to experiment with bendamustine prodrugs after the priority date provides further evidence that the POSA would have pursued prodrugs.  As discussed below, Cephalon, including several of the Drager '006 inventors, attempted to develop alkyl ester bendamustine prodrugs.  *See* International Patent Publication No. WO 2014/075035; ¶ 826.  Researchers also demonstrated that certain bendamustine esters provided greater potency against certain cancer cells, either as prodrugs or as active molecules.  *See* U.S. Patent No. 9,452,988; U.S. Patent No. 8,809,549; Huber et al., *Esters of Bendamustine Are by Far More Potent Cytotoxic Agents than the Parent Compound against Human Sarcoma and Carcinoma Cells*, 10 PLoS ONE e0133743, at 7–21 (2015).  I understand that such post-priority date activities are not prior art.  However, they provide additional evidence that the POSA would have pursued prodrugs at the time of the priority date.

686.    Dr. Pinal opines that, when formulating a bendamustine drug product, the POSA would have considered publications relating to other nitrogen mustards.  Assuming, for the sake

309

of argument, that Dr. Pinal is correct, such publications would have further motivated the POSA to pursue prodrugs. For example, as of the priority date, researchers had prepared prodrugs and other derivatives of chlorambucil and melphalan, which demonstrated improved solubility, stability, and/or potency and reduced toxicity relative to the parent drugs. *See* Genka et al., *Development of Lipophilic Anticancer Agents for the Treatment of Brain Tumors by the Esterification of Water-Soluble Chlorambucil*, 11 CLINICAL & EXPERIMENTAL METASTASIS 131, 136–40 (1993); Pederson 2009 at 3410–11; Urbaniak et al., *Design and Synthesis of a Nitrogen Mustard Derivative Stabilized by Apo-neocarzinostatin*, 47 J. MED. CHEM. 4710, 4712–13 (2004); Vijayaraghavan et al., *Enhanced Hydrolytic Stability and Water Solubility of an Aromatic Nitrogen Mustard by Conjugation with Molecular Umbrellas*, 14 BIOCONJUGATE CHEM. 667, 669–71 (2003). I understand that Dr. Anslyn has opined that the POSA would have understood that chlorambucil and bendamustine are both aniline mustards, which would exhibit similar properties with respect to the reactions in their nitrogen mustard moieties. *See* Anslyn Rep. ¶ 51. Thus, these publications would have further motivated the POSA to pursue prodrugs.

### 10.    Nanoparticles

687.    I disagree with Dr. Pinal's and Dr. Yates's opinion that the POSA would have been motivated to pursue a non-lyophilized bendamustine formulation in the first instance. However, to the extent that the POSA would have been motivated or had reason to pursue a non-lyophilized formulation, the POSA would have considered nanoparticles to be a promising option for increasing the solubility and stability of bendamustine.

688.    In this report, I describe liposomes and dendrimers separately (due to their unique phospholipid bilayer structures and molecular structures, respectively), even though liposomes, dendrimers, and certain drug-polymer complexes (depending on their size) are generally regarded to be nanoparticles. *See* Robertson & Ferrari 2007 at 4–7.

310

EAGLEBEN-SA_00001621

689.    As of the priority date, the POSA would have understood nanoparticles to be a promising option for increasing the solubility and stability of bendamustine.  Nanoparticles are "nanoscale" delivery vehicles that can carry a drug or prodrug.  *See* Robertson & Ferrari 2007 at 4–7.  Unlike conventional delivery vehicles, injectable nanoparticle systems can be designed to particularly target cancer cells, improving efficacy and reducing toxicity.  *See* Robertson & Ferrari, *Introduction and Rationale for Nanotechnology in Cancer Therapy, in* NANOTECHNOLOGY FOR CANCER THERAPY 3, 3 (Mansoor M. Amiji ed. 2007).  As of the priority date, researchers had demonstrated that nanoparticles could be used to deliver a diverse group of anti-cancer drugs.  *See* Robertson & Ferrari 2007 at 4–7.  This would have motivated the POSA to pursue nanoparticles.

690.    Prior-art bendamustine formulations would have further motivated the POSA to pursue nanoparticles.  In addition to the teachings regarding liposomes and dendrimers, discussed above, *see* Massing 2008; ¶¶ 662–665, 672–676, researchers had demonstrated that polymer-based nanoparticles could be used to deliver bendamustine, among other anti-cancer drugs.  *See* U.S. Patent No. 8,912,212 at 13:43–47, ex. 13 (U.S. Provisional Application No. 61/286,897 (filed Dec. 16, 2009)).  Such disclosures would have motivated the POSA to pursue nanoparticles.

691.    The fact that researchers continued to experiment with bendamustine nanoparticles after the priority date provides further evidence that the POSA would have pursued bendamustine nanoparticles.  As discussed below, Cephalon, Celator, and Particle Sciences, Inc. attempted to develop polymer- and lipid-based bendamustine nanoparticle formulations.  *See* U.S. Patent No. 9,452,988; U.S. Patent No. 9,149,464; International Patent Publication No. WO 2014/164957; ¶ 826.  Researchers also demonstrated that polymer-based bendamustine

311

EAGLEBEN-SA_00001622

nanoparticles could provide enhanced potency. *See* Gidwani & Vyas, *Formulation, Characterization and Evaluation of Cyclodextrin-Complexed Bendamustine-Encapsulated PLGA Nanospheres for Sustained Delivery in Cancer Treatment*, 21 PHARM. DEV. & TECH. 161, 168–70 (2016). I understand that such post-priority date activities are not prior art. However, they provide additional evidence that the POSA would have pursued bendamustine-loaded nanoparticles at the time of the priority date.

692. Dr. Pinal opines that, when formulating a bendamustine drug product, the POSA would have considered publications relating to other nitrogen mustards. Assuming, for the sake of argument, that Dr. Pinal is correct, such publications would have further motivated the POSA to pursue nanoparticles. For example, as of the priority date, researchers had demonstrated that solid lipid nanoparticle formulations could be used to stabilize chlorambucil. *See* Sharma et al., *Formulation and Pharmacokinetics of Lipid Nanoparticles of a Chemically Sensitive Nitrogen Mustard Derivative: Chlorambucil*, 367 INT'L J. PHARM. 187 (2009). I understand that Dr. Anslyn has opined that the POSA would have understood that chlorambucil and bendamustine are both aniline mustards, which would exhibit similar properties with respect to the reactions in their nitrogen mustard moieties. *See* Anslyn Rep. ¶ 51. Thus, these publications would have further motivated the POSA to pursue nanoparticles.

### 11. Oral Dosage Forms

693. I disagree with Dr. Pinal's and Dr. Yates's opinion that the POSA would have been motivated to pursue a non-lyophilized bendamustine formulation in the first instance. However, to the extent that the POSA would have been motivated or had reason to pursue a non-lyophilized formulation, the POSA would have considered oral dosage forms to be a promising option for increasing the solubility and stability of bendamustine.

312

EAGLEBEN-SA_00001623

694.    As of the priority date, the POSA would have understood oral formulations to be a promising option for increasing the solubility and stability of bendamustine.  Common types of oral formulations include tablets, capsules, solutions, suspensions, and pellets.  *See* Strickley 2004 at 202, JDG_BENDA_00003290 at 3291.  Among other advantages, solid oral formulations can be stored in a dry state, which would substantially slow hydrolysis and other degradation processes; and can be administered without the assistance of a physician or nurse, in a form that is convenient for patients.  For these reasons, as of the priority date, numerous oral drug products, including numerous anti-cancer drugs, had been approved in the United States and other countries.  *See* Strickey 2004 at 202–07, JDG_BENDA_00003290 at 3291–96.  This would have motivated the POSA to pursue oral formulations.

695.    Based on prior-art bendamustine formulations, the POSA would have understood that oral dosage forms were a promising option for increasing the solubility and stability of bendamustine.  As of the priority date, researchers had proposed multiple oral bendamustine formulations as an alternative to lyophilized or injectable formulations.  *See* International Patent Publication No. WO 2010/126676 ("LaBell 2010") (U.S. Provisional Application No. 61/173423 (filed Apr. 28, 2009)), JDG_BENDA_00003775; International Patent Publication No. 2010/063476 (filed Dec. 3, 2009); International Patent Publication No. 2010/063493 (filed Dec. 3, 2009); Preiss 1985.  For example, LaBell 2010, which relates to Cephalon's investigation into oral bendamustine formulations, states that, in comparison with injectable formulations, oral formulations are "generally more convenient and less invasive for the patient, lending to improved patient outcomes."  LaBell 2010, JDG_BENDA_00003776 at 3776.  LaBell 2010 also states that it was "well known in the art that bendamustine is susceptible to nucleophilic attack by, for example, certain hydroxyl-containing compounds such as water and alkylene glycols such

313

as ethylene glycol and propylene glycol." LaBell 2010, JDG_BENDA_00003776 at 3776. Such disclosures would have motivated the POSA to pursue oral formulations.

696. The fact that researchers continued to experiment with oral bendamustine formulations after the priority date provides further evidence that the POSA would have pursued oral dosage forms as an alternative to an injectable drug product. *See, e.g.*, U.S. Patent No. 9,907,752; U.S. Patent Publication No. 2015/0374670; U.S. Patent Publication No. 2015/0050210; U.S. Patent Publication No. 2013/0209558; U.S. Patent Publication No. 2012/0003305. I understand that such post-priority date activities are not prior art. However, they provide additional evidence that the POSA would have pursued oral formulations at the time of the priority date.

697. Dr. Pinal opines that, when formulating a bendamustine drug product, the POSA would have considered publications relating to other nitrogen mustards. Assuming, for the sake of argument, that Dr. Pinal is correct, such publications would have further motivated the POSA to pursue oral dosage forms of bendamustine formulations. For example, as of the priority date, oral anti-cancer drugs containing chlorambucil (Leukeran®), cyclophosphamide (Cytoxan®), estramustine phosphate (Emcyt®), and mephalan (Alkeran®) had been approved for use in the United States and other countries. *See, e.g.*, Leukeran® Label 2003; PHYSICIAN'S DESK REFERENCE 1037–38 (55th ed. 2001) (Cytoxan®); Emcyt® Label 2008; Alkeran® Label 2003; Strickley 2004 at 221, JDG_BENDA_00003290 at 3310. I understand that Dr. Anslyn has opined that the POSA would have understood that chlorambucil and bendamustine are both aniline mustards, which would exhibit similar properties with respect to the reactions in their nitrogen mustard moieties. *See* Anslyn Rep. ¶ 51. Thus, at least the publications relating to those molecules would have further motivated the POSA to consider oral formulations.

314

EAGLEBEN-SA_00001625

### 12.    Surfactants

698.    I disagree with Dr. Pinal's and Dr. Yates's opinion that the POSA would have been motivated to pursue a non-lyophilized bendamustine formulation in the first instance. However, to the extent that the POSA would have been motivated or had reason to pursue a non-lyophilized formulation, the POSA would have considered surfactants to be a promising option for increasing the solubility and stability of bendamustine.

699.    As of the priority date, the POSA would have understood that surfactants were a promising option for increasing the solubility and stability of bendamustine. Surfactants are molecules containing both hydrophobic and hydrophilic moieties that can self-assemble into "miscelles" at critical concentrations. *See* Rowe 2009 at 209, JDG_BENDA_00003290 at 3298. Accordingly, surfactants can increase the solubility of drug molecules either by acting as direct co-solvents or by encapsulating the drug molecules within the misclles. *See* JDG_BENDA_00003290 at 3298. This would have motivated the POSA to pursue surfactants.

700.    The POSA would have understood that, as of the priority date, multiple surfactant-containing drug products, including injectable drug products, such as Cordorone® and Etoposide®, had been approved in the United States and other countries. *See* Broadhead 2001 at 338, JDG_BENDA_00000404 at 412. Assuming that Dr. Pinal is correct that the POSA would have considered approved products in pursuing a non-lyophilized bendamustine formulation, the POSA would have been motivated by these examples to pursue surfactants.

701.    As explained above, Dr. Pinal opines that the POSA would have been motivated to use excipients based on their "–OH burden" (i.e., unweighted hydroxyl group "concentrations"). See ¶¶ 247–278. Many common surfactants have lower hydroxyl group "concentrations" than other molecules, such as PEG or PG. For example, Cremophors and polysorbates may be used as either surfactants or co-solvents. *See* Rowe 2009 at 209, 228,

315

JDG_BENDA_3290 at 3298, 3317; Broadhead 2001 at 338, JDG_BENDA_00000404 at 412. As I explain below, Cremophor EL, Cremophor RH 60, polysorbate 20, polysorbate 40, and polysorbate 80 all have lower unweighted hydroxyl group "concentrations" than PEG 400 and PG. *See* ¶¶ 728, 733, 800. Assuming that Dr. Pinal is correct that the POSA would have been motivated to minimize the unweighted hydroxyl group "concentration" in the formulation, the POSA would have been preferred to pursue a surfactant formulation based on those molecules rather than pursue a PEG 400 and/or PG-based co-solvent formulation, to minimize esterification reactions with bendamustine.

### 13. Solvents

702. I disagree with Dr. Pinal's and Dr. Yates's opinion that the POSA would have been motivated to pursue a non-lyophilized bendamustine formulation in the first instance, much less a liquid co-solvent formulation. However, even if the POSA would have been motivated or had reason to pursue a liquid co-solvent formulation, the POSA would have needed to consider numerous possible co-solvents, many of which are not described in Dr. Pinal's or Dr. Yates's reports. Given the numerous options available to the POSA, in my opinion, the POSA would not have been motivated or had reason to make the claimed formulations. The POSA also would not have had a reasonable expectation of success in making the claimed formulations.

703. As an initial matter, the POSA would only have considered a co-solvent approach if a sufficiently soluble and stable formulation could not be obtained by adjusting the pH of the formulation or increasing the number of chloride ions. *See* Strickley 2004 at 225, JDG_BENDA_00003290 at 3313 ("If the drug is not solubilized sufficiently by pH modification, the next change is to increase solubility by using a water-soluble organic solvent."). Moreover, to the extent that the POSA would have considered a co-solvent approach, the POSA would also have considered the above-mentioned options.

316

EAGLEBEN-SA_00001627

704.    Furthermore, as noted by the quote in Strickley 2004, and as discussed at length above, the POSA would prefer to use an aqueous co-solvent composition (that is, a formulation with a significant amount of water and an organic solvent).  *See* ¶¶ 170–196.  All of the following solvents discussed in this section could be used in conjunction with a significant amount of water.

705.    The POSA would have understood that a formulation could contain multiple different solvents.  For example, VePesid® contains 60% PEG 300, 30% ethanol, 8% Tween 80 (Polysorbate 80), and 3% benzyl alcohol.  *See* Strickley 2004 at 219, JDG_BENDA_00003290 at 3308.  Vumon® contains 50% Cremophor EL, 42% ethanol, 6% DMA, and 30 mg/mL benzyl alcohol.  *Id.* at 220, JDG_BENDA_00003290 at 3309.  And Valium® contains 40% PG, 10% ethanol, 1.5% benzyl alcohol, and about 45% water.  *Id.* at 216, JDG_BENDA_00003290 at 3305.  As these examples illustrate, the POSA would have known that a co-solvent formulation could include two, three, four, or even more solvents.

706.    Based on that knowledge, the POSA would have known that there were at least 9108 possible co-solvent combinations (22 + 231 + 1540+ 7315) that could be used to formulate a liquid bendamustine composition.  Specifically, as explained below, the POSA would have known that there were at least 18 different solvents that could be used in a liquid bendamustine combination.  *See* ¶¶ 702–811.  Dr. Pinal and Dr. Yates also argue that the POSA would have considered PEG 300, PEG 400, and PG.  The POSA would have also known that each of those solvents could be used in combination with a significant amount of water.  *See* ¶ 704.  Thus, assuming Dr. Pinal and Dr. Yates are correct about PEG 300, PEG 400, and PG, the POSA would have understood that there were at least 22 (= 18 + 3 + 1) possible one-solvent combinations, 231 (= [22 × 21] ÷ 2) possible two-solvent combinations, 1540 (= [22 × 21 × 20]

317

EAGLEBEN-SA_00001628

÷ [3 × 2]) possible three-solvent combinations, and 7315 (= [22 × 21 × 20 × 19] ÷ [4 × 3 × 2]) possible four-solvent combinations. In addition, because the ratios between those solvents could be varied arbitrarily within those combinations, the POSA would have understood that there were an infinite number of possible solvent ratios.

707. Dr. Pinal opines that "parenteral formulators have a limited number of acceptable inactive ingredients, or 'excipients,' that can be used to develop formulations for human administration." Pinal Rep. ¶ 44. Elsewhere in his report, Dr. Pinal opines that the POSA "would have been focused on . . . FDA-approved excipients," and Dr. Pinal appears to use this argument to significantly narrow the range of excipients that the POSA would have considered. Pinal Rep. ¶ 169. Dr. Yates expresses a similar opinion. *See* Yates Rep. ¶ 73.

708. To the extent Dr. Pinal and Dr. Yates argue that the formulator would only have considered excipients that had been used in approved parenteral products in the United States, I disagree. To be sure, the POSA would have considered those solvents that had been used previously in marketed drugs approved by the FDA, and I agree with Dr. Pinal that the POSA would have consulted references such as the FDA's Inactive Ingredient Database, as well as articles reviewing marketed products, such as Nema 1997 and Strickley 2004. *See* Pinal Rep. ¶ 47. I cite those sources extensively in this report. Below, I reproduce Table IV of Strickley 2004, which contains a list of the water-soluble solvents in commercially available injectable formulations in the United States at the time that Strickley 2004 was published.

318

**Table VI.** List of Water-Soluble Solvents and Surfactants in Commercially Available Injectable Formulations

| Solvent | % in Marketed formulation | % Administered | Route of administration* | Selected examples |
|---|---|---|---|---|
| Cremophor EL | 11–65 | ≤10 | IV infusion | Paclitaxel |
| | 50 | 18 | Intravesical | Valrubicin |
| Cremophor RH 60 | 20 | <0.08 | IV infusion | Tacrolimus |
| Dimethylacetamide (DMA) | 6 | ≤3 | IV infusion | Teniposide |
| Ethanol | 5–80 | ≤6 | SC | Dihydroergotamine |
| | | ≤10 | IM | Phenytoin |
| | | ≤10 | IV infusion | Paclitaxel |
| | | ≤20 | IV bolus | Paricalcitol |
| Glycerin | 15–32 | ≤15 | IM, SC, IV | Dihydroergotamine |
| | | ≤2.5 | IV infusion | Idarubicin |
| N-methyl-2-pyrrolidone (Pharmasolve) | 100 (diluent) | 100 | Subgingival | Doxycycline |
| | 10 | 100 | SC | Leuprolide |
| PEG 300 | ≤60 | ≤50 | IM, IV bolus | Methocarbamol |
| PEG 400 | 18–67 | ≤18 | IM | Lorazepam |
| | | ≤9 | IV bolus | Lorazepam |
| Polysorbate 80 (Tween 80) | 0.075–100 | ≤4 | IM | Chlordiazepoxide |
| | | 12 | IM | Vitamin A |
| | | ≤0.4 | IV bolus | Amiodarone |
| | | ≤2 | IV infusion | Docetaxel |
| Propylene glycol (PG) | 10–80 | ≤80 | IM | Lorazepam |
| | | ≤68 | IV bolus | Phenobarbital |
| | | ≤6 | IV infusion | Medroxyprogesterone |
| Solutol HS 15 | | | IV | Diclofenac |
| | 50 | 50 | IV | Propanidid |
| | 7 | 7 | IV | Vitamin K$_1$ |

* IM, intramuscular; IV, intravenous; PEG, polyethylene glycol; SC, subcutaneous

709.    However, in my opinion the formulator also would have known that new excipients could be "qualified" for use in parenteral products. This process involves performing a series of toxicological experiments to demonstrate that the excipient is safe for delivery via the intended route. *See* Ctr. for Drug Evaluation & Research & Ctr. for Biologics Evaluation & Research, U.S. Food & Drug Admin., *Guidance for Industry: Nonclinical Studies for the Safety Evaluation of Pharmaceutical Excipients* at 7–8 (2005) ("FDA Qualification Guidance 2005") (describing requirements for injectable products). To be clear, the POSA would have preferred not to need to conduct these experiments. However, particularly for difficult-to-formulate molecules like bendamustine, the POSA would have understood that "qualifying" a new

319

EAGLEBEN-SA_00001630

excipient was a reasonable option, and the POSA would not have ignored an excipient simply because it had not previously been used in a parenteral product.

710.    As such, in addition to looking at lists of excipients that had previously been used in parenteral products, the POSA also would have looked at the pharmaceutical and toxicological literature—including pharmaceutical patents—for potential excipients that might solubilize and/or stabilize bendamustine.  The POSA would have been particularly interested in safety or toxicology data for potential solvents, since such data would assist with "qualifying" the excipient.  Toxicology publications for a particular solvent would also guide the formulator in setting a limit on the quantity of that solvent to use.  The POSA would also have considered solvents in formulations that had been approved or developed in Europe, Japan, and other countries, according appropriate weight to the particular country, as evidence that those solvents would have possessed the needed characteristics.

711.                                        REDACTED

712.    Drager '006's disclosures further confirm my opinion that, when formulating liquid bendamustine compositions, the POSA would not have been confined to solvents that had

320

EAGLEBEN-SA_00001631

previously been used in parenteral products. For example, the Drager '006 inventors experimented with tetrahydrofuran, dimethylformamide, acetone, propylene carbonate, and 1,3-dimethyl-2-imidazolidinone. *See* Drager '006, 8:5–40, JDG_BENDA_00000990 at 999. None of those excipients were listed on the Inactive Ingredient Database for parenteral products, even as of 2009. *See* Inactive Ingredient Database (Dec. 31, 2009), TEVABEND00288118. The Drager '006 inventors conducted stability testing with dimethylformamide and 1,3-dimethyl-2-imidazolidinone for a year. *See* Drager '006, Figs. 1–2, 8:50–680, JDG_BENDA_00000990 at 992–993, 999. This substantial investment of resources would have confirmed to the POSA that the Drager '006 inventors were seriously considering these solvents in potential marketable bendamustine formulations. It also would have encouraged the POSA to likewise go beyond the list of parenteral excipients that had been used in approved parenteral drug products in developing a liquid bendamustine formulation.

713.                               REDACTED

321

EAGLEBEN-SA_00001632

REDACTED

714.                                   REDACTED

715.    I have reviewed the relevant literature and have identified many solvents that the POSA would have considered using when formulating a liquid bendamustine composition, most of which Dr. Pinal and Dr. Yates do not address.  I discuss those solvents in the subsections below.

716.    I note that the POSA's choice of solvents when formulating bendamustine would have been particularly wide because of the amount of diluent that the POSA would have expected to use.  The POSA would have been aware that every marketed bendamustine formulation as of the priority date for the '707 patent family was diluted into 500 mL of fluid. *See, e.g.*, Ribomustin® Product Monograph (2005) at 9, JDG_BENDA_00000001 at 9; Treanda® Label (2009) at 2, JDG_BENDA_00006932 at 6933.  As such, the POSA would have expected any solvent in the liquid concentrate to be substantially diluted before being administered to the patient.  For example, as I explain above, even if the POSA were to use a 100% organic solvent formulation in the stored, concentrate formulation, the concentration of the

322

EAGLEBEN-SA_00001633

solvent in the liquid that would be administered to the typical patient would only be about 2%, assuming that the liquid concentrate had a bendamustine hydrochloride concentration of 25 mg/mL. *See* ¶ 309. In concentrate formulations with higher bendamustine concentrations—which would likely have been possible with some of the solvents listed below, like DMSO, which yield very high bendamustine solubilities—the amount of solvent needed would be even less. *See, e.g.,* ¶ 235 (calculating the DMA concentration in the liquid Drager '006 formulation that would be administered to be about 0.37%). And, of course, the POSA would have known that multiple different solvents could be used in a single formulation, which would decrease the total amount of any single solvent delivered to the patient, thus decreasing potential toxicities. Dr. Pinal acknowledges the benefit of solvent "splitting." Pinal Rep. ¶ 184.

### a.   Benzyl Alcohol

717.   To the extent that the POSA would have been motivated or had reason to pursue a co-solvent approach, the POSA would have considered benzyl alcohol to be a promising solvent for solubilizing and stabilizing bendamustine. Benzyl alcohol is widely used in parenteral formulations. *See* Strickley 2004 at 215–21, JDG_BENDA_00003290 at 3304–10. Typically, benzyl alcohol is used in parenteral formulations for its preservative properties. *See* Rowe 2009 at 64–66. However, as the *Handbook of Pharmaceutical Excipients* discloses, benzyl alcohol also can function as a "solvent," typically at concentrations of about 5% or more. *See id.* ("Concentrations of 5% v/v or more are employed as a solubilizer."). As of the priority date, the Inactive Ingredient Database listed benzyl alcohol for "IV(Infusion): Injection" at a concentration of 4% and for "IV(Infusion): Powder, for Injection Solution" at a concentration of 6.69%. Inactive Ingredient Database (Dec. 31, 2009), TEVABEND00288118 at 288129. As such, the POSA would have understood that benzyl alcohol could potentially be used as a solvent in bendamustine formulations, at least at low concentrations. However, even at those

323

EAGLEBEN-SA_00001634

concentrations, benzyl alcohol might help to increase the solubility of bendamustine hydrochloride, as required. I note that Dr. Pinal appears to agree that benzyl alcohol can serve as a solvent for bendamustine hydrochloride. *See* Pinal Rep. ¶ 96 ("Drager '006 discloses DMSO (3:12, 8:11-12), benzyl alcohol (7:17), and ethanol (3:40-47) as solvents.").

718.    Furthermore, as of the priority date, formulators had used benzyl alcohol to stabilize liquid formulations. For example, International Publication No. WO 2008/147715 (the "'715 publication") discloses concentrated formulations of esmolol containing benzyl alcohol. *See* International Publication No. WO 2008/147715, abstract. The '715 publication explains that marketed liquid concentrate compositions of esmolol contained 25% ethanol and 25% PG. *See id.* ¶ 3. The '715 publication also explains that the existing commercial concentrate formulation included ethanol and PG "to stabilize the hydrolytic reaction, but those excipients lead[] to the formation of other related ester degradants." *Id.* ¶ 4. The '715 publication inventors disclosed that they had solved this problem by using benzyl alcohol as a solvent: "Benzyl alcohol, typically used as a preservative, has been surprisingly found to stabilize the concentrate esmolol compositions of the present invention." *Id.* ¶ 6. The '715 publication recommends the use of 1–25% benzyl alcohol (which would be further diluted before parenteral administration), with a preferred concentration of 10%. *Id.* ¶¶ 7, 15. The inventors disclosed that the preferable administration route for the diluted composition was intravenous infusion. *Id.* ¶ 22. Based on the '715 publication, the POSA would have concluded that benzyl alcohol was a potential solvent and stabilizer to use in intravenous formulations.

719.                                REDACTED

EAGLEBEN-SA_00001635

REDACTED

720.    Dr. Pinal has not offered any opinion about the expected effect of benzyl alcohol on the degradation of the nitrogen mustard moiety on bendamustine. I understand from Dr. Anslyn that the POSA would have expected benzyl alcohol to react more slowly than PEG with the nitrogen mustard moiety of bendamustine. *See* Anslyn Rep. ¶¶ 133–136. This would have motivated the POSA to use benzyl alcohol with bendamustine.

### b.    Butylene Glycol

721.    To the extent that the POSA would have been motivated or had reason to pursue a co-solvent approach, the POSA would have considered using butylene glycol when formulating liquid bendamustine compositions. As of the priority date, researchers had demonstrated that butylene glycol could be used as a solvent in injectable drug products. *See* Rowe 2009 at 77 ("Butylene glycol is used as a solvent and cosolvent for injectables."). Butylene gylcol was also known to be relatively non-toxic, including when administered parenterally. *See* Rowe 2009 at 77 ("Butylene glycol is used in a wide variety of cosmetic formulations and is generally regarded as a relatively nontoxic material. It is mildly toxic by oral and subcutaneous routes."). As such, the POSA would have considered butylene glycol as a potential solvent in bendamustine formulations.

722.    As of the priority date, formulators had previously used butylene glycol to solubilize the active pharmaceutical ingredients in drug formulations. For example, researchers had demonstrated that butylene glycol could be used as a solvent in parenteral formulations. *See* Rowe 2009 at 77. In addition, U.S. Patent No. 4,784,845 discloses a solubility experiment, in which it describes butylene glycol as a "parenterally acceptable solvent." *See* U.S. Patent No. 4,784,845 at 8:4–18 & tbl. 2. In addition, Drager '006 lists butylene glycol alongside other polar

325

EAGLEBEN-SA_00001636

protic solvents, including PEG and PG. Drager '006, 3:41–48, JDG_BENDA_00000990 at 997. Thus, the POSA would have considered butylene glycol as a potential solvent in bendamustine formulations.

### c.    Cremophor EL

723.    To the extent that the POSA would have been motivated or had reason to pursue a co-solvent approach, the POSA would have considered Cremophor EL to be a promising solvent for solubilizing and stabilizing bendamustine. Cremophor EL (also known as Kolliphor EL and polyoxyl 35 castor oil) is a polyoxyethylene castor oil derivative. *See* Rowe 2009 at 542–549. As Strickley 2004 explains, "Cremophor EL is obtained by reacting 35 moles of ethyleneoxide with 1 mole of castor oil and comprises about 83% hydrophobic constituents of which the main component is glycerol polyethylene glycol ricinoleate." Strickley 2004 at 212, JDG_BENDA_00003290 at 3301. As I explain above, the POSA would have understood that Cremophor EL was a polyol. *See* ¶ 299; Strickley 2004 at 211, Table III, JDG_BENDA_00003290 at 3300.

724.    Cremophor EL has the following chemical structure:

326

EAGLEBEN-SA_00001637

$R_{1,2,3} =$ (CH$_2$)$_6$ ═ (CH$_2$)$_6$-CH$_3$, (OCH$_2$CH$_2$)$_{x,y,z}$OH

R = Polyethylene glycol ricinoleate
x + y + z = 35
Cremophor EL (Polyoxyl 35 castor oil)

$R_{1,2,3} =$ (CH$_2$)$_9$ (CH$_2$)$_6$-CH$_3$, (OCH$_2$CH$_2$)$_{x,y,z}$OH

R = Polyethylene glycol 12-oxystearate
x + y + z = 40
Cremophor RH 40 (Polyoxyl 40 hydrogenated castor oil)

Strickley 2004 at 211, Table III, JDG_BENDA_00003290 at 3300.

725.   Akers 2002 lists Cremophor EL as one of "the most commonly used co-solvents in parenteral formulations." Akers 2002 at 2284, JDG_BENDA_00000166 at 167. Strickley 2004 discloses that Cremophor EL had been used in marketed formulations for intravenous infusion at concentrations up to 65% and had been infused at concentrations of up to 10%. *See* Strickley 2004 at 222, JDG_BENDA_00003290 at 3311. For example, Strickley 2004 discloses that paclitaxel was formulated in 51% Cremophor EL and 49% ethanol, which was administered by intravenous infusion after a 5- to 20-fold dilution. *Id.* Strickley 2004 likewise discloses that teniposide was formulated in the product Vumon® "with 50% Cremophor EL, 42% ethanol, and 6% DMA and is administered by IV infusion after a 10-fold or a 100-fold dilution." *Id.*

726.   I understand that several sources list Cremophor EL as a "surfactant" rather than a "solvent." *E.g.*, Nema 1997 at 167, JDG_BENDA_00002272 at 2273 (characterizing Cremophor EL in the category of "Solubilizing, Wetting, Suspending, or Thickening Agents"); Strickley 2004 at 209, JDG_BENDA_00003290 at 3298. This classification is based on the

327

EAGLEBEN-SA_00001638

molecular structure of Cremophor EL—in particular, the fact that it has a hydrophobic portion and a hydrophilic portion. *See* Strickley 2004 at 209, JDG_BENDA_00003290 at 3298 ("Water-miscible surfactant molecules contain both a hydrophobic and hydrophilic portion and can solubilize many poorly water-soluble drugs."). Nevertheless, as Strickley 2004 makes clear, surfactants can solubilize drug molecules directly. *See id.* ("Thus, surfactants can solubilize drug molecules by either a <u>direct cosolvent effect</u> or by uptake into micelles." (emphasis added)). Moreover, many surfactants, including Cremophor EL, have been used in parenteral formulations at concentrations equivalent to more typical solvents. *See* ¶ 725. Ultimately, regardless of the label applied, the POSA would have understood that Cremophor EL (and other "surfactants" discussed in this section) could be considered for use in liquid bendamustine formulations at relatively high concentrations.

727.                                  REDACTED

728.    As explained above, Dr. Pinal opines that the POSA would have been motivated to use solvents based on their "–OH burden" (i.e., unweighted hydroxyl group "concentrations"). *See* ¶¶ 247–278. I understand from Dr. Anslyn's report that a solvent's unweighted hydroxyl group "concentration" can be derived from the solvent's hydroxyl value (i.e., the number of mg

328

EAGLEBEN-SA_00001639

of potassium hydroxide required to neutralize the acetic acid taken up on acetylation of one g of the solvent).  *See* Anslyn Rep. ¶ 146.  I further understand from Dr. Anslyn's report that Cremophor EL has an unweighted hydroxyl group "concentration" of 1.97%–2.37%.  *See* Anslyn Rep. ¶ 146.  This is substantially lower than the <u>weighted</u> (27.88%) and <u>unweighted</u> (44.68%) hydroxyl group "concentrations" of PG and the hydroxyl group "concentration" of PEG 400, as calculated by Dr. Anslyn (8.5%) and Dr. Pinal (8.21%).  *See* ¶ 269.  As such, according to Dr. Pinal's argument, the POSA would have preferred Cremophor EL to PG and PEG 400, to minimize esterification reactions with bendamustine.

### d.    Cremophor RH

729.    To the extent that the POSA would have been motivated or had reason to pursue a co-solvent approach, the POSA would have considered various grades of Cremophor RH to be promising solvents for solubilizing and stabilizing bendamustine.  Cremophor RH (also known as polyoxyl hydrogenated castor oil) is a polyoxyethylene castor oil derivative.  *See* Rowe 2009 at 542–549.  Strickley 2004 explains the synthesis of one particular type of Cremophor RH: "Cremophor RH 40 is obtained by reacting 40 moles of ethyleneoxide with 1 mole of hydrogenated castor oil and comprises about 75% hydrophobic constituents of which the main component is glycerol polyethylene glycol 12-hydroxystearare."  Strickley 2004 at 212, JDG_BENDA_00003290 at 3301.  As I explain above, the POSA would have understood that Cremophor RH was a polyol.  *See* ¶ 299; Strickley 2004 at 211, Table III, JDG_BENDA_00003290 at 3300.

730.    Cremophor RH 40 has the following chemical structure:

EAGLEBEN-SA_00001640

Strickley 2004 at 211, Table III, JDG_BENDA_00003290 at 3300.

731.    Several grades of Cremophor RH had previously been used in intravenous infusion products.  For example, Cremophor RH 60 had previously been used at a concentration of up to 20% in a marketed tacrolimus formulation.  *See* Strickley 2004 at 222–23, JDG_BENDA_00003290 at 3311–3312.  Cremophor RH 40 had also previously been used in a parenteral formulation at a concentration of 11.5%.  *See* Nema 1997 at 167, JDG_BENDA_00002272 at 2273.

732.    I understand that several sources list Cremophor RH as a "surfactant" rather than a "solvent." *E.g.*, Nema 1997 at 167, JDG_BENDA_00002272 at 2273.  As I explain above, excipients can have multiple functions, and the POSA would nevertheless have considered it for use in high concentrations in bendamustine formulations as a solvent or co-solvent.  *See* ¶ 299.

733.    As explained above, Dr. Pinal opines that the POSA would have been motivated or had reason to use solvents based on their "–OH burden" (i.e., unweighted hydroxyl group "concentrations").  *See* ¶¶ 247–278.  I understand from Dr. Anslyn's report that a solvent's

330

unweighted hydroxyl group concentration can be derived from the solvent's hydroxyl value (i.e., the number of mg of potassium hydroxide required to neutralize the acetic acid taken up on acetylation of one g of the solvent). *See* Anslyn Rep. ¶ 146. I further understand from Dr. Anslyn's report that Cremophor RH 60 has an unweighted hydroxyl group "concentration" of 1.82%–2.28%. *See* Anslyn Rep. ¶ 146. This is substantially lower than the weighted (27.88%) and unweighted (44.68%) hydroxyl group "concentrations" of PG and the hydroxyl group "concentration" of PEG 400, as calculated by Dr. Anslyn (8.5%) and Dr. Pinal (8.21%). *See* ¶ 269. As such, according to Dr. Pinal's argument, the POSA would have preferred Cremophor RH to PG and PEG 400, to minimize esterification reactions with bendamustine.

### e.    Dimethylacetamide

734.    To the extent that the POSA would have been motivated or had reason to pursue a co-solvent approach, the POSA would have considered dimethylacetamide ("DMA") to be a promising option for solubilizing and stabilizing bendamustine. The POSA would have known that bendamustine hydrochloride had a solubility of approximately 56.2 mg/mL in DMA at room temperature. *See* Drager '006, 8:5–40, JDG_BENDA_00000990 at 999. DMA is on the list of polar aprotic solvents disclosed as suitable for use with bendamustine in Drager '006. *Id.* at 3:3–20, JDG_BENDA_00000990 at 997.

735.    Akers 2002 lists DMA as one of "the most commonly used co-solvents in parenteral formulations." Akers 2002 at 2284, JDG_BENDA_00000166 at 167.

736.    Drager '006 discloses stability data for bendamustine hydrochloride in compositions of DMA. Drager '006, Fig. 2, 8:50–680, JDG_BENDA_00000990 at 993, 999. As discussed above, the POSA would have had some concerns that a formulation of bendamustine in pure DMA might not be sufficiently stable to serve as a marketed pharmaceutical product, including because of the amount and variety of impurities measured by

331

EAGLEBEN-SA_00001642

Drager '006 in formulations based on pure DMA. *See* ¶¶ 157–162. However, in my opinion the degradation results for DMA disclosed in Drager '006 are not so negative that they would have disqualified DMA from consideration by the POSA, particularly given the stability results disclosed by Drager '006 for other solvents, many of which show similar instability profiles.

737. I understand that Dr. Pinal has opined that the POSA would not have considered DMA as a solvent when formulating a liquid bendamustine composition because of certain known incompatibilities. *See, e.g.*, Pinal Rep. ¶¶ 154, 452. I address this argument at length above. *See* ¶¶ 231–244. In short, the incompatibilities raised by Dr. Pinal had been known for decades, *see, e.g.*, Berman 1986, JDG_BENDA_00005968, yet formulators (including the Drager '006 inventors) continued to use DMA. Different intravenous products containing DMA were on the market. And the POSA would have been aware of materials that were compatible with DMA.

738.                                                REDACTED

739. Dr. Pinal has not offered any opinion about the expected effect of DMA on the degradation of the nitrogen mustard moiety on bendamustine. I understand from Dr. Anslyn that the POSA would have expected DMA to react more slowly than PEG with the nitrogen mustard

332

EAGLEBEN-SA_00001643

moiety of bendamustine. *See* Anslyn Rep. ¶¶ 133–136. This would have motivated the POSA to use DMA with bendamustine.

740. The POSA would have understood that DMA had a rather promising toxicity profile. For example, as of the priority date, researchers had demonstrated that DMA has a lower hemolytic potential than PEG 400. *See* Strickley 2004 at 214, JDG_BENDA_00003290 at 3303 ("Using the hemolysis method, the following $LD_{50}$s were measured: 37% DMA, 30% PEG 400 . . . .") (citing Reed et al., *Lysis of Human Red Blood Cells in the Presence of Various Cosolvents*, 36 PDA J. PHARM. SCI. & TECH. 64, 67 (1985) (reporting hemolytic $LD_{50}$s of PEG 400 and DMA as 30.0% and 37.0%, respectively)); ¶ 313. I understand that Dr. Pinal has opined that the POSA would have been motivated to choose PEG 400 based on its hemolytic potential. *See, e.g.*, Pinal Rep. ¶ 190. I disagree with that opinion. *See, e.g.*, ¶¶ 309–312. Nevertheless, to the extent the POSA would have been motivated to select PEG for concerns related to hemolysis, Reed et al. would have motivated the POSA to select DMA instead.

741. As explained above, Dr. Pinal opines that the POSA would have been motivated to use solvents based on their "–OH burden" (i.e., unweighted hydroxyl group "concentrations"). *See* ¶¶ 247–278. DMA lacks hydroxyl groups. As such, according to Dr. Pinal's argument, the POSA would have preferred DMA to PG and PEG 400, to avoid esterification reactions with bendamustine.

**f.     Dimethylformamide**

742. To the extent that the POSA would have been motivated or had reason to pursue a co-solvent approach, the POSA would have considered dimethylformamide ("DMF") to be a promising option for solubilizing and stabilizing bendamustine. The POSA would have known that bendamustine hydrochloride had a solubility of approximately 71.8 mg/mL in DMF at room temperature. *See* Drager '006, 8:5–40, JDG_BENDA_00000990 at 999. DMF is on the list of

333

EAGLEBEN-SA_00001644

polar aprotic solvents disclosed as suitable for use with bendamustine in Drager '006. *Id.* at 3:3–20, JDG_BENDA_00000990 at 997.

743.    As of the priority date, formulators had previously used DMF as a solvent in injectable formulations. For example, researchers had demonstrated that DMF could be used to increase the solubility of certain active pharmaceutical ingredients in drug formulations. *See* Ming-Kung Yeh et al., *Improving Tenoxicam Solubility and Bioavailability by Cosolvent System*, 10 AAPS PHARMSCITECH 166, 167 (2009). International Patent Publication No. WO 2006110551 (the "'551 publication") also discloses the use of DMF and other polar aprotic solvents. *See* '551 publication, ¶¶ 121–124. The '551 publication further states that the claimed formulations may be administered parenterally. *See* '551 publication ¶ 99 ("In one embodiment, parenteral administration is used.").

744.    Dr. Pinal has not offered any opinion about the expected effect of DMF on the degradation of the nitrogen mustard moiety on bendamustine. I understand from Dr. Anslyn that the POSA would have expected DMF to react more slowly than PEG with the nitrogen mustard moiety of bendamustine. *See* Anslyn Rep. ¶¶ 133–136. This would have motivated the POSA to use DMF with bendamustine.

745.    As explained above, Dr. Pinal opines that the POSA would have been motivated to use solvents based on their "–OH burden" (i.e., unweighted hydroxyl group "concentrations"). *See* ¶¶ 247–278. DMF lacks hydroxyl groups. As such, according to Dr. Pinal's argument, the POSA would have preferred DMF to PG and PEG 400, to avoid esterification reactions with bendamustine.

746.    Based on these disclosures, the POSA would have considered DMF in bendamustine formulations.

EAGLEBEN-SA_00001645

g.    Dimethylsulfoxide

747.    To the extent that the POSA would have been motivated or had reason to pursue a co-solvent approach, the POSA would have considered dimethylsulfoxide ("DMSO") to be a promising option for solubilizing and stabilizing bendamustine. The POSA would have known that bendamustine hydrochloride had a solubility of approximately 311.7 mg/mL in DMSO at room temperature. *See* Drager '006, 8:5–40, JDG_BENDA_00000990 at 999. DMSO is on the list of polar aprotic solvents disclosed as suitable for use with bendamustine in Drager '006. *Id.* at 3:3–20, JDG_BENDA_00000990 at 997.

748.    Strickley 2004 discloses that DMSO had been used in several parenteral formulations. In particular, DMSO had been used to dissolve leuprolide acetate for subcutaneous delivery through an implanted osmotically driven pump. Strickley 2004 at 225, JDG_BENDA_00003290 at 3313. DMSO had also been used in a formulation based on a 50:50 DMSO:water mixture, which was intended for injection into the bladder via a syringe or catheter. *Id.* Strickley 2004 predicts that DMSO would likely be used more often in the future. *Id.* The Inactive Ingredient Database lists DMSO for use in a lyophilized product intended for intravenous infusion. *See* Inactive Ingredient Database (Dec. 31, 2009), TEVABEND00288118 at 288155. DMSO had been experimented with as a solvent in a patent related to chlorambucil for parenteral administration. *See* '229 publication ¶¶ 78–79.

749.    The uses of DMSO in the United States and abroad, including in parenteral products, were surveyed in a 2008 article. *See* McKim et al., *Dimethyl Sulfoxide USP, PhEur in Approved Pharmaceutical Products and Medical Devices*, 32 PHARMACEUTICAL TECH. 1 (2008) ("McKim 2008"). In addition to the applications described in the previous paragraph, McKim 2008 notes the filing of two medical device applications that "use DMSO as a solubilizing excipient to deliver a medical polymer . . . into the body to provide a structural benefit." *Id.* at

335

EAGLEBEN-SA_00001646

1–2. As McKim 2008 describes, "The medical polymer is injected as a DMSO solution, containing either 6 or 8% EVOH copolymer, at a controlled rate into the bloodstream." *Id.* at 2. The review also provides safety information for DMSO, noting that "[d]uring the past two decades, it would seem that many concerns surrounding the safety of DMSO have largely subsided." *Id.* at 7. The article concludes that DMSO "is a versatile and safe material that has much to offer as an excipient product," noting that the "number of regulated pharmaceutical products and delivery systems that contain [DMSO] have increased in recent years" and predicting that "the positive trends supporting this product will continue." *Id.* at 8.

750. Drager '006 discloses stability data for bendamustine hydrochloride in formulations based on DMSO. Drager '006, Fig. 2, 8:50–68, JDG_BENDA_00000990 at 993, 999. Other than an increase in HP1 and BM1 dimer degradants, DMSO yielded good stability results for bendamustine hydrochloride formulations. *See* ¶¶ 157–162. These data would have encouraged the POSA to use DMSO in bendamustine formulations.

751. Yeh and colleagues describe DMSO and DMSO co-solvent systems to improve the solubility and bioavailability of tenoxicom in parenteral formulations. *See* Yeh 2009. Yeh and colleagues found that the drug substance was 985 times more soluble in DMSO than in water. *See* Yeh 2009 at 167. Yeh and colleagues further found that DMSO cosolvent systems possessed the stability and pharmacokinetic characteristics needed for use in parenteral formulations. *See* Yeh 2009 at 169–71. The authors also found that the rabbits used in the pharmacokinetic studies did not die or suffer local tissue allergy at the injection site and noted that other researchers had demonstrated that DMSO used in a parenteral formulation showed no acute side effects in dogs and humans. *See* Yeh 2009 at 171. These results would have further motivated the POSA to use DMSO.

336

752.                          REDACTED

753.    As explained above, Dr. Pinal opines that the POSA would have been motivated to use solvents based on their "–OH burden" (i.e., unweighted hydroxyl group "concentrations"). *See* ¶¶ 247–278.  DMSO lacks hydroxyl groups.  As such, according to Dr. Pinal's argument, the POSA would have preferred DMSO to PG and PEG 400, to avoid esterification reactions with bendamustine.

### h.    Dimethyl Isosorbide

754.    To the extent that the POSA would have been motivated or had reason to pursue a co-solvent approach, the POSA would have considered dimethyl isosobide ("DMI") to be a promising solvent for solubilizing and stabilizing bendamustine.  The advantages of DMI as a solvent are documented in U.S. Patent Publication No. 2008/0171687 (the "'687 publication"). *See* U.S. Patent Publication No. 2008/0171687.  The '687 publication notes that DMI has "been shown to be a good solvent, even when used without dilution with water, for use as a vehicle for intravenous and intra-arterial administration, due to its low hemolytic activity." *Id.* ¶ 21.  It also notes DMI's usefulness in solubilizing a wide range of organic pharmaceutical substances. *Id.* The preferred formulations disclosed in the '687 publication include a substantially water-insoluble drug dissolved in an aqueous solution of 50% to 80% DMI. *See id.* ¶ 28.  The formulations are intended for injection or intravenous administration. *See id.* ¶¶ 28–29.  The data in the '687 publication demonstrate that many different types of drugs are highly soluble in DMI, including docetaxel, rapamycin, cyclosporine, taxrolimus, propofol, melatonin, etoposide, itraconazole, omeprazole, and analogs. *See id.* ¶ 43.

337

EAGLEBEN-SA_00001648

755.    DMI had also been used to stabilize and solubilize parenteral formulations of etoposide, as disclosed in U.S. Patent No. 4,927,638 (the "'638 patent"). *See* U.S. Patent No. 4,927,638.  That '638 patent notes that DMI had been used as a solvent for tetracyclines, muscle relaxants, steroids, and aspirin, and was miscible with water, PG, isopropyl myristate, diethyl ether, acetone, corn oil, and cottonseed oil. *See id.*, 2:1–8.  The '638 patent also notes that DMI has "a very good toxicity profile." *Id.*, 2:8.  The invention disclosed in the '638 patent is a solution of etoposide in DMI, which can be used in parenteral or oral dosage forms. *See id.*, 2:17–23.  The '638 patent discloses that etoposide in DMI and citric acid was "satisfactorily stable at elevated temperature for a prolonged period of time." *See id.*, 4:48–65 (disclosing data).  The '638 patent also discloses that an etoposide formulation in DMI "showed no precipitation of etoposide for 24 hours after dilution with aqueous parenteral vehicles." *Id.*, 4:65–68.

756.    In accordance with the '687 publication and the '638 patent, the POSA would have understood that DMI would have a promising toxicity profile.  For example, as of the priority date, researchers had demonstrated that DMI has a lower hemolytic potential than both DMA and PEG 400. *See* Reed et al., *Lysis of Human Red Blood Cells in the Presence of Various Cosolvents*, 36 PDA J. PHARM. SCI. & TECH. 64, 67 (1985) (reporting hemolytic $LD_{50}$s of PEG 400, DMA, and DMI as 30.0%, 37.0%, and 39.5%, respectively); Jordan et al., *Biomaterials for Injectable Therapeutic Implants*, 59 CHIMIA 353, 354 (2005) ("Jordan 2005") (reporting minimal hemolytic activity and hemodynamic activity for DMI and an IV $LD_{50}$ in rat of >5g/kg).  I understand that Dr. Pinal has opined that the POSA would have been motivated to choose PEG 400 based on its hemolytic potential. *See, e.g.*, Pinal Rep. ¶ 190.  I disagree with that opinion. *See, e.g.*, ¶¶ 309–312.  Nevertheless, to the extent the POSA would have been motivated to select

338

EAGLEBEN-SA_00001649

PEG for concerns related to hemolysis, Reed et al. would have motivated the POSA to select DMI instead.

757.    As explained above, Dr. Pinal opines that the POSA would have been motivated to use solvents based on their "--OH burden" (i.e., unweighted hydroxyl group "concentrations"). *See* ¶¶ 247–278. As reflected below, DMI lacks hydroxyl groups.

'687 publication, ¶ 20. As such, according to Dr. Pinal's argument, the POSA would have preferred DMI to PG and PEG 400, to avoid esterification reactions with bendamustine.

### i.    Ethanol

758.    To the extent that the POSA would have been motivated or had reason to pursue a co-solvent approach, the POSA would have considered ethanol to be a promising solvent for solubilizing and stabilizing bendamustine. The POSA would have known that bendamustine had a solubility of about 50 mg/mL in ethanol at at 25° C. *See* Olthoff 1983 at 6, JDG_BENDA_00002301 at 2314. And ethanol is on the list of polar protic solvents disclosed as suitable for use with bendamustine in Drager '006. Drager '006 at 3:41–48, JDG_BENDA_00000990 at 997.

759.    I understand that Dr. Pinal has opined that Olthoff 1983 would have discouraged the POSA from using ethanol. *See* Pinal Rep. ¶ 170. I disagree. As I explain above, *see* ¶ 215, the POSA would have given no weight to Olthoff's off-handed assessment that ethanol is "of limited use for the production of injection solutions" in view of unspecified "pharmacological

339

reasons and reasons concerning the production" of monovalent alcohols." Olthoff 1983 at 6, JDG_BENDA_00002301 at 2314. The POSA would have known that ethanol had been previously used in various parenteral formulations. *See* Nema 1997 at 167, JDG_BENDA_00002272 at 2273. Akers 2002 lists ethanol as one of "the most commonly used co-solvents in parenteral formulations." Akers 2002 at 2284, JDG_BENDA_00000166 at 167.

760.    I also understand that Dr. Pinal has opined that the POSA would not have used ethanol because it has "pharmacological properties." *See* Pinal Rep. ¶ 170. I disagree. Ethanol had previously been used in marketed formulations at concentrations of up to 80% and had been administered via intravenous infusion at concentrations of up to 10%, with intravenous boluses at concentrations of up to 20%. *See* Strickley 2004 at 222, JDG_BENDA_00003290 at 3311. For example, Strickley 2004 discloses that paclitaxel was formulated in 51% Cremophor EL and 49% ethanol, which was administered by intravenous infusion after a 5- to 20-fold dilution. *Id.* Based on its extensive use in parenteral products, the POSA would have considered ethanol as a possible (co-)solvent when formulating an improved bendamustine formulation.

761.    Dr. Pinal has not offered any opinion about the expected effect of ethanol on the degradation of the nitrogen mustard moiety on bendamustine. I understand from Dr. Anslyn that the POSA would expect ethanol to react more slowly than PEG or PG with the nitrogen mustard moiety of bendamustine. *See* Anslyn Rep. ¶¶ 133–136. This would have motivated the POSA to use ethanol with bendamustine.

762.    I note that Brittain 2006 reports that adding ethanol to bendamustine compositions substantially slowed down formation of the HP1 and dimer degradants. *See* Brittain 2006, Figs. 3–4, JDG_BENDA_00000375 at 377–378.

340

EAGLEBEN-SA_00001651

763.                                    REDACTED

764.                                    REDACTED

### j.      Ethyl Lactate

765.     To the extent that the POSA would have been motivated or had reason to pursue a co-solvent approach, the POSA would have considered ethyl lactate to be a promising solvent for solubilizing and stabilizing bendamustine. The *Handbook of Pharmaceutical Excipients* explains that ethyl lactate is a GRAS (i.e., "Generally Recognized as Safe," under §§ 201(s) and 409 of the Federal Food, Drug, and Cosmetic Act) listed excipient that "is used as a solvent or co-solvent in liquid formulations and recently as a co-solvent in emulsions and microemulsion

341

EAGLEBEN-SA_00001652

technologies." Rowe 2009 at 256–57. The *Handbook of Pharmaceutical Excipients* discloses toxicity information for ethyl lactate, including an intravenous $LD_{50}$ in mice of 0.6g/kg.

766. Spiegel 1963 discloses additional toxicity data for ethyl lactate. *See* Spiegel 1963 at 921, JDG_BENDA_00003835 at 3841. Spiegel 1963 also discloses that "[e]thyl lactate (10-100%) solubilizes an esterone injection in castor oil," and that "[t]his product is stable at room temperature." *Id.*

767. Mottu 2000 discloses some toxicity data for ethyl lactate, including that it can have a "potent narcotic effect," but notes that ethyl lactate is "used as a solvent at a concentration of 0.1% in a commercially available injectable form containing ergotrate." Mottu 2000 at 462, JDG_BENDA_00005839 at 5845; *see also* Nema 1997 at 169, JDG_BENDA_0002272 at 2275 (noting that ethyl lactate was used at a concentration of 0.1% to solubilize ergotrate maleate in a marketed parenteral product).

768. Ethyl lactate had previously been used in a theophylline formulation intended for use in intravenous administration. *See* Christensen et al., *Ethyl Lactate-Ethanol-Water Cosolvent for Intravenous Theophylline*, 50 RES. COMM. IN CHEM. PATHOLOGY & PHARM. 147 (1985). The authors developed an ethyl lactate-ethanol-water solvent system at a ratio of 25:10:65. *See id.* at 148. The authors assessed the hemolytic effect of the formulation and found that it was an improvement over the marketed product. *Id.* The authors noted that "ethyl lactate should break down to ethanol and lactic acid in the blood" and concluded that the "toxicity of ethyl lactate and ethanol is low and poses no serious problem as a cosolvent to be used for intravenous administration." *Id.* at 150.

EAGLEBEN-SA_00001653

769.    In view of this information, the POSA would have considered using ethyl lactate as a potential solvent in a bendamustine formulation, but would have been cautious to adhere to the safety guidance provided by the published literature in choosing appropriate concentrations.

### k.    Glycerol

770.    To the extent that the POSA would have been motivated or had reason to pursue a co-solvent approach, the POSA would have understood glycerol (also known as glycerin) to be a promising solvent for solubilizing and stabilizing bendamustine. The POSA would have known that bendamustine hydrochloride had a solubility of about 50 mg/mL in glycerol at 25°C. *See* Olthoff 1983 at 6, JDG_BENDA_00002301 at 2314. And glycerol is on the list of polar protic solvents disclosed as suitable for use with bendamustine in Drager '006. Drager '006 at 3:41–48, JDG_BENDA_00000990 at 997.

771.    Nema 1997 discloses that glycerol had been used in 9 different parenteral products at concentrations of up to 70%. Nema 1997 at 167, JDG_BENDA_00002272 at 2273. Akers 2002 lists glycerol as one of "the most commonly used co-solvents in parenteral formulations." Akers 2002 at 2284, JDG_BENDA_00000166 at 167.

772.    I understand that Dr. Pinal has opined that the POSA would "choose PG over glycerol" because "PG is consistently the more powerful solubilizer of the two." Pinal Rep. ¶ 173. While I disagree with this generalization—and I note that Dr. Pinal relies only on a list of solubility measurements related to "nonpolar solutes" from Yalkowsky 1981 to support this opinion—it is irrelevant because the POSA would have understood, based on Olthoff 1983, that the solubility of bendamustine hydrochloride in glycerol is approximately 50 mg/mL, which is a promising value in this context. Specifically, Olthoff 1983 discloses the solubility of bendamustine hydrochloride in PG (125 mg/mL) and glycerol (50 mg/mL). *See* Olthoff 1983 at 6, JDG_BENDA_00002301 at 2314. I agree with Dr. Pinal that the POSA would have viewed

343

the superior solubility in PG as an advantage. However, the POSA would have understood that a solvent like glycerol that provided a solubility of 50 mg/mL for bendamustine hydrochloride could be promising for inclusion in a formulation intended to solubilize 25 mg/mL of bendamustine. Moreover, as Dr. Pinal has opined and published about, combinations of solvents can yield unexpectedly high solubilities, due to the interactions between the co-solvents and the solutes. *See* Pinal Rep. ¶ 204; Miyako 2009 at 293–94, JDG_BENDA_00005823 at 5823–24. For these reasons, the POSA would not have ruled glycerol out as a potential solvent on solubility grounds.

773.    I understand that Dr. Pinal has opined that the POSA would also choose PG over glycerol to minimize esterification. *See* Pinal Rep. ¶ 172 ("[T]he POSA would know that on a per molecule basis, the choice of glycerol would increase by 50% the exposure of [bendamustine] to –OH groups."). In my opinion, the POSA would not have ruled out a solvent on this basis. The POSA would have understood that bendamustine can undergo multiple pathways of degradation, including at both the carboxylic acid moiety and the nitrogen mustard moiety. *See* Anslyn Rep. ¶¶ 44–71. The POSA would have understood that even if a solvent like glycerol might increase degradation via one pathway, it might simultaneously decrease degradation via a different pathway.

774.    Dr. Pinal has not offered any opinion about the expected effect of glycerol on the degradation of the nitrogen mustard moiety on bendamustine. I understand from Dr. Anslyn that the POSA would have expected glycerol to react more slowly than PEG or PG with the nitrogen mustard moiety of bendamustine. *See* Anslyn Rep. ¶¶ 133–136. This would have motivated the POSA to use glycerol with bendamustine.

344

345

775.                                    REDACTED




776.                                    REDACTED
















777.                                    REDACTED

EAGLEBEN-SA_00001656

REDACTED

### I.    Glycerol Formal

778.    To the extent that the POSA would have been motivated or had reason to pursue a co-solvent approach, the POSA would have understood glycerol formal to be a promising solvent for solubilizing and stabilizing bendamustine.  International Patent Publication No. WO 03/051398 discloses parenteral compositions of paracetamol dissolved in glycerol formal.  *See* International Patent Publication No. WO 03/051398 (the "'398 publication").  The '398 publication discloses that "[g]lycerol formal is an almost atoxic solvent (LD50 I.V. to rats, 3,5mg/kg body weight)," which is miscible with water, ethanol, and PG.  *Id.* 5:1–6.  The '398 publication discloses several formulations of paracetamol, in which glycerol formal is the principal solvent, with water, PG, and/or ethanol as cosolvents.  *See id.*, 6:8–9:26.  The claims of the publication are all directed to "[p]harmaceutical injectable parenteral solution[s]" comprising paracetamol and glycerol formal, among other excipients.

779.    There was also robust toxicity information available for glycerol formal before the priority date.  Although Mottu 2000 noted "transient hypotension" that was induced in rats at certain concentrations, that publication concluded that "[i]ts intra-arterial use is useful up to a concentration of 40%."  Mottu 2000 at 461, JDG_BENDA_00005839 at 5844.  More extensive safety information was published in 1996 by the Committee for Veterinary Medicinal Products of the European Agency for the Evaluation of Medicinal Products, which found that "glycerol formal has low toxicity when given orally or intravenously to rats and mice," with an intravenous $LD_{50}$ of approximately 4ml/kg.  Comm. for Veterinary Med. Prods., Eur. Agency for the Evaluation of Med. Prods., *Glycerol Formal Summary Report* 1 (June 1996).  That report

346

EAGLEBEN-SA_00001657

ultimately concluded that "glycerol formal is of low toxicity" and calculated "an acceptable daily intake of 600 µg per person per day for glycerol formal." *Id.* at 2–3.

780. In view of this information, the POSA would have considered using glycerol formal as a potential (co-)solvent to use in a bendamustine formulation, but would have been cautious to adhere to the safety guidance provided by the published literature in choosing appropriate concentrations.

### m. Glycofurol

781. To the extent that the POSA would have been motivated or had reason to pursue a co-solvent approach, the POSA would have understood glycofurol to be a promising solvent for solubilizing and stabilizing bendamustine. As explained by the *Handbook of Pharmaceutical Excipients*, glycofurol "is used as a solvent in parenteral products for intravenous or intramuscular injection in concentrations up to 50%." Rowe at 297–98; *see also id.* ("Glycofurol is mainly used as a solvent in parenteral pharmaceutical formulations . . . ."). Its "tolerability is approximately the same as propylene glycol" and it is "generally regarded as a relatively nontoxic and nonirritant material at the levels used as a phamarceutical excipient." *Id.* The *Handbook* also notes that glycofurol is "[i]ncluded in parenteral medicines licensed in Europe." *Id.*

782. Mottu 2000 also provides safety information for glycofurol and explains that it was found to be tolerable in intra-arterial injections in rabbit ear up to concentrations of 30%. *See* Mottu 2000 at 461, JDG_BENDA_00005839 at 5844.

783. Akers 2002 includes glycofurol on its list of solvent systems that had been used in parenteral formulations. *See* Akers 2002 at 2285, JDG_BENDA_00000166 at 168. I note that Akers 2002 includes glycofurol as an "oil," but the *Handbook of Pharmaceutical Excipients* makes clear that glycofurol is fully miscible in water, PG, ethanol, glycerin, and PEG 400. *See*

347

EAGLEBEN-SA_00001658

Rowe at 297–98. As such, the POSA would have considered glycofurol to be a possible solvent to use in creating new liquid bendamustine formulations, even assuming those formulations were intended to be diluted into saline for infusion to the patient.

784. In a study on the acute toxicity and hemolytic activity of a variety of solvents, it was found that glycofurol had a higher $LD_{50}$ value than both ethanol and NMP (i.e., glycofurol is less toxic than ethanol and NMP). *See* Jordan 2005 at 354. Glycofurol was reported to have similar hemolytic activity to ethanol and NMP and less hemodynamic activity. *Id.*

785. As explained above, Dr. Pinal opines that the POSA would have been motivated to use solvents based on their "–OH burden" (i.e., unweighted hydroxyl group "concentrations"). *See* ¶¶ 247–278. Like PEG, glycofurol can have a variable number of ethylene oxide units. The most common type of glycofurol—glycofurol 75—has the following structure:

**5    Structural Formula**

Glycofurol 75: n = 1–2

Rowe 2009 at 297. The *Handbook* discloses that glycofurol 75 has an average molecular weight of 190.24 Da. Rowe 2009 at 297. According Dr. Pinal's calculation method, glycofurol 75 (which has one hydroxyl group) therefore has an <u>unweighted</u> hydroxyl group "concentration" of about 8.9%. This is substantially lower than the <u>weighted</u> (27.88%) and <u>unweighted</u> (44.68%) hydroxyl group "concentrations" of PG and is close to the hydroxyl group "concentration" of PEG 400, as calculated by Dr. Anslyn (8.5%) and Dr. Pinal (8.21%). *See* ¶ 269. As such, according to Dr. Pinal's argument, the POSA would have been motivated to use glycofurol, to minimize esterification reactions with bendamustine.

348

EAGLEBEN-SA_00001659

786.                                  REDACTED

### n.    N-methyl-2-pyrrolidone

787.    To the extent that the POSA would have been motivated or had reason to pursue a co-solvent approach, the POSA would have considered using N-methyl-2-pyrrolidone ("NMP") when formulating liquid compositions of bendamustine. The POSA would have known that bendamustine hydrochloride had a solubility of approximately 104.0 mg/mL in NMP at room temperature. *See* Drager '006 at 8:5–40, JDG_BENDA_00000990 at 999. NMP is on the list of polar aprotic solvents disclosed as suitable for use with bendamustine in Drager '006. *Id.* at 3:3–20, JDG_BENDA_00000990 at 997.

788.    Akers 2002 lists NMP as one of "the most commonly used co-solvents in parenteral formulations." Akers 2002 at 2284, JDG_BENDA_00000166 at 167. Strickley 2004 discloses that NMP had been used at concentrations of 100% in subgingival and subcutaneous formulations and predicted that it would be used in more formulations in the future. *See* Strickley 2004 at 222, 227, JDG_BENDA_00003290 at 3311, 3316 ("The water-soluble solvent NMP will likely be used more frequently because it has excellent solubilizing [power] and is low viscosity . . . ."). Mottu 2000 provides safety information for NMP, disclosing that it "has been used dermally as a penetration enhancer . . . , subcutaneously . . . , orally . . . , intraperitoneally, intravenously . . . , and in the eye . . . ." Mottu 200 at 461, JDG_BENDA_00005839 at 5844.

789.    Drager '006 discloses stability data for bendamustine hydrochloride in compositions of NMP. Drager '006 at Figure 2, 8:50–68, JDG_BENDA_00000990 at 993, 999. As discussed above, the POSA would have had some concerns that a composition of

349

EAGLEBEN-SA_00001660

bendamustine hydrochloride in pure NMP might not be sufficiently stable to serve as a marketed pharmaceutical product, including because of the amount and variety of impurities in pure NMP formulations. *See* ¶¶ 157–162. However, in my opinion the degradation results for NMP disclosed in Drager '006 are not so negative that they would have disqualified NMP from consideration by the POSA, particularly given the stability results disclosed by Drager '006 for other solvents, many of which show similar instability profiles.

790.    Dr. Pinal has not offered any opinion about the expected effect of NMP on the degradation of the nitrogen mustard moiety on bendamustine. I understand from Dr. Anslyn that the POSA would have expected NMP to react more slowly than PEG with the nitrogen mustard moiety of bendamustine. *See* Anslyn Rep. ¶¶ 133–136. This would have motivated the POSA to use NMP with bendamustine.

791.    As explained above, Dr. Pinal opines that the POSA would have been motivated to use solvents based on their "–OH burden" (i.e., unweighted hydroxyl group "concentrations"). *See* ¶¶ 247–278. NMP lacks hydroxyl groups. As such, according to Dr. Pinal's argument, the POSA would have preferred NMP to PG and PEG 400, to avoid esterification reactions with bendamustine.

### o.    Polypropylene Glycol

792.    To the extent that the POSA would have been motivated or had reason to pursue a co-solvent approach, the POSA would have understood polypropylene glycol ("PPG") to be a promising solvent for solubilizing and stabilizing bendamustine. PPG is on the list of polar protic solvents disclosed as suitable for use with bendamustine in Drager '006. *Id.* at 3:37–50, JDG_BENDA_00000990 at 997.

793.    PPG had previously been used to stabilize pharmaceutical products. U.S. Patent No. 3,140,232 (the "'232 patent") describes the use of PPG with the tetracycline-type antibiotics.

350

EAGLEBEN-SA_00001661

*See* '232 patent, 1:39–65. The '232 patent discloses that tetracycline-type antibiotics are sensitive to oxidative degradation and color change, but that the use of PPG was found to prevent that degradation. *See id.* The '232 patent discloses that the components of the formulation—including PPG—were "all safe and effective for human use." *Id.* at 1:61–63. In particular, the patent discloses that the PPG-containing "compositions are particularly useful for parenteral and topical administration" and that "injectable solutions which are suitable for intravenous administration" "may be prepared in accordance with standard pharmaceutical practice." *Id.* at 3:55–62.

794. Polypropylene glycol was also used as a co-solvent for parenteral administration in U.S. Patent Publication No. 2009/0233951 (the "'951 publication"). The '951 publication discloses parenteral solutions of the diuretic, metolazone, with various solvents, including PPG. *See* '951 publication ¶ 15. Example 4 of the '951 publication discloses that a metolazone formulation comprising 0.1 mL of DMA and 9.9 mL of PPG produced a clear, colorless solution that could be diluted into saline "without any turbidity, preciptation or change in color appearance." *Id.* ¶ 24. The formulations of that invention were intended for intravenous administration. *See id.* ¶ 12.

### p.    Polysorbates

795. To the extent that the POSA would have been motivated or had reason to pursue a co-solvent approach, the POSA would have understood various polysorbates (also known as polyoxyethylene sorbitan fatty acid esters or TWEENs) to be promising solvents for solubilizing and stabilizing bendamustine. As explained by the *Handbook of Pharmaceutical Excipients*, polysorbates "are a series of partial fatty acid esters of sorbitol and its anhydrides copolymerized with approximately 20, 5, or 4 moles of ethylene oxide for each mole of sorbitol and its anhydrides." Rowe 2009 at 549–553.

351

EAGLEBEN-SA_00001662

796.    For example, polysorbate 80 has the following structure:

Strickley 2004 at 210, JDG_BENDA_00003290 at 3299.

797.    Strickley 2004 describes several marketed intravenous formulations that contained polysorbate 80 at concentrations up to 100%, with infused concentrations up to 2% and concentrations injected intramuscularly up to 12%. *See* Strickley 2014 at 222, JDG_BENDA_00003290 at 3311 (describing a docetaxel formulation with 100% polysorbate 80 that is diluted 50- to 100-fold prior to intravenous infusion). Nema 1997 discloses that, as of 1997, there were 31 marketed parenteral formulations containing polysorbate 80. Nema 1997 at 167, JDG_BENDA_00002272 at 2273.

798.    The POSA would have considered other polysorbates in addition to polysorbate 80. For example, the Inactive Ingredient Database as of 2009 disclosed that polysorbate 20 had been used at a concentration of up to 2.4% in an intravenous infusion product. *See* Inactive Ingredient Database (Dec. 31, 2009), TEVABEND00288118 at 288242. The Inactive Ingredient Database likewise discloses that polysorbate 40 had been used for "IM – IV injection," although no concentration is provided. *Id.* The *Handbook of Pharmaceutical Excipients* states that polysorbates are "generally regarded as nontoxic and nonirritant materials" and discloses the $LD_{50}$ values of polysorbate 20 and 40 to be 1.42 g/kg and 1.58 g/kg when given by infusion. Rowe 2009 at 553. This is only slightly more toxic than the widely used polysorbate 80, which

352

EAGLEBEN-SA_00001663

has an $LD_{50}$ of 1.8 g/kg. *Id.* In view of this safety data, the POSA would have considered using polysorbate 20 and 40, in addition to polysorbate 80.

799. Polysorbate 20, 40, and 80 are all on the list of polar protic solvents disclosed as suitable for use with bendamustine in Drager '006. Drager '006, 3:41–48, JDG_BENDA_00000990 at 997. Those compounds are also on Drager '006's list of surfactants to use with formulations of the invention. *See id.*, 7:9–10, JDG_BENDA_00000990 at 990.

800. As explained above, Dr. Pinal opines that the POSA would have been motivated to use solvents based on their "–OH burden" (i.e., unweighted hydroxyl group "concentrations"). *See* ¶¶ 247–278. As reflected above, polysorbate 80 has the following structure:

Strickley 2004 at 210, JDG_BENDA_00003290 at 3299. As disclosed by both the *Handbook* and Strickley 2004, polysorbate 80 has a molecular weight of 1310 Da. *Id.*; Rowe 2009 at 549. According to Dr. Pinal's calculation method, polysorbate 80 (which contains three hydroxyl groups) therefore has an unweighted hydroxyl group "concentration" of about 3.9%. Similar calculations based on the molecular weights disclosed in the *Handbook* demonstrate that polysorbate 20 and 40 have unweighted of hydroxyl group "concentrations" of 4.5% and 4.0%, respectively. All values are lower than the weighted (27.88%) and unweighted (44.68%) hydroxyl group "concentrations" of PG and the hydroxyl group "concentration" of PEG 400, as calculated by Dr. Anslyn (8.5%) and Dr. Pinal (8.21%). *See* ¶ 269. As such, according to Dr.

353

Pinal's argument, the POSA would have preferred polysorbates to PG and PEG 400, to minimize esterification reactions with bendamustine.

801.                                        REDACTED

### q.    Solketal

802.    To the extent that the POSA would have been motivated or had reason to pursue a co-solvent approach, the POSA would have understood Solketal to be a promising solvent for solubilizing and stabilizing bendamustine. Solketal (also known as isopropylidene glycerol and 2,2-dimethyl-1,3-dioxolane-4-methanol) is a "nontoxic, nonirritating solvent, miscible with water, alcohol, esters, aliphatic and aromatic hydrocarbons, and virtually all other organic solvents." Spiegel 1963 at 919, JDG_BENDA_00003835 at 3839. Mottu 2000 reports that Solketal "seems to be acceptable intravenously . . . for clinical use as a diuretic at a concentration of up to 50% as well as when used as a solvent in injectable drug formulations." Mottu 2000 at 461, JDG_BENDA_00005839 at 5844.

803.    In a study on the acute toxicity and hemolytic activity of a variety of solvents, it was found that Solketal had a higher $LD_{50}$ than both ethanol and NMP (i.e., Solketal is less toxic than ethanol and NMP). *See* Jordan 2005 at 354. Solketal was reported to have similar hemolytic and hemodynamic activity to both NMP and ethanol. *Id.*

354

EAGLEBEN-SA_00001665

804.    It had been reported that powdered tetracycline could be dissolved in Solketal and injected intramuscularly, and that such injections give less pain than injections using an aqueous vehicle. *See* U.S. Patent No. 3,004,894, 3:50–6:58.

805.    As explained above, Dr. Pinal opines that the POSA would have been motivated to use solvents based on their "–OH burden" (i.e., unweighted hydroxyl group "concentrations"). *See* ¶¶ 238–267. Solketal has the following structure:

*See* Spiegel 1963 at 919, JDG_BENDA_99993835 at 3839. Thus, Solketal has a molecular mass of approximately 132.159 Da (= 6 × 12.011 Da + 12 × 1.0079 Da + 3 × 15.9994 Da). *See* Morrison & Boyd, ORGANIC CHEMISTRY, Relative Atomic Weights (6th ed. 1992) ($^{12}$C = 12). According to Dr. Pinal's calculation method, Solketal (which has one hydroxyl group per molecule) has an <u>unweighted</u> hydroxyl group "concentration" of about 12.9%. This is substantially lower than the <u>weighted</u> (27.88%) and <u>unweighted</u> (44.68%) hydroxyl group "concentrations" of PG. *See* ¶ 269. As such, according to Dr. Pinal's argument, the POSA would have been motivated to use Solketal, to minimize esterification reactions with bendamustine.

### r.    Solutol HS 15

806.    To the extent that the POSA would have been motivated or had reason to pursue a co-solvent approach, the POSA would have understood Solutol HS 15 to be a promising solvent for solubilizing and stabilizing bendamustine. Strickley 2004 describes Solutol HS 15 (also

355

EAGLEBEN-SA_00001666

known as macrogol 15 hydroxystearate) as "~70% lipophilic consisting of polyglycol mono- and diesters of 12-hydrxystearic acid and ~30% hydrophilic consisting of polyethylene glycol." Strickley 2004 at 212, JDG_BENDA_00003290 at 3301; *see also* Rowe 2009 at 391–93. Solutol is a polyol. *See* Strickley 2004 at 210, Table III, JDG_BENDA_00003290 at 3299.

807.    The mono- and di-esters of Solutol HS 15 have the following chemical structures:

Strickley 2004 at 210, Table III, JDG_BENDA_00003290 at 3299.

808.    Strickley 2004 discloses that Solutol HS 15 had been used in parenteral products at concentrations up to 50% and had been administered intravenously without subsequent dilution. *See* Strickley 2004 at 222, JDG_BENDA_00003290 at 3311. Strickley 2004 also notes that Solutol HS 15 had been used to solubilize Panitol, Vitamin K, and diclofenac in intravenous formulations outside of the United States. *Id.* The *Handbook of Pharmaceutical Excipients* comments that Solutol HS 15 had been used to solubilize a wide variety of pharmaceutical agents for parenteral preparations. Rowe 2009 at 391–93.

809.    I understand that several sources categorize Solutol HS 15 as a "surfactant" rather than a "solvent." *E.g.*, Strickley 2004 at 228, JDG_BENDA_00003290 at 3316. As I explain

356

EAGLEBEN-SA_00001667

above, excipients can have multiple functions, and the POSA would nevertheless have considered it for use in high concentrations in bendamustine formulations, particularly in view of the concentrations that had previously been demonstrated to be safe and that had been used in marketed formulations. *See* ¶ 299.

810. The *Handbook of Pharmaceutical* excipients notes that Solutol HS 15 "has a high chemical stability" and is "stable for at least 24 months if stored in unopened airtight containers at room temperature." Rowe 2009 at 391–93. This stability profile would have caused the POSA to prefer Solutol HS 15 over PEG, in view of PEG's known instability risks. *See* ¶ 339.

811. As explained above, Dr. Pinal opines that the POSA would have been motivated to use solvents based on their "–OH burden" (i.e., unweighted hydroxyl group "concentrations"). *See* ¶¶ 238–267. As disclosed by the *Handbook of Pharmaceutical Excipients*, Solutol HS 15 has an average molecular weight of about 344.53 Da. *See* Rowe 2009 at 391–93. According to Dr. Pinal's calculation method, Solutol HS 15 (which has two hydroxyl groups per molecule) has an <u>unweighted</u> hydroxyl group "concentration" of about 9.9%. This is substantially lower than the <u>weighted</u> (27.88%) and <u>unweighted</u> (44.68%) hydroxyl group "concentrations" of PG and is close to the hydroxyl group "concentration" of PEG 400, as calculated by Dr. Anslyn (8.5%) and Dr. Pinal (8.21%). *See* ¶ 269. As such, according to Dr. Pinal's argument, the POSA would have been motivated to use Solutol HS 15, to minimize esterification reactions with bendamustine.

**J.    Objective Indicia Support the Non-Obviousness of the '707 Patent Family.**

812. For the reasons explained above, I disagree with Dr. Pinal's conclusions that the inventions claimed by the '707 patent family would have been obvious, including based on any of the references or the supposed knowledge of the POSA described in Dr. Pinal's report. However, even if Dr. Pinal's arguments sufficed to establish that the claimed inventions would

357

have been *prima facie* obvious, strong objective indicia of non-obviousness show that the asserted claims are not invalid.

813.    As discussed above, I understand that a proper obviousness analysis involves an evaluation of any objective indicia of non-obviousness. I understand that commonly recognized objective indicia include evidence of failure of others and commercial success, among others. I further understand that any objective indicia must have a sufficient nexus to the claimed inventions. In my opinion, Bendeka® is an embodiment of the asserted claims. In addition, the failure of others to develop the claimed inventions demonstrates that the claimed inventions would not have been obvious. I understand that Dr. John Jarosz has submitted a report providing further opinions related to commercial success. In my opinion, the features of the claimed formulations that I discuss below are due the inventions themselves, not the prior art. I have not been asked in this report to opine on any unexpected properties of the claimed formulations, and I state no opinion on that issue.

### 1.    Embodiment

814.    I understand that Defendants dispute whether Bendeka®, including the use of Bendeka® in accordance with Bendeka®'s FDA-approved labeling, is an embodiment of the asserted claims. I disagree. Claim charts analyzing each of the asserted claims are set forth below, including any unasserted claims from which they depend. Unasserted claims are denoted with an asterisk. I rely on Dr. Agarwal's and Dr. Jeffery Kittendorf's opinions, where appropriate. Because the Defendants' Invalidity Contentions, Supplemental Interrogatory Responses, and Notice Letters do not identify any specific limitations they are contesting, I have attempted to respond to the best of my ability based on the limited information that the Defendants have disclosed. I note that my analysis of Bendeka® is consistent with my analysis of the Defendants' ANDA Products, which Defendants have represented to be qualitatively and

358

quantitatively the same as Bendeka®. *See* Siepmann Opening Rep. ¶¶ 53, 124, 197, 260. That further supports my opinions.

### a.    U.S. Patent No. 8,609,707

| U.S. Patent No. 8,609,707 | Bendeka® |
|---|---|
| **Claim 1\*** | |
| A long term storage stable non-aqueous liquid bendamustine-containing composition, comprising: | Bendeka® is long term storage stable. Representative batches of Bendeka® have 5% total impurities after 15 months of storage at about 5° C, as calculated on a normalized peak area response as determined by HPLC at a wavelength of 223 nm. *See, e.g.,* EGL-BENDEKA_00008565 at 8565; EGL-BENDEKA_00008567 at 8567; EGL-BENDEKA_00008569 at 8569. As explained in my opening report, I understand, based on Dr. Kittendorf's Opening Report, that Eagle's stability measurements, which were conducted at a wavelength of 230 nm, are not meaningfully different from measurements conducted at 223 nm. *See* Siepmann Opening Rep. ¶¶ 329–330. Bendeka® is non-aqueous. Bendeka® comprises polyethylene gylcol and propylene gylcol, which are non-aqueous solvents. Plaintiffs' specifications require Bendeka® to comprise not more than 2.5% water.[10] *See, e.g.,* EGL-BENDEKA_33710 at 33710. Representative batches of Bendeka® comprise 0.5% and 0.4% water. *See, e.g.,* EGL-BENDEKA_00008463 at 8463; EGL-BENDEKA_00008465 at 8465; EGL-BENDEKA_00008467 at 8467. Bendeka® is a liquid composition. Plaintiffs' NDA describes Bendeka® as a "solution" that |

[10] To be clear, I have only been asked to opine on whether Bendeka®, the Defendants' ANDA Products, and the pharmaceutically acceptable fluids contained within those products are "non-aqueous." I have not been asked to opine whether a formulation that contains more water than those products would be non-aqueous, and I state no opinion on that issue.

359

EAGLEBEN-SA_00001670

| U.S. Patent No. 8,609,707 | Bendeka® |
|---|---|
|  | is "ready-for-dilution." *See, e.g.,* EGL-BENDEKA_00002350 at 2370.<br><br>Bendeka® comprises bendamustine hydrochloride. *See, e.g.,* EGL-BENDEKA_00002350 at 2370. |
| a) bendamustine or a pharmaceutically acceptable salt thereof, and | Bendeka® comprises bendamustine hydrochloride, which is a pharmaceutically acceptable salt of bendamustine. *See, e.g.* EGL-BENDEKA_00002350 at 2370. |
| b) a pharmaceutically acceptable fluid comprising | Bendeka® comprises a pharmaceutically acceptable fluid comprising polyethylene glycol 400, propylene glycol, and monothioglycerol. *See, e.g.,* EGL-BENDEKA_00002350 at 2370. |
| i) about 90% polyethylene glycol and about 10% propylene glycol; and | Bendeka®'s pharmaceutically acceptable fluid comprises about 90% polyethylene glycol and about 10% propylene glycol. *See, e.g.,* EGL-BENDEKA_00002350 at 2370; EGL-BENDEKA_00002608 at 2615. |
| ii) a stabilizing amount of an antioxidant. | Bendeka® comprises 5 mg/mL monothioglycerol, which is a stabilizing amount of an antioxidant. *See, e.g.,* EGL-BENDEKA_00002350 at 2370, 2373; Siepmann Opening Rep. ¶¶ 332–338. |
| **Claim 9*** |  |
| The long term storage stable non-aqueous liquid bendamustine-containing composition of claim **1**, | Bendeka® satisfies the limitations of claim 1, as set forth above. |
| wherein the stabilizing amount of the antioxidant is from about 2.5 mg/mL to about 35 mg/mL. | Bendeka® comprises 5 mg/mL monothioglycerol, which is a stabilizing amount of an antioxidant. *See, e.g.,* EGL-BENDEKA_00002350 at 2370, 2373; Siepmann Opening Rep. ¶¶ 332–338. |
| **Claim 10*** |  |
| The long term storage stable non-aqueous liquid bendamustine-containing composition of claim **9**, | Bendeka® satisfies the limitations of claim 9, as set forth above. |
| wherein the stabilizing amount of the antioxidant is from about 5 mg/mL to about 20 mg/mL. | Bendeka® comprises 5 mg/mL monothioglycerol, which is a stabilizing amount of an antioxidant. *See, e.g.,* EGL-BENDEKA_00002350 at 2370, 2373; Siepmann Opening Rep. ¶¶ 332–338. |
| **Claim 12** |  |

360

EAGLEBEN-SA_00001671

| U.S. Patent No. 8,609,707 | Bendeka® |
|---|---|
| The long term storage stable non-aqueous liquid bendamustine-containing composition of claim 10, | Bendeka® satisfies the limitations of claim 10, as set forth above. |
| wherein the stabilizing amount of the antioxidant is about 5 mg/mL. | Bendeka® comprises 5 mg/mL monothioglycerol, which is a stabilizing amount of an antioxidant. *See, e.g.,* EGL-BENDEKA_00002350 at 2370, 2373; Siepmann Opening Rep. ¶¶ 332–338. |
| **Claim 13\*** | |
| The long term storage stable non-aqueous liquid bendamustine-containing composition of claim 1, | Bendeka® satisfies the limitations of claim 1, as set forth above. |
| wherein said long term storage is at least 2 years. | Bendeka® has a two-year shelf life. *See, e.g.,* EGL-BENDEKA_00002350 at 2427. |
| **Claim 14\*** | |
| A long term storage stable non-aqueous liquid bendamustine-containing composition, comprising: | Bendeka® is long term storage stable. Representative batches of Bendeka® have 5% total impurities after 15 months of storage at about 5° C, as calculated on a normalized peak area response as determined by HPLC at a wavelength of 223 nm. *See, e.g.,* EGL-BENDEKA_00008565 at 8565; EGL-BENDEKA_00008567 at 8567; EGL-BENDEKA_00008569 at 8569.<br><br>As explained in my opening report, I understand, based on Dr. Kittendorf's Opening Report, that Eagle's stability measurements, which were conducted at a wavelength of 230 nm, are not meaningfully different from measurements conducted at 223 nm. *See* Siepmann Opening Rep. ¶¶ 329–330.<br><br>Bendeka® is non-aqueous. Bendeka® comprises polyethylene gylcol and propylene gylcol, which are non-aqueous solvents. Plaintiffs' specifications require Bendeka® to comprise not more than 2.5% water. *See, e.g.,* EGL-BENDEKA_33710 at 33710. Representative batches of Bendeka® comprise 0.5% and 0.4% water. *See, e.g.,* EGL-BENDEKA_00008463 at 8463; EGL-BENDEKA_00008465 at 8465; EGL-BENDEKA_00008467 at 8467. |

361

EAGLEBEN-SA_00001672

| U.S. Patent No. 8,609,707 | Bendeka® |
|---|---|
|  | Bendeka® is a liquid composition. Plaintiffs' NDA describes Bendeka® as a "solution" that is "ready-for-dilution." *See, e.g.*, EGL-BENDEKA_00002350 at 2370.<br><br>Bendeka® comprises bendamustine hydrochloride. *See, e.g.*, EGL-BENDEKA_00002350 at 2370. |
| a) bendamustine or a pharmaceutically acceptable salt thereof, and | Bendeka® comprises bendamustine hydrochloride, which is a pharmaceutically acceptable salt of bendamustine. *See, e.g.* EGL-BENDEKA_00002350 at 2370. |
| b) a pharmaceutically acceptable fluid comprising | Bendeka® comprises a pharmaceutically acceptable fluid comprising polyethylene glycol 400, propylene glycol, and monothioglycerol. *See, e.g.*, EGL-BENDEKA_00002350 at 2370. |
| i) about 90% polyethylene glycol and about 10% propylene glycol; and | Bendeka®'s pharmaceutically acceptable fluid comprises about 90% polyethylene glycol and about 10% propylene glycol. *See, e.g.*, EGL-BENDEKA_00002350 at 2370; EGL-BENDEKA_00002608 at 2615. |
| ii) a stabilizing amount of thioglycerol. | Bendeka® comprises 5 mg/mL monothioglycerol, which is a stabilizing amount. *See, e.g.*, EGL-BENDEKA_00002350 at 2370, 2373; Siepmann Opening Rep. ¶¶ 332–338.<br><br>For the purposes of the asserted patents, monothioglycerol is also referred to as thioglycerol. *See, e.g.*, '707 patent, 3:63–4:8. |
| **Claim 17\*** |  |
| The long term storage stable non-aqueous liquid bendamustine-containing composition of claim **14**, | Bendeka® satisfies the limitations of claim 14, as set forth above. |
| wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL. | Bendeka® comprises 25 mg/mL bendamustine hydrochloride. *See, e.g.*, EGL-BENDEKA_00002350 at 2370. |
| **Claim 18** |  |
| The long term storage stable non-aqueous liquid bendamustine-containing composition of claim **17**, | Bendeka® satisfies the limitations of claim 17, as set forth above. |

362

EAGLEBEN-SA_00001673

| U.S. Patent No. 8,609,707 | Bendeka® |
|---|---|
| wherein the bendamustine concentration is from about 25 mg/mL to about 50 mg/mL | Bendeka® comprises 25 mg/mL bendamustine hydrochloride. *See, e.g.,* EGL-BENDEKA_00002350 at 2370. |
| **Claim 20** | |
| The long term storage stable non-aqueous liquid bendamustine-containing composition of claim **14**, | Bendeka® satisfies the limitations of claim 14, as set forth above. |
| wherein said long term storage is at least 2 years. | Bendeka® has a two-year shelf life. *See, e.g.,* EGL-BENDEKA_00002350 at 2427. |

b.    U.S. Patent No. 9,265,831

| U.S. Patent No. 9,265,831 | Bendeka® |
|---|---|
| **Claim 1*** | |
| A non-aqueous liquid bendamustine-containing composition, comprising: | Bendeka® is non-aqueous. Bendeka® comprises polyethylene gylcol and propylene gylcol, which are non-aqueous solvents. Plaintiffs' specifications require Bendeka® to comprise not more than 2.5% water. *See, e.g.,* EGL-BENDEKA_33710 at 33710. Representative batches of Bendeka® comprise 0.5% and 0.4% water. *See, e.g.,* EGL-BENDEKA_00008463 at 8463; EGL-BENDEKA_00008465 at 8465; EGL-BENDEKA_00008467 at 8467.<br><br>Bendeka® is a liquid composition. Plaintiffs' NDA describes Bendeka® as a "solution" that is "ready-for-dilution." *See, e.g.,* EGL-BENDEKA_00002350 at 2370.<br><br>Bendeka® comprises bendamustine hydrochloride. *See, e.g.,* EGL-BENDEKA_00002350 at 2370. |
| a) bendamustine or a pharmaceutically acceptable salt thereof; and | Bendeka® comprises bendamustine hydrochloride, which is a pharmaceutically acceptable salt of bendamustine. *See, e.g.* EGL-BENDEKA_00002350 at 2370. |
| b) a pharmaceutically acceptable fluid comprising: | Bendeka® comprises a pharmaceutically acceptable fluid comprising polyethylene glycol 400, propylene glycol, and monothioglycerol. *See, e.g.,* EGL-BENDEKA_00002350 at 2370. |
| i) about 5% to about 10% by volume propylene glycol, | Bendeka®'s pharmaceutically acceptable fluid comprises about 10% propylene glycol. |

363

EAGLEBEN-SA_00001674

| U.S. Patent No. 9,265,831 | Bendeka® |
|---|---|
|  | *See, e.g.,* EGL-BENDEKA_00002350 at 2370; EGL-BENDEKA_00002608 at 2615. |
| ii) polyethylene glycol, and | Bendeka®'s pharmaceutically acceptable fluid comprises polyethylene glycol. *See, e.g.,* EGL-BENDEKA_00002350 at 2370. |
| iii) a stabilizing amount of an antioxidant selected from the group consisting of thioglycerol, monothioglycerol, lipoic acid, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds and dihydrolipoic acid; | Bendeka® comprises 5 mg/mL monothioglycerol, which is a stabilizing amount of an antioxidant. *See, e.g.,* EGL-BENDEKA_00002350 at 2370, 2373; Siepmann Opening Rep. ¶¶ 332–338. |
| the bendamustine-containing composition having less than or equal to 0.11% total PG esters at about 1 month of storage at a temperature of about 5° C.; | Plaintiffs' stability data demonstrate that representative batches of Bendeka® have less than or equal to 0.11% total PG esters at about 1 month of storage at a temperature of about 5° C. *See, e.g.,* EGL-BENDEKA_00008565 at 8565; EGL-BENDEKA_00008567 at 8567; EGL-BENDEKA_00008569 at 8569.[11] |
| wherein the ratio of polyethylene glycol to propylene glycol is selected from the group consisting of: about 95:5, about 90:10, about 85:15, about 80:20 and about 75:25. | Bendeka® has a polyethylene glycol to propylene glycol ratio of about 90:10. *See, e.g.,* EGL-BENDEKA_00002608 at 2615. |
| **Claim 2** |  |
| The liquid bendamustine-containing composition of claim **1**, | Bendeka® satisfies the limitations of claim 1, as set forth above. |
| wherein said bendamustine-containing composition has less than or equal to 0.18% total PG esters at about 12 months of storage at a temperature of about 5° C. | Plaintiffs' stability data demonstrate that representative batches of Bendeka® have less than or equal to 0.18% total PG esters at about 12 months of storage at a temperature of about 5° C. *See, e.g.,* EGL-BENDEKA_00008565 at 8565; EGL-BENDEKA_00008567 at 8567; EGL-BENDEKA_00008569 at 8569; n.11. |
| **Claim 3** |  |
| The liquid bendamustine-containing composition of claim **1**, | Bendeka® satisfies the limitations of claim 1, as set forth above. |

---

[11] Plaintiffs' stability data report PG-1 and PG-2 as "Single Unknown" impurities. *See* EGL-BENDEKA_00033706 at 33706–08. Thus, the amount of total PG esters is equal to or less than twice the amount of the greatest "Single Unknown" impurity. Plaintiffs' analytical methods have a limit of detection of approximately 0.01% and a limit of quantitation of 0.05%. *See* EGL-BENDEKA_00008298 at 8329; EGL-BENDEKA_00034573.

EAGLEBEN-SA_00001675

| U.S. Patent No. 9,265,831 | Bendeka® |
|---|---|
| wherein the amount of propylene glycol in the pharmaceutically acceptable fluid is about 10%. | Bendeka® comprises a pharmaceutically acceptable fluid comprising about 10% propylene glycol. *See, e.g.*, EGL-BENDEKA_00002608 at 2615. |
| **Claim 4*** | |
| The liquid bendamustine-containing composition of claim **1**, | Bendeka® satisfies the limitations of claim 1, as set forth above. |
| wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL. | Bendeka® comprises 25 mg/mL bendamustine hydrochloride. *See, e.g.*, EGL-BENDEKA_00002350 at 2370. |
| **Claim 5** | |
| The liquid bendamustine-containing composition of claim **4**, | Bendeka® satisfies the limitations of claim 4, as set forth above. |
| wherein the bendamustine concentration is from about 25 mg/mL to about 50 mg/mL. | Bendeka® comprises 25 mg/mL bendamustine hydrochloride. *See, e.g.*, EGL-BENDEKA_00002350 at 2370. |

c.    **U.S. Patent No. 9,572,796**

| U.S. Patent No. 9,572,796 | Bendeka® |
|---|---|
| **Claim 1*** | |
| A non-aqueous liquid composition comprising: | Bendeka® is non-aqueous. Bendeka® comprises polyethylene gylcol and propylene gylcol, which are non-aqueous solvents. Plaintiffs' specifications require Bendeka® to comprise not more than 2.5% water. *See, e.g.*, EGL-BENDEKA_33710 at 33710. Representative batches of Bendeka® comprise 0.5% and 0.4% water. *See, e.g.*, EGL-BENDEKA_00008463 at 8463; EGL-BENDEKA_00008465 at 8465; EGL-BENDEKA_00008467 at 8467.  Bendeka® is a liquid composition. Plaintiffs' NDA describes Bendeka® as a "solution" that is "ready-for-dilution." *See, e.g.*, EGL-BENDEKA_00002350 at 2370.  Bendeka® comprises bendamustine hydrochloride. *See, e.g.*, EGL-BENDEKA_00002350 at 2370. |
| bendamustine, or a pharmaceutically acceptable salt thereof; | Bendeka® comprises bendamustine hydrochloride, which is a pharmaceutically acceptable salt of bendamustine. *See, e.g.* EGL-BENDEKA_00002350 at 2370. |

365

EAGLEBEN-SA_00001676

| U.S. Patent No. 9,572,796 | Bendeka® |
|---|---|
| a pharmaceutically acceptable fluid comprising a mixture of polyethylene glycol and propylene glycol, | Bendeka® comprises a pharmaceutically acceptable fluid comprising polyethylene glycol and propylene glycol. *See, e.g.,* EGL-BENDEKA_00002350 at 2370. |
| wherein the ratio of polyethylene glycol to propylene glycol in the pharmaceutically acceptable fluid is from about 95:5 to about 50:50; and | Bendeka® has a polyethylene glycol to propylene glycol ratio of about 90:10. *See, e.g.,* EGL-BENDEKA_00002608 at 2615. |
| a stabilizing amount of an antioxidant; | Bendeka® comprises 5 mg/mL monothioglycerol, which is a stabilizing amount of an antioxidant. *See, e.g.,* EGL-BENDEKA_00002350 at 2370, 2373; Siepmann Opening Rep. ¶¶ 332–338. |
| wherein the composition has less than about 5% total impurities after 15 months of storage at about 5° C., as calculated on a normalized peak area response basis as determined by high performance liquid chromatography at a wavelength of 223 nm. | Representative batches of Bendeka® have less than about 5% total impurities after 15 months of storage at about 5° C., as calculated on a normalized peak area response basis as determined by high performance liquid chromatography at a wavelength of 223 nm. *See, e.g.,* EGL-BENDEKA_00008565 at 8565; EGL-BENDEKA_00008567 at 8567; EGL-BENDEKA_00008569 at 8569.<br><br>As explained in my opening report, I understand, based on Dr. Kittendorf's Opening Report, that Eagle's stability measurements, which were conducted at a wavelength of 230 nm, are not meaningfully different from measurements conducted at 223 nm. *See* Siepmann Opening Rep. ¶¶ 329–330. |
| **Claim 5** | |
| The non-aqueous liquid composition of claim 1, | Bendeka® satisfies the limitations of claim 1, as set forth above. |
| wherein the bendamustine concentration is about 25 mg/mL. | Bendeka® comprises 25 mg/mL bendamustine hydrochloride. *See, e.g.,* EGL-BENDEKA_00002350 at 2370. |
| **Claim 14\*** | |
| A non-aqueous liquid composition comprising: | Bendeka® is non-aqueous. Bendeka® comprises polyethylene gylcol and propylene gylcol, which are non-aqueous solvents. Plaintiffs' specifications require Bendeka® to comprise not more than 2.5% water. *See, e.g.,* EGL-BENDEKA_33710 at 33710. Representative batches of Bendeka® |

366

EAGLEBEN-SA_00001677

| U.S. Patent No. 9,572,796 | Bendeka® |
|---|---|
| | comprise 0.5% and 0.4% water. *See, e.g.,* EGL-BENDEKA_00008463 at 8463; EGL-BENDEKA_00008465 at 8465; EGL-BENDEKA_00008467 at 8467.<br><br>Bendeka® is a liquid composition. Plaintiffs' NDA describes Bendeka® as a "solution" that is "ready-for-dilution." *See, e.g.,* EGL-BENDEKA_00002350 at 2370.<br><br>Bendeka® comprises bendamustine hydrochloride. *See, e.g.,* EGL-BENDEKA_00002350 at 2370. |
| bendamustine, or a pharmaceutically acceptable salt thereof; | Bendeka® comprises bendamustine hydrochloride, which is a pharmaceutically acceptable salt of bendamustine. *See, e.g.* EGL-BENDEKA_00002350 at 2370. |
| a pharmaceutically acceptable fluid comprising a mixture of polyethylene glycol and propylene glycol, | Bendeka® comprises a pharmaceutically acceptable fluid comprising polyethylene glycol and propylene glycol. *See, e.g.,* EGL-BENDEKA_00002350 at 2370. |
| wherein the ratio of polyethylene glycol to propylene glycol in the pharmaceutically acceptable fluid is from about 95:5 to about 50:50; and | Bendeka® has a polyethylene glycol to propylene glycol ratio of about 90:10. *See, e.g.,* EGL-BENDEKA_00002608 at 2615. |
| a stabilizing amount of an antioxidant; | Bendeka® comprises 5 mg/mL monothioglycerol, which is a stabilizing amount of an antioxidant. *See, e.g.,* EGL-BENDEKA_00002350 at 2370, 2373; Siepmann Opening Rep. ¶¶ 332–338. |
| wherein the composition has less than about 5% total impurities after storage for 15 days at 25° C., as calculated on a normalized peak area response basis as determined by high performance liquid chromatography at a wavelength of 223 nm. | Representative batches of Bendeka® have less than about 5% total impurities after storage for 15 days at 25° C., as calculated on a normalized peak area response basis as determined by high performance liquid chromatography at a wavelength of 223 nm. *See, e.g.,* EGL-BENDEKA_00008564 at 8564; EGL-BENDEKA_00008566 at 8566; EGL-BENDEKA_00008568 at 8568.<br><br>As explained in my opening report, I understand, based on Dr. Kittendorf's Opening Report, that Eagle's stability measurements, which were conducted at a wavelength of 230 nm, are not meaningfully |

EAGLEBEN-SA_00001678

| U.S. Patent No. 9,572,796 | Bendeka® |
|---|---|
| | different from measurements conducted at 223 nm. *See* Siepmann Opening Rep. ¶¶ 329–330. |
| **Claim 18** | |
| The non-aqueous liquid composition of claim **14**, | Bendeka® satisfies the limitations of claim 14, as set forth above. |
| wherein the bendamustine concentration is about 25 mg/mL. | Bendeka® comprises 25 mg/mL bendamustine hydrochloride. *See, e.g.,* EGL-BENDEKA_00002350 at 2370. |

### d.  U.S. Patent No. 9,572,797

| U.S. Patent No. 9,572,797 | Bendeka® |
|---|---|
| **Claim 1\*** | |
| A method of treating leukemia, Hodgkin's disease, or multiple myeloma in a mammal, | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| comprising administering to the mammal, | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| a liquid bendamustine-containing composition comprising: | Bendeka® is a liquid composition. Plaintiffs' NDA describes Bendeka® as a "solution" that is "ready-for-dilution." *See, e.g.,* EGL-BENDEKA_00002350 at 2370.<br><br>Bendeka® comprises bendamustine hydrochloride. *See, e.g.,* EGL-BENDEKA_00002350 at 2370. |
| a) bendamustine or a pharmaceutically acceptable salt thereof; and | Bendeka® comprises bendamustine hydrochloride, which is a pharmaceutically acceptable salt of bendamustine. *See, e.g.* EGL-BENDEKA_00002350 at 2370. |
| b) a non-aqueous pharmaceutically acceptable fluid comprising | Bendeka® comprises a non-aqueous pharmaceutically acceptable fluid comprising polyethylene glycol and propylene glycol. *See, e.g.,* EGL-BENDEKA_00002350 at 2370.<br><br>Bendeka® is non-aqueous. Bendeka® comprises polyethylene gylcol and propylene gylcol, which are non-aqueous solvents. Plaintiffs' specifications require Bendeka® to comprise not more than 2.5% water. *See, e.g.,* EGL-BENDEKA_33710 at 33710. Representative batches of Bendeka® comprise 0.5% and 0.4% water. *See, e.g.,* EGL-BENDEKA_00008463 at 8463; EGL- |

368

EAGLEBEN-SA_00001679

| U.S. Patent No. 9,572,797 | Bendeka® |
|---|---|
| | BENDEKA_00008465 at 8465; EGL-BENDEKA_00008467 at 8467. |
| about 5% to about 10%, based on the volume of the pharmaceutically acceptable fluid, of propylene glycol, | Bendeka®'s pharmaceutically acceptable fluid comprises about 10% propylene glycol. *See, e.g.*, EGL-BENDEKA_00002350 at 2370; EGL-BENDEKA_00002608 at 2615. |
| polyethylene glycol, | Bendeka®'s pharmaceutically acceptable fluid comprises polyethylene glycol. *See* EGL-BENDEKA_00002350 at 2370. |
| and a stabilizing amount of an antioxidant selected from the group consisting of thioglycerol, monothioglycerol, lipoic acid, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds and dihydrolipoic acid; | Bendeka® comprises 5 mg/mL monothioglycerol, which is a stabilizing amount of an antioxidant. *See, e.g.*, EGL-BENDEKA_00002350 at 2370, 2373; Siepmann Opening Rep. ¶¶ 332–338. |
| the bendamustine-containing composition having less than or equal to 0.11% total PG esters at about 1 month of storage at a temperature of about 5° C.; | Representative batches of Bendeka® have less than or equal to 0.11% total PG esters at about 1 month of storage at a temperature of about 5° C. *See, e.g.*, EGL-BENDEKA_00008565 at 8565; EGL-BENDEKA_00008567 at 8567; EGL-BENDEKA_00008569 at 8569; n.11. |
| wherein the ratio of polyethylene glycol to propylene glycol is selected from the group consisting of: about 95:5, about 90:10, about 85:15, about 80:20, and about 75:25. | Bendeka® has a polyethylene glycol to propylene glycol ratio of about 90:10. *See, e.g.*, EGL-BENDEKA_00002608 at 2615. |
| **Claim 9** | |
| The method of claim 1, | Bendeka® or the use according to its labeling satisfies the limitations of claim 1, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein said bendamustine-containing composition has less than or equal to 0.43% total PG esters at about 3 months of storage at a temperature of about 25° C. | Representative batches of Bendeka® have less than or equal to 0.43% total PG esters at about 3 months of storage at a temperature of about 25° C. *See, e.g.*, EGL-BENDEKA_00008564 at 8564; EGL-BENDEKA_00008566 at 8566; EGL-BENDEKA_00008568 at 8568; n.11. |
| **Claim 10** | |
| The method of claim 1, | Bendeka® or the use according to its labeling satisfies the limitations of claim 1, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein said bendamustine-containing | Representative batches of Bendeka® have |

369

EAGLEBEN-SA_00001680

| U.S. Patent No. 9,572,797 | Bendeka® |
|---|---|
| composition has less than or equal to 0.77% total PG esters at about 6 months of storage at a temperature of about 25° C. | less than or equal to 0.77% total PG esters at about 6 months of storage at a temperature of about 25° C. *See, e.g.*, EGL-BENDEKA_00008564 at 8564; EGL-BENDEKA_00008566 at 8566; EGL-BENDEKA_00008568 at 8568; n.11. |
| **Claim 11** | |
| The method of claim 1, | Bendeka® or the use according to its labeling satisfies the limitations of claim 1, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the antioxidant is thioglycerol or monothioglycerol. | Bendeka® comprises 5 mg/mL monothioglycerol, which is an antioxidant. *See, e.g.*, EGL-BENDEKA_00002350 at 2370, 2373. |
| **Claim 16\*** | |
| A method of treating leukemia, Hodgkin's disease, or multiple myeloma in a mammal, comprising administering to the mammal,: | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| a liquid bendamustine-containing composition, comprising | Bendeka® is a liquid composition. Plaintiffs' NDA describes Bendeka® as a "solution" that is "ready-for-dilution." *See, e.g.*, EGL-BENDEKA_00002350 at 2370.<br><br>Bendeka® comprises bendamustine hydrochloride. *See, e.g.*, EGL-BENDEKA_00002350 at 2370. |
| a) bendamustine or a pharmaceutically acceptable salt thereof; and | Bendeka® comprises bendamustine hydrochloride, which is a pharmaceutically acceptable salt of bendamustine. *See, e.g.* EGL-BENDEKA_00002350 at 2370. |
| b) a non-aqueous pharmaceutically acceptable fluid comprising propylene glycol, polyethylene glycol, and | Bendeka® comprises a non-aqueous pharmaceutically acceptable fluid comprising polyethylene glycol and propylene glycol. *See, e.g.*, EGL-BENDEKA_00002350 at 2370.<br><br>Bendeka® is non-aqueous. Bendeka® comprises polyethylene glycol and propylene glycol, which are non-aqueous solvents. Plaintiffs' specifications require Bendeka® to comprise not more than 2.5% water. *See, e.g.*, EGL-BENDEKA_33710 at 33710. Representative batches of Bendeka® comprise 0.5% and 0.4% water. *See, e.g.*, |

370

EAGLEBEN-SA_00001681

| U.S. Patent No. 9,572,797 | Bendeka® |
|---|---|
| | EGL-BENDEKA_00008463 at 8463; EGL-BENDEKA_00008465 at 8465; EGL-BENDEKA_00008467 at 8467. |
| a stabilizing amount of an antioxidant selected from the group consisting of thioglycerol, monothioglycerol, lipoic acid, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenolcontaining aromatic and aliphatic compounds and dihydrolipoic acid; | Bendeka® comprises 5 mg/mL monothioglycerol, which is a stabilizing amount of an antioxidant. *See, e.g.,* EGL-BENDEKA_00002350 at 2370, 2373; Siepmann Opening Rep. ¶¶ 332–338. |
| the bendamustine-containing composition having less than or equal to 0.12% total PG esters at about 15 days of storage at a temperature of about 25° C.; | Representative batches of Bendeka® have less than or equal to 0.12% total PG esters at about 15 days of storage at a temperature of about 25° C. *See, e.g.,* EGL-BENDEKA_00002608 at 2621; n.11. |
| wherein the ratio of polyethylene glycol to propylene glycol is selected from the group consisting of: about 95:5, about 90:10, about 85:15, about 80:20, and about 75:25. | Bendeka® has a polyethylene glycol to propylene glycol ratio of about 90:10. *See, e.g.,* EGL-BENDEKA_00002608 at 2615. |
| **Claim 21** | |
| The method of claim **16**, | Bendeka® or the use according to its labeling satisfies the limitations of claim 16, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the amount of propylene glycol in the pharmaceutically acceptable fluid is about 10%. | Bendeka®'s pharmaceutically acceptable fluid comprises about 10% propylene glycol. *See, e.g.,* EGL-BENDEKA_00002608 at 2615. |

e.     U.S. Patent No. 9,034,908

| U.S. Patent No. 9,034,908 | Bendeka® |
|---|---|
| **Claim 1\*** | |
| A method of treating cancer or malignant disease in a subject, | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| comprising parenterally administering a volume of about 100 ml or less of a liquid composition comprising: | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| a) from about 0.05 to about 12.5 mg/ml of bendamustine or a pharmaceutically acceptable salt thereof; | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| b) a solubilizer comprising polyethylene glycol and propylene glycol, the polyethylene glycol being present in an amount of from about 0.3 to about 45% by volume and the | Bendeka® comprises polyethylene glycol and propylene glycol, which function, in part, as solubilizers. *See, e.g.,* EGL-BENDEKA_00002350 at 2370. |

371

EAGLEBEN-SA_00001682

| U.S. Patent No. 9,034,908 | Bendeka® |
|---|---|
| propylene glycol being present in an amount of from about 0.03 to about 5% by volume; | Based on Dr. Agarwal's Opening Report, I understand that Bendeka®'s labeling recommends diluting Bendeka® at dilution ratios of between 1:50 and 14.4:50. *See, e.g.,* Agarwal Opening Rep. ¶ 32. At those dilution ratios, formulations prepared with Bendeka® comprise polyethylene glycol and propylene glycol ratios that overlap with the claimed range.[12] |
| c) a parenterally acceptable diluent; | Based on Dr. Agarwal's report, *see* Agarwal Opening Rep. ¶ 18, I understand that Bendeka®'s labeling recommends diluting Bendeka® into 0.9% Sodium Chloride Injection, USP; 2.5% Dextrose/0.45% Sodium Chloride Injection, USP; or 5% Dextrose Injection, USP, which are parenterally acceptable diluents, *see, e.g.,* Siepmann Opening Rep. ¶¶ 112–113, 185–186, 309–10. |
| and optionally d) an antioxidant; | Bendeka® comprises monothioglycerol, which is an antioxidant. *See, e.g.,* EGL-BENDEKA_00002350 at 2370, 2373. |
| over a period of less than or equal to about 10 minutes to the subject. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| **Claim 10\*** | |
| The method of claim 1, | Bendeka® or the use according to its labeling satisfies the limitations of claim 1, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the weight ratio of polyethylene glycol to propylene glycol is about 90:10. | Bendeka® has a polyethylene glycol to propylene glycol weight ratio of about 90:10.[13] |

---

[12] Bendeka® comprises about 90% polyethylene glycol and about 10% propylene glycol. *See, e.g.,* EGL-BENDEKA_00002608 at 2615. At a dilution ratio of 1:50, the diluted formulation comprises about 1.8% polyethylene glycol and about 0.2% propylene glycol. At a dilution ratio of 14.4:50, the diluted formulation comprises about 20.1% polyethylene glycol and about 2.2% propylene glycol.

[13] According to Plaintiffs' batch manufacturing records, a 50 L (57.0 kg) batch of Bendeka® comprises 1,250.0 g bendamustine hydrochloride, 5,180.0 g propylene glycol, 250.0 g monothioglycerol, between 0.0 g and 40.0 g sodium hydroxide, between 0 mL and 1000 mL water, and an insubstantial amount of nitrogen. *See* EGL-BENDEKA_00031994 at 32000,

372

EAGLEBEN-SA_00001683

| U.S. Patent No. 9,034,908 | Bendeka® |
|---|---|
| **Claim 14** | |
| The method of claim 10, | Bendeka® or the use according to its labeling satisfies the limitations of claim 10, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the volume administered is about 50 ml or less. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |

### f.    U.S. Patent No. 9,144,568

| U.S. Patent No. 9,144,568 | Bendeka® |
|---|---|
| **Claim 1\*** | |
| A method of treating chronic lymphocytic leukemia or indolent B cell non-Hodgkin's lymphoma | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| comprising parenterally administering to a subject a volume of about 100 ml or less of a liquid composition comprising: | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| a) from about 0.5 to about 5.6 mg/ml of bendamustine or a pharmaceutically acceptable salt thereof; | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| b) a solubilizer comprising polyethylene glycol and propylene glycol, wherein the amount of solubilizer is from about 0.5 to about 26.5% vol; | Based on Dr. Agarwal's Opening Report, I understand that Bendeka®'s labeling recommends diluting Bendeka® at dilution ratios of between 1:50 and 14.4:50. *See, e.g.,* Agarwal Opening Rep. ¶ 32. At those dilution ratios, formulations prepared with Bendeka® comprise polyethylene glycol and propylene glycol ratios that overlap with the claimed range. *See* n.12. |
| c) a parenterally acceptable diluent; | Based on Dr. Agarwal's report, *see* Agarwal Opening Rep. ¶ 18, I understand that Bendeka®'s labeling recommends diluting Bendeka® into 0.9% Sodium Chloride |

---

31723.  The fact that Bendeka®'s approved labeling does not mention nitrogen confirms that any amount of nitrogen in Bendeka® is insubstantial.  *See* Agarwal Opening Rep. Ex. C.  Because Bendeka®'s total weight equals the sum of the ingredient weights, a 50 L (57.0 kg) batch of Bendeka® comprises between approximately 49.28 kg (= 57.0 kg – [1.25 kg + 5.18 kg + 0.25 kg + 0.04 kg + 1.0 kg]) and 50.32 kg (= 57.0 kg – [1.25 kg + 5.18 kg + 0.25 kg + 0.0 kg + 0.0 kg]) polyethylene glycol.  Thus, Bendeka® has a polyethylene glycol to propylene glycol weight ratio of between approximately 90.5:9.5 and 90.7:9.3, which the POSA would understand to be about 90:10.  *See* Siepmann Opening Rep. ¶ 376.

373

EAGLEBEN-SA_00001684

| U.S. Patent No. 9,144,568 | Bendeka® |
|---|---|
| | Injection, USP; 2.5% Dextrose/0.45% Sodium Chloride Injection, USP; or 5% Dextrose Injection, USP, which are parenterally acceptable diluents, *see, e.g.,* Siepmann Opening Rep. ¶¶ 112–113, 185–186, 309–10. |
| and optionally d) an antioxidant; | Bendeka® comprises monothioglycerol, which is an antioxidant. *See, e.g.,* EGL-BENDEKA 00002350 at 2370, 2373. |
| over a period of less than or equal to about 15 minutes to the subject. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| **Claim 9\*** | |
| The method of claim **1**, | Bendeka® or the use according to its labeling satisfies the limitations of claim 1, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the bendamustine is administered to treat chronic lymphocytic leukemia. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| **Claim 10\*** | |
| The method of claim **9**, | Bendeka® or the use according to its labeling satisfies the limitations of claim 9, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the composition is administered intravenously in a volume of about 50 ml | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| in 10 minutes or less | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| on days 1 and 2 of a 28 day cycle. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| **Claim 11** | |
| The method of claim **10**, | Bendeka® or the use according to its labeling satisfies the limitations of claim 10, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the composition is administered in about 10 minutes. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| **Claim 15** | |
| The method of claim **9**, | Bendeka® or the use according to its labeling satisfies the limitations of claim 9, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the liquid composition comprises from about 1.85 mg/ml to about 4.84 mg/ml of bendamustine or a pharmaceutically acceptable salt thereof. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |

374

EAGLEBEN-SA_00001685

| U.S. Patent No. 9,144,568 | Bendeka® |
|---|---|
| **Claim 16*** | |
| The method of claim **1**, | Bendeka® or the use according to its labeling satisfies the limitations of claim 1, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the bendamustine is administered to treat indolent B cell non-Hodgkin's lymphoma. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| **Claim 17*** | |
| The method of claim **16**, | Bendeka® or the use according to its labeling satisfies the limitations of claim 16, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the composition is administered intravenously in a volume of about 50 ml | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| in about 10 minutes or less | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| on days 1 and 2 of as 21 day cycle. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| **Claim 18** | |
| The method of claim **17**, | Bendeka® or the use according to its labeling satisfies the limitations of claim 17, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the composition is administered in about 10 minutes. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| **Claim 22** | |
| The method of claim **16**, | Bendeka® or the use according to its labeling satisfies the limitations of claim 16, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the liquid composition comprises from about 2.19 mg/ml to about 5.59 mg/ml of bendamustine or a pharmaceutically acceptable salt thereof. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |

g.    **U.S. Patent No. 9,572,887**

| U.S. Patent No. 9,572,887 | Bendeka® |
|---|---|
| **Claim 1*** | |
| A method of treating chronic lymphocytic leukemia or indolent B cell non-Hodgkin's lymphoma in a subject comprising: | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| a. providing | I understand Dr. Agarwal's Responsive Report addresses this limitation. |

375

EAGLEBEN-SA_00001686

| U.S. Patent No. 9,572,887 | Bendeka® |
|---|---|
| a non-aqueous liquid composition comprising from about 10 mg/mL to about 100 mg/mL of bendamustine or a pharmaceutically acceptable salt thereof, | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| wherein the total impurities are less than about 5% as determined by HPLC at a wavelength of 223 nm after 15 months at a temperature of from about 5° C. to about 25° C.; | Representative batches of Bendeka® have less than about 5% total impurities as determined by HPLC at a wavelength of 223 nm after 15 months at a temperature of from about 5° C. to about 25° C. *See, e.g.*, EGL-BENDEKA_00008565 at 8565; EGL-BENDEKA_00008567 at 8567; EGL-BENDEKA_00008569 at 8569.<br><br>As explained in my opening report, I understand, based on Dr. Kittendorf's Opening Report, that Eagle's stability measurements, which were conducted at a wavelength of 230 nm, are not meaningfully different from measurements conducted at 223 nm. *See* Siepmann Opening Rep. ¶¶ 329–330. |
| b. diluting | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| said non-aqueous liquid composition with a parenterally acceptable aqueous diluent; and | Based on Dr. Agarwal's report, *see* Agarwal Opening Rep. ¶ 18, I understand that Bendeka®'s labeling recommends diluting Bendeka® into 0.9% Sodium Chloride Injection, USP; 2.5% Dextrose/0.45% Sodium Chloride Injection, USP; or 5% Dextrose Injection, USP, which are parenterally acceptable diluents, *see, e.g.*, Siepmann Opening Rep. ¶¶ 112–113, 185–186, 309–10. |
| c. parenterally administering said diluted composition to the subject at a bendamustine dosage ranging from about 25 mg/m² to about 120 mg/m², | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| wherein said administering step is performed with a total volume of about 100 mL or less of the diluted composition | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| administered over a period of less than or equal to about 15 minutes. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| **Claim 8*** | |
| The method of claim 1, | Bendeka® or the use according to its labeling satisfies the limitations of claim 1, as set forth |

376

| U.S. Patent No. 9,572,887 | Bendeka® |
|---|---|
| | above and in Dr. Agarwal's Responsive Report. |
| wherein the subject is a human. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| **Claim 13** | |
| The method of claim **8**, | Bendeka® or the use according to its labeling satisfies the limitations of claim 8, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the volume administered is about 50 mL. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |

h.    U.S. Patent No. 9,597,397

| U.S. Patent No. 9,597,397 | Bendeka® |
|---|---|
| **Claim 1\*** | |
| A method of treating cancer or malignant disease in a subject comprising parenterally administering to a subject, | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| over a period of less than or equal to about 15 minutes, | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| about 100 mL or less of a liquid composition comprising: | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| 0.96-5.59 mg/mL of bendamustine or a pharmaceutically acceptable salt thereof; | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| 3.8-22.4 vol % of a nonaqueous component comprising polyethylene glycol and propylene glycol; | Bendeka® comprises a non-aqueous component comprising polyethylene glycol and propylene glycol. *See, e.g.,* EGL-BENDEKA_00002350 at 2370.<br><br>Based on Dr. Agarwal's Opening Report, I understand that Bendeka®'s labeling recommends diluting Bendeka® at dilution ratios of between 1:50 and 14.4:50. *See, e.g.,* Agarwal Opening Rep. ¶ 32. At those dilution ratios, formulations prepared with Bendeka® comprise polyethylene glycol and propylene glycol ratios that overlap with the claimed range. *See* n.12. |
| a parenterally acceptable diluent; | Based on Dr. Agarwal's report, *see* Agarwal Opening Rep. ¶ 18, I understand that Bendeka®'s labeling recommends diluting Bendeka® into 0.9% Sodium Chloride Injection, USP; 2.5% Dextrose/0.45% |

377

EAGLEBEN-SA_00001688

| U.S. Patent No. 9,597,397 | Bendeka® |
|---|---|
| | Sodium Chloride Injection, USP; or 5% Dextrose Injection, USP, which are parenterally acceptable diluents, *see, e.g.,* Siepmann Opening Rep. ¶¶ 112–113, 185–186, 309–10. |
| and optionally an antioxidant. | Bendeka® comprises monothioglycerol, which is an antioxidant. *See, e.g.,* EGL-BENDEKA  00002350 at 2370, 2373. |
| **Claim 3** | |
| The method of claim 1, | Bendeka® or the use according to its labeling satisfies the limitations of claim 1, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the composition is administered in about 10 minutes. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |

### i.    U.S. Patent No. 9,597,399

| U.S. Patent No. 9,597,399 | Bendeka® |
|---|---|
| **Claim 1\*** | |
| A method of treating cancer or malignant disease in a subject, | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| comprising parenterally administering a volume of about 100 ml or less of a liquid composition comprising: | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| a) from about 0.05 to about 12.5 mg/ml of bendamustine or a pharmaceutically acceptable salt thereof; | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| b) a solubilizer comprising propylene glycol in an amount of from about 4.5 mg/ml to about 51 mg/ml and polyethylene glycol; | Bendeka® comprises polyethylene glycol and propylene glycol, which function, in part, as solubilizers.  *See* EGL-BENDEKA_000002350 at 2370.<br><br>Based on Dr. Agarwal's Opening Report, I understand that Bendeka®'s labeling recommends diluting Bendeka® at dilution ratios of between 1:50 and 14.4:50.  *See, e.g.,* Agarwal Opening Rep. ¶ 32.  At those dilution ratios, formulations prepared with Bendeka® comprise polyethylene glycol and propylene glycol ratios that overlap with the claimed range.  *See* n.12. |
| c) a parenterally acceptable diluent; and optionally | Based on Dr. Agarwal's report, *see* Agarwal Opening Rep. ¶ 18, I understand that Bendeka®'s labeling recommends diluting |

378

EAGLEBEN-SA_00001689

| U.S. Patent No. 9,597,399 | Bendeka® |
|---|---|
|  | Bendeka® into 0.9% Sodium Chloride Injection, USP; 2.5% Dextrose/0.45% Sodium Chloride Injection, USP; or 5% Dextrose Injection, USP, which are parenterally acceptable diluents, *see, e.g.,* Siepmann Opening Rep. ¶¶ 112–113, 185–186, 309–10. |
| d) an antioxidant; | Bendeka® comprises monothioglycerol, which is an antioxidant. *See, e.g.,* EGL-BENDEKA_00002350 at 2370, 2373. |
| over a period of less than or equal to about 15 minutes to a subject in need thereof. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| **Claim 3\*** | |
| The method of claim 1, | Bendeka® or the use according to its labeling satisfies the limitations of claim 1, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the volume administered is from about 50 ml to about 65 ml. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| **Claim 9\*** | |
| The method of claim 1, | Bendeka® or the use according to its labeling satisfies the limitations of claim 1, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the concentration of bendamustine or pharmaceutically acceptable salt thereof is about 5.6 mg/ml. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| **Claim 12\*** | |
| The method of claim 9, | Bendeka® or the use according to its labeling satisfies the limitations of claim 9, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the composition is administered intravenously. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| **Claim 13** | |
| The method of claim 12, | Bendeka® or the use according to its labeling satisfies the limitations of claim 12, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the composition is administered intravenously over a time period of about 10 minutes or less. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| **Claim 14\*** | |
| The method of claim 3, | Bendeka® or the use according to its labeling satisfies the limitations of claim 3, as set forth |

379

EAGLEBEN-SA_00001690

| U.S. Patent No. 9,597,399 | Bendeka® |
|---|---|
|  | above and in Dr. Agarwal's Responsive Report. |
| wherein the composition is administered intravenously. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| **Claim 15** |  |
| The method of claim 14, | Bendeka® or the use according to its labeling satisfies the limitations of claim 14, as set forth above and in Dr. Agarwal's Responsive Report. |
| Wherein the composition is administered intravenously over a time period of about 10 minutes or less. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |

### j.    U.S. Patent No. 9,000,021

| U.S. Patent No. 9,000,021 | Bendeka® |
|---|---|
| **Claim 1\*** |  |
| A method of treating a bendamustine-responsive condition in a subject requiring restricted fluid and/or sodium intake, comprising | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| a) identifying a subject in need of bendamustine therapy and having a physiological condition requiring restricted fluid and/or sodium intake; | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| b) parenterally administering to said subject a volume of about 100 ml or less of a liquid composition containing: | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| i) from about 0.05 to about 12.5 mg/ml of bendamustine or a pharmaceutically acceptable salt thereof; | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| ii) a solubilizer comprising polyethylene glycol and propylene glycol, the polyethylene glycol being present in an amount of from about 0.3 to about to 45% volume and the propylene glycol being present in an amount of from about 0.03 to about 5% volume; and, optionally | Bendeka® comprises polyethylene glycol and propylene glycol, which function, in part, as solubilizers. *See* EGL-BENDEKA_000002350 at 2370.<br><br>Based on Dr. Agarwal's Opening Report, I understand that Bendeka®'s labeling recommends diluting Bendeka® at dilution ratios of between 1:50 and 14.4:50. *See, e.g.,* Agarwal Opening Rep. ¶ 32. At those dilution ratios, formulations prepared with Bendeka® comprise polyethylene glycol and propylene glycol ratios that overlap with the claimed range. *See* n.12. |

380

EAGLEBEN-SA_00001691

| U.S. Patent No. 9,000,021 | Bendeka® |
|---|---|
| iii) a parenterally acceptable diluent | Based on Dr. Agarwal's report, *see* Agarwal Opening Rep. ¶ 18, I understand that Bendeka®'s labeling recommends diluting Bendeka® into 0.9% Sodium Chloride Injection, USP; 2.5% Dextrose/0.45% Sodium Chloride Injection, USP; or 5% Dextrose Injection, USP, which are parenterally acceptable diluents, *see, e.g.,* Siepmann Opening Rep. ¶¶ 112–113, 185–186, 309–10. |
| over a substantially continuous period of less than or equal to about 30 minutes. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| **Claim 3** | |
| The method of claim 1, | Bendeka® or the use according to its labeling satisfies the limitations of claim 1, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the subject has congestive heart disease. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| **Claim 4** | |
| The method of claim 1, | Bendeka® or the use according to its labeling satisfies the limitations of claim 1, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the subject has renal insufficiency. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| **Claim 7\*** | |
| The method of claim 1, | Bendeka® or the use according to its labeling satisfies the limitations of claim 1, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the concentration of the bendamustine or pharmaceutically acceptable salt is from about 0.5 to about 5.6 mg/ml. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| **Claim 14** | |
| The method of claim 1, | Bendeka® or the use according to its labeling satisfies the limitations of claim 1, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the composition further comprises monothioglycerol and NaOH. | Certain representative batches of Bendeka® comprise monothioglycerol and NaOH. *See, e.g.,* EGL-BENDEKA_00002350 at 2370; EGL-BENDEKA_00008589 at 8620. |
| **Claim 15** | |

381

EAGLEBEN-SA_00001692

| U.S. Patent No. 9,000,021 | Bendeka® |
|---|---|
| The method of claim 7, | Bendeka® or the use according to its labeling satisfies the limitations of claim 7, as set forth above and in Dr. Agarwal's Responsive Report. |
| wherein the volume administered is about 50 ml+/-15% or less | I understand Dr. Agarwal's Responsive Report addresses this limitation. |
| and the composition is administered over a time period of about 10 minutes or less. | I understand Dr. Agarwal's Responsive Report addresses this limitation. |

### 2.      Failure of Others

815.    In my opinion, the failure of the Olthoff 1983 (Jenapharm), Brittain 2006 (Salmedix, Inc. ["Salmedix"]), and Drager '006 (Cephalon) inventors to develop a viable liquid bendamustine product further demonstrates the non-obviousness of the inventions claimed by the '707 patent family.  Between at least 1981 and 2013, pharmaceutical research groups at Jenapharm, Salmedix, and Cephalon each attempted to develop a viable liquid bendamustine product.  However, as discussed below, each of those research groups failed to achieve that goal.

### a.      Jenapharm

816.    In 1971, Jenapharm received approval to market a lyophilized bendamustine product in East Germany.  *See, e.g.*, Brittain ¶ 6, JDG_BENDA_00000375 at 382.  However, as Olthoff 1983 reflects, Jenapharm pursued the development of a liquid formulations despite receiving that approval.  In my opinion, Jenapharm failed to develop a viable liquid bendamustine product.  Although the Olthoff 1983 inventors reported that they had successfully invented stable bendamustine formulations comprising ethanol, PG, and glycerol, those results are inaccurate for the reasons explained above.  *See* ¶¶ 64–65, 96–99, 185, 204–214, 825.  Tellingly, neither Jenapharm nor the Olthoff 1983 inventors marketed a liquid bendamustine product despite what they acknowledged to be the disadvantages of lyophilized products in relation to liquid products.  *See* Olthoff 1983 at 2, JDG_BENDA_00002301 at 2310.  In my

382

EAGLEBEN-SA_00001693

opinion, Jenapharm's failure to develop a liquid bendamustine product further demonstrates the non-obviousness of the inventions claimed by the '707 patent family.

### b.    Salmedix

817.                                              REDACTED

818.                                              REDACTED

EAGLEBEN-SA_00001694

819.                              REDACTED

# REDACTED

EAGLEBEN-SA_00001695

820.                          REDACTED

        c.      Cephalon

821.                              REDACTED

822.                              REDACTED

EAGLEBEN-SA_00001696

823.                                        REDACTED

824.                                        REDACTED

825.                                        REDACTED

EAGLEBEN-SA_00001697

REDACTED

826.                          REDACTED

827.                          REDACTED

387

EAGLEBEN-SA_00001698

REDACTED

828.                              REDACTED

829.                              REDACTED

### 3.    Commercial Success

830.    I understand that Dr. Jarosz has opined that the claimed inventions have been

commercially successful. I further understand that Dr. Jarosz has opined that there is "causal

388

EAGLEBEN-SA_00001699

nexus" between the claimed inventions and that commercial success. *See* Jarosz Rep. ¶¶ 137–138. I understand that, if commercial success is due to an element in the prior art, no nexus exists. In my opinion, the features of the claimed inventions discussed below are due to the inventions themselves, not the prior art.

831.    I understand that Dr. Jarosz has opined that Bendeka®'s benefits include reduced administration volumes. In my opinion, that benefit is made possible by the claimed inventions, not due to the prior art. As the '908 patent family explains, Eagle calculated the bendamustine hydrochloride concentrations for admixture volumes of between 50 mL and 250 mL and determined that the bendamustine hydrochloride in the claimed formulations remained dissolved at those volumes at room temperature. *See, e.g.,* '908 patent, 10:20–13:36 & tbls. 4–5. By contrast, Eagle determined that the bendamustine hydrochloride would <u>not</u> have remained dissolved if Treanda® were diluted into 50 mL of diluent. *See, e.g.,* '908 patent, 11:30–311 ("For example, for a 2.0 m² (average) patient dosed at 120 mg/m², the final concentration of bendamustine HCl in a 50 ml admixture is 4.03 mg/ml. This is above the solubility of bendamustine HCl at both refrigerated and room temperature conditions in the absence of any non-aqueous components . . . , as would be the case with the currently approved Treanda product, thereby precluding preparation and storage of a 50 ml admixture volume."). Thus, the Bendeka®'s reduced administration volumes are only possible because of the composition of the claimed formulations.

832.    I understand that Dr. Jarosz has opined that Bendeka®'s benefits include a DMA-free formulation. In my opinion, that benefit is due to the claimed inventions, not the prior art. As discussed above, Dr. Pinal identifies only two purported prior-art liquid bendamustine references, Olthoff 1983 and Drager '006. For the reasons stated above, the POSA would have

389

EAGLEBEN-SA_00001700

known that Olthoff 1983's formulations were unstable and, therefore, not commercially viable. *See* ¶¶ 199–218. Drager '006's preferred formulation, which was commercialized as Liquid Treanda®, contained DMA. *See* ¶ 853.

833.    I understand that Dr. Jarosz has opined that Bendeka®'s benefits include improved shelf-life and admixture stability. In my opinion, those benefits are due to the claimed inventions, not the prior art.

834.                                REDACTED

EAGLEBEN-SA_00001701

REDACTED

835.                                              REDACTED

836.    Second, Bendeka® has better admixed stability than prior-art formulations. Because of its improved admixed stability, Bendeka®'s labeling states that the admixed formulation may be stored for up six hours at room temperature (15°–30° C) if diluted with 0.9% Sodium Chloride Injection, USP, or 2.5% Dextrose/0.45% Sodium Chloride Injection, USP. *See* Agarwal Opening Rep. Ex. C, at 4 ("If diluted with 0.9% Sodium Chloride Injection, USP, or 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, the final admixture is stable for 24 hours when stored refrigerated (2-8°C or 36-46° F) or for 6 hours when stored at room temperature (15-30°C or 59-86°F) and room light. Administration of diluted BENDEKA (bendamustine hydrochloride) injection must be completed within this period of time."). By contrast, Liquid Treanda®'s labeling states that the admixed formulation must be administered within two hours of dilution. *See* Liquid Treanda® Labeling (2013), EGL-BENDEKA_00126719 at 126733

391

EAGLEBEN-SA_00001702

("Once diluted with either 0.9% Sodium Chloride Injection, USP, or 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, the final admixture is stable for 24 hours when stored under refrigerated conditions at 2°-8°C (36°-46°F) or for 2 hours when stored at room temperature 15°-30°C (59°-86°F) and room light. Administration of TREANDA must be completed within this period."). For comparison, Lyophilized Treanda®'s labeling states that the admixed formulation must be administered within three hours. *See* Lyophilized Treanda® Labeling (2008), EGL-BENDEKA_00126594 at 126575.

837.   In my opinion, Bendeka®'s improved admixed stability is due, at least in part, to the composition of the non-aqueous solvent system in the claimed formulations. As Eagle's studies and Drager '006 demonstrate, the claimed formulations likely have greater admixed stability than Liquid Treanda®.                    REDACTED

, Drager '006 admits that admixtures prepared from Liquid Treanda® have 4.6% total impurities after storage for 8 hours at the same temperature.          REDACTED

; Drager '006 at 10:38–55.

838.   Furthermore, the '908 patent family demonstrates that the claimed formulations have greater admixed stability than Lyophilized Treanda® even when administered at <u>lower</u> bendamustine concentrations. After storage for 24 hours at room temperature, admixtures prepared from the claimed formulations at concentrations of 0.5 mg/mL and 0.25 mg/mL have 14.54% and 13.49% total impurities, respectively. *See* '908 patent ex. 8 & tbl. 9. For comparison, after storage under the same conditions, admixtures prepared from Lyophilized Treanda® at a concentration of 0.6 mg/mL have 17.66% total impurities. *See* '908 patent ex. 8 & tbl. 9. Moreover, as explained above, these results actually understate the improved admixed

392

EAGLEBEN-SA_00001703

stability of the claimed formulations because they can be administered in higher concentrations because of bendamustine's higher solubility in those formulations. *See* '908 patent, 10:20–13:36 & tbls. 4–5; ¶ 831.

839.    I understand that Dr. Jarosz has opined that Bendeka®'s benefits include the ability to administer Bendeka® using 5% dextrose. In my opinion, that benefit is due to the claimed inventions, not the prior art. Unlike Liquid Treanda® and Lyophilized Treanda®, Bendeka® may be administered using 5% dextrose. *See* Agarwal Rep. Ex. C, at 3; Liquid Treanda® Labeling (2013), EGL-BENDEKA_00126719 at 126733; Lyophilized Treanda® Labeling (2008), EGL-BENDEKA_00126594 at 126575. Because, as discussed above, the claimed formulations have improved admixed stability compared to Liquid Treanda® and Lyophilized Treanda®, *see* ¶¶ 836–838, the claimed formulations may be administered in admixtures that do not contain sodium chloride. In less stable formulations, the addition of chloride ions (e.g., from using sodium chloride) is needed to protect against degradation. *See* Maas 1994 Translation at 1, JDG_BENDA_00002261 at 2264 ("In addition to the pH value, the chloride ion concentration has a substantial influence on the hydrolysis equilibrium situation. The bendamustine hydrochloride should preferably be regenerated as the chloride ion concentration increases, which suppresses the formation of the hydroxyl derivative."), 4, JDG_BENDA_00002261 at 2267 ("Typically for solutions with the initial concentration of 0.25 mg/mL, a t90 of 4.2 hours was typically determined at room temperature. This is evidence of the stability increasing influence of the chloride ions. Isotonic sodium chloride solution must be used exclusively as the carrier mechanism for bendamustine preparation."). Thus, the ability to administer Bendeka® in 5% dextrose admixtures is only possible because of the composition of the claimed formulations.

393

## VIII.  THE ASSERTED CLAIMS OF THE '707 PATENT FAMILY ARE NOT INVALID UNDER § 112.

### A.  The Term "Long Term Storage Stable" Is Not Indefinite.

840.    Dr. Pinal opines that the term "long term storage stable," which appears in the preambles of some of the asserted claims, is indefinite. *See* Pinal Rep. ¶¶ 874–78.  I disagree.  In my opinion, the POSA would have understood the term "long term storage stable" to have its plain and ordinary meaning in light of the specification, which discusses the meaning of that limitation in explicit terms.  As the specification explains, the term "long term storage stable" means that the claimed compositions have less than about 5% total impurities, on a normalized peak area response ("PAR") basis as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C to about 25° C.  Thus, the POSA would have understood the scope of the claimed inventions with reasonable certainty.

841.    In attempting to understand the meaning of the term "long term storage stable," the POSA would have relied on the '707 family patents' specifications,[14] which repeatedly explain that the term "long term storage stable" refers to compositions that have less than about 5% total impurities, as calculated on a PAR basis as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C to about 25° C.

842.    First, the '707 patent's abstract states that the '707 family patents disclose "Long term storage stable bendamustine-containing compositions," which "have less than about 5% total impurities, on a normalized peak area response ('PAR') basis as determined by high performance liquid chromatography ('HPLC') at a wavelength of 223 nm, after at least about 15

---

[14] For convenience, I cite the '707 patent's specification only as representative of the specifications of the other patents in the '707 patent family.  Any differences between the specifications of the '707 family patents are immaterial for the purposes of my analysis.

394

months of storage at a temperature of from about 5° C. to about 25° C." *See, e.g.*, '707 patent, abstract ("Long term storage stable bendamustine-containing compositions are disclosed. . . . The bendamustine-containing compositions have less than about 5% total impurities, on a normalized peak area response ('PAR') basis as determined by high performance liquid chromatography ('HPLC') at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.").

843. Second, the '707 patent's summary of the invention states that one of the "advantages of the inventive liquid compositions" is that they have "substantially improved long term stability when compared to currently available formulations" because they are "substantially free of impurities after at least about 15 months at a temperature of from about 5° C. to about 25° C." *See, e.g.*, '707 patent, 2:4–9. The detailed description of the invention proceeds to define "substantially free of impurities" to refer to "bendamustine-containing compositions in which the amount of total impurities is less than about 5%, as calculated on a normalized peak area response ('PAR') basis as determined by high performance liquid chromatography ('HPLC') at a wavelength of 223 nm, after a period of about 15 months at a temperature of from about 5° C. to about 25° C." *See, e.g.*, '707 patent, 2:26–33.

844. Third, the '707 patent's detailed description of the invention states the amount of "total impurities in the inventive compositions resulting from the degradation of the bendamustine in the compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of from about 5° C. to about 25° C., and thus have long term stability for at least the same period of time or longer." *See, e.g.*, '707 patent, 2:57–61.

395

EAGLEBEN-SA_00001706

845.    Based on these statements, which consistently characterize "long term storage stable" compositions as those having the above-mentioned stability properties, the POSA would have had no difficulty in understanding the scope of the claimed inventions with reasonable certainty.

846.    The Defendants' corporate testimony confirms my conclusion that the POSA would have understood the meaning of the term "long term storage stable" with reasonable certainty.                                      REDACTED

847.                                             REDACTED

---

[15] As explained in my opening report, I understand, based on Dr. Kittendorf's analysis, that the Defendants employed analytical methods that are essentially the same as those recited in the asserted patents. *See* Siepmann Opening Rep. ¶ 329–30; 342–43.

396

EAGLEBEN-SA_00001707

848.    Dr. Pinal acknowledges that the '707 family patents state that the amount of total impurities in the "inventive compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of from about 5°C. to about 25°C." Pinal Rep. ¶ 874 (quoting '707 patent, 2:57–63). However, Dr. Pinal states that the '707 family patents provide "inconsistent definitions" of that term elsewhere. Pinal Rep. ¶ 874. To that end Dr. Pinal quotes four[16] statements from the '707 family patents that purportedly demonstrate that the patents inconsistently define the term "long term storage stable." *See* Pinal Rep. ¶ 877. I disagree. None of the statements Dr. Pinal identifies are inconsistent.

849.    First, Dr. Pinal relies upon the statement, discussed above, that "the inventive bendamustine compositions are substantially free of impurities after at least about 15 months at a temperature of from about 5° C. to about 25° C." As explained, the '707 family patents define "substantially free of impurities" to refer to compositions having less than about 5% total impurities, as calculated on PAR basis as determined by high performance liquid chromatography at a wavelength of 223 nm, after a period of about 15 months at a temperature of from about 5° C to about 25° C." *See, e.g.*, '707 patent, 2:26–33. Thus, that statement is consistent with the explanation of the term "long term storage stable."

850.    Second, two of the statements Dr. Pinal relies upon expressly describe only "aspects" or embodiments of the claimed inventions, which are "long term storage stable" for more than 15 months. This is evidenced through the use of phrases such as "in some aspects" or "preferably." *See* '707 patent, 2:44–48 ("In some aspects, the amount of time the inventive

---

[16] Dr. Pinal's report includes five quotations. However, two of the quotations refer to the same passage, i.e., '707 patent, 2:44–48.

EAGLEBEN-SA_00001708

compositions demonstrate long term storage stability is at least about 18 months and <u>preferably</u> at least about 2 years when stored under the conditions described herein." (emphasis added)); '707 patent, 2:63–66 ("<u>Preferably</u>, the bendamustine-containing compositions demonstrate long term storage stability for at least about 2 years, especially when stored at the lower (refrigerated) temperatures." (emphasis added)).  Neither of those statements is inconsistent with the explanation of the term "long term storage stable."

851.    Third, Dr. Pinal relies on a dependent claim, which, as above, describes an embodiment of the claimed inventions that is "long term storage stable" for more than 15 months. *See* '707 patent, claim 13 ("The long term storage stable non-aqueous liquid bendamustine-containing composition of claim 1, wherein said long term storage is at least 2 years.").  For the reasons explained in the paragraph above, that statement is not inconsistent with the explanation of the term "long term storage stable."  Such dependent claims (like the preferred embodiments cited in the prior paragraph) require the claimed compositions to be more stable than would be required by the baseline meaning of the term "long term storage stable." Absent those additional stability requirements, the dependent stability limitations in these claims would be entirely superfluous.

852.    Dr. Pinal argues that the term "long term storage stable" is indefinite because "there are so many different variables that impact the determination of the stability of a formulation: different conditions under which the formulation is stored (temperature, humidity, etc.), the conditions of the stability measurement, the length of time the formulation is stored, the amount of impurities that are deemed 'acceptable', etc." Pinal Rep. ¶ 876.  I disagree.  In my opinion, none of the concerns Dr. Pinal expresses would have prevented the POSA from determining the scope of the claimed inventions with reasonable certainty.

EAGLEBEN-SA_00001709

853.    As discussed above, the '707 patent family's explanation of the term "long term storage stable" directly addresses each of Dr. Pinal's concerns, including the (1) conditions under which the formulation is stored ("at a temperature of from about 5° C. to about 25° C"), (2) the conditions of stability measurement ("less than about 5% PAR as determined by HPLC at a wavelength of 223 nm"), (3) the length of time the formulation is stored ("after at least about 15 months of storage"), and (4) the amounts of impurities that are deemed acceptable ("less than about 5% total impurities"). *See* ¶¶ 840–845. Dr. Pinal does not address any of these specific requirements, which undermine his opinions about the claims' definiteness.

854.    Furthermore, to the extent that the '707 patents do not expressly address each of Dr. Pinal's concerns, the POSA would have known that pharmaceutical compositions are generally stored and measured in accordance with the applicable regulatory guidelines governing storage conditions (e.g., temperature, humidity, etc.) and stability measurements (e.g., accuracy, linearity, precision, specificity, range, robustness, etc.). *See, e.g.*, Ctr. for Drug Evaluation & Research & Ctr. for Biologics Evaluation & Research, U.S. Food & Drug Admin., Guidance for Industry, Q1A (R2) Stability Testing of New Drug Substances and Products 10–14 (2003); Ctr. for Drug Research, U.S. Food & Drug Admin., Validation of Chromatographic Methods (1994). Thus, Dr. Pinal's concerns are therefore without basis in any event.

855.    In addition, Dr. Pinal argues that the term "long term storage stable" is indefinite because "there are multiple methods for determining stability. The patent only discusses the use of HPLC, but does not provide any information on the various conditions under which the HPLC could be run nor account for other methods for determining stability of a product." Pinal Rep. ¶ 878. I disagree. In my opinion, and based on Dr. Kittendorf's conclusions, the POSA would have understood the scope of the claimed inventions with reasonable certainty.

399

EAGLEBEN-SA_00001710

856.    As an initial matter, Dr. Pinal does not explain what any of the purportedly missing HPLC "conditions" might be or why the purported omission of those conditions would affect the POSA's understanding of the scope of the claims.  Dr. Pinal also does not explain why, given that the patents describe total impurity measurements only in terms of HPLC analysis, "other methods for determining stability" are relevant.  Thus, Dr. Pinal provides no reason to conclude that the term "long term storage stable" is indefinite on those grounds.

857.    Regardless, even assuming that the '707 family patents do not expressly recite all possible HPLC "conditions," the POSA would have had no difficulty understanding what those conditions would be.  Based on Dr. Kittendorf's conclusions, I understand that analytical chemists routinely develop HPLC analytical methods to comply with certain standard requirements that ensure that those methods yield valid measurements.  *See* Kittendorf Opening Rep. ¶¶ 28–32.  Indeed, Dr. Pinal acknowledges that the use of HPLC and other "stability indicating" methods is an "integral part of [the development of] every pharmaceutical product in the market."  Pinal Rep. ¶ 269.  Thus, the POSA would have understood that the claimed HPLC methods include those that yield impurity measurements consistent with those requirements.  In doing so, the POSA would have consulted published HPLC methods used to measure the amounts of impurities in bendamustine compositions and other pertinent information.  *See* Kittendorf Opening Rep. ¶¶ 40–43.  Thus, Dr. Pinal's vague discussion of HPLC "conditions" provides no reason to conclude that the asserted claims are indefinite.

858.    Elsewhere, in opining that the asserted claims of the '707 and '887 patents are not enabled at "room temperature," Dr. Pinal asserts that the POSA would not have known whether the limitations require the claimed compositions to be "long term storage stable" or to have "less than about 5% [total impurities] as determined by HPLC at a wavelength of 223 nm after 15

400

EAGLEBEN-SA_00001711

months at a temperature of from about 5° C. to about 25° C"[17] require the compositions to be stable at one or more temperatures between about 5° C to about 25° C or at every temperature in that range. *See* Pinal Rep. ¶¶ 887–890. Dr. Pinal does not mention indefiniteness or discuss any of the applicable legal standards. Thus, I do not understand Dr. Pinal to express an opinion that the claims are indefinite on that basis. To the extent Dr. Pinal expresses such an opinion, I disagree. In my opinion, the POSA would have understood those limitations to mean the former (i.e., that the compositions be stable at one or more temperatures between about 5° C to about 25° C). Thus, the '707 and '887 patents refer to "a temperature of from about 5° C. to about 25° C.," not "every temperature of from about 5° C. to about 25° C." *See, e.g.,* '707 patent, 2:4–9; '887 patent, claim 1 (emphasis added).

859. Although Dr. Pinal suggests that the POSA would contemplate that the asserted claims of the '707 and '887 patents require the claimed compositions to be stable at every temperature between about 5° C to about 25° C, that is not what the patents say, and the POSA would have understood that not to be the case. As reflected throughout the examples, the amount of total impurities is greater at higher temperatures. *See, e.g.,* '707 patent, exs. 1, 3, 5–8. Indeed, Dr. Pinal relies on this assumption in arguing that stability measurements taken of samples stored at refrigerated temperatures cannot be used to establish the stability of the claimed compositions at room temperature. Accordingly, the POSA would have understood that if the inventors had intended for the claimed compositions to be stable at every temperature in the recited range, they would have simply required the compositions to be stable at about 25° C. That the inventors did not do so would have indicated to the POSA that the asserted claims require the claimed

---

[17] I understand that Plaintiffs are presently asserting only claim 13 of the '887 patent.

401

compositions to be stable at one or more, but not necessarily all, temperatures between about 5° C and 25° C.

## B.    The Term "Long Term Storage Stable" Is Enabled.

860.    Dr. Pinal opines that the claims that require the compositions to be "long term storage stable" or to have "less than about 5% [total impurities] as determined by HPLC at a wavelength of 223 nm after 15 months at a temperature of from about 5° C. to about 25° C" are not enabled. Specifically, according to Dr. Pinal, the claimed compositions are not stable (1) without the inclusion of a "pH adjuster" (e.g., sodium hydroxide) or (2) after storage at a temperature of 25° C. *See* Pinal Rep. ¶¶ 879–94. I disagree. In my opinion, the POSA would have been able to practice the full scope of the claimed inventions without undue experimentation.

861.    First, Dr. Pinal is incorrect to assert that the asserted claims are not enabled because they do not expressly recite the inclusion of a "pH adjuster." Examples 1–8 of the '707 patent family describe the results of the inventors' experiments on exemplary formulations of the claimed inventions after storage for particular time periods and at particular temperatures. *See, e.g.*, '707 patent, ex. 1–8. None of those examples include sodium hydroxide or another "pH adjuster." *See, e.g.*, '707 patent, ex. 1–8. Nevertheless, as the patents explain, the data in those examples support the conclusion that certain, identified formulations would have the claimed stability properties (in the words of the patent, the information provided about those formulations "translates" to the formulations having the claimed properties). *See, e.g.*, '707 patent, exs. 4, 7.

862.    To support the conclusion that the asserted claims are not enabled without the inclusion of a "pH adjuster," Dr. Pinal relies on U.S. Patent Publication No. 2013/0210879 ("Palepu 2013"), JDG_BENDA_00003809, and similar data reporting experiments conducted on formulations prepared on specific batches of PEG. (I note that Palepu 2013 was submitted to the

402

EAGLEBEN-SA_00001713

Examiner during the prosecution of several of the applications in the '707 patent family, and it appears on the faces of the '796 and '797 patents.) Dr. Pinal's reliance on that information is misplaced. As Palepu 2013 makes clear, the inclusion of a "pH adjuster" is not required. Rather, the inclusion of a "pH adjuster" permits manufacturers of the claimed bendamustine compositions to use batches of PEG that do not have the required "performance specifications" because of the individual supplier's "storage conditions, handling conditions, etc." Palepu 2013 ¶ 7, JDG_BENDA_00003809 at 3820 ("It has been found that there is significant variability in the excipient's stability depending upon the Supplier, storage conditions, handling conditions, etc. Sometimes, batches including the PEG as received from the supplier have the performance specifications expected. Other times, they do not."). In other words, the inclusion of a "pH adjuster" permits drug product manufacturers to use otherwise deficient batches of PEG 400 rather than simply recalling or destroying the resulting drug products. *See* Palepu 2013 ¶ 6, JDG_BENDA_00003809 at 3820.[18]

863. In my opinion, the POSA could have overcome any stability problems caused by deficient batches of PEG without needing to engage in undue experimentation. As Dr. Pinal acknowledges, the POSA would have known that such deficiencies could be overcome, for example, by "using high quality starting materials," "removing oxygen," "sparging with nitrogen," and "ensuring that a good seal is placed on the vial of the formulation." Pinal Rep. ¶ 223. Although I disagree with Dr. Pinal's assertions that the POSA would have known what

---

[18] Dr. Pinal's analysis of the data in Table 4 of the '707 family patents and Eagle's research and development documents also relies on his mistaken assumption that the asserted claims require the claimed compositions to be stable at every temperature between 5° C and 25° C. As explained above, that assumption is incorrect, and the claims require only that the claimed compositions be stable at one or more temperatures in that range. *See* ¶¶ 858–859. None of the data Dr. Pinal relies upon demonstrate that the claimed compositions are unstable at, for example, 5° C.

403

the stability properties of the claimed formulations would be in the absence of the patents' disclosures, or that those properties are "inherent" in the claimed invention, I agree with his apparent conclusion that the POSA would have had little difficulty in overcoming the problems he identifies, e.g., by using high quality starting materials, removing oxygen, sparging with nitrogen, and ensuring that a good seal is placed on the vial, etc.

864.    To the extent that overcoming the above-mentioned stability problems would require the inclusion of a "pH adjuster," the POSA would have included one in the formulation. Indeed, despite Dr. Pinal's conclusion that certain claims are not enabled because they do not expressly recite the inclusion of a "pH adjuster," Dr. Pinal acknowledges that the use of "pH adjusters," such as sodium hydroxide, "was a well-known way to inhibit acid-catalyzed reactions." Pinal Rep. ¶ 78.                REDACTED

Moreover, although not acknowledged by Dr. Pinal, the U.S. Patent & Trademark Office rejected the Palepu 2013 application on the ground that the inclusion of a "pH adjuster" would have been obvious, and the Office and never withdrew that rejection (in other words, the Office never granted the application). *See* Palepu 2013 File History, EGL-BENDEKA_00201887 at 201897–908. Thus, the POSA would have known, without the need to engage in undue experimentation, that including a "pH adjuster" would have reduced the amount of impurities caused by deficient PEG batches.

865.    I note that Dr. Pinal's opinion that the asserted claims are not enabled is inconsistent                REDACTED

404

REDACTED

.

866.    Second, Dr. Pinal's assertion that the asserted claims are not enabled for room temperature relies upon Dr. Pinal's misunderstanding of the claim language.  As explained above, the asserted claims require only that the claimed compositions be stable at one or more temperatures from about 5° C to about 25° C, not that the compositions be stable at every temperature within that range.  *See* ¶¶ 858–859.  Thus, the possibility that certain formulations may not be stable at 25° C does not establish that the claims are not enabled.

867.    Furthermore, even if the claims were construed to require the claimed compositions to be stable at every temperature from about 5° C to about 25° C, Dr. Pinal's analysis does not demonstrate that the claims are not enabled for their full scope.  Rather, Dr. Pinal selects an arbitrary temperature at one extreme of the claimed range.  That is not enough to establish that the scope of enablement is not reasonably commensurate with the scope of the claims.

405

EAGLEBEN-SA_00001716

C.      The Total PG Ester Limitations Are Enabled.

868.    Dr. Pinal opines that the asserted claims that require the claimed compositions to have less than certain specified amounts of PG esters are not enabled. *See* Pinal Rep. ¶¶ 895–896. For support, Dr. Pinal relies on the same arguments that he makes in connection with the term "long term storage stable" (i.e., that the formulations are not enabled based on Palepu 2013 and similar data). *See* Pinal Rep. ¶¶ 895–896, App'x E. As explained above, I disagree. *See* ¶¶ 860–867. In my opinion, the POSA would be able to practice the full scope of the claimed inventions without undue experimentation.

D.      The Term "Stabilizing Amount" Is Not Indefinite.

869.    Dr. Pinal opines that the asserted claims that require the claimed compositions to comprise a "stabilizing amount" of an antioxidant are indefinite. *See* Pinal Rep. ¶ 898. I disagree. In my opinion, the POSA would have understood the term "stabilizing amount" to have its plain and ordinary meaning in light of the specification, which discusses the meaning of that limitation in explicit terms. According to the specification, the term "stabilizing amount" means an amount of an antioxidant that increases or enhances the stability of the claimed bendamustine compositions. Thus, the POSA would have understood the scope of the claimed inventions with reasonable certainty.

870.    As Dr. Pinal acknowledges, the '707 family patents explain that the term "stabilizing amount" includes "those amounts which increase or enhance the stability of the bendamustine in the compositions described herein." Pinal Rep. ¶ 898 (quoting '707 patent, 3:51–54). Although not addressed by Dr. Pinal, the patents also describe certain antioxidants as suitable for inclusion in the claimed compositions, *see, e.g.,* '707 patent, 3:64–4:26, and provide examples demonstrating the efficacy of particular antioxidant amounts based on the amount of bendamustine degradants in those compositions relative to others described in the patents, *see,*

406

EAGLEBEN-SA_00001717

407

*e.g.*, '707 patent, ex. 3–8.  Based those disclosures, the POSA would have understood which antioxidant amounts would increase or enhance the stability of the bendamustine in the claimed formulations with reasonable certainty.

871.                              REDACTED

872.                              REDACTED

407

EAGLEBEN-SA_00001718

REDACTED

873.    Dr. Pinal opines that the '707 patent family's explanation of the term "stabilizing amount" is indefinite because the asserted patents do not (1) state how much of an increase or enhancement of stability suffices, (2) how stability is determined, or (3) which antioxidant would need to be used to achieve stability. Dr. Pinal also opines (4) that the meaning of the term "stabilizing amount" is indefinite because it depends on the meaning of "long term storage stable." *See* Pinal Rep. ¶ 898. I disagree with each of those assertions.

874.    First, Dr. Pinal assumes, without justification, that a "stabilizing amount" must increase or enhance the stability of the bendamustine beyond some specific, minimum level. However, as the above-cited sentence makes clear, a "stabilizing amount" is an amount that increases or enhances the stability of the bendamustine in the claimed compositions. *See* '707 patent, 3:51–54. In other words, a "stabilizing amount" includes *any* amount that increases or enhances the stability of the bendamustine. Thus, Dr. Pinal is incorrect to assert that the POSA would have failed to understand how much of a stability increase or enhancement suffices.

875.    Second, the POSA would have understood that, in the context of the asserted patents, "stability" refers to the amount of bendamustine degradants in the claimed compositions. The asserted patents consistently describe stability in terms of bendamustine degradation. *See, e.g.,* '707 patent, abstract, 1:36–54, 2:4–9, 2:49–3:4, 4:9–26, 5:31–56; ex. 1–8. Indeed, Dr. Pinal uses "stability" and similar phrases throughout his report to refer to the amount of bendamustine degradants, *see, e.g.,* Pinal Rep. ¶¶ 13, 15, 18, 54, 58, 61, 82, 100, 137, 155, 157, 158, 169, 171, 173, 178, 184, 189, 197, 208–15, 219–27, including in connection with "stabilizing amount," *see* Pinal Rep. ¶¶ 208–215. To the extent Dr. Pinal expresses concerns that the POSA would not

EAGLEBEN-SA_00001719

have understood how the amount of bendamustine degradants would be measured, such concerns are without basis. As Dr. Pinal himself opines, analytical chemistry techniques, such as the HPLC methods described in the patents, were well known at the time of the claimed inventions. *See* Pinal Rep. ¶ 269. For the reasons stated above, the POSA would have had no difficulty in understanding how to measure the amounts of bendamustine degradants. *See* ¶¶ 852–857.

876.    Third, Dr. Pinal's assertion that the asserted patents do not state which antioxidant would be needed to achieve stability conflates definiteness and enablement. Dr. Pinal does not opine that the POSA would have failed to understand the meaning of "antioxidant." *See* Pinal Rep. ¶ 52 ("Oxidation is the loss of electrons during a reaction by a molecule, atom or ion. This process may lead to degradation in a pharmaceutical formulation, and was a known process for several formulations in the prior art. Antioxidants are common and well known, and serve to prevent the oxidation of drugs and/or excipients."). Instead, Dr. Pinal opines that the POSA would not have known which antioxidant to include in the claimed compositions to improve stability. Such concerns, which relate to the POSA's ability to practice the claimed inventions, properly relate to enablement, not indefiniteness. I address that issue below.

877.    Even assuming that Dr. Pinal's concern properly relates to definiteness, the POSA would not have had any difficulty determining which antioxidants to use in the claimed compositions based on the disclosures in the asserted patents. *See* ¶ 870. The POSA would therefore have understood with reasonable certainty which antioxidants would increase or enhance the stability of the bendamustine in the claimed formulations.

878.    Fourth, Dr. Pinal incorrectly asserts that the meaning of "stabilizing amount" depends on the meaning of "long term storage stable." In relevant part, the '707 family patents state that the presence of the described antioxidants "contributes, at least in part to the long term

409

stability of the composition." '707 patent, 2:54–57. Contrary to Dr. Pinal's assertion, that statement is entirely consistent with the understanding that a "stabilizing amount" of an antioxidant is one that increases or enhances the stability of the claimed compositions. It states that the presence of an antioxidant "contributes" to "long term stability"; it does not state that the presence of an antioxidant, by itself, makes a composition "long term storage stable."

879.    Regardless, as explained above, the POSA would have understood with reasonable certainty the meaning of "long term storage stable." *See* ¶¶ 840–859. Thus, even if the meaning of "stabilizing amount" were to depend on the meaning of "long term storage stable," the POSA would not have understood "stabilizing amount" to be indefinite.

### E.    The Term "Stabilizing Amount" Is Enabled

880.    Dr. Pinal opines that the asserted claims that require the claimed compositions to comprise a "stabilizing amount" of an antioxidant are not enabled. *See* Pinal Rep. ¶ 899. I disagree. In my opinion, the POSA would have been able to practice the full scope of the claimed inventions without undue experimentation.

881.    As explained above, in connection with Dr. Pinal's indefiniteness arguments, the asserted patents describe certain antioxidants as suitable for inclusion in the claimed formulations. *See* ¶ 484. The patents further provide examples demonstrating the efficacy of particular antioxidants and antioxidant amounts. *See* ¶ 870. Dr. Pinal does not address those disclosures, much less explain why they are insufficient. Contrary to Dr. Pinal's contention, the POSA would have had no difficulty in practicing the claimed inventions without undue experimentation in view of the asserted patents.

882.    Furthermore, for the reasons explained above, Dr. Pinal's conclusion that the asserted patents are not enabled is inconsistent with the Defendants' corporate testimony and patent filings, which demonstrate that the POSA would have been able to practice the asserted

410

claims based on the patents' disclosures. *See* ¶¶ 871–872.          REDACTED

883.    Dr. Pinal vaguely asserts that "stabilizing amount" is not enabled because "there is no guidance as to what it means for a composition that falls within the scope of the claims to be 'long term stable,'" which according to Dr. Pinal "also lacks a sufficient definition." Pinal Rep. ¶ 899. Although not clear, Dr. Pinal's opinion appears to rely on his apparent conclusion that the meaning of "stabilizing amount" depends on the meaning of "long term storage stable." *See* Pinal Rep. ¶ 898. As explained above, Dr. Pinal is incorrect—both in concluding that the meaning of "stabilizing amount" depends on the meaning of "long term storage stable" and that the meaning of "long term storage stable" is indefinite or not enabled. *See* ¶¶ 878–879.

## IX.    THE ASSERTED CLAIMS OF THE '908 AND '021 PATENT FAMILIES WOULD NOT HAVE BEEN OBVIOUS TO THE POSA.

884.    I understand that other experts will be opining on the obviousness of the claims of the '908 and '021 families. In this section, I offer several opinions about the POSA's motivations and expectation of success with respect to solubility concerns with the claimed compositions.

### A.    The POSA Would Not Have Been Motivated To Use the Claimed Administration Volumes.

#### 1.    Soppimath 2013 Would Not Have Motivated the POSA To Use the Claimed Administration Volumes.

411

885.    Dr. Pinal opines that the '908 and '021 patent families would have been obvious over Soppimath 2013 in view of the knowledge of the POSA. Pinal Rep. ¶¶ 669–795. I disagree. In my opinion, Soppimath 2013, either alone or in combination with any of the other references relied upon in Dr. Pinal's report, does not render the claimed inventions obvious.

886.    First, Dr. Pinal improperly relies on paragraphs in Soppimath 2013 that are not prior art to the asserted patents. I understand that Defendants contend that Soppimath 2013 is prior art to the asserted patents under 35 U.S.C. § 102(e) (2012) because the underlying application was filed before the priority dates for the '908 and '021 patent families. I further understand that because Soppimath 2013 was filed after those priority dates, Soppimath 2013 is only prior art to the extent that its disclosures are supported by the written description of the Soppimath Provisional Application. I understand that to provide such support, the Soppimath Provisional Application must contain a written description of the inventions. Put differently, the Soppimath Provisional Application must demonstrate to the POSA that the Soppimath 2013 inventors were in possession of the materials asserted to be prior art as of the filing date of the Soppimath Provisional Application.

887.    Dr. Pinal asserts that Soppimath 2013's examples disclose administering bendamustine compositions in volumes of less than 100 mL and, specifically, 30 mL. *See* Pinal Rep. ¶ 670 (citing Soppimath 2013 ¶¶ 43–46). However, the POSA would not have understood Soppimath 2013 inventors to have been in possession of those examples as of the filing date of the Soppimath Provisional Application.

888.    In relevant part, Soppimath 2013 discloses nine formulations containing between 30 mL and 30.2 mL of liquid ingredients. Tables 1–4 set forth the contents of these formulations:

412

EAGLEBEN-SA_00001723

## TABLE 1

| Ingredients | Formulation 0 |
|---|---|
| Bendamustine HCl | 150 mg |
| Mannitol | 255 mg |
| DI Water | 30 mL |

## TABLE 2

| Ingredients | Formulation I | Formulation II | Formulation III | Formulation IV |
|---|---|---|---|---|
| Bendamustine HCl | 150 mg | 150 mg | 150 mg | 150 mg |
| Propylene Glycol (PG) | — | 30.0 mL | — | 27.0 mL |
| Polyethylene glycol 300 | 30.0 mL | — | 27.0 mL | — |
| Sodium Chloride | — | — | 175.3 mg | 175.3 mg |
| DI Water | — | — | 3.0 mL | 3.0 mL |

## TABLE 3

| Ingredients | Formulation V | Formulation VI | Formulation VII |
|---|---|---|---|
| Bendamustine HCl | 150 mg | 150 mg | 150 mg |
| Sodium Chloride | — | 175.3 mg | 175.3 mg |
| DI Water | 3.0 mL | 7.5 mL | 15.0 mL |
| Propylene glycol (PG) | 27.0 mL | 22.5 mL | 15.0 mL |

## TABLE 4

| Ingredients | Formulation VIII | Formulation IX |
|---|---|---|
| Bendamustine HCl | 150 mg | 130 mg |
| DI water | 30.0 mL | 30.2 mL |
| Sodium Chloride | 175.3 mg | 70.1 mg |

Soppimath 2013 ¶¶ 43–46, JDG_BENDA_00003277 at 3287.

889.    The POSA would not have understood the Soppimath 2013 inventors to have been in possession of those examples as of the filing date of the Soppimath Provisional Application. Instead the Soppimath Provisional Application presents an entirely different set of examples, comprising different formulations and administration volumes. *See* Soppimath

413

EAGLEBEN-SA_00001724

Provisional Application ¶ 15.[19]  For example, whereas all of the examples in the Soppimath Provisional Application contain between 0.5 mL and 5.0 mL of an acetate buffer, none of the examples in Soppimath 2013 contain that ingredient.  *See* Soppimath Provisional Application ¶ 15; Soppimath 2013 ¶¶ 40–52, JDG_BENDA_00003277 at 3286–88.  The Soppimath Provisional Application also provides no evidence that any of those formulations were actually administered.  Given that the POSA would have had no reasonable expectations about the differences in the pharmacokinetics, pharmacodynamics, and toxicity of the formulations disclosed in Soppimath 2013 or the Soppimath Provisional Application (e.g., because of differences in the co-solvent systems used in those formulations), the Soppimath 2013 inventors cannot reasonably be said to have been in possession of the Soppimath 2013 examples as of the filing date of the Soppimath Provisional Application.

890.    I note that although Dr. Pinal purports to identify a basis for certain paragraphs in Soppimath 2013, *see* Pinal Rep. App'x G, he makes no attempt to justify his reliance on those examples, which are, in any event, unsupported.  Dr. Pinal's failure to attempt justifying his reliance on those examples further confirms my opinion that those examples are unsupported.

891.    In addition, Dr. Pinal asserts that certain limitations would have been obvious over Soppimath 2013's statements regarding bendamustine and solvent concentrations.  *See* Pinal Rep. ¶¶ 127, 670, 672, 673, 677, 679, 709, 759, 764 (citing Soppimath 2013 ¶ 28, JDG_BENDA_00003277 at 3285); 674, 680 (citing Soppimath 2013 ¶ 30, JDG_BENDA_00003277 at 3285).  However, the POSA would not have understood the Soppimath 2013 inventors to have been in possession of those statements as of the filing date of the Soppimath Provisional Application either.  As reflected in Dr. Pinal's own analysis, *see* Pinal

---

[19] I understand that the contents of a provisional application are not, by themselves, prior art.

414

Rep. App'x G, at 5–7, the Soppimath Provisional Application contains only a handful of examples, which do not support the broad, purportedly "high" bendamustine concentration ranges (*e.g.*, "between 5 and 10 mg/ml, between 1 and 10 mg/ml, between 5 and 20 mg/ml, between 10 and 50 mg/ml, and between 20 and 70 mg/ml") that Dr. Pinal relies upon, *see* Soppimath 2013 ¶ 28, JDG_BENDA_00003277 at 3285; Soppimath Provisional Application ¶ 15. The Soppimath Provisional Application also does not contain the statement, included in Soppimath 2013, that the "non-aqueous solvent system will typically equal or more than 20 vol %, more typically more equal or than 30 vol %, even more typically equal or more than 40 vol %, and most typically equal or more than 50 vol %." Soppimath 2013 ¶ 30, JDG_BENDA_00003277 at 3285.

892. The prosecution history of the asserted patents further supports the conclusion that Dr. Pinal improperly relies on paragraphs in Soppimath 2013 that are not prior art. During the prosecution of the '908 patent family, the examiner initially rejected the asserted claims over Soppimath 2013, alone and in combination with other prior art references, including Treanda® Label, Schoffski 2000b, and Preiss 1998. *See, e.g.*, '908 Patent File History, TEVABEND00001663 at 2055–56, 2317–22. In response, the applicant argued that the Soppimath Provisional Application did not support the Soppimath 2013 paragraphs (¶¶ 26, 28, 30, 33) relied upon by the examiner. *See, e.g.*, '908 Patent File History, TEVABEND00001663 at 2370–71, 2381–82. (As explained above, Dr. Pinal relies on many of those same paragraphs.) The examiner agreed with the applicant and withdrew the rejections. '908 Patent File History, TEVABEND00001663 at 2396–97. That the examiner determined that ¶¶ 26, 28, 30, and 33 were not prior art further supports my opinions.

415

893.    Second, even assuming that the paragraphs in Soppimath 2013 that Dr. Pinal relies upon are prior art, Soppimath 2013 does not render the claimed administration volumes obvious. Soppimath 2013 does not provide any evidence suggesting that the exemplary formulations were actually injected and does not present any solubility, stability, pharmacokinetic, pharmakodynamic, or toxicity data suggesting that administering those injections would be safe or effective. *See* Soppimath 2013 ¶ 15, JDG_BENDA_00003277 at 3284. Soppimath 2013 also does not suggest that the claimed formulations could be administered in small volumes. Thus, Soppimath 2013 would not have provided the POSA with a movitation or reasonable expectation of success with respect to administering the claimed formulations in the claimed administration volumes.

894.    In addition, Dr. Pinal does not provide any opinion supporting the conclusion that the POSA would have been motivated or had reason to combine Soppimath 2013 with the claimed formulations, including based on the references discussed in my report. Contary to Dr. Pinal's assumption, the POSA would not have had such a motivation or reason in view of Soppimath 2013's criticisms of other liquid bendamustine formulations. *See, e.g.*, Soppimath 2013 ¶ 6, JDG_BENDA_00003277 at 3283. Instead, to the extent that the POSA would have considered Soppimath 2013 in administering a liquid bendamustine formulation, the POSA would have been motivated to use Soppimath 2013's exemplary formulations, which Soppimath 2013 claims to be superior to other bendamustine formulations.

### 2.    The POSA Would Not Have Been Motivated To Use the Claimed Administration Volumes Because of Solubility Concerns.

895.    Many of the asserted claims of the '908 and '021 families include limitations related to the volume of the diluted composition to be administered to the patient. For example, claim 14 of the '908 patent requires that the "volume administered is about 50 ml or less."

416

Similarly, claim 10 of the '568 patent—on which asserted claim 11 depends—requires the infusion of "a volume of about 50 ml." Other claims—for example, the asserted claims of the '399 patent—require that the volume to be administered be "about 100 ml or less." Other of the asserted claims are similar.

896. I understand that other experts will opine on the motivation of the POSA to use these infusion volumes with patients, including from a medical and pharmacokinetic point of view. In this section, I consider the potential solubility concerns that the POSA might have had about using the claimed infusion volumes.

897. Although some of the claims allow for an infusion volume of up to 100 mL, I understand that Dr. Pinal has only opined that the POSA would have been motivated to use a formulation "having 25 mg/mL of [bendamustine] in a solvent of 90:10 PEG:PG and then diluting it into a 50 mL mini-bag." *See, e.g.*, Pinal Rep. ¶ 479, App'x F (calculating concentrations with a 50 mL dilution volume).

898. In my opinion, the POSA would have had serious concerns that Dr. Pinal's suggested admixture (50 mL of saline with a formulation of 25 mg/mL bendamustine in 90:10 PEG:PG) could cause bendamustine precipitation.

899. As an initial matter, I understand that Dr. Pinal agrees that the POSA would have been strongly dissuaded from using an admixed composition in which the bendamustine precipitated, as that would present serious safety concerns. *See* ¶ 377; Pinal Rep. ¶ 477. As such, in my opinion, the POSA would have been strongly dissuaded from using 50 mL of diluent if doing so would have presented a risk of bendamustine precipitation.

900. In my opinion, the POSA would have expected the dosage of bendamustine delivered to the patient to be up to 120 mg/m$^2$. *See* Treanda® Label (Apr. 2009),

417

JDG_BENDA_00006932 at 6932. As Dr. Pinal acknowledges, the POSA would have accounted for a patient body surface area of up to 3.0 m$^2$. *See* Pinal Rep. ¶ 479. As such, the POSA would have understood that the final, diluted formulation would need to be able to contain at least 360 mg (= 120 mg/m$^2$ × 3.0 m$^2$) of bendamustine. Assuming (as Dr. Pinal does) a concentration of 25 mg/mL in the liquid concentrate, the POSA would have needed to add 14.4 mL (= 360 mg ÷ 25 mg/mL) of the liquid concentrate to 50 mL of saline (resulting in a 14.4 mL + 50 mL = 64.4 mL admixture), for a final bendamustine concentration of about 5.6 mg/mL (=360 mg ÷ 64.4 mL). In other words, the POSA would have understood that using 50 mL of saline would necessitate an admixed bendamustine solubility of at least 5.6 mg/mL.

901.    The POSA would have had no reason to believe that admixing 50 mL of saline with 14.4 mL of a 90:10 PEG:PG formulation would yield a bendamustine solubility of 5.6 mg/mL. First, Dr. Pinal does not identify any prior art disclosure of the solubility of bendamustine in a composition of 90:10 PEG:PG. The '707 patent, for example, does not disclose the solubility of bendamustine in a 90:10 PEG:PG formulation. Rather, Dr. Pinal relies on Eagle's own internal testing for those data. *See* Pinal Rep. ¶ 478 ("Eagle did such testing using PEG 400 and a PEG:PG ratio of 90:10."). Second, Dr. Pinal does not identify any prior art disclosure of the solubility of bendamustine in saline. The only remotely relevant citation that Dr. Pinal provides on this issue is a citation to a reference that obliquely states that "many aromatic mustards" have "poor solubility" in "purely aqueous media." Pinal Rep. ¶ 55 (quoting Williamson 1967 at 37). But as Dr. Pinal himself admits, the addition of sodium chloride would have been expected to decrease the solubility of bendamustine hydrochloride, relative to its solubility in pure water. *See* Pinal Rep. ¶ 135. As such, the POSA would have expected bendamustine hydrochloride to be even less soluble in saline than in water. Dr. Pinal has not

418

EAGLEBEN-SA_00001729

identified any teaching in the prior art disclosing the solubility of bendamustine hydrochloride in saline.

902. Dr. Pinal does not opine that the POSA would have been able to predict the solubility of bendamustine hydrochloride in a mixture of saline and a 90:10 PEG:PG composition. To the contrary, Dr. Pinal provides no evidence that the POSA could have predicted the solubility of bendamustine hydrochloride in an aqueous diluent system using the models that he relies upon in his report. *See* Pinal Rep. ¶ 477 ("While the concentration of [bendamustine] in the (organic) solvent + (aqueous) diluent system drops with dilution in a linear fashion (e.g., mixing equal volumes of the organic [bendamustine] solution and saline decreases the concentration of [bendamustine] by half), the solubility of the [bendamustine] in the solvent + diluent system varies nonlinearly with additional dilution with aqueous diluents."). Indeed, Dr. Pinal rightly acknowledges that it would have been possible that the bendamustine hydrochloride could precipitate at certain concentrations and dilution amounts. *See* Pinal Rep. ¶ 477 ("At some levels of concentration and dilution, there might be more [bendamustine] than the system can handle, so that the [bendamustine] could come out of solution. This would show up as particulate matter at the bottom of the container.").

903.                                    REDACTED

904. Instead of opining that the solubility of bendamustine hydrochloride in an aqueous diluent system could have been predicted using the models that he relies upon, Dr. Pinal opines that the POSA would have conducted experimentation to determine that fact. In

419

EAGLEBEN-SA_00001730

particular, Dr. Pinal opines that the POSA would have repeated Eagle's experiments to determine the solubility of bendamustine hydrochloride after dilution at solvent:saline ratios of 1:5, 1:25, 1:50, and others. *See* Pinal Rep. ¶ 478, App'x F (listing additional dilution ratios). Dr. Pinal opines that the POSA would have then have "calculated the [bendamustine] concentrations in the diluted infusion solutions as well as the dilution ratios that would be typical of those encountered using the proposed formulation." Pinal Rep. ¶ 479. Finally, Dr. Pinal opines that the POSA "would then have compared those calculations with the results of his experimental solubility testing," to see whether the experimentally determined solubilities were higher than the expected concentrations of bendamustine to be infused in patients. *See* Pinal Rep. ¶ 480.

905. My understanding is that the performance of and results from the hypothetical experiments described by Dr. Pinal are not properly considered within the knowledge of the POSA. Because the performance of and results from those experiments are not within the knowledge of the POSA, they would not have motivated or provided rason for the POSA to use a particular infusion volume.

906. Absent his hypothetical solubility experiments, Dr. Pinal provides no evidence that the POSA would have known whether 5.6 mg/mL of bendamustine hydrochloride in a 90:10 PEG:PG formulation would precipitate upon dilution into 50 mL of saline. Accordingly, Dr. Pinal provides no reason to believe that—absent experimentation—the POSA would have known whether an admixture of 14.4 mL of a 90:10 PEG:PG mixture and 50 mL saline could dissolve 5.6 mg/mL of bendamustine, particularly given the lack of any prior art disclosure about the solubility of bendamustine hydrochloride in a 90:10 PEG:PG formulation.

907. In view of this uncertainty, the POSA would not have been motivated or had reason to use 50 mL of diluent. As I explain above, the POSA would have been extremely

420

EAGLEBEN-SA_00001731

hesitant to use an infusion volume that might cause precipitation, in view of serious safety concerns. *See* ¶ 377; Pinal Rep. ¶ 477. In my opinion, the POSA would not have used an infusion volume without knowing with absolute certainty that the volume could fully dissolve all of the bendamustine.

908. Even if Dr. Pinal were right that the POSA would have conducted his proposed solubility experiments, those experiments still would have given the POSA reason for concern. Dr. Pinal makes clear that his proposed solubility experiments would all have been conducted at room temperature. *See* Pinal Rep. ¶ 481 ("The preceding discussion concerned solubility at room temperature, which is what the POSA would have focused on because that is the temperature at which the drug is admixed and administered."), ¶ 478 (reciting solubility measurements made by Eagle at room temperature).

909. I disagree with Dr. Pinal that the POSA would only have been concerned about solubility at room temperature. As the label makes clear, the Lyophilized Treanda® product could be stored—after admixture—"for 24 hours when stored refrigerated." Treanda® Label (2009) at 3, JDG_BENDA_00006932 at 6934. The POSA would have likewise wanted any new bendamustine formulation to be suitable for storage in the refrigerator after admixture. However, the POSA would have known that the solubility of a drug (especially, a salt) is typically temperature dependent, and that decreases in temperature often decrease the drug's solubility in a liquid. *See* ¶¶ 381–385. In particular, Brittain 2006 reported that the solubility of bendamustine decreased as a function of temperature in aqueous-alcohol co-solvent systems. *See* ¶ 384. The POSA would thus have been concerned that refrigerating the admixture would decrease the solubility of bendamustine hydrochloride in that admixture and potentially cause precipitation.

421

910.    Even though the admixture is administered at room temperature, the POSA still would have viewed precipitation in the refrigerator as a major problem.  The POSA would have been concerned that any particles that precipitated during refrigeration might not dissolve fully by the time the admixture was administered to the patient.  Particulate matter——which can be sub-visible——can present a significant health hazard in intravenous administration, and the POSA would have been strongly motivated to avoid this risk.  *See* ¶ 377; Pinal Rep. ¶ 477.

911.    Absent data indicating that the admixture would solubilize 5.6 mg/mL of bendamustine at refrigerated conditions, with a requisite solubility margin, the POSA would not have been motivated or had reason to use 50 mL of diluent, due to solubility concerns.

912.    The other references that Dr. Pinal cites would not have overcome the POSA's solubility-related concerns.  For example, Dr. Pinal cites Broadhead 2001 for the proposition that "drugs may be administered as small-volume parenterals at a volume less than 100 mL."  Pinal Rep. ¶ 461.  This disclosure, however, is not specific to bendamustine, much less to an admixture of a solution of bendamustine in a 90:10 PEG:PG mixture with saline.  *See* Broadhead 2001 at 332, JDG_BENDA_00000404 at 406.  Indeed, the relevant page of Broadhead 2001 is not recommending the use of small-volume infusions, but rather is simply discussing the pharmacopoeial classification of different infusion volumes.  *Id.*

913.    Even if the POSA were motivated or had reason to use a 100 mL infusion volume, the POSA would not have been motivated or had reason to use a 50 mL infusion volume  and would not have had a reasonable expectation of success in using a 50 mL infusion volume with the required pharmaceutical qualities (that is, without precipitation).  The POSA would have understood that diluting with 100 mL of saline would yield a lower bendamustine concentration than diluting with 50 mL of saline.  For example, assuming that the POSA used 14.4 mL of

422

EAGLEBEN-SA_00001733

liquid concentrate at a concentration of 25 mg/mL of bendamustine hydrochloride (i.e., containing 14.4 mL × 25 mg/mL = 360 mg bendamustine hydrochloride), *see* ¶ 900, a dilution into 50 mL of saline would yield a total admixed volume of 64.4 mL. Thus, the concentration of bendamustine hydrochloride in the admixed solution would be 5.6 mg/mL (= 360 mg ÷ 64.4 mL). By contrast, if the same 14.4 mL of liquid concentrate with a concentration of 25 mg/mL of bendamustine hydrochloride (again, containing 360 mg bendamustine hydrochloride) were added to 100 mL of diluent, then the total admixed volume would be 114.4 mL, and the bendamustine hydrochloride concentration would be only approximately 3.1 mg/mL (= 360 mg/114.4 mL). Even if the POSA for some reason would have predicted that the solubility of bendamustine hydrochloride in an admixture of 90:10 PEG:PG liquid concentrate and 100 mL of saline would be greater than 3.1 mg/mL (which Dr. Pinal has not established), that would not imply that an admixture of 90:10 PEG:PG liquid concentrate and 50 mL of saline would have a bendamustine hydrochloride solubility greater than 5.6 mg/mL. Nowhere does Dr. Pinal opine that the POSA could have made such a prediction about the solubility of bendamustine in an admixture with 50 mL of diluent, even if the POSA would have had some information about the drug's solubility in an admixture with 100 mL of diluent. As such, even if the POSA were somehow motivated or had reason to use 100 mL of diluent (which the POSA would not have been, including because of solubility concerns), the POSA would not have been motivated of had reason to further decrease the diluent amount to 50 mL. Likewise, even if the POSA somehow would have expected success with 100 mL of diluent (which the POSA would not have had, *see* ¶¶ 945–952), that would not have provided a reasonable expectation of success of using 50 mL of diluent without precipitation.

423

914.    Dr. Pinal opines that Example 1 of Olthoff 1983 would have motivated the POSA to use a small infusion volume. *See* Pinal Rep. ¶¶ 462, 475–476.  I disagree.  First, the undiluted compositions of Example 1 of Olthoff 1983 are composed entirely of propylene glycol and bendamustine. *See* Olthoff 1983 at 7, JDG_BENDA_00002301 at 2315.  The POSA would not have been able to predict the solubility of bendamustine hydrochloride in a diluted admixture of saline and a formulation of 90:10 PEG:PG in view of Olthoff 1983's disclosures about a composition where PG was the only solvent.  Second, the final concentration the admixed composition of Example 1 of Olthoff 1983 was only 2.5 mg/mL, as Dr. Pinal acknowledges. *See* Pinal Rep. ¶ 462.  But as explained above, the POSA would have understood that the admixed formulation needed to be able to provide a solubility of more than 5.6 mg/mL. *See* ¶ 900.  Third, Olthoff 1983 does not actually disclose that saline was used as the diluent in Example 1.  Rather, Olthoff 1983 only refers to dilution into a "chosen diluent." *See* Olthoff 1983 at 7, JDG_BENDA_00002301 at 2315.  Example 1 of Olthoff 1983 would thus not have provided the POSA with any information about the solubility of bendamustine hydrochloride in an admixed formulation of saline, PEG, and PG.

915.    Dr. Pinal cites several references that purport to disclose the use of 50 mL infusion volumes for other drugs, including cyclophosphamide and 5-Fluorouracil. *See* Pinal Rep. ¶ 463 (citing Bergsagel at 532 and Glimelius 1998 at 677).  I understand that other experts will be addressing the clinical and pharmacokinetic relevance of these studies.  In my opinion, however, these publications would not have changed the POSA's motivations, reasons, or expectations of success in using a 50 mL infusion volume with a bendamustine composition, much less a bendamustine hydrochloride composition admixed in saline, PEG, and PG.  Neither of these references concern bendamustine. *See* Glimelius et al., *Bolus Injection (2-4min) Versus*

424

EAGLEBEN-SA_00001735

*Short-term (10-20min) Infusion of 5-Fluorouracil in Patients with Advanced Colorectal Cancer: a Prospective Randomised Trial*, 34 EUR. J. CANCER 674 (1998) ("Glimelius 1998"); Bergsagel et al., *Effect of Cyclophosphamide on Advanced Lung Cancer and Hematological Toxicity of Large, Intermittent Intravenous Doses*, 98 CAN. MED. ASS'N J. 532 (1968) ("Bergsagel 1968"). Dr. Pinal has not opined that either cyclophosphamide or 5-Fluorouracil have similar solubilities to bendamustine hydrochloride in any solvent, much less in an admixture of saline, PEG, and PG. The POSA would not have expected—based on the disclosures of small-volume administrations of other drugs in other solvent systems—that bendamustine would have the requisite solubility in a 50 mL infusion volume.

916. Dr. Pinal also opines that a reference by Barth and colleagues taught that bendamustine "infusion volumes of 100 – 250 mL were actively practiced in Germany in 2010." Pinal Rep. ¶ 464 (citing Barth et al., *Bendamustine Plus Rituximab (B-R) Is Significantly Superior to CHOP-R as First-Line Therapy in Indolent and Mantle-Cell Lymphoma*, 12 ONKOLOGISCHE PHARMAZIE 3 (Apr. 2010), JDG_BENDA_00008043 ("Barth 2010")). Dr. Pinal cites to a section at the end of that publication, which states that "[t]he 30-minute short infusion that is practiced in Germany can be readily achieved with infusion volumes of 100 to 250 ml 0.9% NaCl." Pinal Rep. ¶ 464 (citing Barth at 7). Dr. Pinal interprets that statement to mean that infusion volumes of "100 – 250 mL were actively practiced in Germany." *Id.* I disagree with Dr. Pinal's reading of that reference, for two reasons. First, the context of that quote suggests that Barth 2010 is not providing a description of the practice at the time in Germany, but rather is offering a suggestion about potentially changing the infusion volume in order to accommodate a 30-minute infusion time. As Barth 2010 concludes at the end of that section, it would not have been feasible to use the German reconstitution procedure in place at the time,

425

EAGLEBEN-SA_00001736

which involved reconstitution to a concentration of 2.5 mg/mL, with 100–250 mL saline bags. *See* Barth 2010 at 7, JDG_BENDA_00008043 at 8047 ("[I] in contrast to the concentration of 2.5 mg/ml at which a volume of 72 ml results. It is not possible to inject 72 ml in the aforementioned bag sizes."). Moreover, the label for the bendamustine product then on the market in Germany, Ribomustin®, directs the use of a 500 mL infusion volume. Ribomustin® Product Monograph at 8 (2005), JDG_BENDA_00000001 at 9. As such, I disagree with Dr. Pinal that Barth 2010 was disclosing that the German practice in 2010 was to administer bendamustine in 100–250 mL volumes.

917. Second, the "100 – 250 mL" volume that Barth 2010 is reciting is not a final volume of administration; rather, it is the volume of saline to which the reconstituted bendamustine solution is added prior to administration. *See* Barth 2010 at 7, JDG_BENDA_00008043 at 8047 (discussing the "volume of injection into 100-250 ml bags").

918. The smallest volume of reconstituted solution that Barth 2010 contemplates using is 36 mL, based on the reconstitution procedure in place in the United States for lyophilized bendamustine at the time. *See* Barth 2010 at 7, JDG_BENDA_00008043 at 8047. Barth 2010 comments that using the German reconstitution procedure, which would yield a volume of 72 mL for a hypothetical patient, would be incompatible with 100–250mL saline bags. *Id.* Barth 2010 never discloses actually preparing an admixed bendamustine composition of 136 mL.

919. Because the POSA would not have understood Barth 2010 as disclosing the routine administration of bendamustine in 100 mL infusion volumes, the teachings of Barth 2010 would not have assuaged the POSA's concerns about the solubility of bendamustine hydrochloride in a small-volume admixture of saline, PEG, and PG.

426

EAGLEBEN-SA_00001737

920.    Even if the POSA read Barth 2010 as Dr. Pinal suggests—that is, as disclosing that some patients had actually been infused with bendamustine admixtures of 136 mL—that still would not have allayed the POSA's solubility concerns. First, Barth 2010 does not disclose the particular concentrations of bendamustine hydrochloride that had been used in its purported small-volume admixtures. The only example it provides (which is clearly a hypothetical) is a patient receiving 180 mg of bendamustine hydrochloride in a 136 mL admixture, which would yield a bendamustine hydrochloride concentration of 1.32 mg/mL. Even if the POSA thought that such an admixture had actually been created (which Barth 2010 does not indicate), that would not have caused the POSA to believe that a 50 mL admixture of saline and a "90% PEG 10% PG concentrate" would yield a bendamustine hydrochloride solubility of 5.6 mg/mL. *See* ¶ 913. Given these uncertainties, Barth 2010 would not have motivated or provided reason for the POSA to make the 50 mL admixed compositions that Dr. Pinal has opined would have been obvious or provided the POSA with a reasonable expectation of success that those admixed compositions could be made without drug precipitation. *See* ¶ 897.

921.    Dr. Thirman suggests that the "POSA would have been motivated to seek a small volume of 100 mL or less (including the common volumes of 50 mL) and have a reasonable expectation of success that a rapid administration, low volume formula would have been effective and tolerated." Thirman Rep. ¶ 227. I disagree that the POSA would have been motivated or had reason to administer such a formulation, based on the serious solubility concerns that the POSA would have had at those volumes. *See* ¶¶ 899–911. Neither Dr. Pinal nor Dr. Thirman cite any prior art that discloses infusing the claimed bendamustine compositions in a range that includes 100 mL. To the contrary, as I discuss in the above-cited paragraphs, the POSA would have been motivated to avoid using low-volume infusions of bendamustine,

EAGLEBEN-SA_00001738

including 100 mL, for fear of precipitation, including at refrigerated conditions. In addition, the POSA would not have predicted that bendamustine would be sufficiently soluble in an admixture with 100 mL of diluent. As Dr. Pinal acknowledges, changing the diluent volume affects the bendamustine concentration linearly, but affects the bendamustine solubility non-linearly. *See* Pinal Rep. ¶ 477. Dr. Pinal does not opine that any of the theoretical models that he refers to in his report could have predicted whether a particular admixture volume would provide sufficient solubility for bendamustine. Accordingly, neither Dr. Thirman nor Dr. Pinal have presented any evidence that the POSA would have had any information sufficient to overcome the POSA's serious solubility concerns.

922.                                    REDACTED

923.                                    REDACTED

428

EAGLEBEN-SA_00001739

REDACTED

924.                              REDACTED

925.                              REDACTED

429

EAGLEBEN-SA_00001740

REDACTED

926.    For the above reasons, the POSA would not have been motivated or had reason to use the claimed infusion volumes.

**B.    The POSA Would Not Have Been Motivated To Use the Claimed Excipients.**

927.    Many of the asserted claims of the '908 and '021 patent families require the administered formulations to comprise PEG and PG. Claim 13 of the '908 patent—from which asserted claim 14 depends—requires the administered formulations to comprise a "solubilizer" comprising "about 0.3 to about 45% by volume" PEG and "about 0.03 to about 5% by volume" PEG, wherein the weight ratio of PEG to PG is "about 90:10." Claim 1 of the '568 patent—from which asserted claims 11, 15, 18, and 22 depend—requires the administered formulations to comprise "about 0.5 to about 26.5% vol." of a "solubilizer" comprising PEG and PG. Claim 1 of the '397 patent—from which asserted claim 3 depends—requires the administered formulations to comprise "3.8-22.4 vol % of a nonaqueous component" comprising PEG and PG. Claim 1 of the '399 patent—from which asserted claims 13 and 15 depend—requires the administered compositions to comprise a "solubilizer" comprising PEG and "about 4.5 mg/ml to about 51 mg/ml" PG. Claim 1 of the '021 patent—from which asserted claims 3, 4, 14, and 15 depend— requires the administered compositions to comprise a "solubilizer" comprising "about 0.3 to about to 45% volume" PEG and "0.03 to about 5% volume" PG.

928.    I understand that Dr. Pinal has only opined about the POSA infusing a formulation "having 25 mg/mL of [bendamustine] in a solvent of 90:10 PEG:PG and then diluting it into a 50 mL mini-bag." *See, e.g.*, Pinal Rep. ¶ 479, App'x F (calculating concentrations with a 50 mL dilution volume).

430

EAGLEBEN-SA_00001741

929. Dr. Pinal has failed to identify any motivation or reason for the POSA to use a formulation with a 90:10 ratio of PEG:PG in combination with a 50 mL diluent volume. Instead, Dr. Pinal simply assumes that the POSA would have started with one of the formulations disclosed by '707 patent family, and then would have assessed the possibility of using a small infusion volume and short infusion time period using that formulation. *See, e.g.*, Pinal Rep. ¶ 461 ("Once a POSA had developed the formulation disclosed in the Family 2 patents, a POSA would have been motivated to use the formulation in a small volume over a short period of time." (emphasis added)), ¶ 462 ("After arriving at a formulation with a BDM concentration of 25 mg/mL, a POSA would have been motivated to determine if the formulation could be administered in a smaller volume than the lower concentration Treanda (which was diluted into 500 mL)." (emphasis added)), ¶ 474 ("Once the formulator had developed the formulation claimed in the '707 patent, '831 patent, '796 patent, '797 patent, '533 patent, a POSA would have immediately appreciated that the higher concentration of the formulation, as compared to Treanda, meant that a substantially smaller infusion volume could be used to administer the same total dose of [bendamustine]." (emphasis added)).

930. Dr. Pinal's opinion on this issue is based on hindsight. Instead of assessing what the POSA would have been motivated or had reason to do as of the priority dates of the '908 and '021 patent families, he has simply retraced the work of the inventors. I note that the assignee of the '707 patent family is the same as the assignee of the '908 and '021 patent families, which might have created a particularized incentive for the inventors of the '908 and '021 patent families to use admixed solutions based on the PEG:PG formulations disclosed in the '707 patent family. The POSA, however, would not have shared that motivation of the inventors.

431

EAGLEBEN-SA_00001742

931.    The POSA would have understood that—as of the priority date for the '908 and '021 patent families—there were multiple candidate formulations that potentially could be used for infusion in small volumes. (For purposes of this section, I have assumed that the POSA would have been motivated to use a 50 mL infusion volume, although in my opinion the POSA would not have been motivated or had reason to do so in view of solubility concerns. *See* ¶¶ 895–926. I understand that other experts have similarly opined that the POSA would not have been motivated or had reason to do so.) For example, Dr. Pinal has opined that Olthoff 1983 taught using an admixture with a 10 mL volume and a bendamustine concentration of 2.5 mg/mL. *See* Pinal Rep. ¶¶ 475–476. Dr. Pinal has opined that the POSA would have considered the stability profile of Olthoff 1983 to be encouraging. *See, e.g.*, Pinal Rep. ¶¶ 157–158. I disagree with Dr. Pinal's opinion about the stability of the Olthoff 1983 formulations. *See* ¶¶ 200–214. However, assuming Dr. Pinal were right that the POSA would have viewed the Olthoff 1983 formulations as encouraging, he fails to explain why the POSA would have used a 90:10 PEG:PG formulation—rather than Olthoff 1983's PG formulation—in creating a 50 mL bendamustine infusion product.

932.    Likewise, Dr. Pinal offers no opinion as to why the POSA would have used the PEG:PG formulations from the '707 patent family rather than the liquid bendamustine formulations disclosed by Drager '006. The only opinion that Dr. Pinal offers that might even relate to this issue—which he provides in a wholly different section of his report—is that the POSA would have had compatibility concerns about DMA. *See, e.g., See* Pinal Rep. ¶ 154. I disagree with that opinion. *See* ¶¶ 231–244. Even if it were correct, though, Dr. Pinal ignores the other solvent systems disclosed in Drager '006. *See, e.g.*, Drager '006 at 8:5–68, JDG_BENDA_00000990 at 999 (providing solubility and stability data for bendamustine in

432

solvents including DMSO, DMF, and NMP). Dr. Pinal offers no opinion as to why the POSA would have ignored these formulations and would have instead used the 90:10 PEG:PG formulation disclosed in the '707 patent family.

933. The solubility disclosures in Olthoff 1983 and Drager '006 would have provided some motivation to the POSA to use the bendamustine formulations disclosed in those references, rather than the PEG:PG formulations disclosed in the '707 patent family. As Dr. Pinal acknowledges, the '707 patent family does not disclose the solubility of bendamustine in a 90:10 PEG:PG formulation. *See* ¶ 901; Pinal Rep. ¶ 478. By contrast, Olthoff 1983 and Drager '006 both disclose solubility measurements for bendamustine hydrochloride in the solvents and solvent systems exemplified in those references. *See* Drager '006, 8:5–40, JDG_BENDA_00000990 at 999; Olthoff 1983 at 6, JDG_BENDA_00002301 at 2314. I agree with Dr. Pinal that the POSA would not have been able to predict the solubility of bendamustine hydrochloride in an admixed aqueous-organic co-solvent system based on the models that he relies upon in his report. *See* Pinal Rep. ¶ 477. However, the POSA likely would have speculated that using an organic solvent that provided a high bendamustine hydrochloride solubility might yield a higher solubility in an admixed aqueous-organic co-solvent system. As such, the POSA would have preferred to use an organic solvent system that provided a high bendamustine hydrochloride solubility, in order to avoid precipitation in the diluted admixture.

934. Elsewhere in his report, Dr. Pinal opines that the POSA would have estimated the solubility of bendamustine hydrochloride in a 90:10 PEG:PG mixture to be 29.4 mg/mL. *See* Pinal Rep. ¶ 203. I disagree with this opinion. *See* ¶¶ 370–375. However, assuming that the POSA would have estimated this solubility of bendamustine hydrochloride in a 90:10 PEG:PG mixture, it would have motivated the POSA away from using this solvent combination to achieve

433

a 50 mL infusion volume.  As I describe in the context of the '707 patent family, the POSA would have known that many of the solvents from Olthoff 1983 and Drager '006 provided much higher solubilities for bendamustine hydrochloride.  *See* ¶ 369.  In attempting to achieve an admixed bendamustine hydrochloride formulation with a 50 mL volume, the POSA would have preferred to use those solvents with a known, higher bendamustine hydrochloride solubility.

935.    Dr. Pinal briefly opines that several references would have motivated the POSA to use a 90:10 PEG:PG formulation in the context of the '908 and '021 families.  *See* Pinal Rep. ¶ 484–85.  I disagree.

936.    First, Dr. Pinal opines that Olthoff 1983's teaching of "polyols" as solubilizers encompasses PEG and PG.  *See* Pinal Rep. ¶ 483.  But Olthoff 1983 does not mention PEG, and it would not have motivated or provided reason for the POSA to use PEG (instead of PG or ethanol) in compositions of bendamustine hydrochloride.

937.    Second, Dr. Pinal opines that the formulations claimed by the '707 patent family "contain[] 90% PEG and 10% PG" and that diluting those excipients into 50 mL of diluent yields the claimed diluted excipient concentrations.  Pinal Rep. ¶ 484; *see also* Pinal Rep. ¶ 666.  This opinion, however, ignores the question of why the POSA would have been motivated or had reason to use the formulations of the '707 patent family in the first place.  As I explain elsewhere, the POSA would have had solubility-related concerns about admixing the formulations claimed by the '707 patent family with 50 mL of diluent.  *See* ¶¶ 895–926, 945–952.  If the POSA would have been motivated or had reason to make an admixed, aqueous-organic bendamustine hydrochloride formulation with a 50 mL volume, the POSA would have preferred to start with a concentrated formulation with a known (and high) solubility.  I note that the '707 patent and the related published patent application, U.S. Patent Publication No.

434

EAGLEBEN-SA_00001745

2011/0184036, were submitted to the Examiner during prosecution of the '908 and '021 patent families, and the Examiner cited those references during prosecution of some of those applications.

938.    Third, Dr. Pinal opines that Drager '006 teaches "nonaqueous solvent mixtures for [bendamustine] formulations that contain PEG and PG." Pinal Rep. ¶ 485. This is a misreading of Drager '006, which does not use PEG in any of its exemplified formulations, and instead requires the use of a polar <u>aprotic</u> solvent. *See, e.g.*, ¶¶ 220–224. If the POSA were motivated or had reason to follow Drager '006, then the POSA would have used one of the formulations disclosed in that reference.

939.    Despite citing Olthoff 1983, the '707 patent family, and Drager '006 in consecutive paragraphs, *see* Pinal Rep. ¶¶ 483–485, Dr. Pinal does not explain how or why the POSA would have combined those references to obtain the formulation claims of the '908 and '021 patent families. Dr. Pinal likewise does not explain why the POSA would have been motivated or had reason to use the particular, 90:10 PEG:PG formulation of the '707 patent family, rather than the other formulations in the references that he relies upon.

940.    Dr. Pinal also opines that Soppimath 2013 would have motivated the POSA to use the claimed combinations of PEG and PG. *See* Pinal Rep. ¶ 674. I disagree. In my opinion, Soppimath 2013, either alone or in combination with any of the other references relied upon in Dr. Pinal's report, does not render the claimed inventions obvious.

941.    To support his conclusion that the claimed PEG/PG combinations would have been obvious, Dr. Pinal relies on claim 12 of Soppimath 2013, which recites a "reconstitution solution" for lyophilized bendamustine, "wherein the non-aqueous solvent system comprises at least one of propylene glycol or polyethylene glycol and wherein the water phase is present in an

435

EAGLEBEN-SA_00001746

amount of at least 10%." *See* Pinal Rep. ¶ 674 (quoting Soppimath 2013, claim 12, JDG_BENDA_00003277 at 3288). Dr. Pinal also relies on Soppimath 2013's statement that "non-aqueous solvent system will typically equal or more than 20 vol %, more typically more equal or than 30 vol %, even more typically equal or more than 40 vol %, and most typically equal or more than 50 vol %." *See* Pinal Rep. ¶ 674 (quoting Soppimath 2013 ¶ 30, JDG_BENDA_00003277 at 3285). Dr. Pinal's reliance on those statements is misplaced.

942. First, Dr. Pinal improperly relies on claims and paragraphs in Soppimath 2013 that are not prior art. Unlike Soppimath 2013, the Soppimath Provisional Application does not present a claim that covers a formulation comprising both PEG and PG. *See* Soppimath Provisional Application, claims 1–12. Instead, the Soppimath Provisional Application claims formulations comprising only PEG or PG. *See* Soppimath Provisional Application, claim 3 ("The pharmaceutical composition of claim 1, whereinthe non-aqueous pharmaceutically acceptable vehicle is aglycol compound such as poly ethylene glycol, propylene glycol, or glycerol."). In addition, the Soppimath Provisional Application does not suggest formulations comprising PEG and PG. To the contrary, the Soppimath Provisional Application's exemplary formulations contain PEG or PG only. *See* Soppimath Provisional Application ¶ 15. As explained above, the Soppimath 2013's statement that "non-aqueous solvent system will typically equal or more than 20 vol %, more typically more equal or than 30 vol %, even more typically equal or more than 40 vol %, and most typically equal or more than 50 vol %" is also not present in the Soppimath Provisional Application. *See* ¶ 891. Accordingly, the POSA would not have understood the Soppimath 2013 inventors to have been in possession of a PEG/PG combination, much less a PEG/PG combination comprising the specific PEG/PG volumes recited in the claims, as of the filing date of the Soppimath Provisional Application.

436

943. Second, even assuming that the paragraphs in Soppimath 2013 that Dr. Pinal relies upon are prior art, Soppimath 2013 does not render the claimed PEG:PG combinations obvious. As Dr. Pinal's reliance on Soppimath 2013's claim 12 demonstrates, Soppimath 2013 does not describe any examples of a PEG/PG formulation, much less a PEG/PG formulation comprising the specific PEG/PG volumes recited in the claims of the asserted patents, or provide a motivation or reason for using such a formulation. *See* Soppimath 2013 ¶¶ 40–52, JDG_BENDA_00003277 at 3286–88. Soppimath 2013 also does not provide any evidence that a PEG/PG formulation was actually administered. Given the lack of information in Soppimath 2013, the POSA would have no reasonable expectations about the pharmacokinetics, pharmacodynamics, and toxicity of a PEG:PG combination. Dr. Pinal is therefore incorrect in concluding that the claimed PEG:PG combinations would have been obvious based on Soppimath 2013 in view of any of the other references or arguments cited in Dr. Pinal's report. And in any event, as explained above, Dr. Pinal is mistaken in his analysis of those references, which would have led the POSA away from the claimed inventions. *See* ¶¶ 927–939.

944. For the above reasons, the POSA would not have been motivated or had reason to use the claimed excipients in the compositions and methods described by the '908 and '021 patent families.

## C. The POSA Would Not Have Had a Reasonable Expectation of Success that the Claimed Bendamustine Concentrations Could Be Dissolved in the Claimed Diluted Compositions.

945. Many of the asserted claims of the '908 and '021 families include limitations specifying that the diluted compositions comprise bendamustine, or a pharmaceutically acceptable salt thereof, at a particular concentration. For example, claim 15 the '568 patent requires that the composition comprise about 1.85 mg/ml to about 4.84 mg/ml of bendamustine or a pharmaceutically acceptable salt thereof. Claim 22 of the '568 patent requires that the

437

EAGLEBEN-SA_00001748

composition comprise about 2.19 mg/ml to about 5.59 mg/ml. And claim 9 of the '399 patent—on which asserted claim 13 depends via claim 12—requires a concentration of about 5.6 mg/ml.

946.   Dr. Pinal opines that the POSA would have been motivated to dilute a composition containing 25 mg/mL bendamustine into 50 mL of saline. *See, e.g.*, Pinal Rep. ¶ 610. Dr. Pinal explains that, for a patient with a 2.0 $m^2$ BSA, this dilution would yield a bendamustine concentration in the admixture of 4.03 mg/mL (for an NHL dosage of 120 $mg/m^2$) or 3.45 mg/mL (with a CLL dosage of 100 $mg/m^2$). *Id.* Dr. Pinal further provides an Appendix which provides bendamustine concentrations in admixtures of up to 5.59 mg/mL. *See* Pinal Rep. ¶ 610 (citing App'x F). I therefore understand that Dr. Pinal is opining that the POSA would have been motivated to use such concentrations of bendamustine in an admixture.

947.   In my opinion, the POSA would not have had a reasonable expectation of success in obtaining the claimed admixtures with the claimed bendamustine concentrations.

948.   As an initial matter, I note that the asserted claims require parenteral administration of the claimed formulations. As I explain above, the POSA would have understood that the bendamustine would need to be fully dissolved in the admixture in order to safely administer it to a patient. *See* ¶ 377. I understand that Dr. Pinal shares this view. *See* Pinal Rep. ¶ 477 ("A particular concern of the POSA would have been to have sufficiently high solubility in the solvent system to prevent the [bendamustine] from coming out of solution (precipitating) when the solvent solution was diluted in the 50 mL mini-bag of saline solution."). As such, in order to have a reasonable expectation of success in practicing the claimed invention, in my opinion, the bendamustine must be completely dissolved at the claimed concentrations in the admixture.

438

EAGLEBEN-SA_00001749

949.    Dr. Pinal opines that the POSA would have been motivated to dilute a formulation with a bendamustine concentration of 25 mg/mL dissolved in a 90:10 PEG:PG solvent system into a 50 mL mini-bag. *See* Pinal Rep. ¶ 479. Assuming for the purposes of this analysis that the POSA would have had such a motivation, the POSA nevertheless would not have had a reasonable expectation of achieving the claimed bendamustine concentrations in the diluted composition. As I explain above, Dr. Pinal does not identify any prior art disclosure of the solubility of bendamustine in a composition based on a 90:10 PEG:PG mixture. *See* ¶ 901. Dr. Pinal likewise does not identify any prior art disclosure of the solubility of bendamustine in saline. *See* ¶ 901. Indeed, Dr. Pinal provides no evidence that the POSA could have predicted the solubility of bendamustine hydrochloride in an aqueous diluent system using the models that he relies upon in his report. *See* ¶ 902.

950.    Rather than opining that the POSA would have had a reasonable expectation of achieving that the admixture could fully dissolve the claimed bendamustine concentrations, Dr. Pinal instead opines that the POSA would have conducted experimentation to determine that fact. *See* ¶ 904. My understanding is that the performance of and results from the hypothetical experiments described by Dr. Pinal are not properly considered within the knowledge of the POSA. Put another way, my understanding is that the POSA would not have a reasonable expectation of success of completely dissolving the claimed bendamustine concentrations using the claimed diluent amounts if the POSA would have had to conduct Dr. Pinal's hypothetical solubility experiments.

951.    In my opinion, the POSA would not have had a reasonable expectation of success in completely dissolving the claimed bendamustine concentrations using the claimed diluent amounts. For example, I disagree with Dr. Pinal that the POSA would have had a reasonable

439

EAGLEBEN-SA_00001750

expectation of success of obtaining a diluted bendamustine composition with about 5.6 mg/mL bendamustine, as required by claim 9 (and asserted claim 13) of the '399 patent, in which the bendamustine were completely dissolved. *See* Pinal Rep. ¶ 610. As I explain above, Dr. Pinal has not identified any teaching in the prior art disclosing the solubility of bendamustine in a 90:10 PEG:PG formulation, and Dr. Pinal has not identified any teaching in the prior art disclosing the solubility of bendamustine in saline. *See* ¶ 949. Indeed, Dr. Pinal provides no evidence that the POSA could have predicted the solubility of bendamustine hydrochloride in an aqueous, diluted system using the models that he relies upon in his report. *See* ¶ 902. Thus, Dr. Pinal has provided no basis from which the POSA could have even estimated the potential solubility of bendamustine in the claimed diluted compositions.

952.    For the above reasons, the POSA would not have had a reasonable expectation of success that the claimed diluted compositions would be able to completely dissolve bendamustine, or a pharmaceutically acceptable salt thereof, at the claimed concentrations.

## X.    THE '908 PATENT AND THE '568 PATENT ARE NOT INVALID FOR OBVIOUS TYPE DOUBLE PATENTING IN VIEW OF THE '707 PATENT

### A.    Claim 14 of the '908 Patent Is Not Invalid for Obviousness-Type Double Patenting in View of the '707 Patent.

953.    I understand that Dr. Pinal has opined that the asserted claims of the '908 patent are invalid for obviousness-type double patenting in view of the '707 patent. *See* Pinal Rep. ¶ 797. I understand that only claim 14 of the '908 patent is being asserted. With respect to double patenting, I have not been asked to opine on the validity of any other '908 claims or reference patents.

954.    Claim 14 of the '908 patent requires that the volume administered be "50 mL or less."

440

955. Dr. Pinal states that claim 14 of the '908 patent would have been obvious for the same reasons that claim 1 of the '908 patent would have been obvious. *See* Pinal Rep. ¶ 810. He also cites paragraphs 474 through 481 of his report, without explanation.

956. Claim 1 of the '908 patent requires that the volume administered be "100 mL or less."

957. Dr. Pinal opines, *see* Pinal Rep. ¶ 800, that the 100 mL volume limitation of claim 1 of the '908 patent is invalid over claim 16 of the '707 patent, which claims a "method of treating cancer in mammals, comprising administering an effective amount of a long term storage stable non-aqueous liquid bendamustine-containing composition of claim 1 to a mammal in need thereof." Claim 1 of the '707 patent, in turn, claims a liquid composition of bendamustine, PEG, PG, and an antioxidant. Neither claim 16 nor claim 1 of the '707 patent contain a limitation regarding the volume of liquid to be administered. Dr. Pinal agrees. *See* Pinal Rep. ¶ 800 ("The composition of claim 1 of the '707 patent is a liquid composition that is for parenteral administration, and there are no limitations on the volume of total liquid that is administered.").

958. Instead of opining that the volume limitations are part of the '707 patent's claims themselves, Dr. Pinal opines that the POSA would have "arrived at a total volume of liquid of 100 mL or less through routine optimization." For this proposition, Dr. Pinal again cites to paragraphs 474 through 481 of his report.

959. In these paragraphs of his report, Dr. Pinal opines that the POSA would have conducted a solubility experiment to assess whether the drug contained in a 90:10 PEG:PG formulation, admixed into a small volume of saline, would precipitate. *See, e.g.*, Pinal Rep. ¶¶ 478–480. I address Dr. Pinal's opinions on this issue above. *See* ¶¶ 899–911. For the

441

EAGLEBEN-SA_00001752

reasons discussed in those paragraphs, I disagree that the POSA would have arrived at an infusion volume of 100 mL through "routine experimentation," even in view of claim 1 of the '707 patent. *See* ¶¶ 899–911. In view of the unpredictability of the solubility of bendamustine hydrochloride in admixtures with a diluent, I disagree that the POSA would have arrived at a 100 mL infusion volume by way of routine optimization.

960. Moreover, even if Dr. Pinal is correct that claim 1 of the '908 patent would have been invalid for obviousness-type double patenting in view of the '707 patent, I disagree that claim 14 of the '908 patent would therefore have been invalid. As I explain above, even if the POSA thought that the required amount of bendamustine hydrochloride could have been dissolved in a 100 mL infusion volume, this would not have motivated or provided reason for the POSA to use a 50 mL infusion volume, and it would not have provided the POSA a reasonable expectation of success that a 50 mL infusion volume would have provided sufficient solubility for bendamustine at the required dose. *See* ¶¶ 913, 920.

961. For the above reasons, I disagree with Dr. Pinal that claim 14 of the '908 patent is invalid for obviousness-type double patenting in view of the '707 patent.

**B.      Claims 11, 15, 18, and 22 of the '568 Patent Are Not Invalid for Obviousness-Type Double Patenting in View of the '707 Patent.**

962. Claims 11 and 18 of the '568 depend, respectively, from claims 10 and 17, which both require that composition to be administered in "a volume of about 50 mL." Claims 15 and 22 both require, via claim 1 of the '568 patent, the administration of "a volume of about 100 mL or less."

963. With respect to claim 10 of the '568 patent (from which claim 11 depends), Dr. Pinal cites back to his discussions of claims 1, 12, and 16 of the '908 patent. *See* Pinal Rep. ¶ 530 (citing ¶¶ 474–481, 488–496, 502, 506). Of these, the only paragraphs that are relevant to

442

EAGLEBEN-SA_00001753

the volume of administration (¶¶ 474–481) are addressed above, with respect to claim 14 of the '908 patent. *See* ¶¶ 953–961.

964.    With respect to claim 17 of the '568 patent (from which claim 18 depends), Dr. Pinal again cites back to paragraphs 474 through 481 of his report and his discussion of claim 1 of the '908 patent, with respect to the volume of administration limitation. *See* Pinal Rep. ¶ 537. I address that above. *See* ¶¶ 953–961.

965.    With respect to claim 1 of the '568 patent (from which claims 15 and 22 ultimately depend), Dr. Pinal again cites to his discussion of the '908 patent and paragraphs 474–481. *See* Pinal Rep. ¶ 516. I address that above. *See* ¶¶ 953–961.

966.    For the above reasons, I disagree with Dr. Pinal that claims 11, 15, 18, and 22 of the '568 patent are invalid for obviousness-type double patenting in view of the '707 patent.

443

EAGLEBEN-SA_00001754

Dated: <u>May 1, 2019</u>

_____
Dr. Juergen Siepmann, Ph.D.

444

EAGLEBEN-SA_00001755

# Exhibit A

EAGLEBEN-SA_00001756

# CURRICULUM VITAE

# Prof. Dr. Juergen Siepmann

**Professor of Pharmaceutical Technology**
**College of Pharmacy, University of Lille, Lille, France**

**Director of the INSERM U 1008 research group**
**"Controlled Drug Delivery Systems and Biomaterials:**
**Mechanisms and Optimization"**

**President of APGI**

**Editor-in-Chief, International Journal of Pharmaceutics**

**23 February 2019**

EAGLEBEN-SA_00001757

*Curriculum Vitae*                                                                    *Prof. Juergen Siepmann*

Prof. Dr. Jürgen Siepmann
Director INSERM U 1008, College of Pharmacy, University of Lille
3, rue du Professeur Laguesse, 59006 Lille, France
Tel.: +33-3-20964708
juergen.siepmann@univ-lille.fr, http://u1008.univ-lille2.fr

**Personal Data**

Born:              5.2.1969 in Muenden, Germany
Nationality:       German and French
Family status:     Married, four children

**University Studies and Diplomas Obtained**

1989-93            University studies of Pharmacy, Freie Universitaet Berlin, Berlin, Germany
1995               "Approbation" as pharmacist

**PhD Thesis**

02/95-08/95        "Polymeric controlled drug delivery systems: Elucidation of transport
*& 07/96-07/99*    mechanisms and optimization of release patterns"
Supervisor:        Prof. R. Bodmeier, College of Pharmacy, Freie Universitaet Berlin, Berlin,
                   Germany
Mark:              "Summa cum laude" (best possible mark)

**Professional/Research Experience/Positions held**

11/93-05/94        Preregistration training (industry), Schering, Berlin, Germany
06/94-12/94        Preregistration training (retail pharmacy), "Phoenix Apotheke", Berlin,
                   Germany
04/95-08/95        Teaching assistant, College of Pharmacy,
*& 07/96-07/99*    Freie Universitaet Berlin, Berlin, Germany
09/95-06/96        Head pharmacist, military service, Krugau, Germany
08/99-01/01        Postdoctoral fellow (Marie Curie), College of Pharmacy, University of
                   Angers, Angers, France
02/01-01/04        Assistant Professor, College of Pharmacy, Freie Universitaet Berlin, Berlin,
                   Germany
Since 02/04        <u>Full Professor, Pharmaceutical Technology</u>, College of Pharmacy,
                   University of Lille, Lille, France
01/06-12/09        Director of the "Young Research Group" "Controlled Drug Delivery
                   Systems: Mechanisms and Optimization"
Since 01/10        <u>Director of the research group INSERM U 1008</u> "Controlled Drug Delivery
                   Systems and Biomaterials: Mechanisms and Optimization"
                   (currently 9 Professors, 6 senior lecturers, 5 technical/administrative staff,
                   20 post-docs/PhD-students, 10 master students)
Since 03/10        <u>President of APGI</u> ("Association de Pharmacie Galénique Industrielle")
Since 01/16        <u>Editor-in-Chief of International Journal of Pharmaceutics</u> (""top 1%
                   journal" in terms of citation share in the field of "Pharmacology and
                   Pharmacy")

*Page 2 of 73*

EAGLEBEN-SA_00001758

*Curriculum Vitae*                                                      *Prof. Juergen Siepmann*

**International Training**

| | |
|---|---|
| 03/97-05/97 | *University of Paris-Sud*, Prof. G. Couarraze, CNRS 1218, Châtenay-Malabry, France, Modeling of drug diffusion in polymeric networks |
| 07/97-10/97 & 06/98-08/98 | *Purdue University*, Prof. N.A. Peppas, School of Chemical Engineering, West Lafayette, IN, USA, Numerical modeling of polymer swelling |
| 09/98-12/98 | *University of Iowa*, Prof. P. Veng-Pedersen, School of Pharmacy, Iowa City, IA, USA, Pharmacokinetic/Pharmacodynamic (PK/PD) modeling |
| 08/99-01/01 | *University of Angers*, Prof. J.P. Benoit, School of Pharmacy, Angers, France, Monte Carlo simulations of biodegradable drug delivery systems |

**Publications**

- 169 Articles in peer-reviewed, international scientific journals
- 9 Patents
- 3 Books
- 17 Book chapters
- 302 Poster presentations at national and international scientific meetings
- 134 Oral presentations at national and international scientific meetings
- 8 Special issues (guest editor) of "Advanced Drug Delivery Reviews" and "International Journal of Pharmaceutics"

**Awards**

- APV-Prize for the outstanding doctoral thesis in Pharmaceutical Sciences from the years 1998/99
- Marie Curie Individual Fellowship (5th European Framework Programme): 1999
- *International Journal of Pharmaceutics* Highest Cited Original Research 2006 Award
- 2012 APV Research Award for Outstanding Achievements in the Pharmaceutical Sciences

**Editor of International Scientific Journals**

➤ *International Journal of Pharmaceutics*
  ➤ Editor-in-Chief: Since 2016
  ➤ Reviews Editor: 2007-2017

The International Journal of Pharmaceutics is the journal for pharmaceutical scientists concerned with the physical, chemical and biological properties of devices and delivery systems for drugs, vaccines and biologicals, including their design, manufacture and evaluation.

« Top 1% journal » in the category "Pharmacology & Pharmacy" in terms of citation share: 38,726 citations in 2015 → #2 of the 255 journals in this category (Web of Knowledge 2017)
~ 900 Articles published in 2016
~ 3000 Submissions per year
~ 2,5 Millions downloads in 2016

➤ *Journal of Drug Delivery Science and Technology*
  ➤ Editor-in-Chief: 2015
  ➤ Co-Editor: 2012-2014

*Page 3 of 73*

EAGLEBEN-SA_00001759

*Curriculum Vitae*                                                    *Prof. Juergen Siepmann*

**Member of Editorial Boards of International Scientific Journals**

- *AAPS PharmSciTech*
- *Drug Development and Industrial Pharmacy*
- *European Journal of Pharmaceutical Sciences*
- *European Journal of Pharmaceutics and Biopharmaceutics*
- *International Journal of Pharmaceutics*
- *Journal of Controlled Release*
- *Journal of Drug Delivery Science and Technology*
- *Journal of Pharmaceutical Sciences*
- *Pharmaceutical Nanotechnology*
- *Pharmaceutical Research (2012-2016)*

**Member of Books Advisory Boards**

- Controlled Release Society (CRS) Books Advisory Board (2008-2012)
- Wiley Book Series Advisory Board for Pharmaceutical Sciences (since 2013)

**Positions Held in Professional Societies and Research Networks**

| | |
|---|---|
| Since 03/10 | President of APGI ("Association de Pharmacie Galénique Industrielle": International Society of Drug Delivery Sciences and Technology) The APGI was created in 1964 in Paris, and is an association for scientists in academia and industry, who are concerned with pharmaceutical technology and the design, formulation as well as biopharmaceutical and pharmacokinetic assessment of dosage forms and drug delivery systems. |
| 01/06-03/10 | Vice-president of APGI |
| Since 01/10 | Member of the research cluster PSSRC ("Pharmaceutical Solid State Research Cluster", http://www.pssrc.org |
| Since 05/12 | Corresponding member of the "Académie Nationale de Pharmacie" (National Academy of Pharmacy" |
| 01/07-12/09 | Member of the EUFEPS (European Federation for Pharmaceutical Sciences) Committee for Training and Education |
| 01/06-12/14 | Member of the APV (International Association for Pharmaceutical Technology) Committee for Education and Science |

**Organization of International Scientific Symposia**

- Chair of the "*7th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*" in Malta, **2010** (1300 participants)
- Chair of the "*1st European Conference on Pharmaceutics: Drug Delivery*" in Reims, France, **2015** (600 participants)
- Chair of the pre-satellite meeting "*Young Pharmaceutical Scientists Meet in Nice*" of the PharmSciFair in Nice, France, **2009** (200 participants)
- Chair of the "*7th PSSRC Annual Meeting: Pharmaceutical Solid State Research Cluster*", Lille, France, **2013** (150 participants).
- Chair of the "*1st APGI Coating Workshop*" in Lille, France, **2008** (150 participants)
- Chair of the "*2nd APGI Coating Workshop*" in Lille, France, **2013** (150 participants)
- Chair of the "*1st APGI Poorly Soluble Drugs Workshop*" in Lille, France, **2011** (165 participants)

*Page 4 of 73*

EAGLEBEN-SA_00001760

*Curriculum Vitae*                                                          *Prof. Juergen Siepmann*

- Chair of the *"2nd APGI Poorly Soluble Drugs Workshop"* in Lille, France, **2014** (150 participants)
- Chair of the *"APGI Workshop on Oral Controlled Drug Delivery"* in Lille, France, **2017** (150 participants)
- Co-chair of the *"8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology"* in Istanbul, Turkey, **2012** (1300 participants)
- Co-chair of the *"9th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology"* in Lisbon, Portugal, **2014** (1300 participants)
- Co-chair of the *"10th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology"* in Glasgow, UK, **2016** (1300 participants)
- Co-chair of the *"11th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology"* in Grenada, Spain, **2018** (1300 participants)
- Co-chair of the *"12h World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology"* in Vienna, Austria, **2020** (1300 participants expected)
- Co-chair of the *"2nd European Conference on Pharmaceutics: Innovative Formulations and Technologies"* in Krakow, Poland, **2017** (500 participants)
- Co-chair of the *"3rd European Conference on Pharmaceutics: Innovative Formulations and Technologies"* in Bologna, Italy, **2019** (500 participants expected)
- Co-chair of the *"4th Symposium Skin and Formulation"* in Lyon, France, **2012** (250 participants)
- Co-chair of the *"3rd Symposium Innovation in Drug Delivery: Site-Specific Drug Release"* in Pisa, Italy, **2013** (350 participants)

- Member of the Scientific Programme Committee of the *"6th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology"* in Barcelona, Spain, **2008** (1300 participants)
- Member of the Organizing Committee of the pre-satellite meeting *"Young Pharmaceutical Scientists Meet in Amsterdam"* of the 3rd Pharmaceutical Sciences World Congress (PSWC) of the FIP in Amsterdam, The Netherlands, **2007** (400 participants)
- Member of the Scientific Programme Committee of the Symposium *"Frontiers in Water Biophysics"* in Perugia, Italy, **2012**
- Member of the Organizing Committee of the *"1st Symposium Innovation in Drug Delivery: From biomaterials to devices"* in Naples, Italy, **2007** (300 participants)
- Member of the Organizing Committee of the *"2nd Symposium Innovation in Drug Delivery: From preformulation to development through innovative evaluation process"* in Aix-en-Provence, France, **2010** (350 participants)
- Member of the Organizing Committee of the *AMPTEC 2014 Conference: Advanced Materials and Pharmaceutical Technologies*, Lille, France, **2014** (150 participants)
- Member of the Organizing Committee of the *"4th Symposium Innovation in Drug Delivery: Site Specific Drug Delivery"* in Antibes, France, **2016** (350 participants)

**Research Achievements**

Prof. Siepmann's work significantly contributed to a better understanding of the underlying mass transport phenomena in controlled drug delivery systems. This is particularly true for matrix tablets, coated pellets, biodegradable microparticles, and lipid implants. Novel mathematical models were developed allowing for: (i) the identification of the dominant drug release mechanisms, and (ii) the quantitative prediction of the effects of key

EAGLEBEN-SA_00001761

*Curriculum Vitae*                                                        *Prof. Juergen Siepmann*

formulation and processing parameters on the resulting drug release kinetics. Based on this knowledge the optimization of this type of advanced drug delivery systems can be facilitated and the safety of the respective medical treatments improved.

**Teaching Activities**

| | |
|---|---|
| 1995-1999 | Practical training and lectures of/for Pharmacy students (Freie Universitaet Berlin) |
| 2001-2004 | Lectures and practical training for/of Pharmacy students (Freie Universitaet Berlin) |
| Since 2004 | Lectures for Pharmacy students (University of Lille 2) |

**Responsibilities at the University of Lille 2** (~ 28,000 students, ~ 2,000 employees)

| | |
|---|---|
| Since 01/05 | Member (elected) of the Council of the College of Pharmacy |
| Since 01/14 | Member of the "Finance Committee" of the College of Pharmacy |
| Since 01/15 | Head of the Department "Industrial Pharmaceutical Technology" at the College of Pharmacy |
| Since 04/16 | Member of the Committee for Biomedical and Public Health Research of the University Hospital (CRBST) |
| 01/10-12/17 | Member (elected) of the Research Council of the University of Lille 2 |
| 01/12-12/13 | Member of the board of the local research cluster Prim ("Interdisciplinary Research on Drug Products") |
| 01/05-12/13 | Member of the Council of the "Institut de Chimie Pharmaceutique Albert Lespagnol (ICPAL) |
| 01/05-12/13 | Head of the "Pharmaceutical Technology" Center of the "Institut de Chimie Pharmaceutique Albert Lespagnol (ICPAL) |
| 06/16-12/17 | Member of the Board of the Research Council of the University of Lille 2 |

**Expert Activities**

*Reviewer for Research Agencies and Foundations:*

- AERES (Former French Evaluation Agency for Research and Higher Education)
- Belgian Fund for the Scientific Research - FNRS
- Dutch Top Institute Pharma
- Flemish Research Foundation: Fonds Wetenschappelijk Onderzoek - Vlaanderen
- Foundation for Polish Science (FNP)
- French Association for Research Technology (ANRT)
- French Ministry for Education and Research
- French Science Foundation (ANR)
- HCERES (High Council for Evaluation of Research and Higher Education)
- INSERM (French National Institute of Health and Medical Research)
- Italian Research Foundation
- National Science Foundation (NSF, USA)
- Netherlands Organisation for Scientific Research (NOW)
- Research Council for the French Region "Centre"
- Science Foundation Ireland
- South-African National Research Foundation
- Swiss National Science Foundation (SNSF)
- The Royal Pharmaceutical Society of Great Britain

EAGLEBEN-SA_00001762

*Reviewer for Universities*
*(evaluation of appointments, promotions, grant applications, PhD theses):*

- Chalmers University of Technology, Gothenburg, Sweden
- Free University of Berlin, Germany
- Free University of Brussels, Belgium
- Rhodes University, South Africa
- University of Angers, France
- University of Cambridge, Cambridge, UK
- University of Clermont-Ferrand, France
- University of Dunedin, New Zealand
- University of Ghent, Belgium
- University of Halle, Germany
- University of Innsbruck, Austria
- University of Kazan State, Russian Federation
- University of Lille 1, France
- University of Lille 2, France
- University of London, UK
- University of Lyon, France
- University of Munich, Germany
- University of Nantes, France
- University of New Mexico, USA
- University of Paris XI, France
- University of Poitiers, France
- University of Regensburg, Germany
- University of Salerno, Italy
- University of Texas at Austin, USA

*Reviewer for international, peer-reviewed scientific journals:*

- AAPS Pharmaceutical Sciences
- AAPS Pharmaceutical Sciences Technology
- Accounts of Chemical Research
- ACS Nano
- Acta Biomaterialia
- Advanced Drug Delivery Reviews
- AIChE Journal
- American Journal of Drug Delivery
- Archiv der Pharmazie
- Biomacromolecules
- Biomaterials
- Carbohydrate Polymers
- Chemical Engineering Science
- Colloid and Polymer Science
- Current Drug Delivery
- Current Topics in Medicinal Chemistry
- Drug Development and Industrial Pharmacy
- European Journal of Pharmaceutical Sciences

EAGLEBEN-SA_00001763

- European Journal of Pharmaceutics and Biopharmaceutics
- International Journal of Pharmaceutics
- Journal of Applied Polymer Science
- Journal of Biomaterial Sciences
- Journal of Biomaterials Applications
- Journal of Colloid and Interface Science
- Journal of Controlled Release
- Journal of Drug Delivery Science and Technology
- Journal of Microencapsulation
- Journal of Nanoparticle Research
- Journal of Nanoscience and Nanotechnology
- Journal of Pharmaceutical Sciences
- Journal of Pharmacy and Pharmaceutical Sciences
- Journal of Pharmacy and Pharmacology
- Journal of Physical Chemistry
- Journal of Polymer Science
- Journal of the American Chemical Society
- Macromolecular Bioscience
- Macromolecular Rapid Communications
- Macromolecules
- Modeling and Simulation
- Molecular Pharmaceutics
- Nature Communications
- Open Drug Delivery Journal
- Pharmaceutical Development and Technology
- Pharmaceutical Research
- Soft Matter
- Spectrochimica Acta
- STP Pharma Sciences
- Thrombosis and Haemostasis

*Reviewer of book proposals:*

- Marcel Dekker
- Wiley
- CRC Press

*Reviewer for scientific meetings:*

- AAPS Annual Meetings (American Association of Pharmaceutical Scientists)
- International Symposia on Controlled Release of Bioactive Materials (CRS)
- Jahrestagungen der Deutschen Pharmazeutischen Gesellschaft (DPhG)
- Symposia "Innovation in Drug Delivery" (ADRITELF/APGI)
- Symposia "Skin and Formulation" (APGI/CED)
- World Meetings on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology (ADRITELF/APGI/APV)
- European Conferences on Pharmaceutics (ADRITELF/APGI/APV)

EAGLEBEN-SA_00001764

**Chair/Member of Award Committees**

- Chair of the CRS *Journal of Controlled Release* Award Committee (01/2010-12/2013)
- Member of the *European Journal of Pharmaceutics and Biopharmaceutics* best paper award committee
- Member of the *Journal of Drug Delivery Science and Technology* best paper award committee
- Member of the *APV-Prize for the outstanding doctoral thesis in Pharmaceutical Sciences* Committee
- Member of the *Best Paper Award Committee of the Annual Controlled Release Society Meetings* (2009-2012)
- Member of the *Maurice Marie Janot Award* Committee
- Member of the *International ADRITELF Award* Committee

**Chairman at Scientific Meetings**

- International Symposia on Controlled Release of Bioactive Materials (CRS Annual Meetings)
- Jahrestagungen der Deutschen Pharmazeutischen Gesellschaft (DPhG)
- Symposia "Innovation in Drug Delivery" (ADRITELF/APGI)
- Symposia "Skin and Formulation" (APGI/CED)
- World Meetings on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology (ADRITELF/APGI/APV)

**Memberships in Scientific Societies**

- American Association of Pharmaceutical Scientists (AAPS)
- Arbeitsgemeinschaft fuer Pharmazeutische Verfahrenstechnik (APV)
- Association de Pharmacie Galénique Industrielle (APGI)

EAGLEBEN-SA_00001765

# Full Paper

1.  Siepmann, J; Paeratakul, O; Bodmeier, R. Modeling plasticizer uptake in aqueous polymer dispersions. *International Journal of Pharmaceutics* 165, 191-200, **1998**.

2.  Siepmann, J; Ainaoui, A; Vergnaud, JM; Bodmeier, R. Calculation of the dimensions of drug-polymer devices based on diffusion parameters. *Journal of Pharmaceutical Sciences* 87, 827-832, **1998**.

3.  Siepmann, J; Podual, K; Sriwongjanya, M; Peppas, NA; Bodmeier, R. A new model describing the swelling and drug release kinetics from hydroxypropyl methylcellulose tablets. *Journal of Pharmaceutical Sciences* 88, 65-72, **1999**.

4.  Siepmann, J; Lecomte, F; Bodmeier, R. Diffusion-controlled drug delivery systems: Calculation of the required composition to achieve desired release profiles. *Journal of Controlled Release* 60, 379-389, **1999**.

5.  Siepmann, J; Kranz, H; Bodmeier, R; Peppas, NA. HPMC-matrices for controlled drug delivery: A new model combining diffusion, swelling and dissolution mechanisms and predicting the release kinetics. *Pharmaceutical Research* 16, 1748-1756, **1999**.

6.  Streubel, A; Siepmann, J; Dashevsky, A; Bodmeier, R. pH-independent release of weakly basic drugs from matrix tablets. *Journal of Controlled Release* 67, 101-110, **2000**.

7.  Siepmann, J; Kranz, H; Peppas, NA; Bodmeier, R. Calculation of the required size and shape of hydroxypropyl methylcellulose matrices to achieve desired drug release profiles. *International Journal of Pharmaceutics* 201, 151-164, **2000**.

8.  Siepmann, J; Peppas, NA. Hydrophilic matrices for controlled drug delivery: An improved mathematical model to predict the resulting drug release kinetics (the "sequential layer" model). *Pharmaceutical Research* 17, 1290-1298, **2000**.

9.  Streubel, A; Siepmann, J; Peppas, NA; Bodmeier, R. Bimodal drug release achieved with new multi-layer matrix tablets. *Journal of Controlled Release* 69, 455-468, **2000**.

10. Ainaoui, A; Siepmann, J; Bodmeier, R; Vergnaud, JM. Calculation of the dimensions of dosage forms with release controlled by diffusion for in vivo use. *European Journal of Pharmaceutics and Biopharmaceutics* 51, 17-24, **2001**.

11. Siepmann, J; Peppas, NA. Mathematical modeling of controlled drug delivery. *Advanced Drug Delivery Reviews* 48, 137-139, **2001**.

12. Siepmann, J; Peppas, NA. Modeling of drug release from delivery systems based on hydroxypropyl methylcellulose (HPMC). *Advanced Drug Delivery Reviews* 48, 139-157, **2001**.

13. Siepmann, J; Göpferich, A. Mathematical modeling of bioerodible, polymeric drug

EAGLEBEN-SA_00001766

delivery systems. *Advanced Drug Delivery Reviews* 48, 229-247, **2001**.

14.    Siepmann, J; Streubel, A; Peppas, NA. Understanding and predicting drug delivery from hydrophilic matrix tablets using the "sequential layer" model. *Pharmaceutical Research* 19, 306-314, **2002**.

15.    Faisant, N; Siepmann, J; Benoit, JP. PLGA-based microparticles: Elucidation of mechanisms and a new, simple mathematical model quantifying drug release. *European Journal of Pharmaceutical Sciences* 15, 355-366, **2002**.

16.    Streubel, A; Siepmann, J; Bodmeier, R. Floating microparticles based on low density foam powder. *International Journal of Pharmaceutics* 241, 279-292, **2002**.

17.    Faisant, N; Siepmann, J; Oury, P; Laffineur, V; Bruna, E; Haffner, J; Benoit, JP. The effect of gamma-irradiation on drug release from bioerodible microparticles: A quantitative treatment. *International Journal of Pharmaceutics* 242, 281-284, **2002**.

18.    Siepmann, J; Faisant, N; Benoit, JP. A new mathematical model quantifying drug release from bioerodible microparticles using Monte Carlo simulations. *Pharmaceutical Research* 19, 1887-1895, **2002**.

19.    Streubel, A; Siepmann, J; Bodmeier, R. Floating matrix tablets based on low density foam powder: Effects of formulation and processing parameters on drug release. *European Journal of Pharmaceutical Sciences* 18, 37-45, **2003**.

20.    Streubel, A; Siepmann, J; Bodmeier, R. Multiple unit gastroretentive drug delivery systems: A new preparation method for low density microparticles. *Journal of Microencapsulation* 20, 329-347, **2003**.

21.    Hombreiro-Pérez, M; Siepmann, J; Zinutti, C; Hoffman, M; Bodmeier, R; Maincent, P. Non-degradable microparticles containing a hydrophilic and/or a lipophilic drug: Preparation, characterization and drug release modeling. *Journal of Controlled Release* 88, 413-428, **2003**.

22.    Pearnchob, N; Siepmann, J; Bodmeier, R. Pharmaceutical applications of shellac: Moisture protective and taste masking coatings and extended release matrix tablets. *Drug Development and Industrial* Pharmacy 29, 925-938, **2003**.

23.    Faisant, N; Siepmann, J; Richard, J; Benoit, JP. Mathematical modeling of drug release from bioerodible microparticles: Effect of gamma-irradiation. *European Journal of Pharmaceutics and Biopharmaceutics* 56, 271-279, **2003**.

24.    Lecomte, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. Blends of enteric and GIT-insoluble polymers used for film coating: Physicochemical characterization and drug release patterns. *Journal of Controlled Release* 89, 457-471, **2003**.

25.    Pearnchob, N; Dashevsky, A; Siepmann, J; Bodmeier, R. Shellac used as coating material for solid pharmaceutical dosage forms: Understanding the effects of

EAGLEBEN-SA_00001767

formulation and processing variables. *S.T.P. Pharma Sciences* 13, 387-396, **2003**.

26.  Siepmann, J; Faisant, N; Akiki, J; Richard, J; Benoit, JP. Effect of the size of biodegradable microparticles on drug release: Experiment and theory. *Journal of Controlled Release* 96, 123-134, **2004**.

27.  Lecomte, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. Polymer blends used for the coating of multiparticulates: Comparison of aqueous and organic coating techniques. *Pharmaceutical Research* 21, 882-890, **2004**.

28.  Lecomte, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. Polymer blends used for the aqueous coating of solid dosage forms: Importance of the type of plasticizer. *Journal of Controlled Release* 99, 1-13, **2004**.

29.  Lecomte, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. pH-sensitive polymer blends used as coating materials to control drug release from spherical beads: Importance of the type of core. *Biomacromolecules* 6, 2074-2083, **2005**.

30.  Lecomte, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. pH-sensitive polymer blends used as coating materials to control drug release from spherical beads: Elucidation of the underlying mass transport mechanisms. *Pharmaceutical Research* 22, 1129-1141, **2005**.

31.  Siepmann, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. Blends of aqueous polymer dispersions used for pellet coating: Importance of the particle size. *Journal of Controlled Release* 105, 226-239, **2005**.

32.  Siepmann, J; Elkharraz, K; Siepmann, F; Klose, D. How autocatalysis accelerates drug release from PLGA-based microparticles: a quantitative treatment. *Biomacromolecules* 6, 2312-2319, **2005**.

33.  Van Tomme, SR; De Geest, BG; Braeckmans, K; De Smedt, SC; Siepmann, F; Siepmann, J; van Nostrum, CF; Hennink, WE. Mobility of model proteins in hydrogels composed of oppositely charged dextran microspheres studied by protein release and fluorescence recovery after photobleaching. *Journal of Controlled Release* 110, 67-78, **2005**.

34.  Streubel, A; Siepmann, J; Bodmeier, R. Gastroretentive drug delivery systems. *Expert Opinion on Drug Delivery* 3, 217-233, **2006**.

35.  Siepmann, J. Local controlled drug delivery to the brain. *International Journal of Pharmaceutics* 314, 99-100, **2006**.

36.  Siepmann, J; Siepmann, F; Florence, AT. Local controlled drug delivery to the brain: Mathematical modeling of the underlying mass transport mechanisms. *International Journal of Pharmaceutics* 314, 101-119, **2006**.

37.  Elkharraz, K; Faisant, N; Guse, C; Siepmann, F; Arica-Yegin, B; Oger, JM; Gust, R;

EAGLEBEN-SA_00001768

Goepferich, A; Benoit, JP; Siepmann, J. Paclitaxel-loaded microparticles and implants for the treatment of brain cancer: Preparation and physicochemical characterization. *International Journal of Pharmaceutics* 314, 127-136, **2006**.

38.  Guse, C; Koennings, S; Kreye, F; Siepmann, F; Goepferich, A; Siepmann, J. Drug release from lipid-based implants: Elucidation of the underlying mass transport mechanisms. *International Journal of Pharmaceutics* 314, 137-144, **2006**.

39.  Guse, C; Koennings, S; Blunk, T; Siepmann, J; Goepferich, A. Programmable implants – From pulsatile to controlled release. *International Journal of Pharmaceutics* 314, 161-169, **2006**.

40.  Faisant, N; Akiki, J; Siepmann, F; Benoit, JP; Siepmann, J. Effects of the type of release medium on drug release from PLGA-based microparticles: Experiment and theory. *International Journal of Pharmaceutics* 314, 189-197, **2006**.

41.  Klose, D; Siepmann, F; Elkharraz, K; Krenzlin, S; Siepmann, J. How porosity and size affect the drug release mechanisms from PLGA-based microparticles. *International Journal of Pharmaceutics* 314, 198-206, **2006**.

42.  Gomes dos Santos, AL; Bochot, A; Doyle, A; Tsapis, N; Siepmann, J; Siepmann, F; Schmaller, J; Besnard, M; Behar-Cohen, F; Fattal, E. Sustained release of nanosized complexes of polyethylenimine and anti-TGF-β2 oligonucleotide improves the outcome of glaucoma surgery. *Journal of Controlled Release* 112, 369-381, **2006**.

43.  Lecomte, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. Aqueous HPMCAS coatings: Effects of formulation and processing parameters on drug release and transport mechanisms. *European Journal of Pharmaceutics and Biopharmaceutics* 63, 262-269, **2006**.

44.  Siepmann, F; Muschert, S; Flament, MP; Leterme, P; Gayot, A; Siepmann, J. Controlled drug release from Gelucire-based matrix pellets: Experiment and theory. *International Journal of Pharmaceutics* 317, 136-143, **2006**.

45.  Siepmann, J; Siepmann, F. Microparticles used as drug delivery systems. *Colloid and Polymer Science* 133, 15-21, **2006**.

46.  Streubel, A; Siepmann, J; Bodmeier, R. Drug delivery to the upper small intestine window using gastroretentive technologies. *Current Opinion in Pharmacology* 6, 501-508, **2006**.

47.  Siepmann, F; Le Brun, V; Siepmann, J. Drugs acting as plasticizers in polymeric systems: A quantitative treatment. *Journal of Controlled Release* 115, 298-306, **2006**.

48.  Luan, X; Skupin, M; Siepmann, J; Bodmeier, R. Key parameters affecting the initial release (burst) and encapsulation effeciency of peptide-containing poly(lactide-co-glycolide) microparticles. *International Journal of Pharmaceutics* 324, 168-175, **2006**.

EAGLEBEN-SA_00001769

49.    Herrmann, S; Winter, G; Mohl, S; Siepmann, F; Siepmann, J. Mechanisms controlling protein release from lipidic implants: Effects of PEG addition. *Journal of Controlled Release* 118, 161-168, **2007**.

50.    Siepmann, F; Hoffmann, A; Leclercq, B; Carlin, B; Siepmann, J. How to adjust desired drug release patterns from ethylcellulose-coated dosage forms. *Journal of Controlled Release* 119, 182-189, **2007**.

51.    Sutter, M; Siepmann, J; Hennink, WE; Jiskoot, W. Recombinant gelatin hydrogels for the sustained release of proteins. *Journal of Controlled Release* 119, 301-312, **2007**.

52.    Herrmann, S; Mohl, S; Siepmann, F; Siepmann, J; Winter, G. New insight into the role of polyethylene glycol acting as protein release modifier in lipidic implants. *Pharmaceutical Research* 24, 1527-1537, **2007**.

53.    Martinez, L; Agnely, F; Leclerc, B; Siepmann, J; Cotte, M; Geiger, S; Couarraze, G. Cross-linking of chitosan and chitosan/poly(ethylene oxide) semi-IPN beads: A quantitative treatment. *European Journal of Pharmaceutics and Biopharmaceutics* 67, 339-348, **2007**.

54.    Siepmann, F; Muschert, S; Zach, S; Leclercq, B; Carlin, B; Siepmann, J. Carrageenan as an efficient drug release modifier for ethylcellulose-coated pharmaceutical dosage forms. *Biomacromolecules* 8, 3984-3991, **2007**.

55.    Siepmann, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. Polymer blends for controlled release coatings. *Journal of Controlled Release* 125, 1-15, **2008**.

56.    Siepmann, F; Wahle, C; Leclercq, B; Carlin, B; Siepmann, J. pH-sensitive film coatings: Towards a better understanding and facilitated optimization. *European Journal of Pharmaceutics and Biopharmaceutics* 68, 2-10, **2008**.

57.    Siepmann, F; Muschert, S; Leclercq, B; Carlin, B; Siepmann, J. How to improve the storage stability of aqueous polymeric film coatings. *Journal of Controlled Release* 126, 26-33, **2008**.

58.    Kreye, F; Siepmann, F; Siepmann, J. Lipid implants as drug delivery systems. *Expert Opinion on Drug Delivery* 5, 291-307, **2008**.

59.    Klose, D; Siepmann, F; Elkharraz, K; Siepmann, J. PLGA-based drug delivery systems: Importance of the type of drug and device geometry. *International Journal of Pharmaceutics* 354, 95-103, **2008**.

60.    Siepmann, F; Herrmann, S; Winter, G; Siepmann, J. A novel mathematical model quantifying drug release from lipid implants. *Journal of Controlled Release* 128, 233-240, **2008**.

61.    Siepmann, J. Future Perspectives in Pharmaceutics. *International Journal of*

EAGLEBEN-SA_00001770

*Pharmaceutics* 364, 157-158, **2008**.

62.  Siepmann, J; Siepmann, F. Mathematical modeling of drug delivery. *International Journal of Pharmaceutics* 364, 328-343, **2008**.

63.  Bley, O; Siepmann, J; Bodmeier, R. Characterization of moisture-protective polymer coatings using differential scanning calorimetry and dynamic vapor sorption. *Journal of Pharmaceutical Sciences* 98, 651-664, **2009**.

64.  Muschert, S; Siepmann, F; Cuppok, Y; Leclercq, B; Carlin, B; Siepmann, J. Improved long term stability of aqueous ethylcellulose film coatings: Importance of the type of drug and starter core. *International Journal of Pharmaceutics* 368, 138-145, **2009**.

65.  Klose, D; Azaroual, N; Siepmann, F; Vermeersch, G; Siepmann, J. Towards more realistic in vitro release measurement techniques for biodegradable microparticles. *Pharmaceutical Research* 26, 691-699, **2009**.

66.  Klose, D; Laprais, M; Leroux, V; Siepmann, F; Deprez, B; Bordet, R; Siepmann, J. Fenofibrate-loaded PLGA microparticles: Effects on ischemic stroke. *European Journal of Pharmaceutical Sciences* 37, 43–52, **2009**.

67.  Muschert, S; Siepmann, F; Leclercq, B; Carlin, B; Siepmann, J. Prediction of drug release from ethylcellulose coated pellets. *Journal of Controlled Release* 135, 71-79, **2009**.

68.  Karrout, Y; Neut, C; Wils, D; Siepmann, F; Deremaux, L; Desreumaux, P; Siepmann, J. Novel polymeric film coatings for colon targeting: How to adjust desired membrane properties. *International Journal of Pharmaceutics* 371, 64-70, **2009**.

69.  Muschert, S; Siepmann, F; Leclercq, B; Carlin, B; Siepmann, J. Drug release mechanisms from ethylcellulose:PVA-PEG graft copolymer coated pellets. *European Journal of Pharmaceutics and Biopharmaceutics* 72, 130-137, **2009**.

70.  Moebus, K; Siepmann, J; Bodmeier, R. Alginate-poloxamer microparticles for controlled drug delivery to mucosal tissue. *European Journal of Pharmaceutics and Biopharmaceutics* 72, 42-53, **2009**.

71.  Cosijns, A; Nizet, D; Nikolakakis, I; Vervaet, C; De Beer, T; Siepmann, F; Siepmann, J; Evrard, B; Remon, JP. Porous pellets as drug delivery system. *Drug Development and Industrial Pharmacy* 35, 655-662, **2009**.

72.  Quinten, T; Gonnissen, Y; Adriaens, E; De Beer, T; Cnudde, V; Masschaele, B; Van Hoorebeke, L; Siepmann, J; Remon, JP; Vervaet, C. Development of injection moulded matrix tablets based on mixtures of ethylcellulose and low-substituted hydroxypropylcellulose. *European Journal of Pharmaceutical Sciences* 37, 207-216, **2009**.

73.  Karrout, Y; Neut, C; Wils, D; Siepmann, F; Deremaux, L; Flament, MP; Dubreuil, L;

EAGLEBEN-SA_00001771

Desreumaux, P; Siepmann, J. Novel polymeric film coatings for colon targeting: Drug release from coated pellets. *European Journal of Pharmaceutical Sciences* 37, 427-433, **2009**.

74.   Bley, O; Siepmann, J; Bodmeier, R. Protection of moisture-sensitive drugs with aqueous polymer coatings: Importance of coating and curing conditions. *International Journal of Pharmaceutics* 378, 59-65, **2009**.

75.   Karrout, Y; Neut, C; Wils, D; Siepmann, F; Deremaux, L; Dubreuil, L; Desreumaux, P; Siepmann, J. Colon targeting with bacteria-sensitive films adapted to the disease state. *European Journal of Pharmaceutics and Biopharmaceutics* 73, 74-81, **2009**.

76.   Bley, O; Siepmann, J; Bodmeier, R. Importance of glassy-to-rubbery state transitions in moisture-protective polymer coatings. *European Journal of Pharmaceutics and Biopharmaceutics* 73, 146-153, **2009**.

77.   Karrout, Y; Neut, C; Wils, D; Siepmann, F; Deremaux, L; Desreumaux, P; Siepmann, J. Characterization of ethylcellulose:starch-based film coatings for colon targeting. *Drug Development and Industrial Pharmacy* 35, 1190-1200, **2009**.

78.   Kranz, H; Juergens, K; Pinier, M; Siepmann, J. Drug release from MCC and carrageenan-based pellets: Experiment and theory. *European Journal of Pharmaceutics and Biopharmaceutics* 73, 302-309, **2009**.

79.   Verhoeven, E; Siepmann, F; De Beer, TRM; Van Loo, D; Van den Mooter, G; Remon, JP; Siepmann, J; Vervaet, C. Modeling drug release from hot-melt extruded mini-matrices with constant and non-constant diffusivities. *European Journal of Pharmaceutics and Biopharmaceutics* 73, 292-301, **2009**.

80.   Ho, L; Cuppok, Y; Muschert, S; Gordon, KC; Pepper, M; Shen, Y; Siepmann, F; Siepmann, J; Taday, PF; Rades, T. Effects of film coating thickness and drug layer uniformity on in-vitro drug release from sustained-release coated pellets: A case study using terahertz pulsed imaging. *International Journal of Pharmaceutics* 382, 151-159, **2009**.

81.   Glaessl, B; Siepmann, F; Tucker, I; Siepmann, J; Rades, T. Characterization of quaternary polymethacrylate films containing tartaric acid, metoprolol free base or metoprolol tartrate. *European Journal of Pharmaceutics and Biopharmaceutics* 73, 366-372, **2009**.

82.   Klose, D; Siepmann, F; Willart, JF; Descamps, M; Siepmann, J. Drug release from PLGA-based microparticles: Effects of the "microparticle:bulk fluid" ratio. *International Journal of Pharmaceutics* 383, 123-131, **2010**.

83.   Siepmann, F; Eckart, K; Maschke, A; Kolter, K; Siepmann, J. Modeling drug release from PVAc/PVP matrix tablets. *Journal of Controlled Release* 141, 216-222, **2010**.

84.   Yang, QW; Flament, MP; Siepmann, F; Busignies, V; Leclerc, B; Herry, C;

EAGLEBEN-SA_00001772

Tchoreloff, P; Siepmann, J. Curing of aqueous polymeric film coatings: Importance of the coating level and type of plasticizer. *European Journal of Pharmaceutics and Biopharmaceutics* 74, 362-370, **2010**.

85.    Glaessl, B; Siepmann, F; Tucker, I; Rades, T; Siepmann, J. Deeper insight into the drug release mechanisms in Eudragit RL-based delivery systems. *International Journal of Pharmaceutics* 389, 139-146, **2010**.

86.    Glaessl, B; Siepmann, F; Tucker, I; Rades, T; Siepmann, J. Mathematical modeling of drug release from Eudragit RS-based delivery systems. *Journal of Drug Delivery Science and Technology* 20, 127-133, **2010**.

87.    Muschert, S; Siepmann, F; Leclercq, B; Carlin, B; Siepmann, J. Simulated food effects on drug release from ethylcellulose:PVA-PEG graft copolymer coated pellets. *Drug Development and Industrial Pharmacy* 36, 173-179, **2010**.

88.    Karrout, Y; Neut, C; Wils, D; Siepmann, F; Deremaux, L; Flament, MP; Dubreuil, L; Desreumaux, P; Siepmann, J. Enzymatically activated multiparticulates containing theophylline for colon targeting. *Journal of Drug Delivery Science and Technology* 20, 193-199, **2010**.

89.    Hoang Thi, TH; Chai, F; Leprêtre, S; Blanchemain, N; Siepmann, F; Hildebrand, HF; Martel, B; Siepmann, J; Flament, MP. Bone implants modified with cyclodextrin: Study of drug release in bulk fluid and into agarose gel. *International Journal of Pharmaceutics* 400, 74-85, **2010**.

90.    Karrout, Y; Neut, C; Siepmann, F; Wils, D; Ravaux, P; Deremaux, L; Flament, MP; Dubreuil, L; Lemdani, M; Desreumaux, P; Siepmann, J. Enzymatically degraded EC:Eurylon 6 HP-PG film coatings for colon targeting in IBD patients. *Journal of Pharmacy and Pharmacology* 62, 1676–1684, **2010**.

91.    Hedoux, A; Krenzlin, S; Paccou, L; Guinet, Y; Flament, MP; Siepmann, J. Influence of urea and guanidine hydrochloride on lysozyme stability and thermal denaturation: a correlation between activity, protein dynamics and conformational changes. *Physical Chemistry Chemical Physics* 12, 13189-13196, **2010**.

92.    Blanchemain, N; Karrout, Y; Tabary, N; Neut, C; Bria, M; Siepmann, J; Hildebrand, HF; Martel, B. Methyl-beta-cyclodextrin modified vascular prosthesis: Influence of the modification level on the drug delivery properties in different media. *Acta Biomaterialia* 7, 304-314, **2011**.

93.    Karrout, Y; Neut, C; Siepmann, F; Wils, D; Deremaux, L; Flament, MP; Dubreuil, L; Desreumaux, P; Siepmann, J. Peas starch-based film coatings for site specific drug delivery to the colon. *Journal of Applied Polymer Science* 119, 1176–1184, **2011**.

94.    Kreye, F; Siepmann, F; Siepmann, J. Drug release mechanisms of compressed lipid implants. *International Journal of Pharmaceutics* 404, 27-35, **2011**.

EAGLEBEN-SA_00001773

95.  Klose, D; Delplace, C; Siepmann, J. Unintended potential impact of perfect sink conditions on PLGA degradation in microparticles. *International Journal of Pharmaceutics* 404, 75-82, **2011**.

96.  Cuppok, Y; Muschert, S; Marucci, M; Hjaertstam, J; Siepmann, F; Axelsson, A; Siepmann, J. Drug release mechanisms from Kollicoat SR: Eudragit NE coated pellets. *International Journal of Pharmaceutics* 409, 30-37, **2011**.

97.  D'Aurizio, E; van Nostrum, CF; van Steenbergen, MJ; Sozio, P; Siepmann, F; Siepmann, J; Hennink WE; Di Stefano, A. Preparation and characterization of poly(lactic-co-glycolic acid) microspheres loaded with a labile antiparkinson prodrug. *International Journal of Pharmaceutics* 409, 289-296, **2011**.

98.  Kreye, F; Siepmann, F; Zimmer, A; Willart, JF; Descamps, M; Siepmann, J. Controlled release implants based on cast lipid blends. *European Journal of Pharmaceutical Sciences* 43, 78-83, **2011**.

99.  Kreye, F; Siepmann, F; Zimmer, A; Willart, JF; Descamps, M; Siepmann, J. Cast lipid implants for controlled drug delivery: Importance of the tempering conditions. *Journal of Pharmaceutical Sciences* 100, 3471-3481, **2011**.

100.  Seidenberger, T; Siepmann, J; Bley, H; Maeder, K; Siepmann, F. Simultaneous controlled vitamin release from multiparticulates: Theory and experiment. *International Journal of Pharmaceutics* 412, 68-76, **2011**.

101.  Kreye, F; Siepmann, F; Willart, JF; Descamps, M; Siepmann, J. Drug release mechanisms of cast lipid implants. *European Journal of Pharmaceutics and Biopharmaceutics* 78, 394-400, **2011**.

102.  Muschert, S; Siepmann, F; Leclercq, B; Siepmann, J. Dynamic and static curing of ethylcellulose:PVA-PEG graft copolymer film coatings. *European Journal of Pharmaceutics and Biopharmaceutics* 78, 455-461, **2011**.

103.  Krenzlin, S; Siepmann, F; Wils, D; Guerin-Deremaux, J; Flament, MP; Siepmann, J. Non-coated multiparticulate matrix systems for colon targeting. *Drug Development and Industrial Pharmacy* 37, 1150-1159, **2011**.

104.  Siepmann, J; Peppas, N. Higuchi equation: Derivation, applications, use and misuse. *International Journal of Pharmaceutics* 418, 6-12, **2011**.

105.  Siepmann, J; Siepmann, F. Mathematical modeling of drug release from lipid dosage forms. *International Journal of Pharmaceutics* 418, 42-53, **2011**.

106.  Gueres, S; Siepmann, F; Siepmann, J; Kleinebudde, P. Drug release from extruded solid lipid matrices: Theoretical predictions and independent experiments. *European Journal of Pharmaceutics and Biopharmaceutics* 80, 122-129, **2012**.

107.  Moebus, K; Siepmann, J; Bodmeier, R. Cubic phase-forming dry powders for

EAGLEBEN-SA_00001774

controlled drug delivery on mucosal surfaces. *Journal of Controlled Release* 157, 206-215, **2012**.

108.  Moebus, K; Siepmann, J; Bodmeier, R. Novel preparation techniques for alginate-poloxamer microparticles controlling protein release on mucosal surfaces. *European Journal of Pharmaceutical Sciences* 45, 358-366, **2012**.

109.  Krenzlin, S; Vincent, C; Munzke, L, Gnansia, D; Siepmann, J; Siepmann, F. Predictability of drug release from cochlear implants. *Journal of Controlled Release* 159, 60-68, **2012**.

110.  Delplace, C; Kreye, F; Klose, D; Danede, F; Descamps, M; Siepmann, J; Siepmann, F. Impact of the experimental conditions on drug release from parenteral depot systems: From negligible to significant. *International Journal of Pharmaceutics* 432, 11-22, **2012**.

111.  Flipo, M; Desroses, M; Lecat-Guillet, N; Villemagne, B; Blondiaux, N; Leroux, F; Piveteau, C; Mathys, V; Flament, MP; Siepmann, J; Villeret, V; Wohlkonig, A; Wintjens, R; Soror, SH; Christophe, T; Jeon, HK; Locht, C; Brodin, P; Deprez, B; Baulard, A; Willand, N. Ethionamide boosters Part 2: Combining bioisosteric replacement and structure-based drug design to solve pharmacokinetic issues in a series of potent 1,2,4-oxadiazole EthR inhibitors. *J. Med. Chem.* 55, 68-83, **2012**.

112.  Moebus, K; Siepmann, J; Bodmeier, R. Zinc-Alginate-Microparticles for Controlled Pulmonary Delivery of Proteins Prepared by Spray-Drying. *European Journal of Pharmaceutics and Biopharmaceutics* 81, 121-130, **2012**.

113.  Kreye, F; Hamm, G; Karrout, Y; Legouffe, R; Bonnel, D; Siepmann, F; Siepmann, J. MALDI-TOF MS Imaging of controlled release implants. *Journal of Controlled Release* 161, 98-108, **2012**.

114.  Siepmann, J; Siepmann, F. Modeling of diffusion controlled drug delivery. *Journal of Controlled Release* 161, 351-362, **2012**.

115.  Gaignaux, A; Reeff, J; Siepmann, F; Siepmann, J; De Vriese, C; Goole, J; Amighi, K. Development and evaluation of sustained-release clonidine-loaded PLGA microparticles *International Journal of Pharmaceutics* 437, 20-28, **2012**.

116.  Blanchemain, N; Karrout, Y; Tabary, N; Brial, M; Neut, C; Hildebrand, HF; Siepmann, J; Martel, B. Comparative study of vascular prostheses coated with different polycyclodextrins for controlled ciprofloxacin release. *Carbohydrate Polymers* 90, 1695-1703, **2012**.

117.  Almeida, A; Brabant, L; Siepmann, F; De Beer, T; Bouquet, W; Van Hoorebeke, L; Siepmann, J; Remon, JP; Vervaet, C. Sustained release from hot-melt extruded matrices based on ethylene vinyl acetate and polyethylene oxide. *European Journal of Pharmaceutics and Biopharmaceutics* 82, 526-533, **2012**.

EAGLEBEN-SA_00001775

*Curriculum Vitae*                                                              *Prof. Juergen Siepmann*

118. Lerbret, A; Affouard, F; Hédoux, A; Krenzlin, S; Siepmann, J; Bellissent-Funel, MC; Descamps, M. How strongly does trehalose interact with lysozyme in the solid state? Insights from molecular dynamics simulation and inelastic neutron scattering. *The Journal of Physical Chemistry B* 116, 11103-11116, **2012**.

119. Siepmann, J; Karrout, Y; Gehrke, M; Penz, FK; Siepmann, F. Predicting drug release from HPMC/lactose tablets. *International Journal of Pharmaceutics* 441, 826-834, **2013**.

120. Regnier-Delplace,C; Thillaye du Boullay, O; Siepmann, F; Martin-Vaca, B; Degrave, N; Demonchaux, P; Jentzer, O; Bourissou, D; Siepmann, J. PLGA microparticles with zero-order release of the labile anti-Parkinson drug apomorphine. *International Journal of Pharmaceutics* 443, 68-79, **2013**.

121. Regnier-Delplace, C; Thillaye du Boullay, O; Siepmann, F; Martin-Vaca, B; Demonchaux, P; Jentzer, O; Danède, F; Descamps, M; Siepmann, J; Bourissou, D. PLGAs bearing carboxylated side chains: Novel matrix formers with improved properties for controlled drug delivery. *Journal of Controlled Release* 166, 256–267, **2013**.

122. Rosiaux, Y; Muschert, S; Chokshi, R; Leclercq, B; Siepmann, F; Siepmann, J. Ethanol-resistant polymeric film coatings for controlled drug delivery. *Journal of Controlled Release* 169, 1-9, **2013**.

123. Siepmann, J; Siepmann, F. Mathematical modeling of drug dissolution. *International Journal of Pharmaceutics* 453, 12-24, **2013**.

124. Reeff, J; Gaignaux, A; Goole, J; Siepmann, J; Siepmann, F; Jerome, C; Thomassin, JM; De Vriese, C; Amighi, K. Characterization and optimization of GMO-based gels with long term release for intraarticular administration. *International Journal of Pharmaceutics* 451, 95-103, **2013**.

125. Bellavia, G; Paccou, L; Achir, S; Guinet, Y; Siepmann, J; Hedoux, A. Analysis of bulk and hydration water during thermal lysozyme denaturation using Raman scattering. Food Biophysics 8, 170-176, **2013**.

126. Siepmann, J. *In-silico* simulations of advanced drug delivery systems: What will the future offer? *International Journal of Pharmaceutics* 454, 512-516, **2013**.

127. Gue, E; Willart, JF; Muschert, S; Danede, F; Delcourt, E; Descamps, M; Siepmann, J. Accelerated ketoprofen release from polymeric matrices: Importance of the homogeneity/heterogeneity of excipient distribution. *International Journal of Pharmaceutics* 457, 298-307, **2013**.

128. Rongthong, T; Sungthongjeen, S; Siepmann, J; Pongjanyakul, T. Quaternary polymethacrylate-magnesium aluminum silicate films: Molecular interactions, mechanical properties and tackiness. *International Journal of Pharmaceutics* 458, 57-64, **2013**.

EAGLEBEN-SA_00001776

129. Siepmann, J; Siepmann, F. Stability of aqueous polymeric controlled release film coatings. *International Journal of Pharmaceutics* 457, 437-445, **2013**.

130. Haaser, M; Karrout, Y; Velghe, C; Cuppok, Y; Gordon, KC; Pepper, M; Siepmann, J; Rades, T; Taday, PF; Strachan, CJ. Application of terahertz pulsed imaging to analyse film coating characteristics of sustained-release coated pellets. *International Journal of Pharmaceutics* 457, 521-526, **2013**.

131. Rosiaux, Y; Velghe, C; Muschert, S; Chokshi, R; Leclercq, B; Siepmann, F; Siepmann, J. Ethanol-resistant ethylcellulose:guar gum coatings – Importance of formulation parameters. *European Journal of Pharmaceutics and Biopharmaceutics* 85, 1250-1258, **2013**.

132. Velghe, C; Rosiaux, Y; Marchaud, D; Siepmann, J; Siepmann, F. *In-silico* simulation of niacin release from lipid tablets: Theoretical predictions and independent experiments. *Journal of Controlled Release* 175, 63-71, **2014**.

133. Rosiaux, Y; Velghe, C; Muschert, S; Chokshi, R; Leclercq, B; Siepmann, F; Siepmann, J. Mechanisms controlling theophylline release from ethanol-resistant coated pellets. *Pharmaceutical Research* 31, 731–741, **2014**.

134. Gue, E; Muschert, S; Willart, JF; Danede, F; Descamps, M; Delcourt, E; Siepmann, J. Accelerated fenofibrate release from spray-dried microparticles based on polymer blends. *Journal of Drug Delivery Science and Technology* 24, 185-190, **2014**.

135. Do, MP; Neut, C; Delcourt, E; Seixas Certo, T; Siepmann, J; Siepmann, F. In-situ forming implants for periodontitis treatment with improved adhesive properties. *European Journal of Pharmaceutics and Biopharmaceutics* 88, 342-350, **2014**.

136. Dekyndt, B; Verin, J; Neut, C; Siepmann, F; Siepmann, J. How to easily provide zero order release of freely soluble drugs from coated pellets. *International Journal of Pharmaceutics* 478, 31-38, **2015**.

137. Karrout, Y; Dubuquoy, L; Piveteau, C; Siepmann, F; Moussa, E; Wils, D; Beghyn, T; Neut, C; Flament, MP; Guerin-Deremaux, L; Dubreuil, L; Deprez, B; Desreumaux, P; Siepmann, J. In vivo efficacy of microbiota-sensitive coatings for colon targeting: A promising tool for IBD therapy. *Journal of Controlled Release* 197, 121-130, **2015**.

138. Gasmi, H; Danede, F; Siepmann, J; Siepmann, F. Does PLGA microparticle swelling control drug release? New insight based on single particle swelling studies. *Journal of Controlled Release* 213, 120-127, **2015**.

139. Gue, E; Muschert, S; Willart, JF; Danede, F; Delcourt, E; Descamps, M; Siepmann, J. Accelerated ketoprofen release from spray-dried polymeric particles: Importance of phase transitions and excipient distribution. *Drug Development and Industrial Pharmacy* 41, 838-85, **2015**.

EAGLEBEN-SA_00001777

140. Rongthong, T; Sungthongjeen, S; Siepmann, F; Siepmann, J; Pongjanyakul, T. Quaternary polymethacrylate-magnesium aluminum silicate films: Water uptake kinetics and film permeability. *International Journal of Pharmaceutics* 490, 165-172, **2015**.

141. Do, MP; Neut, C; Metz, H; Delcourt, E; Siepmann, J; Maeder, K; Siepmann, F. Mechanistic Analysis of PLGA/HPMC-Based In-situ forming implants for periodontitis treatment. *European Journal of Pharmaceutics and Biopharmaceutics* 94, 273-283, **2015**.

142. Do, MP; Neut, C; Metz, H; Delcourt, E; Maeder, K; Siepmann, J; Siepmann, F. In-situ forming composite implants for periodontitis treatment: How the formulation determines system performance. *International Journal of Pharmaceutics* 486, 38-51, **2015**.

143. Nieto-Bobadilla, MS; Siepmann, F; Djouina, M; Dubuquoy, L; Tesse, N; Willart, JF; Dubreuil, L; Siepmann, J; Neut, C. Controlled delivery of a new broad spectrum antibacterial agent against colitis: In vitro and in vivo performance. *European Journal of Pharmaceutics and Biopharmaceutics* 96, 152-161, **2015**.

144. Douchement, D; Terranti, A; Lamblin, J; Salleron, J; Siepmann, F; Siepmann, J; Vincent, C. Dexamethasone eluting electrodes for cochlear implantation: Effect on residual hearing. *Cochlear Implants International* 16, 195-200, **2015**.

145. Gasmi, H; Willart, JF; Danede, F; Hamoudi, MC; Siepmann, J; Siepmann, F. Importance of PLGA microparticle swelling for the control of prilocaine release. *Journal of Drug Delivery Science and Technology* 30, 123-132, **2015**.

146. Vervaeck, A; Monteyne, T; Siepmann, F; Boone, M; De Beer, T; Siepmann, J; Remon, JP; Vervaet, C. Fatty acids for controlled release applications: a comparison between prilling and solid lipid extrusion as manufacturing techniques. *European Journal of Pharmaceutics and Biopharmaceutics* 97, 173-184, **2015**.

147. Jallouli, Y; Willart, JF; Siepmann, F; Descamps, M; Danede, F; Siepmann, J. Preparation of polymeric fenofibrate formulations with accelerated drug release: Solvent evaporation versus co-grinding. *Journal of Drug Delivery Science and Technology* 30, 397-407, **2015**.

148. Hecq, J; Siepmann, F; Siepmann, J; Amighi, K; Goole, J. Development and evaluation of chitosan and chitosan derivative nanoparticles containing insulin for oral administration. *Drug Development and Industrial Pharmacy* 41, 2037-2044, **2015**.

149. Sircoglou, J; Gehrke, M; Tardivel, M; Siepmann, F; Siepmann, J; Vincent, C. Trans-oval-window implants, a new approach for drug delivery to the inner ear: Extended dexamethasone release from silicone-based implants. *Otology & Neurotology* 36, 1572-1579, **2015**.

150. Jensen, SS; Jensen, H; Møller, EH; Cornett, C; Siepmann, F; Siepmann, J; Østergaard,

EAGLEBEN-SA_00001778

J. In vitro release studies of insulin from lipid implants in solution and in a hydrogel matrix mimicking the subcutis. *European Journal of Pharmaceutical Sciences* 81, 103-112, **2016**.

151. Gehrke, M; Sircoglou, J; Vincent, C; Siepmann, J; Siepmann, F. How to adjust dexamethasone mobility in silicone matrices: A quantitative treatment. *European Journal of Pharmaceutics and Biopharmaceutics* 100, 27-37, **2016**.

152. Flores, C; Degoutina, S; Chai, F; Raoul, G; Hornez, JC; Martel, B; Siepmann, J; Ferri, J; Blanchemain, N. Gentamicin-loaded poly(lactic-co-glycolic acid) microparticles for the prevention of maxillofacial and orthopedic implant infections. *Materials Science and Engineering C 64*, 108–116, **2016**.

153. Gehrke, M; Sircoglou, J; Gnansia, D; Tourrel, G; Willart, JF; Danede, F; Lacante, E; Vincent, C; Siepmann, F; Siepmann, J. *Ear Cubes* for local controlled drug delivery to the inner ear. *International Journal of Pharmaceutics* 509, 85-94, **2016**.

154. Fahier, J; Muschert, S; Fayard, B; Velghe, C; Byrne, G; Doucet, J; Siepmann, F; Siepmann, J. Importance of air bubbles in the core of coated pellets: Synchrotron X-ray microtomography allows for new insights. *Journal of Controlled Release* 237, 125-137, **2016**.

155. Vukosavljevic, B; De Kinder, L; Siepmann, J; Muschert, S; Windbergs, M. Novel insights into controlled drug release from coated pellets by confocal Raman microscopy. *Journal of Raman Spectroscopy* 47, 757-762, **2016**.

156. Gasmi, H; Siepmann, F; Hamoudi, MC; Danede, F; Verin, J; Willart, JF; Siepmann, J. Towards a better understanding of the different release phases from PLGA microparticles: Dexamethasone-loaded systems. *International Journal of Pharmaceutics* 514, 189-199, **2016**.

157. Cantin, O; Siepmann, F; Danede, F; Willart, JF; Karrout, Y; Siepmann, J. PEO hot melt extrudates for controlled drug delivery: Importance of the molecular weight. *Journal of Drug Delivery Science and Technology* 36, 130-140, **2016**.

158. Agossa, K; Lizambard, M; Rongthong, T; Delcourt-Debruyne, E; Siepmann, J; Siepmann, F. Physical key properties of antibiotic-free, PLGA/HPMC-based in-situ forming implants for local periodontitis treatment. *International Journal of Pharmaceutics* 521, 282-293, **2017**.

159. Hamoudi-Ben Yelles, MC; Tran Tan, V; Danede, F; Willart, JF; Siepmann, J. PLGA implants: How Poloxamer/PEO addition slows down or accelerates polymer degradation and drug release. *Journal of Controlled Release* 253, 19-29, **2017**.

160. Siepmann, F; Karrout, Y; Gehrke, M; Penz, F; Siepmann, J. Limited drug solubility can be decisive even for freely soluble drugs in highly swollen matrix tablets. *International Journal of Pharmaceutics* 526, 280-290, **2017**.

EAGLEBEN-SA_00001779

161. Khlibsuwan, R; Siepmann, F; Siepmann, J; Pongjanyakul, T. Chitosan-clay nanocomposite microparticles for controlled drug delivery: Effects of the MAS content and TPP crosslinking. *Journal of Drug Delivery Science and Technology* 40, 1-10, **2017**.

162. Krupa, A; Cantin, O; Strach, B; Wyska, E; Tabor, Z; Siepmann, J; Wrobel, A; Jachowicz, R. In vitro and in vivo behavior of tadalafil hot-melt extrudates: Importance of the carrier's crystallinity. *International Journal of Pharmaceutics* 528, 498-510, **2017**.

163. Hoang Thi, Th; Priemel, PA; Karrout, Y; Driss, V; Delbeke, M; Dendooven, A; Flament, MP; Capron, M; Siepmann, J. Preparation and investigation of P28GST-loaded PLGA microparticles for immunomodulation of experimental colitis. *International Journal of Pharmaceutics* 533, 26-33, **2017**.

164. Elisei, E; Willart, JF; Danede, F; Siepmann, J; Siepmann, F; Descamps, M. Crystalline polymorphism emerging from a milling-induced amorphous form: The case of chlorhexidine dihydrochloride. *Journal of Pharmaceutical Sciences* 107, 121-126, **2018**.

165. Karrout, Y; Siepmann, F; Benzine, Y; Paccou, L; Guinet, Y; Hedoux, A; Siepmann, J. When drugs plasticize film coatings: Unusual formulation effects observed with metoprolol and Eudragit RS. *International Journal of Pharmaceutics* 539, 39-49, **2018**.

166. Bode, C; Kranz, H; Siepmann, F; Siepmann, J. In-situ forming PLGA implants for intraocular dexamethasone delivery. *International Journal of Pharmaceutics* 548, 337-348, **2018**.

167. Oliveira, P; Willart, JF; Siepmann, J; Siepmann, F; Descamps, M. Using milling to explore physical states: The amorphous and polymorphic forms of dexamethasone. *Crystal Growth & Design* 18, 1748-1757, **2018**.

168. Gehrke, M; Verin, J; Gnansia, D; Tourrel, G; Risoud, M; Vincent, C; Siepmann, F; Siepmann, J. Hybrid Ear Cubes for local controlled dexamethasone delivery to the inner ear. *European Journal of Pharmaceutical Sciences* 126, 23-32, **2019**.

169. Siepmann, J; Faham, A; Clas, SD; Boyd, BJ; Jannine, V; Bernkop-Schnuerch, A; Zhao, H; Lecommandoux, S; Evans, JC; Allen, C; Merkel, OM; Costabile, G; Alexander, MR; Wildman, RG; Roberts, CJ; Leroux, JC. Lipids and polymers in pharmaceutical technology: lifelong companions. *International Journal of Pharmaceutics* 558, 128-142, **2019**.

EAGLEBEN-SA_00001780

# Patents

1.  Siepmann, J; Siepmann, F; Carlin, B; Jian-Xin, L.
    Latex or pseudolatex compositions, coatings and coating processes.
    International Patent Application
    No.: PCT/US2007/061377
    Pub. No.: WO/2007/092717
    Date of publication: 16 August 2007
    Date of filing: 31 January 2007

2.  Haeusler, O; Wils, D; Karrout, Y; Siepmann, J.
    Water insoluble polymer:modified starch derivative-based film coatings for colon targeting.
    European Patent Application
    No.: 08305740.6
    Pub. No.: EP 2 179 727 A1
    Date of publication: 28 April 2010, Bulletin 2010/17
    Date of filing: 27 October 2008

3.  Haeusler, O; Wils, D; Karrout, Y; Siepmann, J.
    Water insoluble polymer:indigestible water-soluble polysaccharide film coatings for colon targeting.
    International Patent Application
    No.: PCT/EP2009/064165
    Pub. No.: WO 2010/049432 A1
    Date of publication: 6 May 2010
    Date of filing: 27 October 2009

4.  Haeusler, O; Wils, D; Karrout, Y; Siepmann, J.
    Water insoluble polymer:starch-based film coatings for colon targeting.
    International Patent Application
    No.: PCT/EP2009/064166
    Pub. No.: WO 2010/049433 A2
    Date of publication: 6 May 2010
    Date of filing: 27 October 2009

5.  Haeusler, O; Degrave, M.H.; Wils, D; Krenzlin, S; Siepmann, J.
    Modified starch derivative-based matrix for colon targeting.
    European Patent Application
    No.: 10306189.1
    Pub. No.: EP 2 446 877 A1
    Date of publication: 02 May 2012, Bulletin 2012/18
    Date of filing: 29 October 2010

6.  Siepmann, J; Karrout, Y; Guerin-Deremaux, L; Klaeyle, J; Wils, D.
    Indigestible polymer: starch acetate -based film coatings for colon targeting.

EAGLEBEN-SA_00001781

*Curriculum Vitae*                                                      *Prof. Juergen Siepmann*

International Patent Application
No.: PCT/EP2011/056794
Pub. No.: WO/2011/135055
Date of publication: 3 November 2011
Date of filing: 28 April 2011

7.   Siepmann, J; Cuppok, Y.
     Controlled release solid dose forms.
     US Patent Application
     No.: 13/478,668
     Pub. No.: US 2012/0328697 A1
     Date of publication: 27 December 2012
     Date of filing: 23 May 2012

8.   Siepmann, J; Chokshi, R; Sestrick, M; Velghe, C.
     Controlled release solid dose forms.
     International Patent Application
     No.: PCT/US2013/063227
     Pub. No.: WO 2014055740 A1
     Date of publication: 10 April 2014
     Date of filing: 3 October 2013

9.   Siepmann, J; Chokshi, R; Sestrick, M; Velghe, C.
     Controlled release solid dose forms.
     International Patent Application
     No.: PCT/US2013/063224
     Pub. No.: WO 2014055738 A1
     Date of publication: 10 April 2014
     Date of filing: 3 October 2013

# Books

1.   Florence, AT; Siepmann, J (Eds.). *Modern Pharmaceutics*, Vol. 1: *Basic Principles and Systems*, 5th Edition, Informa, New York, pp. 1-633, **2009**.

2.   Florence, AT; Siepmann, J (Eds.). *Modern Pharmaceutics*, Vol. 2: *Applications and Advances*, 5th Edition, Informa, New York, pp. 1-537, **2009**.

3.   Siepmann, J; Siegel, R; Rathbone, M (Eds.). *Fundamentals and Applications of Controlled Release Drug Delivery*, Springer, New York, pp. 1-592, **2012**.

EAGLEBEN-SA_00001782

# Book Chapters

1.  Bodmeier, R; Siepmann, J. Non-degradable polymers for drug delivery, in: *Encyclopedia of Controlled Drug Delivery*, Mathiowitz, E (Ed.), John Wiley & Sons, New York, pp. 664-689, **1999**.

2.  Im-Emsap, W; Paeratakul, O; Siepmann, J. Disperse systems, in: *Modern Pharmaceutics*, Banker, GS; Rhodes, CT (Eds.), 4th Edition, Marcel Dekker, New York, pp. 237-286, **2002**.

3.  Siepmann, F; Siepmann, J. Microencapsulation par extraction/evaporation de solvents, in: *Microencapsulation: Des Sciences Aux Technologies*, Vandamme, T; Poncelet, D; Subra-Paternault, P (Eds.), Lavoisier, Paris, pp. 71-80, **2007**.

4.  Siepmann, J; Siepmann, F. Local controlled drug delivery to the brain, in: *Advanced Formulation Design to Optimize Therapeutic Outcomes*, Williams III, RO; Taft, DR; McConville, JT (Eds.), Informa Healthcare, New York, 245-280, **2007**.

5.  Busignies, V; Chulia, D; Choisnard, L; de Challemaison, R; Gèze, A; Stainmesse, S; Siepmann, J; Tchoreloff, P; Viana, M; Wehrlé, P; Wouessidjewe, D. Poudres, granulés et comprimés, in: *Pharmacie Galénique - Formulation et Technologie Pharmaceutique*, Wehrle, P (Ed.), Editions Maloine, Paris, pp. 27-70, **2007**.

6.  Siepmann, J; Siepmann, F. The modified drug release landscape: Academic viewpoint, in: *Modified-Release Drug Delivery Technology*, Vol. 2, Rathbone, MJ (Ed.), 2nd Edition, Informa Healthcare, New York, pp. 17-34, **2008**.

7.  Siepmann, J; Siepmann, F; Paeratakul, O; Bodmeier, R. Process and formulation factors affecting the drug release from pellets coated with the ethylcellulose-pseudolatex Aquacoat, in: *Aqueous Polymeric Coatings for Pharmaceutical Dosage Forms*, McGinity, J; Felton, L (Eds.), 3rd Edition, Informa Healthcare, New York, pp. 203-235, **2008**.

8.  Colombo, P; Santi, P; Siepmann, J; Colombo, G; Sonvico, F; Rossi, A; Strusi, OL. Swellable and rigid matrices: controlled release matrices with cellulose ethers, in: *Pharmaceutical Dosage Forms: Tablets, Volume 2: Rational Design and Formulation*, Augsburger, LL; Hoag, SW (Eds.), 3rd Edition, Informa Healthcare, New York, pp. 433-468, **2008**.

9.  Florence, AT; Siepmann, J. Pharmaceutics: New challenges, new paradigms, in: *Modern Pharmaceutics*, Vol. 1: *Basic Principles and Systems*, Florence, AT; Siepmann, J (Eds.), 5th Edition, Informa, New York, pp. 1-22, **2009**.

10. Siepmann, J; Siepmann, F; Florence, AT. Factors influencing oral absorption and drug availability, in: *Modern Pharmaceutics*, Vol. 1: *Basic Principles and Systems*, Florence, AT; Siepmann, J (Eds.), 5th Edition, Informa, New York, pp. 117-154, **2009**.

11. Rungseevijitprapa, W; Siepmann, F; Paeratakul, O; Siepmann, J. Disperse Systems, in:

EAGLEBEN-SA_00001783

*Modern Pharmaceutics*, Vol. 1: *Basic Principles and Systems*, Florence, AT; Siepmann, J (Eds.), 5th Edition, Informa, New York, pp. 357-422, **2009**.

12. Siepmann, J; Siepmann, F. Time-controlled drug delivery systems, in: *Modern Pharmaceutics*, Vol. 2: *Applications and Advances*, Florence, AT; Siepmann, J (Eds.), 5th Edition, Informa, New York, pp. 1-22, **2009**.

13. Florence, AT; Siepmann, J. Dosage forms for personalized medicine: From simple to the complex, in: *Modern Pharmaceutics*, Vol. 2: *Applications and Advances*, Florence, AT; Siepmann, J (Eds.), 5th Edition, Informa, New York, pp. 493-512, **2009**.

14. Siepmann, J; Siepmann, F. Freisetzungsmechanismen in Retard- und Depotarzneiformen, in: *Innovative Arzneiformen*, Maeder, K; Weidenauer, U (Eds.), Wissenschaftliche Verlagsgesellschaft, Stuttgart, pp. 135-148, **2009**.

15. Siepmann, J; Siegel, R; Siepmann, F. Diffusion controlled drug delivery systems, in: *Fundamentals and Applications of Controlled Release Drug Delivery*, Siepmann, J; Siegel, R; Rathbone, M (Eds.), Springer, New York, pp. 127-152, **2012**.

16. Siepmann, J; Siepmann, F. Swelling controlled drug delivery systems, in: *Fundamentals and Applications of Controlled Release Drug Delivery*, Siepmann, J; Siegel, R; Rathbone, M (Eds.), Springer, New York, 153-170, **2012**.

17. Siepmann, J; Siepmann, F; Paeratakul, O; Bodmeier, R. Process and formulation factors affecting drug release from pellets coated with the ethylcellulose-pseudolatex Aquacoat, in: *Aqueous Polymeric Coatings for Pharmaceutical Dosage Forms*, Felton, L (Ed.), 4th Edition, CRC Press, New York, pp. 177-205, **2017**.

EAGLEBEN-SA_00001784

# Theme Editor of Special Issues

1. Siepmann, J; Peppas, NA. Mathematical Modeling of Controlled Drug Delivery. *Advanced Drug Delivery Reviews* 48, Issues 2-3, 137-300, **2001**.

2. Siepmann, J. Local Controlled Drug Delivery to the Brain. *International Journal of Pharmaceutics* 314, Issue 2, 99-208, **2006**.

3. Siepmann, J. Future Perspectives in Pharmaceutics. *International Journal of Pharmaceutics* 364, Issue 2, 157-343, **2008**.

4. Siepmann, J; Peppas, NA. Mathematical modeling of drug delivery systems:Fifty years after Takeru Higuchi's models. *International Journal of Pharmaceutics* 418, Issue 1, 1-148, **2011**.

5. Siepmann, J; Muellertz, A; Loftsson, T. Poorly soluble drugs. *International Journal of Pharmaceutics* 453, Issue 1, 1-294, **2013**.

6. Siepmann, J; Bodmeier, R; McGinity, J. Progress in Film Coating. *International Journal of Pharmaceutics* 457, Issue 2, 361-538, **2013**.

7. Florence, AT; Couvreur, P; Fattal, E; Siepmann, J. Special JDDST issue in honor of Prof. Dominique Duchêne. *Journal of Drug Delivery Science and Technology* 30, Part B, 251-510, **2015**.

8. Siepmann, J; Burgess, D. Special IJP issue in honor of Prof. Alexander T. Florence. *International Journal of Pharmaceutics* 514, Issue 1, 1-331, **2016**.

# Editor of Proceedings

1. Siepmann, J; Kerner W. *11th Workshop of Marie Curie Fellows, European Commission*, Berlin, **2001**.

# Book Reviews

1. Siepmann, J. New approaches to better drugs, sur: New approaches to Drug Development, Jollès, P (Ed.), *Trends in Biotechnology* 19, 237, **2001**.

EAGLEBEN-SA_00001785

# Poster Presentations

1.  Siepmann, J; Paeratakul, O; Bodmeier, R. Modeling plasticizer uptake of aqueous polymer dispersions. *12th National Meeting of the American Association of Pharmaceutical Scientists, AAPS*, Boston, USA, Pharmaceutical Research 14, S-323, **1997**.

2.  Siepmann, J; Ainaoui, A; Vergnaud, JM; Bodmeier, R. Calculation of the dimensions of drug-polymer devices based on the parameters of diffusion. *12th National Meeting of the American Association of Pharmaceutical Scientists, AAPS*, Boston, USA, Pharmaceutical Research 14, S-714, **1997**.

3.  Siepmann, J; Bodmeier, R. Computergestützte Entwicklung von Arzneistoffsystemen mit kontrollierter Wirkstofffreisetzung. *Treffen der DPhG Landesgruppe Berlin-Brandenburg „Der wissenschaftliche Nachwuchs stellt sich vor"*, Berlin, Germany, Proceedings # P 7, **1998**.

4.  Siepmann, J; Lecomte, F; Bodmeier, R. Diffusion-controlled drug delivery: A new method to achieve desired release profiles. *13th Meeting of the American Association of Pharmaceutical Scientists, AAPS*, San Francisco, USA, PharmSci 1, S-421, **1998**.

5.  Siepmann, J; Podual, K; Sriwongjanya, M; Peppas, NA; Bodmeier, R. A new model describing the swelling and drug release kinetics from HPMC tablets. *13th Meeting of the American Association of Pharmaceutical Scientists, AAPS*, San Francisco, USA, PharmSci 1, S-423, **1998**.

6.  Siepmann, J; Kranz, H; Peppas, NA; Bodmeier, R. A new model elucidating the transport mechanisms and predicting the release kinetics from HPMC matrices. *26th International Symposium on Controlled Release of Bioactive Materials, CRS*, Boston, USA, Proceedings pp. 994-995, **1999**.

7.  Streubel, A; Siepmann, J; Dashevsky, A; Bodmeier, R. pH-independent release of weakly basic drugs from water-insoluble and –soluble matrix tablets. *3rd World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Berlin, Germany, Proceedings pp. 207-208, **2000**.

8.  Streubel, A; Siepmann, Bodmeier, R. Bimodal drug release achieved with multilayer matrix tablets. *27th International Symposium on Controlled Release of Bioactive Materials, CRS*, Paris, France, Proceedings pp. 397-398, **2000**.

9.  Streubel, A; Siepmann, Bodmeier, R. Multi-layer matrix tablets with bimodal drug release – effect of process and formulation parameters. *15th Meeting of the American Association of Pharmaceutical Scientists, AAPS*, Indianapolis, USA, Pharm. Sci. Supplement 2(4) p. 20, **2000**.

10. Siepmann, J; Streubel, A; Peppas, NA; Bodmeier, R. Drug release mechanisms from HPMCAS (hydroxypropyl methylcellulose acetate succinate) matrices. *15th Meeting of the American Association of Pharmaceutical Scientists, AAPS*, Indianapolis, USA,

EAGLEBEN-SA_00001786

Pharm. Sci. Supplement 2(4) p. 189, **2000**.

11.   Siepmann, J; Faisant, N; Haffner, J; Benoit, JP. Drug release from bioerodible PLGA-based microparticles used for intracranial administration. Jahrestagung der *Association Francophone des Enseignants en Pharmacie Galénique*, Strasbourg, France, Proceedings # 14, **2000**.

12.   Siepmann, J; Faisant, N; Haffner, J; Benoit, JP. Release mechanisms of 5-FU-loaded microparticles for the treatment of brain cancer. Jahrestagung der *Groupe Thématique de Recherche sur les Vecteurs, GTRV*, Paris, France, Proceedings pp. 94-95, **2000**.

13.   Faisant, N; Siepmann, J; Haffner, J; Benoit, JP. Physicochemical characterization of 5-FU-loaded PLGA microparticles during drug release. *New Trends in Polymers for Oral and Parenteral Administration*, Paris, France, Proceedings # 30, **2001**.

14.   Siepmann, J; Faisant, N; Haffner, J; Benoit, JP. A simple mathematical model describing drug release from PLGA-based, bioerodible microparticles used for the treatment of cancer. *New Trends in Polymers for Oral and Parenteral Administration*, Paris, France, Proceedings # 31, **2001**.

15.   Streubel, A; Siepmann, J; Bodmeier, R. Floating microparticles based on polymer-coated foam powder. *28th International Symposium on Controlled Release of Bioactive Materials, CRS*, San Diego, USA, Proceedings # 6058, **2001**.

16.   Siepmann, J; Faisant, N; Laffineur, V; Bruna, E; Oury, P; Haffner, J; Benoit, JP. The effect of gamma-irradiation on PLGA-based microparticles: Physicochemical characterization and mathematical modeling. *28th International Symposium on Controlled Release of Bioactive Materials, CRS*, San Diego, USA, Proceedings # 7186, **2001**.

17.   Faisant, N; Siepmann, J; Oury, P; Laffineur, V; Bruna, E; Haffner, J; Benoit, JP. The effect of gamma-irradiation on drug release from bioerodible microparticles: A quantitative treatment. *13th International Symposium on Microencapsulation*, Angers, France, Proceedings pp. 83-84, **2001**.

18.   Streubel, A; Siepmann, J; Bodmeier, R. Floating microparticles based on foam powder: Effect of the type of coating polymer. *13th International Symposium on Microencapsulation*, Angers, France, Proceedings pp. 84-85, **2001**.

19.   Siepmann, J; Faisant, N; Haffner, J; Benoit, JP. A new, Monte Carlo-based mathematical model quantifying drug release from bioerodible microparticles. *13th International Symposium on Microencapsulation*, Angers, France, Proceedings pp. 85-86, **2001**.

20.   Streubel, A; Siepmann, J; Bodmeier, R. Development of floating controlled-release matrix tablets for gastric retention. *16th Meeting of the American Association of Pharmaceutical Scientists, AAPS*, Denver, USA, Proceedings # T3210, **2001**.

EAGLEBEN-SA_00001787

21.    Streubel, A; Siepmann, J; Bodmeier, R. A new preparation method for floating microparticles using microporous carriers soaked with drug-polymer solution. *16th Meeting of the American Association of Pharmaceutical Scientists, AAPS*, Denver, USA, Proceedings # W4222, **2001**.

22.    Siepmann, J; Streubel, A; Bodmeier, R; Peppas, NA. The "sequential layer" model quantifying drug release from hydrophilic matrix tablets: Experimental verification. *16th Meeting of the American Association of Pharmaceutical Scientists, AAPS*, Denver, USA, Proceedings # W4342, **2001**.

23.    Akiki, J; Faisant, N; Siepmann, J; Oury, P; Troude, R; Bruna, E; Haffner, J; Benoit, JP. Effect of the size of biodegradable microparticles on drug release: Experiment and theory. Jahrestagung der *Groupe Thématique de Recherche sur les Vecteurs, GTRV*, Lyon, France, Proceedings pp. 36-37, **2001**.

24.    Faisant, N; Siepmann, J; Oury, P; Laffineur, V; Bruna, E; Haffner, J; Benoit, JP. Biodegradable microparticles for intracranial controlled drug delivery: Effect of gamma-irradiation. Jahrestagung der *Groupe Thématique de Recherche sur les Vecteurs, GTRV*, Lyon, France, Proceedings pp. 38-39, **2001**.

25.    Streubel, A; Siepmann, J; Bodmeier, R. Floating microparticles based on foam carriers soaked with drug-polymer solution: Optimizing drug release. *4th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-ADRITELF/APGI/APV*, Florence, Italy, Proceedings pp. 1327-1328, **2002**.

26.    Lecomte, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. Blends of enteric and GIT-insoluble polymers for film coating: Physicochemical characterization and drug release patterns. *4th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-ADRITELF/APGI/APV*, Florence, Italy, Proceedings pp. 601-602, **2002**.

27.    Bley, O; Siepmann, J; Bodmeier R. Protective polymer coatings for a moisture sensitive herbal drug: Effect of formulation and processing parameters. *4th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-ADRITELF/APGI/APV*, Florence, Italy, Proceedings pp. 1103-1104, **2002**.

28.    Pearnchob, N; Siepmann, J; Sturm, M; Bodmeier R. Shellac used for moisture protective and taste masking coatings: Effect of formulation and processing variables. *4th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-ADRITELF/APGI/APV*, Florence, Italy, Proceedings pp. 75-76, **2002**.

29.    Akiki, J; Faisant, N; Siepmann, J; Richard, J; Haffner, J; Benoit, JP. Effect of the type of release medium on drug release from PLGA-based microparticles. *4th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-ADRITELF/APGI/APV*, Florence, Italy, Proceedings pp. 1311-1312, **2002**.

30.    Faisant, N; Akiki, J; Haffner, J; Richard, J; Siepmann, J; Benoit, JP. Anticancer drug loaded microparticles for intracranial administration: Effect of the experimental

EAGLEBEN-SA_00001788

conditions on in vitro drug release. *29th Annual Meeting of the Controlled Release Society, CRS*, Seoul, Korea, Proceedings # 273, **2002**.

31.  Bley O, Siepmann J, Bodmeier R. Protective polymer coatings for moisture sensitive herbal drugs: Importance of the water activity. *Jahrestagung der Deutschen Pharmazeutischen Gesellschaft DPhG*, Berlin, Germany, Arch. Pharm. Pharm. Med. Chem. 335, Suppl. 1, 108, **2002**.

32.  Pearnchob, N; Dashevsky, A; Siepmann, J; Bodmeier, R. Effect of plasticizers and pore-formers on the physicochemical properties of shellac. *Jahrestagung der Deutschen Pharmazeutischen Gesellschaft DPhG*, Berlin, Germany, Arch. Pharm. Pharm. Med. Chem. 335, Suppl. 1, 118, **2002**.

33.  Streubel, A; Siepmann, J; Bodmeier, R. Floating microparticles based on low density foam powder, drug and ethylcellulose. *Jahrestagung der Deutschen Pharmazeutischen Gesellschaft DPhG*, Berlin, Germany, Arch. Pharm. Pharm. Med. Chem. 335, Suppl. 1, 122, **2002**.

34.  Streubel, A; Siepmann, J; Bodmeier, R. Low density, floating matrix tablets for gastroretentive drug delivery : Effect of process and formulation parameters. *2002 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Toronto, Canada, Proceedings # T3292, **2002**.

35.  Pearnchob, N; Siepmann, J; Bodmeier R. Physicochemical characterization of shellac used as coating material in controlled drug delivery systems. *2002 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Toronto, Canada, Proceedings # T3269, **2002**.

36.  Pearnchob, N; Siepmann, J; Bodmeier R. Shellac used as matrix-forming polymer in controlled drug delivery systems. *2002 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Toronto, Canada, Proceedings # T3196, **2002**.

37.  Lecomte, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. Coating of pellets with blends of enteric and GIT-insoluble polymers. *2002 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Toronto, Canada, Proceedings # T3279, **2002**.

38.  Lecomte, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. Drug diffusion in blends of enteric and GIT-insoluble polymers. *2002 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Toronto, Canada, Proceedings # W5128, **2002**.

39.  Bley, O; Siepmann, J; Bodmeier R. Protective polymer coatings for moisture sensitive herbal drugs : Importance of the glass transition temperature. *2002 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Toronto, Canada, Proceedings # W5109, **2002**.

EAGLEBEN-SA_00001789

40. Siepmann, J; Faisant, N; Benoit, JP. Elucidation of the drug release mechanisms from bioerodible microparticles using a novel mathematical model based on Monte Carlo simulations. *2002 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists,* Toronto, Canada, Proceedings # T3289, **2002**.

41. Hombreiro-Pérez, M; Siepmann, J; Zinutti, C; Hoffman, M; Bodmeier, R; Maincent, P. Preparation, physicochemical characterization and mathematical modeling of drug release of/from microparticles containing a hydrophilic and/or a lipophilic drug. Jahrestagung der *Groupe Thématique de Recherche sur les Vecteurs, GTRV,* Paris, France, Proceedings p. 23, **2002**.

42. Lecomte, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. Drug release from pellets coated with blends of GIT-insoluble and enteric polymers: Importance of the type of plasticizer. *30th International Symposium on Controlled Release of Bioactive Materials, CRS,* Glasgow, Scotland. Proceedings # 756, **2003**.

43. Faisant, N; Akiki, J; Siepmann, J; Richard, J; Haffner, J; Benoit, JP. Importance of the dimensions of biodegradable controlled drug delivery systems for drug release and polymer degradation. *30th International Symposium on Controlled Release of Bioactive Materials, CRS,* Glasgow, Scotland, Proceedings # 247, **2003**.

44. Streubel, A; Siepmann, J; Dietzsch, C; Peppas, NA; Bodmeier, R. Comparison of low and high molecular weight HPMC types: Drug and polymer release from matrix tablets. *30th International Symposium on Controlled Release of Bioactive Materials, CRS,* Glasgow, Scotland, Proceedings # 767, **2003**.

45. Lecomte, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. Polymer blends used for the coating of solid dosage forms: Comparison of aqueous and organic coating techniques. *30th International Symposium on Controlled Release of Bioactive Materials, CRS,* Glasgow, Scotland, Proceedings # 755, **2003**.

46. Siepmann, J; Streubel, A; Peppas, NA; Bodmeier, R. Calculation of the erosion and swelling front positions in swellable controlled release tablets. *30th International Symposium on Controlled Release of Bioactive Materials, CRS,* Glasgow, Scotland, Proceedings # 770, **2003**.

47. Johannsen, K; Siepmann, J; Bodmeier, R. A novel type of microparticles based on thermogelling polymers. *Erasmus Intensive course* "Liposome technology and applications in therapeutics", Patras, Greece, **2003**.

48. Elkharraz, K; Siepmann, J. Importance of autocatalytic effects for drug diffusion in PLGA-based microparticles: A quantitative treatment. *2003 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists,* Salt Lake City, USA, Proceedings # W5156, **2003**.

49. Lecomte, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. Elucidation of the mechanisms controlling drug release from pellets coated with polymer blends. *2003 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical*

EAGLEBEN-SA_00001790

*Scientists*, Salt Lake City, USA, Proceedings # W5129, **2003**.

50.    Lecomte, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. Pellets coated with blends of enteric and insoluble polymers: Effect of the type of drug. *2003 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Salt Lake City, USA, Proceedings # W5128, **2003**.

51.    Bley, O; Siepmann, J; Bodmeier R. Moisture protective polymer coatings: Water uptake behavior and glassy-to-rubbery-state transitions. *2003 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Salt Lake City, USA, Proceedings # W4225, **2003**.

52.    Siepmann, J; Peppas, NA. Elucidation of Water, Drug and Polymer Transport in Swellable Matrix Tablets under Sterical Restriction. *2003 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Salt Lake City, USA, Proceedings # W5155, **2003**.

53.    Siepmann, J; Klose, D; Voigt, M; Elkharraz, K. Mathematical modeling of drug release from non-porous, PLGA-based microparticles considering autocatalytic effects. Jahrestagung der *Groupe Thématique de Recherche sur les Vecteurs*, GTRV, Lille, France, Proceedings # 43, **2003**.

54.    Johannsen, K; Siepmann, J; Bodmeier, R. Alginate-poloxamer based microparticles for controlled drug delivery. *International Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology 2004*, Nuremberg, Germany, Proceedings # 461, **2004**.

55.    Bley, O; Siepmann, J; Bodmeier R. Protective polymer coatings for moisture sensitive herbal drugs: Effect of anti-plasticizing agents. *International Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology 2004*, Nuremberg, Germany, Proceedings # 57, **2004**.

56.    Bley, O; Siepmann, J; Bodmeier R. Matrix tablets containing moisture-sensitive herbal drugs: Effects of formulation and processing parameters on water uptake. *European Conference on Drug Delivery and Pharmaceutical Technology-APGI*, Sevilla, Spain, Proceedings # 347, **2004**.

57.    Martinez, L; Agnely, F; Siepmann, J; Leclerc, B; Cotte, M; Geiger, S; Colombo, P; Couarraze, G. Crosslinking of chitosan beads: Diffusion kinetics of glyoxal and crosslinking distribution. *European Conference on Drug Delivery and Pharmaceutical Technology-APGI*, Sevilla, Spain, Proceedings # 253, **2004**.

58.    Lecomte, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. Aqueous-based HPMCAS coatings: Effects of formulation and processing parameters on drug release and film properties. *31st International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society*, Honolulu, USA, Proceedings # 440, **2004**.

59.    Lecomte, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. Film coatings based

EAGLEBEN-SA_00001791

on polymer blends: Importance of the preparation technique for plasticizer distribution and storage stability. *31ˢᵗ International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society,* Honolulu, USA, Proceedings # 457, **2004**.

60. Johannsen, K; Siepmann, J; Bodmeier, R. Controlled delivery of bovine serum albumin from alginate-poloxamer based microparticles. *31ˢᵗ International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society,* Honolulu, USA, Proceedings # 663, **2004**.

61. Martinez, L; Agnely, F; Siepmann, J; Leclerc, B; Cotte, M; Geiger, S; Colombo, P; Couarraze, G. Glyoxal uptake into chitosan and chitosan/PEO beads: A quantitative treatment. *31ˢᵗ International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society,* Honolulu, USA, Proceedings # 665, **2004**.

62. Martinez, L; Agnely, F; Leclerc, B; Siepmann, J; Cotte, M; Bettini, R; Colombo, P; Couarraze, G. Micro-réseaux de chitosane obtenus par un procédé de prilling : Caractérisation et application pharmaceutique. *Colloque du Groupe Français des Polymères (GFP) 2004 "Polymères et milieux aqueux",* Toulon, France, Proceedings # 81, **2004**.

63. Klose, D; Elkharraz, K; Siepmann, J. Importance of autocatalytic effects in porous, PLGA-based microparticles of different size. *2004 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists,* Baltimore, USA, Proceedings # M1241, **2004**.

64. Lecomte, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. Elucidation of the drug release mechanisms from pellets coated with blends of Eudragit NE and Eudragit L. *2004 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists,* Baltimore, USA, Proceedings # M1246, **2004**.

65. Bley, O; Siepmann, J; Bodmeier R. Water uptake into matrix tablets containing moisture-sensitive herbal drugs: Theory and experiment. *2004 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists,* Baltimore, USA, Proceedings # M1266, **2004**.

66. Faisant, N; Elkharraz, K; Arica-Yegin, B; Gust, R; Benoit, J.P.; Siepmann, J. Paclitaxel-loaded, controlled release microparticles for the treatment of brain cancer: Preparation and physicochemical characterization. *2004 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists,* Baltimore, USA, Proceedings # T2124, **2004**.

67. Koennings, S; Siepmann, J; Goepferich, A. Protein release from lipid-based implants: Elucidation of the underlying mass transport mechanisms. *2004 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists,* Baltimore, USA, Proceedings # T2125, **2004**.

68. Siepmann, J; Faisant, N; Akiki, J; Kreye, F; Benoit, JP. Mathematical modeling of drug release from PLGA-based microparticles: Importance of the type of release

EAGLEBEN-SA_00001792

medium. *2004 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists,* Baltimore, USA, Proceedings # T2126, **2004**.

69. Lecomte, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. Effects of the type of preparation technique (spraying vs. casting) on the physicomechanical properties of thin films made of polymer blends. *2004 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists,* Baltimore, USA, Proceedings # T2130, **2004**.

70. Johannsen, K; Siepmann, J; Bodmeier, R. Alginate-Poloxamer microparticles for time-controlled pulmonary delivery of proteins. *2004 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists,* Baltimore, USA, Proceedings # W4028, **2004**.

71. Bley, O; Naderi, M; Thielmann, F; Siepmann, J; Bodmeier R. Moisture-protective polymer coatings: Water uptake behavior analyzed by dynamic vapor sorption. *2004 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists,* Baltimore, USA, Proceedings # W5110, **2004**.

72. Klose, D; Elkharraz, K; Siepmann, J. How autocatalysis can affect polymer degradation and drug release in/from highly porous, PLGA-based microparticles. *19èmes Journées Scientifiques du Groupe Thématique de Recherche sur les Vecteurs, GTRV,* Paris, France, Proceedings # 61, **2004**.

73. Siepmann, J; Faisant, N; Akiki, J; Kreye, F; Benoit, JP. Effects of the composition of the release medium on anticancer drug release from intracranially administered microparticles. *19èmes Journées Scientifiques du Groupe Thématique de Recherche sur les Vecteurs, GTRV,* Paris, France, Proceedings # 80, **2004**.

74. Faisant, N; Elkharraz, K; Arica-Yegin, B; Gust, R; Benoit, JP. Siepmann, J. Paclitaxel-loaded, controlled release microparticles for intracranial administration. *19èmes Journées Scientifiques du Groupe Thématique de Recherche sur les Vecteurs, GTRV,* Paris, France, Proceedings # 81, **2004**.

75. Lecomte, F; Le Brun, V; Siepmann, J; Bodmeier, R. Plasticizing effects of drugs in polymeric systems: A quantitative treatment. *32nd International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society,* Miami, USA, Proceedings # 740, **2005**.

76. Lecomte, F; Mohl, S; Herrmann, S; Winter, G; Siepmann, J. rh-Interferon α-2a release from triglyceride-based matrices: Experiment and theory. *32nd International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society,* Miami, USA, Proceedings # 410, **2005**.

77. Muschert, S; Lecomte, F; Flament, M-P; Leterme, P; Gayot, A; Siepmann, J. Drug release from lipid-based matrix pellets: Experiment and theory. *32nd International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society,* Miami, USA, Proceedings # 738, **2005**.

EAGLEBEN-SA_00001793

78. Klose, D; Lecomte, F; Siepmann, J. PLGA-based microparticles used for controlled drug delivery: Importance of the type of drug. *42nd Meeting of the German Colloid Society*, Aachen, Germany, Proceedings # 25, **2005**.

79. Guse, C; Lecomte, F; Goepferich, A; Siepmann, J. Protein loaded lipid implants: Elucidation of the underlying drug release mechanisms. *2005 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Nashville, USA, Proceedings # M1235, **2005**.

80. Klose, D; Lecomte, F; Siepmann, J. Drug Mobility in PLGA-based Microparticles and Free Films: A Quantitative Treatment. *2005 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Nashville, USA, Proceedings # M1236, **2005**.

81. Moebus, K; Siepmann, J; Bodmeier, R. Glycerol monooleate-based Dry Powder Systems for the Controlled Release of Proteins. *2005 AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Nashville, USA, Proceedings # W4059, **2005**.

82. Tourne-Peteilh, C; Siepmann, F; Siepmann, J; Begu, S; Maillols, H; Devoisselle, JM. Proprietes de liberation d'un principe actif a partir de matrices siliciques mesostructurees. *20èmes Journées Scientifiques du Groupe Thématique de Recherche sur les Vecteurs, GTRV*, Montpellier, France, Proceedings # 55, **2005**.

83. Klose, D; Siepmann, F; Elkharraz, K; Siepmann, J. Effects of formulation and processing parameters on drug mobility in PLGA-based delivery systems. *20èmes Journées Scientifiques du Groupe Thématique de Recherche sur les Vecteurs, GTRV*, Montpellier, France, Proceedings # 60, **2005**.

84. Kreye, F; Siepmann, J. Lipidic implants for controlled drug delivery: Effects of formulation and processing parameters. *20èmes Journées Scientifiques du Groupe Thématique de Recherche sur les Vecteurs, GTRV*, Montpellier, France, Proceedings # 65, **2005**.

85. Siepmann, F; Le Brun, V; Bodmeier, R; Siepmann, J. Plasticizing effects of drugs in polymeric systems: A quantitative treatment. *Pharma Polymers International Controlled Release Eudragit Workshop*, Darmstadt, Germany, **2006**.

86. Siepmann, F ; Siepmann, J ; Walther, M ; MacRae, RJ ; Bodmeier, R. Polymer blends used as coating materials for controlled drug delivery systems: Importance of the type of coating technique. *Pharma Polymers International Controlled Release Eudragit Workshop*, Darmstadt, Germany, **2006**.

87. Siepmann, F ; Siepmann, J ; Walther, M ; MacRae, RJ ; Bodmeier, R. Drug release mechanisms from pellets coated with blends of Eudragit NE and Eudragit L. *Pharma Polymers International Controlled Release Eudragit Workshop*, Darmstadt, Germany, **2006**.

EAGLEBEN-SA_00001794

88.   Klose, D; Siepmann, F; Siepmann, J. Importance of the experimental setup for drug release measurements from PLGA-based microparticles. *5th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Geneva, Switzerland, Proceedings # Tu64, **2006**.

89.   Cosijns, A; Vervaet, C; Luyten, J; Mullens, S; Siepmann, F; Siepmann, J; Remon, JP. Porous calcium phosphate matrices as drug carriers for oral drug delivery. *5th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Geneva, Switzerland, Proceedings # We27, **2006**.

90.   Kreye, F; Siepmann, F; Siepmann, J. Controlled release implants based on lipid blends. *5th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Geneva, Switzerland, Proceedings # Th45, **2006**.

91.   Klose, D; Siepmann, J. In vitro drug release from PLGA-based microparticles: Importance of drug solubility and sink conditions. *33rd International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society*, Vienna, Austria, Proceedings # 276, **2006**.

92.   Kreye, F; Siepmann, F; Zimmer, A; Siepmann, J. Importance of the type of experimental setup on drug release from lipidic implants. *33rd International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society*, Vienna, Austria, Proceedings # 706, **2006**.

93.   Klose, D; Siepmann, F; Elkharraz, K; Siepmann, J. Importance of the type of drug and device design on the release patterns from PLGA-based matrices. *Spring 2006 Biopharmacy Day*, Beerse, Belgium, Proceedings # 14, **2006**.

94.   Muschert, S; Siepmann, F; Flament, M-P; Leterme, P; Gayot, A; Siepmann, J. Gelucire-based pellets: Effects of the type of preparation technique on the underlying drug release mechanisms. *Spring 2006 Biopharmacy Day*, Beerse, Belgium, Proceedings # 16, **2006**.

95.   Guse, C; Siepmann, F; Goepferich, A; Siepmann, J. Pyranine release from triglyceride-based implants: A quantitative treatment. *Spring 2006 Biopharmacy Day*, Beerse, Belgium, Proceedings # 18, **2006**.

96.   Siepmann, F; Hoffmann, A; Wahle, C; Zach, S; Leclercq, B; Carlin, B; Siepmann, J. Carragenan as an efficient modulator for the properties of ethylcellulose-based films. *143rd British Pharmaceutical Conference (BPC)*, Journal of Pharmacy and Pharmacology, Supplement, p A-50. Manchester, England, **2006**.

97.   Cosijns, A; Nikolakakis, I; Verveat, C; De Beer, T; Siepmann, F; Siepmann, J; Remon, JP. Porous pellets as drug carriers. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, San Antonio, USA, Proceedings # T2244, **2006**.

EAGLEBEN-SA_00001795

98.  Verhoeven, E; Siepmann, F; Siepmann, J; Van den Mooter, G; Schacht, E; Vervaet, C; Remon, JP. Drug release from EC-PEG/PEO-based mini-matrices prepared by hot-melt extrusion. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, San Antonio, USA, Proceedings # W4247, **2006**.

99.  Siepmann, F; Wahle, C; Zach, S; Leclercq, B; Carlin, B; Siepmann, J. How to adjust desired drug release profiles from ethyl-cellulose coated pellets. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, San Antonio, USA, Proceedings # W4248, **2006**.

100.  Siepmann, F; Wahle, C; Zach, S; Leclercq, B; Carlin, B; Siepmann, J. Ethylcellulose-based controlled release film coatings with pH-triggered permeability. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, San Antonio, USA, Proceedings # W4249, **2006**.

101.  Klose, D; Siepmann, J. Importance of the bulk fluid's volume on drug release from PLGA-based microparticles. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, San Antonio, USA, Proceedings # R6200, **2006**.

102.  Klose, D; Siepmann, F; Vermeersch, G; Siepmann, J; Azaroual, N. Drug transport in agarose gels: A quantitative treatment based on NMR and UV measurements. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, San Antonio, USA, Proceedings # R6201, **2006**.

103.  Klose, D; Siepmann, J. Nouvelles microparticules biodégradables pour le traitement de tumeurs cérébrales: Protection de principes actifs instables. *Journée ARC*, Paris, France, Proceedings # B-18, **2006**.

104.  Kreye, F; Siepmann, J. Towards a better understanding of the drug release mechanisms in controlled release implants for intracranial use. 10ème *Journée Scientifique du Réseau LARC-Neurosciences*, Lille, France, Proceedings # B-201, **2006**.

105.  Klose, D; Siepmann, J. PLGA-based microparticles used for the treatment of neurodegenerative diseases: How to measure drug release. 10ème *Journée Scientifique du Réseau LARC-Neurosciences*, Lille, France, **2006**.

106.  Klose, D; Siepmann, F; Vermeersch, G; Siepmann, J; Azaroual, N. Towards a more realistic in vitro drug release setup for parenteral controlled delivery systems. *21èmes Journées Scientifiques du Groupe Thématique de Recherche sur les Vecteurs, GTRV*, Paris, France, Proceedings # 95, **2006**.

107.  Klose, D; Siepmann, J. Controlled drug release from PLGA-based microparticles : How the bulk fluid's volume affects the system's performance. *21èmes Journées Scientifiques du Groupe Thématique de Recherche sur les Vecteurs, GTRV*, Paris, France, Proceedings # 96, **2006**.

108.  Kreye, F; Siepmann, J. A mechanistic study on molten implants as controlled drug

EAGLEBEN-SA_00001796

delivery systems. *21èmes Journées Scientifiques du Groupe Thématique de Recherche sur les Vecteurs, GTRV*, Paris, France, Proceedings # 97, **2006**.

109. Kreye, F; Siepmann, J. Blending of lipids as an efficient tool to adjust drug release from implants. *21èmes Journées Scientifiques du Groupe Thématique de Recherche sur les Vecteurs, GTRV*, Paris, France, Proceedings # 98, **2006**.

110. Glaessl, B; Siepmann, F; Flament, MP; Leterme, P; Rades, T; Siepmann, J. Drug-polymer interactions in controlled delivery systems: Towards a better understanding of the underlying mechanisms. *3rd Pharmaceutical Sciences World Congress (PSWC)*, Amsterdam, The Netherlands, Proceedings # DD-W-058, **2007**.

111. Yang, QW; Flament, MP; Siepmann, F; Siepmann, J; Herry, C; Busignies, V; Leclerc, B; Tchoreloff, P. Polymeric controlled release barriers: suitability of free films as surrogates for coatings. *3rd Pharmaceutical Sciences World Congress (PSWC)*, Amsterdam, The Netherlands, Proceedings # DD-W-139, **2007**.

112. Verhoeven, E; Siepmann, F; Siepmann, J; Van den Mooter, G; Vervaet, C; Remon, JP. Predicting drug release from EC-PEG/PEO mini-matrices prepared by hot-melt extrusion. *3rd Pharmaceutical Sciences World Congress (PSWC)*, Amsterdam, The Netherlands, Proceedings # DD-W-107, **2007**.

113. Kreye, F; Siepmann, F; Siepmann, J. Molten lipid implants as controlled drug delivery systems: A quantitative analysis of the mass transport mechanisms. *3rd Pharmaceutical Sciences World Congress (PSWC)*, Amsterdam, The Netherlands, Proceedings # DD-T-054, **2007**.

114. Kreye, F; Siepmann, F; Flament, MP;, Leterme, P; Siepmann, J. How to provide broad ranges of drug release patterns from lipid implants prepared by compression, melting or extrusion. *3rd Pharmaceutical Sciences World Congress (PSWC)*, Amsterdam, The Netherlands, Proceedings # DD-T-055, **2007**.

115. Klose, D; Laprais, M; Siepmann, F; Bordet, R; Siepmann, J. Novel controlled release microparticles reducing the neurological consequences of ischemic stroke. *3rd Pharmaceutical Sciences World Congress (PSWC)*, Amsterdam, The Netherlands, Proceedings # DD-T-046, **2007**.

116. Siepmann, F; Muschert, S; Leclercq, B; Carlin, B; Siepmann, J. How to improve the storage stability of aqueous controlled release film coatings. *3rd Pharmaceutical Sciences World Congress (PSWC)*, Amsterdam, The Netherlands, Proceedings # DD-T-108, **2007**.

117. Cosijns, A; Verveat, C; Luyten, J; Mullens, S; Siepmann, J; Remon, JP. In vitro and in vivo evaluation of low-dosed porous calcium phosphate tablets. *3rd Pharmaceutical Sciences World Congress (PSWC)*, Amsterdam, The Netherlands, Proceedings # DD-M-080, **2007**.

118. Glaessl, B; Siepmann, F; Rades, T; Siepmann, J. Drug-polymer interactions in

EAGLEBEN-SA_00001797

controlled delivery systems: Interactions of metoprolol tartrate with Eudragit RL in films. *34th International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society,* Long Beach, USA, Proceedings # 500, **2007**.

119. Muschert, S; Siepmann, F; Leclercq, B; Carlin, B; Siepmann, J. Adjustment of desired drug release patterns from pellets coated with aqueous ethylcellulose dispersions: Importance of the type of core and drug solubility. *34th International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society,* Long Beach, USA, Proceedings # 647, **2007**.

120. Muschert, S; Siepmann, F; Leclercq, B; Carlin, B; Siepmann, J. The stability of ethylcellulose film coatings containing PG alginate or carrageenan. *34th International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society,* Long Beach, USA, Proceedings # 758, **2007**.

121. Muschert, S; Siepmann, F; Leclercq, B; Carlin, B; Siepmann, J. Improved storage stability of controlled release pellets coated with aqueous ethylcellulose dispersion. *144th British Pharmaceutical Conference (BPC),* Manchester, England, # 95, **2007**.

122. Verhoeven, E; Siepmann, F; Siepmann, J; Van den Mooter, G; Schacht, E; Vervaet, C; Remon, JP. Predicting drug release kinetics from EC-PEG/PEO mini-matrices prepared by hot-melt extrusion. *Innovation in drug delivery: From biomaterials to devices, (ADRITELF/APGI),* Naples, Italy, Proceedings # 138, **2007**.

123. Karrout, Y; Neut, C; Wils, D; Deremaux, L; Cherifi, H; Parmentier, E; Desreumaux, P; Flament, MP; Siepmann, F; Dubreuil, L; Siepmann, J. Novel polymeric film coatings for colon targeting. *Innovation in drug delivery: From biomaterials to devices, (ADRITELF/APGI),* Naples, Italy, Proceedings # 149, **2007**.

124. Verhoeven, E; Siepmann, F; Siepmann, J; Van den Mooter, G; Schacht, E; Vervaet, C; Remon, JP. Mathematical modelling of drug release from inert matrices. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists,* San Diego, USA, Proceedings # T2070, **2007**.

125. Muschert, S; Siepmann, F; Leclercq, B; Carlin, B; Siepmann, J. How to provide broad spectra of release patterns from ethylcellulose-coated pellets, irrespective of the type of drug and type of core. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists,* San Diego, USA, Proceedings # T2103, **2007**.

126. Klose, D; Azaroual, N; Vermeersch, G; Siepmann, J. Measurement of drug diffusivities in degrading PLGA-based microparticles using NMR analysis. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists,* San Diego, USA, Proceedings # T2106, **2007**.

127. Cosijns, A; Vervaet, C; Luyten, J; Mullens, S; Siepmann, J; Remon, JP. In-vitro and in-vivo evaluation of low-dosed porous calcium phosphate tablets. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists,* San Diego, USA, Proceedings # T2271, **2007**.

EAGLEBEN-SA_00001798

128. Muschert, S; Siepmann, F; Leclercq, B; Carlin, B; Siepmann, J. Importance of the curing conditions for ethylcellulose-PVA-PEG-graft-copolymer coatings. *6th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Barcelona, Spain, Proceedings # Tu76, **2008**.

129. Muschert, S; Siepmann, F; Leclercq, B; Carlin, B; Siepmann, J. Improved storage stability of aqueous ethylcellulose-based film coatings for controlled drug delivery. *6th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Barcelona, Spain, Proceedings # Tu167, **2008**.

130. Seidenberger, T; Bley, H; Siepmann, F; Siepmann, J; Maeder, K. Simultaneous and controlled release of multiple vitamins. *6th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Barcelona, Spain, Proceedings # Tu170, **2008**.

131. Glaessl, B; Siepmann, F; Tucker, I; Siepmann, J; Rades, T. Deeper insight into drug-polymer interactions in controlled drug delivery systems based on mechanical analysis. *6th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Barcelona, Spain, Proceedings # Tu187, **2008**.

132. Karrout, Y; Neut, C; Wils, D; Deremaux, L; Cherifi, H; Desreumaux, P; Flament, MP; Siepmann, F; Dubreuil, L; Siepmann, J. Physicochemical characterization of thin free polymeric films for site specific delivery in the GIT. *6th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Barcelona, Spain, Proceedings # We204, **2008**.

133. Karrout, Y; Neut, C; Wils, D; Deremaux, L; Cherifi, H; Desreumaux, P; Flament, MP; Siepmann, F; Dubreuil, L; Siepmann, J. Mechanical stability of novel polymeric film coatings for colon targeting. *6th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Barcelona, Spain, Proceedings # We205, **2008**.

134. Kreye, F; Willart, JF; Descamps, M; Siepmann, J. Importance of the tempering conditions for molten lipid implants used as controlled drug delivery systems. *6th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Barcelona, Spain, Proceedings # We219, **2008**.

135. Kreye, F; Siepmann, F; Siepmann, J. Lipid blends as matrix materials for controlled release implants. *6th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Barcelona, Spain, Proceedings # We220, **2008**.

136. Verhoeven, E; Siepmann, F; Vervaet, C; Remon, JP; Siepmann, J. Modelling drug release from ethylcellulose-based mini-matrices with time-dependent diffusivities. *6th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Barcelona, Spain, Proceedings # We265, **2008**.

EAGLEBEN-SA_00001799

137. Herrmann, S; Siepmann, F; Siepmann, J; Winter, G. Protein release from PEG-containing lipid implants: Importance of drug solubility. *6th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Barcelona, Spain, Proceedings # Th103, **2008**.

138. Muschert, S; Siepmann, F; Leclercq, B; Carlin, B; Siepmann, J. Drug release mechanisms from pellets coated with ethylcellulose:PVA-PEG-graft-copolymer. *35th International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society*, New York, USA, Proceedings # 479, **2008**.

139. Muschert, S; Barthelemy, C; Cuppok, Y; Aguilar, B; Flament, MP; Odou, P; Siepmann, F; Siepmann, J. How the experimental setup can affect drug release patterns from oral dosage forms. *35th International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society*, New York, USA, Proceedings # 500, **2008**.

140. Muschert, S; Marucci, M; Cuppok, Y; Hjaertstam, J; Siepmann, F; Siepmann, J; Axelsson, A. Kollicoat SR:Eudragit NE blends used for film coating. *35th International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society*, New York, USA, Proceedings # 519, **2008**.

141. Muschert, S; Siepmann, F; Leclercq, B; Carlin, B; Siepmann, J. Osmotic effects on release from coated pellets: Impact of substrate core composition. *145th British Pharmaceutical Conference (BPC)*, Manchester, England, # 78, **2008**.

142. Muschert, S; Siepmann, F; Leclercq, B; Carlin, B; Siepmann, J. Optimization of the curing conditions for aqueous ethylcellulose-based film coatings. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Atlanta, USA, # T1102, **2008**.

143. Seidenberger, T; Bley, H; Siepmann, F; Siepmann, J; Maeder, K. Simultaneous controlled release of multiple vitamins from sucrose ester-based tablets: How the sucrose ester type and content determine the release mechanisms. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Atlanta, USA, # T1456, **2008**.

144. Yang, QW; Flament, MP; Leclerc, B; Herry, C; Busignies, V; Siepmann, F; Tchoreloff, P; Siepmann, J. Importance of the type of plasticizer for drug release from pellets coated with aqueous ethylcellulose dispersion: Impact of the curing conditions. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Atlanta, USA, # T1457, **2008**.

145. Seidenberger, T; Bley, H; Metz, H; Siepmann, F; Siepmann, J; Maeder, K. Characterisation of sucrose ester matrices using benchtop NMR. *Controlled Release Society German Chapter Annual Meeting*, Halle, Germany, # 55, **2009**.

146. Hoang Thi, TH; Chai, F; Leprêtre, S; Siepmann, F; Siepmann, J; Hildebrand, HF; Martel, B; Flament, MP. Importance of the experimental conditions for drug release

EAGLEBEN-SA_00001800

measurements from bone implants. *2nd Pharmaceutical Sciences Fair (PharmSciFair)*, P-253, Nice, France, **2009**.

147.  Karrout, Y; Neut, C; Wils, D; Deremaux, L; Desreumaux, P; Flament, MP; Siepmann, F; Dubreuil, L; Siepmann, J. Site-specific drug delivery to the colon of IBD-patients. *2nd Pharmaceutical Sciences Fair (PharmSciFair)*, P-255, Nice, France, **2009**.

148.  Cuppok, Y; Muschert, S; Marucci, M; Hjaertstam, J; Siepmann, F; Axelsson, A; Siepmann, J. Kollicoat SR:Eudragit NE films for controlled drug delivery. *2nd Pharmaceutical Sciences Fair (PharmSciFair)*, #P-208, Nice, France, **2009**.

149.  Yang, QW; Flament, MP; Herry, C; Siepmann, F; Leclerc, B; Busignies, V; Tchoreloff, P; Guinet, Y; Paccou, L; Hedoux, A; Miri, V; Siepmann, J. Characterization of Film coatings using AFM and Raman microspectroscopy. *36th International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society*, Copenhagen, Denmark, Proceedings # 276, **2009**.

150.  Muschert, S; Siepmann, F; Leclercq, B; Carlin, B; Siepmann, J. Food effects on drug release from ethylcellulose:PVA-PEG graft copolymer coated pellets. *36th International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society*, Copenhagen, Denmark, Proceedings # 320, **2009**.

151.  Siepmann, F; Eckart, K; Maschke, A; Kolter, K; Siepmann, J. Modeling drug release from Kollidon® SR-based controlled release matrix tablets *36th International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society*, Copenhagen, Denmark, Proceedings # 348, **2009**.

152.  Karrout, Y; Neut, C; Wils, D; Deremaux, L; Flament, MP; Siepmann, F; Dubreuil, L; Desreumaux, P; Siepmann, J. Colon targeting adapted to the pathophysiology of inflammatory bowel disease patients. *36th International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society*, Copenhagen, Denmark, Proceedings # 278, **2009**.

153.  Muschert, S; Siepmann, F; Leclercq, B; Carlin, B; Siepmann, J. Drug release from ethylcellulose:PVA-PEG-graft-copolymer coated pellets under biorelevant conditions. *146th British Pharmaceutical Conference (BPC)*, Manchester, England, Proceedings # 56, **2009**.

154.  Karrout, Y; Neut, C; Wils, D; Deremaux, L; Desreumaux, P; Flament, MP; Siepmann, F; Dubreuil, L; Siepmann, J. Novel film coatings for site specific drug delivery to the colon of IBD-patients. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Los Angeles, USA, # W563, **2009**.

155.  Muschert, S; Cuppok, Y; Siepmann, F; Leclercq, B; Carlin, B; Siepmann, J. Dynamic curing of ethylcellulose:PVA-PEG graft copolymer coated pellets. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Los Angeles, USA, # W588, **2009**.

EAGLEBEN-SA_00001801

156. Karrout, Y; Neut, C; Wils, D; Deremaux, L; Flament, MP; Siepmann, F; Dubreuil, L; Desreumaux, P; Siepmann, J. Enzymatically activated coated multiparticulates for colon targeting. *7th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/ADRITELF/APV*, Valletta, Malta, Proceedings, **2010**.

157. Krenzlin, S; Hedoux, A; Paccou, L; Siepmann, F; Flament, MP; Siepmann, J. Conformational stability of L-lactate dehydrogenase during freeze drying and storage. *7th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/ADRITELF/APV*, Valletta, Malta, Proceedings, **2010**.

158. Muschert, S; Urbin, AL; Cabon, J; Flament, MP; Siepmann, F; Siepmann, J. Release of a weakly basic drug from pellets coated with PVAc:PVA-PEG graft copolymer. *7th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/ADRITELF/APV*, Valletta, Malta, Proceedings, **2010**.

159. Seidenberger T; Bley H; Siepmann, F; Maeder, K; Siepmann, J. Sucrose esters in melt extrusion and spheronisation processes. *7th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/ADRITELF/APV*, Valletta, Malta, Proceedings, **2010**.

160. Muschert, S; Siepmann, F; Leclercq, B; Siepmann, J. Dynamic curing of ethylcellulose:PVA-PEG graft copolymer coated pellets: Importance of the type of drug and starter core. *7th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/ADRITELF/APV*, Valletta, Malta, Proceedings, **2010**.

161. Karrout, Y; Blanchemain, N; Neut, C; Hildebrand, HF; Martel, B; Siepmann, J. Methyl beta cyclodextrin modified vascular prostheses as drug delivery systems: Importance of the coating level. *7th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/ADRITELF/APV*, Valletta, Malta, Proceedings, **2010**.

162. Karrout, Y; Blanchemain, N; Neut, C; Hildebrand, HF; Martel, B; Siepmann, J. Vascular prostheses with controlled ciprofloxacin release: Impact of the type of cyclodextrin. *7th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/ADRITELF/APV*, Valletta, Malta, Proceedings, **2010**.

163. Yang, QW; Flament, MP; Herry, C; Busignies-Goddins, V; Siepmann, F; Tchoreloff, P; Siepmann, J. Free polymeric films as surrogates for controlled release coatings: Impact of the curing conditions. *7th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/ADRITELF/APV*, Valletta, Malta, Proceedings, **2010**.

164. Jallouli, Y; Willart, JF; Descamps, M; Siepmann, J. Dissolution kinetics of a poorly soluble drug co-formulated with hydrophilic polymers: Impact of the type of preparation technique. *7th World Meeting on Pharmaceutics, Biopharmaceutics and*

EAGLEBEN-SA_00001802

*Curriculum Vitae*                                                                 *Prof. Juergen Siepmann*

*Pharmaceutical Technology-APGI/ADRITELF/APV*, Valletta, Malta, Proceedings, **2010**.

165. Blanchemain, N; Karrout, Y; Neut, C; Haulon, S; Siepmann, J; Martel, B; Hildebrand, HF. Control of ciprofloxacin release kinetics from vascular prosthesis coated with cyclodextrin. *Innovation in drug delivery: From preformulation to development through innovative evaluation process-ADRITELF/APGI*, Aix-en-Provence, France, Proceedings # 109, **2010**.

166. Karrout, Y; Brun, B; Siepmann, F; Rades, T; Siepmann, J. Importance of drug-polymer interactions in coated pellets. *Innovation in drug delivery: From preformulation to development through innovative evaluation process-ADRITELF/APGI*, Aix-en-Provence, France, Proceedings # 34, **2010**.

167. Krenzlin, S; Hedoux, A; Guinet, Y; Paccou, L; Flament, MP; Siepmann, F; Siepmann, J. PVP/trehalose blends for L-lactic dehydrogenase stabilization during freeze drying and long term storage. *Innovation in drug delivery: From preformulation to development through innovative evaluation process-ADRITELF/APGI*, Aix-en-Provence, France, Proceedings # 117, **2010**.

168. Krenzlin, S; Dutet, J; Hedoux, A; Guinet, Y; Paccou, L; Flament, MP; Siepmann, F; Siepmann, J. Lysozyme loaded lipid implants: How trehalose effectively preserves protein activity. *Innovation in drug delivery: From preformulation to development through innovative evaluation process-ADRITELF/APGI*, Aix-en-Provence, France, Proceedings # 188, **2010**.

169. Muschert, S; Coppin, AS; Siepmann, J. Drug release and calorimetric characterization of hot melt extrudates based on Soluplus: Impact of the type of drug. *Innovation in drug delivery: From preformulation to development through innovative evaluation process-ADRITELF/APGI*, Aix-en-Provence, France, Proceedings # 115, **2010**.

170. Delplace, C; Klose, D; Siepmann, J. Potential impact of perfect sink conditions on PLGA microparticle degradation. *Innovation in drug delivery: From preformulation to development through innovative evaluation process-ADRITELF/APGI*, Aix-en-Provence, France, Proceedings # 88, **2010**.

171. Muschert, S; Coppin, AS; Danede, F; Descamps, M; Siepmann, J. Hotmelt extrudates based on Soluplus: Physicochemical characterization and drug release patterns. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, New Orleans, USA, Proceedings #W 03874, **2010**.

172. Krenzlin, S; Siepmann, F; Vincent, C; Gnansia, D; Siepmann, J. Cochlear implant electrodes with time controlled dexamethasone release. *10th European Symposium on Paediatric Cochlear Implantation*, Athens, Greece, Proceedings # 57, **2011**.

173. Haaser, M; Cuppok, Y; Gordon, K; Pepper, M; Siepmann, J; Strachan, C; Taday, P; Rades, T. Coating quality analysis of sustained-release coated pellets using terahertz pulsed imaging. *AAPS Annual Meeting and Exposition, American Association of*

*Page 47 of 73*

EAGLEBEN-SA_00001803

*Pharmaceutical Scientists*, Washington, USA, # T0157, **2011**.

174. Cuppok, Y; Muschert, S; Leclercq, B; Siepmann, J. Aqueous ethylcellulose:PVA-PEG graft copolymer coatings for controlled release tablets. *AAPS Annual Meeting and Exposition*, *American Association of Pharmaceutical Scientists*, Washington, USA, # T0356, **2011**.

175. Muschert, S; Baillon, A; Maschke, A; Kolter, K; Siepmann, J; Siepmann, F. Prediction of drug release from PVAc/PVP-based matrix tablets: Importance of the type of drug. *AAPS Annual Meeting and Exposition*, *American Association of Pharmaceutical Scientists*, Washington, USA, # T0366, **2011**.

176. Krenzlin, S; Siepmann, F; Vincent, C; Gnansia, D; Siepmann, J. Drug release from dexamethasone loaded cochlear implants: Experiment and theory. *AAPS Annual Meeting and Exposition*, *American Association of Pharmaceutical Scientists*, Washington, USA, # W1203, **2011**.

177. Karrout, Y; Siepmann, J; Rades, T; Siepmann, F. How drug-polymer interactions can fundamentally alter drug release from coated pellets. *AAPS Annual Meeting and Exposition*, *American Association of Pharmaceutical Scientists*, Washington, USA, # W1205, **2011**.

178. Siepmann, F; Karrout, Y; Gehrke, M; Penz, F-K; Siepmann, J. Mathematical modeling of drug release from RetaLac®-based matrix tablets. *AAPS Annual Meeting and Exposition*, *American Association of Pharmaceutical Scientists*, Washington, USA, # W1209, **2011**.

179. Do, MP; Neut, C; Machado-Ribeiro, E; Boschin, F; Delcourt-Debruyne, E; Siepmann, J; Siepmann, F. In-situ forming, biodegradable implants for the treatment of periodontitis with improved bioadhesion. *AAPS Annual Meeting and Exposition*, *American Association of Pharmaceutical Scientists*, Washington, USA, # Tu2130, **2011**.

180. Delplace, C; Kreye, F; Klose, D; Degrave, N; Siepmann, F; Siepmann, J. Impact of the type of experimental setup on in vitro drug release from PLGA microparticles and lipid implants. *AAPS Annual Meeting and Exposition*, *American Association of Pharmaceutical Scientists*, Washington, USA, # Tu2235, **2011**.

181. Muschert, S; Marucci, M; Siepmann, F; Cuppok, Y; Degeuser, J; Delbarre, J; Hjaertstam, J; Axelsson, A; Siepmann, J. Drug release mechanisms from pellets coated with poly(vinylacetate):poly(ethylacrylate-methylacrylate) blends. *AAPS Annual Meeting and Exposition*, *American Association of Pharmaceutical Scientists*, Washington, USA, # Tu2356, **2011**.

182. Do, MP; Neut, C; Machado-Ribeiro, E; Boschin, F; Delcourt-Debruyne, E; Siepmann, J; Siepmann, F. In-situ forming implants for periodontitis treatment: How to improve Bioadhesion and adjust desired release kinetics. *8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Istanbul, Turkey, Proceedings #

EAGLEBEN-SA_00001804

25, **2012.**

183. Delplace, C; Siepmann, F; Danede, F; Siepmann, J. Impact of the experimental setup on drug release from PLGA microparticles loaded with prilocaine and dexamethasone. *8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Istanbul, Turkey, Proceedings # 38, **2012.**

184. Karrout, Y; Hawley, J; Siepmann, F; Wils, D; Dubreuil, L; Desreumaux, P; Siepmann, J; Neut, C. In vitro test for colon targeting: Intestinal bacteria can induce 5-ASA free set from polysaccharide-coated pellets. *8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Istanbul, Turkey, Proceedings # 165, **2012.**

185. Kreye, F; Hamm, G; Karrout, Y; Velghe, C; Legouffe, R; Bonnel, D; Siepmann, F; Siepmann, J. MALDI-TOF MS imaging of controlled release implants. *8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Istanbul, Turkey, Proceedings # 166, **2012.**

186. Karrout, Y; Siepmann, F; Flament, MP; Moussa, E; Penz, FK; Siepmann, J. HPMC-lactose mixtures as matrix formers in controlled release tablets: Physical mixtures vs. co-processed blends. *8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Istanbul, Turkey, Proceedings # 167, **2012.**

187. Krenzlin, S; Vincent, C; Munzke, L; Gnansia, D; Siepmann, J; Siepmann, F. Predictability of drug release from miniaturized implants. *8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Istanbul, Turkey, Proceedings # 222, **2012.**

188. Mahieu, A; Willart, JF; Dudognon, E; Gue, E; Muschert, S; Siepmann, J; Descamps, M. A new method to explore the solubility diagram of drug/polymer molecular dispersions. *8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Istanbul, Turkey, Proceedings # 310, **2012.**

189. Haaser, M; Karrout, Y; Velghe, C; Cuppok, Y; Gordon, KC; Pepper, M; Siepmann, J; Strachan, CJ; Taday, PF; Rades, T. Application of terahertz pulsed imaging to asses the film coating characteristics of sustained-release coated pellets. *8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Istanbul, Turkey, Proceedings # 426, **2012.**

190. Karrout, Y; Blanchemain, N; Hildebrand, HF; Martel, B; Siepmann, J. Drug eluting prostheses coated with polymerized cyclodextrins: Effects of the in vitro release conditions. *8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Istanbul, Turkey, Proceedings # 557, **2012.**

191. Velghe, C; Karrout, Y; Krenzlin, S; Guinet, Y; Paccou, L; Flament, MP; Hedoux, A; Siepmann, J. Impact of trehalose addition to lysozyme-loaded, lipid implants. *8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Istanbul, Turkey, Proceedings # 701, **2012.**

EAGLEBEN-SA_00001805

192. Muschert, S; Lindner, L; Urbin, AL; Goossens, JF; Siepmann, J. Fluometric monitoring of pH changes inside coated pellets containing verapamil HCl. *8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology,* Istanbul, Turkey, Proceedings # 702, **2012.**

193. Gue, E; Mahieu, A; Claeys, B; Muschert, S; Willart, JF; Dudognon, E; Descamps, M; Vervaet, C; Siepmann, J. The role of plasticizers in hot melt extrudates for poorly soluble drugs. *8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology,* Istanbul, Turkey, Proceedings # 865, **2012.**

194. Haaser, M; Karrout, Y; Velghe, C; Cuppok, Y; Gordon, KC; Pepper, M; Siepmann, J; Strachan, CJ; Taday, PF; Rades, T. Evaluating critical film coating characteristics of sustained-release coated pellets with different size using terahertz pulsed imaging. *12nd Electronic Conference on Pharmaceutical Sciences (ECPS),* **2012.**

195. Bonnel, D; Kreye, F; Hamm, G; Karrout, Y; Legouffe, R; Siepmann, F; Siepmann, J; Stauber, J. Utility of mass spectrometry imaging of drug delivery systems. *60th ASMS Conference on Mass Spectrometry and Allied Topics (ASMS = American Society For Mass Spectrometry),* Vancouver, Canada, Proceedings # 2058, **2012.**

196. Karrout, Y; Dubuquoy, L; Neut, C; Siepmann, F; Wils, D; Dubreuil, D; Desreumaux, P; Siepmann, J. In vivo efficacy of microflora sensitive polysaccharide-based film coatings for colon targeting: a promising tool for IBD therapy. Digestive Disease Week, San Diego, USA, *Gastroenterology* 142, Issue 5, Supplement 1, S-719, **2012.**

197. Siepmann, F; Karrout, Y; Gehrke, M; Penz, KF; Siepmann, J. Modeling drug release from RetaLac® tablets: Impact of drug solubility. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists,* Chicago, USA, Proceedings, **2012.**

198. Delplace, C; Thillaye du Boullay, O; Siepmann, F; Martin-Vaca, B; Demonchaux, P; Jentzer, O; Danède, F; Descamps, M; Siepmann, J; Bourissou, D. Novel PLGAs with carboxyl-functionalized side chains for controlled drug delivery. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists,* Chicago, USA, Proceedings, **2012.**

199. Delplace, C; Thillaye du Boullay, O; Siepmann, F; Martin-Vaca, B; Demonchaux, P; Jentzer, O; Danède, F; Descamps, M; Bourissou, D; Siepmann, J. Encapsulation of the fragile drug apomorphine within PLGA-based microparticles. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists,* Chicago, USA, Proceedings, **2012.**

200. Flores, C; Blanchemain, N; Hornez, JC; Chai, F; Raoult, G; Martel, B; Siepmann, J; Ferri, J; Hildebrand, HF. Macroporous hydroxyapatite scaffolds for the prolonged release of drugs. *25th European Conference on Biomaterials,* Madrid, Spain, Proceedings, **2013.**

EAGLEBEN-SA_00001806

201. Cuppok, Y; Muschert, S; Chokshi, R; Leclercq, B; Siepmann, F; Siepmann, J. Ethanol-resistant polymeric film coatings for controlled drug delivery. *40th International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society,* Honolulu, USA, Proceedings, **2013**.

202. Flores, C; Hornez, JC; Chai, F; Raoul, G; Hildebrand, HF; Martel, B; Siepmann, J; Ferri, J; Blanchemain, N. Controlled release gentamicin microparticles for macroporous bioceramics. *3rd Conference Innovation in drug delivery: Advances in Local Drug Delivery - ADRITELF/APGI,* Pisa, Italy, Proceedings, **2013**.

203. Nieto, S; Siepmann, F; Siepmann, J; Neut, C. Towards colon targeting of a new broad-spectrum antibacterial agent. *3rd Conference Innovation in drug delivery: Advances in Local Drug Delivery - ADRITELF/APGI,* Pisa, Italy, Proceedings, **2013**.

204. Gehrke, M; Vincent, C; Siepmann, J; Siepmann, F. How to adjust desired drug release kinetics from cochlear implants. *3rd Conference Innovation in drug delivery: Advances in Local Drug Delivery - ADRITELF/APGI,* Pisa, Italy, Proceedings, **2013**.

205. Dekyndt, B; Neut, C; Karrout, Y; Siepmann, F; Siepmann, J. Towards a more realistic in vitro test for colon targeting. *3rd Conference Innovation in drug delivery: Advances in Local Drug Delivery - ADRITELF/APGI,* Pisa, Italy, Proceedings, **2013**.

206. Velghe, C; Rosiaux, Y; Marchaud, D; Siepmann, J; Siepmann, F. Compritol 888-based matrix tablets for controlled drug release: How to predict the effects of formulation parameters. *3rd Conference Innovation in drug delivery: Advances in Local Drug Delivery - ADRITELF/APGI,* Pisa, Italy, Proceedings, **2013**.

207. Do, M; Metz, H; Siepmann, J; Maeder, K; Siepmann, F. Monitoring the formation of PLGA-based in-situ forming implants by EPR and 1H-NMR. *3rd Conference Innovation in drug delivery: Advances in Local Drug Delivery - ADRITELF/APGI,* Pisa, Italy, Proceedings, **2013**.

208. Do, M; Neut, C; Delcourt-Debruyne, E; Siepmann, J; Siepmann, F. PLGA-based in-situ forming implants for periotdontitis treatment: Impact of HPMC addition by EPR and 1H-NMR. *3rd Conference Innovation in drug delivery: Advances in Local Drug Delivery - ADRITELF/APGI,* Pisa, Italy, Proceedings, **2013**.

209. Gue, E; Willart, JF; Muschert, S; Danede, F; Delcourt, E; Descamps, M; Siepmann, J. Eudragit E-based matrices for accelerated ketoprofen release in acidic media. *3rd Conference Innovation in drug delivery: Advances in Local Drug Delivery - ADRITELF/APGI,* Pisa, Italy, Proceedings, **2013**.

210. Gasmi, H; Siepmann, J; Siepmann, F. What determines whether drug release from PLGA microparticles is mono-, di-, or trip-phasic? *3rd Conference Innovation in drug delivery: Advances in Local Drug Delivery - ADRITELF/APGI,* Pisa, Italy, Proceedings, **2013**.

211. Gue, E; Muschert, S; Willart, JF; Danede, F; Delcourt, E; Descamps, M; Siepmann, J.

EAGLEBEN-SA_00001807

Ketoprofen hot-melt extrudates with accelerated drug release in 0.1 N HCl. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, San Antonio, USA, Proceedings, **2013**.

212. Siepmann, J; Karrout, Y; Gehrke, M; Penz, F; Siepmann, J. A simple mathematical model allowing for the prediction of drug release from HPMC/lactose-based controlled release matrix tablets. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, San Antonio, USA, Proceedings, **2013**.

213. Rosiaux, Y; Velghe, C; Muschert, S; Chokshi, R; Leclercq, B; Siepmann, F; Siepmann, J. Ethanol-resistant ethylcellulose:guar gum coatings: Importance of the formulation parameters. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, San Antonio, USA, Proceedings, **2013**.

214. Rosiaux, Y; Velghe, C; Muschert, S; Chokshi, R; Leclercq, B; Siepmann, F; Siepmann, J. Drug release mechanisms from ethanol-resistant coated pellets. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, San Antonio, USA, Proceedings, **2013**.

215. Velghe, C; Rosiaux, Y; Marchaud, D; Siepmann, J; Siepmann, F. In-silico simulation of vitamin release from Compritol 888-based matrices. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, San Antonio, USA, Proceedings, **2013**.

216. Gasmi, H; Siepmann, J; Siepmann, F. How does the drug loading affect the key properties of prilocaine-PLGA microparticles? *9th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Lisbon, Portugal, Proceedings, **2014**.

217. Nieto, M; Siepmann, F; Djouina, M; Dubuquoy, L; Siepmann, J; Neut, C. A new broad-spectrum antibacterial formulation for colitis treatment. *9th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Lisbon, Portugal, Proceedings, **2014**.

218. Dekyndt, B; Karrout, Y; Siepmann, F; Siepmann, J; Neut, C. Colon targeting triggered by bacterial enzymes and unaffected by antibiotic treatments. *9th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Lisbon, Portugal, Proceedings, **2014**.

219. Velghe, C; Fahier, J; Muschert, S; Ward, R; Djemai, A; Siepmann, F; Siepmann, J. Mathematical modeling of drug release from Kollicoat SR coated pellets. *9th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Lisbon, Portugal, Proceedings, **2014**.

220. Velghe, C; Rosiaux, Y; Marchaud, D; Siepmann, J; Siepmann, F. Predicting vitamin release from lipid tablets with simple and complex mathematical models. *9th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Lisbon, Portugal, Proceedings, **2014**.

EAGLEBEN-SA_00001808

221. Do, M; Siepmann, F; Delcourt-Debruyne, E; Siepmann, J;Neut, C. Minocycline-containing in-situ forming implants for the treatment of periodontitis: a microbiological evaluation. *9th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Lisbon, Portugal, Proceedings, **2014**.

222. Gue, E; Muschert, S; Willart, JF; Danede, F; Delcourt, E; Descamps, M; Siepmann, J. Accelerated ketoprofen release from spray-dried polymeric particles. *9th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Lisbon, Portugal, Proceedings, **2014**.

223. Gue, E; Muschert, S; Willart, JF; Danede, F; Delcourt, E; Descamps, M; Siepmann, J. Accelerated fenofibrate release from spray-dried microparticles based on polymer blends. *9th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Lisbon, Portugal, Proceedings, **2014**.

224. Fahier, J; Goossens, J; Siepmann, J; Muschert, S. Non-invasive monitoring of the pH in coated pellets. *9th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Lisbon, Portugal, Proceedings, **2014**.

225. Mannina, P; Segale, L; Giovannelli, L; Muschert, S; Siepmann, J; Pattarino, F. Alginate pellets for the modulated release of ibuprofen. *9th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Lisbon, Portugal, Proceedings, **2014**.

226. Chen, Y; Do, M; Li, Q; Siepmann, J; Siepmann, F. Modeling stochastic hydrolysis and mass transport in PLGA films and microparticles. *9th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Lisbon, Portugal, Proceedings, **2014**.

227. Gehrke, M; Vincent, C; Siepmann, J; Siepmann, F. How dexamethasone release can be adjusted from silicone matrices. *9th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Lisbon, Portugal, Proceedings, **2014**.

228. Rongthong, T; Sungthongjeen, S; Siepmann, F; Siepmann, J; Pongjanyakul, T. Investigation of water uptake and drug release of Eudragit - Magnesium Aluminum Silicate coated tablets. *9th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Lisbon, Portugal, Proceedings, **2014**.

229. Pongjanyakul, T; Sungthongjeen, S; Siepmann, J; Rongthong, T. Quaternary polymethacrylate Magnesium Aluminum Silicate films: Tackiness and drug permeability. *9th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Lisbon, Portugal, Proceedings, **2014**.

230. Gehrke, M; Vincent, C; Siepmann, J; Siepmann, F. How dexamethasone release can be adjusted from silicone matrices. *1st International AMPTEC Conference (Advanced Materials and Pharmaceutical Technologies)*, Lille, France, **2014.**

EAGLEBEN-SA_00001809

231. Cantin, O; Siepmann, F; Karrout, Y; Siepmann, J. The importance of HME parameters in the development of PEO extrudates with various molecular weights. *1st International AMPTEC Conference (Advanced Materials and Pharmaceutical Technologies)*, Lille, France, **2014.**

232. Velghe, C; Fahier, J; Muschert, S; Ward, R; Djemai, A; Siepmann, F; Siepmann, J. Mathematical modeling of drug release from Kollicoat SR coated pellets. *1st International AMPTEC Conference (Advanced Materials and Pharmaceutical Technologies)*, Lille, France, **2014.**

233. Gue, E; Willart, JF; Muschert, S; Danede, F, Descamps, M; Delcourt-Debruyne, E; Siepmann, J. Eudragit® E-Based Matrices for Accelerated Ketoprofen Release in Acidic Media. *1st International AMPTEC Conference (Advanced Materials and Pharmaceutical Technologies)*, Lille, France, **2014.**

234. Hamoudi, M; Pattacholi, R; Debraize, C; Siepmann, J. Controlled release implants prepared by compression of spray-dried PLGA/water-soluble polymer microparticles. *1st European Conference on Pharmaceutics*, Reims, France, **2015**.

235. Hecq, J; Siepmann, F; Siepmann, J; Amighi, K; Goole, J; Development, evaluation and mathematical modeling of insulin release from chitosan and chitosan derivatives nanoparticles. *1st European Conference on Pharmaceutics*, Reims, France, **2015**.

236. Cantin, O; Siepmann, F; Danede, F; Karrout, Y; Siepmann, J. Drug release from PEO-hot melt extrudates: impact of the drug loading. *1st European Conference on Pharmaceutics*, Reims, France, **2015**.

237. Muschert, S; Siepmann, F, Rosiaux, Y; Axelsson, A; Siepmann, J; Factors shaping the release profile from film coated pellets controlling drug release through cracks. *1st European Conference on Pharmaceutics*, Reims, France, **2015**.

238. Cantin, O; Siepmann, F; Karrout, Y; Siepmann, J. Hot melt extrusion can provide more robust drug release from PEO matrices than direct compression. *1st European Conference on Pharmaceutics*, Reims, France, **2015**.

239. Dekyndt, B; Verin, J; Neut, C; Siepmann, F; Siepmann, J; How to easily provide zero order release of freely soluble drugs from coated pellets. *1st European Conference on Pharmaceutics*, Reims, France, **2015**.

240. Gehrke, M; Sircoglou, J; Vincent, C; Siepmann, J; Siepmann, F. Importance of diffusion and limited drug solubility in silicone matrices for cochlear implants. *1st European Conference on Pharmaceutics*, Reims, France, **2015**.

241. Kriangkrai, W; Puttipipatkhachorn, S; Sriamornsak, P; Siepmann, F; Siepmann, J; Sungthongjeen, S. Low density floating matrix tablets prepared by hot melt extrusion. *1st European Conference on Pharmaceutics*, Reims, France, **2015**.

EAGLEBEN-SA_00001810

242. Gasmi, H; Siepmann, J; Siepmann, F. Monitoring of size changes of single PLGA-microparticles and comparison with drug release. *1st European Conference on Pharmaceutics*, Reims, France, **2015**.

243. Nieto Bobadilla, MS; Siepmann, F; Djouina, M; Dubuquoy, L; Dubreuil, L; Siepmann, J; Neut, C. Sustained release formulations for a new broad-spectrum antibacterial agent against colitis. *1st European Conference on Pharmaceutics*, Reims, France, **2015**.

244. Fahier, J; Velghe, C; Muschert, S; Byrne, G; Siepmann, F; Siepmann, J. Why increasing drug loadings might lead to faster drug release from Kollicoat SR coated pellets. *1st European Conference on Pharmaceutics*, Reims, France, **2015**.

245. Fahier, J; Velghe, C; Muschert, S; Byrne, G; Siepmann, F; Siepmann, J. Why sugar cores might lead to slower drug release from coated pellets compared to MCC cores. *1st European Conference on Pharmaceutics*, Reims, France, **2015**.

246. Fahier, J; Muschert, S; Byrne, G; Willart, JF; Siepmann, F; Siepmann, J. Importance of osmotic effects for the control of drug release from Kollicoat SR coated pellets. *42th International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society*, Edinburgh, Scotland, **2015**.

247. Hoang Thi, TH; Priemel, P; Karrout, Y; Driss, V; Flament, MP; Capron, M; Siepmann, J. A novel preventive colitis treatment with P28GST-loaded PLGA microparticles (s.c.). *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Orlando, USA, Proceedings, **2015**.

248. Muschert, S; Christmann, L; Maschke, A; Kolter, K; Siepmann, J; Siepmann, F. Predicting the release of a sparingly soluble drug from Kollidon® SR matrix tablets: Theory and experiment. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Orlando, USA, Proceedings, **2015**.

249. Siepmann, F; Vynckier, AK; Vervaet, C; Remon, JP; Siepmann, J. Computer simulations: How the design of CR tablets affects the drug plasma profiles - theory and experiments. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Orlando, USA, Proceedings, **2015**.

250. Siepmann, F; Karrout, Y; Gehrke, M; Penz, F; Siepmann, J. Even in the case of freely water-soluble drugs limited solubility effects can play a major role in the control of drug release from HPMC tablets. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Orlando, USA, Proceedings, **2015**.

251. Siepmann, F; Karrout, Y; Gehrke, M; Moussa, E; Penz, F; Siepmann, J. Computer-aided design of controlled release HPMC:lactose-based tablets. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Orlando, USA, Proceedings, **2015**.

252. Vukosavljevic, B; De Kinder, L; Siepmann, J; Muschert, S; Windbergs, M. Combining confocal Raman microscopy and optical profilometry for analysis of coated pellets.

EAGLEBEN-SA_00001811

*AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Orlando, USA, Proceedings, **2015**.

253. Vukosavljevic, B; De Kinder, L; Siepmann, J; Gossens, JF; Windbergs, M; Muschert, S. Raman spectroscopy and fluorescence spectrophotometry as efficient tools to study drug release from coated pellets. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Orlando, USA, Proceedings, **2015**.

254. Vervaeck, A; Monteyne, T; Vercruysse, J; Siepmann, F; Boone, M; Van Hoorebeke, L; De Beer, T; Siepmann, J; Remon, JP; Vervaet, C. Fatty acids for controlled release applications: a comparison between prilling and solid lipid extrusion as manufacturing techniques. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Orlando, USA, Proceedings, **2015**.

255. Fahier, J; Muschert, S; Fayard, B; Byrne, G; Doucet, J; Siepmann, F; Siepmann, J. Synchrotron radiation based X-Ray microtomography reveals that air bubbles in the cores of coated pellets might play a decisive role for the control of drug release. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Orlando, USA, Proceedings, **2015**.

256. Hamoudi,MC; Tran Tan, V; Danede, F; Siepmann, J. PLGA-PEG and PLGA-Poloxamer implants for controlled drug delivery. *10th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Glasgow, UK, Proceedings, **2016**.

257. Fahier, J; Muschert, S; Byrne, G; Siepmann, F; Siepmann, J. Coated pellets for controlled drug delivery: How the starter core material might affect drug solubility and release. *10th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Glasgow, UK, Proceedings, **2016**.

258. Priemel, P; Hoang Thi, TH; Sarazin, A; Driss, V; Delbeke, M; Dendooven, A; Siepmann, J; Capron, M; Karrout, Y. A New Colitis Treatment: Microparticles loaded with the parasite enzyme P28 for Oral Colon Delivery. *10th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Glasgow, UK, Proceedings, **2016**.

259. Cantin, O; Siepmann, F; Siepmann, J; Karrout, Y. Robustness of drug release from PEO-based hot-melt-extrudates. *10th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Glasgow, UK, Proceedings, **2016**.

260. Cantin, O; Siepmann, F; Karrout, Y; Siepmann, J. How is drug release controlled from PEO hot-melt-extrudates? *10th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Glasgow, UK, Proceedings, **2016**.

261. Kriangkrai, W; Puttipipatkhachorn, S; Sriamornsak, P; Siepmann, F; Siepmann, J; Sungthongjeen, S. Floating matrix tablets prepared by HME: Importance of the type and amount of foam powder. *10th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Glasgow, UK, Proceedings, **2016**.

EAGLEBEN-SA_00001812

262. Krupa, A; Cantin, O; Siepmann, J; Jachowicz, R. HME and supercritical carbon dioxide impregnation as co-processing methods to improve the dissolution of tadalafil. *10th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Glasgow, UK, Proceedings, **2016**.

263. Sircoglou, J; Gehrke, M; Tardivel, M; Siepmann, F; Siepmann, J;Vincent, C. In-situ forming trans-oval-window implants for controlled drug delivery to the inner ear. *10th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Glasgow, UK, Proceedings, **2016**.

264. Gehrke, M; Verin, J; Gnansia, D; Tourrel, G; Vincent, C; Siepmann, J; Siepmann, F. Hybrid Ear Cubes for controlled dexamethasone delivery to the inner ear. *10th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Glasgow, UK, Proceedings, **2016**.

265. Gehrke, M; Verin, J; Gnansia, D; Tourrel, G; Vincent, C; Siepmann, J; Siepmann, F. Ear Cubes: A new approach for local controlled drug delivery to the inner ear. *10th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Glasgow, UK, Proceedings, **2016**.

266. Rongthong, T; Siepmann, J; Siepmann, F. In-situ forming implants containing drug-loaded microparticles for periodontitis treatment. *10th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Glasgow, UK, Proceedings, **2016**.

267. Rongthong, T; Siepmann, J; Siepmann, F. Chlorhexidine-loaded, in-situ forming implants for periodontitis treatment: Importance of the drug form. *10th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Glasgow, UK, Proceedings, **2016**.

268. Khlibsuwan, R; Siepmann, F; Siepmann, J; Pongjanyakul, T. Chitosan microparticles for controlled drug delivery: Effects of the addition of magnesium aluminum silicate and cross-linking. *10th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Glasgow, UK, Proceedings, **2016**.

269. Bode, C; Kranz, H; Siepmann, F; Siepmann, J. In-situ forming implants for intraocular administration: How is drug release affected? *4th Conference on Innovation in drug delivery: Site-Specific Drug Delivery - ADRITELF/APGI*, Antibes-Juan-Les-Pins, France, Proceedings, **2016**.

270. Gehrke, M; Sircoglou, J; Gnansia, D; Tourrel, G; Willart, JF; Danede, F; Lacante, E; Vincent, C; Siepmann, F; Siepmann, J. Characterization of *Ear Cubes* for local controlled dexamethasone delivery to the inner ear. *4th Conference on Innovation in drug delivery: Site-Specific Drug Delivery - ADRITELF/APGI*, Antibes-Juan-Les-Pins, France, Proceedings, **2016**.

271. Gehrke, M; Verin, J; Gnansia, D; Tourrel, G; Vincent, C; Siepmann, F; Siepmann, J.

EAGLEBEN-SA_00001813

Characterization of *Hybrid Ear Cubes* for local controlled dexamethasone delivery to the inner ear. *4th Conference on Innovation in drug delivery: Site-Specific Drug Delivery - ADRITELF/APGI*, Antibes-Juan-Les-Pins, France, Proceedings, **2016**.

272. Gehrke, M; Vincent, C; Gnansia, D; Tourrel, G; Lacante, E; Siepmann, F; Siepmann, J. *Ear Cubes* loaded with gentamicin for controlled drug delivery to the inner ear. *4th Conference on Innovation in drug delivery: Site-Specific Drug Delivery - ADRITELF/APGI*, Antibes-Juan-Les-Pins, France, Proceedings, **2016**.

273. Casati, F; Karrout, Y; Siepmann, F; Siepmann, J; Zema, L; Gazzaniga, A. Injection-molded capsules for colon targeting: Combining a time-controlled and an enzyme-triggered approach. *4th Conference on Innovation in drug delivery: Site-Specific Drug Delivery - ADRITELF/APGI*, Antibes-Juan-Les-Pins, France, Proceedings, **2016**.

274. Xue, J; Florin, H; Siepmann, J; Muschert, S. How to easily adjust drug release kinetics from hot-melt extrudates based on polymer blends. *4th Conference on Innovation in drug delivery: Site-Specific Drug Delivery - ADRITELF/APGI*, Antibes-Juan-Les-Pins, France, Proceedings, **2016**.

275. Agossa, K; Delcourt-Debruyne, E; Rongthong, T; Lizambard, M; Siepmann, J; Siepmann, F. Textural properties and bioadhesion of novel in-situ forming implants for periodontitis treatment. *4th Conference on Innovation in drug delivery: Site-Specific Drug Delivery - ADRITELF/APGI*, Antibes-Juan-Les-Pins, France, Proceedings, **2016**.

276. Rongthong; T; Lizambard, M; Siepmann, J; Siepmann, F. Novel in-situ forming implants loaded with antiseptic and anti-inflammatory drugs for periodontitis treatment. *4th Conference on Innovation in drug delivery: Site-Specific Drug Delivery - ADRITELF/APGI*, Antibes-Juan-Les-Pins, France, Proceedings, **2016**.

277. Cantin, O; Siepmann, F; Siepmann, J; Karrout, Y. How is ibuprofen release controlled from PEO hot-melt extrudates? *4th Conference on Innovation in drug delivery: Site-Specific Drug Delivery - ADRITELF/APGI*, Antibes-Juan-Les-Pins, France, Proceedings, **2016**.

278. Hamoudi-Ben Yelles, M; Tran Tan, V; Danede, F; Siepmann, J. Controlled release implants based on polymer blends: Impact of the type of preparation method. *4th Conference on Innovation in drug delivery: Site-Specific Drug Delivery - ADRITELF/APGI*, Antibes-Juan-Les-Pins, France, Proceedings, **2016**.

279. Hamoudi-Ben Yelles, M; Gaudy, R; Benayad, I; Siepmann, J. PLGA microparticles and implants containing PEO or Poloxamer. *2nd European Conference on Pharmaceutics*, Krakow, Poland, Proceedings, **2017**.

280. Treesinchai, S; Puttipipatkhachorn, S; Pitaksuteepong, T; Siepmann, J; Siepmann, F; Sungthongjeen, S. Floating matrix tablets based on low density foam powder loaded with curcumin. *2nd European Conference on Pharmaceutics*, Krakow, Poland, Proceedings, **2017**.

EAGLEBEN-SA_00001814

281. Rongthong, T; Lizambard, M; Siepmann, J; Siepmann, F. Chlorhexidine-loaded, in-situ forming PLGA implants for periodontitis treatment: Importance of the type of salt and loading. *2nd European Conference on Pharmaceutics*, Krakow, Poland, Proceedings, **2017**.

282. Rongthong, T; Siepmann, J; Siepmann, F. Ibuprofen-loaded PCL/PLGA microparticles for local anti-inflammatory periodontitis treatment. *2nd European Conference on Pharmaceutics*, Krakow, Poland, Proceedings, **2017**.

283. Rongthong, T; Siepmann, J; Siepmann, F. In-situ forming implants for dual local periodontitis treatment with antimicrobial and anti-inflammatory drugs. *2nd European Conference on Pharmaceutics*, Krakow, Poland, Proceedings, **2017**.

284. Marcato, E; Cantin, O; Siepmann, F; Danede, F; Willart, JF; Siepmann, J; Karrout, Y. How can PEO hot-melt extrudates control metoprolol release in vitro? *2nd European Conference on Pharmaceutics*, Krakow, Poland, Proceedings, **2017**.

285. Bode, C; Kranz, H; Siepmann, F; Siepmann, J. How the importance of autocatalysis can be triggered in in-situ forming PLGA implants. *2nd European Conference on Pharmaceutics*, Krakow, Poland, Proceedings, **2017**.

286. Bode, C; Kranz, H; Siepmann, F; Siepmann, J. In-situ forming PLGA implants based on solvent exchange: How important is the administration technique? *2nd European Conference on Pharmaceutics*, Krakow, Poland, Proceedings, **2017**.

287. Bode, C; Kranz, H; Siepmann, F; Siepmann, J. Hollow, in-situ forming PLGA implants for intraocular drug delivery. *2nd European Conference on Pharmaceutics*, Krakow, Poland, Proceedings, **2017**.

288. Fahier, J; Benzine, Y; Muschert, S; Siepmann, F; Siepmann, J. Predicting drug release from Aquacoat ECD:Eudragit NM-coated pellets. *2nd European Conference on Pharmaceutics*, Krakow, Poland, Proceedings, **2017**.

289. Agossa, K; Delepierre, A; Pawlak, G; Lizambard, M; Delcourt-Debuyne, E; Siepmann, J; Siepmann, F; Neut, C. Antimicrobial activity of novel in-situ forming implants for periodontitis treatment. *11th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Granada, Spain, Proceedings, **2018**.

290. Lizambard, M; Menu, T; Siepmann, J; Siepmann, F. Chlorhexidine/ibuprofen-loaded, in-situ forming implants for periodontitis treatment: Chlorhexidine diHCl vs. digluconate. *11th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Granada, Spain, Proceedings, **2018**.

291. Lizambard, M; Menu, T; Siepmann, J; Siepmann, F. Chlorhexidine/ibuprofen-loaded, in-situ forming implants for periodontitis treatment: Ibuprofen free acid vs. ibuprofen lysinate. *11th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Granada, Spain, Proceedings, **2018**.

EAGLEBEN-SA_00001815

292. Gehrke, M; Rongthong, T; Tourrel, G; Gnansia, D; Oliveira, P; Willart, JF; Paccou, L; Guinet, Y; Hedoux, A; Vincent, C; Siepmann, F; Siepmann, J. Homogeneity, drug release and swelling of dexamethasone loaded cochlear implants. *11th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Granada, Spain, Proceedings, **2018**.

293. Benzine, Y; Siepmann, F; Siepmann, J; Karrout, Y. Hot melt extrudates for colon targeting. *11th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Granada, Spain, Proceedings, **2018**.

294. Hamoudi, M; Benayad, I; Coupin, B; Siepmann, J. Ibuprofen-loaded PLGA microparticles: Impact of the drug loading. *11th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Granada, Spain, Proceedings, **2018**.

295. Agossa, K; Antunes, D; Lizambard, M; Delcourt-Debuyne, E; Siepmann, J; Siepmann, F. In-situ forming implants for periodontitis treatment: How the drug loading & form affect the mechanical properties. *11th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Granada, Spain, Proceedings, **2018**.

296. Bode, C; Kranz, H; Siepmann, F; Siepmann, J. In-situ forming PLGA implants for intraocular drug delivery: Effects of additives. *11th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Granada, Spain, Proceedings, **2018**.

297. Bode, C; Kranz, H; Siepmann, F; Siepmann, J. PLGA extrudates for intraocular dexamethasone delivery providing constant release during adjustable time periods. *11th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Granada, Spain, Proceedings, **2018**.

298. Bode, C; Kranz, H; Siepmann, F; Siepmann, J. Towards a better understanding of in-situ forming intraocular PLGA implants using dyes for imaging. *11th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Granada, Spain, Proceedings, **2018**.

299. Poncelet, L; Lizambard, M; Siepmann, F; Siepmann, J; Ait-Belkacem, R; Stauber, J. Quantitative Mass Spectrometry Imaging to monitor drug transport from an in situ forming implant. *11th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Granada, Spain, Proceedings, **2018**.

300. Rongthong, T; Gehrke, M; Oliveira, P; Danede, F; Willart, JF; Vincent, C; Siepmann, F; Siepmann, J. Silicone matrices for controlled drug delivery to the inner ear: Effects of the drug form and agglomerates. *11th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Granada, Spain, Proceedings, **2018**.

301. Tamani, F; Hamoudi-Ben Yelles, M; Siepmann, F; Siepmann, J. Towards a better

EAGLEBEN-SA_00001816

understanding of the drug release mechanisms in PLGA microparticles: The case of caffeine. *11ᵗʰ World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology,* Granada, Spain, Proceedings, **2018**.

302. Tamani, F; Hamoudi-Ben Yelles, M; Siepmann, F; Siepmann, J. Drug release from single PLGA microparticles. *11ᵗʰ World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology,* Granada, Spain, Proceedings, **2018**.

EAGLEBEN-SA_00001817

# Oral Presentations

1.  Siepmann, J. Modeling drug release from purely diffusion-controlled delivery systems. *Erasmus Intensive course* "Microparticle design and physicochemical characterization", Angers, France, **1996**.

2.  Siepmann, J. Experimental determination of drug diffusion coefficients using thin, polymeric films. *Université Jean Monnet*, Saint-Etienne, France, **1997**.

3.  Siepmann, J. Modeling plasticizer uptake in aqueous polymer dispersions. *Erasmus Intensive course* "Liposome technology and applications in therapeutics", Patras, Greece, **1997**.

4.  Siepmann, J. Modeling drug release from highly swellable, controlled drug delivery systems. *Purdue University*, West Lafayette, USA, **1998**.

5.  Ainaoui, A; Siepmann, J; Bodmeier, R; Vergnaud, JM. Calculation of the dimensions of dosage forms with controlled release for in vivo objective. *2nd World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Paris, France, Proceedings pp. 267-268, **1998**.

6.  Siepmann, J; Ainaoui, A; Vergnaud, JM; Bodmeier, R. Computer-aided design of diffusion-controlled drug delivery systems. *2nd World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Paris, France, Proceedings pp. 269-270, **1998**.

7.  Siepmann, J. Mathematical modeling of controlled drug delivery systems: Elucidation of transport mechanisms and prediction of release kinetics. *University of Iowa*, Iowa City, USA, **1998**.

8.  Siepmann, J. Oral controlled drug delivery systems: Transport mechanisms and optimization of drug release patterns. *Université d'Angers*, Angers, France, **1998**.

9.  Siepmann, J. Controlled drug delivery systems: Elucidation of release mechanisms. *Marie Curie Fellowship Association Meeting 2000*, Paris, France, **2000**.

10. Siepmann, J; Kranz, H; Peppas, NA; Bodmeier, R. Calculation of the required size and shape of HPMC matrices to achieve desired drug release profiles. *3rd World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Berlin, Germany, Proceedings pp. 203-204, **2000**.

11. Siepmann, J. Biodegradable controlled drug delivery systems: Elucidation of release mechanisms. *8th Workshop of Marie Curie Fellows, European Commission*, Paris, France, Proceedings pp. 39-41, **2000**.

12. Siepmann, J; Peppas, NA. A new mathematical model to predict drug release from hydrophilic matrices: The "sequential layer" model. *27th International Symposium on Controlled Release of Bioactive Materials, CRS*, Paris, France, Proceedings # 0224,

EAGLEBEN-SA_00001818

**2000**.

13. Siepmann, J. Elucidation of mechanisms and modeling of drug release from solid pharmaceutical dosage forms. *Pfizer*, Research Center, Sittingbourne, England, **2000**.

14. Siepmann, J. Elucidation et modélisation des mécanismes contrôlant la libération des principes actifs à partir de formes galéniques. *Université Paris-Sud*, Châtenay Malabry, France, **2000**.

15. Siepmann, J. Projects supported by the European Commission in Life Sciences: Areas of interest and recent advances. *9th Workshop of Marie Curie Fellows, European Commission*, Proceedings pp. 93-95, Florence, Italy, **2001**.

16. Siepmann, J. Modeling drug release from bioerodible microparticles used for the treatment of brain cancer. *Ethypharm*, Research and Development Center, Paris, France, **2001**.

17. Siepmann, J. Presentation of the company Bertex Pharma, Soapbox session des *28th International Symposium on Controlled Release of Bioactive Materials, CRS*, San Diego, USA, **2001**.

18. Siepmann, J. Specific problems in Life Sciences and overview of Marie Curie Individual Fellows' works. *11th Workshop of Marie Curie Fellows, European Commission*, Berlin, Germany, Proceedings pp. 65-66, **2001**.

19. Siepmann, J. Mathematical modeling of the effects of formulation variables on drug release from EC- and HPMC-based dosage forms. *Modified Release Forum, Colorcon*, Würzburg, Germany, **2002**.

20. Siepmann, J; Faisant, N; Benoit, JP. Modeling drug release from bioerodible microparticles using Monte Carlo simulations. *Jahrestagung der Deutschen Pharmazeutischen Gesellschaft DPhG*, Berlin, Germany, Arch. Pharm. Pharm. Med. Chem. 335, Suppl. 1, 55, **2002**.

21. Siepmann, J. Mathematical modeling of drug release from solid pharmaceutical dosage forms based on cellulose derivatives. *Modified Release Forum, Colorcon*, Dartford, England, **2002**.

22. Siepmann, J; Faisant, N; Benoit, JP. Mathematical modeling of drug release from bioerodible microparticles combining Fick's second law of diffusion with Monte Carlo simulations. *17èmes Journées Scientifiques du Groupe Thématique de Recherche sur les Vecteurs, GTRV*, Paris, France. Proceedings p. 8, **2002**.

23. Siepmann, J; Bodmeier, R. In situ forming biodegradable drug delivery systems. *STAT Complex Parenterals Symposium, AstraZeneca*, Alderley Park, Macclesfield, England, **2003**.

24. Siepmann, J; Bodmeier, R. In situ forming biodegradable drug delivery systems. *140th*

EAGLEBEN-SA_00001819

*British Pharmaceutical Conference (BPC)*, Harrogate, England, **2003**.

25. Siepmann, J. Kontrollierte Wirkstoff-Freisetzung: Mechanismen und Kinetiken. *Abbott Laboratories*, Pharmazeutische Forschung und Entwicklung, Ludwigshafen, Germany, **2003**.

26. Siepmann, J. Moving boundaries in oral controlled drug release tablets: A quantitative treatment. *Jahrestagung der Deutschen Pharmazeutischen Gesellschaft DPhG*, Berlin, Germany, Arch. Pharm. Pharm. Med. Chem. 347, Suppl. 1, 14, **2003**.

27. Siepmann, J; Klose, D; Voigt, M; Elkharraz, K. Autocatalytic effects in PLGA-based microparticles: Experiment and theory. *International Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology 2004*, Nuremberg, Germany, Proceedings # 447, **2004**.

28. Lecomte, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. Blends of enteric and GIT-insoluble polymers used for film coating: Effects of the type of polymer blend. *International Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology 2004*, Nuremberg, Germany, Proceedings # 543, **2004**.

29. Siepmann, J; Streubel, A; Peppas, NA. Drug release mechanisms in swellable matrix tablets with sterical restriction. *European Conference on Drug Delivery and Pharmaceutical Technology-APGI*, Sevilla, Spain, 2004, Proceedings # O1, **2004**.

30. Lecomte, F; Siepmann, J. Film coatings based on blends of enteric and GIT-insoluble polymers for controlled drug delivery. *FMC BioPolymer – European Technical Center*, Brussels, Belgium, **2004**.

31. Lecomte, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. Film coatings based on polymer blends for controlled drug delivery. *Pfizer Ltd., Sittingbourne Research Center*, Sittingbourne, England, **2004**.

32. Siepmann, J. Aufklärung der Transportmechanismen in zeitlich kontrolliert freisetzenden Arzneiformen. *Ludwig-Maximilians-Universität Muenchen, College of Pharmacy*, Munich, Germany, **2004**.

33. Siepmann, J. Coated solid dosage forms for controlled drug delivery. *Abbott Laboratories, Department of Research and Development*, Chicago, USA, **2004**.

34. Siepmann, J. State of the art in microencapsulation by solvent evaporation. *Workshop on Microencapsulation by Solvent Evaporation*, European Space Agency Head Quarter, Paris, France, **2004**.

35. Lecomte, F; Siepmann, J; Walther, M; MacRae, RJ; Bodmeier, R. Film coatings based on polymer blends for controlled drug delivery. *141st British Pharmaceutical Conference (BPC)*, Journal of Pharmacy and Pharmacology, Supplement, p S-96. Manchester, England, **2004**.

EAGLEBEN-SA_00001820

36. Siepmann, J. Polymer blends used for functional coatings. *GDL ("Gesellschaft Deutscher Lebensmitteltechnologen", "Association of agricultural engineers") Symposium "Encapsulation – Microencapsulation – Coating"*, Jena, Germany, Proceedings # 017, **2004**.

37. Siepmann, J. Elucidation of the mechanisms and mathematical modeling of drug release from solid dosage forms. *AstraZeneca, Reserach and Development Center*, Gothenburg, Sweden, **2005**.

38. Siepmann, J. Mathematical modeling of the mass transport processes controlling drug release in oral dosage forms. *University of Lund, Department of Chemical Engineering*, Lund, Sweden, **2005**.

39. Siepmann, J. Controlled drug delivery: Mass transport mechanisms and mathematical modeling. *Utrecht University, College of Pharmacy*, Utrecht, The Netherlands, **2005**.

40. Siepmann, J. Innovative Arzneiformen mit kontrollierter Wirkstofffreisetzung: Mathematische Modellierung. *University of Regensburg, College of Pharmacy*, Regensburg, Germany, **2005.**

41. Siepmann, J. Arzneiformen mit zeitlich-kontrollierter Wirkstofffreisetzung. *Dfg Research group*, Berlin, Germany, **2005**.

42. Siepmann, J. Controlled drug delivery systems: Mechanisms and mathematical modeling. *University of Gent, College of Pharmacy*, Gent, Belgium, **2005**.

43. Siepmann, J. Microparticles used as Controlled Drug Delivery Systems, **invited plenary lecture**, *42nd Meeting of the German Colloid Society*, Aachen, Germany, # O2, **2005**.

44. Klose, D; Siepmann, F; Elkharraz, K; Siepmann, J. Towards a better understanding of the drug release mechanisms in PLG-based microparticles. *20èmes Journées Scientifiques du Groupe Thématique de Recherche sur les Vecteurs, GTRV*, Montpellier, France, Proceedings # 18, **2005**.

45. Siepmann, J. Film coatings based on polymer blends for controlled drug delivery. *Pharma Polymers International Controlled Release Eudragit Workshop*, Darmstadt, Germany, **2006**.

46. Moebus, K; Siepmann, J; Bodmeier, R. In-situ forming, cross-linked alginate microparticles for the controlled pulmonary delivery of proteins. *5th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Geneva, Switzerland, Proceedings # We17, **2006**.

47. Verhoeven, E; Siepmann, F; Siepmann, J; Schacht, E; Vervaet, C; Remon, JP. Drug release from EC-PEG/PEO-based mini-matrices prepared by hot-melt extrusion: Experiment and theory. *5th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Geneva, Switzerland, Proceedings # Th10,

EAGLEBEN-SA_00001821

**2006**.

48.   Kreye, F; Siepmann, F; Siepmann, J. Lipidic implants for controlled drug delivery. *Spring 2006 Biopharmacy Day*, Beerse, Belgium, Proceedings # 12, **2006**.

49.   Siepmann, F; Hoffmann, A; Wahle, C; Zach, S; Leclercq, B; Carlin, B; Siepmann, J. Aquacoat® ECD-based film coatings for controlled drug delivery: How to adjust desired membrane properties. *33rd International Symposium on Controlled Release of Bioactive Materials, Controlled Release Society*, Vienna, Austria, Proceedings # 6, **2006**.

50.   Siepmann, F; Wahle, C; Zach, S; Leclercq, B; Carlin, B; Siepmann, J. Adjustment of drug release kinetics from ethylcellulose-coated pellets. *143rd British Pharmaceutical Conference (BPC)*, Journal of Pharmacy and Pharmacology, Supplement, p A-50. Manchester, England, **2006**.

51.   Moebus, K; Siepmann, J; Bodmeier, R. Controlled pulmonary delivery of proteins with in situ forming, cross-linked alginate-microparticles. *Treffen der DPhG Landesgruppe Berlin-Brandenburg „Der wissenschaftliche Nachwuchs stellt sich vor"*, Berlin, Germany, **2006**.

52.   Siepmann, J. Time-controlled drug delivery systems: Mechanisms and optimization. *RWTH Rheinisch-Westfaelische Technische Hochschule Aachen, Department of Physical Chemistry*, Aachen, Allemagne, **2007**.

53.   Siepmann, J. Swelling matrices: Modeling drug release. *13th UKICRS Annual Symposium*, Nottingham, UK, **2007**.

54.   Siepmann, J. Time controlled drug delivery systems: Mechanisms and optimization. *Servier Laboratories, Department of Research and Development Pharmaceutical Technology*, Orleans, France, **2007**.

55.   Siepmann, J. Time controlled Drug delivery systems (with cases of CNS delivery). *UCB Formulation Symposium "Innovative formulations for strategic launch and Life cycle management"*, UCB Center Brussels, Brussels, Belgium, **2007**.

56.   Siepmann, F; Muschert, S; Leclercq, B; Carlin, B; Siepmann, J. Aquacoat ECD-based film coatings: How to adjust drug release profiles. *FMC Technical Webcast New Research*, **2007**.

57.   Siepmann, J. Oral Controlled Drug Delivery Systems: Mechanisms and Optimization. *FMC Tablet tech seminar*, Brussels, Belgium, **2007**.

58.   Siepmann, J. Principles of drug release from matrices and barrier membrane extended release systems. *Colorcon, Department of Research and Development*, West Point, USA, **2007**.

59.   Siepmann, J. Diffusion. *Controlled Release Society Young Scientist Workshop: Basic*

EAGLEBEN-SA_00001822

*Pharmaceutical Science and Manufacturing Principles*, Long Beach, USA, **2007**.

60.   Siepmann, J. Controlled drug delivery: Mathematical modeling of limited solubility. *Controlled Release Society Workshop: Strategies to Advance the Bioavailability of Low Solubility Drugs*, New York, USA, **2008**.

61.   Yang, QW; Flament, MP; Leclerc, B; Herry, C; Busignies, V; Siepmann, F; Tchoreloff, P; Siepmann, J. How the coating level can alter curing effects observed with aqueous polymeric film coatings. *6th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Barcelona, Spain, Proceedings # Tu 15, **2008**.

62.   Verhoeven, E; Siepmann, F; Siepmann, J; Van den Mooter, G; Schacht, E; Vervaet, C; Remon, JP. Predicting drug release kinetics from EC-PEG/PEO mini-matrices prepared by hot-melt extrusion. *6th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Barcelona, Spain, Proceedings # We 50, **2008**.

63.   Karrout, Y; Neut, C; Wils, D; Deremaux, L; Desreumaux, P; Flament, MP; Siepmann, F; Dubreuil, L; Siepmann, J. Novel polymeric film coatings for colon targeting. *6th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Barcelona, Spain, Proceedings # Th 83, **2008**.

64.   Glaessl, B; Siepmann, F; Tucker, I; Siepmann, J; Rades, T. Drug-polymer interactions in controlled delivery systems: Apparent drug diffusivities in Eudragit RL and RS-based networks. *6th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/APV*, Barcelona, Spain, Proceedings # Th 84, **2008**.

65.   Siepmann, J. Preparation and characterization of free polymeric films for controlled drug delivery. *Pierre Fabre, Department of Research and Development*, Castres, France, **2008**.

66.   Siepmann, J. Understanding drug release mechanisms from coated solid dosage forms. *AGPI Coating Workshop*, Lille, France, Proceedings # O 1, **2008**.

67.   Siepmann, J. Mass transport mechanisms in controlled drug delivery systems. *Controlled Release Society German Chapter Annual Meeting*, Halle, Germany, **2009**.

68.   Seidenberger, T; Bley, H; Metz, H; Siepmann, F; Siepmann, J; Maeder, K. Characterization of sucrose ester matrices using benchtop NMR. *Controlled Release Society German Chapter Annual Meeting*, Halle, Germany, **2009**.

69.   Siepmann, J. Mathematical description of drug release from multi-particulate systems. *CRS Satellite Meeting Oral Multi-particulate Drug Delivery Systems: "Challenges and Opportunities"*, Vienna, Austria, **2009**.

70.   Siepmann, J. Mathematical modeling of drug release from solid dosage forms. *School*

EAGLEBEN-SA_00001823

*of Pharmacy, University of London*, London, UK, **2009**.

71. Siepmann, J. Mathematical modeling of drug dissolution. *The Academy of Pharmaceutical Sciences Meeting: Poorly Soluble Drugs*, Birmingham, United Kingdom, **2009**.

72. Siepmann, J. Optimization of drug delivery systems. *3rd European Compliance Academy Good Development Practice Conference. Part 1 Pharmaceutical Development*. Copenhagen, Denmark, **2009**.

73. Siepmann, F; Muschert, S; Cuppok, Y; Leclercq, B; Carlin, B; Siepmann, J. Aquacoat ECD-based film coatings: How to provide stable and desired drug release profiles. *FMC Technical Webcast New Research*, **2009**.

74. Muschert, S; Siepmann, F; Leclercq, B; Carlin, B; Siepmann, J. Optimization of ethylcellulose coatings for controlled drug delivery. *2nd Pharmaceutical Sciences Fair (PharmSciFair)*, #SC-5, Nice, France, **2009**.

75. Krenzlin, S; Neut, C; Wils, D; Deremaux, L; Flament, MP; Siepmann, F; Dubreuil, L; Desreumaux, P; Siepmann, J. Novel multiple unit matrix systems for colon targeting. *2nd Pharmaceutical Sciences Fair (PharmSciFair)*, #SC-36, Nice, France, **2009**.

76. Karrout, Y; Blanchemain, N; Neut, C; Hildebrand, HF; Siepmann, J; Martel, B. Étude des paramètres de contrôle de la libération d'un antibiotique par une prothèse vasculaire fonctionnalisée par les cyclodextrines. *12èmes Journées du club Français des Cyclodextrines*, Lyon, France, **2009**.

77. Siepmann, J; van Harten, J; Ravillon, M. How to best write a research article. *Elsevier Workshop*, Lille, France, **2010**.

78. Siepmann, J; Klose, D; Siepmann, F. Characterization of controlled drug delivery systems by Differential Scanning Calorimetry. *Mettler Toledo Workshop*, Lille, France, **2010**.

79. Siepmann, J. Mechanistic understanding of controlled drug delivery. *Johnson and Johnson Research Center*, Beerse, Belgium, **2010**.

80. Tourrette, A; Benadballah, R; Tourné-Peteilh, C; Begu, S; Siepmann, J; Di Renzo, F; Quignard, F; Devoisselle, J.M. Release of a model hydrophilic molecule from chitosan/silica composites with different structures. *7th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/ADRITELF/APV*, Valletta, Malta, Proceedings, **2010**.

81. Karrout, Y; Dubuquoy, L; Neut, C; Wils, D; Deremaux, L; Flament, MP; Siepmann, F; Dubreuil, L; Desreumaux, P; Siepmann, J. In vivo efficacy of novel, Nutriose-based film coatings for colon targeting. *7th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology-APGI/ADRITELF/APV*, Valletta, Malta, Proceedings, **2010**.

EAGLEBEN-SA_00001824

82. Siepmann, J. Oral controlled drug delivery: Mechanisms and optimization. *IMCD Excipient Workshop*, Karlsruhe, Germany, **2011**.

83. Siepmann, J. Mathematical modeling of drug dissolution. *APGI Workshop: Poorly water-soluble drugs*, Lille, France, **2011**.

84. Siepmann, J. Quantifying drug dissolution in a mechanistic realistic way. *Pharmaceutical Materials and Drug Efficacy Workshop*, Lille, France, **2011**.

85. Siepmann, J. Theory of drug dissolution. *Pharmaceutical Solid State Research Cluster Workshop: Overcoming the Challenge of Poorly Soluble Drugs*, Helsinki, Finland, **2011**.

86. Siepmann, J. In silico simulation of controlled drug delivery. *Award lecture (plenary): APV Research award for outstanding achievements in the pharmaceutical sciences 2012. 8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*. Istanbul, Turkey, **2012.**

87. Siepmann, J. Médicaments à libération contrôlée du principe actif. *Académie Nationale de Pharmacie*, Paris, France, **2012**.

88. Siepmann, J. Modeling drug release from solid dosage forms in the gastro intestinal tract. *46th Gattefosse Pharmaceutical Technology Symposium*, St. Remy de Provence, France, **2012**.

89. Siepmann, J. Understanding mass transport mechanisms in controlled drug delivery systems. *9th Pharmaceutical Solid State Cluster Annual Meeting*, Lisbon, Portugal, **2012**.

90. Siepmann, J. Controlled drug delivery systems. *APGI Information Day with Unipex*, Paris, France, **2012**.

91. Siepmann, J. Local drug delivery to the inner ear. *Biopharmacy Symposium Sanofi*, Montpellier, France, **2012**.

92. Gehrke, M; Krenzlin, S; Vincent, C; Gnansia, D; Siepmann, J; Siepmann, F. In silico simulation of cochlear implants loaded with dexamethasone. *6th PSSRC Annual Meeting "Pharmaceutical Solid State Research Cluster"*, Lisbon, Portugal, **2012**.

93. Lerbret, A; Affouard, F; Hédoux, A; Krenzlin, S; Siepmann, J; Bellissent-Funel, MC; Descamps, M. How strongly does trehalose interact with lysozyme in the solid state? Insights from molecular dynamics simulation and inelastic neutron scattering. *7th International Discussion Meeting on Relaxations in Complex Systems*, Barcelona, Spain, **2013**.

94. Siepmann, J. Computer-Assisted Design of Advanced Drug Delivery Systems. *INTERREG IDEA "Improving Drug Availability and Efficacy" Workshop*, Lille,

EAGLEBEN-SA_00001825

France, **2013**.

95. Siepmann, J. How can drug release mechanisms be elucidated? *7th PSSRC Annual Meeting "Pharmaceutical Solid State Research Cluster"*, Lille, France, **2013**.

96. Nieto, MS; Siepmann, F; Siepmann, J; Dubreuil, L; Neut, C. Colon targeting of a new broad spectrum antibacterial agent: Formulation parameters. *7th PSSRC Annual Meeting "Pharmaceutical Solid State Research Cluster"*, Lille, France, **2013**.

97. Do, MP; Metz,H; Neut, C; Siepmann, J; Maeder, K; Siepmann, F. Monitoring the formation of PLGA-based in-situ forming implants by EPR and $^1$H NMR. *7th PSSRC Annual Meeting "Pharmaceutical Solid State Research Cluster"*, Lille, France, **2013**.

98. Gasmi, H; Siepmann, J; Siepmann, F. Towards a better understanding of mono-, bi-, and tri-phasic drug release from PLGA microparticles. *7th PSSRC Annual Meeting "Pharmaceutical Solid State Research Cluster"*, Lille, France, **2013**.

99. Gehrke, M; Vincent, C; Siepmann, J; Siepmann, F. Adjustment of drug release of dexamethasone from cochlear implants. *7th PSSRC Annual Meeting "Pharmaceutical Solid State Research Cluster"*, Lille, France, **2013**.

100. Karrout, Y; Dubuquoy, L; Piveteau, C; Siepmann, F; Beghyn, T; Neut, C; Flament, MP; Dubreuil, L; Deprez, B; Siepmann, J. Novel polysaccharide-based drug delivery systems targeting the inflamed colon: Proof of concept in vivo. *9th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology*, Lisbon, Portugal, Proceedings, **2014**.

101. Siepmann, J. Drug delivery systems allowing for local and time-controlled drug delivery to the inner ear. *Oticon*, Copenhagen, Denmark, **2014**.

102. Siepmann, J. Médicaments et Biomatériaux à Libération Contrôlée. *Journée de la Recherche*, School of Medicine, University of Lille, Lille, France, **2014**.

103. Siepmann, J. Controlled Drug Delivery. *INTERREG Summer School AMPTEC: Advanced Materials and Pharmaceutical Technologies*, Val Joly, France, **2014**.

104. Flores, C; Hornez, JC; Chai, F; Raoul, G; Siepmann, J; Ferri, J; Martel, B; Hildebrand, F; Blanchemain, N. Hybrid material (chitosan hydrogel/bio-ceramic) loaded with ciprofloxacin or simvastatin for bone reconstruction. *26th Annual Conference of the European Society for Biomaterials (ESB)*, Liverpool, UK, **2014**.

105. Cantin, O; Siepmann, F; Karrout, Y; Siepmann, J. Polyethyleneoxide extrudates for controlled drug delivery. *8th PSSRC Annual Meeting "Pharmaceutical Solid State Research Cluster"*, Ljubljana, Slovenia, **2014**.

EAGLEBEN-SA_00001826

106. Fahier, J; Velghe, C; Muschert, S; Byrne, G; Siepmann, F; Siepmann, J. Drug release from pellets coated with Kollicoat SR: Unexpected tendencies. *8th PSSRC Annual Meeting "Pharmaceutical Solid State Research Cluster"*, Ljubljana, Slovenia, **2014**.

107. Nieto, MS; Siepmann, F; Djouina, M; Dubuquoy, L; Siepmann, J; Dubreuil, L; Neut, C. Towards colon targeting of a new broad spectrum antibacterial agent. *8th PSSRC Annual Meeting "Pharmaceutical Solid State Research Cluster"*, Ljubljana, Slovenia, **2014**.

108. Siepmann, J; Gehrke, M; Sircoglou, J; Vincent, C; Siepmann, F. Local Controlled Drug Delivery to the Inner Ear. *1st International AMPTEC Conference (Advanced Materials and Pharmaceutical Technologies)*, Lille, France, **2014.**

109. Siepmann, J; Siepmann, F. Advanced drug delivery systems for biopharmaceuticals: How in-silico simulations can facilitate device design. *Annual Meeting of the GDR CNRS "Antibodies and therapeutic targeting"*, Lille, France, **2014**.

110. Gasmi, H; Danede, F; Siepmann, J; Siepmann, F. Does PLGA microparticle swelling control drug release? *AMPTEC (Advanced Materials and Pharmaceutical Technologies) Meeting*, Lille, France, **2015**.

111. Jallouli, JY; Willart, JF; Siepmann, F; Descamps, M; Danede, F; Siepmann, J. Polymeric dosage forms aiming at improved fenofibrate bioavailability. *2nd International AMPTEC Conference (Advanced Materials and Pharmaceutical Technologies)*, Lille, France, **2015**.

112. Vukosavljevic, B; De Kinder, L; Siepmann, J; Muschert, S; Windbergs, M. Raman imaging of coated pellets - New insights into compositions and drug release. *9th PSSRC Annual Meeting "Pharmaceutical Solid State Research Cluster"*, Ghent, Belgium, **2015**.

113. Cantin, O; Siepmann, F; Danede, F; Karrout, K; Siepmann, J. Drug release from PEO hot melt extrudates: Impact of the drug loading. *9th PSSRC Annual Meeting "Pharmaceutical Solid State Research Cluster"*, Ghent, Belgium, **2015**.

114. Fahier, J; Muschert, S; Velghe, C; Byrne, G; Siepmann, F; Siepmann, J. Explaining unexpected tendencies observed with polymer coated, controlled release pellets. *9th PSSRC Annual Meeting "Pharmaceutical Solid State Research Cluster"*, Ghent, Belgium, **2015**.

115. Siepmann, J; Siepmann, F. Simulation of controlled drug delivery systems in vitro and in vivo. *12th French-Japanese Drug Delivery Research Symposium: Recent achievements and further challenges in Drug Delivery Research*, Vaux de Cernay, France, **2016**.

116. Siepmann, J. Drug delivery to the inner ear. *4th Conference on Innovation in drug delivery: Site-Specific Drug Delivery - ADRITELF/APGI*, Antibes-Juan-Les-Pins,

EAGLEBEN-SA_00001827

France, **2016**.

117. Siepmann, J; Siepmann, F. Computer-aided design of controlled drug delivery systems. *10th PSSRC Annual Meeting "Pharmaceutical Solid State Research Cluster"*, Copenhagen, Denmark, **2016**.

118. Siepmann, J. PLGA-based microparticles for controlled drug delivery. *Sanofi research center*, Paris, France, **2016**.

119. Siepmann, J. Mathematical Modeling of Diffusion Controlled Release Dosage Forms. *AAPS Annual Meeting and Exposition, American Association of Pharmaceutical Scientists*, Denver, USA, Proceedings, **2016**.

120. Krupa, A; Strach, B; Wyska, E; Cantin, O; Siepmann, J; Jachowicz, R. Bioavailability of tadalafil upon co-processing with Soluplus: Importance of the manufacturing procedure. *2nd European Conference on Pharmaceutics*, Krakow, Poland, Proceedings, **2017**.

121. Oliveira, PFM; Willart, JF; Siepmann, J; Siepmann, F; Descamps, M. Solid state transformations of dexamethasone induced by milling *2nd European Conference on Pharmaceutics*, Krakow, Poland, Proceedings, **2017**.

122. Siepmann, J. Médicaments et biomatériaux à libération contrôlée du principe actif. *Séance délocalisée Académie Nationale de Pharmacie*, Lille, France, **2017**.

123. Siepmann, J; Siepmann, F. Solid oral controlled release dosage forms: Drug release mechanisms and mathematical modeling. *APGI Workshop on Oral Controlled Drug Delivery*, Lille, France, **2017**.

124. Siepmann, J. How to deliver a drug to the colon? *Johnson and Johnson Research Center*, Beerse, Belgium, **2017**.

125. Siepmann, J. Parenteral controlled drug delivery systems. *Pierre Fabre Research Center*, Toulouse, France, **2017**.

126. Oliveira, PFM; Willart, JF; Siepmann, J; Siepmann, F; Descamps, M. Transformations of dexamethasone drug induced by mechanical milling. *INCOME 2017: 9th International Conference on Mechanochemistry and Mechanical Alloying*, Kosice, Slovakia, **2017**.

127. Siepmann, J. La recherche sur les implants cochléaires. *Les chercheurs accueillent les maladies*, Lille, France, **2017**.

128. Siepmann, J. Libération contrôlée de principes actifs. *Afterworks Laboratoire*, College of Pharmacy, University of Lille, Lille, France, **2018**.

129. Siepmann, J. Controlled drug delivery systems. *INTERREG IMODE Training Days*, University of Lille, Lille, France, **2018**.

EAGLEBEN-SA_00001828

130. Siepmann, J. and Siepmann, F. Drug delivery features of polymer excipients *in-situ*. *51st Gattefosse Pharmaceutical Technology Symposium*, St. Remy de Provence, France, **2018.**

131. Lizambard, M; Menu, T; Siepmann, J; Siepmann, F. In-situ forming PLGA implants loaded with chlorhexidine and ibuprofen for the treatment of periodontitis. *12th PSSRC Annual Meeting "Pharmaceutical Solid State Research Cluster"*, Leuven, Belgium, **2018**.

132. Benzine, Y; Siepmann, F; Siepmann, J; Karrout, Y. Hot melt extrudates for colon targeting. *12th PSSRC Annual Meeting "Pharmaceutical Solid State Research Cluster"*, Leuven, Belgium, **2018**.

133. Tamani, F; Bassand, C; Hamoudi-Ben Yelles, M; Siepmann, F; Siepmann, J. Drug release from single PLGA microparticle. *12th PSSRC Annual Meeting "Pharmaceutical Solid State Research Cluster"*, Leuven, Belgium, **2018**.

134. Siepmann, J. Drug release from single PLGA microparticles. *IMODE (Innovative Multicomponent Drug Design) Meeting*, Lille, France, **2018**.

EAGLEBEN-SA_00001829

PTO/AIA/26 (04-14)
Approved for use through 05/31/2024. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| TERMINAL DISCLAIMER TO OBVIATE A DOUBLE PATENTING REJECTION OVER A "PRIOR" PATENT | Docket Number (Optional) |
|---|---|
| | 107071.000583 |

In re Application of: Nagesh R. Palepu, et al.

Application No.: 18/081,251

Filed: December 14, 2022

For: FORMULATIONS OF BENDAMUSTINE

The applicant, _Eagle Pharmaceuticals, Inc._____, owner of ____100____ percent interest in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term of **prior patent** No. _see attached_____ as the term of said **prior patent** is presently shortened by any terminal disclaimer. The applicant hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the **prior patent** are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the applicant does not disclaim the terminal part of the term of any patent granted on the instant application that would extend to the expiration date of the full statutory term of the **prior patent**, "as the term of said **prior patent** is presently shortened by any terminal disclaimer," in the event that said **prior patent** later:

    expires for failure to pay a maintenance fee;
    is held unenforceable;
    is found invalid by a court of competent jurisdiction;
    is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321;
    has all claims canceled by a reexamination certificate;
    is reissued; or
    is in any manner terminated prior to the expiration of its full statutory term as presently shortened by any terminal disclaimer.

Check either box 1 or 2 below, if appropriate.

1. ☐   The undersigned is the applicant. If the applicant is an assignee, the undersigned is authorized to act on behalf of the assignee.

I hereby acknowledge that any willful false statements made are punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

2. ☑   The undersigned is an attorney or agent of record. Reg. No. _51430_____

| /Stephanie A. Lodise/ | June 14, 2023 |
|---|---|
| Signature | Date |

| Stephanie A. Lodise | |
|---|---|
| Typed or printed name | |

| Attorney of record | 513.929.3400 |
|---|---|
| Title | Telephone Number |

☑ Terminal disclaimer fee under 37 CFR 1.20(d) included.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

A Federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with an information collection subject to the requirements of the Paperwork Reduction Act of 1995, unless the information collection has a currently valid OMB Control Number. The OMB Control Number for this information collection is 0651-0031. Public burden for this form is estimated to average 12 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the information collection. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden to the Chief Administrative Officer, United States Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450 or email InformationCollection@uspto.gov. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **If filing this completed form by mail, send to: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

EAGLEBEN-SA_00001830

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. The United States Patent and Trademark Office (USPTO) collects the information in this record under authority of 35 U.S.C. 2. The USPTO's system of records is used to manage all applicant and owner information including name, citizenship, residence, post office address, and other information with respect to inventors and their legal representatives pertaining to the applicant's/owner's activities in connection with the invention for which a patent is sought or has been granted. The applicable Privacy Act System of Records Notice for the information collected in this form is COMMERCE/PAT-TM-7 Patent Application Files, available in the Federal Register at 78 FR 19243 (March 29, 2013). https://www.govinfo.gov/content/pkg/FR-2013-03-29/pdf/2013-07341.pdf

Routine uses of the information in this record may include disclosure to: 1) law enforcement, in the event that the system of records indicates a violation or potential violation of law; 2) a Federal, state, local, or international agency, in response to its request; 3) a contractor of the USPTO having need for the information in order to perform a contract; 4) the Department of Justice for determination of whether the Freedom of Information Act (FOIA) requires disclosure of the record; 5) a Member of Congress submitting a request involving an individual to whom the record pertains, when the individual has requested the Member's assistance with respect to the subject matter of the record; 6) a court, magistrate, or administrative tribunal, in the course of presenting evidence, including disclosures to opposing counsel in the course of settlement negotiations; 7) the Administrator, General Services Administration (GSA), or their designee, during an inspection of records conducted by GSA under authority of 44 U.S.C. 2904 and 2906, in accordance with the GSA regulations and any other relevant (i.e., GSA or Commerce) directive, where such disclosure shall not be used to make determinations about individuals; 8) another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)); 9) the Office of Personnel Management (OPM) for personnel research purposes; and 9) the Office of Management and Budget (OMB) for legislative coordination and clearance.

If you do not furnish the information requested on this form, the USPTO may not be able to process and/or examine your submission, which may result in termination of proceedings, abandonment of the application, and/or expiration of the patent.

## Additional Uses

Additional USPTO uses of the information in this record may include disclosure to: 1) the International Bureau of the World Intellectual Property Organization, if the record is related to an international application filed under the Patent Cooperation Treaty;  2) the public i) after publication of the application pursuant to 35 U.S.C. 122(b), ii) after issuance of a patent pursuant to 35 U.S.C. 151, iii) if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections, or an issued patent, or iv) without publication of the application or patent under the specific circumstances provided for by 37 CFR 1.14(a)(1)(v)-(vii); and/or 3) the National Archives and Records Administration, for inspection of records.

EAGLEBEN-SA_00001831

**DOCKET NO.: 107071.000583**                                              **PATENT**
**Application No.: 18/081,251**

## TERMINAL DISCLAIMER ATTACHMENT SHEET FOR LISTING MULTIPLE DOUBLE PATENTING REFERENCES

In accordance with the Manual of Patenting Examining Procedure (MPEP) § 804.02, a single terminal disclaimer form is hereby filed in which the term disclaimed is based on all the references listed below:

9,572,797

9,265,831

9,572,888

9,597,398

10,052,385

11,103,483

A relevant excerpt from Manual of Patenting Examining Procedure (MPEP) § 804.02 is shown below:

## IV.  DISCLAIMING MULTIPLE DOUBLE PATENTING REFERENCES

If multiple conflicting patents and/or pending applications are applied in nonstatutory double patenting rejections made in a single application, then prior to issuance of that application, it is necessary to disclaim the terminal part of any patent granted on the application which would extend beyond the expiration date of each one of the conflicting patents and/or applications. A terminal disclaimer fee is required for each terminal disclaimer filed. **To avoid paying multiple terminal disclaimer fees, a single terminal disclaimer based on common ownership may be filed, for example, in which the term disclaimed is based on all the conflicting, commonly owned nonstatutory double patenting references**. Similarly, a single terminal disclaimer based on a joint research agreement may be filed, in which the term disclaimed is based on all the conflicting nonstatutory double patenting references.

EAGLEBEN-SA_00001832

DOCKET NO.: 107071.000583                                              PATENT
Application No.: 18/081,251

## TERMINAL DISCLAIMER ATTACHMENT SHEET FOR LISTING MULTIPLE DOUBLE PATENTING REFERENCES

In accordance with the Manual of Patenting Examining Procedure (MPEP) § 804.02, a single terminal disclaimer form is hereby filed in which the term disclaimed is based on all the references listed below:

10,010,533

9,597,397

9,572,796

8,609,707

9,579,384

A relevant excerpt from Manual of Patenting Examining Procedure (MPEP) § 804.02 is shown below:

## IV.   DISCLAIMING MULTIPLE DOUBLE PATENTING REFERENCES

If multiple conflicting patents and/or pending applications are applied in nonstatutory double patenting rejections made in a single application, then prior to issuance of that application, it is necessary to disclaim the terminal part of any patent granted on the application which would extend beyond the expiration date of each one of the conflicting patents and/or applications. A terminal disclaimer fee is required for each terminal disclaimer filed. **To avoid paying multiple terminal disclaimer fees, a single terminal disclaimer based on common ownership may be filed, for example, in which the term disclaimed is based on all the conflicting, commonly owned nonstatutory double patenting references**. Similarly, a single terminal disclaimer based on a joint research agreement may be filed, in which the term disclaimed is based on all the conflicting nonstatutory double patenting references.

EAGLEBEN-SA_00001833

DOCKET NO.: 107071.000583                                              PATENT
Application No.: 18/081,251

## TERMINAL DISCLAIMER ATTACHMENT SHEET FOR LISTING MULTIPLE DOUBLE PATENTING REFERENCES

In accordance with the Manual of Patenting Examining Procedure (MPEP) § 804.02, a single terminal disclaimer form is hereby filed in which the term disclaimed is based on all the references listed below:

9,597,399

9,034,908

9,144,568

9,572,887

A relevant excerpt from Manual of Patenting Examining Procedure (MPEP) § 804.02 is shown below:

## IV.   DISCLAIMING MULTIPLE DOUBLE PATENTING REFERENCES

If multiple conflicting patents and/or pending applications are applied in nonstatutory double patenting rejections made in a single application, then prior to issuance of that application, it is necessary to disclaim the terminal part of any patent granted on the application which would extend beyond the expiration date of each one of the conflicting patents and/or applications. A terminal disclaimer fee is required for each terminal disclaimer filed. **To avoid paying multiple terminal disclaimer fees, a single terminal disclaimer based on common ownership may be filed, for example, in which the term disclaimed is based on all the conflicting, commonly owned nonstatutory double patenting references**. Similarly, a single terminal disclaimer based on a joint research agreement may be filed, in which the term disclaimed is based on all the conflicting nonstatutory double patenting references.

EAGLEBEN-SA_00001834

# USPTO
## UNITED STATES
## PATENT AND TRADEMARK OFFICE

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC PAYMENT RECEIPT

| APPLICATION # | RECEIPT DATE / TIME | ATTORNEY DOCKET # |
|---|---|---|
| 18/081,251 | 06/14/2023 05:47:24 PM ET | 107071.000583 |

## Title of Invention

FORMULATIONS OF BENDAMUSTINE

## Application Information

| | | | |
|---|---|---|---|
| APPLICATION TYPE | Utility - Nonprovisional Application under 35 USC 111(a) | PATENT # | - |
| CONFIRMATION # | 8743 | FILED BY | VeAndra Luckett |
| PATENT CENTER # | 62271751 | AUTHORIZED BY | Stephanie Lodise |
| CUSTOMER # | 23377 | FILING DATE | 12/14/2022 |
| CORRESPONDENCE ADDRESS | - | FIRST NAMED INVENTOR | Nagesh R. Palepu |

## Payment Information

**PAYMENT METHOD**
DA / 233050

**PAYMENT TRANSACTION ID**
E20236DH49127104

**PAYMENT AUTHORIZED BY**
VeAndra Luckett

**PRE-AUTHORIZED ACCOUNT**
233050

**PRE-AUTHORIZED CATEGORY**
37 CFR 1.16 (National application filing, search, and examination fees); 37 CFR 1.17 (Patent application and reexamination processing fees); 37 CFR 1.19 (Document supply fees); 37 CFR 1.20 (Post Issuance fees); 37 CFR 1.21 (Miscellaneous fees and charges)

| FEE CODE | DESCRIPTION | ITEM PRICE($) | QUANTITY | ITEM TOTAL($) |
|---|---|---|---|---|
| 1806 | SUBMISSION OF AN INFORMATION DISCLOSURE STATEMENT | 260.00 | 1 | 260.00 |
| 1814 | STATUTORY DISCLAIMER, INCLUDING TERMINAL DISCLAIMER | 170.00 | 2 | 340.00 |
| | | | TOTAL AMOUNT: | $600.00 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized

EAGLEBEN-SA_00001835

by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

### New Applications Under 35 U.S.C. 111

If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application

### National Stage of an International Application under 35 U.S.C. 371

If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

### New International Application Filed with the USPTO as a Receiving Office

If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

EAGLEBEN-SA_00001836

I thus find that the term "stabilizing amount of antioxidant" is not indefinite and I construe it as: any amount of an antioxidant that decreases the amount of bendamustine degradation after any time period and at any temperature.

## IV.  ENABLEMENT

Defendants assert that the asserted formulation claims are invalid for lack of enablement because the formulation patents disclosed neither the use of sodium hydroxide (NaOH) or of "other undisclosed variables." D.I. 378 at 59.

### A.    Legal Standards for Enablement

"Claims are not enabled when, at the effective filing date of the patent, one of ordinary skill in the art could not practice their full scope without undue experimentation." *Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380, 1384 (Fed. Cir. 2013) (citation omitted). "That some experimentation is necessary does not preclude enablement; the amount of experimentation, however, must not be unduly extensive." *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1576 (Fed. Cir. 1984) (citations omitted). A challenger must prove invalidity based on non-enablement by clear and convincing evidence. *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012). Enablement is a question of law based on underlying facts. *Abbott Labs.*, 720 F.3d at 1384 (citations omitted).

59

EAGLEBEN-SA_00001837

## B.    Discussion

Defendants argue that the asserted formulation claims are not enabled because the claims do not contain NaOH and "a pH adjuster like NaOH is necessary to obtain the PG ester levels claimed in the [a]sserted [f]ormulation [c]laims." D.I. 378 at 59. Defendants note that "Eagle's later-filed [#]879 application . . . explains [that] 'the control samples, which did not include NaOH did not provide long term storage stability,' and 'exhibited more than 28% total esters compared to initial after six months of storage at 25° C.'" D.I. 378 at 60 (citation omitted).

Evidence that some claimed formulations did not result in the PG ester limitations, however, does not establish that the claims are not enabled. Defendants have not presented any evidence to show that a POSITA would have had to undertake undue experimentation to alter the formulation to obtain the PG ester limitations. That some formulations with the claimed ingredients do not satisfy the PG ester limitations does not support non-enablement unless the number of such formulations is significant enough to have required a POSITA to experiment unduly. *See Atlas Powder*, 750 F.2d at 1576–77 ("Even if some of the claimed combinations were inoperative, the claims are not necessarily invalid. . . . Of course, if the number of inoperative combinations becomes significant, and in effect forces one of ordinary skill in the art to experiment unduly in order to

60

EAGLEBEN-SA_00001838

practice the claimed invention, the claims might indeed be invalid.  That, however, has not been shown to be the case here." (citations omitted)).  Defendants presented no evidence showing that the number of unsuccessful formulations is significant enough to require undue experimentation.  Accordingly, they failed to establish by clear and convincing evidence that the asserted claims are invalid for lack of enablement.

## V.   WRITTEN DESCRIPTION

Apotex argues that claim 9 of the #797 patent is invalid for lack of written description.  D.I. 378 at 60.  It asserts that "the absence of any mention of a pH adjuster like NaOH in the [#]797 patent demonstrates that the inventors did not have possession of it at that time, as confirmed by their later filing of another patent application that discloses and claims it."  D.I. 378 at 61 (citations omitted).  "But written description is about whether the skilled reader of the patent disclosure can recognize that what was claimed corresponds to what was described . . . ."  *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1191 (Fed. Cir. 2014).  And Apotex never cites the intrinsic record to show that the asserted formulation patents claim something that they do not describe in their written descriptions.  Instead, Apotex improperly cites extrinsic evidence—the later-filed Eagle patent application.  Apotex has thus failed to establish that claim 9 is invalid for lack of written description.

61

## VI.    INFRINGEMENT

Defendants stipulated to infringement of the asserted claims with two exceptions.  Apotex, Fresenius Kabi, and Mylan argue that (1) they do not infringe the asserted formulation claims because their ANDA products do not contain "a stabilizing amount of an antioxidant" as the asserted formulation claims require, D.I. 369 at 2; and (2) they do not directly infringe or induce infringement of claim 9 of the #797 patent, which requires that the "bendamustine-containing composition ha[ve] less than or equal to 0.43 % total PG esters at about 3 months of storage at a temperature of about 25°C," because their proposed labeling does not direct physicians to store their ANDA products for about 3 months at about 25°C, D.I. 369 at 4–5.

### A.    Legal Standards for Infringement

A defendant is liable for patent infringement if it files an ANDA "for a drug claimed in a patent or the use of which is claimed in a patent."  35 U.S.C. § 271(e)(2)(A).  To establish infringement based on the filing of an ANDA under § 271(e)(2)(A), a patentee must show that "if the drug were approved based upon the ANDA, the manufacture, use, or sale of that drug would infringe the patent in the conventional sense."  *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir. 1997).

"Conventional" infringement includes direct infringement and inducement.

62

EAGLEBEN-SA_00001840

35 U.S.C. § 271 (a), (b). Direct infringement requires that "every limitation set forth in a claim . . . be found in an accused product, exactly." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995) (citation omitted). Inducement requires a showing "that the accused inducer took an affirmative act to encourage infringement with the knowledge that the induced acts constitute patent infringement." *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 904 (Fed. Cir. 2014) (citation omitted). A plaintiff can prevail on a claim of inducement only if it establishes direct infringement. *See Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014) ("[I]nducement liability may arise if, but only if, there is direct infringement." (internal quotation marks, alterations, and citation omitted)).

A patentee must prove infringement by a preponderance of the evidence. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed. Cir. 1984). "A patentee may prove infringement by any method of analysis that is probative of the fact of infringement, and circumstantial evidence may be sufficient." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009) (internal quotation marks and citations omitted).

**B.    Direct Infringement of the "Stabilizing Amount of Antioxidant" Limitation**

The asserted formulation claims require a "stabilizing amount of an antioxidant," a term that I construed as any amount of an antioxidant that decreases

EAGLEBEN-SA_00001841

the amount of bendamustine degradation after any time period and at any temperature.

Defendants' ANDA products each contain 5 mg/mL of the antioxidant monothioglycerol, *see* PTX-0474 at APOLIQBENDA_ANDA_0005427 (Apotex); PTX-0486 at FK_BENDA_00003243, 3245 (Fresenius Kabi); PTX-0007 at MYLBEN_000248 (Mylan); Tr. 372:19–74:13, and the formulation patents' written description shows that 5 mg/mL of monothioglycerol is a stabilizing amount. The written description identifies "5 mg/mL to about 20 mg/mL" as a "preferable" stabilizing amount of antioxidant. #831 patent at 3:49–68; #797 patent at 3:55–66. The written description also identifies "thioglycerol (also known as monothioglycerol)" as a preferred antioxidant. #831 patent at 4:1–8; #797 patent at 4:6–16. Moreover, Example 3 demonstrates that adding "5 mg/m[L] of lipoic acid . . . as a stabilizing antioxidant" to 20 mg/mL of bendamustine in PEG decreased the amount of bendamustine degradation after 15 days at 25°C and 40°C as compared to the same formulation without an antioxidant. #831 patent at 7:59–8:27; #797 patent at 7:61–8:29; Tr. 371:15–72:18. Example 4 recites dissolving 50 mg/mL bendamustine in 90% PEG and 10% PG, and adding "5 mg/m[L] of [mono]thioglycerol, α-lipoic acid or dihydrolipoic acid," an amount that it describes as "a stabilizing amount of an antioxidant." #831 patent at 8:29–65; #797 patent at 8:32–66.

64

EAGLEBEN-SA_00001842

Circumstantial evidence can establish infringement; and here, the asserted formulation patents' disclosures that 5 mg/mL of an antioxidant (and specifically monothioglycerol) is stabilizing shows that the 5 mg/mL of monothioglycerol that Defendants use in their ANDA products decreases the amount of bendamustine degradation as compared to the same formulation without an antioxidant. Finally, Fresenius Kabi and Mylan represented to the FDA that 5 mg/mL monothioglycerol was sufficient to ensure that the amount of bendamustine in their ANDA products did not fall below specification limits.  *See* PTX-0054 at FK_BENDA_00000543 (Fresenius Kabi); PTX-0201 at MYL-BEN_005258 (Mylan); Tr. 374:14–77:1.

### C. Direct and Induced Infringement of Claim 9 of the #797 Patent

Claim 1 of the #797 patent recites a "method of treating leukemia, Hodgkin's disease, or multiple myeloma" comprising "administering" the specified "liquid bendamustine-containing composition." #797 patent at 12:43–46 (claim 1). Claim 9 recites the method of claim 1, wherein the "bendamustine-containing composition has less than or equal to 0.43% total PG esters at about 3 months of storage at a temperature of about 25° C." #797 patent at claim 9.  Defendants stipulate that their ANDA Products have "less than or equal to 0.43% total PG esters at about 3 months of storage at a temperature of about 25° C," but contend that they do not directly infringe or induce infringement of claim 9 because their

65

EAGLEBEN-SA_00001843

proposed labeling does not recommend storing their ANDA Products for "about 3 months" at "a temperature of about 25° C." D.I. 307-4 ¶ I.a; D.I. 320 ¶ 3.

I find, however, that even though Defendants' labeling does not mention storage, Defendants' ANDA products directly and indirectly infringe claim 9 because the PG ester limitation does not require the user to store the products for three months at 25°C. Claim 9's PG ester limitation describes a characteristic of the claimed formula; it is not a method step and thus, does not require action to infringe. The claim does not recite testing for the PG ester limitation; it just describes a composition that would have less than 0.43% PG esters if one were to test for them after storing the composition for three months at 25°C.

Defendants' proposal to construe the PG ester limitation as a method step that requires actual storage under the specified conditions also fails because it "renders [claim 9] nonsensical." *See Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010) ("A claim construction that renders asserted claims facially nonsensical cannot be correct." (internal quotation marks and citations omitted)). Although claim 1 of the #797 patent requires the composition to have "less than or equal to 0.11% total PG esters at about 1 month of storage *at a temperature of about 5° C*," claim 9 requires the same composition to have "less than or equal to 0.43% total PG esters at about 3 months of storage *at a temperature of about 25° C*." #797 patent at 12:61–63 (claim 1), 13:22–25

66

EAGLEBEN-SA_00001844

(claim 9).  Under Defendants' proposed construction, to infringe, the user would need to store the composition simultaneously at different temperatures, which is impossible.

Defendants therefore directly infringe and induce infringement of claim 9 of the #797 patent.  With respect to direct infringement, Defendants agree that their products have less than or equal to 0.43% total PG esters after storing them for three months at a temperature of about 25°C and, other than with respect to a stabilizing amount of an antioxidant, they stipulated to direct infringement of the remaining limitations.  D.I. 320 ¶ 3.  With respect to induced infringement, Defendants will encourage others to administer their ANDA products through their proposed labels.  Although Defendants' proposed labeling does not mention the claimed PG ester limitations, Defendants know "that [their ANDA products] meet all of the claim limitations and, through [their] proposed label[s], encourage[] patients to administer [their ANDA products] in a manner that infringes the claimed method." *Orexigen Therapeutics, Inc. v. Actavis Labs. FL, Inc.*, 282 F. Supp. 3d 793, 816 (D. Del. 2017), *rev'd in part on other grounds sub nom. Nalpropion Pharm., Inc. v. Actavis Labs. FL, Inc.*, 934 F.3d 1334 (Fed. Cir. 2019). "Whether the [user] who performs the method by administering the [products] knows that the [products] meet the [PG ester limitations] is irrelevant for the purposes of infringement." *Id.*

EAGLEBEN-SA_00001845

## VII.  CONCLUSION

For the foregoing reasons, I find that all asserted claims of the asserted patents are not invalid and that Defendants infringe and induce infringement of each of the asserted claims.

The parties will be directed to submit a proposed order by which the Court may enter final judgment consistent with this Opinion.

68

EAGLEBEN-SA_00001846

**UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC ACKNOWLEDGEMENT RECEIPT

| APPLICATION # | RECEIPT DATE / TIME | ATTORNEY DOCKET # |
|---|---|---|
| **18/081,251** | **06/14/2023 05:47:24 PM ET** | **107071.000583** |

## Title of Invention

FORMULATIONS OF BENDAMUSTINE

## Application Information

| | | | |
|---|---|---|---|
| APPLICATION TYPE | Utility - Nonprovisional Application under 35 USC 111(a) | PATENT # | - |
| CONFIRMATION # | 8743 | FILED BY | VeAndra Luckett |
| PATENT CENTER # | 62271751 | FILING DATE | 12/14/2022 |
| CUSTOMER # | 23377 | FIRST NAMED INVENTOR | Nagesh R. Palepu |
| CORRESPONDENCE ADDRESS | - | AUTHORIZED BY | Stephanie Lodise |

## Documents

# TOTAL DOCUMENTS: 12

| DOCUMENT | | PAGES | DESCRIPTION | SIZE (KB) |
|---|---|---|---|---|
| 107071.000583 - Response NFOA.pdf | | 9 | - | 162 KB |
| 107071.000583 - Response NFOA-A....pdf | (1-1) | 1 | Amendment/Request for Reconsideration-After Non-Final Rejection | 83 KB |
| 107071.000583 - Response NFOA-CLM.pdf | (2-4) | 3 | Claims | 86 KB |
| 107071.000583 - Response NFOA-REM.pdf | (5-9) | 5 | Applicant Arguments/Remarks Made in an Amendment | 152 KB |
| 107071.000583 Terminal | | 2 | Terminal Disclaimer Filed | 300 KB |

EAGLEBEN-SA_00001847

Disclaimer - Applications.pdf

| Document | Pages | Type | Size |
|---|---|---|---|
| 107071.000583 NPL - Siepmann Responsive Expert Report.pdf | 525 | Non Patent Literature | 20735 KB |
| 107071.000583 IDS.pdf | 4 | Information Disclosure Statement (IDS) Form (SB08) | 1029 KB |
| NPL - Opinion_Part1.pdf | 20 | Non Patent Literature | 18225 KB |
| NPL - Opinion_Part2.pdf | 20 | Non Patent Literature | 19226 KB |
| NPL - Opinion_Part3.pdf | 20 | Non Patent Literature | 19815 KB |
| NPL - Opinion_Part4.pdf | 10 | Non Patent Literature | 8900 KB |
| 107071.000583 POA.pdf | 2 | Power of Attorney | 857 KB |
| 107071.000583 Terminal Disclaimer Patents.pdf | 5 | Terminal Disclaimer Filed | 267 KB |

## Digest

| DOCUMENT | MESSAGE DIGEST(SHA-512) |
|---|---|
| 107071.000583 - Response NFOA.pdf | D5E84A5C686C3C7AD966185FF62D3BD2140467920EA55E0B5 6E060EAA578A0D0BF8DCE25BA9737DDAB2FAE0BAC378812A FAB08614A27EF17B3EB95EB1A2734FC |
| 107071.000583 - Response NFOA-A....pdf | 43DBF9D13269016B3A93DC3C2D5C0F18A7004F358FBC834EE 914BA471095359A8A482163023F48CD92672999E35402BE12B1 E79689AF5F3D5CAC420672F0BB39 |
| 107071.000583 - Response NFOA-CLM.pdf | B7E75D25E5A43F45287915A806CD1DAE072F1BF8814D5460F 6618D1CB5574C6B508E6D1E83CE616B32F395E28BDED66743 6B8AC64E22CDF362047C45E5B7A53F |

EAGLEBEN-SA_00001848

| | |
|---|---|
| 107071.000583 - Response NFOA-REM.pdf | 6DCB163745D9EC4F6D9032A2AF76E8690C5F7C4A97E5C7A9C7BF62B0C5BA6EB4CF0AAF8CA24C8AEB3B1C9512744ABEDD64E4D1E07191218B05ACBC1A8B6C053E |
| 107071.000583 Terminal Disclaimer - Applications.pdf | DBB664C28E2CC2357B162DAD30504D7ED1FF01AB38E677FC385B3CB9C05B561C2131158476A5844DD0FFDCB4A46185996ACDA58D4300FCA4B768D0BE173C9DBD |
| 107071.000583 NPL - Siepmann Responsive Expert Report.pdf | A231C9BB0C699D62F012733CA40204061704ADB40248CC730631E36B454A7F7209276E4B539BF721FDD642B891EB988D9D3AB8192232F3653FBC7EA383DBB882 |
| 107071.000583 IDS.pdf | E5C228E494466C0D2420770F4739741248521C7D3E2EA0BB49375F9C6D56F1EFF6A62E9708846BC9E31E2C174CB72D868A1E5D159141913AB283711E1AC77002 |
| NPL - Opinion_Part1.pdf | 71BAB33B3E13EA51274D61369808A2BBAD9E8620649180D2C94F94E3355AE0C2E81349CE3AB1A47E380485A56953663A1CBCFC9D9759F89E09F745173F0FE37E |
| NPL - Opinion_Part2.pdf | 8C79788A307960CFC33A9397FDA39B24A1ED9267A913D971AB41A95A7046F9DF5F9E49E968E943B72549BDCAF64786365D89DA3BD498649FC074692AD1CC003E |
| NPL - Opinion_Part3.pdf | 061F7E6168E4CB9B943923FE25A6610ADBBDF1E38CCDD5A3D7E1D0D1FD49FC3A5CE404E95AAB583B2343D9C94B84A1052FBDFD1BED9A3519072F794B228B2B78 |
| NPL - Opinion_Part4.pdf | AEDBA9496075F20E089853F861A808ABE80035F39F22F88E6574A87D77235E2FF95B2D5CD058340DE8BE0653A27FCC327E8CEE55D403D9D7E8E4699D7D349A12 |
| 107071.000583 POA.pdf | 8AD35F1D8330BE2B91545694FC0DCA92CDA4014D1A3CD742A06B0D1A6655CDDA0E3120600470AAF1D0EDD0CC244CBEE0318C8BF6EE72A5BFB4BD1AA0D42496AD |
| 107071.000583 Terminal Disclaimer Patents.pdf | A5A9946C13373BC9968EA1F998FA08CCDB384A88C0DB3F2D731BB8FC29EC664A41D943F15EF8D3AC85CD5AAC8728DB82CACF0FD78BB869A36AAA4BF173794EFE |

EAGLEBEN-SA_00001849

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

### New Applications Under 35 U.S.C. 111

If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application

### National Stage of an International Application under 35 U.S.C. 371

If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

### New International Application Filed with the USPTO as a Receiving Office

If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

EAGLEBEN-SA_00001850

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CEPHALON, INC., *et al.*,

                    Plaintiffs,

          v.                                  Civil Action No. 17-1154-CFC
                                              **CONSOLIDATED**
SLAYBACK PHARMA LIMITED
LIABILITY CO., *et al.*,

                    Defendants.

---

John W. Shaw, Karen Keller, Nathan Hoeschen, SHAW KELLER LLP,
Wilmington, Delaware; David I. Berl, Adam Harber, Elise Baumgarten, Shaun
Mahaffy, Ben Picozzi, Matthew Lachman, WILLIAMS & CONNOLLY LLP,
Washington, District of Columbia

*Counsel for Plaintiffs*

Eve Ormerod, Neal Belgam, SMITH, KATZENSTEIN, & JENKINS LLP,
Wilmington, Delaware; Beth Finkelstein, Constance Huttner, Frank Rodriguez,
James Barabas, BUDD LARNER, P.C., Short Hills, New Jersey

*Counsel for Slayback Pharma Limited Liability Company*

Jeremy Cole, Damien Tancredi, Jeffrey Cohen, FLASTER GREENBURG, P.C.,
Wilmington, Delaware; John Cravero, Sherry Rollo, Steven Feldman, HAHN
LOESER & PARKS LLP, Chicago, Illinois

*Counsel for Apotex Inc.*

Brian Farnan, Michael Farnan, FARNAN LLP, Wilmington, Delaware; Arun
Mohan, SCHIFF HARDIN LLP, New York, New York; Helen Ji, Kevin Nelson,
Imron Aly, SCHIFF HARDIN LLP, Chicago, Illinois

EAGLEBEN-SA_00001851

*Counsel for Fresenius Kabi USA, LLC*

James Lennon, DEVLIN LAW FIRM LLC, Wilmington, Delaware; David Steuer, Nicole Stafford, Shyamkrishna Palaiyanur, WILSON SONSINI GOODRICH & ROSATI, Austin, Texas; Rhyea Malik WILSON SONSINI GOODRICH & ROSATI, San Diego, California

*Counsel for Mylan Laboratories Limited*

## OPINION

April 27, 2020
Wilmington, Delaware

EAGLEBEN-SA_00001852

COLM F. CONNOLLY
UNITED STATES DISTRICT JUDGE

Plaintiffs Teva Pharmaceuticals International GmbH, Cephalon, Inc., and Eagle Pharmaceuticals, Inc. have sued Defendants Apotex Inc. and Apotex Corp., Fresenius Kabi USA, LLC, Mylan Laboratories Ltd., and Slayback Pharma LLC under the Hatch-Waxman Act, 35 U.S.C. § 271(e)(2)(A). Defendants seek to bring to market generic versions of Plaintiffs' Bendeka®, a drug indicated for the treatment of chronic lymphocytic leukemia (CLL) and indolent B-cell non-Hodgkin lymphoma (NHL). D.I. 1 ¶¶ 1, 12.[1] Plaintiffs allege infringement of U.S. Patent Nos. 9,265,831 (the #831 patent), 9,572,797 (the #797 patent), 9,144,568 (the #568 patent) and 9,597,399 (the #399 patent) by all defendants and infringement of U.S. Patent No. 9,572,887 (the #887 patent) by Slayback. Defendants have stipulated to infringement of the asserted claims with two exceptions outlined below. Defendants argue that all asserted claims of the asserted patents are invalid.

I held a seven-day bench trial, and, as required by Federal Rule of Civil Procedure 52(a)(1), I have set forth separately below my findings of fact and conclusions of law.

---

[1] All docket citations are to the docket for C.A. No. 17-1154 unless stated otherwise.

EAGLEBEN-SA_00001853

## I.    BACKGROUND

Plaintiffs sell Bendeka® under New Drug Application No. 208194.  D.I. 1 ¶ 13.  Eagle is the owner and assignee of the asserted patents and has listed them in connection with Bendeka® in the Orange Book maintained by the Food and Drug Administration (FDA).  *Teva Pharms. Int'l GmbH v. Apotex Inc.*, No. 17-1164 (D. Del. 2017), D.I. 1 ¶¶ 27–35.  Cephalon holds an exclusive license to the asserted patents and has assigned to Teva its rights under the license, including the right to sue for infringement.  *Id.*, D.I. 1 ¶¶ 38–39.

Bendeka®'s active ingredient is bendamustine hydrochloride (referred to by the parties as bendamustine), a nitrogen mustard chemotherapy drug that was first developed in East Germany in the 1960s.  D.I. 334 at 2; D.I. 364 ¶ 1.

In 2008, Cephalon launched the first U.S. bendamustine product, Treanda®.  Tr. 403:18–22.  Cephalon initially sold Treanda® in a lyophilized, or freeze-dried, form.  Tr. 404:7–11, 1357:13–19.  Lyophilized drugs must be reconstituted into an injectable liquid before they can be administered to patients.  Tr. 404:7–18, 405:8–06:4.  Aware that bendamustine's toxicity makes it potentially dangerous for medical staff to reconstitute the drug, Eagle began in 2009 to develop a liquid bendamustine formulation that ultimately became Bendeka®.  Tr. 83:7–84:13, 86:3–19.

2

In November 2014, Cephalon launched its own liquid version of Treanda®. Tr. 981:25–82:2, 1657:10–11.

In 2015, Teva acquired Cephalon, Tr. 1660:10–14, and Cephalon thereafter commercialized Bendeka® as permitted by its exclusive license agreement with Eagle, PTX-0408; Tr. 1660:10–24, 1795:4–9.

On December 7, 2015, the FDA approved Bendeka®, D.I. 307-1 ¶ 152, and on January 27, 2016, Teva launched Bendeka®, DTX-0500; Tr. 984:17–85:23, 1006:6–07:5. Bendeka® subsequently received orphan drug exclusivity, a seven-year period during which the FDA is precluded from approving any other manufacturer's application to market the same drug to treat the same rare disease. *Eagle Pharm., Inc. v. Azar*, 2018 WL 3838265, at *1 (D.D.C. June 8, 2018), *aff'd*, 952 F.3d 323 (D.C. Cir. 2020); Tr. 1725:15–19.

In March of 2016, Teva stopped selling liquid Treanda®. DTX-0500_0001; Tr. 1623:7–8.

In July and August of 2017, Defendants each filed an Abbreviated New Drug Application (ANDA) with Paragraph IV certifications under § 505(j) of the Federal Food, Drug and Cosmetic Act to gain FDA-approval for the commercial manufacture, use, and sale of a generic version of Bendeka®. *E.g.*, D.I. 1 ¶ 15. In August of 2017, Plaintiffs filed these suits alleging that Defendants' ANDA filings with Paragraph IV certifications constituted acts of infringement. *E.g.*, D.I. 1.

EAGLEBEN-SA_00001855

These cases were consolidated for all purposes.  *See* December 13, 2017 Order.

At trial, Plaintiffs accused all Defendants other than Slayback of infringing six formulation claims in two of the asserted patents: claims 2, 3, and 5 of the #831 patent; and claims 9 and 11 of the #797 patent.  Plaintiffs also alleged infringement of six administration claims in four of the asserted patents: claims 11, 18, and 22 of the #568 patent and claim 15 of the #399 patent (by all Defendants); claim 13 of the #399 patent (by Apotex only); and claim 13 of the #887 patent (by Slayback only).  Defendants countered that (1) the asserted formulation and administration claims are invalid for obviousness under 35 U.S.C. § 103; (2) the asserted formulation claims are invalid for indefiniteness under 35 U.S.C. § 112; (3) the asserted formulation claims are invalid for lack of enablement under 35 U.S.C. § 112; and (4) claim 9 of the #797 patent is invalid for lack of written description.  Defendants stipulated that they infringe or induce infringement of each of the asserted claims with two exceptions: Apotex, Fresenius Kabi, and Mylan argue that (1) their ANDA products do not contain "a stabilizing amount of an antioxidant" as the asserted formulation claims require; and (2) they do not induce infringement of claim 9 of the #797 patent.

## II.    OBVIOUSNESS

### A.    Legal Standards for Obviousness

Under § 103 of the Patent Act, codified at 35 U.S.C. § 1 *et seq.*, a patent

4

EAGLEBEN-SA_00001856

"may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art [POSITA] to which said subject matter pertains." 35 U.S.C. § 103. As the Supreme Court explained in the seminal case, *Graham v. John Deere Co.*, 383 U.S. 1 (1966), under § 103, "[a]n invention which has been made, and which is new in the sense that the same thing has not been made before, may still not be patentable if the difference between the new thing and what was known before is not considered sufficiently great to warrant a patent." *Id.* at 14. Section 103 ensures that "the results of ordinary innovation are not the subject of exclusive rights under the patent laws." *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007). "Were it otherwise patents might stifle rather than promote, the progress of useful arts." *Id.* (citing U.S. Const. art. I, § 8, cl. 8).

The Court reaffirmed in *KSR* that the "framework" set out in the following paragraph from *Graham* governs the application of § 103, *id.* at 406:

> While the ultimate question of patent validity is one of law, the [§] 103 condition [of patentability], . . . lends itself to several basic factual inquiries. Under [§] 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but

5

EAGLEBEN-SA_00001857

> unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

*Graham*, 383 U.S. at 14–15 (citations omitted).

It is clear that under this framework, a district court must consider in an obviousness inquiry the three primary factors identified by the Court in *Graham*: (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, and (3) the level of ordinary skill in the pertinent art. Less clear is the role, if any, secondary considerations should play in the analysis.

The logical—some would say necessary—implication of the Court's use of the word "secondary" in *Graham* and its holding that the secondary considerations "*might* be utilized" and "*may* have relevancy" is that a district court is permitted—but not required in all cases—to examine such considerations in evaluating an obviousness-based invalidity challenge. The Court seemed to confirm as much in *KSR*, when it noted that "*Graham* set forth a broad inquiry and *invited* courts, *where appropriate*, to look at any *secondary considerations* that would prove instructive." *KSR*, 550 U.S. at 415 (emphasis added).

But a district court ignores *Graham*'s "invitation" to examine secondary considerations at its peril. One legal scholar, Harmon, has observed that under Federal Circuit law "[w]e are able now safely to strike the 'may' in the . . .

6

EAGLEBEN-SA_00001858

sentence" in *Graham* in which the Court stated that secondary "indicia of obviousness and nonobviousness . . . may have relevancy." Robert Harmon, Cynthia Homan, Laura Lydigsen, *Patents and the Federal Circuit* 245 (13th ed. 2017). Harmon correctly notes that "[t]he Federal Circuit has emphatically and repeatedly held that objective evidence of non-obviousness [i.e., the "secondary considerations" identified in *Graham*] must be taken into account always and not just when the decisionmaker is in doubt." *Id.* In *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530 (Fed. Cir. 1983), for example, the Federal Circuit held that "evidence rising out of the so-called 'secondary considerations' must always when present be considered en route to a determination of obviousness." *Id.* at 1538. And in *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litigation*, 676 F.3d 1063 (Fed. Cir. 2012), the Federal Circuit reaffirmed that holding, *id.* at 1079, and went on to say that the Supreme Court in *Graham* "did not relegate . . . to 'secondary status'" the "objective factors" the Supreme Court had explicitly identified in *Graham* as "secondary considerations," *id.* at 1078.

It is true that less than a month after *In re Cyclobenzaprine*, a different Federal Circuit panel held in *Otsuka Pharmaceutical Co. v. Sandoz, Inc.*, 678 F.3d 1280 (Fed. Cir. 2012) that because it found that the defendants had "failed to prove that [the challenged patent claim] would have been *prima facie* obvious over the asserted prior art," it "need not address" the "objective evidence" of commercial

7

success, long-felt need, and the failure of others. *Id.* at 1296. But the safer course for a district court faced with an obviousness challenge (and looking to avoid reversal by the Federal Circuit) is to treat *Graham*'s "invitation" to look at secondary considerations like a subpoena.

Obviousness is assessed based on the perspective of a POSITA at the time of the invention. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). The court therefore needs to guard against "hindsight bias" that infers from the inventor's success in making the patented invention that the invention was obvious. *In re Cyclobenzaprine*, 676 F.3d at 1079. The ultimate question in the obviousness analysis is "whether there was an apparent reason [for a POSITA] to combine [at the time of the invention] the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418. "The analysis is objective." *Id.* at 406. Thus, a court must determine whether a POSITA "would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and . . . would have had a reasonable expectation of success from doing so." *In re Cyclobenzaprine*, 676 F.3d at 1069.

The party challenging the patent's validity bears the burden of proving obviousness by clear and convincing evidence. *Id.* at 1068–69. In weighing the *Graham* factors to decide whether the party has met that burden, the district court must be guided by common sense. *Wyers v. Master Lock Co.*, 616 F.3d 1231,

8

EAGLEBEN-SA_00001860

1238 (Fed. Cir. 2010). Indeed, "the legal determination of obviousness may include recourse to logic, judgment, and common sense, in lieu of expert testimony." *Id.* at 1239. In *KSR*, the Supreme Court warned lower courts to avoid "[r]igid preventative rules that deny factfinders common sense" and to employ instead "an expansive and flexible approach" under the *Graham* framework. *KSR*, 550 U.S. at 415. Thus, the district court may "reorder[ ] in any particular case" the "sequence" in which it considers the *Graham* factors. *Id.* at 407. And although a court should consider carefully the published prior art, "[t]he obviousness analysis cannot be confined by . . . overemphasis on the importance of published articles and the explicit content of patents." *Id.* at 419.

"[A]ny need or problem known in the field of endeavor at the time of the invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR*, 550 U.S. at 420. And "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* at 416. "[T]he fact that a combination was obvious to try might show that it was obvious under § 103." *Id.* at 421. But a combination is obvious to try only "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions" in the prior art at the time of the invention. *Id.* And the court must also be mindful that "when the prior art teaches away from combing

9

EAGLEBEN-SA_00001861

certain known elements, discovery of a successful means of combining them is more likely to be nonobvious." *Id.* at 416.

## B.  Obviousness of the Asserted Formulation Claims

### 1.  Findings of Fact

#### a.  The Priority Date

The parties agree that the date of invention (i.e., the priority date) for the asserted formulation claims is January 28, 2010. Tr. 403:4–6, 1352:16–21, 2015:3–16; #831 patent at (60); #797 patent at (60).

#### b.  Definition of the Relevant POSITA

The parties agree that a POSITA would have had the skills, education, and expertise of a team of individuals working together to formulate a liquid injectable drug product. Such a team would have included individuals with doctoral degrees in chemistry, biochemistry, pharmaceutics, pharmaceutical sciences, chemical engineering, biochemical engineering or related fields, with at least two years of post-graduate experience in developing liquid injectable drug products, or master's or bachelor's degrees in similar fields of study, with a commensurate increase in their years of postgraduate experience. Such a team also would have been familiar with a variety of issues relevant to developing liquid injectable drug formulations, including, among other things, solubility, stability, pharmacokinetics, pharmacodynamics, and other pharmaceutical characteristics. Such a team also

10

EAGLEBEN-SA_00001862

would have included persons with expertise in analytical chemistry, including the detection and measurement of chemical degradants. The team also would have had access to an individual with a medical degree with experience in treating patients with CLL and NHL. PDX-4-2; Tr. 562:1–63:6, 1036:7–37:11, 1353:6–20, 2014:22–15:2.

### c.    Content of the Asserted Formulation Claims

The asserted formulation claims teach a non-aqueous liquid composition that contains (1) bendamustine (or a pharmaceutically acceptable salt thereof); (2) about 5% to about 10% by volume of the solvent propylene glycol (PG); (3) the solvent polyethylene glycol (PEG); (4) one of the following ratios of PEG to PG: about 95:5, about 90:10, about 85:15, about 80:20, and about 75:25; and (5) a stabilizing amount of an antioxidant. #831 patent at claims 2, 3, 5; #797 patent at claims 9, 11. Two claims also specify components and quantities: (1) claim 11 of the #797 patent requires that "the antioxidant is thioglycerol or monothioglycerol,"[2] and (2) claim 5 of the #831 patent requires that "the bendamustine concentration is from about 25 mg/mL to about 50 mg/mL." Certain claims also recite stability limitations such as "less than or equal to 0.11% PG esters at about 1 month of storage at about 5°C." #831 patent at claims 2, 3, 5; #797 patent at claims 9, 11.

---

[2] Thioglycerol or monothioglycerol are used synonymously. Tr. 519:10–15.

11

### d.    Bendamustine, PEG, and PG

Bendamustine has two relevant functional groups at opposing ends of its chemical structure: a nitrogen mustard group and a carboxylic acid group.  Tr. 422:23–23:13, 430:19–31:6, 1038:5–7.

Nucleophiles—such as water, PG, and PEG—degrade bendamustine at its nitrogen mustard group through reactions in which an aziridinium ring forms.  Tr. 407:12–19, 564:10–66:12, 1038:13–21, 1043:23–46:12, 1381:11–18; DTX-0073 at 4:33–37; PTX-1010 at TEVABEND00296748.  Compounds like PEG and PG that have hydroxyl (OH) groups also degrade bendamustine at its carboxylic acid group through a process called esterification where the carboxylic acid group reacts with the OH groups to form degradants called esters.  Tr. 431:4–13.

When PEG is combined with bendamustine, a process called PEG oxidation accelerates the esterification reaction.  Tr. 484:15–85:11, 1416:11–18:12; PTX-0669 at TEVABEND00294275; PTX-0623 at TEVABEND00289470.  PEG thus causes more degradation at bendamustine's carboxylic acid group than the same amount of PG would cause.  Tr. 1054:5–59:11; PTX-0999 at TEVAVEND00292131; PTX-0997 at TEVABEND00291955.

Because water causes bendamustine to degrade at its nitrogen mustard group, the prior art bendamustine formulations used a lyophilized (freeze-dried) form of bendamustine that required a human operator to reconstitute it using water

12

shortly before administering it to a patient. DTX-0094_0010; Tr. 404:7–18, 405:8–06:4, 408:17–09:1, 410:4–5, 1357:13–19. Reconstitution by human manipulation had two known disadvantages in 2010: it increased the risk of contamination, Tr. 406:16–20; and, because bendamustine is a cytotoxic compound, it posed a potential danger to the operator, Tr. 84:2–13, 406:23–07:3; DTX-0056_0001; DTX-0056 at 2:33–67; DTX-0094_0011.

### e.    Content of the Prior Art

Defendants argue that five prior art references would have motivated a POSITA to arrive at the asserted formulation claims with a reasonable expectation of success: Olthoff, Drager, Alam, Rowe, and Boylan. D.I. 378 at 31.

### 1)    Olthoff (DTX-0094)

Olthoff, a 1983 East German patent, claimed a stable, non-aqueous liquid injection solution of between 25 and 100 mg/mL bendamustine dissolved in a solvent consisting of 100% PG. DTX-0094_0016; Tr. 448:20–25. Olthoff's objective was to "produce a stable and ready-to-use injection solution out of N[itrogen]-mustard compounds, avoiding the technical solution of a dry ampoule [i.e., lyophilization]." DTX-0094_0012; Tr. 409:18–10:5. Olthoff disclosed that bendamustine has "a[n] extraordinarily high chemical stability for the production of injection solutions in" monovalent alcohols, glycols and polyols. DTX-0094_0012; Tr. 410:6–11:8. Olthoff specifically proposed dissolving

13

EAGLEBEN-SA_00001865

bendamustine in "polyols, particularly 1,2-propylene glycol [i.e., PG]." DTX-0094_0014; Tr. 412:6–14. Polyols are another name for compounds that have multiple OH groups. Tr. 412:17–18, 413:11–13. Both PEG and PG are polyols. *Id.*

Olthoff's examples did not use an antioxidant. DTX-0094_0013, _0015; Tr. 1457:5–12.

In the decades between Olthoff's publication and the priority date, its formulations were never used. DTX-0073 at 2:19–29.

### 2)     Drager (DTX-0073)

About 30 years after Olthoff was published, Drager, a U.S. patent, issued in 2013. Tr. 434:6–20; D.I. 307-1 ¶ 223. (Drager's priority date is September 25, 2008 making it prior art to the asserted formulation claims.) Like Olthoff, Drager described stable "liquid pharmaceutical formulations comprising bendamustine." DTX-0073 at 2:33–35, Abstract; Tr. 433:23–25. But Drager determined that the "results described in [Olthoff] were not reproducible." DTX-0073 at 2:62–64. Drager's data showed that bendamustine in 99% PG degraded almost completely after eight weeks at 25°C and more than 20% at 5°C after one year. DTX-0073 at Fig. 3; Tr. 1378:9–80:5. The reason for that degradation, according to Drager, was that (1) PG causes bendamustine to degrade at the nitrogen mustard group, DTX-0073 at 4:19–24, 4:33–37; Tr. 602:13–15, and (2) PG's OH groups cause

14

EAGLEBEN-SA_00001866

bendamustine to degrade at the carboxylic acid group through esterification, DTX-0073 at 5:12–14; Tr. 602:3–6.

As a solution to the degradation problem, Drager disclosed the use of aprotic solvents, i.e., solvents containing no OH groups, in a liquid bendamustine formulation. DTX-0073 at 3:21–25; Tr. 581:19–82:12. Drager showed that dissolving bendamustine in 100% DMA, an aprotic solvent, results in no degradation of bendamustine at the carboxylic acid group. DTX-0073 at Table II; Tr. 432:22–33:7, 435:11–36:9.

Drager also taught that protic solvents—i.e., solvents, including PEG and PG, that have OH groups—are acceptable to use with bendamustine but only when combined with aprotic solvents. DTX-0073 at 3:3–10, 3:36–48, 4:18–24; Tr. 601:11–17. Drager showed that the formulation containing 66% DMA and 34% PG is stable. DTX-0073 at Table II; Tr. 436:16–37:15.

### 3)    Alam (DTX-0056)

Alam, a U.S. Patent issued on November 7, 1989, disclosed stable liquid formulations of cyclophosphamide, a compound that, like bendamustine, has a nitrogen mustard group. DTX-0056 at Abstract, 1:5–8; Tr. 422:3–9, 424:6–12. Alam tested cyclophosphamide's stability in mixtures of three polyols—PG, PEG and glycerol—and found that the formulation containing PEG and PG had "less degradation than the others." Tr. 424:2–25:5, 428:6–12, 1421:18–24; DTX-0056

15

EAGLEBEN-SA_00001867

at Tables 1–5.  Alam disclosed using PG at a ratio of from about 10% to about 90% and PEG at a ratio of from about 90% to about 10%.  DTX-0056 at 4:6–12; Tr. 425:6–14.

Bendamustine and cyclophosphamide have two structural differences that bear on how they degrade when they are mixed with PEG and PG.  First, because cyclophosphamide does not have a carboxylic acid group, cyclophosphamide does not experience esterification, i.e., it does not react with compounds such as PEG and PG that have OH groups to form esters.  Tr. 430:22–31:1, 1077:25–78:6. Second, in bendamustine, the nitrogen mustard group is attached to a benzene ring, while in cyclophosphamide, the group is attached to a phosphoramide.  Tr. 1075:4–25.  Because it is attached to a benzene ring in bendamustine, a POSITA would have expected nucleophiles such as PEG and PG to accelerate degradation at the nitrogen mustard group via the formation of an unstable aziridinium ring. Tr. 1037:19–41:16, 1058:12–17, 1060:2–9; PTX-0376 at JDG_BENDA_00002265; PTX-1010 at TEVABEND00296748.  But in cyclophosphamide, the phosphoramide deactivates the nitrogen mustard group and cyclophosphamide consequently does not degrade by forming the aziridinium ring in a liquid formulation before administration.  Tr. 1076:1–77:24; PTX-0991 at TEVABEND00290978; PTX-0993 at TEVABEND00291516.

Neither Alam nor Drager used an antioxidant in their exemplary or preferred

16

formulations.  Tr. 1458:2–58:23.

### 4) Rowe, Handbook of Pharmaceutical Excipients (DTX-0160)

Rowe's Handbook of Pharmaceutical Excipients disclosed that PEG is susceptible to oxidation and that one can use an antioxidant to prevent such oxidation.  DTX-0160_0011; Tr. 486:7–24.

### 5) Boylan (DTX-0063)

Boylan disclosed a list of "some of the most commonly used antioxidants in pharmaceutical injectable formulations" including monothioglycerol. DTX-0063_0019, 0020; Tr. 487:12–18.  Boylan also disclosed usual concentrations for each of the listed antioxidants.  DTX-0063_0020; Tr. 487:18–19.  Monothioglycerol is FDA-approved.  Tr. 340:20–23.

### 2.   Conclusions of Law

I find that Defendants have not established by clear and convincing evidence that a POSITA would have had reason to combine the limitations recited in the asserted patents' formulation claims.  Although Defendants persuaded me that a POSITA would have had reason to try to develop a non-aqueous liquid bendamustine formulation, they failed to establish by clear and convincing evidence that a POSITA would have used in that formulation the PEG and PG solvents, PEG:PG ratios, antioxidant, concentrations of bendamustine, or PG ester stability limitations recited in the asserted claims.  I do not find Plaintiffs' evidence

17

EAGLEBEN-SA_00001869

of secondary considerations to establish nonobviousness, but I find Defendants'

failure of proof with respect to *Graham*'s primary factors in this case to be

dispositive and that therefore the formulation claims are not invalid under § 103.

### a. Non-Aqueous Liquid Bendamustine Formulation

Every asserted formulation claim requires a non-aqueous liquid formulation.

Due to bendamustine's instability in water, the prior art used a lyophilized form of

bendamustine. Tr. 404:9–18, 1357:13–19. But, as discussed above, lyophilization

had known disadvantages. To avoid lyophilization while still avoiding the use of

water, a POSITA would have been motivated to create a non-aqueous liquid

bendamustine product. In fact, as can be seen in Olthoff and Drager, other

inventors sought to create non-aqueous liquid bendamustine formulations before

the priority date.

### b. Use of PEG and PG

The claimed non-aqueous liquid bendamustine formulations contain the

solvents PEG and PG. Defendants argue that Olthoff, Drager, and Alam would

have motivated a POSITA to use PEG and PG with bendamustine. D.I. 378 at 13,

16.

### 1) Olthoff and Drager

Viewed in isolation, Olthoff would have led a POSITA to use PEG and PG

in a liquid bendamustine formulation. D.I. 378 at 13; DTX-0094_0014; Tr.

18

EAGLEBEN-SA_00001870

Doc Code: PA.

Document Description: Power of Attorney

PTO/AIA/82A (07-13)

Approved for use through 03/31/2021. OMB 0651-0035

U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## TRANSMITTAL FOR POWER OF ATTORNEY TO ONE OR MORE REGISTERED PRACTITIONERS

NOTE: This form is to be submitted with the Power of Attorney by Applicant form (PTO/AIA/82B) to identify the application to which the Power of Attorney is directed, in accordance with 37 CFR 1.5, unless the application number and filing date are identified in the Power of Attorney by Applicant form. If neither form PTO/AIA/82A nor form PTO/AIA82B identifies the application to which the Power of Attorney is directed, the Power of Attorney will not be recognized in the application.

| | |
|---|---|
| Application Number | 18/081,251 |
| Filing Date | December 14, 2022 |
| First Named Inventor | Nagesh R. Palepu |
| Title | FORMULATIONS OF BENDAMUSTINE |
| Art Unit | 1613 |
| Examiner Name | Arnold, Ernst V. |
| Attorney Docket Number | 107071.000583 |

### SIGNATURE of Applicant or Patent Practitioner

| Signature | /Stephanie A. Lodise/ | Date (Optional) | June 14, 2023 |
|---|---|---|---|
| Name | Stephanie A. Lodise | Registration Number | 51,430 |
| Title (if Applicant is a juristic entity) | | | |
| Applicant Name (if Applicant is a juristic entity) | | | |

NOTE: This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4(d) for signature requirements and certifications. If more than one applicant, use multiple forms.

☑ *Total of ___1___ forms are submitted.

This collection of information is required by 37 CFR 1.131, 1.32, and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

EAGLEBEN-SA_00001871

Doc Code: PA..
Document Description: Power of Attorney

PTO/AIA/82B (07-13)
Approved for use through 03/31/2021. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

## POWER OF ATTORNEY BY APPLICANT

I hereby revoke all previous powers of attorney given in the application identified in either the attached transmittal letter or the boxes below.

| Application Number | Filing Date |
|---|---|
| | |

(Note: The boxes above may be left blank if information is provided on form PTO/AIA/82A.)

[✓] I hereby appoint the Patent Practitioner(s) associated with the following Customer Number as my/our attorney(s) or agent(s), and to transact all business in the United States Patent and Trademark Office connected therewith for the application referenced in the attached transmittal letter (form PTO/AIA/82A) or identified above:

23377

OR

[ ] I hereby appoint Practitioner(s) named in the attached list (form PTO/AIA/82C) as my/our attorney(s) or agent(s), and to transact all business in the United States Patent and Trademark Office connected therewith for the patent application referenced in the attached transmittal letter (form PTO/AIA/82A) or identified above. (Note: Complete form PTO/AIA/82C.)

**Please recognize or change the correspondence address for the application identified in the attached transmittal letter or the boxes above to:**

[✓] The address associated with the above-mentioned Customer Number

OR

[ ] The address associated with Customer Number:

| [ ] | Firm or Individual Name | |
|---|---|---|
| Address | | |
| City | State | Zip |
| Country | | |
| Telephone | Email | |

I am the Applicant (if the Applicant is a juristic entity, list the Applicant name in the box)

## Eagle Pharmaceuticals, Inc.

[ ] Inventor or Joint Inventor (title not required below)

[ ] Legal Representative of a Deceased or Legally Incapacitated Inventor (title not required below)

[✓] Assignee or Person to Whom the Inventor is Under an Obligation to Assign (provide signer's title if applicant is a juristic entity)

[ ] Person Who Otherwise Shows Sufficient Proprietary Interest (e.g., a petition under 37 CFR 1.46(b)(2) was granted in the application or is concurrently being filed with this document) (provide signer's title if applicant is a juristic entity)

### SIGNATURE of Applicant for Patent

The undersigned (whose title is supplied below) is authorized to act on behalf of the applicant (e.g., where the applicant is a juristic entity).

| Signature | | Date (Optional) | |
|---|---|---|---|
| Name | Robert Chang, Esq. | | |
| Title | Vice President, Intellectual Property | | |

NOTE: Signature - This form must be signed by the applicant in accordance with 37 CFR 1.33. See 37 CFR 1.4 for signature requirements and certifications. If more than one applicant, use multiple forms.

[ ] Total of _____ forms are submitted.

This collection of information is required by 37 CFR 1.131, 1.32, and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

EAGLEBEN-SA_00001872

Palepu 2011's formulations for the administrations recited in the asserted claims. D.I. 371 at 48. Palepu 2011 itself, however, established a motivation to use its formulations: it touted advantages of its disclosed formulations including "that they have substantially improved long term stability when compared to currently available formulations" and that they "are advantageously ready to use or ready for further dilution" and thus "[r]econstitution of lyophilized powder is not required." DTX-0984_0002 at [0007]; Tr. 889:8–90:3. It is undisputed that a POSITA would have wanted to use a stable and ready-to-use formulation as part of an improved administration method.

A POSITA also would have been motivated to combine Palepu 2011 with the Treanda® Label to come up with the claimed doses and dosing schedule. Palepu 2011 instructed administering its formulations in accordance with the Treanda® dosing schedule. DTX-0984_0004 at [0044]; Tr. 856:8–9. And the Treanda® Label taught similar doses and the same dosing schedules as those in the asserted administration claims. DTX-0993_0001; DTX-1202_0001; Tr. 654:18–21, 695:10–20. The required dose found in the claims is about 25 mg/m$^2$ to about 120 mg/m$^2$ and the Treanda® Label requires doses of 100 mg/m$^2$ or 120 mg/m$^2$. #887 patent at claim 13; DTX-0993_0001; DTX-1202_0001. Also, the dosing schedule recited in the claims is the same as the Treanda® Label's schedule: (1) for CLL, infusion on days one and two of a 28-day cycle, #568 patent

39

EAGLEBEN-SA_00001873

at claim 18; DTX-0993_0001; DTX-1202_001; Tr. 648:3–9; and (2) for NHL, IV infusion on days one and two of a 21-day cycle, #568 patent at claim 11; DTX-0993_0001; DTX-1202_001; Tr. 648:3–9.

That said, the asserted administration claims require administering each bendamustine dose in faster times, in lower volumes, and at higher post-dilution concentrations than the Treanda® Label requires. The question thus remains whether a POSITA would have been motivated to reach the claimed administration times, volumes, and concentrations.

### b.     Administration Times, Volumes, and Post-Dilution Concentrations

All asserted claims require administering bendamustine in 15 minutes or less, with some requiring ten minutes or less. All asserted claims also require administering bendamustine in a volume of 100 mL or less, with some claims requiring about 50 mL. Finally, all but one of the asserted administration claims require post-dilution bendamustine concentrations ranging from 0.05 to 12.5 mg/mL.[8]

Defendants argue that the claimed administration times were obvious under the Preiss and Schöffski studies; that the claimed administration volumes are

---

[8] Claim 13 of the #887 patent, the only claim asserted against Slayback, does not have a concentration limitation. D.I. 362 at 3.

40

EAGLEBEN-SA_00001874

obvious under the Preiss studies, Barth, and Glimelius;[9] and that the claimed post-dilution concentrations are obvious under the Preiss studies and the Treanda® Label. Defendants also contend that Eagle's post-invention statements corroborate Defendants' assertion that the Preiss studies would have motivated a POSITA to use shorter administration times, lower volumes, and higher concentrations.

### 1)    The Preiss Studies

Defendants argue that the Preiss studies support a finding that the claimed administration times, volumes, and concentrations are obvious. First, Defendants argue that a POSITA would have been motivated to administer bendamustine in 15 minutes or less because Preiss 1985 and Preiss 1998 disclosed that administration of bendamustine in three-to-ten minutes was well-tolerated in humans and Schöffski 2000a and 2000b disclosed that the safety results of 30-minute bendamustine administrations were consistent with Preiss's three-to-ten-minute infusions. D.I. 378 at 39–40. Second, Defendants assert that the Preiss studies render the claimed volumes of 100 mL or less obvious because, although the Preiss references did not disclose a volume, a POSITA would have known based on Preiss's three-to-ten-minute time constraint and typical infusion rates that the

---

[9] Relying on the testimony of Dr. Yates, Defendants also cite Olthoff to argue that the claimed volumes were obvious. D.I. 378 at 43. As noted above, I did not find Dr. Yates's testimony to be credible and will not rely on it. Moreover, Olthoff's example bendamustine formulation did not use PEG and, as explained above, Drager discredited Olthoff's data. DTX-0094_0015; Tr. 923:14–24.

41

EAGLEBEN-SA_00001875

studies infused similar volumes. D.I. 378 at 42. Third, Defendants contend that Preiss rendered the claimed concentrations of 0.05 to 12.5 mg/mL obvious because Preiss 1985 likely used a concentration of 5.6 mg/mL. D.I. 378 at 46.

I find, however, that the Preiss studies would not have motivated a POSITA to reach the claimed administration times, volumes, or concentrations because (1) a POSITA would not have relied on the Preiss studies to determine a safe and effective infusion time, volume, or concentration for bendamustine, (2) subsequent prior art taught away from Preiss's three-to-ten-minute infusions, and (3) Defendants only hypothesize that the Preiss studies used volumes and concentrations similar to those in the claimed administrations.

> a) **A POSITA would not have relied on the Preiss studies to determine a safe administration.**

As an initial matter, Preiss 1985 and Preiss 1988 were not designed to evaluate safety, and thus a POSITA would not have relied on the Preiss studies to determine a safe infusion time, volume, or concentration. Tr. 724:7–12, 730:22–31:1, 731:8–21. Moreover, the Preiss studies did not provide enough data points or information to allow a POSITA to rely on them for safety information. Preiss 1985 tested only seven patients with various cancers, DTX-320_0002; Tr. 723:16–24:3, 1122:20–22; it did not discuss how it collected side effect information, including the number or timing of observations, the side effects being

42

observed, or a grading system, Tr. 724:14–28:16; and it neither specified which of the seven patients in the study had side effects nor distinguished between IV and oral side effects, Tr. 728:8–20. A POSITA would not have concluded that side effects would not be present in a larger population, Tr. 1121:1–5, let alone the relevant population, Tr. 1122:20–23:8, based on a study that covered only seven patients with various cancers and offered no explanation of how the side effects were studied or which patients experienced the side effects. Preiss 1998 similarly tested patients with various cancers, Tr. 1125:24–26:1, and it did not disclose when the side effects it reported were monitored or how many times side effect information was collected from patients. Thus, a POSITA would not have relied on either Preiss study to determine the safety of a short bendamustine infusion. Tr. 1122:14–19, 1123:9–22.

In addition, the parties agree that the claimed administrations require repeated cycles, D.I. 378 at 38; D.I. 371 at 59, but the Preiss studies did not administer bendamustine in repeated cycles.[10] And according to Defendants' expert, "bendamustine therapy side effects result from . . . the number of cycles given" and "these side effects are typically more severe in subsequent cycles

---

[10] Defendants cited no reference that administered bendamustine in ten minutes or less in repeated cycles. Tellingly, Defendants' references that did administer bendamustine in repeated cycles all used 30-minute infusions. DTX-0987_0001; DTX-0988_0001; DTX-1004_0002, _0005; DTX-0848; PTX-0268.

43

EAGLEBEN-SA_00001877

because there are cumulative effects on bone marrow." Tr. 736:11–37:20. A POSITA would therefore not have relied on the Preiss studies to determine the safety of a short infusion of bendamustine administered in multiple cycles. Tr. 1133:7–11. Moreover, neither Preiss study administered bendamustine over two consecutive days as the claims require. Tr. 1129:12–20.

The Schöffski articles also would not have motivated a POSITA to rely on the Preiss studies to determine the safety of a short infusion time, lower infusion volume, or higher infusion concentration. Schöffski 2000a reported that it observed *some* side effects like those in Preiss 1998, but did not compare the overall incidence or severity of side effects in the two infusion protocols. DTX_0987_0006,_0007; Tr. 1138:21–39:19. Also, Schöffski 2000b stated that it observed similar side effects to those observed in Schöffski 2000a, not that it observed the same side effects as Preiss. And Schöffski 2000b stated that it did not "observe confusion or other signs of neurotoxicity when giving the drug as a repeated 30-min i.v. infusion," DTX-0988_005, while Preiss 1998 reported "disorientation" and a "vegetative neurotoxic effect," DTX-0991 at JDG_BENDA_00006920–21.

b)   **Subsequent prior art taught away from the Preiss infusions.**

Subsequent prior art also would have dissuaded a POSITA from relying on the Preiss studies. A POSITA would not have stopped with Preiss 1985 and Preiss

44

EAGLEBEN-SA_00001878

1998; instead, it would have also considered later prior art references that used 30 to 60 minute infusions and a 500 mL volume. "Too often the obviousness analysis is framed as an inquiry into whether a person of skill, with two (and only two) references sitting on the table in front of him, would have been motivated to combine . . . the references in a way that renders the claimed invention obvious. The real question is whether that skilled artisan would have plucked [those references] out of the sea of prior art and combined [them]." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016).

The Preiss researchers themselves conducted later studies and recommended in subsequent papers an infusion of at least 30 minutes in 500 mL. DTX-0987_0001; DTX-0988_0001; PTX-0268; DTX-0982_0009; Tr. 1145:13–46:7. Preiss 2003—conducted by the same research group as Preiss 1985 and 1998—reported administration over 30 minutes in repeated cycles. PTX-0268; Tr. 1141:21–43:15. Moreover, the Ribomustin Monograph—which set forth the prescription information for the German bendamustine product Ribomustin and was developed by a company that employed scientists involved in the Preiss and Schöffski studies—recommended a 30 to 60 minute infusion in 500 mL because of local toxicity concerns. DTX-0982_009; Tr. 1143:17–44:13, 1144:14–45:5, 1146:8–54:4.

45

EAGLEBEN-SA_00001879

c)    **Defendants only hypothesize that the Preiss studies used the claimed volumes and concentrations.**

Finally, Defendants only hypothesize that the Preiss studies used similar volumes and concentrations as those recited in the asserted claims. With respect to volume, Defendants assert that although the Preiss references did not disclose a volume, "[b]ecause administration time and volume are related," a POSITA would have known based on Preiss's three-to-ten-minute time constraint and typical infusion rates that the studies infused small volumes. D.I. 378 at 42 (citations omitted). With respect to concentration, Defendants contend that "Preiss 1985 administered bendamustine in a dose of 280-375 mg in a bolus, [i.e., a volume that the] evidence showed likely meant 50 or 100 mL," and diluting 280 mg in 50 mL would result in a concentration of 5.6 mg/mL. D.I. 378 at 46. Such speculations about Preiss's infusion rate and volume, however, are only based on "conclusory and unsupported expert testimony" and they do not support a finding of obviousness by clear and convincing evidence. *See TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1361 (Fed. Cir. 2019) ("In cases like *InTouch*, *ActiveVideo*, and *DSS*, we rejected obviousness determinations based on conclusory and unsupported expert testimony.").

Defendants have thus failed to establish by clear and convincing evidence that the Preiss studies support a finding that the claimed infusion times, volumes,

46

EAGLEBEN-SA_00001880

and concentrations were obvious. "Whether a skilled artisan would be motivated to make a combination includes whether he would select particular references in order to combine their elements," *WBIP*, 829 F.3d at 1337, and a POSITA in 2010 would not have selected the Preiss studies to determine a safe and effective infusion for a bendamustine formulation.

### 2)   Barth and Glimelius

Defendants also argue that the administration volumes are obvious under Barth and Glimelius. They note that Barth recommended a 100 to 250 mL bendamustine infusion, D.I. 378 at 43, and that a "POS[IT]A would have known from Glimelius (DTX-0079) that minibags, [standard infusion bag sizes of 50 or 100 mL], were typically used for infusions of 10-20 min," D.I. 378 at 44 (citations omitted).

Barth and Glimelius, however, would not have motivated a POSITA to use the claimed volumes. First, Barth did not disclose any study or data; it only suggested hypothetical smaller volumes. DTX-1004_0005; Tr. 1159:10–18. And Barth's 100 to 250 mL suggestion did not cover the claimed volumes (all claims require 100 mL or less). DTX-1004_0005; Tr. 1159:3–16. Second, Glimelius did not disclose any bendamustine administration, Tr. 841:3–42:22, and the mere availability of a standard IV bag would not have given a POSITA motivation to use a bag that size. IV bags of 50 mL were available before the priority date, but

47

EAGLEBEN-SA_00001881

had never been used to deliver bendamustine. D.I. 371 at 58.

### 3)    The Treanda® Label

Defendants also assert that the Treanda® Label would have motivated a POSITA to use the claimed post-dilution concentrations. They argue that the claimed concentrations are obvious as inherent because diluting the claimed doses disclosed in the Treanda® Label in the claimed volume of liquid necessarily would have resulted in the claimed concentrations of bendamustine, PG, and PEG. D.I. 378 at 44. But because I find that the claimed volumes are not obvious, it does not follow that the claimed concentrations are obvious as inherent. Defendants also state that "on the lower end of the spectrum, the [claimed] concentration falls within the 0.2-0.6 mg/mL concentration of the Treanda® Label." D.I. 378 at 45. But the Treanda® concentrations only cover a small portion of the claimed range of 0.05 to 12.5 mg/mL and thus they do not render the claimed concentrations obvious.

### 4)    Eagle's Post-Invention Statements

Defendants further argue that, through post-invention statements, Plaintiffs admitted that the prior art taught that short infusions in lower volumes were safe and effective. Defendants point to the fact that Eagle relied on the conclusions from the Preiss studies when it told the FDA that its Bendeka® protocol was safe. D.I. 378 at 51.

48

It is true that, in support of its request for permission to test Bendeka®, Eagle submitted to the FDA a Detailed Review of Literature that relied in part on data from the Preiss and Schöffski references. DTX-1041_0175. The literature review stated: "Thus, the short duration infusion of bendamustine appears to be well tolerated in this study and a dose of 215 milligrams has been reported in the literature as the clinically tolerated dose for bolus administration of bendamustine." DTX-1041_0175. Later, Eagle made similar statements to the FDA when drafting its Investigator's Brochure to support its requested study that required administering the Bendeka® formulation in ten minutes. DTX-1061 at 14.

Eagle's submissions to the FDA, however, also contained non-public, non-prior-art tests and analysis Eagle had conducted to show those short-infusion protocols were safe to test in humans. DTX-1041_0025–26. And I find that Eagle's post-invention discussion of the prior art that is intermingled with its own non-public data that it developed in inventing the claimed administration does not show that a POSITA who did not have Eagle's non-public data would have relied on the Preiss studies. Conclusions drawn from a patentee's "disclosures to the FDA" risk being "distorted by hind-sight bias," especially here where the FDA submission was dated after the priority dates and thus was written "through the lens of what [the inventor] had invented." *Neptune Generics, LLC v. Eli Lilly & Co.*, 921 F.3d 1372, 1377 (Fed. Cir. 2019).

49

In sum, Defendants failed to prove by clear and convincing evidence that a POSITA reading the Preiss and Schöffski studies, Barth, Glimelius, and the Treanda® Label would have found the claimed infusion times, volumes, and concentrations obvious.

### c.    Secondary Considerations

Plaintiffs offered at trial evidence of four secondary considerations that bear on the administration claims: skepticism, long-felt need, commercial success, and industry praise.  I did not, however, find this evidence to be probative indicia of nonobviousness for the following reasons.

### 1)    Skepticism

Plaintiffs argue that "industry participants" were skeptical of the claimed invention.  D.I. 371 at 77.  But the skepticism they cite was apparently held by a "couple of nurses, a pharmacist[,] and an oncology medical resident," DTX-0959_0001, and investors, D.I. 371 at 78.  Such "lack of enthusiasm by a few is not equivalent to skepticism." *BTG Int'l Ltd. v. Amneal Pharm. LLC*, 923 F.3d 1063, 1076 (Fed. Cir. 2019).

Plaintiffs also contend that the FDA declined to allow testing of Eagle's IV push method of administration because of safety concerns.  D.I. 371 at 78.  But the IV push method is not the claimed invention; the invention is the ten-minute infusion and the FDA told Eagle to proceed with its ten-minute infusion study.

50

EAGLEBEN-SA_00001884

PTX-0746 at EGL-BENDEKA_00146354; Tr. 1691:3–14; *see also* PTX-0747 at

EGL-BENDEKA_00146355 ("[Eagle] stated that they have decided not to

evaluate the IV push method administration. [Eagle] will use 120 mg/m$^2$ over 10

minutes in their bridging study.").

### 2) Long-Felt Need

Plaintiffs also argue that Bendeka®'s shorter infusion addressed a "long-felt

need to reduce chair time for chemotherapy, improving patient experience and

allowing more patients to be treated." D.I. 371 at 79. The parties offered

competing expert testimony on this point. I found credible only Defendant's

expert, Dr. Thirman, who testified that Bendeka® does not meaningfully reduce

chair time because patients receive IV fluids and other drugs simultaneously with

the administration of Bendeka® and the administration of those fluids and other

drugs lasts for much longer than 15 minutes. Tr. 188:20–89:9, 189:22–24,

1744:14–51:20, 1745:20–46:6, 1751:3–51:8, 1765:18–66:6, 1779:11–18; DTX-

0968_0001. For example, Bendamustine is frequently administered with a drug

called Rituxan that has an administration time of four to eight hours. Tr.

190:24–91:6, 191:2–6, 713:14–22, 1746:11–17, 1781:14–22.[11]

---

[11] Plaintiffs' expert, Dr. Agarwal, was not credible. He testified that, based on his experience in a "community-based cancer center," Tr. 1288:19, there were "always issues with the chair time" in the oncology field and that Bendeka® resolved the chair time need, Tr. 1304:7–05:19. My assessment of his lack of credibility was informed by the logic and credible nature of Dr. Thirman's testimony and also by

51

EAGLEBEN-SA_00001885

Dr. Agarwal's dissembling with respect to his billing practices (which might explain why he favored shorter chair times). Dr. Agarwal initially denied having any idea how his patients are billed for his work: "I mean, I'm not, I'm not the biller and I don't get paid by the amount I bill or anything. . . . My only concern is the patient's safety and that's all I care about. . . . I have no clue honestly about billing, billing procedures." Tr. 1339:15–21. He volunteered that "billing, which is a totally different department, I have no clue how they do it and I don't take a look at it. I don't even know how to look at it." Tr. 1340:15–17. And when asked how billing relates to infusion time, Dr. Agarwal claimed to have "no idea how the billing codes work with the infusion." Tr. 1344:13–17. But when asked by the Court if he was "paid by salary," Dr. Agarwal responded: "So the way it works is, what they [his practice group] wanted is eat what you kill. Basically, if I see more patients, I get paid more. If I work harder, I get more. If I work less, I get paid less." Tr. 1345:7–11. He then continued to explain the billing process in detail:

> So the way it works is, so we have like repeated billing codes for repeated business, which are from level one to level four, and that's very small. You just mark what billing code you want to put. These are being audited by McKesson and auditors, that you are not -- they look at our notes. They decide if the doctor is overbilling or underbilling with the code. We have another code for the new patient.
>
> * * * *
>
> So they have like one to four levels of visit. Depending on how much time I spend with a patient, either from 15 minutes to 30 minutes, I can go from a level one visit to a level four visit and that's what I mark on that. I think it's level one to level five. Level five is a very complex visit where I spend an hour or more with a patient, and most of the visits are about level three or level four, but these patients that are going to see me, I just bill level 3 or 4 and then I submit the payment and that is taken care of by the billing and coding department.

Tr. 1345:19–46:1, 1346:13–23. Also, when Dr. Agarwal was asked if he was "familiar with a term called infusion billing," he responded "Yes." Tr. 1338:2–4.

52

EAGLEBEN-SA_00001886

### 3)   Commercial Success

Plaintiffs further argue that Bendeka®'s commercial success is demonstrated by (1) the fact that "Bendeka® halted the downward trend in bendamustine sales, despite increasing competition," D.I. 371 at 79, and (2) "Teva's choice to license Bendeka® and pay Eagle a portion of the profit for each Bendeka® sale, when it could keep all profits from Treanda®," D.I. 361 ¶ 222. But such evidence does not support a finding of nonobviousness. Plaintiffs have not provided evidence to establish that Bendeka®'s sales and Teva's decision to license Bendeka® were linked to Bendeka®'s patented advantages as opposed to Bendeka®'s exclusivities. *See* D.I. 371 at 80 ("Eagle's patents expire shortly after Teva's pre-existing patents."); Tr. 1725:25–26:2 (stating that with the Bendeka® license, Teva has FDA exclusivity until 2022). Also, the "competition" that Plaintiffs cite consists only of Eagle's Belrapzo®—a drug that shares Bendeka®'s formulation, but lacks the short-infusion protocol. D.I. 361 ¶ 219. Because Eagle benefits from the sales of both Belrapzo® and Bendeka®, it may have an incentive to market Bendeka® over Belrapzo®, Tr. 1652:19–53:2, and thus any evidence that Bendeka® has higher sales has little if any probative value.

### 4)   Praise

Finally, Plaintiffs argue that "Bendeka®'s patented advantages . . . have received industry praise." D.I. 371 at 81. In support of this assertion, they cite (1)

EAGLEBEN-SA_00001887

Veteran's Administration (VA) newsletter that highlighted the advantages of Bendeka® as compared to Treanda®, (2) a study that noted attributes of Bendeka® that drive Bendeka®'s usage, and (3) Fresenius Kabi's pre-litigation statement that Bendeka® reduced "[p]atient chair time" and that Bendeka® could "have higher pricing and still retain volume due to the benefits it offers." D.I. 371 at 81; D.I. 361 ¶ 226. Here again, I find such evidence to have at best marginal probative value. As an initial matter, the VA does not even use Bendeka®. Tr. 1777:1–78:16. Second, the study Plaintiffs cite was funded by Teva and provides no connection between the claimed limitations and industry praise. Tr. 1305:25–07:4. Third, Fresenius Kabi's statement merely lists reduced chair time as a fact and does not exhibit any praise related to the asserted claims.

* * * *

In sum, the secondary consideration evidence does not support a finding of nonobviousness. I still find, however, that the asserted administration claims are not obvious. Defendants have not shown by clear and convincing evidence that Palepu 2011, the Treanda® Label, Preiss 1985, Preiss 1998, Schöffski 2000a, Schöffski 2000b, Barth, and Glimelius would have motivated a POSITA to arrive at the claimed administrations with a reasonable expectation of success. A POSITA would not have been motivated to follow Preiss's three-to-ten-minute (and potentially lower volume and higher concentration) infusions because (1) a

54

EAGLEBEN-SA_00001888

POSITA would not have relied on the Preiss studies to determine a safe bendamustine infusion protocol, (2) subsequent prior art taught away from the three-to-ten-minute infusions, and (3) Defendants only guess that Preiss used similar volumes and concentrations to those claimed. Moreover, Barth and Glimelius would not have motivated a POSITA to administer bendamustine at lower volumes because (1) Barth only disclosed hypothetical volumes that did not even include the claimed volumes of 100 mL or less and (2) Glimelius did not involve bendamustine. Finally, the claimed concentrations are not obvious as inherent or under the prior art.

## III.   INDEFINITENESS

Defendants argue that the asserted formulation claims are invalid because they each require "a stabilizing amount of antioxidant"—a requirement Defendants contend is indefinite. D.I. 371 at 2.

### A.   Legal Standards for Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). "Indefiniteness is a matter of claim construction, and the same principles that generally govern claim construction are applicable to determining whether

55

allegedly indefinite claim language is subject to construction." *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008), *abrogated on other grounds by Nautilus*, 572 U.S. at 901 (rejecting Federal Circuit's "insolubly ambiguous" standard for indefiniteness).  As in claim construction, in making an indefiniteness determination, the district court may make "any factual findings about extrinsic evidence relevant to the question, such as evidence about knowledge of those skilled in the art." *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).  "Any fact critical to a holding on indefiniteness . . . must be proven by the challenger by clear and convincing evidence." *Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*, 838 F.3d 1224, 1228 (Fed. Cir. 2016) (alteration in original)).

## B.    Discussion

Defendants argue that "the claims recite a 'stabilizing amount' [of antioxidant] with no guidance, functional or otherwise, on what degree of stability is required to obtain some unnamed objective." D.I. 380 at 3.  But this argument conflates (1) whether a given antioxidant amount improves bendamustine's stability with (2) the extent to which that given antioxidant amount improves stability.  The written description defines a "stabilizing amount of antioxidant" as an amount that "increase[s] or enhance[s] the stability of the bendamustine in the compositions described herein," #831 patent at 3:49–54; Tr. 370:25–71:9.  Thus,

56

the "objective" of the antioxidant amount is not "unnamed" but is instead "to increase or enhance the stability of the bendamustine in the compositions" described in the specification.[12]

Defendants argue that the term is indefinite because "[t]he specification does not explain how to determine whether stability has been 'increased' or 'enhanced.'" D.I. 378 at 3. But as Plaintiffs' expert, Dr. Siepmann, credibly testified, a POSITA would understand that a stabilizing amount of an antioxidant includes any amount that decreases the amount of bendamustine degradation after any time period and at any temperature. Tr. 1485:4–87:10, 1502:8–12. And the patents provide a POSITA with a method for measuring stability: using HPLC to compare the amount of overall bendamustine degradation with and without the antioxidant. Tr. 1485:14–86:11. Example 3 demonstrates that a POSITA would compare the amount of bendamustine remaining in the same formulation, stored under the same conditions, with and without the antioxidant, #831 patent at

---

[12] Section 112(b) of Title 35 provides that "[t]he specification shall conclude with one or more claims[.]" This language makes clear that the specification includes the claims asserted in the patent, and the Federal Circuit has so held. *See Markman*, 52 F.3d at 979 ("Claims must be read in view of the specification, of which they are part"). The Federal Circuit and other courts, however, have also used "specification" on occasion to refer to the written description of the patent as distinct from the claims. *See, e.g., id.* ("To ascertain the meaning of claims, we consider three sources: The claims, the specification, and the prosecution history."). To avoid confusion, I refer to the portions of the specification that are not claims as "the written description."

EAGLEBEN-SA_00001891

7:59–8:27; and the specifications describe measuring the remaining bendamustine using HPLC, *id.* at 2:26–44, 2:57–3:4, 4:22–26; Tr. 1487:11–89:11. In addition to providing exemplary test methods, the specification also lists "suitable antioxidant amounts" and "antioxidants," and provides examples of "stabilizing" amounts. #831 patent at 3:57–4:8, 7:59–9:2; Tr. 371:15–72:18, 1489:23–90:4.

In *BASF*, the Federal Circuit held the term "composition . . . effective to catalyze" not indefinite, even though the patent did not "recite a minimum level of function needed to meet this 'effective' limitation" or "a particular measurement method," because tests for determining whether a composition was catalyzing were well-known. 875 F.3d at 1366–68. Here, the term "stabilizing amount of antioxidant" is like the term "composition . . . effective to catalyze" and Plaintiffs' expert, like the expert in *BASF*, persuasively testified that a POSITA would know how to determine whether an amount of antioxidant is stabilizing. Moreover, unlike in *BASF*, the asserted patents here provide a test method.

Finally, Defendants cite the patentee's removal of antioxidant and stability limitations during prosecution as support for their indefiniteness argument. D.I. 378 at 5–6. But the removal of those limitations undercuts Defendants' argument because it confirms that the "examiner understood" the claims without those limitations. *See Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1379–80 (Fed. Cir. 2017).

58

EAGLEBEN-SA_00001892

| Application Number<br><br>**\* 18/081,251 \*** | Application/Control No.<br><br>18/081,251 | Applicant(s)/Patent under Reexamination<br><br>Palepu et al. | |
|---|---|---|---|
| | **Examiner**<br>ARNOLD, ERNST V | **Art Unit**<br>1613 | |

| **Document Code - DISQ** | **Internal Document - DO NOT MAIL** |
|---|---|

| **TERMINAL DISCLAIMER** | ☑ APPROVED | ☐ DISAPPROVED |
|---|---|---|
| **Date Filed:**  **14 June 2023** | **This patent is subject to a Terminal Disclaimer** | |

**Approved/Disapproved by:**

/PAMELA A YOUNG/

**Technology Center:** <u>OPLC</u>

**Telephone:** <u>(571)272-3622</u>

<u>2 TD</u>

EAGLEBEN-SA_00001893

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>18/081,251 | Filing Date<br>12/14/2022 | ☐ To be Mailed |
|---|---|---|---|

**ENTITY:** ☑ LARGE  ☐ SMALL  ☐ MICRO

### APPLICATION AS FILED - PART I

| FOR | (Column 1)<br>NUMBER FILED | (Column 2)<br>NUMBER EXTRA | RATE ($) | FEE ($) |
|---|---|---|---|---|
| ☐ BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | |
| ☐ SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | |
| ☐ EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | minus 20 = | * | x $100 = | |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | minus 3 = | * | x $480 = | |
| ☐ APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | |

### APPLICATION AS AMENDED - PART II

| AMENDMENT | 06/14/2023 | (Column 1)<br>CLAIMS REMAINING AFTER AMENDMENT | | (Column 2)<br>HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3)<br>PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|
| | Total<br>(37 CFR 1.16(i)) | * 16 | Minus | ** 20 | = 0 | x $100 = | 0 |
| | Independent<br>(37 CFR 1.16(h)) | * 2 | Minus | *** 3 | = 0 | x $480 = | 0 |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | |
| | | | | | | TOTAL ADD'L FEE | 0 |

| AMENDMENT | | (Column 1)<br>CLAIMS REMAINING AFTER AMENDMENT | | (Column 2)<br>HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3)<br>PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|
| | Total<br>(37 CFR 1.16(i)) | * | Minus | ** | = | x $0 = | |
| | Independent<br>(37 CFR 1.16(h)) | * | Minus | *** | = | x $0 = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | |
| | | | | | | TOTAL ADD'L FEE | |

| * If the entry in column 1 is less than the entry in column 2, write "0" in column 3. | LIE |
|---|---|
| ** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20". | /TARA J WITCHER/ |
| *** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3". | |
| The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1. | |

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

EAGLEBEN-SA_00001894



UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 18/081,251 | 12/14/2022 | Nagesh R. Palepu | 107071.000583 |

**CONFIRMATION NO. 8743**

**POA ACCEPTANCE LETTER**

23377
BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501

*OC000000058774577*

Date Mailed: 06/29/2023

# NOTICE OF ACCEPTANCE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 06/14/2023.

The Power of Attorney in this application is accepted. Correspondence in this application will be mailed to the above address as provided by 37 CFR 1.33.

Questions about the contents of this notice and the
requirements it sets forth should be directed to the Office
of Data Management, Application Assistance Unit, at
**(571) 272-4000** or **(571) 272-4200** or **1-888-786-0101**.

/zabraha/

EAGLEBEN-SA_00001895

TO:      eofficemonitor@bakerlaw.com
FROM:   noreply@uspto.gov
CC:      patentcenter_eofficeaction@uspto.gov
SUBJECT: USPTO: Patent Electronic System - Correspondence Notification for Customer Number 23377

Thu Jun 29 05:56:54 EDT 2023


Dear Patent Center Customer:

Correspondence Address:

BakerHostetler
1735 Market Street
Suite 3300
Philadelphia,PENNSYLVANIA,19103-7501
UNITED STATES

This is a courtesy notification regarding the following USPTO patent application(s) associated with your Customer Number, 23377, that have new outgoing correspondence. This correspondence is now available for viewing in Patent Center.

The official date of notification of the outgoing correspondence will be indicated on the form (e.g., PTOL-90) accompanying the correspondence.

Disclaimer:

The list of documents shown below are provided as a courtesy and is not part of the official file wrapper. The content of the images shown in the Image File Wrapper is the official record.

| Application | Document | Mailroom Date | Attorney Docket No. |
|---|---|---|---|
| 18081251 | N570 | 06/29/2023 | 107071.000583 |

To view your correspondence online, please sign in to Patent Center and then select Workbench/View correspondence. To update your email address(es), select Manage/Manage customer numbers.

If you have any questions, please contact the Patent Electronic Business Center (EBC) at ebc@uspto.gov or 866-217-9197 Monday – Friday, 6 a.m. to midnight ET.

Please do not reply to this email as it was sent from an unmonitored mailbox.

Sincerely,

The Patent Center Team

EAGLEBEN-SA_00001896

# UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/081,251 | 12/14/2022 | Nagesh R. Palepu | 107071.000583 | 8743 |

23377    7590    07/11/2023
BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501

| EXAMINER |
|---|
| ARNOLD, ERNST V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1613 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 07/11/2023 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

eofficemonitor@bakerlaw.com

PTOL-90A (Rev. 04/07)

EAGLEBEN-SA_00001897

| *Office Action Summary* | Application No. 18/081,251 | Applicant(s) Palepu et al. |
|---|---|---|
| | Examiner ERNST V ARNOLD | Art Unit 1613 | AIA (FITF) Status No |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☑ Responsive to communication(s) filed on <u>6/14/23</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a) ☑ This action is **FINAL.**    2b) ☐ This action is non-final.
3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☑ Claim(s) <u>1-8 and 11-16</u> is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☑ Claim(s) <u>1-8 and 11-16</u> is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10) ☐ The specification is objected to by the Examiner.
11) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    **Certified copies:**
    a) ☐ All    b) ☐ Some**    c) ☐ None of the:
       1. ☐ Certified copies of the priority documents have been received.
       2. ☐ Certified copies of the priority documents have been received in Application No. _____.
       3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)
2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.
3) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date _____.
4) ☐ Other: _____.

EAGLEBEN-SA_00001898

Application/Control Number: 18/081,251                                    Page 2
Art Unit: 1613

### Notice of Pre-AIA or AIA Status

The present application is being examined under the pre-AIA first to invent provisions.

### Claim Status

Claims 9 and 10 have been cancelled.

Claims 1-8 and 11-16 are pending. Applicant's amendment has necessitated new ground of rejection. Accordingly, this Action is FINAL.

### Withdrawn rejections

Applicant's amendments and arguments filed 6/14/23 are acknowledged and have been fully considered. The Examiner has re-weighed all the evidence of record. Any rejection and/or objection not specifically addressed below is herein withdrawn. Claims 1-3, 6-8, 11-13 and 16-18 were rejected under 35 U.S.C. 103(a) as being unpatentable over Drager et al. (US 20110190363, of record, with benefit of PCT/US09/58023 filed September 23, 2009, which claims priority form provisional 61100074 filed September 25, 2008); Claims 4, 5, 14 and 15 were rejected under 35 U.S.C. 103(a) as being unpatentable over Drager et al. (US 20110190363), as applied to claims 1-3, 6-8, 11-13 and 16-18 above, in further view of Tait et al. (WO 0202125), of record; Claims 9 and 10 were rejected under 35 U.S.C. 103(a) as being unpatentable over Drager et al. (US 20110190363 with benefit of PCT/US09/58023 filed September 23, 2009, which claims priority form provisional 61100074 filed September 25, 2008).

EAGLEBEN-SA_00001899

Application/Control Number: 18/081,251                                                    Page 3
Art Unit: 1613

Applicant's amendments and arguments are persuasive and the rejections are

withdrawn.

The following rejections and/or objections are either reiterated or newly applied.

They constitute the complete set of rejections and/or objections presently being applied

to the instant application.


*Terminal Disclaimer*

The terminal disclaimer filed on 6/14/23 disclaiming the terminal portion of any

patent granted on this application which would extend beyond the expiration date of US

Patents:

9,572,797

9,266,831

9,572,888

9,597,398

10,052,385

11,103,483


10,010,533

9,597,397

9,572,796

8,609,707

9,579,384


9,397,399

9,034,908

9,144,568

9,572,887

EAGLEBEN-SA_00001900

Application/Control Number: 18/081,251                                    Page 4
Art Unit: 1613

And applications:

17412623

18081238


has been reviewed and is accepted.  The terminal disclaimer has been recorded.

Applicant's citation of MPEP 804.02 is acknowledged. The double patenting rejections

are withdrawn.


### *Claim Rejections - 35 USC § 103*

In the event the determination of the status of the application as subject to AIA 35

U.S.C. 102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any

correction of the statutory basis for the rejection will not be considered a new ground of

rejection if the prior art relied upon, and the rationale supporting the rejection, would be

the same under either status.

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed
> or described as set forth in section 102 of this title, if the differences between the
> subject matter sought to be patented and the prior art are such that the subject
> matter as a whole would have been obvious at the time the invention was made
> to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was
> made.

The factual inquiries set forth in *Graham* **v.** *John Deere Co.*, 383 U.S. 1, 148

USPQ 459 (1966), that are applied for establishing a background for determining

obviousness under 35 U.S.C. 103(a) are summarized as follows:

EAGLEBEN-SA_00001901

Application/Control Number: 18/081,251                                                    Page 5
Art Unit: 1613

    1.     Determining the scope and contents of the prior art.
    2.     Ascertaining the differences between the prior art and the claims at issue.
    3.     Resolving the level of ordinary skill in the pertinent art.
    4.     Considering objective evidence present in the application indicating obviousness or nonobviousness.

Claims 1-3, 8, 11-13 and 16-18 are rejected under 35 U.S.C. 103(a) as being unpatentable over Brittain et al. (US 20060159713); of record.

This application currently names joint inventors. In considering patentability of the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g) prior art under 35 U.S.C. 103(a).

Applicant claims, for example:

1.    (Currently Amended) A sterile vial containing a liquid bendamustine-containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL;

a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

a stabilizing amount of an antioxidant.

EAGLEBEN-SA_00001902

Application/Control Number: 18/081,251                                     Page 6
Art Unit: 1613

11.    (Currently Amended) A bendamustine-containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of

an antioxidant, in a pharmaceutically acceptable fluid;

wherein the pharmaceutically acceptable fluid ~~comprises~~ consists of polyethylene glycol

and optionally one or more of propylene glycol, ethanol, benzyl alcohol and

glycofurol; and

wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from

about 20 mg/mL to about 60 mg/mL.

Claim interpretation: The MPEP provides, "Claim scope is not limited by claim

language that suggests or makes optional but does not require steps to be performed,

or by claim language that does not limit a claim to a particular structure." See M.P.E.P §

2111.04; see also M.P.E.P §§ 2103(C) and 2173.05(h).


## Level of Ordinary Skill in the Art

## (MPEP 2141.03)

MPEP 2141.03 (I) states: "The "hypothetical 'person having ordinary skill in the

art' to which the claimed subject matter pertains would, of necessity have the capability

of understanding the scientific and engineering principles applicable to the pertinent art."

*Ex parte Hiyamizu*, 10 USPQ2d 1393, 1394 (Bd. Pat. App. & Inter. 1988). The level of

skill is that of a ***medical/pharmaceutical cancer*** research scientist, as is the case here,

then one can assume comfortably that such an educated artisan will draw conventional

ideas from oncology medicine, oncology pharmacy and chemistry— without being told

to do so.

In addition, the prior art itself reflects an appropriate level (MPEP 2141.03(II)).

EAGLEBEN-SA_00001903

Application/Control Number: 18/081,251                                                  Page 7
Art Unit: 1613

## Determination of the scope and content of the prior art

## (MPEP 2141.01)

Regarding claims 1, 2, 8, 11, 12 and 18, Brittain et al. teach a sterile vial

containing about 10-500 mg of lyophilized bendamustine powder ([0099]; claims 73-74).

Brittain et al. teach reconstitution of the lyophilized formulations with a sterile fluid to

provide an appropriate solution of bendamustine for administration [0100]. Brittain et al.

teach that the liquid carrier for the ultimate dosage form can be from a limited list of

liquid polyethyelene glycol, propylene glycol, ethanol or mixtures thereof [0067], thereby

providing an immediately envisaged embodiment with a pharmaceutically acceptable

fluid that consists of polyethyelene glycol and optionally one or more of propylene glycol

and ethanol.

Regarding claims 1 and 11, Brittain et al. teach adding antioxidants [0088], which

implicitly stabilize the composition to oxidation.

## Ascertainment of the difference between the prior art and the claims

## (MPEP 2141.02) and Finding of prima facie obviousness

## Rational and Motivation (MPEP 2142-2143)

The difference between the instant application and Brittain et al. is that Brittain et

al. do not expressly teach about 20-60 mg/mL or about 25 mg/mL bendamustine

concentration. However, it would have been obvious to one of ordinary skill in the art at

the time of the claimed invention to reconstitute the lyophilized bendamustine

composition in the sterile vial with a pharmaceutically acceptable fluid consisting of

polyethylene glycol and optionally propylene glycol or ethanol to a concentration of

EAGLEBEN-SA_00001904

Application/Control Number: 18/081,251                                                      Page 8
Art Unit: 1613

about 20-60 mg/mL or about 25 mg/mL bendamustine and produce the instant invention. One of ordinary skill in the art would have been motivated to do this because it is merely adding an appropriate amount of a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally propylene glycol or ethanol to a concentration of about 20-60 mg/mL or about 25 mg/mL bendamustine prior to administration. Especially when Brittain et al. teach and suggest that the vials contain about 10-500 mg bendamustine lyophilized powder [0099] and occupy between 30-50% of the vial volume and teach 20 mL vials [0151] as well as 50 mL vials [0008]. Accordingly, the ordinary artisan would have a reasonable expectation of success in adding enough pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally propylene glycol or ethanol to the sterile vial to obtain a concentration of about 20-60 mg/mL or about 25 mg/mL bendamustine prior to administration based on vial size and bendamustine amount. It is a simple dilution and calculation any pharmaceutical artisan can perform with no inventive skill but rather ordinary skill. See MPEP 2143: "a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely that product [was] not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103." *KSR*, 550 U.S. at ___, 82 USPQ2d at 1397.

Regarding claims 6, 7, 16 and 17, since Brittain et al. teach and suggest the same component in the same amounts as claimed, then the composition of Brittain et al. will also achieve the same stability and total impurities as claimed. "When the PTO shows a sound basis for believing that the products of the applicant and the prior art are

EAGLEBEN-SA_00001905

Application/Control Number: 18/081,251                                                      Page 9
Art Unit: 1613

the same, the applicant has the burden of showing that they are not." *In re Spada,* 911

F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990). Therefore, the *prima facie*

case can be rebutted by evidence showing that the prior art products do not <u>necessarily</u>

possess the characteristics of the claimed product. *In re Best,* 562 F.2d at 1255, 195

USPQ at 433.

In light of the forgoing discussion, the Examiner concludes that the subject matter

defined by the instant claims would have been obvious within the meaning of 35 USC

103(a).

From the combined teachings of the references, it is apparent that one of

ordinary skill in the art would have had a reasonable expectation of success in

producing the claimed invention. Therefore, the invention as a whole was *prima facie*

obvious to one of ordinary skill in the art at the time the invention was made, as

evidenced by the combined references, especially in the absence of evidence to the

contrary.

**Claims 4, 5, 14 and 15** are rejected under 35 U.S.C. 103(a) as being

unpatentable over Brittain et al. (US 20060159713), as applied to claims 1-3, 8, 11-13

and 16-18 above, in further view of Tait et al. (WO 0202125).

Applicant claims, for example:

4.    (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol.

5.    (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a
concentration of about 5 mg/mL.

Application/Control Number: 18/081,251                                    Page 10
Art Unit: 1613

14.   (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol.

15.   (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

Brittain et al. is discussed in detail above and that discussion is incorporated by reference.

Regarding claims 4, 5, 14 and 15, Tait et al. teach stabilized injectable compositions of the alkylating agent ifosfamide (Abstract; page 1, line 7) comprising PEG200-600, ethanol (page 6, lines 16-24; page 9, lines 15-21; claims 4-6) and antioxidants such as BHA, BHT and up to 5% monothioglycerol (page 9, lies 11-14; page 14, line 6) that are stable for at least 180 days (page 6, lines 25-26).

The difference between the instant application and Brittain et al. is that Brittain et al. do not expressly teach about 5 mg/mL of monothioglycerol antioxidant. This deficiency in Brittain et al. is cured by the teachings of Tait et al. It would have been obvious to one of ordinary skill in the art at the time of the claimed invention to add about 5 mg/mL of monothioglycerol antioxidant to the composition of Brittain et al., as suggested by Tait et al., produce the instant invention.

One of ordinary skill in the art would have been motivated to do this because as noted above Brittain et al. suggest adding an antioxidant and name, for example butyl-hydroxyanisole (BHA) and butyl-hydroxytoluene (BHT). Tait et al. teach the equivalence of monothioglycerol, BHA and BHT as antioxidants to stabilize alkylating agents and thus have interchangeable function. "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable

EAGLEBEN-SA_00001907

results." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007). Moreover, "Where two known alternatives are interchangeable for a desired function, an express suggestion to substitute one for the other is not needed to render a substitution obvious." *In re Fout*, 675 F.2d 297, 301 (CCPA 1982). Accordingly, the ordinary artisan would select the antioxidant monothioglycerol and optimize the amount to about 5 mg/mL to achieve the desired degree of stability with a reasonable expectation of success especially when Tait et al. teach using from 0-5%.

In light of the forgoing discussion, the Examiner concludes that the subject matter defined by the instant claims would have been obvious within the meaning of 35 USC 103(a).

From the combined teachings of the references, it is apparent that one of ordinary skill in the art would have had a reasonable expectation of success in producing the claimed invention. Therefore, the invention as a whole was *prima facie* obvious to one of ordinary skill in the art at the time the invention was made, as evidenced by the combined references, especially in the absence of evidence to the contrary.

**Response to Arguments:**

Applicant's arguments are moot in view of the new ground of rejection necessitated by amendment. In the present case, the scope of the claims is different from the scope of the claims previously allowed by the Examiner and Brittain et al. is relevant now that the rejection over Drager et al. has been overcome. The Examiner has these brief comments concerning the IDS documents filed 6/14/23. Even the responsive expert report of Juergen Siepmann acknowledged in paragraph 61 that

EAGLEBEN-SA_00001908

Application/Control Number: 18/081,251                                      Page 12
Art Unit: 1613

Brittain et al. teach and suggest liquid polyethyelene glycol in the ultimate dosage form from a very limited list of carrier/vehicle solvents. However, in the expert's opinion stated in paragraph 304, that paragraph [0067] in Brittain would not have caused the POSA to limit her or his consideration of solvents to PG, PEG and glycerol because the list of solvents is exemplary, not based on any actual experiments conducted and not related to shelf-stable liquid bendamustine formulations. However, that is not the test for obviousness. "In the consideration of references, the question is, could one skilled in the art with the references before him make the combination of elements here claimed without exercise of the inventive faculty," *In re Goepfrich*, 136 F.2d 918, 920 (C.C.P.A. 1943). In the Examiner's analysis that answer is yes. All that is required to show obviousness is that the applicant "make his claimed invention merely by applying knowledge clearly present in the prior art. Section 103 requires us to presume full knowledge by the inventor of the *prior* art in the field of his endeavor." *In re Winslow*, 365 F.2d 1017, 1020, 53 C.C.P.A. 1574, 1578 (1966). *Application of Sheckler*, 438 F.2d 999, 1001 (C.C.P.A. 1971). Here, there reference of Brittain et al. guides the artisan to adding polyethylene glycol, a common conventional pharmaceutical excipient, to a sterile vial of bendamustine. It does not matter if Brittain et al. did so in an example or not; the teaching is present. Shelf stability is naturally present in the ultimate dosage form of Brittain et al. when so reconstituted whether Brittain et al. recognized it or not. Furthermore, "a formulation intended to be stored for the shelf life of the product", paragraph 306, is merely intended use of the formulation.

Additionally, the expert argues in paragraph 305 that in their opinion, "paragraph 67 of Brittain 2006 would not have provided the POSA with such a motivation or reason.

EAGLEBEN-SA_00001909

Application/Control Number: 18/081,251                                      Page 13
Art Unit: 1613

The teachings of Brittain 2006 that Dr. Pinal cites are entirely focused on lyophilized bendamustine formulations, not liquid bendamustine formulations." The Examiner does not agree because Brittain et al. teach and suggest to the ordinary artisan that once you have the sterile vial with lyophilized bendamustine, in order to make the ultimate dosage form, polyethyelene glycol with optionally ethanol and/or propylene glycol is added. Just having a sterile vial of lyophilized bendamustine is of no use because it has to be reconstituted in order to be administered. Therefore, Brittain et al. does focus on liquid bendamustine formulations as well as lyophilized ones.

### *Conclusion*

No claims are allowed.

Applicant's amendment necessitated the new ground(s) of rejection presented in this Office action.  Accordingly, **THIS ACTION IS MADE FINAL**.  See MPEP § 706.07(a).  Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE MONTHS from the mailing date of this action.  In the event a first reply is filed within TWO MONTHS of the mailing date of this final action and the advisory action is not mailed until after the end of the THREE-MONTH shortened statutory period, then the shortened statutory period will expire on the date the advisory action is mailed, and any extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of the advisory action.  In no event, however, will the statutory period for reply expire later than SIX MONTHS from the date of this final action.

EAGLEBEN-SA_00001910

Application/Control Number: 18/081,251                                            Page 14
Art Unit: 1613

Any inquiry concerning this communication or earlier communications from the examiner should be directed to ERNST V ARNOLD whose telephone number is (571)272-8509. The examiner can normally be reached M-F 7-3:30.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Brian Y Kwon can be reached on 571-272-0581. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of published or unpublished applications may be obtained from Patent Center. Unpublished application information in Patent Center is available to registered users. To file and manage patent submissions in Patent Center, visit: https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-center for more information about Patent Center and https://www.uspto.gov/patents/docx for information about filing in DOCX format. For additional questions, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/ERNST V ARNOLD/
Primary Examiner, Art Unit 1613

EAGLEBEN-SA_00001911

| _Search Notes_ | Application/Control No. | Applicant(s)/Patent Under Reexamination |
| --- | --- | --- |
| | 18/081,251 | Palepu et al. |
| | **Examiner** | **Art Unit** |
| | ERNST V ARNOLD | 1613 |

**CPC - Searched\***

| Symbol | Date | Examiner |
| --- | --- | --- |
| (A61K31/4184 OR A61K9/08 OR A61K47/10 OR A61K47/12 OR A61K47/18 OR A61K47/20 OR A61K47/22 OR A61K9/0019).cpc. AND ((bendamustine OR (nitrogen ADJ mustard) OR (alkylating WITH agent)) AND antioxidant AND (PEG OR (polyalkylene ADJ glycol) OR (polyethylene ADJ glycol))) | 03/09/2023 | eva |

**CPC Combination Sets - Searched\***

| Symbol | Date | Examiner |
| --- | --- | --- |
| | | |

**US Classification - Searched\***

| Class | Subclass | Date | Examiner |
| --- | --- | --- | --- |
| | | | |

\* See search history printout included with this form or the SEARCH NOTES box below to determine the scope of the search.

**Search Notes**

| Search Notes | Date | Examiner |
| --- | --- | --- |
| inventor/assignee name PALM/PE2E | 03/09/2023 | eva |
| PE2E | 03/09/2023 | eva |
| GOOGLE SCHOLAR | 03/09/2023 | eva |
| updated IDS | 07/05/2023 | eva |

**Interference Search**

| US Class/CPC Symbol | US Subclass/CPC Group | Date | Examiner |
| --- | --- | --- | --- |
| | | | |

| | |
| --- | --- |
| | |

EAGLEBEN-SA_00001912

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 18/081,251 | Palepu et al. |
| | Examiner | Art Unit |
| | ERNST V ARNOLD | 1613 |

| | |
|---|---|
| | |

EAGLEBEN-SA_00001913

Receipt date: 06/14/2023                                                                                    18/081,251 - GAU: 1613

Doc code: IDS

Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (02-18)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

## INFORMATION DISCLOSURE STATEMENT BY APPLICANT

( Not for submission under 37 CFR 1.99)

| | |
|---|---|
| Application Number | 18081251 |
| Filing Date | 2022-12-14 |
| First Named Inventor | Nagesh R. Palepu |
| Art Unit | 1613 |
| Examiner Name | Arnold, Ernst V. |
| Attorney Docket Number | 107071.000583 |

### U.S.PATENTS — Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button. **Add**

### U.S.PATENT APPLICATION PUBLICATIONS — Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button. **Add**

### FOREIGN PATENT DOCUMENTS — Remove

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2]i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button **Add**

### NON-PATENT LITERATURE DOCUMENTS — Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00001914

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 18081251 |
| --- | --- | --- |
| | Filing Date | 2022-12-14 |
| | First Named Inventor | Nagesh R. Palepu |
| | Art Unit | 1613 |
| | Examiner Name | Arnold, Ernst V. |
| | Attorney Docket Number | 107071.000583 |

| /E.V.A/ | 1 | Cephalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al., Civil Action No. 1:17-cv-01154: Responsive Expert Report of Juergen Siepmann, Ph.D., 525 pages. | |
| --- | --- | --- | --- |
| /E.V.A/ | 2 | Cephalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al., Civil Action No. 1:17-cv-01154: Opinion, dated 04/27/20, 70 pages. | |

If you wish to add additional non-patent literature document citation information please click the Add button | Add |

### EXAMINER SIGNATURE

| Examiner Signature | /ERNST V ARNOLD/ | Date Considered | 07/05/2023 |
| --- | --- | --- | --- |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00001915

Receipt date: 06/14/2023                                                          18/081,251 - GAU: 1613

| | | | |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Application Number | | 18081251 |
| | Filing Date | | 2022-12-14 |
| | First Named Inventor | | Nagesh R. Palepu |
| | Art Unit | | 1613 |
| | Examiner Name | | Arnold, Ernst V. |
| | Attorney Docket Number | | 107071.000583 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

☒ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

## SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Stephanie A. Lodise/ | Date (YYYY-MM-DD) | 2023-06-14 |
|---|---|---|---|
| Name/Print | Stephanie A. Lodise | Registration Number | 51430 |

This collection of information is required by 37 CFR 1.97 and 1.98.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00001916

Receipt date: 06/14/2023
18/081,251 - GAU: 1613

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.V.A/

EAGLEBEN-SA_00001917

TO:      eofficemonitor@bakerlaw.com
FROM:    noreply@uspto.gov
CC:      patentcenter_eofficeaction@uspto.gov
SUBJECT: USPTO: Patent Electronic System - Correspondence Notification for Customer Number 23377

Tue Jul 11 05:19:06 EDT 2023

Dear Patent Center Customer:

Correspondence Address:

BakerHostetler
1735 Market Street
Suite 3300
Philadelphia,PENNSYLVANIA,19103-7501
UNITED STATES

This is a courtesy notification regarding the following USPTO patent application(s) associated with your Customer Number, 23377, that have new outgoing correspondence. This correspondence is now available for viewing in Patent Center.

The official date of notification of the outgoing correspondence will be indicated on the form (e.g., PTOL-90) accompanying the correspondence.

Disclaimer:

The list of documents shown below are provided as a courtesy and is not part of the official file wrapper. The content of the images shown in the Image File Wrapper is the official record.

| Application | Document | Mailroom Date | Attorney Docket No. |
|---|---|---|---|
| 18081251 | CTFR | 07/11/2023 | 107071.000583 |
| 18081251 | 1449 | 07/11/2023 | 107071.000583 |

To view your correspondence online, please sign in to Patent Center and then select Workbench/View correspondence. To update your email address(es), select Manage/Manage customer numbers.

If you have any questions, please contact the Patent Electronic Business Center (EBC) at ebc@uspto.gov or 866-217-9197 Monday – Friday, 6 a.m. to midnight ET.

Please do not reply to this email as it was sent from an unmonitored mailbox.

Sincerely,

The Patent Center Team

EAGLEBEN-SA_00001918

Doc Code: A.NE.AFCP
Document Description: After Final Consideration Pilot Program Request

PTO/SB/434 (05-13)

## CERTIFICATION AND REQUEST FOR CONSIDERATION UNDER THE AFTER FINAL CONSIDERATION PILOT PROGRAM 2.0

| Practitioner Docket No.: 107071.000583 | Application No.: 18/081,251 | Filing Date: December 14, 2023 |
|---|---|---|
| First Named Inventor: Nagesh R. Palepu | Title: Formulations for Bendamustine | |

APPLICANT HEREBY CERTIFIES THE FOLLOWING AND REQUESTS CONSIDERATION UNDER THE AFTER FINAL CONSIDERATION PILOT PROGRAM 2.0 (AFCP 2.0) OF THE ACCOMPANYING RESPONSE UNDER 37 CFR 1.116.

1. The above-identified application is (i) an original utility, plant, or design nonprovisional application filed under 35 U.S.C. 111(a) [a continuing application (*e.g.*, a continuation or divisional application) is filed under 35 U.S.C. 111(a) and is eligible under (i)], or (ii) an international application that has entered the national stage in compliance with 35 U.S.C. 371(c).

2. The above-identified application contains an outstanding final rejection.

3. Submitted herewith is a response under 37 CFR 1.116 to the outstanding final rejection. The response includes an amendment to at least one independent claim, and the amendment does not broaden the scope of the independent claim in any aspect.

4. This certification and request for consideration under AFCP 2.0 is the only AFCP 2.0 certification and request filed in response to the outstanding final rejection.

5. Applicant is willing and available to participate in any interview requested by the examiner concerning the present response.

6. This certification and request is being filed electronically using the Office's electronic filing system (EFS-Web).

7. Any fees that would be necessary consistent with current practice concerning responses after final rejection under 37 CFR 1.116, *e.g.*, extension of time fees, are being concurrently filed herewith. [There is no additional fee required to request consideration under AFCP 2.0.]

8. By filing this certification and request, applicant acknowledges the following:

   - Reissue applications and reexamination proceedings are not eligible to participate in AFCP 2.0.
   - The examiner will verify that the AFCP 2.0 submission is compliant, *i.e.*, that the requirements of the program have been met (see items 1 to 7 above). For compliant submissions:
     - The examiner will review the response under 37 CFR 1.116 to determine if additional search and/or consideration (i) is necessitated by the amendment and (ii) could be completed within the time allotted under AFCP 2.0. If additional search and/or consideration is required but cannot be completed within the allotted time, the examiner will process the submission consistent with current practice concerning responses after final rejection under 37 CFR 1.116, *e.g.*, by mailing an advisory action.
     - If the examiner determines that the amendment does not necessitate additional search and/or consideration, or if the examiner determines that additional search and/or consideration is required and could be completed within the allotted time, then the examiner will consider whether the amendment places the application in condition for allowance (after completing the additional search and/or consideration, if required). If the examiner determines that the amendment does not place the application in condition for allowance, then the examiner will contact the applicant and request an interview.
       - The interview will be conducted by the examiner, and if the examiner does not have negotiation authority, a primary examiner and/or supervisory patent examiner will also participate.
       - If the applicant declines the interview, or if the interview cannot be scheduled within ten (10) calendar days from the date that the examiner first contacts the applicant, then the examiner will proceed consistent with current practice concerning responses after final rejection under 37 CFR 1.116.

| Signature /Stephanie A. Lodise/ | Date July 28, 2023 |
|---|---|
| Name (Print/Typed) Stephanie A. Lodise | Practitioner Registration No. 51430 |

*Note: This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4(d) for signature requirements and certifications. Submit multiple forms if more than one signature is required, see below*.

☐ * Total of _____ forms are submitted.

EAGLEBEN-SA_00001919

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EAGLEBEN-SA_00001920

**DOCKET NO.:** 107071.000583                                                          **PATENT**
**Application No.:** 18/081,251
**Office Action Dated:  July 11, 2023**

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

    **Nagesh R. Palepu et al.**                          **Confirmation No.:  8743**

**Application No.:  18/081,251**                          **Group Art Unit:  1613**

**Filing Date:  December 14, 2022**                      **Examiner:   ERNST V ARNOLD**

For:     **FORMULATIONS OF BENDAMUSTINE**

Mail Stop AF
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

**REPLY PURSUANT TO 37 CFR § 1.116**

In response to the Official Action dated July 11, 2023, reconsideration is respectfully requested in view of the amendments and/or remarks as indicated below:

☐     **Amendments to the Specification** begin on page of this paper.

☐     **Amendments to the Abstract** begin on page of this paper.

☒     **Amendments to the Claims** are reflected in the listing of the claims which begins on page 2 of this paper.

☐     **Amendments to the Drawings** begin on page of this paper and include an attached replacement sheet.

☒     **Remarks** begin on page 5 of this paper.

☒     The Commissioner is hereby authorized to charge any fee deficiency, charge any additional fees, or credit any overpayment of fees, associated with this application in connection with this filing, or any future filing, submitted to the U.S. Patent and Trademark Office during the pendency of this application, to Deposit Account No. 23-3050.

EAGLEBEN-SA_00001921

DOCKET NO.:  107071.000583                                    **PATENT**
Application No.:  18/081,251
Office Action Dated:  July 11, 2023

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims:**

1.    (currently amended) A sterile vial containing a liquid bendamustine-containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL;

a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

a stabilizing amount of an antioxidant,

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

2.    (Original) The sterile vial of claim 1, wherein the composition comprises about 100 mg of bendamustine.

3.    (Original) The sterile vial of claim 1, wherein the bendamustine concentration in the composition is about 25 mg/mL.

4.    (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol.

5.    (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

6.    (Original) The composition of claim 1, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.

7.    (cancelled)

Page 2 of 14

EAGLEBEN-SA_00001922

DOCKET NO.:  107071.000583                                      **PATENT**
Application No.:  18/081,251
Office Action Dated:  July 11, 2023

8.      (Original) The sterile vial of claim 1, wherein the liquid bendamustine-containing composition further comprises ethanol.

9.      (Cancelled)

10.     (Cancelled)

11.     (currently amended) A <u>liquid</u> bendamustine-containing composition comprising bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid;

wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 20 mg/mL to about 60 mg/mL<u>,</u>

<u>wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C</u>.

12.     (Original) The composition of claim 11, comprising 100 mg of bendamustine.

13.     (Original) The composition of claim 11, wherein the bendamustine concentration is about 25 mg/mL.

14.     (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol.

15.     (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

4877-8133-8480.2

EAGLEBEN-SA_00001923

**DOCKET NO.:**  107071.000583                                    **PATENT**
**Application No.:**  18/081,251
**Office Action Dated:  July 11, 2023**

16.    (cancelled)


17.    (cancelled)


18.    (Previously Presented) The composition of claim 11, further comprising ethanol.

4877-8133-8480.2

EAGLEBEN-SA_00001924

DOCKET NO.: 107071.000583                                              PATENT
Application No.: 18/081,251
Office Action Dated: July 11, 2023

## REMARKS

Claims 1-6, 8, 11-15, and 17-18 are pending, with claims 1 and 11 being independent. Claims 1 and 11 have been amended to incorporate subject matter of claims 7 and 17, respectively. No new subject matter has been added.  A Request for Consideration Under AFCP 2.0 accompanies this response.

Applicant's representative thanks Examiner Arnold for the courtesy of the telephone conference conducted on July 12, 2023, for the related 18/081,238. The office action and cited art were discussed, as well as arguments and evidence submitted and found persuasive in U.S. 11,103,483.

### Withdrawn Rejections

Applicant thanks Examiner Arnold for his comments that the rejections over Drager[1] have been withdrawn and that the terminal disclaimers Applicant filed have been accepted.

### Brief Description of the Claimed Inventions

The pending claims recite, among other things, liquid bendamustine-containing compositions having from about 20 mg/mL to about 60 mg/mL of bendamustine; polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol; and an antioxidant. The recited compositions are not reconstituted lyophilized powders; they are concentrated, bendamustine-containing liquids for administration through infusion with an appropriate diluent.  (*See, e.g.,* Specification at page 2).  This avoids the multi-step reconstitution and preparation for administration required for the Brittain[2] products, including TREANDA®. These liquid compositions, which only need to be diluted prior to patient administration, are surprisingly stable and do not exhibit significant bendamustine degradation after storage for at least 15 months at refrigerated or room temperature conditions.

### Claim Rejections – 35 U.S.C. § 103

The Examiner alleges that claims 1-3, 8, 11-13 and 16-18 would have been obvious Brittain.[3] At the time of the invention, one of ordinary skill in the art would not have been

---

[1] US20110190363
[2] US 2006159713
[3] US 2006/0159713

4877-8133-8480.2

EAGLEBEN-SA_00001925

motivated to make a liquid bendamustine-containing composition incorporating polyethylene glycol (PEG) and an antioxidant, as claimed. Moreover, the stability achieved by the claimed compositions would have been unexpected in view of the cited art. Applicant requests reconsideration and withdrawal of the rejection.

**Those of Ordinary Skill in the Art Would Not Have Had Any Reason to Prepare a Bendamustine-Containing Liquid Having a Concentration of 20 mg/ml to about 60 mg/mL**

Brittain fails to motivate anyone of skill in the art to prepare a liquid composition having a bendamustine concentration of 20 mg/mL to about 60 mg/mL, or any amount within that range. Prior to Applicant's invention, Treanda® (lyophilized bendamustine hydrochloride) was commercially available and would have informed those of ordinary skill about administering bendamustine to a human. In view of that information, the skilled person would not have arbitrarily deviated from those Treanda® administration instructions, as the Examiner suggests. Action at 8-9.

The Prescribing Information for Treanda®, which is of record in this application, instructs that lyophilized bendamustine should be reconstituted with water to a concentration of no more than 5 mg/mL, before being added to a 500 mL infusion bag of aqueous dextrose/sodium chloride to achieve further dilution to 0.2 – 0.6 mg/mL for patient administration:

2.3   Reconstitution/Preparation for Intravenous Administration
Aseptically reconstitute each TREANDA vial as follows:
o   25 mg TREANDA vial: Add 5 mL of only **Sterile Water for Injection, USP.**
o   100 mg TREANDA vial: Add 20 mL of only **Sterile Water for Injection, USP.**

Shake well to yield a clear, colorless to a pale yellow solution with a bendamustine HCl concentration of 5 mg/mL. The lyophilized powder should completely dissolve in 5 minutes. If particulate matter is observed, the reconstituted product should not be used.

Aseptically withdraw the volume needed for the required dose (based on 5 mg/mL concentration) and immediately transfer to a 500 mL infusion bag of 0.9% Sodium Chloride Injection, USP (normal saline). As an alternative to 0.9% Sodium Chloride Injection, USP (normal saline), a 500

mL infusion bag of 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, may be considered. The resulting final concentration of bendamustine HCl in the infusion bag should be within 0.2 – 0.6 mg/mL. The reconstituted solution must be transferred to the infusion bag within 30 minutes of reconstitution. After transferring, thoroughly mix the contents of the infusion bag. The admixture should be a clear and colorless to slightly yellow solution.

(Treanda at Section 2.3; *see also,* Brittain at paragraph [0100] (stating that Brittain's lyophilized formulations are reconstituted with water and then further diluted with, *e.g.,* saline). Brittain refers to polyethylene glycol as an example of a "liquid carrier or vehicle" for preparing the ultimate dosage form. (Brittain at paragraph [0067]). Brittain does not suggest, however, that the skilled person should deviate from the concentrations specified by Treanda®.

EAGLEBEN-SA_00001926

DOCKET NO.:  107071.000583                                           **PATENT**
Application No.:  18/081,251
Office Action Dated:  July 11, 2023

While Treanda® refers to a concentrated solution of bendamustine which is subsequently further diluted for administration, it is clear that Treanda® refers to 5 mg/mL (bendamustine in water), which is much more dilute than presently claimed.  Treanda® then instructs that this concentration should be "immediately" transferred to an infusion bag to provide the 0.2-0.6 mg/mL concentration for administration.  Without Applicant's disclosure, those skilled in the art would have had no reason to prepare more concentrated bendamustine liquids, *e.g.,* 20 mg/mL to 60 mg/mL.  Nor would they have had any expectation that those more concentrated liquids would have had the claimed stability characteristics.  The rejection should be withdrawn for at least these reasons.

**Those of Ordinary Skill in the Art Would Not Have Included an Antioxidant in Any Liquid Bendamustine Composition**

Despite the Examiner's assertions, Brittain does not suggest that an antioxidant should be added to a liquid bendamustine/PEG composition.  In fact, those of ordinary skill in the art would not have expected the addition of an antioxidant to be beneficial to bendamustine's storage stability because no reference had suggested that bendamustine degraded *via* an oxidative mechanism.[4,5]  Moreover, industry guidance discouraged the use of antioxidants, recommending other methods for reducing oxidation.

*Brittain does not teach that an antioxidant should be added to a liquid bendamustine composition*

The Examiner alleges that Brittain teaches lyophilizing bendamustine with an antioxidant.  (Action at 7).  Brittain provides no such disclosure.  None of Brittain's exemplified compositions includes an antioxidant.  Moreover, the paragraph relied upon by the Examiner merely states that an antioxidant could be used as a lyophilization excipient only "if desired." (Brittain at paragraph [0088]; Action at 7).  This statement hardly provides the "clear and unambiguous" instruction to include an antioxidant, as the Examiner appears to imply.  The Examiner has not articulated how Brittain would have suggested to one of ordinary skill in the

---

[4] *See, e.g.,* Exhibit B, Excerpts from the *Responsive Expert Report of Juergen Siepmann, Ph.D.* ("Siepmann Report").
[5] *See also,* Exhibit A, pages 25-26 (finding that "Defendants did not establish by clear and convincing evidence that [the prior art] would have motivated a POSITA to use an antioxidant" to curb PEG oxidation).

4877-8133-8480.2

EAGLEBEN-SA_00001927

DOCKET NO.:  107071.000583                                                                                    **PATENT**
Application No.:  18/081,251
Office Action Dated:  July 11, 2023

art that an antioxidant should be included in a liquid bendamustine/PEG composition and the rejection should be withdrawn for at least this reason.

***The art does not teach that bendamustine can degrade via an oxidative mechanism***

Bendamustine rapidly degrades in water *via* several pathways, none of which are oxidative.  (*See, e.g.,* Specification at page 2).  One pathway by which bendamustine degrades is *via* aziridinium ring hydrolysis, which produces HP1 and HP2:

(Brittain at paragraph [0022]; Maas,[6] Studies and Results, Scheme; U.S. 8,344,066 (the 066 patent)[7] at col. 1, lines 50-65; col. 4, lines 33-45).

Bendamustine also degrades *via* dimer formation, which occurs when a molecule of bendamustine attacks the aziridinium ring:

---

[6] Maas is of record in this application. A copy of Maas, along with an English translation, accompanies this response.
[7] The 066 patent is of record in this application.

4877-8133-8480.2

EAGLEBEN-SA_00001928

DOCKET NO.: 107071.000583                                                    **PATENT**
Application No.: 18/081,251
Office Action Dated: July 11, 2023

(Brittain at paragraph [0027]; the 066 patent at col. 4, lines 50-67).

Another pathway for bendamustine degradation is esterification of the -COOH with mono- and poly-hydroxy-containing compounds. Various bendamustine ester degradation products have been reported in the art:

(Brittain at paragraph [0111]; the 066 patent at col. 5, lines 13-44).

While many bendamustine degradation mechanisms have been reported, the art did *not* teach that bendamustine degrades *via* any oxidative pathway.

4877-8133-8480.2

EAGLEBEN-SA_00001929

**DOCKET NO.:**  107071.000583                                                                          **PATENT**
**Application No.:**  18/081,251
**Office Action Dated:  July 11, 2023**

"Antioxidants are used to reduce the oxidation of active substances and excipients in the finished product."  (Note for Guidance, European Agency for the Evaluation of Medicinal Products, page 8 of 9 (of record)).  Since bendamustine was not known to degrade *via* an oxidative process, those of ordinary skill in the art would not have tried to reduce degradation by adding an antioxidant to a bendamustine composition.[8]  The claims are non-obvious for at least this reason.

### Industry Guidance Discouraged Using Antioxidants in Parenteral Formulations

Even if those skilled in the art sought to discourage oxidation in a particular bendamustine composition, the guidance to the industry at the time of the invention was to ***not*** include an antioxidant.  Instead, industry guidance encouraged addressing oxidation by ***other*** means.  For example, the European Agency for the Evaluation of Medicinal Products (EMEA) stated that:

> Antioxidants should only be included in a formulation if it has been proven that their use cannot be avoided. This applies to cases where the manufacturing process is optimised to minimise the potential for oxidation.

(EMEA Guidance at 8 of 9).  Indeed, it had been suggested at the time of the invention that the use of antioxidants in parenteral formulations was "now in decline" and that a "preferred method of preventing oxidation is simply to exclude oxygen."  (Broadhead at 334)[9].

Even if oxidation of a liquid bendamustine composition was for some reason a concern,[10] industry guidance discouraged adding antioxidants and recommended other means for preventing oxidation.[11]  Those of ordinary skill in the art, therefore, would have been dissuaded from including antioxidants in any liquid bendamustine composition and the rejection should be

---

[8] Noteworthy is that the Treanda® lyophilized product does not include any antioxidant – it contains only bendamustine HCl and mannitol. (Treanda® at Section 11).

[9]

**Use of Excipients**

Excipients may be useful in preventing chemical and physical instability. Antioxidants are included in parenteral formulations, although their use is now in decline, and EU guidelines discourage their use unless no other alternative exists (see sect. "Parenteral Products and the

[10] As discussed *supra*, Applicant does not concede this point.

[11] There were four marketed PEG-containing parenteral formulations available in the United States as of this application's priority date and none of them contained an antioxidant.  (*See* Appendix A, attached hereto, Siepmann Report at ¶¶355-358 (discussing Ativan®, Busulfex®, Robaxin®, and VePesid®))

Page 10 of 14

4877-8133-8480.2

EAGLEBEN-SA_00001930

DOCKET NO.:  107071.000583                                                                 **PATENT**
Application No.:  18/081,251
Office Action Dated:  July 11, 2023

withdrawn for at least this reason.  *See, e.g.,* Exhibit A, Opinion of J. Connelly at pages 26, reproduced, below:

> Other prior art references, however, teach away from the use of antioxidants.
> *See* Tr. 1452:20–53:21; *Note for Guidance*, European Agency for the Evaluation of
> Medicinal Products, PTX-0629 at TEVABEND00290713, TEVABEND00290720
> ("Antioxidants should only be included in a formulation if it has been proven [t]hat
> their use cannot be avoided."); *Pharmaceutical Preformulation and Formulation*,
> Interpharm, PTX-0391 at JDG_BENDA_00000415 (stating that antioxidant use "is
> now in decline" and that "[a] preferred method of preventing oxidation [over
> antioxidants] is simply to exclude oxygen").  Moreover, none of the four approved
> injectable products in the prior art that contained PEG included an antioxidant.  Tr.
> 600:4–6, 1454:24–55:17; PTX-0722 (Ativan); PTX-0718 (Busulfex); PTX-0720
> (Robaxin); PTX-0569 at JDG_BENDA_00003308 (VePesid).  In addition, the

**The Claimed Compositions Are Surprisingly and Unexpectedly Stable During Storage**

As reported in the specification, a composition including bendamustine in PEG exhibited 2.28% of impurities after storage at room temperature for 15 days and 41.9% impurities after storage for 15 days at 40 °C.  (Specification at Example 3, page 13, Table 3, reproduced below).

4877-8133-8480.2

EAGLEBEN-SA_00001931

DOCKET NO.:  107071.000583                                          **PATENT**
Application No.:  18/081,251
Office Action Dated:  July 11, 2023

| Antioxidant | T$^o$C | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
|  | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
|  | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

Based on these poor stability results, a person would have forsaken development of a liquid bendamustine/PEG composition.  A composition presenting such a poor initial stability profile would have been deemed unsuitable as a starting point to create a storage-stable composition.  *See, e.g.,* Exhibit B, attached hereto, Siepmann Report at ¶¶ 359, 469-71, reproduced, below:

359.    The POSA likewise would have understood that Dr. Pinal's suggested formulation approach—to add PEG to the formulation and also to add an antioxidant to fix the degradation caused by the PEG—was not conventional.  Rather, in view of the small number of marketed parenteral drugs containing PEG, and the fact that none of those drugs contained an antioxidant, the POSA would have inferred that formulators simply did not use PEG with drugs that might be susceptible to degradation via PEG's oxidation products.  In my opinion, and based on my experience as a formulator, the POSA would not have been motivated or had reason to add PEG to a formulation if she or he believed that doing so would have necessitated also adding an antioxidant.

Page 12 of 14

4877-8133-8480.2

EAGLEBEN-SA_00001932

DOCKET NO.:  107071.000583                                                         **PATENT**
Application No.:  18/081,251
Office Action Dated:  July 11, 2023

469.    I further agree with Dr. Pinal that it was known that PEG could form various degradation products.  As I explain above, the POSA would have viewed the degradation products of PEG as a disadvantage that would have discouraged the use of that solvent.  *See, e.g.,* ¶¶ 339–360.

470.    I disagree, however, with Dr. Pinal that PEG's known sensitivity to oxidation would have motivated or provided reason for the POSA to use an antioxidant with PEG.  I likewise disagree that the POSA would have been motivated or had reason to use an antioxidant in conjunction with PG and bendamustine.

471.    As I explain in detail above, the POSA would have been strongly motivated to avoid using an antioxidant in the formulation.  *See* ¶¶ 344–360.  The POSA would have preferred to keep the formulation as simple as possible; adding an antioxidant would have introduced substantial complexity into the formulation, including increasing the risk of unwanted interactions between the excipients and bendamustine.  *See* ¶¶ 344–345.  The POSA would have understood that antioxidants are particularly reactive and likely to cause unwanted interactions in the formulation.  *See* ¶ 346.  Adding an antioxidant would also have been undesirable because the concentration of the antioxidant would have to be maintained throughout the shelf life of the product—in effect, the stability of the product would become dependent on the antioxidant.  *See* ¶ 347.  The POSA also would have understood that an antioxidant might not completely solve any potential oxidation problem and that finding an appropriate antioxidant would, in the first instance, be an unpredictable research effort.  *See* ¶¶ 349–352.

Despite the poor stability of bendamustine/PEG, surprisingly, adding an antioxidant substantially eliminated the formation of degradation products.  As shown in the specification, and the Table above, a bendamustine/PEG composition including antioxidant exhibited no

Page 13 of 14

4877-8133-8480.2

EAGLEBEN-SA_00001933

DOCKET NO.: 107071.000583                                      **PATENT**
Application No.: 18/081,251
Office Action Dated: **July 11, 2023**

substantial increase in degradants after storage for 15 days at either room temperature or 40 °C. (Specification at Example 3, page 13, Table 3).

The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if an antioxidant is added. Such an unexpected result could not have been predicted. This result is particularly unexpected given the absence of any report in the literature of an oxidative degradation pathway. The claims are patentable for at least this reason.

Claims 4, 5, 14 and 15 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Brittain in view of Tait.[12] As discussed above, Brittain fails to disclose or suggest a liquid bendamustine composition in PEG, with an antioxidant. Tait does not cure Brittain's deficiencies, nor is it alleged to. Tait is merely cited for its purported disclosure that antioxidants like BHA, BHT, and monothioglycerol might be used in ifosfamide formulations. Action at 11-12. The claims are patentable over the combination of Brittain and Tait and Applicant requests withdrawal of the rejection.

## CONCLUSION

Applicant respectfully submits that the present application is in condition for allowance. Reconsideration of the application and an early Notice of Allowance are respectfully requested. In the event that the Examiner cannot allow the application for any reason, the Examiner is encouraged to contact Applicant's representative.

Date: July 28, 2023                          /Stephanie A. Lodise/
                                             Stephanie A. Lodise
                                             Registration No. 51,430

Baker & Hostetler LLP
1735 Market Street, Suite 3300
Philadelphia, PA 19103
(215)-568-3100

---

[12] WO 200202125

4877-8133-8480.2

EAGLEBEN-SA_00001934

# EXHIBIT A

EAGLEBEN-SA_00001935

Case 1:17-cv-01154-CFC    Document 394    Filed 04/27/20    Page 3 of 30 PageID #:14431

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CEPHALON, INC., *et al.*, | | |
| Plaintiffs, | | |
| v. | | Civil Action No. 17-1154-CFC **CONSOLIDATED** |
| SLAYBACK PHARMA LIMITED LIABILITY CO., *et al.*, | | |
| Defendants. | | |

---

John Shaw, Karen Keller, Nathan Hoeschen, SHAW KELLER LLP, Wilmington, Delaware; David Berl, Adam Harber, Elise Baumgarten, Shaun Mahaffy, Ben Picozzi, Matthew Lachman, WILLIAMS & CONNOLLY LLP, Washington, District of Columbia

*Counsel for Cephalon, Inc.*

John Shaw, Karen Keller, Nathan Hoeschen, SHAW KELLER LLP, Wilmington, Delaware; Alex Grabowski, Kenneth Schuler, Marc Zubick, LATHAM & WATKINS LLP, Chicago, Illinois, Daniel Brown, Michelle Ernst, LATHAM & WATKINS LLP, New York, New York

*Counsel for Eagle Pharmaceuticals, Inc.*

John Shaw, Karen Keller, Nathan Hoeschen, SHAW KELLER LLP, Wilmington, Delaware; Elise Baumgarten, Matthew Lachman, WILLIAMS & CONNOLLY LLP, Washington, District of Columbia

*Counsel for Teva Pharmaceuticals International GmbH*

Eve Ormerod, Neal Belgam, SMITH, KATZENSTEIN, & JENKINS LLP, Wilmington, Delaware; Beth Finkelstein, Constance Huttner, Frank Rodriguez,

EAGLEBEN-SA_00001936

James Barabas, BUDD LARNER, P.C., Short Hills, New Jersey

*Counsel for Slayback Pharma Limited Liability Company*

Jeremy Cole, Damien Tancredi, Jeffrey Cohen, FLASTER GREENBURG, P.C., Wilmington, Delaware; John Cravero, Sherry Rollo, Steven Feldman, HAHN LOESER & PARKS LLP, Chicago, Illinois

*Counsel for Apotex Inc.*

Brian Farnan, Michael Farnan, FARNAN LLP, Wilmington, Delaware; Arun Mohan, SCHIFF HARDIN LLP, New York, New York; Helen Ji, Kevin Nelson, Imron Aly, SCHIFF HARDIN LLP, Chicago, Illinois

*Counsel for Fresenius Kabi USA, LLC*

James Lennon, DEVLIN LAW FIRM LLC, Wilmington, Delaware; David Steuer, Nicole Stafford, Shyamkrishna Palaiyanur, WILSON SONSINI GOODRICH & ROSATI, Austin, Texas; Rhyea Malik WILSON SONSINI GOODRICH & ROSATI, San Diego, California

*Counsel for Mylan Laboratories Limited*

**OPINION**

April 27, 2020
Wilmington, Delaware

ii

EAGLEBEN-SA_00001937

_____

COLM F. CONNOLLY
UNITED STATES DISTRICT JUDGE

Plaintiffs Teva Pharmaceuticals International GmbH, Cephalon, Inc., and Eagle Pharmaceuticals, Inc. have sued Defendants Apotex Inc. and Apotex Corp., Fresenius Kabi USA, LLC, Mylan Laboratories Ltd., and Slayback Pharma LLC under the Hatch-Waxman Act, 35 U.S.C. § 271(e)(2)(A). Defendants seek to bring to market generic versions of Plaintiffs' Bendeka®, a drug indicated for the treatment of chronic lymphocytic leukemia (CLL) and indolent B-cell non-Hodgkin lymphoma (NHL). D.I. 1 ¶¶ 1, 12.[1] Plaintiffs allege infringement of U.S. Patent Nos. 9,265,831 (the #831 patent), 9,572,797 (the #797 patent), 9,144,568 (the #568 patent) and 9,597,399 (the #399 patent) by all defendants and infringement of U.S. Patent No. 9,572,887 (the #887 patent) by Slayback. Defendants have stipulated to infringement of the asserted claims with two exceptions outlined below. Defendants argue that all asserted claims of the asserted patents are invalid.

I held a seven-day bench trial, and, as required by Federal Rule of Civil Procedure 52(a)(1), I have set forth separately below my findings of fact and conclusions of law.

_____

[1] All docket citations are to the docket for C.A. No. 17-1154 unless stated otherwise.

EAGLEBEN-SA_00001938

# I.    BACKGROUND

Plaintiffs sell Bendeka® under New Drug Application No. 208194.  D.I. 1 ¶ 13.  Eagle is the owner and assignee of the asserted patents and has listed them in connection with Bendeka® in the Orange Book maintained by the Food and Drug Administration (FDA).  *Teva Pharms. Int'l GmbH v. Apotex Inc.*, No. 17-1164 (D. Del. 2017), D.I. 1 ¶¶ 27–35.  Cephalon holds an exclusive license to the asserted patents and has assigned to Teva its rights under the license, including the right to sue for infringement.  *Id.*, D.I. 1 ¶¶ 38–39.

Bendeka®'s active ingredient is bendamustine hydrochloride (referred to by the parties as bendamustine), a nitrogen mustard chemotherapy drug that was first developed in East Germany in the 1960s.  D.I. 334 at 2; D.I. 364 ¶ 1.

In 2008, Cephalon launched the first U.S. bendamustine product, Treanda®. Tr. 403:18–22.  Cephalon initially sold Treanda® in a lyophilized, or freeze-dried, form.  Tr. 404:7–11, 1357:13–19.  Lyophilized drugs must be reconstituted into an injectable liquid before they can be administered to patients.  Tr. 404:7–18, 405:8–06:4.  Aware that bendamustine's toxicity makes it potentially dangerous for medical staff to reconstitute the drug, Eagle began in 2009 to develop a liquid bendamustine formulation that ultimately became Bendeka®.  Tr. 83:7–84:13, 86:3–19.

EAGLEBEN-SA_00001939

In November 2014, Cephalon launched its own liquid version of Treanda®. Tr. 981:25–82:2, 1657:10–11.

In 2015, Teva acquired Cephalon, Tr. 1660:10–14, and Cephalon thereafter commercialized Bendeka® as permitted by its exclusive license agreement with Eagle, PTX-0408; Tr. 1660:10–24, 1795:4–9.

On December 7, 2015, the FDA approved Bendeka®, D.I. 307-1 ¶ 152, and on January 27, 2016, Teva launched Bendeka®, DTX-0500; Tr. 984:17–85:23, 1006:6–07:5.  Bendeka® subsequently received orphan drug exclusivity, a seven-year period during which the FDA is precluded from approving any other manufacturer's application to market the same drug to treat the same rare disease. *Eagle Pharm., Inc. v. Azar*, 2018 WL 3838265, at *1 (D.D.C. June 8, 2018), *aff'd*, 952 F.3d 323 (D.C. Cir. 2020); Tr. 1725:15–19.

In March of 2016, Teva stopped selling liquid Treanda®.  DTX-0500_0001; Tr. 1623:7–8.

In July and August of 2017, Defendants each filed an Abbreviated New Drug Application (ANDA) with Paragraph IV certifications under § 505(j) of the Federal Food, Drug and Cosmetic Act to gain FDA-approval for the commercial manufacture, use, and sale of a generic version of Bendeka®. *E.g.*, D.I. 1 ¶ 15.  In August of 2017, Plaintiffs filed these suits alleging that Defendants' ANDA filings with Paragraph IV certifications constituted acts of infringement. *E.g.*, D.I. 1.

3

EAGLEBEN-SA_00001940

These cases were consolidated for all purposes. *See* December 13, 2017 Order.

At trial, Plaintiffs accused all Defendants other than Slayback of infringing six formulation claims in two of the asserted patents: claims 2, 3, and 5 of the #831 patent; and claims 9 and 11 of the #797 patent. Plaintiffs also alleged infringement of six administration claims in four of the asserted patents: claims 11, 18, and 22 of the #568 patent and claim 15 of the #399 patent (by all Defendants); claim 13 of the #399 patent (by Apotex only); and claim 13 of the #887 patent (by Slayback only). Defendants countered that (1) the asserted formulation and administration claims are invalid for obviousness under 35 U.S.C. § 103; (2) the asserted formulation claims are invalid for indefiniteness under 35 U.S.C. § 112; (3) the asserted formulation claims are invalid for lack of enablement under 35 U.S.C. § 112; and (4) claim 9 of the #797 patent is invalid for lack of written description. Defendants stipulated that they infringe or induce infringement of each of the asserted claims with two exceptions: Apotex, Fresenius Kabi, and Mylan argue that (1) their ANDA products do not contain "a stabilizing amount of an antioxidant" as the asserted formulation claims require; and (2) they do not induce infringement of claim 9 of the #797 patent.

## II.    OBVIOUSNESS

### A.    Legal Standards for Obviousness

Under § 103 of the Patent Act, codified at 35 U.S.C. § 1 *et seq.*, a patent

4

EAGLEBEN-SA_00001941

"may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art [POSITA] to which said subject matter pertains." 35 U.S.C. § 103. As the Supreme Court explained in the seminal case, *Graham v. John Deere Co.*, 383 U.S. 1 (1966), under § 103, "[a]n invention which has been made, and which is new in the sense that the same thing has not been made before, may still not be patentable if the difference between the new thing and what was known before is not considered sufficiently great to warrant a patent." *Id.* at 14. Section 103 ensures that "the results of ordinary innovation are not the subject of exclusive rights under the patent laws." *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007). "Were it otherwise patents might stifle rather than promote, the progress of useful arts." *Id.* (citing U.S. Const. art. I, § 8, cl. 8).

The Court reaffirmed in *KSR* that the "framework" set out in the following paragraph from *Graham* governs the application of § 103, *id.* at 406:

> While the ultimate question of patent validity is one of law, the [§] 103 condition [of patentability], . . . lends itself to several basic factual inquiries. Under [§] 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but

5

EAGLEBEN-SA_00001942

Case 1:17-cv-01194-CFC    Document 394    Filed 04/27/20    Page 8 of 70 PageID #: 14438

> unsolved needs, failure of others, etc., might be utilized
> to give light to the circumstances surrounding the origin
> of the subject matter sought to be patented.  As indicia of
> obviousness or nonobviousness, these inquiries may have
> relevancy.

*Graham*, 383 U.S. at 14–15 (citations omitted).

It is clear that under this framework, a district court must consider in an obviousness inquiry the three primary factors identified by the Court in *Graham*: (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, and (3) the level of ordinary skill in the pertinent art.  Less clear is the role, if any, secondary considerations should play in the analysis.

The logical—some would say necessary—implication of the Court's use of the word "secondary" in *Graham* and its holding that the secondary considerations "*might* be utilized" and "*may* have relevancy" is that a district court is permitted—but not required in all cases—to examine such considerations in evaluating an obviousness-based invalidity challenge.  The Court seemed to confirm as much in *KSR*, when it noted that "*Graham* set forth a broad inquiry and *invited* courts, *where appropriate*, to look at any *secondary considerations* that would prove instructive." *KSR*, 550 U.S. at 415 (emphasis added).

But a district court ignores *Graham*'s "invitation" to examine secondary considerations at its peril.  One legal scholar, Harmon, has observed that under Federal Circuit law "[w]e are able now safely to strike the 'may' in the . . .

6

EAGLEBEN-SA_00001943

sentence" in *Graham* in which the Court stated that secondary "indicia of obviousness and nonobviousness . . . may have relevancy." Robert Harmon, Cynthia Homan, Laura Lydigsen, *Patents and the Federal Circuit* 245 (13th ed. 2017). Harmon correctly notes that "[t]he Federal Circuit has emphatically and repeatedly held that objective evidence of non-obviousness [i.e., the "secondary considerations" identified in *Graham*] must be taken into account always and not just when the decisionmaker is in doubt." *Id.* In *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530 (Fed. Cir. 1983), for example, the Federal Circuit held that "evidence rising out of the so-called 'secondary considerations' must always when present be considered en route to a determination of obviousness." *Id.* at 1538. And in *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litigation*, 676 F.3d 1063 (Fed. Cir. 2012), the Federal Circuit reaffirmed that holding, *id.* at 1079, and went on to say that the Supreme Court in *Graham* "did not relegate . . . to 'secondary status'" the "objective factors" the Supreme Court had explicitly identified in *Graham* as "secondary considerations," *id.* at 1078.

It is true that less than a month after *In re Cyclobenzaprine*, a different Federal Circuit panel held in *Otsuka Pharmaceutical Co. v. Sandoz, Inc.*, 678 F.3d 1280 (Fed. Cir. 2012) that because it found that the defendants had "failed to prove that [the challenged patent claim] would have been *prima facie* obvious over the asserted prior art," it "need not address" the "objective evidence" of commercial

7

EAGLEBEN-SA_00001944

success, long-felt need, and the failure of others. *Id.* at 1296. But the safer course for a district court faced with an obviousness challenge (and looking to avoid reversal by the Federal Circuit) is to treat *Graham*'s "invitation" to look at secondary considerations like a subpoena.

Obviousness is assessed based on the perspective of a POSITA at the time of the invention. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). The court therefore needs to guard against "hindsight bias" that infers from the inventor's success in making the patented invention that the invention was obvious. *In re Cyclobenzaprine*, 676 F.3d at 1079. The ultimate question in the obviousness analysis is "whether there was an apparent reason [for a POSITA] to combine [at the time of the invention] the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418. "The analysis is objective." *Id.* at 406. Thus, a court must determine whether a POSITA "would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and . . . would have had a reasonable expectation of success from doing so." *In re Cyclobenzaprine*, 676 F.3d at 1069.

The party challenging the patent's validity bears the burden of proving obviousness by clear and convincing evidence. *Id.* at 1068–69. In weighing the *Graham* factors to decide whether the party has met that burden, the district court must be guided by common sense. *Wyers v. Master Lock Co.*, 616 F.3d 1231,

8

1238 (Fed. Cir. 2010). Indeed, "the legal determination of obviousness may include recourse to logic, judgment, and common sense, in lieu of expert testimony." *Id.* at 1239. In *KSR*, the Supreme Court warned lower courts to avoid "[r]igid preventative rules that deny factfinders common sense" and to employ instead "an expansive and flexible approach" under the *Graham* framework. *KSR*, 550 U.S. at 415. Thus, the district court may "reorder[ ] in any particular case" the "sequence" in which it considers the *Graham* factors. *Id.* at 407. And although a court should consider carefully the published prior art, "[t]he obviousness analysis cannot be confined by . . . overemphasis on the importance of published articles and the explicit content of patents." *Id.* at 419.

"[A]ny need or problem known in the field of endeavor at the time of the invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR*, 550 U.S. at 420. And "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* at 416. "[T]he fact that a combination was obvious to try might show that it was obvious under § 103." *Id.* at 421. But a combination is obvious to try only "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions" in the prior art at the time of the invention. *Id.* And the court must also be mindful that "when the prior art teaches away from combing

EAGLEBEN-SA_00001946

Case 1:17-cv-01164-CFC   Document 394   Filed 04/29/20   Page 42 of 46 PageID #: 14442

certain known elements, discovery of a successful means of combining them is more likely to be nonobvious." *Id.* at 416.

### B.   Obviousness of the Asserted Formulation Claims

#### 1.   Findings of Fact

##### a.   The Priority Date

The parties agree that the date of invention (i.e., the priority date) for the asserted formulation claims is January 28, 2010.  Tr. 403:4–6, 1352:16–21, 2015:3–16; #831 patent at (60); #797 patent at (60).

##### b.   Definition of the Relevant POSITA

The parties agree that a POSITA would have had the skills, education, and expertise of a team of individuals working together to formulate a liquid injectable drug product.  Such a team would have included individuals with doctoral degrees in chemistry, biochemistry, pharmaceutics, pharmaceutical sciences, chemical engineering, biochemical engineering or related fields, with at least two years of post-graduate experience in developing liquid injectable drug products, or master's or bachelor's degrees in similar fields of study, with a commensurate increase in their years of postgraduate experience.  Such a team also would have been familiar with a variety of issues relevant to developing liquid injectable drug formulations, including, among other things, solubility, stability, pharmacokinetics, pharmacodynamics, and other pharmaceutical characteristics.  Such a team also

EAGLEBEN-SA_00001947

would have included persons with expertise in analytical chemistry, including the detection and measurement of chemical degradants. The team also would have had access to an individual with a medical degree with experience in treating patients with CLL and NHL. PDX-4-2; Tr. 562:1–63:6, 1036:7–37:11, 1353:6–20, 2014:22–15:2.

### c.    Content of the Asserted Formulation Claims

The asserted formulation claims teach a non-aqueous liquid composition that contains (1) bendamustine (or a pharmaceutically acceptable salt thereof); (2) about 5% to about 10% by volume of the solvent propylene glycol (PG); (3) the solvent polyethylene glycol (PEG); (4) one of the following ratios of PEG to PG: about 95:5, about 90:10, about 85:15, about 80:20, and about 75:25; and (5) a stabilizing amount of an antioxidant. #831 patent at claims 2, 3, 5; #797 patent at claims 9, 11. Two claims also specify components and quantities: (1) claim 11 of the #797 patent requires that "the antioxidant is thioglycerol or monothioglycerol,"[2] and (2) claim 5 of the #831 patent requires that "the bendamustine concentration is from about 25 mg/mL to about 50 mg/mL." Certain claims also recite stability limitations such as "less than or equal to 0.11% PG esters at about 1 month of storage at about 5°C." #831 patent at claims 2, 3, 5; #797 patent at claims 9, 11.

---

[2] Thioglycerol or monothioglycerol are used synonymously. Tr. 519:10–15.

11

EAGLEBEN-SA_00001948

Case 1:24-cv-00065-JLH   Document 473   Filed 08/07/26   Page 350 of 515 PageID #:
27253
Case 1:17-cv-01064-CFC   Document 394   Filed 04/29/20   Page 19 of 50 PageID #:14444

### d.     Bendamustine, PEG, and PG

Bendamustine has two relevant functional groups at opposing ends of its chemical structure: a nitrogen mustard group and a carboxylic acid group.  Tr. 422:23–23:13, 430:19–31:6, 1038:5–7.

Nucleophiles—such as water, PG, and PEG—degrade bendamustine at its nitrogen mustard group through reactions in which an aziridinium ring forms.  Tr. 407:12–19, 564:10–66:12, 1038:13–21, 1043:23–46:12, 1381:11–18; DTX-0073 at 4:33–37; PTX-1010 at TEVABEND00296748.  Compounds like PEG and PG that have hydroxyl (OH) groups also degrade bendamustine at its carboxylic acid group through a process called esterification where the carboxylic acid group reacts with the OH groups to form degradants called esters.  Tr. 431:4–13.

When PEG is combined with bendamustine, a process called PEG oxidation accelerates the esterification reaction.  Tr. 484:15–85:11, 1416:11–18:12; PTX-0669 at TEVABEND00294275; PTX-0623 at TEVABEND00289470.  PEG thus causes more degradation at bendamustine's carboxylic acid group than the same amount of PG would cause.  Tr. 1054:5–59:11; PTX-0999 at TEVAVEND00292131; PTX-0997 at TEVABEND00291955.

Because water causes bendamustine to degrade at its nitrogen mustard group, the prior art bendamustine formulations used a lyophilized (freeze-dried) form of bendamustine that required a human operator to reconstitute it using water

12

EAGLEBEN-SA_00001949

shortly before administering it to a patient.  DTX-0094_0010; Tr. 404:7–18, 405:8–06:4, 408:17–09:1, 410:4–5, 1357:13–19.  Reconstitution by human manipulation had two known disadvantages in 2010: it increased the risk of contamination, Tr. 406:16–20; and, because bendamustine is a cytotoxic compound, it posed a potential danger to the operator, Tr. 84:2–13, 406:23–07:3; DTX-0056_0001; DTX-0056 at 2:33–67; DTX-0094_0011.

### e.  Content of the Prior Art

Defendants argue that five prior art references would have motivated a POSITA to arrive at the asserted formulation claims with a reasonable expectation of success: Olthoff, Drager, Alam, Rowe, and Boylan.  D.I. 378 at 31.

### 1)  Olthoff (DTX-0094)

Olthoff, a 1983 East German patent, claimed a stable, non-aqueous liquid injection solution of between 25 and 100 mg/mL bendamustine dissolved in a solvent consisting of 100% PG.  DTX-0094_0016; Tr. 448:20–25.  Olthoff's objective was to "produce a stable and ready-to-use injection solution out of N[itrogen]-mustard compounds, avoiding the technical solution of a dry ampoule [i.e., lyophilization]."  DTX-0094_0012; Tr. 409:18–10:5.  Olthoff disclosed that bendamustine has "a[n] extraordinarily high chemical stability for the production of injection solutions in" monovalent alcohols, glycols and polyols.  DTX-0094_0012; Tr. 410:6–11:8.  Olthoff specifically proposed dissolving

13

EAGLEBEN-SA_00001950

bendamustine in "polyols, particularly 1,2-propylene glycol [i.e., PG]." DTX-0094_0014; Tr. 412:6–14.   Polyols are another name for compounds that have multiple OH groups.  Tr. 412:17–18, 413:11–13.  Both PEG and PG are polyols. *Id.*

Olthoff's examples did not use an antioxidant.  DTX-0094_0013, _0015; Tr. 1457:5–12.

In the decades between Olthoff's publication and the priority date, its formulations were never used.  DTX-0073 at 2:19–29.

### 2)    Drager (DTX-0073)

About 30 years after Olthoff was published, Drager, a U.S. patent, issued in 2013.  Tr. 434:6–20; D.I. 307-1 ¶ 223.  (Drager's priority date is September 25, 2008 making it prior art to the asserted formulation claims.)  Like Olthoff, Drager described stable "liquid pharmaceutical formulations comprising bendamustine." DTX-0073 at 2:33–35, Abstract; Tr. 433:23–25.  But Drager determined that the "results described in [Olthoff] were not reproducible."  DTX-0073 at 2:62–64. Drager's data showed that bendamustine in 99% PG degraded almost completely after eight weeks at 25°C and more than 20% at 5°C after one year.  DTX-0073 at Fig. 3; Tr. 1378:9–80:5.  The reason for that degradation, according to Drager, was that (1) PG causes bendamustine to degrade at the nitrogen mustard group, DTX-0073 at 4:19–24, 4:33–37; Tr. 602:13–15, and (2) PG's OH groups cause

14

EAGLEBEN-SA_00001951

bendamustine to degrade at the carboxylic acid group through esterification, DTX-0073 at 5:12–14; Tr. 602:3–6.

As a solution to the degradation problem, Drager disclosed the use of aprotic solvents, i.e., solvents containing no OH groups, in a liquid bendamustine formulation. DTX-0073 at 3:21–25; Tr. 581:19–82:12. Drager showed that dissolving bendamustine in 100% DMA, an aprotic solvent, results in no degradation of bendamustine at the carboxylic acid group. DTX-0073 at Table II; Tr. 432:22–33:7, 435:11–36:9.

Drager also taught that protic solvents—i.e., solvents, including PEG and PG, that have OH groups—are acceptable to use with bendamustine but only when combined with aprotic solvents. DTX-0073 at 3:3–10, 3:36–48, 4:18–24; Tr. 601:11–17. Drager showed that the formulation containing 66% DMA and 34% PG is stable. DTX-0073 at Table II; Tr. 436:16–37:15.

### 3) Alam (DTX-0056)

Alam, a U.S. Patent issued on November 7, 1989, disclosed stable liquid formulations of cyclophosphamide, a compound that, like bendamustine, has a nitrogen mustard group. DTX-0056 at Abstract, 1:5–8; Tr. 422:3–9, 424:6–12. Alam tested cyclophosphamide's stability in mixtures of three polyols—PG, PEG and glycerol—and found that the formulation containing PEG and PG had "less degradation than the others." Tr. 424:2–25:5, 428:6–12, 1421:18–24; DTX-0056

15

at Tables 1–5. Alam disclosed using PG at a ratio of from about 10% to about 90% and PEG at a ratio of from about 90% to about 10%. DTX-0056 at 4:6–12; Tr. 425:6–14.

Bendamustine and cyclophosphamide have two structural differences that bear on how they degrade when they are mixed with PEG and PG. First, because cyclophosphamide does not have a carboxylic acid group, cyclophosphamide does not experience esterification, i.e., it does not react with compounds such as PEG and PG that have OH groups to form esters. Tr. 430:22–31:1, 1077:25–78:6. Second, in bendamustine, the nitrogen mustard group is attached to a benzene ring, while in cyclophosphamide, the group is attached to a phosphoramide. Tr. 1075:4–25. Because it is attached to a benzene ring in bendamustine, a POSITA would have expected nucleophiles such as PEG and PG to accelerate degradation at the nitrogen mustard group via the formation of an unstable aziridinium ring. Tr. 1037:19–41:16, 1058:12–17, 1060:2–9; PTX-0376 at JDG_BENDA_00002265; PTX-1010 at TEVABEND00296748. But in cyclophosphamide, the phosphoramide deactivates the nitrogen mustard group and cyclophosphamide consequently does not degrade by forming the aziridinium ring in a liquid formulation before administration. Tr. 1076:1–77:24; PTX-0991 at TEVABEND00290978; PTX-0993 at TEVABEND00291516.

Neither Alam nor Drager used an antioxidant in their exemplary or preferred

16

EAGLEBEN-SA_00001953

formulations.  Tr. 1458:2–58:23.

### 4)   Rowe, Handbook of Pharmaceutical Excipients (DTX-0160)

Rowe's Handbook of Pharmaceutical Excipients disclosed that PEG is susceptible to oxidation and that one can use an antioxidant to prevent such oxidation.  DTX-0160_0011; Tr. 486:7–24.

### 5)   Boylan (DTX-0063)

Boylan disclosed a list of "some of the most commonly used antioxidants in pharmaceutical injectable formulations" including monothioglycerol. DTX-0063_0019, 0020; Tr. 487:12–18.  Boylan also disclosed usual concentrations for each of the listed antioxidants.  DTX-0063_0020; Tr. 487:18–19.  Monothioglycerol is FDA-approved.  Tr. 340:20–23.

### 2.   Conclusions of Law

I find that Defendants have not established by clear and convincing evidence that a POSITA would have had reason to combine the limitations recited in the asserted patents' formulation claims.  Although Defendants persuaded me that a POSITA would have had reason to try to develop a non-aqueous liquid bendamustine formulation, they failed to establish by clear and convincing evidence that a POSITA would have used in that formulation the PEG and PG solvents, PEG:PG ratios, antioxidant, concentrations of bendamustine, or PG ester stability limitations recited in the asserted claims.  I do not find Plaintiffs' evidence

17

of secondary considerations to establish nonobviousness, but I find Defendants'
failure of proof with respect to *Graham*'s primary factors in this case to be
dispositive and that therefore the formulation claims are not invalid under § 103.

### a.    Non-Aqueous Liquid Bendamustine Formulation

Every asserted formulation claim requires a non-aqueous liquid formulation.
Due to bendamustine's instability in water, the prior art used a lyophilized form of
bendamustine.  Tr. 404:9–18, 1357:13–19.  But, as discussed above, lyophilization
had known disadvantages.  To avoid lyophilization while still avoiding the use of
water, a POSITA would have been motivated to create a non-aqueous liquid
bendamustine product.  In fact, as can be seen in Olthoff and Drager, other
inventors sought to create non-aqueous liquid bendamustine formulations before
the priority date.

### b.    Use of PEG and PG

The claimed non-aqueous liquid bendamustine formulations contain the
solvents PEG and PG.  Defendants argue that Olthoff, Drager, and Alam would
have motivated a POSITA to use PEG and PG with bendamustine.  D.I. 378 at 13,
16.

### 1)    Olthoff and Drager

Viewed in isolation, Olthoff would have led a POSITA to use PEG and PG
in a liquid bendamustine formulation.  D.I. 378 at 13; DTX-0094_0014; Tr.

18

412:3–18, 413:4–13. Olthoff provided a short, finite list of solvent options that included PEG and PG. Specifically, Olthoff reported that bendamustine is stable in monovalent alcohols and polyols, DTX-0094_0012–13; Tr. 410:6–11:8, 1084:13–86:11; and the disclosure of "polyols" would have given a POSITA just three polyol options: PEG, PG, and glycerol, Tr. 413:4–13. Plaintiffs dispute that assertion, D.I. 371 at 20–23, but Plaintiffs' expert himself limited polyols to those three options in a patent application that he submitted in 2009, *see* DTX-0764_0011 ("Preferably the water soluble plasticizer is selected from the group consisting of polyols (glycerin [i.e., glycerol], propylene glycol, polyethylene glycols) . . . ."). His response when confronted with that disclosure at trial was: "Yes, but I didn't -- at that time I didn't know that I would be sitting here today." Tr. 1575:2–76:1. Moreover, while I agree with Plaintiffs that Olthoff would have taught a POSITA also to consider monovalent alcohols, D.I. 371 at 21, Plaintiffs only list four monovalent alcohols that a POSITA would have considered using with bendamustine, D.I. 361 ¶ 73. Olthoff thus would have left a POSITA with three polyols and four monovalent alcohols as options. By providing a finite list, Olthoff would have made using PEG and PG obvious to try because a POSITA would face only "a finite number of identified, predictable solutions." *KSR*, 550 U.S. 398 at 421.

Drager, however, teaches away from Olthoff's teaching of using polyols

EAGLEBEN-SA_00001956

Case 1:17-cv-01154-GFO   Document 394   Filed 04/29/20   Page 21 of 76 PageID #: 14452

such as PEG and PG alone with bendamustine.  As noted, Drager determined that the "results described in [Olthoff] were not reproducible."  DTX-0073 at 2:62–64, 3:1–2.  And Drager's data showed that bendamustine in 99% PG degraded almost completely after eight weeks at 25°C and more than 20% at 5°C after one year.  DTX-0073 at Fig. 3; Tr. 1378:9–80:5.  As Plaintiffs' expert, Dr. Siepmann, credibly testified, a POSITA would have considered 20% degradation after just one year at 5°C to be "not good."  Tr. 1379:25–80:5.

Drager disclosed combining bendamustine with aprotic solvents as a means of reducing such degradation.  DTX-0073 at 3:3–10, 3:21–25; Tr. 581:19–82:12.  Drager also allowed for combining bendamustine with a mixture of aprotic solvents and protic solvents, including PEG and PG.  DTX-0073 at 3:3–10, 3:36–48, 4:18–24; Tr. 601:11–17.  But Drager stated that the concentration of protic solvents should be kept at 90%—and preferably lower—to limit degradation.  DTX-0073 at 3:49–4:25; Tr. 1393:3–22.  Drager specifically showed that a formulation containing 66% DMA and 34% PG is stable.  DTX-0073 at Table II; Tr. 436:16–37:15.

Defendants assert that Drager taught the use of aprotic solvents because they have no OH groups and that, therefore, Drager would have motivated a POSITA to use solvents with a low number of OH-groups.  Tr. 431:20–23, 437:8–15.  They argue that "[w]hile Drager claimed a formulation containing a polar aprotic solvent

20

(DMA) and a polar protic solvent (PG), a POS[IT]A would be motivated to remove DMA from the formulation because DMA has been known to cause problems in formulations." D.I. 379 ¶ 65; D.I. 378 at 14–15. According to Defendants, because DMA was the only aprotic solvent listed by Drager that is "used in FDA products," D.I. 378 at 15, a POSITA would turn to protic solvents like PEG that have a relatively low number of OH groups. D.I. 379 ¶ 67; D.I. 378 at 21.

Drager, however, teaches away from the use of only protic solvents. Therefore, Drager would not have motivated a POSITA to replace DMA with a low-OH protic solvent. Defendants and their expert conceded that neither Drager's disclosures nor its examples taught using exclusively protic solvents. Tr. 583:1–83:10, 1886:17–19. Instead, Drager taught the use of an *aprotic* solvent with bendamustine to avoid degradation by nucleophiles like PEG and PG. Moreover, Drager disclosed numerous alternative aprotic solvents that could potentially replace DMA. DTX-0073 at 3:9–14; Tr. 1395:7–14. And DMA was *not* the only aprotic solvent in an FDA-approved product. The prior art reference Strickley, for example, disclosed that the aprotic solvents NMP and DMSO had been commercially used. PTX-0569 at JDG_BENDA_00003311–14; Tr. 1390:19–24.

A POSITA in 2010 reading Olthoff and Drager thus would have found that Olthoff taught combining bendamustine with polyols including PEG and PG, but

21

EAGLEBEN-SA_00001958

that Drager taught away from using protic solvents, such as PEG and PG, alone with bendamustine. "Where the prior art contains apparently conflicting teachings (i.e., where some references teach the combination and others teach away from it) each reference must be considered for its power to suggest solutions to an artisan of ordinary skill . . . consider[ing] the degree to which one reference might accurately discredit another." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) (internal quotation marks and citation omitted).

After considering the two references, I find that a POSITA would have credited Drager's data and conclusions over those in Olthoff. Drager expressly asserted that the "results described in [Olthoff] were not reproducible." DTX-0073 at 2:62–64. And Drager used high-performance liquid chromatography (HPLC) to make its determinations while Olthoff used thin-layer-chromatography (TLC). Plaintiffs assert, and Defendants do not dispute, that HPLC is more reliable than TLC because of its superior sensitivity and ability to resolve impurities. Tr. 1074:4–75:3, 1086:17–20, 1380:14–25, 1511:5–11. Moreover, in the decades between Olthoff's publication in 1983 and the priority date in 2010, Olthoff's formulations were never used, suggesting that POSITAs generally did not rely on Olthoff. DTX-0073 at 2:19–29. "The elapsed time between [Olthoff] and the [asserted] patent's filing date evinces that the [asserted] patent's claimed invention was not obvious to try." *Leo Pharm. Prod., Ltd. v. Rea*, 726 F.3d 1346, 1356 (Fed.

22

EAGLEBEN-SA_00001959

Case 1:17-cv-01184-CFC   Document 394   Filed 04/29/20   Page 23 of 73 PageID #: 14455

Cir. 2013).  Thus, a POSITA looking at Olthoff and Drager would have followed Drager's teaching not to use protic solvents such as PG and PEG alone with bendamustine.

### 2)  Alam

Defendants also argue that Alam's disclosure of mixing cyclophosphamide with PEG and PG would have motivated a POSITA to use those solvents with bendamustine because both bendamustine and cyclophosphamide have nitrogen mustard groups.  D.I. 378 at 16.  But two structural differences between cyclophosphamide and bendamustine that effect how they degrade when they are combined with PEG and PG would have discouraged a POSITA from relying on Alam in formulating bendamustine.  First, unlike bendamustine, cyclophosphamide does not have a carboxylic acid group and thus does not undergo an esterification reaction when it is combined with PEG or PG.  Tr. 1077:25–78:6, 1421:1–5.  Second, because the nitrogen mustard group in bendamustine is attached to a benzene ring, while in cyclophosphamide it is attached to a phosphoramide, cyclophosphamide degrades differently at the nitrogen mustard group than bendamustine does.  Tr. 1077:4-1077:24; PTX-0991 at TEVABEND00290978; PTX-0993 at TEVABEND00291516.  Defendants' expert, Dr. Pinal, did not point to any prior art references to support his contrary conclusion that "the nitrogen group in the two molecules are exactly the same."  Tr. 423:7–13, 504:21–05:5.

EAGLEBEN-SA_00001960

I find therefore that a POSITA in 2010 would not have viewed cyclophosphamide as a relevant comparator for bendamustine reactions, Tr. 1078:7–11, and would not have considered Alam in formulating a stable bendamustine formulation, Tr. 1420:10–21:5.

* * * *

In sum, Defendants have not proven by clear and convincing evidence that Olthoff, Drager, and Alam would have motivated a POSITA to use PEG and PG to create a non-aqueous liquid bendamustine formulation. Although Olthoff taught using polyols such as PEG and PG with bendamustine, Drager teaches away from the use of protic solvents such as PEG and PG alone with bendamustine and a POSITA would credit Drager's teaching over Olthoff's. Moreover, a POSITA looking to solve the degradation problem in bendamustine would not have considered Alam in formulating a liquid bendamustine product because Alam concerned a compound that degrades differently than bendamustine when combined with PEG and PG.

### c. Use of Claimed PEG:PG Ratios

Every asserted formulation claim requires a PEG:PG ratio that falls between 95:5 and 75:25. Defendants argue that the claimed PEG:PG ratios would have been obvious "in light of Alam's express disclosure of the entire range from 10:90 to 90:10." D.I. 378 at 19–20. But as explained above, the prior art would not have

24

motivated a POSITA to use PEG and PG in the first place.  Also, even if a POSITA had chosen to use PEG and PG, it would not have relied on Alam because Alam concerned a compound that degrades differently than bendamustine in reaction to PEG and PG.  Finally, the claimed formulations use more PEG than PG whereas Alam preferred using more PG than PEG, DTX-0056 at 4:6–12, and a POSITA in 2010 would have known that PEG would cause more degradation at bendamustine's nitrogen mustard group than PG due to PEG oxidation.  Tr. 1054:5–59:11; PTX-0999 at TEVAVEND00292131; PTX-0997 at TEVABEND00291955.  Thus, Alam did not make obvious the PEG:PG ratios recited in the asserted formulation claims.

### d.    Use of An Antioxidant

Every asserted claim requires an antioxidant and one asserted claim requires that the antioxidant be monothioglycerol.  Assuming a POSITA had chosen to use a 90% PEG and 10% PG bendamustine formulation, that POSITA would have been motivated to curb PEG oxidation: a process in which PEG accelerates the esterification reaction.  Tr. 484:15–85:11, 1416:11–18:12; PTX-0669 at TEVABEND00294275; PTX-0623 at TEVABEND00289470.

Defendants argue that Boylan and Rowe would have motivated a POSITA to solve the oxidation problem with an antioxidant.  D.I. 378 at 22–23.  They assert that Rowe taught a POSITA to inhibit the oxidation of PEG with the inclusion of a

25

suitable antioxidant and that Boylan taught using specific antioxidants, including monothioglycerol. D.I. 378 at 23; Tr. 486:7–24, 488:7–9, 505:11–06:7, 543:2–5; DTX-0160_0011; DTX-0063_0020. Defendants also note that monothioglycerol is "very commonly used," and is FDA-approved for injectable products. D.I. 378 at 23.[3]

Other prior art references, however, teach away from the use of antioxidants. *See* Tr. 1452:20–53:21; *Note for Guidance*, European Agency for the Evaluation of Medicinal Products, PTX-0629 at TEVABEND00290713, TEVABEND00290720 ("Antioxidants should only be included in a formulation if it has been proven [t]hat their use cannot be avoided."); *Pharmaceutical Preformulation and Formulation*, Interpharm, PTX-0391 at JDG_BENDA_00000415 (stating that antioxidant use "is now in decline" and that "[a] preferred method of preventing oxidation [over antioxidants] is simply to exclude oxygen"). Moreover, none of the four approved injectable products in the prior art that contained PEG included an antioxidant. Tr. 600:4–6, 1454:24–55:17; PTX-0722 (Ativan); PTX-0718 (Busulfex); PTX-0720 (Robaxin); PTX-0569 at JDG_BENDA_00003308 (VePesid). In addition, the

---

[3] Defendants also assert that Drager taught "the use of antioxidants in the formulation." D.I. 378 at 22. They did not, however, request a finding of fact on this point and none of Drager's preferred or exemplary formulations contained an antioxidant. Drager mentioned that the invention may include other excipients such as an antioxidant, DTX-0073 at 7:1−18, claim 5, but it did not encourage a POSITA to use an antioxidant.

26

EAGLEBEN-SA_00001963

liquid bendamustine examples in Defendants' prior art references do not include antioxidants: Olthoff's liquid bendamustine formulation with PG had no antioxidant, DTX-0094 at JDG_BENDA_00002313; Tr. 1457:5–12, and neither Alam nor Drager used an antioxidant in their exemplary formulations, Tr. 1458:2–58:23. Accordingly, I find that Defendants did not establish by clear and convincing evidence that the combination of Boylan and Rowe would have motivated a POSITA to use an antioxidant.

### e.   Use of the Claimed Bendamustine Concentrations

Claim 5 of the #831 patent requires a bendamustine concentration of "from about 25 mg/mL to about 50 mg/mL." DTX-0006_0009. Defendants argue that "[t]here was nothing special or unobvious about [that] concentration range" in view of the Treanda® Label and Olthoff. D.I. 378 at 25.

First, Defendants assert that the lyophilized Treanda® Label would have motivated a POSITA to use the claimed concentrations because a POSITA would have multiplied the 120 mg/m² dose for NHL patients disclosed in the lyophilized Treanda® Label, DTX-0848_0001, by the average body-surface-area of a human, 2.0 m², to get a 240 mg total dosage, D.I. 378 at 25–26. According to Defendants, the POSITA then would have placed that dose in a common vial size of either 5 mL or 10 mL to arrive at a concentration of either 24 or 48 mg/mL. D.I. 378 at 26. Defendants, however, offered no evidence establishing why a POSITA would have

27

combined a dosage for a lyophilized bendamustine formulation with a particular vial size when making a liquid bendamustine formulation.

Second, Defendants argue that Olthoff would have motivated a POSITA to reach the claimed concentration because "Olthoff disclosed and claimed [PG-only] liquid bendamustine formulations containing 'concentrations of 25 mg/m[L] to 100 mg/m[L],'" D.I. 378 at 25, and Olthoff disclosed that bendamustine's solubility in PG was very high, 125 mg/mL, D.I. 378 at 26. Defendants assert that "[w]hile the prior art did not disclose bendamustine's solubility in PEG, . . . solubility is an inherent (i.e. intrinsic) property" that can be discovered through routine testing, and given the high 125 mg/mL solubility in PG, a POSITA "would understand that by adding PEG to PG, the solubility would drop from 125 to a lower value, and that at ten percent PG and 90 percent PEG, it would be possible to make a solution with a concentration of 25 milligrams per milliliter." D.I. 378 at 26–27.

But as explained above, Defendants have not established a motivation to use PEG and PG in the first place. Thus, even assuming that a POSITA could have found bendamustine's solubility in PEG through routine testing, Defendants did not establish by clear and convincing evidence that a POSITA would have been motivated to conduct such testing. As Plaintiffs note, Defendants' expert "testified only that the POS[IT]A would have considered it 'possible' to dissolve 25 mg/mL bendamustine in 90:10 PEG:PG at room temperature, far short of establishing

28

EAGLEBEN-SA_00001965

motivation" to use PEG.  D.I. 371 at 43.

Moreover, Defendants fail to explain why a POSITA would believe that bendamustine would have a lower solubility in PEG and PG as opposed to in PG alone based only on bendamustine's high solubility in PG.  In choosing a concentration, a POSITA would have required that the bendamustine concentration remain below the formulation's bendamustine solubility limit so that the bendamustine would completely dissolve and dangerous precipitation would not occur.  Tr. 591:19–92:7, 593:23–94:4, 1434:13–35:9, 1435:10–25, 1472:12–14; PTX-0667 at TEVABEND00293319.  Because a POSITA would want to avoid such precipitation, it would likely not combine bendamustine with a 90% PEG and 10% PG formulation based on bendamustine's solubility in PG alone.

### f.     PG Ester Stability Limitations

Finally, certain asserted formulation claims contain a stability limitation, i.e., a maximum amount of degradants called PG esters that the composition can have after storage for a set time period at a set temperature.  For example, claims 2, 3, and 5 of the #831 patent recite compositions having "less than or equal to 0.11% PG esters at about 1 month of storage at about 5°C."  #831 patent at claims 2, 3, 5.

Defendants argue that the stability limitations are an inherent property because at least one obvious formulation in the asserted claims would naturally result in the required PG ester levels.  D.I. 378 at 27.  But "[t]o prove that a claim

29

Case 1:17-cv-01064-CFC   Document 394   Filed 04/29/20   Page 32 of 70 PageID #: 14462

limitation is inherent in the prior art, [the challenger] must show . . . [not only] that the limitation at issue is necessarily present, or the natural result of the combination of elements," but also that the combination of elements that naturally result in the limitation is *"explicitly disclosed by the prior art." Par Pharm., Inc. v. Twi Pharm., Inc.*, 120 F. Supp. 3d 468, 473 (D. Md.), *aff'd*, 624 F. App'x 756 (Fed. Cir. 2015) (emphasis added) (internal quotation marks omitted); *see also* D.I. 378 at 28 (*"Once an embodiment is shown to be obvious*, any corresponding data can be used to show that the stability property is inherent." (emphasis added)). Because I find that the combination of elements that Defendants allege inherently result in the stability limitations is not obvious, such limitations are not obvious through inherency.

### g.     Secondary Considerations

The parties adduced at trial evidence of only one secondary consideration that bears on the formulation claims—commercial success. D.I. 371 at 79–80. Plaintiffs argue that "[s]ales of Bendeka® exceed $2 billion," and that "Bendeka® halted the downward trend in bendamustine sales, despite increasing competition." D.I. 371 at 79. But such evidence does not support a finding of nonobviousness. First, Bendeka® sells at a lower price than the prior art lyophilized Treanda® product. Tr. 1641:25–42:3, 1680:2–12, 1798:8–99:2. Second, Plaintiffs' cluster

30

EAGLEBEN-SA_00001967

of exclusivities has blocked others from entering the market.[4]  Tr. 1723:24–26:1, 1730:3–7.  "Where market entry by others was precluded . . . the inference of nonobviousness of the asserted claims, from evidence of commercial success, is weak." *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 740 (Fed. Cir. 2013) (internal quotation marks, alterations, and citations omitted).

\* \* \* \*

Although the evidence of commercial success does not support a finding of nonobviousness, I still find that Defendants have not shown by clear and convincing evidence that the prior art they cited would have motivated a POSITA to reach the claimed formulations.  As discussed above, a POSITA would have credited Drager over Olthoff, and Drager teaches away from the use of protic solvents such as PG and PEG alone with bendamustine.  Moreover, a POSITA would not have relied on Alam in formulating bendamustine.  Finally, clear and convincing evidence does not show that a POSITA would have relied on Boylan and Rowe as motivation to use an antioxidant because of the references that teach

---

[4] Cephalon had an exclusive license from Fujisawa to develop bendamustine in the U.S. DTX-1230_0001,_0002,_0019; Tr. 1226:24–27:1, 1263:21–25, 1233:18–34:25.  Also, in 2008, lyophilized Treanda® obtained seven years of orphan drug exclusivity (ODE) and an additional six months of pediatric exclusivity. Tr. 1723:24–26:1.  Bendeka® also received ODE. *Eagle Pharm.*, 2018 WL 3838265, at \*1.  Thus, Bendeka® received seven years of exclusivity that would prevent generics from entering the market until 2022.  Tr. 1723:24–26:1.

31

EAGLEBEN-SA_00001968

away from the use of antioxidants in injectable formulations.  And the Treanda®
Label and Olthoff would not have motivated a POSITA to reach the claimed
concentrations.

### C.    Obviousness of the Asserted Administration Claims

### 1.    Findings of Fact

#### a.    The Priority Date

The parties agree that the priority dates for the asserted administrations
claims are (1) March 20, 2012 for claim 22 of the #568 patent, and (2) July 10,
2012 for the remaining administration claims.  D.I. 332; Tr. 2015:10-16.

#### b.    Definition of the Relevant POSITA

The parties agree that a POSITA would have had the skills, education, and
expertise of a team of individuals working together to develop a safe and effective
administration protocol for a cytotoxic parenteral[5] drug product.  Such a team
would have included individuals with doctoral degrees in pharmaceutics,
pharmaceutical sciences, pharmacology, pharmacokinetics, pharmacodynamics, or
related fields, with at least two years of post-graduate experience in developing
protocols for pharmaceutical administration, or master's or bachelor's degrees in
similar fields of study, with a commensurate increase in their years of post-

---

[5] In the pharmaceutical field, "parenteral" typically refers to products that are
administered by injection.  Tr. 407:6–8.

32

EAGLEBEN-SA_00001969

graduate experience.  Such a team would have been familiar with a variety of issues relevant to administering liquid injectable drug products, including, among other things, toxicity, solubility, pharmacokinetics, and pharmacodynamics.  Such a team would have included at least one individual with a medical degree with experience in treating patients with CLL and NHL.  PDX-2-4; Tr. 1112:4-20, 1293:22–94:9, 1233:1–17, 2014:22–15:2.

### c.    Content of the Asserted Administration Claims

The asserted administration claims recite methods of treating CLL or NHL[6] with a liquid bendamustine composition.  #568 patent at claims 11, 18, 22; #887 patent at claim 13.  Certain claims require administering the bendamustine composition on days one and two of a 21-day cycle for NHL, #568 patent at claim 18, or on days one and two of a 28-day cycle for CLL, #568 patent at claim 11.  One claim requires a bendamustine dose of "about 25 mg/m$^2$ to about 120 mg/m$^2$." #887 patent at claim 13.

The asserted administration claims also specify administration times, the longest time being "about 15 minutes or less." *See e.g.,* #568 patent at claim 22; #887 patent at claim 13.  They also specify administration volumes that are all 100 mL or less. *See e.g.,* #399 patent at claim 13.  Finally, certain claims specify post-

---

[6] Two claims recite, more generally, a "method of treating cancer or malignant disease." #399 patent at claims 13, 15.

33

dilution bendamustine concentrations ranging from 0.05 mg/mL to 12.5 mg/mL. *See e.g.*, #568 patent at claims 11, 18.

### d.  Content of the Prior Art

Defendants argue that eight prior art references would have motivated a POSITA to combine the elements of the claimed administration with a reasonable expectation of success: Palepu 2011, the Treanda® Label, Preiss 1985, Preiss 1998, Schöffski 2000a, Schöffski 2000b, Barth, and Glimelius.[7]  D.I. 378 at 53.

### 1)  Palepu 2011 (DTX-0984)

Palepu 2011 is the published application that led to the asserted formulation patents.  Tr. 546:25–47:17.  The parties have stipulated that Palepu 2011 disclosed the formulations claimed in the asserted formulation and administration claims. D.I. 320 ¶ 6.

### 2)  Treanda® Label (DTX-0993 and DTX-1202)

The Treanda® Label, published in April 2009, D.I. 307-1 ¶ 247, disclosed two FDA-approved liquid bendamustine composition dosing schedules: (1) for CLL, intravenous (IV) infusion at a dose of 100 mg/m$^2$ over 30 minutes on days

---

[7] Defendants also cite Olthoff to argue that the asserted administration claims were obvious, but the arguments regarding Olthoff were advanced only by Dr. Yates, an admitted non-formulator, and an expert that all Defendants but Apotex rejected. Tr. 918:11–17, 920:19–22:13.  Dr. Yates is a professional witness with limited relevant experience who has testified repeatedly for Apotex.  Tr. 908:17–13:12.  I did not find his testimony credible and do not rely on it.

34

EAGLEBEN-SA_00001971

one and two of a 28-day cycle for up to six cycles, Tr. 648:3–9; DTX-0993_0001; DTX-1202_001; and (2) for NHL, IV infusion at a dose of 120 mg/m$^2$ over 60 minutes on days one and two of a 21-day cycle for up to eight cycles, DTX-0993_0001; DTX-1202_001; Tr. 648:3–9.

The Treanda® Label required the administration of Treanda® in a volume of 500 mL, Tr. 652:13–16; DTX-1202_002, with a post-dilution bendamustine concentration of 0.2–0.6 mg/mL bendamustine, DTX-0993_0002; DTX-1202_003; Tr. 652:21–23.

### 3)     Preiss 1985 (DTX-0320; DTX-0985)

Preiss 1985 disclosed the results of a pharmacokinetic analysis of bendamustine. DTX-0320_0002; Tr. 658:25–59:2, 1119:18–20. A pharmacokinetic analysis is a preliminary study in which a new drug is administered to a small number of patients to determine the Cmax and area under the curve (AUC). The Cmax is the peak concentration of the drug in the bloodstream; the AUC is the patient's total exposure to the drug. Tr. 659:3–15, 847:8–24, 1114:2–7, 1120:18–25. Pharmacokinetic studies are not designed to assess a drug's safety. Tr. 724:7–12, 1120:8–25.

Preiss 1985 administered bendamustine intravenously for three minutes to seven patients with various cancers. DTX-0320_0002; Tr. 659:23–60:2, 723:16–24:3. Preiss 1985 administered an average total dose of 280 to 375 mg.

35

EAGLEBEN-SA_00001972

Preiss 1985 reported "only rather mild side effects" at those doses. DTX-0320_0006; Tr. 664:6–20, 1123:9–22.

### 4)      Preiss 1998 (DTX-0991)

Preiss 1998 investigated bendamustine's clinical pharmacology and defined bendamustine's maximum tolerated dose (MTD) and dose limiting toxicities (DLT). DTX-0991_0002; Tr. 674:16–25. The MTD of a drug is a tolerable dose without severe or life-threatening toxicities; it differs from a recommended dose for clinical use. Tr. 1126: 9–11. DLTs are severe or life-threatening side effects. Tr. 674:23–75:1, 1126:12–23. Preiss 1998 administered bendamustine to more than 50 patients with various cancers. DTX-0991_002. Preiss 1998 was not designed to evaluate the safety of an infusion protocol. Tr. 730:22–31:1, 731:8–21.

Preiss 1998 administered three-to-ten-minute one-time infusions of bendamustine in doses ranging from 54 to 226 mg/m$^2$. It also administered three-to-ten-minute infusions on four consecutive days in doses ranging from 20 to 88 mg/m$^2$. DTX-0987_005. Preiss 1998 concluded that "only mild toxicity occurred even at high doses (> 200mg/m$^2$ b-hydrochloride per cycle)." DTX-0991_0004; Tr. 676:19–25. Preiss 1998 reported "disorientation" and a "vegetative neurotoxic effect" after the one-time infusions of 175 mg/m$^2$ and 215 mg/m$^2$ doses. DTX-991_0004, _0005.

36

EAGLEBEN-SA_00001973

### 5)    Schöffski 2000a (DTX-0987)

Schöffski 2000a administered bendamustine over 30 minutes and compared its results to the three-to-ten-minute infusions disclosed in Preiss 1998. DTX-0987_0002,_0005; Tr. 678:4–14. Schöffski 2000a reported that some side effects from its 30-minute infusions were comparable to those observed with the three-to-ten-minute infusions in Preiss 1998. DTX-0987_0005,_0006; Tr. 678:10–79:5.

### 6)    Schöffski 2000b (DTX-0988)

Schöffski 2000b administered 60 to 80 mg/m$^2$ of bendamustine in 30 minutes. DTX-0988_0001–03; Tr. 679:20–22. Schöffski 2000b observed side effects that were comparable to those observed in Schöffski 2000a. DTX-0988_0005. Schöffski 2000b's authors did not "observe confusion or other signs of neurotoxicity when giving the drug as a repeated 30-min i.v. infusion." DTX-0988_0005.

### 7)    Barth 2010 (DTX-1004)

Barth suggested administering bendamustine in a solvent volume of 100 to 250 mL. DTX-1004_0005; Tr. 658:12–20, 681:21–83:8. Barth explained that

> [t]he 30-minute short infusion [of bendamustine] that is practiced in Germany can be readily achieved with infusion volumes of 100 to 250 m[L] 0.9% NaCl.
> It is unclear why the American prescribing information specifies 500 m[L] 0.9% NaCl or a final concentration of 0.2-0.6 mg/m[L] . . . . A short infusion with such volume is difficult to implement.

37

EAGLEBEN-SA_00001974

DTX-1004_0005; Tr. 682:9–83:2.  Barth did not disclose any study or data.  DTX-1004_0005; Tr. 1157:22–59:18.

### 8)  Glimelius (DTX-0079)

Glimelius disclosed the administration of 5-Fluorouracil to treat colorectal cancer as an infusion lasting ten to 20 minutes using a 50 to 100 mL mini-bag.  DTX-0079_0001, _0002.  Mini-bags are small standard size bags.  Tr. 554:2–9.

### 2.  Conclusions of Law

Defendants did not establish by clear and convincing evidence that a POSITA would have been motivated to combine the prior art references to arrive at the claimed administrations with a reasonable expectation of success.  Although the prior art would have motivated a POSITA to reach the claimed formulation, dose, and dosing schedule, and although Plaintiffs' proffered secondary indicia of nonobviousness were of little or no probative value, I find that the prior art would not have motivated a POSITA to reach the remaining claim limitations, and thus the claims as a whole are not obvious.

### a.  Formulation, Dose, and Dosing Schedule

The parties agree that Palepu 2011, the published application that led to the asserted formulation patents, disclosed before the priority date the formulations found in the asserted administration claims.  D.I. 320 ¶ 6.  But Plaintiffs argue that Defendants have not shown that a POSITA would have been motivated to select

38

EAGLEBEN-SA_00001975

Case 1:17-cv-01194-CFC   Document 394   Filed 04/29/20   Page 41 of 70 PageID #: 14471

Palepu 2011's formulations for the administrations recited in the asserted claims. D.I. 371 at 48. Palepu 2011 itself, however, established a motivation to use its formulations: it touted advantages of its disclosed formulations including "that they have substantially improved long term stability when compared to currently available formulations" and that they "are advantageously ready to use or ready for further dilution" and thus "[r]econstitution of lyophilized powder is not required." DTX-0984_0002 at [0007]; Tr. 889:8–90:3. It is undisputed that a POSITA would have wanted to use a stable and ready-to-use formulation as part of an improved administration method.

A POSITA also would have been motivated to combine Palepu 2011 with the Treanda® Label to come up with the claimed doses and dosing schedule. Palepu 2011 instructed administering its formulations in accordance with the Treanda® dosing schedule. DTX-0984_0004 at [0044]; Tr. 856:8–9. And the Treanda® Label taught similar doses and the same dosing schedules as those in the asserted administration claims. DTX-0993_0001; DTX-1202_0001; Tr. 654:18–21, 695:10–20. The required dose found in the claims is about 25 mg/m$^2$ to about 120 mg/m$^2$ and the Treanda® Label requires doses of 100 mg/m$^2$ or 120 mg/m$^2$. #887 patent at claim 13; DTX-0993_0001; DTX-1202_0001. Also, the dosing schedule recited in the claims is the same as the Treanda® Label's schedule: (1) for CLL, infusion on days one and two of a 28-day cycle, #568 patent

39

EAGLEBEN-SA_00001976

at claim 18; DTX-0993_0001; DTX-1202_001; Tr. 648:3–9; and (2) for NHL, IV infusion on days one and two of a 21-day cycle, #568 patent at claim 11; DTX-0993_0001; DTX-1202_001; Tr. 648:3–9.

That said, the asserted administration claims require administering each bendamustine dose in faster times, in lower volumes, and at higher post-dilution concentrations than the Treanda® Label requires. The question thus remains whether a POSITA would have been motivated to reach the claimed administration times, volumes, and concentrations.

> **b.      Administration Times, Volumes, and Post-Dilution Concentrations**

All asserted claims require administering bendamustine in 15 minutes or less, with some requiring ten minutes or less. All asserted claims also require administering bendamustine in a volume of 100 mL or less, with some claims requiring about 50 mL. Finally, all but one of the asserted administration claims require post-dilution bendamustine concentrations ranging from 0.05 to 12.5 mg/mL.[8]

Defendants argue that the claimed administration times were obvious under the Preiss and Schöffski studies; that the claimed administration volumes are

---

[8] Claim 13 of the #887 patent, the only claim asserted against Slayback, does not have a concentration limitation. D.I. 362 at 3.

EAGLEBEN-SA_00001977

obvious under the Preiss studies, Barth, and Glimelius;[9] and that the claimed post-dilution concentrations are obvious under the Preiss studies and the Treanda® Label. Defendants also contend that Eagle's post-invention statements corroborate Defendants' assertion that the Preiss studies would have motivated a POSITA to use shorter administration times, lower volumes, and higher concentrations.

### 1) The Preiss Studies

Defendants argue that the Preiss studies support a finding that the claimed administration times, volumes, and concentrations are obvious. First, Defendants argue that a POSITA would have been motivated to administer bendamustine in 15 minutes or less because Preiss 1985 and Preiss 1998 disclosed that administration of bendamustine in three-to-ten minutes was well-tolerated in humans and Schöffski 2000a and 2000b disclosed that the safety results of 30-minute bendamustine administrations were consistent with Preiss's three-to-ten-minute infusions. D.I. 378 at 39–40. Second, Defendants assert that the Preiss studies render the claimed volumes of 100 mL or less obvious because, although the Preiss references did not disclose a volume, a POSITA would have known based on Preiss's three-to-ten-minute time constraint and typical infusion rates that the

---

[9] Relying on the testimony of Dr. Yates, Defendants also cite Olthoff to argue that the claimed volumes were obvious. D.I. 378 at 43. As noted above, I did not find Dr. Yates's testimony to be credible and will not rely on it. Moreover, Olthoff's example bendamustine formulation did not use PEG and, as explained above, Drager discredited Olthoff's data. DTX-0094_0015; Tr. 923:14–24.

41

EAGLEBEN-SA_00001978

studies infused similar volumes. D.I. 378 at 42. Third, Defendants contend that Preiss rendered the claimed concentrations of 0.05 to 12.5 mg/mL obvious because Preiss 1985 likely used a concentration of 5.6 mg/mL. D.I. 378 at 46.

I find, however, that the Preiss studies would not have motivated a POSITA to reach the claimed administration times, volumes, or concentrations because (1) a POSITA would not have relied on the Preiss studies to determine a safe and effective infusion time, volume, or concentration for bendamustine, (2) subsequent prior art taught away from Preiss's three-to-ten-minute infusions, and (3) Defendants only hypothesize that the Preiss studies used volumes and concentrations similar to those in the claimed administrations.

<strong>a)   A POSITA would not have relied on the<br>Preiss studies to determine a safe<br>administration.</strong>

As an initial matter, Preiss 1985 and Preiss 1988 were not designed to evaluate safety, and thus a POSITA would not have relied on the Preiss studies to determine a safe infusion time, volume, or concentration. Tr. 724:7–12, 730:22–31:1, 731:8–21. Moreover, the Preiss studies did not provide enough data points or information to allow a POSITA to rely on them for safety information. Preiss 1985 tested only seven patients with various cancers, DTX-320_0002; Tr. 723:16–24:3, 1122:20–22; it did not discuss how it collected side effect information, including the number or timing of observations, the side effects being

42

EAGLEBEN-SA_00001979

observed, or a grading system, Tr. 724:14–28:16; and it neither specified which of the seven patients in the study had side effects nor distinguished between IV and oral side effects, Tr. 728:8–20. A POSITA would not have concluded that side effects would not be present in a larger population, Tr. 1121:1–5, let alone the relevant population, Tr. 1122:20–23:8, based on a study that covered only seven patients with various cancers and offered no explanation of how the side effects were studied or which patients experienced the side effects. Preiss 1998 similarly tested patients with various cancers, Tr. 1125:24–26:1, and it did not disclose when the side effects it reported were monitored or how many times side effect information was collected from patients. Thus, a POSITA would not have relied on either Preiss study to determine the safety of a short bendamustine infusion. Tr. 1122:14–19, 1123:9–22.

In addition, the parties agree that the claimed administrations require repeated cycles, D.I. 378 at 38; D.I. 371 at 59, but the Preiss studies did not administer bendamustine in repeated cycles.[10] And according to Defendants' expert, "bendamustine therapy side effects result from . . . the number of cycles given" and "these side effects are typically more severe in subsequent cycles

---

[10] Defendants cited no reference that administered bendamustine in ten minutes or less in repeated cycles. Tellingly, Defendants' references that did administer bendamustine in repeated cycles all used 30-minute infusions. DTX-0987_0001; DTX-0988_0001; DTX-1004_0002, _0005; DTX-0848; PTX-0268.

43

because there are cumulative effects on bone marrow." Tr. 736:11–37:20. A POSITA would therefore not have relied on the Preiss studies to determine the safety of a short infusion of bendamustine administered in multiple cycles. Tr. 1133:7–11. Moreover, neither Preiss study administered bendamustine over two consecutive days as the claims require. Tr. 1129:12–20.

The Schöffski articles also would not have motivated a POSITA to rely on the Preiss studies to determine the safety of a short infusion time, lower infusion volume, or higher infusion concentration. Schöffski 2000a reported that it observed *some* side effects like those in Preiss 1998, but did not compare the overall incidence or severity of side effects in the two infusion protocols. DTX_0987_0006,_0007; Tr. 1138:21–39:19. Also, Schöffski 2000b stated that it observed similar side effects to those observed in Schöffski 2000a, not that it observed the same side effects as Preiss. And Schöffski 2000b stated that it did not "observe confusion or other signs of neurotoxicity when giving the drug as a repeated 30-min i.v. infusion," DTX-0988_005, while Preiss 1998 reported "disorientation" and a "vegetative neurotoxic effect," DTX-0991 at JDG_BENDA_00006920–21.

        **b)**     **Subsequent prior art taught away from the Preiss infusions.**

Subsequent prior art also would have dissuaded a POSITA from relying on the Preiss studies. A POSITA would not have stopped with Preiss 1985 and Preiss

44

EAGLEBEN-SA_00001981

1998; instead, it would have also considered later prior art references that used 30 to 60 minute infusions and a 500 mL volume. "Too often the obviousness analysis is framed as an inquiry into whether a person of skill, with two (and only two) references sitting on the table in front of him, would have been motivated to combine . . . the references in a way that renders the claimed invention obvious. The real question is whether that skilled artisan would have plucked [those references] out of the sea of prior art and combined [them]." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016).

The Preiss researchers themselves conducted later studies and recommended in subsequent papers an infusion of at least 30 minutes in 500 mL. DTX-0987_0001; DTX-0988_0001; PTX-0268; DTX-0982_0009; Tr. 1145:13–46:7. Preiss 2003—conducted by the same research group as Preiss 1985 and 1998—reported administration over 30 minutes in repeated cycles. PTX-0268; Tr. 1141:21–43:15. Moreover, the Ribomustin Monograph—which set forth the prescription information for the German bendamustine product Ribomustin and was developed by a company that employed scientists involved in the Preiss and Schöffski studies—recommended a 30 to 60 minute infusion in 500 mL because of local toxicity concerns. DTX-0982_009; Tr. 1143:17–44:13, 1144:14–45:5, 1146:8–54:4.

45

EAGLEBEN-SA_00001982

Case 1:17-cv-01104-CFC   Document 394   Filed 04/29/20   Page 48 of 76 PageID #: 14478

      **c)**     **Defendants only hypothesize that the Preiss studies used the claimed volumes and concentrations.**

Finally, Defendants only hypothesize that the Preiss studies used similar volumes and concentrations as those recited in the asserted claims. With respect to volume, Defendants assert that although the Preiss references did not disclose a volume, "[b]ecause administration time and volume are related," a POSITA would have known based on Preiss's three-to-ten-minute time constraint and typical infusion rates that the studies infused small volumes. D.I. 378 at 42 (citations omitted). With respect to concentration, Defendants contend that "Preiss 1985 administered bendamustine in a dose of 280-375 mg in a bolus, [i.e., a volume that the] evidence showed likely meant 50 or 100 mL," and diluting 280 mg in 50 mL would result in a concentration of 5.6 mg/mL. D.I. 378 at 46. Such speculations about Preiss's infusion rate and volume, however, are only based on "conclusory and unsupported expert testimony" and they do not support a finding of obviousness by clear and convincing evidence. *See TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1361 (Fed. Cir. 2019) ("In cases like *InTouch*, *ActiveVideo*, and *DSS*, we rejected obviousness determinations based on conclusory and unsupported expert testimony.").

Defendants have thus failed to establish by clear and convincing evidence that the Preiss studies support a finding that the claimed infusion times, volumes,

46

EAGLEBEN-SA_00001983

and concentrations were obvious. "Whether a skilled artisan would be motivated to make a combination includes whether he would select particular references in order to combine their elements," *WBIP*, 829 F.3d at 1337, and a POSITA in 2010 would not have selected the Preiss studies to determine a safe and effective infusion for a bendamustine formulation.

### 2) Barth and Glimelius

Defendants also argue that the administration volumes are obvious under Barth and Glimelius. They note that Barth recommended a 100 to 250 mL bendamustine infusion, D.I. 378 at 43, and that a "POS[IT]A would have known from Glimelius (DTX-0079) that minibags, [standard infusion bag sizes of 50 or 100 mL], were typically used for infusions of 10-20 min," D.I. 378 at 44 (citations omitted).

Barth and Glimelius, however, would not have motivated a POSITA to use the claimed volumes. First, Barth did not disclose any study or data; it only suggested hypothetical smaller volumes. DTX-1004_0005; Tr. 1159:10–18. And Barth's 100 to 250 mL suggestion did not cover the claimed volumes (all claims require 100 mL or less). DTX-1004_0005; Tr. 1159:3–16. Second, Glimelius did not disclose any bendamustine administration, Tr. 841:3–42:22, and the mere availability of a standard IV bag would not have given a POSITA motivation to use a bag that size. IV bags of 50 mL were available before the priority date, but

47

EAGLEBEN-SA_00001984

had never been used to deliver bendamustine.  D.I. 371 at 58.

### 3)   The Treanda® Label

Defendants also assert that the Treanda® Label would have motivated a POSITA to use the claimed post-dilution concentrations.  They argue that the claimed concentrations are obvious as inherent because diluting the claimed doses disclosed in the Treanda® Label in the claimed volume of liquid necessarily would have resulted in the claimed concentrations of bendamustine, PG, and PEG.  D.I. 378 at 44.  But because I find that the claimed volumes are not obvious, it does not follow that the claimed concentrations are obvious as inherent.   Defendants also state that "on the lower end of the spectrum, the [claimed] concentration falls within the 0.2-0.6 mg/mL concentration of the Treanda® Label."  D.I. 378 at 45.  But the Treanda® concentrations only cover a small portion of the claimed range of 0.05 to 12.5 mg/mL and thus they do not render the claimed concentrations obvious.

### 4)   Eagle's Post-Invention Statements

Defendants further argue that, through post-invention statements, Plaintiffs admitted that the prior art taught that short infusions in lower volumes were safe and effective.  Defendants point to the fact that Eagle relied on the conclusions from the Preiss studies when it told the FDA that its Bendeka® protocol was safe.  D.I. 378 at 51.

48

EAGLEBEN-SA_00001985

It is true that, in support of its request for permission to test Bendeka®, Eagle submitted to the FDA a Detailed Review of Literature that relied in part on data from the Preiss and Schöffski references. DTX-1041_0175. The literature review stated: "Thus, the short duration infusion of bendamustine appears to be well tolerated in this study and a dose of 215 milligrams has been reported in the literature as the clinically tolerated dose for bolus administration of bendamustine." DTX-1041_0175. Later, Eagle made similar statements to the FDA when drafting its Investigator's Brochure to support its requested study that required administering the Bendeka® formulation in ten minutes. DTX-1061 at 14.

Eagle's submissions to the FDA, however, also contained non-public, non-prior-art tests and analysis Eagle had conducted to show those short-infusion protocols were safe to test in humans. DTX-1041_0025–26. And I find that Eagle's post-invention discussion of the prior art that is intermingled with its own non-public data that it developed in inventing the claimed administration does not show that a POSITA who did not have Eagle's non-public data would have relied on the Preiss studies. Conclusions drawn from a patentee's "disclosures to the FDA" risk being "distorted by hind-sight bias," especially here where the FDA submission was dated after the priority dates and thus was written "through the lens of what [the inventor] had invented." *Neptune Generics, LLC v. Eli Lilly & Co.*, 921 F.3d 1372, 1377 (Fed. Cir. 2019).

49

EAGLEBEN-SA_00001986

Case 1:24-cv-00065-JLH   Document 473   Filed 08/07/26   Page 388 of 515 PageID #:
27291
Case 1:17-cv-01154-CFC   Document 394   Filed 04/29/20   Page 52 of 70 PageID #: 14482

In sum, Defendants failed to prove by clear and convincing evidence that a POSITA reading the Preiss and Schöffski studies, Barth, Glimelius, and the Treanda® Label would have found the claimed infusion times, volumes, and concentrations obvious.

### c.    Secondary Considerations

Plaintiffs offered at trial evidence of four secondary considerations that bear on the administration claims: skepticism, long-felt need, commercial success, and industry praise.  I did not, however, find this evidence to be probative indicia of nonobviousness for the following reasons.

### 1)    Skepticism

Plaintiffs argue that "industry participants" were skeptical of the claimed invention.  D.I. 371 at 77.  But the skepticism they cite was apparently held by a "couple of nurses, a pharmacist[,] and an oncology medical resident," DTX-0959_0001, and investors, D.I. 371 at 78.  Such "lack of enthusiasm by a few is not equivalent to skepticism." *BTG Int'l Ltd. v. Amneal Pharm. LLC*, 923 F.3d 1063, 1076 (Fed. Cir. 2019).

Plaintiffs also contend that the FDA declined to allow testing of Eagle's IV push method of administration because of safety concerns.  D.I. 371 at 78.  But the IV push method is not the claimed invention; the invention is the ten-minute infusion and the FDA told Eagle to proceed with its ten-minute infusion study.

EAGLEBEN-SA_00001987

PTX-0746 at EGL-BENDEKA_00146354; Tr. 1691:3–14; *see also* PTX-0747 at EGL-BENDEKA_00146355 ("[Eagle] stated that they have decided not to evaluate the IV push method administration. [Eagle] will use 120 mg/m$^2$ over 10 minutes in their bridging study.").

### 2)   Long-Felt Need

Plaintiffs also argue that Bendeka®'s shorter infusion addressed a "long-felt need to reduce chair time for chemotherapy, improving patient experience and allowing more patients to be treated." D.I. 371 at 79. The parties offered competing expert testimony on this point. I found credible only Defendant's expert, Dr. Thirman, who testified that Bendeka® does not meaningfully reduce chair time because patients receive IV fluids and other drugs simultaneously with the administration of Bendeka® and the administration of those fluids and other drugs lasts for much longer than 15 minutes. Tr. 188:20–89:9, 189:22–24, 1744:14–51:20, 1745:20–46:6, 1751:3–51:8, 1765:18–66:6, 1779:11–18; DTX-0968_0001. For example, Bendamustine is frequently administered with a drug called Rituxan that has an administration time of four to eight hours. Tr. 190:24–91:6, 191:2–6, 713:14–22, 1746:11–17, 1781:14–22.[11]

---

[11] Plaintiffs' expert, Dr. Agarwal, was not credible. He testified that, based on his experience in a "community-based cancer center," Tr. 1288:19, there were "always issues with the chair time" in the oncology field and that Bendeka® resolved the chair time need, Tr. 1304:7–05:19. My assessment of his lack of credibility was informed by the logic and credible nature of Dr. Thirman's testimony and also by

51

Dr. Agarwal's dissembling with respect to his billing practices (which might explain why he favored shorter chair times). Dr. Agarwal initially denied having any idea how his patients are billed for his work: "I mean, I'm not, I'm not the biller and I don't get paid by the amount I bill or anything. . . . My only concern is the patient's safety and that's all I care about. . . . I have no clue honestly about billing, billing procedures." Tr. 1339:15–21. He volunteered that "billing, which is a totally different department, I have no clue how they do it and I don't take a look at it. I don't even know how to look at it." Tr. 1340:15–17. And when asked how billing relates to infusion time, Dr. Agarwal claimed to have "no idea how the billing codes work with the infusion." Tr. 1344:13–17. But when asked by the Court if he was "paid by salary," Dr. Agarwal responded: "So the way it works is, what they [his practice group] wanted is eat what you kill. Basically, if I see more patients, I get paid more. If I work harder, I get more. If I work less, I get paid less." Tr. 1345:7–11. He then continued to explain the billing process in detail:

> So the way it works is, so we have like repeated billing codes for repeated business, which are from level one to level four, and that's very small. You just mark what billing code you want to put. These are being audited by McKesson and auditors, that you are not -- they look at our notes. They decide if the doctor is overbilling or underbilling with the code. We have another code for the new patient.
>
> * * * *
>
> So they have like one to four levels of visit. Depending on how much time I spend with a patient, either from 15 minutes to 30 minutes, I can go from a level one visit to a level four visit and that's what I mark on that. I think it's level one to level five. Level five is a very complex visit where I spend an hour or more with a patient, and most of the visits are about level three or level four, but these patients that are going to see me, I just bill level 3 or 4 and then I submit the payment and that is taken care of by the billing and coding department.

Tr. 1345:19–46:1, 1346:13–23. Also, when Dr. Agarwal was asked if he was "familiar with a term called infusion billing," he responded "Yes." Tr. 1338:2–4.

52

EAGLEBEN-SA_00001989

### 3) Commercial Success

Plaintiffs further argue that Bendeka®'s commercial success is demonstrated by (1) the fact that "Bendeka® halted the downward trend in bendamustine sales, despite increasing competition," D.I. 371 at 79, and (2) "Teva's choice to license Bendeka® and pay Eagle a portion of the profit for each Bendeka® sale, when it could keep all profits from Treanda®," D.I. 361 ¶ 222. But such evidence does not support a finding of nonobviousness. Plaintiffs have not provided evidence to establish that Bendeka®'s sales and Teva's decision to license Bendeka® were linked to Bendeka®'s patented advantages as opposed to Bendeka®'s exclusivities. *See* D.I. 371 at 80 ("Eagle's patents expire shortly after Teva's pre-existing patents."); Tr. 1725:25–26:2 (stating that with the Bendeka® license, Teva has FDA exclusivity until 2022). Also, the "competition" that Plaintiffs cite consists only of Eagle's Belrapzo®----a drug that shares Bendeka®'s formulation, but lacks the short-infusion protocol. D.I. 361 ¶ 219. Because Eagle benefits from the sales of both Belrapzo® and Bendeka®, it may have an incentive to market Bendeka® over Belrapzo®, Tr. 1652:19–53:2, and thus any evidence that Bendeka® has higher sales has little if any probative value.

### 4) Praise

Finally, Plaintiffs argue that "Bendeka®'s patented advantages . . . have received industry praise." D.I. 371 at 81. In support of this assertion, they cite (1) a

53

EAGLEBEN-SA_00001990

Case 1:17-cv-01104-CFC    Document 394    Filed 04/29/20    Page 58 of 79 PageID #: 14486

Veteran's Administration (VA) newsletter that highlighted the advantages of Bendeka® as compared to Treanda®, (2) a study that noted attributes of Bendeka® that drive Bendeka®'s usage, and (3) Fresenius Kabi's pre-litigation statement that Bendeka® reduced "[p]atient chair time" and that Bendeka® could "have higher pricing and still retain volume due to the benefits it offers." D.I. 371 at 81; D.I. 361 ¶ 226. Here again, I find such evidence to have at best marginal probative value. As an initial matter, the VA does not even use Bendeka®. Tr. 1777:1–78:16. Second, the study Plaintiffs cite was funded by Teva and provides no connection between the claimed limitations and industry praise. Tr. 1305:25–07:4. Third, Fresenius Kabi's statement merely lists reduced chair time as a fact and does not exhibit any praise related to the asserted claims.

* * * *

In sum, the secondary consideration evidence does not support a finding of nonobviousness. I still find, however, that the asserted administration claims are not obvious. Defendants have not shown by clear and convincing evidence that Palepu 2011, the Treanda® Label, Preiss 1985, Preiss 1998, Schöffski 2000a, Schöffski 2000b, Barth, and Glimelius would have motivated a POSITA to arrive at the claimed administrations with a reasonable expectation of success. A POSITA would not have been motivated to follow Preiss's three-to-ten-minute (and potentially lower volume and higher concentration) infusions because (1) a

54

EAGLEBEN-SA_00001991

POSITA would not have relied on the Preiss studies to determine a safe bendamustine infusion protocol, (2) subsequent prior art taught away from the three-to-ten-minute infusions, and (3) Defendants only guess that Preiss used similar volumes and concentrations to those claimed. Moreover, Barth and Glimelius would not have motivated a POSITA to administer bendamustine at lower volumes because (1) Barth only disclosed hypothetical volumes that did not even include the claimed volumes of 100 mL or less and (2) Glimelius did not involve bendamustine. Finally, the claimed concentrations are not obvious as inherent or under the prior art.

## III.   INDEFINITENESS

Defendants argue that the asserted formulation claims are invalid because they each require "a stabilizing amount of antioxidant"—a requirement Defendants contend is indefinite. D.I. 371 at 2.

### A.   Legal Standards for Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). "Indefiniteness is a matter of claim construction, and the same principles that generally govern claim construction are applicable to determining whether

EAGLEBEN-SA_00001992

allegedly indefinite claim language is subject to construction." *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008), *abrogated on other grounds by Nautilus*, 572 U.S. at 901 (rejecting Federal Circuit's "insolubly ambiguous" standard for indefiniteness). As in claim construction, in making an indefiniteness determination, the district court may make "any factual findings about extrinsic evidence relevant to the question, such as evidence about knowledge of those skilled in the art." *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017). "Any fact critical to a holding on indefiniteness . . . must be proven by the challenger by clear and convincing evidence." *Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*, 838 F.3d 1224, 1228 (Fed. Cir. 2016) (alteration in original)).

## B.    Discussion

Defendants argue that "the claims recite a 'stabilizing amount' [of antioxidant] with no guidance, functional or otherwise, on what degree of stability is required to obtain some unnamed objective." D.I. 380 at 3. But this argument conflates (1) whether a given antioxidant amount improves bendamustine's stability with (2) the extent to which that given antioxidant amount improves stability. The written description defines a "stabilizing amount of antioxidant" as an amount that "increase[s] or enhance[s] the stability of the bendamustine in the compositions described herein," #831 patent at 3:49−54; Tr. 370:25−71:9. Thus,

56

the "objective" of the antioxidant amount is not "unnamed" but is instead "to increase or enhance the stability of the bendamustine in the compositions" described in the specification.[12]

Defendants argue that the term is indefinite because "[t]he specification does not explain how to determine whether stability has been 'increased' or 'enhanced.'" D.I. 378 at 3. But as Plaintiffs' expert, Dr. Siepmann, credibly testified, a POSITA would understand that a stabilizing amount of an antioxidant includes any amount that decreases the amount of bendamustine degradation after any time period and at any temperature. Tr. 1485:4–87:10, 1502:8–12. And the patents provide a POSITA with a method for measuring stability: using HPLC to compare the amount of overall bendamustine degradation with and without the antioxidant. Tr. 1485:14–86:11. Example 3 demonstrates that a POSITA would compare the amount of bendamustine remaining in the same formulation, stored under the same conditions, with and without the antioxidant, #831 patent at

---

[12] Section 112(b) of Title 35 provides that "[t]he specification shall conclude with one or more claims[.]" This language makes clear that the specification includes the claims asserted in the patent, and the Federal Circuit has so held. *See Markman*, 52 F.3d at 979 ("Claims must be read in view of the specification, of which they are part"). The Federal Circuit and other courts, however, have also used "specification" on occasion to refer to the written description of the patent as distinct from the claims. *See, e.g., id.* ("To ascertain the meaning of claims, we consider three sources: The claims, the specification, and the prosecution history."). To avoid confusion, I refer to the portions of the specification that are not claims as "the written description."

EAGLEBEN-SA_00001994

7:59–8:27; and the specifications describe measuring the remaining bendamustine using HPLC, *id.* at 2:26–44, 2:57–3:4, 4:22–26; Tr. 1487:11–89:11. In addition to providing exemplary test methods, the specification also lists "suitable antioxidant amounts" and "antioxidants," and provides examples of "stabilizing" amounts. #831 patent at 3:57–4:8, 7:59–9:2; Tr. 371:15–72:18, 1489:23–90:4.

In *BASF*, the Federal Circuit held the term "composition . . . effective to catalyze" not indefinite, even though the patent did not "recite a minimum level of function needed to meet this 'effective' limitation" or "a particular measurement method," because tests for determining whether a composition was catalyzing were well-known. 875 F.3d at 1366–68. Here, the term "stabilizing amount of antioxidant" is like the term "composition . . . effective to catalyze" and Plaintiffs' expert, like the expert in *BASF*, persuasively testified that a POSITA would know how to determine whether an amount of antioxidant is stabilizing. Moreover, unlike in *BASF*, the asserted patents here provide a test method.

Finally, Defendants cite the patentee's removal of antioxidant and stability limitations during prosecution as support for their indefiniteness argument. D.I. 378 at 5–6. But the removal of those limitations undercuts Defendants' argument because it confirms that the "examiner understood" the claims without those limitations. *See Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1379–80 (Fed. Cir. 2017).

58

EAGLEBEN-SA_00001995

Case 1:17-cv-01154-JFB   Document 394   Filed 04/29/20   Page 61 of 70 PageID #: 14491

I thus find that the term "stabilizing amount of antioxidant" is not indefinite and I construe it as: any amount of an antioxidant that decreases the amount of bendamustine degradation after any time period and at any temperature.

## IV.   ENABLEMENT

Defendants assert that the asserted formulation claims are invalid for lack of enablement because the formulation patents disclosed neither the use of sodium hydroxide (NaOH) or of "other undisclosed variables." D.I. 378 at 59.

### A.   Legal Standards for Enablement

"Claims are not enabled when, at the effective filing date of the patent, one of ordinary skill in the art could not practice their full scope without undue experimentation." *Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380, 1384 (Fed. Cir. 2013) (citation omitted). "That some experimentation is necessary does not preclude enablement; the amount of experimentation, however, must not be unduly extensive." *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1576 (Fed. Cir. 1984) (citations omitted). A challenger must prove invalidity based on non-enablement by clear and convincing evidence. *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012). Enablement is a question of law based on underlying facts. *Abbott Labs.*, 720 F.3d at 1384 (citations omitted).

59

EAGLEBEN-SA_00001996

Case 1:17-cv-01154-CFC   Document 394   Filed 04/29/20   Page 62 of 78 PageID #: 14492

## B.   Discussion

Defendants argue that the asserted formulation claims are not enabled because the claims do not contain NaOH and "a pH adjuster like NaOH is necessary to obtain the PG ester levels claimed in the [a]sserted [f]ormulation [c]laims." D.I. 378 at 59.  Defendants note that "Eagle's later-filed [#]879 application . . . explains [that] 'the control samples, which did not include NaOH did not provide long term storage stability,' and 'exhibited more than 28% total esters compared to initial after six months of storage at 25° C.'" D.I. 378 at 60 (citation omitted).

Evidence that some claimed formulations did not result in the PG ester limitations, however, does not establish that the claims are not enabled. Defendants have not presented any evidence to show that a POSITA would have had to undertake undue experimentation to alter the formulation to obtain the PG ester limitations.  That some formulations with the claimed ingredients do not satisfy the PG ester limitations does not support non-enablement unless the number of such formulations is significant enough to have required a POSITA to experiment unduly. *See Atlas Powder*, 750 F.2d at 1576–77 ("Even if some of the claimed combinations were inoperative, the claims are not necessarily invalid. . . . Of course, if the number of inoperative combinations becomes significant, and in effect forces one of ordinary skill in the art to experiment unduly in order to

60

practice the claimed invention, the claims might indeed be invalid. That, however, has not been shown to be the case here." (citations omitted)). Defendants presented no evidence showing that the number of unsuccessful formulations is significant enough to require undue experimentation. Accordingly, they failed to establish by clear and convincing evidence that the asserted claims are invalid for lack of enablement.

## V.    WRITTEN DESCRIPTION

Apotex argues that claim 9 of the #797 patent is invalid for lack of written description. D.I. 378 at 60. It asserts that "the absence of any mention of a pH adjuster like NaOH in the [#]797 patent demonstrates that the inventors did not have possession of it at that time, as confirmed by their later filing of another patent application that discloses and claims it." D.I. 378 at 61 (citations omitted). "But written description is about whether the skilled reader of the patent disclosure can recognize that what was claimed corresponds to what was described . . . ." *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1191 (Fed. Cir. 2014). And Apotex never cites the intrinsic record to show that the asserted formulation patents claim something that they do not describe in their written descriptions. Instead, Apotex improperly cites extrinsic evidence—the later-filed Eagle patent application. Apotex has thus failed to establish that claim 9 is invalid for lack of written description.

61

EAGLEBEN-SA_00001998

## VI.   INFRINGEMENT

Defendants stipulated to infringement of the asserted claims with two exceptions.  Apotex, Fresenius Kabi, and Mylan argue that (1) they do not infringe the asserted formulation claims because their ANDA products do not contain "a stabilizing amount of an antioxidant" as the asserted formulation claims require, D.I. 369 at 2; and (2) they do not directly infringe or induce infringement of claim 9 of the #797 patent, which requires that the "bendamustine-containing composition ha[ve] less than or equal to 0.43 % total PG esters at about 3 months of storage at a temperature of about 25°C," because their proposed labeling does not direct physicians to store their ANDA products for about 3 months at about 25°C, D.I. 369 at 4–5.

### A.   Legal Standards for Infringement

A defendant is liable for patent infringement if it files an ANDA "for a drug claimed in a patent or the use of which is claimed in a patent." 35 U.S.C. § 271(e)(2)(A).  To establish infringement based on the filing of an ANDA under § 271(e)(2)(A), a patentee must show that "if the drug were approved based upon the ANDA, the manufacture, use, or sale of that drug would infringe the patent in the conventional sense." *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir. 1997).

"Conventional" infringement includes direct infringement and inducement.

62

EAGLEBEN-SA_00001999

35 U.S.C. § 271 (a), (b).  Direct infringement requires that "every limitation set forth in a claim . . . be found in an accused product, exactly." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995) (citation omitted). Inducement requires a showing "that the accused inducer took an affirmative act to encourage infringement with the knowledge that the induced acts constitute patent infringement." *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 904 (Fed. Cir. 2014) (citation omitted).  A plaintiff can prevail on a claim of inducement only if it establishes direct infringement.  *See Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014) ("[I]nducement liability may arise if, but only if, there is direct infringement." (internal quotation marks, alterations, and citation omitted)).

A patentee must prove infringement by a preponderance of the evidence. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed. Cir. 1984).  "A patentee may prove infringement by any method of analysis that is probative of the fact of infringement, and circumstantial evidence may be sufficient." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009) (internal quotation marks and citations omitted).

**B.      Direct Infringement of the "Stabilizing Amount of Antioxidant" Limitation**

The asserted formulation claims require a "stabilizing amount of an antioxidant," a term that I construed as any amount of an antioxidant that decreases

63

EAGLEBEN-SA_00002000

Case 1:17-cv-01064-CFC   Document 394   Filed 04/29/20   Page 68 of 70 PageID #: 14496

the amount of bendamustine degradation after any time period and at any temperature.

Defendants' ANDA products each contain 5 mg/mL of the antioxidant monothioglycerol, *see* PTX-0474 at APOLIQBENDA_ANDA_0005427 (Apotex); PTX-0486 at FK_BENDA_00003243, 3245 (Fresenius Kabi); PTX-0007 at MYLBEN_000248 (Mylan); Tr. 372:19–74:13, and the formulation patents' written description shows that 5 mg/mL of monothioglycerol is a stabilizing amount. The written description identifies "5 mg/mL to about 20 mg/mL" as a "preferable" stabilizing amount of antioxidant. #831 patent at 3:49–68; #797 patent at 3:55–66. The written description also identifies "thioglycerol (also known as monothioglycerol)" as a preferred antioxidant. #831 patent at 4:1–8; #797 patent at 4:6–16. Moreover, Example 3 demonstrates that adding "5 mg/m[L] of lipoic acid . . . as a stabilizing antioxidant" to 20 mg/mL of bendamustine in PEG decreased the amount of bendamustine degradation after 15 days at 25°C and 40°C as compared to the same formulation without an antioxidant. #831 patent at 7:59–8:27; #797 patent at 7:61–8:29; Tr. 371:15–72:18. Example 4 recites dissolving 50 mg/mL bendamustine in 90% PEG and 10% PG, and adding "5 mg/m[L] of [mono]thioglycerol, α-lipoic acid or dihydrolipoic acid," an amount that it describes as "a stabilizing amount of an antioxidant." #831 patent at 8:29–65; #797 patent at 8:32–66.

64

EAGLEBEN-SA_00002001

Circumstantial evidence can establish infringement; and here, the asserted formulation patents' disclosures that 5 mg/mL of an antioxidant (and specifically monothioglycerol) is stabilizing shows that the 5 mg/mL of monothioglycerol that Defendants use in their ANDA products decreases the amount of bendamustine degradation as compared to the same formulation without an antioxidant. Finally, Fresenius Kabi and Mylan represented to the FDA that 5 mg/mL monothioglycerol was sufficient to ensure that the amount of bendamustine in their ANDA products did not fall below specification limits. *See* PTX-0054 at FK_BENDA_00000543 (Fresenius Kabi); PTX-0201 at MYL-BEN_005258 (Mylan); Tr. 374:14–77:1.

## C.    Direct and Induced Infringement of Claim 9 of the #797 Patent

Claim 1 of the #797 patent recites a "method of treating leukemia, Hodgkin's disease, or multiple myeloma" comprising "administering" the specified "liquid bendamustine-containing composition." #797 patent at 12:43–46 (claim 1). Claim 9 recites the method of claim 1, wherein the "bendamustine-containing composition has less than or equal to 0.43% total PG esters at about 3 months of storage at a temperature of about 25° C." #797 patent at claim 9. Defendants stipulate that their ANDA Products have "less than or equal to 0.43% total PG esters at about 3 months of storage at a temperature of about 25° C," but contend that they do not directly infringe or induce infringement of claim 9 because their

65

EAGLEBEN-SA_00002002

Case 1:17-cv-01104-JFB   Document 394   Filed 04/29/20   Page 68 of 76 PageID #: 14498

proposed labeling does not recommend storing their ANDA Products for "about 3 months" at "a temperature of about 25° C." D.I. 307-4 ¶ I.a; D.I. 320 ¶ 3.

I find, however, that even though Defendants' labeling does not mention storage, Defendants' ANDA products directly and indirectly infringe claim 9 because the PG ester limitation does not require the user to store the products for three months at 25°C. Claim 9's PG ester limitation describes a characteristic of the claimed formula; it is not a method step and thus, does not require action to infringe. The claim does not recite testing for the PG ester limitation; it just describes a composition that would have less than 0.43% PG esters if one were to test for them after storing the composition for three months at 25°C.

Defendants' proposal to construe the PG ester limitation as a method step that requires actual storage under the specified conditions also fails because it "renders [claim 9] nonsensical." *See Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010) ("A claim construction that renders asserted claims facially nonsensical cannot be correct." (internal quotation marks and citations omitted)). Although claim 1 of the #797 patent requires the composition to have "less than or equal to 0.11% total PG esters at about 1 month of storage *at a temperature of about 5° C*," claim 9 requires the same composition to have "less than or equal to 0.43% total PG esters at about 3 months of storage *at a temperature of about 25° C*." #797 patent at 12:61–63 (claim 1), 13:22–25

66

Case 1:17-cv-01104-JFB   Document 394   Filed 04/29/20   Page 68 of 75   PageID #: 14499

(claim 9). Under Defendants' proposed construction, to infringe, the user would need to store the composition simultaneously at different temperatures, which is impossible.

Defendants therefore directly infringe and induce infringement of claim 9 of the #797 patent. With respect to direct infringement, Defendants agree that their products have less than or equal to 0.43% total PG esters after storing them for three months at a temperature of about 25°C and, other than with respect to a stabilizing amount of an antioxidant, they stipulated to direct infringement of the remaining limitations. D.I. 320 ¶ 3. With respect to induced infringement, Defendants will encourage others to administer their ANDA products through their proposed labels. Although Defendants' proposed labeling does not mention the claimed PG ester limitations, Defendants know "that [their ANDA products] meet all of the claim limitations and, through [their] proposed label[s], encourage[] patients to administer [their ANDA products] in a manner that infringes the claimed method." *Orexigen Therapeutics, Inc. v. Actavis Labs. FL, Inc.*, 282 F. Supp. 3d 793, 816 (D. Del. 2017), *rev'd in part on other grounds sub nom. Nalpropion Pharm., Inc. v. Actavis Labs. FL, Inc.*, 934 F.3d 1334 (Fed. Cir. 2019). "Whether the [user] who performs the method by administering the [products] knows that the [products] meet the [PG ester limitations] is irrelevant for the purposes of infringement." *Id.*

67

## VII.  CONCLUSION

For the foregoing reasons, I find that all asserted claims of the asserted patents are not invalid and that Defendants infringe and induce infringement of each of the asserted claims.

The parties will be directed to submit a proposed order by which the Court may enter final judgment consistent with this Opinion.

EAGLEBEN-SA_00002005

# EXHIBIT B

EAGLEBEN-SA_00002006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CEPHALON, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 17-01154-CFC |
| | ) | (Consolidated) |
| SLAYBACK PHARMA LIMITED | ) | |
| LIABILITY CO., *et al.*, | ) | Highly Confidential |
| | ) | |
| Defendants. | ) | |
| | ) | |

## RESPONSIVE EXPERT REPORT OF JUERGEN SIEPMANN, PH.D.

EAGLEBEN-SA_00002007

solubilizing capabilities and safety." Strickley 2004 at 221, JDG_BENDA_00003290 at 3310.
Notwithstanding these positive attributes, with respect to the relevant context of clinical use,
Strickley 2004 notes that "[t]here are some commercial injectable formulations with PEG 300,
but far fewer compared to propylene glycol and/or ethanol." *Id.* Likewise, Strickley 2004 states
that although "PEG 400 . . . [is a] very effective solubilizing excipient[], [it is] currently in only a
few marketed products." *Id.* As these reviews of marketed FDA products make clear, PEG is
not a particularly common choice to use as a solvent in a marketed parenteral product, and one of
the principal reasons that PEG is not used in more pharmaceutical products is the presence or
generation of peroxides in PEGs, which can cause undesired oxidation.

355.    A review of the marketed parenteral formulations available in the United States as
of the priority date that contained PEG indicates that those formulations do not have
antioxidants:

- Ativan® (lorazepam) contains "0.18 mL polyethylene glycol 400 in propylene glycol with 2.0% benzyl alcohol as preservative." Ativan® Label at 1 (2006), JDG_BENDA_00005945 at 5948.

- Busulfex™ (busulfan) contains "N-N-dimethylacetamide (DMA) 33% wt/wt and polyethylene glycol 400, 67% wt/wt." Busulfex™ Label at 1 (1999), JDG_BENDA_00005643 at 5643.

- Robaxin® (methocarbamol) contains "polyethylene glycol 300, NF 0.5 mL, Water for Injection, USP q.s." Robaxin® Label at 1 (2003), JDG_BENDA_00005854 at 5854.

- VePesid® (etoposide) contains 60% PEG 300, 30% ethanol, 8.0% Tween 80, 3% benzyl alcohol, and 2 mg/mL citric acid. Strickley 2004 at 219, JDG_BENDA_00003290 at 3308.

356.    Of the four formulations listed above containing PEG, none of them contain
excipients that are listed in Nema 1997's list of Antioxidants/Reducing Agents (Table IV).
Nema 1997 at 167, JDG_BENDA_00002272 at 2273. This state of the art refutes clearly Dr.

166

EAGLEBEN-SA_00002008

Pinal's opinion that the POSA would have used PEG and then added an antioxidant to avoid the oxidation of PEG.

357.    I understand that citric acid (which is in VePesid®) may potentially act synergistically in conjunction with other antioxidants. *See, e.g.*, Akers 1982 at 227, JDG_BENDA_00006113 at 6119 (listing citric acid as an "antioxidant synergist," which is a compound that has "no capability of protecting oxygen-sensitive drugs, but, when combined with antioxidants, do serve to increase the maintenance of oxidative stability of the drug" either by "complexing trace amounts of metal," "lowering the solution pH," or "decreasing the oxygen stability in the solution"); Rowe 2009 at 181 ("Citric acid monohydrate is used as a sequestering agent and antioxidant synergist."). However, citric acid is principally a pH adjustor. *See* Rowe 2009 at 181. A publication discussing the VePesid® formulation states that the citric acid in that formulation is for pH adjustment. *See* Jonkman-de Vries at 479, JDG_BENDA_00002062 at 2066 ("The commercial formulation of etoposide (Vepesid®) contains . . . 2 mg citric acid (for pH adjustment) . . . .").

358.    From the above information, the POSA would have understood that, as of the priority date, none of the four commercially available parenteral formulations that contained PEG 300 or PEG 400 also contained an antioxidant. This would have taught the POSA that antioxidants were not routinely added to parenteral formulations containing PEG. ▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉                                                  REDACTED

359.    The POSA likewise would have understood that Dr. Pinal's suggested formulation approach—to add PEG to the formulation and also to add an antioxidant to fix the degradation caused by the PEG—was not conventional. Rather, in view of the small number of

167

marketed parenteral drugs containing PEG, and the fact that none of those drugs contained an antioxidant, the POSA would have inferred that formulators simply did not use PEG with drugs that might be susceptible to degradation via PEG's oxidation products. In my opinion, and based on my experience as a formulator, the POSA would not have been motivated or had reason to add PEG to a formulation if she or he believed that doing so would have necessitated also adding an antioxidant.

360.    In view of the lack of any marketed parenteral drugs containing PEG and an antioxidant, the POSA likely would have hypothesized that PEG was only used with drugs that were not subject to degradation by PEG oxidation products (for example, acid-catalyzed esterification). To test that hypothesis, the POSA could have reviewed the molecular structures of the four APIs listed above. I have depicted those structures below. Most notably, none of those molecules contain a carboxylic acid moiety. As such, none of those molecules would have been prone to esterification via the PEG molecule, which is the only degradation pathway that Dr. Pinal has identified as motivating the use of an antioxidant in formulations of the claimed inventions. This would have bolstered the POSA's understanding that PEG was only used in liquid parenteral formulations where the active ingredients were not susceptible to degradation via PEG's oxidation products. Because bendamustine plainly is a drug molecule whose degradation is accelerated by such oxidation products—as Dr. Pinal acknowledges—the POSA would have avoided using PEG with bendamustine.

168

EAGLEBEN-SA_00002010

468.    I agree with certain aspects of Dr. Pinal's opinions, as I described them in the previous paragraph. In particular, I agree that it was known that PEG and PG could esterify with bendamustine. As I explain above, in my opinion this would have motivated the POSA to use aprotic solvents that could not form these ester degradation products, and would have taught away from using PEG and PG in bedamustine formulations. *See, e.g.,* ¶¶ 221, 245.

469.    I further agree with Dr. Pinal that it was known that PEG could form various degradation products. As I explain above, the POSA would have viewed the degradation products of PEG as a disadvantage that would have discouraged the use of that solvent. *See, e.g.,* ¶¶ 339–360.

470.    I disagree, however, with Dr. Pinal that PEG's known sensitivity to oxidation would have motivated or provided reason for the POSA to use an antioxidant with PEG. I likewise disagree that the POSA would have been motivated or had reason to use an antioxidant in conjunction with PG and bendamustine.

471.    As I explain in detail above, the POSA would have been strongly motivated to avoid using an antioxidant in the formulation. *See* ¶¶ 344–360. The POSA would have preferred to keep the formulation as simple as possible; adding an antioxidant would have introduced substantial complexity into the formulation, including increasing the risk of unwanted interactions between the excipients and bendamustine. *See* ¶¶ 344–345. The POSA would have understood that antioxidants are particularly reactive and likely to cause unwanted interactions in the formulation. *See* ¶ 346. Adding an antioxidant would also have been undesirable because the concentration of the antioxidant would have to be maintained throughout the shelf life of the product—in effect, the stability of the product would become dependent on the antioxidant. *See* ¶ 347. The POSA also would have understood that an antioxidant might not completely solve

224

EAGLEBEN-SA_00002011

any potential oxidation problem and that finding an appropriate antioxidant would, in the first instance, be an unpredictable research effort. *See* ¶¶ 349–352.

472.    The undesirability of using antioxidants in pharmaceutical products has been recognized by regulatory bodies. *See* ¶ 348. The European Union's guidance document about antioxidants states that antioxidants "should only be used once it has been shown that their use cannot be avoided." EU Antioxidant Guidance at 2. Moreover, in order to include an antioxidant in a formulation, the EU regulatory body requires a demonstration of "the necessity to add an antioxidant . . . to the finished product at the chosen level" and "the physical and chemical compatibility of the antioxidant . . . with other constituents of the finished product, the container and the closures." *Id.*

473.    Because of these disadvantages, the use of antioxidants in parenteral formulations was on the decline as of the priority date, *see* Broadhead 2001 at 341, JDG_BENDA_00000404 at 415, and the POSA would likewise have been strongly dissuaded from using an antioxidant in creating a new bendamustine formulation.

474.    In view of the disadvantages of using an antioxidant in a parenteral composition, the POSA would not have been motivated or had reason to add an antioxidant based on mere speculation about potential oxidative degradants. Dr. Pinal's opinions on this topic are based on precisely such speculation. *See, e.g.,* Pinal Rep. ¶ 77 ("The POSA would recognize a <u>potential</u> self-propagating problem . . . ." (emphasis added)). As an initial matter, Dr. Pinal seems to be suggesting that his proposed degradation mechanism is "self-propagating." *See* Pinal Rep. ¶ 77. But Dr. Pinal has not described what about his proposed reaction mechanism is self-propagating. For example, Dr. Pinal has not opined that the formation of acidic species from PEG or PG would cause additional degradative breakdown of the PEG or PG to form additional acidic

225

**UNITED STATES
PATENT AND TRADEMARK OFFICE**

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC ACKNOWLEDGEMENT RECEIPT

| APPLICATION # | RECEIPT DATE / TIME | ATTORNEY DOCKET # |
|---|---|---|
| **18/081,251** | **07/28/2023 12:44:43 PM ET** | **107071.000583** |

## Title of Invention

FORMULATIONS OF BENDAMUSTINE

## Application Information

| | | | |
|---|---|---|---|
| APPLICATION TYPE | Utility - Nonprovisional Application under 35 USC 111(a) | PATENT # | - |
| CONFIRMATION # | 8743 | FILED BY | VeAndra Luckett |
| PATENT CENTER # | 62522974 | FILING DATE | 12/14/2022 |
| CUSTOMER # | 23377 | FIRST NAMED INVENTOR | Nagesh R. Palepu |
| CORRESPONDENCE ADDRESS | - | AUTHORIZED BY | Stephanie Lodise |

## Documents

# TOTAL DOCUMENTS: 5

| DOCUMENT | | PAGES | DESCRIPTION | SIZE (KB) |
|---|---|---|---|---|
| 107071.000583 AFCP request form.pdf | | 2 | After Final Consideration Program Request | 221 KB |
| 107071.000583 Reply FOA 7-11-2023.pdf | | 92 | - | 5426 KB |
| 107071.000583 Reply FOA 7-11-2023-A.NE.pdf | (1-1) | 1 | Response After Final Action | 86 KB |
| 107071.000583 Reply FOA 7-11-2023-CLM.pdf | (2-4) | 3 | Claims | 89 KB |
| 107071.000583 Reply FOA 7-11-2023-REM.pdf | (5-14) | 10 | Applicant Arguments/Remarks Made in an Amendment | 350 KB |

| | | | | |
|---|---|---|---|---|
| 107071.000583 Reply FOA 7-11-2023-LET..pdf | (15-92) | 78 | Miscellaneous Incoming Letter | 5065 KB |

## Digest

| DOCUMENT | MESSAGE DIGEST(SHA-512) |
|---|---|
| 107071.000583 AFCP request form.pdf | DD403C69B608E4B1B6A38B2261560DFA1BF917915FB5E58B1 4721BFE351D02A76DFF361C23B590DA461493195BD91B0F3B BA0FDE16AA2333E3B46A3913429830 |
| 107071.000583 Reply FOA 7-11-2023.pdf | 42236FD9D44E556B6E491258C38F3CD5B57FBD88F49F032ED 1B0150AB4C310B3D7F3C5C3718027D6A442A3D053748006CD 93C5713DD1DB533B0980CEE968639B |
| 107071.000583 Reply FOA 7-11-2023-A.NE.pdf | 929C35140A1879A26D72418D62459B890D1561AA5E9FA7F3F7 FA5150D57D647FBCD1A2211391E70AA8D0C7EB1C9531ABC7 41652E7288D37E2F53E569DB55637E |
| 107071.000583 Reply FOA 7-11-2023-CLM.pdf | 4A9888AB26B3E43EF9E1E6132924D8BC735708DF8C8BFD49A 8EA7D7AF96A49E08E53F1DE8771FB69152A5225823270FF593 AE8E54AEDAEB6E3A08D3B6B220D19 |
| 107071.000583 Reply FOA 7-11-2023-REM.pdf | C15B6F39F29E3BC7B7EE57FD18582ACEC700A5BE8D92EC3F 3EC3BD3A6AE859ADF7A86760B6D1A03F4504CBE9FE2525F37 E7CA8C14A6A7D656F966E2A5720187F |
| 107071.000583 Reply FOA 7-11-2023-LET..pdf | B0B056A2D871C3BBAE327D584138457AE425B73B8364FCA08 8DA0CCCEAF8A8375F26E427B7AAFB9853DA4A2B2628C78B2 334978DD803ED4BF900DD7BFCA49BCC |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**

If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application

EAGLEBEN-SA_00002014

**National Stage of an International Application under 35 U.S.C. 371**

If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**

If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

EAGLEBEN-SA_00002015

# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/081,251 | 12/14/2022 | Nagesh R. Palepu | 107071.000583 | 8743 |

23377      7590      08/21/2023
BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501

| EXAMINER |
|---|
| ARNOLD, ERNST V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1613 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 08/21/2023 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

eofficemonitor@bakerlaw.com

PTOL-90A (Rev. 04/07)

EAGLEBEN-SA_00002016

| *Office Action Summary* | Application No. 18/081,251 | Applicant(s) Palepu et al. | |
|---|---|---|---|
| | Examiner ERNST V ARNOLD | Art Unit 1613 | AIA (FITF) Status No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE **3** MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☑ Responsive to communication(s) filed on 7/28/23.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a) ☐ This action is **FINAL.**       2b) ☑ This action is non-final.
3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims\***

5) ☑ Claim(s) _1-6,8,11-15 and 18_ is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☑ Claim(s) _1-6,8,11-15 and 18_ is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement

\* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10) ☐ The specification is objected to by the Examiner.
11) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    **Certified copies:**
    a) ☐ All    b) ☐ Some\*\*    c) ☐ None of the:
    1. ☐ Certified copies of the priority documents have been received.
    2. ☐ Certified copies of the priority documents have been received in Application No. _____.
    3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

\*\* See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☑ Notice of References Cited (PTO-892)
2) ☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.
3) ☑ Interview Summary (PTO-413) Paper No(s)/Mail Date _____.
4) ☑ Other: _2323_

U.S. Patent and Trademark Office
PTOL-326 (Rev. 11-13)          Office Action Summary          Part of Paper No./Mail Date 20230814a

EAGLEBEN-SA_00002017

Application/Control Number: 18/081,251                                                    Page 2
Art Unit: 1613

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent provisions.

### *Claim Status*

Claims 7, 9-10, 16 and 17 have been cancelled.

Claims 1-6, 8, 11-15 and 18 are pending. Upon further consideration of Applicant's arguments concerning the last Office Action, the finality of that action is withdrawn. This Action is non-FINAL.

### *Withdrawn rejections*

Applicant's amendments and arguments filed 7/28/23 are acknowledged and have been fully considered.  The Examiner has re-weighed all the evidence of record. Any rejection and/or objection not specifically addressed below is herein withdrawn. Claims 1-3, 8, 11-13 and 16-18 were rejected under 35 U.S.C. 103(a) as being unpatentable over Brittain et al. (US 20060159713; of record) and claims 4, 5, 14, and 15 were rejected under 35 U.S.C. 103(a) as being unpatentable over Brittain et al. (US 20060159713) in further view of Tait et al. (WO 0202125). These rejections are withdrawn in favor of the following rejections.

The following rejections and/or objections are either reiterated or newly applied. They constitute the complete set of rejections and/or objections presently being applied to the instant application.

EAGLEBEN-SA_00002018

Application/Control Number: 18/081,251                                      Page 3
Art Unit: 1613

## *Claim Rejections - 35 USC § 103*

In the event the determination of the status of the application as subject to AIA 35 U.S.C. 102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any correction of the statutory basis for the rejection will not be considered a new ground of rejection if the prior art relied upon, and the rationale supporting the rejection, would be the same under either status.

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

The factual inquiries set forth in *Graham* **v.** *John Deere Co.*, 383 U.S. 1, 148 USPQ 459 (1966), that are applied for establishing a background for determining obviousness under 35 U.S.C. 103(a) are summarized as follows:

1. Determining the scope and contents of the prior art.
2. Ascertaining the differences between the prior art and the claims at issue.
3. Resolving the level of ordinary skill in the pertinent art.
4. Considering objective evidence present in the application indicating obviousness or nonobviousness.

Claims 1-3, 6, 8, 11-13 and 18 are rejected under 35 U.S.C. 103(a) as being unpatentable over Brittain et al. (US 20060159713; of record) and Kumar et al. (AAPS PharmSciTech 2006;7(3):E1-E7) and McGinity et al. (Journal of Pharmaceutical

Application/Control Number: 18/081,251                                         Page 4
Art Unit: 1613

Sciences 1975;64(2):356-357) and Wasylaschuk et al. (JOURNAL OF

PHARMACEUTICAL SCIENCES, VOL. 96, NO. 1, JANUARY 2007:106-116).

      This application currently names joint inventors. In considering patentability of the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g) prior art under 35 U.S.C. 103(a).

      Applicant claims, for example:

1.    (currently amended) A sterile vial containing a liquid bendamustine-containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL;

a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

a stabilizing amount of an antioxidant,

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

EAGLEBEN-SA_00002020

Application/Control Number: 18/081,251            Page 5

Art Unit: 1613

11.      (currently amended) A liquid bendamustine-containing composition comprising bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid;

wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 20 mg/mL to about 60 mg/mL,

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

Claim interpretation: The MPEP provides, "Claim scope is not limited by claim language that suggests or makes optional but does not require steps to be performed, or by claim language that does not limit a claim to a particular structure." See M.P.E.P § 2111.04; see also M.P.E.P §§ 2103(C) and 2173.05(h).

## Level of Ordinary Skill in the Art

## (MPEP 2141.03)

MPEP 2141.03 (I) states: "The "hypothetical 'person having ordinary skill in the art' to which the claimed subject matter pertains would, of necessity have the capability of understanding the scientific and engineering principles applicable to the pertinent art." *Ex parte Hiyamizu*, 10 USPQ2d 1393, 1394 (Bd. Pat. App. & Inter. 1988). The level of skill is that of a ***medical/pharmaceutical cancer*** research scientist, as is the case here, then one can assume comfortably that such an educated artisan will draw conventional

EAGLEBEN-SA_00002021

Application/Control Number: 18/081,251                                                    Page 6
Art Unit: 1613

ideas from oncology medicine, oncology pharmacy and chemistry— without being told

to do so.

In addition, the prior art itself reflects an appropriate level (MPEP 2141.03(II)).


**Determination of the scope and content of the prior art**

**(MPEP 2141.01)**

Regarding claims 1, 2, 8, 11, 12 and 18, Brittain et al. teach a sterile vial

containing about 10-500 mg of lyophilized bendamustine powder ([0067, 0099]; claims

73-74). Brittain et al. teach reconstitution of the lyophilized formulations with a sterile

fluid to provide an appropriate solution of bendamustine for administration [0100].

Brittain et al. teach that in the presence of water, nitrogen mustards like bendamustine

undergo degradation by hydrolysis [0004, 0010, 0107]. Brittain et al. teach that the liquid

carrier for the ultimate dosage form can be from a limited list of liquid polyethyelene

glycol, propylene glycol, ethanol or mixtures thereof [0067, 0090], thereby providing an

immediately envisaged embodiment with a pharmaceutically acceptable fluid that

consists of polyethyelene glycol and optionally one or more of propylene glycol and

ethanol.

Regarding claims 1 and 11, Brittain et al. teach adding antioxidants if desired

include ascorbic acid, aceytylcysteine, cysteine, sodium hydrogen sulfite, butyl-

hydroxyanisole, butyl-hydroxytoluene, alpha-tocopherol acetate or chelators [0088],

which implicitly stabilize the composition to oxidation.

McGinity et al. noted in 1975 that polyethylene glycol 300 had high concentration

of peroxides in the vehicle (page 356, left column first paragraph) as well as PEG400

EAGLEBEN-SA_00002022

Application/Control Number: 18/081,251                                              Page 7

Art Unit: 1613

(page 356, left column second paragraph) where samples of polyethylene glycols from

all manufacturers contained peroxides (page 356, right column first paragraph).

McGinity et al. teach that the level of peroxide in polyethylene glycols increases with

aging but that antioxidants in the vehicle helped to decrease the concentration of

peroxides (page 356, right column third paragraph).

Kumar et al. teach that the peroxide content in PEGs increases upon storage

(Abstract) but the levels of residual peroxides can be controlled by the use of

antioxidants (Page E2, left column second paragraph). Kumar et al. also teach that

elevated temperature is known to accelerate the formation of peroxides in PEGs (page

E4, left column Results and Discussion) as shown in Figure 2 at 40° C (page E4).

Wasylaschuk et al. teach that commercial sources of PEG400 can have a

mixture of hydrogen peroxide ($H_2O_2$) and organic hydroperoxide between 20-50% $H_2O_2$

of the hydroperoxides (page 112, Table 7). Wasylaschuk et al. suggest adding

antioxidants to stop HPO propagation (page 113, left column first paragraph).


**Ascertainment of the difference between the prior art and the claims**

**(MPEP 2141.02) and Finding of prima facie obviousness**

**Rational and Motivation (MPEP 2142-2143)**


The difference between the instant application and Brittain et al. is that Brittain et

al. do not expressly teach about 20-60 mg/mL or about 25 mg/mL bendamustine

concentration. However, it would have been obvious to one of ordinary skill in the art at

the time of the claimed invention to reconstitute the lyophilized bendamustine

EAGLEBEN-SA_00002023

Application/Control Number: 18/081,251                                          Page 8
Art Unit: 1613

composition in the sterile vial with a pharmaceutically acceptable fluid consisting of

polyethylene glycol and optionally propylene glycol or ethanol to a concentration of

about 20-60 mg/mL or about 25 mg/mL bendamustine and produce the instant

invention. One of ordinary skill in the art would have been motivated to do this because

it is merely adding an appropriate amount of a pharmaceutically acceptable fluid

consisting of polyethylene glycol and optionally propylene glycol or ethanol to a

concentration of about 20-60 mg/mL or about 25 mg/mL bendamustine prior to

administration. Especially when Brittain et al. teach and suggest that the vials contain

about 10-500 mg bendamustine lyophilized powder [0099] and occupy between 30-50%

of the vial volume and teach 20 mL vials [0151] as well as 50 mL vials [0008].

Accordingly, the ordinary artisan would have a reasonable expectation of success in

adding enough pharmaceutically acceptable fluid consisting of polyethylene glycol and

optionally propylene glycol or ethanol to the sterile vial to obtain a concentration of

about 20-60 mg/mL or about 25 mg/mL bendamustine prior to administration based on

vial size and bendamustine amount. It is a simple dilution and calculation any

pharmaceutical artisan can perform with no inventive skill but rather ordinary skill. See

MPEP 2143: "a person of ordinary skill has good reason to pursue the known options

within his or her technical grasp. If this leads to the anticipated success, it is likely that

product [was] not of innovation but of ordinary skill and common sense. In that instance

the fact that a combination was obvious to try might show that it was obvious under §

103." *KSR*, 550 U.S. at ___, 82 USPQ2d at 1397.

Regarding the addition of an antioxidant, as noted above, Brittain et al. teach

adding antioxidants when desirable including butyl hydroxytoluene and sulfur containing

antioxidants cysteine, sodium hydrogen sulfite and acetylcysteine. The references of McGinity et al., Kumar et al. and Wasylaschuk et al. establish that commercial sources of polyethylene glycol contain hydrogen peroxide impurity and that levels of hydrogen peroxide increase over time when polyethylene glycol is stored and one way to counteract that is to provide an antioxidant. Thus, it is desirable to add an antioxidant to the polyethyelene glycol vehicle to not only decrease any oxidants present from the commercial manufacturing source but also prevent any hydrogen peroxide that may accumulate over storage time, which would not be beneficial for administration to a patient. Furthermore, the prevention of peroxide formation over storage time by the antioxidant has the beneficial function of removing a potential source of water from the storage solution because it is known that hydrogen peroxide decomposes into water and oxygen.

$$2H_2O_{2(l)} \longrightarrow 2H_2O_{(l)} + O_2\uparrow$$
$$\text{Hydrogen peroxide} \qquad \text{Water} \qquad \text{oxygen}$$

The water would then detrimentally react with the hydrolysis susceptible bendamustine to produce undesirable degradation products. Accordingly, the ordinary artisan is motivated to add antioxidants to the bendamustine-PEG containing composition to prevent the formation of hydrogen peroxide over shelf storage time with a reasonable expectation of success.

Regarding claims 1, 6 and 11, since Brittain et al. teach and suggest the same components in the same amounts as claimed, then the composition of Brittain et al. will

Application/Control Number: 18/081,251                                               Page 10
Art Unit: 1613

also achieve the same stability and total impurities as claimed. "When the PTO shows a

sound basis for believing that the products of the applicant and the prior art are the

same, the applicant has the burden of showing that they are not." *In re Spada,* 911 F.2d

705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990). Therefore, the *prima facie* case can

be rebutted by evidence showing that the prior art products do not <u>necessarily</u> possess

the characteristics of the claimed product. *In re Best,* 562 F.2d at 1255, 195 USPQ at

433.

In light of the forgoing discussion, the Examiner concludes that the subject matter

defined by the instant claims would have been obvious within the meaning of 35 USC

103(a).

From the combined teachings of the references, it is apparent that one of

ordinary skill in the art would have had a reasonable expectation of success in

producing the claimed invention. Therefore, the invention as a whole was *prima facie*

obvious to one of ordinary skill in the art at the time the invention was made, as

evidenced by the combined references, especially in the absence of evidence to the

contrary.

**<u>Response to arguments</u>**:

Applicant asserts that: "At the time of the invention, one of ordinary skill in the art

would not have been motivated to make a liquid bendamustine-containing composition

incorporating polyethylene glycol (PEG) and an antioxidant, as claimed. Moreover, the

stability achieved by the claimed compositions would have been unexpected in view of

the cited art." Respectfully, the Examiner cannot agree. It is without question that

Brittain teach and suggest both aqueous carriers and suitable other carriers to provide a

EAGLEBEN-SA_00002026

Application/Control Number: 18/081,251                                    Page 11
Art Unit: 1613

liquid formulation of bendamustine [0090] where the "suitable other carriers" include polyols such as propylene glycol or liquid polyethylene glycols [0067]. However, it is known through the secondary references that polyethylene glycols can produce hydrogen peroxide in storage but to prevent that from happening antioxidants can be added. Brittain teaches that antioxidants can be added when desirable [0088]. It is desirable to prevent hydrogen peroxide from forming because hydrogen peroxide decomposes to produce water, which is deleterious to the hydrolytically unstable bendamustine. Accordingly, the ordinary artisan is motivated to add an antioxidant when the carrier is polyethyelene glycol.

Applicant asserts that: "Brittain fails to motivate anyone of skill in the art to prepare a liquid composition having a bendamustine concentration of 20 mg/mL to about 60 mg/mL, or any amount within that range. Prior to Applicant's invention, Treanda® (lyophilized bendamustine hydrochloride) was commercially available and would have informed those of ordinary skill about administering bendamustine to a human. In view of that information, the skilled person would not have arbitrarily deviated from those Treanda® administration instructions…" Respectfully, the Examiner does not agree because the prescribing information for Treanda® is not being combined with Brittain to make the rejection and Brittain allows for variation in the amount of bendamustine in the vials. As asserted above, Brittain et al. teach and suggest that the vials contain about 10-500 mg bendamustine lyophilized powder [0099] and occupy between 30-50% of the vial volume and teach 20 mL vials [0151] as well as 50 mL vials [0008]. Accordingly, the ordinary artisan would have a reasonable expectation of success in adding enough pharmaceutically acceptable fluid consisting of polyethylene

Application/Control Number: 18/081,251                                      Page 12
Art Unit: 1613

glycol and optionally propylene glycol or ethanol to the sterile vial to obtain a

concentration of about 20-60 mg/mL or about 25 mg/mL bendamustine prior to

administration based on vial size and bendamustine amount. It is a simple dilution and

calculation any pharmaceutical artisan can perform with no inventive skill but rather

ordinary skill. Simply having 250 mg of bendamustine and diluting with 10 mL of liquid

PEG provides 25 mg/mL concentration. Applicant's argument is not persuasive.

Applicant asserts that: "Those of Ordinary Skill in the Art Would Not Have

Included an Antioxidant in Any Liquid Bendamustine Composition"; and "Brittain does

not teach that an antioxidant should be added to a liquid bendamustine composition".

Applicant also argues that: "In fact, those of ordinary skill in the art would not have

expected the addition of an antioxidant to be beneficial to bendamustine's storage

stability because no reference had suggested that bendamustine degraded *via* an

oxidative mechanism." However, the Examiner has shown with a preponderance of

evidence that it was well known to the ordinary artisan that increases levels of hydrogen

peroxide are expected to accumulate on storage of PEG. This is detrimental to the

stability of hydrolytically unstable bendamustine because hydrogen peroxide

decomposes into water and oxygen. So, the expectation is that bendamustine may

hydrolytically degrade over time when stored in a PEG vehicle due to accumulating

hydrogen peroxide and subsequent decomposition into water and consequently it is

advantageous and desirable to add antioxidants to prevent that from happening.

Applicant's comments on the hydrolysis of bendamustine is noted and reinforces the

importance of keeping any potential source of water, such as hydrogen peroxide, out of

the system. Applicant's arguments are not persuasive.

EAGLEBEN-SA_00002028

Application/Control Number: 18/081,251                                                    Page 13
Art Unit: 1613

Applicant argues that the industry guidance discouraged using antioxidants in parenteral formulations. However, the Examiner has shown that it is desirable to add antioxidants to prevent PEG from producing hydrogen peroxide leading to bendamustine hydrolysis, which trumps any discouragement of using antioxidants by the industry. Exhibit A has been carefully considered but is not controlling because the facts are different in the present case.

Applicant asserts that the claimed compositions are surprisingly stable during storage for 15 days at 40° C. However, it is known through Kumar et al. that increasing temperature, such as 40° C increases the amount of hydrogen peroxide significantly (Figure 2 and appropriate text). That peroxide is expected to decompose into water. That water is expected to react with hydrolytically unstable bendamustine. So, it would appear that Applicant's observation is an expected and predictable result.

Applicant asserts that: "Based on these poor stability results, a person would have forsaken development of a liquid bendamustine/PEG composition." Respectfully, the Examiner cannot agree because the ordinary artisan would be aware of the art of McGinity et al., Kumar et al. and Wasylaschuk et al. and simply added an antioxidant to the composition to prevent hydrogen peroxide formation and ultimately water, which is ostensibly the cause of the bendamustine degradation observed by Applicant. The opinion of Exhibit B paragraph 359 is noted but not controlling. Adding antioxidants to pharmaceutical formulations is common practice by the pharmaceutical formulation scientist, does not introduce any complexity into the formulation or risk of unwanted interactions with bendamustine. Brittain even states when desirable to add those antioxidants to the bendamustine formulation [0088] and to make the ultimate dosage

Application/Control Number: 18/081,251                                                              Page 14
Art Unit: 1613

form stable under conditions of manufacture and storage [0067]. Accordingly, paragraph

471 is full allegations unsupported by any evidence.  Nor is there any unpredictable

research effort as the art has provided guidance on what antioxidants to employ.

Respectfully, Applicant's arguments are not persuasive.


**Claims 4, 5, 14 and 15** are rejected under 35 U.S.C. 103(a) as being

unpatentable over Brittain et al. (US 20060159713) and Kumar et al. (AAPS

PharmSciTech 2006;7(3):E1-E7) and McGinity et al. (Journal of Pharmaceutical

Sciences 1975;64(2):356-357) and Wasylaschuk et al. (JOURNAL OF

PHARMACEUTICAL SCIENCES, VOL. 96, NO. 1, JANUARY 2007:106-116), as

applied to claims 1-3, 6, 8, 11-13 and 18 above, in further view of Tait et al. (WO

0202125).

Applicant claims, for example:

4.      (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol.

5.      (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

14.     (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol.

15.     (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.


Brittain et al., McGinity et al., Kumar et al. and  Wasylaschuk et al. are discussed

in detail above and that discussion is incorporated by reference.

EAGLEBEN-SA_00002030

Application/Control Number: 18/081,251                                    Page 15

Art Unit: 1613

Regarding claims 4, 5, 14 and 15, Tait et al. teach stabilized injectable compositions of the alkylating agent ifosfamide (Abstract; page 1, line 7) comprising PEG200-600, ethanol (page 6, lines 16-24; page 9, lines 15-21; claims 4-6) and antioxidants such as BHA, BHT and up to 5% monothioglycerol (page 9, lies 11-14; page 14, line 6) that are stable for at least 180 days (page 6, lines 25-26).

The difference between the instant application and Brittain et al. as modified by McGinity et al., Kumar et al. and Wasylaschuk et al., is that Brittain et al. do not expressly teach about 5 mg/mL of monothioglycerol antioxidant. This deficiency in Brittain et al. is cured by the teachings of Tait et al. It would have been obvious to one of ordinary skill in the art at the time of the claimed invention to add about 5 mg/mL of monothioglycerol antioxidant to the composition of Brittain et al. as modified by McGinity et al., Kumar et al. and Wasylaschuk et al., as suggested by Tait et al., produce the instant invention.

One of ordinary skill in the art would have been motivated to do this because as noted above Brittain et al. as modified by McGinity et al., Kumar et al. and Wasylaschuk et al. suggest adding an antioxidant and name, for example butyl-hydroxyanisole (BHA) and butyl-hydroxytoluene (BHT). Tait et al. teach the equivalence of monothioglycerol, BHA and BHT as antioxidants to stabilize alkylating agents and thus have interchangeable function. "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007). Moreover, "Where two known alternatives are interchangeable for a desired function, an express suggestion to substitute one for the other is not needed to render a substitution obvious." *In re Fout,*

Application/Control Number: 18/081,251                                    Page 16
Art Unit: 1613

675 F.2d 297, 301 (CCPA 1982). Accordingly, the ordinary artisan would select the

antioxidant monothioglycerol and optimize the amount to about 5 mg/mL to achieve the

desired degree of stability with a reasonable expectation of success especially when

Tait et al. teach using from 0-5%.

In light of the forgoing discussion, the Examiner concludes that the subject matter

defined by the instant claims would have been obvious within the meaning of 35 USC

103(a).

From the combined teachings of the references, it is apparent that one of

ordinary skill in the art would have had a reasonable expectation of success in

producing the claimed invention. Therefore, the invention as a whole was *prima facie*

obvious to one of ordinary skill in the art at the time the invention was made, as

evidenced by the combined references, especially in the absence of evidence to the

contrary.

**Response to Arguments:**

Applicant asserts that Tait does not cure Brittain's deficiencies. Respectfully, the

Examiner does not agree for the reasons set forth above.

*Conclusion*

No claims are allowed.

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to ERNST V ARNOLD whose telephone number is

(571)272-8509. The examiner can normally be reached M-F 7-3:30.

Examiner interviews are available via telephone and video conferencing using a

USPTO supplied web-based collaboration tool. To schedule an interview, applicant is

EAGLEBEN-SA_00002032

Application/Control Number: 18/081,251                                        Page 17
Art Unit: 1613

encouraged to use the USPTO Automated Interview Request (AIR) at

http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Brian Y Kwon can be reached on 571-272-0581. The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of published or unpublished applications may be

obtained from Patent Center. Unpublished application information in Patent Center is

available to registered users. To file and manage patent submissions in Patent Center,

visit: https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-

center for more information about Patent Center and

https://www.uspto.gov/patents/docx for information about filing in DOCX format. For

additional questions, contact the Electronic Business Center (EBC) at 866-217-9197

(toll-free). If you would like assistance from a USPTO Customer Service

Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/ERNST V ARNOLD/
Primary Examiner, Art Unit 1613

EAGLEBEN-SA_00002033

| Examiner-Initiated Interview Summary | Application No. 18/081,251 | | Applicant(s) Palepu et al. | | |
|---|---|---|---|---|---|
| | Examiner ERNST V ARNOLD | Art Unit 1613 | AIA (First Inventor to File) Status No | | Page 1 of 1 |

| All Participants (applicant, applicants representative, PTO personnel) | Title | Type |
|---|---|---|
| ERNST V ARNOLD | Primary Examiner | Telephonic |
| Stephanie Lodise | Attorney of Record | |

**Date of Interview:** 15 August 2023

**Issues Discussed:**

**Other**

After consideration of Applicant's AFCP2.0 submission, the Examiner contacted Applicant to alert them that prosecution is being re-opened and to expect a non-FINAL Office Action. Applicant's assistant said that Stephanie Lodise would be out of the Office until August 24th. So, the Examiner left a voicemail instead and is filing this summary.

| | /ERNST V ARNOLD/ Primary Examiner, Art Unit 1613 |
|---|---|

**Applicant is reminded that a complete written statement as to the substance of the interview must be made of record in the application file. It is the applicants responsibility to provide the written statement, unless the interview was initiated by the Examiner and the Examiner has indicated that a written summary will be provided. See MPEP 713.04**
Please further see:
MPEP 713.04
Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews, paragraph (b)
37 CFR § 1.2 Business to be transacted in writing

**Applicant recordation instructions:** It is not necessary for applicant to provide a separate record of the substance of interview.

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

EAGLEBEN-SA_00002034

| | | Application/Control No. 18/081,251 | Applicant(s)/Patent Under Reexamination Palepu et al. |
|---|---|---|---|
| **Notice of References Cited** | | Examiner ERNST V ARNOLD | Art Unit 1613 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | CPC Classification | US Classification |
|---|---|---|---|---|---|---|
| | A | | | | | |
| | B | | | | | |
| | C | | | | | |
| | D | | | | | |
| | E | | | | | |
| | F | | | | | |
| | G | | | | | |
| | H | | | | | |
| | I | | | | | |
| | J | | | | | |
| | K | | | | | |
| | L | | | | | |
| | M | | | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | CPC Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | Kumar et al. (AAPS PharmSciTech 2006;7(3):E1-E7) (Year: 2006) |
| | V | McGinity et al. (Journal of Pharmaceutical Sciences 1975;64(2):356-357) (Year: 1975) |
| | W | Wasylaschuk et al. (JOURNAL OF PHARMACEUTICAL SCIENCES, VOL. 96, NO. 1, JANUARY 2007:106-116). (Year: 2007) |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    **Notice of References Cited**                    Part of Paper No. 20230814a

EAGLEBEN-SA_00002035

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 18/081,251 | Palepu et al. |
| | Examiner | Art Unit |
| | ERNST V ARNOLD | 1613 |

### CPC - Searched*

| Symbol | Date | Examiner |
|---|---|---|
| (A61K31/4184 OR A61K9/08 OR A61K47/10 OR A61K47/12 OR A61K47/18 OR A61K47/20 OR A61K47/22 OR A61K9/0019).cpc. AND ((bendamustine OR (nitrogen ADJ mustard) OR (alkylating WITH agent)) AND antioxidant AND (PEG OR (polyalkylene ADJ glycol) OR (polyethylene ADJ glycol))) | 03/09/2023 | eva |

### CPC Combination Sets - Searched*

| Symbol | Date | Examiner |
|---|---|---|
| | | |

### US Classification - Searched*

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |

\* See search history printout included with this form or the SEARCH NOTES box below to determine the scope of the search.

### Search Notes

| Search Notes | Date | Examiner |
|---|---|---|
| inventor/assignee name PALM/PE2E | 03/09/2023 | eva |
| PE2E | 03/09/2023 | eva |
| GOOGLE SCHOLAR | 03/09/2023 | eva |
| updated IDS | 07/05/2023 | eva |
| GOOGLE | 08/15/2023 | eva |

| | |
|---|---|
| | |

EAGLEBEN-SA_00002036

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 18/081,251 | Palepu et al. |
| | **Examiner** | **Art Unit** |
| | ERNST V ARNOLD | 1613 |

| Interference Search | | | |
|---|---|---|---|
| **US Class/CPC Symbol** | **US Subclass/CPC Group** | **Date** | **Examiner** |
| | | | |

| | |
|---|---|
| | |

EAGLEBEN-SA_00002037

| **AFCP 2.0 Decision** | **Application No.** | **Applicant(s)** | | |
|---|---|---|---|---|
| | 18/081,251 | Palepu et al. | | |
| | **Examiner** | **Art Unit** | **AIA (FITF) Status** | |
| | ERNST V ARNOLD | 1613 | No | |

This is in response to the After Final Consideration Pilot request filed <u>28 July 2023</u>.

1. **Improper Request** – The AFCP 2.0 request is improper for the following reason(s) and the after final amendment submitted with the request will be treated under pre-pilot procedure.

    ☐ An AFCP 2.0 request form PTO/SB/434 (or equivalent document) was not submitted.

    ☐ A non-broadening amendment to at least one independent claim was not submitted.

    ☐ The request is not the first proper AFCP 2.0 request submitted in response to the most recent final rejection.

    ☐ Other: _____

2. **Proper Request**

    **A.** After final amendment submitted with the request will not be treated under AFCP 2.0.
    The after final amendment cannot be reviewed and a search conducted within the guidelines of the pilot program.

        ☐ The after final amendment will be treated under pre-pilot procedure.

    **B.** Updated search and/or completed additional consideration.
    The examiner performed an updated search and/or completed additional consideration of the after final amendment within the time authorized for the pilot program. The result(s) of the updated search and/or completed additional consideration are:

        ☐ 1. All of the rejections in the most recent final Office action are overcome and a Notice of Allowance is issued herewith.

        ☐ 2. The after final amendment would not overcome all of the rejections in the most recent final Office action. See attached interview summary for further details.

        ☐ 3. The after final amendment was reviewed, and it raises a new issue(s). See attached interview summary for further details.

        ☐ 4. The after final amendment raises new issues, but would overcome all of the rejections in the most recent final Office action. A decision on determining allowability could not be made within the guidelines of the pilot. See attached interview summary for further details, including any newly discovered prior art.

        ☑ 5. Other: <u>The Examiner is re-opening prosecution.</u>

    Examiner Note: Please attach an interview summary when necessary as described above.

EAGLEBEN-SA_00002038

## EXPERIMENTAL

All adducts listed in Table I were prepared by the following procedure as exemplified by 1,3-di-(2-furyl)-3-(p-bromomercapto)-propan-1-one.

p-Bromothiophenol (5.0 g, 0.0264 mole) was added to 5.0 g (0.0265 mole) of 1,3-di-(2-furyl)-2-propen-1-one in 100 ml of ethanol, followed immediately by 5 drops of the catalyst triethylamine. After refluxing for 2 hr on a steam bath, the solution was cooled. The precipitate that formed was collected and recrystallized from ethanol–water to give a white crystalline material, mp 90–91°, in almost quantitative yield.

*Anal.*—Calc. for $C_{17}H_{13}BrO_3S$: C, 54.12; H, 3.47; Br, 21.18; S, 8.48. Found: C, 53.81; H, 3.42; Br, 21.02; S, 8.61.

Other intermediates used were 1-(2-furyl)-3-(2-thienyl)-2-propen-1-one, 1-(2-thienyl)-3-(2-furyl)-2-propen-1-one, and 1,3-di-(2-thienyl)-2-propen-1-one.

### REFERENCES

(1) P. F. Wiley, *J. Amer. Chem. Soc.*, **74**, 4329(1952).

(2) G. Jongebreur, *Arch. Int. Pharmacodyn. Ther.*, **90**, 384(1952).

(3) J. Schmutz, R. Hirt, F. Kunzle, E. Eichenberg, and H. Lauener, *Helv. Chim. Acta*, **36**, 620(1953).

(4) A. Wander, British pat. 728,767 (Apr. 27, 1955).

(5) J. Koo, *J. Org. Chem.*, **26**, 635(1961).

(6) N. P. Buu-Hoi, N. D. Xuong, and M. Sy, *Bull. Soc. Chim. Fr.*, 11–**12**, 1646(1956).

(7) R. Kuhn and H. Hensel, *Ber.*, **86**, 1333(1953).

(8) M. Welsch, N. P. Buu-Hoi, and F. Binon, *Experientia*, **11**, 350(1955).

(9) R. LaLiberte, D. Campbell, and F. Bruderlein, *Can. J. Pharm. Sci.*, **2** (2), 37(1967).

(10) J. Durinda, J. Kolena, L. Szucs, L. Krasnec, and J. Heger, *Cesk. Farm.*, **16**, 14(1967).

(11) L. Claisen, *Ber.*, **20**, 657(1887).

(12) W. Ried and W. Marx, *ibid.*, **90**, 2683(1957).

### ACKNOWLEDGMENTS AND ADDRESSES

Received April 13, 1974, from the *Uniroyal Chemical Company, Naugatuck, CT 06770*

Accepted for publication September 11, 1974.

Present address: Carter Products Research, Division of Carter-Wallace, Inc., Cranbury, NJ 08512

---

## *COMMUNICATIONS*

---

## Influence of Peroxide Impurities in Polyethylene Glycols on Drug Stability

---

**Keyphrases** □ Polyethylene glycols—peroxide impurity, corticosteroid stability □ Antioxidants—butylated hydroxytoluene, propyl gallate □ Colorimetric assay—peroxide concentrations

---

*To the Editor:*

The poor stability of an experimental topical corticosteroid formulated in polyethylene glycol 300 was found to be due to the high concentration of peroxides in the vehicle. Removal of the impurity from the vehicle led to an increase in stability of the steroid at elevated temperatures. Boon and Mace (1) reported that degradation of tripelennamine hydrochloride in polyethylene glycol 300 was dependent on the concentration of ethylene oxide in polyethylene glycol; when the concentration of ethylene oxide exceeded 0.1%, there was measurable loss of the active constituent.

Higher molecular weight polyethylene glycols and polyethylene glycol esters, *i.e.,* polyethylene glycol 400, polyethylene glycol 1500, and polyethylene glycol 6000 distearate, used to solubilize the steroid before its incorporation into an ointment formulation (petrolatum base), all contained peroxides as impurities and the steroid showed poor stability. Except for one sample of polyethylene glycol 1500, samples of polyethylene glycols from different manufacturers all contained peroxides. In one instance, a small quantity of hydrogen peroxide had been added by the manufacturer to maintain a water-clear product.

Although the identities of the peroxides present as impurities were not determined, they are believed to consist of various organic peroxides rather than hydrogen peroxide *per se.* The concentrations of peroxide in polyethylene glycols of different molecular weights and polyethylene glycol 6000 distearate are reported in Table I. In the colorimetric assay used, the glycol sample was added to an acidified potassium iodide solution and the iodine liberated was titrated against standard thiosulfate solution.

The level of peroxide in polyethylene glycols increased with aging. Studies in these laboratories showed that the presence of selected antioxidants and water (5–10%) in the vehicle helped to decrease the concentration of peroxides. Thus, of eight antioxidants tested, butylated hydroxytoluene and propyl gallate were the most successful in this respect, and pretreatment of the vehicle with 0.005–0.05% of either agent was effective. The decomposition of peroxides under the influence of water or antioxidants was slow at room temperature but was accelerated by heating. Both the concentration of antioxidant and the duration of heating (60–80°) required for the removal of peroxide were dependent on the initial con-

EAGLEBEN-SA_00002039

**Table I**—Peroxide Concentrations in Polyethylene Glycols

| Manu-facturer | Poly-ethylene Glycol 300[a] | Poly-ethylene Glycol 400[a] | Poly-ethylene Glycol 1500[b] | Poly-ethylene Glycol 6000 Di-stearate[b] |
|---|---|---|---|---|
| I | 1.4 | 3.24 | <0.01 | 1.97 |
| II | 4.86 | 3.95 | 4.26 | N.T.[c] |
| III | 9.3 | 5.7 | N.T. | 1.92[d] |

[a] Microequivalents of thiosulfate per milliliter of glycol. [b] Microequivalents of thiosulfate per gram of glycol. [c] N.T. = not tested. [d] Additional vendor.

centration of peroxide. The presence of water in the formulation helped prevent any further production of peroxide.

Some of these observations were substantiated by McKenzie (2), who studied peroxide formation and decomposition in triethylene glycol. Azaz *et al.* (3) employed antioxidants to stabilize benzocaine hydrochloride in cetomacrogol solutions containing peroxide impurities.

The reaction of trace metals in the polyethylene glycols with propyl gallate to form colored reactants was prevented by the inclusion of a small quantity of a chelating agent, *e.g.*, 20 ppm of ethylenediaminetetraacetic acid. Since all polyethylene glycols used in these studies contained less than 0.01% ethylene oxide, it is suggested that the reported (1) instability of tripelennamine hydrochloride in polyethylene glycol 300 may have been due not only to the presence of ethylene oxide in the formulation but also the presence of peroxides.

We recommend the use of only the highest quality polyethylene glycols in formulations, a determination of the stability of the active constituent in glycols under elevated temperature conditions (to assess the effect of pretreating the vehicle with antioxidants at elevated temperatures), and, finally, the incorporation of a small percent of water in the formulation.

(1) P. F. G. Boon and A. W. Mace, *J. Pharm. Pharmacol., Suppl.,* **20**, 32S(1968).

(2) D. A. McKenzie, "A Study of Peroxide Formation and Decomposition in Certain Glycol Systems," Technical Service Report, Union Carbide Corp., Tarrytown, N.Y., Feb. 1970.

(3) E. Azaz, M. Donbrow, and R. Hamburger, *Pharm. J.,* **211**, 15(1973).

*James W. McGinity* [x]
School of Pharmacy
Texas Southern University
Houston, TX 77004

*John A. Hill*
*Anthony L. La Via*
Pharmaceutical Research & Development
Squibb Institute for Medical Research
New Brunswick, NJ 08902

Received September 19, 1974.
Accepted for publication November 4, 1974.
The authors thank Mr. Peter Valatin of the Squibb Institute for Medical Research, New Brunswick, N.J., for the peroxide evaluation.
[x] To whom inquiries should be directed.

## Constituents of *Cannabis sativa* L. IX: Stability of Synthetic and Naturally Occurring Cannabinoids in Chloroform

**Keyphrases** □ *Cannabis sativa* L.—stability of synthetic and naturally occurring cannabinoids in chloroform □ Cannabinoids—stability in chloroform □ Marijuana—stability of synthetic and naturally occurring cannabinoids in chloroform ■ Stability—synthetic and naturally occurring cannabinoids in chloroform

*To the Editor:*

A report from these laboratories demonstrated that chloroform was a more efficient solvent for extracting cannabinoids from *Cannabis sativa* L. than benzene, pentane, hexane, petroleum ether, ethanol, acetone, and ether. Moreover, cannabinoids[1] extracted with chloroform were stable at ambient temperature for 144 hr (1).

Recently, Parker *et al.* (2) reported that synthetic cannabidiol was unstable in spectrograde chloroform over an 8-day period. The authors stated that: "caution should be exercised in the use of chloroform as a solvent for prolonged extraction and storage of cannabidiol." Since members of this research group (3–6) and others (7) have employed chloroform as an extracting solvent and since a working group, sponsored by the United Nations[2], on the chemistry of *Cannabis* and its components recently recommended that the procedure developed in these laboratories be used worldwide, it seemed imperative that additional data be presented in support of chloroform as the solvent of choice for extracting cannabinoids from *Cannabis*.

The basic procedure utilized in these laboratories is as follows. Samples of *Cannabis* are extracted at ambient temperature with nanograde chloroform[3] for 1 hr[4]. After that time, the chloroform is removed *in vacuo* and an ethanolic solution containing a known amount of the internal standard, androst-4-ene-3,17-dione, is added. Therefore, by allowing 15 min for workup, each sample is exposed to chloroform for a maximum of 75 min. Thus, if synthetic and naturally occurring cannabinoids are stable in chloroform for 75 min, chloroform, as previously recommended (1, 7), would be the solvent of choice for extraction of naturally occurring cannabinoids found in crude drug preparations from *C. sativa* L.

We wish to report results of a 3-month stability study using chloroform as the solvent for the following: (*a*) synthetic cannabidiol, (−)-$\Delta^8$- and $\Delta^9$-*trans*-tetrahydrocannabinols, $\Delta^{9,11}$-tetrahydrocannabinol (exocyclic), and cannabinol; (*b*) an extract of female Mexican *Cannabis* grown in Mississippi (coded CMEF-71, ME-A); and (*c*) a synthetic mix-

[1] Combination cannabidiol–cannabichromene, (−)-$\Delta^9$-*trans*-tetrahydrocannabinol, and cannabinol.

[2] United Nations Document MNAR/9/1974.

[3] Mallinckrodt Chemical. One-gallon amber bottles are kept at ambient temperature, opened one at a time as needed, and used with minimum exposure to air, *etc*.

[4] For details, see Refs. 1 and 4–6. Androst-4-ene-3,17-dione was first used as an internal standard by Davis *et al., Lloydia,* **33**, 453(1970).

EAGLEBEN-SA_00002040

*AAPS PharmSciTech* 2006; 7 (3) Article 62 (http://www.aapspharmscitech.org).

# Removal of Peroxides in Polyethylene Glycols by Vacuum Drying: Implications in the Stability of Biotech and Pharmaceutical Formulations

*Submitted: February 6, 2006; Accepted: May 9, 2006; Published: July 28, 2006*

Vineet Kumar[1] and Devendra S. Kalonia[1,2]

[1]Department of Pharmaceutical Sciences, University of Connecticut, Storrs, CT
[2]Institute of Materials Science, University of Connecticut, Storrs, CT

## ABSTRACT

The purpose of this study was to investigate the utility of vacuum drying for removing peroxides from polyethylene glycols (PEGs). PEG solutions (PEG 1450 and PEG 20000) containing varying levels of peroxides were prepared by storing under different light and temperature conditions. PEGs containing low and high levels of peroxides were vacuum dried from dilute and concentrated solutions (2.5%, 7.5%, 15%, and 50% wt/vol of PEG 1450 and 2.5%, 7.5%, 15%, and 25% wt/vol of PEG 20000). Ferrous ion oxidation in presence of ferric ion indicator xylenol orange (FOX) colorimetric assay was used to determine the concentration of peroxides. Peroxide content in PEGs increased upon storage. The increase was more pronounced when PEGs were stored at higher temperatures and exposed to light. Vacuum drying at 0.1 mm Hg for 48 hours at 25°C resulted in greater than 90% decrease in the level of peroxides in all cases except when high peroxide containing 25% wt/vol solution of PEG 20000 or 50% wt/vol solution of PEG 1450 were dried. The reduction in the level of peroxides for PEGs dried from high peroxide containing 25% wt/vol solution of PEG 20000 and 50% wt/vol solution of PEG 1450 was found to be 88% and 52%, respectively. Oxidation of methionine in Met-Leu-Phe peptide was significantly reduced when vacuum-dried PEGs were used. Vacuum drying PEG solutions at low pressures is an effective method for the removal of the residual peroxides present in commercially available PEGs.

**KEYWORDS:** Freeze drying, peroxides, polyethylene glycol, proteins, vacuum drying.

## INTRODUCTION

Polyethylene glycols (PEGs) are water-soluble synthetic polymers with a general formulae $HO-(CH_2CH_2O)_n-H$.[1] PEGs have found various applications in the pharmaceutical and biotech industry and are widely used as cosolvents, as lubricants and stabilizers, as bases in topical products, as precipitants and crystallization agents for proteins, and as chemical agents for pegylation of proteins.[2-6] In addition, PEGs have been shown to stabilize proteins during freeze drying.[7] Most recently, stable formulations of dry protein powders have been developed by using PEG precipitation and vacuum drying.[8]

Despite their many uses, there is a concern with PEGs, because they contain low levels of residual peroxides, which accumulate on storage, and could potentially affect the stability of oxidation sensitive pharmaceuticals.[9-11] It is well documented in the literature that auto-oxidation can result in the formation of hydroperoxides and peroxide-free radicals in polyoxyethylene linkages containing substances such as polysorbate surfactants, poloxamers, and PEGs (see schematic below).[10-12] Auto-oxidation is initiated by metal- and/or light-induced decomposition of polyoxyethylene chains.[12] The process is propagated by the consumption of oxygen and formation of hydroperoxides and is terminated by the decomposition of hydroperoxides and/or collision among free radicals.[12] Several reports show that the formation and decomposition of peroxides occur simultaneously and are dependent on temperature, light, and the presence of oxygen.[10,13] Generation of peroxides and other oxidizing species such as peroxide and hydroxyl radicals, in formulations containing low levels of residual peroxides, can thus lead to fast degradation of the active drug resulting in significantly compromised therapeutic activity. The following is a schematic of the auto-oxidation process, where R for PEGs = $-(OCH_2CH_2O)-$.[12]

**Initiation**

$RH + \text{light or catalyst} \rightarrow R \cdot + H \cdot$

**Propagation**

$R \cdot + O_2 \rightarrow ROO \cdot$

$ROO \cdot + RH \rightarrow ROOH + R \cdot$

$ROOH \rightarrow ROO \cdot + H \cdot$

**Termination**

$2RO_2 \cdot \rightarrow \text{inactive products}$

$RO_2 \cdot + R \cdot \rightarrow \text{inactive products}$

**Corresponding Author:** Devendra S. Kalonia, U-3092, School of Pharmacy, 69 North Eagleville Road, University of Connecticut, Storrs, CT 06269. Tel: (860) 486-3655; Fax: (860) 486-4998; E-mail: kalonia@uconn.edu

EAGLEBEN-SA_00002041

*AAPS PharmSciTech* 2006; 7 (3) Article 62 (http://www.aapspharmscitech.org).

The effect of peroxides in PEGs and of peroxides in poly-oxyethylenic nonionic surfactants on the oxidative stability of pharmaceuticals has been reported in the literature.[9,14-16] Peptides and proteins have amino acids such as cystine and methionine that are vulnerable to oxidative degradation.[17,18] Although the effect of peroxides in PEGs on protein stability has not been widely studied, there are some reports that describe the effect of peroxides in polysorbates on the oxidative stability of proteins in solution and in the lyophilized form.[13] Since proteins are often formulated in low concentrations, even trace amounts of peroxides can affect the stability of these biomolecules. Therefore, in order to increase the chemical stability of the active constituent, it is necessary that PEGs and polysorbates be purified before they are used in a formulation and adequate precautions should be taken to prevent the formation of peroxides during the storage of the formulation.

In a recent report, it was shown that complete removal of oxygen in the headspace of vials containing aqueous solutions of polysorbates (by storing the product either under nitrogen or in vacuum) resulted in a decrease in the concentration of peroxides.[13] Several authors have also shown that removal of oxygen from the headspace of ampoules or vials is an efficient way of preventing the degradation of the active drug.[13,14] However, maintaining vacuum and/or nitrogen environment in a certain type of vials (used in freeze drying) for a prolonged period of time is not an easy task. Alternatively, the levels of residual peroxides could also be controlled by the use of antioxidants. However, antioxidants can interact with the active constituent and lead to other instabilities such as the precipitation of protein.[19]

The removal of peroxides can be accomplished by using several methods reported in the literature.[20-22] An example of such a method is purification of PEGs by treating with sodium thiosulfate and passing through resin column.[21] Purification procedures reported in literature may be efficient but require chemical treatments, which are undesirable.

This report demonstrates that vacuum drying at low pressures is an efficient method for removing peroxides from PEGs. It is further shown that freeze drying also results in a decrease in the level of peroxides present in PEGs. The benefit of the vacuum-drying technique is demonstrated by a reduction in the rate of oxidation of methionine in a tripeptide in the presence of PEGs.

## MATERIALS AND METHODS

### Materials

Xylenol orange, hydrogen peroxide (30% wt/wt solution), iron (II) chloride (anhydrous beads), butylated hydroxytoluene, sulfuric acid (10N solution) and tripeptide, and Met-Leu-Phe (acetate salt) were purchased from Aldrich (St Louis,

MO). PEG 1450 (flakes) was purchased from Acros Organics (Geel, Belgium) and PEG 20000 (flakes) was purchased from Serva (Heidelberg, Germany). D-sorbitol was purchased from Fluka Chemicals (Buchs, Switzerland). Triple distilled water was used in the preparation of all solutions, and each solution was filtered through 0.22-$\mu$m millex filter (Millipore, Bedford, MA). All buffer reagents were of highest purity grade obtained from commercial sources and were used without further purification.

### Stability Studies on PEG 1450 and PEG 20000

Fifty percent wt/vol and 25% wt/vol stock solutions were prepared for PEG 1450 and PEG 20000 in triple distilled water. The pH of the solutions was adjusted to 5.0 with 1N NaOH or 1N HCl as appropriate. Fresh solutions of PEGs were filled in 15-mL vials (12-mL fill with air in the headspace) and stored at 40°C under ambient light for 6 days. An incubator with glass covering was used to attain the desired temperature. The 6-day solutions were labeled as "type I high peroxide level solutions." Six-day samples were then kept for an additional 20 days in a dark oven at 25°C. The 26-day solutions were labeled as "type II high level peroxide solutions." For the preparation of the PEG solutions (50% wt/vol for PEG 1450 and 25% wt/vol for PEG 20000) under vacuum, the following procedure was used. The solutions (pH 5.0) in glass vials were placed in a freeze dryer and the shelf cooled down to −2°C (product temperature 0°C). After maintaining the samples for 15 minutes at −2°C, the pressure in the chamber was reduced to 0.1 mm Hg. The vials were then stoppered inside the freeze dryer (within the first 5 minutes of the vacuum reaching 0.1 mm Hg) and sealed manually with aluminum seals. High viscosity of the solutions prevented ejection of the samples (at 0.1 mm Hg) from the vials. Vials under vacuum were stored at 25°C for 48 hours. Peroxide level in fresh, type I, type II, and solutions under vacuum were measured by ferrous ion oxidation in presence of ferric ion indicator Xylenol orange (FOX) assay described in Determination of Peroxide Levels in PEGs.

### Vacuum-drying Studies

The drying of the PEG solutions was done in a Durastop Freeze Dryer (FTS Systems, Stoneridge, NY) at a temperature of 25°C and a pressure of 0.1 mm Hg for 48 hours unless otherwise stated. The solutions were dried in 5-mL, 20-mm finish (1 mL fill) serum clear glass vials (Fisher Scientific, Millville, NJ) and stoppered with 20-mm, gray butyl, 3-prong lyophilization rubber stoppers (Fisher Scientific, Millville, NJ). All samples when dried were stoppered and sealed with tear-off 20-mm finish aluminum seals (Fisher Scientific, Millville, NJ). The pH of all the samples kept for drying was adjusted to 5.0 with 1N NaOH or 1N HCl as appropriate.

EAGLEBEN-SA_00002042

*AAPS PharmSciTech* 2006; 7 (3) Article 62 (http://www.aapspharmscitech.org).

### Freeze-drying Studies

Lyophilization of PEG solutions used the following steps: freezing to −40°C at 1°C/min, holding at −40°C for 1 hour, increasing the temperature to −10°C at 1°C/min, increasing the vacuum to 0.06 mm Hg, holding at −10°C for 16.66 hours, increasing the temperature to 25°C at 0.15°C/min, and holding at 25°C for 10 hours. Similar vials as those used in vacuum-drying studies were used and the fill volume was 1 mL. The pH of all the samples kept for drying was adjusted to 5.0 with 1N NaOH or 1N HCl as appropriate.

### Determination of Peroxide Levels in PEGs

The FOX colorimetry assay was used to determine the peroxide levels of PEGs.[23] All dried PEGs were appropriately reconstituted in triple distilled water, and pH of all samples was adjusted to 5.0 prior to the assay with 1N NaOH or 1N HCl as appropriate. A brief description of the assay used in this study is as follows. Five microliters of 10% (wt/vol) butylated-hydroxy toluene (BHT) in ethanol was mixed with 50 μL of the sample and 950 μL of FOX reagent containing 250 μmol/L ferrous chloride and 100 mmol/L sorbitol in 25 mmol/L sulfuric acid. BHT is added to prevent generation of peroxides during the time of the assay. The solution was mixed well and incubated at room temperature for 20 minutes prior to reading the absorbance at 560 nm on a Cary 50 Bio, UV-visible (UV-vis) spectrophotometer (Varian, Walnut Creek, CA). Hydrogen peroxide was used to prepare standard curve (0-5 μmol/L). The intra-assay coefficient of variation of this method was 2.09% (n = 3), while the interassay coefficient of variation was 6.25% (n = 3) for a 2.5 μmol/L concentration solution of hydrogen peroxide. The limit of detection was 0.102 μmol/L. Since only 50 μL of the sample was used for the assay, the concentration (of PEGs) in the sample was adjusted such that the peroxide level was within the range of the $H_2O_2$ standard curve. Peroxide levels in PEGs were obtained as peroxide equivalent to $H_2O_2$ standards. The peroxide level was then calculated (by extrapolating) as micromolar equivalents (μEq) per gram of neat PEG (equivalent to $H_2O_2$ concentration in μmol/L). One micromolar equivalent of peroxides per gram PEGs (1 mEq/kg) reported

here is equivalent to a peroxide value of 2. Our assay and reporting procedure is similar to what has been used in a previously published study.[13]

### Preparation of Met-Leu-Phe Stability Samples

A 1.6 mg/mL solution of the tripeptide was made in pH 5.0, 5 mmol/L acetate buffer. PEG 1450 and the tripeptide solution were mixed to obtain a 30% wt/vol concentration for PEG and 1.4 mg/mL concentration for the peptide. The samples were then incubated at 70°C for 46 hours.

### Reverse-phase High-performance Liquid Chromatography of Met-Leu-Phe Samples

Reverse-phase High-performance liquid chromatography (RP-HPLC) was performed using Perkin-Elmer series 200 pump (Norwalk, CT) and Perkin-Elmer 785A UV-vis detector (Perkin-Elmer Corp, Norwalk, CT). The analysis of the oxidized and the native species of the tripeptide was performed on Peak Simple chromatography data system (SRI Instruments, Torrance, CA). A Vydac (Hesperia, CA) C-4 column (15 × 2.1 mm, 5 μm) was used. The mobile phase contained solvent A (0.1% trifluoroacetic acid [TFA] in water) and B (0.1% TFA and 90% acetonitrile in water). A gradient elution at a flow rate of 1 mL/min was used according to the following program: 95% A and 5% B for the first 5 minutes, from 95% A and 5% B at 5 minutes to 95% B and 5% A over the next 42 minutes, and finally 95% A and 5% B for the following 3 minutes. The tripeptide and its oxidized products were monitored at 214 nm. The oxidized species were identified by comparing the chromatograms of the samples to that obtained by the oxidation of the tripeptide by 100 mmol/L $H_2O_2$ in 5 minutes (Figure 1). The original tripeptide appeared as 2 closely eluting peaks with retention times of 19.0 and 19.5 minutes. The second peak indicated some impurity or degraded product in the peptide. However, both peaks oxidized and disappeared with time. It was not possible to quantify the extent of degradation of the 2 peaks individually since they were closely eluting. Hence, area under the curves of the original species (eluting at 19.0 and 19.5 minutes) and the oxidized species



**Figure 1.** Separation and quantification of Met-Leu-Phe and its oxidized species by RP-HPLC.

EAGLEBEN-SA_00002043

(eluting between 16.0 and 17.0 minutes) were taken into account to calculate the percentage oxidation. The oxidized species appeared as a combination of closely eluting peaks that had retention times between 16.0 and 17.0 minutes.

## RESULTS AND DISCUSSION

To study the effectiveness of vacuum drying for the removal of peroxides from PEGs, it was necessary to use solutions with relatively high levels of peroxides. It has been reported in literature that formation of peroxides in PEGs and polysorbates is accelerated by light, elevated temperature, and presence of oxygen.[9,12] It has also been shown that level of peroxides in cetomacrogol solutions increased even under ordinary storage conditions of room temperature and darkness.[12] Hence, PEG solutions were prepared by storing 50% wt/vol solution of PEG 1450 and 25% wt/vol solution of PEG 20000 under different conditions of light and temperature (see Methods section). Figure 2 shows the level of peroxides present in PEGs before and after storage. The level of peroxides increased from $42.85 \pm 7.02$ μEq to $731.56 \pm 117.39$ μEq ($\approx$17.5-fold) in PEG 1450 and from $35.02 \pm 12.0$ μEq to $2400 \pm 153.0$ μEq ($\approx$70-fold) in PEG 20000 after storing at 40°C for 6 days in ambient light. Peroxide levels in these samples further increased from $731.56 \pm 117.39$ μEq to $1366.436 \pm 9.62$ μEq in PEG 1450 and from $2400 \pm 153.0$ μEq to $4513.17 \pm 235.0$ μEq in PEG 20000 after storing for 20 days in the dark at 25 °C. Several significant observations can be made from these results. First, the level of peroxides in both PEGs increased significantly even when solutions were stored in the dark at room temperature. Second, the level of

peroxides increased rapidly under light at elevated temperature. Third, the increase in the level of peroxides was higher for PEG 20000 than PEG 1450 under similar conditions of storage (70-fold for PEG 20000 and 17.5-fold for PEG 1450, during the first storage period). Since the fraction of water was higher in PEG 20000 solutions (25% wt/vol), the results suggest that water plays an important role in the formation of peroxides. Previous reports have also indicated that the rate of peroxide formation in several surfactant solutions (containing oxyethylene linkages) is related to the fraction of water present in the solution, and thus to the amount of the dissolved oxygen.[9,13] Our results are consistent with this observation.

Since removal of water results in the removal of the dissolved oxygen, the effect of vacuum drying on the level of peroxides present in PEGs was investigated. Therefore, PEG solutions with varying levels of peroxides (fresh and type I; see Methods section) were dried at 0.1 mm Hg and 25°C for 48 hours from dilute and concentrated solutions. PEG concentration was varied to affect the thickness (foam or compact mass) and the residual moisture of the dried product. Table 1 summarizes the results of the vacuum drying studies. Several significant observations can be made from this table. The level of peroxides fell below the detection limit (appears as zero) when fresh solutions of PEG 1450 and PEG 20000 were dried from dilute (2.5%, 7.5%, and 15.0% wt/vol solutions) as well as concentrated solutions (25% wt/vol for PEG 20000 and 50% wt/vol for PEG 1450). The level of peroxides for both PEGs reduced significantly when dilute solutions (2.5%, 7.5%, and 15% wt/vol solutions) with high levels of peroxides (type I) were dried. The reduction in the level of peroxides was also obtained when concentrated solutions (50% PEG 1450 and 25% wt/vol PEG 20000) containing high level of peroxides type I were dried. However, the reduction was smaller than the reduction obtained when dilute solutions were dried (from $731.56 \pm 117.39$ μEq to $381.0 \pm 13.19$ μEq when 50% wt/vol solution of type I PEG 1450 was dried and from $731.56 \pm 117.39$ μEq to $31.002 \pm 4.70$ μEq when 2.5% wt/vol solution of type I PEG 1450 was dried). Because the product was much more compact when PEGs were dried from concentrated solutions, it was anticipated that the compactness would affect the rate of drying, and hence the moisture content of the dried product. The measured residual moisture content of the dried PEG samples is listed in Table 1. Although the residual moisture content of all the dried products was less then 1%, the moisture content of PEGs that were dried from concentrated solutions was comparatively higher than those dried from dilute solutions. Hence, the smaller reduction in the level of peroxides when concentrated solutions were dried was resulted from the presence of higher residual oxygen entrapped within the thick mass.



**Figure 2.** Effect of storage under different conditions on the level of peroxides (peroxide per gram of PEG) in PEG solutions. Key: 1, Fresh solution; 2, Fresh solution stored for 6 days under ambient light at 40°C; and 3, 6-Day solutions stored for additional 20 days in the dark at 25°C. Error bars are standard deviations (n = 3).

E4

*AAPS PharmSciTech* 2006; 7 (3) Article 62 (http://www.aapspharmscitech.org).

**Table 1.** Peroxide Level and Residual Moisture Content in Vacuum-Dried (48 hours at 25°C and 0.1 mm Hg) PEG Samples*

| Solution Sample Dried | Peroxide Level† Before Drying | Peroxide Level† After Drying | % Moisture‡ in Dried PEG |
|---|---|---|---|
| 2.5% wt/vol, fresh PEG 1450 | 42.85 ± 7.02 | 0 | 0.38 ± 0.065 |
| 7.5% wt/vol, fresh PEG 1450 | | | 0.33 ± 0.02 |
| 15% wt/vol, fresh PEG 1450 | | | 0.40 ± 0.085 |
| 50% wt/vol, fresh PEG 1450 | | | 0.86 ± 0.055 |
| 2.5% wt/vol, type I PEG 1450 | 731.56 ± 117.39 | 31.002 ± 4.7 | 0.45 ± 0.045 |
| 7.5% wt/vol, type I PEG 1450 | | 30.0 ± 3.3 | 0.40 ± 0.08 |
| 15% wt/vol, type I PEG 1450 | | 38.12 ± 5.9 | 0.46 ± 0.045 |
| 50% wt/vol, type I PEG 1450 | | 381 ± 13.19 | 0.78 ± 0.025 |
| 2.5% wt/vol, fresh PEG 20000 | 35.01 ± 12.0 | 0 | 0.24 ± 0.04 |
| 7.5% wt/vol, fresh PEG 20000 | | | 0.24 ± 0.04 |
| 15% wt/vol, fresh PEG 20000 | | | 0.32 ± 0.035 |
| 25% wt/vol, fresh PEG 20000 | | | 0.39 ± 0.021 |
| 2.5% wt/vol, type I PEG 20000 | 2400 ± 153.0 | 30.37 ± 6.144 | 0.31 ± 0.07 |
| 7.5% wt/vol, type I PEG 20000 | | 28.85 ± 3.43 | 0.31 ± 0.045 |
| 15% wt/vol, type I PEG 20000 | | 53.64 ± 3.108 | 0.31 ± 0.005 |
| 25% wt/vol, type I PEG 20000 | | 299.0 ± 42.0 | 0.51 ± 0.09 |

*PEG indicates polyethylene glycol.

†Peroxide levels are in micromolar equivalent of hydrogen peroxide present per gram of PEG. Errors bars are standard deviations (n = 3).

‡% moisture in dried sample. Errors represent deviations from average of 2 samples.

It has been reported that peroxide level decreases when polysorbate solutions are stored under vacuum.[13] Therefore, it was necessary to compare the rate of decrease of the peroxide levels in PEG solutions that were stored under vacuum and PEGs that were dried under vacuum. PEG solutions (50% wt/vol for PEG 1450 and 25% wt/vol for PEG 20000) were sealed under vacuum (see Methods section) and were stored for a time period that was equivalent to the time frame of the vacuum drying studies. The levels of peroxides did not decrease in any of the solutions stored under vacuum (Figure 3). In fact, the levels increased in almost

all cases. Considering that peroxides were found to be nonvolatile and were not affected by low temperatures (data not shown), the above results clearly suggest that the decrease in the concentration of peroxides on drying is owing to the decomposition of the peroxides. Previous reports have shown that peroxide number in solutions of nonionic surfactants and PEGs stored in the presence of oxygen first increases owing to the induction and propagation of the radical reactions, reaches a plateau, and finally decreases





**Figure 3.** Effect of storage under vacuum at 25°C for 48 hours on the level of peroxides (peroxides per gram of PEG) in PEG solutions (25% wt/vol of PEG 20000 and 50% wt/vol of PEG 1450). Key: 1, PEG 1450 before storing; 2, PEG 1450 after storing; 3, PEG 20000 before storing; and 4, PEG 20000 after storing. Error bars are standard deviations (n = 3).

**Figure 4.** Levels of peroxides (peroxides per gram of PEG) in PEG samples before and after freeze drying (15% wt/vol solutions were freeze dried) in PEG 1450 and PEG 20000. Key: 1, PEG 1450 before drying; 2, PEG 1450 after drying; 3, PEG 20000 before drying; and 4, PEG 20000 after drying. Error bars are standard deviations (n = 3).

EAGLEBEN-SA_00002045

*AAPS PharmSciTech* 2006; 7 (3) Article 62 (http://www.aapspharmscitech.org).



**Figure 5.** Oxidation of Met of Met-Leu-Phe in the presence of PEG 1450 at 70°C and pH 5.0.

due to the termination of the radical reactions.[10,13] Ha et al further showed that initial increase of the peroxide number in solutions of polysorbate 80 could be inhibited by storing the solutions under vacuum or nitrogen environment.[13] Storage of polysorbate 80 solutions under vacuum resulted in a decrease in the peroxide number because of reduction in available oxygen, which in turn reduced the formation of peroxides.[13] From the data reported in literature and results presented in this manuscript, it can be hypothesized that an increase in the concentration of components during drying step increases the rate of the termination reaction between peroxide radicals (to give inactive end products) along with a simultaneous and effective inhibition of the induction and propagation of the radical reactions (because of the absence of oxygen).

Since vacuum drying resulted in the decomposition of peroxides, the effect of lyophilization (freeze drying) on the level of peroxides present in PEGs was also investigated. For this purpose, 15% wt/vol solutions of PEG 1450 and PEG 20000 (fresh and high level type II solutions; see Methods section) were freeze dried. The residual moisture attained at the end of the freeze-drying cycle was found to be less than 1% in all the dried products. Evidently, freeze drying also resulted in a significant reduction in the levels of peroxides present in PEGs (Figure 4).

Finally, in order to test the effectiveness of the drying technique, rate of oxidation of methionine in a tripeptide (Met-Leu-Phe) in the presence of PEGs with low levels of peroxides, was studied. Two solutions of the tripeptide, one

prepared from fresh PEG 1450 and the other prepared from the vacuum-dried PEG 1450, were stored at 70°C. The samples were analyzed for the native and the oxidized species by RP-HPLC. Significant oxidative degradation of the tripeptide under these conditions was observed when fresh PEG 1450 was used (Figure 5), and effective inhibition of the oxidation was achieved when vacuum-dried PEG was used. The level of peroxides at the start of the study was $42.85 \pm 7.02$ μEq in solution containing fresh PEG and zero μEq in solution containing purified PEG, while at the end of the study (after 46 hours) the level of peroxides was 5421.4 in solution containing fresh PEG and 135.84 μEq in solution containing purified PEG. These results clearly illustrate the utility of the vacuum-drying technique for the removal of peroxides from PEGs.

## CONCLUSIONS

Vacuum drying dilute PEG solutions at low pressures (0.1 mm Hg) is an effective method to purify PEGs. The method uses a simple approach and requires no chemical treatment. Removal of the residual peroxides present in the commercially available PEGs by this method just before the formulation can significantly improve the chemical stability of active ingredients.

## ACKNOWLEDGMENTS

The authors gratefully acknowledge financial support from the National Science Foundation Industry/Dane O. Kildsig Center for Pharmaceutical Processing Research (www.cppr.purdue.edu).

## REFERENCES

1. Windholz M, Budavari S, Stroumtsos LY, Fertig MN. Polyethylene glycol (monographs). *The Merck Index*. Whitehouse Station, NJ: Merck and Co Inc; 1976:983–984.

2. Niazi S. Effect of polyethylene glycol 4000 on dissolution properties of sulfathiazole polymorphs. *J Pharm Sci*. 1976;65:302–308.

3. Dubois JL, Ford JL. Similarities in the release rates of different drugs from polyethylene glycol 6000 solid dispersions. *J Pharm Pharmacol*. 1985;37:494–495.

4. Francis GE, Fisher D, Delgado C, Malik F, Gardiner A, Neale D. PEGylation of cytokines and other therapeutic proteins and peptides: the importance of biological optimization of coupling techniques. *Int J Hematol*. 1998;68:1–18.

5. Gilliland GL, Davies DR. Protein crystallization: the growth of large scale single crystals. *Methods Enzymol*. 1984;104:370–380.

6. McPherson A. Use of polyethylene glycol in the crystallization of macromolecules. *Methods Enzymol*. 1985;114:120–124.

7. Mi Y, Wood G. The application and mechanisms of polyethylene glycol 8000 on stabilizing lactate dehydrogenase during lyophilization. *PDA J Pharm Sci Technol*. 2004;58:192–202.

8. Sharma VK, Kalonia DS. Polyethylene glycol-induced precipitation of interferon alpha-2a followed by vacuum drying: development

E6

EAGLEBEN-SA_00002046

*AAPS PharmSciTech* 2006; 7 (3) Article 62 (http://www.aapspharmscitech.org).

of a novel process for obtaining a dry, stable powder. *AAPS PharmSci.* 2004;6:E4.

9. McGinity JW, Patel TR, Naqvi AH, Hill JA. Implications of peroxide formation in lotion and ointment dosage forms containing polyethylene glycols. *Drug Dev Commun.* 1976;2:505–519.

10. Hamburger R, Azaz E, Donbrow M. Autoxidation of polyoxyethylenic nonionic surfactants and of polyethylene glycols. *Pharm Acta Helv.* 1975;50:10–17.

11. McKenzie DA. *A Study of Peroxide Formation and Decomposition in Certain Glycol Systems.* Technical Service Reports. Tarrytown, NY: Union Carbide Corp; 1970.

12. Donbrow M, Azaz E, Pillersdorf A. Autoxidation of polysorbates. *J Pharm Sci.* 1978;67:1676–1681.

13. Ha E, Wang W, Wang YJ. Peroxide formation in polysorbate 80 and protein stability. *J Pharm Sci.* 2002;91:2252–2264.

14. Johnson DM, Taylor WF. Degradation of fenprostalene in polyethylene glycol 400 solution. *J Pharm Sci.* 1984;73:1414–1417.

15. Azaz E, Donbrow M, Hamburger R. Incompatibility of non-ionic surfactants with oxidizable drugs. *Pharm J.* 1975;211:15.

16. James KC, Leach RH. The stability of chloramphenicol in topical formulations. *J Pharm Pharmacol.* 1970;22:607–611.

17. Manning MC, Patel K, Borchardt RT. Stability of protein pharmaceuticals. *Pharm Res.* 1989;6:903–918.

18. Shechter Y, Burstein Y, Patchornik A. Selective oxidation of methionine residues of proteins. *Biochemistry.* 1975;14:4497–4503.

19. Knepp VM, Whatley JL, Muchnik A, Calderwood TS. Identification of antioxidants for prevention of peroxide mediated oxidation of recombinant ciliary neurotropic factor and recombinant human nerve growth factor. *J Pharm Sci Technol.* 1996;50:163–171.

20. Mishima H, Terada G, Motoyama N, Kondo E, Suzuki K, Kimura K, inventors. Removal of peroxides. Japanese patent 50069011. June 9, 1975.

21. Ray WJ, Puvathingal JM. A simple procedure for removing contaminating aldehydes and peroxides from aqueous solutions of polyethylene glycols and of nonionic detergents that are based on the polyoxyethylene linkage. *Anal Biochem.* 1985;146:307–312.

22. Segal R, Azaz E, Donbrow M. Peroxide removal from nonionic surfactants. *J Pharm Pharmacol.* 1979;31:39–40.

23. Jaeger J, Sorensen K, Wolff SP. Peroxide accumulation in detergents. *J Biochem Biophys Methods.* 1994;29:77–81.

EAGLEBEN-SA_00002047

# Evaluation of Hydroperoxides in Common Pharmaceutical Excipients

WALTER R. WASYLASCHUK, PAUL A. HARMON, GABRIELLA WAGNER, AMY B. HARMAN, ALLEN C. TEMPLETON, HUI XU, ROBERT A. REED

Pharmaceutical Analysis Chemistry, Merck Research Laboratories, Merck & Co., Inc., P.O. Box 4, WP78-210, West Point, PA 19486

*Received 31 August 2005; revised 10 February 2006; accepted 16 June 2006*

*Published online in Wiley InterScience (www.interscience.wiley.com). DOI 10.1002/jps.20726*

**ABSTRACT:** While the physical properties of pharmaceutical excipients have been well characterized, impurities that may influence the chemical stability of formulated drug product have not been well studied. In this work, the hydroperoxide (HPO) impurity levels of common pharmaceutical excipients are measured and presented for both soluble and insoluble excipients. Povidone, polysorbate 80 (PS80), polyethylene glycol (PEG) 400, and hydroxypropyl cellulose (HPC) were found to contain substantial concentrations of HPOs with significant lot-to-lot and manufacturer-to-manufacturer variation. Much lower HPO levels were found in the common fillers, like microcrystalline cellulose and lactose, and in high molecular weight PEG, medium chain glyceride (MCG), and poloxamer. The findings are discussed within the context of HPO-mediated oxidation and formulating drug substance sensitive to oxidation. Of the four excipients with substantial HPO levels, povidone, PEG 400, and HPC contain a mixture of hydrogen peroxide and organic HPOs while PS80 contains predominantly organic HPOs. The implications of these findings are discussed with respect to the known manufacturing processes and chemistry of HPO reactivity and degradation kinetics. Defining critical HPO limits for excipients should be driven by the chemistry of a specific drug substance or product and can only be defined within this context. © 2006 Wiley-Liss, Inc. and the American Pharmacists Association J Pharm Sci 96:106–116, 2007
**Keywords:** chemical stability; physicochemical properties; oxidation; formulation; excipients

## INTRODUCTION

Excipients in pharmaceutical dosage forms are increasingly viewed as important contributors to the overall properties of the dosage form. As such, excipient characterization efforts have become more prevalent. The physical properties of excipients have received the most attention, and the topics of excipient functionality testing and multisource excipient equivalence have been largely discussed in this context.[1,2] However, the chemical impurity profiles of excipients have not, in general, received similar attention. Excipient chemical impurity profiles can be very important in influencing the long-term chemical stability performance of the formulated drug product, particularly if an oxidatively sensitive drug is being formulated.

Oxidative degradation leads to the loss of drug potency over time and may challenge formulation development, reduce shelf life for a drug candidate, prolong development, and delay time to market. In this context, trace level hydroperoxide (HPO) impurities can play a major role. HPOs can

Robert Reed's present address is Xenoport, Inc. 3410 Central Expressway, Santa Clara, CA 95051.

Amy Harman's address is Clinical Research, Merck & Co., Inc., UG3CD-28, North Wales, PA 19454.

Hui Xu's address is AS&QT-Pharm, Merck Manufacturing Division, Merck & Co., Inc., P.O. Box 4, WP78-210, West Point, PA 19486.

*Correspondence to*: Walter R. Wasylaschuk (Telephone: 2156525634; Fax: 2156522821; E-mail: walter_wasylaschuk@merck.com)

Journal of Pharmaceutical Sciences, Vol. 96, 106–116 (2007)
© 2006 Wiley-Liss, Inc. and the American Pharmacists Association



EAGLEBEN-SA_00002048

be an "organic" hydroperoxide (ROOH), where R is a carbon atom, or hydrogen peroxide ($H_2O_2$). HPOs can be catalytically decomposed by trace levels of transition metals (such as iron(III)) as well as by heat and light to give peroxy and alcoxyl radicals. These radicals can initiate chain propagation of peroxy radicals, which subsequently react with and degrade oxidatively sensitive drug substances (single-electron transfer).[3-5] Direct reaction of HPOs with nucleophilic groups (two-electron transfer) such as amines and thio-ethers is also possible and leads to degradation of drug substance.[3,6] Despite this known reactivity, there has generally been only scattered reporting of HPO levels in common pharmaceutical excipients.

Most of these investigations have focused on liquid phase excipients such as polysorbates and polyethylene glycols.[7-13] These measurements were performed using several different techniques: the ferrous oxidation-xylenol orange (FOX2) method, the coupled oxidation of NADPH method and the iodometric method. More recently, Huang et al.[14] described the liquid chromatographic-electrochemical determination of residual $H_2O_2$ in polyethylene glycol (PEG) 400, polyvinylpyrrolidone (PVP), and polysorbate. This work demonstrated significant and variable trace levels of $H_2O_2$ in these excipients. The drawback to this methodology is that it does not measure the ROOH content of the excipients. The goal of this work was to monitor "total" HPO content (ROOH + $H_2O_2$) with a simple, rapid, and sensitive methodology for common pharmaceutical excipients, both soluble and insoluble. The need for a rapid and sensitive method that can be used to measure total HPOs in excipients led to the selection of the FOX2 assay, a sensitive and relatively simple technique for measuring total HPOs.[15] The FOX2 assay has been used to evaluate oxidative damage in human and plant tissues, and in polysorbate 80 (PS80).[11,16-18] For comparative purposes, we have also used a second HPO assay, involving triphenylphosphine (TPP), which is also selective for both ROOH and $H_2O_2$.[19,20] The TPP assay proceeds via a different reaction mechanism than FOX2 and this attribute can be used to validate the results from the two methods.

We report total HPO levels in 10 common pharmaceutical excipients, including PVP, hydroxypropyl cellulose (HPC), PS80, PEG 400, medium chain glycerides (MCGs), poloxamer, lactose, sucrose, microcrystalline cellulose, and mannitol. Total HPO levels range over three orders of magnitude for these excipients; from <10 nmole HPO/g for microcrystalline cellulose, lactose, sucrose, and mannitol to over 10000 nmole HPO/g for certain lots of PVP. A more detailed study of HPO content of HPC, PVP, and PS80 is presented, with data on multiple lots and different excipient grades. These studies include an evaluation of the HPO content of the same excipients from different vendors. Finally, for excipients with the highest total HPO content, the individual contributions from $H_2O_2$ and ROOH are measured and the implications discussed.

## EXPERIMENTAL

### Materials

The following excipients were used as received from commercial vendors: povidone supplied by BASF Corporation (Mount Olive, NJ), International Specialty Products (ISP, Wayne, NJ), and Acros Organics (Morris Plains, NJ), PEG supplied by Dow Chemical Company (Nitro, WV), PS80 supplied by Croda, Inc. (Mill Hall, PA), NOF Corporation (Tokyo, Japan), and Acros Organics, HPC supplied by Hercules/Aqualon (Wilmington, DE), lactose supplied by Foremost Farms USA (Rothschild, WI), mannitol supplied by Roquette (Gurnee, IL), avicel supplied by FMC Corporation (Philadelphia, PA), sucrose supplied by Mallinckrodt (Phillipsburg, NJ), poloxamer supplied by BASF (Roxbury, NJ), and MCGs supplied by Sasol (Witten, Germany). All excipients are compendial grade unless otherwise noted. The specific lot numbers of the excipients are included in the data tables. Catalase from bovine liver, xylenol orange (sodium salt), and butylated hydroxytoluene (BHT) were obtained from Sigma (St. Louis, MO). Ferrous ammonium sulfate was purchased from Aldrich (Milwaukee, WI). TPP and triphenylphosphine oxide (TPO) were purchased from Acros Organics. Sulfuric acid, methanol, and water were obtained from Fisher Scientific (Philadelphia, PA). All other purchased chemicals were of analytical grade or higher.

### Hydroperoxide Assay 1: FOX2 Methodology

The FOX2 assay has been used in total HPO measurements for a range of applications and the chemical principles of the assay have been well studied.[21] The assay is based on the reduction of the HPO by Fe(II) under acidic conditions. The resulting ferric ion forms a strong complex with

DOI 10.1002/jps

JOURNAL OF PHARMACEUTICAL SCIENCES, VOL. 96, NO. 1, JANUARY 2007

EAGLEBEN-SA_00002049

**108**  WASYLASCHUK ET AL.

xylenol orange that is measured spectrophotometrically at 560 nm. The reaction stoichiometry is approximately 2 moles of Fe(III) formed from 1 mole of HPO, for either $H_2O_2$ or ROOH.[21] For this work, the FOX assay version II (FOX2) is selected because it permits more accurate quantitation of the HPOs in common pharmaceutical excipients without detailed knowledge of the type of HPO (ROOH or $H_2O_2$) or the structure of the R group on ROOH.

The FOX2 reagent is prepared according to the method described in previous work.[22] The final FOX2 color reagent (CR) contains 4 mM BHT, 0.10 mM xylenol orange, 0.25 mM ferrous ammonium sulfate, and 25 mM sulfuric acid in 10/90: water/methanol. The final blank reagent (BR) contains the same components as the CR except ferrous ammonium sulfate. The CR and BR are prepared fresh daily in sufficient volume such that all sample controls and the standard solutions can be prepared using the identical preparation of reagent solutions. UV/Vis analysis is performed using an HP 8453 UV/Vis Spectrophotometer from Agilent (Palo Alto, CA) with a 1 mL micro volume quartz cuvette. The absorbance of sample and standard solutions is measured at 560 nm with background subtraction at 900 nm.

Excipients samples are prepared between 0.02 and 0.001 g/mL of the color reagent which is within the linear response of the UV measurement. In most cases the excipient is added into a vigorously stirring solution in order to avoid gel formation. Multipoint stir plates are used to stir all samples at a fixed RPM. The solutions of insoluble excipients are clarified through a two-step process involving centrifugation and then filtration before UV analysis. The filtration procedure requires pretreating the syringes with the color reagent, as the syringes appear to have some HPOs present. A standard curve of $H_2O_2$ with several concentrations between 0 and 15 μM is prepared each day and the response is used to calculate the concentration of HPOs in excipients.

The sample testing methodology is optimized to increase the method precision. For each excipient tested, four sample solutions are prepared: in the color reagent, in the reagent blank, and two control solutions (CR and RB without excipient). All solutions are stirred at a controlled RPM for the same length of time (2 h) to ensure sample homogeneity and reproducible background oxidation of Fe(II). The control solution of color reagent is used to account for Fe(III) present in the ferrous ammonium sulfate and for the background oxida-

tion of color reagent—Fe(III) formed by the slow oxidation of Fe(II). The reagent blank control is used to account for interfering species such as residual Fe(III) in glassware, manufacturing equipment, and excipients.

### Hydroperoxide Assay 2: TPP/TPO Methodology

Triphenylphosphine is a convenient HPLC-based methodology for determining the $H_2O_2$ and ROOH content of solutions. The methodology has been published previously.[19] TPP reacts rapidly and quantitatively with $H_2O_2$ or ROOH to give 1 mole of TPO for each mole of HPO reacted.[20] TPP and TPO are easily resolved chromatographically. Excipients are added to a standard solution of 0.1 mg/mL TPP in 100% methanol. The sample is then allowed to react for 15 min prior to HPLC analysis. TPO area is compared to that from an identical sample without excipient added as a control. With a detection wavelength of 203 nm, the response factors of TPP and TPO are similar. The TPO peak area is converted to TPO concentration by using the TPP standard area and concentration. The TPP/TPO chromatographic conditions are as follows: column; 5 cm × 4.6 mm Synergi Polar-RP, column temperature 40°C, flow rate 1.0 mL/min, injection volume 10 μL, detection wavelength 203 nm, isocratic mobile phase of 75% methanol/25% water with a run time of 12 min. All HPLC analyses were performed on an Agilent 1100 (Agilent, Wilmington, DE) HPLC instrument with diode array detection.

### Organic HPO and Hydrogen Peroxide Distribution: Catalase Methodology

Catalase is used to identify the type of HPOs present in PEG, HPC, PVP, and PS80. Catalase reacts with $H_2O_2$ but not with ROOH, and can be used to distinguish between these two HPOs in excipients. Excipient is reacted with catalase and then tested by the FOX2 assay for the remaining HPO concentration, which is only ROOH. The difference in FOX2 absorbance between excipient with catalase and excipient without catalase shows the amount of $H_2O_2$ in excipient. Spike and recovery experiments are conducted to demonstrate the activity of catalase in the presence of PS80.

A solution of catalase is prepared at 1200 activity units/mL in water. Concentrated excipient solutions are prepared in water at approximately

EAGLEBEN-SA_00002050

$3-10\times$ the concentration used in the FOX2 assay experiments. After mixing, the concentrated excipient solution is divided into two portions and mixed in a 5:1 ratio with catalase solution and with water, respectively. After 1 h of reaction, these two portions are each mixed with the FOX2 color reagent. All other testing methodology is as described for FOX2.

## RESULTS

### Overview of HPOs in Common Pharmaceutical Excipients

The HPO results for 10 common pharmaceutical excipients are presented in Table 1 with measurements performed using the FOX2 assay. Table 1 gives average HPO values as well as the highest and lowest HPO values determined for multiple lots tested. The excipients in Table 1 are listed in order from the highest average HPO determined (PVP, 7300 nmole/g) to the lowest values of <10 nmole/g for MCG, microcrystalline cellulose, mannitol, lactose, and sucrose. Overall PVP, PEG 400, PS80, and HPC contain significant levels of HPOs. In these cases, the difference in HPO content between different excipient lots and grades can be significant and is much larger than the measured RSD (<10%) for multiple preparations of the same lot. MCG and the common formulation diluents/fillers like mannitol and lactose contain low HPO levels. The HPO content of microcrystalline cellulose (avicel PH 101, 102,

105, and 200 grades) was also found to be less than 10 nmole/g.

A comparison of HPO values from the manufacturer certificate of analysis to the FOX2 method is shown in Table 2. It is evident that there is no standardized practice for measuring or reporting peroxide values for oxidizable excipients like PS80, PEG, and povidone. For example, not all grades of povidone or batches of PS80 are tested for peroxides even though peroxides are expected to be present. The certificate of analysis for HPC does not contain HPO-testing results (data not shown). Even when peroxide values are reported, these values are lower than when determined using the FOX2 (and TPP) method. These differences underscore the need for active monitoring of excipients by end users and also highlight the importance of using one assay methodology to test all excipients.

Table 3 shows total HPO determinations for specific lots of povidone, PEG 400, PS80, HPC, MCG, and avicel using both the FOX2 and the TPP/TPO methodologies. Overall the HPO results from both methodologies agree well in that the same ranking of high HPO and low HPO content is generally obtained across all the various excipients as well as within the multiple lots of each excipient tested. This shows there are no large differences in selectivity between the reactivity of the Fe (II) reagent and the reactivity of TPP. There are, however, some interesting excipient-specific trends in Table 3. The agreement between the HPO values measured by FOX2 and TPP/TPO assay is essentially quantitative for HPC and

**Table 1.** Measured Level of Hydroperoxides in a Set of Common Pharmaceutical Excipients

| Excipient | # Lots Tested | Average HPO[a] (nmole/g) | High HPO Lot (nmole/g) | Low HPO Lot (nmole/g) |
|---|---|---|---|---|
| PVP | 5 | 7300 | 11000 | 3600 |
| PEG 400 | 4 | 2200 | 3300 | 1000 |
| PS80 | 8 | 1500 | 4600 | 180 |
| HPC | 21 | 300 | 890 | 50 |
| Poloxamer[b] | 7 | 30 | 50 | 10 |
| PEG solid[c] | 4 | 20 | 40 | <10 |
| MCG | 3 | <10 | <10 | <10 |
| Microcrystalline cellulose | 5 | <10 | 10 | <10 |
| Mannitol | 5 | <10 | <10 | <10 |
| Lactose | 5 | <10 | 10 | <10 |
| Sucrose | 5 | <10 | 20 | <10 |

[a]Hydroperoxide levels were acquired using the FOX2 assay. In some cases data reflect mulitiple vendors and grades of excipient. The overall trend shows that PVP, PEG 400, and PS80 have consistently higher HPO levels. HPC can also have significant levels. Poloxamer HPO content is low and the remaining excipients have very low HPO content at the detection limit of the FOX2 method.
[b]Different batches and grades (188, 338, and 407) of poloxamer solid are included.
[c]Testing is performed on batches of PEG 3400, 4600, and 6000.

DOI 10.1002/jps

EAGLEBEN-SA_00002051

**110**    WASYLASCHUK ET AL.

**Table 2.**  Comparison of HPO Content: FOX2 Assay and Excipient Certificate of Analysis

| Excipient & Grade | Manufacturer and Lot Number | HPO/Peroxides from C of A | HPO (nmole/g) |
|---|---|---|---|
| PVP K17 | BASF 20713588Q0 | 67 mg/kg | 7800 |
| PVP K29 | ISP 05200087543 | 24 ppm | 3900 |
| PVP K29 | ISP 05500129956 | 24 ppm | 5200 |
| PVP K90 | ISP 03400121902 | NR | 7000 |
| PVP K90 | ISP 03500132524 | NR | 8800 |
| PS80 | Croda T4H-1033 | 0.00 mEq^02/kg | 1100 |
| PS80 | Croda T4H-1034 | 0.00 mEq^02/kg | 2100 |
| PS80 | Croda 0000114277 | 0.10 mEq^02/kg | 750 |
| PS80 | Croda 0000136437 | 0.08 mEq^02/kg | 570 |
| PS80 | NOF 402TA52 | NR | 1600 |
| PS80 | NOF 502TA51 | NR | 7700 |
| PEG 400 | Dow RD0755S4D2 | NR | 730 |
| PEG 400 | Dow QJ1155S4D5 | NR | 1100 |
| PEG 4000 | Dow RF1755S7B1 | NR | <10 |
| PEG 4600 | Dow QK0555S7D1 | NR | <10 |

NR, A peroxide # is not reported on the vendor certificate of analysis.
It is estimated that 1 ppm peroxide or mg peroxide/kg = 30 nmole HPO/g and 0.1 mEq^02/kg = 300 nmole HPO/g.

**Table 3.**  Comparison of HPO Content: TPP/TPO Versus FOX2 Methodologies

| Excipient | ID of Lot & Grade | HPO (nmole/g) FOX2 | HPO (nmole/g) TPP/TPO |
|---|---|---|---|
| PVP | K12, Acros A0180479[a] | 2300 | 4300 |
|  | K17, BASF 20713588Q0 | 7800 | 15000 |
|  | K29, Acros A0189374[a] | 3500 | 6700 |
|  | K29, ISP 05200087543 | 3900 | 7400 |
|  | K90, Acros A0159153[a] | 13000 | 22000 |
|  | K90, ISP 03400122434 | 8900 | 15000 |
| PEG 400 | Dow RD0755S4D2 | 730 | 2500 |
|  | Dow QJ1155S4D5 | 1100 | 3300 |
|  | Dow QH2355S4D3 | 3200 | 5700 |
| PEG 3350 | Dow SB2655S7B1 | <10 | 20 |
| PEG 4000 | Dow RF1755S7B1 | <10 | 20 |
| PEG 4600 | Dow QK0555S7D1 | <10 | <10 |
| PS 80 | Croda T4H-1033 | 1100 | 1100 |
|  | Croda T4H-1014 | 1500 | 1400 |
|  | Sigma Aldrich 09414KO[a] | 4600 | 4300 |
| HPC | LF Grade Lot 9899 | 440 | 630 |
|  | LF Grade Lot 9159 | 450 | 390 |
|  | LF Grade Lot 4718 | 750 | 680 |
|  | EF Grade Lot 9897 | 560 | 760 |
| Avicel | PH 101 FMC Lot 1321 | <10 | 30 |
|  | PH 102 FMC Lot 2462 | <10 | 20 |

Comparison of hydroperoxide assay results using FOX2 and TPP/TPO assays. In this case each excipient is sourced from the same vendor. The results are in good agreement in regard to overall HPO trends among the different excipients.
[a]Noncompendial grade.

PS80. However, for PVP and PEG 400, the TPP/TPO methodology gives total HPO values approximately two times larger than the FOX 2 assay. These excipient-specific trends will be discussed later.

### Variable HPO According to Lot and Grade

Table 3 shows three- to sixfold variation in HPO content between different lots of the same excipient from the same vendor. Different HPO contents of different grades of the same material are also evident. This variation prompted a further investigation into the HPO content of several excipients. First, the total HPO content of various grades and lots of HPC was investigated, the resulting HPO data are shown in Table 4a,b. Table 4a shows 15 lots of LF grade HPC from the same vendor. The HPO content ranges from about 100 to 900 nmoles/g with no clear trend. Table 4b shows HPO data for different grades of HPC listed from the highest molecular weight material to the lowest. Once again there is no trend between the total HPO content and the average molecular weight of the HPC.

Polyvinlypyrrolidone and PS80 (Tabs. 1, 3) show high and variable HPO content and were also examined in more detail. Table 5 shows the PVP HPO content as a function of average molecular weight and vendor. From Table 5 there is a correlation between HPO content and

EAGLEBEN-SA_00002052

**Table 4a.** Detailed Study of Hydroperoxides in HPC (LF Grade)

| Lot ID | HPO (nmole/g) | RSD (%) |
|---|---|---|
| 3994 | 890 | 0.2 |
| 4362 | 440 | 4.0 |
| 4360 | 500 | 5.4 |
| 4718 | 750 | 1.3 |
| 5047 | 110 | 1.7 |
| 5825 | 140 | 6.3 |
| 6648 | 200 | 1.2 |
| 6832 | 210 | 3.2 |
| 9137 | 220 | 3.3 |
| 7622 | 270 | 3.9 |
| 9159 | 450 | 1.2 |
| 7616 | 220 | 11.2 |
| 8592 | 150 | 9.9 |
| 8604 | 100 | 17 |
| 8940 | 130 | 9.6 |

HPO Assay of 15 different lots of HPC LF grade material. Significant variation of HPO content is observed. All HPC are from same vendor.

**Table 5.** Study of Hydroperoxides in Different Grades and Batches of PVP

| Grade | Manufacturer | Lot # | HPO (nmole/g) |
|---|---|---|---|
| K17 | BASF | 20713588Q0 | 7800 |
| K17 | BASF | 34-0462 | 6900 |
| K29 | ISP | TX70720 | 10000 |
| K29 | ISP | 05100056272 | 3600 |
| K29 | ISP | 05200087543 | 3900 |
| K29 | ISP | 05500129956 | 5200 |
| K90 | ISP | 03400121902 | 7000 |
| K90 | ISP | 03400122434 | 9000 |
| K90 | ISP | 03500132524 | 8800 |

| Manufacturer & Lot Number | Average Molecular Weight | HPO (nmole/g) |
|---|---|---|
| Acros Lot A0180479[a] | 3500 | 2300 |
| Acros Lot A0199571[a] | 8000 | 2800 |
| Acros Lot A0189374[a] | 58000 | 3500 |
| Acros Lot A0159153[a] | 1300000 | 13000 |

Significant differences in HPO content is observed for different grade of PVP. The method RSD for HPO measurement of povidone is 1.7%.
[a]Noncompendial grade.

the average molecular weight of the PVP; the larger the molecular weight the larger the amount of HPO/g. Table 5 also highlights that significant differences in HPO content (for similar average molecular weight material) between different vendors can be expected. Table 6 shows HPO data for PS80 from different vendors and batches. The HPO content in PS80 varied most significantly by manufacturer. As noted earlier, not all vendors report HPO levels for PS80. Interestingly, non-compendial PS80 from Acros contains low HPO levels comparable to many compendial batches.

**Table 4b.** Detailed Study of Hydroperoxides in HPC (Six Different Grades of HPC)

| Grade | Average Molecular Weight | Lot # | HPO (nmole/g) | RSD (%) |
|---|---|---|---|---|
| HF | 1150000 | 9821 | 330 | 14 |
| GF | 850000 | 9642 | 80 | 11 |
| JF | 370000 | 9686 | 50 | 1.5 |
| LF A | 140000 | 9843 | 150 | 2.0 |
| LF B | 95000 | 9899 | 440 | 0.6 |
| EF | 80000 | 9897 | 560 | 5.8 |

HPO Assay of six batches of HPC, one lot from grade of commercially available material. No clear trend between HPC molecular weight and HPO assay is evident.

## Hydrogen Peroxide and Organic HPOs in Excipients

The distribution of the total HPO content into ROOH and $H_2O_2$ in selected lots of PVP, PEG 400, PS80, and HPC is shown in Table 7 using the catalase methodology. Three of the four excipients (PEG 400, PVP, and HPC) contain various mixtures of ROOH and $H_2O_2$, while PS80 is shown to contain essentially all ROOH and no $H_2O_2$. Our catalase validation results confirm that the catalase was not inactivated by PS80 (data not shown). Similar research on polysorbate 20 and 80 has found significant $H_2O_2$ levels.[14,19] These results may not be comparable to our work because of differences in storage conditions (exposure to fluorescent light for 11 days) and possible chromatographic interference observed in the LC-wired enzyme testing methodology.

## DISCUSSION

### Formulating Oxidatively Sensitive Drug Substances

#### Solid Dosage Forms

Our findings are the first report of the total HPO levels using the same assay methodology in a broad range of common pharmaceutical excipients. It is clear that certain excipients like PVP,

EAGLEBEN-SA_00002053

112    WASYLASCHUK ET AL.

**Table 6.** Variation of Hydroperoxides in Polysorbate 80

| Manufacturer | Lot # | HPO (nmole/g) |
|---|---|---|
| Croda | T4h-1014 | 1500 |
| Croda | T4h-1024 | 1000 |
| Croda | T4h-1027 | 980 |
| Croda | T4h-1028 | 710 |
| Croda | T4h-1033 | 1100 |
| Croda | T4h-1034 | 2100 |
| Croda | 0000114277 | 750 |
| Croda | 0000136437 | 570 |
| NOF | 402TA52 | 1600 |
| NOF | 502TA51 | 7700 |
| ACROS | A017181501[a] | 800 |
| ACROS | A016198601[a] | 290 |
| Sigma-Aldrich | 09414KO[a] | 4600 |
| Sigma-Aldrich | 1312CA[a] | 1600 |

Significant differences in HPO content are observed for different manufacturers of polysorbate 80. The method RSD for HPO measurement of polysorbate 80 is 2.3%.

[a]Noncompendial grade.

PEG 400, PS80, and HPC have significant HPO levels and that these levels may vary across different grades and between manufacturers of the same grade of excipient. In solid dosage forms, PVP is commonly used as a binder for wet granulation and is often used at fairly low levels. However, the total HPO content is high enough in PVP to promote significant degradation levels when formulating an oxidatively sensitive drug substance. Five percent PVP was shown to be responsible for N-oxide formation of raloxifene hydrochloride, due to the high HPO content.[6] Similarly, HPC is used at low levels in solid dosage forms and may introduce HPOs into the formulation. During a wet granulation process of a thio-ether with HPC, we observed sulfoxide formation which was related to the HPOs in the HPC.[23] HPO growth was also observed during wet granulation of the HPC containing placebo. The degradation of raloxifene hydrochloride and of the thio-ether are examples of the two-electron nucleophilic reaction that can occur between HPO and drug substance. Low-level HPO content may also be sufficient to participate in peroxy radical chain propagation (initiated by metal, heat, or light). The radicals can behave as initiators for radical chain processes leading to significant HPO and radical concentrations from a small amount of starting HPO. These radical processes may result in significant degradation of drug substance via single- and two-electron reactions. Fortunately microcrystalline cellulose, lactose, and mannitol commonly used in solid

**Table 7.** Distribution of Hydrogen Peroxide and Organic Hydroperoxides in PEG, PS80, PVP, and HPC

| Excipient | ID of Lot | Distribution of Hydroperoxides | | HPO (nmole/g) |
|---|---|---|---|---|
| | | % ROOH | % H$_2$O$_2$ | |
| PVP | K12 Acros Lot A0180479[a] | 80 | 20 | 2300 |
| | K17 Acros Lot A0199571[a] | 40 | 60 | 2800 |
| | K29 Acros Lot A0189374[a] | 60 | 40 | 3500 |
| | K29 ISP Lot 05200087543 | 70 | 30 | 3900 |
| | K90 Acros Lot A0159153[a] | 80 | 20 | 13000 |
| | K90 ISP Lot 03400121902 | 80 | 20 | 7000 |
| PEG 400 | Dow RD0755S4D2 | 50 | 50 | 730 |
| | Dow QJ1155S4D5 | 60 | 40 | 1100 |
| | Dow QH2355S4D3 | 80 | 20 | 3200 |
| PS 80 | Croda T4H-1033 | 100 | 0 | 1100 |
| | Croda T4H-1014 | 100 | 0 | 1500 |
| | Croda T4H-1028[b] | 100 | 0 | 3900 |
| HPC LF | Hercules Lot 4360 | 30 | 70 | 500 |
| | Hercules Lot 9899 | 40 | 60 | 440 |
| | Hercules Lot 9159 | 50 | 50 | 450 |
| | Hercules Lot 4718 | 30 | 70 | 750 |
| | Hercules EF Lot 9897 | 80 | 20 | 560 |

[a]Noncompendial grade.
[b]Stored under ambient laboratory conditions for approximately 18 months.

JOURNAL OF PHARMACEUTICAL SCIENCES, VOL. 96, NO. 1, JANUARY 2007                    DOI 10.1002/jps

EAGLEBEN-SA_00002054

dosage forms are relatively low in HPO content. Controlling HPO–drug reactions in solid dosage forms can be achieved by selecting excipients with low HPO levels, controlling crystallinity of the drug substance, and by adding antioxidants to stop HPO propagation and single-electron degradation processes.

### Lipid-Based Oral Formulations

Achieving adequate exposure of the drug substance can be a challenge especially for poorly water-soluble compounds. This goal has driven use of lipid-based dosage forms, in which drug substances are formulated with glycerides or surfactants such as MCG, PEG 400, poloxamer, and PS80.[24,25] The HPO data in Tables 1–4 clearly show that PS80 and PEG 400 have much higher HPO levels than MCG and poloxamer. Liquid formulations using PS80 and PEG 400 represent a highly "oxidizing" environment that can be conducive to radical chain degradation reactions as well as the two-electron nucleophilic reactions. The reactivity of drug substance with HPO is further enhanced by the amorphous nature of drug substance and excipients in these types of formulations. Thus, every effort should be made to understand the reactivity of the drug substance toward both HPOs (N-oxide, sulfoxide type reactivity) as well as toward peroxy radicals.[26] If a drug substance is shown to be sensitive to these types of oxidation reactions, PS80 and PEG 400 should be avoided and surfactants such as MCG and poloxamer should be evaluated. The addition of antioxidant may also be necessary for drug substances that are sensitive to oxidation.

### Relationship between HPOs and Excipient Manufacturing

An important finding of this article is that the HPO content of excipients may contain significant contributions from both ROOH and $H_2O_2$. These findings also introduce the possibility that different HPOs may yield different degradation kinetics. Although it may not be necessary to distinguish between ROOH and $H_2O_2$ in all cases, the potential different reactivities of different HPOs may have to be considered in specific cases of drug substance or product sensitive to oxidation.

A final aspect of the HPO distributions is to generally rationalize the data shown in Table 7 with respect to each excipient's known manufac-

turing process. In the case of PS80, there is no hydrogen peroxide used in the manufacturing process. PS80 itself has low energy C–H bonds which can react with peroxy radicals via hydrogen atom abstraction. Addition of molecular oxygen can then lead to a HPO group on the PS80 (an organic HPO). The oleic acid raw material also carries HPO groups. In Table 7, the HPO content for PS80 is exclusively ROOH with no appreciable $H_2O_2$. Similarly, the PEG 400 manufacturing process does not use hydrogen peroxide, and PEG 400 also has oxidizable C–H bonds. Thus, we would anticipate PEG 400 would be dominated by ROOH. Table 6 shows that 20–50% of the HPO content in PEG 400 is actually due to hydrogen peroxide. We can only speculate that after manufacture, PEG 400 slowly oxidizes and some HPO groups are eliminated as hydrogen peroxide. It is also possible that the starting materials contain low-level hydrogen peroxide impurities from their respective syntheses or that some type of bleaching with $H_2O_2$ has been utilized.

Polyvinlypyrrolidone is synthesized from N-vinylpyrolidone via a free-radical polymerization reaction from which oxygen is often excluded as much as possible.[27] However, trace levels of oxygen remain that react with the polymerizing free radicals to form HPO on the PVP backbone. Thus a clear rationale for ROOH in PVP exists. Hydrogen peroxide is also used at elevated temperatures to initiate the free-radical polymerization and may be present as an impurity from the manufacturing process. Table 7 shows that PVP HPO content is typically dominated by ROOH, but can have between 20% and 60% hydrogen peroxide.

Finally, HPC is a slightly different case in which the base cellulose is extracted and purified from natural sources. The cellulose ether is then reacted with propylene oxide under elevated temperature and pressure. Hydrogen peroxide or tert-butyl hydroperoxide treatment is commonly used to reduce the average molecular weight of the cellulose and residual levels may remain in HPC as a processing impurity.[28–30] However, no trend of HPO content with molecular weight was noted in Table 4a,b. Increasing degrees of cellulose chain cleavage do not lead to systematically higher HPO levels. It is possible that the starting cellulose material carries some amount of intrinsic HPO content. The oxidation of low energy C–H bonds on HPC or on impurities may also be responsible for some of the HPO content.

DOI 10.1002/jps    JOURNAL OF PHARMACEUTICAL SCIENCES, VOL. 96, NO. 1, JANUARY 2007

EAGLEBEN-SA_00002055

114    WASYLASCHUK ET AL.

**Attributes of HPO Testing Methodology**

Although most of our HPO characterization has been performed using the FOX2 method, a comparison of the key method attributes shows that either FOX2 or TPP/TPO may be used for HPO testing of excipients. One key similarity is that both methods are sensitive to the two classes of HPO: hydrogen peroxide and organic HPOs. In addition, each method can be used to generate rapid and sensitive HPO measurements with a precision (typical RSD < 3%) that is low enough for discriminating comparisons of different batches of excipients. These methods also yield HPO results showing good agreement for excipients like PS80 and HPC. However, as shown in Table 3 the HPO results for PVP and PEG were significantly higher when using the TPP/TPO method. For all samples, this difference appears to be reproducible, systematic, and excipient specific and was therefore investigated. The possibility of differential reactivity of FOX2 and TPP reagents with peroxides (ROOR) and HPOs was explored. Based on our own findings, the difference is not related to incomplete reactivity with hydrogen peroxide or organic HPOs. In addition, the reactivity of FOX2 and TPP with peroxides does not explain the trends for PVP and PEG since our research indicates neither method is reactive with simple alkyl peroxides and other investigators have shown that FOX2 is more reactive with cyclic peroxides.[31] One explanation for this difference is that non-HPO impurities or functional groups specific to PVP and PEG are responsible for the different HPO results. It is important to note that these non-HPO impurities appear related to the HPO levels in the excipient. For example, the HPO content of PVP tested by TPP/TPO and FOX2 is different by a factor of approximately 1.8× for all batches and grades even spanning a 5× range of HPO values. This off-target reactivity leads to the different and yet reproducible HPO results observed for PVP and PEG by either of two scenarios: reaction with TPP to yield inflated HPO results compared to FOX2 or by reduction of the FOX2 signal (xylenol orange–Fe(III) complex) leading to depressed HPO results compared to the TPP result. It is difficult to identify the exact cause without detailed knowledge of the full excipient matrix for PVP and PEG as well as the exact structure of the organic HPOs which appear related to this off-target reactivity/matrix effect. Hence, an important objective for future work will be characterization of the off-target reactivity/excipient matrix for PVP and PEG as well as structural information on the HPOs that appear to influence this effect. Despite the differences in Table 3, the HPO values obtained by FOX2 and TPP/TPO have the same general trends among all excipients and among different grades of the same excipient (ex. PVP). Either method can be used to provide similar information on common pharmaceutical excipients with the exception that the same HPO assay should be used when running comparative studies of excipients that include PEG and PVP.

**Acceptable HPO Limits Are Related to Chemistry of Drug Substance or Drug Product**

Our findings show that common excipients like PVP, PEG 400, PS80, and HPC contain significant HPO levels even though these are compendial grade. In addition our results indicate considerable variability according to grade, batch, and vendor and different practices for peroxide monitoring by manufacturers. Some of the variability may be related to differences in manufacturing process, impurities in raw materials, bleaching or storage conditions. These differences in addition to HPO levels may not be communicated to end users by the manufactures in part because it is difficult to assign general limits on HPO levels in excipients. These limits can only be properly assigned in the context of a particular formulation and active pharmaceutical ingredient. Thus, when formulating oxidatively sensitive drug substances (especially those in an amorphous state), carefully monitoring HPO content falls to the excipient user.

Even when oxidation of drug substance is not a problem, the HPO levels in excipients may lead to other formulation challenges. Other researchers have shown that HPO levels and oxidizability of excipients can lead to significant changes in pH, appearance, and viscosity.[32–34] Furthermore, the decomposition of HPO may yield unwanted impurities such as aldehydes and carboxylic acids. Aldehydes are also known to promote undesirable capsule cross-linking in both hard and soft gelatin capsules.[35] Once again acceptable HPO limits can only be assigned within the context of a particular formulation that is known to be sensitive to the HPOs and oxidation. In this case, the acceptable limits for HPO content could be defined by understanding the relationship between HPOs and formulation quality. We hope that our findings

JOURNAL OF PHARMACEUTICAL SCIENCES, VOL. 96, NO. 1, JANUARY 2007    DOI 10.1002/jps

EAGLEBEN-SA_00002056

emphasize that excipient equivalence can not be assumed when considering HPO content and that monitoring HPO content of excipients may be prudent in specific cases defined by the chemistry of the drug substance or drug product.

## CONCLUSION

The role of HPOs in the oxidative degradation of a drug substance necessitates monitoring the HPO content of excipients and formulated product. In this study, the FOX2 and TPP/TPO assays were used to produce quick, accurate, and sensitive measurements of HPO concentrations for 10 common pharmaceutical excipients. Some excipients like HPC, PEG, PVP, and PS80 were found to contain significant HPO levels. Other excipients such as lactose, sucrose, avicel, and mannitol have very low HPO levels. For those excipients with significant HPO content, considerable variation in HPO content across different batches and vendors may occur. For these excipients, active monitoring and control of HPOs by the suppliers may be necessary. The application of the HPO measurement described in this article is not limited to the testing of starting excipients but may also be performed on the formulated drug product when needed. The HPO assays could be used in comparative studies of HPO levels. These studies could involve different batches and types of excipients and may lead to the selection of excipients and manufacturing processes that minimize HPO concentration and enhance drug product stability. This methodology would be particularly useful for drug substances prone to HPO-mediated degradation pathways and could be an effective way to avoid, solve, or minimize unexpected stability problems.

## REFERENCES

1. Landin M, Martinez-Pacheco R, Gomez-Maoza JL, Suoto C, Concheiro A, Rowe RC. 1993. Effect of batch variation and source of pulp on the properties of microcrystalline cellulose. Int J Pharm 91:133–141.
2. Shah U, Augsburger L. 2001. Evaluation of the functional equivalence of crospovidone NF from different sources. I. Physical characterization. Pharm Dev Tech 6:39–51.
3. Hovoroka SW, Schoneich C. 2001. Oxidative degradation of pharmaceuticals: Theory, mechanisms and inhibition. J Pharm Sci 90:253–268.
4. Johnson DM, Gu LC. 1988. Autoxidation and antioxidants. In: Swarbrick J, Boylan JC, editors. Encyclopedia of pharmaceutical technology, Vol. 1. New York: Wiley. pp 415–449.
5. Sheldon RA, Kochi JK. 1976. Metal-catalyzed oxidations of organic compounds in the liquid phase: A mechanistic approach. In: Eley DD, editor. Advances in catalysis. New York: Academic Press. pp 273–413.
6. Hartauer KJ, Arbuthnot GN, Baertschi SW, Johnson RA, Luke WD, Person NG, Rickard EC, Tingle CA, Tsang PKS, Wiens RE. 2000. Influence of peroxide impurities in povidone and crospovidone on the stability of raloxifene hydrochloride in tablets: Identification and control of an oxidative degradation product. Pharm Dev Tech 5:303–310.
7. Donbrow M, Azaz E, Pillersdorf A. 1978. Autoxidation of polysorbates. J Pharm Sci 67:1676–1681.
8. Chang HW, Bock E. 1980. Pitfalls in the use of commercial nonionic detergents for the solubilization of integral membrane proteins: Sulfydryl oxidizing contaminants and their elimination. Anal Biochem 104:112–117.
9. Knepp VM, Whatley JL, Muchnik A, Calderwood TS. 1996. Identification of antioxidants for prevention of peroxide-mediated oxidation of recombinant human ciliary neurotropic factor and recombinant human nerve factor. J Pharm Sci Technol 50:163–171.
10. Mancuso JR, McClements DJ, Decker EA. 1999. Ability of iron to promote surfactant peroxide decomposition and oxidize $\alpha$-tocopherol. J Agric Food Chem 47:4146–4149.
11. Ha E, Wang W, Wang J. 2002. Peroxide formation in polysorbate 80 and protein stability. J Pharm Sci 91:2252–2264.
12. McGinity JW, Patel TR, Naqvi AH. 1976. Implications of peroxide formation in lotion and ointment dosage forms containing polyethylene glycols. Drug Dev Comm 2:505–519.
13. Bindra DS, Williams TD, Stella VJ. 1994. Degradation of O6-benzylguanine in aqueous polyethylene glycol 400 (PEG 400) solutions: Concerns with formaldehyde in PEG 400. Pharm Res 11:1060–1064.
14. Huang T, Garceau ME, Gao P. 2003. Liquid chromatographic determination of residual hydrogen peroxide in pharmaceutical excipients using platinum and wired enzyme electrodes. J Pharm Bio Anal 31:1203–1210.
15. Jiang ZY, Hunt JV, Wolff SP. 1992. Ferrous ion oxidation in the presence of xylenol orange for detection of lipid hydroperoxides in low density lipoprotein. Anal Biochem 202:384–389.
16. Gay C, Collins J, Gebicki JM. 2003. Measurement of protein and lipid hydroperoxides in biological systems by the ferric-xylenol orange method. Anal Biochem 315:29–35.

DOI 10.1002/jps

EAGLEBEN-SA_00002057

**116**   WASYLASCHUK ET AL.

17. DeLong JM, Prange RK, Hodges DM, Forney CF, Bishop MC, Quillam M. 2002. Using a modified ferrous oxidation-xylenol orange (FOX) assay for detection of lipid hydroperoxides in plant tissue. J Agric Food Chem 50:248–254.

18. Jaeger J, Sorensen K, Wolff SP. 1994. Peroxide accumulation in detergents. J Biochem Biophys Methods 29:77–81.

19. Nakamura T, Maeda H. 1991. A simple assay for lipid hydroperoxides based on triphenylphosphine oxidation and high-performance liquid chromatography. Lipids 26:765–768.

20. Rowley AG. 1979. Conversions via oxygenation. In: Cadogan JIG, editor. Organophosphorous reagents in organic synthesis. New York: Academic Press. pp 318–327.

21. Gay C, Collins J, Gebicki JM. 1999. Hydroperoxide assay with the ferric-xylenol orange complex. Anal Biochem 273:149–155.

22. Nourooz-Zadeh J, Tajaddini-Sarmadi J, Wolff SP. 1994. Measurement of plasma hydroperoxide concentrations by the ferrous oxidation-xylenol orange assay in conjunction with triphenylphosphine. Anal Biochem 220:403–409.

23. Harmon PA, Wuefling WP, Harman AB, Wasylaschuk WR, Givand J, Shelukar S, Reed RA. 2004. Role of organic hydroperoxides on process robustness and finished product quality (presented at AAPS).

24. Humberstone AJ, Charman WN. 1997. Lipid-based vehicles for the oral delivery of poorly water soluble drugs. Adv Drug Del Rev 25:103–128.

25. Poton CW. 2000. Lipid formulations for oral administration of drugs: Non-emulsifying, self-emulsifying and 'self-microemulsifying' drug delivery systems. Eur J Pharm Sci 11:S93–S98.

26. Harmon PA, Kosuda K, Nelson E, Mowery M, Reed RA. 2006. A novel peroxy radical based oxidative stressing system for ranking the oxidizability of drug substance. J Pharm Sci (in press).

27. Buhler V. 1999. Kollidon: Polyvinylpyrrolidone for the pharmaceutical industry. BASF 9–12.

28. Kroschwitz JI, Howe-Grant M, editors. 1993. Cellulose ethers. In: Kirk-Othmer encyclopedia of chemical technology, Vol. 5. New York: John Wiley & Sons. pp 541–542.

29. U.S. Patent. 2,512,338 (June 20, 1950), E.D. Klug and H.M. Spurlin (to Hercules Powder Co.).

30. U.S. Patent 3,719,663 (March 6, 1973), E.D. Klug (to Hercules Inc.).

31. Yin H, Porter NA. 2003. Specificity of the FOX assay: Analysis of autoxidation products of cholesteryl arachidonate by the TBARS and FOX assays. Anal Biochem 313:319–326.

32. Johnson DM, Taylor WF. 1984. Degradation of fenprostalene in polyethylene glycol 400 solution. J Pharm Sci 84:1414–1417.

33. Kasraian K, Kuzniar AA, Wilson GG, Wood JA. 1999. Developing an injectable formula containing an oxygen-sensitive drug: A case study of danofloxacin injectable. Pharm Dev Tech 4:475–480.

34. Dahl T, He GX, Samules G. 1998. Effect of hydrogen peroxide on the viscosity of a hydroxyethylcellulose-based gel. Pharm Res 15:1137–1140.

35. Digenis GA, Gold TB, Shah VP. 1994. Cross-linking of gelatin capsules and its relevance to their in vitro-in vivo performance. J Pharm Sci 83:915–921.

EAGLEBEN-SA_00002058



Google    PEG400  peroxide contaminant

Shopping    Images    News    Videos    Books    Maps    Flights    Finance

All filters ⌄    Tools    SafeSearch ⌄

Before Jan 28, 2010 ⌄    All results ⌄    Cl

It looks like there aren't many great matches for your search

Try using words that might appear on the page you're looking for. For example, "cake recipes" instead of "how to make a cake."

Need help? Check out other tips for searching on Google.

You can also try these searches:

What is PEG 400 used for?

What is peroxide used for?

What contamination means?



PhaRxmon Consulting LLC
https://pharxmonconsulting.com › files  PDF

**Evaluation of hydroperoxides in common pharmaceutical ...**
by WR WASYLASCHUK · 2007 · Cited by 197 — HPO levels, povidone, PEG 400, and HPC contain a mixture of hydrogen peroxide and organic HPOs while PS80 contains predominantly organic...
11 pages

National Institutes of Health (.gov)
https://pubmed.ncbi.nlm.nih.gov › ...

**Evaluation of hydroperoxides in common pharmaceutical ...**
by WR Wasylaschuk · 2007 · Cited by 197 — Povidone, polysorbate 80 (PS80), polyethylene glycol (PEG) 400, and hydroxypropyl cellulose (HPC) were found to contain substantial concentrations...



https://www.ncbi.nlm.nih.gov › articles › pdf  PDF

**Removal of Peroxides in Polyethylene Glycols by Vacuum ...**
by V Kumar · 2006 · Cited by 78 — PEGs containing low and high levels of peroxides were vacuum dried from dilute and concentrated solutions (2.5%, 7.5%, 15%, and 50% wt/vol of PEG...

Wiley Online Library
https://onlinelibrary.wiley.com › 3527600035.bpol9012

**Biodegradation of Polyethers (Polyethylene Glycol ...**
by F Kawai · 2005 · Cited by 55 — The involvement of a PEG-oxidizing enzyme in the metabolism of PEG was suggested for various PEG (400–20,000)-utilizing bacteria (Kawai et al., 1984)...



ScienceDirect
https://www.sciencedirect.com › article › pii  PDF

**Impact of solvents on the in vitro genotoxicity of TMPTA ...**
by L Le Hegarat · 2020 · Cited by 2 — To investigate the impact of solvent on the cytotoxicity of TMPTA, TMPTA was prepared either in PEG-400 with a final concentration of 0.1 and 1% (base...



Agency for Toxic Substances and Disease Registry (.gov)
https://www.atsdr.cdc.gov › toxprofiles  PDF

**ATSDR Propylene Glycol Tox Profile**
Sep 15, 1997 — A Technical Report for propylene glycol was released in May 1993. ... exposed to propylene glycol by ingestion of contaminated water. Since propylene glycol ...
176 pages

EAGLEBEN-SA_00002059

8/14/23, 1:06 AM
Case 1:24-cv-00065-JLH    Document 478    Filed 09/07/26    Page 461 of 515 PageID #:
27364
PEG400 peroxide contaminant - Google Search

Shree Vallabh Chemical
https://www.shreechem.in › polyethylene-glycol

## Polyethylene Glycol - 200-10000 Molecular Weight PEG

Aug 13, 2004 — The chemical reactivity of polyethylene glycols is mainly confined to the two
terminal hydroxyl groups, which can be either esterified or etherified. However, ...

LSU Digital Commons
https://digitalcommons.lsu.edu › cgi › viewcontent PDF

## Characterization of polyethylene glycol hydrogels for ...

by A Datta · 2007 — PEG 200 and PEG 400 have very small mesh sizes, and show
negligible swelling of the gel. These mesh sizes are small in comparison to the hydrodynamic...

Defense Technical Information Center (.mil)
https://apps.dtic.mil › sti › pdfs › ADA460732 PDF

## Mechanisms to Detoxify Selected Organic Contaminants in ...

by G Kvesitadze · 2004 · Cited by 8 — Compound II can be reduced again to regenerate ferric
enzyme or react with hydrogen peroxide to form a catalytically inactive species, compound III...
144 pages

 European Commission
https://ec.europa.eu › health › docs › scop_o_158 PDF

## OPINION ON 2-Hydroxyethyl picramic acid

Jul 25, 2007 — peroxide. 2-Hydroxyethyl picramic acid is used as a hair colouring agent in semi-
permanent hair dye formulations at a maximum on-head concentration of 2%.
30 pages

**Sponsored**

hmroyal.com
https://www.hmroyal.com

## Peroxide Contamination - Crosslinking peroxides

Contact us today for product information or to discuss your chemical needs. Product selection
includes Armostat®, Ketjenblack®...
Why HM Royal · Find a Sales Rep. · Blog · Contact Us

 European Commission
https://ec.europa.eu › health › docs › scop_o_119 PDF

## OPINION ON 4-Hydroxypropylamino-3-nitrophenol

Dec 18, 2007 — Identification and chemical characterisation by NMR, IR and UV-spectrometry ...
C) oxidative dye formulation without hydrogen peroxide based developer.
23 pages

 wuxuwang.com
https://file.wuxuwang.com › HPE6 › HPE6_229 PDF

## 01 Excipients Prelims 1..9

Mar 10, 2009 — PEG 400 have been used as the vehicle for parenteral dosage forms. ... owing to
the presence of peroxide impurities and secondary.
6 pages

 Purdue Extension
https://www.extension.purdue.edu › extmedia

## Methods and Practices to Reduce Odor from Swine Facilities

Jan 31, 2001 — Chemical deodorants or oxidants can be added to the underfloor manure
storage. Dosages of example oxidants are 100-125 ppm of hydrogen peroxide and 100-500 ...

 Advanced Water Filters
https://www.advancedwaterfilters.com › faq-what-cont...

## What contaminants can reverse osmosis remove?

Jan 12, 2009 — ... and if your water is not chlorinated. List of chemical contaminants which can
be removed by carbon filtration ... Hydrogen Peroxide Hydrogen Selenide

EAGLEBEN-SA_00002060



**MDPI**
https://www.mdpi.com › ...

## Conservation of Waterlogged Wood—Past, Present and ...

by M Broda · 2021 · Cited by 48 — Iron is a common contaminant in waterlogged wood, especially associated with ... Then wooden elements were immersed in a 5% solution of PEG 4...



**United States Environmental Protection Agency (.gov)**
https://nepis.epa.gov › Exe › ZyPURL

## Potentially Toxic and Hazardous Substances in the ...

Feb 9, 2009 — Since the applicability and efficiencies of organic pollutant removal varies widely depending on the specific chemical/process, it was not found possible to ...



**University of Canterbury**
https://www.canterbury.ac.nz › oexp-engineering  PDF

## Prudent-Practices-in-the-Laboratory.pdf

Oct 1, 2006 — promptly upon receipt, and chemical stock should be rotated to ensure use of older chemicals. It is good practice to date peroxide formers upon receipt and ...
361 pages



**U.S. Consumer Product Safety Commission (.gov)**
https://www.cpsc.gov › ...  PDF

## Art and Craft Safety Guide

Apr 9, 2007 — Methyl methacrylate is a moderate irritant and sensitizer. It may be toxic if inhaled or following skin contact. · Benzoyl peroxide (an initiator or hardener) ...
31 pages

**DiVA portal**
https://www.diva-portal.org › FULLTEXT01  PDF

## Biocontrol of solid surfaces in hospitals using microbial- ...

by A Dural-Erem · 2019 · Cited by 9 — devices and contamination of unclean environmental surfaces.4 Wipes are increasingly used as more practical tools for cleaning reusable medical...
7 pages

**Cornell University**
https://ehs.cornell.edu › book › export › html

## Laboratory Safety Manual - Cornell EHS

Oct 15, 1996 — 8.7 Peroxide Forming Compounds ... Appendix J: Peroxide Forming Chemicals ... Due to potential chemical contamination, which may not always be visible, ...

More results  ⌄

EAGLEBEN-SA_00002061

OK to Enter
/EA/
8/15/23

**DOCKET NO.:** 107071.000583                                    **PATENT**
**Application No.:** 18/081,251
**Office Action Dated:  July 11, 2023**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

**In re Application of:**
    **Nagesh R. Palepu et al.**                    **Confirmation No.:  8743**

**Application No.:  18/081,251**                    **Group Art Unit:  1613**

**Filing Date:  December 14, 2022**                    **Examiner:   ERNST V ARNOLD**

**For:**    **FORMULATIONS OF BENDAMUSTINE**

Mail Stop AF
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

### REPLY PURSUANT TO 37 CFR § 1.116

In response to the Official Action dated July 11, 2023, reconsideration is respectfully requested in view of the amendments and/or remarks as indicated below:

☐    **Amendments to the Specification** begin on page of this paper.

☐    **Amendments to the Abstract** begin on page of this paper.

☒    **Amendments to the Claims** are reflected in the listing of the claims which begins on page 2 of this paper.

☐    **Amendments to the Drawings** begin on page of this paper and include an attached replacement sheet.

☒    **Remarks** begin on page 5 of this paper.

☒    The Commissioner is hereby authorized to charge any fee deficiency, charge any additional fees, or credit any overpayment of fees, associated with this application in connection with this filing, or any future filing, submitted to the U.S. Patent and Trademark Office during the pendency of this application, to Deposit Account No. 23-3050.

EAGLEBEN-SA_00002062

TO:        eofficemonitor@bakerlaw.com
FROM:    noreply@uspto.gov
CC:        patentcenter_eofficeaction@uspto.gov
SUBJECT: USPTO: Patent Electronic System - Correspondence Notification for Customer Number 23377

Mon Aug 21 05:27:59 EDT 2023

Dear Patent Center Customer:

Correspondence Address:

BakerHostetler
1735 Market Street
Suite 3300
Philadelphia,PENNSYLVANIA,19103-7501
UNITED STATES

This is a courtesy notification regarding the following USPTO patent application(s) associated with your Customer Number, 23377, that have new outgoing correspondence. This correspondence is now available for viewing in Patent Center.

The official date of notification of the outgoing correspondence will be indicated on the form (e.g., PTOL-90) accompanying the correspondence.

Disclaimer:

The list of documents shown below are provided as a courtesy and is not part of the official file wrapper. The content of the images shown in the Image File Wrapper is the official record.

| Application | Document | Mailroom Date | Attorney Docket No. |
|---|---|---|---|
| 18081251 | CTNF | 08/21/2023 | 107071.000583 |
| 18081251 | EXIN | 08/21/2023 | 107071.000583 |
| 18081251 | 892 | 08/21/2023 | 107071.000583 |
| 18081251 | A.NE.AFCP.D | 08/21/2023 | 107071.000583 |

To view your correspondence online, please sign in to Patent Center and then select Workbench/View correspondence. To update your email address(es), select Manage/Manage customer numbers.

If you have any questions, please contact the Patent Electronic Business Center (EBC) at ebc@uspto.gov or 866-217-9197 Monday – Friday, 6 a.m. to midnight ET.

Please do not reply to this email as it was sent from an unmonitored mailbox.

Sincerely,

The Patent Center Team

EAGLEBEN-SA_00002063

**UNITED STATES
PATENT AND TRADEMARK OFFICE**

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC ACKNOWLEDGEMENT RECEIPT

| APPLICATION #<br>**18/081,251** | RECEIPT DATE / TIME<br>**11/08/2023 08:41:38 AM Z ET** | ATTORNEY DOCKET #<br>**107071.000583** |
|---|---|---|

## Title of Invention

FORMULATIONS OF BENDAMUSTINE

## Application Information

| APPLICATION TYPE | Utility - Nonprovisional Application under 35 USC 111(a) | PATENT # | - |
|---|---|---|---|
| CONFIRMATION # | 8743 | FILED BY | VeAndra Luckett |
| PATENT CENTER # | 63189179 | FILING DATE | 12/14/2022 |
| CUSTOMER # | 23377 | FIRST NAMED INVENTOR | Nagesh R. Palepu |
| CORRESPONDENCE ADDRESS | - | AUTHORIZED BY | Scott Conley |

## Documents

# TOTAL DOCUMENTS: 3

| DOCUMENT | PAGES | | DESCRIPTION | SIZE (KB) |
|---|---|---|---|---|
| 107071.000583 Response NFOA 8-21-2023.pdf | | 15 | - | 497 KB |
| 107071.000583 Response NFOA 8-21-2023-A....pdf | (1-1) | 1 | Amendment/Request for Reconsideration-After Non-Final Rejection | 86 KB |
| 107071.000583 Response NFOA 8-21-2023-CLM.pdf | (2-3) | 2 | Claims | 87 KB |
| 107071.000583 Response NFOA 8-21-2023-REM.pdf | (4-15) | 12 | Applicant Arguments/Remarks Made in an Amendment | 488 KB |

EAGLEBEN-SA_00002064

## Digest

| DOCUMENT | MESSAGE DIGEST(SHA-512) |
|---|---|
| 107071.000583 Response NFOA 8-21-2023.pdf | 689F9BFF257EC8E3EEA6A40DF756E71DD6DE2E7DC2EE3B53 0EE9D9E8989607B97AB765A81627CD8C405484F69A1747A60D 531E1A396A8664FDC5EE42646B93EB |
| 107071.000583 Response NFOA 8-21-2023-A....pdf | 52223F432B7CF6A83F26C97B12267511BD932761900685E6AF 3ABFDA37CDD190C2AED0F775816B8AE70FFDF1DCBA2BAD8 7A3881F2DBCD87EF0B451FC9D5DDF36 |
| 107071.000583 Response NFOA 8-21-2023-CLM.pdf | F4A05C2EBC7B34FDF30358AC4D7BD92664B1A2A28D921672F A0F461CC96E0B0C3FA94F9DFF7A910BFF019AD977D49C0FC A0C428C212833FA7AD9B324778AD169 |
| 107071.000583 Response NFOA 8-21-2023-REM.pdf | A0DD63E5FBD815BFF02EE56247E73085ADD16082BB5787672 14794A1817C41B3BF64150E97F3E96C3714296DC777BD1DD5 889A0DB0A8890635A67E4F7AC37DC8 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**

If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application

**National Stage of an International Application under 35 U.S.C. 371**

If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**

If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

EAGLEBEN-SA_00002065

DOCKET NO.: 107071.000583                                                PATENT
Application No.: 18/081,251
Office Action Dated: August 21, 2023

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:

    Nagesh R. Palepu et al.                Confirmation No.: 8743

Application No.: 18/081,251                Group Art Unit: 1613

Filing Date: December 14, 2022             Examiner: ERNST V ARNOLD

For:  FORMULATIONS OF BENDAMUSTINE

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

### REPLY PURSUANT TO 37 CFR § 1.111

In response to the Official Action dated August 21, 2023, reconsideration is respectfully requested in view of the amendments and/or remarks as indicated below:

☐    **Amendments to the Specification** begin on page of this paper.

☐    **Amendments to the Abstract** begin on page of this paper.

☒    **Amendments to the Claims** are reflected in the listing of the claims which begins on page 2 of this paper.

☐    **Amendments to the Drawings** begin on page of this paper and include an attached replacement sheet.

☒    **Remarks** begin on page 4 of this paper.

☒    The Commissioner is hereby authorized to charge any fee deficiency, charge any additional fees, or credit any overpayment of fees, associated with this application in connection with this filing, or any future filing, submitted to the U.S. Patent and Trademark Office during the pendency of this application, to Deposit Account No. 23-3050.

EAGLEBEN-SA_00002066

DOCKET NO.:  107071.000583                                              **PATENT**
Application No.:  18/081,251
Office Action Dated:  **August 21, 2023**

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims:**

1.      (Currently Amended) A sterile vial containing a liquid bendamustine-containing composition comprising

about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 25 mg/mL ~~20 mg/mL to about 60 mg/mL~~;

a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

a stabilizing amount of an antioxidant,

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

2-3.    (Cancelled)

4.      (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol.

5.      (Original) The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

6.      (Original) The composition of claim 1, wherein the composition is stable for at least about 15 months at 5 °C or for at least about 15 months at 25 °C.

7.      (cancelled)

8.      (Original) The sterile vial of claim 1, wherein the liquid bendamustine-containing composition further comprises ethanol.

9-10.   (Cancelled)

4894-0848-0634.1

EAGLEBEN-SA_00002067

DOCKET NO.: 107071.000583                                                      PATENT
Application No.: 18/081,251
Office Action Dated: August 21, 2023

11.    (Currently Amended) A liquid bendamustine-containing composition comprising

<u>100 mg of</u> bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing

amount of an antioxidant, in a pharmaceutically acceptable fluid;

wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and

optionally one or more of propylene glycol, ethanol, benzyl alcohol and

glycofurol; and

wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from

about 25 mg/mL ~~20 mg/mL to about 60 mg/mL~~,

wherein the total impurities resulting from the degradation of the bendamustine is less

than about 5% peak area response, as determined by HPLC at a wavelength of 223

nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.


12-13.  (Cancelled)


14.    (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol.


15.    (Original) The composition of claim 11, wherein the antioxidant is monothioglycerol in a

concentration of about 5 mg/mL.


16-17.  (cancelled)


18.    (Previously Presented) The composition of claim 11, further comprising ethanol.

4894-0848-0634.1

EAGLEBEN-SA_00002068

DOCKET NO.: 107071.000583                                    PATENT
Application No.: 18/081,251
Office Action Dated: August 21, 2023

REMARKS

Claim 1 has been amended to include subject matter of claims 2 and 3, now cancelled. Claim 11 has been amended to include subject matter of claims 12 and 13. No new matter has been added. Applicant reserves the right to file the cancelled claims in one or more continuing applications.

Claim Rejections – 35 U.S.C. § 103

The Examiner alleges that claims 1-3, 6, 8, 11-13 and 18 would have been obvious over Brittain[1] in view of Kumar,[2] McGinity,[3] and Wasylaschuk.[4] Without the benefit of Applicant's specification, those of ordinary skill in the art would not have produced a composition including ~100 mg of bendamustine (or a salt thereof) at a concentration of ~25 mg/mL, along with an antioxidant and any of the recited fluids, nor would they have considered containing such a composition is a sterile vial, as claimed. Moreover, the person of ordinary skill in the art would not have predicted that any recited composition would have exhibited the stability presently claimed. Applicant respectfully requests reconsideration and withdrawal of the rejection.

**Those of Ordinary Skill in the Art Would Not Have Included Polyethylene Glycol and an Antioxidant in Any Liquid Bendamustine Composition**

The Examiner alleges that a person skilled in the art would have prepared a bendamustine composition with polyethylene glycol (PEG). Action at 11. The Examiner further contends that since PEG was known to produce hydrogen peroxide, the skilled person would have added an antioxidant to the liquid to prevent that from happening. Action at 12. The evidence of record establishes that this proposed scenario would not have been undertaken by anyone skilled in the art.

The rejection relies on a person of ordinary skill picking one of Britain's lyophilized compositions and selecting PEG as a reconstitution vehicle, prior to intravenous administration. Office Action at 11. The rejection notes that PEG's use as an excipient was impeded by its oxidative liabilities. *Id.* at 12. The rejection supposes that, rather than selecting a less troublesome reconstitution vehicle, *e.g.* water, the person of ordinary skill would have proceeded

---

[1] U.S. Publication No. 2006/0159713
[2] AAPS PharmSciTech 2006;7(3):E1-E7
[3] Journal of Pharmaceutical Sciences 1975;64(2):356-357
[4] Journal of Pharmaceutical Sciences, vol. 96, no. 1, January 2007:106-116

Page 4 of 15

4894-0848-0634.1

EAGLEBEN-SA_00002069

DOCKET NO.: 107071.000583                                          **PATENT**
Application No.: 18/081,251
Office Action Dated: **August 21, 2023**

with PEG because the oxidative problem can be "cured" by adding an antioxidant. The cited art, as well as expert testimony presented during district court litigation, demonstrates that this series of events would not have taken place.

Industry guidance at the time of the invention discouraged antioxidant use in pharmaceuticals, instructing that antioxidants should only be used when there is no other way to avoid oxidation. For example, the European Agency for the Evaluation of Medicinal Product (EMEA) stated:

> Antioxidants should only be included in a formulation if it has been proven hat their use cannot be avoided. This applies to cases where the manufacturing process is optimised to minimise the potential for oxidation.

(EMEA Guidance at 8 of 9). Indeed, it had been suggested at the time of the invention that the use of antioxidants in liquid formulations intended for parenteral administration was "now in decline" and that a "preferred method of preventing oxidation is simply to exclude oxygen":

> **Use of Excipients**
> Excipients may be useful in preventing chemical and physical instability. Antioxidants are included in parenteral formulations, although their use is now in decline, and EU guidelines discourage their use unless no other alternative exists (see sect. "Parenteral Products and the

Broadhead at 334.

The Office Action relies on a person of ordinary skill not only selecting the troublesome PEG for lyophilizate dissolution, it requires that the person of ordinary skill also try to address PEG's known oxidative liabilities by pre-emptively including an antioxidant. Expert testimony clearly explains why a person of ordinary skill in the art would not have selected an antioxidant-containing PEG excipient to prepare a liquid bendamustine product, especially since the only known therapeutic use of such a product would have been for parenteral administration.

During district court litigation, an antioxidant-PEG excipient hypothesis, similar to the one proposed by the Examiner, was alleged. There, the court found Dr. Siepmann's testimony persuasive. Dr. Siepmann testified that a person of ordinary skill in the art would not have chosen PEG as a bendamustine excipient. Dr. Siepmann explained that none of the four marketed PEG-containing parenteral formulations available in the United States as of this application's priority date contained an antioxidant. In addition, a person of skill in the art would have understood that antioxidants were not routinely added to any PEG-containing formulation that

4894-0848-0634.1

EAGLEBEN-SA_00002070

DOCKET NO.: 107071.000583                                                                           PATENT
Application No.: 18/081,251
Office Action Dated: August 21, 2023

would have been parenterally administered. In fact, adding an antioxidant to fix the degradation caused by PEG was not conventional, so a person of skill in the art would not have used PEG if it necessitated using an antioxidant. And finally, a person of skill in the art would not have used PEG with a drug that was subject to degradation *via* PEG's oxidation products.

As Dr. Siepmann's testified:

355. A review of the marketed parenteral formulations available in the United States as of the priority date that contained PEG indicates that those formulations do not have antioxidants:

- Ativan® (lorazepam) contains "0.18 mL polyethylene glycol 400 in propylene glycol with 2.0% benzyl alcohol as preservative." Ativan® Label at 1 (2006), JDG_BENDA_00005945 at 5948.

- Busulfex™ (busulfan) contains "N-N-dimethylacetamide (DMA) 33% wt/wt and polyethylene glycol 400, 67% wt/wt." Busulfex™ Label at 1 (1999), JDG_BENDA_00005643 at 5643.

- Robaxin® (methocarbamol) contains "polyethylene glycol 300, NF 0.5 mL, Water for Injection, USP q.s." Robaxin® Label at 1 (2003), JDG_BENDA_00005854 at 5854.

- VePesid® (etoposide) contains 60% PEG 300, 30% ethanol, 8.0% Tween 80, 3% benzyl alcohol, and 2 mg/mL citric acid. Strickley 2004 at 219, JDG_BENDA_00003290 at 3308.

356. Of the four formulations listed above containing PEG, none of them contain excipients that are listed in Nema 1997's list of Antioxidants/Reducing Agents (Table IV). Nema 1997 at 167, JDG_BENDA_00002272 at 2273. This state of the art refutes clearly Dr. Pinal's opinion that the POSA would have used PEG and then added an antioxidant to avoid the oxidation of PEG.

358. From the above information, the POSA would have understood that, as of the priority date, none of the four commercially available parenteral formulations that contained PEG 300 or PEG 400 also contained an antioxidant. This would have taught the POSA that antioxidants were not routinely added to parenteral formulations containing PEG. ████

████████████                                                        REDACTED

4894-0848-0634.1

EAGLEBEN-SA_00002071

**DOCKET NO.:** 107071.000583          **PATENT**
**Application No.:** 18/081,251
**Office Action Dated: August 21, 2023**

359. The POSA likewise would have understood that Dr. Pinal's suggested formulation approach—to add PEG to the formulation and also to add an antioxidant to fix the degradation caused by the PEG—was not conventional. Rather, in view of the small number of marketed parenteral drugs containing PEG, and the fact that none of those drugs contained an antioxidant, the POSA would have inferred that formulators simply did not use PEG with drugs that might be susceptible to degradation via PEG's oxidation products. In my opinion, and based on my experience as a formulator, the POSA would not have been motivated or had reason to add PEG to a formulation if she or he believed that doing so would have necessitated also adding an antioxidant.

360. In view of the lack of any marketed parenteral drugs containing PEG and an antioxidant, the POSA likely would have hypothesized that PEG was only used with drugs that were not subject to degradation by PEG oxidation products (for example, acid-catalyzed esterification). To test that hypothesis, the POSA could have reviewed the molecular structures of the four APIs listed above. I have depicted those structures below. Most notably, none of those molecules contain a carboxylic acid moiety. As such, none of those molecules would have been prone to esterification via the PEG molecule, which is the only degradation pathway that Dr. Pinal has identified as motivating the use of an antioxidant in formulations of the claimed inventions. This would have bolstered the POSA's understanding that PEG was only used in liquid parenteral formulations where the active ingredients were not susceptible to degradation via PEG's oxidation products. Because bendamustine plainly is a drug molecule whose degradation is accelerated by such oxidation products—as Dr. Pinal acknowledges—the POSA would have avoided using PEG with bendamustine.

Siepmann Report at ¶¶355-356, 358-360, of record in this application.

4894-0848-0634.1

EAGLEBEN-SA_00002072

DOCKET NO.: 107071.000583                                    **PATENT**
Application No.: 18/081,251
Office Action Dated: August 21, 2023

Indeed, not even Wasylaschuk recommends adding antioxidant to liquid formulations. Instead, Wasylaschuk's refers to antioxidant use only in ***solid dosage forms***:

> Controlling HPO-drug reactions in solid dosage forms can be achieved by selecting excipients with low HPO levels, controlling crystallinity of the drug substance, and by adding antioxidants to stop HPO propagation and single-electron degradation processes.

Waslylaschuk at page 113, left column.

No evidence in the cited art supports the sequence of steps that the Office Action alleges would have been taken by a person of ordinary skill in the art. PEG would not have been selected for bendamustine's dissolution, but even if it was, antioxidants would have been excluded, not added. Applicant respectfully requests reconsideration and withdrawal of the rejection.

**Those of Ordinary Skill in the Art Would Not Have Had Any Reason to Prepare a Liquid Composition Having a Bendamustine Concentration of about 20 mg/ml to 60 mg/mL**

The Examiner alleges that reconstituting Brittain's lyophilized bendamustine with PEG to a concentration of about 25 mg/mL would have been obvious because "it is merely adding an appropriate amount of a pharmaceutically acceptable fluid. . . to a concentration of about . . . about 25 mg/mL bendamustine prior to administration. . . . It is a simple dilution and calculation any pharmaceutical artisan can perform with no inventive skill." Office Action at 12. But the obviousness inquiry does not ask whether a person of ordinary skill ***could have*** dissolved Brittain's lyophilized compositions to a concentration of about 25 mg/mL - it requires that the Examiner establish ***why*** a person of ordinary skill ***would have***.

That bendamustine could *theoretically* be diluted to a concentration of about 25 mg/mL fails to establish a *prima facie* case of obviousness. The obviousness inquiry requires that the Examiner explain why a person of ordinary skill in the art would have selected ~25 mg/mL as a suitable bendamustine concentration. Here, the evidence establishes that the skilled person would have prepared much more dilute bendamustine concentrations.

At the time of this application's filing, a lyophilized bendamustine product had been approved for use in the United States - Treanda®. The prescribing information for Treanda® would have been considered by a person of ordinary skill in the art seeking to use any bendamustine formulation. The Prescribing Information for Treanda® instructs that lyophilized bendamustine should be reconstituted with water to a concentration of ***no more than 5 mg/mL*** before being further diluted to 0.2 – 0.5 mg/mL:

4894-0848-0634.1

EAGLEBEN-SA_00002073

**DOCKET NO.:** 107071.000583                                                    **PATENT**
**Application No.:** 18/081,251
**Office Action Dated: August 21, 2023**

2.3 Reconstitution/Preparation for Intravenous Administration
Aseptically reconstitute each TREANDA vial as follows:
o    25 mg TREANDA vial: Add 5 mL of only Sterile Water for Injection, USP.
o    100 mg TREANDA vial: Add 20 mL of only Sterile Water for Injection, USP.

Shake well to yield a clear, colorless to a pale yellow solution with a bendamustine HCl concentration of 5 mg/mL. The lyophilized powder
should completely dissolve in 5 minutes. If particulate matter is observed, the reconstituted product should not be used.

Aseptically withdraw the volume needed for the required dose (based on 5 mg/mL concentration) and immediately transfer to a 500 mL infusion
bag of 0.9% Sodium Chloride Injection, USP (normal saline). As an alternative to 0.9% Sodium Chloride Injection, USP (normal saline), a 500

mL infusion bag of 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, may be considered. The resulting final concentration of
bendamustine HCl in the infusion bag should be within 0.2 – 0.6 mg/mL. The reconstituted solution must be transferred to the infusion bag
within 30 minutes of reconstitution. After transferring, thoroughly mix the contents of the infusion bag. The admixture should be a clear and
colorless to slightly yellow solution.

(Treanda® Prescribing Information at Section 2.3; *see also,* Brittain at paragraph [0100] (stating that Brittain's lyophilized formulations are reconstituted with water and then further diluted)). Brittain refers to polyethylene glycol as an example of a "liquid carrier or vehicle" for preparing the ultimate dosage form. (Brittain at paragraph [0067]). Brittain does not suggest, however, that the skilled person should deviate from the concentrations specified by Treanda®.

While Treanda® refers to a "concentrated solution of bendamustine which is subsequently further diluted for administration," it is clear that Treanda® refers to 5 mg/mL (bendamustine in water), which is much more dilute than presently claimed. Treanda® then instructs that this concentration should be "immediately" transferred to an infusion bag to provide the 0.2-0.6 mg/mL concentration for administration. Without Applicant's disclosure, those skilled in the art would have had no reason to prepare more concentrated bendamustine liquids, *e.g.,* 25 mg/mL, when preparing bendamustine.

Brittain does not suggest that the skilled person should deviate from the concentrations specified by Treanda®. Without the benefit of Applicant's specification, they would have had no reason to prepare ~100 mg of bendamustine at a 25 mg/ml concentration, as claimed. Applicant respectfully requests reconsideration and withdrawal of the rejection.

**Those of Ordinary Skill in the Art Would Not Have Included an Antioxidant in Any Bendamustine Composition**

Industry guidance discouraged antioxidant use, suggesting that it be reserved when no other means to protect the active pharmaceutical ingredient or drug product can be established. Those of ordinary skill in the art would not have expected the addition of an antioxidant to be beneficial to bendamustine's storage stability because no reference had suggested that bendamustine degraded *via* an oxidative mechanism.

4894-0848-0634.1

EAGLEBEN-SA_00002074

DOCKET NO.:  107071.000583                                                         PATENT
Application No.:  18/081,251
Office Action Dated:  August 21, 2023

***Brittain does not teach that an antioxidant should be added to a bendamustine composition***

Brittain does not suggest that lyophilized bendamustine requires an antioxidant. None of Brittain's exemplified compositions includes an antioxidant and the publication states that an antioxidant could be used as a lyophilization excipient only "if desired."  (Brittain at paragraph [0088]).

***The art does not teach that bendamustine can degrade via an oxidative mechanism***

Bendamustine rapidly degrades in water *via* several pathways, none of which are oxidative. (*See, e.g.,* Specification at page 2).  One pathway by which bendamustine degrades is *via* aziridinium ring hydrolysis, which produces HP1 and HP2:

(Brittain at paragraph [0022]; Maas,[5] Studies and Results, Scheme; U.S. 8,344,066 (the 066 patent)[6] at col. 1, lines 50-65; col. 4, lines 33-45).

Bendamustine also degrades *via* dimer formation, which occurs when a molecule of bendamustine attacks the aziridinium ring:

---

[5] Maas is of record in this application.
[6] The 066 patent is of record in this application.

4894-0848-0634.1

EAGLEBEN-SA_00002075

DOCKET NO.: 107071.000583                                                    **PATENT**
Application No.: 18/081,251
Office Action Dated: **August 21, 2023**

(Brittain at paragraph [0027]; the 066 patent at col. 4, lines 50-67).

Another pathway for bendamustine degradation is esterification of the -COOH with mono- and poly-hydroxy-containing compounds. Various bendamustine ester degradation products have been reported in the art:

(Brittain at paragraph [0111]; the 066 patent at col. 5, lines 13-44).

While many bendamustine degradation mechanisms have been reported, the art did *not* teach that bendamustine degrades *via* any oxidative pathway.

Page 11 of 15

4894-0848-0634.1

EAGLEBEN-SA_00002076

DOCKET NO.:  107071.000583                                                        **PATENT**
Application No.:  18/081,251
Office Action Dated:  August 21, 2023

"Antioxidants are used to reduce the oxidation of active substances and excipients in the finished product."  (Note for Guidance, European Agency for the Evaluation of Medicinal Products, page 8 of 9 (of record)).  Since bendamustine was not known to degrade *via* an oxidative process, those of ordinary skill in the art would not have tried adding an antioxidant to a bendamustine composition.[7]

### The Recited Bendamustine-Containing Liquid Compositions are Surprisingly and Unexpectedly Stable During Storage

As reported in the specification, a composition including bendamustine in PEG exhibited 2.28% of impurities after storage at room temperature for 15 days and 41.9% impurities after storage for 15 days at 40 °C.  (Specification at Example 3, page 13, Table 3, reproduced below).

| Antioxidant | $T^{o}C$ | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
| | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

As Dr. Siepmann has testified, based on these poor stability results, a person would have forsaken development of a liquid bendamustine/PEG composition.

359.     The POSA likewise would have understood that Dr. Pinal's suggested formulation approach—to add PEG to the formulation and also to add an antioxidant to fix the degradation caused by the PEG—was not conventional.  Rather, in view of the small number of

---

[7] Noteworthy is that the Treanda® lyophilized product does not include any antioxidant – it contains only bendamustine HCl and mannitol. (Treanda® at Section 11).

4894-0848-0634.1

EAGLEBEN-SA_00002077

**DOCKET NO.:**  107071.000583                                                                    **PATENT**
**Application No.:**  18/081,251
**Office Action Dated:  August 21, 2023**

marketed parenteral drugs containing PEG, and the fact that none of those drugs contained an antioxidant, the POSA would have inferred that formulators simply did not use PEG with drugs that might be susceptible to degradation via PEG's oxidation products.  In my opinion, and based on my experience as a formulator, the POSA would not have been motivated or had reason to add PEG to a formulation if she or he believed that doing so would have necessitated also adding an antioxidant.

469.    I further agree with Dr. Pinal that it was known that PEG could form various degradation products.  As I explain above, the POSA would have viewed the degradation products of PEG as a disadvantage that would have discouraged the use of that solvent.  *See, e.g.*, ¶¶ 339–360.

470.    I disagree, however, with Dr. Pinal that PEG's known sensitivity to oxidation would have motivated or provided reason for the POSA to use an antioxidant with PEG.  I likewise disagree that the POSA would have been motivated or had reason to use an antioxidant in conjunction with PG and bendamustine.

471.    As I explain in detail above, the POSA would have been strongly motivated to avoid using an antioxidant in the formulation.  *See* ¶¶ 344–360.  The POSA would have preferred to keep the formulation as simple as possible; adding an antioxidant would have introduced substantial complexity into the formulation, including increasing the risk of unwanted interactions between the excipients and bendamustine.  *See* ¶¶ 344–345.  The POSA would have understood that antioxidants are particularly reactive and likely to cause unwanted interactions in the formulation.  *See* ¶ 346.  Adding an antioxidant would also have been undesirable because the concentration of the antioxidant would have to be maintained throughout the shelf life of the product—in effect, the stability of the product would become dependent on the antioxidant.  *See* ¶ 347.  The POSA also would have understood that an antioxidant might not completely solve any potential oxidation problem and that finding an appropriate antioxidant would, in the first instance, be an unpredictable research effort.  *See* ¶¶ 349–352.

4894-0848-0634.1

EAGLEBEN-SA_00002078

DOCKET NO.: 107071.000583                                      **PATENT**
Application No.: 18/081,251
Office Action Dated: **August 21, 2023**

(*See* Siepmann Report at ¶¶ 359, 469-71, of record in this application)

A composition presenting such a poor initial stability profile would have been deemed unsuitable as a starting point to create a storage-stable composition. Despite the poor stability of bendamustine/PEG, surprisingly, adding an antioxidant substantially eliminated the formation of degradation products. As shown in the specification, and Table 3 (above), a bendamustine/PEG composition including antioxidant exhibited no substantial increase in degradants after storage for 15 days at either room temperature or 40 °C. (Specification at Example 3, page 13, Table 3).

The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if an antioxidant is added. Such an unexpected result could not have been predicted. This result is particularly unexpected given the absence of any report in the literature of an oxidative degradation pathway for bendamustine. The claims are patentable for at least this reason and Applicant respectfully requests reconsideration and withdrawal of the rejection.

The Examiner alleges that claims 4, 5, 14, and 15 would have been obvious over the Brittain, Kumar, McGinity, and Wasylaschuck, in further view of Tait.[8] As discussed above, the combination of Brittain, Kumar, McGinity, and Wasylaschuck fails to render any of claim 1-3, 6, 8, 11-13, or 18 unpatentable. Tait does not cure those deficiencies, nor is it allege to. Tait is merely cited for its purported disclosure of antioxidants. Claims 4, 5, 14, and 15 are patentable and applicant requests withdrawal of the rejection.

## CONCLUSION

Applicant respectfully submits that the present application is in condition for allowance. Reconsideration of the application and an early Notice of Allowance are respectfully requested. In the event that the Examiner cannot allow the application for any reason, the Examiner is encouraged to contact Applicant's representative.

---

[8] WO Publication No. 200202125

Page 14 of 15

4894-0848-0634.1

EAGLEBEN-SA_00002079

**DOCKET NO.:** 107071.000583                                          **PATENT**
**Application No.:** 18/081,251
**Office Action Dated: August 21, 2023**


Date: November 8, 2023                          / Scott R. Conley /
                                                Scott R. Conley
                                                Registration No. 57289


BakerHostetler
312 Walnut Street
Suite 3200
Cincinnati, OH 45202
Telephone: 513.929.3400
Facsimile: 513.929.0303

Page 15 of 15

4894-0848-0634.1

EAGLEBEN-SA_00002080

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| **PATENT APPLICATION FEE DETERMINATION RECORD** Substitute for Form PTO-875 | Application or Docket Number 18/081,251 | Filing Date 12/14/2022 | ☐ To be Mailed |
|---|---|---|---|

**ENTITY:** ☑ LARGE   ☐ SMALL   ☐ MICRO

### APPLICATION AS FILED - PART I

| FOR | (Column 1) NUMBER FILED | (Column 2) NUMBER EXTRA | RATE ($) | FEE ($) |
|---|---|---|---|---|
| ☐ BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | |
| ☐ SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | |
| ☐ EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | |
| TOTAL CLAIMS (37 CFR 1.16(i)) | minus 20 = | * | x $100 = | |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | minus 3 = | * | x $480 = | |
| ☐ APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | |

### APPLICATION AS AMENDED - PART II

| AMENDMENT 11/08/2023 | | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|
| | Total (37 CFR 1.16(i)) | * 9 | Minus | ** 20 | = 0 | x $100 = | 0 |
| | Independent (37 CFR 1.16(h)) | * 2 | Minus | *** 3 | = 0 | x $480 = | 0 |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | |
| | | | | | | TOTAL ADD'L FEE | 0 |

| AMENDMENT | | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|
| | Total (37 CFR 1.16(i)) | * | Minus | ** | = | x $0 = | |
| | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | x $0 = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | |
| | | | | | | TOTAL ADD'L FEE | |

| * If the entry in column 1 is less than the entry in column 2, write "0" in column 3. | LIE |
|---|---|
| ** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20". | /CHRISTINE V MOORE/ |
| *** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3". | |

The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

EAGLEBEN-SA_00002081

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| | | | |
|---|---|---|---|
| 23377 | 7590 | 11/22/2023 | |

BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501

| EXAMINER |
|---|
| ARNOLD, ERNST V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1613 | |

DATE MAILED: 11/22/2023

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/081,251 | 12/14/2022 | Nagesh R. Palepu | 107071.000583 | 8743 |

TITLE OF INVENTION: FORMULATIONS OF BENDAMUSTINE

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1200 | $0.00 | $0.00 | $1200 | 02/22/2024 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 40% the amount of undiscounted fees, and micro entity fees are 20% the amount of undiscounted fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

Page 1 of 3

PTOL-85 (Rev. 11/23)

EAGLEBEN-SA_00002082

**PART B - FEE(S) TRANSMITTAL**

Complete and send this form, together with applicable fee(s), by mail or fax, or via the USPTO patent electronic filing system.

| By mail, send to: | Mail Stop ISSUE FEE | By fax, send to: | (571)-273-2885 |
| --- | --- | --- | --- |

Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications. **Because electronic patent issuance may occur shortly after issue fee payment, any desired continuing application should preferably be filed prior to payment of this issue fee in order not to jeopardize copendency.**

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

23377          7590          11/22/2023

BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via the USPTO patent electronic filing system or by facsimile to (571) 273-2885, on the date below.

| | (Typed or printed name) |
| --- | --- |
| | (Signature) |
| | (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
| --- | --- | --- | --- | --- |
| 18/081,251 | 12/14/2022 | Nagesh R. Palepu | 107071.000583 | 8743 |

TITLE OF INVENTION: FORMULATIONS OF BENDAMUSTINE

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
| --- | --- | --- | --- | --- | --- | --- |
| nonprovisional | UNDISCOUNTED | $1200 | $0.00 | $0.00 | $1200 | 02/22/2024 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
| --- | --- | --- |
| ARNOLD, ERNST V | 1613 | 514-394000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/AIA/122 or PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/AIA/47 or PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE          (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Government

4a. Fees submitted:     ☐ Issue Fee     ☐ Publication Fee (if required)

4b. Method of Payment: *(Please first reapply any previously paid fee shown above)*

☐ Electronic Payment via the USPTO patent electronic filing system     ☐ Enclosed check     ☐ Non-electronic payment by credit card (Attach form PTO-2038)

☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. _____

5. **Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.

NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.

NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____     Date _____

Typed or printed name _____     Registration No. _____

PTOL-85 Part B (11/23) Approved for use through 03/31/2026          OMB 0651-0033          U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

EAGLEBEN-SA_00002083

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/081,251 | 12/14/2022 | Nagesh R. Palepu | 107071.000583 | 8743 |

| | | |
|---|---|---|
| 23377    7590    11/22/2023 | EXAMINER | |
| BakerHostetler | ARNOLD, ERNST V | |
| 1735 Market Street | | |
| Suite 3300 | ART UNIT | PAPER NUMBER |
| Philadelphia, PA 19103-7501 | 1613 | |

DATE MAILED: 11/22/2023

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

Page 3 of 3

PTOL-85 (Rev. 11/23)

EAGLEBEN-SA_00002084

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EAGLEBEN-SA_00002085

| *Notice of Allowability* | Application No.<br>18/081,251 | Applicant(s)<br>Palepu et al. | |
|---|---|---|---|
| | Examiner<br>ERNST V ARNOLD | Art Unit<br>1613 | AIA (FITF) Status<br>No |

**-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address-***

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to 11/8/23.

   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are <u>See Continuation Sheet</u> . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov.**

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

   **Certified copies:**

   a) ☐All     b) ☐ Some*     c) ☐ None of the:

   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
   3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   * Certified copies not received: _____ .

   Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.

   ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .

   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)
2. ☐ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____.
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____.
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____.

5. ☐ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____.

/ERNST V ARNOLD/
Primary Examiner, Art Unit 1613

EAGLEBEN-SA_00002086

**Continuation Sheet (PTOL-37)**                                    **Application No. 18/081,251**

Continuation of 3. The allowed claim(s) is/are: 1,4-6,8,11,14-15 and 18

EAGLEBEN-SA_00002087

Application/Control Number: 18/081,251                                                    Page 2
Art Unit: 1613

## Notice of Pre-AIA or AIA Status

The present application is being examined under the pre-AIA first to invent

provisions.

## Claim Status

Claims 2, 3, 7, 9, 10, 12, 13, 16 and 17 have been cancelled.

Claims 1, 4-6, 8, 11, 14, 15 and 18 are pending.

## Withdrawn rejections

Applicant's amendments and arguments filed 11/8/23 are acknowledged and

have been fully considered.  The Examiner has re-weighed all the evidence of record.

Any rejection and/or objection not specifically addressed below is herein withdrawn.

Claims 1-3, 6, 8, 11-13 and 18 were rejected under 35 U.S.C. 103(a) as being

unpatentable over Brittain et al. (US 20060159713; of record) and Kumar et al. (AAPS

PharmSciTech 2006;7(3):E1-E7) and McGinity et al. (Journal of Pharmaceutical

Sciences 1975;64(2):356-357) and Wasylaschuk et al. (JOURNAL OF

PHARMACEUTICAL SCIENCES, VOL. 96, NO. 1, JANUARY 2007:106-116); and

claims 4, 5, 14 and 15 were rejected under 35 U.S.C. 103(a) as being unpatentable

over Brittain et al. (US 20060159713) and Kumar et al. (AAPS PharmSciTech

2006;7(3):E1-E7) and McGinity et al. (Journal of Pharmaceutical Sciences

1975;64(2):356-357) and Wasylaschuk et al. (JOURNAL OF PHARMACEUTICAL

SCIENCES, VOL. 96, NO. 1, JANUARY 2007:106-116), as applied to claims 1-3, 6, 8,

EAGLEBEN-SA_00002088

Application/Control Number: 18/081,251                                        Page 3
Art Unit: 1613

11-13 and 18 above, in further view of Tait et al. (WO 0202125). Applicant's

amendments and arguments are persuasive.

### *Allowable Subject Matter*

The following is an examiner's statement of reasons for allowance: Applicant's

arguments, especially concerning the expert testimony of Dr. Siepmann which was

found persuasive by the district court, carries more weight than the Examiner's position.

The rejections are withdrawn.

Any comments considered necessary by applicant must be submitted no later

than the payment of the issue fee and, to avoid processing delays, should preferably

accompany the issue fee.  Such submissions should be clearly labeled "Comments on

Statement of Reasons for Allowance."

### *Conclusion*

Claims 1, 4-6, 8, 11, 14, 15 and 18 are allowed.

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to ERNST V ARNOLD whose telephone number is

(571)272-8509. The examiner can normally be reached M-F 7-3:30.

Examiner interviews are available via telephone, in-person, and video

conferencing using a USPTO supplied web-based collaboration tool. To schedule an

interview, applicant is encouraged to use the USPTO Automated Interview Request

(AIR) at http://www.uspto.gov/interviewpractice.

EAGLEBEN-SA_00002089

Application/Control Number: 18/081,251                                                    Page 4
Art Unit: 1613

     If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Brian Y Kwon can be reached on 571-272-0581. The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

     Information regarding the status of published or unpublished applications may be

obtained from Patent Center. Unpublished application information in Patent Center is

available to registered users. To file and manage patent submissions in Patent Center,

visit: https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-

center for more information about Patent Center and

https://www.uspto.gov/patents/docx for information about filing in DOCX format. For

additional questions, contact the Electronic Business Center (EBC) at 866-217-9197

(toll-free). If you would like assistance from a USPTO Customer Service

Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/ERNST V ARNOLD/
Primary Examiner, Art Unit 1613

EAGLEBEN-SA_00002090

| | Index of Claims | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|
| | | 18/081,251 | Palepu et al. |
| | | **Examiner** | **Art Unit** |
| | | ERNST V ARNOLD | 1613 |

| ✓ | **Rejected** | - | **Cancelled** | N | **Non-Elected** | A | **Appeal** |
|---|---|---|---|---|---|---|---|
| = | **Allowed** | ÷ | **Restricted** | I | **Interference** | O | **Objected** |

| CLAIMS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ☑ Claims renumbered in the same order as presented by applicant | | | | | ☐ CPA | ☑ T.D. | ☐ R.1.47 | | |

| CLAIM | | DATE | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 03/09/2023 | 03/09/2023 | 11/13/2023 | | | | | |
| | 1 | 1 | ✓ | = | | | | | |
| | 2 | 2 | ✓ | - | | | | | |
| | 3 | 3 | ✓ | - | | | | | |
| | 4 | 4 | ✓ | = | | | | | |
| | 5 | 5 | ✓ | = | | | | | |
| | 6 | 6 | ✓ | = | | | | | |
| | 7 | 7 | ✓ | - | | | | | |
| | 8 | 8 | ✓ | = | | | | | |
| | 9 | 9 | ✓ | - | | | | | |
| | 10 | 10 | ✓ | - | | | | | |
| | 11 | 11 | ✓ | = | | | | | |
| | 10 | 12 | ✓ | - | | | | | |
| | 11 | 13 | ✓ | - | | | | | |
| | 12 | 14 | ✓ | = | | | | | |
| | 13 | 15 | ✓ | = | | | | | |
| | 14 | 16 | ✓ | - | | | | | |
| | 15 | 17 | ✓ | - | | | | | |
| | 16 | 18 | ✓ | = | | | | | |

EAGLEBEN-SA_00002091

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 18/081,251 | Palepu et al. |
| | **Examiner** | **Art Unit** |
| | ERNST V ARNOLD | 1613 |

### CPC - Searched*

| Symbol | Date | Examiner |
|---|---|---|
| (A61K31/4184 OR A61K9/08 OR A61K47/10 OR A61K47/12 OR A61K47/18 OR A61K47/20 OR A61K47/22 OR A61K9/0019).cpc. AND ((bendamustine OR (nitrogen ADJ mustard) OR (alkylating WITH agent)) AND antioxidant AND (PEG OR (polyalkylene ADJ glycol) OR (polyethylene ADJ glycol))) | 03/09/2023 | eva |

### CPC Combination Sets - Searched*

| Symbol | Date | Examiner |
|---|---|---|
| | | |

### US Classification - Searched*

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |

* See search history printout included with this form or the SEARCH NOTES box below to determine the scope of the search.

### Search Notes

| Search Notes | Date | Examiner |
|---|---|---|
| inventor/assignee name PALM/PE2E | 03/09/2023 | eva |
| PE2E | 03/09/2023 | eva |
| GOOGLE SCHOLAR | 03/09/2023 | eva |
| updated IDS | 07/05/2023 | eva |
| GOOGLE | 08/15/2023 | eva |
| PE2E | 11/13/2023 | eva |

|  |  |
|---|---|
| | |

| U.S. Patent and Trademark Office | Page 1 of 2 | Part of Paper No.: 20231113 |
|---|---|---|

EAGLEBEN-SA_00002092

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
| --- | --- | --- |
| | 18/081,251 | Palepu et al. |
| | **Examiner** | **Art Unit** |
| | ERNST V ARNOLD | 1613 |

| Interference Search | | | |
| --- | --- | --- | --- |
| **US Class/CPC Symbol** | **US Subclass/CPC Group** | **Date** | **Examiner** |
| A61K | 31/4184; 9/0019, 08; 47/08, 10, 12, 18, 20, 22 and ( (bendamustine OR (nitrogen ADJ mustard) OR ( alkylating WITH agent)) AND leukemia AND ( parenteral OR intravenously OR intravenous OR parenterally) AND antioxidant AND (PEG OR ( polyalkylene ADJ glycol) OR (polyethylene ADJ glycol))).clm. | 11/13/2023 | eva |
| A61P | 35/00 and ((bendamustine OR (nitrogen ADJ mustard) OR (alkylating WITH agent)) AND leukemia AND (parenteral OR intravenously OR intravenous OR parenterally) AND antioxidant AND (PEG OR (polyalkylene ADJ glycol) OR ( polyethylene ADJ glycol))).clm. | 11/13/2023 | eva |

| | |
| --- | --- |
| | |

EAGLEBEN-SA_00002093

| *Issue Classification* | Application/Control No.<br><br>18/081,251 | Applicant(s)/Patent Under Reexamination<br><br>Palepu et al. |
|---|---|---|
| | Examiner<br><br>ERNST V ARNOLD | Art Unit<br><br>1613 |

**CPC**

| Symbol | | | | Type | Version |
|---|---|---|---|---|---|
| A61K | / | 31 | / | 4184 | F | 2013-01-01 |
| A61K | / | 47 | / | 10 | I | 2013-01-01 |
| A61K | / | 9 | / | 08 | I | 2013-01-01 |
| A61K | / | 47 | / | 20 | I | 2013-01-01 |
| A61K | / | 47 | / | 12 | I | 2013-01-01 |
| A61K | / | 47 | / | 18 | I | 2013-01-01 |
| A61K | / | 47 | / | 22 | I | 2013-01-01 |
| A61K | / | 9 | / | 0019 | A | 2013-01-01 |

**CPC Combination Sets**

| Symbol | | | Type | Set | Ranking | Version |
|---|---|---|---|---|---|---|
| | / | / | | | | |

| NONE<br><br>(Assistant Examiner) | | (Date) | **Total Claims Allowed:**<br><br>9 | |
|---|---|---|---|---|
| /ERNST V ARNOLD/<br>Primary Examiner, Art Unit 1613<br><br>(Primary Examiner) | 13 November 2023<br><br>(Date) | | O.G. Print Claim(s)<br><br>1 | O.G. Print Figure<br><br>none |

U.S. Patent and Trademark Office

Part of Paper No.: 20231113

Page 1 of 3

EAGLEBEN-SA_00002094

| *Issue Classification* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 18/081,251 | Palepu et al. |
| | **Examiner** | **Art Unit** |
| | ERNST V ARNOLD | 1613 |

**INTERNATIONAL CLASSIFICATION**

**CLAIMED**

| A61K | / | 9 | / | 08 |
|---|---|---|---|---|
| A61K | / | 47 | / | 10 |
| A61K | / | 47 | / | 18 |
| A61P | / | 35 | / | 00 |

**NON-CLAIMED**

| | / | | / | |
|---|---|---|---|---|

**US ORIGINAL CLASSIFICATION**

| CLASS | SUBCLASS |
|---|---|
| | |

**CROSS REFERENCES(S)**

| CLASS | SUBCLASS (ONE SUBCLASS PER BLOCK) | | | | |
|---|---|---|---|---|---|
| | | | | | |

| NONE | | Total Claims Allowed: | |
|---|---|---|---|
| (Assistant Examiner) | (Date) | 9 | |
| /ERNST V ARNOLD/ Primary Examiner, Art Unit 1613 | 13 November 2023 | O.G. Print Claim(s) | O.G. Print Figure |
| (Primary Examiner) | (Date) | 1 | none |

U.S. Patent and Trademark Office

Part of Paper No.: 20231113

Page 2 of 3

EAGLEBEN-SA_00002095

| Issue Classification | Application/Control No. 18/081,251 | Applicant(s)/Patent Under Reexamination Palepu et al. |
|---|---|---|
| | **Examiner** ERNST V ARNOLD | **Art Unit** 1613 |

☑ Claims renumbered in the same order as presented by applicant    ☐ CPA    ☑ T.D.    ☐ R.1.47

**CLAIMS**

| Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |

| NONE | | **Total Claims Allowed:** |
|---|---|---|
| (Assistant Examiner) | (Date) | 9 |
| /ERNST V ARNOLD/ Primary Examiner, Art Unit 1613 | 13 November 2023 | O.G. Print Claim(s) / O.G. Print Figure |
| (Primary Examiner) | (Date) | 1 / none |

U.S. Patent and Trademark Office                                   Part of Paper No.: 20231113

EAGLEBEN-SA_00002096

# PE2E SEARCH – Search History (Prior Art)

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | British Equivalents | Time Stamp |
|---|---|---|---|---|---|---|---|
| L1 | 5 | "2011019363".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/04 09:21 AM |
| L2 | 3 | "20110019363".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/04 09:21 AM |
| L3 | 4 | "4879286".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/04 09:22 AM |
| L4 | 4 | "2002002125".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/04 09:22 AM |
| L5 | 398 | "159289" | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/04 09:23 AM |
| L6 | 2 | "20130210878".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/04 09:31 AM |
| L7 | 2 | "20110184036".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/04 09:36 AM |
| L8 | 4 | "11103483".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/07 10:56 AM |
| L9 | 2 | "9572797".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/07 10:57 AM |
| L10 | 8 | "10110533".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/07 10:58 AM |
| L11 | 8 | "10010533".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/07 10:58 AM |
| L12 | 4 | "11103483".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/07 10:59 AM |
| L13 | 2 | "9265831".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/07 10:59 AM |
| L14 | 5 | "8609707".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/07 11:00 AM |
| L15 | 2 | "20110190363".pn. | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/07 11:22 AM |
| L16 | 0 | "8609707".pn. AND (intravenous OR | (US-PGPUB; USPAT; USOCR; FPRS; EPO; | OR | ON | ON | 2023/03/08 09:56 AM |

EAGLEBEN-SA_00002097

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | intravenously) | JPO; DERWENT) | | | | |
| L17 | 0 | "9265831".pn. AND (intravenous OR intravenously) | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/08 09:57 AM |
| L18 | 1 | "9572797".pn. AND (intravenous OR intravenously) | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/08 09:57 AM |
| L19 | 1 | "10010533".pn. AND (intravenous OR intravenously) | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/08 09:58 AM |
| L20 | 1 | "11103483".pn. AND (intravenous OR intravenously) | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/08 09:58 AM |
| L21 | 0 | "20210393594" .pn. AND (intravenous OR intravenously) | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/08 09:59 AM |
| L22 | 2 | "20210393594" .pn. AND ((intravenous OR intravenously) OR bendamustine) | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/08 10:00 AM |
| L23 | 1 | "8609707".pn. AND (vial WITH (sterile OR sterilized)) | (US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT) | OR | ON | ON | 2023/03/08 10:14 AM |
| L24 | 3941 | (A61K31/4184 OR A61K9/08 OR A61K47/10 OR A61K47/12 OR A61K47/18 OR A61K47/20 OR A61K47/22 OR A61K9/0019).cpc. AND ((bendamustine OR (nitrogen ADJ mustard) OR (alkylating WITH agent)) AND antioxidant AND (PEG OR (polyalkylene ADJ glycol) OR (polyethylene ADJ glycol))) | (US-PGPUB; USPAT; FPRS; EPO; JPO; DERWENT; IBM_TDB) | OR | ON | ON | 2023/03/09 06:34 AM |
| L25 | 632 | L24 AND @ad<"20100128" | (US-PGPUB; USPAT; FPRS; EPO; JPO; DERWENT; IBM_TDB) | OR | ON | ON | 2023/03/09 06:56 AM |
| L26 | 5 | L25 AND ((bendamustine OR (nitrogen ADJ mustard) OR (alkylating WITH agent)) AND antioxidant AND (PEG OR (polyalkylene ADJ glycol) OR (polyethylene ADJ glycol))).clm. | (US-PGPUB; USPAT; FPRS; EPO; JPO; DERWENT; IBM_TDB) | OR | ON | ON | 2023/03/09 06:56 AM |

EAGLEBEN-SA_00002098

| L27 | 41 | (((palepu WITH nagesh) OR (buxton WITH philip)).in. OR eagle.as.) AND ((bendamustine OR (nitrogen ADJ mustard) OR (alkylating WITH agent)) AND antioxidant AND (PEG OR (polyalkylene ADJ glycol) OR (polyethylene ADJ glycol))).clm. | (US-PGPUB; USPAT; FPRS; EPO; JPO; DERWENT; IBM_TDB) | OR | ON | ON | 2023/03/09 10:54 AM |
| L28 | 11 | (((palepu WITH nagesh) OR (buxton WITH philip)).in. OR eagle.as.) AND ((bendamustine OR (nitrogen ADJ mustard) OR (alkylating WITH agent)) AND antioxidant AND (PEG OR (polyalkylene ADJ glycol) OR (polyethylene ADJ glycol))).clm. | (US-PGPUB) | OR | ON | ON | 2023/03/09 10:56 AM |
| L29 | 15 | (((palepu WITH nagesh) OR (buxton WITH philip)).in. OR eagle.as.) AND ((bendamustine OR (nitrogen ADJ mustard) OR (alkylating WITH agent)) AND antioxidant AND (PEG OR (polyalkylene ADJ glycol) OR (polyethylene ADJ glycol))).clm. | (USPAT) | OR | ON | ON | 2023/03/09 10:56 AM |

## PE2E SEARCH – Search History (Interference)

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | British Equivalents | Time Stamp |
|---|---|---|---|---|---|---|---|
| N1 | 17 | (A61K31/4184 OR A61K9/08 OR A61K47/10 OR A61K47/12 OR A61K47/18 OR A61K47/20 OR A61K47/22 OR A61K9/0019).cpc. AND ((bendamustine OR (nitrogen ADJ mustard) OR (alkylating WITH agent)) AND leukemia AND (parenteral OR | (US-PGPUB; USPAT) | OR | ON | ON | 2023/10/17 04:45 PM |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | intravenously OR intravenous OR parenterally) AND antioxidant AND (PEG OR (polyalkylene ADJ glycol) OR (polyethylene ADJ glycol))).clm. | | | | | |
| N2 | 25 | (A61K31/4184 OR A61K9/08 OR A61K47/10 OR A61K47/12 OR A61K47/18 OR A61K47/20 OR A61K47/22 OR A61K9/0019 OR A61P35/00).cpc. AND ((bendamustine OR (nitrogen ADJ mustard) OR (alkylating WITH agent)) AND leukemia AND (parenteral OR intravenously OR intravenous OR parenterally) AND antioxidant AND (PEG OR (polyalkylene ADJ glycol) OR (polyethylene ADJ glycol))).clm. | (US-PGPUB; USPAT) | OR | ON | ON | 2023/10/17 05:07 PM |
| N3 | 7 | (A61K31/4184 OR A61K9/08 OR A61K47/10 OR A61K47/12 OR A61K47/18 OR A61K47/20 OR A61K47/22 OR A61K9/0019).cpc. AND ((bendamustine OR (nitrogen ADJ mustard) OR (alkylating WITH agent)) AND leukemia AND (parenteral OR intravenously OR intravenous OR parenterally) AND antioxidant AND (PEG OR (polyalkylene ADJ glycol) OR (polyethylene ADJ glycol))).clm. | (USPAT) | OR | ON | ON | 2023/11/13 11:15 AM |
| N4 | 7 | (A61K31/4184 OR A61K9/08 OR A61K47/10 OR A61K47/12 OR A61K47/18 OR A61K47/20 OR | (USPAT) | OR | ON | ON | 2023/11/13 11:20 AM |

EAGLEBEN-SA_00002100

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | A61K47/22 OR A61K9/0019 OR A61P35/00).cpc. AND ((bendamustine OR (nitrogen ADJ mustard) OR (alkylating WITH agent)) AND leukemia AND (parenteral OR intravenously OR intravenous OR parenterally) AND antioxidant AND (PEG OR (polyalkylene ADJ glycol) OR (polyethylene ADJ glycol))).clm. | | | | | |

EAGLEBEN-SA_00002101



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

## BIB DATA SHEET

**CONFIRMATION NO. 8743**

| SERIAL NUMBER | FILING or 371(c) DATE | CLASS | GROUP ART UNIT | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 18/081,251 | 12/14/2022 **RULE** | 514 | 1613 | 107071.000583 |

**APPLICANTS**
Eagle Pharmaceuticals, Inc., Woodcliff Lake, NJ;

**INVENTORS**
Nagesh R. Palepu, Southampton, PA;
Philip Christopher Buxton, Denham, Uxbridge, UNITED KINGDOM;

** CONTINUING DATA ***************************
This application is a CON of 17/412,623 08/26/2021
which is a CON of 16/509,920 07/12/2019 PAT 11103483
which is a CON of 16/015,656 06/22/2018 ABN
which is a CON of 15/432,335 02/14/2017 PAT 10010533
which is a CON of 15/013,436 02/02/2016 PAT 9572797
which is a CON of 14/031,879 09/19/2013 PAT 9265831
which is a CON of 13/016,473 01/28/2011 PAT 8609707
which claims benefit of 61/299,100 01/28/2010

** FOREIGN APPLICATIONS **************************

** IF REQUIRED, FOREIGN FILING LICENSE GRANTED **
01/04/2023

| Foreign Priority claimed ❏ Yes ☑ No | | STATE OR COUNTRY | SHEETS DRAWINGS | TOTAL CLAIMS | INDEPENDENT CLAIMS |
|---|---|---|---|---|---|
| 35 USC 119(a-d) conditions met ❏ Yes ☑ No | ❏ Met after Allowance | PA | 0 | 9 | 2 |
| Verified and Acknowledged  /ERNST V ARNOLD/ Examiner's Signature | Initials | | | | |

**ADDRESS**

BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501
UNITED STATES

**TITLE**
FORMULATIONS OF BENDAMUSTINE

| FILING FEE RECEIVED 0.00 | FEES: Authority has been given in Paper No._____ to charge/credit DEPOSIT ACCOUNT No._____ for following: | ❏ All Fees |
|---|---|---|
| | | ❏ 1.16 Fees (Filing) |
| | | ❏ 1.17 Fees (Processing Ext. of time) |
| | | ❏ 1.18 Fees (Issue) |
| | | ❏ Other _____ |
| | | ❏ Credit |

BIB (Rev. 05/07).

EAGLEBEN-SA_00002102

TO:      eofficemonitor@bakerlaw.com
FROM:    noreply@uspto.gov
CC:      patentcenter_eofficeaction@uspto.gov
SUBJECT: USPTO: Patent Electronic System - Correspondence Notification for Customer Number 23377

Wed Nov 22 05:21:06 EST 2023


Dear Patent Center Customer:

Correspondence Address:

BakerHostetler
1735 Market Street
Suite 3300
Philadelphia,PENNSYLVANIA,19103-7501
UNITED STATES

This is a courtesy notification regarding the following USPTO patent application(s) associated with your Customer Number, 23377, that have new outgoing correspondence. This correspondence is now available for viewing in Patent Center.

The official date of notification of the outgoing correspondence will be indicated on the form (e.g., PTOL-90) accompanying the correspondence.

Disclaimer:

The list of documents shown below are provided as a courtesy and is not part of the official file wrapper. The content of the images shown in the Image File Wrapper is the official record.

| Application | Document | Mailroom Date | Attorney Docket No. |
|-------------|----------|---------------|---------------------|
| 18081251 | NOA | 11/22/2023 | 107071.000583 |

To view your correspondence online, please sign in to Patent Center and then select Workbench/View correspondence. To update your email address(es), select Manage/Manage customer numbers.

If you have any questions, please contact the Patent Electronic Business Center (EBC) at ebc@uspto.gov or 866-217-9197 Monday – Friday, 6 a.m. to midnight ET.

Please do not reply to this email as it was sent from an unmonitored mailbox.

Sincerely,

The Patent Center Team

EAGLEBEN-SA_00002103

**UNITED STATES
PATENT AND TRADEMARK OFFICE**

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC ACKNOWLEDGEMENT RECEIPT

| APPLICATION # | RECEIPT DATE / TIME | ATTORNEY DOCKET # |
|---|---|---|
| **18/081,251** | **11/29/2023 05:44:13 PM Z ET** | **107071.000583** |

## Title of Invention

FORMULATIONS OF BENDAMUSTINE

## Application Information

| | | | |
|---|---|---|---|
| APPLICATION TYPE | Utility - Nonprovisional Application under 35 USC 111(a) | PATENT # | - |
| CONFIRMATION # | 8743 | FILED BY | VeAndra Luckett |
| PATENT CENTER # | 63426993 | FILING DATE | 12/14/2022 |
| CUSTOMER # | 23377 | FIRST NAMED INVENTOR | Nagesh R. Palepu |
| CORRESPONDENCE ADDRESS | - | AUTHORIZED BY | Scott Conley |

## Documents                                    TOTAL DOCUMENTS: 1

| DOCUMENT | PAGES | DESCRIPTION | SIZE (KB) |
|---|---|---|---|
| 107071.000583 Issue Fee Trans.pdf | 1 | Issue Fee Payment (PTO-85B) | 236 KB |

## Digest

| DOCUMENT | MESSAGE DIGEST(SHA-512) |
|---|---|
| 107071.000583 Issue Fee Trans.pdf | CD67B7F8B95AF388D1E1508880D505DB385075B2D906E2802D0D8ECD00F5823E3C4428284366E5288831D98D6E5C525D2AA0EE178837EC40D10114D5E1CBA2B5 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized

EAGLEBEN-SA_00002104

by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**

If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application

**National Stage of an International Application under 35 U.S.C. 371**

If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**

If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

EAGLEBEN-SA_00002105

**UNITED STATES PATENT AND TRADEMARK OFFICE**

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC PAYMENT RECEIPT

| APPLICATION # | RECEIPT DATE / TIME | ATTORNEY DOCKET # |
|---|---|---|
| 18/081,251 | 11/29/2023 05:44:13 PM Z ET | 107071.000583 |

## Title of Invention

FORMULATIONS OF BENDAMUSTINE

## Application Information

| | | | |
|---|---|---|---|
| APPLICATION TYPE | Utility - Nonprovisional Application under 35 USC 111(a) | PATENT # | - |
| CONFIRMATION # | 8743 | FILED BY | VeAndra Luckett |
| PATENT CENTER # | 63426993 | AUTHORIZED BY | Scott Conley |
| CUSTOMER # | 23377 | FILING DATE | 12/14/2022 |
| CORRESPONDENCE ADDRESS | - | FIRST NAMED INVENTOR | Nagesh R. Palepu |

## Payment Information

| PAYMENT METHOD | PAYMENT TRANSACTION ID | PAYMENT AUTHORIZED BY |
|---|---|---|
| DA / 233050 | E2023ASH46536500 | VeAndra Luckett |

**PRE-AUTHORIZED ACCOUNT**
233050

**PRE-AUTHORIZED CATEGORY**
37 CFR 1.16 (National application filing, search, and examination fees); 37 CFR 1.17 (Patent application and reexamination processing fees); 37 CFR 1.19 (Document supply fees); 37 CFR 1.20 (Post Issuance fees); 37 CFR 1.21 (Miscellaneous fees and charges)

| FEE CODE | DESCRIPTION | ITEM PRICE($) | QUANTITY | ITEM TOTAL($) |
|---|---|---|---|---|
| 1501 | UTILITY ISSUE FEE | 1200.00 | 1 | 1200.00 |
| | | | TOTAL AMOUNT: | $1,200.00 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**

If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement

EAGLEBEN-SA_00002106

Receipt will establish the filing date of the application

### National Stage of an International Application under 35 U.S.C. 371

If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

### New International Application Filed with the USPTO as a Receiving Office

If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

EAGLEBEN-SA_00002107

**PART B - FEE(S) TRANSMITTAL**

Complete and send this form, together with applicable fee(s), by mail or fax, or via the USPTO patent electronic filing system.

| By mail, send to: | Mail Stop ISSUE FEE<br>Commissioner for Patents<br>P.O. Box 1450<br>Alexandria, Virginia 22313-1450 | By fax, send to: | (571)-273-2885 |
|---|---|---|---|

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications. **Because electronic patent issuance may occur shortly after issue fee payment, any desired continuing application should preferably be filed prior to payment of this issue fee in order not to jeopardize copendency.**

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

23377      7590      11/22/2023

BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via the USPTO patent electronic filing system or by facsimile to (571) 273-2885, on the date below.

|  |
|---|
| (Typed or printed name) |
| (Signature) |
| (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/081,251 | 12/14/2022 | Nagesh R. Palepu | 107071.000583 | 8743 |

TITLE OF INVENTION: FORMULATIONS OF BENDAMUSTINE

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1200 | $0.00 | $0.00 | $1200 | 02/22/2024 |

| EXAMINER | | ART UNIT | CLASS-SUBCLASS |
|---|---|---|---|
| ARNOLD, ERNST V | | 1613 | 514-394000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/AIA/122 or PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/AIA/47 or PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list

(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 __BakerHostetler_____

2 _____

3 ................................................

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE

Eagle Pharmaceuticals, Inc.

(B) RESIDENCE: (CITY and STATE OR COUNTRY)

Woodcliff Lake, New Jersey

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☒ Corporation or other private group entity ☐ Government

4a. Fees submitted: ☒ Issue Fee    ☐ Publication Fee (if required)

4b. Method of Payment: *(Please first reapply any previously paid fee shown above)*

☒ Electronic Payment via the USPTO patent electronic filing system    ☐ Enclosed check    ☐ Non-electronic payment by credit card (Attach form PTO-2038)

☒ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. **23-3050**

5. **Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.

NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.

NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

| Authorized Signature | / Scott R. Conley / | Date | November 29, 2023 |
|---|---|---|---|
| Typed or printed name | Scott R. Conley | Registration No. | 57,289 |

PTOL-85 Part B (11/23) Approved for use through 03/31/2026      OMB 0651-0033      U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

EAGLEBEN-SA_00002108

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | ISSUE DATE | PATENT NO. | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/081,251 | 01/16/2024 | 11872214 | 107071.000583 | 8743 |

23377        7590        12/27/2023

BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501

# ISSUE NOTIFICATION

The projected patent number and issue date are specified above. The patent will issue electronically. The electronically issued patent is the official patent grant pursuant to 35 U.S.C. § 153. The patent may be accessed on or after the issue date through Patent Center at https://patentcenter.uspto.gov/. The patent will be available in both the public and the private sides of Patent Center. Further assistance in electronically accessing the patent, or about Patent Center, is available by calling the Patent Electronic Business Center at 1-888-217-9197.

The USPTO is implementing electronic patent issuance with a transition period, during which period the USPTO will mail a ceremonial paper copy of the electronic patent grant to the correspondence address of record. Additional copies of the patent (i.e., certified and presentation copies) may be ordered for a fee from the USPTO's Certified Copy Center at https://certifiedcopycenter.uspto.gov/index.html. The Certified Copy Center may be reached at (800)972-6382.

### Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment is 0 day(s). Any patent to issue from the above-identified application will include an indication of the adjustment on the front page.

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Center (https://patentcenter.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Application Assistance Unit (AAU) of the Office of Patents Stakeholder Experience (OPSE), Stakeholder Support Division (SSD) at (571)-272-4200.

IR103 (Rev. 10/09)

EAGLEBEN-SA_00002109

INVENTOR(s)  (Please see PATENT CENTER site https://patentcenter.uspto.gov for additional inventors):

Nagesh R. Palepu, Southampton, PA;
Philip Christopher Buxton, Denham, Uxbridge, UNITED KINGDOM;

APPLICANT(s)  (Please see PATENT CENTER site https://patentcenter.uspto.gov for additional applicants):

Eagle Pharmaceuticals, Inc., Woodcliff Lake, NJ;


The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The USA offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to encourage and facilitate business investment. To learn more about why the USA is the best country in the world to develop technology, manufacture products, and grow your business, visit SelectUSA.gov.

IR103 (Rev. 10/09)

EAGLEBEN-SA_00002110

TO:      eofficemonitor@bakerlaw.com
FROM:   noreply@uspto.gov
CC:      patentcenter_eofficeaction@uspto.gov
SUBJECT: USPTO: Patent Electronic System - Correspondence Notification for Customer Number 23377

Thu Dec 28 05:39:55 EST 2023


Dear Patent Center Customer:

Correspondence Address:

BakerHostetler
1735 Market Street
Suite 3300
Philadelphia,PENNSYLVANIA,19103-7501
UNITED STATES

This is a courtesy notification regarding the following USPTO patent application(s) associated with your Customer Number, 23377, that have new outgoing correspondence. This correspondence is now available for viewing in Patent Center.

The official date of notification of the outgoing correspondence will be indicated on the form (e.g., PTOL-90) accompanying the correspondence.

Disclaimer:

The list of documents shown below are provided as a courtesy and is not part of the official file wrapper. The content of the images shown in the Image File Wrapper is the official record.

| Application | Document | Mailroom Date | Attorney Docket No. |
|---|---|---|---|
| 18081251 | ISSUE.NTF | 12/27/2023 | 107071.000583 |

To view your correspondence online, please sign in to Patent Center and then select Workbench/View correspondence. To update your email address(es), select Manage/Manage customer numbers.

If you have any questions, please contact the Patent Electronic Business Center (EBC) at ebc@uspto.gov or 866-217-9197 Monday – Friday, 6 a.m. to midnight ET.

Please do not reply to this email as it was sent from an unmonitored mailbox.

Sincerely,

The Patent Center Team

EAGLEBEN-SA_00002111

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/081,251 | 12/14/2022 | Nagesh R. Palepu | 107071.000583 | 8743 |

23377      7590      01/16/2024

BakerHostetler
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501

| EXAMINER |
|---|
| ARNOLD, ERNST V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1613 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 01/16/2024 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

eofficemonitor@bakerlaw.com

PTOL-90A (Rev. 04/07)

EAGLEBEN-SA_00002112

 Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Pᴀᴛᴇɴᴛ ᴀɴᴅ Tʀᴀᴅᴇᴍᴀʀᴋ Oғғɪᴄᴇ

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | ISSUE DATE | PATENT NO. |
|---|---|---|
| 18/081,251 | 16-Jan-2024 | 11872214 |

BakerHostetler
1735 Market Street
Philadelphia, PA 19103-7501

# EGRANT NOTIFICATION

Your electronic patent grant (eGrant) is now available, which can be accessed via Patent Center at https://patentcenter.uspto.gov

The electronic patent grant is the official patent grant under 35 U.S.C. 153. For more information, please visit https://www.uspto.gov/electronicgrants

EAGLEBEN-SA_00002113

TO:      eofficemonitor@bakerlaw.com
FROM:   noreply@uspto.gov
CC:      patentcenter_eofficeaction@uspto.gov
SUBJECT: USPTO: Patent Electronic System - eGrant Notification for Customer Number 23377

Tue Jan 16 06:11:09 EST 2024

Dear Patent Center Customer:

Correspondence Address:

BakerHostetler
1735 Market Street
Suite 3300
Philadelphia,PENNSYLVANIA,19103-7501
UNITED STATES

This is a courtesy notification regarding the following USPTO patent application(s) associated with your Customer Number, 23377, that have new eGrant(s) and eCofC(s). The eGrant and eCofC are now available for viewing in Patent Center.

The official date of the eGrant notification will be indicated on the form (e.g., PTOL-90) accompanying the correspondence.

Disclaimer:

The list of documents shown below are provided as a courtesy and is not part of the official file wrapper. The content of the images shown in the Image File Wrapper is the official record.

| Application | Patent | Document | Mailroom Date | Attorney Docket No. |
|---|---|---|---|---|
| 18081251 | 11872214 | EGRANT.NTF | 01/16/2024 | 107071.000583 |

To examine your eGrant and eCofC online, please access Patent Center then search using the listed application or patent number. To download your eGrant, click on the eGrant and eCofC link on the left-hand menu or select the "Download eGrant" link on the Application data page. To download your eCofC, click on the eGrant and eCofC link on the left-hand menu.

If you have any questions, please contact the Patent Electronic Business Center (EBC) at ebc@uspto.gov or 866-217-9197 Monday – Friday, 6 a.m. to midnight ET.

Please do not reply to this email as it was sent from an unmonitored mailbox.

Sincerely,

The Patent Center Team

EAGLEBEN-SA_00002114