**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

EAGLE PHARMACEUTICALS, INC. and
EAGLE SUB1 LLC,

      Plaintiffs,

      v.

SLAYBACK PHARMA LLC and AZURITY
PHARMACEUTICALS, INC.,

      Defendants.

C.A. No. 24-65-JLH

**REDACTED PUBLIC VERSION**

**DEFENDANTS' SLAYBACK PHARMA LLC AND AZURITY
PHARMACEUTICALS INC. REPLY TO PLAINTIFFS' OMNIBUS OPPOSITION
(D.I. 415) TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OF NON-INFRINGEMENT (D.I. 344, 347)**

*Of Counsel*

Jason A. Lief
Alan Pollack
Daniel E. Forchheimer
Robyn Ast-Gmoser
Audrey R. Sparschu

**WINDELS MARX LANE &
MITTENDORF LLC**
180 Park Avenue
Florham Park, NJ 07932-1054
(973) 966-3200

156 West 56th Street
New York, NY 10019
(212) 237-1000

jlief@windelsmarx.com
apollack@windelsmarx.com
dforchheimer@windelsmarx.com
rast-gmoser@windelsmarx.com
asparschu@windelsmarx.com

Dated: July 20, 2026

**SMITH KATZENSTEIN & JENKINS LLP**

Neal C. Belgam (No. 2721)
Daniel A. Taylor (No. 6934)
1000 N. West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
dtaylor@skjlaw.com

*Attorneys for Defendants Slayback Pharma
LLC and Azurity Pharmaceuticals, Inc.*

**TABLE OF CONTENTS**

I.  NATURE AND STAGE OF PROCEEDINGS..................................................................1

II.  SUMMARY OF ARGUMENT.......................................................................................1

III.  REPLY ARGUMENT......................................................................................................2

    A.  Slayback's Claim Construction Is Correct ............................................................2

        1.  The Claims Support The Plain And Ordinary Meaning..................................2

        2.  The Specification Refutes Plaintiffs' Claim Construction .............................3

        3.  The File Histories Do Not Support Plaintiffs' Construction ..........................4

        4.  Slayback's Claim Construction Does Not Make "Comprising" Meaningless 4

    B.  Under The Correct Claim Construction (Fluid=Liquid) Slayback Does Not Infringe .................................................................................................................5

        1.  ██████████████████████████ ..................................5

        2.  ████████████████████████████████ ....................7

        3.  ██████████████████████████████ ..............8

    C.  Plaintiffs Are Precluded From Asserting The Doctrine of Equivalents .................9

    D.  Plaintiffs Present False Evidence That ███████████████████ ██████ An Issue Not Even Raised By Slayback's Motion..............................10

    E.  Dr. Trout's Deposition Warrants Exclusion Under The Sham Affidavit Rule .....11

IV.  CONCLUSION ..............................................................................................................12

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baxter Healthcare v. HQ Specialty Pharma*,
133 F. Supp. 3d 692 (D.N.J. 2015)........................................................................6

*Biagro W. Sales, Inc. v. Grow More, Inc.*,
423 F.3d 1296 (Fed. Cir. 2005) .......................................................................9, 10

*In re CitX Corp., Inc.*,
448 F.3d 672 (3d Cir. 2006) ..............................................................................11

*Conoco, Inc. v. Energy & Env't. Int'l*,
460 F.3d 1349 (Fed. Cir. 2006) .............................................................................8

*Corteva Agriscience LLC v. Monsanto Co.*,
No. 22-1046, 2023 WL 6066643 (D. Del. Sept. 18, 2023) ...................................5, 6

*Cytiva Swed. Ab v. Bio-Rad Labs.*,
No. 18-1899-CFC, 2022 LX 152643 (D. Del. Mar. 14, 2022)...................................7

*Jiminez v. All Am. Rathskeller, Inc.*,
503 F.3d 247 (3d Cir. 2007) ..............................................................................11

*Lucent Techs., Inc. v. Gateway, Inc*,
2007 U.S. Dist. LEXIS 16682 (S.D. Cal. Mar. 6, 2007) .........................................10

*Martin v. Merrell Dow Pharm., Inc.*,
851 F.2d 703 (3d Cir. 1988) ..............................................................................11

*Med-El Elektromedizinische v. Advanced Bionics*,
657 F. Supp. 3d 604  (D. Del. 2023) ......................................................................9

*Otsuka Pharm. Co. v. Lupin*,
2022 WL 2952759 (D. Del. July 26, 2022) .............................................................8

*Pharma Tech Sols., Inc. v. LifeScan*,
942 F.3d 1372 (Fed. Cir. 2019) ...........................................................................10

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .............................................................................4

*Unimed Pharms., LLC v. Perrigo*,
Civil Action No. 13-236-RGA, 2015 U.S. Dist. LEXIS 29703 (D. Del. Mar. 11, 2015) .........8

*Vehicular Techs. Corp. v. Titan Wheel*,
212 F.3d 1377 (Fed. Cir. 2000) .............................................................................5

**TABLE OF EXHIBITS**

| Exhibit No. | Exhibit Name |
|---|---|
| 1 | Eagle's Final Infringement Contentions dated 10/10/25 |
| 2 | U.S. Patent No. 11,872,214 |
| 3 | U.S. Patent No. 12,138,248 |
| 4 | Vivimusta® label |
| 5 | Expert Report of Dr. Sinko Regarding Non-Infringement, dated 3/16/26 |
| 6 | A photograph of 6N NaOH and water, taken by Slayback scientist Harish Chinnari, and received by Audrey Sparschu via email on 5/27/26 |
| 7 | Patent Application Publication No. US 2013/0210879 ("Abandoned Patent Publication") |
| 8 | SLAY-VIVMUS0009967-69 |
| 9 | Deposition Transcript of Bernhardt L. Trout, Ph.D., dated 5/8/26. |
| 10 | SLAY-VIVMUS0000691-728 |
| 11 | EAGLEBEN-SA_00094585-605 |
| 12 | Application No. 18/081,251 File History, leading to the '214 patent-in-suit |
| 13 | Application No. 18/646,171 File History, leading to the '248 patent-in-suit |
| 14 | Application No. 18/081,238 File History, leading to the '783 patent (formerly-in-suit, now withdrawn) |
| 15 | SLAY-VIVMUS0000472-474 |
| 16 | EAGLEBEN-SA_00240269-360 |
| 17 | Deposition Transcript of Philip Buxton, dated 8/22/25 |
| 18 | Application No. 13/767,672 ("Abandoned Patent Application") as filed |
| 19 | Excerpts from American Heritage College Dictionary, Dictionary (3rd Ed. 1993) |
| 20 | Excerpts from Oxford Thesaurus of English, (3rd Ed. 2009) |
| 21 | Excerpts from Roget's 21st Century Thesaurus, (3rd Ed. 2005) |
| 22 | Excerpts from Sears, College Physics, 5th Ed. 1980 |
| 23 | Excerpts from Fluid Mechanics, 2d Ed. 2003 |
| 24 | WO2015/095533 |
| 25 | Opening Expert Report of Dr. Bernhardt Trout, Ph.D, dated 2/6/26 |
| 26 | Opening Expert Report of Dr. Bernhard Trout, Ph.D. Appendix B |
| 27 | Pilaniya et al., "Recent trends in the impurity profile of pharmaceuticals," J. Adv. Pharm. Tech. Res., Vol. 1, Issue 3 pgs. 302-310 (July-Sept 2010) |
| 28 | Excerpts from Sinko, Martin's Physical Pharmacy and Pharmaceutical Sciences, 8th ed. 2024 |
| 29 | Excerpts from Brown & LeMay, Chemistry: The Central Science, (1981) |
| 30 | Bancroft, "The Solute as Liquid," SCIENCE, Vol. 82, No. 2130, pgs. 388-89 (1935) |
| 31 | Goodwin, "Is Salt Melting When It Dissolves in Water?," J. Chem. Educ., Vol. 79, No. 3, pgs. 393-96 (March 1, 2002) |
| 32 | EAGLEBEN-SA_00010159-10184 |

| 33 | Excerpts from the Reply Expert Report of Dr. Crowley Regarding Invalidity, dated 4/13/26 |
|----|---|
| 34 | USP <729> |
| 35 | U.S. Patent Application Publication Number US 2009/0221622 |
| 36 | Excerpts from the Reply Report of Dr. Bernhardt Trout, Ph.D., dated 4/13/26 |
| 37 | Excerpts from the Markman Hearing Transcript bearing case numbers 24-64-JLH, 24-65-JLH, and 24-66-JLH, dated 1/30/25 |
| 38 | EAGLEBEN-SA_00116076-116083 |
| 39 | Excerpts from the Deposition Transcript of Harish Chinnari dated 12/10/25 |
| 40 | Excerpts from the Deposition Transcript of Harish Chinnari, dated 12/11/25 |

## I.    NATURE AND STAGE OF PROCEEDINGS

Defendants reply to Plaintiffs' "Omnibus" Opposition (D.I. 415) to Slayback's motion for summary judgment of non-infringement  (D.I. 344, 347) as it regards the Slayback case. Plaintiffs "Omnibus" brief improperly uses Apotex depositions and documents (from an un-consolidated case) against Slayback where Slayback could not attend or cross-examine those witnesses or see those documents during discovery.  Slayback objects.

## II.    SUMMARY OF ARGUMENT

1.    "Consisting of" claims preclude infringement when an accused product has additional ingredients not recited after "consisting of."  (D.I. 347, at 10).  Applying the correct claim construction, Slayback does not infringe because ███████████████████████ ██████████████████████████████████████.  Plaintiffs attempt to avoid summary judgment by positing that ████████████████████████████ ████████████████████████████████.  That simply is *not* true:



(Ex. 6).  Plaintiffs themselves have called ████████████████████████████ ████████████  outside of this litigation.  (Exs. 7 and 18).  Plaintiffs now attempt to walk away from that evidence of infringement – but those are Plaintiffs' own words.  (*See* pgs. 2-8, below).

2.    Plaintiffs next argue that the rare exceptions to non-infringement of a "consisting of" limitation apply – arguing that ████████████████████  is an impurity;  and also that it is unrelated to the limitation.  These exceptions do *not* apply.  (*See* pg. 8, below).

3.      Prosecution history estoppel precludes Plaintiffs from asserting equivalents – as a matter of law.  The narrow tangentiality exception does *not* apply.  (*See* pgs. 9-10, below).

4.      Even applying Plaintiffs' claim construction –which this motion is *not* based upon – Slayback does *not* infringe.   (*See* pgs. 10-11, below).

5.      Plaintiffs' Opposition relies on Dr. Trout's Report.  Under the "sham affidavit" rule the Court should not credit that evidence, given Dr. Trout's extraordinarily evasive and contrary deposition answers on these issues and counsel's disruptive objections.  (*See* pgs. 11-12, below).

## III.   <u>REPLY ARGUMENT</u>

Applying the correct claim construction, Slayback does *not* infringe.

### A. <u>Slayback's Claim Construction Is Correct</u>

The claim term "fluid" should be interpreted pursuant to its plain and ordinary meaning – a liquid that flows.  (D.I. 347, at 11-14; D.I. 419, at 3).  Plaintiffs' Opposition does not dispute that that is the plain and ordinary meaning.  And Plaintiffs have not overcome the "heavy presumption" in favor of that meaning.  (D.I. 347, at 12-13).  The intrinsic, and extrinsic, evidence all support Slayback's position.  A fluid is a liquid that flows.

#### 1.   <u>The Claims Support The Plain And Ordinary Meaning</u>

Plaintiffs do not dispute that "the word 'solvent' is not part of the claims." (Ex. 9, at 197:21-23, 72:8-12, 73:13-14).  Instead, they argue that the fluids listed *after* "consisting of" are all solvents (even if not identified as such).  As a first matter, it is not clear that that is true.  Plaintiffs, and their expert Dr. Trout, do not provide a clear definition of "solvent."  (Ex. 9, at 197:4-5 ("depend[s] on the context.")).  Even PEG, the only required fluid, may not be a solvent given that it can only dissolve 20 mg/ml of bendamustine, but the claims require 25 mg/ml.  (Ex. 5, ¶¶ 178-182; Ex. 17, at 86-91, 90:18 to 91:9; Ex. 32, at EAGLEBEN-SA-10180; Ex. 2, Example 3; D.I. 419, at 6 and fn. 4).  Regardless, even if the recited fluids are all solvents, they

2

are also all liquids – supporting Slayback's construction.  And they are also: carriers (which need not be solvents); diluents; polar compounds; and protic compounds.  (Ex. 5, ¶¶ 161-173; Ex. 9, at 190:16-199:1).  None of that changes the plain and ordinary meaning of "fluid."

### 2.  The Specification Refutes Plaintiffs' Claim Construction

The specification of the patents-in-suit explicitly states:

> In several embodiments of the invention, ***pharmaceutically acceptable fluid*** is non-aqueous and may be, ***but is not necessarily, a solvent*** for the bendamustine or salt thereof.

(Ex. 2, at 3:39-41; Ex. 3, at 3:35-37 (emphases added)).  That directly refutes Plaintiffs' claim construction that a fluid is required to be a solvent.  Plaintiffs respond that this "ignores the context of the claims."  (D.I. 415, at 11).  But the claims do not discuss solvents; and the claims involve non-aqueous recited fluids, as does this passage.  Plaintiffs also falsely argue that: "the specification states that the 'pharmaceutically acceptable fluid' '*is*' the solvent."  (D.I. 415, at 11-12).  That is not true.  Plaintiffs' cited passages never use the word "solvent."  And, the specification *never* defines "fluid" or "pharmaceutically acceptable fluid" as "solvent."

Plaintiffs next argue that Column 6 of the patents-in-suit supports a "solvent" construction because it says the "pharmaceutically acceptable fluid" is used in an "amount which allows the bendamustine to be *dissolved or dispersed* …."  (D.I. 415, at 12-13 (quoting Ex. 2, 6:30-33 (emphasis added)).  This passage in Column 6 refers to lyophilized (freeze-dried) drug – which is not an embodiment of the claimed liquid formulations.  (Ex. 2, 6:18-33).  Regardless, Column 6 supports Slayback's construction because it allows for "dispersions" – which are not solutions and do not require solvents.  (D.I. 347, at 4, 11-14).

Plaintiffs also argue that the Examples are dissolved and that injections must be solutions – thus the fluids supposedly must be solvents.  (D.I. 415, at 13-14).  However, the record

evidence shows intravenous injections that are suspensions and emulsions – not solutions.  (Ex. 2, at 6:6:18-35 (dispersions); Ex. 5, ¶ 50; Ex. 33, ¶ 22; Ex. 34).  Solutions may be preferred, but they are not required.  Plaintiffs' attempt to import preferred embodiments into the claims is improper.  *Phillips*, 415 F.3d at 1303, 1320 (Fed. Cir. 2005) ("cardinal sins of patent law").

### 3. The File Histories Do Not Support Plaintiffs' Construction

Finally, Plaintiffs' discussion of the file history never once identifies a place where applicants either (a) explicitly defined "fluid" as a "solvent"; or (b) distinguished prior art because the prior art supposedly disclosed fluids that were non-solvents.  That never happened during prosecution.  The assertion that the Examiner and applicant were referring to "solvents" in the file history is belied by their use of the term "carrier."  (D.I. 415, at 14-15, 38-39).  Carriers include non-solvents.  Even Dr. Trout's own patent says that. (Ex. 24, at 19:27-30).

### 4. Slayback's Claim Construction Does Not Make "Comprising" Meaningless

Plaintiffs next argue that Slayback's construction would read "comprising" out of the claims and not allow any additional ingredients.  (D.I. 415, at 11).  That is not true.  Additional active ingredients (another cancer drug) or an additional antioxidant would fall within "comprising."  Active ingredients or antioxidants (which have their own limitation) are not "pharmaceutically acceptable fluids" governed by "consisting of."  But "pharmaceutically acceptable fluids" are.  It is Plaintiffs that are attempting to improperly limit "consisting of."

Plaintiffs also repeatedly rely on "the Court's guidance" and suggest that claim construction was decided in their favor.  We do not understand the Court to have ruled on these issues and, if anything, understood the Court to have agreed with Defendants' view that additional "fluids" were not permitted by the claims.  (Ex. 37, *Markman* Tr. at 67).

"Fluid" should be construed in accord with its plain and ordinary meaning – a liquid that

4

flows.  Plaintiffs' construction requires a departure from that.  But Plaintiffs have not overcome the "heavy presumption" in favor of the plain and ordinary meaning.

### B. Under The Correct Claim Construction (Fluid=Liquid) Slayback Does Not Infringe

An accused product can have only the components listed after "consisting of" and "nothing else" *Vehicular Techs. Corp. v. Titan Wheel*, 212 F.3d 1377, 1382-83 (Fed. Cir. 2000). In the present case, the claims contain the limitation "pharmaceutically acceptable fluid consisting of [recited fluids]." ████████████████████████████████████████ █ ████████████████████████████  But, it is not a fluid recited in the claims.  Thus, there is *no* infringement.  Nor do any exceptions apply.  ████████████████████████████████████.

**1.**  ██████████████████████████████████████



██████████████████████████████████ ████████████  That is not credibly disputed.  (D.I. 419, at 11-12).  Most fundamentally, ████████████████████████████████ ████████████████████████████████████████████████.  (Ex. 10, at -698-99 (████████████████████████████████████████████); Ex. 9, 159:17-160:7). And the resultant product remains a clear solution.  (Ex. 25, ¶ 179).  ██████████████ ████████  Plaintiffs also state that ████████████████████ is a "pharmaceutically acceptable fluid" in their Abandoned Patent Application.  (Ex. 18, at 10:4-11; Ex. 7 at [0056-59], Cl. 30).

Plaintiffs now argue that the Abandoned Patent Application should be ignored because "claim construction" does not consider extrinsic evidence – citing *Corteva Agriscience LLC v. Monsanto Co.*, C.A. No. 22-1046, 2023 WL 6066643, at *5 (D. Del. Sept. 18, 2023)).  (D.I. 415, 17-19, 30-31).  But the Abandoned Patent Application (and its Publication) is evidence of non-infringement.  It shows that a POSA would understand ████████████████████████████ ████████  for infringement purposes.  The Abandoned Patent Application is not being used as

"extrinsic evidence" for claim construction – unlike in *Corteva*. Nor do *Corteva*, or the law of claim construction, *per se* forbid extrinsic evidence. And, unlike *Corteva*, the so-called "extrinsic evidence" here is entirely consistent with the intrinsic evidence on claim construction.

Plaintiffs also argue that the patents-in-suit and the Abandoned Patent Application somehow distinguish things *included in* the fluid from *the* fluid itself. (D.I. 415, at 17-19, 30-31). That is not true. The Abandoned Patent Application/Publication identifies both ███ ███████ and PEG (indisputably a fluid) as being "includ[ed]" in the fluid. The patents-in-suit also state that the recited fluids are "includ[ed]." (Ex. 2, 4:54-56). If the words "included" or "including" defined ingredients that were merely *in* the fluid versus *the* fluid itself, Plaintiffs would not have said that PEG and other claimed fluids were "included."

Plaintiffs' assertion that because ████████████ is a pH adjuster, it cannot be a "fluid" (or a solvent) is not true. "[C]ommon components of a formulation can and often do perform multiple functions." *Baxter Healthcare v. HQ Specialty Pharma*, 133 F. Supp. 3d 692, 705-06 (D.N.J. 2015); (Ex. 5, ¶ 183; Ex. 9, at 169:11-17; Ex. 39, at 83:4-8, 89:4-17); Ex. 40, at 156:16-21 (NaOH "multiple functions"). Indeed, Plaintiffs, and the inventors here, have described ████████████ as "fluids" in other patent applications. (Ex. 5, ¶ 123; Ex. 35, [0018] ("pharmacologically suitable fluid comprising an aqueous hydrochloric acid [a pH adjuster] diluent"); Ex. 17, 58:6-10 (█████████████████ ████████████████████████ )).

Plaintiffs also argue that the melting point of *pure* sodium hydroxide (not dissolved in anything) is high and therefore it must be a solid in solution. That is not true. Plaintiffs are referring to the melting point of *pure* – not dissolved – sodium hydroxide. (*See* D.I. 419 at 5).

Plaintiffs next argue that when a solid is dissolved, it remains a solid. That is not true.

6

However, Plaintiffs offer no scientific citation that says that ████████████████ is a solid. Both sides' experts state that dissolution results in a phase transition from solid to liquid.  (Ex. 5, ¶¶ 53-58, 132-134; Ex. 36, ¶ 30 (Trout: "…chemically descriptive of the phase transition at a molecular level …"); Ex. 25, ¶ 76 (NaOH ions dissociate in PEG); *see also* D.I. 419, at 5, 8). And Plaintiffs' expert Dr. Trout's remarkable claim that if you evaporated the product you would get back solids is an absurd position.  (Ex. 9, 164:11-165:4).  If one could assess infringement by altering the product through evaporation, Vivimusta® would not infringe because it would not be a liquid composition (when evaporated).  ████████████████ is a "pharmaceutically acceptable fluid" that is not permitted by the claims.  Slayback does *not* infringe.

   **2.**  ████████████████████████████████████

   Plaintiffs next argue that ████████████████ is not present in Vivimusta® because it is supposedly "consumed" when it reacts with unidentified amounts of acidic impurities in PEG.  But Plaintiffs' expert, Dr. Trout, admitted that some residual ████████████████ remains in equilibrium with the reacted sodium hydroxide.  (Ex. 25, at ¶ 287; Ex. 9, at 215:8-11; *cf.* D.I. 386, ¶ 10 ("Vivimusta, contains sodium hydroxide …").  Slayback's expert, Dr. Sinko, and Plaintiffs' inventor agree. (Ex. 5, ¶¶ 144, 146, and 137-149; Ex. 17, 66:20-23).

   Further, Plaintiffs have no proof that *all* of the ████████████████ is reacted. They offer no calculation or experiment showing how much sodium hydroxide remains or has reacted with acid in any of the accused batches (and amounts of acid and sodium hydroxide vary from batch to batch).  (Ex. 5, ¶ 146; Ex. 9, at 185:2-186:6 (no experiments performed)).  In the absence of proof from Plaintiffs, summary judgment for Slayback of non-infringement must be granted.  *Cytiva Swed. Ab v. Bio-Rad Labs.*, C.A. No. 18-1899-CFC, 2022 LX 152643, at *7 (D. Del. Mar. 14, 2022) (D. Del. Mar. 14, 2022) ("lack of proof").

Regardless, even if <u>all</u> the ▮▮▮▮▮▮▮▮▮▮▮▮ were reacted – and there is no proof of that – ▮▮▮▮▮▮▮▮▮▮ is an added ingredient that impacts long-term stability. FDA understood – as every POSA would – that sodium hydroxide reacts with acids, but still called it an "inactive ingredient" and required it be listed on the Label. (Ex. 8). While all ingredients may undergo subsequent reactions (*e.g.*, antioxidants also react), they are still ingredients. (Ex. 5, ¶¶ 142, 137-149). *Unimed Pharms., LLC v. Perrigo*, C.A. No. 13-236-RGA, 2015 U.S. Dist. LEXIS 29703, at *8, 14-16 (D. Del. Mar. 11, 2015) ("consisting of" construed as: "the ingredients the product is made from, not those it contains as a finished product" where sodium hydroxide was "not necessarily present" in final product). Slayback does <u>not</u> infringe.

**3.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The law allows two rare exceptions where infringement of a "consisting of" limitation can still be found despite the presence of additional things. Those exceptions do not apply here. ▮▮▮▮▮▮▮▮▮▮ is not an impurity. (D.I. 347, at 15-17). Plaintiffs do not deny that it is deliberately added; that FDA called it an inactive ingredient; and that it impacts stability. And Plaintiffs are silent regarding the holding of *Otsuka Pharm. Co. v. Lupin*, 2022 WL 2952759, at *4 (D. Del. July 26, 2022), that "'excipients' contrast with 'impurities' in the pharmaceutical context." Nor do Plaintiffs argue that ▮▮▮▮▮▮▮▮▮ is "ordinarily associated" with the claimed fluids in the "consisting of" limitation – the legal test for impurities. *Conoco, Inc. v. Energy & Env't. Int'l*, 460 F.3d 1349, 1360 (Fed. Cir. 2006). Nor is it disputed that both ▮▮▮▮▮▮▮▮▮ and the claimed fluids impact stability – thus, they are related. Plaintiffs also argue that the amounts of ▮▮▮▮▮▮▮▮▮▮▮. But, Dr. Buxton said that tiny amounts impact pH of bendamustine formulations. (Ex. 17, 68:18-70:7 (▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮)). The exceptions do not apply. Slayback does <u>not</u> infringe.

8

### C. __Plaintiffs Are Precluded From Asserting The Doctrine of Equivalents__

Plaintiffs are precluded from equivalents by prosecution history estoppel. (D.I. 347, at 18-20). Plaintiffs' Opposition does not deny that: (a) Plaintiffs made a narrowing amendment; (b) that the pre-amendment claims would have covered ███████████████ ; and thus (c) that the presumption of estoppel applies. Instead, Plaintiffs argue that the tangentiality exception to the presumption of estoppel applies. It does not. As this Court has recognized:

> The Federal Circuit requires a 'strong showing' to satisfy the 'very narrow' tangential relation exception.

*Med-El Elektromedizinische v. Advanced Bionics*, 657 F. Supp. 3d 604, 616 (D. Del. 2023) (cites omitted). "The Supreme Court made clear that the patentee bears the burden of rebutting the presumption of surrender. …[and] whether the presumption has been rebutted is a question of law." *Biagro W. Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1305 (Fed. Cir. 2005). Plaintiffs have not made any showing of tangentiality. Plaintiffs argue that their narrowing amendment was made to distinguish claimed polar protic solvents from prior art that contained polar aprotic solvents. (D.I. 415, at 14-15, 38-40). That is not an accurate description of the prosecution history; nor would it show tangentiality anyway. Contrary to Plaintiffs' suggestion, the prior art *did* contain polar protic solvents (including PEG and propylene glycol). (Ex. 5, ¶¶ 105, 193). The applicants argued that prior art formulations with polar protic solvents were *unstable* – and that was the real point of distinction. For instance, the applicants stated in one application:

> Moreover, [prior art] Drager's 66% dimethylformamide/34% *propylene glycol* [PG] (*a polar protic solvent) was the least stable of all formulations tested* ….

(Ex. 14, '783 patent file history, EAGLEBEN-SA_248-249 (emphasis added)). Similarly, in the application that led to the '214 patent-in-suit, the applicants argued, *inter alia*, for the surprising and unexpected *stability* of the claimed "composition including bendamustine in PEG" during

9

storage.  (Ex. 12, at 11; Ex. 5, ¶ 109).  Thus, the real rationale for the amendments was the surprising *stabilizing impact* of the recited fluids.  ████████████████ (or "PEG + sodium hydroxide") are related to that rationale because they also stabilize the product – an undisputed fact.  (Ex. 5, ¶¶ 142-43; Ex. 9, 217:24-218:11).  Also water (or ████████ ████) is also a polar protic solvent.  (Ex. 5, ¶ 63; Ex. 25, ¶ 70; Ex. 17, 31:2-6, 33:19-22).

Even beyond stability, at a more general level, the amendment involved selecting certain *fluids* over *other fluids*.  The accused equivalents are related because they are also fluids. Plaintiffs' accused equivalent ("PEG + sodium hydroxide") directly relates to the claimed *fluid* PEG.  Tangentiality looks to the general category that an amendment relates to.  *See, e.g.*, *Biagro Western Sales, Inc.* (*passim* – commonality between the equivalent and amendment was "concentration," not a specific high or low range of concentrations); *Lucent Techs., Inc. v. Gateway*, 2007 U.S. Dist. LEXIS 16682 at * 27-28 (S.D. Cal. Mar. 6, 2007) ("Only where the reason for the amendment and the accused equivalent appear ***wholly unrelated***, the amendment may be deemed tangential.") (emphasis added), *aff'd.*, 525 F.3d 1200 (Fed. Cir. 2008).

Plaintiffs also argue, oddly, that the Abandoned Patent Application "demonstrates that these inventors could have explicitly included sodium hydroxide in the "pharmaceutically acceptable fluid" limitation of the Asserted Patents, but did not." (D.I. 415, at 18). Tangentiality does not arise where applicants "could have" amended to a broader claim, but did not.  *See, e.g.*, *Pharma Tech Sols., Inc. v. LifeScan*, 942 F.3d 1372, 1382-83 (Fed. Cir. 2019) ("That the … amendment may have ceded more claim scope than necessary to overcome prior art does not mean that the tangential relation exception applies here.").  Plaintiffs are estopped.

**D.  Plaintiffs Present False Evidence That ██████████████████ Is Not A Solvent – An Issue Not Even Raised By Slayback's Motion**

Slayback's motion does not raise non-infringement under Plaintiffs' "fluid = solvent"

claim construction. (D.I. 347, at 4, fn. 4). Nonetheless, Plaintiffs oppose Slayback's motion by arguing, irrelevantly, that ███████████████ is supposedly not a solvent. Plaintiffs support this with a falsehood – stating that a Slayback document shows PEG and ethanol can dissolve 25 mg/ml of bendamustine "*without any contribution from NaOH*" (D.I. 415, at 7 (emphasis added)). But, the cited Slayback document says the exact opposite – showing solubility data for PEG *with* ███████████████ ("neutralized PEG"). (Ex. 10, SLAY-VIVMUS-700 (the page cited by Plaintiffs); Ex. 40, at 155:9-16 ("neutralized" = NaOH added)). This proves Slayback's point – ███████████████ is a co-solvent with PEG that allows for dissolution of 25 mg/ml of bendamustine. (Ex. 5, ¶¶ 174-183, 199). Dr. Buxton also said it is a solvent. (███████████████). Also, co-solvents contribute to solubility as a mixture, not individually – which Dr. Trout admitted but never assessed. (Ex. 9, 188:22-189-23). Also, if "solvents" must dissolve excipients, as Dr. Trout said (Ex. 9, at 126:14-19), Plaintiffs offer no proof on that at all. Non-infringement exists even under Plaintiffs construction.

E. **Dr. Trout's Deposition Warrants Exclusion Under The "Sham Affidavit" Rule**

Plaintiffs' Opposition relies on the Reports of Dr. Trout. However, Dr. Trout's deposition was marred by extraordinarily evasive and contrary answers. The "sham affidavit" rule, prohibits a party from opposing summary judgment by relying on an expert's affidavit (or Report here) for a proposition that he evaded or contradicted during deposition. *See, e.g., In re CitX Corp., Inc.*, 448 F.3d 672 (3d Cir. 2006); *Martin v. Merrell Dow Pharm., Inc.*, 851 F.2d 703 (3d Cir. 1988); *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247 (3d Cir. 2007). We invite the Court's inspection of the Transcript. (Ex. 9). Some examples include:

- Plaintiffs now cite to Dr. Trout for the deceptive proposition that "[t]he phrase ███████ ███████████ does not appear in any of Slayback's NDA documents. Trout Appendix B ¶

11

149 ….." (D.I. 421, at 4, No. 13).  But in deposition, Dr. Trout admitted that Slayback does use ███████████████ .  (Ex. 9, 159:17-160:7 ("… But other places, it literally – I can find it, but it says ███████████████████████████████ .  I think your label says ██████████████████████████ … I agree during the process, that's the case.").  Plaintiffs' counsel objected by coaching: "I'll object to the form. I think you're talking about the process as opposed to the product." (Ex. 9, Trout Tr. 156:2-4).

- Plaintiffs now argue that the claim term "fluid" must be a "solvent."  (D.I. 415, at 1-2 ("the 'pharmaceutically acceptable fluid' term excludes only solvents and not other excipients. … the claims… list only solvents in the 'pharmaceutically acceptable fluid' limitation.")).  But Dr. Trout would not confirm that w█████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ███████████ understand your opinion to be that 'pharmaceutically acceptable fluids,' for purposes of these claims, are solvents? … A. I think that's just a bit off,  Mr. Lief. …").

- Plaintiffs now insist that dissolved ████████████████████ – citing to Dr. Trout.  (D.I. 415, at 5 ("Dr. Bernhardt Trout, offers the opinion that sodium hydroxide 'is a solid …"), and 7-8 and 21).  This concept did not appear in Plaintiffs' contentions until the Fall of 2025 – after the *Markman* hearing.  And Dr. Trout and counsel evaded this issue for 10 pages of transcript and concluded with his bizarre "evaporation" non-answer.  (Ex. 9, at 155-165).

Dr. Trout's obstruction warrants disregarding his evidence under the sham affidavit rule.

## IV.    CONCLUSION

For the reasons set forth above, and in Slayback's Opening Brief, Slayback does not infringe.  Summary judgment of non-infringement should be granted.

Dated: July 20, 2026
*Of Counsel:*

Jason A. Lief
Alan Pollack
Daniel E. Forchheimer
Robyn Ast-Gmoser
Audrey R. Sparschu

**WINDELS MARX LANE &
MITTENDORF LLC**
180 Park Avenue
Florham Park, NJ 07932-1054
(973) 966-3200

156 West 56th Street
New York, NY 10019
(212) 237-1000

jlief@windelsmarx.com
apollack@windelsmarx.com
dforchheimer@windelsmarx.com
rast-gmoser@windelsmarx.com
asparschu@windelsmarx.com

**SMITH KATZENSTEIN & JENKINS LLP**

*/s/ Neal C. Belgam*
Neal C. Belgam (No. 2721)
Daniel A. Taylor (No. 6934)
1000 N. West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
dtaylor@skjlaw.com

*Attorneys for Defendants Slayback Pharma
LLC and Azurity Pharmaceuticals, Inc.*