# EXHIBIT 33

# REDACTED PUBLIC VERSION

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

EAGLE PHARMACEUTICALS, INC. and
EAGLE SUB1 LLC,

      Plaintiffs,

    v.

SLAYBACK PHARMA LLC and AZURITY
PHARMACEUTICALS, INC.,

      Defendants.

C.A. No. 24-65-JLH

# REPLY EXPERT REPORT OF
# DR. CROWLEY REGARDING INVALIDITY

## HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## TABLE OF CONTENTS

I.      Summary of Invalidity Opinions ........................................................................................1

II.     The Claims Are Indefinite ................................................................................................2

        A.      The Claim Terms "Fluid" and "Pharmaceutically Acceptable Fluid" are Not
                Limited to "Solvents" .............................................................................................4

                1.      The Claims Do Not Support Dr. Trout's "Solvent" Claim Construction....5

                2.      The Specification Explicitly Supports Slayback's Definition Of a Fluid as
                        Both Solvents and Non-Solvents.................................................................10

                3.      The File Histories for the Patents-in-Suit Do Not Support Dr. Trout's
                        "Solvent Construction".................................................................................13

        B.      Even Under a "Fluid = Solvent" Construction, The Claims Are Indefinite..........13

        C.      Response to Other Arguments from Dr. Trout.......................................................19

III.    The Claims-in-Suit Are Overbroad and Lack Written Description and Enablement........24

        A.      Summary of Reply...................................................................................................26

        B.      Written Description ................................................................................................29

                1.      Breadth of Claims and Lack of Formulations Within the Claims.............29

                2.      Concentrations of Bendamustine and "Bracketing"..................................30

                3.      The Lack of Mass Balance in the Stability Data
                        Also Shows Lack of Possession ................................................................41

                4.      Missing HPLC Parameters .........................................................................47

                5.      Response to Other Miscellaneous Arguments from Dr. Topp ..................50

        C.      Enablement ............................................................................................................54

                1.      Summary of Reply on Enablement.............................................................54

                2.      Brief Response on Legal Arguments..........................................................57

                3.      "Structure-Function Relationship" ............................................................59

                4.      Predictability..............................................................................................64

                5.      "Routine Techniques" and HPLC ..............................................................66

i

6. *Wands* Factors ............................................................................................69

7. Summary Regarding Enablement............................................................71

IV. Conclusion.................................................................................................................72

fluids listed after "consisting of."  For instance, any of the following categories could also apply to all five recited fluids:

(a)  All five fluids could also be characterized as carriers or diluents.  There is no requirement in the claim that the invention be a single-phase solution – *e.g.*, that everything be dissolved in a solvent.  While solutions may be preferable for injections or infusions, non-solutions are also used in injections and infusions.  (Exh. 61, Clevidipine Label; Exh. 62 Invega Label).  And the claims do not require or make any distinction between solutions, suspensions, emulsions or dispersions.  A fluid that is a "carrier" or "diluent" serves the "function" of participating in carrying drug into the body and would encompass both solvents and non-solvents.  There is no more reason to define the word "fluid" as a carrier or diluent than as a solvent – even applying Dr. Trout's "functional analysis";

(b)  The five listed fluids could also be characterized as organic substances.  Organic substances like PEG were sought out over water (an inorganic ingredient) because they were thought to provide a more stable formulation in comparison with the rapid degradation of bendamustine caused by water.  (*See* Exh. 2, '214 Patent at Col. col. 1 ll. 61-63; Exh. 3, '248 Patent at col. 1 ll. 61-63; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).  Contribution to the stability of the bendamustine formulation is a "function" of the specific fluids listed in the claim.  Again, there is no more reason to define "fluid" as an "organic substance" than as a solvent – even applying Dr. Trout's "functional analysis";

(c)  The five fluids listed after "consisting of" are also all protic compounds.  This was argued to be an important, perhaps surprising, aspect of these fluids for purposes of stability (not

8

solubility). (Exh. 40, '251 Application, Jun 14, 2023 Response at 5-6). Again, the "function" of stabilizing the bendamustine is supposedly an important part of the invention. There is no more reason to define the word "fluid" as "protic compounds" than there is to define it as a solvent from a "functional analysis." Indeed, if anything, the focus on stability enhancement with protic compounds was more important to the file history arguments than the passing mention to solvents;

(d) The five fluids listed after "consisting of" all have melting points below 5°C – making them liquids at temperatures of 5°C through 25°C. Being in the liquid phase of matter is important to the "function" of these fluids because if they were solids they would not be very good carriers of the drug. And so, applying Dr. Trout's "function" analysis, one could just as easily claim that "fluid" should be defined as a substance with a melting point below 5°C than as a solvent.

21.    Despite the fact that the five recited fluids share many common functions, it is not appropriate to change the plain and ordinary meaning of the word "fluid" (as used _before_ the words "consisting of") by looking at the sub-group of fluids listed _after_ the words "consisting of." A POSA would understand that "fluid" is a broad term. Fluids not listed after "consisting of" are still fluids. Thus, a POSA would not re-define "fluid" based on the fluids recited _after_ "consisting of" or based upon their functions.

22.    Dr. Trout also argues that the claims somehow indicate that "fluid" means "solvent" because the claims recite a "concentration" of 25 mg/ml of bendamustine. Dr. Trout posits that this numeric ratio of milligrams of bendamustine to milliliters of liquid/fluid necessarily refers to a solution – and therefore the claim term "fluid" necessarily means solvents. (Trout Rebuttal Report at ¶ 50). However, the recitation of 25 mg/ml of bendamustine in the

9

liquid/fluid does not necessarily mean that one is dealing with a solution.  Suspensions and

emulsions are also expressed as concentrations and can be administered intravenously.  For

instance, the FDA Orange Book lists, amongst others, the following injectable suspensions and

emulsion along with their concentrations in mg/ml units:

```
                                9MG                                    N021999  003   Dec 19, 2006

PALIPERIDONE PALMITATE

    SUSPENSION, EXTENDED RELEASE; INTRAMUSCULAR
       INVEGA SUSTENNA
          JOHNSON AND JOHNSON    39MG/0.25ML (39MG/0.25ML)            N022264  001   Jul 31, 2009
                                 78MG/0.5ML (78MG/0.5ML)             N022264  002   Jul 31, 2009
                                 117MG/0.75ML (117MG/0.75ML)         N022264  003   Jul 31, 2009
                                 156MG/ML (156MG/ML)                 N022264  004   Jul 31, 2009
                                 234MG/1.5ML (156MG/ML)              N022264  005   Jul 31, 2009

    PALONOSETRON HYDROCHLORIDE


CLEVIDIPINE BUTYRATE

    EMULSION; INTRAVENOUS
       CLEVIPREX
       +   MEDICINES CO        25MG/50ML (0.5MG/ML)                 N022156  001   Aug 01, 2008
       +                       50MG/100ML (0.5MG/ML)                N022156  002   Aug 01, 2008

    CLINDAMYCIN HYDROCHLORIDE
```

(Exh. 64, FDA Orange Book (2010) at  3-99, 3-303).  Regardless, even if the entire composition

were a solution, and the fluids recited after the words "consisting of" are solvents, that still does

not mean that the claim term "fluid" is limited to solvents or solvents of bendamustine or solvent

systems.

### 2.  The Specification Explicitly Supports Slayback's Definition Of a <u>Fluid</u> <u>as Both Solvents and Non-Solvents</u>

23.    Dr. Trout also asserts that the specification supports his construction of "fluid" as

a "solvent."  (*See, e.g.*, Trout Rebuttal Report at ¶¶ 43-51).  In this regard, Dr. Trout argues that

every Example in the specification shows formulations where the bendamustine is "dissolved,"

and thus the claim term "fluid" supposedly must be construed to be a solvent.  (Trout Rebuttal

Report at ¶ 52).  However, as explained in my Opening Invalidity Report none of the Examples

10

in the patents-in-suit actually fall within the claims. (*See* Opening Invalidity Report at ¶¶ 110-152). For this reason alone, a POSA would not look to the Examples as providing definitions for the claim terms. Regardless, the Examples do not state that they are "defining" the claim term "fluid" at all, let alone as a solvent. They merely discuss how particular formulations were prepared.

24. For instance, Dr. Trout notes that Example 1 refers to certain fluids as "solvent[s]." (*See, e.g.*, Trout Rebuttal Report at ¶ 52). Example 1 is the only Example that actually uses the word "solvent," stating: "As shown in Table 1, the bendamustine formulations are very stable in solutions containing solvent and chloride salt." (Exh. 2, '214 Patent, at Col. 7, lines 25-26; Exh. 3, '248 Patent, at Col. 7, lines 26-27). That statement does not explicitly, or even implicitly, define all fluids to be solvents. It merely notes in passing the presence of certain solvents (*i.e.*, certain specific fluids) in the context of a discussion about stability and choline chloride. And, again, Example 1 does not fall within the claims and would not be relied upon by a POSA.

25. Other than Example 1, the word "solvent" appears in the specification only one other time in a statement that explicitly contradicts Dr. Trout's construction. The specification states that fluids may *or may not* be a solvent:

> In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, *but is not necessarily, a solvent* for the bendamustine or salt thereof.

(Exh. 2, '214 Patent, Col. 3, lines 39-41; Exh. 3, '248 Patent, Col. 3, lines 35-37 (emphasis added)). This language makes clear that a "pharmaceutically acceptable fluid" need not be a solvent for bendamustine at all.

11

Dated: April 13, 2026

_Michael Crowley_