# EXHIBIT 36

# REDACTED PUBLIC VERSION

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC<br><br>Plaintiffs,<br><br>v.<br><br>SLAYBACK PHARMA LLC, AND AZURITY PHARMACEUTICALS, INC.<br><br>Defendants. | C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |

**REPLY REPORT OF DR. BERNHARDT TROUT, PH.D.**

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................................1

II. SUMMARY OF OPINIONS ..................................................................................................1

III. LEGAL STANDARDS ..........................................................................................................2

    A. The "Disclosed-But-Not-Claimed" Doctrine Does Not Apply To Eagle's Doctrine Of Equivalents Theory..............................................................................2

    B. Impurity Exception Is Not Limited to Unintentionally Added Substances .............3

    C. The "Unrelated" Exception Applies to the Claim Element, Not the Entire Invention ...................................................................................................................5

    D. The Scope of "Consisting Of" Is Limited by Its Nesting in the Claim...................6

IV. TECHNICAL BACKGROUND..............................................................................................7

    A. States of Matter and the Definition of Fluids...........................................................8

    B. Dissolution Does Not Transform a pH Adjuster Into a Solvent ............................11

    C. Dr. Sinko's Discussion of Co-Solvents Is Inapplicable to Sodium Hydroxide ...............................................................................................................13

    D. Stability and Stability Testing: Relevance to the Pharmaceutically Acceptable Fluid .....................................................................................................15

    E. Acids, Bases, and pH: Function Defines Classification ........................................16

    F. Conservation of Mass Does Not Alter Functional Classification..........................19

    G. PEG 400 and the Role of pH Adjustment..............................................................22

V. ASSERTED PATENTS AND ASSERTED CLAIMS...........................................................23

VI. SLAYBACK'S NDA PRODUCT INFRINGES THE ASSERTED CLAIMS .................26

    A. Slayback's NDA Product........................................................................................33

    B. ██████████████████████████████████████████ " ..................................................................................................36

    C. Sodium Hydroxide Is Effectively Consumed and Does Not Persist as a Functional Ingredient ...........................................................................................40

D. Sodium Hydroxide Falls Within the Impurity Exception to "Consisting Of"..................................................................................................43

E. Sodium Hydroxide Is Unrelated to the "Pharmaceutically Acceptable Fluid" Limitation ...............................................................46

F. "Pharmaceutically Acceptable Fluid" Refers to the Solvent System ....................49

    1. Opinion Is Consistent with the Agreed Construction and Court's Guidance During *Markman* Hearing ..........................................................49

    2. Dr. Sinko Ignores the Court's Guidance and the Parties Agreed Construction..................................................................................................57

    3. Specification and Prosecution History Confirm the Solvent Function ........................................................................................................59

    4. Dr. Sinko's Remaining Arguments Are Unpersuasive ..............................62

G. Sodium Hydroxide Is Not a Co-Solvent for Bendamustine....................................64

H. Claim Architecture Informs POSA's Understanding of the Asserted Claims .......................................................................................................................72

I. Water Does Not Preclude Infringement...................................................................73

J. Slayback's NDA Product Also Infringes Under the Doctrine of Equivalents.................................................................................................................80

VII. DR. SMITH DOES NOT CHALLENGE THAT SLAYBACK INFRINGES THE IMPURITIES LIMITATION OF THE ASSERTED CLAIMS ........................................89

VIII. PATENTS-IN-SUIT ARE FOUNDATIONAL.................................................................91

IX. PRIOR LITIGATIONS AND OTHER PATENTS IN FAMILY DO NOT UNDERMINE THE VALUE OF THE ASSERTED PATENTS.....................................94

A. Overview of the Patents in the Formulation Family.................................................95

B. Slayback Is an Adjudicated Infringer of Eagle's Patents.........................................98

C. Disclosure-Dedication Decision Led to Asserted Patents .......................................99

D. Asserted Patents Provide Significant Benefits.......................................................101

E. Slayback's Own Conduct Confirms the Value of the Formulation Patents.........102

X.    THE PUBLISHED PATENT APPLICATIONS IN THE CHEN-BRIDGETECH AND JHU-SIGNPATH AGREEMENTS ARE NOT TECHNICALLY COMPARABLE TO THE ASSERTED PATENTS .......................................................104

    A.    2006 Chen-Bridgetech Agreement .....................................................................107

    B.    2013 Johns Hopkins-Signpath Agreement..........................................................118

of propylene glycol, ethanol, benzyl alcohol and glycofurol." Sinko Rebuttal Report ¶¶ 46-48; Trout Rebuttal Report ¶ 73. As I explained in my Responsive Report, I understand that patent claims are interpreted in light of intrinsic evidence—the claims, specification, and prosecution history—not isolated dictionary definitions. Trout Rebuttal Report ¶¶ 73-75. The intrinsic evidence here uniformly confirms that the "pharmaceutically acceptable fluid" refers to the solvent system, regardless of whether "liquid" and "fluid" may share overlapping physical descriptions in other contexts. Trout Rebuttal Report ¶¶ 73, 144.

28.    Moreover, Dr. Sinko's assertion that the patents-in-suit "do not provide any definition of the words 'solid,' 'liquid,' or 'fluid'" is misleading. Sinko Rebuttal Report ¶ 42. While the patents do not provide independent definitions of "solid" and "liquid," the specification does define "pharmaceutically acceptable fluid" as "a fluid which is suitable for pharmaceutical use" and further ties suitability to the fluid's capacity to dissolve bendamustine. Trout Rebuttal Report ¶ 44; '214 patent at 2:56-58, 6:30-33; Examples 1-8. Dr. Sinko ignores this intrinsic definition and corresponding intrinsic evidence entirely.

29.    Dr. Sinko's "melting point" argument is particularly misplaced. Dr. Sinko asserts that ██████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████" Sinko Rebuttal Report ¶¶ 49, 54, 131-136. But the question is not whether █████████████████████████████████████████ ████████████; it is whether sodium hydroxide performs the solvent function that defines the pharmaceutically acceptable fluid claim element. It does not. If dissolution into a liquid medium were sufficient to make a substance part of the pharmaceutically acceptable fluid, then bendamustine hydrochloride—also a solid that dissolves and dissociates when added to PEG—

9

would likewise become part of the fluid element.  Trout Main Body of Opening Report ¶ 135.  No one contends that bendamustine thereby becomes part of the pharmaceutically acceptable fluid. The dissolution of a solute into a solvent does not erase the solute/solvent distinction that is fundamental to pharmaceutical formulation science, and Dr. Sinko's own sources confirm as much: even when sodium chloride dissolves in water, the solvent remains water and the solute remains sodium chloride, regardless of the phase change. Sinko Rebuttal Report ¶¶ 51-55.

30.    Dr. Sinko cites sources describing dissolution as "akin to melting" to argue that NaOH undergoes a state change and therefore becomes a fluid.  Sinko Rebuttal Report ¶ 54.  But this analogy, even if chemically descriptive of the phase transition at a molecular level, does not address the relevant question: what functional role does the dissolved species play in the formulation?  As I explained in the Main Body of my Opening Report, ███████████ ███████████████████████████████████ pH-adjusting reagent, and its hydroxide is effectively consumed through neutralization, leaving low-level inorganic counterions (*e.g.*, $Na^+$) and conjugate bases that are nonfunctional residues.  Trout Main Body of Opening Report ¶¶ 271-272, 280-282.  Whether one describes that process as "dissolution" or "melting" or any other physical chemistry term, the result is the same: the NaOH does not dissolve other components as a solvent, nor does it contribute to the liquid medium's solvation mechanisms.  Trout Main Body of Opening Report ¶ 264.

31.    Slayback's own labels confirm this functional distinction and refute the melting point argument on its own terms.  Each label identifies PEG 400 as the vehicle, ethanol as the co-solvent, and sodium hydroxide solely as a pH adjuster—not as a solvent, co-solvent, or part of the pharmaceutically acceptable fluid. Trout Main Body of Opening Report ¶¶ 202-207.  If dissolved NaOH truly "became" part of the pharmaceutically acceptable fluid upon dissolution, one would

10

expect labels and FDA classifications to reflect that characterization.  They do not.  The FDA required Slayback to list sodium hydroxide as a separate inactive ingredient used "to adjust pH of polyethylene glycol 400"—language that presupposes NaOH is distinct from, and acts upon, the PEG vehicle.  Trout Main Body of Opening Report ¶¶ 202-207; Sinko Rebuttal Report ¶ 72.

32.    Furthermore, the fact that sodium hydroxide must itself be dissolved into the PEG/ethanol matrix underscores that it is a solute or processing aid, not part of the solvent system.  Trout Main Body of Opening Report ¶ 272.  The solvent dissolves; the solute is dissolved.  Dr. Sinko's own framework confirms this: he acknowledges the solute/solvent distinction and the convention that "the component of a solution whose physical state is preserved during solution formation is known as the solvent."  Sinko Rebuttal Report ¶ 51. PEG 400's physical state is preserved when NaOH is added; it remains a liquid polyether vehicle.  Sodium hydroxide's physical state is not preserved; it goes from a solid to a dissolved species.  Under Dr. Sinko's own cited authority, PEG is the solvent and NaOH is the solute.

**B.    Dissolution Does Not Transform a pH Adjuster Into a Solvent**

33.    Dr. Sinko's discussion of pharmaceutical dosage forms, solutions, and the dissolution process is similarly misdirected.  Sinko Rebuttal Report ¶¶ 50-56.  Dr. Sinko correctly states that when a solid dissolves in a liquid, the resulting solution is homogeneous and the solute's constituent atoms or molecules are molecularly dispersed.  Sinko Rebuttal Report ¶¶ 52-53.  But Dr. Sinko then makes an unsupported leap: he asserts that because dissolved sodium hydroxide is no longer in a solid physical state, it must therefore be classified as part of the "pharmaceutically acceptable fluid."  Sinko Rebuttal Report ¶¶ 53, 56, 121-126.  This reasoning conflates dissolution with reclassification.

34.    By Dr. Sinko's logic, every component dissolved in the solvent system—including the bendamustine hydrochloride itself and the antioxidant monothioglycerol—would become the

11

Dated:    4-13-26    _____
                     Dr. Bernhardt L. Trout, Ph.D.