**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC,<br><br>Plaintiffs,<br><br>v.<br><br>SLAYBACK PHARMA LLC and AZURITY PHARMACEUTICALS, INC,<br><br>Defendants. | REDACTED PUBLIC VERSION FILED AUGUST 7, 2026<br><br>C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br> |

**OPENING BRIEF IN SUPPORT OF PLAINTIFFS EAGLE PHARMACEUTICALS, INC, AND EAGLE SUB1 LLC'S *DAUBERT* MOTION TO EXCLUDE THE OPINIONS OF DEFENDANTS' EXPERT, JAMES MALACKOWSKI**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   STATEMENT OF FACTS ....................................................................................2

    A.    The Opinions of Eagle's Damages Expert, Dr. Christopher Vellturo .....................2

    B.    The Rebuttal Opinions of Slayback's Damages Expert, James Malackowski ..........................................................................................................3

III.  LEGAL STANDARD.............................................................................................5

IV.   ARGUMENT ..........................................................................................................6

    A.    Mr. Malackowski's Analysis of the Eagle-Cephalon Agreement is Unreliable.............................................................................................................6

    B.    Mr. Malackowski Improperly Assumes Availability................................................8

    C.    Mr. Malackowski's Use of Non-Comparable Licenses is Unreliable ...................10

V.    CONCLUSION.....................................................................................................13

# TABLE OF AUTHORITIES[1]

## CASES

*Adasa Inc. v. Avery Dennison Corp.*,
  55 F.4th 900 (Fed. Cir. 2022) ...................................................................................... 10, 13

*AVM Techs., LLC v. Intel Corp.*,
  No. 10-610-RGA, 2013 WL 126233 (D. Del. Jan. 4, 2013) ...................................................... 6

*Baltimore Aircoil Co. v. SPX Cooling Techs. Inc.*,
  No. 13-2053, 2016 WL 4426681 (D. Md. Aug. 22, 2016).......................................................... 9

*Bayer HealthCare LLC v. Baxalta Inc.*,
  No. 16-cv-1122-RGA, 2019 WL 330149 (D. Del. Jan. 25, 2019) ........................................... 13

*Biscotti Inc. v. Microsoft Corp.*,
  No 13-1015, 2017 WL 2607882 (E.D. Tex. May 15, 2017) ...................................................... 11

*Chr. Hansen HMO GmbH v. Glycosyn LLC*,
  No. 22-cv-11090, 2025 WL 2176954 (D. Mass. Mar. 31, 2025)............................................... 12

*Fundamental Innovation Sys. Int'l LLC v. Anker Innovations Ltd.*,
  No. 21-339-RGA, 2024 WL 2258127 (D. Del. May 17, 2024) ......................................... 11, 12

*Golden Bridge Tech. v. Apple Inc.*,
  No. 12-4882, 2014 WL 2194501 (N.D. Cal. May 18, 2014) ............................................. 1, 6, 7

*In re Paoli R.R. Yard PCB Litig.*,
  35 F.3d 717 (3d Cir. 1994) ......................................................................................................... 6

*Innovative Memory Sys., Inc. v. Micron Tech., Inc.*,
  No. 14-1480-RGA, 2022 WL 4548644 (D. Del. Sept. 29, 2022) .............................................. 6

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) .................................................................................................................... 5

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  No. 06-348, 2011 WL 197869 (E.D. Tex. Jan. 20, 2011) ..................................................... 9, 10

*Limelight Networks, Inc. v. XO Commc'ns, LLC*,
  No. 15-720, 2018 WL 678245 (E.D. Va. Feb. 2, 2018) ............................................................. 7

*Mars, Inc. v. TruRx LLC*,
  No. 13-526, 2016 WL 4034790 (E.D. Tex. Apr. 18, 2016) ...................................................... 11

---

[1] All emphasis added, and internal citations and quotation marks omitted, unless otherwise noted.

*Microsoft Corp. v. Motorola, Inc.*,
   No. 10-1823, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013) .................................................. 7

*Personalized Media Commc'ns, LLC v. Apple, Inc.*,
   No. 15-1366, 2021 WL 662237 (E.D. Tex. Feb. 20, 2021)..................................................... 6, 8

*Puff Corp. v. SHO Prods., LLC*,
   No. 22-2008, 2024 WL 2208929 (C.D. Cal. Aug. 19, 2024) ................................................ 8, 10

*ResQNet.com, Inc. v. Lansa, Inc.*,
   828 F. Supp. 2d 688 (S.D.N.Y. 2011) ...................................................................................... 7

*Sound View Innovations, LLC v. Hulu, LLC*,
   No. 17-4146, 2019 WL 9047211 (C.D. Cal. Nov. 18, 2019) ...................................................... 9

*Sprint Commc'ns Co. v. Comcast IP Holdings, LLC*,
   No. 12-1013-RGA, 2015 WL 456154 (D. Del. Jan. 30, 2015) ........................................... 11, 12

*The Nielsen Co. (US), LLC v. TVision Insights, Inc.*,
   No. 22-57-CJB, 2026 WL 1091330 (D. Del. Apr. 17, 2026)................................................ 8, 9

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) ........................................................................................ 8, 10

*Utah Med. Prods., Inc. v. Graphic Controls Corp.*,
   350 F.3d 1376, 69 U.S.P.Q.2d 1136 (Fed. Cir. 2003)....................................................... 10, 13

**RULES**

FEDERAL RULE OF EVIDENCE 702 ........................................................................................ 7

iii

## I.    INTRODUCTION

Since the damages period began in January 2024, Slayback has earned about $36 million from selling over 25 million infringing Vivimusta products in direct competition with Eagle, while knowingly infringing the Asserted Patents, thereby eroding the price of Eagle's patented Belrapzo product, and causing Eagle to lose substantial profits.  Despite this overwhelming evidence of competition, lost sales, and price erosion, Slayback's expert, James Malackowski, contends that Eagle should recover only reasonable royalty damages of about $1 million based on an artificially low 3.0% royalty rate.  To do so, he undertakes an analysis that fails *Daubert* for three reasons.

*First*, while he properly relies on a 2015 license between Eagle and Cephalon (the "Eagle-Cephalon Agreement") under the Market Approach, Mr. Malackowski derives a 1% implied "per patent" rate by simply dividing the royalty rate (███) by the number of licensed patents (██).  But "the case law is clear that mere patent counting and dividing is not enough" to conduct an appropriate apportionment analysis.  *Golden Bridge Tech. v. Apple Inc.*, No. 12-4882, 2014 WL 2194501, at *6 (N.D. Cal. May 18, 2014).  Mr. Malackowski's even-division method is arbitrary and unreliable because experts cannot simply assume that each licensed patent has equal value.

*Second*, to form the other benchmark underlying his 3% rate, Mr. Malackowski relies on the costs he claims Slayback incurred to develop an alleged non-infringing alternative known as the PAS NDA formulation.  He converts the $1.4 million total cost to a percentage of Slayback's infringing net sales to derive an implied 3.9% royalty rate.  But Mr. Malackowski improperly assumes this alternative would have been "available" at the January 2024 hypothetical negotiation.  As set forth in Eagle's concurrently-filed summary judgment motion, this formulation was not available as a matter of law.  It took Slayback over four years to develop, was not completed until well after the hypothetical negotiation, and Slayback did not even receive FDA authorization until

1

October 2025—approximately 21 months after the hypothetical negotiation.  And to this day, the PAS NDA formulation has undisputedly never been offered for sale, sold, or used by a clinician.

*Third*, to corroborate his 3% royalty rate, Mr. Malackowski cherry-picks two third-party agreements that bear no resemblance to the hypothetical license.  He admits that the hypothetical negotiation is between two direct competitors (Eagle and Slayback) for a non-exclusive license to only the Asserted Patents covering only the U.S.  Yet he relies on two agreements executed over 10 years before the hypothetical negotiation executed by non-competing third parties that grant exclusive licenses to pending patent applications (not issued patents) and know-how that are not related to bendamustine—one of which was terminated long before the hypothetical negotiation.  Because Mr. Malackowski arbitrarily relies on radically different agreements without establishing economic comparability, his analysis is unreliable.  And, even assuming economic comparability, Mr. Malackowski's opinions still fail *Daubert* because he ignores technical comparability, does not account for the significant differences between these third-party licenses and the hypothetical license, and uses their royalty rates without adjustment and while ignoring milestone payments.

## II.    STATEMENT OF FACTS

### A.    The Opinions of Eagle's Damages Expert, Dr. Christopher Vellturo

Eagle's expert, Dr. Vellturo, found the *Panduit* test is satisfied.  Ex. 1 ¶¶ 12-17, 106-168. For Factor 1, he found demand exists for the patented products.  *Id.* ¶¶ 106-113.  For Factor 2, he explained that each alternative Slayback identified—(1) powder bendamustine; (2) non-bendamustine drugs; and (3) Slayback's PAS NDA formulation—are not "acceptable," and the PAS NDA formulation would not be "available."  *Id.* ¶¶ 114-129.  After he found Factor 3 met (*id.* ¶¶ 130-138), Dr. Vellturo quantified Eagle's lost profits as $20.3M through Q3 2025.  *Id.* ¶ 21.

Dr. Vellturo calculates reasonable royalty damages using an "Edgeworth Box" analysis to determine Eagle's minimum willingness to accept ███████████) and Slayback's maximum

2

willingness to pay ████████ ). Ex. 1 ¶¶ 18-19. He then assesses the *Georgia-Pacific* factors and conservatively adopts Eagle's minimum willingness to accept as the running royalty. *Id.* ¶ 20. He applies this royalty to calculate royalties of $██████ through September 2025. *Id.* ¶ 21.

Dr. Vellturo also concludes the royalty would be no lower than the ██ rate in the Eagle-Cephalon Agreement, where Cephalon received an exclusive license to ██ Eagle patents, including the Asserted Patents. *Id.* ¶¶ 20, 200-203. In exchange, Cephalon agreed to lump-sum payments up to ████ and running royalties that, after several amendments, increased to ██ of net sales after October 1, 2021. *Id.* ¶¶ 204-208. After finding this agreement to be comparable, Dr. Vellturo explains the original ██ rate is a conservative benchmark. *Id.* ¶¶ 215-224, 268-269.

## B.    The Rebuttal Opinions of Slayback's Damages Expert, James Malackowski

In his rebuttal report, Mr. Malackowski finds lost profits are not warranted because, under Factor 2, certain alleged alternatives—but not Slayback's PAS NDA formulation—are acceptable, non-infringing substitutes to Belrapzo. Ex. 4 at 94:2-25, 97:5-11, 100:15-20. Mr. Malackowski applies his 3.0% royalty rate to net sales of Vivimusta ($35,919,807) to calculate royalty damages of $1,077,594 through Q3 2025. Ex. 3 at 6. As discussed below, Mr. Malackowski's 3% rate is based on benchmarks from his analysis of the Cost and Market Approaches. Ex. 4 at 153:5-24.

*First*, Mr. Malackowski used the Cost approach, which considers the amount that a licensee would pay based on the cost to implement an available non-infringing alternative. Ex. 3 at 52-54. Specifically, he assessed the costs that Slayback allegedly incurred to develop the PAS NDA formulation, which it claims is identical to Vivimusta but allegedly lacks an antioxidant. *Id.* at 52.

None of Slayback's technical experts addressed the availability of this formulation. *See, e.g.*, Ex. 5 ¶ 73 ("I have been asked to *assume* that the PAS Product would meet the requirement of being available …"). Nor did Mr. Malackowski actually opine in his report that this formulation would have been available at the hypothetical negotiation; he only addresses certain facts related

3

to availability in two paragraphs.  Ex. 3 at 53-54; *id.* at 72 (same).  He first recounts the timeline from conception (July 2021) to the FDA application filing (Oct. 2024) to FDA authorization (Oct. 2025).  *Id.* at 53.  He then acknowledges that "as of February 2026," Slayback "did not identify an anticipated date of the first offer for sale."  *Id.* at 54.  Mr. Malackowski also quotes Slayback's interrogatory response, which asserts that Slayback "plans to commercially launch" the PAS NDA formulation "once it exhausts the inventory" of Vivimusta, which Slayback "expects will happen by the end of 2026."  *Id.*  No evidence is cited to support this assertion.  *See id.*  Mr. Malackowski confirmed at deposition that Slayback still has not actually sold this product.  Ex. 4 at 241:6-242:2.

*Second*, Mr. Malackowski agreed that the Eagle-Cephalon Agreement is comparable to the hypothetical license.  Ex. 3 at 55-61.  But, unlike Dr. Vellturo, he did not obtain any input from Slayback's technical experts to address its non-economic aspects.  Ex. 4 at 165:4-8.  Instead, Mr. Malackowski "conducted a per patent apportionment" of the ▮▮ rate in the agreement, found that it "indicates a per patent royalty of about 1 percent," and doubled the 1% to conclude there is an implied royalty rate of about 2% for a license to the two Asserted Patents.  *Id.* at 170:7-23, 198:19-199:1.  But he did no "apportionment" at all—he simply divided the ▮▮ rate by the "approximate" number of licensed patents (▮▮).  *See* Ex. 3 at 67-68; Ex. 4 at 199:2-200:21, 201:17-21 ("Q. I just want to be clear on your methodology was to take the stated ▮▮▮▮▮ and divide by the number of patents licensed in the Eagle-Cephalon agreement. A. Yes, that was the methodology.").

Mr. Malackowski also analyzed eight third-party licenses he found in "late February, early March of 2026," months after fact discovery closed, by searching "publicly available [] databases."  Ex. 3 at 62-66; Ex. 4 at 204:19-22, 205:18-208:4.  He summarized the licenses (Ex. 3 at App. 12.1, 62-66, 73) and found that six are not comparable to the hypothetical license.  Ex. 4 at 173:2-175:9.  Mr. Malackowski ultimately found two agreements—the 2006 Chen-Bridgetech Agreement and

the 2013 Johns Hopkins-Signpath Agreement—to be economically comparable and opines that their royalty rates "corroborate or confirm" his 3% royalty rate. *Id* at 205:4-15, 209:10-16. Here, too, Mr. Malackowski did not rely on input from Slayback's technical experts. *Id.* at 210:17-22.

**Chen-Bridgetech (Ex. 6)**. The parties are Andrew Xian Chen ("Chen") as licensor and Bridgetech Holdings ("Bridgetech") as licensee. Ex. 3 at 62. They are not competitors. Ex. 4 at 211:23-214:12. This agreement neither provides U.S. rights nor relate to bendamustine or any drug indicated to treat CLL or NHL. *See id.* at 213:4-215:22. Bridgetech received an exclusive license to develop, make, sell, and otherwise commercialize lyophilized docetaxel intravenous and lyophilized paclitaxel intravenous emulsion formulations for cancer treatment, and lyophilized formulations of vancomycin and clarithromycin for the treatment of infectious diseases, in Asia. Ex. 3 at 62-63. Bridgetech also received rights to know how and patent applications, but no issued U.S. patents. *Id.* at 63. Bridgetech agreed to pay a royalty of 4.0% of net sales of licensed products, an upfront payment of $500,000, and regulatory and milestone payments of up to $2.0 million. *Id.*

**JHU-Signpath (Ex. 7).** The parties are Johns Hopkins University as licensor and Signpath Pharma as licensee. Ex. 3 at 64. They also do not compete. Ex. 4 at 224:20-24. Signpath received an exclusive, worldwide license—with the right to sublicense—know-how and patent applications that do not relate to bendamustine or any drug indicated to treat CLL or NHL *Id.* at 225:21-226:8, 228:8-11, 228:18-23, 228:24-229:21. The agreement relates to "a form of particle encapsulation with biodegradable particles to assure delivery of cancer drugs to where they need to go." *Id.* at 226:13-20. Signpath agreed to various licensee fee, regulatory, and milestone payments, as well as a 3.0% royalty. Ex. 3 at 65. This agreement was terminated in December 2014. Ex. 8 at -393.

## III.    LEGAL STANDARD

This Court is the "gatekeeper" to "ensure the reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Slayback has the burden to establish

5

that Mr. Malackowski's testimony is helpful, based on sufficient facts or data, and the product of reliable methods. *AVM Techs., LLC v. Intel Corp.*, No. 10-610, 2013 WL 126233, at *1 (D. Del. Jan. 4, 2013). "[A]ny step that renders [his] analysis unreliable under the *Daubert* factors renders [his] testimony inadmissible." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994).

## IV.    ARGUMENT

### A.    Mr. Malackowski's Analysis of the Eagle-Cephalon Agreement is Unreliable

Both experts properly rely on the Eagle-Cephalon Agreement, but Mr. Malackowski makes no attempt to tie the stated ███ royalty rate to the facts of this case. Instead, he assumes, without analysis, that each licensed patent has equal value and uses simple patent-counting. That is error.

"[T]he case law is clear that mere patent counting and dividing is not enough" to pass muster under *Daubert*. *Golden Bridge*, 2014 WL 2194501, at *6. Experts "cannot assume that each patent has equal value." *Personalized Media Commc'ns, LLC v. Apple, Inc.*, No. 15-1366, 2021 WL 662237, at *7 (E.D. Tex. Feb. 20, 2021) ("*PMC*"). "The exercise of performing an apportionment analysis is to separate the specific value of the patents-in-suit using reliable known methods" and, because "not all patents are created equal," it is "unscientific to make a conclusory assumption that each patent has equal value." *Id.* Courts routinely exclude opinions where experts "assume without explanation that all patents were equally valuable." *Innovative Memory Sys., Inc. v. Micron Tech., Inc.*, No. 14-1480, 2022 WL 4548644, at *19 (D. Del. Sept. 29, 2022).

In *PMC*, the expert "divided the profitability of [the accused feature] by 53 (50 Apple DRM patents plus the three patents-in-suit)" to determine the royalty. 2021 WL 662237, at *6-7. The court found this method "unreliable" because the expert implicitly assumed each patent had "equal value," which "cannot be made without any support." *Id.* at *7. Likewise, the court in *Limelight Networks, Inc. v. XO Commc'ns, LLC* excluded a similar "even-division method" royalty analysis:

6

> The Court excludes [the expert's] testimony on the '348 patent because he uses an arbitrary method to determine the patent's value. … [The expert] determines that the technologies acquired in the Blaze acquisition and the '348 Patent both are technically comparable.  Then, **because the Blaze acquisition involved four buckets of technology, [the expert] divides the total value of the technology by four**.  [The expert] admits that he did not perform any analysis to determine whether the four buckets of technology had equal value and stated that nobody ever told him that they had equal value.  Despite this methodology, [the expert] recognized at the evidentiary hearing that different patents may have highly varying values.  [The expert's] **even-division method fails because it simply ignores facts in this case that [he] himself recognizes—that different patents have different values**.

No. 15-720, 2018 WL 678245, at *7 (E.D. Va. Feb. 2, 2018).  In *Golden Bridge*, the expert "erred in assuming the value of the [asserted] patent was no different" than the value of any other patent considered under a comparable license.  2014 WL 2194501, at *6-7; *ResQNet.com, Inc. v. Lansa, Inc.*, 828 F. Supp. 2d 688, 695 (S.D.N.Y. 2011) (rejecting analysis that "simply divided [] rates by the number of [licensed] patents" as "supported by nothing other than its simplicity"); *Microsoft Corp. v. Motorola, Inc.*, No. 10-1823, 2013 WL 2111217, at *88 (W.D. Wash. Apr. 25, 2013) (discrediting "patent-counting" analysis that "does not distinguish between patents" on "merit").

The "even-division" and "patent-counting" exercise that Mr. Malackowski used to analyze the Eagle-Cephalon Agreement is unreliable for the same reasons.  Mr. Malackowski admits he calculated an implied 1% "per patent" royalty rate by dividing the royalty rate       ) in the Eagle-Cephalon Agreement by the "approximate" number of licensed patents (   ), and then "included the 1 percent for the fact that there are two patents. Therefore, 2 percent." Ex. 4 at 198:19, 200:21, 201:17-202:3.  Just like in the cases above, Mr. Malackowski did no analysis to identify the relative value of each licensed patent, made no effort to assess how they compare to the Asserted Patents, and did not obtain technical input from any Slayback expert.  *See* Ex. 3 at 67-68; Ex. 4 at 165:4-8; *compare, e.g.*, *Limelight*, 2018 WL 678245, at *7.  Instead, he implicitly assumed that each of the    licensed patents has equal value, despite admitting that each patent recites a unique invention and will "not necessarily" have the same value as another.  Ex. 4 at 28:17-20, 29:6-11.

Mr. Malackowski "cannot assume that each patent has equal value," and his "conclusory assumption" that each patent licensed in the Eagle-Cephalon Agreement "has equal value" is a fatal flaw warranting exclusion. *PMC*, 2021 WL 662237, at *7. Because his 3% rate rests on the rate he implied from this agreement (*see* Ex. 4 at 154:13-18), his entire royalty opinion should be excluded. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) ("Beginning from a fundamentally flawed premise … results in a fundamentally flawed conclusion.").

### B.      Mr. Malackowski Improperly Assumes Availability

The Court also should exclude Mr. Malackowski's 3% royalty rate because it hinges on the erroneous assumption that Slayback's PAS NDA formulation would be available at the January 2024 hypothetical negotiation. While the reasonable royalty analysis "can involve consideration of acceptable non-infringing alternatives," there "must be some showing that the alternative would have been available" as of "the hypothetical negotiation." *The Nielsen Co. (US), LLC v. TVision Insights, Inc.*, No. 22-57, 2026 WL 1091330, at *1 (D. Del. Apr. 17, 2026). Thus, an "alternative cannot be relevant to the reasonable royalty analysis unless available ***at the time infringement began***." *Puff Corp. v. SHO Prods., LLC*, No. 22-2008, 2024 WL 2208929, at *13 (C.D. Cal. Aug. 19, 2024) (emphasis in original). "[W]hen a proposed non-infringing alternative is not on the market," then "the accused infringer must overcome an inference that it was not available with more than just speculation or conclusory assertions." *Nielsen*, 2026 WL 1091330, at *1.

*Puff* is highly instructive. There, the defendant's expert opined the parties "would have settled on a royalty rate equal to no more than the difference in BOM cost" between the accused "Carta OG" product and the "Carta 2" non-infringing alternative. 2024 WL 2208929, at *13. But the court struck the expert's opinions after holding that the Carta 2 alternative was not "available" because there was no evidence it was available as of the hypothetical negotiation (January 2020), explaining that the "Defendants did not launch the Carta 2 until two years later, in February 2022."

*Id.* at \*13-14.  Likewise, in *LaserDynamics, Inc. v. Quanta Computer, Inc.*, the court held that the defendant "has not established that [its expert's] non-infringing alternatives were available," as there was no evidence they "were on the market," even though one was "practically implemented." No. 06-348, 2011 WL 197869, at \*3 (E.D. Tex. Jan. 20, 2011).  The expert's opinions were mere "speculation that it might have been theoretically possible" for defendant to produce them as of the hypothetical negotiation, which does "not assist the trier of fact."  *Id.*; *Sound View Innovations, LLC v. Hulu, LLC*, No. 17-4146, 2019 WL 9047211, at \*13-14 (C.D. Cal. Nov. 18, 2019) (same).

Mr. Malackowski's 3.0% rate is fundamentally flawed for the same reason.  As explained in Eagle's summary judgment motion on damages, the PAS NDA formulation is not "available" as a matter of law because it undisputedly took over four years to develop, did not receive FDA authorization until 21 months *after* the hypothetical negotiation, and has never been.  *See supra* at 3-4.  Mr. Malackowski's reliance on this unavailable alternative is improper and, because his 3% rate must be recalculated if it were found unavailable (*see* Ex. 4 at 154:19-155:3), his opinion "lacks sufficient factual support to meet *Daubert*'s reliability threshold."  *Baltimore Aircoil Co. v. SPX Cooling Techs. Inc.*, No. 13-2053, 2016 WL 4426681, at \*26 (D. Md. Aug. 22, 2016).

Mr. Malackowski argued at deposition (but not in his report) that this formulation need *not* be available at the hypothetical negotiation to be relevant.  Ex. 4 at 236:16-237:7 ("Q. And you also agree that a next best alternative must be available at the time of the hypothetical negotiation to be informative under the cost approach or the *Georgia-Pacific* analysis; correct? A. No, I don't agree with that…").  According to him, to be relevant, an alleged alternative need only be available at some point before *patent expiration* (here, 2031).  *See id.* at 236:16-239:21 ("Q. So which period did you use, though, to consider the availability of the PAS NDA product? A. The term of the license GP factor 7, which is through 2031.").  That belated opinion is *not* in his report, is *ipse*

9

*dixit*, and contradicts the law that "there must be some showing that the alternative would have been available … **as of the date of the hypothetical negotiation**." *Nielsen*, 2026 WL 1091330, at \*1; *Puff*, 2024 WL 2208929, at \*13 (same). Mr. Malackowski's opinions amount are "speculation that it might have been theoretically possible for [Slayback] to produce" this alternative, which are "irrelevant" and "do not assist the trier of fact." *LaserDynamics*, 2011 WL 197869, at \*3.

### C. Mr. Malackowski's Use of Non-Comparable Licenses is Unreliable

An expert may rely on licenses to assess the reasonable royalty, but "there must be a basis in fact to associate the royalty rates … the particular hypothetical negotiation." *Uniloc USA*, 632 F.3d at 1317. Slayback "bears the burden" to show "economic and technological comparability," and merely "alleging a loose or vague comparability … does not suffice." *Adasa Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 915 (Fed. Cir. 2022); *see* Ex. 4 at 163:6-10 (acknowledging the same). Even where a baseline comparability is established, the expert also "must account for differences in the technologies and economic circumstances," and then reliably apply the license to the facts of the case. *Adasa*, 55 F.4th at 915. Here, Mr. Malackowski's flawed analysis of the Bridgetech and Johns Hopkins Agreements fails at each step—he ignored technical comparability, failed to establish economic comparability, and relied on their royalty rates without adjustment.

*First*, Mr. Malackowski ignores technical comparability. There is no dispute that neither third-party agreement mentions or relates to bendamustine (the technology at issue), much less stable liquid bendamustine (the patented technology). Ex. 4 at 215:8-22, 217:24-218:6. And Mr. Malackowski admittedly did not rely on Slayback's technical experts to inform, much less establish, technical comparability between the claims of the Asserted Patents and the disparate technology licensed in these third-party agreements. *Id.* at 210:19-22. Such input was necessary as they relate to, for example, drugs for treating pneumonia and cancers other than CLL and NHL (the cancers the patented products are indicated to treat). *Supra* at 5; Ex. 4 at 217:24-218:6,

10

228:18-23.  Under Federal Circuit law, such vague connections cannot establish the requisite technical comparability.  *See Adasa*, 55 F.4th at 915 (affirming exclusion of expert "testimony and related licenses from evidence" as "insufficient to establish comparability" where the technical expert did "not attempt any independent or meaningful comparison to the [] patent claims"); *Utah Med. Prods., Inc. v. Graphic Controls Corp.*, 350 F.3d 1376, 1385-86 (Fed. Cir. 2003) (affirming trial court's exclusion of medical device "industry licenses").  Mr. Malackowski's "complete failure to provide any analysis regarding technological comparability warrants exclusion." *Biscotti Inc. v. Microsoft Corp.*, No 13-1015, 2017 WL 2607882, at *3 (E.D. Tex. May 15, 2017).

*Second*, Mr. Malackowski falls far short of establishing economic comparability.  There is no dispute that, at the January 2024 hypothetical negotiation, two competitors (Eagle/Slayback) would agree to a non-exclusive license to the Asserted Patents with a 7-year term limited to the U.S.  Ex. 4 at 157:18-158:10, 159:5-160:22.  That license would *not* be worldwide, cover Slayback customers or suppliers, include sublicense rights, or include rights outside of the U.S.  *See id.*  As discussed below, the third-party agreements share almost no similarities with the hypothetical license—both are radically different and lack economic comparability.  *See* Ex. 2 ¶¶ 107-144.

The Bridgetech Agreement was signed in 2006, about 18 years before the hypothetical negotiation (Ex. 4 at 212:13-23), which is "a considerable temporal difference, and would have a dramatic effect on the economic positions of the negotiating parties."  *Sprint Commc'ns Co. v. Comcast IP Holdings, LLC*, No. 12-1013, 2015 WL 456154, at *2 (D. Del. Jan. 30, 2015) (13 years).  The parties are "not comparable to the parties to the hypothetical license." *Fundamental Innovation Sys. Int'l LLC v. Anker Innovations Ltd.*, No. 21-339, 2024 WL 2258127, at *1-5 (D. Del. May 17, 2024).  Neither Chen nor Bridgetech would be party to the hypothetical negotiation and, unlike Eagle and Slayback, they do not compete.  Ex. 4 at 210:23-211:7, 211:23-212:12; *see*

11

*Mars, Inc. v. TruRx LLC*, No. 13-526, 2016 WL 4034790, at \*3-4 (E.D. Tex. Apr. 18, 2016) ("the license was between NPIC and Adam Springer … is not relevant to the hypothetical negotiation here, which would occur between Mars and True Science"). The license scope is also materially different—Mr. Chen granted Bridgetech an exclusive "technology development" license that includes rights to patent applications and "know how," which "is more than a bare patent license." Ex. 4 at 212:24-213:3, 213:12-15, 219:1-4; *Chr. Hansen HMO GmbH v. Glycosyn LLC*, 22-11090, 2025 WL 2176954, at \*4-6 (D. Mass. Mar. 31, 2025) (finding "significant differences do exist" where "agreement provided for an exclusive, worldwide license, while the hypothetical negotiation would have resulted in a non-exclusive … license"). There is also no overlap in geographical scope: Bridgetech received rights only in Asia, whereas Slayback obtains only U.S. rights. Ex. 4 at 213:16-214:5. The licensed products are also different as the hypothetical license covers a successful liquid bendamustine product indicated to treat CLL and NHL (Vivimusta), while the Bridgetech agreement only covers potential future lyophilized products for treating pneumonia and cancer other than CLL or NHL. *Id.* at 215:4-22, 217:24-218:6. And the Bridgetech agreement did not include rights to an issued patent, much less any that would be presumed infringed and valid (as the Asserted Patents would be at the hypothetical negotiation). *Id.* at 218:7-8, 219:5-15.

The Johns Hopkins Agreement is equally non-comparable. It was signed in 2013, 11 years before the hypothetical negotiation. Ex. 4 at 225:17-20; *compare Sprint*, 2015 WL 456154, at \*2. It involves parties that, unlike Eagle and Slayback, were not competitors. *See* Ex. 4 at 224:9-16; *Fundamental*, 2024 WL 2258127, at \*4-5. The license scope is exclusive, worldwide, includes sublicense rights, and grants rights to know how—none of which is in the hypothetical license. *See* Ex. 4 at 225:21-226:8, 229:19-21. The agreement licenses "particle encapsulation with biodegradable particles," which is wholly unrelated to bendamustine, stable liquid bendamustine,

12

or treating CLL and NHL.  *Id.* at 226:13-20.  Further, unlike Vivimusta as of the hypothetical negotiation, no licensed product had been commercialized.  Ex. 4 at 227:12-18, 228:8-11; *see also id.* at 228:18-23.  And, like the Bridgetech Agreement, there are only two patent applications—no issued patents—licensed in the Johns Hopkins Agreement, and no evidence that they are valid or infringed.  *Id.* at 228:24-229:11, 229:22-230:2.  Finally, the parties terminated this agreement in 2014—a decade before the hypothetical negotiation.  *Id.* at 230:17-232:22 (quoting Ex. 8 at -322).

*Third*, even if comparability could be established, Mr. Malackowski made no adjustments before using these rates as "corroboration."  He simply plucked them from these disparate licenses, ignored the milestone payments and other consideration, and did not adjust the rates to account for their significant differences, including their exclusivity and different parties, licensed patents, licensed products, license term, geographical scope, and the additional rights granted (e.g., know-how, sublicense rights).  *See Bayer HealthCare LLC v. Baxalta Inc.*, No. 16-cv-1122-RGA, 2019 WL 330149, at *5-6 (D. Del. Jan. 25, 2019) (excluding opinions on exclusive licenses with milestone payments as expert failed "to reconcile these features with the hypothetical license").  Mr. Malackowski's wholesale failure to account for the significant economic differences between these licenses and the hypothetical license warrants exclusion.  *See Adasa*, 55 F.4th at 915.

Because Mr. Malackowski did not establish baseline technical or economic comparability, and made no adjustments to account for the significant differences between these agreements and the hypothetical license, his analysis of these third-party licenses is unreliable and he should be barred from relying on them at trial.  Separately, because their introduction would only "mislead and confuse the jury," these agreements are also inadmissible under Federal Rule of Evidence 401 and 403.  *See Utah Med.*, 350 F.3d at 1386 (excluding non-comparable licenses under Rule 403).

## V.    CONCLUSION

Eagle requests that the Court exclude Mr. Malackowski's reasonable royalty opinions.

13

Dated: June 5, 2026

OF COUNSEL:

Kenneth G. Schuler
Marc N. Zubick
Alex Grabowski
Michelle Chin
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700

Kelly A. Welsh
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200

Brett M. Sandford
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 9411
(415) 391-0600

Ramya Sri Vallabhaneni
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
ramya.vallabhaneni@lw.com

**MCCARTER & ENGLISH, LLP**

*/s/ Daniel M. Silver*

Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Attorneys for Plaintiffs*

14

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that true and correct copies of the foregoing documents were caused to be served on June 5, 2026, on the following counsel in the manner indicated:

**VIA EMAIL:**

Daniel A. Taylor
Neal C. Belgam
SMITH KATZENSTEIN & JENKINS LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
Dtaylor@skjlaw.com
Nbelgam@skjlaw.com

Jason A. Lief
Allan H. Pollack
Audrey R. Sparschu
WINDELS MARX LANE & MITTENDORF, LLP
156 West 56th Street
New York, NY 10019
jlief@windelsmarx.com
apollack@windelsmarx.com
asparschu@windelsmarx.com

Andrew Miller
Ajay Kayal
Robyn Ast-Gmoser
Daniel E. Forchheimer
Kiersten A. Fowler
WINDELS MARX LANE & MITTENDORF, LLP
One Giralda Farms
Madison, NJ 07940
amiller@windelsmarx.com
akayal@windelsmarx.com
rast-gmoser@windelsmarx.com
dforchheimer@windelsmarx.com
kfowler@windelsmarx.com

*Attorneys for Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)