# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC, <br><br> Plaintiffs, <br><br> v. <br><br> SLAYBACK PHARMA LLC and AZURITY PHARMACEUTICALS, INC, <br><br> Defendants. | REDACTED PUBLIC VERSION FILED AUGUST 7, 2026 <br><br> C.A. No. 24-65-JLH (CONSOLIDATED) <br><br> **JURY TRIAL DEMANDED** <br><br>  |

## DECLARATION OF ALEXANDRA JOYCE IN SUPPORT OF PLAINTIFFS EAGLE PHARMACEUTICALS, INC. AND EAGLE SUB 1 LLC'S *DAUBERT* MOTION TO EXCLUDE THE OPINIONS OF DEFENDANTS' DAMAGES EXPERT, <u>JAMES MALACKOWSKI</u>

I, Alexandra Joyce, declare as follows:

1.    I am an attorney at the law firm of McCarter & English, LLP and counsel for Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC ("Eagle") in the above-captioned case.  I am admitted to practice before the Court.

2.    I make this declaration in support of Eagle's *Daubert* Motion to Exclude the Opinions of Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s ("Slayback's") Damages Expert, James Malackowski.

3.    I have personal knowledge of the facts set forth in this declaration, and if called as a witness, could and would competently testify thereto.

4.    Attached as **Exhibit 1** is a true and correct copy of excerpts of the Supplemental Expert Report of Dr. Christopher A. Vellturo, dated March 6, 2026.

5.    Attached as **Exhibit 2** is a true and correct copy of excerpts of the Reply Expert Report of Dr. Christopher A. Vellturo, dated April 13, 2026.

6.    Attached as **Exhibit 3** is a true and correct copy of excerpts of the Rebuttal Report of James Malackowski, dated March 16, 2026.

7.    Attached as **Exhibit 4** is a true and correct copy of excerpts of the Deposition Transcript of James Malackowski, dated April 15, 2026.

8.    Attached as **Exhibit 5** is a true and correct copy of excerpts of the Rebuttal Expert Report of Dr. Michael L. Brandt.

9.    Attached as **Exhibit 6** is a true and correct copy of the Johns Hopkins University/Signpath Pharma Inc. Exclusive License Agreement (SLAY-VIVMUS0227465).

10.    Attached as **Exhibit 7** is a true and correct copy of the Andrew Xian Chen/BridgeTechHoldings, Inc. Agreement for Purchase and Sale (SLAY-VIVMUS0227539).

1

11.     Attached as **Exhibit 8** is a true and correct copy of excerpts of the Signpath Pharma

Inc. 2015 Form 10-K (EAGLEBEN-SA_00376322).

I declare under penalty of perjury that the foregoing is true and correct.


DATED: June 5, 2026                              /s/ Alexandra M. Joyce
                                                 Alexandra Joyce

# Exhibit 1
# Filed Under Seal

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1, LLC., <br><br> PLAINTIFFS, <br><br><br> V. <br><br><br><br> SLAYBACK PHARMA LLC AND AZURITY PHARMACEUTICALS, INC., <br><br> DEFENDANTS. | C.A. NO. 24-65-JLH <br><br> (CONSOLIDATED) <br><br> HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY |

# EXPERT REPORT OF CHRISTOPHER A. VELLTURO, PH.D.

## I. OVERVIEW

### A. Qualifications and Experience

1. I am the founder and president of Quantitative Economic Solutions, LLC, a microeconomic consulting firm. I received a Doctor of Philosophy degree (Ph.D.) in Economics from the Massachusetts Institute of Technology in Cambridge, Massachusetts in 1989. My fields of specialization include industrial organization and econometrics. My curriculum vitae, which lists my testimony for the last four years and my publications, is attached as Exhibit 1.

2. I have extensive experience in the valuation of intellectual property and in the assessment of economic injury/damages sustained as a result of copyright, trademark, and/or patent infringement. Industries that I have studied in this context include: pharmaceutical products, medical devices, over-the-counter medications and instruments, consumer products, computer hardware and software, semiconductors, and many others.

3. I have studied the pharmaceutical industry extensively and along a number of dimensions. From an intellectual property standpoint, I have analyzed patent infringement damages issues (including lost profits, price erosion, and reasonable royalties), commercial success and nexus, and irreparable harm. I have also studied the pharmaceutical industry in the context of merger reviews in the United States and abroad, in private antitrust actions, and in the context of contract disputes. I have previously served as an expert in damages assessment, economics generally, statistics/econometrics, and as an expert on the pharmaceutical industry in particular. In addition, I have designed licensing programs for patent holders on several occasions, including programs for intellectual property relating to pharmaceuticals.

### B. Statement of Assignment

4. I have been retained by counsel for Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC (collectively "Eagle" or "Plaintiffs") in connection with the above captioned litigation.[1] I have been asked to perform an economic analysis to assess the appropriate measure and quantum of damages to Eagle as a result of the infringement of claims 1-9 of U.S. Patent No. 11,872,214 ("the '214 patent") and claims 1-6, 8-11, 15, and 20 of U.S. Patent No. 12,138,248 ("the '248 patent")

---

[1] QES is being compensated for my time spent on this matter at an hourly rate of $1,250, which is my customary rate. Payment is not contingent on the outcome of this matter. QES is also compensated for the time spent on this matter by persons working at my direction. Those rates are lower than my hourly rate.

- Conversations with Eagle current and former employees, including Christopher Krawtschuk, David Bricker, and Alan Eagle;

- Opening Expert Report of Bernhardt Trout, Ph.D., February 6, 2026 ("Trout Opening Report"), and Appendix B thereto.

- Court filings in this case; and

- Deposition testimony and exhibits.

9. A complete list of the information I considered in forming my opinions is in Exhibit 2 to this report.

10. My findings at this point are based on the information available to me. I may revise or supplement my opinions based on additional discovery and analyses. I may also provide additional analyses (including, but not limited to, additional expert reports) if I am called upon to do so, including a response to any opinions offered by experts on behalf of Slayback.

## D. Exhibits

11. At trial, I may provide and rely on visual aids and/or demonstrative exhibits to demonstrate basic principles of economics, calculations of damages, in general and in this case, and my opinions expressed herein and the bases for them, and enlargements of documents considered in forming my opinions.

## E. Summary of Conclusions

12. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

██ ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

14. **<u>Lost Profits Damages.</u>** A reasonable hypothesis in situations where an incumbent pharmaceutical brand faces infringing competitive pharmaceutical products is that the supplier of the incumbent product may sustain harm in the form of "lost profits." Such lost profits can be driven by two related dynamics.



[4] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F. 2d 1152 (6th Cir. 1978).

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

17.

18. **Reasonable Royalty Damages.** In the event that the finder of fact determines lost profits should not be awarded, I have also undertaken a reasonable royalty damages assessment. I understand reasonable royalty damages are generally assessed under the framework of a "hypothetical negotiation" at which the parties sit down on the eve of first infringement to negotiate a license via which the patentee grants rights to the infringer to practice the patent(s)-at-issue. In the present case, I understand that the application of this framework yields a negotiation between Eagle and Slayback on or around the issuance date of the first Asserted Patent. Under this framework, I evaluate the fifteen factors enumerated in *Georgia-Pacific Corporation v. United States Plywood Corporation* (the "*Georgia-Pacific* Factors").[7]

19. Under *Georgia-Pacific* Factor 15, the central focus of the hypothetical negotiation would be Eagle's expected sales and profits for Belrapzo and royalties associated with Bendeka that the Accused

---

[5] In the event that only the '214 patent is found not invalid and infringed, my lost profits calculations would not change. However, for completeness, I present alternative damages calculations in the event that only the '248 patent (and not the '214 patent) is found not invalid and infringed in the Exhibits attached to this report.

[6] I further estimate that, in the alternative scenario where only the '248 patent is found valid and infringed, Eagle would suffer lost profits totaling ███████ from Q1 2024 through Q3 2025 due to Slayback's infringement. ████████████ ████████████ *See* Exhibits 3-A, 4-A, 5-A, 6-A.

[7] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).



20. ██████████████████████████████████████, I assess the remaining *Georgia-Pacific* Factors to determine where relative to the bounds the reasonable royalty rate would fall. █ ██████████████████████████████████████ ██████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████ ████████████████████

21. Applied to Slayback's infringing units of ████████████████████████, I arrive at a reasonably royalty estimate of ██████████ for Slayback through September 2025, and in no event less than ██████████.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

**Figure 2: Reasonable Royalty Damages Summary**
**Q1 2024 – Q3 2025**
*($ millions)*
*Source: Exhibits 7, 8*

| | Royalty Rate | Damages |
|---|---|---|
| Eagle Minimum Royalty Rate | | |
| Edgeworth Box Eagle Minimum WTA | | |

22. I discuss the bases for these opinions in the remainder of this report. In Section II, I provide background relevant to my economic analyses, including about the present parties, relevant marketplace, and the pharmaceutical industry more broadly. In Section III, I provide my understanding of the Asserted Patents and Eagle's infringement allegations. In Section IV, I provide an overview of the framework for my damages analysis. In Sections V and VI, I provide my lost profits and reasonable royalty damages assessments, respectively.

## II.  BACKGROUND

### A.  Relevant Entities

#### 1.  Eagle

23. Eagle is a pharmaceutical company focused on critical care and oncology treatments.[8] It is headquartered in New Jersey and has facilities and offices in Massachusetts and Indiana.[9] Eagle became a publicly traded company on February 12, 2014.[10]

24. ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛.[11] Eagle's products include:

- Barhemsys and Byfavo, indicated for the treatment of postoperative nausea and vomiting, and for use in procedural sedation, respectively; [12]

- Belrapzo, Bendeka, and Treakisym for the treatment of chronic lymphocytic leukemia and non-Hodgkin lymphoma, with Bendeka licensed to Teva in the U.S. and Treakisym licensed to SymBio in Japan;[13]

- Ryanodex, indicated for treatment of malignant hyperthermia;[14] and

---

[8] EAGLEBEN-SA_00366636 at 636; EAGLEBEN-SA_00364462 at 468.
[9] EAGLEBEN-SA_00363514 at 542.
[10] EAGLEBEN-SA_00367201 at 201.
[11] EAGLEBEN-SA_00366641 at 641-642; EAGLEBEN-SA_00366638 at 638-639; EAGLEBEN-SA_00364462 at 468.
[12] EAGLEBEN-SA_00366641 at 641-642.
[13] EAGLEBEN-SA_00366641 at 641-642; EAGLEBEN-SA_00364462 at 468.
[14] EAGLEBEN-SA_00366641 at 641-642.

**Figure 3: Timeline of Liquid Bendamustine Product Releases and Asserted Patents**



## V.    LOST PROFIT DAMAGES

### A.  *Panduit* Factor 1: Demand for the Patented Products

106.  Under *Panduit* Factor 1, I assess demand for the products that practice the Asserted Patents.  The Court of Appeals for the Federal Circuit provided an assessment of the first *Panduit* factor in *DePuy Spine, Inc. v. Medtronic Safamor Danek, Inc.*:

> All that the first factor states, and thus requires, is 'demand for the patented product.' … This factor does not require any allocation of consumer demand among the various limitations recited in a patent claim. Instead, the first Panduit factor simply asks whether demand existed for the 'patented product,' i.e., a product that is 'covered by the patent in suit' or that 'directly competes with the infringing device.' … As we have held, the focus on particular features corresponding to individual claim limitations is unnecessary when considering whether demand exists for a patented product under the first *Panduit* factor.[268]

---

[268] *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1331 (Fed. Cir. 2009).  *See also Versata Software, Inc. v. SAP Am., Inc.,* 717 F.3d 1255, 1265-66 (Fed. Cir. 2013) ("The Panduit factors do not require showing demand for a particular embodiment of the patented functionality … Nor does it require any allocation of consumer demand among the various limitations recited in a patent claim. In other words, the Panduit factors place no qualitative requirement on the level of demand necessary to show lost profits."); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1360-1361 (Fed. Cir. 2012) ("ATC argues that the record does not link market demand with the claimed fringe-effect capacitance limitation. This argument

107. I further understand that, where the patentee's product competes in the same market as the Accused Product, a high volume of allegedly infringing sales can prove the requisite demand under the first *Panduit* factor.[269]

108. To assess demand, I consider the actual historical sales and prescriptions of Belrapzo, Bendeka, and each of Apotex, Baxter, and Slayback's liquid bendamustine products. I understand from Dr. Trout that each of these products practice at least one claim of the Asserted Patents.[270] Based on my analysis, as discussed below, substantial demand exists for the patented products and those products have been commercially successful in the marketplace.

109. Figures 4 and 5 below report Eagle's U.S. quarterly net sales of Belrapzo and Teva's U.S. quarterly net sales of Bendeka since their respective launches. As shown, Belrapzo and Bendeka have generated significant revenues for Eagle and Teva. ███████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████ ██████████

████████████████████████████████████████████████████████

████████████████████

---

fails because the first Panduit factor 'does not require any allocation of consumer demand among the various limitations recited in a patent claim.'").

[269] *Gyromat Corp. v. Champion Spark Plug Co.,* 735 F.2d 549, 552 (Fed. Cir. 1984) ("The substantial number of sales by Champion of infringing products containing the patented features itself is compelling evidence of the demand for the product. Champion's sales necessarily meant that there were buyers who wanted the product and were willing to pay Champion's price, which was substantially the same as that of Gyromat."); *Parker-Hannifin Corp. v. Champion Labs., Inc.,* No. 06-cv-2616, 2008 WL 1843922, at *7 (N.D. Ohio Apr. 22, 2008) (explaining that, "[i]n the Gyromat case," the Federal Circuit "found that proof of sales of an infringing product was sufficient to establish demand for the patented product even where defendant demonstrated sales of a non-infringing product.")

[270] Trout Conversation; Opening Expert Report of Dr. Bernhardt Trout, Ph.D., February 6, 2026 ("Trout Opening Report"), § XIII.

[271] Exhibits 9, 10.

██ ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████

**Figure 4: Eagle U.S. Net Sales of Belrapzo**
**Q2 2018 – Q2 2025**
*($ millions)*
*Source: Exhibit 9*



HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

**Figure 5: Teva U.S. Net Sales of Bendeka**
**Q1 2016 – Q2 2025**
*($ millions)*
*Source: Exhibit 10*



110.  This confirms there is demand for Belrapzo and Bendeka in the market.

111. Since their launches, Slayback's Vivimusta product, as well as Apotex's and Baxter's liquid bendamustine products, have also generated considerable demand.  Importantly, because I understand from Dr. Trout that each of these products infringe the Asserted Patents, and I understand from Dr. Ashraf the demand that exists from prescribers and patients for these

---

[273] Exhibit 11; EAGLEBEN-SA_00367593 at 594.

products are primarily due to their established therapeutic equivalence to Belrapzo, their unit and net sales constitute additional evidence of demand for the patented products.[274]

112.    As shown in Exhibit 12, from May 2023 through November 2025, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As shown in Exhibit 13, from February 2023 through September 2025, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As shown in Exhibit 14, from December 2022 through September 2025, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

113.    In total, through Q2 2025, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The significant unit and dollar sales associated with these liquid bendamustine products show that there has been strong historical and continuing demand for the patented products.  I therefore conclude that *Panduit* Factor 1 is satisfied.

### B.  *Panduit* Factor 2: Absence of Non-Infringing Substitutes

114.    Under this factor, I consider whether there would have been any acceptable, non-infringing alternatives to Belrapzo in the reconstructed "but for" market.  I briefly discuss each element and then provide my analysis of this factor below.

115.    First, with respect to availability, I understand that "substitutes only theoretically possible will not" preclude lost profits.[279]  I also understand that "[t]he critical time period for determining availability of an alternative is the period of infringement for which the patent owner claims damages, i.e., the accounting period."[280]  In addition, while I understand that a non-infringing alternative need not be on the market during the infringement period to factor into a lost profits analysis, I also understand that "when an alleged alternative is not on the market during the

---

[274] Trout Conversation; Trout Opening Report, § XIII; Ashraf Conversation.
[275] Exhibit 12.
[276] Exhibit 13.  I understand that redacted versions of certain financial documents from Apotex and Baxter have been designated for use in estimating damages.  I use these redacted versions when using data from Apotex and Baxter.
[277] Exhibit 14.
[278] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
*See* Exhibits 9, 10, 12, 13, 14, net sales and unit sales summed through Q2 2025.
[279] *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999).
[280] *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999), citing *State Indus.*, 883 F.2d at 1579; *Panduit*, 575 F.2d at 1162.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

accounting period, a trial court may reasonably infer that it was not available as a non-infringing substitute at that time"[281] and, thus, "[t]he accused infringer then has the burden to overcome this inference by showing that the substitute was available."[282]  I understand that having "the necessary equipment, know-how, and experience" to make an alternative product during the relevant time period may render the product "available,"[283] but the "high cost of a necessary material"[284] or a "finding that an infringer had to design or invent around the patented technology to develop an alleged substitute weighs against a finding of availability."[285]

116.    Second, with respect to acceptability, I understand "[t]he correct inquiry under *Panduit* is whether a non-infringing alternative would be acceptable compared to the patent owner's product, not whether it is a substitute for the infringing product."[286]  I also understand that "[t]he mere existence of a competing device does not necessarily make that device an acceptable substitute,"[287] because a product "which lacks the advantages of the patented product can hardly be termed a substitute acceptable to the customer who wants those advantages."[288]  Further, I understand that "[t]o be deemed acceptable, the alleged acceptable non-infringing substitute must not have a disparately higher price than or possess characteristics significantly different from the patented product."[289]  "In other words, buyers must view the substitute as equivalent to the patented device."[290]  Finally, I understand that this factor "must be viewed of limited influence where the infringer knowingly made and sold the patented product for years while ignoring the 'substitute.'"[291]

[281] *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999).
[282] *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999).
[283] *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999).
[284] *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999).
[285] *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119 (Fed. Cir. 2003).
[286] *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1361 (Fed. Cir. 2012).
[287] *Standard Havens Products, Inc., v. Gencor Industries, Inc.,* 953 F.2d 1360 (Fed. Cir. 1992), citing *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 901, 229 USPQ 525, 529 (Fed. Cir. 1986).
[288] *Standard Havens Products, Inc., v. Gencor Industries, Inc.,* 953 F.2d 1360 (Fed. Cir. 1992), citing *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 901, 229 USPQ 525, 529 (Fed. Cir. 1986).
[289]  *Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1142 (Fed. Cir. 1991).
[290] *American Seating Company, v. USSC Group, Inc.,* 514 F.3d U.S.P.Q.2d 1683 (Fed. Cir. 2008).
[291] *Panduit Corp., v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978)

117. Third, with respect to non-infringement, I understand the hypothetical but for market must be reconstructed with "likely outcomes with infringement factored out of the economic picture."[292] Thus, to be "available," a proposed alternative must not infringe either of the Asserted Patents.[293]

118.

---

[292] *Grain Processing Corp. v. Am. Maize-Prods. Co.,* 185 F.3d 1341 (Fed. Cir. 1999).

[293] *See, e.g., Gyromat Corp. v. Champion Spark Plug Co.,* 735 F.2d 549, 553 (Fed. Cir. 1984) ("The master's finding that no acceptable noninfringing substitutes were available is not undermined by, but is fully consistent with, the fact that long-stroke systems also infringed the patent."); *Micro Motion, Inc. v. Kane Steel Co., Inc.*, 894 F.2d 1318, 1322 (Fed. Cir. 1990) ("There is precedent for finding causation despite an alternative source of supply if that source is an infringer."); *Rite-Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1548 (Fed. Cir. 1995) ("Here, the only substitute for the patented device was the ADL-100, another of the patentee's devices. Such a substitute was not an 'acceptable, non-infringing substitute' within the meaning of Panduit because, being patented by Rite- Hite, it was not available to customers except from Rite-Hite."); *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1578 (Fed. Cir. 1989) ("If the court is correct in its finding that the other competitors were likely infringers of one or the other of [the plaintiff's] patents, [the plaintiff] would have been entitled to" lost profits); *Parker-Hannifin Corp. v. Champion Labs., Inc.,* No. 06-cv-2616, 2008 WL 3166318, at *6 (N.D. Ohio Aug. 4, 2008) ("In light of State, the Court finds that plaintiffs are entitled to argue that the alleged substitutes infringe patents not at issue here. This result is not illogical, as defendant would have it. … [I]f the alleged substitutes infringe any one of plaintiffs' patents, those substitutes are illegally on the market and it would thus be reasonable to conclude that plaintiffs would make those sales instead."); *GlaxoSmithKline LLC v. Teva Pharm. USA, Inc.*, 7 F.4th 1320, 1341 (Fed. Cir. 2021) ("'[i]t doesn't matter whether the sales by other generic suppliers would be noninfringing, because the ultimate use of those products by doctors would be infringing and thus not a permissible consideration.' … Had another generic producer made those sales, those uses too would have been infringing. The other generic carvedilol producers were, therefore, not noninfringing alternatives.").

[294] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Fifth Supplemental Response to Plaintiffs' Common Interrogatories (No. 7), December 5 2025, pp. 8-11, 13-15.

[295] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Fifth Supplemental Response to Plaintiffs' Common Interrogatories (No. 7), December 5, 2025, pp. 8-11.  See also, Deposition of Harish Chinnari, February 20, 2026 ("Chinnari February 20, 2026 Deposition"), p. 34.

███████████████████████████████████ I address each alternative below.

120. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

---

[296] Ashraf Conversation; Attia Conversation; Trout Conversation; Trout Opening Report, § XIII.
[297] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Fifth Supplemental Response to Plaintiffs' Common Interrogatories (No. 7), December 5, 2025, pp. 8-11.
[298] *See* Section II.D.3.b.
[299] Trout Conversation; Trout Opening Report, § XIV.
[300] Exhibit 10.
[301] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Fifth Supplemental Response to Plaintiffs' Common Interrogatories (No. 7), December 5, 2025, pp. 8-11.
[302] Trout Conversation; Trout Opening Report, § XIII.
[303] Complaint, January 17, 2024, Case 1:24-cv-00064-JLH; Complaint for Patent Infringement, January 17, 2024, Case 1:24-cv-00066-JLH; *Pall Corp. v. Micron Separations, Inc.,* 66 F.3d 1211 (Fed. Cir. 1995).

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

122. Third, Slayback identified Treanda and other generic powder bendamustine products as alleged non-infringing alternatives to Belrapzo.[304]  As discussed in Section II.D, I understand from Dr. Attia and Dr. Ashraf that powder bendamustine products (e.g., Treanda) are not acceptable alternatives to Belrapzo. ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████ ██████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████

123. ███████████████████████████████████████████████████████ ███████████████████████████████████████████ ████████████████ ████████████████████████████████████████████████[307] I discuss some of these documents in my *Panduit* Factor 4 analysis, which I incorporate herein by reference.

124. Further, Teva markets both Bendeka – ██████████████████████████ ███ – and Treanda.[308] ████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████. Similarly, generic versions of Treanda are currently available and approved by the FDA.[309]  Slayback could have pursued approval for and marketed a generic powder bendamustine product, yet it chose to develop and launch a liquid bendamustine product that I understand from Dr. Trout infringes the Asserted Patents.[310]

---

[304] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Fifth Supplemental Response to Plaintiffs' Common Interrogatories (No. 7), December 5, 2025, pp. 8-11.
[305] Ashraf Conversation; Attia Conversation.  *See also* Lovesy Deposition, p. 84.
[306] *See, e.g.,* SLAY-VIVMUS0089522 at 533; Mathew Deposition, p. 173.
[307] Eagle Deposition, Exhibit 4 (EAGLEBEN-SA_00344611 at 648).
[308] EAGLEBEN-SA_00072401 at 401-402; *See also,* Teva 2025 10-K Annual Report, available at Teva SEC form 10-K (2025), pp. 4, 10 (available at EAGLEBEN-SA_00368190 at 195, 201).
[309] *See, e.g.,* EAGLEBEN-SA_00368133 at 133.
[310] Trout Conversation; Trout Opening Report, § XIII.

125.

126. Additionally, I understand that Slayback identified a number of non-bendamustine treatments, for example BTK inhibitors and monoclonal antibodies, as alleged non-infringing alternatives to Belrapzo.[311] I understand that Drs. Attia and Ashraf have addressed these non-bendamustine products ████████████████████████████████████████████████ Moreover, Slayback does not consider many of the drugs identified above as competitors to its liquid bendamustine product. For example, prior to the launch of Vivimusta, Slayback ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████.[313]

127. More broadly, based on the economic principle of revealed preference,[314] a physician's choice of medication when writing a prescription demonstrates that the physician regards the prescribed medication as more appropriate, all things considered, for the treatment of the patient in question than other available options. I understand this is particularly relevant in treating patients with CLL and NHL where the appropriate treatment is specific for each individual patient.[315] In general, I therefore expect that physicians who have already revealed their preference for liquid bendamustine would, as a general matter, overwhelmingly not regard any other products as acceptable non-infringing substitutes to branded Belrapzo or Bendeka in a world where Apotex, Baxter, and Slayback's liquid bendamustine products are not on the market.

128. I understand that ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

---

[311] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Fifth Supplemental Response to Plaintiffs' Common Interrogatories (No. 7), December 5, 2025, pp. 13-15.
[312] Ashraf Conversation.
[313] Mathew Deposition, Exhibit 21 (SLAY-VIVMUS0072988) at 010-011.
[314] EAGLEBEN-SA_00367840.
[315] Ashraf Conversation.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



---

[316] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Fifth Supplemental Response to Plaintiffs' Common Interrogatories (No. 7), December 5, 2025, pp. 14-15; SLAY-VIVMUS0226550 at 554-555.

Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 5, 2026, p. 1.  See also, Chinnari February 20, 2026 Deposition, pp. 80-81.
[317] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 5, 2026, pp. 1, 6.
[318] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 5, 2026, p. 6; Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Fifth Supplemental Response to Plaintiffs' Common Interrogatories (No. 7), December 5, 2025, pp. 11, 14-15; EAGLEBEN-SA_00368152.
[319] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 5, 2026, p. 5-6.
[320] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 5, 2026, p. 5-6.
[321] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 5, 2026, p. 5-6; SLAY-VIVMUS0180466.
[322] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Amended Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 13, 2026, p. 6.   See also, Chinnari February 20, 2026 Deposition, p. 70.
[323] Chinnari February 20, 2026 Deposition, p. 70.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY                                                                                    44



129.

---

[324] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Amended Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 13, 2026, p. 6.

[325] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Amended Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 13, 2026, pp. 7-8.

[326] Attia Conversation.

[327] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 5, 2026, p. 7.

[328] *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999).

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

### C. *Panduit* Factor 3: Manufacturing/Marketing Capability to Exploit Demand

130. I understand that *Panduit* analysis further requires consideration of whether the patentee had the manufacturing and marketing capability to exploit the demand for the patented and infringing product(s) and capture the sales claimed as lost. Here, I consider whether Eagle would have had the capacity to make the unit sales on which I assess lost profits under my consideration of *Panduit* Factor 4 below.

131. I begin my analysis of *Panduit* Factor 3 by outlining some relevant background. As discussed above, Eagle generates profits from selling Belrapzo and receives royalties from Teva's net sales of Bendeka. While Teva does not own the Asserted Patents, I consider sales of Bendeka that were displaced by the infringing sales in my calculation of Eagle's lost profits. █████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ █████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████ ███████████████████████████████████

---

[329] Conversation with David S. Bricker, Senior Vice President of Eagle ("Bricker Conversation"); Deposition of David Bricker, November 25, 2025 ("Bricker Deposition"), p. 38; Krawtschuk Deposition, pp. 63-64; EAGLEBEN-SA_00321346; EAGLEBEN-SA_00347581.

**Figure 6: But-For and Actual Bendeka and Belrapzo Liquid Bendamustine Unit Sales Q4 2021 – Q2 2025**

*Source: Exhibit 15*



132. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮.[330] Since October 2014, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ Eagle has additional contracts with ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

133. I have seen no evidence that Eagle would have been unable to continue supplying the liquid bendamustine market or would have faced significant supply disruptions during the damages period.[333] In fact, the evidence shows that Eagle was able to consistently meet demand throughout

---

[330] Bricker Deposition, pp. 17-18; EAGLEBEN-SA_00367464 at 466.

[331] EAGLEBEN-SA_00333015 at 015-016; Bricker Deposition, p. 23.

[332] EAGLEBEN-SA_00332934 at 934-939, 966, 968; EAGLEBEN-SA_00332859 at 859; EAGLEBEN-SA_00332905 at 905-907; Bricker Deposition, pp. 23-25.

[333] *See also* Krawtschuk Deposition, Exhibit 16, p. 1 (EAGLEBEN-SA_00347509 at 509).

the damages period.  Mr. David Bricker, Eagle's Head of Global Manufacturing and Supply,

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████ ██████████████

███████████████████████████████████████████████████████████████

████████████████████████████████

134.  As part of my analysis, I analyzed Eagle's capacity to scale up its production to meet the increased demand for Belrapzo and Bendeka during the damages period (i.e., ██████████████████ ████████████ █████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ By comparison, in 2024 ████████████████████████████████████████ ████████████████████████████████████ I note that the ████████ ████████ mentioned above does not account for ████████████████ supply Eagle with liquid bendamustine.[338]  A similar February 2024 supply forecast relating to ██████████ ████████████████████████████████████ Eagle therefore would have had substantial manufacturing capacity through its established partners to return to supplying the entire liquid bendamustine marketplace ██████████████████████████████████

135.  My analysis above is consistent with evidence showing ████████████████████████ ████████████████████████████████████████ For example, Mr. Bricker ██████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████

---

[334] Bricker Deposition, p. 116.
[335] Bricker Deposition, p. 25-26.
[336] EAGLEBEN-SA_00352417, sheet ████████████████████████████████████ 00.  Bricker Conversation.
[337] ████████████████████████████████████████████████████████████████
*See* Exhibit 15.
[338] Bricker Conversation.
[339] EAGLEBEN-SA_00352405.

█████████████████████████████████████████████████████████ In comparison, Slayback has sold a total of █████████ of liquid bendamustine from Q4 2022 – Q3 2025.[341] These events demonstrate that, in addition to the substantial capacity at Eagle's disposal, Eagle and its suppliers have demonstrated an ability to quickly respond to significant increases in needed production of liquid bendamustine (if necessary).

136. Eagle also had sufficient sales and marketing capacity to capture the claimed lost sales. I note that █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

137. In the fourth quarter of 2023 – ████████████████████████████████ – ██ █████████████████████████████████████ In the first quarter of 2024, Eagle's spending on ████████████████████████████████████████, suggesting there was minimal change in available personnel at that time.[345] Additionally, I note that this ████████████ ████████████████████████████████████████████████████████ I understand from Alan Eagle that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[340] Bricker Deposition, p. 116-121.
[341] Exhibit 15.
[342] EAGLEBEN-SA_00353678, Sheets "2022Q1", "2022Q2", "2022Q3" and "2022Q4".
[343] EAGLEBEN-SA_00353678, Sheets "2023Q1", "2023Q2", "2023Q3" and "2023Q4".
[344] EAGLEBEN-SA_00353678, Sheet "2023Q4".
[345] EAGLEBEN-SA_00353678, Sheet "2024Q1".
[346] EAGLEBEN-SA_00353678, Sheets ██████████████████████████████████████ Furthermore, I note that Eagle's spending on Sales and Marketing personnel salaries does not appear to directly constrain the number of Belrapzo units sold. For example, in Q4 2024, ████████████████████████████████████████ ████████████ Two quarters later, in Q2 2025, ████████████████████████████████ ████████████
[347] Conversation with Alan Eagle, Vice President of Eagle ("Eagle Conversation").

138.  I therefore conclude that ███████████████████████████████████ ███████████████████████████ I further conclude that Eagle would have been able to quickly adjust to this increased demand when ██████████████████████████

### D. Panduit Factor 4: Quantification of Lost Profits

139.  *Panduit* Factor 4 requires the patentee's lost profits be quantified in a reliable, non-speculative manner.[348]

#### 1.  Quantification of Lost Profits Attributable to Slayback's Infringement

140.  Commonly, harm to the reference brand upon entry of a pharmaceutically equivalent product includes lost profits of one or both of two forms – lost profits due to lost unit sales (on which the brand loses its incremental profit per unit for those lost units), and lost profits due to price erosion (where the brand's realized effective net price on its retained sales is lower than it would have been "but for" the entry).

141.  In this section, I quantify the aggregate lost profits incurred by Eagle due to Slayback's infringement accounting for these key elements.  First, I provide relevant background for the data and dynamics I considered in creating my comparison of the actual and "but-for" worlds.  Next, I use this information to estimate the total profits Eagle would have made in a but-for world where the infringing products are removed from the market on ███████████████████████ ██████████████████████

142.  In principle, my quantification of aggregate lost profits to Eagle rests on the difference between its estimated but-for profits and the profits it realized in the actual world from ████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████ █████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████

---

[348] *See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F. 2d 1152 (6th Cir. 1978).

**Figure 7: Eagle Belrapzo U.S. Actual and But-for Net Sales**
**Q4 2021 – Q2 2025**
*($ millions)*
*Source: Exhibit 15*



**Figure 8: Teva Bendeka U.S. Actual and But-for Net Sales**
**Q4 2021 – Q2 2025**
*($ millions)*
*Source: Exhibit 15*

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

143. The details underlying my estimations for the lost profits due to Slayback's infringement of the Asserted Patents are in the sections below.

### a. Key Marketplace Dynamics

144. I begin my quantification of lost profits by summarizing marketplace dynamics and considerations relevant to my analysis. In Section II.E.3, I laid out the general dynamics governing competition between pharmaceutically equivalent products in the pharmaceutical industry. Further I demonstrated that Slayback directly competes with Belrapzo because Vivimusta used Belrapzo as a reference product in its 505(b)2 application with the FDA. Here, I provide further evidence of Slayback acknowledging direct competition with Bendeka and Belrapzo. Notably:



145. Indeed, the evidence shows that ████████████████████████████████████ ████████████████████████████████████ Furthermore, Eagle's Chief Financial Officer, Christopher Krawtschuk, ████████████████ ████████████████████████████████████████ ████████████████████████ I therefore conclude that it is reasonable to assume that Apotex, Baxter, and Slayback's unit sales of their liquid bendamustine products would return to Belrapzo or Bendeka when those products are removed from the market in the but-for world.[354]

146. Finally, I note that Eagle ████████████████████████████████ ████████████████████████████ As noted above, Eagle specifically noted

---

[349] Mathew Deposition, pp. 114-119, Exhibit 14. *See also* Mathew Deposition, pp. 120-125, Exhibit 15.
[350] SLAY-VIVMUS0072180 at 180-181.
[351] Chinnari Deposition, pp. 123-135.
[352] Mathew Deposition, pp. 114-119, Exhibit 14; Eagle Deposition, Exhibit 4, p. 38 (EAGLEBEN-SA_00344611 at 648). *See also* Mathew Deposition, pp. 120-125, Exhibit 15.
[353] Krawtschuk Deposition, pp. 34-37, 146-147.
[354] Attia Conversation; Ashraf Conversation.
[355] Eagle Conversation.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

52



In fact,

### b. "But-For" Incremental Profit and Unit Sales

147. As mentioned above, Slayback launched Vivimusta in December 2022, before the first Asserted Patent issued on January 16, 2024. I understand from Dr. Trout that Slayback's Vivimusta infringes the Asserted Patents. Therefore, I understand when the '214 patent issues, Slayback would be forced to remove Vivimusta from the market absent a license from Eagle.[358] Therefore, my but-for construction of the marketplace considers the incremental unit sales and profit Eagle would have realized but for Slayback's infringement In constructing the but-for world I understand from Dr. Trout that all of Apotex's, Baxter's, and Slayback's liquid bendamustine products infringe the Asserted Patents and thus are not "available" in the market during the damages period.[359] In the remainder of this section I discuss the steps I undertake to estimate the profits Eagle would have realized in a world but for the infringement.

148. As an initial matter, while I find that both Belrapzo and Bendeka lost unit sales to Slayback's Accused Product, I consider that Belrapzo's unit sales may have been disproportionately impacted by the entry of Apotex's, Baxter's, and Slayback's liquid bendamustine products. As noted above, Slayback used Belrapzo as its reference product when securing FDA approval for Vivimusta, meaning that Slayback relied on Eagle's clinical efficacy and safety information for Belrapzo to inform the approval of Vivimusta.[360]

149. As a first step, I allocate Slayback's Vivimusta unit sales between Belrapzo and Bendeka by calculating shares of their incremental sales but-for the entry of Apotex's, Baxter's, and Slayback's liquid bendamustine products using IQVIA-estimated units. As shown in Exhibit 17, I first calculate the unit sales trend for Belrapzo and Bendeka using IQVIA unit sales data from Q4 2020 – Q3 2022, before the entry of Vivimusta (the first infringing liquid bendamustine product to

---

[356] Eagle Deposition, Exhibit 4, p. 38 (EAGLEBEN-SA_00344611 at 648).
[357] Mathew Deposition, pp. 156-160, Exhibit 19 (SLAY-VIVMUS0216524) at 527.
[358] Trout Conversation; Trout Opening Report, § XIII.
[359] Trout Conversation; Trout Opening Report, § XIII.
[360] EAGLEBEN-SA_00364335 at 338.

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY

launch).  I use these trends to estimate the total IQVIA units for Belrapzo and Bendeka from Q1 2024 – Q2 2025 in a world but for Slayback's infringement.[361]  I then sum the total units sold across Belrapzo, Apotex, Baxter, and Slayback and compare this total to the amount of IQVIA units I project Belrapzo would have accumulated in the but-for world over the same period.  As is evident from Exhibit 17 and discussed further below, I do not observe that there has been a significant expansion in demand for liquid bendamustine attributable to the launch of Apotex's, Baxter's, and Slayback's liquid bendamustine products.  Thus, I assume that all of Apotex's, Baxter's, and Slayback's infringing unit sales would be allocated between Belrapzo and Bendeka.

150.  I assume that the difference between IQVIA-estimated units flowing to Belrapzo, Apotex, Baxter, and Slayback in the actual world and the IQVIA-estimated units flowing to Belrapzo in the but-for world reflects infringing IQVIA-estimated units that likely would have gone to Bendeka in the but-for world.  I estimate these but-for units flowing to Bendeka represent ▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉ accruing to the infringing products through the last full quarter for which IQVIA data is currently available in this matter (Q2 2025).[362]

151.  Next, I estimate units sold for Belrapzo in the but-for world through the end of available data by summing units sold for Belrapzo and a proportion of ▉ of the total Apotex's, Baxter's, and Slayback's units sold.[363]  I similarly estimate units sold for Bendeka in the but-for world through the end of available data by summing units sold for Bendeka and a proportion of ▉ of total Apotex's, Baxter's, and Slayback's units sold.[364]

152.  I then estimate price per unit for Belrapzo and Bendeka in the world but for Slayback's infringement.  I estimate price for Belrapzo in the but-for world from Q1 2024 through Q3 2025

---

[361] I rely on IQVIA-estimated unit sales for determining the extent to which Apotex's units displaced unit sales of Bendeka as opposed to Belrapzo as IQVIA data directly captures end sales to hospitals and patients.  Furthermore, IQVIA collects unit sales data in a consistent manner across all products in the liquid bendamustine marketplace.  *See* EAGLEBEN-SA_00358761; Eagle Deposition, pp. 25-26, Exhibit 4 (EAGLEBEN-SA_00344611 at 629-630); EAGLEBEN-SA_00363577 at 577; Lovesy Deposition, pp. 28-31.  For example, Eagle and Apotex units data reflect at least some sales to group purchasing organizations (GPOs) which negotiate on behalf of groups of patients or hospitals, i.e. end customers.  *See, e.g.*, Krawtschuk Deposition, pp. 75-76, 87, 114-115, 118-119; Mathew Deposition, pp. 95-96, 106-107, 137-138, 179-180.  Therefore, IQVIA data likely provides a more comparable measure of the direct demand from end customers across different products.  *See, e.g.*, EAGLEBEN-SA_00363577 at 577; Krawtschuk Deposition, Exhibit 12 (EAGLEBEN-SA_00351791).
[362] Exhibit 17.
[363] Exhibit 15.
[364] Exhibit 15.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

by holding the value constant at the average price per unit from Q1 2023 to Q4 2023, the period where Apotex's, Baxter's, and Slayback's liquid bendamustine products are on the market.[365]  I note that this is a conservative approach ███████████████████████████████████ ████████████████████████████████████, as can be seen in Figure 10 below. ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ Furthermore, ██████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████ ███████████

153.  Finally, I estimate the net price for Bendeka in the but-for world from Q1 2024 through Q3 2025 by fitting a linear trend to Bendeka's net price in the actual world from Q4 2020 through Q2 2022, the 7 quarters preceding the entry of Slayback's Vivimusta.[367] ██████████████████ ████████████████████████████████████████████ ██████████████████ I then apply the estimated trend coefficients prospectively, starting from a baseline equal to the average level Bendeka's price over Q1 2023 – Q4 2023, the period before the issuance of the '214 patent where all of Apotex's, Baxter's, and Slayback's liquid bendamustine products are on the market.[369]

### c.  Eagle Lost Profits

154.  In this section, I describe the conclusions and methodology I use to quantify Eagle's lost profits – incorporating my findings about the "but-for" state of the world from the previous section.  I proceed through the following steps to analyze Eagle's lost profits in this subsection:

•

---

[365] Exhibit 15.

[366] I understand that Eagle owes Teva a 20% profit royalty on sales of Belrapzo.  Additionally, I note that assuming Belrapzo's COGS would remain the same in the but-for world despite increased unit sales conservatively assumes that any and all fixed costs become incremental variable costs.  *See* EAGLEBEN-SA_00072300 at 379.

[367] Exhibit 15.

[368] *See* EAGLEBEN-SA_00367203 at 206.

[369] Exhibit 15.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

- █████████████████████████████████████

█████████████████████████████████████████
████████████████

█████████████████████████████████████████████.

155. As an initial matter, I note that during the development and FDA approval process of Vivimusta, ████████████████████████████████████████ █████████████████████████████[370] ████████████████████████ ████████████████████. Furthermore, I understand from Alan Eagle that ████████████████████████████████████████ ████████████████████[371] ███████████████████████████ ████████████████████████████

156. It is evident in Figure 9 below that these dynamics have resulted in ████████████████ ██████████████████████████

[370] EAGLEBEN-SA_00364335 at 338; Chinnari Deposition, pp. 123-130.
[371] Eagle Conversation.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

**Figure 9: Eagle U.S. Belrapzo Actual and But-For Unit Sales**
**Q4 2021 – Q2 2025**
*Source: Exhibit 15*



157.

---

372 Exhibit 17.
373 *See* Exhibit 17.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



158.

━━ Exhibit 17.
375 Section V.D.1.a.
376 I note that there was a decline in Eagle's net price during 2020 through the start of 2021. *See* Exhibit 15. This decline likely was at least in part caused by the COVID-19 pandemic which led to a decline in chemotherapy use, putting downward pressure on demand for products like bendamustine. *See, e.g.*, EAGLEBEN-SA_00364924 at 926-928; EAGLEBEN-SA_00368120 at 127.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY                                                                                            58

**Figure 10: Eagle U.S. Actual and But-For Belrapzo Net Price per Unit**
**Q4 2021 – Q2 2025**
*Source: Exhibit 15*



159.

**Figure 11: Teva U.S. Actual and But-For Bendeka Net Price per Unit**
**Q4 2021 – Q2 2025**
*Source: Exhibit 15*



160. ████████████████████████████████████████████████

████████████████████████████████████████

- ████████████████████████████████████████

- ████████████████████████████████████████

161. Next, I evaluate whether the aggregate unit sales of liquid bendamustine have expanded since the launch of Slayback's Accused Product. In some circumstances, the aggregate unit sales of a

---

[377] Mathew Deposition, pp. 156-160, Exhibit 19 (SLAY-VIVMUS0216524 at 527).
[378] Mathew Deposition, pp. 145-147.
[379] SLAY-VIVMUS0175102, sheet "████████."

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

pharmaceutical product can increase after competitors enter the market due to declines in net price. However, for products where cost is not a primary factor in physician prescribing behavior, especially those specialized for extremely dangerous conditions, there may not a significant change in aggregate unit sales despite lower net prices in the marketplace. In the present case as shown in Figure 12 below, █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**Figure 12: Aggregate U.S. Actual Unit Sales of Liquid Bendamustine**
**Q4 2020 – Q2 2025**
*Source: Exhibit 15*



162. This finding is consistent with the nature of the liquid bendamustine marketplace and the conditions it is indicated to treat. Further, both CLL and NHL are incurable, and patients in

which the disease has progressed are at serious risk of death.[380]  As explained above, for both CLL and indolent B-Cell NHL, bendamustine is generally prescribed as a second line therapy, i.e. after another therapy has failed.[381] ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

163.   Given the findings above, my estimate of lost profits damages incurred by Eagle due to Slayback's infringement consists of four components: ██████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████. To quantify these lost profits, I undertake the following steps:



[380] Sections II.B, II.C.  *See also* EAGLEBEN-SA_00364713 at 717; EAGLEBEN-SA_00367099 at 100-101.
[381] Sections II.B, II.C.
[382] Attia Conversation; Ashraf Conversation.
[383] Exhibit 3.
[384] Exhibit 4.
[385] Exhibits 4, 18.
[386] Exhibit 5.
[387] Exhibit 5.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY                                                                            62

### d. The Blue Owl Agreement

164. ██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
███████████[390] Eagle received ██████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████ Under the agreement, Blue Owl
would █████████████████████████████████████████████████████
██████████████████████████████████████ The ██████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████

165. I understand that Eagle entered into the Blue Owl agreement to ███████
██████████████████████████████████████████████████████████████
Furthermore, I understand from Mr. Krawtschuk that ██████████████████
███████████████████████████████████████.[395] To confirm this, I
analyze ██████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████[396] ██████████████████████████████████████
██████████████████████████████████████████████████████████████

---

[388] Exhibit 6.

[389] Exhibit 6.

[390] EAGLEBEN-SA_00346062 at 066; EAGLEBEN-SA_00367197 at 197.  Hedgewig Funding is an affiliate of Blue Owl, *see, e.g.*, EAGLEBEN-SA_00346062 at 414.

[391] EAGLEBEN-SA_00346062 at 078, 082.

[392] EAGLEBEN-SA_00346062 at 077-078, 082.

[393] EAGLEBEN-SA_00346062 at 078.

[394] EAGLEBEN-SA_00367197 at 197; Krawtschuk Conversation; Krawtschuk Deposition, pp. 34-37.

[395] Krawtschuk Conversation; Krawtschuk Deposition, pp. 34-37, 146-147.

[396] Exhibit 19; Krawtschuk Deposition, pp. 34-37, 146-147; Krawtschuk Conversation.



---

[397] Krawtschuk Deposition, pp. 45-47.
[398] EAGLEBEN-SA_00367197 at 197.
[399] EAGLEBEN-SA_00366581 at 596; Krawtschuk Deposition, p. 37.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

████████████████████████████████████████████████████████

### 2. Summary

167.  In sum, as established in this section, I find that based on a review of the *Panduit* Factors, Eagle sustained lost profits damages as a result of Slayback's infringement.

168.  I find that from January 16, 2024 through Q3 2025, Eagle sustained ███████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ for a total of $███ ████ in lost profits.[401] Furthermore, Eagle sustained $██ ████ in lost profits from ████████████████████ ████████████████████ I summarize the lost profit damages I estimate are owed to Eagle in Figure 13 below.[403]



### VI.    REASONABLE ROYALTY DAMAGES (IN THE ALTERNATIVE TO LOST PROFITS)

### A.  Overview

169.  As noted in the previous section, I have determined that Eagle sustained lost profits damages resulting from Slayback's infringement.  Here, I provide a reasonable royalty assessment on

---

██ ████████████████████████████████████████████████████████ ████████████████████████████ Exhibit 20.
[401] Exhibits 3, 4, 5, 6.  Furthermore, I find that in the case where only the '248 patent is found valid and infringed, █████ ████████████████████████████████████████████████████████ ████████████ I reserve the right to amend these numbers in view of additional discovery, including if supplemental financial data is produced.
[402] Exhibit 20.
[403] I understand from counsel that, based on the evidence presented at trial, ████████████████████ ████████████████████████████████████████████████████████ ████████████████████. *See* Exhibits 4, 6.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

Factor and whether they suggest any adjustment to the rates derived under my consideration of Factor 15 may be warranted.

**Factor 1: The royalties received by the patentee for the licensing of the patents-in-suit, proving or tending to prove an established royalty.**

199. I understand that agreements with ███████████████████████ involve rights to the Asserted Patents, and I therefore analyze these licenses under Factor 1.[418]

    **1.** ██████████████████

200. ████████████████████████████████████████████



---

[418] *See, e.g.,* Plaintiffs Eagle Pharmaceuticals, Inc.'s and Eagle Sub1 LLC's Second Supplemental Objections and Responses to Slayback Pharma LLC and Azurity Pharmaceuticals Inc.'s Second Set of Interrogatories (No. 4), December 3, 2025, pp. 12, 47.

[419] ███████████████████████████ *See* EAGLEBEN-SA_00367601 at 601.

[420] EAGLEBEN-SA_00072300 at 300, 305; EAGLEBEN-SA_00367655; EAGLEBEN-SA_00366546 at 555-556.

[421] EAGLEBEN-SA_00072300 at 301. ████████████████████████████████████████████████████████████████ *See* EAGLEBEN-SA_00072300 at 368-369; EAGLEBEN-SA_00364180.

[422] *See, e.g.,* EAGLEBEN-SA_00365443 at 474-476. *See also* EAGLEBEN-SA_00333070 at 070.

[423] EAGLEBEN-SA_00367662.

[424] EAGLEBEN-SA_00072300 at 307.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

[425] EAGLEBEN-SA_00072300 at 305, 308; EAGLEBEN-SA_00364204 at 205; EAGLEBEN-SA_00364180 at 181.
[426] EAGLEBEN-SA_00072300 at 312.
[427] EAGLEBEN-SA_00072300 at 305, 360-362.
[428] EAGLEBEN-SA_00367462 at 463; EAGLEBEN-SA_00367460 at 461.
[429] *See* EAGLEBEN-SA_00072300 at 305, 360; EAGLEBEN-SA_00368093 at 093; EAGLEBEN-SA_00368106 at 106; Trout Opening Report, § 415.
[430] EAGLEBEN-SA_00072300 at 325-326.
[431] Trout Opening Report, § XV.
[432] EAGLEBEN-SA_00072300 at 318, 321.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

[433] EAGLEBEN-SA_00072300 at 330-331.

[434] *See, e.g.,* Eagle SEC Form 10-K (2017), pp. 18-19 (available at EAGLEBEN-SA_00365443 at 474-476).

[435] EAGLEBEN-SA_00072300 at 331.

[436] *See* EAGLEBEN-SA_0347562, EAGLEBEN-SA_00347565, EAGLEBEN-SA_00072401, EAGLEBEN-SA_00347573.

[437] EAGLEBEN-SA_0347562 at 562.

[438] EAGLEBEN-SA_00345611 at 784.

[439] EAGLEBEN-SA_00345611 at 785.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



In exchange for the territory expansion, TPIG would pay Eagle an

209.  From its U.S. commercial launch in 2016 through Q2 2025, Bendeka has ████████ ██████████████████████████████████████ Eagle has received ████████████ ████████████████████████████████████████ Indeed, as

---

[440] EAGLEBEN-SA_00345611 at 790-791.
[441] EAGLEBEN-SA_00345611 at 785; EAGLEBEN-SA_00072300 at 303.
[442] EAGLEBEN-SA_00345611 at 790-791.
[443] EAGLEBEN-SA_00347565 at 565-566.
[444] EAGLEBEN-SA_00347565 at 566.
[445] EAGLEBEN-SA_00347573 at 573-574.
[446] EAGLEBEN-SA_00072401 at 401-402.
[447] EAGLEBEN-SA_00072401 at 401-402.
[448] Exhibit 10.
[449] Exhibits 10, 11.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

Namely, the parties to each agreement would have recognized there was some positive – but less than 100% – likelihood that Eagle's relevant patents would ultimately be found valid and infringed by the generic manufacturers, were they to commercialize generic liquid bendamustine products. The parties would have weighed this perceived likelihood against the cost to the generic manufacturers (and the benefit to Eagle) of an agreement excluding the generics for several years. If Eagle were guaranteed its relevant patents would be found valid and infringed, and therefore the generic products would not be able to launch (at least without being ultimately required to pay fully compensatory damages to Eagle), Eagle would have had no reason to agree to permit the generics to launch on a royalty-free basis. As noted, the present hypothetical negotiation exercise assumes validity and infringement of the Asserted Patents, where the settlement agreements did not definitively do so. Additionally, Eagle's agreements with ████████████████ both settled litigation, which makes them different from the hypothetical negotiation, where the presence of litigation (and the associated fees and costs) would not be present.

214. The above distinctions render the ███████████████ settlement agreements not economically comparable to the hypothetical negotiation for a license to the Asserted Patents. More importantly, the generic suppliers forfeited launching their products, and in exchange for launching at a later date, the generic suppliers received ██████████████. Slayback, however, would be getting a license to the Asserted Patents that would allow Slayback to continue to sell their infringing product beginning in January 2024. At the hypothetical negotiation, Eagle would recognize that Slayback is receiving a license to continue to sell a product that will compete with its own liquid bendamustine product (Belrapzo) and the liquid bendamustine product on which Eagle receives a royalty (Bendeka). ███████████████████ ████████████████████████████████████ ███████████████████████████████. Further, ██████████████ would run contrary to the considerations resulting from my Edgeworth Box analysis, as discussed in detail above.

215. ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████



216.

---

[455] EAGLEBEN-SA_00072300 at 301.
[456] EAGLEBEN-SA_00072300 at 301.
[457] EAGLEBEN-SA_00072300 at 301.
[458] I note that this litigation and regulatory risk was not directly related to validity, enforceability or infringement of the Asserted Patents. EAGLEBEN-SA_00072300 at 366.
[459] EAGLEBEN-SA_00072300 at 301.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY                                                                81



In economic terms,

---

[460] *See* Section II.D.3.
[461] EAGLEBEN-SA_00072300 at 321.
[462] EAGLEBEN-SA_00072300 at 322.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

██████████████████████████████████████████ By contrast, at the Hypothetical Negotiation, Slayback would ███████████████████████████████████ ████████████████████████████████. Instead, Slayback's licensed sales would merely cannibalize Belrapzo and reduce Bendeka royalties. The absence of ████████ ████████████, which materially suppressed the effective royalty rate in 2015, means that a rational licensor in Eagle's position would insist on a higher royalty rate in the Hypothetical Negotiation.

221. In addition to the benefits provided to Eagle in the ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████ ████████████████████████ ████████████████████████████████████████████████████ ████████ ███████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████ █████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████ None of these considerations are present at the Hypothetical Negotiation and as such, the economic logic that justified ████████████████████████████ does not apply here, and the royalty rate that would emerge in the Hypothetical Negotiation would therefore ████████████████████████████████████████.



463 EAGLEBEN-SA_00366841 at 867.

464 ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY

222. In addition to the Asserted Patents, I understand that the ███████████████ ██████████████████████████████████████████████████████ I understand from Dr. Trout that in the ███████████████████████████ ██████████████████████████████████████████ I also understand from Dr. Trout that the Asserted Patents, which are part of the formulation patent family, are foundational and enabling patents, and that the inventions claimed in the Asserted Patents are the technical bedrock and foundational and enabling relative to later inventions.[467] Further, I understand from Dr. Trout that the formulation patents are the technical bedrock and enabling technology for the later rapid administration method claims.[468] Moreover, I understand that that the later rapid administration advances build upon the formulation attributes and provide only an incremental benefit.[469] ███████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████ Under the Hypothetical Negotiation construct, Slayback would only require a license to the Asserted Patents. ████ ████████████████████████████████████████████████ █████████████████████████████████████████████████████ ████████████████████████████████

223. Beyond the many benefits discussed above included in the ████████████████ discussed above that suggest the royalty rate that would emerge in the Hypothetical Negotiation would therefore be substantially higher than the royalty rate agreed to by ████████████ ██████████████ themselves have increased the royalty rate upwards over time. As discussed

[465] Trout Opening Report ¶¶ 409-416.
[466] Trout Opening Report ¶¶ 409-416.
[467] Trout Opening Report ¶¶ 417-419.
[468] Trout Opening Report ¶¶ 417-419.
[469] Trout Opening Report ¶ 418.
[470] Trout Opening Report ¶ 420; EAGLEBEN-SA_00072300 at 366. ███████████████████████ ████████████████████████████████████████████
EAGLEBEN-SA_00072300 at 374, 379.
[471] ████████████████████████████████████████████

above, in their ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Eagle ██████ agreed ██████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████[3] The

███████████████████████████████████████████ provide direct evidence that the

royalty rate that would emerge from the Hypothetical Negotiation would be substantially higher

than the royalty rate agreed to by ███████████████████████

224.    On balance, in full consideration of these elements discussed above, I conclude that the ████

███████████████████████████████████████ represents a substantially understated

measure of the value of the Asserted Patents at the Hypothetical Negotiation date.  Relative to the

reasonable royalty range implied by my Factor 15 Edgeworth box analysis, █████████████

████████████████████████████████████████████████████████████████████████

████████ The █████████████████████████████████████████████ is also

substantially lower than the ██████████████████████████████████████████████

████████████████████████████████.  Considering the vastly different commercial

context, the ████████████████████████████████████ the lack of ██████████

█████████, and the ███████████████████████████████████████████████████

█████████████████████, the hypothetical negotiation would not, in any event, █████████████

█████████████.  To the contrary, the economic evidence indicates that the hypothetical

negotiation would result in a rate meaningfully higher than ████████████████████████

████████████████████████████████████████

---

████ EAGLEBEN-SA_00072401 at 401-402.
[473] EAGLEBEN-SA_00072401 at 401-402.
[474] Based on Slayback's total net sales royalty damages of ██████████████████████████████████
████████████████████████████████████████████████████. *See* Exhibits 7, 8.

one factor (Factor 3) called for modest upward pressure, and two factors (Factors 4 and 13) may call for modest downward pressure.

268. To determine the reasonable royalty rate per unit the parties would have agreed to, I refer back to the results of my Edgeworth Box analysis. Given Slayback's maximum willingness to pay on the high end of the range, and Eagle's minimum willingness to accept on the low end of the range, that the guiding principle of the exercise is that the reasonable royalty is meant to compensate Eagle for Slayback's infringement, and my finding that the remaining *Georgia-Pacific* Factors may, overall, suggest modest downward pressure to this range, ███████████████████████ ████████████████████████████████████████████████████████ Furthermore, while this amount represents the most likely outcome, I also find that in no event would the parties agree to any net sales royalty rate lower than what was included in the ████ ████████████████████████████████████████████████████████ I reserve the right to update these amounts to reflect supplemental data production if asked to do so and in accordance with the Court's schedule.[539]

### F.  Computation of Reasonable Royalty Damages

269. As shown in Exhibit 21, Slayback has sold ███████████████ from ███████████ through September 2025.[540] As applied to these units, ████████████████████████████████ ████████████████████████████████████████████████, the last month for which historical data are available.[541] I also find that in no event would the parties agree to any net sales royalty rate lower than what was included in the ███████████████████████████ which generates a royalty damages estimate of ████████ ████████████████████, the last month for which historical data are available. I report these results in Exhibit 8.

---

[538] ████████████████████████. *See* Exhibits 7, 8.

[539] Additionally, I reserve the right, if requested by the Court or finder of fact, to calculate and offer an opinion regarding an appropriate post-verdict ongoing royalty.

[540] In the case that only the '248 patent is found valid and infringed, I find that Slayback has sold ███████████ nits from November 12, 2024 through September 2025. *See* Exhibit 22-A.

[541] Exhibit 7.

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY

March 6, 2026

Christopher A. Vellturo, Ph.D.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

# Exhibit 2
# Filed Under Seal

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1, LLC.,** <br><br> PLAINTIFFS, <br><br><br> V. <br><br><br><br> **SLAYBACK PHARMA LLC AND AZURITY PHARMACEUTICALS, INC.,** <br><br> DEFENDANTS. | **C.A. NO. 24-65-JLH** <br><br> **(CONSOLIDATED)** <br><br> **HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY** |

# REPLY EXPERT REPORT OF CHRISTOPHER A. VELLTURO, PH.D.

## I. OVERVIEWS

### A. Qualifications and Experience

1. I am the founder and president of Quantitative Economic Solutions, LLC, a microeconomic consulting firm. I received a Doctor of Philosophy degree (Ph.D.) in Economics from the Massachusetts Institute of Technology in Cambridge, Massachusetts in 1989. My fields of specialization include industrial organization and econometrics. My curriculum vitae, which lists my testimony for the last four years and my publications, is attached as Exhibit 1. I also provide more information about my background and experience in Section I to my Opening Report.

### B. Statement of Assignment

2. I have been retained by counsel for Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC (collectively "Eagle" or "Plaintiffs") in connection with the above captioned litigation.[1] I previously submitted an expert report in this case, dated February 6, 2026 ("Vellturo Opening Report" or "my Opening Report")[2] in which I was asked to perform an economic analysis as to the damages sustained by Eagle due to Defendants' Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s (collectively "Defendants" or "Slayback") infringement of claims 1-9 of U.S. Patent No. 11,872,214 ("the '214 patent") and claims 1-6, 8-11, 15, and 20 of U.S. Patent No. 12,138,248 ("the '248 patent") (collectively, the "Asserted Patents"). Specifically, I understand that Eagle alleges that Slayback infringes the Asserted Patents via their making, using, selling, and offering for sale of Slayback's FDA-approved liquid bendamustine product ("Vivimusta," the "Accused Product," or "Slayback's liquid bendamustine product").[3]

3. On March 16, 2026, Slayback served expert reports including from Mr. James Malackowski (the "Malackowski Report").[4] In his report, Mr. Malackowski responded to certain opinions in my Opening Report. In this reply report, I respond to the opinions in the Malackowski Report.

---

[2] On March 6, 2026, I submitted a supplemental opening report which primarily (1) updates certain footnotes to add Bates numbers for publicly available documents; and (2) adds citations to certain deposition testimony and exhibits that were not available as of the date of my original report (February 6, 2026). I did not change any opinion in my supplemental report. For ease of reference in this report, I collectively refer to this supplemental report and my original report as "my Opening Report" and the "Vellturo Opening Report" as paragraph and section numbers remained unchanged between both reports.

[3] EAGLEBEN-SA_00364331 at 331, 334.

[4] Expert Report of James Malackowski, March 16, 2026.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

infringement significantly understate the harm to Eagle. When accounting for the full scope of Eagle's lost profits, and after accounting for Eagle's "but-for" incremental profits, ██████████ ███████████████████████████████████████████████████████████ ██████████████████████████

85. Third, Mr. Malackowski repeats his assertion that Vivimusta ████████████████████ ██████████████████████████████████████ As explained above, this claim is inconsistent with the evidence and sales data which demonstrate that Vivimusta ███████ ████████████████████████████████████████████ Notably, even under Mr. Malackowski's lowest lost profits estimate, he still estimates that Slayback's infringement caused █████████████████████████████ Mr. Malackowski agrees that ██████████████████████████████████████ Therefore, when considering the evidence that Vivimusta impacted ████████████████████████ ██████████████████████████████████████████████████████ ████████████████ is both reliable and tied to the facts of the case.

### E. Mr. Malackowski's Reasonable Royalty Assessment

86. Mr. Malackowski's reasonable royalty assessment comprises two parts. First, Mr. Malackowski presents his affirmative analysis of the reasonable royalty that he claims the parties would agree to at the hypothetical negotiation. Second, he addresses my reasonable royalty opinions.

87. I address Mr. Malackowski's affirmative reasonable royalty opinions and his analysis of the Income, Market, and Cost Approaches below. I then address Mr. Malackowski's critiques of my reasonable royalty opinions as set forth in Section VI of my Opening Report.

#### 1. Mr. Malackowski's Cost Approach

88. ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

---

[139] Vellturo Opening Report, ¶ 165.
[140] Malackowski Report, § 12.4.4.
[141] Malackowski Report, Figure 2.
[142] Malackowski Report, § 12.4.4.3.
[143] Chinnari February 20, 2026 Deposition, pp. 21-22.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



---

145 Vellturo Opening Report, ¶ 128. █████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████ *See, e.g.,* Chinnari February 20, 2026 Deposition, p. 21, Exhibit 2 and Vellturo Opening Report, ¶ 128.
146 *See, e.g.,* Ashraf Reply Report, ¶ 5.
147 Malackowski Report, § 10.1.
148 Malackowski Report, § 10.1.



92.

<sup></sup>

[149] Trout Conversation; Vellturo Opening Report, ¶ 241.

[150] Trout Conversation; Attia Conversation; Vellturo Opening Report, ¶ 241.

[151] Vellturo Opening Report, ¶ 241.

[152] *See, e.g.*, SLAY-VIVMUS0071737 at 737; SLAY-VIVMUS0083044 at 047; SLAY-VIVMUS0009765 at 767; SLAY-VIVMUS0010348 at 348; SLAY-VIVMUS0010348 at 352.

[153] Chinnari February 20, 2026 Deposition, Exhibit 8, p. 1.

[154] Chinnari February 20, 2026 Deposition, Exhibit 9, p. 1.

[155] Chinnari February 20, 2026 Deposition, pp. 17-18.

[156] Chinnari February 20, 2026 Deposition, pp. 60-61.

[157] Chinnari February 20, 2026 Deposition, pp. 72-73.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



[158] Vellturo Opening Report, ¶ 128.  Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Third Set of Requests for Admission (Nos. 11-14), January 29, 2026, pp. 5-6.
[159] Vellturo Opening Report, Exhibits 8, 21.
[160] Chinnari February 20, 2026 Deposition, pp. 115-116.
[161] Chinnari February 20, 2026 Deposition, pp. 116-117.
[162] Chinnari February 20, 2026 Deposition, p. 117.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

96. ████████████████████████████████████████████████

████████████████████████████████████ ██ ██████████

████████████████████████████████████

### 2. Mr. Malackowski's Income Approach

97. Mr. Malackowski states that the Income Approach "provides a systematic framework for estimating an asset's price based on the value of the benefits derived from the use of that asset."[164] He then claims the Asserted Patents provide no new therapeutic function or clinical benefit, and he repeats his understanding of the benefits attributable to the Asserted Patents.[165]  Although his opinions about the benefits provided by the Asserted Patents are largely (if not exclusively) based on his understanding from Dr. Brandt, I disagree with Mr. Malackowski's conclusion that "there is no data to evaluate or quantify the incremental profits, if any, related to the Asserted Patents."[166]

98. As I explain in the previous section, based on my understanding from Dr. Trout, I understand that the Asserted Patents offer significant advantages associated with the stability of the product, allowing bendamustine to have a longer shelf-life without requiring reconstitution before use.[167] Further, without a license to the Asserted Patents, Slayback could not market and sell Vivimusta in the United States after January 2024.  Thus, any incremental profits related to selling Vivimusta after January 2024 are properly associated with the Asserted Patents.  Indeed, under my Edgeworth Box framework, I assess Slayback's incremental profit per unit under a license to the Asserted Patents.  Mr. Malackowski improperly ignores this evidence by discounting the benefits of the Asserted Patents.

### 3. Mr. Malackowski's Market Approach

99. Under his Market Approach, Mr. Malackowski assesses agreements to which Eagle is a party and eight third-party agreements, relying on the Sedona Commentary License Comparability Factors ("Sedona Factors") to assess economic comparability.[168]  While I do not independently assess the Sedona Factors to evaluate the relevant licenses (nor am I required to), they cover similar

---

[163] Vellturo Opening Report, Exhibits 8, 21.
[164] Malackowski Report, § 10.2.
[165] Malackowski Report, § 10.2.
[166] Malackowski Report, § 10.2.
[167] *See* Section III.E.1.
[168] Malackowski Report, § 10.3.1.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

parameters as those I analyzed to assess economic comparability in my Opening Report, and they do not change my opinions on comparability or on Mr. Malackowski's flawed Market Approach.[169]

    **a.** ████████████████████

100. As discussed in my Opening Report, the ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ from that agreement and fails to properly adjust that rate to the facts of this case.

101. Mr. Malackowski analyzes the ████████████████████████████████ ████████████████████████████████████████████ ████████████ █████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████

102. Mr. Malackowski's analysis is incomplete, and he overlooks several key components of the ████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████

    ■ ████████████████████████████████████ ████████████████████████████████

    ■ ████████████████████████████████████ ████████████████████████████████████████

    ■ ████████████████████████████████████████ ████████████████████████

---

[169] *See, e.g.*, Vellturo Opening Report, ¶¶ 206-230.

[170] Malackowski Report, § 10.3.2.

[171] This litigation and regulatory risk were not directly related to the validity, enforceability, or infringement of the Asserted Patents. EAGLEBEN-SA_00072300 at 366. *See also* Vellturo Opening Report, ¶ 223.

[172] Vellturo Opening Report, ¶ 226.

[173] I also note that, the hypothetical license has a presumption of validity and infringement of the Asserted Patents, but the Eagle-Cephalon Agreement does not require such an assumption. Mr. Malackowski appears to acknowledge this difference, but as with all the other factors present in the Eagle-Cephalon agreement that would exert downward pressure on the Eagle-Cephalon royalty rate, Mr. Malackowski does nothing with this fact.

103. Mr. Malackowski also relies on ███████████████████████████ – ██ ███████████████ As I discuss in my Opening Report, the royalty rate ████████████ ████████████████████████████████████████████ Thus, at the time of the hypothetical negotiation, the ████ royalty rate was controlling and would be the informative rate the parties would consider to determine comparable royalty benchmarks.

104. Further, ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████ ████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████

105. In addition, as specified above, the ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ [6] Mr. Malackowski does not account for the impact of this on his royalty rate estimate.

106. Because Mr. Malackowski did not address or attempt to account for any of the additional value to Eagle or ████████████████████████████████

---

[174] Vellturo Opening Report, ¶¶ 229-230.
[175] *See, e.g.,* EAGLEBEN-SA_00375256; EAGLEBEN-SA_00374833.
[176] Vellturo Opening Report, ¶ 221.

████████████████████████████████████████████

████████████ Mr. Malackowski undertakes further assessment of the██████████████████████ under *Georgia-Pacific* Factor 1, which I address below in my response to his *Georgia-Pacific* analyses.

### b. Third-Party Agreements

107. Mr. Malackowski considers eight "potentially comparable" third-party agreements that he obtained from databases, which he then limits to two third-party agreements: (1) the 2006 Chen-Bridgetech Agreement, and (2) the 2013 Johns Hopkins-Signpath Agreement. Mr. Malackowski then evaluates these two agreements for comparability to the hypothetical license, concludes they are comparable, and opines that the royalty rates in each of these agreements corroborate his ultimate royalty rate of 3% of net sales of Vivimusta.[177]

108. I disagree with Mr. Malackowski that these third-party agreements would be informative at the hypothetical negotiation.[178] These third-party agreements would not be considered at the hypothetical negotiation because they are neither economically nor technically comparable to the hypothetical license to the Asserted Patents. As discussed in detail below, these agreements do not pertain to the facts of this case, do not relate to the technology at issue, and do not involve either party to the hypothetical negotiation.

109. Further, Mr. Malackowski's search parameters for finding these third-party agreements shows that they are divorced from the facts of this case. For example, Mr. Malackowski used broad search parameters such as "Oncology" and "Formulation," which are much broader than the specific technology at issue in this case: bendamustine (liquid bendamustine, in particular). This lack of filtering rigor caused him to identify agreements that are far removed from the facts of this case.

110. Even if these third-party agreements were sufficiently comparable, Mr. Malackowski fails to compare the value of the Asserted Patents to the value of their licensed patents and applications. Nor does he consider the profitability of the products commercialized under these agreements or any other commercial considerations that would have undergirded the negotiation of those agreements.

---

[177] Malackowski Report, § 3.3.

[178] I understand that Eagle is filing a motion to preclude Mr. Malackowski from relying on these eight third-party agreements because they were not produced during fact discovery or otherwise disclosed in response to Eagle's Interrogatory No. 7.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

111.    Mr. Malackowski's selection of these eight third-party agreements is also arbitrary. The databases he consulted, such as RoyaltyStat and ktMINE, typically rely on licenses reported to the SEC;[179] as such, they are likely to exclude relevant licenses simply because they are not reported.[180]

### i.    2006 Chen-Bridgetech Agreement

112.    Mr. Malackowski concludes that the Chen-Bridgetech Agreement, signed between Andrew Xian Chen and Bridgetech Holdings International, Inc., is comparable to the hypothetical license.[181] I disagree. As explained below, I understand that the technology licensed in the Chen-Bridgetech Agreement is not comparable, from a technical perspective, to the Asserted Patents, and Mr. Malackowski does nothing to ascertain technical comparability. Indeed, although I understand from Dr. Trout that Dr. Sinko does appear to discuss certain patent applications disclosing technology licensed under the Chen-Bridgetech Agreement, Mr. Malackowski does not cite to Dr. Sinko's assessment of that agreement's technology.[182]

113.    I understand from Dr. Trout the Chen-Bridgetech Agreement covers lyophilized docetaxel intravenous emulsion formulations and lyophilized paclitaxel intravenous emulsion formulations, which I understand to be significantly different from liquid bendamustine.[183] Among other differences, I understand that:

- The treatments specified in the agreement are in powder form and require reconstitution prior to administration, as opposed to the Asserted Patents that claim liquid bendamustine compositions that are ready-to-dilute and suitable for long-term storage in liquid form, specifically eliminating the need for reconstitution;[184]

- The treatments are emulsion formulations, meaning they require an emulsion system to make the active ingredient water-soluble;[185]

---

[179] "SEC" stands for the U.S. Securities & Exchange Commission. *See, e.g.*, EAGLEBEN-SA_00376317 at 617.

[180] *See, e.g.*, EAGLEBEN-SA-00375982; EAGLEBEN-SA_00375985; EAGLEBEN-SA_00376544 at 549; EAGLEBEN-SA_00376676 at 676-678; EAGLEBEN-SA_00376679 at 679.

[181] SLAY-VIVMUS0227539 at 540; Malackowski Report, § 10.3.3.1.

[182] Malackowski Report, § 10.3.3.1; Expert Report of Dr. Sinko Regarding Non-Infringement, March 16, 2026 ("Sinko Report"), ¶¶ 242-247; Trout Reply Report, § X; SLAYVIVMUS0227539 at 554.

[183] I note that the license agreement covers additional products and patents that Mr. Malackowski does not discuss. For ease of exposition, my discussion focuses on the products and patents discussed by Mr. Malackowski. However, I understand that the additional patents and products are not comparable to those covered under the hypothetical license.

[184] Trout Reply Report, ¶ 227.

[185] Trout Reply Report, ¶ 229.

- The treatments may not achieve the same degree of long-term stability as the liquid bendamustine formulations claimed in the Asserted Patents;[186]

- The Subject Products in the agreement involve active pharmaceutical ingredients that are entirely different from bendamustine;[187]

- The Asserted Patents are directed to bendamustine hydrochloride, an alkylating drug for CLL and NHL; in contrast, none of the licensed intellectual property covered by the 2006 Chen-Bridgetech Agreement claims bendamustine, any alkylating agent, or any nonaqueous PEG-based solvent system.[188]

114. In addition to covering docetaxel, I also understand the Chen-Bridgetech Agreement covers lyophilized formulations of vancomycin and clarithromycin, which I understand are used to treat infections like pneumonia, and not CLL or NHL – or, indeed, any kind of cancer[189] – with the consequence that prescription and demand drivers for these treatments will vary from those of bendamustine. Thus, the substantial technological differences – and resulting economic differences – render this agreement uninformative at the hypothetical negotiation.

115. Further, I understand from Dr. Trout that the licensed patent applications analyzed by Slayback's expert, Dr. Sinko – U.S. Patent Application Publication No. 2006/0024360 and WO 2006/015120 – differ from the patented technology at issue in this case. As an initial matter, Dr. Trout notes that, unlike the Asserted Patents, which are issued patents, the licensed patent applications under the Chen-Bridgetech Agreement are largely unexamined published patent applications that have not been through the rigorous examination process that the Asserted Patents underwent, have not had their claims allowed by any Patent Office, and do not benefit from the presumptions that attach to U.S. issued patents.[190] Dr. Trout further notes that published patent applications afford no right to exclude others from making, using, or selling the invention in the market and thus, they are, by definition, less valuable than issued patents because they confer no enforceable patent rights.[191] Crucially, the Asserted Patents are issued U.S. patents which are practiced by multiple commercial liquid bendamustine products that have been successful in the market. And, as Dr. Trout notes, Dr. Sinko provides no evidence that anyone has ever practiced the technology

---

[186] Trout Reply Report, ¶ 231.
[187] Trout Reply Report, ¶ 233.
[188] Trout Reply Report, ¶ 235.
[189] *See, e.g.,* EAGLEBEN-SA_00376296 at 296; EAGLEBEN-SA_00376304 at 304-305.
[190] Trout Reply Report, ¶ 220.
[191] Trout Reply Report, ¶ 220.

described in these patent publications.[192]  Indeed, I note that the patent publications were subsequently abandoned by the patentee, further supporting the perceived value (or lack thereof) of the publications by the patentee.[193]

116.  Dr. Trout also states that the patents cover entirely different drugs, entirely different formulation technologies, and entirely different stability challenges from those addressed by the Asserted Patents.[194]  Indeed, Dr. Trout explains that "[e]very drug presents unique formulation challenges dictated by its chemical properties, degradation pathways, and solubility profile, and a POSA would not consider any of these emulsion formulations to be technically comparable to a liquid bendamustine composition."[195]

117.  Finally, I note Dr. Sinko and Mr. Malackowski exclude several patents from their discussion and analysis without explanation.[196]  Thus, their assessment is incomplete.

118.  The Chen-Bridgetech Agreement is also not economically comparable because it differs significantly from the hypothetical license for several reasons.  First, the Chen-Bridgetech Agreement has a different geographical scope than the hypothetical license.  The Chen-Bridgetech Agreement grants rights to practice patents in China, Hong Kong, Macau, and Taiwan.[197]  By comparison, the hypothetical license would grant rights to practice the Asserted Patents in the United States only.  Regulatory frameworks and competitive dynamics differ between the territories covered under these agreements, yet Mr. Malackowski apparently does not even consider this difference, much less account for it when comparing the royalty rate from the Chen-Bridgetech Agreement to his ultimate ███████████.

119.  Second, the parties to the Chen-Bridgetech Agreement have a different commercial relationship than the parties to the hypothetical negotiation (Eagle and Slayback).  The parties to the Chen-Bridgetech Agreement are not competitors.  The licensor is one Andrew Xian Chen, an individual who developed the licensed products, which were licensed to Bridgetech prior to their first

---

[192] Trout Reply Report, ¶ 222.
[193] EAGLEBEN-SA_00376604 at 605; EAGLEBEN-SA_00376611; EAGLEBEN-SA_00376612 at 612; EAGLEBEN-SA_00376660 at 660.
[194] Trout Reply Report, ¶ 233.
[195] Trout Reply Report, ¶ 234.
[196] Trout Reply Report, ¶¶ 218-219; SLAY-VIVMUS0227539 at 554.
[197] SLAY-VIVMUS0227539 at 542.

commercial sale.[198]  The licensee, Bridgetech, is an early-stage company focused primarily on facilitating the transfer of medical drugs, devices, and diagnostics from the United States to China and other international locations.[199]  These entities do not compete.  Mr. Malackowski acknowledges this point of non-comparability in passing, yet he relies on the agreement's royalty rate without any adjustment to account for the different commercial relationships.

120.  Third, the timing of the Chen-Bridgetech Agreement is very different from the hypothetical negotiation.  Specifically, the agreement was executed in 2006,[200] almost two decades before the hypothetical negotiation would occur in January 2024.  Over these 18 years, technology and marketplace conditions would change, which should be accounted for when assessing economic comparability, but Mr. Malackowski does not do so.

121.  Fourth, the licensed product covered under the Chen-Bridgetech Agreement was initially developed by Mr. Chen, the licensor, and later sold to Bridgetech as part of the license.  Thus, the license does not only grant rights to the patents licensed under the agreement, but also to a product under development.  In contrast, the hypothetical license only conveys rights to the Asserted Patents and does not include rights to any product development.

122.  Fifth, the Chen-Bridgetech Agreement covers a product that was not yet commercialized and was still undergoing clinical trials at the time of the agreement was executed.  Thus, the stated royalty rate will reflect the high uncertainty and increased risk associated with a product still under development with no guarantee of success.  By contrast, the hypothetical negotiation would cover a product that had already been approved by the FDA and had a proven track record of sales.

123.  Sixth, the agreement specifies payments for various milestones, including the initiation of clinical trials and FDA approval.[201]  Under the hypothetical negotiation, these milestones would have already been achieved prior to the hypothetical license and thus, there would be no corresponding milestone payments to Eagle.  This would exert upward pressure on the hypothetical license's royalty rate and would need to be considered in an assessment of the consideration received under this agreement.  Mr. Malackowski fails to consider this or make any adjustment to account for it.

---

[198] SLAY-VIVMUS0227539 at 540.
[199] EAGLEBEN-SA_00375646 at 648.
[200] SLAY-VIVMUS0227539 at 540.
[201] SLAY-VIVMUS0227539 at 543.

124.   For the above reasons, the Chen-Bridgetech Agreement is not economically comparable to the hypothetical license and therefore would not be informative at the hypothetical negotiation.

125.   Moreover, the licensee (Bridgetech) ceased operations and declared bankruptcy in 2011.[202]  It noted in a public filing that none of its prior business operations had been successful.[203]  This further demonstrates that there was no commercialized product resulting from the agreement making it an unreliable benchmark for a comparability exercise.

126.   Even if the agreement were comparable, Mr. Malackowski makes no attempt to assess the value of the Asserted Patents relative to the patents licensed in the Chen-Bridgetech Agreement.  In failing to do so, he assumes, without any technical basis, that the Asserted Patents are of equal value to the licensed patent applications in the Chen-Bridgetech Agreement.  For the reasons in my Opening Report, I understand from Dr. Trout that the Asserted Patents provide significant benefits, which reinforces the point that Mr. Malackowski's assumption of equal value is both unsupported and incorrect.

### ii.  Johns Hopkins-Signpath Agreement

127.   Mr. Malackowski also concludes that the Johns Hopkins-Signpath Agreement is comparable to the hypothetical license.[204]  I disagree.  As discussed below, the Johns Hopkins-Signpath Agreement is not technically or economically comparable to the hypothetical negotiation license.

128.   First, I understand from Dr. Trout that the technology licensed in the Johns Hopkins-Signpath Agreement is not comparable, from a technical perspective, to the hypothetical negotiation license.[205]  As with the Chen-Bridgetech Agreement, Mr. Malackowski does nothing to ascertain the technical comparability of the Johns Hopkins-Signpath Agreement, and he does not cite to Dr. Sinko to support any claims regarding the licensed patent applications.

129.   First, I note that the Johns-Hopkins Agreement covers several other patents that are not discussed by Mr. Malackowski, and as I understand from Dr. Trout, are not assessed by Dr. Sinko.[206]  It is

---

[202] Bridgetech Holdings International, Inc SEC Form 10-Q (2014), pp. 7, 11 (available at EAGLEBEN-SA_00374911 at 918, 922).

[203] Bridgetech Holdings International, Inc SEC Form 10-Q (2014), p. 12 (available at EAGLEBEN-SA_00374911 at 923).

[204] Malackowski Report, § 10.3.3.2.

[205] Trout Reply Report, ¶ 9; § X.

[206] Trout Reply Report, § X.B.

unclear why Mr. Malackowski and Dr. Sinko exclude the other patents in their analysis. For the patent applications discussed in Mr. Malackowski's report and the one analyzed by Dr. Sinko, U.S. Provisional Patent Application 61/421,709 and International Patent Application PCT/US2011/063870,[207] I understand from Dr. Trout that these are not issued patents. Dr. Trout further explains neither a provisional application nor a PCT application grants its owner the right to exclude others from making, using, selling, offering for sale, or importing the claimed invention, and that by contrast, the Asserted Patents are issued U.S. patents that confer enforceable exclusionary rights.[208]

130. I also understand from Dr. Trout that the technology licensed in the Johns Hopkins-Signpath Agreement discloses technology that is significantly different from the Asserted Patents. Specifically, I understand the licensed technology relates to composite polymeric nanoparticles designed to overcome multidrug resistance to cancer chemotherapeutics and treatment-related systemic toxicity, which I understand from Dr. Trout is significantly different from the technology claimed in the Asserted Patents.[209] In particular, I understand that bendamustine is used for the treatment of CLL and NHL, whereas the technology licensed in the Johns Hopkins-Signpath Agreement is "designed to overcome drug resistance—*i.e.*, the failure of cancer cells to respond to chemotherapeutic agents due to overexpression of drug efflux transporter proteins."[210]

131. Further, I understand that the nanoparticles covered by the licensed patent claims cover a polymer chemistry platform that is unrelated to the nonaqueous liquid formulation approach described in the Asserted Patents, which uses polyethylene glycol-based solvent systems with an antioxidant stabilizer to achieve long-term stability.[211] Furthermore, I understand from Dr. Trout that the nanoparticle technology "involves a different formulation paradigm—solid polymeric particles dispersed in a carrier fluid—rather than a liquid composition of a dissolved active pharmaceutical ingredient in a nonaqueous solvent."[212]

---

[207] I note that Dr. Sinko only assesses U.S. Provisional Patent Application 61/421,709 (corresponding to U.S. Patent Publication 2013/0330412), although Mr. Malackowski discusses both licensed patent applications.
[208] Trout Reply Report, ¶ 247.
[209] Trout Reply Report, ¶ 240.
[210] Trout Reply Report, ¶ 242.
[211] Trout Reply Report, ¶ 243.
[212] Trout Reply Report, ¶ 243.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

132. Moreover, I understand from Dr. Trout that "the nanoparticle formulation is directed to delivering curcumin in combination with chemotherapeutic agents" and that none of the chemotherapeutic agents is bendamustine.[213]  In particular, Dr. Trout notes that the preferred embodiment in the licensed patents is "a composite nanoparticle with doxorubicin covalently grafted to the nanoparticle surface and curcumin encapsulated in its hydrophobic core" and that a "POSA would understand that a polymeric nanoparticle platform designed to deliver curcumin combined with doxorubicin to overcome drug resistance is technically and commercially distinct from a liquid, ready-to-dilute bendamustine formulation designed for long-term storage stability."[214]

133. Dr. Trout also highlights that the design features covered by the nanoparticle technology have no analog in the Asserted Patents, which are directed to a pharmaceutical formulation of bendamustine dissolved in a defined nonaqueous solvent system with a stabilizing antioxidant.[215]  Dr. Trout also specifies that the patent applications are directed to a different field of pharmaceutical science than the Asserted Patents, which claim liquid bendamustine compositions with defined stability profiles.[216]

134. In summary, Dr. Trout concludes that the technology licensed under the 2013 Johns Hopkins-Signpath Agreement is not technically comparable to the Asserted Patents.

135. The Johns Hopkins-Signpath Agreement is also not economically comparable because it differs from the hypothetical negotiation license in several significant ways.

136. First, the parties to the Johns Hopkins-Signpath Agreement have a different commercial relationship than the parties to the hypothetical negotiation (Eagle and Slayback).  The parties to the Johns Hopkins-Signpath Agreement are not competitors.  Johns Hopkins is a non-profit educational institution, and it had a collaborative relationship with Signpath leading up to execution of this agreement.[217]  By contrast, Eagle and Slayback are competitors at the

---

[213] Trout Reply Report, ¶ 244.
[214] Trout Reply Report, ¶ 244.
[215] Trout Reply Report, ¶ 245.
[216] Trout Reply Report, ¶ 246.
[217] *See e.g.,* EAGLEBEN-SA_00375849, pp. 880-881, 884, 894, 901.

hypothetical negotiation and not collaborators. Mr. Malackowski acknowledges this difference but does not adjust the royalty rate in this agreement to account for its impact.[218]

137. Second, the Johns Hopkins-Signpath Agreement covers a product that had not yet been commercialized, and was still in early clinical trials at the time the agreement was executed.[219] Thus, the royalty rate will reflect the high uncertainty and increased risk associated with a product still under development with no guarantee of success. By contrast, the hypothetical license covers a product (Vivimusta) that was already FDA-approved and had a proven track record of success.

138. Third, the Johns Hopkins-Signpath Agreement specifies lump sum payments for achieving various milestones, including initiating clinical trials and FDA approval.[220] Under the hypothetical license,

████████████████████████████████████    █████████████████████

████████████████████████████ e and would need to be considered in assessing the consideration under this agreement. Mr. Malackowski fails to consider this or make any adjustment to account for this.

139. Fourth, the agreement specified that the parties "understand and accept that the availability of the licensed products and services at affordable prices to poor segments of the world's populations is an important objective of the parties."[221] This consideration very likely impacted the agreed royalty rate, given that the product commercialized under the agreement may be sold at reduced prices. █████████████████████████████████████████

140. Fifth, the agreement specified additional obligations for the licensee which would impact the agreed royalty rate. For example, Signpath was responsible for paying a portion of patent costs incurred by Johns Hopkins.[222] ███████████████████████████████████

141. Sixth, the Johns Hopkins-Signpath Agreement was subject to 35 U.S.C. §§ 200-204, which meant the agreement provided the U.S. government with non-exclusive rights to the licensed patent applications if federal funds were used to develop the patented inventions, and that the licensed

---

[218] Malackowski Report, § 10.3.3.2.
[219] SLAY-VIVMUS0227465 at 465, 486-487; Signpath Pharma, Inc Form 10-K (2013) (available at EAGLEBEN-SA_00375753 at 754).
[220] SLAY-VIVMUS0227465 at 486-487.
[221] SLAY-VIVMUS0227465 at 465.
[222] SLAY-VIVMUS0227465 at 472.

products sold in the U.S. be manufactured substantially in the U.S.[223]  This ▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

142.  For the above reasons, the Johns-Hopkins-Signpath Agreement is not comparable to the hypothetical license and would therefore not be informative as to the outcome of the hypothetical negotiation.

143.  Even if it were comparable, the Johns Hopkins-Signpath Agreement was terminated in 2014.[224] Thus, it would not be an active license as of the hypothetical negotiation in January 2024.

144.  In addition, Mr. Malackowski makes no attempt to assess the value of the Asserted Patents relative to the patent applications licensed in the Johns Hopkins-Signpath Agreement.  In failing to do so, he assumes, without any technical basis, that the Asserted Patents are of equal value to the patent applications licensed in the Johns Hopkins-Signpath Agreement.  Mr. Malackowski provides no factual basis for this assumption, and I am not aware of any such basis.  Further, the patent applications licensed under the Johns Hopkins-Signpath Agreement were also later abandoned by the licensor,[225] which shows the licensor did not consider them to have meaningful value.  In addition, as addressed in my Opening Report, I understand from Dr. Trout that the Asserted Patents provide significant benefits, which reinforces the point that Mr. Malackowski's assumption of equal value is both unsupported and incorrect.

### 4.  Mr. Malackowski's Consideration of the *Georgia-Pacific* Factors

145.  Under his assessment of the *Georgia-Pacific* Factors, Mr. Malackowski agrees with some of my conclusions, including as to Factors 2, 4, 6, 7, 8, 14.  Thus, in this section, I address only the *Georgia-Pacific* Factors under which Mr. Malackowski's conclusions deviate from my conclusions on the impact of those Factors on the hypothetical license, or whose conclusions I disagree with.

146.  As an initial matter, the starting point of Mr. Malackowski's hypothetical negotiation includes his conclusions from his Market and Cost Approaches.  As explained above, his analysis under these approaches results in starting royalty rates that are significantly understated, do not capture the benefits of the Asserted Patents, and ignore the competitive dynamics underlying the hypothetical

---

[223] SLAY-VIVMUS0227465 at 469.
[224] Signpath Pharma, Inc SEC Form 10-K (2015), p. 60 (EAGLEBEN-SA_00376322 at 393).
[225] EAGLEBEN-SA_00376608 at 608; EAGLEBEN-SA_00376606 at 607; EAGLEBEN-SA_00376627 at 627.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY                                                                45

negotiation.  Thus, given that his starting point is unreliable, Mr. Malackowski's conclusions from the *Georgia-Pacific* Factors are also flawed and unreliable.

147.   Further, when assessing the *Georgia-Pacific* Factors, Mr. Malackowski does not provide any quantitative or qualitative incremental adjustments to his baseline royalty rates from the Market or Cost Approach.  In other words, Mr. Malackowski does not actually analyze the factors relative to his starting range or evaluate whether a given factor puts upward or downward pressure *relative to* his baseline rate(s).  Instead, he analyzes the *Georgia-Pacific* factors in a vacuum, simply determining whether each factor favors the licensee or licensor, and ultimately concluding that his "evaluation" supports a ██████[226] without actually explaining why that is true or what it means for a Factor to favor a licensee or licensor as it applies to his royalty rates from the Market and Cost Approaches.  This further highlights that Mr. Malackowski's reasonable royalty assessment is unreliable and provides no meaningful insight into how the parties to the hypothetical negotiation would have negotiated the reasonable royalty for a license to the Asserted Patents.

**Factor 1: The royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty.**

148.   Under Factor 1, Mr. Malackowski summarizes his conclusions from his Market Approach and makes additional observations.  I address each in turn below.

149.   Mr. Malackowski asserts the ██████████████████████████████████████████ – ██████████████████████████████████ – are not related to the Asserted Patents.[227]  Specifically, he states that "████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ ██████"[228]  I disagree.

150.   ████████████████████████████████████████████████ ████████████████████████████████████████

---

[226] Malackowski Report, § 11.2.
[227] Malackowski Report, § 11.1.1.
[228] Malackowski Report, § 11.1.1.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

█████████████████████████████████████████████████████████

███████████████████████████████████████████

151. ███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████    There is no indication in this provision that ██████████████████████

██████████████████████ as Mr. Malackowski claims.  Notwithstanding, from an economics

perspective, ███████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████

152. Next, Mr. Malackowski allegedly apportions ██████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████[20]  As discussed below,

this approach is fundamentally flawed, unreliable, and not tied to the facts of this case.

153. First, Mr. Malackowski provides no basis for assuming that ███████████████████

████████████████████.  He neither relies on technical input nor cites any evidence to

support his assumption.  Mr. Malackowski's assumption is inconsistent with my understanding

that each claim covers a different invention and, thus, all else equal, one invention will be more

valuable than another.  █████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████[21]  His assumption is also inconsistent with the

---

[229] *See, e.g.,* EAGLEBEN-SA_00375590.
[230] Malackowski Report, § 11.1.1.
[231] *See, e.g.,* EAGLEBEN-SA_00376523 at 526. ██████████████████

facts of this case. For example, my understanding from Dr. Trout is that the Asserted Patents are



154. Second, as I explain in the previous section, Mr. Malackowski does not consider the impact of the

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████. I incorporate by reference

my discussion of these factors into this section.

**Factor 3: The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.**

155. Mr. Malackowski concludes that the ████████████████████████████████████

███████████████████████████████████████."[232] I disagree.

156. As an initial matter, this is an example of Mr. Malackowski analyzing a *Georgia-Pacific* factor in a vacuum instead of as an incremental consideration relative to his own starting range and conclusions from the Market and/or Cost Approach. In other words, he does not explain what it means that this factor "favor the licensee" or how that impacts his reasonable royalty benchmarks. Thus, his conclusion from this Factor (and for his other *Georgia-Pacific* Factors that supposedly favor one party over the other) is conclusory and vague.

157. Nonetheless, as I explain in my Opening Report, the hypothetical license is properly considered as

████████████████████████████████████████████████████████

██ Even if Mr. Malackowski were correct that this factor would "tend to favor the licensee" at the hypothetical negotiation, my ultimate opinions would not change.

**Factor 5: The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are the inventor and promoter.**

158. Mr. Malackowski does not opine that Eagle and Slayback are not competitors in the marketplace. Nor could he. As discussed in my Opening Report, and throughout this reply report, there is

---

[232] Malackowski Report, § 11.1.3.
[233] Velluro Opening Report, ¶ 227.

significant evidence showing that Eagle and Slayback directly compete in the liquid bendamustine marketplace.

159.   A competitive commercial relationship typically places an upward pressure on the royalty rate in the hypothetical license.  Indeed, Mr. Malackowski concludes that, in this case, Factor 5 will tend to favor the licensor (Eagle) in the hypothetical negotiation.[234]  While I agree that Factor 5 will favor Eagle at the hypothetical negotiation, Mr. Malackowski understates the degree of upward impact.

160.   Mr. Malackowski claims that █████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████  This opinion is belied by the evidence, and the testimony of Slayback's own expert. In particular, as I explain in Section III.C.2.a above, the sole document relied on by Mr. Malackowski does not reflect ████████████████████  Even if it did, the actual IQVIA sales data shows that Vivimusta ████████████████████████████████ ███████████████████████████████████████████████. In addition to the sales data, there is a significant amount of evidence showing that Vivimusta has ██████████████████████████████████████, including from Slayback and Eagle internal business documents, regulatory filings, and testimony.[236]  Furthermore, Mr. Malackowski bases his claim on the assumption that ████████████████████████ ████████████████████████"[237]  However, Slayback's own expert, Dr. Thirman, testified that ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████"[238]  Lastly, even if Slayback's Vivimusta sales did ████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████

---

[■] Malackowski Report, § 11.1.5.
[235] Malackowski Report, § 11.1.5.
[236] Section **Error! Reference source not found.**.
[237] Malackowski Report, § 11.1.5.
[238] Section III.A.

161. As with the other Factors, Mr. Malackowski fails to adequately explain how ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████

162. Further, because his reasonable royalty rate is incorrectly bounded by his royalties from his Market and Cost Approaches, Factor 5 should tell Mr. Malackowski that his benchmark royalties are understated and do not sufficiently compensate Eagle for the competitive impact from granting Slayback a license to the Asserted Patents.  Indeed, his Market and Cost Approaches do not account for ███████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████  ███████████  Thus, under Mr. Malackowski's various approaches, Eagle would be left worse off than if it did not grant the license to Slayback.  He does not explain why a rational, profit-maximizing company would be willing to accept less in royalty fees than the expected cost of granting a license (in this case, the profits lost to a competitor).  They would not.

> **Factor 9: The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.**
>
> **Factor 10: The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.**

163. Mr. Malackowski concludes that these Factors would "tend to favor the licensee" (here Slayback).[239]  I disagree.[240]

164. Mr. Malackowski asserts that he is "aware of no record evidence that the formulations change bendamustine's mechanism of action, clinical efficacy, or dosing.  The active ingredient, dose, and

---

[239] Malackowski Report, §§ 11.1.9, 11.1.10.
[240] I note that Mr. Malackowski does not cite a technical expert to support several of his understandings, although I note that he relies on Dr. Brandt in other areas of his report.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

route of administration remain identical to patents in the same patent family."[241]   I understand from Dr. Trout that Mr. Malackowski's contention that the Asserted Patents provide no incremental benefits because certain prior patents in the same family already delivered the advantages of liquid bendamustine is flawed.  I understand that each patent in the family claims distinct subject matter, and each must be evaluated on its own terms.[242]  Here, I understand from Dr. Trout that the Asserted Patents claim liquid bendamustine compositions in a pharmaceutically acceptable fluid consisting of PEG and optionally one or more of a defined set of co-solvents, including ethanol, with a stabilizing amount of an antioxidant and specified impurity limitations.[243] I understand from Dr. Trout that the specification of a patent does not override the specific claim language and that the benefits of a given patent "are not measured solely by what was 'added' relative to earlier claims in the same family."[244]  Thus, I understand that Mr. Malackowski's assertion that the Asserted Patents merely "replicate a decade-old specification" and "broaden the list of solvents" is erroneous and fails to recognize the full scope of the contributions of the Asserted Patents.[245]  I understand that it is the claims, not the specification, that define the patent right.[246]  I also understand that the benefits of the claimed compositions include substantially improved long-term stability, elimination of the need for reconstitution, reduced risk of dosing errors, and greater convenience for healthcare providers.[247]  I further understand that these benefits are properly measured against the prior art, not against other patents in Eagle's own family, because Eagle's own patents are not prior art to the Asserted Patents.[248]

165. Likewise, I understand that Mr. Malackowski's assertion, relying on input from Dr. Brandt, that shelf-life stability is "not typically a factor" for oncology products and therefore provides no additional value ignores that the specification identifies the instability of bendamustine in water – with stability "measured in hours" – as one problem solved by the invention.[249]  I also understand that this assertion ignores the clinical consequences that flow from that instability, including the

---

[241] Malackowski Report, p. 71.
[242] Trout Reply Report, ¶ 203.
[243] Trout Reply Report, ¶ 204. *See also* '214 patent, cl. 1; '248 patent, cl. 1.
[244] Trout Reply Report, ¶¶ 128-133, 213-214; Malackowski Report, § 11.1.10.
[245] Trout Reply Report, ¶¶ 128-133, 213-214; Malackowski Report, § 11.1.10.
[246] *See, e.g.*, Trout Reply Report, ¶ 59.  *See also* 35 U.S.C. § 112(b).
[247] Trout Reply Report, ¶ 214.  *See also* '214 patent at 2:18-27.
[248] Trout Reply Report, ¶¶ 213-214.
[249] Trout Reply Report, ¶ 211.  *See also* '214 patent at 1:61-63.

reconstitution burden and associated dosing errors that the claimed ready-to-dilute liquid formulations eliminate.[250]

166. Mr. Malackowski also claims that the Asserted Patents provide no new therapeutic function or clinical benefit, and that Eagle is reclaiming rights to formulations that courts previously ruled were dedicated to the public.[251] ███████████████████



**Factor 11: The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.**

167. To assess Factor 11, Mr. Malackowski asserts that the value of the Asserted Patents is limited "in part by ████████████████████ and thus at this Factor "would tend to favor the licensee in this hypothetical negotiation."[254]  I disagree.

168. ████████████████████

---

[250] Trout Reply Report, ¶ 211. *See also* '214 patent at 1:63-66, 2:18-27.
[251] Malackowski Report, §§ 11.1.9, 11.1.10.
[252] Trout Reply Report, ¶ 210. *See also Eagle Pharms. Inc. v. Slayback Pharma LLC*, 958 F.3d 1171, 1177 (Fed. Cir. 2020); Memorandum Opinion, *Eagle Pharms. Inc. v. Slayback Pharma LLC*, C.A. No. 18-1953-CFC, at 11 (D. Del. May 9, 2019).
[253] Trout Reply Report, ¶¶ 204-205. *See also* '214 patent (issued Jan. 16, 2024); '248 patent (issued Nov. 12, 2024).
[254] Malackowski Report, § 11.1.11.



**Factor 12: The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.**

170. For Factor 12, Mr. Malackowski refers back to his review of the third-party agreements and concludes they "would tend to favor the licensee in this hypothetical negotiation."[257]  I disagree.

---

[255] Vellturo Opening Report, ¶ 128. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See, e.g.,* Chinnari February 20, 2026 Deposition, p. 21, Exhibit 2 and Vellturo Opening Report, ¶ 128.
[256] Vellturo Opening Report, ¶¶ 111-112, 128, 243-245.
[257] Malackowski Report, § 11.1.12.  Mr. Malackowski erroneously claimed, after his assessment of Factor 12, that "I find that Factor No. *11* would tend to favor the licensee in this hypothetical negotiation." (emphasis added).

171. As explained above, the third-party agreements that Mr. Malackowski relies on are radically different from the hypothetical negotiation license.[258]  They would not be considered at the hypothetical negotiation, and are not relevant under this Factor, because none of these third-party agreements are economically or technically comparable to the hypothetical negotiation license.

172. Thus, none of the eight third-party agreements on which Mr. Malackowski relies support his opinion that Factor 12 would tend to favor the licensee at the hypothetical negotiation.

> **Factor 13: The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.**

173. Under Factor 13, Mr. Malackowski does not adopt a position as to whether the Factor will "favor" the licensee or the licensor, as he does for other Factors.  Instead, among other things, he concludes that "the concept of apportionment was presumably considered by the parties to the various licenses discussed in Section 10.3" (i.e., under his Market Approach).  I disagree with several of Mr. Malackowski's underlying opinions for this Factor, as addressed below.

174. First, Mr. Malackowski states: "[g]iven that Vivimusta® is prescribed for the therapeutic effect provided by bendamustine, the majority of Vivimusta®'s profits is attributable to bendamustine."[259]  While I agree the active ingredient (bendamustine) is an important component of Vivimusta, Mr. Malackowski understates the importance of the patented inventions to the success of Slayback's infringing sales.  In particular, Vivimusta could not enjoy supra-competitive profits in the marketplace simply because it offers a product containing bendamustine, given that there are many other formulations in the marketplace that also contain bendamustine.  Instead, those supra-profits are driven by the benefits that Vivimusta offers by using the inventions in the Asserted Patents, as compared to other bendamustine treatments do not (e.g., powder bendamustine products and non-bendamustine treatments).

175. Mr. Malackowski also opines that apportioning profits from Vivimusta sales requires considering the contributions that Slayback and/or Azurity made to commercialize Vivimusta.[260]  However, he

---

[258] Section III.E.3.b.  I understand that Eagle is filing a motion to preclude Mr. Malackowski from relying on these eight third-party agreements because they were not produced during fact discovery or otherwise disclosed in response to Eagle's Interrogatory No. 7.

[259] Malackowski Report, § 11.1.13.

[260] Malackowski Report, § 11.1.13.

concludes that "the concept of apportionment was presumably considered by the parties to the various licenses" discussed under his Market Approach and "has largely been considered through [his] evaluation of the terms of these comparable third-party licenses as well as the 2015 Eagle – Cephalon Agreement."[261]

176. Notably, Mr. Malackowski claims his Market Approach accounts for apportionment of ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████ As I explained above, Mr. Malackowski provides no support for his so-called apportionment methodology, which is flawed, defies accepted economic principles, and contradicts the facts of this case.[262]

> **Factor 15: The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee - who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention - would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.**

177. To assess Factor 15, Mr. Malackowski states "in determining the reasonable royalty due Eagle for Slayback/Azurity's alleged non-licensed use of the Asserted Patents, I utilized common methods of valuing intangible assets, including the Market Approach and the Cost Approach, and I considered the *Georgia-Pacific* factors."[263] I responded to Mr. Malackowski's approaches in the sections above, and explained why they result in understated royalty rates that do not compensate Eagle for the competitive harm suffered from granting a license to a competitor ████████████

---

[261] Malackowski Report, § 11.1.13.
[262] Section III.E.3.
[263] Malackowski Report, § 11.1.15.

████████████████████████████████. I incorporate by reference my response to Mr. Malackowski's Cost and Market Approaches into this section.

### 5.   Mr. Malackowski's ██ Royalty Rate is Significantly Understated

178.  Mr. Malackowski concludes his reasonable royalty assessment by presenting the royalty rates implied from his various approaches.  Each of his ultimate royalty rates are unreasonable and understated for the reasons above.  I discuss each briefly in turn below.

179.  ████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████
██████

180.  Second, for his Market Approach, Mr. Malackowski concludes the ████████████████ implies a ██ royalty rate for the Asserted Patents, which he claims is confirmed by the 4% royalty rate in the Chen-Bridgetech Agreement and the 3% rate from the Johns Hopkins-Signpath Agreement.  But, as discussed above, while Mr. Malackowski correctly concludes that ████████ ████████████████ is a comparable license, he misinterprets the agreement, relies on the wrong royalty rate, and improperly apportions that rate.  Further, his reliance on the third-party agreements is improper because those agreements are neither economically nor technically comparable to the hypothetical license and, thus, they would not be relied on at the hypothetical negotiation, either to corroborate his claimed royalty rates or otherwise.  Thus, Mr. Malackowski's royalty rates from his Market Approach would make Eagle worse off from granting a hypothetical license to Slayback, and they do not restore Eagle to the financial condition it would be in had Slayback not infringed the Asserted Patents.

181.  As to his ultimate royalty rate, Mr. Malackowski does not assess whether Eagle would be willing to accept a license for ██ particularly when it fails to fully compensate Eagle for the competitive impact of granting a license.  Mr. Malackowski does not consider the difference in Eagle's financial

condition with and without the hypothetical license, and thus proposes a royalty that does not restore Eagle to its financial condition in a scenario where Slayback's Vivimusta was absent from the marketplace. In other words, under Mr. Malackowski's framework, Eagle would be worse off under this agreement than if it chose not to grant one, with Slayback enjoying all of the upside from being able to stay in the marketplace. This is not a royalty that is adequate to compensate Eagle for the use of the patented inventions, as I understand is required by the patent damages statute.[264]

182. In sum, Mr. Malackowski's Cost and Market Approaches result in reasonable royalty rates that are understated, incorrectly bounded, and fail to sufficiently account for the competitive impact from Eagle licensing the Asserted Patents to Slayback.

### F. Mr. Malackowski's Incorrect Critiques of my Reasonable Royalty Analysis

183. After presenting his affirmative reasonable royalty assessment, Mr. Malackowski makes several critiques of my reasonable royalty analysis. Most of Mr. Malackowski's critiques are based on the same flawed premises he relies on to conduct his affirmative reasonable royalty assessment, and thus I do not address them again here. As I explain below, none of Mr. Malackowski's critiques cause me to revise my conclusions as to the reasonable royalty the parties would agree on at the hypothetical negotiation for a license to the Asserted Patents.

#### 1. Mr. Malackowski's Critiques of my Edgeworth Box Analysis Are Flawed

184. Mr. Malackowski begins by critiquing my assessment of Eagle's minimum willingness to accept and Slayback's maximum willingness to pay. I address these below.

185. First, Mr. Malackowski claims that his identified flaws with my lost profit analysis also exist in my estimation of Eagle's willingness to accept, and render my estimation unreliable.[265] As I explain in in Section III.C above, Mr. Malackowski's criticisms of my lost profit analysis lack merit and do not change my opinions. Mr. Malackowski's erroneous criticisms, and proposed corrections to my lost profits estimates, do not sufficiently address the competitive impact, lost sales, and lost royalties that Eagle would incur under a license to allow Slayback to sell Vivimusta in competition with Belrapzo and Bendeka. In contrast, my Edgeworth Box approach yields a royalty rate that

---

[264] 35 U.S.C. § 284.
[265] Malackowski Report, § 12.6.2.

would make Eagle whole for granting Slayback a license to practice the Asserted Patents and sell Vivimusta in competition with Belrapzo and Bendeka.

186.   Second, Mr. Malackowski criticizes my estimate of Slayback's willingness to pay, claiming that I did not: (1) apportion Slayback's net profit per unit to the Asserted Patents, (2) consider other factors, such as the value of the API and Slayback's contribution to commercializing Vivimusta, and (3) ████████████████████████████████████████████████████████ ██████████████████[266]   Mr. Malackowski's critiques are uniformly without merit.

187.   As an initial matter, I disagree that any incremental apportionment is required.  At the time of the hypothetical negotiation, Slayback could not continue selling Vivimusta in the marketplace without a license to the Asserted Patents.  Contrary to Mr. Malackowski's claims, I did consider Slayback's contribution to the development and commercialization of Vivimusta in connection with *Georgia-Pacific* Factor 13, which ultimately impacted the assessment of where within my reasonable royalty range a royalty rate would fall.  In addition, █████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████[67] ██████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████ ████████████████████████████████████████ ██████████████████

---

[266] Malackowski Report, § 12.6.2.  *See also*, Malackowski Report, § 12.8.
[267] Vellturo Opening Report, ¶ 128.  ████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████   *See, e.g.,* Chinnari February 20, 2026 Deposition, p. 21, Exhibit 2 and Vellturo Opening Report, ¶ 128.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

### 2.  Mr. Malackowski's Critiques Regarding My Evaluation of License Agreements

188.  Mr. Malackowski's next set of critiques relate to my assessment of the licenses I discuss under *Georgia-Pacific* Factors 1 and 12, as well as critiques concerning my lack of consideration for certain agreements.  I discuss these below.

189.  First, Mr. Malackowski faults me for purportedly failing to properly apportion the royalty rate from ███████████████████████████████████████.[268]  I disagree.  As I explain in my Opening Report, I understand from Dr. Trout that █████████████████████████████████ ██████████████████████████████████████████████████████████████ █████████████████████████████████████████████████ █████████████████████████████████[69]  In contrast, Mr. Malackowski did not rely on any technical input to analyze this agreement.  Further, in my Opening Report, I noted the difference in intellectual property granted between the hypothetical license and █████████████ █████████ as one factor that would exert downward pressure on the royalty rate for the hypothetical license.  I also accounted for this difference in my Opening Report by explaining that this downward pressure is offset by the numerous factors that would exert significant upward pressure on the royalty rate for the hypothetical license, which suggest that reliance on the observed rate as a proxy for the reasonable royalty rate would be appropriate and conservative.

190.  Further, ███████████ agreed to ████████████████████████████████ ██████████████████████████████████████████████ █████████████████  However, to be conservative, I ultimately do not █████████████████████ In addition, the royalty rate that I derive ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████  Eagle would still not be fully compensated for the competitive harm a license to Slayback would cause.

191.  Mr. Malackowski also claims that I should have used the █████████████████████ ████████████████████████████.[271]  I disagree.  As I explain above, the royalty rate

---

[268] Malackowski Report, § 12.5.1.
[269] Vellturo Opening Report, ¶ 222.
[270] Vellturo Opening Report, ¶ 223.
[271] Malackowski Report, § 12.5.1.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

April 13, 2026

Christopher A. Vellturo, Ph.D.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

# Exhibit 3
# Filed Under Seal



# EAGLE PHARMACEUTICALS, INC, AND EAGLE SUB1 LLC.

## V.

# SLAYBACK PHARMA LLC AND AZURITY PHARMACEUTICALS, INC.

Civil Action No. 1:24-cv-00065-JLH

United States District Court for the District of Delaware

---

# EXPERT REPORT OF JAMES MALACKOWSKI

**March 16, 2026**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# 1    FIRM BACKGROUND AND QUALIFICATIONS

I am the Chief Intellectual Property Officer (CIPO) of J.S. Held LLC and the firm's Intellectual Property (IP) Practice Leader.  I am also a Co-founder and Senior Managing Director of Ocean Tomo, LLC, a part of J.S. Held.  Ocean Tomo provides Financial Expert, Management Consulting, Advisory, and Specialty Services focused on matters involving IP and other intangible assets.  Practice offerings address economic damage calculations and testimony; technical and intangible asset valuation; strategy and risk management consulting; debt and equity private placement; and IP brokerage.  With more than 100 offices globally, J.S. Held assists clients – corporations, insurers, law firms, governments, and institutional investors – on complex technical, scientific, and financial matters across all assets and value at risk.[1]

Along with Supreme Court Justice Stephen Breyer, I was inducted into the IP Hall of Fame in 2022, chosen by the IP Hall of Fame Academy from a long list of nominees put forward by the global IP community.  I was recognized by the Academy in 2022 with the Q. Todd Dickinson Award, which honors those who have made significant contributions to IP as a business asset.  My inclusion into the IP Hall of Fame follows annual recognition since 2007 by leading industry publications as one of the "World's Leading IP Strategists."  Significantly, I have been listed among "50 Under 45" by IP Law & Business™; included in the National Law Journal's inaugural list of 50 Intellectual Property Trailblazers & Pioneers; and named as one of "The Most Influential People in IP" by Managing Intellectual Property™.  I was named as one of 50 individuals, companies, and institutions that framed the first 50 issues of IAM Magazine as well as one of 60 leading global Economics Expert Witnesses by the same publication in 2014.  In 2011, I was selected by the World Economic Forum as one of less than twenty members of the Network of Global Agenda Councils to focus on questions of IP policy.  In 2013, I was inducted into the Chicago Area Entrepreneurship Hall of Fame by the Institute for Entrepreneurial Studies at the University of Illinois at Chicago College of Business Administration.  In 2018, I joined the Standards Development Organization Board of the Licensing Executives Society (USA & Canada), Inc. governing voluntary consensus-based professional practices that are guided in their development by the American National Standards Institute's (ANSI's) Essential Requirements.  LES standards are designed to encourage and teach consensus practices in many of the business process aspects of intellectual capital management.

On more than one hundred occasions, I have served as an expert in U.S. Federal Court, U.S. Bankruptcy Court, State Court, Court of Chancery, the Ontario Superior Court of Justice, the U.S. Patent and Trademark Office Patent Trial and Appeal Board, and global arbitrations on questions relating to intellectual property economics including the subject of valuation, reasonable royalty, lost profits, price erosion, commercial success, corrective advertising, creditor allocations, Hatch Waxman Act market exclusivity, business significance of licensing terms including RAND obligations, venture financing including expected risk / return, and equities of a potential injunction.  My experience extends to matters of general business valuation and commercial disputes, both domestic and foreign.  I have publicly addressed policy issues affecting

---

[1] J.S. Held, its affiliates and subsidiaries are not certified public accounting firm(s) and do not provide audit or attest services.  J.S. Held is not a law firm and does not provide legal advice.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



**INTELLECTUAL CAPITAL EQUITY**

### 3.1.2    Reasonable Royalty

**Figure 3** summarizes the reasonable royalty due Plaintiffs at a royalty rate of ▮▮▮▮▮ of Vivimusta® net revenue during the damages period of January 16, 2024 through September 30, 2025.

**Figure 3**
**Reasonable Royalty for Sales of Vivimusta® During the Damages Period[11]**

|  | Q1 2024 | Q2 2024 | Q3 2024 | Q4 2024 | Q1 2025 | Q2 2025 | Q3 2025 | Total |
|---|---|---|---|---|---|---|---|---|
| Vivimusta® Revenue | | | | | | | | |
| Royalty Rate | | | | | | | | |
| Reasonable Royalty | | | | | | | | |

As **Figure 3** illustrates, assuming the Asserted Patents are found to be valid and infringed, the reasonable royalty due Eagle is ▮▮▮▮▮.[12]

### 3.2    Evaluation of the Vellturo Report

Dr. Vellturo contends that the Plaintiffs sustained lost profits of ▮▮▮▮▮ or, alternatively, is due a reasonable royalty in the range of ▮▮▮▮▮▮▮▮.[13]  Dr. Vellturo's opinions are defective and unreliable for at least the following reasons:

- Dr. Vellturo improperly excludes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮.[14]

- Dr. Vellturo's lost profits analyses are based on false premises and defective analyses which render his opinions unreliable.[15]

- Dr. Vellturo's ▮▮▮▮▮ opinions are defective and unreliable.[16]

- Dr. Vellturo's opinions concerning ▮▮▮▮▮▮▮▮ are defective and unreliable.[17]

---

[11] Appendix 3.3.

[12] Appendix 3.3.  In the event only the '248 patent is found to be valid and infringed, the reasonable royalty is ▮▮▮▮▮.

[13] Vellturo Report, February 6, 2026, pp. 5 – 6.

[14] Vellturo Report, February 6, 2026, p. 18.

[15] Vellturo Report, February 6, 2026, Exhibit 21.

[16] Vellturo Report, February 6, 2026, pp. 60 – 65.

[17] Vellturo Report, February 6, 2026, pp. 65 – 67.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

in a variety of ways, including "by careful selection of the royalty base to reflect the value added by the patented feature [or] . . . by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof."[388]

## 9.4    Royalty Rate

*Georgia-Pacific Corp. v. United States Plywood Corp.* identifies fifteen non-exclusive factors which may be relevant to the determination of a reasonable royalty, although it is possible that certain of the fifteen factors have no relevance to the hypothetical negotiation. The *Georgia-Pacific* factors are addressed in Section 11 below. Certain of the *Georgia-Pacific* factors concern quantitative valuation factors are addressed in Section 10.

## 10       QUANTITATIVE VALUATION FACTORS

Determining a reasonable royalty involves valuing intangible asset(s) and determining what a user would pay for the use of the assets. There are three common approaches to value intangible assets in evaluating reasonable royalty damages – the Cost Approach, the Income Approach, and the Market Approach. My consideration of these approaches is discussed below.

## 10.1    The Cost Approach

As described in Economic Damages in Intellectual Property:

> The cost approach values assets based on the cost to create and develop the assets. The premise behind the cost approach is that no party involved in an arm's-length transaction would be willing to pay more to use the property than the cost to replace the property. In the context of patents, for instance, a potential licensee would not pay more to license a patent than the cost to design around the technology contributed by the patent. An alternative to designing around the technology would be to purchase the technology. Accordingly, a potential licensee would not pay more to license the technology than it would have to pay to purchase or create the technology.[389]

Under the cost approach, the licensee would pay no more in royalties than the cost of a non-infringing alternative. Properly applied, the cost approach considers out-of-pocket expenditures, as well as risks, lost sales and other adverse economic impacts connected with the alternative technology. The cost approach has been recognized and accepted by Federal courts for determining reasonable royalties for patent infringement:

> [A] fair and accurate reconstruction of the 'but for' market also must take into account, where relevant, alternative actions the infringer foreseeably would have undertaken had he not infringed. Without the infringing product, a rational would-be infringer is likely to offer an acceptable non-infringing alternative, if available, to compete with the patent owner rather than

---

[388] *Gree Inc. v. Supercell Oy*, 2020 WL 4057640 (E.D.Tx. 2020); *AstraZeneca AB v. Apotex,* 782 F.3d 1324 (Fed. Cir. 2015).
[389] Slottje, Daniel, Economic Damages in Intellectual Property, 2006, p. 291.

INTELLECTUAL CAPITAL EQUITY

leave the market altogether. . . .  Moreover, only by comparing the patented invention to its next-best available alternative(s) – regardless of whether the alternative(s) were actually produced and sold during the infringement – can the court discern the market value of the patent owner's exclusive right, and therefore his expected profit or reward, had the infringer's activities not prevented him from taking full economic advantage of this right.[390]





[390] *Grain Processing Corp. v. American Maize-Products Co.,* 185 F.3d 1341, 1350 – 1351 (Fed. Cir. 1999).

[391] https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/212209Orig1s000ltr.pdf; Appendix 4.2.

[392] Defendants' Fifth Supplemental Response to Interrogatories (No. 7), December 5, 2025, p. 14.

[393] Prior Approval Supplement (PAS) New Drug Application (NDA).

[394] Defendants' Fifth Supplemental Response to Interrogatories (No. 7), December 5, 2025, p. 15.

[395] Defendants' Fifth Supplemental Response to Interrogatories (No. 7), December 5, 2025, p. 36.

[396] Brandt Report, March 16, 2026, p. 26.

[397] Brandt Report, March 16, 2026, pp. 26 – 27.

[398] Brandt Report, March 16, 2026, pp. 26 – 27.

[399] Defendants' Fifth Supplemental Response to Interrogatories (No. 7), December 5, 2025, p. 37.

[400] Defendants' Response to Interrogatories (Nos. 10 – 12), February 5, 2026, p. 6.

[401] Defendants' Response to Interrogatories (Nos. 10 – 12), February 5, 2026, p. 6.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**INTELLECTUAL CAPITAL EQUITY**



## 10.2    The Income Approach

The Income Approach provides a systematic framework for estimating an asset's price based on the value of the benefits derived from the use of that asset. As described in *Economic Damages in Intellectual Property*:

> The income approach is a method used to value intellectual property assets based on the present value of the future income stream generated by an asset. There are three major inputs to the income approach: (1) expected future cash flows from the asset; (2) economic life of the asset; and (3) business risk associated with the realization of the cash flow stream. The key goal is to

---

[402] Defendants' Response to Interrogatories (Nos. 10 – 12), February 5, 2026, pp. 5 – 6.

[403] Defendants' Fifth Supplemental Response to Interrogatories (No. 7), December 5, 2025, p. 37.

[404] Appendix 9.1; Defendants' Response to Interrogatories (Nos. 10 – 12), February 5, 2026, p. 6.

[405] Brandt Report, March 16, 2026, p. 26.

[406] Defendants' Response to Interrogatories (Nos. 10-12), February 5, 2026, p. 6.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

estimate the present value of incremental profits generated by the asset over its economic life, taking into account the risk associated with generating those profits.  Once the present value of the incremental profits is determined, these profits are split in some manner between the licensor and licensee, typically in the form of a royalty.[407]

As set forth in Section 6.3, I understand that the asserted patents provide no new therapeutic function or clinical benefit.  I understand that by explicitly claiming ethanol-based solvents and chloride stabilizers, Eagle is reclaiming rights to formulations that courts previously ruled were dedicated to the public.[408]  I am aware of no record evidence that the formulations change bendamustine's mechanism of action, clinical efficacy, or dosing.  The active ingredient, dose, and route of administration remain identical to patents in the same patent family.

I also understand that the subject matter of the Asserted Patents do not reduce infusion time, but instead, expand the list of acceptable co-solvents to include ethanol and benzyl alcohol and emphasize that PEG can be a mixture of different molecular-weight PEGs.[409]

As indicated above,



## 10.3    The Market Approach

The market approach values assets based on comparable transactions between unrelated parties.  As described in the well-known text, *Economic Damages in Intellectual Property:*

> The market approach references a market with comparable transactions to determine the fair market value of an asset.  The degree of reliance on comparable transactions depends on an assessment of the transactions to determine if they are sufficiently similar to provide an indication of the fair market value for the assets in question.  Factors to consider include the nature of the assets being transferred, the industry and products involved, agreement terms, and other factors that may affect the agreed-on compensation.  The market approach is often helpful in determining the running royalty rates in specific licensing transactions based on similar

---

[407] Slottje, Daniel, Economic Damages in Intellectual Property, 2006, pp. 291 – 293.

[408] Memorandum Opinion, *Eagle v Slayback*, Civil Action No. 18-1953-CFC, May 9, 2019, p. 11.

[409] The 214 patent, pp. 7 – 8, 12; The '248 patent, pp. 7 – 10, 13.

[410] Brandt Report, March 16, 2026, p. 26.

[411] Brandt Report, March 16, 2026, pp. 26 – 27.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

transactions in the marketplace. . . Any market approach analysis will likely require reasonable adjustments.[412]

### 10.3.1    The Sedona Conference Comparability Factors

The Sedona Conference is a nonpartisan, nonprofit research and educational institute dedicated to the advanced study of law and policy in the areas of antitrust law, complex litigation, and intellectual property rights.[413]  As part of the Sedona Conference Working Group Series, in December 2016, the Sedona Conference Working Group on Patent Damages and Remedies published a paper entitled "Commentary on Patent Reasonable Royalty Determinations" ("the Sedona Commentary").

The Sedona Commentary addressed the comparability of license agreements used to inform royalties for patent infringement.  With respect to assessing comparability, the Sedona Commentary stated that:

> Courts, however, have not yet provided a definitive, comprehensive outline stating what criteria must be evaluated to determine if a license agreement is properly "comparable."  Indeed, a one-size-fits-all list may be impossible and the components of any such list, like the *Georgia-Pacific* factors, may not all be appropriate for the facts of a given case.[414]

In recognition of the absence of a comprehensive outline of criteria, the Sedona Conference Working Group on Patent Damages and Remedies presented the following Principle: "Any proposed comparable license offered as 'comparable' to the hypothetical license must be evaluated for its similarities to and differences from the hypothetical license."[415]  The Working Group on Patent Damages and Remedies stated that it:

> [S]upports a rigorous analysis to determine the comparability of license agreements.  Rigorously analyzing and adjusting for any material differences between a benchmark license and the hypothetical license, based upon evidence presented, provides a rational and justifiable basis for determining what royalty would result from the hypothetical negotiation.[416]

To assist licensing professionals in rigorously analyzing the comparability "and therefore the probative value, of a benchmark license to the hypothetical license," the Sedona Commentary provided the 15 factors listed in **Figure 13**.[417]

---

[412] Slottje, Daniel, Economic Damages in Intellectual Property, 2006, pp.  291 – 292.

[413] https://thesedonaconference.org/.

[414] "Commentary on Patent Reasonable Royalty Determinations", Sedona Conference, December 2016, p. 11.

[415] "Commentary on Patent Reasonable Royalty Determinations", Sedona Conference, December 2016, p. 35.

[416] "Commentary on Patent Reasonable Royalty Determinations", Sedona Conference, December 2016, p. 35.

[417] "Commentary on Patent Reasonable Royalty Determinations", Sedona Conference, December 2016, p. 36.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

**Figure 13**
**Sedona Commentary License Comparability Factors[418]**

| | |
|---|---|
| 1 | Cross-license provisions |
| 2 | Agreements licensing the patent(s)-in-suit |
| 3 | Agreements licensing patent(s)-in-suit plus additional patents |
| 4 | Any technology, property, "know-how," or other grant of rights in addition to or instead of patent rights |
| 5 | Agreements licensing different patents from the patent(s)-in-suit |
| 6 | Any business relationship between the parties to the patent license agreement that exist outside of the agreement |
| 7 | The scope of the patent rights granted |
| 8 | The product or service for which the patent(s) were licensed |
| 9 | The royalty base used in the agreement |
| 10 | The relative bargaining positions of the parties |
| 11 | Whether the agreement was a bona fide agreement and royalties were actually paid |
| 12 | The royalty structure |
| 13 | The date and term of the agreement |
| 14 | Any assumption (or lack thereof) of validity and infringement |
| 15 | Litigation factors for litigation settlement agreements |

**10.3.2   Comparability Evaluation of the ██████████████████████**

*Georgia-Pacific* Factor 1 concerns the royalties and other economic consideration received by the patentee for the licensing of the Asserted Patents. This represents a quantitative valuation metric associated with the determination of a reasonable royalty. Here, I evaluate the ████████████████████████ for comparability to the hypothetically negotiated license for rights to the Asserted Patents based in part on the Sedona Commentary License Comparability Factors.

As set forth in Section 4.1.1.2, in ██████████████████████████████████████ ██████████████████████ whereby █████████████████████████████████████

---

[418] "Commentary on Patent Reasonable Royalty Determinations", Sedona Conference, December 2016, pp. 36 – 40.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



---

[419] EAGLEBEN-SA_00072300 – 400 at 325 – 326.

[420] Appendix 7.2.1.

[421] EAGLEBEN-SA_00072300 – 400 at 301.

[422] https://www.eagleus.com/about/.

[424] EAGLEBEN-SA_00072300 – 400 at 314 – 315, 318 – 326.

[425] EAGLEBEN-SA_00072300 – 400 at 325 – 326.

[426] EAGLEBEN-SA_00072300 – 400 at 324 – 325.

[427] EAGLEBEN-SA_00072300 – 400 at 336.

[428] EAGLEBEN-SA_00072300 – 400 at 304.



Schedule 1.22 of the Agreement identifies the ███████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████

Economic Consideration – In exchange for ██████████████████████████████████████ ███████████████████ ██████████████████████████████████████████████████████████

---

429 EAGLEBEN-SA_00072300 – 400 at 304 – 305.

430 EAGLEBEN-SA_00072300 – 400 at 305.

431 EAGLEBEN-SA_00072300 – 400 at 360 – 362.

432 Appendix 10.1.1.

433 EAGLEBEN-SA_00072300 – 400 at 330.



INTELLECTUAL CAPITAL EQUITY

█████████ ████████████████████████████████████████████████████████

█████████████████████████████████

The parties entered into ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████

Observations and Inferences –

- <u>Points of similarity</u>: Like the hypothetical negotiation, ████████████████████████ is between two independent pharmaceutical firms involved with the research, development, and/or commercialization of pharmaceuticals, ████████████████████████████████ ███████████████████████ There is no indication that the parties' relative bargaining positions were unequal.

- <u>Differences that place upward pressure on the royalty</u>: Unlike the hypothetical negotiation, the consideration of the ████████████████████ included █████████████████████ ████████████████████████████████ In addition, unlike the hypothetical negotiation, the █████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████ ████████████████████████ These factors would place upward pressure on the royalty rate of the hypothetical negotiation compared to the royalty rate of the ████████████████████.

- <u>Differences that place downward pressure on the royalty</u>: The ██████████████ of the ████████ ██████████████████ places downward pressure on the hypothetically negotiated royalty rate for a non-exclusive license. ████████████████████████ ████████████████████████ ███████████████████████████████[9]

  With respect to U.S. patent rights, ███████████████████████████████████████ █████████████████████████████████████████████████████████[0] During the period 2017 through 2025, Eagle filed a dozen or so patent infringement actions against such

---

[434] EAGLEBEN-SA_00072300 – 400 at 330 – 331.

[435] EAGLEBEN-SA_00072300 – 400 at 331.

[436] EAGLEBEN-SA_00072401 – 405 at 401-402.

[437] EAGLEBEN-SA_00072401 – 405 at 402.

[438] Eagle 2022 10-K, p, 19.

[439] EAGLEBEN-SA_00072300 – 400 at 304 – 305, 360 – 362. .

[440] Appendix 10.1.1.

INTELLECTUAL CAPITAL EQUITY

pharmaceutical firms as Mylan, Hospira, Lupin, and Dr. Reddy's[441] as well as five previous legal actions against Slayback for patent infringement. **Appendix 10.1.1** contains a summary of Eagle's actions by defendant and asserted patent claiming formulations containing and treatment using Eagle's patent rights. The ██████████ and ██████████████████████████████ ████████████████ place downward pressure on the hypothetically negotiated royalty rate.

- Conclusions: On balance, these considerations indicate that ██████████████████████████ is comparable to the hypothetically negotiated license, and that the parties to the hypothetical negotiation would consider its ██████████, the █████████████████, the ████ ██████████ the factors influencing the ████████████, and the ████████ ██████, in determining its impact on the hypothetically negotiated royalty rate for rights to the Asserted Patents.

Given the indicated similarities of the ██████████████████████, I consider this agreement to be informative of the hypothetically negotiated royalty for rights to the Asserted Patents. My summary of observations and inferences of this agreement explains the basis for any upward or downward influence at the hypothetical negotiation. **Figure 14** is a summary of the Sedona Commentary License Comparability factors for the ██████████████████.

**Figure 14**
**Sedona Commentary Factors Considered for the ██████████████████**

| | Sedona Conference Factors | Ceph | Conclusion |
|---|---|---|---|
| 1 | Cross-license provisions | ✓ | ████████████ |
| 2 | Agreements licensing patents (also 3 and 5) | ✓ | ██████████████████ |
| 4 | Other technology, property, or "know-how" | ✓ | ██████████████████ |
| 6 | Any business relationship between the parties | ✓ | ███████████████ |
| 7 | The scope of the patent rights granted | ✓ | █████████████ |
| 8 | The product or service of the patents | ✓ | ██████████████████ |
| 9 | The royalty base used in the agreement | ✓ | ███████████ |
| 10 | Parties relative bargaining positions (also 15) | ✓ | █████████████████ |
| 11 | Bona fide agreement and royalties paid | ✓ | ██████████████████ |
| 12 | The royalty structure | X | ████████████ |
| 13 | The date and term of the agreement | ✓ | ███████████ |
| 14 | Validity and infringement assumptions | X | As discussed in Georgia-Pacific factors |

---

[441] Appendix 10.1.1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

### 10.3.3  Comparabilty Evauations of Third-Party License Agreements

Ocean Tomo identified potentially comparable third-party licenses through searches of publicly available license databases such as RoyaltyStat® and ktMINE.  RoyaltyStat® is a subscription database of more than 23,000 license and service agreements.[442]  ktMINE was founded by industry practitioners and technologists who were set to provide data and insights for royalty benchmarking.  According to ktMINE, it "offers the most comprehensive royalty rate data, offering over 86,000 royalty rates across various industries coming from over 26,000 license agreements – the largest repository on the market."[443]

Comparable license agreements were identified through searches of the RoyaltyStat® and ktMINE databases using keyword and combination-of-keyword searches.  The keywords and combinations included, for example, "Oncology," "Formulation," "Chronic Lymphocytic Leukemia," and "Non-Hodgkin's Lymphoma."  Through searches of the RoyaltyStat® and ktMINE databases and other industry sources conducted at my direction, eight third-party license agreements were identified for further review and evaluation.

**Appendix 10.2** contains summary information concerning the eight identified license agreements.  As **Appendix 10.2** illustrates, these agreements are between third parties involved in the life sciences industry, involve transfers of cancer and/or formulation technologies, and typically have running royalties based on percentages of revenues from future sales of products.  Upon further review of the agreements summarized in **Appendix 10.2**, the following two licenses were evaluated for comparability to a hypothetically negotiated license based in part on the Sedona Commentary License Comparability factors set forth in **Figure 13**.  Both of these licenses concern formulation related technology for cancer treatments.

### 10.3.3.1  The 2006 Chen – Bridgetech Holdings Int'l Agreement

<u>The Parties</u> – The parties to the 2006 Chen – Bridgetech Agreement ("2006 Bridgetech Agreement") are Mr. Andrew Xian Chen ("Chen") as the licensor, and Bridgetech Holdings International, Inc. ("Bridgetech") as the licensee.[444]  In or about 2006, Mr. Chen was the President of Latitude Pharmaceuticals, Inc. ("Latitude").  Latitude is a drug formulation development company based in San Diego, California.[445]  In 2006, Bridgetech was a Florida corporation focused primarily on the business of facilitating the transfer of medical drugs, devices and diagnostics from the U.S. to China and other international locations.[446]

<u>The Nature of the Agreement</u> - The 2006 Bridgetech Agreement granted Bridgetech an exclusive license to technology to develop, manufacture, sell and otherwise commercialize lyophilized docetaxel intravenous

---

[442] https://royaltystat.com/.

[443] https://www.ktmine.com/why-ktmine/our-data/royalty-rates/.

[444] The 2006 Chen – Bridgetech Agreement, April 29, 2006, p. 1.

[445] https://www.latitudepharma.com/formulation.

[446] Bridgetech Holdings Int'l Inc. Form 10-SB, July 2006, F-44.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

emulsion formulations[447] and lyophilized paclitaxel intravenous emulsion formulations[448] for cancer treatment in the People's Republic of China, Hong Kong, Macau, and Taiwan.[449] The 2006 Bridgetech Agreement also granted Bridgetech rights to lyophilized formulations of vancomycin and clarithromycin for the treatment of infectious diseases in the People's Republic of China, Hong Kong, Macau, and Taiwan.[450] Under the agreement, Bridgetech was responsible for all regulatory and patent related costs.[451]

The Technology – As of the date of the 2006 Bridgetech Agreement, the cancer-related patented technology included U.S. Patent Application No. 11/192,439, WO Patent Application No. US2005/026783, both filed on July 28, 2005,[452] and two U.S. provisional patent applications filed in February 2006.[453] Know-how is defined as including all knowledge, ideas, inventions, data, instructions, tangible or intangible materials, processes, formulas, expert opinions and information.[454]

Economic Consideration – In exchange for the exclusive rights to the licensed technology, Bridgetech agreed to pay Mr. Chen a running royalty of 4.0 percent of net revenue from sales of licensed products. Bridgetech also agreed to pay Mr. Chen an upfront payment of $500,000 and regulatory and other milestone payments of up to $2.0 million, depending in part on the number of and timing of clinical trials.[455]

Observations and Inferences -

- Points of Similarity: Like the hypothetical negotiation, the 2006 Bridgetech Agreement involves rights to formulations of cancer treatments with APIs that were FDA approved years earlier. Like the hypothetical negotiation, both parties are involved with the development and/or commercialization of drug products – Mr. Chen representing a willing licensor, and Bridgetech representing a willing licensee. There is no indication that the parties' relative bargaining positions were unequal. In addition, like the hypothetical negotiation, the 2006 Bridgetech Agreement grants rights to a limited number of formulation-related technologies.

---

[447] The 2006 Chen – Bridgetech Agreement, April 29, 2006, Appendix A. Docetaxel was first FDA approved in 1996. It is currently approved to treat such cancers as breast cancer, lung cancer, prostate cancer, and stomach cancer. https://www.mayoclinic.org/drugs-supplements/docetaxel-intravenous-route/description/drg-20068305; https://www.accessdata.fda.gov/drugsatfda_docs/nda/2014/202356Orig1s000OtherR.pdf.

[448] The 2006 Chen – Bridgetech Agreement, April 29, 2006, Appendix A. Paclitaxel was first FDA approved in 1992. It is currently approved to treat such cancers as ovarian cancer, breast cancer, lung cancer and pancreatic cancer. https://www.mayoclinic.org/drugs-supplements/paclitaxel-intravenous-route/description/drg-20065247; https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/020262Orig1s048.pdf.

[449] The 2006 Chen – Bridgetech Agreement, April 29, 2006, pp. 2 – 3.

[450] The 2006 Chen – Bridgetech Agreement, April 29, 2006, pp. 2, 15.

[451] The 2006 Chen – Bridgetech Agreement, April 29, 2006, p. 5.

[452] U.S. Patent Application No. 11/192,439 was published as U.S. Patent Application Publication No. 2006/0024360 and WO Patent Application No. US2005/026783 was published as WO 2006/015120.

[453] The 2006 Chen – Bridgetech Agreement, April 29, 2006, Appendix A.

[454] The 2006 Chen – Bridgetech Agreement, April 29, 2006, p 1.

[455] The 2006 Chen – Bridgetech Agreement, April 29, 2006, p 3.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- <u>Differences that place upward pressure on the royalty:</u> Unlike the hypothetical negotiation, the consideration of the 2006 Bridgetech Agreement included an upfront payment and milestone payments totaling as much as $2.0 million.  Also, unlike the hypothetical negotiation, the licensed products to which Bridgetech received rights had not been commercialized at the time of the license.  In addition, the licensed patent rights were to applications, and Bridgetech was responsible for the cost of future prosecution in the territory as well as for all future regulatory costs - including for clinical trials.[456] Furthermore, although the parties to the 2006 Bridgetech agreement were involved in the pharmaceutical industry, unlike the parties to the hypothetical negotiation, they were not competing in the same product segment.  These factors would place upward pressure on the royalty rate of the hypothetical negotiation compared to the royalty rate of the 2006 Bridgetech Agreement.

- <u>Differences that place downward pressure on the royalty:</u> The exclusive nature of the 2006 Bridgetech Agreement places downward pressure on the hypothetically negotiated royalty rate for non-exclusive rights to the Asserted Patents.  The 2006 Bridgetech Agreement also includes rights to Mr. Chen's know-how.[457]  These factors would place downward pressure on the royalty rate of the hypothetical negotiation compared to the royalty rate of the 2006 Bridgetech Agreement.

- <u>Conclusions:</u> On balance, these considerations indicate that the 2006 Bridgetech Agreement is comparable to the hypothetically negotiated license, and that the parties to the hypothetical negotiation would consider its exclusive nature, the scope of granted IP rights, and Bridgetech's requirement to finance future patent and regulatory costs in determining its influence on the hypothetically negotiated royalty rate for rights to the Asserted Patents.

### 10.3.3.2  The 2013 John Hopkins - Signpath Agreement

<u>The Parties</u> – The parties to the 2013 John Hopkins – Signpath Agreement ("the 2013 John Hopkins Agreement") are John Hopkins University as the licensor and Signpath Pharma as the licensee.[458]  John Hopkins University is a highly-ranked, private medical research university located in Baltimore, Maryland.  According to its Form S-1 dated January 2015, Signpath Pharma was a clinical stage biotechnology company founded in May 2006 to develop synthesized proprietary formulations of curcumin, a naturally occurring compound found in the root of the Curcuma longa Linn plant, for applications in human diseases.[459]

<u>The Nature of the Agreement</u> – The 2013 John Hopkins Agreement granted Signpath exclusive rights to an invention that was developed by the parties through a previous license agreement in 2007.[460]  Through the 2013 John Hopkins Agreement, John Hopkins granted Signpath an exclusive worldwide license to use "a

---

[456] The 2006 Chen – Bridgetech Agreement, April 29, 2006, Appendix B.

[457] The 2006 Chen – Bridgetech Agreement, April 29, 2006, p. 1.

[458] 2013 John Hopkins Agreement, June 5, 2013, p. 1.

[459] Signpath Pharma Inc. Form S – 1, January 27, 2015, p. 3.

[460] Signpath Pharma Inc. Form S – 1, January 27, 2015, p. 46.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

composite polymeric nanoparticle for overcoming multidrug resistance to cancer chemotherapeutics and treatment-related systemic toxicity."[461]

The Technology – As set forth in Exhibit A of the 2013 John Hopkins Agreement, the licensed technology consisted of one U.S. Provisional Patent Application 61/421,709 and Int'l Patent Application PCT/US2011/063870.[462]  The invention is described as "[a] composite polymeric nanoparticle for overcoming multidrug resistance to cancer chemotherapeutics and treatment-related systemic toxicity."[463]

Economic Consideration – The 2013 John Hopkins Agreement required Signpath to pay an initial license fee of $10,000, $15,000 within one year, with minimum annual royalties of $10,000 in year three, $20,000 in year four, and $30,000 in year five.  Signpath was also required to pay a royalty of 3.0 percent of revenue from sales of the licensed product for a minimum of 10 years from the first commercial sale of the licensed product.  The 2013 John Hopkins Agreement required Signpath to pay milestone payments based on the first patent dosing in Phases I, II and III clinical trials and then upon regulatory approval, increasing from $25,000 to $150,000.[464]  The term of the Agreement ended with the last to expire patent in each country, or if no patents are issued then 20 years from June 5, 2013, subject to earlier termination.[465]

- Points of Similarity: Like the hypothetical negotiation, the 2013 John Hopkins Agreement involves rights to formulations of cancer treatments.  Like the hypothetical negotiation, both parties are involved with the research, development and/or commercialization of drug products – John Hopkins representing a willing licensor, and Signpath representing a willing licensee.  There is no indication that the parties' relative bargaining positions were unequal.  In addition, like the hypothetical negotiation, the 2013 John Hopkins Agreement grant rights to a limited number of formulation-related technologies.

- Differences that place upward pressure on the royalty: Unlike the hypothetical negotiation, the consideration of the 2013 John Hopkins Agreement included an upfront payment and milestone payments.  Also, unlike the hypothetical negotiation, the licensed product to which Signpath received rights had not been commercialized at the time of the license and Signpath was responsible for developing the product.  In addition, the licensed patent rights were to patent applications.  Furthermore, although the parties to the 2013 John Hopkins Agreement were involved in the pharmaceutical industry, unlike the parties to the hypothetical negotiation, they were not competing in the same product segment.  These factors would place upward pressure on the royalty rate of the hypothetical negotiation compared to the royalty rate of the 2013 John Hopkins Agreement.

---

[461] Signpath Pharma Inc. Form S – 1, January 27, 2015, p. 47.

[462] 2013 John Hopkins Agreement, June 5, 2013, Exhibit A.  U.S. Provisional Patent Application 61/421,709 and Int'l Patent Application PCT/US2011/063870 were published as U.S. Patent Application Publication No. 2013/0330412.

[463] 2013 John Hopkins Agreement, June 5, 2013, Exhibit A.

[464] 2013 John Hopkins Agreement, June 5, 2013, Exhibit A.

[465] Signpath Pharma Inc. Form S – 1, January 27, 2015, p. 46.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- <u>Differences that place downward pressure on the royalty:</u> The exclusive nature of the 2013 John Hopkins Agreement places downward pressure on the hypothetically negotiated royalty rate for non-exclusive rights to the Asserted Patents.  This factor would place downward pressure on the royalty rate of the hypothetical negotiation compared to the royalty rate of the 2013 John Hopkins Agreement.

- <u>Conclusions:</u> On balance, these considerations indicate that the 2013 John Hopkins Agreement is comparable to the hypothetically negotiated license, and that the parties to the hypothetical negotiation would consider its exclusive nature, and Signpath's requirement to finance future product development and regulatory costs, in determining its influence on the hypothetically negotiated royalty rate for rights to the Asserted Patents.

### 10.3.3.3  Conclusions Concerning Comparability of Third-Party Agreements

Given the indicated similarities of these licenses, I consider these third-party agreements to be informative of the royalty to which Eagle and Slayback would have agreed during the hypothetical negotiation for rights to the Asserted Patents.  My summary of observations and inferences of these agreements explains the basis for any upward or downward influence at the hypothetical negotiation. **Figure 15** is a summary of the Sedona Commentary factors for the third-party agreements evaluated above.

**Figure 15**
**Sedona Commentary Factors Considered for Third-Paty Agreements**

|  | Sedona Conference Factors | Bridge | JHU | Condusion |
|---|---|---|---|---|
| 1 | Cross-license provisions | ✓ | ✓ | No cross licenses: more comparable |
| 2 | Agreements licensing patents (also 3 and 5) | ✓ | ✓ | Benchmarks for formulation/cancer patents: more comparable |
| 4 | Other technology, property, or "know-how" | ✓ | ✓ | Form & Bridge indude know-how; Bridge indudes milestones |
| 6 | Any business relationship between the parties | ✓ | ✓ | Unrelated parties: more comparable |
| 7 | The scope of the patent rights granted | ✓ | ✓ | Scope of granted patent rights similar: more comparable |
| 8 | The product or service of the patents | ✓ | ✓ | Involve fromulation/cancer technology: more comparable |
| 9 | The royalty base used in the agreement | ✓ | ✓ | Royalties structured as % of net revenue: more comparable |
| 10 | Parties relative bargaining positions (also 15) | ✓ | ✓ | Between willing licensors and licensees: more comparable |
| 11 | Bona fide agreement and royalties paid | ✓ | ✓ | Are bona fide agreements: more comparable |
| 12 | The royalty structure | X | ✓ | Running royalty % of sales; Bridge upfront fee + milestones |
| 13 | The date and term of the agreement | ✓ | ✓ | Dates within 5 to 18 years of hypothetical negotiation |
| 14 | Validity and infringement assumptions | X | X | As discussed in Georgia-Pacific factors |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**INTELLECTUAL CAPITAL EQUITY**

## 11    REASONABLE ROYALTY DETERMINATION

### 11.1    The Georgia-Pacific Factors

As set forth above, a reasonable royalty is generally determined using the construct of a hypothetical negotiation between the patentee and the accused infringer. *Georgia-Pacific Corp. v. United States Plywood Corp.*[466] identifies fifteen non-exclusive factors which may be relevant to the determination of a reasonable royalty, although it is possible that certain of the fifteen factors have no relevance to the hypothetical negotiation. In the subsections that follow, I give consideration to each of the 15 factors, and identify relevant information and facts that would influence the hypothetically negotiated royalty.

### 11.1.1    ███████████████████████████████████████████



Eagle contends that ██████████████████████████████████████ According to Eagle, it ███████████████████████████████████████████[8] Dr. Vellturo contends that ██ █ ██████████████████████ According to Dr. Vellturo, ████████████████████████████████████████ ████████████

As set forth in Section 10.3.1, █████████████████████ identifies the licensed patent rights as including the ████████████████████ Ultimately, Eagle was issued, and Cephalon/Teva received ████████████████████████

---

[466] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).

[467] Eagle's Response to Defendants' Second Set of Interrogatories (No. 4), September 23, 2025, p. 11.

[468] Eagle's Response to Defendants' Second Set of Interrogatories (No. 4), September 23, 2025, p. 11.

[469] Vellturo Report, February 6, 2025, p. 44.

[470] Vellturo Report, February 6, 2025, p. 87.

[471] EAGLEBEN-SA_00072300 – 400 at 360 – 362.

[472] Appendix 10.1.1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**INTELLECTUAL CAPITAL EQUITY**



### 11.1.2    Factor No. 2: The rates paid by the licensee for the use of other patents comparable to the patent-in-suit.

Factor No. 2 also relates to the Market Approach and considers licenses entered into by the licensee which may provide relevant insight into the hypothetical negotiation.



---

473 EAGLEBEN-SA_00072300 – 400 at 331.

474 EAGLEBEN-SA_00072401 – 405 at 402.

475 Eagle 2022 10-K, p. 19.

476 Deposition of Josh Mathew, December 17, 2025, pp. 38 – 39.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

### 11.1.11  Factor No. 11: The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.



I find that Factor No. 11 would tend to favor the licensee in this hypothetical negotiation.

### 11.1.12  Factor No. 12: The portion of the profit or the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

Like Factors No. 1 and  No. 2, Factor No. 12 relates to the Market Approach and considers licenses and licensing practices within the relevant industry.

As set forth in Section 10.3, Ocean Tomo conducted searches of the ktMINE® and RoyaltyStat® license databases for potentially comparable license agreements using keyword and combination-of-keyword searches.  Through searches of the ktMINE® and RoyaltyStat® databases conducted at my direction, eight agreements were identified.  These agreements are summarized in **Appendix 12.1**.

Upon further review of the agreements summarized in **Appendix 12.1**, the 2006 Bridgetech Agreement and the 2013 John Hopkins Agreement were evaluated for comparability to a hypothetically negotiated license based in part on the Sedona Commentary License Comparability factors set forth in **Figure 13**.  As set forth in Section 10.3, given the indicated similarities of these licenses, I consider these third-party agreements to be informative of the hypothetically negotiated royalty rate for rights to the Asserted Patents.  The revenue-based royalty rate of the 2006 Bridgetech Agreement is 4.0 percent.  And the revenue-based royalty rate of the 2013 John Hopkins Agreement is 3.0 percent.

I find that Factor No. 11 would tend to favor the licensee in this hypothetical negotiation.

---

[501] Appendix 3.2.1.

[502] Appendix 3.3.

[503] Appendix 9.1; Defendants' Response to Interrogatories (Nos. 10 – 12), February 5, 2026, p. 6.

[504] Defendants' Response to Interrogatories (Nos. 10-12), February 5, 2026, p. 6.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix 12

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

*Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC. v. Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*
**SUMMARY OF THIRD PARTY LICENSE AGREEMENTS**
Appendix 12.1

| | Title | Licensor | Licensee | Effective Date | Term | License Grant | Licensed Technology | Payment & Royalty |
|---|---|---|---|---|---|---|---|---|
| **1998 Albert Einstein College - Pain Therapeutics Agreement** | | | | | | | | |
| [1] | License Agreement | Albert Einstein College of Medicine of Yeshiva University | Pain Therapeutics, Inc. | 5/5/1998 | This Agreement shall continue in effect on a country-by-country basis until expiration date of the last obligation of licensee to pay royalty to university for the sale of a Licensed Product in that country. | An exclusive license, with right to grant sublicenses, under the Patent Rights and Know-How to make, have made, use, sell, offer for sale and import Licensed Products in the entire world. | - U.S. Patent No. 5,472,943; U.S. Patent No. 5,512,578, U.S. Patent No. 5,580,876; U.S. Patent No. 5,765,125; U.S. Patent No. 5,585,348.<br>- 4 United States patent applications<br>- 1 International Patent<br>- 9 International patent applications<br><br>"Know-How" means all information and materials, including but not limited to, technology, experience, discoveries, improvements, processes, formulae, data (including but not limited to all preclinical, clinical, toxicological, and pharmacological data) and inventions, trade secrets, patentable or otherwise, developed by the university through Drs. Crain and Shen. | License Fee: $100,000<br>Research Funding: $600,000<br>Milestones Payments: Up to $4,000,000<br><br>Royalty: 4% of the total aggregate Net Sales of Licensed Products in all countries in the Territory in which the sale of the Licensed Product is covered by a Valid Patent Claim;<br><br>A royalty of 2% as a Know-How royalty, for each country in the Territory in which the sale of the Licensed product is not covered by a Valid Patent Claim but involves the use of Know-How. |
| **2000 Molecular Medicine Research Institute - Amarillo Biosciences Inc. Agreement** | | | | | | | | |
| [2] | License Agreement | Molecular Medicine Research Institute | Amarillo Biosciences, Inc. | 2/1/2000 | This Agreement and all rights licensed here under shall terminate upon the expiration of the Patent, or if there should be one or more foreign counterparts, upon the expiration of the last expiring Patent. | A royalty-bearing, exclusive license under the Patent and under MMRI Technical Information to make, have made, or use Licensed Product labeled for testing or trials, and upon proper regulatory approval, for use and sale to treat humans or animals in the United States. | United States Patent Application No. 60/156,480, dated September 28, 1999, relating to a method for using interferon-g ("IFN-g") orally, and which, along with all modifications, revisions, continuations, continuations-in-part, divisions, re-issues, extensions, or foreign counterparts thereof. | A royalty of 10% of all amounts received by ABI or an ABI Affiliate from a Sublicensee or Sublicensee Affiliate, which amounts are based on sales of Licensed Product. |

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

*Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC. v. Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*

**SUMMARY OF THIRD PARTY LICENSE AGREEMENTS**

Appendix 12.1

| | Title | Licensor | Licensee | Effective Date | Term | License Grant | Licensed Technology | Payment & Royalty |
|---|---|---|---|---|---|---|---|---|
| **2001 Wayne State - SafeScience Agreement** | | | | | | | | |
| [3] | License Agreement | Wayne State University and Barbara Ann Karmanos Cancer Institute | SafeScience, Inc. | 1/26/2001 | The Agreement shall remain in effect until the later of the expiration of the term of the last to expire of the Licensed Patents, or on a Territory-by-Territory basis, twelve years following the first commercial sale of Licensed Products. | Wayne State and Barbara Ann Karmanos hereby grant to SafeScience an exclusive, worldwide, royalty-bearing license under the Licensed Patents and Licensed Technology, including the right to grant sublicenses and the right to make, have made, use, lease and sell Licensed Products. | 1. European National Phase PCT Application No. 95 925 253.7<br>2. Norwegian Patent Application No. 19970039<br>3. Australian Patent No. 695677<br>4. Brazilian Patent Application No. PI 9508245<br>5. Singapore Patent No. 36374<br>6. Japanese National Phase PCT Application No. 8-504302<br>7. Mexican National Stage Application No. 970118<br>8. Canadian Patent Application No. 2,194,586<br>9. Chinese National Stage Application No. 95194958.6<br>10. Finnish Patent Application No. 965269<br>11. U.S. Patent No. 5,834,442<br>12. U.S. Patent No. 5,895,784 | On the Effective Date, SafeScience shall pay Licensors a license fee of $300,000.<br><br>SafeScience, Inc. shall pay to Licensors royalties in respect of the most recent three-month period then ended equal to (i) 2% of Net Revenue in respect of Licensed Products.<br><br>(ii) 1.5% of Net Revenue in respect of Licensed Products that are not covered by an issued claim of any Licensed Patents. |
| **2005 Trustees of Columbia University - Omnimmune Corp Agreement** | | | | | | | | |
| [4] | License Agreement | The Trustees of Columbia University | Omnimmune Corp. | 2/1/2005 | The term of the exclusive license granted under the Licensed Patents shall extend until the expiration of the last to expire of the Licensed Patents or ten years from the date of the first sale, whichever is later, on a product by product basis. | (i) A worldwide exclusive license to develop, manufacture, use, sell, have sold, rent, or lease Licensed Products in the Therapeutic Subfield and the Animal Subfield;<br>(ii) With respect to any right, title or interest Columbia may have in the Licensed Patents, and/or Licensed Material, a worldwide non-exclusive license to develop, manufacture, use, sell, have sold, rent, or lease Licensed Products in the Diagnostic Subfield, except that no license is granted in the Licensed Patents and/or Licensed Materials with respect to B152 as listed on Attachment A in the Diagnostic Subfield. | 1) Methods of Using Antibodies Against Human Chorionic Gonadotropin-Related Determinants to Lyse, Quantitatively Measure and Enrich Human Malignant Cells. European Patent No. 0636171 issued 6/7/00.<br>2) Methods of Using Antibodies Against Human Luteinizing Hormone-Related Determinants to Detect and Enrich Human Malignant Cells.  U.S. Serial No. 10/164,914 and any continuation, or divisional continuation thereof; Patent No. 6,403,326 issued 6/11/02.<br>3) Method of Using Antibodies against Hormone-Related Determinants. U.S. Patent number 6,339,143 issued January 15, 2002.<br><br>Licensed Materials: Antibodies and Cell Lines:<br>A) A501, A502, A201, A202,<br>B) B109, B201, B204, B205, B151, B152 , B405, B406, B407, B408, B409, B411, B412, B413,<br>C) CTP-101, CTP-102, CTP-103, CTP 104, CTP 105. | Nonrefundable and non-creditable license fee of $30,000.<br><br>A royalty of 1% of Net Sales of all Licensed Products that involve use of Licensed Material or Licensed Information but are not covered by a Claim of a Licensed Patent for a term of ten (10) years from the date of the first sale of each product.<br><br>A royalty of 2% of Net Sales of all Licensed Products covered by a Claim of a Licensed Patent exclusively licensed to the Company hereunder, for a period of ten (10) years from the date of First Sale of each new Licensed Product in a territory or the last to expire Licensed Patent in such territory, whichever is longer. |

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

*Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC. v. Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*

**SUMMARY OF THIRD PARTY LICENSE AGREEMENTS**

Appendix 12.1

| | Title | Licensor | Licensee | Effective Date | Term | License Grant | Licensed Technology | Payment & Royalty |
|---|---|---|---|---|---|---|---|---|
| **2006 Andrew Chen - Bridgetech Agreement** | | | | | | | | |
| [5] | Agreement for Purchase and Sale | Andrew Xian Chen | Bridgetech Holdings International, Inc. | 4/29/2006 | The longer of (i) the life of the last to expire of the patents included in the Intellectual Property, and (ii) a period of ten years; unless this Agreement is terminated earlier. | Agreement granted Bridgetech an exclusive license to technology to develop, manufacture, sell and otherwise commercialize lyophilized docetaxel intravenous emulsion formulations and lyophilized paclitaxel intravenous emulsion formulations for cancer treatment in the People's Republic of China, Hong Kong, Macau, and Taiwan.  The 2006 Bridgetech Agreement also granted Bridgetech rights to lyophilized formulations of vancomycin and clarithromycin for the treatment of infectious diseases in the People's Republic of China, Hong Kong, Macau, and Taiwan. | The Bridgetech Agreement cancer-related patented technology included U.S. Patent Application No. 11/192439, WO Patent Application No. US2005/026783 both filed on July 28, 2005, and two U.S. provisional patent applications filed in February 2006.  Know-how is defined as including all knowledge, ideas, inventions, data, instructions, tangible or intangible materials, processes, formulas, expert opinions and information. | A running royalty of 4.0 percent of net revenue from sales of licensed products. Bridgetech also agreed to pay Mr. Chen an upfront payment of $500,000 and regulatory and other milestone payments of up to $2.0 million, depending in part on the number of and timing of clinical trials.  Under the agreement, Bridgetech was responsible for all regulatory and patent related costs. |
| **2011 SCOLR Pharma Inc. - Syntrix Biosystems Agreement** | | | | | | | | |
| [6] | Drug "X" Exclusive License Agreement | SCOLR Pharma Inc. | Syntrix Biosystems, Inc. | 6/2/2011 | Royalty Term means the period commencing on the date of the first commercial sale and ending on the earlier of (i) July 19, 2017, and (ii) Syntrix's aggregate payment of the maximum cap amount of US $20 million. | SCOLR grants Syntrix an exclusive, perpetual, royalty-bearing, assignable license in the worldwide Territory under the Patents and Licensed Know-How for the sole purpose of developing, manufacturing, commercializing, making, having made, using, selling, offering for sale and importing Products. | U.S. Patent Application 09/037,096, U.S. Patent 6,090,411, PCT Application PCT/US99/04508, European Patent Application No. 99 909 726.4, Canadian Patent CA 2323102, and Mexican Patent 220625 which relate to controlled-release pharmaceutical compositions and associated methods.  Licensed Know-how: SCOLR must provide, within 30 days of the Effective Date, all information listed in Annex B of the Agreement, including formulation data, analytical data, and manufacturing data. | Upfront Payment: $18,000 (non-refundable, non-recoupable) paid as of the Effective Date.  Running Royalties: 4% of Net Sales and 4% of Sublicense Sales Royalties actually received by Syntrix. |

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

*Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC. v. Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*
**SUMMARY OF THIRD PARTY LICENSE AGREEMENTS**
Appendix 12.1

| | Title | Licensor | Licensee | Effective Date | Term | License Grant | Licensed Technology | Payment & Royalty |
|---|---|---|---|---|---|---|---|---|
| | **2013 John Hopkins - Signpath Pharma Agreement** | | | | | | | |
| [7] | Exclusive License Agreement | John Hopkins | Signpath Pharma | 6/5/2013 | The term of the Agreement ended with the last to expire patent in each country, or if no patents are issued then 20 years from June 5, 2013, subject to earlier termination. | Granted Signpath exclusive rights to an invention that was developed by the parties through a previous license agreement in 2017. Through the 2013 John Hopkins Agreement, John Hopkins granted Signpath an exclusive worldwide license to use "a composite polymeric nanoparticle for overcoming multidrug resistance to cancer chemotherapeutics and treatment-related systemic toxicity." | The licensed technology consisted of one U.S. Provisional Patent Application 61/421,709 and Int'l Patent Application PCT/US2011/063870. | John Hopkins Agreement required Signpath to pay an initial license fee of $10,000, $15,000 within one year, with minimum annual royalties of $10,000 in year three, $20,000 in year four, and $30,000 in year five.<br><br>Signpath was also required to pay an earned royalty of 3.0 percent of revenue from sales of the licensed product for a minimum of 10 years from the first commercial sale of the licensed product.<br><br>The 2013 John Hopkins Agreement required Signpath to pay milestone payments based on the first patent dosing in Phases I, II and III clinical trials and then upon regulatory approval, increasing from $25,000 to $150,000. |
| | **2019 Formulex Pharma Innovations - Nasus Pharma License Agreement** | | | | | | | |
| [8] | License Agreement | Formulex Pharma Innovations Ltd. | Nasus Pharma Ltd. | 5/1/2019 | Until the expiration of all payment obligations of the Company pursuant to this Agreement. | The 2019 Formulex Agreement granted Nasus an exclusive, worldwide, irrevocable, transferable, sub-licensable, royalty-bearing license to Formulex technology for the purpose of developing, manufacturing, and otherwise commercializing the licensed technology and/or related products. | The Formulex technology ultimately included at least three U.S. patents, one international patent application, and Formulex know-how. Licensed know-how is described as being in the fields of intranasal and inhales formulations, combination products, and particle engineering.<br><br>With respect to patented technology, Exhibit B to the 2019 Formulex Agreement identifies only International Patent Application WO 2019 038756 – titled: Dry Powder Compositions for Intranasal Delivery. However, this international patent application led to the issuance of three United States patents. | 0.5% of Net Sales of Products which are capped by the aggregate amount to be paid to Formulex not to exceed $100,000.<br><br>The royalties are payable for the longer of 15 years from first commercial sale in each country or until the last to expire licensed patent in each country. |

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

*Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC. v. Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*

**SUMMARY OF THIRD PARTY LICENSE AGREEMENTS**

Appendix 12.1

| Title | Licensor | Licensee | Effective Date | Term | License Grant | Licensed Technology | Payment & Royalty |
|-------|----------|----------|----------------|------|---------------|---------------------|-------------------|
|       |          |          |                |      |               |                     |                   |

**Notes:**

[1]  The 1998 Albert Einstein College and Pain Therapeutics Agreement, May 5, 1998.

[2]  The 2000 Molecular Medicine Research Institute and Amarillo Biosciences Inc. Agreement, February 1, 2000.

[3]  The 2001 Wayne State and SafeScience Agreement, January 1, 2001.

[4]  The 2005 Trustees of Columbia University and Omnimmune Corp Agreement, February 1, 2005.

[5]  The 2006 Andrew Chen and Bridgetech Agreement, April 29, 2006.

[6]  The 2011 SCOLR Pharma Inc. and Syntrix Biosystems Agreement, June 2, 2011.

[7]  The 2013 John Hopkins and Signpath Pharma Agreement, June 5, 2013.

[8]  The 2019 Formulex Pharma Innovations and Nasus Pharma License Agreement, May 1, 2019.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

# Exhibit 4
# Filed Under Seal



**Planet Depos**
*We Make It Happen*™

## HIGHLY CONFIDENTIAL

# Transcript of James Malackowski

**Date:** April 15, 2026
**Case:** Eagle Pharmaceuticals, Inc., et al. -v- Slayback Pharma/Azurity Pharma

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

----------------------------x

EAGLE PHARMACEUTICALS,      :

INC. and EAGLE SUB1 LLC,    :

            Plaintiffs,  :  Case No.

   v.                    :  1:24-CV-00065-JLH

SLAYBACK PHARMA LLC and     :

AZURITY PHARMACEUTICALS,    :

INC.,                       :

            Defendants.  :

----------------------------x

**HIGHLY CONFIDENTIAL**

Videotaped Deposition of JAMES MALACKOWSKI

Chicago, Illinois

Wednesday, April 15, 2026

8:41 a.m. CST

Job No.:  629327

Pages:  1 - 264

Reported Stenographically by:

Tiffany M. Pietrzyk, CSR RPR CRR

**Page 2**

Videotaped deposition of JAMES MALACKOWSKI, held at the location of:

OCEAN TOMO, LLC

200 West Madison Street

Chicago, Illinois 60606

312.327.4400

Pursuant to notice, before Tiffany M. Pietrzyk, a Certified Shorthand Reporter in the States of California, Illinois, and Texas, Registered Professional Reporter, Certified Realtime Reporter, and a Notary Public in and for the State of Illinois.

**Page 3**

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

BRETT M. SANDFORD, ESQUIRE

LATHAM & WATKINS LLP

140 Scott Drive

Menlo Park, California 94025

650.328.4600

ON BEHALF OF THE DEFENDANTS:

DANIEL E. FORCHHEIMER, ESQUIRE (via Zoom)

ROBYN AST-GMOSER, ESQUIRE

WINDELS MARX LANE & MITTENDORF LLP

180 Park Avenue

Florham Park, New Jersey 07932-1054

973.966.3284

ALSO PRESENT:

Karlo Papa

Erin Schuppert, Planet Depos Videographer

**Page 4**

C O N T E N T S

EXAMINATION OF JAMES MALACKOWSKI          PAGE

  By Mr. Sandford                              8

E X H I B I T S

(Attached to transcript.)

DEPOSITION EXHIBITS                         PAGE

Exhibit 1    Expert Report of James          11
             Malackowski, dated 3/16/26

Exhibit 2    Errata to Expert Report of      12
             James Malackowski, dated
             4/12/26

Exhibit 3    Azurity Pharmaceuticals         48
             presentation entitled
             "Bendamustine Module," dated
             11/20/23, Bates number
             SLAY-VIVMUS0218279 through
             8292

Exhibit 4    Marketing materials, Bates      54
             number SLAY-VIVMUS0009765
             through 770

Exhibit 5    Marketing materials, Bates      55
             number SLAY-VIVMUS0010350
             through 377

HIGHLY CONFIDENTIAL

Transcript of James Malackowski
Conducted on April 15, 2026

4 (13 to 16)

wish to change sitting here today?

A. No, sir.

Q. Okay. Having reviewed Dr. Vellturo's reply report, are there any new opinions that you formed that are not fairly expressed in your rebuttal report?

A. Generally, no. The same opinions and principles hold. Obviously, he presented a rather lengthy reply, so we could go through paragraph by paragraph, and there might be additional observations, but generally, they're all consistent with Exhibit 1.

Q. Okay. So fair to say that at least sitting here right now, there's no new opinions that you intend to offer based on a review of Dr. Vellturo's reply report; fair?

A. Fair. Maybe new explanations or support for the opinions I hold, but nothing that would be a fundamentally new opinion.

Q. Okay. Thank you.
Now, you, I think, understand that Eagle, in addition to this lawsuit, has also sued Apotex and Baxter for alleged infringement of the same two patents that are at issue in this case; is that right?

A. Correct. Within my report, there's an appendix that details a number of Eagle litigations for patent infringement.

Q. Have you spoken with any expert witness that's been retained by Apotex or Baxter?

A. No, sir.

Q. And I should have said in connection with this case.

A. That was my presumption.

Q. Yeah.

A. And no.

Q. Have you reviewed any expert reports submitted by Apotex or Baxter in connection with their cases?

A. No, sir.

Q. Now, if we look at Appendix 2.1 to your report.

A. Yes, sir.

Q. And Appendix 2.1 identifies the deposition testimony that you considered to form your opinions in this case; correct?

A. Yes, sir.

Q. Then if we go to the next page, Appendix 2.2, this appendix identifies the documents and other materials that you considered to form your

opinions in this case; is that right?

A. It is.

Q. And other than the materials identified in Appendix 2.1, 2.2, are there any other materials that you considered to form your opinions in this case?

A. Not other than referring back to our last discussion. My opinions are still in formation pending new discovery. We've talked about Dr. Vellturo's recent evidence. Nothing else comes to mind.

Q. Okay. Did you or your team have access to the full, what they call the production database in this case?

A. Yes, sir.

Q. Okay. So you had the ability to -- or your team did, at least, to review documents on your own and search for materials that may be relevant to your opinions in this case; is that fair?

A. Generally, yes. I'm not aware of the complete logistics as to how that coordination was completed, but we had access to the data that we were interested to see.

Q. Okay. And to form your opinions, you didn't analyze any samples of the various bendamustine

products that are at issue in this case; right?

A. Not physical sample, no.

Q. You didn't do any testing on those products; fair?

A. Fair.

Q. Okay. Now, if I have your report right, you spoke to various individuals -- well, withdrawn.
You spoke to a Slayback employee as well as some of Slayback's technical or clinical experts to form your opinions; right?

A. Correct, as described within my report.

Q. Right.

A. Generally, in the footnotes related to those.

Q. I think that starts on 3 -- if helpful, page 3 and 4.
On pages 3 and 4 of your report, I believe you identify discussions with Mr. Josh Mathew, Dr. Brandt, and Dr. Thirman.
Do I have that right?

A. Yes, sir.

Q. Did you speak with anybody other than Mr. Mathew and Drs. Brandt and Thirman to form your opinions in this case?

A. No, sir.

**17**

Q. Okay. Did you personally attend each of these interviews?

A. Yes, sir.

Q. Did you take any notes of your discussions?

A. I did not.

Q. And on pages 3 and 4, you describe, in one paragraph for each conversation, some of the information you obtained from Mr. Mathew and Dr. Brandt and Dr. Thirman; right?

A. Yes. I would describe those paragraphs as summary. There's further detail within the body of the report, generally by footnote, regarding those conversations.

Q. Would it be fair to say that if you're relying on information from your discussions with these individuals, it's either identified in the body of your report or a footnote? Is that fair?

A. Yes. Certainly as it relates to the contents of my report. There may be questions you ask me today that harken back to those conversations. And if so, I'll try to relay that, but as I sit here today, nothing further.

Q. And have you had any conversations with any Slayback employees or Slayback experts since you submitted this report?

**18**

A. No, sir.

Q. How many conversations -- let's start with Mr. Mathew. How many conversations did you have with him?

A. I had one.

Q. Okay. And just to short-circuit, did you have one conversation with Dr. Brandt and Dr. Thirman as well?

A. I did.

Q. Okay. And generally, when did those conversations occur?

A. A week to ten days before the report date.

Q. And about how long was each of these discussions?

A. The discussion with Mr. Mathew was slightly longer. I think we allocated an hour and used a substantial portion of it. The discussions with Dr. Brandt and Dr. Thirman were probably a half-hour or so.

Q. And other than lawyers, did anybody else participate in these discussions?

A. Mr. Papa, who is here with us today, and Mr. McSorley from my office.

Q. And would Mr. Mathew -- at least on page 3, you report that he provided information concerning

**19**

the products that compete in the bendamustine product market, Vivimusta product pricing, and the importance of Vivimusta's 20-minute infusion time to certain hospitals, cancer clinics, and cancer patients.

Do you see that?

A. Yes, sir.

Q. Okay. Is there anything else -- any other categories of information you recall discussing with Mr. Mathew other than what's reported here on page 3?

A. I don't recall any other categories. That said, what's listed here is reasonably broad as it relates to the issues of damages in this case, and in particular, the disagreements I have with Dr. Vellturo.

Q. And with respect to Dr. Thirman, on page 4, you state that he provided information concerning the availability of acceptable non-infringing alternatives for treating CLL and NHL and that he also provided information concerning the factors oncologists focus on in preparing a treatment plan.

Do you see that?

A. I do.

Q. And are there any other categories of

**20**

information that you recall learning from Dr. Thirman during your conversation with him?

A. No. He described generally the content of his assignment, what his report would cover. I believe there are references to his report within my report. But it's all generally within these categories.

Q. And I skipped over Dr. Brandt, but if you go to the bottom of page 3, moving onto page 4 in your report, you state that "Dr. Brandt provided information concerning the available FDA-approved treatments for CLL and NHL, including bendamustine and non-bendamustine products."

And that he "also provided information concerning the factors oncologists and pharmacists consider when selecting a bendamustine product."

Do you see that?

A. I do.

Q. And, again, other than footnotes that may be cited in your report, did Dr. Brandt provide you with any other categories of information other than what's reported here on pages 3 and 4 of your report?

A. No, sir.

Q. Okay. Fair to say you did not discuss any

Transcript of James Malackowski
Conducted on April 15, 2026

25

A. Correct.

Q. Not offering any legal opinions in this case?

A. Correct.

Q. And at least as of now, you haven't earned any technical degrees; is that fair?

A. Yes.

Q. And you're not an engineer; right?

A. Not as I would use that term. I don't have a degree in engineering.

Q. And you're not holding yourself out as one of what's called ordinary skill of the art in the patents that are asserted in this case; right?

A. Correct.

Q. And just at a high level, you're not offering any technical opinions in this case; is that fair?

A. Not as I would use that term. In a litigation, technical opinions are reserved for the technical experts, which we've already discussed.

Q. And you're not a medical practitioner, an oncologist, pharmacist, clinician, anything in that field; fair?

A. Fair.

Q. And so you're not offering any -- call them

26

clinical or medical opinions in this case; is that accurate?

A. Yes, sir.

Q. Okay. At a high level, what were you asked to do in this case? What was your assignment?

A. To become familiar with the record in anticipation of a review of plaintiff's damage expert report, Dr. Vellturo, and then to provide my comments on his work, as well as if appropriate, my own independent opinion as to damages, assuming liability is found.

Q. And you're familiar with Dr. Vellturo before this case; right?

A. I am. Chris and I have known each other for decades.

Q. Is it fair to say that you disagree with his opinions, his methodology, but you're not contesting his qualifications as an expert in the field of economics or IP valuation, patent damages; correct?

A. Correct.

Q. And when you performed your work in this case, you assumed that the asserted claims of the asserted patents are enforceable, valid, and infringed by Slayback's Vivimusta product; right?

A. Correct.

27

Q. And that's a common assumption that damages experts make in basically every patent damages case; fair?

A. Liability is a common assumption, yes.

Q. And so you're not offering any opinions on validity or infringement; correct?

A. Correct.

Q. And I don't believe I saw any analysis or opinions relating to what are referred to as secondary considerations of non-obviousness or sometimes it's called objective indicia of non-obviousness; right?

A. I am not. Certainly not as it relates to this matter.

Q. And that includes a subcomponent of that analysis called a nexus. You don't offer any opinions in your report related to whether a sufficient nexus exists between the objective evidence and the asserted claims; is that fair?

A. Not with respect to whether or not the claims at issue are embodied within the accused product, certainly not.

Q. Okay. Let's talk about the scope of the claims a little bit.

You've read the patents, including the

28

claims; right, sir?

A. I have.

Q. Okay. And just at a high level, can you just give me your lay understanding of what the inventions are or the alleged inventions claimed in those patents?

A. Yes. It's described within my report and obviously the patents and the specifications themself. But generally speaking, it relates to a formulation or a method of administering bendamustine with certain solvents and/or stabilizers.

Q. Now, just to kind of walk through, there's multiple claims asserted in this case; is that your understanding?

A. Yes, sir.

Q. And understanding you're not a lawyer, you understand that each claim in a patent recites a different invention with a different scope; fair?

A. By definition, yes.

Q. And therefore, all else equal, one patent will not have the same value -- well, I'm going to restate that.

All else equal, one patent claim will not carry the same value as another patent claim; is



29

that fair?

A. I don't think so. Even though there may be technical distinctions within the claim, the translation of those claims to a market condition may suggest that the claims are equally valuable.

Q. And how about between patents? All else equal, one patent will not necessarily carry the same value as another patent; fair?

A. Not necessarily. But in many cases, it could, again, depending upon the scope of the claim coverage and how that translates to a product.

Q. So to understand whether two distinct patents carry equal value, you would need to look at things such as the scope of the claims in those patents and how it may or may not read on various products; is that fair?

A. Well, it depends upon how specific you want to be. Certainly, understanding the claim distinctions, at least at a general level, like, for example, do the claims simply distinguish themselves by the solvents that are used, is likely sufficient from a business licensing perspective to assess whether they are comparable. But there may be further technical analysis that could be relevant based upon, for example, the cost of various

30

solvents. So it's case dependent.

Q. And what's your understanding of the benefits provided by the patents that are being asserted in this case?

A. Well, primary benefit is the certain formulation that has a stability improvement over the next best alternative. In particular, a stability that may extend three years or more as opposed to an alternative that may have a stability on shelf of, say, a couple years.

So technically a distinction, from a market perspective, of no value because the stability issue beyond a reasonable period of time does not affect the purchase decision.

Q. When you say a stability improvement over

31

the next best alternative, what were you referring to there?

Q. Are there any other benefits that you understand are provided by practicing the asserted patents other than stability or shelf-life?

A. In order to answer that question, you have to say provided by the patents as compared to what? And so if you look either to                    to the other patents that are owned and have been asserted by Eagle, or the market generally, there aren't significant benefits to this patent. This patent, as we talk about in my report, is simply reclaiming certain solvents that were previously not claimed.

Q. So your understanding is that, as compared to the next best alternative, the only benefit provided by the asserted patents is an improvement in stability; is that fair?

A. I would say from an economic perspective, that is the benefit, yes.

Q. And so to form your opinions in this case

32

and perform your analysis, you did so with the understanding that the only benefit, from an economic perspective, is an improvement in stability as compared to the next best alternative; correct?

A. Well, that was an -- part of the analysis that I prepared. My analysis is much broader than that, considers multiple assumptions, alternative, Dr. Vellturo's work. But in the end, if you ask me in front of the jury what is the benefit of this patent, my opinion, consistent with the technical expert reports, is it's a relatively minor reclaiming of certain processes for this drug that have a potential but non-economic benefit of stability.

Q. And I should have asked this in the beginning, but fair to say that you're not offering independent opinions about what the benefits may or may not be from using these patents. You're relying on Slayback's technical experts for that input; correct?

A. That's a broad question. So if you're talking about the technical benefits, I'm relying largely on the technical expert. But if you're talking about more broadly what the benefits are, there's substantial discussion in my report that





93

consideration of that would be in my review of Dr. Vellturo's assessment of ███████████ ████████.

Q. In your report, you did not calculate the revenue Eagle has earned related to selling Treakisym in Japan; correct?

A. My report will speak for itself, but I don't believe it's in there.

Q. Apologize. I may have asked you this before, but I can't find the thing.

For purposes of your reasonable royalty analysis under factor 8, you agree that Bendeka and Belrapzo are commercially successful; correct?

A. I don't specifically call them out in factor 8, but I'm not disputing that they are commercially successful.

MR. SANDFORD: Okay. Let's go off the record.

THE VIDEOGRAPHER: Stand by.

We are going off the record. The time is 10:37.

(A short break was had.)

THE VIDEOGRAPHER: We are back on the record. The time is 10:48.

///

94

BY MR. SANDFORD:

Q. Let's talk about Panduit factor 2.

Is it your opinion or understanding that Eagle has not established Panduit factor 2 in this case?

Page 41, I believe.

A. So it is my opinion that there are acceptable non-infringing alternatives, and rather than have a wholesale dismissal of factor 2 and a rejection of any lost profits considerations, I have substituted a Mor-Flo, or market share test, in order to quantify lost profits.

Q. So then is my understanding correct that your opinion's that there are non-infringing alternatives, and thus, factor 2 is not met?

A. Yes. In the strict application, there are alternatives. Whether they be the powder product or the other combination therapies.

And so a strict application says that it is not met. But, again, to be conservative, in my analysis of lost profits, I've assumed a market approach. But, of course, remember my primary conclusion is there's no lost sales at all. So this analysis is only for scenario A and B as a fallback to the royalty determination.

95

Q. And just so we're on the same page, the second Panduit factor, at a high level, asks whether there are acceptable non-infringing alternatives to the patent owner's product, which is Belrapzo, that were available during the damages period; is that fair?

A. We need to talk about what the word "available" means. But generally speaking, yes.

Q. And Eagle, for a given alternative, Eagle does not need to show that the alternative would not be acceptable, would infringe, and would not be available; right?

A. If you're asking me who holds the legal burden for that, I'm not offering that legal opinion.

Q. Different question.

In order to show that a specific opinion is -- specific opinion -- withdrawn.

In order to show that a specific alternative would not capture sales, Eagle can show either that it would not be an acceptable substitute, that it would infringe the patents, or that it would not be available during the damages period; right?

A. Generally, yes, though there's further discussion on the word "available." It doesn't

96

necessarily have to be in the market for the totality of the period.

Q. Understood.

But my simple point is Eagle doesn't have to show all three of those things to remove an alternative from the factor 2 analysis?

A. I don't impose that obligation on them. That would ultimately be a legal question.

Q. You've mentioned it twice now. So I'll just ask you. What does it mean to be available, to your understanding, as you applied your analysis in this case?

A. So here again, the case law has been somewhat evolving or inconsistent over time. Generally speaking, if there is a product that was on the market during the period or was available in the sense of could have been on the market, technically sound, those can be considered in the Panduit factor 2 analysis.

Q. And you, yourself, are not offering the ultimate opinion that any specific alternative was available during the damages period, are you?

A. Not with respect to Panduit because I'm not imposing that as a restriction to the lost profits calculation.

HIGHLY CONFIDENTIAL
Transcript of James Malackowski
Conducted on April 15, 2026



Q. Okay. We'll come back to that. I don't mean to jump to the royalty analysis right now. Let's stay focused on factor 2.

So you -- well, let me ask this.

What is your understanding of what it means for an alternative to be acceptable?

A. That -- it does not mean that it essentially be the patented product. It means that within the context of the record of the case, that it is a product that would be acceptable or one that customers would choose in the absence of the accused products.

Q. And you understand that merely competing with the patent owner's product does not, in and of itself, make an alternative an acceptable substitute; right?

A. It would depend upon the characteristics of the competition. But simply to say that it was offered in competition is not, in my view, sufficient.

Q. Put differently, in order for an alternative to be considered as an acceptable substitute, it must offer some of the advantages and benefits of the patented product; fair?

A. I don't dispute that. In this case, for example, if it's a bendamustine product, it's offering the clinical benefits of the patented product.

Q. That's my next question.

Did you perform your analysis with the understanding that if a product is able to treat either CLL or NHL, then it is an acceptable substitute?

A. So there are other experts who address that question in more detail or more broadly than me. I

believe the opinion is that, yes, they are an available substitute.

For purposes of my analysis, I've gone into a deeper assessment of what are the characteristics of each product, and that's reflected in the products I do or do not include within the market share study.

Q. And you're not offering an opinion on acceptability of any of the alleged alternatives; right? That's addressed by Slayback's clinical and technical experts; correct?

A. In part, yes. In part, no. I'm not, for example, offering any opinion, clinical or otherwise, related to the combination therapies.

I do and have already given you my opinion that, from a licensing or damage assessment perspective, that because doctors prescribe bendamustine without further instructions to dispense as written, generally speaking, if not universally speaking, that that speaks to what the market would consider to be acceptable alternatives. And that's taken into account more specifically in my royalty analysis.

Q. Well, focusing specifically on Panduit factor 2 -- and we'll get to the royalty analysis --

are you offering the ultimate opinion that powder bendamustine products, non-bendamustine drugs are acceptable alternatives to Belrapzo?

A. I am offering, in scenario B, that the powdered products are acceptable alternatives, as one study to present to the jury.

But of course my first opinion is that there's no lost profits whatsoever, and this is an alternative.

Q. And, again, you didn't perform any lost profits calculation where non-bendamustine products are included as an acceptable non-infringing alternative in the but-for world; correct?

A. Correct.

And so for purposes of -- so what products did you include as acceptable non-infringing alternatives for purposes of Panduit Factor 2?

Is it only lyophilized powder bendamustine

101

products?

A. Well, in Scenario A, it's none of the above. The only products that are considered would be the ready-to-dilute bendamustine products. In Scenario B, it includes those plus the lyophilized or powdered product.

Q. And you would agree that Vivimusta cannot be considered an acceptable non-infringing alternative for purposes of the lost profits analysis; correct?

A. Vivimusta, as produced historically, no, that would be an accused product.

Q. And why can't the accused product, here Vivimusta, be considered an acceptable non-infringing alternative in the damages analysis?

A. The analysis starts with the assumption of infringement. And the whole purpose of the analysis is to presume what would have happened in the but-for world. So unless there was a design around or modification to the product, the Georgia-Pacific criteria have universally required that you remove the accused product from the analysis.

Q. And you would agree that Belrapzo, Eagle's product, can also not be considered an acceptable non-infringing alternative for purposes of the lost profits analysis; correct?

102

A. I think that's a more complex question that depends on the facts of the case. But in this case, I'm not presuming that.

Q. And, again, you did not treat Apotex or Baxter's liquid bendamustine product as an acceptable non-infringing alternative for your Panduit Factor 2 scenarios; correct?

A. Correct.

Q. Okay. Now, can you look at Appendix 11.1 in your report?

A. Yes, sir.

Q. And in Appendix 11.1, you list a variety of FDA-approved treatments for CLL; correct?

A. Correct.

Q. And then on 11.2, Appendix 11.2, you list various FDA-approved treatments for NHL; correct?

A. Correct.

Q. And is it your understanding or opinion in this case that all of these FDA treatments for CLL and NHL listed here are acceptable non-infringing alternatives to Belrapzo?

A. Yes. It's my understanding that there are other experts who draw that conclusion, and so that's something I've considered in my analysis. But to be conservative, I have not factored it into

103

the quantification of my lost profits.

Q. None of the products -- well, none of the -- yeah, withdrawn.

None of the products identified in Appendix 11.1 or 11.2 have bendamustine in it other than the liquid and powder products we've discussed; correct?

A. I'm only slightly -- yes, I would agree with that.

Q. How can a drug that doesn't have bendamustine be an acceptable substitute for a product -- a liquid bendamustine product with respect to a patent claim that claims a liquid bendamustine solution?

A. Well, I don't think the patent claim coverage factors into this discussion. The discussion is whether or not other products would be substitutes by the decision-maker. And ultimately, the decision-maker for this level of assessment is the prescribing physician. And I understand that the prescribing physician can and has interchangeably recommended or prescribed bendamustine products versus other combination therapy products, and that there are physicians and pharmacists who are speaking to that.

104

Q. So your understanding is that the scope of the patent claims being asserted have no bearing on whether a specific alternative is considered an acceptable substitute?

A. Well, two responses to that. One is the product has to be outside the scope of the claim, so to that extent, yes it has a bearing. And then two, you have to understand where and how the claimed invention factors into the decision-making process in the market. So because of that two-stage process that we talked earlier, the physician versus the hospital, you have to look at those distinctly and understand to what extent the patent claims are relevant to that decision-making process.

Q. At its core, your understanding is that these products identified in 11.1 and 11.2 that lack bendamustine are acceptable alternatives because they're capable of treating either CLL or NHL; is that fair?

A. Fair, but not complete. They are not only capable, but I understand the testimony will be that doctors prescribe them in the alternative.

Q. And I didn't mean to suggest they couldn't treat it, so I'll reask it in a better way.

Your understanding is that the

117

Belrapzo because it's indicated to treat both CLL and NHL; right?

A. Well, that's a better question for those experts. I indicate that it's an available alternative because the FDA has approved it for such purpose.

Q. But is that your understanding from -- withdrawn.

Is it your understanding, from the clinical experts that Slayback has retained in this case, that Brukinsa is an acceptable alternative for Belrapzo?

A. You would have to go back to their specific reports. There is a set of research that I did independent of those experts to look at FDA approvals for these two conditions. I understand that the technical experts also say that these types of therapies are alternative and substitutes. Whether they, too, list each and every one of these for each of the two indications, we'd have to go back and map it to their work.

Q. But you cited all their rebuttal reports in your report; correct? Other than Dr. Sinko?

A. I believe that's true. I don't know how that affects what we're talking about, but...

118

Q. Well, I mean, do you have an understanding one way or the other as to whether Slayback's clinical experts have offered the opinion that Brukinsa is an acceptable alternative to Belrapzo?

A. As it relates to that specific drug, you need to go ask them, or we need to look to their reports. I'm not trying to draw that linear conclusion.

Q. Well, I'm just asking -- I just asked if you have an understanding one way or the other as to whether they've offered that opinion?

A. Not from memory.

Q. Okay.

Q. Okay. Put that document aside.

Now let's shift gears and go to factor 3 briefly. Panduit factor 3 asks, at a high level, whether Eagle had the manufacturing, distribution, and financial capacity it make the accused sales that are claimed as lost; is that fair?

A. Yes.

Q. And in this case, you analyzed factor 3 and

119

concluded that it is met, in agreement with Dr. Vellturo; correct?

A. Yes.

Q. And I think it's 42, if it helps you. I'm going to jump there really quick.

In the third paragraph of your Panduit factor 3 discussion on page 42, you say, "Based on this evidence, I have concluded that, during the damages period, Eagle had the capacity to achieve the additional unit sales of Belrapzo and Bendeka, quantified in my market share analysis set forth below."

Do you see that?

A. Yes.

Q. Is it your -- withdrawn.

Did you also conclude that Eagle had the capacity to achieve the additional unit sales of Belrapzo and Bendeka that was quantified in Dr. Vellturo's analysis in his opening report?

A. No.

Q. Can you explain that?

A. I haven't conducted that analysis, in part because the analysis is faulty for all the reasons I've set forth in my report, and, of course, in part because the quantities that he presumes at certain

120

prices, I think, are inconsistent with the facts of the case.

So I'm not obligated to assess factor 3 under his condition. I am presenting it under my own.

Q. So you did not perform an analysis to determine whether Eagle had the capacity, under Panduit factor 3, to make the additional unit sales of Belrapzo and Bendeka that Dr. Vellturo is -- has included in his analysis; is that fair?

A. Correct. I don't think that's a necessary analysis.

Q. And he concluded that Panduit Factor 3 was met for the units that he is claiming as lost; right?

A. I believe so.

Q. And you don't dispute that in your report; fair?

A. I'm not specifically disputing his conclusion on factor 3.

Q. Okay. And in your report, you don't identify any manufacturing disruptions or supply chain issues that Eagle experienced with respect to supplying Belrapzo or Bendeka during the damages period; right?

149



Q. Okay. You can set that aside.

I'm going to switch to reasonable royalties. Do you want to break now, or do you want me to keep going?

A. Given what we said off the record, I say we push forward.

Q. Cool. Okay.

Here's the hardest question of the day. Can you describe in your lay words, sir, what a reasonable royalty is?

A. Yes. A reasonable royalty in this context is the minimum measure of damage for an infringement, which can be derived using a number of methodologies, but most commonly, through a hypothetical negotiation between the parties, considering a range of business factors specified in the Georgia-Pacific case from the 1970s.

Q. And the reasonable royalty is meant to compensate the patent holder, here Eagle, for the accused infringer, here Slayback's, use of the claimed inventions; fair?

150

A. I think that's fair.

Q. And you would agree that there are different approaches to determine a reasonable royalty; right?

A. Yes.

Q. And there's no one, single, universal way to determine what the appropriate reasonable royalty should be?

A. Correct.

Q. And you mentioned a few approaches, the income cost and market approaches in your report; right?

A. Yes, but I don't put those in the category of the means to determine a royalty in the larger context.

Q. Okay.

A. So the cost market and income approach are generally inputs into the Georgia-Pacific analysis, which is one approach. A secondary approach is an established rate. A third approach would be evidence by Dr. Vellturo's Edgeworth Box analysis, and there may be others.

Q. Have you ever used an Edgeworth Box analysis to determine a reasonable royalty in a patent case?

A. I have, but in a limited circumstance where the intellectual property is not only co-extensive

151

with but essentially represents the product. So if you're dealing, for example, with a pharmacy product that is the compound, the Edgeworth Box may be very effective.

If you're dealing, however, with an improvement patent or method of formulation patent, the type of technology here, it is not, in my opinion, appropriate because it does not apportion to the value of the invention. Any of the many patents that are considered to be central or co-extensive with this product would all derive from the same royalty, which effectively doesn't apportion and

Q. How many times have you used an Edgeworth Box to determine the reasonable royalty in a patent case?

A. A small percentage. I've assessed royalty hundreds of times, and I could probably count on one hand the number of times I've used the Edgeworth Box.

Q. But understanding you disagree with Dr. Vellturo's analysis and conclusions, you don't have any objection to the Edgeworth Box analysis as a reliable methodology for assessing the reasonable

152

royalty; fair?

A. No. In this case, I have a fundamental objection that the Edgeworth Box cannot possibly apportion a royalty to this invention because it's looking at a range between the

the Edgeworth Box is inappropriate for the analysis.

Q. Dr. Vellturo's reasonable royalty does not equate to Eagle's profits on the sales of its products, as I think you just suggested; right?

A. No, it does.

Q. His ultimate reasonable royalty rate?

A. Yes. His ultimate reasonable royalty is the bottom of the Edgeworth Box, which is their



profitability or, in the alternative, a ▮▮▮▮ rate, which is completely distinct and separate.

Q. Okay. Well, let's talk about this a little bit.

In your opinion, setting aside Dr. Vellturo's, at the hypothetical negotiation, Eagle and Slayback would agree to a reasonable ▮▮▮▮▮▮ of Vivimusta net sales; right?

A. True.

Q. Okay. And as I read your report, that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

A. I think that's fair.

Q. Okay. And so your indicated royalty rates under both the cost and market approach form starting points or benchmarks for your ultimate ▮▮▮▮▮▮▮▮; fair?

A. I don't use the term "starting point," but I think a "benchmark" is a fair term.

Q. Okay. And so if you cannot rely on either the royalty indicated under your cost approach or your market approach, your ultimate reasonable royalty rate would change; correct, sir?

A. Well, it depends. If you simply eliminated those, looking at the balance of factors, I don't believe that it would change or certainly change materially because the remaining Georgia-Pacific factors all point to a royalty that's a modest measure of an improvement or formulation patent, as distinct from a more aggressive royalty that represents, you know, a portfolio of patents or a compound patent.

Q. So if you couldn't rely on, let's say, the royalty indicated by the ▮▮▮▮▮▮▮▮▮▮▮▮, your opinion would still be that a ▮▮▮▮▮▮ royalty rate is appropriate?

A. I haven't reached that conclusion. I would need to give that thought.

Q. Okay. And likewise, if you couldn't rely on the royalty indicated by the cost approach, you have not formed an opinion as to what the ultimate reasonable royalty rate would be; fair?

A. Correct. I would have to give that thought. My analysis is a single comprehensive study. There are a lot of factors, by definition, under

Georgia-Pacific that must be considered. And I've not done a permutation of what if these factors but not those factors.

Q. And you and Dr. Vellturo, I believe agree that the appropriate royalty base is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; right?

A. Not necessarily. I certainly agree that's what it is. I believe if you look at Dr. Vellturo's ▮▮▮▮▮▮ royalty opinion, that is the same. But if you consider his Edgeworth Box royalty opinion, it doesn't look at revenue at all. It looks at units times this profit factor.

Q. Yeah. Fair, fair.

Well, let me just ask this. You -- under your opinions, the appropriate royalty base is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; correct?

A. Yes, sir.

Q. And so under -- well, withdrawn.

And then just to walk through your calculations, you calculated royalty damages by multiplying ▮▮▮▮▮▮ by ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the date on which Slayback last produced financial data in this case; right?

A. Correct. And to the extent further data is produced, I would supplement.

Q. Uh-huh. And your ultimate reasonable royalty calculation, assuming both patents are valid and infringed, is ▮▮▮▮▮▮; is that right?

A. Correct.

Q. Okay. And if only the '248 patent is found to be valid and infringed, damages would be ▮▮▮▮▮▮?

A. Correct.

Q. Okay. Now, from my review of your report there's a fair amount of places where you and Dr. Vellturo actually agree with respect to the reasonable royalty analysis; is that a fair statement, sir?

A. Yes, if you put aside the fundamental distinction of the appropriateness of the Edgeworth Box, with respect to many of the Georgia-Pacific factors, as well as the core assumption of validity, infringement, date of hypothetical, there are many areas where we do agree.

Q. You both, for example, agree that there's no established royalty in this case for a license to the asserted patents; right?

A. Correct.

Q. And you both agree that a reasonable royalty can be determined by using the hypothetical negotiation framework; correct?

A. Correct.

Q. And I know you disagree with his analysis, but you and Dr. Vellturo both applied the 15 Georgia-Pacific factors?

A. Correct.

Q. And you and Dr. Vellturo agree that the hypothetical negotiation would be between Eagle, as the licensor, and Slayback/Azurity as the licensee; correct?

A. Correct.

Q. Okay. In the real world, Slayback has not taken a license to the asserted patents; fair?

A. Of course, or we wouldn't be here.

Q. Right. And you and Dr. Vellturo agree that there would be one hypothetical negotiation for a license to both asserted patents; right?

A. Correct.

Q. And you and Dr. Vellturo agree that the hypothetical negotiation, assuming both patents are valid and infringed, would occur on the date of Slayback's first alleged infringement around January 16, 2024; right?

A. This is an issue that can sometimes be very precise. So you said "the date," implying a day, and then you said "occurs around." Suffice it to say that we generally agree that the date of the hypothetical is that period leading up to that first sale.

Q. Well, I mean, the date of first alleged infringement is January 16, 2024; right?

A. Correct.

Q. Everyone just says "leading up to that period." I believe you use that language in your report. But anyway, it's --

A. Right, but that's really important language because it essentially requires that you not put the defendant over a barrel saying, hey, I showed up today, and you're infringing. If you don't take a license, you have to leave the market and factor in all of that penalty.

And that's an important concept here because that supports the notion that you do not factor into account the period associated with FDA exclusivity, but you only take into account patent exclusivity --

Q. I'm going to stop you because I didn't ask a question. But that's okay.

MR. SANDFORD: So I'll just put on the record to strike that.

Q. You and Dr. Vellturo -- well, let me -- let's talk about the hypothetical license.

You and Dr. Vellturo agree that the hypothetical license would be sometimes what's referred to as a naked patent license?

A. True.

Q. Or a bare patent license?

A. Either one.

Q. Yeah. And what that means, essentially, is that the hypothetical license would only be for the asserted patents; it wouldn't include a license to non-patent IP such as know-how or trade secrets; right?

A. True.

Q. Okay. And you and Dr. Vellturo agree the hypothetical license would be a one-way license from Eagle to Slayback with no cross-license; fair?

A. Fair.

Q. You and Dr. Vellturo agree that the hypothetical license would not give Slayback the right to sublicense the asserted patents to any third parties; right?

A. Correct.

Q. Okay. And you and Dr. Vellturo agree -- sorry.

You and Dr. Vellturo agree that the geographical scope of a hypothetical license would be limited to the United States and would not include rights outside of the United States; fair?

A. Correct.

Q. You and Dr. Vellturo both offer royalty rates on a running royalty basis and not a lump sum basis; right?

A. Correct.

Q. So we agree on the royalty structure as well; fair?

A. Well, we agree on that element of the structure, not necessarily fully because Dr. Vellturo offers a percentage and an amount per unit.

Q. Right.

And you and Dr. Vellturo agree that the term of the hypothetical license would be about seven years, from January 2024 to January 2031; right?

A. Yes.

Q. Okay. And just in terms of the mathematical calculations, you don't dispute any of Dr. Vellturo's calculations of the royalty base or

his ultimate reasonable royalty damages; is that fair?

A. I don't dispute the mathematics of it.

Q. Right. Okay.

Now, one approach that you discuss in your report is the income approach; right?

A. Concluding that there isn't sufficient quantifiable benefit to have that as a benchmark, yes.

Q. Correct.

You didn't quantify a royalty rate under the income approach because your understanding or conclusion is that there's no data to evaluate or quantify the incremental profits related to the asserted patents; correct?

A. Correct, but carefully understanding "incremental" means the benefits of these patents as opposed to next-best alternative, not the overall profitability of the product. That's considered in other Georgia-Pacific factors.

Q. Right.

And your conclusion that there's no data to evaluate or otherwise quantify the incremental benefits -- sorry. Withdrawn.

Your conclusion that there's no data to evaluate or quantify the incremental profits related to the asserted patents is based on your understanding that they provide no new therapeutic function or clinical benefits; fair?

A. It includes that consideration, yes.

Q. And what else led you to determine that the income approach is not applicable here?

A. That the patents do not allow measurable portion of profits attributable specifically to them, to the patents, as opposed to other aspects of the product overall. There isn't, for example, a with the patented invention versus without the patented invention to suggest some sort of premium or a with the patented invention versus without suggesting some sort of cost savings.

Q. And another approach you applied is the market approach; right?

A. Correct.

Q. And an analogy that's often used -- I don't know if you've used it -- is for the market approach, it's like the price of a comparable house to determine the value of your own house if you're selling it.

A. Generally speaking. You may need to adjust for the pool or the fireplace, but yes.

Q. Have you used that analogy in your testimony before?

A. I have.

Q. I've asked that question 30 times, and I never got a no to that.

Under the market approach, an agreement must be both economically and technically comparable to be informative at the hypothetical negotiation; correct?

A. Yes.

Q. Okay. And if -- you're not offering any opinions on the technical comparability of any patent license agreement at issue in this case; right?

A. You asked me that earlier in the day.

Q. Right.

A. And I drew a distinction between technical comparability that would be within the scope of a technical expert and technical comparability that would be within the scope of a licensing professional. And in this case, I've considered both.

Q. So help me understand, then -- you're obviously, for the licenses that you find informative, are offering the opinion that they're economically comparable; right?

A. True.

Q. Is it you or someone else that is offering the opinion that the licenses you find informative are technically comparable to the technology in the asserted patents?

A. It is both myself from a business perspective -- and I'm happy to explain that -- as well as the technical experts from a technical perspective.

Q. Explain that, please.

A. So as I mentioned earlier in the day, the standard used in normal course licensing exercises outside of litigation is not as rigorous as it is within litigation in the sense that you typically don't go and engage a third-party technical expert. So within my scope of experience and expertise is the ability to look at other business license agreements and determine whether they are technically sufficiently related in order to be useful to assess a royalty. And I've done that with respect to the GP 12 licenses that I've looked at, meaning they are related to methods of formulation for cancer treatments, as well as for the ███ ██████████ that are licensed under the ███



165

But in addition to that, we have the technical experts that provide a much more detailed assessment of the technology.

Q. You did not have any discussions with any of Slayback's technical experts regarding the ▮▮▮▮▮▮▮▮▮▮▮▮; fair?

A. I don't recall. If I did, it would be cited in my report and defer to that.

Q. Okay. And you did not have any discussions with Slayback's technical experts regarding any of the third-party agreements you rely on in your report; correct?

A. We discussed that earlier. I believe there will be testimony or reports to that regard, but I have not specifically had that conversation.

Q. Okay. So you don't know what, if any, conclusions any of Slayback's technical experts may have arrived at with respect to any third-party agreement, right, sitting here today, at least?

A. Well, I understand through discussions with counsel that there will be technical experts who will provide testimony on this issue. I don't -- I've seen some of the technical experts. I haven't seen -- reports. I haven't seen all of them.

Q. Come back to that as well.

166

So let me ask it this way.

167

168

Q. Maybe -- right. And I don't -- maybe we're talking past each other. I'm not sure we are.

A. I disagree. Now, we are gonna use the terms "comparable" versus "similar," but maybe I can answer it this way. It is not necessary in each and every case that there be a technical expert to support the work of the damages expert. That is an additional factor that's beneficial but not necessarily required.

My scope of expertise as a licensing expert includes not only assessing economic situations, but being able to draw a line that the technology being licensed is sufficiently relevant from a business perspective to inform the rate. A technical expert may look at the technology and say, well, that may be true, but from a technical perspective, there's this chemical nuance that makes it different. That's fine.

I'm telling you, even if I did not have the



**169**

technical expert support, it would be my opinion that the agreements I relied upon are sufficient for my purposes to factor into my analysis.

Q. But you acknowledge that you need technical input as to the technical comparability to perform your analysis in a reasonable royalty context; right?

A. No. I tell you that it's helpful and I have it and I'm thankful that I have it, but it's not necessary. I've sat on the board of biotech companies, helping them to negotiate licenses, including cancer-related treatments and cancer-related forms of therapy, and I don't go out and hire a technical expert when I do that. If it's sufficiently close, I consider it to be relevant to the negotiation. The other licensing expert may dispute that and say it's not sufficiently close, and we'll wrestle through that in our discussions.

Q. In your report, you did not cite an opinion from any of Slayback's technical experts that they concluded that the patents licensed in any agreement you rely on are technically comparable to the asserted patents; right?

A. Maybe I don't understand your question because you've asked me that repeatedly, and I've

**170**

explained what's in my report is cited in my report. I understand there will be other technical experts who address that issue. I have not seen necessarily all those reports, but I don't think that's necessary. At the time of trial, I expect that to happen, and I'll be there listening.

Q. Well, under the market approach, you determined that ███████████ indicates a ███████████████; right?

A. Yes.

Q. And then you took that ██████████ royalty rate and made it ███████ royalty rate for the hypothetical license to the asserted patents because there's ████████; right?

A. Correct.

Q. Okay. And just to drill down on that a little bit more, you conducted a per patent apportionment of the █████████████ in the ████████████████████████████ rate of about ███████; right?

A. Correct.

Q. And other than the ███████████████

**171**

████████████████████████████
██████████████████
████████████

Q. And there are no -- Slayback did not produce any patent license agreements to which it or Azurity is a party in this case, to your knowledge; right?

A. Correct.

Q. Okay. And then to assess economic comparability, you analyze the Sedona Commentary License Comparability Factors; right?

A. Correct.

Q. Okay. And I think you discuss this on page 56 and 57, where you've set forth the Sedona Factors; right?

A. Correct.

Q. Okay. And on page 56, you discuss a little bit your understanding as to assessing comparability of patent license agreements; right?

A. Correct.

Q. Okay. And you say -- you quote the Sedona Conference Working Group on patent damages and remedies, specifically the statement "Any proposed comparable license offered as comparable to the hypothetical license must be evaluated for its similarities to and differences from the

**172**

hypothetical license"; right?

A. Yes.

Q. And you agree with that statement, sir?

A. Yes.

Q. Okay. And then you go on, in block quote, two more sentences from the Sedona Conference Working Group; correct?

A. Yes.

Q. And the second sentence that you quoted states, "Rigorously analyzing and adjusting for any material differences between a benchmark license and the hypothetical license, based upon evidence presented, provides a rational and justifiable basis for determining what royalty would result from the hypothetical negotiation."

Do you see that?

A. Yes.

Q. You agree with this as well; correct, sir?

A. Yes.

Q. And it's important, when assessing comparable license, to adjust for any material differences between the benchmark and the hypothetical license when you're determining what the ultimate royalty rate will be; right?

A. Yes, recognizing the adjustments may go both



173

directions and even net out, but I agree.

Q. Okay. And in addition to the ███████ agreement under the market approach, you also analyzed, I believe it's eight third-party agreements.

A. More specifically, those are considered under Georgia-Pacific factor 12, but yes, there are eight other agreements that I've considered, two of which I relied upon.

Q. You ultimately rely on, just for shorthand, we'll call them the -- well, specifically, you relied on a 2006 agreement between Andrew Chen and Bridgetech Holdings International Incorporated, as well as a 2013 agreement between Johns Hopkins University and Signpath Pharma; correct?

A. Correct.

Q. Okay. And you concluded that both the Bridgetech and Johns Hopkins agreements were economically comparable to the hypothetical license; right?

A. With potential consideration of adjustments, yes.

Q. Okay. And there are -- the other six third-party agreements that are identified in the appendices to your report, you did not rely on those

174

to quantify the ultimate royalty rate that you're advancing in this case; fair?

A. Correct.

Q. Did you conclude that any of those six agreements were economically comparable to the hypothetical license?

A. I did not.

Q. Okay. And just -- so just so we have a clear record -- and you can look at your appendix if you want. It's Appendix 12.

The six third-party agreements that were just referenced in your prior testimony and my question are -- which are identified in Appendix 12, are the 1998 Albert Einstein Agreement, the 2000 Molecular Medicine Research Institute Agreement, the 2001 Wayne State Agreement, the 2005 Trustees of Columbia Agreement, 2011 SCOLR, all upper case, Pharma Inc. Agreement, and a 2019 Formulex Pharma Innovations Agreement.

A. Correct.

Q. Okay. And so you concluded that those six agreements are not economically comparable and therefore not informative to determining the reasonable royalty in this case; correct?

A. Including consideration of business

175

technical comparability, i.e., whether or not they relate to certain formulations for cancer treatments.

Q. And you did -- yeah, okay. Fair enough.

But you ultimately concluded they are not sufficiently comparable to be informative of the reasonable royalty for the hypothetical license; right?

A. Correct.

Q. Okay. Let's revert back to the ███████████████.

Now, you and Dr. Vellturo agree that the ███████████████████████████████████████████████████████████████; correct?

A. If properly considered, yes.

Q. When you say "if properly considered," what are you referring to?

A. Well, we draw different conclusions --

Q. Correct.

A. -- from that agreement, so it's not a blanket endorsement without understanding the context.

Q. Setting aside the interpretation of the agreement itself, as to comparability, you and

176

Dr. Vellturo agree that ███████████████████ ██████████ correct?

A. Correct.

Q. And you and Dr. Vellturo both agree ███████████████████████████████████████████████████████████; correct?

A. Correct for me. Correct in part for Dr. Vellturo. It depends which analysis you're referring to.

Q. And what are the similarities between the ████████████████ the hypothetical license that led you to conclude that it's a sufficiently comparable license?

A. Well, I refer to those within my report, so I encourage you to review that.

But generally speaking, ████████████ ████████████████████████████████████████████████████████████████████████████████████

Q. Okay. And you concluded, in your analysis that ██████████████████████████████████

Transcript of James Malackowski
Conducted on April 15, 2026



Transcript of James Malackowski
Conducted on April 15, 2026



Q. Okay. Let's -- you have two exhibits in front of you.

(Exhibit 11 was marked for identification and is attached to the transcript.)

(Exhibit 12 was marked for identification and is attached to the transcript.)

BY MR. SANDFORD:

Q. As discussed earlier, you analyzed eight third-party agreements as part of your Georgia-Pacific Factor 12 analysis; right?

A. Correct.

Q. Okay. And I believe you concluded that these third-party agreements would support your opinion that Georgia-Pacific Factor 12 would favor

205

the licensee Slayback at the hypothetical negotiation.

A. Correct.

Q. And you also relied on the royalty rates in the Bridgetech and Johns Hopkins agreements to corroborate or confirm your ultimate ███ royalty rate; fair?

A. Fair.

Q. The royalty rates in the Bridgetech and Johns Hopkins agreements do not actually form the basis from a quantitative perspective of your ultimate royalty rate; is that fair?

A. That's fair. They would fall into the category of qualitative assessments under Georgia-Pacific.

Q. Okay. And you found, at least as reported by your report, these databases -- withdrawn.

You located these eight third-party agreements by doing searches on RoyaltyStat and ktMINE, which are both databases; correct?

A. Correct.

Q. Okay. Did you do the searching, or did your team do it?

A. My team.

Q. And RoyaltyStat is a subscription database;

206

is that right?

A. I believe so.

Q. And you have to pay to get that subscription?

A. Yes.

Q. Do you know how much or approximately how much?

A. I don't. I know we've been subscribing for a very long time. I don't think it's hugely significant.

Q. I should ask him.

A. He probably knows.

Q. But we agree that you have to pay some amount of money on a recurring basis to have access to search RoyaltyStat for potentially comparable licenses; correct?

A. Correct.

Q. And ktMINE, is that also a subscription database?

A. It is also a fee-based database, yes.

Q. Okay. And do you have a sense of what the fee is that you need to pay to have access to the ktMINE database?

A. No. It's, again, relatively minor.

Q. Okay.

207

When did your team conduct these searches?

A. I don't know the calendar date, but I would say kind of the -- two-thirds of the way through our process, maybe, as we were starting to compile the detailed Georgia-Pacific analysis and looking for our own independent validations outside of the context of this record.

Q. And when you say two-thirds through your process, do you have, like, a month or ...

A. No. So early March, late February, something like that.

Q. Okay. So you -- all right.

Your team began searching for these third-party agreements in late February, early March of 2026; fair?

A. Sounds about right. I don't have a particular date in mind.

Q. Yeah, okay.

And in your report, you state that the search terms that were used were oncology, formulation, CLL, and NHL; is that right?

A. Correct.

Q. Do you recall using any other search terms, either you or your team, to locate potentially comparable third-party licenses?

208

A. No.

Q. Did you use -- your team use bendamustine as a search term?

A. No.

Q. Why not?

A. Because it's my understanding from the balance of this record that there are no other such licenses. If there were bendamustine licenses, I would have expected them to be produced or revealed by the parties.

Q. Well, there could be third-party licenses between -- involving or relating to bendamustine; fair?

A. Theoretically.

Q. That the parties would not produce?

A. I suppose. But bendamustine has been around since the 1960s, so I wouldn't expect to see any licensing activity unless it related to some of these formulation indications, and then we would see that in the Orange Book, for example. And I don't believe there are.

Q. But to be clear, your team did not even search bendamustine or liquid bendamustine to try to locate potentially comparable third-party licenses; right?

**209**

A. They did not. But factually speaking, I don't believe there are such, so it's kind of a moot point.

Q. Do you know one way or the other if you search bendamustine whether you get the Johns Hopkins or Chen-Bridgetech agreement as results?

A. I wouldn't expect that you would because the word "bendamustine" does not show in either of those two agreements.

Q. Okay. ████████████████████████

A. Fair.

Q. Okay. Let's start -- we've marked as in front of you -- Exhibit 11 is the 2013 Johns Hopkins agreement with Signpath Pharma.

Do you see that?

A. I do.

Q. And you recognize this as the agreement you located through the database search?

A. Yes.

Q. Okay. I'm going to call this the Johns

**210**

Hopkins agreement for short, if that's all right with you?

A. Of course.

Q. And then let's look at the other document marked as Exhibit 12. And Exhibit 12 is the 2006 Chen-Bridgetech agreement; correct?

A. Yes.

Q. Okay. And I'll call that just the Bridgetech agreement, which I believe is how you reference it in your report.

MR. SANDFORD: And just for the record, Exhibit 11 has Bates number SLAY-VIVMUS0227465 through 7491.

And Exhibit 12 has Bates numbers ending in 7539 to 7555.

BY MR. SANDFORD:

Q. Let's start with the Bridgetech agreement, which is Exhibit 12.

You did not rely on any input from Slayback's experts regarding this agreement, correct, in your report?

A. Correct.

Q. Okay. Now, the Bridgetech agreement has different parties from the hypothetical license; right?

**211**

A. Correct.

Q. Neither Eagle nor Slayback is a party to the Bridgetech agreement?

A. Correct.

Q. And neither Bridgetech nor Mr. Chen would be parties to the hypothetical negotiation; right?

A. Correct.

Q. And the parties to the Bridgetech agreement have a different commercial relationship than the parties to the hypothetical; right?

A. Well, to the extent they're different entities, that's true. But generally speaking, Bridgetech is a publicly traded sophisticated development of pharma technologies focused on the Asian marketplace and actively has a search pattern to transfer U.S. products overseas. So they have a level of sophistication that I think is generally similar to that of the hypothetical.

Q. And I'm asking more about the commercial relationship kind of in the GP factor 5 context, not necessarily with respect to sophistication level. But -- so I'll be a little more specific.

Mr. Chen and Bridgetech are not competitors or were not competitors at the time they entered their agreement in 2006; right?

**212**

A. Correct.

Q. In the contrast, at the hypo, Eagle and Slayback would consider themselves competitors in the liquid bendamustine space; right?

A. Broadly defined, as we talked about this morning.

Q. Right. And so from a competitive standpoint, the parties to the Bridgetech agreement have a different competitive commercial relationship than the parties to the hypothetical negotiation; agreed?

A. Agreed.

Q. Okay. The Bridgetech agreement was executed about 18 years before the hypothetical negotiation; right?

A. Correct.

Q. Okay. And the Bridgetech agreement was executed in 2006, before the first ever bendamustine treatment was approved by the FDA in 2008; agreed?

A. Factually, true. I'm not sure the relevance. Obviously bendamustine had been around a long time in Europe, so yeah, the dates are what the dates are.

Q. And the license in the Bridgetech agreement has a different scope than the hypothetical license;

213

agreed?

A. Yes, in that it is more than a bare patent license.

Q. ████████████████████████████████████, similar to the Cephalon agreement, as sort of a technology development license. That's true.

Q. Well, I'm not asking about the Cephalon agreement.

The Bridgetech agreement includes ████████████████████████████████████ correct?

A. Correct.

Q. And the Bridgetech agreement has a different geographical scope than the hypothetical license; correct?

A. The focus of the sales is in Asia, largely China, Hong Kong, and other countries.

Q. Right. Under the agreement, I believe Bridgetech received the rights to practice the licensed technology in only China, Hong Kong, Macao, Taiwan; right?

A. That sounds familiar, yes.

214

Q. And under the hypothetical license, the geographic scope would be limited to the United States and would not include any rights in China, Hong Kong, Macao, or Taiwan; right?

A. Correct.

Q. And you agree that the regulatory frameworks in the U.S. are different from those countries; correct?

A. Well, they're obviously different in some ways. But if you look, for example, to the SEC filings of Bridgetech, they specifically talk about those distinctions and equate them as far as their licensing policy. So that's something I considered. But I believe inherent within the transaction, there's no need for an adjustment.

Q. You didn't look at the SEC filings -- well, did you look at the SEC filings for Bridgetech in connection with your opening report?

A. Yes.

Q. Or I'm sorry. With your rebuttal report?

A. I only have one report, but yes.

Q. Okay. And you also agree that the competitive dynamics in the U.S. market are different than those in the markets in China and Hong Kong, Macao, Taiwan; right?

215

A. That's such a broad question. Yes, there are certainly differences, but there are also similarities.

Q. And the Bridgetech agreement and licensed a product that was under development at the time, in addition to patents; right?

A. Correct.

Q. And the Bridgetech agreement and hypothetical license, they have different licensed products; fair?

A. Correct.

Q. And what's your understanding of the products licensed under the Bridgetech agreement?

A. So the Bridgetech agreement, as well as the Hopkins agreement, are both formulation technologies related to cancer therapy.

Q. And no product licensed in the Bridgetech agreement is indicated to treat CLL or NHL; correct?

A. Correct.

Q. And none of the products licensed in the Bridgetech agreement include bendamustine; correct?

A. Correct.

Q. And the scope of the patents licensed in the Bridgetech agreement are different than the patents that would be subject to the hypothetical

216

negotiation; right?

A. Well, every patent is, by definition, different and different in its scope. But the point of the analysis is to develop an understanding of the relative value of formulation treatments for cancer as opposed to, for example, API agreements.

Q. My question was just simply the patents licensed in the Bridgetech agreement are different than those that would be subject to the hypothetical license; right?

A. Clearly they are different patents, different licensors.

Q. And what -- what's your understanding of the of the actual patents that were licensed under the Bridgetech agreement?

A. Maybe you could be more specific. They related to --

Q. Yeah. Sorry. Just -- you discuss two patent applications in your report. If you look at page 62, 63 -- 63 in particular.

A. Yes, sir.

Q. Okay. And you call out the '439 application and the '783 application in your discussion of the Bridgetech agreement; right?

A. Yes.

217

Q. And you don't discuss, in your report, any other application or patent license under the Bridgetech agreement; right?

A. I don't, in my report, call out any other agreement. There are other references within the agreement itself.

Q. Why did you only discuss those two patent applications?

A. Because they're specifically detailed as relating to the field of technology of interest, which is cancer formulation patents and technology.

I think it's also relevant that they're U.S. patent applications, emphasizing the mission of Bridgetech, as described within their public documents, that they are looking at bringing U.S.-based pharmaceutical products to Asia.

Q. Just circling back to the licensed technology, I think you mentioned that licensed technology is two groups, one of which is used to treat cancer; right?

A. I don't understand the context of that question.

Q. Yeah, sure.

You say that the licensed technology is a lyophilized product that's used to treat cancer;

218

right?

A. Correct.

Q. Okay. And in addition, there's a group of technology licensed under this agreement that is used to treat pneumonia; right?

A. Correct.

Q. Okay. And as of the effective date of the Bridgetech agreement, there were no issued patents licensed under the agreement; right?

A. Correct.

Q. And your report does not identify any evidence at any of these applications that were licensed under the Bridgetech agreement ever actually issued as patents; is that right?

A. Within my report, there's not reference to that, no.

Q. Okay. And you don't identify any evidence in your report that anybody actually practiced any of these applications or patents that were licensed under the Bridgetech agreement; right?

A. That's true, but those later events are not a factor that need be considered because the time of the negotiation is the information that was considered, and what happened later didn't obviously affect what are the terms of the agreement.

219

Q. And the Bridgetech agreement also includes a license to asserted know-how; right?

A. Correct. There's an appendix that shows the know-how assistance with regulatory filings.

Q. And there's no indication in the Bridgetech agreement or in your report that the parties to that agreement believed the licensed patents were valid and enforceable and infringed; correct?

A. Well, they were applications, so that wouldn't be applicable. And the know-how, for example, would be an element that would increase the rate. The fact that they're not issued would decrease the rate. So they're all part of the setoff that one considers when considering the relevance.

Q. Yeah. Okay.

And ultimately, you rely on the 4 percent of net sales royalty rate that's in this agreement to corroborate your ultimate royalty rate; right, as we discussed?

A. Yes, of course, and I would only add that an understanding of Georgia-Pacific factor 12 requires that we look to agreements other than those for the patents-in-suit. So there's no concern or hesitation about doing that.

220

Q. Is it your understanding that you can properly consider agreement -- you can properly rely on factors -- agreements under Georgia-Pacific factor 8 even if they are not both economically and technically comparable to the hypothetical license?

A. You meant factor 12 I understand.

Q. Yeah. Correct.

A. The limitation of factor -- and this is a great question. The limitation of factor 12 is not the same standard of comparability as you have for factors 1 and 2, which is specific, as you suggest. Factor 12 talks about comparable businesses. It's a much broader criterion for selection.

So when I look at a comparable business of a company that is offering lyophilized cancer formulations, that business, to me, as a licensing professional, is directly relevant to factor 12. And the specificity that would be needed for factor 1 and 2 are different.

Q. So it's your understanding, setting aside factor 12, that you can use royalty rates from patent license agreements to corroborate or confirm your ultimate reasonable royalty rate without establishing that those agreements are both economically and technically comparable to the

---

**221**

hypothetical license?

A. The factor does not require that level of detail. I do believe they're economically and technically comparable with adjustment, and I describe those adjustments. But we're looking for comparable businesses, not agreements, and we're looking for analogous inventions, not the inventions in suit. So we're taught that this is different than the first two criteria.

Q. But to be clear, you're not just using these agreements in the context of Georgia-Pacific Factor 12; right?

You're also using them to corroborate your ultimate royalty rate.

A. Well, I'm using them in factor 12, and my ultimate royalty rate is based upon an assessment of all the factors, so I don't understand those two things to be different.

Q. Well, they're different in the sense that you could say, Look, I looked at these third-party agreements, and they show that there's downward pressure under factor 8. That would be one way to use them; right?

A. Factor 12, yes.

Q. Correct, factor 12.

**222**

Another way to use them would be outside of the context of that to say, Hey, they're independent confirmation for my ultimate royalty rate. Those are separate and distinct uses. No?

A. I don't think so.

Q. Okay.

A. But regardless, in my ultimate conclusion, I don't cite back to them again. I cite specifically to factors 3, 9, 10, 11, 13, 5, and 8.

Q. Don't you also discuss these third-party agreements under the market approach, which is separate and distinct from factor 12?

A. I don't believe so, no.

Q. Yeah. I mean, you do.

A. Which page are you referring to?

Q. Yeah, so your discussion of the market approach starts on page 55, just to orient you.

And then -- are you with me on 55?

A. I am.

Q. And then you go and you start and you talk about the comparability factors and then the Cephalon agreement; right?

A. Right.

Q. And then Section 10.33 is Comparability Evaluations of Third-Party License Agreements where

**223**

you discuss specifically the Chen-Bridgetech and the Johns Hopkins-Signpath agreements; correct?

A. Yes.

Q. And then your conclusion is that these third-party agreements are informative of the royalty to which Eagle and Slayback would have agreed during the hypothetical negotiation; correct?

A. Yes.

Q. Right?

A. And then put them into GP 12. That's fair.

Q. And you made no adjustment to the 4 percent of net sales royalty rate from the Bridgetech agreement before using it to corroborate or confirm your ultimate ███████ royalty rate; correct?

A. No. I looked at both upward and downward adjustments. I ultimately concluded that the benchmark rate in the agreement is appropriate, but that's not for lack of consideration.

Q. It's not my question.

My question was -- let me ask it a little differently.

You made no specific quantitative adjustments to the 4 percent stated royalty rate in the Bridgetech agreement before using it to corroborate or confirm your ultimate ███████

**224**

royalty rate; true?

A. I would say I made a 0 percent quantitative adjustment based upon the upward and downward factors, but it is the benchmark rate that's imputed in GP 12.

Q. Let's talk about the Johns Hopkins agreement briefly. That's Exhibit 11 to your deposition.

A. Yes, sir.

Q. The Johns Hopkins agreement has different parties than the hypothetical license; correct?

A. By requirement of GP 12, yes.

Q. Right.

The parties to the Johns Hopkins agreement are Johns Hopkins as a licensor and Cigna path pharma [sic] as the licensee.

A. Correct.

Q. Neither of those entities would be a party to the hypothetical license; correct?

A. Correct.

Q. Okay. And Johns Hopkins and Signpath had a different commercial relationship in the sense that they weren't competitors as compared to Eagle and Slayback at the hypothetical negotiation; fair?

A. Fair.

Q. Johns Hopkins is a research institute;

**225**

correct?

A. Yes.

Q. And Signpath, at the time, was a -- I believe you describe them as a clinical stage biotech startup; right?

A. Oh, they were publicly traded at the time.

Q. Or, sorry. Company. I misread my outline. In 2013, Signpath was a clinical stage biotech company that developed synthesized proprietary formulations of curcumin. Am I saying that right?

A. That was part of their focus, yes.

Q. Okay. And so they had more akin to an inventor-promoter relationship in 2013; is that fair?

A. Yes.

Q. And the agreement was executed in June 2013, about 11 years before the hypothetical negotiation; correct?

A. Yes.

Q. And the Johns Hopkins agreement included ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ correct?

A. Yes.

Q. And the geographical scope of the license in

**226**

the Johns Hopkins agreement is a worldwide license, whereas the hypothetical license only covers the United States; correct?

A. Correct.

Q. And the Johns Hopkins agreement also ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ correct?

A. True.

Q. And there's different licensed products in both the hypothetical license and the Johns Hopkins agreement; right?

A. I would say analogous, but different, yes.

Q. Well, what products are licensed, to your understanding, under the Johns Hopkins agreements?

A. It also relates to formulations for cancer treatments. The agreement will speak for itself, but effectively, it's a form of particle encapsulation with biodegradeable particles to assure delivery of cancer drugs to where they need to go.

Q. Is it your understanding that all formulations that are used to treat cancer are sufficiently, technically comparable to be used in a reasonable royalty analysis?

A. No, I don't think that would be the case.

**227**

But remember GP 12 requires that we look for analogous businesses and analogous inventions. I did a search of more than 20,000 agreements to find the eight that would best fit that criteria and then considered the two that were well within the industry in an analogous business. And it turns out they are for formulations for cancer-related drugs. So although they have limitations, the end conclusion is, in fact, what I would expect to be consistent with a formulation technology as opposed to a fundamental API technology.

Q. Neither -- well, at the time of the agreement, the products licensed under the Johns Hopkins agreement were not commercialized; correct?

A. Correct.

Q. They were still in the early clinical trials?

A. Correct.

Q. Okay. And the -- do you know what cancers the technology licensed in this was intended to treat?

A. I certainly did. I don't know if my notes reflect that. My recollection is it dealt with drug resistance to a number of chemotherapy products that

**228**

would be used across a variety of cancers. Within the SEC filings, there is a greater detailed discussion of which cancers, but that wouldn't have a significant bearing on my work. I don't recall that it specifically included the two cancers at issue with bendamustine.

Q. Right. The Johns Hopkins agreement, as I think you said earlier, it doesn't mention bendamustine; right?

A. Correct.

Q. And so none of the technology licenses indicated to treat CLL or NHL; correct?

A. I can't say that because it relates to a number of chemotherapy drugs and the toxicity of chemotherapy more broadly, and as we know, chemotherapy can be used for the cancers at issue.

Q. So is your understanding that -- is it that you don't know one way or the other, or are you affirmatively saying that the technology licensed in this agreement can be used to treat CLL or NHL?

A. I haven't specifically discussed that with the medical experts. I would need their opinion.

Q. Okay. Now, the patents that are licensed in the Johns Hopkins agreement are a provisional

application, the '709, and then a PCT application; correct?

A. The '870, yes.

Q. Yeah.

And as of the effective date, there were no issued patents licensed under this agreement; right?

A. Correct.

Q. And your report doesn't identify any evidence that either one of these ever issued as a patent; correct?

A. Correct.

Q. And, again, no evidence in your report that anyone has ever practiced these patents -- applications; right?

A. Not within the report, no. For the reasons I explained earlier, it would not be known at the time of the license and, therefore, not priced into the license.

Q. And the Johns Hopkins agreement also includes a license to certain know-how; correct?

A. Yes.

Q. And based on my review, I didn't see any provision suggesting the parties agreed that any of the -- I mean, they're patent applications, but licenses were valid, enforceable, and infringed; fair?

A. Fair, especially for that reason.

Q. And the running royalty rate stated in this agreement is 3 percent of the net sales, and there's some minimum royalties and upfront payments as well; right?

A. Correct.

Q. Okay. And, again, you did not make any quantitative adjustment to the 3 percent of net sales rate in the Johns Hopkins agreement before using it to corroborate or confirm your ultimate royalty rate; correct?

A. Although I considered the need for such, with respect to points of similarity and differences, ultimately, I concluded there would be no adjustment.

Q. The Johns Hopkins agreement was terminated in December 2014; correct?

A. I don't recall the date, but eventually, it was, yes.

Q. Let's just --

MR. SANDFORD: Let's make that 13.

(Exhibit 13 was marked for identification and is attached to the transcript.)

MR. SANDFORD: We've marked as Exhibit 13 a document bearing Bates numbers EAGLEBEN-SA_00376322 through 401.

BY MR. SANDFORD:

Q. Do you recognize this document, Mr. Malackowski?

A. Yes. This is one of the SEC reports I've reviewed for Signpath.

Q. Okay. And did you review this SEC report -- and I believe it's from fiscal year 2015 -- before you submitted your rebuttal report in this case?

A. I reviewed SEC filings for Signpath before my rebuttal report. My focus was on those at the time or before the agreement. I do have some that post-dated the agreement, but I can't tell you from memory if this is one of them.

Q. So sitting here today, you can't recall specifically reviewing the fiscal year 2015 SEC form 10-K for Signpath before submitting your report; correct?

A. From memory, I can't tell you which years I reviewed, though I reviewed several of Signpath 10-Ks.

Q. Okay. And if you turn to the page ending in Bates number 393 towards the back.

A. Yes.

Q. And there's a note 9, Commitments and Contingencies.

Do you see that?

A. Yes.

Q. And the second paragraph in particular, I want to direct your attention there.

A. Yes.

Q. And Signpath here says in their form 10-K that they previously had a license agreement with Johns Hopkins University that the company terminated in December 2014. As part of the termination, the company paid JHU $20,000.

Do you see that?

A. Yes.

Q. And does this refresh your recollection that the Johns Hopkins agreement that you discuss in your report was terminated in December 2014?

A. It refreshes the particular date, yes.

Q. Yeah. And so at the time of the hypothetical negotiation in January 2024, the Johns Hopkins agreement would not be in effect; correct?

A. Correct.

Q. Okay. You can set that aside.

Let's talk briefly about the cost approach.

A. Yes, sir.



233

Q. So as we discussed earlier, your ▮▮▮▮ ultimate reasonable royalty relies in part on the indicated royalty under your cost approach; correct?

A. Correct.

Q. Okay. And just in a few sentences, what's the cost approach?

A. The cost approach focuses on the cost of the next best alternative or a design-around which would be used in the negotiation to assess or temper the royalty.

Q. And in this case, it's your opinion that Eagle and Slayback would consider the costs that ▮▮▮▮▮▮▮▮

A. Yes.

234

next best alternative is not a cap on the reasonable royalty that results from the hypothetical negotiation as a legal principle; correct, sir?

A. It is not a, per se, cap as a legal principle, but there are many cases where it is an effective cap.

Q. Okay. How did the concept of acceptability factor into your analysis of the ▮▮▮▮▮▮ under your Georgia-Pacific framework -- I'm sorry -- under your cost approach?

A. Primarily in two ways. One is the unique circumstances of the relationship of these parties, understanding that ▮▮▮▮▮▮▮

235

236

Q. What specifically innovation did -- well, withdrawn.

But it's your understanding, going back to my original question, that a next best alternative must be acceptable to be informative under the Georgia-Pacific and cost approach; right?

A. Generally, I agree.

Q. Okay. And you also agree that a next best alternative must be available at the time of the hypothetical negotiation to be informative under the cost approach or the Georgia-Pacific analysis; correct?

A. No, I don't agree with that. I think if you look to the Grain Processing in related cases, the standard of availability is different for a reasonable royalty than for lost profits, and I think the cases are clear that if it was available



**237**

at all during the period of the damages period, it should be considered. That leaves only, in this case, the issue of availability due to FDA regulatory requirements, and to factor that in would be valuing the FDA regulatory process, not the invention, so I don't believe it should be a consideration.

Q. So what standard for availability did you apply or use in your -- under the cost approach

Q. But is your understanding that so long as a next best alternative is available at some point in the entire damages period, that it can be considered at the hypothetical negotiation?

A. If, in fact, it would be knowable at the hypothetical negotiation, absolutely.

**238**

Q. What is the damages period in this case again?

A. Beginning of patent issue through the most recent discovery to date, which --

Q. September 30, 2025?

A. Correct. And then an ongoing royalty if not an injunction.

Q. What was the damages period you considered when performing your reasonable royalty analysis as expressed in your report?

A. The period is the period through the end of the patent. I think it's 2031, as we've talked about. But from an accounting perspective, it's shortened based upon data.

Q. So which period did you use, though, to consider the ?

A. The term of the license GP factor 7, which is through 2031.

Q. Okay. So your understanding is that



A. Correct.  That's a legal determination.

Q. Now, we agree that

HIGHLY CONFIDENTIAL
Transcript of James Malackowski
Conducted on April 15, 2026

---

261

A. Well, by definition, if it's around 500,000 now, 500,001 is between your bookends.

Q. Okay. And you can't give me any more of a specificity on that?

A. I really don't know what I'm going to be asked to do.

Q. Who are the folks that -- from your team that worked on this report with you? If you can just identify them.

A. Sure. Carlo, who's joining us today; Robert McSorley, who's a managing director; Nikki Tavasoli, who is a manager; and there were others who, at time to time, would help with certain research or QCs.

Q. Okay. And just generally, where do their rates fall?

A. Mr. McSorley is 7 to 800. Nikki is probably 400. Carlo is probably 150 to 250ish.

Q. And do you know approximately how much time they collectively have spent working on this case?

A. Not specifically, only that the cumulative effect of that is the approximate $500,000 number I gave you.

Q. Your CV is attached as Appendix 1 to your report.

Is that still accurate and up to date?

---

262

A. I've had one deposition since then in the matter of Aerosonic versus Joby on eVTOL aircraft. Nothing related to this.

Q. Okay. Did you speak with anyone other than the lawyers at Windels Marx or Slayback's local counsel in this case to prepare for your deposition today?

A. No.

Q. Okay. In your report, you state you're a named inventor on over 20 patents?

A. True.

Q. You don't include any opinions or discussions about those patents in your report; right?

A. True.

Q. You don't intend to offer any opinions about the substance of those patents at trial; fair?

A. True.

MR. SANDFORD: Okay. No further questions.

THE WITNESS: Thank you. Very professional.

MS. AST-GMOSER: No questions on behalf of --

I'm sorry, Dan. Go ahead.

MR. FORCHHEIMER: No questions on our end.

THE VIDEOGRAPHER: All right. Stand by.

---

263

This marks the end of the deposition of James Malackowski. We are going off the record. The time is 14:43.

(Off the record at 2:43 p.m.)

---

264

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, Tiffany M. Pietrzyk, CSR RPR CRR, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 18th of April, 2026.

My commission expires:

February 28th, 2028

---

# Exhibit 5
# Filed Under Seal

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC,<br><br>        Plaintiffs,<br><br>    v.<br><br>SLAYBACK PHARMA LLC AND AZURITY PHARMACEUTICALS, INC.<br><br>        Defendants. | C.A. No. 24-65-JLH<br><br>**HIGHLY CONFIDENTIAL** |

**REBUTTAL EXPERT REPORT OF DR. MICHAEL L. BRANDT, PHARMD, FASHP**

1

developed using alternative stabilizing strategies that do not require the specific claimed combination of polyethylene glycol and antioxidant features described in the patents. Accordingly, the existence of multiple approved liquid bendamustine formulations demonstrates that non-infringing design pathways were technically feasible and commercially realistic during the damages period.

**B.** ███████████████████

███  ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████

███  ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

███  ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████

27

**MICHAEL L. BRANDT, PHARMD, FASHP**

# Exhibit 6

```
EX-10.96signpathexh109.htmEXCLUSIVE LICENSE AGREEMENT, DATED JUNE 5, 2013, WITH JOHNS HOPKINS UNI
VERSITY.
```

Exhibit 10.09

EXCLUSIVE LICENSE AGREEMENT

THIS LICENSE AGREEMENT (the "Agreement") is entered into by and between THE JOHNS HOPKINS UNIVERSITY, a Maryland corporation having an address at 3400 N. Charles Street, Baltimore, Maryland, 21218-2695 ("**JHU**") and Signpath Pharma, ("**LICENSEE**"), a Pennsylvania co oration having an address at 1375 California Road, Quakertown, PA 18951 and is effective on the 5th day of June 2013 ("**EFFECTIVE DATE**"), but If none stated, then on the date of the last signature affixed.

RECITALS

A valuable invention or inventions listed and described in Exhibit A ("INVENTION") was/were developed during the course of research conducted by the inventors listed on Exhibit A (all hereinafter, "INVENTORS"). JHU has acquired through assignment all rights, title and interest of said INVENTORS in said valuable INVENTION and the related PATENT RIGHTS. JHU desires that the INVENTION be perfected and marketed as soon as possible so that resulting products may be available for public use and benefit.

JHU and LICENSEE understand and accept that the availability of LICENSED PRODUCTS and LICENSED SERVICES at affordable prices to poor segments of the world's populations is an important objective of the parties.

LICENSEE desires to obtain certain rights in such INVENTIONS as herein provided, and to commercially develop, manufacture, use and distribute products and processes based upon or embodying said valuable INVENTIONS.

1.      DEFINITIONS

All references to particular Exhibits, Articles or Paragraphs shall mean the Exhibits to, and Paragraphs and Articles of, this Agreement, unless otherwise specified. Any reference herein to any defined term shall include both the singular and the plural, whether or not both forms are included in the reference. For the purposes of this Agreement and the Exhibits hereto, the following words and phrases shall have the following meanings:

1.1      **"AFFILIATED COMPANY"** shall mean any corporation, company, partnership, joint venture or other entity, which controls, is controlled by or is under common control with LICENSEE. For purposes of this Paragraph control shall mean the direct or indirect ownership of at least fifty percent (50%).

1.2      "**EFFECTIVE DATE**" of this License Agreement shall mean the date stated above at the beginning of this Agreement, but if none is stated, then it shall mean the last date that this Agreement was signed by JHU and LICENSEE.

1.3      **"EXCLUSIVE LICENSE"** means that, subject to specific limitations in this Agreement, and subject to rights retained by the United States Government, if any, JHU grants to **LICENSEE** all of **JHU**'s rights under the **LICENSED PATENT(S)** in the **LICENSED FIELD** of **USE** in the **LICENSED TERRITORY**.

SLAY-VIVMUS0227465

1.4 **"FIRST COMMERCIAL SALE"** shall mean the first transfer by a **LICENSEE, AFFILIATED COMPANY** or **SUBLICENSEE** of a **LICENSED PRODUCT** or **LICENSED SERVICE** for value, but shall not include a transfer of materials for the purpose of use in a clinical trial, where the consideration received is intended to cover the manufacturing cost of the materials.

1.5 **"JHU REF. NUMBER"** shall mean the **JHU** Technology Transfer Office case number or numbers, shown on Exhibit A, to which the LICENSED PATENTS pertain. It is used for **JHU** reference only.

1.6 **"JHU INDEMNITEES"** means **JHU**, The Johns Hopkins Hospital, The Johns Hopkins Health System Corporation (JHHS), and their affiliated entities, their present and former trustees, officers, **INVENTORS**, agents, faculty, employees and students.

1.7 **"LICENSED FIELD of USE"** shall be as described on EXHIBIT A.

1.8 **"LICENSED PATENT"** means the **JHU** Patent Applications and issued Patents listed on Exhibit A, and any foreign patent application corresponding thereto, and any divisional, continuation, or reexamination application, and each patent that issues or reissues from any of these patent applications. Any claim of an unexpired **LICENSED PATENT** is presumed to be valid unless it has been held to be invalid by a final judgment of a court of competent jurisdiction from which no appeal can be or is taken. **"LICENSED PATENT"** excludes any continuation-in-part (CIP) patent application or patent.

1.9 **"LICENSED PRODUCT"** shall mean any process or method, material, compositions, drug, or other product, created or developed using **INVENTIONS**, or for which the development, manufacture, use or sale, if done by a third party without rights under the **LICENSED PATENT**(S), would constitute an infringement of a claim of **PATENT RIGHTS** (infringement shall include, but is not limited to, direct, contributory, or inducement to infringe).

1.10 **"LICENSED SERVICE"** includes any service or services, including the manufacture of any product or the use of any product or composition, performed by **LICENSEE** for any third party using or incorporating the **INVENTIONS**, or which, if done by a third party without rights under the **LICENSED PATENT**(S), would constitute an infringement of a claim of **PATENT RIGHTS** (infringement shall include, but is not limited to, direct, contributory, or inducement to infringe).

1.11 **"LICENSED TERRITORY"** shall be that territory described on EXHIBIT A.

1.12 **"NET REVENUES"** whether they be **NET SALES REVENUES** OR **NET SERVICE REVENUES** shall include everything of value received by **LICENSEE, AFFILIATED COMPANIES** and **SUBLICENSEE**(S) for the sale, license, lease or other transfer of **LICENSED PRODUCTS**, or the performance of **LICENSED SERVICES**. Consideration includes but is not limited to currency, equity, intangible rights, services and other things of value provided or received as part of the transaction for **LICENSED PRODUCTS** or **LICENSED SERVICES**, the fair value of which must be included to determine **NET REVENUES**. **NET REVENUES** may be calculated using the accrual or cash method, but such calculation must be consistent from month to month and year to year, and must be the same method used by **LICENSEE** for all similar transactions, or if none, the same method used generally by **LICENSEE** in reporting its business activity for United States federal tax purposes.

SLAY-VIVMUS0227466

**NET REVENUE**S may exclude the following items, but only to the extent that they are included in gross revenue, and are separately billed to purchaser, and paid or remitted by **LICENSEE** to third parties:

(i)        import, export, excise and sales taxes, custom duties, and shipping charges;

(ii)        costs of packing, insurance covering damage during shipping, and transportation from the place of manufacture to the customer's premises or point of installation

.

In the event that a **LICENSED PRODUCT** is sold in combination with other ingredients or substances or as part of a kit, **NET REVENUES** shall be the revenues and fees received from the entire combination or kit.

In the event that a **LICENSED SERVICE** is provided in combination with other services or results in the production of a kit or package, **NET REVENUES** shall be the revenues and fees received for all services, or for the entire combination, kit or package.

1.13        "**NET SALES REVENUES**" shall mean **NET REVENUES** derived from the sale of **LICENSE PRODUCTS**, where a sale includes any license of use, lease, sale or other transfer of rights to the **LICENSED PRODUCT**.

1.14        "**NET SERVICE REVENUES**" SHALL mean **NET REVENUES** derived from the sale or performance of **LICENSED SERVICES**.

1.15        "**PATENT COSTS**" are all costs of prosecuting and maintaining any **LICENSED PATENT**, including reasonable attorneys' fees or costs paid or incurred, and expenses paid or incurred for filing, maintenance, annuities, translation, cost of defending or protecting a patent from infringement, or other costs directly related to **LICENSED PATENT** prosecution and protection.

1.16        "**PATENT RIGHTS**" are those rights granted to **LICENSEE** under **LICENSED PATENT**(S).

1.17        "**SUBLICENSEE**" shall mean any person or entity other than an **AFFILIATED COMPANY** to which **LICENSEE** has granted a sublicense under this Agreement.

1.18        "**SUBLICENSING INCOME**" includes everything of value received by **LICENSEE** in consideration for any sublicense which includes rights to any **LICENSED PATENTS** licensed herein. It is the total amount received, regardless of whether or not the sublicense includes intellectual property in addition to the LICENSED PATENTS, and includes the sublicense fee, milestone payments, stock or other forms of equity, and the fair value of any services or other compensation received.

SLAY-VIVMUS0227467

The following may be excluded from **SUBLICENSING INCOME**:

     (i)     The reasonable cost of services to be performed <u>thereafter</u> by **LICENSEE** for or on behalf of the **SUBLICENSEE**, if, but only if those services are specifically described and the cost itemized and stated separately in the sublicense. Payments on the achievement of results shall be deemed to be milestone payments and are included in **SUBLICENSING INCOME**.

     (ii)     Reimbursement of the amount paid for fees incurred by **LICENSEE**, such as patent costs, or fees paid to governmental agencies, which are incurred after the effective date of the sublicense and are actually paid to third parties by **LICENSEE**.

     (iii)     Royalty payments to **LICENSEE** based on **SUBLICENSEE**'s **NET REVENUES**, where royalties are provided and will be paid to **JHU** on **SUBLICENSEE**'s **NET REVENUES** pursuant to this Agreement.

     (iv)     The amount of any Milestone payment made to **JHU** under this Agreement as a result of activity of **LICENSEE** or **SUBLICENSEE**, which results in a Milestone payment by **SUBLICENSEE** to **LICENSEE** under the sublicense. The difference between the Milestone payment to be paid to JHU and the milestone payment paid to **LICENSEE** by **SUBLICENSEE** shall be considered **SUBLICENSING INCOME**. For clarification, if **SUBLICENSEE** makes a payment to **LICENSEE** as a Milestone, and **LICENSEE** is obligated to make a Milestone payment to **JHU** under this Agreement for that sanle Milestone, that Milestone payment amount paid to **JHU** shall be deducted from the Milestone amount paid under the sublicense, and the remainder shall be the **SUBLICENSING INCOME**.

     (v)     The amount received for technology of third parties acquired by **LICENSEE** and included in the sublicense, if said amount is separately stated in the sublicense. If the sublicense includes the right or obligation of the **SUBLICENSEE** to purchase equity in **LICENSEE** at a cost greater than the then current fair market value of the equity, the difference between the fair market value and the amount paid shall be **SUBLICENSING INCOME**.

2.     GRANT

     2.1     **Grant**. Subject to the terms and conditions of this Agreement, **JHU** grants **LICENSEE** an **EXCLUSIVE LICENSE** under the **LICENSED PATENT**(S) in the **LICENSED FIELD**(S) of **USE** to make, have made, use, import, offer to sell and sell **LICENSED PRODUCTS** and perform **LICENSED SERVICES** in the **LICENSED TERRITORY**. This Grant shall apply to the **LICENSEE** and any **AFFILIATED COMPANY**, except that any **AFFILIATED COMPANY** shall not have the right to sublicense to others without **JHU** approval. If any **AFFILIATED COMPANY** exercises rights under this Agreement, such **AFFILIATED COMPANY** shall be bound by all terms and conditions of this Agreement, including but not limited to indemnity and insurance provisions and royalty payments. In addition, **LICENSEE** shall remain fully liable to **JHU** for all acts and obligations of **AFFILIATED COMPANY** such that acts of the AFFILIATED COMPANY shall be considered acts of the **LICENSEE**.

SLAY-VIVMUS0227468

2.2        **Retained Rights**.

2.2.1        **JHU** retains the right, on behalf of itself, the INVENTORS and all other non-profit academic or research institutions to whom JHU extends rights, to practice a LICENSED PATENT and use INVENTIONS for any research or non-profit purpose, including, but not limited to sponsored research and collaborations with commercial entities, and assessment of patients a t JHHS/JHU institutions. JHU also has the right to publish any information included in the INVENTION or a LICENSED PATEN T.

2.2.2        Government Rights. This Agreement is subject to Title 35 Sections 200-204 of the United States Code a s implemented in 37 CFR Part 401, as may be amended from time to time. Among other things, these provisions provide the Unite d States Government with certain nonexclusive rights in a LICENSED PATENT if federal funds were used to develop the INVEN TION. They also impose the obligation that LICENSED PRODUCTS sold or produced in the United States be "manufactured sub stantially in the United States. LICENSEE will ensure all required obligations of these provisions are met.

2.3        Specific Exclusions. **JHU** does not:

2.3.1        Commit to **LICENSEE** to bring suit against third parties for infringement, except as described in Articl e 9;

2.3.2        ~~Agree to furnish to **LICENSEE** any technology or technological information other than the **LICENSE D PATENTS**; or~~

2.3.3 Agree to provide **LICENSEE** with any know how, invention, data, results or other assistance in the future unle ss specifically and clearly identified in this Agreement.

2.4        **Global Access for Essential Medicines**. This Agreement is subject to the provisions of **Exhibit D**: **GLOB AL ACCESS FOR ESSENTIAL MEDICINES**.

3.        **SUBLICENSING**

3.1        **Permitted Sublicensing**. **LICENSEE** may grant sublicenses in the **LICENSED FIELD of USE** in the **LI CENSED TERRITORY**.

3.2        **LICENSEE** shall be responsible to pay to **JHU** royalties due **JHU** on sales of **LICENSED PRODUCTS** o r **LICENSED SERVICES** by a **SUBLICENSEE**, to the same extent as if **LICENSEE** made those sales directly, and whether or not **SUBLICENSEE** remits required royalty payments to **LICENSEE**.

SLAY-VIVMUS0227469

3.3        Required Sublicensing.

3.3.1      If **LICENSEE** is unable or unwilling to develop a potential **LICENSED PRODUCT** or to serve a market territory for which there is an organization willing to be a sublicensee, **LICENSEE** will, at **JHU**'s request, negotiate in good faith a sublicense with any such potential sublicensee.

3.4        Sublicense Requirements. Any sublicense:

(i)      is subject to this Agreement;

(ii)      will not permit a **SUBLICENSEE** to further sublicense;

(iii)      will, as a condition of validity, expressly include the provisions of Articles 7, 8, 10.3 and 12.2 for the benefit of **JHU**;

(iv)      will, if this Agreement is terminated, require the transfer to **JHU** of all obligations, including the payment of royalties specified in the sublicense, without setoff for debts or obligations of **LICENSEE** to **SUBLICENSEE**; and

(v)      will not be valid against **JHU** as to terms, conditions, obligations or limitations that are inconsistent with this Agreement and these sublicensing requirements.

3.5      **Notice and Copy** of sublicense. **LICENSEE** will notify **JHU** and within 30 days of execution will submit to JHU an unredacted copy of each sublicense, the terms of which will not be considered confidential as to **JHU**, but which terms **JHU** will treat as **LICENSEE** confidential information.

3.6      Sharing of **SUBLICENSING INCOME**. **LICENSEE** will share with and pay to **JHU** a portion of **SUBLICENSING INCOME** as stated on **EXHIBIT A**.

4.      **DILIGENCE REPORTING AND DEVELOPMENT**

4.1      **Federal Funding**. It is the requirement of federal law, and the obligation of **JHU** and **LICENSEE** that inventions created with federal funding be diligently developed into useful products and services.

4.2      **Milestones**. **LICENSEE** will diligently develop markets for and develop, manufacture, and sell **LICENSED PRODUCTS** and **LICENSED SERVICES**. In addition, **LICENSEE** will meet the milestones and target dates, if any, shown in **EXHIBIT A**, and notify JHU in writing within 30 days after each milestone is met.

4.3      **Diligence Report**.

4.3.1      By March 1 of each year, **LICENSEE** will submit a written annual report to **JHU** covering the preceding calendar year. The report will follow the Diligence Report Guidelines stated on **EXHIBIT C** and shall include information sufficient to enable **JHU** to satisfy reporting requirements of the U.S. Government and for **JHU** to ascertain progress by **LICENSEE** toward meeting this Agreements diligence requirements. Each report will describe, where relevant:

SLAY-VIVMUS0227470

(i)      progress by **LICENSEE, AFFILIATED COMPANIES** or **SUBLICENSEE**(S) toward commercialization of **LICENSED PRODUCTS** or **LICENSED SERVICES**, including work completed, key scientific discoveries, summary of work-in-progress, current schedule of anticipated events or milestones, market plans (if any) for introduction of **LICENSED PRODUCTS** or **LICENSED SERVICES**, and significant corporate transactions involving **LICENSED PRODUCTS** or **LICENSED SERVICES**;

(ii)     notice of all FDA or other governmental filings and/or approvals regarding any **LICENSED PRODUCTS** or **LICENSED SERVICE** made or obtained by **LICENSEE, AFFILIATED COMPANY** or **SUBLICENSEE**, the patents or patent applications licensed under this Agreement upon which such product or service is based, and the commercial name of such product or service;

(iii)    a Certificate of Insurance or other evidence of insurance, as required by this Agreement, or a statement of why such insurance is not currently required;

(iv)    identification of all **AFFILIATED COMPANIES** and **SUBLICENSEE**(S) which have exercised rights to the **LICENSED PATENTS**, or a statement that no **AFFILIATED COMPANY** or **SUBLICENSEE** has exercised such rights;

(v)     description of any diligence milestones achieved, and identification of any milestones expected to be achieved in the next year;

(vi)    description of any sublicense(s) entered during the year, with a copy of the sublicense if not previously provided.

(vii)   Notification of any change of control, name change or other significant change related to this Agreement or LICENSEE.

    4.3.2    Reports may be submitted electronically to an email address provided on request by **JHU**.

    4.4    **Reasonable Commercial Efforts: LICENSEE** shall exercise reasonable commercial efforts to develop and to introduce the **LICENSED PRODUCTS** and **LICENSED SERVICES** into the commercial market as soon as practicable, consistent with sounds and reasonable business practice and judgment; thereafter, until the expiration or termination of this Agreement, LICENSEE shall endeavor to keep **LICENSED PRODUCTS** and **LICENSED SERVICES** reasonably available to the public. **LICENSED PRODUCTS** and **LICENSED SERVICES** will be made available to the public and research community by **LICENSEE. LICENSEE** shall also exercise reasonable commercial efforts to develop **LICENSED PRODUCT** suitable for different medical indications, so that the **PATENT RIGHTS** can be commercialized as broadly and as rapidly as good scientific and business judgment deem possible.

SLAY-VIVMUS0227471

## 5. FEES, ROYALTIES AND OTHER PAYMENTS

5.1 **License Fee**. **LICENSEE** shall pay to **JHU** a non-creditable, nonrefundable license fee and any other payments as described in EXHIBIT A, within 30 days of the **EFFECTIVE DATE**, or at such time as stated on Exhibit A.

5.2 **PATENT COSTS**. Within 30 days of receipt of an invoice from **JHU** showing unreimbursed **PATENT COSTS**, **LICENSEE** will reimburse **JHU** the amount stated. EXHIBIT A may include unreimbursed **PATENT COSTS**, and if so, **LICENSEE** will reimburse **JHU** the amount stated in EXHIBIT A at such time or in such manner as stated in EXHIBIT A.

5.3 **Minimum Annual Royalty**.

5.3.1 **LICENSEE** will pay **JHU** a yearly Minimum Annual Royalty (MAR) as described in Exhibit A, which will be paid in advance on or before January 1 of each calendar year and which will apply to that calendar year.

5.3.2 Minimum Annual Royalty payments are nonrefundable. Earned royalty payments due on **NET REVENUES** occurring in the year to which the MAR pertains may be offset against the Minimum Annual Royalty paid for that year, but only for that year, without carry forward or back.

5.4 **Milestone Payments: LICENSEE** will pay **JHU** Milestone payments as stated on Exhibit A. Within 30 days of achieving a Milestone, **LICENSEE** will report the achievement to JHU, and pay to JHU the Milestone Payment required. Milestones achieved should be included in the Annual Report, even if previously reported.

5.5 Earned Royalty. **LICENSEE** will pay **JHU** earned royalties, as described on Exhibit A, which shall be paid quarterly unless a different payment schedule is specifically stated. **LICENSEE** may deduct from the earned royalty the amount of any Minimum Annual Royalty paid for the year in which the quarter occurs, until all of the MAR has been deducted from payments due for that year, after which any earned royalty in excess of the MAR shall be paid to **JHU**.

5.6 **Duration of Royalty Payments**. Royalties shall be paid as described herein for each **LICENSED PRODUCT** manufactured or produced and each **LICENSED SERVICE** performed for a minimum period of ten (10) years from date of **FIRST COMMERCIAL SALE** of that particular **LICENSED PRODUCT** or **LICENSED SERVICE** or the life of the last to expire patent included within the **PATENT RIGHTS**, whichever is last to occur. Products manufactured during the life of the **PATENT RIGHTS** shall carry the full royalty when sold. Royalties on products manufactured and sold within the minimum ten (10) year period, but after the last to expire Patent, shall be reduced by 50%.

5.7 **Payment for all activities performed under this Agreement**. If **LICENSED PRODUCTS** are made, used, imported, or offered for sale before the date this Agreement terminates, and those **LICENSED PRODUCTS** are sold after the termination date, **LICENSEE** will pay **JHU** the full earned royalty based on **NET SALES REVENUES**.

SLAY-VIVMUS0227472

5.8 **Obligation to Pay Royalties and other payments**. Payments required herein must be paid on the dates or upon the conditions stated, notwithstanding any claims by either **LICENSEE** or third party challenging the validity of the **PATENT RIGHTS**. Payments once made are not refundable even if the **PATENT RIGHTS** are later determined to be invalid or not applicable to the particular product or service.

5.9 **Currency**. For Revenue in currencies other than U.S. Dollars, **LICENSEE** will calculate the royalty in U.S. Dollars quarterly, using the appropriate foreign exchange rate for the currency as quoted by United States Federal Reserve Bank, for the last business day of each calendar quarter, to apply to payments earned by activities during that quarter. **LICENSEE** will make royalty payments to JHU in U.S. Dollars.

5.10 Non-U.S. Taxes. If non-U.S. taxes are due on royalty or other payments, such taxes shall be deemed to be in addition to the payment, and **LICENSEE** will pay all non-U.S. taxes related to royalty and any other payments under this Agreement. These tax payments are not deductible from any payments due to **JHU**. **JHU** will cooperate with **LICENSEE** to receive a refund of such taxes to the extent available, and such refund shall be retained by **LICENSEE**.

5.11 **No requirement of invoice**. All payments are due on the due date without invoice or demand for payment by or from **JHU**.

5.12 **Interest**. Payments are considered due on the dates and at the times described in this agreement, and if not so stated, within 30 days of the date of the event requiring the payment. Payment is made when received by JHU. Payments not received within 30 days of the due date shall, beginning on the due date, bear interest at the rate of 6% per annum, whether or not JHU has made a demand for such payment or interest. Acceptance of late payments without interest will not act as a waiver of this provision.

5.13 **Payments and Obligations**. All payments and obligations which come due shall be and remain due, and the existence of a dispute shall not suspend any duties under this License Agreement.

5.14 **Invoicing by JHU. JHU** may submit all invoices for any payments due in electronic form via e-mail sent to the e-mail address supplied by **LICENSEE** from time-to-time. An invoice directed to the last email address provided by **LICENSEE** to **JHU** shall be deemed received by LICENSEE when sent by JHU.

5.15 **Method of Payment**. All payments under this Agreement shall be made in U.S. Dollars by either check or wire transfer.

5.16 **Payment Information**. Payments shall be made as follows, or as further notified from time to time by **JHU**:

SLAY-VIVMUS0227473

All check payments from **LICENSEE** to **JHU** shall be sent to: Executive Director

> Johns Hopkins Technology Transfer
> The Johns Hopkins University
> 100 N. Charles Street
> 5th Floor
> Baltimore, MD 21201
> Attn: [This Agreement# A21235]

For Wire payments:

> Johns Hopkins University Central Lockbox
> Bank of America
> 100 West 33rd Street
> New York, NY 10001
> Transit/Routing/ABA number: 026009593
> Account number: XXXXXXXXX
> Type of account: Depository
> Reference: JHU Tech Transfer Agreement# A21235
> Attn: Financial Manager

If needed for international wires:

SWIFT code: BOFAUS3N CHIPS ABA number: None

### 6.    ROYALTY REPORTS AND ACCOUNTING

6.1    **Quarterly Earned Royalty Payment and Report**. Beginning with the **FIRST COMMERCIAL SALE** of a **LICENSED PRODUCT** or **LICENSED SERVICE, LICENSEE** will thereafter submit to **JHU** a written report 30 days after the end of each calendar quarter (even if there are no sales during that quarter), along with payment of any earned royalty due. This report will be in the form of Exhibit B and will state the number, description, and aggregate Net Sales of **LICENSED PRODUCTS** and **LICENSED SERVICES** during the completed calendar quarter. Such reports must be filed and payments made during any claim against or challenge to the scope or validity of the **PATENT RIGHTS**.

6.2    **No Refund**. In the event that a validity or non-infringement challenge of a **LICENSED PATENT** is successful, **LICENSEE** will have no right to recoup any royalties paid before or during the challenge period.

6.3    **Termination or Expiration Report**. **LICENSEE** will pay to **JHU** all applicable royalties and submit to JHU a written report within 90 days after the license expires or terminates. **LICENSEE** will continue to submit earned royalty payments and reports to **JHU** after the license terminates, until all **LICENSED PRODUCTS** made or imported under the license have been sold, and thereafter until the time for paying earned royalties has expired.

SLAY-VIVMUS0227474

6.4     **Accounting**. **LICENSEE** will maintain records showing manufacture, importation, sale, and use of **LICENSED PRODUCTS** or performance of **LICENSED SERVICES** and the revenue received for seven (7) years from the date of sale of that **LICENSED PRODUCT** or **LICENSED SERVICE**. Records will include general-ledger records showing cash receipts and expenses, and records that include: production records, customers, invoices, serial numbers, and related information in sufficient detail to enable **JHU** to determine the royalties payable under this Agreement.

6.5     **Audit by JHU**. **LICENSEE** will allow **JHU** or its designee to examine **LICENSEE**'s records at reasonable times and frequency at **JHU**'s expense, to verify payments made by **LICENSEE** under this Agreement.  If the audit reveals an under reporting of earned royalties due **JHU** of 5% or more for the period being audited, **LICENSEE** will pay the additional royalties due, and reimburse **JHU** the reasonable audit costs incurred.

6.6     **Self-audit**. **LICENSEE** will conduct an independent audit of sales and royalties at least once every two (2) years if annual sales of **LICENSED PRODUCT** are over $10,000,000. The audit will address, at a minimum, the amount of gross sales by or on behalf of **LICENSEE** during the audit period, the amount of funds owed to **JHU** under this Agreement, and whether the amount owed has been paid to JHU and is reflected in the records of the **LICENSEE. LICENSEE** will submit the auditor's report promptly to **JHU** upon completion. **LICENSEE** will pay for the entire cost of the audit.

7     **WARRANTIES, EXCLUSIONS AND NEGATION**

7.1     **JHU Warranty**. **JHU** warrants and represents that the Inventors listed have provided an invention disclosure to the **JHU** Office of Technology Transfer (JHTT), that the Inventors have assigned such rights as they have in the INVENTIONS to **JHU**, and that **JHU**, as assignee of the **INVENTIONS**, has filed the patent applications referred to in this Agreement. To the best of **JHU**'s knowledge, information and belief, the **LICENSED PATENT**(S) accurately list the inventors of that Patent and **JHU** has received no claims of a third party to rights in the Patents other than as may be specifically stated in this Agreement **JHU** does not warrant against presently unknown claims of third parties that may arise after this Agreement.

7.2     **Negation of Warranties**. **JHU** provides **LICENSEE** the rights granted in this Agreement AS IS and WITH ALL FAULTS. **JHU** makes no other representations and extends no warranties of any kind, either expresses or implied. Among other things, **JHU** disclaims any express or implied **WARRANTY OF MERCHANTABILITY**, or **FITNESS FOR A PARTICULAR PURPOSE**.

7.3     No Representation of **LICENSED PATENT**. **LICENSEE** also acknowledges that **JHU** does not represent or warrant:

(i)     the validity or scope of any **LICENSED PATENT**, or

(ii)     that the exploitation of **LICENSED PATENT** will be successful, or

SLAY-VIVMUS0227475

(iii)    that there are no third party claims or prior filed patents that would affect ownership of the **LICENSED PAT ENTS** or freedom to operate.

7.4    No other Promises or Warranties. Other than the obligations specifically stated in this Agreement, **JHU** mak es no promises, express or implied, regarding the **LICENSED PATENTS**. **LICENSEE** agrees that no representation or staten1ent by any **JHU** employee shall be deemed to be a statement or representation by **JHU**, and that LICENSEE was not induced to enter this Agreement based upon any statement or representation of JHU, or any employee of **JHU**. JHU is not responsible for any publi cations, experiments or results reported by any **JHU** employee, now or in the future, including any of the **INVENTORS** and it is t he sole responsibility of **LICENSEE** to evaluate the **LICENSED PATENTS** and the accuracy of any data or results.

8.    INDEMNITY AND INSURANCE

8.1    **Application**. **LICENSEE** shall have exclusive control over the **LICENSED PRODUCTS** and **LICENSED SERVICES** provided by **LICENSEE**, and the risks and costs associated therewith. Therefore, **LICENSEE** will protect **JHU IND EMNITEES** from exposure to damages which arise from the actions of **LICENSEE**.

8.2    **Indemnification. LICENSEE, AFFILIATED COMPANY and/or SUBLICENSEE** agree that each shall b e responsible for injuries or losses to third parties arising from or related to their own acts or omissions, or caused by or arising fro m **LICENSED PRODUCTS** or **LICENSED SERVICES**, or allegedly arising as a consequence of the exercise by **LICENSEE, AFFILIATED COMPANY** or **SUBLICENSEE** of any rights granted in this Agreement. To that end, **LICENSEE, AFFILIATE D COMPANY** and **SUBLICENSEE** shall protect **JHU INDEMNITEES** from any claims arising therefrom, including defending any action brought against **JHU INDEMNITEES**, with counsel reasonably acceptable to **JHU**, and indemnifying **JHU INDEMN ITEES** as against any judgments, fees, expenses, or other costs arising from or incidental to any such lawsuit, claim, demand or ot her action, whether or not any **JHU INDEMNITEE,** is named as a party defendant in any such lawsuit and whether or not the **JH U INDEMNITEES** are alleged to be negligent or otherwise responsible for any injuries to persons or property. Exercise of the rig hts granted in this Agreement, by an **AFFILIATED COMPANY** or an agent or a **SUBLICENSEE** or a third party on behalf of or for the account of **LICENSEE**, shall be considered **LICENSEE**'s practice of said inventions for purposes of this Paragraph.

8.3    **Exclusions**.

8.3.1    No indemnification will be provided for claims arising from the practice by a **JHU INDEMNITEE** of th e **PATENT RIGHTS**, or exercise of rights retained by **JHU** under this Agreement.

8.3.2    No indemnification will be provided for a claim against a **JHU INDEMNITEE** for injuries allegedly cau sed solely and directly by negligent use or administration by a **JHU INDEMNITEE** of a **LICENSED PRODUCT** or **LICENSE D SERVICE**, but any products liability or similar claim based upon a **LICENSED PRODUCT** or **LICENSED SERVICE**, made by or provided by **LICENSEE** or any **AFFILIATED COMPANY** or **SUBLICENSEE** will be covered by this indemnification re quirement.

SLAY-VIVMUS0227476

8.4 **Survival after termination**. The obligation of **LICENSEE** to defend and indemnify as set out in this Paragraph shall survive the termination of this Agreement, shall continue even after assignment of rights and responsibilities to an affiliate or **SUBLICENSEE**, and shall not be limited by any other limitation of liability elsewhere in this Agreement.

8.5 **Rights and obligations of JHU**. **JHU** shall provide **LICENSEE** with prompt notice of any claims covered by **LICENSEE**'s obligation to indemnify, and will provide reasonable cooperation to **LICENSEE** in **LICENSEE**'s investigation and defense of such claims. **JHU** shall have the right to participate in such defense with counsel of its choice and at **JHU**'s own expense. **JHU** shall have the right to approve the settlement of any claim hereunder that imposes any liability or obligation on **JHU**, or affects the **PATENT RIGHTS**, other than the payment of money damages paid by the **LICENSEE**.

8.6 **Insurance**. Prior to initial human testing or **FIRST COMMERCIAL SALE** of any **LICENSED PRODUCT** or **LICENSED SERVICE**, **LICENSEE** will establish and maintain Comprehensive General Liability Insurance, including Product Liability Insurance, with a reputable and financially secure insurance carrier acceptable to **JHU** to cover any liability of **LICENSEE** and **JHU** to third parties related to any **LICENSED PRODUCT** or **LICENSED SERVICE**, or otherwise arising from the activities of **LICENSEE**, any **AFFILIATED COMPANY** or **SUBLICENSEE**. The **LICENSEE** or the acquired insurance will provide minimum limits of liability of $10,000,000 per claim and will include all **JHU INDEMNITEES** as additional insureds. **LICENSEE** will furnish a Certificate of Insurance or other evidence of compliance upon reasonable request. All insurance of **LICENSEE** will be primary coverage; other insurance of JHU and **JHU INDEMNITEES** will be excess and noncontributory.

9. **PATENT PROSECUTION, MAINTENANCE & INFRINGEMENT**

9.1 **Prosecution & Maintenance**.

9.1.1 **Filing and Prosecution. JHU**, at **LICENSEE**'s expense, shall file, prosecute and maintain all patents and patent applications specified under **PATENT RIGHTS**. Title to all such patents and patent applications shall reside in **JHU**. **JHU** shall have final decision authority over all patent matter. **JHU** shall (a) request its patent counsel to timely copy **LICENSEE** on all official actions and written correspondence with any patent office, and (b) allow **LICENSEE** an opportunity to comment and advise **JHU**.

9.1.2 **Responsibility of LICENSEE. LICENSEE** shall be responsible for assuring that **PATENT RIGHTS** desired by **LICENSEE** are protected to the extent and in the areas desired by **LICENSEE**, including assuring timely review of patents drafted or filed, timely filing as necessary and payment of required costs.

9.1.3 **Election not to file in certain jurisdictions**. By concurrent written notification to **JHU** and its patent counsel at least thirty (30) days in advance (or later at **JHU**'s discretion) of any filing or response deadline, or fee due date, **LICENSEE** may elect not to have a patent application filed in any particular country or not to pay expenses associated with prosecuting or maintaining any patent application or patent, provided that **LICENSEE** pays for all costs incurred up to **JHU**'s receipt of such notification. Failure to provide such notification will be considered by **JHU** to be **LICENSEE**'s authorization to proceed at **LICENSEE**'s expense. Upon such notification, JHU may file, prosecute, and/or maintain such patent applications or patent at its own expense and for its own benefit, and any rights or license granted hereunder held by **LICENSEE, AFFILIATED COMPANIES** or **SUBLICENSEE**(S) relating to the PATENT RIGHTS which comprise the subject of such patent applications or patent and/or apply to the particular country, shall terminate, and thereafter reside solely in JHU.

9.2 Notification of Infringement by third party. Each party will notify the other promptly in writing when any infringement by another is uncovered or suspected.

9.3 **Suit for Infringement**.

SLAY-VIVMUS0227477

9.3.1    **LICENSEE** shall have the first right to enforce the **PATENT RIGHTS** against any infringement or alleged infringement thereof, and shall at all times keep **JHU** informed as to the status thereof. This right to sue for infringement shall not be used in an arbitrary or capricious manner. Before **LICENSEE** commences an action with respect to any infringement of such patents, **LICENSEE** shall give careful consideration to the views of **JHU** and to potential effects on the public interest in making its decision whether or not to sue. Thereafter, **LICENSEE** may, at its own expense, institute suit against any such infringer or alleged infringer and control and defend such suit in a manner consistent with the terms and provisions hereof.

9.3.2    No settlement, consent judgment or other voluntary final disposition of the suit may be concluded without the prior written consent of **JHU**, which consent shall not be unreasonably withheld. **JHU** shall reasonably cooperate in any such litigation at **LICENSEE**'s expense.

9.3.3    If **LICENSEE** elects not to enforce any patent within the **PATENT RIGHTS**, it shall so notify **JHU** promptly in writing and **JHU** may, in its sole judgment and at its own expense, take steps to enforce any patent and control, settle, and defend such suit in a manner consistent with the terms and provisions hereof, and recover, for its own account, any damages, awards or settlements resulting therefrom.

9.4    **Patent Invalidity Suit**. **LICENSEE** shall defend at **LICENSEE**'s expense a declaratory judgment or other action brought by a third party naming **LICENSEE** or **JHU** as a defendant and alleging invalidity of any of the **PATENT RIGHTS**. **JHU** shall reasonably cooperate in any such defense at LICENSEE'S expense. **JHU** in its discretion may elect to take over the sole defense of the action at its own expense, in which case **LICENSEE** shall cooperate fully with **JHU** in connection with any such action.

9.5    **Recovery**. **LICENSEE** shall pay to **JHU** fifteen percent (15%) of any monetary award, settlement or recovery, net of all reasonable atton1eys' fees and out-of-pocket costs and expenses paid to third parties by LICENSEE in connection with each suit or settlement. If the cost and expenses exceed the recovery no additional amount shall be paid to JHU.

SLAY-VIVMUS0227478

10.       **HANDLING AND RESOLUTION OF DISPUTES**.

10.1       **Governing Law**. This Agreement shall be construed, and legal relations between the parties hereto shall be determined, in accordance with the laws of the State of Maryland applicable to contracts executed and wholly to be performed within the State of Maryland without giving effect to the principles of conflicts of laws. Any disputes between the parties to the Agreement including the applicability or validity of any **PATENT RIGHTS**, shall be brought in the state or federal courts located in Baltimore, Maryland. Both parties agree to waive their right to a jury trial and to consent to jurisdiction in such courts.

10.2       **Resolution**.   The parties shall attempt to resolve all disputes through informal means. This may include mediation, arbitration, or any other procedures upon which the parties agree. Each party agrees that, prior to resorting to litigation, it will confer with the other party to determine whether other procedures that are less expensive or less time consuming can be adopted to resolve the dispute.

10.3       **Challenges to PATENT RIGHTS, Scope and Applicability - requirements during and after challenge of PATENT RIGHTS by LICENSEE**. These terms shall be included in any sublicense and pertain also to actions by a **SUBLICENSEE**. If **LICENSEE, AFFILIATED COMPANY** or **SUBLICENSEE** brings an action against **JHU** challenging the validity or scope of the **PATENT RIGHTS**, or applicability of the **PATENT RIGHTS** to a **LICENSED PRODUCT** or **LICENSED SERVICE** the following shall apply:

10.3.1       Actions by a **SUBLICENSEE** shall be attributed to **LICENSEE** unless **LICENSEE** demonstrates that the action was taken independent of any influence by **LICENSEE**, and **LICENSEE** fully cooperates in defending the action, including affirming the validity of the **PATENT RIGHTS** challenged.

10.3.2 If such action determines that at least one claim of a patent challenged by **LICENSEE, AFFILIATED COMPANY** or **SUBLICENSEE** is valid and, if applicable, but for this Agreement, infringed by a **LICENSED PRODUCT** or **LICENSED SERVICE**, the party challenging will thereafter, except as to , pay twice the payment amount which would otherwise be required to be paid under this Agreement or sublicense. For clarity, this shall apply to MAR's, Milestones, Sublicensing fees, royalty rates and other payments, except incurred which will be paid as otherwise agreed.

10.3.3       If such action determines that at least one claim of a patent challenged by **LICENSEE, AFFILIATED COMPANY** or **SUBLICENSEE** is valid and, if applicable, but for this Agreement, infringed by a **LICENSED PRODUCT** or **LICENSED SERVICE**, the **LICENSEE, AFFILIATED COMPANY** or **SUBLICENSEE** challenging will pay all reasonable attorneys' fees and litigation costs, including expert witness fees and exhibit preparation costs incurred by JHU in defending the challenge.

10.3.4       During the course of such challenge, all payments otherwise required by this Agreement shall be paid as and when due, to the same extent as if there were no challenge to the **PATENT RIGHTS**, and **LICENSEE, AFFILIATED COMPANY** or **SUBLICENSEE** will have no right to recoup any payments, including royalties, which become due before or during the challenge.

SLAY-VIVMUS0227479

10.3.5      **LICENSEE, AFFILIATED COMPANY** or **SUBLICENSEE** shall not pay royalties into any escrow or other similar account, but shall make all payments to **JHU** as due and when due, unless **LICENSEE** or **SUBLICENSEE** has prior to the payment becoming due, voluntarily and completely terminated this Agreement. Timely and complete payment and full compliance by **LICENSEE, AFFILIATED COMPANY** and **SUBLICENSEE** with all terms of this Agreement shall be a condition precedent to bringing and maintaining the legal action challenging the **PATENT RIGHTS**.

10.3.6 No less than three months prior to bringing an action seeking to invalidate or limit a **LICENSED PATENT, LICENSEE, AFFILIATED COMPANY** or **SUBLICENSEE** will provide written notice of the expected challenge to **JHU** which shall include a clear statement of the factual and legal basis for the challenge, and an identification of all prior art and other matter believed to invalidate any claim of the **LICENSED PATENT** or which supports the claim that the **LICENSED PATENT** does not apply to the **LICENSED PRODUCT** or **LICENSED SERVICE**.

11.      **TERM AND TERMINATION**

11.1 **Term**. The term of this Agreement shall commence on the **EFFECTIVE DATE** and shall continue, in each country, until the date of expiration of the last to expire patent included within **PATENT RIGHTS** in that country or if no patents issue then for a term of twenty (20) years from the **EFFECTIVE DATE** of this Agreement.

11.2 **Termination by LICENSEE. LICENSEE** may terminate this Agreement by giving **JHU** written notice at least 90 days in advance of the proposed effective date of termination selected by **LICENSEE. LICENSEE** shall pay all sums due under this Agreement, including Minimum Annual Royalties, earned royalties, milestone payments or **PATENT COSTS** which are incurred or are or become due prior to the effective date of termination. In addition, **LICENSEE** shall also be obligated to pay any **PATENT COSTS** which are required to be incurred to preserve the patent prior to the effective date of termination, and any other costs which **JHU** has incurred or will incur prior to the termination date which under this Agreement are required to be reimbursed by **LICENSEE**. Termination is not effective and payments shall continue to accrue and become due until all amounts due to **JHU** shall have been paid.

11.3      **Termination by JHU**.

11.3.1      **JHU** may terminate this Agreement if **LICENSEE**:

(i)      is delinquent on any report, payment or other obligation;

(ii)      is not diligently developing and commercializing **LICENSED PRODUCT**;

(iii)      misses a milestone that has a required date for completion described in Exhibit A;

(iv)      is in breach of any provision of this agreement or of any related agreement including a related sponsored research agreement; (v) provides any false report; or

(vi)      voluntarily or involuntarily enters bankruptcy or receivership proceedings.

SLAY-VIVMUS0227480

11.3.2 Termination under this Section will take effect 30 days after written notice by **JHU** unless **LICENSEE** cures the default within that 30-day period. If **LICENSEE** has had no prior defaults, and **LICENSEE** is diligently and in good faith attempting to cure the default, **LICENSEE** may request, and **JHU** shall grant an additional 60 days to cure the default.

11.3.3 **Failure to meet a required diligence milestone**. If this agreement provides for diligence milestones which must be accomplished by specified dates or within specified periods of time, LICENSEE may cure any default for failure to meet a required diligence milestone in accordance with this subsection.

(i) **LICENSEE** must be diligently pursuing the milestone;

(ii) **LICENSEE** can cure such default, by paying one half the milestone payment amount (or if there is no payment associated with the milestone, then twice the MAR applicable for the year in which the milestone occurs or $10,000 whichever is greater) within the 30-day cure period, which will automatically extend the milestone date (and the full amount of the original milestone payment) for an additional six (6) months.

(iii) Such a cure may be made no more than twice as to any one milestone.

12. **MISCELLANEOUS PROVISIONS**

12.1 **MARKING. LICENSEE** will mark **LICENSED PRODUCT** with the words "Patent Pending" before any **LICENSED PATENT** issues, and thereafter **LICENSEE** will mark **LICENSED PRODUCT** with the number of any issued **LICENSED PATENT** which applies.

12.2 **Use of Name. LICENSEE, AFFILIATED COMPANIES** and **SUBLICENSEE**(S) shall not use the name of The Johns Hopkins University or The Johns Hopkins Health System or any of its constituent parts, such as the Johns Hopkins Hospital or any contraction thereof or the name of **INVENTORS** in any advertising, promotional, sales literature or fundraising documents without prior written consent from an authorized representative of **JHU. LICENSEE, AFFILIATED COMPANIES** and **SUBLICENSEE**(S) shall allow at least seven (7) business days notice of any proposed public disclosure for **JHU**'s review and comment or to provide written consent. Such request shall be made through JHTT. LICENSEE may cite INVENTORS' publications on its website or in discussions with potential investors or corporate partners. Notwithstanding the foregoing, LICENSEE may use the following statement on LICENSEE's website: "Signpath Pharma has in-licensed the following technology, invented by Dr. Anirban Maitra and others, from The Johns Hopkins University: Smart Polymeric Nanoparticles which Overcome Multidrug Resistance to Cancer Chemotherapeutics and Treatment-Related Systemic Toxicity."

SLAY-VIVMUS0227481

12.3      **No Partnership**. Nothing in this Agreement shall be construed to create any agency, employment, partnership, joint venture or similar relationship between the parties other than that of a licensor/licensee. Neither party shall have any right or authority whatsoever to incur any liability or obligation (express or implied) or otherwise act in any manner in the name or on the behalf of the other, or to make any promise, warranty or representation binding on the other.

12.4      **Notice of Claim**. Each party shall give the other or its representative immediate notice of any suit or action filed, or prompt notice of any claim made, against them arising out of the performance of this Agreement or arising out of the practice of the INVENTIONS licensed hereunder.

12.5      **ASSIGNMENT**

12.5.1      **Permitted Assignment by LICENSEE**. Subject to Section 12.5, **LICENSEE** may assign this Agreement as part of a sale or merger, regardless of whether such a sale occurs through an asset sale, stock sale, merger or other combination, if the sale or merger is of **LICENSEE**'s entire business.

12.5.2 Any Other Assignment by **LICENSEE.** Any other attempt to assign this Agreement by **LICENSEE** is null and void in the absence of **JHU**'s written permission.

12.5.3 **Conditions of Assignment**. Prior to any assignment, the following conditions must be met:

(i)      **LICENSEE** must give **JHU** 30 days prior written notice of the assignment, including the new assignee's contact information; and

(ii) the new assignee must agree in writing to **JHU** to be bound by this Agreement.

12.5.4      **Assignment Payment to JHU**. Where the assignment is the result of complete sale or merger of **LICENSEE**, then **LICENSEE** (or its assignee) shall pay to **JHU** an assignment fee equal to the greater of:

(i)      twice the MAR applicable to the year when the assignment will be completed, or

(ii)      the initial License Fee paid for this Agreement; or

(iii)      $10,000.

For all other assignments, the assignment shall be treated in the same manner as a sublicense, such that assignment income shall be treated as **SUBLICENSING INCOME.**

SLAY-VIVMUS0227482

12.5.5 After the Assignment. Upon a permitted complete assignment of this Agreement, **LICENSEE** will be released from further obligations under this Agreement, except for those sections that survive termination, and the term "**LICENSEE**" in this Agreement will thereafter mean the assignee.

12.6 **Notice**. Except for those communications which specifically under this Agreement may be sent via e-mail or other electronic communication (such as notification of **PATENT COSTS** incurred and due, and other routine communications), all notices, requests or communication required or permitted to be given by either party hereunder shall be given by registered mail or certified mail, return receipt requested, or sent by overnight courier, such as Federal Express, to the other party at its respective address set forth below or to such other address as one party shall give notice of to the other from time to time hereunder. Notices shall be deemed effective when received.

If to **LICENSEE**:        Attn: Lawrence Helson
1375 California Road
Quakertown, PA 18951

If to **JHU**:        Executive Director
Johns Hopkins Technology Transfer
100 N. Charles Street, 5th Floor
Baltimore, MD 21201
Agreement No. A21235

Communications requiring a prompt response should also be sent via email to Wesley D. Blakeslee, wdb@jhu.edu

12.7 **Compliance with All Laws**. In all activities undertaken pursuant to this Agreement, both **JHU** and **LICENSEE** covenant and agree that each will in all material respects comply with such Federal, state and local laws and statutes, as may be in effect at the time of performance and all valid rules, regulations and orders thereof regulating such activities.

12.8 **Successors and Assigns**. Other than as specifically stated herein, neither this Agreement nor any of the rights or obligations created herein, except for the right to receive any remuneration hereunder, may be assigned by either party, in whole or in part, without the prior written consent of the other party. This Agreement shall bind and inure to the benefit of the successors and permitted assigns of the parties hereto.

12.9 **No Waivers; Severability**. No waiver of any breach of this Agreement shall constitute a waiver of any other breach of the same or other provision of this Agreement, and no waiver shall be effective unless made in writing and signed by the party waiving. Any provision hereof prohibited by or unenforceable under any applicable law of any jurisdiction shall as to such jurisdiction be deemed ineffective and deleted here from without affecting any other provision of this Agreement. It is the desire of the parties hereto that this Agreement be enforced to the maximum extent permitted by law, and should any provision contained herein be held by any governmental agency or court of competent jurisdiction to be void, illegal and unenforceable, the parties shall negotiate in good faith for a substitute term or provision which carries out the original intent of the parties.

SLAY-VIVMUS0227483

12.10     **Entire Agreement; Amendment**. **LICENSEE** and **JHU** acknowledge that they have read this entire Agreement and that this Agreement, including the attached Exhibits constitutes the entire understanding and contract between the parties hereto and supersedes any and all prior or contemporaneous oral or written communications with respect to the subject matter hereof, all of which communications are merged herein. It is expressly understood and agreed that: (i) there being no expectations to the contrary between the parties hereto, no usage of trade, verbal agreement or another regular practice or method dealing within any industry or between the parties hereto shall be used to modify, interpret, supplement or alter in any manner the express terms of this Agreement; and (ii) this Agreement shall not be modified, amended or in any way altered except by an instrument in writing signed by both of the parties hereto.

12.11     **Binding Agreement**. Exchange of this Agreement in draft or final form between the parties shall not be considered a binding offer, and this Agreement shall not be deemed final or binding on either party until the final Agreement has been signed by both parties.

12.12     **Delays or Omissions**. Except as expressly provided herein, no delay or omission to exercise any right, power or remedy accruing to any party hereto, shall impair any such right, power or remedy to such party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or in any similar breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

12.13     **Survival**. All representations, warranties, covenants and agreements made herein and which by their express terms or by implication are to be performed or continue to apply after the execution and/or termination hereof, or are prospective in nature, shall survive such execution and/or termination, as the case may be.  In addition, the following shall explicitly and specifically survive any termination or expiration:

(i)     **LICENSEE**'s obligation to make payments to **JHU**, accrued or accruable during the License, including earned royalties, sublicensing payments, reimbursement of **PATENT COSTS**, late payments and interest;

(ii)     any claim of **LICENSEE** or **JHU**, accrued or to accrue, because of any breach or default by the other party; and

(iii)     the provisions of Articles 7 and 8.

12.14 **No Third Party Beneficiaries**. Nothing in this Agreement shall be construed as giving any person, firm, corporation or other entity, other than the parties hereto and their successors and permitted assigns, any right, remedy or claim under or in respect of this Agreement or any provision hereof.

12.15 **Headings**. Article headings are for convenient reference and not a part of this Agreement. All Exhibits are incorporated herein by this reference.

12.16 **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which when taken together shall be deemed but one instrument.

IN WITNESS WHEREOF, this Agreement shall take effect as of the **EFFECTIVE DATE** when it has been executed below by the duly authorized representatives of the parties.

SLAY-VIVMUS0227484

THE JOHN HOPKINS UNIVERSITY

SignPath Pharma

/s/Wesley D. Blakeslee, J.D.
Executive Director
John Hopkins Technology Transfer

/s/ Lawrence Helsonj
Name:
Title: CEO and President

June 7, 2013
Date:

June 5, 2013
Date:

SLAY-VIVMUS0227485

EXHIBIT A LICENSE DEAL SHEET PATENTS, FEES, ROYALTIES, SUBLICENSING PAYMENTS
AND OTHER TERMS SPECIFIC TO THE LICENSE

1.        Patents, Inventions and Inventors:

Patents: U.S. Provisional Patent Application 61/421,709 and International Patent
Application PCT/US2011/063870.
Invention: "A composite polymeric nanoparticle for overcoming multidrug resistance to cancer chemotherapeutics and treatment-related systemic toxicity". JHU Ref# C11349.
Inventors: Anirban Maitra and Dipankar Pramanik

2.        Unreimbursed Patent Costs: $110.00

3.        Licensed Field of Use: Use of the licensed polymeric formulation incorporating curcumin and chemotherapeutic agents for treating cancer.

4.        License Fee: The license fee due under Paragraph 5.1 is:
Ten thousand dollars ($10,000) within thirty (30) days of the EFFECTIVE DATE; and Fifteen thousand dollars ($15,000) within twelve (12) months of the EFFECTIVE DATE.

5.        LICENSED TERRITORY: Worldwide

6.        Minimum Annual Royalties: The minimum annual royalties pursuant to the Agreement are:

1st year:                    None.

2nd year:                    None.

3rd year:                    Ten thousand dollars ($10,000).

4th year:                    Twenty thousand dollars ($20,000).

5th year onwards:                    Thirty thousand dollars ($30,000).

7.        Royalties: The earned royalty rate payable under Paragraph 5.5 is Three Percent (3°/o).

8.     Milestone payments:
The following milestones payments shall be made when achieved in accordance with Paragraph 4.2 of this Agreement,

        1.        Dosing of first patient with LICENSED PRODUCT in Phase I at a site other than JHU    $25,000
        2.        Dosing of first patient with LICENSED PRODUCT in Phase II at a site other than JHU    $50,000
        3.        Dosing of first patient with LICENSED PRODUCT in Phase III at a site other than JHU    $75,000

SLAY-VIVMUS0227486

4. Upon first regulatory approval of LICENSED PRODUCT OR LICENSED SERVICE    $150,000

Provided that if no **LICENSED PATENT** has issued at the time this milestone is achieved, the amount of the milesto ne shall be reduced to    $100,000

5.  Receipt of notice of allowance for a **LICENSED PATEN**

T                                                                                 $25,000

9         **Sharing of SUBLICENSING INCOME**.

9.1    Twenty Five percent (25%) if the sublicense is executed before the third anniversary of the effective date of this A greement; and

9.2    Fifteen percent (15%) if the sublicense is executed on or after the third anniversary of the effective date of this Ag reement.

9.3   Multiple technologies included in sublicense. Where multiple technologies or licenses are included on one sublice nse, where the amount attributed to each is not specifically stated in the sublicense, the amount attributable to each shall be deeme d to apply equally to each technology or license that is included in the sublicense. Where reasonable to do so, **LICENSEE** may re quest another application of the **SUBLICENSING INCOME**, by providing a written request and analysis to JHTT of the basis for **LICENSEE**'s request, but in no circumstance shall less than 10% of the **SUBLICENSING INCOME** be applied to the **LICENS ED PATENTS** licensed by this Agreement.

SLAY-VIVMUS0227487

EXHIBIT B QUARTERLY SALES & ROYALTY REPORT FOR LICENSE AGREEMENT BETWEEN AND THE JOHNS HOPKINS UNIVERSITY DATED

JHU Reference Number(s) _____,_____

PERIOD: From ------         To ------

TOTAL ROYALTIES DUE FOR THIS PERIOD$-----

| PROD-UCT ID | PRODUCT NAME | *JHU REFERENCE | 1st COMMERCIAL SALE DATE | TOTAL NET SALES/ SERVICES | ROYALTY RATE | AMOUNT DUE |
|---|---|---|---|---|---|---|
| | | | | | | |

**\*Please provide the JHU Reference Number or Patent Reference**

**This report format is to be used to report quarterly royalty statements to JHU. It should be placed on LICENSEE letterhead and accompany any royalty payments due for the reporting period. After the first sale on which royalties accrue, his report shall be submitted even if no sales are reported.**

SLAY-VIVMUS0227488

EXHIBITC

DILIGENCE AND ANNUAL REPORT GUIDELINES
FOR LICENSE AGREEMENT BETWEEN


AND
THE JOHNS HOPKINS UNIVERSITY
DATED ----------------------

**JHU** Reference Number(s)


PERIOD:          From ------                          To ------


A.Progress by **LICENSEE, AFFILIATED COMPANIES** or **SUBLICENSEE**(S) toward commercialization of **LICENSED PR
ODUCTS** or **LICENSED SERVICES**, including work completed, key scientific discoveries, summary of work-in-progress, curre
nt schedule of anticipated events or milestones, market plans (if any) for introduction of **LICENSED PRODUCTS** or **LICENSE
D SERVICES**, and significant corporate transactions involving **LICENSED PRODUCTS** or **LICENSED SERVICES**:


B.         Notice of all FDA or other governmental filings and/or approvals regarding any **LICENSED PRODUCT** or **LICENSE
D SERVICE** made or obtained by **LICENSEE, AFFILIATED COMPANY** or **SUBLICENSEE**, the patents or patent applicatio
ns licensed under this Agreement upon which such product or service is based, and the commercial name of such product or servic
e:


C.A Certificate of Insurance or other evidence of insurance is required and is attached.
is not required. Reason:                                                                                                      _



D.         AFFILIATED COMPANIES and SUBLICENSEES which have exercised rights to the LICENSED PATENTS:
----NONE
---- List attached with description of rights exercised.


E.         Diligence and other milestones achieved:
F.         Diligence and other milestones expected to be achieved this year:
G.         Sublicense(s) entered during the year:
---NONE


         Identification of **SUBLICENSEE**{S) (copy of the sublicense attached, if not previously provided):


H.         Change of control, name change or other significant change related to this Agreement or **LICENSEE:**
----NONE Details:

SLAY-VIVMUS0227489

EXHIBIT D.
GLOBAL ACCESS FOR ESSENTIAL MEDICINES

The following terms, conditions, rights and duties shall be deemed to be a part of the License Agreement and shall be included therein, and shall be in addition to any terms in the Agreement.

1    **DEFINITIONS**

1.1    **GAVI COUNTRY** shall mean any country listed as eligible to receive support from the GAVI Alliance (formerly known as the Global Alliance for Vaccines and Immunisation), as such list may be updated from to time by the GAVI Alliance.

1.2    **HUMANITARIAN PURPOSES** shall mean practice of **PATENT RIGHTS** in the prevention or treatment of disease in humans by or on behalf of any Qualified Humanitarian Organization (including, for clarity, practice of **PATENT RIGHTS** by contractors, manufactures or distributors acting for or on behalf of such Qualified Humanitarian Organizations on a fee-for service, fee-for-product or charitable basis):
  (a) to manufacture **LICENSED PRODUCTS** anywhere in the world for the sole and express purposes of distribution and use of such **LICENSED PRODUCTS** in one or more GAVI Countries, and (b) to sell or otherwise distribute **LICENSED PRODUCTS** for use solely in one or more GAVI Countries; provided, however, that sales and distribution of **LICENSED PRODUCTS** shall not be deemed made for Humanitarian Purposes unless products are distributed at locallyaffordable prices.

1.3    **NON-GAVI COUNTRY** shall mean any country that is not a GAVI Country.

1.4    **QUALIFIED HUMANITARIAN ORGANIZATION** shall mean any governmental agency, non-governmental agency or other not-for-profit organization that has as one of its bona fide missions to address the public health needs of underserved populations on a not-for profit basis. For clarity, Qualified Humanitarian Organizations do not include non-governmental agencies and non-for-profit organizations that are formed or established for the benefit of any for profit entity.

2.    **Retained Rights**

2.1.1    **HUMANITARIAN PURPOSES**. JHU retains the right to license the INVENTION, including **LICENSED PATENT**(S), to a QUALIFIED **HUMANITARIAN ORGANIZATION** for **HUMANITARIAN PURPOSES**, provided that any such license shall be non-exclusive, and shall expressly prohibit the distribution or use of any **LICENSED PRODUCT** or LICENSED SERVICE in any NON-GAVI country. Prior to entering such license, **JHU** will notify **LICENSEE**, who shall have the first right to negotiate a license direct to the organization.

3.    **Sublicensing**

3.1    The Parties will cooperate such that essential medicines which may be developed under this License can be made available in economically disadvantaged nations. **JHU** agrees to consider reasonable requests of **LICENSEE** for a commensurate reduction of royalty and sublicensing fees in circumstances where **LICENSEE** demonstrates to the satisfaction of **JHU** that **LICENSED PRODUCTS** are or will be made available in such nations at reduced cost. **LICENSEE** agrees to apply the principles of subsection 3.3.1 of the License Agreement upon request of **JHU** or a potential sublicensee willing to serve such a market or territory.

SLAY-VIVMUS0227490

Other Resources
ktMINE.com (//www.ktmine.com)
Contact Us (//www.ktmine.com/contact/)

Apps
Benchmark (/b/)
Royalty Rates (https://rrf.ktmine.com/SearchCenter.aspx?
a=SubscriptionManagement1@jsheld.com&ts=134055573116798066&k=wK_wjn9PdBwbTsAbfKM3DqDak7pF8406gld4HWgdcTw=)
Agreements (/agreement/search)

© 2025 Copyright ktMINE. All rights reserved.

ktMINE
940 W. Adams St., Suite 100
Chicago, IL 60607

» Terms of Services (/tos)   » Privacy Policy (//www.ktmine.com/privacy/)

SLAY-VIVMUS0227491

# Exhibit 7

SLAY-VIVMUS0227539

EXHIBIT 10.23

AGREEMENT FOR PURCHASE AND SALE

OF RIGHTS FOR PRODUCTS

This Agreement (this "AGREEMENT") is made effective as of April 29, 2006(the "EFFECTIVE DATE"), between ANDREW XIAN CHEN
("Seller") and BRIDGETECHHOLDINGS INTERNATIONAL, INC., a Delaware corporation (together with itsAffiliates, "BRIDGETECH").

RECITALS

A. Seller has developed the Subject Products (as defined below), and Selleris the sole owner of all the rights relating to the
Subject Products in theTerritory (as defined below), including all related Seller Intellectual Property (as defined below).

B. Bridgetech wishes to obtain and purchase from Seller, and Seller iswilling to sell to Bridgetech, all rights to the Subject
Products in theTerritory, all on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises, the mutual covenants madeherein, and other good and valuable consideration, the
receipt and adequacy ofwhich are hereby acknowledged, the parties hereto agree as follows:

ARTICLE 1. DEFINITIONS

Capitalized terms used herein and not otherwise defined herein shall havethe meaning set forth below.

1.1 "AFFILIATE" shall mean, in respect of any business entity and acommercially identifiable line of business, that entity and
anybusiness entity directly or indirectly controlling, controlled by orunder common control with that entity. For purposes of
thisdefinition, "CONTROL" shall mean (a) holding a 20% or greater votinginterest, or (b) that the affairs of the one entity in
carrying onsuch line of business are conducted in accordance with the wishes ofthe other entity as the result of the holding of
voting capital stock,voting partnership shares or other similar ownership medium or throughcontractual relationships. Each reference
to a party herein shall bedeemed to include such party and its Affiliates.

1.2 "FDA" shall mean the United States Food and Drug Administration or anyUnited States successor agency having the
administrative authority toregulate the approval for testing or marketing of humanpharmaceutical, biological, medical or medical
device products.

1.3 "FIRST COMMERCIAL SALE" shall mean the first sale by Bridgetech or itsAffiliates of a Subject Product to a third party in a
bona fide arm'slength transaction, but shall not include and shall not be construedto mean use of a Subject Product by

Bridgetech or its Affiliate for its own internal purposes or inconjunction with third parties for purpo

SLAY-VIVMUS0227540

ses of evaluating,
testing,and/or test-marketing such Subject Product.

1.4 "FORCE MAJEURE" shall have the meaning set forth in Section 10.11hereof.

1.5 "GAAP" shall mean United States generally accepted accountingprinciples.

1.6 "INTELLECTUAL PROPERTY" shall mean inventions, discoveries, Patents,Know-How, trade secrets, copyrights and similar rights of
any typeunder the laws of any governmental authority, domestic or foreign,including all applications and registrations relating to
any of theforegoing.

1.7 "KNOW-HOW" shall mean all knowledge, ideas, inventions, data,instructions, tangible or intangible materials, processes,
formulas,expert opinions and information, including without limitation,pharmaceutical, biological, chemical, analytical,
clinical,manufacturing and quality control data and information, materials,methods, processes, techniques, and technical and
non-technical dataand information, and the results of tests, assays, methods andprocesses, and plans, specifications and other
documents containingsaid information and data.

1.8 "NET SALES" shall mean, in relation to any Subject Product and withrespect to the relevant period, the gross amount invoiced
on sales ofsuch Subject Product by Bridgetech or its Affiliates in arm's lengthtransactions involving such Subject Product, less the
following:

(a) customary trade, quantity, or cash discounts, and non-affiliatedbrokers' or agents' commissions, to the extent actually
allowedand taken as a reduction from the amount billed;

(b) amounts repaid or credited by reason of rejection or return andtaken as a reduction of the amount billed;

(c) to the extent separately stated on purchase orders, invoices, orother documents of sale and included in the gross amount
billed,any taxes or other governmental charges levied on the production,sale, transportation, delivery, or use of a Subject Product
whichis paid by or on behalf of Bridgetech or its Affiliates; and

(d) outbound transportation costs prepaid or allowed and costs ofinsurance in transit, but only to the extent separately stated
onpurchase orders, invoices, or other documents of sale andincluded in the gross amount billed.

In the event of a sale of any Subject Product by Bridgetech to anAffiliate of Bridgetech, and the subsequent resale of such
SubjectProduct by such Affiliate, Net Sales shall be computed on the basis ofsuch subsequent resale.

2

In the event that any Subject Product is sold as a component ofanother product, "NET SALES" shall mean the portion of such
otherproduct's invoice price that is allocable to the Subject Product basedon the customary price of the Subject Product when sold

SLAY-VIVMUS0227541

separately or, in the absence of such customary price, on the ratio of the cost of the Subject Product to the total cost of such other product.

1.9 "SELLER INTELLECTUAL PROPERTY" shall mean all Intellectual Property that Seller owns or has the right to license during the term of this Agreement applicable to the Subject Products in the Territory.

1.10 "PATENTS" shall mean (i) all patents applicable in the Territory, including without limitation, all substitutions, reissues, renewals, reexaminations, patents of addition, and inventor's certificates thereof; (ii) all term extensions or other government action which provides exclusive rights to an invention beyond the original patent expiration date; and (iii) all pending patent applications (including provisional applications, divisions, continuations, continued prosecutions and continuations-in-part).

1.11 "REGULATORY AUTHORITY" shall mean the FDA and any similar regulatory agency or authority in any country or geographic region in the Territory.

1.12 "SPECIFICATIONS" shall mean all the written specifications, standards, analytical methods and criteria for each Subject Product as mutually agreed upon by the parties from time to time, and any supplement or amendment thereto required by any Regulatory Authority.

1.13 "TECHNICAL FILE" shall mean all information relating to a Subject Product and including the quality specifications and analyses, the description of the manufacturing process, the description of the production facilities and organization, and the packaging of the Subject Product, as mutually agreed upon by the parties from time to time, as necessary to support Bridgetech's efforts to receive regulatory approval for said Subject Product.

1.14 "TERRITORY" shall mean the People's Republic of China, Hong Kong, Macau, and Taiwan.

1.15 "SUBJECT PRODUCTS" shall mean the four Subject Products outlined in Appendix A.

ARTICLE 2. PURCHASE AND SALE OF RIGHTS TO PRODUCTS

In consideration of the payments specified in Article 3, Seller hereby sells and transfers to Bridgetech, and Bridgetech hereby purchases and acquires from Seller, all of the rights applicable to the Products as follows:

2.1 LICENSE RIGHTS. Seller grants to Bridgetech the exclusive license under the Seller Intellectual Property, to develop, modify, enhance, improve, make, have made,

3

use, import, offer for sale, sell, and have sold Subject Products solely in the Territory.

2.2 Commercialization. Seller grants to Bridgetech the exclusive right to commercialize, distribute and sell the Subject Products in the Territory.

SLAY-VIVMUS0227542

2.3 No Sublease Rights. Bridgetech is not entitled to grant anysublicenses to third parties (other than Affiliates) to practice
theSeller Intellectual Property. However, Bridgetech is entitled (i) tohire contract manufacturers to produce the Subject Products
for theaccount of Bridgetech, and (ii) to appoint independent distributors tomarket and sell the Subject Products which are supplied
by Bridgetech.

2.4 Outside Territory. For avoidance of doubt, Bridgetech shall have norights to make, use or sell Subject Products outside the
Territory, orto sell Subject Products for others to sell or use outside theTerritory.

ARTICLE 3. PAYMENTS

3.1 INSTALLMENT PAYMENTS. Bridgetech agrees to pay to Seller the followinginstallment purchase payments:

(a) An Initial Cash Payment of $500,000 on the Effective Date of thisAgreement.

(b) A payment of $1,000,000, twelve months after the Effective Dateof this Agreement. This payment can be either $1,000,000 in
cashor 335,000 shares of Bridgetech common stock, at the solediscretion of the Seller.

(c) Cash payment of $250,000 within 30 days after first regulatoryapproval for conducting a human clinical trial is obtained in
theTerritory for the first Subject Product, but not later than June2007.

(d) Cash payment of $250,000 within 30 days after first regulatoryapproval for conducting a human clinical trial is obtained in
theTerritory for the second Subject Product, but not later thanMarch 2007.

(e) Cash payment of $250,000 within 30 days after first regulatoryapproval for conducting a human clinical trial is obtained in
theTerritory for the third Subject Product, but not later than March2008.

(f) Cash payment of $250,000 within 30 days after first regulatoryapproval for conducting a human clinical trial is obtained in
theTerritory for the fourth Subject Product, but not later thanMarch 2010.

3.2 ROYALTY. Bridgetech agrees to pay to Seller a royalty equal to fourpercent (4%) of Net Sales of Subject Products sold by
Bridgetech orits Affiliates.

3.3 REPORTS.

4

(a) As of each June 1 and December 1 (commencing with December 2006),Bridgetech shall provide to Seller a written report as to
thestatus, progress, and plans for completing development of each ofthe four Subject Products, and for becoming ready to file
forregulatory approval for conducting clinical trials.

(b) Once the First Commercial Sale has occurred, Bridgetech shallprovide to Seller, within 30 days following the end of

SLAY-VIVMUS0227543

eachcalendar quarter, reports of all Net Sales of Subject Products,together with payment of all royalties due thereon under
Section3.2, together with all information reasonably necessary tosupport the calculation of such royalties.

(c) Seller shall provide Bridgetech with updates on a monthly basisas to the completion status of Subject Products 2, 3 and 4.

3.4 AUDITS. Upon not less than 10 business days written notice fromSeller, from time to time Bridgetech shall allow Seller or its
agentto inspect and copy the records and books of account of Bridgetech,during reasonable business hours, on reasonable advance
notice, but inany not more than once per year. In the event of underpayment byBridgetech under Section 3.2, Bridgetech shall
promptly pay Seller allamounts underpaid, together with interest due on such underpaidamounts at an interest rate equal to the then
existing prime lendingrate as published in The Wall Street Journal, or if less, the maximuminterest rate permitted under applicable
law, from the payment duedate until the actual date of payment. The cost of such audit shall beborne by Seller, unless such audit
reveals a discrepancy of greaterthan ten percent (10%) of the total amount determined to be actuallydue, in which case Bridgetech
shall bear such cost.

3.5 COMPLETION. Bridgetech will enter into a contract with Seller toperform specified research and development work necessary for
thepreparation of the initial regulatory filings in the Territory. Thesecond, third and fourth Subject Products shall be made into
such astate of completion as the first Subject Product was at the EffectiveDate. The total cost to be borne by Bridgetech for this
work asoutlined in Appendix B is not to exceed $150,000.00

3.6 LATE PAYMENTS. If any required payment is not paid when due, it shallbear a late payment interest charge of twelve percent
(12%) per annumuntil paid in full.

ARTICLE 4. ANCILLARY AGREEMENTS

4.1 BRIDGETECH DILIGENCE. Bridgetech shall use commercially reasonable anddiligent efforts to develop, obtain regulatory
approvals for,commercialize, market and sell the four Subject Products, in theTerritory, as soon as is reasonably feasible.

4.2 RIGHT OF FIRST REFUSAL. If Seller acquires rights to a new oncologyproduct, and if Seller decides to sell or license the
rights tocommercialize such new oncology product in the Territory to a thirdparty, then Seller will give a written notice to
Bridgetech of theterms which Seller proposes to accept from a third party (the "TermsNotice"). Seller agrees to give Bridgetech a
30-day first right ofrefusal

5

for Bridgetech to purchase rights in the Territory to such new productpursuant to the Terms Notice. All rights under this Section
4.2 willterminate on the first anniversary of the Effective Date, unless theparties mutually agree to a

SLAY-VIVMUS0227544

renewal and specified
payments fromBridgetech for any such renewal. This Article 4 will not be applicableif Bridgetech is in default of any of its
obligations under thisAgreement.

4.3 PATENT MATTERS. The parties acknowledge and agree that Seller shallremain as the owner of all of the Seller Intellectual
Property(including the Patent Rights), and that Bridgetech is acquiring bythis Agreement an exclusive right to use such Seller
IntellectualProperty for the Subject Products in the Territory. Bridgetech will beresponsible for prosecuting, maintaining and
managing the PatentRights in the Territory, in consultation with Seller and Seller'sselected patent agent. Bridgetech will give due
consideration to anyrequests or recommendations from Seller concerning the Patent Rights.Bridgetech will keep Seller informed of all
material mattersconcerning the prosecution and maintenance of the Patent Rights in theTerritory. Bridgetech will pay all expenses
incurred after theEffective Date for the prosecution and maintenance of the PatentRights in the Territory, such as patent attorneys'
fees, and feespayable to governmental patent agencies.

4.4 REGISTRATION. If any country in the Territory requires that thisAgreement be registered, Bridgetech shall be responsible for
affectingsuch registration.

4.5 To the extent that Seller received any FDA documentation applicable tothe Subject Products (such as applications, clinical
trial protocols,and outcomes), subject to satisfying any confidentiality obligationsapplicable to such documentation, Seller will
furnish copies of suchdocumentation to Bridgetech, for Bridgetech to use to support itsregulatory filings in the Territory.

ARTICLE 5. REGULATORY MATTERS

5.1 REGULATORY APPROVALS. Bridgetech shall be responsible for obtaining,at its expense, such approvals from Regulatory
Authorities asBridgetech deems necessary or advisable for the manufacture, use andsale of Subject Products that Bridgetech desires
to make, have made,use, import, offer for sale, sell, or have sold in the Territory.Seller agrees that each Technical File may be
used by Bridgetech andits customers for filings with all Regulatory Authorities.

5.2 RECORDS. Bridgetech shall maintain, and shall cause its Affiliates,contract manufacturers and other agents to maintain, all
recordsnecessary to comply with all applicable laws relating to themanufacture, filling, packaging, storage and shipment of
SubjectProducts. Bridgetech shall keep and maintain complete and accuraterecords and books of account in sufficient detail and form
so as toenable verification of prices or royalties or other amounts duepursuant to this Agreement, including Bridgetech's Net
Sales.Bridgetech shall maintain such records and books of account for theperiod required by applicable laws, but in

6

any event for a period of at least three years following the year towhich the records pertain.

SLAY-VIVMUS0227545

5.3 ADVERSE EVENT REPORTING. During the term of this Agreement and for oneyear thereafter (or as required by applicable laws),
each party shall

(i) provide prompt written notice to the other party of information inor coming into its possession or control concerning side
effects,injury, toxicity or sensitivity reaction ("Adverse Events") associatedwith uses, studies, investigations or tests of any
Subject Product,whether or not determined to be attributable to such Subject Product,

(ii) notify the other party's responsible drug safety department bytelephone and facsimile within 72 hours after such party first
becomesaware of any Adverse Event that gives cause for concern or isunexpected or that is fatal, life-threatening (as it
occurred),permanently disabling, requires (or prolongs) inpatienthospitalization, represents a significant hazard, or is a cancer or
acongenital anomaly or represents an overdose, or any othercircumstance that might necessitate a recall, expedited notificationof
the FDA or any other relevant Regulatory Authorities or asignificant change in the label of such Subject Product.

5.4 CUSTOMER COMPLAINTS. Bridgetech shall maintain customer complaintfiles. Each party will cooperate reasonably with the other
parties inconnection with a party's investigation of an Adverse Event.

5.5 MATERIAL COMMUNICATIONS; GOVERNMENT INSPECTIONS. Each party shallprovide the other party, within 30 days of receipt, of
copies of allcommunications to or from any Regulatory Authority regarding anySubject Product or the facilities, procedures or
processes used inconnection with such Subject Product (including without limitationAdverse Event reports, 483's and safety reports).
The foregoingnotification obligation shall be 24 hours, if a Regulatory Authorityis commencing or threatening seizure of such
Subject Product. Eachparty shall have the right to consult with the other party on suchother party's responses to a Regulatory
Authority.

5.6 NOTIFICATIONS AND RECALL. Each party shall notify the other parties assoon as possible of any recall known to such party,
threatened orpending, of any Subject Product.

ARTICLE 6. CONFIDENTIAL INFORMATION

6.1 CONFIDENTIALITY. Except as otherwise provided in this Agreement, theparties agree that, for the term of this Agreement and
for five yearsthereafter, all non-public, proprietary or confidential disclosures,of any nature whatsoever, (collectively,
"Confidential Information"),disclosed or submitted, either orally or in writing (including withoutlimitation by electronic means) or
through observation, by one party

(the "Disclosing Party") to the other party (the "Receiving Party")hereunder shall be received and maintained by the Receiving
Party instrict confidence, shall not be used for any purpose other than the

SLAY-VIVMUS0227546

7

purposes expressly permitted by this Agreement and shall not bedisclosed to any third party other than the Receiving Party'sdirectors, officers, employees, agents, consultants andrepresentatives that have a need to know such Confidential Informationto achieve the purposes of this Agreement, provided that such partyshall ensure that it and its recipients to whom disclosure is to bemade are bound by, and take commercially reasonable efforts to ensurecompliance with, the confidentiality terms hereof. Each party willpromptly notify the other upon discovery of any unauthorized use ordisclosure of the Confidential Information. Confidential Informationbelongs to and shall remain the property of the Disclosing Party.

6.2 EXCEPTIONS. The obligations of confidentiality set forth in Section6.1 shall not apply to Confidential Information which the ReceivingParty can prove by documentary evidence:

(a) was already in is possession and at its free disposal before thedisclosure to it hereunder; or

(b) is subsequently disclosed to the Receiving Party by a third partynot under any obligations of confidentiality to the DisclosingParty; or

(c) is or becomes generally available to the public through nofault of the Receiving Party; or

(d) is independently developed by the Receiving Party without the useof any other Confidential Information of the Disclosing Party; or

(e) is required by law to be disclosed by the Receiving Party,subject to Section 6.3 below.

6.3 AUTHORIZED DISCLOSURE. Each party may disclose ConfidentialInformation hereunder solely to the extent such disclosure isreasonably necessary in connection with submissions to anygovernmental authority in connection with this Agreement or in filingor prosecuting regulatory applications contemplated under thisAgreement, prosecuting or defending litigation, complying withapplicable laws or for the purposes expressly permitted by thisAgreement; provided that in the event of any such disclosure of theDisclosing Party's Confidential Information by the Receiving Party,the Receiving Party will, except where impracticable, give reasonableadvance notice to the Disclosing Party of such disclosure requirementso that the Disclosing Party may seek a protective order and or otherappropriate remedy or waive compliance with the confidentialityprovisions of this Article 6, and will use its commercially reasonableefforts to secure confidential treatment of such ConfidentialInformation required to be disclosed.

6.4 RETURN OF CONFIDENTIAL INFORMATION. The Receiving Party shall keepConfidential Information belonging to the Disclosing Party inappropriately secure locations. Upon the expiration or termination ofthis Agreement, any and

8

all Confidential Information possessed in tangible form by a ReceivingParty and belonging to the Disclo

SLAY-VIVMUS0227547

sing Party, shall, upon

writtenrequest, be immediately returned to the Disclosing Party (or destroyedif so requested) and not retained by the Receiving

Party; providedhowever that a party may retain one copy of any ConfidentialInformation in an appropriately secure location, which by

applicablelaws it must retain, for so long as such applicable laws require suchretention but thereafter shall dispose of such

retained ConfidentialInformation in accordance with applicable laws or this Section.

ARTICLE 7. TERM AND TERMINATION

7.1 TERM. This Agreement shall become effective upon the Effective Dateand shall continue in effect for the longer of (i) the

life of thelast to expire of the patents included in the Seller IntellectualProperty, and (ii) a period of ten years; unless this

Agreement isterminated earlier in accordance with the terms and conditions of thisArticle.

7.2 TERMINATION FOR MATERIAL BREACH.

(a) In the event that any party hereto shall commit any breach of ordefault in any of the material terms or conditions of

theAgreement, and also shall fail to remedy such default or breachwithin 60 days after receipt of written notice thereof fromanother

party hereto, the party giving notice may, at its optionand in addition to any other remedies which it may have at law orin equity,

terminate this Agreement by sending notice oftermination in writing to the other parties, and such terminationshall be effective as

of the date of the receipt of such notice.

(b) If Bridgetech fails to pay the first $1,750,000 sums payableunder Section 3.1(a), (b) and (c), and said failure is not

curedwithin 60 days after receipt of a notice of default, Seller mayterminate all of Bridgetech's rights under this Agreement for

allof the Subject Products.

(c) If Bridgetech does timely pay the first $1,750,000 sums payableunder Section 3.1(a), (b) and (c), but Bridgetech

thereafterdefaults in any subsequent installment payment obligation under

Section 3.1(d), (e) or (f), then Seller may terminate the rightsof Bridgetech only as to the particular Subject Product for

whichthe default occurred and for all subsequent Subject Products(e.g., the second, third or fourth Subject Product).

(d) Upon any termination of this Agreement as to only particularSubject Products, all rights to such particular Subject

Productsshall revert to Seller.

7.3 RIGHTS ON TERMINATION.

(a) In the event that Seller or Bridgetech terminates this Agreementas permitted by this Agreement, all rights granted and sold

bySeller to Bridgetech hereunder shall revert to Seller; andBridgetech and its Affiliates shall cease to make and sell any ofthe

Subject Products.

SLAY-VIVMUS0227548

9

(b) Except as otherwise provided in this Agreement, in the event oftermination (i) Bridgetech shall surrender to Seller, or, at thesole option of Seller, shall destroy and provide Seller with acertificate signed by a responsible executive of Bridgetechattesting to the destruction of, all copies of any ConfidentialInformation provided by Seller hereunder; and (ii) Seller shallsurrender to Bridgetech, or, at the sole option of Bridgetech,Seller shall destroy and provide Bridgetech with a certificatesigned by a responsible executive of Seller attesting to thedestruction of, all copies of any Confidential Informationprovided by Bridgetech hereunder.

(c) Termination or expiration of this Agreement shall be withoutprejudice to any right which shall have accrued to the benefit ofany party prior to such termination or expiration. Suchtermination or expiration shall not relieve any party fromobligations which are expressly indicated to survive terminationor expiration of this Agreement.

7.4 SURVIVAL. In addition to those Articles or Sections which expresslysurvive throughout the term of this Agreement, the following Articlesand Sections of this Agreement shall survive termination or expirationof this Agreement: Articles 1, 6, 8, 9 and 10 and Sections 7.3 and7.4.

ARTICLE 8. REPRESENTATIONS, WARRANTIES, DISCLAIMERS AND INDEMNITY

8.1 ALL PARTIES. Each party represents and warrants to the other that ithas, and shall have, the full legal right and authority to enter intothis Agreement, and to perform its obligations hereunder, includingwith respect to Seller, to grant the rights and licenses to Bridgetechcontemplated hereunder.

8.2 GENERAL DISCLAIMER. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT,THE PARTIES MAKE NO REPRESENTATIONS OR WARRANTIES OF ANY KINDWHATSOEVER, EITHER EXPRESS OR IMPLIED, WRITTEN OR ORAL, INCLUDINGWITHOUT LIMITATION ANY IMPLIED WARRANTY RELATING TO MERCHANTABILITY,REGULATORY STATUS, EFFICACY CLAIMS, OR FITNESS FOR A PARTICULARPURPOSE.

8.3 DISCLAIMER REGARDING PATENT RIGHTS. Seller does not represent orwarrant that any particular patent claims will ultimately be issuedfor any of the pending patent applications, or that any issued patentswill be valid and enforceable.

8.4 SELLER RIGHTS. Seller is the sole owner of all rights relating to theSubject Properties in the Territory.

8.5 Seller makes no representations whatsoever with regard to the scope ofthe Seller Intellectual Property, or that the Subject Products can bedeveloped and sold without infringing other patents.

10

8.6 PRODUCT EFFICACIES AND APPROVAL. Seller does not represent or warrantthat any of the Subject Products will in fact be able to

SLAY-VIVMUS0227549

be developedinto (i) commercially viable products, (ii) efficacious products, or

(iii) approvable products.

8.7 LIMITATIONS OF LIABILITY; REMEDIES CUMULATIVE.

(a) EXCEPT FOR ANY CLAIMS RELATED TO ONE PARTY'S INFRINGEMENT OFANOTHER PARTY'S INTELLECTUAL PROPERTY OR BREACH BY A PARTY OF
ITSCONFIDENTIALITY OBLIGATIONS HEREUNDER, UNDER NO CIRCUMSTANCESSHALL A PARTY HEREOF BE LIABLE TO THE OTHER PARTY HEREOF
FORCONSEQUENTIAL, INDIRECT, INCIDENTAL, PUNITIVE OR SPECIAL DAMAGES.

(b) UNDER NO CIRCUMSTANCE WILL SELLER HAVE ANY POTENTIAL LIABILITY INTHE AGGREGATE IN EXCESS OF THE PAYMENTS ACTUALLY RECEIVED
BYSELLER UNDER THIS AGREEMENT.

(c) THE REMEDIES PROVIDED IN THIS AGREEMENT ARE CUMULATIVE AND NOTEXCLUSIVE OR IN LIMITATION OF ANY OTHER REMEDY AVAILABLE AT
LAWOR IN EQUITY. ACCORDINGLY, UNLESS OTHERWISE EXPRESSLY PROVIDED INTHIS AGREEMENT A REMEDY PROVIDED AS AVAILABLE TO ANY PARTY IS
NOTINTENDED AS AN EXCLUSIVE REMEDY.

8.8 INDEMNITY

(a) Seller hereby agrees to save, defend, and hold Bridgetech, itsAffiliates and their respective officers, directors,
employees,agents and representatives (the "BRIDGETECH INDEMNIFIED Parties")harmless from and against any and all losses,
damages,liabilities, obligations, costs and expenses (includingreasonable attorneys' fees and expenses that arise in
connectiontherewith) ("LOSSES") resulting from or arising out of: (a) thenegligence or willful misconduct of Seller or its
Affiliates, andtheir respective directors, officers, agents, employees, orrepresentatives, or (b) the material breach by Seller of
anyprovision of this Agreement.

(b) Bridgetech hereby agrees to save, defend, and hold Sellerharmless from and against any and all losses, damages,liabilities,
obligations, costs and expenses (includingreasonable attorneys' fees and expenses that arise in connectiontherewith) ("Losses")
resulting from or arising out of: (a) thegross negligence or willful misconduct of Bridgetech, or (b) thematerial breach by
Bridgetech of any provision of this Agreement,or (c) product liability claims for products produced byBridgtech or its Affiliates or
contractors.

11

ARTICLE 9. GOVERNING LAW; DISPUTE RESOLUTION

9.1 GOVERNING LAW. This Agreement shall be governed by, and construed andinterpreted in accordance with, the laws of the State of
Delaware,without regard for conflicts of laws principles.

9.2 DISPUTE RESOLUTION. In the event of any dispute arising under thisAgreement, or any breach of any of this Agreement, the

SLAY-VIVMUS0227550

parties shallrefer such dispute to its respective authorized representatives forattempted resolution by good faith negotiations
within 30 days aftersuch referral is made. In the event such authorized representativesare unable to resolve such dispute within
such 30-day period, eitherparty may assert its rights in a court of law.

ARTICLE 10. GENERAL PROVISIONS

10.1 INDEPENDENT CONTRACTORS. The parties are independent contractors andno party shall be deemed to be, nor entitled to the
benefits of, anemployee, joint venturer, or partner of any other party. No party isauthorized or empowered to act as agent for, or
to direct or controlthe day-to-day activities of any other party for any purpose and shallnot on behalf of any other party enter
into any contract, warranty, orrepresentation as to any matter.

10.2 NO PERSONAL LIABILITY. Each action or claim against any party arisingunder or relating to this Agreement shall be made only
against suchparty as a corporation and any liability relating thereto shall beenforceable only against the assets of such party. No
party shall seekto pierce the corporate veil or otherwise seek to impose any liabilityrelating to, or arising from, this Agreement
against any shareholder,employee, officer, director, trustee or manager of another party. Eachof such persons is an intended
beneficiary of the mutual promises setforth in this Section and shall be entitled to enforce the provisionsof this Section.

10.3 NO THIRD PARTY BENEFICIARIES. It is the explicit intention of theparties hereto that, except as expressly provided herein,
no person orentity other than the parties hereto is or shall be entitled to bringany action to enforce any provision of this
Agreement against any ofthe parties hereto, and that covenants, undertakings, and agreementsset forth in this Agreement shall be
enforceable only by the partieshereto or their respective successors or permitted assigns.

10.4 ASSIGNMENT. No party may assign this Agreement without the priorwritten consent of the other parties hereto, except that any
party mayassign this Agreement to the purchaser of all or part of the businessor operations conducted by such party related to this
Agreement;provided that no such assignment shall relieve the assignor as theprimary obligor hereunder. This Agreement shall be
binding upon andinure to the benefit of the successors and assigns of the parties. Anyassignment not in accordance with this
Agreement shall be void.

10.5 MODIFICATION; WAIVER. This Agreement may not be modified or amendedexcept by a document signed by all parties hereto. No
failure ofeither party to exercise

12

and no delay in exercising any right or remedy in connection with thisAgreement will operate as a waiver thereof, nor will any
single orpartial exercise of any right preclude any other or further exerciseof such right or the exercise of any other right
hereunder.

SLAY-VIVMUS0227551

10.6 NOTICES. All notices must be in writing. Communications regarding thisAgreement shall be between the individuals identified
below, who willact on behalf of the parties respectively. Either party mayre-designate the recipient of communications and
correspondence, orchange the address specified below, at any time during the term ofthis Agreement by providing the other party with
written notice of thename and address of its new designate.

IftoSeller:AndrewX.Chen,Ph.D.

4646BrysonTer

SanDiego,CA92130

IftoBridgetech:BridgetechHoldingsInternational,Inc.

402W.Broadway,26thFloor

SanDiego,CA92101

Attention:ThomasC.KuhnIII

The date of receipt of any notice given under this Agreement shall bedeemed to be (i) the date given if delivered personally (ii)
sevendays after the date mailed if mailed by registered or certified mailreturn receipt requested, postage prepaid, and (iii) two
days afterthe date sent if sent by nationally recognized commercial courier, andaddressed to the party to receive such notice.

10.7 SEVERABILITY. If any term or provision of this Agreement is or becomesinvalid or held illegal or unenforceable by a court of
competentjurisdiction, then (i) it is the intention of the parties that theremaining terms or provisions of this Agreement shall not
be affectedthereby and shall be enforced to the fullest extent permitted by law,and (ii) the parties shall renegotiate in good faith
such invalid,illegal or unenforceable term or provision in order to provide areasonably acceptable alternative whose effect on
economic andbusiness objectives shall be as similar as possible to the effectintended by the parties under the original invalid,
illegal orunenforceable term or provision, it being the intent of the partiesthat the basic purposes of this Agreement are to be
effectuated.

10.8 ENTIRE AGREEMENT. This Agreement constitutes the entire understandingof the parties with respect to the subject matter
hereof. As of theEffective Date, there are no covenants, promises, agreements,warranties, representations, conditions or
understandings, either oralor written, between the parties other than as set forth herein. Nosubsequent alteration, amendment,
change or addition to this Agreementshall be binding upon the parties hereto unless reduced to writing andsigned by the respective
authorized officers of the parties. Theheadings are for the convenience of the parties and have no legal orinterpretive significance

SLAY-VIVMUS0227552

whatsoever.

13

10.9 FORCE MAJEURE. No party shall be liable to the other party for damagesor loss resulting from the failure of performance by
such party ifsuch failure results from earthquake, war, acts of terrorism, fire,explosion, flood, strike or any other cause beyond
the control of thedefaulting party ("Force Majeure"), provided that the party claimingForce Majeure exerts all commercially
reasonable efforts to avoid orremedy such Force Majeure. In the event a Force Majeure extends formore than six months, then another
party may terminate this Agreementupon written notice to the non-performing party (so long as such otherparty is not itself then in
material breach of this Agreement).

10.10 ADDITIONAL ACTIONS AND DOCUMENTS. Each of the parties hereto herebyagrees to take or cause to be taken such further
actions, to execute,acknowledge, deliver and file or cause to be executed, acknowledged,delivered and filed such further documents
and instruments, and to useits best efforts to obtain such consents, as may be necessary or asmay be reasonably requested in order
to fully effectuate the purposes,terms and conditions of this Agreement, whether at or after theexecution of this Agreement.

10.11 COUNTERPARTS. This Agreement may be executed in counterparts, each ofwhich shall be deemed an original, but all of which
together shallconstitute one and the same instrument.

[The following page is the signature page.]

14

IN WITNESS WHEREOF, the parties hereto have caused this Supply and LicenseAgreement to be executed effective as of the date first
above written.

ANDREW XIAN CHEN

By|s|AndrewXianChen
                                                                                            -----------
-------------------------

Name:AndrewXianChen

BRIDGETECH HOLDINGS INTERNATIONAL, INC.

By|s|ThomasC.KuhnIII
                                                                                            -----------
-----------------------

Name:ThomasC.KuhnIII

SLAY-VIVMUS0227553

Title:President&COO

APPENDIX A

SUBJECT PRODUCTS SPECIFICATIONS

1. A lyophilized docetaxel intravenous emulsion formulation for cancer treatment(under US patent applic
ation 11/192439 filed on
28-July-2005, WO patentapplication US2005/026783 filed on 28-July-2005, and US provisional patentapplic
ations 60/764,061 filed on
1-Feb-2006 and 60/771,816 filed on 8-Feb-2006)

2. A lyophilized paclitaxel intravenous emulsion formulation for cancertreatment (under US patent appli
cation 11/192439 filed on
28-July-2005, WOpatent application US2005/026783 filed on 28-July-2005, and US provisionalpatent applic
ations 60/764,061 filed on
1-Feb-2006 and 60/771,816 filed on8-Feb-2006)

3. A lyophilized vancomycin intravenous emulsion formulation for infectiousdiseases (under US patent ap
plication 10/889226 filed
on 12-Jul-2004, WOapplication US2005/024594 filed on 12-Jul-2005 and a future application to befiled)

4. A lyophilized clarithromycin intravenous emulsion formulation for infectiousdiseases (under US paten
t application 10/895018
filed on 20-Jul-2004 and afuture application to be filed)

The Seller has filed patent applications for and owns exclusive rights to theSubject Products in the Te
rritory defined above.

APPENDIX B

Work necessary for the preparation of the initial regulatory filings in theTerritory

1. Definition of product composition and components

2. Description of small-to-pilot scale manufacturing process

3. Six-month stability study

4. Proposed test methods and quality specification

5. Efficacy study in animals according to an established protocol

6. Acute toxicity study in animals according to an established protocol

7. Hypersensitivity study in animals according to an established protocol

8. Vein irritation study in animals according to an established protocol

SLAY-VIVMUS0227554

9. Hemolysis study with animal blood according to an established protocol

17

Other Resources
ktMINE.com (//www.ktmine.com)
Contact Us (//www.ktmine.com/contact/)

pps
enchmark (/b/)
oyalty Rates (https://rrf.ktmine.com/SearchCenter.aspx?
=SubscriptionManagement1@jsheld.com&ts=134055500683815786&k=ohZ2kCEa5RmqAxP239ONW0IkjrOjfxXwt9cORiG9n2o=
greements (/agreement/search)

© 2025 Copyright ktMINE. All rights reserved.

ktMINE
940 W. Adams St., Suite 100
Chicago, IL 60607

» Terms of Services (/tos)   » Privacy Policy (//www.ktmine.com/privacy/)

SLAY-VIVMUS0227555

# Exhibit 8

10-K 1 form10-k.htm

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2015**

**TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**COMMISSION FILE NUMBER 333-158474**

# SIGNPATH PHARMA INC.
**(Exact name of Registrant as Specified in Its Charter)**

| | |
|---|---|
| Delaware | 20-5079533 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 3477 Corporate Parkway, Suite 100 Center Valley, PA | 18034 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (215) 538-9996

SECURITIES REGISTERED PURSUANT TO SECTION 12(B) OF THE EXCHANGE ACT: NONE

SECURITIES REGISTERED PURSUANT TO SECTION 12(G) OF THE EXCHANGE ACT: NONE

Indicate by check mark if the registrant is a well-known seasoned issuer. [ ] Yes [X] No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act. [X] Yes [ ] No

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. [X] Yes [ ] No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). [X] Yes [ ] No.

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2

EAGLEBEN-SA_00376322

Case 1:24-cv-00065-JLH    Document 499    Filed 08/07/26    Page 204 of 205 PageID #: 30365

The income tax provision differs from the amount of income tax determined by applying the U.S. federal and state income tax rates of 39% to pretax income from continuing operations for the years ended December 31, 2015 and 2014 due to the following:

| | 2015 | 2014 |
|---|---|---|
| Income tax benefit at U. S. federal statutory rates: | $ (637,646) | $ (1,071,794) |
| Stock-based compensation | 6,240 | - |
| Derivative liability | - | - |
| Modification of warrants | - | 5,121 |
| Change in valuation allowance | 631,906 | 1,066,673 |
| | $ - | $ - |

## NOTE 9 – COMMITMENTS AND CONTINGENCIES

SignPath is obligated to pay running royalties of 2.5% on net sales of less than $250 million for products covered by an issued patent licensed under the UTMDACC License Agreement. This royalty rate increases to 3% for sales equal to, or greater than, $250 million. A royalty of 1.5% of net sales is payable by SignPath for products covered under the license which are not protected by an issued patent. After sales to the public begin, SignPath must pay a minimum annual royalty $75,000 which can be deducted from the royalties on net sales due under the agreement. In addition, SignPath is obligated to pay 20% to 25% of all non-royalty consideration received under sublicensing agreements.

SignPath previously had a License Agreement with Johns Hopkins University that the Company terminated in December 2014. As part of the termination, the Company paid JHU $20,000.

On December 12, 2014, the Board of Directors authorized an amendment to Dr. Helson's employment agreement to provide that: (A) upon successful completion of Phase I trials for anti-Ebola testing in Africa paid for by the United States Army Medical Research Institute of Infectious Diseases ("USAMRIID"), exclusive of the cost of drug products and shipping, Dr. Helson would receive options to purchase 300,000 shares of Common Stock exercisable at then current fair market value and a cash bonus of $75,000, and (B) upon successful completion of Phase I trials in Vienna, Austria for the lead anti-QT prolongation drugs (Moxifloxacin) for liposomes Dr. Helson would receive additional options to purchase 300,000 shares of Common Stock exercisable at then current fair market value and a cash bonus of $75,000.

On March 27, 2015, the Board of Directors authorized a bonus to Dr. Helson providing that: upon the closing of financing for $20 million or more with The Westbury Group, or any other financing, Dr. Helson would be awarded a discretionary bonus of up to 100% of his then current salary estimated to be $375,000 per annum.

On May 1, 2015 The Company entered into an employment agreement with Mr. Kai Larson and appointed him as Vice President of Corporate Development, Chief Operating Officer, and Secretary. Mr. Larson will have a salary of $200,000 per year, $150,000 of which is deferred until such time that the Company raises an aggregate of $10 million through either debt or equity financing, or licensing revenues. In addition, the Company granted Mr. Larson options to purchase 750,000 shares of common stock as noted in Note 7.

On December 23, 2015, the Company entered into an agreement with Annie Bouchard, a co-inventor of the SPP4040 drug candidate under development. In the Agreement, Ms. Bouchard agreed to assign all patent rights relating to cardiac arrhythmia mitigation drugs to SignPath and continue collaborations with SignPath regarding future development of cardiac arrhythmia therapies. In return, Ms. Bouchard is entitled to one third of any future profits earned from these cardiac arrhythmia therapies.

## NOTE 10 – RELATED PARTY

Meyers Securities Corp. and Meyers Associates LP, the placement agent for its preferred stock offerings, have numerous relationships and related transactions. Meyers Associates LP receives a 10% sales commission of the gross proceeds from the sale of all Proffered Units, as well as a non-accountable expense allowance equal to 3% of the gross proceeds of the Offering and warrants to purchase 20% of the Securities sold in the Offering.

For the year ended December 31, 2015 and 2014, Meyers Associates LP received total commissions in the amount of $319,487, and $289,240, respectively, and were issued 254,884 and 443,800 in Placement Agent warrants for the year ended December 31, 2015 and 2014, respectively.

For the year ended December 31, 2015 the Company had a payable due to Dr. Larry Helson related to Medicare coverage for the time he has been employed by the Company. The total amount due is $30,000 to be paid out at a rate of $2,900 per annum.

EAGLEBEN-SA_00376393

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that true and correct copies of the foregoing documents were caused to be served on June 5, 2026, on the following counsel in the manner indicated:

**VIA EMAIL:**

Daniel A. Taylor
Neal C. Belgam
SMITH KATZENSTEIN & JENKINS LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
Dtaylor@skjlaw.com
Nbelgam@skjlaw.com

Jason A. Lief
Allan H. Pollack
Audrey R. Sparschu
WINDELS MARX LANE & MITTENDORF, LLP
156 West 56th Street
New York, NY 10019
jlief@windelsmarx.com
apollack@windelsmarx.com
asparschu@windelsmarx.com

Andrew Miller
Ajay Kayal
Robyn Ast-Gmoser
Daniel E. Forchheimer
Kiersten A. Fowler
WINDELS MARX LANE & MITTENDORF, LLP
One Giralda Farms
Madison, NJ 07940
amiller@windelsmarx.com
akayal@windelsmarx.com
rast-gmoser@windelsmarx.com
dforchheimer@windelsmarx.com
kfowler@windelsmarx.com

*Attorneys for Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)

ME1\61334401.v1