## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC, <br><br> Plaintiffs, <br><br> v. <br><br> SLAYBACK PHARMA LLC and AZURITY PHARMACEUTICALS, INC, <br><br> Defendants. | REDACTED PUBLIC VERSION FILED AUGUST 7, 2026 <br><br> C.A. No. 24-65-JLH (CONSOLIDATED) <br><br> **JURY TRIAL DEMANDED** <br><br> ██████████████ - ███████ |

I, Kelly A. Welsh, declare as follows:

1.      I am an attorney at the law firm of Latham & Watkins LLP and counsel for Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC ("Eagle") in the above-captioned case.  I am admitted to practice before the Court *pro hac vice*.

2.      I make this declaration in support of Eagle's *Daubert* Motion to Exclude the Opinions of Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s ("Slayback's") Expert, Dr. Patrick Sinko.

3.      I have personal knowledge of the facts set forth in this declaration, and if called as a witness, could and would competently testify thereto.

4.      Attached as **Exhibit 1** is a true and correct copy of Slayback's Bendamustine Hydrochloride Injection New Drug Application, Section 3.2. P.1 Description and Composition of the Drug Product (SLAY-VIVMUS0000472).

5.      Attached as **Exhibit 2** is a true and correct copy of Slayback's Bendamustine Hydrochloride Injection New Drug Application, Section 2.3 Quality Overall Summary (SLAY-VIVMUS0000243).

6.      Attached as **Exhibit 3** is a true and correct copy of excerpts of the Expert Report of Dr. Sinko Regarding Non-Infringement, dated March 16, 2026.

7.      Attached as **Exhibit 4** is a true and correct copy of excerpts of Appendix B of Dr. Trout's Opening Expert Report Regarding Infringement, dated February 6, 2026.

8.      Attached as **Exhibit 5** is a true and correct copy of excerpts of the Deposition Transcript of Harish Chinnari, dated December 10, 2025.

9.      Attached as **Exhibit 6** is a true and correct copy of excerpts of the Deposition Transcript of Patrick Sinko, dated April 16, 2026.

1

10.     Attached as **Exhibit 7** is a true and correct copy of Slayback's Bendamustine Hydrochloride Injection New Drug Application, Section 3.2.P.4.4. Justification of Specification (SLAY-VIVMUS0005646).

11.     Attached as **Exhibit 8** is a true and correct copy of the Corden Pharma Latina S.p.A. Specification Report for Sodium Hydroxide (SLAY-VIVMUS0010975).

12.     Attached as **Exhibit 9** is a true and correct copy of excerpts of the Reply Expert Report of Dr. Bernhardt Trout, dated April 13, 2026.

13.     I declare under penalty of perjury that the foregoing is true and correct.


June 5, 2026                                              */s/* Kelly A. Welsh_____
                                                         Kelly A. Welsh

# Exhibit 1
# Filed Under Seal

# Exhibit 2
# Filed Under Seal

# Exhibit 3
# Filed Under Seal

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

EAGLE PHARMACEUTICALS, INC. and
EAGLE SUB1 LLC,

      Plaintiffs,

    v.

SLAYBACK PHARMA LLC and AZURITY
PHARMACEUTICALS, INC.,

      Defendants.

C.A. No. 24-65-JLH

**EXPERT REPORT OF
DR. SINKO REGARDING NON-INFRINGEMENT**

I. <u>**DR. SINKO'S BACKGROUND**</u>

A. <u>**Education and Professional Background**</u>

1.      My name is Dr. Patrick J. Sinko and I am a Distinguished Professor of Pharmaceutics and the Parke-Davis Endowed Chair in Pharmaceutics and Drug Delivery in the Ernest Mario School of Pharmacy at Rutgers, The State University of New Jersey.  My current research focuses on biopharmaceutics, pharmaceutical formulations, and molecular-, nano-, and micro-scale drug delivery.

2.      I was Chair of the Department of Pharmaceutics from 1998 to 2008.  I also served as the Associate Vice President for Research at Rutgers from 2007 through 2019, providing executive-level oversight of Comparative Medicine Resources, Research Core Facilities, In Vivo Research Services, Biomedical Advisory Committees, and the Controlled Substances program across Rutgers' three regional campuses.  Since 2003, I have held the Parke-Davis Endowed Chair in Pharmaceutics and Drug Delivery at Rutgers.

3.      I received a Bachelor of Science in Pharmacy from Rutgers University in 1982 and completed my Ph.D. in Pharmaceutics at the University of Michigan in 1988. After completing my Ph.D., I continued as a Research Scientist at the University of Michigan until 1991.

4.      In 1991, I joined the faculty at Rutgers in the Department of Pharmaceutics as an Assistant Professor.  I was promoted to Associate Professor in 1997, Professor in 2000, and Distinguished Professor in 2007. As a professor at Rutgers, I have taught courses in several graduate and undergraduate subjects, including drug delivery, general toxicology, pharmacology, pharmacokinetics, and pharmaceutics.

5.      At Rutgers, my research is generally directed to biopharmaceutics, drug delivery, and pharmaceutical formulations.  I have numerous active and completed projects, sponsored by

1

### C. Compensation

17.    I am being compensated at a rate of $ 1250 per hour for my consulting services, including testimony at depositions, hearings, and at trial, and $ 625 per hour for travel.  My compensation does not depend upon my opinions or the outcome of this case.

## II.    SCOPE OF WORK AND SUMMARY OF OPINIONS

18.    I have been retained by Defendants ("Slayback Pharma LLC" and "Azurity Pharmaceuticals, Inc.") as a technical expert in this matter to provide opinions regarding various issues relating to the United States Patent No. 11,872,214 ("the '214 patent") (Exh. 2), and United States Patent No. 12,138,248 ("the '248 patent") (Exh. 3) (collectively "patents-in-suit").[1]

19.    For this Report, I have been asked by counsel for Defendants to provide my opinion on whether claims 1-9 of the '214 Patent and claims 1-11, 15, and 20 of the '248 Patent (hereinafter collectively "the Asserted Claims") are infringed or not infringed by Slayback's NDA Product.

20.    As detailed below, it is my opinion that there is _no_ infringement of the Asserted Claims by the accused Slayback NDA Product either literally or under the doctrine of equivalents, because:



---

[1]    I have also analyzed United States Patent No. 11,844,783 ("the '783 Patent") (Exh. 4) and its file history, which I understand plaintiffs have withdrawn from this case.  Nonetheless, the '783 Patent and its file history are relevant to understanding the patents-in-suit, and are therefore also discussed below.

21.    I have also been asked to provide my opinion as to whether ███████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████ It is my understanding that this opinion of non-infringement will be relied upon by the damages experts in this case. However, beyond this opinion of non-infringement, I am not offering any other opinions about ███████████ ████████ or any opinions regarding damages.

22.    I have also been asked to express my opinion as to whether the Treanda® bendamustine product, and certain non-bendamustine cancer products would infringe the patents-in-suit – again solely for purposes of damages issues in the case. As detailed below, Treanda® is a lyophilized product that is not in liquid form. It does not infringe the claims-in-suit because those claims require a liquid. And, all cancer drugs that do not contain bendamustine do not infringe because the claims-in-suit require bendamustine.

23.    The opinions expressed in this Report are based on the materials set forth in Exhibit 5 ("Sinko Materials Considered for Non-Infringement Report"), and on my knowledge and experience in the field as a POSA. I reserve the right to consider additional materials and express additional arguments in response to expert opinions submitted by Plaintiffs.

## III.    LEGAL PRINCIPLES APPLIED

24.    In reaching my opinions, I have also applied certain legal concepts as explained to me by the attorneys for Defendants.

presence of additional components in the accused product, beyond what is listed after "consisting of," means there is *no* infringement.

37.    When the "consisting of" phrase applies only to a particular claim limitation, it closes only that limitation.  Furthermore, I also understand that when a "consisting of" limitation is nested underneath an open-ended "comprising" phrase, the "consisting of" limitation itself remains closed as to that limitation.

38.    I understand that there are two exceptions to the closed nature of "consisting of." If either of these two exceptions apply, the "consisting of" language will not preclude a finding of infringement.  First, the presence of an impurity that is normally present in a product will not violate the "consisting of" language and thus will not avoid infringement.  However, an ingredient that is purposefully added and impacts the performance of the product is not an impurity.  The second exception is when the additional component in the accused product is unrelated to the invention.  For instance, a claim to a kit "consisting of" certain recited ingredients to be mixed together would not avoid infringement where the accused product contains the recited ingredients and also contains an added spatula that does not interact with the chemicals.

39.    I further understand that the doctrine of equivalents can be applied, in a general sense, to a "consisting of" limitation, as with any other limitation, subject to all the other limitations on the doctrine of equivalents.

## IV.    SCIENTIFIC BACKGROUND

40.    At trial, I may provide testimony regarding various aspects of pharmaceutical science including pharmaceutical formulation, pharmaceutical dosage forms, stability testing, HPLC techniques, validation, pharmaceutical degradation, and basic concepts from chemistry and organic chemistry, including the definitions of atoms, molecules, chemical bonds, chemical

reactions, reaction kinetics, states of matter (solids, liquids and gases), the definition of a "fluid," solutions, solutes, solvents, and co-solvents.

### A.  States of Matter And The Definition of Solids, Liquids, and Fluids

41.  I understand that a dispute exists between the parties regarding whether ███████ ████████████████████████████████████████████████████ Thus, the definitions of solids and fluids are pertinent to the resolution of this case.

42.  The patents-in-suit do not provide any definition of the words "solid," "liquid," or "fluid" – let alone provide a unique definition that would depart from a POSA's understanding of the scientific and dictionary meaning of these words.  (*See, e.g.*, Exh. 2, '214 Patent, *passim*; Exh. 3, '248 Patent, *passim*).

43.  A POSA chemist would understand that "solids", "liquids", and "gases" are the three most common "states of matter."  (Exh. 6, Brown & LeMay, Chemistry: The Central Science, at pg. 304 (1981) ("matter exists in three states, gaseous, liquid, or solid.") (hereinafter "Brown & LeMay").  A fourth recognized state of matter – plasma – is not applicable to the formulations and products at issue in this case.

44.  A POSA would further understand that a solid material has a fixed shape and volume, does not fill the volume of the container it is placed in, and is not compressible to any degree.  (Exh. 6, Brown & LeMay, at pg. 26 ("A solid has a firmness that is not associated with either gases or liquids.  It has a fixed volume and shape.").  Similarly, The American Heritage College Dictionary defines the noun "solid" as follows:

> – n.  1. A substance having a definite shape and volume;
> one that is neither liquid nor gaseous.

(Exh. 7, American Heritage College Dictionary (3rd. Ed. 1993) at pg. 1295).

45.     A POSA would further understand that solids maintain their fixed shape and volume because the particles that make up the solid (atoms or molecules) are tightly packed in a fixed arrangement and do not move significantly (beyond small vibrational movements).  Stated differently, the atoms or molecules within a solid do not flow.  (Exh. 6, Brown & LeMay, at pgs. 26, 305 (Table 11.1)).

46.     By contrast, a POSA would understand that a "liquid" is properly defined as:

> **1a.** A state of matter characterized by a readiness to flow, little or no tendency to disperse, and relatively high incompressibility, **b**. Matter or a specific body of matter in this state.

(Exh. 7, The American Heritage College Dictionary (3rd Ed. 1993), at pg. 791; *see also* Exh. 6, Brown & LeMay, at pgs. 26, 305, Table 11.1 (liquid "flows readily");  Exh. 8, Oxford Paperback Dictionary and Thesaurus, (3rd Ed. 2009) at pg. 542 ("**liquid** > **noun** a substance such as water or oil that flows freely");  Exh. 9, Roget's 21st Century Thesaurus (3rd Ed. 2005), at pg. 509 ("**liquid** [n] *fluid* aqua, aqueous material, broth, elixir, extract, flow, flux, goo*, goop*, juice, liquor, melted material, nectar, sap, secretion, slop*, solution, swill*; CONCEPT 467 — *Ant.* solid")).

47.     Although the patents-in-suit state: "For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use."  (Exh. 2, '214 Patent, Col. 2, lines 56-58; Exh. 3, '248 Patent, Col. 2, lines 53-55), they do not provide an actual definition of the word "fluid" itself.

48.     A POSA would understand a fluid to be a substance that flows, including liquids and gases.  As The American Heritage College Dictionary states, a fluid is:

> A continuous amorphous substance whose molecules move freely past one another and that assumes the shape of its container, a liquid or a gas.

13

(Exh. 7, <u>The American Heritage College Dictionary</u>, <u>Dictionary</u> (3rd Ed. 1993), at pg. 524).

Similarly, <u>The Oxford Thesaurus of English</u>'s entry for fluid states:

> **fluid noun** he designed instruments to measure the flow of fluids: flowing substance; liquid, water substance, moisture, solution, juice, sap; gas, gaseous substance, vapour.

(Exh. 10, <u>Oxford Thesaurus of English</u>, (3rd Ed. 2009) at pg. 341;  *See also* Exh. 9, <u>Roget's 21st Century Thesaurus</u>, (3rd Ed. 2005), at pg. 356 ("**fluid** [n] liquid aqua, broth, chaser, cooler, goo*, goop*, juice, liquor, solution, vapor; CONCEPT 467 -Ant. solid"); Exh. 11, Sears, <u>College Physics</u>, 5th Ed. 1980, at pg. 193 ("The term 'fluid' means a substance that can flow; hence the term applies to both liquids and gases."); Exh. 12, Landau et al., <u>Fluid Mechanics</u>, 2d Ed. 2003, at pg. 1 ("Fluid dynamics concerns itself with the study of the motion of fluids (liquids and gases)."); Exh. 13, National Cancer Institute (NCI) Website at https://www.cancer.gov/publications/dictionaries/cancer-terms/search/fluid/?searchMode=Begins) defines a "fluid" as a "substance that flows smoothly and takes the shape of its container.  Liquids and gases are fluids."; Exh. 14, US 2009/0229671 A at [0020] ("sterile fluid transfer device, such as a flow-through connector or valve, wherein the fluids are liquids and/or gases.");  Exh. 15, U.S. Patent No. 5,304,432 at Col. 5, lines 58-63; Col. 8, lines 1-7; col. 8, lines 30-34; and claim 10 (aqueous NaOH is a fluid); *see also* Exh. 16, Sundaram Depo. at pg. 10, lines 10-22 ("A fluid is not a solid.  It's a liquid or a gas.") and at pg. 11, lines 18-22 ("Q. Above the melting point of a chemical, all liquids are fluids; correct?  THE WITNESS: That's my understanding."); Exh. 18, Buxton Depo. Day 2, Aug. 22, 2025 at pg. 36, line 11 to pg. 38, line 8 (admitting that PEG, identified as a fluid in the patent claims, is in fact both a liquid and a fluid).

49.     Thus, a POSA would understand that both liquids and gases are "fluids," and that all liquids are also fluids.

### B. Pharmaceutical Dosage Forms as Solutions and Fluids

50.     There are different types of pharmaceutical dosage forms, including solid oral dosage forms (such as tablets or capsules) and liquid/fluid dosage forms (such as oral syrups and intravenous fluids). Dosage forms that are liquids/fluids (*e.g.*, syrups and intravenous injections) are often solutions.[2] This allows the drug to enter the body already dissolved, ready for absorption and/or able to deliver its pharmacological effect immediately. By contrast, a tablet must first disintegrate into particles, which must then dissolve within the body to release the drug before it can be absorbed. (Exh. 19, Martin's Pharmacy, at pg. 287 Table 12.1 ("Drug 'dissolution' occurs when a tablet is introduced into a solution and is usually accompanied by disintegration and deaggregation of the solid matrix followed by drug diffusion from the remaining small particles."). Intravenous dosage forms are also preferred as solutions because the presence of suspended solids in the liquid/fluid can result in painful or difficult injections. (*See, e.g.*, Trout Opening Report at ¶ 219 ("Moreover, the POSA would have understood that the presence of solid particles in the diluted infusion solution would present a serious health concern.").

51.     A solution is a homogeneous mixture. (Exh. 6, Brown & LeMay, at pg. 27; Exh. 19, Martin's Pharmacy, at pg. 111 ("A true solution is a mixture of two or more components that

---

2   When the chemicals in the dosage form do not dissolve within each other, a solution is not possible. In these instances, suspensions or emulsions may be used. In contrast to solutions, a "suspension" exists when small particles of a solid are mixed throughout a liquid/fluid, but the particles themselves remain in the solid form. Suspensions are two-phase fluids; whereas solutions are one-phase fluids. As explained below, solutions involve a "phase change" where solid ingredients are dissolved and thereby converted into non-solid liquids/fluids. (*See* Paragraphs 51-54, below).

form a homogeneous molecular dispersion, in other words, a one-phase system with consistent properties.")). Chemists use the term "solute" to refer to a chemical that gets dissolved into a "solvent" to form a solution. (Exh. 6, Brown & LeMay, at pg. 84 ("In discussing solutions, it is often convenient to call one component the solvent and the others solutes. The component of a solution whose physical state is preserved during solution formation is known as the solvent. For example, when sodium chloride (a solid) is mixed with water, the resultant solution is a liquid. If all components of a solution are in the same state, the one present in the greatest amount is called the solvent.")). Before it dissolves, a solute can be in the solid, liquid, or gaseous phase. Solvents are generally liquids/fluids – although in certain circumstances, solvents can be gases or solids. (Exh. 19, Martin's Pharmacy, at pgs. 111-12). As the Brown & LeMay textbook says at pg. 84, the distinction between solutes and solvents is often one of arbitrary linguistic "convenience," as the two chemicals are actually dissolving within each other to form a homogeneous mixture. (*See also* (Exh. 19, Martin's Pharmacy at pg. 111-12 ("The constituent present in the greater amount in a binary solution is *arbitrarily* designated as the solvent and the constituent in the lesser amount as the solute. When a solid is dissolved in a liquid, however, the liquid is usually taken as the solvent and the solid as the solute, irrespective of the relative amounts of the constituents. When water is one of the constituents of a liquid mixture, it is usually considered the solvent. When dealing with mixtures of liquids that are miscible in all proportions, such as alcohol and water, it is less meaningful to classify the constituents as solute and solvent.") (emphasis added)).

52.     The process of dissolving one or more chemicals into a solution (a homogeneous mixture) is known as "solvation" or "dissolution." During solvation, the atoms or molecules of the solute are separated and surrounded (or "solvated") by the atoms or molecules of the solvent.

16

(Exh. 6, Brown & LeMay, at pg. 350-51 ("Once removed from the crystal, the Na+ and Cl- ions [of previously solid sodium chloride] are surrounded by water molecules …. Such interactions between solute and solvent molecules are known as solvation.  When the solvent is water, it is known as hydration.").

53.    Thus, a POSA understands that when solids are dissolved in a liquid/fluid, they are no longer solids.  The process of dissolution, or solvation, separates a solid's constituent atoms or molecules that were previously fixed in place and molecularly disperses them within the solvent.  In solution, all of those atoms or molecules (of the solute and the solvent) move freely or flow – they are all fluids.  Thus, the solute has changed physical state from solid to liquid.  (Exh. 6, Brown & LeMay, at pg. 84 ("when sodium chloride (a solid) is mixed with water, the resultant solution is a liquid."); Exh. 20, Bancroft, "The Solute as Liquid," SCIENCE, Vol. 82, No. 2130, pgs. 388-89 at 389 (1935) ("*All liquid solutions are mixtures of liquids, regardless whether any or all of the pure components are solids* …") (emphases added) (hereinafter "Bancroft")).

54.    Indeed, some authors have described the dissolution of a solid as being akin to melting – wherein the fixed structure of the solid is changed into a flowing liquid/fluid.  (*See, e.g.*, Exh. 21, Goodwin, "Is Salt Melting When It Dissolves in Water?,"  J. Chem. Educ., Vol. 79, No. 3, pgs. 393-96 at 394 (March 1, 2002) ("both *melting* sodium chloride and *dissolving* it in water … *involve the separation* of sodium and chloride ions *into the liquid state*, where they are *relatively free to move*.") (emphases added)) (hereinafter "Goodwin"); Exh. 22, Goodwin, at Abstract (https://pubs.acs.org/doi/abs/10.1021/ed079p393: "Both melting and dissolving involve transition between the solid and liquid states and are controlled by analogous thermodynamic and kinetic principles.")).

55.     Thus, a saline solution – which is sodium chloride dissolved in water, a solution frequently used in intravenous injections – is understood to be a liquid/fluid.  (*See, e.g.*, Exh. 6, Brown & LeMay, at pg. 84 ("when sodium chloride (a solid) is mixed with water, the resultant solution is a liquid."); Exh. 23, Hoorn, E.J. "Intravenous fluids: balancing solutions," J Nephrol 30, 485–492 at 487 (2017) at https://doi.org/10.1007/s40620-016-0363-9  ("Normal *saline has long been the dominant type of IV fluid* both for replacement and maintenance. … Normal saline differs from other IV fluids in two regards: it does not contain a buffer, and it has a higher chloride concentration.") (emphases added)).  The fact that the sodium chloride (salt) in the fluid was a solid before it was dissolved does not mean that it is a solid after dissolution.  And no reasonable scientist would refer to a saline solution (at room temperature) as a solid.  When sodium chloride dissolves in water, it becomes a liquid/fluid.

56.     ████████████████████████████████████████████████████ ████ (See Paragraphs 121-126, below).

57.     Co-solvents are mixtures of chemicals that together form a liquid/fluid that dissolves other chemicals (other solutes).  (*See* Exh. 24, Webster's Third New International Dictionary of the English Language Unabridged (2002) at pg. 514 ("Co-solvent: A solvent that in conjunction with another solvent can dissolve a solute.")).

58.     Thus, a POSA would recognize that a solute that is dissolved in a solvent can itself participate in dissolving other solutes – i.e., act as a cosolvent.  In a paper entitled "Solution in a Dissolved Solid," the authors state:

> … *a dissolved solid itself frequently acts as a solvent* or, if one prefers so to view it, alters the nature of the liquid in which it dissolves, the resultant solution becoming a true solvent with an entirely different freezing-point which is raised in the particular case under consideration.

18

(Exh. 25, Parsons, "Solution in a Dissolved Solid," The Journal Of Physical Chemistry, December 1, 1907, Volume 11, No. 9, Pages 659-680 (emphasis added)); *See also* Exh. 61, Yan, L., Gao, Z. "Dissolving of cellulose in PEG/NaOH aqueous solution," Cellulose, Vol. 15, pgs. 789–796 (2008) (https://doi.org/10.1007/s10570-008-9233-5) (Abstract: "Here, a new *solvent system* for cellulose is reported. *The solvent is a mixed aqueous solution of 1.0 wt.% poly(ethylene glycol) (PEG) and 9.0 wt.% of NaOH*.") (emphasis added)).

59. A POSA would also recognize that



is identified as a pharmaceutically acceptable fluid, on its own, and also in combination with the fluid PG. Propylene glycol is also identified as a fluid in the current patents-in-suit. (Exh. 26, Buxton-Deposition-Exhibit-22, U.S. Pub. No.: US 2013/0231357 Al at para. [27] ("In several embodiments of the invention, the pharmaceutical compositions include ████████. In other embodiments of the invention, however, the pharmaceutical compositions include a mixture of propylene glycol (PG) ████████

### C. Stability and Stability Testing

60. Once a formulation is created, it is tested for stability. Stability involves a study of how the drug molecule degrades over time and loses its own potency, while degradants increase. The FDA requires that drug products be tested for stability. (Exh. 81, 21 CFR 211.137(a)). This allows for assessment of drug strength and degradant levels over time.

66.    The addition of a hydroxide-containing excipient (█████████████ ████████ will raise the pH of a formulation above where it would have otherwise been.

67.    When acids and bases react, they neutralize each other, forming water (H+ reacts with OH- to form $H_2O$) and salts.  As an example when hydrochloric acid (aqueous) reacts with the base ████████████████████████████████████████ ██████

████████████████ █ ████████████████

(Exh. 6, Brown & LeMay, pg. 69).  (*See also* Exh. 79, "Considerations for Waiver Requests for pH Adjusters in Generic Drug Products Intended for Parenteral, Ophthalmic, or Otic Use Guidance for Industry" (2025) at pg. 6 ("Thus, a pH adjuster can become an indistinguishable part of the buffer.  For example, an acetic acid (CH3COOH) sodium acetate (CH3COONa) buffer may be created by mixing a ratio of these two ingredients in solution or by adding a sodium hydroxide (NaOH) pH adjuster to acetic acid.")).

### E.  Conservation of Mass

68.    It is a fundamental law of nature that matter cannot be created or destroyed.  (Exh. 6, Brown & LeMay, at pg. 61).  An ionic chemical that is added to a solution does not disappear when it dissolves.  It is still there, but it becomes solvated – i.e., its constituent ions dissociate and are surrounded by solvent molecules.  A base that is added to a solution and then reacts with an acid does not disappear.  It only changes form to the extent it reacts.  This will be pertinent when addressing plaintiffs' assertion that sodium hydroxide is "consumed" or "neutralized" when it encounters acid.  A POSA would understand that all of the atoms that were part of the original acid or base remain in solution.  Furthermore, adding ███████████████████████

22

███████████████████████████████████████████

████████

### F. PEG

**69.** Polyethylene glycol ("PEG") is a polymer. Each "weight" of PEG (e.g., PEG-400) indicates a product that has polymers of varying lengths (and weights) that have an average molecular weight indicated in the name of the product. The heavier PEGs are solids (Mw >1000). However, PEGs with relatively lower molecular weights are liquids/fluids (Mw <1000). PEG-400 is a commonly used liquid/fluid version of PEG.

**70.** PEG is known to contain certain acidic impurities that develop during manufacture. Amongst these impurities are acetic acid and formic acid. These impurities can vary from one manufacturer to another. PEG is also known to have other oxidative impurities. (*See, e.g.*, Exh. 28, Mary-Anne del Barrio et al., "Simultaneous determination of formic acid and formaldehyde in pharmaceutical excipients using headspace GC/MS", Journal of Pharmaceutical and Biomedical Analysis, Volume 41, Issue 3, 7 June 2006, Pages 738-743; Exh. 80, Hemenway, "Reactive Impurities in PEG: A Case Study", in Excipient Applications in Formulation Design and Drug Delivery (2012); Exh. 29, McGinity, "Influence of Peroxide Impurities in Polyethylene Glycols on Drug Stability," Journal of Pharmaceutical Sciences, Vol. 64, No. 2, pgs. 356-57) ("Higher molecular weight polyethylene glycols and polyethylene glycol esters, i.e., polyethylene glycol 400 …. all contained peroxides as impurities.")).

## V.    THE SLAYBACK NDA PRODUCT

**71.** Slayback's NDA Product Label states: "Each milliliter contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, 39.45 mg (5% v/v) of absolute alcohol, and q.s. to 1 mL polyethylene glycol 400." The Label

also identifies sodium hydroxide as an ingredient, stating: "Sodium hydroxide is used to adjust pH of polyethylene glycol 400." (Exh. 30, Vivimusta® Slayback NDA Product Label).

**72.**

And indeed the FDA lists sodium hydroxide as an inactive ingredient in its "Inactive Ingredients Database," which is available online at: https://www.accessdata.fda.gov/scripts/cder/iig/index.cfm?event=BasicSearch.page. Thus, the FDA recognized, as a POSA also would recognize, that sodium hydroxide is an "*inactive ingredient*" in the Slayback NDA Product. The term "inactive ingredient" is used in the pharmaceutical field synonymously with "excipient" and refers to chemicals in a pharmaceutical formulation that are not the active drug substance but are nonetheless part of the formulation. "Inactive ingredients" or "excipients" are not the same thing as degradants or impurities, which are unwanted chemicals in a formulation. (*See* Paragraphs 150-152, below).

24

25

**73.** ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████



---

[3] Normality (N) is a measure of the concentration of a solute (████████████████████ in a solvent ███████████  Normality represents the number of gram equivalents of a solute dissolved in one liter of a solution and is calculated by using the formula N = Number of Gram Equivalents/Volume of Solution (in liters).  To calculate Gram Equivalents, divide the actual mass of the solute (in grams) by the Equivalent Weight.  To calculate Equivalent Weight, divide

26



Both the Slayback Label and plaintiffs' expert Dr. Trout point this out:

> Like Belrapzo® and Bendeka®, Slayback's NDA Product is a sterile, liquid injectable anti-cancer drug product provided in a vial. Slayback's Label states that Slayback's NDA Product is "supplied as a *sterile, clear, and colorless to yellow solution* in a multiple-dose vial." EAGLEBEN-SA_00363932 (Slayback Label 12/2022) at -946-47;

---

the Molar Mass of the substance by its "n-factor". For acids and bases, the n-factor is the number of ions that it can donate. For example, ▮▮▮▮▮▮▮ it can donate one OH- so n = 1.

27

EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at -924.

(Trout Opening Report on Infringement at ¶ 179 quoting the Slayback Label (emphasis added)).

78. ████████████████████████████████████████████████

████████████ ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

## VI.  THE ANTIOXIDANT-FREE FORMULATION

79.  I have also reviewed Slayback's "Product Development Report" and related documents describing the Antioxidant-Free Formulation, which I understand is another formulation of bendamustine that Slayback has developed and the FDA has approved.

80. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

---

4  (Exh. 38, Bricker Depo. at pg. 29, lines 8-10, and pg. 95, line 24 to pg. 96, line 2).



## VII.   THE ASSERTED PATENTS

### A.   History of Eagle Patent Applications

81.   I review here the history of some of plaintiffs' Eagle's many patent applications.

82.   The patent applications that directly led to the '214 patent-in-suit and United States Patent No. 11,844,783 ("the '783 Patent"), were first filed in December 2022.  That was some 12 years after the original provisional application was filed (January 2010), but mere months after plaintiff Eagle lost a patent litigation asserting that Slayback's NDA Product infringed United States Patent No. 11,103,483 ("the '483 Patent") (Exh. 42).  The '483 Patent had a limitation requiring a "ready to use" composition of liquid bendamustine product, which the Slayback NDA Product (the same product accused in this case) was found not to infringe.

29

83.     When plaintiffs went back to the Patent Office in December 2022 they attempted to obtain claims that did not have the "ready to use" limitation from the '483 Patent.  The initial attempted claims also did not have the "pharmaceutically acceptable fluid consisting of" limitation either, which would later be added to obtain allowance of the claims-in-suit.

84.     The '214 and '248 patents-in-suit and the '783 Patent are related.  Although I understand that plaintiffs have now withdrawn the '783 patent from this case, an understanding of the application leading to the '783 patent (Application 18/081,238 – the '238 Application" (Exh. 43)) is important to the remaining two patents-in-suit, given the common patent application family, the common specification, the common claim limitations, and the amendments made during the prosecution of the application that led to the '783 Patent.  The following chart illustrates the inter-relationships between these patents and their immediate applications:



85.     While the graphic above represents the patent applications and "file histories" that led directly to the patents-in-suit, those applications trace back through many additional

30

applications to a provisional application filed in January 2010.  The face of the '214 patent-in-suit shows its lineage as follows:

(21) Appl. No.: **18/081,251**

(22) Filed: **Dec. 14, 2022**

(65) **Prior Publication Data**

US 2023/0115693 A1    Apr. 13, 2023

**Related U.S. Application Data**

(63) Continuation of application No. 17/412,623, filed on Aug. 26, 2021, which is a continuation of application No. 16/509,920, filed on Jul. 12, 2019, now Pat. No. 11,103,483, which is a continuation of application No. 16/015,656, filed on Jun. 22, 2018, now abandoned, which is a continuation of application No. 15/432,335, filed on Feb. 14, 2017, now Pat. No. 10,010,533, which is a continuation of application No. 15/013,436, filed on Feb. 2, 2016, now Pat. No. 9,572,797, which is a continuation of application No. 14/031,879, filed on Sep. 19, 2013, now Pat. No. 9,265,831, which is a continuation of application No. 13/016,473, filed on Jan. 28, 2011, now Pat. No. 8,609,707.

(60) Provisional application No. 61/299,100, filed on Jan. 28, 2010.

(Exh. 2, face of patent).

**86.**    In addition to the file histories discussed below, I have also reviewed what is called in this Opinion the "Abandoned Patent Application Publication."  (Exh. 27, Buxton-Deposition-Exhibit-9, Abandoned Patent Publication, U.S. Patent Publication No. 2013/0210879), and its related file history (Exh. 44, Abandoned Patent Application File History, U.S. Application 13/767,672 (filed February 14, 2013) ("the Abandoned Patent Application")).  This Abandoned Patent Application does not claim priority to the 2010 original application from which the patents-in-suit derive priority.  But it does relate to liquid bendamustine formulations, and has the same applicant, Eagle Pharmaceuticals, Inc., and shares two of its three inventors with the patents-in-suit.  Significantly, this patent application did attempt to patent the use of aqueous sodium hydroxide in a bendamustine composition.  However, that attempt was abandoned.  The current patents-in-suit do not claim or mention sodium hydroxide at all.

31

87.     I have also reviewed the file history (Exh. 45) for U.S. Patent Application No. 13 / 016,473 that led to U.S. Patent No. 8,609,707 ("the '707 Patent") – which is in the line of patent applications leading to the patents-in-suit.  During the prosecution of that patent, the applicants repeatedly explained that their inventions were "non-aqueous" and distinguished the prior art on that basis as well.  (*See, e.g.*, Exh. 45, Applicant's Response dated November 30, 2012, *passim*; Applicant Initiated Interview Summary, dated August 14, 2013; Applicant's Response dated September 4, 2013, *passim*).

88.     I have also reviewed another file history in the chain leading to the patents-in-suit – Application No. 14/031,879 ("the '879 Application") (Exh. 46), which became U.S. Patent Number 9,265,831 ("the '831 patent").  It was in that Application that antioxidant limitations were added as an amendment in response to a rejection.

### 1.   The '783 Patent Application – Appl. No.: 18/081,238

89.     The '783 patent derives from U.S. Application No. 18/081,238 ("the '238 patent"), which was filed on December 22, 2022.  The '238 Application (Exh. 43) initially presented 29 claims, including composition claims 1-27 and method of treatment claims 28-29. Representative claim 1 recited:

### CLAIMS

We claim:

1.     A ready for dilution, liquid bendamustine-containing composition comprising bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL; polyethylene glycol; and a stabilizing amount of an antioxidant.

Of note, this initial claim did not contain the "pharmaceutically acceptable fluid consisting of"

32

19.    The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and propylene glycol.

20.    The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and ethanol.

21.    The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and benzyl alcohol.

22.    The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and glycofurol.

## VIII.    <u>NON-INFRINGEMENT OF THE SLAYBACK NDA PRODUCT</u>

### A.  There Is No Infringement Because ███████████████████████████████████████████████████████████████████████

███████████████████████████████████

██  ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

122.    Indeed, in the related "Abandoned Patent Application Publication" – that also involved liquid bendamustine formulations, and was filed by the same applicant and shared the same two inventors of the patents-in-suit – Eagle Pharmaceuticals, Inc., and sharing two of same inventors as the current patents-in-suit – ████████████████████████████

████████████████████████

47

48





(*See, e.g.*, Exh. 27, Buxton-Deposition-Exhibit-9, '879 Abandoned Patent Publication at [0055] through [0067] and also Exh. 27, Buxton-Deposition-Exhibit-9, '879 Abandoned Patent Publication at Claim 30 (listing ████████████████████████████████████████ in the context of bendamustine formulations)).

123.   ████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
██████████████████████████████ (Exh. 49, Buxton-Deposition-Exhibit-26, U.S. Patent Publication 2009/0221622 (entitled "Topotecan Ready to Use Solutions") at [18] ("*a pharmacologically suitable fluid* comprising an *aqueous hydrochloric acid* [a pH adjuster] diluent …") (emphases added); Exh. 18, ████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

49

████████████████████████████████████████████████████████

███████████████████████

██   ████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████ (*See, e.g.*, Exh. 26, Buxton-Deposition-Exhibit-22 (entitled "Pharmaceutical

Compositions Containing Pemetrexed Having Extended Storage Stability") at [0026] ████

███████████████████████████████████████████████████████.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████ (emphases added);

Exh. 18, ██████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████

125.   The third inventor of the Abandoned Patent Application, ████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████

126.    A POSA would clearly understand that ███████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████

2.    ████████████████████████████████████████████████████

127.    As noted above, all of the claims-in-suit recite, or depend from claims that recite, the phrase: "a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol."[5]  That "consisting of" limitation was added by amendment to overcome rejections for obviousness in several file histories leading to the patents-in-suit.

128.    And as noted above, I understand that, with rare exceptions, a "consisting of" limitation forecloses infringement where additional components are in the accused product, but are not recited after the claim's "consisting of" language. ████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

---

[5] Asserted Claim 9 of the '214 Patent and Asserted Claims 11 and 15 of the '248 Patent also require ethanol in addition to PEG.  And Asserted Claim 11 of the '248 Patent requires PEG and also requires "one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol."

129.    For these reasons, there is no literal infringement of any of the Asserted Claims.

130.    Dr. Trout posits several responses to non-infringement of the "consisting of" limitation.  I address those arguments below.

**3.**

---

[6] *See, e.g.*, Trout Report on Infringement at pg. 18, ¶ 70, pg. 40-41 at ¶ 132; pg. 42, ¶ 135; pg. 68 ¶¶ 199-200; pg. 69 ¶ 202; pg. 70-71 ¶ 205; pg. 72 ¶ 207; pg. 75 ¶¶ 211-212; pg. 81 ¶ 224; pg. 95 ¶ 257; pg. 93 ¶ 258; pg. 102 ¶ 279; pg. 115 ¶ 318; pg. 118 ¶ 325; pg. 136 ¶ 383; pg. 139-140 ¶ 391.



And, as such, it is subject to the "pharmaceutically acceptable fluid consisting of" limitation. There is no infringement.

**4.** ████████████████████████████

████ ██████████████████████████████████████████████████

████████████████████████████████████████████████[7] and therefore is somehow not an ingredient in the Slayback NDA Product and is thus not to be considered in any non-infringement analysis. This is incorrect.

---

[7] *See, e.g.*, Trout Opening Report on Infringement at pg. 18 ¶ 70; pgs. 19-20 ¶¶ 73-76; pg. 75 ¶ 212; pg. 77 ¶ 217; pgs. 89-90 ¶ 250; pg. 90 ¶ 251; pg. 90 ¶ 252; pg. 92 ¶ 257; pg. 102 ¶ 278; pg. 120 ¶¶ 334-335; etc.

**138.** I am informed that there has been no claim construction argument that has been made by plaintiffs, and there is no ruling from the Court, that the ingredients must remain in the form they were added or they do not count for the claims. Therefore I understand that this argument may not be allowed as untimely. Furthermore, the claims do not use any terms like "unaltered" or "unchanged" or "unreacted" when they refer to various chemical components of the claimed formulations. Regardless, I address the argument substantively below.

**139.** A POSA would not adopt a claim construction that ignored deliberately added ingredients that subsequently undergo chemical reaction after being added. ███████████ ██████ is a purposefully added inactive ingredient in the Slayback NDA Product. ██████ ████████████████████████████████████████████████████ ████████████████████████████████████████ ████████████ ████████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████ ████████████████████████████████████ ████████████████████████████ More generally, the FDA identifies sodium hydroxide as an inactive ingredient in its "Inactive Ingredients Database" for intravenous injections and solutions, among other uses.

https://www.accessdata.fda.gov/scripts/cder/iig/index.cfm?event=BasicSearch.page:

| SODIUM HYDROXIDE | INTRAVENOUS | SOLUTION | 1310732 | 55X04QC32I | 2.78%w/v |
|---|---|---|---|---|---|

140.    The FDA's recognition of sodium hydroxide as an "inactive ingredient" is consistent with the understanding of a POSA that sodium hydroxide is routinely added to pharmaceutical compositions in solution as an excipient/ingredient.  (Exh. 51, Handbook of Pharm'l Excipients for Sodium Hydroxide, at "18. Comments" ("Sodium hydroxide is most commonly used in solution ….").  Further, a POSA would understand that the fact that sodium hydroxide may react, partially or wholly, in an acid-base reaction – what Dr. Trout refers to as neutralization or "effective consumption" – does not change the fact that it is an added ingredient.  pH adjusters, like sodium hydroxide, are understood by a POSA (and the FDA) to both (1) react in acid-base reactions, but nonetheless (2) to be ingredients in pharmaceutical products.  (Exh. 79, "Considerations for Waiver Requests for pH Adjusters in Generic Drug Products Intended for Parenteral, Ophthalmic, or Otic Use Guidance for Industry" (2025) at pg. 6 (showing that sodium hydroxide will react with acids to form buffers, but still calling it an excipient or ingredient).

141.    In that regard, a POSA would understand the claims to be referring to the initial ingredients.  A POSA would understand that ingredients that are added to a formulation may change chemical form or react with other chemicals in the formulation, but are still considered to be part of the formulation.  And such ingredients would still be identified by a POSA as the material that was added at the outset regardless of subsequent chemical changes.  A pharmaceutical formulator identifies those chemicals that will be added to a formulation in the same way that a chef will list ingredients in a recipe.  The fact that those ingredients may chemically change over time, due to chemical reactions in a pharmaceutical formulation or chemical changes during cooking in a recipe, does not change their status as ingredients from a definitional standpoint.

55

142.    pH adjusters like sodium hydroxide are understood to have long-lasting impacts on a formulation once added, again irrespective of subsequent chemical changes.  As this applicant and these inventors themselves noted in the related Abandoned Patent Application Publication, the addition of sodium hydroxide to a PEG-containing bendamustine formulation improves the stability of the bendamustine, stating:

> [0038]   Without meaning to be bound by any theory or hypothesis, polyethylene glycol quality can vary from batch to batch, manufacturer to manufacturer, over product lifetime and as a result of handling. Such variation has made it difficult to make reproducible long term storage stable bendamustine-containing formulations with high amounts of polyethylene glycol and propylene glycol, as the formation of PEG and PG esters is high. In order to obtain reproducible formulations, PEG is treated with an organic or inorganic compound to achieve the desired USP apparent pH. This treatment results in reproducible long-term storage stable bendamustine-containing compositions, with substantially no PEG or PG ester formation.

(Exh. 27, Buxton-Deposition-Exhibit-9, '879 Abandoned Publication at [0038]). ███

████████████████████████████████████████████████

████████████████████████████████  As the Abandoned Patent Application Publication states:

> Inorganic compounds include compounds known to those of skill in the art, including, but not limited to, salts of hydroxides and salts of phosphates, sodium formate, sodium phosphate, potassium hydroxide, and phosphoric acid. Most preferably, the inorganic compound is sodium hydroxide.

(Exh. 27, Buxton-Deposition-Exhibit-9, '879 Abandoned Publication at [0041]).  Thus, the deliberate addition of sodium hydroxide as an inactive ingredient has a long-lasting, beneficial impact on the stability of the entire formulation.

**143.** ███████████████████████████████████

███████████████████████████████████████████

███████



███████████████████████████████████

███████████████████████████████████

█████████████████████████████████

█████████████████████████████████

███████████████████████████████████

███████████████████

**144.** Additionally, as noted above, chemicals do not simply disappear during a chemical reaction. It is understood to be a law of nature that matter is neither created nor destroyed. This is known to chemists and scientists generally as the law of conservation of matter or mass. (*See, e.g.*, Exh. 6, <u>Brown & LeMay</u>, at pg. 61 ("More precisely, *atoms are neither created not destroyed during a chemical reaction*; they merely exchange partners or become otherwise rearranged."; Exh. 18, ████████████████████████ ███. For instance, sodium hydroxide is known to react with acetic acid to form a buffer system made of acetic acid and sodium acetate. (Exh. 79, Considerations for Waiver Requests for pH Adjusters in Generic Drug Products Intended for Parenteral, Ophthalmic, or Otic Use Guidance

for Industry" (2025) at pg. 6).  And, it is also known that acetic acid, and formic acid, are acidic impurities in PEG.  (Exh. 80, Hemenway, "Reactive Impurities in PEG: A Case Study", in Excipient Applications in Formulation Design and Drug Delivery (2012)).  And thus, a POSA would understand that the addition of sodium hydroxide to PEG would result in the formation of some amount of acetate and formate buffer systems.

145.  ███████████████████████████████████████████████

████████████████████████  As far as I can tell, Dr. Trout does not dispute that at all.

146.  Furthermore, even if one were to accept Dr. Trout's premise that sodium hydroxide should not be considered an ingredient after it reacts with an acid – which is incorrect – Dr. Trout nonetheless provides no evidence that the entirety of the added sodium hydroxide is, to use his words, "effectively consumed" in an acid-base reaction – i.e., that there is no excess sodium hydroxide in the Slayback NDA Product.  As any chemist knows, chemical reactions proceed in ratios of one reactant to another.  In this instance, each molecule of sodium hydroxide would, in theory, react with one molecule of an acid species that it encountered.  Because the amount of acid impurities will vary from one lot of PEG to another, there is no way to specifically know whether every molecule of sodium hydroxide that is added will have reacted with an equal amount of acid in the formulation.  As even inventor Dr. Buxton testified:

███████████████████████████████████████
███████████████████████████

███████████████████████████

147.  ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████      Similarly, the plaintiff's inventor, Dr. Buxton, ████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████

148.    Furthermore, the long-term beneficial impacts of sodium hydroxide on stability indicate that it has not disappeared or been "effectively consumed," but rather continues to have a long-term impact (likely through its presence and pH effects) on the entire formulation, including after bendamustine is added.

149.    For all the above reasons, sodium hydroxide is an inactive ingredient of the Slayback NDA Product; it does not disappear when it reacts with unknown amounts of acid in the PEG formulation, it supports the overall formulation's performance with regard to stability and solubility, and it must be considered in the infringement analysis.

**5.** ████████████████████████████████████

150.    Dr. Trout also argues that sodium hydroxide is an impurity, or t██████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████    This is also not correct.

151.    ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████    And, more generally, sodium hydroxide is also listed in the FDA

"Inactive Ingredient Database."  In recognizing sodium hydroxide as an inactive ingredient, the

FDA necessarily also distinguished sodium hydroxide from impurities and contaminants.  The

FDA, as well as a POSA, understands that "inactive ingredients" are not the same thing as

"contaminants" or "impurities."  The FDA website (https://www.fda.gov/drugs/drug-approvals-

and-databases/inactive-ingredients-approved-drug-products-search-frequently-asked-questions),

states:

> **8. Does the Inactive Ingredient Database include contaminants found in approved drug products?**
>
> No. The Inactive Ingredients Database does not include contaminants found in approved drug products.

152.    Other authorities also recognize – as a POSA would – that inactive ingredients

(excipients) are not impurities – and indeed the two are mutually exclusive categories.  (Exh. 53,

Pilaniya *et al.*, "Recent trends in the impurity profile of pharmaceuticals," J. Adv. Pharm. Tech.

Res., Vol. 1, Issue 3 pgs. 302-310 at 302 (July-Sept 2010) (defining impurity as: "Any

component of the drug product which is not the chemical entity defined as the drug substance or

an excipient in the drug product") (quoting from the ICH)); Exh. 19, Martin's Pharmacy, at pg.

610 ("Process or product-related impurities such as degradation products, leachates, residual solvents, or extraneous contaminants in pharmaceutical dosage forms are not considered excipients.  An excipient is a 'substance other than the active ingredient, which has been appropriately evaluated for safety and is included in a drug delivery system to: 1. Aid in the processing of the drug delivery system during its manufacture; 2. Protect, support, or enhance stability (formulation feasibility), bioavailability, or patient acceptability; 3. Aid in product identification; or 4. Enhance any other attribute of the overall safety and effectiveness of the drug during storage and use.'")).

**153.**



**154.**    Dr. Trout's argument that the reaction products resulting from any reaction between sodium hydroxide and an acid would be impurities is also incorrect.  First, the ingredient added is the ███████████████    Any subsequent reaction products are not the ingredient.  A POSA would consider ███████████████ to be the ingredient of interest.



Thus, even if the resultant reaction products were deemed impurities (which they are not), there is no

evidence that some of the added sodium hydroxide does not remain present and unreacted as well.  Third, the reaction of the sodium hydroxide with any acids in the formulation provides a long-lasting change in the properties of the formulation – an improvement in stability.  Thus, a POSA would not consider the reaction products impurities, but rather functional components of the formulation that improve its performance.  Fourth, pH adjusters are considered inactive ingredients in pharmaceutical formulations, even though they are known to react with acids or bases to some degree and form other chemicals.

**6.** ███████████████████████████████████

155.    Plaintiffs and Dr. Trout also argue that ████████████████████████████ ████████████████████████  Thus, they assert that the "unrelated exception" to "consisting of" applies.  This is not correct.

156.    As a first matter, the "consisting of" limitation modifies the phrase "pharmaceutically acceptable fluids" in the claims-in-suit.  ██████████████████

███████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████

███████████████████████████████

████████████████████████████

157.    And the applicants for the patents-in-suit explained to the Patent Office during the application process that the "pharmaceutically acceptable fluids" are directly tied to improved

stability of the bendamustine formulations – a key focus of the claims-in-suit.  (*See* Paragraphs 142-143, above).

158.   Applicants have also acknowledged that █████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████ ██████████████████████████████████████ ███████████████████████████████ ██████████████████████████████████ ████████████████████████████████████ ██████████████████████████████████████ ████    ████████████████████████████████████████ ███████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████████ ████████████████████

159.   █████████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████████████████████ ████████

160.   Thus, the addition of ████████████████████████████████████ ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████    The "unrelated exception" to "consisting of" does not apply.

### 7. "Fluids" are Not Limited to "Solvents" As a Matter of Claim Construction; ███████████████████████████████████████████.

161.    Plaintiffs and Dr. Trout also argue that "fluids" are limited to solvents in the patents-in-suit.  Dr. Trout then posits that, ██████████████████████████████ ██████████████████████████████████████.  Neither of these propositions is correct.

162.    First, I am informed that plaintiffs did not raise the claim construction argument that "a fluid is a solvent" during the claim construction / Markman phase of this case.  As a result, I am informed that plaintiffs may not be permitted to argue this claim construction at all. Nonetheless, to the extent plaintiffs are allowed to pursue this definition of "fluid," there are substantive reasons why this construction is incorrect.

163.    The claims do not use the word "solvent" anywhere.  The specification only refers to "solvents" in Example 1, and does not define "fluids" to be "solvents" in that Example.  Nor does the patent provide a definition of the word "fluid" anywhere, and certainly not one that equates fluids with solvents.  The only definition of a "pharmaceutically acceptable fluid" in the patent merely states:

> For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.

64

(Exh. 2, '214 Patent, Col. 2, lines 56-58; Exh. 3, '248 Patent, Col. 2, lines 53-55). This definition: (1) does not limit "pharmaceutically acceptable fluids" to solvents, and (2) does not define the word "fluid" at all, let alone as a solvent.

164. To the contrary, the patents-in-suit say explicitly that "pharmaceutically acceptable fluids" may or may not be solvents, stating:

> In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, *but is not necessarily, a solvent* for the bendamustine or salt thereof.

(Exh. 2, '214 Patent, Col. 3, lines 39-41; Exh. 3, '248 Patent, Col. 3, lines 35-37 (emphasis added)). This language makes clear that a "pharmaceutically acceptable fluid" need not be a solvent for bendamustine at all.

165. In support of his argument, Dr. Trout points to the fact that all of the fluids listed in claims (after the "consisting of" language) are also solvents of bendamustine; that the specification supposedly points to fluids that are solvents; and that the file history contains statements that refer to PEG and other fluids as solvents. And Dr. Trout repeatedly refers to fluids as solvents throughout his Opening Report.[8] This does not change the fact that the specification clearly states that the required "pharmaceutically acceptable fluids" can include non-solvents as well.

166. Dr. Trout attempts to get around this impediment to his argument by arguing in Paragraph 113 of the Trout's Opening Report on Infringement (at pg. 28), Dr. Trout attempts to limit the patent claims by observing that all of the recited fluids in the claims are solvents of

---

[8] *See, e.g.*, Trout Opening Report on Infringement at pg. 15, ¶ 58; pg. pg. 24, ¶ 103; pg. 25, ¶¶ 105-106; pgs. 26-27, ¶¶ 109-111; pg. 28, ¶ 113; pg. 29, ¶ 116; pgs. 29-31, ¶¶ 117-119; pg. 40, ¶¶ 130-131; pg. 41, ¶¶ 133-134; pgs. 42-43, ¶¶ 135-136; pg. 145-47, ¶¶ 139-144; pgs. 47-50, ¶¶ 145-155 (regarding the file histories); etc.; *passim*.

bendamustine.  From this, Dr. Trout concludes that the section of the specification stating that the fluids may or may *not* be solvents does not apply to the claims.  This is not correct.  As a first response, if the applicants wanted to limit the claims to only solvents, they could have used the word "solvent" in the claims. But the claims do not use that word and instead recite "pharmaceutically acceptable fluids."  A POSA would not read the claims to impose a limitation of solvents on the word "fluid" where none exists in the claims, and the word "fluid" does not have that limited meaning to a POSA.  (*See* Paragraphs 163-164, above).

167.    Moreover, there is no particular reason to characterize the specific fluids recited in the patent claim as "solvents" as opposed to "organic fluids" or "non-aqueous fluids" or "carriers" or "diluents" or "substances having melting points below room temperature."  The claims give no indication of how to group them.  A POSA would simply understand a "pharmaceutically acceptable fluid" to be a broad term encompassing fluids that are suitable – as the specification states.  (Exh. 2, '214 Patent, Col. 2, lines 56-58; Exh. 3, '248 Patent, Col. 2, lines 53-55) ("For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.")).  Nowhere in the patent claims or the specification does the term "fluid" get re-defined as "solvent" or as anything narrower than its general meaning to a POSA – a substance that flows freely.

168.    In paragraphs 117 and 137 of his Opening Report, Dr. Trout attempts to distinguish language in the patent that talks about what "is" the fluid (for certain very particular embodiments) from what is "included" in the fluid.  Dr. Trout's apparent point is that things that are dissolved in the fluid may be "included" in the fluid, but nonetheless they are supposedly not the fluid itself.  This appears to be a variant of the ███████████████████████     ███████  (*See, e.g.*, Trout Opening Report at ¶ 135 mixing these arguments).  As discussed above, ████████

66

██████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████ Dr. Trout's attempted linguistic distinction between what "is" the fluid and what is "included" in the fluid would not be accepted by a POSA who understands the definitions of fluids and dissolution from a chemical perspective. Further belying Dr. Trout's linguistic distinction based upon the word "included," is the Abandoned Patent Application Publication. That application – regarding liquid bendamustine formulations from the same applicants and two of the three same inventors – states that PEG and PG are "include[ed]" within the "pharmaceutically acceptable fluids" and sodium hydroxide is also "included":

> [0055]   Some more preferred formulations include:
> I. a) bendamustine or a pharmaceutically acceptable salt thereof; and
>    [0056]   b) a pharmaceutically acceptable fluid including
>       [0057]   i) polyethylene glycol and propylene glycol;
>       [0058]   ii) sodium hydroxide in an amount sufficient to obtain a pH of from about 6.5 to about 11 for the

(Exh. 27, Buxton-Deposition-Exhibit-9, '879 Publication at [0056] to [0058]). If Dr. Trout's linguistic distinction were correct – where the PEG (and PG) "is" the fluid, and the other ingredients (other than PEG or PG) are merely "included" in the fluid – the applicants would not have referred to PEG and PG as "included" in the fluid as well. Cleary the applicants did not use the word "included" in the very particularized manner that Dr. Trout now posits.

67

169.     A POSA would not understand the word "fluid" or the phrase "pharmaceutically acceptable fluid" – taken on their own – to be limited to those fluids listed after "consisting of." While the overall claim is limited, the word "fluid" refers to a broader category of chemicals that are fluids. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████

170.     In Paragraph 119 (at least) of Dr. Trout's Opening Report he argues that the specification separates out discussions of solvents from discussions of other excipients that serve different purposes, like pH adjusters and other solutes.  Of course, the passages in the patent specification that Dr. Trout cites as separating out "solvents" do not identify or define the fluids as solvents.  Further, although Dr. Trout refers to ████████████████████████████

██████████████████████████████████████     And the patents-in-suit also do not refer to any "pH adjusters" – let alone distinguish them from (or separate them out into separate paragraphs from) either "fluids" or "solvents."  Thus, Dr. Trout's assertion that the patent specification somehow separates different categories of excipients in different paragraphs, and in particular somehow separates solvents from sodium hydroxide and "pH adjusters" (where pH adjusters are not discussed anywhere in the patent) so as to define "fluids" as "solvents" is simply incorrect based upon examination of the patents-in-suit.

171.     In Paragraphs 119 and 142 of Dr. Trout's Opening Report, he argues that Example 1, Table 1 of the specifications of the patents-in-suit actually identifies a solvent of bendamustine.  This is the only time in the entire specification of the patents-in-suit that any of the claimed fluids are also referred to as a solvent.  Regardless, Example 1 does not say that all fluids are restricted to being a solvent.  The "solvents" identified in Example 1 and Table 1 are

68

only ethanol and "PG". Example 1 does not include PEG in its formulations, but all of the claims-in-suit require PEG. Thus, the formulations of Example 1 and Table 1 do not fall within the claims at all because they do not have the required PEG fluid. Moreover, several formulations in Table 1 containing ethanol and PG fail to meet stability requirements. Thus, a POSA would not look to Example 1 to limit the meaning of the phrase "pharmaceutically acceptable fluid" in the claims, which involve other formulations.

172. In Paragraphs 145-155, Dr. Trout argues that the file histories of the patents-in-suit support his view that fluids are limited to solvents. However, he cites no place in the file history where applicants stated that "pharmaceutically acceptable fluids are limited to solvents" or any similar language that defined "pharmaceutically acceptable fluids" in that manner, or in any manner. He cites no rejection of the Examiner that was overcome because of a distinction between a fluid that was a solvent (supposedly in the claim) and a fluid that was not a solvent (in the prior art). And no allowance was based on this supposed distinction. Dr. Trout cites nothing in the file histories that focuses on this supposed distinction between fluids that are solvents from those that are not. And my review of the file histories reveals no such definitions or distinctions. While the adjective "solvent" may be used occasionally to describe certain fluids, it is a passing mention of no apparent import to the outcome of the prosecution.

173. In sum, to the extent that Eagle is permitted to pursue this claim construction argument, I would disagree with Dr. Trout's conclusion and do not believe that the claim term "pharmaceutically acceptable fluid" should be limited to solvents. It is my understanding that the single most important aspect of any claim construction is the claim language itself. The claims do not use the word "solvent" anywhere; they use the words "pharmaceutically acceptable fluid." Clearly, the applicants were aware of the term "solvent," as they used it in Example 1.

But they chose not to include this word in the claims.  Additionally, the specification explicitly states that "pharmaceutically acceptable fluids" may or may not be solvents.  Thus, both the claim language and the specification strongly argue against Dr. Trout's proposed claim construction.  Furthermore, in the related Abandoned Patent Application and Publication, ███████████████████████████████████████████████████████.  Finally, any stray references to solvents in the file history do not constitute limiting language.  The file history references to solvents are simply places where particular fluids were described with the adjective solvent.  A POSA would not regard this as a reason to limit the clear language of the claims to solvents only.

174.    Even if "pharmaceutically acceptable fluid" is nevertheless construed to be limited to solvents of bendamustine, it still would not prove infringement.  As shown below,



175.    █████████████████████████████████████████████████████████

█████████████████████ (*See, e.g.*, Exh. 18, ████████████████████ ██████████████████████████

176.    PEG is also known to be water soluble.  (Exh. 19, <u>Martin's Pharmacy</u>, at pg. 498-99 ("The synthetic water-soluble polymers have also found extensive applications in pharmaceutical industries, among them polyethylene glycol …").

**177.** ████████████████████████████████████████████████████████████

other chemicals.[9]  And a POSA would also recognize that the combination of sodium hydroxide

with PEG is also a known solvent system.[10]

**178.** And, specifically for bendamustine hydrochloride solutions, the combination of

sodium hydroxide with PEG-400 creates a solvent system with improved solubility compared to

PEG-400 alone.  Using only PEG-400 as a solvent, bendamustine hydrochloride's solubility is

limited to 20 mg/ml. ████████████████████████████████



---

[9] *See, e.g.*, Exh. 62, Budtova, T., Navard, P. ███████████████████████ ████████ Cellulose 23, 5-55 (2016), ██████████████████████ Exh. 63. Li, Z., Mumford, K. A., Smith, K. H., Wang, Y., & Stevens, G. W., "Extraction of Phenol by Toluene in the Presence of Sodium Hydroxide," Separation Science and Technology, 49(18), 2913–2920 (2014), https://doi.org/10.1080/01496395.2014.952748.

[10] *See, e.g.*, Exh. 61, Yan, L., Gao, Z. ███████████████████████ ████████ Cellulose, Vol. 15, pgs. 789–796 (2008) (Abstract: "Here, a ██████████████████████████████████████ ███████████████████████████████████ (emphasis added).

And the patents themselves present only one Example of a PEG-only formulation which is limited to 20mg/ml.  (Exh. 2, '214 Patent, Col. 8, Example 3 ("Bendamustine-containing compositions were prepared by dissolving bendamustine HC1 to a concentration of 20 mg/ml in polyethylene glycol 400"); Exh. 3, '248 Patent, Col. 8, Example 3).

179.

180.

**181.** ██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████

**182.** Further, as discussed above (Paragraphs 77-78), ███████████████

██████████████████████████████████████████████████

███████████████████████████ That is to say, everything dissolves in everything else in these

formulations.  This shows that there is a solution where PEG ██████████████████████

█████████████████

**183.** Finally, Dr. Trout appears to argue that because ██████████████████

███████████████████████████ That is not true.  A POSA would understand that an

excipient can have more than one functional role in a formulation.  (Exh. 19, Martin's Pharmacy,

at pg. 610-14 ("Excipients, however, can have multiple functions, and like drugs, they can exert

pharmacologic and toxic effects.").  Thus, a POSA would know that the fact that an excipient has

one role (e.g., pH adjuster or solute) does not mean it cannot have another role (like solvent or

co-solvent).  (*See, e.g.*, Exh. 61, Yan, L., Gao, Z. ███████████████████████

██████████████" Cellulose, Vol. 15, pgs. 789–796 (2008) ██████████████████

██████ (Abstract: "Here, ████████████████████████████████████.

████████████████████████████████████████ (emphasis

added);  Exh. 62,  Budtova, T., Navard, P. █████████████████████████████

73

Cellulose 23, 5-55 (2016), ████████████████████████████ Exh. 63, Li, Z., Mumford, K. A., Smith, K. H., Wang, Y., & Stevens, G. W., "Extraction of Phenol by Toluene in the Presence of Sodium Hydroxide," Separation Science and Technology, 49(18), 2913–2920 (2014), https://doi.org/10.1080/01496395.2014.952748).  And the evidence in this case shows that █████████████████████████████████████████████████

### 8.  **Sodium Hydroxide is Not Subject to the "Comprising" Claim Language**

184.    Dr. Trout also argues that the addition of the inactive ingredient sodium hydroxide does not avoid infringement because sodium hydroxide is supposedly subject to the open-ended "comprising" claim language.  For instance, Dr. Trout states:

> Defendants list sodium hydroxide as an ingredient on their Label by name with a statement of effect, differentiating sodium hydroxide from the other components of their NDA Products, particularly the solvent system.  This separate treatment of sodium hydroxide on the label of each Defendant's NDA Product informs a POSA that *the sodium hydroxide* is not part of the pharmaceutically acceptable fluid, i.e. solvent, it *is a different component of the liquid bendamustine-containing composition that would be governed by the "comprising" in the preamble*.

(Trout Opening Report on Infringement at pgs. 75-76 at ¶ 213 (emphases added)).

185.    Dr. Trout's opinion emphasizes the arrangement of words in a Label over chemical fact.  ███████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████ (*See* Paragraphs 121-126, 47-48, and 51-56, above).

186.    Dr. Trout's opinion that sodium hydroxide should be "governed by" the "liquid comprising" language in the claim is also inconsistent with ███████████████ ████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████  For this reason, Dr. Trout's arguments do not make sense and I disagree with them.

187.    ████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████  Therefore, there is no infringement.

188.    To the extent plaintiffs argue that ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

189.    Further, such an argument would illustrate a broader problem with the claims-in-suit. ████████████████████████████████    ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████, the claim is contradictory.

### 9.  There Is No Infringement by Equivalents

190.    Dr. Trout also argues that even if there is no literal infringement, there would supposedly be infringement under the doctrine of equivalents.  In arguing this theory, Dr. Trout: (1) claims there is no estoppel despite the narrowing amendment that added "consisting of"; (2)

---

11 ████████████████████████████████████████████

████████████████████████████████████

claims that even if there is a presumption of estoppel, the amendment is tangential and estoppel does not apply. And applying the doctrine of equivalents, Dr. Trout argues that a combination of PEG and NaOH should be considered an equivalent to PEG alone.[12] I disagree with all of these assertions.

191.    With respect to estoppel, I am informed that a narrowing amendment made in response to a rejection for reasons of patentability leads to a rebuttable presumption of estoppel. I also understand that such narrowing amendments can lead to estoppel when made in the file histories that directly lead to the claims-in-suit or when made in related file histories in the chain of applications that lead ultimately to the claims-in-suit. My review of the file histories of the patents-in-suit (the '251 application that led to the '214 patent-in-suit, and the '171 application that led to the '248 patent-in-suit), and the '283 application (which led to the '783 Patent) reveals that the "pharmaceutically acceptable fluid consisting of" limitation was added by amendment after rejections for patentability over prior art. (*See* Paragraphs 92, 105, 106, above). I thus conclude that a rebuttable presumption of estoppel should apply.

192.    With respect to Dr. Trout's assertion that any presumption of estoppel is rebutted because the amendments were supposedly only tangential to the accused equivalent, I disagree. Accepting for purposes of this argument that the accused equivalent is "PEG ▮▮▮▮▮▮ ▮▮▮▮▮▮" that accused equivalent is certainly related (not tangential) to the reasons for the amendment, which limited the claim to require PEG fluid. At a basic level, all of these ("PEG ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ or PEG) are pharmaceutically acceptable fluids, and the amendment related to pharmaceutically acceptable fluids. The alleged equivalent is not tangential to the amendment.

---

[12] *See, e.g.*, Trout Opening Report at pg. 111 ¶¶ 306-308.

**193.**     When PEG was found in the prior art with bendamustine, the applicants argued, *inter alia*, that the prior art did not disclose PEG alone but in combination with polar aprotic solvents.  (Exh. 47, '251 Application, Jun 14, 2023 Response at 5-6) ("Drager teaches that each of its formulations must include some amount of polar aprotic solvent.  While Drager references that polar protic solvent may be used, that is only ***in addition to, not instead of***, the polar aprotic solvent.  Drager fails to disclose or suggest any bendamustine formulations with solvent systems composed of protic solvent in the absence of any aprotic solvent.").  Thus, supposedly to distinguish the prior art, applicants narrowed the claims with the "consisting of" language to only require PEG (and to only allow certain other recited optional other fluids).  The narrowing amendment related to limiting the fluids that can be combined to a single required fluid.  The alleged equivalent here █████████████████████████████████████████████ ████████████████████████████ it is not a fluid that is listed as either required or optional under the "consisting of" limitation.  It is related (and not tangential) to the amendment limiting those fluids.

**194.**     More generally, the amendment relates to which "pharmaceutically acceptable fluids" constitute the claimed invention.  Whether the accused equivalent is ████████████ ███████████████████████████████████████████████████ both are "pharmaceutically acceptable fluids" and thus both relate to the focus of the amendment (what "pharmaceutically acceptable fluids" constitute the claimed invention).  Therefore, I do not believe that the tangentiality exception to estoppel applies and plaintiffs should not be allowed to argue doctrine of equivalents at all.

**195.**     Further, ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████

196.    To the extent that plaintiffs are allowed to argue the doctrine of equivalents, I do not believe that there is infringement by equivalents on the merits.

197.    As a first matter, the comparison that Dr. Trout chooses to make seems to be the wrong comparison.  Instead of comparing the actual inactive ingredient that Slayback adds

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████  ████████████████████████████████████████████

███  ███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[13] *See, e.g.*, Trout Opening Report at pg. 19, ¶ 76, and 92, ¶ 257.
[14] Trout Opening Report at pg. 104 ¶ 285 █████████████████████████████████
████████████████████████████████████████████████████████████

78

██████████████████████████████████████████████████████████

███████ if anything.

**198.** ████████████████████████████████████████████

███████████████████████████████████████████

████    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

> As shown in FIG. 1 (Table 1), the sample, which did not include NaOH, did not provide long term storage stability. …
>
> It was determined that the cause of the excess ester formation was the PEG.

(Exh. 27, Buxton-Deposition-Exhibit-9, Abandoned Patent Publication, '879 Publication at [0127]).

**200.** ████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████

**201.** Thus, even if one should compare "PEG + NaOH" with PEG alone for a doctrine of equivalents analysis – which I do not agree with – the two have a different "result" – stability versus instability. And thus there would be no equivalents under the "function way result" analysis, because the "result" is not the same.

**202.** Additionally, the "way" that "PEG + NaOH" contributes to stability is different from how "PEG" alone impacts stability. ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████

**203.** Additionally, "PEG + NaOH" is substantially different from PEG alone. ████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████████████



There is no infringement under the doctrine of equivalents.

### B. There Is No Infringement – ███████████████ In The "Pharmaceutically Acceptable Fluid Consisting Of" Limitation

206. ████████████████████████████████████████

████████████████████████████████████████

██████ ████████████████████████████ Dr. Sundaram (a co-inventor of the Abandoned Patent Application) █████████████████████████

████████████████████████████████ *see also* Exh. 10, <u>Oxford Thesaurus of English</u>, (3rd Ed. 2009) at pg. 341 (█████████████████████

██████████████████████████████ (emphasis added); Exh. 26, Buxton-Deposition-Exhibit-22 at pg. 2 [0027] (in a patent application from the same inventors for the patents-in-suit, but for a different drug pemetrexed, they state: ██████

████████████████████████████████████

█████████████████████ (emphasis added); Exh. 64, Buxton-Deposition-Exhibit-24, US Patent Application Publication 2014/0135299 Al ("Enema Composition For Treatment Of

Dated: March 16, 2026                          _Patr D. Sith_____

# Exhibit 4
# Filed Under Seal

# Exhibit 5
# Filed Under Seal

# Exhibit 6
# Filed Under Seal



**Planet Depos**

We Make It *Happen*™

# Transcript of Patrick Sinko, Ph.D.

**Date:** April 16, 2026

**Case:** Eagle Pharmaceuticals, Inc., et al. -v- Slayback Pharma/Azurity Pharma

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

----------------------------------------x
EAGLE PHARMACEUTICALS, INC. and
EAGLE SUB1 LLC,

          Plaintiffs,

    -against-    C.A. No:
              24-65-JLH (CONSOLIDATED)


SLAYBACK PHARMA LLC and AZURITY
PHARMACEUTICALS, INC.,

          Defendants.
----------------------------------------x

    VIDEOTAPED DEPOSITION of PATRICK SINKO, Ph.D., taken by the Plaintiff, pursuant to Notice, held at Le Meridien Hotel 120 West 57th Street New York, NY 10019, on April 16, 2026, at 9:06 a.m., before a Notary Public of the State of New York.

**********************************************

---

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Patrick Sinko, Ph.D. | Marc Zubick | 5 |

EXHIBITS

| SINKO | DESCRIPTION | PAGE |
|---|---|---|
| Ex. 1 | Expert Report of Dr. Patrick Sinko Regarding Non-Infringement | 17 |
| Ex. 2 | EAGLEBEN-Sa_00363910-931 | 26 |
| Ex. 3 | EAGLEBEN-Sa_00363932-953 | 27 |
| Ex. 4 | EAGLEBEN-Sa_00361850-855 | 48 |
| Ex. 5 | EAGLEBEN-Sa_00002115-127 | 62 |
| Ex. 6 | Handbook of Pharmaceutical Expedients Excerpts | 65 |
| Ex. 7 | Slay-Vivmus0010979-080 | 85 |
| Ex. 8 | Slay-Vimus0000472-474 | 99 |
| Ex. 9 | Slay-Vivmus0000012-017 | 107 |
| Ex. 10 | Slay-Vivmus0000243-321 | 109 |
| Ex. 11 | Slay-Vivmus0000691-728 | 117 |
| Ex. 12 | Cellulose Document | 120 |
| Ex. 13 | Article Entitled Extraction of Phenol By Tolune in the Presence of Sodium Hydroxide | 127 |
| Ex. 14 | Article Entitled Solubility of Organic Hydrochlorides By S.F. Kramer and G.L. Flynn | 135 |
| Ex. 15 | Ich Guidelines For Elemental Impurities | 141 |
| Ex. 16 | Slay-Vivmus0001899-927 | 147 |

(Exhibits retained by Reporter.)

---

APPEARANCES:

LATHAM & WATKINS
    Attorneys for Plaintiff
    330 North Wabash Avenue, Suite 2800
    Chicago, IL 60611

BY:    MARC N. ZUBICK, ESQ.
    marc.zubick@lw.com
    KELLY ANNE WELSH, ESQ.
    kelly.welsh@lw.com

WINDELS MARX LANE & MITTENDORF, LLP
    Attorneys for Defendant
    156 West 56th Street
    New York, NY 10019

BY:    JASON A. LIEF, ESQ.
    jlief@windelsmarx.com

ALSO PRESENT:

NAADIRAH MOORE-Videographer

---

    THE VIDEOGRAPHER: Please stand by. Here begins media one in the video deposition of Dr. Patrick Sinko in the matter of Eagle Pharmaceuticals Inc. et al. V Slayback Pharma/Azurity Pharmaceuticals, Inc., in the United State District Court for the District of Delaware, case number 24-65-JLH. Today's date is April 16, 2026. The time on the video monitor is 9:06 a.m. The videographer today is Naadirah Moore representing Planet Depos, headquartered at 451 Hungerford Drive, Suite 400, Rockville, Maryland, 20850. The video deposition is taking place at 120 West 57th Street, New York, New York, 10019.

    Would counsel please voice identify themselves and state whom they represent, and if you haven't, please clip your mic to your chest.

    MR. ZUBICK: Marc Zubick from Latham and Watkins, representing plaintiff. With me is my colleague, Kelly Welsh.

    MR. LIEF: Jason Lief from Windels Marx, on behalf of the defendant and the witness.

    THE VIDEOGRAPHER: The court reporter

Transcript of Patrick Sinko, Ph.D.
Conducted on April 16, 2026

12 (45 to 48)

---

45

through a USP or whatever, and so they set those based on the product, and that's why they have these expert advisory boards or commissions that looks at all those -- looked at all those factors to determine if it is or not, you know. And that's why you have these monographs.

Q.    Acids release hydrogen ions when they're dissolved in water, right?

MR. LIEF:  Objection to the form.

A.    Yeah.  Typically, when you measure pH, you're measuring that.  That's correct.

Q.    Bases release hydroxide ions when they're dissolved in water, correct?

A.    Yes.  At the most basic level, that's correct.

Q.    He said based on your high school level of chemistry, that's correct.  He did not say that.

A.    Paraphrasing.

Q.    PH is the negative logarithm of the hydrogen ion concentration, correct?

A.    That's correct.

Q.    When a solid dissolves in a liquid, the resulting solution is homogenous, correct?

A.    If a solid is completely dissolved in a liquid and you get a true, you know, molecular dispersion, then it is considered to be homogenous, that's correct.

---

46

That's one type of solution.

Q.    When a solid is completely dissolved, it doesn't result in a phase change, correct?

MR. LIEF:  Objection to the form.

A.    Well, when a solid is dissolved -- once again, same thing, if's completely dissolved, it's a single phase.

Q.    But the solid itself doesn't become a liquid, does it?

A.    At the molecular level, it becomes part of a liquid, yes.  It's fully dissolved -- it's a true molecular dispersion, and that liquid would, as you said, would be homogenous, and so would become part of it, that's correct.

Q.    So your testimony is that when a solid dissolves in a liquid there is a phase change, correct?

MR. LIEF:  Objection to the form.

A.    No.  I said if it's completely dissolved, you now have a single phase.

MR. LIEF:  If I might, I think both of you are using the word "phase" differently.

Q.    I'm going to ask one more time, make sure I get the answer.  Is there a phase change when a solid dissolves in a liquid?  Yes or no?

MR. LIEF:  Same objection to form.

---

47

A.    Well, if you're taking a solid and putting it into a liquid, that's two phases.  When it fully dissolves, okay, which is what you said it does, then you now have a single phase.  So is it a phase change? It's a phase change for the solid, but once it's dissolved, it's all just part of that liquid or fluid or whatever it is.

Q.    Okay.  So your testimony is, that when you dissolve a solid in a liquid, as to the solid, there is a phase change; is that right?

A.    It's going from a solid to a liquid, that's correct.

Q.    What's the difference between melting and dissolution?

A.    Well, I mean, some people make analogies to it, meaning that when you melt something, you are -- are, to, let's say thermal energy or whatever, you're taking, let's say closely packed molecules and you're allowing them to now flow more freely, and it depends of course, what temperature you get to and whatever.  And so from that perspective, melting is akin because of its inducing flow.

Q.    Right.  So you use the word "akin" in your expert report as well.  But do you believe melting and dissolving are the same thing?

---

48

A.    Well I never thought of it that way, because to me they're two different processes that have both, in essence, induce flow.  If you took a tablet and put it in a glass of water and dissolved it, I would not call that melting.

Q.    And if you took salt and dissolved it in water, you wouldn't say the salt has melted, correct?

A.    No, I would not.

Q.



(Whereupon, EAGLEBEN-SA_00361850-855 was marked as Sinko Exhibit 4, for identification, as of this date.)

BY MR. ZUBICK:

Q.    Dr. Sinko, you've been handed Sinko Exhibit 4, which is United States Patent 8722814.  Do you see that?

---

49

A.   Yes, I do.

Q.   And did you review this patent in your review of Dr. Trout's expert reports?

A.   I don't recall doing so.

Q.   Do you know the difference between an issued patent and a patent application?

A.   Yes, I am generally aware.

Q.   What's your understanding?

A.   Well, when a -- when an applicant applies for a patent, they're given a certain amount of time to, I guess, apply for the full patent. And you know, the -- I don't remember the exact time of year or something, but they will publish a patent application. It doesn't mean the patent, if it's been published, would issue or become the full patent.

Q.   Now you cite to a number of patent applications in your expert report. Do you recall that?

A.   Yes, I do.

Q.   And did you look into whether all of those applications issued as patents?

A.   I would say that I -- it was not a primary objective of what I was doing, but I would see -- I don't remember which ones did or didn't, but -- but I was aware that some did, in that -- kind of that patent tree. But there's a lot more patents than even was in

50

that patent tree than in my report. So I would say it was not the primary focus of what I was doing.

Q.   Okay. Do you see on the Exhibit 4, on the top left there's an assignee listed. It says Croda International?

A.   Yes, I do.

Q.   And you see there's a PCT date, line 87, November of 2008?

A.   Oh, I see. Line 87, yes, I do.

Q.   So this would have been available before the priority date of the patents-in-suit, right?

A.   That's correct.

Q.   Can I just have you turn to the first page, and you see there's a column 2.

A.   Yes, I see column 2.

Q.   And do you see around line 4, there's a sentence, "the reaction proceeds." Can you read that sentence to yourself. Let me know when you're ready.

A.   Yes, I see that sentence.

Q.   And it mentions a base catalyst to drive the reaction that's being discussed, correct?

A.   Yes. At line five it does say that.

Q.   And at line 18 it mentions that suitable catalysts include alkaline metal. Do you see that?

A.   Yes, I do.

51

Q.   And sodium is an alkaline metal, correct?

A.   That's correct.

Q.   And in fact, in the next line, it actually calls out particularly NaOH, correct?

A.   Yes, it does.

     MR. ZUBICK:  You can put that aside.

Q.   Now we were discussing PEG 400 before. We can agree that PEG 400 is known to contain acetic acid and formic acid, correct?

A.   So acetic acid and formic acid are impurities. Are they in every grade of PEG 400, I'm not sure. But I do know they can exist.

Q.   Okay. You make a good point. When you talk about impurities like formic acid, they may not be in every batch of PEG, but they are known that they can arise in certain PEGs, correct?

A.   Yeah, I believe so.

Q.   Are acetic acid and formic acid as they would appear in PEG toxic?

A.   I have not studied that. I would assume that since it's used as an approved ingredient in pharmaceutical formulations, and I have not seen required purification steps in anything I've reviewed, I would assume at those levels that they are.

Q.   That they are or not?

52

A.   That they are safe.

Q.   And yet you consider acetic acid and formic acid to be impurities in PEG, correct?

A.   Yes. I believe that they are -- they are considered impurities.

Q.   Now you agree that adding sodium hydroxide to PEG will result in the sodium hydroxide reacting with the -- the acidic impurities we just discussed, correct?

     MR. LIEF:  Objection to form.

     Incomplete hypothetical.

A.   Well, the -- yeah, sodium hydroxide is a strong base. Acetic, formic acids are, you know, weak acids, and so, yeah, they will react and you'll get some sort of kind of buffer formed -- buffer salts -- yeah, buffer components formed.

Q.   When you put sodium hydroxide into PEG, PEG is the solvent and sodium hydroxide is the solute, correct?

A.   Can you repeat that?

Q.   Yes. When you put sodium hydroxide into PEG, PEG is the solvent and sodium hydroxide is the solute, correct?

     MR. LIEF:  Objection to form.

A.   So I think the whole solvent-solute issue, from my perspective, at least, if I'm teaching undergraduate chemistry, you know, it's convenient for me to first

Transcript of Patrick Sinko, Ph.D.
Conducted on April 16, 2026

77

A.    Yes, I see that.

Q.    And so I can see that you're reading. And what it says in the first sentence there is that, the USP describes PEG as being ethylene oxide and water, right?

MR. LIEF: Objection.

A.    It says in addition polymer of ethylene oxide and water, that is correct.

Q.    Can you go to the entry for propylene glycol, please. Propylene glycol is another of the optional solvents listed in claims in the asserted patents, right?

A.    Propylene glycol is listed as one of the optional ingredients, that's correct.

Q.    And if you look under the functional category, which is section 6, it includes water miscible co-solvent, right?

A.    That is correct.

Q.    It also, to the left of that, lists solvent, correct?

A.    That is correct.

Q.    And that's consistent with your experience in pharmaceutical formulation?

MR. LIEF: Objection to form.

A.    Yes, it is.

Q.    If you look at Section 9, pharmaceutical

78

specifications, there are specifications for the amount of water for three different compendia, correct?

A.    What section?

Q.    Section 9, on the right-hand column. There's an entry for the water specification in all three pharmacopeial specifications, correct?

A.    Oh, there it is. Yes, there is.

Q.    So for every single one of the ingredients listed after the consisting of, they're listed as having solvent as one of their functional categories in the Handbook of Pharmaceutical Excipients, correct?

A.    It is correct that that's one of the functional categories that it lists in the Handbook.

Q.    Okay. Now, if you go back to the Handbook of Pharmaceutical Excipients, the last entries for sodium hydroxide, do you see that?

A.    Yes, I see that.

Q.    And you cited to this -- I believe you used a different edition, but you cited to the Handbook of Pharmaceutical Excipients for sodium hydroxide in your expert report, correct?

A.    Yes, I did. I thought it was the sixth edition, but --

Q.    It may be -- I --

MR. ZUBICK: Do you know?

79

Q.    We'll check. I want to get that straight.

So if you look at Section 6, it says "functional category," and it says alkalizing agent and buffering agent, correct?

A.    I do see that.

Q.    What's an alkalizing agent?

A.    You know, we've been using the term pH adjuster, so the pH adjuster.

Q.    And that's consistent with your experience, correct, that that's how sodium hydroxide is used in pharmaceutical applications?

MR. LIEF: Objection to the form.

A.    Well, I -- you know, I see, you know, these two functional categories as I think it's used in both ways. I also see at least two others ways that it's used that's not listed in the Handbook, and like I said, Handbook doesn't list all of the functions, but there are other functions for sodium hydroxide as well.

Q.    Okay. But at least the two that are listed here, those two are consistent with your experience, correct?

MR. LIEF: Objection to the form.

A.    Well, those two are consistent with my experience, but the ones that are not listed are also consistent with my experience as well.

80

Q.    Understood. But in your experience, sodium hydroxide is used for at least those two purposes, correct?

MR. LIEF: Same objection.

A.    For at least those two purposes, sure.

Q.    By the way, do you see the pharmacopeial specification for sodium hydroxide in number 9?

A.    Yep, I see number 9.

Q.    Would you consider those impurities?

A.    Well, things like, yeah, mercury, heavy metal, I mean, these are concerning elements for sure, yeah.

Q.    Would you consider them impurities?

A.    I would say they're impurities.

Q.    So if you add the NaOH to your pharmaceutical formulation, and it brings the mercury along with it, the mercury is an impurity as you understand that term, correct?

A.    Yeah, I believe so. I think with the same, you know, caveat I gave before. I mean it's, you know, it's -- you know, heavy metals or mercury, are -- you know, could be potentially toxic, and so they would be considered, I think an impurity.

Q.    So for the record, I was incorrect. You did cite the sixth edition. So this should be the same one you cited. I apologize for that misunderstanding.

**81**

Going back to the discussion of impurities we were having, does the mercury need to reach a toxic level to be considered an impurity when it comes along with the intentionally added NaOH, under your understanding?

MR. LIEF: Objection to the form.

A.    No.  In fact, if it -- you know making assumptions here about how the -- how these specs were derived, I don't know how they were derived.  But basically, you know, someone, some group, some advisory group determined that, you know, you need to keep them below these thresholds to be an acceptable product, that meets those specifications.  That's a kind of purity standard.

Q.    Right.  But are you defining whether something is an impurity by whether or not it is below or above these thresholds?

A.    No.  I think -- I think if they're listed here, these are impurities, but the specification of this monograph is saying they need to be at or below that level, you know, to get the certification of JP15 or et cetera.

Q.    Can you turn to the next page, and there's an item 10, typical properties?

A.    10.

**82**

Q.    Yep.

A.    I see that.

Q.    And it says that the melting point is 318 degrees celsius.  Do you see that?

A.    Yes, I do.

Q.    Any reason to disagree with that?

A.    No.

Q.    ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

MR. ZUBICK:  Okay.  Why don't we take a break?  It's been about an hour.

THE VIDEOGRAPHER:  We are going off the record.  The time is 11:21 a.m.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER:  Everybody stand by.  We are back on the record.  The time is 11:32 a.m.

BY MR. ZUBICK:

Q.    Welcome back, Dr. Sinko.

**83**

A.    Thank you.

Q.    Can you give Exhibit 5 back in front of you?  And that and -- that's the one.  That is one of the patents-in-suit, right?

A.    That's correct.

Q.    And it's the '214 patent, specifically.  Can you go to column 6, and there's a line 30.  Let me know when you're there.

A.    Line -- yes, I'm there.

Q.    Okay.  And read that paragraph to yourself and let me know when you're ready.

A.    Okay.

Q.    And this is talking about the amount of fluid necessary, correct?

MR. LIEF: Objection to the form.

A.    Let's see.  He says for the purposes of this embodiment, the amount of fluid, which is sufficient, so yes, it seems that way.

Q.    And the amount of fluid that's sufficient is the amount which allows the bendamustine to be dissolved or dispersed, right?

MR. LIEF:  Object to the form.  Incomplete.

A.    Right.  It says which allows the bendamustine to be dissolved or dispersed to a degree which renders

**84**

it ready to use.

Q.    Now in your experience, when you're infusing a pharmaceutical formulation, it needs to be a solution, not a dispersion, correct?

A.    Go back to the beginning of what you said?  When it's --

Q.    In your experience, when you're infusing a pharmaceutical formulation, it generally needs to be a solution, not a dispersion, correct?

A.    So you're saying when you're giving it intravenously.

Q.    Correct?

A.    When you're giving it intravenously, it could be a solution, it could be a colloidal dispersion, or it could be suspension as well.  It could have particles.

Q.    But when you're giving -- when you're giving it by IV injection, certainly you need enough fluid to dissolve or disperse the bendamustine, correct?

A.    To dissolve or disperse, yeah, I think that would be true, right.  Either you want to have it completely in solution or you want to have it dispersed so that, you know, it could be administered IV.

Q.    It could be very dangerous to have particulates for IV infusion, correct?

MR. LIEF:  Objection to the form.



**137**

A.    Yes, absolutely.

Q.    And you said absolutely. This is a -- one of the leading journals in pharmaceuticals, right?

A.    Yeah, it -- historically, it's one of the originals, for sure.

Q.    If you look at the abstract, what this paper is talking about is the solubilities of two organic hydrochloride drugs as a function of pH, temperature and solvent, correct?

A.    So, since I have not possibly seen this in like forever, I just need to at least take a look at this.

Q.    Please do.

A.    Okay. Well, I've at least looked at the abstract, so I have to look at the rest of the manuscript.

Q.    So they're looking at three different variables, one is pH, one is temperature, and one is solvent composition, correct?

A.    That is correct.

Q.    And those are different variables that you're familiar with in the course of your work in pharmaceutical formulation, correct?

A.    Yeah, I think that that's fair.

Q.    Each of those three variables can affect solubility in pharmaceutical formulation, correct?

**138**

A.    They can all affect, but also I think it's important to note that they're also not just in isolation, right. So -- but yeah, they all can affect and combinations of them can affect and it's a bit more complicated.

Q.    Can you turn to the second page, there's an experimental section. And specifically there's a subheading that says "solubility determination." Do you see that?

A.    Yes. Let me just take a second to review.

Q.    Please. Let me know when you're ready.

A.    I went to the first paragraph of solubility, I'll see where you go, before I read the entire paper.

Q.    Yeah, it's going to be a softball. The pH was adjusted in the experiments described in this paper, by using either hydrochloric acid or sodium hydroxide, correct?

A.    That is correct.

Q.    Okay. NaOH is not described as a solvent there, correct?

A.    They don't describe it as a solvent there.

Q.    They do describe three other solvents, correct -- four other solvents, correct?

MR. LIEF: Objection to the form.

Q.    The authors describe four solvents in that

**139**

paragraph, correct?

MR. LIEF: Same objection.

Q.    I'm being told it's the prior paragraph.

A.    Yeah, I'm not seeing it, sorry. I see where it says water or a mixed solvent.

Q.    Yeah. Can you look at the section chemicals, which is one paragraph above. And in that paragraph, the authors describes "the solvents" and they name four different solvents, correct?

A.    Yes, I see that there.

Q.    Can you turn to paragraph 136 of your expert report, please?

A.    Sure. I'm there.

Q.    Okay. In paragraph 136, it's the second sentence:

**140**

A.

MR. ZUBICK: All right. Let's take a break.

Transcript of Patrick Sinko, Ph.D.
Conducted on April 16, 2026

36 (141 to 144)

---

**141**

THE VIDEOGRAPHER: Stand by. We're going off the record. The time is now 1:56 p.m.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER: Stand by. We are back on the record. The time is now 2:12 p.m.

BY MR. ZUBICK:

Q. Welcome back, Dr. Sinko.

A. Thank you.

Q. You've been handed Exhibit 15. Do you recognize Exhibit 15?

A. I think I do. I think it might be something Dr. Trout referred to.

(Whereupon, ICH Guidelines for Elemental Impurities was marked as Sinko Exhibit 15, for identification, as of this date.)

BY MR. ZUBICK:

Q. So these are ICH guidelines for elemental impurities. Do you see that?

A. Yes, I do.

Q. Are you familiar with ICH guidelines?

A. Yes, generally speaking.

Q. What is ICH?

A. It's a harmonization organization that

---

**142**

basically tries to, or, you know, harmonize methods and protocols across organizations, you know, around the world, you know, basically, for a variety of different things.

Q. Including pharmaceutical formulation, correct?

A. Yeah. Actually that's the only one I'm really familiar with, so, yeah.

Q. And you're familiar with elemental impurities in the course of your work as a pharmaceutical formulator, correct?

A. Yes. It's not my focus, but I'm generally aware of it, yes.

Q. Can I have you turn to page 6, there's a section 5.2. Let me know when you're there.

A. Sure. I'm here.

Q. And this is describing, as it says, broad categories of potential sources of elemental impurities, correct?

A. Oh, yes. I see that.

Q. And the first category is:

"Residual impurities resulting from elements intentionally added, for example catalysts, in the formation of the drug substance, excipients or other drug product components."

---

**143**

Correct?

A. That's correct.

Q. Next category of potential sources of elemental impurities in drug products are those that are:

"Not intentionally added and are potentially present in the drug substance, water or excipients used in the preparation of the drug product."

Correct?

A. That is correct.

Q. And then the final two categories are impurities that come from either the manufacturing equipment or the container closure systems, correct?

A. That is correct.

Q. Do you disagree with anything that we just looked at in section 5.2?

MR. LIEF: Objection to the form.

A. Well, I mean in terms of the context of, you know, the ICH guideline and then listing, you know, for their purpose of what they're trying to do here, potential sources, I don't disagree.

Q. Okay. Do I take from that answer that they have a different purpose in pharmaceutical formulation than you do?

A. Well, I think their purpose is much more

---

**144**

specific. Sorry, not their general purpose, but the purpose, of like, this guideline, for example, is much more specific. You know, looking at, you know, these elemental impurities and the way they're doing it, it appears to be, you know, quite thorough, yeah.

Q. If you look at section 4 on page 5, it's entitled element classification. Let me know when you're there. Yeah, it's one page back.

A. Section -- what does it start with?

Q. Element classification.

A. Oh, yeah, yeah. I see that, yes.

Q. Do you see in the first sentence that it refers to the toxicity and then uses an abbreviation, PDE?

A. Yes.

Q. Do you know what PDE refers to?

A. Well, they define it somewhere here. PDE.

Q. Yeah if you look at --

A. Yeah, permitted daily exposure.

Q. That's right. And that, we can tell from section 4, that's something tied to the toxicity of what's being talked about, right?

A. Yeah, that would be correct.

Q. Something highly toxic might have a low PDE, something somewhat less toxic might have a slightly higher PDE, right?

169

record. The time is now 2:54 p.m.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER: Stand by. We are back on the record. The time is now 3:05 p.m.

BY MR. ZUBICK:

Q.   Welcome back, Dr. Sinko. Home stretch. I know you reviewed the court's Markman order in this case, right?

A.   **Yeah, I may have. I actually don't recall.**

Q.   Okay. Did you review the transcripts from the claim construction hearing?

A.   **If I did, it was a long time ago. I don't really recall.**

Q.   If you did, it would appear on your materials considered, though, right?

A.   **Yes, it would be.**

MR. ZUBICK: Okay. Subject to anything from counsel your counsel, no further questions from me. That you very much for your time.

MR. LIEF: Nothing.

THE VIDEOGRAPHER: This marks the end of the deposition of Dr. Patrick Sinko. The time on the record is now 3:06 p.m.

THE REPORTER: Would you both like a rough draft?

170

MR. ZUBICK: Yeah, that would be great.

MR. LIEF: Yeah, same.

(Time Noted: 3:06 p.m.)

171

ACKNOWLEDGMENT

STATE OF NEW YORK    )
                                          :ss
COUNTY OF              )

I, PATRICK SINKO, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of the 16th day of April, 2026; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

_____
PATRICK SINKO, Ph.D.

Signed and subscribed to before me, this              day of              , 2026.

_____
Notary Public, State of New York

172

CERTIFICATE

STATE OF NEW YORK    )
                                    ) ss.:
COUNTY OF QUEENS )

I, BROOKE E. PERRY, a Notary Public within and for the State of New York, do hereby certify:

That PATRICK SINKO, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 16th day of April, 2026.

*Brooke E. Perry*
BROOKE E. PERRY

# Exhibit 7
# Filed Under Seal

# Exhibit 8
# Filed Under Seal

# Exhibit 9
# Filed Under Seal

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC<br><br>Plaintiffs,<br><br>v.<br><br>SLAYBACK PHARMA LLC, AND AZURITY PHARMACEUTICALS, INC.<br><br>Defendants. | C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |

**REPLY REPORT OF DR. BERNHARDT TROUT, PH.D.**

48.     Dr. Sinko also cites the 2025 FDA Guidance for pH Adjusters and the acid-base neutralization equation for hydrochloric acid and sodium hydroxide.  Sinko Rebuttal Report ¶ 67. That pH adjusters participate in acid-base reactions and can form buffer systems is uncontested; indeed, this is consistent with the classification of NaOH as a pH control agent rather than a solvent.  The FDA's own Guidance recognizes that "a pH adjuster can become an indistinguishable part of the buffer," confirming that the NaOH functions to modify acidity and is effectively consumed—it does not become the  solvent.

49.     The FDA has classified sodium hydroxide as a "pH control agent" under 21 CFR § 184.1763, which defines pH control agents as "substances added to change or maintain active acidity or basicity, including buffers, acids, alkalies, and neutralizing agents."  Trout Main Body of Opening Report ¶ 212.  This is a distinct classification from "solvents and vehicles," which section 170.3(o)(27) defines as "substances used to extract or dissolve another substance."  Trout Main Body of Opening Report ¶ 212.  The Handbook of Pharmaceutical Excipients likewise confirms that "[s]odium hydroxide is widely used in pharmaceutical formulations to adjust the pH of solutions"—not as a solvent.  Trout Main Body of Opening Report ¶¶ 211, 294.

Scientific publications align—sodium hydroxide is not a solvent, it is a solute. *See, e.g.*, Slayback Ex. 6, Brown & LeMay at 84 ("In discussing solutions it is often convenient to call one component the solvent and the others solutes.  The component of a solution whose physical state is preserved when the solution is formed is known as the solvent.  For example, when sodium chloride (a solid) is mixed with water, the resultant solution is a liquid. Consequently, water is referred to as the solvent and sodium chloride as the solute.  If all components of a solution are in the same state, the one present in greatest amount if called the solvent."), *id.* at 68 ████████

████████████████████████████████████████████████████

18

██████████████████████████████████████████████████████████

███████████████████████████████ Slayback Ex. 21, Goodwin at 393 ("All that is requires is a liquid (solvent) and another substance, solid, liquid, or gas (the solute), which will mix with it intimately under prevailing conditions and in the proportions present.  The resulting liquid is a solution.").  Sodium hydroxide is a white crystalline solid that is highly soluble in water. EAGLEBEN-SA_00376310 (Remington 2006) at 1089-90; EAGLEBEN-SA_00361690 (EMPROVE NaOH Data Sheet) at -695 (Water solubility = 1.090 g/L at 20 °C"). ████████████

██████████████████████████████████████████████████████████

████████████████████████████ Slayback Ex. 19, PATRICK J. SINKO, MARTIN'S PHYSICAL PHARMACY AND PHARMACEUTICAL SCIENCES: PHYSICAL CHEMICAL AND BIOPHARMACEUTICAL PRINCIPLES IN THE PHARMACEUTICAL SCIENCES (8th ed. 2024) ("The constituent present in the greater amount in a binary solution is arbitrarily designated as the solvent and the constituent in the lesser amount as the solute. When a solid is dissolved in a liquid, however, the liquid is usually taken as the solvent and the solid as the solute, irrespective of the relative amounts of the constituents. ████████████████████

████████████████████

### F.    Conservation of Mass Does Not Alter Functional Classification

50.    Dr. Sinko invokes the law of conservation of mass to argue that sodium hydroxide does not "disappear" when it reacts with acidic species in PEG.  Sinko Rebuttal Report ¶ 68.  I have never contended that atoms are destroyed during a chemical reaction.  The law of conservation of mass is undisputed.  But this fundamental principle does not address the question at hand: whether, after sodium hydroxide has been dissolved ████████████████████ acid-base neutralization, the resulting ionic residues constitute part of the "pharmaceutically acceptable fluid" within the meaning of the Asserted Claims.

and the constituent in the lesser amount as the solute. When a solid is dissolved in a liquid, however, the liquid is usually taken as the solvent and the solid as the solute, irrespective of the relative amounts of the constituents. ███████████████████████████████████████████████. A solute, once dissolved, does not become the solvent—it is dissolved in the solvent or solvent system. Trout Main Body of Opening Report ¶¶ 133-134; Slayback Ex. 6, Brown & LeMay, Chemistry: The Central Science, at 84 ("In discussing solutions it is often convenient to call one component the solvent and the others solutes. The component of a solution whose physical state is preserved when the solution is formed is known as the solvent. For example, when sodium chloride (a solid) is mixed with water, the resultant solution is a liquid. Consequently, water is referred to as the solvent and sodium chloride as the solute. If all components of a solution are in the same state, the one present in greatest amount is called the solvent."); Slayback Ex. 21, Goodwin, *Is Salt Melting When It Dissolves in Water?*, J. Chem. Educ., Vol. 79, No. 3, at 393 (2002) ("All that is required is a liquid (solvent) and another substance, solid, liquid, or gas (the solute), which will mix with it intimately under prevailing conditions and in the proportions present. The resulting liquid is a solution.").

69. ████████████████████████████████████████████████████ ███████████████████████████████████ EAGLEBEN-SA_00315043 (Handbook of Pharmaceutical Excipients) at -719 ("Sodium hydroxide occurs as a white or nearly white fused mass. It is available in small pellets, flakes, sticks, and other shapes or forms. It is hard and brittle and shows a crystalline fracture."); EAGLEBEN-SA_00361690 (EMPROVE NaOH Data Sheet) at -695 (Water solubility = 1,090 g/L at 20 °C). ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

28

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████ when sodium hydroxide is dissolved in PEG 400 or in a PEG/ethanol solvent system: NaOH is a solid solute that dissolves into the solvent vehicle—it does not thereby become part of the solvent or transform the solvent into a different substance. Trout Main Body of Opening Report ¶¶ 272, 278 (explaining that "[t]he fact that sodium hydroxide itself must be dissolved into the PEG/ethanol matrix underscores that it is a solute or processing aid, not part of the solvent system" and that "NaOH is not a solvent for bendamustine (or anything else in the composition). It is not even a liquid."). Thus, a POSA would understand from fundamental solution chemistry that sodium hydroxide is a solute dissolved in the pharmaceutically acceptable fluid, not a component of it.

70.    This distinction is critical because Dr. Sinko's entire noninfringement theory depends on conflating what is "in" the pharmaceutically acceptable fluid with what the pharmaceutically acceptable fluid "is." The specification itself draws this distinction. It states that the pharmaceutically acceptable fluid "is" the solvent—for example, "the pharmaceutically acceptable fluid is propylene glycol (PG) or polyethylene glycol (PEG)"—while using different language ("includes" or "contains") to describe other components dissolved in the fluid. Trout Main Body of Opening Report ¶ 117; '214 patent at 3:42-45. As I explained in my Opening Report, "[t]hat various components of the liquid bendamustine formulation are dissolved in the pharmaceutically acceptable fluid does not fundamentally redefine what the pharmaceutically acceptable fluid is—a solvent or solvent system." Trout Main Body of Opening Report ¶ 133. And "[t]hat the components of the composition are dissolved into the pharmaceutically acceptable

29

Dated: _____4-13-26_____        _____

Dr. Bernhardt L. Trout, Ph.D.

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that true and correct copies of the foregoing documents were caused to be served on June 5, 2026, on the following counsel in the manner indicated:                    **VIA EMAIL:**

Daniel A. Taylor
Neal C. Belgam
SMITH KATZENSTEIN & JENKINS LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
Dtaylor@skjlaw.com
Nbelgam@skjlaw.com

Jason A. Lief
Allan H. Pollack
Audrey R. Sparschu
WINDELS MARX LANE & MITTENDORF, LLP
156 West 56th Street
New York, NY 10019
jlief@windelsmarx.com
apollack@windelsmarx.com
asparschu@windelsmarx.com

Andrew Miller
Ajay Kayal
Robyn Ast-Gmoser
Daniel E. Forchheimer
Kiersten A. Fowler
WINDELS MARX LANE & MITTENDORF, LLP
One Giralda Farms
Madison, NJ 07940
amiller@windelsmarx.com
akayal@windelsmarx.com
rast-gmoser@windelsmarx.com
dforchheimer@windelsmarx.com
kfowler@windelsmarx.com

*Attorneys for Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)

ME1\61334401.v1