# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC,<br><br>Plaintiffs,<br><br>v.<br><br>SLAYBACK PHARMA LLC and AZURITY PHARMACEUTICALS, INC,<br><br>Defendants. | REDACTED PUBLIC VERSION FILED AUGUST 7, 2026<br><br>C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br> |

## DECLARATION OF DANIEL SILVER IN SUPPORT OF PLAINTIFFS  EAGLE PHARMACEUTICALS, INC. AND EAGLE SUB 1 LLC'S MOTION <u>FOR SUMMARY JUDGMENT REGARDING DAMAGES</u>

I, Daniel Silver, declare as follows:

1.      I am an attorney at the law firm of McCarter & English, LLP and counsel for Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC ("Eagle") in the above-captioned case.  I am admitted to practice before the Court.

2.      I make this declaration in support of Eagle's Motion for Summary Judgement Regarding Damages.

3.      I have personal knowledge of the facts set forth in this declaration, and if called as a witness, could and would competently testify thereto.

4.      Attached as **Exhibit 1** is a true and correct copy of excerpts of Supplemental Expert Report of Dr. Christopher A. Vellturo, dated March 6, 2026.

5.      Attached as **Exhibit 2** is a true and correct copy of excerpts of Reply Expert Report of Dr. Christopher A. Vellturo, dated April 13, 2026.

6.      Attached as **Exhibit 3** is a true and correct copy of excerpts of the Expert Report of James Malackowski, dated March 16, 2026.

7.      Attached as **Exhibit 4** is a true and correct copy of excerpts of the Deposition Transcript of James Malackowski, dated April 15, 2026.

8.      Attached as **Exhibit 5** is a true and correct copy of excerpts of the Rebuttal Expert Report of Dr. Michael L. Brandt.

9.      Attached as **Exhibit 6** is a true and correct copy of excerpts of the Slayback Pharma LLC and Azurity Pharmaceuticals Inc. Amended Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), dated February 13, 2026.

10.     Attached as **Exhibit 7** is a true and correct copy of excerpts of the Supplemental Expert Report of Dr. Khaleel K. Ashraf, dated March 6, 2026.

1

11.     Attached as **Exhibit 8** is a true and correct copy of excerpts of the Supplemental

Expert Report of Dr. Caroline Attia, dated March 6, 2026.

I declare under penalty of perjury that the foregoing is true and correct.


DATED: June 5, 2026                          _/s/ Daniel M. Silver_____
                                             Daniel Silver

# Exhibit 1
# Filed Under Seal

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1, LLC., <br><br> PLAINTIFFS, <br><br><br> v. <br><br><br><br> SLAYBACK PHARMA LLC AND AZURITY PHARMACEUTICALS, INC., <br><br> DEFENDANTS. | C.A. NO. 24-65-JLH <br><br> (CONSOLIDATED) <br><br> HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY |

# EXPERT REPORT OF CHRISTOPHER A. VELLTURO, PH.D.

## I. OVERVIEW

### A. Qualifications and Experience

1.  I am the founder and president of Quantitative Economic Solutions, LLC, a microeconomic consulting firm.  I received a Doctor of Philosophy degree (Ph.D.) in Economics from the Massachusetts Institute of Technology in Cambridge, Massachusetts in 1989.  My fields of specialization include industrial organization and econometrics.  My curriculum vitae, which lists my testimony for the last four years and my publications, is attached as Exhibit 1.

2.  I have extensive experience in the valuation of intellectual property and in the assessment of economic injury/damages sustained as a result of copyright, trademark, and/or patent infringement.  Industries that I have studied in this context include: pharmaceutical products, medical devices, over-the-counter medications and instruments, consumer products, computer hardware and software, semiconductors, and many others.

3.  I have studied the pharmaceutical industry extensively and along a number of dimensions.  From an intellectual property standpoint, I have analyzed patent infringement damages issues (including lost profits, price erosion, and reasonable royalties), commercial success and nexus, and irreparable harm.  I have also studied the pharmaceutical industry in the context of merger reviews in the United States and abroad, in private antitrust actions, and in the context of contract disputes.  I have previously served as an expert in damages assessment, economics generally, statistics/econometrics, and as an expert on the pharmaceutical industry in particular.  In addition, I have designed licensing programs for patent holders on several occasions, including programs for intellectual property relating to pharmaceuticals.

### B. Statement of Assignment

4.  I have been retained by counsel for Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC (collectively "Eagle" or "Plaintiffs") in connection with the above captioned litigation.[1]  I have been asked to perform an economic analysis to assess the appropriate measure and quantum of damages to Eagle as a result of the infringement of claims 1-9 of U.S. Patent No. 11,872,214 ("the '214 patent") and claims 1-6, 8-11, 15, and 20 of U.S. Patent No. 12,138,248 ("the '248 patent")

---

[1] QES is being compensated for my time spent on this matter at an hourly rate of $1,250, which is my customary rate. Payment is not contingent on the outcome of this matter.  QES is also compensated for the time spent on this matter by persons working at my direction.  Those rates are lower than my hourly rate.

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY

(collectively, the "Asserted Patents") by Slayback Pharma LLC and Azurity Pharmaceuticals, Inc., (collectively, "Defendants" or "Slayback").[2]

5.    Around December 7, 2022, Slayback secured final FDA approval for, and soon after commercially launched, its liquid bendamustine product called VIVIMUSTA® ("Vivimusta," the "Accused Product," or "Slayback's liquid bendamustine product").[3]

6.    I understand that Eagle alleges that Slayback infringes the Asserted Patents by making, using, selling, and/or offering for sale in the U.S., as well as importing into the U.S., the Accused Product without Eagle's authorization. Accordingly, in this report, I have been asked to perform an economic analysis to assess an appropriate measure and quantum of damages to assist a trier of fact in determining the damages to Eagle due to this infringement. For the purposes of my damages analysis, I assume the Asserted Patents are valid and infringed.

7.    I understand that Eagle contends that its Belrapzo product, as well as Teva's Bendeka product, practice the Asserted Patents. I also understand that Eagle contends that Apotex's, Slayback's, and Baxter's liquid bendamustine products infringe the Asserted Patents. While I am not opining on liability or whether these products actually practice the Asserted Patents, in this report I estimate damages attributable to Slayback's infringing sales of the Accused Product. I undertake my analysis with the understanding that Apotex's, Baxter's, and Slayback's liquid bendamustine products available on the market infringe the Asserted Patents.

### C.  Documents/Materials Considered

8.    In connection with this case, I, or others working under my direction, have considered information from the following sources:

- Financial documents, including sales and cost data produced in this case;
- Publicly available financial statements;
- Documents produced relating to business strategy, pricing, and financial matters;
- Produced and/or public marketing materials and product information for Belrapzo and Bendeka;
- Conversations with experts retained by Eagle, including Dr. Bernhardt Trout, Dr. Khaleel K. Ashraf, and Dr. Caroline Attia;

---

[2] I refer to Slayback and Azurity collectively as "Slayback" for ease of exposition.
[3] EAGLEBEN-SA_00364331 at 331, 334.

- Conversations with Eagle current and former employees, including Christopher Krawtschuk, David Bricker, and Alan Eagle;

- Opening Expert Report of Bernhardt Trout, Ph.D., February 6, 2026 ("Trout Opening Report"), and Appendix B thereto.

- Court filings in this case; and

- Deposition testimony and exhibits.

9. A complete list of the information I considered in forming my opinions is in Exhibit 2 to this report.

10. My findings at this point are based on the information available to me. I may revise or supplement my opinions based on additional discovery and analyses. I may also provide additional analyses (including, but not limited to, additional expert reports) if I am called upon to do so, including a response to any opinions offered by experts on behalf of Slayback.

**D. Exhibits**

11. At trial, I may provide and rely on visual aids and/or demonstrative exhibits to demonstrate basic principles of economics, calculations of damages, in general and in this case, and my opinions expressed herein and the bases for them, and enlargements of documents considered in forming my opinions.

**E. Summary of Conclusions**

12. ████████████████████████████████████████████
████████████████████████████████████
████████████████████████████████
████████████████████████████████████
██████████████████████████████████
██████████████████████████
██ ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████
████████████████████████████████

14.  **Lost Profits Damages.**  A reasonable hypothesis in situations where an incumbent pharmaceutical brand faces infringing competitive pharmaceutical products is that the supplier of the incumbent product may sustain harm in the form of "lost profits."  Such lost profits can be driven by two related dynamics.



16.

[4] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F. 2d 1152 (6th Cir. 1978).

**Figure 3: Timeline of Liquid Bendamustine Product Releases and Asserted Patents**



## V.   LOST PROFIT DAMAGES

### A.   *Panduit* Factor 1: Demand for the Patented Products

106.   Under *Panduit* Factor 1, I assess demand for the products that practice the Asserted Patents.  The Court of Appeals for the Federal Circuit provided an assessment of the first *Panduit* factor in *DePuy Spine, Inc. v. Medtronic Safamor Danek, Inc.*:

> All that the first factor states, and thus requires, is 'demand for the patented product.' … This factor does not require any allocation of consumer demand among the various limitations recited in a patent claim. Instead, the first Panduit factor simply asks whether demand existed for the 'patented product,' i.e., a product that is 'covered by the patent in suit' or that 'directly competes with the infringing device.' … As we have held, the focus on particular features corresponding to individual claim limitations is unnecessary when considering whether demand exists for a patented product under the first *Panduit* factor.[268]

---

[268] *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1331 (Fed. Cir. 2009).  *See also Versata Software, Inc. v. SAP Am., Inc.,* 717 F.3d 1255, 1265-66 (Fed. Cir. 2013) ("The Panduit factors do not require showing demand for a particular embodiment of the patented functionality … Nor does it require any allocation of consumer demand among the various limitations recited in a patent claim. In other words, the Panduit factors place no qualitative requirement on the level of demand necessary to show lost profits."); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1360-1361 (Fed. Cir. 2012) ("ATC argues that the record does not link market demand with the claimed fringe-effect capacitance limitation. This argument

107.  I further understand that, where the patentee's product competes in the same market as the Accused Product, a high volume of allegedly infringing sales can prove the requisite demand under the first *Panduit* factor.[269]

108.  To assess demand, I consider the actual historical sales and prescriptions of Belrapzo, Bendeka, and each of Apotex, Baxter, and Slayback's liquid bendamustine products.  I understand from Dr. Trout that each of these products practice at least one claim of the Asserted Patents.[270]  Based on my analysis, as discussed below, substantial demand exists for the patented products and those products have been commercially successful in the marketplace.

109.  Figures 4 and 5 below report Eagle's U.S. quarterly net sales of Belrapzo and Teva's U.S. quarterly net sales of Bendeka since their respective launches.  ███████████████████████
██████████████████████████████   ████████████████████████
██████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████   ██████
██████████████████████████████████████████████████████████
█████████████████████████

fails because the first Panduit factor 'does not require any allocation of consumer demand among the various limitations recited in a patent claim.'").

[269] *Gyromat Corp. v. Champion Spark Plug Co.,* 735 F.2d 549, 552 (Fed. Cir. 1984) ("The substantial number of sales by Champion of infringing products containing the patented features itself is compelling evidence of the demand for the product. Champion's sales necessarily meant that there were buyers who wanted the product and were willing to pay Champion's price, which was substantially the same as that of Gyromat."); *Parker-Hannifin Corp. v. Champion Labs., Inc.,* No. 06-cv-2616, 2008 WL 1843922, at *7 (N.D. Ohio Apr. 22, 2008) (explaining that, "[i]n the Gyromat case," the Federal Circuit "found that proof of sales of an infringing product was sufficient to establish demand for the patented product even where defendant demonstrated sales of a non-infringing product.")

[270] Trout Conversation; Opening Expert Report of Dr. Bernhardt Trout, Ph.D., February 6, 2026 ("Trout Opening Report"), § XIII.

[271] Exhibits 9, 10.

[272] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████).

**Figure 4: Eagle U.S. Net Sales of Belrapzo**
**Q2 2018 – Q2 2025**
*($ millions)*
*Source: Exhibit 9*



HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

**Figure 5: Teva U.S. Net Sales of Bendeka**
**Q1 2016 – Q2 2025**
*($ millions)*
*Source: Exhibit 10*



110.  This confirms there is demand for Belrapzo and Bendeka in the market.

111. Since their launches, Slayback's Vivimusta product, as well as Apotex's and Baxter's liquid bendamustine products, [redacted]. Importantly, because I understand from Dr. Trout that each of these products infringe the Asserted Patents, and I understand from Dr. Ashraf the demand that exists from prescribers and patients for these

---

[273] Exhibit 11; EAGLEBEN-SA_00367593 at 594.

products are primarily due to their established therapeutic equivalence to Belrapzo, their unit and net sales constitute additional evidence of demand for the patented products.[274]

112.  As shown in Exhibit 12, from May 2023 through November 2025,  As shown in Exhibit 13, from February 2023 through September 2025, ███████████████████████████ ███████████████████████████ As shown in Exhibit 14, from December 2022 through September 2025, Slayback sold ███████████████████████ ███████████████████[277]

113.  In total, through Q2 2025, ██████████████████████████████ ████████████████████████████████████████ ████████████████████████ The significant unit and dollar sales associated with these liquid bendamustine products show that there has been strong historical and continuing demand for the patented products.  I therefore conclude that *Panduit* Factor 1 is satisfied.

### B.  *Panduit* Factor 2: Absence of Non-Infringing Substitutes

114.  Under this factor, I consider whether there would have been any acceptable, non-infringing alternatives to Belrapzo in the reconstructed "but for" market.  I briefly discuss each element and then provide my analysis of this factor below.

115.  First, with respect to availability, I understand that "substitutes only theoretically possible will not" preclude lost profits.[279]  I also understand that "[t]he critical time period for determining availability of an alternative is the period of infringement for which the patent owner claims damages, i.e., the accounting period."[280]  In addition, while I understand that a non-infringing alternative need not be on the market during the infringement period to factor into a lost profits analysis, I also understand that "when an alleged alternative is not on the market during the

---

[274] Trout Conversation; Trout Opening Report, § XIII; Ashraf Conversation.
[275] Exhibit 12.
[276] Exhibit 13.  I understand that redacted versions of certain financial documents from Apotex and Baxter have been designated for use in estimating damages.  I use these redacted versions when using data from Apotex and Baxter.
[277] Exhibit 14.
[278] ████████████████████████████████████████████████████████
*See* Exhibits 9, 10, 12, 13, 14, net sales and unit sales summed through Q2 2025.
[279] *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999).
[280] *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999), citing *State Indus.*, 883 F.2d at 1579; *Panduit*, 575 F.2d at 1162.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

122. Third, Slayback identified Treanda and other generic powder bendamustine products as alleged non-infringing alternatives to Belrapzo.[304]  As discussed in Section II.D, I understand from Dr. Attia and Dr. Ashraf that powder bendamustine products (e.g., Treanda) are not acceptable alternatives to Belrapzo. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

123. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[307] I discuss some of these documents in my *Panduit* Factor 4 analysis, which I incorporate herein by reference.

124. Further, Teva markets both Bendeka – ████████████████████████████ – and Treanda.[308] ███████████████████████████████████████████████████████████████████████████████████████ Similarly, generic versions of Treanda are currently available and approved by the FDA.[309] ███████████████████████████████████████████████████████████████████████████████████████████████████████

---

[304] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Fifth Supplemental Response to Plaintiffs' Common Interrogatories (No. 7), December 5, 2025, pp. 8-11.
[305] Ashraf Conversation; Attia Conversation.  *See also* Lovesy Deposition, p. 84.
[306] *See, e.g.*, SLAY-VIVMUS0089522 at 533; Mathew Deposition, p. 173.
[307] Eagle Deposition, Exhibit 4 (EAGLEBEN-SA_00344611 at 648).
[308] EAGLEBEN-SA_00072401 at 401-402; *See also,* Teva 2025 10-K Annual Report, available at Teva SEC form 10-K (2025), pp. 4, 10 (available at EAGLEBEN-SA_00368190 at 195, 201).
[309] *See, e.g.*, EAGLEBEN-SA_00368133 at 133.
[310] Trout Conversation; Trout Opening Report, § XIII.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

125. ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████████████████████

126. Additionally, I understand that Slayback identified a number of non-bendamustine treatments, for example BTK inhibitors and monoclonal antibodies, as alleged non-infringing alternatives to Belrapzo.[311]  I understand that Drs. Attia and Ashraf have addressed these non-bendamustine products ████████████████████████████████████████████████████.[312] Moreover, Slayback does not consider many of the drugs identified above as competitors to its liquid bendamustine product.  For example, prior to the launch of Vivimusta, Slayback looked at the competitive landscape and █████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████

127. More broadly, based on the economic principle of revealed preference,[314] a physician's choice of medication when writing a prescription demonstrates that the physician regards the prescribed medication as more appropriate, all things considered, for the treatment of the patient in question than other available options.  I understand this is particularly relevant in treating patients with CLL and NHL where the appropriate treatment is specific for each individual patient.[315]  In general, I therefore expect that physicians who have already revealed their preference for liquid bendamustine would, as a general matter, overwhelmingly not regard any other products as acceptable non-infringing substitutes to branded Belrapzo or Bendeka in a world where Apotex, Baxter, and Slayback's liquid bendamustine products are not on the market.

128. I understand that ████████████████████████████████████████████ ███████████████████████████████████████████████████████

---

[311] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Fifth Supplemental Response to Plaintiffs' Common Interrogatories (No. 7), December 5, 2025, pp. 13-15.
[312] Ashraf Conversation.
[313] Mathew Deposition, Exhibit 21 (SLAY-VIVMUS0072988) at 010-011.
[314] EAGLEBEN-SA_00367840.
[315] Ashraf Conversation.



---

[316] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Fifth Supplemental Response to Plaintiffs' Common Interrogatories (No. 7), December 5, 2025, pp. 14-15; SLAY-VIVMUS0226550 at 554-555. ▮▮▮▮▮▮▮▮▮▮

Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 5, 2026, p. 1.  See also, Chinnari February 20, 2026 Deposition, pp. 80-81.

[317] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 5, 2026, pp. 1, 6.

[318] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 5, 2026, p. 6; Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Fifth Supplemental Response to Plaintiffs' Common Interrogatories (No. 7), December 5, 2025, pp. 11, 14-15; EAGLEBEN-SA_00368152.

[319] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 5, 2026, p. 5-6.

[320] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 5, 2026, p. 5-6.

[321] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 5, 2026, p. 5-6; SLAY-VIVMUS0180466.

[322] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Amended Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 13, 2026, p. 6.   See also, Chinnari February 20, 2026 Deposition, p. 70.

[323] Chinnari February 20, 2026 Deposition, p. 70.



129.

---

324 Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Amended Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 13, 2026, p. 6.

325 Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Amended Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 13, 2026, pp. 7-8.

326 Attia Conversation.

327 Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 5, 2026, p. 7.

328 *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999).

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

### C. *Panduit* Factor 3: Manufacturing/Marketing Capability to Exploit Demand

130. I understand that *Panduit* analysis further requires consideration of whether the patentee had the manufacturing and marketing capability to exploit the demand for the patented and infringing product(s) and capture the sales claimed as lost. Here, I consider whether Eagle would have had the capacity to make the unit sales on which I assess lost profits under my consideration of *Panduit* Factor 4 below.

131. I begin my analysis of *Panduit* Factor 3 by outlining some relevant background. As discussed above, Eagle generates profits from selling Belrapzo and receives royalties from Teva's net sales of Bendeka. While Teva does not own the Asserted Patents, I consider sales of Bendeka that were displaced by the infringing sales in my calculation of Eagle's lost profits. █████████████

████████████████████████████████████████████████

███████████████████████████████████████ ████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████

---

[329] Conversation with David S. Bricker, Senior Vice President of Eagle ("Bricker Conversation"); Deposition of David Bricker, November 25, 2025 ("Bricker Deposition"), p. 38; Krawtschuk Deposition, pp. 63-64; EAGLEBEN-SA_00321346; EAGLEBEN-SA_00347581.

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY

**Figure 6: But-For and Actual Bendeka and Belrapzo Liquid Bendamustine Unit Sales Q4 2021 – Q2 2025**

*Source: Exhibit 15*



132. ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████.[330] Since October 2014, ████████████████████████████

████████████████████████████████████████████████████

███████████████[331] Eagle has additional contracts with ██████████████

████████████████████████████████████████████████████████████

██████████████████████████████[332]

133. I have seen no evidence that Eagle would have been unable to continue supplying the liquid bendamustine market or would have faced significant supply disruptions during the damages period.[333] In fact, the evidence shows that Eagle was able to consistently meet demand throughout

---

[330] Bricker Deposition, pp. 17-18; EAGLEBEN-SA_00367464 at 466.
[331] EAGLEBEN-SA_00333015 at 015-016; Bricker Deposition, p. 23.
[332] EAGLEBEN-SA_00332934 at 934-939, 966, 968; EAGLEBEN-SA_00332859 at 859; EAGLEBEN-SA_00332905 at 905-907; Bricker Deposition, pp. 23-25.
[333] *See also* Krawtschuk Deposition, Exhibit 16, p. 1 (EAGLEBEN-SA_00347509 at 509).

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

the damages period.  Mr. David Bricker, Eagle's Head of Global Manufacturing and Supply, ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████

134.  As part of my analysis, I analyzed Eagle's capacity to scale up its production to meet the increased demand for Belrapzo and Bendeka during the damages period (i.e., after the first Asserted Patent issued in January 2024). ██████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████ By comparison, in 2024 ████████████████████████████████████████ ██████████████████████████████████████ I note that the ████████ ████████ mentioned above does not account for ████████████████████ supply Eagle with liquid bendamustine.[338]  A similar February 2024 supply forecast relating to ██████████ ████████████████████████████████████ Eagle therefore would have had substantial manufacturing capacity through its established partners to return to supplying the entire liquid bendamustine marketplace when the first Asserted Patent issued in January 2024.

135.  My analysis above is consistent with evidence showing ████████████████████████████ █████████████████████████████████████ For example, Mr. Bricker ████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

---

[334] Bricker Deposition, p. 116.
[335] Bricker Deposition, p. 25-26.
[336] EAGLEBEN-SA_00352417, sheet ████████████████████████████████ Bricker Conversation.
[337] ███████████████████████████████████████████████████████████████████████.
See Exhibit 15.
[338] Bricker Conversation.
[339] EAGLEBEN-SA_00352405.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY                                                                48

████████████████████████████████████████████  ██████████
████████████████████████████████████████████████████████

These events demonstrate that, in addition to the substantial capacity at Eagle's disposal, Eagle and its suppliers have demonstrated an ability to quickly respond to significant increases in needed production of liquid bendamustine (if necessary).

136.    Eagle also had sufficient sales and marketing capacity to capture the claimed lost sales.  I note that ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████  ██████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████

137.    In the fourth quarter of 2023 – the quarter before the first Asserted Patent issued – ████ ████████████████████████████████████████  In the first quarter of 2024, Eagle's spending on ███████████████████████████████████████, ████████████ ████████████████████████████████████.[345]  Additionally, I note that this ██████████ ██████████████████████████████████████████████████████████ ████████████████████████████████  I understand from Alan Eagle that ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████

---

[340] Bricker Deposition, p. 116-121.
[341] Exhibit 15.
[342] EAGLEBEN-SA_00353678, Sheets "2022Q1", "2022Q2", "2022Q3" and "2022Q4".
[343] EAGLEBEN-SA_00353678, Sheets "2023Q1", "2023Q2", "2023Q3" and "2023Q4".
[344] EAGLEBEN-SA_00353678, Sheet "2023Q4".
[345] EAGLEBEN-SA_00353678, Sheet "2024Q1".
[346] EAGLEBEN-SA_00353678, Sheets ████████████████████████████████████  Furthermore, I note that Eagle's spending on Sales and Marketing personnel salaries ████████████████████████ ████████.  For example, in Q4 2024, ██████████████████████ Two quarters later, in Q2 2025, ████████████ ████████
[347] Conversation with Alan Eagle, Vice President of Eagle ("Eagle Conversation").

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

138.  I therefore conclude that ███████████████████████████████████████████ ████████████████████████████ I further conclude that ███████████████████████ ████████████████████████████████████████████████████

### D. Panduit Factor 4: Quantification of Lost Profits

139.  *Panduit* Factor 4 requires the patentee's lost profits be quantified in a reliable, non-speculative manner.[348]

#### 1. Quantification of Lost Profits Attributable to Slayback's Infringement

140.  Commonly, harm to the reference brand upon entry of a pharmaceutically equivalent product includes lost profits of one or both of two forms – lost profits due to lost unit sales (on which the brand loses its incremental profit per unit for those lost units), and lost profits due to price erosion (where the brand's realized effective net price on its retained sales is lower than it would have been "but for" the entry).

141.  In this section, I quantify the aggregate lost profits incurred by Eagle due to Slayback's infringement accounting for these key elements. First, I provide relevant background for the data and dynamics I considered in creating my comparison of the actual and "but-for" worlds. Next, I use this information to estimate the total profits Eagle would have made in a but-for world where the infringing products are removed from the market on January 16, 2024, the issuance date of the first Asserted Patent, the '214 patent.

142.  In principle, my quantification of aggregate lost profits to Eagle rests on the difference between its estimated but-for profits and the profits it realized in the actual world from ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████

---

[348] *See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F. 2d 1152 (6th Cir. 1978).

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

143. The details underlying my estimations for the lost profits due to Slayback's infringement of the Asserted Patents are in the sections below.

### a. Key Marketplace Dynamics

144. I begin my quantification of lost profits by summarizing marketplace dynamics and considerations relevant to my analysis. In Section II.E.3, I laid out the general dynamics governing competition between pharmaceutically equivalent products in the pharmaceutical industry.

145. Indeed, the evidence shows that ██████████████████████████████████████████████████ Furthermore, Eagle's Chief Financial Officer, Christopher Krawtschuk, ████████████████████████████████████████████████████████████████████████ I ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.[354]

146. Finally, I note that Eagle █████████████████████████████████████████ce.[355] As noted above, Eagle specifically noted

---

[349] Mathew Deposition, pp. 114-119, Exhibit 14. *See also* Mathew Deposition, pp. 120-125, Exhibit 15.
[350] SLAY-VIVMUS0072180 at 180-181.
[351] Chinnari Deposition, pp. 123-135.
[352] Mathew Deposition, pp. 114-119, Exhibit 14; Eagle Deposition, Exhibit 4, p. 38 (EAGLEBEN-SA_00344611 at 648). *See also* Mathew Deposition, pp. 120-125, Exhibit 15.
[353] Krawtschuk Deposition, pp. 34-37, 146-147.
[354] Attia Conversation; Ashraf Conversation.
[355] Eagle Conversation.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY                                          52

**Figure 11: Teva U.S. Actual and But-For Bendeka Net Price per Unit**
**Q4 2021 – Q2 2025**
*Source: Exhibit 15*



160. Finally, I note that ███████████████████████████████████████████

███████████████████████████████████████████████████████

▪ ██████████████████████████████████████████████████████
███████████████████████████████████

▪ ██████████████████████████████████████████████████████
███████████████████████

161. Next, I evaluate whether the aggregate unit sales of liquid bendamustine have expanded since the launch of Slayback's Accused Product. In some circumstances, the aggregate unit sales of a

---

[377] Mathew Deposition, pp. 156-160, Exhibit 19 (SLAY-VIVMUS0216524 at 527).
[378] Mathew Deposition, pp. 145-147.
[379] SLAY-VIVMUS0175102, sheet ███████████

**Factor 6: The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.**

232.

Therefore, I conclude Factor 6 does not inform the rate the parties would likely agree to at the hypothetical negotiation relative to the reasonable royalty range from my Edgeworth Box analysis or to the ███████████████████████ royalty rate identified under Factor 1, above.

**Factor 7: The duration of the patent and the term of the license.**

233. As discussed above, for Eagle's hypothetical negotiation with Slayback, the date of the negotiation would be January 16, 2024. At the time of the hypothetical negotiation, there were approximately seven years until both of the Asserted Patents expired. The hypothetical license would extend from the hypothetical negotiation date until the expiration of the Asserted Patents. I note that, as discussed in Factor 1 above, ████████████████████████████████████████ ████████████████████████████████████████████████ ██████.

234. ███████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████.

**Factor 8: The established profitability of the product made under the patent; its commercial success; and its current popularity.**

235. I understand that Belrapzo and Bendeka are both commercial products covered by the Asserted Patents. Both Belrapzo and Bendeka have experienced success in the bendamustine marketplace as I discussed in detail in my *Panduit* Factor 1 analysis.

236. From 2016 through Q2 2025, in the U.S., ████████████████████████████  ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████

---

[476] EAGLEBEN-SA_00072401 at 401-402.
[477] Exhibits 9-11.
[478] Exhibits 9-11.



From 2016 through Q2 2025, U.S. ███████

███████████████████████████████████

237.   In addition, as discussed above, from May 2023 through November 2025, ███████

█████████████████████████████████████████████

███████████   Further, from February 2023 through Q3 2025, ██████████

█████████████████████████████████████████████

██████ ████████████████████████████████████████

█████████████████████████████████████████████

████

238.   In total, across the data available to me, there have been ███████████████████

█████████████████████████████████████████████

████████████████████████████   The significant unit and dollar sales

associated with these liquid bendamustine products show that there has been strong historical and

continuing demand for the patented products.

239.   I have accounted for the considerable volume and profitability of Belrapzo (and Bendeka) in my

baseline royalty consideration under Factor 15, above.  I address Slayback's sales of the Accused

Product under Factor 11, below.  No additional adjustment of the reasonable royalty rate is

warranted here.

---

[479] ███████████████

[480] Exhibits 9-11.

[481] Exhibit 12.

[482] Exhibit 13.  I understand that redacted versions of certain documents from Baxter and Apotex have been designated for use in estimating damages.  I use these redacted versions when using data from Baxter and Apotex.

[483] Exhibit 14.

[484] █████████████████████████████████████████████

March 6, 2026

Christopher A. Vellturo, Ph.D.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



**Highly Confidential - Attorneys' Eyes Only**

**q**uantitative **e**conomic **s**olutions, LLC

**Highly Confidential - Attorneys' Eyes Only**

**q**uantitative **e**conomic **s**olutions, LLC



Highly Confidential - Attorneys' Eyes Only

quantitative economic solutions, LLC

Highly Confidential - Attorneys' Eyes Only

quantitative economic solutions, LLC



**Highly Confidential - Attorneys' Eyes Only**

quantitative economic solutions, LLC

# Exhibit 2
# Filed Under Seal

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1, LLC., <br><br> PLAINTIFFS, <br><br><br> V. <br><br><br><br> SLAYBACK PHARMA LLC AND AZURITY PHARMACEUTICALS, INC., <br><br> DEFENDANTS. | C.A. NO. 24-65-JLH <br><br> (CONSOLIDATED) <br><br> HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY |

# REPLY EXPERT REPORT OF CHRISTOPHER A. VELLTURO, PH.D.



46. In sum, none of Mr. Malackowski's opinions changes my conclusion, based in part on my understanding from Drs. Attia and Ashraf, that powder bendamustine products are not an "acceptable" alternative to Belrapzo and thus would not capture any of the accused sales in the "but-for" marketplace.

### B. Mr. Malackowski Understates Eagle's Lost Profits

#### 1. Mr. Malackowski's Agrees that *Panduit* Factors 1 and 3 are Met

47. Mr. Malackowski agrees with my conclusion that *Panduit* Factor 1 is met because there is demand for the patented products, namely Belrapzo, Bendeka, Vivimusta, as well as Apotex's and Baxter's liquid bendamustine products.[76]

48. Mr. Malackowski also agrees with my conclusion that *Panduit* Factor 3 is met because Eagle had the manufacturing and marketing capability to exploit the demand.[77]

#### 2. Mr. Malackowski's Consideration of *Panduit* Factor 2

49. As I discuss in my Opening Report, *Panduit* Factor 2 is met because none of the alternatives that Slayback identified would be available, acceptable, and non-infringing.

50. Mr. Malackowski does not claim that any alleged acceptable non-infringing alternatives preclude a finding of lost profits incurred by Eagle or a reliable quantification of those lost profits. Instead, he opines that "the record evidence indicates that FDA-approved treatments for CLL and NHL

---

[72] Mathew Deposition, pp. 114-119, Exhibit 14. *See also* Mathew Deposition, pp. 120-125, Exhibit 15.
[73] SLAY-VIVMUS0072180 at 180-181.
[74] Vellturo Opening Report, ¶¶ 97, 155. *See also*, Chinnari Deposition, pp. 123-130; EAGLEBEN-SA_00364335 at 338.
[75] Vellturo Opening Report, §§ II.D.3, V.D.1.
[76] Malackowski Report, § 8.1.1.
[77] Malackowski Report, § 8.1.3.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

███████████████████████████████████████████████████████████.[144]  I disagree with Mr.

Malackowski for several reasons.

89.    █████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████ ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████

███    ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████ ███████████████████████

██████████████████████████████████████

███    █████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████ █████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

---

[144] Malackowski Report, § 10.1.
[145] Vellturo Opening Report, ¶ 128. ███████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████████ *See, e.g.,* Chinnari February 20, 2026 Deposition, p. 21, Exhibit 2 and Velltuuro Opening Report, ¶ 128.
[146] *See, e.g.,* Ashraf Reply Report, ¶ 5.
[147] Malackowski Report, § 10.1.
[148] Malackowski Report, § 10.1.

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY

April 13, 2026

Christopher A. Vellturo, Ph.D.

62

# Exhibit 3
# Filed Under Seal



**EAGLE PHARMACEUTICALS, INC, AND
EAGLE SUB1 LLC.**

V.

**SLAYBACK PHARMA LLC AND
AZURITY PHARMACEUTICALS, INC.**

Civil Action No. 1:24-cv-00065-JLH

United States District Court for the District of Delaware

---

**EXPERT REPORT OF JAMES MALACKOWSKI**

**March 16, 2026**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

███████████████████████████████████████████████████████████
████████████████████████████

In addition, with respect to Bendeka®, ████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████████████████████████

## 8    QUANTIFICATION OF EAGLE'S LOST PROFITS

I understand that the lost profits inquiry for patent infringement focuses on the position the patentee would have been in "but for" the infringement. *Rite-Hite Corp. v. Kelley Co.* states that "the general rule for determining actual damages to a patentee that is itself producing the patented item is to determine the sales and profits lost to the patentee because of the infringement. To recover lost profits damages, the patentee must show a reasonable probability that, 'but for' the infringement, it would have made the sales that were made by the infringer."[314]

### 8.1    The *Panduit*-Test

In practical terms, to assess potential damages in a patent infringement case, a determination must be made as to whether and to what extent the plaintiff would have realized additional sales "but for" the defendant's infringement. One non-exclusive test for establishing "but for" causation is described in the *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.* case.[315] Pursuant to *Panduit,* a patentee may show an inference of lost profits by demonstrating the following four factors:

- Demand for the patented product;

- Absence of acceptable non-infringing alternatives;

- Manufacturing and marketing capability to exploit the demand; and

- The amount of profit that the claimant would have made absent the infringement.[316]

---

[311] Appendix 6.2.

[312] Appendix 6.2.

[313] Appendices 11.1 and 11.2.

[314] *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995).

[315] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).

[316] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1156 (6th Cir. 1978).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

The application of the "but for" analysis for calculating patent damages was affirmed by the United States Court of Appeals for the Federal Circuit ("CAFC") in *Grain Processing Corp. v. American Maize-Products Company*.[317]

### 8.1.1    Demand for the Patented Product

I understand that the first *Panduit* factor addresses "whether demand existed for the patented product" and "the focus on particular features corresponding to individual claim limitations is unnecessary when considering whether demand exists for a patented product."[318]

As reflected in **Appendix 4.2**, Slayback sold ▮▮▮▮▮▮▮▮ of Vivimusta® during the period December 2022 through September 2025.[319]  In connection with these sales, Slayback reported net revenues of ▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

### 8.1.2    Absence of Acceptable Non-Infringing Alternatives

The second *Panduit* factor evaluates the availability of acceptable non-infringing alternatives.  As set forth in Section 7.1, the record evidence indicates that FDA-approved treatments for CLL and NHL compete with bendamustine products.  **Appendix 11.1** lists FDA-approved treatments for CLL, and **Appendix 11.2** lists FDA-approved treatments for NHL.  Teva's 2024 Form 10-K is an example of such record evidence, stating:

> [C]ompetitors to BENDEKA include combination therapies such as R-CHOP (a combination of cyclophosphamide, vincristine, doxorubicin, and prednisone in combination with rituximab)… for the treatment of NHL, as well as a combination of fludarabine, doxorubicin and rituximab for the treatment of CLL and newer targeted oral therapies, such as ibrutinib, idelilisib and venetoclax.[321]

As set forth in Section 7.3, the record evidence also demonstrates that, although liquid and powder formulations may differ in certain respects, they are alternatives within the bendamustine product market.[322]

I understand that the Federal Circuit has held that when more than two suppliers exist in the product market, a patentee may satisfy the second prong of the *Panduit* test by substituting proof of its competing product(s) market share for proof of the absence of acceptable non-infringing substitutes.[323]  I have utilized this widely accepted market share approach to quantify Eagle's lost profits.

---

[317] *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341 (Fed. Cir. 1999).

[318] *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1330-1331 (Fed. Cir. 2009); *Georgetown Rail Equip. Co. v. Holland L.P.*, No. 2016-2297, 2017 WL 3499240, at *7.

[319] Appendix 4.2.

[320] Appendix 4.2.

[321] Teva 2024 Form 10-K, p. 10.

[322] EAGLEBEN-SA_00344611-762 at 688; EAGLEBEN-SA_00344400-610 at 443.

[323] *State Industries, Inc. v. Mor-Flo Industries, Inc.*, 883 F.2d 1573, 1577 (Fed. Cir. 1989)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**INTELLECTUAL CAPITAL EQUITY**

### 8.1.3    Manufacturing and Distribution Capacity

The third prong of the *Panduit* test requires that a patentee demonstrate that it possessed sufficient manufacturing, distribution, and financial capacity to make the additional unit sales it claims to have lost due to the infringement.

Eagle sells Belrapzo® to hospitals and cancer clinics. █████████████████████ ███████████████████████████ As set forth in Section 7.2.1.2, I understand that ████████████████████ ████████████████████████ liquid bendamustine products.[326]  According to Mr. Bricker, Eagle's Sr. V.P. and Head of Global Manufacturing and Supply,[327] ████████████████████████████████████████████ ███████████████████████████████████

As illustrated in **Appendix 5.4**, ██████████████████████████████████ █████████████████████████████ Based on this evidence, I have concluded that, during the damages period, Eagle had the capacity to achieve the additional unit sales of Belrapzo® and Bendeka® quantified in my market share analysis set forth below.

### 8.1.4    Quantification of Lost Profits





### 8.2    Quantification of Lost Profits Under Scenario A: Only Liquid Products

### 8.2.1    Eagle's Lost Profits from Lost Belrapzo® Sales – Scenario A

The calculation of Eagle's lost profits from lost Belrapzo® sales under Scenario A is contained in **Appendix 3.1.2**.  As **Appendix 3.1.2** illustrates, during the damages period of January 16, 2024 through September 30,

---

[324] EAGLEBEN-SA_00353678.

[325] Deposition of David Bricker, November 25, 2025, pp. 23 – 24.

[326] Deposition of David Bricker, November 25, 2025, pp. 23 – 24.

[327] Deposition of David Bricker, November 25, 2025, pp. 95 – 96, Exhibit 3.

[328] Deposition of David Bricker, November 25, 2025, p. 116.

[329] Appendix 5.1.

[330] Appendix 5.1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

in a variety of ways, including "by careful selection of the royalty base to reflect the value added by the patented feature [or] . . . by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof."[388]

## 9.4    Royalty Rate

*Georgia-Pacific Corp. v. United States Plywood Corp.* identifies fifteen non-exclusive factors which may be relevant to the determination of a reasonable royalty, although it is possible that certain of the fifteen factors have no relevance to the hypothetical negotiation.  The *Georgia-Pacific* factors are addressed in Section 11 below.  Certain of the *Georgia-Pacific* factors concern quantitative valuation factors are addressed in Section 10.

## 10    QUANTITATIVE VALUATION FACTORS

Determining a reasonable royalty involves valuing intangible asset(s) and determining what a user would pay for the use of the assets.  There are three common approaches to value intangible assets in evaluating reasonable royalty damages – the Cost Approach, the Income Approach, and the Market Approach.  My consideration of these approaches is discussed below.

## 10.1    The Cost Approach

As described in Economic Damages in Intellectual Property:

> The cost approach values assets based on the cost to create and develop the assets.  The premise behind the cost approach is that no party involved in an arm's-length transaction would be willing to pay more to use the property than the cost to replace the property.  In the context of patents, for instance, a potential licensee would not pay more to license a patent than the cost to design around the technology contributed by the patent.  An alternative to designing around the technology would be to purchase the technology.  Accordingly, a potential licensee would not pay more to license the technology than it would have to pay to purchase or create the technology.[389]

Under the cost approach, the licensee would pay no more in royalties than the cost of a non-infringing alternative.  Properly applied, the cost approach considers out-of-pocket expenditures, as well as risks, lost sales and other adverse economic impacts connected with the alternative technology.  The cost approach has been recognized and accepted by Federal courts for determining reasonable royalties for patent infringement:

> [A] fair and accurate reconstruction of the 'but for' market also must take into account, where relevant, alternative actions the infringer foreseeably would have undertaken had he not infringed.  Without the infringing product, a rational would-be infringer is likely to offer an acceptable non-infringing alternative, if available, to compete with the patent owner rather than

---

[388] *Gree Inc. v. Supercell Oy*, 2020 WL 4057640 (E.D.Tx. 2020); *AstraZeneca AB v. Apotex,* 782 F.3d 1324 (Fed. Cir. 2015).
[389] Slottje, Daniel, Economic Damages in Intellectual Property, 2006, p. 291.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**INTELLECTUAL CAPITAL EQUITY**

leave the market altogether. . . .  Moreover, only by comparing the patented invention to its next-best available alternative(s) – regardless of whether the alternative(s) were actually produced and sold during the infringement – can the court discern the market value of the patent owner's exclusive right, and therefore his expected profit or reward, had the infringer's activities not prevented him from taking full economic advantage of this right.[390]



---



[390] *Grain Processing Corp. v. American Maize-Products Co.,* 185 F.3d 1341, 1350 – 1351 (Fed. Cir. 1999).

[391] https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/212209Orig1s000ltr.pdf; Appendix 4.2.

[392] Defendants' Fifth Supplemental Response to Interrogatories (No. 7), December 5, 2025, p. 14.

[393] Prior Approval Supplement (PAS) New Drug Application (NDA).

[394] Defendants' Fifth Supplemental Response to Interrogatories (No. 7), December 5, 2025, p. 15.

[395] Defendants' Fifth Supplemental Response to Interrogatories (No. 7), December 5, 2025, p. 36.

[396] Brandt Report, March 16, 2026, p. 26.

[397] Brandt Report, March 16, 2026, pp. 26 – 27.

[398] Brandt Report, March 16, 2026, pp. 26 – 27.

[399] Defendants' Fifth Supplemental Response to Interrogatories (No. 7), December 5, 2025, p. 37.

[400] Defendants' Response to Interrogatories (Nos. 10 – 12), February 5, 2026, p. 6.

[401] Defendants' Response to Interrogatories (Nos. 10 – 12), February 5, 2026, p. 6.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**INTELLECTUAL CAPITAL EQUITY**



## 10.2    The Income Approach

The Income Approach provides a systematic framework for estimating an asset's price based on the value of the benefits derived from the use of that asset. As described in *Economic Damages in Intellectual Property*:

> The income approach is a method used to value intellectual property assets based on the present value of the future income stream generated by an asset. There are three major inputs to the income approach: (1) expected future cash flows from the asset; (2) economic life of the asset; and (3) business risk associated with the realization of the cash flow stream. The key goal is to

---

[402] Defendants' Response to Interrogatories (Nos. 10 – 12), February 5, 2026, pp. 5 – 6.

[403] Defendants' Fifth Supplemental Response to Interrogatories (No. 7), December 5, 2025, p. 37.

[404] Appendix 9.1; Defendants' Response to Interrogatories (Nos. 10 – 12), February 5, 2026, p. 6.

[405] Brandt Report, March 16, 2026, p. 26.

[406] Defendants' Response to Interrogatories (Nos. 10-12), February 5, 2026, p. 6.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### 11.1.11   Factor No. 11: The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.



I find that Factor No. 11 would tend to favor the licensee in this hypothetical negotiation.

### 11.1.12   Factor No. 12: The portion of the profit or the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

Like Factors No. 1 and  No. 2, Factor No. 12 relates to the Market Approach and considers licenses and licensing practices within the relevant industry.

As set forth in Section 10.3, Ocean Tomo conducted searches of the ktMINE® and RoyaltyStat® license databases for potentially comparable license agreements using keyword and combination-of-keyword searches.  Through searches of the ktMINE® and RoyaltyStat® databases conducted at my direction, eight agreements were identified.  These agreements are summarized in **Appendix 12.1**.

Upon further review of the agreements summarized in **Appendix 12.1**, the 2006 Bridgetech Agreement and the 2013 John Hopkins Agreement were evaluated for comparability to a hypothetically negotiated license based in part on the Sedona Commentary License Comparability factors set forth in **Figure 13**.  As set forth in Section 10.3, given the indicated similarities of these licenses, I consider these third-party agreements to be informative of the hypothetically negotiated royalty rate for rights to the Asserted Patents.  The revenue-based royalty rate of the 2006 Bridgetech Agreement is 4.0 percent.  And the revenue-based royalty rate of the 2013 John Hopkins Agreement is 3.0 percent.

I find that Factor No. 11 would tend to favor the licensee in this hypothetical negotiation.

---

[501] Appendix 3.2.1.

[502] Appendix 3.3.

[503] Appendix 9.1; Defendants' Response to Interrogatories (Nos. 10 – 12), February 5, 2026, p. 6.

[504] Defendants' Response to Interrogatories (Nos. 10-12), February 5, 2026, p. 6.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

## 14    SIGNATURE

Respectfully submitted,

_____           March 16, 2026

James E. Malackowski               Date                        _____

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix 4

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY



**Notes:**

[1] SLAY-VIVMUS018469.

[2] ████████████████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

# Exhibit 4
# Filed Under Seal



## Planet Depos
We Make It *Happen*™

**HIGHLY CONFIDENTIAL**

# Transcript of James Malackowski

**Date:** April 15, 2026
**Case:** Eagle Pharmaceuticals, Inc., et al. -v- Slayback Pharma/Azurity Pharma

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

----------------------------x

EAGLE PHARMACEUTICALS,        :

INC. and EAGLE SUB1 LLC,      :

          Plaintiffs,   :  Case No.

   v.                   :  1:24-CV-00065-JLH

SLAYBACK PHARMA LLC and       :

AZURITY PHARMACEUTICALS,      :

INC.,                         :

          Defendants.   :

----------------------------x

**HIGHLY CONFIDENTIAL**

Videotaped Deposition of JAMES MALACKOWSKI

Chicago, Illinois

Wednesday, April 15, 2026

8:41 a.m. CST

Job No.:  629327

Pages:  1 - 264

Reported Stenographically by:

Tiffany M. Pietrzyk, CSR RPR CRR

## Page 2

Videotaped deposition of JAMES MALACKOWSKI, held

at the location of:

        OCEAN TOMO, LLC

        200 West Madison Street

        Chicago, Illinois 60606

        312.327.4400

Pursuant to notice, before Tiffany M. Pietrzyk, a

Certified Shorthand Reporter in the States of

California, Illinois, and Texas, Registered

Professional Reporter, Certified Realtime Reporter,

and a Notary Public in and for the State of

Illinois.

## Page 3

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

    BRETT M. SANDFORD, ESQUIRE

    LATHAM & WATKINS LLP

    140 Scott Drive

    Menlo Park, California 94025

    650.328.4600

ON BEHALF OF THE DEFENDANTS:

    DANIEL E. FORCHHEIMER, ESQUIRE (via Zoom)

    ROBYN AST-GMOSER, ESQUIRE

    WINDELS MARX LANE & MITTENDORF LLP

    180 Park Avenue

    Florham Park, New Jersey 07932-1054

    973.966.3284

ALSO PRESENT:

    Karlo Papa

    Erin Schuppert, Planet Depos Videographer

## Page 4

C O N T E N T S

EXAMINATION OF JAMES MALACKOWSKI          PAGE

  By Mr. Sandford                              8

E X H I B I T S

        (Attached to transcript.)

DEPOSITION EXHIBITS                        PAGE

Exhibit 1    Expert Report of James          11
             Malackowski, dated 3/16/26

Exhibit 2    Errata to Expert Report of      12
             James Malackowski, dated
             4/12/26

Exhibit 3    Azurity Pharmaceuticals         48
             presentation entitled
             "Bendamustine Module," dated
             11/20/23, Bates number
             SLAY-VIVMUS0218279 through
             8292

Exhibit 4    Marketing materials, Bates      54
             number SLAY-VIVMUS0009765
             through 770

Exhibit 5    Marketing materials, Bates      55
             number SLAY-VIVMUS0010350
             through 377

HIGHLY CONFIDENTIAL

Transcript of James Malackowski
Conducted on April 15, 2026

6 (21 to 24)

---

**21**

patent license agreements with Mr. Mathew or Dr. Brandt or Dr. Thirman?

A. I believe there are expert reports that discussed patent license comparability. There's more reference to that within my report. I don't recall a further detailed phone discussion in that regard.

Q. And just so we're clear, so you're saying that you reviewed an expert report that addressed comparability of one or more licenses, but you did not have a discussion with either Dr. Brandt, Dr. Thirman, or Mr. Mathew about any patent license produced in this case; is that right?

A. I don't recall an oral conversation with them on that subject.

Q. Okay. Do you recall which expert addressed comparability?

A. I don't recall specifically, and it may have also been a third expert that has been presented by defendants. It's my understanding that there will be testimony at trial describing the technical comparability that I can rely upon. The technical analysis is outside my scope.

Q. I believe there's another expert, Dr. Sinko, that's been retained by Slayback. I believe he may

**22**

be who you're referring to?

A. He is.

Q. Okay. And so if you're relying on input from Dr. Sinko, fair to say that -- well, withdrawn.

You did not have any discussions or interviews with Dr. Sinko to form your opinions; right?

A. Correct.

Q. Okay. And fair to say if you were relying on input from Dr. Sinko, it would be cited either in the body or the footnotes of your report; right?

A. Yes. But generally speaking, it's my understanding that there will be expert technical testimony related to the comparability of licenses. And so I have taken it as a precursor to my analysis that that will exist. I make reference to it, but I'm not offering a technical comparability opinion.

Q. Is there specific input or an opinion that you are relying on from Dr. Sinko that is not reflected in your report?

A. I don't know the full scope of what his testimony will be, so I can't say. I'm relying generally on the principle that I cited to you. Of course, I also have my own business perspective on what agreements are comparable for my purposes but

**23**

as it relates to the technical analysis, again, I don't have a more fulsome description for you.

Q. Right.

You're not offering the opinion in this case that any patent license agreements that have been produced are technically comparable to the asserted patents; right?

A. So there is a distinction between the assessment of technical or field comparability when one is doing general licensing versus litigation. General licensing doesn't typically have an independent expert come in and address comparability. Litigation does.

In reviewing the licenses that were selected under Georgia-Pacific 12, it's my opinion, having done such analysis for 40 years, that they are sufficiently, technically comparable for purposes of assessment. I understand that there are other experts who will extend my business licensing assessment of comparability to a more technical detail, but that's outside my scope.

Q. We'll come back to that.

Did you discuss -- well, withdrawn.

**24**

Q. Okay. What degrees do you hold, sir?

A. I have a business degree in accounting and philosophy. And along with my son, I am working through a master's degree in AI at Georgetown.

Q. And you're not a lawyer; right?

---

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of James Malackowski
Conducted on April 15, 2026

---

**25**

A. Correct.

Q. Not offering any legal opinions in this case?

A. Correct.

Q. And at least as of now, you haven't earned any technical degrees; is that fair?

A. Yes.

Q. And you're not an engineer; right?

A. Not as I would use that term. I don't have a degree in engineering.

Q. And you're not holding yourself out as one of what's called ordinary skill of the art in the patents that are asserted in this case; right?

A. Correct.

Q. And just at a high level, you're not offering any technical opinions in this case; is that fair?

A. Not as I would use that term. In a litigation, technical opinions are reserved for the technical experts, which we've already discussed.

Q. And you're not a medical practitioner, an oncologist, pharmacist, clinician, anything in that field; fair?

A. Fair.

Q. And so you're not offering any -- call them

---

**26**

clinical or medical opinions in this case; is that accurate?

A. Yes, sir.

Q. Okay. At a high level, what were you asked to do in this case? What was your assignment?

A. To become familiar with the record in anticipation of a review of plaintiff's damage expert report, Dr. Vellturo, and then to provide my comments on his work, as well as if appropriate, my own independent opinion as to damages, assuming liability is found.

Q. And you're familiar with Dr. Vellturo before this case; right?

A. I am. Chris and I have known each other for decades.

Q. Is it fair to say that you disagree with his opinions, his methodology, but you're not contesting his qualifications as an expert in the field of economics or IP valuation, patent damages; correct?

A. Correct.

Q. And when you performed your work in this case, you assumed that the asserted claims of the asserted patents are enforceable, valid, and infringed by Slayback's Vivimusta product; right?

A. Correct.

---

**27**

Q. And that's a common assumption that damages experts make in basically every patent damages case; fair?

A. Liability is a common assumption, yes.

Q. And so you're not offering any opinions on validity or infringement; correct?

A. Correct.

Q. And I don't believe I saw any analysis or opinions relating to what are referred to as secondary considerations of non-obviousness or sometimes it's called objective indicia of non-obviousness; right?

A. I am not. Certainly not as it relates to this matter.

Q. And that includes a subcomponent of that analysis called a nexus. You don't offer any opinions in your report related to whether a sufficient nexus exists between the objective evidence and the asserted claims; is that fair?

A. Not with respect to whether or not the claims at issue are embodied within the accused product, certainly not.

Q. Okay. Let's talk about the scope of the claims a little bit.

You've read the patents, including the

---

**28**

claims; right, sir?

A. I have.

Q. Okay. And just at a high level, can you just give me your lay understanding of what the inventions are or the alleged inventions claimed in those patents?

A. Yes. It's described within my report and obviously the patents and the specifications themself. But generally speaking, it relates to a formulation or a method of administering bendamustine with certain solvents and/or stabilizers.

Q. Now, just to kind of walk through, there's multiple claims asserted in this case; is that your understanding?

A. Yes, sir.

Q. And understanding you're not a lawyer, you understand that each claim in a patent recites a different invention with a different scope; fair?

A. By definition, yes.

Q. And therefore, all else equal, one patent will not have the same value -- well, I'm going to restate that.

All else equal, one patent claim will not carry the same value as another patent claim; is

---

HIGHLY CONFIDENTIAL
Transcript of James Malackowski
Conducted on April 15, 2026

73

specifically, but it's a factual thing. There's not a dispute about it. He specifically does not take into account the year of legal competition in forming his trend lines, and that's part of why our numbers are so different.

Q. My original question was just a little more basic. So separate and apart from your and Dr. Vellturo's specific analysis, just what is your understanding of the reconstruction or but-for market, just at a basic level?

A. I thought that's what I explained. But my assessment of a but-for market is to take the sales that Slayback actually made and allocate them according to historical market shares.

Dr. Vellturo's construction of a but-for market is to create a trend line prior to the introduction of the Vivimusta product to jump that trend line to the start of infringement and then determine all products and calculate a difference as to what he thinks that Belrapzo should have earned.

The import of that is it's a non-traditional methodology that doesn't follow classic Panduit framework, and that results in a substantial overstatement because he ignores the competitive impact to Eagle prior to patent issuance.

74

Q. I think we're talking past each other a little bit. So let's do it this way. Let's look at page 28 at your report, please.

A. Yes, sir.

Q. Okay. And in page 28 starts section 7.3. It's specifically 7.3.1 of your report; right?

A. Yes, sir.

Q. And it's titled "Legal Precedence and Clinical Evidence" under the broader heading "Evidence Supporting Inclusion of Powder Products in Market Definition"; right?

A. True.

Q. And just at a high level, what you're discussing in this section is your understanding of certain legal precedents, as well as clinical evidence that supports your Scenario B, where you include the powder bendamustine products in the reconstructed market; is that fair?

A. True.

Q. Okay. And in the first paragraph specifically is where you discuss certain legal precedents supporting that decision; right?

A. Yes.

Q. Okay. And to my knowledge or to my review, you cite specifically the EI du Pont Supreme Court

75

case, the Brown Shoe Supreme Court case, and the Clayton Antitrust Act of 1914 in your discussion of the legal precedents that supports your conclusion to put powder products in the market definition under Scenario B; right?

A. I discuss all three of those, that's correct.

Q. Right. And you don't cite any patent cases or patent act in your discussion of the legal precedents in this paragraph; right, sir?

A. Not in that paragraph. Obviously, later in the report, there's a discussion of Panduit, for example, and other patent cases.

Q. How come you discussed these two antitrust cases and the Clayton Antitrust Act when discussing the appropriate market definition in this patent case?

A. Because I think it sets forth an initial framework to try to understand what it means to define a market. So I could have cited a textbook or a number of sources, but I thought citing this legal precedent of the U.S. Supreme Court would help to explain, in part, what needs to be considered when assessing a marketplace.

Q. And you understand that the three sources

76

you cite here at 230 and 231 -- footnotes 230 and 231, none of those three are patent cases or patent acts; right?

A. Correct.

Q. Okay. Now, stepping back and talking about the reconstructed -- the actual market, we agree that during the damages period, there were five liquid bendamustine products available in the actual market; correct?

A. Eagle, Teva, Slayback, Apotex, and Baxter. Is that what you're referring to?

Q. Correct.

A. Yes.

Q. So I'll just put it together. The five liquid bendamustine products that were available in the actual market during the damages period were Belrapzo from Eagle, Bendeka from Teva, Slayback's Vivimusta product, Apotex's liquid bendamustine product, and Baxter's liquid bendamustine product; agreed?

A. Yes.

Q. And then as you discuss in your report at, for example, page 27, there were also powder bendamustine products on the market during the damages period; right?

Transcript of James Malackowski
Conducted on April 15, 2026

---

**77**

A. Yes.

Q. And you identify those, I believe as Treanda and then four Treanda TE generics from Accord Healthcare, Dr. Reddy's, Eugia Pharma -- is it Meithal Pharmaceuticals?

A. Correct.

Q. Are you aware of any other Treanda generics that were on the market during the damages period?

A. Not that I recall.

Q. Okay. And then other than Treanda and the four generics that we just identified, as well as the liquid bendamustine products, are you aware of any other bendamustine products that were available on the market during the damages period?

A. No.

Q. Okay. Now, going back to the reconstructed or but-for market -- do you have a preference in term, "reconstructed" or "but-for"?

A. Given that we use reconstitution, I think the but-for would be clearest.

Q. I actually hadn't thought of that. That's fair.

Okay. Now, the but-for market, it's a hypothetical exercise; right?

A. True.

---

**78**

Q. Okay. Although the analyzing the but-for market is hypothetical, you agree that it's important to reconstruct that market so it accurately reflects the economic realities of the actual market; correct, sir?

A. I don't know what you mean by that. There isn't a requirement to reconstruct a market. There's a requirement to measure the damages that are incurred. So I don't think we need to, for example, know what would have been the share between the various Treanda generics. What we just need to understand is if there is a reasonably supported claim for lost profits by the plaintiff.

Q. Well, part of the exercise we're doing is we're looking at a hypothetical market that didn't exist; right?

A. Yes, but we're not, to use your words, trying to reconstruct every aspect of that market. We're simply trying to understand, but for the infringement, what additional sales would the plaintiff have earned?

Q. And to analyze lost profits in the but-for market, the product that's actually accused of infringement here, Slayback's Vivimusta product, is removed from that but-for market; correct?

---

**79**

A. Yes.

Q. And so in other words, to analyze lost profits, we assume that Slayback could not sell the Vivimusta in the but-for market; right?

A. As accused, correct.

Q. And so in the but-for market, neither Belrapzo nor Bendeka would actually need to compete with Vivimusta; right?

A. Correct.

Q. And then in addition, when we're looking at the but-for market, any infringing products supplied by third parties are also removed; correct?

A. I think there is some threshold that may be required in order to make that judgment because those products are asserted to be infringing, not known to be infringing.

I have conservatively assumed that they are infringing and removed them from consideration, but that is a debatable issue.

Q. Let's break that down a bit.

You said there's some threshold that may be required in order to make that judgment.

Can you just explain to me what you meant by that?

A. Well, there has to be some consensus or

---

**80**

agreement that those third-party products actually do infringe. I have had cases where Plaintiff have asserted such, and Defendant has vigorously denied. And so that may result in a different calculus than presented here.

In this case, for the benefit of Plaintiff, to be conservative, I've assumed, in my lost profits calculations, that they do infringe, and I've removed them from the market.

Q. You did not perform a lost profits calculation under any of your scenarios where either Apotex's or Baxter's liquid bendamustine product was treated as an acceptable non-infringing alternative that would have captured accused sales in the but-for market; right?

A. Correct.

Q. Okay. Now, just mostly for my -- and you understand that for the entirety of the damages period, Baxter's liquid bendamustine product and Apotex's liquid bendamustine product have been the subject of separate patent infringement lawsuits filed by Eagle; correct?

A. Generally, yes.

Q. And I understand you're not a lawyer, but is it your understanding that a product that is alleged

---



**81**

as an alternative that is the subject of a lawsuit cannot be treated as a non-infringing alternative in the but-for market until it has a license?

A. I don't know that that's a legal requirement or that is the conclusion of the law. It's not necessary for me to undergo that investigation given the assumptions I've made.

Q. Are you familiar with the Pall Corp case?

A. Pall Corp, P-a-l-l?

Q. Corp, yes.

A. Yes, but I haven't looked at it recently.

Q. Do you have an understanding of that case as it pertains to the issue of whether a third-party product can be treated as a non-infringing alternative while it is subject to an ongoing lawsuit?

A. I don't recall. I would have to look and understand the ruling and then the facts of that case to see if it would apply here.

Q. But at the end of the day, whether or not Baxter's or Apotex's liquid bendamustine products infringe or they don't infringe is not relevant to your lost profits analysis; correct?

A. As I sit here today, it is not because I've not -- I've excluded them from the market. If

**82**

something changes between now and trial to suggest that they don't infringe, I would revisit that issue.

Q. I think as you noted, Eagle's -- one of Eagle's experts in their opening report set forth an analysis supporting his opinion, Dr. Trout, that Baxter's and Apotex's products do, in his view, infringe the asserted patents.

Is that your understanding?

A. I understand that Eagle has made that assertion. I don't recall which report it was in.

Q. Do you have an understanding or from any of Slayback's experts as to whether they disagree with that opinion or set forth an analysis demonstrating their view that either Baxter or Apotex does not infringe the asserted patents?

A. I have not seen that, but I would not expect that. I would rather expect that from the Apotex and Baxter experts, and I've not seen their reports.

Q. And you didn't ask Slayback's experts when you spoke with them whether or not they addressed that issue; fair?

A. Not that I recall.

Q. Okay. Now, let's ping-pong back to the actual market for a second.

**83**

**84**

Q. And you've reviewed documents in this case where,

A. Yes, in the sense that I mentioned.

Q. Let's see if we can streamline this. Setting aside all bendamustine products, you've reviewed correct?

A. Generally, yes.

Q. Okay. Let's turn to the Panduit analysis briefly.

Panduit Factor 1 involves assessing the demand for the patented products; right?

A. Yes.

Q. Okay. And to analyze factor 1, you agree you don't need to consider specific claim limitations or whether there's demand for particular features; right?

A. Over the years, the cases have been varied on that point. But for purposes of my assessment

HIGHLY CONFIDENTIAL
Transcript of James Malackowski
Conducted on April 15, 2026

22 (85 to 88)

85

here, I've not imposed that requirement. So I've accepted that there's demand for the patented product.

Q. That's a separate conversation.

And you have the understanding, then, at least as you did your analysis, that factor 1 can be met by showing a significant amount of sales and revenue associated with the patented products; right?

A. I've accepted that, yes.

Q. Yeah.

And what were the patented -- well, take a step back.

You and Dr. Vellturo agree that Panduit Factor 1 has been met in this case; correct?

A. Correct.

Q. Just what patented products did you include in your factor 1 analysis?

A. The accused product primarily because I'm making the assumptions that is, in fact, infringing. And also the Belrapzo and Bendeka products.

Q. Did you consider the sales and revenue associated with Apotex and Baxter's liquid bendamustine products under your factor 1 analysis?

A. I defer to my report if that's specifically

86

mentioned, but that would not be necessary for my analysis.

Q. Well, you can look at page 41, if you'd like.

And page 41 sets forth your Panduit Factor 1 analysis; right, sir?

A. A summary of it. It doesn't specifically list the third-party products.

Q. And so did you consider -- did you -- well, withdrawn.

Did you treat Apotex and Baxter's liquid bendamustine products as patented products for purposes of analyzing factor 1?

A. I don't believe so.

Q. Okay. Why not?

A. It was not necessary to reach my conclusion.

Q. In other words, you concluded that factor 1 was met simply based on the sales and revenue associated with the accused product, Bendeka and Belrapzo, such that you do not think further analysis of Apotex and Baxter was necessary for the purposes of factor 1; is that fair?

A. That's a true statement.

Q. Okay. And I believe you concluded that demand exists for Vivimusta, as well as Belrapzo and

87

Bendeka; correct?

A. Well, I believe that's a true statement, but the analysis in my report is focused on Vivimusta only.

Q. Fair enough. So let's just I guess break it down, then.

You agree that there's demand in the market for Vivimusta; right?

A. I do.

Q. And you also agree that's demand in the market for both Belrapzo and Bendeka; correct?

A. I do.

Q. And I believe based on your calculations, if you look at page 43, from the start of the damages period through September 30, 2025, ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ correct?

Did I screw that up?

A. No. That's correct.

Q. Okay. And I won't go through all the calculations for efficiency.

But you don't dispute any of Dr. Vellturo's calculations of unit sales or revenue associated with Bendeka, Belrapzo, or Apotex or Baxter's liquid bendamustine products in your report; correct, sir?

88

A. I don't dispute any of his representations of historical sales.

Q. Right. Okay.

You agree that Vivimusta is commercially successful in the market?

A. That's a term of art. Depends upon the context of the analysis. I think this record would show that ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Q. So you just haven't formed an opinion, one way or the other, whether Vivimusta is commercially successful in the context of validity; right?

A. Not in the context of validity. My only assessment of commercial success would be as that term is used in the Georgia-Pacific factors.

Q. Well, under the Georgia-Pacific construct,

HIGHLY CONFIDENTIAL

Transcript of James Malackowski
Conducted on April 15, 2026

---

**89**

you would agree that Vivimusta has been commercially successful; correct?

A. Yes.

Q. Okay. And the same is true for Belrapzo and Bendeka; right?

A. Yes.

Q. Would you agree that Slayback -- withdrawn. Excuse me.

Would you agree that Apotex and Baxter's liquid bendamustine products have been successful in the market under the Georgia-Pacific construct?

A. I have not considered that issue.

Q. Okay.

A. I haven't offered an opinion.

Q. Why did you not analyze the extent of the success or the lack thereof of Apotex and Baxter's liquid bendamustine products under the Georgia-Pacific analysis?

A. So within Georgia-Pacific Factor 8, which is the factor describing commercial success on page 71 of my report, although I focus on Vivimusta, I do make reference to the Baxter and Apotex products, noting the assertion by Eagle, and reporting their profitability at 94 percent.

Q. You did not consider the unit sales or

---

**90**

revenue associated with either Apotex or Baxter's liquid bendamustine product when analyzing Georgia-Pacific Factor 8 or any of the other factors; correct?

A. Well, I did not consider unit sales specifically in Factor 8. I considered profitability. I would defer to the report, whether they're mentioned on a unit basis under other factors. I don't recall that.

Q. I guess my question stands, is why did you not consider the unit sales or revenue separate from profitability of either Baxter or Apotex's liquid bendamustine product in your reasonable royalty analysis?

A. I don't think that it's required. This is a negotiation between the parties in suit, and the royalty is going to apply to all of the sales at issue. And I've made the assumption or removed the other Apotex and Baxter products, so I'm not going to advance those as an alternative that would affect the royalty. I don't see its relevance.

Q. But those are removed for purposes of the but-for market in the lost profits analysis; correct?

A. True. But they're also removed here in the

---

**91**

sense that I don't advance them as alternatives that would temper the royalty.

Q. So under your reasonable royalty analysis, whether or not a third-party product that is alleged and actually accused, in a separate lawsuit, of infringing the same patents that are being negotiated, the success of that product is not relevant to the hypothetical negotiation?

A. If, in fact, they're removed from the but-for world, I don't see how that would be relevant. I don't see any Georgia-Pacific factors that speak to that.

Q. But there's no but-for world in the Georgia-Pacific construct; right?

A. Well, sure there is. The but-for world is you're not infringing, but you're going to get a license. So I've not assumed, for example, that Baxter and Apotex are also getting a license or that we need to calculate one for them. This is simply a license for Slayback.

Q. I mean, there's not a but-for world in the sense of how we reconstruct the lost profits market when you're assessing the hypothetical negotiation; right? Those are two different concepts.

A. But they can be related in the sense that

---

**92**

the royalty can take into account the award of lost profits, and so you're only determining the royalty on the residual.

I'm not doing that here. I'm doing a royalty based upon the totality of the accused sales.

Q. So when analyzing the reasonable royalty in this case, your assumption was that Baxter and Apotex would be infringing and would not be on the market for purposes of that negotiation?

A. Correct.

Q. Okay. Now, is it your understanding that Eagle also sells a branded liquid bendamustine product in Japan called Treakisym?

A. Yes. I'm familiar with that existing. I believe, in some of the financial documents, there is allocations of royalties to that product in addition to the Belrapzo and Bendeka products.

Q. I didn't see Treakisym mentioned in your report; is that fair?

A. I don't believe it's referenced.

Q. You didn't calculate the revenue that Eagle has earned from selling Treakisym in Japan; that's fair too; right?

A. Not in my royalty analysis. My only

---

117

Belrapzo because it's indicated to treat both CLL and NHL; right?

A. Well, that's a better question for those experts. I indicate that it's an available alternative because the FDA has approved it for such purpose.

Q. But is that your understanding from -- withdrawn.

Is it your understanding, from the clinical experts that Slayback has retained in this case, that Brukinsa is an acceptable alternative for Belrapzo?

A. You would have to go back to their specific reports. There is a set of research that I did independent of those experts to look at FDA approvals for these two conditions. I understand that the technical experts also say that these types of therapies are alternative and substitutes. Whether they, too, list each and every one of these for each of the two indications, we'd have to go back and map it to their work.

Q. But you cited all their rebuttal reports in your report; correct? Other than Dr. Sinko?

A. I believe that's true. I don't know how that affects what we're talking about, but...

118

Q. Well, I mean, do you have an understanding one way or the other as to whether Slayback's clinical experts have offered the opinion that Brukinsa is an acceptable alternative to Belrapzo?

A. As it relates to that specific drug, you need to go ask them, or we need to look to their reports. I'm not trying to draw that linear conclusion.

Q. Well, I'm just asking -- I just asked if you have an understanding one way or the other as to whether they've offered that opinion?

A. Not from memory.

Q. Okay. But you agree that in Exhibit 6, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Q. Okay. Put that document aside.

Now let's shift gears and go to factor 3 briefly. Panduit factor 3 asks, at a high level, whether Eagle had the manufacturing, distribution, and financial capacity it make the accused sales that are claimed as lost; is that fair?

A. Yes.

Q. And in this case, you analyzed factor 3 and

119

concluded that it is met, in agreement with Dr. Vellturo; correct?

A. Yes.

Q. And I think it's 42, if it helps you. I'm going to jump there really quick.

In the third paragraph of your Panduit factor 3 discussion on page 42, you say, "Based on this evidence, I have concluded that, during the damages period, Eagle had the capacity to achieve the additional unit sales of Belrapzo and Bendeka, quantified in my market share analysis set forth below."

Do you see that?

A. Yes.

Q. Is it your -- withdrawn.

Did you also conclude that Eagle had the capacity to achieve the additional unit sales of Belrapzo and Bendeka that was quantified in Dr. Vellturo's analysis in his opening report?

A. No.

Q. Can you explain that?

A. I haven't conducted that analysis, in part because the analysis is faulty for all the reasons I've set forth in my report, and, of course, in part because the quantities that he presumes at certain

120

prices, I think, are inconsistent with the facts of the case.

So I'm not obligated to assess factor 3 under his condition. I am presenting it under my own.

Q. So you did not perform an analysis to determine whether Eagle had the capacity, under Panduit factor 3, to make the additional unit sales of Belrapzo and Bendeka that Dr. Vellturo is -- has included in his analysis; is that fair?

A. Correct. I don't think that's a necessary analysis.

Q. And he concluded that Panduit Factor 3 was met for the units that he is claiming as lost; right?

A. I believe so.

Q. And you don't dispute that in your report; fair?

A. I'm not specifically disputing his conclusion on factor 3.

Q. Okay. And in your report, you don't identify any manufacturing disruptions or supply chain issues that Eagle experienced with respect to supplying Belrapzo or Bendeka during the damages period; right?

HIGHLY CONFIDENTIAL

Transcript of James Malackowski
Conducted on April 15, 2026



**121**

A. True.

Q. Okay. Let's shift to factor 4.

You and Dr. Vellturo have a disagreement about the appropriate way to allocate the accused sales to Belrapzo and Bendeka in the but-for world; fair?

A. True.

Q. Dr. Vellturo, at a high level, he allocated accused sales to Bendeka and Belrapzo by calculating shares of their incremental sales by using IQVIA data?

A. In part, yes.

Q. And you don't object to him just relying on IQVIA data in and of itself; fair?

A. It depends upon the purpose for which he's using it. If he's using it generally for market share parameters, I don't object. I've tested that data against the actual results, and they're very close, within a percentage or so. If he's using it to somehow hypothecate some projected growth line resulting in an inversion of sales between Bendeka and Belrapzo, then I would object.

Q. And the parties, Eagle and Slayback, both routinely rely on IQVIA data in the ordinary course of their business to make business decisions; fair?

**122**

A. I think that's fair.

Q. Okay. And ultimately, Dr. Vellturo allocated ?

A. Correct, which I think is inverted. It should be the other way around.

Q. Right.

You offer the exact opposite opinion, ; right?

**123**

Q. But your calculations here do not yield an allocation of ; right?

A. It's on average, .

Q. Where are you looking?

A. The bottom of the chart. The Total column under Scenario A.

Q. Oh, I see. Okay.

A. Which is shockingly close to the .

Q. And this is -- but this is based on IQVIA sales data, right, per the title?

**124**

A. Yes.

Q. Okay. And so my question was you did not -- maybe we just pass -- two ships passing.

You did not base your allocation on the actual sales data that was produced. There's a better way to describe that. I never liked actual sales data.

Setting aside the -- withdrawn.



at all during the period of the damages period, it should be considered.  That leaves only, in this case, the issue of availability due to FDA regulatory requirements, and to factor that in would be valuing the FDA regulatory process, not the invention, so I don't believe it should be a consideration.

Q. So what standard for availability did you apply or use in your -- under the cost approach

Q. But is your understanding that so long as a next best alternative is available at some point in the entire damages period, that it can be considered at the hypothetical negotiation?

A. If, in fact, it would be knowable at the hypothetical negotiation, absolutely.

Q. What is the damages period in this case again?

Q. What was the damages period you considered when performing your reasonable royalty analysis as expressed in your report?

Q. So which period did you use, though, to consider                                    ?

Q. Okay.  So your understanding is that if

HIGHLY CONFIDENTIAL
Transcript of James Malackowski
Conducted on April 15, 2026

61 (241 to 244)



HIGHLY CONFIDENTIAL
Transcript of James Malackowski
Conducted on April 15, 2026

62 (245 to 248)



HIGHLY CONFIDENTIAL

Transcript of James Malackowski
Conducted on April 15, 2026

63 (249 to 252)



And since it doesn't look like we're going to finish immediately, can we take a break and think about lunch.

THE VIDEOGRAPHER:  Stand by.

We are going off the record.  The time is 14:29.

(A short break was had.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 14:29.

BY MR. SANDFORD:

Q.

261

A. Well, by definition, if it's around 500,000 now, 500,001 is between your bookends.

Q. Okay. And you can't give me any more of a specificity on that?

A. I really don't know what I'm going to be asked to do.

Q. Who are the folks that -- from your team that worked on this report with you? If you can just identify them.

A. Sure. Carlo, who's joining us today; Robert McSorley, who's a managing director; Nikki Tavasoli, who is a manager; and there were others who, at time to time, would help with certain research or QCs.

Q. Okay. And just generally, where do their rates fall?

A. Mr. McSorley is 7 to 800. Nikki is probably 400. Carlo is probably 150 to 250ish.

Q. And do you know approximately how much time they collectively have spent working on this case?

A. Not specifically, only that the cumulative effect of that is the approximate $500,000 number I gave you.

Q. Your CV is attached as Appendix 1 to your report.

Is that still accurate and up to date?

262

A. I've had one deposition since then in the matter of Aerosonic versus Joby on eVTOL aircraft. Nothing related to this.

Q. Okay. Did you speak with anyone other than the lawyers at Windels Marx or Slayback's local counsel in this case to prepare for your deposition today?

A. No.

Q. Okay. In your report, you state you're a named inventor on over 20 patents?

A. True.

Q. You don't include any opinions or discussions about those patents in your report; right?

A. True.

Q. You don't intend to offer any opinions about the substance of those patents at trial; fair?

A. True.

MR. SANDFORD: Okay. No further questions.

THE WITNESS: Thank you. Very professional.

MS. AST-GMOSER: No questions on behalf of --

I'm sorry, Dan. Go ahead.

MR. FORCHHEIMER: No questions on our end.

THE VIDEOGRAPHER: All right. Stand by.

263

This marks the end of the deposition of James Malackowski. We are going off the record. The time is 14:43.

(Off the record at 2:43 p.m.)

264

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, Tiffany M. Pietrzyk, CSR RPR CRR, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 18th of April, 2026.

My commission expires:
February 28th, 2028

# Exhibit 5
# Filed Under Seal

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC,<br><br>          Plaintiffs,<br><br>     v.<br><br>SLAYBACK PHARMA LLC AND AZURITY PHARMACEUTICALS, INC.<br><br>          Defendants. | C.A. No. 24-65-JLH<br><br>**HIGHLY CONFIDENTIAL** |

**REBUTTAL EXPERT REPORT OF DR. MICHAEL L. BRANDT, PHARMD, FASHP**

1

developed using alternative stabilizing strategies that do not require the specific claimed combination of polyethylene glycol and antioxidant features described in the patents. Accordingly, the existence of multiple approved liquid bendamustine formulations demonstrates that non-infringing design pathways were technically feasible and commercially realistic during the damages period.

27

**MICHAEL L. BRANDT, PHARMD, FASHP**

41

# Exhibit 6
# Filed Under Seal

# Exhibit 7
# Filed Under Seal

# Exhibit 8
# Filed Under Seal