## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC,<br><br>Plaintiffs,<br><br>v.<br><br>SLAYBACK PHARMA LLC and AZURITY PHARMACEUTICALS, INC,<br><br>Defendants. | REDACTED PUBLIC VERSION FILED AUGUST 7, 2026<br><br> C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>██████████████ |

**DECLARATION OF MANUELA BUREK IN SUPPORT OF PLAINTIFFS  EAGLE PHARMACEUTICALS, INC. AND EAGLE SUB 1 LLC'S *DAUBERT* MOTION TO EXCLUDE THE OPINIONS OF DEFENDANTS' EXPERT, DR. BRIAN SMITH**

I, Manuela Burek, declare as follows:

1.      I am an attorney at the law firm of Latham & Watkins LLP and counsel for Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC ("Eagle") in the above-captioned case.  I am admitted to practice before the Court *pro hac vice*.

2.      I make this declaration in support of Eagle's *Daubert* Motion to Exclude the Opinions of Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s ("Slayback's") Expert, Dr. Brian Smith.

3.      I have personal knowledge of the facts set forth in this declaration, and if called as a witness, could and would competently testify thereto.

4.      Attached as **Exhibit 1** is a true and correct copy of excerpts of the Expert Report of Dr. Jeffrey D. Kittendorf, dated February 5, 2026.

5.      Attached as **Exhibit 2** is a true and correct copy of excerpts of the Corden Pharma Latina S.p.A. Bendamustine Testing Protocol (SLAY-VIVMUS0010983).

6.       Attached as **Exhibit 3** is a true and correct copy of excerpts of the Opening Expert Report of Dr. Bernhardt Trout, dated February 6, 2026.

7.      Attached as **Exhibit 4** is a true and correct copy of excerpts of the Expert Report of Dr. Brian C. Smith, dated March 16, 2026.

8.      Attached as **Exhibit 5** is a true and correct copy of excerpts of the Deposition Transcript of Brian C. Smith, dated April 24, 2026.

9.      Attached as **Exhibit 6** is a true and correct copy of excerpts of Practical HPLC Method Development, Second Edition (EAGLEBEN-SA_00373969).

I declare under penalty of perjury that the foregoing is true and correct.

1

June 5, 2026

/s/ Manuela Burek
Manuela Burek

# Exhibit 1
# Filed Under Seal

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC<br><br>        Plaintiffs,<br><br>   v.<br><br>SLAYBACK PHARMA LLC and AZURITY PHARMACEUTICALS, INC.,<br><br>        Defendant. | C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY** |

**EXPERT REPORT OF DR. JEFFREY D. KITTENDORF, PH.D.**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

monitored using an enclosed data logger.  The temperature data is attached as **Exhibit C**.  Upon receipt, I opened the package containing the samples and stored them in a secure laboratory refrigerator at about 4° C.  Receipt records are attached as **Exhibit D**.  Given that the Slayback liquid bendamustine product has a shelf life of 36 months, I understand that the foregoing samples were tested at approximately 21 months after being packaged in the vials.

32.    I purchased BDM HCl reference standard (USP No. 1065221; Lot No. F070G0) from USP.  The certificates of analysis for those reference standards are attached as **Exhibit E**.

33.    I also purchased bendamustine related compound D (USP No. 1065265; Lot No. F070L0) and bendamustine related compound E (USP No. 1065276; Lot No. F070M0) from USP. Records are attached as **Exhibit F**.

### 2.    Analytical Method

34.

9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**



56.    As explained above, I understand that certain claim limitations relate to the amount of total impurities present after at least 15 months of storage. *See supra* ¶ 4.  The product samples that Slayback supplied for this experiment included a lot number (pertaining to a broad group of products manufactured under similar conditions, which may include products from different batches) but no batch number (pertaining to a specific group of products manufactured under identical conditions in a single production).  Without batch information, I was unable to identify certain information about the samples, such as the date when they were placed on stability.[5]  As

---

[5] I understand from counsel that it took almost a year and a half from Eagle's initial request for product samples to receipt of those samples. *See* Eagle's First Set of Requests for Prod. (May 21,

Dated:  February 5, 2026

Dr. Jeffrey D. Kittendorf, Ph.D.

# Exhibit 2
# Filed Under Seal



Highly Confidential Information

SLAY-VIVMUS0010983



Highly Confidential Information



Highly Confidential Information

SLAY-VIVMUS0010998

# Exhibit 3
# Filed Under Seal

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC<br><br>Plaintiffs,<br><br>v.<br><br>APOTEX INC., AND APOTEX CORP.,<br><br>Defendants. | C.A. No. 24-64-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC<br><br>Plaintiffs,<br><br>v.<br><br>SLAYBACK PHARMA LLC, AND AZURITY PHARMACEUTICALS, INC.<br><br>Defendants. | C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |
| EAGLE PHARMACEUTICALS, INC. AND EAGLE SUB1 LLC,<br><br>Plaintiffs,<br><br>v.<br><br>BAXTER HEALTHCARE CORPORATION,<br><br>Defendant. | C.A. No. 24-66-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |

**OPENING EXPERT REPORT OF DR. BERNHARDT TROUT, PH.D.**

the "pharmaceutically acceptable fluid" PEG component, and its inclusion in the PEG of Belrapzo® and Bendeka® means that those embodiments do not meet the "pharmaceutically acceptable fluid" element of the claim.  For the same reasons discussed above, I disagree. ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████

**2.** **"wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C."**

392.   I understand that one or more Defendants dispute whether Belrapzo® practices the Asserted Claims which require the claimed compositions to meet a certain stability profile "wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C."  Based on the results of Dr. Kittendorf's testing, I disagree.

393.   First, Dr. Kittendorf's experiments and analysis are the kinds of facts and data that I, as a POSA, would reasonably rely upon in formulating, validating, and controlling a liquid injectable drug product.  In this field, the skilled team is multidisciplinary by necessity.  It includes formulation scientists, analytical chemists, stability scientists, quality-control and quality-assurance personnel, and clinical and medical professionals.  Within that team construct, it is

standard practice for the formulator and chemistry, manufacturing, and controls ("CMC") lead to rely on the work product of qualified analytical and stability colleagues—method validations, chromatographic data, release and stability testing, spectral assessments, impurity identifications and quantitation, and statistical shelf-life justifications—when making technical determinations about solubility, stability, specifications, expiry dating, and comparability.

396.    As a formulator in this field, I routinely and reasonably rely on such analytical and stability work when forming technical conclusions; it is neither expected nor efficient for a formulator to personally generate every chromatogram or replicate every stability timepoint. Instead, the accepted practice is to evaluate the method's validation status, the data's conformance to system-suitability and control requirements, and the integrity of the trending, and then to integrate those results into formulation and regulatory conclusions.  That is what I have done here.

397.    I understand that the stability profile limitation should be construed according to its "plain and ordinary meaning in light of the specification."  I apply this construction in my analysis.

398.    In accordance with the plain and ordinary meaning, a POSA would understand "the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C" in Belrapzo®.

142



399.

400.

401.

402.    To the extent that one or more Defendants dispute infringement based on the HPLC analytical methods used, I disagree, including because of Dr. Kittendorf's conclusions.  I understand that Dr. Kittendorf has performed multiple experiments involving Bendeka® and has concluded, based on those experiments, that Bendeka® has less than about 5% total impurities, as calculated on a normalized peak area response basis as determined by HPLC at a wavelength of 223 nm, after at least about 15 months at a temperature of from about 5° C. to about 25° C. EAGLEBEN-SA_00353427 (Dr. Kittendorf's Expert Report in *Eagle Pharms. Inc, v. Hospira,*

143

*Inc.*, No. 18-1074 (D. Del.)) at -447-48. Since Belrapzo® has the identical formulation, a POSA would understand Belrapzo® to have the same impurity measure as Bendeka®.

403.    First, I understand that Dr. Kittendorf's experiments provide direct evidence that Belrapzo® and Bendeka® meets the stability profile of the claims. Specifically, I note that Dr. Kittendorf measured the amounts of total impurities in representative batches of the Bendeka® using HPLC analysis at a wavelength of 223 nm and determined that those batches had less than about 5% total impurities, as calculated on a normalized peak area response basis after ███████ ████████████████████████████. *See* EAGLEBEN-SA_00353427 (Dr. Kittendorf's Expert Report in Eagle Pharms. Inc, v. Hospira, Inc., No. 18-1074 (D. Del.)) at -447-48. Since Belrapzo® and Bendeka® have identical formulations, I understand Dr. Kittendorf's testing of Bendeka® to be equally applicable to Belrapzo®. Thus, Dr. Kittendorf's experiments demonstrate that the Belrapzo® "has less than about 5% total impurities, as calculated on a normalized peak area response basis as determined by HPLC at a wavelength of 223 nm, after at least about 15 months at a temperature of from about 5° C.," irrespective of the Eagle's methods for measuring the amounts of impurities in Belrapzo®.

404.    Second, I understand that Dr. Kittendorf's experiments establish that Belrapzo® stability data shows that the Belrapzo® meets the stability profile of the claims. Specifically, I understand that Dr. Kittendorf compared the amounts of total impurities in batches of Bendeka® using HPLC analysis ███████████████████████████████████ ██████████████████████████████████████████████████████. *See* EAGLEBEN-SA_00353427 (Dr. Kittendorf's Expert Report in *Eagle Pharms. Inc, v. Hospira, Inc.*, No. 18-1074 (D. Del.)) at -447-48. ████████████████████ ████████████████████████████████████████████████████████

144

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

405.    Because, as discussed above, the Eagle's long-term stability data report that representative batches of Belrapzo® have less than about 5% total impurities after 15 months of storage at a temperature of about 5° C, Eagle's stability data also demonstrate that Belrapzo® and Bendeka® meet the stability profile of the claims.  *See* ¶¶ 388-390.. ███████████████

███████████████████████████████████████████████████████████

███████. EAGLEBEN-SA_00353427 (Dr. Kittendorf's Expert Report in *Eagle Pharms.  Inc, v. Hospira, Inc.*, No. 18-1074 (D.  Del.)) at -447-48.

406.    Third, I understand that Dr. Kittendorf concluded that HPLC analysis at a wavelength of 223 nm is a valid method for measuring the amounts of total impurities in Bendeka® and Belrapzo® because the formulation is the same.    EAGLEBEN-SA_00353427 (Dr. Kittendorf's Expert Report in *Eagle Pharms.  Inc, v. Hospira, Inc.*, No. 18-1074 (D.  Del.)) at -447-48. ████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████

407.    In addition to Belrapzo®'s specifications, long-term storage data, and Dr. Kittendorf's experiments and analysis, I understand that in a prior case involving Apotex and Slayback as Defendants, the parties previously stipulated that the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to

███

about 25° C. in Belrapzo®.  Final Pretrial Order in *Eagle Pharms., Inc. v. Slayback Pharma LLC*, et al., C.A. No. 21-1256-CFC-JLH (D.  Del.), D.I. 107, Ex. 1 at ¶ 32.

408.    Since I understand that the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. in Belrapzo® and Bendeka®, I understand the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. in Belrapzo® and Bendeka®.

## XV.    THE RELATIVE VALUE OF THE ASSERTED PATENTS

409.    I have been informed that the Asserted Patents were licensed in an agreement between Eagle and Teva.[10]  *See* EAGLEBEN-SA_00072300 (Exclusive License Agreement) at -301, -305 ("1.22 "Eagle Patent Rights""); -360-62 (Schedule 1.22).  I will refer to this as the "Eagle-Teva License."

410.    I understand that, in the Eagle-Teva License, Teva granted Eagle a license to one patent, U.S. Patent No. 8,791,270, and Eagle granted Teva a license two families of patents, which I will refer to as the (1) "formulation" patents and (2) "rapid administration" patents.  I understand that Bendeka® practices both sets of patents, whereas Belrapzo® practices only the formulation patents.

---

[10] I understand that the agreement states that it is between Eagle and Cephalon, Inc.  I understand that Teva acquired Cephalon, Inc. on October 14, 2011 and thus the agreement is between Eagle and Teva. *See* EAGLEBEN-SA_00361846I also understand that there were several amendments to the Eagle-Cephalon License.

Dated: 2/6/26

_____
Dr. Bernhardt L. Trout, Ph.D.

# Exhibit 4
# Filed Under Seal

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

EAGLE PHARMACEUTICALS, INC. and
EAGLE SUB1 LLC,

        Plaintiffs,

      v.

SLAYBACK PHARMA LLC and AZURITY
PHARMACEUTICALS, INC.,

        Defendants.

C.A. No. 24-65-JLH

**EXPERT REPORT OF DR. BRIAN C. SMITH
REGARDING THE TESTING OF DR. KITTENDORF**

**HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER**

such a person and understand how such a POSA analytical chemist would view Dr. Kittendorf's experiments and the patents-in-suit from an analytical chemistry perspective.

17. A list of my selected peer reviewed publications can be found in my CV, included here as Exh. 1.

### B. Litigation Experience

18. In the past four years, I have not testified by deposition or at trial in any matter as an expert.

## II.   SCOPE OF WORK AND SUMMARY OF OPINIONS

19. I have been retained by Defendants as a technical expert in this matter to provide opinions regarding various issues surrounding United States Patent No. 11,872,214 ("the '214 patent", Exh. 2) and United States Patent No. 12,138,248 ("the '248 patent", Exh. 3) (collectively the "patents-in-suit"). For purposes of this Report, I have been asked to review the report of Dr. Kittendorf and opine regarding its conclusions. The billing rate for my services is $650.00 per hour for all work, plus expenses. My compensation does not depend upon my opinions or the outcome of this proceeding.

20. A list of the materials I considered while forming the opinions herein is attached as Exhibit 4. I also relied upon my experience, education, and training.

21. As I will explain in detail, I have reviewed the report and underlying data from Dr. Kittendorf. █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ a

5

> is less than about 5% peak area response, as determined by
> HPLC at a wavelength of 223 nm …

Thus, I understand that for purposes of patent infringement, the patentee bears the burden of proving that the total impurities resulting from the degradation of bendamustine are below 5% as shown by an HPLC method that detects impurities at 223nm and determines the percentages by the peak area response method.

25.      A method that uses a different wavelength or a technique other than "peak area response" to determine the total impurities would be expected to give different results and thus is of no relevance to this claim. Thus, I have focused my analysis on Dr. Kittendorf's studies at 223 nm using what he calls "normalized peak area response" and "mass percentages" – which are both versions of a "peak area response" analysis.  That said, I recognize that Dr. Kittendorf also did testing at ▮▮▮▮. This testing is not relevant to the patents-in-suit because it is not at 223 nm as required by the claims. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## IV.      BACKGROUND KNOWLEDGE ON ANALYTICAL CHEMISTRY

26.      Analytical chemistry is the science of determining the identity and quantity of chemical species in samples.  In analytical chemistry the analyte is the chemical species whose identity and/or concentration we wish to determine.  A _qualitative analysis_ is where the identity of an analyte is determined, and a _quantitative analysis_ is where the concentration or amount of an analyte is determined.  (Exh. 6, J. Kenkel, _Analytical Chemistry for Technicians_, CRC Press, Boca Raton, 2003, pg. 2).  In a lab setting analytical chemistry can involve the use of glassware, pipettes, chemicals, instrumentation, computers, and software.

7

$L$ = Pathlength

$C_{unk}$ = The concentration of analyte in the unknown sample.

50.    A is obtained from the peak height or area of the analyte in a chromatogram or spectrum, L is known from the spectrometer used and is generally a constant, and the absorptivity is obtained from the slope of the calibration line.  In this fashion then the concentrations of analytes in samples can be determined by HPLC using UV-Vis detection.

51.    Another concept of importance here is that of "peak area response" or "peak area normalization" quantitation method.  Here is an example of how this method can work.  Let's imagine we have a solution that contains bendamustine or "BDM" at 50% and an impurity "IMP" at 50%.  Let's also imagine that their response factors (in the case of UV-Vis detection these are the absorptivities) are the same and are both equal to 1.  We can calculate the area of the chromatographic peak for each of these analytes by rearranging equation 1 (from above) as seen in equation 5:

$$A = C\,(RF) \quad (5)$$

Where A is area, C is concentration, RF is response factor, and given that L (path length of the sample) is constant.

52.    For impurity IMP its peak area will be (50 x 1) or 50, and similarly the peak area for BDM will be (50 x 1) or 50.  Note that the total peak area is the area of components IMP and BDM added together and equals 50 +50 or 100.

53.    The peak area normalization method calculates analyte concentrations by dividing the peak area for a given analyte by the total peak area as seen in equation 6:

$$\% \text{ Analyte} = \text{Analyte Peak Area/Total Peak Area} \quad (6)$$

54.    Thus, where the RFs are the same and are both equal to one, then the peak area for impurity IMP is 50, and for BDM is 50, and the total peak area is 100, then we find that

17

amount of impurity IMP is 50/100 or 50% and the amount of bendamustine is 50/100 or 50%. These results comport with the known reality – since we assumed a 50/50 mixture and that the response factors of analytes BDM and IMP were equal, we obtained the correct results.

55.    However, if the response factor for these two analytes are different, then the results will not comport with reality.  Let's imagine our sample still actually contains 50% BDM and 50% IMP, and the response factor for BDM is still 1, but the response factor for impurity IMP is now 2.  We can use equation 6 to calculate the peak areas for this new case generating equations 7:

$$\text{New Peak area of IMP} = A\,(RF) = 50(2) = 100 \quad (7)$$
$$\text{New Peak area of BDM} = A\,(RF) = 50(1) = 50$$

56.    Note then that the total peak area is now $100 + 50$ or 150.  Using the peak area normalization method as given in equation 6 we find the new calculated concentrations as given by equations 8:

$$\%\ IMP = 100/150 = 66.7\% \quad (8)$$
$$\%\ BDM = 50/150 = 33.3\%$$

57.    Note that when the response factors for two analytes are different, the peak area normalization method predicts that the concentrations of BDM and IMP are 33.3% and 66.7% respectively.  But we know the real concentrations are 50% BDM and 50% IMP.  When the response factors for the analytes are not equal the peak area normalization method fails to accurately predict the concentrations of bendamustine and its impurity.  In this case where the response factor of degradant IMP was higher than bendamustine, the concentration of IMP is overestimated and the concentration of bendamustine is underestimated.  Alternatively, one could imagine a scenario where the response factor for the degradant/impurity is lower than

18

==bendamustine and that degradant will be underestimated if one falsely assumes that the response factors are the same.==

58.     This example illustrates a known problem with the peak area normalization HPLC method that has been outlined in the literature.  The peak area normalization method only works correctly when the response factors of the analytes are equal.  This is clearly stated in two classic books on chromatography.  The first reference, written by Lloyd Snyder is called "Practical HPLC Method Development" and states:

> The proper use of a normalized-peak-area technique assumes that the response factor for each component is identical… . This is rarely true in UV detection, where even closely related compounds can have different molar absorptivities. …different compounds rarely have the same UV absorbance.

(Exh. 12, Snyder, Practical HPLC Method Development (1997) at pg. 655).

59.     The second book, written by Snyder and Kirkland and published in 2010, states:

> [peak] area normalization…rel[ies] on the assumption that the detector response for nonstandardized (e.g., unknown) is the same as for peaks for which standards are available; this assumption may or may not be appropriate, depending on the sample composition and choice of detector.  UV detection is notorious for order of magnitude differences in sensitivity for different compounds.

(Exh. 13, Snyder and Kirkland, 2nd Edition, 2010, pages 525-526).

60.     In sum, as shown in the calculations above and as supported by the literature, unless we know that the response factors of the analytes are the same, the peak area normalization method will not produce an accurate number, particularly for UV-Vis detection. An analytical chemist would know this and only use the peak area normalization method having proven that the response factors for all the analytes are the same.

61.     A different way of calculating impurities involves a technique called the "external standards method" which does not involve making any assumptions about the response factors of

**C. Dr. Kittendorf's "Peak Area Response" Method Is Premised on A False Assumption That the Absorptivities of The Analytes Are the Same, They Are Not and Therefore Dr. Kittendorf's Results Are Not Accurate**

83.    As noted above, a "peak area response" normalization approach is premised upon an assumption that all analytes have the same "response factor" (a/k/a "absorptivity").  (Exh. 12, Snyder, Practical HPLC Method Development (1997) at pg. 655; Exh. 13, Snyder and Kirkland, 2nd Edition, 2010, pgs. 525-26).

84.    When that assumption is true, the collective peak areas can be added up and the amounts for each analyte determined by dividing the peak area for that analyte by the total peak area.  That is the essence of the peak area response normalization approach to calculating concentrations.  (*See* Paragraphs 51-60, esp. 56-59, above).  If that assumption is incorrect, the entire calculation is inaccurate – and sometimes by very large margins as shown above.

85.    Dr. Kittendorf bases all his calculations on the assumption that all of the analytes have the same response factor.  Dr. Kittendorf states this explicitly for his "mass percentage" calculation (Kittendorf Opening Report at pg. 15, fn. 3) – which is a form of peak area response analysis.  And, Dr. Kittendorf used the same assumption for what he calls his "normalized peak area response" calculation – because that is the definition of peak area normalization.

86.    However, Dr. Kittendorf did not calculate the response factors for any of the chemical species (bendamustine or any of its impurities) at 223 nm that he detected.  Thus, Dr. Kittendorf never justified his assumption that the response factors of all analytes are equal.  Those necessary experiments involve making samples with known concentrations of the analyte and determining the absorption of those known samples at 223 nm, and then calculating the absorptivity for each analyte.

29

<mark>87.     In the absence of data showing that the analytes have the same absorptivity or response factor (or that the relative response factor is 1), the results cannot be considered accurate using a peak area response normalization technique.  Because Kittendorf did not do appropriate calculations of the response factors, his analytical technique is not reliable.</mark>

88.     That said, Dr. Kittendorf's experiments do permit for an assessment of the absorptivities for bendamustine and two of the eleven impurities (impurities D and E) at 223 nm.

89.     In particular, my calculations were performed by first rearranging the Beer's Law equation from above to solve for Absorptivity ($\varepsilon$) as follows:

$$A = \varepsilon C$$

$$\varepsilon = A/C$$

In this equation A stands for peak Area, and C stands for a known concentration of a substance. Thus for example if we had a peak area from a chromatogram for a sample containing bendamustine measured at 223 nm, and we knew the concentration of bendamustine in that same sample, we could determine the absorptivity of bendamustine at 223 nm by dividing the peak area by the known concentration.  (The path length is the same for all analytes and so that variable is not needed in the equation).

90.     ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



**91.** ████████████████████████████████████████████████

████████████████████████████████████████████████████

██████

**93.** In his opening report in paragraph 52 Dr. Kittendorf gives an equation for mass percentage where one of the parameters is "Relative Response Factor" or RRF. In footnote 3 on page 15 of his report Dr. Kittendorf states that, "For this experiment, the mass percentage calculations assume an RRF of 1." The same assumption that the RRFs are equal to 1 was also necessarily used by Dr. Kittendorf when he did his "normalized peak area response" calculations. The calculations above clearly show, based on Dr. Kittendorf's own work, that RRFs for impurities D and E are not one. This means Dr. Kittendorf made a false assumption in his work, and his data are inaccurate and unreliable.

Dated: March 16, 2026

_____

# Exhibit 5
# Filed Under Seal



**Planet Depos**
We Make It *Happen*™

# Transcript of Brian C. Smith, Ph.D.

**Date:** April 24, 2026
**Case:** Eagle Pharmaceuticals, Inc., et al. -v- Slayback Pharma/Azurity Pharma

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

-----------------------------x

EAGLE PHARMACEUTICALS,

INC. and EAGLE SUB1 LLC,

Plaintiffs,      Case No.

v.              1:24-CV-00065-JLH

SLAYBACK PHARMA LLC and

AZURITY PHARMACEUTICALS,

INC.,

Defendants.

-----------------------------x

VIDEOTAPED DEPOSITION OF BRIAN C. SMITH, Ph.D.

New York, New York

Friday, April 24, 2026

9:00 a.m.

Reported by:

MARY F. BOWMAN, RPR, CRR

JOB NO. 629333

**Page 2**

April 24, 2026

9:00 a.m.

Deposition of BRIAN C. SMITH, Ph.D., held at Le Meridien New York, Central Park 120 West 57th Street New York, New York, before Mary F. Bowman, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public of the States of New Jersey and New York.

**Page 3**

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

LATHAM & WATKINS LLP

330 North Wabash Avenue

Chicago, IL 60611

BY:  MANUELA BUREK, ESQ.

RAMYA VALLABHANENI, ESQ.

ON BEHALF OF THE DEFENDANTS:

WINDELS MARX LANE & MITTENDORF LLP

180 Park Avenue

Florham Park, New Jersey 07932-1054

BY:  JASON LIEF, ESQ.

Also Present:

Elizabeth Gonzales, Legal Videographer

**Page 4**

THE VIDEOGRAPHER:  Good morning. Here begins media no. 1 in the videotaped deposition of Brian Smith in the matter of Eagle Pharmaceuticals Inc., et al., versus Slayback Pharma/Azurity Pharma, in the United States District for the District of Delaware, case no. 24/65.

Today's date is April 23, 2026, and the time on the video monitor is 9:00 a.m.

The videographer today is Elizabeth Gonzalez representing Planet Depos headquartered at 451 Hungerford Drive, Suit 400, Rockville, Maryland.

This video deposition is taking place at 120 West 57th Street, New York, New York.

Will counsel please voice-identify themselves and state whom they represent.

(Whereupon, counsel placed their appearances on the audio record.)

MR. LIEF:  And I'll also just note, I think that the videographer said today is the 23rd, and I could be wrong, but I think it's the 24th.

THE VIDEOGRAPHER:  You are right,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026



talked about before.

Understanding there is different reasons to conduct testing, to be sure, Dr. Kittendorf's testing is not supporting data that is being submitted to the FDA, correct?

MR. LIEF: Objection, mischaracterizes.

A. He submitted some data in a report in a litigation.

I don't know if that data is going to be used by the FDA or not. I don't know what's going to be done with that data.

Q. Regarding changes in wavelengths, changing the detection wavelength does not change the actual chemical composition of the sample being tested, correct?

A. No.

Q. And changing the detection wavelength does not change how the compound separates, correct?

A. Changing the detector wavelength means that you can see some things and not others.

So for example, I don't know what you mean by "separate," but yes, the illusion

profile can be different at different wavelengths.

███████████████████

I don't have a copy of -- I don't have a copy of his report.

Q. No, I didn't hand you one. We are not referencing it directly right now.

A. I thought you might be.

Q. No, sorry.

If there is anything that I will be directly referencing, I'll hand it to you beforehand.

A. Okay.

Q. You can turn back to paragraph 25 in your report.

A. Can I take a second to read it?

Q. Um-hm.

A. I think we're talking about -- no, we haven't.

Okay. Go ahead.

Q. So you acknowledge that the asserted

claims specifically require the impurity measurements as determined at a wavelength of 223 nanometers, right?

A. I don't like your use of the word "require." Okay?

Those words appear in the patent, yes.

Q. And by testing at 223 nanometers, Dr. Kittendorf is following the approach as it is stated in the claims with respect to the detection wavelength, correct?

A. The detection wavelength --

MR. LIEF: Objection to the form.

THE WITNESS: I'm sorry. Go ahead.

A. The detection wavelength in the patent is 223 nanometers. Dr. Kittendorf detected at 223 nanometers as well.

Q. You can go ahead and turn to paragraph 72 in your report.

A. Can I read it quickly?

Q. Um-hm.

A. Okay.

Q. ███████████████████
███████████████████

███████████████████

Q. Briefly, can you explain what peak area response -- what the peak area response method is?

A. Okay. I believe there is an equation in my report, but let's say, in the context of the bendamustine-containing formulations we are talking about, once you've got a chromatogram, you would add up the areas of the bendamustine and the impurities to get a total, and then for an individual impurity, you would take its area and divide it by the total and get a percentage.

Now, that's assuming the response factors of all the anolytes involved are the same. And again, my criticism of Dr. Kittendorf is that we know they are different at ███ and my work has shown they are different at 223.

Q. Have you used a peak area response method in any of your work before?

A. No, I haven't, and I've never seen a

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

23 (89 to 92)

89

pharmaceutical company use it either because it's generally considered inaccurate for UV detection.

Q. You understand that for purposes of this litigation, the total impurities measured in the product have to be less than about 5 percent peak area response?

A. The claim has that word -- verbiage in it, yes.

Q. Now, before you mentioned you don't like the use of the word "require" as related to the claims.

Why not?

A. I'm not sure what you mean by it. I mean, as I've said, and will continue to say, a -- the accuracy of a method is determined by the application. And a POSA would choose an accurate method.

And in my opinion, peak area response in this application is inaccurate, and I wouldn't choose to use it to measure impurities in bendamustine.

Q. But we agreed that the asserted claims use peak area response in claim 1, for example.

90

A. Those words appear in the claim, yes.

Q. And by using the peak area response method, Dr. Kittendorf is following the approach that is referenced in claim 1 of the '248 patent, for example, correct?

MR. LIEF: Objection, mischaracterizes.

A. May I rephrase your question?

Q. Go ahead.

A. Are you saying that Dr. Kittendorf's testing method is identical to that mentioned in the patent?

Q. No. I'm saying that Dr. Kittendorf used peak area response method, correct?

A. In his --

MR. LIEF: Same objection.

A. In his report?

Q. Correct.

A. If we're going to compare the patent -- okay. Just answer the question.

Can you rephrase it -- I'm sorry, could you reask the question?

Q. No, no apology needed.

We will go piece by piece?

91

A. Sure.

Q. Dr. Kittendorf in his testing used the peak area response method, correct?

MR. LIEF: Same objection.

A. He says he did in his report, yes.

Q. And the claim, claim 1 in the '248 patent, for example, references 5 percent peak area response, correct?

A. May I take a quick look?

I'm sorry, so we are talking '248, claim 1? Okay.

And that would be Exhibit 4?

Q. Correct.

A. All right. So we have got the words -- "5 percent peak area response" is in the claim, yes.

Q. And I'm not asking if the methods as compared are identical. But just focusing on the peak area response piece, Dr. Kittendorf followed that specific reference from the claim, correct?

MR. LIEF: Same objection.

A. Honestly, the patent has such a paucity of information about the HPLC method that I think it would be hard to answer that

92

question.

For example, Dr. Kittendorf assumed that the response factors for all 11 anolytes are the same at 223 nanometers.

The patent is silent on that. The patent says nothing about whether the method used in the patent, the response factors were considered to be the same or not.

So it's really hard, I think, to say, at least in that respect, he used the same method as the patent does.

Q. I'm not asking about the method used generally. Just specifically with regard to peak area response, the claims as you identified reference using peak area response, correct?

A. Those words --

MR. LIEF: Objection, asked and answered.

A. Those words appear in the claim, yes.

Q. And Dr. Kittendorf tested using peak area response?

A. He says he --

MR. LIEF: Same objection.

A. He says he did. Whether those mean

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

24 (93 to 96)

the same thing to the developers of this method and to Dr. Kittendorf, I don't know.

It would have been helpful in the patent if they had told us what response factors were used in the analysis, and they didn't, so...

Q.   Now, in your report, you acknowledge that a method that uses a technique other than peak area response to determine total impurities is not relevant to the claim, is that right?

A.   Could you point that out?

Q.   It will be paragraph 25.

In that first sentence.

A.   What was the question again?

Q.   That you acknowledge that a method that uses a technique other than peak area response to determine total impurities is not relevant to the claim at issue.

A.   I don't think that's what I'm saying here.

Again, I'm just saying -- I'm saying that a POSA would choose an accurate method, and the peak area response method was used and it's inaccurate.

I mean, I'm not sure what your point

is honestly.

Q.   So -- I don't want to interrupt you.

A.   No, go ahead.

Q.   The first sentence of this paragraph reads, "A method that uses a different wavelength or a technique other than peak area response to determine the total impurities would be expected to give different results and thus is of no relevance to this claim."

My question is that it's correct -- that you acknowledge a technique other than peak area response would be irrelevant to the claim, right?

A.   I think -- I think you're mischaracterizing my report.

What's relevant is an accurate measurement, and a POSA would not choose this technique for this analysis.

Again, I think the sentence was within the context of saying that some of his results at ▮ aren't relevant to the patent because the patent specifies 223.

And I believe we have already talked about this, so...

Q.   But is it your opinion that using

external standards method, for example, as a technique to measure the impurities -- let me rephrase.

Is it your opinion that using, for example, an external standards method to identify the amount of impurities is relevant to the claims that are at issue in this case?

MR. LIEF:  Objection to the form.

A.   It's relevant to Dr. Kittendorf's report, and he says he has an accurate method for measuring those impurities.

I'm saying he doesn't.

Q.   Do you have an opinion on whether that method -- that technique, external standards method, for example, has any relevance to the claims?

MR. LIEF:  Objection, beyond the scope.

A.   I'm sorry, I'm not understanding your question.

I mean, I see what the claim says. The words "external standards" don't appear in the claim, but again, what's -- or as a POSA, what's relevant is getting number -- an accuracy appropriate to the application.

And if that means using external standards, then that's what a POSA would do.

Q.   And what's your understanding of the application in this case that a POSA would be considering?

A.   Well, the application is for a drug that's injected into people's veins and is subject to a litigation, and given those facts, a POSA would choose an accurate way to do things, and choosing peak area response and assuming all of the response factors are equal would be an inaccurate way to do things, and I think we have evidence in my report showing that.

Q.   Can you turn to paragraph 83 in your report?  It will be page 29.

A.   Give me a second to read it.  Okay? Okay.

Q.   So you state that a peak area response normalization approach is premised upon an assumption that all anolytes have the same response factor, correct?

A.   I see that.

Q.   And you cited Snyder --

A.   Snyder and Kirkland.

97

Q.  -- practical HPLC method development from 1997 as support, correct?

A.  **Correct.**

Q.  Give me a second.

A.  **Do you have a copy?**

Q.  I sure do.

Can we please mark this for identification as Exhibit 9.

(Exhibit 9, document, Bates stamped EAGLEBEN-SA_00373969, marked for identification, as of this date.)

Q.  And for further identification, the ending Bates for the first page of this document are 3969.

I'm going to ask you about a specific page in this document --

A.  **Can you give me a chance to review this, please?**

MR. LIEF:  Counsel, there is another Snyder as well that he cited.

A.  **That's why -- it is a little confusing, there is multiple books by these authors, so it's...**

Q.  I understand this is the 1997 version.

98

A.  **I'm just double-checking that.**

**Okay.**

Q.  Please turn to page 665 in this document.

A.  **Already there.**

Q.  Perfect.

And just for reference, the ending Bates on this page is 4007.

So here, this is one of the -- the page that you cite.  On that second paragraph at the top of the page starting with "The proper use" -- do you see that?

A.  **Yup.**

MR. LIEF:  Objection to the form.

Q.  Now, the document states that proper use of a normalized peak area technique assumes that the response factor for each component is identical, correct?

A.  **I see that.**

Q.  And we will also take a look at the other reference.

So you cited the 2010 edition, correct?

A.  **Yeah.**

Q.  We can mark this for identification

99

as Exhibit 10.

(Exhibit 10, document entitled "Introduction to Modern Liquid Chromatography," marked for identification, as of this date.)

Q.  And just let me know when you're done looking through the document.

A.  **This might be a -- it says second edition in my report, and this says third edition.**

Q.  This is the one that was attached to your report.

A.  **All right.**

Q.  Just --

A.  **One moment.**

**Okay.  Go ahead.**

Q.  All right.  Since there is a little bit of a difference between how it is referenced in your report and the document that was provided as written here, there is no page number, but I believe it's the fourth page has the copyright information.

A.  **It says 2010?**

Q.  Yeah.  So if you can just turn there and just you can confirm this is the 2010

100

version that you are talking about in your report?

MR. LIEF:  This is Smith 10.  This is Smith deposition Exhibit 10.

MS. BUREK:  2010 is the year for this publication.

MR. LIEF:  But by "this," you mean Smith Exhibit 10?

MS. BUREK:  Correct, yeah.

A.  **I see 2010, yes.**

Q.  Okay.  Thank you.

You can go ahead and turn to page 525 of this document.

A.  **Yup.**

Q.  All right.  And at the bottom of the section that's titled "Area normalization" -- do you see that?

A.  **Yes.**

Q.  And it references percent peak area and then a little bit later down, area normalization.

Do you see those two references?

A.  **Yes.**

Q.  Now, on the next page, at the very top, it says that both procedures rely on the

129

MR. LIEF: Objection to form.

A.   I don't care to speculate what data the FDA relied on to come to its decision.

Q.   But you don't have any reason to believe that anything in Slayback's NDA document is inaccurate, do you?

A.   I've not seen the entirety of their NDA documents, so I don't care to speculate on that either.

Q.   Fair.
Can you turn to paragraph 100 in your report?

A.   Where is it?

Q.   I think it is under Dr. Kittendorf's report.

A.   All right. Maybe this is it.
Yeah, go ahead. I'm sorry, what paragraph?

Q.   100 --

A.   Okay.

Q.   -- page 34.

A.   Give me a second to read this, please.
Go ahead.

Q.   ████████████

130



Q.

MR. LIEF: Objection to form.

A.

131

████████████████████

Q.   In this matter, you were retained as a technical expert, correct?

A.   Correct.

Q.   You are not opining on any legal opinions?

A.   Such as?

Q.   For example, you are not opining on any ultimate conclusions of infringement?

A.   I am opining that the data in Dr. Kittendorf -- you know, as I say here in paragraph 100 -- I think it was 100 -- yeah -- that Dr. Kittendorf's data does not provide evidence of infringement.

Q.   For purposes of your report and in this case, were you retained to provide opinions on infringement?

A.   No.

Q.   Did you talk to any other experts in this case?

A.   Talk to? No.

Q.   And did you conduct any independent experiments in this case?

A.   I performed some calculations, but I

132

did not perform any like experiments.

Q.   Why did you not conduct any independent experiments?

A.   A couple of reasons. First of all, it's my understanding -- or I've been told that in a case like this, the burden is on the plaintiff to prove infringement.
I wasn't asked to perform any lab experiments, and we -- I don't feel I have the time to do any. I've got -- between when Dr. Kittendorf's report was put in my hands and now, we only had about a month. And given, in my opinion, the need to calibrate and validate, find a lab, find a contract lab, get them vetted, get the materials and instrumentation together, I wouldn't have had time to do that kind of experimentation.

Q.   How long would that process take, just approximately, if you were asked to do that kind of testing?

A.   In this specific case?

Q.   In this specific case, yes.

A.   Okay. So just to review -- let's think about it. We need to find a contract lab. We need to buy the standard materials. We would

153

lunch at some point.
    MS. BUREK:  Let's take a couple of minutes.
    THE VIDEOGRAPHER:  Okay.  We are going off the record.  The time is 12:24 a.m. -- p.m.
    (Luncheon recess.)

154

    AFTERNOON SESSION
    THE VIDEOGRAPHER:  We are back on the record.  The time is 1:29 p.m.
BY MS. BUREK:
    Q.   Welcome back.
    A.   Thank you.
    Q.   As I mentioned, it's just a couple more questions before we wrap up here.
    A.   Okay.
    Q.   Now, Dr. Smith, your opinions in this case are limited to criticisms of Dr. Kittendorf's HPLC testing methodology, correct?
    A.   Correct.
    Q.   You are not opining on any opinions that Dr. Trout presented in his reports, are you?
    A.   I think I mentioned Dr. Trout in my report, and I had a criticism there.  But -- we went through that paragraph before lunch.  I don't remember which number it was but...
    Q.   So other than the references to Dr. Trout's report in your report, you're not providing an opinion on other things he said, correct?

155



    Q.   And previously you mentioned that

156

you're aware that Slayback submitted certain stability data to the FDA, correct?
    A.   I've been told they have submitted stability data, yes.
    Q.   [REDACTED]
    MR. LIEF:  Objection, incomplete hypothetical.
    A.   No, I -- I don't know that.
    Q.   Now, you're not offering any opinion on the validity of either of the patents asserted in this case, are you?
    MR. LIEF:  Objection to form.
    A.   Again, my opinion is limited to Dr. Kittendorf's report, and again, I don't believe there is any evidence in his report that Slayback's product infringes the patents-in-suit.
    Q.   But you don't offer any evidence of your own based on independent testing to contradict or support the impurity measurements, do you?
    A.   Evidence of my own?

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

157

Q. Correct.

A. I think the calculations I did are evidence of my own that his method is incorrect. The calculations I did are evidence.

Q. My question was evidence of your own based on independent testing.

MR. LIEF: Objection, asked and answered.

A. I -- if the question is did I do any experimental work, the answer is no.

Q. And you're not offering any opinions on damages, correct?

A. No. I'm not a lawyer, I'm not a damages expert and...

Q. Now, just to be sure so that we have a clear answer here, your opinions, you said, are limited to Dr. Kittendorf's testing.

A. And as --

Q. To be --

A. Go ahead. I'm sorry.

Q. Thank you. To be sure, you're not offering any opinions on the validity of the asserted patents in this case, correct?

MR. LIEF: Objection to the form.

158

A. Correct.

MR. LIEF: I believe those are all the questions that I have for you today.

THE WITNESS: We could have done this before lunch. Okay. Anyway...

MS. BUREK: I did mention I just had a couple.

THE WITNESS: I know, just --

MR. LIEF: You told me you were hungry.

THE WITNESS: I was hungry.

(Reporter seeks clarification.)

MR. LIEF: Why don't we take a short break and I will see.

THE VIDEOGRAPHER: We are going off the record. The time is 1:34 p.m.

(Recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 1:37 p.m.

MR. LIEF: Okay. No questions from defendant.

THE VIDEOGRAPHER: This marks the end of the deposition of Dr. Brian Smith. The time is 1:37 p.m. Thank you.

* * * *

159

NAME OF CASE: EAGLE V. SLAYBACK

DATE OF DEPOSITION: 4.24.26

NAME OF WITNESS: BRIAN C. SMITH, Ph.D.

ACKNOWLEDGEMENT OF DEPONENT

I, BRIAN C. SMITH, Ph.D., do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____

BRIAN C. SMITH, Ph.D.

_____

Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS    DAY OF _____, 20___.

160

INDEX:

| WITNESS | EXAM BY: | PAGE: |
|---------|----------|-------|
| B. Smith | Ms. Burek | 5 |

EXHIBIT INDEX:

| NUMBER | DESCRIPTION | PAGE: |
|--------|-------------|-------|
| Exhibit 1 | Curriculum Vitae, | 21 |
| Exhibit 2 | updated Curriculum Vitae, | 22 |
| Exhibit 3 | expert report, | 44 |
| Exhibit 4 | patent number 12,138,248, | 52 |
| Exhibit 5 | patent number 11,872,214, | 52 |
| Exhibit 6 | USP chromatography, | 76 |
| Exhibit 7 | document, Bates stamped EAGLEBEN-SA_00368468, | 80 |
| Exhibit 8 | article entitled "Method Adjustment, the USP Way," dated June 12, 2017, | 82 |
| Exhibit 9 | document, Bates stamped EAGLEBEN-SA_00373969, | 97 |
| Exhibit 10 | document entitled "Introduction to Modern Liquid Chromatography," | 99 |
| Exhibit 11 | validation of compendial procedures, | 107 |

161

EXHIBIT INDEX:

NUMBER          DESCRIPTION          PAGE:

Exhibit 12  document, Bates stamped          114
       EAGLEBEN-SA_0369991,

Exhibit 13  document, Bates stamped          119
       EAGLEBEN-SA_00369941,

Exhibit 14  expert report of Dr. Jeffrey          121
       D. Kittendorf, Ph.D.,

Exhibit 15  document entitled "Reply          144
       Expert Report of Dr. Jeffrey
       D. Kittendorf, Ph.D.,

(Note: All quotations from exhibits are reflected in the manner they were read and do not denote an exact quote from the document.)

162

CERTIFICATE

STATE OF NEW JERSEY )
                              )ss:
COUNTY OF UNION     )

    I, MARY F. BOWMAN, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public within and for the State of New Jersey, do hereby certify:

    That DR. BRIAN C. SMITH, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

    I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

    In witness whereof, I have hereunto set my hand this 1st day of May, 2026.

_____
MARY F. BOWMAN, RPR, CRR

163

* * *ERRATA SHEET* * *
NAME OF CASE:  EAGLE V. SLAYBACK
DATE OF DEPOSITION:  4.24.26
NAME OF WITNESS:  BRIAN C. SMITH, Ph.D.
Reason codes:
   1. To clarify the record.
   2. To conform to the facts.
   3. To correct transcription errors.
Page ____ Line ____ Reason____
From _____to_____

Page ____ Line ____ Reason____
From _____to_____

Page ____ Line ____ Reason____
From _____to_____

Page ____ Line ____ Reason____
From _____to_____

Page ____ Line ____ Reason____
From _____to_____

Page ____ Line ____ Reason____
From _____to_____

Page ____ Line ____ Reason____
From _____to_____

_____
BRIAN C. SMITH, Ph.D.

# Exhibit 6

# PRACTICAL HPLC METHOD DEVELOPMENT

10829781, 18592014.finatter, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/9781118592014.fmatter, Wiley Online Library on [15/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

TEVABENDDRL00210565

EAGLEBEN-SA_00373969

# PRACTICAL HPLC METHOD DEVELOPMENT

## Second Edition

**LLOYD R. SNYDER**
LC Resources, Inc.
Walnut Creek, California

**JOSEPH J. KIRKLAND**
Rockland Technologies, Inc.
Newport, Delaware

**JOSEPH L. GLAJCH**
DuPont Merck Pharmaceutical Company
North Billerica, Massachusetts



A Wiley-Interscience Publication
**JOHN WILEY & SONS, INC.**

10829781118592014.fmatter, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/9781118592014.fmatter, Wiley Online Library on [15/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

TEVABENDDRL00210566

EAGLEBEN-SA_00373970

19429781188592014.fmatter, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/9781118592014.fmatter, Wiley Online Library on [15/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

This text is printed on acid-free paper.

Copyright © 1997 by John Wiley & Sons, Inc.

All rights reserved. Published simultaneously in Canada.
No part of this publication may be reproduced, stored in a retrieval system or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning or otherwise, except as permitted under Sections 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher, or authorization through payment of the appropriate per-copy fee to the Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400, fax (978) 750-4470. Requests to the Publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 111 River Street, Hoboken, NJ 07030, (201) 748-6011, fax (201) 748-6008, E-Mail: PERMREQ@WILEY.COM.
To order books or for customer service please, call 1(800)-CALL-WILEY (225-5945).

*Library of Congress Cataloging in Publication Data:*

Snyder, Lloyd R.
    Practical HPLC method development / Lloyd R. Snyder, Joseph J. Kirkland, Joseph L. Glajch.—2nd ed.
        p.   cm.
    Includes index.
    ISBN 0-471-00703-X (cloth : alk. paper)
    1. High performance liquid chromatography—Methodology.
I. Kirkland, J. J. (Joseph Jack), 1925–    II. Glajch, Joseph L.
III. Title.
QP519.9.H53S69   1997
543'.0894—dc20                                                      96-34296

Printed in the United States of America

18  17  16  15  14

TEVABENDDRL00210567

EAGLEBEN-SA_00373971

Case 1:24-cv-00065-JLH    Document 510    Filed 08/07/26    Page 55 of 56 PageID #: 30650

method per se, since there is no comparison to known amounts for any peak in the chromatogram. However, this technique is widely used to estimate the relative amounts of small impurities or degradation compounds in a purified material.

The proper use of a normalized-peak-area technique assumes that the response factor for each component is identical (i.e., that the responses per unit of concentration of peaks 2 to 5 are the same as the response for the main peak 1 in Fig. 14.6). This is rarely true in UV detection, where even closely related compounds can have different molar absorptivities. However, the technique of normalized peak area is especially useful in early method-development studies, when characterized standards of all components are not available. Despite the probable inequality of response factors, it is expedient to use normalized peak areas for these analyses.

While different compounds rarely have the same UV absorbance, bulk-property detectors, such as refractive index (RI) or evaporative light scattering (ELS) do exhibit similar responses for many unrelated compounds. Their use with normalized peak areas is more reliable; further discussion of these detectors is found in Section 3.3.1. Unfortunately, bulk property detectors usually are much less sensitive than UV detection of strongly absorbing compounds.

### 14.3.2  External Standard Calibration

The most general method for determining the concentration of an unknown sample is to construct a calibration plot using external standards, as shown in Fig. 14.7. Standard solutions (sometimes called calibrators) are prepared at known concentrations (1.0, 2.0, and 3.0 mg/mL in this case). A fixed volume



**FIGURE 14.7**  Calibration plot for external standard method.

Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/9781118559201.ch14 by Reprints Desk Inc, Wiley Online Library on [15/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

TEVABENDDRL00210603

EAGLEBEN-SA_00374007

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that true and correct copies of the foregoing documents were caused to be served on June 5, 2026, on the following counsel in the manner indicated:                                  **VIA EMAIL:**

Daniel A. Taylor
Neal C. Belgam
SMITH KATZENSTEIN & JENKINS LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
Dtaylor@skjlaw.com
Nbelgam@skjlaw.com

Jason A. Lief
Allan H. Pollack
Audrey R. Sparschu
WINDELS MARX LANE & MITTENDORF, LLP
156 West 56th Street
New York, NY 10019
jlief@windelsmarx.com
apollack@windelsmarx.com
asparschu@windelsmarx.com

Andrew Miller
Ajay Kayal
Robyn Ast-Gmoser
Daniel E. Forchheimer
Kiersten A. Fowler
WINDELS MARX LANE & MITTENDORF, LLP
One Giralda Farms
Madison, NJ 07940
amiller@windelsmarx.com
akayal@windelsmarx.com
rast-gmoser@windelsmarx.com
dforchheimer@windelsmarx.com
kfowler@windelsmarx.com

*Attorneys for Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*

/s/ Daniel M. Silver
Daniel M. Silver (#4758)

ME1\61334401.v1