# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC,<br><br>Plaintiffs,<br><br>v.<br><br>SLAYBACK PHARMA LLC and AZURITY PHARMACEUTICALS, INC,<br><br>Defendants. | REDACTED PUBLIC VERSION FILED AUGUST 7, 2026<br><br>C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br> |

**DECLARATION OF MICHELLE CHIN IN SUPPORT OF PLAINTIFFS  EAGLE PHARMACEUTICALS, INC. AND EAGLE SUB 1 LLC'S MOTION FOR SUMMARY JUDGMENT REGARDING INFRINGEMENT**

I, Michelle Chin, declare as follows:

1. I am an attorney at the law firm of Latham & Watkins LLP and counsel for Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC ("Eagle") in the above-captioned case. I am admitted to practice before the Court *pro hac vice*.

2. I make this declaration in support of Eagle's Motion for Summary Judgement Regarding Infringement by Slayback Pharma LLC and Azurity Pharmaceuticals, Inc. ("Slayback").

3. I have personal knowledge of the facts set forth in this declaration, and if called as a witness, could and would competently testify thereto.

4. Attached as **Exhibit 1** is a true and correct copy of Slayback's Vivimusta Label dated 12/2022 (EAGLEBEN-SA_00363932).

5. Attached as **Exhibit 2** is a true and correct copy of Slayback's Vivimusta Label dated 2/2024 (EAGLEBEN-SA_00363910).

6. Attached as **Exhibit 3** are true and correct excerpts from the Deposition Transcript of Dr. Patrick Sinko, Ph.D. dated April 16, 2026.

7. Attached as **Exhibit 4** are true and correct excerpts from the Reply Expert Report of Dr. Bernhardt Trout, Ph.D., dated April 13, 2026.

8. Attached as **Exhibit 5** are true and correct excerpts from the Markman Hearing Transcript, dated January 30, 2025.

9. Attached as **Exhibit 6** is a true and correct copy of Slayback's NDA, Section 3.2.P.1 Description and Composition of the Drug Product, for Vivimusta (SLAY-VIVMUS0000472).

10. Attached as **Exhibit 7** are true and correct excerpts from Appendix B of the Opening Expert Report of Dr. Bernhardt Trout, Ph.D., dated February 6, 2026.

11. Attached as **Exhibit 8** are true and correct excerpts from Slayback's 2024 Batch Manufacturing Record, dated December 5, 2024 (SLAY-VIVMUS0137635).

12. Attached as **Exhibit 9** are true and correct excerpts from the Opening Expert Report of Dr. Bernhardt Trout, Ph.D., dated February 6, 2026.

13. Attached as **Exhibit 10** are true and correct excerpts from Slayback's NDA, Section 2.3 Quality Overall Summary, 2.3.P Drug Product, for Vivimusta (SLAYVIVMUS0000243).

14. Attached as **Exhibit 11** are true and correct excerpts from Slayback's NDA, Section 3.2.P.2.3 Manufacturing Process Development, for Vivimusta (SLAY-VIVMUS0000691).

15. Attached as **Exhibit 12** are true and correct excerpts from Slayback's Final Non-Infringement Contentions, dated October 31, 2025.

16. Attached as **Exhibit 13** are true and correct excerpts from the Expert Report of Dr. Patrick Sinko, Ph.D., March 16, 2026.

17. Attached as **Exhibit 14** are true and correct excerpts from the Deposition Transcript of Ravindhar Gonti, dated December 4, 2025.

18. Attached as **Exhibit 15** are true and correct excerpts from Slayback's Elemental Impurities Risk Assessment Report (SLAY-VIVMUS0013211).

19. Attached as **Exhibit 16** are true and correct excerpts from Slayback's NDA, Section 3.2.P.4.1 Specification, for Vivimusta, including CRODA Certificate of Analysis for PEG 400 (SLAY-VIVMUS0001235).

20.     Attached as **Exhibit 17** is a true and correct copy of Slayback's NDA, Section 3.2.P.4.1 Specification, for Vivimusta, including a Certificate of Analysis for Ethanol absolute (SLAY-VIVMUS0005624).

21.     Attached as **Exhibit 18** are true and correct excerpts from the Responsive Expert Report of Dr. Bernhardt Trout, Ph.D., dated March 16, 2026.

22.     Attached as **Exhibit 19** are true and correct excerpts from Slayback's Stability Data for Batch #7G04376V, Batch #7G04377V, and Batch #7G04378V (SLAY-VIVMUS0011140).

23.     Attached as **Exhibit 20** is a true and correct copy of Slayback's Finished Product Specification Report (SLAY-VIVMUS0010981).

24.     Attached as **Exhibit 21** are true and correct excerpts from Expert Report of Dr. Jeffrey D. Kittendorf, Ph.D., dated February 5, 2026

25.     Attached as **Exhibit 22** is a true and correct copy of Slayback's HPLC Analytical Testing Method Procedure, dated June 6, 2022 (SLAY-VIVMUS0010983).

26.     Attached as **Exhibit 23** are true and correct excerpts from Slayback's Annual Report for Vivimusta's NDA, reporting period: December 7, 2022 through December 6, 2023 (SLAY-VIVMUS0010634).

27.     Attached as **Exhibit 24** is a true and correct copy of Slayback's HPLC Method Validation Protocol, dated October 16, 2019 (SLAY-VIVMUS0056846).

28.     Attached as **Exhibit 25** are true and correct excerpts from Slayback's NDA, Section 2.3 Quality Overall Summary, 2.3.S Drug Substance (SLAY-VIVMUS0005301).

29.     Attached as **Exhibit 26** are true and correct excerpts from the Handbook of Pharmaceutical Excipients, sixth edition, edited by Raymond C Rowe, Paul J Sheskey and Marian

E Quinn, published 2009, for entries on "Alcohol," and "Monothioglycerol" (EAGLEBEN-SA_00315043).

30.     Attached as **Exhibit 27** are true and correct excerpts from the Deposition Transcript of Ravindhar Gonti, Volume 2, dated December 5, 2025.

31.     Attached as **Exhibit 28** is a true and correct copy of Slayback's NDA, Section 3.2.P.8.1 Stability Summary and Conclusion (SLAYVIVMUS0009579).


I declare under penalty of perjury that the foregoing is true and correct.


June 5, 2026                                             /s/ ___Michelle Chin_____
                                                        Michelle Chin

# Exhibit 1

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use VIVIMUSTA safely and effectively. See full prescribing information for VIVIMUSTA.**

**VIVIMUSTA (bendamustine hydrochloride injection), for intravenous use**
**Initial U.S. Approval: 2008**

------------------------INDICATIONS AND USAGE--------------------------
VIVIMUSTA is an alkylating drug indicated for treatment of patients with:
- Chronic lymphocytic leukemia (CLL). Efficacy relative to first line therapies other than chlorambucil has not been established. (1.1)
- Indolent B-cell non-Hodgkin lymphoma (NHL) that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen. (1.2)

--------------------DOSAGE AND ADMINISTRATION-----------------------
For CLL:
- 100 mg/m$^2$ infused intravenously over 20 minutes on Days 1 and 2 of a 28-day cycle, up to 6 cycles (2.1)

For NHL:
- 120 mg/m$^2$ infused intravenously over 20 minutes on Days 1 and 2 of a 21-day cycle, up to 8 cycles (2.2)

--------------------DOSAGE FORMS AND STRENGTHS---------------------
Injection: 100 mg/4 mL (25 mg/mL) in a multiple-dose vial (3).

-----------------------------CONTRAINDICATIONS-----------------------------
History of a hypersensitivity reaction to bendamustine, polyethylene glycol 400, dehydrated alcohol, or monothioglycerol. Reactions to bendamustine hydrochloride have included anaphylaxis and anaphylactoid reactions. (4, 5.4)

------------------------WARNINGS AND PRECAUTIONS----------------------
- Myelosuppression: Delay or reduce dose, and restart treatment based on ANC and platelet count recovery. (5.1)
- Infections: Monitor for fever and other signs of infection or reactivation of infections and treat promptly. (5.2)
- Progressive multifocal leukoencephalopathy (PML): Monitor for new or worsening neurological, cognitive or behavioral signs or symptoms suggestive of PML. (5.3)
- Anaphylaxis and Infusion-Related Reactions: Severe anaphylactic reactions have occurred. Monitor clinically and discontinue drug for severe reactions. Pre-medicate in subsequent cycles for milder reactions. (5.4)

- Tumor Lysis Syndrome: May lead to acute renal failure and death; anticipate and use supportive measures in patients at high risk. (5.5)
- Skin Reactions: Discontinue for severe skin reactions. Cases of SJS, DRESS and TEN, some fatal, have been reported. (5.6).
- Hepatotoxicity: Monitor liver chemistry tests prior to and during treatment. (5.7)
- Other Malignancies: Pre-malignant and malignant diseases have been reported. (5.8)
- Extravasation Injury: Take precautions to avoid extravasation, including monitoring intravenous infusion site during and after administration. (5.9)
- Embryo-Fetal Toxicity: Can cause fetal harm. Advise females of reproductive potential and males with female partners of reproductive potential of the potential risk to a fetus and to use an effective method of contraception. (5.10, 8.1)

--------------------------------ADVERSE REACTIONS---------------------------------
- Adverse reactions (> 5%) during infusion and within 24 hours post-infusion are nausea, and fatigue. (6.1)
- Most common adverse reactions (≥15%) for CLL are anemia, thrombocytopenia, neutropenia, lymphopenia, leukopenia, hyperbilirubinemia, pyrexia, nausea, vomiting. (6.1)
- Most common adverse reactions (≥15%) for NHL are lymphopenia, leukopenia, anemia neutropenia, thrombocytopenia, nausea, fatigue, vomiting, diarrhea, pyrexia, constipation, anorexia, cough, headache, weight decreased dyspnea, rash, and stomatitis. (6.1)

**To report SUSPECTED ADVERSE REACTIONS, contact Slayback Pharma at 1-844-566-2505 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

---------------------------DRUG INTERACTIONS---------------------------
Consider alternative therapies that are not CYP1A2 inducers or inhibitors during treatment with VIVIMUSTA. (7.1)

-----------------------USE IN SPECIFIC POPULATIONS-------------------------
- Lactation: Advise not to breastfeed. (8.2)
- Infertility: May impair fertility. (8.3)
- Renal Impairment: Do not use in patients with creatinine clearance < 30 mL/min. (8.6)
- Hepatic Impairment: Do not use in patients with total bilirubin 1.5-3 x ULN and AST or ALT 2.5-1.0 x ULN, or total bilirubin > 3 x ULN. (8.7)

**See 17 for PATIENT COUNSELING INFORMATION**

**Revised: 12/2022**

---

**FULL PRESCRIBING INFORMATION: CONTENTS\***
**1 INDICATIONS AND USAGE**
  1.1 Chronic Lymphocytic Leukemia (CLL)
  1.2 Non-Hodgkin Lymphoma (NHL)
**2 DOSAGE AND ADMINISTRATION**
  2.1 Dosing Instructions for CLL
  2.2 Dosing Instructions for NHL
  2.3 Preparation and Administration
  2.4 Admixture Stability
  2.5 Stability of Partially Used Vials (Needle Punched Vials)
**3 DOSAGE FORMS AND STRENGTHS**
**4 CONTRAINDICATIONS**
**5 WARNINGS AND PRECAUTIONS**
  5.1 Myelosuppression
  5.2 Infections
  5.3 Progressive Multifocal Leukoencephalopathy (PML)
  5.4 Anaphylaxis and Infusion-Related Reactions
  5.5 Tumor Lysis Syndrome
  5.6 Skin Reactions
  5.7 Hepatotoxicity
  5.8 Other Malignancies
  5.9 Extravasation Injury
  5.10 Embryo-Fetal Toxicity
**6 ADVERSE REACTIONS**
  6.1 Clinical Trials Experience
  6.2 Postmarketing Experience

**7 DRUG INTERACTIONS**
  7.1 Effect of Other Drugs on VIVIMUSTA
**8 USE IN SPECIFIC POPULATIONS**
  8.1 Pregnancy
  8.2 Lactation
  8.3 Females and Males of Reproductive Potential
  8.4 Pediatric Use
  8.5 Geriatric Use
  8.6 Renal Impairment
  8.7 Hepatic Impairment
**10 OVERDOSAGE**
**11 DESCRIPTION**
**12 CLINICAL PHARMACOLOGY**
  12.1 Mechanism of Action
  12.2 Pharmacodynamics
  12.3 Pharmacokinetics
**13 NONCLINICAL TOXICOLOGY**
  13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
**14 CLINICAL STUDIES**
  14.1 Chronic Lymphocytic Leukemia (CLL)
  14.2 Non-Hodgkin Lymphoma (NHL)
**15 REFERENCES**
**16 HOW SUPPLIES/STORAGE AND HANDLING**
**17 PATIENT COUNSELING INFORMATION**

\*Sections or subsections omitted from the full prescribing information are not listed.

1

EAGLEBEN-SA_00363932

## FULL PRESCRIBING INFORMATION

## 1    INDICATIONS AND USAGE

### 1.1    Chronic Lymphocytic Leukemia (CLL)

VIVIMUSTA is indicated for the treatment of adult patients with chronic lymphocytic leukemia. Efficacy relative to first line therapies other than chlorambucil has not been established.

### 1.2    Non-Hodgkin Lymphoma (NHL)

VIVIMUSTA is indicated for the treatment of adult patients with indolent B-cell non-Hodgkin lymphoma that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen.

## 2    DOSAGE AND ADMINISTRATION

### 2.1    Dosing Instructions for CLL

Recommended Dosage

The recommended dosage is 100 mg/m$^2$ administered intravenously over 20 minutes on Days 1 and 2 of a 28-day cycle for up to 6 cycles.

Dose Delays, Dose Modifications and Re-initiation of Therapy for CLL

Delay VIVIMUSTA for Grade 4 hematologic toxicity or clinically significant Grade 2 or greater non-hematologic toxicity.

Once non-hematologic toxicity has recovered to less than or equal to Grade 1 and/or the blood counts have improved [Absolute Neutrophil Count (ANC) greater than or equal to 1 x 10$^9$/L and platelets greater than or equal to 75 x 10$^9$/L], reinitiate VIVIMUSTA at the discretion of the healthcare provider. In addition, consider dose reduction *[see Warnings and Precautions (5.1)]*.

Dose modifications for hematologic toxicity: for Grade 3 or greater toxicity, reduce the dose to 50 mg/m$^2$ on Days 1 and 2 of each cycle; if Grade 3 or greater toxicity recurs, reduce the dose to 25 mg/m$^2$ on Days 1 and 2 of each cycle.

Dose modifications for non-hematologic toxicity: for clinically significant Grade 3 or greater toxicity, reduce the dose to 50 mg/m$^2$ on Days 1 and 2 of each cycle.

Consider dose re-escalation in subsequent cycles at the discretion of the healthcare provider.

### 2.2    Dosing Instructions for NHL

Recommended Dosage

The recommended dosage is 120 mg/m$^2$ administered intravenously over 20 minutes on Days 1 and 2 of a 21-day cycle for up to 8 cycles.

Dose Delays, Dose Modifications and Re-initiation of Therapy for NHL

Delay VIVIMUSTA for Grade 4 hematologic toxicity or clinically significant Grade 2 or greater non-hematologic toxicity.

Once non-hematologic toxicity has recovered to less than or equal to Grade 1 and/or the blood counts

2

Reference ID: 5089558

EAGLEBEN-SA_00363933

have improved [Absolute Neutrophil Count (ANC) greater than or equal to $1 \times 10^9$/L and platelets greater than or equal to $75 \times 10^9$/L], reinitiate VIVIMUSTA at the discretion of the healthcare provider. In addition, consider dose reduction *[see Warnings and Precautions (5.1)]*.

Dose modifications for hematologic toxicity: for Grade 4 toxicity, reduce the dose to 90 mg/m$^2$ on Days 1 and 2 of each cycle; if Grade 4 toxicity recurs, reduce the dose to 60 mg/m$^2$ on Days 1 and 2 of each cycle.

Dose modifications for non-hematologic toxicity: for Grade 3 or greater toxicity, reduce the dose to 90 mg/m$^2$ on Days 1 and 2 of each cycle; if Grade 3 or greater toxicity recurs, reduce the dose to 60 mg/m$^2$ on Days 1 and 2 of each cycle.

**2.3     Preparation and Administration**

VIVIMUSTA is a hazardous drug. Follow applicable special handling and disposal procedures.[1]

VIVIMUSTA is a clear and colorless to yellow solution in a multiple-dose vial.

Store VIVIMUSTA refrigerated at 2°C to 8°C (36°F to 46°F). When refrigerated, the contents may partially freeze. Allow the vial to reach room temperature (15°C to 30°C or 59°F to 86°F) prior to use. Observe the contents of the vial for any visible solid or particulate matter. Do not use the product if solid or particulate matter is observed after reaching room temperature.

<u>Intravenous Infusion</u>

Aseptically withdraw the volume needed for the required dose from the 25 mg/mL solution as per Table 1 below and immediately transfer to a **250 mL infusion bag** of one of the following diluents: 0.9% Sodium Chloride Injection, USP; or
2.5% Dextrose/0.45% Sodium Chloride Injection, USP.
**The resulting final concentration of bendamustine hydrochloride in the infusion bag should be within 0.1 mg/mL to 1.36 mg/mL**.

After transferring, thoroughly mix the contents of the infusion bag. The admixture should be a clear and colorless to slightly yellow solution.

**No other diluents have been shown to be compatible** *[see Dosage and Administration (2.4)]*.

Table 1:     **Volume of VIVIMUSTA required for <u>Dilution into 250 mL</u> of 0.9% Sodium Chloride Injection, USP, or 2.5% Dextrose/0.45% Sodium Chloride Injection, USP for a Given Dose and Body Surface Area**

| Body Surface Area (m$^2$) | Volume of VIVIMUSTA to Withdraw (mL) from Vial | | | | | |
|---|---|---|---|---|---|---|
| | 120 mg/m$^2$ | 100 mg/m$^2$ | 90 mg/m$^2$ | 60 mg/m$^2$ | 50 mg/m$^2$ | 25 mg/m$^2$ |
| 1 | 4.8 | 4 | 3.6 | 2.4 | 2 | 1 |
| 1.1 | 5.3 | 4.4 | 4 | 2.6 | 2.2 | 1.1 |
| 1.2 | 5.8 | 4.8 | 4.3 | 2.9 | 2.4 | 1.2 |
| 1.3 | 6.2 | 5.2 | 4.7 | 3.1 | 2.6 | 1.3 |
| 1.4 | 6.7 | 5.6 | 5 | 3.4 | 2.8 | 1.4 |
| 1.5 | 7.2 | 6 | 5.4 | 3.6 | 3 | 1.5 |
| 1.6 | 7.7 | 6.4 | 5.8 | 3.8 | 3.2 | 1.6 |
| 1.7 | 8.2 | 6.8 | 6.1 | 4.1 | 3.4 | 1.7 |
| 1.8 | 8.6 | 7.2 | 6.5 | 4.3 | 3.6 | 1.8 |

3

EAGLEBEN-SA_00363934

| Body Surface Area (m²) | Volume of VIVIMUSTA to Withdraw (mL) from Vial | | | | | |
|---|---|---|---|---|---|---|
| | 120 mg/m² | 100 mg/m² | 90 mg/m² | 60 mg/m² | 50 mg/m² | 25 mg/m² |
| 1.9 | 9.1 | 7.6 | 6.8 | 4.6 | 3.8 | 1.9 |
| 2 | 9.6 | 8 | 7.2 | 4.8 | 4 | 2 |
| 2.1 | 10.1 | 8.4 | 7.6 | 5 | 4.2 | 2.1 |
| 2.2 | 10.6 | 8.8 | 7.9 | 5.3 | 4.4 | 2.2 |
| 2.3 | 11 | 9.2 | 8.3 | 5.5 | 4.6 | 2.3 |
| 2.4 | 11.5 | 9.6 | 8.6 | 5.8 | 4.8 | 2.4 |
| 2.5 | 12 | 10 | 9 | 6 | 5 | 2.5 |
| 2.6 | 12.5 | 10.4 | 9.4 | 6.2 | 5.2 | 2.6 |
| 2.7 | 13 | 10.8 | 9.7 | 6.5 | 5.4 | 2.7 |
| 2.8 | 13.4 | 11.2 | 10.1 | 6.7 | 5.6 | 2.8 |
| 2.9 | 13.9 | 11.6 | 10.4 | 7 | 5.8 | 2.9 |
| 3 | 14.4 | 12 | 10.8 | 7.2 | 6 | 3 |

Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration whenever solution and container permit. Discard any unused solution according to institutional procedures for hazardous drugs.

## 2.4    Admixture Stability

VIVIMUSTA contains no antimicrobial preservative. Prepare the admixture as close as possible to the time of patient administration.

Once diluted with 0.9% Sodium Chloride Injection, USP, or 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, the final admixture is stable for 24 hours when stored refrigerated (2°C to 8°C or 36°F to 46°F) or for 3 hours when stored at room temperature (15°C to 30°C or 59°F to 86°F) and room light. Complete administration of diluted VIVIMUSTA within this period of time.

VIVIMUSTA (bendamustine hydrochloride injection) is supplied in a multiple-dose vial. Retain the partially used vial in original package to protect from light and store refrigerated (2°C to 8°C or 36°F to 46°F) if additional dose withdrawal from the same vial is intended.

## 2.5    Stability of Partially Used Vials (Needle Punched Vials)

VIVIMUSTA is supplied as a multiple-dose vial. Although it does not contain any antimicrobial preservative, VIVIMUSTA is bacteriostatic. The partially used vials are stable for up to 28 days when stored in its original carton under refrigeration (2°C to 8°C or 36°F to 46°F). Each vial is not recommended for more than a total of six (6) dose withdrawals.

After first use, store the partially used vial in the original carton at 2°C to 8°C (36°F to 46°F) and then discard after 28 days.

## 3    DOSAGE FORMS AND STRENGTHS

Injection: 100 mg/4 mL (25 mg/mL) as a clear and colorless to yellow solution in multiple-dose vial.

## 4    CONTRAINDICATIONS

4

EAGLEBEN-SA_00363935

VIVIMUSTA is contraindicated in patients with a known hypersensitivity (e.g., anaphylactic and anaphylactoid reactions) to bendamustine, polyethylene glycol 400, dehydrated alcohol, or monothioglycerol *[see Warnings and Precautions (5.4)]*.

## 5    WARNINGS AND PRECAUTIONS

### 5.1    Myelosuppression

VIVIMUSTA causes myelosuppression. Bendamustine hydrochloride caused severe myelosuppression (Grade 3-4) in 98% of patients in the two NHL studies *[see Adverse Reactions (6.1)]*. Three patients (2%) died from myelosuppression-related adverse reactions; one each from neutropenic sepsis, diffuse alveolar hemorrhage with Grade 3 thrombocytopenia and pneumonia from an opportunistic infection (CMV).

Monitor complete blood counts, including leukocytes, platelets, hemoglobin (Hgb), and neutrophils frequently. In the clinical trials, blood counts were monitored every week initially. Hematologic nadirs were observed predominantly in the third week of therapy. Myelosuppression may require dose delays and/or subsequent dose reductions if recovery to the recommended values has not occurred by the first day of the next scheduled cycle. Delay the next cycle of therapy if ANC less than $1 \times 10^9/L$ or platelet count less than $75 \times 10^9/L$ *[see Dosage and Administration (2.1, 2.2)]*.

### 5.2    Infections

Infection, including pneumonia, sepsis, septic shock, hepatitis and death has occurred in adult and pediatric patients in clinical trials and in postmarketing reports for bendamustine hydrochloride. Patients with myelosuppression following treatment with bendamustine hydrochloride are more susceptible to infections. Advise patients with myelosuppression following VIVIMUSTA treatment to contact healthcare provider immediately if they have symptoms or signs of infection.

Patients treated with VIVIMUSTA are at risk for reactivation of infections including (but not limited to) hepatitis B, cytomegalovirus, Mycobacterium tuberculosis, and herpes zoster. Implement appropriate measures (including clinical and laboratory monitoring, prophylaxis, and treatment) for infection and infection reactivation prior to administration.

### 5.3    Progressive Multifocal Leukoencephalopathy (PML)

Progressive multifocal leukoencephalopathy (PML), including fatal cases, have occurred following treatment with bendamustine, primarily in combination with rituximab or obinutuzumab *[see Adverse Reactions (6.2)]*. Consider PML in the differential diagnosis in patients with new or worsening neurological, cognitive or behavioral signs or symptoms. If PML is suspected, withhold VIVIMUSTA treatment and perform appropriate diagnostic evaluations. Consider discontinuation or reduction of any concomitant chemotherapy or immunosuppressive therapy in patients who develop PML.

### 5.4    Anaphylaxis and Infusion-Related Reactions

Infusion-related reactions to bendamustine hydrochloride have occurred commonly in clinical trials. Symptoms include fever, chills, pruritus and rash. In rare instances, severe anaphylactic and anaphylactoid reactions have occurred, particularly in the second and subsequent cycles of therapy.

Monitor clinically and discontinue drug for severe reactions. Ask patients about symptoms suggestive

5

EAGLEBEN-SA_00363936

of infusion-related reactions after their first cycle of therapy. Do not rechallenge patients who experienced Grade 3 or worse allergic-type reactions. Consider measures to prevent severe reactions, including antihistamines, antipyretics and corticosteroids in subsequent cycles in patients who have experienced Grade 1 or 2 infusion-related reactions. Discontinue VIVIMUSTA for patients with Grade 4 infusion-related reactions. Consider discontinuation for Grade 3 infusion-related reactions as clinically appropriate considering individual benefits, risks, and supportive care.

## 5.5    Tumor Lysis Syndrome

Tumor lysis syndrome associated with bendamustine hydrochloride has occurred in patients in clinical trials and in postmarketing reports. The onset tends to be within the first treatment cycle of bendamustine hydrochloride and, without intervention, may lead to acute renal failure and death.

Administer vigorous hydration and monitor blood chemistry, particularly potassium and uric acid levels, at baseline and closely during treatment with VIVIMUSTA. Allopurinol has also been used during the beginning of bendamustine hydrochloride therapy. However, there may be an increased risk of severe skin toxicity when bendamustine hydrochloride and allopurinol are administered concomitantly *[see Warnings and Precautions (5.6)]*.

## 5.6    Skin Reactions

Fatal and serious skin reactions have been reported with bendamustine hydrochloride treatment in clinical trials and postmarketing safety reports, including toxic skin reactions [Stevens-Johnson Syndrome (SJS), toxic epidermal necrolysis (TEN), and drug reaction with eosinophilia and systemic symptoms (DRESS)], bullous exanthema, and rash. Events occurred when bendamustine hydrochloride was given as a single agent and in combination with other anticancer agents or allopurinol. Where skin reactions occur, they may be progressive and increase in severity with further treatment.

Monitor patients with skin reactions closely. If skin reactions are severe or progressive, withhold or discontinue VIVIMUSTA.

## 5.7    Hepatotoxicity

Fatal and serious cases of liver injury have been reported with Bendamustine Hydrochloride Injection. Combination therapy, progressive disease or reactivation of hepatitis B were confounding factors in some patients *[see Warnings and Precautions (5.2)]*. Most cases were reported within the first three months of starting therapy.

Monitor liver chemistry tests prior to and during treatment with VIVIMUSTA.

## 5.8    Other Malignancies

Pre-malignant and malignant diseases have developed in patients who have been treated with bendamustine hydrochloride, including myelodysplastic syndrome, myeloproliferative disorders, acute myeloid leukemia, bronchial carcinoma, and non-melanoma skin cancer including basal cell carcinoma and squamous cell carcinoma *[see Adverse Reactions (6.2)]*.

Monitor patients for the development of secondary malignancies. Perform dermatologic evaluations during and after treatment with VIVIMUSTA.

## 5.9    Extravasation Injury

Reference ID: 5089558

EAGLEBEN-SA_00363937

Bendamustine hydrochloride extravasations have been reported in postmarketing resulting in hospitalizations from erythema, marked swelling, and pain.

Assure good venous access prior to starting VIVIMUSTA infusion and monitor the intravenous infusion site for redness, swelling, pain, infection, and necrosis during and after administration of VIVIMUSTA.

### 5.10  Embryo-Fetal Toxicity

Based on findings from animal reproduction studies and the drug's mechanism of action, VIVIMUSTA can cause fetal harm when administered to a pregnant woman. Single intraperitoneal doses of bendamustine (that approximated the maximum recommended human dose based on body surface area) to pregnant mice and rats during organogenesis caused adverse developmental outcomes, including an increase in resorptions, skeletal and visceral malformations, and decreased fetal body weights.

Advise pregnant women of the potential risk to a fetus. Advise females of reproductive potential to use an effective method of contraception during treatment with VIVIMUSTA and for 6 months after the last dose. Advise males with female partners of reproductive potential to use effective contraception during treatment with VIVIMUSTA and for 3 months after the last dose *[see Use in Specific Populations (8.1, 8.3) and Clinical Pharmacology (12.1)]*.

### 6  ADVERSE REACTIONS

The following clinically significant adverse reactions are described elsewhere in the labeling:

- Myelosuppression *[see Warnings and Precautions (5.1)]*
- Infections *[see Warnings and Precautions (5.2)]*
- Progressive Multifocal Leukoencephalopathy *[see Warnings and Precautions (5.3)]*
- Anaphylaxis and Infusion-Related Reactions *[see Warnings and Precautions (5.4)]*
- Tumor Lysis Syndrome *[see Warnings and Precautions (5.5)]*
- Skin Reactions *[see Warnings and Precautions (5.6)]*
- Hepatotoxicity *[see Warnings and Precautions (5.7)]*
- Other Malignancies *[see Warnings and Precautions (5.8)]*
- Extravasation Injury *[see Warnings and Precautions (5.9)]*

### 6.1  Clinical Trials Experience

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in practice.

Chronic Lymphocytic Leukemia (CLL)

The data described below reflect exposure to bendamustine hydrochloride in 153 patients. Bendamustine hydrochloride was studied in an active-controlled, randomized trial. The population was 45-77 years of age, 63% were male, 100% were White, and had treatment naïve CLL. All patients started the study at a dose of 100 mg/m$^2$ intravenously over 30 minutes on Days 1 and 2 every 28 days.

7

Reference ID: 5089558

EAGLEBEN-SA_00363938

Adverse reactions were reported according to NCI CTC v.2.0. In the randomized CLL clinical study, non-hematologic adverse reactions (any grade) in the bendamustine hydrochloride group that occurred with a frequency greater than 15% were pyrexia (24%), nausea (20%), and vomiting (16%).

Other adverse reactions seen frequently in one or more studies included asthenia, fatigue, malaise, and weakness; dry mouth; somnolence; cough; constipation; headache; mucosal inflammation and stomatitis.

Worsening hypertension was reported in 4 patients treated with bendamustine hydrochloride and in none treated with chlorambucil. Three of these 4 adverse reactions were described as a hypertensive crisis and were managed with oral medications and resolved.

The most frequent adverse reactions leading to study withdrawal for patients receiving bendamustine hydrochloride were hypersensitivity (2%) and pyrexia (1%).

Table 2 summarizes the adverse reactions that were reported in $\geq$ 5% of patients in either treatment group in the randomized CLL clinical study.

**Table 2:** **Non-Hematologic Adverse Reactions that Occurred in at Least 5% of Patients Who Received Bendamustine Hydrochloride or Chlorambucil in the Randomized CLL Clinical Study**

| Adverse Reaction | Bendamustine Hydrochloride (N=153) | | Chlorambucil (N=143) | |
|---|---|---|---|---|
| | All Grades n (%) | Grade 3 or 4 n (%) | All Grades n (%) | Grade 3 or 4 n (%) |
| Total number of patients with at least 1 adverse reaction | 121 (79) | 52 (34) | 96 (67) | 25 (17) |
| Gastrointestinal disorders | | | | |
| Nausea | 31 (20) | 1 (<1) | 21 (15) | 1 (<1) |
| Vomiting | 24 (16) | 1 (<1) | 9 (6) | 0 |
| Diarrhea | 14 (9) | 2 (1) | 5 (3) | 0 |
| General disorders and administration site conditions | | | | |
| Pyrexia | 36 (24) | 6 (4) | 8 (6) | 2 (1) |
| Fatigue | 14 (9) | 2 (1) | 8 (6) | 0 |
| Asthenia | 13 (8) | 0 | 6 (4) | 0 |
| Chills | 9 (6) | 0 | 1 (<1) | 0 |
| Immune system disorders | | | | |
| Hypersensitivity | 7 (5) | 2 (1) | 3 (2) | 0 |
| Infections and infestations | | | | |
| Nasopharyngitis | 10 (7) | 0 | 12 (8) | 0 |
| Infection | 9 (6) | 3 (2) | 1 (<1) | 1 (<1) |
| Herpes simplex | 5 (3) | 0 | 7 (5) | 0 |
| Investigations | | | | |
| Weight decreased | 11 (7) | 0 | 5 (3) | 0 |
| Metabolism and nutrition disorders | | | | |
| Hyperuricemia | 11 (7) | 3 (2) | 2 (1) | 0 |
| Respiratory, thoracic and mediastinal disorders | | | | |
| Cough | 6 (4) | 1 (<1) | 7 (5) | 1 (<1) |

8

Reference ID: 5089558

EAGLEBEN-SA_00363939

| Adverse Reaction | Bendamustine Hydrochloride (N=153) | | Chlorambucil (N=143) | |
|---|---|---|---|---|
| | All Grades n (%) | Grade 3 or 4 n (%) | All Grades n (%) | Grade 3 or 4 n (%) |
| **Skin and subcutaneous tissue disorders** | | | | |
| Rash | 12 (8) | 4 (3) | 7 (5) | 3 (2) |
| Pruritus | 8 (5) | 0 | 2 (1) | 0 |

Hematology laboratory abnormalities are described in Table 3. Red blood cell transfusions were administered to 20% of patients receiving bendamustine hydrochloride compared with 6% of patients receiving chlorambucil. Bilirubin elevation occurred in 34% of patients, some without associated significant elevations in AST and ALT. Grade 3 or 4 increased bilirubin occurred in 3% of patients. Increases in AST and ALT of Grade 3 or 4 were limited to 1% and 3% of patients, respectively. Patients treated with bendamustine hydrochloride may also have changes in their creatinine levels.

**Table 3:    Hematology Laboratory Abnormalities in Patients Who Received Bendamustine Hydrochloride or Chlorambucil in the Randomized CLL Clinical Study**

| Laboratory Abnormality | Bendamustine Hydrochloride (N=150) | | Chlorambucil (N=141) | |
|---|---|---|---|---|
| | All Grades n (%) | Grade 3 or 4 n (%) | All Grades n (%) | Grade 3 or 4 n (%) |
| Hemoglobin Decreased | 134 (89) | 20 (13) | 115 (82) | 12 (9) |
| Platelets Decreased | 116 (77) | 16 (11) | 110 (78) | 14 (10) |
| Neutrophils Decreased | 113 (75) | 65 (43) | 86 (61) | 30 (21) |
| Lymphocytes Decreased | 102 (68) | 70 (47) | 27 (19) | 6 (4) |
| Leukocytes Decreased | 92 (61) | 42 (28) | 26 (18) | 4 (3) |

Non-Hodgkin Lymphoma (NHL)

The data described below reflect exposure to bendamustine hydrochloride in 176 patients with indolent B-cell NHL treated in two single-arm studies. The population was 31-84 years of age; 60% were male; 89% were White, 7% were Black, 3% were Hispanic, 1% were other, and <1% were Asian. These patients received bendamustine hydrochloride at a dose of 120 mg/m$^2$ intravenously on Days 1 and 2 for up to eight 21-day cycles.

In both studies, serious adverse reactions were reported in 37% of patients receiving bendamustine hydrochloride. The most frequent serious adverse reactions occurring in ≥5% of patients were febrile neutropenia and pneumonia. Other important serious adverse reactions reported in clinical trials and/or postmarketing experience were acute renal failure, cardiac failure, hypersensitivity, skin reactions, pulmonary fibrosis, and myelodysplastic syndrome.

Serious adverse reactions reported in clinical trials included myelosuppression, infection, pneumonia, tumor lysis syndrome and infusion-related reactions *[see Warnings and Precautions (5)]*. Adverse reactions occurring less frequently but possibly related to bendamustine hydrochloride treatment were hemolysis, dysgeusia/taste disorder, atypical pneumonia, sepsis, herpes zoster, erythema,

9

Reference ID: 5089558

EAGLEBEN-SA_00363940

dermatitis, and skin necrosis.

The most common non-hematologic adverse reactions (≥30%) were nausea (75%), fatigue (57%), vomiting (40%), diarrhea (37%) and pyrexia (34%). The most common non-hematologic Grade 3 or 4 adverse reactions (≥5%) were fatigue (11%), febrile neutropenia (6%), and pneumonia, hypokalemia and dehydration, each reported in 5% of patients.

Non-hematologic adverse reactions are shown in Table 4.

**Table 4:    Non-Hematologic Adverse Reactions that Occurred in at Least 5% of Patients who Received Bendamustine Hydrochloride in the NHL Studies**

| Adverse Reaction | Bendamustine Hydrochloride (N=176*) | |
|---|---|---|
| | All Grades n (%) | Grade 3 or 4 n (%) |
| Total number of patients with at least 1 adverse reaction | 176 (100) | 94 (53) |
| **Cardiac Disorders** | | |
| Tachycardia | 13 (7) | 0 |
| **Gastrointestinal disorders** | | |
| Nausea | 132 (75) | 7 (4) |
| Vomiting | 71 (40) | 5 (3) |
| Diarrhea | 65 (37) | 6 (3) |
| Constipation | 51 (29) | 1 (<1) |
| Stomatitis | 27 (15) | 1 (<1) |
| Abdominal pain | 22 (13) | 2 (1) |
| Dyspepsia | 20 (11) | 0 |
| Gastroesophageal reflux disease | 18 (10) | 0 |
| Dry mouth | 15 (9) | 1 (<1) |
| Abdominal pain upper | 8 (5) | 0 |
| Abdominal distension | 8 (5) | 0 |
| **General disorders and administration site conditions** | | |
| Fatigue | 101 (57) | 19 (11) |
| Pyrexia | 59 (34) | 3 (2) |
| Chills | 24 (14) | 0 |
| Edema peripheral | 23 (13) | 1 (<1) |
| Asthenia | 19 (11) | 4 (2) |
| Chest pain | 11 (6) | 1 (<1) |
| Infusion site pain | 11 (6) | 0 |
| Pain | 10 (6) | 0 |
| Catheter site pain | 8 (5) | 0 |
| **Infections and infestations** | | |
| Herpes zoster | 18 (10) | 5 (3) |
| Upper respiratory tract infection | 18 (10) | 0 |
| Urinary tract infection | 17 (10) | 4 (2) |
| Sinusitis | 15 (9) | 0 |
| Pneumonia | 14 (8) | 9 (5) |
| Febrile neutropenia | 11 (6) | 11 (6) |
| Oral candidiasis | 11 (6) | 2 (1) |
| Nasopharyngitis | 11 (6) | 0 |
| **Investigations** | | |

10

Reference ID: 5089558

EAGLEBEN-SA_00363941

| Adverse Reaction | Bendamustine Hydrochloride (N=176*) | |
|---|---|---|
| | All Grades n (%) | Grade 3 or 4 n (%) |
| Weight decreased | 31 (18) | 3 (2) |
| **Metabolism and nutrition disorders** | | |
| Anorexia | 40 (23) | 3 (2) |
| Dehydration | 24 (14) | 8 (5) |
| Decreased appetite | 22 (13) | 1 (<1) |
| Hypokalemia | 15 (9) | 9 (5) |
| **Musculoskeletal and connective tissue disorders** | | |
| Back pain | 25 (14) | 5 (3) |
| Arthralgia | 11 (6) | 0 |
| Pain in extremity | 8 (5) | 2 (1) |
| Bone pain | 8 (5) | 0 |
| **Nervous system disorders** | | |
| Headache | 36 (21) | 0 |
| Dizziness | 25 (14) | 0 |
| Dysgeusia | 13 (7) | 0 |
| **Psychiatric disorder** | | |
| Insomnia | 23 (13) | 0 |
| Anxiety | 14 (8) | 1 (<1) |
| Depression | 10 (6) | 0 |
| **Respiratory, thoracic and mediastinal disorders** | | |
| Cough | 38 (22) | 1 (<1) |
| Dyspnea | 28 (16) | 3 (2) |
| Pharyngolaryngeal pain | 14 (8) | 1 (<1) |
| Wheezing | 8 (5) | 0 |
| Nasal congestion | 8 (5) | 0 |
| **Skin and subcutaneous tissue disorders** | | |
| Rash | 28 (16) | 1 (<1) |
| Pruritus | 11 (6) | 0 |
| Dry skin | 9 (5) | 0 |
| Night sweats | 9 (5) | 0 |
| Hyperhidrosis | 8 (5) | 0 |
| **Vascular disorders** | | |
| Hypotension | 10 (6) | 2 (1) |

*Patients may have reported more than 1 adverse reaction.
**NOTE:** Patients counted only once in each preferred term category and once in each body system category.

Hematologic toxicities, based on laboratory values and CTC grade, in patients with NHL treated in both single arm studies combined are described in Table 5. Clinically important chemistry laboratory values that were new or worsened from baseline and occurred in >1% of patients at Grade 3 or 4, in patients with NHL who were treated in both single arm studies combined were hyperglycemia (3%), elevated creatinine (2%), hyponatremia (2%), and hypocalcemia (2%).

11

Reference ID: 5089558

EAGLEBEN-SA_00363942

**Table 5:    Hematology Laboratory Abnormalities in Patients Who Received Bendamustine Hydrochloride in the NHL Studies**

| Hematology Variable | Bendamustine Hydrochloride | |
|---|---|---|
| | All Grades (%) | Grade 3 or 4 (%) |
| Lymphocytes Decreased | 99 | 94 |
| Leukocytes Decreased | 94 | 56 |
| Hemoglobin Decreased | 88 | 11 |
| Neutrophils Decreased | 86 | 60 |
| Platelets Decreased | 86 | 25 |

## 6.2    Postmarketing Experience

The following adverse reactions have been identified during postapproval use of bendamustine hydrochloride. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

*Blood and lymphatic systems disorders:* Pancytopenia.

*Cardiovascular disorders:* Atrial fibrillation, congestive heart failure (some fatal), myocardial infarction (some fatal), palpitation.

*General disorders and administration site conditions:* Injection site reactions (including phlebitis, pruritus, irritation, pain, swelling), infusion site reactions (including phlebitis, pruritus, irritation, pain, swelling).

*Immune system disorders:* Anaphylaxis.

*Infections and infestations: Pneumocystis jiroveci* pneumonia, progressive multifocal leukoencephalopathy (PML).

*Respiratory, thoracic and mediastinal disorders*: Pneumonitis.

*Skin and subcutaneous tissue disorders:* Stevens-Johnson syndrome (SJS), toxic epidermal necrolysis (TEN), drug reaction with eosinophilia and systemic symptoms (DRESS), and non-melanoma skin cancer (NMSC).

## 7    DRUG INTERACTIONS

### 7.1    Effect of Other Drugs on VIVIMUSTA

CYP1A2 Inhibitors

The coadministration of VIVIMUSTA with CYP1A2 inhibitors may increase bendamustine plasma concentrations and may result in increased incidence of adverse reactions with VIVIMUSTA *[see Clinical Pharmacology (12.3)]*. Consider alternative therapies that are not CYP1A2 inhibitors during treatment with VIVIMUSTA.

CYP1A2 Inducers

12

Reference ID: 5089558

EAGLEBEN-SA_00363943

The coadministration of VIVIMUSTA with CYP1A2 inducers may decrease bendamustine plasma concentrations and may result in decreased efficacy of VIVIMUSTA *[see Clinical Pharmacology (12.3)]*. Consider alternative therapies that are not CYP1A2 inducers during treatment with VIVIMUSTA.

## 8       USE IN SPECIFIC POPULATIONS

### 8.1    Pregnancy

Risk Summary

In animal reproduction studies, intraperitoneal administration of bendamustine to pregnant mice and rats during organogenesis at doses 0.6 to 1.8 times the maximum recommended human dose (MRHD) resulted in embryo-fetal and/or infant mortality, structural abnormalities, and alterations to growth *(see Data)*. There are no available data on bendamustine hydrochloride use in pregnant women to evaluate for a drug-associated risk of major birth defects, miscarriage or adverse maternal or fetal outcomes. Advise pregnant women of the potential risk to a fetus.

The estimated background risk of major birth defects and miscarriage for the indicated population is unknown. All pregnancies have a background risk of birth defect, loss, or other adverse outcomes. In the U.S. general population, the estimated background risk of major birth defects and miscarriage in clinically recognized pregnancies is 2% to 4% and 15% to 20%, respectively.

Data

*Animal Data*

Bendamustine hydrochloride was intraperitoneally administered once to mice from 210 mg/m$^2$ (approximately 1.8 times the MRHD) during organogenesis and caused an increase in resorptions, skeletal and visceral malformations (exencephaly, cleft palates, accessory rib, and spinal deformities) and decreased fetal body weights. This dose did not appear to be maternally toxic and lower doses were not evaluated. Repeat intraperitoneal administration of bendamustine hydrochloride in mice on gestation days 7 to 11 resulted in an increase in resorptions from 75 mg/m$^2$ (approximately 0.6 times the MRHD) and an increase in abnormalities from 112.5 mg/m$^2$ (approximately 0.9 times the MRHD), similar to those seen after a single intraperitoneal administration.

Bendamustine hydrochloride was intraperitoneally administered once to rats from 120 mg/m$^2$ (approximately the MRHD) on gestation days 4, 7, 9, 11, or 13 and caused embryo and fetal lethality as indicated by increased resorptions and a decrease in live fetuses. A significant increase in external (effect on tail, head, and herniation of external organs [exomphalos]) and internal (hydronephrosis and hydrocephalus) malformations were seen in dosed rats.

### 8.2    Lactation

Risk Summary

There are no data on the presence of bendamustine hydrochloride or its metabolites in either human or animal milk, the effects on the breastfed child, or the effects on milk production. Because of the potential for serious adverse reactions in the breastfed child, advise women not to breastfeed during treatment with VIVIMUSTA and for 1 week after the last dose.

### 8.3    Females and Males of Reproductive Potential

13

Reference ID: 5089558

EAGLEBEN-SA_00363944

VIVIMUSTA can cause embryo-fetal harm when administered to a pregnant woman *[see Use in Specific Populations (8.1)]*.

Pregnancy Testing

Pregnancy testing is recommended for females of reproductive potential prior to initiation of treatment with VIVIMUSTA.

Contraception

*Females*

Advise female patients of reproductive potential to use effective contraception during treatment with VIVIMUSTA and for 6 months after the last dose.

*Males*

Based on genotoxicity findings, advise males with female partners of reproductive potential to use effective contraception during treatment with VIVIMUSTA and for 3 months after the last dose *[see Nonclinical Toxicology (13.1)]*.

Infertility

Based on findings from clinical studies, VIVIMUSTA may impair male fertility. Impaired spermatogenesis, azoospermia, and total germinal aplasia have been reported in male patients treated with alkylating agents, especially in combination with other drugs. In some instances spermatogenesis may return in patients in remission, but this may occur only several years after intensive chemotherapy has been discontinued. Advise patients of the potential risk to their reproductive capacities.

Based on findings from animal studies, VIVIMUSTA may impair male fertility due to an increase in morphologically abnormal spermatozoa. The long-term effects of VIVIMUSTA on male fertility, including the reversibility of adverse effects, have not been studied *[see Nonclinical Toxicology (13.1)]*.

**8.4    Pediatric Use**

Safety and effectiveness in pediatric patients have not been established.

Safety, pharmacokinetics and efficacy were assessed in a single open-label trial (NCT01088984) in patients aged 1-19 years with relapsed or refractory acute leukemia, including 27 patients with acute lymphocytic leukemia (ALL) and 16 patients with acute myeloid leukemia (AML).

Bendamustine hydrochloride was administered as an intravenous infusion over 60 minutes on Days 1 and 2 of each 21-day cycle. There was no treatment response (CR+ CRp) in any patient. The safety profile in these patients was consistent with that seen in adults and no new safety signals were identified.

The pharmacokinetics of bendamustine in 43 patients aged 1 to 19 years (median age of 10 years) were within range of values previously observed in adults given the same dose based on body surface area.

**8.5    Geriatric Use**

No overall differences in safety were observed between patients ≥65 years of age and younger patients. Efficacy was lower in patients 65 and over with CLL receiving bendamustine hydrochloride

14

Reference ID: 5089558

EAGLEBEN-SA_00363945

based upon an overall response rate of 47% for patients 65 and over and 70% for younger patients. Progression free survival was also longer in younger patients with CLL receiving bendamustine (19 months vs. 12 months). No overall differences in efficacy in patients with non-Hodgkin Lymphoma were observed between geriatric patients and younger patients.

### 8.6    Renal Impairment

Do not use VIVIMUSTA in patients with creatinine clearance (CLcr) less than 30 mL/min *[see Clinical Pharmacology (12.3)]*.

### 8.7    Hepatic Impairment

Do not use VIVIMUSTA in patients with AST or ALT 2.5 to 10 times upper limit of normal (ULN) and total bilirubin 1.5 to 3 times ULN or total bilirubin greater than 3 times ULN *[see Clinical Pharmacology (12.3)]*

## 10    OVERDOSAGE

The intravenous lethal dose 50 ($LD_{50}$) of bendamustine hydrochloride is 240 mg/m$^2$ in the mouse and rat. Toxicities included sedation, tremor, ataxia, convulsions and respiratory distress.

Across all clinical experience, the reported maximum single dose received was 280 mg/m$^2$. Three of four patients who received this dose showed ECG changes considered dose-limiting at 7 and 21 days post-dosing. These changes included QT prolongation (one patient), sinus tachycardia (one patient), ST and T wave deviations (two patients) and left anterior fascicular block (one patient). Cardiac enzymes and ejection fractions remained normal in all patients.

No specific antidote for bendamustine hydrochloride overdose is known. Management of overdosage should include general supportive measures, including monitoring of hematologic parameters and ECGs.

## 11    DESCRIPTION

Bendamustine hydrochloride is an alkylating agent. The chemical name of bendamustine hydrochloride monohydrate is 5-[Bis(2-chloroethyl)-amino]-1-methyl-1H-benzimidazole-2-butanoic acid hydrochloride monohydrate. Its empirical molecular formula is $C_{16}H_{21}Cl_2N_3O_2 \cdot HCl.H_2O$ and the molecular weight is 412.74. Bendamustine hydrochloride monohydrate contains a mechlorethamine group and a benzimidazole heterocyclic ring with a butyric acid substituent, and has the following structural formula:

VIVIMUSTA (bendamustine hydrochloride injection) is intended for intravenous use after dilution with either 0.9% Sodium Chloride Injection, USP or 2.5% Dextrose/0.45% Sodium Chloride Injection, USP. It is supplied as a sterile, clear, and colorless to yellow solution in a clear glass

15

Reference ID: 5089558

EAGLEBEN-SA_00363946

multiple-dose vial. Each milliliter contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, 39.45 mg dehydrated alcohol, and q.s. to 1 mL polyethylene glycol 400.

## 12    CLINICAL PHARMACOLOGY

### 12.1    Mechanism of Action

Bendamustine is a bifunctional mechlorethamine derivative containing a purine-like benzimidazole ring. Mechlorethamine and its derivatives form electrophilic alkyl groups. These groups form covalent bonds with electron-rich nucleophilic moieties, resulting in interstrand DNA crosslinks. The bifunctional covalent linkage can lead to cell death via several pathways. Bendamustine is active against both quiescent and dividing cells. The exact mechanism of action of bendamustine remains unknown.

### 12.2    Pharmacodynamics

Based on the pharmacokinetics/pharmacodynamics analyses of data from adult patients with NHL, nausea increased with increasing bendamustine maximum concentrations ($C_{max}$).

Cardiac Electrophysiology

The effect of bendamustine on the QTc interval was evaluated in 53 patients with indolent NHL and mantle cell lymphoma on Day 1 of Cycle 1 after administration of rituximab at 375 mg/m$^2$ intravenous infusion followed by a 30-minute intravenous infusion of bendamustine at 90 mg/m$^2$/day. No mean changes greater than 20 milliseconds were detected up to one hour post infusion. The potential for delayed effects on the QT interval after one hour was not evaluated.

### 12.3    Pharmacokinetics

Absorption

Following a single IV dose of bendamustine hydrochloride $C_{max}$ typically occurred at the end of infusion. The dose proportionality of bendamustine has not been studied.

Distribution

The protein binding of bendamustine ranged from 94-96% and was concentration independent from 1 to 50 µg/mL. The blood to plasma concentration ratios in human blood ranged from 0.84 to 0.86 over a concentration range of 10 to 100 µg/mL.

The mean steady-state volume of distribution (Vss) of bendamustine was approximately 20 to 25 L.

Elimination

After a single intravenous dose of 120 mg/m$^2$ of bendamustine over 1 hour, the intermediate half-life (t½) of the parent compound was approximately 40 minutes. The mean terminal elimination t½ of two active metabolites, γ-hydroxybendamustine (M3) and N desmethylbendamustine (M4) were approximately 3 hours and 30 minutes, respectively. Bendamustine clearance in humans was approximately 700 mL/min.

*Metabolism*

Bendamustine is extensively metabolized via hydrolytic, oxidative, and conjugative pathways. Bendamustine is primarily metabolized via hydrolysis to monohydroxy (HP1) and dihydroxy-bendamustine (HP2) metabolites with low cytotoxic activity in vitro. Two active minor metabolites,

16

EAGLEBEN-SA_00363947

M3 and M4, are primarily formed via CYP1A2 in vitro. M3 and M4 concentrations of these metabolites in plasma are $1/10^{th}$ and $1/100^{th}$ that of the parent compound, respectively.

*Excretion*

Following intravenous infusion of radiolabeled bendamustine hydrochloride in patients with cancer, approximately 76% of the dose was recovered. Approximately 50% of the dose was recovered in the urine (3.3% unchanged) and approximately 25% of the dose was recovered in the feces. Less than 1% of the dose was recovered in the urine as M3 and M4, and less than 5% of the dose was recovered in the urine as HP2.

Specific Populations

No clinically meaningful effects on the pharmacokinetics of bendamustine were observed based on age (31 to 84 years), sex, mild to moderate renal impairment (CLcr $\geq$ 30 mL/min), or hepatic impairment with total bilirubin 1.5 < ULN and AST or ALT < 2.5 × ULN. The effects of severe renal impairment (CLcr < 30 mL/min) or hepatic impairment with total bilirubin 1.5 to 3 × ULN and AST or ALT 2.5 to 10 × ULN or total bilirubin > 3 × ULN on the pharmacokinetics of bendamustine is unknown.

*Race/Ethnicity*

Exposures in Japanese subjects (n=6) were 40% higher than non-Japanese subjects receiving the same dose. The clinical importance of this difference on the safety and efficacy of bendamustine hydrochloride in Japanese subjects has not been established.

Drug Interaction Studies

*In Vitro Studies*

*Effect of Bendamustine Hydrochloride on CYP Substrates:* Bendamustine hydrochloride did not inhibit CYP1A2, 2C9/10, 2D6, 2E1, or 3A4/5. Bendamustine hydrochloride did not induce metabolism of CYP1A2, CYP2A6, CYP2B6, CYP2C8, CYP2C9, CYP2C19, CYP2E1, or CYP3A4/5.

*Effect of Transporters on Bendamustine Hydrochloride:* Bendamustine hydrochloride is a substrate of P-glycoprotein and breast cancer resistance protein (BCRP).

**13      NONCLINICAL TOXICOLOGY**

**13.1    Carcinogenesis, Mutagenesis, Impairment of Fertility**

Bendamustine was carcinogenic in mice. After intraperitoneal injections at 37.5 mg/m$^2$/day (the lowest dose tested, approximately 0.3 times the maximum recommended human dose [MRHD]) and 75 mg/m$^2$/day (approximately 0.6 times the MRHD) for 4 days, peritoneal sarcomas in female AB/jena mice were produced. Oral administration at 187.5 mg/m$^2$/day (the only dose tested, approximately 1.6 times the MRHD) for 4 days induced mammary carcinomas and pulmonary adenomas.

Bendamustine is a mutagen and clastogen. In a reverse bacterial mutation assay (Ames assay), bendamustine was shown to increase revertant frequency in the absence and presence of metabolic activation. Bendamustine was clastogenic in human lymphocytes in vitro, and in rat bone marrow cells in vivo (increase in micronucleated polychromatic erythrocytes) from 37.5 mg/m$^2$, (the lowest dose tested, approximately 0.3 times the MRHD).

17

Reference ID: 5089558

EAGLEBEN-SA_00363948

Bendamustine induced morphologic abnormalities in spermatozoa in mice. Following tail vein injection of bendamustine at 120 mg/m$^2$ or a saline control on days 1 and 2 for a total of three weeks, the number of spermatozoa with morphologic abnormalities was 16% higher in the bendamustine-treated group as compared to the saline control group.

## 14    CLINICAL STUDIES

### 14.1    Chronic Lymphocytic Leukemia (CLL)

The efficacy of bendamustine hydrochloride was evaluated in an open-label, randomized, controlled multicenter trial comparing bendamustine hydrochloride to chlorambucil. The trial was conducted in 301 previously-untreated patients with Binet Stage B or C (Rai Stages I - IV) CLL requiring treatment. Need-to-treat criteria included hematopoietic insufficiency, B-symptoms, rapidly progressive disease or risk of complications from bulky lymphadenopathy. Patients with autoimmune hemolytic anemia or autoimmune thrombocytopenia, Richter's syndrome, or transformation to prolymphocytic leukemia were excluded from the study. Patients were randomly assigned to receive either bendamustine hydrochloride 100 mg/m$^2$ intravenously over 30 minutes on Days 1 and 2 of each 28-day cycle or chlorambucil 0.8 mg/kg (Broca's normal weight) orally on Days 1 and 15 of each 28-day cycle.

The patient populations in the bendamustine hydrochloride and chlorambucil treatment groups were balanced with regard to the following baseline characteristics: age (median 63 vs. 66 years), sex (63% vs. 61% male), Binet stage (71% vs. 69% Binet B), lymphadenopathy (79% vs. 82%), enlarged spleen (76% vs. 80%), enlarged liver (48% vs. 46%), hypercellular bone marrow (79% vs. 73%), "B" symptoms (51% vs. 53%), lymphocyte count (mean 65.7 x 10$^9$/L vs. 65.1 x 10$^9$/L), and serum lactate dehydrogenase concentration (mean 370.2 vs. 388.4 U/L). Ninety percent of patients in both treatment groups had immuno-phenotypic confirmation of CLL (CD5, CD23 and either CD19 or CD20 or both).

Efficacy endpoints of objective response rate and progression-free survival were calculated using a pre-specified algorithm based on NCI working group criteria for CLL. The results of this open-label randomized study demonstrated a higher rate of overall response and a longer progression-free survival for bendamustine hydrochloride compared to chlorambucil (*see* Table 6). Survival data are not mature.

**Table 6:    Efficacy Data for CLL**

|  | Bendamustine Hydrochloride (N=153) | Chlorambucil (N=148) | p-value |
|---|---|---|---|
| **Response Rate n (%)** | | | |
| Overall response rate | 90 (59) | 38 (26) | <0.0001 |
| (95% CI) | (51, 66.6) | (18.6, 32.7) | |
| Complete response (CR)* | 13 (8) | 1 (<1) | |
| Nodular partial response (nPR)** | 4 (3) | 0 | |
| Partial response (PR) † | 73 (48) | 37 (25) | |
| **Progression-Free Survival††** | | | |
| Median, months (95% CI) | 18 (11.7, 23.5) | 6 (5.6, 8.6) | |
| Hazard ratio (95% CI) | 0.27 (0.17, 0.43) | | <0.0001 |

CI = confidence interval

18

Reference ID: 5089558

EAGLEBEN-SA_00363949

\* CR was defined as peripheral lymphocyte count $\leq 4 \times 10^9$/L, neutrophils $\geq 1.5 \times 10^9$/L, platelets $>100 \times 10^9$/L, hemoglobin $>110$ g/L, without transfusions, absence of palpable hepatosplenomegaly, lymph nodes $\leq 1.5$ cm, $< 30\%$ lymphocytes without nodularity in at least a normocellular bone marrow and absence of "B" symptoms. The clinical and laboratory criteria were required to be maintained for a period of at least 56 days.

\*\* nPR was defined as described for CR with the exception that the bone marrow biopsy shows persistent nodules.

† PR was defined as $\geq 50\%$ decrease in peripheral lymphocyte count from the pre-treatment baseline value, and either $\geq 50\%$ reduction in lymphadenopathy, or $\geq 50\%$ reduction in the size of spleen or liver, as well as one of the following hematologic improvements: neutrophils $\geq 1.5 \times 10^9$/L or 50% improvement over baseline, platelets $>100 \times 10^9$/L or 50% improvement over baseline, hemoglobin $>110$ g/L or 50% improvement over baseline without transfusions, for a period of at least 56 days.

†† PFS was defined as time from randomization to progression or death from any cause.

Kaplan-Meier estimates of progression-free survival comparing bendamustine hydrochloride with chlorambucil are shown in Figure 1.

**Figure 1. Progression-Free Survival**



Progression – Free Survival (months)

Study Treatment    —— Bendamustine Hydrochloride    _ _ _ Chlorambucil

## 14.2    Non-Hodgkin Lymphoma (NHL)

The efficacy of bendamustine hydrochloride was evaluated in a single arm study of 100 patients with indolent B-cell NHL that had progressed during or within six months of treatment with rituximab or a rituximab-containing regimen. Patients were included if they relapsed within 6 months of either the first dose (monotherapy) or last dose (maintenance regimen or combination therapy) of rituximab. All patients received bendamustine hydrochloride 120 mg/m$^2$ intravenously on Days 1 and 2 of a 21-day treatment cycle for up to 8 cycles.

The median age was 60 years, 65% were male, and 95% had a baseline WHO performance status of 0 or 1. Major tumor subtypes were follicular lymphoma (62%), diffuse small lymphocytic lymphoma (21%), and marginal zone lymphoma (16%). Ninety-nine percent of patients had received previous chemotherapy, 91% of patients had received previous alkylator therapy, and 97% of patients had relapsed within 6 months of either the first dose (monotherapy) or last dose (maintenance regimen or combination therapy) of rituximab.

Efficacy was based on the assessments by a blinded independent review committee (IRC) and included overall response rate (complete response + complete response unconfirmed + partial

19

Reference ID: 5089558

EAGLEBEN-SA_00363950

response) and duration of response (DR) as summarized in Table 7.

**Table 7:     Efficacy Data for NHL***

| | Bendamustine Hydrochloride (N=100) |
|---|---|
| **Response Rate (%)** | |
| Overall response rate (CR+CRu+PR) | 74 |
| (95% CI) | (64.3, 82.3) |
| Complete response (CR) | 13 |
| Complete response unconfirmed (CRu) | 4 |
| Partial response (PR) | 57 |
| **Duration of Response (DR)** | |
| Median, months (95% CI) | 9.2 months (7.1, 10.8) |

CI = confidence interval

*IRC assessment was based on modified International Working Group response criteria (IWG-RC). Modifications to IWG-RC specified that a persistently positive bone marrow in patients who met all other criteria for CR would be scored as PR. Bone marrow sample lengths were not required to be $\geq 20$ mm.

## 15     REFERENCES

1.     OSHA Hazardous Drugs. *OSHA*. https://www.osha.gov/hazardous-drugs

## 16     HOW SUPPLIED/STORAGE AND HANDLING

How Supplied

VIVIMUSTA (bendamustine hydrochloride injection) is a sterile clear, colorless to yellow solution for intravenous use supplied in individual cartons of 5 mL clear glass multiple-dose vials providing 100 mg bendamustine hydrochloride per 4 mL.

100 mg/4 mL (25 mg/mL)     NDC 71225-120-01

Safe Handling and Disposal

VIVIMUSTA (bendamustine hydrochloride injection) is a hazardous drug. Follow applicable special handling and disposal procedures.[1] Care should be exercised in the handling and preparation of solutions prepared from VIVIMUSTA. The use of gloves and safety glasses is recommended to avoid exposure in case of breakage of the vial or other accidental spillage. If gloves come in contact with VIVIMUSTA prior to dilution, remove gloves and follow disposal procedures. If a solution of VIVIMUSTA (bendamustine hydrochloride injection) contacts the skin, wash the skin immediately and thoroughly with soap and water. If VIVIMUSTA (bendamustine hydrochloride injection) contacts the mucous membranes, flush thoroughly with water.

Storage

Store VIVIMUSTA (bendamustine hydrochloride injection) refrigerated at 2°C to 8°C (36°F to 46°F). Retain in original carton until time of use to protect from light.

## 17     PATIENT COUNSELING INFORMATION

Myelosuppression

Reference ID: 5089558

EAGLEBEN-SA_00363951

Inform patients of the likelihood that bendamustine hydrochloride will cause a decrease in white blood cells, platelets, and red blood cells and the need for frequent monitoring of blood counts. Advise patients to report shortness of breath, significant fatigue, bleeding, fever, or other signs of infection *[see Warnings and Precautions (5.1)]*.

Progressive Multifocal Leukoencephalopathy (PML)

Inform patients to immediately contact their healthcare provider if they experience confusion, memory loss, trouble thinking, difficulty talking or walking, vision loss or other neurological or cognitive symptoms *[see Warnings and Precautions (5.3)]*.

Anaphylaxis and Infusion-Related Reactions

Inform patients of the possibility of serious or mild allergic reactions and to immediately report rash, facial swelling, or difficulty breathing during or soon after infusion *[see Warnings and Precautions (5.4)]*.

Skin Reactions

Advise patients that a rash or itching may occur during treatment with VIVIMUSTA. Advise patients to immediately report severe or worsening rash or itching *[see Warnings and Precautions (5.6)]*.

Hepatotoxicity

Inform patients of the possibility of developing liver function abnormalities and serious hepatic toxicity. Advise patients to immediately contact their healthcare provider if signs of liver failure occur, including jaundice, anorexia, bleeding or bruising *[see Warnings and Precautions (5.7)]*.

Fatigue

Advise patients that VIVIMUSTA may cause tiredness and to avoid driving any vehicle or operating any dangerous tools or machinery if they experience this side effect *[see Adverse Reactions (6.1)]*.

Nausea and Vomiting

Advise patients that VIVIMUSTA may cause nausea and/or vomiting. Patients should report nausea and vomiting so that symptomatic treatment may be provided *[see Adverse Reactions (6.1)]*.

Diarrhea

Advise patients that VIVIMUSTA may cause diarrhea. Patients should report diarrhea to the healthcare provider so that symptomatic treatment may be provided *[see Adverse Reactions (6.1)]*.

Non-melanoma Skin Cancer (NMSC)

Advise patients to undergo regular skin cancer screenings, and to report any suspicious skin changes to their healthcare provider *[see Warnings and Precautions (5.8)]*.

Embryo-Fetal Toxicity

Advise pregnant women and females of reproductive potential of the potential risk to a fetus. Advise females to inform their healthcare provider of a known or suspected pregnancy *[see Warnings and Precautions (5.10), Use in Specific Populations (8.1, 8.3), and Nonclinical Toxicology (13.1)]*.

Advise female patients of reproductive potential to use effective contraception during treatment with VIVIMUSTA and for 6 months after the last dose *[see Use in Specific Populations (8.1, 8.3)]*.

Advise males with female partners of reproductive potential to use effective contraception during

21

EAGLEBEN-SA_00363952

treatment with VIVIMUSTA and for 3 months after the last dose *[see Use in Specific Populations (8.3) and Nonclinical Toxicology (13.1)]*.

<u>Lactation</u>

Advise females not to breastfeed during treatment with VIVIMUSTA and for 1 week after the last dose *[see Use in Specific Populations (8.2)]*.

<u>Infertility</u>

Advise males of reproductive potential that VIVIMUSTA may impair fertility *[see Use in Specific Populations (8.3)]*.


Manufactured for:
Slayback Pharma LLC
Princeton, NJ 08540.

Manufactured at:
Corden Pharma Latina S.p.A.
04013 Sermoneta (LT), Italy.

22

Reference ID: 5089558

EAGLEBEN-SA_00363953

# Exhibit 2

This label may not be the latest approved by FDA.
For current labeling information, please visit https://www.fda.gov/drugsatfda

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use VIVIMUSTA safely and effectively. See full prescribing information for VIVIMUSTA.**

**VIVIMUSTA® (bendamustine hydrochloride injection), for intravenous use**
**Initial U.S. Approval: 2008**

------------------------INDICATIONS AND USAGE--------------------------
VIVIMUSTA is an alkylating drug indicated for treatment of patients with:
- Chronic lymphocytic leukemia (CLL). Efficacy relative to first line therapies other than chlorambucil has not been established. (1.1)
- Indolent B-cell non-Hodgkin lymphoma (NHL) that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen. (1.2)

--------------------DOSAGE AND ADMINISTRATION----------------------
For CLL:
- 100 mg/m² infused intravenously over 20 minutes on Days 1 and 2 of a 28-day cycle, up to 6 cycles (2.1)

For NHL:
- 120 mg/m² infused intravenously over 20 minutes on Days 1 and 2 of a 21-day cycle, up to 8 cycles (2.2)

--------------------DOSAGE FORMS AND STRENGTHS--------------------
Injection: 100 mg/4 mL (25 mg/mL) in a multiple-dose vial (3).

----------------------------CONTRAINDICATIONS-------------------------
History of a hypersensitivity reaction to bendamustine, polyethylene glycol 400, dehydrated alcohol, or monothioglycerol. Reactions to bendamustine hydrochloride have included anaphylaxis and anaphylactoid reactions. (4, 5.4)

-----------------------WARNINGS AND PRECAUTIONS----------------------
- Myelosuppression: Delay or reduce dose, and restart treatment based on ANC and platelet count recovery. (5.1)
- Infections: Monitor for fever and other signs of infection or reactivation of infections and treat promptly. (5.2)
- Progressive multifocal leukoencephalopathy (PML): Monitor for new or worsening neurological, cognitive or behavioral signs or symptoms suggestive of PML. (5.3)
- Anaphylaxis and Infusion-Related Reactions: Severe anaphylactic reactions have occurred. Monitor clinically and discontinue drug for severe reactions. Pre-medicate in subsequent cycles for milder reactions. (5.4)

- Tumor Lysis Syndrome: May lead to acute renal failure and death; anticipate and use supportive measures in patients at high risk. (5.5)
- Skin Reactions: Discontinue for severe skin reactions. Cases of SJS, DRESS and TEN, some fatal, have been reported. (5.6).
- Hepatotoxicity: Monitor liver chemistry tests prior to and during treatment. (5.7)
- Other Malignancies: Pre-malignant and malignant diseases have been reported. (5.8)
- Extravasation Injury: Take precautions to avoid extravasation, including monitoring intravenous infusion site during and after administration. (5.9)
- Embryo-Fetal Toxicity: Can cause fetal harm. Advise females of reproductive potential and males with female partners of reproductive potential of the potential risk to a fetus and to use an effective method of contraception. (5.10, 8.1, 8.3)

------------------------------ADVERSE REACTIONS----------------------------
- Adverse reactions (> 5%) during infusion and within 24 hours post-infusion are nausea, and fatigue. (6.1)
- Most common adverse reactions (≥15%) for CLL are anemia, thrombocytopenia, neutropenia, lymphopenia, leukopenia, hyperbilirubinemia, pyrexia, nausea, vomiting. (6.1)
- Most common adverse reactions (>15%) for NHL are lymphopenia, leukopenia, anemia neutropenia, thrombocytopenia, nausea, fatigue, vomiting, diarrhea, pyrexia, constipation, anorexia, cough, headache, weight decreased dyspnea, rash, and stomatitis. (6.1)

**To report SUSPECTED ADVERSE REACTIONS, contact Slayback Pharma at 1-844-566-2505 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

------------------------------DRUG INTERACTIONS------------------------------
Consider alternative therapies that are not CYP1A2 inducers or inhibitors during treatment with VIVIMUSTA. (7.1)

------------------------USE IN SPECIFIC POPULATIONS------------------------
- Lactation: Advise not to breastfeed. (8.2)
- Infertility: May impair fertility. (8.3)
- Renal Impairment: Do not use in patients with creatinine clearance < 30 mL/min. (8.6)
- Hepatic Impairment: Do not use in patients with total bilirubin 1.5-3 x ULN and AST or ALT 2.5-1.0 x ULN, or total bilirubin > 3 x ULN. (8.7)

**See 17 for PATIENT COUNSELING INFORMATION**

**Revised: 2/2024**

---

**FULL PRESCRIBING INFORMATION: CONTENTS***
**1 INDICATIONS AND USAGE**
  1.1 Chronic Lymphocytic Leukemia (CLL)
  1.2 Non-Hodgkin Lymphoma (NHL)
**2 DOSAGE AND ADMINISTRATION**
  2.1 Dosing Instructions for CLL
  2.2 Dosing Instructions for NHL
  2.3 Preparation and Administration
  2.4 Admixture Stability
  2.5 Stability of Partially Used Vials (Needle Punched Vials)
**3 DOSAGE FORMS AND STRENGTHS**
**4 CONTRAINDICATIONS**
**5 WARNINGS AND PRECAUTIONS**
  5.1 Myelosuppression
  5.2 Infections
  5.3 Progressive Multifocal Leukoencephalopathy (PML)
  5.4 Anaphylaxis and Infusion-Related Reactions
  5.5 Tumor Lysis Syndrome
  5.6 Skin Reactions
  5.7 Hepatotoxicity
  5.8 Other Malignancies
  5.9 Extravasation Injury
  5.10 Embryo-Fetal Toxicity
**6 ADVERSE REACTIONS**
  6.1 Clinical Trials Experience
  6.2 Postmarketing Experience

**7 DRUG INTERACTIONS**
  7.1 Effect of Other Drugs on VIVIMUSTA
**8 USE IN SPECIFIC POPULATIONS**
  8.1 Pregnancy
  8.2 Lactation
  8.3 Females and Males of Reproductive Potential
  8.4 Pediatric Use
  8.5 Geriatric Use
  8.6 Renal Impairment
  8.7 Hepatic Impairment
**10 OVERDOSAGE**
**11 DESCRIPTION**
**12 CLINICAL PHARMACOLOGY**
  12.1 Mechanism of Action
  12.2 Pharmacodynamics
  12.3 Pharmacokinetics
**13 NONCLINICAL TOXICOLOGY**
  13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
**14 CLINICAL STUDIES**
  14.1 Chronic Lymphocytic Leukemia (CLL)
  14.2 Non-Hodgkin Lymphoma (NHL)
**15 REFERENCES**
**16 HOW SUPPLIES/STORAGE AND HANDLING**
**17 PATIENT COUNSELING INFORMATION**

*Sections or subsections omitted from the full prescribing information are not listed.

1

EAGLEBEN-SA_00363910

This label may not be the latest approved by FDA.
For current labeling information, please visit https://www.fda.gov/drugsatfda

# FULL PRESCRIBING INFORMATION

## 1    INDICATIONS AND USAGE

### 1.1    Chronic Lymphocytic Leukemia (CLL)

VIVIMUSTA is indicated for the treatment of adult patients with chronic lymphocytic leukemia. Efficacy relative to first line therapies other than chlorambucil has not been established.

### 1.2    Non-Hodgkin Lymphoma (NHL)

VIVIMUSTA is indicated for the treatment of adult patients with indolent B-cell non-Hodgkin lymphoma that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen.

## 2    DOSAGE AND ADMINISTRATION

### 2.1    Dosing Instructions for CLL

Recommended Dosage

The recommended dosage is 100 mg/m$^2$ administered intravenously over 20 minutes on Days 1 and 2 of a 28-day cycle for up to 6 cycles.

Dose Delays, Dose Modifications and Re-initiation of Therapy for CLL

Delay VIVIMUSTA for Grade 4 hematologic toxicity or clinically significant Grade 2 or greater non-hematologic toxicity.

Once non-hematologic toxicity has recovered to less than or equal to Grade 1 and/or the blood counts have improved [Absolute Neutrophil Count (ANC) greater than or equal to 1 x 10$^9$/L and platelets greater than or equal to 75 x 10$^9$/L], reinitiate VIVIMUSTA at the discretion of the healthcare provider. In addition, consider dose reduction *[see Warnings and Precautions (5.1)]*.

Dose modifications for hematologic toxicity: for Grade 3 or greater toxicity, reduce the dose to 50 mg/m$^2$ on Days 1 and 2 of each cycle; if Grade 3 or greater toxicity recurs, reduce the dose to 25 mg/m$^2$ on Days 1 and 2 of each cycle.

Dose modifications for non-hematologic toxicity: for clinically significant Grade 3 or greater toxicity, reduce the dose to 50 mg/m$^2$ on Days 1 and 2 of each cycle.

Consider dose re-escalation in subsequent cycles at the discretion of the healthcare provider.

### 2.2    Dosing Instructions for NHL

Recommended Dosage

The recommended dosage is 120 mg/m$^2$ administered intravenously over 20 minutes on Days 1 and 2 of a 21-day cycle for up to 8 cycles.

Dose Delays, Dose Modifications and Re-initiation of Therapy for NHL

Delay VIVIMUSTA for Grade 4 hematologic toxicity or clinically significant Grade 2 or greater non-hematologic toxicity.

Once non-hematologic toxicity has recovered to less than or equal to Grade 1 and/or the blood counts have improved [Absolute Neutrophil Count (ANC) greater than or equal to 1 x 10$^9$/L and platelets

Reference ID: 5336025

EAGLEBEN-SA_00363911

This label may not be the latest approved by FDA.
For current labeling information, please visit https://www.fda.gov/drugsatfda

greater than or equal to 75 x $10^9$/L], reinitiate VIVIMUSTA at the discretion of the healthcare provider. In addition, consider dose reduction *[see Warnings and Precautions (5.1)]*.

Dose modifications for hematologic toxicity: for Grade 4 toxicity, reduce the dose to 90 mg/m² on Days 1 and 2 of each cycle; if Grade 4 toxicity recurs, reduce the dose to 60 mg/m² on Days 1 and 2 of each cycle.

Dose modifications for non-hematologic toxicity: for Grade 3 or greater toxicity, reduce the dose to 90 mg/m² on Days 1 and 2 of each cycle; if Grade 3 or greater toxicity recurs, reduce the dose to 60 mg/m² on Days 1 and 2 of each cycle.

## 2.3    Preparation and Administration

VIVIMUSTA is a hazardous drug. Follow applicable special handling and disposal procedures.[1]

VIVIMUSTA is a clear and colorless to yellow solution in a multiple-dose vial.

Store VIVIMUSTA refrigerated at 2°C to 8°C (36°F to 46°F). When refrigerated, the contents may partially freeze. Allow the vial to reach room temperature (15°C to 30°C or 59°F to 86°F) prior to use. Observe the contents of the vial for any visible solid or particulate matter. Do not use the product if solid or particulate matter is observed after reaching room temperature.

Intravenous Infusion

Aseptically withdraw the volume needed for the required dose from the 25 mg/mL solution as per Table 1 below and immediately transfer to a **250 mL infusion bag** of one of the following diluents: 0.9% Sodium Chloride Injection, USP; or
2.5% Dextrose/0.45% Sodium Chloride Injection, USP.
**The resulting final concentration of bendamustine hydrochloride in the infusion bag should be within 0.1 mg/mL to 1.36 mg/mL.**

After transferring, thoroughly mix the contents of the infusion bag. The admixture should be a clear and colorless to slightly yellow solution.

**No other diluents have been shown to be compatible *[see Dosage and Administration (2.4)]*.**

Table 1:    **Volume of VIVIMUSTA required for <u>Dilution into 250 mL</u> of 0.9% Sodium Chloride Injection, USP, or 2.5% Dextrose/0.45% Sodium Chloride Injection, USP for a Given Dose and Body Surface Area**

| Body Surface Area (m²) | Volume of VIVIMUSTA to Withdraw (mL) from Vial | | | | | |
|---|---|---|---|---|---|---|
| | 120 mg/m² | 100 mg/m² | 90 mg/m² | 60 mg/m² | 50 mg/m² | 25 mg/m² |
| 1 | 4.8 | 4 | 3.6 | 2.4 | 2 | 1 |
| 1.1 | 5.3 | 4.4 | 4 | 2.6 | 2.2 | 1.1 |
| 1.2 | 5.8 | 4.8 | 4.3 | 2.9 | 2.4 | 1.2 |
| 1.3 | 6.2 | 5.2 | 4.7 | 3.1 | 2.6 | 1.3 |
| 1.4 | 6.7 | 5.6 | 5 | 3.4 | 2.8 | 1.4 |
| 1.5 | 7.2 | 6 | 5.4 | 3.6 | 3 | 1.5 |
| 1.6 | 7.7 | 6.4 | 5.8 | 3.8 | 3.2 | 1.6 |
| 1.7 | 8.2 | 6.8 | 6.1 | 4.1 | 3.4 | 1.7 |
| 1.8 | 8.6 | 7.2 | 6.5 | 4.3 | 3.6 | 1.8 |
| 1.9 | 9.1 | 7.6 | 6.8 | 4.6 | 3.8 | 1.9 |

Reference ID: 5336025

EAGLEBEN-SA_00363912

| Body Surface Area (m²) | Volume of VIVIMUSTA to Withdraw (mL) from Vial | | | | | |
|---|---|---|---|---|---|---|
| | 120 mg/m² | 100 mg/m² | 90 mg/m² | 60 mg/m² | 50 mg/m² | 25 mg/m² |
| 2 | 9.6 | 8 | 7.2 | 4.8 | 4 | 2 |
| 2.1 | 10.1 | 8.4 | 7.6 | 5 | 4.2 | 2.1 |
| 2.2 | 10.6 | 8.8 | 7.9 | 5.3 | 4.4 | 2.2 |
| 2.3 | 11 | 9.2 | 8.3 | 5.5 | 4.6 | 2.3 |
| 2.4 | 11.5 | 9.6 | 8.6 | 5.8 | 4.8 | 2.4 |
| 2.5 | 12 | 10 | 9 | 6 | 5 | 2.5 |
| 2.6 | 12.5 | 10.4 | 9.4 | 6.2 | 5.2 | 2.6 |
| 2.7 | 13 | 10.8 | 9.7 | 6.5 | 5.4 | 2.7 |
| 2.8 | 13.4 | 11.2 | 10.1 | 6.7 | 5.6 | 2.8 |
| 2.9 | 13.9 | 11.6 | 10.4 | 7 | 5.8 | 2.9 |
| 3 | 14.4 | 12 | 10.8 | 7.2 | 6 | 3 |

Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration whenever solution and container permit. Discard any unused solution according to institutional procedures for hazardous drugs.

## 2.4    Admixture Stability

VIVIMUSTA contains no antimicrobial preservative. Prepare the admixture as close as possible to the time of patient administration.

Once diluted with 0.9% Sodium Chloride Injection, USP, or 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, the final admixture is stable for 24 hours when stored refrigerated (2°C to 8°C or 36°F to 46°F) or for 3 hours when stored at room temperature (15°C to 30°C or 59°F to 86°F) and room light. Complete administration of diluted VIVIMUSTA within this period of time.

VIVIMUSTA (bendamustine hydrochloride injection) is supplied in a multiple-dose vial. Retain the partially used vial in original package to protect from light and store refrigerated (2°C to 8°C or 36°F to 46°F) if additional dose withdrawal from the same vial is intended.

## 2.5    Stability of Partially Used Vials (Needle Punched Vials)

VIVIMUSTA is supplied as a multiple-dose vial. Although it does not contain any antimicrobial preservative, VIVIMUSTA is bacteriostatic. The partially used vials are stable for up to 28 days when stored in its original carton under refrigeration (2°C to 8°C or 36°F to 46°F). Each vial is not recommended for more than a total of six (6) dose withdrawals.

After first use, store the partially used vial in the original carton at 2°C to 8°C (36°F to 46°F) and then discard after 28 days.

## 3    DOSAGE FORMS AND STRENGTHS

Injection: 100 mg/4 mL (25 mg/mL) as a clear and colorless to yellow solution in multiple-dose vial.

## 4    CONTRAINDICATIONS

VIVIMUSTA is contraindicated in patients with a known hypersensitivity (e.g., anaphylactic and anaphylactoid reactions) to bendamustine, polyethylene glycol 400, dehydrated alcohol, or

4

EAGLEBEN-SA_00363913

monothioglycerol *[see Warnings and Precautions (5.4)]*.

## 5    WARNINGS AND PRECAUTIONS

### 5.1    Myelosuppression

VIVIMUSTA causes myelosuppression. Bendamustine hydrochloride caused severe myelosuppression (Grade 3-4) in 98% of patients in the two NHL studies *[see Adverse Reactions (6.1)]*. Three patients (2%) died from myelosuppression-related adverse reactions; one each from neutropenic sepsis, diffuse alveolar hemorrhage with Grade 3 thrombocytopenia and pneumonia from an opportunistic infection (CMV).

Monitor complete blood counts, including leukocytes, platelets, hemoglobin (Hgb), and neutrophils frequently. In the clinical trials, blood counts were monitored every week initially. Hematologic nadirs were observed predominantly in the third week of therapy. Myelosuppression may require dose delays and/or subsequent dose reductions if recovery to the recommended values has not occurred by the first day of the next scheduled cycle. Delay the next cycle of therapy if ANC less than $1 \times 10^9$/L or platelet count less than $75 \times 10^9$/L *[see Dosage and Administration (2.1, 2.2)]*.

### 5.2    Infections

Infection, including pneumonia, sepsis, septic shock, hepatitis and death has occurred in adult and pediatric patients in clinical trials and in postmarketing reports for bendamustine hydrochloride *[see Adverse Reactions (6.1, 6.2)]*. Patients with myelosuppression following treatment with bendamustine hydrochloride are more susceptible to infections. Advise patients with myelosuppression following VIVIMUSTA treatment to contact healthcare provider immediately if they have symptoms or signs of infection.

Patients treated with VIVIMUSTA are at risk for reactivation of infections including (but not limited to) hepatitis B, cytomegalovirus, Mycobacterium tuberculosis, and herpes zoster. Implement appropriate measures (including clinical and laboratory monitoring, prophylaxis, and treatment) for infection and infection reactivation prior to administration.

### 5.3    Progressive Multifocal Leukoencephalopathy (PML)

Progressive multifocal leukoencephalopathy (PML), including fatal cases, have occurred following treatment with bendamustine, primarily in combination with rituximab or obinutuzumab *[see Adverse Reactions (6.2)]*. Consider PML in the differential diagnosis in patients with new or worsening neurological, cognitive or behavioral signs or symptoms. If PML is suspected, withhold VIVIMUSTA treatment and perform appropriate diagnostic evaluations. Consider discontinuation or reduction of any concomitant chemotherapy or immunosuppressive therapy in patients who develop PML.

### 5.4    Anaphylaxis and Infusion-Related Reactions

Infusion-related reactions to bendamustine hydrochloride have occurred commonly in clinical trials. Symptoms include fever, chills, pruritus and rash. In rare instances, severe anaphylactic and anaphylactoid reactions have occurred, particularly in the second and subsequent cycles of therapy.

Monitor clinically and discontinue drug for severe reactions. Ask patients about symptoms suggestive of infusion-related reactions after their first cycle of therapy. Do not rechallenge patients who experienced Grade 3 or worse allergic-type reactions. Consider measures to prevent severe reactions,

Reference ID: 5336025

EAGLEBEN-SA_00363914

This label may not be the latest approved by FDA.
For current labeling information, please visit https://www.fda.gov/drugsatfda

including antihistamines, antipyretics and corticosteroids in subsequent cycles in patients who have experienced Grade 1 or 2 infusion-related reactions. Discontinue VIVIMUSTA for patients with Grade 4 infusion-related reactions. Consider discontinuation for Grade 3 infusion-related reactions as clinically appropriate considering individual benefits, risks, and supportive care.

## 5.5    Tumor Lysis Syndrome

Tumor lysis syndrome associated with bendamustine hydrochloride has occurred in patients in clinical trials and in postmarketing reports. The onset tends to be within the first treatment cycle of bendamustine hydrochloride and, without intervention, may lead to acute renal failure and death.

Administer vigorous hydration and monitor blood chemistry, particularly potassium and uric acid levels, at baseline and closely during treatment with VIVIMUSTA. Allopurinol has also been used during the beginning of bendamustine hydrochloride therapy. However, there may be an increased risk of severe skin toxicity when bendamustine hydrochloride and allopurinol are administered concomitantly *[see Warnings and Precautions (5.6)]*.

## 5.6    Skin Reactions

Fatal and serious skin reactions have been reported with bendamustine hydrochloride treatment in clinical trials and postmarketing safety reports, including toxic skin reactions [Stevens-Johnson Syndrome (SJS), toxic epidermal necrolysis (TEN), and drug reaction with eosinophilia and systemic symptoms (DRESS)], bullous exanthema, and rash. Events occurred when bendamustine hydrochloride was given as a single agent and in combination with other anticancer agents or allopurinol. Where skin reactions occur, they may be progressive and increase in severity with further treatment.

Monitor patients with skin reactions closely. If skin reactions are severe or progressive, withhold or discontinue VIVIMUSTA.

## 5.7    Hepatotoxicity

Fatal and serious cases of liver injury have been reported with Bendamustine Hydrochloride Injection *[see Adverse Reactions (6.1)]*. Combination therapy, progressive disease or reactivation of hepatitis B were confounding factors in some patients *[see Warnings and Precautions (**Error! Reference source not found.**)]*. Most cases were reported within the first three months of starting therapy.

Monitor liver chemistry tests prior to and during treatment with VIVIMUSTA.

## 5.8    Other Malignancies

Pre-malignant and malignant diseases have developed in patients who have been treated with bendamustine hydrochloride, including myelodysplastic syndrome, myeloproliferative disorders, acute myeloid leukemia, bronchial carcinoma, and non-melanoma skin cancer including basal cell carcinoma and squamous cell carcinoma *[see Adverse Reactions (6.2)]*.

Monitor patients for the development of secondary malignancies. Perform dermatologic evaluations during and after treatment with VIVIMUSTA.

## 5.9    Extravasation Injury

Bendamustine hydrochloride extravasations have been reported in postmarketing resulting in hospitalizations from erythema, marked swelling, and pain.

Assure good venous access prior to starting VIVIMUSTA infusion and monitor the intravenous

Reference ID: 5336025

EAGLEBEN-SA_00363915

infusion site for redness, swelling, pain, infection, and necrosis during and after administration of VIVIMUSTA.

## 5.10  Embryo-Fetal Toxicity

Based on findings from animal reproduction studies and the drug's mechanism of action, VIVIMUSTA can cause fetal harm when administered to a pregnant woman. Single intraperitoneal doses of bendamustine (that approximated the maximum recommended human dose based on body surface area) to pregnant mice and rats during organogenesis caused adverse developmental outcomes, including an increase in resorptions, skeletal and visceral malformations, and decreased fetal body weights.

Advise pregnant women of the potential risk to a fetus. Advise females of reproductive potential to use an effective method of contraception during treatment with VIVIMUSTA and for 6 months after the last dose. Advise males with female partners of reproductive potential to use effective contraception during treatment with VIVIMUSTA and for 3 months after the last dose *[see Use in Specific Populations (8.1, 8.3) and Clinical Pharmacology (12.1)]*.

## 6  ADVERSE REACTIONS

The following clinically significant adverse reactions are described elsewhere in the labeling:

- Myelosuppression *[see Warnings and Precautions (5.1)]*
- Infections *[see Warnings and Precautions (5.2)]*
- Progressive Multifocal Leukoencephalopathy *[see Warnings and Precautions (5.3)]*
- Anaphylaxis and Infusion-Related Reactions *[see Warnings and Precautions (5.4)]*
- Tumor Lysis Syndrome *[see Warnings and Precautions (5.5)]*
- Skin Reactions *[see Warnings and Precautions (5.6)]*
- Hepatotoxicity *[see Warnings and Precautions (5.7)]*
- Other Malignancies *[see Warnings and Precautions (5.8)]*
- Extravasation Injury *[see Warnings and Precautions (5.9)]*

## 6.1  Clinical Trials Experience

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in practice.

Chronic Lymphocytic Leukemia (CLL)

The data described below reflect exposure to bendamustine hydrochloride in 153 patients. Bendamustine hydrochloride was studied in an active-controlled, randomized trial. The population was 45-77 years of age, 63% were male, 100% were White, and had treatment naïve CLL. All patients started the study at a dose of 100 mg/m$^2$ intravenously over 30 minutes on Days 1 and 2 every 28 days.

Adverse reactions were reported according to NCI CTC v.2.0. In the randomized CLL clinical study, non-hematologic adverse reactions (any grade) in the bendamustine hydrochloride group that occurred with a frequency greater than 15% were pyrexia (24%), nausea (20%), and vomiting (16%).

7

Reference ID: 5336025

EAGLEBEN-SA_00363916

Other adverse reactions seen frequently in one or more studies included asthenia, fatigue, malaise, and weakness; dry mouth; somnolence; cough; constipation; headache; mucosal inflammation and stomatitis.

Worsening hypertension was reported in 4 patients treated with bendamustine hydrochloride and in none treated with chlorambucil. Three of these 4 adverse reactions were described as a hypertensive crisis and were managed with oral medications and resolved.

The most frequent adverse reactions leading to study withdrawal for patients receiving bendamustine hydrochloride were hypersensitivity (2%) and pyrexia (1%).

Table 2 summarizes the adverse reactions that were reported in $\geq$ 5% of patients in either treatment group in the randomized CLL clinical study.

**Table 2:** **Non-Hematologic Adverse Reactions that Occurred in at Least 5% of Patients Who Received Bendamustine Hydrochloride or Chlorambucil in the Randomized CLL Clinical Study**

| Adverse Reaction | Bendamustine Hydrochloride (N=153) | | Chlorambucil (N=143) | |
|---|---|---|---|---|
| | All Grades n (%) | Grade 3 or 4 n (%) | All Grades n (%) | Grade 3 or 4 n (%) |
| Total number of patients with at least 1 adverse reaction | 121 (79) | 52 (34) | 96 (67) | 25 (17) |
| Gastrointestinal disorders | | | | |
| Nausea | 31 (20) | 1 (<1) | 21 (15) | 1 (<1) |
| Vomiting | 24 (16) | 1 (<1) | 9 (6) | 0 |
| Diarrhea | 14 (9) | 2 (1) | 5 (3) | 0 |
| General disorders and administration site conditions | | | | |
| Pyrexia | 36 (24) | 6 (4) | 8 (6) | 2 (1) |
| Fatigue | 14 (9) | 2 (1) | 8 (6) | 0 |
| Asthenia | 13 (8) | 0 | 6 (4) | 0 |
| Chills | 9 (6) | 0 | 1 (<1) | 0 |
| Immune system disorders | | | | |
| Hypersensitivity | 7 (5) | 2 (1) | 3 (2) | 0 |
| Infections and infestations | | | | |
| Nasopharyngitis | 10 (7) | 0 | 12 (8) | 0 |
| Infection | 9 (6) | 3 (2) | 1 (<1) | 1 (<1) |
| Herpes simplex | 5 (3) | 0 | 7 (5) | 0 |
| Investigations | | | | |
| Weight decreased | 11 (7) | 0 | 5 (3) | 0 |
| Metabolism and nutrition disorders | | | | |
| Hyperuricemia | 11 (7) | 3 (2) | 2 (1) | 0 |
| Respiratory, thoracic and mediastinal disorders | | | | |
| Cough | 6 (4) | 1 (<1) | 7 (5) | 1 (<1) |
| Skin and subcutaneous tissue disorders | | | | |
| Rash | 12 (8) | 4 (3) | 7 (5) | 3 (2) |
| Pruritus | 8 (5) | 0 | 2 (1) | 0 |

8

Reference ID: 5336025

EAGLEBEN-SA_00363917

Hematology laboratory abnormalities are described in Table 3. Red blood cell transfusions were administered to 20% of patients receiving bendamustine hydrochloride compared with 6% of patients receiving chlorambucil. Bilirubin elevation occurred in 34% of patients, some without associated significant elevations in AST and ALT. Grade 3 or 4 increased bilirubin occurred in 3% of patients. Increases in AST and ALT of Grade 3 or 4 were limited to 1% and 3% of patients, respectively. Patients treated with bendamustine hydrochloride may also have changes in their creatinine levels.

**Table 3:** **Hematology Laboratory Abnormalities in Patients Who Received Bendamustine Hydrochloride or Chlorambucil in the Randomized CLL Clinical Study**

| Laboratory Abnormality | Bendamustine Hydrochloride (N=150) | | Chlorambucil (N=141) | |
|---|---|---|---|---|
| | All Grades n (%) | Grade 3 or 4 n (%) | All Grades n (%) | Grade 3 or 4 n (%) |
| Hemoglobin Decreased | 134 (89) | 20 (13) | 115 (82) | 12 (9) |
| Platelets Decreased | 116 (77) | 16 (11) | 110 (78) | 14 (10) |
| Neutrophils Decreased | 113 (75) | 65 (43) | 86 (61) | 30 (21) |
| Lymphocytes Decreased | 102 (68) | 70 (47) | 27 (19) | 6 (4) |
| Leukocytes Decreased | 92 (61) | 42 (28) | 26 (18) | 4 (3) |

Non-Hodgkin Lymphoma (NHL)

The data described below reflect exposure to bendamustine hydrochloride in 176 patients with indolent B-cell NHL treated in two single-arm studies. The population was 31-84 years of age; 60% were male; 89% were White, 7% were Black, 3% were Hispanic, 1% were other, and <1% were Asian. These patients received bendamustine hydrochloride at a dose of 120 mg/m$^2$ intravenously on Days 1 and 2 for up to eight 21-day cycles.

In both studies, serious adverse reactions were reported in 37% of patients receiving bendamustine hydrochloride. The most frequent serious adverse reactions occurring in ≥5% of patients were febrile neutropenia and pneumonia. Other important serious adverse reactions reported in clinical trials and/or postmarketing experience were acute renal failure, cardiac failure, hypersensitivity, skin reactions, pulmonary fibrosis, and myelodysplastic syndrome.

Serious adverse reactions reported in clinical trials included myelosuppression, infection, pneumonia, tumor lysis syndrome and infusion-related reactions *[see Warnings and Precautions **(Error! Reference source not found.)]**. Adverse reactions occurring less frequently but possibly related to bendamustine hydrochloride treatment were hemolysis, dysgeusia/taste disorder, atypical pneumonia, sepsis, herpes zoster, erythema, dermatitis, and skin necrosis.

The most common non-hematologic adverse reactions (≥30%) were nausea (75%), fatigue (57%), vomiting (40%), diarrhea (37%) and pyrexia (34%). The most common non-hematologic Grade 3 or 4 adverse reactions (≥5%) were fatigue (11%), febrile neutropenia (6%), and pneumonia, hypokalemia and dehydration, each reported in 5% of patients.

Non-hematologic adverse reactions are shown in Table 4.

9

EAGLEBEN-SA_00363918

**Table 4:    Non-Hematologic Adverse Reactions that Occurred in at Least 5% of Patients who Received Bendamustine Hydrochloride in the NHL Studies**

| Adverse Reaction | Bendamustine Hydrochloride (N=176*) | |
|---|---|---|
| | All Grades n (%) | Grade 3 or 4 n (%) |
| Total number of patients with at least 1 adverse reaction | 176 (100) | 94 (53) |
| **Cardiac Disorders** | | |
| Tachycardia | 13 (7) | 0 |
| **Gastrointestinal disorders** | | |
| Nausea | 132 (75) | 7 (4) |
| Vomiting | 71 (40) | 5 (3) |
| Diarrhea | 65 (37) | 6 (3) |
| Constipation | 51 (29) | 1 (<1) |
| Stomatitis | 27 (15) | 1 (<1) |
| Abdominal pain | 22 (13) | 2 (1) |
| Dyspepsia | 20 (11) | 0 |
| Gastroesophageal reflux disease | 18 (10) | 0 |
| Dry mouth | 15 (9) | 1 (<1) |
| Abdominal pain upper | 8 (5) | 0 |
| Abdominal distension | 8 (5) | 0 |
| **General disorders and administration site conditions** | | |
| Fatigue | 101 (57) | 19 (11) |
| Pyrexia | 59 (34) | 3 (2) |
| Chills | 24 (14) | 0 |
| Edema peripheral | 23 (13) | 1 (<1) |
| Asthenia | 19 (11) | 4 (2) |
| Chest pain | 11 (6) | 1 (<1) |
| Infusion site pain | 11 (6) | 0 |
| Pain | 10 (6) | 0 |
| Catheter site pain | 8 (5) | 0 |
| **Infections and infestations** | | |
| Herpes zoster | 18 (10) | 5 (3) |
| Upper respiratory tract infection | 18 (10) | 0 |
| Urinary tract infection | 17 (10) | 4 (2) |
| Sinusitis | 15 (9) | 0 |
| Pneumonia | 14 (8) | 9 (5) |
| Febrile neutropenia | 11 (6) | 11 (6) |
| Oral candidiasis | 11 (6) | 2 (1) |
| Nasopharyngitis | 11 (6) | 0 |
| **Investigations** | | |
| Weight decreased | 31 (18) | 3 (2) |
| **Metabolism and nutrition disorders** | | |
| Anorexia | 40 (23) | 3 (2) |
| Dehydration | 24 (14) | 8 (5) |
| Decreased appetite | 22 (13) | 1 (<1) |
| Hypokalemia | 15 (9) | 9 (5) |
| **Musculoskeletal and connective tissue disorders** | | |

10

Reference ID: 5336025

EAGLEBEN-SA_00363919

| Adverse Reaction | Bendamustine Hydrochloride (N=176*) | |
|---|---|---|
| | All Grades n (%) | Grade 3 or 4 n (%) |
| Back pain | 25 (14) | 5 (3) |
| Arthralgia | 11 (6) | 0 |
| Pain in extremity | 8 (5) | 2 (1) |
| Bone pain | 8 (5) | 0 |
| **Nervous system disorders** | | |
| Headache | 36 (21) | 0 |
| Dizziness | 25 (14) | 0 |
| Dysgeusia | 13 (7) | 0 |
| **Psychiatric disorder** | | |
| Insomnia | 23 (13) | 0 |
| Anxiety | 14 (8) | 1 (<1) |
| Depression | 10 (6) | 0 |
| **Respiratory, thoracic and mediastinal disorders** | | |
| Cough | 38 (22) | 1 (<1) |
| Dyspnea | 28 (16) | 3 (2) |
| Pharyngolaryngeal pain | 14 (8) | 1 (<1) |
| Wheezing | 8 (5) | 0 |
| Nasal congestion | 8 (5) | 0 |
| **Skin and subcutaneous tissue disorders** | | |
| Rash | 28 (16) | 1 (<1) |
| Pruritus | 11 (6) | 0 |
| Dry skin | 9 (5) | 0 |
| Night sweats | 9 (5) | 0 |
| Hyperhidrosis | 8 (5) | 0 |
| **Vascular disorders** | | |
| Hypotension | 10 (6) | 2 (1) |

*Patients may have reported more than 1 adverse reaction.
NOTE: Patients counted only once in each preferred term category and once in each body system category.

Hematologic toxicities, based on laboratory values and CTC grade, in patients with NHL treated in both single arm studies combined are described in Table 5. Clinically important chemistry laboratory values that were new or worsened from baseline and occurred in >1% of patients at Grade 3 or 4, in patients with NHL who were treated in both single arm studies combined were hyperglycemia (3%), elevated creatinine (2%), hyponatremia (2%), and hypocalcemia (2%).

**Table 5:    Hematology Laboratory Abnormalities in Patients Who Received Bendamustine Hydrochloride in the NHL Studies**

| Hematology Variable | Bendamustine Hydrochloride | |
|---|---|---|
| | All Grades (%) | Grade 3 or 4 (%) |
| Lymphocytes Decreased | 99 | 94 |
| Leukocytes Decreased | 94 | 56 |

11

EAGLEBEN-SA_00363920

| Hematology Variable | Bendamustine Hydrochloride | |
|---|---|---|
| | All Grades (%) | Grade 3 or 4 (%) |
| Hemoglobin Decreased | 88 | 11 |
| Neutrophils Decreased | 86 | 60 |
| Platelets Decreased | 86 | 25 |

## 6.2 Postmarketing Experience

The following adverse reactions have been identified during postapproval use of bendamustine hydrochloride. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

*Blood and lymphatic systems disorders:* Pancytopenia.

*Cardiovascular disorders:* Atrial fibrillation, congestive heart failure (some fatal), myocardial infarction (some fatal), palpitation.

*General disorders and administration site conditions:* Injection site reactions (including phlebitis, pruritus, irritation, pain, swelling), infusion site reactions (including phlebitis, pruritus, irritation, pain, swelling).

*Immune system disorders:* Anaphylaxis.

*Infections and infestations: Pneumocystis jiroveci* pneumonia, progressive multifocal leukoencephalopathy (PML).

*Renal and urinary disorders*: Nephrogenic diabetes insipidus (NDI)

*Respiratory, thoracic and mediastinal disorders*: Pneumonitis.

*Skin and subcutaneous tissue disorders:* Stevens-Johnson syndrome (SJS), toxic epidermal necrolysis (TEN), drug reaction with eosinophilia and systemic symptoms (DRESS), and non-melanoma skin cancer (NMSC).

## 7 DRUG INTERACTIONS

### 7.1 Effect of Other Drugs on VIVIMUSTA

CYP1A2 Inhibitors

The coadministration of VIVIMUSTA with CYP1A2 inhibitors may increase bendamustine plasma concentrations and may result in increased incidence of adverse reactions with VIVIMUSTA *[see Clinical Pharmacology (12.3)]*. Consider alternative therapies that are not CYP1A2 inhibitors during treatment with VIVIMUSTA.

CYP1A2 Inducers

The coadministration of VIVIMUSTA with CYP1A2 inducers may decrease bendamustine plasma concentrations and may result in decreased efficacy of VIVIMUSTA *[see Clinical Pharmacology (12.3)]*. Consider alternative therapies that are not CYP1A2 inducers during treatment with VIVIMUSTA.

12

Reference ID: 5336025

EAGLEBEN-SA_00363921

This label may not be the latest approved by FDA.
For current labeling information, please visit https://www.fda.gov/drugsatfda

## 8 USE IN SPECIFIC POPULATIONS

### 8.1 Pregnancy

<u>Risk Summary</u>

In animal reproduction studies, intraperitoneal administration of bendamustine to pregnant mice and rats during organogenesis at doses 0.6 to 1.8 times the maximum recommended human dose (MRHD) resulted in embryo-fetal and/or infant mortality, structural abnormalities, and alterations to growth *(see Data)*. There are no available data on bendamustine hydrochloride use in pregnant women to evaluate for a drug-associated risk of major birth defects, miscarriage or adverse maternal or fetal outcomes. Advise pregnant women of the potential risk to a fetus.

The estimated background risk of major birth defects and miscarriage for the indicated population is unknown. All pregnancies have a background risk of birth defect, loss, or other adverse outcomes. In the U.S. general population, the estimated background risk of major birth defects and miscarriage in clinically recognized pregnancies is 2% to 4% and 15% to 20%, respectively.

<u>Data</u>

*Animal Data*

Bendamustine hydrochloride was intraperitoneally administered once to mice from 210 mg/m$^2$ (approximately 1.8 times the MRHD) during organogenesis and caused an increase in resorptions, skeletal and visceral malformations (exencephaly, cleft palates, accessory rib, and spinal deformities) and decreased fetal body weights. This dose did not appear to be maternally toxic and lower doses were not evaluated. Repeat intraperitoneal administration of bendamustine hydrochloride in mice on gestation days 7 to 11 resulted in an increase in resorptions from 75 mg/m$^2$ (approximately 0.6 times the MRHD) and an increase in abnormalities from 112.5 mg/m$^2$ (approximately 0.9 times the MRHD), similar to those seen after a single intraperitoneal administration.

Bendamustine hydrochloride was intraperitoneally administered once to rats from 120 mg/m$^2$ (approximately the MRHD) on gestation days 4, 7, 9, 11, or 13 and caused embryo and fetal lethality as indicated by increased resorptions and a decrease in live fetuses. A significant increase in external (effect on tail, head, and herniation of external organs [exomphalos]) and internal (hydronephrosis and hydrocephalus) malformations were seen in dosed rats.

### 8.2 Lactation

<u>Risk Summary</u>

There are no data on the presence of bendamustine hydrochloride or its metabolites in either human or animal milk, the effects on the breastfed child, or the effects on milk production. Because of the potential for serious adverse reactions in the breastfed child, advise women not to breastfeed during treatment with VIVIMUSTA and for 1 week after the last dose.

### 8.3 Females and Males of Reproductive Potential

VIVIMUSTA can cause embryo-fetal harm when administered to a pregnant woman *[see Use in Specific Populations (8.1)]*.

<u>Pregnancy Testing</u>

13

Reference ID: 5336025

Pregnancy testing is recommended for females of reproductive potential prior to initiation of treatment with VIVIMUSTA.

Contraception

*Females*

Advise female patients of reproductive potential to use effective contraception during treatment with VIVIMUSTA and for 6 months after the last dose.

*Males*

Based on genotoxicity findings, advise males with female partners of reproductive potential to use effective contraception during treatment with VIVIMUSTA and for 3 months after the last dose *[see Nonclinical Toxicology (13.1)]*.

Infertility

Based on findings from clinical studies, VIVIMUSTA may impair male fertility. Impaired spermatogenesis, azoospermia, and total germinal aplasia have been reported in male patients treated with alkylating agents, especially in combination with other drugs. In some instances spermatogenesis may return in patients in remission, but this may occur only several years after intensive chemotherapy has been discontinued. Advise patients of the potential risk to their reproductive capacities.

Based on findings from animal studies, VIVIMUSTA may impair male fertility due to an increase in morphologically abnormal spermatozoa. The long-term effects of VIVIMUSTA on male fertility, including the reversibility of adverse effects, have not been studied *[see Nonclinical Toxicology (13.1)]*.

## 8.4   Pediatric Use

Safety and effectiveness in pediatric patients have not been established.

Safety, pharmacokinetics and efficacy were assessed in a single open-label trial (NCT01088984) in patients aged 1-19 years with relapsed or refractory acute leukemia, including 27 patients with acute lymphocytic leukemia (ALL) and 16 patients with acute myeloid leukemia (AML).

Bendamustine hydrochloride was administered as an intravenous infusion over 60 minutes on Days 1 and 2 of each 21-day cycle. There was no treatment response (CR+ CRp) in any patient. The safety profile in these patients was consistent with that seen in adults and no new safety signals were identified.

The pharmacokinetics of bendamustine in 43 patients aged 1 to 19 years (median age of 10 years) were within range of values previously observed in adults given the same dose based on body surface area.

## 8.5   Geriatric Use

No overall differences in safety were observed between patients ≥65 years of age and younger patients. Efficacy was lower in patients 65 and over with CLL receiving bendamustine hydrochloride based upon an overall response rate of 47% for patients 65 and over and 70% for younger patients. Progression free survival was also longer in younger patients with CLL receiving bendamustine (19 months vs. 12 months). No overall differences in efficacy in patients with non-Hodgkin Lymphoma were observed between geriatric patients and younger patients.

14

EAGLEBEN-SA_00363923

### 8.6    Renal Impairment

Do not use VIVIMUSTA in patients with creatinine clearance (CLcr) less than 30 mL/min *[see Clinical Pharmacology (12.3)]*.

### 8.7    Hepatic Impairment

Do not use VIVIMUSTA in patients with AST or ALT 2.5 to 10 times upper limit of normal (ULN) and total bilirubin 1.5 to 3 times ULN or total bilirubin greater than 3 times ULN *[see Clinical Pharmacology (12.3)]*

## 10    OVERDOSAGE

The intravenous lethal dose 50 ($LD_{50}$) of bendamustine hydrochloride is 240 mg/m$^2$ in the mouse and rat. Toxicities included sedation, tremor, ataxia, convulsions and respiratory distress.

Across all clinical experience, the reported maximum single dose received was 280 mg/m$^2$. Three of four patients who received this dose showed ECG changes considered dose-limiting at 7 and 21 days post-dosing. These changes included QT prolongation (one patient), sinus tachycardia (one patient), ST and T wave deviations (two patients) and left anterior fascicular block (one patient). Cardiac enzymes and ejection fractions remained normal in all patients.

No specific antidote for bendamustine hydrochloride overdose is known. Management of overdosage should include general supportive measures, including monitoring of hematologic parameters and ECGs.

## 11    DESCRIPTION

Bendamustine hydrochloride is an alkylating agent. The chemical name of bendamustine hydrochloride monohydrate is 5-[Bis(2-chloroethyl)-amino]-1-methyl-1H-benzimidazole-2-butanoic acid hydrochloride monohydrate. Its empirical molecular formula is $C_{16}H_{21}Cl_2N_3O_2 \cdot HCl \cdot H_2O$ and the molecular weight is 412.74. Bendamustine hydrochloride monohydrate contains a mechlorethamine group and a benzimidazole heterocyclic ring with a butyric acid substituent, and has the following structural formula:

VIVIMUSTA (bendamustine hydrochloride injection) is intended for intravenous use after dilution with either 0.9% Sodium Chloride Injection, USP or 2.5% Dextrose/0.45% Sodium Chloride Injection, USP. It is supplied as a sterile, clear, and colorless to yellow solution in a clear glass multiple-dose vial. Each milliliter contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, 39.45 mg (5% v/v) of absolute alcohol, and q.s. to 1 mL polyethylene glycol 400. Sodium hydroxide is used to adjust pH of polyethylene glycol 400.

15

Reference ID: 5336025

EAGLEBEN-SA_00363924

This label may not be the latest approved by FDA.
For current labeling information, please visit https://www.fda.gov/drugsatfda

## 12    CLINICAL PHARMACOLOGY

### 12.1  Mechanism of Action

Bendamustine is a bifunctional mechlorethamine derivative containing a purine-like benzimidazole ring. Mechlorethamine and its derivatives form electrophilic alkyl groups. These groups form covalent bonds with electron-rich nucleophilic moieties, resulting in interstrand DNA crosslinks. The bifunctional covalent linkage can lead to cell death via several pathways. Bendamustine is active against both quiescent and dividing cells. The exact mechanism of action of bendamustine remains unknown.

### 12.2  Pharmacodynamics

Based on the pharmacokinetics/pharmacodynamics analyses of data from adult patients with NHL, nausea increased with increasing bendamustine maximum concentrations ($C_{max}$).

Cardiac Electrophysiology

The effect of bendamustine on the QTc interval was evaluated in 53 patients with indolent NHL and mantle cell lymphoma on Day 1 of Cycle 1 after administration of rituximab at 375 $mg/m^2$ intravenous infusion followed by a 30-minute intravenous infusion of bendamustine at 90 $mg/m^2/day$. No mean changes greater than 20 milliseconds were detected up to one hour post infusion. The potential for delayed effects on the QT interval after one hour was not evaluated.

### 12.3  Pharmacokinetics

Absorption

Following a single IV dose of bendamustine hydrochloride $C_{max}$ typically occurred at the end of infusion. The dose proportionality of bendamustine has not been studied.

Distribution

The protein binding of bendamustine ranged from 94-96% and was concentration independent from 1 to 50 $\mu g/mL$. The blood to plasma concentration ratios in human blood ranged from 0.84 to 0.86 over a concentration range of 10 to 100 $\mu g/mL$.

The mean steady-state volume of distribution (Vss) of bendamustine was approximately 20 to 25 L.

Elimination

After a single intravenous dose of 120 $mg/m^2$ of bendamustine over 1 hour, the intermediate half-life ($t\frac{1}{2}$) of the parent compound was approximately 40 minutes. The mean terminal elimination $t\frac{1}{2}$ of two active metabolites, $\gamma$-hydroxybendamustine (M3) and N desmethylbendamustine (M4) were approximately 3 hours and 30 minutes, respectively. Bendamustine clearance in humans was approximately 700 mL/min.

*Metabolism*

Bendamustine is extensively metabolized via hydrolytic, oxidative, and conjugative pathways. Bendamustine is primarily metabolized via hydrolysis to monohydroxy (HP1) and dihydroxy-bendamustine (HP2) metabolites with low cytotoxic activity in vitro. Two active minor metabolites, M3 and M4, are primarily formed via CYP1A2 in vitro. M3 and M4 concentrations of these metabolites in plasma are $1/10^{th}$ and $1/100^{th}$ that of the parent compound, respectively.

*Excretion*

16

Reference ID: 5336025

EAGLEBEN-SA_00363925

This label may not be the latest approved by FDA.
For current labeling information, please visit https://www.fda.gov/drugsatfda

Following intravenous infusion of radiolabeled bendamustine hydrochloride in patients with cancer, approximately 76% of the dose was recovered. Approximately 50% of the dose was recovered in the urine (3.3% unchanged) and approximately 25% of the dose was recovered in the feces. Less than 1% of the dose was recovered in the urine as M3 and M4, and less than 5% of the dose was recovered in the urine as HP2.

Specific Populations

No clinically meaningful effects on the pharmacokinetics of bendamustine were observed based on age (31 to 84 years), sex, mild to moderate renal impairment (CLcr $\geq$ 30 mL/min), or hepatic impairment with total bilirubin 1.5 < ULN and AST or ALT < 2.5 × ULN. The effects of severe renal impairment (CLcr < 30 mL/min) or hepatic impairment with total bilirubin 1.5 to 3 × ULN and AST or ALT 2.5 to 10 × ULN or total bilirubin > 3 × ULN on the pharmacokinetics of bendamustine is unknown.

*Race/Ethnicity*

Exposures in Japanese subjects (n=6) were 40% higher than non-Japanese subjects receiving the same dose. The clinical importance of this difference on the safety and efficacy of bendamustine hydrochloride in Japanese subjects has not been established.

Drug Interaction Studies

*In Vitro Studies*

*Effect of Bendamustine Hydrochloride on CYP Substrates:* Bendamustine hydrochloride did not inhibit CYP1A2, 2C9/10, 2D6, 2E1, or 3A4/5. Bendamustine hydrochloride did not induce metabolism of CYP1A2, CYP2A6, CYP2B6, CYP2C8, CYP2C9, CYP2C19, CYP2E1, or CYP3A4/5.

*Effect of Transporters on Bendamustine Hydrochloride:* Bendamustine hydrochloride is a substrate of P-glycoprotein and breast cancer resistance protein (BCRP).

## 13    NONCLINICAL TOXICOLOGY

### 13.1  Carcinogenesis, Mutagenesis, Impairment of Fertility

Bendamustine was carcinogenic in mice. After intraperitoneal injections at 37.5 mg/m$^2$/day (the lowest dose tested, approximately 0.3 times the maximum recommended human dose [MRHD]) and 75 mg/m$^2$/day (approximately 0.6 times the MRHD) for 4 days, peritoneal sarcomas in female AB/jena mice were produced. Oral administration at 187.5 mg/m$^2$/day (the only dose tested, approximately 1.6 times the MRHD) for 4 days induced mammary carcinomas and pulmonary adenomas.

Bendamustine is a mutagen and clastogen. In a reverse bacterial mutation assay (Ames assay), bendamustine was shown to increase revertant frequency in the absence and presence of metabolic activation. Bendamustine was clastogenic in human lymphocytes in vitro, and in rat bone marrow cells in vivo (increase in micronucleated polychromatic erythrocytes) from 37.5 mg/m$^2$, (the lowest dose tested, approximately 0.3 times the MRHD).

Bendamustine induced morphologic abnormalities in spermatozoa in mice. Following tail vein injection of bendamustine at 120 mg/m$^2$ or a saline control on days 1 and 2 for a total of three weeks, the number of spermatozoa with morphologic abnormalities was 16% higher in the bendamustine-

17

Reference ID: 5336025

This label may not be the latest approved by FDA.
For current labeling information, please visit https://www.fda.gov/drugsatfda

treated group as compared to the saline control group.

## 14    CLINICAL STUDIES

### 14.1  Chronic Lymphocytic Leukemia (CLL)

The efficacy of bendamustine hydrochloride was evaluated in an open-label, randomized, controlled multicenter trial comparing bendamustine hydrochloride to chlorambucil. The trial was conducted in 301 previously-untreated patients with Binet Stage B or C (Rai Stages I - IV) CLL requiring treatment. Need-to-treat criteria included hematopoietic insufficiency, B-symptoms, rapidly progressive disease or risk of complications from bulky lymphadenopathy. Patients with autoimmune hemolytic anemia or autoimmune thrombocytopenia, Richter's syndrome, or transformation to prolymphocytic leukemia were excluded from the study. Patients were randomly assigned to receive either bendamustine hydrochloride 100 mg/m$^2$ intravenously over 30 minutes on Days 1 and 2 of each 28-day cycle or chlorambucil 0.8 mg/kg (Broca's normal weight) orally on Days 1 and 15 of each 28-day cycle.

The patient populations in the bendamustine hydrochloride and chlorambucil treatment groups were balanced with regard to the following baseline characteristics: age (median 63 vs. 66 years), sex (63% vs. 61% male), Binet stage (71% vs. 69% Binet B), lymphadenopathy (79% vs. 82%), enlarged spleen (76% vs. 80%), enlarged liver (48% vs. 46%), hypercellular bone marrow (79% vs. 73%), "B" symptoms (51% vs. 53%), lymphocyte count (mean 65.7 x 10$^9$/L vs. 65.1 x 10$^9$/L), and serum lactate dehydrogenase concentration (mean 370.2 vs. 388.4 U/L). Ninety percent of patients in both treatment groups had immuno-phenotypic confirmation of CLL (CD5, CD23 and either CD19 or CD20 or both).

Efficacy endpoints of objective response rate and progression-free survival were calculated using a pre-specified algorithm based on NCI working group criteria for CLL. The results of this open-label randomized study demonstrated a higher rate of overall response and a longer progression-free survival for bendamustine hydrochloride compared to chlorambucil (*see* Table 6). Survival data are not mature.

**Table 6:    Efficacy Data for CLL**

| | Bendamustine Hydrochloride (N=153) | Chlorambucil (N=148) | p-value |
|---|---|---|---|
| **Response Rate n (%)** | | | |
| Overall response rate | 90 (59) | 38 (26) | <0.0001 |
| (95% CI) | (51, 66.6) | (18.6, 32.7) | |
| Complete response (CR)* | 13 (8) | 1 (<1) | |
| Nodular partial response (nPR)** | 4 (3) | 0 | |
| Partial response (PR) † | 73 (48) | 37 (25) | |
| **Progression-Free Survival††** | | | |
| Median, months (95% CI) | 18 (11.7, 23.5) | 6 (5.6, 8.6) | |
| Hazard ratio (95% CI) | 0.27 (0.17, 0.43) | | <0.0001 |

CI = confidence interval

* CR was defined as peripheral lymphocyte count ≤ 4 x 10$^9$/L, neutrophils ≥ 1.5 x 10$^9$/L, platelets >100 x 10$^9$/L, hemoglobin >110 g/L, without transfusions, absence of palpable hepatosplenomegaly, lymph nodes ≤ 1.5 cm, < 30% lymphocytes without nodularity in at least a normocellular bone marrow and absence of "B" symptoms. The clinical and laboratory criteria were required to be maintained for a period of at least 56 days.

18

Reference ID: 5336025

EAGLEBEN-SA_00363927

\*\* nPR was defined as described for CR with the exception that the bone marrow biopsy shows persistent nodules.
† PR was defined as ≥50% decrease in peripheral lymphocyte count from the pre-treatment baseline value, and either ≥50% reduction in lymphadenopathy, or ≥50% reduction in the size of spleen or liver, as well as one of the following hematologic improvements: neutrophils ≥ 1.5 x $10^9$/L or 50% improvement over baseline, platelets >100 x $10^9$/L or 50% improvement over baseline, hemoglobin >110 g/L or 50% improvement over baseline without transfusions, for a period of at least 56 days.
†† PFS was defined as time from randomization to progression or death from any cause.

Kaplan-Meier estimates of progression-free survival comparing bendamustine hydrochloride with chlorambucil are shown in Figure 1.

**Figure 1. Progression-Free Survival**



## 14.2  Non-Hodgkin Lymphoma (NHL)

The efficacy of bendamustine hydrochloride was evaluated in a single arm study of 100 patients with indolent B-cell NHL that had progressed during or within six months of treatment with rituximab or a rituximab-containing regimen. Patients were included if they relapsed within 6 months of either the first dose (monotherapy) or last dose (maintenance regimen or combination therapy) of rituximab. All patients received bendamustine hydrochloride 120 mg/m$^2$ intravenously on Days 1 and 2 of a 21-day treatment cycle for up to 8 cycles.

The median age was 60 years, 65% were male, and 95% had a baseline WHO performance status of 0 or 1. Major tumor subtypes were follicular lymphoma (62%), diffuse small lymphocytic lymphoma (21%), and marginal zone lymphoma (16%). Ninety-nine percent of patients had received previous chemotherapy, 91% of patients had received previous alkylator therapy, and 97% of patients had relapsed within 6 months of either the first dose (monotherapy) or last dose (maintenance regimen or combination therapy) of rituximab.

Efficacy was based on the assessments by a blinded independent review committee (IRC) and included overall response rate (complete response + complete response unconfirmed + partial response) and duration of response (DR) as summarized in Table 7.

19

Reference ID: 5336025

EAGLEBEN-SA_00363928

**Table 7:        Efficacy Data for NHL\***

|  | Bendamustine Hydrochloride (N=100) |
|---|---|
| **Response Rate (%)** |  |
| Overall response rate (CR+CRu+PR) | 74 |
| (95% CI) | (64.3, 82.3) |
| Complete response (CR) | 13 |
| Complete response unconfirmed (CRu) | 4 |
| Partial response (PR) | 57 |
| **Duration of Response (DR)** |  |
| Median, months (95% CI) | 9.2 months (7.1, 10.8) |

CI = confidence interval

\*IRC assessment was based on modified International Working Group response criteria (IWG-RC). Modifications to IWG-RC specified that a persistently positive bone marrow in patients who met all other criteria for CR would be scored as PR. Bone marrow sample lengths were not required to be ≥20 mm.

## 15   REFERENCES

1.    OSHA Hazardous Drugs. *OSHA.* https://www.osha.gov/hazardous-drugs

## 16   HOW SUPPLIED/STORAGE AND HANDLING

How Supplied

VIVIMUSTA (bendamustine hydrochloride injection) is a sterile clear, colorless to yellow solution for intravenous use supplied in individual cartons of multiple-dose vials providing 100 mg bendamustine hydrochloride per 4 mL.

100 mg/4 mL (25 mg/mL)      NDC 71225-120-01

Safe Handling and Disposal

VIVIMUSTA (bendamustine hydrochloride injection) is a hazardous drug. Follow applicable special handling and disposal procedures.[1] Care should be exercised in the handling and preparation of solutions prepared from VIVIMUSTA. The use of gloves and safety glasses is recommended to avoid exposure in case of breakage of the vial or other accidental spillage. If gloves come in contact with VIVIMUSTA prior to dilution, remove gloves and follow disposal procedures. If a solution of VIVIMUSTA (bendamustine hydrochloride injection) contacts the skin, wash the skin immediately and thoroughly with soap and water. If VIVIMUSTA (bendamustine hydrochloride injection) contacts the mucous membranes, flush thoroughly with water.

Storage

Store VIVIMUSTA (bendamustine hydrochloride injection) refrigerated at 2°C to 8°C (36°F to 46°F). Retain in original carton until time of use to protect from light.

## 17   PATIENT COUNSELING INFORMATION

Myelosuppression

Inform patients of the likelihood that bendamustine hydrochloride will cause a decrease in white blood cells, platelets, and red blood cells and the need for frequent monitoring of blood counts. Advise patients to report shortness of breath, significant fatigue, bleeding, fever, or other signs of

20

Reference ID: 5336025

EAGLEBEN-SA_00363929

This label may not be the latest approved by FDA.
For current labeling information, please visit https://www.fda.gov/drugsatfda

infection *[see Warnings and Precautions (5.1)]*.

Progressive Multifocal Leukoencephalopathy (PML)

Inform patients to immediately contact their healthcare provider if they experience confusion, memory loss, trouble thinking, difficulty talking or walking, vision loss or other neurological or cognitive symptoms *[see Warnings and Precautions (5.3)]*.

Anaphylaxis and Infusion-Related Reactions

Inform patients of the possibility of serious or mild allergic reactions and to immediately report rash, facial swelling, or difficulty breathing during or soon after infusion *[see Warnings and Precautions (5.4)]*.

Skin Reactions

Advise patients that a rash or itching may occur during treatment with VIVIMUSTA. Advise patients to immediately report severe or worsening rash or itching *[see Warnings and Precautions (5.6)]*.

Hepatotoxicity

Inform patients of the possibility of developing liver function abnormalities and serious hepatic toxicity. Advise patients to immediately contact their healthcare provider if signs of liver failure occur, including jaundice, anorexia, bleeding or bruising *[see Warnings and Precautions (5.7)]*.

Fatigue

Advise patients that VIVIMUSTA may cause tiredness and to avoid driving any vehicle or operating any dangerous tools or machinery if they experience this side effect *[see Adverse Reactions (6.1)]*.

Nausea and Vomiting

Advise patients that VIVIMUSTA may cause nausea and/or vomiting. Patients should report nausea and vomiting so that symptomatic treatment may be provided *[see Adverse Reactions (6.1)]*.

Diarrhea

Advise patients that VIVIMUSTA may cause diarrhea. Patients should report diarrhea to the healthcare provider so that symptomatic treatment may be provided *[see Adverse Reactions (6.1)]*.

Non-melanoma Skin Cancer (NMSC)

Advise patients to undergo regular skin cancer screenings, and to report any suspicious skin changes to their healthcare provider *[see Warnings and Precautions (5.8)]*.

Embryo-Fetal Toxicity

Advise pregnant women and females of reproductive potential of the potential risk to a fetus. Advise females to inform their healthcare provider of a known or suspected pregnancy *[see Warnings and Precautions (5.10), Use in Specific Populations (8.1, 8.3), and Nonclinical Toxicology (13.1)]*.

Advise female patients of reproductive potential to use effective contraception during treatment with VIVIMUSTA and for 6 months after the last dose *[see Use in Specific Populations (8.1, 8.3)]*.

Advise males with female partners of reproductive potential to use effective contraception during treatment with VIVIMUSTA and for 3 months after the last dose *[see Use in Specific Populations (8.3) and Nonclinical Toxicology (13.1)]*.

Reference ID: 5336025

EAGLEBEN-SA_00363930

This label may not be the latest approved by FDA.
For current labeling information, please visit https://www.fda.gov/drugsatfda

Lactation

Advise females not to breastfeed during treatment with VIVIMUSTA and for 1 week after the last dose *[see Use in Specific Populations (8.2)]*.

Infertility

Advise males of reproductive potential that VIVIMUSTA may impair fertility *[see Use in Specific Populations (8.3)]*.


Manufactured for:
Slayback Pharma LLC
Princeton, NJ 08540.

Manufactured at:
Latina Pharma S.p.A
04013 Sermoneta (LT), Italy.

Reference ID: 5336025

EAGLEBEN-SA_00363931

# Exhibit 3



**Planet Depos**
We Make It *Happen*™

# Transcript of Patrick Sinko, Ph.D.

**Date:** April 16, 2026
**Case:** Eagle Pharmaceuticals, Inc., et al. -v- Slayback Pharma/Azurity Pharma

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of Patrick Sinko, Ph.D.
Conducted on April 16, 2026

1 (1 to 4)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
----------------------------------------x
EAGLE PHARMACEUTICALS, INC. and
EAGLE SUB1 LLC,

                    Plaintiffs,

          -against-      C.A. No:
                         24-65-JLH (CONSOLIDATED)


SLAYBACK PHARMA LLC and AZURITY
PHARMACEUTICALS, INC.,

                    Defendants.
----------------------------------------x

        VIDEOTAPED DEPOSITION of PATRICK SINKO, Ph.D.,
taken by the Plaintiff, pursuant to Notice, held at Le
Meridien Hotel 120 West 57th Street New York, NY 10019,
on April 16, 2026, at 9:06 a.m., before a Notary Public
of the State of New York.

************************************************

---

APPEARANCES:

LATHAM & WATKINS
        Attorneys for Plaintiff
        330 North Wabash Avenue, Suite 2800
        Chicago, IL 60611
BY:     MARC N. ZUBICK, ESQ.
        marc.zubick@lw.com
        KELLY ANNE WELSH, ESQ.
        kelly.welsh@lw.com


WINDELS MARX LANE & MITTENDORF, LLP
        Attorneys for Defendant
        156 West 56th Street
        New York, NY 10019
BY:     JASON A. LIEF, ESQ.
        jlief@windelsmarx.com




ALSO PRESENT:

NAADIRAH MOORE-Videographer

---

INDEX

WITNESS              EXAMINATION BY       PAGE
Patrick Sinko, Ph.D.  Marc Zubick          5


                    EXHIBITS
SINKO               DESCRIPTION          PAGE
Ex. 1   Expert Report of Dr. Patrick     17
        Sinko Regarding Non-Infringement
Ex. 2   EAGLEBEN-Sa_00363910-931         26
Ex. 3   EAGLEBEN-Sa_00363932-953         27
Ex. 4   EAGLEBEN-Sa_00361850-855         48
Ex. 5   EAGLEBEN-Sa_00002115-127         62
Ex. 6   Handbook of Pharmaceutical       65
        Expedients Excerpts
Ex. 7   Slay-Vivmus0010979-080           85
Ex. 8   Slay-Vimus0000472-474            99
Ex. 9   Slay-Vivmus0000012-017          107
Ex. 10  Slay-Vivmus0000243-321          109
Ex. 11  Slay-Vivmus0000691-728          117
Ex. 12  Cellulose Document              120
Ex. 13  Article Entitled Extraction of  127
        Phenol By Tolune in the Presence
        of Sodium Hydroxide
Ex. 14  Article Entitled Solubility of  135
        Organic Hydrochlorides By S.F.
        Kramer and G.L. Flynn
Ex. 15  Ich Guidelines For Elemental    141
        Impurities
Ex. 16  Slay-Vivmus0001899-927          147


                    (Exhibits retained by Reporter.)

---

THE VIDEOGRAPHER: Please stand by. Here begins media one in the video deposition of Dr. Patrick Sinko in the matter of Eagle Pharmaceuticals Inc. et al. V Slayback Pharma/Azurity Pharmaceuticals, Inc., in the United State District Court for the District of Delaware, case number 24-65-JLH. Today's date is April 16, 2026. The time on the video monitor is 9:06 a.m. The videographer today is Naadirah Moore representing Planet Depos, headquartered at 451 Hungerford Drive, Suite 400, Rockville, Maryland, 20850. The video deposition is taking place at 120 West 57th Street, New York, New York, 10019.

Would counsel please voice identify themselves and state whom they represent, and if you haven't, please clip your mic to your chest.

MR. ZUBICK: Marc Zubick from Latham and Watkins, representing plaintiff. With me is my colleague, Kelly Welsh.

MR. LIEF: Jason Lief from Windels Marx, on behalf of the defendant and the witness.

THE VIDEOGRAPHER: The court reporter

Transcript of Patrick Sinko, Ph.D.
Conducted on April 16, 2026

**33**

there's a picture of the bendamustine molecule we saw, right?

A.    That's correct.

Q.    And in fact I think it's bendamustine HCl.

And when you see PEG, if you look up PEG on Wikipedia, it's got a picture and it's got brackets because, you know, there's a whole range of the lengths of the PEG chains.  The average for PEG 400 is 400, right?

A.    That's correct.

Q.    This is the -- it's the absolute limit of my chemistry, but I got that right.  Now in practical use though, if I buy PEG from Croda, there's inherently going to be some amount of water in it, right?

MR. LIEF:  Objection to the form.

Speculation.

A.    So I have not looked at the -- as I mentioned, I haven't look at Croda label.  I would suspect that there may be, but I think you have to actually look at the label and see, you know, what they may include or what they may not include.  But there's probably going to be some, but I've not actually looked at that or the degree.  Depending on the type of, you know, grade of the PEG, there may be more, there may be less or there may be none.  I don't know, yeah.

**34**

Q.    Are you familiar with -- this is going to invite jokes, but are you familiar with ethanol outside of this litigation as a pharmaceutical excipient?

A.    Yes, I am.  I mean in, you know, compounding pharmacy and we've used it all the time, yeah.

Q.    And are you familiar with the phrase on page 15 of Sink Exhibit 2 is absolute ethanol.

Are you familiar with absolute ethanol?

A.    Yes, I am.

Q.    That's sometimes called dehydrated ethanol as well, right?

A.    That's correct.

Q.    Are you familiar with the term azeotropic ethanol?

A.    I've not used that term.

Q.    Having heard the term from me, do you know what that term means?

A.    Azeotropic?

Q.    Yes.

A.    No.  Actually I -- if I've heard it in the past, I'm not really focused on it.  I mean, but like, dehydrated alcohol, absolute alcohol or absolute ethanol, those are terms commonly used in pharmacy, but I'm not really aware -- I don't think on the other one.

Q.    And what it refers to when you call something

**35**

absolute alcohol or absolute ethanol or dehydrated ethanol, is that more water has been removed from the ethanol, correct?

A.    That is correct.

Q.    So back to my example before, if we look up ethanol on Wikipedia, it will be a chemical structure, but in reality, there's going to be impurities in the ethanol, including water, correct?

MR. LIEF:  Objection to the form.

A.    Well, there's going to be something in the ethanol, other than water.  I'm not sure of other -- I've never studied if there's other impurities in ethanol.  But, you know, water is something, for sure, you know, because water can have certain properties that in pharmacy, you know, we take care, you know, to take out as much as we can when needed, when you need like an absolute ethanol.

Q.    And this is something again, we'd look at the manufacturing spec sheet to see what's in it, right?

A.    That's true, yes.

Q.    Now absolute alcohol still has some water in it, correct?

A.    Yes, I -- but I don't know to what degree.  I've not really recently spent time looking that up.  I mean in the past I know I have, but not recently.  So

**36**

there's probably some.  I don't know what the limits are for -- I haven't looked up USP, absolute ethanol to see what their limitations are on having it still be considered that, but having some water in it so...

Q.    ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████

Q.    If you go back to Sinko Exhibit 2, which is the 2024 vivimusta label, I want you to go back to those two sentence we were looking at, "each milliliter" and the second sentence starting "sodium hydroxide".  Are you there?

A.    Yes, I'm there.

Q.    Okay.  The first excipient that's mentioned in those two sentences is bendamustine hydrochloride, correct?

MR. LIEF:  Objection to the form.

A.    No, bendamustine is the API, not an excipient.

Q.    Fair enough.  The first ingredient in vivimusta

Transcript of Patrick Sinko, Ph.D.
Conducted on April 16, 2026

16 (61 to 64)



**Page 61**

PEG, and, well, I guess there's some other optional ones that you put, but you just focused on PEG, so that would be the pharmaceutically acceptable fluid.

Q. Right, and I think you're talking about the claims.

A. That's right.

Q. I don't want you to get twisted here. A moment ago you were talking about the definition of pharmaceutically acceptable fluid in the spec. Do you remember that?

MR. LIEF: Objection.

A. Sure.

Q. And thinking about the way the term is used in the specification, would a solution of bendamustine dissolved in PEG, be a pharmaceutically acceptable fluid?

MR. LIEF: Objection to the form. Same objection.

A. In the spec you're saying?

Q. Yes.

MR. LIEF: Same objection.

A. No. I think the pharmaceutically acceptable fluid, you know, would be in this case the PEG. You're dissolving the bendamustine in the pharmaceutically acceptable fluid.

**Page 62**

Q. Now, you are aware there's different types of claims, and by that I mean, it could be to a drug product, it could be to method of manufacture, or method of treatment, right?

A. Sure.

Q. The claims at issue in this case are not to method of manufacture, correct?

MR. LIEF: Objection.

A. I believe that's correct.

Q. So you understand that infringement is determined by the product vivimusta itself, correct?

MR. LIEF: Objection. Form.

A. Yes. Well comparing it to the claim.

Q. Fair enough. But what we compare to the claims will be the vivimusta product on the shelf, correct?

A. That's my understanding.

(Whereupon, EAGLEBEN-SA_00002115-127 was marked as Sinko Exhibit 5, for identification, as of this date.)

BY MR. ZUBICK:

Q. And just let me know when you're ready, Dr. Sinko.

A. Yeah, I'm ready.

Q. You've seen Sinko Exhibit 5 before, correct?

A. Yes, I have.

**Page 63**

Q. And this is one of the patents-in-suit?

A. That's correct.

Q. And you reviewed this patent on the course of your working this case, correct?

A. Yes, I did.

Q. Can I have you turn to the page ending in 127, which is column 14. That's where the claims start. Let me know when you're there.

A. Sure. I'm there.

Q.

Q.

**Page 64**

Q.

Q. Now, if you look at the consisting of language, which is around line 7, column 14, Sinko Exhibit 5, it goes onto list PEG and then optionally a choice of other solvents, correct?

A. That is correct.

Q. Are you familiar with all of those solvents outside of this litigation?

MR. LIEF: Objection to the form.

A. Generally, yes. I'm not sure how much I've worked with glycofurol, but the others I've worked with, yes.

Q. Are all of these five known to be pharmaceutically acceptable solvents, with regard to

Transcript of Patrick Sinko, Ph.D.
Conducted on April 16, 2026

17 (65 to 68)

---

**65**

pharmaceutical formulations?

MR. LIEF: Objection to the form. Incomplete hypothetical.

A.   Well actually, like I said, I didn't specifically, you know, research that, but like I said I've seen the propylene glycol and ethanol, like I said, used. I don't remember the glycofurol, so I can't say, but I think the others are.

MR. ZUBICK: You can put that aside for now.

(Whereupon, Handbook of Pharmaceutical Expedients Excerpts was marked as Sinko Exhibit 6, for identification, as of this date.)

BY MR. ZUBICK:

Q.   Dr. Sinko, you've been handed Sinko Exhibit 6. Which is some excerpts from the Handbook of Pharmaceutical Excipients, correct?

A.   That is correct.

Q.   And if you look this is the sixth edition, correct?

A.   That's correct.

Q.   And if you turn forward to sort of the -- whatever this page is called, the title page, you could see the sixth edition is published 2009, right?

A.   That's correct.

---

**66**

Q.   So this was available as of the priority date of the patents-in-suit, correct?

A.   That is correct.

Q.   Now you've cited to the Handbook of Pharmaceutical Excipients in your expert report, correct?

A.   Yes, I believe so.

Q.   So if you turn forward, the first entry we have is for alcohol. Do you see that?

A.   Yes, I do.

Q.   Okay. Alcohol is also referred to as ethanol in the context of pharmaceutical formulation, right?

A.   That is correct.

Q.   And sort of as we talked about before, it shows a structural formula which is the underlying molecule, right?

A.   That is correct.

Q.   And you can see the functional category lists antimicrobial preservative, disinfectant, skin penetrant, and solvent, correct?

A.   That is correct.

Q.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Q.   And if you look under number 7 on the page

---

**67**

we're on, it actually say, explicitly, although ethanol is primarily used as a solvent, right?

A.   Section 7 you're saying?

Q.   Yes, as in number 7.

A.   I see it. Yes, I see that.

Q.   And that's your experience, right, that ethanol is primarily used in pharmaceutical formulations as a solvent, correct?

MR. LIEF: Objection to the form.

A.   Yes. In pharmaceutical formulations, it's typically used as a solvent.

Q.   Now if you look under number 8 description, do you see that?

A.   8 description. Yes, I see that.

Q.   And it says in the BP 2009, the term ethanol, used without other qualification, refers to ethanol containing greater than or equal to 99.5 percent volume per volume of the ethanol molecular formula; correct?

A.   Yes, distinguishing ethanol. I see that, yes.

Q.   And below that, it has a similar sentence addressing anhydrous ethanol, right?

A.   Let's see, I see it defines alcohol. Oh, I see, next paragraph, also anhydrous alcohol -- ethanol.

Q.   If you go to the next column, there's a similar discussion for dehydrated alcohol, right?

---

**68**

A.   That's correct.

Q.   And none of these are 100 percent, right?

MR. LIEF: Objection to form.

A.   Well, I mean, they could be, because it all says greater than or equal to, so they could be, but they have to be at least whatever that lower value is.

Q.   Right, that's fair. None of these specification are 100 percent, correct?

MR. LIEF: Same objection to form.

A.   None of the specifications say it has to be 100 percent, but it could be.

Q.   Okay. And a POSA would understand that these -- that that number between, say, 99.5 and 100, that may contain impurities like water, right?

MR. LIEF: Objection to the form.

A.   Well, it contains something other than -- than the ethanol.

Q.   Okay. If you go to number 13 on page 18. Let me know when you're there.

A.   Okay.

Q.   And under -- if you read the method of manufacture to yourself, it talks about getting to the ethanol 95 percent volume per volume by fractional distillation, right?

A.   Let me just review it.

69

Q.  Please.

A.  Okay.  Yeah, I'm done reading it.

Q.  And the 95 percent volume per volume ethanol is obtained by using fractional distillation, correct?

A.  That is correct.

Q.  And that involves removing water, correct?

MR. LIEF:  Objection to the form.

A.  Well, I think water is removed.  I'm trying to think if the ethanol is removed.  And I think the ethanol is actually removed and in essence concentrated.

Q.  That's fair enough.  The ethanol is separated from water to get to that 95 percent or greater, correct?

MR. LIEF:  Objection to the form.

A.  I believe so.

Q.  If you look at section 17, it says "related substances."  Do you see that?

A.  Yes, I do.

Q.  And there's an italicized bold moisture content.  Do you see that?

A.  One second.  Oh, yes, I do.

Q.  And it says that ethanol absorbs water rapidly from the air.  Do you see that?

A.  Yes, I do.

Q.  That's consistent with your experience using

70

ethanol, correct?

A.  Sure.  Yes.

Q.  Can you go back -- sorry, going backwards I know is against the rules, but can you go back to number 8, description?

A.  Okay.

Q.  And do you see the very last sentence at the bottom of that first column, it says:

"The term ethanol 96 percent, is used to describe the material containing water."

Do you see that?

A.  Yes, I do.

Q.  Okay.  So what that means is that, that other four percent in ethanol is water, right?

MR. LIEF:  Objection.

Mischaracterizes.

A.  Well, it contains water.  It doesn't say how much water, but it contains water.

Q.  Can you turn to the next entry, which is benzyl alcohol?  Benzyl alcohol is one of the other optional solvents listed in the claims in the patents-in-suit, correct?

A.  Benzyl alcohol, yeah, is one of the optional components of the pharmaceutically acceptable fluid.

Q.  And, I'm sorry, you have or have not worked

71

with benzyl alcohol outside of this litigation?

A.  I think I have, but like I said, for this one probably a long time ago.

Q.  And if you look under functional category, it says antimicrobial preservative, disinfectant, and solvent, correct?

A.  That is correct.

Q.  Do you know if benzyl alcohol contains water?

A.  I have not looked into that, so -- so it may.  I would assume it would tell me something like that in here.

Q.  Okay.  Can you turn to -- you haven't looked into that in the course of your work in this litigation, correct?

A.  No.

Q.  Can you turn to glycofurol, which is the next entry.  And you said that your experience with glycofurol is somewhat limited, correct?

A.  I don't remember working with it.  I may have, you know, but I just don't recall.

Q.  And if you look under number 6, functional category, glycofurol is listed in the Handbook of Pharmaceutical Excipients as a penetration agent and a solvent, correct?

A.  Oh, penetration agent.  Maybe that's where I've

72

seen it.  Okay.  Yes, that's true, and maybe that was my experience with that as a penetration agent, actually.

Q.  You have no reason to disagree with it being categorized as a solvent, correct?

MR. LIEF:  Objection to the form.

A.  No.  Typically if the handbook -- handbook doesn't list all functional categories, but it lists the one that -- so in this case, if it lists it, that means it probably has some experience as a solvent.  My experience is that there might be other functional categories that the handbook doesn't list, but I would say, if it's used a solvent, I'm not sure how much it's used as a solvent or how frequently, but it would definitely have some use as a solvent.

Q.  And, in fact, look at number 7.  It distinguishes its use in parenteral products from its use in topical and true nasal formulations, right?

MR. LIEF:  Objection.

A.  Yes, and I think that's where I've, now that I'm reading this, I've seen it as a permeation enhancer.  They call it penetration enhancer.

Q.  Right.  And with regard to parenteral products, the Handbook says glycerol -- or glycofurol is used as a solvent, right?

A.  Yes, it does list that.

Transcript of Patrick Sinko, Ph.D.
Conducted on April 16, 2026

22 (85 to 88)



**85**

A.    Well, I don't -- so that's a big -- that's a big question, meaning that there's lots to unpack there. But, you know, there are, you know, known products that are product suspensions that, you know, are particles administered by IV as suspensions, the answer is yes. You know, could it cause some injection site irritation or something like that, sure. That's not necessarily dangerous, but it's something, of course, when you're developing a product like that, you want to be aware of, you know, the number of particles, the size of the particles, but they are given by IV as well.

(Whereupon, SLAY-VIVMUS0010979-080 was marked as Sinko Exhibit 7, for identification, as of this date.)

BY MR. ZUBICK:

Q.    You ready?

A.    Sure.

Q.    Dr. Sinko, you've been handed Sinko Exhibit 7. Do you recognize this Exhibit?

A.    Not in particular. If I did review it, it was very short review. But I actually don't recall this one.

Q.    So this was attached to Dr. Trout's report. And this is a vivimusta specification report. Do you accept that representation?

**86**

A.    Sure. You say it's the vivimusta spec report?

Q.    Correct.

A.    Okay. Yep.

Q.



MR. LIEF: Objection to the form on that. I do want to clarify this. Is this Sinko 7 the whole product or just bendamustine?

MR. ZUBICK: I believe it's the whole product.

THE WITNESS: I was told it was vivimusta.

MR. ZUBICK: Yeah. I -- we can clarify it at the break if you think I've mischaracterized. I certainly didn't intend to.

Q.    You agree, Dr. Sinko, that as the pH decreases the concentration of free hydroxide ions decreases as well, correct?

A.    Well, I think the free hydrogen ions increase, and yeah, probably there's a decrease in free hydroxide ions as well.

Q.    If you have two beakers of solution, one of pH 3 and one of pH 10, all else being equal, the one of pH 3 has fewer free hydroxide ions, correct?

A.    Yeah, that's true.

Q.

Q.

Q.    Right. And I'm not arguing that matter is destroyed or created, but we can agree there is some degree of reaction that happens to some portion of the sodium hydroxide, correct?

MR. LIEF: Objection. Incomplete hypothetical.

A.    Well, there's -- I guess I'm not sure if I would call it necessarily a reaction, but it's their -- like I said, sodium is changing partners from the hydroxide to the formic acid or to the acetic acid, so, you know, I guess in some sense that might be a reaction.

Q.    Let's talk about that. So if I have a beaker and I have formic acid in it and I add sodium hydroxide, do those two chemicals react?

A.    Well, they form an equilibrium, right, that's a thing. So whenever you have a strong base and a weak acid, it makes a buffer pair, okay, and so they interact. So if you typically talk about a chemical reaction, you're saying I start at A and I get to B. But in this case, you starting with A and you also have B and they go back and forth. So are they interacting, sure, but it's not like your classic chemical reaction whereby you can't go back to A, right. It's an equilibrium.

Q.    Isn't that called a reversible reaction?

A.    It could be called that, that's true.

Q.

Q.    That was my next question. You didn't perform either a theoretical calculation of that or an

Transcript of Patrick Sinko, Ph.D.
Conducted on April 16, 2026



93

experimental test of that as part of your work in this case, correct?

A.    No.  No.

Q.

94

Q.

Q.    He didn't waive the objection, that's fine, but your answer was no, correct?

A.    Can you repeat the question?

Q.    A

95

Q.    Can you go to paragraph 154 of your expert report?  Let me know when you're there.

A.    154?

Q.    Yes.

A.    Okay.

Q.    Can you read -- read as much as you need, but I want to ask you about two sentences.  It's the second and third sentence of that paragraph.  So again, read as much as you need; let me know when you're ready.

A.    Okay.

Q.

96

Q.

A.



**Page 105**

different ingredients we looked at. Do you remember that?

A.    Yes, that's correct.

Q.    Do you think the Handbook of Pharmaceutical Excipients entries you looked at were incomplete?

A.    Well, I think the -- the answer is yes, depending on the context. So, for example, with sodium hydroxide, you know, it's known to be -- have other functions, you know, as well. So they don't list that there. I don't know why they don't list that there. But -- so is it incomplete? I think with respect to the really important issues, okay, such as, you know, its composition, its purity, its physical chemical properties, all those things, I think it is complete because it's very -- it's exhaustive. But when it comes to descriptive terms like their functions, it doesn't reflect what's known in the field. Sometimes it does, sometimes it doesn't.

Q.

**Page 106**

Q.    Can you turn to the next page, and there's two tables, and I want to direct your attention to the second table. Do you see that?

A.    To the second table?

Q.    Yes.

A.    Sure.

Q.

**Page 107**

Q.

Q.    That's what you get for confusing me with all the pharma stuff today. Let's ask again.

MR. ZUBICK:  Exhibit 9.  You can put that aside.

(Whereupon, SLAY-VIVMUS0000012-017 was

**Page 108**

marked as Sinko Exhibit 9, for identification, as of this date.)

BY MR. ZUBICK:

Q.    So I don't think we need to spend too long on this one, Dr. Sinko, but this is a portion of the vivimusta NDA.  And if you turn to the page with the Bates number ending in 14, do you see that?  The third page of text, and do you see there's a certification section?

A.    Oh, yes, I do.

Q.



Transcript of Patrick Sinko, Ph.D.
Conducted on April 16, 2026

28 (109 to 112)

MR. ZUBICK: All right. I'm told lunch is here, so why don't we take a break. 45 minutes, 1 o'clock.

THE VIDEOGRAPHER: We're going off the record. The time is now 12:14 p.m.

(Whereupon, a luncheon recess was taken from 12:14 p.m. to 1:05 p.m.)

THE VIDEOGRAPHER: Stand by. We are back on the record. The time is now 2:05 p.m. Sorry. 1:05 p.m.

BY MR. ZUBICK:

Q. Welcome back, Dr. Sinko.

A. Thank you.

MR. ZUBICK: I'm sorry, it's only 1:05. Let's ask the court reporter to mark as Sinko 10 document Bates number starting with SLAY-VIVMUS0000243.

(Whereupon, SLAY-VIVMUS0000243-321 was marked as Sinko Exhibit 10, for identification,

as of this date.)

BY MR. ZUBICK:

Q. I'm just going to keep doing it, the alarm is going to go off and I'm still going to be looking at the document.

All right. Dr. Sinko, do you recognize Exhibit 10?

A. Yes, I do.

Q. Exhibit 10 is the quality overall summary for vivimusta, correct?

A. Yes, that is correct.

Q. And this is the one of the documents that you reviewed in the course of your work in this case, correct?

A. Yes, it is.

Q.

A.

MR. LIEF: Objection. Asked and answered.

A.

Q. Can you turn to the page of Sinko Exhibit 10 that ends in Bates number 250? Mine is under the

169

record.  The time is now 2:54 p.m.
(Whereupon, a short break was taken.)
THE VIDEOGRAPHER:  Stand by.  We are back on the record.  The time is now 3:05 p.m.

BY MR. ZUBICK:

Q.    Welcome back, Dr. Sinko.  Home stretch.
I know you reviewed the court's Markman order in this case, right?

A.    **Yeah, I may have.  I actually don't recall.**

Q.    Okay.  Did you review the transcripts from the claim construction hearing?

A.    **If I did, it was a long time ago.  I don't really recall.**

Q.    If you did, it would appear on your materials considered, though, right?

A.    **Yes, it would be.**

MR. ZUBICK:  Okay.  Subject to anything from counsel your counsel, no further questions from me.  That you very much for your time.

MR. LIEF:  Nothing.

THE VIDEOGRAPHER:  This marks the end of the deposition of Dr. Patrick Sinko.  The time on the record is now 3:06 p.m.

THE REPORTER:  Would you both like a rough draft?

170

MR. ZUBICK:  Yeah, that would be great.

MR. LIEF:  Yeah, same.

(Time Noted:  3:06 p.m.)

171

A C K N O W L E D G M E N T

STATE OF NEW YORK    )
                              :ss
COUNTY OF            )

I, PATRICK SINKO, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of the 16th day of April, 2026; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

_____
PATRICK SINKO, Ph.D.

Signed and subscribed to before me, this            day of            , 2026.

_____
Notary Public, State of New York

172

C E R T I F I C A T E

STATE OF NEW YORK    )
                        ) ss.:
COUNTY OF QUEENS )

I, BROOKE E. PERRY, a Notary Public within and for the State of New York, do hereby certify:

That PATRICK SINKO, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 16th day of April, 2026.

*Brooke E. Perry*
BROOKE E. PERRY

# Exhibit 4
# File Under Seal

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC<br><br>Plaintiffs,<br><br>v.<br><br>SLAYBACK PHARMA LLC, AND AZURITY PHARMACEUTICALS, INC.<br><br>Defendants. | C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |

**REPLY REPORT OF DR. BERNHARDT TROUT, PH.D.**

## I.    INTRODUCTION

1.    I submitted an Opening Expert Report in this case on February 6, 2026 and a Responsive Expert Report on March 16, 2026.

2.    I provided a copy of my current curriculum vitae attached as Exhibit A to my Opening Expert Report. I also provided a list of each case in which I have testified as an expert in trial or deposition as Exhibit B to my Opening Expert Report.

3.    In this Reply Expert Report, I respond to the opinions offered by Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s (collectively, "Slayback") expert Dr. Patrick Sinko in his Rebuttal Expert Report dated March 16, 2026.

4.    As part of my analysis, I considered the materials cited in Appendix A to the Reply Expert Report.

5.    I incorporate by reference the entirety of my Opening Expert Report and my Responsive Expert Report, including the opinions and documents set forth and considered therein.

## II.    SUMMARY OF OPINIONS

6.    Slayback's NDA Product infringes the Asserted Claims, both literally and under the doctrine of equivalents. The term "pharmaceutically acceptable fluid" in the context of the entire claim limitation at issue in the claims of the Asserted Patents, refers to the solvent/co-solvent(s). Slayback's NDA Product has a "pharmaceutically acceptable fluid" consisting of the solvent PEG 400 and the co-solvent ethanol, both of which are expressly listed in the Asserted Claims.

7.    The Asserted Patents are foundational and enabling patents that disclose and claim the critical formulation components that make a ready-to-dilute, long-term storage-stable liquid bendamustine feasible for commercial products.

solvent, active ingredient, antioxidant, pH adjuster—not merely by their physical state after mixing.  Trout Rebuttal Report ¶¶ 66-68; Trout Main Body of Opening Report ¶ 132.

**C.** ███████████████████████████████████████████████

█ ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

38.    Dr. Sinko also invokes the Parsons article "Solution in a Dissolved Solid" and the Yan article concerning dissolving cellulose in PEG/NaOH aqueous solution to support his co-solvent theory.  Sinko Rebuttal Report ¶ 58.  However, these references involve entirely different contexts—Parsons addresses freezing-point phenomena and Yan describes an aqueous solution designed to dissolve cellulose at far higher NaOH concentrations (9.0 wt.%) than anything used in pharmaceutical pH adjustment.  ███████████████████████████████████████

██████████████████████████████████████████████████.

39.    ████████████████████████████████████████████

███████████████████████████████████████████████████

█████████    Sinko Rebuttal Report ¶ 181.  Many formulation variables—including pH, temperature, ionic strength, and surfactant levels—can influence solubility without themselves

13

being classified as solvents.  Trout Main Body of Opening Report ¶ 271.  A pH adjuster can influence rates of acid- or base-catalyzed reactions and solubility conditions, but that instrumental effect does not create or redefine the solvent system.  Trout Main Body of Opening Report ¶ 216. Scientifically, the solvent remains PEG (with any co-solvent), while the base serves a transient conditioning function.  ██████████████████████████████████████████████████████

████████  EAGLEBEN-SA_00363932 (Slayback Label 12/2022); EAGLEBEN-SA_00363910 (Slayback Label 2/2024); SLAY-VIVMUS0000472 (Description and Composition) at -472; see also SLAYVIVMUS0000243 (Quality Overall Summary) at -243 (same).  ██████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████

40.    Dr. Sinko also argues that "an excipient can have more than one functional role in a formulation."  Sinko Rebuttal Report ¶ 183.  While this general principle is true in the abstract, Dr. Sinko provides no credible evidence that ████████████████████████████████████

████████████████████████████  Trout Main Body of Opening Report ¶¶ 271-272.  The Defendants' own labels, NDA documents, and corporate testimony ████████████████████

████████████████████████████████████████████████████rout Rebuttal Report ¶¶ 96-100, 105-107.  ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████  Trout Rebuttal Report ¶¶ 105, 113.

14

fluid also does not redefine the pharmaceutically acceptable fluid to include ingredients that are not fluids." Trout Main Body of Opening Report ¶ 133.

71.    The claim structure reinforces this understanding. Independent Claim 6 of the '214 patent and Claim 8 of the '248 patent recite bendamustine and an antioxidant "in a pharmaceutically acceptable fluid; wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol." Trout Main Body of Opening Report ¶ 134. The "in a pharmaceutically acceptable fluid" language tells a POSA that other components (bendamustine, antioxidant) are in the fluid—they are solutes dissolved in the solvent. The "consists of" language then tells a POSA what the fluid is—PEG and optionally one or more of the listed co-solvents. Trout Main Body of Opening Report ¶ 134. Thus, if there is another component that is added in to the pharmaceutically acceptable fluid, like sodium hydroxide, a POSA would understand it to be another component of the composition, not part of the pharmaceutically acceptable fluid. Trout Main Body of Opening Report ¶ 134.

72.    Moreover, because the overall composition "comprises" various components, and the pharmaceutically acceptable fluid sub-element "consists of" a limited set of solvents, any pH adjuster, process residual ions, or trace water—if present and not performing the solvent role—fall within the open "comprising" aspect of the composition and outside the specific solvent element. Trout Main Body of Opening Report ¶ 224.

Trout Main Body of Opening Report ¶ 222.

30

143. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████    ████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████

144. In fact, the phrase "█████████████████" does not appear to be used in any of Slayback's NDA documents. Trout Appendix B ¶ 149. Nor does the phrase "████████" Trout Appendix B ¶ 149. ████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████ Trout Appendix B ¶ 100.

67

presence independently precludes infringement.   Sinko Rebuttal Report ¶¶ 206-215.   This argument fails for the reasons I have addressed in my Opening Report and Rebuttal Report and as further explained below.

159.    As a threshold matter, D███████████████████████████

████████████████████████████████████████████████████

████████    Again, the Asserted Claims are composition claims—they are neither method of manufacture claims nor product-by-process claims.   The relevant inquiry is what the product contains as sold, not what processing steps occurred during manufacture.

160.    Slayback's December 2022 label states: "Each milliliter contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, 39.45 mg dehydrated alcohol, and q.s. to 1 mL polyethylene glycol 400." EAGLEBEN-SA_00363932 (Slayback Label 12/2022).  The revised 2024 label states: "Each milliliter contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, 39.45 mg (5% v/v) of absolute alcohol, and q.s. to 1 mL polyethylene glycol 400. Sodium hydroxide is used to adjust pH of polyethylene glycol 400."   EAGLEBEN-SA_00363910 (Slayback Label 2/2024).

161.    Neither Slayback's December 2022 label nor its revised 2024 label states that Slayback's NDA Product contains water as a formulation component.  The 2024 label identifies sodium hydroxide only by its function—"used to adjust pH of polyethylene glycol 400"—and lists it separately from the quantitative composition.   The 2022 label does not reference sodium hydroxide at all.   Water is entirely absent from both labels.  Slayback's corporate representative confirmed at deposition that the prescribing information does not list water as a component of Slayback's NDA Product.  Gonti Tr. 120:10-20.

74

162.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████   Trout Appendix B ¶ 111.

163.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████   Trout Appendix B ¶ 136.

164.    Thus, there is no basis in Slayback's own labeling, NDA submissions, or regulatory filings for the claim that Slayback is selling a product that contains ██████████████████ ████████████████████████   ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

██████████   Trout Main Body of Opening Report ¶ 178; Trout Appendix B ¶ 139.

¶ 113.    Indeed, Slayback's Label does not list water as part of the bendamustine liquid composition—███████████████████████████████████████████████████

███████████████████████████████████.  Trout Main Body of Opening Report ¶ 328.

169.    Dr. Sinko further argues that ████ is "certainly 'related' to a claim limitation that recites fluids" and therefore cannot fall within the unrelated exception.  Sinko Rebuttal Report ¶ 213.  For the reasons explained in §VI.E above, the "unrelated" inquiry examines whether the additional component performs the solvent function that defines the "pharmaceutically acceptable fluid" element—not whether it happens to be a liquid.  Trout Main Body of Opening Report ¶¶ 264, 271.  ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████  Trout Main Body of Opening Report ¶ 330; Trout Rebuttal Report ¶ 90.

170.    Dr. Sinko also argues that there can be no infringement under the doctrine of equivalents because ████ is "inorganic," "known to degrade bendamustine," and was "explicitly identified in the patent specification as something to avoid."  Sinko Rebuttal Report ¶ 214.  These very features confirm that ███████████████████████ is not a solvent component of the formulation and does not need to be analyzed under the doctrine of equivalents at all.

171.    ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

78

[REDACTED]

172.    The claim construction order in *Eagle Pharmaceuticals, Inc. v. Hospira, Inc.*, No. 18-1074, D.I. 108 (D. Del. Dec. 28, 2020), regarding a patent in the rapid administration family further confirms this understanding.  There the Court construed the term "non-aqueous liquid composition" in U.S. Patent No. 9,572,887 to mean "a solution in which water does not make up a substantial portion and is not a significant solvent."  This construction recognizes that "non-aqueous" does not mean "zero water"—it means water is not a substantial portion and does not serve as a significant solvent.  That recognition is consistent with the undisputed scientific reality that each component of the liquid bendamustine formulations at issue carries water as an impurity.

[REDACTED]

192. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

193. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

[REDACTED]

194.    [REDACTED]

[REDACTED]

195.    In sum, Dr. Smith's criticisms of Dr. Kittendorf's methodology, even if credited, would not undermine my infringement conclusion because Dr. Kittendorf's testing is only one of several independent bases for that conclusion. Trout Appendix B at ¶¶ 182-196. [REDACTED]

[REDACTED]

## VIII.    PATENTS-IN-SUIT ARE FOUNDATIONAL

196.    Dr. Sinko contends that the Asserted Patents are not "foundational" because bendamustine has existed since the 1960s, the claims represent merely "incremental

91

Dated:    4-13-26

_____
Dr. Bernhardt L. Trout, Ph.D.

# Exhibit 5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS, INC.,      )
                                  )
            Plaintiff,            )
                                  ) C.A. No. 24-64-JLH
v.                                )
                                  )
APOTEX INC. and APOTEX CORP.,     )
                                  )
            Defendant.            )
- - - - - - - - - - - - - - - - - -
EAGLE PHARMACEUTICALS, INC.,      )
                                  )
            Plaintiff,            ) C.A. No. 24-65-JLH
                                  )
v.                                )
                                  )
SLAYBACK PHARMA LLC,              )
                                  )
            Defendant.            )
- - - - - - - - - - - - - - - - - -
EAGLE PHARMACEUTICALS, INC.,      )
                                  )
            Plaintiff,            ) C.A. No. 24-66-JLH
                                  )
v.                                )
                                  )
BAXTER HEALTHCARE CORPORATION,    )
                                  )
            Defendant.            )

                            J. Caleb Boggs Courthouse
                            844 North King Street
                            Wilmington, Delaware

                            Thursday, January 30, 2025
                            10:02 a.m.
                            Markman Hearing

BEFORE:  THE HONORABLE JENNIFER L. HALL, U.S.D.C.J.

APPEARANCES:

        McCARTER & ENGLISH, LLP
        BY:  DANIEL M. SILVER, ESQUIRE
        BY:  WYLEY S. PROCTOR, ESQUIRE

             -and-

        LATHAM & WATKINS LLP
        BY:  DANIEL G. BROWN, ESQUIRE
        BY:  ALEX GRABOWSKI, ESQUIRE
        BY:  KELLY ANNE WELSH, ESQUIRE

             For the Plaintiff

        POTTER ANDERSON & CORROON LLP
        BY:  PHILIP A. ROVNER, ESQUIRE

             -and-

        DECHERT LLP
        BY:  MARTIN BLACK, ESQUIRE
        BY:  JUDAH BELLIN, ESQUIRE
        BY:  AMANDA K. ANTONS, Ph.D.
        BY:  NOAH M. LEIBOWITZ, ESQUIRE

             For the Defendant
             Baxter Healthcare

        MORRIS JAMES LLP
        BY:  CORTLAN S. HITCH, ESQUIRE

             -and-

        KATTEN MUCHIN ROSENMAN
        BY:  CHRISTOPHER B. FERENC, ESQUIRE

             For the Apotex Defendants

        SMITH KATZENSTEIN & JENKINS LLP
        BY:  DANIEL A. TAYLOR, ESQUIRE

             -and-

        WINDELS MARX
        BY:  JASON A. LIEF, ESQUIRE

             For the Slayback Defendant

---

*** PROCEEDINGS ***

DEPUTY CLERK:  All rise.  Court is now in session.  The Honorable Jennifer Hall presiding.

THE COURT:  Please be seated.  Good morning, everyone.

ALL COUNSEL:  Good morning, Your Honor.

THE COURT:  We're here today for a Markman hearing.  This is *Eagle Pharmaceuticals vs. Apotex* and *Slayback*.

Let's go ahead and put our appearances on the record.

MR. SILVER:  Good morning, Your Honor.  Dan Silver from McCarter & English on behalf of Eagle.  And I'm joined today by my partner, Wyley Proctor, my co-counsel in the Baxter case.  And then also by co-counsel from Latham & Watkins, Dan Brown, Alex Grabowski and Kelly Welsh, who are my co-counsel in the Apotex and Slayback cases.

THE COURT:  All right.  Very good.

MR. SILVER:  We also have Jacob Whitt present for Eagle as well.

THE COURT:  All right.  Good to see you.  Thanks for coming.

MR. ROVNER:  Good morning, Your Honor.  Phil Rovner from Potter Anderson & Corroon on behalf of Defendant, Baxter Healthcare, in the 26 case.  With me is my co-counsel from the Dechert firm, Martin Black, Judah Bellin Noah Leibowitz, Amanda Antons.

And also with us is in-house counsel from Baxter, Laura DeMoor.

Just to let you know, Mr. Black and Mr. Bellin will be presenting argument on behalf of all three Defendants.

THE COURT:  Great.  Thank you very much.

MR. HITCH:  Good morning, Your Honor.  On behalf of Apotex, it's Cortlan Hitch from Morris James.  And joining me today is Christopher Ferenc from Katten.

THE COURT:  Okay.

MR. TAYLOR:  And good morning, Your Honor.  This is Daniel Taylor from Smith Katzenstein & Jenkins on behalf of Slayback.  And with me is Jason Lief of Windels Marx.

Thank you.

MR. BLACK:  Your Honor, if I might address the Court briefly?

THE COURT:  Sure.

MR. BLACK:  Martin Black, as just introduced. I'm here for Baxter.  You didn't call us initially, but we're the third case on the list.

THE COURT:  Yes.

MR. BLACK:  Just for clarification, we represent

bound rendering this indefinite.

Other than the specification itself and the prosecution history, they haven't even put in evidence of that. There's nothing about what a POSA would understand the inherent bounds to be. They clearly haven't met that burden.

So even, if Your Honor thinks, Oh, this isn't a typo, and, frankly, I think, given the wording in Exhibit 6, that's, you know, not supported. But even if Your Honor thinks this isn't a typo, it's clearly not meeting their clear and convincing burden of what a POSA would understand inherently to support.

THE COURT: Okay. Thank you very much.

MR. GRABOWSKI: Thank you, Your Honor.

THE COURT: I have some thoughts, but I want to take a couple minutes just to make sure I express them clearly, especially in a case like this. It's probably better to be precise.

So why don't you give me a little time. I don't think I need much time. Maybe let's take a 15-minute recess. And if I need a little more time, I'll have somebody let you know.

DEPUTY CLERK: All rise.

(Recess was taken.)

DEPUTY CLERK: All rise.

THE COURT: Hi. Please be seated.

Okay. I've got some thoughts that I wanted to convey while everything is fresh in my mind, because I've got 300 other cases that need my attention and I'll forget. So I wanted to give you what I can give you today.

So, just at the outset, I don't think there's a reasonable debate that these claims are a mess. I agree with counsel about that. We have very, very skilled attorneys on both sides arguing, and I appreciated hearing from everyone today. Everyone did the best that they could with these claims. It is not counsel in this room's fault that the claims are the way they are, but they are a mess.

And so the question is: What we're going to do about it?

So starting with Terms 1 and 2, everybody in this room knows what "consisting of" and "comprising" means. We all know that. We've got proposed constructions from both sides, but neither clarifies what the real issue is here, which is: How do these claim elements fit together.

And the mess we're in in this respect is compounded by the fact that the patent is internally inconsistent about what it means when it talks about a pharmaceutically acceptable fluid.

So I'll just say the record, here's where we found, things that seem to support the proposition that the

fluid, when it's referred to, includes additional things that aren't necessarily a solvent. So, for example, the abstract. We have the portion we talked about during the hearing today, which is Column 2, Line 65 to Column 3 to 5. We have Column 4, Lines 30 to 39. We have Column 5, Lines 36 to 46. We have Column 5, Lines 52 to 61. And we have Column 6, Lines 20 to 27.

And then we've also got portions of the patent where it talks about the stabilizer being a separate aspect or separate element. We've got Column 2, Lines 1 to 7. Column 4, Lines 45 to 53. Column 7, Lines 25 to 35. Column 8, Lines 26 to 34. And Column 9, Lines 15 to 19.

So what do we do about this?

I agree with Defendants, in the abstract, that you can't have in the product another fluid that is a pharmaceutically acceptable fluid that is not on the list and still infringe. I agree with them.

That said, I'm not willing to say, at this point, that a product that has, for example, liquid Vitamin E as an antioxidant doesn't infringe because it's a liquid. Because the patent claim expressly allows for an antioxidant as a separate element.

I think Plaintiff agreed today, and I think we all agree that there can't be another solvent system that's not on the list of pharmaceutically acceptable fluids. But I'm not going to say that the use of an antioxidant, that someone might characterize as a solvent because it's capable of dissolving a solid, would take a product outside of the scope of the claims.

I'm not going to allow the jury to decide the issue of whether a substance is "unrelated to this element" or "unrelated to the invention." That's not something that's within the province of the jury.

I think that impurities that are normally associated with a component are included in the scope of the term. I think we all agree on that. We just have a dispute about whether or not to tell it to the jury.

And so what do we take from all of this? I think the only thing we can do is to ultimately give the jury a narrative that explains how the "comprising" and "consisting" elements fit together. But it's premature for us to work on that until I understand what the parties' positions are.

And, of course, I understand that the Court is to construe claims without reference to the accused products. But the Court also only needs to construe claim terms to the extent there's a dispute, and I don't have an understanding about what the dispute is here still.

And doing it right now or adopting one or the other's party's proposed constructions right now is just

69

going to invite word games in front of the jury. And I have no interest in doing that.

So the bottom line here is that we all know what comprising and consisting of are. Adopting one or the other side's proposals is not going to help. It's just going to invite word games later.

So what we're going to do is we're going to hear what the parties have to say about it at summary judgment. And then, to the extent there's a dispute about what to tell the jury, we will deal with it at the jury instructions.

So that's Terms 1 and 2.

So for Term 3, the Court agrees with Plaintiff. The Court can correct typographical errors if the correction is not subject to reasonable debate based on consideration of the claim language and the specification. And the prosecution history does not suggest a different interpretation of the claims. And I find that both of those factors are met.

The prosecution history shows that the correction is not subject to reasonable debate, as was discussed here at the hearing today. There was an original claim that claimed "from about 20 milligrams per mill to about 60 milligrams per mL and a dependent claim that claimed about 25 milligrams per mL." The claims were amended. It's clear from the prosecution history that the

70

patentee was incorporating the dependent claim "about 25 milligrams per mL," but just forgot to delete the "from."

It would be a different situation if the claim said more than about 25 and less than about 60 and just deleted the 60 part, but that's just not what happened here.

And, also, I note that "from about 25 milligrams per mL" doesn't make any sense in the context of the patent, and a person of skill in the art would understand that the word "from" was included accidentally during prosecution and needs to be deleted.

And that's all I had to say.

Is there anything else we need to address today?

MR. SILVER: Nothing from Plaintiffs, Your Honor. Thank you.

MR. BLACK: Nothing from Baxter. Nothing from the Defendants, Your Honor.

THE COURT: All right. It was great to see everyone. Have a lovely weekend.

DEPUTY CLERK: All rise.

(Court was concluded at 11:56 a.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Heather M. Triozzi
Certified Merit and Real-Time Reporter
U.S. District Court

# Exhibit 6
# File Under Seal

Highly Confidential Information

SLAY-VIVMUS0000472

Highly Confidential Information

SLAY-VIVMUS0000473

Confidential Information

SLAY-VIVMUS0000474

Highly Confidential Information

SLAY-VIVMUS0000474

# Exhibit 7
# File Under Seal

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC<br><br>Plaintiffs,<br><br>v.<br><br>SLAYBACK PHARMA LLC, AND AZURITY PHARMACEUTICALS, INC.,<br><br>Defendants. | C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |

**APPENDIX B: SLAYBACK ADDITIONAL EVIDENCE OF INFRINGEMENT**

## I.    INTRODUCTION

1.    In this Appendix B, I discuss in further detail and include additional evidence of infringement of the Asserted Claims by Slayback Pharma LLC and Azurity Pharmaceuticals, Inc. (collectively, "Slayback") through Slayback's making, using, offering for sale, selling, and importing into the United States, as described in New Drug Application No. 212209 ("Slayback's NDA"), its Bendamustine Hydrochloride Injection, 100 mg/4 mL product commercially sold under the tradename Vivimusta ("Slayback's NDA Product" or "Vivimusta").[1]

2.    I understand that Eagle has asserted that Slayback infringes certain claims of U.S. Patent No. 11,872,214 (the "'214 patent"); and U.S. Patent No. 12,138,248 (collectively, the "Asserted Patents" or the "Patents-in-Suit").  I understand that the Asserted Patents share the same specification.  The claims of the Asserted Patents that I understand Eagle asserts Slayback infringes ("Asserted Claims") are identified in the table below.

| Asserted Patents | Asserted Claims |
|---|---|
| U.S. Patent No. 11,872,214 | 1-9 |
| U.S. Patent No. 12,138,248 | 1-6, 8-11, 15, 20 |

3.    This report sets forth further evidence supporting my opinion that Slayback's NDA Product infringes the Asserted Claims of the Asserted Patents.

## II.    MATERIALS CONSIDERED

4.    This report contains a statement of my additional opinions and includes the further bases and reasons for my opinions, including the additional data and other information that I have considered in forming these opinions.

---

[1] ███████████████████████████████████████████

1

54.

55.



81.

**D.    Stability Data**

86.

88. ███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

    ███████████████████████████████████████

      ███████████████████████████████████████

      █████████████████████████████████

    ███████████████████████████████████████

      ███████████████████████████████████████

      ███████████████████████████████████████

      ██████

    ███████████████████████████████████████

      ███████████████████████████████████████

      ███████████████████████████████████████

      ██████

89. Thus, according to Slayback, Slayback's stability data demonstrates that ████████████████████████████████████

90. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

29

99.     In addition, the Asserted Patents describe both polyethylene glycol and ethanol as "pharmaceutically acceptable fluids," specifically, "solvents." *See* '214 patent at 3:39-45 (PEG); 7:25-26 (ethanol).     The specification even refers to PEG and ethanol as "preferred pharmaceutically acceptable fluids." '214 patent at 4:59-60.  Nowhere does the specification of the Asserted Patents identify sodium hydroxide, a solid, as a pharmaceutically acceptable fluid. Moreover, the parties agreed upon construction states that the "pharmaceutically acceptable fluid" is a fluid, therefore it cannot be a solid.

     **a.**     ████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

     ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

     ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

104.

33

37

████████████████████████████████████████████████████

███████████████████████████████████

134.    Moreover, the solvent is an essential component of the formulation making up a substantial amount of the formulation and requiring identification in the Contraindication section of Slayback's NDA Product Label, whereas a pH adjuster is presumed to be effectively consumed or present in a negligible amount.  Consistent with this delineation, the Contraindications section of Slayback's NDA Product Label does ***not*** list sodium hydroxide.  SLAY-VIVMUS0009435 (12/2022 Label) at -425; SLAY-VIVMUS0011522 (2/2024 Label) at -522.  It lists hypersensitivity to bendamustine, polyethylene glycol 400, dehydrated alcohol, or monothioglycerol.  *See, e.g.*, SLAY-VIVMUS0011522 (2/2024 Label) at -522.  ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

**e.**    ██████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

43

139.

44

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████

144.　Slayback's reference to statements describing the invention as "non-aqueous" in contrast to prior art during prosecution of family patents are fully consistent with this scientific classification. Describing the invention as non-aqueous in the context of bendamustine stability and solvent selection communicates that the stored, ready-to-dilute formulation's solvent system is not an aqueous vehicle. It does not transform de minimis, tightly controlled process-aid water into a co-solvent or into part of the solvent element.  Indeed, a Delaware Court rejected that very contention in a case involving Eagle patents describing similar liquid bendamustine compositions, construing the term "non-aqueous liquid composition" to mean "a solution in which water does not make up a substantial portion and is not a significant solvent." *See Eagle Pharms. Inc. v. Hospira, Inc.*, No. 18-1074, D.I 108 (D. Del. Dec. 28, 2020).  In pharmaceutical practice, non-aqueous liquid formulations routinely include low-level water specifications for quality control and release; those limits do not reclassify the solvent system as aqueous, nor do they redefine trace, nonfunctional water as a solvent component.

145.　"Non-aqueous" in this context does not mean "zero water," and low-level water does not defeat a solvent-limited claim. ████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

46

146.

147.    The element at issue is the pharmaceutically acceptable fluid, *i.e.*, the continuous liquid solvent phase. In the finished product, that fluid consists of PEG 400 and ethanol; neither WFI used upstream to meter NaOH nor low-level residual water within specification is the vehicle, nor does it act as a significant solvent for the stored solution. Consequently, the presence of a

47

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ .

172.    Water is ubiquitous in pharmaceutical manufacturing: hygroscopic excipients (*e.g.,* PEG 400) carry low-level moisture per their USP/NF monographs and COAs; dehydrated alcohol (ethanol) still contains trace water within compendial limits; drug substance lots report loss-on-drying/water content; antioxidants such as monothioglycerol are handled under moisture-controlled conditions but can contain residual water; and sodium hydroxide pellets are deliquescent and managed accordingly. ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████

173.    Thus, even if one were to assume that some water used as a vehicle remains in the vials imported into the United States and sold here, and somehow would consider that water to be part of the "pharmaceutically acceptable fluid" limitation, it would fall within the "impurity" exception.

56

Dated:  2/6/26

_____
Dr. Bernhardt L. Trout, Ph.D.

# Exhibit 8
# File Under Seal

Table of Contents



Highly Confidential

SLAY-VIVMUS0137635

Highly Confidential



Confidential Document

SLAY-VIVMUS0137644

# Exhibit 9
# File Under Seal

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC<br><br>Plaintiffs,<br><br>v.<br><br>APOTEX INC., AND APOTEX CORP.,<br><br>Defendants. | C.A. No. 24-64-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC<br><br>Plaintiffs,<br><br>v.<br><br>SLAYBACK PHARMA LLC, AND AZURITY PHARMACEUTICALS, INC.<br><br>Defendants. | C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |
| EAGLE PHARMACEUTICALS, INC. AND EAGLE SUB1 LLC,<br><br>Plaintiffs,<br><br>v.<br><br>BAXTER HEALTHCARE CORPORATION,<br><br>Defendant. | C.A. No. 24-66-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |

**OPENING EXPERT REPORT OF DR. BERNHARDT TROUT, PH.D.**

## I. Background and Qualifications

### A. Introduction

1. I have been retained by counsel for Plaintiffs Eagle Pharmaceuticals, Inc. and Eagle Sub 1 LLC ("Eagle") to provide technical assistance and expert opinions in the above-captioned litigations. I understand these litigations are related to Eagle's patents and Belrapzo® (bendamustine hydrochloride) drug product, among other things. Specifically, I understand that Defendants Apotex Inc. and Apotex Corp. (collectively, "Apotex"), Slayback Pharma LLC and Azurity Pharmaceuticals, Inc. (collectively, "Slayback), and Baxter Healthcare Corp. ("Baxter") (each collectively a "Defendant" and together "Defendants") market and sell versions of Belrapzo® (bendamustine hydrochloride) that were approved through the United States Food and Drug Administration's ("FDA's") 505(b)(2) New Drug Application ("NDA") process (each Defendant's "NDA Product" collectively "Defendants' NDA Products").

2. I understand that Eagle currently asserts that each Defendant's NDA Product infringes certain claims of U.S. Patent No. 11,872,214 (the "'214 patent") and U.S. Patent No. 12,138,248 (collectively, the "Asserted Patents"). I understand that the Asserted Patents share the same specification. The claims of the Asserted Patents that I understand Eagle asserts each Defendant infringes (the "Asserted Claims") are identified in the table below.

| Asserted Patent[1] | Asserted Claims |
|---|---|
| U.S. Patent No. 11,872,214 | 1-9 |
| U.S. Patent No. 12,138,248 | 1-6, 8-11, 15, 20 |

---

[1] I understand that U.S. Patent No. 11,844,783 (the "'783 patent") is no longer asserted in these cases. *See* C.A. No. 24-64, D.I. 305; C.A. No. 24-65, D.I. 294; C.A. No. 24-66, D.I. 252. I offer no opinions on the '783 patent.

112.     The specification defines the "pharmaceutically acceptable fluid' as "a **fluid** which is suitable for pharmaceutical use." *See, e.g.*, '214 patent at 2:56-58 (emphasis added). Thus, a POSA would understand the pharmaceutically acceptable fluid term in the claim refers only to "fluids" and not "solids."

113.     The specification states: "In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof." '214 patent at 3:39-41. A POSA would thus look at the list of pharmaceutically acceptable fluids recited in the claim to determine whether those fluids are solvents for bendamustine. Each of those listed in the claims at issue are solvents, such that a POSA would understand the pharmaceutically acceptable fluid limitation in the claim to have the function of solvent in the claimed formulation. Here, as other descriptions in the specification confirm, propylene glycol, ethanol, benzyl alcohol, and glycofurol are all solvents for bendamustine.

114.     For example, the specification explains that for the "pharmaceutically acceptable fluid" to be "sufficient" for use, it must contain the "amount which allows the bendamustine to be dissolved or dispersed to a degree which renders the liquid composition ready for use." '214 patent at 6:30-33. Therefore, a POSA would understand that the pharmaceutically acceptable fluid is the solvent because its purpose is to dissolve the bendamustine so that the injectable formulation is ready for use or ready for dilution.

115.     The specification also identifies "preferred" pharmaceutically acceptable fluids, *i.e.* solvents, as "PG, PEG or ethanol." '214 patent at 4:59-60. By identifying the "preferred pharmaceutically acceptable fluids" exclusively as solvents, the specification confirms that this claim element addresses the solvent system (the continuous liquid phase supplying solvency,

28

polarity, viscosity, and miscibility), not every component that may be dissolved within that system or used transiently to condition it.

116. The specification also confirms that in preferred embodiments the pharmaceutically acceptable fluid consists of a mixture of solvents in an amount that always adds up to 100%. By specifying mixtures like "about 95% PEG and about 5% PG," "about 90% PEG and about 10% PG," and ranges "about 95:5 to about 50:50," the specification treats the fluid as a closed component comprised solely of solvents. This is exactly how solvent systems are conventionally expressed: as ratios of constituent solvents totaling 100%. And there is no "room" for the pharmaceutically acceptable fluid to be anything other than a solvent. Moreover, the passage specifying PEG molecular weight (PEG 400) further underscores that the "fluid" element is the solvent system itself.

> In other embodiments of the invention however, the pharmaceutically acceptable fluid is a mixture of PEG and PG. For example, the pharmaceutically acceptable fluid can include about 50% PEG and about 50% PG. Alternatively, pharmaceutically acceptable fluid includes about 95% PEG and about 5% PG. The amount of PEG and PG can also be varied within the ranges, i.e. the ratio of PEG:PG in the pharmaceutically acceptable fluid can range from about 95:5 to about 50:50. Within this range, is a pharmaceutically acceptable fluid containing about 75% PEG and about 25% PG, and preferably 80% PEG and 20% PG. In another embodiment, a pharmaceutically acceptable fluid can include about 85% PEG and about 15% PG while another preferred pharmaceutically acceptable fluid includes about 90% PEG and about 10% PG. The molecular weight of the PEG will be within the range of pharmaceutically acceptable weights although PEG 400 is preferred in many aspects of the invention.

'214 patent at 3:43-61.

117. The specification differentiates between what the pharmaceutically acceptable fluid "is" and what can be "included" in the pharmaceutically acceptable fluid. The specification states that pharmaceutically acceptable fluid "is" the solvent, for example PEG or PG. *See, e.g.*, '214

Dated: 2/6/26

_____

Dr. Bernhardt L. Trout, Ph.D.

# Exhibit 10
# File Under Seal

Highly Confidential Information

SLAY-VIVMUS0000243



Highly Confidential Information



Highly Confidential Information

# Exhibit 11
# File Under Seal

Table of Contents



Highly Confidential Information



Highly Confidential Information

# Exhibit 12
# File Under Seal

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC,<br><br>       Plaintiffs,<br><br>     v.<br><br>SLAYBACK PHARMA LLC and AZURITY PHARMACEUTICALS, INC.,<br><br>       Defendants. | C.A. No. 24-65-JLH<br><br>**HIGHLY CONFIDENTIAL** |

**SLAYBACK PHARMA LLC AND AZURITY PHARMACEUTICALS, INC.
OCTOBER 31, 2025 FINAL NON-INFRINGEMENT CONTENTIONS
AND SECOND SUPPLEMENTAL RESPONSE TO PLAINTIFFS'
COMMON INTERROGATORY NO. 5 REGARDING
U.S. PATENT NOS. 11,844,783; 11,872,214; AND 12,138,248**

Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc. (hereinafter collectively "Slayback" or "Defendants") provide herein their final non-infringement contentions and responses to plaintiffs' infringement contentions (served on October 10, 2025), pursuant to the Court's Scheduling Order (D.I. 156). Slayback notes that fact discovery is still ongoing, and expert discovery has not yet begun, and therefore Slayback reserves the right to supplement and/or amend these contentions as new information and arguments are discovered.

**I.      Summary of Non-Infringement Contentions**

Defendants do not infringe all of the patents-in-suit for multiple independent reasons, including:



---

[1] "Defendants' Accused NDA Product" refers to the product currently being sold in the market pursuant to NDA 212209.



**II.    Detailed Discussion of Slayback's Non-Infringement Contentions**

**A. The Law of Infringement**

**1.  Burden of Proof**

A patentee who bears the burden to prove infringement by a preponderance of the evidence.  *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878 (Fed. Cir. 1988). An analysis of patent infringement involves a two-step process.  First, the claims are properly construed, and then those claims are compared with the accused product.  *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1565-66 (Fed. Cir. 1997).

Slayback reserves the right to supplement this list of substantial differences from the claimed "pharmaceutically acceptable fluids" as fact and expert discovery progress.

**2.** ██████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████

Water is identified in the patents-in-suit, in the various patent applications leading to the patents-in-suit, and in the prior art as anathema to the stability of bendamustine. Inventor Dr. Buxton testified, the whole point of this invention was to supposedly stabilize bendamustine. (Buxton Aug. 21, 2025 Dep. Tr. at 94:24-95:13; 110:8-111:22; Buxton Aug. 22, 2025 Dep. Tr. at 86:19-87:11). And Dr. Buxton agreed that water harms bendamustine. (Buxton Aug. 21, 2025 Dep. Tr. at 111:14-116:16; Buxton Aug. 22, 2025 Dep. Tr. at 9:22-11:3; 17:4-16; 25:3-28:5; 40:20-42:15). And, in the 13/016,473 patent application (later issued as the U.S. Patent 8,609,707) – which is in the chain of applications leading to the patents-in-suit – the applicants specifically explained that this invention is "non-aqueous." That assertion, disparaging water-containing bendamustine formulations, came in response to a rejection over prior art. And, of course, the claims do not recite water at all.

████████████████████████████████████████████

███████████████████████████████████ As the Federal Circuit has explained, arguments made to support patentability in the Patent Office can result in the disavowal or disclaimer of subject matter:

> Prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). "[F]or prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable." *Id.* at 1325–26. "Thus, when the patentee unequivocally and

17

unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013). Such disclaimer can occur through amendment or argument. *See Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985). In *Standard Oil*, we explained, in the context of disclaimer, that the prosecution history "includes all express representations made by or on behalf of the applicant to the examiner to induce a patent grant ... includ[ing] amendments to the claims and arguments made to convince the examiner." *Id.*

This doctrine is deeply rooted in Supreme Court precedent. *See, e.g.*, *Roemer v. Peddie*, 132 U.S. 313, 317, 10 S.Ct. 98, 33 L.Ed. 382 (1889). As the Supreme Court has explained, "when a patentee, on the rejection of his application, inserts in his specification, in consequence, limitations and restrictions for the purpose of obtaining his patent, he cannot after he has obtained it, claim that it shall be construed as it would have been construed if such limitations and restrictions were not contained in it." *Id.*

Over time, prosecution disclaimer has become "a fundamental precept in our claim construction jurisprudence," which "promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." *Omega Eng'g*, 334 F.3d at 1323–24. The doctrine is rooted in the understanding that "[c]ompetitors are entitled to rely on those representations when determining a course of lawful conduct, such as launching a new product or de-signing-around a patented invention." *Biogen*, 713 F.3d at 1095. Similarly, we *1360 have explained that the prosecution history "provides evidence of how the [PTO] and the inventor understood the patent." *Id.* (quoting *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1327 (Fed. Cir. 2009) (alteration in original)). Ultimately, the doctrine of prosecution disclaimer ensures that claims are not "construed one way in order to obtain their allowance and in a different way against accused infringers." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

*Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359–60 (Fed. Cir. 2017). The applicants here made clear and unmistakable assertions to distinguish the prior art that their inventive formulations were "non-aqueous."

18

Apart from disclaimer, the limitation "a pharmaceutically acceptable fluid consisting of …" simply does not recite water after the "consisting of" language. But water is a fluid. Water is also a solvent for bendamustine – as Dr. Buxton admitted. (Buxton Aug. 22, 2025 Depo. at 31). ██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

**3.**  ███████████████████████████████
███████████████████████████████████
████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ As noted in Slayback's invalidity contentions, the absorptivities of different degradants at different wavelengths are all different. And, indeed, not all degradants may be known – let alone their absorptivities. This means that one would expect different results at different wavelengths. Stability to a certain quantifiable level shown at

one wavelength need not be stability to that same level at another wavelength.  For these reasons, plaintiffs have not proven infringement of this limitation.

### 4.    Slayback Does Not Induce or Contribute to Infringement

With respect to the claims-in-suit that are "method of treatment" claims, Slayback does not directly infringe because it does not treat patients.  *See, e.g.*, *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 n.7 (Fed. Cir. 2003) (finding non-infringement where "the [pharmaceutical company] itself [does not] treat the disease" as required by the claim limitations); *Eli Lilly and Co. v. Actavis Elizabeth LLC*, No. 07-CV-3770-DMC, 2009 U.S. Dist. LEXIS 43003, 2009 WL 1444606, at *4 (D.N.J. May 21, 2009) (pharmaceutical company cannot directly infringe method of treatment claims that require drug to be physically administered by "the physician in charge of the case"); *Acorda Therapeutics Inc. v. Apotex Inc.*, No. 07-CV-4937-GEB-MCA, 2011 U.S. Dist. LEXIS 102875, 2011 WL 4074116, at *14 (D.N.J. Sept. 6, 2011) (no direct infringement where patent claims required giving drug with food to patient).

As noted above, induced or contributory infringement requires a third party to directly infringe.  Because no one will infringe the patents-in-suit for the reasons set forth above there can be no indirect inducement or contribution to infringement.  Plaintiffs Eagle's final infringement contentions incorrectly assert that Slayback is not making this argument.  Slayback has argued from the outset that the formulation limitations are not infringed for the reasons set forth above.  As a consequence, neither Slayback nor any third party can infringe – and thus Slayback could not be inducing or contributing to any third party's alleged infringement.  Plaintiffs attempt to argue that such an argument has not been made is not well taken.

Furthermore, Slayback does not induce infringement because it does not actively encourage third parties to infringe the patents.  "To state a claim for induced infringement, the

20

Dated: October 31, 2025

*Of Counsel:*

Constance S. Huttner
Alan H. Pollack
Jason A. Lief
Robyn Ast-Gmoser

WINDELS MARX LANE & MITTENDORF,
LLP
One Giralda Farms
Madison, NJ 07940
(973) 966-3200

156 West 56th Street
New York, NY 10019

chuttner@windelsmarx.com
apollack@windelsmarx.com
jlief@windelsmarx.com
rast-gmoser@windelsmarx.com

**SMITH KATZENSTEIN & JENKINS LLP**

/s/ Daniel A. Taylor
Neal C. Belgam (No. 2721)
Daniel A. Taylor (No. 6934)
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
dtaylor@skjlaw.com

*Attorneys for Defendant Slayback Pharma LLC
and Azurity Pharmaceuticals, Inc.*

42

# Exhibit 13
# File Under Seal

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS, INC. and
EAGLE SUB1 LLC,

      Plaintiffs,

    v.

SLAYBACK PHARMA LLC and AZURITY
PHARMACEUTICALS, INC.,

      Defendants.

C.A. No. 24-65-JLH

## EXPERT REPORT OF
## DR. SINKO REGARDING NON-INFRINGEMENT

## HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

**TABLE OF CONTENTS**

**Page**

I.    DR. SINKO'S BACKGROUND................................................................................1

    A.    Education and Professional Background.................................................1

    B.    Prior Testimony ....................................................................................5

    C.    Compensation .......................................................................................6

II.    SCOPE OF WORK AND SUMMARY OF OPINIONS ....................................6

III.    LEGAL PRINCIPLES APPLIED ......................................................................7

IV.    SCIENTIFIC BACKGROUND .........................................................................11

    A.    States of Matter And The Definition of Solids, Liquids, and Fluids....................12

    B.    Pharmaceutical Dosage Forms as Solutions and Fluids .......................................15

    C.    Stability and Stability Testing ..............................................................................19

    D.    Acids, Bases and pH............................................................................................20

    E.    Conservation of Mass ..........................................................................................22

    F.    PEG......................................................................................................................23

V.    THE SLAYBACK NDA PRODUCT ........................................................................23

VI.    THE ANTIOXIDANT-FREE FORMULATION .............................................................28

VII.    THE ASSERTED PATENTS........................................................................................29

    A.    History of Eagle Patent Applications ...................................................................29

        1.    The '783 Patent Application – Appl. No.: 18/081,238...............................32

        2.    Prosecution of the '214 Patent – Application 18/081,251.........................37

        3.    Prosecution of the '248 Patent – Application No. 18/646,171 ..................41

    B.    Claims Of The Patents-In-Suit ............................................................................43

        1.    Claims of the '214 Patent .........................................................................43

        2.    Claims of the '248 Patent .........................................................................44



VIII.

X.    THE PATENTS-IN-SUIT ARE NOT "FOUNDATIONAL" ..........................................93

XI.    OTHER PATENTS .............................................................................................96

XII.    CONCLUSION .................................................................................................98

## I.   DR. SINKO'S BACKGROUND

### A. Education and Professional Background

1.      My name is Dr. Patrick J. Sinko and I am a Distinguished Professor of Pharmaceutics and the Parke-Davis Endowed Chair in Pharmaceutics and Drug Delivery in the Ernest Mario School of Pharmacy at Rutgers, The State University of New Jersey.  My current research focuses on biopharmaceutics, pharmaceutical formulations, and molecular-, nano-, and micro-scale drug delivery.

2.      I was Chair of the Department of Pharmaceutics from 1998 to 2008.  I also served as the Associate Vice President for Research at Rutgers from 2007 through 2019, providing executive-level oversight of Comparative Medicine Resources, Research Core Facilities, In Vivo Research Services, Biomedical Advisory Committees, and the Controlled Substances program across Rutgers' three regional campuses.  Since 2003, I have held the Parke-Davis Endowed Chair in Pharmaceutics and Drug Delivery at Rutgers.

3.      I received a Bachelor of Science in Pharmacy from Rutgers University in 1982 and completed my Ph.D. in Pharmaceutics at the University of Michigan in 1988. After completing my Ph.D., I continued as a Research Scientist at the University of Michigan until 1991.

4.      In 1991, I joined the faculty at Rutgers in the Department of Pharmaceutics as an Assistant Professor.  I was promoted to Associate Professor in 1997, Professor in 2000, and Distinguished Professor in 2007. As a professor at Rutgers, I have taught courses in several graduate and undergraduate subjects, including drug delivery, general toxicology, pharmacology, pharmacokinetics, and pharmaceutics.

5.      At Rutgers, my research is generally directed to biopharmaceutics, drug delivery, and pharmaceutical formulations.  I have numerous active and completed projects, sponsored by

1

19.    The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and propylene glycol.

20.    The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and ethanol.

21.    The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and benzyl alcohol.

22.    The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and glycofurol.

**VIII.**



Additionally, PEG alone is non-aqueous (a distinction of importance according to the applicants as expressed in the file history leading to the '707 Patent), ████████████████████

████████████████████████████

**204.** ███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

██████████

█████████████████████████████████████
████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

**207.** Water is a pharmaceutically acceptable fluid.  Dr. Sundaram (a co-inventor of the Abandoned Patent Application) testified that water is a fluid, and that would be known to any POSA.  (Exh. 16, Sundaram Depo. at pg. 11, line 24 to 12, line 5; *see also* Exh. 10, Oxford Thesaurus of English, (3rd Ed. 2009) at pg. 341 (defining "fluid" as "flowing substance; liquid, *water substance*, moisture, solution, juice, sap; gas, gaseous substance, vapour" (emphasis added); Exh. 26, Buxton-Deposition-Exhibit-22 at pg. 2 [0027] (in a patent application from the same inventors for the patents-in-suit, but for a different drug pemetrexed, they state: "In several embodiments of the invention, the pharmaceutical compositions include *water as a pharmaceutically acceptable fluid.*") (emphasis added); Exh. 64, Buxton-Deposition-Exhibit-24, US Patent Application Publication 2014/0135299 Al ("Enema Composition For Treatment Of

Ulcerative Colitis Having Long Term Stability") ("In several aspects of the invention, the *pharmaceutically acceptable fluid* includes a mixture of *propylene glycol (PG) and water*.")).

208.    However, water is not listed in the claims-in-suit as a permitted "pharmaceutically acceptable fluid" that is recited after "consisting of" language.

209.    In fact, the specification specifically teaches away from using water – because it degrades bendamustine rapidly.  (Exh. 2, '214 Patent at Col. 1, lines 61-63 ("The stability of bendamustine in water is measured in hours, and is therefore, not suitable for long-term storage in liquid form."); Exh. 3, '248 Patent, Col. 1, lines 61-63).  And there are no examples in the specification of any formulation made with water or aqueous sodium hydroxide.

210.    Initially, the inventors investigated whether water solutions could be used to stabilize bendamustine formulations.  In particular, the inventors looked at saline water fluids because there was some evidence that chloride-containing water might be more stable.  In a 2010 summary report, the inventors explained:

> There are some indications in the leaflet data that saline provides some stability so *before an aqueous product could be completely discarded* we examined this in greater detail

(Exh. 65, Buxton-Deposition-Exhibit-20, at EAGLEBEN-SA_00240315 taken from pages EAGLEBEN-SA_00240269 through EAGLEBEN-SA_00240360, entitled "Eagle-SciDose Project Review Project Discussion September 22, 2010." (emphasis added)).  After that attempt, the inventors did "completely discard" attempts to pursue an aqueous formulation.   (Exh. 18, Buxton Depo. Day 2, at pg. 27, line 10 to pg. 31, line 24) ("Q. And is that a fair statement of the decision that was made at that point in time to not pursue an aqueous system but to pursue something that was non-aqueous?  A . By and large that is correct.")).

82

211.    The applicants did contemplate the addition of water

in a liquid bendamustine formulation in the Abandoned Patent Application – but that is not the

patents-in-suit.

212.    Simply stated, although water is a "pharmaceutically acceptable fluid", it is not a

fluid that is recited after the "fluid consisting of" language in the claims-in-suit.  Water was

understood to be antithetical to the stability of bendamustine.  There is no infringement, either

literally or under the doctrine of equivalents.

213.    ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉

214.    Nor would there be infringement under the doctrine of equivalents.  As a first

matter, for all the reasons discussed above, the claims-in-suit were amended and narrowed

during prosecution to the "fluid consisting of …" limitation.  This creates an estoppel.  The use

of an unrecited fluid ▉▉▉▉▉▉▉▉▉▉▉▉ is related to that amendment, and not

tangential.  On the merits of equivalents, water is not equivalent to the recited fluids in the claim.

It is inorganic, where the recited fluids are organic.  Water is known to degrade bendamustine,

whereas the recited fluids are supposedly capable of minimizing degradation.  Water was

explicitly identified in the patent specification as something to avoid because it causes

degradation.  And the related file histories described these inventions as "non-aqueous."  And, an

84

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████

███████████████████████████████████████████

███████████████████████████████████████████████

█████████████

**IX.** ████████████████████████ ████████████████████████████

███████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

█████████████

███████████████████████████████████████

█████████████████████████████████████████

███████████████████████████



Dated: March 16, 2026

# Exhibit 14
# File Under Seal



**Planet Depos**
*We Make It Happen™*

**HIGHLY CONFIDENTIAL**

# Transcript of Ravindhar Gonti, Corporate Designee & Individually

**Date:** December 4, 2025
**Case:** Eagle Pharmaceuticals, Inc., et al. -v- Apotex/Slayback/Baxter Healthcare

**Planet Depos**

**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com

**www.planetdepos.com**

Michigan #8598 | Nevada #089F | New Mexico #566

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS, INC.,
        Plaintiff,            C.A. No.
    V.                        1:24-CV-00064-JLH
APOTEX INC. and APOTEX CORP.,
        Defendants.
_____
EAGLE PHARMACEUTICALS, INC.,
        Plaintiff,            C.A. No.
    V.                        1:24-CV-00065-JLH
SLAYBACK PHARMA LLC and
AZURITY PHARMACEUTICALS, INC.,
        Defendants.
_____
EAGLE PHARMACEUTICALS, INC.,
        Plaintiff,            C.A. No.
    V.                        1:24-CV-00066-JLH
BAXTER HEALTHCARE CORPORATION,
        Defendant.
_____

HIGHLY CONFIDENTIAL

VIDEOTAPED VIDEO-TELECONFERENCE DEPOSITION OF

RAVINDHAR GONTI

In His Individual Capacity and as Corporate

Representative of SLAYBACK PHARMA LLC

Thursday, December 4, 2025

7:08 a.m. CST

Job No.: 611389

Pages: 1 - 108

Reported Stenographically by:

Cassidy Western, RPR, CRR, CA CSR #14722, WA CCR

**Page 2**

Videotaped Deposition of RAVINDHAR GONTI, In His Individual Capacity and as Corporate Representative of SLAYBACK PHARMA LLC, conducted virtually.

Pursuant to notice, before Cassidy Western, Registered Professional Reporter, Certified Realtime Reporter, California Certified Shorthand Reporter #14722.

**Page 3**

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS, EAGLE

PHARMACEUTICALS, INC. AND EAGLE SUB1 LLC:

    MICHELLE CHIN, ESQUIRE

    LATHAM & WATKINS LLP

    330 North Wabash Avenue, Suite 2800

    Chicago, IL 60611

    (312) 876-7700

ON BEHALF OF THE DEFENDANTS, SLAYBACK PHARMA

LLC AND AZURITY PHARMACEUTICALS, INC:

    JASON LIEF, ESQUIRE

    WINDELS, MARX, LANE & MITTENDORF

    156 West 56th Street

    New York, NY 10019

    (212) 237-1061

ALSO PRESENT:

Mike Martinez, Remote Technician

Nia Muhammad, Videographer

**Page 4**

C O N T E N T S

EXAMINATION OF RAVINDHAR GONTI                PAGE
    By Ms. Chin                                7

E X H I B I T S

GONTI DEPOSITION EXHIBIT                       PAGE

Exhibit 1  Plaintiffs' Notice of Deposition    17
           of Ravindhar Gonti

Exhibit 2  Defendant Slayback Pharma, LLC's     18
           Responses and Objections to Plaintiff
           Eagle Pharmaceuticals, Inc.'s Notice
           of Rule 30(b)(6) Deposition and
           Topics (Nos. 1-45)

Exhibit 3  Plaintiffs' Amended Notice of        30
           Deposition of Ravindhar Gonti

Exhibit 4  LinkedIn profile of Ravindhar        31
           Gonti

Exhibit 5  Department of Health and Human       57
           Services Application to Market a New
           or Abbreviated New Drug or Biologic
           for Human Use
           [SLAY-VIVMUS0000012-0000017]
           (Highly Confidential Information)

Exhibit 6  Slayback Pharma letter to FDA,       64
           August 31, 2018
           [SLAY-VIVMUS0000024]
           (Highly Confidential Information)

Exhibit 7  Slayback Pharma NDA Cover Letter,    65
           Annexure 1
           [SLAY-VIVMUS0000018-0000023]
           (Highly Confidential Information)

Exhibit 8  FDA Tentative Approval letter        69
           NDA 212209
           [SLAY-VIVMUS0008822-0008848]
           (Highly Confidential Information)

**57**

BY MS. CHIN:

Q   -- as a whole team?

**A   So once I receive the deficiency, I forward it to the team to understand and to take inputs to draft the response.**

Q   Okay.  And you said you forward it to the team.  That's the team that includes the cross -- the -- the separate either technical or whatever the other teams?

**A   Yes.**

Q   Okay.

MS. CHIN:  Why don't we move to Tab 5. If you could please put that in the chat and on the screen.  And can we mark that as Gonti Exhibit 5.

(GONTI Exhibit 5 was marked for identification and is attached to the transcript.)

THE TECHNICIAN:  All right.  Stand by.

MS. CHIN:  Thank you.

THE TECHNICIAN:  Exhibit 5 in the chat, uploading.

Counsel, you have control.

MS. CHIN:  Thank you.

MR. LIEF:  I don't see it in the chat.

Ah, thank you.

**58**

BY MS. CHIN:

Q   Mr. Gonti, do you recognize -- this is -- let me see.  This is a document with Bates stamp SLAY-VIVMUS ending in 12.  Do you recognize this document?

**A   Yes.**

Q   What is it?

**A   This is from 356h.**

Q   And this is from, I believe, the original submission.

Let me just go down.  It's a little laggy.  I don't know why it's lagging so much. Please bear with me.  It also might help if you download it and look at it yourself in case this is lagging too much.

It says in Box 32, "August 31st, 2018." So this is the 356h form.  Is that right?

**A   Yes.**

Q   And Slayback prepared this NDA submission form in the ordinary course of its business?

**A   What is "ordinary course of business" means?**

Q   It means that this is, you know, a business record that Slayback prepares routinely

**59**

in the course of how it runs its business.

**A   Yes.**

Q   And preparing 356h forms is regular practice for Slayback?

**A   FDA requires 356 form for each and every submission.**

Q   Okay.  So Slayback regularly prepares these forms?

**A   Yes.**

Q   And I know this was submitted before you joined Slayback, but do you help prepare documents like this in your tenure at Slayback?

**A   Yes.**

Q   And do you see here under the box 31 -- it's kind of hard to read.  But I think it says "Ms. Joan Janulis, Senior Vice President, Global Regulatory Affairs."  I think they are the one who prepared this form.

Do you know who that is?

**A   No.**

Q   Okay.  And feel free to scroll through this form if you download it in the chat.  But I'll just ask you a few questions.

**60**



**73**

approval letter was also the Slayback approved label. Is that right?

A Yes, it appears.

Q And this label is dated December 2022. Is that right?

A Yes, it appears.

Q And this is the label that was used with Slayback's NDA product as of 2022?

A Could you please reframe the question?

Q And this is the label that was used with Slayback's NDA product as of December 2022. Is that right?

A Yes, as the document states.

Q Okay. And this label confirms that Slayback's NDA product contains bendamustine hydrochloride. Right?

A Yes.

Q And the label confirms that Slayback's NDA product is an injection with 25 mg/mL of bendamustine solution. Is that right?

A Yes, as the label confirms.

Q Uh-huh. And this label confirms that Slayback's NDA product is packaged in a vial. Is that right?

A Yes.

**74**

Q And this label also confirms, as in the approval letter, that Slayback's NDA product, Vivimusta, is approved and marketed for CLL and NHL. Is that right?

A Yes.

Q Okay. Great.

MS. CHIN: I'm going to put --

THE VIDEOGRAPHER: You have one minute remaining, Counsel.

MS. CHIN: Okay. Why don't we -- can we swap out the SD card, and then also put up Tab 10 and put it in the chat and mark it as Gonti Exhibit 10.

(GONTI Exhibit 10 was marked for identification and is attached to the transcript.)

THE VIDEOGRAPHER: Okay. It's okay to go off the record?

MS. CHIN: Yeah.

THE VIDEOGRAPHER: All right. We are now off the record. The time is 9:18 a.m.

(Brief pause off the record.)

THE VIDEOGRAPHER: We're now back on the record. The time is 9:21 a.m.

MS. CHIN: Thank you.

**75**

BY MS. CHIN:

Q Mr. Gonti, I'm going to represent to you that this is the label that we just looked at. It's just standalone so that it's a little bigger for us.

It's the label revised December 2022, and I'm going to just direct your attention to the dosing -- dosage and administration. Let me see if there's a...

Okay. So here's the dosage and administration section. It says the recommended dosage for CLL is 100 mg administered intravenously over 20 minutes on days 1 and 2 of a 28-day cycle for up to six cycles.

Is that right?

A Yes, I can read the same, Michelle.

Q All right. And then also that the recommended dosage for the NHL indication is 120 mg administered intravenously over 20 minutes on days 1 and 2 of a 21-day cycle for up to eight cycles.

Is that right?

A Yes, as the label states.

Q Okay. And then if we keep going, there's a section called intravenous --

**76**

"Intravenous Infusion." The label provides instructions for the intravenous administration. Is that right?

A Yes, as it appears.

Q And I think it goes onto two pages here.

So here the label provides instructions for how to dilute the solution. Is that right?

MR. LIEF: Form.

THE WITNESS: Yes.

BY MS. CHIN:

Q And that's according to this chart, right, on page 3 and 4 of the label?

A Yes.

Q And Slayback instructs healthcare providers to dilute its product. Right?

MR. LIEF: Form.

THE WITNESS: Yes, the label says.

BY MS. CHIN:

Q And then Slayback instructs healthcare providers to then intravenously administer the diluted composition to the human. Right?

MR. LIEF: Same objection.

THE WITNESS: The label instruct the same.

---

**105**

A    So if I received information request as on there, I'll send it to the team who is currently working for the -- on the artwork changes as well as, as I told you, like, all the CFTs for their endorsement and their review and comments.

Q    Sorry.  What does CFT stand for?

A    Cross-functional teams.

Q    Oh, cross-functional teams.  Okay.  So you send it to all the different teams?

A    Yes, typically.

Q    Typically.  Okay.

MS. CHIN:  Can we please put up Tab 18?

MR. LIEF:  Counsel, before you move to another document, it's now, on my clock, 11:33 East Coast U.S., which I think is -- I think it's 10:00 p.m. in India now.

If this is a good moment before you go to a new document to break until tomorrow's session.

MS. CHIN:  Yeah, that's fine with me.

THE WITNESS:  Yes.  Yes.  And I feel the same.  Like, need to travel from office to home also.

THE VIDEOGRAPHER:  Let me read off the

---

**106**

record -- the video record.

We're now off the record.  The time is 10:33 a.m.

(Off the record at 10:33 a.m.)

---

**107**

ACKNOWLEDGMENT OF DEPONENT

I, RAVINDHAR GONTI, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct, and complete transcription of the testimony given by me, and any corrections appear on the attached Errata sheet signed by me.

_____    _____
(DATE)                (SIGNATURE)

---

**108**

REPORTER'S CERTIFICATE

I, CASSIDY WESTERN, RPR, CRR, CA CSR, WA CCR, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 11th day of December, 2025.

_____
Cassidy Western, RPR, CRR, CA CSR, WA CCR

---

# Exhibit 15
# File Under Seal

## Table of Contents



Highly Confidential Information



Highly Confidential Information



Highly Confidential Information

SLAY-VIVMUS0013213



Highly Confidential Information

SLAY-VIVMUS0013214



Highly Confidential Information

SLAY-VIVMUS0013215



Highly Confidential Information

SLAY-VIVMUS0013216

Highly Confidential Information

SLAY-VIVMUS0013217



Highly Confidential Information

SLAY-VIVMUS0013218

Highly Confidential Information

SLAY-VIVMUS0013225



Highly Confidential Information

SLAY-VIVMUS0013226

Highly Confidential Information

SLAY-VIVMUS0013227



Highly Confidential Information

# Exhibit 16
# File Under Seal

Table of Contents



Highly Confidential Information

SLAY-VIVMUS0001235



Highly Confidential Information

SLAY-VIVMUS0001236



Highly Confidential Information



Highly Confidential Information

SLAY-VIVMUS0001243

# Exhibit 17
# File Under Seal

Highly Confidential Information

SLAY-VIVMUS0005624

Highly Confidential Information

SLAY-VIVMUS0005625



Highly Confidential Information

# Exhibit 18
# File Under Seal

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC. AND EAGLE SUB1 LLC, <br><br> Plaintiffs, <br><br> v. <br><br> SLAYBACK PHARMA LLC, AND AZURITY PHARMACEUTICALS, INC., <br><br> Defendants. | C.A. No. 24-65-JLH (CONSOLIDATED) <br><br> **JURY TRIAL DEMANDED** <br><br> **HIGHLY CONFIDENTIAL** |

**RESPONSIVE EXPERT REPORT OF DR. BERNHARDT TROUT, PH.D.**

88. ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

   ██████████████████████████████████

   ████████████████████████████████████████

   ████████████████████████████████████████████

      ████████

   ██  ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████

   ██  ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

   ██  ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

29

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████

██    █████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████

### G.    Defendants' Product Labels Confirm a POSA Would Understand the Claim Scope with Reasonable Certainty

93.    Dr. Crowley argues that the "asserted patents provide no guidance that would enable a POSA to distinguish between a 'liquid' and a 'fluid' when an additional liquid ingredient is added." Crowley Opening Report ¶ 109. The Defendants' own product labels demonstrate that this concern is unfounded. A POSA reviewing these labels would understand with reasonable certainty whether each component falls within the "pharmaceutically acceptable fluid consisting of" element or is instead part of the broader "liquid bendamustine-containing composition comprising" that permits additional unrecited components.

30

Dated: 3/16/26

Dr. Bernhardt L. Trout, Ph.D.

# Exhibit 19
# File Under Seal

Table of Contents



Highly Confidential Information

SLAY-VIVMUS0011140



Highly Confidential Information



Highly Confidential Information

SLAY-VIVMUS0011148



Highly Confidential Information

SLAY-VIVMUS0011154

# Exhibit 20
# File Under Seal



Highly Confidential Information



Highly Confidential Information

SLAY-VIVMUS0010982

# Exhibit 21
# File Under Seal

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC<br><br>Plaintiffs,<br><br>v.<br><br>SLAYBACK PHARMA LLC and AZURITY PHARMACEUTICALS, INC.,<br><br>Defendant. | C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY** |

## EXPERT REPORT OF DR. JEFFREY D. KITTENDORF, PH.D.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

## I.    ASSIGNMENT

1.    I have been retained by Latham & Watkins LLP on behalf of Eagle Pharmaceuticals, Inc. and Eagle SUB1 LLC (collectively, "Plaintiffs" or "Eagle") as an expert in the fields of medicinal chemistry and analytical chemistry.  Specifically, I have been retained as an expert on high-performance liquid chromatography ("HPLC") testing and analysis, which is a technique in analytical chemistry used to separate, identify, and quantify different chemical compounds within a liquid sample.

2.    I understand this litigation is primarily related to Plaintiff's Belrapzo® drug product.  Specifically, I understand that Slayback Pharma LLC and Azurity Pharmaceuticals, Inc. (collectively, "Slayback") filed a New Drug Application under the 505(b)(2) regulatory pathway ("505(b)(2) Application") with the U.S. Food and Drug Administration ("FDA") seeking approval for its proposed liquid bendamustine product, Vivimusta®, which relies on Belrapzo® as the listed drug ("LD").

3.    For this litigation, I was asked to use HPLC to test the composition of Slayback's liquid bendamustine product samples and identify the extent to which impurities were present.  I was specifically asked to provide my opinion as to whether samples of Slayback's liquid bendamustine product have "less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C," which I understand is a limitation relating to the amount of total impurities in certain asserted claims.  *See, e.g.*, U.S. Patent No. 12,138,248 cl. 1, 8; U.S. Patent No. 11,872,214 cl. 1, 6.

4.    I was also asked whether performing the HPLC measurements at different wavelengths, ███████████████████████, would have any material effect on the measured percentages of total impurities in Slayback's liquid bendamustine product samples.

1

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

29.    To determine whether a given HPLC analytical method is valid, an analytical chemist will perform a series of routine analyses designed to ensure that the method possesses certain characteristics, including accuracy, linearity, precision, specificity, range, and robustness, among others.  Assuming the HPLC analytical method in question possesses these characteristics, the method is deemed valid for the given task.  *See, e.g.*, Ex. B*,* at 685-713.

30.    Accordingly, the FDA requires applicants to demonstrate that their HPLC analytical methods possess the above-mentioned characteristics before accepting their measurements as valid.  *See* EAGLEBEN-SA_00361338 (Analytical Procedures and Methods Validation for Drugs and Biologics (2015)); EAGLEBEN-SA_00361356 (Validation of Chromatographic Methods (1994)).  Specifically, the FDA requires each NDA applicant, such as Slayback, to "include the analytical procedures necessary to ensure the identity, strength, quality, purity, and potency of the drug substance and drug product" and to "submit the data used to establish that the analytical procedures used in testing meet proper standards of accuracy and reliability."  EAGLEBEN-SA_00361338 at -1342, -1348 (Analytical Procedures and Methods Validation for Drugs and Biologics (2015)).  "When an analytical procedure is approved/licensed as part of the NDA, ANDA, or BLA, it becomes the FDA-approved analytical procedure for the approved product."  *Id.* at -1343.  Thus, if the FDA has approved or tentatively approved an NDA or ANDA, the associated analytical methods are generally understood to be valid.

### B.    Analysis of Slayback's Liquid Bendamustine Product

#### 1.    Samples and Reference Standards

31.    As part of this litigation, I received 10 vials of Slayback's liquid bendamustine product (25 mg/mL) (Lot No. 4E08594) (Exp. 03/2027) on November 7, 2025 from Slayback. The samples were shipped in controlled temperature packaging.  The shipping temperature was

8

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

monitored using an enclosed data logger.  The temperature data is attached as **Exhibit C**.  Upon receipt, I opened the package containing the samples and stored them in a secure laboratory refrigerator at about 4° C.  Receipt records are attached as **Exhibit D**.  ██████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

32.     I purchased BDM HCl reference standard (USP No. 1065221; Lot No. F070G0) from USP.  The certificates of analysis for those reference standards are attached as **Exhibit E**.

33.     I also purchased bendamustine related compound D (USP No. 1065265; Lot No. F070L0) and bendamustine related compound E (USP No. 1065276; Lot No. F070M0) from USP.  Records are attached as **Exhibit F**.

### 2.     Analytical Method

34.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████

██   ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

██   ████████████████████████████████████████████████████

████████████████████████████████████████████████. *See supra*, ¶ 30.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

37.



**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**



56.     As explained above, I understand that certain claim limitations relate to the amount of total impurities present after at least 15 months of storage. *See supra* ¶ 4.  The product samples that Slayback supplied for this experiment included a lot number (pertaining to a broad group of products manufactured under similar conditions, which may include products from different batches) but no batch number (pertaining to a specific group of products manufactured under identical conditions in a single production).  Without batch information, I was unable to identify certain information about the samples, such as the date when they were placed on stability.[5]  As

---

[5] I understand from counsel that it took almost a year and a half from Eagle's initial request for product samples to receipt of those samples.  *See* Eagle's First Set of Requests for Prod. (May 21,

Dated: February 5, 2026

Dr. Jeffrey D. Kittendorf, Ph.D.

19

# Exhibit 22
# File Under Seal



Highly Confidential Information

SLAY-VIVMUS0010983



Highly Confidential Information



Highly Confidential Information

SLAY-VIVMUS0010985



Highly Confidential Information

SLAY-VIVMUS0010986



Highly Confidential Information



Highly Confidential Information



Highly Confidential Information

SLAY-VIVMUS0010989



Highly Confidential Information



Highly Confidential Information



Highly Confidential Information

SLAY-VIVMUS0010992



Highly Confidential Information

SLAY-VIVMUS0010993



Highly Confidential Information

SLAY-VIVMUS0010994



Highly Confidential Information



Highly Confidential Information

SLAY-VIVMUS0010996



Highly Confidential Information



Highly Confidential Information

SLAY-VIVMUS0010998



Highly Confidential Information



Highly Confidential Information

SLAY-VIVMUS0011000



Highly Confidential Information

SLAY-VIVMUS0011001



Highly Confidential Information



Highly Confidential Information



Highly Confidential Information



Highly Confidential Information



Highly Confidential Information    SLAY-VIVMUS0011006



Highly Confidential Information

SLAY-VIVMUS0011007



Highly Confidential Information

SLAY-VIVMUS0011008



Highly Confidential Information



Highly Confidential Information



Highly Confidential Information



Highly Confidential Information



Highly Confidential Information

SLAY-VIVMUS0011013



Highly Confidential Information



Highly Confidential Information



Highly Confidential Information

SLAY-VIVMUS0011016



Highly Confidential Information



Highly Confidential Information



Highly Confidential Information

SLAY-VIVMUS0011019



Highly Confidential Information



Highly Confidential Information

SLAY-VIVMUS0011021



Highly Confidential Information



Highly Confidential Information

SLAY-VIVMUS0011023

# Exhibit 23
# File Under Seal



Highly Confidential Information

SLAY-VIVMUS0010634



Highly Confidential Information

# Exhibit 24
# File Under Seal



Highly Confidential

SLAY-VIVMUS0056846



Highly Confidential

SLAY-VIVMUS0056847



Highly Confidential

SLAY-VIVMUS0056848



Highly Confidential

SLAY-VIVMUS0056849



Highly Confidential



Highly Confidential

SLAY-VIVMUS0056851



Highly Confidential

SLAY-VIVMUS0056852



Highly Confidential

SLAY-VIVMUS0056853



Highly Confidential

SLAY-VIVMUS0056854

Highly Confidential

SLAY-VIVMUS0056855

Highly Confidential

SLAY-VIVMUS0056856



Highly Confidential

SLAY-VIVMUS0056857

Highly Confidential

SLAY-VIVMUS0056858



Highly Confidential

SLAY-VIVMUS0056859



Highly Confidential

SLAY-VIVMUS0056860

Highly Confidential

SLAY-VIVMUS0056861

Highly Confidential

SLAY-VIVMUS0056862



Highly Confidential

SLAY-VIVMUS0056863



Highly Confidential

SLAY-VIVMUS0056864



Highly Confidential

SLAY-VIVMUS0056865



Highly Confidential

SLAY-VIVMUS0056866



Highly Confidential



Highly Confidential

SLAY-VIVMUS0056868



Highly Confidential

SLAY-VIVMUS0056869



Highly Confidential

Highly Confidential

SLAY-VIVMUS0056871

Highly Confidential

SLAY-VIVMUS0056872

Highly Confidential

SLAY-VIVMUS0056873

Corden Pharma Latina SpA

-Analytical Development-

## 4.12.    RANGE

### 4.12.1.    OPERATIVE PROCEDURE

Range will be established during the accuracy, linearity and precision tests.

### 4.12.2.    ACCEPTANCE CRITERIA

Validation range must provide acceptable precision, accuracy and linearity when applied to samples containing Related Substances in Bendamustine Hydrochloride Injection at the extremes of the related range as well as within it.

## 5.    REMEDIAL ACTION FOR RESULTS OUTSIDE THE ACCEPTANCE CRITERIA

Communicate the result outside the acceptance criteria to the client as soon as it is evidenced.

Perform an investigation to determine whether a determinate error [1] can be assigned. If a determinate error can be assigned, perform a reanalysis on the errant solution or repeat the test.

If a determinate error cannot be assigned, repeat the test (or portion of test, if appropriate) in duplicate.

a) Report the repeat test results if they both meet the acceptance criteria.

b) If one or both of the repeated test results continue to fail the acceptance criteria, consult with the client to agree the appropriate actions.

[1] Error of known cause, such as human error or equipment malfunction that could yield an inaccurate or erroneous result.

## 6.    REFERENCES

1. AD-VP-16003-Rev. 01: Validation of the HPLC method for the Related substances determination in Bendamustine Hydrochloride Injection, 100mg/4mL (25mg/mL) Presentation 1.
2. AD-VR-16003: Validation Report for HPLC method for the Related substances determination in Bendamustine Hydrochloride Injection, 100mg/4mL (25mg/mL) Presentation 1.
3. QCM 238 current edition: Analisi della Bendamustina PE-1 SINJ 25mg/mL BVI (Controlli di Processo e Rilascio)/Testing of Bendamustine PE-1 SINJ 25mg/mL BVI (in-process and release controls).
4. USDMF 025512, Specification Bendamustine hydrochloride monohydrate Vers. 03-19.
5. QCO 25 current edition: Validazione, Verifica e Tech Transfer di Metodi Analitici.

## 7.    VALIDATION PROTOCOL HISTORY

This is the first addendum of the protocol AD-VP-16003 issued by Corden Pharma Latina for the validation of a new HPLC method for the related substances determination in Bendamustine Hydrochloride Injection Presentation 1.

AD-VP-16003-Addendum 01: Addendum to validation of the HPLC method for the Related substances determination in Bendamustine Hydrochloride Injection, 100mg/4mL (25mg/mL) Presentation 1 (QCM 238)

Highly Confidential                                                                    SLAY-VIVMUS0056874

# Exhibit 25
# File Under Seal

Highly Confidential Information

SLAY-VIVMUS0005301

Highly Confidential Information

SLAY-VIVMUS0005305

# Exhibit 26

# Handbook of
# Pharmaceutical Excipients

## Sixth edition

Edited by
**Raymond C Rowe, Paul J Sheskey and Marian E Quinn**

Pharmaceutical Press

APhA

Dist. Delaware
No. 17-1154-CFC

**PTX-0669**

TEVABEND00293727

CONFIDENTIAL

EAGLEBEN-SA_00315043

# Handbook of Pharmaceutical Excipients

CONFIDENTIAL

TEVABEND00293728

EAGLEBEN-SA_00315044

# Handbook of Pharmaceutical Excipients

## SIXTH EDITION

*Edited by*

### Raymond C Rowe BPharm, PhD, DSC, FRPharmS, FRSC, CPhys, MInstP

**Chief Scientist**
*Intelligensys Ltd, Stokesley, North Yorkshire, UK*

### Paul J Sheskey BSc, RPh

**Application Development Leader**
*The Dow Chemical Company, Midland, MI, USA*

### Marian E Quinn BSc, MSc

**Development Editor**
*Royal Pharmaceutical Society of Great Britain, London, UK*



APhA



London · Chicago    **Pharmaceutical Press**

TEVABEND00293730

CONFIDENTIAL

EAGLEBEN-SA_00315046

**Published by the Pharmaceutical Press**
An imprint of RPS Publishing

1 Lambeth High Street, London SE1 7JN, UK
100 South Atkinson Road, Suite 200, Grayslake, IL 60030-7820, USA

**and the American Pharmacists Association**
2215 Constitution Avenue, NW, Washington, DC 20037-2985, USA

© Pharmaceutical Press and American Pharmacists Association 2009

 is a trade mark of RPS Publishing

RPS Publishing is the publishing organisation of the Royal Pharmaceutical Society of Great Britain

First published 1986
Second edition published 1994
Third edition published 2000
Fourth edition published 2003
Fifth edition published 2006
Sixth edition published 2009

Typeset by Data Standards Ltd, Frome, Somerset
Printed in Italy by L.E.G.O. S.p.A.

ISBN 978 0 85369 792 3 (UK)
ISBN 978 1 58212 135 2 (USA)

All rights reserved. No part of this publication may be
reproduced, stored in a retrieval system, or transmitted in any
form or by any means, without the prior written permission
of the copyright holder.
   The publisher makes no representation, express or implied,
with regard to the accuracy of the information contained in
this book and cannot accept any legal responsibility or
liability for any errors or omissions that may be made.

*A catalogue record for this book is available from the British Library*

TEVABEND00293731

CONFIDENTIAL

EAGLEBEN-SA_00315047



# Alcohol

## 1  Nonproprietary Names

BP: Ethanol (96%)
JP: Ethanol
PhEur: Ethanol (96 per cent)
USP: Alcohol

## 2  Synonyms

Ethanolum (96 per centum); ethyl alcohol; ethyl hydroxide; grain alcohol; methyl carbinol.

## 3  Chemical Name and CAS Registry Number

Ethanol [64-17-5]

## 4  Empirical Formula and Molecular Weight

$C_2H_6O$    46.07

## 5  Structural Formula



## 6  Functional Category

Antimicrobial preservative; disinfectant; skin penetrant; solvent.

## 7  Applications in Pharmaceutical Formulation or Technology

Ethanol and aqueous ethanol solutions of various concentrations (see Sections 8 and 17) are widely used in pharmaceutical formulations and cosmetics; see Table I. Although ethanol is primarily used as a solvent, it is also employed as a disinfectant, and in solutions as an antimicrobial preservative.[1,2] Topical ethanol solutions are used in the development of transdermal drug delivery systems as penetration enhancers.[3-10] Ethanol has also been used in the development of transdermal preparations as a co-surfactant.[11-13]

**Table I:** Uses of alcohol.

| Use | Concentration (% v/v) |
| --- | --- |
| Antimicrobial preservative | ≥ 10 |
| Disinfectant | 60–90 |
| Extracting solvent in galenical manufacture | Up to 85 |
| Solvent in film coating | Variable |
| Solvent in injectable solutions | Variable |
| Solvent in oral liquids | Variable |
| Solvent in topical products | 60–90 |

## 8  Description

In the BP 2009, the term 'ethanol' used without other qualification refers to ethanol containing ≥99.5% v/v of $C_2H_6O$. The term 'alcohol', without other qualification, refers to ethanol 95.1–96.9% v/v. Where other strengths are intended, the term 'alcohol' or 'ethanol' is used, followed by the statement of the strength.

In the PhEur 6.0, anhydrous ethanol contains not less than 99.5% v/v of $C_2H_6O$ at 20°C. The term ethanol (96%) is used to describe the material containing water and 95.1–96.9% v/v of $C_2H_6O$ at 20°C.

In the USP 32, the term 'dehydrated alcohol' refers to ethanol ≥99.5% v/v. The term 'alcohol' without other qualification refers to ethanol 94.9–96.0% v/v.

In the JP XV, ethanol (alcohol) contains 95.1–96.9% v/v (by specific gravity) of $C_2H_6O$ at 15°C.

In the *Handbook of Pharmaceutical Excipients*, the term 'alcohol' is used for either ethanol 95% v/v or ethanol 96% v/v.

Alcohol is a clear, colorless, mobile, and volatile liquid with a slight, characteristic odor and burning taste.

*See also* Section 17.

## 9  Pharmacopeial Specifications

*See* Table II. *See also* Sections 17 and 18.

**Table II:** Pharmacopeial specifications for alcohol.

| Test | JP XV | PhEur 6.0 | USP 32 |
| --- | --- | --- | --- |
| Identification | + | + | + |
| Characters | — | | | — |
| Specific gravity | 0.809–0.816 | 0.805–0.812 | 0.812–0.816 |
| Acidity or alkalinity | + | + | + |
| Clarity and color of solution | | | | | | |
| Nonvolatile residue | ≤ 2.5 mg | ≤ 25 ppm | ≤ 2.5 mg |
| Volatile impurities | + | + | + |
| Absorbance | + | + | + |
| at 240 nm | ≤ 0.40 | ≤ 0.40 | ≤ 0.40 |
| at 250–260 nm | ≤ 0.30 | ≤ 0.30 | ≤ 0.30 |
| at 270–340 nm | ≤ 0.10 | ≤ 0.10 | ≤ 0.10 |
| Assay | 95.1–96.9% | 95.1–96.9% | 92.3–93.8% by weight 94.9–96.0% by volume |

## 10  Typical Properties

*Antimicrobial activity*  Ethanol is bactericidal in aqueous mixtures at concentrations between 60% and 95% v/v; the optimum concentration is generally considered to be 70% v/v. Antimicrobial activity is enhanced in the presence of edetic acid or edetate salts.[1] Ethanol is inactivated in the presence of nonionic surfactants and is ineffective against bacterial spores.

*Boiling point*  78.15°C

*Flammability*  Readily flammable, burning with a blue, smokeless flame.

*Flash point*  14°C (closed cup)

*NIR spectra*  see Figures 1 and 2.

*Solubility*  Miscible with chloroform, ether, glycerin, and water (with rise of temperature and contraction of volume).

*Specific gravity*  0.8119–0.8139 at 20°C

*Note*  The above typical properties are for alcohol (ethanol 95% or 96% v/v). *See* Section 17 for typical properties of dehydrated alcohol.

## 11  Stability and Storage Conditions

Aqueous ethanol solutions may be sterilized by autoclaving or by filtration and should be stored in airtight containers, in a cool place.

## 12  Incompatibilities

In acidic conditions, ethanol solutions may react vigorously with oxidizing materials. Mixtures with alkali may darken in color owing to a reaction with residual amounts of aldehyde. Organic

17

**18    Alcohol**

A



**Figure 1:** Near-infrared spectrum of alcohol (96%) measured by transflectance (1 mm path-length).



**Figure 2:** Near-infrared spectrum of alcohol (absolute) measured by transflectance (1 mm path-length).

salts or acacia may be precipitated from aqueous solutions or dispersions. Ethanol solutions are also incompatible with aluminum containers and may interact with some drugs.

## 13    Method of Manufacture

Ethanol is manufactured by the controlled enzymatic fermentation of starch, sugar, or other carbohydrates. A fermented liquid is produced containing about 15% ethanol; ethanol 95% v/v is then obtained by fractional distillation. Ethanol may also be prepared by a number of synthetic methods.

## 14    Safety

Ethanol and aqueous ethanol solutions are widely used in a variety of pharmaceutical formulations and cosmetics. It is also consumed in alcoholic beverages.

Ethanol is rapidly absorbed from the gastrointestinal tract and the vapor may be absorbed through the lungs; it is metabolized, mainly in the liver, to acetaldehyde, which is further oxidized to acetate.

Ethanol is a central nervous system depressant and ingestion of low to moderate quantities can lead to symptoms of intoxication including muscle incoordination, visual impairment, slurred speech, etc. Ingestion of higher concentrations may cause depression of medullary action, lethargy, amnesia, hypothermia, hypoglycemia, stupor, coma, respiratory depression, and cardiovascular collapse. The lethal human blood-alcohol concentration is generally estimated to be 400–500 mg/100 mL.

Although symptoms of ethanol intoxication are usually encountered following deliberate consumption of ethanol-containing beverages, many pharmaceutical products contain ethanol as a solvent, which, if ingested in sufficiently large quantities, may cause adverse symptoms of intoxication. In the USA, the maximum quantity of alcohol included in OTC medicines is 10% v/v for products labeled for use by people of 12 years of age and older, 5% v/v for products intended for use by children aged 6–12 years of age, and 0.5% v/v for products for use by children under 6 years of age.[14]

Parenteral products containing up to 50% of alcohol (ethanol 95 or 96% v/v) have been formulated. However, such concentrations can produce pain on intramuscular injection and lower concentrations such as 5–10% v/v are preferred. Subcutaneous injection of alcohol (ethanol 95% v/v) similarly causes considerable pain followed by anesthesia. If injections are made close to nerves, neuritis and nerve degeneration may occur. This effect is used therapeutically to cause anesthesia in cases of severe pain, although the practice of using alcohol in nerve blocks is controversial. Doses of 1 mL of absolute alcohol have been used for this purpose.[15]

Preparations containing more than 50% v/v alcohol may cause skin irritation when applied topically.

LD$_{50}$ (mouse, IP): 0.93 g/kg[16]
LD$_{50}$ (mouse, IV): 1.97 g/kg
LD$_{50}$ (mouse, oral): 3.45 g/kg
LD$_{50}$ (mouse, SC): 8.29 g/kg
LD$_{50}$ (rat, IP): 3.75 g/kg
LD$_{50}$ (rat, IV): 1.44 g/kg
LD$_{50}$ (rat, oral): 7.06 g/kg

## 15    Handling Precautions

Observe normal precautions appropriate to the circumstances and quantity of material handled. Ethanol and aqueous ethanol solutions should be handled in a well-ventilated environment. In the UK, the long-term 8-hour TWA workplace exposure limit for ethanol is 1920 mg/m³ (1000 ppm).[17] Ethanol may be irritant to the eyes and mucous membranes, and eye protection and gloves are recommended. Ethanol is flammable and should be heated with care. Fixed storage tanks should be electrically grounded to avoid ignition from electrostatic discharges when ethanol is transferred.

## 16    Regulatory Status

Included in the FDA Inactive Ingredients Database (dental preparations; inhalations; IM, IV, and SC injections; nasal and ophthalmic preparations; oral capsules, solutions, suspensions, syrups, and tablets; rectal, topical, and transdermal preparations). Included in the Canadian List of Acceptable Non-medicinal Ingredients. Included in nonparenteral and parenteral medicines licensed in the UK.

## 17    Related Substances

Dehydrated alcohol; denatured alcohol; dilute alcohol; isopropyl alcohol.

**Dehydrated alcohol**
*Synonyms*   Absolute alcohol; anhydrous ethanol; ethanol.
*Autoignition temperature*   365°C.
*Boiling point*   78.5°C
*Explosive limits*   3.5–19.0% v/v in air
*Flash point*   12°C (closed cup)
*Melting point*   −112°C
*Moisture content*   Absorbs water rapidly from the air.
*Refractive index*   $n_D^{20} = 1.361$
*Specific gravity*   0.7904–0.7935 at 20°C
*Surface tension*   22.75 mN/m at 20°C (ethanol/vapor)
*Vapor density (relative)*   1.59 (air = 1)

TEVABEND00293773

EAGLEBEN-SA_00315089

*Vapor pressure*  5.8 Pa at 20°C

*Viscosity (dynamic)*  1.22 mPa s (1.22 cP) at 20°C

*Comments*  Dehydrated alcohol is ethanol ≥99.5% v/v. *See* Section 8. Dehydrated alcohol is one of the materials that have been selected for harmonization by the Pharmacopeial Discussion Group. For further information see the General Information Chapter <1196> in the USP32–NF27, the General Chapter 5.8 in PhEur 6.0, along with the 'State of Work' document on the PhEur EDQM website, and also the General Information Chapter 8 in the JP XV.

### Denatured alcohol

*Synonyms*  Industrial methylated spirit; surgical spirit.

*Comments*  Denatured alcohol is alcohol intended for external use only. It has been rendered unfit for human consumption by the addition of a denaturing agent such as methanol or methyl isobutyl ketone.

### Dilute alcohol

*Synonyms*  Dilute ethanol.

*Specific gravity*  *see* Table III.

**Table III:** Specific gravity of alcohol.

| Strength of alcohol (% v/v) | Specific gravity at 20°C |
| --- | --- |
| 90 | 0.8289–0.8319 |
| 80 | 0.8599–0.8621 |
| 70 | 0.8860–0.8883 |
| 60 | 0.9103–0.9114 |
| 50 | 0.9314–0.9326 |
| 45 | 0.9407–0.9417 |
| 25 | 0.9694–0.9703 |
| 20 | 0.9748–0.9759 |

*Comments*  The term 'dilute alcohol' refers to a mixture of ethanol and water of stated concentration. The USP32–NF27 lists diluted alcohol. The BP 2009 lists eight strengths of dilute alcohol ( dilute ethanol) containing 90%, 80%, 70%, 60%, 50%, 45%, 25%, and 20% v/v respectively of ethanol.

## 18  Comments

Alcohol is one of the materials that have been selected for harmonization by the Pharmacopeial Discussion Group. For further information see the General Information Chapter <1196> in the USP32–NF27, the General Chapter 5.8 in PhEur 6.0, along with the 'State of Work' document on the PhEur EDQM website, and also the General Information Chapter 8 in the JP XV.

Possession and use of nondenatured alcohols are usually subject to close control by excise authorities.

A specification for alcohol is contained in the Food Chemicals Codex (FCC).[18]

The EINECS number for alcohol is 200-578-6. The PubChem Compound ID (CID) for alcohol is 702.

## 19  Specific References

1  Chiori CO, Ghobashy AA. A potentiating effect of EDTA on the bactericidal activity of lower concentrations of ethanol. *Int J Pharm* 1983; 17: 121–128.

2  Karabit MS *et al.* Studies on the evaluation of preservative efficacy. IV. The determination of antimicrobial characteristics of some pharmaceutical compounds in aqueous solutions. *Int J Pharm* 1989; 54: 51–56.

3  Liu P *et al.* Quantitative evaluation of ethanol effects on diffusion and metabolism of β-estradiol in hairless mouse skin. *Pharm Res* 1991; 8(7): 865–872.

4  Verma DD, Fahr A. Synergistic penetration enhancement of ethanol and phospholipids on the topical delivery of cyclosporin A. *J Control Release* 2004; 97(1): 55–66.

5  Gwak SS *et al.* Transdermal delivery of ondansetron hydrochloride: effects of vehicles and penetration enhancers. *Drug Dev Ind Pharm* 2004; 30(2): 187–194.

6  Williams AC, Barry BW. Penetration enhancers. *Adv Drug Delivery Rev* 2004; 56(5): 603–618.

7  Heard CA *et al.* Skin penetration enhancement of mefenamic acid by ethanol and 1,8-cineole can be explained by the 'pull' effect. *Int J Pharm* 2006; 321: 167–170.

8  Rhee YS *et al.* Effects of vehicles and enhancers on transdermal delivery of clebopride. *Arch Pharm Res* 2007; 30: 1155–1161.

9  Fang C *et al.* Synergistically enhanced transdermal permeation and topical analgesia of tetracaine gel containing menthol and ethanol in experimental and clinical studies. *Eur J Pharm Biopharm* 2008; 68: 735–740.

10  Krishnaiah YS *et al.* Penetration-enhancing effect of ethanolic solution of menthol on transdermal permeation of ondansetron hydrochloride across rat epidermis. *Drug Deliv* 2008; 15: 227–234.

11  Kweon JH *et al.* Transdermal delivery of diclofenac using microemulsions. *Arch Pharmacol Res* 2004; 27(3): 351–356.

12  Huang YB *et al.* Transdermal delivery of capsaicin derivative-sodium nonivamide acetate using microemulsions as vehicles. *Int J Pharm* 2008; 349: 206–211.

13  El Maghraby GM. Transdermal delivery of hydrocortisone from eucalyptus oil microemulsion: effects of cosurfactants. *Int J Pharm* 2008; 355: 285–292.

14  Jass HE. Regulatory review. *Cosmet Toilet* 1995; 110(5): 21–22.

15  Lloyd JW. Use of anaesthesia: the anaesthetist and the pain clinic. *Br Med J* 1980; 281: 432–434.

16  Lewis RJ, ed. *Sax's Dangerous Properties of Industrial Materials*, 11th edn. New York: Wiley, 2004; 1627–1628.

17  Health and Safety Executive. *EH40/2005: Workplace Exposure Limits.* Sudbury: HSE Books, 2005 (updated 2007). http://www.hse.gov.uk/coshh/table1.pdf (accessed 5 February 2009).

18  *Food Chemicals Codex*, 6th edn.  Bethesda, MD: United States Pharmacopeia, 2008; 303.

## 20  General References

European Directorate for the Quality of Medicines and Healthcare (EDQM). European Pharmacopoeia – State Of Work Of International Harmonisation. *Pharmeuropa* 2009; 21(1): 142–143. http://www.edqm.eu/site/-614.html (accessed 3 February 2009).

Lund W, ed. *The Pharmaceutical Codex: Principles and Practice of Pharmaceutics*, 12th edn. London: Pharmaceutical Press, 1994; 694–695.

Spiegel AJ, Noseworthy MN. Use of nonaqueous solvents in parenteral products. *J Pharm Sci* 1963; 52: 917–927.

Wade A, ed. *Pharmaceutical Handbook*, 19th edn. London: Pharmaceutical Press, 1980; 227–230.

## 21  Author

ME Quinn.

## 22  Date of Revision

5 February 2009.

CONFIDENTIAL

# Monothioglycerol

## 1  Nonproprietary Names

USP-NF: Monothioglycerol

## 2  Synonyms

1-Mercaptoglycerol; 1-mercapto-2,3-propanediol; monothioglycerin; α-monothioglycerol; thioglycerin; 1-thioglycerol.

## 3  Chemical Name and CAS Registry Number

3-Mercapto-1,2-propanediol [96-27-5]

## 4  Empirical Formula and Molecular Weight

$C_3H_8O_2S$    108.16

## 5  Structural Formula

## 6  Functional Category

Antimicrobial preservative; antioxidant.

## 7  Applications in Pharmaceutical Formulation or Technology

Monothioglycerol is used as an antioxidant in pharmaceutical formulations, mainly in parenteral preparations.[1] Monothioglycerol is reported to have some antimicrobial activity.[2–4] It is also widely used in cosmetic formulations such as depilating agents.

Therapeutically, monothioglycerol has been used in a 0.02% w/w aqueous solution to stimulate wound healing, and as a 0.1% w/w jelly in atrophic rhinitis.

## 8  Description

Monothioglycerol occurs as a colorless or pale-yellow colored, viscous, hygroscopic liquid with a slight odor of sulfide.

## 9  Pharmacopeial Specifications

See Table I.

**Table I:** Pharmacopeial specifications for monothioglycerol.

| Test | USP32–NF27 |
| --- | --- |
| Specific gravity | 1.241–1.250 |
| Refractive index | 1.521–1.526 |
| pH (10% aqueous solution) | 3.5–7.0 |
| Water | ⩽ 5.0% |
| Residue on ignition | ⩽ 0.1% |
| Selenium | ⩽ 0.003% |
| Heavy metals | ⩽ 0.002% |
| Assay (anhydrous basis) | 97.0–101.0% |

## 10  Typical Properties

*Acidity/alkalinity*   pH = 3.5–7.0 (10% w/v aqueous solution)
*Boiling point*   118°C
*Flash point*   110°C
*Refractive index*   $n_D^{25}$ = 1.521–1.526
*Solubility*   Miscible with ethanol (95%); freely soluble in water; practically insoluble in ether.
*Specific gravity*   1.241–1.250

## 11  Stability and Storage Conditions

Monothioglycerol is unstable in alkaline solutions. Monothioglycerol should be stored in a well-closed container in a cool, dry place.

## 12  Incompatibilities

Monothioglycerol can react with oxidizing materials.

## 13  Method of Manufacture

Monothioglycerol is prepared by heating an ethanolic solution of 3-chloro-1,2-propanediol with potassium bisulfide.

## 14  Safety

Monothioglycerol is generally regarded as a relatively nontoxic and nonirritant material at the concentrations used as a pharmaceutical excipient. It is used in topical and injectable preparations.

Undiluted monothioglycerol is considered a poison by the IP and IV routes; it has also been reported to be mutagenic.[5]

LD$_{50}$ (cat, IV): 0.22 g/kg[5]
LD$_{50}$ (mouse, IP): 0.34 g/kg
LD$_{50}$ (rabbit, IV): 0.25 g/kg
LD$_{50}$ (rat, IP): 0.39 g/kg

## 15  Handling Precautions

Observe normal precautions appropriate to the circumstances and quantity of material handled. Monothioglycerol is flammable when exposed to heat or flame; when heated to decomposition it emits toxic fumes of $SO_x$.

## 16  Regulatory Status

Included in the FDA Inactive Ingredients Database (IM, IV and other injections). Included in the Canadian List of Acceptable Non-medicinal Ingredients.

## 17  Related Substances

—

## 18  Comments

The EINECS number for monothioglycerol is 202-495-0. The PubChem Compound ID (CID) for monothioglycerol includes 7291 and 447638.

## 19  Specific References

1  Kasraian K *et al.* Developing an injectable formula containing an oxygen sensitive drug: case study of danofloxacin injectable. *Pharm Dev Technol* 1999; 4(4): 475–480.
2  Jensen KK, Javor GT. Inhibition of *Escherichia coli* by thioglycerol. *Antimicrob Agents Chemother* 1981; 19: 556–561.
3  Javor GT. Depression of adenosylmethionine content of *Escherichia coli* by thioglycerol. *Antimicrob Agents Chemother* 1983; 24: 860–867.
4  Javor GT. Inhibition of respiration of *Escherichia coli* by thioglycerol. *Antimicrob Agents Chemother* 1983; 24: 868–870.
5  Lewis RJ, ed. *Sax's Dangerous Properties of Industrial Materials*, 11th edn. New York: Wiley, 2004; 2574.

454

TEVABEND00294209

CONFIDENTIAL

EAGLEBEN-SA_00315525

## 20    General References

Modi S *et al*. Determination of thio-based additives for biopharmaceuticals by pulsed electrochemical detection following HPLC. *J Pharm Biomed Anal* 2005; 37(1): 19–25.

Nealon DA *et al*. Diluent pH and the stability of the thiol group in monothioglycerol, N-acetyl-ʟ-cysteine, and 2-mercaptoethanol. *Clin Chem* 1981; 27(3): 505–506.

Sherman F, Kuselman I. Water determination in drugs containing thiols. *Int J Pharm* 1999; 190(2): 193–196.

## 21    Author

PJ Sheskey.

## 22    Date of Revision

10 January 2009.



# Myristic Acid

## 1    Nonproprietary Names

None adopted.

## 2    Synonyms

*Edenor C14 98-100*; *n*-tetradecanoic acid; 1-tridecanecarboxylic acid.

## 3    Chemical Name and CAS Registry Number

Tetradecanoic acid [544-63-8]

## 4    Empirical Formula and Molecular Weight

$C_{14}H_{28}O_2$    228.37

## 5    Structural Formula



## 6    Functional Category

Emulsifying agent; skin penetrant; tablet and capsule lubricant.

## 7    Applications in Pharmaceutical Formulation or Technology

Myristic acid is used in oral and topical pharmaceutical formulations. Myristic acid has been evaluated as a penetration enhancer in melatonin transdermal patches in rats[1] and bupropion formulations on human cadaver skin.[2] Further studies have assessed the suitability of myristic acid in oxymorphone formulations[3] and clobetasol 17-propionate topical applications.[4] Furthermore, polyvinyl alcohol substituted with myristic acid (as well as other fatty acids) at different substitution degrees has been used for the preparation of biodegradable microspheres containing progesterone or indomethacin.[5]

## 8    Description

Myristic acid occurs as an oily white crystalline solid with a faint odor.

## 9    Pharmacopeial Specifications

*See* Section 18.

## 10    Typical Properties

*Boiling point*    326.2°C

*Flash point*    >110°C

*Melting point*    54.5°C

*Solubility*    Soluble in acetone, benzene, chloroform, ethanol (95%), ether, and aromatic and chlorinated solvents; practically insoluble in water.

*Specific gravity*    0.860–0.870

## 11    Stability and Storage Conditions

The bulk material should be stored in a well-closed container in a cool, dry, place.

## 12    Incompatibilities

Myristic acid is incompatible with strong oxidizing agents and bases.

## 13    Method of Manufacture

Myristic acid occurs naturally in nutmeg butter and in most animal and vegetables fats. Synthetically, it may be prepared by electrolysis of methyl hydrogen adipate and decanoic acid or by Maurer oxidation of myristyl alcohol.

## 14    Safety

Myristic acid is used in oral and topical pharmaceutical formulations and is generally regarded as nontoxic and nonirritant at the levels employed as an excipient. However, myristic acid is reported to be an eye and skin irritant at high levels and is poisonous by intravenous administration. Mutation data have also been reported.[6]

LD$_{50}$ (mouse, IV): 0.043 g/kg[6]

LD$_{50}$ (rat, oral): >10 g/kg

## 15    Handling Precautions

Observe normal precautions appropriate to the circumstances and quantity of the material handled. Acrid smoke and irritating fumes are emitted when myristic acid is heated to decomposition.

## 16    Regulatory Status

GRAS listed. Included in the FDA Inactive Ingredients Database (oral capsules). Included in nonparenteral medicines licensed in the UK.

## 17    Related Substances

Lauric acid; myristyl alcohol; palmitic acid; potassium myristate; sodium myristate; stearic acid.

M

# Exhibit 27
# File Under Seal



## Planet Depos
We Make It *Happen*™

<span style="color:darkred">**HIGHLY CONFIDENTIAL**</span>

# Transcript of Ravindhar Gonti, Corporate Designee & Individually, Volume 2

**Date:** December 5, 2025
**Case:** Eagle Pharmaceuticals, Inc., et al. -v- Apotex/Slayback/Baxter Healthcare

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

**WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY**

109

IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS, INC.,
          Plaintiff,              C.A. No.
V.                                1:24-CV-00064-JLH
APOTEX INC. and APOTEX CORP.,
          Defendants.
_____
EAGLE PHARMACEUTICALS, INC.,
          Plaintiff,              C.A. No.
V.                                1:24-CV-00065-JLH
SLAYBACK PHARMA LLC and
AZURITY PHARMACEUTICALS, INC.,
          Defendants.
_____
EAGLE PHARMACEUTICALS, INC.,
          Plaintiff,              C.A. No.
V.                                1:24-CV-00066-JLH
BAXTER HEALTHCARE CORPORATION,
          Defendant.
_____


          HIGHLY CONFIDENTIAL

          VOLUME 2

VIDEOTAPED VIDEO-TELECONFERENCE DEPOSITION OF

          RAVINDHAR GONTI

In His Individual Capacity and as Corporate

Representative of SLAYBACK PHARMA LLC

          Friday, December 5, 2025

          7:04 a.m. CST

Job No.: 611392

Pages: 109 - 160

Reported Stenographically by:

Cassidy Western, RPR, CRR, CA CSR #14722, WA CCR

110

          Videotaped Deposition of RAVINDHAR GONTI, In
His Individual Capacity and as Corporate Representative
of SLAYBACK PHARMA LLC, Volume II, conducted virtually.













          Pursuant to notice, before Cassidy Western,
Registered Professional Reporter, Certified Realtime
Reporter, California Certified Shorthand
Reporter #14722.

111

          A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS, EAGLE

PHARMACEUTICALS, INC. AND EAGLE SUB1 LLC:

          MICHELLE CHIN, ESQUIRE

          LATHAM & WATKINS LLP

          330 North Wabash Avenue, Suite 2800

          Chicago, IL 60611

          (312) 876-7700


ON BEHALF OF THE DEFENDANTS, SLAYBACK PHARMA

LLC AND AZURITY PHARMACEUTICALS, INC:

          JASON LIEF, ESQUIRE

          WINDELS, MARX, LANE & MITTENDORF

          156 West 56th Street

          New York, NY 10019

          (212) 237-1061




ALSO PRESENT:

Mike Martinez, Remote Technician

Nia Muhammad, Videographer

112

          C O N T E N T S

EXAMINATION OF RAVINDHAR GONTI              PAGE
          By Ms. Chin                        114
          By Mr. Lief                        157


          E X H I B I T S

GONTI DEPOSITION EXHIBIT                     PAGE

Exhibit 18 FDA Supplement Approval,          123
          NDA 212209/S-004
          [SLAY-VIVMUS0159976-0160003]
          (Highly Confidential)

Exhibit 19 FDA Supplement Approval,          128
          NDA 212209/S-005
          [SLAY-VIVMUS0152747-0152772]
          (Highly Confidential)

Exhibit 20 Slayback Pharma Bendamustine      135
          Hydrochloride Injection 100 mg/4mL
          (25mg/mL) New Drug Application
          2.3 Quality Overall Summary
          [SLAY-VIVMUS0000403-0000430]
          (Highly Confidential Information)

Exhibit 21 2.3.P Drug Product                138
          [SLAY-VIVMUS0000322-0000402]
          (Highly Confidential Information)

Exhibit 22 Vimta Report                      146
          No: CMR/CSP/22/0124/1.0
          [SLAY-VIVMUS0009691-0009735]
          (Highly Confidential Information)

Exhibit 23 Corden Pharma Latina SpA          148
          Analytical Development
          [SLAY-VIVMUS0002776-0002795]
          (Highly Confidential Information)

Exhibit 24 3.2.P.8.3 Stability Data          151
          [SLAY-VIVMUS0053802-0053897]
          (Highly Confidential)

Case 1:24-cv-00065-JLH   Document 512   Filed 08/07/26   Page 279 of 284 PageID #: 30936

HIGHLY CONFIDENTIAL
Transcript of Ravindhar Gonti, Corporate Designee & Individually, Volume 2 (117 to 120)
Conducted on December 5, 2025



**117**

BY MS. CHIN:

Q   Does the label list sodium hydroxide as a component of Slayback's NDA product?

MR. LIEF:  Same objection.

THE WITNESS:  So Michelle, the label indicates the only prescribing information are contained on the carton label as well.

BY MS. CHIN:

Q   So I'm asking, is sodium hydroxide listed as a component of Slayback's NDA product?

A   Yes.

Q   Could you tell me where?

A   So you are -- you are asking whether in the NDA product or in the prescribed -- prescribing information?

Q   In the label.

A   In the label which you are showing, I could not able to see it.  But in the product, we have sodium hydroxide.

Q   Okay.  But in the label, it's not listed as a component?

MR. LIEF:  Objection to the form.

THE WITNESS:  So I could not see it here in the label which you are showing to me.

**118**

BY MS. CHIN:

Q   Okay.  So you don't see it in the label?

A   Yeah.

MR. LIEF:  Objection to the form.

THE WITNESS:  In this document.

BY MS. CHIN:

Q   

Q   

**119**

MR. LIEF:  Objection to the form.

THE WITNESS:  The document you are showing is not having that.  I could not able to see that.

BY MS. CHIN:

Q   Okay.

A   

Q   Okay.  But it does not list -- it does not say that in the label?

MR. LIEF:  Same objection.

THE WITNESS:  I could not exactly recollect, like, how this was.

BY MS. CHIN:

Q   So you've agreed that this is the label, the prescribing information for Slayback's NDA product.  Is that right?

MR. LIEF:  Objection.

THE WITNESS:  Yes, if you have taken it from the dossier, yes.

BY MS. CHIN:

Q   Uh-huh.  So in this -- I'm just asking in this prescribing information in the label, does Slayback list water as a component of the

**120**

Slayback's NDA product?

MR. LIEF:  Same objection.

THE WITNESS:  Could you please little zoom it?

Same, Michelle.  Here it is not -- I could not able to see it here, 

BY MS. CHIN:

Q   Okay.  So it -- but it's not in the label?

MR. LIEF:  Objection --

THE WITNESS:  I could not say --

MR. LIEF:  -- mischaracterizes.

THE WITNESS:  Sorry, Jason.  I interrupt you.

BY MS. CHIN:

Q   You can answer the question, Mr. Gonti.

A   Yeah.  I could not able to see in the document which you are showing.

Q   Which is the label.

A   Yeah, which is the prescribing information.

Q   Okay.  Thank you.

MS. CHIN:  Can we -- we can take that

HIGHLY CONFIDENTIAL

Transcript of Ravindhar Gonti, Corporate Designee & Individually, Volume 2 13 (157 to 160)

Conducted on December 5, 2025

---

**157**

case. We believe we've timely said it. And we've offered witnesses on that.

Those were submissions to the FDA that those submissions would fall within these topics. And as far as I can tell, there wasn't a question on it. And so I note that for the record.

I guess I have one question for Mr. Gonti.

EXAMINATION BY COUNSEL FOR THE DEFENDANTS

BY MR. LIEF:

Q   Yesterday, there was some discussion of the time spent preparing for this deposition. Do you recall that?

A   Yes, Jason.

Q   And I believe, subject to seeing the final transcript, you were asked whether we had met before this business week. Do you recall that?

A   Yes.

Q   Do you recall being asked that -- that kind of question?

A   Yes, Jason.

Q   Okay. And just to clarify, did we meet before this business week? And without discussing what was or wasn't said, but did we meet before

---

**158**

this business week in preparation for this deposition?

A   It's a little tricky, Jason. Could you please break it down? Sorry to...

Q   I believe you testified we met this week, and that's correct. Correct?

A   Yes.

Q   Did we meet before this week?

A   Yes.

Q   Okay. I just wanted to clarify that.

MR. LIEF:  I have nothing else. And we consider the deposition complete.

THE VIDEOGRAPHER:  Okay. This marks the end of the deposition of Ravindhar Gonti, and we're going off the record at 8:51 a.m.

(Off the record at 8:51 a.m.)

---

**159**

ACKNOWLEDGMENT OF DEPONENT

I, RAVINDHAR GONTI, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct, and complete transcription of the testimony given by me, and any corrections appear on the attached Errata sheet signed by me.

_____  _____
  (DATE)                (SIGNATURE)

---

**160**

REPORTER'S CERTIFICATE

I, CASSIDY WESTERN, RPR, CRR, CA CSR, WA CCR, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 12th day of December, 2025.

_____
Cassidy Western, RPR, CRR, CA CSR, WA CCR

---

# Exhibit 28
# File Under Seal



Highly Confidential Information



Highly Confidential Information

SLAY-VIVMUS0009580

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that true and correct copies of the foregoing documents were caused to be served on June 5, 2026, on the following counsel in the manner indicated:

**VIA EMAIL:**

Daniel A. Taylor
Neal C. Belgam
SMITH KATZENSTEIN & JENKINS LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
Dtaylor@skjlaw.com
Nbelgam@skjlaw.com

Jason A. Lief
Allan H. Pollack
Audrey R. Sparschu
WINDELS MARX LANE & MITTENDORF, LLP
156 West 56th Street
New York, NY 10019
jlief@windelsmarx.com
apollack@windelsmarx.com
asparschu@windelsmarx.com

Andrew Miller
Ajay Kayal
Robyn Ast-Gmoser
Daniel E. Forchheimer
Kiersten A. Fowler
WINDELS MARX LANE & MITTENDORF, LLP
One Giralda Farms
Madison, NJ 07940
amiller@windelsmarx.com
akayal@windelsmarx.com
rast-gmoser@windelsmarx.com
dforchheimer@windelsmarx.com
kfowler@windelsmarx.com

*Attorneys for Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*

/s/ Daniel M. Silver
Daniel M. Silver (#4758)

ME1\61334401.v1