# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>SLAYBACK PHARMA LLC and AZURITY PHARMACEUTICALS, INC,<br><br>　　　　Defendants. | REDACTED PUBLIC VERSION FILED AUGUST 7, 2026<br><br>C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>███████████ |

**DECLARATION OF DANIEL M. SILVER IN SUPPORT OF PLAINTIFFS  EAGLE PHARMACEUTICALS, INC. AND EAGLE SUB1 LLC'S REPLY BRIEF IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES**

I, Daniel M. Silver, declare as follows:

1.      I am an attorney at the law firm of McCarter & English, LLP and counsel for Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC ("Eagle") in the above-captioned case.  I am admitted to practice before the Court.

2.      I make this declaration in support of Eagle's Reply brief in support of Eagle's Motion for Summary Judgement Regarding Damages.

3.      I have personal knowledge of the facts set forth in this declaration, and if called as a witness, could and would competently testify thereto.

4.      Attached as **Exhibit 9** is a true and correct copy of excerpts of the Rebuttal Expert Report of Dr. Michael J. Thirman, dated March 16, 2026.

5.      Attached as **Exhibit 10** is a true and correct copy of excerpts of the deposition transcript of Harish Chinnari, dated February 20, 2026.

6.      Attached as **Exhibit 11** is a true and correct copy of excerpts of the Reply Expert Report of Dr. Christopher Vellturo, dated April 13, 2026.

7.      Attached as **Exhibit 12** is a true and correct copy of excerpts of the Supplemental Opening Expert Report of Khaleel K. Ashraf, M.D., dated March 6, 2026.

I declare under penalty of perjury that the foregoing is true and correct.


Date: July 20, 2026                                     */s/  Daniel M. Silver*_____
                                                         Daniel M. Silver


1

# Exhibit 9
# Filed Under Seal

*HIGHLY CONFIDENTIAL*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC, <br><br> Plaintiffs, <br><br> v. <br><br> SLAYBACK PHARMA LLC AND AZURITY PHARMACEUTICALS, INC. <br><br> Defendants. | C.A. No. 24-65-JLH <br><br><br> *HIGHLY CONFIDENTIAL* |

**REBUTTAL EXPERT REPORT OF DR. MICHAEL J. THIRMAN, M.D.**

*HIGHLY CONFIDENTIAL*

## I.    INTRODUCTION

1.    At the request of counsel for Defendants Slayback Pharma LLC and Azurity Pharmaceuticals Inc. (collectively, "Slayback" or "Defendants"), I hereby submit this Rebuttal Expert Report pursuant to Fed. R. Civ. P. 26(a)(2)(B) in response to the Supplemental Opening Expert Reports of Khaleel K Ashraf, M.D. ("Supp. Ashraf Rep.") and Caroline Attia, PharmD. ("Supp. Attia Rep.") (collectively "Eagle Reports"). I understand that Plaintiffs Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC ("Eagle") accuses Slayback's VIVIMUSTA® product of infringing various claims of U.S. Patent Nos. 11,872,214 (the "'214 patent") and 12,138,248 (the "'248 patent"), and that Slayback denies infringement.

2.    I have been retained by counsel for Slayback to provide expert opinions concerning certain matters in the above-captioned litigation. Specifically, I have been retained to review and respond to the analyses set forth in the Ashraf Report and Attia Report and provide my independent expert opinion concerning the availability and acceptability of non-infringing alternatives during the accused period of infringement.

3.    For the reasons stated herein, it is my opinion that during the accused period of infringement, there were numerous non-infringing alternatives to BELRAPZO® that would have been available and acceptable to oncologists seeking to treat patients.  This includes both bendamustine- and non-bendamustine-containing products and treatment regimens. This report provides the bases for my opinion, information considered by me in forming my opinions, my qualifications, and compensation for my services.

4.    If called to testify at trial, I expect to testify about the following:

-    my professional background, qualifications, and experience;

-    the information I considered in forming my opinions; and

1

*HIGHLY CONFIDENTIAL*

ï    my opinion that there were numerous products and treatment regimens that would have been acceptable alternatives to BELRAPZO® during the relevant period of accused infringement.

5.    I may also testify in rebuttal to any opinions offered by expert(s) testifying on behalf of Eagle at deposition or trial. I reserve the right to amend or supplement my opinion in light of any evidence offered by Eagle, or additional information made available to me in the future. To the extent Eagle and/or their expert(s) provide any additional statements, opinions, or conclusions, including in any future reports, I may offer further opinions.

6.    I also reserve the right to illustrate my opinions using demonstrative exhibits at trial. I have not yet created any exhibits that I expect to use at trial, but they may include diagrams, presentations, videos, animations, still images, or call-outs. I also reserve the right to provide a technology tutorial at trial if called upon to do so. In addition, I may use the cited materials to assist me in preparing demonstratives, such as graphics and animations, for my testimony or in the event that I am asked to provide a technology tutorial

## II.    COMPENSATION AND PRIOR TESTIMONY

7.    I am being compensated for my time at my customary hourly rate of $850.  My compensations is not contingent on the nature of my opinions or the outcome of this litigation.

8.    In the past four years, I have given expert testimony in the following matter: *Takeda Pharmaceuticals America, Inc. et. al. v Apotex Corp*.  C.A. No.: 2:21-cv-12998-KM-AME.

## III.    QUALIFICATIONS

9.    I am an expert in the field of Hematology Oncology, with a particular expertise in leukemia and lymphoma. I am presently employed by the University of Chicago Department of

*HIGHLY CONFIDENTIAL*

Medicine. A copy of my *curriculum vitae*, which further details my experience and qualifications, is attached to this Report as Exhibit A.

10. Briefly, I earned a Bachelor degree (BA) from the University of Michigan in 1979 and a Doctor of Medicine from the University of Michigan Medical School in 1986. I was an Internal Medicine Resident at the University of Minnesota Hospitals from 1986-1989 and I served as a clinical fellow in the University of Chicago Section of Hematology and Oncology from 1990-1991. I obtained initial board certification in Medical Oncology in 1993.

11. I am currently the Director of Leukemia Biology and an Associate Professor in the Section of Hematology and Oncology at the University of Chicago and have held these positions since 2003. I previously served as the Co-Program Director at the University of Chicago Cancer Research Center, focusing on Hematopoiesis and Hematologic Malignancies from 2007 to 2014. From 1996 to 2003, I served as an Assistant Professor in the Section of Hematology and Oncology at the University of Chicago.

12. I served as a Fellow in the laboratory of Dr. Jordan Holtzman M.D., Ph.D. department of Clinical Pharmacology at the Minneapolis VA Medical Center from 1989-1990. I served as a Fellow in the laboratory of Manuel O. Diaz M.D. and Janet Rowley M.D. at the University of Chicago Section of Hematology and Oncology from 1991-1994. I served as a Research Associate in the Laboratory of M. Celeste Simon Ph.D. at the University of Chicago Section of Hematology and Oncology from 1994-1996.

13. I have significant experience with treating hematologic cancers, including leukemia and lymphoma. I regularly see patients in both the hospital and clinic setting. I have taught and mentored countless Ph.D. graduate students, medical students, and residents since 1996. I have mentored 8 research trainees in my laboratory, which focuses on the development of mouse models

3

*HIGHLY CONFIDENTIAL*

of leukemia and the characterization of the MLL and ELL genes in leukemogenesis. I have over 85 publications including multiple book chapters on myeloid proliferative disorders and leukemia. I have given over 30 presentations related to my research at conferences across the country. I served on the editorial boards of the "Journal of Cancer Biology and Therapy," the journal of "Leukemia and Lymphoma," and the journal "Blood Advances." I have been a member of multiple committees, including for example, the Leukemia and Lymphoma Society Illinois Chapter Board of Trustees and the Medical Advisory Board of the Leukemia Research Foundation. I currently serve on the University of Chicago Protocol Review and Monitoring Committee. I am a member of the CLL Committee for the Alliance for Clinical Trials in Oncology (a national cooperative group).

14.     Over the past 10 years, I have served as the University of Chicago site Principal Investigator for approximately 15-20 industry sponsored clinical trials and for 3 National Cancer Instituted sponsored cooperative groups (Alliance and ECOG) trials that have studied multiple drugs for chemotherapy of leukemia and lymphoma. I am also the Principal Investigator and national director for a 3 center investigator-initiated trial for chronic lymphocytic leukemia (CLL) and Non-Hodgkin's Lymphoma (NHL).

15.     I served as the University of Chicago site Principal Investigator for two clinical trials involving bendamustine.

16.     I have received several honors in my career, including being named as Chicago Magazines' Top Doctor from 2021-2026 and a Stohlman Scholar for the Leukemia and Lymphoma Society. I was honored with the American Medical Associations Florence A. Carter Fellowship in Leukemia Research in addition to the Leukemia Research Foundations New Investigator Award in 1997. I was awarded the American Society of Hematology's Junior Faculty Award from 1998-

*HIGHLY CONFIDENTIAL*

2000, Cancer Research Foundation Associates Board Young Investigator Award in 1995, the American Society of Clinical Oncology Young Investigator Award in 1993, and the Howard Hughes Postdoctoral Research Fellowship for Physicians from 1993-1996.

## IV.    MATERIALS CONSIDERED

17.    In preparing this report, I reviewed and considered the materials cited throughout this report, as well as those set forth in Exhibit B. [1]  I have also reviewed the Ashraf Report and Attia Report in their entirety, including the exhibits cited therein. I have also reviewed the Rebuttal Expert Report of Dr. Michael L. Brandt, PharmD, FASHP ("Brandt Rep.") on behalf of Slayback and Azurity.  Throughout this report, I cite to portions of certain documents. These citations are intended only as examples, and I reserve the right to rely on portions of these documents in addition to those cited in this report. I have also relied on my extensive knowledge, education, training, and work experience, as reflected and set forth above and in my curriculum vitae.

## V.    RELEVANT LEGAL STANDARDS

18.    As I am not a lawyer, before formulating my opinions, I was provided an explanation of general principles of U.S. patent law by counsel. The discussion of legal principles set forth below is intended to inform and provide context for my opinions and is not intended to be exhaustive.

19.    I have been informed that, under U.S. patent law, a patentee seeking monetary relief for infringement may recover damages adequate to compensate for the infringement, but in no event less than a reasonable royalty. I understand that the governing statute, 35 U.S.C. § 284, provides the overarching framework for patent damages, and that courts generally recognize two

---

[1] I have reviewed some of the materials listed in Dr. Ashraf and Dr. Attia's materials reviewed. However, due to significant ongoing technical issues with Eagle's document production, I have been unable to review certain listed references. At present, I do not have any reason to believe those materials would change my opinions.

5

*HIGHLY CONFIDENTIAL*

principal categories of recovery: lost profits and reasonable royalty damages. Lost profits are intended to place the patentee in the financial position it would have occupied absent the infringement, while a reasonable royalty reflects the amount that would have resulted from a hypothetical negotiation between a willing licensor and willing licensee at the time infringement began.

20. I have been informed that, to show entitlement to lost profits, a patentee must show infringement and must additionally demonstrate a causal nexus between the infringement and the profits allegedly lost. Courts commonly evaluate this issue using the framework set forth in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, which identifies four factors: (1) demand for the patented product, (2) the absence of acceptable non-infringing alternatives, (3) the patentee's manufacturing and marketing capability to meet demand, and (4) the amount of profit the patentee would have made. In my understanding, these factors are not rigid elements but provide a structured way to assess whether the patentee would have captured the sales made by the accused infringer.

21. I have been informed that the availability of acceptable non-infringing alternatives is a central consideration in the lost-profits analysis. If acceptable alternatives were "available" to customers during the relevant period, courts may conclude that some or all sales would have been diverted to those alternatives rather than to the patentee, thereby reducing or eliminating lost-profits recovery. An alternative is generally considered "acceptable" if it is "available" and does not infringe the asserted patent. In assessing whether an alternative would be considered an acceptable substitute, generally, an inquiry is made into how the alternative would have been viewed by customers, because customer demand defines the relevant market as well as the relative substitutability of the products therein. Some factors that may give insight into the acceptability of

a substitute, includes, but is not limited to, performance of the product, price, regulatory status, and other market-relevant attributes. Whether an alternative would be considered available, the alternative need not be actually produced or sold during the alleged period of infringement. Thus, while market sales provide significant evidence of availability of a substitute, a substitute not actually "on sale" may nonetheless be considered available and thus part of the economic calculation of lost profits. There is no rigid test for determining availability, but some considerations include, but are not limited to, whether a non-infringing alternative existed or could have been made available using routine efforts, including consideration of regulatory readiness, technical feasibility, manufacturability and scalability, timing of development or launch, economic viability, and the extent to which the alternative could have meaningfully constrained demand or influenced purchasing decisions during the relevant period.. Thus, the timing and feasibility of non-infringing alternatives are relevant, and courts examine whether the alternative was actually on the market, imminently available, or could have been implemented using routine or predictable modifications.

22.    I have also been informed that the presence and characteristics of non-infringing alternatives play a distinct but related role in the reasonable-royalty analysis. In the hypothetical negotiation framework, the availability of viable alternatives affects the bargaining positions of the parties. For example, where a viable alternative exists, the accused infringer's willingness to pay may be reduced because it could have adopted that alternative instead of taking a license. Similarly, when multiple alternatives exist, it may decrease the value of the patent product, which would also reduce the amount an accused infringer would be willing to pay. Conversely, where such alternatives are limited or non-existent, the patentee's bargaining position may be strengthened, potentially increasing the royalty rate. Due to the distinct role alternatives play in a

hypothetical negotiation, the consideration of such alternatives for reasonable royalty rate analyses looks to the best imperfect substitutes, which need not be identical in performance and can even be considered inferior to the patented product. Such limitations in an alternative used in this context do not render the alternative unacceptable, as the alternative may nonetheless still put the accused infringer in a stronger position to negotiate. In the same vein, the availability of viable alternatives for the hypothetical negotiation framework has less stringent standards. This is because the royalty negotiation is purely hypothetical, which renders a degree of speculation permissible when considering whether an alternative could have been designed or manufactured, even if the substitute had not yet begun being designed or manufactured. After all, an accused infringer's willingness to pay for a license would certainly be affected if a viable alternative was "in the wings."

23.    Finally, I understand that courts consider non-infringing alternatives within the broader context of the *Georgia-Pacific* factors, including factors addressing competitive relationships, the advantages of the patented technology over available substitutes, and the economic value attributable to the patented features. In my understanding, the analysis focuses on real-world market conditions at the time of the hypothetical negotiation, including the technical, commercial, and regulatory feasibility of alternatives. Accordingly, I have been informed that a rigorous assessment of non-infringing alternatives is often central to both lost-profits and reasonable-royalty determinations, as it informs causation, apportionment, and the economic value of the patented invention.

## VI.    SUMMARY OF OPINIONS

24.    I have been retained by Defendants as a technical and medical expert in this matter to provide opinions regarding the use of bendamustine intravenous formulations, including

*HIGHLY CONFIDENTIAL*

Date: March 16, 2026

Michael J. Thirman, M.D.

Dr. Michael J. Thirman

# Exhibit 10
# Filed Under Seal



**Planet Depos**

We Make It *Happen*™

## HIGHLY CONFIDENTIAL

# Transcript of Harish Chinnari, Corporate Designee & Individually

**Date:** February 20, 2026

**Case:** Eagle Pharmaceuticals, Inc., et al. -v- Apotex/Slayback/Baxter Healthcare

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - x

EAGLE PHARMACEUTICALS, INC.    :

and EAGLE SUB1 LLC,            :

     Plaintiffs,           :

  v.                      : Civil Action No.

SLAYBACK PHARMA LLC and        : C.A. No. 24-65-JLH

AZURITY PHARMACEUTICALS, INC., :

     Defendants.           :

- - - - - - - - - - - - - - - - - x

HIGHLY CONFIDENTIAL

Deposition of Slayback Pharma LLC and Azurity

Pharmaceuticals, Inc.

By and through its Designated Representative

HARISH CHINNARI

And in his Individual Capacity

Conducted virtually

Friday, February 20, 2026

8:04 a.m. India Standard Time (UTC+5:30)

Job No.:  620986
Pages:  1 - 122
Reported By:  M. Allred, RPR

## Page 2

Deposition of HARISH CHINNARI, conducted virtually by videoconference.  All parties attended remotely.

Pursuant to notice, before M. Allred, Registered Professional Reporter.

## Page 3

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS EAGLE PHARMACEUTICALS, INC. AND EAGLE SUB1 LLC:

    BRETT M. SANDFORD, ESQUIRE

    HANNA BONDAROWICZ, ESQUIRE  (Chicago)

    LATHAM & WATKINS LLP

    505 Montgomery Street, Suite 2000

    San Francisco, CA 94111

    Phone:  +1-415-391-0600

ON BEHALF OF THE DEFENDANTS SLAYBACK PHARMA LLC AND AZURITY PHARMACEUTICALS, INC.:

    JASON A. LIEF, ESQUIRE

    WINDELS MARX LANE & MITTENDORF LLP

    156 West 56th Street

    New York, NY 10019

    Phone:  +1-212-237-1061

ALSO PRESENT:

    TREVOR PRICE, CLVS, Videographer

    SCOTT YUKEN, Technician

## Page 4

C O N T E N T S

EXAMINATION OF HARISH CHINNARI          PAGE

  By Mr. Sandford                         6

E X H I B I T S

(Attached to the transcript.)

CHINNARI DEPOSITION EXHIBIT              PAGE

Exhibit 1    Plaintiffs' Notice of         13
      Deposition of Harish Chinnari

Exhibit 2    SLAY-VIVMUS0013091            22

Exhibit 3    Defendants Slayback Pharma LLC  45
      and Azurity Pharmaceuticals
      Inc. Amended Response to
      Plaintiffs  Fifth Set of
      Individual Interrogatories
      (Nos. 10-12)

Exhibit 4    SLAY-VIVMUS0013082            62

Exhibit 5    SLAY-VIVMUS0123911            69

Exhibit 6    SLAY-VIVMUS0125205            70

Exhibit 7    SLAY-VIVMUS0152647            86

Exhibit 8    SLAY-VIVMUS0161184            93

Exhibit 9    SLAY-VIVMUS0153734           103

Exhibit 10   SLAY-VIVMUS0141789           118

Exhibit 11   SLAY-VIVMUS0126514           118

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Corporate Designee & Individually   2 (5 to 8)
Conducted on February 20, 2026

---

5

P R O C E E D I N G S

THE VIDEOGRAPHER: Here begins Media Unit Number 1 in the videotaped deposition of Harish Chinnari in the matter of Eagle Pharmaceuticals, Inc., versus Slayback Pharma LLC, et al., in the United States District Court for the District of Delaware, Case Number 24-65-JLH.

Today's date is February 20, 2026. The time on the video monitor is 8:04.

The remote videographer today is Trevor Price representing Planet Depos.

All parties of this video deposition are attending remotely.

Would counsel please voice identify themselves and state whom they represent.

MR. SANDFORD: My name is Brett Sandford from the law firm of Latham & Watkins on behalf of the plaintiffs.

And with me today is my colleague Hanna Bondarowicz.

MR. LIEF: And my name is Jason Lief, and I'm from the firm of Windels Marx, and I represent the defendants Azurity and Slayback and the witness. And that's it.

THE VIDEOGRAPHER: The court reporter today

---

6

is Mary Allred representing Planet Depos.

The court reporter will now read stipulations, if any, and swear in the witness.

THE COURT REPORTER: Yes. One moment. Before I swear in the witness, I will do the stipulation about the remote oath.

Will counsel please stipulate that in lieu of formally swearing in the witness, the reporter will instead ask the witness to acknowledge that their testimony will be true under the penalties of perjury, that counsel will not object to the admissibility of the transcript based on proceeding in this way, and that the witness's identity has been verified.

Is that agreed by counsel?

MR. SANDFORD: Agreed.

MR. LIEF: That's fine.

THE COURT REPORTER: Thank you.

HARISH CHINNARI, having been first duly sworn by the court reporter by stipulation of the parties, was examined and testified as follows:

E X A M I N A T I O N
BY MR. SANDFORD:

Q Thank you. Good evening, my time,

---

7

Dr. Chinnari. I understand it's morning your time in India; is that right?

A Yes. That's true.

Q Okay. So as I mentioned before we got on the record, I'm going to ask you some questions here today. And I'll start with this question.

What is your name?

A My name is Harish G. Chinnari.

Q What is your home address, sir?

A My home address is Flat Number 908, Swan Lake Apartments, Kukatpally, Hyderabad, India.

Q And can you just spell the city just for the record?

A Hyderabad, H-Y-D-E-R-A-B-A-D.

Q Thank you.

What is your business address?

A Business address is the building number, Maximus 2B, Azurity Pharmaceuticals, 9th Floor, Mindspace, Hyderabad.

Q Where do you work?

A I work with Azurity Pharmaceuticals.

Q And what is your current job at Azurity?

A I am working in the capacity of senior director in research and development.

Q Is your current job as senior director in

---

8

research and development specific to a certain set of products or product line or does it encompass all of Azurity's products?

A It is a set --

MR. LIEF: Object to form.

MR. SANDFORD: I'm sorry, sir.

A It is a set of products.

Q It is a subset of products; is that your answer?

A Yes.

Q What subset of products is your current role of senior director of research and development directed to?

A There are multiple products that include bendamustine.

Q Can you give me some examples of those products, please?

MR. LIEF: I guess I'll caution the witness, to the extent there's something confidential and non-bendamustine related, that you're uncomfortable revealing, I'm not sure that it's needed. But...

A So I do handle injectable products, that is, sterile dosage forms and as well as the oral liquid dosage forms.

Q Now, what is the relationship between

---



65

A Yes.

Q And "RLD" is "Reference Listed Drug"; right?

A Right.

Q And the Reference Listed Drug for both PE-1 and ▮▮▮▮ is Eagle's Belrapzo product; correct?

A Correct.

Q ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

MR. LIEF: And I'll caution you, to the extent you have an answer for that and that answer is derived from statements from lawyers, you should not disclose that.

To the extent you have an understanding outside of anything any lawyer said to you, you can answer.

A ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Q ▮▮▮▮▮▮▮▮▮▮▮

66

right?

MR. LIEF: Yeah. Same caution.

A ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

MR. LIEF: Again, I will caution you, to the extent you have an understanding of that independent of anything lawyers have said to you, you can answer.

If it's from lawyers, you shouldn't answer.

A ▮▮▮▮▮▮▮▮▮▮▮▮

67

MR. LIEF: Same caution.

A ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Q Understood. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

MR. LIEF: Same caution.

A To my knowledge, yes.

Q ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

MR. LIEF: Objection to the form.

You can answer if you have a date in mind.

A ▮▮▮▮▮▮▮▮▮▮▮▮▮.

Q ▮▮▮▮▮▮▮▮▮▮

68

MR. LIEF: Objection to the form.

Q ▮▮▮▮▮▮▮.

MR. LIEF: Same objection.

A Yes.

Q ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮t?

MR. LIEF: Objection to the form.

A ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Corporate Designee & Individually   18 (69 to 72)
Conducted on February 20, 2026



**Page 69**

Q Okay. [redacted]

Q [redacted] -- let me ask -- withdrawn. [redacted]

Q Do you remember the month?

A No.

MR. SANDFORD: Let's bring up Tab 13 and 14 and drop both in the chat, please.

THE WITNESS: Can we take a break.

THE TECHNICIAN: Please stand by.

MR. SANDFORD: A break? Sure. Let's go off the record.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: Stand by. We are off the record. The time is 10:03.

(Chinnari Deposition Exhibit 5 marked for identification and attached to the transcript.)

**Page 70**

(Chinnari Deposition Exhibit 6 marked for identification and attached to the transcript.)

(Recess from 10:04 a.m. until 10:09 a.m.)

THE VIDEOGRAPHER: We are on the record. The time is 10:09.

BY MR. SANDFORD:

Q [redacted]

Q [redacted]

**Page 71**

Q [redacted]

MR. LIEF: Objection to the form.

A [redacted]

MR. LIEF: Objection to the form. Asked and answered.

A [redacted]

MR. LIEF: Objection. Mischaracterizes.

**Page 72**

A [redacted]

MR. LIEF: Objection to form. Asked and answered.

A [redacted]

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Corporate Designee & Individually   19 (73 to 76)
Conducted on February 20, 2026



**73**

Q

-- I'm sorry.  Withdrawn.

Q  Sure.

A

**74**

MR. LIEF:  Objection.  Scope.  And form.

**75**

Q  And you would agree that at least as -- well, withdrawn.

MR. LIEF:  Now, I'm going to direct him not to answer that.  It's beyond the scope of what this deposition is about, PE-1.  And, again, we're beyond fact discovery.  We've agreed to a limited deposition.

But we're not going to go back and ask questions that could have been asked of Josh Mathew and probably were before fact discovery ended on PE-1.  That's not happening.

Q  Are you going to follow your counsel's instruction and not answer my question, Dr. Chinnari?

A Yes.

MR. SANDFORD:  And so just for the record, I'll disagree.  The performance, whether it's financial or technical, of how a product that's accused of infringing the two asserted patents here compares to the product that Slayback has put at

**76**

issue as an alternative is the definition of the acceptability test, and that includes both financial and technical reasons of that comparison.

So I'll disagree, but I understand that the witness is following the instruction not to answer, and so I'll proceed to the next question but reserve all rights.

BY MR. SANDFORD:

MR. LIEF:  Objection to the form.  Asked and answered.



Page 77

Is that your testimony?

Q  I appreciate that.

MR. LIEF:  Objection.  Form.

MR. LIEF:  Objection.  Form.

MR. LIEF:  Objection.  Form.

MR. LIEF:  Objection.  Form.  Incomplete.

Page 78

MR. LIEF:  Objection.  Form.  Asked and answered.

MR. LIEF:  Objection.  Form.  And mischaracterizes.

-- well, withdrawn.

MR. LIEF:  Objection.  Asked and answered.

Page 79

MR. LIEF:  Same objections.

MR. LIEF:  Can I hear that back?
MR. SANDFORD:  Sure.
Q  Slayback -- well, withdrawn.

Page 80

Q  When you say "yes," do you mean "correct," or, "Yes," you have --
A  Correct.  Correct.
Q  So let's just -- let me just re-ask just so we have a clear record.

# Exhibit 11
# Filed Under Seal

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1, LLC., <br><br> PLAINTIFFS, <br><br><br> V. <br><br><br><br> SLAYBACK PHARMA LLC AND AZURITY PHARMACEUTICALS, INC., <br><br> DEFENDANTS. | C.A. NO. 24-65-JLH <br><br> (CONSOLIDATED) <br><br> HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY |

# REPLY EXPERT REPORT OF CHRISTOPHER A. VELLTURO, PH.D.

would be willing to pay for a non-exclusive license to the Asserted Patents.[144]  I disagree with Mr. Malackowski for several reasons.

89.    First, Mr. Malackowski has not established that either Slayback or Eagle would have viewed ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████████.  As I discussed in detail in my opening report I understand that ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████[145]  Mr. Malackowski has not established that at the hypothetical negotiation, either Slayback or Eagle would ████████████████████████████████████████████████, and as I discussed above, Mr. Malackowski has failed to consider ████████████████████████ ████████████████████████████████████████.

90.    Second, the parties to the hypothetical negotiation would not consider ██████████ ███████████████, because I understand from Drs. Ashraf and Attia that it is not an acceptable substitute for using the inventions claimed in the Asserted Patents.[146]  None of Mr. Malackowski's opinions establish that this alternative is an acceptable substitute.

91.    Mr. Malackowski does not expressly address the acceptability of this alternative (or lack thereof). However, he opines that █████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ █████████[147]  Mr. Malackowski attempts to dismiss ██████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████████████████████████████████[148]  I understand that Mr. Malackowski's understanding is incorrect.  As I explain in my Opening Report, I understand that there are significant advantages associated with the stability and shelf life achieved by using the inventions

---

[144] Malackowski Report, § 10.1.
[145] Vellturo Opening Report, ¶ 128.  ███████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████████ ███████████████████████████████.  *See, e.g.,* Chinnari February 20, 2026 Deposition, p. 21, Exhibit 2 and Vellturo Opening Report, ¶ 128.
[146] *See, e.g.,* Ashraf Reply Report, ¶ 5.
[147] Malackowski Report, § 10.1.
[148] Malackowski Report, § 10.1.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

of the Asserted Patents.  In particular, I understand from Dr. Trout that the Asserted Patents offer a commercially viable, refrigerator-stable, ready-to-dilute product that does not require complicated reconstitution procedures before use.[149]  I further understand from Dr. Trout and Dr. Attia that the Asserted Patents also provide improved stability of bendamustine, allowing for liquid bendamustine products to have a longer shelf life.[150]  I understand that these benefits enabled by practicing the Asserted Patents make liquid bendamustine products preferred over powder bendamustine products.[151]  Indeed, both Eagle and Slayback promote the shelf life as a benefit of their practicing liquid bendamustine products.[152]

92.    Slayback's internal emails and documents confirm



[157]

93.    Indeed, because ███████████████████████████████████████ ████████████████████████████ to using the inventions in the Asserted Patents.  As I explained in my Opening Report, ███████████████████████████████████████

---

[149] Trout Conversation; Vellturo Opening Report, ¶ 241.

[150] Trout Conversation; Attia Conversation; Vellturo Opening Report, ¶ 241.

[151] Vellturo Opening Report, ¶ 241.

[152] See, e.g., SLAY-VIVMUS0071737 at 737; SLAY-VIVMUS0083044 at 047; SLAY-VIVMUS0009765 at 767; SLAY-VIVMUS0010348 at 348; SLAY-VIVMUS0010348 at 352.

[153] Chinnari February 20, 2026 Deposition, Exhibit 8, p. 1.

[154] Chinnari February 20, 2026 Deposition, Exhibit 9, p. 1.

[155] Chinnari February 20, 2026 Deposition, pp. 17-18.

[156] Chinnari February 20, 2026 Deposition, pp. 60-61.

[157] Chinnari February 20, 2026 Deposition, pp. 72-73.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

████████████████████████████████████████████████.[158] Mr. Malackowski does not argue otherwise; instead, he simply ignores these facts and assumes acceptability.

94.    Moreover, even if ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████[159] Mr. Malackowski does not account for this.

95.    The parties to the hypothetical negotiation would also consider ████████████████████

████████████████████████████████ which Mr. Malackowski does not account for.  Further, I understand that Slayback ████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ ██ █████████████████

████████████████████████████████████████████

█████████████████████████████████████████ ██ ██

██████████████████████████████."[162]

---

[158] Vellturo Opening Report, ¶ 128.  Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Third Set of Requests for Admission (Nos. 11-14), January 29, 2026, pp. 5-6.

[159] Vellturo Opening Report, Exhibits 8, 21.

[160] Chinnari February 20, 2026 Deposition, pp. 115-116.

[161] Chinnari February 20, 2026 Deposition, pp. 116-117.

[162] Chinnari February 20, 2026 Deposition, p. 117.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

April 13, 2026

Christopher A. Vellturo, Ph.D.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

# Exhibit 12
# Filed Under Seal

HIGHLY CONFIDENTIAL

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>SLAYBACK PHARMA LLC and AZURITY PHARMACEUTICALS, INC.,<br><br>　　　　　Defendants. | C.A. No. 24-65-JLH<br><br>**HIGHLY CONFIDENTIAL** |

**SUPPLEMENTAL OPENING EXPERT REPORT OF KHALEEL K. ASHRAF, M.D.**

**HIGHLY CONFIDENTIAL**

**B.** ███████████████████████████████████████████████

██ ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████. Defs. Fifth Supp. Resp. to Pls. Common Interr. No. 7 at 36-37. Based on my analysis and conversation with Mr. Vellturo, it is my opinion that ████████████████ would not be an acceptable or available alternative to Belrapzo®.

55. Regarding availability, it is my opinion that ████████████████████████ ██████████████████████████████ which I understand from counsel begins from when the '214 patent issued in January 2024. Chinnari February 20, 2026 Dep. Tr. at 60:4-8. As an initial matter, as noted in the legal standards section of my report, I understand from counsel that, while a non-infringing alternative need not be on the market during the infringement period to factor into a lost profits analysis, where an alternative was not on the market during the relevant time period, the accused infringer (here, Slayback) has the burden to overcome this inference by showing the alternative would be "available."

56. Here, I am not aware of any evidence █████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

*See* Defs. Resp. to Pls. Individual Interr. No. 10 (providing that t█████████████████████ ████████████████████████████████████████████████████████████████████);

Chinnari February 20, 2026 Dep. Tr. at 23:6-9. █████████████████████████

████████████████████████████████████████████████████████████████████

17

**HIGHLY CONFIDENTIAL**

January 15, 2026.  Defs. Resp. to Pls. RFA No. 14; Chinnari February 20, 2026 Dep. Tr. at 61:11-15.  Consistent with Slayback's admission, ██████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████.

Defs. Resp. to Pls. RFA No. 11.

57.    Further, ████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████.  SLAY-VIVMUS0153734

at -734 (July 2, 2024 email from Ravindhar Gonti) ("████████████████

██████████████████████████████████████████████████

████████████████████); Chinnari February 20, 2026 Dep. Tr. at 70:7-71:15.

58.    As noted above, I understand from counsel that, because ████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████.  Based on my review of Slayback's response to Common Interrogatory

No. 7 and the information presently available to me, I have not seen any evidence to support a

finding that ████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████  *See* Defs. Resp. to Pls. Individual Interr. No. 10.  ████

██████████████████████████████████████████████████

18

**HIGHLY CONFIDENTIAL**

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████ To the extent that Slayback's experts offer any opinions on how this alleged alternative would be "available," I reserve the right to respond to address those opinions.

59.     Regarding acceptability, even ███████████████████████ were found to be available, it is my opinion that ███████████████ would not be an "acceptable" alternative to Belrapzo®. Again, ████████████████████████████████████████████████ ████████████████████████████████████. Defs. Resp. to Pls. RFA No. 14.  Moreover, I have seen information or evidence showing █████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████ SLAY-VIVMUS0152647 (February 20, 2024 email from Sumitra Pillai) (emphasis added).   Further, Slayback's employee, Ravindhar Gonti, acknowledged that ████████████

████████████████████████████████████████████████████████████"

SLAY-VIVMUS0161184 at -184 (email from Ravindhar Gonti dated April 22, 2024) (emphasis added); Chinnari February 20, 2026 Dep. Tr. at 107:7-24, 111:6-112:3.

60.     █████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

19

**HIGHLY CONFIDENTIAL**



76.    Further, ███████████████████████████████████████████████████████

██████████████████████████████████████████████████ a physician would not

consider liquid bendamustine, such as Belrapzo®, if they intend to use to one of the non-

**HIGHLY CONFIDENTIAL**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████.

77.    From a treating physician's perspective, the non-bendamustine drugs identified by Slayback are not interchangeable with or substitutes to with Belrapzo® as they have significantly different characteristics.  As background, physicians have developed successive lines of therapy, or treatments, for given cancers. For example, CLL and NHLs have recommended initial, or first-line, treatments and then second- and third-line treatments in the event the cancer relapses—i.e., when the cancer returns after improvement or remission—or in the event the cancer becomes refractory—i.e., when the cancer did not respond to treatment initially or stopped responding during treatment.  The characteristics of drugs guide physicians in what recommendations as to what line of treatment a drug should be included.  Thus, the differences in characteristics between drugs are reflected in the NCCN Guidelines.  Because of the significant differences in characteristics are reflected in the NCCN Guidelines, it is my opinion that if one of the drugs identified by Slayback falls within a different line of treatment as Belrapzo®, that drug would not be an acceptable alternative to Belrapzo®.

78.    Below, I summarized where the NCCN guidelines recommend using bendamustine in the treatment of CLL, FL, MZL, and WM:

28

**HIGHLY CONFIDENTIAL**

| Drug Name | Cancer Type(s) | Line(s) of Therapy | Footnotes/Special Considerations |
|---|---|---|---|
| **Bendamustine** | CLL | First-line: Useful in certain circumstances - with rituximab<br><br>Relapsed or refractory CLL after cBTKi and BCL2i therapy: With rituximab | Consider only when cBTKi and BCL2i are not available or not feasible; not recommended for del(17p)/TP53 mutation; dose adjustment: 70 mg/m² in cycle 1 with escalation to 90 mg/m² if tolerated for patients ≥65 y or <65 y with significant comorbidities; not recommended for frail patients |
| | FL | First-line: Useful for high tumor burden: Preferred with obinutuzumab or rituximab;<br><br>Second-line: Preferred with obinutuzumab or rituximab (not recommended if treated with prior bendamustine) | |
| | MZL | First-line: With rituximab;<br><br>Second-line: Preferred with rituximab; Other recommended with obinutuzumab (not recommended if treated with prior bendamustine) | BRISMA/IELSG36 study: favorable outcomes in symptomatic splenic MZL. GADOLIN study: bendamustine + obinutuzumab followed by obinutuzumab maintenance significantly prolonged PFS vs. bendamustine monotherapy (26 vs. 14 months) in rituximab-refractory indolent lymphoma |
| | WM | Primary therapy: Preferred with rituximab; Previously treated: Preferred with rituximab | FILO study: 5-year PFS 66%, OS 80% with BR. Relapsed/refractory: ORR 80-83%; effective and durable responses |

As shown above, bendamustine is a first-line treatment for FL, MZL, and WM when used in combination with rituximab and can be a second-line treatment for FL and MZL when used in combination with rituximab.  For CLL, bendamustine is only used as a first-line treatment in

29

**HIGHLY CONFIDENTIAL**

certain circumstances.  For example, bendamustine is recommended only when Bruton tyrosine kinase inhibitors (BTKi) and B-cell lymphoma 2 inhibitors (BCL2i) are not available or feasible. Bendamustine is also not recommended for patients with a specific genetic mutation (del(17p)/TP53 mutation) or for frail patients.  Bendamustine is also recommended as a line of therapy to treat relapsed or refractory CLL after a prior BTKi-based and BCL2i therapy.  Overall, Belrapzo® is still widely employed even after introduction of more targeted therapies.  For example, real-life studies have shown that "responses, as well as survival, are relevant even in advanced age patients, with a relatively low incidence of acute toxicity, compared with either alkylating agents or fludarabine."  EAGLEBEN-SA_00363966 at -80 (Dogilotti 2021).

79.    In sum, it is my opinion that the non-bendamustine drugs identified by Slayback in the table above are not acceptable alternatives to Belrapzo®.  I provide further detail supporting my opinion in the paragraphs below.

### 1.    BTKi Drugs (Calquence®, Imbruvica®, Jaypirca®, and Brukinsa®)

80.    In its response to Common Interrogatory No. 7, Slayback identified four drugs that are called "BTKi," which include Calquence® (acalabrutinib maleate monohydrate), Imbruvica® (ibrutinib), Jaypirca® (pirtobrutinib), and Brukinsa® (zanubrutinib).  Defs. Fifth Supp. Resp. to Pls. Common Interr. No. 7 at 9, 13-14.  None of these drugs contain bendamustine.  For CLL, Calquence®, Imbruvica®, and Brukinsa® are considered preferred first-line treatments under the NCCN guidelines; Jaypirca® is considered a second-line or subsequent therapy because it is a non-covalent BTKi.  EAGLEBEN-SA_00361180 at -209 (CLL/SLL NCCN Guidelines).  In contrast, bendamustine is a first-line therapy in only certain circumstances or as a subsequent therapy in the event a cBTKi-containing therapy fails; it is not recommended for use with frail patients or those with a specific genetic mutation (del(17p)/TP53 mutation).  *Id.*  Likewise, for MZL, the BTKi drugs and bendamustine are used in different lines of therapy.  EAGLEBEN-

30

**HIGHLY CONFIDENTIAL**

March 6, 2026

_____
Date

_____
Khaleel Ashraf

48

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that true and correct copies of the foregoing documents were caused to be served on July 20, 2026, on the following counsel in the manner indicated:

**VIA EMAIL:**

Daniel A. Taylor
Neal C. Belgam
SMITH KATZENSTEIN & JENKINS LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
Dtaylor@skjlaw.com
Nbelgam@skjlaw.com

Jason A. Lief
Allan H. Pollack
Audrey R. Sparschu
WINDELS MARX LANE & MITTENDORF, LLP
156 West 56th Street
New York, NY 10019
jlief@windelsmarx.com
apollack@windelsmarx.com
asparschu@windelsmarx.com

Andrew Miller
Ajay Kayal
Robyn Ast-Gmoser
Daniel E. Forchheimer
Kiersten A. Fowler
WINDELS MARX LANE & MITTENDORF, LLP
One Giralda Farms
Madison, NJ 07940
amiller@windelsmarx.com
akayal@windelsmarx.com
rast-gmoser@windelsmarx.com
dforchheimer@windelsmarx.com
kfowler@windelsmarx.com

*Attorneys for Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*

*/s/ Alexandra M. Joyce*
Alexandra M. Joyce (#6423)

ME1\61695075.v1