# EXHIBIT 1

**Redacted Public Version**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC,<br><br>Plaintiffs,<br><br>v.<br><br>SLAYBACK PHARMA LLC and AZURITY PHARMACEUTICALS, INC.,<br><br>Defendants. | C.A. No. 24-65-JLH |

## EXPERT REPORT OF DR. BRIAN C. SMITH
## REGARDING THE TESTING OF DR. KITTENDORF

## HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

Kittendorf
Exhibit No. 16
Date: 4/28/26 DT

## TABLE OF CONTENTS

**Page**

I.     DR. BRIAN C. SMITH'S BACKGROUND ........................................................................ 1

     A.     Education and Professional Background ................................................................. 1

     B.     Litigation Experience ......................................................................................... 5

II.     SCOPE OF WORK AND SUMMARY OF OPINIONS ..................................................... 5

III.     THE ASSERTED PATENTS AND THE CLAIM LIMITATION OF RELEVANCE ...... 6

IV.     BACKGROUND KNOWLEDGE ON ANALYTICAL CHEMISTRY ............................ 7

     A.     Accuracy and Precision ...................................................................................... 8

     B.     Introduction to Chromatography ....................................................................... 10

     C.     Introduction to Spectroscopy ............................................................................ 14

V.     DR. KITTENDORF'S RESULTS REGARDING THE SLAYBACK NDA PRODUCT ARE FLAWED AND UNRELIABLE ......................................................................... 22

     A.     Dr. Kittendorf's HPLC Method for the Analysis of Bendamustine and its Impurities is Not the Same as Slayback's Method ............................................. 22

     B.     Dr. Kittendorf Did Not Properly Validate His HPLC Method So His Data are Unvalidated and Unreliable .............................................................................. 24

     C.     Dr. Kittendorf's "Peak Area Response" Method Is Premised on A False Assumption That the Absorptivities of The Analytes Are the Same, They Are Not and Therefore Dr. Kittendorf's Results Are Not Accurate ................................... 29

     D.     If Anything, Dr. Kittendorf's Testing May Show Non-Infringement – But The Method Is Too Flawed to Come To Any Ultimate Conclusion ........................... 32

VI.     DR. KITTENDORF'S TESTING OF THE BELRAPZO® AND BENDEKA® PRODUCTS IN THE PRIOR *HOSPIRA* LITIGATION ARE ALSO FLAWED AND UNRELIABLE ................................................................................................... 35

VII.     CONCLUSION ......................................................................................................... 37

# I.    DR. BRIAN C. SMITH'S BACKGROUND

## A. Education and Professional Background

1.      My name is Dr. Brian C. Smith. I graduated from Rochester Institute of Technology (RIT) in Rochester NY in 1982 with a Bachelor of Science degree in chemistry with highest honors. I was on the Dean's List every quarter and was awarded the Jones Chemical award for being an outstanding science student.

2.      After graduating from RIT I worked at AT&T Bell Labs from 1982 to 1984 as an analytical chemist. I developed, calibrated, and validated methods in infrared spectroscopy (IR) which is used to identify molecules in unknown samples and in high pressure liquid chromatography (HPLC) which is used to purify, separate, and quantify the amounts of substances in samples.

3.      I graduated from Dartmouth College with a Ph.D. in Chemistry in 1988. My thesis project involved using infrared spectroscopy to measure the high-resolution spectra of gases. My research resulted in two publications in the peer-reviewed Journal of Chemical Physics. I was appointed as a Dartmouth College Presidential Fellow based upon my research.

4.      After my graduation from Dartmouth I worked as an analytical chemist for Waters Associates in Milford MA from 1988-1990. Waters Associates makes chromatography equipment. While at Waters Associates, I developed analytical chemistry methods, including methods in high pressure liquid chromatography (HPLC) using UV-Vis detection, and also infrared spectroscopy (IR) methods where I calibrated and validated said methods in support of the companies' chemical manufacturing processes.

5.      From 1990 to 1992 I was employed as an analytical chemistry applications specialist by the Digilab division of Bio-Rad. In this capacity I calibrated and validated infrared

1

and chromatographic methods for customers, gave customer demonstrations, researched and wrote application notes, supported salespeople, handled customer problems, trained customers in the theory and use of analytical chemistry equipment, and presented research results at scientific meetings.

6.    In 1992 I left Digilab and started my own company, Spectros Associates. I have been employed by Spectros Associates on either a full or part-time basis ever since. In my work at Spectros Associates I developed and taught training courses in analytical chemistry, chromatography, and spectroscopy including the topics of calibration and validation. In that time thousands of scientists from around the world have benefitted from my instruction. Amongst my clients are the United States Pharmacopeia ("USP"); Glaxo SmithKline; Novartis; Pfizer; Lily; Bristol Myers Squibb; Johnson & Johnson; Merck; etc. I have taught analytical chemistry training courses for the American Chemical Society for over 30 years at their meetings, at client sites, and online.

7.    In my work at Spectros Associates I teach forensic scientists how to use analytical chemistry, spectroscopy, and chromatography to analyze evidence including how to calibrate and validate their methods. Amongst my clients are the New York City Police Department, the United States Drug Enforcement Agency, and the United States Department of Homeland Security.

8.    Since 2014 I have been member of the faculty of the California Criminalistics Institute (CCI). The CCI is the state agency in California responsible for arranging training courses for the forensic scientists of the state. In my capacity as a faculty member I teach forensic scientists how to use analytical chemistry, spectroscopy, and chromatography to analyze evidence including calibration and validation of methods.

2

9.     From 2012 to 2014 I worked as an analytical chemistry applications specialist for Princeton Instruments. I conducted demonstrations, ran customer samples, taught customer training courses, and maintained equipment in a demonstration laboratory. I also supported sales staff with customer visits, taught salesperson training courses, and wrote application notes.

10.     From 2014 to 2016 I worked at PerkinElmer as an analytical chemistry applications specialist. I conducted demonstrations, ran customer samples, taught customer training courses, and calibrated and validated instrumentation in a demonstration laboratory. I also supported sales staff with customer visits, teaching salesperson training courses, writing application notes, and developing sales tools. Customers included pharmaceutical and nutraceutical companies.

11.     I left PerkinElmer in 2016 to found my own company, Big Sur Scientific, where I am the CEO and Chief Technical Officer. I invented a new type of quantitative chemical analyzer based on infrared spectroscopy, patented it, and then built the company around it. This involved calibrating and validating quantitative analytical chemistry methods, working with chromatography labs to obtain and validate reference data, and calibrating and validating methods in the analysis of cannabis, milk, olive oil, and ground beef. I am in the process of wrapping up the operations of Big Sur Scientific.

12.     Since 2012 I have been a paid columnist for Spectroscopy magazine. I write a column titled "Infrared Spectral Interpretation Workshop" where I teach readers how to use infrared spectroscopy to identify molecules.

13.     Since 2018 I have been a paid columnist for Cannabis Science and Technology magazine where I write a column called "Cannabis Analysis." These columns are designed to promote increased and better testing in the cannabis industry. Column topics have included

3

discussions of accuracy, precision, calibration, and validation in spectroscopy and chromatography.

14.    I have published 3 books on analytical chemistry that are entitled:

- *Fundamentals of Fourier Transform Infrared Spectroscopy,* 2nd edition, Taylor and Francis, Boca Raton, 2011.

- *Infrared Spectral Interpretation: A Systematic Approach*, Taylor and Francis, Boca Raton, 1999.

- *Quantitative Spectroscopy: Theory and Practice*, Elsevier, New York, 2002.

15.    I am informed that the following definition of a "person of ordinary skill in the art" (a POSA) is being used in this case, and has been adopted by other experts on behalf of Slayback, with regard to the entirety of the claims as follows:

> A POSA would have had the skills, education, and expertise of a team of individuals working together to formulate a liquid injectable drug product. Such a team would have included individuals with doctoral degrees in chemistry, biochemistry, pharmaceutics, pharmaceutical sciences, chemical engineering, biochemical engineering or related fields, with at least two years of post-graduate experience in developing liquid injectable drug products, or master's or bachelor's degrees in similar fields of study, with a commensurate increase in their years of postgraduate experience. Such a team also would have been familiar with a variety of issues relevant to developing liquid injectable drug formulations, including, among other things, solubility, stability, pharmacokinetics, pharmacodynamics, and other pharmaceutical characteristics. Such a team also would have included persons with expertise in analytical chemistry, including the detection and measurement of chemical degradants. The team also would have had access to an individual with a medical degree with experience in treating patients with CLL and NHL.

16.    I note that the definition of a POSA team includes "persons with expertise in analytical chemistry including the detection and measurement of chemical degradants." I am

4

such a person and understand how such a POSA analytical chemist would view Dr. Kittendorf's experiments and the patents-in-suit from an analytical chemistry perspective.

17.    A list of my selected peer reviewed publications can be found in my CV, included here as Exh. 1.

### B. Litigation Experience

18.    In the past four years, I have not testified by deposition or at trial in any matter as an expert.

## II.    SCOPE OF WORK AND SUMMARY OF OPINIONS

19.    I have been retained by Defendants as a technical expert in this matter to provide opinions regarding various issues surrounding United States Patent No. 11,872,214 ("the '214 patent", Exh. 2) and United States Patent No. 12,138,248 ("the '248 patent", Exh. 3) (collectively the "patents-in-suit"). For purposes of this Report, I have been asked to review the report of Dr. Kittendorf and opine regarding its conclusions. The billing rate for my services is $▮▮▮▮ per hour for all work, plus expenses. My compensation does not depend upon my opinions or the outcome of this proceeding.

20.    A list of the materials I considered while forming the opinions herein is attached as Exhibit 4. I also relied upon my experience, education, and training.

21.    As I will explain in detail, I have reviewed the report and underlying data from Dr. Kittendorf. In summary, I find Dr. Kittendorf's work to be flawed and to not provide accurate and reliable numbers for the "total impurities" in the samples of Slayback's NDA Product tested at 223nm using the peak area response method. The reasons for these conclusions, in part, include:

- Dr. Kittendorf has not used the Slayback method for determining bendamustine and its impurities. Dr. Kittendorf's method is novel. As a

5

result Dr. Kittendorf's method needs to be validated. The United States Pharmacopeia provides guidance that to validate a method seven separate steps are involved. Dr. Kittendorf either failed to perform or did not fully or properly perform six of the seven required validation steps. I therefore conclude that his method was not validated and its results are unreliable.

- By using the peak area normalization quantitation method Dr. Kittendorf assumes that the response factors for all the analytes at a detection wavelength of 223 nm are the same. Using data from Dr. Kittendorf's own report I calculated the response factors for Bendamustine, impurity D, and impurity E are NOT the same. Using these response factors I found Dr. Kittendorf's quantitation method underestimates the amounts of impurities D and E in bendamustine containing products ████ ███. On the whole, Dr. Kittendorf's quantitation method is based on a false assumption, and therefore all his data are unreliable.

22.    I also understand that it is the patentee's burden to prove infringement of each limitation of the asserted claims by a preponderance of the evidence.

## III.    THE ASSERTED PATENTS AND THE CLAIM LIMITATION OF RELEVANCE

23.    I understand that the '214 Patent (Exh. 2), and the '248 Patent (Exh. 3) are being asserted against Slayback in this case.[1] I further understand that the plaintiffs are asserting claims 1-9 of the '214 Patent and claims 1-11, 15, and 20 of the '248 Patent (hereinafter collectively "the Asserted Claims").

24.    The Asserted Claims all contain a limitation regarding the determination of total impurities by HPLC at a particular wavelength. For instance, representative claim 1 of the '214 Patent states:

> total impurities in the liquid bendamustine-containing composition resulting from the degradation of the bendamustine

---

[1] I also understand that United Patent No. 11,844,783 ("the '783 Patent" (Exh. 5)) was previously asserted against Slayback in this case but has now been withdrawn by the plaintiffs. All of the arguments that I am making with respect to the '214 and '248 patents would also apply to the '783 Patent as its claims also contain the same "HPLC impurity" limitation, and I reserve the right to present the same evidence and arguments regarding the '783 Patent if it is re-asserted.

6

> is less than about 5% peak area response, as determined by
> HPLC at a wavelength of 223 nm ...

Thus, I understand that for purposes of patent infringement, the patentee bears the burden of proving that the total impurities resulting from the degradation of bendamustine are below 5% as shown by an HPLC method that detects impurities at 223nm and determines the percentages by the peak area response method.

25.    A method that uses a different wavelength or a technique other than "peak area response" to determine the total impurities would be expected to give different results and thus is of no relevance to this claim. Thus, I have focused my analysis on Dr. Kittendorf's studies at 223 nm using what he calls "normalized peak area response" and "mass percentages" – which are both versions of a "peak area response" analysis. That said, I recognize that Dr. Kittendorf also did testing ████ ███ This testing is not relevant to the patents-in-suit because it is not at 223 nm as required by the claims. Furthermore, Dr. Kittendorf's testing ██ ███ ███ is also not the same as the Slayback method because it uses "peak area response" quantitation methods to determine the results, while the Slayback method uses ██ ██████ ██████████.

## IV.    BACKGROUND KNOWLEDGE ON ANALYTICAL CHEMISTRY

26.    Analytical chemistry is the science of determining the identity and quantity of chemical species in samples. In analytical chemistry the analyte is the chemical species whose identity and/or concentration we wish to determine. A *qualitative analysis* is where the identity of an analyte is determined, and a *quantitative analysis* is where the concentration or amount of an analyte is determined. (Exh. 6, J. Kenkel, *Analytical Chemistry for Technicians*, CRC Press, Boca Raton, 2003, pg. 2). In a lab setting analytical chemistry can involve the use of glassware, pipettes, chemicals, instrumentation, computers, and software.

27.    Chromatography and spectroscopy are disciplines within the field of analytical chemistry. Chromatography is the science of separating mixtures into their chemical components and measuring the amounts of those components. Spectroscopy is the study of the interaction of light with matter. By measuring the amount of light absorbed at specific wavelengths the identity and amount of analytes in a sample can be determined.

28.    To the extent that I give testimony at trial, I may provide a tutorial that discusses the basics of analytical chemistry, chromatography, spectroscopy, and the use of spectroscopy for detection and quantification in liquid chromatography.

## A. Accuracy and Precision

29.    In analytical chemistry, results are assessed in terms of accuracy and precision. Accuracy is a measure of how far away a measurement is from its true value. Precision is a measure of repeatability. (Exh. 7, USP Chapter 1225 page 3). They are not the same thing as illustrated below:



| Imprecise and Inaccurate | Precise and Inaccurate | Precise And Accurate |

**Figure 1** An illustration of the concepts of accuracy and precision.

30.    Figure 1 shows attempts to obtain consistent bullseyes (true values). The leftmost target illustrates results that are neither accurate (far from the true value) nor precise (not consistently in one place). The middle target in Figure 1 shows results that are precise but inaccurate. The shots are precise because they are tightly clustered together, and thus the results are repeatable. However, the results are inaccurate because the cluster is far from the bullseye

8

(true value). The target on the right of Figure 1 shows results that are both precise and accurate. The results are precise because the shots are tightly clustered. The results are accurate because the shots are tightly clustered around the true value, again in this case the bullseye. This illustration shows that accuracy and precision are not the same thing. Thus, the fact that one obtains similar results in multiple tests does not mean that the results are accurate.

31.     An analytical chemist understands that the degree of accuracy that is required for an analytical method is determined by the application or context. A harmless ingredient in a dinner recipe may be inaccurately measured but the meal will still be edible. This is an example of an application where high accuracy is not needed. By contrast, the patents-in-suit here are for a cytotoxic cancer drug being injected into the veins of patients. In this application an analytical chemist would know that high accuracy is vital to insure both (a) that the drug injected has the correct potency and (b) that no dangerous levels of toxic impurities are being injected.

32.     An aspect of analytical chemistry is that all measurements are accompanied by a certain amount of error. This error can be caused by using unvalidated equipment, unvalidated methods, unknown impurities in samples, false assumptions, and operator error amongst other things. The fact is that human beings cannot control all of the variables in an experiment at all times, hence error is inevitable in measurements. In analytical chemistry measurements are often reported as a value with a margin of error, usually as ± and some value. For example if in a public opinion poll the number of people intending to vote for candidate X is 40% ±5% we would say the margin of error in the poll is "plus or minus five percent." In this case it is important to survey a large number of people to minimize the margin of error. For example, if you ask 1 person who they are going to vote for that is not indicative of the preference of the voting public and the result would be inaccurate. On the other hand if you ask thousands of

9

people who they are going to vote for that would give a more accurate result. Analyzing many samples and averaging the results is one way in analytical chemistry of increasing accuracy.

## B. Introduction to Chromatography

33.    The word chromatography comes from the Greek and means "color writing." This is because in some of the original work done with chromatography the samples consisted of colored plant pigments that were separated. The pigments were dissolved in a solvent, poured into a column (tube) full of sand (the "column packing" or "stationary phase") and solvent ("eluant" or "mobile phase"), a valve was opened at the bottom of the column, and new solvent was added at the top of the column to make up for that which had exited at the bottom. It was found that the plant pigments migrated down the column at different speeds and exited (eluted) from the column at different points in time. Depending on the chemical structures of the analyte, solvent, and column packing different analytes will have different "affinities" for the column packing. Analytes with a high affinity for the stationary phase will move slowly through the chromatographic column, whereas analytes with a low affinity for the stationary phase will move quickly through the column. We can draw the analogy to a horse race. A well-behaved horse with no tendency, or affinity, for stopping and eating grass during a race will travel at high speed and finish first. A misbehaving horse that has an affinity for stopping and eating grass will travel more slowly and lose the race. (Exh. 6, J. Kenkel, *Analytical Chemistry for Technicians*, CRC Press, Boca Raton (3rd Ed. 2003), pg. 310).

34.    We can also think of affinity as "stickiness." An analyte with low affinity or stickiness will be weakly bound to the column packing, travel quickly through the column, and will come out of the column ("elute") first. Whereas an analyte with high stickiness will bind strongly to the column packing, move slowly, and exit the column later. In chromatographic

10

method development scientists run experiments under different conditions to achieve the separation of the analytes in a sample and perform calibrations and validations to insure the measured amounts of analytes are accurate. As a band of molecules leaves the column their concentration can be measured with a detector. In the patents-in-suit the claims call for the absorbance of the analytes (bendamustine and impurities) to be measured with ultraviolet light at a wavelength of 223 nm to determine concentration. This technique is a type of spectroscopy as will be discussed below.

35.    Liquid chromatography is usually done at high pressure hence the term High Pressure Liquid Chromatography or HPLC for short. (It is also sometimes referred to as High Performance Liquid Chromatography). A modern HPLC system can consist of a reservoir or reservoirs of solvent(s) to comprise a mobile phase, a pump to move the mobile phase through the system, an injector to introduce samples, a column where the tubing is often made of stainless steel, the column packing which is often silica or coated silica, and a detector. The system is often controlled and monitored by a computer and software. An instrument that performs chemical separations using chromatography is called a chromatograph, and the result it measures is called a chromatogram. A chromatogram is often a plot of detector response on the y-axis versus time on the x-axis. For example when using UV-Vis detection the chromatogram can be a plot of the amount of light absorbed at a specific wavelength versus time.

36.    Under the right conditions different analytes (which can include a drug and its impurities and degradants) will have different affinities for the column packing and exit (elute) the column at different points in time. The detector detects each analyte as it elutes, giving a peak in the chromatogram. The size of this peak can be used to determine the amount of the

11

analyte in the original sample.  The position of a chromatographic peak on the x-axis is called its "elution time" or "retention time."

37.    HPLC methods involve the setting of a number of parameters.  For example, in plaintiff's document entitled  Exh. 8, Bates EAGLEBEN-SA_00132554),

38.    Similarly, as Dr. Kittendorf notes,

**Table A1.  Slayback's Method Conditions and Parameters**



**Table A2.  Slayback's Gradient Program**

*See* SLAY-VIVMUS0010983, at 0997-98; Ex. G, at 5-6; Ex. H, at 5.

(Kittendorf Opening Report at pg. 10 (████  ██████████████████  SLAY-VIVMUS_0010983 (the Slayback document herein is Exh. 9)).

**39.**     The United States Pharmacopeia ("USP") – a source of pharmaceutical industry reference materials and standard methods– also describes an HPLC method for analyzing bendamustine and its impurities with the same level of detail.  (Exh. 10, The USP Monograph – Bendamustine Hydrochloride, March 1, 2019).

**40.**     By contrast, the patents-in-suit provide none of this detail, and instead only state that the HPLC method is, "…wherein the total impurities in the liquid bendamustine containing composition …is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm…"  Thus, of the numerous standard parameters listed in plaintiff's documents, ████████████████ the USP, the patents-in-suit report only two, the

13

detection wavelength and quantitation method. I discuss the detection wavelength in the next section regarding spectroscopy. Thus, Dr. Kittendorf did not use the "HPLC parameters" set forth in the patents-in-suit (other than 223 nm and "peak area response") because the patents do not specify other parameters.

### C. Introduction to Spectroscopy

41.    Spectroscopy is the study of the interaction of light with matter. A *spectrum* can be measured by shining light of different wavelengths on a sample and measuring how much of it is absorbed at each wavelength. The wavelengths absorbed can be used to identify the molecules in a sample, and the amount of light absorbed is used to measure their concentrations. Thus, spectroscopy can be used for both qualitative and quantitative analysis.

42.    There are different types of light that can be used to measure a spectrum. There is the visible light (Vis) we can see, infrared (IR) light or heat, and ultraviolet light (UV) which is given off by the sun and gives us sunburns. An instrument that measures a spectrum is called a *spectrometer*. A specific type of spectroscopy that uses ultraviolet and visible light to measure spectra is abbreviated UV-Vis spectroscopy.

43.    In liquid chromatography UV-Vis spectroscopy is used to detect and measure the concentrations of molecules as they exit the chromatographic column. This is known as UV-Vis detection. The concentrations can be measured because of "Beer's Law" which defines the relationship between light absorbance and concentration. Beer's Law is stated in equation 1:

$$A = \varepsilon LC \quad (1)$$

Where

$A$ = The amount of light absorbed by a sample

$\varepsilon$ = Absorptivity

$L$ = Pathlength

14

C = Concentration

(Exh. 11, Brian C. Smith, *Quantitative Spectroscopy: Theory and Practice*, Elsevier, Boston, 2002, pages 7-16).

44.    Because of Beer's law the height or area of a molecule's peak in a spectrum or chromatogram can be proportional to the concentration of that molecule in a sample. Thus A in Beer's Law can be a measured as a peak height or area, C is the concentration of analyte molecule in the sample, and L is the thickness of sample that the light passes through.

45.    The absorptivity, $\varepsilon$, is the proportionality constant between absorbance and concentration. It is a measure of how strongly a given molecule absorbs light at a specific wavelength under given conditions. For example, the absorptivity of liquid water at 700 nanometers (nm), which is red light, is a constant. However, the absorptivity of a molecule varies with wavelength. (Exh. 11, Brian C. Smith, *Quantitative Spectroscopy: Theory and Practice*, Elsevier, Boston, 2002, page. 15). Thus, for example the absorptivity of liquid water at 400 nm, which is blue light, is different than at 700 nm. This is part of why the ocean appears blue; water absorbs red light more strongly than blue light, leaving more of the blue light to enter our eyes. Also, the absorptivity varies from molecule to molecule. For example, a blue shirt will contain a pigment that absorbs strongly in the red leaving more blue light to enter our eyes, similar to liquid water. However, a red shirt will contain a pigment that absorbs blue light and little red light leaving more red light (unabsorbed) to enter our eyes. The difference in color between these two shirts then is due, in part, to different pigments absorbing different amounts of red light because they have different absorptivities. In summary then the absorptivity is a constant for a given molecule and wavelength but varies from wavelength to wavelength for a given molecule, and from molecule to molecule at a given wavelength. (Exh. 11, Brian C. Smith, *Quantitative Spectroscopy: Theory and Practice*, Elsevier, Boston, 2002, page. 15). We

15

can think of the absorptivity as the response factor or RF for a given analyte at a given wavelength when using UV-Vis detection in HPLC.

46.     In liquid chromatography when UV-Vis spectrometers are used to measure the concentrations of analytes as they exit the chromatographic column, we use a rearranged form of Beer's Law as seen in equation 2:

$$C = A/\varepsilon L \quad (2)$$

47.     A can be measured as a peak height or area in the chromatogram of the sample, L is usually known from the UV-Vis detector used, so the only thing missing is the absorptivity. We determine this by rearranging Beer's Law yet again as seen in equation 3:

$$\varepsilon = A/LC \quad (3)$$

48.     We can determine $\varepsilon$ for an analyte by preparing samples with known concentrations of the analyte called *standards*. We then analyze each standard on a spectrometer or chromatograph, measure its peak height or area, and then use the known pathlength and known concentration to calculate the absorptivity in a process called *calibration*. Often times we plot peak area versus concentration for a series of known standards of different concentrations to obtain what is called a *calibration line*. The slope of this line gives the absorptivity or response factor for an analyte. The process of using a series of standards to plot a calibration line is called the "external standards" method.

49.     Once we know the absorptivity of the analyte in a sample, we can use it and equation 4 to determine the concentration of analyte in an unknown sample:

$$C_{unk} = A/\varepsilon L \quad (4)$$

Where

A = Peak Height or Area

$\varepsilon$ = Absorptivity as determined form the calibration line

16

$L$ = Pathlength

$C_{unk}$ = The concentration of analyte in the unknown sample.

50.    A is obtained from the peak height or area of the analyte in a chromatogram or spectrum, L is known from the spectrometer used and is generally a constant, and the absorptivity is obtained from the slope of the calibration line. In this fashion then the concentrations of analytes in samples can be determined by HPLC using UV-Vis detection.

51.    Another concept of importance here is that of "peak area response" or "peak area normalization" quantitation method. Here is an example of how this method can work. Let's imagine we have a solution that contains bendamustine or "BDM" at 50% and an impurity "IMP" at 50%. Let's also imagine that their response factors (in the case of UV-Vis detection these are the absorptivities) are the same and are both equal to 1. We can calculate the area of the chromatographic peak for each of these analytes by rearranging equation 1 (from above) as seen in equation 5:

$$A = C\,(RF) \quad (5)$$

Where A is area, C is concentration, RF is response factor, and given that L (path length of the sample) is constant.

52.    For impurity IMP its peak area will be (50 x 1) or 50, and similarly the peak area for BDM will be (50 x 1) or 50. Note that the total peak area is the area of components IMP and BDM added together and equals 50 +50 or 100.

53.    The peak area normalization method calculates analyte concentrations by dividing the peak area for a given analyte by the total peak area as seen in equation 6:

$$\% \text{ Analyte} = \text{Analyte Peak Area/Total Peak Area} \quad (6)$$

54.    Thus, where the RFs are the same and are both equal to one, then the peak area for impurity IMP is 50, and for BDM is 50, and the total peak area is 100, then we find that

17

amount of impurity IMP is 50/100 or 50% and the amount of bendamustine is 50/100 or 50%. These results comport with the known reality – since we assumed a 50/50 mixture and that the response factors of analytes BDM and IMP were equal, we obtained the correct results.

55.    However, if the response factor for these two analytes are different, then the results will not comport with reality. Let's imagine our sample still actually contains 50% BDM and 50% IMP, and the response factor for BDM is still 1, but the response factor for impurity IMP is now 2. We can use equation 6 to calculate the peak areas for this new case generating equations 7:

$$\text{New Peak area of IMP} = A\ (RF) = 50(2) = 100 \quad (7)$$
$$\text{New Peak area of BDM} = A\ (RF) = 50(1) = 50$$

56.    Note then that the total peak area is now $100 + 50$ or 150. Using the peak area normalization method as given in equation 6 we find the new calculated concentrations as given by equations 8:

$$\%\ \text{IMP} = 100/150 = 66.7\% \quad (8)$$
$$\%\ \text{BDM} = 50/150 = 33.3\%$$

57.    Note that when the response factors for two analytes are different, the peak area normalization method predicts that the concentrations of BDM and IMP are 33.3% and 66.7% respectively. But we know the real concentrations are 50% BDM and 50% IMP. When the response factors for the analytes are not equal the peak area normalization method fails to accurately predict the concentrations of bendamustine and its impurity. In this case where the response factor of degradant IMP was higher than bendamustine, the concentration of IMP is overestimated and the concentration of bendamustine is underestimated. Alternatively, one could imagine a scenario where the response factor for the degradant/impurity is lower than

18

bendamustine and that degradant will be underestimated if one falsely assumes that the response factors are the same.

58.     This example illustrates a known problem with the peak area normalization HPLC method that has been outlined in the literature. The peak area normalization method only works correctly when the response factors of the analytes are equal. This is clearly stated in two classic books on chromatography. The first reference, written by Lloyd Snyder is called "Practical HPLC Method Development" and states:

> The proper use of a normalized-peak-area technique assumes that the response factor for each component is identical... . This is rarely true in UV detection, where even closely related compounds can have different molar absorptivities. ...different compounds rarely have the same UV absorbance.

(Exh. 12, Snyder, Practical HPLC Method Development (1997) at pg. 655).

59.     The second book, written by Snyder and Kirkland and published in 2010, states:

> [peak] area normalization...rel[ies] on the assumption that the detector response for nonstandardized (e.g., unknown) is the same as for peaks for which standards are available; this assumption may or may not be appropriate, depending on the sample composition and choice of detector. UV detection is notorious for order of magnitude differences in sensitivity for different compounds.

(Exh. 13, Snyder and Kirkland, 2nd Edition, 2010, pages 525-526).

60.     In sum, as shown in the calculations above and as supported by the literature, unless we know that the response factors of the analytes are the same, the peak area normalization method will not produce an accurate number, particularly for UV-Vis detection. An analytical chemist would know this and only use the peak area normalization method having proven that the response factors for all the analytes are the same.

61.     A different way of calculating impurities involves a technique called the ███

███  ███  ████████



For instance, Slayback also uses ███████████████████ – not 223 nm) for its current Vivimusta® NDA Product. (Exh. 14, SLAY-VIVMUS 0005716).

Slayback also used the ████ ████ ████ for a different bendamustine product ████ ██ ███ ███ ████ ████ | ████ ██ (Exh. 15, SLAY BEND 0123592-123638).

63.    No one that I am aware of – before Dr. Kittendorf's testing in this case – performed an HPLC test for bendamustine impurities using either "peak area response normalization" or ████ ████ at 223 nm (not counting Dr. Kittendorf's other testing in the *Hospira* case). Indeed, the patents-in-suit provide no evidence that the impurity data reported in the specification of those patents were performed at 223 nm or were performed by "peak area normalization."[2] Neither Slayback nor plaintiffs have used an HPLC method at 223 nm in their FDA-approved tests.

---

[2] Indeed, the patents-in-suit do not provide parameters for any HPLC method – let alone parameters paired with detection at 223 nm. And the patents-in-suit provide no calibration or

**64.** As a result, no one has ever calibrated or validated an HPLC method at 223 nm for bendamustine formulations. And, as discussed below, Dr. Kittendorf did not validate his HPLC method at 223 nm either.

**65.** An HPLC method needs to be validated with standards of known concentration of each analyte (here bendamustine and its degradants) measured at the wavelength of interest. (Exh. 7, USP 1225 pg. 1 (validation tests to be done for the analytes); Exh. 16, "USP 621 Chromatography, November 2024," (hereinafter referred to as "USP 621"), at pgs. 16 and 18 ("Detection Wavelength: No Adjustment Permitted" without a new validation); Exh. 17,



**66.** To validate an HPLC method the system suitability studies that should be performed per the United States Pharmacopeia include accuracy, precision, specificity, detection limit, quantitation limit, linearity, range, and robustness (Exh. 7, USP Chapter 1225, "Validation of Compendial Procedures"). A document from Corden Pharma (Slayback's manufacturer) entitled ███████ ████████████ ██████████ ██████████ ████████ (Exh. 15, SLAY BEND 0123592 to 0123638). An analytical chemist would know that these tests are needed to validate an HPLC method and determine its accuracy. As discussed below, Dr.

---

validation of any HPLC procedure – let alone calibration or validation of an HPLC technique at 223 nm.

Kittendorf's method is not equivalent to Slayback's method and hence is novel. An analytical

chemist would know, and the USP requires, that a novel method must be validated. Dr.

Kittendorf did not perform or did not properly perform 6 of the 7 tests required by the USP (Exh.

7, USP Chapter 1225 page 4) to validate a method. Further, there are no statements given for the

accuracy for any of the amounts of any of the chemical species detected by Dr. Kittendorf

including bendamustine, impurity D, and impurity E. Because of the lack of validation and any

statements of accuracy, the entirety of the results given by Dr. Kittendorf results are unvalidated

and unreliable.

## V.    DR. KITTENDORF'S RESULTS REGARDING THE SLAYBACK NDA PRODUCT ARE FLAWED AND UNRELIABLE

67.    I have reviewed Dr. Kittendorf's Opening Report and find that his method and

assumptions are flawed. His results are therefore not the result of an accurate and reliable

method. An analytical chemist would not rely upon these results.

### A. Dr. Kittendorf's HPLC Method for the Analysis of Bendamustine and its Impurities is Not the Same as Slayback's Method

68.    The United States Pharmacopeia (USP) is an organization that issues reference

standards and reference methods for the pharmaceutical industry. In USP 621, there is a section

entitled "Adjustment of Chromatographic Conditions." It says:

> The extent to which the various parameters of a
> chromatographic test may be adjusted without fundamentally
> modifying the pharmacopeial analytical procedures are listed
> below. Changes other than those indicated require revalidation
> of the procedure.

(Exh. 16, USP 621 at pg. 14).

69.    In his report Dr. Kittendorf lists the conditions under which he analyzed

Slayback's bendamustine containing product, and concludes in paragraph 39 that, "…these

system suitability parameters suggested that I could successfully transfer and employ Slayback's

22

analytical method to analyze the impurity profile of bendamustine-containing products, using my laboratory's HPLC equipment."

70.    Dr. Kittendorf's assumption that he can rely on Slayback's validation is not justified because he is not using the same method as Slayback. One important difference between Dr. Kittendorf's method and Slayback's method is that the relevant testing that he does is at 223 nm and that is not the same as ███████ ███████ ████████████████ ███████ ██ USP 621 clearly states on pages 16 and 18 (Exh. 16), "Detector Wavelength: No adjustment permitted." This restriction exists because the absorptivity (response factor) of molecules varies with wavelength (see above). The change in detection wavelength between Slayback's method and Dr. Kittendorf's method testing at 223 nm means that his method and Slayback's method are not the same, and that he needs to validate his method at 223 nm to claim equivalency between the two methods.

71.    I note that in Dr. Trout's Opening Report, at paragraph 395, he says, "I considered wavelength-bridging and comparability analyses showing that quantitation at 223 nm and at a nearby wavelength are materially consistent for this impurity profile." Dr. Trout appears to be saying that if the results at 223 nm are similar to ███████████, then that confirms their accuracy. At best, it would confirm their precision relative to each other. But without a proper linearity and range study for each analyte, accuracy has not been shown. That is why USP 621 does not allow a change of wavelength without a new validation. Further, an analysis ███████ ██

---

[3] As noted above, I am aware that Dr. Kittendorf also does ███████ ████████ However, this testing is: (a) irrelevant to the patent claims that require testing at 223 nm, and (b) still not the Slayback method because ██████████████ ██ ██ ███████ ████████████████ ██ ███████ ███████ ███████ while Dr. Kittendorf uses a "peak area response" quantitation method.

using peak area response quantitation methods (Kittendorf), is not the same as ▮▮▮▮▮

▮▮▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮ ▮▮▮ (Slayback).

72.     A second important difference between Dr. Kittendorf's method and the

Slayback's method is the quantitation method used.  Slayback uses ▮ ▮▮▮▮ ▮▮▮



▮▮▮▮▮▮▮▮▮ ▮ ▮▮▮▮ ▮▮ Dr. Kittendorf uses a "peak area response" or

"peak area normalization" method that ▮▮ ▮ ▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮ ▮ ▮▮▮ ▮▮

▮▮▮▮▮▮▮▮▮ ▮▮ ▮▮▮▮▮ ▮▮▮▮▮▮ ▮ ▮▮▮▮▮ For these

reasons Dr. Kittendorf's method and Slayback's method are different because the wavelength

and quantitation method he used is outside the scope of allowed variations according to USP 621

and hence Dr. Kittendorf's method needs to be validated to prove it gives accurate results.

73.     Because Dr. Kittendorf's method is a novel method, and is not equivalent to

Slayback's method, a full validation is required.

**B.  Dr. Kittendorf Did Not Properly Validate His HPLC Method
So His Data are Unvalidated and Unreliable**

74.     The USP has promulgated a document entitled, "Chapter 1225 Validation of

Compendial Procedures."  Table 2 (pg. 6) of Chapter 1225 of the USP (Exh. 7) lists seven data

elements required for validation for a quantitative procedure.  These are: accuracy, precision,

specificity, detection limit, quantitation limit, linearity, range, and robustness.  (*See also* Exh. 18,

Kittendorf *Hospira* Report at ¶ 29; Trout Opening Report at ¶ 394).  I discuss each of these

validation tests in turn, and then discuss whether Dr. Kittendorf performed this particular test or

whether the test was performed properly:

24

75.    **Accuracy** – As stated above, accuracy is a measure of how far off a measurement is from its true value. According to USP Chapter 1225 page 3 (Exh. 7): "Assessment of accuracy can be accomplished…including evaluating the recovery of the analyte (percent recovery) across the range of the assay or evaluating the linearity of the relationship between estimated and actual concentrations." Nowhere in Dr. Kittendorf's report is their data from a percent recovery study. Dr. Kittendorf did not analyze standard samples across a range of concentrations, so nowhere in Dr. Kittendorf's report is their data on linearity and the relationship between estimated and known concentrations. In fact, I can find nowhere in Dr. Kittendorf's report a measurement of what accuracy he claims for his method. Determining the accuracy of any method is of great importance for knowing if said method is suitable for a given application and that its results are reliable. Given the lack of accuracy studies and data, I conclude that Dr. Kittendorf's data is unvalidated and unreliable.

76.    **Precision** – As stated above precision is a measure of the repeatability of a set of measurements. As stated in USP Chapter 1225 page 3 (Exh. 7), "The precision of an analytical procedure is usually expressed as the standard deviation or relative standard deviation of a series of measurements." An abbreviation for relative standard deviation is RSD. In his Exhibit H on page 7 Dr. Kittendorf states, "%RSD of bendamustine peak areas in the ███████ ████████ █ ████████' I am satisfied with this measurement.

77.    **Specificity** - USP Chapter 1225 page 3 (Exh. 7) says, "In the case of analytical procedures for impurities, specificity may be established by spiking the drug substance or product with appropriate levels of impurities and demonstrating that these impurities are determined with appropriate accuracy…." Nowhere in Dr. Kittendorf's Report did I see data from spiked samples, nor did I see data for the accuracy of the impurity levels that were

25

measured. Therefore I conclude that Dr. Kittendorf's method was not validated for specificity and hence his data are unvalidated and unreliable.

78.     **Detection Limit** – According to USP Chapter 1225 page 4 (Exh. 7) a detection limit is, "…the lowest amount of analyte in a sample that can be detected, but not necessarily quantitated, under the stated experimental conditions." Note here that the detection limit is specific to a given analyte, therefore this means a detection limit for each analyte should be determined. A way of determining detection limit according to USP chapter 1225 is to determine the concentration of analyte that gives a signal 3 times that of the noise in the chromatogram. The amount of noise in a spectrum or chromatogram is a measurement of measurement error. The calculation referred to here where the size of the signal from an analyte is divided by the noise level is called the "signal-to-noise ratio" or S/N for short. A knowledge of S/N then is needed to calculate a detection limit. What the USP is calling for here is a measurement of S/N for *all* analytes. The analytes in Dr. Kittendorf's method are bendamustine, impurity D, impurity E and nine other impurities that were not identified. On page 7 of his Exhibit H Dr. Kittendorf does say that the "S/N of bendamustine in the ███████████ ██ █ ██ however, he does not report S/N measurements any of the other analytes, and hence no detection limits exist for these analytes. This measurement is required by Table 1 of Chapter 1225 of the USP but is optional in the guidance seen in Table 2. But, in my opinion, given the importance of this application an analytical chemist would do all the validation tests as required by Table 1.

79.     **Quantitation Limit** – According to USP Chapter 1225 page 4 (Exh. 7): "The quantitation limit is a characteristic of quantitative assays for low levels of compounds in sample matrices, such as impurities in bulk drug substances and degradation products in finished pharmaceuticals. It is the lowest amount of analyte in a sample that can be determined with

26

acceptable precision and accuracy under the stated experimental conditions." Note that a quantitation limit should be determined for each analyte including impurities and degradation products. Given the focus in this litigation on impurities and degradation products in bendamustine containing injectable fluids, an analytical chemist would determine quantitation limits for all the impurities and degradation products for which concentration data is reported. In his work at 223 nm Dr. Kittendorf found eleven impurities. There are no quantitation limit data for these eleven impurities. Dr. Kittendorf's failure to perform this validation step makes his data unvalidated and unreliable.

80.    **Linearity and Range** – On page 4 of USP 1225 (Exh. 7) the definition of linearity is, "The linearity of an analytical procedure is its ability to elicit test results that are directly…proportional to the concentration of analyte in samples within a given range." Also on page 4 of USP 1225 it defines range as, "The range of an analytical procedure is the interval between the upper and lower levels of analyte (including these levels) that have been demonstrated…with a suitable level of precision, accuracy, and linearity …." USP 1225 page 4 (Exh. 7) goes on to say that linearity and range are determined as such, "Linearity should be established across the range of the analytical procedure. It should be established initially by visual examination of a plot of signals as a function of analyte concentration…." That initial assessment should be followed with a correlation coefficient analysis. (Exh. 11, Brian C. Smith, Quantitative Spectroscopy: Theory and Practice, Elsevier, Boston, 2002, at pg. 58). What the USP is calling for here is that for each analyte a series of standards should be run and a plot of peak area versus concentration should be made giving a calibration line. There are no such plots or supporting data in Dr. Kittendorf's report for bendamustine, impurities D and E, nor any

27

of the other impurities for which he reports mass percentage data. I therefore conclude that Dr. Kittendorf has failed to perform these validation tests and his data are unvalidated and unreliable.

81.    **Robustness** – Page 5 of USP 1225 (Exh. 7) defines robustness as such, "The robustness of an analytical procedure is a measure of its capacity to remain unaffected by small but deliberate variations…." This would be done, for example, by varying experimental parameters within the ranges allowed by USP 621 (Exh. 16). I saw no evidence of any experiments or data in Dr. Kittendorf's report where he varied conditions to measure robustness. Therefore I conclude he did not perform this validation step and thus his data are unvalidated and unreliable.

82.    Dr. Kittendorf's method for determining bendamustine and its impurities is a separate method to Slayback's because he uses a different detection wavelength and quantitation method. Since Dr. Kittendorf's method is different, the method must be validated before reporting any results obtained with said method. USP Chapter 1225 (Exh. 7) provides guidance that there are 7 steps to be performed to validate an analytical method. While Dr. Kittendorf performed a precision study properly for one analyte (bendamustine), and did Limit of Quantitation for bendamustine, and Impurities D and E only, he did not do Limit of Quantitation for the other impurities or do any of the other required validation tests. In total, Dr. Kittendorf either did not perform or did not properly perform 6 of the 7 validation steps required by the USP. In light of this I conclude that all the data for the amounts of bendamustine and its impurities in Slayback's products are unvalidated and unreliable. Given these facts, I conclude that there is no evidence in Dr. Kittendorf's report that Slayback's product infringes the patents-in-suit with respect to the impurity limitation.

**C. Dr. Kittendorf's "Peak Area Response" Method Is Premised on A False Assumption That the Absorptivities of The Analytes Are the Same, They Are Not and Therefore Dr. Kittendorf's Results Are Not Accurate**

83.     As noted above, a "peak area response" normalization approach is premised upon an assumption that all analytes have the same "response factor" (a/k/a "absorptivity"). (Exh. 12, Snyder, Practical HPLC Method Development (1997) at pg. 655; Exh. 13, Snyder and Kirkland, 2nd Edition, 2010, pgs. 525-26).

84.     When that assumption is true, the collective peak areas can be added up and the amounts for each analyte determined by dividing the peak area for that analyte by the total peak area. That is the essence of the peak area response normalization approach to calculating concentrations. (*See* Paragraphs 51-60, esp. 56-59, above). If that assumption is incorrect, the entire calculation is inaccurate – and sometimes by very large margins as shown above.

85.     Dr. Kittendorf bases all his calculations on the assumption that all of the analytes have the same response factor. Dr. Kittendorf states this explicitly for his "mass percentage" calculation (Kittendorf Opening Report at pg. 15, fn. 3) – which is a form of peak area response analysis. And, Dr. Kittendorf used the same assumption for what he calls his "normalized peak area response" calculation – because that is the definition of peak area normalization.

86.     However, Dr. Kittendorf did not calculate the response factors for any of the chemical species (bendamustine or any of its impurities) at 223 nm that he detected. Thus, Dr. Kittendorf never justified his assumption that the response factors of all analytes are equal. Those necessary experiments involve making samples with known concentrations of the analyte and determining the absorption of those known samples at 223 nm, and then calculating the absorptivity for each analyte.

29

**87.** In the absence of data showing that the analytes have the same absorptivity or response factor (or that the relative response factor is 1), the results cannot be considered accurate using a peak area response normalization technique. Because Kittendorf did not do appropriate calculations of the response factors, his analytical technique is not reliable.

**88.** That said, Dr. Kittendorf's experiments do permit for an assessment of the absorptivities for bendamustine and two of the eleven impurities (impurities D and E) at 223 nm.

**89.** In particular, my calculations were performed by first rearranging the Beer's Law equation from above to solve for Absorptivity ($\varepsilon$) as follows:

$$A = \varepsilon C$$

$$\varepsilon = A/C$$

In this equation A stands for peak Area, and C stands for a known concentration of a substance. Thus for example if we had a peak area from a chromatogram for a sample containing bendamustine measured at 223 nm, and we knew the concentration of bendamustine in that same sample, we could determine the absorptivity of bendamustine at 223 nm by dividing the peak area by the known concentration. (The path length is the same for all analytes and so that variable is not needed in the equation).

**90.** In "Exhibit I" of his Report, Dr. Kittendorf discussed preparing an "LOQ" solution containing 0.000112 mg/ml bendamustine, 0.0012 mg/ml of impurity D (also referred to as the monosubstituted impurity Ref. Kittendorf Exhibit F), and 0.00156 mg/ml of impurity E (also referred to as the monochloro impurity per Kittendorf Exhibit F). (Kittendorf Opening Report at pg. 13 ¶ 46). A chromatogram of the LOQ solution measured at 223 nm is included in Kittendorf's Exhibit I with the filename "20260112_LW_Bendamustine_SlaybackLOQ12_01_2026003.pdf". The peak areas measured for the concentrations of bendamustine and impurity D and impurity E are also listed in Exhibit

I. Specifically, the relevant peak areas are:  These data provide the information needed to calculate the absorptivities for bendamustine, impurity D, and impurity E and to test whether Dr. Kittendorf's assumption that all the absorptivities are the same at 223 nm is correct.

91.    Using the concentrations and peak areas from above we can calculate the absorptivities for bendamustine, impurity D, and impurity E at 223 nm with the following results:

$$\text{Absorptivity of bendamustine } (\varepsilon_B) = \blacksquare$$

$$\text{Absorptivity of impurity D } (\varepsilon_D) = \blacksquare$$

$$\text{Absorptivity of impurity E } (\varepsilon_E) = \blacksquare$$

92.    Thus, the relative response factors for impurities D and E (relative to bendamustine) are:

Relative response factor for impurity D ($RRF_D$)



Relative response factor for impurity E ($RRF_E$)

93.    In his opening report in paragraph 52 Dr. Kittendorf gives an equation for mass percentage where one of the parameters is "Relative Response Factor" or RRF. In footnote 3 on page 15 of his report Dr. Kittendorf states that, "For this experiment, the mass percentage calculations assume an RRF of 1." The same assumption that the RRFs are equal to 1 was also necessarily used by Dr. Kittendorf when he did his "normalized peak area response" calculations. The calculations above clearly show, based on Dr. Kittendorf's own work, that RRFs for impurities D and E are not one. This means Dr. Kittendorf made a false assumption in his work, and his data are inaccurate and unreliable.

**94.** Additionally, since the real RRFs are different from the assumed value of 1 by a ███████████ Kittendorf's method underestimates those particular impurities when measured at 223 nm by ██████ █ ██████ █ ███ A method based on a false assumption that is off by █ ████ █ █gives inaccurate results. In addition, there is no data and thus no ability to determine the absorptivities (and RRFs) for the other nine impurities. However, because we know that for three analytes the absorptivities are not the same, it is impossible for _all_ the analytes to have the same absorptivities. As a result, the entirety of Kittendorf's results are not accurate.[4] Thus, in my opinion, Dr. Kittendorf's results are neither accurate nor reliable and thus there is no evidence in Dr. Kittendorf's report for infringement of the impurity limitation.

## D. If Anything, Dr. Kittendorf's Testing May Show Non-Infringement – But The Method Is Too Flawed to Come To Any Ultimate Conclusion

**95.** To the extent that Dr. Kittendorf's testing shows anything, it appears to show that the total impurities as tested by Kittendorf at 223 nm, and applying peak area response normalization, may have been above 5%.

**96.** Dr. Kittendorf assumed that all of the impurities had the same absorptivity, and given that assumption he found the following results at 223 nm:

---

[4] Both sets of results from Dr. Kittendorf's at 223 nm – the "normalization of peak area response" technique and also the "mass percent" technique – involve a peak area response analysis and therefore require that all absorptivities (or response factors) of all analytes at 223 nm be the same. Stated differently these peak area response techniques require that the "relative response factors" (RRF) for the analytes be "1."



97.     As can be seen from these data of the ████████████████ reported in Table B.1, the combination of impurities D and E (peaks 2 and 3) accounted for ████ ██ ██ ███. In Table B.3, the total impurities were measured at ██████ and impurities D and E (peaks 2 and 3) accounted for ████ ██ ███████.

98.     However, as we saw, the RRF's for impurities D and E are ████████ ███ respectively. What that means is that a single unit of peak area (which Dr. Kittendorf equates with concentration) for bendamustine does *not* equate to a single unit of peak area for impurities D and E. The D and E impurities absorb much less than bendamustine – ████████ ████ for equal concentrations. As a result, any attempt to calculate the actual concentrations of D and E would have to adjust their peak areas to account for their lesser absorptivity relative to

33

bendamustine. In other words, the reported values for impurities D and E are underestimated and the true values are approximately █████

99.    We can correct the data in Tables B1 and B3 (for Impurities D and E) by using this equation, assuming all other things are equal, with the following calculation:

$$Corrected\ Value = Kittendorf\ Value\ /\ RRF$$

Where the RRF for Impurity D is: ████
And the RRF for Impurity E is: ████

Applying this calculation to impurities D and E (in Kittendorf's Tables B1 and B3) we obtain:

| Substance | Kittendorf Table B1 For Impurities D and E (Peak Area Percent) | Corrected Table B1 For Impurities D and E (Peak Area Percent) | Kittendorf Table B3 For Impurities D and E (Mass Percent) | Corrected Table B3 For Impurities D and E (Mass Percent) |
|---|---|---|---|---|
| Impurity D | | | | |
| Impurity E | | | | |
| Sum of Only These Two Impurities = | | | | |

100.    This shows is that for two of eleven impurities the corrected numbers are ████████████████ that Kittendorf reports as measured at 223 nm by peak area response. And, we simply do not know how the other nine impurities might need to be corrected. If we were to assume that the other nine impurities are underestimated by a similar amount as, or more than, impurities D and E, the total impurities may be well over 5% – proving non-infringement.

34

**101.** However, given the lack of knowledge regarding these other impurities with respect to their RRF values at 223 nm and the possibility that they could be underestimating by *much more* than ███████, or could be overestimating as well, there is no viable way to "correct" Dr. Kittendorf's total impurity numbers. Further, given the other flaws in Kittendorf's method discussed above – including lack of validation – the entire test should not be relied upon.

## VI.   DR. KITTENDORF'S TESTING OF THE BELRAPZO® AND BENDEKA® PRODUCTS IN THE PRIOR *HOSPIRA* LITIGATION ARE ALSO FLAWED AND UNRELIABLE

**102.** I have also been asked to review Dr. Kittendorf's Report from the *Hospira* case (Exh. 18, "Kittendorf *Hospira* Report"), which I understand is relied upon for a different issue in this case by Dr. Trout and Eagle's damages experts. I am not opining on anything about damages. However, I do offer the following opinions regarding the unreliability of the Kittendorf *Hospira* Report -- which raises similar concerns as noted above with respect to Dr. Kittendorf's testing of the Slayback NDA Product.

**103.** In the Kittendorf *Hospira* Report, Dr. Kittendorf performs ██████████ ███ ███████ ███ ████ ████ ████ ███ █ ██ ██ ████ ████ ██ Dr. Kittendorf supposedly "models" his testing in *Hospira* on ██ █████████████████ ██ ███ ███ ██████████████ s ██████ █████ ▍Exh. 18, Kittendorf *Hospira* Report at EAGLEBEN-SA_00353438-39, Tables B1-B3 █████ █████████████ )). Again, as with the testing of the Slayback Product in this case, Dr. Kittendorf and Dr. Trout appear to claim that the validation of ████████████████ could be transferred to the Kittendorf *Hospira* Report method.

**104.** However, ████████████████ is different from what Dr. Kittendorf did in the *Hospira* case. The relevant testing that Dr. Kittendorf did was at 223 nm in *Hospira*, is not at

the same wavelength as ███████████████████ ██ (Exh. 18, Kittendorf *Hospira* Report, at EAGLEBEN-SA_00353438 – ████ ████████████████████ ██). And the Kittendorf *Hospira* method at 223 nm also uses a different quantitation method (peak area response) than ████████████████ ████████████████ Kittendorf's *Hospira* testing ████ ██ is also not the same as ████████████████ because, even though the wavelengths are the same, it uses a different quantitiation method.

105. As explained above, a novel HPLC method must be validated. (Exh. 7, USP Chapter 1225, Table 2 (pg. 6); Exh. 16, USP 621; *see also* Exh. 18, Kittendorf *Hospira* Report at ¶ 29; Trout Opening Report at ¶ 394). Dr. Kittendorf's *Hospira* Report, from what I see, does not perform the necessary validation steps. For example, there are no tests for linearity and range for any bendamustine impurities, nor was a robustness study performed. Therefore, for the same reasons set forth above with respect to Dr. Kittendorf's testing in this case, his results in the *Hospira* case are unvalidated and unreliable.

106. As with the Kittendorf Report in this case, Kittendorf assumes that all of the absorptivities are the same for all of his peak area response quantitation method determinations in the *Hospira* case. (*See, e.g.*, Exh. 18, Kittendorf *Hospira* Report at EAGLEBEN-SA_00353444 fn. 1). However, there are no calculated absorptivities for any of the analytes in the Kittendorf *Hospira* Report, and I have not found any data from which an absorptivity could be calculated. As a result there is no basis to know whether the absorptivities are the same, and therefore no justification of the assumption that would allow a peak area response quantitation method. As a result there is no way to know if the numbers presented at 223 nm by Kittendorf's *Hospira* Report are accurate.

36

107.    The Kittendorf's *Hospira* Report and its results are unvalidated and unreliable. Thus, I conclude that there is no evidence in the Kittendorf *Hospira* Report that the Belrapzo® and Bendeka® products satisfy the impurity limitation of the claims-in-suit as tested at 223 nm and using a peak area response quantitation method.

## VII.    CONCLUSION

108.    Dr. Kittendorf's HPLC method for the analysis of bendamustine and its impurities at 223 nm is not the same as, or equivalent to, Slayback's method hence he should have validated his method. Dr. Kittendorf failed to perform or perform properly six of the seven steps required by the USP to complete a validation. It is my conclusion then that Dr. Kittendorf's method is not validated and his results are unvalidated and unreliable.

109.    Dr. Kittendorf reported quantities of bendamustine and its impurities based upon a false assumption that the response factors for bendamustine and all the impurities are the same. Using Dr. Kittendorf's own data we have shown that the response factors for bendamustine, impurity D, and impurity E at 223 nm are different. This means Dr. Kittendorf's data are based on a false assumption and therefore are inaccurate and unreliable.

110.    In fact because the actual values of the response factors for bendamustine and impurities D and E are different, Dr. Kittendorf's method underestimates those impurities by ███ ██████ █. Given the uncertainty in Dr. Kittendorf's data, the total level of impurities in the three Slayback samples he examined may well be over 5%, proving non-infringement. However, given this, and the other flaws in Dr. Kittendorf's work, are not reliable and would not be relied upon by an analytical chemist.

111.    The test results from Dr. Kittendorf's testing of the Belrapzo® and Bendeka® products in the prior *Hospira* litigation also suffer lack of validation and reliance on assumptions

37

that were not justified.  And for those reasons the results in the Kittendorf *Hospira* Report are

unvalidated and unreliable as well.

Brian C. Smith

Dated: March 16, 2026                    _____

# EXHIBIT 2

**Redacted Public Version**



**Planet Depos**
We Make It *Happen*™

# HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Transcript of Jeffrey Kittendorf, Ph.D.

**Date:** April 28, 2026
**Case:** Eagle Pharmaceuticals, Inc., et al. -v- Slayback Pharma/Azurity Pharma

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

1 (1 to 4)

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS, INC. and )
EAGLE SUB1 LLC, )
 )
        Plaintiffs,    )  C.A. No.
 )  24-65-JLH
     v.                )
 )
SLAYBACK PHARMA LLC, and AZURITY )
PHARMACEUTICALS, INC., )
 )
        Defendants.    )

        * * * Highly Confidential * * *

        * * * Attorneys' Eyes Only * * *

        The highly confidential videotaped deposition of JEFFREY KITTENDORF, Ph.D., taken in the above-entitled cause, before Deborah A. Thompson, a Certified Shorthand Reporter in the State of Illinois, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts at 330 North Wabash Avenue, Chicago, Illinois, on the 28th day of April 2026, at 9:00 o'clock AM.

**Page 2**

APPEARANCES:

LATHAM & WATKINS LLP, by
MR. KENNETH G. SCHULER
MS. MANUELA BUREK
330 North Wabash Avenue, Suite 2800
Chicago, Illinois  60611
312.876.7700
kenneth.schuler@lw.com

        on behalf of the Plaintiffs;

WINDELS MARK LANE & MITTENDORF, LLP, by
MR. JASON A. LIEF
MS. AUDREY SPARSCHU
156 West 56th Street
New York, New York  10019
212.237.1061
jlief@windelsmarx.com

        on behalf of the Slayback Pharma, LLC, and
        Azurity Pharmaceuticals, Inc.;

KATTEN MUCHIN ROSENMAN, LLP, by
MR. CHRISTOPHER B. FERENC
1919 Pennsylvania Avenue Northwest
Suite 800
Washington, D.C.  20006-3404
202.625.3647
christopher.ferenc@katten.com

        on behalf of the Apotex.

ALSO PRESENT:

    Mr. Ned O'Brien, Videographer

^^ REPORTER' NOTE:  All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily indicate an exact quote from the document.

REPORTED BY:  DEBORAH A. THOMPSON, CSR, RPR
            LICENSE NO.:  084-003487

**Page 3**

            I N D E X

WITNESS                                PAGE

JEFFREY D. KITTENDORF, Ph.D.

    Examination By Mr. Lief .....................11

    Examination By Mr. Ferenc ..................161

            E X H I B I T S

NUMBER        DESCRIPTION              MARKED OR
                                       REFERENCED
Kittendorf Exhibit

Exhibit 1    Kittendorf Curriculum Vitae        14

Exhibit 2    '214 Patent                        30

Exhibit 3    Kittendorf Ph.D.                   32
             Dissertation

Exhibit 4    Chemical Analysis page from        35
             website

Exhibit 5    Expert Report of Jeffrey D.        42
             Kittendorf, Ph.D.

Exhibit 6    Notebook pages.                    50

Exhibit 7    Reply Expert Report of Dr.         78
             Jeffrey D. Kittendorf, Ph.D.
             Exhibit 1 - Chromatograms
             235 NM

Exhibit 8    Introduction to Modern            86
             Liquid Chromatography

Exhibit 9    Reply Expert Report of Dr.        89
             Jeffrey D. Kittendorf, Ph.D.

Exhibit 10   USP 621                           95

Exhibit 11   USP monograph for                 98
             bendamustine hydrochloride.
             Bates EAGLEBEN-SA_00368468

**Page 4**

            E X H I B I T S  (Continued)

NUMBER        DESCRIPTION              MARKED OR
                                       REFERENCED
Kittendorf Exhibit

Exhibit 12   "Method Adjustment the USP        109
             Way"

Exhibit 13   ORA-LAB.5.4.5                     117

Exhibit 14   Eagle Pharmaceuticals v.          121
             Hospira Kittendorf Expert
             Report.  Bates
             EAGLEBEN-SA_00353427-3652

Exhibit 15   Exhibit H of Kittendorf           128
             Opening Report

Exhibit 16   Expert Report of Dr. Brian        141
             C. Smith Regarding the
             Testing of Dr. Kittendorf

Exhibit 17   Mikromol.  External               145
             reference standards or
             relative response factors

Exhibit 18   Bendamustine Related              155
             Compound A

Exhibit 19   Compounds D and E                 158
             certificates

Exhibit 20   2009 USP 32 NF 27 Volume 1        161

Exhibit 21   Expert Report of Jeffrey D.       161
             Kittendorf, Ph.D.

Exhibit 22   Bates Number                      170
             APOBENDA64_002956 through
             3031

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

---

5

THE VIDEOGRAPHER:  Here begins Media Unit 1 in the videotaped deposition of Dr. Jeffrey Kittendorf in the matter of Eagle Pharmaceuticals, et al., v. Slayback Pharma and Azurity Pharma in the United States District Court for the District of Delaware.  The case number is CA Number 24-65-JLH.

Today's date is Tuesday, April 28th, 2026.  The time on the video monitor is 9:08 AM.  The videographer today is Ned O'Brien representing Planet Depos.  This video deposition is taking place at Latham & Watkins, Chicago.

Would counsel please voice-identify themselves and state whom they represent.

MR. SCHULER:  Ken Schuler, Latham & Watkins.  Along with my colleague Manuela Burek, for the witness and Eagle Pharmaceuticals.

MR. LIEF:  Jason Lief from Windels Marx on behalf of defendants Azurity and Slayback.  And with me is my colleague, Audrey Sparschu.

MR. FERENC:  Christopher Ferenc from Katten Muchin Rosenman on behalf of the Apotex defendants.

THE VIDEOGRAPHER:  Thank you.

The court reporter today is Deborah Thompson representing Planet Depos.

The witness will now be sworn in.

---

6

(Witness duly sworn.)

MR. SCHULER:  Before we begin, the defendant's position that led us here was that they needed ten hours with Dr. Kittendorf because they each had separate issues and had separate reports, and they had not shared any of that information with one another.  We said we would accommodate the ten-hour request and we would go in trial order Apotex, Slayback, and Baxter.  Was that just gamesmanship?

MR. LIEF:  Counsel, let me say a few things about that.  One, the last time you and I were in deposition together, we had a discussion both on the record and off the record about long speaking objections from you.  And I told you then, as I'll tell you now, if you do that in this deposition, we will get the Court on the phone.

Number two, with respect to how we're going to proceed, this is our deposition, not yours.

MR. SCHULER:  Excuse me.  You induced us to give you ten hours.

MR. LIEF:  We didn't induce anything, Counsel.  We came to an agreement.  Are you reneging on that agreement?

MR. SCHULER:  You appear to be reneging on

---

7

the agreement.  I said I would produce him in trial order 3 hours and 15, 20 minutes.

MR. LIEF:  That was not our agreement.  Our agreement was --

MR. SCHULER:  You said you needed ten hours; correct?

MR. LIEF:  That is part of the agreement.

MR. SCHULER:  And you need ten hours because --

MR. LIEF:  We said we would split between the defendants as we saw fit.  You do not get to micromanage what we're doing.

MR. SCHULER:  No.  That was your initial position.

MR. LIEF:  What would be your possible reason for saying that Apotex has to go before Slayback?

MR. SCHULER:  I said I would produce him in trial order.  Was that just gamesmanship that you needed these separate sessions --

MR. LIEF:  It was gamesmanship on your part.

MR. SCHULER:  Excuse me, sir.  How is it gamesmanship on my part to accommodate your request because you said you hadn't shared any conversation

---

8

between each other so that you needed three separate sessions of 3 hours and 20 minutes each, and I accommodated that.

MR. LIEF:  There are three separate tests done.

MR. SCHULER:  I disagree with that.  You said you weren't sharing information so that you could have --

MR. LIEF:  And we all have different criticisms of those tests.

MR. SCHULER:  You said you could not coordinate it because you hadn't shared the information.

MR. LIEF:  We haven't coordinated, okay?  We got our client to agree that Apotex could sit in.  But we haven't coordinated.  He has his own questions, and I have my own questions, and they're based upon -- I don't know who his witness is who opposes Dr. Kittendorf.  I know who my witness is, who is Dr. Smith.  You deposed him last week.  This is a total disruption for the sake of disrupting.

MR. SCHULER:  Stop.

MR. LIEF:  It's a game of micromanaging.  And I'll say something else on the record.  You've had this thing going on where you send -- as we're

---

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

9

coming up on depositions, as we're coming up on other things, you sent a thing a day ago about Miller. You've had that Miller report for two weeks. Talk about gamesmanship. And all of a sudden an objection shows up and you need a meet and confer instantly right in the middle of two other major depositions. You could have done that two weeks ago. This is all gamesmanship in your part, in my view, and it absolutely should end.

MR. SCHULER: We objected the day after you disclosed Dr. Willard.

MR. LIEF: That was a different objection. That was a different objection.

MR. SCHULER: No, it's the same one. You can't --

MR. LIEF: No, it's not.

MR. SCHULER: -- sneak in an expert report through attaching something to a reply report.

MR. LIEF: Your objection didn't say that.

MR. SCHULER: Yes.

MR. LIEF: No, it didn't.

MR. SCHULER: Rule 26, you have the burden of proof.

MR. LIEF: You're wrong on Rule 26. But your objection about his report itself came two weeks

10

late, and it just happened to show up in the middle of these depositions. You know you're playing games.

MR. SCHULER: Sir, we objected the day after you disclosed him as an expert.

MR. LIEF: That was before the 13th when --

MR. SCHULER: What was the basis for our objection?

MR. LIEF: Rule 26. This is a different objection, okay? And if you had that objection, why didn't it come back again on April 14? It came back in the middle of these depositions as a disruptive effort. That's what you've been doing throughout this litigation.

MR. SCHULER: I've made my record. We've accommodated your ten-hour request. You appeared to have made a representation to induce that ten hours.

MR. LIEF: That's nonsense. That's absolute nonsense, Counsel, and you know it. That's absolute nonsense. Now, are you going to let us proceed, or are we going to just do this all day?

MR. SCHULER: Go ahead. I've made my record I said.

JEFFREY D. KITTENDORF, Ph.D., called as a witness herein, having been first duly sworn, was examined and testified as follows:

11

EXAMINATION

BY MR. LIEF:

Q   Dr. Kittendorf, would you state your full name for the record.

A   Jeffrey David Kittendorf.

Q   Have you ever gone by any other name?

A   Jeff.

Q   Anything else?

A   No.

Q   What is your current business address?

A   Business address is 600 South Wagner Road, Ann Arbor, Michigan.

Q   What is your current home address?

A   2287 Hillside Court, Dexter, Michigan.

Q   Do you have any other residences?

A   No.

Q   Do you own any other property anywhere?

A   Not directly, no.

Q   Indirectly?

A   My wife does.

Q   And where is that?

A   Where is the property?

Q   Yes.

MR. SCHULER: I'll object on relevance grounds. What possible relevance could this have?

12

MR. LIEF: Counsel, you've objected. It is relevant.

MR. SCHULER: I can tell the witness is a little bit uncomfortable with you asking very personal questions.

MR. LIEF: Are you directing him not to answer?

MR. SCHULER: I'm asking what the relevance is.

MR. LIEF: I'll tell you afterwards. But what's the answer?

THE WITNESS: Colorado, Florida, Michigan.

MR. SCHULER: What's the relevance?

BY MR. LIEF:

Q   Anywhere within 100 miles of Delaware?

A   No.

MR. LIEF: That's the relevance, Counsel.

BY MR. LIEF:

Q   Who is your current employer?

A   I technically have two. So I have my company, PharmaForensics Laboratories, that I do work on cases such as this. And then I'm a part-time employee at the University of Michigan.

Q   Are you a professor at Michigan?

A   I have a long history at Michigan. I'm

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

---

**13**

currently an adjunct professor at the University of Michigan, but my current role -- my payroll, I guess I should say, is in their innovation partnerships office where I'm a mentor and resident.

Q   PharmaForensics, what is your title?

A   Owner, cofounder, managing partner, trash hauler.

Q   How many employees are there at PharmaForensics?

A   Technically no W-2 employees. It's just myself and cofounder.

Q   Two people?

A   Two people.

Q   Do you have a physical space that is part of PharmaForensics?

A   Yes, at that address that I gave prior.

Q   Is there a laboratory at that address?

A   Yes.

Q   Do you know how many square feet that is?

A   The laboratory?

Q   Yes.

A   Maybe 1200.

Q   Can you briefly outline for us your educational degrees?

A   It's on my CV, which I think was part of

---

**14**

my --

Q   We marked that.  Do you have 32?

MR. LIEF:  We'll mark this as Kittendorf 1.

(Kittendorf Exhibit 1 marked.)

BY MR. LIEF:

Q   Dr. Kittendorf, take a look at what's been marked as Kittendorf Exhibit 1.  Please let me know if you've seen this before.

A   Yes, I've seen this before.

Q   And looking at it, can you tell me whether this is the most recent version of your CV?

A   Yes.  I would just note it's the most recent produced.  There is one additional deposition that I was part of about two weeks ago, two or three weeks ago which is not reflected on this CV.

Q   Do you know what case that was?

A   Not offhand.

Q   Do you know who the parties were?

A   I know who I was working on behalf of, yes.

Q   Who were you working on behalf?

A   AstraZeneca.

Q   And do you know what court that case was in?

A   I don't recall.

Q   Do you know what drug it involved?

---

**15**

A   I do.

Q   What drug?

A   I don't know that I could say.

Q   Is it a publicly filed lawsuit?

A   Yeah, but I don't know that I'm comfortable saying that.

Q   Well, unless there's an issue of third-party confidentiality, if the name of the drug is public in court, I think we should know.

A   Fair enough.  Lynparza.

Q   And I take it you did testing in that case? That can be a yes or no.

A   Yes.

Q   In terms of your education, you have a BS in biochemistry from the Eastern Michigan University; is that correct?

A   Correct.

Q   And your research adviser it says was Ronald M. Scott?

A   That's who I did some research with back -- way back in history.

Q   And you graduated in 1997?

A   Correct.

Q   During your undergraduate work, did you take any courses in analytical chemistry?

---

**16**

A   I don't remember.  At least one.

Q   You think more than one?

A   I don't remember, sir.

Q   And during your undergraduate work, did you do any HPLC experiments?

A   During my undergraduate work?

Q   Yes.

A   In terms of my research or my coursework?

Q   Either.

A   Yes.

Q   And what kind of HPLC did you do during your undergraduate work?

A   What kind of HPLC did I do?

Q   Yeah.

A   Maybe give me --

Q   Was it quantitative?

A   Give me some options, and then I'll answer it.

Q   Was it quantitative?

A   Yeah, it was.

Q   Did you validate those HPLC methods?

A   During my coursework?  No.

Q   What was the main focus of your studies as an undergraduate?

A   Biochemistry.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

5 (17 to 20)

17

Q   And did you go immediately upon graduation into a Ph.D. program?

A   Yes.

Q   And I see you obtained your Ph.D. from the University of Michigan in 2004; is that correct?

A   Yes.

Q   And the subject matter of your Ph.D. or the department that you got it in was medicinal chemistry?

A   Yes.

Q   What was the subject matter of your dissertation?

A   Enzyme mechanisms, enzymology, enzyme kinetics.

Q   Would it be fair to say the subject matter was not analytical chemistry?

A   Correct.  Although it was a tool that we use, but did I get a Ph.D. in analytical chemistry? I got a Ph.D. in medicinal chemistry.

Q   For purposes of your dissertation, did you do any work with HPLC?

A   Certainly.

Q   You did?

A   Yeah.

Q   What kind of work did you do?

18

A   Isolating products that have enzyme reactions, purifying products from small synthesis.

Q   Anything else?

A   Not that I recall, but could be.

Q   What you've described, would you agree with me, would not be quantitative HPLC; correct?

A   If I'm following an enzyme reaction by looking at the products produced, I would need to quantitate those products; so I think some of it would be quantitative HPLC, sir.

Q   You think so?

A   (Nodding.)

Q   Do you have a direct memory of doing quantitative HPLC for your dissertation?

A   I just explained that I quantitated products from enzyme catalysis.  So isn't that quantitative?

Q   And that would be reported in your dissertation?

A   Probably.  I don't know.

Q   All right.  And then you did postdoctoral work, also at the University of Michigan, correct, from 2004 to 2008?

A   Correct.

Q   And what was the work you did as

19

postdoctoral work?

A   Natural product biosynthesis, understanding how enzymes produce complex natural products.

Q   Did you use HPLC during your postdoctoral work?

A   I did.

Q   And was it, again, all related to the natural products and enzymes?

A   Yes.

Q   During your Ph.D. studies, did you use HPLC to separate small molecules?

A   Yes.

Q   You did?  What small molecules?

A   Part -- well, so my focus was on pikromycin.  I did some things with erythromycin. And I did some experiments with cryptophycin.  So all those products and resultant sort of product mixtures from the enzymes had to be separated and analyzed.

Q   The enzymes themselves were not small molecules?

A   We didn't do HPLC on the enzymes, sir.

Q   You didn't purify enzymes with HPLC then?

A   Typically, you'd purify enzymes with FPLC or gravity, nickel columns, or some other media.

Q   So what did you purify with HPLC during

20

your Ph.D. work?

A   Again, looking at reactions, enzyme reactions, substrates and products, and the conversion from A to B, substrate to product.

Q   And that would have been true in your postdoctoral work as well?

MR. SCHULER:  Object to form.

THE WITNESS:  I'm sorry.  Were we not talking about -- I'm sorry.  Were we talking about graduate school?

BY MR. LIEF:

Q   We had gone back to your Ph.D. for a moment in that last question.

A   Okay.

Q   Do you need to change your answer in light of that?

A   No.

Q   With your postdoctoral work, did you do HPLC of small molecules there?

A   Yes.

Q   And was it quantitative?

A   To the extent that I was looking at the conversion of A to B, yes, it was quantitative.

Q   In your undergraduate work, did you take any courses on spectroscopy?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

6 (21 to 24)

**Page 21**

A   I'm sure I did.

Q   You did.

Do you know whether Eastern Michigan University offered any courses in spectroscopy?

A   To be honest, I don't remember what my course load was at Eastern Michigan University. I'm sure I can dig out the transcripts and figure it out, but I don't remember.

Q   During your Ph.D. work, did you take any courses in spectroscopy?

A   Yeah, absolutely.

Q   And during your postdoctoral work, did you work with spectroscopy?

A   Spectroscopy is a broad term. Yes. I did.

Q   In what respect?

MR. SCHULER:  Object to the form.

THE WITNESS:  In what respect is it a broad term? It covers a lot of -- it could cover fluorescence. It could cover UV. It could cover Vis. It could cover -- there's a wide range of spectroscopy techniques.

BY MR. LIEF:

Q   With respect to UV-Vis, did you do any UV-Vis at any time during your undergraduate, graduate, or postdoctoral work?

**Page 22**

A   Very common technique, yes.

Q   Did you do it, though?

A   Yes. It's a very common technique.

Q   Did you use UV-Vis --

MR. SCHULER:  Just make sure you guys don't talk over each other.

BY MR. LIEF:

Q   And did you do UV-Vis as a quantitative analysis?

A   Yes.

MR. SCHULER:  Object to the form.

I also cannot hear, like, the last part of most of your questions.

MR. LIEF:  Is the court reporter having trouble hearing me?

THE REPORTER:  You are soft-spoken, I will say that. You are. Both of you. Everyone is soft-spoken, so...

MR. LIEF:  Okay. We'll try to do better.

BY MR. LIEF:

Q   In terms of the analytical techniques you used in -- during your educational period, which I'm including from your undergraduate through your postdoctoral work, would you say that HPLC was the focal point of your analytical techniques that you

**Page 23**

used?

A   I would say there was not one focal point. I would say it was a tool in my toolbox that I used routinely.

Q   Did you use any other tool more routinely?

A   At what point in my career?

Q   Throughout your education, from your undergraduate to your Ph.D. work to your postdoctoral work.

A   You know, it's obviously project-dependent. I will say that HPLC is pretty ubiquitous in labs. It's a pretty well-known tool, and it can answer a lot of different questions.

Was I at the HPLC every day?  No.

Q   Was there any tool you were at every day?

A   My computer.

Q   Any analytical tool?

A   My PIPETMAN.

(Reporter clarification.)

BY MR. LIEF:

Q   During your Ph.D. work, did you use affinity chromatography?

A   Yep. Yes.

Q   Would you say you used that more frequently than your HPLC?

**Page 24**

A   So, again, I think we need to distinguish because HPLC is a technique that I could do affinity chromatography with. So I did a bunch of -- I did quite a bit of affinity chromatography, yes.

Q   You consider that HPLC work?

A   That was not. That was gravity, generally gravity fed or FPLC work.

Q   So you don't consider it HPLC work?

A   I didn't use -- I think there's a distinction here. I didn't use an HPLC to do the affinity chromatography; right?  HPLC is a broad term. I did affinity chromatography. I could have used HPLC to do the affinity chromatography. It's basically what the column media is, the key differential. I did not do that.

Q   Okay. So the answer is you didn't do that when you did affinity chromatography?

A   Correct.

Q   When were you first retained for this case?

A   For this particular -- for this particular matter.

I'd have to go back and look at my notes. It's probably 2024.

Q   And approximately how many total hours have you spent on this case, on this particular matter,

**25**

which refers to -- to me, the Slayback matter?

A  I couldn't even begin to estimate without looking at notes.

Q  Do you think it was more than 500 hours?

A  No.

Q  Do you think it was more than 100 hours?

A  I wouldn't be surprised if it was more than 100 hours. I really can't give you a guess.

Q  And that number would be going back to 2024?

A  To the original engagement, yeah.

Q  Do you have a sense of how many hours you spent on the experiments that you've reported in your report with respect to Slayback?

A  Again, I'd have to go consult my notes, but...

Q  Roughly?

A  Fifteen to twenty.

Q  What is your hourly rate in this case?

A  I believe it's ███████.

Q  Is that your usual rate?

A  That is my usual rate.

Q  Would you say that the majority of your income in any particular year comes from being an expert witness?

**26**

A  I would say no.

Q  Have there been years where the majority of your income came from being an expert witness?

A  I would say have there been years? It's a good question. I don't really know the answer to that, to be honest with you. I've got several income streams.

Q  What are the other income streams just generally?

A  Passive income, investments. General.

Q  That's it?

A  (Nodding.)

Q  Would you say that in terms of non-passive income, in terms of salary or profits from your business, that the majority of that does come from being an expert witness?

A  I would say that depends on the year.

Q  So there are some years where your non-passive income, the majority of it was from being an expert witness?

A  No. I would say that's probably not true. I would say my non-passive income is the majority of my income. Sorry. Let me go back. My passive income is the majority of my income.

Q  Setting aside your passive income in terms

**27**

of money you make from your businesses, I take it there are years where the majority of that is from being an expert witness?

A  Yes, it could be.

Q  On the fifth page of your CV, which is again Kittendorf Exhibit 1, there's a reference to a deposition and testifying experience. Do you see that?

A  I do.

Q  For the Chiesi case?

A  Yes.

Q  Do you know who you represented in that case?

MR. SCHULER:  Object to the form.

THE WITNESS:  I do know.

BY MR. LIEF:

Q  Who was it?

A  Chiesi.

Q  Were they a patentee?

A  I don't recall.

Q  Do you have a sense of whether you've ever testified on behalf of a generic pharmaceutical company?

A  Have I ever testified on behalf of a generic? I've worked with many generics. To the

**28**

extent that it's -- my work has been subjected to deposition, I don't recall.

Q  When you said you worked with many generics, was that in the context of litigations?

A  To the best of my understanding. Again, nothing ever went to deposition. So -- but I do believe that I was engaged on legal matters, yes.

Q  Have you ever testified at trial?

A  I testified once at an ITC trial.

Q  Do you know who the parties were?

A  I worked on behalf of Kaeneka. I don't remember who they were adverse to.

Q  And do you recall whether your position in that case was accepted by the ITC court?

A  I don't know about my position, but I recall that Kaeneka did not do well in that case.

MR. SCHULER:  While he's waiting, do you want to spell that?

THE WITNESS:  K-a-e-n-e-k-a.

BY MR. LIEF:

Q  In your CV again, starting on the second page and going through the third page, there's a list of 20 publications. Do you see that?

A  I do.

Q  Am I correct that none of those

29

publications are about the methodology of analytical chemistry?

A   The methodology.  Yeah, I think that would be fair to say.

Q   And am I correct that you haven't published any books or articles on quantitative analytical chemistry methodology; correct?

A   I have not.

Q   Is it fair to say that you've published no books or articles on HPLC methodology?

A   I have not.

Q   Have you published any books or articles on validating HPLC methodologies?

A   No.

Q   Have you published any books or articles regarding Beer's law?

A   It's interesting because that's a very old law.  I don't know if anybody would publish anything nowadays on Beer's law.  But I have not, no.

Q   Do you have any publications regarding the impact of changing the detection wavelength on an HPLC experiment?

A   Any publications?

Q   Yes.

A   No.

30

Q   And would it be fair to say that all of your articles, your publications listed here, relate to enzymology; correct?

A   Yes.

Q   Have you ever published anything about bendamustine?

MR. SCHULER:  It's bendamustine.

MR. LIEF:  I'll pronounce it your way.

BY MR. LIEF:

Q   And how would you characterize bendamustine as a molecule?

A   Show me -- if you could show me the structure, I can help you characterize it.

MR. LIEF:  We will mark as Kittendorf Exhibit 2 the '214 patent in suit.

(Kittendorf Exhibit 2 marked.)

BY MR. LIEF:

Q   Let me begin by asking you to take a look at Kittendorf Exhibit 2.  And have you seen this before?

A   Yes.

Q   If you look at Column 1, there's a structure for bendamustine.  And do you recognize that to be the structure of bendamustine?

A   Yes.

31

Q   And how would you characterize that molecule?

A   I think there are a number of ways.  Maybe clarify the question for me.

Q   Well, it's not an enzyme; correct?

A   Correct.

Q   It's not a peptide; correct?

A   Correct.

Q   It's not a protein; correct?

A   Nope.

Q   It's a small molecule, isn't it?

A   It's a nitrogen mustard with a benzimidazole core.

Q   As one of my old partners used to say, "that too."

Is this the first time you've done experiments with bendamustine for this case?

A   No.

Q   You've done experiments in a prior case?

A   Yes.

Q   And was that the Hospira case?

A   I would have to be reminded of who the parties were, but I have worked with bendamustine before.

Q   Other than those two cases, have you worked

32

with bendamustine before?

A   No, I don't believe so.

MR. LIEF:  We're going to mark as Kittendorf Exhibit 3 a document which I'll ask you some questions about.

(Kittendorf Exhibit 3 marked.)

BY MR. LIEF:

Q   Take a look through Kittendorf Exhibit 3.  And if you could tell me generally -- do you recognize this document?

A   I do.

Q   And am I correct that this is a copy of your Ph.D. dissertation?

A   It looks to be.

Q   And am I correct that the title is Catalysis By tRNA-Guanine Transglycosylase from escherichia coli?

A   Yes.

Q   And you would agree with me that that topic is not about analytical methodology per se?

A   But nonetheless interesting.  But I would agree with you.

Q   I'm sure it was interesting.

And if you had to summarize this, is it fair to say that what you were doing in this research

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

---

33

was studying an enzyme that may play a role in Shigellosis?

A    That was the working hypothetical in the 1990s.

Q    And Shigellosis is an infectious disease that causes severe diarrhea?

A    That's my understanding.

Q    Now, would it surprise you to learn that in searching through this document we found no reference to HPLC?

A    Would it surprise me?  No, probably not.

Q    Is that because you didn't use HPLC for your dissertation?

A    Likely not for the studies reported here. I did use HPLC in my graduate work.  That work was not in my dissertation.

Q    And would you say that the statements you've made in your dissertation you would expect to be scientifically true?

A    So if I could go back and edit and change my dissertation, would I?  I probably would.  Were they scientifically true at the time?  Likely.  But remember, the goal of the Ph.D., it's a training exercise, much like going to any sort of professional school.  So this was as good as it was at the time

---

34

that it was defended.  And I'm sure there are things that I would go back and change.

Q    As far as you know, you didn't say anything that was untruthful knowingly in your Ph.D. thesis?

A    No.

Q    With respect to PharmaForensics, and I apologize if you answered this before, but when was it formed?

A    2008, 2009 time frame.  Let me see what I have on the CV.  2009.

Q    And what was the reason for forming it?

A    We saw -- my partner and I were interested in starting a contract research organization, and we had done work for attorneys, in particular one project for an attorney doing litigation support, doing testing for an attorney-client, and we thought there might be a niche that we could service there. And so we started PharmaForensics Laboratories.

Q    Other than litigation support, is there any other purpose to PharmaForensics?

A    You know, our main focus is on doing science for attorneys and their clients.  So have we done one-off projects and experiments for others, I think we have.  I think sometimes people will call us up and they'll have a pill bottle from a generic

---

35

supplier and they say, can you analyze this to make sure it's the right dose or there's no -- there's something weird, can you look into it.  Sometimes we'll take that on.  But in general we stick to doing work for attorneys.

MR. LIEF:  Okay.  I'd like to mark as Kittendorf Exhibit 4 a printout I'll represent to you of a page from your website.

(Kittendorf Exhibit 4 marked.)

BY MR. LIEF:

Q    And do you recognize this?  It's entitled, "Chemical Analysis," as being a page from your website.

A    I do.

Q    Okay.  And towards the -- towards the bottom of that page, there's a series of bullet points that begin "Nuclear Magnetic Resonance Spectroscopy."

Do you see that?

A    I do.

Q    It lists one, two, three, four, five, six different analytical techniques.  Do you see that?

A    I do.

Q    And one of those is high-pressure liquid chromatography; correct?

---

36

A    It is.

Q    Is the majority of the work that you do at PharmaForensics high-pressure liquid chromatography?

A    I would say HPLC is utilized for many of the projects we are engaged in, yes.

Q    When you say "many," does that mean the majority or less than the majority?

A    That's tough to say.  I would just say many.

Q    When was the last time before the current HPLC experiment that we're going to discuss in this case that you did an HPLC?

A    The case I was just deposed on was HPLC.

Q    When was that experiment done, roughly, without revealing any details of it?  Just when was it done?

A    Yeah.  2025.

Q    End of the year, beginning of the year?

A    My recollection is in the first half of the year.

Q    So more than six months ago?

A    If it was the first half of the year, your math would be correct.

Q    And between that and the testing you did for this case in -- I believe it was in January you

---

37

did the testing for this case?

A I would have to look at the report. January sounds right, but I don't recall the specific time.

Q Between those two HPLC experiments, you did no other HPLC experiments; correct?

A I don't recall. I would have to look at my project log to see what projects I was involved with between those two.

Q And in terms of HPLC, do you have a setup for HPLC in your laboratory, in your 1,200 square-foot laboratory that's dedicated to HPLC?

MR. SCHULER: Object to the form.

THE WITNESS: I have two HPLCs.

BY MR. LIEF:

Q Do you have a nuclear magnetic resonance machine in your lab?

A No, I don't have an NMR.

Q Do you have a fluorescence spectrometer?

A I do.

Q Do you have an IR spectroscopy machine?

A I don't have that.

Q Do you have a gas chromatography machine?

A I do.

Q Are there any other machines you have in

38

your lab other than what we've just discussed?

A I think you mentioned -- or you forgot UV-Vis. I have that.

Q Is that part of the HPLC setup, or is that a separate?

A That would be separate.

Q Anything else?

A In terms of equipment? You want a rundown of my laboratory equipment?

Q That relates to a test.

A PH meter?

(Reporter clarification.)

A PH meter. Stir plates. Karl Fischer water titration.

(Reporter clarification.)

A Karl Fischer.

Dissolution apparatus. I have a lot of biochemistry tools: PCR, water baths, incubators, stability chambers.

Q Do you ever contract out experiments to the labs?

A We have done that in the past, yes.

Q Is that just for nuclear magnetic resonance, because you don't have that machine, or other things too?

39

A No. Actually, for the NMR, we would pay a recharge rate at the university to access their instrumentation. The university opens up a wide range of instruments that we can pay to use. In certain cases -- you know, specifically if we needed to do some synthesis, I would contract that out.

Q So is it fair to say that HPLC is not -- is just one of many types of experiments that you perform at PharmaForensics?

A Sure. HPLC is a tool we use at PharmaForensics, and we have a variety of tools at our disposal.

Q In the entire history of PharmaForensics, roughly how often do you perform HPLC?

A Can you restate the question. I got caught up on the entire history, roughly how often do I perform.

Q Let me try to fix it.

Since the founding of PharmaForensics, approximately how often have you done HPLC?

MR. SCHULER: Object to the form.

THE WITNESS: It's difficult for me to answer, but I think what I can tell you is HPLC analysis is oftentimes -- I don't know if it's a majority or if it's many, but it's oftentimes used as

40

an analytical tool in many of my projects.

BY MR. LIEF:

Q And when you have done HPLC in the past, have you developed the HPLC methodology on your own from scratch?

A Not for PharmaForensics Labs' work. So most of the work that we get for PharmaForensics Labs are methods that are already developed, and we're asked to run them.

Q When you do a method that's already developed, I take it it's your view that it doesn't need to be validated?

A I think the validation would be context-specific. If I'm doing samples for the FDA, I would probably make sure that's validated. If I'm given a method that's already validated and asked to use that on my instrumentation, I would say I wouldn't have to validate that method.

Q For purposes of the experiments you did here for Slayback, you didn't validate those methods?

A I don't think they were more than one method; so I'm going to need you to clarify which methods.

Q Well, with respect to any of the experiments you did for the Slayback case on

**41**

bendamustine, you didn't validate any of those methods; correct?

**A   Those methods were already validated.  I did not validate them.  They were validated methods.**

Q   And in your work in this case, before you did the experiments for the Slayback case, did you do any literature searches?

**A   Literature?  On which topic?**

Q   On any topic.

MR. SCHULER:  Object to the form.

THE WITNESS:  I don't recall.

BY MR. LIEF:

Q   Do you typically do a literature search before you undertake an experimental project?

**A   Again, it would be context-specific.**

Q   And for purposes of this case, meaning Slayback, did you look at any referenced texts at all before you did the experiments?

MR. SCHULER:  Object to the form.

THE WITNESS:  I don't recall.

BY MR. LIEF:

Q   Have you ever done a literature search in the past?

**A   In the past.  Yes, I have done literature searches.**

**42**

Q   When you do a literature search at PharmaForensics, do you save the results of your search?

**A   Probably not generally, no.**

Q   You cite to several reference books in your report.  Did you look at those before you did your experiments, the ones cited in your report?

**A   I'd have to see my report to confirm or deny that.**

MR. LIEF:  We'll come back to that.

Let's mark that as Kittendorf 5, which will be your first report in this case.

(Kittendorf Exhibit 5 marked.)

BY MR. LIEF:

Q   As a first matter with respect to Kittendorf 5, which is your opening report, do you recognize it?

**A   I do.**

Q   And on the last page, page 19, that's your signature; right?

**A   It is.**

Q   And does this report represent the entirety of the testing you've done for this case?

MR. SCHULER:  Object to the form.

THE WITNESS:  We're referring simply to the

**43**

Slayback?

BY MR. LIEF:

Q   To the Slayback.

**A   Yes.**

Q   Okay.  And am I correct that for this -- it's reported here you tested three samples of Slayback's product; correct?

MR. SCHULER:  Object to the form.

THE WITNESS:  Yes, three samples, yes.

BY MR. LIEF:

Q   And am I also correct that you had access to ten samples that were supplied by Slayback?

**A   Yes, ten vials.**

Q   And you tested three of those vials?

**A   Correct.**

Q   Is there some reason you didn't test the other set?

**A   Simply because three is generally good enough.  Like, you have -- the companies aren't going to test every vial they're going to put on to the shelves; right?  Slayback wouldn't test every vile of a batch.  You would test a representative sampling of your samples.  And so three was the representative sample in the sampling that I had from the time.**

Q   Do you still have the other seven vials?

**44**

**A   I do.**

Q   So if someone asked for them back, you could give them back?

**A   Yeah.**

Q   Are you aware of any other testing that was done for this case by you or anyone else on behalf of Eagle?

**A   I'm unaware.**

Q   And you did nothing other than what's reported in your opening report?

**A   Correct.**

Q   And upon receiving -- I take it at some point you received a report from a Dr. Smith?

**A   That sounds familiar, yes.**

Q   Which presented a critique of your opening report, correct?  Do you recall that?

**A   Yes.**

Q   And upon receiving Dr. Smith's report, did you undertake to do any testing from the time you received Dr. Smith's report to the time you submitted your reply report?

**A   No.**

Q   And since the submission of your reply report, have you done any testing again in the Slayback case?

45

A No.

Q After reading -- I take it you read Dr. Smith's report?

A I did.

Q And after reading it, were you prompted to pursue any experiments?

MR. SCHULER: Object to the form. When you say "prompted," are you asking about discussions, or are you just...

MR. LIEF: Fair enough.

BY MR. LIEF:

Q After reading Dr. Smith's report, did you want to do any experiments?

A After reading his report, did I want to do experiments? I didn't think about it, no.

Q In terms of the experiments that were done in this case for Slayback, on those three vials, did you personally perform those experiments?

A I did.

Q Was anyone else involved?

A No.

Q Did anyone review what you had done?

A No.

Q Did you discuss how you were going to do it with anyone before you did it?

46

MR. SCHULER: You can answer that yes or no.

THE WITNESS: No.

BY MR. LIEF:

Q And I didn't mean lawyers, I meant any -- your cofounder at PharmaForensics, did you discuss it with them?

A No.

MR. SCHULER: Just make sure you don't talk over each other.

THE WITNESS: Sorry.

MR. SCHULER: It's okay.

Do you have it?

THE REPORTER: I got it. Thank you. I appreciate it.

BY MR. LIEF:

Q Am I correct that in the experiments you did, you did not determine the response factor for any of the anolytes; is that correct?

A Correct. We did not calculate response factors for our data analysis.

Q That would have been true for the bendamustine and also for any of the impurities?

MR. SCHULER: Object to the form.

THE WITNESS: Any of the impurities, yes,

47

we did not calculate RFs.

BY MR. LIEF:

Q And you didn't do that for how they were absorbing at 223 nanometers; correct?

A Correct.

Q And you didn't do that for how they were absorbing at ████████ either; correct?

A Correct.

Q Could you have done that?

MR. SCHULER: Object to form.

THE WITNESS: We could have, yes.

BY MR. LIEF:

Q And just as a linguistics issue, when I use the phrase "response factor," do you understand that in this context to mean the same thing as absorptivity?

A I do not, no.

Q What do you understand it to mean?

A A response factor is how an anolyte responds to a signal in a relative sense to another anolyte.

Q That's a relative response factor; correct?

A Fair enough. So response factor is how an anolyte responds to a signal.

Q And in terms of a signal that's a UV

48

wavelength, it's a constant that relates to how much it absorbs per unit of concentration; correct?

A That's correct.

Q And you don't consider that to be an absorptivity?

A Sure, I do.

Q The experiments that were done for the Slayback case, do you know whether they were done before or the experiments that you did for Apotex and Baxter?

A I don't know what order I did the defendant samples in. I don't know.

Q Do you know whether those experiments were run for Slayback on the same column that they were run for Apotex or Baxter?

A I do know. It was not the same column.

Q Was the column that was used for the Slayback experiments, had it ever been used before for anything?

A It was brand new.

Q And I take it there were multiple injections on that column during your experiments for the Slayback case; correct?

A Of course.

Q Between each injection, was the column

**49**

cleaned?

A   We can look at the method here a minute if you don't mind.

Q   Of course.

A   It looks like in Slayback's method we get ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Q   And that's what you did?

A   Exactly.

Q   Have you ever heard the phrase "a column's dead time"?

A   Yes.

Q   And what is that?

A   Let me try to -- it's the amount of volume that runs through the column before -- I'm going to

**50**

struggle to give you a definition of this. It's actually the amount of volume of solvent in the column at any one time. So it's sort of the volume of the column. Let me put it that way.

Q   Did you measure at that time for the columns for the Slayback experiment?

A   No.

MR. SCHULER:  Good time for a break.

THE VIDEOGRAPHER:  We are going off the record. The time is -- sorry. We are going off the record, the time is 10:17 AM.

(Recess taken.)

THE VIDEOGRAPHER:  We are back on the record. The time is 10:30 AM.

MR. LIEF:  I think we're going to mark as Kittendorf Exhibit 6 a several-page document that was attached to your report.

(Kittendorf Exhibit 6 marked.)

BY MR. LIEF:

Q   As a first question, do you recognize this document?

A   I do.

Q   Is this your handwriting?

A   It is.

Q   What is this document?

**51**

A   Notebook pages.

Q   And at PharmaForensics, do you have a standard operating procedure on how to keep notebook pages?

A   No.

Q   So in some experiments you keep them one way, and in other experiments you keep them another way?

A   I wouldn't say that. I just don't have a standard operating procedure for it.

Q   Do you generally record your laboratory experiments in a bound book?

A   I've gone to digital paper now.

Q   So this is digital?

A   Yes.

Q   So it's a printout of a digital?

A   Yes.

Q   When did you make that change?

A   About a year ago.

Q   So there are no more signatures on each page of your lab notebooks?

A   Signing them myself, no. I've gotten away from that.

Q   And you don't have anyone else look at them either?

**52**

A   It's highly confidential; so I wouldn't have anyone else look at them.

Q   Within PharmaForensics?

A   No.

Q   The very first page, the first date, it looks -- I think if I'm reading it right, it's 1/12/26; is that right?

A   Yes.

Q   So that is when you began these experiments?

A   Yes.

Q   And then the very last entry on the last page also says, if I'm reading it right, 1/12/26 continued, yes?

A   Yes.

Q   So you finished these experiments in one day?

A   Yes. I think this is the sample prep for the HPLC. So, yeah, it would be about one day.

Q   And on the last page, it has a list of -- what it says are "injections versus source." I guess it says "source." Do you see that?

A   I don't see "source." Let me interpret that. That says "injection sequence."

Q   You're right. It's handwriting. It's

53

okay. Injection sequence. And are those the 19 steps that constituted the experiments for Slayback?

A   Let me clarify. Those are the 19 injections that constituted the Slayback HPLC sequence.

Q   And the last one, 19, just says "shutdown." Did that involve an injection, or did it just involve flipping the switch on the machine?

A   It was probably a sample injection, just one more time to cut the flow rate and shut off the detector.

Q   And if you look at Injections 13, 14, and 15, do you see those?

A   I do.

Q   Those are the actual Slayback samples that you injected; is that correct?

A   That would be true.

Q   And so, for instance, when you did Injection Number 13 for what's called Sample 1, that sample went through that column only once; correct?

A   Yes.

Q   And you took absorbences at both 223 and ▮▮ simultaneously as anolytes came out of the column?

A   That's correct.

54

Q   And so, for instance, if we go to your -- if we go to your opening report and if we look at your results table, which is on pages 15 and 16 -- for instance, on page 15, if I look at Table B1 and Table B2, do you see that?

A   I do.

Q   Those are -- B1 is reporting results at 223 nanometers; correct?

A   Yes.

Q   And B2 is reporting results at ▮▮ nanometers; correct?

A   Yes.

Q   But those two tables are reporting results, albeit at different wavelengths, for the exact same injections?

A   That's correct.

Q   If you look at Table B1, there are 11 peaks reported in that table. Do you see that?

A   I do.

Q   Are any of those bendamustine?

A   No. We took out bendamustine for this table.

Q   So all of those you consider impurities that are degradants of bendamustine?

A   I don't know if they're degradants or not,

55

but they were peaks that were integrated in the chromatogram.

Q   Did you do any testing to determine the identities of any of those 11 peaks?

A   Well, so we knew the retention times of the related compound D and E because I believe that was part of the injection sequence. So in one of the samples -- let me back up. So we had D and E, and so we can map the retention time of D and E.

For H and I it was just based on relative retention times that had been previously reported by Slayback in their method. And for the others they're just unknown -- what I would characterize as "unknown impurities."

Q   So setting aside for the moment D, E, H, and I, which are peaks respectively 2, 3, 10, and 11; correct?

A   At 223 nanometers, yes.

Q   Correct.

A   Yes.

Q   Setting those aside for the moment, with respect to Peaks 1, 5, 6, 7, 8, and 9 at 223 nanometers, you don't know what those substances are?

A   Yeah. Nor do I know what those substances are at ▮▮ nanometers.

56

Q   And for that matter, you don't know whether they're impurities of bendamustine or not -- or degradants -- strike that.

You don't know whether they're degradants of bendamustine or not; correct?

A   I know they come from the sample, and that's all I can tell you.

Q   So the answer to my question is yes?

MR. SCHULER:  Objection to form.

THE WITNESS:  You'll have to ask the question again.

BY MR. LIEF:

Q   With respect to Peaks 1, 5, 6, 7, 8, and 9 at 223 nanometers, you don't know whether those are degradants of bendamustine or not?

A   Yeah. I don't know what the origin of those unknown impurities are.

Q   And with respect -- again, at 223 nanometers in Table B1, with respect to Peaks 2, 3, 10, and 11, you didn't do any chemical identifying test to determine what those chemicals were?

A   I need you to repeat that question. I got lost in the beginning.

Q   So with respect to Peaks 2, 3, 10, and 11, which are respectively substances -- you report them

**57**

as substances RCD, RCE, RCH, and RCI respectively. The only basis for your saying that that is the identity of those chemicals is their relative retention time; correct?

MR. SCHULER:  Object to the form.

THE WITNESS:  That's how I've assigned those substances, yes, based on relative retention times.

BY MR. LIEF:

Q   Correct.

**A   But also on the retention time of D and E that we injected.**

Q   Which was a known sample?

**A   Yes.**

Q   And for H and I, I take it you didn't do a known sample?

**A   We did not.**

Q   And for either, D, E, H, or I, other than the relative retention time, you did no other chemical tests to determine what those molecules were; correct?

**A   Correct.**

Q   Could you have done another test to determine what they were?

**A   I'm sure it's possible.  I don't know what**

**58**

**I would have -- what it would be, but I'm sure it's possible.  Sure.**

Q   Have you ever done mass spectroscopy?

**A   Sure.**

Q   Would that have determined what the chemical structure of any of these 11 peaks were?

**A   Mass spec would have given insight possibly into the chemical structure, especially of the known compounds.**

Q   With respect to Table B2, which is the ▇ nanometer data, do you see that?

**A   Yes.**

Q   Would the answers for Peaks 1 through 12 be the same?

MR. SCHULER:  Object to the form.

THE WITNESS:  For which question?

BY MR. LIEF:

Q   Let's be clear.  With respect to Peaks 1 through 12, you did no chemical testing to determine the chemical identity of those peaks; correct?

**A   Correct.**

Q   And with respect, in Table B2, to Peaks 1, 2, 6, 7, 8, 9, and 10, is it correct to say you have no idea of whether those are degradants of bendamustine or not?

**59**

**A   Correct.**

Q   With respect to Peaks 3, 4, 11, and 12, which are respectively assigned as RCV, RCE, RCH, and RCI, the only basis for your assigning them to those molecular structures is the relative retention time; correct?

**A   Correct.**

Q   Now, both Table B1 and Table B2 were generated for each respective sample from the exact same injection; correct?

**A   Yes.  If the column is going left to right, you'll see Sample 1, Sample 2, Sample 3.  Those are the same Sample 1, Sample 2, and Sample 3 across the two tables.**

Q   Understood.  But not only are they the same samples, the data presented for Sample 1 in Table B1 is derived from the exact same injection as the data presented for Sample 1 in Table B2?

**A   That's correct.**

Q   And that would be true for Sample 2 as well?

**A   Correct.**

Q   And that would be true for Sample 3 as well?

**A   Correct.**

**60**

Q   Given that, do you have an explanation for why for each of these samples, which are the same sample and the same injection, when measured at 223, you found 11 peaks, while when measured at ▇ you found 12 peaks?

**A   Yes.  Certainly.  Do I have a good explanation?  I think it's important to look at the area and magnitude of that new peak.  So it's very negligible at ▇   Is there some sort of substance or contamination or something that is coming up with an RRT at .61 that we just don't see at 223?  Maybe. But it's negligible, and it's not of really any significance.**

Q   But in terms of seeing it at ▇ nanometers -- this is Peak 2 in Table B2; right?

**A   Correct.**

Q   In terms of seeing it at ▇ nanometers, it wouldn't be the result of some failure to separate it in the chromatography part of the experiment itself; correct?

MR. SCHULER:  Object to the form.

THE WITNESS:  I would have to go back and think about that a little bit.  I will note that in Sample 3 we didn't see it at ▇.  So if you compare Sample 3s across the two, they are the same.  Is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

**61**

there a bump in the chromatogram that looked like a peak and that we should have integrated as an unknown impurity? That's what we did here.

This is sort of a comprehensive most-impurities-counted type of analysis, if you can appreciate what I'm trying to say. So in doing that across the two wavelengths, we see no significant difference in the impurity -- in the amount of impurities that were calculated.

BY MR. LIEF:

Q    But is it fair to say that, at least for Samples 1 and 2 at ▮ nanometers, you observed a different peak that had to also have been eluting in the 223 nanometer experiment because it's the same injection? It's the same experiment?

MR. SCHULER:  Object to form.

THE WITNESS:  Yes, sure.  And it didn't pick up at 223.  And I think, you know, that it just was not observed because it was at such a low level, a low amount present that you didn't see it.

BY MR. LIEF:

Q    But the point being that whether it shows up in Table B1 or B2 does not turn on the ability of your column to separate it out at a different retention time; correct?

**62**

A    I'm sorry.  Can you repeat that question?

MR. LIEF:  Can you read that back.

(Record read as requested.)

MR. SCHULER:  I'll object to the form.

THE WITNESS:  I don't -- please clarify.

BY MR. LIEF:

Q    So for both Table B1 and B2, let's say looking just at Sample 1.

A    Okay.

Q    That's the exact same injection; correct?

A    Yes.

Q    And the chemicals that eluted off the column, there was only one series of elutions off that column at various times; correct?

A    One series of elutions at various times.  I don't know what that means.  Can you explain that?

Q    The trouble is in Table B2 you didn't do a separate experiment from what's reported in Table B1 for either Sample 1 or Sample 2.

A    Correct.

Q    So the only difference that could account for the extra peak in Table B2 is the fact that you're doing a detection at a different wavelength?

MR. SCHULER:  Object to the form.

THE WITNESS:  That is the difference in

**63**

those two tables.

BY MR. LIEF:

Q    And so, for instance, the 223 data, it was there to some small degree because it was the exact same injection.  It just wasn't detected at 223; correct?

MR. SCHULER:  Object to the form.

THE WITNESS:  I did not see it at 223.

BY MR. LIEF:

Q    But it was there?

MR. SCHULER:  Object to the form.

THE WITNESS:  I did not see it at 223.

BY MR. LIEF:

Q    You saw it at ▮ for the exact same experiment; right?

A    Not in Sample 3.

Q    Okay.  For Sample 1?

A    At a very low level, it was there at ▮.

Q    I mean, is it fair to say that that's not uncommon when you change wavelengths, that you can see different anolytes?

MR. SCHULER:  Object to the form.

THE WITNESS:  That's a very broad statement when you say you can see different anolytes when you change wavelengths.  I think anybody would agree with

**64**

that.  It's contextual though; right?

BY MR. LIEF:

Q    I mean, you don't find this phenomenon in your experiment where you have 12 peaks in Table B2 and only 11 peaks in Table B1 for the exact same run to be an anomaly?

MR. SCHULER:  Object to the form.

THE WITNESS:  I don't find it -- are you asking if it is an anomaly?  Please repeat the question.

BY MR. LIEF:

Q    Is it an anomaly?  Is this something you would never expect in this type of experiment?

A    At very low levels, like we've reported here, it's not an anomaly.

Q    And that's a result of different wavelengths of detection; correct?

A    All things being equal otherwise, it's the difference in the two wavelengths.

Q    Now, if I understand your view of your experiment, your view is that you used Slayback's FDA-approved methodology; correct?

A    Correct.

Q    And is there some reason you didn't use the methodology in the patent?

65

**A   Well, I think, number one, first of all, Slayback had a validated method.  Slayback is the defendant in this case.  And the thought was use their method and look at the two different wavelengths.**

Q   Did you consider using the method in the patent?

**A   We previously considered and used, I believe, the Eagle validated method.  But I did not consider the patent, no.**

Q   You looked at the patent before you did these experiments?

**A   I don't know that I did.**

Q   You only looked at the patent after your experiments?

**A   I don't recall.  I don't recall when I looked at the patent to be honest with you.**

Q   Why don't you get the patent in hand.  And before we do that -- and your report.  Have those two things.

**A   Sorry?**

Q   In your opening report, on page 10 you list what you call Slayback's method conditions and parameters in your Table A1.  Do you see that?

**A   I do.**

66

Q   And am I correct that this is the way a POSA would typically list an HPLC experiment?

MR. SCHULER:  Object to the form.

THE WITNESS:  I would say this is how I would think of an HPLC experiment.  I don't know.  There are many ways to think of an HPLC experiment, I'm certain.  But these are what I would consider listing, yes.

BY MR. LIEF:

Q   Do you think that you could have replicated, as you seem to believe you did, Slayback's technique if you didn't have these parameters?

MR. SCHULER:  Object to the form.

THE WITNESS:  Could I have replicated exactly what Slayback did if I didn't have access to Slayback's method?

BY MR. LIEF:

Q   Correct.

**A   It's likely, but it would have -- I would have to develop that method, and I would have to -- it would be possible but very, very small chance that I would develop the same method that Slayback would have developed.**

Q   As a POSA, you found it necessary to have

67

these parameters to do what you say is the exact same method as Slayback; correct?

MR. SCHULER:  Object to the form.

THE WITNESS:  Slayback outlined these parameters, and I used them, yes.  In the absence of those parameters, I would have had to develop my own parameters.  And if I developed my own parameters, would they have precisely mirrored what Slayback did?  Probably not.

BY MR. LIEF:

Q   And if you had done it that way, would you have had to validate that experiment in your opinion?

**A   So if you develop a method from scratch, there might be some -- there would be some validation steps.  But, again, since I'm not representing to a regulatory body, such as the FDA, on what my product contains or doesn't contain, it may not be an exhaustive validation.  But you would want to make sure that you can see -- you can see the peaks that you're interested in, and you would do some precision studies and maybe some others.  But it wouldn't necessarily have to be a full validation.**

Q   Do you have a sense of how long that would have taken you to do if you had to start from scratch?

68

MR. SCHULER:  Object to the form. Incomplete hypothetical.

THE WITNESS:  You know, method validations take on the order of months, sometimes half a year. It really depends on the complexity of the matrix, the complexity of the sample you're trying to evaluate.  There's all kinds of factors that go into it.

BY MR. LIEF:

Q   Looking at the various parameters you list in Tables A1 and A2 of your opening report.  Do you see those?

**A   I do.**

Q   I'd like you to take a look at the patent and tell me how similar or different those parameters are from what's in the patent?

MR. SCHULER:  Object to the form.

THE WITNESS:  So the patent specifies a wavelength of ███ nanometers.  The patent specifies determined by HPLC.  So to the extent that somebody read this patent and developed this method, these parameters would be exactly the same.  To the extent that somebody read this patent and developed a different method -- I'm aware of many methods to evaluate bendamustine and the related substances that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

18 (69 to 72)

---

**69**

are dissimilar -- it would be dissimilar to the Slayback method.

BY MR. LIEF:

Q   And is it fair to say that the parameters you list in Tables A1 and A2 are not identified in the patent in suit, the '214 patent?

MR. SCHULER:  Object to form.

THE WITNESS:  The patent in suit does specify 223 nanometers, and it does specify HPLC.

BY MR. LIEF:

Q   Beyond that, for instance, it doesn't say what the Mobile Phase A is; correct?

A   That's correct.  You would have to develop that or figure that out.

Q   It doesn't say what Mobile Phase B is?

A   I don't believe it does.

Q   In fact, it doesn't necessarily say whether it's a gradient elution or an isocratic elution; correct?

A   It doesn't.

Q   And it doesn't say what the column is; correct?

A   It doesn't.

Q   It doesn't say what the flow rate is; correct?

**70**

A   No, it does not.

Q   It doesn't say what the injection volume is; correct?

A   It doesn't.

Q   It does list a detector wavelength as you said?

A   Correct.

Q   It doesn't say what the column temperature is?

A   It does not.

Q   It doesn't say what a sample temperature is?

A   Correct.

Q   Do you know what your sample temperature was in the Slayback case?

A   5 degrees.

Q   It doesn't say what the run time is in the patent either, no?

A   No.

Q   It doesn't say anything about the needle wash?

A   No.

Q   It doesn't say anything about the elution mode, gradient or isocratic; right?

A   It does not describe that, no.

**71**

Q   It doesn't give a gradient program at all?

A   No.

Q   Now, would you agree that generally in analytical chemistry if you don't know what another laboratory's experimental conditions were, it's difficult to duplicate their work?

MR. SCHULER:  Object to the form. Incomplete hypothetical.

THE WITNESS:  I don't know that.  It would depend on the work and the experiment we're talking about.  Everything is contextual.  So if you can give me an example, I can give you an answer.

BY MR. LIEF:

Q   In general would you say that no reasonable POSA would say that in the absence of knowing parameters, I can't really generate the same experiment?

MR. SCHULER:  Objection.  That was a triple negative.  I have no clue what it means.

MR. LIEF:  Let me try it again.  I'll take your word on that.

BY MR. LIEF:

Q   Do you think it would be unreasonable for a POSA to say if I don't have parameters, I can't duplicate an experiment?

**72**

MR. SCHULER:  Still a triple negative. Object to the form.

THE WITNESS:  I'm trying to interpret what you're trying to say.  Please ask again.

BY MR. LIEF:

Q   Have you ever struggled in lab with an analytical technique because you couldn't duplicate what someone else had previously done but not described?

MR. SCHULER:  Object to the form.

THE WITNESS:  Again, it's contextual.  Have I ever had to develop methods apriori to get to a certain answer?  Of course.  You have to do that in science.  Is an easier starting point to have the parameters with you?  Maybe.  But, look, HPLC in specific is so routine, and there are so many ways to go about this.  In fact, I think there were three defendants plus the plaintiff in this case, and they all address the HPLC analysis differently.

All four pharmaceutical laboratories with highly trained individuals spent time developing methods, and none of the methods looked the same. And they all get to the same sort of analysis.  So it's not unreasonable to do that.

**73**

BY MR. LIEF:

Q   Do you disagree with the idea, though, that when doing an analytical technique, it's unlikely to duplicate what someone else did if they don't tell you how they did it?

MR. SCHULER:  Object to the form.

THE WITNESS:  Again, it's contextual. "Analytical technique" is just a broad term.  I don't know how to answer that.

BY MR. LIEF:

Q   In your experiences, let's say in your dissertation, you did anion chromatography; correct?

MR. SCHULER:  Object to form.

THE WITNESS:  Sure.

BY MR. LIEF:

Q   How would you say that compares with HPLC?

**A   How does the ion exchange chromatography compare to the HPLC?**

Q   Yes.

**A   It's essentially -- if I was explaining this to my mom and dad, I would say it's essentially the same thing.  It's just a different solid phase that separates out the molecules.  HPLC in this case uses reverse phase.**

Q   So if someone asked you to repeat the

**74**

results of anion chromatography experiment that they got in their experiment, but they didn't tell you how it was done, that would be hard to do, wouldn't it?

**A   I would need to know what the goal is.  So you would have to tell me what we're trying to analyze.  And I don't think it would be super hard to do if I knew what the end goal was.**

Q   You don't think it would be unlikely to duplicate?

**A   The exact same method?**

Q   Yes.

MR. SCHULER:  Object to the form.

THE WITNESS:  I don't know -- so, again, it would be highly unlikely that anybody would take and develop a method that was exactly 100 percent Slayback's, exactly 100 percent Eagle's, exactly 100 percent somebody else's.  There are many ways to get to the same answer is what I'm saying.

So if you told me this is what we're analyzing, can you do that?  Then it would be possible to develop that method to do that.  Would it match exactly what you did without giving me your parameters?  I would say that's probably highly unlikely.

**75**

BY MR. LIEF:

Q   Let's take a look at your thesis again, which was -- I believe it was Kittendorf Exhibit -- you've got it.

**A   Yes.**

Q   Three.  I'd like you to look at page 156 for a minute.

**A   All right.  Okay.**

Q   At the bottom of 156 -- do you have that?

**A   Yes.**

Q   There's a section that begins "Anion exchange chromatography."  Do you see that?

**A   Yes.**

Q   As you said, that's highly similar to HPLC; right?

**A   Yes.**

Q   And if we read -- it reads here, "Prior to crystallization, Xie et al., reported that anion exchange chromatography was utilized to purify the covalent intermediate formed between Z mobilis TGT and a mini-helical RNA.  Given this, it was anticipated that anion exchange chromatography could be used to isolate the TGT-RNA intermediate formed with the E.coli TGT.  However, preliminary experiments suggested that the covalent intermediate

**76**

co-eluted with the unbound RNA.  Unfortunately, the experimental conditions utilized by Xie et al. were not described in their manuscript; therefore, it is likely that their method was not duplicated in our attempts."

Did I read that correctly?

**A   Correct.**

Q   So in your Ph.D. thesis in this methodology that you've described as very similar to HPLC where you did not have a described methodology, in fact, you don't believe you duplicated what was done there?

MR. SCHULER:  Object to the form.

THE WITNESS:  I would say that since this is on page 157 of my dissertation, it was probably an experiment that we tried and then gave up on pretty early so I could graduate.  I wouldn't read too much into how hard I tried to duplicate or get analyses. This was to satisfy a Ph.D. committee and really nobody else.

BY MR. LIEF:

Q   But that's a general truth, though, that without the parameters described to you, it's going to be hard to duplicate an experiment?

MR. SCHULER:  Object to the form.

THE WITNESS:  Again, duplicate exact

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

77

parameters? It's likely difficult. But you can develop -- I could have spent time developing this method to get to the answer. I wanted to graduate and go to my post doc. So I probably did this again half-heartedly to satisfy my boss and the Ph.D. committee.

But you can develop a method that will get you to that answer, and that method may not be the same method that another lab utilized.

BY MR. LIEF:

Q   In your experiments in the Slayback case, am I correct that you quantified the percentages of each anolyte using a peak area normalization technique?

MR. SCHULER:  Object to the form.

THE WITNESS:  So we did both the mass percentage and the normalized peak area.

BY MR. LIEF:

Q   Is the mass percentage that you did not normalized to the overall total area in the chromatogram?

A   It's normalized to the bendamustine standard.

Q   Okay.  And for the peak area normalization -- what you call "the peak area

78

normalization tables," that is normalized to the total area?

A   Yes.  So what that would be is simple.  If you see four peaks in your chromatogram, you sum up the total area across those four peaks, and then you assign the percentage to each peak.

Q   Now, when you do a peak area normalization calculation like you just described, summing up the various peaks in the chromatogram and then dividing each peak's area by the total area, the sum of all of those should be 100 percent; correct?

A   Correct.

Q   And that's true for peak area normalization?  By definition it has to be true?

A   Correct.

Q   In fact, in your results, if we could -- so we're going to mark what I believe is Kittendorf Number 7, a spiral bound document that is the copy of what I believe is Exhibit I from your opening report.

(Kittendorf Exhibit 7 marked.)

BY MR. LIEF:

Q   Do you recognize this document?

A   I don't.

Yes.  These are the chromatograms.

Q   So I take it you recognize the

79

chromatograms underneath each of the numbered tabs within Kittendorf 7, but you may not recognize the cover page?

A   Correct.

Q   For instance, if we look at Tab 1, the chromatogram there, do you see that?

A   Yes.

Q   There's a column underneath the graphing, and it has an "Area Percent" in the heading.  Do you see it?

A   Yes.

Q   Sort of in the middle.  And at the very bottom it reads "100 percent"?

A   Yes.

Q   And that is consistent with the peak area normalization?

A   Correct.

Q   And, similarly, if we look at, for instance, Tab 17, again there's a column that says "Area Percent."  Do you see that?

A   I do.

Q   When you total up the 11 peaks there, you get 100 percent?

MR. SCHULER:  Object to the form.

THE WITNESS:  I think there's 12 peaks;

80

right?

BY MR. LIEF:

Q   Tab 17?

MR. SCHULER:  Correct.

MR. LIEF:  Why does mine look different?

MR. SCHULER:  Can you give us some part of this top or the bottom that might --

MR. LIEF:  My copy seems to be different. Interesting.

BY MR. LIEF:

Q   I'll take it your way.

In Tab 17 the total in the area is 100 percent; correct?

A   Yes.

Q   And in Tab 18, again, the total for all those peaks is 100 percent; correct?

A   Yes.

Q   And then in Tab 19, the total of all those peaks is 100 percent?

A   Yes.

Q   And if you didn't get to 100 percent, I would be justified in telling you you didn't do peak area normalization; right?

MR. SCHULER:  Object to the form.

THE WITNESS:  That's what I think of when I

**81**

think of normalized peak area.

BY MR. LIEF:

Q   100 percent?

A   Yes.

Q   Good.  Thank you.

With respect to the experiments you did, particularly the peak area normalization at 223 nanometers, can you tell me what the accuracy of those experiments was?

A   What the accuracy was?

Q   Yes.

A   Can you define "accuracy"?

Q   What is your definition, as an analytical chemist, of accuracy?

A   Here's what I can tell you.  We looked at the same sample across two wavelengths, right, all things being equal, a validated method that was obtained from Slayback.  And the only change we made was in wavelength.  And we saw similar percent impurities across both wavelengths.

The system suitability and the standard injection precision was spot on for both.  And so if you're accurate for ███ you're going to be accurate for 223.

Q   In that answer, am I right that you are

**82**

using the precision of your experiments to point to accuracy?

A   I would also say that at the end of the run we did a standard injection at the end, and the recovery came back within 96 percent or more of the expected value.

Q   Which standard did you inject for that?

MR. SCHULER:  Were you done with your prior answer?

THE WITNESS:  Yes.

Bendamustine.

BY MR. LIEF:

Q   Did you do a similar standard injection for all of the 11 peaks found at 223 for impurities?

A   No.

Q   Did you do --

MR. SCHULER:  You just need to both make sure that the question is done before you answer.  It gives me a chance to object.  It gives her a chance to make sure she's got it right.

BY MR. LIEF:

Q   Did you do a standard injection with a known concentration for any of the 11 peaks at 223 that were impurities?

A   We did related compound D and E.

**83**

Q   And did you do that for any of the others?

A   No.

Q   And would you say that the way that you're characterizing accuracy comports with or doesn't comport with the USP test of accuracy?

MR. SCHULER:  Object to the form.

THE WITNESS:  So, again, the USP test for accuracy in method development is a very high bar that pharmaceutical companies do need to meet.  For this experiment, my charge was pretty simple.  Can you use the same method and look at two different wavelengths, in this case ███ nanometers and in another case 223 nanometers, with the same sample, and do you get significantly different results?  My data suggests that I don't get significantly different results.

BY MR. LIEF:

Q   But the answer to my question is -- whether you think it applies or not -- is that you did not do the USP method for determining accuracy for any of the anolytes in your experiment; correct?

MR. SCHULER:  Object to the form.

THE WITNESS:  That's correct.  It was a validated method already.

**84**

BY MR. LIEF:

Q   Did you do the FDA methodology for determining accuracy for any of the anolytes in your experiment, again, with respect to Slayback?

A   No.  This was a validated method that I simply looked at two different wavelengths at the same run.

Q   If I understand what you're saying, your point is that you used an FDA-validated method, and, therefore, what you did didn't need further validation?

MR. SCHULER:  Object to the form.

THE WITNESS:  I think this is my point.  My point is I use a validated method that I received from Slayback.  The change I made was to look at a different wavelength and to see how that compared to the wavelength that Slayback met.  And what I saw was the data was comparable.  There was very little change in the percent impurity calculated at either wavelength, which, by the way, is ███ apart.  And the results that I saw were ███ the 5 percent limit in the claim.

BY MR. LIEF:

Q   But the reason you didn't do any further validations is your belief that Slayback had

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

22 (85 to 88)

---

**85**

validated that method and the FDA had accepted that; correct?

MR. SCHULER: Object to the form.

THE WITNESS: That's correct.

BY MR. LIEF:

Q In other words, if you had come up with, let's say, the exact same methodology on your own, you came up by happenstance -- or maybe Slayback's method didn't exist and you came up with the identical method to Slayback on your own, you would expect that you would have to validate that?

MR. SCHULER: Objection. Asked and answered.

THE WITNESS: It would depend on the context. And if I am validating a method to put drugs on the shelf that are approved by the FDA, you would validate it.

BY MR. LIEF:

Q Do you consider yourself an expert in FDA requirements for validation?

**A No.**

Q Do you consider yourself an expert in validating HPLC methods?

**A To the extent that I've done it, I've done it. But am I the world's leading expert? No.**

---

**86**

Q And how many times have you validated an HPLC method?

**A It's difficult to say. Less than ten. Less than five. A handful. I don't know. I've done it.**

MR. LIEF: Okay. We're going to hand you a large document, which is a book, but we're only looking at a bit of it. And it's going to become, I believe, Kittendorf Exhibit 8.

(Kittendorf Exhibit 8 marked.)

MR. SCHULER: You're just trying to unload paper.

MR. LIEF: Well, in the past you've graciously agreed to shred our excess documents. So one way or another.

MR. SCHULER: Can I get a sticker or something?

THE REPORTER: Yes.

BY MR. LIEF:

Q Before we go into this book a little, do you recognize this book?

**A Not in the binder form.**

Q But the book itself?

**A I'm not sure. Did I cite it?**

Q I believe you cited one of the Synder

---

**87**

books. I don't recall whether it was this particular one. There are several versions.

**A I see that it's "Introduction to Modern Liquid Chromatography."**

Q You're familiar that Synder has written books on liquid chromatography?

**A Sure.**

Q You consider those books to be authoritative?

**A I don't know if any book is authoritative. I consider it to be guidance.**

Q Have you ever found anything in the Synder books -- I take it you've read them?

**A Not cover to cover.**

Q Have you read parts of them?

**A I'm sure -- I've used them as references, sure.**

Q Have you ever found anything in it that you thought was wrong?

**A I don't recall.**

Q Would it be fair to say that your use of the Slayback technique, you would view that -- because it was FDA approved, you view it as an official methodology for analyzing bendamustine impurities?

---

**88**

MR. SCHULER: Object to the form.

THE WITNESS: I don't have the power to view anything as an official methodology. So I would view it as one way to analyze bendamustine impurities.

BY MR. LIEF:

Q Does the fact that the FDA has approved it give you any assurance that it's a good methodology?

**A Certainly.**

Q And you would expect that the FDA approved it under FDA guidelines; correct?

**A Certainly.**

Q And your -- one of your points in your reply report is that, however, the USP does not apply to Slayback's methodology; is that correct?

MR. SCHULER: Objection. His report speaks for itself.

THE WITNESS: I don't recall what I put in my report.

BY MR. LIEF:

Q Do you want to look at that?

**A Sure.**

MR. LIEF: Why don't we get his reply report out if we haven't marked it yet. So we'll mark this as Kittendorf Exhibit 9.

---

89

(Kittendorf Exhibit 9 marked.)

BY MR. LIEF:

Q   With respect to Kittendorf Exhibit 9, do you recognize this?

A   Yes.

Q   And this is your report?

A   Yes.

Q   And on the last page, which is page 14, that's your signature?

A   It is.

Q   Okay.  If you look, for instance, at the bottom of page 3 of your reply report in paragraph 20.  Do you have that?

A   I do.

Q   It reads, first, USP 621 "applies only to monograph methods published in the USP," which "means that it does not apply to methods that [have been] developed and been validated in [one's] laboratory, obtained from the scientific literature, or inherited from somewhere else."  And then you cite USP 621, and you also cite an article by John Dolan.  Do you see that?

A   I do.

Q   So while I think -- strike that.
     Your position is that the requirements of

90

USP 621 for validating a method simply don't apply to the experiments you've done; correct?

A   Correct.

Q   And does the fact that you used an FDA-approved methodology change your view as to whether USP 621 applies or not?

MR. SCHULER:  Object to the form.

THE WITNESS:  It does not.

BY MR. LIEF:

Q   And so as you came to your opinions in this case, you had no understanding that USP 621 applies to FDA regulatory approved methods?

MR. SCHULER:  Object to the form.

THE WITNESS:  I don't know if I had an understanding of that or not.

BY MR. LIEF:

Q   Do you have any understanding of it as you sit here now?

A   There are -- I have an understanding that there are guidance on method validations prescribed by the USP and the FDA.  The USP provides guidance that go for methods that are put into USP monographs.  Those are largely marketed pharmaceuticals.
     So you can connect the dots and say, sure, USP is important for FDA review and approval of the

91

method.

Q   And do you understand, as you sit here today, that a change in the detection wavelength for purposes of USP 621 does require a new validation?

A   Again, contextual.  So if I'm Slayback and I'm going to change the method to 223, I'm going to have to go through a new validation to prove to the FDA that that works.
     For the purposes of my work, it was a validated method at ██.  That method, because it's validated, has a certain level of robustness.
     And the only parameter that I looked at differently than the Slayback at ██ was at 223.  So it was inconsequential in my work.  I saw the same level of impurities -- similar level of impurities anyway at both wavelengths.

Q   Did you, in doing your experiments, make a conscious decision that you did not need to do validation?

A   I don't know if it's conscious or unconscious.  It was not done because in this context I am not seeking FDA approval.

Q   And I guess your view is that if Slayback did the exact same experiments you did at 223, the FDA would require them to do a validation, but it's

92

okay for you not to do a validation here?

MR. SCHULER:  Objection.  Misstates his prior testimony.

THE WITNESS:  That's not my view at all.  Slayback could go back into their labs and change their wavelength to whatever they want.  But if they're going to sell their pharmaceuticals, to get it approved, they're going to have to, I would guess, revalidate.

BY MR. LIEF:

Q   So let me rephrase that question.  It's your view that if Slayback were to change their current method to the exact method you used at 223, doing peak area normalization and using 223 as a detection wavelength, and go to the FDA, they would be required to validate that new technique; correct?

A   I would think that's true.

Q   However, in your view, when you make those exact same changes from their FDA-validated method, you don't have to validate; is that correct?

A   It's contextual, but I don't think a validation is required in this context.

Q   If we could go to in Kittendorf Exhibit 8, page 561 of that book.  You see a section there that says 12.8, "Method Adjustment or Method

93

Modification"?

MR. SCHULER: Give me a second.

BY MR. LIEF:

Q   Do you see that?

A   I do.

Q   Have you ever seen this section before?

A   If I have, I'm not recalling.

Q   The heading of the section is called "Method Adjustment or Method Modification"; correct?

A   Correct.

Q   And the first paragraph there begins with, "Official or validated methods can be found in a number of places, such as the USP or in the official methods of analysis of the Association of Official Analytical Chemists (AOAC). Methods in both new drug applications (NDA) and abbreviated new drug applications (ANDA) are also considered to be standardized, official, validated methods." Did I read that correctly?

A   You seem to have, yes.

Q   And do you disagree that a method that comes from an FDA approved new drug application is an official validated method?

A   Yes, it would be.

Q   And that's what you purport to have

94

replicated in your experiments, Slayback's official FDA method; correct?

A   Correct.

Q   If we go down a couple of paragraphs, there's a paragraph that begins "In 1998." Do you see that?

A   I do.

Q   And it reads, "In 1998 Furman, et al., proposed a way to classify allowable adjustments, but it was not until 2005 that official guidance appeared on the topic. Although USP guidance on this topic was recently included into USP Chapter 621 on chromatography, the FDA Office of Regulatory Affairs (ORA) has had guidance in place for a number of years." Did I read that correctly?

A   You did.

Q   Do you have any reason to believe that's untrue?

A   This is the first I've looked at this document; so I'll take it as face value. But I'm not familiar with any of the new references that they cite in this to back that up.

MR. LIEF: We're going to mark as Kittendorf Exhibit 10 a document which is a copy of USP 621.

95

(Kittendorf Exhibit 10 marked.)

BY MR. LIEF:

Q   With respect to Kittendorf Exhibit 10, have you ever seen this before?

A   Yes.

MR. SCHULER: Can I put this to the side?

MR. LIEF: Yes.

BY MR. LIEF:

Q   And when is the first time you saw this?

A   That's a very good question. I don't know the answer to it.

Q   Was it before your engagement in this case?

A   I think so.

Q   So before 2024 at least?

A   I wouldn't be able to speculate, but I have seen it before.

Q   And you do understand that this document lays out USP's requirements for when you should revalidate if you make a change in an existing HPLC methodology?

A   Where does it say that?

Q   For instance, if you look at page 14 of 21, you see there there's a section toward the bottom of the page that reads, "Adjustment of chromatographic conditions." Do you see that?

96

A   Yes.

Q   And that section talks about "The chromatographic conditions described have been validated during the elaboration of the monograph. The extent to which the various parameters of a chromatographic test may be adjusted without fundamentally modifying the pharmacopeial analytical procedure are listed below. Changes other than those indicated require revalidation of the procedure." Did I read that correctly?

A   Yes, you did.

Q   So you understand, at least to the extent USP 621 applies, if you change something beyond what they permit, you have to revalidate?

A   If you modify the pharmacopeial method -- analytical procedure actually; right.

Q   And one of the parameters that they say you cannot change at all, if you look at page 16 of 21, there's a section that reads "Detector wavelength. No adjustment permitted." Do you see that?

MR. SCHULER: I have no clue where you are on the page.

MR. LIEF: Sort of the bottom here. There's a 16 of 21.

MR. SCHULER: I know that. I'm saying on

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

25 (97 to 100)

**97**

the page.

MR. LIEF: Oh. I would say about a third of the way down there's a centered heading that says "Detector Wavelength."

MR. SCHULER: Okay.

BY MR. LIEF:

Q Do you see that?

A I do see that.

Q And it reads, "Detector Wavelength. No adjustment permitted."

A I see that.

Q Now, you didn't do a USP-monographed test; correct?

A Correct.

Q And your parameters depart from USP monograph for bendamustine in many ways; correct?

MR. SCHULER: Object to the form.

THE WITNESS: Can you repeat that?

MR. LIEF: Read that back.

(Record read as requested.)

THE WITNESS: I don't know where -- was it the USP monograph of bendamustine?

THE REPORTER: Yes.

THE WITNESS: Can you show me the USP monograph for bendamustine?

**98**

MR. LIEF: Sure. We'll mark as Kittendorf Exhibit 11 a copy of the USP monograph for bendamustine hydrochloride.

(Kittendorf Exhibit 11 marked.)

BY MR. LIEF:

Q Do you have that? Dr. Kittendorf, do you have Exhibit 11?

A I do.

Q Have you ever seen this before?

A I don't recall.

Q In coming to the view of how you would do the experiments for the Slayback case, did you look at the USP bendamustine monograph?

A I don't think I did.

Q If you look at it, I think you can see there are various HPLC parameters listed for testing of bendamustine hydrochloride; correct?

A Point me to where you're looking.

Q For instance, if you look on Bates page -- which is the second page of the document, EAGLEBEN-SA_00368469, and if you look there in the second column, you can see a series of parameters for an analysis. Do you see that?

A Right. So just to be clear, those parameters are continuing from Column 1 under assay?

**99**

Q I think that's correct, yes. But they're HPLC parameters; correct?

A I don't disagree.

Q And in Column 1 there is a -- there is, in fact, a gradient program in Table 1; right?

A Correct.

Q And if you look at the next page, there's a Table 2 that lists various potential impurities of bendamustine. Do you see that?

A I do.

Q And you see, going back to the second page of the document which ends Bates 8469, in that second column it talks about a chromatographic system. Do you see that?

A I do.

Q And talks about a detector at UV of 254 nanometers. Do you see that?

A I do.

Q And it talks about certain column size and a certain temperature and a column temperature and the flow rate and an injector volume and an analysis time. Do you see all that?

A I do.

Q Now, you didn't use that type of chromatography experiment; correct?

**100**

MR. SCHULER: Object to the form.

THE WITNESS: I don't know. What do you mean by "that type of chromatography experiment"? We used HPLC. We used reverse phase. We used gradient. We used what Slayback -- we replicated what Slayback uses. So to the extent that you're saying this is an HPLC method, we used an HPLC method.

BY MR. LIEF:

Q Okay. But the particular HPLC parameters that the USP puts out there for bendamustine hydrochloride are different from the parameters you used, no?

A Let me repeat your question just so I understand. The parameters that are specified in the USP were different than the parameters that I used?

Q Yes.

A Certainly, yes.

Q So you departed from various of those parameters; correct?

MR. SCHULER: Object to the form.

THE WITNESS: I did not replicate a bendamustine USP monograph.

BY MR. LIEF:

Q Including changing from the wavelength; correct?

101

A   "Including changing from the wavelength."

Q   Strike that.

You did not use the USP's detection wavelength in your experiments?

A   We used 223 and ██

Q   But not 254; correct?

A   Correct.

Q   And you also see in this -- strike that.

Again, your position is that USP 621's requirement to revalidate if you change the wavelength doesn't apply to you?

A   My position is I didn't need to do it.

Q   And would you agree with me that USP 621 is generally regarded by analytical POSAs, persons of skill in the art, as providing guidelines that make sense?

MR. SCHULER:  Object to the form.

THE WITNESS:  "Providing guidelines that make sense." I would say that it is -- it is a document that analytical chemists regard, yes.

BY MR. LIEF:

Q   Even when dealing with a non-USP monograph test; correct?

A   Again, it's all contextual. And just to reframe it, I'm comparing two wavelengths. I can't

102

say this more plainly. I was asked to compare two different wavelengths to see if you would get significantly different or similar results. And my data suggests you have similar results when you analyze -- similar results for total impurities when you use the Slayback method and you utilize 223 or ██ nanometers.

Q   So, I guess, let me come back to something else that we had discussed before.

MR. SCHULER:  Can we take a break? It's been an hour and a half.

MR. LIEF:  That's fair.

THE VIDEOGRAPHER:  We are going off the record. The time is 11:55 AM.

(Recess taken.)

THE VIDEOGRAPHER:  We are back on the record. The time is 12:08 PM.

BY MR. LIEF:

Q   Now, during either of the breaks we've had, have you had any substantive discussions with your counsel about your testimony?

A   No.

Q   I wanted to return to a question that we had touched on before, and I wanted to ask whether you can provide us with an accuracy of your numbers

103

at 223 in the Slayback case in a number fashion; numerically, what is your accuracy?

MR. SCHULER:  Object to the form.

THE WITNESS:  I don't have that.

BY MR. LIEF:

Q   And that's because you didn't study quantitatively what the accuracy of that test was; correct?

A   I didn't study quantitatively what the accuracy of that test was. It's not -- it was not a parameter that I looked at.

Q   Did you do a robustness study with respect to wavelength?

A   No. Other than the fact that I looked at the two different wavelengths under the same condition and my data is similar across wavelengths. And so the fact that they're similar would indicate that that method -- the 223 would be -- I'm sorry. Let me back up.

The fact that the data I collected at either wavelength was similar to each other would indicate that 223 would be an acceptable wavelength to collect data.

Q   Are you presenting your results at 223 nanometers on their own as evidence that the

104

Slayback product has less than 5 percent impurities at 15 months or more?

(Reporter clarification.)

MR. LIEF:  Months, yeah.

MR. SCHULER:  I'll object to the form as the report speaks for itself, or his reports speak for themselves.

THE WITNESS:  I don't want to misquote, but my -- I think my opinions are laid out in my opening report.

BY MR. LIEF:

Q   That's fine.

A   It is my opinion that Slayback's liquid bendamustine products have less than about 5 percent peak area response, as determined by HPLC at a wavelength of 223 nanometers, after at least about 15 months at a temperature of about 5 degrees to about 25 degrees C.

It is also my opinion that the HPLC measurements, at different wavelengths, produce essentially the same results.

Q   Okay. So your --

MR. SCHULER:  Can I just ask a clarification. What were you reading? What paragraph were you reading from?



**105**

THE WITNESS:  Oh, 24 and 25.

BY MR. LIEF:

Q   Of the opening report?

**A   Yes.**

Q   Your opinion in your reports, if I understand correctly, goes beyond simply saying that the results that you got were similar at 223 and ▮ correct?

MR. SCHULER:  Again, his reports speak for themselves.

THE WITNESS:  Please tell me where you see that.

BY MR. LIEF:

Q   Well, in some of your prior answers, I thought you characterized your experiments as for the purpose of showing that 223 and ▮ give very similar results, and you seem to stop with that.  Is that, in your understanding, what your opinion relates to, or does it relate to more?

**A   My opinion relates to paragraph 24 and 25 in my report.**

Q   Okay.  And so, for instance, if you had done only the experiment at 223 and done nothing at ▮, would you feel in a position to give an opinion that the Slayback product at 223, using peak area

**106**

normalization, has less than 5 percent impurities?

MR. SCHULER:  Objection.  Incomplete hypothetical.

THE WITNESS:  That's a hypothetical.  I can't go back and think that because I have the data in front of me.  I don't have an answer for that.

BY MR. LIEF:

Q   In other words, you're unprepared to say here that the 223 data you have on its own would support your opinions?

MR. SCHULER:  Can I have that read back.

(Record read as requested.)

MR. SCHULER:  I'll object.  I think it misstates his prior testimony as reports.  They speak for themselves.

THE WITNESS:  So my data, at 223 nanometers, shows less than 5 percent impurities.

BY MR. LIEF:

Q   Is it your view that that data can support the opinion of less than 5 percent in the absence of the ▮ data?

MR. SCHULER:  Again, his reports speak for themselves.

THE WITNESS:  I think the addition of the ▮ data adds to the story; right.

**107**

BY MR. LIEF:

Q   Do you need it, though?

MR. SCHULER:  Please stop interrupting him.

MR. LIEF:  I haven't interrupted him.  Don't make it like -- this one instance, I...  Go ahead.

THE WITNESS:  The 223 data correlates to the ▮ data, and, by the way, Slayback has stability data up to ▮ that utilizes ▮ that shows that ▮.

BY MR. LIEF:

Q   That's not with your test, though; correct?

**A   It --**

MR. SCHULER:  Were you done?

THE WITNESS:  Yes.

BY MR. LIEF:

Q   So my question, again, was, the Slayback data you're referring to did not use your test; correct?

**A   The Slayback data I'm referring to used ▮.**

Q   But it didn't use peak area normalization?

**A   It utilized -- my understanding is it utilized the ▮.**

**108**

(Reporter clarification.)

**A   The ▮.**

**BY MR. LIEF:**

Q   You don't understand Slayback's test to be using ▮?

MR. SCHULER:  Object to the form.

THE WITNESS:  I understand how Slayback calculated or performed the calculation for their analysis, yes.

BY MR. LIEF:

Q   And was it using ▮, or was it using something else?

**A   ▮ And so we did the same type of analysis.**

Q   You didn't ▮; correct?

**A   I don't believe Slayback ▮, so...**

(Reporter clarification.)

**A   ANDA.**

**BY MR. LIEF:**

Q   Now, your bendamustine calculation for the

109

percentage of bendamustine, is it a separate assay, or is it part of the summing of all the peak areas?

A   Say that again?

Q   When you determined the percent of bendamustine in each of Slayback's vials, did you do that percentage based upon a separate assay for bendamustine, or is it part of the run that you did for all anolytes in the sample?

A   Well, I will tell you I was focused on the appearance; right?  And so that was the main goal. So the bendamustine was essentially not part of the equation, but you could calculate it both ways.

Q   Oh.  But I take it you did not do a separate test for bendamustine by assay?

A   I did not do a separate assay test, no.

Q   And the reason that all your peaks add up to 100 percent is because bendamustine is one of those peaks; correct?

A   In the peak area normalization calculation; correct.

MR. LIEF:  Okay.

I wanted to mark as Kittendorf 12 an article called "Method Adjustment the USP Way."

(Kittendorf Exhibit 12 marked.)

110

BY MR. LIEF:

Q   Do you recognize this article?

A   Not in this current landscape form.

Q   Unfortunate.  But do you recognize the title of the article?

A   It's not coming to me, no.

Q   No? Okay.

Do you think you've never seen this article before?

A   I didn't say that.  I just don't recognize it right away.

Q   For instance, your reply report --

A   Yep.

Q   -- do you have that, which is Kittendorf 9?

A   Yes.

Q   There is a paragraph that bridges 3 and 4.

A   Okay.

Q   Paragraph 20.

A   Okay.

Q   And it says -- it talks about USP 621.

A   Yep.

Q   Do you see that?

A   Yep.

Q   And on page 4, it cites to John W. Dolan, "Method Adjustment the USP Way" from LCGC, June 12,

111

2017, with an Internet link to the article.

Do you see that?

A   I do.

Q   Do you understand that this is the article you're citing?

A   Correct.

Q   And you cite in particular, I think, to what is the first paragraph-- strike that.

A   Second.

Q   The second paragraph on the first page of this article that begins, "First, let me address a common misconception."

Do you see that?

A   Yes.

Q   I'll read that to you.

"First, let me address a common misconception that I frequently encounter.  USP 621 has become a de facto standard as rules for adjusting chromatographic methods, and, as such, many users think this means all methods.  In fact, 621 applies only to monograph methods published in the USP.  This means that it does not apply to methods that you've developed and validated in your laboratory, obtained from the scientific literature, or inherited from somewhere else."

112

I'll stop there.  That's the passage that you are referring to; correct?

A   Correct.

Q   All right.  In the next sentence, which I don't believe you're referring to, it goes on to say, "With all that said, most of the guidelines make sense as a basis of method adjustment for many other types of methods.  For example, you might adopt [sic] them as a basis for your own standard operating procedure that you will use to govern how you deal with method adjustment in your laboratory."

And it goes on.

MR. SCHULER:  It said "adapt," not "adopt."

MR. LIEF:  I can't find the word.

THE WITNESS:  Yeah, it does say "adapt."

MR. LIEF:  It does say "adapt."

THE WITNESS:  Yeah.

MR. LIEF:  That's fine.

BY MR. LIEF:

Q   For the part I read and with the correction of the "adopt" becomes "adapt," did I read that correctly?

A   The part you read other than the change from the "adopt" to "adapt," you read that correctly.

Q   Yeah.  And that's a fair statement from

113

this author that the USP guidelines are generally in the industry looked upon as commonsense guidelines; correct?

A   Sure.

Q   And --

A   That you may adapt based on context and based on what you're doing.

Q   By the way, that article that we're looking at from Dolan, do you know if that's a peer-reviewed article?

A   I believe it's probably a technical bulletin from LCGC. So it's probably Dolan's opinion.

Q   Not peer reviewed?

A   Likely not peer reviewed.

Q   Okay.  You recall I read you a passage from the Snyder book, do you recall that, about official compendiums and things like that?

A   How could I forget.

Q   And one of the things it said was an official compendium or an official test was something that was in an NDA for the FDA; correct?

MR. SCHULER:  I'll object to the extent that it misstates the document.

114

BY MR. LIEF:

Q   Do you want to look at it again?

A   Please repeat the question.

Q   Why don't we just look at it.  I believe it was Section 12.8.

A   I flipped through this on the break, so I'm not on the exact page.

Q   Let's see if we can find Section 12.8.

MR. SCHULER:  It's on page 561.

THE WITNESS:  Thank you.

BY MR. LIEF:

Q   You see that section we looked at on page 561, Section 12.8, Method Adjustment or Method Modification; correct?

A   Yes.

Q   And it talks about USP method as one of these official methods, but it also talks about NDA methodologies that have been approved by the FDA as an official method; correct?

A   Correct.

Q   And then it also talks about, in that paragraph that begins in 1998, firming that out.

Do you see that paragraph?

A   Yes.

Q   It talks about how the USP guidance is

115

included in USP 621 and the FDA Office of Regulatory Affairs has had guidance in place for a number of years.

Do you see that?

A   I do.

Q   And do you have an understanding as to whether or not the FDA guidances on that, on changing an FDA-approved methodology, include the same restriction that USP does about changing the wavelength?

MR. SCHULER:  Object to the form.

THE WITNESS:  Do I have -- what was the question?

BY MR. LIEF:

Q   Do you have any knowledge as to what the FDA guidance says about changing the wavelength of detection?

A   I don't.

Q   Did you look that up in coming to your opinions in this case?

A   No.

Q   Would it surprise you to learn that the FDA applies the exact same words that the USP 621 does that changes in detection wavelength are not permitted?

116

A   No.

Q   Why do you think that is?

MR. SCHULER:  Object to the form.

THE WITNESS:  Because the FDA controls the quality of the drugs going to market.

BY MR. LIEF:

Q   And if you want a good test --

A   They want to make sure that any change made to any of the processes, even manufacturing processes, would lead to a quality drug coming to the market.  They have a regulatory viewpoint of this; right?  They are bound by that.

Q   And in using the Slayback test that the FDA approved, you are assigning to your own tests the quality of the FDA-approved test; correct?

MR. SCHULER:  Object to the form.

THE WITNESS:  I mean, I'm evaluating a product for a percent impurity across two different wavelengths.  I'm not reporting that to the FDA.  I imagine if Slayback found impurities greater than ████████████████████, they would notify the FDA.  They would respond to the FDA.  They would communicate with the FDA.  I don't have FDA burden.  I don't communicate with the FDA.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

30 (117 to 120)

---

117

BY MR. LIEF:

Q   So despite using an FDA-validated test, according to your view of what you did, you are not holding yourself to the FDA standard of if I change the wavelength, I need to revalidate; correct?

MR. SCHULER:  Object to the form.

THE WITNESS:  I don't have to hold myself to that standard.  The work I've done is not in that context of the FDA eye.

MR. LIEF:  Let me mark as Kittendorf Exhibit 13 a document.  And we will look at this for a moment.

(Kittendorf Exhibit 13 marked.)

BY MR. LIEF:

Q   And I'll ask you first with respect to Kittendorf 13, have you ever seen this before?

A   I don't think so.

Q   Have you ever looked at any of the FDA guidances regarding chromatography?

A   I don't recall.

Q   And I'd like you to turn -- in the top right of each page, there's a little box that has a page number out of 19.  Do you see that?

A   I do.

Q   There is a page 14 out of 19.  Do you have

118

that?

A   Okay.

Q   At the top of the page -- and I guess this was true on the first page too -- there's a reference to ORA Laboratory Procedures.  Do you see that?

A   Yes.

Q   Do you know what that is?

A   I've read it here.  It's the Office of Regulatory Affairs.

Q   And when you say you read it in here, you're referring to Snyder at page 561?

A   Correct.

Q   And this is called "Attachment A, Modification Criteria."

Do you see that?

A   Correct.

Q   And at the very beginning of it, do you see it says, "If adjustments to operating conditions are needed, each of the following is the maximum specification (USP General Chapter 621 chromatography) that can be considered.  All adjustments falling outside the maximum specifications will be considered as method modifications and will be subject to the method modification protocol."

119

Did I read that correctly?

A   Word for word.

Q   Again, you have no doubt that the FDA adopts USP 621?

MR. SCHULER:  Object to the form.

THE WITNESS:  I have no reason to believe they don't.

BY MR. LIEF:

Q   And if you look down sort of towards the middle of the page, there is a bolded -- I'll call it a heading that reads, "Wavelength of UV Visible Detector HPLC."

Do you see that?

A   I do.

Q   Am I correct that it reads, "Deviations from the wavelength specified in the method are not permitted."

Did I read that first sentence correctly?

A   You did.

Q   And the next sentence reads, "The procedure specified by the detector manufacturer or another validated procedure is to be used to verify the error in the detector wavelength is, at most, plus or minus 3 nanometers."

Did I read that correctly?

120

A   You did.

Q   Your deviation from Slayback's FDA-approved methodology is ███████████ correct?

A   Yes.

MR. LIEF:  I know we had talked about lunch.  This is an appropriate breaking point.

MR. SCHULER:  Okay.

THE VIDEOGRAPHER:  We are going off the record.  The time is 12:33 PM.

(Recess taken.)

THE VIDEOGRAPHER:  We are on the record.  The time is 1:16 PM.

BY MR. LIEF:

Q   Dr. Kittendorf, during the lunch break, did you have any conversations with your counsel regarding your testimony?

A   No.

Q   Is it your view that the USP would never apply to any tests done for litigation?

MR. SCHULER:  Object to the form.

THE WITNESS:  It would be depending upon the context.

BY MR. LIEF:

Q   Is it your view that the USP would not apply to any of the bendamustine testing you've done

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

31 (121 to 124)

121

in any litigation?
MR. SCHULER: Object to the form.
THE WITNESS: Yes.
BY MR. LIEF:
Q   Do you have a sense of when you came to that opinion?
A   No.
Q   Did you come to that opinion before this case, meaning the Slayback case that we're currently litigating?
A   I don't think so.  The work I've done previously, I don't think I considered USP and USP method validations.
MR. LIEF: I'd like to mark as Kittendorf Exhibit 14 an expert report from the case of Eagle Pharmaceuticals v. Hospira.
(Kittendorf Exhibit 14 marked.)
BY MR. LIEF:
Q   Do you have that?
A   I have it.
Q   Okay.  If you could look at it and let me know if you recall seeing it before.
A   I do.
Q   And you recall it to be the report you issued in what I'll refer to as the Hospira case?

122

A   Okay.
Q   You agree with that?
A   Yes.
Q   And if you look at page 21 of the report itself, which is -- I'm going to guesstimate -- maybe 10 percent into the document, do you see a signature there?
A   Yes.
Q   And is that your signature?
A   Yes.
Q   Now, this report was issued on June 16, 2021; correct?
A   Yes.
Q   And at that point in time, would it have been your view that the USP doesn't apply to the testing you did here?
A   I'd have to remind myself of what the testing I did here was.
Q   Take a look at it and let us know.
Have you reviewed it?
A   Yes.
Q   And am I correct that in this report you also did an HPLC study of --
A   Yes.
Q   -- of bendamustine impurities in the Eagle

123

product?
A   Correct.
Q   And am I also correct that you also applied, for at least some of your experiments, a detection wavelength of 223 nanometers?
A   Correct.
Q   Am I also correct that you also applied a quantitation method using a peak area normalization?
A   Correct.
Q   And am I also correct that you took Eagle's FDA-approved methodology and used that methodology but changed the detection wavelength there?
MR. SCHULER: Object to the form.
THE WITNESS: I think I collected it a couple of different wavelengths.  I didn't change the wavelength.  I added to the wavelength.
BY MR. LIEF:
Q   Well, to the extent you measured it to 223 nanometers, that was a change from the Eagle FDA-approved detection wavelength; correct?
A   Correct.
Q   Also, as in the current Slayback case, you assumed that the relative response factors for the various anolytes were all 1; correct?
MR. SCHULER: Is there a particular

124

paragraph you want him to look at?
MR. LIEF: Why don't we take a look at page 16, at footnote 1.  Maybe that will help.
THE WITNESS: Correct.
BY MR. LIEF:
Q   And am I correct that in the tests that were done in the Hospira case as well, you didn't actually have any experimental data as to the response factors for the anolytes?
A   Correct.
Q   With this set of tests that you did for the Hospira case, in your opinion, as you sit here today, you wouldn't consider USP 621 as having any guidance to give for these Hospira tests; correct?
MR. SCHULER: Objection. The report speaks for itself.
THE WITNESS: Repeat that, please.
BY MR. LIEF:
Q   As you sit here today, looking at the Hospira case and the testing you did in it, in particular, I take it your view is that USP 621 is inapplicable to those tests?
A   It's not necessary.
Q   It's not necessary. Is it inapplicable?
MR. SCHULER: Object to the form.

125

THE WITNESS:  You don't have to apply it.

BY MR. LIEF:

Q   Back in 2021, was that your view?

**A   I did not do method validation, full method validations according to USP for 621.**

(Reporter clarification.)

THE WITNESS:  I did not do full validations.

BY MR. LIEF:

Q   I'd like you to turn in this Hospira report, which we've been looking at, to page 15.

**A   Yeah.**

Q   And in particular, paragraph 58.  And I'll read you that paragraph.  It reads, "To quantify the amounts of the impurities, I calculated the normalized peak area response of each impurity at both 223 nanometers and ████ nanometers."

And you cite see U.S. Patent Number 9,572,887, Column 5, lines 13 to 27.

"Specifically, I recorded and divided (i.e., normalized) the integrated peak area for each observed impurity within the chromatogram by the total integrated the area of all identified peaks in the chromatogram."

Did I read that correctly?

126

**A   Yes.**

Q   And that description is a description of what peak area normalization is; correct?

**A   That's how I understand it to be, yes.**

Q   And given that methodology, again -- strike that.

In the next passage after you say that, you say, "See, e.g., one U.S. Pharmacopeia Chapter 621 at 12 (32nd Edition official May 1, 2009; Lloyd R. Snyder, et al., Introduction to Modern Liquid Chromatography, 525 to 26, 3d Edition, 2010; Lloyd R. Snyder, et al., Practical HPLC Method Development, supra, at 654 to 55."

Did I read that citation correctly?

**A   Yes.**

Q   Do you have any understanding why, in 2021, you were citing U.S. Pharmacopeia Chapter 621 in relation to your testing in the Hospira case, but today you take the position that it's inapplicable?

**A   I'm assuming I'm citing that to discuss what peak area response is.**

Q   So you cited it for that, but you ignored it for everything else?

MR. SCHULER:  Object to the form.

THE WITNESS:  I don't have a recollection

127

of what I did in 2021; so I can't tell you what I thought in 2021.

BY MR. LIEF:

Q   You think it was inappropriate to cite to 621 here?

**A   I don't have an opinion on that.**

Q   Turning back to the Slayback testing, the testing you did at ████ nanometers --

MR. SCHULER:  Is there a particular exhibit you're talking about?  Is there a particular exhibit you want him to look at?

MR. LIEF:  Not yet.  We'll get there.

MR. SCHULER:  You said "turning back to."

MR. LIEF:  I meant conceptually because we had gone to Hospira, and now we're coming back to Slayback.

BY MR. LIEF:

Q   The testing that you did at ████ nanometers in the Slayback case, in this litigation, am I correct that your peak area normalization numbers are premised upon the assumption that the relative response factors are all 1; correct?

**A   Right.  We compared both wavelengths -- we compared the impurity profiles at both wavelengths using RRF, or relative response factors, as 1.**

128

Q   And that would be true for both what you called "the mass balance" or "the mass percent numbers" and also the peak area normalization numbers?

**A   Yes.**

Q   And did you, at ████, generate any experimental data to confirm that all of the response factors for all of the anolytes were the same?

**A   No.**

MR. LIEF:  I'd like you -- I marked it already.

I'm going to hand you what we're going to mark as Kittendorf Exhibit 15, which is from an exhibit to your report, which I believe is Exhibit H at page 8.

(Kittendorf Exhibit 15 marked.)

MR. SCHULER:  I object to an incomplete exhibit under Rule 1001.

(Reporter clarification.)

MR. SCHULER:  I object to an incomplete exhibit under Federal Rule of Evidence 1001.

BY MR. LIEF:

Q   Do you recognize this page?

**A   It's got my company's letterhead on it.**

Q   Do you recognize it?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

33 (129 to 132)



**129**

A   Remind me again what it's from.

Q   It's from Exhibit H of your attachments to your opening report.

MR. SCHULER:  Why don't we have the entire exhibit?

MR. LIEF:  I'm not intending to talk about the entire exhibit.

MR. SCHULER:  That's not how the Rules of Evidence work, but -- right?  You don't get to say I'm only going to talk about page 621 of a 1,000-page exhibit.  You have to introduce the whole entire exhibit.

MR. LIEF:  I don't think so.

MR. SCHULER:  Yes.

MR. LIEF:  Not for this.

MR. SCHULER:  Definitely.  Like, we're supposed to act as if we are in court, and in court you could not put an exhibit in front of a witness with a single page.

MR. LIEF:  If we have to, we'll get the whole exhibit, but I don't think it's necessary.

BY MR. LIEF:

Q   Do you recognize this document?

A   This looks like a document that I would have generated, just based on it's on my letterhead.

**130**

Q   Yeah.  Now, in the table --

A   Yeah.

Q   -- it's a table that says, "Known Impurities."  Do you see that?

A   Yes.

Q   And in the right-hand column of the table, it says, "Slayback RRF."  Do you see that?

A   I do.

Q   What does that refer to?

A   I think that is Slayback's reported RRF for those impurities.

Q   And am I correct that that is data that would have come from Slayback's ▇-nanometer testing?

A   Yes.

Q   Because Slayback never did 223 nanometers?

A   I don't know if they ever did or not.

Q   But in the documents you saw from Slayback, it was only ▇ nanometers?

A   In the documents I saw from Slayback, it was only ▇ nanometers.

Q   And at ▇ nanometers, am I correct that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇?

MR. SCHULER:  Objection to the form.

**131**

THE WITNESS:  You're correct in that ▇▇▇▇▇▇.

BY MR. LIEF:

Q   ▇▇▇▇▇▇▇▇▇▇▇▇ right?

A   That's correct.

Q   Do you have any reason to believe that the RRFs that Slayback determined when they did a study of ▇ nanometers would not also apply to your study of ▇ nanometers?

MR. SCHULER:  Objection.  Form.

THE WITNESS:  I have no reason to believe that.

BY MR. LIEF:

Q   I'm sorry.  What was the answer?

(Record read as requested.)

BY MR. LIEF:

Q   So you expect that Slayback's reported RRFs also apply to your study at ▇ nanometers?

A   Sure.

Q   And so is it fair to say that your studies at ▇ nanometers, which assumed that all the impurities had the same RRF, that that assumption is false at ▇ nanometers?

MR. SCHULER:  Objection to form.

**132**

THE WITNESS:  So, again, just to go back and reference back to the charge, we were evaluating and comparing two different wavelengths; right?  We had RF values for 1.  We didn't have RRF values for the second.  And so how do you do that apples-to-apples comparison?  You treat all RRFs as 1.

BY MR. LIEF:

Q   Well, I understand you treated them as 1, but am I not correct that you had actual experimental data that showed they were not 1 for all of them?

A   I had a table of data.  I don't know if I had experimental data.  But they are not all 1 for ▇.

Q   And so at least for your experiments at ▇, the assumption that they were 1 is wrong?

MR. SCHULER:  Object to the form.

THE WITNESS:  They are not all 1.

BY MR. LIEF:

Q   And the assumption is wrong; correct?

A   They are not all 1.

Q   Do you believe that the RRFs that are reported at ▇ would be the same or similar at 223?

MR. SCHULER:  Objection.  His reports speak for themselves.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

---

133

THE WITNESS: I don't have any reason to not believe that.

BY MR. LIEF:

Q   With that belief, you would believe that the RRFs at 223 are, in fact, also not all equal to 1 or equal to each other; correct?

A   **I would suspect they're not all equal to 1.**

Q   Now, I believe in your reply report -- do you have that?

A   **You tell me.**

Q   You should. That was Kittendorf 9.

A   **Yes.**

Q   Now, this reply report is a response to Dr. Smith's report; correct?

A   **Correct.**

Q   I take it you read through Dr. Smith's report?

A   **I did.**

Q   And I take it you're aware that Dr. Smith performs a calculation, at least for Impurities D and E, of the response factors for those anolytes?

A   **That's right.**

Q   And I take it that you disagree with Dr. Smith's calculation?

A   **Okay.**

---

134

Q   Do you?

A   **Yes.**

Q   Okay. Just checking.

If we go to paragraph 27 of your reply report, which is on page 6. Paragraph 27 reads, "Dr. Smith calculates RRFs for Impurities D and E using concentrations and peak areas from the LOQ solution data in my opening report, id, paragraph 90. He allegedly derives RRFs of ▮▮▮▮▮ for Impurity D and E respectively and concludes that the peak area normalization method underestimates these impurities by approximately ▮▮▮▮▮ id, paragraphs 91 to 94. But Dr. Smith's calculations are improper as they are based on a single LOQ solution measured at a single concentration for each of the two anolytes, see id, paragraphs 91 to 92. A proper determination of response factors would require linearity data across multiple concentrations--the very validation step Dr. Smith faults me for allegedly omitting. See Bernard A. Olson and Christian Zeine, External reference standards were relative response factors: Considerations for quantitation of impurities in pharmaceuticals, LGC(2018). Dr. Smith cannot simultaneously fault me for allegedly not performing

---

135

linearity studies and then rely on single-point calculations as though they were definitive measures of absorptivity."

And that concludes paragraph 27.

Did I read that correctly?

A   **I think so. I wasn't listening to you. I was reading it.**

Q   Sorry.

Does that paragraph encompass the entirety of your criticism of Dr. Smith's calculation of the RRFs or not?

MR. SCHULER: Objection. His reports speak for themselves. It is a silly question to say does a single paragraph incorporate all of your opinions or all --

MR. LIEF: It's a long objection, Counsel.

MR. SCHULER: It's a silly question. It's not a fair question. The purpose of Rule 26 reports is to give fair notice to all the opinions --

MR. LIEF: Let's get the magistrate on the phone.

MR. SCHULER: They are in writing. So even if he were to say, yes, it doesn't preclude him from testifying what's in his reports.

MR. LIEF: Either I get an answer here that

---

136

you're not going to do that again -- you can object. You can object to form with maybe another word or two. But that's too much. And the rules don't allow that. And they particularly don't allow it in Delaware.

MR. SCHULER: Let me put it to you this way. If we were at trial and you said do you have an Opinion X, right, and it was in his reports, do you think he would be precluded from giving Opinion X if it was in his Rule 26 report?

MR. LIEF: I am trying to find out what the basis of his criticism of Smith is. And it's a totally fair question. Absolutely.

BY MR. LIEF:

Q   And so my question is -- let me ask it this way because your counsel wanted to kind of move me off that question. Let me ask it differently.

Do you see what I read to you in paragraph 27; correct?

A   **Yes.**

Q   Other than saying he relied on one data point, do you have any criticism of Dr. Smith's calculation of the RRFs for Impurities D and E?

MR. SCHULER: Objection. His reports speak for themselves.

---

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

35 (137 to 140)

---

**137**

THE WITNESS:  No, nothing other than what's written in my report.

BY MR. LIEF:

Q   I want you to take a look through that reply report and tell me if there's anything else that is an additional criticism of Dr. Smith's calculation?

A   Of his calculation of?

Q   The RRFs.

A   No.

Q   Thank you.

Now, we've talked about the assumption for peak area normalization, that the RRFs be the same. Am I correct there's another assumption that goes into peak area normalization, which is that the RRF for any particular anolyte be linear over the concentration of interest?

A   I don't think I know what you mean by the RRF, any anolyte being linear over the concentration of interest.

Q   Let me correct that. The response factor itself for any anolyte has to be linear over various concentrations for this calculation to work in peak area normalization; correct?

MR. SCHULER:  Object to form.

---

**138**

THE WITNESS:  Do you have an example? Maybe I'm not understanding the question. So if you could point me to an example in my report.

BY MR. LIEF:

Q   I think, you know, when we discussed RRFs and RRFs originally today, I think you agreed with me that an RRF is a constant.

MR. SCHULER:  Object to the form.

THE WITNESS:  Did I say "constant"?

BY MR. LIEF:

Q   You did.

A   Okay.

Q   You don't think RRFs are constants?

A   Okay.  I don't remember saying constant.

MR. SCHULER:  I don't either.  But you can look at the transcript.

I'll object to the extent you're misstating his prior testimony.

BY MR. LIEF:

Q   As you sit here now, do you believe that an RRF is a constant over a range of concentration of that anolyte?

A   I'm trying to think that through.  I've never heard it stated that way.  Could you break it down a little less complex?

---

**139**

Q   So there are ways that you would accept measuring of RRFs; correct?  There's some way to measure it.  Whether you agree with how Dr. Smith did it or not, there is some way to measure an RRF?

A   Sure.

Q   If you measured an RRF for an anolyte at 1 percent concentration in some units and you measured that RRF for that anolyte at 2 percent concentration and then maybe at 3 percent, if you're studying it in that range of 1 to 3 percent concentrations, the RRF ought to be the same at each concentration for that anolyte; right?  It's constant.

A   Okay.  I agree.

Q   And if that assumption is wrong, if the RRF for that anolyte were to change from 1 percent to 2 percent to 3 percent concentrations, the application of peak area response wouldn't work to give an accurate number; right?

MR. SCHULER:  Object to the form. Incomplete hypothetical.

THE WITNESS:  You could still do peak area response, and you would default to the RRF of 1.

BY MR. LIEF:

Q   You would assume it's 1 even if it's

---

**140**

changing over concentrations?

A   If you don't have a measured RRF, you would assume it's 1.  So you can still do the peak area normalization calculation.  It would not preclude you from doing the peak area normalization.

Q   Of course you can add up the areas and divide.  Of course.  But the question is would you get an accurate number if the response factors are varying over concentrations?

MR. SCHULER:  Objection.  Incomplete hypothetical.

THE WITNESS:  Can you contextualize that a little bit?

BY MR. LIEF:

Q   Is it your view that in Beer's law absorptivity, or what we've been calling "response factor," is not a constant?

MR. SCHULER:  Object to the form.

THE WITNESS:  Remind me what Beer's law is.

BY MR. LIEF:

Q   You don't know what Beer's law is offhand?

A   I do.  I just want to make sure that we're talking about the same variable in Beer's law.

MR. LIEF:  Why don't we mark this as Kittendorf Exhibit 16.  And I will get you an

---

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

36 (141 to 144)

**141**

exacting page to look at.

(Kittendorf Exhibit 16 marked.)

BY MR. LIEF:

Q   This is Dr. Smith's report that we've marked as Kittendorf Exhibit 16. And I take it you've seen this?

A   Yes.

MR. SCHULER: I need a copy.

MS. SPARSCHU: Sorry.

MR. SCHULER: Thank you.

BY MR. LIEF:

Q   All right. I take it you've seen this, yes?

A   Yes.

Q   And if you turn to paragraph 43, which is on page 14.

A   Okay.

Q   You see there's an equation 1 there, do you see that?

A   Yes.

Q   And it says, "A," which is capital A, which is the amount of light absorbed by a sample, equals -- I'm going to guess that that's epsilon, but it's a little Greek letter, LC, where epsilon is the absorptivity, L is the path length, and C is the

**142**

concentration. Do you see that?

A   Yeah, I don't -- I do see that.

Q   And is that your understanding of what Beer's law is?

A   Yeah, I've never seen the epsilon be labeled as absorptivity. It's the molar extinction coefficient.

(Reporter clarification.)

BY MR. LIEF:

Q   So you think that's wrong?

A   I've never seen it labeled as absorptivity.

Q   But that's what it's referring to; correct?

A   It's referring to the molar absorption coefficient; right.

Q   What is your definition of a molar absorption coefficient?

A   It's a constant that relates path length and concentration to absorption.

Q   Would you agree that that is the response factor we've been talking about?

A   Yeah, I would agree that's the molar absorption coefficient.

Q   Okay. And that, what you've called the molar absorption coefficient, has to be the same for each anolyte for peak area normalization to give an

**143**

accurate number; correct?

MR. SCHULER: Object to the form.

THE WITNESS: That has to be the same? To give an...

BY MR. LIEF:

Q   An accurate number for concentration for an anolyte.

A   That would be an assumption.

Q   And if the assumption is wrong, the numbers are inaccurate; right?

MR. SCHULER: Object to the form.

THE WITNESS: I wouldn't say that.

BY MR. LIEF:

Q   What would you say?

A   I don't think there is the right or wrong here; right? I mean, these are all hypothetical questions.

Q   Well, in the event that things have different absorptivities or different response factors, doesn't that distort the percentage impurity for that anolyte?

A   It could.

Q   How would you know if it did?

MR. SCHULER: Object to the form. Incomplete hypothetical.

**144**

THE WITNESS: I haven't thought about that.

BY MR. LIEF:

Q   In coming to your report in this case, did you give any thought to whether your reported percent impurities could be wrong if the response factors were different?

MR. SCHULER: Object to the form.

THE WITNESS: I didn't give a whole lot of thought to that because we looked at two different wavelengths. We looked at Slayback's wavelength at ▆ under the same conditions, and we could use their RRFs to calculate and determine how close the RRF value was to when we assigned it a 1. And then I compared Slayback's ▆ to 223, using an RF value of 1, and show they were similar. They're not egregiously different.

BY MR. LIEF:

Q   For purposes of this question, I want you to assume that Dr. Smith's calculations of the RRF are correct.

A   Okay.

Q   It's an assumption for this question.

A   Okay.

Q   If you had an RRF for an anolyte around .5 or .6, but you had assumed it was 1, is it true that

145

for that anolyte you would be underestimating?

A   Yes.

Q   And is it true if it were .5 that you would be underestimating by about double?

A   That's how the math works, yes.

MR. LIEF:  I'd like to mark as Kittendorf Exhibit 17 a document that I'll just describe by the front page as having the word "Mikromol" on it.

(Kittendorf Exhibit 17 marked.)

BY MR. LIEF:

Q   Do you recognize this article?

A   I believe I've seen it before.

Q   Do you consider this article to be authoritative?

A   Do I consider it to be authoritative?

I consider it to be a reference article.  I don't know how much weight or not weight I put on the authority of the article.

Q   I'd like you to turn to page 3 in this article.  There's a section sort of the middle of the page that's entitled "Number 3.  Assignments of RRFs."

Do you see that?

A   Yes.

Q   On the right-hand side there, there's a

146

paragraph that begins, "As discussed below."  Do you see that?

A   Yes.

Q   And it reads, "As discussed below, RRFs are subject to variability, depending on the spectra of the compounds involved and experimental conditions of the analysis, such as instrument-specific factors. When methods are transferred into a laboratory or a pharmacopeial method is implemented, it is advisable to verify the stated RRFs to ensure instrumental differences have not caused a significant discrepancy."

Did I read that correctly?

A   Can I pause you, because I thought we were at assignment -- Number 3.  "Assignment of RRFs." And then I looked away, and then you were reading something else.  So please read.

Q   I'm sorry.

A   Go back again.

Q   I'm sorry.  It is underneath "Assignment of RRFs," but it's in the right-hand column.  Do you see that?  There's a paragraph that's --

A   That starts "In pharmacopeial methods."

Q   Below that.  "As discussed before."  That's what I read you.  So let me read it again.

147

A   You don't have to.  I can read it.

Q   Okay.  Can you see that paragraph?

A   Yeah, I see it.  I'm reading that paragraph right now.  Thank you.

I see that.

Q   Is it fair to say even if we were to agree -- I guess we don't -- but that you had done exactly the same method as Slayback does in their FDA method, would you agree that you did it on a different column, with different materials than what Slayback used in their laboratory?

MR. SCHULER:  Object to the form.

THE WITNESS:  I don't know what you mean by a different column and different materials.

BY MR. LIEF:

Q   Maybe it's the same model number and the same ingredients you used.  Let's say that.  But it's not the identical column that was physically removed from Slayback's laboratory and brought to yours?

A   Right.

Q   Correct?

A   Correct.

Q   Okay.  And I believe in your opening report you talk about you could transfer Slayback's method to your laboratory; right?

148

MR. SCHULER:  Object to the form.  The report speaks for itself.

THE WITNESS:  Where did I say that?  Let's look.  Can you point me to it?

BY MR. LIEF:

Q   But do you believe you transferred Slayback's method?

A   Which paragraph?

Q   I don't know.  We'll find it for you if you want to spend the time on it.

A   I just want to know what I said.

Q   If you look at, for instance, paragraph 39 in your opening report.

A   Okay.

Q   And if you look at the last sentence there, it begins "Based on my education."  Do you see that?

A   Yep.  I'll read the sentence.

Q   So let me read it for the record.

"Based on my education, training, and experience, evaluation of these system suitability parameters suggested that I could successfully transfer and employ Slayback's analytical method to analyze the impurity profile of bendamustine-containing products, including Slayback's liquid bendamustine product, using my

149

laboratory's HPLC equipment."

Did I read that correctly from your report?

A   You read that sentence.

Q   And so you believed you were transferring the Slayback method to your laboratory; correct?

A   Yes.

Q   And do you believe what this article, which you also cited says, that when -- "when methods are transferred into a laboratory or a pharmacopeial method is implemented, it is advisable to verify the stated RRFs to ensure instrumental differences have not caused a significant discrepancy."

Is that a fair statement of how one should conduct oneself with chromatography experiments?

A   In terms of it being advisable and not a requirement; correct.

Q   Is it advisable?

A   I'm sure it's context-specific.

Q   But it's advisable?

A   If that's what the sentence says.

Q   And also in this article I wanted to take a look at page 6. And there's a Figure 2 there. Do you see that?

A   I do.

Q   And the X axis, am I correct, shows

150

different wavelengths; correct?

A   Yep.

Q   And the Y axis shows absorptivities; correct?

A   Yep.

Q   And for any -- there are three curves that are on that graph: A, B, and C. Correct?

A   I see that.

Q   And am I correct that what this shows is for each of these curves, each of those curves represents a different compound scanned over these wavelengths; right?

A   Is that you telling me that?

Q   I'm asking you.

A   I have no idea.

Q   Okay. If you look at the heading, it says, "Figure 2, UV Spectra of Drug Substance A and Impurities B and C."

Do you see that?

A   I do.

Q   And so what's being illustrated here is the scan over many different wavelengths of three different molecules; correct?

A   To the extent that's what the title says, I'll agree with you.

151

Q   And am I also correct that the absorptivities that are shown for any one of these compounds vary as the wavelength changes; correct?

A   Yes.

Q   And as between one molecule and another, they vary differently; correct?

A   They vary.

Q   Well, like between, say, 220 and 240, Molecule C is having its absorptivity increase; right?

A   Yes.

Q   Whereas Molecules A and B between 220 and 240 are decreasing?

A   Okay.

Q   In your experience is that kind of behavior for absorptivities over different wavelengths unusual?

MR. SCHULER:  Object to the form.

THE WITNESS:  It happens. It occurs. It's not unusual, no.

BY MR. LIEF:

Q   Have you read the patents in suit?

A   I don't think cover to cover.

Q   Have you found -- from what you've read of the patents in suit, have you found anywhere where

152

the patents in suit say you can perform an HPLC technique for purposes of this patent that gives inaccurate numbers?

MR. SCHULER:  I'm sorry. Can I have that one back.

(Record read as requested.)

MR. SCHULER:  Object to the form.

THE WITNESS:  I don't think the patents in suit consider the numbers other than the 5 percent limitation.

BY MR. LIEF:

Q   But you couldn't find me anywhere in the patent in suit where it says it's okay to have an inaccurate HPLC test?

MR. SCHULER:  Object to the form.

THE WITNESS:  If I may just review the patents to make sure where they are.

MS. SPARSCHU:  Exhibit 2.

MR. LIEF:  Kittendorf 2.

MS. SPARSCHU:  Kittendorf 2.

THE WITNESS:  So the only thing the patent contemplates with respect to values is, like I said before, that impurities are less than about 5 percent as measured by peak area response.

153

BY MR. LIEF:

Q   And nowhere in the patent does it say "And it's fine to measure it using an inaccurate method"?

MR. SCHULER:  Same objection.

THE WITNESS:  I don't think any protocol would say it's okay to measure it with an inaccurate method.

BY MR. LIEF:

Q   Because any analytical chemist would want an accurate method; correct?

A   Yes.

Q   I wanted to ask you about something else in the patent.

A   Could I ask for a break?  We can do this, but I've got to empty a bladder.

MR. LIEF:  That comes first.  Go.

THE VIDEOGRAPHER:  We are going off the record.  The time is 2:17 PM.

(Recess taken.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 2:25 PM.

BY MR. LIEF:

Q   I think we had been looking at the patent -- one of the patents in suit, the '214 patent, and I would like you to look at Column 1 of

154

the patent at around lines 53 to 60 or so.  There's a sentence that begins, "Some of the main degradants."

Do you see that?

A   I do.

Q   And I'll read it to you.  It reads, "Some of the main degradants of bendamustine are the monohydroxy compound known as HP1, hydrolysis product 1, and dihydroxy compound HP2, hydrolysis product 2.  The monohydroxy compound appears as the main impurity at relative retention time, RRT 0.6, and the dihydroxy compound appears as the main impurity at relative retention time 0.27.  Minor peaks appear at RRT 1.2, which are presently unknown."

Did I read that correctly?

A   You did.

Q   The reference there to the dihydroxy compound with an RRT of about 0.27.  Do you see that?

A   I do.

Q   Am I correct in your experiments in the Slayback case, you did not find any RRT at 0.27; correct?

A   Likely due to the differences in methods.

Q   Differences between which methods?

A   The Slayback method that I used and whatever method is being used here.  But I would

155

agree with you I did not find a specific RRT at 0.27.

Q   Do you know whether -- irrespective of whether you found something at RRT 0.27, whether you did find one of the main degradants of bendamustine, which is the dihydroxy compound?

A   Can you tell me what that compound is referred to in terms of related compounds?

Q   I think we have a way to correlate those.  I think.

A   And also having the structure of that compound would be helpful.

MR. LIEF:  Okay.  So we're going to mark as Kittendorf Exhibit 18 a document which is a USP certificate for Bendamustine Related Compound A.

(Kittendorf Exhibit 18 marked.)

BY MR. LIEF:

Q   And my understanding is that what I've just handed you as Kittendorf 18 is -- what the patent refers to is HP2, which is the dihydroxy compound.  And you can see at the top of the drawing of the structure both of the arms of bendamustine no longer have a chloro moiety and they have a hydroxy moiety?

A   The arms.

Q   They are little ethyl groups off that nitrogen.

156

A   I see that, yes.

Q   And so our understanding is this is HP2.

MR. SCHULER:  Is that a question?

MR. LIEF:  No.  It's just a statement for his consideration.

BY MR. LIEF:

Q   Do you have an understanding that agrees with that?

A   I take your understanding that it's HP2.  I have no reason to not believe that.

Q   So am I correct that in your studies you didn't find an RRT at .27, which the patent reports for HP2?

A   So in the Slayback method, I think Impurity A would have an ▒▒▒▒▒

Q   Did you find it?

A   Did I find?

Q   In your studies did you find HP2 of the Slayback product?

A   I did not, no.

Q   Does the fact that you didn't find HP2 anywhere, let alone at 0.27 RRT, cause you to lack confidence in your results?

A   No, absolutely not.

Q   And would you expect in proper analytical

157

methods that from one method to another you would have the same RRTs?

MR. SCHULER: Object to the form.

THE WITNESS: No.

BY MR. LIEF:

Q   Do you know whether you found any esters, TAG esters of bendamustine in your analysis of the Slayback product?

A   Which related compound is that?

Q   There are a number of them. I don't know which they would be in your experiment?

A   Well, so if you go -- if you can show me a USP certification or a structure that we could relate -- is it a related Compound A through H?

Q   I don't think it is, but I'm not sure.

MR. SCHULER: It is.

BY MR. LIEF:

Q   Let me ask it this way.

MR. SCHULER: You said two contradictory things.

BY MR. LIEF:

Q   Do you know whether any of the impurities you found were esters at all?

A   So let me ask you for the USP sheets for D, E, H, and I, and then I can confirm.

158

MR. LIEF: We're going to mark as Kittendorf Exhibit 19 a different USP certificate that includes -- it's actually two certificates for what I believe you call Compounds D and E.

(Kittendorf Exhibit 19 marked.)

THE WITNESS: Is there another one?

MR. SCHULER: He put two together.

THE WITNESS: Okay. Do you have them for H and I? Just so I can know what those compounds look like.

MR. LIEF: I don't believe we do for H and I.

MS. SPARSCHU: I don't think so.

MR. LIEF: No.

BY MR. LIEF:

Q   These are not esters, clearly, D and E; correct?

A   I would say those are not esters; correct.

Q   And as you sit here, you're not clear about whether H and I are esters?

A   I don't know what the chemical structure of H and I look like.

Q   And for the rest of the peaks you found, you don't know what their structure is at all?

A   Those would be assigned as unknown

159

impurities; correct.

Q   Would you agree with me, as a matter of logic, that if you have 11 anolytes and any two of them have a different RRF, then it is a correct statement to say all 11 of them do not all have equal RRFs?

MR. SCHULER: Object to the form.

THE WITNESS: I wasn't very good at logic games. So let's please try this again.

BY MR. LIEF:

Q   Let's say I have 11 anolytes in an HPLC.

A   Yes.

Q   And I know that two of them have different RRFs from each other.

A   Okay.

Q   Does it not follow, as a logical imperative, that all 11 cannot have the same RRF?

A   I would agree with that.

Q   In your experiments, am I correct that you use trifluoroacetic acid as a solvent -- as one of the solvents?

A   As a solvent?

Q   Yes.

A   So mobile phase was supplemented with TFA, yes.

160

Q   And so it was a solvent?

A   It was part of the mobile phase.

Q   Would you consider it a solvent or a co-solvent?

A   I would consider it, for the HPLC purposes, an additive.

Q   And why was it added?

A   Typically acids are added to HPLC mobile phases to sharpen peak shapes or enhance the chromatography somehow.

Q   Did it have any other purpose in your experiment?

MR. SCHULER: Objection. Asked and answered.

THE WITNESS: The TFA was an additive to Mobile Phase A.

MR. LIEF: Why don't we take a few minutes, and I'll see where I am.

THE WITNESS: Break?

MR. LIEF: Yes.

THE VIDEOGRAPHER: We are going off the record. The time is 2:39 PM.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 2:53 PM.

161

MR. LIEF: I'm going to mark as Kittendorf Exhibit 20 a document from the USP from 2009.

(Kittendorf Exhibit 20 marked.)

THE WITNESS: Thank you.

BY MR. LIEF:

Q   Dr. Kittendorf, with respect to Kittendorf Exhibit 20, have you ever seen this document before?

A   I don't recall.

Q   Would it be a fair statement to say in coming to your opinions in this case, you did not consider this document?

A   To the best of my knowledge.

Q   You did or you did not consider it?

A   I don't know that I've seen this before; so I did not.

MR. LIEF: With that, subject to any questioning from Eagle's counsel or anything else that may develop, we are concluded for Slayback, reserving that if there's any follow-up.

MR. FERENC: Can I mark as Kittendorf Exhibit 21?

(Kittendorf Exhibit 21 marked.)

EXAMINATION

BY MR. FERENC:

Q   Hi. Dr. Kittendorf, you've been handed

162

what's been marked as Exhibit 21. I'll represent to you that this is the expert report that you submitted in connection with the Apotex case. If you don't mind just quickly flipping through it, just to confirm that, please?

A   Okay. Yes.

Q   Okay. So I wanted to just walk quickly through your report together and get some clarifications on my end.

So if we go to page 1 of your report, you look at paragraph 3, it sets out on paragraph 4 the assignment you were asked to do in this litigation; correct?

A   Correct.

Q   And is it your opinion that the testing that you conducted is sufficient to demonstrate the peak area response impurities in Apotex products at 223 nanometers after at least about 15 months?

A   Yes.

Q   Is that based on your testing?

MR. SCHULER: Objection. The report speaks for itself.

THE WITNESS: Largely based on my testing, yes.

163

BY MR. FERENC:

Q   Okay. If you skip ahead quickly to paragraph 24?

A   Sure.

Q   Again, you have an opinion there, and I think you quote back to paragraph 4, but just to clarify, that's based on your testing?

A   On paragraph 24?

Q   Correct.

MR. SCHULER: Objection. The report speaks for itself.

THE WITNESS: It's largely based on my testing.

BY MR. FERENC:

Q   What other things is it based on?

A   Based on also some ANDA documents from Apotex as in with respect to the timing of the impurity measurements.

Q   And all of that's contained in this report, as far as you know; right?

A   I believe so, yes.

Q   Is it fair to say there's no other testing that you conducted in this case with respect to the Apotex product beyond what is disclosed in your report?

164

A   That is fair to say.

Q   In paragraph 25, you say, "As further explained below, it is also my opinion that the HPLC measurements at different wavelengths, i.e., nanometers and nanometers produce essentially the same results."

Do you see that?

A   I do.

Q   Is this referencing all tests across those two wavelengths?

A   With respect to the Apotex -- with respect to the tests I have done for Apotex.

Q   Okay. But when you say "the HPLC measurements" --

MR. SCHULER: I think he was asking for a clarification from you.

BY MR. FERENC:

Q   Oh, I'm sorry. I didn't catch that.

A   Yeah. Do you mean with respect to the Apotex testing?

Q   Why don't I ask it this way: You say "the HPLC measurements." I'm trying to understand what you mean by referencing the HPLC measurements.

A   The HPLC data that was generated at both and nanometers.

165

Q   And that would be the data generated by you in your lab; correct?

A   Correct.

Q   And that would not be including the Apotex data in its NDA submission; correct?

MR. SCHULER:  I'll object to the extent this report speaks for itself.

THE WITNESS:  For that first sentence, that's correct.

BY MR. FERENC:

Q   Okay.  So if we go to paragraph 27 on the next page, you talk a little bit about designing an HPLC analytical method.  Do you see that?

A   I do.

Q   And then you say Exhibit B references the document as Snyder 1997.  Do you see that?

A   I do.

Q   If you flip to Tab B in that binder, that should be Snyder 1997.  Do you see that?

A   I do.

Q   Why did you cite to that document?

A   This document shares or references method validation, and I think the paragraph references -- let me get back to the paragraph.  So the paragraph references what you would think about

166

experimentally when designing an HPLC method, and I think the Snyder exhibit speaks to that in terms of the parameters and things to consider.

Q   If you flip back to the Snyder exhibit, this is the sort of document that a person of ordinary skill in the art would rely on in terms of engaging in the type of analysis that you conducted in this case; right?

MR. SCHULER:  Object to the form.

THE WITNESS:  Well, I mean, it's a guide that advises.  Whether or not every POSA would rely on something in it, they may or may not.  I don't know.

BY MR. FERENC:

Q   Did you rely on it in providing your opinions?

A   This was basically just to talk about HPLC method development.  So to the extent that I relied on it, it was for that paragraph.

Q   And at the front page of Exhibit B, I guess this is a chapter maybe pulled out a larger book which I don't have with me but...

A   Is it the book I threw on the floor?

Q   It's possible.

It says, "Completing the method and

167

validation transfer."  Do you see that?

A   I do.

Q   What's your understanding of the differences between validation as opposed to transfer?

A   As it stands right now, I think there are certain system suitability parameters that you would want to ensure are maintained when you transfer a method.  When you develop and validate a method, it's a more rigorous process.

Q   Are some of those considerations listed in the Table of Contents on that first page?

A   For the validation, yes.

Q   What about for the transfer?  Which of these -- I don't know what you call them -- guidelines, measurements.  What would you refer to them as?

A   System suitability, likely.

Q   Okay.  Which of the sections refer to system suitabilities?

A   15-11.

Q   Just 15-11?  So is it your opinion that none of these other sections apply?

A   Again, this is going to be contextual, and it's going to depend on the points of the -- the

168

point of the analysis and what those results are going to be used for.

Q   With respect to -- let's just walk through some of these.

A   Sure.

Q   15.2 is accuracy.  And feel free to flip to the actual section --

A   Sure.

Q   -- if you need to look at it.

With respect to what you've been asked to do in this case, did you conduct any studies, experiments, or testing regarding the accuracy of your HPLC methods?

A   No.  I will say that for each HPLC experiment, there was at the end of the run a standard of bendamustine that was used to assess recovery and assess -- in order to assess sort of the chromatography from Sample 1 to Sample -- whatever the end was.  That was injected to give assurance that the chromatography system worked as expected throughout the run.

You would get -- I don't remember what I got in the Apotex sample, but you would expect like 95 to 105 percent recovery in that sample.

Q   Is that the extent of the, I guess,

169

experiments that you conducted to ensure accuracy in your method?

A   That's probably fair, yes.

Q   I guess if we look at 15.2.1, it says "Comparison to a standard." Is that what you're referring to?

A   Correct. I think so.

Q   Okay. And then the next section, 15.2.2, says, "Anolyte Recovery." Do you see that?

A   Correct.

Q   And it talks about a spiked recovery method?

A   Correct.

Q   What's your understanding of that method?

A   So when you are developing a method, you want to make sure that your method preparation will recover the anolyte of interest; right? So this would be likely a spiked amount of standard into placebo, and then you would treat that as an experimental sample to see if you could extract out the known amount of sample that you put in.

Q   Would that apply to the bendamustine degradation products you were trying to identify in your testing?

A   Well, so in this case, we were using

170

Apotex's method, and there were no changes to the method preparation. So I would say no.

Q   So it's your testimony that you used the same exact method that Apotex used?

A   I used the -- correct.

Q   So everything was identical?

A   Except for the wavelength.

Q   We might come back to Exhibit B because I want to look quickly at that. If you go to paragraph 34 of your report. So you have marked -- in paragraph 34 you cite to some Apotex documents that I think you reviewed in compiling your method. Is that a fair characterization?

MR. SCHULER: Object to the form.

THE WITNESS: I don't know what those numbers mean. But I did. I did use Apotex's documents to develop the HPLC method.

BY MR. FERENC:

Q   Okay. So we're going to look at one of those documents.

Can we mark as Kittendorf Exhibit Number 22 a document bearing Bates Number APOBenda64_002956 through 3031.

(Kittendorf Exhibit 22 marked.)

171

BY MR. FERENC:

Q   Does this look familiar to you at all? On the top -- I'll try to use some guide points. On the first page, it says, "Analytical method validation report for related substances." And if we go to, I guess, the Bates number ending in 2962. Just let me know when you're there.

A   Sure. Got it.

Q   And this just gives a synopsis of this document, and is this consistent with your citation with respect to identifying some of the parameters and processes for validating the method used by Apotex in its NDA?

A   Yes. This is the method validation report. I assume that it details the method within this report. But as it stands, I can assess that this is the method validation report.

Q   Okay. And that's the one that's cited in your paragraph 34; correct?

A   Yes.

Q   So if we go to the next page in your report -- we're going to kind of look at these two documents together. Paragraph 37 below that, there's Table A1. This is your characterization of Apotex's method; correct?

172

A   Yes.

Q   So point of confusion here, I guess. It says, "detecter wavelength," it says,         "
Do you see that?

A                   ; right.

Q   It does say that; correct?

A   Yes.

Q   I'm just curious as to what your basis is to contend that Apotex's method was done at nanometers?

A   I guess what I can say is I adapted this method, and Apotex's method is for        nanometers. And we looked at              .

Q   So why don't we look at page 2970 in Exhibit 22.

A   Okay.

Q   And that has a section titled, "11.5 Chromatographic Conditions." Do you see that?

A   I do.

Q   And under "UV Detection," that row, it says,        nanometers"; correct?

A   It does.

Q   So it would be inaccurate to say that Apotex's method had a detector wavelength of nanometers; correct?

173

A    Apotex's method does not have a wavelength of    nanometers.

Q    You're not aware of any testing by Apotex of its bendamustine product that was conducted at    nanometers; correct?

A    I have no knowledge of that.

Q    So that Table A1 is incorrect insofar as it states the incorrect wavelength for Apotex's method; right?

A    It does say    . So we can agree that Apotex does not test at    , but they do test at

Q    So you would agree with me that the inclusion of    nanometers was a mistake in your Table A1; correct?

MR. SCHULER:  Object to the form.

THE WITNESS:  I think it was highlighting the method that I was using to do the analysis.  So it's not Apotex's method, but it's the method that I used in the analysis.

BY MR. FERENC:

Q    The table is titled "Apotex's Method"; right?

A    It is.

Q    And Apotex does not use    ?

A    They use

174

Q    Okay.  So that would be inaccurate in your table; correct?

MR. SCHULER:  Objection.  Asked and answered.

THE WITNESS:  Yes.  Apotex does not use

BY MR. FERENC:

Q    Okay.  Let's look at the column.  So in the column it says "Phenomenex Luna" column.  Do you see that?

A    Yes.

Q    That is not the column Apotex uses; correct?

A    Right.  They use    , which is essentially the same column.

Q    Why do you say it's essentially the same column?

A    Because if you searched and did some research, the    , to my understanding, is no longer available.  And it's been superseded by this Phenomenex Luna chemistry with the same exact dimensions and pore size.

Q    Where in your report did you conduct that analysis?

A    Where in my report?  I just bought the

175

Phonomenex Luna column because it was equivalent.

Q    Based on what analysis is your opinion?

A    Chemistry column dimensions, protocol size, vendor recommendations.

Q    But you don't include those details in your report anywhere, do you?

A    Probably not, no.

Q    Okay.  So it's fair to say that you don't -- you don't intend to testify at trial regarding the equivalency of the column you used and the column that Apotex uses; correct?

A    Yes.  I would say that a person in the art would know that they're the same chemistries.

Q    How would they know that?

A    Because they are    , and they have the same dimension and particle size.    .

Q    Can't they have same different physical structures even though they have the same    ?

A    It's going to be a    chain.  It's hard to argue that they would have different physical structures.

Q    But they are different columns?

A    I'll grant you that.

Q    Okay.  Great.

Okay.  So if you look at paragraph 38 of

176

your report below those tables, you say, "Prior to beginning the analysis, I first evaluated Apotex's system suitability parameters."

Do you see that?

A    Yes.

Q    Then you say 1, 2, and 3?

A    Yes.

Q    Those are all Apotex parameters?

A    Correct.

Q    Did you calculate the tailing factor for your method?

MR. SCHULER:  Sorry.  What?

BY MR. FERENC:

Q    Did you calculate the tailing factor for your method?

A    It's essentially the same method other than the detection, so no.

Q    That's not my question, Doctor.  I'm asking, did you calculate the tailing factor for your method?

A    No.

Q    So the plate count, that was an Apotex system suitability parameter; right?

A    Correct.

Q    Did you determine the plate count for your

177

method?

A   I need to back up. I have that data. And they should be in the chromatograms. I'm pretty sure, and I'm almost certain, that I looked at tailing factors, plate counts, et cetera. Those parameters are established by Apotex, if that's what you're asking. But I did determine what they were.

Q   I guess that's my question. I'm trying to understand where you report in the tailing factor for your methods?

A   It's in the chromatography. It's probably in the raw data of the chromatograms.

Q   And the chromatograms that you produced with your report, it's your testimony that the tailing factor would be in there?

A   I believe it's in the software, yes.

Q   And is that something that you produced in the litigation?

A   I produced hard copies of the chromatograms.

Q   Do you have the underlying data?

A   In my lab, yes.

Q   Would you be able to provide that to your counsel?

A   Sure.

178

MR. FERENC: We'd make a request for the underlying data.

MR. SCHULER: You've got the chromatograms.

MR. FERENC: He said the underlying data is not in the chromatograms. It's in the data that he has in his lab. So we would request the data for the tailing factor that was not provided.

MR. SCHULER: I'll take that under advisement, but this is like four months after his report.

MR. FERENC: I'm just asking him now, Counsel, so I wouldn't know the answer until I ask the question.

BY MR. FERENC:

Q   So let's go on to the RSD. Do you see that?

A   Yes.

Q   You calculated RSD for your methods; correct?

A   I calculated the RSD for the Apotex chromatography that I did, yes.

Q   I'm confused. Let's just make sure we're understanding each other because you said the Apotex chromatography. That would be the Apotex testing method described in its NDA; right?

179

A   Yes.

Q   And then your method is the one that -- I believe you used the phrase adopted in paragraph 36.

A   Okay.

Q   Right?

A   So just for clarification then, the methods that I used at the two different wavelengths, so the experiments that I did, that's what we're asking? That's going to be my methods.

Q   Right. So when I refer to your methods, that will be the methods that you conducted.

A   Okay.

Q   And then the Apotex methods will be the ones that are described in Apotex NDA.

A   Got it.

Q   For the RSD's for your methods, did you calculate the RSDs?

A   Yes.

Q   Where are those reported?

A   They're probably not reported, but you can calculate them from the standard chromatograms.

Q   Did you calculate them?

A   I'm sure I did.

Q   They would be in the chromatograms or the underlying data?

180

A   You would have to do the calculation using the underlying data.

Q   Do you know, sitting here today, whether you had RSDs of no more than 5 percent?

A   I'm quite certain I did.

Q   Okay. Thank you.
In paragraph 39, you talk about the -- I guess the                    system. Do you see that?

A   I do.

Q   Is that the same system that Apotex used in its HPLC method?

A   I have no idea.

Q   You didn't do any investigations into what system Apotex used compared to the one that you were using?

A   Irrelevant.

Q   Why is it irrelevant?

A   Because the parameters -- what matters is not the instrumentation. What matters are the parameters and the column.

Q   Okay. So I didn't see in your testing any, I guess, calibration studies or certificates of analysis with respect to this system. Is that something that you do on a regular basis in your lab?

A   A certificate of analysis for my system?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

46 (181 to 184)

181

Q   A calibration.  Is that a machine that needs to be calibrated at all?

A   No, no.

Q   Never?

A   It gets provided maintenance.

Q   What type of preventive maintenance gets done?

A   The technician comes in and tears it apart and puts it back together with new parts.

Q   How frequent is that done?

A   Usually annual to 18 months, 12 to 18 months.

Q   Why is it done that frequently?

A   Because I like to keep my equipment up and running, and I don't want to risk having a breakdown. So I try to keep it -- I try to keep on top of the preventive maintenance.

Q   Do you know when the last time that machine was serviced prior to you running the tests?

A   It was in the fall.

Q   Of 2025?

A   Yeah.

Q   Okay.  So going back to the Exhibit 2 -- or B, sorry, to your report -- this is the Snyder 1997 document.  So we talked about accuracy.  Did you do

182

any testing or experimentation to ensure precision on your HPLC testing?

A   Yeah, that's the RSDs of the sampling -- or the standard detections.

Q   And what about any calculations or experimentation to assess the linearity of your methods?

A   I did not do any linearity studies.

Q   Why not?

A   I just didn't.

Q   What is the purpose of a linearity study?

A   To show that the response is linear over a concentration.

Q   So what was the reason for you not doing the linearity study?

A   I just didn't do it.

Q   Did you have the data to conduct it?

A   Did I have the data to conduct it?  I don't know which data you're talking about.  I may have had the data to conduct it.

Q   Well, it says -- so if we look at 15.4 on Exhibit B to your report.

A   Yep.

MR. SCHULER:  Sorry.  What page?

MR. FERENC:  15.4 on Exhibit B is the

183

section titled "Linearity."

THE WITNESS:  Yep.

BY MR. FERENC:

Q   So if we read together, it says, "As described in Section 14.1.1, the linearity of a method is a measure of how well a calibration plot of response versus concentration approximates a straight line."

Do you see that?

A   I do.

Q   And it says, "Linearity can be assessed by performing single measurements at several anolyte concentrations"?

A   Yep.

Q   So it's fair to assume since you did not conduct any linearity studies that you did not identify any of the bendamustine degradation product measurements at various concentrations?

MR. SCHULER:  Object to the form.

THE WITNESS:  Is it fair to say that since I didn't -- can you repeat that?

BY MR. FERENC:

Q   You didn't do any linearity studies.  So, I guess, let's go back to the Apotex document, right, because there's a lot in here about linearity studies

184

that were done with respect to specific bendamustine related compounds?

A   Okay.

Q   Okay?

So by one example if you look at -- gosh, ending on -- again, this is Bates Number 3006.

A   Yep.

Q   There's Table 31.  It says, "A linearity for Bendamustine-Related Compound C."

A   Yep.

Q   Right?

And you see a table that provides various information.

A   Yes.

Q   So this type of information was not something that you provided in your testing because this testing was never done?

MR. SCHULER:  Object to the form.

THE WITNESS:  Yes, for related substance C, no, we didn't have it.

BY MR. FERENC:

Q   Was it done for any related substances?

A   No.

Q   Why did you not consider doing that testing for your experiments?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

47 (185 to 188)

185

A   It wasn't important.

Q   What does the linearity testing such as that described in the Apotex NDA provide?

A   **What does the linearity testing -- response over concentration.**

Q   Why would that be important to include?

MR. SCHULER:  Object to the form.

THE WITNESS:  I was injecting the sample --

(Reporter clarification.)

THE WITNESS:  Like, why would it not be important to include, or why would it be important to include?

BY MR. FERENC:

Q   Typically, why are linearity studies done in an HPLC method?

A   **Yeah, to assess response over concentration.**

Q   Okay.  So for this Table 31 --

A   **To make sure you're in the linear range, yes.**

Q   So let's unpack that a little bit; right?

A   **Yeah.**

Q   Apotex, in its NDA, did a linearity study with bendamustine-related compound C; right?

A   **Yes.**

186

Q   It has sample numbers, and then it has a percent level, and then it has a concentration in PPM?

A   **Yes.**

Q   And as a person of ordinary skill in the art, why would Apotex engage in this study for the purposes of its HPLC method validation?

A   **It's essentially requirement method validation.**

Q   Why is it a requirement?

A   **Because you need to know what the response is of a concentration.**

Q   And if you don't have this information, what does that say about the method?

MR. SCHULER:  Object to the form.

THE WITNESS:  For a new validated method, if you don't have that, it would say you don't know what the linearity is.

BY MR. FERENC:

Q   Okay.  So if we go back to the Exhibit B to your report, on that same page, if you look at the bottom, it says, "Small changes in the calculated value" -- on to the next page -- "of either the slope or intercept can lead to errors in estimating the True Value for a sample."

187

Do you see that?

A   **I do.**

Q   And you agree with that?

A   **Sure.**

Q   You were unable -- your methods in your experiments were unable to detect any changes associated with those calculated values because you did not engage in any linearity studies; correct?

MR. SCHULER:  Objection.  The document speaks for itself.

THE WITNESS:  Yeah.  I did not do linearity.

BY MR. FERENC:

Q   Did the absence of linearity studies in your experimentations have any impact on the detection of any impurities in Apotex's products?

A   **Well, I would note that the impurities in Apotex's product are very -- they are zero to very low levels.  So I would not be concerned about linearity with the impurities that I found both at**

**.**

Q   But the linearity would allow you to ascertain different concentration levels of those impurities; right?

MR. SCHULER:  Object to the form.

188

THE WITNESS:  It would allow you, sure.

BY MR. FERENC:

Q   All right.  Let's move on to the next one. Range.  Did you do any studies or experimentations to assess the range of your methods?

A   **No.**

Q   Why not?

A   **It was not relevant.**

Q   Why was it not relevant?

A   **Because the charge here was to test Apotex's samples using a method adopted from Apotex located at two different wavelengths.  And when I did that, I collected data simultaneously and I saw an elution profile of various peaks at very low levels that were similar across the wavelengths.  So having the range is not going to affect my data or my data analysis.  Having that range would be important for validating a method.**

Q   Okay.  But you did not do any range studies; correct?

A   **I did not.**

Q   Next one, 15.6 on the next page talks about limit of detection and limit of quantification [sic]?

MR. SCHULER:  Quantitation.

MR. FERENC:  What did I say wrong?

189

MR. SCHULER: Quantification.

MR. FERENC: Quantification, sorry. Keep me in line.

BY MR. FERENC:

Q   Limit of quantitation.

A   Yes.

Q   Are you familiar with those phrases?

A   Yes.

Q   Let's take them one at a time. What is the limited detection?

A   Limited detection would be the lowest concentration that you would detect in a sample.

Q   And what about limit of quantitation?

A   It would be the lowest concentration of an anolyte that you would quantitate.

Q   How do you determine LOD and LOQ for a particular HPLC method?

A   There's a variety of ways. It's injecting the lowest concentration of a standard curve, injecting -- there's some statistical methods where you don't inject the lowest of your standard curve, but you inject a low concentration of a particular anolyte and you're injecting them multiple times, and then you're doing statistics on that, and then you're deriving an LOD from an LOQ based on further

190

statistics.

Q   There's another phrase in here called "signal-to-noise ratio." Do you see that?

A   Yes.

Q   What's that?

A   It's essentially your signal divided by a noise.

Q   Did you conduct any studies, experiments to determine LOD, LOQ, or signal-to-noise ratio in your experiments?

A   We used the LOD and the LOQ that was prescribed by Apotex, but we did no studies to determine it independently.

Q   What about the signal-to-noise ratio, did you do any calculations to determine that for your methods?

A   I mean, you derive that from every chromatogram, and you can look at signal-to-noise for every sample you check. I have that data. Is there a defined signal-to-noise? No, I did not define it in my method.

Q   Did you provide that in your report?

A   I think you can calculate that. If it's not in the chromatograms, it's easy to get.

Q   If it was easy, why didn't you do it? It's

191

not in your report. I haven't seen signal-to-noise in your report. So I'm trying to understand what is or is not in your report. That something might exist in the ether in data is not really helpful to me. Because you gave your report of what you're going to say at trial.

A   Yeah.

Q   So there's nothing in here about signal-to-noise. So I'm trying to understand why there is nothing in here about signal-to-noise?

MR. SCHULER: Hold on.

His report encompasses all the materials in his report, so don't misrepresent or pretend that he can't testify to stuff that's in his report, including the appendices. Okay? So that's number one.

Number two, you guys are speaking way too fast to each other. She's giving me the eye. Slow down. Give me time to object. Slow down.

Maybe restate your question.

BY MR. FERENC:

Q   I guess when reporting the results of your testing, it's fair to say that you did not contemplate signal-to-noise ratio; correct?

A   I don't know if that's fair to say. It

192

just didn't get included in my report.

Q   So the results that you are reporting in your report don't include signal-to-noise ratio calculations?

A   That's fair.

Q   Next one, 15.7, Specificity.

A   Could I ask for a break?

MR. FERENC: Yes. Of course.

THE VIDEOGRAPHER: We are going off the record. The time is 3:35 PM.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:41 PM.

BY MR. FERENC:

Q   Dr. Kittendorf, the next section is 15.7, Specificity. Do you see that?

A   I do.

Q   This paper describes it as the single-most important aspect of most analytical methods. Do you agree with that?

A   I'm not sure.

Q   Why are you not sure?

A   I want to read what they say.

Q   Sure.

A   Yes, I did make that very important

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

49 (193 to 196)

193

characteristic in developing and validating a method.

Q   Did you engage in any experimentation or testing to assess the specificity of your methods?

A   No.

Q   So if we go to the next page, it might be two pages beyond that, 697 of the chapter.

A   Okay.

Q   They start talking about, I guess, 15.7.1, "Spiking of Potential Interference." Do you see that?

A   I do.

Q   What is your understanding of that process?

A   I have no idea.  I have to read it.

Q   You never heard of that phrase before?

A   I think I know what it means, but it's kind of awkward wording.  If you don't mind, I'll read the paragraph.

Q   Not at all.  Go ahead.

A   Okay.  I understand it.

Q   What's your understanding of what's described there?

A   You would add in interference into a sample and determine if you can identify the interferant along with the sample analytic.

Q   Did you conduct any studies in your testing

194

to identify any potential interference?

A   May I refer to my report for a minute?

Q   Absolutely.

A   I don't believe I did.

Q   So we're going to skip ahead a few pages to 701 in this book.

A   Okay.

Q   To 15.8.

A   Yes.

Q   It's called "Ruggedness."  Do you see that?

A   Yes.

Q   Are you familiar with the concept of ruggedness?

A   I know of it, yes.

Q   What's your understanding?

A   You sort of adjust method parameters to see how the method responds.

Q   Did you conduct any ruggedness assessments of your HPLC methods?

A   No.

Q   Go to the next page, 15.9.  It says, "robustness."  Are you familiar with that concept?

A   Yes.

Q   Did you engage in any studies or experimentation to evaluate or assess the robustness

195

of your methods?

A   I did collect data at two different wavelengths, and the data was pretty similar.  So to the extent that that's robustness, I evaluated that.

Q   Outside of the wavelength change, there was no other experiments conducted by you to assess the robustness of your method?

A   Correct.

Q   All right.  We talked about system suitability.  I'm going to move to a couple of pages. 707 is the chapter page.  15.13, "Inter-laboratory Crossover Studies:  Transferability."  Do you see that?

A   Yes.

Q   It talks about how a validated method often will be used in other laboratories.

A   Yes.

Q   Is that consistent with what you had done with the Apotex method?

A   Yes.  I adapted the Apotex method to use in my lab, yes.

Q   And on the next it has some methods for determining equivalence.  Do you see that?

A   I do.

Q   It says a T test, an F test, an analysis of

196

variance test, and a Q test.  Do you see that?

A   I do.

Q   Did you conduct any of these tests or analyses in transferring the Apotex process to your lab?

A   I did not.

Q   Why not?

A   I just didn't.

Q   Okay.  I'm going to go back to your report. Let's go to paragraph 42.  Just let me know when you're there.

A   Sure.  Okay.

Q   So in paragraph 42 you talk about preparing the BDM HCl stock standard:  Is that the bendamustine standard solution?

A   It would be, yes.

Q   And you used -- I think you got bendamustine from USP; is that right?

A   Yes.

Q   Do you know if it was the same or different than the bendamustine standard used by Apotex in its NDA documentation?

A   Point me to what they used.

Q   So it's --

A   Page 10.

197

Q   Go to the Bates Number 2966.  It has Section 9.2.  It talks about the standard impurity details.

MR. SCHULER:  Where are you at?

THE WITNESS:  2966, 9.2.

MR. SCHULER:  Sorry.

THE WITNESS:  I can't -- they don't have a source for their standard; so I can't say whether or not theirs comes from USP.

BY MR. FERENC:

Q   But you can say whether you sourced your standard from something that you found in the Apotex documents or not; right?

MR. SCHULER:  Object to form.

BY MR. FERENC:

Q   Let me rephrase that.
Did you pick your standard stock solution based on something you saw in Apotex's documents, or did you just pick from the USP based on your experience?

A   Are we talking about the solution?

Q   The standard solution that you used in reference in paragraphing 42.

A   Right.  So the standard solution was prepared according to how Apotex prepares their

198

standard solution.  But I think -- are you referring to the source material?

Q   The stock.  Yes, the source.  Let's look at paragraph 42 so we can clear this up.

A   Right.

Q   You said, "I prepared a BDM HCl stock standard from the BDM HCl reference standard obtained from USP."
Do you see that?

A   I do.

Q   I'm trying to understand if the bendamustine hydrochloride reference standard that you used and obtained from USP is something that you selected independently, or is it something you selected based on information in Apotex's NDA documents?

A   Right.  Just for point of clarification, previously you referred to that as the standard solution.

Q   I'm sorry.

A   That reference standard is sold as a solid.

Q   Gotcha.

A   So the standard solution was prepared according to Apotex's method preparation.

Q   Okay.  But the reference standard was

199

obtained from USP based on the decision that you made?

A   I procured it from the USP, yes.

Q   And then paragraph 43 you talk about preparing a BDM HCl intermediate standard.  What is that?

A   So again, this is taken from the Apotex sample preparation method.  But at paragraph 42, you prepare a stock standard.  In paragraph 43, you prepare a diluted intermediate standard.

Q   What is the purpose of preparing an intermediate standard?

A   To get to the working standard.  So Apotex's method has two different dilutions from the stock standard.  It's a -- you make a stock standard at a certain concentration.  It looks like this was approximately 1 mg per mL.  And then you perform two dilution steps to get to the working standard.

Q   And for the bendamustine related compounds that are reported in Apotex's NDA, you did not prepare any working standards for those compounds; correct?

A   I did not.

Q   Why not?

A   I just didn't.

200

Q   Did you try to do it and failed?

A   No.

Q   What was your decision making for not doing that?

A   We just didn't do it.

Q   Is that something that Apotex had done in their process?

A   I don't believe Apotex's method talks about that.  But I would need to review the document that I used to develop the method to be 100 percent sure.

Q

201

Q   Okay.  So -- okay.  I see what you're saying.  All right.

All right.  So let's look at -- so paragraph 45, it says,

A   Just random.

Q   So then it goes and continues, it says, "Using a sterile syringe, I withdrew approximately 3 milliliters of the combined product and transferred approximately" -- "approximated 2 grams to a tiered 25-milliliter volume metric flask."

Do you see that?

202

A   I do.

Q   Then it continues, "I added approximately 10 milliliters of diluent and sonicated for 5 minutes.  I then diluted to volume with diluent and inverted to mix."

Does that accurately describe how you prepared the samples that you tested?

A   Yes.

Q   My understanding is that you took two vials, pulled them together, and then you took a 3-milliliter sample from that combination to create the three samples that you tested; is that correct?

A   Correct.

Q   But you just used two vials.  You didn't use anything else?

A   Right.

Q   Okay.  But the fact that you have three samples that you tested doesn't really reflect all of the samples that you received.  They're not independent; right?  They came from the same source?

A   I grant you that, yes.  It's two samples mixed together to get a representation of the impurity profile; right.  So you take two vials.  You mix them together.  Prep one sample and inject that

203

sample three times.

Q   Why didn't you just test a single vial?

Do you have any knowledge about the products that are actually sold by Apotex?

A   I have no knowledge of what Apotex sells.

Q   Okay.  Because I just found that curious why you did it that way.

A   Well, it's why Apotex -- I think the more -- the bigger question is the curiosity is why Apotex does it that way.

Q   So you don't have any independent basis for doing it other than the fact that Apotex did it that way?

A   I have thoughts and theories, yes, but I repeated their sample preparation procedure.

Q   Why did you not do something different?

A   Because I followed Apotex's sample preparation procedure.

Q   Why was it important for you to follow Apotex's procedure?

A   Because we were evaluating Apotex's product.

204

Q   But Apotex doesn't sell a combined product.  So is it fair to say that what you did was alter --

MR. SCHULER:  I'll object.

MR. FERENC:  I have to get my question out.

MR. SCHULER:  Sure, go ahead.

BY MR. FERENC:

Q   Is it fair to say that you altered the Apotex product to create this 20-milliliter glass vial and then tested that sample?

MR. SCHULER:  Hold on.  Let me object.  I think that misstates the label for the Apotex product.

BY MR. FERENC:

Q   You can answer.

A   Yeah, I need you to repeat that for me.

MR. FERENC:  Sure.  Can we have the question read back, please.

(Record read as requested.)

THE WITNESS:  I would say I did not alter the product.

BY MR. FERENC:

Q   But you didn't test the product that's actually sold by Apotex, right, in the manner in which it's -- the format in which it's sold?

MR. SCHULER:  I'll object again.  That

205

misstates the label.

THE WITNESS: I tested the bendamustine drug product, and my understanding is they sell that.

BY MR. FERENC:

Q   Well, I'm just trying to understand if what you tested is what is claimed in the patent. So if you can get the '248 patent. I think you have that in front of you; right? So, again --

A   I have the '214 patent.

Q   Oh, the '214. Okay. Okay, '214, let me get that. So if you go to -- this is Exhibit 2.

MR. SCHULER: Okay. Claim 1, I assume?

MR. FERENC: Claim 1 on Column 14.

BY MR. FERENC:

Q   It says, "A sterile vial containing a liquid bendamustine-containing composition, comprising about 100 milligrams of bendamustine."

Do you see that?

A   I do.

Q   So what you tested was a 20-milliliter glass vial solution that was pulled from two of Apotex's products. So it would contain -- or it would not contain about 100 milligrams of bendamustine; correct?

MR. SCHULER: Object to the form.

206

THE WITNESS: It would contain 25 milligrams per milliliter.

BY MR. FERENC:

Q   That wasn't my question, Dr. Kittendorf. My question was, the 20-milliliter glass vial would not contain about 100 milligrams of bendamustine; correct?

A   So when you combine two vials, each of 50 milligrams, you're going to have a representative sample of 100 milligrams.

Q   Okay. And if the Apotex products contain -- each vial contains 100 milligrams and you combine two, would that make about 100 milligrams?

A   It would, at the same concentration of 25 mgs per vial.

Q   That's not my question.

(Reporter clarification.)

A   Concentration of 25 mgs per vial.

BY MR. FERENC:

Q   I'm not asking about concentration. The claims require about 100 milligrams of bendamustine. So how much bendamustine was in the 20-milliliter glass vial that you withdrew the samples from?

A   But it also says a concentration -- or a composition is from about 25 milligrams per

207

milliliter.

Q   Right, that's a separate element of the claim. Right? But it says "about 100 milligrams of bendamustine." We agree with that; right?

A   Right.

MR. SCHULER: Hold on. I think you are arguing with the witness.

MR. FERENC: I don't think I am at all. I asked him a question, and he said "Right."

MR. SCHULER: You said it's a separate limitation. He's reading it as a whole. I think you're just arguing with him. But anyway, my objection is I think you keep cutting him off. Please don't talk over each other.

THE WITNESS: Sorry.

BY MR. FERENC:

Q   Looking at Claim 1, the '214 patent, you would agree with me that the claims require a sterile vial containing a liquid bendamustine-containing composition; correct?

A   Yes.

Q   And that sterile vial must contain about 100 milligrams of bendamustine, and then it provides a concentration of 25 mgs per milliliter?

A   Yes.

208

Q   So doing that math, you would agree that that reads on a 4-milliliter vial; correct?

A   Yes.

Q   So the Apotex product that you combined resulted in an 8-milliliter solution having about 200 milligrams of bendamustine; correct?

MR. SCHULER: Object to the form.

THE WITNESS: Yes.

BY MR. FERENC:

Q   Okay. So the samples that you withdrew from your preparation are not within the scope of Claim 1 of the '214 patent; correct?

MR. SCHULER: Object to the form.

THE WITNESS: I would disagree.

BY MR. FERENC:

Q   Why would you disagree with that?

A   Because it's still at the same concentration.

Q   Does it still have about 100 milligrams of bendamustine?

A   That vial would now have 200 milligrams of bendamustine at a 25 mgs per mil concentration.

Q   Is 200 milligrams of bendamustine the same as about 100 milligrams of bendamustine?

A   200 is not the same as 100.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

53 (209 to 212)

**209**

Q   Okay.  So is 200 milligrams about the same as 100 milligrams?

A   **200 is not the same as 100.**

Q   You would agree with me that the solution that you tested did not have about 100 milligrams of bendamustine; correct?

A   **So the solution that we tested -- I would have to go through the dilutions, but the solution that we -- it was diluted further anyway, the sample prep.**

MR. SCHULER:  You're just talking about step 1.

THE WITNESS:  The sample is --

MR. FERENC:  It's my examination, Ken, come on.  I'm not going to get in an argument with you about it.

BY MR. FERENC:

Q   I'm trying to understand what you tested.  You combined two vials in a 20-milliliter vial; correct?

MR. SCHULER:  Just let me state my objection.  You keep saying "what you tested," and you are only referring to step 1 that he combined into one, and then you are omitting the subsequent steps.

**210**

BY MR. FERENC:

Q   This is a step that you did; right?  We agree that you combined two vials into one.

MR. SCHULER:  Okay.  But you asked about what he tested, please --

MR. FERENC:  Object.  And then you'll be able to exclude it, and we'll have that fight later.

MR. SCHULER:  Okay.  You're misstating his report.

MR. FERENC:  I don't believe I am.

BY MR. FERENC:

Q   We talked about how you prepared a sample by selecting two vials.  I'm reading in paragraph 45.

A   **Okay.**

Q   Okay?

Two vials of Apotex's liquid bendamustine product.

A   **Okay.**

Q   Okay?

You did not test one vial; right.  You had to select two; correct?

MR. SCHULER:  Objection.  Asked and answered.

THE WITNESS:  I selected two, yes.

**211**

BY MR. FERENC:

Q   And if you selected -- you could have chose to select one and did the same dilution steps that, I guess, you talk about, right, but you chose not to do that?  You combined two; right?

MR. SCHULER:  Object to the form.

THE WITNESS:  Yes.

BY MR. FERENC:

Q   Okay.  I'm just trying to understand that when you did that combination step, you had a solution in a 20-milliliter glass vial, and that solution is what you tested under the HPLC methods; correct?

MR. SCHULER:  Objection.  That misstates his report.

THE WITNESS:  It was further diluted, but that was the stock standard or stock sample that I tested.

BY MR. FERENC:

Q   Okay.  So setting aside any further dilution steps, you tested a stock solution that was equivalent to two independent Apotex vials combined?

MR. SCHULER:  Objection.  That totally misstates his testimony and his report.

MR. FERENC:  Okay.  Your objection is

**212**

noted, Counsel.

MR. SCHULER:  You keep saying that he tested, and he says, "I tested it after dilution," and you say, "But independent of dilution, you tested X."  You can't say that.

MR. FERENC:  We're going to have a fight about time later, and we're going to have this conversation to point to.

BY MR. FERENC:

Q   I'm just trying to understand it because it's a curious way to test whether or not a vial that contains 100 milligrams of bendamustine would assess, under HPLC parameters, why you would combine two.  And I understand that you did that because Apotex does that.  And I'm just trying to get to an agreement that by combining two vials, you've now created a product that Apotex does not sell in that format.  Correct?  Do we agree with that?

MR. SCHULER:  Objection.  Misstates the label.

THE WITNESS:  I don't know what -- I don't know what Apotex sells, so...

BY MR. FERENC:

Q   Of course you do.  You've got, what, 12 vials; right?  You received 12 vials in connection

213

with your report.

A   And those aren't for sale.  Literally, I don't know.

Q   I'll represent to you that Apotex sells those, and that's why you got those as samples; okay?

MR. SCHULER:  You guys need to slow down. You're arguing right now.

MR. FERENC:  I'm not arguing.

MR. SCHULER:  Yes, you are.  You've got these two-paragraph things where you're like, I'm trying to understand what you did, blah, blah, blah, blah, blah.

MR. FERENC:  Then I guess that's going to be my record that I have to sift through.

MR. SCHULER:  Understood.  I'm just saying they are really long questions, and then you are talking over each other.

BY MR. FERENC:

Q   Let's go back.  So in your paragraph 31, it says, "As part of this litigation, I received 12 vials of Apotex's liquid bendamustine product."

Do you see that?

A   I do.

Q   It says 25 mgs per milliliter.  Do you see that?

214

A   I do.

Q   So you recall receiving those 12 vials; right?

A   I do.

Q   Each of those vials was 4 milliliters, each; correct?

A   Yes.

Q   So we agree that at that concentration a 4-milliliter vial would have a total of 100 milligrams of bendamustine; correct?

A   Yes.

Q   And then if we go to paragraph 45 again where you selected two vials and combined them into a 20-milliliter glass vial.  Do you see that?

A   Yes.

Q   The solution in that 20-milliliter glass vial would have 200 milligrams of bendamustine; correct?

A   Yes.

Q   So that 200-milligram solution is what you used to prepare the samples that you ultimately tested; correct?

A   Correct.

Q   All right.  Now we can move on.

In paragraph 47 and 48 of your report, you

215

talk about quantifying the amount of impurities. Which impurities?

A   Impurities -- I would say peaks not associated with bendamustine.  Or peaks that are not bendamustine in the chromatogram.

Q   Okay.  Is it your testimony that peaks that are not associated with bendamustine all qualify as impurities resulting from the degradation of bendamustine?

MR. SCHULER:  I think you're misstating his answer.  She got it, though.

BY MR. FERENC:

Q   If I'm misstating your answer, Dr. Kittendorf, please correct me.  I'm not trying to do this intentionally.  There's a lot of words.

A   Yes.

Q   I'm trying to understand.  So when I asked about impurities, you said you were calculating the peaks not associated with bendamustine.

A   Right.  So let me try to simplify this.

Q   Sure.

A   In the HPLC injection, you are going to see a bendamustine peak, right, because bendamustine is going to be the main component in that peak.

Q   Sure.

216

A   There may be other peaks that are not bendamustine that you see in the chromatogram.  And those would be considered the impurities.

Q   Okay.  We understand one another.  And with respect to the non-bendamustine peaks, did you do anything in your testing to identify whether those peaks qualify as an impurity resulting from the degradation of the bendamustine?

A   I was able to identify four different bendamustine-related compounds based on relative retention times.

Q   And that was based on relative retention times as reported by Apotex; correct?

A   Yes.

Q   So you just saw where the peak was, matched it up to the RRT data reported by Apotex, and drew an inference that that corresponded to a particular bendamustine impurity; correct?

A   Correct.

Q   All right.  Let's look at Table B1, which is under paragraph 49 of your report.  Let me know when you're there.

A   Yes.

Q   All right.  So in paragraph 49 you have a Footnote 2; right?  And the Footnote 2 says, "For

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

---

217

this experiment, the mass percentage calculations assume an RRF of 1." Do you see that?

A    Correct.

Q    I know we talked about RRF a little bit earlier today, and I won't go over what Mr. Lief talked about.  But I wanted to point you to the Apotex document ending in Bates number 2974.

A    Yes.

MR. SCHULER:  By that you mean 22?

MR. FERENC:  Yes.

MR. SCHULER:  2974?

MR. FERENC:  Correct.

BY MR. FERENC:

Q    All right.  You see there, Dr. Kittendorf -- sorry.  Are you on that page?

A    Yes.

Q    So we see the table.  At the top it has the name of the impurity, the retention time, the relative retention time, and then the RRF; right?

A    Yes.

Q    And remind me what RRF is.  I don't seem to be recalling.  Was it the relative retention factor?

A    Response.

Q    Response factor.  Okay.

So if we look at the RRFs reported by

---

218

Apotex, none of them are equal to 1; correct?

A    Correct.

Q    Why did you assume an RRF that was not reported by Apotex?

A    **Again, we didn't have RRF values for the 223-nanometer wavelength data.  And to compare apples to apples to determine whether or not the two wavelengths could give similar results, we assigned RF values of 1 to every impurity peak we saw.**

Q    Okay.  But if you made that assumption for the     -- or for the 223-nanometer testing, why did you need to make that assumption for the      -nanometer testing if you had the reported RRFs for Apotex?

A    **Simply so you are comparing apples to apples.**

Q    Yeah, but you're not comparing apples to apples.  You're selecting which parameters to use despite reported data that is not consistent with your assumption.  So my question is, why did you not use the RRFs reported by Apotex in your      -nanometer testing?

MR. SCHULER:  Objection.  Asked and answered.  Argumentative.

THE WITNESS:  We certainly could have, but

---

219

we did not have the same -- we didn't have RRF values for 223.  So if we were going to compare the two, we just used RF values of 1.

BY MR. FERENC:

Q    Don't RRF values -- I think you testified earlier about this.  RRF values will impact the measurements of any particular impurity; correct?

A    Correct.

Q    All right.  So if we had reported RRF values for      that you disregarded and that decision would impact the values obtained, how can you say that you're making an apples-to-apples comparison?

A    **There was a lot to unpack there.  Can I ask you to repeat that?**

Q    That was my best question of the day, but I'll try.

MR. SCHULER:  Or you can have her read it back.

(Record read as requested.)

THE WITNESS:  Well, I think we've taken RRF out of the equation, I guess.  That's what I mean by apples to apples.

BY MR. FERENC:

Q    Okay.  What you say as you're taking out of the equation, I could say that you're altering the

---

220

calculations by ignoring data that you had available to you.  So that's what I'm trying to understand, is why you made that assumption with respect to the 254-nanometer testing when you had the reported data available to you?

MR. SCHULER:  Same objection.  Asked and answered.  Argumentative.

THE WITNESS:  So we could have calculated it -- we could have calculated the responses using the RRFs provided by Apotex for      .  We just didn't.

BY MR. FERENC:

Q    Okay.  And if you did calculate it using the RRFs with Apotex for      , that would change your analysis with respect to the comparison that you're making that 224 and 223 are essentially the same?

MR. SCHULER:  Object to the form.

THE WITNESS:  I think you misquoted a wavelength.

BY MR. FERENC:

Q    Okay.

A    **I think you said 224 and 223.**

Q    If you did calculate it using the RRFs for Apotex for the      -nanometer, it would change the results; right?

A    **Yes.**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

56 (221 to 224)

221

Q   So the change in that results would necessarily impact your conclusion that the 223 is essentially the same as the        data; correct?

A   I would say just by looking at this, if I use the RRFs to calculate -- to do the calculation at        , it's going to change slightly, but it's not going to change to be over 5 percent, which is the limit in the patent.  So we could do this exercise and calculate it at the RRF, but the bottom line is there's very, very, very little impurities found at either 223 or        See, he's got me doing it.  Very little -- very low level of impurities at 223 and

Q   But you did not do those calculations; correct?

A   I don't remember if I did or not.

Q   Presumably --

A   We could do it.

Q   I don't know that we have the time to do it, but I don't see them in your report, so --

A   Fair enough.

Q   -- I think it's just fair to say you did not do them.

A   Okay.

Q   So at the very least, it's accurate for you

222

to tell me that you don't know how the results will change by using the Apotex reported RRF numbers for the 254 data; correct?

MR. SCHULER:  Objection.  Asked and answered.

THE WITNESS:  I could hypothesize just rough calculations, and it may increase a little bit.  It likely would but not significantly.

BY MR. FERENC:

Q   Not significantly compared to what?

A   Reporting the data with the -- using the calculation of 1.0 for the RRFs.

Q   Okay.  So it would change the 254-nanometer results; correct?

A   Certainly.

Q   We don't know how exactly they would change for each number in each table, but we agree that it would change.  And in some instances, it might increase the spread; correct?

A   I'm just ballparking this a minute.

Q   Sure.  Would you like some pen and paper to do the calculations?

A   No, no, no.  I mean, there may be a change of about .2 percent.

Q   With which data?

223

A   The 254.

Q   Across every single calculation?

MR. SCHULER:  I object to form.  I have no idea what that means.

BY MR. FERENC:

Q   Dr. Kittendorf, I'm not trying to be rude.  I know you are probably doing advanced calculations in your head.  None of that got on the record.  I need to understand what is your basis of testifying that there would be a .2 difference?

A   All right.  Let's --

Q   Let's walk through one.

A   This is what I'm looking at.  Okay?

Q   Sure.  We're going to have to be very specific in where you're looking and what numbers you're referring to.

A   Compound RCI; right?

Q   On which table?

A   B2.

Q   Table B2?

A   Right.

Q   RCI.  So this is Peak 20.

A   And I get .1 percent of that.  I get .1 percent across three sample injections.  And that RF value is about 1.09.

224

Q   Okay.

A   So fairly close to 1.  It would decrease that slightly if you used that RRF value in that calculation.

Q   Let's go --

A   For RCC, another one that I have a value for, that mean is about 0.  There's .01 percent there.  That RRF for C is about .8.  Pretty close to 1; right?  That would change insignificantly.  For RCE, right, that RRF value is about .5.  That would double; right?

Q   Okay.

A   So you would go from .05 to .1 percent.  Did we do C?  We did C.  Did we do D?  D is about the same.  It's about .6.  That would go up a little bit.  Say that doubles and goes to .12 percent.  The rest are all going to be considered RRF 1.  So what you're doing by applying the RRFs to this table is maybe increasing the amount of impurity by .12 percent.

Q   When you say ".12 percent," I want to make sure that the record is clear.  That's specific to the one calculation; right?  That's not .12 percent as to everyone.  Because you are changing RRFs compared to your one assumption; right?

MR. SCHULER:  I'm sorry.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

225

THE WITNESS:  I'm lost.

MR. SCHULER:  I'm not following you.

BY MR. FERENC:

Q   You said they would change by .12 percent. And I don't read that as a generalization that every number would change by .12 percent.

MR. SCHULER:  Can I ask one question?  Were you looking at the mean?

THE WITNESS:  Yeah, I was looking at the mean.  Sorry.

BY MR. FERENC:

Q   Which mean?

A   The last.

MR. SCHULER:  The mean column.

THE WITNESS:  The last column on the table at 254.

BY MR. FERENC:

Q   Okay.  So it's your testimony that the mean column would change by .12 percent?

A   **Right.  So that would be reflective in each sample; right?  So the samples would each change by that, and then your average would change by the same amount.**

Q   Okay.  Suffice to say, you haven't done the calculations.  Aside from the quick math in your

226

head, you're unable to tell me what the exact changes would be, without having spent the time and gone through the calculations based on the RRFs reported by Apotex; right?

A   **Yeah.  All I can tell you is they would be insignificant.**

Q   Okay.

All right.  Let's talk about significance here.  So if we flip between Tables B1 and B2; right?  If we look at the -- some of these numbers.  For Sample 1, you report the total impurities at 223 nanometers is .75 percent.

A   **Yeah.**

Q   Do you see that?

A   **Yeah.**

Q   And then for the same sample at 254, you report that as .44 percent; right?

MR. SCHULER:  This is for Sample 1?

MR. FERENC:  Sample 1 and Table B2.

THE WITNESS:  Yeah.

BY MR. FERENC:

Q   The total impurities are reported as 0.44 percent.

A   **Yeah.**

Q   And then in Sample 1, Table B1, the total

227

impurities reported are       percent.  Do you see that?

A   **Yeah.**

Q   Okay.  So you would agree with me that that represents approximately a     percent increase from      to 223; right?

A   **So that's absolutely misleading.  That's an increase in about .3 percent of total impurities. You can run -- you can run the percentages, and it's going to be a big percentage, but it's insignificant in this type of analysis.  You would be looking for orders of magnitude difference before you would say something is not similar.**

Q   I'm just trying to get -- if I have my math; right?  You would agree with me that there is about     percent increase from Table B2 to Table B1; right?

A   **On the percentages, there would be approximately a              percent increase.**

Q   Okay.  So in your professional experience, have you ever seen a     percent change described as essentially the same?

A   **That argument is false.  I mean, you look at the absolute numbers, and this is a .3 percent change of total impurities; right?  The percentage**

228

**argument simply doesn't apply here for significance.**

Q   Why does it not apply?

A   **Because it overstates the change.**

Q   But it states exactly what the change is across the same conditions and across two different wavelengths; right?

So let me ask a clarifying question.  These are done -- these measurements that these wavelengths are done at the same time; right?

A   **Correct.**

Q   You have to --

A   **Correct.**

Q   There is no different sample.  There's no different time.  It's a snapshot in a relatively close proximity of time, maybe identical time, but it's just at two different wavelengths; correct?

MR. SCHULER:  Just make sure you don't answer before he's done with his question.

THE WITNESS:  It's in close proximity of time.  Maybe this...

BY MR. FERENC:

Q   Let me ask it this way.  Right?  The injection profile that you conducted, which I think is in your lab notebooks, that protocol was run once, and the machine was able to give you readouts for

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

58 (229 to 232)

---

**229**

each wavelength based on that same protocol?

A   I see what you're saying.  That is correct.

Q   Okay.  So my -- in my understanding of the data, you're going to look at what's the difference between the 223 readout and the      readout, all other conditions being the same; right?

A   Okay.

Q   And there is a difference; correct?

A   There's a slight difference.

Q   Okay.  I'm trying to understand where we're going to find that line.  At what point does it not become slight?  At what point is it not essentially the same?  Do you have an understanding of that in your head?

A   I think -- so this is going to be a matter of opinion based on sort of scientific knowledge and expertise.  But, you know, it's really -- you really want to see changes of orders of magnitude; right?  And what we're seeing is not orders of magnitude.

Q   Okay.  And I understand your -- that's your opinion, in terms of you want to see changes in order of magnitude.  I think you're using that to interpret the total impurities, and I'm really just focusing on the magnitude of differences across the two wavelengths.  One way to assess the magnitude of

---

**230**

difference would be to assess the percentage change from one reading to the other for the same row and column.

MR. SCHULER:  Object to the form.

THE WITNESS:  So what I would say is your math is right.  There is an increase in total impurities from      to 223.  Your percentage increase is right on the percentage of the total impurities.  But when you start to talk about percentage of a percentage, if this makes sense, it becomes a big number that's really not as big or as significant as the data would suggest.

BY MR. FERENC:

Q   But it's not an inaccurate number?

A   The percentage is the percentage.

Q   Okay.

Okay.  So none of the testing that you had done was conducted on an Apotex sample at the 15-month requirement of the claims; correct?

A   I'm going to refer to my report on that.

Q   Okay.  So let's look at paragraph 52.

A   Okay.

Q   You say, "As explained above, I understand that certain claim limitations relate to the amount of total impurities present after at least 15 months

---

**231**

of storage."

Do you see that?

A   I do see that.

Q   So the testing that you did of the Apotex products was not done at     months; correct?

A   I think we had to approximate when it was done.  And I think we've approximated less than    months.

Q   Okay.  So in paragraph 52, you say, in the middle of the paragraph, "Without batch information, I was unable to identify certain information about the samples, such the date when they were placed on stability."

Is that accurate?

A   Yeah.  I think what's accurate is the documentation didn't tell me much about the samples other than the expiration date.  There was no batch or lot information.

Q   Did you request the batch or lot information?

A   I did not.

Q   Why not?

A   I just didn't.

Q   Okay.  And you basically took the expiration date and then looked at Apotex's reported

---

**232**

shelf life and worked backwards from that to get 13 months?

A   I think that's what we did, yes.

Q   Okay.  So the testing that you conducted, as described and reported in Tables B1 through B4, is done for samples that you understand were stored for approximately     months?

A   Yes.  That's what was deduced.

Q   Now, you have a footnote about some discovery dispute on Footnote 5.  Do you see that?

A   Yeah.

Q   Why did you put that in your report?

MR. SCHULER:  I object to the extent that would call for any discussions between you and counsel.  So you can answer with -- I would instruct you not to divulge any such communications.  If you can otherwise answer the question.

THE WITNESS:  I don't know.

BY MR. FERENC:

Q   Yeah, I don't want any discussions with your counsel.  I'm just trying to understand.  You put in a footnote about something you understood from counsel about the time it took to get the samples.

A   Yes.

Q   Why is that relevant?

---

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

59 (233 to 236)

**233**

A   Yes.  I think it just goes to show that samples were requested, you know, a lot -- samples were requested, and there was a delay in receiving those samples.

Q   Okay.  But you understand that your concept of delay is informed by discussions with your counsel; right?

MR. SCHULER:  Don't ask that.  Withdraw it.

MR. FERENC:  I'll withdraw it.  Ken doesn't like it.

BY MR. FERENC:

Q   So you got the samples around October of 2025; right?

A   If that's what it says in the paragraph.

Q   It is.  You can look at the example, but I'll represent to you that that's October 31, 2025.

A   Fine.

Q   You waited about a month and a half before you tested them; right?

A   Yes.  I don't know the exact date I did the test.

Q   Looks like in paragraph 52 at the bottom. It says, "Thus, at the time I analyzed the samples December 10, 2025, they had been stored for approximately 13 months"; right?

**234**

A   Yes.

Q   So there was no other testing of any other samples that you had done outside of what's reported in this report; correct?

A   That I had done, no.

Q   You're not aware of any other testing that had been done by any other experts?

MR. SCHULER:  Apotex samples.

MR. FERENC:  Apotex samples that we talked about in his report.

MR. SCHULER:  Understood.  You said any testing or anything else.

MR. FERENC:  How much am I going to owe you for this mentoring?

MR. SCHULER:  It was a very, very broad question.  As you know, he tested other samples on other products.

BY MR. FERENC:

Q   Just focusing on the Apotex products alone.

A   Okay.

Q   You received them in October.  You tested them in December of 2025.  And you conducted no other tests?

A   That's correct.

Q   Do you have any intention of conducting any

**235**

other tests?

A   To the best of my knowledge, no.

Q   Okay.  So continuing on to the next page, you say that testing at     months was not feasible; right?

A   Correct.

Q   And why was it not feasible?

A   I think it butted up against the due date of the reports.  That      month.

Q   And then you continue by saying, "Nonetheless, based on my education, training, and experience, as well as Apotex's stability data, no meaningful difference in the mean normalized peak response or the mean mass percentage is expected between analysis at          months."

Do you see that?

A   I do.

Q   So the Apotex stability data was not run at 223 nanometers; correct?

A   No.  It was run at      nanometers.

Q   And you don't recall seeing any data within the Apotex documents that had 13-month at 223-nanometer data; correct?

A   Correct.  What I do recall is seeing

**236**

Q   Okay.  But you did not engage in any sort of formal statistical analysis or regression analysis to extrapolate what the impurity levels would be at a time point other than 13 months; correct?

A   No.  Other than to know that it was not at 5 percent.

Q   But you didn't do any statistical analysis to quantify what it would be; right?

A   No.  Other than it was not 5 percent.

Q   How do you know it wasn't 5 percent if you didn't do the analysis?

A   Well, because Apotex's stability studies say -- or their spec says it should be                    .  My total impurities across the two wavelengths were less than 1 percent.  And so it would not stand to reason that in two months you would go to greater than 5 percent and then drop down post month

Q   But you didn't do any Arrhenius calculations or anything like that; correct?

A   No.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

60 (237 to 240)

---

237

Q   And you did not do any accelerated stability tests with Apotex's product; right?

A   No.

Q   And you didn't test at any other time points of Apotex's products; right?

A   Correct.

Q   You did no kinetic data studies for Apotex's products; correct?

A   I did not.

Q   You did no reaction modeling studies for Apotex's products; correct?

A   I wouldn't even know how to.

Q   You didn't calculate any degradation constants in your analysis of Apotex's products; correct?

A   I did not.

MR. FERENC:  Okay.  Why don't we take a break.  I might have just a little bit more, but now is a good time.

THE WITNESS:  I was going to ask for a break anyway.

THE VIDEOGRAPHER:  We are going off the record.  The time is 4:39 PM.

(Recess taken.)

THE VIDEOGRAPHER:  We are back on the

---

238

record.  The time is 4:51 PM.

BY MR. FERENC:

Q   Dr. Kittendorf, earlier today I recall you testifying that you reviewed the patents in suit, but you did not read them cover to cover.  Did I get that correct?

A   Yes.

Q   Okay.  And you've seen at least the examples in the patents; correct?

A   I have seen them, yes.

Q   But you're not offering any opinions in this case regarding any of the data reported in the patent, whether it's contained in an example or otherwise in the specification; is that right?

A   That's correct.

MR. FERENC:  Okay.  I have no further questions subject to any redirect by your counsel.

MR. SCHULER:  No questions.

MR. LIEF:  No questions.

THE VIDEOGRAPHER:  We are going off the record.  This concludes today's testimony given by Dr. Kittendorf.  The time on the record is 4:52 PM.  Thank you.

MR. FERENC:  Can we mark the transcript highly confidential.  Attorneys' eyes only, please.

---

239

MR. LIEF:  We want an original.  Rough draft, daily copy.

MR. FERENC:  I'll need a copy.  A rough and a normal standard.  No rush transcript.

MS. BUREK:  Rough draft.  Regular delivery.

(Off the record at 4:52 p.m.)

FURTHER DEPONENT SAITH NOT

---

240

I, Deborah A. Thompson, a Certified Shorthand Reporter within and for the State of Illinois, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition was reported stenographically by me, was thereafter reduced to a printed transcript by me, and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand at Chicago, Illinois, this 28th day of April 2026.

*Deborah A. Thompson*
_____
Certified Shorthand Reporter
State of Illinois
CSR License No. 084-003487

---

| A | | | |
|---|---|---|---|
| **a1** | 141:25, 142:6, | 103:16, 116:18, | **adjusting** |
| 65:24, 68:11, | 142:11, 151:9 | 134:18, 164:9, | 111:18 |
| 69:5, 171:24, | **accelerated** | 188:15, 223:2, | **adjustment** |
| 173:7, 173:14 | 237:1 | 223:24, 228:5, | 4:5, 92:25, |
| **a2** | **accept** | 229:24, 236:1, | 93:9, 95:24, |
| 68:11, 69:5 | 139:1 | 236:18 | 96:20, 97:10, |
| **abbreviated** | **acceptable** | **act** | 109:23, 110:25, |
| 93:16 | 103:22 | 129:17 | 112:7, 112:11, |
| **ability** | **accepted** | **action** | 114:13 |
| 61:23 | 28:14, 85:1 | 240:21 | **adjustments** |
| **able** | **access** | **actual** | 94:9, 118:18, |
| 95:15, 177:23, | 39:2, 43:11, | 53:15, 132:10, | 118:22 |
| 210:7, 216:9, | 66:16 | 168:7, 200:20 | **adopt** |
| 228:25 | **accommodate** | **actually** | 112:8, 112:13, |
| **above** | 6:7, 7:24 | 39:1, 50:2, | 112:21, 112:24, |
| 230:23 | **accommodated** | 96:16, 124:8, | 200:23 |
| **above-entitled** | 8:3, 10:15 | 158:3, 203:7, | **adopted** |
| 1:21 | **according** | 204:23 | 179:3, 188:11, |
| **absence** | 117:3, 125:5, | **adapt** | 200:20 |
| 67:5, 71:15, | 197:25, 198:24 | 112:13, 112:15, | **adopts** |
| 106:20, 187:14 | **account** | 112:16, 112:21, | 119:4 |
| **absolute** | 62:21 | 112:24, 113:6 | **advanced** |
| 10:18, 10:19, | **accuracy** | **adapted** | 223:7 |
| 227:24 | 81:8, 81:10, | 172:11, 195:20 | **adverse** |
| **absolutely** | 81:12, 81:14, | **add** | 28:12 |
| 9:9, 21:11, | 82:2, 83:4, | 109:16, 140:6, | **advisable** |
| 136:13, 156:24, | 83:5, 83:8, | 193:22 | 146:9, 149:10, |
| 194:3, 227:7 | 83:20, 84:3, | **added** | 149:15, 149:17, |
| **absorbed** | 102:25, 103:2, | 123:16, 160:7, | 149:19 |
| 141:22 | 103:7, 103:10, | 160:8, 202:2 | **advisement** |
| **absorbences** | 168:6, 168:12, | **addition** | 178:9 |
| 53:22 | 169:1, 181:25 | 106:24 | **adviser** |
| **absorbing** | **accurate** | **additional** | 15:18 |
| 47:4, 47:7 | 81:23, 139:19, | 14:13, 137:6 | **advises** |
| **absorbs** | 140:8, 143:1, | **additive** | 166:11 |
| 48:2 | 143:6, 153:10, | 160:6, 160:15 | **affairs** |
| **absorption** | 221:25, 231:14, | **address** | 94:13, 115:2, |
| 142:13, 142:16, | 231:15 | 11:10, 11:11, | 118:9 |
| 142:18, 142:22, | **accurately** | 11:13, 13:16, | **affect** |
| 142:24 | 202:6 | 13:17, 72:19, | 188:16 |
| **absorptivities** | **acid** | 111:11, 111:16 | **affinity** |
| 143:19, 150:3, | 159:20 | **adds** | 23:22, 24:2, |
| 151:2, 151:16 | **acids** | 106:25 | 24:4, 24:11, |
| **absorptivity** | 160:8 | **adjunct** | 24:12, 24:13, |
| 47:16, 48:5, | **across** | 13:1 | 24:17 |
| 135:3, 140:16, | 59:13, 60:25, | **adjust** | **after** |
| | 61:7, 78:5, | 194:16 | 9:10, 10:4, |
| | 81:16, 81:20, | **adjusted** | 45:2, 45:5, |
| | | 96:6 | |

45:12, 45:14, 49:13, 65:14, 104:16, 126:7, 162:18, 178:9, 212:3, 230:25
**afterwards**
12:10
**again**
10:10, 19:7, 20:2, 24:1, 25:15, 27:6, 28:5, 28:21, 41:15, 44:24, 56:11, 56:18, 67:15, 71:20, 72:4, 72:11, 73:7, 74:13, 75:2, 76:25, 77:4, 79:19, 80:15, 83:7, 84:4, 91:5, 101:9, 101:24, 105:9, 106:22, 107:18, 109:3, 114:2, 119:3, 126:5, 129:1, 132:1, 136:1, 146:19, 146:25, 159:9, 163:5, 167:24, 184:6, 199:7, 204:25, 205:8, 214:12, 218:5
**against**
235:8
**agilent**
180:8
**ago**
9:2, 9:7, 14:14, 14:15, 36:21, 51:19
**agree**
8:15, 18:5, 32:19, 32:22, 63:25, 71:3, 101:13, 122:2, 139:3, 139:14, 142:19, 142:21,

147:7, 147:9, 150:25, 155:1, 159:2, 159:18, 173:10, 173:12, 187:3, 192:20, 207:4, 207:18, 208:1, 209:4, 210:3, 212:18, 214:8, 222:17, 227:4, 227:15
**agreed**
86:14, 138:6
**agreement**
6:23, 6:24, 7:1, 7:3, 7:4, 7:7, 212:16
**agrees**
156:7
**ahead**
10:21, 107:6, 163:2, 193:18, 194:5, 204:5
**al**
5:4, 75:18, 76:2, 94:8, 126:10, 126:12
**albeit**
54:14
**all**
2:34, 8:9, 9:4, 9:7, 10:20, 18:21, 19:7, 19:16, 30:1, 41:17, 54:23, 56:7, 64:18, 65:1, 68:7, 71:1, 72:19, 72:20, 72:23, 75:8, 78:10, 80:15, 80:18, 81:16, 82:14, 92:4, 96:18, 99:22, 101:24, 108:17, 108:20, 109:2, 109:8, 109:16, 111:20, 112:4, 112:6, 118:21, 123:24,

125:23, 127:22, 128:7, 128:8, 130:23, 131:22, 132:6, 132:11, 132:13, 132:18, 132:21, 133:5, 133:7, 135:14, 135:15, 135:19, 141:12, 143:16, 157:23, 158:24, 159:5, 159:17, 163:19, 164:9, 171:2, 176:8, 181:2, 188:3, 191:12, 193:18, 195:9, 201:7, 201:8, 202:19, 207:8, 214:24, 215:7, 216:20, 216:24, 217:14, 219:9, 223:11, 224:17, 226:5, 226:8, 229:5
**allegedly**
134:9, 134:20, 134:25
**allow**
136:3, 136:4, 187:22, 188:1
**allowable**
94:9
**almost**
177:4
**alone**
156:22, 234:19
**along**
5:15, 193:24
**already**
40:8, 40:10, 40:16, 41:3, 83:24, 128:11
**also**
2:30, 18:22, 22:12, 43:11, 46:23, 52:13, 57:11, 61:13, 82:3, 89:21, 93:17, 101:8,

104:19, 108:14, 114:17, 114:21, 122:23, 123:3, 123:7, 123:10, 123:22, 128:3, 131:9, 131:19, 133:5, 149:8, 149:21, 151:1, 155:10, 163:16, 164:3, 206:24
**alter**
204:2, 204:19
**altered**
204:7
**altering**
219:25
**although**
17:17, 94:11
**amount**
49:24, 50:2, 61:8, 61:20, 141:22, 169:18, 169:21, 215:1, 224:19, 225:23, 230:24
**amounts**
125:15
**analyses**
76:17, 196:4
**analysis**
3:15, 22:9, 35:12, 39:24, 46:21, 61:5, 72:19, 72:23, 93:14, 98:23, 99:21, 108:9, 108:16, 146:7, 157:7, 166:7, 168:1, 173:17, 173:19, 174:24, 175:2, 176:2, 180:23, 180:25, 188:17, 195:25, 201:2, 220:14, 227:11, 235:15, 236:5, 236:10, 236:14, 237:14
**analytic**
193:24

**analytical**
15:25, 17:16, 17:18, 22:21, 22:25, 23:17, 29:1, 29:6, 32:20, 35:22, 40:1, 71:4, 72:7, 73:3, 73:8, 81:13, 93:15, 96:7, 96:16, 101:14, 101:20, 148:22, 153:9, 156:25, 165:13, 171:4, 192:19

**analyze**
35:1, 74:6, 88:4, 102:5, 148:23

**analyzed**
19:18, 233:23

**analyzing**
74:20, 87:24

**anda**
93:17, 108:20, 108:23, 163:16

**anion**
73:12, 74:1, 75:11, 75:18, 75:22

**ann**
11:12

**annual**
181:11

**anolyte**
47:19, 47:21, 47:24, 77:13, 137:16, 137:19, 137:22, 138:22, 139:6, 139:8, 139:12, 139:16, 142:25, 143:7, 143:21, 144:24, 145:1, 169:9, 169:17, 183:12, 189:15, 189:23

**anolytes**
46:19, 49:14,

53:23, 63:21, 63:24, 83:21, 84:3, 109:8, 123:24, 124:9, 128:8, 133:21, 134:16, 159:3, 159:11

**anomaly**
64:6, 64:9, 64:12, 64:15

**another**
6:7, 47:20, 51:7, 57:23, 71:4, 77:9, 83:13, 86:15, 119:21, 136:2, 137:14, 151:5, 157:1, 158:6, 190:2, 216:4, 224:6

**answer**
12:7, 12:11, 16:17, 20:15, 23:12, 24:16, 26:5, 39:23, 46:1, 56:8, 71:12, 72:13, 73:9, 74:18, 77:3, 77:8, 81:25, 82:9, 82:18, 83:18, 95:11, 106:6, 131:15, 135:25, 178:12, 204:14, 215:11, 215:13, 228:18, 232:15, 232:17

**answered**
34:7, 85:13, 160:14, 174:4, 210:23, 218:24, 220:7, 222:5

**answers**
58:13, 105:14

**anticipated**
75:22

**anybody**
29:18, 63:25,

74:14

**anyone**
44:6, 45:20, 45:22, 45:25, 51:24, 52:2

**anything**
6:22, 11:8, 18:3, 29:18, 30:5, 34:3, 38:7, 48:19, 70:20, 70:23, 87:12, 87:18, 88:3, 137:5, 161:17, 202:15, 216:6, 234:12, 236:24

**anyway**
91:16, 207:12, 209:9, 237:21

**anywhere**
11:17, 12:15, 151:25, 152:12, 156:22, 175:6

**aoac**
93:15

**apart**
84:21, 181:8

**apobenda**
4:35, 170:22

**apologize**
34:7

**apotex**
2:28, 5:21, 6:9, 7:16, 8:15, 48:9, 48:15, 162:3, 162:17, 163:17, 163:24, 164:11, 164:12, 164:20, 165:4, 168:23, 170:4, 170:11, 171:13, 173:3, 173:11, 173:24, 174:5, 174:12, 175:11, 176:8, 176:22, 177:6, 178:20, 178:23, 178:24, 179:13, 179:14,

180:10, 180:14, 183:24, 185:3, 185:23, 186:6, 188:11, 190:12, 195:19, 195:20, 196:4, 196:21, 197:12, 197:25, 199:7, 200:6, 200:14, 200:20, 200:23, 200:25, 201:3, 201:15, 202:17, 203:4, 203:5, 203:7, 203:8, 203:11, 203:13, 203:15, 204:1, 204:8, 204:11, 204:23, 206:11, 208:4, 211:22, 212:14, 212:17, 212:22, 213:4, 216:13, 216:16, 217:7, 218:1, 218:4, 218:14, 218:21, 220:10, 220:13, 220:23, 222:2, 226:4, 230:18, 231:4, 234:8, 234:9, 234:19, 235:18, 235:22, 235:25

**apotex's**
170:1, 170:16, 171:24, 172:9, 172:12, 172:24, 173:1, 173:8, 173:18, 173:21, 176:2, 187:16, 187:18, 188:11, 197:18, 198:15, 198:24, 199:14, 199:20, 200:8, 200:12, 201:10, 203:20, 203:23, 203:24, 205:22, 210:16, 213:21, 231:25, 235:12, 236:15, 237:2,

237:5, 237:8,
237:11, 237:14
**apparatus**
38:17
**appear**
6:25, 154:12
**appearance**
109:10
**appearances**
2:1
**appeared**
10:15, 94:10
**appears**
154:9, 154:11
**appendices**
191:15
**apples**
218:6, 218:7,
218:15, 218:16,
218:17, 218:18,
219:22
**apples-to-apples**
132:6, 219:12
**application**
93:22, 139:18
**applications**
93:16, 93:17
**applied**
123:4, 123:7
**applies**
83:19, 89:15,
90:6, 90:11,
96:13, 111:20,
115:23
**apply**
88:14, 89:17,
90:1, 101:11,
111:22, 120:19,
120:25, 122:15,
125:1, 131:9,
131:19, 167:23,
169:22, 228:1,
228:2
**applying**
224:18
**appreciate**
46:15, 61:6
**appropriate**
120:6

**approval**
90:25, 91:22
**approved**
85:16, 87:23,
88:7, 88:10,
90:12, 92:8,
93:22, 114:18,
116:14
**approximate**
231:6
**approximated**
201:23, 231:7
**approximately**
24:24, 39:20,
134:12, 199:17,
201:21, 201:23,
202:2, 227:5,
227:19, 232:7,
233:25
**approximates**
183:7
**april**
1:26, 5:7,
10:10, 240:23
**apriori**
72:12
**arbor**
11:12
**area**
60:8, 77:13,
77:17, 77:20,
77:24, 77:25,
78:2, 78:5,
78:7, 78:10,
78:13, 79:9,
79:15, 79:20,
80:12, 80:23,
81:1, 81:7,
92:14, 104:15,
105:25, 107:23,
109:19, 123:8,
125:16, 125:21,
125:23, 126:3,
126:21, 127:20,
128:3, 134:11,
137:13, 137:15,
137:24, 139:18,
139:22, 140:3,

140:5, 142:25,
152:24, 162:17
**areas**
109:2, 134:7,
140:6
**aren't**
43:19, 213:2
**argue**
175:20
**arguing**
207:7, 207:12,
213:7, 213:8
**argument**
209:15, 227:23,
228:1
**argumentative**
218:24, 220:7
**arms**
155:21, 155:23
**around**
144:24, 154:1,
233:12
**arrhenius**
236:23
**art**
101:15, 166:6,
175:12, 186:6
**article**
89:21, 109:23,
110:2, 110:5,
110:8, 111:1,
111:4, 111:11,
113:8, 113:10,
145:11, 145:13,
145:16, 145:18,
145:20, 149:7,
149:21
**articles**
29:6, 29:10,
29:12, 29:15,
30:2
**ascertain**
187:23
**aside**
26:25, 55:15,
55:21, 211:20,
225:25
**asked**
40:9, 40:16,

44:2, 73:25,
85:12, 102:1,
160:13, 162:12,
168:10, 174:3,
207:9, 210:4,
210:22, 215:17,
218:23, 220:6,
222:4
**asking**
12:4, 12:8,
30:18, 45:8,
64:9, 150:14,
164:15, 176:19,
177:7, 178:11,
179:8, 206:20
**aspect**
192:19
**assay**
98:25, 109:1,
109:6, 109:14,
109:15
**assess**
168:16, 168:17,
171:16, 182:6,
185:16, 188:5,
193:3, 194:25,
195:6, 212:12,
229:25, 230:1
**assessed**
183:11
**assessments**
194:18
**assign**
78:6
**assigned**
57:6, 59:3,
144:13, 158:25,
218:8
**assigning**
59:4, 116:14
**assignment**
146:15, 146:20,
162:12
**assignments**
145:21
**associated**
187:7, 215:4,
215:7, 215:19

**association**
93:14
**assume**
139:25, 140:3,
144:19, 171:15,
183:15, 205:12,
217:2, 218:3
**assumed**
123:23, 131:22,
144:25
**assuming**
126:20
**assumption**
127:21, 131:23,
132:16, 132:20,
137:12, 137:14,
139:15, 143:8,
143:9, 144:22,
218:10, 218:12,
218:20, 220:3,
224:24
**assurance**
88:8, 168:19
**astrazeneca**
14:21
**attached**
50:17
**attaching**
9:18
**attachment**
118:13
**attachments**
129:2
**attempts**
76:5
**attorney**
34:15, 240:18,
240:19
**attorney-client**
34:16
**attorneys**
1:18, 34:14,
34:22, 35:5,
238:25
**audrey**
2:12, 5:19
**author**
113:1

**authoritative**
87:9, 87:10,
145:14, 145:15
**authority**
145:18
**available**
174:20, 220:1,
220:5
**avenue**
1:25, 2:5, 2:22
**average**
225:22
**aware**
44:5, 68:24,
133:19, 173:3,
234:6
**away**
51:22, 110:11,
146:16
**awkward**
193:16
**axis**
149:25, 150:3
**azurity**
1:12, 2:18,
5:4, 5:18

--- **B** ---

**b1**
54:4, 54:7,
54:17, 56:19,
59:8, 59:16,
61:23, 62:7,
62:18, 64:5,
216:20, 226:9,
226:25, 227:16,
232:5
**b2**
54:5, 54:10,
58:10, 58:22,
59:8, 59:18,
60:15, 61:23,
62:7, 62:17,
62:22, 64:4,
223:19, 223:20,
226:9, 226:19,
227:16
**b4**
232:5

**back**
10:10, 15:20,
15:21, 20:12,
24:22, 25:9,
26:23, 33:20,
34:2, 42:10,
44:2, 44:3,
50:13, 55:8,
60:22, 62:2,
82:5, 92:5,
94:22, 97:19,
99:11, 102:8,
102:16, 103:19,
106:5, 106:11,
125:3, 127:7,
127:13, 127:15,
132:1, 132:2,
146:19, 152:5,
153:20, 160:24,
163:6, 165:24,
166:4, 170:8,
177:2, 181:9,
181:23, 183:24,
186:20, 192:12,
196:9, 204:17,
213:19, 219:18,
237:25
**backwards**
232:1
**balance**
128:2
**ballparking**
222:20
**bar**
83:8
**based**
8:18, 55:10,
57:7, 109:6,
113:6, 113:7,
129:25, 134:14,
148:16, 148:19,
162:20, 162:23,
163:7, 163:12,
163:15, 163:16,
175:2, 189:25,
197:18, 197:19,
198:15, 199:1,
216:10, 216:12,

226:3, 229:1,
229:16, 235:11
**basically**
24:14, 166:17,
231:24
**basis**
10:6, 57:2,
59:4, 112:7,
112:9, 136:12,
172:8, 180:24,
203:14, 223:9
**batch**
43:22, 231:10,
231:17, 231:19
**bates**
3:34, 4:12,
4:34, 98:19,
99:12, 170:22,
171:6, 184:6,
197:1, 200:13,
217:7
**baths**
38:18
**baxter**
6:9, 48:10,
48:15
**bdm**
196:14, 198:6,
198:7, 199:5
**bearing**
170:22
**because**
6:4, 7:9, 7:25,
8:12, 24:2,
29:17, 33:12,
38:24, 43:18,
55:6, 61:14,
61:19, 63:4,
72:7, 87:23,
91:10, 91:21,
103:6, 106:5,
109:17, 116:4,
127:14, 130:16,
136:16, 144:9,
146:14, 153:9,
170:8, 174:18,
175:1, 175:15,
178:23, 180:18,

181:14, 183:25,
184:16, 186:11,
187:7, 188:10,
191:5, 200:25,
203:3, 203:9,
203:20, 203:24,
208:17, 212:10,
212:14, 215:23,
224:23, 228:3,
236:15
**become**
86:8, 111:18,
229:12
**becomes**
112:21, 230:10
**been**
10:12, 10:24,
14:6, 20:5,
26:2, 26:4,
28:1, 46:22,
48:18, 55:11,
61:13, 89:17,
89:18, 96:3,
102:11, 114:18,
122:15, 125:11,
140:16, 142:20,
153:23, 161:25,
162:1, 168:10,
174:20, 233:24,
234:7
**beer's**
29:16, 29:19,
140:15, 140:19,
140:21, 140:23,
142:4
**before**
1:21, 6:2,
7:16, 10:5,
14:8, 14:9,
30:20, 31:24,
32:1, 34:7,
36:10, 41:5,
41:14, 41:18,
42:6, 45:25,
48:9, 48:18,
49:7, 49:25,
65:11, 65:19,
82:18, 86:20,

93:6, 95:4,
95:12, 95:14,
95:16, 98:9,
102:9, 102:24,
110:9, 117:16,
121:8, 121:22,
145:12, 146:24,
152:23, 161:7,
161:14, 193:14,
227:12, 228:18,
233:18, 240:15
**began**
52:9
**begin**
6:2, 25:2,
30:18, 35:17
**beginning**
36:18, 56:23,
118:17, 176:2
**begins**
5:1, 75:11,
93:11, 94:5,
111:11, 114:22,
146:1, 148:16,
154:2
**behalf**
2:9, 2:17,
2:28, 5:18,
5:21, 14:19,
14:20, 27:22,
27:24, 28:11,
44:6
**behavior**
151:15
**being**
25:24, 26:3,
26:16, 26:19,
27:3, 35:12,
61:22, 64:18,
81:17, 137:19,
149:15, 150:21,
154:25, 229:6
**belief**
84:25, 133:4
**believe**
25:20, 28:7,
32:2, 36:25,
55:6, 65:9,

66:11, 69:16,
75:3, 76:11,
78:17, 78:19,
86:9, 86:25,
94:17, 108:19,
112:5, 113:11,
114:4, 119:6,
128:14, 131:7,
131:12, 132:22,
133:2, 133:4,
133:8, 138:20,
145:12, 147:23,
148:6, 149:7,
156:10, 158:4,
158:11, 163:21,
177:16, 179:3,
194:4, 200:8,
200:25, 210:10
**believed**
149:4
**below**
96:8, 146:1,
146:4, 146:24,
164:3, 171:23,
176:1
**bendamustine**
3:33, 4:25,
30:6, 30:7,
30:10, 30:23,
30:24, 31:17,
31:23, 32:1,
41:1, 46:23,
54:20, 54:21,
54:24, 56:2,
56:5, 56:15,
58:25, 68:25,
77:22, 82:11,
87:24, 88:4,
97:16, 97:22,
97:25, 98:3,
98:13, 98:17,
99:9, 100:10,
100:22, 104:14,
108:14, 108:25,
109:1, 109:5,
109:7, 109:11,
109:14, 109:17,
120:25, 122:25,

148:25, 154:6,
155:4, 155:14,
155:21, 157:7,
168:16, 169:22,
173:4, 183:17,
184:1, 196:14,
196:18, 196:21,
198:12, 199:19,
201:10, 205:2,
205:17, 205:24,
206:7, 206:21,
206:22, 207:4,
207:23, 208:6,
208:20, 208:22,
208:23, 208:24,
209:6, 210:16,
212:12, 213:21,
214:10, 214:17,
215:4, 215:5,
215:7, 215:9,
215:19, 215:23,
216:2, 216:8,
216:18
**bendamustine-con-**
**taining**
148:24, 205:16,
207:19
**bendamustine-rel-**
**ated**
184:9, 185:24,
216:10
**benzimidazole**
31:13
**bernard**
134:20
**best**
28:5, 161:12,
219:15, 235:2
**better**
22:19
**between**
7:10, 8:1,
36:24, 37:5,
37:9, 48:25,
49:10, 75:20,
151:5, 151:8,
151:12, 154:23,
167:4, 226:9,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

67

229:5, 232:14, 235:15

**beyond**
69:11, 96:13, 105:6, 163:24, 193:6

**big**
227:10, 230:10, 230:11

**bigger**
203:12

**binder**
86:22, 165:18

**biochemistry**
15:15, 16:25, 38:18

**biosynthesis**
19:2

**bit**
12:4, 24:4, 60:23, 86:8, 140:13, 165:12, 185:21, 217:4, 222:7, 224:15, 237:18

**bladder**
153:15

**blah**
213:11, 213:12

**body**
67:16

**bolded**
119:10

**book**
51:12, 86:7, 86:20, 86:21, 86:23, 87:10, 92:24, 113:17, 166:21, 166:23, 194:6

**books**
29:6, 29:10, 29:12, 29:15, 42:5, 87:1, 87:6, 87:8, 87:13

**boss**
77:5

**both**
6:13, 22:17, 53:22, 59:8, 62:7, 77:16, 81:20, 81:22, 82:17, 91:16, 93:15, 108:15, 109:12, 125:17, 127:23, 127:24, 128:1, 155:21, 164:24, 187:20, 201:11

**bottle**
34:25

**bottom**
35:16, 75:9, 79:13, 80:7, 89:12, 95:23, 96:23, 186:22, 221:9, 233:22

**bought**
174:25

**bound**
51:12, 78:18, 116:12

**box**
117:22

**brand**
48:20

**break**
50:8, 102:10, 114:6, 120:14, 138:24, 153:14, 160:19, 192:7, 237:18, 237:21

**breakdown**
181:15

**breaking**
120:6

**breaks**
102:19

**brian**
4:17

**bridges**
110:16

**briefly**
13:23

**broad**
21:14, 21:17,

24:11, 63:23, 73:8, 234:15

**brought**
147:19

**bs**
15:14

**bullet**
35:16

**bulletin**
113:12

**bump**
61:1

**bunch**
24:3

**burden**
9:22, 116:24

**burek**
2:4, 5:15, 239:5

**business**
11:10, 11:11, 26:15

**businesses**
27:1

**butted**
235:8

--- C ---

**c**
185:24

**ca**
5:6

**calculate**
46:20, 47:1, 109:12, 144:12, 176:10, 176:14, 176:19, 179:17, 179:21, 179:22, 190:23, 220:12, 220:22, 221:5, 221:9, 237:13

**calculated**
61:9, 84:19, 108:8, 125:15, 178:18, 178:20, 186:22, 187:7, 220:8, 220:9, 236:17

**calculates**
134:6

**calculating**
215:18

**calculation**
78:8, 108:2, 108:8, 108:25, 109:19, 133:20, 133:24, 135:10, 136:23, 137:7, 137:8, 137:23, 140:4, 180:1, 221:5, 222:12, 223:2, 224:4, 224:22

**calculations**
134:13, 135:2, 144:19, 182:5, 190:15, 192:4, 217:1, 220:1, 221:14, 222:7, 222:22, 223:7, 225:25, 226:3, 236:24

**calibrated**
181:2

**calibration**
180:22, 181:1, 183:6

**call**
34:24, 65:23, 77:25, 119:10, 158:4, 167:15, 232:14

**called**
10:24, 53:19, 93:8, 109:23, 118:13, 128:2, 142:23, 190:2, 194:10

**calling**
140:16

**came**
6:23, 9:25, 10:10, 26:3, 53:23, 82:5, 85:8, 85:9, 90:10, 121:5,

202:21

**can't**
9:15, 25:8,
71:16, 71:24,
101:25, 106:5,
112:14, 127:1,
175:17, 191:14,
197:7, 197:8,
212:5

**cannot**
22:12, 96:18,
134:24, 159:17

**capital**
141:21

**carbon**
175:19

**career**
23:6

**case**
5:6, 14:16,
14:22, 15:11,
24:19, 24:25,
25:19, 27:10,
27:13, 28:14,
28:16, 31:17,
31:19, 31:21,
36:12, 36:13,
36:25, 37:1,
40:25, 41:5,
41:6, 41:16,
42:12, 42:23,
44:6, 44:25,
45:17, 48:8,
48:23, 65:3,
70:15, 72:18,
73:23, 77:11,
83:12, 83:13,
90:11, 95:12,
98:12, 103:1,
115:20, 121:9,
121:15, 121:25,
123:22, 124:7,
124:12, 124:20,
126:18, 127:19,
144:3, 154:20,
161:10, 162:3,
163:23, 166:8,
168:11, 169:25,

238:12

**cases**
12:22, 31:25,
39:5, 107:11,
236:2

**catalysis**
18:16, 32:16

**catch**
164:18

**caught**
39:15

**cause**
1:21, 156:22

**caused**
146:11, 149:12

**causes**
33:6

**centered**
97:3

**certain**
39:5, 66:7,
72:13, 91:11,
99:19, 99:20,
167:7, 177:4,
180:5, 199:16,
230:24, 231:11

**certainly**
17:22, 60:6,
88:9, 88:12,
100:17, 218:25,
222:15

**certificate**
155:14, 158:2,
180:25

**certificates**
4:28, 158:3,
180:22

**certification**
157:13

**certified**
1:22, 240:1,
240:29

**certify**
240:3

**cetera**
177:5

**chain**
175:19

**chambers**
38:19

**chance**
66:22, 82:19

**change**
20:15, 33:20,
34:2, 51:18,
63:20, 63:25,
81:18, 84:15,
84:19, 90:5,
91:3, 91:6,
92:5, 92:12,
95:19, 96:13,
96:18, 101:10,
112:23, 116:8,
117:4, 123:15,
123:19, 139:16,
195:5, 220:13,
220:23, 221:1,
221:6, 221:7,
222:2, 222:13,
222:16, 222:18,
222:23, 224:9,
225:4, 225:6,
225:19, 225:21,
225:22, 227:21,
227:25, 228:3,
228:4, 230:1

**changed**
123:12

**changes**
92:19, 96:8,
115:24, 151:3,
170:1, 186:22,
187:6, 226:1,
229:18, 229:21

**changing**
29:21, 100:24,
101:1, 115:7,
115:9, 115:16,
140:1, 224:23

**chapter**
94:12, 118:20,
126:8, 126:17,
166:21, 193:6,
195:11

**characteristic**
193:1

**characterization**
170:13, 171:24

**characterize**
30:10, 30:13,
31:1, 55:13

**characterized**
105:15

**characterizing**
83:4

**charge**
83:10, 132:2,
188:10

**check**
190:19

**checking**
134:3

**chemical**
3:15, 35:12,
56:20, 57:20,
58:6, 58:8,
58:19, 58:20,
158:21

**chemicals**
56:21, 57:3,
62:12

**chemist**
81:14, 153:9

**chemistries**
175:13

**chemistry**
15:25, 17:9,
17:16, 17:18,
17:19, 29:2,
29:7, 71:4,
174:21, 175:3

**chemists**
93:15, 101:20

**chicago**
1:25, 2:6,
5:11, 240:23

**chiesi**
27:10, 27:18

**chloro**
155:22

**chose**
211:2, 211:4

**christian**
134:21

**christopher**
2:21, 2:26,
5:20
**chromatogram**
55:2, 61:1,
77:21, 78:4,
78:9, 79:6,
125:22, 125:24,
190:18, 215:5,
216:2
**chromatograms**
3:24, 78:24,
79:1, 177:3,
177:12, 177:13,
177:20, 178:3,
178:5, 179:21,
179:24, 190:24
**chromatographic**
95:24, 96:3,
96:6, 99:13,
111:19, 172:18
**chromatography**
3:27, 23:22,
24:3, 24:4,
24:11, 24:12,
24:13, 24:17,
35:25, 36:3,
37:23, 60:19,
73:12, 73:17,
74:1, 75:12,
75:19, 75:22,
87:4, 87:6,
94:13, 99:25,
100:3, 117:19,
118:21, 126:11,
149:14, 160:10,
168:18, 168:20,
177:11, 178:21,
178:24
**citation**
126:14, 171:10
**cite**
42:5, 86:24,
89:20, 89:21,
94:22, 111:7,
125:18, 127:4,
165:21, 170:11
**cited**
42:7, 86:25,

126:22, 149:8,
171:18
**cites**
110:24
**citing**
111:5, 126:17,
126:20
**civil**
1:24
**claim**
84:22, 205:12,
205:13, 207:3,
207:17, 208:12,
230:24
**claimed**
205:6
**claims**
206:21, 207:18,
230:19
**clarification**
23:19, 38:12,
38:15, 104:3,
104:24, 108:1,
108:22, 125:6,
128:19, 142:8,
164:16, 179:6,
185:9, 198:17,
206:17
**clarifications**
162:9
**clarify**
31:4, 40:22,
53:3, 62:5,
163:7
**clarifying**
228:7
**classify**
94:9
**cleaned**
49:1
**cleaning**
49:7, 49:9
**clear**
58:18, 98:24,
158:19, 198:4,
224:21
**clearly**
158:16

**client**
8:15
**clients**
34:22
**close**
144:12, 224:2,
224:8, 228:15,
228:19
**clue**
71:19, 96:21
**co-eluted**
76:1
**co-solvent**
160:4
**coefficient**
142:7, 142:14,
142:16, 142:22,
142:24
**cofounder**
13:6, 13:11,
46:6
**coli**
32:17, 75:24
**colleague**
5:15, 5:19
**collect**
103:23, 195:2
**collected**
103:20, 123:14,
188:13
**colorado**
12:12
**column**
24:14, 30:22,
48:14, 48:16,
48:17, 48:22,
48:25, 49:7,
49:15, 49:25,
50:3, 50:4,
53:20, 53:24,
59:11, 61:24,
62:13, 62:14,
69:21, 70:8,
79:8, 79:19,
98:22, 98:25,
99:4, 99:13,
99:19, 99:20,
125:19, 130:6,

146:21, 147:10,
147:14, 147:18,
153:25, 174:8,
174:9, 174:12,
174:15, 174:17,
175:1, 175:3,
175:10, 175:11,
180:20, 205:13,
225:14, 225:15,
225:19, 230:3
**column's**
49:20
**columns**
19:24, 50:6,
175:22
**com**
2:8, 2:16, 2:26
**combination**
202:11, 211:10
**combine**
206:8, 206:13,
212:13
**combined**
201:22, 203:6,
204:1, 208:4,
209:19, 209:23,
210:3, 211:5,
211:22, 214:13
**combining**
212:16
**come**
10:10, 26:15,
42:10, 56:6,
85:6, 102:8,
121:8, 130:13,
170:8, 209:14
**comes**
25:24, 93:22,
153:16, 181:8,
197:9
**comfortable**
15:5
**coming**
9:1, 60:10,
98:11, 110:6,
115:19, 116:10,
127:15, 144:3,
161:10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

70

| | | | |
|---|---|---|---|
| **commencement** 240:4 | **complexity** 68:5, 68:6 | 199:16, 206:14, 206:18, 206:20, 206:24, 207:24, 208:18, 208:22, 214:8 | 173:4, 179:11, 195:6, 228:23, 230:18, 232:4, 234:22 |
| **committee** 76:18, 77:6 | **component** 215:24 | | **conducting** 234:25 |
| **common** 22:1, 22:3, 111:12, 111:16 | **comport** 83:5 | **concentrations** 134:7, 137:23, 139:11, 139:17, 140:1, 140:9, 183:13, 183:18 | **confer** 9:5 |
| **commonsense** 113:2 | **comports** 83:4 | | **confidence** 156:23 |
| **communicate** 116:23, 116:24 | **composition** 205:16, 206:25, 207:20 | **concentrations--- the** 134:19 | **confidential** 1:17, 1:19, 52:1, 238:25 |
| **communications** 232:16 | **compound** 4:26, 55:6, 82:25, 150:11, 154:7, 154:8, 154:9, 154:11, 154:17, 155:5, 155:6, 155:11, 155:14, 155:19, 157:9, 157:14, 184:9, 185:24, 223:17 | **concept** 194:12, 194:22, 233:5 | **confidentiality** 15:8 |
| **companies** 43:19, 83:9 | | **conceptually** 127:14 | **confirm** 42:8, 128:7, 157:25, 162:5 |
| **company** 12:21, 27:23 | | **concerned** 187:19 | **confused** 178:22 |
| **company's** 128:24 | | **concerning** 240:6 | **confusion** 172:2 |
| **comparable** 84:18 | | **concluded** 161:18 | **connect** 90:24 |
| **compare** 60:24, 73:18, 102:1, 218:6, 219:2 | **compounds** 4:27, 49:15, 58:9, 146:6, 151:3, 155:7, 158:4, 158:9, 184:2, 199:19, 199:21, 216:10 | **concludes** 134:10, 135:4, 238:21 | **connection** 162:3, 212:25 |
| **compared** 84:16, 127:23, 127:24, 144:14, 180:14, 222:10, 224:24 | | **conclusion** 221:2 | **conscious** 91:18, 91:20 |
| | **comprehensive** 61:4 | **condition** 103:16 | **consider** 24:5, 24:8, 48:4, 49:9, 54:23, 65:6, 65:10, 66:7, 85:19, 85:22, 87:8, 87:11, 124:13, 145:13, 145:15, 145:16, 152:9, 160:3, 160:5, 161:11, 161:13, 166:3, 184:24 |
| **compares** 73:16 | **comprising** 205:17 | **conditions** 65:23, 71:5, 76:2, 95:25, 96:3, 118:18, 144:11, 146:6, 172:18, 228:5, 229:6 | |
| **comparing** 101:25, 132:3, 218:15, 218:17 | **computer** 23:16 | | |
| **comparison** 132:6, 169:5, 219:12, 220:14 | **concentration** 48:2, 49:13, 82:23, 134:15, 137:17, 137:19, 138:21, 139:7, 139:9, 139:12, 142:1, 142:18, 143:6, 182:13, 183:7, 185:5, 185:17, 186:2, 186:12, 187:23, 189:12, 189:14, 189:19, 189:22, | **conduct** 149:14, 168:11, 174:23, 182:17, 182:18, 182:20, 183:16, 190:8, 193:25, 194:18, 196:3 | |
| **compendium** 113:21 | | | **consideration** 156:5 |
| **compendiums** 113:18 | | **conducted** 162:16, 163:23, 166:7, 169:1, | **considerations** 134:23, 167:11 |
| **compiling** 170:12 | | | **considered** 49:7, 65:8, 93:17, 118:21, |
| **completing** 166:25 | | | |
| **complex** 19:3, 138:25 | | | |

118:23, 121:12,
216:3, 224:17
**consistent**
79:15, 171:10,
195:18, 218:19
**constant**
48:1, 138:7,
138:9, 138:14,
138:21, 139:13,
140:17, 142:17
**constants**
138:13, 237:14
**constituted**
53:2, 53:4
**constitutes**
240:11
**consult**
25:15
**contain**
67:17, 205:22,
205:23, 206:1,
206:6, 206:12,
207:22
**contained**
163:19, 238:13
**containing**
205:15, 207:19
**contains**
67:17, 206:12,
212:12
**contamination**
60:10
**contemplate**
191:24
**contemplates**
152:22
**contend**
172:9
**contents**
167:12, 201:11
**context**
28:4, 47:15,
85:15, 91:21,
92:22, 113:6,
117:9, 120:22
**context-specific**
40:14, 41:15,
149:18

**contextual**
64:1, 71:11,
72:11, 73:7,
91:5, 92:21,
101:24, 167:24
**contextualize**
140:12
**continue**
235:10
**continued**
4:1, 52:14
**continues**
201:20, 202:2
**continuing**
98:25, 235:3
**contract**
34:13, 38:20,
39:6
**contradictory**
157:19
**controls**
116:4
**conversation**
7:25, 212:8
**conversations**
120:15
**conversion**
20:4, 20:23
**coordinate**
8:12
**coordinated**
8:14, 8:16
**copies**
177:19
**copy**
32:12, 78:18,
80:8, 94:24,
98:2, 141:8,
239:2, 239:3
**core**
31:13
**correction**
112:20
**correctly**
76:6, 93:19,
94:15, 96:10,
105:6, 112:22,
112:24, 119:1,

119:18, 119:25,
125:25, 126:14,
135:5, 146:13,
149:2, 154:14
**correlate**
155:8
**correlates**
107:7
**corresponded**
216:17
**could**
8:8, 8:11,
8:15, 9:7,
11:25, 15:3,
18:4, 21:18,
21:19, 21:20,
24:2, 24:12,
27:4, 30:12,
32:9, 33:20,
34:17, 44:3,
47:9, 47:11,
57:23, 62:21,
66:10, 66:15,
75:22, 76:16,
77:2, 78:16,
92:5, 92:23,
109:12, 113:19,
121:21, 129:18,
138:3, 138:24,
139:22, 143:22,
144:5, 144:11,
147:24, 148:21,
153:14, 157:13,
169:20, 192:7,
211:2, 218:8,
218:25, 219:25,
220:8, 220:9,
221:8, 221:18,
222:6
**couldn't**
25:2, 72:7,
152:12
**counsel**
5:12, 6:11,
6:23, 10:18,
12:1, 12:17,
102:21, 120:15,
135:16, 136:16,

161:17, 177:24,
178:12, 212:1,
232:15, 232:21,
232:23, 233:7,
238:17, 240:18,
240:19
**count**
176:22, 176:25
**counts**
177:5
**couple**
94:4, 123:15,
195:10
**course**
21:6, 48:24,
49:4, 72:13,
140:6, 140:7,
192:8, 212:24
**courses**
15:25, 20:25,
21:4, 21:10
**coursework**
16:8, 16:22
**court**
1:1, 5:5, 5:23,
6:17, 11:14,
14:22, 15:9,
22:14, 28:14,
129:17
**courts**
1:25
**covalent**
75:20, 75:25
**cover**
21:18, 21:19,
21:20, 79:3,
87:14, 151:23,
238:5
**covers**
21:18
**create**
202:11, 204:8
**created**
212:17
**criteria**
118:14
**criticism**
135:10, 136:12,

Case 1:24-cv-00065-JLH    Document 528-1    Filed 08/07/26    Page 116 of 361 PageID
#: 31830
HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

72

136:22, 137:6
**criticisms**
8:10
**critique**
44:15
**crossover**
195:12
**cryptophycin**
19:16
**crystallization**
75:18
**csr**
2:39, 240:31
**curiosity**
203:12
**curious**
172:8, 203:9,
212:11
**current**
11:10, 11:13,
12:19, 13:2,
36:10, 92:13,
110:3, 123:22
**currently**
13:1, 121:9
**curriculum**
3:10
**curve**
189:19, 189:21
**curves**
150:6, 150:10
**cut**
53:10
**cutting**
207:13
**cv**
13:25, 14:11,
14:15, 27:5,
28:21, 34:10

**D**

**dad**
73:21
**daily**
239:2
**data**
46:21, 58:11,
59:16, 59:17,

63:3, 83:15,
84:18, 102:4,
103:16, 103:20,
103:23, 106:5,
106:9, 106:16,
106:19, 106:21,
106:25, 107:7,
107:8, 107:9,
107:19, 107:21,
124:8, 128:7,
130:12, 132:11,
132:12, 132:13,
134:8, 134:18,
136:21, 164:24,
165:1, 165:5,
177:2, 177:12,
177:21, 178:2,
178:4, 178:5,
178:6, 179:25,
180:2, 182:17,
182:18, 182:19,
182:20, 188:13,
188:16, 190:19,
191:4, 195:2,
195:3, 201:1,
216:16, 218:6,
218:19, 220:1,
220:4, 221:3,
222:3, 222:11,
222:25, 229:4,
230:12, 235:12,
235:18, 235:21,
235:23, 235:25,
237:7, 238:12
**date**
5:7, 52:5,
231:12, 231:17,
231:25, 233:20,
235:8
**david**
11:5
**day**
1:26, 9:2,
9:10, 10:3,
10:20, 23:14,
23:15, 52:17,
52:19, 219:15,
240:23

**de**
111:18
**dead**
49:21
**deal**
112:10
**dealing**
101:22
**deborah**
1:21, 2:39,
5:23, 240:1
**december**
233:24, 234:22
**decision**
91:18, 199:1,
200:3, 219:10
**decrease**
224:2
**decreasing**
151:13
**dedicated**
37:12
**deduced**
232:8
**default**
139:23
**defendant**
48:11, 65:3
**defendant's**
6:3
**defendants**
1:15, 5:18,
5:21, 7:11,
72:18
**defended**
34:1
**define**
81:12, 190:20
**defined**
190:20
**definitely**
129:16
**definition**
50:1, 78:14,
81:13, 142:15
**definitive**
135:2
**degradants**
54:24, 54:25,

56:3, 56:4,
56:15, 58:24,
154:2, 154:6,
155:4
**degradation**
169:23, 183:17,
215:8, 216:8,
237:13
**degree**
63:4
**degrees**
13:24, 70:16,
104:17, 104:18
**delaware**
1:2, 5:6,
12:15, 136:5
**delay**
233:3, 233:6
**delivery**
239:5
**demonstrate**
162:16
**deny**
42:9
**depart**
97:15
**departed**
100:18
**department**
17:8
**depend**
71:10, 85:14,
167:25
**depending**
120:21, 146:5
**depends**
26:17, 68:5
**deponent**
239:7
**depos**
5:10, 5:24
**deposed**
8:20, 36:13
**deposition**
1:20, 5:2,
5:10, 6:13,
6:16, 6:19,
14:13, 27:7,

28:2, 28:6,
240:9, 240:15
**depositions**
9:1, 9:6, 10:2,
10:11
**derive**
190:17
**derived**
59:17
**derives**
134:9
**deriving**
189:25
**describe**
70:25, 145:7,
202:6
**described**
18:5, 72:9,
76:3, 76:9,
76:10, 76:22,
78:8, 96:3,
178:25, 179:14,
183:5, 185:3,
193:21, 227:21,
232:5
**describes**
192:18
**description**
3:7, 4:2,
126:2, 200:12
**designing**
165:12, 166:1
**despite**
117:2, 218:19
**details**
36:15, 171:15,
175:5, 197:3
**detect**
187:6, 189:12
**detected**
63:5
**detecter**
172:3
**detection**
29:21, 62:23,
64:17, 91:3,
92:15, 101:3,
115:17, 115:24,

123:5, 123:12,
123:20, 172:20,
176:17, 187:16,
188:23, 189:10,
189:11
**detections**
182:4
**detector**
53:11, 70:5,
96:19, 97:4,
97:9, 99:16,
119:12, 119:21,
119:23, 172:24
**determination**
134:17
**determine**
46:18, 55:3,
56:21, 57:20,
57:24, 58:19,
144:12, 176:25,
177:7, 189:16,
190:9, 190:13,
190:15, 193:23,
218:7
**determined**
58:5, 68:20,
104:15, 109:4,
131:8
**determining**
83:20, 84:3,
195:23
**develop**
66:21, 66:23,
67:6, 67:13,
69:13, 72:12,
74:15, 74:21,
77:2, 77:7,
161:18, 167:9,
170:17, 200:10
**developed**
40:4, 40:8,
40:11, 66:24,
67:7, 68:21,
68:23, 89:18,
111:23
**developing**
72:21, 77:2,
169:15, 193:1

**development**
83:8, 126:12,
166:18
**deviation**
120:2
**deviations**
119:15
**dexter**
11:14
**diarrhea**
33:6
**difference**
61:8, 62:21,
62:25, 64:19,
223:10, 227:12,
229:4, 229:8,
229:9, 230:1,
235:13
**differences**
146:11, 149:11,
154:22, 154:23,
167:4, 229:24
**different**
8:9, 9:12,
9:13, 10:8,
23:13, 35:22,
54:14, 61:13,
61:24, 62:23,
63:21, 63:24,
64:16, 65:4,
68:15, 68:24,
73:22, 80:5,
80:8, 83:11,
83:14, 83:16,
84:6, 84:16,
100:11, 100:15,
102:2, 102:3,
103:15, 104:20,
116:18, 123:15,
130:23, 132:3,
143:19, 144:6,
144:9, 144:16,
147:10, 147:14,
150:1, 150:11,
150:22, 150:23,
151:16, 158:2,
159:4, 159:13,
164:4, 175:17,

175:20, 175:22,
179:7, 187:23,
188:12, 195:2,
196:20, 199:14,
203:19, 216:9,
228:5, 228:13,
228:14, 228:16
**differential**
24:15
**differently**
72:19, 91:13,
136:17, 151:6
**difficult**
39:22, 71:6,
77:1, 86:3
**dig**
21:7
**digital**
51:13, 51:14,
51:16
**dihydroxy**
154:8, 154:11,
154:16, 155:5,
155:19
**diluent**
202:3, 202:4
**diluted**
199:10, 202:4,
209:9, 211:16
**dilution**
199:18, 211:3,
211:21, 212:3,
212:4
**dilutions**
199:14, 209:8
**dimension**
175:16
**dimensions**
174:22, 175:3
**direct**
18:13
**directing**
12:6
**directly**
11:18, 240:20
**disagree**
8:6, 73:2,
93:21, 99:3,

Case 1:24-cv-00065-JLH   Document 528-1   Filed 08/07/26   Page 118 of 361 PageID #: 31832
HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

74

133:23, 208:14,
208:16
**disclosed**
9:11, 10:4,
163:24
**discovery**
232:10
**discrepancy**
146:12, 149:12
**discuss**
36:11, 45:24,
46:6, 126:20
**discussed**
38:1, 102:9,
138:5, 146:1,
146:4, 146:24
**discussion**
6:13
**discussions**
45:8, 102:20,
232:14, 232:20,
233:6
**disease**
33:5
**disposal**
39:12
**dispute**
232:10
**disregarded**
219:10
**disrupting**
8:21
**disruption**
8:21
**disruptive**
10:11
**dissertation**
3:13, 17:12,
17:20, 18:14,
18:19, 32:13,
33:13, 33:16,
33:18, 33:21,
73:12, 76:14
**dissimilar**
69:1
**dissolution**
38:17
**distinction**
24:10

**distinguish**
24:1
**distort**
143:20
**district**
1:1, 1:2, 1:25,
5:5
**divide**
140:7
**divided**
125:20, 190:6
**dividing**
78:9
**divulge**
232:16
**doc**
77:4
**doctor**
176:18
**document**
2:37, 32:4,
32:10, 33:9,
50:16, 50:21,
50:25, 78:18,
78:22, 86:7,
94:20, 94:24,
95:17, 98:20,
99:12, 101:20,
113:24, 117:11,
122:6, 129:23,
129:24, 145:7,
155:13, 161:2,
161:7, 161:11,
165:16, 165:21,
165:22, 166:5,
170:22, 171:10,
181:25, 183:24,
187:9, 200:9,
200:14, 217:7
**documentation**
196:22, 231:16
**documents**
86:14, 130:18,
130:20, 163:16,
170:11, 170:17,
170:20, 171:23,
197:13, 197:18,
198:16, 235:22

**doing**
7:12, 10:12,
18:13, 32:25,
34:15, 34:16,
34:21, 35:4,
40:14, 61:6,
62:23, 73:3,
91:17, 92:14,
113:7, 140:5,
182:14, 184:24,
189:24, 200:3,
203:15, 208:1,
221:11, 223:7,
224:18
**dolan**
89:21, 110:24,
113:9
**dolan's**
113:12
**done**
8:5, 9:7,
31:16, 31:19,
34:14, 34:23,
36:14, 36:16,
38:22, 39:20,
40:3, 41:22,
41:24, 42:23,
44:6, 44:24,
45:16, 45:22,
47:9, 48:7,
48:8, 57:23,
58:3, 67:11,
72:8, 74:3,
76:11, 82:8,
82:18, 85:24,
86:4, 90:2,
91:21, 105:23,
107:15, 117:8,
120:19, 120:25,
121:11, 124:7,
147:7, 164:12,
172:9, 181:7,
181:10, 181:13,
184:1, 184:17,
184:22, 185:14,
195:18, 200:6,
225:24, 228:8,
228:9, 228:18,

230:18, 231:5,
231:7, 232:6,
234:3, 234:5,
234:7
**dose**
35:2
**dots**
90:24
**double**
145:4, 224:11
**doubles**
224:16
**doubt**
119:3
**down**
49:8, 94:4,
97:3, 119:9,
138:25, 191:19,
213:6, 236:21
**dr**
3:22, 3:29,
4:17, 4:19, 5:2,
6:4, 8:19, 8:20,
9:11, 11:3,
14:6, 44:13,
44:18, 44:20,
45:3, 45:12,
98:6, 120:14,
133:14, 133:16,
133:19, 133:24,
134:6, 134:13,
134:19, 134:24,
135:10, 136:22,
137:6, 139:3,
141:4, 144:19,
161:6, 161:25,
192:15, 206:4,
215:14, 217:15,
223:6, 238:3,
238:22
**draft**
239:2, 239:5
**drawing**
155:20
**drew**
216:16
**drop**
236:21

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026                        75

**drug**
14:25, 15:2,
15:8, 93:15,
93:16, 93:22,
116:10, 150:17,
205:3
**drugs**
85:16, 116:5
**due**
154:22, 235:8
**duly**
6:1, 10:24,
240:5
**duplicate**
71:6, 71:25,
72:7, 73:4,
74:9, 76:17,
76:23, 76:25
**duplicated**
76:4, 76:11
**during**
15:24, 16:4,
16:6, 16:11,
16:22, 19:4,
19:10, 19:25,
21:9, 21:12,
21:24, 22:22,
23:21, 48:22,
96:4, 102:19,
120:14

**E**

**e**
158:16
**each**
6:5, 8:1, 8:2,
22:6, 46:10,
48:25, 49:10,
51:20, 59:9,
60:2, 77:13,
78:6, 78:10,
79:1, 103:21,
109:5, 117:22,
118:19, 125:16,
125:21, 130:24,
133:6, 134:15,
139:11, 142:25,
150:10, 159:14,

168:14, 178:23,
191:18, 206:8,
206:12, 207:14,
213:17, 214:5,
214:6, 222:17,
225:20, 225:21,
229:1
**eagle**
1:5, 1:6, 4:10,
5:3, 5:16, 44:7,
65:9, 121:15,
122:25, 123:19
**eagle's**
74:16, 123:10,
161:17
**eagleben-sa**
3:34, 98:21
**eagleben-sa_**
4:13
**earlier**
217:5, 219:6,
238:3
**early**
76:16
**easier**
72:14
**eastern**
15:15, 21:3,
21:6
**easy**
190:24, 190:25
**edit**
33:20
**edition**
126:9, 126:11
**education**
15:14, 23:7,
148:16, 148:19,
235:11
**educational**
13:24, 22:22
**effort**
10:12
**egregiously**
144:16
**either**
16:9, 47:7,
51:25, 57:18,

62:19, 70:18,
84:19, 102:19,
103:21, 135:25,
138:15, 186:23,
221:11
**elaboration**
96:4
**element**
207:2
**else**
8:24, 11:8,
18:3, 38:7,
44:6, 45:20,
51:24, 52:2,
72:8, 73:4,
76:19, 89:20,
102:9, 108:12,
111:25, 126:23,
137:5, 146:17,
153:12, 161:17,
202:15, 234:12
**else's**
74:17
**elute**
49:14
**eluted**
62:12
**eluting**
61:13
**elution**
49:11, 69:18,
70:23, 188:14
**elutions**
62:13, 62:15
**employ**
148:22
**employed**
201:15
**employee**
12:23, 240:17,
240:18
**employees**
13:8, 13:10
**employer**
12:19
**empty**
153:15
**encompass**
135:9

**encompasses**
191:12
**encounter**
111:17
**end**
9:9, 36:18,
74:7, 82:3,
82:4, 162:9,
168:15, 168:19
**ending**
171:6, 184:6,
217:7
**ends**
99:12
**engage**
186:6, 187:8,
193:2, 194:24,
236:4
**engaged**
28:7, 36:5
**engagement**
25:11, 95:12
**engaging**
166:7
**enhance**
160:9
**enough**
15:10, 43:19,
45:10, 47:23,
221:21
**ensure**
146:10, 149:11,
167:8, 169:1,
182:1
**entire**
39:13, 39:16,
129:4, 129:7,
129:12
**entirety**
42:22, 135:9
**entitled**
35:11, 145:21
**entry**
52:12
**enzyme**
17:13, 18:1,
18:7, 18:16,
20:2, 31:5, 33:1

**enzymes**
19:3, 19:8,
19:18, 19:19,
19:21, 19:22,
19:23
**enzymology**
17:13, 30:3
**epsilon**
141:23, 141:24,
142:5
**equal**
64:18, 81:17,
133:5, 133:6,
133:7, 159:5,
218:1
**equals**
141:23
**equation**
109:12, 141:18,
219:21, 219:25
**equipment**
38:8, 38:9,
149:1, 181:14
**equivalence**
195:23
**equivalency**
175:10
**equivalent**
175:1, 211:22
**error**
119:22
**errors**
186:24
**erythromycin**
19:15
**escherichia**
32:17
**especially**
58:8
**essentially**
73:20, 73:21,
104:21, 109:11,
164:5, 174:15,
174:16, 176:16,
186:8, 190:6,
220:15, 221:3,
227:22, 229:12
**established**
177:6

**esters**
157:6, 157:7,
157:23, 158:16,
158:18, 158:20
**estimate**
25:2
**estimating**
186:24
**et**
5:3, 75:18,
76:2, 94:8,
126:10, 126:12,
177:5
**ether**
191:4
**ethyl**
155:24
**evaluate**
68:7, 68:25,
194:25
**evaluated**
176:2, 195:4
**evaluating**
116:17, 132:2,
203:24
**evaluation**
148:20
**even**
25:2, 101:22,
116:9, 135:22,
139:25, 147:6,
175:18, 237:12
**event**
143:18
**ever**
11:6, 27:21,
27:24, 28:6,
28:8, 30:5,
38:20, 41:22,
48:18, 49:20,
58:3, 72:6,
72:12, 87:12,
87:18, 93:6,
95:4, 98:9,
117:16, 117:18,
130:17, 161:7,
227:21
**every**
23:14, 23:15,

43:20, 43:21,
166:11, 190:17,
190:19, 218:9,
223:2, 225:5
**everyone**
22:17, 224:23
**everything**
71:11, 126:23,
170:6
**evidence**
103:25, 128:21,
129:9
**exact**
2:37, 54:14,
59:9, 59:17,
62:10, 63:4,
63:14, 64:5,
67:1, 74:10,
76:25, 85:7,
91:24, 92:13,
92:19, 114:7,
115:23, 170:4,
174:21, 226:1,
233:20
**exacting**
141:1
**exactly**
49:19, 66:16,
68:22, 74:15,
74:16, 74:22,
147:8, 222:16,
228:4
**examination**
3:4, 3:5, 11:1,
161:23, 209:14,
240:5
**examined**
10:25
**example**
71:12, 112:8,
138:1, 138:3,
184:5, 233:15,
238:13
**examples**
238:9
**except**
170:7
**excess**
86:14

**exchange**
73:17, 75:12,
75:19, 75:22
**exclude**
210:7
**excuse**
6:20, 7:23
**exercise**
33:24, 221:8
**exhaustive**
67:18
**exhibits**
2:34
**exist**
85:9, 191:3
**existing**
95:19
**expect**
33:18, 64:13,
85:11, 88:10,
131:18, 156:25,
168:23
**expected**
82:6, 168:20,
235:14
**experience**
27:7, 148:20,
151:15, 197:20,
227:20, 235:12
**experiences**
73:11
**experiment**
29:22, 36:11,
36:14, 50:6,
60:19, 61:14,
61:15, 62:18,
63:15, 64:4,
64:13, 64:21,
66:2, 66:5,
66:6, 67:12,
71:10, 71:17,
71:25, 74:1,
74:2, 76:15,
76:23, 83:10,
83:21, 84:4,
99:25, 100:3,
105:23, 157:11,
160:12, 168:15,

**217:1**

**experimental**
41:14, 71:5,
76:2, 124:8,
128:7, 132:10,
132:13, 146:6,
169:20

**experimentally**
166:1

**experimentation**
182:1, 182:6,
193:2, 194:25

**experimentations**
187:15, 188:4

**experiments**
16:5, 19:16,
25:13, 31:17,
31:19, 34:23,
37:5, 37:6,
38:20, 39:8,
40:19, 40:25,
41:6, 41:18,
42:7, 45:6,
45:13, 45:15,
45:16, 45:18,
46:17, 48:7,
48:9, 48:13,
48:18, 48:22,
51:6, 51:7,
51:12, 52:10,
52:16, 53:2,
65:12, 65:15,
75:25, 77:11,
81:6, 81:9,
82:1, 90:2,
91:17, 91:24,
94:1, 98:12,
101:4, 105:15,
123:4, 132:15,
149:14, 154:19,
159:19, 168:12,
169:1, 179:8,
184:25, 187:6,
190:8, 190:10,
195:6

**expert**
3:17, 3:22,
3:29, 4:11,

4:17, 4:32,
9:17, 10:4,
25:25, 26:3,
26:16, 26:20,
27:3, 85:19,
85:22, 85:25,
121:15, 162:2

**expertise**
229:17

**experts**
234:7

**expiration**
231:17, 231:25

**explain**
62:16

**explained**
18:15, 164:3,
230:23

**explaining**
73:20

**explanation**
60:1, 60:7

**extent**
20:22, 28:1,
68:20, 68:22,
85:24, 96:5,
96:12, 100:6,
113:23, 123:18,
138:17, 150:24,
165:6, 166:18,
168:25, 195:4,
232:13

**external**
4:21, 108:5,
108:11, 108:13,
108:17, 108:19,
134:21

**extinction**
142:6

**extra**
62:22

**extract**
169:20

**extrapolate**
236:6

**eye**
117:9, 191:18

**eyes**
1:18, 238:25

| F |
|---|

**face**
94:20

**fact**
62:22, 69:17,
72:17, 76:10,
78:16, 88:7,
90:4, 99:5,
103:14, 103:17,
103:20, 111:20,
133:5, 156:21,
202:18, 203:15

**facto**
111:18

**factor**
46:18, 47:14,
47:19, 47:22,
47:23, 134:12,
137:21, 140:17,
142:20, 176:10,
176:14, 176:19,
177:9, 177:15,
178:7, 217:22,
217:24

**factors**
4:23, 46:21,
68:7, 123:23,
124:9, 127:22,
127:25, 128:8,
133:21, 134:17,
134:22, 140:8,
143:20, 144:5,
146:7, 177:5

**failed**
200:1

**failure**
60:18

**fair**
15:10, 17:15,
29:4, 29:9,
30:1, 32:25,
39:7, 45:10,
47:23, 61:11,
63:19, 69:4,
87:21, 102:12,
112:25, 131:21,
135:18, 135:19,

136:13, 147:6,
149:13, 161:9,
163:22, 164:1,
169:3, 170:13,
175:8, 183:15,
183:20, 191:23,
191:25, 192:5,
204:2, 204:7,
221:21, 221:22

**fairly**
224:2

**fall**
181:20

**falling**
118:22

**false**
131:24, 227:23

**familiar**
44:14, 87:5,
94:21, 171:2,
189:7, 194:12,
194:22

**far**
34:3, 163:20

**fashion**
103:1

**fast**
191:18

**fault**
134:25

**faults**
134:20

**fda**
40:14, 67:16,
84:2, 85:1,
85:16, 85:19,
87:23, 88:7,
88:10, 88:11,
90:12, 90:21,
90:25, 91:8,
91:22, 91:25,
92:15, 93:22,
94:2, 94:13,
113:22, 114:18,
115:1, 115:7,
115:16, 115:22,
116:4, 116:13,
116:19, 116:22,

116:23, 116:24,
117:4, 117:9,
117:18, 119:3,
147:8
**fda-approved**
64:22, 90:5,
115:8, 116:15,
120:2, 123:11,
123:20
**fda-validated**
84:9, 92:19,
117:2
**feasible**
235:4, 235:7
**fed**
24:7
**federal**
1:23, 128:21
**feel**
105:24, 168:6
**feet**
13:19
**ferenc**
2:21, 3:5,
5:20, 161:20,
161:24, 163:1,
163:14, 164:17,
165:10, 166:14,
170:18, 171:1,
173:20, 174:7,
176:13, 178:1,
178:4, 178:11,
178:14, 182:25,
183:3, 183:22,
184:21, 185:13,
186:19, 187:13,
188:2, 188:25,
189:2, 189:4,
191:21, 192:8,
192:14, 197:10,
197:15, 204:4,
204:6, 204:13,
204:16, 204:21,
205:4, 205:13,
205:14, 206:3,
206:19, 207:8,
207:16, 208:9,
208:15, 209:14,

209:17, 210:1,
210:6, 210:10,
210:11, 211:1,
211:8, 211:19,
211:25, 212:6,
212:9, 212:23,
213:8, 213:13,
213:18, 215:12,
217:10, 217:12,
217:13, 219:4,
219:23, 220:11,
220:19, 222:9,
223:5, 225:3,
225:11, 225:17,
226:19, 226:21,
228:21, 230:13,
232:19, 233:9,
233:11, 234:9,
234:13, 234:18,
237:17, 238:2,
238:16, 238:24,
239:3
**ferenc@katten**
2:26
**few**
6:11, 160:17,
194:5
**fifteen**
25:18
**fifth**
27:5
**fight**
210:7, 212:6
**figure**
21:7, 69:14,
149:22, 150:17
**filed**
15:4
**find**
64:3, 64:8,
112:14, 114:8,
136:11, 148:9,
152:12, 154:20,
155:1, 155:4,
156:12, 156:16,
156:17, 156:18,
156:21, 229:11
**fine**
104:12, 112:18,

153:3, 233:17
**finished**
52:16
**firming**
114:22
**first**
10:24, 24:19,
31:16, 36:19,
36:22, 42:12,
42:15, 50:20,
52:5, 65:1,
89:15, 93:11,
94:19, 95:9,
111:8, 111:10,
111:11, 111:16,
117:15, 118:4,
119:18, 153:16,
165:8, 167:12,
171:4, 176:2
**fischer**
38:13, 38:16
**fit**
7:11
**five**
35:21, 86:4
**fix**
39:18
**flask**
201:24
**flip**
165:18, 166:4,
168:6, 226:9
**flipped**
114:6
**flipping**
53:8, 162:4
**floor**
166:23
**florida**
12:12
**flow**
53:10, 69:24,
99:21
**fluorescence**
21:19, 37:19
**flush**
49:14
**focal**
22:25, 23:2

**focus**
16:23, 19:14,
34:21
**focused**
109:9
**focusing**
229:23, 234:19
**follow**
159:16, 203:22
**follow-up**
161:19
**followed**
202:16, 203:20
**following**
18:7, 118:19,
203:3, 225:2
**follows**
10:25, 202:17,
203:4
**footnote**
124:3, 216:25,
232:9, 232:10,
232:22
**foregoing**
240:9
**forget**
113:19
**forgot**
38:2
**formal**
236:5
**format**
204:24, 212:18
**formed**
34:8, 75:20,
75:23
**forming**
34:11
**found**
33:9, 60:4,
60:5, 66:25,
82:14, 87:12,
87:18, 93:12,
116:20, 151:24,
151:25, 155:3,
157:6, 157:23,
158:23, 187:20,
197:12, 203:9,

221:10
**founding**
39:19
**four**
35:21, 72:20, 78:4, 78:5, 178:9, 216:9
**fplc**
19:23, 24:7
**frame**
34:9
**free**
168:6
**frequent**
181:10
**frequently**
23:24, 111:17, 181:13
**front**
106:6, 129:18, 145:8, 166:20, 205:8
**full**
11:3, 67:22, 125:4, 125:7
**fundamentally**
96:7
**furman**
94:8
**further**
84:10, 84:24, 164:2, 189:25, 209:9, 211:16, 211:20, 238:16, 239:7

**G**

**game**
8:23
**games**
10:2, 159:9
**gamesmanship**
6:10, 7:19, 7:21, 7:24, 9:4, 9:8
**gas**
37:23
**gave**
13:16, 76:15,

191:5
**general**
26:10, 35:4, 71:14, 76:21, 118:20
**generalization**
225:5
**generally**
24:6, 26:9, 32:9, 42:4, 43:18, 51:11, 71:3, 101:14, 113:1
**generate**
71:16, 128:6
**generated**
59:9, 129:25, 164:24, 165:1
**generic**
27:22, 27:25, 34:25
**generics**
27:25, 28:4
**give**
6:21, 16:15, 16:17, 25:8, 44:3, 50:1, 71:1, 71:11, 71:12, 80:6, 88:8, 93:2, 105:16, 105:24, 124:14, 135:19, 139:19, 142:25, 143:4, 144:4, 144:8, 168:19, 191:19, 218:8, 228:25
**given**
40:16, 58:7, 60:1, 75:21, 126:5, 238:21, 240:12
**gives**
82:19, 152:2, 171:9
**giving**
74:22, 136:9, 191:18

**glass**
201:12, 204:8, 205:21, 206:5, 206:23, 211:11, 214:14, 214:16
**go**
6:8, 7:16, 10:21, 17:1, 24:22, 25:15, 26:23, 33:20, 34:2, 49:17, 54:1, 54:2, 60:22, 68:7, 72:17, 77:4, 86:20, 90:22, 91:7, 92:5, 92:15, 92:23, 94:4, 106:5, 107:6, 132:1, 134:4, 146:19, 153:16, 157:12, 162:10, 165:11, 170:9, 171:5, 171:21, 178:15, 183:24, 186:20, 193:5, 193:18, 194:21, 196:9, 196:10, 197:1, 201:17, 204:5, 205:11, 209:8, 213:19, 214:12, 217:5, 224:5, 224:13, 224:15, 236:20, 236:21
**goal**
33:23, 74:4, 74:7, 109:10
**goes**
105:6, 112:5, 112:12, 137:14, 201:20, 224:16, 233:1
**going**
6:18, 8:25, 10:19, 10:20, 25:9, 28:22, 32:3, 33:24, 36:11, 40:22,

43:19, 43:20, 45:24, 49:13, 49:25, 50:9, 50:10, 50:15, 59:11, 76:22, 78:17, 81:23, 86:6, 86:8, 91:6, 92:7, 92:8, 94:23, 99:11, 102:13, 116:5, 120:8, 122:5, 128:12, 129:10, 136:1, 141:23, 153:17, 155:12, 158:1, 160:21, 161:1, 167:24, 167:25, 168:2, 170:19, 171:22, 175:19, 179:9, 181:23, 188:16, 191:5, 192:9, 194:5, 195:10, 196:9, 200:16, 206:9, 209:15, 212:6, 212:7, 213:13, 215:22, 215:24, 219:2, 221:6, 221:7, 223:14, 224:17, 227:10, 229:4, 229:11, 229:15, 230:20, 234:13, 237:20, 237:22, 238:20
**gone**
11:6, 20:12, 51:13, 127:15, 226:2
**good**
26:5, 33:25, 43:18, 50:8, 60:6, 81:5, 88:8, 95:10, 116:7, 159:8, 237:19
**gosh**
184:5
**gotcha**
198:22

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

80

| | | | |
|---|---|---|---|
| **gotten** 51:22 | 172:11, 177:8, 180:8, 180:22, 183:24, 191:22, 193:8, 211:4, 213:13, 219:21 | **hard** 74:3, 74:6, 76:17, 76:23, 175:20, 177:19 | 228:1 |
| **govern** 112:10 | | | **here's** 81:15 |
| **graciously** 86:14 | **guesstimate** 122:5 | **hauler** 13:7 | **hereby** 240:3 |
| **gradient** 49:11, 69:18, 70:24, 71:1, 99:5, 100:4 | **guidance** 87:11, 90:20, 90:21, 94:10, 94:11, 94:14, 114:25, 115:2, 115:16, 124:13 | **hcl** 196:14, 198:6, 198:7, 199:5 | **herein** 10:24, 240:7 |
| **graduate** 20:10, 21:25, 33:15, 76:16, 77:3 | | **head** 223:8, 226:1, 229:14 | **hereto** 240:20 |
| | | **heading** 79:9, 93:8, 97:3, 119:11, 150:16 | **hereunto** 240:22 |
| **graduated** 15:22 | **guidances** 115:7, 117:19 | | **hi** 161:25 |
| **graduation** 17:1 | **guide** 166:10, 171:3 | **hear** 22:12 | **high** 49:13, 83:8, 131:4 |
| **grams** 201:23 | **guidelines** 88:11, 101:15, 101:18, 112:6, 113:1, 113:2, 167:16 | **heard** 49:20, 138:24, 193:14 | **high-pressure** 35:24, 36:3 |
| **grant** 175:23, 202:22 | | **hearing** 22:15 | **highlighting** 173:16 |
| **graph** 150:7 | **guys** 22:5, 191:17, 213:6 | **help** 30:13, 124:3, 200:13 | **highly** 1:17, 1:19, 52:1, 72:21, 74:14, 74:23, 75:14, 238:25 |
| **graphing** 79:8 | | | |
| **gravity** 19:24, 24:6, 24:7 | **H** | **helpful** 155:11, 191:4 | **hillside** 11:14 |
| | **half** 36:19, 36:22, 68:4, 102:11, 233:18 | **here** 5:1, 6:3, 24:10, 30:2, 33:14, 40:20, 43:6, 49:2, 61:3, 64:15, 75:17, 90:18, 91:2, 92:1, 96:23, 106:9, 118:8, 118:10, 122:16, 122:18, 124:12, 124:19, 127:5, 135:25, 138:20, 143:16, 150:21, 154:25, 158:19, 172:2, 180:3, 183:25, 188:10, 190:2, 191:8, 191:10, 200:17, 226:9, | **history** 12:25, 15:21, 39:13, 39:16 |
| **great** 175:24 | | | |
| **greater** 116:20, 116:21, 236:20 | **half-heartedly** 77:5 | | **hold** 117:7, 191:11, 204:10, 207:6 |
| | **hand** 65:18, 86:6, 128:12, 240:23 | | **holding** 117:4 |
| **greek** 141:24 | | | **home** 11:13 |
| **grounds** 11:25 | **handed** 155:18, 161:25 | | **honest** 21:5, 26:6, 65:17 |
| **groups** 155:24 | **handful** 86:4 | | |
| **guess** 13:2, 25:8, 52:21, 91:23, 92:8, 102:8, 118:3, 141:23, 147:7, 166:20, 168:25, 169:4, 171:6, 172:2, | **handwriting** 50:23, 52:25 | | **hospira** 4:11, 31:21, 121:16, 121:25, 124:7, 124:12, 124:14, 124:20, 125:10, 126:18, 127:15 |
| | **happened** 10:1 | | |
| | **happens** 151:19 | | **hour** 25:20, 102:11 |
| | **happenstance** 85:8 | | |

**hourly**
25:19
**hours**
6:4, 6:21, 7:2,
7:6, 7:8, 8:2,
10:16, 24:24,
25:4, 25:6,
25:8, 25:12
**however**
75:24, 88:14,
92:18
**hp1**
154:7
**hp2**
154:8, 155:19,
156:2, 156:9,
156:13, 156:18,
156:21
**hplcs**
37:14
**hydrochloride**
3:33, 98:3,
98:17, 100:11,
198:12
**hydrolysis**
154:7, 154:8
**hydroxy**
155:22
**hypothesize**
222:6
**hypothetical**
33:3, 68:2,
71:8, 106:3,
106:4, 139:21,
140:11, 143:16,
143:25

**I**

**id**
134:8, 134:12,
134:16
**idea**
58:24, 73:2,
150:15, 180:12,
193:13, 223:4
**identical**
85:10, 147:18,
170:6, 228:15

**identified**
69:5, 125:23
**identify**
169:23, 183:17,
193:23, 194:1,
216:6, 216:9,
231:11
**identifying**
56:20, 171:11
**identities**
55:4
**identity**
57:3, 58:20
**ignored**
126:22
**ignoring**
220:1
**illinois**
1:23, 1:26,
2:6, 240:3,
240:23, 240:30
**illustrated**
150:21
**imagine**
116:20
**immediately**
17:1
**impact**
29:21, 187:15,
219:6, 219:11,
221:2
**imperative**
159:17
**implemented**
146:9, 149:10
**important**
60:7, 90:25,
185:1, 185:6,
185:11, 188:17,
192:19, 192:25,
203:22
**improper**
134:14
**impurities**
46:23, 46:25,
54:23, 55:14,
56:2, 56:17,
61:9, 81:20,

82:14, 82:24,
87:25, 88:5,
91:15, 99:8,
102:5, 104:1,
106:1, 106:17,
107:10, 108:18,
108:20, 116:20,
122:25, 125:15,
130:4, 130:11,
131:23, 133:20,
134:6, 134:12,
134:23, 136:23,
144:5, 150:18,
152:23, 157:22,
159:1, 162:17,
187:16, 187:17,
187:20, 187:24,
215:1, 215:2,
215:3, 215:8,
215:18, 216:3,
221:10, 221:12,
226:11, 226:22,
227:1, 227:8,
227:25, 229:23,
230:7, 230:8,
230:25, 236:1,
236:18
**impurity**
61:3, 61:8,
84:19, 116:18,
125:16, 125:22,
127:24, 134:10,
143:20, 148:23,
154:9, 154:11,
156:15, 163:18,
197:2, 202:24,
216:7, 216:18,
217:18, 218:9,
219:7, 224:19,
236:6
**inaccurate**
143:10, 152:3,
152:14, 153:3,
153:6, 172:23,
174:1, 230:14
**inapplicable**
124:22, 124:24,
126:19

**inappropriate**
127:4
**inc**
1:5, 1:13, 2:18
**include**
115:8, 175:5,
185:6, 185:11,
185:12, 192:3,
200:21
**included**
94:12, 115:1,
192:1
**includes**
158:3
**including**
22:23, 100:24,
101:1, 148:24,
165:4, 191:15
**inclusion**
173:13
**income**
25:24, 26:3,
26:6, 26:8,
26:10, 26:14,
26:19, 26:22,
26:23, 26:24,
26:25
**incomplete**
68:2, 71:8,
106:2, 128:17,
128:20, 139:21,
140:10, 143:25
**inconsequential**
91:14
**incorporate**
135:14
**incorrect**
173:7, 173:8
**increase**
49:12, 151:9,
222:7, 222:19,
227:5, 227:8,
227:16, 227:19,
230:6, 230:7
**increasing**
224:19
**incubators**
38:18

**independent**
202:21, 203:14, 211:22, 212:4
**independently**
190:13, 198:14
**indicate**
2:36, 103:17, 103:22
**indicated**
96:9
**indirectly**
11:19, 240:20
**individuals**
72:21
**induce**
6:22, 10:16
**induced**
6:20
**industry**
113:2
**infectious**
33:5
**inference**
216:17
**information**
6:6, 8:7, 8:13, 184:13, 184:15, 186:13, 198:15, 231:10, 231:11, 231:18, 231:20
**informed**
233:6
**ingredients**
147:17
**inherited**
89:19, 111:24
**initial**
7:13, 49:16
**inject**
82:7, 189:21, 189:22, 202:25
**injected**
53:16, 57:12, 168:19
**injecting**
185:8, 189:18, 189:20, 189:23
**injection**
48:25, 49:10,

49:17, 52:24, 53:1, 53:7, 53:9, 53:19, 55:7, 59:10, 59:17, 60:3, 61:15, 62:10, 63:5, 70:2, 81:22, 82:4, 82:13, 82:22, 200:21, 215:22, 228:23
**injections**
48:22, 52:21, 53:4, 53:12, 54:15, 223:24
**injector**
99:21
**innovation**
13:3
**insight**
58:7
**insignificant**
226:6, 227:10
**insignificantly**
224:9
**insofar**
173:7
**instance**
53:18, 54:1, 54:4, 63:3, 69:11, 79:5, 79:19, 89:11, 95:22, 98:19, 105:22, 107:5, 110:12, 148:12
**instances**
222:18
**instantly**
9:5
**instruct**
232:15
**instrument-speci-
fic**
146:7
**instrumental**
146:10, 149:11
**instrumentation**
39:3, 40:17,

180:19
**instruments**
39:4
**integrated**
55:1, 61:2, 125:21, 125:23
**intend**
175:9
**intending**
129:6
**intention**
234:25
**intentionally**
215:15
**inter-laboratory**
195:11
**intercept**
186:24
**interest**
137:17, 137:20, 169:17
**interested**
34:12, 67:20, 240:20
**interesting**
29:17, 32:21, 32:23, 80:9
**interferant**
193:23
**interference**
193:9, 193:22, 194:1
**intermediate**
75:20, 75:23, 75:25, 199:5, 199:10, 199:12
**internet**
111:1
**interpret**
52:23, 72:3, 229:22
**interrupted**
107:4
**interrupting**
107:3
**introduce**
129:11
**introduction**
3:26, 87:3,

126:10
**inverted**
202:5
**investigations**
180:13
**investments**
26:10
**involve**
53:7
**involved**
14:25, 37:8, 45:20, 146:6
**ion**
73:17
**ir**
37:21
**irrelevant**
180:16, 180:17
**irrespective**
155:2
**isocratic**
69:18, 70:24
**isolate**
75:23
**isolating**
18:1
**issue**
15:7, 47:13
**issued**
121:25, 122:11
**issues**
6:5
**itc**
28:9, 28:14
**itself**
9:25, 60:19, 86:23, 88:17, 104:6, 122:5, 124:16, 137:22, 148:2, 162:22, 163:11, 165:7, 187:10

**J**

**january**
36:25, 37:3
**jason**
2:11, 5:17

Transcript of Jeffrey Kittendorf, Ph.D.

| | | | |
|---|---|---|---|
| **jeff** | **kittendorf** | **knowing** | **laid** |
| 11:7 | 1:20, 3:3, 3:9, | 71:15 | 104:9 |
| **jeffrey** | 3:10, 3:12, | **knowingly** | **landscape** |
| 1:20, 3:3, | 3:18, 3:23, | 34:4 | 110:3 |
| 3:17, 3:23, | 3:30, 4:4, 4:11, | **knowledge** | **lane** |
| 3:30, 4:32, 5:2, | 4:14, 4:19, | 115:15, 161:12, | 2:10 |
| 10:23, 11:5 | 4:33, 5:3, 6:4, | 173:6, 203:6, | **large** |
| **jlief@windelsmarx** | 8:19, 10:23, | 203:8, 229:16, | 86:7 |
| 2:16 | 11:3, 11:5, | 235:2 | **largely** |
| **john** | 14:3, 14:4, | **known** | 90:23, 162:23, |
| 89:21, 110:24 | 14:6, 14:7, | 57:13, 57:16, | 163:12 |
| **june** | 27:6, 30:14, | 58:8, 82:23, | **larger** |
| 110:25, 122:11 | 30:16, 30:19, | 130:3, 154:7, | 166:21 |
| **justified** | 32:4, 32:6, | 169:21 | **last** |
| 80:22 | 32:8, 35:7, | **kromasil** | 6:12, 8:20, |
| **K** | 35:9, 42:11, | 174:14, 174:19 | 20:13, 22:12, |
| **k-a-e-n-e-k-a** | 42:13, 42:16, | **L** | 36:10, 42:19, |
| 28:19 | 50:16, 50:18, | **lab** | 52:12, 52:20, |
| **kaeneka** | 75:3, 78:17, | 37:17, 38:1, | 53:6, 89:8, |
| 28:11, 28:16 | 78:20, 79:2, | 51:21, 72:6, | 148:15, 181:18, |
| **karl** | 86:9, 86:10, | 77:9, 165:2, | 225:13, 225:15 |
| 38:13, 38:16 | 88:25, 89:1, | 177:22, 178:6, | **late** |
| **katten** | 89:3, 92:23, | 180:24, 195:21, | 10:1 |
| 2:20, 5:20 | 94:24, 95:1, | 196:5, 228:24 | **later** |
| **keep** | 95:3, 98:1, | **label** | 210:7, 212:7 |
| 51:3, 51:6, | 98:4, 98:6, | 204:11, 205:1, | **latham** |
| 51:7, 181:14, | 109:22, 109:24, | 212:20 | 2:2, 5:11, 5:14 |
| 181:16, 189:2, | 110:14, 117:10, | **labeled** | **law** |
| 207:13, 209:22, | 117:13, 117:16, | 142:6, 142:11 | 29:16, 29:18, |
| 212:2 | 120:14, 121:14, | **laboratories** | 29:19, 140:15, |
| **ken** | 121:17, 128:13, | 12:21, 34:18, | 140:19, 140:21, |
| 5:14, 209:14, | 128:16, 133:11, | 72:20, 195:16 | 140:23, 142:4 |
| 233:9 | 140:25, 141:2, | **laboratory** | **lawsuit** |
| **kenneth** | 141:5, 145:6, | 13:17, 13:20, | 15:4 |
| 2:3, 2:8 | 145:9, 152:19, | 37:11, 37:12, | **lawyers** |
| **key** | 152:20, 155:13, | 38:9, 51:11, | 46:5 |
| 24:14 | 155:15, 155:18, | 89:18, 111:23, | **lays** |
| **kind** | 158:2, 158:5, | 112:11, 118:5, | 95:18 |
| 16:11, 16:13, | 161:1, 161:3, | 146:8, 147:11, | **lc** |
| 17:25, 136:16, | 161:6, 161:20, | 147:19, 147:25, | 141:24 |
| 151:15, 171:22, | 161:22, 161:25, | 149:5, 149:9 | **lcgc** |
| 193:15 | 170:21, 170:24, | **laboratory's** | 110:25, 113:12 |
| **kinds** | 192:15, 206:4, | 71:5, 149:1 | **lead** |
| 68:7 | 215:14, 217:15, | **labs** | 116:10, 186:24 |
| **kinetic** | 223:6, 238:3, | 23:11, 38:21, | **leading** |
| 237:7 | 238:22 | 40:6, 40:7, 92:5 | 85:25 |
| **kinetics** | **knew** | **lack** | **learn** |
| 17:14 | 55:5, 74:7 | 156:22 | 33:8, 115:22 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

84

| | | | |
|---|---|---|---|
| **least** | 186:2, 221:12 | 187:22 | 84:18, 86:20, |
| 16:1, 61:11, | **levels** | **lines** | 117:22, 138:25, |
| 95:14, 96:12, | 64:14, 187:19, | 125:19, 154:1 | 140:13, 141:24, |
| 104:16, 123:4, | 187:23, 188:14, | **linguistics** | 155:24, 165:12, |
| 132:15, 133:20, | 236:6 | 47:13 | 185:21, 217:4, |
| 162:18, 221:25, | **lgc(** | **link** | 221:10, 221:12, |
| 230:25, 238:8 | 134:24 | 111:1 | 222:7, 224:15, |
| **led** | **license** | **liquid** | 237:18 |
| 6:3 | 2:40, 240:31 | 3:27, 35:24, | **llc** |
| **left** | **life** | 36:3, 87:4, | 1:6, 1:12, 2:17 |
| 59:11 | 232:1 | 87:6, 104:13, | **lloyd** |
| **legal** | **light** | 126:10, 148:25, | 126:9, 126:11 |
| 28:7 | 20:15, 141:22 | 201:10, 205:16, | **llp** |
| **length** | **likely** | 207:19, 210:16, | 2:2, 2:10, 2:20 |
| 141:25, 142:17 | 33:14, 33:22, | 213:21 | **load** |
| **less** | 66:20, 76:4, | **list** | 21:6 |
| 36:7, 84:21, | 77:1, 113:15, | 28:22, 52:20, | **located** |
| 86:3, 86:4, | 154:22, 167:18, | 65:22, 66:2, | 188:12 |
| 104:1, 104:14, | 169:18, 222:8 | 68:10, 69:5, | **lod** |
| 106:1, 106:17, | **limit** | 70:5 | 189:16, 189:25, |
| 106:20, 107:11, | 84:22, 188:23, | **listed** | 190:9, 190:11 |
| 138:25, 152:23, | 189:5, 189:13, | 30:2, 96:8, | **log** |
| 231:7, 236:1, | 221:8 | 98:16, 167:11 | 37:8 |
| 236:2, 236:17, | **limitation** | **listening** | **logic** |
| 236:18, 236:22 | 152:10, 207:11 | 135:6 | 159:3, 159:8 |
| **let's** | **limitations** | **listing** | **logical** |
| 42:11, 58:18, | 230:24 | 66:8 | 159:16 |
| 62:7, 73:11, | **limited** | **lists** | **long** |
| 75:2, 85:7, | 189:10, 189:11 | 35:21, 99:8 | 6:14, 12:25, |
| 114:8, 135:20, | **line** | **literally** | 67:23, 135:16, |
| 147:17, 148:3, | 183:8, 189:3, | 213:2 | 213:16 |
| 159:9, 159:11, | 221:9, 229:11 | **literature** | **longer** |
| 168:3, 174:8, | **linear** | 41:7, 41:8, | 155:21, 174:20 |
| 178:15, 178:22, | 137:16, 137:19, | 41:13, 41:22, | **look** |
| 183:24, 185:21, | 137:22, 182:12, | 41:24, 42:1, | 14:6, 24:22, |
| 188:3, 189:9, | 185:19 | 89:19, 111:24 | 30:18, 30:22, |
| 196:10, 198:3, | **linearity** | **litigating** | 32:8, 35:3, |
| 201:8, 213:19, | 134:18, 135:1, | 121:10 | 37:2, 37:7, |
| 216:20, 223:11, | 182:6, 182:8, | **litigation** | 41:17, 42:6, |
| 223:12, 224:5, | 182:11, 182:15, | 10:13, 34:15, | 49:2, 51:24, |
| 226:8, 230:21 | 183:1, 183:5, | 34:19, 120:19, | 52:2, 53:12, |
| **letter** | 183:11, 183:16, | 121:1, 127:19, | 54:2, 54:4, |
| 141:24 | 183:23, 183:25, | 162:12, 177:18, | 54:17, 60:7, |
| **letterhead** | 184:8, 185:2, | 213:20 | 65:4, 68:14, |
| 128:24, 129:25 | 185:4, 185:14, | **litigations** | 72:15, 75:2, |
| **level** | 185:23, 186:18, | 28:4 | 75:6, 79:5, |
| 61:19, 63:18, | 187:8, 187:12, | **little** | 79:18, 80:5, |
| 91:11, 91:15, | 187:14, 187:20, | 12:4, 60:23, | 83:11, 84:15, |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026                                    85

88:21, 89:11,
95:22, 96:18,
98:12, 98:15,
98:19, 98:21,
99:7, 114:2,
114:4, 115:19,
117:11, 119:9,
121:21, 122:4,
122:19, 124:1,
124:2, 127:11,
137:4, 138:16,
141:1, 148:4,
148:12, 148:15,
149:22, 150:16,
153:25, 158:9,
158:22, 162:11,
168:9, 169:4,
170:9, 170:19,
171:2, 171:22,
172:14, 174:8,
175:25, 182:21,
184:5, 186:21,
190:18, 198:3,
201:8, 216:20,
217:25, 226:10,
227:23, 229:4,
230:21, 233:15
**looked**
61:1, 65:11,
65:14, 65:17,
72:22, 81:15,
84:6, 91:12,
94:19, 103:11,
103:14, 113:2,
114:12, 117:18,
144:9, 144:10,
146:16, 172:13,
177:4, 231:25
**looking**
14:10, 18:8,
20:2, 20:22,
25:3, 62:8,
68:10, 86:8,
98:18, 113:8,
124:19, 125:11,
153:23, 207:17,
221:4, 223:13,
223:15, 225:8,

225:9, 227:11
**looks**
32:14, 49:5,
52:6, 129:24,
199:16, 233:22
**loq**
134:7, 134:14,
189:16, 189:25,
190:9, 190:11
**lost**
56:23, 225:1
**lot**
21:18, 23:13,
38:17, 144:8,
183:25, 215:15,
219:13, 231:18,
231:19, 233:2
**low**
61:19, 61:20,
63:18, 64:14,
131:4, 187:19,
188:14, 189:22,
221:12
**lowest**
189:11, 189:14,
189:19, 189:21
**luna**
174:9, 174:21,
175:1
**lunch**
120:6, 120:14
**lynparza**
15:10

### M

**machine**
37:17, 37:21,
37:23, 38:24,
53:8, 181:1,
181:18, 228:25
**machines**
37:25
**made**
10:14, 10:16,
10:21, 33:18,
81:18, 84:15,
116:8, 199:2,
218:10, 220:3

**magistrate**
135:20
**magnetic**
35:17, 37:16,
38:23
**magnitude**
60:8, 227:12,
229:18, 229:19,
229:22, 229:24,
229:25
**main**
16:23, 34:21,
109:10, 154:2,
154:6, 154:9,
154:11, 155:4,
215:24
**maintained**
167:8
**maintenance**
181:5, 181:6,
181:17
**major**
9:6
**majority**
25:23, 26:2,
26:15, 26:19,
26:22, 26:24,
27:2, 36:2,
36:7, 39:25
**make**
22:5, 27:1,
35:1, 40:15,
46:9, 51:18,
67:18, 82:17,
82:20, 91:17,
92:18, 95:19,
101:15, 101:19,
107:5, 112:6,
116:8, 140:22,
152:17, 169:16,
178:1, 178:22,
185:19, 192:25,
199:15, 206:13,
218:12, 224:20,
228:17
**makes**
230:10
**making**
200:3, 219:12,

220:15
**managing**
13:6
**manner**
2:35, 204:23
**manuela**
2:4, 5:15
**manufacturer**
119:21
**manufacturing**
116:9
**manuscript**
76:3
**many**
13:8, 13:19,
24:24, 25:12,
27:25, 28:3,
36:4, 36:6,
36:9, 39:8,
39:25, 40:1,
66:6, 68:24,
72:16, 74:17,
86:1, 97:16,
111:19, 112:7,
150:22
**map**
55:9
**mark**
2:10, 14:3,
30:14, 32:3,
35:6, 42:11,
50:15, 78:17,
88:25, 94:23,
98:1, 109:22,
117:10, 121:14,
128:13, 140:24,
145:6, 155:12,
158:1, 161:1,
161:20, 170:21,
238:24
**marked**
3:7, 4:2, 14:2,
14:4, 14:7,
30:16, 32:6,
35:9, 42:13,
50:18, 78:20,
86:10, 88:24,
89:1, 95:1,

98:4, 109:24,
117:13, 121:17,
128:10, 128:16,
141:2, 141:5,
145:9, 155:15,
158:5, 161:3,
161:22, 162:1,
170:10, 170:24
**market**
116:5, 116:11
**marketed**
90:23
**marx**
5:17
**mass**
58:3, 58:7,
77:16, 77:19,
107:25, 108:2,
128:2, 217:1,
235:14
**match**
74:22
**matched**
216:15
**material**
198:2
**materials**
147:10, 147:14,
191:12
**math**
36:23, 145:5,
208:1, 225:25,
227:15, 230:6
**matrix**
68:5
**matter**
5:3, 17:7,
17:11, 17:15,
24:21, 24:25,
25:1, 42:15,
56:1, 159:2,
229:15
**matters**
28:7, 180:18,
180:19, 240:7
**maximum**
118:19, 118:22
**maybe**
13:22, 16:15,

31:3, 60:11,
67:21, 72:15,
85:8, 122:5,
124:3, 136:2,
138:2, 139:9,
147:16, 166:21,
191:20, 224:18,
228:15, 228:20
**mean**
36:6, 46:5,
47:15, 47:18,
63:19, 64:3,
100:3, 116:17,
137:18, 143:16,
147:13, 164:19,
164:23, 166:10,
170:16, 190:17,
217:9, 219:21,
222:23, 224:7,
225:8, 225:10,
225:12, 225:14,
225:18, 227:23,
235:13, 235:14
**meaning**
41:16, 121:9
**meaningful**
235:13
**means**
62:16, 71:19,
89:16, 111:20,
111:22, 193:15,
223:4
**meant**
46:5, 127:14
**measure**
50:5, 139:3,
139:4, 153:3,
153:6, 183:6
**measured**
60:3, 60:4,
123:18, 134:15,
139:6, 139:8,
140:2, 152:24
**measurements**
104:20, 163:18,
164:4, 164:14,
164:22, 164:23,
167:16, 183:12,

183:18, 219:7,
228:8
**measures**
135:2
**measuring**
139:2
**mechanisms**
17:13
**media**
5:1, 19:24,
24:14
**medicinal**
17:8, 17:19
**meet**
9:5, 83:9
**memory**
18:13
**mentioned**
38:2
**mentor**
13:4
**mentoring**
234:14
**met**
84:17
**meter**
38:11, 38:13
**method"**
173:21
**methodologies**
29:13, 114:18
**methodology**
29:1, 29:3,
29:7, 29:10,
32:20, 40:4,
64:22, 64:25,
76:8, 76:10,
84:2, 85:7,
87:24, 88:3,
88:8, 88:15,
90:5, 95:20,
115:8, 120:3,
123:11, 126:5
**methods**
16:21, 40:8,
40:20, 40:23,
41:2, 41:3,
41:4, 68:24,

72:12, 72:22,
85:23, 89:16,
89:17, 90:12,
90:22, 93:12,
93:14, 93:15,
93:18, 111:19,
111:20, 111:21,
111:22, 112:8,
114:17, 146:8,
146:23, 149:8,
154:22, 154:23,
157:1, 168:13,
177:10, 178:18,
179:6, 179:9,
179:10, 179:11,
179:13, 179:16,
182:7, 187:5,
188:5, 189:20,
190:16, 192:19,
193:3, 194:19,
195:1, 195:22,
200:23, 211:12
**metric**
201:24
**mg**
199:17
**mgs**
206:15, 206:18,
207:24, 208:22,
213:24
**michigan**
11:12, 11:14,
12:12, 12:23,
12:24, 12:25,
13:2, 15:15,
17:5, 18:22,
21:3, 21:6
**micromanage**
7:12
**micromanaging**
8:23
**middle**
9:6, 10:1,
10:11, 79:12,
119:10, 145:20,
231:10
**might**
34:17, 67:14,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

87

80:7, 112:8,
170:8, 191:3,
193:5, 222:18,
237:18
**mikromol**
4:21, 145:8
**mil**
208:22
**miles**
12:15
**miller**
9:2, 9:3
**milligram**
214:20
**milligrams**
205:17, 205:23,
206:2, 206:6,
206:9, 206:10,
206:12, 206:13,
206:21, 206:25,
207:3, 207:23,
208:6, 208:19,
208:21, 208:23,
208:24, 209:1,
209:2, 209:5,
212:12, 214:10,
214:17
**milliliter**
201:12, 201:24,
204:8, 205:20,
206:2, 206:5,
206:22, 207:1,
207:24, 209:19,
211:11, 213:24,
214:14, 214:16
**milliliters**
201:22, 202:3,
214:5
**mind**
49:3, 162:4,
193:16
**mine**
80:5
**mini-helical**
75:21
**minor**
154:12
**minus**
119:23

**minute**
49:2, 75:7,
194:2, 222:20
**minutes**
7:2, 8:2,
160:17, 202:4
**mirrored**
67:8
**misconception**
111:12, 111:17
**misleading**
227:7
**misquote**
104:8
**misquoted**
220:17
**misrepresent**
191:13
**misstates**
92:2, 106:14,
113:24, 204:11,
205:1, 211:14,
211:24, 212:19
**misstating**
138:17, 210:8,
215:10, 215:13
**mistake**
173:13
**mittendorf**
2:10
**mix**
202:5, 202:25
**mixed**
202:23
**mixtures**
19:17
**ml**
199:17
**mobile**
49:6, 49:8,
49:12, 49:16,
69:12, 69:15,
159:24, 160:2,
160:8, 160:16
**mobilis**
75:20
**mode**
70:24

**model**
147:16
**modeling**
237:10
**modern**
3:26, 87:3,
126:10
**modification**
93:1, 114:14,
118:14, 118:25
**modification"**
93:9
**modifications**
118:24
**modify**
96:15
**modifying**
96:7
**moiety**
155:22
**molar**
142:6, 142:13,
142:15, 142:21,
142:24
**molecular**
59:5
**molecule**
30:11, 31:2,
31:11, 151:5,
151:9
**molecules**
19:11, 19:13,
19:20, 20:19,
57:20, 73:23,
150:23, 151:12
**mom**
73:21
**moment**
20:12, 55:15,
55:21, 117:12
**money**
27:1
**monitor**
5:8
**monograph**
3:32, 89:16,
96:4, 97:16,
97:22, 97:25,

98:2, 98:13,
100:22, 101:22,
111:21
**monographs**
90:22
**monohydroxy**
154:7, 154:9
**month**
230:19, 233:18,
235:9, 235:22,
235:25, 236:21
**months**
36:21, 68:4,
104:2, 104:4,
104:17, 107:9,
162:18, 178:9,
181:11, 181:12,
230:25, 231:5,
231:8, 232:2,
232:7, 235:4,
235:15, 236:1,
236:7, 236:20
**months"**
233:25
**more**
16:2, 23:5,
23:24, 25:4,
25:6, 25:7,
36:21, 40:21,
51:20, 53:10,
82:5, 102:1,
104:2, 105:19,
107:10, 120:3,
167:10, 180:4,
203:12, 237:18
**most**
14:11, 14:12,
22:13, 40:7,
107:11, 112:6,
119:23, 192:19,
236:2
**most-impurities--
counted**
61:5
**move**
136:16, 188:3,
195:10, 214:24
**much**
33:24, 48:1,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026                                            88

76:16, 84:21,
136:3, 145:17,
206:22, 231:16,
234:13, 236:2,
236:17
**muchin**
2:20, 5:21
**multiple**
48:21, 134:18,
189:23
**must**
207:22
**mustard**
31:12
**myself**
13:11, 51:22,
117:7, 122:17

**N**

**name**
11:4, 11:6,
15:8, 217:18
**nanometer**
58:11, 61:14,
130:13, 218:6,
218:11, 218:13,
218:21, 220:4,
220:23, 222:13,
235:23
**nanometers**
47:4, 47:7,
54:8, 54:11,
55:18, 55:23,
55:25, 56:14,
56:19, 60:15,
60:17, 61:12,
68:19, 69:9,
81:8, 83:12,
83:13, 84:20,
99:17, 102:7,
103:25, 104:16,
106:17, 119:24,
120:3, 123:5,
123:19, 125:17,
127:8, 127:18,
130:16, 130:19,
130:21, 130:22,
131:9, 131:10,

131:19, 131:22,
131:24, 162:18,
164:5, 164:25,
172:10, 172:12,
172:25, 173:2,
173:5, 173:13,
226:12, 235:19,
235:20
**nanometers"**
172:21
**natural**
19:2, 19:3,
19:8
**nd**
126:9
**nda**
93:16, 113:22,
114:17, 165:5,
171:13, 178:25,
179:14, 185:3,
185:23, 196:22,
198:15, 199:20
**necessarily**
2:36, 67:22,
69:17, 221:2
**necessary**
66:25, 124:23,
124:24, 129:21
**ned**
2:32, 5:9
**need**
7:8, 9:5, 18:8,
20:15, 24:1,
40:12, 40:22,
56:22, 74:4,
82:17, 83:9,
84:10, 91:18,
101:12, 107:2,
117:5, 141:8,
168:9, 177:2,
186:11, 200:9,
204:15, 213:6,
218:12, 223:9,
239:3
**needed**
6:4, 7:5, 7:20,
8:1, 39:5,
118:19

**needle**
70:20
**needs**
181:2
**negative**
71:19, 72:1
**negligible**
60:9, 60:12
**never**
64:13, 110:8,
120:18, 130:16,
138:24, 142:5,
142:11, 181:4,
184:17, 193:14
**new**
2:14, 48:20,
60:8, 91:4,
91:7, 92:16,
93:15, 93:16,
93:22, 94:21,
181:9, 186:16
**next**
49:17, 99:7,
112:4, 119:20,
126:7, 165:12,
169:8, 171:21,
186:23, 188:3,
188:22, 192:6,
192:15, 193:5,
194:21, 195:22,
235:3
**nf**
4:30
**niche**
34:17
**nickel**
19:24
**nitrogen**
31:12, 155:25
**nm**
3:25
**nmr**
37:18, 39:1
**nobody**
76:19
**nodding**
18:12, 26:12
**noise**
190:7

**non-bendamustine**
216:5
**non-passive**
26:13, 26:19,
26:22
**non-usp**
101:22
**none**
28:25, 72:22,
167:23, 218:1,
223:8, 230:17
**nonetheless**
32:21, 235:11
**nonsense**
10:17, 10:18,
10:19
**nope**
31:10
**normal**
239:4
**normalization**
77:13, 77:25,
78:1, 78:7,
78:14, 79:16,
80:23, 81:7,
92:14, 106:1,
107:23, 109:19,
123:8, 126:3,
127:20, 128:3,
134:11, 137:13,
137:15, 137:24,
140:4, 140:5,
142:25
**normalized**
77:17, 77:20,
77:22, 78:1,
81:1, 125:16,
125:21, 235:13
**north**
1:25, 2:5
**northwest**
2:22
**note**
2:34, 14:12,
60:23, 187:17
**notebook**
3:20, 51:1,
51:3, 200:17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

89

| | | | |
|---|---|---|---|
| **notebooks** | 186:1, 222:2, | **october** | 53:10, 55:7, |
| 51:21, 228:24 | 223:15, 226:10, | 233:12, 233:16, | 62:13, 62:15, |
| **noted** | 227:24 | 234:21 | 65:1, 86:15, |
| 212:1 | **numerically** | **offered** | 86:25, 87:2, |
| **notes** | 103:2 | 21:4 | 88:4, 88:13, |
| 24:22, 25:3, | | **offering** | 96:17, 107:5, |
| 25:15 | O | 238:11 | 109:17, 113:20, |
| **nothing** | **o'brien** | **offhand** | 114:16, 126:8, |
| 28:6, 44:9, | 2:32, 5:9 | 14:17, 140:21 | 136:21, 149:13, |
| 105:23, 137:1, | **o'clock** | **office** | 151:2, 151:5, |
| 191:8, 191:10 | 1:27 | 13:4, 94:13, | 152:5, 153:24, |
| **notice** | **objected** | 115:1, 118:8 | 155:4, 157:1, |
| 135:19 | 9:10, 10:3, | **official** | 158:6, 159:20, |
| **notify** | 12:1 | 87:24, 88:3, | 170:19, 171:18, |
| 116:22 | **objection** | 93:12, 93:13, | 179:2, 180:14, |
| **nowadays** | 9:4, 9:12, | 93:14, 93:18, | 184:5, 188:3, |
| 29:19 | 9:13, 9:19, | 93:23, 94:1, | 188:22, 189:9, |
| **nowhere** | 9:25, 10:7, | 94:10, 113:17, | 191:16, 192:6, |
| 153:2 | 10:9, 56:9, | 113:21, 114:17, | 202:25, 209:24, |
| **nuclear** | 71:18, 85:12, | 114:19, 126:9 | 210:3, 210:20, |
| 35:17, 37:16, | 88:16, 92:2, | **often** | 211:3, 216:4, |
| 38:23 | 106:2, 124:15, | 39:14, 39:16, | 223:12, 224:6, |
| **number** | 130:25, 131:11, | 39:20, 195:15 | 224:22, 224:24, |
| 3:7, 4:2, 4:34, | 131:25, 132:24, | **oftentimes** | 225:7, 229:25, |
| 5:6, 6:18, 25:9, | 135:12, 135:16, | 39:24, 39:25 | 230:2 |
| 31:3, 53:19, | 136:24, 140:10, | **oh** | **one's** |
| 65:1, 78:18, | 153:4, 160:13, | 97:2, 105:1, | 89:18 |
| 93:13, 94:14, | 162:21, 163:10, | 109:13, 164:18, | **one-off** |
| 103:1, 115:2, | 174:3, 187:9, | 205:10 | 34:23 |
| 117:23, 125:19, | 207:13, 209:22, | **old** | **ones** |
| 139:19, 140:8, | 210:22, 211:14, | 29:17, 31:14 | 42:7, 179:14 |
| 143:1, 143:6, | 211:23, 211:25, | **olson** | **oneself** |
| 145:21, 146:15, | 212:19, 218:23, | 134:21 | 149:14 |
| 147:16, 157:10, | 220:6, 222:4 | **omitting** | **only** |
| 170:21, 170:22, | **objections** | 134:20, 209:24 | 1:18, 53:20, |
| 171:6, 184:6, | 6:15 | **once** | 57:2, 59:4, |
| 191:15, 191:17, | **observed** | 28:9, 53:20, | 59:15, 62:13, |
| 197:1, 200:13, | 61:12, 61:19, | 228:24 | 62:21, 64:5, |
| 217:7, 222:17, | 125:22 | **one** | 65:14, 81:18, |
| 225:6, 230:11, | **obtained** | 6:7, 6:12, | 86:7, 89:15, |
| 230:14 | 17:4, 81:18, | 9:14, 14:13, | 91:12, 105:23, |
| **numbered** | 89:19, 111:23, | 16:1, 16:2, | 111:21, 129:10, |
| 79:1 | 198:7, 198:13, | 23:2, 31:14, | 130:19, 130:21, |
| **numbers** | 199:1, 219:11 | 34:14, 35:21, | 152:21, 209:23, |
| 102:25, 127:20, | **obviously** | 35:24, 39:8, | 238:25 |
| 128:3, 128:4, | 23:10 | 40:21, 50:3, | **opening** |
| 143:9, 152:3, | **occurs** | 51:6, 52:16, | 4:15, 42:16, |
| 152:9, 170:16, | 151:19 | 52:19, 53:6, | 44:10, 44:15, |

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

90

54:2, 65:22,
68:11, 78:19,
104:9, 105:3,
129:3, 134:8,
147:23, 148:13
**opens**
39:3
**operating**
51:3, 51:10,
112:9, 118:18
**opinion**
67:12, 104:13,
104:19, 105:5,
105:18, 105:20,
105:24, 106:20,
113:13, 121:6,
121:8, 124:12,
127:6, 136:8,
136:9, 162:15,
163:5, 164:3,
167:22, 175:2,
229:16, 229:21
**opinions**
90:10, 104:9,
106:10, 115:20,
135:14, 135:19,
161:10, 166:16,
238:11
**opposed**
167:4
**opposes**
8:19
**options**
16:17
**ora**
94:14, 118:5
**ora-lab**
4:8
**order**
6:8, 7:2, 7:19,
48:11, 68:4,
168:17, 229:21
**orders**
227:12, 229:18,
229:19
**ordinary**
166:6, 186:5
**organization**
34:13

**origin**
56:16
**original**
25:11, 239:1
**originally**
138:6
**other**
8:1, 9:1, 9:6,
11:6, 11:15,
11:17, 19:24,
22:6, 23:5,
26:8, 31:25,
34:19, 34:20,
37:6, 37:25,
38:1, 38:25,
43:17, 43:25,
44:5, 44:9,
46:10, 51:7,
57:18, 57:19,
85:6, 96:8,
103:14, 103:21,
106:8, 112:7,
112:23, 130:24,
133:6, 136:21,
137:1, 152:9,
159:14, 160:11,
163:15, 163:22,
167:23, 176:16,
178:23, 191:18,
195:6, 195:16,
203:15, 207:14,
213:17, 216:1,
229:6, 230:2,
231:17, 234:2,
234:6, 234:7,
234:16, 234:17,
234:22, 235:1,
236:7, 236:8,
236:12, 237:4
**others**
34:23, 55:12,
67:21, 83:1
**otherwise**
64:18, 232:17,
238:14
**ought**
139:11
**out**
21:7, 38:20,

39:6, 53:23,
54:21, 61:24,
69:14, 73:23,
88:24, 95:18,
100:10, 104:9,
114:22, 117:23,
117:25, 136:11,
162:11, 166:21,
169:20, 204:4,
219:21, 219:24
**outcome**
240:21
**outline**
13:23
**outlined**
67:4
**outside**
118:22, 195:5,
234:3
**over**
22:6, 46:10,
137:16, 137:19,
137:22, 138:21,
140:1, 140:9,
150:11, 150:22,
151:16, 182:12,
185:5, 185:16,
207:14, 213:17,
217:5, 221:7
**overall**
77:20
**overstates**
228:3
**owe**
234:13
**own**
8:16, 8:17,
11:17, 40:4,
67:6, 67:7,
85:7, 85:10,
103:25, 106:9,
112:9, 116:14
**owner**
13:6

---
**P**
---

**page**
3:2, 3:15,

27:5, 28:22,
35:8, 35:12,
35:16, 42:19,
51:21, 52:5,
52:13, 52:20,
54:4, 65:22,
75:6, 76:14,
79:3, 89:8,
89:12, 92:24,
95:22, 95:24,
96:18, 96:22,
97:1, 98:19,
98:20, 99:7,
99:12, 110:24,
111:10, 114:7,
114:9, 114:13,
117:22, 117:23,
117:25, 118:3,
118:4, 118:11,
119:10, 122:4,
124:3, 125:11,
128:15, 128:23,
129:10, 129:11,
129:19, 134:5,
141:1, 141:16,
145:8, 145:19,
145:21, 149:22,
162:10, 165:12,
166:20, 167:12,
171:4, 171:21,
172:14, 182:24,
186:21, 186:23,
188:22, 193:5,
194:21, 195:11,
196:25, 200:13,
217:15, 235:3
**pages**
3:20, 51:1,
51:4, 54:3,
193:6, 194:5,
195:10
**paper**
51:13, 86:12,
192:18, 222:21
**paragraph**
89:13, 93:11,
94:5, 104:25,
105:20, 110:16,

Case 1:24-cv-00065-JLH    Document 528-1    Filed 08/07/26    Page 135 of 361 PageID #: 31849
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

91

110:18, 111:10,
114:22, 114:23,
124:1, 125:13,
125:14, 134:4,
134:5, 134:8,
135:4, 135:9,
135:14, 136:19,
141:15, 146:1,
146:22, 147:2,
147:4, 148:8,
148:12, 162:11,
163:3, 163:6,
163:8, 164:2,
165:11, 165:23,
165:24, 165:25,
166:19, 170:10,
170:11, 171:19,
171:23, 175:25,
179:3, 180:7,
193:17, 196:10,
196:13, 198:4,
199:4, 199:8,
199:9, 201:9,
210:13, 213:19,
214:12, 214:25,
216:21, 216:24,
230:21, 231:9,
231:10, 233:14,
233:22
**paragraph-**
111:8
**paragraphing**
197:23
**paragraphs**
94:4, 134:13,
134:16
**parameter**
91:12, 103:11,
176:23
**parameters**
65:24, 66:13,
67:1, 67:5,
67:6, 67:7,
68:10, 68:15,
68:22, 69:4,
71:16, 71:24,
72:15, 74:23,
76:22, 77:1,

96:5, 96:17,
97:15, 98:16,
98:22, 98:25,
99:2, 100:9,
100:11, 100:14,
100:15, 100:19,
148:21, 166:3,
167:7, 171:11,
176:3, 176:8,
177:6, 180:18,
180:20, 194:16,
212:13, 218:18
**part**
7:7, 7:22,
7:24, 9:8,
13:14, 13:25,
14:14, 19:14,
22:12, 38:4,
55:7, 60:19,
80:6, 109:2,
109:7, 109:11,
112:20, 112:23,
160:2, 213:20
**part-time**
12:22
**particle**
175:16
**particular**
24:20, 24:25,
25:24, 34:14,
87:1, 100:9,
111:7, 123:25,
124:21, 125:13,
127:9, 127:10,
137:16, 189:17,
189:22, 216:17,
219:7
**particularly**
81:7, 136:4
**parties**
14:18, 28:10,
31:23, 240:19
**partner**
13:6, 34:12
**partners**
31:14
**partnerships**
13:3

**parts**
87:15, 181:9
**passage**
112:1, 113:16,
126:7
**passive**
26:10, 26:23,
26:25
**past**
38:22, 40:3,
41:23, 41:24,
86:13
**patent**
3:11, 30:15,
64:25, 65:7,
65:10, 65:11,
65:14, 65:17,
65:18, 68:14,
68:16, 68:18,
68:19, 68:21,
68:23, 69:6,
69:8, 70:18,
125:18, 152:2,
152:13, 152:21,
153:2, 153:13,
153:24, 153:25,
154:1, 155:18,
156:12, 205:6,
205:7, 205:9,
207:17, 208:12,
221:8, 238:13
**patentee**
27:19
**patents**
151:22, 151:25,
152:1, 152:8,
152:17, 153:24,
238:4, 238:9
**path**
141:25, 142:17
**pause**
146:14
**pay**
39:1, 39:4
**payroll**
13:2
**pcr**
38:18

**peak**
60:8, 60:15,
61:2, 61:13,
62:22, 77:13,
77:17, 77:24,
77:25, 78:6,
78:7, 78:13,
79:15, 80:22,
81:1, 81:7,
92:14, 104:15,
105:25, 107:23,
109:2, 109:19,
123:8, 125:16,
125:21, 126:3,
126:21, 127:20,
128:3, 134:7,
134:11, 137:13,
137:15, 137:23,
139:18, 139:22,
140:3, 140:5,
142:25, 152:24,
160:9, 162:17,
215:23, 215:24,
216:15, 218:9,
223:22, 235:13
**peak's**
78:10
**peaks**
54:17, 55:1,
55:4, 55:16,
56:13, 56:19, 56:24,
58:6, 58:13,
58:18, 58:20,
58:22, 59:2,
60:4, 60:5,
64:4, 64:5,
67:19, 78:4,
78:5, 78:9,
79:22, 79:25,
80:16, 80:19,
82:14, 82:23,
109:16, 109:18,
125:23, 154:12,
158:23, 188:14,
215:3, 215:4,
215:6, 215:19,
216:1, 216:5,

216:7
**peer**
113:14, 113:15
**peer-reviewed**
113:9
**pen**
222:21
**pennsylvania**
2:22
**people**
13:12, 13:13,
34:24
**peptide**
31:7
**percent**
49:6, 49:8,
74:15, 74:16,
74:17, 78:11,
79:9, 79:13,
79:20, 79:23,
80:13, 80:16,
80:19, 80:21,
81:3, 81:19,
82:5, 84:19,
84:22, 104:1,
104:14, 106:1,
106:17, 106:20,
107:10, 107:11,
109:4, 109:17,
116:18, 116:21,
122:6, 128:2,
139:7, 139:8,
139:9, 139:10,
139:16, 139:17,
144:4, 152:9,
152:23, 168:24,
180:4, 186:2,
200:10, 221:7,
222:24, 223:23,
223:24, 224:7,
224:13, 224:16,
224:19, 224:20,
224:22, 225:4,
225:6, 225:19,
226:12, 226:17,
226:23, 227:1,
227:5, 227:8,
227:16, 227:19,

227:21, 227:24,
236:2, 236:3,
236:9, 236:12,
236:13, 236:16,
236:17, 236:19,
236:21, 236:22
**percentage**
77:17, 77:19,
78:6, 107:25,
108:2, 109:1,
109:6, 143:20,
217:1, 227:10,
227:25, 230:1,
230:7, 230:8,
230:9, 230:10,
230:15, 235:14
**percentages**
77:12, 227:9,
227:18
**perform**
39:9, 39:14,
39:17, 45:18,
152:1, 199:17
**performed**
108:8
**performing**
134:25, 183:12
**performs**
133:20, 201:16
**period**
22:22
**permit**
96:14
**permitted**
96:20, 97:10,
115:25, 119:17
**person**
166:5, 175:12,
186:5
**personal**
12:5
**personally**
45:18
**persons**
101:14
**ph**
1:20, 3:3,
3:12, 3:18,

3:23, 3:30,
4:33, 10:23,
17:2, 17:4,
17:7, 17:18,
17:19, 19:10,
20:1, 20:12,
21:9, 23:8,
23:21, 32:13,
33:23, 34:4,
38:11, 38:13,
76:8, 76:18,
77:5
**pharma**
1:12, 2:17, 5:4
**pharmaceutical**
27:22, 72:20,
83:9
**pharmaceuticals**
1:5, 1:13,
2:18, 4:10, 5:3,
5:16, 90:23,
92:7, 121:16,
134:24
**pharmacopeia**
126:8, 126:17
**pharmacopeial**
96:7, 96:15,
146:9, 146:23,
149:9
**pharmaforensics**
12:21, 13:5,
13:9, 13:15,
34:6, 34:18,
34:20, 36:3,
39:9, 39:11,
39:13, 39:19,
40:6, 40:7,
42:2, 46:6,
51:2, 52:3
**phase**
49:6, 49:8,
49:12, 49:16,
69:12, 69:15,
73:22, 73:24,
100:4, 159:24,
160:2, 160:16
**phases**
160:9

**phenomenex**
174:9, 174:21
**phenomenon**
64:3
**phone**
6:17, 135:21
**phonomenex**
175:1
**phrase**
47:14, 49:20,
179:3, 190:2,
193:14
**phrases**
189:7
**physical**
13:14, 175:17,
175:20
**physically**
147:18
**pick**
61:18, 197:17,
197:19
**pikromycin**
19:15
**pill**
34:25
**pipetman**
23:18
**place**
5:10, 94:14,
115:2, 240:16
**placebo**
169:19, 200:11,
200:12, 200:14,
200:21, 200:23,
201:3
**placed**
231:12
**places**
93:13
**plainly**
102:1
**plaintiff**
72:18
**plaintiffs**
1:8, 2:9
**planet**
5:9, 5:24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026                     93

| | | | |
|---|---|---|---|
| **plate** | **position** | 198:24, 199:8, | **prior** |
| 176:22, 176:25, | 6:3, 7:14, | 200:15, 203:4, | 13:16, 31:19, |
| 177:5 | 28:13, 28:15, | 203:18, 203:21, | 75:17, 82:8, |
| **plates** | 89:25, 101:9, | 208:11 | 92:3, 105:14, |
| 38:13 | 101:12, 105:24, | **prepare** | 106:14, 138:18, |
| **play** | 126:19 | 199:9, 199:10, | 176:1, 181:19 |
| 33:1 | **possible** | 199:21, 214:21 | **probably** |
| **playing** | 7:15, 11:25, | **prepared** | 18:20, 24:23, |
| 10:2 | 57:25, 58:2, | 197:25, 198:6, | 26:21, 33:11, |
| **please** | 66:22, 74:21, | 198:23, 201:9, | 33:21, 40:15, |
| 5:12, 14:7, | 166:24 | 202:7, 210:12 | 42:4, 53:9, |
| 62:5, 64:9, | **possibly** | **prepares** | 67:9, 74:23, |
| 72:4, 105:11, | 58:7 | 197:25 | 76:14, 77:4, |
| 107:3, 114:3, | **post** | **preparing** | 113:11, 113:12, |
| 124:17, 146:17, | 77:4, 236:21 | 196:13, 199:5, | 169:3, 175:7, |
| 159:9, 162:5, | **postdoctoral** | 199:11 | 177:11, 179:20, |
| 204:17, 207:14, | 18:21, 19:1, | **prescribed** | 223:7 |
| 210:5, 215:14, | 19:4, 20:6, | 90:20, 190:12 | **procedure** |
| 238:25 | 20:18, 21:12, | **present** | 1:24, 51:3, |
| **plot** | 21:25, 22:24, | 2:30, 61:20, | 51:10, 96:8, |
| 183:6 | 23:8 | 230:25 | 96:9, 96:16, |
| **plus** | **potential** | **presented** | 112:10, 119:20, |
| 72:18, 119:23 | 99:8, 193:9, | 44:15, 59:16, | 119:22, 202:16, |
| **point** | 194:1 | 59:18 | 203:18, 203:21, |
| 22:25, 23:2, | **power** | **presenting** | 203:23 |
| 23:6, 44:13, | 88:2 | 103:24 | **procedures** |
| 61:22, 72:14, | **ppm** | **presently** | 118:5 |
| 82:1, 84:9, | 186:3 | 154:13 | **proceed** |
| 84:13, 84:14, | **practical** | **presumably** | 6:19, 10:20 |
| 98:18, 120:6, | 126:12 | 221:17 | **proceedings** |
| 122:14, 136:22, | **precisely** | **pretend** | 240:12 |
| 138:3, 148:4, | 67:8 | 191:13 | **process** |
| 168:1, 172:2, | **precision** | **pretty** | 167:10, 193:12, |
| 196:23, 198:17, | 67:20, 81:22, | 23:11, 23:12, | 196:4, 200:7, |
| 212:8, 217:6, | 82:1, 182:1 | 76:15, 83:10, | 200:24 |
| 229:11, 229:12, | **preclude** | 177:3, 195:3, | **processes** |
| 236:7 | 135:23, 140:4 | 224:8 | 116:9, 116:10, |
| **points** | **precluded** | **preventive** | 171:12 |
| 35:17, 88:13, | 136:9 | 181:6, 181:17 | **procured** |
| 167:25, 171:3, | **preliminary** | **previous** | 199:3 |
| 237:5 | 75:24 | 240:4 | **produce** |
| **pore** | **premised** | **previously** | 7:1, 7:18, |
| 174:22 | 127:21 | 55:11, 65:8, | 19:3, 104:20, |
| **posa** | **prep** | 72:8, 121:12, | 164:5 |
| 66:2, 66:25, | 52:18, 202:25, | 198:18 | **produced** |
| 71:15, 71:24, | 209:10 | **printed** | 14:13, 18:8, |
| 166:11 | **preparation** | 240:11 | 177:13, 177:17, |
| **posas** | 169:16, 170:2, | **printout** | 177:19 |
| 101:14 | | 35:7, 51:16 | |

Case 1:24-cv-00065-JLH    Document 528-1    Filed 08/07/26    Page 138 of 361 PageID #: 31852
HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

94

**product**
19:2, 19:17,
20:4, 43:7,
67:16, 104:1,
105:25, 116:18,
123:1, 148:25,
154:7, 154:8,
156:19, 157:8,
163:24, 173:4,
183:17, 187:18,
201:11, 201:22,
203:25, 204:1,
204:8, 204:12,
204:20, 204:22,
205:3, 208:4,
210:17, 212:17,
213:21, 237:2
**products**
18:1, 18:2,
18:8, 18:9,
18:16, 19:3,
19:8, 19:17,
20:3, 104:14,
148:24, 162:17,
169:23, 187:16,
203:7, 205:22,
206:11, 231:5,
234:17, 234:19,
237:5, 237:8,
237:11, 237:14
**professional**
33:24, 227:20
**professor**
12:24, 13:1
**profile**
148:23, 188:14,
202:24, 228:23
**profiles**
127:24
**profits**
26:14
**program**
17:2, 71:1,
99:5
**project**
34:15, 37:8,
41:14
**project-dependent**
23:10

**projects**
34:23, 36:5,
37:8, 40:1
**prompted**
45:5, 45:8
**pronounce**
30:8
**proof**
9:23
**proper**
134:17, 156:25
**property**
11:17, 11:22
**proposed**
94:9
**protein**
31:9
**protocol**
118:25, 153:5,
175:3, 228:24,
229:1
**prove**
91:7
**provide**
102:25, 177:23,
185:3, 190:22
**provided**
178:7, 181:5,
184:16, 220:10
**provides**
90:21, 184:12,
207:23
**providing**
101:15, 101:18,
166:15
**proximity**
228:15, 228:19
**public**
15:9
**publications**
28:23, 29:1,
29:20, 29:23,
30:2
**publicly**
15:4
**publish**
29:18
**published**
29:5, 29:9,

29:12, 29:15,
30:5, 89:16,
111:21
**pulled**
166:21, 202:10,
205:21
**purify**
19:22, 19:23,
19:25, 75:19
**purifying**
18:2
**purport**
93:25
**purpose**
34:20, 49:11,
105:16, 135:18,
160:11, 182:11,
199:11
**purposes**
17:20, 40:19,
41:16, 91:4,
91:9, 144:18,
152:2, 160:5,
186:7
**pursuant**
1:23
**pursue**
45:6
**put**
43:20, 50:4,
85:15, 88:18,
90:22, 95:6,
129:18, 136:6,
145:17, 158:7,
169:21, 232:12,
232:22
**puts**
100:10, 181:9

**Q**

**qualify**
215:7, 216:7
**quality**
116:5, 116:10,
116:15
**quantification**
188:23, 189:1,
189:2

**quantified**
77:12
**quantify**
125:14, 236:11
**quantifying**
215:1
**quantitate**
18:9, 189:15
**quantitated**
18:15
**quantitation**
123:8, 134:23,
188:24, 189:5,
189:13
**quantitative**
16:16, 16:19,
18:6, 18:10,
18:14, 18:17,
20:21, 20:23,
22:8, 29:6
**quantitatively**
103:7, 103:9
**question**
20:13, 26:5,
31:4, 39:15,
50:20, 56:8,
56:11, 56:22,
58:16, 62:1,
64:10, 82:18,
83:18, 92:11,
95:10, 100:13,
102:23, 107:18,
114:3, 115:13,
135:13, 135:17,
135:18, 136:13,
136:15, 136:17,
138:2, 140:7,
144:18, 144:22,
156:3, 176:18,
177:8, 178:13,
191:20, 203:12,
204:4, 204:17,
206:4, 206:5,
206:16, 207:9,
218:20, 219:15,
225:7, 228:7,
228:18, 232:17,
234:16

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

95

| | | | |
|---|---|---|---|
| **questioning**<br>161:17<br>**questions**<br>8:17, 12:5,<br>22:13, 23:13,<br>32:5, 143:17,<br>213:16, 238:17,<br>238:18, 238:19<br>**quick**<br>225:25<br>**quickly**<br>162:4, 162:7,<br>163:2, 170:9,<br>200:17<br>**quite**<br>24:4, 180:5<br>**quotations**<br>2:34<br>**quote**<br>2:37, 163:6<br><br>       **R**<br>**random**<br>201:19<br>**range**<br>21:20, 39:4,<br>131:4, 138:21,<br>139:10, 185:19,<br>188:4, 188:5,<br>188:16, 188:17,<br>188:19<br>**rate**<br>25:19, 25:21,<br>25:22, 39:2,<br>53:10, 69:24,<br>99:21<br>**ratio**<br>190:3, 190:9,<br>190:14, 191:24,<br>192:3<br>**raw**<br>177:12<br>**rcc**<br>224:6<br>**rcd**<br>57:1<br>**rce**<br>57:1, 59:3, | 224:10<br>**rch**<br>57:1, 59:3<br>**rci**<br>57:1, 59:4,<br>223:17, 223:22<br>**rcv**<br>59:3<br>**re-equilibrate**<br>49:8, 49:16<br>**reaction**<br>18:7, 237:10<br>**reactions**<br>18:2, 20:2,<br>20:3<br>**read**<br>2:35, 45:2,<br>62:2, 62:3,<br>68:21, 68:23,<br>75:17, 76:6,<br>76:16, 87:13,<br>87:15, 93:19,<br>94:15, 96:10,<br>97:19, 97:20,<br>106:11, 106:12,<br>111:15, 112:20,<br>112:21, 112:23,<br>112:24, 113:16,<br>118:8, 118:10,<br>119:1, 119:18,<br>119:25, 125:14,<br>125:25, 126:14,<br>131:16, 133:16,<br>135:5, 136:18,<br>146:13, 146:17,<br>146:25, 147:1,<br>148:17, 148:18,<br>149:2, 149:3,<br>151:22, 151:24,<br>152:6, 154:5,<br>154:14, 183:4,<br>192:23, 193:13,<br>193:16, 204:17,<br>204:18, 219:17,<br>219:19, 225:5,<br>238:5<br>**reading**<br>45:2, 45:5, | 45:12, 45:14,<br>52:6, 52:13,<br>104:24, 104:25,<br>135:7, 146:16,<br>147:3, 207:11,<br>210:13, 230:2<br>**readout**<br>229:5<br>**readouts**<br>228:25<br>**reads**<br>75:17, 79:13,<br>89:15, 94:8,<br>95:24, 96:19,<br>97:9, 119:11,<br>119:15, 119:20,<br>125:14, 134:5,<br>146:4, 154:5,<br>208:2<br>**really**<br>25:8, 26:5,<br>60:12, 68:5,<br>71:16, 76:18,<br>191:4, 202:19,<br>213:16, 229:17,<br>229:23, 230:11<br>**reason**<br>7:16, 34:11,<br>43:16, 64:24,<br>84:24, 94:17,<br>109:16, 119:6,<br>131:7, 131:12,<br>133:1, 156:10,<br>182:14, 236:19<br>**reasonable**<br>71:14<br>**recall**<br>14:24, 18:4,<br>27:20, 28:2,<br>28:13, 28:16,<br>37:3, 37:7,<br>41:11, 41:20,<br>44:16, 65:16,<br>87:1, 87:20,<br>88:18, 98:10,<br>113:16, 113:17,<br>117:20, 121:22,<br>121:24, 161:8, | 200:11, 214:2,<br>235:21, 235:24,<br>238:3<br>**recalling**<br>93:7, 217:22<br>**received**<br>44:13, 44:20,<br>84:14, 202:20,<br>212:25, 213:20,<br>234:21<br>**receiving**<br>44:12, 44:18,<br>214:2, 233:3<br>**recent**<br>14:11, 14:13<br>**recently**<br>94:12<br>**recess**<br>50:12, 102:15,<br>120:10, 153:19,<br>160:23, 192:11,<br>237:24<br>**recharge**<br>39:2<br>**recognize**<br>30:23, 32:10,<br>35:11, 42:17,<br>50:20, 78:22,<br>78:25, 79:2,<br>86:21, 89:4,<br>110:2, 110:4,<br>110:10, 128:23,<br>128:25, 129:23,<br>145:11<br>**recollection**<br>36:19, 126:25,<br>200:19<br>**recommendations**<br>175:4<br>**record**<br>2:36, 6:14,<br>8:24, 10:14,<br>10:22, 11:4,<br>50:10, 50:11,<br>50:14, 51:11,<br>62:3, 97:20,<br>102:14, 102:17,<br>106:12, 120:9, |

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

96

120:11, 131:16,
148:18, 152:6,
153:18, 153:21,
160:22, 160:25,
192:10, 192:13,
204:18, 213:14,
219:19, 223:8,
224:21, 237:23,
238:1, 238:21,
238:22, 239:6,
240:12
**recorded**
125:20
**recover**
169:17
**recovery**
82:5, 168:17,
168:24, 169:9,
169:11
**redirect**
238:17
**reduced**
240:10
**refer**
121:25, 130:9,
167:16, 167:19,
179:10, 194:2,
200:16, 230:20
**reference**
4:22, 27:6,
33:9, 42:5,
118:4, 132:2,
134:21, 145:16,
154:16, 197:23,
198:7, 198:12,
198:21, 198:25
**referenced**
3:8, 4:3, 41:17
**references**
87:16, 94:21,
165:15, 165:22,
165:23, 165:25
**referencing**
164:9, 164:23
**referred**
155:7, 198:18
**referring**
42:25, 107:19,

107:21, 112:2,
112:5, 118:11,
142:12, 142:13,
169:6, 198:1,
209:23, 223:16
**refers**
25:1, 155:19
**reflect**
202:19
**reflected**
2:35, 14:15
**reflective**
225:20
**reframe**
101:25
**regard**
101:20
**regarded**
101:14
**regarding**
4:18, 29:16,
29:20, 117:19,
120:16, 168:12,
175:10, 238:12
**regression**
236:5
**regular**
180:24, 239:5
**regulatory**
67:16, 90:12,
94:13, 115:1,
116:11, 118:9
**relate**
30:2, 105:19,
157:14, 230:24
**related**
4:25, 19:7,
55:6, 68:25,
82:25, 155:7,
155:14, 157:9,
157:14, 171:5,
184:2, 184:19,
184:22, 199:19
**relates**
38:10, 48:1,
105:18, 105:20,
142:17
**relation**
126:18

**relative**
4:23, 47:20,
47:22, 55:10,
57:3, 57:7,
57:19, 59:5,
123:23, 127:21,
127:25, 134:22,
154:10, 154:12,
216:10, 216:12,
217:19, 217:22,
240:17, 240:18
**relatively**
228:14
**relevance**
11:24, 11:25,
12:8, 12:13,
12:17
**relevant**
12:2, 188:8,
188:9, 232:25
**relied**
136:21, 166:18
**rely**
135:1, 166:6,
166:11, 166:15
**remember**
16:1, 16:3,
21:5, 21:8,
28:12, 33:23,
138:14, 168:22,
221:16
**remind**
122:17, 129:1,
140:19, 217:21
**reminded**
31:22
**removed**
147:18
**reneging**
6:23, 6:25
**repeat**
56:22, 62:1,
64:9, 73:25,
97:18, 100:13,
114:3, 124:17,
183:21, 204:15,
219:14
**repeated**
203:18

**rephrase**
92:11, 197:16
**replicate**
100:21
**replicated**
66:11, 66:15,
94:1, 100:5
**reply**
3:22, 3:29,
9:18, 44:21,
44:23, 88:14,
88:23, 89:12,
110:12, 133:8,
133:13, 134:4,
137:5
**reported**
2:39, 18:18,
25:13, 33:14,
43:6, 44:10,
54:18, 55:11,
62:18, 64:14,
75:18, 108:15,
130:10, 131:18,
132:23, 144:4,
179:19, 179:20,
199:20, 216:13,
216:16, 217:25,
218:4, 218:13,
218:19, 218:21,
219:9, 220:4,
222:2, 226:3,
226:22, 227:1,
231:25, 232:5,
234:3, 238:12,
240:9
**reporter**
1:22, 2:34,
5:23, 22:14,
22:16, 23:19,
38:12, 38:15,
46:14, 86:18,
97:23, 104:3,
108:1, 108:22,
125:6, 128:19,
142:8, 185:9,
206:17, 240:2,
240:29
**reporting**
54:7, 54:10,

| | | | |
|---|---|---|---|
| 54:13, 116:19, 191:22, 192:2, 222:11 | **requirements** 85:20, 89:25, 95:18 | 46:20, 47:14, 47:19, 47:22, 47:23, 104:15, | 222:14 |
| **reports** 6:5, 104:6, 105:5, 105:9, 106:14, 106:22, 130:23, 132:24, 135:12, 135:18, 135:24, 136:8, 136:24, 156:12, 235:9 | **research** 15:18, 15:20, 16:8, 32:25, 34:13, 174:19 | 123:23, 124:9, 125:16, 126:21, 127:22, 127:25, 128:7, 133:13, 133:21, 134:17, 134:22, 137:21, 139:18, 139:23, 140:8, 140:16, | **retained** 24:19 **retention** 55:5, 55:9, 55:11, 57:4, 57:7, 57:11, 57:19, 59:5, 61:25, 154:10, 154:12, 216:11, 216:12, 217:18, 217:19, 217:22 |
| **represent** 5:13, 35:7, 42:22, 162:1, 213:4, 233:16 | **reserving** 161:19 **residences** 11:15 | 142:19, 143:19, 144:5, 152:24, 162:17, 182:12, 183:7, 185:4, | **return** 102:23 **revalidate** 92:9, 95:19, |
| **representation** 10:16, 202:23 | **resident** 13:4 | 185:16, 186:11, 217:23, 217:24, 235:14 | 96:14, 101:10, 117:5 |
| **representative** 43:22, 43:23, 206:9 | **resonance** 35:17, 37:16, 38:24 | **responses** 220:9 | **revalidation** 96:9 |
| **represented** 27:12 | **respect** 6:18, 21:15, 21:17, 21:23, | **rest** 158:23, 224:16 **restate** | **revealing** 36:15 **reverse** 73:24, 100:4 |
| **representing** 5:9, 5:24, 67:15 | 25:14, 34:6, 40:24, 42:15, 55:22, 56:13, 56:18, 56:19, | 39:15, 191:20 **restriction** 115:9 | **review** 45:22, 90:25, 152:16, 200:9 |
| **represents** 150:11, 227:5 | 56:24, 58:10, 58:18, 58:22, 59:2, 81:6, | **result** 60:18, 64:16 **resultant** | **reviewed** 113:14, 113:15, 122:20, 170:12, |
| **request** 6:8, 7:24, 10:15, 178:1, 178:6, 231:19 | 84:4, 89:3, 95:3, 103:12, 117:15, 152:22, 161:6, 163:17, | 19:17 **resulted** 208:5 **resulting** | 238:4 **rf** 132:4, 144:14, 218:9, 219:3, |
| **requested** 62:3, 97:20, 106:12, 131:16, 152:6, 204:18, 219:19, 233:2, 233:3 | 163:23, 164:11, 164:19, 168:3, 168:10, 171:11, 180:23, 184:1, 216:5, 220:3, 220:14 | 215:8, 216:7 **results** 42:2, 54:3, 54:7, 54:10, 54:13, 74:1, | 223:25 **rfs** 47:1 **right-hand** 130:6, 145:25, 146:21 |
| **require** 91:4, 91:25, 96:9, 134:18, 206:21, 207:18 | **respective** 59:9 **respectively** 55:16, 56:25, | 78:16, 83:14, 83:16, 84:21, 102:3, 102:4, | **rigorous** 167:10 **risk** 181:15 |
| **required** 92:16, 92:22 | 57:1, 59:3, 134:10 | 102:5, 103:24, 104:21, 105:7, 105:17, 156:23, | **rna** 75:21, 76:1 |
| **requirement** 101:10, 149:16, 186:8, 186:10, 230:19 | **respond** 116:22 **responds** 47:20, 47:24, 194:17 **response** 4:23, 46:18, | 164:6, 168:1, 191:22, 192:2, 218:8, 220:24, 221:1, 222:1, | **road** 11:11 |

| | | | |
|---|---|---|---|
| **robustness** 91:11, 103:12, 194:22, 194:25, 195:4, 195:7 **role** 13:2, 33:1 **ronald** 15:19 **rosenman** 2:20, 5:21 **rough** 222:7, 239:1, 239:3, 239:5 **roughly** 25:17, 36:14, 39:14, 39:16 **routine** 72:16 **routinely** 23:4, 23:5 **row** 172:20, 230:2 **rpr** 2:39 **rrf** 127:25, 130:7, 130:10, 131:2, 131:23, 132:4, 137:15, 137:19, 138:7, 138:21, 139:4, 139:6, 139:8, 139:11, 139:15, 139:23, 140:2, 144:12, 144:19, 144:24, 159:4, 159:17, 217:2, 217:4, 217:19, 217:21, 218:3, 218:5, 219:1, 219:5, 219:6, 219:9, 219:20, 221:9, 222:2, 224:3, 224:8, 224:10, 224:17 **rrfs** 130:23, 131:8, 131:18, 132:6, | 132:22, 133:5, 134:6, 134:9, 135:11, 136:23, 137:9, 137:13, 138:5, 138:6, 138:13, 139:2, 144:12, 145:22, 146:4, 146:10, 146:15, 146:21, 149:11, 159:6, 159:14, 217:25, 218:13, 218:21, 220:10, 220:13, 220:22, 221:5, 222:12, 224:18, 224:23, 226:3 **rrt** 60:11, 154:10, 154:13, 154:17, 154:20, 155:1, 155:3, 156:12, 156:15, 156:22, 216:16 **rrts** 157:2 **rsd** 178:15, 178:18, 178:20 **rsd's** 179:16 **rsds** 179:17, 180:4, 182:3 **rude** 223:6 **ruggedness** 194:10, 194:13, 194:18 **rule** 9:22, 9:24, 10:8, 128:18, 128:21, 135:18, 136:10 **rules** 1:24, 111:18, 129:8, 136:3 **run** 40:9, 48:14, | 48:15, 49:13, 64:5, 70:17, 82:3, 84:7, 109:7, 168:15, 168:21, 227:9, 228:24, 235:18, 235:20 **rundown** 38:8 **running** 181:15, 181:19 **runs** 49:25 **rush** 239:4 ---S--- **s** 101:9 **said** 6:7, 7:1, 7:5, 7:10, 7:18, 7:25, 8:7, 8:11, 10:22, 28:3, 70:6, 75:14, 112:6, 112:13, 113:20, 127:13, 136:7, 148:11, 152:22, 157:19, 178:4, 178:23, 198:6, 207:9, 207:10, 215:18, 220:21, 225:4, 234:11, 240:15 **saith** 239:7 **sake** 8:21 **salary** 26:14 **sale** 213:2 **same** 9:14, 47:15, 48:14, 48:16, 54:14, 58:14, 59:10, 59:13, 59:15, 59:17, | 60:2, 60:3, 60:25, 61:14, 61:15, 62:10, 63:5, 63:14, 64:5, 66:23, 67:1, 68:22, 71:16, 72:22, 72:23, 73:22, 74:10, 74:18, 77:9, 81:16, 83:11, 83:13, 84:7, 85:7, 91:14, 91:24, 92:19, 103:15, 104:21, 108:15, 115:8, 115:23, 128:8, 131:23, 132:23, 137:13, 139:11, 140:23, 142:24, 143:3, 144:11, 147:8, 147:16, 147:17, 153:4, 157:2, 159:17, 164:6, 170:4, 174:15, 174:16, 174:21, 175:13, 175:16, 175:17, 175:18, 176:16, 180:10, 186:21, 196:20, 202:21, 206:14, 208:17, 208:23, 208:25, 209:1, 209:3, 211:3, 219:1, 220:6, 220:15, 221:3, 224:15, 225:22, 226:16, 227:22, 228:5, 228:9, 229:1, 229:6, 229:13, 230:2 **sample** 43:24, 52:18, 53:9, 53:19, 53:20, 56:6, 57:13, 57:16, 59:9, 59:12, 59:13, 59:16, |

**samples**
59:18, 59:20, 59:23, 60:3, 60:24, 60:25, 62:8, 62:19, 63:16, 63:17, 68:6, 70:11, 70:14, 81:16, 83:13, 109:8, 141:22, 168:18, 168:23, 168:24, 169:20, 169:21, 185:8, 186:1, 186:25, 189:12, 190:19, 193:22, 193:24, 199:8, 201:9, 202:11, 202:25, 203:1, 203:3, 203:18, 203:20, 204:9, 206:10, 209:9, 209:13, 210:12, 211:17, 223:24, 225:21, 226:11, 226:16, 226:18, 226:19, 226:25, 228:13, 230:18

**samples**
40:14, 43:6, 43:9, 43:12, 43:23, 48:12, 53:15, 55:8, 59:16, 60:2, 61:12, 188:11, 202:7, 202:12, 202:19, 202:20, 202:22, 206:23, 208:10, 213:5, 214:21, 225:21, 231:12, 231:16, 232:6, 232:23, 233:2, 233:4, 233:12, 233:23, 234:3, 234:8, 234:9, 234:16

**sampling**
43:22, 43:24, 182:3

**satisfy**
76:18, 77:5

**save**
42:2

**saw**
7:11, 34:12, 63:14, 81:19, 84:17, 84:21, 91:14, 95:9, 130:18, 130:20, 188:13, 197:18, 216:15, 218:9

**saying**
7:16, 15:6, 57:2, 74:18, 84:8, 96:25, 100:6, 105:6, 136:21, 138:14, 201:7, 209:22, 212:2, 213:15, 229:2, 235:10

**says**
15:18, 52:13, 52:21, 52:22, 52:24, 53:6, 79:19, 92:25, 97:3, 110:20, 115:16, 118:18, 130:3, 130:7, 141:21, 149:8, 149:20, 150:16, 150:24, 152:13, 166:25, 169:4, 169:9, 171:4, 172:3, 172:21, 174:9, 182:21, 183:4, 183:11, 184:8, 186:22, 194:21, 195:25, 200:14, 201:9, 201:20, 205:15, 206:24, 207:3, 212:3, 213:20, 213:24, 216:25, 233:14, 233:23, 236:16

**scan**
150:22

**scanned**
150:11

**school**
20:10, 33:25

**schuler@lw**
2:8

**science**
34:22, 72:14

**scientific**
89:19, 111:24, 229:16

**scientifically**
33:19, 33:22

**scope**
208:11

**scott**
15:19

**scratch**
40:5, 67:13, 67:25

**se**
32:20

**search**
41:13, 41:22, 42:1, 42:3

**searched**
174:18

**searches**
41:7, 41:25

**searching**
33:9

**second**
28:21, 93:2, 98:20, 98:22, 99:11, 99:13, 111:9, 111:10, 132:5

**section**
75:11, 92:24, 93:6, 93:8, 95:23, 96:2, 96:19, 114:5, 114:8, 114:12, 114:13, 145:20, 168:7, 169:8, 172:17, 183:1, 183:5, 192:15, 197:2, 200:14

**sections**
167:19, 167:23

**seeing**
60:14, 60:17, 121:22, 229:19, 235:21, 235:24

**seeking**
91:22

**seem**
66:11, 93:20, 105:17, 217:21

**seems**
80:8

**seen**
14:8, 14:9, 30:19, 93:6, 95:4, 95:16, 98:9, 110:8, 117:16, 141:6, 141:12, 142:5, 142:11, 145:12, 161:7, 161:14, 191:1, 227:21, 238:8, 238:10

**select**
210:21, 211:3

**selected**
198:14, 198:15, 210:24, 211:2, 214:13

**selecting**
201:10, 201:17, 210:13, 218:18

**sell**
92:7, 203:5, 204:1, 205:3, 212:17

**sells**
203:8, 212:22, 213:4

**send**
8:25

**sense**
25:12, 27:21, 47:20, 67:23, 101:16, 101:19, 112:7, 121:5, 230:10

**sent**
9:2

**sentence**
112:4, 119:18, 119:20, 148:15, 148:17, 149:3, 149:20, 154:2, 165:8
**separate**
6:5, 7:20, 8:1, 8:4, 19:11, 38:5, 38:6, 60:18, 61:24, 62:18, 109:1, 109:6, 109:14, 109:15, 207:2, 207:10
**separated**
19:18
**separates**
73:23
**sequence**
52:24, 53:1, 53:5, 55:7
**series**
35:16, 62:13, 62:15, 98:22
**service**
34:17
**serviced**
181:19
**sessions**
7:20, 8:2
**set**
43:17, 124:11, 240:22
**sets**
108:15, 162:11
**setting**
26:25, 55:15, 55:21, 211:20
**setup**
37:10, 38:4
**seven**
43:25
**several**
26:6, 42:5, 87:2, 183:12
**several-page**
50:16

**severe**
33:6
**shapes**
160:9
**shared**
6:6, 7:25, 8:12
**shares**
165:22
**sharing**
8:7
**sharpen**
160:9
**sheets**
157:24
**shelf**
85:16, 232:1
**shelves**
43:21
**shigellosis**
33:2, 33:5
**shorthand**
1:22, 240:2, 240:29
**should**
9:9, 13:3, 15:9, 61:2, 78:11, 95:18, 133:11, 149:13, 165:19, 177:3, 236:16
**show**
10:1, 30:12, 97:24, 144:15, 157:12, 182:12, 233:1
**showed**
132:11, 235:25
**showing**
105:16
**shown**
151:2
**shows**
9:5, 61:22, 106:17, 107:9, 149:25, 150:3, 150:9
**shred**
86:14

**shut**
53:10
**shutdown**
53:6
**sic**
112:8, 188:23
**side**
95:6, 145:25
**sift**
213:14
**signal**
47:20, 47:24, 47:25, 190:6
**signal-to-noise**
190:3, 190:9, 190:14, 190:18, 190:20, 191:1, 191:9, 191:10, 191:24, 192:3
**signature**
42:20, 89:9, 122:6, 122:9
**signature-mig2k**
240:27
**signatures**
51:20
**significance**
60:13, 226:8, 228:1
**significant**
61:7, 146:11, 149:12, 230:11
**significantly**
83:14, 83:15, 102:3, 222:8, 222:10
**signing**
51:22
**silly**
135:13, 135:17
**similar**
68:15, 75:14, 76:9, 81:19, 82:13, 91:15, 102:3, 102:4, 102:5, 103:16, 103:17, 103:21, 105:7, 105:16,

132:23, 144:15, 188:15, 195:3, 218:8, 227:13
**similarly**
79:18
**simple**
78:3, 83:10
**simplify**
215:20
**simply**
42:25, 43:18, 84:6, 90:1, 105:6, 218:15, 228:1
**simultaneously**
53:23, 134:25, 188:13
**since**
39:19, 44:23, 67:15, 76:13, 183:15, 183:20
**single**
129:19, 134:14, 134:15, 135:14, 183:12, 203:2, 223:2
**single-most**
192:18
**single-point**
135:1
**sir**
7:23, 10:3, 16:3, 18:10, 19:21
**sit**
8:15, 90:18, 91:2, 124:12, 124:19, 138:20, 158:19
**sitting**
180:3
**six**
35:21, 36:21
**size**
99:19, 174:22, 175:3, 175:16
**skill**
101:15, 166:6,

Case 1:24-cv-00065-JLH   Document 528-1   Filed 08/07/26   Page 145 of 361 PageID
#: 31859
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

101

186:5
**skip**
163:2, 194:5
**slayback**
1:12, 2:17,
5:4, 5:18, 6:9,
7:17, 25:1,
25:14, 40:20,
40:25, 41:6,
41:17, 43:1,
43:3, 43:12,
43:21, 44:25,
45:17, 48:8,
48:14, 48:18,
48:23, 50:6,
53:2, 53:4,
53:15, 55:12,
65:2, 66:16,
66:23, 67:2,
67:4, 67:8,
69:2, 70:15,
77:11, 81:18,
84:4, 84:15,
84:17, 84:25,
85:10, 87:22,
91:5, 91:13,
91:23, 92:5,
92:12, 98:12,
100:5, 102:6,
103:1, 104:1,
105:25, 107:8,
107:18, 107:21,
108:7, 108:19,
116:13, 116:20,
121:9, 123:22,
127:7, 127:16,
127:19, 130:7,
130:16, 130:18,
130:20, 130:23,
131:8, 147:8,
147:11, 149:5,
154:20, 154:24,
156:14, 156:19,
157:8, 161:18
**slayback's**
43:7, 49:5,
64:21, 65:23,
66:12, 66:17,

74:16, 85:8,
88:15, 94:1,
104:13, 108:4,
109:5, 120:2,
130:10, 130:13,
131:18, 144:10,
144:14, 147:19,
147:24, 148:7,
148:22, 148:25
**slight**
229:9, 229:12
**slightly**
221:6, 224:3
**slope**
186:23
**slow**
191:18, 191:19,
213:6
**small**
18:2, 19:11,
19:13, 19:19,
20:19, 31:11,
63:4, 66:22,
186:22
**smith**
4:18, 8:20,
44:13, 133:19,
134:6, 134:19,
134:24, 136:12,
139:3
**smith's**
44:18, 44:20,
45:3, 45:12,
133:14, 133:16,
133:24, 134:13,
135:10, 136:22,
137:6, 141:4,
144:19
**snapshot**
228:14
**sneak**
9:17
**snyder**
113:17, 118:11,
126:10, 126:12,
165:16, 165:19,
166:2, 166:4,
181:24

**soft-spoken**
22:16, 22:18
**software**
177:16
**sold**
198:21, 203:7,
204:23, 204:24
**solid**
73:22, 198:21
**solution**
134:8, 134:15,
196:15, 197:17,
197:21, 197:22,
197:24, 198:1,
198:19, 198:23,
205:21, 208:5,
209:4, 209:7,
209:8, 211:11,
211:12, 211:21,
214:16, 214:20
**solvent**
50:2, 159:20,
159:22, 160:1,
160:3
**solvents**
159:21
**some**
15:20, 16:17,
18:9, 19:15,
19:16, 19:24,
26:18, 32:5,
39:6, 43:16,
44:12, 51:6,
60:9, 60:18,
63:4, 64:24,
67:14, 67:20,
67:21, 80:6,
105:14, 123:4,
139:2, 139:4,
139:7, 154:2,
154:5, 162:8,
163:16, 167:11,
168:4, 170:11,
171:3, 171:11,
174:18, 189:20,
195:22, 222:18,
222:21, 226:10,
232:9

**somebody**
68:20, 68:23,
74:17
**somehow**
160:10
**someone**
44:2, 72:8,
73:4, 73:25
**something**
8:24, 9:18,
35:3, 60:10,
64:12, 86:17,
96:13, 102:8,
108:12, 113:21,
146:17, 153:12,
155:3, 166:12,
177:17, 180:24,
184:16, 191:3,
197:12, 197:18,
198:13, 198:14,
200:6, 203:19,
227:13, 232:22
**sometimes**
34:24, 35:3,
68:4
**somewhere**
89:20, 111:25
**sonicated**
202:3
**sorry**
20:8, 20:9,
26:23, 46:11,
50:10, 62:1,
65:21, 103:18,
131:15, 135:8,
141:9, 146:18,
146:20, 152:4,
164:18, 176:12,
181:24, 182:24,
189:2, 197:6,
198:20, 207:15,
217:15, 224:25,
225:10
**sort**
19:17, 33:24,
50:3, 60:9,
61:4, 72:23,
79:12, 96:23,

Case 1:24-cv-00065-JLH    Document 528-1    Filed 08/07/26    Page 146 of 361 PageID #: 31860
HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

102

119:9, 145:20, 166:5, 168:17, 194:16, 229:16, 236:4

**sounds**
37:3, 44:14

**source**
52:21, 52:22, 52:23, 197:8, 198:2, 198:3, 202:21

**sourced**
197:11

**south**
11:11

**space**
13:14

**sparschu**
2:12, 5:19, 141:9, 152:18, 152:20, 158:13

**speak**
104:6, 105:9, 106:14, 106:22, 132:24, 135:12, 136:24

**speaking**
6:14, 191:17

**speaks**
88:16, 104:6, 124:15, 148:2, 162:21, 163:10, 165:7, 166:2, 187:10

**spec**
58:7, 236:16

**specific**
37:3, 72:16, 155:1, 184:1, 223:15, 224:21

**specifically**
39:5, 125:20

**specification**
118:20, 238:14

**specifications**
118:23

**specificity**
192:6, 192:16,

193:3

**specified**
100:14, 119:16, 119:21, 240:16

**specifies**
68:18, 68:19

**specify**
69:9

**spectra**
146:5, 150:17

**spectrometer**
37:19

**spectroscopy**
20:25, 21:4, 21:10, 21:13, 21:14, 21:21, 35:18, 37:21, 58:3

**speculate**
95:15

**spell**
28:18

**spend**
148:10

**spent**
24:25, 25:13, 72:21, 77:2, 226:2

**spiked**
169:11, 169:18

**spiking**
193:9

**spiral**
78:18

**split**
7:10

**spot**
81:22

**spread**
222:19

**square**
13:19

**square-foot**
37:12

**stability**
38:19, 107:8, 201:1, 231:13, 235:12, 235:18,

235:25, 236:15, 237:2

**stand**
236:19

**standard**
51:3, 51:10, 77:23, 81:21, 82:4, 82:7, 82:13, 82:22, 108:5, 108:14, 111:18, 112:9, 117:4, 117:8, 168:16, 169:5, 169:18, 179:21, 182:4, 189:19, 189:21, 196:14, 196:15, 196:21, 197:2, 197:8, 197:12, 197:17, 197:22, 197:24, 198:1, 198:7, 198:12, 198:18, 198:21, 198:23, 198:25, 199:5, 199:9, 199:10, 199:12, 199:13, 199:15, 199:18, 211:17, 239:4

**standardized**
93:18

**standards**
4:22, 108:11, 108:13, 108:17, 108:20, 134:22, 199:21

**stands**
167:6, 171:16

**start**
67:24, 193:8, 230:9

**started**
34:18

**starting**
28:21, 34:13, 72:14

**starts**
146:23

**state**
1:23, 5:13,

11:3, 209:21, 240:2, 240:30

**stated**
138:24, 146:10, 149:11

**statement**
63:23, 112:25, 149:13, 156:4, 159:5, 161:9

**statements**
33:17

**states**
1:1, 1:24, 5:5, 173:8, 228:4

**statistical**
189:20, 236:5, 236:10

**statistics**
189:24, 190:1

**stenographically**
240:10

**step**
134:19, 200:23, 201:16, 209:12, 209:23, 210:2, 211:10

**steps**
53:2, 67:15, 199:18, 209:25, 211:3, 211:21

**sterile**
201:21, 205:15, 207:18, 207:22

**stick**
35:4, 49:15

**sticker**
86:16

**stickiness**
49:14

**still**
43:25, 72:1, 139:22, 140:3, 208:17, 208:19

**stir**
38:13

**stock**
196:14, 197:17, 198:3, 198:6,

199:9, 199:15,
211:17, 211:21
**stop**
8:22, 105:17,
107:3, 112:1
**storage**
231:1
**stored**
232:6, 233:24
**story**
106:25
**straight**
183:7
**streams**
26:7, 26:8
**street**
2:13
**strike**
56:3, 89:24,
101:2, 101:8,
111:8, 126:5
**structure**
30:13, 30:23,
30:24, 58:6,
58:8, 155:10,
155:21, 157:13,
158:21, 158:24
**structures**
59:5, 175:18,
175:21
**struggle**
50:1
**struggled**
72:6
**studies**
16:23, 19:10,
33:14, 67:21,
131:21, 135:1,
156:11, 156:18,
168:11, 180:22,
182:8, 183:16,
183:23, 183:25,
185:14, 187:8,
187:14, 188:4,
188:20, 190:8,
190:12, 193:25,
194:24, 195:12,
236:15, 237:7,

237:10
**study**
103:6, 103:9,
103:12, 122:23,
131:8, 131:9,
131:19, 182:11,
182:15, 185:23,
186:6
**studying**
33:1, 139:10
**stuff**
191:14
**sub1**
1:6
**subject**
17:7, 17:11,
17:15, 118:24,
146:5, 161:16,
238:17
**subjected**
28:1
**submission**
44:23, 165:5
**submitted**
44:20, 162:2
**subsequent**
209:24
**substance**
60:9, 150:17,
184:19
**substances**
55:23, 55:24,
56:25, 57:1,
57:7, 68:25,
171:5, 184:22
**substantive**
102:20
**substrate**
20:4
**substrates**
20:3
**successfully**
148:21
**sudden**
9:4
**suffice**
225:24
**sufficient**
162:16

**suggest**
230:12
**suggested**
75:25, 148:21
**suggests**
83:15, 102:4
**suit**
30:15, 69:6,
69:8, 151:22,
151:25, 152:1,
152:9, 152:13,
153:24, 238:4
**suitabilities**
167:20
**suitability**
81:21, 148:20,
167:7, 167:18,
176:3, 176:23,
195:10
**suite**
2:5, 2:23
**sum**
78:4, 78:10
**summarize**
32:24
**summing**
78:8, 109:2
**super**
74:6
**superseded**
174:20
**supplemented**
159:24
**supplied**
43:12
**supplier**
35:1
**support**
34:15, 34:19,
106:10, 106:19
**supposed**
129:17
**supra**
126:13
**sure**
21:1, 21:7,
22:5, 32:23,
34:1, 35:2,

39:10, 40:15,
46:9, 48:6,
57:25, 58:1,
58:2, 58:4,
61:17, 67:19,
73:14, 82:18,
82:20, 86:24,
87:7, 87:16,
87:17, 88:22,
90:24, 98:1,
113:4, 116:8,
131:20, 139:5,
140:22, 149:18,
152:17, 157:15,
163:4, 168:5,
168:8, 169:16,
171:8, 177:4,
177:25, 178:22,
179:23, 185:19,
187:4, 188:1,
192:21, 192:22,
192:24, 196:12,
200:10, 200:18,
201:5, 204:5,
204:16, 215:21,
215:25, 222:21,
223:14, 224:21,
228:17
**surprise**
33:8, 33:11,
115:22
**surprised**
25:7
**suspect**
133:7
**switch**
53:8
**sworn**
5:25, 6:1,
10:25, 240:6
**synder**
86:25, 87:5,
87:12
**synopsis**
171:9
**synthesis**
18:2, 39:6
**syringe**
201:21

**system**
81:21, 99:14, 148:20, 167:7, 167:18, 167:20, 168:20, 176:3, 176:23, 180:8, 180:10, 180:14, 180:23, 180:25, 195:9

**T**

**tab**
79:5, 79:19, 80:3, 80:12, 80:15, 80:18, 165:18

**table**
54:3, 54:4, 54:5, 54:17, 54:18, 54:22, 56:19, 58:10, 58:22, 59:8, 59:16, 59:18, 60:15, 61:23, 62:7, 62:17, 62:18, 62:22, 64:4, 64:5, 65:24, 99:5, 99:8, 130:1, 130:3, 130:6, 132:12, 167:12, 171:24, 173:7, 173:14, 173:21, 174:2, 184:8, 184:12, 185:18, 216:20, 217:17, 222:17, 223:18, 223:20, 224:18, 225:15, 226:19, 226:25, 227:16

**tables**
54:13, 59:14, 63:1, 68:11, 69:5, 78:1, 176:1, 226:9, 232:5

**tabs**
79:1

**tag**
157:7

**tailing**
176:10, 176:14, 176:19, 177:5, 177:9, 177:15, 178:7

**take**
14:6, 15:11, 15:25, 20:24, 21:9, 27:1, 30:18, 32:8, 35:4, 40:11, 44:12, 45:2, 48:21, 57:15, 68:4, 68:14, 71:20, 74:14, 75:2, 78:25, 80:11, 87:13, 94:20, 102:10, 109:13, 122:19, 124:2, 124:21, 126:19, 133:16, 133:19, 133:23, 137:4, 141:5, 141:12, 149:21, 156:9, 160:17, 178:8, 189:9, 202:24, 237:17

**taken**
1:20, 1:23, 50:12, 67:24, 102:15, 120:10, 153:19, 160:23, 192:11, 199:7, 219:20, 237:24, 240:15

**taking**
5:10, 219:24

**talk**
9:3, 22:6, 46:9, 129:6, 129:10, 147:24, 165:12, 166:17, 180:7, 196:13, 199:4, 207:14, 211:4, 215:1, 226:8, 230:9

**talked**
120:5, 137:12, 181:25, 195:9, 210:12, 217:4, 217:6, 234:9

**talking**
20:9, 71:10, 127:10, 140:23, 142:20, 182:19, 193:8, 197:21, 209:11, 213:17

**talks**
96:2, 99:13, 99:16, 99:19, 110:20, 114:16, 114:17, 114:21, 114:25, 169:11, 188:22, 195:15, 197:2, 200:8

**tears**
181:8

**technical**
113:11

**technically**
12:20, 13:10

**technician**
181:8

**technique**
22:1, 22:3, 24:2, 66:12, 72:7, 73:3, 73:8, 77:14, 87:22, 92:16, 152:2

**techniques**
21:21, 22:21, 22:25, 35:22

**tell**
6:16, 12:3, 12:10, 14:10, 32:9, 39:23, 56:7, 68:15, 73:4, 74:2, 74:5, 81:8, 81:15, 105:11, 109:9, 127:1, 133:10, 137:5, 155:6, 222:1,

226:1, 226:5, 231:16

**telling**
80:22, 150:13

**temperature**
70:8, 70:11, 70:14, 99:20, 104:17

**ten**
6:4, 6:21, 7:5, 7:8, 10:16, 43:12, 43:13, 86:3

**ten-hour**
6:8, 10:15

**term**
21:14, 21:18, 24:12, 73:8

**terms**
15:14, 16:8, 22:21, 26:13, 26:14, 26:25, 37:10, 38:8, 45:16, 47:25, 60:14, 60:17, 149:15, 155:7, 166:2, 166:6, 229:21

**test**
38:10, 43:16, 43:20, 43:21, 43:22, 56:21, 57:23, 83:5, 83:7, 96:6, 97:12, 101:23, 103:7, 103:10, 107:13, 107:19, 108:4, 109:14, 109:15, 113:21, 116:7, 116:13, 116:15, 117:2, 152:14, 173:11, 188:10, 195:25, 196:1, 203:2, 204:22, 210:20, 212:11, 233:21, 237:4

**tested**
43:6, 43:14,

202:7, 202:12,
202:19, 204:9,
205:2, 205:6,
205:20, 209:5,
209:7, 209:18,
209:22, 210:5,
211:12, 211:18,
211:21, 212:3,
212:4, 214:22,
233:19, 234:16,
234:21
**testified**
10:25, 27:22,
27:24, 28:8,
28:9, 219:5
**testify**
175:9, 191:14,
240:6
**testifying**
27:7, 135:24,
223:9, 238:4
**testimony**
92:3, 102:21,
106:14, 120:16,
138:18, 170:3,
177:14, 211:24,
215:6, 225:18,
238:21, 240:12
**testing**
4:19, 15:11,
34:16, 36:24,
37:1, 42:23,
44:5, 44:19,
44:24, 55:3,
58:19, 98:16,
120:25, 122:16,
122:18, 124:20,
126:18, 127:7,
127:8, 127:18,
130:14, 162:15,
162:20, 162:23,
163:7, 163:13,
163:22, 164:20,
168:12, 169:24,
173:3, 178:24,
180:21, 182:1,
182:2, 184:16,
184:17, 184:24,

185:2, 185:4,
191:23, 193:3,
193:25, 216:6,
218:11, 218:13,
218:22, 220:4,
230:17, 231:4,
232:4, 234:2,
234:6, 234:12,
235:4
**tests**
8:4, 8:10,
57:20, 116:14,
120:19, 124:6,
124:11, 124:14,
124:22, 164:9,
164:12, 181:19,
196:3, 234:23,
235:1, 237:2
**texts**
41:17
**tfa**
159:24, 160:15
**tgt**
75:20, 75:24
**tgt-rna**
75:23
**th**
1:26, 2:13,
5:7, 10:5,
240:23
**thank**
5:22, 46:14,
81:5, 114:10,
137:11, 141:10,
147:4, 161:4,
180:6, 238:23
**theirs**
197:9
**themselves**
5:13, 19:19,
104:7, 105:10,
106:15, 106:23,
132:25, 135:13,
136:25
**theories**
203:17
**thereafter**
240:10

**therefore**
76:3, 84:10
**thesis**
34:4, 75:2,
76:8
**thing**
8:25, 9:2,
47:15, 73:22,
152:21
**things**
6:11, 9:2,
19:15, 34:1,
38:25, 64:18,
65:20, 81:17,
113:18, 113:20,
143:18, 157:20,
163:15, 166:3,
213:10
**third**
28:22, 97:2
**third-party**
15:8
**thompson**
1:22, 2:39,
5:24, 240:1
**thought**
34:16, 65:3,
87:19, 105:15,
127:2, 144:1,
144:4, 144:9,
146:14
**thoughts**
203:17
**three**
8:1, 8:4,
14:14, 35:21,
43:6, 43:9,
43:14, 43:18,
43:23, 45:17,
72:17, 75:6,
150:6, 150:22,
202:12, 202:18,
203:1, 223:24
**threw**
166:23
**through**
4:35, 9:18,
22:23, 28:22,

32:8, 33:9,
49:25, 53:20,
58:13, 58:19,
91:7, 114:6,
133:16, 137:4,
138:23, 157:14,
162:4, 162:8,
168:3, 170:23,
209:8, 213:14,
223:12, 226:3,
232:5
**throughout**
10:12, 23:7,
168:21
**tiered**
201:23
**time**
5:8, 6:12,
21:24, 31:16,
33:22, 33:25,
34:9, 36:10,
37:4, 43:24,
44:19, 44:20,
49:21, 50:3,
50:5, 50:8,
50:10, 50:11,
50:14, 53:10,
55:9, 57:4,
57:11, 57:19,
59:5, 61:25,
70:17, 72:21,
77:2, 95:9,
99:22, 102:14,
102:17, 120:9,
120:12, 122:14,
148:10, 153:18,
153:21, 154:10,
154:12, 160:22,
160:25, 181:18,
189:9, 191:19,
192:10, 192:13,
212:7, 217:18,
217:19, 221:19,
226:2, 228:9,
228:14, 228:15,
228:20, 232:23,
233:23, 236:7,
237:4, 237:19,

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

106

237:23, 238:1,
238:22, 240:16
**times**
55:5, 55:11,
57:8, 62:14,
62:15, 86:1,
189:23, 203:1,
216:11, 216:13
**timing**
163:17
**title**
13:5, 32:15,
110:5, 150:24
**titled**
172:17, 173:21,
183:1
**titration**
38:14
**today**
5:9, 5:23,
91:3, 124:12,
124:19, 126:19,
138:6, 180:3,
217:5, 238:3
**today's**
5:7, 238:21
**together**
6:13, 158:7,
162:8, 171:23,
181:9, 183:4,
202:10, 202:23,
202:25
**told**
6:15, 74:19
**took**
53:22, 54:21,
123:10, 202:9,
202:10, 231:24,
232:23
**tool**
17:17, 23:3,
23:5, 23:12,
23:15, 23:17,
39:10, 40:1
**toolbox**
23:3
**tools**
38:18, 39:11

**top**
80:7, 117:21,
118:3, 155:20,
171:3, 181:16,
217:17
**topic**
32:19, 41:8,
41:9, 94:11
**total**
8:21, 24:24,
77:20, 78:2,
78:5, 78:10,
79:22, 80:12,
80:15, 80:18,
102:5, 125:23,
214:9, 226:11,
226:22, 226:25,
227:8, 227:25,
229:23, 230:6,
230:8, 230:25,
236:18
**totally**
136:13, 211:23
**touched**
102:24
**tough**
36:8
**toward**
95:23
**towards**
35:15, 119:9
**trained**
72:21
**training**
33:23, 148:19,
235:11
**transcript**
138:16, 238:24,
239:4, 240:11
**transcripts**
21:7
**transfer**
147:24, 148:22,
167:1, 167:5,
167:8, 167:14
**transferability**
195:12
**transferred**
146:8, 148:6,

149:9, 201:22
**transferring**
149:4, 196:4,
201:11
**transglycosylase**
32:16
**trash**
13:6
**treat**
132:6, 169:19
**treated**
132:9
**trial**
6:8, 7:1, 7:19,
28:8, 28:9,
136:7, 175:9,
191:6
**tried**
76:15, 76:17
**trifluoroacetic**
159:20
**triple**
71:18, 72:1
**trna-guanine**
32:16
**trouble**
22:15, 62:17
**true**
20:5, 26:21,
33:19, 33:22,
46:22, 53:17,
59:20, 59:23,
78:13, 78:14,
92:17, 118:4,
128:1, 144:25,
145:3, 186:25,
240:11
**truth**
76:21, 240:6
**try**
22:19, 39:18,
49:24, 71:20,
159:9, 171:3,
181:16, 200:1,
215:20, 219:16
**trying**
61:6, 68:6,
72:3, 72:4,

74:5, 86:11,
136:11, 138:23,
164:22, 169:23,
177:8, 191:2,
191:9, 198:11,
205:5, 209:18,
211:9, 212:10,
212:15, 213:11,
215:14, 215:17,
220:2, 223:6,
227:14, 229:10,
232:21
**tuesday**
5:7
**turn**
61:23, 117:21,
125:10, 141:15,
145:19, 200:13
**turning**
127:7, 127:13
**twenty**
25:18
**two**
6:18, 9:3, 9:6,
9:7, 9:25,
12:20, 13:12,
13:13, 14:14,
31:25, 35:21,
37:5, 37:9,
37:14, 54:13,
59:14, 60:25,
61:7, 63:1,
64:19, 65:4,
65:19, 81:16,
83:11, 84:6,
101:25, 102:1,
103:15, 116:18,
132:3, 134:16,
136:3, 144:9,
157:19, 158:3,
158:7, 159:3,
159:13, 164:10,
171:22, 179:7,
188:12, 191:17,
193:6, 195:2,
199:14, 199:17,
201:10, 202:9,
202:14, 202:22,

Case 1:24-cv-00065-JLH    Document 528-1    Filed 08/07/26    Page 151 of 361 PageID
#: 31865

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

107

202:24, 205:21,
206:8, 206:13,
209:19, 210:3,
210:13, 210:16,
210:21, 210:24,
211:5, 211:22,
212:13, 212:16,
214:13, 218:7,
219:2, 228:5,
228:16, 229:24,
236:18, 236:20
**two-paragraph**
213:10
**type**
61:5, 64:13,
99:24, 100:3,
108:16, 166:7,
181:6, 184:15,
227:11
**types**
39:8, 112:8
**typically**
19:23, 41:13,
66:2, 160:8,
185:14

**U**

**ubiquitous**
23:11
**uh-huh**
201:13
**ultimately**
214:21
**unable**
187:5, 187:6,
226:1, 231:11
**unaware**
44:8
**unbound**
76:1
**uncomfortable**
12:4
**uncommon**
63:20
**unconscious**
91:21
**under**
88:11, 98:25,

103:15, 128:18,
128:21, 144:11,
172:20, 178:8,
211:12, 212:13,
216:21
**underestimates**
134:11
**underestimating**
145:1, 145:4
**undergraduate**
15:24, 16:4,
16:6, 16:12,
16:24, 20:24,
21:24, 22:23,
23:8
**underlying**
177:21, 178:2,
178:4, 179:25,
180:2
**underneath**
79:1, 79:8,
146:20
**understand**
47:14, 47:18,
64:20, 84:8,
91:2, 95:17,
96:12, 100:14,
105:6, 108:4,
108:7, 111:4,
126:4, 132:9,
164:22, 177:9,
191:2, 191:9,
193:19, 198:11,
205:5, 209:18,
211:9, 212:10,
212:14, 213:11,
215:17, 216:4,
220:2, 223:9,
229:10, 229:20,
230:23, 232:6,
232:21, 233:5
**understanding**
19:2, 28:5,
33:7, 90:11,
90:15, 90:17,
90:19, 105:18,
107:24, 115:6,
126:16, 138:2,

142:3, 155:17,
156:2, 156:7,
156:9, 167:3,
169:14, 174:19,
178:23, 193:12,
193:20, 194:15,
200:22, 202:9,
205:3, 229:3,
229:13
**understood**
59:15, 213:15,
232:22, 234:11
**undertake**
41:14, 44:19
**unfortunate**
110:4
**unfortunately**
76:1
**unit**
5:1, 48:2
**united**
1:1, 1:24, 5:5
**units**
139:7
**university**
12:23, 13:1,
15:15, 17:5,
18:22, 21:4,
21:6, 39:2, 39:3
**unknown**
55:13, 56:17,
61:2, 154:13,
158:25
**unless**
15:7
**unlikely**
73:3, 74:8,
74:14, 74:24
**unload**
86:11
**unpack**
185:21, 219:13
**unprepared**
106:8
**unreasonable**
71:23, 72:24
**until**
94:10, 178:12

**untrue**
94:18
**untruthful**
34:4
**unusual**
151:17, 151:20
**use**
17:18, 19:4,
19:10, 22:4,
23:5, 23:21,
24:9, 24:10,
33:12, 33:15,
39:4, 39:10,
40:17, 47:13,
64:24, 65:3,
83:11, 84:14,
87:21, 99:24,
101:3, 102:6,
107:19, 107:23,
112:10, 144:11,
159:20, 170:16,
171:3, 173:24,
173:25, 174:5,
174:14, 195:20,
200:12, 201:18,
202:15, 218:18,
218:21, 221:5
**users**
111:19
**uses**
73:24, 100:6,
108:19, 174:12,
175:11, 200:25,
201:3
**using**
65:6, 77:13,
82:1, 92:14,
105:25, 108:5,
108:11, 108:12,
116:13, 117:2,
123:8, 127:25,
134:7, 144:14,
148:25, 153:3,
169:25, 173:17,
180:1, 180:15,
188:11, 201:21,
220:9, 220:12,
220:22, 222:2,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

108

222:11, 229:22
**usp**
3:31, 3:32,
4:5, 4:30, 83:5,
83:7, 83:20,
88:14, 89:15,
89:16, 89:20,
90:1, 90:6,
90:11, 90:21,
90:22, 90:25,
91:4, 93:13,
94:11, 94:12,
94:25, 96:13,
97:15, 97:22,
97:24, 98:2,
98:13, 100:10,
100:15, 100:22,
101:9, 101:13,
109:23, 110:20,
110:25, 111:17,
111:21, 113:1,
114:16, 114:25,
115:1, 115:9,
115:23, 118:20,
119:4, 120:18,
120:24, 121:12,
122:15, 124:13,
124:21, 125:5,
155:13, 157:13,
157:24, 158:2,
161:2, 196:18,
197:9, 197:19,
198:8, 198:13,
199:1, 199:3
**usp's**
95:18, 101:3
**usp-monographed**
97:12
**usual**
25:21, 25:22
**usually**
181:11
**utilize**
102:6
**utilized**
36:4, 75:19,
76:2, 77:9,
107:24, 107:25

**utilizes**
107:9
**uv**
21:19, 47:25,
99:16, 119:11,
150:17, 172:20
**uv-vis**
21:23, 21:24,
22:4, 22:8, 38:3

**V**

**validate**
16:21, 40:18,
40:20, 41:1,
41:4, 67:12,
85:11, 85:17,
92:16, 92:20,
167:9
**validated**
40:12, 40:15,
40:16, 41:3,
41:4, 65:2,
65:9, 81:17,
83:24, 84:5,
84:14, 85:1,
86:1, 89:18,
91:10, 91:11,
93:12, 93:18,
93:23, 96:4,
111:23, 119:22,
186:16, 195:15
**validating**
29:13, 85:15,
85:23, 90:1,
171:12, 188:18,
193:1
**validation**
40:13, 67:14,
67:18, 67:22,
84:11, 85:20,
91:4, 91:7,
91:19, 91:25,
92:1, 92:22,
125:4, 134:19,
165:23, 167:1,
167:4, 167:13,
171:4, 171:14,
171:17, 186:7,

186:9, 201:5
**validations**
68:3, 84:25,
90:20, 121:13,
125:5, 125:8
**value**
82:6, 94:20,
144:13, 144:14,
186:23, 186:25,
223:25, 224:3,
224:6, 224:10
**values**
108:15, 131:2,
132:4, 152:22,
187:7, 218:5,
218:9, 219:1,
219:3, 219:5,
219:6, 219:10,
219:11
**variability**
146:5
**variable**
140:23
**variance**
196:1
**variety**
39:11, 131:2,
189:18
**various**
62:14, 62:15,
68:10, 78:9,
96:5, 98:16,
99:8, 100:18,
123:24, 137:22,
183:18, 184:12,
188:14
**vary**
151:3, 151:6,
151:7
**varying**
140:9
**vendor**
175:4
**verify**
119:22, 146:10,
149:10
**version**
14:11

**versions**
87:2
**versus**
52:21, 183:7
**vial**
43:20, 201:12,
203:2, 204:9,
205:15, 205:21,
206:6, 206:12,
206:15, 206:18,
206:23, 207:19,
207:22, 208:2,
208:21, 209:19,
210:20, 211:11,
212:11, 214:9,
214:14, 214:17
**vials**
43:13, 43:14,
43:25, 45:17,
109:5, 201:10,
201:11, 201:17,
202:10, 202:14,
202:24, 203:6,
206:8, 209:19,
210:3, 210:13,
210:16, 211:22,
212:16, 212:25,
213:21, 214:2,
214:5, 214:13
**video**
5:8, 5:10
**videographer**
2:32, 5:1, 5:9,
5:22, 50:9,
50:13, 102:13,
102:16, 120:8,
120:11, 153:17,
153:20, 160:21,
160:24, 192:9,
192:12, 237:22,
237:25, 238:20
**videotaped**
1:19, 5:2
**view**
9:8, 40:11,
64:20, 64:21,
87:22, 87:23,
88:3, 88:4,

90:5, 91:23,
92:4, 92:12,
92:18, 98:11,
106:19, 117:3,
120:18, 120:24,
122:15, 124:21,
125:3, 140:15
**viewpoint**
116:11
**vile**
43:21
**vis**
21:20
**visible**
119:11
**vitae**
3:10
**voice-identify**
5:12
**volume**
4:30, 49:24,
50:2, 50:3,
70:2, 99:21,
201:24, 202:4

**W**

**w-2**
13:10
**wabash**
1:25, 2:5
**wagner**
11:11
**waited**
233:18
**waiting**
28:17
**walk**
162:7, 168:3,
223:12
**want**
28:18, 38:8,
45:13, 45:14,
67:18, 88:21,
92:6, 104:8,
114:2, 116:7,
116:8, 124:1,
127:11, 137:4,
140:22, 144:18,

148:10, 148:11,
153:9, 167:8,
169:16, 170:9,
181:15, 192:23,
224:20, 229:18,
229:21, 232:20,
239:1
**wanted**
77:3, 102:23,
102:24, 109:22,
136:16, 149:21,
153:12, 162:7,
217:6
**wash**
70:21
**washington**
2:24
**water**
38:13, 38:18
**watkins**
2:2, 5:11, 5:15
**wavelength**
29:21, 48:1,
62:23, 68:19,
70:5, 81:19,
84:16, 84:17,
84:20, 91:3,
92:6, 92:15,
96:19, 97:4,
97:9, 100:24,
101:1, 101:4,
101:11, 103:13,
103:21, 103:22,
104:16, 115:10,
115:16, 115:24,
117:5, 119:11,
119:16, 119:23,
123:5, 123:12,
123:16, 123:20,
144:10, 151:3,
170:7, 172:3,
172:24, 173:1,
173:8, 195:5,
218:6, 220:18,
229:1
**wavelengths**
54:14, 61:7,
63:20, 63:25,

64:17, 64:19,
65:5, 81:16,
81:20, 83:12,
84:6, 91:16,
101:25, 102:2,
103:15, 103:16,
104:20, 116:19,
123:15, 127:23,
127:24, 132:3,
144:10, 150:1,
150:12, 150:22,
151:16, 164:4,
164:10, 179:7,
188:12, 188:15,
195:3, 218:8,
228:6, 228:8,
228:16, 229:25,
236:18
**way**
4:6, 15:21,
30:8, 50:4,
51:7, 51:8,
66:1, 67:11,
80:11, 83:3,
84:20, 86:15,
88:4, 94:9,
97:3, 107:8,
109:23, 110:25,
113:8, 136:7,
136:16, 138:24,
139:2, 139:4,
155:8, 157:18,
164:21, 191:17,
203:10, 203:13,
203:16, 212:11,
228:22, 229:25
**ways**
31:3, 66:6,
72:16, 74:17,
97:16, 109:12,
139:1, 189:18
**we'll**
14:3, 22:19,
35:4, 42:10,
88:24, 98:1,
127:12, 129:20,
148:9, 210:7
**we're**
6:18, 7:12,

8:25, 9:1, 32:3,
36:11, 40:8,
42:25, 50:15,
71:10, 74:5,
74:19, 78:17,
86:6, 86:7,
94:23, 113:8,
121:9, 127:15,
128:12, 129:16,
140:22, 155:12,
158:1, 170:19,
171:22, 178:22,
179:8, 194:5,
212:6, 212:7,
223:14, 229:10,
229:19
**we've**
10:14, 38:1,
64:14, 102:19,
125:11, 137:12,
140:16, 141:4,
142:20, 219:20,
231:7
**website**
3:16, 35:8,
35:13
**week**
8:20
**weeks**
9:3, 9:7, 9:25,
14:14, 14:15
**weight**
145:17
**weird**
35:3
**well-known**
23:12
**went**
28:6, 53:20
**weren't**
8:7
**west**
2:13
**whatever**
92:6, 154:25,
168:18
**whereas**
151:12

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

110

| | | | |
|---|---|---|---|
| **whereof** 240:22 **whether** 14:10, 21:3, 27:21, 28:13, 48:8, 48:13, 56:1, 56:4, 56:14, 58:24, 61:22, 69:17, 83:18, 87:1, 90:6, 102:24, 115:7, 139:3, 144:4, 155:2, 155:3, 157:6, 157:22, 158:20, 166:11, 180:3, 197:8, 197:11, 212:11, 216:6, 218:7, 238:13 **whole** 129:11, 129:21, 144:8, 207:11, 240:6 **wide** 21:20, 39:3 **wife** 11:20 **willard** 9:11 **windels** 2:10, 5:17 **withdraw** 233:8, 233:9 **withdrew** 201:21, 206:23, 208:10 **within** 12:15, 52:3, 79:2, 82:5, 125:22, 171:15, 208:11, 235:21, 240:2 **without** 25:2, 36:15, 74:22, 76:22, 96:6, 226:2, 231:10 **word** 71:21, 112:14, | 119:2, 136:2, 145:8 **wording** 193:16 **words** 85:6, 106:8, 115:23, 215:15 **work** 12:21, 15:24, 16:4, 16:6, 16:12, 17:21, 17:25, 18:22, 18:25, 19:1, 19:5, 20:1, 20:6, 20:18, 20:24, 21:9, 21:12, 21:13, 21:25, 22:24, 23:8, 23:9, 23:21, 24:5, 24:7, 24:8, 28:1, 33:15, 34:14, 35:5, 36:2, 40:6, 40:7, 41:5, 71:6, 71:10, 91:9, 91:14, 117:8, 121:11, 129:9, 137:23, 139:18 **worked** 27:25, 28:3, 28:11, 31:23, 31:25, 168:20, 232:1 **working** 14:19, 14:20, 33:3, 199:13, 199:18, 199:21 **works** 91:8, 145:5 **world's** 85:25 **wouldn't** 25:7, 40:18, 43:21, 51:9, 52:1, 60:18, 67:21, 74:3, | 76:16, 95:15, 124:13, 139:18, 143:12, 178:12, 237:12 **writing** 135:22 **written** 87:5, 137:2 **wrong** 9:24, 87:19, 132:16, 132:20, 139:15, 142:10, 143:9, 143:15, 144:5, 188:25 <br> **X** <br> **xie** 75:18, 76:2 <br> **Y** <br> **yeah** 15:5, 16:14, 16:20, 17:24, 21:11, 25:11, 29:3, 36:17, 44:4, 52:19, 55:24, 56:16, 104:4, 112:15, 112:17, 112:25, 125:12, 130:1, 130:2, 142:2, 142:5, 142:21, 147:3, 164:19, 181:22, 182:3, 185:16, 185:22, 187:11, 191:7, 200:25, 204:15, 218:17, 225:9, 226:5, 226:13, 226:15, 226:20, 226:24, 227:3, 231:15, 232:11, 232:20 **year** 25:24, 26:17, 36:18, 36:20, 36:22, 51:19, 68:4 | **years** 26:2, 26:4, 26:18, 27:2, 94:15, 115:3 **yep** 23:23, 110:13, 110:21, 110:23, 148:17, 150:2, 150:5, 182:23, 183:2, 183:14, 184:7, 184:10 **york** 2:14 **yourself** 85:19, 85:22, 117:4 <br> **Z** <br> **zeine** 134:21 **zero** 187:18 <br> **.** <br> **.01** 224:7 **.05** 224:13 **.1** 169:4, 183:5, 193:8, 223:23, 223:24, 224:13 **.1061** 2:15 **.11** 3:4 **.12** 224:16, 224:19, 224:20, 224:22, 225:4, 225:6, 225:19 **.161** 3:5 **.2** 169:8, 222:24, 223:10 **.27** 156:12 |

**.3**
227:8, 227:24
**.33**
156:15
**.3647**
2:25
**.4**
4:8
**.42**
131:4
**.44**
226:17
**.5**
4:8, 144:24, 145:3, 224:10
**.6**
144:25, 224:15
**.61**
60:11
**.75**
226:12
**.7700**
2:7
**.8**
224:8

**0**

**0.27**
154:12, 154:17, 154:20, 155:1, 155:3, 156:22
**0.44**
226:23
**0.56**
134:9
**0.6**
154:10
**0.62**
134:9
**0.75**
227:1
**00**
1:27
**002956**
4:35, 170:22
**003487**
2:40, 240:31
**00353427**
4:13

**00368468**
3:34
**00368469**
98:21
**084**
2:40, 240:31
**09**
4:30, 161:2

**1**

**1**
99:5, 123:24, 127:22, 218:1, 224:9
**1,000**
129:11
**1,200**
37:11
**1.0**
222:12
**1.09**
131:5, 223:25
**1.2**
154:13
**1.9**
236:2, 236:3, 236:16, 236:17, 236:22
**10**
3:31, 55:16, 56:20, 56:24, 58:23, 65:22, 94:24, 95:1, 95:3, 122:6, 196:25, 202:3, 233:24
**100**
12:15, 25:6, 25:8, 74:15, 74:16, 74:17, 78:11, 79:13, 79:23, 80:13, 80:16, 80:19, 80:21, 81:3, 109:17, 200:10, 205:17, 205:23, 206:6, 206:10, 206:12, 206:13,

206:21, 207:3, 207:23, 208:19, 208:24, 208:25, 209:2, 209:3, 209:5, 212:12, 214:9
**1001**
128:18, 128:21
**10019**
2:14
**105**
168:24
**109**
4:5
**10:17 am**
50:11
**10:30 am**
50:14
**11**
3:32, 54:17, 55:4, 55:16, 56:20, 56:24, 58:6, 59:2, 60:4, 64:5, 79:22, 82:14, 82:23, 98:2, 98:4, 98:7, 159:3, 159:5, 159:11, 159:17, 167:21, 167:22
**11.5**
172:17
**11.9**
200:14
**1100**
180:8
**117**
4:8
**11:55 am**
102:14
**12**
4:5, 52:7, 52:13, 58:13, 58:19, 59:2, 60:5, 64:4, 79:25, 84:20, 109:22, 109:24, 110:25, 126:9,

181:11, 212:24, 212:25, 213:20, 214:2
**12.8**
92:25, 114:5, 114:8, 114:13
**1200**
13:22
**121**
4:10
**128**
4:14
**12:08 pm**
102:17
**12:33 pm**
120:9
**13**
4:8, 10:5, 53:12, 53:19, 117:11, 117:13, 117:16, 125:19, 232:2, 232:7, 233:25, 235:15, 235:22, 236:7
**14**
3:10, 4:10, 10:10, 53:12, 89:8, 95:22, 117:25, 121:15, 121:17, 141:16, 205:13
**14.1**
183:5
**141**
4:17
**145**
4:21
**15**
4:14, 7:2, 53:13, 54:3, 54:4, 104:2, 104:17, 125:11, 128:13, 128:16, 162:18, 167:21, 167:22, 230:19, 230:25, 231:5, 231:8, 235:4, 235:9, 235:15,

**236:21**
**15.13**
195:11
**15.2**
168:6, 169:4,
169:8
**15.4**
182:21, 182:25
**15.6**
188:22
**15.7**
192:6, 192:15,
193:8
**15.8**
194:8
**15.9**
194:21
**155**
4:25
**156**
2:13, 75:6,
75:9
**157**
76:14
**158**
4:27
**16**
4:17, 54:3,
96:18, 96:24,
122:11, 124:3,
140:25, 141:2,
141:5
**161**
4:30, 4:32
**17**
4:21, 79:19,
80:3, 80:12,
145:7, 145:9
**170**
4:34
**18**
4:25, 80:15,
155:13, 155:15,
155:18, 174:14,
175:15, 175:16,
175:18, 175:19,
181:11
**19**
4:27, 42:19,

53:1, 53:3,
53:6, 80:18,
117:23, 117:25,
158:2, 158:5
**1919**
2:22
**1990**
33:4
**1997**
15:22, 165:16,
165:19, 181:24
**1998**
94:5, 94:8,
114:22
**1:16 pm**
120:12

---
**2**
---
**2**
216:25
**20**
4:30, 7:2, 8:2,
28:23, 89:13,
110:18, 161:2,
161:3, 161:7,
201:12, 204:8,
205:20, 206:5,
206:22, 209:19,
211:11, 214:14,
214:16, 223:22
**200**
208:6, 208:21,
208:23, 208:25,
209:1, 209:3,
214:17, 214:20
**20006**
2:24
**2004**
17:5, 18:23
**2005**
94:10
**2008**
18:23, 34:9
**2009**
4:30, 34:9,
34:10, 126:9,
161:2
**2010**
126:11

**2017**
111:1
**2018**
134:24
**202.625**
2:25
**2021**
122:12, 125:3,
126:16, 127:1,
127:2
**2024**
24:23, 25:10,
95:14
**2025**
36:17, 181:21,
233:13, 233:16,
233:24, 234:22
**2026**
1:26, 5:7,
240:24
**21**
4:32, 95:22,
96:18, 96:24,
122:4, 161:21,
161:22, 162:1
**212.237**
2:15
**214**
3:11, 30:15,
69:6, 153:24,
205:9, 205:10,
207:17, 208:12
**22**
4:34, 170:21,
170:24, 172:15,
217:9
**220**
151:8, 151:12
**223**
47:4, 53:22,
54:7, 55:18,
55:22, 56:14,
56:18, 60:3,
60:11, 61:14,
61:18, 63:3,
63:5, 63:8,
63:12, 69:9,
81:7, 81:24,

82:14, 82:23,
83:13, 91:6,
91:13, 91:24,
92:13, 92:14,
101:5, 102:6,
103:1, 103:18,
103:22, 103:25,
104:16, 105:7,
105:16, 105:23,
105:25, 106:9,
106:17, 107:7,
123:5, 123:19,
125:17, 130:16,
132:23, 133:5,
144:14, 162:18,
164:5, 164:25,
172:3, 172:5,
172:9, 172:13,
172:24, 173:2,
173:4, 173:11,
173:13, 173:24,
174:6, 187:21,
218:6, 218:11,
219:2, 220:15,
220:21, 221:2,
221:11, 221:12,
226:12, 227:6,
229:5, 230:7,
235:19, 235:23
**224**
220:15, 220:21
**2287**
11:14
:17
5, 47:7,
53:23, 54:10,
55:25, 58:10,
60:4, 60:9,
60:14, 60:17,
60:24, 61:12,
63:14, 63:18,
68:19, 81:23,
83:12, 91:10,
91:13, 101:5,
102:7, 105:7,
105:16, 105:24,

HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY
Transcript of Jeffrey Kittendorf, Ph.D.
Conducted on April 28, 2026

113

106:21, 106:25,
107:8, 107:9,
107:22, 127:8,
127:18, 128:6,
130:13, 130:19,
130:21, 130:22,
131:9, 131:10,
131:19, 131:22,
131:24, 132:14,
132:16, 132:23,
144:11, 144:14
**24**
1:9, 5:6,
105:1, 105:20,
163:3, 163:8
**240**
151:8, 151:13
**248**
205:7
**25**
104:18, 105:1,
105:20, 164:2,
201:24, 206:2,
206:15, 206:18,
206:25, 207:24,
208:22, 213:24
**254**
99:16, 101:6,
164:5, 164:25,
172:5, 172:12,
172:13, 172:21,
173:10, 173:11,
173:25, 187:21,
218:11, 218:13,
218:21, 219:10,
220:4, 220:10,
220:13, 220:23,
221:3, 221:6,
221:11, 221:13,
222:3, 222:13,
223:1, 225:16,
226:16, 227:6,
229:5, 230:7,
235:20
**26**
9:22, 9:24,
10:8, 52:7,
52:13, 126:11,

135:18, 136:10
**27**
4:30, 125:19,
134:4, 134:5,
135:4, 136:19,
165:11
**28**
1:26, 5:7,
240:23
**2800**
2:5
**2962**
171:6
**2966**
197:1, 197:5
**2970**
172:14
**2971**
200:13
**2974**
217:7, 217:11
**2:17 pm**
153:18
**2:25 pm**
153:21
**2:39 pm**
160:22
**2:53 pm**
160:25

---
**3**
---
**3-milliliter**
202:11
**30**
3:11
**3006**
184:6
**3031**
4:36, 170:23
**31**
184:8, 185:18,
213:19, 233:16
**312.876**
2:7
**32**
3:12, 4:30,
14:2, 126:9
**330**
1:25, 2:5

**34**
170:10, 170:11,
171:19
**3404**
2:24
**35**
3:15
**36**
107:9, 179:3,
235:25, 236:1
**3652**
4:13
**37**
171:23
**38**
175:25
**39**
148:12, 180:7
**3:35 pm**
192:10
**3:41 pm**
192:13
**3d**
126:11
**3s**
60:25

---
**4**
---
**4**
239:6
**4-milliliter**
208:2, 214:9
**42**
3:17, 196:10,
196:13, 197:23,
198:4, 199:8
**43**
141:15, 199:4,
199:9
**45**
201:9, 210:13,
214:12
**47**
214:25
**48**
214:25
**49**
216:21, 216:24

**4:39 pm**
237:23
**4:51 pm**
238:1
**4:52 pm**
238:22

---
**5**
---
**50**
3:20, 206:8
**500**
25:4
**52**
230:21, 231:9,
233:22, 239:6
**525**
126:11
**53**
154:1
**55**
126:13
**56**
2:13
**561**
92:24, 114:9,
114:13, 118:11
**58**
125:13

---
**6**
---
**60**
154:1, 227:19
**600**
11:11
**60611**
2:6
**621**
3:31, 89:15,
89:20, 90:1,
90:6, 90:11,
91:4, 94:12,
94:25, 96:13,
101:9, 101:13,
110:20, 111:17,
111:20, 115:1,
115:23, 118:20,
119:4, 124:13,
124:21, 125:5,

126:8, 126:17,
127:5, 129:10
**64**
4:35, 170:22
**65**
1:9, 5:6
**654**
126:13
**697**
193:6

---
**7**
---

**70**
49:6, 227:5,
227:16, 227:19,
227:21
**700**
25:20
**701**
194:6
**707**
195:11
**78**
3:22

---
**8**
---

**8-milliliter**
208:5
**800**
2:23
**8469**
99:12
**86**
3:26
**89**
3:29

---
**9**
---

**9**
1:27
**9,572,887**
125:19
**9.2**
197:2, 197:5
**90**
134:8
**91**
134:13, 134:16

**92**
134:16
**94**
134:13
**95**
3:31, 49:8,
168:24
**96**
82:5
**98**
3:32
**9:08 am**
5:8

---
**^**
---

**^^**
2:34

# Exhibit 6

**Redacted Public Version**



# Transcript of Brian C. Smith, Ph.D.

**Date:** April 24, 2026
**Case:** Eagle Pharmaceuticals, Inc., et al. -v- Slayback Pharma/Azurity Pharma

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

----------------------------x

EAGLE PHARMACEUTICALS,

INC. and EAGLE SUB1 LLC,

                 Plaintiffs,      Case No.

      v.                    1:24-CV-00065-JLH

SLAYBACK PHARMA LLC and

AZURITY PHARMACEUTICALS,

INC.,

                 Defendants.

----------------------------x


VIDEOTAPED DEPOSITION OF BRIAN C. SMITH, Ph.D.

New York, New York

Friday, April 24, 2026

9:00 a.m.




Reported by:

MARY F. BOWMAN, RPR, CRR

JOB NO. 629333

April 24, 2026

9:00 a.m.


          Deposition of BRIAN C. SMITH, Ph.D.,

held at Le Meridien New York, Central Park 120

West 57th Street New York, New York, before Mary

F. Bowman, a Registered Professional Reporter,

Certified Realtime Reporter, and Notary Public

of the States of New Jersey and New York.

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                          3

```
                      APPEARANCES:


ON BEHALF OF THE PLAINTIFFS:

LATHAM & WATKINS LLP

      330 North Wabash Avenue

      Chicago, IL 60611

BY:   MANUELA BUREK, ESQ.

      RAMYA VALLABHANENI, ESQ.



ON BEHALF OF THE DEFENDANTS:

WINDELS MARX LANE & MITTENDORF LLP

      180 Park Avenue

      Florham Park, New Jersey 07932-1054

BY:   JASON LIEF, ESQ.



Also Present:

      Elizabeth Gonzales, Legal Videographer
```

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                4

THE VIDEOGRAPHER: Good morning. Here begins media no. 1 in the videotaped deposition of Brian Smith in the matter of Eagle Pharmaceuticals Inc., et al., versus Slayback Pharma/Azurity Pharma, in the United States District for the District of Delaware, case no. 24/65.

Today's date is April 23, 2026, and the time on the video monitor is 9:00 a.m.

The videographer today is Elizabeth Gonzalez representing Planet Depos headquartered at 451 Hungerford Drive, Suit 400, Rockville, Maryland.

This video deposition is taking place at 120 West 57th Street, New York, New York.

Will counsel please voice-identify themselves and state whom they represent.

(Whereupon, counsel placed their appearances on the audio record.)

MR. LIEF: And I'll also just note, I think that the videographer said today is the 23rd, and I could be wrong, but I think it's the 24th.

THE VIDEOGRAPHER: You are right,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    5

sir, April 24, 2026.  Thank you.

The court reporter today is Mary Bowman representing Planet Depos.

The witness will now be sworn and then you may proceed.

BRIAN SMITH, called as a witness by the plaintiffs, having been duly sworn, testified as follows:

EXAMINATION BY
MS. BUREK:

Q.    Good morning.

A.    Morning.

Q.    Please state and spell your name for the record.

A.    Okay.  First name Brian, B-R-I-A-N, the C for Charles, C-H-A-R-L-E-S, last name, Smith, S-M-I-T-H.

Q.    Thank you.

And what is your home address?

A.    548 Armstrong Road, Mumford, New York.

Q.    Can you also state your current title and the location of your office?

A.    The office is the same as my home

address.  I'm the president of Spectros
Associates.  I'm the only employee.  I'm
self-employed.

Q.    And have you ever testified under
oath before either in a deposition, like we have
here today, or at trial?

A.    Yes.

Q.    How many times?

A.    Deposition, I've given two
depositions in the past.

Q.    And how many times have you
testified at trial?

A.    Once.

Q.    Starting with the depositions, when
were those testimonies?

A.    The first one was in 2003.  And the
second one, I believe, was in 2006.

Q.    Do you remember just generally the
subject matter that you were testifying about?

A.    Yeah.  Some of this is in my CV
but --

MR. LIEF:  I'll just -- I'll caution
you, to the extent there is any
third-party confidential information from
those other cases --

THE WITNESS:  Okay.

MR. LIEF:  -- you shouldn't reveal that.

THE WITNESS:  Thank you.

A.    The first case was a patent litigation suit.

THE WITNESS:  I guess I can I say the defendants and plaintiffs, right?  Is that --

MR. LIEF:  I think so.

THE WITNESS:  Okay.

A.    It was Glaxo versus Ranbaxy, and it was a patent litigation suit about an antibiotic called Ceftin, and that was in about 2003.

And in about 2006, there was a case Four Pillars versus Avery Dennison, I think it was called, and I was deposed in that case as well.  It was a -- I think again, it was a patent litigation suit about tape and analysis of tape and stuff like that.  And that's about I think all I can say, so...

Q.    And your testimony at trial, was it for a different matter or one of the two you just described?

A.    It's the first one, the Glaxo versus

09:02:49
09:02:49
09:02:50
09:02:51
09:02:55
09:02:57
09:03:00
09:03:01
09:03:02
09:03:03
09:03:03
09:03:04
09:03:07
09:03:14
09:03:17
09:03:20
09:03:23
09:03:26
09:03:29
09:03:32
09:03:35
09:03:36
09:03:38
09:03:40
09:03:41

Ranbaxy.

Q.    And did either of those involve pharmaceutical product testing?

A.    Yes.  The first one did.

Q.    Was that your role in -- as an expert in that case?

A.    I was hired as an expert in analytical chemistry for that case, yes.

Q.    And did you personally perform any high-pressure liquid chromatography, or HPLC, analysis in that matter?

A.    No.

Q.    Did you review another expert's testing or work in that matter?

A.    Good question.  It has been 25 years, 26.

Q.    To the extent you remember.

A.    I'm sure I saw some other expert reports, but I don't believe we had any other analytical chemistry experts on our side.

Of course, I reviewed the work of analytical chemists from the other side, so...

Q.    And in those cases, were you retained by the patent owner or the party that was accused of infringement?

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    9

A.    Glaxo versus Ranbaxy -- it was the plaintiff because Glaxo hired a firm that hired me, so...

Q.    And are you more often retained by the patent owner?

A.    That's only been the three or four cases in my career, so I can't say one way or the other.  I would say in this case, it's the -- not the patent owner.  In that case, it was the patent owners.

Q.    Understood.

And I know you've been deposed before.  I want to go over some just basics and some ground rules just for us today to make sure this goes smooth and easy for everyone.  So to the extent you know all this, bear with me.  We will just kind of get through it briefly.

A.    Okay.

Q.    But as you know, your testimony today is under oath and all penalties, including the penalty of perjury, are going to apply to the testimony you are going to give today.

Do you understand?

A.    Yes.

Q.    And it's important that you give

09:04:46
09:04:47
09:04:50
09:04:51
09:04:52
09:04:55
09:04:58
09:05:00
09:05:02
09:05:06
09:05:08
09:05:10
09:05:12
09:05:16
09:05:18
09:05:21
09:05:24
09:05:25
09:05:25
09:05:26
09:05:29
09:05:32
09:05:34
09:05:34
09:05:35

answers to my questions verbally, as you have
been doing, to make sure that the court reporter
can pick up the answer you're conveying.  So
please continue to give verbal answers.

Okay?

A.    Um-hm.  Yes.

I did that wrong, didn't I?

Q.    But good catch.  Thank you.

And it is also important for us to
speak one at a time so we are not speaking over
each other, again, to make it easy for the court
reporter to know what the questions and answers
fully are.  So please let me finish my question
before answering, even if you know what the
question is going to be or if you think you know
where it's going, and likewise, I will let you
finish your complete answer before asking any
follow-up questions or other questions.

Does that sound good?

A.    I understand.

Q.    Thank you.

Your attorney may object from time
to time, but you are required to still answer my
questions unless you are specifically instructed
not to answer.

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    11

Do you understand?

A.    Yes.

Q.    And then do you also understand that you are not permitted to discuss the substance of your testimony with your attorney, including during any breaks that we might take today, unless it's to ask any questions specifically about any privileged information that you might be implicating?

A.    I understand.

Q.    And on the note of breaks, if you do want a break at any time, please just let me know.  I just ask that you answer any pending questions before we do go off the record for the break.

Okay?

A.    I understand.

Q.    Do you have any questions at this time?

A.    No.

Q.    Is there any reason that you are unable to provide accurate and truthful testimony today?

A.    No.

Q.    So just some background information

09:06:28
09:06:28
09:06:31
09:06:32
09:06:35
09:06:38
09:06:41
09:06:43
09:06:45
09:06:47
09:06:49
09:06:51
09:06:54
09:06:57
09:06:59
09:07:00
09:07:00
09:07:01
09:07:01
09:07:02
09:07:03
09:07:04
09:07:07
09:07:08
09:07:13

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026          12

before we really get into it.

You are retained by counsel for Slayback and Azurity in this case, correct?

A.   Correct.

Q.   And I'll refer to Slayback and Azurity just collectively as "Slayback."

A.   That's fine.

Q.   Is that fine?

A.   Yes.

Q.   Thank you.

A.   Or defendants, whatever.  Yeah, defendants.

Q.   Okay.  So either one, you will know --

A.   Yeah.

Q.   -- who I am talking about.

A.   Yeah.

Q.   Perfect.

How many times has Slayback retained you as an expert?

A.   This is the first time.

Q.   And when did they first retain you in this case, do you remember?

A.   About a year ago.

Q.   And you're being compensated for

your work in this matter, correct?

A.    Yes.

Q.    Is your rate $650 per hour, correct?

A.    Yes.

Q.    Approximately how many hours have you spent on this matter?

A.    Total?

Q.    Total, yes.

A.    About 200.

Q.    Does that include your preparation for the deposition today?

A.    Yes.

Q.    Approximately how many hours did you spend on deposition prep of those 200 hours?

A.    At least 50.

Q.    So regarding the preparation, what did you do to prepare for today's testimony?

MR. LIEF:  Still, I'll caution you, you can answer generally, but you shouldn't discuss anything that we discussed or the substance of our conversations.

THE WITNESS:  Okay.

A.    I reviewed some documents and had some discussions with counsel.

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    14

Q.    Who did you meet with?

A.    I discussed things with Jason.

THE WITNESS:  Am I aloud to give the names of the people in the firm I've talked to or --

MR. LIEF:  Yes.

THE WITNESS:  Okay.  Sorry.

A.    There is a couple of people in the firm of -- one is Saibal.  I don't know his last name.  I'm sorry.

MR. LIEF:  Saibal Singh.

A.    Sorry.  Audrey is -- I don't know her last name either.

MR. LIEF:  Audrey Sparschu.

A.    Sorry.

And then Robin --

MR. LIEF:  Robin Ast-Gmoser.

A.    Yeah.  Okay.

And that's probably most of the discussions we had, as best I can remember.

Q.    And how many times did you meet?

A.    Probably once a week -- I mean -- as far as deposition prep you mean?

Q.    Yes, for deposition prep.

A.    Okay.

Well, via Zoom about once a week.          09:09:34

Q.    For how many weeks?  So how many          09:09:38
total --          09:09:40

A.    Well, I would say the deposition          09:09:41
prep began after I received Dr. Kittendorf's          09:09:43
reply report.  So that was about a month ago          09:09:47
maybe, so...          09:09:49

Q.    Understanding that there were a          09:09:53
couple of meetings, about how long did you meet          09:09:54
for?          09:09:57

A.    A couple of hours each meeting.          09:09:57

Q.    Did you discuss your deposition with          09:10:00
anyone other than the counsel that you described          09:10:02
for those meetings?          09:10:06

A.    Not that I recall.          09:10:07

Q.    You didn't meet with anyone else?          09:10:08

A.    No.          09:10:10

Q.    And you mentioned you reviewed          09:10:12
documents in preparation for today, right?          09:10:13

A.    Yeah.          09:10:15

Q.    Do you recall about how many          09:10:16
documents you reviewed?          09:10:18

A.    Well, there is the documents that I          09:10:19
listed in my report, and pretty much those and          09:10:21
some other ones as well, so...          09:10:24

Q.    Just generally, do you recall some of the other documents that you reviewed?    09:10:27 09:10:29

A.    Since which date?  In total or --    09:10:31

Q.    Just during your deposition prep.    09:10:34

A.    So about the last month?    09:10:36

Q.    Sure.    09:10:38

A.    I would say the ones -- except the exhibits in my report, which I think they are numbered eight -- I think there's nine of them, and maybe a half a dozen other documents since then.    09:10:38 09:10:41 09:10:42 09:10:45 09:10:48

Q.    And those half a dozen other documents, just generally, can you describe what those documents are, what the --    09:10:49 09:10:52 09:10:55

A.    Well, some of them --    09:11:14

(Reporter clarification.)    09:11:14

Q.    No, we can leave it at the end of the question.  Can you describe what those documents are?    09:11:14 09:11:16 09:11:17

A.    I'm sorry, could you repeat the question, please?    09:11:18 09:11:19

Q.    Those half a dozen other documents that are exhibits in your report, can you describe generally what those documents are?    09:11:21 09:11:23 09:11:26

A.    They generally refer to    09:11:29

high-pressure liquid chromatography and

validation of high-pressure liquid

chromatography methods.

Q.    Did you review Dr. Kittendorf's

report in preparation for today?

A.    Yes.

Q.    Did you review the documents that

are cited in his reports?

MR. LIEF:  Objection to the form.

THE WITNESS:  What's that?

MR. LIEF:  Objection to the form.

Q.    You can answer.

A.    The documents he cited, yes, some of

them.

Q.    Did you review Dr. Trout's reports

in preparation for today?

A.    I did read Dr. Trout's report.

Q.    Specifically, did you review his

reply report from April 13?

A.    I don't think I saw his reply

report.  I did see -- if there were two reports,

I only saw one, and it was the first one, so I

don't think it was the reply report.

Q.    Did you review any of Slayback's

documents in preparation for today?

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                18

A.    Yes.

Q.    Again, generally, what documents?

A.    They were documents relating to their analysis of the bendamustine product and the manufacturing of their product as well.

Q.    Did you review any hearing or deposition transcripts in preparation?

A.    Yes.

Q.    Are those transcripts that took place in this litigation?

A.    Yes.

Q.    Which transcripts?

A.    Dr. Buxton, and there was one other, and I'm going to get the name wrong, Sujendra, Sumendra?

THE WITNESS:  Do you know who I'm talking about?  All right.

A.    I don't -- I'm sorry.

Q.    Do you remember the position of the -- or who the person was, even if you don't remember the name?

A.    He was someone that worked with Dr. Buxton, as I recall, and -- but I don't recall his position.  He was in charge of the lab perhaps, so...

Q.    As part of the documents that you said you reviewed, were Slayback's long-term stability data part of those documents?    09:13:33 09:13:35 09:13:37

A.    No.    09:13:41

Q.    Are you aware that Slayback submitted stability data to the FDA supporting its product?    09:13:42 09:13:43 09:13:47

MR. LIEF:  Objection to the form.    09:13:48

A.    I've been told that.    09:13:49

Q.    Who told you that?    09:13:54

MR. LIEF:  If it's a discussion with counsel, you should not answer that.    09:13:56 09:13:57

THE WITNESS:  Okay.    09:13:59

A.    Honestly, I don't recall seeing any data from Slayback on stability.  The topic of stability came up in our discussions, and I heard somewhere along the line that Slayback did stability studies, and some of the results of those studies were discussed.    09:14:05 09:14:08 09:14:13 09:14:19 09:14:27 09:14:29

Q.    Based on what was discussed and you have been informed on, did you consider Slayback stability data in forming your opinions?    09:14:39 09:14:40 09:14:43

A.    No.    09:14:46

Q.    And in Dr. Kittendorf's report, he referred to some of Slayback's stability data    09:14:48 09:14:50

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    20

and documents.

Did you review those documents?

MR. LIEF:  Objection, mischaracterizes.

A.    I reviewed Dr. Kittendorf's report, and there is stability data in the patents-in-suit, and I would have to say that's about the extent of the stability data I've looked at personally.

Q.    Understood.

Regarding the references cited in your report, did you identify those references yourself or were you provided those or some of them?

A.    Well, certainly, like the documents from Slayback were provided to me.  The patents were provided to me.  Some of the other documents referring to analytical chemistry I found on my own.

Q.    And as you sit here today, are you aware of any mistakes in your report?

A.    No.  I'm sure I'm not perfect and I made some but not to the best of my knowledge, no.

Q.    And to your knowledge, today, is

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    21

there anything that you would change about the      09:15:53

report as you sit here today?      09:15:55

A.    No.      09:15:56

Q.    Now, I want to talk a little bit      09:15:59

about your experience and background now.      09:16:01

A.    Sure.      09:16:03

Q.    I'm going to hand you two documents,      09:16:05

if you can bear with me.      09:16:06

And these have been marked.      09:16:21

Exhibit 1, this is the -- let me just make sure      09:16:22

I'm looking at the right one.      09:16:29

This is the copy of your CV that you      09:16:31

submitted as Exhibit 1 of your expert report.      09:16:35

(Exhibit 1, Curriculum Vitae, marked      09:16:37

for identification, as of this date.)      09:16:39

Q.    Do you recognize this to be your CV      09:16:55

or resume?      09:16:57

A.    It might not be the most recent one.      09:17:11

We submitted an updated one about a week ago, I      09:17:16

think.      09:17:19

Q.    Yes, that one though, that is your      09:17:21

CV though that you submitted with your report,      09:17:25

right?      09:17:27

A.    You mean originally?      09:17:28

Q.    Yes, originally.      09:17:30

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    22

A.    Oh, okay.                                    09:17:33

Yes, this is that CV, correct?                     09:17:33

Q.    And to your point, we did receive an         09:17:36
updated resume earlier this week, and so --        09:17:38

A.    Correct.                                      09:17:40

Q.    -- I'm going to hand you -- this was         09:17:40
marked as Exhibit 2 for identification.  This      09:17:42
will be the updated one.                           09:17:44

If you can confirm that that's the                 09:17:48
one.                                               09:17:49

(Exhibit 2, updated Curriculum                     09:17:49
Vitae, marked for identification, as of            09:17:50
this date.)                                         09:17:52

A.    Yes.  It's the updated one.  I will          09:18:07
keep them straight.                                09:18:10

Q.    And feel free to go back and forth          09:18:11
between them --                                    09:18:21

A.    Okay.                                         09:18:21

Q.    -- but to understand the changes            09:18:21
between the updates, why did you submit an         09:18:25
updated resume after --                            09:18:28

A.    I'm sorry.                                    09:18:31

Q.    That's my bad.                                09:18:32

Why did you submit an updated                       09:18:33
resume?                                            09:18:35

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

23

A. Well, the first one is a year old and some things changed, so I needed to update that.

I also realized there was one position I held previously in my career that I hadn't listed in the first resume that I thought was germane to this work, so I included that.

Q. And comparing the two resumes, all the changes made are to past experiences or activities that have occurred, is that correct?

A. I think that's correct, yeah.

Q. So what new information came up?

A. Okay. One of my positions was as a columnist for a magazine called "Cannabis Science and Technology," and that work ended in December. So it was after the last resume, so I felt the need to update that.

Q. Understood.

But none of the changes in this updated version that was submitted earlier this week add new experience, for example, new depositions that were taken or new positions or anything like that in the last month since you submitted the original one?

A. No.

09:18:36
09:18:37
09:18:41
09:18:41
09:18:44
09:18:48
09:18:50
09:18:54
09:18:57
09:19:01
09:19:04
09:19:06
09:19:10
09:19:14
09:19:17
09:19:20
09:19:25
09:19:27
09:19:29
09:19:31
09:19:35
09:19:38
09:19:41
09:19:44
09:19:45

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                24

Q. If you can take a look at -- it's going to be the top of both of those.

Under the position that you have listed for Spectros Associates, in your first one, which will be Exhibit 1 for reference, you originally wrote that you taught trainings and courses to hundreds of forensic scientists, is that right?

A. That's correct.

Q. Now, if you look at the same position for the updated resume --

A. Yeah.

Q. -- under Spectros Associates --

A. Yeah.

Q. -- the description there says that -- same, you thought training courses, here, it says to hundreds of pharmaceutical scientists, is that right?

A. That's correct.

Q. Why did you replace "forensic scientists" with "pharmaceutical scientists"?

A. Well, I just felt that given the field that we are discussing in this case, that I wanted to bring to light that part of my experience.

09:19:49
09:19:52
09:20:00
09:20:01
09:20:07
09:20:13
09:20:16
09:20:25
09:20:27
09:20:27
09:20:30
09:20:34
09:20:34
09:20:36
09:20:36
09:20:37
09:20:39
09:20:43
09:20:45
09:20:47
09:20:50
09:20:53
09:20:59
09:21:03
09:21:05

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    25

And honestly, this first resume was I think aimed more towards getting work in the -- towards forensic science type fields and then I am conversant in several fields, so I used different phraseology for different purposes, I guess.

Q.    Is it accurate to say that you taught courses to hundreds of forensic scientists and separately to hundreds of pharmaceutical scientists?

A.    Yes.

Q.    When is the last time that you taught a course for pharmaceutical scientists specifically?

A.    Last year.

Q.    Can you tell me about that course?

A.    I'm under an NDA.  So I prefer not to.

Q.    Understood.

Can you generally give the subject matter of the course?

A.    Spectroscopy and chromatography.

Q.    And how often do you teach courses for pharmaceutical scientists specifically?

A.    It depends on the year.  I mean,

09:21:09
09:21:14
09:21:16
09:21:21
09:21:24
09:21:28
09:21:31
09:21:33
09:21:36
09:21:38
09:21:39
09:21:40
09:21:42
09:21:45
09:21:45
09:21:47
09:21:50
09:21:53
09:21:54
09:21:54
09:21:57
09:21:59
09:22:01
09:22:04
09:22:11

I've been doing it for 30 years.  Maybe on average, a couple of times a year.

Q.    And what is the -- let me start over.

Are these courses you offer and people sign up?  Do people approach you and ask for you to teach courses to employees or whoever it might be?  How does that work?

A.    I would say it's both.  I mean, I do some marketing to try to attract business, but people also reach out to me, let's say through LinkedIn or something like that, or sometimes past customers reach back out to have me come by a second time or another time to do consulting and training.

Q.    You mentioned that you are under the NDA for the last course.

A.    Yeah.

Q.    To the extent you can share, what are some of the customers that have requested these trainings for pharmaceutical purposes?

A.    Well, it's in my report, but just off the top, I mean -- I'm sorry, in the pharmaceutical industry you mean?

Q.    Correct.

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    27

A.    Okay.

Shire, Glaxo, Novartis, Merck, Johnson & Johnson -- maybe it's right here -- Genentech and so on, so...

Q.    And who suggested the changes to your CV?

A.    I did.

Q.    Going into some of the education and training that you have, can you give an overview of your educational background?

A.    Okay.  So I have a Ph.D. -- excuse me, I need a little bit of water.

I have a Ph.D. in chemistry from Dartmouth College, a bachelor's degree in chemistry from Rochester Institute of Technology.

Q.    And your bachelor's degree, you performed research during your undergraduate studies, correct?

A.    Yeah.

Q.    And that research involved -- correct -- bear with me -- use of electron microscopy and x-ray spectroscopy, correct?

A.    Correct.

Q.    To my understanding, those are not

09:23:19
09:23:20
09:23:25
09:23:28
09:23:32
09:23:34
09:23:35
09:23:43
09:23:45
09:23:47
09:23:51
09:23:53
09:24:03
09:24:06
09:24:10
09:24:14
09:24:14
09:24:17
09:24:19
09:24:20
09:24:21
09:24:25
09:24:27
09:24:33
09:24:33

forms of chromatography, is that right?

A.   Correct.

Q.   Did any of the research that you did do as part of your undergraduate studies involve chromatography?

A.   No, but I did have coursework in chromatography as an undergraduate and used chromatographs during that coursework.

Q.   What kind of coursework?

A.   It was the analytical chemistry courses that was part of the major.

Q.   And what was the subject of your Ph.D. thesis?

A.   It's the overtone spectroscopy and dynamics of acetylene.

Q.   I won't pretend to know what that is.

Did any of that research involve chromatography?

A.   No.

Q.   Did any of the courses that you took as part of your graduate studies involve chromatography or HPLC specifically?

A.   No.

Q.   Have you ever taken courses or

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    29

received formal training specifically in

analysis of pharmaceutical products?

        A.    I've worked with pharmaceutical

companies in the analysis of pharmaceutical

products and I've worked with forensics labs

where they analyze controlled substances, which

are sometimes pharmaceutical products as well.

        Q.    But as far as your training and

education, did you receive any --

        A.    In terms of --

              (Reporter clarification.)

        Q.    Did you receive any formal training

in that respect?

        A.    Either at --

              MR. LIEF:  Objection to the form.

        A.    Either at RIT or Dartmouth?

        Q.    Correct.

        A.    And so, I'm sorry, if I may rephrase

the question.

              Did I receive any training in

pharmaceutical analysis at RIT or Dartmouth, is

that the question?

        Q.    Yes.

        A.    I took courses in general analytical

chemistry, and the techniques I learned about,

09:25:31
09:25:34
09:25:36
09:25:37
09:25:40
09:25:43
09:25:45
09:25:48
09:25:50
09:25:57
09:25:57
09:25:57
09:25:58
09:25:59
09:25:59
09:26:01
09:26:04
09:26:05
09:26:07
09:26:08
09:26:10
09:26:14
09:26:15
09:26:21
09:26:24

including spectroscopy and chromatography, are

used in pharmaceutical analysis.

Whether we analyzed any

pharmaceuticals per se, I can't recall.

Q.    Have any of the courses that you

took at RIT or Dartmouth involved specific --

specifically developing methods in HPLC for

pharmaceutical drug analysis?

A.    The courses involved method

development for HPLC generally.  Again, I can't

recall if we developed any pharmaceutical

methods or not.  It was a while ago.

Q.    Understood.

Did those courses involve -- or

teach HPLC method validation?

A.    Yes.

Q.    Generally or were there any aspects

specific to pharmaceutical applications?

A.    The principles of validation -- in

my opinion, the principles of validation for

HPLC generally apply to the pharmaceutical

industry as well.

So, for example, the principles of

doing a linearity study, range study, robustness

study, limit of detection, limit of

quantitation, those concepts were taught, and they are just as applicable to a pharmaceutical analysis as any other analysis.

Q. Understanding that the application may carry over, the courses themselves did not specifically focus on pharmaceuticals, correct?

A. No. I don't think such a course was available to me to be honest. It was a more general, analytical chemistry course.

Q. I would like to move into some of your professional experience post studies.

Starting with your work at Waters Associates, can you describe the nature of your work there?

A. So Waters Associates makes HPLC equipment. And I worked in an analytical lab there doing HPLC, developing HPLC methods.

I also did work in spectroscopy there as well. And I was -- I supervised lab workers, I did some lab work myself, all in support of the company's manufacturing.

Q. Did any of that work involve the analysis of drug impurities in pharmaceutical products?

A. If I recall correctly, some of the

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    32

samples -- excuse me -- that I analyzed were --
or supervised the analysis of were
pharmaceutical preparations, yes.

Q.    Can you explain that a little bit
more?  How did -- let me backtrack a little bit.

Do you recall what those samples
were?  Were they from customers or just --

A.    They were from customers --

Q.    Okay.

A.    -- and in some respects, there's
probably NDAs on those as well, so I don't want
to talk about --

MR. LIEF:  I was going to caution
you --

THE WITNESS:  Yeah.

MR. LIEF:  -- about third-party --

THE WITNESS:  Yeah.

MR. LIEF:  -- confidential
information.

THE WITNESS:  Yeah.

Q.    But just generally --

A.    Okay.

Q.    -- I wanted to understand.

And when you say you supervised that
analysis or work, what does that look like, or

09:29:05
09:29:10
09:29:14
09:29:20
09:29:23
09:29:35
09:29:37
09:29:41
09:29:42
09:29:42
09:29:44
09:29:47
09:29:48
09:29:49
09:29:49
09:29:49
09:29:51
09:29:51
09:29:51
09:29:51
09:29:51
09:29:52
09:29:52
09:29:54
09:29:56

what did that look like in your position?

A. Well, I was --

MR. LIEF: Objection to the form.

A. Okay. I was part of a team. We had an analytical lab with several people in it, and sometimes I would do the lab work myself and sometimes one of the technicians in the lab would do the work, and I would either write up a method for them to perform the analysis or just review with them what the method was. And then sometimes I would watch them do the analysis and sometimes I would review the results.

Q. And when you mentioned sometimes you would write up a method for them to perform the analysis, what does that look like?

A. Well --

MR. LIEF: Same objection.

THE WITNESS: I'm sorry. Okay.

A. So I guess the part -- part of what we do in analytical chemistry is develop what is called standard operating procedures.

So, for example, to develop an HPLC method, you would want to do validation and calibration studies. You would want to run standards. You would want to do linearity

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    34

range, robustness, limit of detection, limit of

quantitation to develop a method and then

validate it and then write that up and then give

it to the person doing the actual lab work.

Q.   And in those cases, in the context

of -- I don't want to mischaracterize it --

developing or testing the equipment?

A.   Well, there is the equipment and

then there is the method itself.  I mean,

there's -- yes, part of the job of method

development is to take the instrument and make

sure it's suitable for purpose and then you

would run standards to calibrate the instrument

to make sure you get accurate quantitative

results and then you would validate the

instrument with a set of standards to make sure

that it is doing its job properly.

Q.   Understood.

Specifically in the context of your

position at Waters Associates, maybe the better

question is, when you developed the standard

operating procedures --

A.   Yeah.

Q.   -- or the methods for testing the

product, the ultimate purpose is to assist in

developing those products, whatever samples you received, is that right?

A.    Correct.

Q.    Okay.  So then the process and the testing that you described, the end goal there is to -- whatever the end goal is in respect to that product for...

MR. LIEF:  Objection to the form.

A.    The goal of my analyses at Waters was to develop accurate methods for the testing of products.

Q.    Do you know -- you don't have to reveal any confidential information, but do you know if those products were being submitted for regulatory purposes or for commercialization?

A.    The products -- some of the products that Waters sells are used in the pharmaceutical industry under what's called good manufacturing practices.  So they actually are considered -- and I may be wrong on this, it's been a few years, but they're actually considered like medical devices in some respects.

And so our methods had to conform to FDA standards for the testing of these devices, and so that was why we were -- that was my

responsibility, to develop those methods.    09:33:38

Q.    Understood.  Thank you.    09:33:40

Moving on a little bit, and it's --    09:33:42
we won't go through every position here, just    09:33:45
to --    09:33:47

A.    I've been around a while.    09:33:48

Q.    Just to summarize --    09:33:50

A.    Yeah.    09:33:51

Q.    -- from my understanding, from about    09:33:51
1990 to 2016, you held positions in spectroscopy    09:33:52
applications or product specialists.    09:33:58

Is that fair to summarize those?    09:34:00

A.    Well --    09:34:03

MR. LIEF:  Objection to form.    09:34:03

A.    I don't think that's a complete    09:34:06
characterization of my employment record.    09:34:07

As I think I said in my report, the    09:34:11
position at Spectros Associates is a company I    09:34:13
founded in 1992.  That's been part of my job,    09:34:16
full or part time, ever since.    09:34:20

I have had -- also held some product    09:34:23
specialist positions.  So I've kind of been    09:34:26
self-employed at times and then worked for other    09:34:29
people at times.  And those product specialists    09:34:32
positions, it was analytical chemistry using    09:34:35

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026          37

spectroscopy and chromatography.          09:34:40

Q.    Thank you.  Yes, I was looking just          09:34:42
at those positions and not at your work at          09:34:44
Spectros Associates, so that is a helpful          09:34:47
distinction.          09:34:50

For those positions where you were a          09:34:51
spectroscopy application specialist or a product          09:34:53
specialist, I believe there is those three?          09:34:56

A.    Yeah.          09:34:58

MR. LIEF:  Objection to form.          09:35:02

Q.    Did those roles focus on sales          09:35:02
aspects of the equipment more?          09:35:06

A.    No.          09:35:09

Q.    Could you explain what your role          09:35:13
there primary looked like?          09:35:14

A.    Well, it was part, I guess -- it was          09:35:16
mostly customer support, to be honest.  So there          09:35:20
was definitely some after-sales work and it was          09:35:22
also -- part of the job were sales support.          09:35:25

If a salesman had -- I would train          09:35:28
the salespeople on -- salesman, salespeople -- I          09:35:30
would train the salespeople on the applications,          09:35:34
the equipment.  I would write up application          09:35:36
notes.  I would sometimes go on sales calls if          09:35:39
there were any technical questions that the          09:35:43

salesperson might not be able to answer.

Q.    And in any of those positions, did your work involve analyzing drug impurities in pharmaceutical products?

MR. LIEF:  Objection to form.

A.    Yes.

Q.    Would you say that was a big piece of the analysis in those roles?

A.    I couldn't --

MR. LIEF:  Same objection.

A.    I couldn't speculate on the percentage, but certainly, I did some of that work.

Q.    And directly or did you supervise people --

A.    Directly.

Q.    And when you say, "some of that work," can you just briefly explain what type of analysis you were doing for those products?

A.    Well, we would get samples from customers, and I would either use spectroscopy or chromatography to analyze those samples for the customer.

Q.    And is what you are analyzing or looking for dependent on what they ask?

A.   Yeah, it's whatever the customer wants to have analyzed, yes.

Q.   Do you still teach at the California Criminalistics Institute?

A.   Yes.

Q.   Can you describe what forensic evidence analysis entails?

A.   So my job at the California Criminalistic Institute is to teach the forensic scientists of California how to use spectroscopy and chromatography to analyze forensic evidence, including let's say blood alcohol, drugs and urine and blood, controlled substances and trace evidence, amongst other things.

Q.   Now, you mention analyzing pharmaceutical compounds and controlled substances.

What does it mean to analyze pharmaceutical compounds in the forensic context?

A.   So when -- in a case when drugs are seized, they oftentimes are the same medications you might get by prescription but are sold on the black market.

So the analysis, let's say, of a

09:36:44
09:36:46
09:36:50
09:36:53
09:36:54
09:36:55
09:36:58
09:37:00
09:37:05
09:37:08
09:37:11
09:37:15
09:37:20
09:37:25
09:37:28
09:37:35
09:37:36
09:37:37
09:37:39
09:37:41
09:37:42
09:37:49
09:37:52
09:37:54
09:37:56

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

40

Valium tablet that the manufacturer might do, a
forensic lab might need to do because a Valium
tablet was seized being sold illegally.

So in both cases, it is a
pharmaceutical product and the analyses would be
similar actually.

Q.   And is a lot of that identifying --

A.   It's identifying and quantifying,
yeah.

Q.   Looking at Big Sur Scientific, do
you perform -- or I suppose this would have
been --

A.   Past tense.

Q.   -- past tense -- did you perform any
HPLC analysis of pharmaceutical products?

A.   Yes.  And I supervised the use of
chromatography to analyze things and worked with
contract labs that did chromatography.

Q.   What kind of pharmaceutical products
did you work on there?

A.   Well, there might be a definition
problem.  I was working with cannabis and
cannabis-related products.  Whether you consider
that pharmaceutical or not, it's up to the
beholder maybe.

But in that work, part of what I did was I visited a number of chromatography labs around the country, and I would bring my instrument with me and we would validate each other's methods.

So I was working with these chromatography labs to analyze the main ingredients and the impurities in these cannabis-based -- I'll call them cannabis-based medicines -- and just to develop methods to analyze the impurities in those things.

Q. And just to be sure in the context today of deposition, let's separate kind of how you mentioned the cannabis-based medicines from pharmaceutical drug products that we are discussing.

A. All right. Yeah.

Q. So -- and just to be sure, before our discussion right now for the other previous positions, when we were talking about any pharmaceutical product testing, did any of your answers there include cannabis-based medicines or was that --

A. I guess it depends on the time frame. I mean, I started testing cannabis about

2000 -- let's see, 2014.  So -- but -- so I guess, to be clear, before 2014, I had experience testing pharmaceuticals and then since 2014, I've had experience testing pharmaceuticals and cannabis-based products.

Q.    Okay.  That's very helpful.  So we will just keep those separate for the purpose today.

A.    Fine.  Okay.  Okay.

Q.    And approximately how many HPLC analyses have you personally performed in your career?

A.    You mean hands on in the lab?

Q.    Yes.

A.    Hundreds.

Q.    In the higher end of hundreds, in the lower end of hundreds?

A.    Lower end.  I didn't count.

Q.    Understood.

The same question regarding how many you have supervised, if you can give an estimate?

A.    The similar, hundreds.

Q.    When was the last time that you personally performed an HPLC analysis?

A.    Well, I would say my answer to that is in a scientist's career, early on, we are oftentimes in the lab doing hands-on work.  As we progress, we transition into doing training and supervision.

So the last time I was in a lab supervising and training on chromatography was December.  The last time I physically had my hands on an instrument by myself doing an analysis has probably been a decade.

Q.    Okay.  And do you -- are you familiar with the term a "person of ordinary skill in the art" or "POSA"?

A.    Yes.

Q.    What is your familiarity with that term?

A.    Well, "POSA" means person of ordinary skill in the art.  And I cited a definition of it in my report within the context of this case, and so I guess I would leave it at that.

Q.    And then can we mark -- this will be Dr. Smith's expert report.

A.    Can I ask what time it is?

Q.    9:42.

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    44

A.    I'm good.                                      09:42:55

Q.    Do you want to take a break?                  09:42:55

A.    No, I'm just -- I'm good.                      09:42:58

Q.    Okay.  If you need --                          09:42:59

A.    I'll let you know.                             09:42:59

Q.    Okay.  So this will be marked for             09:43:00
identification as Exhibit 3.  This is your          09:43:02
expert report in this case.                          09:43:04

        (Exhibit 3, expert report, marked           13:13:37
    for identification, as of this date.)           13:13:38

Q.    I know you mentioned a definition.            09:43:18

        If you can turn to --                        09:43:24

A.    Can I look at the report first,                09:43:25
please?                                              09:43:26

Q.    Yeah, of course.                               09:43:26

A.    Just make sure it is what we say it            09:43:27
is.                                                  09:43:29

        Yes, this is my report.                      09:43:42

Q.    Great.                                         09:43:43

        In paragraphs -- paragraph 15 is            09:43:53
where you mentioned the definition in this case.    09:43:54

        Is that what you recall the                  09:43:56
definition to be?                                    09:43:58

A.    That's what I was referring to, yes.          09:44:00

Q.    And do you consider yourself to be a          09:44:01

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026          45

POSA in this case?

A.    Yes.

Q.    So what is the basis of that qualification?

A.    Well, the -- there is analytical chemistry as part of the case, and I consider myself a person of ordinary skill in analytical chemistry based on my training and experience as outlined in my CV.

Q.    And then for a POSA in this case, is HPLC analysis common in the industry?

A.    Which industry?

Q.    The one for a POSA in this case. So --

A.    That would be the pharmaceutical industry?

Q.    Um-hm.

MR. LIEF:  Objection to the form.

A.    HPLC is commonly used in the pharmaceutical industry.

Q.    And in the same industry, a POSA would have learned how to conduct an HPLC analysis in school, as you've described in your experience, correct?

MR. LIEF:  Objection to the form.

A.    You might learn it in school, you might learn it in your subsequent career --

Q.    Okay.

A.    -- or both, which is what I've done.

Q.    And for a POSA in this case, is HPLC method development common in the pharmaceutical industry?

MR. LIEF:  The same objection.

A.    Yes.

Q.    Now, a POSA is capable of designing a method to test drug impurities, for example, in a pharmaceutical product, correct?

MR. LIEF:  Same objection, incomplete hypothetical.

A.    I prefer the word "develop" rather than "design."

But I would say it is common for a POSA to develop methods for HPLC, and in the pharmaceutical industry, it would be common for a POSA to develop methods for pharmaceuticals.

Q.    And I have a series of questions that may require some approximation.  So if that is the case, just let me know that it's an approximate amount, but how many HPLC methods have you personally developed for pharmaceutical

applications?

A.   I can't give an exact number, but I guess I would say I developed hundreds of methods in my career, dozens, and I've supervised and trained a number of chromatographers in the pharmaceutical industry how to do that type of work.

Q.   But personally, how many did you develop for pharmaceutical applications?

A.   I don't have an exact answer but dozens.

Q.   And how many HPLC methods have you personally validated for pharmaceutical applications?

A.   Dozens.

Q.   Have you ever submitted or assisted in submitting any application for FDA approval of a product?

A.   I'm not sure what you mean by "assisted."

Q.   For example, if you conducted any testing or -- let's just start with testing --

A.   Well, I --

Q.   Sorry, can I just finish?

A.   Sorry.

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    48

Q.    No, that's okay.

Have you conducted any testing that was used in support of an application that would be an example?

A.    I've done testing for pharmaceutical companies.  Whether they subsequently used that data in front of the FDA, I'm not sure because they wouldn't have told me, and if they did, I don't think my NDAs would allow me to say so anyway, so...

Q.    Have you ever been employed by a pharmaceutical company in any quality control or regulatory purpose?

MR. LIEF:  Objection to the form.

A.    I've been a contract employee of pharmaceutical companies.

Q.    Do you recall what companies?

A.    Well, some of the ones I've listed already.

Q.    And when you say some of the ones you've listed, are we talking about in the beginning when we -- the trainings that you've done, for example --

A.    Yeah, the pharmaceutical companies I have listed in my resume and mentioned earlier

this morning.

Q.    Have you ever been involved in preparing for reviewing an NDA, or a new drug application?

A.    No.

Q.    Have you ever been involved in preparing or reviewing an abbreviated new drug application or an ANDA?

A.    No.  I'm not a regulatory affairs professional.  I'm a scientist.

Q.    Okay.  Have you ever analyzed a pharmaceutical drug product in a litigation before?

MR. LIEF:  Objection to the form.

A.    Yes.  This is a case where I was just -- I was told there was a litigation, I was given a sample, I analyzed it, I gave them the results and that was the end of it to the best of my knowledge, so...

Q.    Were you -- you weren't retained as an expert in that case?

A.    No.  I was retained to do the analysis.  I didn't write an expert report, I wasn't deposed or anything like that.

Q.    Understood.

09:48:22
09:48:28
09:48:30
09:48:34
09:48:37
09:48:38
09:48:39
09:48:42
09:48:44
09:48:46
09:48:47
09:48:51
09:48:55
09:48:56
09:49:11
09:49:15
09:49:18
09:49:24
09:49:26
09:49:27
09:49:28
09:49:30
09:49:31
09:49:34
09:49:36

Is this one of the cases --

A. No, actually -- I thought I forgot to mention that. Because it was just one sample, just a couple of hours of work, but it was relevant to a litigation.

Q. Understood.

And when was that work?

A. About ten years ago.

Q. Do you recall who retained you?

A. No.

Q. Do you recall any other information about the litigation, any of the parties?

A. It was -- no.

Q. So you said you didn't submit an expert report --

A. No. I wrote up my results and gave it -- like I would for any client, and gave them to the client.

Q. Do you know if this was a patent infringement matter?

A. It was not.

Q. And are you familiar with bendamustine?

A. Yes.

Q. What's your familiarity?

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    51

A.    From reading the documents in this case and the patents.

Q.    Before this litigation, were you familiar with bendamustine?

A.    No.

Q.    Have you ever formulated or assisted in formulating a bendamustine product?

A.    No.  I'm not a formulation scientist.

Q.    So to that extent, you have never formulated or assisted in formulating any injectable drug product, correct?

A.    No.

Q.    Have you ever developed, validated or used an HPLC method to analyze bendamustine or any bendamustine-related product?

A.    No.

Q.    Have you ever developed, validated or used an HPLC method for the purpose of quantifying impurities in a bendamustine-containing product?

A.    No.

Q.    You understand that this is a patent infringement case, right?

A.    Yes.

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    52

Q.    I'm going to hand you two more
documents.

We can mark this as Exhibit 4 for
identification.

(Exhibit 4, patent number
12,138,248, marked for identification, as
of this date.)

Q.    And we will mark this one as Exhibit
5 for identification.

(Exhibit 5, patent number
11,872,214, marked for identification, as
of this date.)

MR. LIEF:  Counsel, it might be
helpful if you identify on the record
which is which.

MS. BUREK:  Yes.

Q.    So for reference, what is now
Exhibit 4, this is patent number 12,138,248.
I'll refer to this as the '248 patent.  And just
for identification, the Bates number beginning
at the start of this document ends in 4077.

And then what is Exhibit 5 is patent
number 11,872,214, and I'll refer to this as the
'214 patent.  Also for identification, the
beginning Bates number for this document ends in

2115.

A.    Begins with 2115.

Q.    Or, sorry, ends in 2115.

A.    I'm sorry.

Q.    Thank you.

Okay.  Have you seen these documents before?

And feel free to look through them if you would like.

A.    Yes, I've seen these.

Q.    What is your understanding of the patents at issue in this case?

MR. LIEF:  Objection to the form.

A.    I've been told by counsel that the plaintiffs -- plaintiffs allege that Slayback's product infringes some of the claims in these patents.

Q.    Do you understand that the claims at issue are not method of testing claims, correct?

MR. LIEF:  Objection to the form.

A.    The claims and the specification discuss testing and discuss high-pressure liquid chromatography.  So that's my understanding.

Q.    Do you understand that the claims are to a composition --

A.   Can I stop you?

Which claim are we talking about and which patent?

Q.   Let's focus on the '248 patent.

A.   And that would be Exhibit --

Q.   Exhibit 4.

A.   Okay.

Q.   And you can turn to the second-to-last page, the last full page, the one above this one.

A.   Yes, um-hm.

Q.   So those will be the claims in the patent.

A.   Sure.  Okay.

And which claim are we specifically referring to?

Q.   Claim 1.

A.   And what about it?

Q.   You understand that this is directed to a composition, correct?

MR. LIEF:  Objection to the form.

A.   I don't know that it's my job to construe what a claim means.  That's really the job of the court, I would imagine, or the Patent Office.  It says what it says, I mean.

09:55:09
09:55:10
09:55:12
09:55:13
09:55:16
09:55:19
09:55:21
09:55:21
09:55:23
09:55:26
09:55:28
09:55:29
09:55:30
09:55:31
09:55:37
09:55:38
09:55:39
09:55:40
09:55:42
09:55:45
09:55:48
09:55:48
09:55:50
09:55:53
09:55:55

Q.    And to be clear, I'm not asking you to construe it.  I understand that's not -- not your --

A.    Yeah.

Q.    -- your role here.

I just want to make sure your understanding of, for example, claim 1 here, that it's to a composition or a drug formulation, just in your understanding.

MR. LIEF:  Same objection.

A.    I think that's a narrow construction, honestly.  The claim clearly mentions HPLC and testing, and the testing I assume is in support of the rest of the claim or it wouldn't be there.

So the claim mentions -- I see -- I see words about a formulation and I see words about testing.  So I'm assuming the claim refers to both.

Q.    Focusing on the -- you mentioned some of the testing pieces.

What does it say about HPLC in the -- in claim 1 that you've identified?

A.    As determined by HPLC, at a wavelength of 223 nanometers.

09:55:58
09:56:00
09:56:03
09:56:03
09:56:03
09:56:05
09:56:08
09:56:10
09:56:13
09:56:16
09:56:23
09:56:25
09:56:29
09:56:32
09:56:35
09:56:37
09:56:40
09:56:43
09:56:46
09:56:49
09:56:53
09:56:55
09:56:58
09:57:05
09:57:08

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    56

Q.    Can you explain what the -- this claim requires regarding the measurement of total impurities?

A.    It says something about -- well, hang on.

The claim says -- there is words to the effect of 5 percent peak area response and total impurities.

Q.    And the analytical method is HPLC, correct?

A.    Yes.

Q.    And the wavelength is -- the detection wavelength is identified as 223 nanometers, correct?

A.    Correct.

Q.    And you mentioned reference to requirement of peak area response, correct?

A.    Those words are in the claim, yes.

Q.    You can turn to your expert report, specifically at paragraph 25.

In paragraph 25 in your report, you write, "A method that uses different wavelengths or a technique other than peak area response to determine the total impurities would be expected to give different results and thus is of no

relevance to this claim."                                    09:58:55

          Correct?                                           09:58:57

     A.     I see that.                                      09:58:58

     Q.     Why do you associate expected                    09:59:01

results between the different wavelengths with               09:59:04

relevance to the claims?                                     09:59:07

     A.     Could you repeat the question,                   09:59:13

please --                                                    09:59:14

     Q.     Yes.                                             09:59:14

     A.     -- or rephrase the question?                     09:59:14

     Q.     Yeah.                                            09:59:16

          So in paragraph 25, you say that the               09:59:17

different wavelengths -- skipping some of the in             09:59:23

between -- would be expected to give different               09:59:27

results.                                                     09:59:30

     A.     That's correct.                                  09:59:30

     Q.     Okay.  And then you say, "and thus,              09:59:31

it is of no relevance to this claim."                        09:59:34

          So what association in your                        09:59:36

understanding is there between whether the                   09:59:38

results are expected to be different and the                 09:59:43

claim?                                                       09:59:47

     A.     What I am saying here is that                    10:00:02

different methods can give different results.                10:00:03

          The patent mentions some HPLC                      10:00:07

parameters, and what I'm saying is that I focused on Dr. Kittendorf's work at 223 nanometers using normalized peak area response because that's what the words in the patent say.

Q.   Understood.

And this is a fairly specific question because it seems that you're tying the expectation that you would get different results to the relevance of the claim.

So I just want to understand --

A.   I don't -- oh, I'm sorry.  I don't know if it's the relevance of the claim.  It was relevance to what work I was going to cite and what work I wasn't going to cite.

So, for example, he did work at ███████████ and he did work at 223 nanometers, and for the purposes of this discussion, I'm focusing on 223 nanometers because that's the wavelength mentioned in the patent.

Q.   Understood.

In the sentence though, you're specifically saying that a method that uses a different wavelength, for example, ██████ because to your point, that's different than the

claim language -- would be expected to give different results.

And my understanding based on how this is written is that that means it is not relevant to the claim, the results, not the actual different wavelengths.

Can you explain that?

A.    The results --

MR. LIEF:  Objection to the form.

A.    Okay.  The results at 223 are relevant to the patent because that's what the patent calls for.

I'm saying -- I don't know that I'm saying anything about the relevance of the data at ███ to the patent.  I'm just saying for the purposes of this discussion, I'm focusing on 223 nanometers because that's what the patent calls for.

I don't think my saying anything about ███ -- I stand by what I said.

Q.    So still focusing on this sentence, is it your understanding that if the total impurities at both wavelengths, hypothetically, would be expected to give the same results, would that then be relevant to the claim?

A.    If I may rephrase your question.

So what you're asking, if a test at ███ and 223 got the same results, whether that's relevant to the claim?

Q.    Not if it got the same results, but -- again, because here you're focusing on the expectation of different results, and that, because of that, there is no relevance to the claim, so I'm just trying to understand.

If you expected the same results, would it make it relevant to the claim?

A.    Well, I believe that goes to Dr. Kittendorf's contention that in his report, he draws an analogy between the Slayback method at ███ and his method at 223.

And within that context, yeah, what he did at ███ might be relevant, but I don't think I was opining about the relevance of the ███ data to the claim necessarily.

I was opining about the fact that he is claiming that -- he is basically saying he should get the same results at the two wavelengths, and I'm saying I'm going to focus on 223 because that's what the claim requires.

Q.    And just going back to some

fundamental questions now that we have your

report up, did you write your expert report

yourself?

A.   I wrote it, yes.

Q.   And when the report was done and you

signed it, do you consider all of the words in

the report to be your own?

A.   Yes.

Q.   They reflect your independent

opinions in everything that you wrote?

A.   Yes.

MS. BUREK:  I think we have been

going for maybe about an hour or so.  We

can take a five-minute break now.

THE VIDEOGRAPHER:  We are going off

the record.  The time is 10:04 a.m.

(Recess.)

THE VIDEOGRAPHER:  We are back on

the record.  The time is 10:14 a.m.

BY MS. BUREK:

Q.   Welcome back.

A.   Thank you.

Q.   Okay.  So -- and you can reference

the patents if you need, but based on your

understanding, do the claims require using an

████████████████████████ ?

A.   Which claim and which patent?

Q.   Fair point.

Let's still look at the '248 patent, which is Exhibit 4, and we will look at claim 1.

A.   The claim does not mention -- the words ███████████████ do not appear in the claim.

Q.   The claims only say that the total impurities resulting from the degradation of the bendamustine is less than about 5 percent peak area response, correct?

A.   Those words are in the patent, yes.

Q.   So in your report, why do you highlight that Dr. Kittendorf does not use an ███████████ method?

A.   Given the importance of this drug, being that it's a chemotherapy drug and it's going into people's veins, and given the importance of this litigation, I felt that, as a POSA -- and as I say in my report, the accuracy you want is depending upon the application.  In this case, it's an important application, and a POSA would want an accurate method.

The method called for in the patent,

the PTR response method, assumes the response factors of all the anolytes in the bendamustine, of which there was at least 11, have the same response factor at 223.

And I didn't think that was a good assumption, and I have data in my report showing that, and so I think that ▮▮▮▮▮▮▮▮ method in this application would be more accurate than a peak area normalization method.

Q.    You understand that the method in the patent -- let me rephrase.

You understand that Dr. Kittendorf's testing pertains specifically to the patent, correct?

A.    His testing pertains to Slayback's products and whether the impurities in Slayback's -- let me rephrase that.

His testing in his report was really limited to three vials of Slayback's product and the impurities in those.  And the impurities in those products are germane to whether there is infringement or not, and the gist of my report is that his method is unvalidated, inaccurate, and so we really don't know what the impurity levels are in those three vials.

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    64

Q.    But Dr. Kittendorf is not testing Slayback's product --

A.    Yes, he did.

Q.    Sorry, let me finish my question.

Dr. Kittendorf is not testing Slayback's product for purposes of commercializing this product, or to your point, making sure everything is safe for marketing the product or submitting it to the FDA to be approved as a safe drug.  He is not doing testing for those official purposes, correct?

A.    I think you should ask Dr. Kittendorf what the purposes of his tests were.

All I know is that he submitted results on three vials of Slayback's product. And he was looking at the impurities in those products.

Q.    To your understanding, he was looking at the impurities in those products for purposes of this litigation with respect to these patent claims, correct?

A.    Well, I'm assuming he analyzed these samples because he was hired to by his client, and yes, his results have been used in this

litigation.

Q.   Now, based on your understanding --
based on your understanding, do the claims
require using Slayback's testing method?

MR. LIEF:  Objection to the form.

A.   What do -- I'm not sure what you
mean by "require."

Can we --

Q.   Is there any reference to what you
understand is Slayback's testing method in this
patent?

MR. LIEF:  Same objection.

A.   No.

Q.   Based on your understanding, do the
claims require any specific level of validation
of the method?

A.   The claims are silent on let's say
method validation, but a POSA would know,
particularly in an important litigation like
this, to choose an accurate testing method.

And again, the contention of my
report is that Dr. Kittendorf didn't do that
and -- so...

Q.   So you say that a POSA would know to
choose an appropriate method --

A.    Yeah, an accurate method.

Q.    Is it your opinion that a POSA can choose the method to test the level of impurities in this product on a -- on their own?

MR. LIEF:  Objection to the form.

A.    In analytical chemistry, POSAs develop methods and choose which methods to use.

The method to use -- the accuracy of the method you choose is determined by the application.  And again, in this case, given the importance of the litigation and the fact that this is a drug that goes into people's bodies, a POSA would choose an accurate method.

The peak area response method in my opinion is not accurate enough in this case to measure the levels of those impurities accurately.

Q.    But this litigation pertains to patent infringement of, for example, the patent that is in front of you, correct?

A.    Yeah, um-hm.

Q.    And the patent requires certain elements of a method, correct?

A.    It -- the patent pertains to two elements of a method.  It leaves out an awful

lot of other elements.  As a POSA would want to be able to reproduce the work.

Q.    But the method -- the components of the method that are specified in the claims are required for the method in this patent, right?

A.    I don't know what you mean by "required."  I'm sorry.

Q.    Claim 1 of Exhibit 4, the '248 patent in front of you, as we looked at before, identifies the wavelength of 223 nanometers, right?

A.    Correct.

Q.    If a POSA thought that a different wavelength was a better choice, is it your opinion that a POSA could select a different wavelength to test the product as needed in the claim?

MR. LIEF:  Objection, legal.

THE WITNESS:  I'm sorry.

Q.    The objection is to me.  You can go ahead and disregard, unless he's telling you not to answer.

A.    Well, I guess it kind of goes with the question of given -- as an analytical chemist, you are presented with a sample, and

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                            68

you are told to analyze it, and given the

context, you choose the accuracy of the method.

I don't know if by law you have to

do the method in the patent in this case to show

what the impurities are in those three vials of

Slayback's product.

Given again the importance of the

litigation, a POSA would choose, and the method

that he has validated and -- he, she -- a POSA

would choose a method that has been validated

and known to be accurate.

And again, my contention is

Dr. Kittendorf didn't do that.

Q.    You referenced the importance of the

litigation.

A.    Yeah.

Q.    Can you tell me what you understand

the importance of the litigation to be when you

say that?

A.    There is money involved and market

share, and that is all I know.  I'm not a

business person.  I'm a scientist.

I mean, I'm assuming it is important

or we all wouldn't be here today, would we?

Q.    That is a good point.

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    69

Can you turn to paragraph 70 of your expert report?

And let me know when you're there.

A.    I'm going to read it real quick, if that's okay.

Q.    Totally fine.

A.    Okay.

Q.    You argue that the method that Dr. Kittendorf used is novel in part because he tested using the wavelength of 223 nanometers, is that right?

A.    Correct.

Q.    And you say that he needs to validate this method at 223 nanometers specifically, right?

A.    Correct.

Q.    What do you expect the difference in results to be between 223 and ███ nanometers?

Not looking for a specific percentage in impurities but just fundamentally given the product and what you understand about the science behind it, what do you expect the difference in that range?

MR. LIEF:  Objection, incomplete hypothetical.

A.    I have no expectation.  A good scientist would do the work and measure the response factors at 223 and do the validation.

And I guess I'll leave it at that.

Q.    Would an understanding of the chemical compositions and chemistry specific to bendamustine and its impurities shed any light on the difference in behavior you could expect at different wavelengths?

A.    Well, the fact of the matter is, is we have response factors ███ that are in Dr. Kittendorf's report, and they are clearly different ███ for bendamustine and some of its impurities.

My own calculations based on Dr. Kittendorf's data show that the response factors are different at 223.  So that shows that the behaviors would be different.

I should also add, there is nothing in the literature or in the record of any kind of HPLC experiment on bendamustine and its impurities at 223.  So I had no expectations going in because there was no literature and no data to inform me.

Q.    A little more fundamentally just

10:25:27
10:25:30
10:25:33
10:25:37
10:25:43
10:25:46
10:25:49
10:25:52
10:25:55
10:26:04
10:26:06
10:26:09
10:26:11
10:26:14
10:26:15
10:26:16
10:26:18
10:26:21
10:26:23
10:26:26
10:26:28
10:26:31
10:26:34
10:26:36
10:26:41

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    71

based on the drug at issue, so specifically                    10:26:42

involving bendamustine here, do you have any                   10:26:50

understanding of the chemistry of that -- those                10:26:57

compounds that would provide an understanding of               10:27:01

the differences you could expect?                              10:27:11

MR. LIEF:  Objection to the form.                              10:27:14

Objection, incomplete hypothetical.                            10:27:14

A.    Are you asking me to predict what                        10:27:17

the specter of these molecules would be at                     10:27:19

223 nanometers.                                                10:27:22

Q.    Not predicting specifically, just                        10:27:24

understanding -- let me rephrase and actually                  10:27:26

ask maybe a different question here.                           10:27:30

More broadly, what is the -- or can                            10:27:42

you tell me about the range of the UV spectrum                 10:27:44

wavelengths?                                                   10:27:48

A.    The ultraviolet.                                         10:27:49

Q.    Um-hm.                                                   10:27:52

A.    Typically, 200 to 400 nanometers.                        10:27:53

Q.    Now, I understand that there is                          10:27:56

different -- maybe "categories" isn't right                    10:27:59

word, but categories of wavelength bands, for                  10:28:03

example, UVA, B, C.  That's the extent of my                   10:28:05

understanding.                                                 10:28:09

But when you say that it ranges from                           10:28:10

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    72

200 to 400, are you -- is that the whole                    10:28:12

spectrum?  Are you like --                                  10:28:16

        A.    Oh, this just gets into semantics,            10:28:18

honestly.  I mean, you can define ultraviolet at            10:28:19

different wavelength regions.  You can define               10:28:24

visible with different wavelength regions.                  10:28:28

        My experience is that when we say                   10:28:30

ultraviolet, we mean 200 to 400 nanometers.                 10:28:32

        Q.    Okay.  Are the wavelengths of                 10:28:41

223 nanometers ██████ nanometers in the same                10:28:43

wavelength band?                                            10:28:48

        A.    What do you mean by "band"?                   10:28:49

        Q.    UVC for example, I --                         10:28:55

        A.    I don't --                                    10:28:58

        Q.    Sorry, can you let me finish?                 10:28:58

        A.    I'm sorry.                                    10:29:00

        Q.    My understanding -- and correct me            10:29:00

if I am wrong -- but UVC, for example, includes             10:29:01

wavelengths, as I understand, to be I think 200             10:29:04

to 280 nanometers, is that generally correct?               10:29:07

        A.    I don't know.                                 10:29:11

        Q.    Okay.                                         10:29:14

        A.    My -- I would say that                        10:29:15

223 nanometers and ████ nanometers are in the               10:29:17

ultraviolet range.                                          10:29:22

Transcript of Brian C. Smith, Ph.D.

Conducted on April 24, 2026                73

Q.    And the difference between those two wavelengths is ████████ , correct?

A.    Correct.

Q.    Would you consider this to be a large difference within the UV spectrum?

MR. LIEF:  Objection to the form.

A.    Define "large."

Q.    That's part of my question.  On the spectrum, the difference of --

A.    Well, if you're getting --

Q.    So sorry.  Let's just take a beat. Let me get through my question and then you can go ahead and explain.

On the spectrum that you identify, part of my question is whether that difference ████ would be considered a large difference.

You asked what do I mean by "large." I guess that's part of my question to you, is how you would look at that difference on the scale of the spectrum?

A.    Well, I think the word "large" is a bit loose.

What I would say is that I would expect different results at the two wavelengths and that the spectra of many molecules are

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    74

different at those two wavelengths.

So that difference of ███████ does make a difference in the spectra of some molecules.

Q.   And that's in -- in some molecules, it's specific to the compounds itself and its properties, correct?

A.   I'm not sure what you're asking.

Q.   Isn't it your opinion that the difference -- there is always a difference?

A.   No.

The spectrum changes with wavelength -- or can change with wavelength, and some compounds -- let's say the two wavelengths -- oftentimes, two compounds at two -- let me rephrase that.

Sometimes a compound will have different absorbences at different wavelengths, sometimes they're the same.

Q.   So going back to your opinion that Dr. Kittendorf needed to validate the method specifically at 223 nanometers --

A.   Right.

Q.   -- is your opinion based on the requirements in USP chapter 621?

A.    It's based on several things.  It's based on -- as a POSA, as I've -- you've stated, you need for an accurate method in this case, the USP 621 provides guidance for an accurate method.

It's based on the fact that the FDA references USP 621 for getting an accurate method, and it's also based on my 30 years' experience working with pharmaceutical companies knowing that the standard way to do things is to use USP 621 as a guide to ensure methods are accurate.

And honestly, I've never seen -- again, just in my experience and observation, I've never seen a pharmaceutical company not develop an HPLC method that didn't conform with USP 621.

Q.    Your experience working with those companies developing HPLC methods is for commercializing a product or submitting it to FDA requirements, correct?

MR. LIEF:  Objection, mischaracterizes.

A.    I don't know what they did with my methods.  Okay?  It's up to them.  And I don't

10:31:33
10:31:36
10:31:39
10:31:43
10:31:47
10:31:48
10:31:52
10:31:55
10:31:58
10:32:01
10:32:04
10:32:08
10:32:09
10:32:12
10:32:15
10:32:17
10:32:21
10:32:25
10:32:29
10:32:37
10:32:42
10:32:45
10:32:45
10:32:46
10:32:47

know if any of the methods I developed were used for FDA submissions or not.

And if I did know, I probably couldn't tell you anyway, so...

Q.    Fair.

Let's focus on USP chapter 621 --

A.    Okay.

Q.    -- which I'm going to hand you.

A.    There is different versions of it, so we have to be careful.

Q.    So this is the one that you provided with your report?

A.    Okay.  2021 version?

Q.    The official date is December 2024. This is the one that you attached as an exhibit. So this was associated with your report.

A.    Okay.

Q.    If we can mark this for identification as Exhibit No. 6.

(Exhibit 6, USP chromatography, marked for identification, as of this date.)

A.    I need a moment.  Is that okay?

Q.    Of course.  Take your time.

Let me know when you're done looking

at the document.

A.    There's no page numbers on it I guess -- or I'm sorry.  I'm sorry, I found the page numbers.

Is this downloaded from the USP website or was this something that we sent -- you were sent by counsel?

Q.    This was an exhibit to your expert report.  So we received it from counsel.

A.    From counsel, okay.

So it has some email -- it looks like it -- there is some stuff at the top about where it came from is all.  Okay.

Okay.  We can proceed.

Q.    Have you seen this document before?

A.    Yeah.

Q.    Did you consider this document as part of your expert report?

A.    Yes.

Q.    And did you review this document as part of your preparation for today?

A.    Yes.

Q.    So we are just going to look at page 1 right now.

And at the bottom of the page, there

is a section that's titled "General Procedures."

Do you see that?

A.   Yup.

Q.   And it says, "This section describes the basic procedures when used -- when -- used when a chromatographic method is described in a monograph.  The following procedures are followed unless otherwise indicated in the individual monograph."

Is that right?

A.   I see that.

Q.   Officially, the USP chapter 621 applies to monograph methods that are published in the USP, correct?

MR. LIEF:  Objection to the form.

A.   Where did you find that?

Q.   Where it says that it's used when a chromographic method is described in a monograph.

A.   But that's not limiting.

Q.   Explain.

A.   It's my understanding that Dr. Kittendorf has argued that this standard does not apply to his work.

And again, I would argue that -- we

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

79

could argue that his work is a monograph
procedure because there is a monograph on
bendamustine, and he is analyzing bendamustine,
so why didn't he use the USP method. He didn't.

That -- again, this is going to be
repetitive, but a POSA -- you want an accurate
method in this case. Ignoring USP 621 is
dangerous because it's part of what we do in
this industry to ensure we have accurate
methods.

And so he should have validated his
method. He should have realized that changing
the wavelength means you have to change the
method or change the -- redo a validation and do
a crossover study.

It says right in this document, no
wavelength adjustment allowed on the wavelength.

Q. Now, you mentioned that
Dr. Kittendorf's method, you say, could be a
monograph procedure?

A. He is doing an analysis of a product
that's also a monograph USP method.

And as a POSA, and given the
importance of the case, I would want to follow
that monograph rather than the type of work he

did to ensure accuracy.

Q.    Could we mark this document for identification as Exhibit 7.

(Exhibit 7, document, Bates stamped EAGLEBEN-SA_00368468, marked for identification, as of this date.)

A.    Is there a question?

Q.    You were looking over the document.

Are you done?

A.    Yeah.

Q.    Have you seen this document before?

A.    I've not seen this first page.

I have seen the -- are there page numbers here?  All right.  We have got some Bates numbers here.

I have not seen the top page ending in 468.

I have seen 469, 470.

Q.    Okay.  When you reference that there is a USP monograph for bendamustine, is this the monograph you were referencing --

A.    Yes.

Q.    -- the method?

A.    Yes.

Q.    And looking at this, we agree this

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    81

is not the method that Dr. Kittendorf used in his testing, correct?

A.    Correct.

Q.    You can turn back to chapter -- USP chapter 621, Exhibit 6.

A.    Um-hm.

Q.    So in that section, General Procedures, a monograph --

A.    I'm sorry, we are still on page 1?

Q.    Page 1, yes, under General Procedures.

A.    Yeah, go ahead.

Q.    A monograph method for bendamustine officially would be one that we just looked at, the USP monograph, correct?

A.    Correct.

Q.    The method that Dr. Kittendorf used is not that monograph, correct?

A.    Dr. Kittendorf did not use the USP method.

Q.    So regardless of your opinions on what method should or could have been used, he did not use the -- a USP method.

A.    To be clear, you're asking me did he use this method in this document?

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026          82

Q.    Correct.

A.    No, he did not.

Q.    And I would also like to use as reference.

If we can mark this for identification as Exhibit 8.

(Exhibit 8, article entitled "Method Adjustment, the USP Way," dated June 12, 2017, marked for identification, as of this date.)

A.    Let me get my papers organized. Give me a minute.

Q.    Take your time.

A.    Go ahead.

Q.    All right.  Have you seen this document before?

A.    Give me a second.

Yeah, I have.

Q.    Where did you see it?

A.    It was submitted as an exhibit, I believe, along with Dr. Kittendorf's reply report.

Q.    You can turn to page 2.  The pages aren't labeled the way it printed, but it is just the second page.

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                   83

A.    Yeah, I understand.                      10:43:06

Q.    And so we will be looking at the        10:43:07
second full paragraph right there in the middle,   10:43:09
starts with "First."                           10:43:11

Do you see that?                               10:43:13

A.    Yup.                                     10:43:14

Q.    On the third line there, it says --     10:43:21
starting with "In fact, chapter 621" --        10:43:22

A.    Yup.                                     10:43:25

Q.    -- "applies only to monograph           10:43:26
methods published in the USP."                 10:43:28

This means that it does not apply to           10:43:30
methods that you have developed and validated in   10:43:32
your laboratory, obtained from scientific      10:43:34
literature or inherited from somewhere else, is   10:43:36
that right?                                     10:43:39

A.    I see that.                             10:43:39

I would like to add that the next              10:43:44
line said, "With all that said, most of the    10:43:46
guidelines make sense as a basis of method     10:43:49
adjustment for many other types of methods."   10:43:52

Q.    Yes.  But the method itself -- or       10:43:56
the chapter requirements themselves only       10:43:57
apply -- just give me a second -- only apply to   10:44:00
monograph method published in the USP          10:44:04

officially, correct?

MR. LIEF:  Objection, mischaracterizes.

A.    I don't know what you mean by "officially."

Let's be clear about why the USP exists.  Okay?

Dr. Kittendorf's interpretation of the purpose of the USP narrows -- is narrow. Okay?

In the pharmaceutical -- the USP exists for a reason.  These methods exist for a reason.  It's not just for these monographs, it is for general purpose HPLC in the pharmaceutical industry.

And again, in my 30 years' experience working with the pharmaceutical industry, I've never seen anyone develop a method that didn't conform with USP 621.

And I'm not holding him to any higher standard than I would any other analytical chemist in the pharmaceutical industry.  I think that's a reasonable thing to do.

Q.    Just going back to something we

10:44:07
10:44:09
10:44:10
10:44:10
10:44:11
10:44:12
10:44:14
10:44:16
10:44:18
10:44:22
10:44:23
10:44:27
10:44:29
10:44:33
10:44:35
10:44:36
10:44:37
10:44:40
10:44:42
10:44:47
10:44:49
10:44:51
10:44:53
10:44:55
10:44:59

talked about before.

Understanding there is different reasons to conduct testing, to be sure, Dr. Kittendorf's testing is not supporting data that is being submitted to the FDA, correct?

MR. LIEF: Objection, mischaracterizes.

A. He submitted some data in a report in a litigation.

I don't know if that data is going to be used by the FDA or not. I don't know what's going to be done with that data.

Q. Regarding changes in wavelengths, changing the detection wavelength does not change the actual chemical composition of the sample being tested, correct?

A. No.

Q. And changing the detection wavelength does not change how the compound separates, correct?

A. Changing the detector wavelength means that you can see some things and not others.

So for example, I don't know what you mean by "separate," but yes, the illusion

profile can be different at different wavelengths.

For example, in Dr. Kittendorf's report, as I recall correctly, at one wavelength, he saw 11 peaks, and at another wavelength, he saw 12 peaks.  So the illusion profile is affected by change in the wavelength.

I don't have a copy of -- I don't have a copy of his report.

Q.   No, I didn't hand you one.  We are not referencing it directly right now.

A.   I thought you might be.

Q.   No, sorry.

If there is anything that I will be directly referencing, I'll hand it to you beforehand.

A.   Okay.

Q.   You can turn back to paragraph 25 in your report.

A.   Can I take a second to read it?

Q.   Um-hm.

A.   I think we're talking about -- no, we haven't.

Okay.  Go ahead.

Q.   So you acknowledge that the asserted

claims specifically require the impurity

measurements as determined at a wavelength of

223 nanometers, right?

A.    I don't like your use of the word

"require."  Okay?

Those words appear in the patent,

yes.

Q.    And by testing at 223 nanometers,

Dr. Kittendorf is following the approach as it

is stated in the claims with respect to the

detection wavelength, correct?

A.    The detection wavelength --

MR. LIEF:  Objection to the form.

THE WITNESS:  I'm sorry.  Go ahead.

A.    The detection wavelength in the

patent is 223 nanometers.  Dr. Kittendorf

detected at 223 nanometers as well.

Q.    You can go ahead and turn to

paragraph 72 in your report.

A.    Can I read it quickly?

Q.    Um-hm.

A.    Okay.

Q.    In your report, you argue as a

second reason that the method Dr. Kittendorf

used is novel because he used the peak area

response method, correct?

A.    I'm arguing that his method is different from Slayback's in the two important parameters of the quantitation method and wavelength of detection.

Q.    Briefly, can you explain what peak area response -- what the peak area response method is?

A.    Okay.  I believe there is an equation in my report, but let's say, in the context of the bendamustine-containing formulations we are talking about, once you've got a chromatogram, you would add up the areas of the bendamustine and the impurities to get a total, and then for an individual impurity, you would take its area and divide it by the total and get a percentage.

Now, that's assuming the response factors of all the anolytes involved are the same.  And again, my criticism of Dr. Kittendorf is that we know they are different at ███ and my work has shown they are different at 223.

Q.    Have you used a peak area response method in any of your work before?

A.    No, I haven't, and I've never seen a

pharmaceutical company use it either because 10:51:30

it's generally considered inaccurate for UV 10:51:32

detection. 10:51:36

Q.    You understand that for purposes of 10:51:37
this litigation, the total impurities measured 10:51:38
in the product have to be less than about 10:51:41
5 percent peak area response? 10:51:44

A.    The claim has that word -- verbiage 10:51:47
in it, yes. 10:51:51

Q.    Now, before you mentioned you don't 10:51:52
like the use of the word "require" as related to 10:51:56
the claims. 10:51:59

Why not? 10:52:00

A.    I'm not sure what you mean by it.  I 10:52:01
mean, as I've said, and will continue to say, 10:52:03
a -- the accuracy of a method is determined by 10:52:06
the application.  And a POSA would choose an 10:52:09
accurate method. 10:52:13

And in my opinion, peak area 10:52:14
response in this application is inaccurate, and 10:52:16
I wouldn't choose to use it to measure 10:52:20
impurities in bendamustine. 10:52:23

Q.    But we agreed that the asserted 10:52:26
claims use peak area response in claim 1, for 10:52:28
example. 10:52:32

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                90

A.    Those words appear in the claim, yes.

Q.    And by using the peak area response method, Dr. Kittendorf is following the approach that is referenced in claim 1 of the '248 patent, for example, correct?

MR. LIEF:  Objection, mischaracterizes.

A.    May I rephrase your question?

Q.    Go ahead.

A.    Are you saying that Dr. Kittendorf's testing method is identical to that mentioned in the patent?

Q.    No.  I'm saying that Dr. Kittendorf used peak area response method, correct?

A.    In his --

MR. LIEF:  Same objection.

A.    In his report?

Q.    Correct.

A.    If we're going to compare the patent -- okay.  Just answer the question.

Can you rephrase it -- I'm sorry, could you reask the question?

Q.    No, no apology needed.

We will go piece by piece?

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    91

A.    Sure.

Q.    Dr. Kittendorf in his testing used the peak area response method, correct?

MR. LIEF:  Same objection.

A.    He says he did in his report, yes.

Q.    And the claim, claim 1 in the '248 patent, for example, references 5 percent peak area response, correct?

A.    May I take a quick look?

I'm sorry, so we are talking '248, claim 1?  Okay.

And that would be Exhibit 4?

Q.    Correct.

A.    All right.  So we have got the words -- "5 percent peak area response" is in the claim, yes.

Q.    And I'm not asking if the methods as compared are identical.  But just focusing on the peak area response piece, Dr. Kittendorf followed that specific reference from the claim, correct?

MR. LIEF:  Same objection.

A.    Honestly, the patent has such a paucity of information about the HPLC method that I think it would be hard to answer that

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                 92

question.

For example, Dr. Kittendorf assumed that the response factors for all 11 anolytes are the same at 223 nanometers.

The patent is silent on that.  The patent says nothing about whether the method used in the patent, the response factors were considered to be the same or not.

So it's really hard, I think, to say, at least in that respect, he used the same method as the patent does.

Q.    I'm not asking about the method used generally.  Just specifically with regard to peak area response, the claims as you identified reference using peak area response, correct?

A.    Those words --

MR. LIEF:  Objection, asked and answered.

A.    Those words appear in the claim, yes.

Q.    And Dr. Kittendorf tested using peak area response?

A.    He says he --

MR. LIEF:  Same objection.

A.    He says he did.  Whether those mean

10:54:50
10:54:51
10:54:55
10:54:59
10:55:02
10:55:04
10:55:07
10:55:11
10:55:12
10:55:14
10:55:18
10:55:19
10:55:21
10:55:25
10:55:30
10:55:33
10:55:33
10:55:35
10:55:36
10:55:37
10:55:38
10:55:41
10:55:41
10:55:42
10:55:43

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    93

the same thing to the developers of this method and to Dr. Kittendorf, I don't know.

It would have been helpful in the patent if they had told us what response factors were used in the analysis, and they didn't, so...

Q.   Now, in your report, you acknowledge that a method that uses a technique other than peak area response to determine total impurities is not relevant to the claim, is that right?

A.   Could you point that out?

Q.   It will be paragraph 25.

In that first sentence.

A.   What was the question again?

Q.   That you acknowledge that a method that uses a technique other than peak area response to determine total impurities is not relevant to the claim at issue.

A.   I don't think that's what I'm saying here.

Again, I'm just saying -- I'm saying that a POSA would choose an accurate method, and the peak area response method was used and it's inaccurate.

I mean, I'm not sure what your point

is honestly.

Q. So -- I don't want to interrupt you.

A. No, go ahead.

Q. The first sentence of this paragraph reads, "A method that uses a different wavelength or a technique other than peak area response to determine the total impurities would be expected to give different results and thus is of no relevance to this claim."

My question is that it's correct -- that you acknowledge a technique other than peak area response would be irrelevant to the claim, right?

A. I think -- I think you're mischaracterizing my report.

What's relevant is an accurate measurement, and a POSA would not choose this technique for this analysis.

Again, I think the sentence was within the context of saying that some of his results ██████ aren't relevant to the patent because the patent specifies 223.

And I believe we have already talked about this, so...

Q. But is it your opinion that using

█████████████████████, for example, as a technique to measure the impurities -- let me rephrase.

Is it your opinion that using, for example, ███████████████████████ to identify the amount of impurities is relevant to the claims that are at issue in this case?

MR. LIEF:  Objection to the form.

A.   It's relevant to Dr. Kittendorf's report, and he says he has an accurate method for measuring those impurities.

I'm saying he doesn't.

Q.   Do you have an opinion on whether that method -- that technique, ████████ ████████████ for example, has any relevance to the claims?

MR. LIEF:  Objection, beyond the scope.

A.   I'm sorry, I'm not understanding your question.

I mean, I see what the claim says. The words ████████████████ don't appear in the claim, but again, what's -- or as a POSA, what's relevant is getting number -- an accuracy appropriate to the application.

And if that means using ███████ ██████████ then that's what a POSA would do.

Q. And what's your understanding of the application in this case that a POSA would be considering?

A. Well, the application is for a drug that's injected into people's veins and is subject to a litigation, and given those facts, a POSA would choose an accurate way to do things, and choosing peak area response and assuming all of the response factors are equal would be an inaccurate way to do things, and I think we have evidence in my report showing that.

Q. Can you turn to paragraph 83 in your report? It will be page 29.

A. Give me a second to read it. Okay?

Okay.

Q. So you state that a peak area response normalization approach is premised upon an assumption that all anolytes have the same response factor, correct?

A. I see that.

Q. And you cited Snyder --

A. Snyder and Kirkland.

Q.    -- practical HPLC method development from 1997 as support, correct?

A.    Correct.

Q.    Give me a second.

A.    Do you have a copy?

Q.    I sure do.

Can we please mark this for identification as Exhibit 9.

(Exhibit 9, document, Bates stamped EAGLEBEN-SA_00373969, marked for identification, as of this date.)

Q.    And for further identification, the ending Bates for the first page of this document are 3969.

I'm going to ask you about a specific page in this document --

A.    Can you give me a chance to review this, please?

MR. LIEF:  Counsel, there is another Snyder as well that he cited.

A.    That's why -- it is a little confusing, there is multiple books by these authors, so it's...

Q.    I understand this is the 1997 version.

11:01:11
11:01:13
11:01:15
11:01:20
11:01:22
11:01:25
11:01:29
11:01:33
11:01:34
11:01:35
11:01:40
11:01:47
11:01:50
11:01:53
11:02:02
11:02:04
11:02:06
11:02:08
11:02:16
11:02:17
11:02:19
11:02:20
11:02:24
11:02:25
11:02:27

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

98

A. I'm just double-checking that.

Okay.

Q. Please turn to page 665 in this document.

A. Already there.

Q. Perfect.

And just for reference, the ending Bates on this page is 4007.

So here, this is one of the -- the page that you cite. On that second paragraph at the top of the page starting with "The proper use" -- do you see that?

A. Yup.

MR. LIEF: Objection to the form.

Q. Now, the document states that proper use of a normalized peak area technique assumes that the response factor for each component is identical, correct?

A. I see that.

Q. And we will also take a look at the other reference.

So you cited the 2010 edition, correct?

A. Yeah.

Q. We can mark this for identification

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    99

as Exhibit 10.

(Exhibit 10, document entitled
"Introduction to Modern Liquid
Chromatography," marked for
identification, as of this date.)

Q.    And just let me know when you're
done looking through the document.

A.    This might be a -- it says second
edition in my report, and this says third
edition.

Q.    This is the one that was attached to
your report.

A.    All right.

Q.    Just --

A.    One moment.

Okay.  Go ahead.

Q.    All right.  Since there is a little
bit of a difference between how it is referenced
in your report and the document that was
provided as written here, there is no page
number, but I believe it's the fourth page has
the copyright information.

A.    It says 2010?

Q.    Yeah.  So if you can just turn there
and just you can confirm this is the 2010

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

100

version that you are talking about in your report?

MR. LIEF:  This is Smith 10.  This is Smith deposition Exhibit 10.

MS. BUREK:  2010 is the year for this publication.

MR. LIEF:  But by "this," you mean Smith Exhibit 10?

MS. BUREK:  Correct, yeah.

A.    I see 2010, yes.

Q.    Okay.  Thank you.

You can go ahead and turn to page 525 of this document.

A.    Yup.

Q.    All right.  And at the bottom of the section that's titled "Area normalization" -- do you see that?

A.    Yes.

Q.    And it references percent peak area and then a little bit later down, area normalization.

Do you see those two references?

A.    Yes.

Q.    Now, on the next page, at the very top, it says that both procedures rely on the

assumption that the detector response are nonstandardized.  For example, unknown peaks is the same as for peaks for which standards are available.  This assumption may or may not be appropriate depending on the sample composition and choice of detector.

Do you see that?

A.    Yes.

Q.    This is the same proposition as from the previous document, that the assumption is that all values are identical, right?

MR. LIEF:  Objection to form.

A.    Which values?

Q.    The response factors.

MR. LIEF:  Same objection to form.

A.    All right.  So if I am understanding your question correctly, you're asking me if these two references, Exhibit 10 and Exhibit 9, are saying that the peak area response method means you're assuming the response factors are equal, is that your question?

Q.    Yes.

A.    The answer is yes.

Q.    Would you agree then that the claims which reference use of peak area response

require that the response factors are all equal?

MR. LIEF:  Objection to the form.

A.    It assumes the response factors are equal.

And that's part of my criticism of the technique.

Q.    Understood.

But -- and by assuming that all the anolytes --

A.    Have the same response factor.

Q.    Let me finish.

A.    Sorry.

Q.    By assuming that all the anolytes -- that all the anolytes have the same response factor as Dr. Kittendorf did, that is consistent with the approach in the claims, whether or not you agree that's the correct approach, correct?

MR. LIEF:  Objection.

A.    All right.  So you're asking me whether the claim use of peak area normalization is the same as Dr. Kittendorf's use of peak area of normalization?

Q.    Correct.

A.    Again, the paucity of information on the HPLC method in the patent makes it difficult

for me to compare what Dr. Kittendorf did with what the patent calls for because I don't think the information is there.

Dr. Kittendorf clearly states that he assumed the response factors were all equal. The patent does not say that. The patent is silent on that matter.

Q. Just understanding peak area response method and what it requires, is there ever a case where the response factors would not be identical and it would still be the proper peak area response method?

MR. LIEF: Objection to the form.

A. I think it is improper to assume they are equal when they're not.

Q. Understood.

But just if someone is referring to peak area response, for example, as we have seen in the --

A. These two references.

Q. -- in the literature, the assumption is that the response factors are equal, right?

MR. LIEF: Objection, mischaracterizes.

A. When you see the words -- or a POSA

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                   104

sees the words "peak area response" or "peak      11:10:34
area normalization," we're raising are those two  11:10:39
phrases, that's -- they're the same thing.        11:10:40
Okay?                                             11:10:43
        The way Dr. Kittendorf uses it is         11:10:44
that the response factors he is assuming are      11:10:49
equal.                                            11:10:53
        I've seen in the literature what's        11:10:54
called -- and this is where the semantics gets a  11:10:57
little difficult -- a peak area normalization     11:11:00
method where they use response factors that       11:11:03
were -- they didn't assume the response factors   11:11:05
were equal and they actually measured the         11:11:09
response factors.                                 11:11:11
        So, for example, in the                   11:11:12
bendamustine -- this is what, exhibit what, 7 --  11:11:15
they used the response factors here, but they     11:11:22
also use peak areas.                              11:11:28
        So we could argue that this is also       11:11:31
a peak area response method but using -- but not  11:11:33
making the assumption that the response factors   11:11:36
were equal.                                       11:11:38
        Which is, again, the correct way to       11:11:40
do things as far as I'm concerned.                11:11:42
        MS. BUREK:  I think we are in a good       11:11:44

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    105

                    spot to take another short break.            11:11:46

                         THE VIDEOGRAPHER:  We are going off     11:11:49

                    the record.  The time is 11:11 a.m.          11:11:49

                         (Recess.)                               11:11:52

                         THE VIDEOGRAPHER:  We are back on        11:11:51

                    the record.  The time is 11:22 a.m.          11:22:18

BY MS. BUREK:                                                    11:22:22

          Q.    I have a couple of questions that               11:22:24

kind of mirror each other.  Bear with me while I                11:22:29

get through them.                                               11:22:32

          So first, in your report and today                    11:22:36

you have argued that a full validation is                       11:22:37

required, correct?                                              11:22:40

               MR. LIEF:  Objection,                            11:22:41

          mischaracterizes.                                     11:22:41

          A.    I think we need to be clear about               11:22:45

the circumstances, and what I'm arguing in my                   11:22:47

report is that since Dr. Kittendorf changed the                 11:22:49

detection wavelength and the quantitation method               11:22:55

compared to Slayback's method, he needed to do a                11:22:59

full validation.                                               11:23:03

          Q.    And this is where these series of               11:23:04

questions come in.                                              11:23:06

          A.    Okay.                                           11:23:07

          Q.    So again --                                     11:23:07

A.    Yeah, yeah.

Q.    -- bear with me, let me get through them.

A.    Yup.

Q.    You understand that Dr. Kittendorf's testing was not done to support any clinical trial, correct?

MR. LIEF:  Objection to the form.

A.    Correct.

Q.    And you understand that Dr. Kittendorf's testing was not submitted in any new drug application, correct?

MR. LIEF:  Objection, mischaracterizes.

A.    I don't know what is going to be done with his data, to be honest.  I don't think I can answer that.

Q.    You understand that the purpose of Dr. Kittendorf's testing in this patent infringement litigation is not to determine whether Slayback's product is safe for patients, right?

A.    You're asking me to speculate on the purposes of Dr. Kittendorf's test, correct?

Q.    I'm not asking you to speculate, but

you said you reviewed his report.  He was --

A.    Yes.

Q.    -- he had specific purposes of the testing.

A.    What I can opine on is the accuracy of his results.  They're inaccurate.

What the data is -- what's going to be done with the data, I don't care to speculate on.  Why he did the analysis, I don't care to speculate on.

Assuming he was hired by your firm to -- well, I know what he did.  He tested three vials of Slayback's product and made some assertions about the impurity levels that are wrong.

Q.    The FDA has already approved Slayback's product, correct?

A.    Yes.

I've been told that, let me put it that way.  I'm not a regulatory affairs person.

Q.    I'm going to hand you a document.

Can we please mark this for identification as Exhibit 11.

(Exhibit 11, validation of compendial procedures, marked for

identification, as of this date.)                    11:25:30

Q.    Have you seen this document before?            11:26:37

A.    Is this what was submitted as my               11:26:40
exhibit?                                             11:26:43

Q.    Correct.                                        11:26:44

A.    Okay.  I don't see a date.  I                  11:26:44
guess -- because I've never seen that heading at     11:26:54
the top before.  So -- the rest of the document,     11:26:56
I have seen.                                          11:27:00

It says, "Currently official as of                   11:27:01
2026."  So official date -- okay -- 2017.  Okay.     11:27:04

Yeah, I've seen this.                                 11:27:11

Q.    This is chapter 1225, correct?                 11:27:17

A.    Of what?                                        11:27:20

Q.    The USP.                                        11:27:21

A.    Yes.                                            11:27:23

Q.    The title is "Validation of                    11:27:24
Compendial Procedures"?                              11:27:27

A.    I see that.  I see that.                        11:27:29

Q.    Did you know what "compendial"                 11:27:32
means?                                               11:27:34

A.    It's the validation -- well,                   11:27:38
"compendial" would mean -- what's the word --        11:27:41
it's procedures that would be part of the USP.       11:27:51

Q.    And as we discussed, just to be                11:27:57

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

109

clear, Dr. Kittendorf's testing procedure is not
one that is part of the USP, correct?

MR. LIEF:  Objection,
mischaracterizes.

A.    What do you mean "part of"?

Q.    It's not, for example, the same
procedure as the monograph for bendamustine?

MR. LIEF:  Objection, form.

A.    Which would be exhibit -- you are
referring to Exhibit 7?

Q.    Correct.

A.    So again, is your question that did
Dr. Kittendorf's -- is Dr. Kittendorf's method
the same as the method in Exhibit 6 -- 7?

Q.    Correct.

A.    His method is different than the
method in Exhibit 7.

Q.    Now, looking back to chapter 1225,
that first paragraph at the top of the page
states, "Test procedures for assessment of the
quality levels of pharmaceutical articles are
subject to various requirements," and then it
goes on to discuss some of those requirements.

Is that right?

A.    It goes on to discuss the FDA and

11:27:59
11:28:02
11:28:05
11:28:06
11:28:06
11:28:08
11:28:10
11:28:14
11:28:16
11:28:18
11:28:23
11:28:25
11:28:28
11:28:31
11:28:35
11:28:35
11:28:37
11:28:40
11:28:47
11:28:52
11:28:55
11:28:58
11:29:01
11:29:05
11:29:07

good manufacturing practices.

Q. And later in that paragraph, it states, "Recognizing the legal status of the USP and NSF standards, it is essential therefore that proposals for adoption of new and revised compendial and analytical procedures be supported by sufficient laboratory data to document their validity."

Did I read that right?

A. I see that.

Q. Now, in that same section, that last paragraph states, "The text of this information chapter harmonizes to the extent possible with the International Council for Harmonization, ICH, tripartite guideline validation of analytical procedures and the methodology extension text, which are concerned with analytical procedures included as part of registration application submitted with the EC, Japan and the U.S."

Correct?

A. I see that.

Q. If you can just turn the page over to page 2 there.

Specifically, we are looking at --

under this table 1, there are two -- paragraph 1

is -- starts with "In the case of compendial

procedures" --

      A.   I'm sorry, where are you?

      Q.   Paragraph starting at "In the case

of compendial procedures."

          Do you see that?

      A.   Oh, I'm sorry, yes.

      Q.   That sentence goes on, "revalidation

may be necessary in the following cases:  A

submission to the USP of a revised analytical

procedure for the use of an established general

procedure with a new product or raw material."

          Is that right?

      A.   I see that.

      Q.   Is Dr. Kittendorf's testing part of

a submission to the USP in the case of this

litigation?

      A.   Again, I don't know what he is going

to do with this data.  All I know is what was in

his report.

          So this data may or may not be used

at some point as per a USP submission, so I

don't care to speculate.

      Q.   To your understanding, as we sit

here today -- no need to speculate into what

happens after today, just as we sit here today,

to your understanding, has Dr. Kittendorf's

testing -- is the purpose of Dr. Kittendorf's

testing in this litigation to submit a new

method to the USP?

A.    I don't know what his purposes are

aside from analyzing those three vials to

determine what the impurities were.

Q.    Do you know if Dr. Kittendorf's

testing used a new product other than Slayback's

NDA product?

A.    He used the vials supplied to him by

Slayback.

Q.    So the existing approved Slayback

product, correct?

A.    I'm -- he was given three vials by

Slayback.  I'm assuming those were the approved

product.

I mean, I don't know that I was told

that specifically, but...

Q.    To your understanding, based on your

review of his report, Dr. Kittendorf didn't

change any raw materials in Slayback's product

that he received, correct?

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    113

A.    He didn't mention making any changes to those three vials, no.

Q.    Now, back to this document, the next paragraph starts with "The ICH documents."

Do you see that?

A.    Yeah.

Q.    Here it says, "The ICH documents give guidance on the necessity for revalidation in the following circumstances:  Changes in the synthesis of the drug substance, changes in the composition of the drug and changes in the analytical procedure."

Is that right?

A.    I see that.

Q.    But to your understanding, did Dr. Kittendorf's testing change the synthesis of the actual drug substance?

A.    No, but he did change the analytical procedure, which is why I opined that he needs to do a new validation.

Q.    So we saw in -- on the previous page -- and we can turn back if you need to -- we saw that it says, "The ICH documents give guidance on the necessary for revalidation and that guidance is specifically concerned with

analytical procedures."

A.    I'm sorry, which paragraph are we on?

Q.    It's that second paragraph in that first section, so the second paragraph --

A.    That begins with the text "So this information chapter harmonizes"?

Q.    Yes.

A.    Okay.  Go ahead.

Q.    At the end there, we see that the ICH guidelines referenced are concerned with analytical procedures included as part of registration application submitted within the EC, Japan and the U.S., correct?

A.    I see that.

Q.    Please mark this for identification. That will be Exhibit 12.

(Exhibit 12, document, Bates stamped EAGLEBEN-SA_0369991, marked for identification, as of this date.)

Q.    Go ahead and take a look at the document.  Let me know when you're done.

A.    Go ahead.

Q.    Do you recognize this document?

A.    No.

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    115

Q.    Now, the title is "Validation of
Analytical Procedures Q2R2."

Do you see that?

A.    I see that.

Q.    And above that, it says, "ICH
Harmonized Guidelines."

Do you see that?

A.    I see that.

Q.    Okay.  And just for identification,
here the Bates number for this starting page
ends in 9991.

So this is the ICH Validation of
Analytical Procedures document that is
referenced in USP chapter 1225 that we just
read.

MR. LIEF:  Objection to the form.

Q.    On -- can you turn to page 1, which
is going to be Bates ending in 9995?

A.    Okay.

Q.    At the start there, under
Introduction, there is a section 1.1, Objective.

Do you see that?

A.    I see that.

Q.    Now, the first paragraph in this
section states that this guideline presents

elements for consideration during the

validation's analytical procedures included as

part of registration applications.

        Do you see that?

        A.    I see that sentence.

        Q.    To your understanding as of today,

are the analytical procedures Dr. Kittendorf

used to conduct his testing in this case

included as part of a registration application

for any pharmaceutical product?

        MR. LIEF:  Objection to the form.

        A.    Again, you're asking me to speculate

what Dr. Kittendorf is going to do with his

data.  I suggest you ask him.

        Q.    No, Dr. Smith, I asked as of today,

to your understanding, the purpose of the

testing of Dr. Kittendorf's data, not any future

speculation, just to your understanding today,

based on your review of his report, the purpose

of his testing was not included as part of any

registration application.

        MR. LIEF:  Objection,

    mischaracterizes and argumentative.

        A.    I can't say whether his data is

going to be used for that purpose or not.  Maybe

it will be, maybe it won't be.

Q.    I'm not asking about whether it will or will not --

A.    Well, it's not mentioned in his --

Q.    Sorry, Dr. Smith --

A.    I'm sorry.

Q.    -- I understand you know what my follow-up is.  Please let me finish.  It is really hard for the court reporter.

A.    Okay.

Q.    As of today, just your understanding is that it hasn't been used for a registration for Slayback's product, for example?

MR. LIEF:  Objection to form.  And objection, mischaracterized.

A.    I can't say one way or another whether it's been used for that purpose or not.

Q.    Okay.

Turning back to the document --

A.    Which one?

Q.    The one that we were just looking at.  This is the ICH guideline.  It's going to be --

A.    This is Exhibit 12.

Q.    Yup.

The next section is 1.2, Scope.

A.    The next paragraph, yeah.

Same page?

Q.    Same page, correct.

A.    Okay.

Q.    So looking at this section, it says, "This guideline applies to analytical procedures used for release and stability testing of commercial drug substances and products, hereinafter referred to as products."

Do you see that?

A.    I see that.

Q.    And then skipping ahead to the last sentence here, it says, "The scientific principles described in this guideline can be applied in a phase-appropriate manner to analytical procedures used during clinical development."

Correct?

A.    I see that.

Q.    Now, as of today, do you understand that Slayback's NDA product is not being developed, it's already approved?

A.    I've been told that.

Q.    You can set this document aside.  I

know you have a lot of documents in front of you, so we can put this one aside for now. No need to have it out.

A. Yup.

Q. I am going to hand you a new one though.

(Exhibit 13, document, Bates stamped EAGLEBEN-SA_00369941, marked for identification, as of this date.)

A. Go ahead.

Q. Do you recognize this document?

A. No.

Q. Just looking at the front page of this document, the title is "Validation of Analytical Procedures, Text and Methodology."

Correct?

A. I see that.

Q. And this is also an ICH harmonized tripartite --

A. Tripartite.

Q. -- Tripartite guideline, correct?

A. I see that.

Q. Can you turn to page 1, which is going to be for identification Bates number ending in 9945.

A.   I see that.

Q.   We are going to look at the first section under Introduction.

A.   Um-hm.

Q.   Now, this is the ICH methodology extension text that's referenced in the USP chapter 1225.

In this first paragraph, it says, "This document presents a discussion of the characteristics for consideration during the validation of the analytical procedures included as part of the registration application submitted within the EC, Japan and U.S."

Do you see that?

A.   I see that.

Q.   That's the only part of this document that we are going to look at.  You can go ahead and put it away to lessen some of the documents.

We will turn back to your expert report.

Specifically, if you can turn to paragraph 32.

A.   I would like to take a moment to read it.

It's a long paragraph.

Okay.  Go ahead.

Q.    And this will be towards the end of the paragraph -- or actually, I'm sorry, it will be the last sentence of the paragraph on page 10.

A.    Um-hm.  Go ahead.

Q.    You write that analyzing many samples and averaging the results is one way in analytical chemistry of increasing accuracy, correct?

A.    I see that.

Q.    Do you know how many samples Dr. Kittendorf tested at each wavelength?

MR. LIEF:  Objection to the form.

A.    Based on his report, he tested three samples of Slayback's product.

Q.    And are Dr. Kittendorf's conclusions about the total impurities in Slayback's product in his report based on the average of those three samples?

A.    I would have to go back and look at the report actually.

(Exhibit 14, expert report of Dr. Jeffrey D. Kittendorf, Ph.D., marked

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    122

for identification, as of this date.)

A.    Go ahead.

Q.    You can turn to paragraph 54.

A.    Go ahead.

Q.    I'm going to ask the same question. Are Dr. Kittendorf's conclusions about the total impurities in Slayback's product as determined in his report based on the average of the three samples that he ran?

A.    I see that he calculated the average -- well, like in table -- for example, table B3, mass percentages at 223 nanometers, I see that he measured the total impurities in three samples and then averaged them.

Q.    All right. We are going to go back to your report.

It is going to be paragraph 76, page 25.

A.    Give me a moment to read, please.

Q.    Sure thing.

A.    Go ahead.

Q.    So as stated in your report, you acknowledge that Dr. Kittendorf's results are precise, correct?

MR. LIEF:  Objection,

11:45:02
11:45:27
11:45:28
11:45:48
11:45:54
11:45:55
11:45:59
11:46:03
11:46:06
11:46:08
11:46:11
11:46:14
11:46:19
11:46:21
11:46:23
11:46:34
11:46:40
11:46:42
11:46:57
11:47:01
11:47:16
11:47:17
11:47:19
11:47:22
11:47:28

Transcript of Brian C. Smith, Ph.D.

Conducted on April 24, 2026                    123

        mischaracterizes.

        A.    I stand by what I wrote, which is,

for those six injections -- let me see if I have

it right.

              I'll acknowledge that he did six

standard -- sorry -- that he did six standard

injections, and that the relative standard

deviation was less than 10 percent.  I saw that

data in his report.

              And that says I'm satisfied with

that measurement in my report.

        Q.    Can you turn the page back to

paragraph 71 in your report?

        A.    Give me a minute to read it, please.

              That was paragraph 71, right?

        Q.    71, yes.

        A.    Go ahead.

        Q.    So here you mention addressing

Dr. Trout's report that if the results at 223

nanometers are similar to those at

              , then it would confirm their

position relative to each other.

              Do you see that?

        A.    I'm sorry, "relative to each other,"

where in the paragraph is that?

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

124

Q.    It's the fifth line towards the end of that.

A.    Oh, yeah, I'm sorry, go ahead.  I see that.

Q.    Can you explain what you mean by "relative to each other"?

A.    The way that precision is measured, in this case, is that Dr. Kittendorf took the same solution, injected it six times and got six results and averaged them, if I remember his report correctly.

And I think here what I am discussing is that in his report, Dr. Kittendorf did measurements of impurity, concentrations at 223 nanometers and ████████.  He got similar results.  But that tells us nothing about accuracy because accuracy is a measure of how far away you are from a true value.

There are no accuracy data in his report, so we don't know what the accuracy of his results are.

And in terms of precision, he got numbers that were similar to each other, so when we compare -- let's -- if I may take his report here, if we compare, for example, tables B3 and

B4, which are results at 223 and ▮ the numbers are around ▮

So what I'm saying is that -- I'm simply acknowledging the fact that he got similar values using his method at the two wavelengths, which makes them precise within the scope of these two tables, but there is no independent means of assessing accuracy because he didn't run the right samples given that true value I mentioned to give us an accuracy number.

So as I mentioned in my report, it's possible for data to be precise and not accurate, and that's the case here.

Q. Now, specifically regarding Dr. Kittendorf's results, looking at -- this is going to be table B1, Dr. Kittendorf found, based on his testing, that at 223 nanometers, the mean normalized peak area response that he calculated for total impurities is ▮▮▮, correct?

A. That's table B1?

Q. Correct.

A. At 223 nanometers?

Q. Um-hm.

A. I see that.

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                126

Q.    And looking down at table B2 right below it, he found that, based on his testing, the mean normalized peak area response at ▮▮▮▮▮▮▮ correct?

A.    I see that.

Q.    And Slayback's own validation method tests at ▮▮▮▮▮, right?

MR. LIEF:  Objection, incomplete and mischaracterizes.

A.    The documentation I've read from Slayback says ▮▮▮▮▮.

Q.    And ▮▮▮▮▮ is below 5 percent, correct?

A.    Correct.

Q.    Now, the difference between ▮▮▮▮▮, correct?

A.    It's ▮▮▮▮▮.

Q.    Would those two results, ▮▮▮▮▮, are the -- let me start over.  Apologies.  ▮▮▮▮▮ are not meaningfully different percentages, correct?

MR. LIEF:  Objection to the form.

A.    That's really a loaded question,

"meaningfully different."  It's all within the context of the accuracy of the method.

And I talk about margin of error in my report.  There is a plus or minus in every measurement we make in analytical chemistry.  And there are actually statistical tests -- I'm not going to go into that, but there are statistical tests to prove whether numbers are meaningfully different or not.

We don't know the accuracy of these numbers, so we don't know what the margin of error is, so it is hard to compare them to each other and say whether they are -- whether they are the same or not or whether they are meaningfully significantly different or not.

Q.    Based on your earlier testimony, is it fair to say though that the result at 223 nanometers and ███████████ are similar to each other?

MR. LIEF:  Same objection to form.

A.    In his testing, he got similar numbers at the two different wavelengths.

Q.    By Dr. Kittendorf's testing and his --

A.    Yes.

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    128

Q.    -- method --

A.    Yes.

Q.    That's not the end of my question.

A.    I'm sorry.

Q.    Please let me finish my question.

A.    I'm sorry.

Q.    By Dr. Kittendorf's testing, both of the results at 223 nanometers and ███████████ measure less than 5 percent, correct?

A.    If you're asking me if ████████ ████████████████████████ that is correct.

Q.    Are you aware that Slayback's product specification ███████████████████ ████████████████████████████ ██████████████

MR. LIEF:  Objection to form.

A.    I've been told that.

Q.    Are you aware that Slayback represented to the FDA that ████████████ ███████████████████████████ ████████████

MR. LIEF:  Objection to form.

A.    I've been told that.

Q.    Are you aware that the FDA ████████ ███████████████████████████

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                      129

MR. LIEF:  Objection to form.                                    11:55:32

A.    I don't care to speculate █████████             11:55:34

████████████████████████████████                               11:55:36

Q.    But you don't have any reason to                          11:55:40
believe that anything in Slayback's NDA document                11:55:41
is inaccurate, do you?                                          11:55:45

A.    I've not seen the entirety of their                       11:55:47
NDA documents, so I don't care to speculate on                  11:55:49
that either.                                                    11:55:51

Q.    Fair.                                                     11:55:53

Can you turn to paragraph 100 in                                11:55:55
your report?                                                    11:55:59

A.    Where is it?                                              11:56:07

Q.    I think it is under Dr. Kittendorf's                      11:56:08
report.                                                         11:56:11

A.    All right.  Maybe this is it.                             11:56:12

Yeah, go ahead.  I'm sorry, what                                11:56:16
paragraph?                                                      11:56:18

Q.    100 --                                                    11:56:19

A.    Okay.                                                     11:56:20

Q.    -- page 34.                                              11:56:20

A.    Give me a second to read this,                           11:56:32
please.                                                         11:56:34

Go ahead.                                                       11:56:51

Q.    At the end of that paragraph, you                        11:56:52

write that the total impurities may be ███████

███████

   Do you see that piece?

  A. I see that.

  Q. Is it your opinion that the total impurities in Slayback's product could be ████

███████

   MR. LIEF:  Objection to the form.

  A. I stand by what I said here, which is that the total impurities may ████████

███████

  Q. And as we just discussed, ████████ ██████████████████████████ ████████████████

   MR. LIEF:  Objection, mischaracterizes.

  Q. ███████████████ ████████████████ ████████████████ ██████████

   MR. LIEF:  Objection to form.

  A. In terms of documents?  The only Slayback documents I really recall seeing are ████████████████ and I don't recall seeing -- I'm trying to wrack my memory here.

Q.    In this matter, you were retained as a technical expert, correct?

A.    Correct.

Q.    You are not opining on any legal opinions?

A.    Such as?

Q.    For example, you are not opining on any ultimate conclusions of infringement?

A.    I am opining that the data in Dr. Kittendorf -- you know, as I say here in paragraph 100 -- I think it was 100 -- yeah -- that Dr. Kittendorf's data does not provide evidence of infringement.

Q.    For purposes of your report and in this case, were you retained to provide opinions on infringement?

A.    No.

Q.    Did you talk to any other experts in this case?

A.    Talk to?  No.

Q.    And did you conduct any independent experiments in this case?

A.    I performed some calculations, but I

did not perform any like experiments.

Q.    Why did you not conduct any independent experiments?

A.    A couple of reasons.  First of all, it's my understanding -- or I've been told that in a case like this, the burden is on the plaintiff to prove infringement.

I wasn't asked to perform any lab experiments, and we -- I don't feel I have the time to do any.  I've got -- between when Dr. Kittendorf's report was put in my hands and now, we only had about a month.  And given, in my opinion, the need to calibrate and validate, find a lab, find a contract lab, get them vetted, get the materials and instrumentation together, I wouldn't have had time to do that kind of experimentation.

Q.    How long would that process take, just approximately, if you were asked to do that kind of testing?

A.    In this specific case?

Q.    In this specific case, yes.

A.    Okay.  So just to review -- let's think about it.  We need to find a contract lab. We need to buy the standard materials.  We would

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

133

need to -- I would need to make up solutions,

prepare samples, perform the studies I mentioned

in my report, linearity, limit of detection,

limit of quantification, specificity,

ruggedness, et cetera, and then run the actual

samples.  That could take several -- several

months.

Q.    The -- how long do you estimate the

actual -- the preparing the samples and running

those experiments as opposed to finding the

contract and the lab --

A.    That would be the majority of the

time.  The lab work would be the majority of

that time.

Q.    So would it -- to understand, would

it take several months to validate a method?  Is

that your opinion?

A.    If you're starting from scratch,

yes, it can take that long.

Q.    And if you're not from -- starting

from scratch and have certain conditions that

are presented as components of a method, how

long would that take?

A.    I think --

MR. LIEF:  Objection to the form.

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                         134

A.    Okay.  Well, I think I lay out in my report there is like seven validation steps. And if someone else had done some of those steps, and I trusted their work, that would mean I would have to do less of that work.  But it still has to be done.

And part of what we are running into here is that each of these runs can take upwards of an hour between sample prep, running of the chromatograph and the data analysis.

So you can only do -- one person by themselves in HPLC could only do maybe eight samples a day.  So that's kind of a great limiting step so to speak.

And so -- and since -- to do this work properly, I think hundreds of injections would be needed, it would take a number of weeks -- or a number of months actually, so...

Q.    Now, to your understanding, Slayback has access to its product, correct?

A.    You mean -- they make it and they have it, yes.

Q.    So if needed, you would have access to samples of Slayback's liquid bendamustine product, correct?

12:02:24
12:02:26
12:02:28
12:02:30
12:02:34
12:02:37
12:02:39
12:02:43
12:02:45
12:02:51
12:02:52
12:02:54
12:02:57
12:03:01
12:03:03
12:03:05
12:03:08
12:03:10
12:03:12
12:03:15
12:03:19
12:03:21
12:03:24
12:03:25
12:03:29

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    135

A.    I'm assuming they would give it to me, yes.

Q.    So if asked, you could have run your own HPLC analysis at 223 nanometers, correct?

A.    I wasn't asked, but yes, I could have.

Q.    And you could have determined the -- well, the individual RF values?

A.    Well, I did for three of the components, and they're different from each other in contradiction to Dr. Kittendorf's assumption.

Q.    There are some that you didn't recalculate, correct?

A.    Because there was no data in the record or no literature allowing me to do that.

Q.    And if -- so let me take a step back.

You could have purchased the reference standards for the known impurities to have -- to obtain those measurements yourself, correct?

A.    I could have, yes.

Q.    Why didn't you for that purpose?

MR. LIEF:  Objection, incomplete

hypothetical.

A.    Why didn't I purchase the standards?

Q.    To determine the RFL use for the other known --

A.    Because I --

MR. LIEF:  The same objection.

A.    -- would have had to set up a -- because of the -- the time involved.

Just purchasing the standards is just one part of an entire process of getting to a validated method at 223 nanometers.

And I wasn't about to buy the standards if I wasn't being asked to do the study, so...

Q.    And so as of today, you don't have competing impurity measurements to offer in this case, correct?

A.    I have data at -- well, I have the calculations in my report.  I guess you could call those competing.

But if you're asking me if I have done any work beyond my report, no.

Q.    That was my question.  Thank you.

A.    Okay.

Q.    There is no independent HPLC

analysis that you conducted that gave you competing measurements?

A.    I've not done any HPLC analysis on Slayback's product.

Q.    And you mentioned the burden of proof previously.

Did counsel provide you with a -- with the understanding regarding the burden of proof?

A.    I was told that in a case like this where Eagle is asserting that its patent claims are violated by Slayback, that the burden of proof is for Eagle to prove on a preponderance of the evidence.

Q.    What do you understand "preponderance of the evidence" to mean?

A.    I'm not a lawyer.

It would mean that the majority of the evidence would argue for or against something.

But again, I'm not a lawyer.  I'm not a judge.  That's for them to decide.

Q.    Now, you mentioned calculations. And as part of your report -- are the calculations you are referring to your

| | |
|---|---|
| | 12:05:37 |
| | 12:05:40 |
| | 12:05:41 |
| | 12:05:45 |
| | 12:05:50 |
| | 12:05:51 |
| | 12:05:54 |
| | 12:05:56 |
| | 12:05:58 |
| | 12:06:00 |
| | 12:06:02 |
| | 12:06:06 |
| | 12:06:09 |
| | 12:06:16 |
| | 12:06:17 |
| | 12:06:18 |
| | 12:06:20 |
| | 12:06:30 |
| | 12:06:32 |
| | 12:06:36 |
| | 12:06:37 |
| | 12:06:39 |
| | 12:06:42 |
| | 12:06:49 |
| | 12:06:53 |

recalculations of the certain RRF values?

A.    I'm referring to those and -- I'm looking at my report here.  This is paragraph 99, this table, and so my work included the RRF calculations at the top of paragraph 99 and the impurity calculations in the table below it against page 34 in paragraph 99.

Q.    And these numbers are calculated using Dr. Kittendorf's data, correct?

A.    It depends on the column you're looking at.

So for example -- yeah, just look at the column headings.

So let's say there is data from table B1 -- let's say impurity D of that second column, table B1, there is a number, ███████, that was taken from Dr. Kittendorf's report.  The next column is my corrected value for that number.

And similarly, we have got a -- the table that says -- I'm sorry, the column says Kittendorf table B3, yeah, that's taken from Dr. Kittendorf's report.  And then that final column is my correction of those numbers.

Q.    And the data that you used here is from a single solution, correct?

MR. LIEF:  Objection to the form.

A.    Correct.

Q.    Which can make a single concentration?

MR. LIEF:  Same objection.

A.    My reading of Dr. Kittendorf's report that the solution had a concentration of bendamustine, a concentration of impurity D and a concentration of impurity E.

Q.    Is considering the data from a solution with not a single concentration in your opinion sufficient to determine the response factors?

A.    The solution had three different things in it, not one, to be clear.

Is that what you are asking -- I mean, are you asking -- actually, I'm trying to correct you.

The solution he used didn't have a single thing in it.  It had three things in it.  Okay?

Q.    Understood.  Let me rephrase.

So I mean for each anolyte, in a

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                     140

single concentration for each anolyte, which the ones that you looked at would have been bendamustine, impurity D and impurity E, correct?

A.    Yeah.

Q.    And so the data for that solution only contained one concentration for each of those three anolytes, correct?

A.    Correct.

Q.    So then going back -- with that understanding, going back to my previous question, is it your opinion that the calculations using a single concentration of each of those anolytes is sufficient to determine the response factors for each of those anolytes?

A.    It is -- those numbers are accurate. The three numbers I calculated, the three response factors -- well, let me phrase it this way:  Dr. Kittendorf's contention is that all the response factors are the same.

I have three data points based on his data that they're different.  So each individual data point I stand by.  He has no data supporting his contention.  I have some

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

141

data supporting my contention.

Would I have liked more data points? Yes, but there were none available because he only ran one sample with known amounts of D and E in it.

If he had run more sample with known amounts of D and E in them, I would have been able to calculate more data points and improve the quality of my data.

Now, that being said, he makes the assumption in his work that the response factor is linear with concentration.

If that's the case, one data point is as good as any other, and if that assumption has been violated, then we're all wrong, so...

Q. So a proper determination of the response factors, if you were to do it with your own data, just as an independent determination, requires linearity data across multiple concentrations, right?

A. I object to the use of the word "proper." Okay?

In science, no data is bad. Some data is good. More data is better.

I have some data supporting my

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                     142

contentions.  Dr. Kittendorf has no data

supporting his contentions.  And I stand by my

calculations.

Q.    Just to be sure, you didn't prepare

samples of any of the anolytes at different

concentrations?

A.    No.

Q.    And you didn't plot the peak area

versus concentration for any of those at

different concentrations, right?

A.    No.  Because the data wasn't

available to me.

Q.    You didn't obtain a calibration line

for any of the anolytes, right?

A.    No.

Q.    Of your corrected, as you put it in

your table, measurements, do any of them exceed

██████ ?

MR. LIEF:  Objection to the form.

A.    Oh, okay.  Which numbers are we

talking about?

Q.    Either of them.  You can --

A.    Either of what?  There is nine

numbers here.

Q.    Let's look at the sum of the two

12:11:49
12:11:51
12:11:54
12:12:03
12:12:05
12:12:07
12:12:08
12:12:09
12:12:11
12:12:13
12:12:15
12:12:17
12:12:18
12:12:20
12:12:22
12:12:26
12:12:31
12:12:34
12:12:37
12:12:38
12:12:44
12:12:45
12:12:47
12:12:49
12:12:50

impurities --

A.    Okay.

Q.    -- that you are looking at, D and E.

A.    Right.

Q.    So starting with the peak area of percent that you've recalculated, that sum does not exceed ███████, does it?

MR. LIEF:  Objection to the form.

A.    Which column are we in?

Q.    Column 3.

A.    It just says --

MR. LIEF:  Same objection.

A.    -- corrected table B1 for impurities D and E peak area percent, that column?

Q.    Correct.

A.    And you are referring to the bottom number?

Q.    Correct.

A.    That number is the sum of the percentages of two of the impurities, and that number is ███████.

Q.    And you didn't recalculate the impurity measurements for any other impurity, did you?

A.    D.  I recalculated for D and E

because that was the only data available to me because those were the only two standards -- standards materials that Dr. Kittendorf used in his work.

Q.    To restate my question, you didn't recalculate any other impurities --

A.    Because I didn't --

MR. LIEF:  Objection, asked and answered.

A.    Because I didn't have the data.

Q.    Now, when your calculations are combined with those remaining measurements that were not recalculated, that total by peak area percent does not exceed ███████, right?

MR. LIEF:  Objection, incomplete hypothetical.

A.    I'm not seeing that in my report.

Q.    If we can mark this for identification.

(Exhibit 15, document entitled "Reply Expert Report of Dr. Jeffrey D. Kittendorf, Ph.D., marked for identification, as of this date.)

Q.    You can go to page 7.

A.    You didn't ask me if I have seen

12:13:37
12:13:39
12:13:41
12:13:44
12:13:46
12:13:48
12:13:51
12:13:53
12:13:53
12:13:53
12:13:55
12:13:57
12:14:00
12:14:04
12:14:08
12:14:09
12:14:09
12:14:36
12:14:37
12:14:37
12:14:39
12:14:42
12:14:43
12:14:43
12:15:07

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

145

this before.

Q. Have you seen this before?

A. Yes.

Q. Are you on page 7?

A. I'm sorry, what paragraph number?

Q. 29. We will be looking at table 1 on the bottom of that page.

A. Just give me a second to read this. Okay?

Okay. Go ahead.

Q. All right. We will be looking at the last two columns.

A. Um-hm.

Q. And the ones shaded in blue are ones that you have calculated in your report.

A. I don't recall seeing that in the copy I saw earlier, maybe because it wasn't printed in blue, but -- but I see that those are shaded, yes.

Q. And the other -- the other values there in those last two columns, those are the ones for impurities that you did not recalculate, correct?

A. Correct, because I didn't have the data.

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                146

MR. LIEF:  Objection to the form.

A.    I'm sorry.  Because I didn't have the data.

Q.    Now, if you look at the total for the mean normalized peak area percentage, including those two recalculations from your report, the total there is ███ correct?

A.    I see that number is there.

Let me take an aside here.  And I should have maybe saw this earlier.  The title --

Q.    Dr. Smith -- sorry to interrupt -- if your --

MR. LIEF:  I would ask you to let him finish the answer.

Q.    I would ask that you answer my question.  To the extent you want to explain anything, if your counsel has any follow-up questions, you can do it then --

A.    This has to do --

Q.    Please don't interrupt me when I'm speaking though.

Your counsel can ask if there is anything you would like to clarify.

My question was just whether the

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

147

total for those impurities, including your
recalculation, is ███████████ ?

        MR. LIEF:  Well, I object.  He
should be allowed to give the answer he
wishes to give.

    A.    This goes to what my recalculations
were.  And the title of those two columns says,
"Dr. Smith's Recalculations."

        There are a number of numbers in
those columns.  Only four of them, the ones
shaded, were my work.

        The rest is not my work.  So I think
it is a mischaracterization of the data to say
that the values at the bottom are my
recalculations.  They're not.

        There Dr. Kittendorf's calculations.
He took my data and his data and added them
together apparently and then called it my work.
It's not my work.

    Q.    Understood.

        And so there is a footnote that the
blue highlighted cells are your calculations.
I'm not trying to suggest that the other ones
are yours.

    A.    Well, I think the title of the

12:17:23
12:17:25
12:17:27
12:17:29
12:17:31
12:17:32
12:17:34
12:17:42
12:17:45
12:17:47
12:17:52
12:17:55
12:17:57
12:18:01
12:18:04
12:18:06
12:18:08
12:18:12
12:18:14
12:18:15
12:18:15
12:18:17
12:18:19
12:18:22
12:18:23

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                 148

columns should be corrected, to be honest, and I                12:18:24
didn't catch that earlier, but --                               12:18:27

Q.    Okay.                                                      12:18:29

A.    -- so be it.                                              12:18:29

Q.    Understanding that those are the two                       12:18:30
calculations you made.  The other ones are the                  12:18:32
originals from Dr. Kittendorf's report.                         12:18:35

When you add those values up, just                               12:18:37
the sum of those in that first -- in that                       12:18:40
second-to-last column is ███ correct?                           12:18:43

A.    I see that number.                                         12:18:46

Q.    Now, if we are looking at the math                        12:18:49
percentage, which is the column right to the                    12:18:50
right of that, adding the two recalculated                      12:18:52
values from your report -- the others are                       12:18:56
unchanged because you didn't recalculate them --                12:18:58
the sum of those is --                                          12:19:01

A.    Can I answer that?  Is that a                             12:19:03
question?                                                       12:19:05

Q.    I wasn't done.  It is a question,                         12:19:05
but I was not done.                                             12:19:07

Adding those together, considering                               12:19:09
the two you recalculated and the remainder, the                 12:19:11
sum of that is ███ correct?                                     12:19:14

A.    I see that number.                                         12:19:17

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    149

Q.   Now, for unknown impurities -- and we can put this away.

For unknown impurities, it is common practice to assume that an RFF -- a RRF of 1, correct?

MR. LIEF:  Objection to the form, incomplete hypothetical.

A.   You used the term "common"?

Q.   Yes.

A.   My experience is that that is not the case.

My experience with the many pharmaceutical companies I've worked with is that they don't assume the RRFs are equal to 1. They actually measure them and use those numbers instead.

Q.   For unknown impurities --

A.   Okay.

Q.   -- when you can't do that analysis for ones that are known, would you say that it is standard to assume an RRF of 1 for those?

A.   Well, I think we need to be careful about what we mean about impurities and known impurities and unknown impurities.  Okay?

The peak area response method as

used by Dr. Kittendorf assumes the response factors for all impurities are equal, known and unknown.

The, for example, USP method we were discussing earlier -- and just give me a chance to pull it out -- so it should be Exhibit 7, okay -- they went for this method, measured the response factors for 7 of the different known impurities and then assumed for the other impurities the response factor was 1.

So I would have to say then my criticism of Dr. Kittendorf is that -- well, he actually assumed they were all equal, and they're not.

I guess my criticism is he assumed they were all equal for known and unknown impurities.  He assumed that impurities D and E had the same response factors as all the other impurities, when my calculations show that is not the case, whereas what the USP is saying is that you should, for these 7 impurities, measure the response factors -- those would again be the known impurities -- and then for the unknown impurities, assume that the response factors -- what did they say, relative response factor is

1.

Q.    So for unknown impurities, it is proper to assume the value of 1, right?

MR. LIEF:  Objection to the form.

A.    Again, it depends on the method and the circumstances.  I don't want to make a blanket statement.

A good POSA would try to measure -- try to get as many known impurities measured as they can with response factors.  And then for minor impurities, it is done that the response factors are assumed to be equal to 1.

Whether it is common, I can't say it is because I've not seen it done in my observations in the pharmaceutical industry over the last 30-plus years.

Q.    Now, in your report -- and this is specifically in paragraph 101 on page 35.

A.    Just give me a sec to read it.

Go ahead.

Q.    So in your report here, you claim that there is no viable way to "correct Dr. Kittendorf's total impurities numbers."

Is that right?

A.    I'm saying that the data do not

exist in his report to correct his impurity numbers. One could do the lab work to measure the response factors for those other impurities and correct those numbers.

Q. So your statement here is specific to the information that was available, not a general statement that it's not viable to do so --

A. I'm sorry, which statement are you referring to?

Q. The one that we just read, that there is no viable way to correct the impurity numbers.

A. That's within the context of his work, yes.

MS. BUREK: Okay. There is a handful of questions that I have left. Do you want to take one more break before we kind of go through the rest of it?

I think we have been going for a little bit, so I think that might make sense.

MR. LIEF: It's 12:24. Do you want a break? It's up to you.

THE WITNESS: We do need to get

lunch at some point.                                   12:24:32

        MS. BUREK:  Let's take a couple of              12:24:39

minutes.                                               12:24:40

        THE VIDEOGRAPHER:  Okay.  We are                12:24:40

going off the record.  The time is                     12:24:41

12:24 a.m. -- p.m.                                     12:24:42

        (Luncheon recess.)                             13:29:29

AFTERNOON SESSION

THE VIDEOGRAPHER:  We are back on the record.  The time is 1:29 p.m.

BY MS. BUREK:

Q.    Welcome back.

A.    Thank you.

Q.    As I mentioned, it's just a couple more questions before we wrap up here.

A.    Okay.

Q.    Now, Dr. Smith, your opinions in this case are limited to criticisms of Dr. Kittendorf's HPLC testing methodology, correct?

A.    Correct.

Q.    You are not opining on any opinions that Dr. Trout presented in his reports, are you?

A.    I think I mentioned Dr. Trout in my report, and I had a criticism there.  But -- we went through that paragraph before lunch.  I don't remember which number it was but...

Q.    So other than the references to Dr. Trout's report in your report, you're not providing an opinion on other things he said, correct?

A.    No.  No.    13:30:24

Q.    And you're not offering an opinion    13:30:26

that the total impurities in Slayback's product    13:30:28

actually ████████████████ , correct?    13:30:31

MR. LIEF:  Objection to the form.    13:30:35

A.    I'm opining that Dr. Kittendorf's    13:30:41

method did not accurately measure the impurities    13:30:45

in Slayback's product.    13:30:50

Q.    Whether or not the actual number in    13:30:51

your opinion is the above or below is not part    13:30:53

of your opinion in this case, correct?    13:30:57

MR. LIEF:  Objection,    13:30:59

mischaracterizes.    13:31:00

A.    I don't think -- on the -- in the    13:31:09

record, there is -- I've seen -- let me phrase    13:31:16

it this way:  The test that Slayback does is a    13:31:22

different test than Dr. Kittendorf does.  And I    13:31:28

would expect them to get different results.    13:31:31

I'm not opining on what's in any of    13:31:36

Slayback's product except those three vials that    13:31:39

Dr. Kittendorf tested, and I'm opining that    13:31:43

using his method, it's so inaccurate, we don't    13:31:47

know what the percent impurities are in those    13:31:50

three vials.    13:31:53

Q.    And previously you mentioned that    13:31:56

you're aware that █████████████████ ███████████████████████████? 13:31:59 13:32:03

A.    I've been told ███████████ ████████████ ███ ████ █████████████████ ███████████████████████ ███████████████████ ██    ██ 13:32:06 13:32:11 13:32:12 13:32:14 13:32:19 13:32:21

MR. LIEF:  Objection, incomplete hypothetical.

A.    No, I -- I don't know that.

Q.    Now, you're not offering any opinion on the validity of either of the patents asserted in this case, are you?

MR. LIEF:  Objection to form.

A.    Again, my opinion is limited to Dr. Kittendorf's report, and again, I don't believe there is any evidence in his report that Slayback's product infringes the patents-in-suit.

Q.    But you don't offer any evidence of your own based on independent testing to contradict or support the impurity measurements, do you?

A.    Evidence of my own?

157

Q.   Correct.                                              13:33:09

A.   I think the calculations I did are                   13:33:10

evidence of my own that his method is incorrect.          13:33:11

     The calculations I did are evidence.                 13:33:17

Q.   My question was evidence of your own                 13:33:18

based on independent testing.                             13:33:21

     MR. LIEF:  Objection, asked and                      13:33:23

     answered.                                            13:33:23

A.   I -- if the question is did I do any                 13:33:26

experimental work, the answer is no.                      13:33:29

Q.   And you're not offering any opinions                 13:33:34

on damages, correct?                                      13:33:35

A.   No.  I'm not a lawyer, I'm not a                     13:33:36

damages expert and...                                     13:33:40

Q.   Now, just to be sure so that we have                 13:33:40

a clear answer here, your opinions, you said,             13:33:53

are limited to Dr. Kittendorf's testing.                  13:34:00

A.   And as --                                            13:34:03

Q.   To be --                                             13:34:04

A.   Go ahead.  I'm sorry.                                13:34:05

Q.   Thank you.                                           13:34:07

     To be sure, you're not offering any                  13:34:08

opinions on the validity of the asserted patents          13:34:10

in this case, correct?                                    13:34:12

     MR. LIEF:  Objection to the form.                    13:34:14

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

158

A.    Correct.                                      13:34:16

MR. LIEF:  I believe those are all            13:34:24
the questions that I have for you today.           13:34:25

THE WITNESS:  We could have done              13:34:27
this before lunch.  Okay.  Anyway...               13:34:28

MS. BUREK:  I did mention I just had          13:34:29
a couple.                                          13:34:30

THE WITNESS:  I know, just --                 13:34:31

MR. LIEF:  You told me you were               13:34:31
hungry.                                            13:34:32

THE WITNESS:  I was hungry.                   13:34:33

(Reporter seeks clarification.)               13:34:33

MR. LIEF:  Why don't we take a short          13:34:41
break and I will see.                              13:34:43

THE VIDEOGRAPHER:  We are going off           13:34:44
the record.  The time is 1:34 p.m.                 13:34:45

(Recess.)                                     13:34:47

THE VIDEOGRAPHER:  We are back on             13:37:37
the record.  The time is 1:37 p.m.                 13:37:38

MR. LIEF:  Okay.  No questions from           13:37:42
defendant.                                         13:37:44

THE VIDEOGRAPHER:  This marks the             13:37:47
end of the deposition of Dr. Brian Smith.          13:37:48
The time is 1:37 p.m.  Thank you.                  13:37:51

                * * * *                            13:38:03

NAME OF CASE:  EAGLE V. SLAYBACK

DATE OF DEPOSITION:  4.24.26

NAME OF WITNESS:  BRIAN C. SMITH, Ph.D.


            ACKNOWLEDGEMENT OF DEPONENT

            I, BRIAN C. SMITH, Ph.D., do hereby

       declare  that I have read the foregoing

       transcript,  I have made any corrections,

       additions, or  changes I deemed necessary

       as noted on the  Errata to be appended

       hereto, and that the  same is a true,

       correct and complete  transcript of the

       testimony given by me.




_____

BRIAN C. SMITH, Ph.D.


_____

Date


*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS      DAY

OF _____, 20___.

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                              160

```
                         INDEX:

WITNESS             EXAM BY:              PAGE:

B. Smith            Ms. Burek              5


                    EXHIBIT INDEX:

NUMBER              DESCRIPTION           PAGE:

Exhibit 1   Curriculum Vitae,                  21

Exhibit 2   updated Curriculum Vitae,          22

Exhibit 3   expert report,                     44

Exhibit 4   patent number 12,138,248,          52

Exhibit 5   patent number 11,872,214,          52

Exhibit 6   USP chromatography,                76

Exhibit 7   document, Bates stamped            80

            EAGLEBEN-SA_00368468,

Exhibit 8   article entitled "Method           82

            Adjustment, the USP Way,"

            dated June 12, 2017,

Exhibit 9   document, Bates stamped            97

            EAGLEBEN-SA_00373969,

Exhibit 10  document entitled                  99

            "Introduction to Modern Liquid

            Chromatography,"

Exhibit 11  validation of compendial          107

            procedures,
```

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                          161

```
               EXHIBIT INDEX:

NUMBER              DESCRIPTION              PAGE:

Exhibit 12  document, Bates stamped          114

            EAGLEBEN-SA_0369991,

Exhibit 13  document, Bates stamped          119

            EAGLEBEN-SA_00369941,

Exhibit 14  expert report of Dr. Jeffrey     121

            D. Kittendorf, Ph.D.,

Exhibit 15  document entitled "Reply         144

            Expert Report of Dr. Jeffrey

            D. Kittendorf, Ph.D.,

(Note: All quotations from exhibits are

reflected in the manner they were read and do

not denote an exact quote from the document.)
```

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    162

                    CERTIFICATE

STATE OF NEW JERSEY )
                    )ss:
COUNTY OF UNION     )

        I, MARY F. BOWMAN, a Registered

Professional Reporter, Certified Realtime

Reporter, and Notary Public within and for

the State of New Jersey, do hereby

certify:

        That DR. BRIAN C. SMITH, the witness

whose deposition is hereinbefore set

forth, was duly sworn by me and that such

deposition is a true record of the

testimony given by such witness.

        I further certify that I am not

related to any of the parties to this

action by blood or marriage and that I am

in no way interested in the outcome of

this matter.

        In witness whereof, I have hereunto

set my hand this 1st day of May, 2026.

    _____

  MARY F. BOWMAN, RPR, CRR

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

```
               * * *ERRATA SHEET* * *

NAME OF CASE:  EAGLE V. SLAYBACK

DATE OF DEPOSITION:  4.24.26

NAME OF WITNESS:  BRIAN C. SMITH, Ph.D.

Reason codes:

    1. To clarify the record.
    2. To conform to the facts.
    3. To correct transcription errors.

Page ____ Line ____ Reason____
From _____ to_____


Page ____ Line ____ Reason____
From _____ to_____


Page ____ Line ____ Reason____
From _____ to_____


Page ____ Line ____ Reason____
From _____ to_____


Page ____ Line ____ Reason____
From _____ to_____


Page ____ Line ____ Reason____
From _____ to_____


Page ____ Line ____ Reason____
From _____ to_____



                    _____
                    BRIAN C. SMITH, Ph.D.
```

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

164

| A | | | |
|---|---|---|---|
| **abbreviated** | **access** | 133:5, 133:9, | 93:14, 93:21, |
| 49:7 | 134:20, 134:23 | 155:9 | 94:19, 95:23, |
| **able** | **accuracy** | **actually** | 102:24, 104:23, |
| 38:1, 67:2, | 62:21, 66:8, | 35:19, 35:21, | 105:25, 109:12, |
| 141:8 | 68:2, 80:1, | 40:6, 50:2, | 111:19, 116:12, |
| **about** | 89:16, 95:24, | 71:12, 104:13, | 137:21, 150:22, |
| 6:19, 7:13, | 107:5, 121:10, | 121:4, 121:23, | 151:5, 156:16, |
| 7:14, 7:15, | 124:17, 124:19, | 127:6, 134:18, | 156:17 |
| 7:19, 7:20, | 124:20, 125:8, | 139:19, 149:15, | **against** |
| 11:8, 12:16, | 125:10, 127:2, | 150:13, 155:4 | 137:19, 138:7 |
| 12:24, 13:9, | 127:10 | **add** | **ago** |
| 15:1, 15:6, | **accurate** | 23:21, 70:19, | 12:24, 15:6, |
| 15:9, 15:21, | 11:22, 25:7, | 83:18, 88:13, | 21:19, 30:12, |
| 16:5, 18:17, | 34:14, 35:10, | 148:8 | 50:8 |
| 20:8, 21:1, | 62:24, 63:9, | **added** | **agree** |
| 21:5, 21:19, | 65:20, 66:1, | 147:17 | 80:25, 101:24, |
| 25:16, 29:25, | 66:13, 66:15, | **adding** | 102:17 |
| 32:12, 32:16, | 68:11, 75:3, | 148:14, 148:22 | **agreed** |
| 36:9, 41:20, | 75:4, 75:7, | **additions** | 89:23 |
| 41:25, 48:21, | 75:12, 79:6, | 159:9 | **ahead** |
| 50:8, 50:12, | 79:9, 89:18, | **address** | 67:21, 73:13, |
| 54:2, 54:18, | 93:22, 94:16, | 5:20, 6:1 | 81:12, 82:14, |
| 55:17, 55:18, | 95:10, 96:9, | **addressing** | 86:24, 87:14, |
| 55:22, 56:4, | 125:13, 128:20, | 123:18 | 87:18, 90:10, |
| 59:14, 59:20, | 140:17 | **adjustment** | 94:3, 99:16, |
| 60:18, 60:20, | **accurately** | 79:17, 82:8, | 100:12, 114:9, |
| 61:13, 62:11, | 66:17, 155:7 | 83:21, 160:16 | 114:21, 114:23, |
| 69:21, 71:15, | **accused** | **adoption** | 118:13, 119:10, |
| 77:12, 84:6, | 8:25 | 110:5 | 120:18, 121:2, |
| 85:1, 86:22, | **acetylene** | **affairs** | 121:7, 122:2, |
| 88:12, 89:6, | 28:15 | 49:9, 107:20 | 122:4, 122:21, |
| 91:24, 92:6, | **acknowledge** | **affected** | 123:17, 124:3, |
| 92:12, 94:24, | 86:25, 93:7, | 86:7 | 129:17, 129:24, |
| 97:15, 100:1, | 93:15, 94:11, | **after** | 145:10, 151:20, |
| 105:16, 107:14, | 122:23, 123:5 | 15:5, 22:21, | 157:20 |
| 117:2, 121:19, | **acknowledgement** | 23:16, 112:2 | **aimed** |
| 122:6, 124:17, | 159:5 | **after-sales** | 25:2 |
| 126:16, 127:3, | **acknowledging** | 37:18 | **al** |
| 132:12, 132:24, | 125:4 | **afternoon** | 4:4 |
| 136:12, 142:21, | **across** | 154:1 | **alcohol** |
| 149:23 | 141:19 | **again** | 39:12 |
| **above** | **action** | 7:18, 10:11, | **all** |
| 54:10, 115:5, | 162:17 | 18:2, 30:10, | 7:21, 9:16, |
| 155:10 | **activities** | 60:6, 65:21, | 9:20, 18:17, |
| **absorbences** | 23:10 | 66:10, 68:7, | 23:8, 31:20, |
| 74:18 | **actual** | 68:12, 75:14, | 41:17, 61:6, |
| | 34:4, 59:6, | 78:25, 79:5, | 63:2, 64:15, |
| | 85:15, 113:17, | 84:16, 88:20, | 68:21, 68:24, |

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

165

77:13, 80:14,
82:15, 83:19,
88:19, 91:14,
92:3, 96:11,
96:21, 99:13,
99:17, 100:15,
101:11, 101:16,
102:1, 102:8,
102:13, 102:14,
102:19, 103:5,
111:20, 122:15,
127:1, 129:16,
132:4, 140:20,
141:15, 145:11,
150:2, 150:13,
150:16, 150:18,
158:2, 161:12
**allege**
53:15
**allow**
48:9
**allowed**
79:17, 147:4
**allowing**
135:16
**along**
19:17, 82:21
**aloud**
14:3
**already**
48:19, 94:23,
98:5, 107:16,
118:23
**also**
3:19, 4:21,
5:23, 10:9,
11:3, 23:4,
26:11, 31:18,
36:21, 37:19,
52:24, 70:19,
75:8, 79:22,
82:3, 98:20,
104:18, 104:19,
119:18
**always**
74:10
**amongst**
39:14

**amount**
46:24, 95:6
**amounts**
141:4, 141:7
**analogy**
60:14
**analyses**
35:9, 40:5,
42:11
**analysis**
7:19, 8:11,
18:4, 29:2,
29:4, 29:21,
30:2, 30:8,
31:3, 31:23,
32:2, 32:25,
33:9, 33:11,
33:15, 38:8,
38:19, 39:7,
39:25, 40:15,
42:25, 43:10,
45:11, 45:23,
49:23, 79:21,
93:5, 94:18,
107:9, 134:10,
135:4, 137:1,
137:3, 149:19
**analytical**
8:8, 8:20,
8:22, 20:18,
28:10, 29:24,
31:9, 31:16,
33:5, 33:20,
36:25, 45:5,
45:7, 56:9,
66:6, 67:24,
84:22, 110:6,
110:16, 110:18,
111:11, 113:12,
113:18, 114:1,
114:12, 115:2,
115:13, 116:2,
116:7, 118:7,
118:17, 119:15,
120:11, 121:10,
127:5
**analyze**
29:6, 38:22,

39:11, 39:18,
40:17, 41:7,
41:11, 51:15,
68:1
**analyzed**
30:3, 32:1,
39:2, 49:11,
49:17, 64:23
**analyzing**
38:3, 38:24,
39:15, 79:3,
112:8, 121:8
**anda**
49:8
**anolyte**
139:25, 140:1
**anolytes**
63:2, 88:19,
92:3, 96:21,
102:9, 102:13,
102:14, 140:8,
140:14, 140:16,
142:5, 142:14
**another**
8:13, 26:14,
86:5, 97:19,
105:1, 117:16
**answer**
10:3, 10:17,
10:23, 10:25,
11:13, 13:19,
17:12, 19:12,
38:1, 43:1,
47:10, 67:22,
90:21, 91:25,
101:23, 106:17,
146:15, 146:16,
147:4, 148:18,
157:10, 157:16
**answered**
92:18, 144:9,
157:8
**answering**
10:14
**answers**
10:1, 10:4,
10:12, 41:22
**antibiotic**
7:13

**any**
6:23, 8:9,
8:19, 10:17,
11:6, 11:7,
11:8, 11:12,
11:13, 11:18,
11:21, 17:24,
18:6, 19:14,
20:21, 28:3,
28:18, 28:21,
29:9, 29:12,
29:20, 30:3,
30:5, 30:11,
30:17, 31:3,
31:22, 35:13,
37:25, 38:2,
40:14, 41:20,
41:21, 47:17,
47:21, 48:2,
48:12, 50:11,
50:12, 50:17,
51:11, 51:16,
65:9, 65:15,
70:7, 70:20,
71:2, 76:1,
84:20, 84:21,
88:24, 95:15,
106:6, 106:12,
112:24, 113:1,
116:10, 116:17,
116:20, 129:4,
131:6, 131:10,
131:20, 131:23,
132:1, 132:2,
132:8, 132:10,
136:22, 137:3,
141:14, 142:5,
142:9, 142:14,
142:17, 143:23,
144:6, 146:18,
154:15, 155:19,
156:12, 156:18,
156:21, 157:9,
157:11, 157:22,
159:8, 162:16
**anyone**
15:13, 15:16,
84:18

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

166

| | | | |
|---|---|---|---|
| **anything**<br>13:20, 21:1,<br>23:23, 49:24,<br>59:14, 59:19,<br>86:14, 129:5,<br>146:18, 146:24<br>**anyway**<br>48:10, 76:4,<br>158:5<br>**apologies**<br>126:21<br>**apology**<br>90:24<br>**apparently**<br>147:18<br>**appear**<br>62:7, 87:6,<br>90:1, 92:19,<br>95:22<br>**appearances**<br>3:1, 4:20<br>**appended**<br>159:10<br>**applicable**<br>31:2<br>**application**<br>31:4, 37:7,<br>37:23, 47:17,<br>48:3, 49:4,<br>49:8, 62:22,<br>62:23, 63:8,<br>66:10, 89:17,<br>89:20, 95:25,<br>96:4, 96:6,<br>106:12, 110:19,<br>114:13, 116:9,<br>116:21, 120:12<br>**applications**<br>30:18, 36:11,<br>37:22, 47:1,<br>47:9, 47:14,<br>116:3<br>**applied**<br>118:16<br>**applies**<br>78:13, 83:10,<br>118:7<br>**apply**<br>9:21, 30:21, | 78:24, 83:12,<br>83:24<br>**approach**<br>26:6, 62:1,<br>87:9, 90:4,<br>96:20, 102:16,<br>102:17<br>**appropriate**<br>65:25, 95:25,<br>101:5<br>**approval**<br>47:17<br>**approved**<br>64:10, 107:16,<br>112:15, 112:18,<br>118:23<br>**approving**<br>128:25<br>**approximate**<br>46:24<br>**approximately**<br>13:5, 13:13,<br>42:10, 132:19<br>**approximation**<br>46:22<br>**april**<br>1:16, 2:6, 4:8,<br>5:1, 17:19<br>**area**<br>56:7, 56:17,<br>56:23, 58:3,<br>62:12, 63:9,<br>66:14, 87:25,<br>88:7, 88:16,<br>88:23, 89:7,<br>89:19, 89:24,<br>90:3, 90:15,<br>91:3, 91:8,<br>91:15, 91:19,<br>92:14, 92:15,<br>92:22, 93:9,<br>93:16, 93:23,<br>94:6, 94:12,<br>96:10, 96:19,<br>98:16, 100:16,<br>100:19, 100:20,<br>101:19, 101:25,<br>102:20, 102:21, | 103:8, 103:12,<br>103:18, 104:1,<br>104:2, 104:10,<br>104:20, 125:18,<br>126:3, 142:8,<br>143:5, 143:14,<br>144:13, 146:5,<br>149:25<br>**areas**<br>88:13, 104:18<br>**aren't**<br>82:24, 94:21<br>**argue**<br>69:8, 78:25,<br>79:1, 87:23,<br>104:19, 137:19<br>**argued**<br>78:23, 105:12<br>**arguing**<br>88:2, 105:17<br>**argumentative**<br>116:23<br>**armstrong**<br>5:21<br>**around**<br>36:6, 41:3,<br>125:2<br>**art**<br>43:13, 43:18<br>**article**<br>82:7, 160:15<br>**articles**<br>109:21<br>**aside**<br>112:8, 118:25,<br>119:2, 146:9<br>**asked**<br>73:17, 92:17,<br>116:15, 132:8,<br>132:19, 135:3,<br>135:5, 136:13,<br>144:8, 157:7<br>**asking**<br>10:17, 55:1,<br>60:2, 71:8,<br>74:8, 81:24,<br>91:17, 92:12,<br>101:17, 102:19, | 106:23, 106:25,<br>116:12, 117:2,<br>128:10, 136:21,<br>139:18, 139:19<br>**aspects**<br>30:17, 37:12<br>**asserted**<br>86:25, 89:23,<br>156:14, 157:23<br>**asserting**<br>137:11<br>**assertions**<br>107:14<br>**assessing**<br>125:8<br>**assessment**<br>109:20<br>**assist**<br>34:25<br>**assisted**<br>47:16, 47:20,<br>51:6, 51:11<br>**associate**<br>57:4<br>**associated**<br>76:16<br>**associates**<br>6:2, 24:4,<br>24:13, 31:13,<br>31:15, 34:20,<br>36:18, 37:4<br>**association**<br>57:19<br>**assume**<br>55:14, 103:14,<br>104:12, 149:4,<br>149:14, 149:21,<br>150:24, 151:3<br>**assumed**<br>92:2, 103:5,<br>150:9, 150:13,<br>150:15, 150:17,<br>151:12<br>**assumes**<br>63:1, 98:16,<br>102:3, 150:1<br>**assuming**<br>55:18, 64:23, |

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

167

68:23, 88:18,
96:11, 101:20,
102:8, 102:13,
104:6, 107:11,
112:18, 135:1
**assumption**
63:6, 96:21,
101:1, 101:4,
101:10, 103:21,
104:21, 135:12,
141:11, 141:14
**ast-gmoser**
14:17
**attached**
76:15, 99:11
**attorney**
10:22, 11:5
**attract**
26:10
**audio**
4:20
**audrey**
14:12, 14:14
**authors**
97:23
**available**
31:8, 101:4,
141:3, 142:12,
144:1, 152:6
**avenue**
3:5, 3:13
**average**
26:2, 121:20,
122:8, 122:11
**averaged**
122:14, 124:10
**averaging**
121:9
**avery**
7:16
**aware**
19:5, 20:21,
128:12, 128:18,
128:24, 156:1,
156:5
**away**
120:18, 124:18,
149:2

**awful**
66:25
**azurity**
1:9, 4:5, 12:3,
12:6

**B**

**b-r-i-a-n**
5:16
**b1**
125:16, 125:21,
138:16, 138:17,
143:13
**b2**
126:1
**b3**
122:12, 124:25,
138:23
**b4**
125:1
**bachelor's**
27:14, 27:17
**back**
22:16, 26:13,
60:25, 61:18,
61:21, 74:20,
81:4, 84:25,
86:18, 105:5,
109:18, 113:3,
113:22, 117:19,
120:20, 121:22,
122:15, 123:12,
135:18, 140:10,
140:11, 154:2,
154:5, 158:18
**background**
11:25, 21:5,
27:10
**backtrack**
32:5
**bad**
22:23, 141:23
**band**
72:11, 72:12
**bands**
71:22
**based**
19:20, 45:8,

59:3, 61:24,
65:2, 65:3,
65:14, 70:15,
71:1, 74:24,
75:1, 75:2,
75:6, 75:8,
112:22, 116:19,
121:16, 121:20,
122:8, 125:17,
126:2, 127:16,
140:22, 156:22,
157:6
**basic**
78:5
**basically**
60:21
**basics**
9:13
**basis**
45:3, 83:20
**bates**
52:20, 52:25,
80:4, 80:15,
97:9, 97:13,
98:8, 114:18,
115:10, 115:18,
119:7, 119:24,
160:13, 160:18,
161:3, 161:5
**bear**
9:16, 21:8,
27:22, 105:9,
106:2
**beat**
73:11
**because**
9:2, 40:2,
48:7, 50:3,
58:4, 58:7,
58:19, 58:25,
59:11, 59:17,
60:6, 60:8,
60:24, 64:24,
69:9, 70:23,
79:2, 79:8,
87:25, 89:1,
94:22, 103:2,
108:7, 124:17,

125:8, 135:15,
136:5, 136:8,
141:3, 142:11,
144:1, 144:2,
144:7, 144:10,
145:17, 145:24,
146:2, 148:16,
151:14
**been**
5:8, 8:15, 9:6,
9:12, 10:2,
19:9, 19:21,
21:9, 26:1,
35:20, 36:6,
36:19, 36:22,
40:12, 43:10,
48:11, 48:15,
49:2, 49:6,
53:14, 61:12,
64:25, 68:10,
81:22, 93:3,
107:19, 117:12,
117:17, 118:24,
128:17, 128:23,
132:5, 140:2,
141:7, 141:15,
152:20, 156:3
**before**
2:12, 6:5,
9:13, 10:14,
10:17, 11:14,
12:1, 41:18,
42:2, 49:13,
51:3, 53:7,
67:9, 77:15,
80:11, 82:16,
85:1, 88:24,
89:10, 108:2,
108:8, 145:1,
145:2, 152:18,
154:8, 154:20,
158:5, 159:23
**beforehand**
86:16
**began**
15:5
**beginning**
48:22, 52:20,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

168

**52:25**
**begins**
4:2, 53:2, 114:6
**behalf**
3:3, 3:11
**behavior**
70:8
**behaviors**
70:18
**behind**
69:22
**beholder**
40:25
**being**
12:25, 35:14, 40:3, 62:18, 85:5, 85:16, 118:22, 136:13, 141:10
**believe**
6:17, 8:19, 37:8, 60:12, 82:21, 88:9, 94:23, 99:21, 129:5, 156:18, 158:2
**below**
126:2, 126:12, 138:7, 155:10
**bendamustine**
18:4, 50:23, 51:4, 51:7, 51:15, 62:11, 63:2, 70:7, 70:13, 70:21, 71:2, 79:3, 80:20, 81:13, 88:14, 89:22, 104:16, 109:7, 134:24, 139:10, 140:3
**bendamustine-con-**
**taining**
51:21, 88:11
**bendamustine-rel-**
**ated**
51:16

**best**
14:20, 20:23, 49:18
**better**
34:20, 67:14, 141:24
**between**
22:17, 22:20, 57:5, 57:14, 57:20, 60:14, 69:18, 73:1, 99:18, 126:15, 132:10, 134:9, 156:7
**beyond**
95:17, 136:22
**big**
38:7, 40:10
**bit**
21:4, 27:12, 32:4, 32:5, 36:3, 73:22, 99:18, 100:20, 152:21
**black**
39:24
**blanket**
151:7
**blood**
39:12, 39:13, 162:17
**blue**
145:14, 145:18, 147:22
**bodies**
66:12
**books**
97:22
**both**
24:2, 26:9, 40:4, 46:4, 55:19, 59:23, 100:25, 128:7
**bottom**
77:25, 100:15, 143:16, 145:7, 147:14
**bowman**
1:22, 2:13,

5:3, 162:5, 162:24
**break**
11:12, 11:15, 44:2, 61:14, 105:1, 152:18, 152:24, 158:14
**breaks**
11:6, 11:11
**brian**
1:14, 2:10, 4:3, 5:6, 5:16, 158:23, 159:3, 159:6, 159:17, 162:10, 163:4, 163:32
**briefly**
9:17, 38:18, 88:6
**bring**
24:24, 41:3
**broadly**
71:14
**burden**
132:6, 137:5, 137:8, 137:12
**burek**
3:7, 5:11, 52:16, 61:12, 61:20, 100:5, 100:9, 104:25, 105:7, 152:16, 153:2, 154:4, 158:6, 160:3
**business**
26:10, 68:22
**buxton**
18:13, 18:23
**buy**
132:25, 136:12

**C**

**c-h-a-r-l-e-s**
5:17
**calculate**
141:8
**calculated**
122:10, 125:19,

138:9, 140:18, 145:15
**calculations**
70:15, 131:25, 136:19, 137:23, 137:25, 138:5, 138:6, 140:13, 142:3, 144:11, 147:16, 147:22, 148:6, 150:19, 157:2, 157:4
**calibrate**
34:13, 132:13
**calibration**
33:24, 142:13
**california**
39:3, 39:8, 39:10
**call**
41:9, 136:20
**called**
5:7, 7:14, 7:17, 23:14, 33:21, 35:18, 62:25, 104:9, 147:18
**calls**
37:24, 59:12, 59:17, 103:2
**came**
19:16, 23:12, 77:13
**can't**
9:7, 30:4, 30:10, 47:2, 116:24, 117:16, 149:19, 151:13
**cannabis**
23:14, 40:22, 41:25
**cannabis-based**
41:9, 41:14, 41:22, 42:5
**cannabis-related**
40:23
**capable**
46:10
**care**
107:8, 107:9,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

169

111:24, 129:2,
129:8
**career**
9:7, 23:5,
42:12, 43:2,
46:2, 47:4
**careful**
76:10, 149:22
**carry**
31:5
**case**
1:6, 4:7, 7:5,
7:15, 7:17, 8:6,
8:8, 9:8, 9:9,
12:3, 12:23,
24:23, 39:21,
43:20, 44:8,
44:21, 45:1,
45:6, 45:10,
45:13, 46:5,
46:23, 49:15,
49:21, 51:2,
51:24, 53:12,
62:23, 66:10,
66:15, 68:4,
75:3, 79:7,
79:24, 95:7,
96:4, 103:10,
111:2, 111:5,
111:17, 116:8,
124:8, 125:13,
131:17, 131:21,
131:24, 132:6,
132:21, 132:22,
136:17, 137:10,
141:13, 149:11,
150:20, 154:11,
155:11, 156:14,
157:24, 159:1,
163:2
**cases**
6:25, 8:23,
9:7, 34:5, 40:4,
50:1, 111:10
**catch**
10:8, 148:2
**categories**
71:21, 71:22

**caution**
6:22, 13:18,
32:13
**ceftin**
7:14
**cells**
147:22
**central**
2:11
**certain**
66:22, 133:21,
138:1, 156:1
**certainly**
20:15, 38:12
**certificate**
162:1
**certified**
2:14, 162:6
**certify**
162:9, 162:15
**cetera**
133:5
**chance**
97:17, 150:5
**change**
21:1, 74:13,
79:13, 79:14,
85:15, 85:19,
86:7, 112:24,
113:16, 113:18
**changed**
23:2, 105:18
**changes**
22:19, 23:9,
23:19, 27:5,
74:12, 85:13,
113:1, 113:9,
113:10, 113:11,
159:9
**changing**
79:12, 85:14,
85:18, 85:21
**chapter**
74:25, 76:6,
78:12, 81:4,
81:5, 83:8,
83:23, 108:13,
109:18, 110:13,

114:7, 115:14,
120:7
**characteristics**
120:10
**characterization**
36:16
**charge**
18:24
**charles**
5:17
**chemical**
70:6, 85:15
**chemist**
67:25, 84:22
**chemistry**
8:8, 8:20,
20:18, 27:13,
27:15, 28:10,
29:25, 31:9,
33:20, 36:25,
45:6, 45:8,
66:6, 70:6,
71:3, 121:10,
127:5
**chemists**
8:22
**chemotherapy**
62:18
**chicago**
3:6
**choice**
67:14, 101:6
**choose**
65:20, 65:25,
66:3, 66:7,
66:9, 66:13,
68:2, 68:8,
68:10, 89:17,
89:21, 93:22,
94:17, 96:9
**choosing**
96:10
**chromatogram**
88:13
**chromatograph**
134:10
**chromatographers**
47:6

**chromatographic**
78:6
**chromatographs**
28:8
**chromatography**
8:10, 17:1,
17:3, 25:22,
28:1, 28:5,
28:7, 28:19,
28:23, 30:1,
37:1, 38:22,
39:11, 40:17,
40:18, 41:2,
41:7, 43:7,
53:23, 76:20,
99:4, 160:12,
160:22
**chromographic**
78:18
**circumstances**
105:17, 113:9,
151:6
**cite**
58:13, 58:14,
98:10
**cited**
17:8, 17:13,
20:11, 43:18,
96:24, 97:20,
98:22
**claim**
54:2, 54:15,
54:17, 54:23,
55:7, 55:12,
55:14, 55:16,
55:18, 55:23,
56:2, 56:6,
56:18, 57:1,
57:18, 57:22,
58:9, 58:12,
59:1, 59:5,
59:25, 60:4,
60:9, 60:11,
60:19, 60:24,
62:2, 62:5,
62:6, 62:8,
67:8, 67:17,
89:8, 89:24,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

170

90:1, 90:5,
91:6, 91:11,
91:16, 91:20,
92:19, 93:10,
93:18, 94:9,
94:12, 95:21,
95:23, 102:20,
151:21
**claiming**
60:21
**claims**
53:16, 53:18,
53:19, 53:21,
53:24, 54:12,
57:6, 61:25,
62:9, 64:22,
65:3, 65:15,
65:17, 67:4,
87:1, 87:10,
89:12, 89:24,
92:14, 95:7,
95:16, 101:24,
102:16, 137:11
**clarification**
16:16, 29:11,
158:12
**clarify**
146:24, 163:6
**clear**
42:2, 55:1,
81:24, 84:6,
105:16, 109:1,
139:17, 157:16
**clearly**
55:12, 70:12,
103:4
**client**
50:17, 50:18,
64:24
**clinical**
106:6, 118:17
**codes**
163:5
**collectively**
12:6
**college**
27:14
**column**
138:11, 138:14,

138:17, 138:19,
138:22, 138:25,
143:9, 143:10,
143:14, 148:10,
148:13
**columnist**
23:14
**columns**
145:12, 145:21,
147:7, 147:10,
148:1
**combined**
144:12
**come**
26:13, 105:23,
129:3
**commercial**
118:9
**commercialization**
35:15
**commercializing**
64:7, 75:20
**common**
45:11, 46:6,
46:17, 46:19,
149:3, 149:8,
151:13
**commonly**
45:19
**companies**
29:4, 48:6,
48:16, 48:17,
48:24, 75:9,
75:19, 149:13
**company**
36:18, 48:12,
75:15, 89:1
**company's**
31:21
**compare**
90:20, 103:1,
124:24, 124:25,
127:12
**compared**
91:18, 105:20
**comparing**
23:8
**compendial**
107:25, 108:18,

108:20, 108:23,
110:6, 111:2,
111:6, 160:23
**compensated**
12:25
**competing**
136:16, 136:20,
137:2
**complete**
10:17, 36:15,
130:14, 159:12
**component**
98:17
**components**
67:3, 133:22,
135:10
**composition**
53:25, 54:20,
55:8, 85:15,
101:5, 113:11
**compositions**
70:6
**compound**
74:17, 85:19
**compounds**
39:16, 39:19,
71:4, 74:6,
74:14, 74:15
**concentration**
139:6, 139:9,
139:10, 139:11,
139:13, 140:1,
140:7, 140:13,
141:12, 142:9
**concentrations**
124:14, 141:20,
142:6, 142:10
**concepts**
31:1
**concerned**
104:24, 110:17,
113:25, 114:11
**conclusions**
121:18, 122:6,
131:10
**conditions**
133:21
**conduct**
45:22, 85:3,

116:8, 131:23,
132:2
**conducted**
47:21, 48:2,
137:1
**confidential**
6:24, 32:18,
35:13
**confirm**
22:9, 99:25,
123:21
**conform**
35:23, 75:16,
84:19, 163:7
**confusing**
97:22
**consider**
19:21, 40:23,
44:25, 45:6,
61:6, 73:4,
77:17
**consideration**
116:1, 120:10
**considered**
35:19, 35:21,
73:16, 89:2,
92:8
**considering**
96:5, 139:12,
148:22
**consistent**
102:15
**construction**
55:12
**construe**
54:23, 55:2
**consulting**
26:14
**contained**
140:7
**contention**
60:13, 65:21,
68:12, 140:20,
140:25, 141:1
**contentions**
142:1, 142:2
**context**
34:5, 34:19,

39:20, 41:12,
43:19, 60:16,
68:2, 88:11,
94:20, 127:2,
152:14

**continue**
10:4, 89:15

**contract**
40:18, 48:15,
132:14, 132:24,
133:11

**contradict**
156:23

**contradiction**
135:11

**control**
48:12

**controlled**
29:6, 39:13,
39:16

**conversant**
25:4

**conversations**
13:22

**conveying**
10:3

**copy**
21:12, 86:8,
86:9, 97:5,
145:17

**copyright**
99:22

**corrected**
138:20, 142:16,
143:13, 148:1

**correction**
138:25

**corrections**
159:8

**correctly**
31:25, 86:4,
101:17, 124:11

**could**
4:23, 16:20,
37:14, 57:7,
67:15, 70:8,
71:5, 79:1,
79:19, 80:2,

81:22, 90:23,
93:11, 104:19,
130:6, 133:6,
134:12, 135:3,
135:5, 135:7,
135:19, 135:23,
136:19, 152:2,
158:4

**couldn't**
38:9, 38:11,
76:4

**council**
110:14

**counsel**
4:17, 4:19,
12:2, 13:25,
15:13, 19:12,
52:13, 53:14,
77:7, 77:9,
77:10, 97:19,
137:7, 146:18,
146:23

**count**
42:18

**country**
41:3

**county**
162:4

**couple**
14:8, 15:9,
15:11, 26:2,
50:4, 105:8,
132:4, 153:2,
154:7, 158:7

**course**
8:21, 25:13,
25:16, 25:21,
26:17, 31:7,
31:9, 44:15,
76:24

**courses**
24:7, 24:16,
25:8, 25:23,
26:5, 26:7,
28:11, 28:21,
28:25, 29:24,
30:5, 30:9,
30:14, 31:5

**coursework**
28:6, 28:8,
28:9

**court**
1:1, 5:2, 10:2,
10:11, 54:24,
117:9

**criminalistic**
39:9

**criminalistics**
39:4

**criticism**
88:20, 102:5,
150:12, 150:15,
154:19

**criticisms**
154:11

**crossover**
79:15

**crr**
1:22, 162:24

**current**
5:23

**currently**
108:10

**curriculum**
21:14, 22:11,
160:7, 160:8

**customer**
37:17, 38:23,
39:1

**customers**
26:13, 26:20,
32:7, 32:8,
38:21

**cv**
6:20, 21:12,
21:16, 21:22,
22:2, 27:6, 45:9

---
**D**
---

**damages**
157:12, 157:14

**dangerous**
79:8

**dartmouth**
27:14, 29:16,
29:21, 30:6

**data**
19:3, 19:6,
19:15, 19:22,
19:25, 20:6,
20:8, 48:7,
59:14, 60:19,
63:6, 70:16,
70:24, 85:4,
85:8, 85:10,
85:12, 106:16,
107:7, 107:8,
110:7, 111:20,
111:22, 116:14,
116:17, 116:24,
123:9, 124:19,
125:12, 128:25,
129:2, 131:11,
131:14, 134:10,
135:15, 136:18,
138:10, 138:15,
139:1, 139:12,
140:6, 140:22,
140:23, 140:24,
140:25, 141:1,
141:2, 141:8,
141:9, 141:13,
141:18, 141:19,
141:23, 141:24,
141:25, 142:1,
142:11, 144:1,
144:10, 145:25,
146:3, 147:13,
147:17, 151:25,
156:2, 156:4,
156:6

**date**
4:8, 16:3,
21:15, 22:13,
44:10, 52:7,
52:12, 76:14,
76:22, 80:6,
82:10, 97:11,
99:5, 108:1,
108:6, 108:11,
114:20, 119:9,
122:1, 144:23,
159:2, 159:20,
163:3

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

172

dated
82:8, 160:17
day
134:13, 159:23,
162:21
decade
43:10
december
23:16, 43:8,
76:14
decide
137:22
decision
129:3
declare
159:7
deemed
159:9
defendant
158:21
defendants
1:11, 3:11,
7:8, 12:11,
12:12
define
72:4, 72:5,
73:7
definitely
37:18
definition
40:21, 43:19,
44:11, 44:21,
44:23
degradation
62:10
degree
27:14, 27:17
delaware
1:2, 4:7
dennison
7:16
denote
161:14
dependent
38:25
depending
62:22, 101:5
depends
25:25, 41:24,

138:11, 151:5
deponent
159:5
depos
4:11, 5:3
deposed
7:17, 9:12,
49:24
deposition
1:14, 2:10,
4:3, 4:14, 6:5,
6:9, 13:11,
13:14, 14:23,
14:24, 15:4,
15:12, 16:4,
18:7, 41:13,
100:4, 158:23,
159:2, 162:11,
162:13, 163:3
depositions
6:10, 6:14,
23:22
describe
16:13, 16:18,
16:24, 31:13,
39:6
described
7:24, 15:13,
35:5, 45:23,
78:6, 78:18,
118:15
describes
78:4
description
24:15, 160:6,
161:2
design
46:16
designing
46:10
detected
87:17
detection
30:25, 34:1,
56:13, 85:14,
85:18, 87:11,
87:12, 87:15,
88:5, 89:3,

105:19, 133:3
detector
85:21, 101:1,
101:6
determination
141:16, 141:18
determine
56:24, 93:9,
93:17, 94:7,
106:20, 112:9,
136:3, 139:14,
140:15
determined
55:24, 66:9,
87:2, 89:16,
122:7, 135:7
develop
33:20, 33:22,
34:2, 35:10,
36:1, 41:10,
46:15, 46:18,
46:20, 47:9,
66:7, 75:16,
84:18
developed
30:11, 34:21,
46:25, 47:3,
51:14, 51:18,
76:1, 83:13,
118:23
developers
93:1
developing
30:7, 31:17,
34:7, 35:1,
75:19
development
30:10, 34:11,
46:6, 97:1,
118:18
deviation
123:8
devices
35:22, 35:24
difference
69:17, 69:23,
70:8, 73:1,
73:5, 73:9,

73:15, 73:16,
73:19, 74:2,
74:3, 74:10,
99:18, 126:15
differences
71:5
different
7:23, 25:5,
56:22, 56:25,
57:5, 57:13,
57:14, 57:21,
57:24, 58:8,
58:24, 58:25,
59:2, 59:6,
60:7, 67:13,
67:15, 70:9,
70:13, 70:17,
70:18, 71:13,
71:21, 72:5,
72:6, 73:24,
74:1, 74:18,
76:9, 85:2,
86:1, 88:3,
88:21, 88:22,
94:5, 94:8,
109:16, 126:23,
127:1, 127:9,
127:15, 127:22,
135:10, 139:16,
140:23, 142:5,
142:10, 150:8,
155:17, 155:18
difficult
102:25, 104:10
directed
54:19
directly
38:14, 38:16,
86:11, 86:15
discuss
11:4, 13:20,
15:12, 53:22,
109:23, 109:25
discussed
13:21, 14:2,
19:19, 19:20,
108:25, 130:12
discussing
24:23, 41:16,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

173

124:13, 150:5
**discussion**
19:11, 41:19,
58:18, 59:16,
120:9
**discussions**
13:25, 14:20,
19:16
**disregard**
67:21
**distinction**
37:5
**district**
1:1, 1:2, 4:6
**divide**
88:16
**document**
52:21, 52:25,
77:1, 77:15,
77:17, 77:20,
79:16, 80:2,
80:4, 80:8,
80:11, 81:25,
82:16, 97:9,
97:13, 97:16,
98:4, 98:15,
99:2, 99:7,
99:19, 100:13,
101:10, 107:21,
108:2, 108:8,
110:8, 113:3,
114:18, 114:22,
114:24, 115:13,
117:19, 118:25,
119:7, 119:11,
119:14, 120:9,
120:17, 129:5,
131:1, 144:20,
160:13, 160:18,
160:20, 161:3,
161:5, 161:9,
161:14
**documentation**
126:10
**documents**
13:24, 15:19,
15:22, 15:23,
16:2, 16:10,

16:13, 16:14,
16:19, 16:22,
16:24, 17:7,
17:13, 17:25,
18:2, 18:3,
19:1, 19:3,
20:1, 20:2,
20:15, 20:18,
21:7, 51:1,
52:2, 53:6,
113:4, 113:7,
113:23, 119:1,
120:19, 129:8,
130:13, 130:18,
130:22, 130:23,
130:24
**doing**
10:2, 26:1,
30:24, 31:17,
34:4, 34:17,
38:19, 43:3,
43:4, 43:9,
64:10, 79:21
**done**
46:4, 48:5,
48:23, 61:5,
76:25, 80:9,
85:12, 99:7,
106:6, 106:16,
107:8, 114:22,
134:3, 134:6,
136:22, 137:3,
148:20, 148:21,
151:11, 151:14,
158:4
**double-checking**
98:1
**down**
100:20, 126:1
**downloaded**
77:5
**dozen**
16:10, 16:12,
16:22
**dozens**
47:4, 47:11,
47:15
**draws**
60:14

**drive**
4:12
**drug**
30:8, 31:23,
38:3, 41:15,
46:11, 49:3,
49:7, 49:12,
51:12, 55:8,
62:17, 62:18,
64:10, 66:12,
71:1, 96:6,
106:12, 113:10,
113:11, 113:17,
118:9
**drugs**
39:12, 39:21
**duly**
5:8, 162:12
**during**
11:6, 16:4,
27:18, 28:8,
116:1, 118:17,
120:10
**dynamics**
28:15

**E**

**each**
10:11, 15:11,
41:4, 98:17,
105:9, 121:14,
123:22, 123:24,
124:6, 124:23,
127:12, 127:19,
134:8, 135:10,
139:25, 140:1,
140:7, 140:14,
140:15, 140:23
**eagle**
1:4, 1:5, 4:4,
137:11, 137:13,
159:1, 163:2
**eagleben-sa**
80:5, 97:10,
114:19, 119:8,
160:14, 160:19,
161:4, 161:6
**earlier**
22:4, 23:20,

48:25, 127:16,
145:17, 146:10,
148:2, 150:5
**early**
43:2
**easy**
9:15, 10:11
**ec**
110:19, 114:14,
120:13
**edition**
98:22, 99:9,
99:10
**education**
27:8, 29:9
**educational**
27:10
**effect**
56:7
**eight**
16:9, 134:12
**either**
6:5, 8:2,
12:13, 14:13,
29:14, 29:16,
33:8, 38:21,
89:1, 129:9,
142:22, 142:23,
156:13
**electron**
27:22
**elements**
66:23, 66:25,
67:1, 116:1
**elizabeth**
3:20, 4:10
**else**
15:16, 83:15,
134:3
**email**
77:11
**employed**
48:11
**employee**
6:2, 48:15
**employees**
26:7
**employment**
36:16

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

174

**end**
16:17, 35:5,
35:6, 42:16,
42:17, 42:18,
49:18, 114:10,
121:3, 124:1,
128:3, 129:25,
158:23
**ended**
23:15
**ending**
80:16, 97:13,
98:7, 115:18,
119:25
**ends**
52:21, 52:25,
53:3, 115:11
**enough**
66:15
**ensure**
75:11, 79:9,
80:1
**entails**
39:7
**entire**
136:10
**entirety**
129:7
**entitled**
82:7, 99:2,
144:20, 160:15,
160:20, 161:9
**equal**
96:11, 101:21,
102:1, 102:4,
103:5, 103:15,
103:22, 104:7,
104:13, 104:22,
149:14, 150:2,
150:13, 150:16,
151:12
**equation**
88:10
**equipment**
31:16, 34:7,
34:8, 37:12,
37:23
**errata**
159:10, 163:1

**error**
127:3, 127:12
**errors**
163:8
**esq**
3:7, 3:8, 3:15
**essential**
110:4
**established**
111:12
**estimate**
42:22, 133:8
**et**
4:4, 133:5
**even**
10:14, 18:20
**ever**
6:4, 28:25,
36:20, 47:16,
48:11, 49:2,
49:6, 49:11,
51:6, 51:14,
51:18, 103:10
**every**
36:4, 127:4
**everyone**
9:15
**everything**
61:10, 64:8
**evidence**
39:7, 39:11,
39:14, 96:13,
131:15, 137:14,
137:16, 137:19,
156:18, 156:21,
156:25, 157:3,
157:4, 157:5
**exact**
47:2, 47:10,
161:14
**exam**
160:2
**examination**
5:10
**example**
23:21, 30:23,
33:22, 46:11,
47:21, 48:4,

48:23, 55:7,
58:15, 58:24,
66:19, 71:23,
72:13, 72:18,
85:24, 86:3,
89:25, 90:6,
91:7, 92:2,
95:1, 95:5,
95:15, 101:2,
103:18, 104:15,
109:6, 117:13,
122:11, 124:25,
131:9, 138:13,
150:4
**exceed**
142:17, 143:7,
144:14, 155:4
**except**
16:7, 155:20
**excuse**
27:11, 32:1
**exhibit**
21:10, 21:13,
21:14, 22:7,
22:11, 24:5,
44:7, 44:9,
52:3, 52:5,
52:8, 52:10,
52:18, 52:22,
54:5, 54:6,
62:5, 67:8,
76:15, 76:19,
76:20, 77:8,
80:3, 80:4,
81:5, 82:6,
82:7, 82:20,
91:12, 97:8,
97:9, 99:1,
99:2, 100:4,
100:8, 101:18,
104:16, 107:23,
107:24, 108:4,
109:9, 109:10,
109:14, 109:17,
114:17, 114:18,
117:24, 119:7,
121:24, 144:20,
150:6, 160:5,

160:7, 160:8,
160:9, 160:10,
160:11, 160:12,
160:13, 160:15,
160:18, 160:20,
160:23, 161:1,
161:3, 161:5,
161:7, 161:9
**exhibits**
16:8, 16:23,
161:12
**exist**
84:12, 152:1
**existing**
112:15
**exists**
84:7, 84:12
**expect**
69:17, 69:22,
70:8, 71:5,
73:24, 155:18
**expectation**
58:8, 60:7,
70:1
**expectations**
70:22
**expected**
56:24, 57:4,
57:14, 57:21,
59:1, 59:24,
60:10, 94:8
**experience**
21:5, 23:21,
24:25, 31:11,
42:3, 42:4,
45:8, 45:24,
72:7, 75:9,
75:14, 75:18,
84:17, 149:10,
149:12
**experiences**
23:9
**experiment**
70:21
**experimental**
157:10
**experimentation**
132:17

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                                    175

| | | | |
|---|---|---|---|
| **experiments** 131:24, 132:1, 132:3, 132:9, 133:10 | 98:17, 102:10, 102:15, 141:11, 150:10, 150:25 | 132:9 | **focus** 31:6, 37:11, 54:4, 60:23, 76:6 |
| **expert** 8:6, 8:7, 8:18, 12:20, 21:13, 43:23, 44:8, 44:9, 49:21, 49:23, 50:15, 56:19, 61:2, 69:2, 77:8, 77:18, 120:20, 121:24, 131:4, 144:21, 157:14, 160:9, 161:7, 161:10 | **factors** 63:2, 70:3, 70:11, 70:17, 88:19, 92:3, 92:7, 93:4, 96:11, 101:14, 101:20, 102:1, 102:3, 103:5, 103:10, 103:22, 104:6, 104:11, 104:12, 104:14, 104:17, 104:21, 139:15, 140:15, 140:19, 140:21, 141:17, 150:2, 150:8, 150:18, 150:22, 150:24, 151:10, 151:12, 152:3 | **felt** 23:17, 24:22, 62:20 | **focused** 58:2 |
| | | **few** 35:20 | **focusing** 55:20, 58:18, 59:16, 59:21, 60:6, 91:18 |
| | | **field** 24:23 | **follow** 79:24 |
| | | **fields** 25:3, 25:4 | **follow-up** 10:18, 117:8, 146:18 |
| | | **fifth** 124:1 | **followed** 78:8, 91:20 |
| | | **final** 138:24 | **following** 78:7, 87:9, 90:4, 111:10, 113:9 |
| | | **find** 78:16, 132:14, 132:24 | **follows** 5:9 |
| **expert's** 8:13 | | **finding** 133:10 | |
| **experts** 8:20, 131:20 | | **fine** 12:7, 12:8, 42:9, 69:6 | **footnote** 147:21 |
| **explain** 32:4, 37:14, 38:18, 56:1, 59:7, 73:13, 78:21, 88:6, 124:5, 146:17 | **facts** 96:8, 163:7 | **finish** 10:13, 10:17, 47:24, 64:4, 72:15, 102:11, 117:8, 128:5, 146:15 | **foregoing** 159:7 |
| | **fair** 36:12, 62:3, 76:5, 127:17, 129:10 | | **forensic** 24:7, 24:20, 25:3, 25:8, 39:6, 39:9, 39:11, 39:19, 40:2 |
| **extension** 110:17, 120:6 | **fairly** 58:6 | **firm** 9:2, 14:4, 14:9, 107:11 | |
| **extent** 6:23, 8:17, 9:16, 20:8, 26:19, 51:10, 71:23, 110:13, 146:17 | **familiar** 43:12, 50:22, 51:4 | **first** 5:16, 6:16, 7:5, 7:25, 8:4, 12:21, 12:22, 17:22, 23:1, 23:6, 24:4, 25:1, 44:13, 80:12, 83:4, 93:13, 94:4, 97:13, 105:11, 109:19, 114:5, 115:24, 120:2, 120:8, 132:4, 148:9 | **forensics** 29:5 |
| | **familiarity** 43:15, 50:25 | | **forgot** 50:2 |
| **external** 62:1, 62:7, 62:16, 63:7, 95:1, 95:5, 95:14, 95:22, 96:1 | **far** 14:23, 29:8, 104:24, 124:18 | | **form** 17:9, 17:11, 19:8, 29:15, 33:3, 35:8, 36:14, 37:10, 38:5, 45:18, 45:25, 48:14, 49:14, 53:13, 53:20, 54:21, 59:9, 65:5, 66:5, 71:6, |
| **F** | **fda** 19:6, 35:24, 47:17, 48:7, 64:9, 75:6, 75:21, 76:2, 85:5, 85:11, 107:16, 109:25, 128:19, 128:24, 129:3, 156:2 | | |
| **fact** 60:20, 66:11, 70:10, 75:6, 83:8, 125:4 | | **five-minute** 61:14 | |
| **factor** 63:4, 96:22, | | **florham** 3:14 | |
| | **feel** 22:16, 53:8, | | |

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

176

73:6, 78:15,
87:13, 95:8,
98:14, 101:12,
101:15, 102:2,
103:13, 106:8,
109:8, 115:16,
116:11, 117:14,
121:15, 126:24,
127:20, 128:16,
128:22, 129:1,
130:8, 130:21,
133:25, 139:3,
142:19, 143:8,
146:1, 149:6,
151:4, 155:5,
156:15, 157:25
**formal**
29:1, 29:12
**forming**
19:22
**forms**
28:1
**formulated**
51:6, 51:11
**formulating**
51:7, 51:11
**formulation**
51:8, 55:9,
55:17
**formulations**
88:12
**forth**
22:16, 162:12
**found**
20:19, 77:3,
125:16, 126:2
**founded**
36:19
**four**
7:16, 9:6,
147:10
**fourth**
99:21
**frame**
41:25
**free**
22:16, 53:8
**friday**
1:16

**front**
48:7, 66:20,
67:9, 119:1,
119:13
**full**
36:20, 54:9,
83:3, 105:12,
105:21
**fully**
10:13
**fundamental**
61:1
**fundamentally**
69:20, 70:25
**further**
97:12, 162:15
**future**
116:17

--- G ---

**gave**
49:17, 50:16,
50:17, 137:1
**genentech**
27:4
**general**
29:24, 31:9,
78:1, 81:7,
81:10, 84:14,
111:12, 152:7
**generally**
6:18, 13:19,
16:1, 16:13,
16:24, 16:25,
18:2, 25:20,
30:10, 30:17,
30:21, 32:21,
72:20, 89:2,
92:13
**germane**
23:7, 63:21
**getting**
25:2, 73:10,
75:7, 95:24,
136:10
**gist**
63:22
**give**
9:22, 9:25,

10:4, 14:3,
25:20, 27:9,
34:3, 42:21,
47:2, 56:25,
57:14, 57:24,
59:1, 59:24,
82:12, 82:17,
83:24, 94:8,
96:17, 97:4,
97:17, 113:8,
113:23, 122:19,
123:14, 125:10,
129:22, 135:1,
145:8, 147:4,
147:5, 150:5,
151:19
**given**
6:9, 24:22,
49:17, 62:17,
62:19, 66:10,
67:24, 68:1,
68:7, 69:21,
79:23, 96:8,
112:17, 125:9,
132:12, 159:13,
162:14
**glaxo**
7:12, 7:25,
9:1, 9:2, 27:2
**go**
9:13, 11:14,
22:16, 36:4,
37:24, 67:20,
73:13, 81:12,
82:14, 86:24,
87:14, 87:18,
90:10, 90:25,
94:3, 99:16,
100:12, 114:9,
114:21, 114:23,
119:10, 120:18,
121:2, 121:7,
121:22, 122:2,
122:4, 122:15,
122:21, 123:17,
124:3, 127:7,
129:17, 129:24,
144:24, 145:10,

151:20, 152:19,
157:20
**goal**
35:5, 35:6,
35:9
**goes**
9:15, 60:12,
66:12, 67:23,
109:23, 109:25,
111:9, 147:6
**going**
9:21, 9:22,
10:15, 10:16,
18:14, 21:7,
22:6, 24:2,
27:8, 32:13,
52:1, 58:13,
58:14, 60:23,
60:25, 61:13,
61:15, 62:19,
69:4, 70:23,
74:20, 76:8,
77:23, 79:5,
84:25, 85:10,
85:12, 90:20,
97:15, 105:2,
106:15, 107:7,
107:21, 111:19,
115:18, 116:13,
116:25, 117:22,
119:5, 119:24,
120:2, 120:17,
122:5, 122:15,
122:17, 125:16,
127:7, 140:10,
140:11, 152:20,
153:5, 158:15
**gonzales**
3:20
**gonzalez**
4:11
**good**
4:1, 5:12,
8:15, 10:8,
10:19, 35:18,
44:1, 44:3,
63:5, 68:25,
70:1, 104:25,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                                    177

| | | | |
|---|---|---|---|
| 110:1, 141:14, 141:24, 151:8 | **happens** 112:2 | 157:16 | 42:10, 42:25, 45:11, 45:19, |
| **graduate** 28:22 | **hard** 91:25, 92:9, 117:9, 127:12 | **hereby** 159:6, 162:8 | 45:22, 46:5, 46:18, 46:24, |
| **great** 44:19, 134:13 | **harmonization** 110:14 | **hereinafter** 118:10 | 47:12, 51:15, 51:19, 55:13, |
| **ground** 9:14 | **harmonized** 115:6, 119:18 | **hereinbefore** 162:11 | 55:22, 55:24, 56:9, 57:25, |
| **guess** 7:7, 25:6, 33:19, 37:16, 41:24, 42:2, 43:20, 47:3, 67:23, 70:4, 73:18, 77:3, 108:7, 136:19, 150:15 | **harmonizes** 110:13, 114:7 | **hereto** 159:11 | 70:21, 75:16, 75:19, 84:14, 91:24, 97:1, 102:25, 130:24, 134:12, 135:4, 136:25, 137:3, 154:12 |
| | **heading** 108:7 | **hereunto** 162:20 | |
| | **headings** 138:14 | **high-pressure** 8:10, 17:1, 17:2, 53:22 | |
| | **headquartered** 4:12 | **higher** 42:16, 84:21 | |
| **guidance** 75:4, 113:8, 113:24, 113:25 | **heard** 19:17 | **highlight** 62:15 | **hundreds** 24:7, 24:17, 25:8, 25:9, 42:15, 42:16, |
| **guide** 75:11 | **hearing** 18:6 | **highlighted** 147:22 | 42:17, 42:23, 47:3, 134:16 |
| **guideline** 110:15, 115:25, 117:22, 118:7, 118:15, 119:21 | **held** 2:11, 23:5, 36:10, 36:21 | **hired** 8:7, 9:2, 64:24, 107:11 | **hungerford** 4:12 |
| | **helpful** 37:4, 42:6, 52:14, 93:3 | **holding** 84:20 | **hungry** 158:10, 158:11 |
| **guidelines** 83:20, 114:11, 115:6 | **here** 4:2, 6:6, 20:20, 21:2, 24:17, 27:3, 36:4, 55:5, 55:7, 57:23, 60:6, 68:24, 71:2, 71:13, 80:14, 80:15, 93:20, 98:9, 99:20, 104:17, 112:1, 112:2, 113:7, 115:10, 118:14, 123:18, 124:12, 124:25, 125:13, 130:9, 130:25, 131:12, 134:8, 138:3, 139:1, 142:24, 146:9, 151:21, 152:5, 154:8, | **home** 5:20, 5:25 | **hypothetical** 46:14, 69:25, 71:7, 136:1, 144:16, 149:7, 156:10 |
| **H** | | **honest** 31:8, 37:17, 106:16, 148:1 | **hypothetically** 59:23 |
| **half** 16:10, 16:12, 16:22, 126:16 | | **honestly** 19:14, 25:1, 55:12, 72:4, 75:13, 91:23, 94:1 | **I** |
| **hand** 21:7, 22:6, 52:1, 76:8, 86:10, 86:15, 107:21, 119:5, 162:21 | | **hour** 13:3, 61:13, 134:9 | **ich** 110:15, 113:4, 113:7, 113:23, 114:11, 115:5, 115:12, 117:22, 119:18, 120:5 |
| **handful** 152:17 | | **hours** 13:5, 13:13, 13:14, 15:11, 50:4 | **identical** 90:12, 91:18, 98:18, 101:11, 103:11 |
| **hands** 42:13, 43:9, 132:11 | | **hplc** 8:10, 28:23, 30:7, 30:10, 30:15, 30:21, 31:15, 31:17, 33:22, 40:15, | **identification** 21:15, 22:7, 22:12, 44:7, 44:10, 52:4, |
| **hands-on** 43:3 | | | |
| **hang** 56:5 | | | |

52:6, 52:9, 52:11, 52:20, 52:24, 76:19, 76:21, 80:3, 80:6, 82:6, 82:9, 97:8, 97:11, 97:12, 98:25, 99:5, 107:23, 108:1, 114:16, 114:20, 115:9, 119:9, 119:24, 122:1, 144:19, 144:23

**identified**
55:23, 56:13, 92:14

**identifies**
67:10

**identify**
20:12, 52:14, 73:14, 95:6

**identifying**
40:7, 40:8

**ignoring**
79:7

**il**
3:6

**illegally**
40:3

**illusion**
85:25, 86:6

**imagine**
54:24

**implicating**
11:9

**importance**
62:17, 62:20, 66:11, 68:7, 68:14, 68:18, 79:24

**important**
9:25, 10:9, 62:23, 65:19, 68:23, 88:3

**improper**
103:14

**improve**
141:8

**impurities**
31:23, 38:3, 41:8, 41:11, 46:11, 51:20, 56:3, 56:8, 56:24, 59:23, 62:10, 63:16, 63:20, 64:17, 64:20, 66:4, 66:16, 68:5, 69:20, 70:7, 70:14, 70:22, 88:14, 89:5, 89:22, 93:9, 93:17, 94:7, 95:2, 95:6, 95:11, 112:9, 121:19, 122:7, 122:13, 125:19, 128:14, 128:20, 130:1, 130:6, 130:10, 130:19, 131:2, 135:20, 143:1, 143:13, 143:20, 144:6, 145:22, 147:1, 149:1, 149:3, 149:17, 149:23, 149:24, 150:2, 150:9, 150:10, 150:17, 150:19, 150:21, 150:23, 150:24, 151:2, 151:9, 151:11, 151:23, 152:3, 155:3, 155:7, 155:23, 156:6

**impurity**
63:24, 87:1, 88:15, 107:14, 124:14, 136:16, 138:6, 138:16, 139:10, 139:11, 140:3, 143:23, 152:1, 152:12, 156:23

**inaccurate**
63:23, 89:2,

89:20, 93:24, 96:12, 107:6, 129:6, 155:22

**inc**
1:5, 1:10, 4:4

**include**
13:10, 41:22

**included**
23:7, 110:18, 114:12, 116:2, 116:9, 116:20, 120:11, 138:5

**includes**
72:18

**including**
9:20, 11:5, 30:1, 39:12, 146:6, 147:1

**incomplete**
46:14, 69:24, 71:7, 126:8, 135:25, 144:15, 149:7, 156:9

**incorrect**
157:3

**increasing**
121:10

**independent**
61:9, 125:8, 131:23, 132:3, 136:25, 141:18, 156:22, 157:6

**index**
160:1, 160:5, 161:1

**indicated**
78:8

**individual**
78:9, 88:15, 135:8, 140:24

**industry**
26:24, 30:22, 35:18, 45:11, 45:12, 45:16, 45:20, 45:21, 46:7, 46:19, 47:6, 79:9, 84:15, 84:18,

84:23, 151:15

**inform**
70:24

**information**
6:24, 11:8, 11:25, 23:12, 32:19, 35:13, 50:11, 91:24, 99:22, 102:24, 103:3, 110:12, 114:7, 152:6

**informed**
19:21

**infringement**
8:25, 50:20, 51:24, 63:22, 66:19, 106:20, 131:10, 131:15, 131:18, 132:7

**infringes**
53:16, 156:19

**ingredients**
41:8

**inherited**
83:15

**injectable**
51:12

**injected**
96:7, 124:9

**injections**
123:3, 123:7, 134:16

**instead**
149:16

**institute**
27:15, 39:4, 39:9

**instructed**
10:24

**instrument**
34:11, 34:13, 34:16, 41:4, 43:9

**instrumentation**
132:15

**interested**
162:18

**international**
110:14

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

179

| | | | |
|---|---|---|---|
| **interpretation** 84:8 **interrupt** 94:2, 146:12, 146:21 **introduction** 99:3, 115:21, 120:3, 160:21 **involve** 8:2, 28:4, 28:18, 28:22, 30:14, 31:22, 38:3 **involved** 27:21, 30:6, 30:9, 49:2, 49:6, 68:20, 88:19, 136:8 **involving** 71:2 **irrelevant** 94:12 **issue** 53:12, 53:19, 71:1, 93:18, 95:7 **itself** 34:9, 74:6, 83:22 | **judge** 137:22 **june** 82:8, 160:17 | **know** 82:21, 84:8, 85:4, 86:3, 90:11, 95:9, 102:21, 106:5, 106:11, 106:19, 106:24, 109:1, 109:13, 111:16, 112:3, 112:4, 112:10, 113:16, 116:17, 121:18, 122:6, 122:23, 125:15, 127:23, 128:7, 129:14, 131:14, 132:11, 135:11, 138:10, 138:19, 138:24, 139:8, 140:20, 147:16, 148:7, 151:23, 154:12, 155:6, 156:17, 157:17 | 121:13, 124:20, 127:10, 127:11, 131:12, 155:23, 156:11, 158:8 **knowing** 75:10 **knowledge** 20:23, 20:25, 49:19 **known** 68:11, 135:20, 136:4, 141:4, 141:6, 149:20, 149:23, 150:2, 150:8, 150:16, 150:23, 151:9 |
| **J** | **K** | | **L** |
| **japan** 110:20, 114:14, 120:13 **jason** 3:15, 14:2 **jeffrey** 121:25, 144:21, 161:7, 161:10 **jersey** 2:15, 3:14, 162:2, 162:8 **job** 1:23, 34:10, 34:17, 36:19, 37:19, 39:8, 54:22, 54:24 **johnson** 27:3 | **keep** 22:15, 42:7 **kind** 9:17, 28:9, 36:22, 40:19, 41:13, 67:23, 70:20, 105:9, 132:17, 132:20, 134:13, 152:19 **kirkland** 96:25 **kittendorf** 62:15, 64:1, 64:5, 64:13, 65:22, 68:13, 69:9, 74:21, 78:23, 81:1, 81:17, 81:19, 87:9, 87:16, 87:24, 88:20, 90:4, 90:14, 91:2, 91:19, 92:2, 92:21, 93:2, 102:15, 103:1, 103:4, 104:5, 105:18, 112:23, 116:7, 116:13, 121:14, 121:25, 124:8, 124:13, 125:16, 131:12, 138:23, 142:1, 144:3, 144:22, 150:1, 150:12, 155:17, 155:21, 161:8, 161:11 **kittendorf's** 15:5, 17:4, 19:24, 20:5, 58:2, 60:13, 63:12, 70:12, 70:16, 79:19, | **know** 9:12, 9:16, 9:19, 10:12, 10:14, 10:15, 11:13, 12:14, 14:9, 14:12, 18:16, 28:16, 35:12, 35:14, 44:5, 44:11, 46:23, 50:19, 54:22, 58:12, 59:13, 63:24, 64:15, 65:18, 65:24, 67:6, 68:3, 68:21, 69:3, 72:21, 75:24, 76:1, 76:3, 76:25, 84:4, 85:10, 85:11, 85:24, 88:21, 93:2, 99:6, 106:15, 107:12, 108:20, 111:19, 111:20, 112:7, 112:10, 112:20, 114:22, 117:7, 119:1, | **lab** 18:25, 31:16, 31:19, 31:20, 33:5, 33:6, 33:7, 34:4, 40:2, 42:13, 43:3, 43:6, 132:8, 132:14, 132:24, 133:11, 133:13, 152:2 **labeled** 82:24 **laboratory** 83:14, 110:7 **labs** 29:5, 40:18, 41:2, 41:7 **lane** 3:12 **language** 59:1 **large** 73:5, 73:7, 73:16, 73:17, 73:21 **last** 5:17, 14:9, 14:13, 16:5, 23:16, 23:23, 25:12, 25:15, |

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

180

26:17, 42:24,
43:6, 43:8,
54:9, 110:11,
118:13, 121:5,
145:12, 145:21,
151:16
**later**
100:20, 110:2
**latham**
3:4
**law**
68:3
**lawyer**
137:17, 137:21,
157:13
**lay**
134:1
**le**
2:11
**learn**
46:1, 46:2
**learned**
29:25, 45:22
**least**
13:15, 63:3,
92:10
**leave**
16:17, 43:20,
70:4
**leaves**
66:25
**left**
152:17
**legal**
3:20, 67:18,
110:3, 131:6
**less**
62:11, 89:6,
123:8, 128:9,
128:10, 128:11,
128:15, 130:19,
134:5
**lessen**
120:18
**let's**
26:11, 39:12,
39:25, 41:13,
42:1, 47:22,

54:4, 62:4,
65:17, 73:11,
74:14, 76:6,
84:6, 88:10,
124:24, 132:23,
138:15, 138:16,
142:25, 153:2
**level**
65:15, 66:3
**levels**
63:25, 66:16,
107:14, 109:21
**light**
24:24, 70:7
**liked**
141:2
**likewise**
10:16
**limit**
30:25, 34:1,
133:3, 133:4
**limited**
63:19, 154:11,
156:16, 157:17
**limiting**
78:20, 134:14
**line**
19:17, 83:7,
83:19, 124:1,
142:13, 163:9,
163:12, 163:15,
163:18, 163:21,
163:24, 163:27
**linear**
141:12
**linearity**
30:24, 33:25,
133:3, 141:19
**linkedin**
26:12
**liquid**
8:10, 17:1,
17:2, 53:22,
99:3, 134:24,
160:21
**listed**
15:24, 23:6,
24:4, 48:18,

48:21, 48:25
**literature**
70:20, 70:23,
83:15, 103:21,
104:8, 135:16
**litigation**
7:6, 7:13,
7:19, 18:10,
49:12, 49:16,
50:5, 50:12,
51:3, 62:20,
64:21, 65:1,
65:19, 66:11,
66:18, 68:8,
68:15, 68:18,
85:9, 89:5,
96:8, 106:20,
111:18, 112:5
**little**
21:4, 27:12,
32:4, 32:5,
36:3, 70:25,
97:21, 99:17,
100:20, 104:10,
152:21
**llc**
1:5, 1:8
**llp**
3:4, 3:12
**loaded**
126:25
**location**
5:24
**long**
15:9, 121:1,
132:18, 133:8,
133:19, 133:23
**long-term**
19:2, 156:5
**look**
24:1, 24:10,
32:25, 33:1,
33:15, 44:13,
53:8, 62:4,
62:5, 73:19,
77:23, 91:9,
98:20, 114:21,
120:2, 120:17,

121:22, 138:13,
142:25, 146:4
**looked**
20:9, 37:15,
67:9, 81:14,
140:2
**looking**
21:11, 37:2,
38:25, 40:10,
64:17, 64:20,
69:19, 76:25,
80:8, 80:25,
83:2, 99:7,
109:18, 110:25,
117:21, 118:6,
119:13, 125:15,
126:1, 138:3,
138:12, 143:3,
145:6, 145:11,
148:12
**looks**
77:11
**loose**
73:22
**lot**
40:7, 67:1,
119:1
**lower**
42:17, 42:18
**lunch**
153:1, 154:20,
158:5
**luncheon**
153:7

**M**

**made**
20:23, 23:9,
107:13, 148:6,
159:8
**magazine**
23:14
**main**
41:7
**major**
28:11
**majority**
133:12, 133:13,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                                    181

137:18
**make**
9:14, 10:2,
10:11, 21:10,
34:11, 34:14,
34:16, 44:16,
55:6, 60:11,
74:3, 83:20,
127:5, 133:1,
134:21, 139:5,
151:6, 152:21
**makes**
31:15, 102:25,
125:6, 141:10
**making**
64:8, 104:21,
113:1
**manner**
118:16, 161:13
**manuela**
3:7
**manufacturer**
40:1
**manufacturing**
18:5, 31:21,
35:18, 110:1
**many**
6:8, 6:11,
12:19, 13:5,
13:13, 14:21,
15:2, 15:21,
42:10, 42:20,
46:24, 47:8,
47:12, 73:25,
83:21, 121:8,
121:13, 149:12,
151:9
**margin**
127:3, 127:11
**mark**
43:22, 52:3,
52:8, 76:18,
80:2, 82:5,
97:7, 98:25,
107:22, 114:16,
144:18
**marked**
21:9, 21:14,

22:7, 22:12,
44:6, 44:9,
52:6, 52:11,
76:21, 80:5,
82:9, 97:10,
99:4, 107:25,
114:19, 119:8,
121:25, 144:22
**market**
39:24, 68:20
**marketing**
26:10, 64:8
**marks**
158:22
**marriage**
162:17
**marx**
3:12
**mary**
1:22, 2:12,
5:2, 162:5,
162:24
**maryland**
4:13
**mass**
122:12
**material**
111:13
**materials**
112:24, 132:15,
132:25, 144:3
**math**
148:12
**matter**
4:3, 6:19,
7:23, 8:11,
8:14, 13:1,
13:6, 25:21,
50:20, 70:10,
103:7, 131:3,
162:19
**maybe**
15:7, 16:10,
26:1, 27:3,
34:20, 40:25,
61:13, 71:13,
71:21, 116:25,
117:1, 129:16,

134:12, 145:17,
146:10
**mean**
14:22, 14:23,
21:24, 25:25,
26:9, 26:23,
26:24, 34:9,
39:18, 41:25,
42:13, 47:19,
54:25, 65:7,
67:6, 68:23,
72:4, 72:8,
72:12, 73:17,
84:4, 85:25,
89:14, 89:15,
92:25, 93:25,
95:21, 100:7,
108:23, 109:5,
112:20, 124:5,
125:18, 126:3,
134:4, 134:21,
137:16, 137:18,
139:19, 139:25,
146:5, 149:23
**meaningfully**
126:23, 127:1,
127:9, 127:15
**means**
43:17, 54:23,
59:4, 79:13,
83:12, 85:22,
96:1, 101:20,
108:21, 125:8
**measure**
66:16, 70:2,
89:21, 95:2,
124:17, 128:9,
128:14, 149:15,
150:21, 151:8,
152:2, 155:7
**measured**
89:5, 104:13,
122:13, 124:7,
150:7, 151:9
**measurement**
56:2, 94:17,
123:11, 127:5
**measurements**
87:2, 124:14,

128:19, 135:21,
136:16, 137:2,
142:17, 143:23,
144:12, 156:23
**measuring**
95:11
**media**
4:2
**medical**
35:22
**medications**
39:22
**medicines**
41:10, 41:14,
41:22
**meet**
14:1, 14:21,
15:9, 15:16
**meeting**
15:11
**meetings**
15:9, 15:14
**memory**
130:25
**mention**
39:15, 50:3,
62:6, 113:1,
123:18, 158:6
**mentioned**
15:18, 26:16,
33:13, 41:14,
44:11, 44:21,
48:25, 55:20,
56:16, 58:19,
79:18, 89:10,
90:12, 117:4,
125:10, 125:11,
133:2, 137:5,
137:23, 154:7,
154:18, 155:25
**mentions**
55:13, 55:16,
57:25
**merck**
27:2
**meridien**
2:11
**methodology**
110:16, 119:15,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

182

120:5, 154:12
**methods**
17:3, 30:7,
30:12, 31:17,
34:24, 35:10,
35:23, 36:1,
41:5, 41:10,
46:18, 46:20,
46:24, 47:4,
47:12, 57:24,
66:7, 75:11,
75:19, 75:25,
76:1, 78:13,
79:10, 83:11,
83:13, 83:21,
84:12, 91:17
**microscopy**
27:23
**middle**
83:3
**might**
11:6, 11:8,
21:18, 26:8,
38:1, 39:23,
40:1, 40:2,
40:21, 46:1,
46:2, 52:13,
60:17, 86:12,
99:8, 152:21
**minor**
151:11
**minus**
127:4
**minute**
82:12, 123:14
**minutes**
153:3
**mirror**
105:9
**mischaracterizat-
ion**
147:13
**mischaracterize**
34:6
**mischaracterized**
117:15
**mischaracterizes**
20:4, 75:23,

84:3, 85:7,
90:8, 103:24,
105:15, 106:14,
109:4, 116:23,
123:1, 126:9,
130:16, 155:13
**mischaracterizing**
94:15
**mistakes**
20:21
**mittendorf**
3:12
**modern**
99:3, 160:21
**molecules**
71:9, 73:25,
74:4, 74:5
**moment**
76:23, 99:15,
120:24, 122:19
**money**
68:20
**monitor**
4:9
**monograph**
78:7, 78:9,
78:13, 78:19,
79:1, 79:2,
79:20, 79:22,
79:25, 80:20,
80:21, 81:8,
81:13, 81:15,
81:18, 83:10,
83:25, 109:7
**monographs**
84:13
**month**
15:6, 16:5,
23:23, 132:12
**months**
133:7, 133:16,
134:18
**more**
9:4, 25:2,
31:8, 32:5,
37:12, 52:1,
63:8, 70:25,
71:14, 141:2,

141:6, 141:8,
141:24, 152:18,
154:8
**morning**
4:1, 5:12,
5:13, 49:1
**most**
14:19, 21:18,
83:19
**mostly**
37:17
**move**
31:10
**moving**
36:3
**much**
15:24
**multiple**
97:22, 141:19
**mumford**
5:21
**myself**
31:20, 33:6,
43:9, 45:7

---
**N**
---
**name**
5:14, 5:16,
5:17, 14:10,
14:13, 18:14,
18:21, 159:1,
159:3, 163:2,
163:4
**names**
14:4
**nanometers**
55:25, 56:14,
58:3, 58:16,
58:17, 58:18,
59:17, 67:10,
69:10, 69:14,
69:18, 71:10,
71:19, 72:8,
72:10, 72:20,
72:24, 73:2,
74:2, 74:22,
87:3, 87:8,
87:16, 87:17,

92:4, 122:12,
123:20, 123:21,
124:15, 125:17,
125:23, 126:4,
126:7, 126:11,
127:18, 128:8,
135:4, 136:11
**narrow**
55:11, 84:9
**narrows**
84:9
**nature**
31:13
**nda**
25:17, 26:17,
49:3, 112:12,
118:22, 129:5,
129:8, 130:13,
130:19
**ndas**
32:11, 48:9
**necessarily**
60:19
**necessary**
111:10, 113:24,
159:9
**necessity**
113:8
**need**
23:17, 27:12,
40:2, 44:4,
61:24, 75:3,
76:23, 105:16,
112:1, 113:22,
119:3, 132:13,
132:24, 132:25,
133:1, 149:22,
152:25
**needed**
23:2, 67:16,
74:21, 90:24,
105:20, 134:17,
134:23
**needs**
69:13, 113:19
**never**
51:10, 75:13,
75:15, 84:18,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

183

88:25, 108:7
**new**
1:15, 2:11,
2:12, 2:15,
3:14, 4:15,
4:16, 5:21,
23:12, 23:21,
23:22, 49:3,
49:7, 106:12,
110:5, 111:13,
112:5, 112:11,
113:20, 119:5,
162:2, 162:8
**next**
83:18, 100:24,
113:3, 118:1,
118:2, 138:19
**nine**
16:9, 142:23
**none**
23:19, 141:3
**nonstandardized**
101:2
**normalization**
63:9, 96:20,
100:16, 100:21,
102:20, 102:22,
104:2, 104:10
**normalized**
58:3, 98:16,
125:18, 126:3,
146:5
**north**
3:5
**notary**
2:14, 159:22,
162:7
**note**
4:21, 11:11,
161:12
**noted**
159:10
**notes**
37:24
**nothing**
70:19, 92:6,
124:16
**novartis**
27:2

**novel**
69:9, 87:25
**nsf**
110:4
**number**
41:2, 47:2,
47:5, 52:5,
52:10, 52:18,
52:20, 52:23,
52:25, 95:24,
99:21, 115:10,
119:24, 125:10,
134:17, 134:18,
138:17, 138:20,
143:17, 143:19,
143:21, 145:5,
146:8, 147:9,
148:11, 148:25,
154:21, 155:9,
160:6, 160:10,
160:11, 161:2
**numbered**
16:9
**numbers**
77:2, 77:4,
80:14, 80:15,
124:23, 125:2,
127:8, 127:11,
127:22, 138:9,
138:25, 140:17,
140:18, 142:20,
142:24, 147:9,
149:15, 151:23,
152:2, 152:4,
152:13

---

**O**

**oath**
6:5, 9:20
**object**
10:22, 141:21,
147:3
**objection**
17:9, 17:11,
19:8, 20:3,
29:15, 33:3,
33:17, 35:8,
36:14, 37:10,

38:5, 38:10,
45:18, 45:25,
46:8, 46:13,
48:14, 49:14,
53:13, 53:20,
54:21, 55:10,
59:9, 65:5,
65:12, 66:5,
67:18, 67:20,
69:24, 71:6,
71:7, 73:6,
75:22, 78:15,
84:2, 85:6,
87:13, 90:7,
90:17, 91:4,
91:22, 92:17,
92:24, 95:8,
95:17, 98:14,
101:12, 101:15,
102:2, 102:18,
103:13, 103:23,
105:14, 106:8,
106:13, 109:3,
109:8, 115:16,
116:11, 116:22,
117:14, 117:15,
121:15, 122:25,
126:8, 126:24,
127:20, 128:16,
128:22, 129:1,
130:8, 130:15,
130:21, 133:25,
135:25, 136:6,
139:3, 139:7,
142:19, 143:8,
143:12, 144:8,
144:15, 146:1,
149:6, 151:4,
155:5, 155:12,
156:9, 156:15,
157:7, 157:25
**objective**
115:21
**observation**
75:14
**observations**
151:15
**obtain**
135:21, 142:13

**obtained**
83:14
**occurred**
23:10
**offer**
26:5, 136:16,
156:21
**offering**
155:2, 156:12,
157:11, 157:22
**office**
5:24, 5:25,
54:25
**official**
64:11, 76:14,
108:10, 108:11
**officially**
78:12, 81:14,
84:1, 84:5
**often**
9:4, 25:23
**oftentimes**
39:22, 43:3,
74:15
**oh**
22:1, 58:11,
72:3, 111:8,
124:3, 142:20
**okay**
5:16, 7:1,
7:11, 9:18,
10:5, 11:16,
12:13, 13:23,
14:7, 14:18,
14:25, 19:13,
22:1, 22:18,
23:13, 27:1,
27:11, 32:9,
32:22, 33:4,
33:18, 35:4,
42:6, 42:9,
43:11, 44:4,
44:6, 46:3,
48:1, 49:11,
53:6, 54:7,
54:14, 57:17,
59:10, 61:23,
69:5, 69:7,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

184

72:9, 72:22,
75:25, 76:7,
76:13, 76:17,
76:23, 77:10,
77:13, 77:14,
80:19, 84:7,
84:10, 86:17,
86:24, 87:5,
87:22, 88:9,
90:21, 91:11,
96:17, 96:18,
98:2, 99:16,
100:11, 104:4,
105:24, 108:6,
108:11, 114:9,
115:9, 115:19,
117:10, 117:18,
118:5, 121:2,
129:20, 132:23,
134:1, 136:24,
139:23, 141:22,
142:20, 143:2,
145:9, 145:10,
148:3, 149:18,
149:24, 150:7,
152:16, 153:4,
154:9, 158:5,
158:20
**old**
23:1
**once**
6:13, 14:22,
15:1, 88:12
**one**
6:16, 6:17,
7:23, 7:25, 8:4,
9:7, 10:10,
12:13, 14:9,
17:22, 18:13,
21:11, 21:18,
21:19, 21:21,
22:8, 22:10,
22:14, 23:1,
23:4, 23:13,
23:24, 24:5,
33:7, 45:13,
50:1, 50:3,
52:8, 54:9,

54:10, 76:11,
76:15, 81:14,
86:4, 86:10,
98:9, 99:11,
99:15, 109:2,
117:16, 117:20,
117:21, 119:2,
119:5, 121:9,
134:11, 136:10,
139:17, 140:7,
141:4, 141:13,
152:2, 152:11,
152:18
**ones**
15:25, 16:7,
48:18, 48:20,
140:2, 145:14,
145:22, 147:10,
147:23, 148:6,
149:20
**only**
6:2, 9:6,
17:22, 62:9,
83:10, 83:23,
83:24, 120:16,
130:22, 132:12,
134:11, 134:12,
140:7, 141:4,
144:1, 144:2,
147:10
**operating**
33:21, 34:22
**opine**
107:5
**opined**
113:19
**opining**
60:18, 60:20,
131:6, 131:9,
131:11, 154:15,
155:6, 155:19,
155:21
**opinion**
30:20, 66:2,
66:15, 67:15,
74:9, 74:20,
74:24, 89:19,
94:25, 95:4,

95:13, 130:5,
132:13, 133:17,
139:14, 140:12,
154:24, 155:2,
155:10, 155:11,
156:12, 156:16
**opinions**
19:22, 61:10,
81:21, 131:7,
131:17, 154:10,
154:15, 157:11,
157:16, 157:23
**opposed**
133:10
**ordinary**
43:12, 43:18,
45:7
**organized**
82:11
**original**
23:24
**originally**
21:24, 21:25,
24:6
**originals**
148:7
**other**
6:25, 8:18,
8:19, 8:22, 9:8,
10:11, 10:18,
15:13, 15:25,
16:2, 16:10,
16:12, 16:22,
18:13, 20:17,
31:3, 36:23,
39:14, 41:19,
50:11, 56:23,
67:1, 83:21,
84:21, 93:8,
93:16, 94:6,
94:11, 98:21,
105:9, 112:11,
123:22, 123:24,
124:6, 124:23,
127:13, 127:19,
131:20, 135:11,
136:4, 141:14,
143:23, 144:6,

145:20, 147:23,
148:6, 150:9,
150:18, 152:3,
154:22, 154:24
**other's**
41:5
**others**
85:23, 148:15
**otherwise**
78:8
**out**
26:11, 26:13,
66:25, 93:11,
119:3, 134:1,
150:6
**outcome**
162:18
**outlined**
45:9
**over**
9:13, 10:10,
26:4, 31:5,
80:8, 110:23,
126:21, 130:1,
130:6, 130:10,
151:15
**overtone**
28:14
**overview**
27:9
**own**
20:19, 61:7,
66:4, 70:15,
126:6, 135:4,
141:18, 156:22,
156:25, 157:3,
157:5
**owner**
8:24, 9:5, 9:9
**owners**
9:10

**P**

**page**
54:9, 77:2,
77:4, 77:24,
77:25, 80:12,
80:13, 80:16,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                                          185

81:9, 81:10,
82:23, 82:25,
96:16, 97:13,
97:16, 98:3,
98:8, 98:10,
98:11, 99:20,
99:21, 100:13,
100:24, 109:19,
110:23, 110:24,
113:22, 115:10,
115:17, 118:3,
118:4, 119:13,
119:23, 121:6,
122:18, 123:12,
129:21, 138:7,
144:24, 145:4,
145:7, 151:18,
160:2, 160:6,
161:2, 163:9,
163:12, 163:15,
163:18, 163:21,
163:24, 163:27
**pages**
82:23
**papers**
82:11
**paragraph**
44:20, 56:20,
56:21, 57:12,
69:1, 83:3,
86:18, 87:19,
93:12, 94:4,
96:15, 98:10,
109:19, 110:2,
110:12, 111:1,
111:5, 113:4,
114:2, 114:4,
114:5, 115:24,
118:2, 120:8,
120:23, 121:1,
121:4, 121:5,
122:3, 122:17,
123:13, 123:15,
123:25, 129:11,
129:18, 129:25,
131:13, 138:4,
138:6, 138:8,
145:5, 151:18,

154:20
**paragraphs**
44:20
**parameters**
58:1, 88:4
**park**
2:11, 3:13,
3:14
**part**
19:1, 19:3,
24:24, 28:4,
28:11, 28:22,
33:4, 33:19,
34:10, 36:19,
36:20, 37:16,
37:19, 41:1,
45:6, 69:9,
73:8, 73:15,
73:18, 77:18,
77:21, 79:8,
102:5, 108:24,
109:2, 109:5,
110:18, 111:16,
114:12, 116:3,
116:9, 116:20,
120:12, 120:16,
134:7, 136:10,
137:24, 155:10
**particularly**
65:19
**parties**
50:12, 162:16
**party**
8:24
**past**
6:10, 23:9,
26:13, 40:13,
40:14
**patent**
7:5, 7:13,
7:19, 8:24, 9:5,
9:9, 9:10,
50:19, 51:23,
52:5, 52:10,
52:18, 52:19,
52:22, 52:24,
54:3, 54:4,
54:13, 54:24,

57:25, 58:4,
58:20, 59:11,
59:12, 59:15,
59:17, 62:2,
62:4, 62:13,
62:25, 63:11,
63:13, 64:22,
65:11, 66:19,
66:22, 66:24,
67:5, 67:9,
68:4, 87:6,
87:16, 90:6,
90:13, 90:21,
91:7, 91:23,
92:5, 92:6,
92:7, 92:11,
93:4, 94:21,
94:22, 102:25,
103:2, 103:6,
106:19, 137:11,
160:10, 160:11
**patents**
20:16, 51:2,
53:12, 53:17,
61:24, 156:13,
157:23
**patents-in-suit**
20:7, 156:20
**patients**
106:21
**paucity**
91:24, 102:24
**peak**
56:7, 56:17,
56:23, 58:3,
62:11, 63:9,
66:14, 87:25,
88:6, 88:7,
88:23, 89:7,
89:19, 89:24,
90:3, 90:15,
91:3, 91:7,
91:15, 91:19,
92:14, 92:15,
92:21, 93:9,
93:16, 93:23,
94:6, 94:11,
96:10, 96:19,

98:16, 100:19,
101:19, 101:25,
102:20, 102:21,
103:8, 103:12,
103:18, 104:1,
104:10, 104:18,
104:20, 125:18,
126:3, 142:8,
143:5, 143:14,
144:13, 146:5,
149:25
**peaks**
86:5, 86:6,
101:2, 101:3
**penalties**
9:20
**penalty**
9:21
**pending**
11:13
**people**
14:4, 14:8,
26:6, 26:11,
33:5, 36:24,
38:15
**people's**
62:19, 66:12,
96:7
**percent**
56:7, 62:11,
89:7, 91:7,
91:15, 100:19,
123:8, 125:19,
126:4, 126:12,
126:16, 126:17,
126:18, 126:20,
126:22, 128:9,
128:15, 130:2,
130:7, 130:11,
130:20, 131:2,
138:18, 142:18,
143:6, 143:7,
143:14, 143:21,
144:14, 147:2,
155:4, 155:23,
156:7
**percentage**
38:12, 69:20,

88:17, 146:5, 148:13

**percentages**
122:12, 126:23, 143:20

**perfect**
12:18, 20:22, 98:6

**perform**
8:9, 33:9, 33:14, 40:11, 40:14, 132:1, 132:8, 133:2

**performed**
27:18, 42:11, 42:25, 131:25

**perhaps**
18:25

**perjury**
9:21

**permitted**
11:4

**person**
18:20, 34:4, 43:12, 43:17, 45:7, 68:22, 107:20, 134:11

**personally**
8:9, 20:9, 42:11, 42:25, 46:25, 47:8, 47:13

**pertains**
63:13, 63:15, 66:18, 66:24

**ph**
1:14, 2:10, 27:11, 27:13, 28:13, 121:25, 144:22, 159:3, 159:6, 159:17, 161:8, 161:11, 163:4, 163:32

**pharma**
1:8, 4:5

**pharmaceutical**
8:3, 24:17, 24:21, 25:10,

25:13, 25:24, 26:21, 26:24, 29:2, 29:3, 29:4, 29:7, 29:21, 30:2, 30:8, 30:11, 30:18, 30:21, 31:2, 31:23, 32:3, 35:17, 38:4, 39:16, 39:19, 40:5, 40:15, 40:19, 40:24, 41:15, 41:21, 45:15, 45:20, 46:6, 46:12, 46:19, 46:25, 47:6, 47:9, 47:13, 48:5, 48:12, 48:16, 48:24, 49:12, 75:9, 75:15, 84:11, 84:15, 84:17, 84:22, 89:1, 109:21, 116:10, 149:13, 151:15

**pharmaceuticals**
1:4, 1:9, 4:4, 30:4, 31:6, 42:3, 42:5, 46:20

**phase-appropriate**
118:16

**phrase**
140:19, 155:15

**phraseology**
25:5

**phrases**
104:3

**physically**
43:8

**pick**
10:3

**piece**
38:7, 90:25, 91:19, 130:3

**pieces**
55:21

**pillars**
7:16

**place**
4:15, 18:10

**placed**
4:19

**plaintiff**
9:2, 132:7

**plaintiffs**
1:6, 3:3, 5:7, 7:8, 53:15

**planet**
4:11, 5:3

**please**
4:17, 5:14, 10:4, 10:13, 11:12, 16:21, 44:14, 57:8, 97:7, 97:18, 98:3, 107:22, 114:16, 117:8, 122:19, 123:14, 128:5, 129:23, 146:21

**plot**
142:8

**plus**
127:4, 151:16

**point**
22:3, 58:25, 62:3, 64:7, 68:25, 93:11, 93:25, 111:23, 140:24, 141:13, 153:1

**points**
140:22, 141:2, 141:8

**posa**
43:13, 43:17, 45:1, 45:10, 45:13, 45:21, 46:5, 46:10, 46:18, 46:20, 62:21, 62:24, 65:18, 65:24, 66:2, 66:13, 67:1, 67:13,

67:15, 68:8, 68:9, 75:2, 79:6, 79:23, 89:17, 93:22, 94:17, 95:23, 96:2, 96:4, 96:9, 103:25, 151:8

**posas**
66:6

**position**
18:19, 18:24, 23:5, 24:3, 24:11, 33:1, 34:20, 36:4, 36:18, 123:22

**positions**
23:13, 23:22, 36:10, 36:22, 36:25, 37:3, 37:6, 38:2, 41:20

**possible**
110:13, 125:12

**post**
31:11

**practical**
97:1

**practice**
149:4

**practices**
35:19, 110:1

**precise**
122:24, 125:6, 125:12

**precision**
124:7, 124:22

**predict**
71:8

**predicting**
71:11

**prefer**
25:17, 46:15

**premised**
96:20

**prep**
13:14, 14:23, 14:24, 15:5,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

187

16:4, 134:9
**preparation**
13:10, 13:16,
15:19, 17:5,
17:16, 17:25,
18:7, 77:21
**preparations**
32:3
**prepare**
13:17, 133:2,
142:4
**preparing**
49:3, 49:7,
133:9
**preponderance**
137:13, 137:16
**prescription**
39:23
**present**
3:19
**presented**
67:25, 133:22,
154:16
**presents**
115:25, 120:9
**president**
6:1
**pretend**
28:16
**pretty**
15:24
**previous**
41:19, 101:10,
113:21, 140:11
**previously**
23:5, 137:6,
155:25
**primary**
37:15
**principles**
30:19, 30:20,
30:23, 118:15
**printed**
82:24, 145:18
**privileged**
11:8
**probably**
14:19, 14:22,

32:11, 43:10,
76:3
**problem**
40:22
**procedure**
79:2, 79:20,
109:1, 109:7,
111:12, 111:13,
113:12, 113:19
**procedures**
33:21, 34:22,
78:1, 78:5,
78:7, 81:8,
81:11, 100:25,
107:25, 108:18,
108:24, 109:20,
110:6, 110:16,
110:18, 111:3,
111:6, 114:1,
114:12, 115:2,
115:13, 116:2,
116:7, 118:7,
118:17, 119:15,
120:11, 160:24
**proceed**
5:5, 77:14
**process**
35:4, 132:18,
136:10
**product**
8:3, 18:4,
18:5, 19:7,
34:25, 35:7,
36:11, 36:21,
36:24, 37:7,
40:5, 41:21,
46:12, 47:18,
49:12, 51:7,
51:12, 51:16,
51:21, 53:16,
63:19, 64:2,
64:6, 64:7,
64:9, 64:16,
66:4, 67:16,
68:6, 69:21,
75:20, 79:21,
89:6, 106:21,
107:13, 107:17,

111:13, 112:11,
112:12, 112:16,
112:19, 112:24,
116:10, 117:13,
118:22, 121:17,
121:19, 122:7,
128:13, 128:25,
130:6, 130:19,
134:20, 134:25,
137:4, 155:3,
155:8, 155:20,
156:19
**products**
29:2, 29:5,
29:7, 31:24,
35:1, 35:11,
35:14, 35:16,
38:4, 38:19,
40:15, 40:19,
40:23, 41:15,
42:5, 63:16,
63:21, 64:18,
64:20, 118:9,
118:10
**professional**
2:13, 31:11,
49:10, 162:6
**profile**
86:1, 86:7
**progress**
43:4
**proof**
137:6, 137:9,
137:13
**proper**
98:11, 98:15,
103:11, 141:16,
141:22, 151:3
**properly**
34:17, 134:16
**properties**
74:7
**proposals**
110:5
**proposition**
101:9
**prove**
127:8, 132:7,

137:13
**provide**
11:22, 71:4,
131:14, 131:17,
137:7
**provided**
20:13, 20:16,
20:17, 76:11,
99:20
**provides**
75:4
**providing**
154:24
**ptr**
63:1
**public**
2:14, 162:7
**publication**
100:6
**published**
78:13, 83:11,
83:25
**pull**
150:6
**purchase**
136:2
**purchased**
135:19
**purchasing**
136:9
**purpose**
34:12, 34:25,
42:7, 48:13,
51:19, 84:9,
84:14, 106:18,
112:4, 116:16,
116:19, 116:25,
117:17, 135:24
**purposes**
25:6, 26:21,
35:15, 58:17,
59:16, 64:6,
64:11, 64:13,
64:21, 89:4,
106:24, 107:3,
112:7, 131:16
**put**
107:19, 119:2,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

188

120:18, 132:11,
142:16, 149:2

**Q**

**q2r2**
115:2
**qualification**
45:4
**quality**
48:12, 109:21,
141:9
**quantification**
133:4
**quantifying**
40:8, 51:20
**quantitation**
31:1, 34:2,
88:4, 105:19
**quantitative**
34:14
**question**
8:15, 10:13,
10:15, 16:18,
16:21, 29:19,
29:22, 34:21,
42:20, 57:7,
57:10, 58:7,
60:1, 64:4,
67:24, 71:13,
73:8, 73:12,
73:15, 73:18,
80:7, 90:9,
90:21, 90:23,
92:1, 93:14,
94:10, 95:20,
101:17, 101:21,
109:12, 122:5,
126:25, 128:3,
128:5, 136:23,
140:12, 144:5,
146:17, 146:25,
148:19, 148:20,
157:5, 157:9
**questions**
10:1, 10:12,
10:18, 10:24,
11:7, 11:14,
11:18, 37:25,

46:21, 61:1,
105:8, 105:23,
146:19, 152:17,
154:8, 158:3,
158:20
**quick**
69:4, 91:9
**quickly**
87:20
**quotations**
161:12
**quote**
161:14

**R**

**raising**
104:2
**ramya**
3:8
**ran**
122:9, 141:4
**ranbaxy**
7:12, 8:1, 9:1
**range**
30:24, 34:1,
69:23, 71:15,
72:25
**ranges**
71:25
**rate**
13:3
**rather**
46:15, 79:25
**raw**
111:13, 112:24
**rd**
4:23
**reach**
26:11, 26:13
**read**
17:17, 69:4,
86:20, 87:20,
96:17, 110:9,
115:15, 120:25,
122:19, 123:14,
126:10, 129:22,
130:14, 145:8,
151:19, 152:11,

159:7, 161:13
**reading**
51:1, 139:8
**reads**
94:5
**real**
69:4
**realized**
23:4, 79:12
**really**
12:1, 54:23,
63:18, 63:24,
92:9, 117:9,
126:25, 130:23
**realtime**
2:14, 162:6
**reask**
90:23
**reason**
11:21, 84:12,
84:13, 87:24,
129:4, 163:5
**reason___**
163:9, 163:12,
163:15, 163:18,
163:21, 163:24,
163:27
**reasonable**
84:23
**reasons**
85:3, 132:4
**recalculate**
135:14, 143:22,
144:6, 145:23,
148:16
**recalculated**
143:6, 143:25,
144:13, 148:14,
148:23
**recalculation**
147:2
**recalculations**
138:1, 146:6,
147:6, 147:8,
147:15
**recall**
15:15, 15:21,
16:1, 18:23,

18:24, 19:14,
30:4, 30:11,
31:25, 32:6,
44:22, 48:17,
50:9, 50:11,
86:4, 130:23,
130:24, 145:16
**receive**
22:3, 29:9,
29:12, 29:20
**received**
15:5, 29:1,
35:2, 77:9,
112:25
**recent**
21:18
**recess**
61:17, 105:4,
153:7, 158:17
**recognize**
21:16, 114:24,
119:11
**recognizing**
110:3
**record**
4:20, 5:15,
11:14, 36:16,
52:14, 61:16,
61:19, 70:20,
105:3, 105:6,
135:16, 153:5,
154:3, 155:15,
158:16, 158:19,
162:13, 163:6
**redo**
79:14
**refer**
12:5, 16:25,
52:19, 52:23
**reference**
24:5, 52:17,
56:16, 61:23,
65:9, 80:19,
82:4, 91:20,
92:15, 98:7,
98:21, 101:25,
135:20
**referenced**
68:14, 90:5,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                                        189

99:18, 114:11,
115:14, 120:6
**references**
20:11, 20:12,
75:7, 91:7,
100:19, 100:22,
101:18, 103:20,
154:22
**referencing**
80:21, 86:11,
86:15
**referred**
19:25, 118:10
**referring**
20:18, 44:24,
54:16, 103:17,
109:10, 137:25,
138:2, 143:16,
152:10
**refers**
55:18
**reflect**
61:9
**reflected**
161:13
**regard**
92:13
**regarding**
13:16, 20:11,
42:20, 56:2,
85:13, 125:14,
137:8
**regardless**
81:21
**regions**
72:5, 72:6
**registered**
2:13, 162:5
**registration**
110:19, 114:13,
116:3, 116:9,
116:21, 117:12,
120:12
**regulatory**
35:15, 48:13,
49:9, 107:20
**related**
89:11, 162:16

**relating**
18:3
**relative**
123:7, 123:22,
123:24, 124:6,
150:25
**release**
118:8
**relevance**
57:1, 57:6,
57:18, 58:9,
58:12, 58:13,
59:14, 60:8,
60:18, 94:9,
95:15
**relevant**
50:5, 59:5,
59:11, 59:25,
60:4, 60:11,
60:17, 93:10,
93:18, 94:16,
94:21, 95:6,
95:9, 95:24
**relied**
128:24, 129:3
**rely**
100:25
**remainder**
148:23
**remaining**
144:12
**remember**
6:18, 8:17,
12:23, 14:20,
18:19, 18:21,
124:10, 154:21
**repeat**
16:20, 57:7
**repetitive**
79:6
**rephrase**
29:18, 57:10,
60:1, 63:11,
63:17, 71:12,
74:16, 90:9,
90:22, 95:3,
139:24
**replace**
24:20

**reply**
15:6, 17:19,
17:20, 17:23,
82:21, 144:21,
161:9
**reported**
1:21
**reporter**
2:13, 2:14,
5:2, 10:2,
10:12, 16:16,
29:11, 117:9,
158:12, 162:6,
162:7
**reports**
8:19, 17:8,
17:15, 17:21,
154:16
**represent**
4:18
**represented**
128:19
**representing**
4:11, 5:3
**reproduce**
67:2
**requested**
26:20
**require**
46:22, 61:25,
65:4, 65:7,
65:15, 87:1,
87:5, 89:11,
102:1
**required**
10:23, 67:5,
67:7, 105:13,
159:22
**requirement**
56:17
**requirements**
74:25, 75:21,
83:23, 109:22,
109:23
**requires**
56:2, 60:24,
66:22, 103:9,
128:13, 141:19

**research**
27:18, 27:21,
28:3, 28:18
**respect**
29:13, 35:6,
64:21, 87:10,
92:10
**respects**
32:10, 35:22
**response**
56:7, 56:17,
56:23, 58:3,
62:12, 63:1,
63:4, 66:14,
70:3, 70:11,
70:16, 88:1,
88:7, 88:18,
88:23, 89:7,
89:20, 89:24,
90:3, 90:15,
91:3, 91:8,
91:15, 91:19,
92:3, 92:7,
92:14, 92:15,
92:22, 93:4,
93:9, 93:17,
93:23, 94:7,
94:12, 96:10,
96:11, 96:20,
96:22, 98:17,
101:1, 101:14,
101:19, 101:20,
101:25, 102:1,
102:3, 102:10,
102:14, 103:5,
103:9, 103:10,
103:12, 103:18,
103:22, 104:1,
104:6, 104:11,
104:12, 104:14,
104:17, 104:20,
104:21, 125:18,
126:3, 139:14,
140:15, 140:19,
140:21, 141:11,
141:17, 149:25,
150:1, 150:8,
150:10, 150:18,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

190

150:22, 150:24,
150:25, 151:10,
151:11, 152:3
**responsibility**
36:1
**rest**
55:14, 108:8,
147:12, 152:19
**restate**
144:5
**result**
127:17
**resulting**
62:10
**results**
19:18, 33:12,
34:15, 49:18,
50:16, 56:25,
57:5, 57:15,
57:21, 57:24,
58:8, 59:2,
59:5, 59:8,
59:10, 59:24,
60:3, 60:5,
60:7, 60:10,
60:22, 64:16,
64:25, 69:18,
73:24, 94:8,
94:21, 107:6,
121:9, 122:23,
123:19, 124:10,
124:16, 124:21,
125:1, 125:15,
126:19, 128:8,
155:18
**resume**
21:17, 22:4,
22:21, 22:25,
23:6, 23:16,
24:11, 25:1,
48:25
**resumes**
23:8
**retain**
12:22
**retained**
8:24, 9:4,
12:2, 12:19,

49:20, 49:22,
50:9, 131:3,
131:17
**revalidation**
111:9, 113:8,
113:24
**reveal**
7:2, 35:13
**review**
8:13, 17:4,
17:7, 17:15,
17:18, 17:24,
18:6, 20:2,
33:10, 33:12,
77:20, 97:17,
112:23, 116:19,
132:23
**reviewed**
8:21, 13:24,
15:18, 15:22,
16:2, 19:2,
20:5, 107:1
**reviewing**
49:3, 49:7
**revised**
110:5, 111:11
**rf**
135:8
**rff**
149:4
**rfl**
136:3
**right**
4:25, 7:8,
15:19, 18:17,
21:11, 21:23,
24:8, 24:18,
27:3, 28:1,
35:2, 41:17,
41:19, 51:24,
67:5, 67:11,
69:11, 69:15,
71:21, 74:23,
77:24, 78:10,
79:16, 80:14,
82:15, 83:3,
83:16, 86:11,
87:3, 91:14,

93:10, 94:13,
99:13, 99:17,
100:15, 101:11,
101:16, 102:19,
103:22, 106:22,
109:24, 110:9,
111:14, 113:13,
122:15, 123:4,
123:15, 125:9,
126:1, 126:7,
129:16, 141:20,
142:10, 142:14,
143:4, 144:14,
145:11, 148:13,
148:14, 151:3,
151:24
**rit**
29:16, 29:21,
30:6
**road**
5:21
**robin**
14:16, 14:17
**robustness**
30:24, 34:1
**rochester**
27:15
**rockville**
4:13
**role**
8:5, 37:14,
55:5
**roles**
37:11, 38:8
**rpr**
1:22, 162:24
**rrf**
138:1, 138:5,
149:4, 149:21
**rrfs**
149:14
**ruggedness**
133:5
**rules**
9:14
**run**
33:24, 34:13,
125:9, 133:5,

135:3, 141:6
**running**
133:9, 134:7,
134:9
**runs**
134:8

---
**S**
---

**s-m-i-t-h**
5:18
**safe**
64:8, 64:10,
106:21
**saibal**
14:9, 14:11
**said**
4:22, 19:2,
36:17, 50:14,
59:20, 83:19,
89:15, 107:1,
130:9, 141:10,
154:24, 157:16
**sales**
37:11, 37:19,
37:24
**salesman**
37:20, 37:21
**salespeople**
37:21, 37:22
**salesperson**
38:1
**same**
5:25, 24:10,
24:16, 33:17,
38:10, 39:22,
42:20, 45:21,
46:8, 46:13,
55:10, 59:24,
60:3, 60:5,
60:10, 60:22,
63:3, 65:12,
72:10, 74:19,
88:20, 90:17,
91:4, 91:22,
92:4, 92:8,
92:10, 92:24,
93:1, 96:21,
101:3, 101:9,

191

101:15, 102:10, 102:14, 102:21, 104:3, 109:6, 109:14, 110:11, 118:3, 118:4, 122:5, 124:9, 127:14, 127:20, 136:6, 139:7, 140:21, 143:12, 150:18, 159:11

**sample**
49:17, 50:4, 67:25, 85:16, 101:5, 134:9, 141:4, 141:6

**samples**
32:1, 32:6, 35:1, 38:20, 38:22, 64:24, 121:9, 121:13, 121:17, 121:21, 122:9, 122:14, 125:9, 133:2, 133:6, 133:9, 134:13, 134:24, 142:5

**satisfied**
123:10

**saw**
8:18, 17:20, 17:22, 86:5, 86:6, 113:21, 113:23, 123:8, 145:17, 146:10

**say**
7:7, 7:21, 9:7, 9:8, 15:4, 16:7, 20:7, 25:7, 26:9, 26:11, 32:24, 38:7, 38:17, 39:12, 39:25, 43:1, 44:16, 46:17, 47:3, 48:9, 48:20, 55:22, 57:12, 57:17, 58:4, 62:9, 62:21, 65:17,

65:24, 68:19, 69:13, 71:25, 72:7, 72:23, 73:23, 74:14, 79:19, 88:10, 89:15, 92:10, 103:6, 116:24, 117:16, 127:13, 127:17, 131:12, 138:15, 138:16, 147:13, 149:20, 150:11, 150:25, 151:13

**saying**
57:23, 58:1, 58:23, 59:13, 59:14, 59:15, 59:19, 60:21, 60:23, 90:11, 90:14, 93:19, 93:21, 94:20, 95:12, 101:19, 125:3, 150:20, 151:25

**says**
24:15, 24:17, 54:25, 56:4, 56:6, 78:4, 78:17, 79:16, 83:7, 91:5, 92:6, 92:23, 92:25, 95:10, 95:21, 99:8, 99:9, 99:23, 100:25, 108:10, 113:7, 113:23, 115:5, 118:6, 118:14, 120:8, 123:10, 126:11, 131:1, 138:22, 143:11, 147:7

**scale**
73:20

**school**
45:23, 46:1

**science**
23:15, 25:3, 69:22, 141:23

**scientific**
40:10, 83:14, 118:14

**scientist**
49:10, 51:9, 68:22, 70:2

**scientist's**
43:2

**scientists**
24:7, 24:18, 24:21, 25:9, 25:10, 25:13, 25:24, 39:10

**scope**
95:18, 118:1, 125:7

**scratch**
133:18, 133:21

**se**
30:4

**sec**
151:19

**second**
6:17, 26:14, 82:17, 82:25, 83:3, 83:24, 86:20, 87:24, 96:17, 97:4, 98:10, 99:8, 114:4, 114:5, 129:22, 138:16, 145:8

**second-to-last**
54:9, 148:10

**section**
78:1, 78:4, 81:7, 100:16, 110:11, 114:5, 115:21, 115:25, 118:1, 118:6, 120:3

**see**
17:21, 42:1, 55:16, 55:17, 57:3, 78:2, 78:11, 82:19, 83:5, 83:17, 85:22, 95:21,

96:23, 98:12, 98:19, 100:10, 100:17, 100:22, 101:7, 103:25, 108:6, 108:19, 110:10, 110:22, 111:7, 111:15, 113:5, 113:14, 114:10, 114:15, 115:3, 115:4, 115:7, 115:8, 115:22, 115:23, 116:4, 116:5, 118:11, 118:12, 118:20, 119:17, 119:22, 120:1, 120:14, 120:15, 121:12, 122:10, 122:13, 123:3, 123:23, 124:4, 125:25, 126:5, 130:3, 130:4, 145:18, 146:8, 148:11, 148:25, 158:14

**seeing**
19:14, 130:23, 130:25, 144:17, 145:16

**seeks**
158:12

**seems**
58:7

**seen**
53:6, 53:10, 75:13, 75:15, 77:15, 80:11, 80:12, 80:13, 80:16, 80:18, 82:15, 84:18, 88:25, 103:18, 104:8, 108:2, 108:7, 108:9, 108:12, 129:7, 131:1, 144:25, 145:2, 151:14, 155:15

**sees**
104:1

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

192

**seized**
39:22, 40:3
**select**
67:15
**self-employed**
6:3, 36:23
**sells**
35:17
**semantics**
72:3, 104:9
**sense**
83:20, 152:22
**sent**
77:6, 77:7
**sentence**
58:22, 59:21,
93:13, 94:4,
94:19, 111:9,
116:5, 118:14,
121:5
**separate**
41:13, 42:7,
85:25
**separately**
25:9
**separates**
85:20
**series**
46:21, 105:22
**session**
154:1
**set**
34:16, 118:25,
136:7, 162:11,
162:21
**seven**
134:2
**several**
25:4, 33:5,
75:1, 133:6,
133:16
**shaded**
145:14, 145:19,
147:11
**share**
26:19, 68:21
**shed**
70:7

**sheet**
163:1
**shire**
27:2
**short**
105:1, 158:13
**should**
19:12, 60:22,
64:12, 70:19,
79:11, 79:12,
81:22, 146:10,
147:4, 148:1,
150:6, 150:21
**shouldn't**
7:2, 13:20
**show**
68:4, 70:16,
130:18, 150:19
**showing**
63:6, 96:13
**shown**
88:22
**shows**
70:17, 156:6
**side**
8:20, 8:22
**sign**
26:6
**signature-p1kal**
162:22
**signed**
61:6
**significantly**
127:15
**silent**
65:17, 92:5,
103:7
**similar**
40:6, 42:23,
123:20, 124:16,
124:23, 125:5,
127:18, 127:21
**similarly**
138:21
**simply**
125:4
**since**
16:3, 16:10,

23:23, 36:20,
42:4, 99:17,
105:18, 134:15
**singh**
14:11
**single**
139:2, 139:5,
139:13, 139:22,
140:1, 140:13
**sir**
5:1
**sit**
20:20, 21:2,
111:25, 112:2
**six**
123:3, 123:5,
123:6, 124:9
**skill**
43:13, 43:18,
45:7
**skipping**
57:13, 118:13
**slayback**
1:8, 4:5, 12:3,
12:5, 12:6,
12:19, 19:5,
19:15, 19:17,
19:21, 20:16,
60:14, 112:14,
112:15, 112:18,
126:11, 128:18,
130:23, 134:19,
137:12, 155:16,
156:1, 159:1,
163:2
**slayback's**
17:24, 19:2,
19:25, 53:15,
63:15, 63:17,
63:19, 64:2,
64:6, 64:16,
65:4, 65:10,
68:6, 88:3,
105:20, 106:21,
107:13, 107:17,
112:11, 112:24,
117:13, 118:22,
121:17, 121:19,

122:7, 126:6,
128:12, 128:25,
129:5, 130:6,
130:12, 130:18,
134:24, 137:4,
155:3, 155:8,
155:20, 156:19
**smith**
1:14, 2:10,
4:3, 5:6, 5:18,
100:3, 100:4,
100:8, 116:15,
117:5, 146:12,
154:10, 158:23,
159:3, 159:6,
159:17, 160:3,
162:10, 163:4,
163:32
**smith's**
43:23, 147:8
**smooth**
9:15
**snyder**
96:24, 96:25,
97:20
**sold**
39:23, 40:3
**solution**
124:9, 139:2,
139:9, 139:13,
139:16, 139:21,
140:6
**solutions**
133:1
**some**
6:20, 8:18,
9:13, 9:14,
11:25, 13:24,
13:25, 15:25,
16:1, 16:15,
17:13, 19:18,
19:25, 20:13,
20:17, 20:23,
23:2, 26:10,
26:20, 27:8,
31:10, 31:20,
31:25, 32:10,
35:16, 35:22,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

193

36:21, 37:18,
38:12, 38:17,
46:22, 48:18,
48:20, 53:16,
55:21, 57:13,
57:25, 60:25,
70:13, 74:3,
74:5, 74:14,
77:11, 77:12,
80:14, 85:8,
85:22, 94:20,
107:13, 109:23,
111:23, 120:18,
131:25, 134:3,
135:13, 140:25,
141:23, 141:25,
153:1
**someone**
18:22, 103:17,
134:3
**something**
26:12, 56:4,
77:6, 84:25,
137:20
**sometimes**
26:12, 29:7,
33:6, 33:7,
33:11, 33:12,
33:13, 37:24,
74:17, 74:19
**somewhere**
19:17, 83:15
**sorry**
14:7, 14:10,
14:12, 14:15,
16:20, 18:18,
22:22, 26:23,
29:18, 33:18,
47:24, 47:25,
53:3, 53:4,
58:11, 64:4,
67:7, 67:19,
72:15, 72:16,
73:11, 77:3,
81:9, 86:13,
87:14, 90:22,
91:10, 95:19,
102:12, 111:4,

111:8, 114:2,
117:5, 117:6,
121:4, 123:6,
123:24, 124:3,
128:4, 128:6,
129:17, 138:22,
145:5, 146:2,
146:12, 152:9,
157:20
**sound**
10:19
**sparschu**
14:14
**speak**
10:10, 134:14
**speaking**
10:10, 146:22
**specialist**
36:22, 37:7,
37:8
**specialists**
36:11, 36:24
**specific**
30:6, 30:18,
58:6, 65:15,
69:19, 70:6,
74:6, 91:20,
97:16, 107:3,
132:21, 132:22,
152:5
**specifically**
10:24, 11:7,
17:18, 25:14,
25:24, 28:23,
29:1, 30:7,
31:6, 34:19,
54:15, 56:20,
58:23, 63:13,
69:15, 71:1,
71:11, 74:22,
87:1, 92:13,
110:25, 112:21,
113:25, 120:22,
125:14, 151:18
**specification**
53:21, 128:13,
131:2
**specificity**
133:4

**specified**
67:4
**specifies**
94:22
**specter**
71:9
**spectra**
73:25, 74:3
**spectros**
6:1, 24:4,
24:13, 36:18,
37:4
**spectroscopy**
25:22, 27:23,
28:14, 30:1,
31:18, 36:10,
37:1, 37:7,
38:21, 39:10
**spectrum**
71:15, 72:2,
73:5, 73:9,
73:14, 73:20,
74:12
**speculate**
38:11, 106:23,
106:25, 107:8,
107:10, 111:24,
112:1, 116:12,
129:2, 129:8
**speculation**
116:18
**spell**
5:14
**spend**
13:14
**spent**
13:6
**spot**
105:1
**ss**
162:3
**stability**
19:3, 19:6,
19:15, 19:16,
19:18, 19:22,
19:25, 20:6,
20:8, 118:8,
156:2, 156:4,

156:6
**stamped**
80:4, 97:9,
114:18, 119:7,
160:13, 160:18,
161:3, 161:5
**stand**
59:20, 123:2,
130:9, 140:24,
142:2
**standard**
33:21, 34:21,
75:10, 78:23,
84:21, 123:6,
123:7, 132:25,
149:21
**standards**
33:25, 34:13,
34:16, 35:24,
62:1, 62:7,
62:16, 63:7,
95:1, 95:5,
95:15, 95:22,
96:2, 101:3,
110:4, 135:20,
136:2, 136:9,
136:13, 144:2,
144:3
**start**
26:3, 47:22,
52:21, 115:20,
126:21
**started**
41:25
**starting**
6:14, 31:12,
83:8, 98:11,
111:5, 115:10,
133:18, 133:20,
143:5
**starts**
83:4, 111:2,
113:4
**state**
4:18, 5:14,
5:23, 96:19,
162:2, 162:8
**stated**
75:2, 87:10,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

194

| | | | |
|---|---|---|---|
| 122:22 | **submit** | **summarize** | **synthesis** |
| **statement** | 22:20, 22:24, | 36:7, 36:12 | 113:10, 113:16 |
| 151:7, 152:5, | 50:14, 112:5 | **supervise** | **T** |
| 152:7, 152:9 | **submitted** | 38:14 | **table** |
| **states** | 19:6, 21:13, | **supervised** | 111:1, 122:11, |
| 1:1, 2:15, 4:6, | 21:19, 21:22, | 31:19, 32:2, | 122:12, 125:16, |
| 98:15, 103:4, | 23:20, 23:24, | 32:24, 40:16, | 125:21, 126:1, |
| 109:20, 110:3, | 35:14, 47:16, | 42:21, 47:5 | 138:4, 138:7, |
| 110:12, 115:25 | 64:15, 82:20, | **supervising** | 138:16, 138:17, |
| **statistical** | 85:5, 85:8, | 43:7 | 138:22, 138:23, |
| 127:6, 127:8 | 106:11, 108:3, | **supervision** | 142:17, 143:13, |
| **status** | 110:19, 114:13, | 43:5 | 145:6 |
| 110:3 | 120:13, 156:1, | **supplied** | **tables** |
| **step** | 156:3, 156:6 | 112:13 | 124:25, 125:7 |
| 134:14, 135:17 | **submitting** | **support** | **tablet** |
| **steps** | 47:17, 64:9, | 31:21, 37:17, | 40:1, 40:3 |
| 134:2, 134:4 | 75:20 | 37:19, 48:3, | **take** |
| **still** | **subscribed** | 55:14, 97:2, | 11:6, 24:1, |
| 10:23, 13:18, | 159:23 | 106:6, 156:23 | 34:11, 44:2, |
| 39:3, 59:21, | **subsequent** | **supported** | 61:14, 73:11, |
| 62:4, 81:9, | 46:2 | 110:7 | 76:24, 82:13, |
| 103:11, 134:6 | **subsequently** | **supporting** | 86:20, 88:16, |
| **stop** | 48:6 | 19:6, 85:4, | 91:9, 98:20, |
| 54:1 | **substance** | 140:25, 141:1, | 105:1, 114:21, |
| **straight** | 11:4, 13:21, | 141:25, 142:2 | 120:24, 124:24, |
| 22:15 | 113:10, 113:17 | **suppose** | 132:18, 133:6, |
| **street** | **substances** | 40:11 | 133:16, 133:19, |
| 2:12, 4:15 | 29:6, 39:13, | **sur** | 133:23, 134:8, |
| **studies** | 39:17, 118:9 | 40:10 | 134:17, 135:17, |
| 19:18, 19:19, | **sufficient** | **sure** | 146:9, 152:18, |
| 27:19, 28:4, | 110:7, 139:14, | 8:18, 9:14, | 153:2, 158:13 |
| 28:22, 31:11, | 140:14 | 10:2, 16:6, | **taken** |
| 33:24, 133:2 | **suggest** | 20:22, 21:6, | 23:22, 28:25, |
| **study** | 116:14, 147:23 | 21:10, 34:12, | 138:18, 138:23 |
| 30:24, 30:25, | **suggested** | 34:14, 34:16, | **taking** |
| 79:15, 136:14 | 27:5 | 41:12, 41:18, | 4:14 |
| **stuff** | **suit** | 44:16, 47:19, | **talk** |
| 7:20, 77:12 | 4:13, 7:6, | 48:7, 54:14, | 21:4, 32:12, |
| **sub1** | 7:13, 7:19 | 55:6, 64:8, | 127:3, 131:20, |
| 1:5 | **suitable** | 65:6, 74:8, | 131:22 |
| **subject** | 34:12 | 85:3, 89:14, | **talked** |
| 6:19, 25:20, | **sujendra** | 91:1, 93:25, | 14:5, 85:1, |
| 28:12, 96:8, | 18:14 | 97:6, 122:20, | 94:23 |
| 109:22 | **sum** | 142:4, 157:15, | **talking** |
| **submission** | 142:25, 143:6, | 157:22 | 12:16, 18:17, |
| 111:11, 111:17, | 143:19, 148:9, | **sworn** | 41:20, 48:21, |
| 111:23, 128:21 | 148:17, 148:24 | 5:4, 5:8, | 54:2, 86:22, |
| **submissions** | **sumendra** | 159:23, 162:12 | |
| 76:2 | 18:15 | | |

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

195

88:12, 91:10,
100:1, 142:21
**tape**
7:19, 7:20
**taught**
24:6, 25:8,
25:13, 31:1
**teach**
25:23, 26:7,
30:15, 39:3,
39:9
**team**
33:4
**technical**
37:25, 131:4
**technicians**
33:7
**technique**
56:23, 93:8,
93:16, 94:6,
94:11, 94:18,
95:2, 95:14,
98:16, 102:6
**techniques**
29:25
**technology**
23:15, 27:16
**tell**
25:16, 68:17,
71:15, 76:4
**telling**
67:21
**tells**
124:16
**ten**
50:8
**tense**
40:13, 40:14
**term**
43:12, 43:16,
149:8
**terms**
29:10, 124:22,
130:22
**test**
46:11, 60:2,
66:3, 67:16,
106:24, 109:20,

155:16, 155:17
**tested**
69:10, 85:16,
92:21, 107:12,
121:14, 121:16,
155:21
**testified**
5:8, 6:4, 6:12
**testifying**
6:19
**testimonies**
6:15
**testimony**
7:22, 9:19,
9:22, 11:5,
11:23, 13:17,
127:16, 159:13,
162:14
**testing**
8:3, 8:14,
34:7, 34:24,
35:5, 35:10,
35:24, 41:21,
41:25, 42:3,
42:4, 47:22,
48:2, 48:5,
53:19, 53:22,
55:13, 55:18,
55:21, 63:13,
63:15, 63:18,
64:1, 64:5,
64:11, 65:4,
65:10, 65:20,
81:2, 85:3,
85:4, 87:8,
90:12, 91:2,
106:6, 106:11,
106:19, 107:4,
109:1, 111:16,
112:4, 112:5,
112:11, 113:16,
116:8, 116:17,
116:20, 118:8,
125:17, 126:2,
127:21, 127:23,
128:7, 130:13,
132:20, 154:12,
156:22, 157:6,

157:17
**tests**
64:13, 126:7,
127:6, 127:8
**text**
110:12, 110:17,
114:6, 119:15,
120:6
**th**
2:12, 4:15,
4:24
**thank**
5:1, 5:19, 7:4,
10:8, 10:21,
12:10, 36:2,
37:2, 53:5,
61:22, 100:11,
136:23, 154:6,
157:21, 158:24
**themselves**
4:18, 31:5,
83:23, 134:12
**therefore**
110:4
**thesis**
28:13
**thing**
84:23, 93:1,
104:3, 122:20,
139:22
**things**
14:2, 23:2,
39:14, 40:17,
41:11, 75:1,
75:10, 85:22,
96:10, 96:12,
104:24, 139:17,
139:22, 154:24
**think**
4:22, 4:24,
7:10, 7:16,
7:18, 7:21,
10:15, 16:8,
16:9, 17:20,
17:23, 21:20,
23:11, 25:2,
31:7, 36:15,
36:17, 48:9,

55:11, 59:19,
60:18, 61:12,
63:5, 63:7,
64:12, 72:19,
73:21, 84:23,
86:22, 91:25,
92:9, 93:19,
94:14, 94:19,
96:13, 103:2,
103:14, 104:25,
105:16, 106:16,
124:12, 129:14,
131:13, 132:24,
133:24, 134:1,
134:16, 147:12,
147:25, 149:22,
152:20, 152:21,
154:18, 155:14,
157:2
**third**
83:7, 99:9
**third-party**
6:24, 32:16
**thought**
23:6, 24:16,
50:2, 67:13,
86:12
**three**
9:6, 37:8,
63:19, 63:25,
64:16, 68:5,
107:12, 112:8,
112:17, 113:2,
121:16, 121:21,
122:8, 122:14,
135:9, 139:16,
139:22, 140:8,
140:18, 140:22,
155:20, 155:24
**through**
9:17, 26:11,
36:4, 53:8,
73:12, 99:7,
105:10, 106:2,
152:19, 154:20
**time**
4:9, 10:10,
10:22, 10:23,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

196

11:12, 11:19,
12:21, 25:12,
26:14, 36:20,
41:24, 42:24,
43:6, 43:8,
43:24, 61:16,
61:19, 76:24,
82:13, 105:3,
105:6, 132:10,
132:16, 133:13,
133:14, 136:8,
153:5, 154:3,
158:16, 158:19,
158:24

**times**
6:8, 6:11,
12:19, 14:21,
26:2, 36:23,
36:24, 124:9

**title**
5:24, 108:17,
115:1, 119:14,
146:11, 147:7,
147:25

**titled**
78:1, 100:16

**to__**
163:10, 163:13,
163:16, 163:19,
163:22, 163:25,
163:28

**today**
4:10, 4:22,
5:2, 6:6, 9:14,
9:20, 9:22,
11:6, 11:23,
13:11, 15:19,
17:5, 17:16,
17:25, 20:20,
20:25, 21:2,
41:13, 42:8,
68:24, 77:21,
105:11, 112:1,
112:2, 116:6,
116:15, 116:18,
117:11, 118:21,
136:15, 158:3

**today's**
4:8, 13:17

**together**
132:16, 147:18,
148:22

**told**
19:9, 19:10,
48:8, 49:16,
53:14, 68:1,
93:4, 107:19,
112:20, 118:24,
128:17, 128:23,
132:5, 137:10,
156:3, 158:9

**took**
18:9, 28:21,
29:24, 30:6,
124:8, 147:17

**top**
24:2, 26:23,
77:12, 80:16,
98:11, 100:25,
108:8, 109:19,
138:5

**topic**
19:15

**total**
13:7, 13:8,
15:3, 16:3,
56:3, 56:8,
56:24, 59:22,
62:9, 88:15,
88:16, 89:5,
93:9, 93:17,
94:7, 121:19,
122:6, 122:13,
125:19, 128:14,
130:1, 130:5,
130:10, 130:18,
144:13, 146:4,
146:7, 147:1,
151:23, 155:3

**totally**
69:6

**towards**
25:2, 25:3,
121:3, 124:1

**trace**
39:13

**train**
37:20, 37:22

**trained**
47:5

**training**
24:16, 26:15,
27:9, 29:1,
29:8, 29:12,
29:20, 43:4,
43:7, 45:8

**trainings**
24:6, 26:21,
48:22

**transcript**
159:8, 159:12

**transcription**
163:8

**transcripts**
18:7, 18:9,
18:12

**transition**
43:4

**trial**
6:6, 6:12,
7:22, 106:7

**tripartite**
110:15, 119:19,
119:20, 119:21

**trout**
154:16, 154:18

**trout's**
17:15, 17:17,
123:19, 154:23

**true**
124:18, 125:9,
159:11, 162:13

**trusted**
134:4

**truthful**
11:22

**try**
26:10, 151:8,
151:9

**trying**
60:9, 130:25,
139:19, 147:23

**turn**
44:12, 54:8,
56:19, 69:1,
81:4, 82:23,

86:18, 87:18,
96:15, 98:3,
99:24, 100:12,
110:23, 113:22,
115:17, 119:23,
120:20, 120:22,
122:3, 123:12,
129:11

**turning**
117:19

**two**
6:9, 7:23,
17:21, 21:7,
23:8, 52:1,
60:22, 66:24,
73:1, 73:24,
74:1, 74:14,
74:15, 74:16,
88:3, 100:22,
101:18, 103:20,
104:2, 111:1,
125:5, 125:7,
126:19, 127:22,
142:25, 143:20,
144:2, 145:12,
145:21, 146:6,
147:7, 148:5,
148:14, 148:23

**tying**
58:7

**type**
25:3, 38:18,
47:7, 79:25

**types**
83:21

**typically**
71:19

---
**U**
---

**ultimate**
34:25, 131:10

**ultraviolet**
71:17, 72:4,
72:8, 72:25

**um-hm**
10:6, 45:17,
54:11, 66:21,
71:18, 81:6,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

197

| | | | |
|---|---|---|---|
| 86:21, 87:21, 120:4, 121:7, 125:24, 145:13 | 95:19, 96:3, 101:16, 103:8, 111:25, 112:3, 112:22, 113:15, 116:6, 116:16, 116:18, 117:11, 130:17, 132:5, 134:19, 137:8, 140:11, 148:5 | 39:10, 40:16, 62:15, 66:7, 66:8, 75:11, 79:4, 81:19, 81:23, 81:25, 82:3, 87:4, 89:1, 89:11, 89:21, 89:24, 98:12, 98:16, 101:25, 102:20, 102:21, 104:11, 104:18, 111:12, 136:3, 141:21, 149:15 | **uv** 71:15, 73:5, 89:2 |

**unable**
11:22

**unchanged**
148:16

**under**
6:4, 9:20, 24:3, 24:13, 25:17, 26:16, 35:18, 81:10, 111:1, 115:20, 120:3, 129:14

**undergraduate**
27:18, 28:4, 28:7

**understand**
9:23, 10:20, 11:1, 11:3, 11:10, 11:17, 22:19, 32:23, 51:23, 53:18, 53:24, 54:19, 55:2, 58:10, 60:9, 63:10, 63:12, 65:10, 68:17, 69:21, 71:20, 72:19, 83:1, 89:4, 97:24, 106:5, 106:10, 106:18, 117:7, 118:21, 130:13, 133:15, 137:15

**understanding**
15:8, 27:25, 31:4, 36:9, 53:11, 53:23, 55:7, 55:9, 57:20, 59:3, 59:22, 61:25, 64:19, 65:2, 65:3, 65:14, 70:5, 71:3, 71:4, 71:12, 71:24, 72:17, 78:22, 85:2,

**understood**
9:11, 20:10, 23:18, 25:19, 30:13, 34:18, 36:2, 42:19, 49:25, 50:6, 58:5, 58:21, 102:7, 103:16, 139:24, 147:20

**union**
162:4

**united**
1:1, 4:6

**unknown**
101:2, 149:1, 149:3, 149:17, 149:24, 150:3, 150:16, 150:23, 151:2

**unless**
10:24, 11:7, 67:21, 78:8

**unvalidated**
63:23

**update**
23:2, 23:17

**updated**
21:19, 22:4, 22:8, 22:11, 22:14, 22:21, 22:24, 23:20, 24:11, 160:8

**updates**
22:20

**upwards**
134:8

**urine**
39:13

**use**
27:22, 38:21,

**uses**
56:22, 58:23, 93:8, 93:16, 94:5, 104:5

**using**
36:25, 58:3, 61:25, 65:4, 69:10, 90:3, 92:15, 92:21, 94:25, 95:4, 96:1, 104:20, 125:5, 138:10, 140:13, 155:22

**usp**
74:25, 75:4, 75:7, 75:11, 75:17, 76:6, 76:20, 77:5, 78:12, 78:14, 79:4, 79:7, 79:22, 80:20, 81:4, 81:15, 81:19, 81:23, 82:8, 83:11, 83:25, 84:6, 84:9, 84:11, 84:19, 108:15, 108:24, 109:2, 110:3, 111:11, 111:17, 111:23, 112:6, 115:14, 120:6, 150:4, 150:20, 160:12, 160:16

**uva**
71:23

**uvc**
72:13, 72:18

**V**

**valid**
128:20

**validate**
34:3, 34:15, 41:4, 69:14, 74:21, 132:13, 133:16

**validated**
47:13, 51:14, 51:18, 68:9, 68:10, 79:11, 83:13, 136:11

**validation**
17:2, 30:15, 30:19, 30:20, 33:23, 65:15, 65:18, 70:3, 79:14, 105:12, 105:21, 107:24, 108:17, 108:22, 110:15, 113:20, 115:1, 115:12, 119:14, 120:11, 126:6, 134:2, 160:23

**validation's**
116:2

**validity**
110:8, 156:13, 157:23

**valium**
40:1, 40:2

**vallabhaneni**
3:8

**value**
124:18, 125:10, 138:20, 151:3

**values**
101:11, 101:13,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

198

125:5, 135:8,
138:1, 145:20,
147:14, 148:8,
148:15
**various**
109:22
**veins**
62:19, 96:7
**verbal**
10:4
**verbally**
10:1
**verbiage**
89:8
**version**
23:20, 76:13,
97:25, 100:1
**versions**
76:9
**versus**
4:4, 7:12,
7:16, 7:25, 9:1,
142:9
**vetted**
132:15
**via**
15:1
**viable**
151:22, 152:7,
152:12
**vials**
63:19, 63:25,
64:16, 68:5,
107:13, 112:8,
112:13, 112:17,
113:2, 155:20,
155:24
**video**
4:9, 4:14
**videographer**
3:20, 4:1,
4:10, 4:22,
4:25, 61:15,
61:18, 105:2,
105:5, 153:4,
154:2, 158:15,
158:18, 158:22
**videotaped**
1:14, 4:2

**violated**
137:12, 141:15
**visible**
72:6
**visited**
41:2
**vitae**
21:14, 22:12,
160:7, 160:8
**vivimusta**
128:14
**voice-identify**
4:17

**W**

**wabash**
3:5
**want**
9:13, 11:12,
21:4, 32:11,
33:23, 33:24,
33:25, 34:6,
44:2, 55:6,
58:10, 62:22,
62:24, 67:1,
79:6, 79:24,
94:2, 146:17,
151:6, 152:18,
152:23
**wanted**
24:24, 32:23
**wants**
39:2
**watch**
33:11
**water**
27:12
**waters**
31:12, 31:15,
34:20, 35:9,
35:17
**watkins**
3:4
**wavelength**
55:25, 56:12,
56:13, 58:19,
58:24, 67:10,
67:14, 67:16,

69:10, 71:22,
72:5, 72:6,
72:11, 74:13,
79:13, 79:17,
85:14, 85:19,
85:21, 86:5,
86:6, 86:7,
87:2, 87:11,
87:12, 87:15,
88:5, 94:6,
105:19, 121:14
**wavelengths**
56:22, 57:5,
57:13, 59:6,
59:23, 60:23,
70:9, 71:16,
72:9, 72:19,
73:2, 73:24,
74:1, 74:15,
74:18, 85:13,
86:2, 125:6,
127:22
**way**
9:7, 75:10,
82:8, 82:24,
96:9, 96:12,
104:5, 104:23,
107:20, 117:16,
121:9, 124:7,
140:20, 151:22,
152:12, 155:16,
160:16, 162:18
**we're**
86:22, 90:20,
104:2, 141:15
**website**
77:6
**week**
14:22, 15:1,
21:19, 22:4,
23:21
**weeks**
15:2, 134:18
**welcome**
61:21, 154:5
**went**
150:7, 154:20
**weren't**
49:20

**west**
2:12, 4:15
**whatever**
12:11, 35:1,
35:6, 39:1
**whereas**
150:20
**whereof**
162:20
**whereupon**
4:19
**whether**
30:3, 40:23,
48:6, 57:20,
60:3, 63:16,
63:21, 73:15,
92:6, 92:25,
95:13, 102:16,
102:20, 106:21,
116:24, 117:2,
117:17, 127:8,
127:13, 127:14,
146:25, 151:13,
155:9
**whoever**
26:7
**whole**
72:1
**windels**
3:12
**wishes**
147:5
**within**
43:19, 60:16,
73:5, 94:20,
114:13, 120:13,
125:6, 127:1,
152:14, 162:7
**witness**
5:4, 5:7, 7:1,
7:4, 7:7, 7:11,
13:23, 14:3,
14:7, 17:10,
18:16, 19:13,
32:15, 32:17,
32:20, 33:18,
67:19, 87:14,
152:25, 158:4,

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

199

158:8, 158:11,
159:3, 160:2,
162:10, 162:14,
162:20, 163:4
**word**
46:15, 71:22,
73:21, 87:4,
89:8, 89:11,
108:23, 141:21
**words**
55:17, 56:6,
56:18, 58:4,
61:6, 62:7,
62:13, 87:6,
90:1, 91:15,
92:16, 92:19,
95:22, 103:25,
104:1
**work**
8:14, 8:21,
13:1, 23:7,
23:15, 25:2,
26:8, 31:12,
31:14, 31:18,
31:20, 31:22,
32:25, 33:6,
33:8, 34:4,
37:3, 37:18,
38:3, 38:13,
38:18, 40:20,
41:1, 43:3,
47:7, 50:4,
50:7, 58:2,
58:13, 58:14,
58:15, 58:16,
67:2, 70:2,
78:24, 79:1,
79:25, 88:22,
88:24, 133:13,
134:4, 134:5,
134:16, 136:22,
138:4, 141:11,
144:4, 147:11,
147:12, 147:18,
147:19, 152:2,
152:15, 157:10
**worked**
18:22, 29:3,

29:5, 31:16,
36:23, 40:17,
149:13
**workers**
31:20
**working**
40:22, 41:6,
75:9, 75:18,
84:17
**wouldn't**
48:8, 55:15,
68:24, 89:21,
132:16
**wrack**
130:25
**wrap**
154:8
**write**
33:8, 33:14,
34:3, 37:23,
49:23, 56:22,
61:2, 121:8,
130:1
**written**
59:4, 99:20
**wrong**
4:23, 10:7,
18:14, 35:20,
72:18, 107:15,
141:15
**wrote**
24:6, 50:16,
61:4, 61:10,
123:2

**X**

**x-ray**
27:23

**Y**

**yeah**
6:20, 12:11,
12:15, 12:17,
14:18, 15:20,
23:11, 24:12,
24:14, 26:18,
27:20, 32:15,
32:17, 32:20,

34:23, 36:8,
37:9, 39:1,
40:9, 41:17,
44:15, 48:24,
55:4, 57:11,
60:16, 66:1,
66:21, 68:16,
77:16, 80:10,
81:12, 82:18,
83:1, 98:24,
99:24, 100:9,
106:1, 108:12,
113:6, 118:2,
124:3, 129:17,
131:13, 138:13,
138:23, 140:5
**year**
12:24, 23:1,
25:15, 25:25,
26:2, 100:5
**years**
8:16, 26:1,
35:21, 50:8,
75:8, 84:16,
151:16
**york**
1:15, 2:11,
2:12, 2:15,
4:15, 4:16, 5:22
**yourself**
20:13, 44:25,
61:3, 135:21
**yup**
78:3, 83:6,
83:9, 98:13,
100:14, 106:4,
117:25, 119:4

**Z**

**zoom**
15:1

**$**

**$650**
13:3

**.**

**.05**
126:18

**.07**
138:18
**.26**
159:2, 163:3
**.9**
156:7

**0**

**00**
1:17, 2:7, 4:9
**00065**
1:7
**00368468**
80:5, 160:14
**00369941**
119:8, 161:6
**00373969**
97:10, 160:19
**0369991**
114:19, 161:4
**04**
61:16
**07932**
3:14

**1**

**1**
154:3, 158:16,
158:19, 158:24
**1.1**
115:21
**1.2**
118:1
**10**
61:16, 61:19,
99:1, 99:2,
100:3, 100:4,
100:8, 101:18,
121:6, 123:8,
160:20
**100**
129:11, 129:19,
131:13
**101**
151:18
**1054**
3:14
**107**
160:23

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026

200

**11**
63:3, 86:5,
92:3, 105:3,
105:6, 107:23,
107:24, 160:23
**11,872,214**
52:11, 52:23,
160:11
**114**
161:3
**119**
161:5
**12**
73:2, 73:16,
74:2, 82:8,
86:6, 114:17,
114:18, 117:24,
152:23, 153:6,
160:17, 161:3
**12,138,248**
52:6, 52:18,
160:10
**120**
2:11, 4:15
**121**
161:7
**1225**
108:13, 109:18,
115:14, 120:7
**13**
17:19, 119:7,
161:5
**14**
61:19, 121:24,
161:7
**144**
161:9
**15**
44:20, 144:20,
161:9
**180**
3:13
**1990**
36:10
**1992**
36:19
**1997**
97:2, 97:24

**1:-cv--jlh**
1:7
**1st**
162:21

---
**2**
---

**2.94**
125:19, 126:16,
126:20, 126:22,
128:10
**2.99**
126:4, 126:12,
126:16, 126:20,
126:22, 128:11
**20**
159:24
**200**
13:9, 13:14,
71:19, 72:1,
72:8, 72:19
**2000**
42:1
**2003**
6:16, 7:14
**2006**
6:17, 7:15
**2010**
98:22, 99:23,
99:25, 100:5,
100:10
**2014**
42:1, 42:2,
42:4
**2016**
36:10
**2017**
82:9, 108:11,
160:17
**2021**
76:13
**2024**
76:14
**2026**
1:16, 2:6, 4:8,
5:1, 108:11,
162:21
**21**
160:7

**2115**
53:1, 53:2,
53:3
**214**
52:24
**22**
105:6, 160:8
**223**
55:25, 56:13,
58:2, 58:17,
58:18, 59:10,
59:16, 60:3,
60:15, 60:24,
63:4, 67:10,
69:10, 69:14,
69:18, 70:3,
70:17, 70:22,
71:10, 72:10,
72:24, 74:22,
87:3, 87:8,
87:16, 87:17,
88:22, 92:4,
94:22, 122:12,
123:19, 124:15,
125:1, 125:17,
125:23, 127:18,
128:8, 135:4,
136:11
**23**
4:8, 4:23
16, 58:24,
59:15, 59:20,
60:3, 60:15,
60:17, 60:19,
69:18, 70:11,
70:13, 72:10,
72:24, 88:21,
94:21, 123:21,
124:15, 125:1,
126:4, 126:7,
126:11, 127:18,
128:8
**24**
1:7, 1:16, 2:6,
4:7, 4:24, 5:1,
152:23, 153:6
**248**
52:19, 54:4,

**62:4, 67:8,**
90:5, 91:6,
91:10
**25**
8:16, 56:20,
56:21, 57:12,
86:18, 93:12,
122:18
**26**
8:16
**280**
72:20
**29**
96:16, 145:6,
154:3

---
**3**
---

**30**
26:1, 75:8,
84:16, 151:16
**32**
120:23
**330**
3:5
**34**
129:21, 138:7,
158:16
**35**
151:18
**37**
158:19, 158:24
**3969**
97:14

---
**4**
---

**4.24**
159:2, 163:3
**4.32**
143:21
**4.59**
148:24
**4.82**
146:7, 147:2,
148:10
**400**
4:13, 71:19,
72:1, 72:8
**4007**
98:8

Transcript of Brian C. Smith, Ph.D.
Conducted on April 24, 2026                    201

**4077**
52:21
**42**
43:25
**44**
160:9
**451**
4:12
**468**
80:17
**469**
80:18
**470**
80:18

**5**

**5**
91:15
**50**
13:15
**52**
160:10, 160:11
**525**
100:13
**54**
122:3
**548**
5:21
**57**
2:12, 4:15

**6**

**60611**
3:6
**621**
74:25, 75:4,
75:7, 75:11,
75:17, 76:6,
78:12, 79:7,
81:5, 83:8,
84:19
**629333**
1:23
**65**
4:7
**665**
98:3

**7**

**70**
69:1

**71**
123:13, 123:15,
123:16
**72**
87:19
**76**
122:17, 160:12

**8**

**80**
160:13
**82**
160:15
**83**
96:15

**9**

**9**
1:17, 2:7, 4:9,
43:25
**97**
160:18
**99**
138:4, 138:6,
138:8, 160:20
**9945**
119:25
**9991**
115:11
**9995**
115:18