# Exhibit 1

**Redacted Public Version**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS, INC. and
EAGLE SUB1 LLC,

        Plaintiffs,

    v.

SLAYBACK PHARMA LLC and AZURITY
PHARMACEUTICALS, INC.,

        Defendants.

C.A. No. 24-65-JLH

## EXPERT REPORT OF
## DR. SINKO REGARDING NON-INFRINGEMENT

## TABLE OF CONTENTS

**Page**

I.    DR. SINKO'S BACKGROUND ............................................................................1

    A.    Education and Professional Background .................................................1

    B.    Prior Testimony .....................................................................................5

    C.    Compensation .........................................................................................6

II.    SCOPE OF WORK AND SUMMARY OF OPINIONS ....................................6

III.    LEGAL PRINCIPLES APPLIED .....................................................................7

IV.    SCIENTIFIC BACKGROUND .......................................................................11

    A.    States of Matter And The Definition of Solids, Liquids, and Fluids.....................12

    B.    Pharmaceutical Dosage Forms as Solutions and Fluids .......................................15

    C.    Stability and Stability Testing ..............................................................19

    D.    Acids, Bases and pH..............................................................................20

    E.    Conservation of Mass ............................................................................22

    F.    PEG..........................................................................................................23

V.    THE SLAYBACK NDA PRODUCT ..............................................................23

VI.    THE ANTIOXIDANT-FREE FORMULATION ............................................28

VII.    THE ASSERTED PATENTS............................................................................29

    A.    History of Eagle Patent Applications ....................................................29

        1.    The '783 Patent Application – Appl. No.: 18/081,238..............................32

        2.    Prosecution of the '214 Patent – Application 18/081,251.........................37

        3.    Prosecution of the '248 Patent – Application No. 18/646,171 ..................41

    B.    Claims Of The Patents-In-Suit ..............................................................43

        1.    Claims of the '214 Patent .......................................................................43

        2.    Claims of the '248 Patent .......................................................................44

VIII.   NON-INFRINGEMENT OF THE SLAYBACK NDA PRODUCT ...............................47

    A.   ███████████████████████████████████████████ 47

        1.   ██████████████████████ ....................................47

        2.   ███████████████████████████████████████
            ██████████████████████████████████████████

        █   ██████████████████████████████████████████

        █   ██████████████████████████████████████████

        █   ██████████████████████████████████████████

        █   ██████████████████████████████████████████

        █   ████████████████████████████████████
            ██████████████████████████████████ 64

        8.   Sodium Hydroxide is Not Subject to the "Comprising" Claim Language 74

        9.   There Is No Infringement by Equivalents ...................................................75

    B.   There Is No Infringement – ████████████████████
       "Pharmaceutically Acceptable Fluid Consisting Of" Limitation .........................81

IX.   NON-INFRINGEMENT BY ████████████████████
    OTHER PRODUCTS ..............................................................................................84

    A.   ██████████████████████████████ .......................84

    B.   There is No Infringement By Treanda® ................................................................90

    C.   There is No Infringement By Non-Bendamustine Cancer Drugs ........................91

X.   THE PATENTS-IN-SUIT ARE NOT "FOUNDATIONAL" .........................................93

XI.   OTHER PATENTS ...................................................................................................96

XII.   CONCLUSION ........................................................................................................98

## I.    DR. SINKO'S BACKGROUND

### A.    Education and Professional Background

1.      My name is Dr. Patrick J. Sinko and I am a Distinguished Professor of Pharmaceutics and the Parke-Davis Endowed Chair in Pharmaceutics and Drug Delivery in the Ernest Mario School of Pharmacy at Rutgers, The State University of New Jersey.  My current research focuses on biopharmaceutics, pharmaceutical formulations, and molecular-, nano-, and micro-scale drug delivery.

2.      I was Chair of the Department of Pharmaceutics from 1998 to 2008.  I also served as the Associate Vice President for Research at Rutgers from 2007 through 2019, providing executive-level oversight of Comparative Medicine Resources, Research Core Facilities, In Vivo Research Services, Biomedical Advisory Committees, and the Controlled Substances program across Rutgers' three regional campuses.  Since 2003, I have held the Parke-Davis Endowed Chair in Pharmaceutics and Drug Delivery at Rutgers.

3.      I received a Bachelor of Science in Pharmacy from Rutgers University in 1982 and completed my Ph.D. in Pharmaceutics at the University of Michigan in 1988. After completing my Ph.D., I continued as a Research Scientist at the University of Michigan until 1991.

4.      In 1991, I joined the faculty at Rutgers in the Department of Pharmaceutics as an Assistant Professor.  I was promoted to Associate Professor in 1997, Professor in 2000, and Distinguished Professor in 2007. As a professor at Rutgers, I have taught courses in several graduate and undergraduate subjects, including drug delivery, general toxicology, pharmacology, pharmacokinetics, and pharmaceutics.

5.      At Rutgers, my research is generally directed to biopharmaceutics, drug delivery, and pharmaceutical formulations.  I have numerous active and completed projects, sponsored by

1

the National Institutes of Health (NIH) and the pharmaceutical industry, focused on formulations and drug delivery systems. As such, I have extensive experience formulating and evaluating drug delivery systems, dosage forms and their respective components and processes.

6.    I have written and published extensively in pharmaceutics, including authoring or co-authoring more than 186 peer-reviewed publications, 70 book chapters and monographs, and 292 abstracts. I have also given over 175 lectures at scientific meetings and conferences, universities, and companies. I have been named as an inventor of 20 patents issued in the field of pharmaceutics.

7.    I have also served as a Visiting Professor, Department of Pharmaco-biodynamics, Faculty of Pharmacy, Kanazawa University, Kanazawa, Japan, during the time period of 1997 to 1998, and as a Research Scientist, College of Pharmacy, the University of Michigan and Therapeutic Systems Research Laboratories, Inc., Ann Arbor, Michigan, during the time period of 1988 to 1991.  I also have taught course work at the U.S. Food and Drug Administration ("FDA") on Drug Transporters in February of 2005.  The FDA audience included medical officers, scientists, and clinicians

8.    I am the Editor and Principal Author of the recent (5th through 7th) and current (8th, published in 2023) editions of Martin's Physical Pharmacy and Pharmaceutical Sciences (hereinafter referred to as "Martin's Pharmacy"), which has been a well-recognized textbook in the Pharmaceutical Sciences since 1960, and is used extensively worldwide.  The book has been published in several languages including Portuguese (2008), Complex Chinese (2009), German (2022), Indonesian (2009), Korean (2009, 2010), and Simplified Chinese (2010).

9.    I currently serve as Editor-in-Chief for the journal *Pharmaceutics*. I also serve or have served on the editorial advisory boards for Advanced Drug Delivery Reviews (2005-2010),

2

Applied Nano, Molecular Pharmaceutics, Therapy (2004-2011), Biomedical Materials (2006-2010), Pharmaceutics, Recent Patents on Drug Delivery & Formulation, Current Drug Discovery Technologies, Journal of Drug Delivery Science and Technology, Journal of Drug Delivery, Drug Delivery and Translational Research, and Scientia Pharmaceutica, and European Journal of Pharmaceutical Sciences (2004-2010) (Section Editor).

10.    In 2021, I was elected as President and a member of the Board of Directors of the American Association of Pharmaceutical Scientists (AAPS), serving for one three-year cycle. AAPS is a professional, scientific organization with approximately 8,000 individual members and over 12,000 actively participating stakeholders employed in academia, industry, government, and other pharmaceutical science-related institutes worldwide. The mission of the AAPS is to advance the capacity of pharmaceutical scientists to develop products and therapies that improve global health.

11.    I have received several awards, honors, and recognitions throughout my academic career. In 2003, I was elected a Fellow of the AAPS for being "internationally recognized as an expert in biopharmaceutics and drug delivery." In 2006, I was awarded MERIT status for my NIH research grant titled "Enhancing Brain & Intestinal Uptake of Anti-AIDS Drugs." MERIT status is awarded to a select number of NIH investigators (less than 5% of funded investigators) who have demonstrated superior competence, outstanding productivity, and are leaders in their fields with paradigm-shifting ideas. In 2011, I was elected Fellow of the American Association for the Advancement of Science (AAAS) for distinguished contributions to biopharmaceutics and innovative approaches for drug delivery and targeting, as well as academic leadership at Rutgers. In 2017, I was elected Fellow in the Controlled Release Society in recognition of "outstanding contributions to the field of delivery science and technology." In 2023, I was

3

elected to the United States National Academy of Inventors as a Fellow in recognition of my "commitment to innovation and entrepreneurship and translation of intellectual property into patient cures." In 2024, I was awarded the International Science and Technology Cooperation Prize from the Fujian Provincial Government in China.

12. I am extensively involved with the NIH as a grant reviewer, having served on over 70 review panels. I also served as a charter member of the Pharmacology Study Section, the Xenobiotic and Nutrient Disposition and Action Study Section, and the Developmental Therapeutics Study Section in the Center for Scientific Review. These study sections review research grant applications related to drugs and drug delivery systems.

13. In addition to my academic work, I have been a consultant to numerous pharmaceutical and biotechnology companies including: Merck, Sharp and Dohme Corp., Alza Corporation, Wyeth Ayerst, Sandoz Pharmaceuticals Corp., Geneva, Ribi ImmunoChem Research, Inc., Biogen Corporation, Novo Nordisk A/S (Denmark), Uniroyal Chemical Company, Inc., Warner-Lambert Company, Glaxo-Wellcome PLC, Teva Pharmaceuticals, USA, Trega Biosciences, Inc., Merck & Co., Eli Lilly & Co., Nobex Corp., Affymax, Spherics, Inc., Lion Bioscience, Inc., Abbott Laboratories, Syntonix, and Genteric. I have served on advisory panels for Boehringer Ingelheim, Wyeth Ayerst, Lederle Laboratories, Novo Nordisk (US), and Abbott Laboratories. I served as a member of the Scientific Advisory Board for Metacrine Sciences and as Chair of the Scientific Advisory Board for TheraPort Biosciences.

14. My work has included efforts with cancer drugs – including work on Non-Small Cell Lung Cancer, Breast Cancer, Colon cancer, Leukemia, Glioblastoma Multiforme cancer treatments.  I am a Full Member of the Cancer Institute of New Jersey (CINJ) and I am a member of the Cancer Pharmacology Program (https://cinj.org/researcher-

4

profiles?name=patrick-j-sinko-phd-rph).  I have also worked on projects related to cancer detection and prevention.  I have worked extensively with polyethylene glycol.  And I have done work with injectable drug delivery systems (including intravenous, intraductal, subcutaneous, intradermal, intraperitoneal injectable systems).

15.     Attached as Exhibit 1 is a recent copy of my curriculum vitae.

### B. **Prior Testimony**

16.     I have given testimony at trial or at deposition in the following cases within the last four years:

- *Novo Nordisk Inc. and Novo Nordisk A/S* v. Apotex Inc., **Product**: Rybelsus. Case No. 24-9729 (RMB) (AMD) US District Court, District of New Jersey (2025 – current), D.

- *Mylan Pharmaceuticals, Inc. (Petitioner) v. **Novo Nordisk A/S** (Patent Owner)*, **Product**: Ozempic, Case IPR2023-00724 (2023 – 2024), D.

- *Avalyn Pharma, Inc. v. Richard G. Vincent*, Seller Representative. Case no.: 3:20-cv-02267-JO-KSC, US District Court, Southern District of California (2022 - 2024), D.

- *Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica NV v. Tolmar Inc.* **Product**: Invega Sustenna, Civil Action no. 21-1784-RGA-SRF, US District Court, District of Delaware (2022 – 2023), D, T.

- *Supernus Pharmaceuticals, Inc. v. Apotex Inc. and Apotex Corp.* **Product:** Oxtellar XR, Civil Action No. 20-7870 (MAS)(TJB)(consolidated), US District Court, District of New Jersey (2022-2023), D.

- *Medexus Pharmaceuticals Inc., Medexus Inc. and Medac Gesellschaft Für Klinische Spezialpräparate MBH v. Accord Healthcare Inc. and Intas Pharmaceuticals Ltd*; **Product**: Metex and Methotrexat, Court File No. T-1007-20, Toronto, Canada. (2022-2023), T.

(D=deposition(s), M/A = Markman or Arbitration Hearing, T = Trial(s); Bold indicates retaining party).

C. **Compensation**

17.     I am being compensated at a rate of $ ███ per hour for my consulting services, including testimony at depositions, hearings, and at trial, and $ ███ per hour for travel.  My compensation does not depend upon my opinions or the outcome of this case.

II.     **SCOPE OF WORK AND SUMMARY OF OPINIONS**

18.     I have been retained by Defendants ("Slayback Pharma LLC" and "Azurity Pharmaceuticals, Inc.") as a technical expert in this matter to provide opinions regarding various issues relating to the United States Patent No. 11,872,214 ("the '214 patent") (Exh. 2), and United States Patent No. 12,138,248 ("the '248 patent") (Exh. 3) (collectively "patents-in-suit").[1]

19.     For this Report, I have been asked by counsel for Defendants to provide my opinion on whether claims 1-9 of the '214 Patent and claims 1-11, 15, and 20 of the '248 Patent (hereinafter collectively "the Asserted Claims") are infringed or not infringed by Slayback's NDA Product.

20.     As detailed below, it is my opinion that there is *no* infringement of the Asserted Claims by the accused Slayback NDA Product either literally or under the doctrine of equivalents, because:



_____

[1]  I have also analyzed United States Patent No. 11,844,783 ("the '783 Patent") (Exh. 4) and its file history, which I understand plaintiffs have withdrawn from this case.  Nonetheless, the '783 Patent and its file history are relevant to understanding the patents-in-suit, and are therefore also discussed below.

21.     I have also been asked to provide my opinion as to whether ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████ It is my understanding that this opinion of

non-infringement will be relied upon by the damages experts in this case.  However, beyond this

opinion of non-infringement, I am not offering any other opinions about ██████████████

█████████ or any opinions regarding damages.

22.     I have also been asked to express my opinion as to whether the Treanda®

bendamustine product, and certain non-bendamustine cancer products would infringe the

patents-in-suit – again solely for purposes of damages issues in the case.  As detailed below,

Treanda® is a lyophilized product that is not in liquid form.  It does not infringe the claims-in-

suit because those claims require a liquid.  And, all cancer drugs that do not contain

bendamustine do not infringe because the claims-in-suit require bendamustine.

23.     The opinions expressed in this Report are based on the materials set forth in

Exhibit 5 ("Sinko Materials Considered for Non-Infringement Report"), and on my knowledge

and experience in the field as a POSA.  I reserve the right to consider additional materials and

express additional arguments in response to expert opinions submitted by Plaintiffs.

III.    **LEGAL PRINCIPLES APPLIED**

24.     In reaching my opinions, I have also applied certain legal concepts as explained to

me by the attorneys for Defendants.

25.     I have applied a definition of a POSA that I understand all of the parties have accepted, as follows:

> A POSA would have had the skills, education, and expertise of a team of individuals working together to formulate a liquid injectable drug product. Such a team would have included individuals with doctoral degrees in chemistry, biochemistry, pharmaceutics, pharmaceutical sciences, chemical engineering, biochemical engineering or related fields, with at least two years of post-graduate experience in developing liquid injectable drug products, or master's or bachelor's degrees in similar fields of study, with a commensurate increase in their years of postgraduate experience. Such a team also would have been familiar with a variety of issues relevant to developing liquid injectable drug formulations, including, among other things, solubility, stability, pharmacokinetics, pharmacodynamics, and other pharmaceutical characteristics. Such a team also would have included persons with expertise in analytical chemistry, including the detection and measurement of chemical degradants. The team also would have had access to an individual with a medical degree with experience in treating patients with CLL and NHL.

26.     I understand that there is a dispute about the infringement or non-infringement of the patents-in-suit by Slayback's NDA Product. And I further understand that the patentee has the burden of proving infringement by a preponderance of the evidence – meaning that the evidence shows that it is more likely than not that there is infringement.

27.     I understand that a patent's claims define the scope of the alleged invention and the exclusionary rights claimed by the patentee. I have been informed that infringement occurs when, without authority, a patented invention is made, used, offered for sale, or sold within the United States or imported into the United States during the term of the patent therefor. I have been informed that a patentee asserting infringement must present evidence showing that it is more likely than not – a preponderance of the evidence – that an accused product or method meets each limitation of an asserted claim, either literally or, if applicable, under the doctrine of equivalents.

8

28.     I understand that determining infringement is a two-step process.  First, the Court interprets the asserted claims through a process referred to as "claim construction," if necessary. I have been advised that the claims of a patent must be interpreted from the perspective of a POSA at the time of filing the patent application.  Second, the accused product is compared to the claims, as construed by the Court, to determine whether there is infringement.

29.     I understand that infringement must be shown by comparing, on a limitation-by-limitation basis, the construed claims to the accused product.  In order to prove infringement, a patentee must show that the accused product contains every limitation of the claim either literally or, if applicable, as an equivalent.  If one claim limitation is not present in the accused product, there is no infringement of that claim.  Furthermore, when an independent claim is not infringed, all of the claims that depend from that claim are also not infringed.

30.     In the present context, I understand that the asserted claims are being compared to the proposed Slayback NDA Product.

31.     Literal infringement of a claim limitation means that the limitation is literally present in the accused product.  When an accused product does not literally contain a limitation, infringement may still be found under the doctrine of equivalents.  A component of an accused product can infringe under the doctrine of equivalents when it is "insubstantially different" from the claimed limitation.  One way to determine "insubstantial difference" is to assess whether the component in the accused product serves the same function, in the same way, to produce the same result.  This test of equivalents is known as the "function, way, result" (or the "FWR") test.

32.     I also understand that a patentee may not be allowed to use the doctrine of equivalents in certain circumstances.  One of those circumstances is called prosecution history estoppel.  Prosecution history estoppel prevents the patentee from arguing equivalents where the

9

claims proposed to the Patent Office were rejected by the Examiner as unpatentable and, in response, the applicant (future patentee) amended and narrowed their claims to overcome the rejection. In that circumstance, there is a rebuttable presumption that the patentee is not allowed to use the doctrine of equivalents.

33. I also understand that the presumption of estoppel (flowing from a narrowing amendment for a reason of patentability) can be rebutted in certain circumstances. One such circumstance, which plaintiffs are arguing for here, is called the tangential exception. If the reasons for the amendment are deemed tangential to the accused equivalent component then prosecution history estoppel does not apply – and thus the patentee could pursue arguments about equivalent infringement.

34. I also understand that another limitation on the doctrine of equivalents is the doctrine of claim vitiation. Under this doctrine, if the use of equivalents would make a claim limitation meaningless (*i.e.*, would vitiate the limitation), then the doctrine of equivalents is not appropriate.

35. I also understand that the doctrine of equivalents cannot be applied to argue that a chemical disclosed in a patent specification, but not claimed in the claims, is an equivalent. For instance, water is disclosed in the specification as a fluid that bendamustine can be dissolved in – although it is argued that such a fluid cannot be used to sustain stability over time. However, water is not mentioned in the claims. Thus, I am informed that it should be impermissible to argue that water is an equivalent of one of the listed fluids in the claims.

36. In addition, I understand that the phrase "consisting of" in a patent claim narrows the scope of the claim. In particular, "consisting of" is a closed phrase that requires the accused product to have *only* what is listed after the words "consisting of" and nothing else. The

10

presence of additional components in the accused product, beyond what is listed after "consisting of," means there is *no* infringement.

37.     When the "consisting of" phrase applies only to a particular claim limitation, it closes only that limitation.  Furthermore, I also understand that when a "consisting of" limitation is nested underneath an open-ended "comprising" phrase, the "consisting of" limitation itself remains closed as to that limitation.

38.     I understand that there are two exceptions to the closed nature of "consisting of." If either of these two exceptions apply, the "consisting of" language will not preclude a finding of infringement.  First, the presence of an impurity that is normally present in a product will not violate the "consisting of" language and thus will not avoid infringement.  However, an ingredient that is purposefully added and impacts the performance of the product is not an impurity.  The second exception is when the additional component in the accused product is unrelated to the invention.  For instance, a claim to a kit "consisting of" certain recited ingredients to be mixed together would not avoid infringement where the accused product contains the recited ingredients and also contains an added spatula that does not interact with the chemicals.

39.     I further understand that the doctrine of equivalents can be applied, in a general sense, to a "consisting of" limitation, as with any other limitation, subject to all the other limitations on the doctrine of equivalents.

## IV.     SCIENTIFIC BACKGROUND

40.     At trial, I may provide testimony regarding various aspects of pharmaceutical science including pharmaceutical formulation, pharmaceutical dosage forms, stability testing, HPLC techniques, validation, pharmaceutical degradation, and basic concepts from chemistry and organic chemistry, including the definitions of atoms, molecules, chemical bonds, chemical

11

reactions, reaction kinetics, states of matter (solids, liquids and gases), the definition of a "fluid," solutions, solutes, solvents, and co-solvents.

### A. States of Matter And The Definition of Solids, Liquids, and Fluids

41.    I understand that a dispute exists between the parties regarding whether ███████ ██████████████████████████████████████████████████████ Thus, the definitions of solids and fluids are pertinent to the resolution of this case.

42.    The patents-in-suit do not provide any definition of the words "solid," "liquid," or "fluid" – let alone provide a unique definition that would depart from a POSA's understanding of the scientific and dictionary meaning of these words. (*See, e.g.*, Exh. 2, '214 Patent, *passim*; Exh. 3, '248 Patent, *passim*).

43.    A POSA chemist would understand that "solids", "liquids", and "gases" are the three most common "states of matter."  (Exh. 6, Brown & LeMay, Chemistry: The Central Science, at pg. 304 (1981) ("matter exists in three states, gaseous, liquid, or solid.") (hereinafter "Brown & LeMay").  A fourth recognized state of matter – plasma – is not applicable to the formulations and products at issue in this case.

44.    A POSA would further understand that a solid material has a fixed shape and volume, does not fill the volume of the container it is placed in, and is not compressible to any degree. (Exh. 6, Brown & LeMay, at pg. 26 ("A solid has a firmness that is not associated with either gases or liquids.  It has a fixed volume and shape.").  Similarly, The American Heritage College Dictionary defines the noun "solid" as follows:

> – n.  1. A substance having a definite shape and volume;
> one that is neither liquid nor gaseous.

(Exh. 7, American Heritage College Dictionary (3rd. Ed. 1993) at pg. 1295).

12

**45.**     A POSA would further understand that solids maintain their fixed shape and volume because the particles that make up the solid (atoms or molecules) are tightly packed in a fixed arrangement and do not move significantly (beyond small vibrational movements).  Stated differently, the atoms or molecules within a solid do not flow.  (Exh. 6, <u>Brown & LeMay</u>, at pgs. 26, 305 (Table 11.1)).

**46.**     By contrast, a POSA would understand that a "liquid" is properly defined as:

> **1a.** A state of matter characterized by a readiness to flow, little or no tendency to disperse, and relatively high incompressibility, **b**. Matter or a specific body of matter in this state.

(Exh. 7, <u>The American Heritage College Dictionary</u> (3rd Ed. 1993), at pg. 791; *see also* Exh. 6, <u>Brown & LeMay</u>, at pgs. 26, 305, Table 11.1 (liquid "flows readily");  Exh. 8, <u>Oxford Paperback Dictionary and Thesaurus</u>, (3rd Ed. 2009) at pg. 542 ("**liquid** > **noun** a substance such as water or oil that flows freely");  Exh. 9, <u>Roget's 21st Century Thesaurus</u> (3rd Ed. 2005), at pg. 509 ("**liquid** [n] *fluid* aqua, aqueous material, broth, elixir, extract, flow, flux, goo\*, goop\*, juice, liquor, melted material, nectar, sap, secretion, slop\*, solution, swill\*; CONCEPT 467 — *Ant.* solid")).

**47.**     Although the patents-in-suit state: "For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use."  (Exh. 2, '214 Patent, Col. 2, lines 56-58; Exh. 3, '248 Patent, Col. 2, lines 53-55), they do not provide an actual definition of the word "fluid" itself.

**48.**     A POSA would understand a fluid to be a substance that flows, including liquids and gases.  As <u>The American Heritage College Dictionary</u> states, a fluid is:

> A continuous amorphous substance whose molecules move freely past one another and that assumes the shape of its container, a liquid or a gas.

13

(Exh. 7, The American Heritage College Dictionary, Dictionary (3rd Ed. 1993), at pg. 524).

Similarly, The Oxford Thesaurus of English's entry for fluid states:

> **fluid noun** he designed instruments to measure the flow of fluids: flowing substance; liquid, water substance, moisture, solution, juice, sap; gas, gaseous substance, vapour.

(Exh. 10, Oxford Thesaurus of English, (3rd Ed. 2009) at pg. 341; *See also* Exh. 9, Roget's 21st Century Thesaurus, (3rd Ed. 2005), at pg. 356 ("**fluid** [n] liquid aqua, broth, chaser, cooler, goo*, goop*, juice, liquor, solution, vapor; CONCEPT 467 -Ant. solid"); Exh. 11, Sears, College Physics, 5th Ed. 1980, at pg. 193 ("The term 'fluid' means a substance that can flow; hence the term applies to both liquids and gases."); Exh. 12, Landau et al., Fluid Mechanics, 2d Ed. 2003, at pg. 1 ("Fluid dynamics concerns itself with the study of the motion of fluids (liquids and gases)."); Exh. 13, National Cancer Institute (NCI) Website at https://www.cancer.gov/publications/dictionaries/cancer-terms/search/fluid/?searchMode=Begins) defines a "fluid" as a "substance that flows smoothly and takes the shape of its container.  Liquids and gases are fluids."; Exh. 14, US 2009/0229671 A at [0020] ("sterile fluid transfer device, such as a flow-through connector or valve, wherein the fluids are liquids and/or gases.");  Exh. 15, U.S. Patent No. 5,304,432 at Col. 5, lines 58-63; Col. 8, lines 1-7; col. 8, lines 30-34; and claim 10 (aqueous NaOH is a fluid); *see also* Exh. 16, Sundaram Depo. at pg. 10, lines 10-22 ("A fluid is not a solid.  It's a liquid or a gas.") and at pg. 11, lines 18-22 ("Q. Above the melting point of a chemical, all liquids are fluids; correct?  THE WITNESS: That's my understanding."); Exh. 18, Buxton Depo. Day 2, Aug. 22, 2025 at pg. 36, line 11 to pg. 38, line 8 (admitting that PEG, identified as a fluid in the patent claims, is in fact both a liquid and a fluid).

14

**49.**    Thus, a POSA would understand that both liquids and gases are "fluids," and that all liquids are also fluids.

B.  **Pharmaceutical Dosage Forms as Solutions and Fluids**

**50.**    There are different types of pharmaceutical dosage forms, including solid oral dosage forms (such as tablets or capsules) and liquid/fluid dosage forms (such as oral syrups and intravenous fluids).  Dosage forms that are liquids/fluids (*e.g.*, syrups and intravenous injections) are often solutions.[2]  This allows the drug to enter the body already dissolved, ready for absorption and/or able to deliver its pharmacological effect immediately.  By contrast, a tablet must first disintegrate into particles, which must then dissolve within the body to release the drug before it can be absorbed.  (Exh. 19, Martin's Pharmacy, at pg. 287 Table 12.1 ("Drug 'dissolution' occurs when a tablet is introduced into a solution and is usually accompanied by disintegration and deaggregation of the solid matrix followed by drug diffusion from the remaining small particles.").  Intravenous dosage forms are also preferred as solutions because the presence of suspended solids in the liquid/fluid can result in painful or difficult injections. (*See, e.g.*, Trout Opening Report at ¶ 219 ("Moreover, the POSA would have understood that the presence of solid particles in the diluted infusion solution would present a serious health concern.").

**51.**    A solution is a homogeneous mixture.  (Exh. 6, Brown & LeMay, at pg. 27;  Exh. 19, Martin's Pharmacy, at pg. 111 ("A true solution is a mixture of two or more components that

---

[2]   When the chemicals in the dosage form do not dissolve within each other, a solution is not possible.  In these instances, suspensions or emulsions may be used.  In contrast to solutions, a "suspension" exists when small particles of a solid are mixed throughout a liquid/fluid, but the particles themselves remain in the solid form.  Suspensions are two-phase fluids; whereas solutions are one-phase fluids.  As explained below, solutions involve a "phase change" where solid ingredients are dissolved and thereby converted into non-solid liquids/fluids.  (*See* Paragraphs 51-54, below).

form a homogeneous molecular dispersion, in other words, a one-phase system with consistent properties.")).  Chemists use the term "solute" to refer to a chemical that gets dissolved into a "solvent" to form a solution.  (Exh. 6, Brown & LeMay, at pg. 84 ("In discussing solutions, it is often convenient to call one component the solvent and the others solutes.  The component of a solution whose physical state is preserved during solution formation is known as the solvent. For example, when sodium chloride (a solid) is mixed with water, the resultant solution is a liquid.  If all components of a solution are in the same state, the one present in the greatest amount is called the solvent.")).  Before it dissolves, a solute can be in the solid, liquid, or gaseous phase.  Solvents are generally liquids/fluids – although in certain circumstances, solvents can be gases or solids.  (Exh. 19, Martin's Pharmacy, at pgs. 111-12).  As the Brown & LeMay textbook says at pg. 84, the distinction between solutes and solvents is often one of arbitrary linguistic "convenience," as the two chemicals are actually dissolving within each other to form a homogeneous mixture.  (*See also* (Exh. 19, Martin's Pharmacy at pg. 111-12 ("The constituent present in the greater amount in a binary solution is *arbitrarily* designated as the solvent and the constituent in the lesser amount as the solute. When a solid is dissolved in a liquid, however, the liquid is usually taken as the solvent and the solid as the solute, irrespective of the relative amounts of the constituents.  When water is one of the constituents of a liquid mixture, it is usually considered the solvent.  When dealing with mixtures of liquids that are miscible in all proportions, such as alcohol and water, it is less meaningful to classify the constituents as solute and solvent.") (emphasis added)).

52.     The process of dissolving one or more chemicals into a solution (a homogeneous mixture) is known as "solvation" or "dissolution."  During solvation, the atoms or molecules of the solute are separated and surrounded (or "solvated") by the atoms or molecules of the solvent.

16

(Exh. 6, Brown & LeMay, at pg. 350-51 ("Once removed from the crystal, the Na+ and Cl- ions [of previously solid sodium chloride] are surrounded by water molecules …. Such interactions between solute and solvent molecules are known as solvation. When the solvent is water, it is known as hydration.").

53.    Thus, a POSA understands that when solids are dissolved in a liquid/fluid, they are no longer solids. The process of dissolution, or solvation, separates a solid's constituent atoms or molecules that were previously fixed in place and molecularly disperses them within the solvent. In solution, all of those atoms or molecules (of the solute and the solvent) move freely or flow – they are all fluids. Thus, the solute has changed physical state from solid to liquid. (Exh. 6, Brown & LeMay, at pg. 84 ("when sodium chloride (a solid) is mixed with water, the resultant solution is a liquid."); Exh. 20, Bancroft, "The Solute as Liquid," SCIENCE, Vol. 82, No. 2130, pgs. 388-89 at 389 (1935) ("*All liquid solutions are mixtures of liquids, regardless whether any or all of the pure components are solids* …") (emphases added) (hereinafter "Bancroft")).

54.    Indeed, some authors have described the dissolution of a solid as being akin to melting – wherein the fixed structure of the solid is changed into a flowing liquid/fluid. (*See, e.g.*, Exh. 21, Goodwin, "Is Salt Melting When It Dissolves in Water?," J. Chem. Educ., Vol. 79, No. 3, pgs. 393-96 at 394 (March 1, 2002) ("both *melting* sodium chloride and *dissolving* it in water … *involve the separation* of sodium and chloride ions *into the liquid state*, where they are *relatively free to move*.") (emphases added)) (hereinafter "Goodwin"); Exh. 22, Goodwin, at Abstract (https://pubs.acs.org/doi/abs/10.1021/ed079p393: "Both melting and dissolving involve transition between the solid and liquid states and are controlled by analogous thermodynamic and kinetic principles.")).

55.     Thus, a saline solution – which is sodium chloride dissolved in water, a solution frequently used in intravenous injections – is understood to be a liquid/fluid.  (*See, e.g.*, Exh. 6, Brown & LeMay, at pg. 84 ("when sodium chloride (a solid) is mixed with water, the resultant solution is a liquid."); Exh. 23, Hoorn, E.J. "Intravenous fluids: balancing solutions," J Nephrol 30, 485–492 at 487 (2017) at https://doi.org/10.1007/s40620-016-0363-9  ("Normal *saline has long been the dominant type of IV fluid* both for replacement and maintenance. … Normal saline differs from other IV fluids in two regards: it does not contain a buffer, and it has a higher chloride concentration.") (emphases added)).  The fact that the sodium chloride (salt) in the fluid was a solid before it was dissolved does not mean that it is a solid after dissolution.  And no reasonable scientist would refer to a saline solution (at room temperature) as a solid.  When sodium chloride dissolves in water, it becomes a liquid/fluid.

56.     ███████████████████████████████████████████████ ████ (See Paragraphs 121-126, below).

57.     Co-solvents are mixtures of chemicals that together form a liquid/fluid that dissolves other chemicals (other solutes).  (*See* Exh. 24, Webster's Third New International Dictionary of the English Language Unabridged (2002) at pg. 514 ("Co-solvent: A solvent that in conjunction with another solvent can dissolve a solute.")).

58.     Thus, a POSA would recognize that a solute that is dissolved in a solvent can itself participate in dissolving other solutes – i.e., act as a cosolvent.  In a paper entitled "Solution in a Dissolved Solid," the authors state:

> … *a dissolved solid itself frequently acts as a solvent* or, if one prefers so to view it, alters the nature of the liquid in which it dissolves, the resultant solution becoming a true solvent with an entirely different freezing-point which is raised in the particular case under consideration.

(Exh. 25, Parsons, "Solution in a Dissolved Solid," The Journal Of Physical Chemistry, December 1, 1907, Volume 11, No. 9, Pages 659-680 (emphasis added)); *See also* Exh. 61, Yan, L., Gao, Z. "Dissolving of cellulose in PEG/NaOH aqueous solution," Cellulose, Vol. 15, pgs. 789–796 (2008) (https://doi.org/10.1007/s10570-008-9233-5) (Abstract: "Here, a new *solvent system* for cellulose is reported. *The solvent is a mixed aqueous solution of 1.0 wt.% poly(ethylene glycol) (PEG) and 9.0 wt.% of NaOH*.") (emphasis added)).

59.    A POSA would also recognize that  is identified as a pharmaceutically acceptable fluid, on its own, and also in combination with the fluid PG.  Propylene glycol is also identified as a fluid in the current patents-in-suit.  (Exh. 26, Buxton-Deposition-Exhibit-22, U.S. Pub. No.: US 2013/0231357 Al at para. [27] ("In several embodiments of the invention, the pharmaceutical compositions include ████████ ████████████████████████.  In other embodiments of the invention, however, the pharmaceutical compositions include a mixture of propylene glycol (PG) ████████

### C.  Stability and Stability Testing

60.    Once a formulation is created, it is tested for stability.  Stability involves a study of how the drug molecule degrades over time and loses its own potency, while degradants increase.  The FDA requires that drug products be tested for stability.  (Exh. 81, 21 CFR 211.137(a)).  This allows for assessment of drug strength and  degradant levels over time.

19

61. Stability in drug formulations is often measured using an HPLC technique that separates and quantifies the drug molecule (also called the "active pharmaceutical ingredient" or "API") and its various degradants.

62. From a POSA formulator's perspective, high accuracy is needed for measuring the amounts of an API and its degradants because those numbers are important to (1) the delivery of an appropriate and effective amount of the drug itself and (2) to the avoidance of delivering potentially toxic degradants. Because exacting numbers are required, any HPLC method used must be properly validated. A novel method must be validated. Indeed, even a change of apparatus, while using the same method, requires validation on the new apparatus. A POSA would not accept stability test results from an unvalidated methodology. (Exh. 82, USP 621; Exh. 83, USP 1225).

### D. Acids, Bases and pH

63. Acids are generally understood, according to one standard definition in chemistry, as substances that release hydrogen ions into solution. Bases are generally understood in chemistry as chemicals that release hydroxide ions into solution (or reduce hydrogen ion concentration). (Exh. 6, Brown & LeMay, pg. 67-68). While other definitions exist, these are most commonly used and appropriate for the purposes of this case. Water can dissociate into equal amounts of hydrogen and hydroxide ions, so pure water is considered neutral. (Exh. 6, Brown & LeMay, pg. 446).

64. pH is a measure of the acidity or basicity of a solution. In particular, pH is the negative logarithm of the concentration of hydrogen ions or protons [H+]. The pH scale ranges from 0 to 14. A pH of 7 is considered neutral. pH numbers below 7 are considered acidic, and pH numbers above 7 are considered basic or alkaline. As hydrogen ion concentration increases,

20

pH decreases.  And vice versa – as the hydrogen ion concentration goes down, the pH goes up. The concentration of hydrogen ions [H+] is inversely associated with the concentration of hydroxide ions [OH-].  Hydroxide ion concentration increases with increasing pH, as hydrogen ion concentration decreases.  Even at pHs below 7, hydroxide ions are present in solution.  (Exh. 6, Brown & LeMay, pg. 446-448).

65.    pH can be an important aspect of a pharmaceutical formulation.  pH can affect the solubility of drugs and other chemicals (excipients) in a pharmaceutical dosage form.  Excipients are all intentionally added substances in a formulation other than the Active Pharmaceutical Ingredient (API).  pH can also affect the stability of a pharmaceutical dosage form, with some pHs producing more degradant impurities and others producing less.  Bendamustine hydrochloride can be positively or negatively charged or neutral in various parts of its molecular structure.  Changes to bendamustine hydrochloride's charge structure can impact both its solubility and stability.  ████████████████████████████████████████ ████████████████████████████████████.  (Exh. 27, Buxton-Deposition-Exhibit-9, Abandoned Patent Publication, '879 Publication at [0038] ("Without meaning to be bound by any theory or hypothesis, polyethylene glycol quality can vary front batch to batch, manufacturer to manufacturer, over product lifetime and as a result of handling. Such variation has made it difficult to make reproducible long term storage stable bendamustine-containing formulations with high amounts of polyethylene glycol and propylene glycol, as the formation of PEG and PG esters is high. In order to obtain reproducible formulations, PEG is treated with an organic or inorganic compound to achieve the desired USP apparent pH. This treatment results in reproducible long-term storage stable bendamustine-containing compositions, with substantially no PEG or PG ester formation")).

66.     The addition of a hydroxide-containing excipient (███████████ ███████ will raise the pH of a formulation above where it would have otherwise been.

67.     When acids and bases react, they neutralize each other, forming water (H+ reacts with OH- to form $H_2O$) and salts.  As an example when hydrochloric acid (aqueous) reacts with the base ████████████ ████████████████████████ ████

███████████ █ ███████████

(Exh. 6, Brown & LeMay, pg. 69).  (*See also* Exh. 79, "Considerations for Waiver Requests for pH Adjusters in Generic Drug Products Intended for Parenteral, Ophthalmic, or Otic Use Guidance for Industry" (2025) at pg. 6 ("Thus, a pH adjuster can become an indistinguishable part of the buffer.  For example, an acetic acid (CH3COOH) sodium acetate (CH3COONa) buffer may be created by mixing a ratio of these two ingredients in solution or by adding a sodium hydroxide (NaOH) pH adjuster to acetic acid.")).

E.  **Conservation of Mass**

68.     It is a fundamental law of nature that matter cannot be created or destroyed.  (Exh. 6, Brown & LeMay, at pg. 61).  An ionic chemical that is added to a solution does not disappear when it dissolves.  It is still there, but it becomes solvated – i.e., its constituent ions dissociate and are surrounded by solvent molecules.  A base that is added to a solution and then reacts with an acid does not disappear.  It only changes form to the extent it reacts.  This will be pertinent when addressing plaintiffs' assertion that sodium hydroxide is "consumed" or "neutralized" when it encounters acid.  A POSA would understand that all of the atoms that were part of the original acid or base remain in solution.  Furthermore, adding ████████████████████

22

███████████████████████████████████████████████████

███████

### F. PEG

69.     Polyethylene glycol ("PEG") is a polymer.  Each "weight" of PEG (e.g., PEG-400) indicates a product that has polymers of varying lengths (and weights) that have an average molecular weight indicated in the name of the product.  The heavier PEGs are solids (Mw >1000).  However, PEGs with relatively lower molecular weights are liquids/fluids (Mw <1000).  PEG-400 is a commonly used liquid/fluid version of PEG.

70.     PEG is known to contain certain acidic impurities that develop during manufacture.  Amongst these impurities are acetic acid and formic acid.  These impurities can vary from one manufacturer to another.  PEG is also known to have other oxidative impurities. (*See, e.g.*, Exh. 28, Mary-Anne del Barrio et al., "Simultaneous determination of formic acid and formaldehyde in pharmaceutical excipients using headspace GC/MS", Journal of Pharmaceutical and Biomedical Analysis, Volume 41, Issue 3, 7 June 2006, Pages 738-743;  Exh. 80, Hemenway, "Reactive Impurities in PEG: A Case Study", in Excipient Applications in Formulation Design and Drug Delivery (2012);  Exh. 29, McGinity, "Influence of Peroxide Impurities in Polyethylene Glycols on Drug Stability," Journal of Pharmaceutical Sciences, Vol. 64, No. 2, pgs. 356-57) ("Higher molecular weight polyethylene glycols and polyethylene glycol esters, i.e., polyethylene glycol 400 …. all contained peroxides as impurities.")).

## V.     THE SLAYBACK NDA PRODUCT

71.     Slayback's NDA Product Label states: "Each milliliter contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, 39.45 mg (5% v/v) of absolute alcohol, and q.s. to 1 mL polyethylene glycol 400."  The Label

23

also identifies sodium hydroxide as an ingredient, stating: "Sodium hydroxide is used to adjust pH of polyethylene glycol 400."  (Exh. 30, Vivimusta® Slayback NDA Product Label).

72.



And indeed the FDA lists sodium hydroxide as an inactive ingredient in its "Inactive Ingredients Database," which is available online at: https://www.accessdata.fda.gov/scripts/cder/iig/index.cfm?event=BasicSearch.page.  Thus, the FDA recognized, as a POSA also would recognize, that sodium hydroxide is an "*inactive ingredient*" in the Slayback NDA Product.  The term "inactive ingredient" is used in the pharmaceutical field synonymously with "excipient" and refers to chemicals in a pharmaceutical formulation that are not the active drug substance but are nonetheless part of the formulation. "Inactive ingredients" or "excipients" are not the same thing as degradants or impurities, which are unwanted chemicals in a formulation.  (*See* Paragraphs 150-152, below).

24

**73.** ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

25



**74.**

---

[3] Normality (N) is a measure of the concentration of a solute (█████████████████████) in a solvent (███████████). Normality represents the number of gram equivalents of a solute dissolved in one liter of a solution and is calculated by using the formula N = Number of Gram Equivalents/Volume of Solution (in liters). To calculate Gram Equivalents, divide the actual mass of the solute (in grams) by the Equivalent Weight. To calculate Equivalent Weight, divide



**75.** ████████████████████████████████████████████████

**76.** ████████████████████████████████████████████████

**77.** ████████████████████████████████████████████████

████████████████████████████████████████. Both the Slayback Label and

plaintiffs' expert Dr. Trout point this out:

> Like Belrapzo® and Bendeka®, Slayback's NDA Product
> is a sterile, liquid injectable anti-cancer drug product
> provided in a vial. Slayback's Label states that Slayback's
> NDA Product is "supplied as a *sterile, clear, and colorless*
> *to yellow solution* in a multiple-dose vial." EAGLEBEN-
> SA_00363932 (Slayback Label 12/2022) at -946-47;

---

the Molar Mass of the substance by its "n-factor". For acids and bases, the n-factor is the number of ions that it can donate. For example, ████████, it can donate one OH- so n = 1.

EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at - 924.

(Trout Opening Report on Infringement at ¶ 179 quoting the Slayback Label (emphasis added)).

**78.** ███████████████████████████████████████████

██████████ ████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████

████████████████████

## VI.    THE ANTIOXIDANT-FREE FORMULATION

**79.**    I have also reviewed Slayback's "Product Development Report" and related documents describing the Antioxidant-Free Formulation, which I understand is another formulation of bendamustine that Slayback has developed and the FDA has approved.

**80.** ████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████

████████████████████



---

4  (Exh. 38, Bricker Depo. at pg. 29, lines 8-10, and pg. 95, line 24 to pg. 96, line 2).

## VII.    THE ASSERTED PATENTS

### A.    History of Eagle Patent Applications

81.    I review here the history of some of plaintiffs' Eagle's many patent applications.

82.    The patent applications that directly led to the '214 patent-in-suit and United States Patent No. 11,844,783 ("the '783 Patent"), were first filed in December 2022.  That was some 12 years after the original provisional application was filed (January 2010), but mere months after plaintiff Eagle lost a patent litigation asserting that Slayback's NDA Product infringed United States Patent No. 11,103,483 ("the '483 Patent") (Exh. 42).  The '483 Patent had a limitation requiring a "ready to use" composition of liquid bendamustine product, which the Slayback NDA Product (the same product accused in this case) was found not to infringe.

29

83.    When plaintiffs went back to the Patent Office in December 2022 they attempted to obtain claims that did not have the "ready to use" limitation from the '483 Patent.  The initial attempted claims also did not have the "pharmaceutically acceptable fluid consisting of" limitation either, which would later be added to obtain allowance of the claims-in-suit.

84.    The '214 and '248 patents-in-suit and the '783 Patent are related.  Although I understand that plaintiffs have now withdrawn the '783 patent from this case, an understanding of the application leading to the '783 patent (Application 18/081,238 – the '238 Application" (Exh. 43)) is important to the remaining two patents-in-suit, given the common patent application family, the common specification, the common claim limitations, and the amendments made during the prosecution of the application that led to the '783 Patent.  The following chart illustrates the inter-relationships between these patents and their immediate applications:



85.    While the graphic above represents the patent applications and "file histories" that led directly to the patents-in-suit, those applications trace back through many additional

applications to a provisional application filed in January 2010.  The face of the '214 patent-in-suit shows its lineage as follows:

(21)  Appl. No.: **18/081,251**

(22)  Filed:      **Dec. 14, 2022**

(65)                    **Prior Publication Data**
US 2023/0115693 A1      Apr. 13, 2023

**Related U.S. Application Data**

(63)  Continuation of application No. 17/412,623, filed on Aug. 26, 2021, which is a continuation of application No. 16/509,920, filed on Jul. 12, 2019, now Pat. No. 11,103,483, which is a continuation of application No. 16/015,656, filed on Jun. 22, 2018, now abandoned, which is a continuation of application No. 15/432,335, filed on Feb. 14, 2017, now Pat. No. 10,010,533, which is a continuation of application No. 15/013,436, filed on Feb. 2, 2016, now Pat. No. 9,572,797, which is a continuation of application No. 14/031,879, filed on Sep. 19, 2013, now Pat. No. 9,265,831, which is a continuation of application No. 13/016,473, filed on Jan. 28, 2011, now Pat. No. 8,609,707.

(60)  Provisional application No. 61/299,100, filed on Jan. 28, 2010.

(Exh. 2, face of patent).

**86.**     In addition to the file histories discussed below, I have also reviewed what is called in this Opinion the "Abandoned Patent Application Publication."  (Exh. 27, Buxton-Deposition-Exhibit-9, Abandoned Patent Publication, U.S. Patent Publication No. 2013/0210879), and its related file history (Exh. 44, Abandoned Patent Application File History, U.S. Application 13/767,672 (filed February 14, 2013) ("the Abandoned Patent Application")).  This Abandoned Patent Application does not claim priority to the 2010 original application from which the patents-in-suit derive priority.  But it does relate to liquid bendamustine formulations, and has the same applicant, Eagle Pharmaceuticals, Inc., and shares two of its three inventors with the patents-in-suit.  Significantly, this patent application did attempt to patent the use of aqueous sodium hydroxide in a bendamustine composition.  However, that attempt was abandoned.  The current patents-in-suit do not claim or mention sodium hydroxide at all.

31

87.     I have also reviewed the file history (Exh. 45) for U.S. Patent Application No. 13 / 016,473 that led to U.S. Patent No. 8,609,707 ("the '707 Patent") – which is in the line of patent applications leading to the patents-in-suit.  During the prosecution of that patent, the applicants repeatedly explained that their inventions were "non-aqueous" and distinguished the prior art on that basis as well.  (*See, e.g.*, Exh. 45, Applicant's Response dated November 30, 2012, *passim*; Applicant Initiated Interview Summary, dated August 14, 2013; Applicant's Response dated September 4, 2013, *passim*).

88.     I have also reviewed another file history in the chain leading to the patents-in-suit – Application No. 14/031,879 ("the '879 Application") (Exh. 46), which became U.S. Patent Number 9,265,831 ("the '831 patent").  It was in that Application that antioxidant limitations were added as an amendment in response to a rejection.

1.  **The '783 Patent Application – Appl. No.: 18/081,238**

89.     The '783 patent derives from U.S. Application No. 18/081,238 ("the '238 patent"), which was filed on December 22, 2022.  The '238 Application (Exh. 43) initially presented 29 claims, including composition claims 1-27 and method of treatment claims 28-29.  Representative claim 1 recited:

**CLAIMS**

We claim:

1.     A ready for dilution, liquid bendamustine-containing composition comprising bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL; polyethylene glycol; and a stabilizing amount of an antioxidant.

Of note, this initial claim did not contain the "pharmaceutically acceptable fluid consisting of"

32

limitation. And it attempted to substitute "ready for dilution" for the "ready to use" limitation that had led to a litigation loss for Eagle a few months earlier.

90.     Representative "method of treatment" claim 28 recited:

> 28. A method of treating leukemia in a human in need thereof comprising
>     providing a liquid bendamustine-containing composition comprising about 25 mg/ml of
>        bendamustine;
>     diluting the liquid bendamustine containing composition; and
>     intravenously administering the diluted composition to the human.

Again, this claim did *not* include the "pharmaceutically acceptable fluid consisting of" limitation and shifted from "ready to use" to "diluting."

91.     In an Office Action dated March 21, 2023 the Patent Office rejected all of the claims for obviousness and obviousness-type double-patenting. (Exh. 43, and EAGLEBEN-SA_00000091-140). The obviousness rejections were premised on a reference called Drager. The Patent Office explained, *inter alia*, that Drager disclosed stable liquid formulations of bendamustine and PEG. (Exh. 43, at EAGLEBEN-SA_00000095-97).

92.     In a June 15, 2023, response and amendment, the applicants amended their composition claims, argued that Drager did not invalidate the claims, and provided a terminal disclaimer to overcome the double-patenting obviousness rejection. Amended claim 1 recited:

33

DOCKET NO.: 107071.000582          **PATENT**
Application No.: 18/081,238
Office Action Dated: March 21, 2023

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims:**

1.     (currently amended) A ready for dilution, liquid bendamustine-containing composition comprising

    bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL;

    a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

    a stabilizing amount of an antioxidant;

    wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

(Exh. 43, '238 Application, June 15, 2023 Response, at EAGLEBEN-SA_00000242). Thus, applicants introduced, for the first time, the phrase "consisting of" before a list of fluids.

93.     However, the June 15, 2023 response from applicants did not amend the method of treatment claims to also include the "consisting of" limitations. For instance, Claim 28 was amended, instead, as follows:

28.     (Currently Amended) A method of treating leukemia in a human in need thereof comprising

    providing a liquid bendamustine-containing composition according to claim 3 ~~comprising about 25 mg/ml of bendamustine~~;

    diluting the liquid bendamustine containing composition; and

    intravenously administering the diluted composition to the human.

(Exh. 43, '238 Application, June 15, 2023 Response, at EAGLEBEN-SA_00000245 (emphases in original)).

94.     In their remarks, applicants emphasized that their claims related to "total impurities," while the prior art Drager did not disclose all impurities, stating:

34

> The present claims recite that the bendamustine-containing compositions will exhibit less than 5% of ***total*** bendamustine degradation impurities (by HPLC) after at least 15 months at about 5-25 °C. Drager's paragraphs [0022] and [0023], cited by the Examiner, do not refer to ***total impurities***; rather, Drager reports separately on levels of ***only five individual impurities*** after storage under only refrigerated conditions. …
>
> Significantly, none of Drager's tested formulations included polyethylene glycol, as recited in the pending claims. Moreover, Drager's 66% dimethylformamide/34% propylene glycol (a polar protic solvent) was the least stable of all formulations tested, producing each of the five identified impurities, even under refrigerated conditions. Noteworthy is that Drager considers a "stable" formulation to be one that includes up to 10% of bendamustine impurities.

(Exh. 43, '238 Application, June 15, 2023 Response, at EAGLEBEN-SA_00000248-249 (emphases in original)).  Thus, the applicants emphasized (1) the need to account for all impurities ("total impurities"); (2) the importance of being below 5% impurities and not merely the 10% in the prior art; (3) supposed problems expressed in the prior art with stability when using polar protic solvents (which include PEG and PG as claimed in the patents-in-suit); (4) the fact that testing is needed to know whether a claimed formulation is stable, and (5) the idea that stability testing at refrigerated conditions is not sufficient.

95.    In a July 11, 2023 Office Action, the Examiner rejected the pending claims as obvious over another piece of prior art – the Brittain prior art reference.  However, the Examiner withdrew his obviousness rejections over Drager stating:  "Applicant's amendments and arguments are persuasive and the rejections are withdrawn."  (Exh. 43, '238 Applications, July 11, 2023 Office Action, at EAGLEBEN-SA_00000836).

96.    In a response dated July 28, 2023, the applicants made no claim amendments, acknowledged a telephone interview on July 12th with the Examiner, and argued that the Brittain

35

reference did not motivate the use of PEG or antioxidants to produce a stable liquid bendamustine formulation. Thus, the applicants argued that their invention was premised on the recognition that antioxidants were beneficial to bendamustine stability – an insight supposedly not understood within the prior art. (Exh. 43, '238 Applications, July 28, 2023 Response, at EAGLEBEN-SA_00000870-877 and *passim*).

97.    On August 21, 2023, the Examiner withdrew his prior rejections over Brittain and asserted new rejections against all pending claims based upon obviousness over Brittain in combination with other pieces of prior art. (Exh. 43, '238 Applications, August 21, 2023 Office Action, at EAGLEBEN-SA_00000962-981).

98.    On September 14, 2023 the Examiner filed an "Applicant-Initiated Interview Summary." The Examiner noted that during the Interview, there was a discussion of limiting the claims to methods of treatment claims with 25 mg/ml of bendamustine to distinguish over Brittain. The Examiner invited the claim amendment and said it would be considered. (Exh. 43, '238 Applications, Sep. 14, 2023 Interview Summary, at EAGLEBEN-SA_00001010-1011).

99.    In a September 19, 2023 submission, the applicants cancelled all claims that were not "method of treatment" claims. In addition, they amended the method of treatment claims to include the "pharmaceutical acceptable fluid consisting of" limitations. Applicants included expert opinions regarding non-obviousness as well. (Exh. 43, '238 Applications, Sept. 19, 2023 Applicant Submission, at EAGLEBEN-SA_00001017-1028).

100.    On October 24, 2023, the Examiner issued a Notice of Allowance and Notice of Allowability. (Exh. 43, '238 Applications, Notice of Allowance, at EAGLEBEN-SA_00001031-1038). The Examiner acknowledged the importance of the amendments to the allowance, and stated: "Applicant's amendments and arguments, including expert opinions, are persuasive. The

claims are allowed for the reasons of record.  The Examiner notes for the record that similar

method claims, albeit free of the required antioxidant in the present application, were allowed in

US 11707450."  (Exh. 43, '238 Applications, at EAGLEBEN-SA_1037).

### 2.  Prosecution of the '214 Patent – Application 18/081,251

**101.**    The '214 Patent derives from U.S. Application No. 18/081,251 ("the '251

Application") (Exh. 47), which was filed on Dec. 14, 2022.  The '251 Application was a

continuation application of U.S. Application No. 17/412,623 ("the '623 Patent Application") –

which was also the parent application of the '238 Application (discussed above) that led to the

'783 Patent.  (*See, .e.g.*, Exh. 2, '214 Patent at front page, "Related U.S. Application Data.").

**102.**    There were 16 original claims in the '251 Application.  Only one of the claims

had a stability limitation, and none of them had the "consisting of" language that ultimately

would be added by amendment.  (Exh. 47, '251 Application).  Representative original Claim 1

recited:

> 1.    A sterile vial containing a liquid bendamustine-containing composition comprising
>        bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine
>            concentration in the composition is from about 20 mg/mL to about 60 mg/mL;
>        polyethylene glycol; and
>        a stabilizing amount of an antioxidant.

**103.**    On March 14, 2023, the claims were rejected as indefinite and obvious. In part,

the Examiner cited Drager for the proposition that "it has been discovered that stable formulation

of bendamustine or a pharmaceutical salt thereof can be obtained by mixing with a polar aprotic

solvent such as polyethylene glycol such as PEG300 or PEG400 as well as antioxidants such as

vitamin E, ascorbic acid, BHA, BHT, propyl gallate, which naturally stabilizes the composition."

(Exh. 47, '251 Application, Mar. 14th 2023 Office Action, at 7 (citations omitted)).

**104.** The applicant and Examiner participated in an interview on March 7, 2023 in which "Applicant explained that Eagle sought to improve the prior art by eliminating the reconstitution step thus making it easier to use and less commercial burden to manufacture and provide a liquid ready to use dosage form." (Exh. 47, '251 Application, "Applicant-Initiated Interview Summary" dated March 7, 2023 at 1).

**105.** Subsequently, on June 14, 2023, the applicants amended the independent claims in an effort to overcome the Examiner's rejection, and explained that "[p]olyethylene glycol is 'protic'" while "Drager's composition must comprise a polar 'aprotic' solvent." (Exh. 47, '251 Application, Jun 14, 2023 Response at 5-6). Applicants further stated that "Drager teaches that each of its formulations must include some amount of polar aprotic solvent. While Drager references that polar protic solvent may be used, that is only *in addition to, not instead of*, the polar aprotic solvent. Drager fails to disclose or suggest any bendamustine formulations with solvent systems composed of protic solvent in the absence of any aprotic solvent." (Exh. 47, '251 Application, Jun 14, 2023 Response at 5-6). Claim 1 was thus amended as shown below:

> 1. (Currently Amended) A sterile vial containing a liquid bendamustine-containing composition comprising
>
> bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL;
>
> a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
>
> a stabilizing amount of an antioxidant.

(Exh. 47, '251 Application, Jun 14, 2023 Response at 2). Thus, the applicants distinguished the prior art based on the nature of fluids in the prior art (stating that the prior art "must include" a polar aprotic fluid and may additionally have a polar protic fluids) from the claimed invention. At the same time applicants amended the claims to limit them to require only a protic fluid, PEG

38

(with other optional fluids possible) – and limited that entire group with the phrase "consisting of."

**106.**   Claim 11 was amended as shown below:

> 11.   (Currently Amended) A bendamustine-containing composition comprising bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid;
> wherein the pharmaceutically acceptable fluid ~~comprises~~ consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
> wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 20 mg/mL to about 60 mg/mL.

(Exh. 47, '251 Application, Jun 14, 2023 Response at 3).

**107.**   On July 11, 2023, the claims were again rejected as obvious under 35 U.S.C. § 103 based on Brittain and Treanda.

**108.**   The applicant replied on July 28, 2023.  The applicant began by thanking the Examiner for a July 12th Interview regarding both the current application and the "related" '238 Application, stating:

> Applicant's representative thanks Examiner Arnold for the courtesy of the telephone conference conducted on July 12, 2023, for the related 18/081,238. The office action and cited art were discussed, as well as arguments and evidence submitted and found persuasive in U.S. 11,103,483.

(Exh. 47, '251 Application, Jul 28, 2023 Response at pg. 5).

**109.**   The applicants argued that the prior art Treanda® contains 5 mg/mL.  Applicants also argued that while "Brittain refers to polyethylene glycol as an example of a 'liquid carrier or vehicle' for preparing the ultimate dosage form," Brittain does not teach "that the skilled person should deviate from the concentrations specified by Treanda®."  (Exh. 47, '251 Application, July 28, 2023 Response at 6-7).  Nor did the art teach the addition of an antioxidant, or that bendamustine can degrade via an oxidative mechanism.  (Exh. 47, '251 Application, July 28,

39

2023 Response at 7-8).  The applicants also argued for the surprising and unexpected stability of the claimed "composition including bendamustine in PEG" during storage – where PEG was the only required fluid after the "consisting of" language in amended claim 1.  (Exh. 47, '251 Application, July 28, 2023 Response at 11).

110.  Additionally, the applicants attached a U.S. District Court opinion finding a related patent not obvious, and also included excerpts of an expert opinion that the District Court relied on from Dr. Siepmann.  In particular, the applicants cited to Dr. Siepmann's Opinion at ¶¶ 359, and 469-471.  Siepmann paragraph 359 states in part:

> 359. … In view of the small number of marketed parenteral drugs containing PEG, and the fact that none of those drugs contained an antioxidant, the POSA would have inferred that formulators simply did not use PEG with drugs that might be susceptible to degradation via PEG's oxidation products.  In my opinion, and based on my experience as a formulator, the POSA would not have been motivated or had reason to add PEG to a formulation if she or he believed that doing so would have necessitated also adding an antioxidant.

(Exh. 47, '251 Application, "Exhibit B to the July 28, 2023 Response: Siepmann Excerpts" ¶ 359, EAGLEBEN-SA_00001478-79).  Siepmann paragraph 469 states:

> 469.  I further agree with Dr. Pinal that it was known that PEG could form various degradation products.  As I explain above. the POSA would have viewed the degradation products of PEG as a disadvantage that would have discouraged the use of that solvent. ….

(Exh. 47, '251 Application, "Exhibit B to the July 28, 2023 Response: Siepmann Excerpts" ¶ 469, EAGLEBEN-SA_00001535).  The focus of the Siepmann Opinion excerpts was on the non-obviousness of using PEG fluid, let alone using it with an antioxidant.

40

**111.** On August 21, 2023, the Examiner withdrew the earlier rejections over Brittain, but entered new rejections over Brittain in light of other art.

**112.** The applicants replied on November 8, 2023. Applicants amended the claims to narrow the bendamustine concentration to "about 25mg/ml." The applicants again argued that the combination of PEG and an antioxidant to produce a stable liquid bendamustine formulation was non-obvious. And, again, the applicants cited, quoted, and relied upon the Siepmann Opinion in the District Court to argue for patentability. (Exh. 47, '251 Application, November 8, 2023 Response at 5-8, and 12-15).

**113.** A Notice of Allowance and Allowability was issued on November 22, 2023. In the Notice of Allowability, the Examiner stated:

> Applicant's arguments, especially concerning the expert testimony of Dr. Siepmann which was found persuasive by the district court, carries more weight than the Examiner's position. The rejections are withdrawn.

(Exh. 47, '251 Application, Notice of Allowability at 3).

### 3. Prosecution of the '248 Patent – Application No. 18/646,171

**114.** The '248 patent-in-suit was filed as U.S. Application No. 18/646,171 ("the '171 Application) (Exh. 48) on April 25, 2024. The '171 Application derives from a long chain of continuation applications, including continuation Application 18/498,259 (filed on Oct. 31, 2023), which was a continuation of Application No. 17/412,623 (filed on Aug. 26, 2021, now abandoned), which was a continuation of Application No. 16/509,920 (filed on Jul. 12, 2019), which became U.S. Patent No. 11,103,483. Additional applications in the chain are shown on the front page of the '248 patent. (Exh. 3, '248 Patent at first page "Related U.S. Application Data"). (*See also* Exh. 48 ('171 file history)).

41

115.    The application leading to the '248 patent was filed with 23 claims, two of which were independent.  Initial Claim 1 recited:

**CLAIMS**

We claim:

1.  A sterile container containing a liquid bendamustine-containing composition comprising bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is about 25 mg/mL;

   a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

   a stabilizing amount of an antioxidant,

   wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C to about 25° C.

(Exh. 48, '171 Application, at EAGLEBEN-SA_00353708).  Thus, by April 2024, the applicants submitted a claim containing the "pharmaceutically acceptable fluid consisting of" limitation from the outset.

116.    On July 9, 2024, the claims were rejected for at least indefiniteness and obviousness.

117.    The applicant replied on July 31, 2024, arguing that "one of ordinary skill in the art would not have been motivated to make a liquid bendamustine-containing composition incorporating polyethylene glycol (PEG) and an antioxidant, as claimed." (Exh. 48, '171 Application, July 31, 2024 Reply at 5).  Applicant also argued that a person of skill would not have deviated from Treanda® to prepare a liquid composition with 25 mg/mL of bendamustine. (Exh. 48, '171 Application, July 31, 2024 Reply at 6).  Applicant further argued that the prior art did not suggest adding an antioxidant to a liquid bendamustine and PEG composition, or that

42

bendamustine can degrade via an oxidative mechanism, or including PEG and an antioxidant in a liquid bendamustine composition. (Exh. 48, '171 Application, July 31, 2024 Reply at 7-10).

**118.**    A Notice of Allowance was issued on August 21, 2024.  As with the '214 Patent Allowance, the Allowance here deferred to Dr. Siepmann's Opinion in the District Court, stating:

> Applicant persuasively argued that the Examiner's anti-oxidant-PEG excipient hypothesis had already been argued in district court litigation where the court found Dr. Seipmann's expert testimony persuasive. Since the Examiner is not in a position to contradict the expert testimony or challenge the court's findings, then the rejection is withdrawn and the claims are allowed.

(Exh. 48, '171 Application, Notice of Allowance at 4).

## B.    CLAIMS OF THE PATENTS-IN-SUIT

### 1.  Claims of the '214 Patent

**119.**    I have been told that claims 1-9 of the '214 patent are asserted in this case. Those claims read as follows:

> 1.      A sterile vial containing a liquid bendamustine containing composition comprising
>
>> about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 25 mg/mL;
>>
>> a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
>>
>> a stabilizing amount of an antioxidant,
>>
>> wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C
>
> 2.      The sterile vial of claim 1, wherein the antioxidant is monothioglycerol.

3.    The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

4.    The composition of claim 1, wherein the composition is stable for at least about 15 months at 5° C. or for at least about 15 months at 25° C.

5.    The sterile vial of claim 1, wherein the liquid bendamustine containing composition further comprises ethanol.

6.    A liquid bendamustine containing composition comprising

100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid;

wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol;

and wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 25 mg/mL,

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

7.    The composition of claim 6, wherein the antioxidant is monothioglycerol.

8.    The composition of claim 6, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

9.    The composition of claim 6, further comprising ethanol.

### 2.  Claims of the '248 Patent

120.    I also understand that claims 1-11, 15, and 20 of the '248 patent are asserted in this case.  For completeness, I have reproduced _all_ of the claims of the '248 patent (asserted and unasserted) here:

1. A sterile container containing a liquid bendamustine containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is about 25 mg,/m1;

a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

a stabilizing amount of an antioxidant,

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength 35 of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

2.    The sterile container of claim 1, wherein the antioxidant is monothioglycerol.

3.    The sterile container of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

4.    The sterile container of claim 1, wherein the composition is stable for at least about 15 months at 5° C. or for at least about 15 months at 25° C.

5.    The sterile container of claim 1, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol.

6.    The sterile container of claim 1, wherein the liquid bendamustine containing composition comprises about 100 50 mg of bendamustine, or a pharmaceutically acceptable salt thereof.

7.    The sterile container of claim 1, wherein the liquid bendamustine containing composition comprises about 100 mg of bendamustine.

8.    A liquid bendamustine containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, and

a stabilizing amount of an antioxidant,

45

in a pharmaceutically acceptable fluid; wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

wherein the bendamustine concentration in the pharmaceutically acceptable fluid is about 25 mg/mL,

wherein the total impurities resulting from the degrada¬tion of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

9.      The composition of claim 8, wherein the antioxidant is monothioglycerol.

10.     The composition of claim 8, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

11.     The composition of claim 8, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol.

12.     The composition of claim 8, wherein the bendamustine concentration in the composition is 25 mg/mL.

13.     The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol.

14.     The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and propylene glycol.

15.     The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and ethanol.

16.     The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and benzyl alcohol.

17.     The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and glycofurol.

18.     The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol.

46

19.    The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and propylene glycol.

20.    The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and ethanol.

21.    The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and benzyl alcohol.

22.    The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and glycofurol.

## VIII.    NON-INFRINGEMENT OF THE SLAYBACK NDA PRODUCT

### A.    There Is No Infringement Because █████████████████████████
█████████████████████████████████████████████████████████████.

███████████████████████████████

**121.**    ████████████████████████████████████████████████



122.    Indeed, in the related "Abandoned Patent Application Publication" – that also involved liquid bendamustine formulations, and was filed by the same applicant and shared the same two inventors of the patents-in-suit – Eagle Pharmaceuticals, Inc., and sharing two of same inventors as the current patents-in-suit – ███████████████████████████

██████████████████████████

47





(*See, e.g.*, Exh. 27, Buxton-Deposition-Exhibit-9, '879 Abandoned Patent Publication at [0055] through [0067] and also Exh. 27, Buxton-Deposition-Exhibit-9, '879 Abandoned Patent Publication at Claim 30 (listing ██████████████████████████████████████ in the context of bendamustine formulations)).

123.    ██████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████    (Exh. 49, Buxton-Deposition-Exhibit-26, U.S. Patent Publication 2009/0221622 (entitled "Topotecan Ready to Use Solutions") at [18] ("*a pharmacologically suitable fluid* comprising an *aqueous hydrochloric acid* [a pH adjuster] diluent …") (emphases added); Exh. 18, ████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

**124.**    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████    (*See, e.g.*, Exh. 26, Buxton-Deposition-Exhibit-22 (entitled "Pharmaceutical

Compositions Containing Pemetrexed Having Extended Storage Stability") at [0026] ████

████████████████████████████████████████████████████████████.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████) (emphases added);

Exh. 18, ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████

**125.**    The third inventor of the Abandoned Patent Application, ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████

**126.**    A POSA would clearly understand that ████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████

**2.**    █████████████████████████████████████████████
████████████████████

**127.**    As noted above, all of the claims-in-suit recite, or depend from claims that recite, the phrase: "a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol."[5]  That "consisting of" limitation was added by amendment to overcome rejections for obviousness in several file histories leading to the patents-in-suit.

**128.**    And as noted above, I understand that, with rare exceptions, a "consisting of" limitation forecloses infringement where additional components are in the accused product, but are not recited after the claim's "consisting of" language.  ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[5] Asserted Claim 9 of the '214 Patent and Asserted Claims 11 and 15 of the '248 Patent also require ethanol in addition to PEG.  And Asserted Claim 11 of the '248 Patent requires PEG and also requires "one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol."

129.    For these reasons, there is no literal infringement of any of the Asserted Claims.

130.    Dr. Trout posits several responses to non-infringement of the "consisting of" limitation.  I address those arguments below.

**3.**

---

[6]  *See, e.g.*, Trout Report on Infringement at pg. 18, ¶ 70, pg. 40-41 at ¶ 132; pg. 42, ¶ 135; pg. 68 ¶¶ 199-200; pg. 69 ¶ 202; pg. 70-71 ¶ 205; pg. 72 ¶ 207; pg. 75 ¶¶ 211-212; pg. 81 ¶ 224; pg. 95 ¶ 257; pg. 93 ¶ 258; pg. 102 ¶ 279; pg. 115 ¶ 318; pg. 118 ¶ 325; pg. 136 ¶ 383; pg. 139-140 ¶ 391.



**136.** ███████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████ And, as such, it is

subject to the "pharmaceutically acceptable fluid consisting of" limitation.  There is no

infringement.

**4.** ██████████████████████████

███ █████████████████████████████████████

████████████████████████████████████████ and

therefore is somehow not an ingredient in the Slayback NDA Product and is thus not to be

considered in any non-infringement analysis.  This is incorrect.

---

[7] *See, e.g.*, Trout Opening Report on Infringement at pg. 18 ¶ 70; pgs. 19-20 ¶¶ 73-76; pg. 75 ¶ 212; pg. 77 ¶ 217; pgs. 89-90 ¶ 250; pg. 90 ¶ 251; pg. 90 ¶ 252; pg. 92 ¶ 257; pg. 102 ¶ 278; pg. 120 ¶¶ 334-335; etc.

138.    I am informed that there has been no claim construction argument that has been made by plaintiffs, and there is no ruling from the Court, that the ingredients must remain in the form they were added or they do not count for the claims.  Therefore I understand that this argument may not be allowed as untimely.  Furthermore, the claims do not use any terms like "unaltered" or "unchanged" or "unreacted" when they refer to various chemical components of the claimed formulations.  Regardless, I address the argument substantively below.

139.    A POSA would not adopt a claim construction that ignored deliberately added ingredients that subsequently undergo chemical reaction after being added. ▮▮▮▮▮▮ ▮▮▮▮▮▮ is a purposefully added inactive ingredient in the Slayback NDA Product. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ More generally, the FDA identifies sodium hydroxide as an inactive ingredient in its "Inactive Ingredients Database" for intravenous injections and solutions, among other uses.

https://www.accessdata.fda.gov/scripts/cder/iig/index.cfm?event=BasicSearch.page:

| SODIUM HYDROXIDE | INTRAVENOUS | SOLUTION | 1310732 | 55X04QC32I | 2.78%w/v |
|---|---|---|---|---|---|

**140.** The FDA's recognition of sodium hydroxide as an "inactive ingredient" is consistent with the understanding of a POSA that sodium hydroxide is routinely added to pharmaceutical compositions in solution as an excipient/ingredient. (Exh. 51, Handbook of Pharm'l Excipients for Sodium Hydroxide, at "18. Comments" ("Sodium hydroxide is most commonly used in solution …."). Further, a POSA would understand that the fact that sodium hydroxide may react, partially or wholly, in an acid-base reaction – what Dr. Trout refers to as neutralization or "effective consumption" – does not change the fact that it is an added ingredient. pH adjusters, like sodium hydroxide, are understood by a POSA (and the FDA) to both (1) react in acid-base reactions, but nonetheless (2) to be ingredients in pharmaceutical products. (Exh. 79, "Considerations for Waiver Requests for pH Adjusters in Generic Drug Products Intended for Parenteral, Ophthalmic, or Otic Use Guidance for Industry" (2025) at pg. 6 (showing that sodium hydroxide will react with acids to form buffers, but still calling it an excipient or ingredient).

**141.** In that regard, a POSA would understand the claims to be referring to the initial ingredients. A POSA would understand that ingredients that are added to a formulation may change chemical form or react with other chemicals in the formulation, but are still considered to be part of the formulation. And such ingredients would still be identified by a POSA as the material that was added at the outset regardless of subsequent chemical changes. A pharmaceutical formulator identifies those chemicals that will be added to a formulation in the same way that a chef will list ingredients in a recipe. The fact that those ingredients may chemically change over time, due to chemical reactions in a pharmaceutical formulation or chemical changes during cooking in a recipe, does not change their status as ingredients from a definitional standpoint.

142.    pH adjusters like sodium hydroxide are understood to have long-lasting impacts

on a formulation once added, again irrespective of subsequent chemical changes.  As this

applicant and these inventors themselves noted in the related Abandoned Patent Application

Publication, the addition of sodium hydroxide to a PEG-containing bendamustine formulation

improves the stability of the bendamustine, stating:

> [0038]   Without meaning to be bound by any theory or
> hypothesis, polyethylene glycol quality can vary from batch
> to batch, manufacturer to manufacturer, over product lifetime
> and as a result of handling. Such variation has made it difficult
> to make reproducible long term storage stable bendamustine-
> containing formulations with high amounts of polyethylene
> glycol and propylene glycol, as the formation of PEG and PG
> esters is high. In order to obtain reproducible formulations,
> PEG is treated with an organic or inorganic compound to
> achieve the desired USP apparent pH. This treatment results
> in reproducible long-term storage stable bendamustine-con-
> taining compositions, with substantially no PEG or PG ester
> formation.

(Exh. 27, Buxton-Deposition-Exhibit-9, '879 Abandoned Publication at [0038]).  ██████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████.  As the

Abandoned Patent Application Publication states:

> Inorganic compounds include compounds
> known to those of skill in the art, including, but not limited to,
> salts of hydroxides and salts of phosphates, sodium formate,
> sodium phosphate, potassium hydroxide, and phosphoric
> acid. Most preferably, the inorganic compound is sodium
> hydroxide.

(Exh. 27, Buxton-Deposition-Exhibit-9, '879 Abandoned Publication at [0041]).  Thus, the

deliberate addition of sodium hydroxide as an inactive ingredient has a long-lasting, beneficial

impact on the stability of the entire formulation.

56

**143.** ████████████████████████████████████████

████████████████████████████████████████████████████

████████



████████████████████████████████████  ████████████

████████████████████████████████████████████████████

███████████████████████████████████  ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

**144.** Additionally, as noted above, chemicals do not simply disappear during a chemical reaction. It is understood to be a law of nature that matter is neither created nor destroyed. This is known to chemists and scientists generally as the law of conservation of matter or mass. (*See, e.g.*, Exh. 6, <u>Brown & LeMay</u>, at pg. 61 ("More precisely, *atoms are neither created not destroyed during a chemical reaction*; they merely exchange partners or become otherwise rearranged."; Exh. 18, ████████████████████████████████ ██. For instance, sodium hydroxide is known to react with acetic acid to form a buffer system made of acetic acid and sodium acetate. (Exh. 79, Considerations for Waiver Requests for pH Adjusters in Generic Drug Products Intended for Parenteral, Ophthalmic, or Otic Use Guidance

for Industry" (2025) at pg. 6). And, it is also known that acetic acid, and formic acid, are acidic impurities in PEG. (Exh. 80, Hemenway, "Reactive Impurities in PEG: A Case Study", in Excipient Applications in Formulation Design and Drug Delivery (2012)). And thus, a POSA would understand that the addition of sodium hydroxide to PEG would result in the formation of some amount of acetate and formate buffer systems.

145. ███████████████████████████████████████████████████ ████████████████████████████████ As far as I can tell, Dr. Trout does not dispute that at all.

146. Furthermore, even if one were to accept Dr. Trout's premise that sodium hydroxide should not be considered an ingredient after it reacts with an acid – which is incorrect – Dr. Trout nonetheless provides no evidence that the entirety of the added sodium hydroxide is, to use his words, "effectively consumed" in an acid-base reaction – i.e., that there is no excess sodium hydroxide in the Slayback NDA Product. As any chemist knows, chemical reactions proceed in ratios of one reactant to another. In this instance, each molecule of sodium hydroxide would, in theory, react with one molecule of an acid species that it encountered. Because the amount of acid impurities will vary from one lot of PEG to another, there is no way to specifically know whether every molecule of sodium hydroxide that is added will have reacted with an equal amount of acid in the formulation. As even inventor Dr. Buxton testified:

147. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████



Similarly, the plaintiff's inventor, Dr. Buxton,

148.    Furthermore, the long-term beneficial impacts of sodium hydroxide on stability indicate that it has not disappeared or been "effectively consumed," but rather continues to have a long-term impact (likely through its presence and pH effects) on the entire formulation, including after bendamustine is added.

149.    For all the above reasons, sodium hydroxide is an inactive ingredient of the Slayback NDA Product; it does not disappear when it reacts with unknown amounts of acid in the PEG formulation, it supports the overall formulation's performance with regard to stability and solubility, and it must be considered in the infringement analysis.

59

**5.** A█████████████████████████████████

150.    Dr. Trout also argues that sodium hydroxide is an impurity, or ███████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████    This is also not correct.

151.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████    And, more generally, sodium hydroxide is also listed in the FDA

"Inactive Ingredient Database."  In recognizing sodium hydroxide as an inactive ingredient, the

FDA necessarily also distinguished sodium hydroxide from impurities and contaminants.  The

FDA, as well as a POSA, understands that "inactive ingredients" are not the same thing as

"contaminants" or "impurities."  The FDA website (https://www.fda.gov/drugs/drug-approvals-

and-databases/inactive-ingredients-approved-drug-products-search-frequently-asked-questions),

states:

> **8. Does the Inactive Ingredient Database include contaminants found in approved drug products?**
>
> No. The Inactive Ingredients Database does not include contaminants found in approved drug products.

152.    Other authorities also recognize – as a POSA would – that inactive ingredients

(excipients) are not impurities – and indeed the two are mutually exclusive categories.  (Exh. 53,

Pilaniya *et al.*, "Recent trends in the impurity profile of pharmaceuticals," J. Adv. Pharm. Tech.

Res., Vol. 1, Issue 3 pgs. 302-310 at 302 (July-Sept 2010) (defining impurity as: "Any

component of the drug product which is not the chemical entity defined as the drug substance or

an excipient in the drug product") (quoting from the ICH)); Exh. 19, Martin's Pharmacy, at pg.

60

610 ("Process or product-related impurities such as degradation products, leachates, residual solvents, or extraneous contaminants in pharmaceutical dosage forms are not considered excipients. An excipient is a 'substance other than the active ingredient, which has been appropriately evaluated for safety and is included in a drug delivery system to: 1. Aid in the processing of the drug delivery system during its manufacture; 2. Protect, support, or enhance stability (formulation feasibility), bioavailability, or patient acceptability; 3. Aid in product identification; or 4. Enhance any other attribute of the overall safety and effectiveness of the drug during storage and use.'")).

**153.**

**154.** Dr. Trout's argument that the reaction products resulting from any reaction between sodium hydroxide and an acid would be impurities is also incorrect. First, the ingredient added is ███████████████████ Any subsequent reaction products are not the ingredient. A POSA would consider ██████████████ to be the ingredient of interest.  Thus, even if the resultant reaction products were deemed impurities (which they are not), there is no

evidence that some of the added sodium hydroxide does not remain present and unreacted as well. Third, the reaction of the sodium hydroxide with any acids in the formulation provides a long-lasting change in the properties of the formulation – an improvement in stability. Thus, a POSA would not consider the reaction products impurities, but rather functional components of the formulation that improve its performance. Fourth, pH adjusters are considered inactive ingredients in pharmaceutical formulations, even though they are known to react with acids or bases to some degree and form other chemicals.

**6.** ███████████████████████████████
███████████████████████████

155.    Plaintiffs and Dr. Trout also argue that ████████████████████████
████████████████████████████ Thus, they assert that the "unrelated exception" to "consisting of" applies. This is not correct.

156.    As a first matter, the "consisting of" limitation modifies the phrase "pharmaceutically acceptable fluids" in the claims-in-suit. ███████████████████
███████████████████████████████████████████
██████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████
███████████████████████████████████
███████████████████████████████

157.    And the applicants for the patents-in-suit explained to the Patent Office during the application process that the "pharmaceutically acceptable fluids" are directly tied to improved

62

stability of the bendamustine formulations – a key focus of the claims-in-suit.  (*See* Paragraphs 142-143, above).

158.   Applicants have also acknowledged that



);

159.

160.   Thus, the addition of

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ The "unrelated exception" to "consisting of" does not apply.

### 7.  "Fluids" are Not Limited to "Solvents" As a Matter of Claim Construction; ███████████████████████████████.

161.    Plaintiffs and Dr. Trout also argue that "fluids" are limited to solvents in the patents-in-suit.  Dr. Trout then posits that, █████████████████████████ ████████████████████████ Neither of these propositions is correct.

162.    First, I am informed that plaintiffs did not raise the claim construction argument that "a fluid is a solvent" during the claim construction / Markman phase of this case.  As a result, I am informed that plaintiffs may not be permitted to argue this claim construction at all. Nonetheless, to the extent plaintiffs are allowed to pursue this definition of "fluid," there are substantive reasons why this construction is incorrect.

163.    The claims do not use the word "solvent" anywhere.  The specification only refers to "solvents" in Example 1, and does not define "fluids" to be "solvents" in that Example.  Nor does the patent provide a definition of the word "fluid" anywhere, and certainly not one that equates fluids with solvents.  The only definition of a "pharmaceutically acceptable fluid" in the patent merely states:

> For purposes of the present invention, a pharmaceutically
> acceptable fluid is a fluid which is suitable for
> pharmaceutical use.

(Exh. 2, '214 Patent, Col. 2, lines 56-58; Exh. 3, '248 Patent, Col. 2, lines 53-55).  This definition: (1) does not limit "pharmaceutically acceptable fluids" to solvents, and (2) does not define the word "fluid" at all, let alone as a solvent.

164.    To the contrary, the patents-in-suit say explicitly that "pharmaceutically acceptable fluids" may or may not be solvents, stating:

> In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, *but is not necessarily, a solvent* for the bendamustine or salt thereof.

(Exh. 2, '214 Patent, Col. 3, lines 39-41; Exh. 3, '248 Patent, Col. 3, lines 35-37 (emphasis added)).  This language makes clear that a "pharmaceutically acceptable fluid" need not be a solvent for bendamustine at all.

165.    In support of his argument, Dr. Trout points to the fact that all of the fluids listed in claims (after the "consisting of" language) are also solvents of bendamustine; that the specification supposedly points to fluids that are solvents; and that the file history contains statements that refer to PEG and other fluids as solvents.  And Dr. Trout repeatedly refers to fluids as solvents throughout his Opening Report.[8]  This does not change the fact that the specification clearly states that the required "pharmaceutically acceptable fluids" can include non-solvents as well.

166.    Dr. Trout attempts to get around this impediment to his argument by arguing in Paragraph 113 of the Trout's Opening Report on Infringement (at pg. 28), Dr. Trout attempts to limit the patent claims by observing that all of the recited fluids in the claims are solvents of

---

[8]  *See, e.g.*, Trout Opening Report on Infringement at pg. 15, ¶ 58; pg. pg. 24, ¶ 103; pg. 25, ¶¶ 105-106; pgs. 26-27, ¶¶ 109-111; pg. 28, ¶ 113; pg. 29, ¶ 116; pgs. 29-31, ¶¶ 117-119; pg. 40, ¶¶ 130-131; pg. 41, ¶¶ 133-134; pgs. 42-43, ¶¶ 135-136; pg. 145-47, ¶¶ 139-144; pgs. 47-50, ¶¶ 145-155 (regarding the file histories); etc.; *passim*.

bendamustine. From this, Dr. Trout concludes that the section of the specification stating that the fluids may or may *not* be solvents does not apply to the claims. This is not correct. As a first response, if the applicants wanted to limit the claims to only solvents, they could have used the word "solvent" in the claims. But the claims do not use that word and instead recite "pharmaceutically acceptable fluids." A POSA would not read the claims to impose a limitation of solvents on the word "fluid" where none exists in the claims, and the word "fluid" does not have that limited meaning to a POSA. (*See* Paragraphs 163-164, above).

167. Moreover, there is no particular reason to characterize the specific fluids recited in the patent claim as "solvents" as opposed to "organic fluids" or "non-aqueous fluids" or "carriers" or "diluents" or "substances having melting points below room temperature." The claims give no indication of how to group them. A POSA would simply understand a "pharmaceutically acceptable fluid" to be a broad term encompassing fluids that are suitable – as the specification states. (Exh. 2, '214 Patent, Col. 2, lines 56-58; Exh. 3, '248 Patent, Col. 2, lines 53-55) ("For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.")). Nowhere in the patent claims or the specification does the term "fluid" get re-defined as "solvent" or as anything narrower than its general meaning to a POSA – a substance that flows freely.

168. In paragraphs 117 and 137 of his Opening Report, Dr. Trout attempts to distinguish language in the patent that talks about what "is" the fluid (for certain very particular embodiments) from what is "included" in the fluid. Dr. Trout's apparent point is that things that are dissolved in the fluid may be "included" in the fluid, but nonetheless they are supposedly not the fluid itself. This appears to be a variant of the ███████████████████████ (*See, e.g.*, Trout Opening Report at ¶ 135 mixing these arguments). As discussed above, ████████



Dr. Trout's attempted linguistic distinction between what "is" the fluid and what is "included" in the fluid would not be accepted by a POSA who understands the definitions of fluids and dissolution from a chemical perspective. Further belying Dr. Trout's linguistic distinction based upon the word "included," is the Abandoned Patent Application Publication. That application – regarding liquid bendamustine formulations from the same applicants and two of the three same inventors – states that PEG and PG are "include[ed]" within the "pharmaceutically acceptable fluids" and sodium hydroxide is also "included":

[0055]   Some more preferred formulations include:
I. a) bendamustine or a pharmaceutically acceptable salt thereof; and
     [0056]   b) a pharmaceutically acceptable fluid including
     [0057]   i) polyethylene glycol and propylene glycol;
     [0058]   ii) sodium hydroxide in an amount sufficient to obtain a pH of from about 6.5 to about 11 for the

(Exh. 27, Buxton-Deposition-Exhibit-9, '879 Publication at [0056] to [0058]). If Dr. Trout's linguistic distinction were correct – where the PEG (and PG) "is" the fluid, and the other ingredients (other than PEG or PG) are merely "included" in the fluid – the applicants would not have referred to PEG and PG as "included" in the fluid as well. Cleary the applicants did not use the word "included" in the very particularized manner that Dr. Trout now posits.

169.    A POSA would not understand the word "fluid" or the phrase "pharmaceutically acceptable fluid" – taken on their own – to be limited to those fluids listed after "consisting of." While the overall claim is limited, the word "fluid" refers to a broader category of chemicals that are fluids. █████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

170.    In Paragraph 119 (at least) of Dr. Trout's Opening Report he argues that the specification separates out discussions of solvents from discussions of other excipients that serve different purposes, like pH adjusters and other solutes.  Of course, the passages in the patent specification that Dr. Trout cites as separating out "solvents" do not identify or define the fluids as solvents.  Further, although Dr. Trout refers to ██████████████████████████

█████████████████████████████████████████ And the patents-in-suit also do not refer to any "pH adjusters" – let alone distinguish them from (or separate them out into separate paragraphs from) either "fluids" or "solvents."  Thus, Dr. Trout's assertion that the patent specification somehow separates different categories of excipients in different paragraphs, and in particular somehow separates solvents from sodium hydroxide and "pH adjusters" (where pH adjusters are not discussed anywhere in the patent) so as to define "fluids" as "solvents" is simply incorrect based upon examination of the patents-in-suit.

171.    In Paragraphs 119 and 142 of Dr. Trout's Opening Report, he argues that Example 1, Table 1 of the specifications of the patents-in-suit actually identifies a solvent of bendamustine.  This is the only time in the entire specification of the patents-in-suit that any of the claimed fluids are also referred to as a solvent.  Regardless, Example 1 does not say that all fluids are restricted to being a solvent.  The "solvents" identified in Example 1 and Table 1 are

68

only ethanol and "PG". Example 1 does not include PEG in its formulations, but all of the claims-in-suit require PEG. Thus, the formulations of Example 1 and Table 1 do not fall within the claims at all because they do not have the required PEG fluid. Moreover, several formulations in Table 1 containing ethanol and PG fail to meet stability requirements. Thus, a POSA would not look to Example 1 to limit the meaning of the phrase "pharmaceutically acceptable fluid" in the claims, which involve other formulations.

172. In Paragraphs 145-155, Dr. Trout argues that the file histories of the patents-in-suit support his view that fluids are limited to solvents. However, he cites no place in the file history where applicants stated that "pharmaceutically acceptable fluids are limited to solvents" or any similar language that defined "pharmaceutically acceptable fluids" in that manner, or in any manner. He cites no rejection of the Examiner that was overcome because of a distinction between a fluid that was a solvent (supposedly in the claim) and a fluid that was not a solvent (in the prior art). And no allowance was based on this supposed distinction. Dr. Trout cites nothing in the file histories that focuses on this supposed distinction between fluids that are solvents from those that are not. And my review of the file histories reveals no such definitions or distinctions. While the adjective "solvent" may be used occasionally to describe certain fluids, it is a passing mention of no apparent import to the outcome of the prosecution.

173. In sum, to the extent that Eagle is permitted to pursue this claim construction argument, I would disagree with Dr. Trout's conclusion and do not believe that the claim term "pharmaceutically acceptable fluid" should be limited to solvents. It is my understanding that the single most important aspect of any claim construction is the claim language itself. The claims do not use the word "solvent" anywhere; they use the words "pharmaceutically acceptable fluid." Clearly, the applicants were aware of the term "solvent," as they used it in Example 1.

But they chose not to include this word in the claims.  Additionally, the specification explicitly states that "pharmaceutically acceptable fluids" may or may not be solvents.  Thus, both the claim language and the specification strongly argue against Dr. Trout's proposed claim construction.  Furthermore, in the related Abandoned Patent Application and Publication, ███████████████████████████████████████████████████ Finally, any stray references to solvents in the file history do not constitute limiting language.  The file history references to solvents are simply places where particular fluids were described with the adjective solvent.  A POSA would not regard this as a reason to limit the clear language of the claims to solvents only.

174.    Even if "pharmaceutically acceptable fluid" is nevertheless construed to be limited to solvents of bendamustine, it still would not prove infringement.  As shown below,



(*See, e.g.*, Exh. 18, ███████████████) ████████████████████

176.    PEG is also known to be water soluble.  (Exh. 19, <u>Martin's Pharmacy</u>, at pg. 498-99 ("The synthetic water-soluble polymers have also found extensive applications in pharmaceutical industries, among them polyethylene glycol …").

70



other chemicals.[9]  And a POSA would also recognize that the combination of sodium hydroxide with PEG is also a known solvent system.[10]

178.    And, specifically for bendamustine hydrochloride solutions, the combination of sodium hydroxide with PEG-400 creates a solvent system with improved solubility compared to PEG-400 alone.  Using only PEG-400 as a solvent, bendamustine hydrochloride's solubility is limited to 20 mg/ml.

---

[9]  *See, e.g.*, Exh. 62, Budtova, T., Navard, P. ██████████████████████ Cellulose 23, 5-55 (2016) ████████████████████████ Exh. 63. Li, Z., Mumford, K. A., Smith, K. H., Wang, Y., & Stevens, G. W., "Extraction of Phenol by Toluene in the Presence of Sodium Hydroxide," Separation Science and Technology, 49(18), 2913–2920 (2014)█████████████████████████

[10] *See,e.g.*, Exh. 61, Yan, L., Gao, Z. "███████████████████████ ██████" Cellulose, Vol. 15, pgs. 789–796 (2008)████████████████████) (Abstract: "Here, ████████████████████████████████████ ████████████████████████████ (emphasis added).

And the patents themselves present only one Example of a PEG-only formulation which is limited to 20mg/ml.  (Exh. 2, '214 Patent, Col. 8, Example 3 ("Bendamustine-containing compositions were prepared by dissolving bendamustine HC1 to a concentration of 20 mg/ml in polyethylene glycol 400"); Exh. 3, '248 Patent, Col. 8, Example 3).

179.



180.

72



181. ███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████

182.  Further, as discussed above (Paragraphs 77-78), ██████████████

██████████████████████████████████████████████████

████████████████████  That is to say, everything dissolves in everything else in these

formulations.  This shows that there is a solution where PEG████████████████████

██████████████████

183.  Finally, Dr. Trout appears to argue that because ███████████████████

████████████████████████  That is not true.  A POSA would understand that an

excipient can have more than one functional role in a formulation.  (Exh. 19, Martin's Pharmacy,

at pg. 610-14 ("Excipients, however, can have multiple functions, and like drugs, they can exert

pharmacologic and toxic effects.").  Thus, a POSA would know that the fact that an excipient has

one role (e.g., pH adjuster or solute) does not mean it cannot have another role (like solvent or

co-solvent).  (See, e.g., Exh. 61, Yan, L., Gao, Z. ███████████████████████

█████████████ Cellulose, Vol. 15, pgs. 789–796 (2008) ████████████████████

██████ (Abstract: "Here, a██████████████████████████████████.

████████████████████████████████████████ (emphasis

added);  Exh. 62,  Budtova, T., Navard, P. █████████████████████████

73

Cellulose 23, 5-55 (2016), ████████████████████████████ Exh. 63, Li, Z.,
Mumford, K. A., Smith, K. H., Wang, Y., & Stevens, G. W., "Extraction of Phenol by Toluene
in the Presence of Sodium Hydroxide," Separation Science and Technology, 49(18), 2913–2920
(2014), https://doi.org/10.1080/01496395.2014.952748).  And the evidence in this case shows
that ███████████████████████████████████

### 8.  Sodium Hydroxide is Not Subject to the "Comprising" Claim Language

184.    Dr. Trout also argues that the addition of the inactive ingredient sodium
hydroxide does not avoid infringement because sodium hydroxide is supposedly subject to the
open-ended "comprising" claim language.  For instance, Dr. Trout states:

> Defendants list sodium hydroxide as an ingredient on their
> Label by name with a statement of effect, differentiating
> sodium hydroxide from the other components of their NDA
> Products, particularly the solvent system.  This separate
> treatment of sodium hydroxide on the label of each
> Defendant's NDA Product informs a POSA that *the sodium
> hydroxide* is not part of the pharmaceutically acceptable
> fluid, i.e. solvent, it *is a different component of the liquid
> bendamustine-containing composition that would be
> governed by the "comprising" in the preamble*.

(Trout Opening Report on Infringement at pgs. 75-76 at ¶ 213 (emphases added)).

185.    Dr. Trout's opinion emphasizes the arrangement of words in a Label over
chemical fact.  ████████████████████████████████

████████████████████████████████████

████████████████████████████ (*See* Paragraphs 121-126,
47-48, and 51-56, above).

186.    Dr. Trout's opinion that sodium hydroxide should be "governed by" the "liquid
comprising" language in the claim is also inconsistent with ███████████████

████████████████████████████████████



For this reason, Dr. Trout's arguments do not make sense and I disagree with them.

187. 

Therefore, there is no infringement.

188.     To the extent plaintiffs argue that

189.     Further, such an argument would illustrate a broader problem with the claims-in-suit. the

claim is contradictory.

### 9. There Is No Infringement by Equivalents

190.     Dr. Trout also argues that even if there is no literal infringement, there would supposedly be infringement under the doctrine of equivalents.  In arguing this theory, Dr. Trout: (1) claims there is no estoppel despite the narrowing amendment that added "consisting of"; (2)

---

[11]

claims that even if there is a presumption of estoppel, the amendment is tangential and estoppel does not apply. And applying the doctrine of equivalents, Dr. Trout argues that a combination of PEG and NaOH should be considered an equivalent to PEG alone.[12] I disagree with all of these assertions.

191.    With respect to estoppel, I am informed that a narrowing amendment made in response to a rejection for reasons of patentability leads to a rebuttable presumption of estoppel. I also understand that such narrowing amendments can lead to estoppel when made in the file histories that directly lead to the claims-in-suit or when made in related file histories in the chain of applications that lead ultimately to the claims-in-suit. My review of the file histories of the patents-in-suit (the '251 application that led to the '214 patent-in-suit, and the '171 application that led to the '248 patent-in-suit), and the '283 application (which led to the '783 Patent) reveals that the "pharmaceutically acceptable fluid consisting of" limitation was added by amendment after rejections for patentability over prior art. (*See* Paragraphs 92, 105, 106, above). I thus conclude that a rebuttable presumption of estoppel should apply.

192.    With respect to Dr. Trout's assertion that any presumption of estoppel is rebutted because the amendments were supposedly only tangential to the accused equivalent, I disagree. Accepting for purposes of this argument that the accused equivalent is "PEG ███████████ ████████ that accused equivalent is certainly related (not tangential) to the reasons for the amendment, which limited the claim to require PEG fluid. At a basic level, all of these ("PEG █ ███████████████████ or PEG) are pharmaceutically acceptable fluids, and the amendment related to pharmaceutically acceptable fluids. The alleged equivalent is not tangential to the amendment.

---

[12] *See, e.g.*, Trout Opening Report at pg. 111 ¶¶ 306-308.

193.    When PEG was found in the prior art with bendamustine, the applicants argued, *inter alia*, that the prior art did not disclose PEG alone but in combination with polar aprotic solvents. (Exh. 47, '251 Application, Jun 14, 2023 Response at 5-6) ("Drager teaches that each of its formulations must include some amount of polar aprotic solvent. While Drager references that polar protic solvent may be used, that is only ***in addition to, not instead of***, the polar aprotic solvent. Drager fails to disclose or suggest any bendamustine formulations with solvent systems composed of protic solvent in the absence of any aprotic solvent."). Thus, supposedly to distinguish the prior art, applicants narrowed the claims with the "consisting of" language to only require PEG (and to only allow certain other recited optional other fluids). The narrowing amendment related to limiting the fluids that can be combined to a single required fluid. The alleged equivalent here ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ it is not a fluid that is listed as either required or optional under the "consisting of" limitation. It is related (and not tangential) to the amendment limiting those fluids.

194.    More generally, the amendment relates to which "pharmaceutically acceptable fluids" constitute the claimed invention. Whether the accused equivalent is ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ both are "pharmaceutically acceptable fluids" and thus both relate to the focus of the amendment (what "pharmaceutically acceptable fluids" constitute the claimed invention). Therefore, I do not believe that the tangentiality exception to estoppel applies and plaintiffs should not be allowed to argue doctrine of equivalents at all.

195.    Further, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

77

██████████████████████████████████████████████████████████████████

████████████████████████████ ).

196.    To the extent that plaintiffs are allowed to argue the doctrine of equivalents, I do not believe that there is infringement by equivalents on the merits.

197.    As a first matter, the comparison that Dr. Trout chooses to make seems to be the wrong comparison.  Instead of comparing the actual inactive ingredient that Slayback adds

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ ██████████████████████████████████████████████

████ ████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[13] *See, e.g.*, Trout Opening Report at pg. 19, ¶ 76, and 92, ¶ 257.
[14] Trout Opening Report at pg. 104 ¶ 285 (" ██████████████████████████████████████████████████████████████████████████████████████ ).

78

██████████████████████████████████████████████████████

████████ if anything.

198.     ███████████████████████████████████████

███████████████████████████████████████████

██     ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████     █████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

> As shown in FIG. 1 (Table 1), the sample, which did
> not include NaOH, did not provide long term storage
> stability. …
>
> It was determined that the cause of the excess ester
> formation was the PEG.

(Exh. 27, Buxton-Deposition-Exhibit-9, Abandoned Patent Publication, '879 Publication at

[0127]).

200.     ███████████████████████████████████████

██████████████████████████████████████████████

███████████████████

201.    Thus, even if one should compare "PEG + NaOH" with PEG alone for a doctrine of equivalents analysis – which I do not agree with – the two have a different "result" – stability versus instability.  And thus there would be no equivalents under the "function way result" analysis, because the "result" is not the same.

202.    Additionally, the "way" that "PEG + NaOH" contributes to stability is different from how "PEG" alone impacts stability.  ██████████████████████████

████████████████████████████████████████████████████████

██████████████████████    ████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████    ████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

203.    Additionally, "PEG + NaOH" is substantially different from PEG alone.  ████████

██████████████████████████████████████████████

████████████████████████████████████████████████████



████████████████████████████████████ There is no infringement under the doctrine of equivalents.

**B. There Is No Infringement –** ████████████████████
**In The "Pharmaceutically Acceptable Fluid Consisting Of" Limitation**

206.    ████████████████████████████████████████

████████████████████████████████████████

207.    ████████████████████████████ Dr. Sundaram (a co-inventor of the Abandoned Patent Application) ████████████████████████████

████████████████████████████████████ *see also* Exh. 10, Oxford Thesaurus of English, (3rd Ed. 2009) at pg. 341 (████████████████████████

████████████████████████████████████" (emphasis added); Exh. 26, Buxton-Deposition-Exhibit-22 at pg. 2 [0027] (in a patent application from the same inventors for the patents-in-suit, but for a different drug pemetrexed, they state: ███████

████████████████████████████████████

████████████████████ (emphasis added); Exh. 64, Buxton-Deposition-Exhibit-24, US Patent Application Publication 2014/0135299 Al ("Enema Composition For Treatment Of

81

Ulcerative Colitis Having Long Term Stability") ███████████████████

███████████████████████████████████████████████████████

**208.** ███████████████████████████████████████

████████████████████████████████████

███  ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███  ███████████████████████████████████████

█████████████████  █████████████████████████

███████████████████████████████████████████ .  █████

███████████████████████



███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

**211.** ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

██    ██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████    There is no infringement, either

literally or under the doctrine of equivalents.

**213.**    The addition of ██████████████████████████████████

████████████████████████████████████████████████

██████████    Furthermore, the two exceptions to "consisting of" do not apply to ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████    And the use of ████████████████    in a bendamustine liquid

formulation is certainly "related" to a claim limitation that recites fluids.

**214.**    Nor would there be infringement under the doctrine of equivalents.  As a first

matter, for all the reasons discussed above, the claims-in-suit were amended and narrowed

during prosecution to the "fluid consisting of …" limitation.  This creates an estoppel.  The use

of an █████████████████████████████████    is related to that amendment, and not

tangential.  On the merits of equivalents, ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

83

215. In sum, the purposeful addition of ███████████████████████████ ██████████████████ takes the Product out of the "consisting of" language and results in

non-infringement.

## IX.    NON-INFRINGEMENT BY ██ ███████████████████████ OTHER PRODUCTS

### A.  ████████████████████████████████████.

217. ██████████████████████████████████████████





██████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████

222.    ██████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████



████████████████████████████████

██    ████████████████████████████████████████████

██████████████████████







227.

228.

████████████████████   I reserve the right to supplement that opinion upon seeing plaintiffs' responses.  I am not offering any opinions regarding the significance of my non-infringement opinions to any other aspect of the case, including damages.

### B.   There is No Infringement By Treanda®

229.    I have also been asked to opine on whether the Treanda® lyophilized bendamustine product (and any generic versions of it that are also lyophilized) would infringe the patents-in-suit.  The patents-in-suit require a liquid composition.  A lyophilized product is a freeze-dried solid and, by definition, not a liquid.  Treanda® is lyophilized.  (Exh. 69, TREANDA® Label).  As a result, the Treanda® product cannot infringe the patents-in-suit, either literally or under the doctrine of equivalents.

230.    I reserve the right to further address any theory of equivalent infringement by Treanda® that plaintiffs may posit – although I do not believe the doctrine of equivalents should allow a claim to a liquid composition to cover a lyophilized product because it would entirely vitiate the claim limitation "liquid composition."  That is particularly true where the entire supposed purpose of the inventions in the claims-in-suit was to provide a stable liquid product as contrasted with the prior art lyophilized Treanda® product – and the patents-in-suit explicitly distinguish their invention from Treanda®.  (Exh. 2, '214 Patent at Col. 1, lines 46-48 and 63-67 ("Bendamustine is the active ingredient of the commercial product Treanda®, a lyophilized powder for reconstitution. … The lyophile possesses good chemical stability.  However, reconstitution of the lyophile is clinically inconvenient, taking 15-30 mins with implications of chemical 65 instability.  There is a need for ready to use (RTU) bendamustine formulations having enhanced stability."); Exh. 3, '248 Patent, at Col. 1, 46-48 and 63-67 (same)).

231.    For these reasons, it is my opinion that the Treanda® product (and any generic versions of it) do not infringe the patents-in-suit, either literally or under the doctrine of equivalents.  My opinion regarding non-infringement by Treanda® is strictly limited to the question of non-infringement.  I reserve the right to supplement my opinions upon seeing plaintiffs' responses.  I am not offering any opinions regarding the significance of my non-infringement opinions to any other aspect of the case, including damages.

### C.    There is No Infringement By Non-Bendamustine Cancer Drugs

232.    I understand that the infringement or non-infringement of certain other non-bendamustine cancer drugs is also potentially at issue in the case.  I further understand that this issue relates only to damages, which I understand will be addressed by a different expert.  These non-bendamustine drugs are:

| | |
|---|---|
| acalabrutinib maleate monohydrate | Jaypirca (pirtobrutinib) |
| alemtuzumab | Leukeran (chlorambucil) |
| Arzerra (ofatumumab) | lisocabtagene maraleucel |
| ofatumumab | obinutuzumab |
| Breyanzi (lisocabtagene maraleucel) | pirtobrutinib |
| Brukinsa (zanubrutinib) | prednisone |
| Calquence (acalabrutinib maleate monohydrate) | Riabni (rituximab) |
| Campath (alemtuzumab) | Rituxan (rituximab) |
| chlorambucil | Rituxan Hycela (rituximab and hyaluronidase human) |
| CHOP (cyclophosphamide, doxorubicin, vincristine, prednisone) | CVP (cyclophosphamide, vincristine, prednisone) |
| Copikfra (duvelisib) | rituximab |
| cyclophosphamide | rituximab and hyaluronidase human |
| dexamethasone | Ruxience (rituximab) |
| fludarabine phosphate | Truxima (rituximab) |
| Gazyva (obinutuzumab) | Venclexta (venetoclax) |
| ibrutinib | venetoclax |
| idelalisib | zanubrutinib |
| Imbruvica (ibrutinib) | Zydelig (idelalisib) |
| acalabrutinib maleate monohydrate | Monjuvi (tafasitamab-cxix) |
| Adcetris (brentuximab vedotin) | mosunetuzumab-axgb |
| Ananon (nelarabine) | Mozobil (plerixafor) |
| asparaginase erwinia chrysanthemi (recombinant)- rywn | nelarabine |
| axicabtagene ciloleucel | obinutuzumab |
| Beleodaq (belinostat) | Pemazyre (pemigatinib) |
| belinostat | pembrolizumab |

| | |
|---|---|
| BiCNU (cannustinc) | plerixafor |
| bleomycin sulfate | polatuzumab vedotin-piiq |
| bortezomib | Polivy (polatuzumab vedotin-piiq) |
| brentuximab vedotin | Poteligeo (mogamulizumab-kpkc) |
| brexucabtagene autoleucel | pralatrexate |
| Breyanzi (lisocabtagene maraleucel) | prednisone |
| Brukinsa (zanubrutinib) | recombinant interferon alfa-2b |
| Calquence (acalabrutinib maleate monohydrate) | Revlimid (lenalidomide) |
| carmustine | Riabni (rituximab) |
| chlorambucil | Rituxan (rituximab) |
| Columvi (glofitamab-gxbm) | Rituxan Hycela (rituximab and hyaluronidase human) |
| crizotinib | rituximab |
| cyclophosphamide | rituximab and hyaluronidase human |
| denileukin diftitox-cxdl | romidepsin |
| dexamethasone | Ruxience (rituximab) |
| doxorubicin hydrochloride | Rylaze (asparaginase erwinia chrysanthemi [recombinant]-rywn) |
| epcoritamab-bysp | selinexor |
| Epkinly (epcoritamab-bysp) | tafasitamab-cxix |
| Folotyn (pralatrexate) | tazemetostat hydrobromide |
| Gazyva (obinutuzumab) | Tazverik (tazemetostat hydrobromide) |
| glofitamab-gxbm | Tecartus (brexucabtagene autoleucel) |
| ibritumomab Tiuxetan | tisagenlecleucel |
| Imbruvica (ibrutinib) | Truxima (rituximab) |
| Intron A (recombinant interferon alfa-2b) | Velcade (bortezomib) |
| Istodax (romidepsin) | Venclexta (venetoclax) |
| Jaypirca (pirtobrutinib) | venetoclax |
| Keytruda (pembrolizumab) | vinblastine sulfate |
| Kymriah (tisagenlecleucel) | vincristine sulfate |
| lenalidomide | vorinostat |
| Leukeran (chiorambucil) | Xalkori (crizotinib) |
| lisocabtagene maraleucel | Xpovio (selinexor) |
| loncastuximab tesirine-lpyl | Yescarta (axicabtagene ciloleucel) |
| Lunsumio (mosunetuzumab-axgb) | aanubrutinib |
| Lymphir (denileukin diftitox-cxdl) | Zevalin (ibritumomab tiuxetan) |
| methotrexate sodium | Zolinza (vorinostat) |
| mogamulizumab-kpkc | Zynlonta (loncastuximab tesirine-lpyl) |

233.    These drugs do not contain bendamustine.  Thus, they do not literally infringe the claims-in-suit that require bendamustine.  Nor do they infringe under the doctrine of equivalents when the entire focus of the claims-in-suit is bendamustine and stable formulations of the bendamustine.  A doctrine of equivalents assertion would vitiate the "bendamustine" limitation in these claims.  Further, these drugs act via different mechanism from bendamustine, have

different chemicals structures, some are biologics and not small molecules like bendamustine, have different formulations, and different stability profiles.

234.    For these reasons, it is my opinion that cancer drugs that do not include bendamustine do not infringe the patents-in-suit, either literally or under the doctrine of equivalents.  My opinion regarding non-infringement by the non-bendamustine products is strictly limited to the question of non-infringement.  I reserve the right to supplement that opinion upon seeing plaintiffs' responses.  I am not offering any opinions regarding the significance of my non-infringement opinions to any other aspect of the case, including damages.

## X.    THE PATENTS-IN-SUIT ARE NOT "FOUNDATIONAL"

235.    Dr. Trout also states in his report that the patents-in-suit are "foundational."  In particular, Dr. Trout states:

> In my opinion, for the reasons described throughout this report, the inventions claimed in the Asserted Patents— which, as noted, are part of the formulation family—are foundational and enabling patents. They disclose and claim the critical formulation components that makes a ready-to-dilute, long-term storage-stable liquid bendamustine feasible for commercial products like Belrapzo® and Bendeka®— namely, liquid bendamustine-containing compositions with less than about 5% total impurities after at least about 15 months at about 5-25°C using specific non-aqueous solvent systems and antioxidants at therapeutically relevant concentrations. Those are precisely the stability and formulation attributes that enable a commercially viable, refrigerator-stable ready-to-dilute product and obviate lyophilization and complicated reconstitution steps. A POSA would view the inventions claimed in the Asserted Patents as the technical bedrock, and thus as foundational and enabling relative to later innovations.

(Trout Opening Report on Infringement at pg. 151, ¶ 417 and also ¶¶ 409-420).

236.    I disagree that the patents-in-suit represent "foundational" patents.  These patents are formulation patents for a drug that has existed for a very long time.  ████████████

93



237.    There is nothing about the current claims-in-suit that represents a ground-breaking advance in cancer treatment.  The patents-in-suit claim stable liquid formulations of bendamustine.  In the absence of the bendamustine molecule itself – which arguably was foundational back in the 1960s – there would be nothing to formulate.  And without the bendamustine molecule there would be no cancer treatment.  By contrast, without the current claims-in-suit, there is still a treatment for Non-Hodgkins Lymphoma and leukemia – it is the bendamustine molecule.  For instance, Treanda® treats these diseases but does not employ a stable liquid formulation.  To the extent it is argued that these formulations provide some advantage in terms of convenience to the pharmacist preparing the infusion for the patient, I understand that in the prior trial the Court found that the Slayback NDA Product was not "ready-to-use" and required significant preparation and dilution anyway.  Any "advantage" from being a liquid, as opposed to a lyophilized, formulation can only be considered incremental and not foundational.

238.    The applicants here have pursued numerous variations of patent claims for liquid bendamustine formulations since 2010 – with an ever-shifting focus on the supposed key aspect of a liquid bendamustine formulation.  The original provisional application focused on stability provided by choline chloride.  Subsequent applications focused on PEG (and the other fluids) as providing stability.  Other patent applications focused on antioxidants as ingredients that provide

stability. Still other applications introduced the concept of "ready to use" into the claims and then removed it when the "ready to use" claims resulted in a litigation loss. And, the Abandoned Patent Application focused on the advantages of adding sodium hydroxide to stabilize the formulations.

239. There is no evidence that the current claims-in-suit are foundational or pivotal in general, or as compared to the other variations of claims that have been pursued. If the stability of the formulations is foundational, that was covered in many prior applications and issued patents that are not in-suit here. (*See, e.g.*, Exh. 42, '483 Patent (reciting the same impurity limitations as the claims-in-suit); Exh. 52, U.S. Patent No. 8,609,707 (claims reciting "long term storage stable" liquid formulations of bendamustine); Exh. 70, U.S. Patent No. 9,265,831 (claims reciting: "the bendamustine-containing composition having less than or equal to 0.11% total PG esters at about 1 month of storage at a temperature of about 5° C."); Exh. 75, U.S. Patent No. 9,572,796 (reciting the same impurity limitations as the claims-in-suit); Exh. 76, U.S. Patent No. 10,010,533 ("less than or equal to 0.11% total PG esters at about 1 month of storage at a temperature of about 5° C."); Exh. 77, U.S. Patent No. 9,572,797 (same)).

240. If the "ready to use" aspect of these formulations is foundational, that was claimed in the '483 Patent and the current Slayback NDA Product was found to not be "ready-to-use" by the the federal courts. (*See* Exh. 42, '483 Patent; Exh. 71, District Court Opinion; Exh. 72, Federal Circuit Opinion affirming). After that judicial determination, the claim limitation "ready-to-use" was removed from the applications that led to the current claims-in-suit – so "ready to use" it is not foundational to these claims.

241. If the use of sodium hydroxide is key, plaintiffs abandoned the patent application that would have covered that. None of these are foundational inventions. At best they are

incremental improvements – to the extent not obvious – upon the basic invention of the drug. And, it is far from clear which of these particular claims obtained over the decade-and-a-half of applications is important or valuable.

## XI.    OTHER PATENTS

242.    I have also been asked to read several other patent documents and opine on their comparability to the patents-in-suit.  In reviewing these patents, I note that many are pharmaceutical formulation patents for pre-existing drugs as well – like the patents-in-suit. Further, some of these are solid dosage forms for controlled-release tablet structures or intranasal powders of exacting sizes of particles.

243.    For instance, U.S. Patent Application Publication No. 2006/0024360 (Exh. 73), entitled "Stable Injectable Composition Of Alphatocopheryl Succinate, Analogues And Salts Thereof"; and WO 2006/015120 (Exh. 74), entitled "Stable Injectable Composition Of Alpha Tocopheryl Succinate, Analogues And Salts Thereof" are, like the patents-in-suit, liquid formulations for cancer drugs that are delivered intravenously and are stable.  As the first paragraph in Exhs. 73 and 74 states:

> This invention relates to the field of compositions of alpha-tocopheryl Succinate, analogues or Salts thereof. In particular, this invention provides colloidal dispersion compositions of alpha-tocopheryl Succinate, analogues or salts thereof that are stable, safe and efficacious.

(Exh. 73 at [0003]; Exh. 74 at pg. 1, lines 5-8).

244.    The first claim of each of these patent documents (Exhs. 73 and 74) recites a "colloidal dispersion" (a liquid) as follows:

96

1.    A pharmaceutical composition, comprising alpha-tocopheryl succinate, an analogue or salt thereof; at least one component selected from the group consisting of an oil component, phospholipid, and antioxidant; and water; wherein the composition is a colloidal dispersion having an average particle size less than 200 nm in diameter, the alpha-tocopheryl succinate, the analogue or salt thereof is stable for at least 6 months at room temperature, and the alpha-tocopheryl succinate has the chemical structure:

wherein $R_1$ is $CH_3$, $R_2$ is $CH_3$, $R_3$ is $CH_3$, and R is $-OOC-(CH_2)_2-COOH$.

Other claims recite combination with anticancer drugs, including paclitaxel:

4.    The composition according to claim 1 or claim 2, further comprising an anticancer agent.

17.    The composition according to claim 4, wherein the anticancer agent is paclitaxel or docetaxel.

245.    As can be seen, these claims share features with the claims-in-suit.  They recite liquid formulations for intravenous use of known cancer drugs that are stable.  However, in certain respects these claims are broader than the claims-in-suit – encompassing more than one cancer drug ("an anticancer agent").  This means that these patent claims are applicable to a broader class of drugs than the claims-in-suit.

246.    United States Patent Application Publication 2013/0330412 (Exh. 78) is entitled "Smart Polymeric Nanoparticles Which Overcome Multidrug Resistance To Cancer Therapeutics And Treatment Related Systemic Toxcity."  Like the patents-in-suit, this patent

publication claims formulations for cancer drugs.  And, like the patents-in-suit, these formulations can be included in liquid intravenous compositions.  For instance, claim 13 in Exh. 78, recites:

> 13. An injectable formulation for systemic administration to a subject for providing chemotherapy to a subject comprising:
> a carrier fluid; and
> polymeric nanoparticles dispersed in said carrier fluid,
> said polymeric nanoparticles having a lower critical solution temperature (LCST) above 37 C, said polymeric nanoparticles including
> a polymeric substrate formed from monomers consisting of
> N-isopropylacrylamide (NIPAAM), acrylic acid (AA), and at least one vinyl monomer selected from the group consisting of vinyl acetate, 4-vinyl benzoic acid, methylmethacrylate, vinylmethacrylate, N-vinylpyrrolidone, N-vinyl piperidone, N-vinyl caprolacum, N-vinyl carbazole, and styrene,
> wherein said NIPAAM, said AA, and said vinyl monomer are present at molar ratios of 50-70:10-30:10-30 for NIPAAM:AA:vinyl monomer,
> wherein said polymeric substrate is in the form of a particle having a diameter of 50-100 nm or smaller,
> curcumin entrapped within said polymeric substrate, and
> one or more chemotherapeutic agents associated with said polymeric substrate, said one or more chemotherapeutics agents being selected from the group consisting of anthracyclines, taxanes, chemotherapeutic platinum compounds, and topoisomerase inhibitors.

247.    And, again of note, the claims in Exhibit 78 cover more than one cancer drug, using broad language like "one or more chemotherapeutic agents."  Thus, these patent claims are broader than claims that would only cover one drug (like the patents-in-suit that cover only bendamustine).

## XII.    CONCLUSION

248.    For the foregoing reasons, it is my opinion that the Slayback NDA Product does not infringe, either literally or under the doctrine of equivalents, the patents-in-suit.  In addition, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Treanda®, and all non-bendamustine products also do not infringe the patents-in-suit, literally or under the doctrine of equivalents.  And, finally, various

other patents and patent publications that I have been asked to look at are comparable to the

patents-in-suit technologically, or are broader.

Dated: March 16, 2026

_____

# EXHIBIT 2
## Redacted Public Version



**Planet Depos**
*We Make It Happen*™

## HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Transcript of Bernhardt L. Trout, Ph.D.

**Date:** May 8, 2026
**Case:** Eagle Pharmaceuticals, Inc., et al. -v- Apotex/Slayback/Baxter Healthcare

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


---------------------------------------x

EAGLE PHARMACEUTICALS, INC.
AND EAGLE SUB 1 LLC,
     Plaintiffs

v.                 CA No. 24-64-JLH

APOTEX INC., AND APOTEX CORP.,
     Defendants
_____

EAGLE PHARMACEUTICALS, INC. AND
EAGLE SUB 1 LLC.,
     Plaintiffs

v.                 CA No. 24-65-JLH

SLAYBACK PHARMA LLC AND AZURITY
PHARMACEUTICALS, INC.,
     Defendants
_____


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEOTAPED DEPOSITION OF BERNHARDT L. TROUT, Ph.D.

Friday, May 8, 2026 9:09 a.m.

Latham & Watkins LLP

200 Clarendon Street, Boston, MA 02116


Reported by:
Janet McHugh, RMR, CRR, CLR
JOB NO. 632511

May 8, 2026

9:09 a.m.


     Videotaped deposition of BERNHARDT L. TROUT, Ph.D., held at the offices of Latham & Watkins LLP, 200 Clarendon Street, Boston, Massachusetts, pursuant to Agreement, before Janet McHugh, a Registered Merit Reporter, Certified Realtime Reporter, Certified LiveNote Reporter, and a Notary Public within and for the Commonwealth of Massachusetts.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                              3

APPEARANCES:


ON BEHALF OF PLAINTIFFS:

Kenneth Schuler, Esquire

Kelly Welsh, Esquire

LATHAM & WATKINS LLP

330 North Wabash Avenue, Suite 2800

Chicago, Illinois 60611

312.876.7700

kenneth.schuler@lw.com

kelly.welsh@lw.com



ON BEHALF OF THE APOTEX DEFENDANTS

Christopher Ferenc, Esquire (via Zoom)

KATTEN, MUCHIN, ROSENMAN, LLP

1919 Pennsylvania Avenue NW, Suite 800

Washington,DC 2006

202.625.3500

christopher.ferenc@katten.com




- Continued -

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    4

APPEARANCES:   (Continued)


ON BEHALF OF THE SLAYBACK DEFENDANT:

Jason Lief, Esquire

Audrey Sparschu, Esquire

WINDELS MARX

156 West 56th Street

New York, New York 10019

jlief@windelsmarx.com

asparschu@windelsmarx.com

212.237.1144


ALSO PRESENT:

Dimas Bardales, Videographer

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    5

I N D E X

WITNESS                        DIRECT        CROSS

BERNHARDT L. TROUT, Ph.D.

By Mr. Lief                    15


E X H I B I T S

Number          Description                  Page

Exhibit 1  Curriculum vitae of Bernhardt

           Trout, Ph.D.                      18

Exhibit 2  Opening Expert Report of Dr.

           Bernhardt Trout, Ph.D.            45

Exhibit 3  Appendix B:  Slayback Additional

           Evidence of Infringement          45

Exhibit 4  Reply Report of Bernhardt

           Trout, Ph.D.                       46

Exhibit 5  Responsive Expert Report of

           Dr. Bernhardt Trout, Ph.D.        46

Exhibit 6  U.S. Patent No. 11,872,214        47

Exhibit 7  U.S. Patent No. 12,138,248        47

Exhibit 8  International Patent Application

           WO 2015/095533                    87

Exhibit 9  International Patent Application

           WO 2012/065082                   105

Exhibit 10 International Patent Application

           WO 2010/141902                   109

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                         6

E X H I B I T S

Number          Description                         Page

Exhibit 11 Excerpt from Handbook of

Pharmaceutical Excipients relating

to Polyethylene Glycol              174

Exhibit 12 Excerpt from Handbook of

Pharmaceutical Excipients relating

to Propylene Glycol                 178

Exhibit 13 Excerpt from Handbook of

Pharmaceutical Excipients relating

to Alcohol                          180

Exhibit 14 Excerpt from the Handbook or

Pharmaceutical Excipients relating

to Benzyl Alcohol                   190

Exhibit 15 Excerpt from the Handbook or

Pharmaceutical Excipients relating

to Glycofurol                       195

Exhibit 16  "Cellulose" article entitled

"Dissolving of cellulose in PEG/NaOH

aqueous solution"                   199

Exhibit 17 Document Bates-stamped

EAGLEBEN-SA_00361489 through -1576  222

Exhibit 18 Document Bates-stamped

EAGLEBEN-SA_00361465 through -1482  223

- Continued -

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                              7

E X H I B I T S

Number          Description                    Page

Exhibit 19 Document Bates-stamped

           EAGLEBEN-SA_00361577

           through -1592                    228

Exhibit 20 Document Bates-stamped

           EAGLEBEN-SA_00361447 through

           -1456                            230

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    8

P R O C E E D I N G S

THE VIDEOGRAPHER:  Here begins                    09:09:54
Media No. 1 in the videotaped deposition of       09:09:55
Dr. Bernhardt Trout in the matter of Eagle        09:09:58
Pharmaceuticals, et al., versus                   09:10:01
Apotex/Slayback/Baxter Healthcare in the          09:10:03
United States District Court for the District of  09:10:07
Delaware, Case No. 1:24-CV-00065-JLH.             09:10:09

Today's date is May 8, 2026.  The time            09:10:21
on the video monitor is 9:10 a.m.  The            09:10:25
videographer today is Dimas Bardales,             09:10:28
representing Planet Depos, headquartered at 451   09:10:29
Hungerford Drive, Suite 400, Rockville, Maryland  09:10:34
20850.  This video deposition is taking place at  09:10:38
200 Clarendon Street, Boston, Massachusetts       09:10:41
02116.                                            09:10:44

Would counsel please voice identify               09:10:47
themselves and state whom they represent.         09:10:49

MR. SCHULER:  Ken Schuler for Eagle               09:10:51
Pharmaceuticals on behalf of the witness and      09:10:54
Eagle.  Along with me is my colleague, Kelly      09:10:55
Welsh.                                            09:10:58

MR. LIEF:  And Jason Lief from Windels            09:10:59
Marx on behalf of defendants Azurity and          09:11:04
Slayback.  And with me is my colleague, Audrey    09:11:08

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    9

Sparschu.

MR. FERENC:  Chris Ferenc of Katten Muchin Rosenman on behalf of the Apotex defendants.

I'd also like to note for the record that the caption should also include the Apotex case, which is Case No. 24-CV-64-JLH.

THE VIDEOGRAPHER:  The court reporter today is Janet McHugh, representing Planet Depos.

The witness will be sworn and we may proceed.

(Witness sworn.)

MR. SCHULER:  Just before we go, he read Baxter, but Baxter is no longer a party to any proceeding.

And then our understanding is that Slayback will be questioning today and then Apotex tomorrow, so he has focused his preparation, obviously, on Slayback for today.

I would prefer that we close out the transcript and then have another transcript, but I don't object to having one transcript as long as we can agree that the rule is suspended after today's session.

MR. LIEF:  Which rule?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                     10

MR. SCHULER:  The witness -- I can't                 09:12:22
talk to the witness if he's on Cross-Examination.          09:12:24

MR. FERENC:  Yeah.  It's the same                    09:12:27
deposition.  I don't understand, because we've             09:12:29
done this for three separate depositions where we          09:12:32
agreed that this will be taken jointly under a             09:12:35
single transcript.                                         09:12:36

THE COURT REPORTER:  I'm sorry, I can't              09:12:36
hear.                                                      09:12:36

MR. FERENC:  This is a new objection.                09:12:36
This is the first time at a deposition --                  09:12:36

MR. SCHULER:  Chris.  Chris, the court               09:12:46
reporter was having trouble hearing you.  I don't          09:12:48
know if the volume is low or what it is.                   09:12:50

MR. FERENC:  I have my mic on.  I don't              09:12:54
know how I can raise the volume there.  I'm not             09:12:56
there.                                                     09:12:59

But from the perspective of the                      09:12:59
defendants, this is a single deposition that is            09:13:01
occurring over the course of two days, so it's a           09:13:03
single transcript.  It's a single examination.             09:13:06

This is the way that the parties have                09:13:08
operated for the last three depositions, for Dr.           09:13:10
Kittendorf, Dr. Topp, Dr. Ashraf, so I don't see           09:13:14
the need to alter that structure today.                    09:13:17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026    11

I think the objection is not timely. So defendants intend to move forward in the same manner we've been progressing on the other depositions.

MR. SCHULER:  We did not -- we did not agree.  We said that it was two seven-hour days, which is what the rule would provide for.  And if this were proceeding at trial, obviously, there are two separate trials.  I'd be able to talk to my witness between the trials.  It's a simple matter of fairness.

As I said, I don't object to a single transcript if we can agree that the rule is suspended after the deposition session today.  I think it's a reasonable request.

There's no unfairness to you guys.  You each get seven hours of deposition time.  It's simply that the witness's request that we be able to focus on his Apotex testimony tomorrow, since he prepared for Slayback today.  I think that's entirely reasonable.

MR. LIEF:  I mean, I think I agree with Chris, you know, and his view of it.  I think that, you know, there are some differences in the two cases that I'm probably not even aware of

because I don't fully know what Apotex's product is, exactly.

But there's also some commonality in issues, and to the extent that we cover some ground that is common and it's going to be a common transcript, and then you talk to the witness in the middle, and then Chris comes back to a question or doesn't come back to a question because he wants to just use what was, you know -- what was already said, and somehow the witness says something different the next day, it's kind of problematic, I think.

MR. SCHULER:  There's two ways to proceed.  Either we're having a Slayback transcript, and we're going to close it out and you guys have up to seven hours, and then tomorrow will be an Apotex transcript, up to seven hours, or we can agree to suspend the rule.

It's your choice.  But we're not going to proceed with pretending this is one 14-hour deposition.  We did not agree to that, and that's not how we're going to proceed.  That's not how it would proceed at trial, and we're not going to proceed that way.

It's unfair to the witness.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    13

MR. FERENC:  I don't think it's unfair to the witness, Ken.  I think you guys agreed to a 14-hour deposition --

MR. SCHULER:  No.  We agreed to two seven-hour days.

MR. FERENC:  What's your basis for that?  I don't --

MR. SCHULER:  Our email.

MR. LIEF:  I don't think that was in your emails, is it?

MR. SCHULER:  Yes, it was.

So here's what we're going to do. We're going to do a Slayback transcript today. This is only in the Slayback case.  We will conclude after up to seven hours, and we will proceed tomorrow with the Apotex deposition.

MS. SPARSCHU:  I'll just say our counteroffer was no restrictions on how the defendants divide their time, and Kelly accepted that.

MR. SCHULER:  No, she said we'll provide him for two seven-hour --

MS. SPARSCHU:  She says -- it says, "Eagle will agree to defendants' proposal."  It doesn't say --

09:15:57
09:15:57
09:15:59
09:16:01
09:16:02
09:16:03
09:16:04
09:16:05
09:16:06
09:16:07
09:16:08
09:16:10
09:16:10
09:16:13
09:16:17
09:16:21
09:16:28
09:16:29
09:16:32
09:16:35
09:16:36
09:16:36
09:16:38
09:16:39
09:16:43

MS. WELSH:  Read the entire email.                    09:16:43

MS. SPARSCHU:  -- 14 hours for each of                09:16:43
them, split across two days at seven hours per        09:16:43
day.                                                  09:16:47

MR. LIEF:  But it didn't say seven                    09:16:49
hours per defendant.                                  09:16:50

MS. SPARSCHU: Right.  You didn't                      09:16:50
indicate this restriction --                          09:16:50

MR. SCHULER:  I've chatted with local                 09:16:51
counsel on this, and this is how we're going to       09:16:51
proceed.  You each get seven hours.  Today will       09:16:53
be Slayback and Slayback, alone, and tomorrow         09:16:55
will be Apotex.  You each get up to seven hours.      09:16:58

That's the way we will proceed.                       09:17:01

MR. LIEF:  Well, I guess what I would                 09:17:04
say is to the extent there's some change in the       09:17:05
testimony overnight, my view would be when Chris      09:17:07
is questioning him, he would have a right to ask,     09:17:12
What did you discuss to change your testimony?        09:17:14

So that would be my view of it.                       09:17:18

MR. FERENC:  We're reserving rights.                  09:17:23
This is new.  I don't think it's appropriate to       09:17:23
continue to waste time here on the record.            09:17:29

We'll take a look at it, and we can                   09:17:31
discuss it at a break, if that makes sense, but I     09:17:34

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    15

think the record reflects and the emails that

this was going to be a 14-hour deposition shared

across both defending groups as a single

transcript.  And, you know, there certainly

wasn't an objection raised to the extent that two

separate depositions before this morning.

So we can proceed, and we can bring

this out on a break.

MR. LIEF:  Yeah.  And I would also ask

that whatever time we spent discussing this not

count in his seven hours today because this was

kind of just colloquy, completely.

All right.  May we begin?

BERNHARDT L. TROUT, Ph.D.,

having been duly sworn, after presenting

identification in the form of a driver's license,

deposes and says as follows:

DIRECT EXAMINATION

BY MR. LIEF:

Q    Would you state your full name for the

record.

A    Yes.  Bernhardt Levy Trout.

Q    Have you ever gone by any other name?

A    I mean, maybe just Bernhardt L. Trout

or Bernhardt Trout, but no changes in first or --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    16

no official changes in names.                           09:18:29

        Q    And are you currently employed?            09:18:33

        A    Yes.                                        09:18:36

        Q    And who is your employer?                  09:18:37

        A    It's Massachusetts Institute of            09:18:39
Technology.                                             09:18:42

        Q    And what is your current business          09:18:45
address?                                                09:18:48

        A    It's 77 Massachusetts Avenue, E19, so      09:18:51
just E19, but E is capitalized -- -502b,                09:19:00
Cambridge, Massachusetts 02139.                         09:19:07

        Q    And what is your current home address?     09:19:14

        A    It's 20 Partridge Road,                    09:19:18
P-A-R-T-R-I-D-G-E, Lexington, Massachusetts             09:19:23
02420.                                                  09:19:32

        Q    Do you have any other residences?          09:19:36

        A    No.                                         09:19:39

        Q    Okay.  No property within 100 miles of     09:19:40
Delaware?                                               09:19:45

        A    No.                                         09:19:50

        Q    Okay.  Have you been deposed before?       09:19:52

        A    Yes.                                        09:20:01

        Q    About how many times?                      09:20:02

        A    I'm guessing over 25-plus years,           09:20:09
probably over 20 times, around that.                    09:20:11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026          17

Q    Okay.

A    Meaning a few over 20, maybe around 20. Something like that.

Q    Okay.  And have you given trial testimony before?

A    Yes.

Q    And how many times have you given trial testimony?

A    I think -- I think it's about nine times, so I think just about ten.  Maybe it's ten.  But around that number.

Q    How long have you been doing expert witness work?

A    I think -- you might recall better than me, because I think you found some -- one of my first cases, but over 20 years, anyway.  It may be close to 25, but over 20.

Q    In those 25 years or so, roughly, have there been years in which your income from being an expert witness exceeded your income as a professor?

A    Yes, I think so.  Yes.

MR. LIEF:  I'm going to hand you what we've already marked as Trout Exhibit 1, which is a copy, I believe, of your CV.  And that is this.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    18

There's two copies.

(Curriculum vitae of Bernhardt
Trout, Ph.D. marked Exhibit 1.)

BY MR. LIEF:

Q    And as a first matter, can you take a
look at this document and tell me if it is a
recent copy of your CV.

A    Yes, it does look to be recent.  I'm
not sure if it's the exact most updated one.

Q    But fairly recent?

A    Yes.

Q    And any reason to believe anything in
here is inaccurate?

A    No reason to believe.  I update it
myself, so I could have missed something, but I
try to make it accurate and intend for it to be
accurate and don't know of anything that's not
accurate.

Q    Good.  If we could turn to the
Education section, which is on numbered page 2 at
the top.  Are those all of the degrees and
certificates you hold?

A    Well, yes, as far as academic degrees.
I don't recall if I have other certificates, per
se, but this is the substantive education.  I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    19

mean, the certificate in University of Paris is less relevant, but it's -- the three degrees are the substantive degrees.  Like I said, I might have other certificates that don't come to mind now.

Q    Okay.  Just to put it to the side, the certificate from the University of Paris, what was the subject of that certificate?

A    The subject was language and civil -- French language and civilization.

Q    Unrelated to science?

A    Not directly related.  That's correct.

Q    Okay.  Your bachelor's degree, you obtained in 1990 from the Massachusetts Institute of Technology, correct?

A    Correct.

Q    And it was in chemical engineering?

A    Correct.  And I should qualify one thing about that.  It's a BS in chemical engineering.  Officially, for whatever historical reason, MIT calls it an SB.  It's the same thing. So if you ever see somewhere SB, it's the same. I put it this way because I think people are more familiar with that.

Q    And in your undergraduate studies

09:24:51
09:24:56
09:25:01
09:25:04
09:25:07
09:25:07
09:25:13
09:25:16
09:25:22
09:25:26
09:25:33
09:25:38
09:25:41
09:25:48
09:25:51
09:25:57
09:25:58
09:26:06
09:26:09
09:26:14
09:26:19
09:26:25
09:26:28
09:26:31
09:26:34

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                              20

towards chemical engineering, did you take any          09:26:39

courses in pharmaceutical formulation?                  09:26:42

A    I took courses related to                           09:26:51

pharmaceutical formulation.  There weren't -- it        09:26:54

wasn't a specific course called "Pharmaceutical         09:26:59

Formulation."                                           09:27:01

Q    What courses would you have considered             09:27:03

related to pharmaceutical formulation that you          09:27:05

took as an undergraduate?                               09:27:07

A    So I -- well, I should -- okay.  As you             09:27:11

see, I got my bachelor's and my master's in the         09:27:19

same year, so my coursework for the two degrees         09:27:22

overlapped.                                             09:27:29

Q    Okay.                                              09:27:31

A    So I think I was officially an                      09:27:31

undergraduate, but technically the courses which        09:27:35

I will relay to you were courses for -- I think         09:27:39

they counted towards my master's degree, but I          09:27:43

was officially an undergraduate.                        09:27:46

And a couple courses come to mind.  The                 09:27:49

graduate courses that I'm thinking of -- this is        09:27:54

a while back, as you note -- I took like a              09:27:56

biochemical engineering course.  I took a -- I          09:28:02

don't remember the exact titles of either of           09:28:08

them, but I also took a drug product course.            09:28:10

Both of those were process focused but certainly had formulation aspects to them.

Also, I took -- now, these are undergraduate courses for which the fundamental subjects are related -- actually directly related to issues in this class. One of the first courses I took was a mass and energy balance course. I recall mass balance as one of the topics here that was brought up by Slayback.

I also took basic courses like thermodynamics and kinetics, which are related, you know, broadly to the issues here, and other courses in the chemical engineering construction column, chemistry course, et cetera. Biochemistry courses, those sort of things.

Q And then you went on to get your Ph.D. in chemical engineering in 1996 from the University of California Berkeley, correct?

A That's correct.

Q And the title of your Ph.D. thesis was "Reaction Processes in ZSM-5 Zeolites Elucidated by Quantum Density Functional Theory and by Dynamic Monte Carlo." Is that correct?

A Yes.

Q And what was the subject of your thesis

dissertation?

A   Well, I guess in a sense, the title is the subject.  I can elaborate.  My -- so as an undergraduate -- you actually specifically asked me about courses, but I also -- I also did extensive research.  My research focused on -- my undergraduate research focused on pharmaceuticals processing, but also related to product formulation.  And I had an interest in theoretical methodology, and so I wanted to bring that into the pharmaceutical space, which I did when I began at MIT.

And so the reason I gave you that background is because the subject is these methods, density, functional theory, and dynamic Monte Carlo.  The application was ZSM-5 zeolites, so these are catalysts.  I'm happy to go into more depth --

Q   So --

A   -- as you'd like.

Q   The ZSM zeolite catalysts were, as I understand it, catalysts for converting nitrogen oxides into nitrogen and oxygen, correct?

A   Yes.  I mean, they could potentially convert other things, but that was the focus of the reactions in my thesis, correct.

Q    And those are reactions that take place in a catalytic converter of an automobile exhaust, correct?

A    Well, those are reactions that take place in a catalytic converter, but the catalytic converter in automobiles are different than the application, the focus of my thesis.  As far as I know, these zeolites are not used in automobile applications.

But my focus wasn't so much the application, per se, as trying to elucidate, as I say there, the chemistry of the reaction processes.

Q    And what types of applications were you focused on for the ZSM-5 zeolites of your dissertation?

A    Oh, sorry.  I thought I answered that in the previous question.

So the -- there are a variety of applications of ZSM-5 zeolites.  My focus wasn't so much a direct practical application as elucidating the various chemical mechanisms that can occur.

Q    Okay.

A    In addition, again, to learning the methodology, which I did, and have applied since

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    24

early in my independent career.                        09:33:24

Q    The reactions that you were studying in           09:33:26
your dissertation were inorganic chemistry             09:33:29
reactions?                                             09:33:33

A    That's correct.                                   09:33:36

Q    Okay.  And am I correct to say that the           09:33:37
reactions you were studying in your dissertation       09:33:42
thesis were unrelated to pharmaceutical                09:33:45
chemistry?                                             09:33:48

A    That's, I think, correct.  That's a               09:33:51
fair statement.  Again, the intention was              09:33:53
learning the methodology, and these were the kind      09:33:58
of applications in which one could learn the           09:34:02
methodology.  So my intention had been                 09:34:04
pharmaceuticals, but the application of those          09:34:08
reactions -- and they could be related, but those      09:34:12
applications were specifically inorganic.  That's      09:34:15
correct.                                               09:34:19

Q    And your pharmaceutical -- strike that.           09:34:21

Your Ph.D. dissertation is unrelated to                09:34:24
pharmaceutical formulation, correct?                   09:34:31

A    Well, again, I wouldn't say that's                09:34:39
completely correct.  I agree that the subject          09:34:41
matter didn't have to do with pharmaceutical           09:34:44
formulation.  As I said, I wanted to learn the         09:34:47

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    25

methodology to bring them into the pharmaceutical
space where they had not been applied, which is
exactly what I did in my independent career with
respect to formulation.

Q    But that followed your Ph.D. thesis?
The thesis itself was unrelated to pharmaceutical
work?

A    The application of the thesis, the
elucidation of the various chemical mechanisms,
agreed, was not a pharmaceutical application.

The methodology was, in my view, potentially
applicable, which is how I used it.

Q    All right.  I take it as a professor --
your professorship at MIT, you teach courses?

A    Yes.

Q    And do you teach any courses in
analytical chemistry?

A    Well, just to be clear, I teach in
chemical engineering.  So certainly some of the
courses involve analysis, but I don't teach a
course with the rubric analytical chemistry, per
se.  But certainly our courses involve the
analytics of chemical systems.

Q    Okay.  But you don't teach a formal
course in analytical chemistry with that title?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    26

A    Correct.  I don't teach a course with the title "Analytical Chemistry."  Almost all of the courses I teach certainly involve analytical chemistry in various ways, applications of analytical chemistry and analysis, including a laboratory course that I've taught in the past.

Q    In terms of those courses that involve analytical chemistry, is that the major focus of those courses?

A    No.  I would say it's a focus.  I would say it's something that needs to be incorporated into understanding the material in various courses.  Analysis, analytical chemistry, per se, is core to -- well, pretty much everything that we do in -- directly or indirectly.

Q    Does MIT offer courses specifically about analytical chemistry?

A    I would have to check the course catalog.  I would expect, but I don't know if they would be undergraduate or graduate.  Maybe they don't have courses with exactly that title. We could check.

Again, analytical chemistry is something that's incorporated in pretty much all of our research and coursework.

09:36:31
09:36:33
09:36:37
09:36:40
09:36:44
09:36:49
09:36:51
09:36:53
09:36:56
09:36:57
09:37:05
09:37:07
09:37:12
09:37:16
09:37:21
09:37:24
09:37:27
09:37:32
09:37:34
09:37:39
09:37:42
09:37:45
09:37:47
09:37:49
09:37:54

Q    And do you teach any courses on -- specifically on HPLC methodology?

A    I'm trying to remember.  I mean, we certainly have incorporated the results of HPLC methodology in courses, but if you're asking about a standalone course, I took a course as an undergraduate that involved HPLC, but I don't think I've actually taught a course that specifically used that methodology.

I'd have to think of the lab course that I taught.  Maybe it did.  It certainly used various analytical toxicology related to separations.

And, by the way, my laboratory, we've had -- we apply HPLC regularly and have for many years.

Q    And in your -- in this CV you have a listing of your scientific publications, which on page 4.  The most recent one listed, I assume, is No. 229.

Do you see that?

A    Yes.

Q    Does that sound about right as the total number of publications you've had over the years?

A    That sounds -- that's about right.  I'm trying to remember if -- what we may have

09:37:57
09:38:00
09:38:11
09:38:17
09:38:22
09:38:23
09:38:28
09:38:34
09:38:38
09:38:40
09:38:44
09:38:47
09:38:51
09:38:54
09:39:01
09:39:05
09:39:10
09:39:18
09:39:21
09:39:24
09:39:27
09:39:29
09:39:31
09:39:38
09:39:40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    28

submitted.  Sometimes the order changes, what we
may have submitted recently.

I mean, I know that some of these that say
"submitted" or "in press" are now published.
There may have been another couple publications
since then.  But that's -- as -- you asked about,
right.  I think that's approximately correct.

Q    And in terms of these publications, am
I correct that you don't have any publications
that are specifically focused on HPLC techniques
and validation of such techniques?

A    I don't think that's correct.  I think
there are quite a few that involve HPLC
techniques, and we've validated the methodologies
that we've used.  I'm not -- I'd have to find --
but, you know, we have -- do quite a bit of work
using HPLCs.  We have to validate the
methodology.  At one point when I was running the
center, specifically in my lab, we had five HPLCs
running basically 24/7, so we needed to do lots
of analysis, and we needed to use validated
methods.

Q    Were you doing work that was geared
towards FDA approvals when you were validating
those methods?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                29

A   No.  We were doing work on pilot scale, also laboratory scale work.  At MIT, we don't do FDA submissions, but a lot of this work was with companies, and so we work with companies.  And some -- it was the hope that some of these methods would be used, and, in fact, some of the methods have been used in commercial products by companies.

Q   Have you ever used an unvalidated HPLC method in your lab?

A   Let me be clear what you mean by "validated."  I want to make sure we're using the term the same way.

Q   Well, how have you been using it?  Let me ask it that way.  You've used the word "validated" several times.

What do you mean by that?

A   I mean a method that's appropriate for the application that's going to give accurate and precise results that are reasonable for the application.

Q   Have you ever used a method that you understood was inaccurate?

MR. SCHULER:  Object to the form.

A   I'm not quite -- using a method

09:41:31
09:41:37
09:41:43
09:41:46
09:41:54
09:41:57
09:41:59
09:42:02
09:42:05
09:42:08
09:42:12
09:42:14
09:42:18
09:42:19
09:42:22
09:42:24
09:42:26
09:42:27
09:42:31
09:42:37
09:42:40
09:42:49
09:42:52
09:42:55
09:43:01

intentionally that was inaccurate?

Q    Yeah.

A    Not as far as I know.  I mean, methods may have varying degrees of accuracy given the application.

I may not quite understand your premise.

Q    That's okay.

A    To the degree that we applied methods that were less accurate than maybe we wanted them to be, there might have been a reason for that. So in a certain sense, the inaccuracies related to the application and the degree of accuracy and precision -- we can focus on accuracy if you want.

Q    Have you ever used the methodology that -- well, strike that.  Let me ask you a different question.

Your use of HPLC, was it quantitative or just for purposes of separating different molecules?

MR. SCHULER:  Object to the form.

A    Well, I've used quantitative HPLC with the objective of analyzing actually degradation, degradation products, for example, in pharmaceuticals that we were working with.

09:43:04
09:43:06
09:43:10
09:43:14
09:43:18
09:43:21
09:43:25
09:43:25
09:43:28
09:43:33
09:43:35
09:43:40
09:43:46
09:43:48
09:43:50
09:43:52
09:43:56
09:43:58
09:44:01
09:44:06
09:44:08
09:44:10
09:44:18
09:44:26
09:44:28

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    31

Q    Okay.

A    If that's what you mean.

Q    So in terms of the quantitative HPLC you've done, if you had results that you knew were underestimating a degradant by half, would you consider that accurate in any context?

MR. SCHULER:  Object to the form. Incomplete hypothetical.

A    I'm not sure what you're getting at. If you know the degree of underestimation and it seems like you have an understanding of the methodology, maybe you could explain a little more what you mean.  I'm not quite following.

Q    Let me ask that, then.

If you knew that a certain methodology was producing quantitative numbers that were underestimating by a half, would you seek to correct those numbers?

MR. SCHULER:  Object to the form. Incomplete hypothetical.

A    I'd have to look at the situation and understand.  I mean, I would want to do whatever I did for appropriate reasons.  But it depends on the situation, I guess.

Q    Can you envision a situation where

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    32

reporting numbers that are off from true values
by half would be appropriate?

MR. SCHULER:  Same objection.

A    I'd have to understand the situation.
We strive for -- to report things correctly.
You're asking about my lab, I presume, so --

Q    Yes.

A    -- we strive to report things correctly
and, you know, applying appropriately methodology
with the degree of accuracy and precision needed
for the particular application.

Q    In your lab, would it ever be
acceptable to report a number that was -- varied
from what you knew to be the true value by half,
where you knew that the true value was twice as
high?

MR. SCHULER:  Object to the form.
Incomplete hypothetical.

A    I don't -- there might be reasons.  I
don't know.  I'd have to look at the specifics.
Again, I think I, myself, and expect of my
students, postdocs and other laboratory members,
to report what -- the results that they got,
using appropriate methodology and analyses.  But
I'd have to understand the specific situation.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                              33

Q    Would it be fair to say that you expect          09:47:48
of your laboratory that the results reported be       09:47:50
as close to accurate as you can get?                  09:47:54
A    I'm not sure I understand exactly what           09:48:02
you're asking.  I think I would say -- repeat         09:48:05
what I said.  We would apply methodology with the     09:48:11
degree of accuracy or precision intended and          09:48:16
understand whether we're able to -- for the given     09:48:25
application and understand whether we're able to      09:48:29
make conclusions based on the results.                09:48:32
And, I mean, part of doing science and                09:48:39
addressing a hypothesis is choosing a methodology     09:48:44
that will hopefully be able to answer it.             09:48:49
Sometimes it's inconclusive.  Sometimes it's          09:48:52
negative, sometimes positive.                         09:48:54
Q    Is it fair to say that, as you sit here          09:49:01
today, you wouldn't give an answer one way or the     09:49:03
other as to whether a number that's half of the       09:49:09
true value is appropriate in any particular           09:49:13
application?                                          09:49:17
MR. SCHULER:  Object to the form.                     09:49:20
A    I'm not understanding your                       09:49:23
hypothetical.  I would have to understand it          09:49:26
better.  Again, if you're saying reporting --         09:49:30
falsifying numbers or reporting wrong numbers, I      09:49:33

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                 34

wouldn't say that would be appropriate.

But there might be reasons -- I just don't know. I'd have to understand -- I'm not quite sure -- your question is very vague, so I'm not quite sure what you're getting at. But if you have something more specific, we could potentially discuss that.

Q    We could. Well, with respect to your publications, is it fair to say that a lot of the work you've done relates to peptides and proteins in the pharmaceutical area?

A    I think that's correct. As you've noted, I have over -- about 230 publications. So many of them have to do with peptides and proteins. Many of them have to do with small molecule pharmaceuticals. I'm not sure what the ratio is. Very roughly, half and half. Well, some of them maybe not either, so 40/40 or something. Something like that. But quite a large number have to do with proteins and peptides and quite a large number have to do with small molecule pharmaceuticals.

Q    Okay. Have you ever worked with bendamustine in any way before this case?

A    And I guess I shouldn't assume. You

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    35

mean before this case specifically?

Q    Before -- outside of litigation.  In
your research, have you worked with bendamustine?

A    No, I have not specifically worked with
bendamustine outside of these -- these types of
cases.

Q    In terms of your research, have you
ever worked with any nitrogen mustard?

A    I'd have to go back.  I think it's
unlikely.  We've worked with quite a number of
compounds even Class 3+ compounds.  I don't
recall specifically having worked with nitrogen
mustards in my laboratory.  I could go back and
try to -- we've done quite a number of projects
over the years.

Q    When you said class 3 -- I think you
said class 3 compounds -- what were you referring
to?

A    Oh, I'm sorry.  I said -- so Class 3+
is a designation for our laboratory.  We no
longer have that designation because we're not
working with such potential toxic compounds.  But
you have certain ratings in your laboratory and
you can work on certain compounds, and they have
different potential levels that you have to

09:51:14
09:51:17
09:51:19
09:51:24
09:51:26
09:51:29
09:51:31
09:51:34
09:51:45
09:51:48
09:51:52
09:51:59
09:52:01
09:52:06
09:52:09
09:52:09
09:52:12
09:52:14
09:52:18
09:52:21
09:52:28
09:52:31
09:52:37
09:52:41
09:52:44

monitor, things like that.

Q And I take it you viewed nitrogen mustards as -- they would fall within a Class 3+ category?

A No, I don't know specifically. I mean, I guess it depends on the type of compounds. But generally, cancer compounds tend to have a pretty high level of rating, so one could designate that.

My point is that we've worked with compounds up to very high level of potential toxicity and require appropriate monitoring and personal protection and those sort of things.

Q Your Ph.D. dissertation had nothing to do with bendamustine, correct?

A Not specifically. Again, I discussed the methodology, which is related -- methodology which we used for subsequent chemical analyses and reactions, including degradation, but not specifically that molecule.

Q Nothing in your opinions in this case, I take it, relates to quantum density functional theory or dynamic Monte Carlo theory?

A I mean, broadly speaking, these are methodologies to understand chemical systems,

09:52:47
09:52:49
09:52:53
09:52:57
09:53:01
09:53:03
09:53:08
09:53:14
09:53:19
09:53:20
09:53:22
09:53:28
09:53:34
09:54:17
09:54:19
09:54:27
09:54:31
09:54:35
09:54:38
09:54:42
09:54:44
09:54:48
09:54:54
09:55:06
09:55:10

including chemical reactions.  I don't think --
there may be -- there are so many references
here.  There may be references that employ those
sort of methods.

But as far as directly applying those
methods, I agree.  I don't think that your
witnesses or I have specifically applied them.
But they're related to broadly understanding
chemical reactions, including degradation, since
density functional theory is a way of
understanding -- as you correctly said, is a
quantum mechanical technique which is the way to
understand chemical reactive processes, also to
understand what processes aren't specifically
chemical reactive processes and differentiating
those.

Q   I guess the question is:  In the
specific opinions you present in your reports in
this case, I didn't see anything referring to any
form of quantum theory or Monte Carlo theory.  Am
I wrong about that?

A   No, that's correct.  I don't think I
referred to either of those explicitly in my
reports here.  Again, they might be in some of
the references.  But they're broadly related to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    38

understanding chemical processes, including --

well, I should have added thermodynamic

processes, but also, in particular, reactive

processes, quantum mechanical methods, as you

appropriately referred to it.

Q    And if we can -- again, going back to
your CV, you have a section that you call
"Philosophical Publications."

A    Which page?

Q    It's on page 24.  And -- do you see
that?

A    Yes.

Q    And --

A    I'm there.

Q    And the fifth one there is -- it looks
like a publication entitled "AI Ethics Education
in the AI Ethics Handbook."

I seem to recall you've also taught a course
in ethics.

A    Correct.

Q    In terms of ethics, would you agree
with me that when an author writes a paper, it's
important that they correctly quote from sources
they use when they're quoting?

MR. SCHULER:  Object to the form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    39

A    I mean, look, Counsel, there are people who write papers.  People can make mistakes.  In general, one, as I said, tries to be accurate.  But that's the intention, to be accurate or should be the intention to be accurate.

Q    And that's true in terms of how one quotes from a source, correct?  It should accurately reflect words that you're quoting?

A    I mean, it can depend on certain reasons.  It might or may not be accurate.  I'm not sure what you have in mind, but broadly speaking, there are many authors who change even their own quotes, and part of understanding those authors' works is understanding the reason for those changes or quoting other people and making changes.  But if you have some -- something specific, we can certainly discuss that.

Q    If one were to quote from a source and leave out words without putting an ellipse in, is that appropriate from an academic integrity standpoint?

MR. SCHULER:  Object to the form.  Incomplete hypothetical.

A    I guess it depends on the situation.  Again, there might be reasons for it.  People can

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                40

make mistakes.  But the intention is -- it            09:59:58

depends, as I said.  There might be situations.       10:00:02

    Q   Okay.  Would you agree there might be   10:00:05

situations where that would be inappropriate, to      10:00:10

quote from a source, leave out words, and not put     10:00:12

an ellipse in?                                         10:00:16

    A   I guess it could be appropriate or    10:00:19

inappropriate.  It depends on the situation and       10:00:22

the context.                                           10:00:25

    Q   I take it in this case, you understand  10:00:34

there are two patents-in-suit that I'll refer to,     10:00:38

I guess, through the day as the '214 and the '248     10:00:42

patent?                                               10:00:46

    A   Yes.  I think that's fine.             10:00:58

    Q   And I take it you've read those        10:01:00

patents?                                              10:01:03

    A   Yes.                                    10:01:08

    Q   Okay.  In overview, what is your       10:01:09

understanding of the invention being claimed in       10:01:15

those patents?                                        10:01:19

    MR. SCHULER:  Object to the form.         10:01:22

    A   I mean, I have a whole overview -- I'm  10:01:40

on my opening expert report, starting on page 20      10:01:44

of the asserted claims.  I mean, I think the          10:01:50

claims speak for themselves, but I have               10:01:53

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    41

descriptions of them.  I can read them or go

through them.  I'm not sure -- the claims, I

think -- I've analyzed those claims throughout --

Q    In your report.  I know.

A    -- my reports and in responding to some

of Slayback's experts.

Q    I mean, how do you characterize those

claims, in summary?

What do you think has been invented here?

MR. SCHULER:  Objection.  Asked and

answered.

A    Well, again, I discuss those throughout

my reports.  I'm in my opening report on page 20.

I go through the claims.  I can -- I'm happy to

read them.  I'm sure you've read my report.  I go

through the claims in some detail.

I think the claims speak for themselves in

the context of the patents, and I have explained

that throughout in my reports and also responding

to Slayback's expert -- there might be others,

but the experts that I -- it was relevant for me

to respond to.

Q    Do you understand -- well, strike that.

In your own career, you are the inventor of

certain patents, correct?

A    I am an inventor in some patents.  I believe -- I can double-check.  It should -- all the inventors might not be in my CV, but I believe all of my patents have coinventors.

Q    And most of the litigations you've been involved in are also patent cases, correct?

A    I think that's fair.  Not all, but most.

Q    And do you have an understanding that in the pharmaceutical field, there are categories of patents that are called "new chemical entity patents"?

Have you ever heard that term?

A    I think I've heard that term.  I talk about claim types starting on page 13 of my opening report.  But I've had -- certainly have heard the term "new chemical entities."  I'll leave it to you as an attorney if that's a category, per se.

Q    And is it fair to say that the patents-in-suit here, the ones we talked about, you had reviewed the '214 and the '248 patent, do not claim a new chemical entity?

A    Well, I would just say, as I say here under this Section C, starting on page 13, that I

10:03:33
10:03:38
10:03:42
10:03:47
10:03:59
10:04:02
10:04:09
10:04:13
10:04:20
10:04:25
10:04:30
10:04:34
10:04:35
10:05:00
10:05:02
10:05:07
10:05:13
10:05:17
10:05:19
10:05:20
10:05:24
10:05:26
10:05:30
10:05:41
10:05:47

was informed by counsel that the asserted claims of the '214 patent and '248 patent are "formulation" claims, also known as "composition" claims, which delineate specific components of the formulation.

So as I was informed by counsel, these are formulation claims, specifically not product-by-process claims.  I leave it to you if they can -- or counsel if they can be under different categories or not.  But that's -- they're not product-by-process claims.

Q    As you sit here today, do you know whether or not they should be considered new chemical entity patents?

A    Maybe you could help define "new chemical entity" in your -- because I think you're using it in a legal context.

Q    Well, I think historically, you would agree that bendamustine is a molecule that was created in 1963 or so, correct?

A    Yes.  I think we could figure out the exact year, but I think that's approximately correct, in the '60s, I believe.

Q    And, you know, at the time that was created as a new molecule, at least in theory,

10:05:54
10:05:57
10:06:01
10:06:07
10:06:11
10:06:15
10:06:19
10:06:22
10:06:29
10:06:33
10:06:36
10:06:38
10:06:40
10:06:43
10:06:52
10:06:55
10:06:58
10:07:01
10:07:04
10:07:08
10:07:16
10:07:18
10:07:21
10:07:24
10:07:28

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    44

one might get a patent on that molecule itself.

Do you understand?

A    Again, I leave it to you as the lawyer. I presume that's a possibility.  It seems reasonable.  It sounds like a legal question.  I don't know --

Q    Okay.

A    -- what the specifics were and if that was even a possibility.

Q    So that was sort of the question.  I think you've answered it, largely.  But the patents-in-suit are not claiming a new -- newly discovered molecule; they're claiming a formulation of an existing molecule, correct?

A    Again, I think that's fair.  They're -- as I say here, they're patent -- they're formulation claims, also known as "composition claims."

But I agree, bendamustine would have been known before the '214 and the '248 patents.

Q    And is it your understanding that the patents-in-suit are claiming a cure for cancer?

MR. SCHULER:  Object to the form.

A    If we're going to talk about the patents, maybe we should introduce them.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026　　　　45

MR. LIEF: If you want a copy. Do we have those?　　10:09:08　10:09:10

THE WITNESS: Yes, please.　　10:09:12

MR. LIEF: I'm sure we do somewhere.　　10:09:13

But I'm also thinking we might as well -- you've got copies of them, and I'm going to assume they're complete, because our copies are -- have issues.　　10:09:18　10:09:21　10:09:22　10:09:25

MS. SPARSCHU: No. That's okay.　　10:09:28

MR. LIEF: But for your reports. Maybe we should mark the opening report you're looking at as Trout Exhibit 2 instead of the print that I had that was a mess.　　10:09:31　10:09:32　10:09:36　10:09:41

The one you've been looking at could just be the deposition exhibit, if that's okay.　　10:09:47　10:09:49

So make that 2.　　10:09:53

(Opening Expert Report of Dr. Bernhardt Trout, Ph.D. marked Exhibit 2.)　　10:09:54　10:09:54

MR. LIEF: All right. So then -- we already marked what was Appendix B to your opening report, which was specific to Slayback, as Trout Exhibit 3.　　10:10:21　10:10:33　10:10:38　10:10:41

(Appendix B: Slayback Additional Evidence of Infringement marked Exhibit 3.)　　10:10:44　10:10:44

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                46

BY MR. LIEF:

Q    So I'll hand you that.

A    Okay.  Thank you.

MR. SCHULER:  Do you have one for me?

MR. LIEF:  Yeah, we should.  I've got it.  This is Appendix B., and that's Trout Exhibit 3.

And then I'm going to hand you what we marked as Trout Exhibit 4, which was your reply report.

(Reply Report of Bernhardt Trout, Ph.D. marked Exhibit 4.)

THE WITNESS:  Okay.

MR. LIEF:  And that is Trout Exhibit 4. We might as well just get them put away.

That one is an issue.  It didn't print well.

BY MR. LIEF:

Q    Do you have a copy of your responsive expert report in the Slayback case?

A    Yes.

MR. LIEF:  Okay.  Maybe we'll just mark that as 5, because the one we have is also a misprint.

(Responsive Expert Report of Dr.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    47

Bernhardt Trout, Ph.D. marked Exhibit 5.)                    10:12:03

MR. LIEF:  If you could, for the                    10:12:10

responsive expert report in Slayback.                    10:12:10

And then we're going to mark as 6 --                    10:12:12

MR. SCHULER:  Wait.  So that's 5?                    10:12:13

MR. LIEF:  That's 5.  This is the                    10:12:21

responsive report.  That goes to the validity                    10:12:22

issue.                    10:12:24

MR. SCHULER:  Thanks.                    10:12:24

MR. LIEF:  Then we're going to mark as                    10:12:24

6 the '214 patent.                    10:12:26

(U.S. Patent No. 11,872,214 marked                    10:12:28

Exhibit 6.)                    10:12:28

MR. LIEF:  And we're going to mark as 7                    10:12:38

the '248 patent.                    10:12:41

(U.S. Patent No. 12,138,248 marked                    10:12:52

Exhibit 7.)                    10:12:52

BY MR. LIEF:                    10:12:52

Q    So that should give us some material to                    10:12:58

look at.  Some light reading material.                    10:13:00

So where were we?  On the '214 patent, I had                    10:13:10

asked you:  Do you understand that the claims to                    10:13:16

the '214 or, for that matter, the '248, represent                    10:13:22

a cure for cancer?                    10:13:27

A    My understanding is that these are                    10:14:19

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                     48

formulation claims, as we've been discussing. 10:14:21

And I have, for example, on page 13 of my report, 10:14:26

that they're formulations that are intended and 10:14:35

actually are used to treat cancer, certain types 10:14:39

of cancer, if that's what you had in mind. 10:14:45

    Q   Do the formulations set forth in the 10:14:49

claims of the '214 and the '248 patent represent 10:14:50

an advance in treating cancer over prior 10:14:58

compositions that contained bendamustine? 10:15:02

       MR. SCHULER:  Object to the form. 10:15:06

    A   Well, they are an advance.  And I 10:15:36

discuss this, I think, many places.  But for 10:15:38

example, in my section of my opening report, 10:15:42

Exhibit No. 2, Roman numeral capital V, 10:15:49

paragraph 57, where I state the advantages and 10:15:57

then -- I'm sure you've read it.  I don't have to 10:16:05

reread the whole thing. 10:16:08

    But it says, the last sentence:  "The 10:16:10

inventors in the asserted patents address these 10:16:13

problems" -- that was discussed earlier in the 10:16:16

paragraph -- "by describing and claiming liquid 10:16:19

bendamustine compositions comprising novel 10:16:23

combinations of ingredients suitable for 10:16:26

long-term storage." 10:16:28

    So it's an advance in that sense.  And I 10:16:31

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                      49

elaborate further throughout, of course.          10:16:37

Q    Do you have any understanding that the       10:16:41

use of the patented compositions results in       10:16:42

better survival rates for patients as compared    10:16:49

with, say, a lyophilized bendamustine             10:16:51

formulation?                                       10:16:54

A    I'm not sure.  I haven't seen that            10:17:15

data, as far as I recall.  If there's something   10:17:19

in my reports, plural, I think we can go to that. 10:17:23

I think they're helpful in addressing the         10:17:27

problems that I discuss and are therefore         10:17:34

beneficial.  In particular, the aqueous           10:17:39

formulations were not suitable for "long-term     10:17:42

storage in liquid form."  And then the            10:17:47

reconstitution of the formulations was            10:17:51

"clinically inconvenient."                         10:17:53

And those are from paragraph 57 of my             10:17:56

opening report, Exhibit 2.  And they're both      10:18:00

quotes from the '214 patent.                       10:18:04

Q    Other than those benefits, are there         10:18:09

any other benefits you're aware of that flow from 10:18:12

the formulations claimed in the '214 and '248     10:18:16

patents?                                           10:18:20

MR. SCHULER:  Object to the form.                  10:18:23

A    This is a summary.  I guess we can            10:18:44

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                50

discuss -- I think I discuss benefits throughout.

I think the key benefits from an application standpoint are summarized in 57.  I can go through -- sorry -- in paragraph 57 of my opening report.

I could go through.  I'm sure I discuss benefits broadly throughout.  I can do that. There's quite a few pages, if you'd like.  I would treat this as a summary.  It's at the very beginning of my opening report.

Q    From your perspective, is there any reason to believe that a patient treated with reconstituted bendamustine from a lyophilized product would do better or worse if they were treated with the formulations of the '214 and '248 claims?

MR. SCHULER:  Object to the form.

A    My understanding from my extensive experience over the years in pharmaceutical formulation and its application -- and you may have noticed that some of my recent work was on a new approach to lyophilization to make it more efficient, potentially make reconstitution more efficient -- is that reconstitution, consistent with what the '214 patent says, is "clinically

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                           51

inconvenient," and so having a liquid composition like in the claims that's suitable for long-term storage is useful.  It creates -- creating more clinical convenience, helps make clinicians more efficient, hospitals more efficient.

So it was well known to be an advancement, not necessarily easy to achieve, which is why we still, in 2026, work on lyophilization.  But it's -- so -- so convenience, in the end, is good for patients.

Q   Do you have any reason to believe that once the bendamustine drug is introduced intravenously to the patient that there's a difference in the clinical outcome if the original bendamustine product was lyophilized, meaning freeze-dried, or was a liquid composition, as called for in the claims of the '214 and '248 patent?

MR. SCHULER:  Object to the form.

A   Is there anything in my reports you're referring to or --

Q   I don't think so.  I mean, I think -- I don't think you have an opinion on this.  I'm just trying to pin that down.

Like -- let me ask you this, before we come

back to that.

You're not a medical doctor, correct?

A    That's correct.

Q    And you -- have you been involved with clinical studies from the -- well, have you been involved with clinical studies?

MR. SCHULER:  Object to the form.

A    Yes, I've been involved with clinical studies, and I've certainly read about clinical study results in my over 20 years in the field.

Q    Right.  And are you aware of any clinical studies that say for the exact same drug molecule that the clinical outcome for a patient who is treated with a lyophilized formulation is better or worse than a patient who is treated with a liquid composition of the same drug?

MR. SCHULER:  Object to the form.

THE WITNESS:  Sorry.  Someone is knocking.

A    Do you mind just repeating that?

MR. LIEF:  Yes.  Can you read that back, because I won't get it exact.

MR. SCHULER:  Just remind me what his response report was.  No. 6?  5?

MR. LIEF:  I believe it's 5, yes.

MR. SCHULER:  Thank you.   10:23:32

(The question was read by the   10:23:33

reporter, as requested.)   10:23:33

THE WITNESS:  Thank you.   10:24:00

A    I have not done that analysis, per se,   10:24:04

because I've done the analysis that I've done,   10:24:10

which shows the benefits.  I think -- it hasn't   10:24:13

been an issue in the case.   10:24:20

Q    Okay.   10:24:24

A    But, again, I can tell you that going   10:24:24

from a lyophilized to a liquid form, for the   10:24:30

reasons that I've been mentioning and the patent   10:24:34

mentions, is important.   10:24:37

Q    Okay.  And so is it fair to say that   10:24:42

for purposes of this litigation, you will not   10:24:45

present an opinion that the patented compositions   10:24:49

of the '214 and '248 patents produce an   10:24:55

improvement in cancer survival in patients as   10:25:05

compared with a lyophilized bendamustine?   10:25:09

A    I don't intend to at this point, but   10:25:19

things could change.  I'm not sure what might   10:25:23

happen in litigation.  If it becomes appropriate,   10:25:25

I might.  I haven't done that so far, as we've   10:25:32

been discussing.   10:25:36

Q    As you sit here today, are you aware of   10:25:37

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                54

any evidence that the patented formulations from the '214 and '248 claims produce better cancer survival as compared with a lyophilized bendamustine product?

A    As I sit here, I don't have numbers on the cancer survival rates or I haven't done an analysis, per se.

Again, the advantages of the patents are addressing the problems that I've been mentioning, including this clinical inconvenience, which I'm now not directly quoting, because it would be an adverb, "clinically inconvenient," in the patent.  I know you want quotes to be accurate.

Q    Okay.  All right.  Good.

Just as a housekeeping thing, have we already marked the responsive report as Exhibit 5?  Do you have a marked copy of that already?  It might be your copy, but -- we do, it looks like.

MS. SPARSCHU:  We should.

A    Yes.

MR. LIEF:  This can sit to the side, then.  Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    55

BY MR. LIEF:

Q    In reviewing the patents-in-suit, I take it from your prior answer you came to an understanding that the compositions claimed here are nonaqueous formulations, correct?

MR. SCHULER:  Object to the form.

A    I would say, broadly speaking, from a chemistry standpoint, yes.  I know that that was part of a past litigation, which I refer to.  I can try to find that.

Again, as I discuss in my reports -- we can go to the sections -- there's going to be water present.  But if you want to refer to these as nonaqueous, with that understanding and the opinions in my reports on water, then that's fine with me.

Q    When you say "there will be water present," what do you mean by that?

THE WITNESS:  I apologize.  Is it possible to make this a little longer, just a little bit, so can I put it over the corner here? Great.  Thank you.  Get it out of the way.

MR. SCHULER:  Just for my edification, do you have numbers on all of the things you're looking at?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    56

THE WITNESS:  Oh.

MR. SCHULER:  And if you don't, look at the one that does have a number.  If you only have ones that --

MR. LIEF:  Yeah, let's make sure we have because -- so the responsive report should be 5, and you should have a copy of that marked.

THE WITNESS:  Yes.

MR. LIEF:  The opening report is 2.

THE WITNESS:  Okay.

MR. LIEF:  And then there's a reply report, which I believe we've marked already.

THE WITNESS:  Yes.  I have the reply -- now I have -- thank you.  Okay.  Because these, I have not looked through to verify the Exhibits 3 and 4.  The others, I brought.  Exhibits --

MR. SCHULER:  I don't care if you put numbers on them yourself.  I just want to make sure that when you refer to something, you can tell counsel what number you're looking at.

THE WITNESS:  Okay.

MR. LIEF:  So if you prefer to look at the ones that are spiral bound, put your number on it.  Otherwise, please look at the one that counsel has put a sticker on.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    57

Do you understand what I'm saying?                    10:30:43

THE WITNESS:  Yes.                    10:30:45

MR. LIEF:  Let's try for the stickered                    10:30:46
ones at this point, unless you find something --                    10:30:47

MR. SCHULER:  Right.  That's fine.                    10:30:50

MR. LIEF:  -- wrong.                    10:30:51

MR. SCHULER:  Okay.                    10:30:53

A    Okay.  So I discuss water throughout my                    10:30:53
four reports.  But I have, I think, a good                    10:31:53
discussion -- it's not the only one, but in my                    10:31:59
reply report, which is Trout Exhibit No. 4.                    10:32:05
Again, this is not the only place, but page 73,                    10:32:12
starting on page 73.                    10:32:20

I'll wait until you get there.  It's                    10:32:26
Exhibit 4.                    10:32:37

Q    Yeah. Go ahead.                    10:32:38

A    Page 73, I can summarize what I mean.                    10:32:41
For example, this is really page 74,                    10:32:49
paragraph 161.  I note "Water is entirely absent                    10:32:53
from both labels," so Slayback's December 2022                    10:33:01
label or its revised 2024 label.                    10:33:08

███████████████████████████ I                    10:33:14
discuss that, but I want to get -- I think that's                    10:33:20
important, but I want to get to the point.                    10:33:23

████████████████████████                    10:33:34

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    58

████████████████████████████████████     10:33:42

████████████████████████████████████     10:33:48

█████████████████████████████████        10:33:55

███████████████                          10:33:59

    And I also note -- again, I have a lot of     10:34:00

opinions on this.  ████████████████████    10:34:05

████████████████████████████████████████  10:34:12

███████████████████████████████████████   10:34:17

██████████████████████████████████        10:34:26

██████████████████████████████████        10:34:31

██████████████████████████████████        10:34:34

███████████████████████████████████       10:34:38

███████████████████████████████████       10:34:42

    And then I'm just -- and then starting at    10:34:47

the bottom of page 79, I think I may as well just   10:34:57

quote it, starting one line from the bottom, two    10:35:02

lines up.                                10:35:08

    ████████████████████████████████     10:35:09

████████████████████████████████         10:35:12

██████████████████████████████           10:35:15

███████████████████████████████████      10:35:18

██████████████████████████████           10:35:20

██████████████████████████████           10:35:26

████████████████████████████   And then...   10:35:32

    And I discuss at other points we can find    10:35:40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    59

███████████████        ████████████████████     10:35:42

████████████████████████████████████            10:35:44

██████████████████████                           10:35:47

Q    Setting aside for the moment Slayback's             10:35:51
product, I believe in the prior answer, before          10:35:54
this discussion, when I said to you, you know,           10:35:59
what did you mean when you said "There will be           10:36:03
water in it," I was asking about the patents             10:36:06
themselves.                                              10:36:11

What is your understanding of how much water             10:36:15
the patents permit?                                      10:36:18

MR. SCHULER:  Object to the form.             10:36:21
Incomplete hypothetical.                                 10:36:23

A    Oh, well, sorry if I wasn't clear. █     10:36:25

████████████████████████████████████████     10:36:30

███████████████████████████████              10:36:35

██████████████████████████████████████       10:36:38

████████████████████████████████████         10:36:44

█████████████████████████████████████████    10:36:49

██████████████████████████████████████       10:36:55

██████████████████████████████               10:37:00

█████████████████████████████████████████    10:37:03

███████████████████████████████████████      10:37:10

███████████████████████████████████████      10:37:13

██████████████████████████████               10:37:17

Q   Okay.  And so in your understanding of the claims, your view of nonaqueous includes a certain level of water, nonetheless?

MR. SCHULER:  Object to the form. "Understanding of the claims."

I'll object to the extent that it misstates the claim language.

Do you need the question back?

MR. LIEF:

BY MR. LIEF:

Q   Well, I think we've agreed that you understand this invention as claimed to be for a nonaqueous formulation, correct?

MR. SCHULER:  Objection.  Asked and answered.

A   I don't think that's quite correct.  I think you asked me something like the formulation is nonaqueous, and I think I referred to previous litigation of that term in particular and said I can answer it just from a broad chemist's perspective, and then that, as we've just been discussing, a skilled person would understand that water is almost assuredly going to be present.

And I can go through again, but I just

10:37:24
10:37:27
10:37:39
10:37:46
10:37:46
10:37:53
10:37:55
10:37:58
10:37:59
10:37:59
10:38:00
10:38:02
10:38:06
10:38:08
10:38:09
10:38:13
10:38:18
10:38:23
10:38:29
10:38:32
10:38:35
10:38:40
10:38:44
10:38:50
10:38:50

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

61

discussed various specifications, ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮

Q Does the past --

A Excipients that allow water as a potential process aid. I'm just summarizing the previous --

Q No. You said that already.

Does the patent define how much water is permissible in the claimed compositions?

MR. SCHULER: Object to the form.

A I believe that you said "the patent."

Q Well, the patents-in-suit. Excuse me. Do the patents-in-suit define how much water would be permissible in the claimed compositions?

MR. SCHULER: Object to the form.

A I certainly have read these patents many times, but I don't have them memorized. If you want me to give you a fully accurate answer, I would want to go through these again.

▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮

10:38:54
10:38:58
10:39:02
10:39:06
10:39:07
10:39:09
10:39:11
10:39:14
10:39:15
10:39:17
10:39:21
10:39:26
10:39:33
10:39:36
10:39:38
10:39:42
10:39:50
10:40:03
10:40:06
10:40:12
10:40:15
10:40:21
10:40:25
10:40:31
10:40:37

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                62

[REDACTED]                                                        10:40:40

[REDACTED]                                                        10:40:45

[REDACTED]                                                        10:40:52

[REDACTED]                                                        10:40:55

[REDACTED]                                                        10:41:00

Q    And, again, my question is:  Setting    10:41:05
aside Slayback's specification or anyone else's    10:41:08
specification, does the patent itself give a    10:41:14
specific percentage of water that is permissible    10:41:19
for the claimed compositions?    10:41:24

MR. SCHULER:  Same objection.  The    10:41:30
patent speaks for itself.    10:41:36

A    So, again, I can go through these    10:41:37
again, if you'd like me to.    10:41:44

Q    I will represent to you --    10:41:49

MR. SCHULER:  Hold.  Whoa, whoa, whoa.    10:41:50
Let him finish.    10:41:53

MR. LIEF:  Well, he's giving very long    10:41:54
answers, and I want to get to a certain concept    10:41:55
here.    10:41:58

A    But -- I'm sorry.  Do you not want me    10:41:59
to answer?    10:42:01

Q    Let me interject for a moment because I    10:42:02
think this is -- you said this before.    10:42:04

MR. SCHULER:  Can you withdraw the    10:42:08

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                      63

question?

    MR. LIEF:  That's neither here nor there.

    MR. SCHULER:  Whoa, whoa.  He has to be able to finish his answer.  In court, you don't get to say, I'm stopping the witness's answer.

    MR. LIEF:  Okay.  I don't know that I agree with that.

    MR. SCHULER:  Were you finished?

    THE WITNESS:  No, I wasn't finished.

BY MR. LIEF:

    Q  How is what you're about to say different than what you said in your prior answer, that you could go through the patent again?

    A  Well, I don't think that's a fair summary of my prior answer.  I think I also referred to how the skilled person would understand the claims.

    And, again, I want to be clear, because I think you didn't quite present my answer clearly.

10:42:09
10:42:10
10:42:11
10:42:12
10:42:13
10:42:15
10:42:18
10:42:19
10:42:23
10:42:24
10:42:26
10:42:26
10:42:28
10:42:30
10:42:32
10:42:35
10:42:38
10:42:42
10:42:45
10:42:49
10:42:52
10:42:57
10:43:02
10:43:04
10:43:09

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026     64

Q Given that, how would the skilled person -- what would the skilled person understand to be the limit of water permissible in the claimed compositions?

MR. SCHULER: Object to the form. Incomplete hypothetical.

A The skilled person would understand that water could be present, and as long as a particular -- well, as long as, I guess, looking at Claim 1 of the '214, the sterile vial contains the components here, as I've explained throughout my reports, a skilled person would understand that some water can be present.

And, again, I mentioned this earlier, but not in the context of this particular question. But we focused on the lyophilization. But now I'm going back to my opening, Exhibit 2, the -- I lost the place. Paragraph 57, where I noted "The reconstitution of water, which caused the bendamustine within to degrade rapidly," it's

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                    65

well known that bendamustine can degrade if                    10:45:09

it's -- over time if it's in contact with enough               10:45:12

water.  So the skilled person would understand                 10:45:15

that also.                                                     10:45:17

    Q    Now, in those answers, I believe you            10:45:18

said that the skilled person would understand                  10:45:21

that some water can be present in the claimed                  10:45:24

compositions.                                                  10:45:27

    Can you put a number on what "some" means?      10:45:28

        MR. SCHULER:  Object to the form.         10:45:36

Incomplete hypothetical.                                       10:45:36

    A    I mean, there's not a specific                 10:45:38

numerical amount.  It's a qualitative amount, as               10:45:44

I've discussed in my reports. ████████                         10:45:50

██████████████████████████████████                             10:45:56

███████████████████████████████████                            10:46:00

████████████████████████████████                               10:46:08

███████████████████████████████                                10:46:12

███████████████████████████████                                10:46:16

██████████████████████████████████                             10:46:22

█████████                                                      10:46:26

    Q    In a formulation where no aqueous              10:46:27

ingredient or inactive ingredient is added, would              10:46:31

there be water present as well?                                10:46:35

        MR. SCHULER:  Object to the form.         10:46:40

Incomplete hypothetical.

A    I didn't understand, actually, let alone incomplete.

Q    ███████████████████████

████████████████████████████

██████████████████████

MR. SCHULER:  Objection.  Misstates the prior testimony.

A    No.  That's not an accurate summary.

Q    ████████████████████

█████████████████████

MR. SCHULER:  Objection.  Misstates the label.

MR. LIEF:  Strike that.

BY MR. LIEF:

Q    Do you have an understanding that compositions can have what is called "adventitious" water in them in the pharmaceutical field?

MR. SCHULER:  Object to the form.

A    We can call it adventitious.  We can call it impurities.  We can call it residual.  I think I've been calling it impurities or a processing aid ████████████████ but -- so as I -- I mean, I won't go

back, but I discussed this already in          10:47:53

paragraph 165 and paragraphs 171 of my reply   10:47:55

report, Exhibit 4.  So I just want to note my   10:48:04

answer there.                                   10:48:09

Q    Okay.  So if I understand what you just   10:48:11

said, do you or do you not make a distinction   10:48:14

between small amounts of moisture that get into a   10:48:19

pharmaceutical from the environment as           10:48:25

differentiated from water that is deliberately   10:48:29

added as an ingredient?                          10:48:33

MR. SCHULER:  Object to the form.           10:48:36

Incomplete hypothetical.                         10:48:36

A    I'm trying to find the place where I     10:49:45

refer to this, but I specifically address this   10:49:48

point in surely the same section.  I'm trying to 10:49:50

find the exact statement on impurities.  I have  10:49:58

multiple times.  I don't know where.  I can find 10:50:03

it, though.                                      10:50:10

So I think the best place is still in that     10:50:58

section starting on page 73 of my reply report.  10:51:02

Again, Exhibit No. 4.  Starting out in           10:51:08

paragraph 158, I refer to ███████████████        10:51:13

██████████████████████                           10:51:17

███████████████████████                          10:51:23

██████████████████████████                       10:51:26

Q    I want you to focus for this question solely on the patents-in-suit.

Am I correct that the patents-in-suit do not mention sodium hydroxide anywhere?

MR. SCHULER:  Object to the form.

A    Again, I know the patents pretty well. I don't have it memorized.  I can go through. Let me -- without going through line by line, let me see if I can... again, I just skimmed through this.  I could go through in more detail.

I don't think -- this can be confirmed.  If you'd like me to, I can go through it.  I don't think the patents specifically mention sodium hydroxide.  I think the skilled person would understand that pH is an aspect of pharmaceutical formulation.  I discuss this in places in my report, and certainly sodium hydroxide is one of the most prevalent pH-adjusting agents, and I discuss this in my reports.  We can find that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                69

place too if you'd like.

MR. LIEF:  I think we've been going for a while.  It might be a good moment for a break.

THE VIDEOGRAPHER:  We are going off the record.  The time is 10:54.

(A recess was taken.)

THE VIDEOGRAPHER:  We are going back on the record.  The time is 11:11.

BY MR. LIEF:

Q    Okay.  Dr. Trout, during the break, did you have any conversations with your counsel?

MR. SCHULER:  Object to the form.

A    Just chatting.  I don't even remember. Chatting about nothing important.

Q    Nothing substantive about your testimony?

A    No, no.

Q    So returning to the patents-in-suit, the '214 and the '248, again, can you confirm for me that there's no discussion in the patents-in-suit of a pH adjuster either?

A    I'm just refreshing my memory, flipping through.  I don't see the term "pH adjuster," but certainly there's -- as you know, I'm sure, pH is a parameter, let's say, that's quite prevalent in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                70

pharmaceutics.  There's acids mentioned, lipoic acid, for example.  I think we're all familiar with acids and bases as related to pH, so the skilled person would understand that pH could be relevant.

Q    In the context of the patents-in-suit, lipoic acid is referred to as an antioxidant, correct?

A    Well, for example, I'm in the '214 patent, column 8, line 15.  It's referred to as a "stabilizing antioxidant."

Again, I'm just pointing out that pH is directly related to acid-base chemistry.  The term "acid" is used, and the skilled person could understand that pH could be generally applicable in the pharmaceutical field.

Q    In the context of the claimed compositions of the patents-in-suit, would you understand lipoic acid to have multiple functions as a pH adjuster and an antioxidant?

MR. SCHULER:  Object to the form. Incomplete hypothetical.

A    No.  I think in the context -- we can look at Claim 1 of the '214, for example, lipoic acid would fall under a stabilizing amount of an

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    71

antioxidant, as is stated in column 8.  It                11:16:27

says -- explicitly refers to it as "a stabilizing         11:16:34

antioxidant."                                             11:16:39

    My point was that a skilled person would              11:16:41

think of pH as generally relevant to                      11:16:50

pharmaceuticals, and the term "acid" is directly          11:16:54

related to pH.  It's just an example.  It's not           11:16:58

pH, per se, of course.                                    11:17:02

    Q    Is there anything in the                         11:17:04

patents-in-suit that you would consider a pH              11:17:06

adjuster?                                                 11:17:13

    A    Oh, that was -- sorry.  I didn't                 11:17:20

understand that was the end of your question.             11:17:22

        MR. SCHULER:  Object to the form.                 11:17:26

    A    Oh, and I should just mention at the             11:18:31

bottom of column 4 of the '214, this is what I            11:18:36

was looking for before.  Sodium is explicitly            11:18:40

mentioned here.  Of course, sodium chloride, not          11:18:43

sodium hydroxide, but just to indicate the               11:18:48

prevalence of sodium.                                     11:18:51

    As far as a pH adjuster, again, I would              11:18:54

agree, I don't see an explicit mention to that.          11:19:04

I think the skilled person would understand that         11:19:09

it's part of pharmaceuticals, and to the extent          11:19:11

that one were needed or wanted to be introduced,         11:19:15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                          72

I can say this.  We can find in my reports.  But that would fall under the "comprising" claim. But that's a brief summary.

Again, I think the skilled person would understand the pH adjusters are potentially part of -- well, are part of pharmaceuticals and could potentially be used in a given formulation.

Q    If you look at the claims of the '214 patent, to start with, am I correct that in those claims, the word "solvent" does not appear?

A    So I agree that the word "solvent" is not in the claim.  However, as I've discussed extensively that the pharmaceutical acceptable fluid consisting of polyethylene glycol and optionally one or more of those other components would be understood to be a solvent.  For example, I'll just refer to Exhibit 2, my opening report.  Paragraph 62 on page 16 talks about solvents explicitly and the pharmaceutical solvents, which are explicitly referred to in that limitation in the claim.

I also talk about how the skilled person would understand the claim structure and the specific claims.  For example, on page 25, the same report, paragraph 105, that each of those is

11:19:19
11:19:24
11:19:27
11:19:30
11:19:32
11:19:35
11:19:39
11:19:58
11:20:03
11:20:10
11:21:32
11:21:39
11:21:43
11:21:49
11:21:54
11:21:59
11:22:02
11:22:07
11:22:14
11:22:18
11:22:21
11:22:25
11:22:28
11:22:31
11:22:38

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                           73

a solvent and that the skilled person would

understand their function.

    Again, I discussed this over many pages, but

that would be a summary at the beginning.

    Q    And in the '248 patent, would you agree

with me, looking at that, that none of the claims

use the word "solvent"?

    A    Again, I would give the same answer.

For the record, just looking at Claim 8, for

example, the top of Column 14 of the '248,

basically same is as Claim 1 of the -- same place

as Claim 1 of the '214.

    I agree the word "solvent" is not explicitly

in there, but the skilled person would understand

the "wherein the pharmaceutically acceptable

fluid consists of polyethylene glycol and

optionally one or more of..." these other four

components, that that those are the solvents,

vehicle, carrier, and I think that explanation is

throughout my reports.

    But, again, I would just refer, for example,

to paragraph 62, and the other paragraph is 105

of my opening report and the other discussion,

which explains that they would be understood to

function as solvents.

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    74

Q    To your understanding, apart from the patents and apart from the case, in science, has the definition of the word "fluid" changed between 2009 and the present?

MR. SCHULER:  Object to the form. Incomplete hypothetical.

A    So you're not talking about the patents?

Q    Correct.  Just in science, the standard, ordinary definition of the word "fluid," has it changed since 2009 to the present day?

A    Well, I would say that the term "fluid" has not changed since 2009.  The question is what is its meaning in a particular context; for example, whether it's aeronautics, physics, whether it's pharmaceuticals, whether it's specifically in the '214 or the '248 patents here.

And I have a feeling we'll discuss it a lot, so I can go to my reports, but you know I discuss the liquid and the fluid extensively in my reports.  We can go to that, if you have anything more specific.

Q    Well, it is fair to say, I think, that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    75

your opinion in this case is that the word                    11:26:08

"fluid" in these claims should be interpreted as              11:26:10

"solvent."                                                    11:26:14

        MR. SCHULER:  Object to the form.                     11:26:18

These reports speak for themselves.                           11:26:18

    A    No, I don't think that's exactly                     11:26:29

correct.  I don't -- that's not a quote.  I'm not             11:26:32

replacing words.  I'm explaining how the skilled              11:26:36

person would understand the claims in light of                11:26:40

the claim construction.                                       11:26:44

    And, again, I'm just referring to the                     11:26:47

beginnings.  We can refer to other places, but in             11:26:52

that paragraph 110, I say that "Each                          11:26:54

pharmaceutically acceptable fluid listed in the               11:26:58

claims, polyethylene glycol, polypropylene                    11:27:00

glycol, ethanol, benzol alcohol, and glycofurol               11:27:06

are solvents for bendamustine used to dissolve                11:27:11

poorly soluble or unstable actives to form                    11:27:14

injectable solutions."                                        11:27:18

    And then I explain this in many, many pages.              11:27:20

We can discuss the understanding.                             11:27:23

    Q    Is it not your position in this case                 11:27:27

that the word "fluid" in the claim should be                  11:27:29

interpreted as meaning a solvent or a co-solvent              11:27:33

or a solvent system?                                          11:27:38

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                76

MR. SCHULER:  I'll object.  The reports speak for themselves.  If you have a particular paragraph, feel free to ask him about it.

A    That's what I was going to ask.  If you have a particular paragraph in mind or is there something you want to refer to?

Q    Just -- and this is so fundamental to your opinions that I thought it was uncontroversial that your view is that the word "fluid" in the claim, according to your view, is that it means a solvent.

MR. SCHULER:  Same objection.  I think he's repeated his opinions multiple times.  The reports speak for themselves.

MR. LIEF:  I don't think I've heard an answer, Counsel.

BY MR. LIEF:

Q    I mean, if that's not your view and you think "fluid" means other things than "solvent," I'd like to know about that, because I didn't perceive that in the report.

MR. SCHULER:  Again, I'll object.  I think he keeps referring you to the entire phrase at issue, and you keep trying to isolate it to the word "fluid."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                 77

MR. LIEF:  Well, I do want and our position is that the word "fluid" needs to be construed.  And so I want to know --

MR. SCHULER:  I think you waived any request -- you stipulated to the word "fluid."

MR. LIEF:  No, we didn't.

MR. SCHULER:  Yeah.

MR. LIEF:  That's not true.

MR. SCHULER:  Did we not reach -- I'm sorry.  I thought we submitted an agreed construction.

MR. LIEF:  No, that's not true.  The word "fluid" was never construed, and I want to know when has an opinion about what "fluid" means in the claim.

MR. SCHULER:  Where did you disclose this construction dispute?

MR. LIEF:  I don't think --

MR. SCHULER:  What contention or expert report?

MR. LIEF:  Well, number one, you're burning my time with the colloquy --

MR. SCHULER:  You just said there's a fundamental dispute, and I'm asking you where it is --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                          78

MR. LIEF:  I think --

MR. SCHULER:  -- where it was raised.

MR. LIEF:  I think, quite clearly, it's developed throughout the case.  And I think that it was evidently clear to me that his position was that the word "fluid" means solvent.

MR. SCHULER:  Okay.  I'll take that at face value.  Could you just point me to a paragraph in his report where it says that?

MR. LIEF:  In his report.

MR. SCHULER:  Then find one paragraph.

MR. LIEF:  I don't need to do that.  I don't have it in front of me.  But he should know.

MR. SCHULER:  You have all the reports in front of you.

MR. LIEF:  I mean, is --

BY MR. LIEF:

Q    Let me ask you this:  Is it your view that the phrase "pharmaceutically acceptable fluid" must mean solvent?

A    I don't think that that is completely accurate, and that's why I'm going back and explaining.  The skilled person, how the skilled person would understand the whole limitation,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    79

wherein the -- I'm looking at Claim 8 of the    11:30:35

'248 -- would understand when the    11:30:39

pharmaceutically acceptable fluid consists of    11:30:44

polyethylene glycol and optionally -- and the    11:30:46

other components that I already read those, I'm    11:30:49

not substituting words.  I am explaining in those    11:30:52

paragraphs and other paragraphs -- for example,    11:30:58

now I've gone to paragraph 144, which is a    11:31:01

summary of that section, page 47 of my opening.    11:31:07

Taken as a whole, these disclosures show a    11:31:11

consistent and uniform disclosure:  The    11:31:16

"pharmaceutically acceptable fluid" is the    11:31:19

solvent medium.  And then those are specifically    11:31:22

referring to disclosures in the specification of    11:31:26

the patents.    11:31:29

     So I'm explaining how the skilled person    11:31:31

would understand that limitation.  I'm not just    11:31:34

substituting words.    11:31:37

     Q    So maybe you've expanded from the word    11:31:38

"fluid" to the phrase "pharmaceutically    11:31:43

acceptable fluid."  But am I wrong to understand    11:31:46

your opinion to be that "pharmaceutically    11:31:50

acceptable fluids," for purposes of these claims,    11:31:52

are solvents?    11:31:56

          MR. SCHULER:  I'll object to the extent    11:32:00

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                80

that you're misstating his prior testimony.

A    I think that's just a bit off, Mr. Lief.  I am showing, explaining, let's say, how the skilled person would understand that limitation, which certainly includes the words "pharmaceutically acceptable fluid," but it continues "consists of polyethylene glycol" and then optionally the other components.  And I've --

Well, you asked again, so I'm trying to clarify.  And then in those paragraphs that I refer to -- and I can keep going, because I talk about this --

Q    I understand --

A    -- throughout --

MR. SCHULER:  Don't interrupt him.

MR. LIEF:  No.  No.

A    -- any explanation of how the skilled person would understand that limitation.

Q    Is it your view that the "pharmaceutically acceptable fluid" phrase before the words "consisting of" is defined by the words that follow "consisting of"?

MR. SCHULER:  Object to the form.  And also, repeat that his reports speaks for

themselves.

11:33:16

THE WITNESS:  Yeah, I don't think I used -- and, again, it looks like you're not referring to anything specific.  I don't recall using the word "defined."  I think I've explained how I think the skilled person would understand this and why.  But if there's someplace where I use the word "defined," we should clarify.

11:33:17
11:33:17
11:33:20
11:33:22
11:33:28
11:33:32
11:33:36

Q    I think you just, in your prior answer, defined it that way.

11:33:39
11:33:41

But to ask it differently, do "pharmaceutically acceptable fluids" have any additional definition beyond "solvents," to your understanding, in this case?

11:33:42
11:33:46
11:33:53
11:34:00

MR. SCHULER:  Object to the form.

11:34:03

A    I mean, I use different terms.  I believe "carrier" is another term, "vehicle." But, I mean, it's really throughout my reports, I'm explaining how the skilled person would understand.

11:34:09
11:34:14
11:34:17
11:34:21
11:34:23

And, again, it's not just that -- those three words; it's the limitation.  And for all reasons I mentioned, I would just refer to my previous answer.  This is how the skilled person would understand.  They are solvents.

11:34:24
11:34:27
11:34:31
11:34:33
11:34:37

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                              82

Q    Exactly.                                          11:34:44

A    No, those are solvents.                           11:34:44

Q    Exactly.                                          11:34:46

A    It's not a def- -- okay.                          11:34:48

Q    Okay.                                             11:34:49

A    Literally, that's --                              11:34:49

Q    That's your position, correct?                    11:34:53

A    I literally -- I literally said this              11:34:54
in -- where is it now?  Oh, sorry.                     11:34:58

Q    It's fine.                                        11:35:04

A    I literally said this in a previous               11:35:05
answer that those -- at the very beginning of my       11:35:06
report and throughout that those five components       11:35:10
are solvents for bendamustine, that one has to         11:35:14
understand the limitation in the context as a          11:35:18
whole and not pull apart words, per se.                11:35:23

Q    Okay.                                             11:35:27

A    If that answers your question,                    11:35:28
hopefully.                                             11:35:29

Q    I think it does explain your position.            11:35:30

A    Okay.                                             11:35:33

Q    Now, given that answer, isn't it fair             11:35:33
to say that your understanding of the three            11:35:37
words, "pharmaceutically acceptable fluid,"            11:35:42
depends on what follows the words "consisting         11:35:48

of"?                                                         11:35:51

MR. SCHULER:  Objection to the form.                         11:35:53
And you're continually misstating his prior                  11:35:54
testimony.  It's -- but go ahead.                            11:35:56

A    I would just answer again.                              11:36:04

I looked at all the intrinsic evidence here,                 11:36:08
including that specific limitation, the whole                11:36:15
limitation, which I've summarized.  I actually               11:36:18
didn't repeat the whole one, but I've summarized             11:36:22
it.  I think we know what we're talking about.               11:36:25

I discuss it multiple places, starting                       11:36:28
towards the beginning of my opening report.  And             11:36:30
we can go through all of that.  I have a lot --              11:36:32
lot of discussion.  It's an important aspect of              11:36:35
the case.                                                    11:36:38

Q    For purposes of this case, have you                     11:36:39
formed any view of what the word "fluid" alone               11:36:43
means in the claim?                                          11:36:49

MR. SCHULER:  Objection.  His reports                        11:36:55
speak for themselves.                                        11:36:56

A    Well, we can keep going.  I started at                  11:37:25
the beginning, but we can keep going through my              11:37:27
opening report, Exhibit 2.                                   11:37:30

I have a whole section on "pharmaceutically                  11:37:35
acceptable fluid," starting on page 67.  So you              11:37:38

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                84

asked specifically about the word "fluid." "Fluid" is part of that phrase, which is part of the whole limitation, which includes the specific five solvents in that limitation.

And, I mean, I can go through this, but it's basically what I said before. It's understood as part of the limitation as the skilled person would understand it as I've elaborated. Again, I think it's in each of my reports.

And I don't mean just to summarize. If you'd like me to go through, I gather you don't. But that's a summary of what's in my reports.

Q   Would you agree with me that the ordinary meaning of the word "fluid" would not be "solvents" in science?

MR. SCHULER:  Object to the form.

A   What -- do you have a particular context in mind?

Q   In the pharmaceutical field. You would agree that the word "fluid" means liquids or gases, right?

MR. SCHULER:  Object to the form. You mean in the pharmaceutical field?

A   I --

MR. SCHULER:  Your question wasn't

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    85

clear.                                                    11:39:13

But do you understand it?                        11:39:13

A    I thought I understood your question        11:39:16
was:  In the pharmaceutical fluid, does fluid --        11:39:18

Q    Pharmaceutical fluid?                        11:39:22

A    In the pharmaceutical field --              11:39:23

Q    Let's start over.  Let's start over,        11:39:25
because we're going around a little bit here.            11:39:27

In the pharmaceutical field, the ordinary            11:39:28
definition of the word "fluid" would be liquids          11:39:33
or gases, correct?                                       11:39:37

A    So I -- now I'm moving ahead to my          11:39:59
responsive expert report, which is Exhibit No. 5,        11:40:02
because I address this directly responding to            11:40:07
Dr. Crowley.  I'll wait until you get there.             11:40:12
It's page 21.                                            11:40:16

And I literally address this right here.             11:40:18
Well, this is liquid equals fluid, and I address         11:40:22
that.  And I can go through this.                        11:40:26

Q    I'd rather you not.  It takes too long.     11:40:34

A    Okay.  But the point -- just the point      11:40:36
is that the skilled person is going to understand        11:40:38
this within the context, pharmaceutical context,         11:40:41
the context of the patents as discussed, the             11:40:46
specification and the file history, and not just         11:40:51

dictionary definitions or definitions from

physics, per se.  That's a summary, but I state

it in my report.

Q    But my question is different.  My

question is:  Stepping outside of these patents

for a moment, you would agree that the ordinary

meaning of "fluid" is a liquid or a gas, in

science?

MR. SCHULER:  Object to the form.

A    In the context of, for example,

physics, as referred to -- Dr. Crowley refers to

Landau and Lifshitz' volume on the subject.

There are dictionary definitions.  Well, I guess

in aeronautics it's probably primarily just a

gas, so I think it depends on the context.  And

whatever "ordinary" means, I mean, I think this

is the ordinary understanding within the context

of the patents.  If you have some other context,

we can discuss that.

Q    Again, for this question, I'm asking

you to step outside of the patents-in-suit and

just in the pharmaceutical field, the ordinary

meaning of a "fluid" is a liquid or a gas.  You

would agree with that, right?

A    I'm not sure I can agree with that.  If

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    87

you have some reference in mind, I think we can                11:42:33

discuss it.  I think it depends on the context                 11:42:35

also in pharmaceuticals or anywhere in science.                11:42:39

    Q    Is there any context in pharmaceutics      11:42:44

that you would agree that the ordinary meaning of              11:42:45

a "fluid" is a liquid or a gas?                                11:42:48

    A    I would have to look into that.  Maybe      11:42:55

references.  My point is that this is what this                11:43:02

limitation means here, as I've explained                      11:43:05

throughout my reports.  We could go to any of                 11:43:09

them.                                                         11:43:11

    Q    And --                                      11:43:11

        MR. LIEF:  Why don't we mark as Trout       11:43:21

Exhibit 8 an international published patent                    11:43:25

application, WO2015/095533.                                    11:43:32

        (International Patent Application            11:43:38

    WO 2015/095533 marked Exhibit 8.)                 11:43:38

        MR. SCHULER:  Did you say 8?                11:43:49

        MS. SPARSCHU:  Yes.                         11:43:51

        COURT REPORTER:  Yes.                       11:43:52

        THE WITNESS:  Thank you.                    11:43:53

BY MR. LIEF:                                                   11:43:54

    Q    With respect to Trout Exhibit 8,           11:43:55

Dr. Trout, have you seen this before?                         11:43:56

    A    I've certainly seen the content of         11:45:03

this.  I'm not sure, sitting here, if I've actually seen this particular document, but certainly --

Q   Am I correct that on this patent application, you are listed as one of the coinventors?

A   Yes.

Q   Okay.  And the applicant is the Massachusetts Institute of Technology?

A   Yes.

Q   And when a patent application goes in with your name on it, I take it you review it?

A   Yes.

Q   And you wouldn't let something go through to the patent office that was false?

A   That's certainly not the intention.  Mistakes can happen, as we've discussed earlier this morning.

Q   If we look at what is page 20 of this document, as a first matter, this -- the invention recited here is a pharmaceutical invention, correct?

A   So this is from over ten years ago.  I'd have to refresh my memory.  I believe this is certainly intended to be in the pharmaceutical

11:45:05
11:45:09
11:45:13
11:45:14
11:45:18
11:45:21
11:45:29
11:45:30
11:45:32
11:45:37
11:45:38
11:45:41
11:45:51
11:45:53
11:45:56
11:46:01
11:46:06
11:46:09
11:46:10
11:46:14
11:46:20
11:46:24
11:47:12
11:47:15
11:47:26

area, at least related to it.  But it's broader.  11:47:28

It's for controlling crystallization, so it's  11:47:32

more like for a process.  I think we were  11:47:36

developing this as -- again, I haven't refreshed  11:47:42

myself, but just flipping through, I think we  11:47:46

were developing this for a potentially  11:47:48

process-type application, controlling  11:47:52

crystallization.  11:47:56

Q    Any other industry other than the  11:47:58

pharmaceutical industry that this would apply to?  11:48:00

A    Well, I mean, certainly chemicals,  11:48:07

broadly.  Doesn't have to be pharmaceutical  11:48:14

chemicals.  There are a lot of applications in  11:48:19

fine chemicals, potentially die manufacturing.  11:48:22

Unfortunately, I'm not sure if this went  11:48:25

anywhere in any industry, but it was, I thought,  11:48:27

an interesting idea.  11:48:29

But, yeah, this can be generally applied.  11:48:33

It's certainly not limited to the pharmaceuticals  11:48:36

as a whole.  11:48:40

Q    Okay.  11:48:42

A    But I see now -- again, I'm refreshing  11:48:42

myself.  It looks like Claim 1 specifically does  11:48:45

say "pharmaceutically active agent."  But at  11:48:48

least the technology could be more broadly  11:48:51

implied.

But as I said, it's within the pharmaceutical field. That was certainly our intent.

Q And, again, if you go to page 20 of this document, and if you look around line 30, there's a paragraph there. I'll read it to you. It will go over to the next page.

"As used herein, a 'fluid' is given its ordinary meaning; i.e., a liquid or a gas. A fluid cannot maintain a defined shape and will flow during an observable time frame to fill the container in which it is put. Thus, the fluid may have any suitable viscosity that permits flow."

And it goes on. But did I read that part of page 20 correctly?

A Yes, I believe so.

Q And that's from the patent that you're a coinventor on.

Do you disagree that that is the ordinary meaning in science of the word "fluid"?

A Just to make sure I give you an accurate answer, to save some time, can you point me to where "fluid" is referred to in here?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    91

Because I just don't remember the specifics from 20 -- this was probably I saw it before -- well, 2014 at least.

Q    Well, I think that's where it's referred to, what I read you, is the most prominent place that I saw it.

A    But I would want to see where else it's referred to.

First of all, is it referred to anywhere else?  I can go through it, if you'd like.

Q    I mean, I think the question is more general.  It's -- you don't dispute that that's the ordinary meaning in science of the word "fluid"?

Why don't I point you to page 41.

A    Okay.  Thank you.

Q    And if you look at, for instance, as an example, Claim 47 on page 41.  You see -- I'm sorry.  46.  It says "A method comprising crystallizing a pharmaceutically active agent in a fluid droplet."

Do you see that?

A    Yes.  Give me a second to familiarize myself with this so I can accurately answer your question.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    92

Okay.  So just flipping through, I think
what we've done here is made droplets with
polymers to help facilitate crystallization, and
so the "fluid" here -- I don't dispute what's
written here -- has the physics terminology.  The
point is creating these droplets.  Frankly, I
think it's primarily liquid, but best as I can
remember.  But -- so it's referring to the
physics definition, and that's what it means by
ordinary meaning.

Q    It doesn't say the word "physics"
definition.  It just says "ordinary meaning,"
right?

A    That's right.  But the point is why I
said someone has to look at the context, so it's
referring in the previous paragraph also to a
droplet.  So the point is that these are
droplets, which are not necessarily spherical.
But that's what it's referring to as "fluid"
droplet.  And there are different fluids.  So
it's acting as a fluid, something that flows.
That's the point here.

These are not -- in the '248 and the '214,
as I said, these are not process claims, per se.
And one has to understand the whole -- as I've

11:53:40
11:53:43
11:53:56
11:54:00
11:54:07
11:54:12
11:54:15
11:54:20
11:54:24
11:54:31
11:54:33
11:54:35
11:54:37
11:54:43
11:54:46
11:54:49
11:54:52
11:54:55
11:55:01
11:55:06
11:55:08
11:55:13
11:55:16
11:55:19
11:55:24

been saying, the whole limitation that we've been    11:55:29

discussion, not just pull out one word, but    11:55:32

understand the whole limitation in its context.    11:55:35

Q    You don't disagree, though, that the    11:55:38

general definition of the word "fluid" is a    11:55:41

liquid or a gas?    11:55:44

A    I don't disagree that that's a    11:55:50

definition, for example, in physics and    11:55:52

dictionaries we've discussed.  I think the    11:55:55

skilled person has to understand what the    11:55:59

particular use is in the context, as I've been    11:56:01

saying, including in the '214 and the '248    11:56:06

patents, which is as I've been discussing in    11:56:10

answering your questions and throughout my    11:56:14

reports.    11:56:17

Q    Now, in this patent that you are the    11:56:19

coinventor of, the fluids that -- where the    11:56:22

crystallization occurs are also solvents, aren't    11:56:27

they?    11:56:30

MR. SCHULER:  Object to the form.    11:56:32

A    I'm happy to answer your questions.    11:56:36

Like I said, I'm not familiar -- I just don't    11:56:39

remember the details from so long ago.  As you    11:56:43

noted, it's a publication.  I don't know its    11:56:47

status, but from close to 12 years ago.  I think    11:56:52

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    94

if we're going to talk about specifics, I'll have to review it in detail.

Q    That's okay.

A    I'm happy to do that, but I think I answered your question about the fluid and importance of context.

Q    Okay.

A    But I can go through it if you want me to in more detail.

Q    Not right now.

And I believe you also have said in your opinions that one of the reasons you assign the word "solvent" to the "pharmaceutically acceptable fluid" is because the examiner in the file histories for these patents used the word "carrier"?

        MR. SCHULER:  Can you stop misrepresenting his testimony?

        MR. LIEF:  Counsel --

        MR. SCHULER:  He keeps having to answer the same question over and over again by saying --

        MR. LIEF:  Counsel, you have to stop doing that.  You have to stop doing that.

        MR. SCHULER:  I'm trying to facilitate

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    95

the deposition going forward.                          11:58:21

MR. LIEF:  You're not.  You're          11:58:22
disrupting.                                            11:58:23

MR. SCHULER:  You express frustration   11:58:24
because you say he keeps repeating his answers.        11:58:25
Because you misrepresent his testimony.  His           11:58:26
testimony is not that he's putting the word            11:58:26
"solvent" in the "pharmaceutically acceptable          11:58:28
fluid."  He keeps saying, "I'm construing the          11:58:30
entire phrase as a whole," and you keep forming        11:58:33
questions saying, "I believe one of the reasons        11:58:35
that you say that you substituted the word             11:58:37
'solvent'" --                                          11:58:39

MR. LIEF:  Counsel, if you have no      11:58:40
position on what "fluid" or "pharmaceutically          11:58:41
acceptable fluid" mean at all, then I assume that      11:58:43
our construction is the only construction on the       11:58:47
table.                                                 11:58:50

MR. SCHULER:  We stipulated to the --   11:58:51

MR. LIEF:  Yeah, we stipulated to       11:58:54
something that didn't define the word "fluid."         11:58:55
And so we said a fluid is a fluid --                   11:58:57

MR. SCHULER:  But even your definition  11:59:00
doesn't apply to sodium hydroxide, so it               11:59:01
doesn't -- I don't see how it's a live --              11:59:04

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    96

MR. LIEF:  So says you, Counsel.

MR. SCHULER:  What do you mean, so says me?

MR. LIEF:  Exactly what I said.

MR. SCHULER:  It's a solid.

MR. LIEF:  We're going to get to that, which is also amusing.

But, you know, in a deposition, Counsel, you've done this now -- this is the third deposition you've done this, and I'm just noting it because --

MR. SCHULER:  I'm noting your frustration at him repeating his answers.

MR. LIEF:  I'm not frustrated.  I'm asking questions.

MR. SCHULER:  Okay.  I'll let him repeat his answer, then.

MR. LIEF:  I'm just asking questions.

BY MR. LIEF:

Q    All right.  For instance, why don't we take a look at your reply report.

Do you have that?

A    I have to get the marked one.  Hold on.

Okay.

Q    If you look at your reply report,

there's a paragraph 131 in there.  11:59:53

MR. SCHULER:  131?  11:59:55

MR. LIEF:  Yeah.  11:59:55

BY MR. LIEF:  11:59:55

Q  And I'm going to read you roughly the  11:59:59
first four lines of that.  12:00:01

A  Hold on.  12:00:03

Okay.  I'm there.  12:00:10

Q  And it says:  "The examiner's  12:00:11
subsequent treatment of the amended claims  12:00:14
further confirms this understanding.  In  12:00:16
evaluating the claims against the written prior  12:00:19
art reference, the examiner -- who I understand  12:00:23
is presumed to be a POSA -- characterized the  12:00:26
pharmaceutically acceptable fluid as 'the liquid  12:00:31
carrier for the ultimate dosage form'; i.e., the  12:00:36
solvent."  12:00:42

Did I -- first, did I read that correctly  12:00:44
from your reply report?  12:00:47

A  Yes.  12:00:52

Q  And there, am I incorrect in saying  12:00:53
that you are equating the word "carrier" with  12:00:57
being a solvent?  12:01:05

A  I don't think it's -- I mean, you could  12:01:20
call it equating, but I'm not just equating one  12:01:22

word with another.

When I say the "pharmaceutically acceptable fluid," I am referring to it in the context of the full limitation in the patents that we've been discussing.  And this section -- and you did read those lines correctly, but they also refer to subsequent -- well, I guess both -- well, previous and subsequent paragraphs.

Q    Let's take a look at something else. Okay?

A    Okay.  But just to finish the answer.

So that's in this context.  It's in the context of the section as a whole and referring to the "pharmaceutically acceptable fluid" limitation, which also includes the five solvents there.

Q    Let's take a look at your rebuttal report, which is from round two, which also addresses this.

MR. SCHULER:  Exhibit 8?  7?

MR. LIEF:  Do you have that?

MS. WELSH:  5.

MR. LIEF:  5 is the rebuttal report.

BY MR. LIEF:

Q    Do you have that?

12:01:29
12:01:33
12:01:39
12:01:42
12:01:45
12:01:52
12:01:55
12:01:59
12:02:02
12:02:03
12:02:04
12:02:07
12:02:12
12:02:16
12:02:21
12:02:24
12:02:26
12:02:27
12:02:30
12:02:34
12:02:39
12:02:42
12:02:43
12:02:44
12:02:45

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                99

A    It says "responsive."  That's the same?    12:02:46

Q    Responsive.  Yes.  Responsive report.    12:02:48

A    Okay.  I have 5.    12:02:50

Q    Okay.  And if you look at paragraph 116 in that report, I'm going to read you this.    12:02:52 / 12:02:54

A    Just one second, please.    12:03:12

Okay.  Thank you.    12:03:16

Q    Okay.  In paragraph 116 in your responsive report, it states:    12:03:18 / 12:03:20

"As discussed supra paragraph 63, during prosecution, the examiner characterized the pharmaceutically acceptable fluid as 'the liquid carrier for the ultimate dosage form' and as 'suitable of the carriers to provide a liquid formulation of bendamustine,'" and there's a citation.    12:03:24 / 12:03:28 / 12:03:32 / 12:03:36 / 12:03:40 / 12:03:45 / 12:03:48

The next sentence reads:  "The examiner's use of 'carrier' terminology -- referring to the liquid medium that carries the active ingredient -- is standard pharmaceutical vocabulary for describing a solvent or vehicle."    12:03:49 / 12:03:53 / 12:03:59 / 12:04:03 / 12:04:06

Close quote from you.  Did I read that correctly?    12:04:13 / 12:04:15

A    Yes.    12:04:16

Q    And so, again, am I correct that you    12:04:17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

100

are pointing to the examiner's use of the word
"carrier" as evidence that the claims should be
interpreted in the limitation "pharmaceutically
acceptable fluid" to be specifically relating to
solvents?

MR. SCHULER: I'll object to the form.

A   I was following you until the
specifically relating, the relating part. Could
you clarify.

Q   You are pointing to the examiner's use
of the word "carrier" as evidence that the
"pharmaceutically acceptable fluid" limitation
should be construed as relating to solvents?

MR. SCHULER: I'll object to the form.
If by "the pharmaceutically acceptable fluid
limitation," are you using that as shorthand for
the whole limitation?

MR. LIEF: However he's using it.

MR. SCHULER: Okay.

A   I think it's fine to use it for
shorthand as long as we understand
"pharmaceutically acceptable fluid" limitation is
the full limitation, which includes those five
solvents.

And, again, here in paragraph 116 -- and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

101

this is one paragraph in a longer section, as you
pointed out, is part of an analysis in the reply
report and other places too.  And I'm looking at
the whole and prosecution history and, in
particular, the context and those -- that phrase
in quotes, and I'm explaining what's being --
what -- how the examiner is characterizing and
what the examiner is referring to.

Q    The examiner never used the word
"solvent" in that passage you're referring to; he
used the word "carrier," right?

A    Well, certainly -- I have to look
through this to see if he ever used "solvent."
But certainly in this paragraph, I am explaining
how the kit, the examiner and a POSA, examiner
also being a POSA, would understand that
"pharmaceutically acceptable fluid" limitation as
the liquid carrier for the ultimate dosage form
and the other one that you read.

So that's -- I'm explaining how the skilled
person would understand and how that's related to
that "pharmaceutically acceptable" limitation.

Q    You would agree that the word "carrier"
itself, as used in the pharmaceutical field, is
not limited to solvents?

12:05:46
12:05:50
12:05:54
12:05:58
12:06:05
12:06:12
12:06:17
12:06:21
12:06:23
12:06:25
12:06:28
12:06:52
12:06:54
12:06:59
12:07:06
12:07:13
12:07:16
12:07:20
12:07:24
12:07:29
12:07:33
12:07:36
12:07:39
12:07:42
12:07:48

MR. SCHULER:  Is not limited?

Q    Is not limited to solvents.

A    Like most terms, the context might matter.  If you have some other context, we can discuss that.

Q    Again --

A    Here, these are -- remember, Mr. Lief, these are -- and I say this throughout -- we can go to my report.  But the point is these are five solvents for bendamustine, so one has to look -- and we look at the examples and the specification, and then this is the file history, which I understand we're also supposed to look at.

Q    The five -- the five chemicals that are listed after "consisting of" that you referred to as "solvents," they would also satisfy the ordinary meaning definition of "fluid" as a liquid or a gas, correct?

MR. SCHULER:  Object to the form.

A    As I wrote it throughout the whole section in this same report, responsive report, Exhibit 5, just to summarize what I say, end of paragraph 44 on page 13:

Thus, the "pharmaceutically acceptable

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                 103

fluid" -- where "fluid" is bold, underlined -- in these claims is the solvent and the "liquid" -- italics, bold, underlined, like fluid -- "bendamustine-containing composition" refers to the physical state of the composition as a whole. So the physical state --

Q    Different question.

A    Well, the physical state -- you have this very broad -- or you or your expert was putting forward very broad physical state definitions, and I refer to the physical state here.  So certainly the physical state, the whole as a liquid and the fluid is a liquid, and the composition is a liquid as a whole.  The point is specifically what these mean in the context here of the comprising and the consisting of and as I discuss throughout my reports.

So you have this very, very broad physics definition, and a substantial part of these significant number of pages in the reports is explaining, responding, but also explaining how the skilled person would understand this limitation.

Q    The word "carrier" in the pharmaceutical industry is not limited to

12:10:13
12:10:18
12:10:21
12:10:28
12:10:33
12:10:37
12:10:38
12:10:39
12:10:43
12:10:48
12:10:52
12:10:55
12:11:00
12:11:07
12:11:10
12:11:13
12:11:19
12:11:20
12:11:24
12:11:28
12:11:31
12:11:35
12:11:37
12:11:39
12:11:43

solvents, correct?

MR. SCHULER:  Objection.  Asked and answered.

A    If you have a specific example, we can turn to that.  Context certainly matters, and I'm explaining the meaning in the context here.

Q    I'm asking a more general question about how the word "carrier" is understood, generally, in the pharmaceutical field.  And I think you will agree with me that generally it is understood that it includes solvents and to include other things as well?

MR. SCHULER:  Object to the form.

A    If you have some -- something specific, we can look at that and discuss that.  Context matters.  It might mean different things in different contexts.

Q    Does the general --

A    I think it's clear what's meant here and what I mean in this, in the context of the file history.

Q    Does the general definition of a word change in different contexts?

Is that your testimony?

A    I don't think --

12:11:46
12:11:48
12:11:48
12:11:53
12:11:56
12:12:03
12:12:05
12:12:08
12:12:11
12:12:15
12:12:20
12:12:23
12:12:27
12:12:28
12:12:31
12:12:35
12:12:38
12:12:39
12:12:40
12:12:42
12:12:45
12:12:47
12:12:52
12:12:53
12:12:59

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

105

MR. SCHULER: Object to the form. 12:13:01

A I don't think that's what I said. I think you're not quoting me. What I said is the context matters. And, frankly, I think it's -- and I also talk about Slayback's use of the term. I think it's undisputed that these are all solvents in this limitation and that it's a solvent for bendamustine and it's a carrier, the pharmaceutically acceptable fluid...

MR. LIEF: Let's mark as, I believe it's Trout Exhibit 9, a document which is an international published patent application WO2012/065082.

(International Patent Application WO 2012/065082 marked Exhibit 9.)

MR. LIEF: We'll mark that as 9.

THE WITNESS: Thank you.

BY MR. LIEF:

Q And with respect to Trout Exhibit 9, Dr. Trout, am I correct that you are named as the first inventor on this international patent application?

A I'm looking at the cover page. That looks like my name, yes.

Q And I'd like you to turn to what is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026          106

page 15 of this document, and at around line 9,          12:15:05

do you see that begins "The phrase          12:15:22

'pharmaceutically acceptable carrier'"?          12:15:24

    Do you see that?          12:15:27

    A    Yes.          12:15:32

    Q    Okay.  And it reads, and I'll read you          12:15:33

the relevant part of this:          12:15:37

    "The phrase 'pharmaceutically acceptable          12:15:37

carrier' as used herein means a pharmaceutically          12:15:42

acceptable material, composition, or vehicle such          12:15:46

as a liquid or solid filler, diluent, excipient,          12:15:52

solvent, or encapsulating material involved in          12:15:58

carrying or transporting the subject chemical          12:16:03

from one organ or portion of the body to another          12:16:08

organ or portion of the body."          12:16:10

    Did I read that correctly?          12:16:15

    A    Yes, I think you did.          12:16:21

    Q    And so while a solvent is one part of          12:16:23

what a carrier can be, there are other things          12:16:29

that a carrier can be?          12:16:32

        MR. SCHULER:  Object to the form.          12:16:35

    A    Again, it's defined here very broadly.          12:16:49

I'm just trying to recall.  This is from 2010, so          12:16:56

this is even older.  This is specifically -- I'd          12:16:59

have to look through this, but -- more -- but          12:17:05

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                   107

this specifically refers to transporting the                    12:17:10

chemical from one organ or portion of the body to               12:17:14

another organ or portion of the body.  So I think               12:17:17

it's a carrier in that sense, as opposed to a                   12:17:21

formulation carrier.                                            12:17:25

        Q    You wouldn't -- you wouldn't call this             12:17:27

relevant to an intravenous formulation?                         12:17:30

            MR. SCHULER:  Object to the form.                   12:17:35

        A    Sorry?                                             12:17:40

        Q    You wouldn't say that what I just read             12:17:41

you is a definition of "carrier" that would be                  12:17:43

relevant to an intravenous formulation?                         12:17:46

            MR. SCHULER:  Same objection.                       12:17:53

        A    I'd have to go through this.  I'm                  12:17:55

just -- I'm not sure.  But it's defined here in                 12:17:57

this context, and it's specifically talking                     12:18:00

about -- what you read is specifically talking                  12:18:05

about carrying or transporting the subject                      12:18:08

chemical from one organ or portion of the body to              12:18:11

another organ or portion of the body.                           12:18:14

        And I'd have to review this document, but --           12:18:18

        Q    The --                                             12:18:24

        A    -- the carrier that I referred to in my           12:18:24

reports with respect to the examiner is for the                12:18:28

formulation.                                                    12:18:31

Q    For an intravenous drug?          12:18:33

A    Yes.  But my point is it's for the          12:18:38
formulation, so it's a carrier with respect to          12:18:41
the formulation, as opposed to carrying it from          12:18:46
one organ or portion of the body to another organ          12:18:49
or portion of the body.          12:18:53

But at any rate, I understand that a patent          12:18:54
can define its own terms.          12:18:59

Q    Well, do you think the definition in          12:19:02
Trout Exhibit 9 is a departure from the general          12:19:05
meaning of the word "carrier"?          12:19:13

A    Again, it's coming back to me, but I          12:19:37
don't remember the details.  If maybe you know          12:19:42
where I -- where we actually have that -- use          12:19:47
that term, it could help save some time and          12:19:52
understanding, because I think it's really          12:19:56
depending on this specific -- it's like a general          12:19:59
definition specific to this context, but then in          12:20:01
that general definition, it has that specific          12:20:05
term, which means transporting from one organ to          12:20:08
another.          12:20:17

Q    Let's set that one aside.  I have          12:20:17
another one for you.          12:20:20

A    Okay.          12:20:21

MR. LIEF:  Why don't we mark as Trout          12:20:22

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                          109

Exhibit 10 a document that is an international    12:20:23

patent application, WO2010/141902.  That will be  12:20:32

Trout 10.                                         12:20:43

            (International Patent Application     12:20:46

    WO 2010/141902 marked Exhibit 10.)           12:20:46

BY MR. LIEF:                                      12:20:55

    Q    With respect to Trout 10, can you       12:20:55

confirm for me that you are listed as one of the  12:20:57

coinventors of this application?                 12:21:01

    A    Looking at the cover page, yes.         12:21:13

    Q    Will you turn to page 51 of this        12:21:20

document.  There's a paragraph at the bottom      12:21:22

there, 00163.                                     12:21:33

    Do you see that?                             12:21:35

    A    Yes.                                     12:21:40

    Q    And it says:                            12:21:42

    "As used herein, 'pharmaceutically           12:21:43

acceptable carrier' includes any and all          12:21:46

solvents, dispersion media, coatings,            12:21:50

antibacterial and antifungal agents, isotonic and 12:21:54

absorption-delaying agents and the like that are  12:21:59

physiologically compatible.  Preferably, the      12:22:04

carrier is suitable for intravenous,             12:22:08

intramuscular, subcutaneous, parenteral, spinal,  12:22:12

or epidermal administration (e.g., by injection   12:22:16

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

110

or infusion)."

Did I read that part of paragraph 00163 correctly?

A    Yes, noting that paragraph 163 continues, and depending on the route of administration, it continues there.  It's showing this is for immunoglobulins.

Q    And when it says "dispersion media" in there, it says a carrier "can include any and all of solvents, dispersion media," and it goes on with other categories.

Dispersion media are not solvents, correct?

A    Just for curiosity -- not for curiosity, but to understand how it's used, do you know how it's used?

Have you found its use in the actual rest of the patent?

Q    It's your patent.  Maybe you can tell me.

A    I can tell you, but it's from 2010, and I'd have to go through it.  But I can tell you this is -- looks to be a very general definition here.  I'm not sure if it's used at all.

Q    But --

A    But to understand it, it would be

12:22:21
12:22:25
12:22:28
12:22:33
12:22:36
12:22:41
12:22:43
12:22:47
12:22:55
12:22:57
12:23:01
12:23:03
12:23:27
12:23:30
12:23:32
12:23:36
12:23:39
12:23:41
12:23:44
12:23:46
12:23:51
12:23:55
12:24:00
12:24:05
12:24:05

important to understand how it's used.

Q    I think the point is that the general definition of "carrier" is not limited to solvents?

MR. SCHULER:  Object to the form.

A    By "general," I mean a very broad definition.  The patentees, me being one of them, can define terms.  And as I've been saying all along, the context matters.  And so all of these patents -- World Intellectual Property Organization PCT applications are in their specific context, which is different from the '214 and the '248 patents.

Q    This is in the context of intravenous injections, though, correct?

MR. SCHULER:  Object to the form.

A    The best as I can recall, which is kind of looking through the claims again, I think the focus is actually -- of this invention was subcutaneous administration.  I understand -- that's why some of these background terms are very broad.  I'm not sure if that term is used at all.  I don't even see it used in the claims, which look like they're all claims to a particular set of immunoglobulins.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                    112

Q    It's for injections, though, right?

A    I think the administration would be subcutaneous injection, or that's the aim, which is certainly a type of injection.  It's not IV. The point of this is not to do IV, except really the point of this is claiming new classes of these biologic molecules.

Q    Now, when you make an intravenous injection, is it that -- is it your view that all intravenous injections must be solutions?

MR. SCHULER:  Object to the form.

A    I think that one doesn't want to make -- one should be careful, I should say, making broad generalizations, because there are often exceptions.  In general, and I think it's clear in the context of the patents, and as I'm speaking as a pharmaceutical scientist, one does not want to introduce anything but liquids in an intravenous delivery.  There can be exceptions to that.

But I think the context here of the '214 and '248 would be -- well, literally the beginning is that it's a liquid.  The beginning of the claims. Sorry.  That it's a liquid.

Q    Is it possible to have a liquid

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                      113

composition that is not a solution?                    12:29:18

        MR. SCHULER:  Object to the form.          12:29:24

   A   Again, I think it depends on the          12:29:33

context and the ways in which certain terms are        12:29:37

used.  There are other types of formulations.          12:29:42

There are solids, gases, mixtures thereof.  These      12:29:50

two patents, the '214 and the '248, are specific       12:30:04

to liquids.  The claims, I should say, are             12:30:08

specific to liquids.                                   12:30:12

   Q   All right.  I think we agree that         12:30:13

they're specific to liquids.  I think the              12:30:15

question is:  Can you have a liquid that,              12:30:17

although it's a liquid, is nonetheless not a           12:30:22

solution?                                              12:30:25

        MR. SCHULER:  Do you mean in the           12:30:26

pharmaceutical context?                                12:30:27

        MR. LIEF:  Yes.                            12:30:28

   A   Again, there could be uses -- terms are   12:30:34

used in particular contexts and mean particular        12:30:40

things.  If you have examples, we can talk about       12:30:44

those contexts.                                        12:30:47

   In general, a liquid is like the liquid     12:30:52

here, which does not encompass physical mixtures       12:30:54

of -- well, solids in particular.  Probably            12:31:00

not -- and not gases either.  So generally, as a       12:31:03

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                          114

formulation scientist, it's not what you want to

inject by intravenous.

Q    Your view is that the invention here

does not encompass dispersions.

MR. SCHULER:  Object to the form.

A    Do you mean solid dispersion, like

they're solid particles?  I mean -- what do you

mean by "dispersion," solid dispersion, you mean

solid particles in the sterile -- for example,

the sterile vial containing a liquid

bendamustine-containing composition?

Q    Yeah.  As one example.  In your view,

could the current claims in the patents-in-suit

encompass that type of dispersion?

MR. SCHULER:  Object to the form.

Incomplete hypothetical.

A    I don't think the intention is for,

let's say, solid bendamustine material or

extensive solid bendamustine material.  It's

meant, as I said, as it says, as a liquid.  It

doesn't say dispersion.

There can be particulates similar to

impurities that we've discussed, and there are

limits on particulates and whatnot, but it's

going to be a liquid.  So the bendamustine is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

115

going to be dissolved in the context of the '214 and the '248 patents.

Q    And so you associate liquid with solution, correct?

MR. SCHULER:  Object to the form.

A    Well, so I think it's important not to oversimplify and say I'm associating one term with another.

I have a -- just simply as such.  That's why I've done the analysis here.  And I think I already referred to the section on page 21 of my responsive report, Exhibit 5, in which the header is "The Relevant Inquiry is Function."

MR. SCHULER:  Which exhibit?

MR. LIEF:  5.

THE WITNESS:  I'm sorry.  Exhibit 5. The responsive report, Exhibit 5.

A    And I talk about the liquid physical state.  Page 21, paragraph 66.  And I discuss the meaning of liquids here.  I can go through it. And then also fluids.  I discuss the meaning of the claims, the '214 and '248.

Q    But I believe that your view is that the invention and the claims of the patents-in-suit require that everything be

dissolved, that it not be dispersed, that it be dissolved.

MR. SCHULER: Object to the form.

A As far as everything, it's intended to be a solution. And as opposed to having solid particles, a significant number of solid particles or components, a significant fraction is -- the focus being on the solid particles. So it's meant to be a liquid.

And, again, it doesn't mean there's going to be a limitation on certain fraction of particulates. So it doesn't mean they're completely absent, but like impurities, they're not -- the key component is not the intention. It's meant to be a liquid.

Q Now, in terms of dispersions, we've talked about dispersions that have solid particulates in them.

It's also the case that a dispersion can be two liquids that are not really dissolving in each other. Sort of a biphasic emulsion would be a type of dispersion, correct?

MR. SCHULER: Object to the form.

A I guess it depends on the context and how you want to define those. I think I discuss

12:34:49
12:34:55
12:35:00
12:35:06
12:35:11
12:35:17
12:35:22
12:35:25
12:35:29
12:35:34
12:35:36
12:35:40
12:35:43
12:35:47
12:35:53
12:35:55
12:35:58
12:36:00
12:36:02
12:36:06
12:36:10
12:36:16
12:36:18
12:36:23
12:36:26

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                117

this in my reply report.  Oh, I'm sorry.  I keep    12:36:31

going to the one that I brought as opposed to the    12:36:35

one that's marked.    12:36:37

So Trout Exhibit 4.  If you have this    12:36:39

marked, it may save some time in my finding this,    12:37:13

but I certainly discuss this here in the context    12:37:17

of the patents.    12:37:19

Q    Is this your reply report?    12:37:21

A    Yes, it's my reply report, Exhibit 4.    12:37:26

Anyway, maybe it's in the earlier one when I    12:38:31

specifically talk about the liquid.  But the    12:38:34

point is that I don't think that this encompasses    12:38:37

an emulsion, per se, defined as two different    12:38:42

liquids which are -- and I'm finding this, but --    12:38:49

for which there's macroscopic inhomogeneity.    12:38:55

Q    When you say "this" does not encompass,    12:39:02

I take it what you're referring to is the claims    12:39:03

in the patents-in-suit?    12:39:07

A    Yes.  I apologize.  To be more    12:39:08

accurate, yes.  The claims in the '214 -- well,    12:39:10

the claims in the '214 and the '248 patent that    12:39:15

are being asserted.    12:39:19

Q    Okay.    12:39:20

A    So it's a liquid.  That's how it's    12:39:21

defined at the beginning.  I think I discuss it    12:39:23

probably more in the responsive report.  We can find that, if you'd like.  But I refer to my discussion there.

Q   And that type of emulsion that you're thinking of that is not within the claims, that is its own type of dispersion, correct, in pharmaceutical language?

MR. SCHULER:  Object to the form.

A   Again, you're asking very broad questions.  You don't have a particular context?

Q   No.  It's just the general definitional question, that emulsions fall within a category of dispersions.  They're a type of dispersion, correct?

MR. SCHULER:  Object to the form.

A   I think it depends on the context.  If you have a particular context in mind, we can refer to that.  I'm thinking of emulsions as, again, having -- being liquid -- in liquid with macroscopic inhomogeneity.

Q   And whatever you call that, those liquids would not be dissolved in each other when you don't have macroscopic homogeneity between two liquids?

MR. SCHULER:  Object to the form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                           119

A    Again, you're asking very high-level questions, but as I'm understanding you're asking about emulsions, they wouldn't be dissolved in each other.  They'd be individual droplets or whatever we want to call them.  This is to a liquid.

Again, it doesn't mean that there's not -- that the claims, the asserted -- the claims, all the claims of the '214 and the '248, wouldn't allow a small number of, you know, inhomogeneous droplets in there.  Again, there's going to be impurities.  Thinking of solid, liquid impurities, whatever.  But there's going to be a small number.

Q    And if you had an emulsion of two liquids that didn't dissolve in each other, they would still be liquids, though, right?

MR. SCHULER:  Object to the form.

A    Again, I think it depends on the context, how terms are used.  The term "liquid" here is referring to the compositions as I've been describing them, understanding clearly from the context, including the claims themselves, the specifications, and the file history.

Q    But outside of the context of the

12:40:58
12:41:01
12:41:05
12:41:09
12:41:14
12:41:18
12:41:18
12:41:22
12:41:25
12:41:30
12:41:38
12:41:41
12:41:46
12:41:48
12:41:50
12:41:56
12:42:00
12:42:09
12:42:10
12:42:13
12:42:18
12:42:24
12:42:28
12:42:32
12:42:38

patents, if you had an emulsion, both liquids would be considered liquids?

MR. SCHULER: Outside of the context -- object to the form. It's completely circular.

A You're making a tautology.

Q Let me rephrase.

A Okay. Fine.

Q Again, outside of the context of the patents but in the pharmaceutical field, when you say an emulsion of two liquids, the fact that they don't dissolve in each other doesn't change the fact that they're still considered liquids as a matter of the state of matter they're in?

MR. SCHULER: Same objection.

A Again, when you ask questions about states of matter, that's at an extremely broad, very high level.

My point is I think people would generally call emulsions exactly as we've been calling them, emulsions. But we've talked about lots of contexts. Words are used with different meanings in different contexts, and they could be used -- it could be called a liquid in some contexts. If you have a specific in mind, we can discuss the context.

12:42:40
12:42:46
12:42:51
12:42:56
12:43:03
12:43:06
12:43:07
12:43:09
12:43:10
12:43:13
12:43:18
12:43:21
12:43:23
12:43:29
12:43:32
12:43:36
12:43:41
12:43:48
12:43:52
12:43:55
12:44:00
12:44:04
12:44:09
12:44:16
12:44:18

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026
121

Q   Let's take a look, to start, with your reply report at paragraph 24.  And I'll read that to you.

"As I explained in my main body of my opening report, a POSA would understand that the 'pharmaceutically acceptable fluid' recited in the asserted claims refers to the solvent/co-solvent system used to dissolve bendamustine and other excipients for stable liquid pharmaceutical compositions."  And there's a cite.

And then it continues:  "The specification expressly defines a 'pharmaceutically acceptable fluid' as 'a fluid which is suitable for pharmaceutical use' and further explains that the fluid to be --

MR. SCHULER:  "For the fluid."

Q   "And further explains that for the fluid to be 'sufficient' for use, it must contain the 'amount which allows the bendamustine to be dissolved.'"  And then there's a citation.

With counsel's correction, did I read that correctly?

A   Not quite.

Q   Okay.  What did I get wrong?

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026          122

A    Well, there's several citations at the

end both to my report and to the patent.  But

also, at line 5, the "pharmaceutically acceptable

fluid" term is in quotes.  I don't think you

included those quotes.

Q    True.  Okay.  So let me read that last

bit again, starting with the sentence "The

specification."  Right?

Do you see it?

A    Yes.

Q    In the middle of paragraph 24 there's a

sentence, and it reads, quoting you:

"The specification expressly defines a

'pharmaceutically acceptable fluid' as a"-- I'm

sorry -- "as 'a fluid which is suitable for

pharmaceutical use' and further explains that for

the fluid to be 'sufficient' for use, it must

contain the 'amount which allows the bendamustine

to be dissolved.'  Trout rebuttal report,

paragraph 44, '214 patent, at column 2, Lines 56

to 58, and column 6, lines 30 to 33," period.

And that ends the section I'm quoting from.

Did I read that correctly?

A    Yes.

Q    Okay.  And if I understand what you're

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                          123

saying here is that you're quoting a part of the    12:47:51

patent that says that "the amount which allows    12:47:59

the bendamustine to be dissolved," in that last    12:48:06

quote in the sentence I read.    12:48:10

    Do you see that?    12:48:11

    A   Yes.  That's a phrase from the patent.    12:48:52

    Q   And you're pointing out that, in your    12:48:54

view, that passage from the patent supports the    12:48:56

idea that the claims are referring to a liquid    12:49:01

solution?    12:49:06

        MR. SCHULER:  Object to the form.  And    12:49:09

his reports speak for themselves.    12:49:15

    A   Okay.  Now, I've looked at the    12:50:06

citations.  Could you please state your question    12:50:07

again.    12:50:10

        MR. LIEF:  Can you read that last    12:50:11

question back.    12:50:11

        (The question was read by the    12:50:12

    reporter, as requested.)    12:50:12

        MR. SCHULER:  So I object.  The reports    12:50:42

speak for themselves.    12:50:44

    A   Yeah.    12:50:53

    Q   Let me ask --    12:50:55

    A   You're changing -- I think you're    12:50:56

change the words a bit.    12:50:57

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    124

Q    Let me ask it differently.

A    Okay.

Q    Is it your view that the passage you quote from column 6 of the '214 patent supports your view that a "pharmaceutically acceptable fluid" refers to the solvent or co-solvent system used to dissolve bendamustine and other excipients?

A    I would say that the quote in column 6 is -- and this is just in my technical background.  I discuss this in many places and, as you rightly noted, refer to other reports, and there are other places in other reports -- this is a quote which talks about the embodiment in which the bendamustine is to be dissolved as opposed to dispersed.

But in particular, in column 6, it is referring to the liquid composition -- sorry -- liquid composition being ready for use.  That's not a direct quote, but those words are in there.

So the point here -- it's not just pulling out an individual phrase from a sentence elsewhere.  The point is understanding the claims in light of the patent as a whole and the file history, including the examples and the other

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    125

statements.

So that's just one phrase in the sentence in the section in the patent, which helps discuss that embodiment that's being claimed.

Q    But you do pull out that quote in your paragraph 24 in your reply report as support for the idea that the "pharmaceutically acceptable fluid" recited in the asserted claims refers to the solvent/co-solvent system used to dissolve bendamustine and other excipients, correct?

A    I think you're referring to the previous sentence.  I'm sorry.  I didn't quite follow if you read it correctly.  But I would refer to the sentence.  These are quotes from the patent and also references -- another reference to the patent and to my report related to the other sentence that you paraphrased or quoted part of in that paragraph.

Q    And the reason you quote from the paragraph -- strike that.

And the reason you quote from the patent is as support for your view of the definition of "pharmaceutically acceptable fluid"?

MR. SCHULER:  Sorry.  I object.  I don't understand the question at all.

12:53:07
12:53:07
12:53:12
12:53:17
12:53:19
12:53:21
12:53:26
12:53:29
12:53:33
12:53:37
12:53:42
12:53:48
12:53:51
12:53:54
12:53:59
12:54:03
12:54:08
12:54:13
12:54:15
12:54:17
12:54:20
12:54:25
12:54:29
12:54:35
12:54:41

MR. LIEF:  I'm simply asking him what the purpose of quoting from column 6 is.

MR. SCHULER:  That's a better question: What's the purpose.

MR. LIEF:  How about that?  I'll take your tutelage on that.  How about that.

Q    What is the purpose of quoting from column 6 in paragraph 24 of your reply report?

A    So again, the purpose of these quotes, and I refer exactly to where in the patent I'm quoting them, are to -- this is the reply report, Exhibit 4.  So this is the reply report, referring back to my opening report, where in paragraphs 131 and 132, I explain the "pharmaceutically acceptable fluid" limitation as we've been discussing, and the solvent or co-solvent system used to dissolve bendamustine and other excipients for stable liquid pharmaceutical compositions.  That's from paragraph 131 of my opening report, Exhibit No. 2.

So it's just -- that's part of -- frankly, those are particular citations, but we have no doubt seen in the four documents that are my reports, I discuss this in many, many pages.  So

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    127

we have to look at the discussion as a whole.

Q    I understand there are other arguments
you make.  But am I correct that one of the
arguments you make is that this quotation you
have from column 6, which talks about
bendamustine being dissolved, is support for the
view that the fluids are solvents?

A    I think -- I wouldn't just pull
apart -- I think it's indicative of a skilled
person's understanding.  I don't think that quote
by itself is particularly important.

I'm just saying here that the patent -- oh,
sorry.  I lost it.

The patent -- yeah, sufficient -- fluid to
be sufficient has to have a sufficient, which you
quoted, put in quotes correctly, for use, and
then it contains -- and then the phrase that you
mentioned with dissolved.

I understand that it also talks about
dispersion here, but it also talks about
dissolved.  So that's the point.  And the claims
are not to dispersions.  I think the term is
"unclaimed embodiment" or something.  But the
claims are not to dispersions; they're liquid.
So --

Q    But dispersions can be all liquids, right?  They can be?

MR. SCHULER:  Object to the form.

A    Again, if you have a particular context.  I mean, you're asking very broadly.  I think I've explained -- we can go through my reports and evidence and the POSA's understanding that the liquid in the claim, however it's defined in other contexts or dispersions can be defined as liquids, that's not what's intended here.  It's intended that the bendamustine is dissolved, and those are solvents and I've explained why.  We can go back through.  We've been discussing it quite a bit, but happy to keep going through it, if you'd like.

Q    The way this is quoted in paragraph 24, where it says "amount which allows the bendamustine to be dissolved," period -- is a misquoting of column 6, isn't it?

MR. SCHULER:  Object to the form.

A    No, I don't think that's correct.  The point is that there's an example that allows it to be dissolved or dispersed.  So "dissolved" is one of the terms that's explicitly used.  I include 30 to 33 as the reference.  I include the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    129

full paragraph.                                    13:00:45

But, again, the -- I don't think that the          13:00:48

claims, as such -- and again, I understand there   13:00:53

can be unclaimed embodiments discussed in the      13:00:57

specification, but that the claims refer to        13:01:00

dispersions.                                        13:01:02

Q    Dr. Trout, in quoting from column 6 at        13:01:07

around Lines 32 to 33, you put a period after the  13:01:12

word "dissolved," didn't you, in your reply        13:01:19

report, correct?                                    13:01:23

A    Yes.  That's the convention in the            13:01:31

English language to put the quote after the        13:01:33

period, as I learned it.  And I refer to the full  13:01:36

citation, which anyone in the case can access,     13:01:42

which you did.  And the point here is the          13:01:47

dissolved, not the dispersed.                       13:01:51

Q    Wouldn't it be appropriate to have put        13:01:55

an ellipse, because you've removed from your       13:01:58

quote the word "dispersed," and you've also        13:02:01

removed -- it says -- the actual column 6 says     13:02:04

"dissolved or dispersed to a degree, which         13:02:09

renders the liquid composition ready for use."     13:02:15

You've removed the word "dispersed" and            13:02:19

you've removed the words "to a degree" from your   13:02:22

quote without an ellipse; isn't that right?        13:02:24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                      130

MR. SCHULER:  Object to the form.                 13:02:29

A    No, that's not correct.  I haven't           13:02:30

removed anything.  I have not removed -- I've put    13:02:32

the quote as I put it.  There are lots of other      13:02:35

quotes.  "Pharmaceutically acceptable fluid" in      13:02:39

the same paragraph, which I've explained refers      13:02:44

to the full limitation, and I didn't use ellipses    13:02:48

there.  I didn't need to.  And I think it's quite     13:02:56

common to quote specific parts of patents like        13:02:59

this.  We could check.  I would -- I'm sure that      13:03:05

some of Slayback's experts do similar things.         13:03:11

But we can look at that.                               13:03:14

But anyway, that's, I think, quite normal.        13:03:15

Q    Okay.                                        13:03:23

A    I mean, just above in paragraph 23, I         13:03:23

quote "consisting of."  That's the sixth line of      13:03:27

paragraph 23.  I think we all know what I'm           13:03:35

referring to.  I don't have ellipses before or        13:03:38

after.  I think this is quite normal when             13:03:41

referring to patents.                                 13:03:47

But anyway, if there's any doubt, I                13:03:47

reference the full paragraph, cite the full -- or     13:03:52

reference the full paragraph.                         13:03:55

Q    And the full paragraph includes both         13:03:56

the concept of dissolving and also the concept of     13:03:59

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                     131

dispersing?                                                    13:04:02

A    Correct.  And here, in this context,                      13:04:14

the skilled person would understand the claims,                13:04:17

for all the reasons that I've discussed in my                  13:04:19

reports and have been discussing here, would                   13:04:23

understand that it's dissolved, that they're                   13:04:26

solvents.                                                      13:04:31

Q    And another concept that comes out in                     13:04:36

this paragraph 24 is --                                         13:04:38

A    Oh, sorry.                                                13:04:48

Q    --  another concept that comes out in                     13:04:49

paragraph 24 is that the phrase "pharmaceutically              13:04:56

acceptable" is expressly defined as "suitable for              13:05:01

pharmaceutical use" by the patent.                             13:05:09

Do you see that?                                               13:05:11

A    I'm sorry.  You're talking about my                       13:05:21

paragraph 24?                                                  13:05:24

Q    In your reply report.                                     13:05:25

A    Of my reply report, Exhibit 4?                            13:05:26

Q    Correct.                                                  13:05:29

A    Well, I think you didn't include the                      13:05:30

full quote, which I have in quotes there.  I                   13:05:33

think you mean "a fluid which is suitable for                  13:05:37

pharmaceutical use."                                           13:05:41

Q    That's fine.  That's fine.                                13:05:42

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    132

A    That's, I assume, what you're referring to.

Q    Yes.

A    Yes.

Q    So the patent does say that.  I agree with you.

And then you associate the phrase "pharmaceutically acceptable," I believe, with the concept that the fluid must be sufficient to dissolve, right?

MR. SCHULER:  I'm sorry.  Object to the form.  I thought you asked him why -- I'm sorry. I thought he answered this.  And to the extent it was asked and answered, I also object.

A    I didn't -- I don't think you --

Q    This sentence that we've been looking at that begins "The specification expressly defines," right, it links two different parts of the patent.  It links something from column 2 that defines "pharmaceutically acceptable fluid" as a fluid sufficient -- a fluid suitable for pharmaceutical use, and it links that with "a fluid sufficient to dissolve" in column 6, right?

MR. SCHULER:  Object.  I think it says "an amount" as opposed to "a fluid."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

133

A    Yeah.  I think you're mixing the "sufficient" and the other phrase.

Q    Well, let me -- these are what I'm asking you, really.  Are you equating "suitable" with "a sufficient amount"?

MR. SCHULER:  Object to the form.

A    I'm not equating things.  I'm just quoting parts of the specification, but it's really the specification as a whole.  But "parts of the specification, including choices" -- there's an "or" in that citation -- "which help the skilled person to understand what the claims, as construed, mean."

And, again, this is one paragraph, second paragraph in my technical background of Exhibit 4.  I've got many pages on this.

Q    So you don't equate "pharmaceutically acceptable" with "an amount sufficient to dissolve"?

A    Maybe I don't understand what you mean by "equate."  I'm not equating things.  I'm giving an explanation over multiple pages of how the skilled person would understand the invention, as expressed in the claims, in light of the specification and the file history.  And

13:06:51
13:06:54
13:06:57
13:06:59
13:07:02
13:07:06
13:07:52
13:07:57
13:08:02
13:08:06
13:08:10
13:08:15
13:08:21
13:08:23
13:08:27
13:08:31
13:08:36
13:08:41
13:08:44
13:08:59
13:09:00
13:09:06
13:09:11
13:09:14
13:09:19

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    134

lots of examples throughout, many pages in this            13:09:22

report and others.                                         13:09:26

Q    Well, would you explain the words               13:09:28

"pharmaceutically acceptable" as being "an amount          13:09:32

sufficient to dissolve"?                                   13:09:40

MR. SCHULER:  Object to the form.  I           13:09:42

don't understand that one.                                 13:09:43

A    Just to be clear, you're still                  13:09:52

referring to paragraph 24 in my reply report,              13:09:53

Exhibit 4?                                                 13:09:58

Q    Sure.                                           13:09:59

A    But what I have here is                         13:10:02

"pharmaceutically acceptable fluid."                       13:10:06

Q    Right.                                          13:10:09

A    Maybe pose your question again.  I              13:10:15

think you may have asked it in a way you didn't            13:10:16

mean to.                                                   13:10:19

Q    Would you say that -- I'll ask it the           13:10:20

way you want me to ask it.                                 13:10:23

Would you say that the "pharmaceutically             13:10:25

acceptable fluid," for it to be pharmaceutically           13:10:26

acceptable, it must be in an amount sufficient to          13:10:30

dissolve the bendamustine and the other                    13:10:33

components?                                                13:10:37

MR. SCHULER:  Object to the form.              13:10:39

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

135

Incomplete hypothetical.

A    So paragraph 24 of my reply report, Exhibit 4, you mentioned the citation but didn't say what it was.  So it refers -- the first citation is "Trout, main body of opening report, 131 to 132" -- paragraphs, I should say, 131 to 132.  And if one just goes to paragraph 131, which, again, that is of Exhibit 2, which, again, is just one paragraph in a larger section within the bodies of all of my reports, I'm not sure -- now, if you want me to read the full sentence, it's a long sentence paragraph, but what I say here, after a dash, is:  "A POSA would conclude that the 'pharmaceutically acceptable fluid' recited in the asserted claims refers to the solvent or co-solvent system used to dissolve bendamustine and other excipients for stable liquid pharmaceutical compositions."

Dissolve.  So that's -- and I give the evidence throughout that that's what I mean, further mean in that paragraph 24.  By the way, this is my reply report, so I think I'm replying to Dr. Sinko.

MR. SCHULER:  We've been going for two hours.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                               136

Do you want to take a break?                           13:12:50

MR. LIEF:  It's sort of lunchtime.                     13:12:51

MR. SCHULER:  It's lunchtime.                          13:12:54

MR. LIEF:  That would be a good moment.                13:12:55

THE VIDEOGRAPHER:  We are going off the                13:12:56

record.  The time is 1:12.                             13:12:57

(Lunch recess was taken.)                              13:13:35

THE VIDEOGRAPHER:  We are going back on                13:50:54

the record.  The time is 1:50.                         13:50:55

BY MR. LIEF:                                           13:51:03

     Q    Good afternoon.                              13:51:04

     A    Good afternoon.                              13:51:10

     Q    During the lunch break, did you have         13:51:14

any substantive discussions about your testimony       13:51:15

with counsel?                                          13:51:19

     A    No, no substantive conversations at          13:51:20

all.                                                   13:51:23

     Q    Okay.  And would you agree with me that      13:51:24

in the pharmaceutical field, the term                  13:51:38

"pharmaceutically acceptable" is not generally         13:51:41

used to -- is not generally used to refer to a         13:51:51

sufficient amount of an excipient to dissolve          13:52:03

things?                                                13:52:08

MR. SCHULER:  Object to the form.                      13:52:12

Incomplete hypothetical.                               13:52:15

A    Your question started out very general, but then it sounded like you got very specific. Are we back to paragraph 24?  I'm not --

Q    I think it is, you know, a general question about the general usage of the phrase "pharmaceutically acceptable" in the pharmaceutical field.

Would you agree that "pharmaceutically acceptable," as a phrase in the pharmaceutical field, is not specific to amounts necessary to dissolve things?

MR. SCHULER:  Object to the form.  Also incomplete hypothetical.

A    I mean, as I've been quite clear, I hope, and it's really for each of the understanding of each term that you've been asking about, the context makes a difference.

And I think you're referring to what we've been discussing in paragraph 24.  At any rate, that sentence which you already read in, which includes the quote "pharmaceutically acceptable fluid" and what follows and, frankly, what is, I think, throughout my reports is an explanation of how the POSA would understand the claims of the '214 and the '248.  Different terms may mean

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                          138

different things in different contexts.  But I'm          13:54:15

telling you for -- and it's not just asserting.          13:54:18

I have lots of reasons why that's the case in            13:54:22

this context.                                            13:54:26

Q    And -- but I think you would agree with        13:54:28

me that in other contexts, the general meaning of        13:54:34

"pharmaceutically acceptable" is not linked to           13:54:39

being a good solvent?                                    13:54:45

MR. SCHULER:  Object to the form.             13:54:50

A    If you have another context in mind, I        13:54:55

know --                                                  13:54:58

Q    Sure?                                          13:55:00

A    -- you're not shy about bringing up           13:55:00

other contexts, so I'm happy to discuss that.            13:55:02

Q    Sure.                                          13:55:05

A    I emphasize that the full quote is            13:55:05

"pharmaceutically acceptable fluid," and I think         13:55:07

it's quite clear what it is.                             13:55:11

Q    For instance, as one example, if we           13:55:14

could go back to -- I think it was Trout                 13:55:17

Exhibit 8.  This is the patent that you are a            13:55:19

coinventor on, right?                                    13:55:28

MR. SCHULER:  Can you give me one              13:55:37

second.  This is the crystallization?                    13:55:38

MR. LIEF:  This is WO2015/095533.             13:55:45

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                          139

MR. SCHULER:  Thank you.                                    13:55:50

A    I think what you produced is an                        13:55:52

application, pretty much.  So you -- but --                 13:55:54

Q    The application, yes.                                  13:55:58

A    It's -- as I understand it, PCT                        13:56:00

application, published PCT application, as I                13:56:03

understand it.                                              13:56:07

Q    And you're a coinventor on this, right?                13:56:08

A    Yes.                                                   13:56:14

Q    Okay.  And so here, if you look at                     13:56:15

page 19, starting at around line 22, you'll see a           13:56:21

paragraph that begins, "The phrase                          13:56:38

'pharmaceutically acceptable.'"                             13:56:42

Do you see that?                                            13:56:47

A    Yes.  That's the beginning of that                     13:56:49

line.                                                       13:56:51

Q    And so this reads, "the" -- I'm sorry.                 13:56:52

"The phrase 'pharmaceutically acceptable' is                13:56:58

employed herein to refer to those structures,              13:57:02

materials, compositions, and/or dosage forms               13:57:05

which are, within the scope of sound medical               13:57:08

judgment, suitable for use in contact with the             13:57:11

tissues of human beings and animals without                13:57:15

excessive toxicity, irritation, allergic                   13:57:18

response, or other problem or complication                 13:57:24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

140

commensurate with a reasonable benefit-to-risk
ratio."

Q   Did I read that correctly?

A   Yes.

Q   Okay.  And that general definition of
"pharmaceutically acceptable" is the way it's
generally used in the pharmaceutical field,
correct?

MR. SCHULER:  Object to the form.

A   It says "employed herein."  In other
words, it's defining it explicitly in this -- in
this document.  The "pharmaceutically acceptable
fluid" is used in the '214 and the '248, and in
my reports I've explained what that means in the
context of the full limitation.

Q   In the context of the '214 and '248
patents, you apply a different definition of
"pharmaceutically acceptable," correct?

MR. SCHULER:  Object to the form.

A   Tell me what you're referring to --

Q   Well --

A   -- point me to what you --

Q   -- as you were pointing to, you could
look at your reply at paragraph 24.  There, you
don't discuss, you know, compatibility with the

13:57:27
13:57:31
13:57:32
13:57:38
13:57:39
13:57:45
13:57:49
13:57:51
13:57:52
13:58:01
13:58:05
13:58:11
13:58:14
13:58:21
13:58:25
13:58:28
13:58:31
13:58:34
13:58:38
13:58:40
13:58:43
13:58:43
13:58:45
13:58:46
13:58:53

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

141

patient or compatibility with an animal or any of

these other descriptions in the patent that

you're a coinventor of.  You employ a different

definition of "pharmaceutically acceptable,"

right?

MR. SCHULER:  I'll object.  It's not a

patent; it's an application.

MR. LIEF:  Application.  Fair enough.

A    I'm not sure that there's -- what the

differences are you're referring to.  The words

are different.  That one says "employed herein"

in the PCT application.  That, as you correctly

quoted, is "pharmaceutically acceptable," whereas

here, it's "pharmaceutically acceptable fluid."

But, again, it would be important to see

where it's used.  I'm not sure if it's even used

in the PCT, the claims -- let me just

double-check at least the claims, because I don't

even think it's used.

So I just skimmed through it.  I may have

missed it, but I don't see it in any of the

claims applied in this PCT application.  Maybe

it's used elsewhere in the specification.

Q    Well, irrespective of whether it's in

the claim or not, the definition that's given for

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    142

"pharmaceutically acceptable" in your PCT                14:01:00

application, Trout Exhibit 8, does not talk about         14:01:07

sufficient amounts to dissolve, correct?                 14:01:19

    A   But -- you always want to pull things    14:01:31

apart instead of comparing what's there.  So this        14:01:37

is a pharmaceutically acceptable fluid which you         14:01:44

correctly quoted, for example, in paragraph 24 of        14:01:47

Exhibit 4, my reply report.  And then I also             14:01:53

include the quote, same line, same paragraph, "a         14:01:59

fluid which is suitable for pharmaceutical use."         14:02:05

    But this is just "pharmaceutically              14:02:11

acceptable," and as we discussed, it's generally         14:02:15

a pharmaceutical context, but it's quite                 14:02:17

different than the context here, and it's                14:02:19

different wording.                                       14:02:23

       (Discussion off the record.)            14:03:08

BY MR. LIEF:                                             14:03:16

    Q   If you could go to 9, which we've          14:03:19

marked, and if you look there at page 15, there's        14:03:21

a phrase that starts -- there's a paragraph that         14:03:46

starts at around line 9.                                 14:03:51

    Do you see that?  It says the phrase            14:03:54

"pharmaceutically acceptable carrier."                   14:03:57

    Do you see that?                               14:04:00

    A   Yes.                                        14:04:02

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026          143

Q    Okay.

A    And "pharmaceutically acceptable carrier" is in quotes.

Q    Yes.  And so I'll read this.  And this reads:

"The phrase 'pharmaceutically acceptable carrier' as used herein means a pharmaceutically acceptable material, composition, or vehicle such as a liquid or solid, filler, diluent, excipient, solvent, or encapsulating material involved in carrying or transporting the subject chemical from one organ or portion of the body to another organ or portion of the body.  Each carrier must be 'acceptable' in the sense of being compatible with the other ingredients in the formulation, not injurious to the patient, and substantially nonpyrogenic."

I'll stop there.  The paragraph goes on. But did I read that portion of the paragraph correctly?

A    Yes.

Q    Okay.  And that usage of that word "acceptable" there with respect to these carriers is the general way people think about "pharmaceutically acceptable" in the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

144

pharmaceutical field, correct?

MR. SCHULER:  Objection.  Lack of foundation.  Also object to the form.

A    Just so I'm absolutely clear to your question, you're just asking about the quote "acceptable"?

Q    Yup.  "Each carrier must be 'acceptable' in the sense of being compatible with the other ingredients of the formulation, not injurious to the patient, and substantially nonpyrogenic."

That's the general definition of "pharmaceutically acceptable," right?

MR. SCHULER:  Objection to the form.

A    That's in quotes, so that's under the definitions section, so that's the definition here.

Again, if we go to the claims, I'm not sure if it's even used at all.

Q    Is there any significance to that, going to the claims aspect of your testimony?

A    Well, yes, I would say so.  I think there's often many terms, many things in a specification, even just an application, that aren't necessarily reflected in the claims.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                145

With respect to my reports and the "pharmaceutically acceptable fluid" element for shorthand, that's literally an element in all of the claims, all the asserted claims.  So that's what we're trying to understand.  A term that's defined and not used -- there's a lot of things, a lot of terms.  There are a lot of terms, but also a lot of claim embodiments, a lot of things discussed in a specification that may have varying degrees of relevance to a given claim.

As far as I see, there's no use of that term in the PCT application, but in the '214 and '248, that's what we're trying to understand, what it means, or actually, that's what the POSA understands what it means, as I've been discussing it.

Q   Are you saying that the definition that's given of an "acceptable carrier" in your PCT application is not a real definition in the pharmaceutical field?

MR. SCHULER:  Object to the form.

A   No, Mr. Lief.  I did not say that.

Q   It is a real definition, right?  That's a reasonable definition of what a "pharmaceutically acceptable carrier" is, right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                          146

MR. SCHULER:  Object to the form.                    14:08:55

A    I think it's certainly a reasonable              14:08:56

definition within the context of this                 14:08:59

application.  Again, I can look through it as a        14:09:03

whole, but, you know, I remember it broadly, and      14:09:08

it's used -- it's used here.  I'm not sure if         14:09:14

it's ever used again, if there's any particular       14:09:19

context.                                              14:09:21

But I emphasize that the "pharmaceutically            14:09:23

acceptable carrier" includes this:  "Transporting     14:09:26

the subject chemical from one organ or portion of     14:09:31

the body to another organ or portion of the           14:09:33

body."  And I think that's quite a specific           14:09:36

definition, specific to this document.                14:09:41

Q    In terms of your understanding of the            14:10:00

law of infringement, when it relates to a             14:10:03

"consisting of" phrase in the current case, I         14:10:06

think you would agree with me, but tell me if I'm     14:10:13

wrong, that if one had an unrecited fluid in          14:10:18

one's product that was not recited after              14:10:26

"consisting of" and that fluid was not an             14:10:32

impurity and was related to the invention, then       14:10:36

one would not infringe?                               14:10:43

MR. SCHULER:  I'll object to the extent               14:10:48

it calls for a legal conclusion.  And his reports     14:10:49

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

147

speak for themselves.

A    I think I addressed this exactly in my opening expert report, Exhibit No. 2, starting on page 24, where I talk about exactly this point. It's Section B, "Claim Structure."  And as I say "comprising," that's the second line of paragraph 103, "comprising" -- that's in quotes -- "certain components; i.e., 'including but not limited to' the components set forth in each claim."

And then in paragraph 104, just below, I address this and say, starting at the second -- it's all important, but I'm just giving you a summary:

"A POSA would understand that the pharmaceutically acceptable fluid is a solvent system that is limited to polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzol alcohol, and glycofurol, with the legal exceptions for impurities and other substances unrelated to the pharmaceutically acceptable fluid element."

Q    So my question, though, is a little different.

MR. SCHULER:  I don't think he was

14:10:53
14:11:39
14:11:48
14:11:58
14:12:06
14:12:13
14:12:17
14:12:22
14:12:26
14:12:31
14:12:32
14:12:41
14:12:47
14:12:50
14:12:50
14:12:53
14:12:55
14:12:59
14:13:02
14:13:07
14:13:09
14:13:12
14:13:14
14:13:16
14:13:17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026          148

done.

MR. LIEF:  I think he was done.

MR. SCHULER:  Were you done?

MR. LIEF:  He looked up at me.

THE WITNESS:  Yeah, yeah.  I was done.

MR. SCHULER:  Sorry.

BY MR. LIEF:

Q   As I was saying, my question is a little different.

If we were to agree that some substance is a pharmaceutically acceptable fluid, let's call it X, and we all agree that -- for purposes of the patents-in-suit, it is a "pharmaceutically acceptable fluid."  I'm asking you to take that as a given, as a hypothetical for this question. And X is not listed after "consisting of," "pharmaceutically fluids consisting of" five fluids, but not X, and we further were to agree that X is not an impurity and X is related to the limitation "pharmaceutically acceptable fluid," I think you would agree that the law says in that circumstance that the presence of X as a nonimpurity related to "pharmaceutically acceptable fluids" and a "pharmaceutically acceptable fluid" itself means that that product

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026          149

does not infringe.  That's your understanding of

the law of "consisting of," correct?

MR. SCHULER:  Object to that question.

It was hopelessly vague.

But if you understand it, you can

answer.

And it's clearly an incomplete

hypothetical.  You didn't explain what is in the

product at all.  Then at the end you said "the

product."

Q    Assume a product that, in every other

way, infringes and it has PEG and it has maybe

some PG and it has bendamustine at the right

amount and it has an antioxidant at the right

amount and it's stable, and it has this

additional "pharmaceutically acceptable fluid"

that we will assume is a "pharmaceutically

acceptable fluid" and is not an impurity and is

related to that limitation.

If all of that were the case and that X

chemical was in a product, you would agree that

that product does not infringe?

MR. SCHULER:  I'll object.  Still an

incomplete hypothetical.  Are you saying X is in

it and is listed as one of the ingredients in the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    150

label?

       MR. LIEF:  X is an ingredient in the label.  We can even say that.

    A    I talk about infringement in my opening report.  I have some legal understandings starting on page 8.  If you want to go, it's Exhibit No. 2 still.

    And I understand, as I say in paragraph 30, that "when considering whether a person or entity infringes a patent, each asserted claim must be considered individually against an accused product."

    But also in paragraph 31, I understand that an accused product may still infringe an asserted claim under the "Doctrine of Equivalents," even if it does not literally infringe the asserted claim.  And then I continue.  Those are excerpts from this.

    So I think I would say to do an infringement analysis, one would have to just do the analysis and if, in the end, one concludes that the "pharmaceutically acceptable fluid" limitation or any other limitation, as far as I understand, is not infringed, then the claim -- therefore, the claim isn't infringed, and, therefore, it

14:15:55
14:15:58
14:15:59
14:16:09
14:16:13
14:16:18
14:16:22
14:16:26
14:16:38
14:16:41
14:16:44
14:16:46
14:16:48
14:16:52
14:16:57
14:17:00
14:17:05
14:17:08
14:17:10
14:17:17
14:17:24
14:17:31
14:17:33
14:17:36
14:17:43

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

151

wouldn't be infringed, except for this Doctrine of Equivalents.

But that's the analysis I did here for Slayback's products. But you're the lawyer. I'm not trying to make a legal analysis.

I talk about the infringement here, but for any other situation, one would have to do an analysis, and if one determines that it's not infringed literally or under the Doctrine of Equivalents -- there might be others -- then it wouldn't infringe.

Q Okay. And so for literal infringement purposes only, if you had a formulation that had the right amount of bendamustine and it had PEG and it had maybe one of the optional fluids and it had an antioxidant and it was stable, as called for in the claim, and it had this additional ingredient X, and for this question, we'll assume that X meets whatever definition of "pharmaceutically acceptable fluid" we wish. And X is a "pharmaceutically acceptable fluid," but it is not listed after "consisting of," it is not an impurity and it is related to "pharmaceutically acceptable fluids."

In that scenario, I think you would agree

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                      152

that the law concludes that that formulation does    14:19:26

not literally infringe?    14:19:32

      MR. SCHULER:  Objection.  You're asking    14:19:33

an expert who's a scientist what the law    14:19:34

concludes?    14:19:36

      MR. LIEF:  Well, he's drawing a    14:19:37

conclusion of infringement, and I want to --    14:19:40

      MR. SCHULER:  You literally said "the    14:19:44

law concludes" as opposed to "a POSA would    14:19:45

conclude."  I don't think he's capable of saying    14:19:47

what the law concludes.  That's for the federal    14:19:50

circuit.    14:19:52

      MR. LIEF:  I think he should have some    14:19:53

sense of what the law is consisting of.    14:19:54

      MR. SCHULER:  I have no objection if    14:19:58

you ask him a POSA would conclude.  I really    14:19:59

don't.  I'm not trying to --    14:20:02

      MR. LIEF:  Well, it's just a long    14:20:02

question, and now you're going to make me restate    14:20:03

it again.  That's fine.  All right.  I'll do it.    14:20:06

      MR. SCHULER:  If he --    14:20:09

BY MR. LIEF:    14:20:10

    Q    I want to know, really, what you    14:20:11

conclude, and maybe that's the way to ask it.    14:20:12

    Would it be your understanding with the    14:20:15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

153

claims in suit, the '214 and '248 patents, that if you had a formulation that met all the other limitations, it had the right amount of bendamustine, it had an antioxidant that was stabilizing, stabilizing amount, it had the PEG and/or an optional fluid that's listed, and it was satisfactorily stable, as called for in the claims, but it had an additional ingredient -- we'll call it X -- and that additional ingredient X, we would, for this question, understand X to be a "pharmaceutically acceptable fluid" that is not an impurity and that is related to the "pharmaceutically acceptable fluid" limitation, would you understand that that formulation, as I have described it, would not literally infringe?

MR. SCHULER:  It's still an incomplete hypothetical.

A    Okay.  I discuss infringement here, my understanding of it, and I did an extensive analysis over multiple reports.

So I would need the type of information that was in all of my reports to come up with a conclusion.  So I need to have -- do an analysis like I did here.

But, having said that, my understanding is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

154

if it were a given, because I know people
disagree on things, but if it were a given that
it had a sterile vial containing all these other
things, but it did not contain or does not -- did
not, subjunctive, contain a "pharmaceutically
acceptable fluid" consisting of polyethylene
glycol and optionally one or more of propylene
glycol, ethanol benzyl alcohol, and glycofurol,
then it would not infringe.

Q    Thank you.

All right.  As part of your noninfringement
analysis, if we could look in your opening
report, for instance, at paragraph 70.  This is
repeated in other places, but this is an example.

Do you have that?

A    Yes, I am there.

Q    So paragraph 70, the first words of the
first sentence read:

"Sodium hydroxide (NaOH), a solid," and it
goes on.

Do you see that?  Do you see that?

A    Yes.  The rest is important, though.

Q    Well, I'm asking you about one thing at
a time.

If you look then again at paragraph 199 in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                   155

your opening report, paragraph 199 reads:                 14:23:50

"As explained in Section Roman Numeral VII,               14:24:02

a POSA would understand the claimed                       14:24:07

'pharmaceutically acceptable fluid' to be a               14:24:10

solvent for bendamustine."                                14:24:13

██████████████████████████                                14:24:15

████████████████████████████████████                      14:24:19

██████████████████████                                    14:24:26

Q    Did I read that correctly?                           14:24:30

A    Almost.                                               14:24:35

Q    What did I miss?                                      14:24:36

A    Well, you didn't include the quotes                  14:24:37

around "pharmaceutically acceptable fluid."               14:24:39

Q    Okay.                                                 14:24:43

A    And it's important to include those for              14:24:43

the reasons we discussed.                                 14:24:45

Q    That's fine.  That doesn't change my                 14:24:48

question.                                                 14:24:49

A    Okay.                                                 14:24:51

Q    Other than that, I read that correctly?              14:24:51

A    Yes.                                                  14:24:56

Q    ██████████████████████                               14:24:57

██████████████████████████████                            14:25:03

█████████████████████████████                             14:25:08

███████████████████████████████                           14:25:12

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

156

14:25:16

14:25:18

14:25:18

14:25:21

14:25:24

14:25:26

MR. SCHULER:  Just as a matter of fact, we should now designate this Confidential -- Highly Confidential.

MR. LIEF:  We should.  I think this should be Highly Confidential - Attorneys' Eyes Only as we get into the Slayback product.  And I would assume it would be the same tomorrow for the Apotex product.

MR. SCHULER:  This is one transcript. That will be a separate one.  That will be up to Mr. Ferenc to decide what he wants to designate that transcript.

MR. LIEF:  I don't know that the defendants agree with that.

MR. FERENC:  This is not going to be a separate transcript.  We never agreed to that.

MR. SCHULER:  You don't get to agree or not agree.  The rule is --

MR. FERENC:  The parties have agreed

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    157

to --

MR. SCHULER:  We haven't agreed to anything.

MR. FERENC:  -- earlier today.  We can talk about it again.

MR. SCHULER:  We're not going to.

MR. FERENC:  The notion there is going to be two separate transcripts is completely inefficient.  And we talked about this with respect to both parties examining Dr. Trout on his opinions and achieving efficiencies across issues common to the reports, including Dr. Trout's background.  We will be objecting on the timing.  We even contended that there were several issues that were overlapping and wanted to achieve efficiencies.  This notion we're having two separate depositions is simply not supported by the parties' agreement as evidenced by the emails and communications exchanged.

MR. SCHULER:  There's no such agreement.  The rule says a person shall be deposed once in an action.  He's getting deposed once in the Slayback action and once in the Apotex action.  You guys have made pains to say this is not consolidated; it's only coordinated.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

158

They are two separate actions.  That's how we're going to proceed.

You have no basis to claim otherwise. The rules are the rules and that's that.  But we're not going to spend more time on the transcript.

(Simultaneous speaking.)

MR. SCHULER:  I agree with counsel. You're not being heard, because Mr. Lief and I are going to continue the deposition.

MR. FERENC:  -- depositions in this case.

MR. LIEF:  I do agree with counsel for Apotex, and we do object to it being split that way for the purpose of being able to avoid the rule that you don't speak during a deposition --

MR. SCHULER:  I'm not avoiding the rule.  The rule only applies if we were at trial or in a consolidated action.  We're not.  I offered that as a compromise to the fact that they are separate and we will have separate transcripts.  You guys didn't agree to it. Therefore, we're having separate transcripts.

MR. LIEF:  Well, again, we respectfully disagree.  But we should continue.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

159

MR. SCHULER:  But I also wanted to note that whatever -- when he's referring to "that," it wouldn't be in your opening report, because that's only the public information about the product.

MR. LIEF:  It would be in the appendix for Slayback.  If you want to look at something specific to the Slayback process --

MR. SCHULER:  We marked that as --

MR. LIEF:  We did.  I believe it's Appendix something.  It's one of the existing exhibits that is --

MR. SCHULER:  3.

MR. LIEF:  3.  There it is.  It's 3. Thank you.

BY MR. LIEF:

Q   So the pending question is:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                      160

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

161

14:33:30
14:33:35
14:33:39
14:33:43
14:33:51
14:33:55
14:33:57
14:34:00
14:34:06
14:34:10
14:34:16
14:34:23
14:34:28
14:34:30
14:34:34
14:34:37
14:34:40
14:34:44
14:34:45
14:34:49
14:34:53
14:34:56
14:35:01
14:35:04
14:35:09

14:38:30

14:38:35

14:38:40

14:38:45

14:38:50

14:38:55

14:38:59

14:39:03

14:39:10

14:39:15

14:39:19

14:39:22

14:39:26

14:39:40

14:39:42

14:39:47

14:39:54

14:39:59

14:40:04

14:40:08

14:40:12

14:40:18

14:40:23

14:40:26

14:40:29

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

165

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                          166

14:43:33
14:43:35
14:43:43
14:43:49
14:43:54
14:43:57
14:44:00
14:44:02
14:44:07
14:44:12
14:44:14
14:44:18
14:44:19
14:44:24
14:44:28
14:44:31
14:44:34
14:44:35
14:44:37
14:44:40
14:44:41
14:44:41
14:44:44
14:44:44
14:44:47

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    167

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                              168

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

169

14:47:42
14:47:47
14:47:47
14:48:02
14:48:05
14:48:12
14:48:19
14:48:23
14:48:36
14:48:37
14:48:46
14:48:49
14:48:52
14:49:02
14:49:05
14:49:10
14:49:13
14:49:14
14:49:21
14:49:25
14:49:30
14:49:34
14:49:34
14:49:41
14:49:42

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

170

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

171

14:52:12
14:52:14
14:52:19
14:52:22
14:52:26
14:52:29
14:52:34
14:52:37
14:52:38
14:52:41
14:52:44
14:52:51
14:52:56
14:52:59
14:52:59
14:53:03
14:53:07
14:53:11
14:53:16
14:53:18
14:53:18
14:53:21
14:53:24
14:53:26
14:53:27

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

173

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

174

████████████████████████████     14:57:21

████████████████████████     14:57:27

Q    Thank you.    14:57:33

MR. LIEF:  Let me mark as Trout    14:57:37

Exhibit 11 an excerpt from the Handbook of    14:57:46

Pharmaceutical Excipients from 2006.    14:57:49

(Excerpt from Handbook of    14:57:57

Pharmaceutical Excipients relating to    14:57:57

Polyethylene Glycol marked Exhibit 11.)    14:57:57

BY MR. LIEF:    14:58:15

Q    Dr. Trout --    14:58:16

MR. SCHULER:  Oh, third page?    14:58:17

MR. LIEF:  Yeah.    14:58:19

Q    Dr. Trout, this is an excerpt from the    14:58:20

2006 Handbook of Pharmaceutical Excipients for    14:58:23

its section on polyethylene glycol.    14:58:26

Have you seen this before?    14:58:34

A    I probably have.  I have exactly this    14:58:43

edition in my bookshelf.  I certainly looked    14:58:45

through it.    14:58:50

Q    Sure.    14:58:51

A    I'm probably familiar with it    14:58:52

generally.    14:58:54

Q    Okay.  Now, PEG, itself, has multiple    14:59:01

functional categories, correct?    14:59:15

MR. SCHULER:  Object to the form.

A    Oh, sorry.  You're referring to Section 6 on the right column, first page?

Q    Sure.

A    Yes.  There are several listed.

Q    Okay.  And, for instance, in Section 7, which is entitled "Applications in Pharmaceutical Formulation or Technology," if you look down to the fourth paragraph there, it states:

"Aqueous polyethylene glycol solutions can be used either as suspending agents or to adjust the viscosity and consistency of other suspending agents."

It should say "suspending vehicles."

Do you see that?

A    With that correction, there's a sentence there that says that.

Q    And in that role, the polyethylene glycol would not be a solvent, right?

MR. SCHULER:  Object to the form.

A    I just want to ask, you're referring to aqueous polyethylene glycol solutions?

Q    Right.

A    Could you state your question, please, just so I have it.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                 176

Q    So those can be used not only as
solvents, but they can be used in emulsions,
correct?

        MR. SCHULER:  Object to the form.

A    I mean, this is a high-level
description which talks about suspending agents.
But what's important from the standpoint of the
analysis of the patent is how it's used in the
patent.

    But I agree there are ways of using
polyethylene glycol that aren't relevant --
directly relevant to the '214, '248 patents.

Q    Okay.

A    I mean, it looks -- you mentioned
functional category.  There's a tablet and
capsule lubricant, suppository base.  So there
are different functions that are not of direct
relevance to the patents.

Q    But as a liquid, in its liquid state,
the polyethylene glycols that are liquids can be
solvents or they can be involved in suspensions
and emulsions as well?

        MR. SCHULER:  Object to the form.

A    That's a statement, but you're making
it a question?

Q    Well, you could add to the statement, "that's correct, isn't it?"

A    Well, this -- there are different uses outside of the '214 and '248 patents for polyethylene glycols.  This paragraph that you refer to specifically talks about aqueous polyethylene glycol solutions, which, first of all, that's not relevant to these patents, nor are suspending agents.

Q    Because you discount the word "disperse" in the patent specification and say it only involves dissolving, right?

MR. SCHULER:  Object to the form.

A    No.  That's highly oversimplified. I've done an analysis of the patents as a whole, in their context, with all the materials I've cited in my reports and my knowledge as a POSA -- well, applying my knowledge to what a POSA -- how a POSA would understand these claims.

Q    Okay.  And you do agree that PEG 400 is a liquid?

A    Generally, at room temperature, it's a liquid.  Or conditions of interest, I should say. Temperatures of interest and other conditions of interest, generally the case.

15:03:01
15:03:03
15:03:10
15:03:14
15:03:20
15:03:23
15:03:28
15:03:33
15:03:39
15:03:45
15:03:47
15:03:51
15:03:56
15:04:00
15:04:03
15:04:08
15:04:12
15:04:20
15:04:24
15:04:26
15:04:36
15:04:45
15:04:48
15:04:52
15:04:55

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

178

MR. LIEF:  We'll mark as Trout Exhibit 12 another excerpt from the Handbook of Pharmaceutical Excipients for polyethylene glycol.

(Excerpt from Handbook of Pharmaceutical Excipients relating to Propylene Glycol marked Exhibit 12.)

THE WITNESS:  Thank you.

BY MR. LIEF:

Q    With respect to the polyethylene glycol section of the handbook, there are various functional categories at Topic 6, "Functional Category."

Do you see that?

A    Yes.

Q    And amongst them are antimicrobial preservative, disinfectant, humectant, plasticizer, solvent, stabilizer for vitamins, and water-miscible co-solvent.

Do you see that?

A    Yes.

Q    And so amongst the functions that polyethylene glycol can perform in a formulation, not all of them are solvents, right?

A    Yes.  But the question is what's

relevant, what's the function in the patents-in-suit, the '214 and the '248. And I've done an analysis of this, including what specifically the specification says about polyethylene glycol.

Q    Okay.

A    And it's in my report. We can find it, but it refers to the patent.

Q    I think we have your answer on that question.

And as we discussed with polyethylene glycol, if you look at the description part in the right-hand column for propylene glycol, it is "a clear, colorless, viscous, practically odorless liquid."

It's a liquid, correct, at room temperature?

A    Yes. I mean, the description continues, but...

Q    "With a sweet, slightly acrid taste resembling that of glycerine," right?

A    Yes.

Q    But like PEG, polyethylene glycol, propylene glycol is also a liquid, correct?

MR. SCHULER:  Object to the form.

A    It's a liquid at the conditions of

15:06:50
15:06:54
15:06:58
15:07:02
15:07:12
15:07:13
15:07:14
15:07:16
15:07:17
15:07:19
15:07:23
15:07:25
15:07:28
15:07:34
15:07:39
15:07:41
15:07:48
15:07:49
15:07:51
15:07:54
15:08:02
15:08:02
15:08:06
15:08:10
15:08:19

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                    180

interest.  That's the state of matter.                      15:08:22

          MR. LIEF:  Correct.                               15:08:27

     A    I want to be clear.  We're talking --             15:08:30
we're talking about the state of matter, and I              15:08:33
know there's a lot of discussion of liquid and              15:08:35
fluid, and I discuss this in my report.  So I               15:08:38
want to be clear:  That's the state of matter and           15:08:41
that's how in the patents one gets the liquid at            15:08:45
the top.                                                    15:08:50

     Then there's the "pharmaceutically                     15:08:51
acceptable fluid" limitation, and it's important            15:08:53
not to confound the two.  So I've been saying,              15:08:57
yes, the state of the matter is liquid, not solid           15:09:00
or gas.                                                     15:09:04

          MR. LIEF:  Okay.  We'll mark as -- I              15:09:05
think it's Trout 13, another excerpt from the               15:09:08
pharmaceutical -- the Handbook of Pharmaceutical            15:09:16
Excipients.                                                 15:09:16

          (Excerpt from Handbook of                         15:09:18
     Pharmaceutical Excipients relating to                  15:09:18
     Alcohol marked Exhibit 13.)                            15:09:18

          MR. SCHULER:  One of my favorite                  15:09:31
substances.                                                 15:09:32

BY MR. LIEF:                                                15:09:33

     Q    And the substance that Mr. Schuler is             15:09:34

referring to has a heading of "Alcohol."  But can you confirm for me, as a chemist, that alcohol here, in particular, is referring to ethanol?

A    Yes.  The reference is to ethyl alcohol or ethanol, noting that, depending on the grade, it has -- like the other excipients that we discussed, has some water in it.  But the reference here is focusing on ethanol.

Q    And amongst the functional categories for ethanol, it lists antimicrobial preservative, disinfectant, skin penetrant, and solvent, correct?

A    Yes.

Q    And so ethanol in a formulation could play one or more of those roles?

MR. SCHULER:  Object to the form. Incomplete hypothetical.

A    In broad terms, here, as I've discussed, it's used as -- optionally as part of the solvent.

Q    Okay.  Do you think that the ethanol in Slayback's product stops being an antimicrobial preservative because it's a solvent?

A    ███████████████████████████

████████████████████████████████

15:09:38
15:09:42
15:09:47
15:10:14
15:10:19
15:10:23
15:10:30
15:10:32
15:10:36
15:10:39
15:10:43
15:10:48
15:10:53
15:10:55
15:11:00
15:11:04
15:11:06
15:11:10
15:11:14
15:11:18
15:11:20
15:11:24
15:11:31
15:12:01
15:12:06

Q      In coming to your opinion --

          MR. SCHULER:   Hang on one second.

Sorry.   I knocked it over.

BY MR. LIEF:

     Q

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    183

MR. SCHULER:  Is this a good time for a break?

MR. LIEF:  One more question?

MR. SCHULER:  Sure.

BY MR. LIEF:

Q    So with respect to alcohol, am I also correct that in the description, we'll say at room temperature?

MR. SCHULER:  You're back at this.

MR. LIEF:  Yes.

BY MR. LIEF:

Q   With respect to alcohol, again, at reinsurance it's described as being a liquid, correct?

MR. SCHULER:  Just so I'm following, which number?

MR. LIEF:  Right-hand column, under 8, which begins in the left-hand column.

MR. SCHULER:  Oh, the last part of 8?

MR. LIEF:  Yeah, the last part of 8.

BY MR. LIEF:

Q   It's described as a liquid, right?  And it is.

MR. SCHULER:  Every time I've used it.

I'll withdraw that.

Do you understand the question?

A   Yes.  It certainly says it's a volatile liquid, and I think there's no disagreement that it's in a liquid state.

MR. LIEF:  Okay.  That would be a good time for a break.

THE VIDEOGRAPHER:  We are going off the record.  The time is 3:16.

(A recess was taken.)

THE VIDEOGRAPHER:  We are going back on the record.  The time is 3:33.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

185

BY MR. LIEF:

Q    Okay.  Have you done any experiments at all for this litigation?

A    I have not done laboratory experiments. I've used experimental results in all the analyses that I've reported here.

Q    Okay.  Other than Dr. Kittendorf's experiments, are you aware of any experiments that were done for this litigation?

A    Oh, you stopped?  Sounded like you were still going.

Well, I mean, aside from the Slayback data, I guess those experiments were related to this litigation.  Those are the only ones that come to mind.

Q    You didn't authorize any other laboratory beyond your own to do an experiment?

A    What do you mean, beyond my own?

Q    Yeah.  Like you said, you didn't do any experiments.

Did you tell someone else at some other laboratory to do an experiment for this case?

A    No.  I only used all the information that I report here.

Q    And other than what's in your reports

15:33:50
15:33:51
15:33:54
15:34:04
15:34:07
15:34:11
15:34:13
15:34:19
15:34:20
15:34:32
15:34:34
15:34:40
15:34:44
15:34:47
15:34:55
15:34:55
15:34:58
15:35:05
15:35:08
15:35:10
15:35:11
15:35:13
15:35:18
15:35:21
15:35:23

and Dr. Kittendorf's experiments, you're unaware of any other experiments that were done for this case?

A    I mean, just what I discuss in my reports.  I'm not aware of any others, sitting here.

Q    Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                          188

15:39:21
15:39:23
15:39:26
15:39:36
15:39:39
15:39:44
15:39:47
15:39:47
15:39:53
15:39:59
15:40:11
15:40:17
15:40:24
15:40:27
15:40:40
15:40:45
15:40:52
15:41:02
15:41:07
15:41:15
15:41:16
15:41:28
15:41:33
15:41:40
15:41:43

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    189

15:41:53
15:42:01
15:42:07
15:42:10
15:42:13
15:42:14
15:42:17
15:42:24
15:42:25
15:42:26
15:42:28
15:42:29
15:42:31
15:42:34
15:42:38
15:42:41
15:42:46
15:42:53
15:42:57
15:43:10
15:43:14
15:43:20
15:43:22
15:43:26
15:43:31

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    190

MR. LIEF:  We'll mark as Trout 14 another excerpt from the pharmaceutical handbook from 2006.

(Excerpt from the Handbook or Pharmaceutical Excipients relating to Benzyl Alcohol marked Exhibit 14.)

BY MR. LIEF:

Q    And this excerpt is for another one of the recited fluids in the claim, benzyl alcohol.

Do you see that?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    191

A    Yes.                                              15:45:57

Q    Okay.  And benzyl alcohol has several            15:45:59
listed functions, correct?                            15:46:05

MR. SCHULER:  Object to the form.                15:46:09

A    Again, you're talking about 6,                   15:46:19
"Functional Category"?                                15:46:20

Q    Correct.                                         15:46:23

A    Yeah.  There are three listed there.             15:46:26

Q    And so it lists antimicrobial                    15:46:29
preservative, disinfectant, and solvent, correct?    15:46:31

A    Yes.                                             15:46:35

Q    Okay.  And so, again, fair to say that           15:46:39
benzyl alcohol, while it may be a solvent, could     15:46:43
also play other roles in the formulation?            15:46:47

MR. SCHULER:  Object to the form.                15:46:55

A    Now, by "the formulation," I think               15:46:57
you're referring to the patents again or some        15:47:00
other formulation?                                   15:47:02

Q    In the patented formulations, if you            15:47:04
had benzyl alcohol, it could be a solvent.  It       15:47:06
could also simultaneously be an antimicrobial        15:47:12
preservative, correct?                               15:47:16

MR. SCHULER:  Object to the form.                15:47:18
Incomplete hypothetical.                             15:47:18

A    Again, as I, like the others, have --            15:48:09

for example on page 27, paragraph 110 of my

opening report, Exhibit 2:

"A POSA would also understand that each

pharmaceutically acceptable fluid listed in the

claims, polyethylene glycol, propylene glycol,

ethanol, benzyl alcohol, and glycofurol, are

solvents for bendamustine used to dissolve poorly

soluble or unstable actives to form injectable

solutions."

So the point -- and that's just a statement,

and I refer to the patent in various places

further on.  But the point of the benzyl alcohol

in the limitation that we're talking about is as

part of the pharmaceutically acceptable fluid

with PEG and then optionally, in this case,

benzyl alcohol.

So -- and that fluid has the function that

I've explained throughout my reports.

Q    But even if it's playing that function

as a solid, that doesn't preclude it from also

killing some bacteria, being an antimicrobial,

right?

A    I'd have to look at a specific

circumstance.  From the analysis of the claims,

specifically in light of the specification and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

193

the file history and the knowledge of a POSA, as I've been discussing throughout my report, that's the point of benzyl alcohol here.  I'd have to think about it if there's an actual formulation in which it purportedly has a different function. The function here is as a co-solvent.

Q    I guess the question is a little different.  It's not really about the claim. It's about the chemistry of, in this instance, benzyl alcohol.

Is it impossible that it could be doing two things in some formulation, that it could be both a solvent and an antimicrobial?

Is that, in your view, impossible for an excipient?

MR. SCHULER:  Object to the form.

A    No.  You're talking about outside of the patents here.  I agree.  It can be used as an antimicrobial preservative.  My point is how the POSA would understand the limitation here, which explicitly has benzyl alcohol in it.

Q    Well, at the beginning, you agreed, but then the rest of your answer, I think, answered a different question.  So let me try again.

Is it impossible for an excipient benzyl

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026          194

alcohol to do two things in the same formulation, 15:51:43

be a solvent and an antimicrobial also?  Is it 15:51:46

relegated to only doing one thing in any 15:51:53

particular formulation? 15:51:55

MR. SCHULER:  Object to the form.  It's 15:51:58

multiple questions. 15:52:00

A    As far as the first one, I think I did 15:52:06

answer your question.  To the extent that you're 15:52:13

asking the same question, I would have the same 15:52:16

answer, which is that, as the Handbook of 15:52:18

Pharmaceutical Excipients states and my 15:52:22

experience, benzyl alcohol could act as an 15:52:26

antimicrobial preservative.  Here in the patent, 15:52:32

it's clearly a solvent, co-solvent, whatever you 15:52:35

want to call it, that goes with PEG. 15:52:40

If you have a specific -- something specific 15:52:44

in mind, nothing is coming to my mind, but the 15:52:46

function in the patent is specific to its 15:52:51

function as a solvent, again, as I noted here in 15:52:56

this paragraph 110 that I referenced before in 15:53:01

Exhibit 2 and throughout my reports. 15:53:04

Q    Okay.  Benzyl alcohol, am I also 15:53:14

correct, at room temperature is a liquid, as 15:53:18

reported in the handbook? 15:53:22

A    Yes.  That's its state of matter at 15:53:32

room temperature.  Again, in the patents, it's under the pharmaceutically acceptable fluid limitation.

MR. LIEF:  Okay.  And let me mark as -- is it 15?

MR. SCHULER:  Yes.

MR. LIEF:  Trout Exhibit 15, another excerpt from the handbook.  And this one is for glycofurol.

(Excerpt from the Handbook or Pharmaceutical Excipients relating to Glycofurol marked Exhibit 15.)

BY MR. LIEF:

Q    And the functions listed for glycofurol are penetration enhancer and solvent, correct?

Do you see that?

A    Under 6, "Functional Category."  Yes, those are there.

Q    And glycofurol itself also, at room temperature, is a liquid, correct?

A    Again, agreed.  That's the state of matter.  In the patents it's clearly under the pharmaceutically acceptable fluid limitation.

Q    And with respect to all five of the pharmaceutically acceptable fluids that we've

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    196

looked at in the handbook, I am correct that all                15:55:16

five of those are also organic compounds?                       15:55:19

    A   Yes.  Using the general, very general       15:55:38

definition of "organic compounds."                              15:55:42

    Q   And they're also all protic compounds,      15:55:48

correct?                                                        15:56:03

    A   Yes.                                         15:56:16

    Q   And would you agree that they're also        15:56:18

all nonaqueous compounds?                                       15:56:20

    A   Again, agree.  So "aqueous" means            15:56:38

water, I think, in your question, $H_2O$.  These are            15:56:43

not water.  As I have been emphasizing in all of               15:56:49

these, there's going to be some percentage of                  15:56:57

water impurity.                                                 15:56:59

    Q   But the compound itself is nonaqueous,       15:57:04

all five of them?                                               15:57:10

    A   Those compounds are not water, as such.      15:57:16

I only -- I'm not sure why you're using that term              15:57:19

exactly.  I just want to be careful because I                  15:57:22

know it was a term of issue in the past, so I                  15:57:25

want to be careful.  But aqueous -- "nonaqueous"               15:57:30

means not water, and these are not water, noting               15:57:36

that they can have some amount of water with them              15:57:40

as an impurity.                                                 15:57:45

    Q   In your experience in the                    15:58:09

pharmaceutical field, have you ever seen more than one definition for the word "solvent"?

MR. SCHULER:  Object to the form.

A    As I've been saying, the use of the word "solvent" can depend on the context.  If you have something in mind, I'm not sure what you might be referring to, but I can look at it.

I think it's the solvent is -- with respect to the patents is, as I've been discussing, in my reports ███████████████████

Q    In your understanding of the word "solvent" in the patents, does it require that the solvent dissolve bendamustine only, or does it need to dissolve the other excipients in the product as well?

MR. SCHULER:  Object to the form.

Do you mean in the claims or in the specification, or both?

BY MR. LIEF:

Q    Let's start with the claims.

A    I mean, again, I think, as we've been saying, the term -- the word "solvent" is not part of the claims.  It's the pharmaceutically acceptable fluid consisting of, and the other components and, as I've discussed extensively in

all my reports, how the skilled person would

understand that function of that limitation.  But

maybe you're referring to the limitation.  I'm

not sure what you're referring to.

Q    In that regard, we'll take it that way.

Does the pharmaceutically acceptable fluid in the

claim need to dissolve just the bendamustine or

everything in the formulation?

MR. SCHULER:  Object to the form.

A    Can I discuss how the skilled person,

as we've been -- for example, as we've been

referring to in paragraph 110, would -- I'll

reread the sentence, but it's throughout my

report, that are solvents for bendamustine.  The

header of the claim -- I'm not using that term in

a legal sense, if that's legal, but the first

part of the claim -- I'm looking at the '214,

Claim 1:

"Sterile vial containing a liquid

bendamustine-containing composition comprising."

So it's a liquid that we've been discussing,

so it has to be dissolved as -- the components

have to be dissolved to make it into a liquid,

with the caveats as I've been explaining.  There

can be certain particulate amounts based on the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    199

specifications and guidelines.

MR. LIEF:  Okay.  I'm going to mark as Trout Exhibit 16 an article.

("Cellulose" article entitled "Dissolving of cellulose in ███ ████████ marked Exhibit 16.)

BY MR. LIEF:

Q    Have you seen this article before?

A    I think so, but I should check my materials considered.  It looks familiar, but everything -- lots of things look familiar at this point.  Oh, but my -- I think it might be in my reply report or in one of the others.

Q    Maybe.  I will -- just to represent to you, this is an article that I believe both Dr. Sinko and Dr. Crowley had cited to and for the proposition that, in the past, people had referred to PEG and sodium hydroxide together as a solvent system, and I imagine that you disagree with that.

A    I'm pretty sure I've seen it.  I think it's in my reply is what I said.  The copy you gave me doesn't have my materials, but I'm sure -- given what you said, I'm sure I've seen it before.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026          200

Q    Okay.  And, by the way, do you know if -- have you heard of the journal "Cellulose"?

A    As far as I recall, I had not heard of that journal before.  If I've come across papers, I don't have a recollection outside of this one. I don't think it's the kind of journal that pharmaceutical scientists would typically refer to.  "Cellulose" is, of course, the main component in wood.  Well, and other plants, I should add.

Q    Do you know whether or not it's a peer-reviewed journal?

A    I don't know, sitting here.  I don't recall if Dr. Sinko or another witness said that it was and gave the reason.  I can find this in my report, but I don't know, sitting here.

Q    Okay.  If you would turn to what is page 791 in this article that we're looking at. In the very last sentence on the right-hand column of that page, do you see that?  It begins "The results reveal..."?

A    Yes.

Q    It says:  "The results reveal that the 1 weight percent ███████████████████ ████████████ is a direct cellulose solvent

16:05:49
16:05:54
16:06:08
16:06:12
16:06:22
16:06:24
16:06:30
16:06:33
16:06:38
16:06:45
16:06:46
16:06:48
16:07:36
16:07:41
16:07:45
16:07:49
16:07:53
16:08:01
16:08:16
16:08:20
16:08:24
16:08:29
16:08:31
16:08:33
16:08:42

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                        201

rather than a ███████████████

system."

16:08:48
16:08:50
16:08:51
16:09:02
16:09:07
16:09:10
16:09:19
16:09:23
16:09:29
16:09:32
16:09:32
16:09:34
16:09:35
16:09:40
16:09:43
16:09:48
16:09:50
16:09:50
16:09:52
16:09:53
16:09:55
16:09:58
16:10:00
16:10:05
16:10:11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

203

16:12:06

16:12:11

16:12:11

16:12:17

16:12:18

16:12:21

16:12:28

16:12:30

16:12:33

16:12:37

16:12:40

16:12:46

16:12:47

16:13:43

16:13:50

16:13:53

16:13:55

16:14:03

16:14:11

16:14:17

16:14:21

16:14:24

16:14:28

16:14:32

16:14:36

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                              204

████████████████████████████████                    16:14:40

████████████████████████████                        16:14:44

██████████████████████████████                      16:14:49

██████████████████                                  16:14:51

Q    In your opinion, can a salt be part of          16:14:55
a solvent system?                                    16:14:59

MR. SCHULER:  Object to the form.               16:15:06

A    Again, as we've been discussing today,          16:15:11
people use different terms in different contexts,    16:15:17
so I would want to look at a particular context,     16:15:20
if you have one in mind.                             16:15:25

In general, at very high level, as you          16:15:32
asked, it is possible for a salt to be dissolved     16:15:36
in a solvent.                                        16:15:39

Q    I know a salt can be dissolved in a             16:15:41
solvent.  But when it's dissolved in a solvent,      16:15:43
can it then become the solvent itself?  Can it       16:15:46
become solvent?                                      16:15:52

MR. SCHULER:  Object to the form of the         16:16:18
question.                                            16:16:18

If you understand it, you can answer.           16:16:19

A    Will you just repeat it, please.                16:16:23

Q    Salt dissolves in a solvent.  Can it            16:16:27
then become part of the solvent system?              16:16:32

MR. SCHULER:  Object to the form.  Also         16:16:37

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                205

asked and answered.

A    What do you mean by "solvent system"?

Q    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

Can a salt that dissolves in a solvent then participate itself in solvating other solutes?

MR. SCHULER:  Object to the form.  Also asked and answered.

A    ██████████████████████████

████████████████████████████████████████████

█  ████████████████████████████

█  ████████████████████████████████

████████████████████████████

█  ██████████████████████

█  ████████████████████████████

██████████████████████████████

██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

████████████████████████████

██████████████

█  ██████████████

16:16:38
16:16:45
16:16:49
16:16:52
16:16:55
16:16:59
16:17:03
16:17:11
16:17:20
16:17:21
16:17:23
16:17:26
16:17:30
16:17:34
16:17:35
16:17:41
16:17:42
16:17:44
16:17:48
16:17:56
16:17:58
16:18:03
16:18:05
16:18:08
16:18:09

A    I happened to just have it open, so that was convenient.

Q    Okay.  And so when a salt dissolves in another solvent, can it be considered to be part of a solvent system?

MR. SCHULER:  Object to the form. Asked and answered.

A    I think one has to look at the specific context.  And I've done the analysis here.  And the -- again, the claims, in particular the "pharmaceutically acceptable fluid" that we've talked about, and we talked about those exemptions of impurities and unrelated.

But, in general, the "pharmaceutically acceptable fluid" -- well, I apologize.  Not in general.  Specific to the patent as I've analyzed, the "pharmaceutically acceptable fluid" is as I've discussed.  There are the possibility of impurities and other components, but it's as I've discussed here in the context of the '214 and '248 patents.

Q    Again, as a matter of chemistry, not specific to the patents, but just as a matter of chemistry, what about a buffer that's dissolved in a solvent?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                          207

Can the buffer participate in the solvent system?

MR. SCHULER:  Object to the form. Incomplete hypothetical.

A    But the question here is not just a matter of chemistry.  It's a matter of usage of terms.  And so I'm explaining how the terms are used here in this context.  If there's a different context in mind, then we can discuss that.  But I think --

Q    It's a more -- it is a more general question in that as a matter of chemistry, can something that is dissolved, like a salt or a buffer, participate in being a solvent itself, in being part of a solvent system?

MR. SCHULER:  Object to the form.

Q    Do you disagree that that's impossible?

MR. SCHULER:  Multiple compound.

A    Do I disagree that that's impossible?

Q    Well, do you agree -- is it your view that that's impossible for a salt or a buffer to participate in a solvent system?

MR. SCHULER:  Object to the form. Incomplete hypothetical.

A    What do you mean by "participate"?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                          208

Q    Well, I assume that, for instance, when you're talking about PEG and PG in the patented solvent system, they're each participating and solvating other solutes.  Fair?

A    Yeah.  They're -- they make up the solvent system or the solvent system, as such.

Q    And in that same way, but not talking about the patented formulations necessarily, is it possible for a salt or a buffer to be dissolved in another solvent and then participate as a co-solvent as part of a solvent system?

MR. SCHULER:  Object to the form. Incomplete hypothetical.

A    Could you -- I want to make sure I got all your terms exactly right.  Could you just repeat that.

MR. LIEF:  Can you read that one back, because I don't know that I can duplicate it.

(The question was read by the reporter, as requested.)

A    So you have a lot of different terms there, and as I've been emphasizing, context matters.  And I think, as you rightly pointed out earlier this morning, in addition to my work in small molecule pharma, I work in the field of

proteins and peptide pharmaceuticals.

In that area, we do call -- maybe this is what you're thinking of -- we do often call -- there are other terms, but we often call certain additives in protein aqueous, so water solutions, co-solutes, because what they do is -- it's a different -- slightly different use or somewhat different use because it doesn't change the thermodynamic solubility of the protein, per se, but it hinders the protein from precipitating from solution.

So that's an example that comes to mind in our field, broadly but in proteins in which we might call solids and solution co-solutes. That's different application from here. So I'm thinking of different usage and application and I have explained why it's different if that's --

Q    Okay.

A    Maybe if you have something else in mind, I can certainly talk about some specific example.

Again, in chemistry, often there are terms that are used in different contexts somewhat differently.

Q    In your view, whatever you're referring

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026    210

to there, in I guess peptides?

A    What I'm thinking of is maybe the broader field of peptides and proteins, particularly in aqueous solution.

Q    Okay.

A    It would normally be in aqueous solutions.

Q    Same kind of linguistic usage that a salt or a buffer could dissolve and then become part of the co-solvent system, is that never used when it comes to small molecules?

MR. SCHULER:  Object to the form to the extent that it misstates his prior testimony.

A    I think you didn't ask the question as you intended.  I think you -- but it's your question.  I can --

Q    It is.

A    -- try to answer it.

Q    I'll try to make you happy.  I don't know what's wrong with it.

But I believe you recognized in your prior answers some view that in peptide and protein solutions, salts and buffers can be part of the solvent system.

Is that same language inapplicable to a

small molecule solution?

MR. SCHULER:  Again, object to the extent it misstates his prior testimony.

A    I think it's important not to sort of mix up words.  And I said in that other field, solids that are dissolved in aqueous solution -- there's some work in nonaqueous proteins and peptides, but it's almost exclusively aqueous. At least that's what my work has been.

We do use the term "co-solute" to describe solids dissolved in aqueous solution that have the kind of effects that I described, which are different from the effects or functions here in the patents-in-suit ███████████████████████████

They also have other names, kosmotropes, for example.  There might be uses, and we can talk about those uses in other parts of pharmaceuticals.  Again, one has to look at the context and the meaning of the term or terms used, as I've done throughout my analysis here of the claims ████████████████████  and the other issues here in this case.

Q    In your last answer, I think you used the word "co-solute."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                     212

Did you mean "co-solvent?"                                    16:28:23

A    Oh, I thought that was the term you          16:28:30

used.                                                        16:28:32

Q    Okay.                                                16:28:34

A    But, again, different people might use        16:28:35

different terms.  I thought I was following your     16:28:40

term.  But maybe, if I misspoke, co-solvent.        16:28:42

Q    Would that equally apply to that prior       16:28:49

answer?                                                      16:28:51

MR. SCHULER:  Object to the form.                    16:28:53

Would what apply?                                           16:28:53

Q    Co-solvent?                                          16:28:56

MR. SCHULER:  Object to the form.                    16:28:59

A    Again, if you have specific examples,        16:29:04

we can talk about them, but yeah, I think I          16:29:08

could -- in the protein field, which I've been       16:29:11

involved for a long time, protein formulation,       16:29:16

again, in an aqueous solution, which is what my      16:29:20

work has been in, yes, that term is used,            16:29:26

"co-solvent."                                               16:29:30

I thought you had said "co-solute."  I               16:29:31

apologize.  Co-solvent.  And it's understood as      16:29:34

I've explained.  I can explain again, but it's a     16:29:39

different context than here and a different          16:29:41

meaning and different function.                      16:29:46

Again, there's a lot of terms in chemistry that are the same terms used in different contexts, and one has to understand the meaning in a given context and not mix up the contexts.

Q    Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                      214

16:31:30
16:31:33
16:31:35
16:31:36
16:31:37
16:31:39
16:31:40
16:31:41
16:31:43
16:31:52
16:31:55
16:32:17
16:32:19
16:32:21
16:32:28
16:32:30
16:32:34
16:32:36
16:32:40
16:32:43
16:32:45
16:32:47
16:33:00
16:33:05
16:33:09

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    215

16:33:16
16:33:22
16:33:30
16:33:34
16:33:39
16:33:43
16:33:46
16:33:53
16:34:01
16:34:03
16:34:07
16:34:11
16:34:14
16:34:15
16:34:19
16:34:23
16:34:35
16:34:39
16:34:39
16:35:24
16:35:31
16:35:41
16:35:50
16:35:52
16:35:52

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

216

16:35:54

16:35:54

16:35:57

16:35:59

16:36:00

16:36:06

16:36:13

16:36:20

16:36:27

16:36:34

16:36:39

16:36:45

16:36:49

16:36:53

16:36:58

16:37:05

16:37:10

16:37:14

16:37:19

16:37:21

16:37:23

16:37:23

16:37:25

16:37:26

16:37:27

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

217

16:37:27

16:37:27

16:37:29

16:37:30

16:37:30

16:37:32

16:37:35

16:37:43

16:37:50

16:37:58

16:38:02

16:38:09

16:38:16

16:38:22

16:38:25

16:38:31

16:38:37

16:38:39

16:38:46

16:38:53

16:38:57

16:38:59

16:39:05

16:39:08

16:39:24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

218

16:39:29

16:39:34

16:39:41

16:40:27

16:40:33

16:40:41

16:40:47

16:40:49

16:40:53

16:40:57

16:41:00

16:41:02

16:41:08

16:41:11

16:41:15

16:41:17

16:41:22

16:41:25

16:41:26

16:41:28

16:41:30

16:41:33

16:41:34

16:41:37

16:41:41

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

219

16:41:45
16:41:48
16:41:51
16:42:00
16:42:04
16:42:09
16:42:12
16:42:19
16:42:21
16:42:27
16:42:30
16:42:33
16:42:36
16:42:39
16:42:44
16:42:48
16:42:52
16:42:57
16:43:06
16:43:13
16:43:17
16:43:21
16:43:27
16:43:31
16:43:35

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

220

16:43:39
16:43:41
16:43:45
16:43:48
16:43:52
16:43:57
16:44:00

Q    Do you also agree that the five listed fluids in the claim after "consisting of" play a role in improving the stability of the patented formulations?

MR. SCHULER:  Objection to form.

A    Again, I just want to be absolutely clear.  These are -- we can call them fluids, if you want.  They're solvents, but together they make up the "pharmaceutically acceptable fluid" in that limitation.

And if you say "improve the stability," the question is with respect to what?

Q    Well, for instance, with respect to alternatives of fluids or solvents, for that matter, like water?

A    Yes.  That's the point.  Again, it's a relative thing.  And I know there's other types of solvents that may have higher stability.  But

the point is solvents need to be compatible with the various components, bendamustine in particular.  Bendamustine is known -- and I have the chemistry in my report, some of the chemistry, we can go to -- to be degraded by water.

And so if you want to make a relative statement like that, it's, I think, correct, but the question -- but the question is:  Does it improve it with respect to lyophilized form or to another solvent?  That's another story, because by the time of the patent, there was this issue that water degraded bendamustine.  It was not a suitable solvent.

(Discussion off the record.)

MR. SCHULER:  To you want to break now or five more minutes?

THE WITNESS:  I'm fine.  We can keep going.

MR. LIEF:  I'm fine.

MR. SCHULER:  I need a break in like three or four minutes.

THE WITNESS:  You're very precise, Counsel.

MR. LIEF:  So we're going to mark as

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    222

Trout Exhibit 17 a document bearing Bates numbers
EAGLEBEN-SA00361489 through -00361576.

    (Document Bates-stamped

    EAGLEBEN-SA_00361489 through -1576 marked

    Exhibit 17.)

BY MR. LIEF:

    Q    And I'll ask you, have you seen this document before?

    A    I've certainly seen Q3 DR2 document. I'm not sure if it's this specific one.

    I realize my reports don't always have the materials considered.  I mean, I'm generally familiar with these types of ICH documents.

    If there's -- if it's in the case, this specific one, let me know where it's referenced. But anyway, I'm generally familiar, but I don't have my materials here in what we marked.

    MR. LIEF:  I think your counsel said this might be a good time for a break.

    THE VIDEOGRAPHER:  We're going off the record.  The time is 4:51.

    (A recess was taken.)

    THE VIDEOGRAPHER:  We are going back on the record.  The time is 5:10.

    MR. LIEF:  Okay.  I'd also like to mark

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                223

as -- I guess it's Trout 18, a document bearing

Bates No. EAGLEBEN-SA00361465 through -1482.

        (Document Bates-stamped

    EAGLEBEN-SA_00361465 through -1482 marked

    Exhibit 18.)

BY MR. LIEF:

    Q   I'd like you to turn in your opening
report to paragraph 236, which spans, at least in
my copy, pages 84 to 85.  That may or may not be
right, the way these things printed.

        MR. SCHULER:  No.  That's right.
That's right.

    Q   236.

    A   I'm sorry.  236.

    Q   Correct.

    A   Yes.  I am there.

    Q   Okay.  And so as a first matter, this
paragraph is a discussion about sodium --
actually, go back a paragraph to 235.  This is a
discussion of sodium is an elemental impurity.

    Do you see that?

    A   Yes.

    Q   And you have a citation there.  Do you
see that?

    A   Just to be clear, you're referring to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

224

the second line of paragraph 235 of the opening?

Q    Correct.

A    Okay.  Thank you.  Yes, I see that.

Q    And am I correct that Trout 17 is what you're citing there?

A    If you said 17, yes, that looks like 17.  Yes.

Q    Yes.  And in this guideline, you cite page -496, Bates ending in -496.

Do you see that?

A    Yes.

Q    And on that page there's a list of element classifications.

Do you see that?

A    Yes.

Q    And the sodium that you talk about really doesn't fall into either Class 1, Class 2, Class 2(a), Class 2(b) or Class 3.

Do you see that?

A    Well, that's right.  It falls under --

Q    Other elements?

A    -- other elements.  That's right, which is why, if you look at the next line or next sentence of paragraph 235, I say, "The guidance document states that 'NA' is an elemental

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                          225

impurity that is not inherently toxic and thus

does not require a formal risk assessment for

toxicity but should still be evaluated and

controlled for other reasons, such as quality or

for specific high dose or parenteral

administration routes, id."

    Q    But this particular document, Trout 17,

actually says with respect to sodium that it does

not address that in this guideline.

    Do you see that in that first sentence,

after "other elements"?

        MR. SCHULER:  I'm sorry.  The first

sentence?

        MR. LIEF:  Yeah, the first sentence

after "other elements," on page -361496 reads:

"Some elemental impurities for which PDAs have

not been established" --

        MR. SCHULER:  I understand.  I didn't

need you to read it.  I just wanted to make sure

which sentence you were reading.

        MR. LIEF:  Okay.

BY MR. LIEF:

    Q    Do you see that?

    A    The first line under "other elements,"

yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026          226

Q    Okay.  Thank you.                                17:15:57

A    I mean, therefore -- but I think if you           17:15:59
keep reading that paragraph, then you understand       17:16:02
what I wrote in paragraph 235 and elsewhere in         17:16:07
this section.                                          17:16:11

Q    Okay.  And then paragraph 236, you cite           17:16:12
this document again at the end of 236, correct?        17:16:16

A    Yes.  I cite, just to be precise, I               17:16:49
cite three documents, and this is one of them.         17:16:51

Q    Correct.  And one of the other ones is            17:16:55
what is Trout 18, correct?                             17:16:58

A    Yes.                                              17:17:37

Q    And if you look at Trout 18, at page --           17:17:39
Bates page ending 361469.                              17:17:44

Do you have that?                                      17:17:46

A    Yes.                                              17:17:59

Q    And the very first sentence at the top            17:17:59
reads:  "This guidance addresses only those            17:18:02
impurities in new drug products classified as          17:18:04
degradation products of the drug substance or          17:18:08
reaction products of the drug substance with an        17:18:11
excipient and/or immediate container closure           17:18:14
system (collectively referred to as 'degradation       17:18:18
products' in this guidance)."                          17:18:23

Did I read that correctly?                             17:18:26

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    227

A    Oh, yes.  You read that correctly.    17:18:47
And, again, like the other one, the point of this    17:18:58
was not to use the guidance as -- for regulatory    17:19:02
purpose, per se.  It's to use it for    17:19:11
understanding what I discuss in this section with    17:19:14
respect to the impurity exception.    17:19:18

Q    I mean, Trout 18 is a guidance that    17:19:22
wouldn't apply to an impurity if it were an    17:19:24
impurity like sodium?    17:19:29

MR. SCHULER:  Object to the form.    17:19:39

A    I think the point, as I say, for    17:20:30
example, in the third line of paragraph 236 in    17:20:37
this document, "Any persistent inorganic residues    17:20:41
are not active ingredients or functional    17:20:45
excipients and they are not the solvent itself.    17:20:47
And a POSA would understand that under compendial    17:20:52
and ICH definitions, they are properly regarded    17:20:55
an inorganic impurities, the finished material,    17:20:59
consistent with the treatment of elemental and    17:21:03
inorganic residues that originate from reagents    17:21:05
and processing aids used during manufacture."    17:21:09
So the point of referring to these is how    17:21:11
they discuss them, and as we talked about, the    17:21:15
ICH document explicitly discussed sodium as an    17:21:18
elemental impurity.  So that's the point.    17:21:23

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    228

Q    The degradant of bendamustine would not be inorganic, correct?                    17:21:28 17:21:30

A    Sorry.  Could you repeat that?                    17:21:35

Q    A degradant of bendamustine, which is the drug product here, the drug substance here, would not be inorganic?                    17:21:37 17:21:39 17:21:43

A    Agreed.                    17:21:48

Q    Okay.                    17:21:49

MR. LIEF:  Let me mark as Trout Exhibit 19 a document bearing Bates numbers EAGLEBEN-SA_-361577 through -361592.                    17:21:50 17:21:52 17:22:01

(Document Bates-stamped EAGLEBEN-SA_00361577 through -1592 marked Exhibit 19.)                    17:22:06 17:22:06 17:22:06

BY MR. LIEF:                    17:22:06

Q    And can you confirm for me that this document is cited by you at paragraph 242?                    17:22:06 17:22:19

MS. SPARSCHU:  242.                    17:23:11

(Discussion off the record.)                    17:23:14

BY MR. LIEF:                    17:23:19

Q    Do you see that, that Trout 19 is cited in your opening report at paragraph 242?                    17:23:45 17:23:47

A    Yes.                    17:23:53

Q    Okay.  And in Trout 19, if you could turn to the first numbered page, which is Bates                    17:24:18 17:24:25

page EAGLEBEN-SA_00361581.

A    Okay.

Q    And do you see there's a Section 1.3, "Scope of the Guideline"?

A    Yes.

Q    And that sentence reads -- the first sentence there reads:  "This guideline addresses only those impurities in new drug products classified as degradation products of the drug substance or reaction products of the drug substance with an excipient and/or immediate container closure system (collectively referred to as 'degradation products' in this guideline)."

Did I read that first sentence of Section 1.3 correctly?

A    Yes.  That's what the document says. And, again, the point here, like the others, is -- I mean, here, as I say in paragraph 242 under ICH/FDA practice, "The fact that a reagent's use was 'purposeful' upstream has no bearing on whether residual nonfunctional species or impurities at release.  Classification depends on persistence, role, and control in the final product."

It's kind of throughout, farther down in

17:24:29
17:24:44
17:24:44
17:24:46
17:24:52
17:24:52
17:24:54
17:24:58
17:25:02
17:25:05
17:25:09
17:25:13
17:25:17
17:25:24
17:25:26
17:25:31
17:25:33
17:25:38
17:25:45
17:25:49
17:25:54
17:25:58
17:26:01
17:26:04
17:26:05

this document.  So it's how all these documents, 17:26:08

I wanted to include how the regulatory bodies 17:26:13

would think about impurities like sodium. 17:26:17

MR. LIEF:  I'd like to mark as Trout 17:26:25

Exhibit 20 a document bearing Bates numbers 17:26:28

EAGLEBEN-SA_00361447 through -1456. 17:26:32

(Document Bates-stamped 17:26:42

EAGLEBEN-SA_00361447 through -1456 marked 17:26:42

Exhibit 20.) 17:26:42

BY MR. LIEF: 17:26:55

Q    And with respect to Trout 20, can you 17:26:55

confirm for me that you cite things, for 17:26:57

instance, at paragraph 237 of your opening 17:27:01

report? 17:27:09

A    Yes, I cite that. 17:27:43

Q    Okay.  And if you would turn to page -- 17:27:48

Bates page EAGLEBEN-SA_00361450, which is the 17:27:50

first substantive page after the Table of 17:27:57

Contents. 17:28:00

Do you see the introduction? 17:28:00

A    I see that, yes. 17:28:08

Q    And that first sentence of the 17:28:10

introduction reads:  "This guidance provides 17:28:13

recommendation on what chemistry and 17:28:15

manufacturing and controls (CMC) information 17:28:19

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                    231

sponsors should include regarding the reporting,                17:28:25

identification, and qualification of impurities                 17:28:29

that are classified as degradation products in                  17:28:32

drug products when submitting."                                 17:28:37

    Did I read that correctly?               17:28:40

    A   Yes.  It continues, but yes.        17:28:44

    Q   Yes.  And if you go past the bullet     17:28:46

points, it continues:  "The guidance also                       17:28:52

provides recommendations for establishing                       17:28:55

acceptance criteria for degradation products                    17:28:58

(specifically, degradation products of the active               17:29:02

ingredient or reaction products of the active                   17:29:06

ingredient with an excipient(s) and/or immediate                17:29:10

container/closure system) in generic drug                       17:29:15

products."                                                      17:29:19

    Did I read that correctly?               17:29:21

    A   Yes.                   17:29:24

    Q   Okay.                  17:29:28

    A   Again, the point of these documents are  17:29:29

for -- as I state in my report, and this one in                 17:29:31

particular, I'm looking at page 448.  As I say in               17:29:37

paragraph 237, "recommending that 'degradation                  17:29:43

products' for a particular drug product be listed               17:29:48

'to predict the degradation profile for the                     17:29:51

commercial product' as a result of 'manufacture[]               17:29:55

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    232

by the proposed commercial process.'"

So again, I'm using these documents to give the general understanding that I've included here in this report.

Q   Dr. Trout, you also give an opinion in this case that Slayback is a willful infringer.

Are you aware of that?

MR. SCHULER:  Object to the form.

A   Oh, maybe it's in this.  Yes.  I have -- well, I used the words that I have in my report, but I have a section on willful infringement starting at page 65 of -- it's the opening report, but Appendix B for Slayback, which is Exhibit 3.  It's called "Willful Infringement."

Q   I apologize if I asked this before at the beginning, but you are not a lawyer, correct?

A   Correct.

Q   What is your understanding of what is required to have a finding of willful infringement?

A   So you don't want me to read all of this, but my understanding is based on my legal section, the infringement part, legal standard -- well, it really should start with the legal

standards on page 7 of my opening expert report, 17:32:58

Exhibit 2.  I think all of that section is 17:33:04

important, including an explicit section on 17:33:11

infringement. 17:33:15

And then that Appendix B for Slayback that 17:33:16

we referred to, Exhibit 3, starting at page 65, 17:33:21

paragraph 197, in which I say ██████████ 17:33:31

████████████████████████ 17:33:37

███████████████████████████ 17:33:39

█████████████████████████████ 17:33:42

█████████████████████████████ 17:33:45

████ 17:33:49

I guess the rest of the section might be 17:33:50

relevant to that, but that's my broad 17:33:52

understanding of willful infringement in the 17:33:56

legal context. 17:33:59

█ ████████████████ 17:34:01

████████████████████████████ 17:34:05

███████ 17:34:08

█ ██████████████████████ 17:35:38

████████████████████ 17:35:41

████████████████████ 17:35:47

█████████████████████████ 17:35:52

████████████████████████ 17:35:58

████████████████████████ 17:36:03

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                           234

17:36:14

17:36:17

17:36:20

17:36:23

17:36:29

17:36:32

17:36:34

17:36:39

17:36:40

17:36:43

17:36:55

17:36:59

17:37:05

17:37:09

17:37:14

17:37:18

17:37:22

17:37:25

17:37:31

17:37:35

17:37:38

17:37:40

17:37:43

17:37:47

17:37:55

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    235

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                     236

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                  237

17:42:26
17:42:31
17:42:34
17:42:38
17:42:40
17:42:42
17:42:47
17:43:04
17:43:06
17:43:08
17:43:15
17:43:18
17:43:26
17:43:29
17:43:32
17:43:45
17:43:47
17:43:50
17:43:54
17:44:02
17:44:05
17:44:09
17:44:11
17:44:16
17:44:17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                            238

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

239

MR. SCHULER:  We've been going for seven hours and ten minutes.

MR. LIEF:  No, we -- that doesn't include a whole bunch of colloquy that we've had.

MR. SCHULER:  Six or seven minutes' worth.  I've given you more than enough time.

MR. LIEF:  But let me --

MR. SCHULER:  If you have two or three questions, I'll indulge.

MR. LIEF:  A couple of things.

The last category I have is a category which probably has only one question but is a category that I would ask Apotex to leave for.  Having said that, I know that Apotex's counsel does have a comment for the record, which, again, I don't want to counted against my time, and I will agree with what I believe he's going to say.  And so I

think he should say that now, and then we'll move to finish up and that will be that.

MR. FERENC:  Thank you, Jason.

So for the record, we identified our objection to the treatment of this deposition as two separate depositions, so we wanted to note our objection for the record to the concerns raised by counsel for Eagle this morning.

We believe that the parties should continue to operate under the same framework that we've been operating under for other joint depositions in treating this as one deposition with a shared transcript that the parties can rely on for the purpose of their joint summary judgment motions and at trial.

So I wanted to make that note for the record.  We feel that the local rules and general Rules of Civil Procedure Rule 30 apply and that the witness is not to discuss the substance of his testimony and any anticipated testimony he will provide tomorrow.

MR. SCHULER:  We entirely disagree. The Rule 30(d) especially says in an action that a deponent shall be deposed only once for a duration of seven hours.  The Slayback attorneys

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                            241

have been questioning for over seven hours.                    17:48:43

They've had their deposition.  This transcript                 17:48:45

will be closed.  The Slayback action deposition                17:48:47

will be closed.  Apotex will get its deposition                17:48:50

tomorrow of up to seven hours.                                 17:48:53

        The only thing you've suggested is that                17:48:56

there's some alleged efficiencies associated with              17:48:57

a longer single deposition.  The only thing I can              17:49:01

think of is if you're willing to stipulate that                17:49:04

you will take no more than four hours tomorrow                 17:49:05

because there's a consolidated transcript and                  17:49:08

it's efficient, then maybe I'll consider that.                 17:49:09

        MR. FERENC:  But --                                    17:49:15

        MR. SCHULER:  But if you're reserving                  17:49:16

right to take seven hours --                                   17:49:17

        MR. FERENC:  -- you agreed to provide                  17:49:19

Mr. -- Dr. Trout for 14 hours, so we're holding                17:49:22

you to that agreement.                                         17:49:25

        Does Eagle have any objection to Apotex                17:49:25

using any portion of Dr. Trout's testimony or                  17:49:27

transcript for any purpose?                                    17:49:30

        MR. SCHULER:  No.  You guys can order                  17:49:32

the transcript from the Slayback proceeding.  I                17:49:33

have no problem with that.                                     17:49:35

        I will note that Mr. Lief presumably                   17:49:36

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                 242

will not want you to see at least one part of it, 17:49:41

which is the part he just talked about, so you 17:49:44

guys have to work that out.  Maybe he can be the 17:49:46

person that gets the transcript and delivers it 17:49:49

to you so that he can excise whatever.  But I 17:49:52

have no objection -- subject to his point about 17:49:54

the one subject matter, I have no problem with 17:49:57

Apotex ordering the Slayback deposition and using 17:50:00

it. 17:50:03

MR. LIEF:  I guess, you know, I concur 17:50:04

with Apotex's counsel.  And maybe the concern is 17:50:06

a little different, having gone first, which is, 17:50:11

you know, there are undoubtedly some overlapping 17:50:17

concepts that exist as well as differences.  But 17:50:22

whatever he said today, if you speak to him about 17:50:30

it and tomorrow he says something different on 17:50:34

something that's the same issue, you know, that 17:50:39

would be problematic. 17:50:45

MR. SCHULER:  It's called impeachment. 17:50:47

I don't think that's going to happen, but it's 17:50:48

called impeachment.  Right? 17:50:50

MR. LIEF:  It could also be called 17:50:52

coaching the witness.  I mean, there's a lot 17:50:53

of -- this is an unusual circumstance.  I think 17:50:55

you agreed to something different is what I would 17:50:59

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                  243

say.  And I agree with counsel for Apotex.                   17:51:02

MR. SCHULER:  Well, no.  I mean, let's                   17:51:03
be very fair to the witness.  He's got like six              17:51:04
reports for Slayback alone, right?  He's got to              17:51:06
prepare himself to give accurate and precise                 17:51:09
answers.                                                     17:51:11

When you alerted us that you guys were                   17:51:12
questioning today, that's what he did, and that's            17:51:14
what any reasonable person would do.  Right?  So             17:51:16
now he has to prepare for a second deposition.               17:51:19
It's a separate deposition and it's a separate               17:51:21
case.  It's a separate action.  And the                      17:51:24
Rule 30(d) provides for what it provides.  We can            17:51:26
agree to disagree, but I think we should adjourn             17:51:29
Mr. Ferenc, and then we can proceed with your                17:51:32
couple of questions, hopefully, on this last                 17:51:37
subject, and I will leave it to you two to work              17:51:39
out how you excise that part of the transcript.              17:51:41

MR. FERENC:  Thank you, Counsel.  Per                    17:51:44
Slayback's counsel's request, I will sign off                17:51:47
from Zoom.  And it's our position that this                  17:51:50
deposition is continuing and that the federal and            17:51:53
local rules apply.                                           17:51:57

We would request that the court                          17:51:58
reporter not provide any transcripts to any                  17:52:00

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    244

parties at the conclusion of today's portion of          17:52:03

the deposition.                                          17:52:06

         MR. SCHULER:  I don't have a problem            17:52:06

with the court reporter not providing the               17:52:08

transcript to the parties until they're ordered.        17:52:11

         MR. LIEF:  Including a rough.                   17:52:14

         MR. SCHULER:  Yeah.                             17:52:15

         MR. LIEF:  All right.  So, Chris, when          17:52:17

you're off, I'll do this last segment.                  17:52:19

         MR. FERENC:  Sorry.  I just want to             17:52:21

confirm that we are starting at 9:00 a.m.               17:52:23

tomorrow.                                               17:52:26

         MR. SCHULER:  Yes.                             17:52:27

         MR. FERENC:  Jason, unless you have an          17:52:29

independent reason that I should come back on, I        17:52:30

don't know that that would be the case, but if          17:52:33

there is a reason I should come back on, I am           17:52:36

here.  Jason, you can just give me a call.              17:52:39

         MR. LIEF:  We'll contact you if there's        17:52:42

a reason.                                               17:52:44

         MR. FERENC:  Okay.  Thank you.                 17:52:46

         MR. LIEF:  Let us know when he's off.          17:52:47

         THE VIDEOGRAPHER:  He's off.                   17:52:55

BY MR. LIEF:                                            17:52:55

         ██  ████████████████                          17:52:56

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

245

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                      246

         And thank you for your patience.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    247

THE VIDEOGRAPHER:  This marks the end     17:55:23
of the deposition of Dr. Bernhardt Trout.  We are     17:55:24
going off the record at 5:55.     17:55:27
     (Deposition adjourned at 5:55 p.m.)     17:55:30

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    248

                    C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

    I, Janet M. McHugh, a Registered Merit Reporter

and a Notary Public within and for the Commonwealth

of Massachusetts do hereby certify:

    THAT BERNHARDT L. TROUT, PH.D., the witness

whose testimony is hereinbefore set forth, was duly

sworn by me and that such testimony is a true and

accurate record of my stenotype notes taken in the

foregoing matter, to the best of my knowledge, skill

and ability; that before completion of the deposition

review of the transcript was not requested.

    I further certify that I am not related to any

parties to this action by blood or marriage; and that

I am in no way interested in the outcome of this

matter.

    IN WITNESS WHEREOF, I have hereunto set my hand

this 11th day of May, 2026.

_____
JANET M. MCHUGH
Notary Public
My Commission Expires:
July 16, 2028

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    249

| **A** |
| --- |

**a"-**
122:14
**ability**
216:5, 248:12
**able**
11:9, 11:18,
33:8, 33:9,
33:13, 63:5,
158:15
**above**
130:15
**absent**
57:19, 116:13
**absolute**
170:24, 182:1,
182:22, 188:18
**absolutely**
144:4, 220:13,
238:21
**absorption-delay-
ing**
109:21
**academic**
18:23, 39:20
**acceptance**
231:10
**accepted**
13:19
**access**
129:14
**according**
76:10
**account**
169:15, 169:16,
173:10, 183:2,
190:9, 202:9,
219:10
**accuracy**
30:4, 30:12,
30:13, 32:10,
33:7
**accurate**
18:16, 18:17,
18:18, 29:19,
30:9, 31:6,
33:3, 39:3,

39:4, 39:5,
39:10, 54:14,
61:20, 66:9,
78:23, 90:24,
117:20, 213:15,
243:5, 248:10
**accurately**
39:8, 91:24
**accused**
150:11, 150:14,
186:22, 234:10,
236:6, 236:15
**achieve**
51:7, 157:16
**achieving**
157:11
**acid**
70:2, 70:7,
70:14, 70:19,
70:25, 71:6,
216:6, 217:15
**acid-base**
70:13
**acidic**
215:9
**acidity**
167:5, 168:3,
168:17, 168:25,
169:20, 172:19
**acids**
70:1, 70:3,
213:23, 214:22,
216:12, 217:23
**acrid**
179:19
**across**
14:3, 15:3,
157:11, 188:5,
200:4
**act**
194:12
**acting**
92:21, 202:1
**action**
157:22, 157:23,
157:24, 158:19,
240:23, 241:3,
243:12, 248:15

**actions**
158:1
**active**
89:24, 91:20,
99:19, 227:14,
231:11, 231:12
**actives**
75:18, 192:8
**actual**
58:23, 110:16,
129:20, 193:4
**actually**
21:5, 22:4,
27:8, 30:23,
48:4, 66:2,
83:8, 88:2,
108:14, 111:19,
145:14, 223:19,
225:8, 239:2
**add**
65:15, 66:5,
66:10, 177:1,
200:10
**added**
38:2, 65:23,
67:10, 155:23,
155:24, 159:19,
213:9, 215:6,
215:15, 219:17
**adding**
159:23
**addition**
23:24, 208:24,
219:1, 237:2
**additional**
5:12, 45:23,
81:13, 149:16,
151:18, 153:8,
153:9, 203:20,
218:23, 219:5,
220:6
**additives**
209:5
**address**
16:8, 16:12,
48:19, 67:14,
85:14, 85:17,
85:18, 147:12,

225:9
**addressed**
147:2
**addresses**
98:19, 226:18,
229:7
**addressing**
33:12, 49:10,
54:9, 202:11,
215:3, 218:5
**adjourn**
243:14
**adjourned**
247:4
**adjust**
160:15, 171:4,
173:21, 175:11,
216:15, 217:11,
217:12
**adjuster**
69:21, 69:23,
70:20, 71:11,
71:21, 160:3,
170:10, 173:14
**adjusters**
72:5
**adjusting**
217:14, 218:10,
219:25
**adjustment**
215:6, 218:8
**administration**
109:25, 110:6,
111:20, 112:2,
225:6
**adopt**
233:9, 236:20
**advance**
48:8, 48:11,
48:25
**advancement**
51:6
**advantages**
48:15, 54:8
**adventitious**
66:18, 66:21
**adverb**
54:12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

250

**aeronautics**
74:16, 86:14
**after**
9:23, 11:14,
13:15, 15:15,
102:16, 129:8,
129:12, 130:19,
135:13, 146:20,
148:16, 151:22,
220:9, 225:11,
225:15, 230:18,
237:6, 237:15,
238:14, 238:17,
238:25
**afternoon**
136:11, 136:12
**against**
97:12, 150:11,
239:24
**agent**
89:24, 91:20
**agents**
68:24, 109:20,
109:21, 175:11,
175:13, 176:6,
177:9
**ago**
88:23, 93:23,
93:25
**agree**
9:23, 11:6,
11:13, 11:22,
12:18, 12:21,
13:24, 24:23,
37:6, 38:21,
40:3, 43:19,
44:19, 63:8,
71:22, 72:11,
73:5, 73:13,
84:13, 84:20,
86:6, 86:24,
86:25, 87:5,
101:23, 104:10,
113:10, 132:5,
136:18, 137:8,
138:5, 146:18,
148:10, 148:12,
148:18, 148:21,

149:21, 151:25,
156:20, 156:23,
156:24, 158:8,
158:13, 158:22,
160:6, 169:11,
176:10, 177:20,
182:22, 193:18,
196:8, 196:10,
207:20, 217:24,
218:9, 219:25,
220:8, 239:24,
243:1, 243:14
**agreed**
10:6, 13:2,
13:4, 25:10,
60:11, 77:10,
156:22, 156:25,
157:2, 193:22,
195:21, 228:7,
241:16, 242:25
**agreement**
2:11, 157:18,
157:21, 241:18
**ahead**
57:16, 83:4,
85:12, 205:16
**ai**
38:16, 38:17
**aid**
58:4, 61:7,
62:4, 66:24
**aids**
227:21
**aim**
112:3
**al**
8:5
**alcohol**
6:11, 6:14,
75:16, 147:19,
154:8, 170:24,
180:21, 181:1,
181:2, 181:4,
182:2, 182:22,
183:20, 184:1,
187:9, 190:21,
190:24, 191:2,
191:13, 191:20,

192:6, 192:12,
192:16, 193:3,
193:10, 193:21,
194:1, 194:12,
194:22
**alerted**
243:7
**all**
15:13, 18:21,
25:13, 26:2,
26:24, 42:2,
42:4, 42:7,
45:19, 54:15,
55:24, 58:13,
70:2, 78:15,
81:22, 83:6,
83:13, 91:9,
95:16, 96:20,
105:6, 109:18,
110:9, 110:23,
111:8, 111:9,
111:23, 111:24,
112:9, 113:10,
119:8, 125:25,
128:1, 130:17,
131:4, 135:10,
136:17, 144:19,
145:3, 145:4,
147:13, 148:12,
149:9, 149:20,
152:20, 153:2,
153:22, 154:3,
154:11, 160:4,
160:11, 161:4,
163:4, 171:13,
172:3, 173:9,
173:10, 177:8,
177:16, 178:24,
182:19, 185:3,
185:5, 185:23,
186:10, 189:21,
189:25, 195:24,
196:1, 196:5,
196:9, 196:12,
196:16, 198:1,
202:9, 205:13,
208:15, 218:18,
230:1, 232:22,

233:2, 244:8,
245:10
**alleged**
241:7
**allergic**
139:24
**allow**
61:6, 119:10
**allows**
121:20, 122:18,
123:2, 128:17,
128:22
**almost**
26:2, 59:19,
60:23, 155:10,
211:8
**alone**
14:12, 66:3,
83:17, 243:4
**along**
8:21, 111:9
**already**
12:10, 17:24,
45:20, 54:17,
54:19, 56:12,
61:9, 67:1,
79:5, 115:11,
137:20, 183:5,
183:7, 213:7,
238:4, 238:24
**also**
4:13, 9:5, 9:6,
12:3, 15:9,
20:25, 21:3,
21:10, 22:5,
22:8, 29:2,
37:13, 38:3,
38:18, 41:19,
42:6, 43:3,
44:17, 45:5,
46:23, 57:22,
58:5, 58:11,
61:24, 63:17,
63:25, 65:4,
67:25, 72:22,
80:25, 87:3,
92:16, 93:18,
94:11, 96:7,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    251

98:6, 98:15, 98:18, 101:16, 102:13, 102:17, 103:21, 105:5, 115:21, 116:19, 122:3, 125:15, 127:19, 127:20, 129:19, 130:25, 132:14, 137:12, 142:8, 144:3, 145:8, 150:13, 155:6, 159:1, 165:6, 170:9, 171:11, 171:21, 173:5, 173:8, 173:23, 179:23, 183:20, 191:14, 191:21, 192:3, 192:20, 194:2, 194:22, 195:19, 196:2, 196:5, 196:8, 201:11, 202:15, 202:25, 204:25, 205:9, 211:16, 214:18, 216:17, 220:8, 222:25, 231:8, 232:5, 235:19, 242:22, 245:5

**alter**
10:25
**alternatives**
220:21
**although**
113:13
**always**
142:4, 165:9, 222:11
**amended**
97:10
**amongst**
178:16, 178:22, 181:9
**amount**
58:7, 59:1, 59:18, 65:13, 70:25, 121:20, 122:18, 123:2,

128:17, 132:25, 133:5, 133:18, 134:4, 134:22, 136:22, 149:14, 149:15, 151:14, 153:3, 153:5, 182:3, 182:16, 186:21, 186:23, 187:12, 187:15, 187:16, 196:23
**amounts**
65:15, 67:7, 137:10, 142:3, 198:25
**amusing**
96:7
**analyses**
32:24, 36:18, 58:9, 161:8, 166:13, 166:14, 171:13, 183:8, 185:6, 190:12
**analysis**
25:20, 26:5, 26:13, 28:21, 53:5, 53:6, 54:7, 101:2, 115:10, 150:20, 151:3, 151:5, 151:8, 153:20, 153:23, 154:12, 165:25, 167:3, 167:20, 169:17, 170:13, 172:4, 172:12, 173:8, 176:8, 177:15, 179:3, 189:23, 192:24, 204:3, 206:9, 211:21, 236:15
**analytical**
25:17, 25:21, 25:25, 26:2, 26:3, 26:5, 26:8, 26:13, 26:17, 26:23, 27:12
**analytics**
25:23

**analyzed**
41:3, 167:7, 204:1, 206:17, 215:22
**analyzing**
30:23
**animal**
141:1
**animals**
139:23
**another**
9:21, 28:5, 81:17, 98:1, 106:14, 107:3, 107:20, 108:5, 108:21, 108:23, 115:8, 125:15, 131:8, 131:11, 138:10, 143:12, 146:12, 178:2, 180:16, 190:17, 190:23, 195:7, 200:14, 206:4, 208:10, 221:11, 235:9, 245:2
**answer**
33:13, 33:17, 55:3, 59:5, 60:20, 61:20, 62:22, 63:5, 63:6, 63:14, 63:17, 63:21, 67:4, 73:8, 76:16, 81:9, 81:24, 82:12, 82:22, 83:5, 90:24, 91:24, 93:21, 94:20, 96:17, 98:11, 149:6, 162:22, 162:24, 163:16, 163:17, 163:18, 170:4, 179:9, 193:23, 194:8, 194:10, 202:23, 204:21, 210:18, 211:24, 212:9, 218:17, 218:21,

220:4
**answered**
23:16, 41:11, 44:11, 60:15, 94:5, 104:3, 132:13, 132:14, 173:16, 193:23, 205:1, 205:10, 206:7
**answering**
93:14, 216:24, 217:2
**answers**
62:19, 65:5, 82:18, 95:5, 96:13, 210:22, 243:6
**antibacterial**
109:20
**anticipated**
240:20
**antifungal**
109:20
**antimicrobial**
178:16, 181:10, 181:22, 182:5, 191:9, 191:21, 192:21, 193:13, 193:19, 194:2, 194:13
**antioxidant**
70:7, 70:11, 70:20, 71:1, 71:3, 149:14, 151:16, 153:4
**antioxidant-free**
245:4, 245:16, 245:25, 246:7
**any**
9:15, 15:23, 16:16, 18:12, 20:1, 25:16, 27:1, 28:9, 31:6, 33:19, 34:24, 35:8, 37:19, 49:2, 49:21, 50:11, 51:11, 52:11,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                252

54:1, 68:6, 69:11, 77:4, 80:18, 81:12, 83:17, 87:4, 87:10, 89:9, 89:16, 90:14, 108:7, 109:18, 110:9, 130:21, 136:14, 137:19, 141:1, 141:21, 144:20, 146:7, 150:23, 151:7, 160:9, 161:13, 161:18, 182:16, 185:2, 185:8, 185:16, 185:19, 186:2, 186:5, 194:3, 203:3, 203:20, 219:16, 227:13, 240:20, 241:19, 241:20, 241:21, 243:9, 243:25, 246:5, 248:14

**anyone**
62:7, 129:14, 246:14

**anything**
18:12, 18:17, 37:19, 51:20, 71:9, 74:23, 81:4, 112:18, 130:3, 157:3

**anyway**
17:16, 117:10, 130:13, 130:21, 222:16

**anywhere**
68:10, 87:3, 89:16, 91:9, 245:22

**apart**
74:1, 74:2, 82:16, 127:9, 142:5, 188:24, 190:5, 219:8

**apologies**
167:17

**apologize**
55:19, 117:19, 206:15, 212:22, 232:16, 238:19

**apotex**
1:9, 3:14, 8:6, 9:3, 9:6, 9:18, 11:19, 12:17, 13:16, 14:13, 156:14, 157:24, 158:14, 239:21, 241:4, 241:19, 242:8, 243:1

**apotex's**
12:1, 239:22, 242:11

**appear**
72:10

**appearances**
3:1, 4:1

**appendix**
5:12, 45:20, 45:23, 46:6, 159:6, 159:11, 159:21, 165:12, 232:13, 233:5, 236:17

**applicable**
25:12, 70:15

**applicant**
88:8

**application**
5:20, 5:22, 5:24, 22:16, 23:7, 23:10, 23:20, 24:15, 25:8, 25:10, 29:19, 29:21, 30:5, 30:12, 32:11, 33:9, 33:20, 50:2, 50:20, 87:15, 87:16, 88:5, 88:11, 89:7, 105:12, 105:14, 105:22, 109:2, 109:4, 109:9, 139:3, 139:4,

139:6, 141:7, 141:8, 141:12, 141:22, 142:2, 144:24, 145:12, 145:19, 146:4, 209:15, 209:16, 237:11

**applications**
23:9, 23:13, 23:19, 24:13, 24:17, 26:4, 89:13, 111:11, 175:7

**applied**
23:25, 25:2, 30:8, 37:7, 89:18, 141:22

**applies**
158:18

**apply**
27:14, 33:6, 89:10, 95:24, 140:17, 212:8, 212:11, 227:8, 240:18, 243:23

**applying**
32:9, 37:5, 177:18

**approach**
50:22, 63:25

**appropriate**
14:22, 29:18, 31:23, 32:2, 32:24, 33:19, 34:1, 36:12, 39:20, 40:7, 53:22, 129:17

**appropriately**
32:9, 38:5

**approvals**
28:24

**approving**
216:18

**approximately**
28:7, 43:22

**aqueous**
6:20, 49:12, 58:2, 65:22,

66:11, 67:23, 155:25, 159:19, 160:1, 160:2, 160:17, 160:21, 160:25, 175:10, 175:22, 177:6, 196:10, 196:21, 199:6, 200:25, 201:1, 201:4, 201:25, 209:5, 210:4, 210:6, 211:6, 211:8, 211:11, 212:18

**area**
34:11, 89:1, 209:2

**aren't**
37:14, 93:18, 144:25, 176:11

**argument**
161:3

**arguments**
127:2, 127:4

**around**
16:25, 17:2, 17:11, 85:8, 90:6, 106:1, 129:8, 139:11, 142:21, 155:13, 233:11, 233:24, 236:16, 236:22

**art**
97:13

**article**
6:18, 199:3, 199:4, 199:8, 199:15, 200:18

**articles**
201:6, 202:25

**ashraf**
10:24

**aside**
59:4, 62:7, 108:22, 185:12, 186:18

**asked**
22:4, 28:6, 41:10, 47:22,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

253

60:14, 60:17, 80:10, 84:1, 104:2, 132:12, 132:14, 134:16, 173:15, 186:16, 204:13, 205:1, 205:10, 206:7, 232:16

**asking**
27:5, 32:6, 33:5, 59:8, 77:24, 86:20, 96:15, 96:18, 104:7, 118:9, 119:1, 119:2, 126:1, 128:5, 133:4, 137:17, 144:5, 148:14, 152:3, 154:23, 156:6, 162:8, 162:21, 167:9, 171:25, 187:24, 188:11, 188:16, 188:24, 194:9, 216:13, 219:20, 237:18

**asparschu@windel-smarx**
4:10

**aspect**
68:2, 68:21, 83:14, 144:21, 170:12, 246:22

**aspects**
21:2, 234:19

**asserted**
40:24, 43:1, 48:19, 117:22, 119:8, 121:7, 125:8, 135:15, 145:4, 150:10, 150:14, 150:16, 233:11, 233:22, 236:21

**asserting**
138:2

**assessment**
225:2

**assign**
94:12

**associate**
115:3, 132:7

**associated**
241:7

**associating**
115:7

**assume**
27:17, 34:25, 45:7, 95:16, 132:1, 149:11, 149:17, 151:19, 156:13, 163:10, 186:20, 208:1, 217:19

**assuming**
186:25

**assumption**
163:12

**assuredly**
60:23

**attempted**
236:16

**attorney**
42:18

**attorneys**
1:21, 156:11, 240:25

**attributable**
188:13, 188:19

**attributing**
168:9

**audrey**
4:5, 8:25

**author**
38:22

**authorities**
161:22

**authorize**
185:16

**authors**
39:12, 39:14

**automatic**
66:5, 160:21

**automobile**
23:2, 23:8

**automobiles**
23:6

**availability**
246:18

**available**
215:9, 235:2

**avenue**
3:7, 3:17, 16:9

**avoid**
158:15

**avoiding**
158:17

**aware**
11:25, 49:21, 52:11, 53:25, 155:23, 185:8, 186:5, 202:14, 202:24, 232:7, 233:22, 233:25, 234:2, 234:4, 234:16, 234:18, 234:23, 235:3, 235:13, 235:24, 238:13, 238:22, 245:7, 245:14, 245:17

**awareness**
238:25

**away**
46:15

**azurity**
1:16, 8:24

---
**B**
---

**b**
5:12, 16:10, 45:23

**bachelor's**
19:13, 20:11

**back**
12:7, 12:8, 20:22, 35:9, 35:13, 38:6, 52:1, 52:22, 60:8, 64:22, 67:1, 69:7, 78:23, 108:12, 123:17, 126:13, 128:13, 136:8, 137:3, 138:20,

164:24, 182:19, 183:23, 184:24, 201:21, 208:17, 222:23, 223:19, 244:15, 244:17

**background**
22:13, 111:21, 124:11, 133:15, 157:13

**bacteria**
192:21

**balance**
21:7, 21:8

**bardales**
4:14, 8:11

**base**
176:16, 217:22

**based**
33:10, 163:12, 198:25, 232:23, 238:15

**bases**
70:3

**basic**
21:10

**basically**
28:20, 73:11, 84:6

**basis**
13:6, 158:3, 236:9

**batch**
58:23

**bates**
222:1, 223:2, 224:9, 226:14, 228:10, 228:25, 230:5, 230:17

**bates-stamped**
6:21, 6:23, 7:3, 7:6, 222:3, 223:3, 228:12, 230:7

**baxter**
8:6, 9:14

**beaker**
163:1

**bearing**
222:1, 223:1,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

254

228:10, 229:21,
230:5
**became**
233:22, 234:16,
237:12, 238:13,
238:22
**because**
10:4, 12:1,
12:9, 15:11,
17:15, 19:23,
22:14, 35:21,
43:16, 45:7,
46:23, 52:22,
53:6, 54:12,
56:6, 56:14,
62:23, 63:20,
63:23, 76:20,
80:12, 85:8,
85:14, 91:1,
94:14, 95:5,
95:6, 96:11,
108:16, 112:14,
129:18, 141:18,
154:1, 158:9,
159:3, 160:23,
163:17, 170:9,
177:10, 181:23,
183:4, 187:21,
196:19, 203:21,
205:18, 208:18,
209:6, 209:8,
213:11, 213:14,
218:13, 219:23,
221:11, 237:22,
241:11
**become**
204:17, 204:18,
204:24, 210:9
**becomes**
53:22, 161:25
**been**
11:3, 15:15,
16:21, 17:12,
17:19, 24:14,
25:2, 28:5,
29:7, 29:14,
30:10, 41:9,
42:5, 44:19,

45:14, 48:1,
52:4, 52:5,
52:8, 53:8,
53:12, 53:24,
54:9, 60:21,
65:21, 66:23,
69:2, 93:1,
93:11, 93:13,
98:5, 111:8,
119:22, 120:19,
126:16, 128:14,
131:5, 132:16,
135:24, 137:14,
137:16, 137:19,
145:15, 164:24,
171:7, 180:12,
193:2, 196:12,
197:4, 197:9,
197:21, 198:11,
198:21, 198:24,
204:8, 208:22,
211:9, 212:16,
212:19, 216:15,
217:12, 219:12,
219:20, 225:17,
237:1, 237:20,
238:4, 238:9,
239:9, 240:11,
241:1
**before**
2:11, 9:13,
15:6, 16:21,
17:5, 34:24,
35:1, 35:2,
44:20, 51:25,
59:5, 62:24,
71:17, 80:21,
84:6, 87:24,
91:2, 130:18,
162:6, 174:17,
194:20, 199:8,
199:25, 200:4,
201:20, 215:17,
216:6, 222:8,
232:16, 234:3,
234:14, 236:13,
237:6, 237:14,
248:12

**beforehand**
234:19
**began**
22:12
**begin**
15:13
**beginning**
50:10, 73:4,
82:12, 83:12,
83:22, 112:22,
112:23, 117:25,
139:15, 193:22,
232:17
**beginnings**
75:12
**begins**
8:2, 106:2,
132:17, 139:12,
166:8, 168:15,
184:7, 200:20
**begun**
238:6
**behalf**
3:3, 3:14, 4:3,
8:20, 8:24, 9:3
**behavior**
215:16, 216:4
**being**
17:19, 40:19,
97:23, 101:6,
101:16, 111:7,
116:8, 117:22,
118:19, 124:19,
125:4, 127:6,
134:4, 138:8,
143:14, 144:8,
158:9, 158:14,
158:15, 181:22,
184:2, 188:13,
192:21, 207:14,
207:15, 236:5
**beings**
139:23
**believe**
17:25, 18:12,
18:14, 42:2,
42:4, 43:23,
50:12, 51:11,

52:25, 56:12,
59:5, 61:13,
65:5, 81:17,
88:24, 90:18,
94:11, 95:11,
105:10, 115:23,
132:8, 159:10,
161:22, 199:15,
201:14, 210:21,
239:25, 240:9,
246:15
**below**
58:24, 147:11
**belrapzo**
172:14, 235:3,
235:14, 235:23,
235:24, 236:1,
236:3
**belrapzo's**
236:24
**bendamustine**
34:24, 35:3,
35:5, 36:15,
43:19, 44:19,
48:9, 48:22,
49:5, 50:13,
51:12, 51:15,
53:19, 54:4,
58:12, 64:25,
65:1, 75:17,
82:14, 99:15,
102:10, 105:8,
114:18, 114:19,
114:25, 121:9,
121:20, 122:18,
123:3, 124:7,
124:15, 125:10,
126:17, 127:6,
128:11, 128:18,
134:23, 135:17,
149:13, 151:14,
153:4, 155:5,
170:21, 170:22,
182:10, 182:18,
183:6, 186:10,
186:23, 187:8,
187:13, 187:15,
188:2, 188:10,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

255

188:13, 189:19, 189:25, 192:7, 197:13, 198:7, 198:14, 218:11, 220:1, 221:2, 221:3, 221:13, 228:1, 228:4

**bendamustine-con-taining**
103:4, 114:11, 198:20

**bendeka**
172:14

**beneficial**
49:12

**benefit-to-risk**
140:1

**benefits**
49:20, 49:21, 50:1, 50:2, 50:7, 53:7

**benzol**
75:16, 147:19

**benzyl**
6:14, 154:8, 190:21, 190:24, 191:2, 191:13, 191:20, 192:6, 192:12, 192:16, 193:3, 193:10, 193:21, 193:25, 194:12, 194:22

**berkeley**
21:18

**bernhardt**
1:23, 2:8, 5:3, 5:8, 5:11, 5:14, 5:17, 8:4, 15:14, 15:22, 15:24, 15:25, 18:2, 45:18, 46:11, 47:1, 247:2, 248:7

**best**
67:19, 92:7, 111:17, 238:9, 248:11

**better**
17:14, 33:24,

49:4, 50:14, 52:15, 54:2, 126:3

**between**
11:10, 67:7, 74:4, 118:23

**beyond**
81:13, 185:17, 185:18

**bio**
235:21, 235:24

**biochemical**
20:23

**biochemistry**
21:15

**biologic**
112:7

**biphasic**
116:21

**bit**
28:16, 55:21, 80:2, 85:8, 122:7, 123:25, 128:14, 163:3

**blood**
248:15

**bodies**
135:10, 230:2

**body**
106:14, 106:15, 107:2, 107:3, 107:19, 107:20, 108:5, 108:6, 121:4, 135:5, 143:12, 143:13, 146:12, 146:13

**bold**
103:1, 103:3

**bookshelf**
174:19

**boston**
1:26, 2:10, 8:15

**both**
15:3, 21:1, 49:18, 57:20, 98:7, 120:1, 122:2, 130:24,

157:10, 193:12, 197:18, 199:15

**bottom**
58:15, 58:16, 71:16, 109:12, 205:19

**bound**
56:23

**break**
14:25, 15:8, 69:3, 69:10, 136:1, 136:13, 183:16, 184:20, 221:16, 221:21, 222:19

**brief**
72:3

**bring**
15:7, 22:10, 25:1

**bringing**
138:13

**broad**
60:20, 103:9, 103:10, 103:18, 111:6, 111:22, 112:14, 118:9, 120:16, 181:18, 216:10, 217:18, 233:14

**broader**
89:1, 210:3

**broadly**
21:12, 36:24, 37:8, 37:25, 39:11, 50:7, 55:7, 89:12, 89:25, 106:22, 128:5, 146:5, 165:8, 169:14, 209:13

**brought**
21:9, 56:16, 117:2, 236:10

**bs**
19:19

**buffer**
206:24, 207:1,

207:14, 207:21, 208:9, 210:9

**buffers**
210:23

**bullet**
231:7

**bunch**
239:12

**burning**
77:22

**business**
16:7

### C

**ca**
1:8, 1:15

**calculation**
182:16, 183:4, 183:11

**calculations**
189:4

**california**
21:18

**call**
38:7, 66:21, 66:22, 97:25, 107:6, 118:21, 119:5, 120:19, 148:11, 153:9, 194:15, 201:6, 209:2, 209:3, 209:4, 209:14, 220:14, 244:18, 245:3, 246:6

**called**
20:5, 42:11, 51:17, 66:17, 120:23, 151:17, 153:7, 164:3, 182:24, 232:14, 242:19, 242:21, 242:22, 245:3

**calling**
66:23, 120:19

**calls**
19:21, 146:25, 160:25

**cambridge**
16:11

**came**
55:3
**can't**
10:1, 10:8, 235:7
**cancer**
36:7, 44:22, 47:24, 48:4, 48:5, 48:8, 53:18, 54:2, 54:6
**cannot**
90:11, 170:9, 188:4
**capable**
152:10
**capital**
48:14
**capitalized**
16:10
**capsule**
176:16
**caption**
9:6
**care**
56:17
**career**
24:1, 25:3, 41:24
**careful**
112:13, 196:19, 196:21
**carlo**
21:23, 22:15, 36:23, 37:20
**carrier**
73:19, 81:17, 94:16, 97:16, 97:22, 99:13, 99:18, 100:2, 100:11, 101:11, 101:18, 101:23, 103:24, 104:8, 105:8, 106:3, 106:9, 106:19, 106:20, 107:4, 107:5, 107:11, 107:23, 108:3,

108:11, 109:18, 109:23, 110:9, 111:3, 142:23, 143:3, 143:7, 143:13, 144:7, 145:18, 145:25, 146:10
**carriers**
99:14, 143:23, 173:6
**carries**
99:19
**carrying**
106:13, 107:18, 108:4, 143:11
**case**
8:8, 9:7, 13:14, 34:24, 35:1, 36:21, 37:19, 40:10, 46:20, 53:8, 59:23, 74:2, 75:1, 75:22, 78:4, 81:14, 83:15, 83:16, 116:19, 129:14, 138:3, 146:17, 149:20, 158:12, 160:7, 162:14, 169:14, 172:17, 173:11, 177:25, 182:16, 185:22, 186:3, 192:15, 201:3, 211:23, 217:21, 222:14, 232:6, 243:12, 244:16, 245:18
**cases**
11:25, 17:16, 35:6, 42:6
**catalog**
26:19
**catalysts**
22:17, 22:20, 22:21
**catalytic**
23:2, 23:5
**categories**
42:10, 43:10,

110:11, 174:25, 178:12, 181:9
**category**
36:4, 42:19, 118:12, 176:15, 178:13, 191:6, 195:17, 239:19, 239:20
**caused**
64:24
**caveats**
198:24
**cellulose**
6:18, 6:19, 199:5, 200:2, 200:8, 200:25
**celsius**
164:6
**center**
28:19
**central**
167:12
**certain**
30:11, 31:15, 35:23, 35:24, 39:9, 41:25, 48:4, 60:3, 62:19, 113:4, 116:11, 147:8, 198:25, 209:4, 217:19
**certainly**
15:4, 21:1, 25:19, 25:22, 26:3, 27:4, 27:11, 39:17, 42:16, 52:9, 59:19, 61:18, 67:24, 68:23, 69:24, 80:5, 87:25, 88:3, 88:16, 88:25, 89:11, 89:19, 90:3, 101:12, 101:14, 103:12, 104:5, 112:4, 117:6, 146:2, 167:7, 169:15,

170:12, 170:15, 171:10, 174:19, 183:2, 184:16, 186:16, 188:25, 202:6, 203:23, 204:1, 209:20, 222:9, 235:3, 235:13
**certificate**
19:1, 19:7, 19:8
**certificates**
18:22, 18:24, 19:4, 58:9
**certified**
2:12
**certify**
248:6, 248:14
**cetera**
21:14
**change**
14:16, 14:19, 39:12, 53:21, 104:23, 120:11, 123:25, 155:17, 161:24, 186:11, 209:8, 219:17
**changed**
74:3, 74:11, 74:14, 165:3
**changes**
15:25, 16:1, 28:1, 39:15, 39:16
**changing**
123:24, 164:9
**characterization**
171:21, 215:3
**characterize**
41:7
**characterized**
97:14, 99:11, 219:6
**characterizing**
101:7
**chart**
166:22, 166:25, 167:11, 167:15,

167:16, 167:22,
168:8
**chatted**
14:9
**chatting**
69:13, 69:14
**check**
26:18, 26:22,
130:10, 199:9,
237:23
**chemical**
19:17, 19:19,
20:1, 21:13,
21:17, 23:21,
25:9, 25:19,
25:23, 36:18,
36:25, 37:1,
37:9, 37:13,
37:15, 38:1,
42:11, 42:17,
42:23, 43:14,
43:16, 106:13,
107:2, 107:19,
143:11, 146:11,
149:21, 162:10,
164:24, 165:2,
165:6, 215:16,
216:4
**chemicals**
89:11, 89:13,
89:14, 102:15
**chemist**
181:2
**chemist's**
60:20
**chemistry**
21:14, 23:12,
24:3, 24:9,
25:17, 25:21,
25:25, 26:2,
26:4, 26:5,
26:8, 26:13,
26:17, 26:23,
55:8, 70:13,
162:2, 162:8,
162:9, 193:9,
206:22, 206:24,
207:6, 207:12,

209:22, 213:1,
221:4, 221:5,
230:24
**chicago**
3:8
**chloride**
71:18, 162:16,
163:8, 163:9,
163:11, 163:14,
164:4, 164:9,
164:17
**choice**
12:19
**choices**
133:10
**choosing**
33:12
**chris**
9:2, 10:12,
11:23, 12:7,
14:17, 244:8
**christopher**
3:15, 3:20
**circuit**
152:12
**circular**
120:4
**circumstance**
148:22, 192:24,
242:24
**citation**
99:16, 121:21,
129:14, 133:11,
135:3, 135:5,
223:23
**citations**
122:1, 123:14,
126:23
**cite**
121:11, 130:22,
224:8, 226:6,
226:8, 226:9,
230:12, 230:15
**cited**
161:23, 177:17,
199:16, 202:15,
228:17, 228:21
**citing**
224:5

**civil**
19:9, 240:18
**civilization**
19:10
**claim**
42:15, 42:23,
60:7, 64:15,
70:24, 72:2,
72:12, 72:21,
72:23, 73:9,
73:11, 73:12,
75:10, 75:23,
76:10, 77:15,
79:1, 83:18,
89:23, 91:18,
128:8, 141:25,
145:8, 145:10,
147:5, 147:10,
150:10, 150:15,
150:17, 150:24,
150:25, 151:17,
158:3, 171:18,
188:9, 190:24,
193:8, 198:7,
198:15, 198:17,
198:18, 218:17,
220:9, 238:2
**claimed**
40:19, 49:22,
55:4, 60:12,
61:11, 61:16,
62:10, 64:9,
65:7, 70:17,
125:4, 155:3
**claiming**
44:12, 44:13,
44:22, 48:21,
112:6
**claims**
40:24, 40:25,
41:2, 41:3,
41:8, 41:14,
41:16, 41:17,
43:1, 43:3,
43:4, 43:7,
43:8, 43:11,
44:17, 44:18,
47:22, 48:1,

48:7, 50:16,
51:2, 51:17,
54:2, 59:17,
60:2, 60:5,
63:19, 64:5,
72:8, 72:10,
72:24, 73:6,
75:2, 75:9,
75:15, 79:23,
92:24, 97:10,
97:12, 100:2,
103:2, 111:18,
111:23, 111:24,
112:23, 113:8,
114:13, 115:22,
115:24, 117:17,
117:20, 117:21,
118:5, 119:8,
119:9, 119:23,
121:7, 123:9,
124:23, 125:8,
127:21, 127:24,
129:3, 129:5,
131:3, 133:12,
133:24, 135:15,
137:24, 141:17,
141:18, 141:22,
144:18, 144:21,
144:25, 145:4,
153:1, 153:8,
177:19, 192:5,
192:24, 197:17,
197:20, 197:23,
206:10, 211:22,
233:11, 235:5,
236:21, 237:3,
237:6, 237:9,
237:11, 237:13,
238:14
**clarendon**
1:26, 2:10,
8:15
**clarify**
80:11, 81:8,
100:9, 205:23
**class**
21:6, 35:11,
35:16, 35:17,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    258

35:19, 36:3,
224:17, 224:18
**classes**
112:6
**classification**
229:22
**classifications**
224:13
**classified**
226:19, 229:9,
231:3
**clear**
25:18, 29:11,
59:14, 63:20,
78:5, 85:1,
104:19, 112:16,
134:8, 137:14,
138:18, 144:4,
162:18, 179:14,
180:3, 180:7,
218:12, 218:13,
219:9, 219:21,
220:14, 223:25,
238:20
**clearly**
63:21, 78:3,
119:22, 149:7,
194:14, 195:22,
235:24
**clinical**
51:4, 51:14,
52:5, 52:6,
52:8, 52:9,
52:12, 52:13,
54:10
**clinically**
49:16, 50:25,
54:13
**clinicians**
51:4
**close**
9:20, 12:15,
17:17, 33:3,
93:25, 99:22
**closed**
241:3, 241:4
**closure**
226:22, 229:12,

231:14
**clr**
1:29
**cmc**
230:25
**co-solute**
211:10, 211:25,
212:21
**co-solutes**
209:6, 209:14
**co-solvent**
75:24, 121:8,
124:6, 125:9,
126:17, 135:16,
178:19, 182:8,
186:12, 187:1,
189:16, 190:2,
193:6, 194:14,
201:5, 208:11,
210:10, 212:1,
212:7, 212:12,
212:20, 212:22,
236:3
**co-solvents**
205:22
**coaching**
242:23
**coatings**
109:19
**coinventor**
90:20, 93:17,
138:22, 139:8,
141:3
**coinventors**
42:4, 88:6,
109:9
**colleague**
8:21, 8:25
**collectively**
226:23, 229:12
**colloquy**
15:12, 77:22,
239:12
**colorless**
179:14
**column**
21:14, 70:10,
71:1, 71:16,

73:10, 122:20,
122:21, 124:4,
124:9, 124:17,
126:2, 126:8,
127:5, 128:19,
129:7, 129:20,
132:19, 132:23,
166:3, 167:12,
175:3, 179:13,
184:6, 184:7,
200:20
**com**
3:10, 3:11,
3:20, 4:9, 4:10
**combination**
187:19, 201:7,
201:25
**combinations**
48:23
**combined**
171:12
**come**
12:8, 19:4,
20:20, 51:25,
153:22, 161:20,
165:20, 172:16,
185:14, 188:5,
200:4, 201:21,
244:15, 244:17
**comes**
12:7, 131:8,
131:11, 209:12,
210:11
**coming**
108:12, 182:11,
182:15, 194:17,
201:3
**commensurate**
140:1
**comment**
239:23
**commercial**
29:7, 231:25,
232:1
**commission**
248:24
**common**
12:5, 12:6,

130:9, 157:12
**commonality**
12:3
**commonwealth**
2:14, 248:2,
248:5
**communications**
157:19
**companies**
29:4, 29:8
**compared**
49:4, 53:19,
54:3
**comparing**
142:5
**compatibility**
140:25, 141:1
**compatible**
109:22, 143:14,
144:8, 221:1
**compendial**
58:19, 227:16
**complete**
45:7
**completely**
15:12, 24:23,
78:22, 116:13,
120:4, 157:8
**completion**
248:12
**complex**
165:10
**complication**
139:25
**component**
116:14, 189:24,
200:9
**components**
43:4, 58:11,
64:5, 64:16,
68:1, 72:15,
73:18, 79:5,
80:8, 82:13,
116:7, 134:24,
147:8, 147:9,
182:10, 188:17,
189:22, 190:1,
190:5, 197:25,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                    259

198:22, 206:19,
221:2
**composition**
43:3, 44:17,
51:1, 51:17,
52:16, 103:4,
103:5, 103:14,
106:10, 113:1,
114:11, 124:18,
124:19, 129:22,
143:8, 164:13,
188:23, 198:20
**compositions**
48:9, 48:22,
49:3, 53:16,
55:4, 61:11,
61:16, 62:10,
64:9, 65:8,
66:17, 70:18,
119:21, 121:10,
126:19, 135:18,
139:20
**compound**
196:15, 207:18,
238:8
**compounds**
35:11, 35:17,
35:22, 35:24,
36:6, 36:7,
36:10, 196:2,
196:4, 196:5,
196:9, 196:17
**comprising**
48:22, 72:2,
91:19, 103:16,
147:6, 147:7,
198:20
**compromise**
158:20
**concept**
62:19, 130:25,
131:8, 131:11,
132:9
**concepts**
218:24, 242:14
**concern**
242:11
**concerns**
240:7

**conclude**
13:15, 135:13,
152:10, 152:16,
152:24, 164:13,
246:24
**concludes**
150:21, 152:1,
152:5, 152:9,
152:11, 202:16
**conclusion**
146:25, 152:7,
153:23, 244:1
**conclusions**
33:10, 172:16,
190:13, 204:4
**concur**
242:10
**conditions**
161:16, 163:11,
163:12, 164:5,
164:10, 164:18,
165:4, 177:23,
177:24, 179:25
**confidential**
1:21, 156:8,
156:9, 156:11,
202:4
**confirm**
69:19, 109:8,
181:2, 228:16,
230:12, 244:11
**confirmed**
68:17
**confirms**
97:11
**confound**
180:12
**confused**
171:23, 215:20,
219:8
**confusing**
167:18, 168:7,
168:12
**confusion**
218:6
**consider**
31:6, 71:10,
186:25, 190:2,

201:6, 236:23,
241:12
**considered**
20:7, 43:13,
120:2, 120:12,
150:11, 199:10,
206:4, 222:12
**considering**
150:9
**consistency**
175:12
**consistent**
50:24, 79:11,
171:11, 172:15,
227:19, 233:8,
236:19
**consisting**
72:14, 80:22,
80:23, 82:25,
102:16, 103:16,
130:16, 146:17,
146:21, 148:16,
148:17, 149:2,
151:22, 152:14,
154:6, 197:24,
220:9
**consists**
73:16, 79:3,
80:7
**consolidated**
157:25, 158:19,
241:11
**construction**
21:13, 75:10,
77:11, 77:17,
95:17, 218:17
**construed**
77:3, 77:13,
100:13, 133:13
**construing**
95:9
**consumed**
161:5, 161:20,
213:9, 213:20,
214:2, 214:16,
214:21, 215:10
**contact**
65:2, 139:22,

244:19
**contain**
121:19, 122:18,
154:4, 154:5,
239:4
**contained**
48:9
**container**
90:13, 226:22,
229:12, 231:14
**containing**
114:10, 154:3,
198:19
**contains**
64:15, 127:17,
170:20, 188:17
**contended**
157:14
**contends**
160:23
**content**
65:18, 87:25
**contention**
77:19, 233:17
**contents**
230:19
**context**
31:6, 40:9,
41:18, 43:17,
64:20, 70:6,
70:17, 70:23,
74:15, 82:15,
84:18, 85:23,
85:24, 86:10,
86:15, 86:17,
86:18, 87:2,
87:4, 92:15,
93:3, 93:11,
94:6, 98:3,
98:12, 98:13,
101:5, 102:3,
102:4, 103:15,
104:5, 104:6,
104:15, 104:20,
105:4, 107:16,
108:18, 111:9,
111:12, 111:14,
112:16, 112:21,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                        260

113:4, 113:16,
115:1, 116:24,
117:6, 118:10,
118:16, 118:17,
119:20, 119:23,
119:25, 120:3,
120:8, 120:25,
128:5, 131:2,
137:17, 138:4,
138:10, 140:15,
140:16, 142:13,
142:14, 146:3,
146:8, 177:16,
197:5, 204:10,
206:9, 206:20,
207:8, 207:9,
208:22, 211:20,
212:24, 213:4,
216:13, 217:18,
218:13, 219:12,
219:13, 233:16
**contexts**
104:17, 104:23,
113:19, 113:21,
120:21, 120:22,
120:23, 128:9,
138:1, 138:6,
138:14, 204:9,
209:23, 213:3,
213:4
**contiguous**
66:6
**continually**
83:3
**continue**
14:23, 150:17,
158:10, 158:25,
240:10
**continued**
3:23, 4:1, 6:25
**continues**
80:7, 110:5,
110:6, 121:12,
159:24, 173:3,
173:19, 179:18,
231:6, 231:8,
235:23
**continuing**
243:22

**contribute**
190:6
**contribution**
188:25, 189:18,
190:8
**control**
229:23
**controlled**
225:4
**controlling**
89:2, 89:7
**controls**
230:25
**convenience**
51:4, 51:9
**convenient**
206:2
**convention**
129:11
**conversations**
69:11, 136:16
**convert**
22:24
**converter**
23:2, 23:5,
23:6
**converting**
22:21
**coordinated**
157:25
**copied**
233:18
**copies**
18:1, 45:6,
45:7
**copy**
17:25, 18:7,
45:1, 46:19,
54:18, 54:19,
56:7, 199:22,
223:9
**copying**
234:1
**core**
26:14
**corner**
55:21
**corp**
1:9

**correction**
121:22, 160:12,
175:16
**correctly**
32:5, 32:8,
37:11, 38:23,
90:17, 97:18,
98:6, 99:23,
106:16, 110:3,
121:23, 122:23,
125:13, 127:16,
140:3, 141:12,
142:7, 143:20,
155:9, 155:20,
226:25, 227:1,
229:15, 231:5,
231:16
**could**
18:15, 18:19,
22:23, 24:13,
24:16, 26:22,
31:12, 34:6,
34:8, 35:13,
36:8, 40:7,
43:15, 43:21,
45:14, 47:2,
50:6, 53:21,
63:14, 64:13,
68:16, 70:4,
70:14, 70:15,
72:6, 78:8,
87:10, 89:25,
97:24, 100:8,
108:15, 113:18,
114:13, 120:22,
120:23, 123:14,
130:10, 138:20,
140:23, 142:18,
154:12, 161:11,
168:10, 175:24,
177:1, 181:14,
190:7, 191:13,
191:20, 191:21,
193:11, 193:12,
194:12, 208:14,
208:15, 210:9,
212:16, 216:22,
217:4, 217:22,

228:3, 228:24,
234:12, 242:22
**counsel**
8:17, 14:10,
39:1, 43:1,
43:6, 43:9,
56:20, 56:25,
69:11, 76:16,
94:19, 94:23,
95:14, 96:1,
96:9, 136:15,
158:8, 158:13,
221:24, 222:18,
239:22, 240:8,
242:11, 243:1,
243:19
**counsel's**
121:22, 243:20
**count**
15:11
**counted**
20:18, 239:24
**counteroffer**
13:18
**couple**
20:20, 28:5,
239:18, 243:16
**course**
10:20, 20:5,
20:23, 20:25,
21:7, 21:14,
25:21, 25:25,
26:1, 26:6,
26:18, 27:6,
27:8, 27:10,
38:18, 49:1,
71:8, 71:18,
200:8, 202:3
**courses**
20:2, 20:3,
20:7, 20:16,
20:17, 20:20,
20:21, 21:4,
21:6, 21:10,
21:13, 21:15,
22:5, 25:14,
25:16, 25:20,
25:22, 26:3,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                        261

26:7, 26:9,
26:13, 26:16,
26:21, 27:1,
27:5
**coursework**
20:12, 26:25
**court**
1:1, 8:7, 9:8,
10:8, 10:12,
63:5, 87:20,
243:24, 244:4
**cover**
12:4, 105:23,
109:10
**created**
43:20, 43:25
**creates**
51:3
**creating**
51:3, 92:6
**criteria**
231:10
**cross**
5:2
**cross-examination**
10:2
**crowley**
85:15, 86:11,
161:23, 199:16
**crr**
1:29
**crystallization**
89:2, 89:8,
92:3, 93:18,
138:24
**crystallizing**
91:20
**cure**
44:22, 47:24
**curiosity**
110:13, 110:14
**current**
16:7, 16:12,
114:13, 146:17
**currently**
16:2, 234:10,
236:5
**curriculum**
5:8, 18:2

**cut**
246:3
**cv**
17:25, 18:7,
27:15, 38:7,
42:3
**cv--jlh**
9:7

---
**D**

**d**
240:23, 243:13
**damages**
246:16, 246:22
**dash**
135:13
**data**
49:8, 185:12,
189:5
**date**
8:9, 215:17,
215:22, 216:1,
216:2, 239:4
**dates**
234:1, 234:4,
234:11, 234:13,
234:14, 238:11,
238:24
**day**
12:11, 14:4,
40:12, 74:12,
205:13, 248:19
**days**
10:20, 11:6,
13:5, 14:3
**dc**
3:18
**december**
57:20
**decide**
156:17
**decision**
233:9, 236:19
**def**
82:4
**defendant**
4:3, 14:6
**defendants**
1:10, 1:18,

3:14, 8:24, 9:4,
10:19, 11:2,
13:19, 13:24,
156:20
**defending**
15:3
**define**
43:15, 61:10,
61:15, 95:21,
108:8, 111:8,
116:25
**defined**
80:22, 81:5,
81:8, 81:10,
90:11, 106:22,
107:15, 117:13,
117:25, 128:9,
128:10, 131:13,
145:6
**defines**
121:13, 122:13,
132:18, 132:20
**defining**
140:11
**definition**
74:3, 74:10,
81:13, 85:10,
92:9, 92:12,
93:5, 93:8,
95:23, 102:18,
103:19, 104:22,
107:11, 108:9,
108:18, 108:19,
110:22, 111:3,
111:7, 125:22,
140:5, 140:17,
141:4, 141:25,
144:12, 144:16,
145:17, 145:19,
145:23, 145:24,
146:3, 146:14,
151:19, 196:4,
197:2
**definitional**
118:11
**definitions**
86:1, 86:13,
103:11, 144:16,

227:17
**degradant**
31:5, 228:1,
228:4
**degradation**
30:23, 30:24,
36:19, 37:9,
226:20, 226:23,
229:9, 229:13,
231:3, 231:10,
231:11, 231:22,
231:24
**degrade**
64:25, 65:1
**degraded**
221:5, 221:13
**degree**
19:13, 20:18,
30:8, 30:12,
31:10, 32:10,
33:7, 129:21,
129:24
**degrees**
18:21, 18:23,
19:2, 19:3,
20:12, 30:4,
145:10, 161:16,
164:5
**delaware**
1:2, 8:8, 16:19
**deliberate**
233:9, 236:19
**deliberately**
67:9
**delineate**
43:4
**delivers**
242:4
**delivery**
112:19
**density**
21:22, 22:14,
36:22, 37:10
**departure**
108:10
**depend**
39:9, 197:5
**depending**
108:17, 110:5,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                              262

181:5, 202:7, 239:7

**depends**
31:23, 36:6, 39:24, 40:2, 40:8, 82:25, 86:15, 87:2, 113:3, 116:24, 118:16, 119:19, 229:22

**deponent**
240:24

**depos**
8:12, 9:9

**deposed**
16:21, 157:22, 240:24

**deposes**
15:17

**deposition**
1:23, 2:8, 8:3, 8:14, 10:4, 10:11, 10:19, 11:14, 11:17, 12:21, 13:3, 13:16, 15:2, 45:15, 95:1, 96:9, 96:10, 158:10, 158:16, 240:5, 240:12, 241:2, 241:3, 241:4, 241:8, 242:8, 243:10, 243:11, 243:22, 244:2, 247:2, 247:4, 248:12

**depositions**
10:5, 10:23, 11:4, 15:6, 157:17, 158:11, 240:6, 240:12

**depth**
22:17

**derivative**
201:1

**describe**
171:18, 211:10

**described**
153:15, 171:16,

183:7, 184:2, 184:11, 211:12

**describes**
168:16

**describing**
48:21, 99:21, 119:22

**description**
5:7, 6:2, 7:2, 170:19, 176:6, 179:12, 179:17, 183:21, 215:14

**descriptions**
41:1, 141:2

**design**
233:11, 236:16, 236:22

**design-around**
236:25

**designate**
36:8, 156:8, 156:17

**designation**
35:20, 35:21

**designed**
233:18

**detail**
41:16, 68:16, 94:2, 94:9

**details**
93:23, 108:13

**determine**
189:15

**determines**
151:8

**determining**
171:17, 172:20

**developed**
78:4, 234:10, 235:11, 237:7, 238:4, 238:15, 238:17, 238:18, 239:1

**developing**
89:4, 89:6, 234:22, 235:17

**development**
233:8, 234:14,

236:18, 237:15, 238:5

**dictionaries**
93:9

**dictionary**
86:1, 86:13

**die**
89:14

**difference**
51:14, 137:17

**differences**
11:24, 141:10, 242:14

**different**
12:11, 23:6, 30:17, 30:19, 35:25, 43:10, 63:13, 64:4, 81:16, 86:4, 92:20, 103:7, 104:16, 104:17, 104:23, 111:12, 117:13, 120:21, 120:22, 132:18, 137:25, 138:1, 140:17, 141:3, 141:11, 142:14, 142:15, 147:24, 148:9, 161:6, 161:7, 162:21, 176:17, 177:3, 186:19, 193:5, 193:8, 193:24, 201:21, 204:9, 207:9, 208:21, 209:7, 209:8, 209:15, 209:16, 209:17, 209:23, 211:13, 212:5, 212:6, 212:24, 212:25, 213:2, 218:7, 219:7, 242:12, 242:16, 242:25

**differentiate**
68:6

**differentiated**
67:9

**differentiating**
37:15

**differently**
81:11, 124:1, 209:24

**diluent**
106:11, 143:9

**dimas**
4:14, 8:11

**direct**
5:2, 15:18, 23:20, 124:20, 176:17, 200:25

**directly**
19:12, 21:5, 26:15, 37:5, 54:11, 70:13, 71:6, 85:14, 176:12, 215:2, 237:3

**disagree**
90:21, 93:4, 93:7, 154:2, 158:25, 199:19, 207:17, 207:19, 240:22, 243:14

**disagreement**
184:17

**disassociates**
215:7

**disclose**
77:16

**disclosure**
79:11

**disclosures**
79:10, 79:14

**discount**
177:10

**discovered**
44:13

**discuss**
14:19, 14:25, 34:7, 39:17, 41:12, 48:12, 49:11, 50:1, 50:6, 55:11, 57:8, 57:23, 58:6, 58:25,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

263

68:22, 68:25,
74:20, 74:21,
75:21, 83:11,
86:19, 87:2,
102:5, 103:17,
104:15, 115:19,
115:21, 116:25,
117:6, 117:25,
120:24, 124:11,
125:3, 126:25,
138:14, 140:25,
153:18, 161:5,
162:3, 166:1,
167:7, 173:17,
180:6, 186:4,
198:10, 201:14,
203:25, 207:9,
218:24, 227:5,
227:23, 234:7,
234:19, 235:4,
240:19, 245:11
**discussed**
36:16, 48:20,
61:1, 65:14,
67:1, 67:25,
72:12, 73:3,
85:24, 88:17,
93:9, 99:10,
114:23, 129:4,
131:4, 142:12,
145:9, 155:16,
172:25, 179:11,
181:7, 181:19,
182:21, 183:8,
189:22, 197:25,
206:18, 206:20,
227:24, 234:15,
239:3, 245:2,
245:18
**discussing**
15:10, 48:1,
53:24, 60:22,
93:13, 98:5,
126:16, 128:14,
131:5, 137:19,
145:16, 193:2,
197:9, 198:21,
204:8, 219:12,

237:1
**discussion**
57:10, 59:6,
69:20, 73:23,
83:14, 93:2,
118:3, 127:1,
142:16, 180:5,
213:5, 213:7,
221:15, 223:18,
223:20, 228:19
**discussions**
136:14
**disinfectant**
178:17, 181:11,
191:10
**disperse**
177:11
**dispersed**
116:1, 124:16,
128:23, 129:16,
129:19, 129:21,
129:23
**dispersing**
131:1
**dispersion**
109:19, 110:8,
110:10, 110:12,
114:6, 114:8,
114:14, 114:21,
116:19, 116:22,
118:6, 118:13,
127:20, 164:15
**dispersions**
114:4, 116:16,
116:17, 118:13,
127:22, 127:24,
128:1, 128:9,
129:6
**dispute**
77:17, 77:24,
91:12, 92:4,
161:18, 218:25,
239:8
**disrupting**
95:3
**dissertation**
22:1, 23:15,
24:3, 24:7,

24:20, 36:14
**dissolution**
58:3, 189:20
**dissolve**
75:17, 119:16,
120:11, 121:8,
124:7, 125:9,
126:17, 132:10,
132:23, 133:19,
134:5, 134:23,
135:16, 135:19,
136:22, 137:11,
142:3, 161:24,
164:1, 186:10,
186:23, 187:18,
192:7, 197:13,
197:14, 198:7,
210:9
**dissolved**
115:1, 116:1,
116:2, 118:22,
119:3, 121:21,
122:19, 123:3,
124:15, 127:6,
127:18, 127:21,
128:12, 128:18,
128:23, 129:9,
129:16, 129:21,
131:6, 161:14,
161:15, 163:8,
163:13, 163:24,
164:3, 164:12,
164:19, 164:20,
169:7, 188:10,
188:12, 198:22,
198:23, 204:13,
204:15, 204:16,
206:24, 207:13,
208:10, 211:6,
211:11, 215:11
**dissolves**
160:23, 162:16,
163:4, 182:9,
182:18, 204:23,
205:7, 206:3
**dissolving**
6:19, 116:20,
130:25, 163:23,

177:12, 189:18,
189:25, 199:5
**distinction**
67:6
**distinguishing**
68:2
**district**
1:1, 1:2, 8:7
**divide**
13:19
**doctor**
52:2
**doctrine**
150:15, 151:1,
151:9
**document**
6:21, 6:23,
7:3, 7:6, 18:6,
88:2, 88:20,
90:6, 105:11,
106:1, 107:21,
109:1, 109:12,
140:12, 146:14,
160:13, 165:13,
168:14, 189:11,
203:23, 222:1,
222:3, 222:8,
222:9, 223:1,
223:3, 224:25,
225:7, 226:7,
227:13, 227:24,
228:10, 228:12,
228:17, 229:16,
230:1, 230:5,
230:7
**documents**
58:13, 126:24,
188:6, 222:13,
226:9, 230:1,
231:19, 232:2
**doing**
17:12, 28:23,
29:1, 33:11,
94:24, 169:15,
169:16, 193:11,
194:3
**done**
10:5, 31:4,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

264

34:10, 35:14,
53:5, 53:6,
53:23, 54:6,
92:2, 96:9,
96:10, 115:10,
148:1, 148:2,
148:3, 148:5,
171:14, 173:8,
177:15, 179:3,
185:2, 185:4,
185:9, 186:2,
189:2, 190:12,
206:9, 211:21,
217:21
**dosage**
97:16, 99:13,
101:18, 139:20
**dose**
225:5
**dosing**
58:20
**double**
169:22, 170:6
**double-check**
42:2, 141:18
**doubt**
126:24, 130:21
**down**
51:24, 58:1,
171:2, 175:8,
215:5, 229:25
**dr**
5:10, 5:17,
8:4, 10:23,
10:24, 45:17,
46:25, 69:10,
85:15, 86:11,
87:24, 105:20,
129:7, 135:23,
157:10, 157:13,
161:22, 161:23,
162:20, 174:11,
174:14, 185:7,
186:1, 199:16,
200:14, 202:11,
202:15, 203:15,
215:3, 218:5,
219:24, 232:5,

241:17, 241:20,
245:1, 245:9,
245:17, 246:5,
247:2
**dr2**
222:9
**drawing**
152:6
**drive**
8:13
**driver's**
15:16
**droplet**
91:21, 92:17,
92:20
**droplets**
92:2, 92:6,
92:18, 119:4,
119:11
**drug**
20:25, 51:12,
52:12, 52:16,
108:1, 169:12,
226:19, 226:20,
226:21, 228:5,
229:8, 229:9,
229:10, 231:4,
231:14, 231:23
**due**
190:8
**duly**
15:15, 248:8
**duplicate**
208:18
**duration**
240:25
**during**
69:10, 90:12,
99:10, 136:13,
158:16, 160:6,
160:25, 227:21,
237:10
**dynamic**
21:23, 22:15,
36:23

--- E ---

**e**
109:25

**each**
11:17, 14:2,
14:11, 14:13,
72:25, 75:13,
84:9, 116:21,
118:22, 119:4,
119:16, 120:11,
137:15, 137:16,
143:13, 144:7,
147:10, 150:10,
170:20, 192:3,
208:3
**eagle**
1:5, 1:6, 1:12,
1:13, 8:4, 8:19,
8:21, 13:24,
236:10, 237:19,
237:21, 238:1,
238:10, 238:15,
238:17, 240:8,
241:19
**eagle's**
233:9, 236:20
**eagleben-sa**
6:22, 6:24,
7:4, 7:7, 222:2,
222:4, 223:2,
223:4, 228:13,
229:1, 230:6,
230:8, 230:17
**eagleben-sa_**
228:11
**earlier**
48:20, 64:19,
88:17, 117:10,
157:4, 164:14,
173:6, 173:23,
208:24
**earliest**
237:25
**early**
24:1
**easily**
237:23
**easy**
51:7
**edification**
55:23

**edition**
174:19
**education**
18:20, 18:25,
38:16
**effectively**
213:20, 214:2,
214:15, 214:20,
215:10
**effects**
190:9, 211:12,
211:13
**efficiencies**
157:11, 157:16,
241:7
**efficient**
50:23, 50:24,
51:5, 241:12
**either**
12:14, 20:24,
34:18, 37:23,
69:21, 113:25,
175:11, 187:1,
224:17, 236:14,
245:3, 246:1
**elaborate**
22:3, 49:1
**elaborated**
84:8
**element**
145:2, 145:3,
147:22, 224:13
**elemental**
223:20, 224:25,
225:16, 227:19,
227:25
**elements**
224:21, 224:22,
225:11, 225:15,
225:24
**ellipse**
39:19, 40:6,
129:18, 129:25
**ellipses**
130:7, 130:18
**else**
91:7, 91:10,
98:9, 185:21,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    265

| | | | |
|---|---|---|---|
| 209:19, 246:14 | encompass | epidermal | 236:24, 237:1, |
| **else's** | 113:23, 114:4, | 109:25 | 237:2, 237:5, |
| 62:7 | 114:14, 117:16 | **equally** | 237:12, 238:3, |
| **elsewhere** | **encompasses** | 212:8 | 239:6 |
| 124:23, 141:23, | 117:12 | **equals** | **ethics** |
| 226:4 | **end** | 85:18 | 38:16, 38:17, |
| **elucidate** | 51:9, 71:13, | **equate** | 38:19, 38:21 |
| 23:11 | 102:23, 122:2, | 133:17, 133:21 | **ethyl** |
| **elucidated** | 149:9, 150:21, | **equating** | 181:4 |
| 21:21 | 171:3, 226:7, | 97:22, 97:25, | **evaluated** |
| **elucidating** | 247:1 | 133:4, 133:7, | 225:3 |
| 23:21 | **ending** | 133:21 | **evaluating** |
| **elucidation** | 224:9, 226:14 | **equilibrium** | 97:12 |
| 25:9 | **ends** | 215:11 | **evaporate** |
| **email** | 122:22 | **equivalence** | 164:23 |
| 13:8, 14:1 | **energy** | 235:19, 235:22 | **even** |
| **emails** | 21:7 | **equivalent** | 11:25, 35:11, |
| 13:10, 15:1, | **engineering** | 170:21 | 39:12, 44:9, |
| 157:19 | 19:17, 19:20, | **equivalents** | 69:13, 95:23, |
| **embodiment** | 20:1, 20:23, | 150:15, 151:2, | 106:24, 111:23, |
| 124:14, 125:4, | 21:13, 21:17, | 151:10 | 141:16, 141:19, |
| 127:23, 235:5, | 25:19, 162:10 | **especially** | 144:19, 144:24, |
| 235:15, 235:25 | **english** | 240:23 | 150:3, 150:15, |
| **embodiments** | 129:12 | **esquire** | 155:8, 157:14, |
| 129:4, 145:8 | **enhancer** | 3:4, 3:5, 3:15, | 164:6, 164:19, |
| **emphasize** | 195:15 | 4:4, 4:5 | 172:5, 192:19, |
| 138:16, 146:9, | **enough** | **established** | 234:2, 238:5, |
| 183:12 | 65:2, 141:8, | 225:17 | 239:6, 245:13 |
| **emphasizing** | 203:22, 239:14 | **establishing** | **ever** |
| 196:12, 208:22 | **entire** | 231:9 | 15:23, 19:22, |
| **employ** | 14:1, 76:23, | **et** | 29:9, 29:22, |
| 37:3, 141:3 | 95:10 | 8:5, 21:14 | 30:15, 32:12, |
| **employed** | **entirely** | **ethanol** | 34:23, 35:8, |
| 16:2, 139:19, | 11:21, 57:19, | 75:16, 147:19, | 42:13, 101:13, |
| 140:10, 141:11 | 240:22 | 154:8, 169:8, | 146:7, 197:1 |
| **employer** | **entities** | 181:3, 181:5, | **every** |
| 16:4 | 42:17 | 181:8, 181:10, | 149:11, 184:13 |
| **emulsion** | **entitled** | 181:14, 181:21, | **everyone** |
| 116:21, 117:13, | 6:18, 38:16, | 182:2, 182:17, | 164:21 |
| 118:4, 119:15, | 175:7, 199:4 | 182:21, 182:23, | **everything** |
| 120:1, 120:10 | **entity** | 186:8, 186:12, | 26:14, 115:25, |
| **emulsions** | 42:11, 42:23, | 186:21, 187:1, | 116:4, 172:11, |
| 118:12, 118:18, | 43:14, 43:16, | 187:16, 187:18, | 198:8, 199:11, |
| 119:3, 120:19, | 150:9 | 188:3, 188:13, | 218:20 |
| 120:20, 176:2, | **environment** | 188:17, 188:19, | **evidence** |
| 176:22 | 67:8 | 192:6, 205:5, | 5:13, 45:24, |
| **encapsulating** | **envision** | 236:1, 236:4, | 54:1, 83:6, |
| 106:12, 143:10 | 31:25 | 236:6, 236:8, | 100:2, 100:11, |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    266

128:7, 135:20,
172:7, 172:10,
186:8, 186:15,
186:18
**evidenced**
157:18
**evidently**
78:5
**exact**
18:9, 20:24,
43:22, 52:12,
52:22, 67:16,
234:13
**exactly**
12:2, 25:3,
26:21, 33:4,
75:6, 82:1,
82:3, 96:4,
120:19, 126:10,
147:2, 147:4,
174:18, 187:12,
196:19, 208:15
**examination**
10:21, 15:18
**examiner**
94:14, 97:13,
99:11, 101:7,
101:8, 101:9,
101:15, 107:24
**examiner's**
97:9, 99:17,
100:1, 100:10
**examining**
157:10
**example**
30:24, 48:2,
48:13, 57:18,
57:25, 59:20,
59:21, 59:23,
61:23, 63:23,
63:24, 64:2,
70:2, 70:9,
70:24, 71:7,
72:17, 72:24,
73:10, 73:21,
74:16, 79:7,
86:10, 91:18,
93:8, 104:4,

114:9, 114:12,
128:22, 138:19,
142:7, 154:14,
164:18, 166:14,
192:1, 198:11,
205:19, 209:12,
209:21, 211:17,
218:4, 227:12,
235:4, 235:14,
237:22
**examples**
102:11, 113:20,
124:25, 134:1,
212:14
**exceeded**
17:20
**except**
112:5, 151:1
**exception**
227:6
**exceptions**
112:15, 112:19,
147:20, 165:9
**excerpt**
6:3, 6:6, 6:9,
6:12, 6:15,
174:5, 174:7,
174:14, 178:2,
178:5, 180:16,
180:19, 190:17,
190:19, 190:23,
195:8, 195:10
**excerpts**
150:17
**excessive**
139:24
**exchanged**
157:19
**excipient**
58:19, 106:11,
136:22, 143:9,
169:12, 172:5,
193:15, 193:25,
226:22, 229:11
**excipient(s**
231:13
**excipients**
6:4, 6:7, 6:10,

6:13, 6:16,
61:6, 62:3,
121:9, 124:8,
125:10, 126:18,
135:17, 174:6,
174:8, 174:15,
178:3, 178:6,
180:18, 180:20,
181:6, 190:20,
194:11, 195:11,
197:14, 227:15
**excise**
242:5, 243:18
**exclusively**
211:8
**excuse**
61:14
**exemptions**
206:13
**exhaust**
23:3
**exhibits**
56:15, 56:16,
159:12
**exist**
242:14
**existing**
44:14, 159:11
**expanded**
79:19
**expect**
26:19, 32:21,
33:1
**experience**
50:19, 194:12,
196:25
**experiment**
185:17, 185:22
**experimental**
185:5
**experiments**
185:2, 185:4,
185:8, 185:13,
185:20, 186:1,
186:2
**expert**
5:10, 5:16,
17:12, 17:20,

40:23, 41:20,
45:17, 46:20,
46:25, 47:3,
77:19, 85:13,
103:9, 147:3,
152:4, 173:18,
181:24, 205:18,
233:1, 246:17
**expert's**
202:12
**experts**
41:6, 41:21,
130:11, 163:19
**expires**
248:24
**explain**
31:12, 75:20,
82:20, 126:14,
134:3, 149:8,
203:17, 212:23,
214:17, 218:18
**explained**
41:18, 64:16,
81:5, 87:9,
121:4, 128:6,
128:13, 130:6,
140:14, 155:2,
170:15, 192:18,
209:17, 212:23,
215:5
**explaining**
75:8, 78:24,
79:6, 79:16,
80:3, 81:19,
101:6, 101:14,
101:20, 103:21,
104:6, 198:24,
207:7
**explains**
73:24, 121:15,
121:18, 122:16
**explanation**
73:19, 80:18,
133:22, 137:23
**explicit**
71:22, 233:3
**explicitly**
37:23, 71:2,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

267

71:17, 72:19,
72:20, 73:13,
128:24, 140:11,
193:21, 227:24
**express**
95:4, 219:14
**expressed**
133:24, 219:15
**expressly**
121:13, 122:13,
131:13, 132:17
**extensive**
22:6, 50:18,
114:19, 153:19,
204:3
**extensively**
72:13, 74:22,
197:25
**extent**
12:4, 14:16,
15:5, 60:6,
71:24, 79:25,
132:13, 146:24,
161:10, 161:13,
194:8, 203:3,
210:13, 211:3
**extremely**
120:16
**eyes**
1:21, 156:11

---
**F**
---

**face**
78:8
**facilitate**
92:3, 94:25
**fact**
29:6, 66:5,
120:10, 120:12,
156:7, 158:20,
164:9, 166:15,
167:3, 168:1,
169:18, 183:5,
219:17, 229:19,
236:8, 245:2
**factor**
236:14
**factual**
156:6, 218:25

**fair**
24:11, 33:1,
33:16, 34:9,
42:7, 42:20,
44:15, 53:14,
63:16, 74:25,
82:22, 141:8,
191:12, 208:4,
243:3
**fairly**
18:10, 61:3
**fairness**
11:11
**fall**
36:3, 70:25,
72:2, 118:12,
224:17
**fallacy**
172:9
**falls**
224:20
**false**
88:15
**falsifying**
33:25
**familiar**
19:24, 70:2,
93:22, 174:22,
199:10, 199:11,
222:13, 222:16
**familiarize**
91:23
**far**
18:23, 23:7,
30:3, 37:5,
49:8, 53:23,
71:21, 116:4,
145:11, 150:23,
194:7, 200:3
**farther**
171:2, 229:25
**favorite**
180:22
**fda**
28:24, 29:3,
57:22, 171:16,
173:12, 173:20,
173:24, 216:18,

216:23, 217:9,
217:13, 217:20,
229:19
**federal**
152:11, 243:22
**feel**
76:3, 240:17
**feeling**
74:20, 217:17
**ferenc**
3:15, 9:2,
10:3, 10:10,
10:15, 13:1,
13:6, 14:21,
156:17, 156:21,
156:25, 157:4,
157:7, 158:11,
240:3, 241:13,
241:16, 243:15,
243:19, 244:10,
244:14, 244:21
**ferenc@katten**
3:20
**few**
17:2, 28:13,
50:8
**field**
42:10, 52:10,
66:19, 70:16,
84:19, 84:23,
85:6, 85:9,
86:22, 90:3,
101:24, 104:9,
120:9, 136:19,
137:7, 137:10,
140:7, 144:1,
145:20, 165:10,
197:1, 208:25,
209:13, 210:3,
211:5, 212:16,
217:19
**fifth**
38:15, 215:1
**figure**
43:21
**file**
85:25, 94:15,
102:12, 104:21,

119:24, 124:24,
133:25, 173:7,
193:1, 237:22,
237:23
**fill**
90:12
**filler**
106:11, 143:9
**final**
68:3, 68:5,
160:9, 160:10,
229:23
**find**
28:15, 55:10,
57:4, 58:25,
67:13, 67:16,
67:17, 68:25,
72:1, 78:11,
118:2, 159:25,
162:4, 179:7,
183:3, 188:7,
200:15, 201:14,
201:16, 202:2,
203:4, 203:6,
213:6, 213:11
**finding**
117:5, 117:14,
232:20, 236:9
**fine**
40:14, 55:15,
57:5, 82:10,
89:14, 100:20,
120:7, 131:25,
152:20, 155:17,
201:17, 202:23,
205:16, 205:25,
215:24, 221:18,
221:20
**finish**
62:17, 63:5,
98:11, 240:2
**finished**
58:22, 63:9,
63:10, 227:18
**first**
10:11, 15:25,
17:16, 18:5,
21:6, 88:20,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

268

91:9, 97:6, 97:18, 105:21, 135:4, 154:17, 154:18, 160:11, 161:4, 175:3, 177:7, 182:19, 194:7, 198:16, 213:21, 223:17, 225:10, 225:12, 225:14, 225:24, 226:17, 228:25, 229:6, 229:14, 230:18, 230:22, 242:12

**five**
28:19, 82:13, 84:4, 98:15, 100:23, 102:9, 102:15, 148:17, 195:24, 196:2, 196:16, 215:4, 220:8, 221:17

**flipping**
69:22, 89:5, 92:1

**flow**
49:21, 90:12, 90:15

**flows**
92:21

**fluids**
79:23, 81:12, 92:20, 93:17, 115:21, 127:7, 148:17, 148:18, 148:24, 151:15, 151:24, 190:24, 195:25, 220:9, 220:14, 220:21

**focus**
11:19, 22:24, 23:7, 23:10, 23:19, 26:8, 26:10, 30:13, 68:7, 111:19, 116:8, 163:22, 167:3, 167:20, 215:21

**focused**
9:18, 21:1, 22:6, 22:7, 23:14, 28:10, 64:21

**focusing**
181:8

**follow**
80:23, 125:13, 166:19

**followed**
25:5

**following**
31:13, 100:7, 184:4, 212:6

**follows**
15:17, 82:25, 137:22

**foregoing**
248:11

**forget**
187:12

**form'**
97:16

**formal**
25:24, 225:2

**formed**
83:17, 236:8

**forming**
95:10, 205:6

**forms**
139:20

**formulation**
20:2, 20:4, 20:6, 20:8, 21:2, 22:9, 24:21, 24:25, 25:4, 43:3, 43:5, 43:7, 44:14, 44:17, 48:1, 49:6, 50:20, 52:14, 58:22, 60:13, 60:17, 61:25, 65:22, 66:4, 68:22, 72:7, 99:15, 107:5, 107:7, 107:12,

107:25, 108:3, 108:4, 114:1, 143:15, 144:9, 151:13, 152:1, 153:2, 153:14, 164:11, 172:6, 175:8, 178:23, 181:14, 189:17, 191:14, 191:16, 191:18, 193:4, 193:12, 194:1, 194:4, 198:8, 212:17, 213:10, 218:11, 233:10, 235:18, 236:20, 245:3, 245:4, 245:5, 245:6, 245:15, 245:16, 246:1

**formulations**
48:3, 48:6, 49:13, 49:15, 49:22, 50:15, 54:1, 55:5, 113:5, 191:19, 208:8, 211:14, 220:2, 220:11, 246:6

**formulators**
235:10

**forth**
48:6, 147:9, 248:8

**forward**
11:2, 95:1, 103:10

**found**
17:15, 110:16, 159:20

**foundation**
144:3, 216:21

**four**
57:9, 73:17, 97:6, 126:24, 221:22, 241:10

**fourth**
175:9

**fraction**
116:7, 116:11

**frame**
90:12

**framework**
240:10

**frankly**
92:6, 105:4, 126:22, 137:22

**free**
76:3

**freeze-dried**
51:16

**french**
19:10

**friday**
1:24

**front**
78:13, 78:16

**frustrated**
96:14

**frustration**
95:4, 96:13

**full**
15:20, 98:4, 100:23, 129:1, 129:13, 130:7, 130:22, 130:23, 130:24, 131:22, 135:11, 138:16, 140:15, 161:3, 214:24

**fully**
12:1, 61:20

**function**
73:2, 73:25, 115:13, 166:3, 166:17, 167:4, 167:13, 168:2, 168:16, 168:23, 169:13, 169:19, 173:1, 173:13, 179:1, 182:6, 192:17, 192:19, 193:5, 193:6, 194:18, 194:19, 198:2, 212:25

**functional**
21:22, 22:15, 36:22, 37:10,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    269

172:6, 174:25,
176:15, 178:12,
181:9, 191:6,
195:17, 214:16,
227:14

**functions**
70:19, 172:20,
176:17, 178:22,
191:3, 195:14,
211:13

**fundamental**
21:4, 76:7,
77:24

**further**
49:1, 97:11,
121:15, 121:18,
122:16, 135:21,
148:18, 192:12,
248:14

**furthermore**
220:5

G

**gas**
86:7, 86:15,
86:23, 87:6,
90:10, 93:6,
102:19, 180:14

**gases**
84:21, 85:11,
113:6, 113:25

**gather**
84:11

**gave**
22:13, 61:23,
199:23, 200:15

**geared**
28:23

**general**
39:3, 91:12,
93:5, 104:7,
104:18, 104:22,
108:10, 108:17,
108:19, 110:22,
111:2, 111:6,
112:15, 113:22,
118:11, 137:1,
137:4, 137:5,

138:6, 140:5,
143:24, 144:12,
162:1, 162:8,
162:14, 163:22,
171:12, 196:3,
204:12, 206:14,
206:16, 207:11,
216:16, 232:3,
240:17

**generalizations**
112:14

**generally**
36:7, 70:15,
71:5, 89:18,
104:9, 104:10,
113:25, 120:18,
136:20, 136:21,
140:7, 142:12,
165:10, 174:23,
177:22, 177:25,
222:12, 222:16

**generic**
231:14

**getting**
31:9, 34:5,
157:22

**give**
29:19, 33:17,
47:19, 61:20,
62:8, 73:8,
90:23, 91:23,
135:19, 138:23,
163:1, 232:2,
232:5, 243:5,
244:18, 245:19

**given**
17:4, 17:7,
30:4, 33:8,
64:6, 72:7,
82:22, 90:9,
141:25, 145:10,
145:18, 148:15,
154:1, 154:2,
168:23, 188:16,
199:24, 213:4,
239:14

**giving**
62:18, 133:22,

147:13

**glycerine**
179:20

**glycofurol**
6:17, 75:16,
147:19, 154:8,
192:6, 195:9,
195:12, 195:14,
195:19

**glycol**
6:5, 6:8,
72:14, 73:16,
75:15, 75:16,
79:4, 80:7,
147:17, 147:18,
154:7, 154:8,
160:16, 167:6,
168:4, 168:18,
170:25, 171:5,
173:22, 174:9,
174:16, 175:10,
175:19, 175:22,
176:11, 177:7,
178:4, 178:7,
178:10, 178:23,
179:5, 179:12,
179:13, 179:22,
179:23, 182:4,
182:25, 192:5,
236:24, 237:2

**glycols**
176:20, 177:5

**go**
9:13, 22:17,
35:9, 35:13,
41:1, 41:14,
41:15, 49:9,
50:3, 50:6,
55:12, 57:16,
58:13, 60:25,
61:2, 61:21,
62:1, 62:13,
63:14, 66:25,
68:13, 68:16,
68:18, 74:21,
74:23, 83:4,
83:13, 84:5,
84:11, 85:19,

87:10, 88:14,
90:5, 90:8,
91:10, 94:8,
102:9, 107:14,
110:21, 115:20,
128:6, 128:13,
138:20, 142:18,
144:18, 150:6,
160:3, 161:2,
162:6, 162:7,
163:18, 183:9,
202:19, 205:16,
213:6, 214:17,
221:5, 223:19,
231:7, 234:12,
236:13, 238:11

**goes**
47:7, 88:11,
90:16, 110:10,
135:7, 143:18,
154:20, 170:14,
194:15, 215:12

**going**
12:5, 12:15,
12:19, 12:22,
12:23, 13:12,
13:13, 14:10,
15:2, 17:23,
29:19, 38:6,
44:24, 45:6,
46:8, 47:4,
47:10, 47:14,
53:10, 55:12,
60:23, 64:22,
68:14, 69:2,
69:4, 69:7,
76:4, 78:23,
80:12, 83:21,
83:22, 85:8,
85:22, 94:1,
95:1, 96:6,
97:5, 99:5,
114:25, 115:1,
116:10, 117:2,
119:11, 119:13,
128:15, 135:24,
136:5, 136:8,
144:21, 152:19,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

270

156:21, 157:6,
157:7, 158:2,
158:5, 158:10,
161:20, 162:5,
162:11, 182:19,
184:21, 184:24,
185:11, 196:13,
199:2, 201:13,
202:20, 213:24,
221:19, 221:25,
222:20, 222:23,
239:9, 239:25,
242:20, 245:8,
245:12, 247:3
**gone**
15:23, 79:8,
242:12
**good**
18:19, 51:9,
54:15, 57:9,
69:3, 136:4,
136:11, 136:12,
138:8, 183:15,
184:19, 214:18,
222:19
**grade**
181:5
**graduate**
20:21, 26:20
**great**
55:22
**ground**
12:5
**groups**
15:3
**guess**
14:15, 22:2,
31:24, 34:25,
36:6, 37:17,
39:24, 40:7,
40:12, 49:25,
64:14, 86:13,
98:7, 116:24,
161:21, 166:9,
185:13, 188:11,
193:7, 210:1,
213:21, 223:1,
233:13, 242:10

**guessing**
16:24
**guidance**
224:24, 226:18,
226:24, 227:3,
227:7, 230:23,
231:8
**guideline**
224:8, 225:9,
229:4, 229:7,
229:13
**guidelines**
199:1
**guys**
11:16, 12:16,
13:2, 157:24,
158:22, 241:22,
242:3, 243:7

**H**

**half**
31:5, 31:17,
32:2, 32:14,
33:18, 34:17
**hand**
17:23, 46:2,
46:8, 248:18
**handbook**
6:3, 6:6, 6:9,
6:12, 6:15,
38:17, 174:5,
174:7, 174:15,
178:2, 178:5,
178:11, 180:17,
180:19, 190:17,
190:19, 194:10,
194:24, 195:8,
195:10, 196:1
**hang**
182:12
**happen**
53:22, 88:17,
203:5, 242:20
**happened**
206:1
**happy**
22:17, 41:14,
93:21, 94:4,

128:14, 138:14,
163:20, 210:19
**head**
235:8
**header**
115:12, 198:15,
214:13
**heading**
167:12, 181:1
**headquartered**
8:12
**healthcare**
8:6
**hear**
10:9
**heard**
42:13, 42:14,
42:17, 76:15,
158:9, 200:2,
200:3
**hearing**
10:13
**held**
2:9
**help**
43:15, 92:3,
108:15, 133:11
**helpful**
49:10, 59:22,
63:24
**helps**
51:4, 64:3,
125:3
**here's**
13:12, 160:20
**hereby**
248:6
**herein**
90:9, 106:9,
109:17, 139:19,
140:10, 141:11,
143:7
**hereinbefore**
248:8
**hereunto**
248:18
**high**
32:16, 36:8,

36:11, 120:17,
204:12, 225:5
**high-level**
119:1, 176:5
**higher**
220:25
**highly**
1:21, 156:9,
156:11, 177:14
**himself**
243:5
**hinders**
209:10
**historical**
19:20
**historically**
43:18
**histories**
94:15
**history**
85:25, 101:4,
102:12, 104:21,
119:24, 124:25,
133:25, 173:7,
193:1, 237:22,
237:23
**hold**
18:22, 62:16,
96:23, 97:7
**holding**
241:17
**home**
16:12
**homogeneity**
118:23
**hope**
29:5, 137:15
**hopefully**
33:13, 82:19,
243:16
**hopelessly**
149:4, 169:25
**hospitals**
51:5
**host**
170:16, 171:9
**hour**
12:20, 13:3,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                           271

**15:2**

**hours**
11:17, 12:16, 12:18, 13:15, 14:2, 14:3, 14:6, 14:11, 14:13, 15:11, 135:25, 239:10, 240:25, 241:1, 241:5, 241:10, 241:15, 241:17

**housekeeping**
54:16

**however**
72:12, 100:18, 128:8, 234:17

**hplc**
27:2, 27:4, 27:7, 27:14, 28:10, 28:13, 29:9, 30:18, 30:22, 31:3

**hplcs**
28:17, 28:19

**huh**
217:1

**human**
139:23

**humectant**
178:17

**hungerford**
8:13

**hydrochloride**
170:21, 187:9, 188:2

**hydroxide**
58:2, 58:20, 66:6, 66:11, 66:25, 67:23, 68:10, 68:20, 68:23, 71:19, 95:24, 154:19, 155:6, 155:23, 155:25, 159:19, 160:3, 160:10, 160:15, 160:18, 160:21, 160:24, 160:25, 161:4,
161:12, 161:17, 164:4, 166:1, 166:16, 167:5, 168:3, 168:17, 168:24, 169:6, 169:19, 170:8, 171:4, 171:16, 172:8, 172:18, 173:2, 173:5, 173:13, 173:21, 173:25, 199:18, 201:4, 201:7, 201:25, 202:16, 203:1, 213:8, 213:20, 214:2, 214:15, 215:6, 215:7, 215:8, 215:9, 215:15, 216:5, 216:10, 216:14, 217:10, 217:11, 217:14, 217:22, 217:25, 219:2, 219:17

**hypothesis**
33:12

**hypothetical**
31:8, 31:20, 32:18, 33:23, 39:23, 59:13, 64:11, 65:11, 66:1, 67:12, 70:22, 74:6, 114:16, 135:1, 136:25, 137:13, 148:15, 149:8, 149:24, 153:17, 181:17, 186:15, 186:20, 187:3, 187:5, 187:7, 187:22, 191:24, 207:4, 207:24, 208:13

**hypothetically**
187:7

---
**I**
---

**ich**
222:13, 227:17,
227:24, 229:19

**id**
225:6

**idea**
89:17, 123:9, 125:7

**identification**
15:16, 231:2

**identified**
240:4

**identify**
8:17

**illinois**
3:8

**illustrate**
64:3

**illustrative**
65:16

**imagine**
199:19

**immediate**
226:22, 229:11, 231:13

**immunoglobulins**
110:7, 111:25

**impact**
218:15, 220:3

**impeachment**
242:19, 242:21

**implied**
90:1

**implies**
160:2

**importance**
94:6

**important**
38:23, 53:13, 57:24, 69:14, 83:14, 111:1, 115:6, 127:11, 141:15, 147:13, 154:22, 155:15, 176:7, 180:11, 190:11, 202:19, 203:20, 211:4, 218:12, 219:13, 219:22, 219:23, 233:3

**impossible**
193:11, 193:14, 193:25, 207:17, 207:19, 207:21

**improve**
218:10, 220:1, 220:18, 221:10

**improvement**
53:18

**improves**
218:9, 219:18

**improving**
218:2, 219:3, 220:10

**impurities**
59:20, 66:22, 66:23, 67:16, 114:23, 116:13, 119:12, 119:13, 147:20, 206:13, 206:19, 225:16, 226:19, 227:18, 229:8, 229:22, 230:3, 231:2

**impurity**
65:16, 68:3, 146:22, 148:19, 149:18, 151:23, 153:12, 196:14, 196:24, 223:20, 225:1, 227:6, 227:8, 227:9, 227:25

**in-**
237:8

**inaccuracies**
30:11

**inaccurate**
18:13, 29:23, 30:1

**inactive**
65:23

**inapplicable**
210:25

**inappropriate**
40:4, 40:8

**inc**
1:5, 1:9, 1:12,

1:17
**incapable**
189:25
**include**
9:6, 104:12,
110:9, 128:25,
131:21, 142:9,
155:12, 155:15,
190:10, 230:2,
231:1, 239:12
**included**
122:5, 172:1,
174:1, 202:3,
202:6, 232:3
**includes**
60:2, 80:5,
84:3, 98:15,
100:23, 104:11,
109:18, 130:24,
137:21, 146:10,
239:6
**including**
26:5, 36:19,
37:1, 37:9,
38:1, 54:10,
58:12, 61:23,
63:24, 83:7,
93:12, 119:23,
124:25, 133:10,
147:8, 157:12,
170:17, 172:10,
172:11, 179:3,
188:18, 202:11,
233:3, 244:6
**income**
17:19, 17:20
**incomplete**
31:8, 31:20,
32:18, 39:23,
59:13, 64:11,
65:11, 66:1,
66:3, 67:12,
70:22, 74:6,
114:16, 135:1,
136:25, 137:13,
149:7, 149:24,
153:16, 181:17,
187:2, 191:24,

207:4, 207:24,
208:13
**inconclusive**
33:14
**inconvenience**
54:11
**inconvenient**
49:16, 51:1,
54:13
**incorporated**
26:11, 26:24,
27:4
**incorrect**
97:21
**independent**
24:1, 25:3,
244:15
**indicate**
14:8, 71:19
**indicative**
59:16, 127:9
**indirectly**
26:15
**individual**
119:4, 124:22
**individually**
150:11
**indulge**
239:17
**industry**
89:9, 89:10,
89:16, 103:25
**inefficient**
157:9
**inform**
246:13
**information**
153:21, 159:4,
185:23, 202:4,
203:22, 230:25,
234:5, 234:7,
239:5
**informed**
43:1, 43:6
**infringe**
146:23, 149:1,
149:22, 150:14,
150:16, 151:11,

152:2, 153:15,
154:9, 161:2,
246:1
**infringed**
150:24, 150:25,
151:1, 151:9
**infringement**
5:13, 45:24,
146:16, 150:4,
150:19, 151:6,
151:12, 152:7,
153:18, 165:14,
165:25, 166:15,
167:2, 167:19,
167:23, 167:25,
215:21, 215:23,
232:12, 232:15,
232:21, 232:24,
233:4, 233:15,
234:8, 234:20,
246:20
**infringer**
232:6
**infringes**
149:12, 150:10,
246:1
**infusion**
110:1
**ingredient**
65:23, 66:6,
66:11, 67:10,
99:20, 150:2,
151:18, 153:8,
153:9, 214:17,
231:12, 231:13
**ingredient's**
218:15
**ingredients**
48:23, 143:15,
144:9, 149:25,
220:3, 227:14
**inherently**
225:1
**inhomogeneity**
117:15, 118:20
**inhomogeneous**
119:10, 164:15
**inject**
114:2

**injectable**
75:19, 192:8
**injection**
109:25, 112:3,
112:4, 112:9,
160:24
**injections**
111:15, 112:1,
112:10
**injurious**
143:16, 144:10
**inorganic**
24:3, 24:17,
227:13, 227:18,
227:20, 228:2,
228:6
**inquiry**
115:13
**instance**
91:17, 96:20,
138:19, 154:13,
175:6, 193:9,
208:1, 220:20,
230:13
**instead**
45:12, 142:5,
236:24
**institute**
16:5, 19:14,
88:9
**insufficient**
186:10, 186:22
**integrity**
39:20
**intellectual**
111:10
**intend**
11:2, 18:16,
53:20, 245:24
**intended**
33:7, 48:3,
88:25, 116:4,
128:10, 128:11,
210:15, 245:23
**intent**
90:4
**intention**
24:11, 24:14,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                    273

39:4, 39:5,
40:1, 88:16,
114:17, 116:14
**intentionally**
30:1
**interest**
22:9, 177:23,
177:24, 177:25,
180:1
**interested**
248:16
**interesting**
89:17
**interject**
62:23
**international**
5:20, 5:22,
5:24, 87:14,
87:16, 105:12,
105:14, 105:21,
109:1, 109:4
**interpreted**
75:2, 75:24,
100:3
**interrupt**
80:16, 166:18,
205:15
**intramuscular**
109:24
**intravenous**
107:7, 107:12,
108:1, 109:23,
111:14, 112:8,
112:10, 112:19,
114:2
**intravenously**
51:13
**intrinsic**
83:6
**introduce**
44:25, 112:18
**introduced**
51:12, 67:22,
71:25, 189:12,
237:6, 237:9,
237:19, 237:21
**introduction**
230:20, 230:23

**invented**
41:9
**invention**
40:19, 60:12,
88:21, 88:22,
111:19, 114:3,
115:24, 133:24,
146:22
**inventor**
41:24, 42:1,
105:21
**inventors**
42:3, 48:19
**invert**
170:6
**involve**
25:20, 25:22,
26:3, 26:7,
28:13
**involved**
27:7, 42:6,
52:4, 52:6,
52:8, 106:12,
143:10, 176:21,
202:8, 212:17
**involves**
177:12
**ions**
161:10, 161:11,
215:8
**irrelevant**
171:17, 172:1,
203:17, 204:2
**irrespective**
141:24
**irritation**
139:24
**isolate**
76:24
**isotonic**
109:20
**issue**
46:16, 47:8,
53:8, 76:24,
196:20, 221:12,
242:17, 246:12
**issues**
12:4, 21:5,

21:12, 45:8,
157:12, 157:15,
202:8, 211:23,
219:7
**italics**
103:3
**itself**
25:6, 44:1,
58:12, 62:8,
62:12, 101:24,
127:11, 148:25,
174:24, 195:19,
196:15, 204:17,
205:8, 207:14,
227:15
**iv**
112:4, 112:5

**J**

**janet**
1:29, 2:11,
9:9, 248:4,
248:22
**january**
233:23
**jason**
4:4, 8:23,
240:3, 244:14,
244:18
**jlief@windelsmarx**
4:9
**job**
1:30
**joint**
240:11, 240:14
**jointly**
10:6
**journal**
200:2, 200:4,
200:6, 200:12
**judgment**
139:22, 240:15
**july**
248:25

**K**

**katten**
3:16, 9:2

**keep**
76:24, 80:12,
83:21, 83:22,
95:10, 117:1,
128:14, 162:5,
167:18, 167:19,
221:18, 226:3
**keeps**
76:23, 94:20,
95:5, 95:9
**kelly**
3:5, 3:11,
8:21, 13:19
**ken**
8:19, 13:2
**kenneth**
3:4, 3:10
**key**
50:2, 116:14
**killing**
192:21
**kind**
12:12, 15:12,
24:12, 111:17,
200:6, 210:8,
211:12, 229:25,
245:21
**kinetics**
21:11
**kit**
101:15
**kittendorf**
10:24
**kittendorf's**
185:7, 186:1
**knew**
31:4, 31:15,
32:14, 32:15,
238:2
**knocked**
182:13
**knocking**
52:19
**know**
10:14, 10:16,
11:23, 11:24,
12:1, 12:10,
15:4, 18:17,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

274

| | | | |
|---|---|---|---|
| 21:12, 23:8, 26:19, 28:3, 28:16, 30:3, 31:10, 32:9, 32:20, 34:3, 36:5, 41:4, 43:12, 43:24, 44:6, 54:13, 55:8, 59:6, 63:7, 67:17, 68:12, 69:24, 74:21, 76:20, 77:3, 77:14, 78:14, 83:10, 93:24, 96:8, 108:13, 110:15, 119:10, 130:17, 137:4, 138:11, 140:25, 146:5, 152:23, 154:1, 156:19, 162:7, 163:1, 167:8, 170:5, 180:5, 187:10, 188:1, 196:20, 200:1, 200:11, 200:13, 200:16, 201:18, 203:5, 204:15, 208:18, 210:20, 213:25, 216:10, 216:22, 218:24, 220:5, 220:24, 222:15, 234:9, 234:16, 235:9, 236:11, 237:5, 237:14, 238:3, 239:3, 239:22, 242:10, 242:13, 242:17, 244:16, 244:22, 246:16 **knowledge** 171:12, 177:17, 177:18, 193:1, 202:6, 248:11 **known** 43:3, 44:17, 44:20, 51:6, 65:1, 216:16, | 216:17, 217:12, 217:13, 221:3 **knows** 164:21, 216:23 **kosmotropes** 211:16 <br> **L** <br> **lab** 27:10, 28:19, 29:10, 32:6, 32:12 **label** 57:21, 61:24, 66:13, 67:24, 150:1, 150:3, 160:2, 160:14, 160:16, 170:19, 171:1, 171:2, 173:21, 182:7, 182:20 **labels** 57:20, 217:10 **laboratory** 26:6, 27:13, 29:2, 32:22, 33:2, 35:13, 35:20, 35:23, 185:4, 185:17, 185:22 **lack** 144:2, 189:21, 216:20 **landau** 86:12 **language** 19:9, 19:10, 60:7, 118:7, 129:12, 210:25 **large** 34:20, 34:21 **largely** 44:11 **larger** 135:9 **last** 10:23, 48:18, 122:6, 123:3, | 123:16, 184:8, 184:9, 200:19, 211:24, 214:8, 239:19, 243:16, 244:9, 244:25 **later** 161:20, 168:10 **latham** 1:25, 2:9, 3:6 **law** 146:16, 148:21, 149:2, 152:1, 152:4, 152:9, 152:11, 152:14 **lawyer** 44:3, 151:4, 232:17 **leads** 172:15 **learn** 24:13, 24:25 **learned** 129:13 **learning** 23:24, 24:12 **least** 43:25, 89:1, 89:25, 91:3, 141:18, 190:7, 211:9, 223:8, 238:13, 238:25, 242:1 **leave** 39:19, 40:5, 42:18, 43:8, 44:3, 164:22, 239:21, 243:17 **leaving** 215:10 **left** 59:20, 65:16, 161:12, 161:13 **left-hand** 184:7 **legal** 43:17, 44:5, 146:25, 147:20, 150:5, 151:5, | 198:16, 232:23, 232:24, 232:25, 233:16 **less** 19:2, 30:9, 59:2, 163:10 **let's** 56:5, 57:3, 69:25, 80:3, 85:7, 98:9, 98:17, 105:10, 108:22, 114:18, 121:1, 148:11, 197:20, 216:2, 237:25, 243:2 **level** 36:8, 36:11, 58:24, 60:3, 120:17, 164:17, 204:12 **levels** 35:25 **levy** 15:22 **lexington** 16:14 **license** 15:16 **lifshitz** 86:12 **light** 47:20, 75:9, 124:24, 133:24, 192:25 **limit** 64:8 **limitation** 72:21, 78:25, 79:17, 80:5, 80:19, 81:22, 82:15, 83:7, 83:8, 84:3, 84:4, 84:7, 87:9, 93:1, 93:3, 98:4, 98:15, 100:3, 100:12, 100:16, 100:17, 100:22, |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    275

100:23, 101:17,
101:22, 103:23,
105:7, 116:11,
126:15, 130:7,
140:15, 148:20,
149:19, 150:22,
150:23, 153:13,
171:18, 180:11,
192:13, 193:20,
195:3, 195:23,
198:2, 198:3,
220:17
**limitations**
153:3
**limited**
89:19, 101:25,
102:1, 102:2,
103:25, 111:3,
147:9, 147:17
**limits**
114:24
**line**
58:16, 68:14,
70:10, 90:6,
106:1, 122:3,
130:16, 139:11,
139:16, 142:9,
142:21, 147:6,
224:1, 224:23,
225:24, 227:12
**linearly**
190:6
**lines**
58:1, 58:17,
97:6, 98:6,
122:20, 122:21,
129:8, 215:4
**linguistic**
210:8
**linked**
138:7
**links**
132:18, 132:19,
132:22
**lipoic**
70:1, 70:7,
70:19, 70:24
**liquid**
48:21, 49:14,

51:1, 51:16,
52:16, 53:11,
74:22, 85:18,
86:7, 86:23,
87:6, 90:10,
92:7, 93:6,
97:15, 99:12,
99:14, 99:19,
101:18, 102:19,
103:2, 103:13,
103:14, 106:11,
112:23, 112:24,
112:25, 113:12,
113:13, 113:22,
114:10, 114:20,
114:25, 115:3,
115:18, 116:9,
116:15, 117:11,
117:24, 118:19,
119:6, 119:12,
119:20, 120:23,
121:10, 123:9,
124:18, 124:19,
126:18, 127:24,
128:8, 129:22,
135:18, 143:9,
161:25, 162:17,
163:13, 164:2,
176:19, 177:21,
177:23, 179:15,
179:16, 179:23,
179:25, 180:5,
180:8, 180:13,
184:2, 184:11,
184:17, 184:18,
188:9, 194:23,
195:20, 198:19,
198:21, 198:23
**liquids**
84:20, 85:10,
112:18, 113:8,
113:9, 113:11,
115:20, 116:20,
117:14, 118:22,
118:24, 119:16,
119:17, 120:1,
120:2, 120:10,
120:12, 128:1,

128:10, 176:20
**list**
224:12
**listed**
27:17, 75:14,
88:5, 102:16,
109:8, 148:16,
149:25, 151:22,
153:6, 167:4,
170:9, 171:7,
175:5, 191:3,
191:8, 192:4,
195:14, 205:22,
220:8, 231:23
**listing**
27:16
**lists**
168:2, 169:1,
181:10, 191:9
**literal**
151:12
**literally**
82:6, 82:8,
82:11, 85:17,
112:22, 145:3,
150:16, 151:9,
152:2, 152:8,
153:15, 159:25,
235:7, 235:10,
235:14
**literature**
201:23, 201:24,
202:2, 202:14
**litigation**
35:2, 53:15,
53:22, 55:9,
60:19, 185:3,
185:9, 185:14,
236:10
**litigations**
42:5
**little**
31:12, 55:20,
55:21, 85:8,
147:23, 148:9,
161:12, 163:3,
193:7, 215:10,
215:20, 242:12

**live**
95:25
**livenote**
2:13
**llc**
1:6, 1:13, 1:16
**llp**
1:25, 2:9, 3:6,
3:16
**local**
14:9, 240:17,
243:23
**logical**
172:9
**long**
9:22, 17:12,
62:18, 64:13,
64:14, 85:20,
93:23, 100:21,
135:12, 152:18,
212:17
**long-term**
48:24, 49:13,
51:2
**longer**
9:14, 35:21,
55:20, 101:1,
162:17, 163:4,
241:8
**look**
14:24, 18:6,
18:8, 31:21,
32:20, 39:1,
47:20, 56:2,
56:22, 56:24,
63:24, 70:24,
72:8, 87:7,
88:19, 90:6,
91:17, 92:15,
96:21, 96:25,
98:9, 98:17,
99:4, 101:12,
102:10, 102:11,
102:13, 104:15,
106:25, 111:24,
121:1, 127:1,
130:12, 139:10,
140:24, 142:19,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                      276

146:4, 154:12,
154:25, 159:7,
165:12, 165:17,
166:7, 168:13,
175:8, 179:12,
186:16, 192:23,
197:7, 199:11,
202:22, 203:23,
204:10, 206:8,
211:19, 213:16,
213:18, 224:23,
226:13, 245:9
**looked**
56:15, 83:6,
123:13, 148:4,
174:19, 196:1,
205:13
**looking**
45:11, 45:14,
55:25, 56:20,
64:14, 71:17,
73:6, 73:9,
79:1, 101:3,
105:23, 109:10,
111:18, 132:16,
166:2, 167:11,
198:17, 200:18,
214:5, 214:6,
231:21
**looks**
38:15, 54:20,
81:3, 89:23,
105:24, 110:22,
176:14, 199:10,
224:6
**lost**
64:23, 127:13
**lot**
29:3, 34:9,
58:5, 74:20,
83:13, 83:14,
89:13, 145:6,
145:7, 145:8,
161:8, 180:5,
208:21, 213:1,
214:6, 242:23
**lots**
28:20, 120:20,

130:4, 134:1,
138:3, 199:11
**low**
10:14
**lubricant**
176:16
**lunch**
136:7, 136:13
**lunchtime**
136:2, 136:3
**lyophilization**
50:22, 51:8,
64:21
**lyophilized**
49:5, 50:13,
51:15, 52:14,
53:11, 53:19,
54:3, 221:10

——————————— M ———————————
**ma**
1:26
**macroscopic**
117:15, 118:20,
118:23
**made**
92:2, 157:24
**main**
121:4, 135:5,
200:8
**maintain**
90:11
**major**
26:8
**make**
18:16, 29:12,
33:10, 39:2,
40:1, 45:16,
50:22, 50:23,
51:4, 55:20,
56:5, 56:18,
58:21, 67:6,
90:23, 112:8,
112:13, 127:3,
127:4, 151:5,
152:19, 198:23,
208:5, 208:14,
210:19, 218:13,

218:20, 220:16,
221:7, 225:19,
240:16
**makes**
14:25, 137:17,
189:18, 218:15,
220:3
**making**
39:15, 112:14,
120:5, 164:8,
172:9, 176:24,
219:21
**manner**
11:3
**manufacture**
227:21, 231:25
**manufacturing**
89:14, 161:1,
172:12, 173:9,
230:25
**many**
16:23, 17:7,
27:14, 34:14,
34:15, 37:2,
39:12, 48:12,
61:19, 73:3,
75:20, 124:11,
126:25, 133:16,
134:1, 144:23
**mark**
45:11, 46:22,
47:4, 47:10,
47:14, 87:13,
105:10, 105:16,
108:25, 174:4,
178:1, 180:15,
190:16, 195:4,
199:2, 221:25,
222:25, 228:9,
230:4
**marked**
17:24, 18:3,
45:18, 45:20,
45:24, 46:9,
46:12, 47:1,
47:12, 47:16,
54:17, 54:18,
56:7, 56:12,

87:17, 96:23,
105:15, 109:5,
117:3, 117:5,
142:19, 159:9,
174:9, 178:7,
180:21, 190:21,
195:12, 199:6,
222:4, 222:17,
223:4, 228:13,
230:8
**market**
216:7
**marks**
247:1
**marriage**
248:15
**marx**
4:6, 8:24
**maryland**
8:13
**mass**
21:7
**massachusetts**
2:10, 2:14,
8:15, 16:5,
16:9, 16:11,
16:14, 19:14,
88:9, 248:2,
248:6
**master's**
20:11, 20:18
**material**
26:12, 47:19,
47:20, 106:10,
106:12, 114:18,
114:19, 143:8,
143:10, 227:18
**materials**
139:20, 177:16,
199:10, 199:23,
222:12, 222:17
**matter**
8:4, 11:11,
18:5, 24:24,
47:23, 88:20,
102:4, 120:13,
120:16, 156:7,
174:1, 180:1,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

277

180:4, 180:7, 180:13, 189:17, 194:25, 195:22, 206:22, 206:23, 207:6, 207:12, 219:1, 220:22, 223:17, 242:7, 244:25, 248:11, 248:17

**matters**
104:5, 104:16, 105:4, 111:9, 189:6, 189:21, 208:23, 218:16

**maybe**
15:24, 17:2, 17:10, 26:20, 27:11, 30:9, 31:12, 34:18, 43:15, 44:25, 45:10, 46:22, 79:19, 87:7, 108:13, 110:18, 117:10, 133:20, 134:15, 141:22, 149:12, 151:15, 152:24, 198:3, 199:14, 203:9, 203:11, 209:2, 209:19, 210:2, 212:7, 232:9, 241:12, 242:3, 242:11, 245:13

**mchugh**
1:29, 2:11, 9:9, 248:4, 248:22

**mean**
11:22, 15:24, 19:1, 22:23, 27:3, 28:3, 29:11, 29:17, 29:18, 30:3, 31:2, 31:13, 31:22, 33:11, 35:1, 36:5, 36:24, 39:1, 39:9, 40:22,

40:24, 41:7, 51:22, 55:18, 57:17, 59:7, 65:12, 66:25, 76:18, 78:17, 78:21, 81:16, 81:18, 84:5, 84:10, 84:23, 86:16, 89:11, 91:11, 95:16, 96:2, 97:24, 103:15, 104:16, 104:20, 111:6, 113:15, 113:19, 114:6, 114:7, 114:8, 116:10, 116:12, 119:7, 128:5, 130:15, 131:23, 133:13, 133:20, 134:17, 135:20, 135:21, 137:14, 137:25, 159:20, 165:8, 166:18, 176:5, 176:14, 179:17, 185:12, 185:18, 186:4, 188:22, 190:11, 197:17, 197:21, 202:2, 205:2, 205:13, 205:15, 207:25, 212:1, 213:22, 216:9, 216:14, 217:8, 218:4, 222:12, 226:2, 227:7, 229:18, 234:25, 237:8, 237:10, 242:23, 243:2

**meaning**
17:2, 51:16, 74:15, 75:24, 84:14, 86:7, 86:23, 87:5, 90:10, 90:22, 91:13, 92:10, 92:12, 102:18, 104:6, 108:11,

115:20, 115:21, 138:6, 211:20, 212:25, 213:3

**meanings**
120:21

**means**
65:9, 76:11, 76:19, 77:14, 78:6, 83:18, 84:20, 86:16, 87:9, 92:9, 106:9, 108:20, 140:14, 143:7, 145:14, 145:15, 148:25, 196:10, 196:22

**meant**
104:19, 114:20, 116:9, 116:15

**mechanical**
37:12, 38:4

**mechanisms**
23:21, 25:9

**media**
8:3, 109:19, 110:8, 110:10, 110:12

**medical**
52:2, 139:21

**medium**
79:13, 99:19

**meets**
151:19, 171:17

**melting**
165:5, 165:11

**members**
32:22

**memorized**
61:19, 68:13, 234:11

**memory**
69:22, 88:24

**mention**
61:25, 68:10, 68:19, 71:15, 71:22

**mentioned**
59:24, 64:19,

70:1, 71:18, 81:23, 127:18, 135:3, 176:14, 181:24, 213:8, 245:13

**mentioning**
53:12, 54:10

**mentions**
53:13

**mere**
169:18

**merit**
2:11, 248:4

**mess**
45:13

**met**
153:2

**method**
29:10, 29:18, 29:22, 29:25, 91:19

**methodologies**
28:14, 36:25

**methodology**
22:10, 23:25, 24:12, 24:14, 25:1, 25:11, 27:2, 27:5, 27:9, 28:18, 30:15, 31:12, 31:15, 32:9, 32:24, 33:6, 33:12, 36:17

**methods**
22:14, 28:22, 28:25, 29:6, 29:7, 30:3, 30:8, 37:4, 37:6, 38:4

**mic**
10:15

**middle**
12:7, 122:11

**might**
17:14, 19:3, 30:10, 32:19, 34:2, 37:24, 39:10, 39:25,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    278

40:2, 40:3, 41:20, 42:3, 44:1, 45:5, 46:15, 53:21, 53:23, 54:19, 69:3, 102:3, 104:16, 151:10, 161:10, 188:6, 197:7, 199:12, 209:14, 211:17, 212:5, 222:19, 233:13, 234:2, 239:7

**miles**
16:18

**milligrams**
170:20, 170:22, 170:23, 187:8, 187:9, 187:11

**milliliter**
170:20, 170:25, 182:3, 187:11

**mind**
19:4, 20:20, 39:11, 48:5, 52:20, 76:5, 84:18, 87:1, 118:17, 120:24, 138:10, 185:15, 194:17, 197:6, 204:11, 205:12, 205:24, 207:9, 209:12, 209:20

**minds**
235:10

**minus**
215:8

**minutes**
221:17, 221:22, 239:10, 239:13

**mischaracterizat-ion**
215:4

**misprint**
46:24

**misquoting**
128:19

**misrepresent**
95:6

**misrepresenting**
94:18

**miss**
155:11

**missed**
18:15, 141:21

**misspoke**
212:7

**misstates**
60:7, 66:7, 66:12, 203:3, 210:13, 211:3

**misstating**
80:1, 83:3

**mistakes**
39:2, 40:1, 88:17

**mit**
19:21, 22:12, 25:14, 26:16, 29:2

**mix**
211:5, 213:4

**mixed**
159:23, 190:5

**mixing**
133:1

**mixture**
164:16, 169:8, 188:23, 189:1

**mixtures**
113:6, 113:23

**mm-hmm**
169:9

**modeling**
190:10

**moisture**
58:20, 67:7

**molecular**
164:16

**molecule**
34:16, 34:22, 36:20, 43:19, 43:25, 44:1, 44:13, 44:14, 52:13, 208:25, 211:1

**molecules**
30:20, 112:7,

210:11

**moltened**
163:11

**moment**
59:4, 62:23, 69:3, 86:6, 136:4, 237:25

**monitor**
8:10, 36:1

**monitoring**
36:12

**monothioglycerol**
170:23

**monte**
21:23, 22:15, 36:23, 37:20

**months**
238:12

**more**
19:23, 22:17, 31:13, 34:6, 50:22, 50:23, 51:3, 51:4, 51:5, 59:23, 68:16, 72:15, 73:17, 74:24, 89:3, 89:25, 91:11, 94:9, 104:7, 106:25, 117:19, 118:1, 147:18, 154:7, 158:5, 162:8, 163:10, 169:12, 172:6, 181:15, 183:17, 197:1, 203:10, 207:11, 221:17, 239:14, 241:10

**morning**
15:6, 88:18, 208:24, 240:8

**most**
18:9, 27:17, 42:5, 42:8, 68:24, 91:5, 102:3, 161:5

**motions**
240:15

**move**
11:2, 240:1

**moving**
85:12

**much**
23:10, 23:20, 26:14, 26:24, 59:10, 61:10, 61:15, 139:3, 182:17, 188:19

**muchin**
3:16, 9:3

**multiple**
67:17, 70:19, 76:13, 83:11, 133:22, 153:20, 169:4, 170:14, 174:24, 194:6, 207:18, 214:25

**must**
78:21, 112:10, 121:19, 122:17, 132:9, 134:22, 143:13, 144:7, 150:10

**mustard**
35:8

**mustards**
35:13, 36:3

**myself**
18:15, 32:21, 89:5, 89:23, 91:24, 183:4

**N**

**na**
215:7, 224:25

**name**
15:20, 15:23, 88:12, 105:24

**named**
105:20

**names**
16:1, 211:16

**naoh**
6:19, 154:19, 155:7, 159:23, 160:1, 199:5,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                    279

**nda**
200:24, 215:11

**nda**
58:18, 160:14,
160:17, 161:1,
165:21, 166:3,
166:10, 166:25,
168:16, 168:18,
169:7, 216:19,
218:1

**necessarily**
51:7, 92:18,
144:25, 190:6,
208:8, 237:19

**necessary**
137:10

**need**
10:25, 60:8,
78:12, 130:8,
153:21, 153:23,
183:11, 188:24,
189:8, 190:9,
197:14, 198:7,
213:6, 219:8,
221:1, 221:21,
225:19, 234:13

**needed**
28:20, 28:21,
32:10, 71:25,
190:1, 202:10

**needs**
26:11, 77:2

**negative**
33:15, 169:23,
170:6

**neither**
63:2

**neutralize**
168:25, 216:12,
217:23

**neutralized**
159:22, 167:5,
168:3, 168:17

**neutralizes**
172:19

**neutralizing**
169:20

**never**
77:13, 101:9,

**new**
156:22, 210:10

**new**
4:8, 10:10,
14:22, 42:11,
42:17, 42:23,
43:13, 43:15,
43:25, 44:12,
50:22, 112:6,
163:17, 226:19,
229:8

**newly**
44:12

**next**
12:11, 90:8,
99:17, 160:19,
160:20, 172:13,
189:14, 224:23

**nine**
17:9

**nitrogen**
22:21, 22:22,
35:8, 35:12,
36:2

**nmt**
58:23

**non-infringement**
236:9

**nonaqueous**
55:5, 55:14,
60:2, 60:13,
60:18, 196:9,
196:15, 196:21,
211:7

**none**
73:6

**nonetheless**
60:3, 113:13

**nonfunctional**
229:21

**nonimpurity**
148:23

**noninfringement**
154:11

**nonlinear**
190:9

**nonpyrogenic**
143:17, 144:11

**normal**
58:2, 130:13,

**normal**
130:19, 159:23,
160:1, 163:10

**normally**
210:6

**north**
3:7

**notary**
2:13, 248:5,
248:23

**note**
9:5, 20:22,
57:19, 57:22,
58:5, 67:3,
68:4, 159:1,
240:6, 240:16,
241:25

**noted**
34:13, 64:23,
93:24, 124:12,
194:19

**notes**
248:10

**nothing**
36:14, 36:21,
69:14, 69:15,
194:17

**noticed**
50:21

**noting**
96:11, 96:12,
110:4, 181:5,
196:22

**notion**
157:7, 157:16

**novel**
48:22

**november**
233:25

**number**
5:7, 6:2, 7:2,
17:11, 27:22,
32:13, 33:18,
34:20, 34:21,
35:10, 35:14,
56:3, 56:20,
56:23, 65:9,
77:21, 103:20,
116:6, 119:10,

**number**
119:14, 184:5

**numbered**
18:20, 228:25

**numbers**
31:16, 31:18,
32:1, 33:25,
54:5, 55:24,
56:18, 222:1,
228:10, 230:5

**numeral**
48:14, 155:2

**numerical**
65:13

**numerically**
188:1

**nw**
3:17

**O**

**objecting**
157:13

**objection**
10:10, 11:1,
15:5, 32:3,
41:10, 60:14,
62:11, 66:7,
66:12, 76:12,
83:2, 83:19,
104:2, 107:13,
120:14, 144:2,
144:14, 152:3,
152:15, 168:5,
169:2, 169:22,
172:22, 216:20,
217:16, 220:12,
240:5, 240:7,
241:19, 242:6

**objective**
30:23

**observable**
90:12

**obtained**
19:14, 235:21

**obviously**
9:19, 11:8

**occur**
23:22

**occurred**
237:14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

280

| | | | |
|---|---|---|---|
| **occurring** | 56:23, 57:4, | **opinion** | 107:2, 107:3, |
| 10:20 | 185:14, 226:10 | 51:23, 53:16, | 107:19, 107:20, |
| **occurs** | **only** | 75:1, 77:14, | 108:5, 108:20, |
| 93:18 | 1:21, 13:14, | 79:22, 182:11, | 143:12, 143:13, |
| **odorless** | 56:3, 57:10, | 204:5, 218:21, | 146:11, 146:12 |
| 179:15 | 57:12, 59:22, | 219:16, 232:5, | **organic** |
| **offense** | 63:22, 95:17, | 233:20, 236:18, | 196:2, 196:4 |
| 162:12 | 151:13, 156:12, | 245:24, 246:14 | **organization** |
| **offer** | 157:25, 158:18, | **opinions** | 111:11 |
| 26:16, 245:24, | 159:4, 170:12, | 36:21, 37:18, | **original** |
| 246:5 | 176:1, 177:12, | 55:15, 58:6, | 51:15 |
| **offered** | 185:14, 185:23, | 76:8, 76:13, | **originate** |
| 158:20 | 187:5, 194:3, | 94:12, 157:11, | 227:20 |
| **offering** | 196:18, 197:13, | 172:3, 182:15, | **others** |
| 246:4 | 226:18, 229:8, | 201:3, 219:5, | 41:20, 56:16, |
| **office** | 239:20, 240:24, | 219:10, 219:15, | 61:3, 134:2, |
| 88:15, 237:11 | 241:6, 241:8, | 220:6, 245:19, | 151:10, 162:21, |
| **offices** | 246:21 | 246:5 | 186:5, 191:25, |
| 2:9 | **open** | **opposed** | 199:13, 229:17 |
| **official** | 206:1 | 107:4, 108:4, | **otherwise** |
| 16:1 | **opening** | 116:5, 117:2, | 56:24, 158:3 |
| **officially** | 5:10, 40:23, | 124:16, 132:25, | **out** |
| 19:20, 20:15, | 41:13, 42:16, | 152:9, 156:4, | 9:20, 12:15, |
| 20:19 | 45:11, 45:17, | 163:11 | 15:8, 39:19, |
| **often** | 45:21, 48:13, | **option** | 40:5, 43:21, |
| 112:15, 144:23, | 49:18, 50:4, | 205:21 | 55:22, 64:2, |
| 209:3, 209:4, | 50:10, 56:9, | **optional** | 67:21, 70:12, |
| 209:22 | 64:22, 72:17, | 151:15, 153:6 | 93:2, 101:2, |
| **oh** | 73:23, 79:9, | **optionally** | 123:7, 124:22, |
| 23:16, 35:19, | 83:12, 83:23, | 72:15, 73:17, | 125:5, 131:8, |
| 56:1, 59:14, | 121:5, 126:13, | 79:4, 80:8, | 131:11, 137:1, |
| 71:12, 71:15, | 126:20, 135:5, | 147:18, 154:7, | 171:10, 201:24, |
| 82:9, 117:1, | 147:3, 150:4, | 181:19, 192:15 | 203:24, 208:23, |
| 127:12, 131:10, | 154:12, 155:1, | **order** | 219:11, 219:14, |
| 161:11, 174:12, | 159:3, 164:7, | 28:1, 241:22 | 242:3, 243:18, |
| 175:2, 184:8, | 170:17, 173:18, | **ordered** | 246:11, 246:12 |
| 185:10, 199:12, | 181:24, 192:2, | 244:5 | **outcome** |
| 212:2, 215:8, | 203:18, 205:18, | **ordering** | 51:14, 52:13, |
| 216:3, 227:1, | 223:7, 224:1, | 242:8 | 248:16 |
| 232:9, 246:19 | 228:22, 230:13, | **ordinary** | **outside** |
| **older** | 232:13, 233:1 | 74:10, 84:14, | 35:2, 35:5, |
| 106:24 | **operate** | 85:9, 86:6, | 86:5, 86:21, |
| **once** | 233:10, 236:20, | 86:16, 86:17, | 119:25, 120:3, |
| 51:12, 157:22, | 240:10 | 86:22, 87:5, | 120:8, 177:4, |
| 157:23, 240:24 | **operated** | 90:10, 90:21, | 193:17, 200:5, |
| **one's** | 10:23 | 91:13, 92:10, | 215:19 |
| 146:20 | **operating** | 92:12, 102:18 | **over** |
| **ones** | 240:11 | **organ** | 10:20, 16:24, |
| 42:21, 56:4, | | 106:14, 106:15, | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                              281

| | | | |
|---|---|---|---|
| 16:25, 17:2, 17:16, 17:17, 27:22, 34:13, 35:15, 48:8, 50:19, 52:10, 55:21, 59:20, 65:2, 65:16, 73:3, 85:7, 88:23, 90:8, 94:21, 133:22, 153:20, 170:14, 182:13, 241:1 | 67:20, 68:4, 72:18, 72:24, 79:9, 83:25, 85:16, 88:19, 90:5, 90:8, 90:17, 91:15, 91:18, 102:24, 105:23, 106:1, 109:10, 109:11, 115:11, 115:19, 139:11, 142:19, 147:4, 150:6, 159:21, 165:22, 165:23, 166:2, 166:8, 166:20, 168:13, 169:6, 170:18, 171:11, 173:2, 173:19, 173:20, 174:12, 175:3, 182:1, 182:7, 182:20, 182:24, 192:1, 200:18, 200:20, 214:1, 214:11, 214:14, 215:1, 218:5, 224:9, 224:12, 225:15, 226:13, 226:14, 228:25, 229:1, 230:16, 230:17, 230:18, 231:21, 232:12, 233:1, 233:6, 236:17 | **paragraphs** 67:2, 79:7, 80:11, 98:8, 126:14, 135:6 | 207:25, 208:10 |
| **overlapped** 20:13 | | **parameter** 69:25 | **participating** 208:3 |
| **overlapping** 157:15, 242:13 | | **paraphrased** 125:17 | **particles** 114:7, 114:9, 116:6, 116:7, 116:8 |
| **overnight** 14:17 | | **paraphrasing** 218:8 | **particular** 32:11, 33:19, 38:3, 49:12, 60:19, 64:14, 64:20, 74:15, 76:2, 76:5, 84:17, 88:2, 93:11, 101:5, 111:25, 113:19, 113:24, 118:10, 118:17, 124:17, 126:23, 128:4, 146:7, 160:19, 166:1, 181:3, 189:3, 194:4, 204:10, 206:10, 216:13, 217:18, 217:21, 221:3, 225:7, 231:21, 231:23, 233:23 |
| **oversimplified** 177:14 | | **parenteral** 109:24, 225:5 | |
| **oversimplify** 115:7 | | **paris** 19:1, 19:7 | |
| **overview** 40:18, 40:22 | | **part** 33:11, 39:13, 55:9, 61:25, 67:23, 71:24, 72:5, 72:6, 84:2, 84:7, 90:16, 100:8, 101:2, 103:19, 106:7, 106:18, 110:2, 123:1, 125:18, 126:22, 154:11, 161:5, 161:9, 167:22, 167:25, 170:13, 171:6, 171:7, 172:4, 179:12, 181:19, 184:8, 184:9, 192:14, 197:23, 198:17, 204:5, 204:24, 205:20, 206:4, 207:15, 208:11, 210:10, 210:23, 214:23, 218:15, 219:11, 219:14, 219:16, 220:3, 232:24, 237:13, 242:1, 242:2, 243:18 | |
| **own** 39:13, 41:24, 108:8, 118:6, 185:17, 185:18, 186:9, 186:24, 189:24, 235:19 | | | **particularly** 127:11, 210:4, 219:22 |
| **oxides** 22:22 | | | **particulate** 198:25 |
| **oxygen** 22:22 | | | **particulates** 114:22, 114:24, 116:12, 116:18 |
| **P** | | | |
| **p-a-r-t-r-i-d-g-e** 16:14 | **pages** 50:8, 73:3, 75:20, 103:20, 126:25, 133:16, 133:22, 134:1, 165:17, 169:4, 170:14, 187:6, 214:25, 223:9 | | **parties** 10:22, 156:25, 157:10, 157:18, 240:9, 240:13, 244:1, 244:5, 248:15 |
| **page** 5:7, 6:2, 7:2, 18:20, 27:17, 38:9, 38:10, 40:23, 41:13, 42:15, 42:25, 48:2, 57:12, 57:13, 57:17, 57:18, 58:2, 58:15, 59:25, | | | **partridge** 16:13 |
| | **pains** 157:24 | **partial** 218:21 | **parts** 130:9, 132:18, 133:8, 133:9, 211:18, 235:4 |
| | **paper** 38:22 | **participate** 205:8, 207:1, 207:14, 207:22, | **party** 9:14, 236:16 |
| | **papers** 39:2, 200:4, 202:15 | | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

282

**pas**
245:4, 246:7, 246:8
**passage**
101:10, 123:8, 124:3
**past**
26:6, 55:9, 61:5, 196:20, 199:17, 231:7
**patent**
5:18, 5:19, 5:20, 5:22, 5:24, 40:13, 42:6, 42:22, 43:2, 44:1, 44:16, 47:11, 47:12, 47:15, 47:16, 47:21, 48:7, 49:19, 50:25, 51:18, 53:12, 54:13, 61:10, 61:13, 62:8, 62:12, 63:14, 70:10, 72:9, 73:5, 87:14, 87:16, 88:4, 88:11, 88:15, 90:19, 93:16, 105:12, 105:14, 105:21, 108:7, 109:2, 109:4, 110:17, 110:18, 117:21, 122:2, 122:20, 123:2, 123:6, 123:8, 124:4, 124:24, 125:3, 125:15, 125:16, 125:21, 126:10, 127:12, 127:14, 131:14, 132:5, 132:19, 138:21, 141:2, 141:7, 150:10, 172:11, 176:8, 176:9, 177:11, 179:8, 192:11, 194:13,

194:18, 202:9, 206:16, 221:12, 233:9, 233:23, 233:24, 235:15, 237:11
**patented**
49:3, 53:16, 54:1, 191:19, 208:2, 208:8, 220:10, 236:20
**patentees**
111:7
**patents**
40:16, 40:20, 41:18, 41:25, 42:1, 42:4, 42:11, 42:12, 43:14, 44:20, 44:25, 48:19, 49:23, 53:17, 54:8, 59:8, 59:11, 59:17, 61:18, 68:12, 68:19, 74:2, 74:8, 74:18, 79:15, 85:24, 86:5, 86:18, 93:13, 94:15, 98:4, 111:10, 111:13, 112:16, 113:7, 115:2, 117:7, 120:1, 120:9, 130:9, 130:20, 140:17, 153:1, 176:12, 176:18, 177:4, 177:8, 177:15, 180:8, 191:17, 193:18, 195:1, 195:22, 197:9, 197:12, 206:21, 206:23, 215:17, 233:22, 234:6, 234:16, 234:18, 235:2, 236:16, 238:23, 239:2, 239:4
**patents-in-suit**
40:11, 42:21,

44:12, 44:22, 55:2, 61:14, 61:15, 68:8, 68:9, 69:18, 69:21, 70:6, 70:18, 71:10, 86:21, 114:13, 115:25, 117:18, 148:13, 179:2, 211:14, 233:18, 234:3, 234:17, 234:24, 237:12, 246:2
**patience**
246:25
**patient**
50:12, 51:13, 52:13, 52:15, 141:1, 143:16, 144:10
**patients**
49:4, 51:10, 53:18
**pct**
111:11, 139:5, 139:6, 141:12, 141:17, 141:22, 142:1, 145:12, 145:19
**pdas**
225:16
**pe3**
245:6, 246:8
**peer-reviewed**
200:12
**peg**
6:19, 58:10, 149:12, 151:14, 153:5, 155:24, 159:19, 159:22, 169:8, 169:20, 172:19, 174:24, 177:20, 179:22, 187:19, 188:17, 192:15, 194:15, 199:5, 199:18, 200:24, 201:5, 201:7, 201:24,

202:16, 202:25, 205:5, 205:21, 208:2, 213:23, 215:6, 218:10, 219:25
**pending**
159:17
**penetrant**
181:11
**penetration**
195:15
**pennsylvania**
3:17
**people**
19:23, 39:1, 39:2, 39:15, 39:25, 120:18, 143:24, 154:1, 199:17, 204:9, 212:5, 217:19
**peptide**
209:1, 210:22
**peptides**
34:10, 34:14, 34:21, 210:1, 210:3, 211:8
**perceive**
76:21
**percent**
58:11, 170:23, 182:1, 182:6, 182:21, 188:18, 200:24
**percentage**
62:9, 188:12, 196:13
**perform**
178:23
**performing**
189:3
**performs**
172:20
**perhaps**
169:5
**period**
122:21, 128:18, 129:8, 129:13, 238:24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

283

**permissible**
59:19, 61:11, 61:16, 62:9, 64:8
**permit**
59:11
**permits**
58:10, 90:14
**persist**
214:16
**persistence**
229:23
**persistent**
227:13
**person**
59:16, 60:22, 62:4, 63:18, 64:4, 64:7, 64:12, 64:17, 65:3, 65:6, 65:19, 68:20, 70:4, 70:14, 71:4, 71:23, 72:4, 72:22, 73:1, 73:14, 75:9, 78:24, 78:25, 79:16, 80:4, 80:19, 81:6, 81:19, 81:24, 84:7, 85:22, 93:10, 101:21, 103:22, 131:3, 133:12, 133:23, 150:9, 157:21, 198:1, 198:10, 242:4, 243:9
**person's**
127:10
**personal**
36:12
**perspective**
10:18, 50:11, 60:21
**pg**
149:13, 208:2
**ph**
1:23, 2:9, 5:3,

5:9, 5:11, 5:15, 5:17, 15:14, 18:3, 21:16, 21:20, 24:20, 25:5, 36:14, 45:18, 46:12, 47:1, 68:21, 69:21, 69:23, 69:24, 70:3, 70:4, 70:12, 70:15, 70:20, 71:5, 71:7, 71:8, 71:10, 71:21, 72:5, 160:3, 160:15, 162:9, 162:12, 170:10, 171:4, 173:14, 173:21, 215:6, 216:16, 217:11, 217:12, 217:14, 218:8, 218:10, 219:25, 248:7
**ph-adjusting**
68:24
**pharma**
1:16, 208:25
**pharmaceutical**
6:4, 6:7, 6:10, 6:13, 6:16, 20:2, 20:4, 20:5, 20:8, 22:11, 24:8, 24:19, 24:21, 24:24, 25:1, 25:6, 25:10, 34:11, 42:10, 50:19, 66:19, 67:8, 68:21, 70:16, 72:13, 72:19, 84:19, 84:23, 85:4, 85:5, 85:6, 85:9, 85:23, 86:22, 88:21, 88:25, 89:10, 89:12, 90:3, 99:20, 101:24,

103:25, 104:9, 112:17, 113:16, 118:7, 120:9, 121:10, 121:15, 122:16, 126:19, 131:14, 131:24, 132:22, 135:18, 136:19, 137:7, 137:9, 140:7, 142:10, 142:13, 144:1, 145:20, 166:3, 166:16, 167:4, 167:13, 168:2, 174:6, 174:8, 174:15, 175:7, 178:3, 178:6, 180:17, 180:20, 190:17, 190:20, 194:11, 195:11, 197:1, 200:7, 201:24, 235:22
**pharmaceuticals**
1:5, 1:12, 1:17, 8:5, 8:20, 22:7, 24:15, 30:25, 34:16, 34:22, 71:6, 71:24, 72:6, 74:17, 87:3, 89:19, 209:1, 211:19
**pharmaceutics**
70:1, 87:4
**phase**
161:24
**philosophical**
38:8
**phrase**
76:23, 78:20, 79:20, 80:21, 84:2, 95:10, 101:5, 106:2, 106:8, 123:6, 124:22, 125:2, 127:17, 131:12, 132:7, 133:2, 137:5, 137:9,

139:12, 139:18, 142:20, 142:22, 143:6, 146:17, 167:20, 213:21
**physical**
103:5, 103:6, 103:8, 103:10, 103:11, 103:12, 113:23, 115:18, 164:25, 165:1, 165:5, 165:11
**physics**
74:16, 86:2, 86:11, 92:5, 92:9, 92:11, 93:8, 103:18
**physiologically**
109:22
**picture**
164:6
**pilot**
29:1
**pin**
51:24
**place**
8:14, 23:1, 23:5, 57:12, 64:23, 67:13, 67:19, 69:1, 73:11, 91:6
**places**
48:12, 68:22, 75:12, 83:11, 101:3, 124:11, 124:13, 154:14, 159:21, 159:25, 183:9, 192:11
**plaintiffs**
1:7, 1:14, 3:3
**planet**
8:12, 9:9
**plants**
200:9
**plasticizer**
178:18
**play**
172:5, 181:15, 191:14, 220:9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                               284

**playing**
192:19
**plays**
189:18, 219:2
**please**
8:17, 45:3,
56:24, 99:6,
123:14, 175:24,
204:22
**plural**
49:9
**plus**
16:24, 215:7
**point**
28:18, 36:10,
53:20, 57:4,
57:24, 66:4,
67:15, 71:4,
78:8, 85:21,
87:8, 90:24,
91:15, 92:6,
92:14, 92:17,
92:22, 102:9,
103:14, 108:2,
111:2, 112:5,
112:6, 117:12,
120:18, 124:21,
124:23, 127:21,
128:22, 129:15,
140:22, 147:4,
161:3, 164:17,
166:2, 166:15,
168:1, 168:21,
168:22, 188:5,
188:8, 192:10,
192:12, 193:3,
193:19, 199:12,
203:24, 205:12,
214:25, 218:6,
220:2, 220:23,
221:1, 227:2,
227:11, 227:22,
227:25, 229:17,
231:19, 234:15,
237:10, 242:6
**pointed**
101:2, 208:23
**pointing**
70:12, 100:1,

100:10, 123:7,
140:23
**points**
58:25, 202:12,
231:8
**polyethylene**
6:5, 72:14,
73:16, 75:15,
79:4, 80:7,
147:17, 154:6,
160:16, 167:6,
168:3, 168:18,
170:25, 171:5,
173:22, 174:9,
174:16, 175:10,
175:18, 175:22,
176:11, 176:20,
177:5, 177:7,
178:3, 178:10,
178:23, 179:5,
179:11, 179:22,
182:4, 182:25,
192:5
**polymers**
92:3
**polypropylene**
75:15
**poorly**
75:18, 192:7
**portion**
58:21, 106:14,
106:15, 107:2,
107:3, 107:19,
107:20, 108:5,
108:6, 143:12,
143:13, 143:19,
146:11, 146:12,
241:20, 244:1
**posa**
97:14, 101:15,
101:16, 121:5,
135:13, 137:24,
145:14, 147:15,
152:9, 152:16,
155:3, 171:13,
177:17, 177:18,
177:19, 192:3,
193:1, 193:20,

202:7, 216:9,
217:8, 217:19,
217:20, 227:16
**posa's**
128:7
**posas**
215:16, 216:6
**pose**
134:15
**posed**
163:17
**position**
75:22, 77:2,
78:5, 82:7,
82:20, 95:15,
213:19, 219:24,
243:21
**positive**
33:15
**possibility**
44:4, 44:9,
169:16, 206:18
**possible**
55:20, 112:25,
204:13, 208:9
**postdocs**
32:22
**potential**
35:22, 35:25,
36:11, 61:7
**potentially**
22:23, 25:11,
34:7, 50:23,
72:5, 72:7,
89:6, 89:14,
189:3
**practical**
23:20
**practically**
179:14
**practice**
229:19
**precipitating**
209:10
**precise**
29:20, 221:24,
226:8, 243:5
**precision**
30:13, 32:10,

33:7
**preclude**
192:20
**predicated**
235:21
**predict**
231:24
**prefer**
9:20, 56:22
**preferably**
109:22
**preferred**
239:6
**premise**
30:6
**preparation**
9:19
**prepare**
243:5, 243:10
**prepared**
11:20
**presence**
148:22
**present**
4:13, 37:18,
53:16, 55:13,
55:18, 58:18,
59:19, 60:24,
62:5, 63:21,
64:13, 64:18,
65:7, 65:20,
65:24, 74:4,
74:11, 186:7,
186:21, 213:23,
217:15
**presenting**
15:15
**preservative**
178:17, 181:10,
181:23, 191:10,
191:22, 193:19,
194:13
**press**
28:4
**presumably**
241:25
**presume**
32:6, 44:4

**presumed**
97:14
**pretending**
12:20
**pretty**
26:14, 26:24,
36:7, 68:12,
139:3, 199:21,
234:12, 234:13
**prevalence**
71:20
**prevalent**
68:24, 69:25
**previous**
23:17, 60:18,
61:8, 81:24,
82:11, 92:16,
98:8, 125:12,
162:19, 163:15,
215:2
**primarily**
86:14, 92:7
**print**
45:12, 46:16
**printed**
223:10
**prior**
48:8, 55:3,
59:5, 63:13,
63:17, 66:8,
80:1, 81:9,
83:3, 97:12,
171:21, 210:13,
210:21, 211:3,
212:8, 236:10
**priority**
215:17, 215:25,
239:4
**probably**
11:25, 16:25,
86:14, 91:2,
113:24, 118:1,
166:7, 174:18,
174:22, 217:9,
239:20
**problem**
139:25, 241:24,
242:7, 244:3

**problematic**
12:12, 242:18
**problems**
48:20, 49:11,
54:9, 203:24
**procedure**
240:18
**proceed**
9:11, 12:14,
12:20, 12:22,
12:23, 12:24,
13:16, 14:11,
14:14, 15:7,
158:2, 243:15
**proceeding**
9:15, 11:8,
241:23
**process**
21:1, 58:3,
61:7, 62:3,
89:3, 92:24,
156:3, 159:8,
159:18, 160:6,
165:2, 165:5,
165:6, 165:11,
172:13, 173:9,
232:1
**process-type**
89:7
**processes**
21:21, 23:12,
37:13, 37:14,
37:15, 38:1,
38:3, 38:4
**processing**
22:8, 58:4,
64:1, 66:24,
227:21
**produce**
53:17, 54:2
**produced**
139:2
**producing**
31:16
**product**
12:1, 20:25,
22:8, 50:14,
51:15, 54:4,

58:19, 58:22,
59:5, 68:4,
146:20, 148:25,
149:9, 149:10,
149:11, 149:21,
149:22, 150:12,
150:14, 155:22,
155:24, 156:4,
156:12, 156:14,
159:5, 160:9,
160:10, 160:14,
160:17, 161:1,
168:18, 168:24,
169:7, 169:12,
172:12, 181:22,
182:17, 186:9,
186:11, 186:22,
186:24, 187:8,
187:13, 187:14,
187:18, 188:9,
188:16, 197:15,
201:6, 205:6,
213:10, 215:23,
216:7, 216:19,
218:1, 218:2,
219:2, 219:18,
228:5, 229:24,
231:23, 231:25,
233:19, 234:9,
234:14, 234:22,
235:11, 236:5,
237:7, 237:15,
238:4, 238:15,
239:1
**product-by-proce-
ss**
43:8, 43:11
**products**
29:7, 30:24,
58:8, 151:4,
172:13, 211:22,
226:19, 226:20,
226:21, 226:24,
229:8, 229:9,
229:10, 229:13,
231:3, 231:4,
231:10, 231:11,
231:12, 231:15,

231:23
**professor**
17:21, 25:13
**professorship**
25:14
**profile**
231:24
**progressing**
11:3
**projects**
35:14
**prominent**
91:6
**proof**
169:20, 170:3
**proofs**
167:23, 168:1
**properly**
227:17
**properties**
182:6
**property**
16:18, 111:10
**proposal**
13:24
**propose**
190:8
**proposed**
232:1
**proposition**
199:17
**propylene**
6:8, 147:18,
154:7, 178:7,
179:13, 179:23,
192:5, 236:24,
237:2
**prosecution**
99:11, 101:4
**protection**
36:13
**protein**
209:5, 209:9,
209:10, 210:22,
212:16, 212:17
**proteins**
34:10, 34:15,
34:20, 209:1,

209:13, 210:3, 211:7

**protic**
196:5

**provide**
11:7, 13:22, 99:14, 240:21, 241:16, 243:25

**provides**
230:23, 231:9, 243:13

**providing**
244:4

**public**
2:13, 159:4, 237:20, 238:1, 238:2, 248:5, 248:23

**publication**
38:16, 93:24

**publications**
27:16, 27:22, 28:5, 28:8, 28:9, 34:9, 34:13, 38:8

**published**
28:4, 87:14, 105:12, 139:6

**pull**
82:16, 93:2, 125:5, 127:8, 142:4, 171:10, 188:24, 190:4, 219:14

**pulled**
219:8

**pulling**
124:21, 219:11

**purportedly**
193:5

**purpose**
126:2, 126:4, 126:7, 126:9, 158:15, 218:2, 227:4, 240:14, 241:21

**purposeful**
229:20

**purposes**
30:19, 53:15, 79:23, 83:16, 148:12, 151:13

**pursuant**
2:10

**put**
19:6, 19:23, 40:5, 46:15, 55:21, 56:17, 56:23, 56:25, 65:9, 90:13, 127:16, 129:8, 129:12, 129:17, 130:3, 130:4, 162:16, 163:3, 186:23, 188:24, 216:7

**putting**
39:19, 95:7, 103:10

### Q

**q3**
222:9

**qs**
170:25, 182:3

**qualification**
231:2

**qualify**
19:18, 219:4

**qualitative**
65:13

**quality**
225:4

**quantify**
188:12

**quantitative**
30:18, 30:22, 31:3, 31:16

**quantities**
189:9

**quantum**
21:22, 36:22, 37:12, 37:20, 38:4

**question**
12:8, 23:17,

30:17, 34:4, 37:17, 44:5, 44:10, 53:2, 60:8, 62:6, 63:1, 64:20, 68:7, 71:13, 74:14, 82:18, 84:25, 85:3, 86:4, 86:5, 86:20, 91:11, 91:25, 94:5, 94:21, 103:7, 104:7, 113:12, 118:12, 123:14, 123:17, 123:18, 125:25, 126:3, 134:15, 137:1, 137:5, 144:5, 147:23, 148:8, 148:15, 149:3, 151:18, 152:19, 153:10, 155:18, 156:6, 159:17, 161:6, 161:7, 161:9, 161:19, 161:21, 162:9, 162:19, 162:20, 162:21, 163:15, 163:17, 163:18, 170:2, 175:24, 176:25, 178:25, 179:10, 183:17, 184:15, 188:15, 189:14, 193:7, 193:24, 194:8, 194:9, 196:11, 201:21, 201:22, 204:20, 207:5, 207:12, 208:19, 210:14, 210:16, 213:22, 218:14, 220:19, 221:9, 237:17, 239:20, 245:22

**questioning**
9:17, 14:18, 241:1, 243:8

**questions**
93:14, 93:21,

95:11, 96:15, 96:18, 118:10, 119:2, 120:15, 189:7, 194:6, 218:7, 239:17, 243:16

**quite**
28:13, 28:16, 29:25, 30:6, 31:13, 34:3, 34:5, 34:19, 34:21, 35:10, 35:14, 50:8, 60:16, 63:21, 69:25, 78:3, 121:24, 125:12, 128:14, 130:8, 130:13, 130:19, 137:14, 138:18, 142:13, 146:13, 186:14

**quotation**
127:4

**quote**
38:23, 39:18, 40:5, 58:16, 75:7, 99:22, 123:4, 124:4, 124:9, 124:14, 124:20, 125:5, 125:19, 125:21, 127:10, 129:12, 129:19, 129:25, 130:4, 130:9, 130:16, 131:22, 137:21, 138:16, 142:9, 144:5, 171:3, 173:2

**quoted**
125:17, 127:16, 128:16, 141:13, 142:7, 171:3

**quotes**
39:7, 39:13, 49:19, 54:14, 101:6, 122:4, 122:5, 125:14, 126:9, 127:16,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                287

130:5, 131:22,
143:3, 144:15,
147:8, 155:12
**quoting**
38:24, 39:8,
39:15, 54:12,
105:3, 122:12,
122:22, 123:1,
126:2, 126:7,
126:11, 129:7,
133:8

**R**

**raise**
10:16
**raised**
15:5, 78:2,
240:8
**rapidly**
64:25
**rate**
108:7, 137:19
**rates**
49:4, 54:6
**rather**
85:20, 201:1,
233:11, 236:21
**rating**
36:8
**ratings**
35:23
**ratio**
34:17, 140:2
**reach**
77:9, 190:13,
204:3
**reached**
190:14, 204:4
**react**
215:8, 216:5,
216:11, 217:15
**reacting**
214:22
**reaction**
21:21, 23:12,
226:21, 229:10,
231:12
**reactions**
22:25, 23:1,

23:4, 24:2,
24:4, 24:7,
24:16, 36:19,
37:1, 37:9
**reactive**
37:13, 37:15,
38:3
**reacts**
213:23
**read**
9:14, 14:1,
40:15, 41:1,
41:15, 48:16,
52:9, 52:21,
53:2, 61:18,
79:5, 90:7,
90:16, 91:5,
97:5, 97:18,
98:6, 99:5,
99:22, 101:19,
106:6, 106:16,
107:10, 107:17,
110:2, 121:2,
121:22, 122:6,
122:23, 123:4,
123:16, 123:18,
125:13, 135:11,
137:20, 140:3,
143:4, 143:19,
154:18, 155:9,
155:20, 208:17,
208:19, 225:19,
226:25, 227:1,
229:14, 231:5,
231:16, 232:22,
245:17
**reading**
47:20, 225:20,
226:3
**reads**
99:17, 106:6,
122:12, 139:17,
143:5, 155:1,
225:15, 226:18,
229:6, 229:7,
230:23
**ready**
124:19, 129:22

**reagent's**
229:20
**reagents**
227:20
**real**
145:19, 145:23
**realize**
222:11
**really**
57:18, 81:18,
108:16, 112:5,
116:20, 133:4,
133:9, 137:15,
152:16, 152:23,
173:3, 193:8,
213:6, 219:14,
224:17, 232:25,
233:20, 245:12,
245:21
**realtime**
2:12
**reason**
18:12, 18:14,
19:21, 22:13,
30:10, 39:14,
50:12, 51:11,
125:19, 125:21,
170:8, 182:9,
200:15, 244:15,
244:17, 244:20
**reasonable**
11:15, 11:21,
29:20, 44:5,
140:1, 145:24,
146:2, 243:9
**reasons**
31:23, 32:19,
34:2, 39:10,
39:25, 53:12,
65:20, 81:23,
94:12, 95:11,
131:4, 138:3,
155:16, 170:16,
171:9, 225:4
**rebuttal**
98:17, 98:23,
122:19, 203:15
**recall**
17:14, 18:24,

21:7, 35:12,
38:18, 49:8,
81:4, 106:23,
111:17, 200:3,
200:14, 213:19
**recent**
18:7, 18:8,
18:10, 27:17,
50:21
**recently**
28:2
**recess**
69:6, 136:7,
184:23, 222:22
**recited**
88:21, 121:6,
125:8, 135:15,
146:20, 190:24
**recognize**
166:24
**recognized**
210:21
**recollection**
200:5
**recommendation**
230:24
**recommendations**
231:9
**recommending**
231:22
**reconstituted**
50:13
**reconstitution**
49:15, 50:23,
50:24, 64:24
**record**
9:5, 14:23,
15:1, 15:21,
69:5, 69:8,
73:9, 136:6,
136:9, 142:16,
184:22, 184:25,
221:15, 222:21,
222:24, 228:19,
233:8, 236:19,
238:12, 239:23,
240:4, 240:7,
240:17, 247:3,

248:10
**refer**
40:11, 55:9,
55:13, 56:19,
58:9, 67:14,
67:22, 67:24,
72:17, 73:21,
75:12, 76:6,
80:12, 81:23,
98:6, 103:11,
118:2, 118:18,
124:12, 125:14,
126:10, 129:5,
129:13, 136:21,
139:19, 177:6,
192:11, 200:7,
202:25
**reference**
87:1, 97:13,
125:15, 128:25,
130:22, 130:23,
181:4, 181:8,
203:15, 203:25
**referenced**
194:20, 222:15
**references**
37:2, 37:3,
37:25, 87:8,
125:15, 163:19,
202:5, 202:21,
203:3, 203:16,
204:1
**referred**
37:23, 38:5,
59:2, 60:18,
63:18, 65:18,
70:7, 70:10,
72:20, 86:11,
90:25, 91:5,
91:8, 91:9,
102:16, 107:23,
115:11, 155:7,
173:3, 199:18,
205:11, 226:23,
229:12, 233:6,
245:6, 245:15
**referring**
35:17, 37:19,

51:21, 75:11,
76:23, 79:14,
81:4, 92:8,
92:16, 92:19,
98:3, 98:13,
99:18, 101:8,
101:10, 117:17,
119:21, 123:9,
124:18, 125:11,
126:13, 130:18,
130:20, 132:1,
134:9, 137:18,
140:20, 141:10,
159:2, 166:6,
167:8, 167:9,
167:16, 167:17,
169:5, 175:2,
175:21, 181:1,
181:3, 191:17,
197:7, 198:3,
198:4, 198:12,
203:13, 203:15,
209:25, 223:25,
227:22
**refers**
71:2, 86:11,
103:4, 107:1,
121:7, 124:6,
125:8, 130:6,
135:4, 135:15,
179:8
**reflect**
39:8
**reflected**
144:25
**reflects**
15:1
**refresh**
88:24
**refreshed**
89:4
**refreshing**
69:22, 89:22
**regard**
198:5, 218:24
**regarded**
227:17
**regarding**
163:15, 231:1

**registered**
2:11, 248:4
**regularly**
27:14
**regulatory**
227:3, 230:2
**reinsurance**
184:2
**reject**
161:21, 162:1
**related**
19:12, 20:3,
20:8, 21:5,
21:11, 22:8,
24:16, 27:12,
30:11, 36:17,
37:8, 37:25,
62:2, 70:3,
70:13, 71:7,
89:1, 101:21,
125:16, 146:22,
148:19, 148:23,
149:19, 151:23,
153:12, 162:20,
185:13, 248:14
**relates**
34:10, 36:22,
146:16
**relating**
6:4, 6:7, 6:10,
6:13, 6:16,
100:4, 100:8,
100:13, 174:8,
178:6, 180:20,
190:20, 195:11
**relative**
190:8, 220:24,
221:7
**relay**
20:17
**release**
229:22
**relegated**
194:3
**relevance**
145:10, 176:18
**relevant**
19:2, 41:21,

70:5, 71:5,
106:7, 107:7,
107:12, 115:13,
172:4, 172:19,
173:10, 173:12,
173:17, 174:2,
176:11, 176:12,
177:8, 179:1,
186:15, 233:14,
245:20
**rely**
240:14
**remains**
163:25
**remember**
20:24, 27:3,
27:25, 69:13,
91:1, 92:8,
93:23, 102:7,
108:13, 146:5,
188:4
**remind**
52:23, 236:11
**removed**
129:18, 129:20,
129:23, 129:24,
130:3
**renders**
129:22
**repeat**
33:5, 80:25,
83:9, 96:17,
204:22, 208:16,
228:3
**repeated**
76:13, 154:14
**repeating**
52:20, 95:5,
96:13
**rephrase**
120:6, 169:23
**replacing**
75:8
**replay**
214:4
**reply**
5:14, 46:9,
46:11, 56:11,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

289

56:13, 57:11,
59:25, 67:2,
67:20, 96:21,
96:25, 97:19,
101:2, 117:1,
117:8, 117:9,
121:2, 125:6,
126:8, 126:11,
126:12, 129:9,
131:18, 131:19,
134:9, 135:2,
135:22, 140:24,
142:8, 162:4,
162:6, 199:13,
199:22, 201:15,
203:12, 203:19,
214:14, 215:21
**replying**
135:22
**reported**
1:28, 33:2,
185:6, 194:24
**reporter**
2:12, 2:13,
9:8, 10:8,
10:13, 53:3,
87:20, 123:19,
208:20, 243:25,
244:4, 248:4
**reporting**
32:1, 33:24,
33:25, 231:1
**reports**
37:18, 37:24,
41:5, 41:13,
41:19, 45:10,
49:9, 51:20,
55:11, 55:15,
57:9, 64:17,
65:14, 68:25,
72:1, 73:20,
74:21, 74:23,
75:5, 76:1,
76:14, 78:15,
80:25, 81:18,
83:19, 84:9,
84:12, 87:10,
93:15, 103:17,

103:20, 107:24,
123:12, 123:20,
124:12, 124:13,
126:25, 128:7,
131:5, 135:10,
137:23, 140:14,
145:1, 146:25,
153:20, 153:22,
157:12, 161:23,
162:3, 168:5,
169:2, 172:11,
172:22, 177:17,
183:8, 185:25,
186:5, 189:23,
192:18, 194:21,
197:10, 198:1,
201:11, 202:3,
205:4, 214:7,
214:19, 220:6,
222:11, 243:4,
245:11, 245:19,
245:23
**represent**
8:18, 47:23,
48:7, 62:15,
199:14
**representations**
235:19
**representative**
61:2, 63:23
**representing**
8:12, 9:9
**reproducing**
168:8
**request**
11:15, 11:18,
77:5, 243:20,
243:24
**requested**
53:3, 123:19,
208:20, 235:20,
248:13
**require**
36:12, 115:25,
197:12, 225:2
**required**
232:20
**reread**
48:17, 198:13

**research**
22:6, 22:7,
26:25, 35:3,
35:7
**resembling**
179:20
**reserving**
14:21, 241:14
**residences**
16:16
**residual**
66:22, 161:10,
161:11, 229:21
**residues**
227:13, 227:20
**respect**
25:4, 34:8,
87:23, 105:19,
107:24, 108:3,
109:7, 143:23,
145:1, 157:10,
178:10, 183:20,
184:1, 195:24,
197:8, 205:4,
220:19, 220:20,
221:10, 225:8,
227:6, 230:11
**respectfully**
158:24
**respectively**
165:22
**respond**
41:22
**responding**
41:5, 41:19,
85:14, 103:21,
219:23
**response**
52:24, 139:25
**responsive**
5:16, 46:19,
46:25, 47:3,
47:7, 54:17,
56:6, 85:13,
99:1, 99:2,
99:9, 102:22,
115:12, 115:17,
118:1, 203:18

**rest**
110:16, 154:22,
182:23, 193:23,
233:13
**restate**
152:19
**restriction**
14:8
**restrictions**
13:18
**result**
163:22, 231:25
**results**
27:4, 29:20,
31:4, 32:23,
33:2, 33:10,
49:3, 52:10,
58:24, 59:15,
185:5, 200:21,
200:23
**returning**
69:18
**reveal**
200:21, 200:23
**review**
88:12, 94:2,
107:21, 248:13
**reviewed**
42:22, 217:20,
245:10
**reviewing**
55:2
**revised**
57:21
**right**
14:7, 14:18,
15:13, 25:13,
27:21, 27:24,
28:7, 45:19,
52:11, 54:15,
57:5, 66:6,
84:21, 85:17,
86:24, 92:13,
92:14, 94:10,
96:20, 101:11,
112:1, 113:10,
119:17, 122:8,
128:2, 129:25,

132:10, 132:18,
132:23, 134:14,
138:22, 139:8,
141:5, 144:13,
145:23, 145:25,
149:13, 149:14,
151:14, 152:20,
153:3, 154:11,
163:16, 167:6,
170:7, 170:10,
172:21, 175:3,
175:19, 175:23,
177:12, 178:24,
179:20, 184:11,
192:22, 208:15,
223:10, 223:11,
223:12, 224:20,
224:22, 241:15,
242:21, 243:4,
243:9, 244:8

**right-hand**
179:13, 184:6,
200:19

**rightly**
124:12, 208:23

**rights**
14:21

**risk**
225:2

**rmr**
1:29

**road**
16:13

**rockville**
8:13

**role**
172:6, 175:18,
189:17, 189:20,
219:2, 220:10,
229:23

**roles**
181:15, 191:14

**roman**
48:14, 155:2

**room**
164:5, 177:22,
179:16, 183:22,
194:23, 195:1,

195:19

**rosenman**
3:16, 9:3

**rough**
244:6

**roughly**
17:18, 34:17,
97:5

**round**
98:18

**route**
110:5

**routes**
225:6

**rubric**
25:21

**rule**
9:23, 9:25,
11:7, 11:13,
12:18, 156:24,
157:21, 158:16,
158:18, 240:18,
240:23, 243:13

**rules**
158:4, 240:17,
240:18, 243:23

**running**
28:18, 28:20

---

**S**

**s**
43:23

**said**
11:6, 11:12,
12:10, 13:21,
19:3, 24:25,
33:6, 35:16,
35:17, 35:19,
37:11, 39:3,
40:2, 59:6,
59:7, 60:19,
61:9, 61:13,
62:24, 63:13,
65:6, 67:6,
77:23, 82:8,
82:11, 84:6,
90:2, 92:15,
92:24, 93:22,

94:11, 95:22,
96:4, 105:2,
105:3, 114:20,
149:9, 152:8,
153:25, 168:23,
170:3, 171:3,
172:24, 173:23,
185:19, 199:22,
199:24, 200:14,
204:2, 211:5,
212:21, 216:15,
217:2, 222:18,
224:6, 239:22,
242:15

**salt**
162:15, 163:2,
163:3, 164:22,
164:23, 165:3,
165:4, 204:5,
204:13, 204:15,
204:23, 205:7,
206:3, 207:13,
207:21, 208:9,
210:9

**salts**
210:23

**same**
10:3, 11:2,
19:21, 19:22,
20:12, 29:13,
32:3, 52:12,
52:16, 62:11,
67:15, 72:25,
73:8, 73:11,
76:12, 94:21,
99:1, 102:22,
107:13, 120:14,
130:6, 142:9,
156:13, 160:12,
166:5, 169:6,
194:1, 194:9,
205:3, 208:7,
210:8, 210:25,
213:2, 214:4,
215:1, 217:16,
218:4, 240:10,
242:17

**satisfactorily**
153:7

**satisfy**
102:17

**save**
90:24, 108:15,
117:5, 201:18,
205:17

**saw**
91:2, 91:6

**say**
13:17, 13:25,
14:5, 14:16,
23:11, 24:6,
24:22, 26:10,
26:11, 28:3,
33:1, 33:5,
33:16, 34:1,
34:9, 42:20,
42:24, 44:16,
49:5, 52:12,
53:14, 55:7,
55:17, 61:22,
63:6, 63:12,
69:25, 72:1,
74:13, 74:25,
75:13, 80:3,
82:23, 87:18,
89:24, 92:11,
95:5, 95:12,
98:2, 102:8,
102:23, 107:10,
112:13, 113:8,
114:18, 114:21,
115:7, 117:16,
120:10, 124:9,
132:5, 134:18,
134:20, 135:4,
135:6, 135:12,
144:22, 145:22,
147:5, 147:12,
150:3, 150:8,
150:19, 155:6,
157:24, 160:11,
160:17, 160:20,
162:11, 162:15,
171:15, 172:7,
175:14, 177:11,
177:23, 183:21,
191:12, 201:13,

203:13, 203:16,
205:20, 214:20,
215:4, 217:4,
217:8, 218:6,
218:8, 220:18,
224:24, 227:11,
229:18, 231:21,
233:7, 235:18,
236:17, 239:25,
240:1, 243:1

**saying**
33:24, 57:1,
65:21, 93:1,
93:12, 94:22,
95:9, 95:11,
97:21, 111:8,
123:1, 127:12,
145:17, 148:8,
149:24, 152:10,
167:19, 168:11,
171:25, 172:25,
180:12, 187:5,
197:4, 197:22,
238:10

**says**
12:11, 13:23,
15:17, 48:18,
50:25, 71:2,
78:9, 91:19,
92:12, 96:1,
96:2, 97:9,
99:1, 109:16,
110:8, 110:9,
114:20, 123:2,
128:17, 129:20,
132:24, 140:10,
141:11, 142:22,
148:21, 157:21,
160:1, 160:2,
166:16, 170:19,
172:11, 175:17,
179:4, 182:22,
184:16, 200:23,
225:8, 229:16,
240:23, 242:16

**sb**
19:21, 19:22

**scale**
29:1, 29:2

**scenario**
151:25

**schuler@lw**
3:10

**science**
19:11, 33:11,
74:2, 74:9,
84:15, 86:8,
87:3, 90:22,
91:13

**scientific**
27:16, 202:14

**scientist**
112:17, 114:1,
152:4

**scientists**
200:7

**scope**
139:21, 215:19,
229:4, 233:10,
236:21

**screenshot**
166:9

**se**
18:25, 23:11,
25:22, 26:13,
42:19, 53:5,
54:7, 62:1,
71:8, 82:16,
86:2, 92:24,
117:13, 161:12,
183:4, 209:9,
227:4

**search**
201:23

**searching**
203:20

**second**
91:23, 99:6,
133:14, 138:24,
147:6, 147:12,
182:12, 218:14,
224:1, 243:10

**section**
18:20, 38:7,
42:25, 48:13,
67:15, 67:20,
79:9, 83:24,

98:5, 98:13,
101:1, 102:22,
115:11, 122:22,
125:3, 135:9,
144:16, 147:5,
155:2, 160:19,
160:20, 173:4,
174:16, 175:3,
175:6, 178:11,
202:20, 214:15,
214:18, 226:5,
227:5, 229:3,
229:15, 232:11,
232:24, 233:2,
233:3, 233:13,
233:21, 234:8,
234:20, 245:1

**sections**
55:12

**see**
10:24, 19:22,
20:11, 27:19,
37:19, 38:10,
68:15, 69:23,
71:22, 89:22,
91:7, 91:18,
91:22, 95:25,
101:13, 106:2,
106:4, 109:14,
111:23, 122:9,
123:5, 131:15,
139:11, 139:14,
141:15, 141:21,
142:22, 142:24,
145:11, 154:21,
165:22, 166:11,
166:24, 167:14,
167:15, 168:19,
175:15, 178:14,
178:20, 190:25,
195:16, 200:20,
201:23, 223:21,
223:24, 224:3,
224:10, 224:14,
224:19, 225:10,
225:23, 228:21,
229:3, 230:20,
230:21, 242:1

**seek**
31:17

**seem**
38:18

**seems**
31:11, 44:4

**seen**
49:7, 87:24,
87:25, 88:2,
126:24, 174:17,
197:1, 199:8,
199:21, 199:24,
217:9, 222:7,
222:9

**segment**
244:9

**sense**
14:25, 22:2,
30:11, 48:25,
66:24, 107:4,
143:14, 144:8,
152:14, 162:15,
198:16

**sentence**
48:18, 99:17,
122:7, 122:12,
123:4, 124:22,
125:2, 125:12,
125:14, 125:17,
132:16, 135:11,
135:12, 137:20,
154:18, 175:17,
198:13, 200:19,
205:20, 215:2,
224:24, 225:10,
225:13, 225:14,
225:20, 226:17,
229:6, 229:7,
229:14, 230:22

**sentences**
215:2

**separate**
10:5, 11:9,
15:6, 156:16,
156:22, 157:8,
157:17, 158:1,
158:21, 158:23,
240:6, 243:11,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    292

243:12
**separately**
187:17
**separating**
30:19
**separations**
27:12
**serves**
169:19, 218:1
**session**
9:24, 11:14
**set**
48:6, 108:22,
111:25, 147:9,
186:18, 248:8,
248:18
**setting**
59:4, 62:6
**seven**
11:17, 12:16,
12:18, 13:15,
14:3, 14:5,
14:11, 14:13,
15:11, 58:1,
239:10, 239:13,
240:25, 241:1,
241:5, 241:15
**seven-hour**
11:6, 13:5,
13:22
**several**
29:16, 122:1,
157:15, 175:5,
191:2
**shall**
157:21, 240:24
**shape**
90:11
**shared**
15:2, 240:13
**short**
246:4
**shorthand**
100:16, 100:21,
145:3
**should**
9:6, 19:18,
20:10, 38:2,

39:5, 39:7,
42:2, 43:13,
44:25, 45:11,
46:5, 47:19,
54:21, 56:6,
56:7, 71:15,
75:2, 75:23,
78:13, 81:8,
100:2, 100:13,
112:13, 113:8,
135:6, 152:13,
156:8, 156:10,
156:11, 158:25,
171:3, 171:7,
175:14, 177:23,
199:9, 200:10,
201:14, 213:11,
225:3, 231:1,
232:25, 233:20,
240:1, 240:9,
243:14, 244:15,
244:17, 245:9
**shouldn't**
34:25, 245:13
**show**
79:10
**showing**
80:3, 110:6
**shows**
53:7, 182:7,
182:8
**shy**
138:13
**side**
19:6, 54:23
**sign**
243:20
**signature-p1kal**
248:20
**significance**
144:20, 168:9
**significant**
103:20, 116:6,
116:7
**significantly**
59:1
**similar**
61:4, 61:22,

114:22, 130:11
**simple**
11:10, 245:22
**simply**
11:18, 115:9,
126:1, 157:17
**simultaneous**
158:7
**simultaneously**
191:21
**since**
11:19, 23:25,
28:6, 37:9,
74:11, 74:14,
205:11
**single**
10:7, 10:19,
10:21, 11:12,
15:3, 241:8
**sinko**
135:23, 161:22,
162:20, 199:16,
200:14, 202:15
**sinko's**
202:11, 203:15,
215:3, 218:5,
219:24, 245:1,
245:9, 245:17
**sit**
33:16, 43:12,
53:25, 54:5,
54:23, 202:13
**sitting**
88:1, 162:25,
186:5, 188:4,
200:13, 200:16
**situation**
31:21, 31:24,
31:25, 32:4,
32:25, 39:24,
40:8, 151:7
**situations**
40:2, 40:4
**six**
58:1, 239:13,
243:3
**sixth**
130:16

**skill**
248:11
**skilled**
59:16, 60:22,
62:4, 63:18,
64:3, 64:6,
64:7, 64:12,
64:17, 65:3,
65:6, 65:19,
68:20, 70:4,
70:14, 71:4,
71:23, 72:4,
72:22, 73:1,
73:14, 75:8,
78:24, 79:16,
80:4, 80:18,
81:6, 81:19,
81:24, 84:7,
85:22, 93:10,
101:20, 103:22,
127:9, 131:3,
133:12, 133:23,
198:1, 198:10
**skimmed**
68:15, 141:20
**skin**
181:11
**slayback**
1:16, 4:3,
5:12, 8:6, 8:25,
9:17, 9:19,
11:20, 12:14,
13:13, 13:14,
14:12, 21:9,
45:21, 45:23,
46:20, 47:3,
57:25, 61:23,
63:22, 65:17,
68:5, 155:22,
155:24, 156:12,
157:23, 159:7,
159:8, 159:18,
160:22, 165:21,
166:15, 167:4,
168:1, 168:23,
169:1, 169:18,
173:12, 173:20,
173:24, 181:25,

182:17, 185:12,
186:22, 187:7,
189:16, 197:10,
201:5, 202:5,
205:5, 216:7,
219:2, 219:18,
232:6, 232:13,
233:5, 233:17,
233:21, 234:9,
234:16, 234:21,
235:3, 235:20,
237:7, 237:15,
238:10, 238:13,
238:17, 238:22,
239:1, 240:25,
241:3, 241:23,
242:8, 243:4,
245:15

**slayback's**
41:6, 41:20,
57:20, 58:9,
58:13, 58:18,
59:4, 59:15,
59:22, 61:2,
61:24, 62:7,
65:14, 66:4,
67:24, 105:5,
130:11, 151:4,
160:14, 160:16,
166:3, 166:25,
168:16, 168:18,
169:7, 170:19,
171:2, 172:12,
172:18, 181:22,
186:9, 188:8,
188:9, 188:16,
211:22, 213:10,
216:19, 218:1,
233:7, 235:10,
235:19, 236:18,
238:4, 243:20

**slayback-specific**
165:13

**slightly**
179:19, 209:7

**small**
34:15, 34:22,
58:7, 67:7,

119:10, 119:14,
182:2, 208:25,
210:11, 211:1

**sodium**
58:2, 58:20,
66:6, 66:11,
66:24, 67:23,
68:10, 68:19,
68:23, 71:17,
71:18, 71:19,
71:20, 95:24,
154:19, 155:6,
155:23, 155:25,
159:19, 160:3,
160:9, 160:15,
160:18, 160:21,
160:23, 160:25,
161:4, 161:10,
161:12, 161:17,
162:15, 163:7,
163:9, 163:11,
163:14, 164:3,
164:4, 164:9,
164:17, 166:1,
166:16, 167:5,
168:2, 168:17,
168:24, 169:6,
169:19, 170:8,
171:4, 171:16,
172:8, 172:18,
173:2, 173:5,
173:13, 173:21,
173:25, 199:18,
201:4, 201:7,
201:25, 202:16,
202:25, 213:8,
213:19, 214:1,
214:15, 215:5,
215:7, 215:14,
216:5, 216:10,
216:14, 217:10,
217:11, 217:14,
217:22, 217:25,
219:1, 219:17,
223:18, 223:20,
224:16, 225:8,
227:9, 227:24,
230:3

**solely**
68:8

**solid**
96:5, 106:11,
114:6, 114:7,
114:8, 114:9,
114:18, 114:19,
116:5, 116:6,
116:8, 116:17,
119:12, 143:9,
154:19, 155:8,
160:9, 161:14,
161:17, 161:24,
162:15, 162:17,
163:2, 163:4,
163:7, 163:9,
163:13, 163:14,
163:23, 163:25,
164:2, 164:4,
164:10, 164:15,
164:18, 165:4,
180:13, 192:20

**solids**
113:6, 113:24,
164:13, 209:14,
211:6, 211:11

**solubility**
188:2, 188:19,
188:25, 209:9

**solubilizing**
163:23

**soluble**
75:18, 192:8

**solute**
163:8, 164:3,
164:12, 164:20

**solutes**
205:8, 208:4

**solution**
6:20, 113:1,
113:14, 115:4,
116:5, 123:10,
155:25, 161:14,
163:7, 163:14,
164:8, 164:16,
164:22, 188:23,
189:1, 199:6,
200:25, 201:1,

209:11, 209:14,
210:4, 211:1,
211:6, 211:11,
212:18

**solutions**
75:19, 112:10,
175:10, 175:22,
177:7, 192:9,
209:5, 210:7,
210:23

**solvate**
183:5, 183:6

**solvating**
205:8, 208:4

**solvation**
183:1

**solvents**
72:19, 72:20,
73:18, 73:25,
75:17, 79:24,
81:13, 81:25,
82:2, 82:14,
84:4, 84:15,
93:18, 98:15,
100:5, 100:13,
100:24, 101:25,
102:2, 102:10,
102:17, 104:1,
104:11, 105:7,
109:19, 110:10,
110:12, 111:4,
127:7, 128:12,
131:7, 169:1,
173:6, 173:25,
176:2, 176:21,
178:24, 192:7,
198:14, 220:15,
220:21, 220:25,
221:1

**some**
11:24, 12:3,
12:4, 14:16,
17:15, 25:19,
28:3, 29:5,
29:6, 34:18,
37:24, 39:16,
41:5, 41:16,
42:1, 47:19,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026

294

47:20, 50:21, 58:7, 59:18, 64:18, 65:7, 65:9, 86:18, 87:1, 90:24, 102:4, 104:14, 108:15, 111:21, 117:5, 120:23, 130:11, 148:10, 149:13, 150:5, 152:13, 163:1, 181:7, 185:21, 188:5, 191:17, 192:21, 193:12, 196:13, 196:23, 201:19, 203:8, 203:22, 205:17, 209:20, 210:22, 211:7, 213:12, 221:4, 225:16, 237:10, 239:7, 241:7, 242:13

**somehow**
12:10

**someone**
52:18, 92:15, 185:21, 246:15

**someplace**
81:7

**something**
12:11, 17:3, 18:15, 26:11, 26:23, 34:6, 34:19, 39:16, 49:8, 56:19, 57:4, 60:17, 76:6, 88:14, 92:21, 95:21, 98:9, 104:14, 127:23, 132:19, 159:7, 159:11, 189:15, 194:16, 197:6, 207:13, 209:19, 219:14, 242:16, 242:17, 242:25

**sometimes**
28:1, 33:14,

33:15, 245:5

**somewhat**
209:7, 209:23

**somewhere**
19:22, 45:4

**sorry**
10:8, 23:16, 35:19, 50:4, 52:18, 59:14, 62:21, 71:12, 77:10, 82:9, 91:19, 107:9, 112:24, 115:16, 117:1, 122:15, 124:18, 125:12, 125:24, 127:13, 131:10, 131:16, 132:11, 132:12, 139:17, 148:6, 162:5, 164:25, 166:18, 175:2, 182:13, 187:21, 205:14, 214:10, 223:14, 225:12, 228:3, 237:8, 238:10, 238:19, 244:10

**sort**
21:15, 36:13, 37:4, 44:10, 116:21, 136:2, 189:14, 202:23, 205:3, 211:4

**sound**
27:21, 139:21

**sounded**
137:2, 185:10

**sounds**
27:24, 44:5

**source**
39:7, 39:18, 40:5

**sources**
38:23

**space**
22:11, 25:2

**spans**
223:8

**sparschu**
4:5, 9:1, 13:17, 13:23, 14:2, 14:7, 45:9, 54:21, 87:19, 189:8, 189:11, 203:7, 203:10, 214:1, 214:4, 214:8, 214:11, 228:18

**speak**
40:25, 41:17, 75:5, 76:2, 76:14, 83:20, 123:12, 123:21, 147:1, 158:16, 168:6, 169:3, 172:23, 201:12, 242:15

**speaking**
36:24, 39:12, 55:7, 112:17, 158:7, 165:8, 169:14

**speaks**
62:12, 80:25

**spec**
68:5

**species**
215:9, 216:6, 217:15, 229:21

**specific**
20:5, 32:25, 34:6, 37:18, 39:17, 43:4, 45:21, 62:9, 65:12, 72:24, 74:24, 81:4, 83:7, 84:3, 104:4, 104:14, 108:17, 108:18, 108:19, 111:12, 113:7, 113:9, 113:11, 120:24, 130:9, 137:2, 137:10, 146:13, 146:14, 159:8, 163:18, 183:9,

192:23, 194:16, 194:18, 202:8, 202:21, 206:8, 206:16, 206:23, 209:20, 212:14, 219:21, 222:10, 222:15, 225:5, 234:3, 234:5, 238:13, 238:25

**specifically**
22:4, 24:17, 26:16, 27:2, 27:9, 28:10, 28:19, 35:1, 35:4, 35:12, 36:5, 36:16, 36:20, 37:7, 37:14, 43:7, 58:8, 67:14, 68:19, 74:18, 79:13, 84:1, 89:23, 100:4, 100:8, 103:15, 106:24, 107:1, 107:16, 107:17, 117:11, 162:20, 173:4, 173:11, 177:6, 179:4, 192:25, 231:11, 239:3

**specification**
58:23, 59:21, 62:7, 62:8, 65:17, 79:14, 85:25, 102:12, 121:12, 122:8, 122:13, 129:5, 132:17, 133:8, 133:9, 133:10, 133:25, 141:23, 144:24, 145:9, 173:7, 177:11, 179:4, 192:25, 197:18, 234:4, 234:6, 234:18, 234:23, 235:16, 235:17, 239:5

**specifications**
61:1, 62:2,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    295

| | | | |
|---|---|---|---|
| 63:22, 63:25, 65:15, 119:24, 199:1, 235:2 | **standpoint** 39:21, 50:3, 55:8, 176:7 | 120:16, 160:14, 175:9, 194:11, 224:25 | 51:3 |
| **specifics** 32:20, 44:8, 91:1, 94:1, 187:23, 216:14 | **start** 72:9, 85:7, 121:1, 197:20, 232:25, 238:20 | **status** 93:25 | **story** 214:24, 221:11 |
| **speed** 58:3 | **started** 83:21, 137:1 | **stenotype** 248:10 | **street** 1:26, 2:10, 4:7, 8:15 |
| **spend** 158:5 | **starting** 40:23, 42:15, 42:25, 57:13, 58:10, 58:14, 58:16, 67:20, 67:21, 83:11, 83:25, 122:7, 139:11, 147:3, 147:12, 150:6, 170:18, 232:12, 233:6, 244:11 | **step** 58:21, 86:21 | **strike** 24:19, 30:16, 41:23, 66:14, 125:20 |
| **spent** 15:10 | | **stepping** 86:5 | **strive** 32:5, 32:8 |
| **spherical** 92:18 | | **sterile** 64:15, 114:9, 114:10, 154:3, 198:19 | **structure** 10:25, 72:23, 147:5 |
| **spinal** 109:24 | | **sticker** 56:25 | **structures** 139:19 |
| **spiral** 56:23 | | **stickered** 57:3 | **students** 32:22 |
| **split** 14:3, 158:14 | **starts** 142:20, 142:21, 173:19 | **still** 51:8, 67:19, 119:17, 120:12, 134:8, 149:23, 150:7, 150:14, 153:16, 160:12, 161:13, 165:3, 172:7, 185:11, 186:25, 187:6, 190:2, 225:3, 238:5 | **studies** 19:25, 52:5, 52:6, 52:9, 52:12 |
| **sponsors** 231:1 | **state** 8:18, 15:20, 48:15, 86:2, 103:5, 103:6, 103:8, 103:10, 103:11, 103:12, 115:19, 120:13, 123:14, 175:24, 176:19, 180:1, 180:4, 180:7, 180:13, 184:18, 187:22, 194:25, 195:21, 231:20 | | **study** 52:10 |
| **ss** 248:3 | | | **studying** 24:2, 24:7 |
| **stability** 218:2, 218:9, 218:11, 218:15, 219:3, 219:18, 220:1, 220:3, 220:10, 220:18, 220:25 | | | **sub** 1:6, 1:13 |
| | | | **subcutaneous** 109:24, 111:20, 112:3 |
| **stabilizer** 178:18 | | **stipulate** 241:9, 246:4 | **subject** 19:8, 19:9, 21:25, 22:3, 22:14, 24:23, 86:12, 106:13, 107:18, 143:11, 146:11, 242:6, 242:7, 243:17, 244:25 |
| **stabilizing** 70:11, 70:25, 71:2, 153:5 | **stated** 71:1, 169:18, 187:24 | **stipulated** 77:5, 95:19, 95:20 | |
| **stable** 121:9, 126:18, 135:17, 149:15, 151:16, 153:7 | | **stipulation** 246:23 | |
| | **statement** 24:11, 67:16, 172:18, 176:24, 177:1, 192:10, 215:13, 221:8 | **stop** 94:17, 94:23, 94:24, 143:18 | |
| **standalone** 27:6 | | **stopped** 185:10 | **subjects** 21:4 |
| **standard** 74:10, 99:20, 232:24 | **statements** 125:1 | **stopping** 63:6 | **subjunctive** 154:5 |
| | | **stops** 181:22 | **submissions** 29:3, 57:22 |
| **standards** 233:1 | **states** 1:1, 8:7, 99:9, | **storage** 48:24, 49:14, | **submitted** 28:1, 28:2, |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                          296

28:4, 77:10,
163:19
**submitting**
231:4
**subsequent**
36:18, 97:10,
98:7, 98:8
**substance**
148:10, 180:25,
226:20, 226:21,
228:5, 229:10,
229:11, 240:19
**substances**
147:21, 180:23
**substantial**
58:21, 103:19
**substantially**
143:16, 144:10
**substantive**
18:25, 19:3,
69:15, 136:14,
136:16, 230:18
**substituted**
95:12
**substituting**
79:6, 79:18
**sufficient**
121:19, 122:17,
127:14, 127:15,
132:9, 132:21,
132:23, 133:2,
133:5, 133:18,
134:5, 134:22,
136:22, 142:3,
202:11, 203:22
**suffolk**
248:3
**sugar**
164:22
**suggested**
241:6
**suit**
153:1
**suitable**
48:23, 49:13,
51:2, 90:14,
99:14, 109:23,
121:14, 122:15,

131:13, 131:23,
132:21, 133:4,
139:22, 142:10,
189:5, 190:13,
221:14
**suite**
3:7, 3:17, 8:13
**summarize**
57:17, 84:10,
102:23
**summarized**
50:3, 83:8,
83:9
**summarizing**
61:7
**summary**
41:8, 49:25,
50:9, 63:17,
66:9, 72:3,
73:4, 79:9,
84:12, 86:2,
147:14, 213:15,
240:14
**support**
125:6, 125:22,
127:6, 235:20
**supported**
157:18
**supports**
123:8, 124:4
**supposed**
102:13
**suppository**
176:16
**supra**
99:10
**sure**
18:9, 29:12,
31:9, 33:4,
34:4, 34:5,
34:16, 39:11,
41:2, 41:15,
45:4, 48:16,
49:7, 50:6,
53:21, 56:5,
56:19, 69:24,
86:25, 88:1,
89:15, 90:23,

107:15, 110:23,
111:22, 130:10,
134:11, 135:10,
138:12, 138:15,
141:9, 141:16,
144:18, 146:6,
174:21, 175:4,
182:5, 183:18,
186:14, 189:4,
189:6, 196:18,
197:6, 198:4,
199:21, 199:24,
208:14, 217:20,
217:25, 218:20,
219:21, 222:10,
225:19, 234:12,
234:13
**surely**
67:15
**survival**
49:4, 53:18,
54:3, 54:6
**suspend**
12:18
**suspended**
9:23, 11:14
**suspending**
175:11, 175:12,
175:14, 176:6,
177:9
**suspensions**
176:21
**sweet**
179:19
**sworn**
9:10, 9:12,
15:15, 248:9
**system**
75:25, 121:8,
124:6, 125:9,
126:17, 135:16,
147:17, 171:6,
171:8, 173:25,
183:1, 183:6,
183:12, 199:19,
201:2, 202:17,
203:1, 204:6,
204:24, 205:2,

205:6, 205:21,
206:5, 207:2,
207:15, 207:22,
208:3, 208:6,
208:11, 210:10,
210:24, 218:16,
220:4, 226:23,
229:12, 231:14
**systems**
25:23, 36:25

**T**

**table**
95:18, 163:2,
166:2, 171:11,
172:1, 182:7,
182:20, 182:24,
230:18
**tables**
165:20, 166:10
**tablet**
176:15
**take**
14:24, 18:5,
20:1, 23:1,
23:4, 25:13,
36:2, 36:22,
40:10, 40:15,
55:3, 78:7,
88:12, 96:21,
98:9, 98:17,
117:17, 121:1,
126:5, 136:1,
148:14, 155:22,
162:15, 163:2,
164:12, 168:13,
198:5, 213:22,
216:2, 241:10,
241:15
**taken**
10:6, 69:6,
79:10, 136:7,
173:9, 184:23,
187:17, 222:22,
248:10
**takes**
85:20, 219:9,
219:10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

297

taking
8:14, 190:8
talk
10:2, 11:9,
12:6, 42:14,
44:24, 72:22,
80:12, 94:1,
105:5, 113:20,
115:18, 117:11,
142:2, 147:4,
150:4, 151:6,
157:5, 161:23,
202:20, 209:20,
211:17, 212:15,
213:24, 214:19,
218:7, 224:16,
245:8, 245:12
talked
42:21, 116:17,
120:20, 157:9,
164:14, 173:1,
173:5, 173:6,
173:7, 206:12,
227:23, 238:24,
242:2
talking
74:7, 83:10,
107:16, 107:17,
131:16, 156:3,
163:10, 180:3,
180:4, 191:5,
192:13, 193:17,
208:2, 208:7,
211:15, 214:21,
215:25, 217:17
talks
72:18, 124:14,
127:5, 127:19,
127:20, 176:6,
177:6
taste
179:19
taught
26:6, 27:8,
27:11, 38:18
tautology
120:5
teach
25:14, 25:16,

25:18, 25:20,
25:24, 26:1,
26:3, 27:1
teachings
235:16
technical
124:10, 133:15
technically
20:16
technique
37:12
techniques
28:10, 28:11,
28:14
technology
16:6, 19:15,
88:9, 89:25,
175:8
tell
18:6, 53:10,
56:20, 110:18,
110:20, 110:21,
140:20, 146:18,
185:21, 235:7
telling
138:2, 170:15,
171:12
temperature
164:5, 177:22,
179:16, 183:22,
194:23, 195:1,
195:20
temperatures
177:24
ten
17:10, 17:11,
88:23, 239:10
tend
36:7
term
29:13, 42:13,
42:14, 42:17,
60:19, 69:23,
70:14, 71:6,
74:13, 81:17,
105:5, 108:15,
108:20, 111:22,
115:7, 119:20,

122:4, 127:22,
136:19, 137:16,
145:5, 145:11,
196:18, 196:20,
197:10, 197:22,
198:15, 211:10,
211:20, 212:2,
212:7, 212:19,
216:11
terminology
92:5, 99:18
terms
26:7, 28:8,
31:3, 35:7,
38:21, 39:6,
81:16, 102:3,
108:8, 111:8,
111:21, 113:4,
113:18, 116:16,
119:20, 128:24,
137:25, 144:23,
145:7, 146:15,
181:18, 204:9,
207:7, 208:15,
208:21, 209:4,
209:22, 211:20,
212:6, 213:1,
213:2, 213:24,
216:10, 217:18
testimony
11:19, 14:17,
14:19, 17:5,
17:8, 66:8,
69:16, 80:1,
83:4, 94:18,
95:6, 95:7,
104:24, 136:14,
144:21, 171:22,
210:13, 211:3,
240:20, 241:20,
245:23, 248:8,
248:9
textbooks
162:2
th
4:7, 248:19
thank
46:3, 53:1,

53:4, 55:22,
56:14, 87:21,
91:16, 99:7,
105:17, 139:1,
154:10, 159:15,
174:3, 178:8,
189:10, 203:4,
214:9, 217:24,
224:3, 226:1,
238:19, 240:3,
243:19, 244:21,
246:24
thanks
47:9, 216:24,
217:2
themselves
8:18, 40:25,
41:17, 59:9,
75:5, 76:2,
76:14, 81:1,
83:20, 119:23,
123:12, 123:21,
147:1, 168:6,
169:3, 172:23,
201:12
theoretical
22:10
theory
21:22, 22:15,
36:23, 37:10,
37:20, 43:25
therapeutic
235:22
thereby
215:10
therefore
49:11, 150:24,
150:25, 158:23,
226:2
thereof
113:6, 189:21
thermodynamic
38:2, 189:4,
209:9
thermodynamics
21:11
thesis
21:20, 21:25,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026                                          298

22:25, 23:7,
24:8, 25:5,
25:6, 25:8
**they'd**
119:4
**thing**
19:19, 19:21,
48:17, 54:16,
154:23, 194:3,
220:24, 241:6,
241:8
**things**
21:15, 22:24,
32:5, 32:8,
36:1, 36:13,
53:21, 55:24,
76:19, 104:12,
104:16, 106:19,
113:20, 130:11,
133:7, 133:21,
136:23, 137:11,
138:1, 142:4,
144:23, 145:6,
145:8, 154:2,
154:4, 165:10,
169:1, 174:2,
187:17, 190:4,
193:12, 194:1,
199:11, 223:10,
230:12, 239:18
**thinking**
20:21, 45:5,
118:5, 118:18,
119:12, 209:3,
209:16, 210:2
**third**
96:10, 174:12,
227:12
**thought**
23:16, 76:8,
77:10, 85:3,
89:16, 132:12,
132:13, 167:15,
167:17, 202:10,
203:21, 212:2,
212:6, 212:21,
245:20
**three**
10:5, 10:23,

19:2, 81:22,
82:23, 191:8,
202:15, 221:22,
226:9, 239:16,
246:6
**through**
6:22, 6:24,
7:5, 7:7, 40:12,
41:2, 41:14,
41:16, 50:4,
50:6, 56:15,
58:13, 59:15,
60:25, 61:21,
62:13, 63:14,
66:5, 68:13,
68:14, 68:15,
68:16, 68:18,
69:23, 83:13,
83:22, 84:5,
84:11, 85:19,
88:15, 89:5,
91:10, 92:1,
94:8, 101:13,
106:25, 107:14,
110:21, 111:18,
115:20, 128:6,
128:13, 128:15,
141:20, 146:4,
174:20, 222:2,
222:4, 223:2,
223:4, 228:11,
228:13, 230:6,
230:8, 234:12,
235:23, 238:11
**throughout**
41:3, 41:12,
41:19, 49:1,
50:1, 50:7,
57:8, 64:16,
73:20, 78:4,
80:15, 81:18,
82:13, 87:10,
93:14, 102:8,
102:21, 103:17,
134:1, 135:20,
137:23, 167:10,
170:16, 173:4,
183:8, 189:23,

192:18, 193:2,
194:21, 198:13,
211:21, 220:6,
229:25
**time**
8:9, 10:11,
11:17, 13:19,
14:23, 15:10,
43:24, 65:2,
69:5, 69:8,
77:22, 90:12,
90:24, 108:15,
117:5, 136:6,
136:9, 154:24,
158:5, 183:15,
184:13, 184:20,
184:22, 184:25,
201:19, 202:8,
205:17, 212:17,
216:18, 221:12,
222:19, 222:21,
222:24, 234:21,
238:23, 239:14,
239:24
**timely**
11:1
**times**
16:23, 16:25,
17:7, 17:10,
29:16, 61:19,
67:17, 76:13
**timing**
157:14
**tissues**
139:23
**title**
21:20, 22:2,
25:25, 26:2,
26:21
**titles**
20:24
**today**
8:11, 9:9,
9:17, 9:19,
10:25, 11:14,
11:20, 13:13,
14:11, 15:11,
33:17, 43:12,

53:25, 157:4,
204:8, 219:12,
219:20, 242:15,
243:8
**today's**
8:9, 9:24,
244:1
**together**
162:25, 190:5,
199:18, 220:15
**told**
173:12, 173:20,
173:24
**tomorrow**
9:18, 11:19,
12:17, 13:16,
14:12, 156:13,
240:21, 241:5,
241:10, 242:16,
244:12
**took**
20:3, 20:9,
20:22, 20:23,
20:25, 21:3,
21:6, 21:10,
27:6, 169:15,
183:2, 202:9
**top**
18:21, 59:24,
68:4, 73:10,
166:22, 180:9,
181:25, 226:17
**topic**
178:12
**topics**
21:8
**topp**
10:24
**total**
27:22, 59:24,
65:18, 186:23,
187:12, 187:15,
187:16
**totality**
172:15
**towards**
20:1, 20:18,
28:24, 83:12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

299

**toxic**
35:22, 225:1
**toxicity**
36:11, 139:24, 225:3
**toxicology**
27:12
**trace**
58:18
**transcript**
9:21, 9:22, 10:7, 10:21, 11:13, 12:6, 12:15, 12:17, 13:13, 15:4, 156:15, 156:18, 156:22, 158:6, 240:13, 241:2, 241:11, 241:21, 241:23, 242:4, 243:18, 244:5, 248:13
**transcripts**
157:8, 158:22, 158:23, 243:25
**transformation**
164:24, 164:25
**transporting**
106:13, 107:1, 107:18, 108:20, 143:11, 146:10
**treat**
48:4, 50:9
**treated**
50:12, 50:15, 52:14, 52:15
**treating**
48:8, 240:12
**treatment**
97:10, 227:19, 240:5
**trial**
11:8, 12:23, 17:4, 17:7, 158:18, 240:15, 245:23
**trials**
11:9, 11:10

**tried**
187:22
**tries**
39:3
**trouble**
10:13
**trout**
1:23, 2:8, 5:3, 5:9, 5:11, 5:15, 5:17, 8:4, 15:14, 15:22, 15:24, 15:25, 17:24, 18:3, 45:12, 45:18, 45:22, 46:6, 46:9, 46:11, 46:14, 47:1, 57:11, 69:10, 87:13, 87:23, 87:24, 105:11, 105:19, 105:20, 108:10, 108:25, 109:3, 109:7, 117:4, 122:19, 129:7, 135:5, 138:20, 142:2, 157:10, 173:18, 174:4, 174:11, 174:14, 178:1, 180:16, 181:25, 190:16, 195:7, 199:3, 222:1, 223:1, 224:4, 225:7, 226:11, 226:13, 227:7, 228:9, 228:21, 228:24, 230:4, 230:11, 232:5, 241:17, 246:5, 247:2, 248:7
**trout's**
157:13, 241:20
**true**
32:1, 32:14, 32:15, 33:19, 39:6, 77:8, 77:12, 122:6, 168:10, 248:9

**try**
18:16, 35:14, 55:10, 57:3, 188:6, 193:24, 210:18, 210:19
**trying**
23:11, 27:3, 27:25, 51:24, 67:13, 67:15, 76:24, 80:10, 94:25, 106:23, 145:5, 145:13, 151:5, 152:17, 187:4, 190:4, 205:17
**turn**
18:19, 104:5, 105:25, 109:11, 200:17, 223:7, 228:25, 230:16
**tutelage**
126:6
**twice**
32:15
**two**
10:20, 11:6, 11:9, 11:25, 12:13, 13:4, 13:22, 14:3, 15:5, 18:1, 20:12, 40:11, 58:16, 98:18, 113:7, 116:20, 117:13, 118:24, 119:15, 120:10, 132:18, 135:24, 157:8, 157:17, 158:1, 165:20, 180:12, 187:17, 193:11, 194:1, 203:14, 218:7, 219:7, 239:16, 240:6, 243:17
**type**
36:6, 112:4, 114:14, 116:22, 118:4, 118:6, 118:13, 153:21

**types**
23:13, 35:5, 42:15, 48:4, 113:5, 220:24, 222:13
**typically**
200:7

**U**

**u**
47:12, 47:16
**ultimate**
97:16, 99:13, 101:18
**unaware**
186:1
**unclaimed**
127:23, 129:4
**uncontested**
218:9
**uncontroversial**
76:9
**under**
10:6, 42:25, 43:9, 70:25, 72:2, 144:15, 150:15, 151:9, 184:6, 195:2, 195:17, 195:22, 224:20, 225:24, 227:16, 229:19, 240:10, 240:11
**underestimating**
31:5, 31:17
**underestimation**
31:10
**undergraduate**
19:25, 20:9, 20:16, 20:19, 21:3, 22:4, 22:7, 26:20, 27:7
**underlined**
103:1, 103:3
**understanding**
9:16, 26:12, 31:11, 33:22, 37:8, 37:11,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

300

38:1, 39:13, 39:14, 40:19, 42:9, 44:21, 47:25, 49:2, 50:18, 55:4, 55:14, 59:10, 60:1, 60:5, 66:16, 74:1, 75:21, 81:14, 82:23, 86:17, 97:11, 108:16, 119:2, 119:22, 124:23, 127:10, 128:7, 137:16, 146:15, 149:1, 152:25, 153:19, 153:25, 163:22, 187:23, 197:11, 227:5, 232:3, 232:19, 232:23, 233:15, 234:22, 234:25, 236:14, 238:16, 238:22

**understandings**
150:5

**understands**
145:15

**understood**
29:23, 72:16, 73:24, 84:6, 85:3, 104:8, 104:11, 212:22, 218:23, 245:21

**undisputed**
105:6, 235:1

**undoubtedly**
242:13

**unfair**
12:25, 13:1

**unfairness**
11:16

**unfortunately**
89:15

**uniform**
79:11

**united**
1:1, 8:7

**university**
19:1, 19:7,

21:18

**unknown**
215:16, 216:6

**unless**
57:4, 244:14

**unlikely**
35:10

**unquote**
173:2

**unrecited**
146:19

**unrelated**
19:11, 24:8, 24:20, 25:6, 147:21, 206:13

**unstable**
75:18, 192:8

**until**
57:14, 85:15, 100:7, 244:5

**unusual**
242:24

**unvalidated**
29:9

**update**
18:14

**updated**
18:9

**upstream**
229:20

**usage**
137:5, 143:22, 205:12, 205:23, 207:6, 209:16, 210:8

**use**
12:9, 28:21, 30:18, 38:24, 49:3, 63:22, 73:7, 81:8, 81:16, 93:11, 99:18, 100:1, 100:10, 100:20, 105:5, 108:14, 110:16, 121:15, 121:19, 122:16, 122:17, 124:19, 127:16, 129:22,

130:7, 131:14, 131:24, 132:22, 139:22, 142:10, 145:11, 197:4, 204:9, 209:7, 209:8, 211:10, 212:5, 219:21, 227:3, 227:4, 229:20, 233:20, 236:8, 236:23

**useful**
51:3

**uses**
58:1, 62:3, 113:18, 177:3, 197:10, 211:17, 211:18

**using**
28:17, 29:12, 29:14, 29:25, 32:24, 43:17, 81:5, 100:16, 100:18, 176:10, 196:3, 196:18, 198:15, 205:3, 219:11, 232:2, 241:20, 242:8

**V**

**vague**
34:4, 149:4, 170:1

**validate**
28:17

**validated**
28:14, 28:21, 29:12, 29:16

**validating**
28:24

**validation**
28:11

**validity**
47:7

**value**
32:14, 32:15, 33:19, 78:8

**values**
32:1

**varied**
32:13

**variety**
23:18

**various**
23:21, 25:9, 26:4, 26:12, 27:11, 61:1, 62:3, 68:1, 159:21, 178:11, 192:11, 221:2, 238:12

**varying**
30:4, 145:10

**vehicle**
73:19, 81:17, 99:21, 106:10, 143:8, 182:24

**vehicles**
175:14

**verify**
56:15

**versus**
8:5

**via**
3:15

**vial**
64:15, 114:10, 154:3, 187:13, 187:14, 190:1, 198:19

**video**
8:10, 8:14

**videographer**
4:14, 8:2, 8:11, 9:8, 69:4, 69:7, 136:5, 136:8, 184:21, 184:24, 222:20, 222:23, 244:23, 247:1

**videotaped**
1:23, 2:8, 8:3

**view**
11:23, 14:17, 14:20, 25:11, 60:2, 76:9, 76:10, 76:18,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026                                    301

78:19, 80:20,
83:17, 112:9,
114:3, 114:12,
115:23, 123:8,
124:3, 124:5,
125:22, 127:7,
162:1, 163:24,
164:1, 172:17,
186:11, 189:15,
193:14, 207:20,
209:25, 210:22,
213:9
**viewed**
36:2
**vii**
155:2
**viscosity**
90:14, 175:12
**viscous**
179:14
**vitae**
5:8, 18:2
**vitamins**
178:18
**vocabulary**
99:21
**voice**
8:17
**volatile**
184:16
**volume**
10:14, 10:16,
86:12, 170:24,
182:1, 188:18

**W**

**wabash**
3:7
**wait**
47:5, 57:14,
85:15
**waived**
77:4
**waiver**
235:21, 235:24
**want**
29:12, 30:14,
31:22, 45:1,

54:14, 55:13,
56:18, 57:23,
57:24, 61:20,
61:21, 62:19,
62:21, 63:20,
67:3, 68:7,
76:6, 77:1,
77:3, 77:13,
91:7, 94:8,
112:12, 112:18,
114:1, 116:25,
119:5, 134:19,
135:11, 136:1,
142:4, 150:6,
152:7, 152:23,
159:7, 160:4,
162:18, 163:21,
166:19, 167:8,
175:21, 180:3,
180:7, 183:9,
186:20, 194:15,
196:19, 196:21,
202:22, 204:10,
208:14, 213:16,
213:18, 218:13,
218:20, 219:4,
219:9, 219:13,
220:13, 220:15,
221:7, 221:16,
232:22, 239:24,
242:1, 244:10,
246:6, 246:9
**wanted**
22:10, 24:25,
30:9, 71:25,
157:15, 159:1,
205:23, 225:19,
230:2, 240:6,
240:16
**wants**
12:9, 156:17
**washington**
3:18
**waste**
14:23
**water**
55:12, 55:15,
55:17, 57:8,

57:19, 58:7,
58:11, 58:18,
58:22, 59:1,
59:8, 59:10,
59:18, 60:3,
60:23, 61:6,
61:10, 61:15,
61:25, 62:5,
62:9, 64:1,
64:4, 64:8,
64:13, 64:18,
64:24, 65:3,
65:7, 65:16,
65:18, 65:20,
65:24, 66:5,
66:10, 66:18,
67:9, 67:22,
67:25, 68:6,
160:24, 162:16,
163:1, 163:3,
163:8, 164:23,
174:1, 181:7,
182:3, 196:11,
196:12, 196:14,
196:17, 196:22,
196:23, 209:5,
220:22, 221:6,
221:13
**water-miscible**
178:19
**watkins**
1:25, 2:9, 3:6
**way**
10:22, 12:24,
14:14, 19:23,
27:13, 29:13,
29:15, 33:17,
34:24, 37:10,
37:12, 55:22,
81:10, 128:16,
134:16, 134:19,
135:21, 140:6,
143:24, 149:12,
152:24, 158:15,
171:15, 186:19,
187:24, 189:3,
198:5, 200:1,
205:3, 208:7,

216:22, 219:6,
219:15, 223:10,
235:9, 245:24,
248:16
**ways**
12:13, 26:4,
113:4, 176:10,
190:7
**we'll**
13:21, 14:24,
46:22, 74:20,
105:16, 151:19,
153:9, 161:20,
178:1, 180:15,
183:21, 190:16,
198:5, 201:21,
240:1, 244:19,
246:4
**we're**
12:14, 12:15,
12:19, 12:22,
12:23, 13:12,
13:13, 14:10,
14:21, 29:12,
33:8, 33:9,
35:21, 44:24,
47:4, 47:10,
47:14, 70:2,
83:10, 85:8,
94:1, 96:6,
102:13, 145:5,
145:13, 157:6,
157:16, 158:1,
158:5, 158:19,
158:23, 162:25,
167:11, 180:3,
180:4, 192:13,
200:18, 202:20,
211:15, 213:24,
214:6, 215:25,
216:13, 219:21,
221:25, 222:20,
241:17, 245:8,
246:4
**we've**
10:4, 11:3,
17:24, 27:13,
28:14, 28:15,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

302

35:10, 35:14,
36:10, 48:1,
53:23, 56:12,
60:11, 60:21,
69:2, 88:17,
92:2, 93:1,
93:9, 98:4,
114:23, 116:16,
120:19, 120:20,
126:16, 128:13,
132:16, 135:24,
137:18, 142:18,
173:1, 173:3,
195:25, 197:21,
198:11, 198:21,
204:8, 205:13,
206:11, 219:12,
237:1, 238:9,
239:9, 239:12,
240:11
**weight**
200:24
**welsh**
3:5, 8:22,
14:1, 98:22
**welsh@lw**
3:11
**went**
21:16, 59:15,
89:15
**weren't**
20:4
**west**
4:7
**whatever**
15:10, 19:20,
31:22, 86:16,
118:21, 119:5,
119:13, 151:19,
159:2, 162:22,
164:22, 187:12,
187:14, 187:16,
194:14, 202:3,
202:10, 209:25,
219:6, 242:5,
242:15, 245:18,
246:6, 246:9
**whatnot**
114:24

**whatsoever**
246:5
**whereas**
141:13
**wherein**
73:15, 79:1
**whereof**
248:18
**whether**
33:8, 33:9,
33:18, 43:13,
58:19, 74:16,
74:17, 141:24,
150:9, 171:17,
172:20, 189:15,
200:11, 202:24,
218:8, 218:14,
220:2, 229:21,
236:15, 237:5,
237:14, 238:1,
238:2, 238:3,
245:25, 246:14
**whoa**
62:16, 63:4
**whole**
40:22, 48:17,
78:25, 79:10,
82:16, 83:7,
83:9, 83:24,
84:3, 89:20,
92:25, 93:1,
93:3, 95:10,
98:13, 100:17,
101:4, 102:21,
103:5, 103:12,
103:14, 124:24,
127:1, 133:9,
146:5, 170:16,
171:9, 177:15,
183:2, 183:6,
183:13, 189:1,
233:21, 239:12
**willful**
232:6, 232:11,
232:14, 232:20,
233:15, 234:7,
234:20
**willfulness**
235:20, 236:15

**willing**
241:9
**windels**
4:6, 8:23
**wish**
151:20
**withdraw**
62:25, 162:23,
184:14
**withdrawing**
162:19
**within**
2:13, 16:18,
36:3, 64:25,
85:23, 86:17,
90:2, 118:5,
118:12, 135:9,
139:21, 146:3,
166:9, 233:10,
236:21, 248:5
**without**
39:19, 68:14,
129:25, 139:23,
219:11
**witness**
5:2, 8:20,
9:10, 9:12,
10:1, 10:2,
11:10, 12:7,
12:11, 12:25,
13:2, 17:13,
17:20, 45:3,
46:13, 52:18,
53:4, 55:19,
56:1, 56:8,
56:10, 56:13,
56:21, 57:2,
63:10, 81:2,
87:21, 105:17,
115:16, 148:5,
178:8, 200:14,
221:18, 221:23,
240:19, 242:23,
243:3, 248:7,
248:18
**witness's**
11:18, 63:6
**witnesses**
37:7

**wo**
5:21, 5:23,
5:25, 87:15,
87:17, 105:13,
105:15, 109:2,
109:5, 138:25
**wood**
200:9
**word**
29:15, 72:10,
72:11, 73:7,
73:13, 74:3,
74:10, 75:1,
75:23, 76:9,
76:25, 77:2,
77:5, 77:13,
78:6, 79:19,
81:5, 81:8,
83:17, 84:1,
84:14, 84:20,
85:10, 90:22,
91:13, 92:11,
93:2, 93:5,
94:13, 94:15,
95:7, 95:12,
95:21, 97:22,
98:1, 100:1,
100:11, 101:9,
101:11, 101:23,
103:24, 104:8,
104:22, 108:11,
129:9, 129:19,
129:23, 143:22,
177:10, 197:2,
197:5, 197:11,
197:22, 211:25
**wording**
142:15
**words**
39:8, 39:19,
40:5, 75:8,
79:6, 79:18,
80:5, 80:22,
81:22, 82:16,
82:24, 82:25,
120:21, 123:25,
124:20, 129:24,
134:3, 140:11,

Case 1:24-cv-00065-JLH    Document 530-1    Filed 08/07/26    Page 409 of 1024 PageID
#: 32492
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

303

141:10, 154:17,
168:10, 186:18,
211:5, 219:22,
232:10

**work**
17:13, 25:7,
28:16, 28:23,
29:1, 29:2,
29:3, 29:4,
34:10, 35:24,
50:21, 51:8,
208:24, 208:25,
211:7, 211:9,
212:19, 242:3,
243:17

**worked**
34:23, 35:3,
35:4, 35:8,
35:10, 35:12,
36:10

**working**
30:25, 35:22

**works**
39:14

**world**
111:10

**worse**
50:14, 52:15

**worth**
239:14

**wouldn't**
24:22, 33:17,
34:1, 88:14,
107:6, 107:10,
119:3, 119:9,
127:8, 129:17,
151:1, 151:11,
159:3, 171:10,
171:15, 187:17,
227:8

**write**
39:2

**writes**
38:22

**written**
92:5, 97:12

**wrong**
33:25, 37:21,

57:6, 79:21,
121:25, 146:19,
168:22, 210:20

**wrote**
102:21, 226:4,
238:1, 245:19

### Y

**yan**
203:14, 203:25

**yeah**
10:3, 15:9,
30:2, 46:5,
56:5, 57:16,
77:7, 81:2,
89:18, 95:20,
97:3, 114:12,
123:22, 127:14,
133:1, 148:5,
167:18, 172:2,
174:13, 184:9,
185:19, 188:21,
191:8, 208:5,
212:15, 217:24,
225:14, 244:7

**year**
20:12, 43:22

**years**
16:24, 17:16,
17:18, 17:19,
27:14, 27:23,
35:15, 50:19,
52:10, 88:23,
93:25

**york**
4:8

**yourself**
56:18

**yup**
144:7

### Z

**zeolite**
22:20

**zeolites**
21:21, 22:16,
23:8, 23:14,
23:19

**zoom**
3:15, 243:21

**zsm**
22:20

**zsm-5**
21:21, 22:16,
23:14, 23:19

### "

**"cellulose**
199:4

### .

**.1144**
4:11

**.3500**
3:19

**.7700**
3:9

### 0

**00**
244:11

**00065**
8:8

**00163**
109:13, 110:2

**00361447**
7:7, 230:6,
230:8

**00361450**
230:17

**00361465**
6:24, 223:2,
223:4

**00361489**
6:22, 222:2,
222:4

**00361576**
222:2

**00361577**
7:4, 228:13

**00361581**
229:1

**02116**
1:26, 8:16

**02139**
16:11

**02420**
16:15

**065082**
5:23, 105:13,
105:15

**09**
1:24, 2:5

**095533**
5:21, 87:15,
87:17, 138:25

### 1

**1**
136:6, 136:9,
198:18

**1.3**
229:3, 229:15

**10**
5:24, 8:10,
69:5, 109:1,
109:3, 109:5,
109:7, 222:24

**100**
16:18

**10019**
4:8

**103**
147:7

**104**
147:11

**105**
5:23, 72:25,
73:22, 160:13

**107**
160:22, 205:19

**109**
5:25

**11**
6:3, 69:8,
174:5, 174:9,
248:19

**11,872,214**
5:18, 47:12

**110**
75:13, 192:1,
194:20, 198:12

**116**
99:4, 99:8,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

304

| | | | |
|---|---|---|---|
| **100:25** | **156** | **190** | **2010** |
| **12** | 4:7 | 6:14 | 5:25, 106:23, |
| 6:6, 93:25, | **1576** | **1919** | 109:2, 109:5, |
| 136:6, 178:2, | 6:22, 222:4 | 3:17 | 110:20, 239:8 |
| 178:7, 233:25 | **158** | **195** | **2011** |
| **12,138,248** | 67:22 | 6:17 | 239:8 |
| 5:19, 47:16 | **1592** | **1963** | **2012** |
| **120** | 7:5, 228:13 | 43:20 | 5:23, 105:13, |
| 214:10 | **16** | **197** | 105:15 |
| **13** | 6:18, 72:18, | 233:7 | **2014** |
| 6:9, 42:15, | 159:21, 184:22, | **199** | 91:3 |
| 42:25, 48:2, | 199:3, 199:6, | 6:20, 154:25, | **2015** |
| 102:24, 168:13, | 233:23, 248:25 | 155:1 | 5:21, 87:15, |
| 173:2, 180:16, | **161** | **1990** | 87:17, 138:25 |
| 180:21 | 57:19, 67:25 | 19:14 | **202.625** |
| **131** | **163** | **1996** | 3:19 |
| 97:1, 97:2, | 110:4 | 21:17 | **2022** |
| 126:14, 126:20, | **165** | **1:-cv--jlh** | 57:20 |
| 135:6, 135:7 | 57:25, 67:2 | 8:8 | **2024** |
| **132** | **167** | | 57:21, 233:23, |
| 126:14, 135:6, | 58:6 | **2** | 233:25, 234:14, |
| 135:7 | **17** | **2** | 238:12, 238:23 |
| **14** | 6:21, 222:1, | 192:2 | **2026** |
| 6:12, 12:20, | 222:5, 224:4, | **2(a** | 1:24, 2:4, 8:9, |
| 13:3, 14:2, | 224:6, 224:7, | 224:18 | 51:8, 248:19 |
| 15:2, 73:10, | 225:7 | **2(b** | **2028** |
| 169:6, 190:16, | **171** | 224:18 | 248:25 |
| 190:21, 241:17 | 58:8, 67:2 | **20** | **203** |
| **141902** | **172** | 7:6, 16:13, | 235:18 |
| 5:25, 109:2, | 59:3 | 16:25, 17:2, | **205** |
| 109:5 | **174** | 17:16, 17:17, | 233:21 |
| **144** | 6:5 | 40:23, 41:13, | **20850** |
| 79:8 | **178** | 52:10, 88:19, | 8:14 |
| **1456** | 6:8, 173:19 | 90:5, 90:17, | **21** |
| 7:8, 230:6, | **179** | 91:2, 196:11, | 85:16, 115:11, |
| 230:8 | 172:13 | 230:5, 230:9, | 115:19 |
| **1482** | **18** | 230:11 | **212.237** |
| 6:24, 223:2, | 5:9, 6:23, | **200** | 4:11 |
| 223:4 | 223:1, 223:5, | 1:26, 2:10, | **214** |
| **15** | 226:11, 226:13, | 8:15 | 40:12, 42:22, |
| 5:4, 6:15, | 227:7 | **2000** | 43:2, 44:20, |
| 70:10, 106:1, | **180** | 200:24 | 47:11, 47:21, |
| 142:19, 166:8, | 6:11 | **2006** | 47:23, 48:7, |
| 195:5, 195:7, | **19** | 3:18, 174:6, | 49:19, 49:22, |
| 195:12 | 7:3, 16:9, | 174:15, 190:18 | 50:15, 50:25, |
| **151** | 16:10, 139:11, | **2009** | 51:18, 53:17, |
| 203:11, 203:13 | 228:10, 228:14, | 74:4, 74:11, | 54:2, 64:15, |
| **152** | 228:21, 228:24 | 74:14 | 69:19, 70:9, |
| 203:24 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Bernhardt L. Trout, Ph.D.
Conducted on May 8, 2026

305

70:24, 71:16,
72:8, 73:12,
74:18, 92:23,
93:12, 111:13,
112:21, 113:7,
115:1, 115:22,
117:20, 117:21,
119:9, 122:20,
124:4, 137:25,
140:13, 140:16,
145:12, 153:1,
176:12, 177:4,
179:2, 198:17,
206:20, 233:23,
237:3, 238:14,
238:23
**22**
139:11
**22.7**
170:21
**222**
6:22
**223**
6:24
**228**
7:5
**229**
27:18
**23**
130:15, 130:17
**230**
7:8, 34:13
**235**
223:19, 224:1,
224:24, 226:4
**236**
223:8, 223:13,
223:14, 226:6,
226:7, 227:12
**237**
230:13, 231:22
**24**
1:8, 1:15, 8:8,
9:7, 28:20,
38:10, 121:2,
122:11, 125:6,
126:8, 128:16,
131:9, 131:12,

131:17, 134:9,
135:2, 135:21,
137:3, 137:19,
140:24, 142:7,
147:4
**242**
228:17, 228:18,
228:22, 229:18
**248**
40:12, 42:22,
43:2, 44:20,
47:15, 47:23,
48:7, 49:22,
50:16, 51:18,
53:17, 54:2,
69:19, 73:5,
73:10, 74:18,
79:2, 92:23,
93:12, 111:13,
112:22, 113:7,
115:2, 115:22,
117:21, 119:9,
137:25, 140:13,
140:16, 145:12,
153:1, 176:12,
177:4, 179:2,
206:21, 233:24,
237:4, 238:14,
238:23
**25**
16:24, 17:17,
17:18, 72:24,
161:16, 164:5,
170:20, 187:8,
187:11
**27**
192:1
**2800**
3:7

---
**3**
---
**3**
169:6, 184:22,
184:25
**3+**
35:11, 35:19,
36:3
**3.2**
159:22

**30**
90:6, 122:21,
128:25, 150:8,
240:18, 240:23,
243:13
**31**
150:13
**312.876**
3:9
**32**
129:8
**33**
122:21, 128:25,
129:8, 184:25
**330**
3:7
**361469**
226:14
**361496**
225:15
**361577**
228:11
**361592**
228:11
**38**
203:9
**39.45**
170:23, 187:9

---
**4**
---
**4**
222:21
**40**
34:18, 214:1,
214:11, 214:14,
215:1
**400**
8:13, 58:10,
159:22, 160:16,
169:8, 170:25,
171:5, 173:22,
177:20, 182:4,
182:25
**41**
91:15, 91:18
**42**
218:5
**44**
102:24, 122:20

**448**
231:21
**45**
5:11, 5:13
**451**
8:12
**46**
5:15, 5:17,
91:19
**47**
5:18, 5:19,
79:9, 91:18
**496**
224:9

---
**5**
---
**5**
170:23, 222:24,
247:3, 247:4
**50**
136:9
**502**
16:10
**51**
109:11, 222:21
**53**
168:14
**54**
69:5
**55**
182:1, 247:3,
247:4
**56**
4:7, 122:20
**57**
48:15, 49:17,
50:3, 50:4,
64:23, 169:5
**58**
122:21

---
**6**
---
**6**
58:2
**60**
43:23
**60611**
3:8

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Bernhardt L. Trout, Ph.D.

Conducted on May 8, 2026
306

**61**
170:18, 173:19, 187:6
**62**
72:18, 73:22, 173:20, 182:1, 187:6
**63**
99:10
**632511**
1:30
**64**
1:8, 9:7
**65**
1:15, 232:12, 233:6, 236:17
**66**
115:19
**67**
83:25

**7**

**70**
154:13, 154:17
**73**
57:12, 57:13, 57:17, 67:20
**74**
57:18
**76**
58:2
**77**
16:9
**79**
58:15
**791**
200:18

**8**

**80**
59:25, 68:4
**800**
3:17
**84**
223:9
**85**
223:9
**87**
5:21

**9**

**9**
1:24, 2:5, 8:10, 244:11
**91**
214:11, 215:1

# EX. 3
# REDACTED IN ITS ENTIRETY

# Exhibit 5

**Redacted Public Version**



**Planet Depos**
We Make It *Happen*™

**\*\*HIGHLY CONFIDENTIAL\*\***

# Transcript of Harish Chinnari

**Date:** December 10, 2025
**Case:** Eagle Pharmaceuticals, Inc., et al. -v- Apotex/Slayback/Baxter Healthcare

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS,   )
INC., and EAGLE SUB 1    )
LLC,                     )
                         )
    Plaintiffs,          )
                         )
VS.                      )
                         ) C.A. NO.: 24-65-JLH
SLAYBACK PHARMA LLC and  )
AZURITY                  )
PHARMACEUTICALS, INC.,   )
                         )
    Defendants.          )

-----------------------------------

ORAL, REALTIMED, VIDEOTAPED DEPOSITION OF

HARISH CHINNARI

HIGHLY CONFIDENTIAL - VOLUME 1 OF 2

DECEMBER 10, 2025

TAKEN VIA ZOOM VIDEOCONFERENCE

-----------------------------------

JOB NO.: 611396

PAGES: 1 - 101

REPORTED STENOGRAPHICALLY BY:

ANNETTE PELTIER, CSR, CRR

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari
Conducted on December 10, 2025                    2

ORAL, REALTIMED, VIDEOTAPED DEPOSITION OF
HARISH CHINNARI, produced as a witness at the
instance of the Plaintiffs, and duly sworn, was
taken in the above-styled and numbered cause on
DECEMBER 10, 2025, from 7:03 a.m. to 10:51  a.m.
Central time, before Annette Peltier, CSR, Texas
Certified Realtime Reporter, in and for the
State of Texas, reported by machine shorthand
pursuant to the Federal Rules of Civil Procedure
and the provisions stated on the record or
attached hereto.

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025                    3

                    A P P E A R A N C E S


ON BEHALF OF THE PLAINTIFFS:

          RAMYA SRI VALLABHANENI, ESQUIRE
          Latham Watkins
          1271 Avenue of the Americas
          New York, NY 10020
          212.906.1200


ON BEHALF OF THE DEFENDANTS:

          JASON LEIF, ESQUIRE
          Windels Marx
          156 West 56th Street
          New York, NY 10019
          212.237.1061


ALSO PRESENT:

          Nick Heisler, Videographer
          Melody Adair, Zoom Tech

RECEIVING REALTIME:

          MS. Vallabhaneni
          Chris Douglas, Alston & Bird

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025                    4

```
                         Index
                                              Page

Appearances.............................    3

Examination by Ms. Vallabhaneni........    7

Adjournment.............................   97

Signature Page..........................   98

Court Reporter's Certificate............   99

                        Exhibits
Number      Description                     Page

Exhibit 1   Notice of Deposition.........   17

Exhibit 2   Slayback's Responses and
            Objections to Eagle's 30(b)(6)
            Deposition Notice............   23

Exhibit 3   LinkedIn profile for
            Harish Chinnari, Senior
            Director at Slayback Pharma...  35

Exhibit 4   NDA Submission Application
            SLAY-VIVMUS0000012...........   50

Exhibit 5   NDA Document
            SLAY-VIVMUS0000029...........   56

Exhibit 6   Cover letter- Annexure-1
            SLAY-VIVMUS0000018...........   64

Exhibit 7   Quality Overall Summary
            Section 2.3
            SLAY-VIVMUS0000322...........   72

                    *  *  *  *  *
```

EXHIBIT TECH:  Thank you to everyone for attending this proceeding remotely, which we anticipate will run smoothly.

Please remember to speak slowly and do your best not to talk over one another.

Please be aware that we are recording this proceeding for backup purposes.

Any off-the-record discussions should be had away from the computer.

Please remember to mute your mic for those conversations.

Please have your video enabled to help the reporter identify who is speaking.  If you are unable to connect with video and are connecting via phone, please identify yourself each time before speaking.

I apologize in advance for any technical-related interruptions.

Thank you.                                             07:04:36

THE VIDEOGRAPHER:  Here begins                        07:04:36
media number one in the videotaped deposition of      07:04:36
Harish Chinnari in the matter of Eagle                07:04:51
Pharmaceuticals, Inc., et al verse                    07:04:51
Apotex/Slayback/Baxter Healthcare in the United       07:05:01
States District Court for the District of             07:05:03

Delaware, Case Number 24-65-JLH.                    07:05:04

Today's date is December 10th,              07:05:07
2025.  The time on the video monitor is             07:05:11
8:05 a.m.                                           07:05:14

The remote videographer today is            07:05:15
Nick Heisler, representing Planet Depos.

All parties of this video
deposition are attending remotely.

Would counsel please voice
identify themselves and state whom they
represent?                                          07:05:27

MS. VALLABHANENI:  Ramya                    07:05:27
Vallabhaneni of Latham & Watkins on behalf of       07:05:28
plaintiffs.                                         07:05:31

MR. LIEF:  And Jason Lief from              07:05:31
Windels Marx on behalf of defendant Slayback and    07:05:37
Apotex.                                             07:05:40

And one note about what the                 07:05:41
videographer read, the -- the other defendants,     07:05:42
Baxter and Apotex, are not implicated by this       07:05:46
deposition and should not get a transcript of       07:05:52
it, as we'll mark it highly confidential.  It is    07:05:55
only Azurity and Slayback, if I didn't say that,    07:05:58
that I represent.                                   07:06:03

THE VIDEOGRAPHER:  The court               07:06:07

reporter today is Annette Peltier, representing

Planet Depos.

          The witness will now be sworn.

        HARISH CHINNARI,

Having been first duly sworn, testified upon his

oath as follows:

        EXAMINATION

BY MS. VALLABHANENI:

   Q.  Good morning, Dr. Chinnari -- or good
evening for you.

   A.  Yeah, good morning.  Good morning.

   Q.  Can you please state your full name for
the record?

   A.  My name is Harish Govindaraja Setty
Chinnari.

   Q.  Okay.  And you're based in India; is that
right?

   A.  Yes, that's right.

   Q.  Okay.  And have you been deposed before?

   A.  Sorry, can you repeat?

   Q.  Sure.

      Have you been deposed ever before in
any type of case?

   A.  No.

   Q.  Okay.  Have you ever testified at a trial

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari

Conducted on December 10, 2025                    8

or any type of administrative hearing before?                    07:07:25

    A.  No.                    07:07:30

    Q.  Okay.  Have you ever submitted any                    07:07:31

declaration in any type of case before?                    07:07:34

    A.  No.                    07:07:39

    Q.  Okay.  So since this is your first, let's                    07:07:40

go over some ground rules.                    07:07:44

        You'll notice here that there's a                    07:07:47

court reporter on the screen as well as a                    07:07:49

videographer.  They're going to be keeping a                    07:07:52

record of our conversation today; and then after                    07:07:54

we're done talking tomorrow, they'll produce a                    07:07:57

transcript.                    07:08:01

        So in order for the court reporter to                    07:08:01

hear both of us clearly and to make sure that                    07:08:03

they are doing their job and putting -- you                    07:08:06

know, taking down the transcript and making sure                    07:08:08

it's accurate, it's important that both of us                    07:08:10

speak very clearly and audibly.                    07:08:13

        So if I ask you a question, I would                    07:08:16

ask that you give a verbal answer, so no nodding                    07:08:18

heads, no shaking heads, no "uh-huhs," so "yes,"                    07:08:21

"no," is -- is sort of what we need here.  Does                    07:08:25

that make sense?                    07:08:28

    A.  Yes.                    07:08:29

Q.  Okay.  And again, because we have a court reporter taking down everything that we say, it's important that we don't speak over one another.  So I will always wait for you to finish your answer before I ask and that -- and -- the next question and I ask that you wait for me to finish my question before you answer.

Does that sound good?

A.  Yes.

Q.  Okay.  And if you don't understand a question, please just ask me to clarify it. I'll try to reword it as needed.

If you answer a question, I'm just going to assume that you understood it.

Does that make sense?

A.  Yes.

Q.  Okay.  And if you need a break at any time, please go ahead and ask.  This is not a marathon.  I'm happy to go for breaks.  The only thing that I ask is that if I have a question pending, please answer the question before we go on the break.

The one exception is that if you have -- if you need to confer with your counsel about a question regarding privilege -- so

| |
|---|
| 07:08:30 |
| 07:08:35 |
| 07:08:37 |
| 07:08:39 |
| 07:08:42 |
| 07:08:46 |
| 07:08:48 |
| 07:08:51 |
| 07:08:52 |
| 07:08:52 |
| 07:08:56 |
| 07:08:59 |
| 07:09:01 |
| 07:09:04 |
| 07:09:06 |
| 07:09:07 |
| 07:09:08 |
| 07:09:13 |
| 07:09:15 |
| 07:09:19 |
| 07:09:21 |
| 07:09:24 |
| 07:09:25 |
| 07:09:27 |
| 07:09:29 |

anything regarding attorney/client privilege, 07:09:33

you can request a break after I've asked the 07:09:36

question. 07:09:38

          Does that make sense? 07:09:39

    A.   Sure, it makes sense. 07:09:40

    Q.   Okay.  So at times, your lawyer, you're 07:09:42

going to hear them object to some questions that 07:09:45

I might ask.  Even if your counsel objects to my 07:09:49

question, you're obligated to answer the 07:09:53

question unless your counsel specifically 07:09:55

instructs you not to answer the question. 07:09:57

          Does that make sense? 07:09:59

    A.   Yes. 07:10:01

    Q.   Okay.  Is there any reason why you can't 07:10:01

give any complete or accurate testimony today? 07:10:06

    A.   No. 07:10:11

    Q.   Okay.  And do you have any questions about 07:10:11

any of the ground rules I just covered with you? 07:10:13

    A.   No, I'm good.  I request you to speak a 07:10:17

little slow and clear so that I'm understanding 07:10:21

that. 07:10:24

    Q.   Sure.  I -- thank you for that note 07:10:24

because I do speak very quickly, so... 07:10:27

          Okay.  So we can start hopping into it 07:10:30

with the prep done. 07:10:34

Did you meet with any lawyers to prepare for your deposition today?

A.  Yes.  I prepared for the deposition today.

Q.  And who did you meet with?

A.  I met with Mr. Lief.

Q.  Did you meet with anyone else?

A.  No.

Q.  Okay.  And when did you meet with Mr. Lief?

MR. LIEF:  And I'll caution you, you can give the dates on that, but you shouldn't discuss what we discussed.

A.  Yeah, so we met for purposes of discussions in the last couple of weeks.  I don't exactly remember the dates, but we discussed in the last couple of weeks.

Q.  (BY MS. VALLABHANENI)  Okay.  So is it fair to say you met several times over the last few weeks?

A.  Yes.

Q.  Okay.  And you said no one else was present at any of those meetings, correct?

A.  That's correct.

Q.  Okay.  And did you take notes during your meetings with Mr. Lief?

07:10:35
07:10:38
07:10:43
07:10:45
07:10:49
07:10:52
07:10:55
07:10:56
07:10:59
07:11:01
07:11:03
07:11:05
07:11:13
07:11:16
07:11:18
07:11:22
07:11:24
07:11:25
07:11:27
07:11:28
07:11:29
07:11:34
07:11:37
07:11:38
07:11:42

A.  No, I was just understanding what he was saying.

Q.  Okay.  And without getting into the contents of anything that you actually discussed with Mr. Lief during these meetings, did you review any documents during these meetings?

MR. LIEF:  You can answer that "yes" or "no."

A.  Yes, we did --

Q.  (BY MS. VALLABHANENI)  Do you recall -- sorry, go ahead.

A.  Yes, we did.

Q.  Okay.  Do you recall how many documents you reviewed?

MR. LIEF:  You can answer that with a number, if you know.

A.  I don't remember the number exactly.  So it would be like around 10, 20.  I don't exactly remember the number.

Q.  (BY MS. VALLABHANENI)  Understood.

And Mr. Lief provided these documents to you, correct?

MR. LIEF:  You can answer that "yes" or "no."

A.  Yes.

Q.  (BY MS. VALLABHANENI)  Did you select any of these documents that you reviewed?

A.  What do you mean by "documents"?

Q.  Sure.  Did you -- strike that.

During the meetings, did you bring up and review any documents that you chose rather than Mr. Lief?

MR. LIEF:  You can answer that "yes" or "no."

A.  No.

Q.  (BY MS. VALLABHANENI)  Okay.  And did any of the documents that you reviewed educate you on any of the topics that you were designated on today to testify on?

A.  Yes.

Q.  Okay.  Did you review any documents outside any of your meetings with Mr. Lief?

A.  Yes.

Q.  And when did you review those documents?

A.  In last couple of weeks.

Q.  Okay.  Actually, let me -- let me clarify that.

So you reviewed additional documents outside of the documents that you reviewed with Mr. Lief; is that right?

07:12:45
07:12:46
07:12:52
07:12:53
07:13:01
07:13:03
07:13:05
07:13:08
07:13:09
07:13:13
07:13:13
07:13:15
07:13:18
07:13:22
07:13:27
07:13:27
07:13:33
07:13:38
07:13:39
07:13:47
07:13:49
07:13:53
07:13:53
07:13:57
07:13:59

MR. LIEF:  Objection to the form.

You can answer that "yes" or "no," but I -- at this point, I wouldn't reveal what documents, and we'll see where the questions go.

A.  Yes.

Q.  (BY MS. VALLABHANENI)  Okay.  And did you review those documents at the request of Mr. Lief?

A.  Few, yes; but few on my own.

Q.  Okay.  And did you review those documents -- okay.  Strike that.

The documents that you reviewed on your own, did you review them to refresh your recollection?

A.  That was mainly directed to the topics that was assigned to me.

Q.  Okay.  And did you discuss your deposition or any documents that you reviewed with anyone from Slayback or Azurity?

A.  Yes, I discussed with my team.

Q.  Okay.  Who did you discuss?

A.  I discussed with Somashekhar Battani and T. Lourdu Chinnu.

Q.  Can you spell both of their -- those names for me, please?

07:14:01
07:14:02
07:14:05
07:14:09
07:14:16
07:14:16
07:14:18
07:14:24
07:14:31
07:14:35
07:14:38
07:14:40
07:14:42
07:14:47
07:14:53
07:14:56
07:14:57
07:15:02
07:15:06
07:15:12
07:15:14
07:15:19
07:15:25
07:15:27
07:15:29

A.  Somashekhar, S-O-M-A-S-H-E-K-A-R; Battani, B-A-T-T-A-N-I.    07:15:30 / 07:15:39

Q.  Okay.    07:15:43

A.  Second name is T. Lourdu, L-O-U-R-D-U, Lourdu; Chinnu, C-H-I-N-N-U.    07:15:44 / 07:15:51

Q.  Thank you.    07:15:55

And both of these individuals are on your team; is that right?    07:15:57 / 07:16:01

A.  Yes.    07:16:02

Q.  Do they report to you?    07:16:02

A.  Yes.    07:16:06

Q.  Okay.  And what team are they on?  What's the name of their team?    07:16:06 / 07:16:11

MR. LIEF:  Objection to the form.    07:16:13

A.  They report to me, so Somashekhar is responsible for formulation development. T. Lourdu Chinnu is responsible for analytical development.    07:16:18 / 07:16:23 / 07:16:25 / 07:16:29

Q.  (BY MS. VALLABHANENI)  Okay.  And how long did you speak with both of these individuals?    07:16:32 / 07:16:37

MR. LIEF:  You can answer that.    07:16:42

A.  I did not more than 30 minutes.    07:16:47

Q.  (BY MS. VALLABHANENI)  Okay.  And was Mr. Lief present at these meetings when you spoke to these individuals?    07:16:49 / 07:16:51 / 07:16:53

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari

Conducted on December 10, 2025                                16

MR. LIEF:  You can answer that
"yes" or "no."                                                    07:16:55
                                                                  07:16:57
    A.  No.                                                       07:16:57

            MR. LIEF:  Yeah.                                      07:16:58

    Q.  (BY MS. VALLABHANENI)  Sorry, I didn't get                07:16:59
that.  No?                                                        07:17:00

    A.  No.                                                       07:17:01

    Q.  Okay.  And did you reference any documents                07:17:01
during your discussions with Mr. Somashekhar or                  07:17:07
Mr. Chinnu, I think?                                              07:17:13

    A.  No, I didn't reference any documents.  I                  07:17:14
was just clearing my doubts with them.                           07:17:19

    Q.  Okay.  And did you discuss your deposition                07:17:25
with anybody else besides these two individuals?                 07:17:27

    A.  No.                                                       07:17:31

    Q.  Okay.  When did you have these discussions                07:17:31
with these two individuals?                                       07:17:38

            MR. LIEF:  Objection, form.                           07:17:41

    A.  Last week.                                                07:17:48

    Q.  (BY MS. VALLABHANENI)  Okay.  And did you                 07:17:50
meet with them separately?                                        07:17:53

    A.  Yes.                                                      07:17:58

    Q.  Do you recall what -- well, strike that.                  07:17:58

            I think you said earlier that you                     07:18:07
wanted to clear your doubts with them.                            07:18:11

Can you explain further what you meant by that?    07:18:16 07:18:19

MR. LIEF:  Objection, mischaracterizes.    07:18:19 07:18:20

A.  It was mainly specific to -- I asked some specific questions to them to understand.    07:18:32 07:18:38

Q.  (BY MS. VALLABHANENI)  Well, what specific questions, if you recall, did you ask them?    07:18:43 07:18:45

MR. LIEF:  So I'm going to caution you to the extent the questions you asked were derived from -- out of discussions or my directions to you, you shouldn't reveal that. To the extent you asked other questions on your own, you may reveal that.    07:18:48 07:18:50 07:18:54 07:18:57 07:19:01 07:19:04

A.  With Chinnu, I was mainly talking about -- I was asking about the method because he is analytical lead, and I am basically a formulation scientist by experience, I was understanding the metrics.    07:19:11 07:19:16 07:19:21 07:19:24 07:19:27

And with Soma, I was trying to understand what happened before I joined.    07:19:30 07:19:34

Q.  (BY MS. VALLABHANENI)  Thank you for that.    07:19:38

So is it correct that Somashekhar Battani joined Slayback or Azurity before you did?    07:19:40 07:19:46 07:19:51

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari

Conducted on December 10, 2025                    18

A.  Yes, that's right.

Q.  Okay.  Okay.  Thank you.

MS. VALLABHANENI:  Can we please bring up tab one and mark it as Chinnari Exhibit 1, please?

(Whereupon Exhibit Number 1 was marked for identification.)

MR. LIEF:  And I would ask that whatever exhibits we mark are placed in chat so he could download them and look at them.

MS. VALLABHANENI:  Yep.

Sorry.  Melanie, are you there?

EXHIBIT TECH:  Apologies, I did not have my microphone turned up.  I put the exhibit in the Zoom chat, and I'm actually about to share it.

MS. VALLABHANENI:  Okay, thank you.

MR. LIEF:  I don't see it in the chat yet, but I'm sure we'll get it.

EXHIBIT TECH:  One moment.

MR. LIEF:  There it is.

EXHIBIT TECH:  Document is on screen.  Would counsel like control of the document?

07:19:53
07:19:54
07:20:01
07:20:03
07:20:06
07:20:08
07:20:14
07:20:14
07:20:15
07:20:19
07:20:22
07:21:10
07:21:18
07:21:20
07:21:23
07:21:26
07:21:26
07:21:27
07:21:27
07:21:31
07:21:34
07:21:41
07:21:50
07:21:51
07:21:53

MS. VALLABHANENI:  No, that's okay.  If you could just blow it up, though.

EXHIBIT TECH:  Is that good, counsel?

MS. VALLABHANENI:  Keep going if you can.  It's a little tough to read.  That's good.

Q.  (BY MS. VALLABHANENI)  Dr. Chinnari, can you see the document on the screen?

A.  Yes, I can see.

Q.  Okay.  And do you recognize this document?

A.  This is just a hard document what I have received in the chat.

Q.  Okay.  And have you seen this document before?

A.  The first page seems to be familiar.

Q.  Okay.  And do you understand you're here to testify on behalf of both Slayback and Azurity regarding certain topics as those topics relate to Slayback's NDA product?

A.  Yes.

Q.  Okay.  And we'll talk about those topics later, but other than the preparations that we just discussed, did you do anything else to prepare to testify on these topics?

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari
Conducted on December 10, 2025                    20

A.  No.

Q.  Okay.  And do you have personal knowledge about each of the topics that you are designated on?

MR. LIEF:  Objection, form.

A.  Yes.

Q.  (BY MS. VALLABHANENI)  Okay.  Okay.  So for the record, when I refer to Slayback's NDA, I'm going to be referring to Slayback's NDA Number 212209 and any amendments or supplements to that NDA.

Do you understand that definition?

A.  Yes, I do understand.

Q.  Okay.  And then when I refer to Slayback's NDA product, I'm going to be referring to Slayback's 505(b)(2) bendamustine hydrochloride injection product that is the subject of the Slayback NDA.

Do you understand that definition?

MR. LIEF:  Objection to the form.

A.  Yes.

Q.  (BY MS. VALLABHANENI)  Okay.  And for today's deposition, just for ease, I'm going to use the name "Slayback" to refer to both Slayback Pharma, LLC and Azurity

Pharmaceuticals, unless I ask about any other companies specifically.

Does that make sense?

A. Yes.

Q. Okay. And does that work for you?

A. Yes.

Q. Okay. Do you have an understanding of what a Reference Listed Drug is in the context of a 505(b)(2) NDA?

MR. LIEF: Objection, legal.

A. Yes, I do.

Q. (BY MS. VALLABHANENI) So what is your understanding of what a Reference Listed Drug is?

A. During the submission of any 505(b)(2) application, you need to reference a listed drug, so that will be the basis of the application.

Q. Okay. And so the Reference Listed Drug for Slayback's NDA product is Belrapzo; is that right?

A. That's right.

Q. Okay. And you understand that the active ingredient in Slayback's NDA product is bendamustine hydrochloride, right?

A.  Yes.

Q.  And bendamustine hydrochloride's the same active ingredient in Belrapzo, right?

A.  Yes.

Q.  Okay.  And is Slayback's NDA product known by any other names?

A.  Yes.

Q.  What are those names?

A.  So the brand name for the Slayback's product is Vivimusta.

Q.  Okay.  And was the Slayback NDA product referred to internally at Slayback by any name or code name, for example?

MR. LIEF:  I think I'm just going to take a standing objection on the Slayback NDA product because, as you know, we've invited questions on ███████████████████ ███████████████ and so to the extent it's not clear what you're talking about, I don't want to repeat the objection again and again, I'll just take a standing objection on that, if that's okay.

MS. VALLABHANENI:  Understood.

Q.  (BY MS. VALLABHANENI)  Dr. Chinnari, you can answer the question, or would you like me to

repeat it?

A. Can you repeat, please?

Q. Sure.

Is Slayback's NDA product known internally at Slayback by a certain name or code name?

A. It is referenced as Vivimusta.

Q. Okay. Or was it -- strike that.

Was the Slayback NDA product referred to by a project name before it gained the name Vivimusta?

A. Before the brand name was awarded, it was called as bendamustine hydrochloride injection.

Q. Okay. Okay.

MS. VALLABHANENI: We can take down this document.

And if we can bring up tab 2 and go ahead and mark that as Chinnari Exhibit 2.

EXHIBIT TECH: Stand by.

(Whereupon Exhibit Number 2 was

marked for identification.)

EXHIBIT TECH: Document is on screen, document is in the Zoom chat.

MS. VALLABHANENI: Thank you.

Q. (BY MS. VALLABHANENI) So the document in

front of you marked as Chinnari Exhibit 2 is                07:29:32

Slayback's responses and objections to Eagle's              07:29:38

30(b)(6) deposition notice.                                 07:29:43

        Have you seen this document before,                 07:29:44

Dr. Chinnari?                                               07:29:46

    A.   No, I have not seen this document.                 07:30:00

    Q.   Okay.  And if it wasn't clear, feel free           07:30:02

to download the document in the chat if you want            07:30:06

to leaf through it; but essentially this lists              07:30:09

each of the 30(b)(6) deposition topics that were            07:30:13

served on Slayback.                                         07:30:17

        MS. VALLABHANENI:  If we can                        07:30:20

scroll down to topic 1, please.  No.  Keep                  07:30:21

going.  If you can scroll back to Page 2.  Yep.             07:30:29

Okay.                                                       07:30:40

    Q.   (BY MS. VALLABHANENI)  So if you could             07:30:40

read topic 1 and let me know when you're                    07:30:43

finished.                                                   07:30:47

    A.   Yes, I'm done.                                     07:31:25

    Q.   Okay.  And do you understand you're                07:31:26

designated to testify on behalf of Slayback                 07:31:29

regarding topic 1?                                          07:31:32

        MR. LIEF:  Objection to the form.                   07:31:34

Let me quickly reference some of my letters and             07:31:36

maybe help with this.  My understanding is we               07:31:43

have designated Mr. Chinnari for parts of topic                    07:31:47

1 on the scientific and technical side,                            07:31:52

similarly parts of topic 2, topic 5, and in                        07:31:59

particular ███████████████████████████████                         07:32:02

████████████ topic 7 through 16, topic 30, to                      07:32:05

the extent there's nonprivileged information                       07:32:11

there, and topics 39 and 40 -- again, largely                      07:32:14

with respect to any technical aspects,                             07:32:20

scientific aspects, ████████████████████████                       07:32:24

█████████████████ -- and more generally scientific                 07:32:28

and technical aspects of -- of this product, but                   07:32:32

I think that's all I'll say on that, and I'll                      07:32:37

allow you to, if you wish, go through these.                       07:32:40

                    MS. VALLABHANENI:  Thank you,                   07:32:44

Mr. Lief.                                                          07:32:45

    Q.  (BY MS. VALLABHANENI)  Mr. Chinnari, do                     07:32:46

you want me to repeat the question?                                07:32:48

Dr. Chinnari, sorry.                                               07:32:51

    A.  Yes, please.                                               07:32:52

    Q.  Okay.  Subject to Slayback's objections                    07:32:53

that counsel just stated, are you prepared to                      07:32:58

testify regarding topic 1?                                         07:33:01

    A.  Yes, I'm prepared, but for technical                       07:33:07

aspects.                                                           07:33:10

    Q.  Okay.  And do you have personal knowledge                  07:33:10

regarding this topic?                                        07:33:13

A.  Yes, I do.                                               07:33:17

Q.  And did you meet with anyone at Slayback                 07:33:17
to prepare to testify on this topic?                         07:33:25

          MR. LIEF:  Objection.                              07:33:30

A.  No.                                                      07:33:30

          THE COURT REPORTER:  I'm sorry,                    07:33:33
what was the objection?                                      07:33:33

          MR. LIEF:  Asked and answered.                     07:33:35

Q.  (BY MS. VALLABHANENI)  Okay.                             07:33:37

          MS. VALLABHANENI:  And if we can                   07:33:38
scroll down to topic 2, please.                              07:33:38

Q.  (BY MS. VALLABHANENI)  I'll speed this up                07:33:43
because I think you're designated on quite a few             07:33:44
topics and I don't want to spend too much time              07:33:47
on this, but Dr. Chinnari do you understand that            07:33:49
you are designated on topic 2 subject to                     07:33:51
Slayback's objections -- objections and                      07:33:55
responses?                                                   07:33:58

A.  Yes, on the technical aspects.                           07:34:08

Q.  Okay.  And you're prepared to testify                    07:34:10
regarding topic 2?                                           07:34:12

A.  Yes, on the technical aspects.                           07:34:15

Q.  And do you have personal knowledge about                 07:34:17
this topic?                                                  07:34:21

A.  Yes, I do.    07:34:24

Q.  Okay.    07:34:25

MS. VALLABHANENI:  And if we can scroll down to topic 4.    07:34:26 / 07:34:26

Q.  (BY MS. VALLABHANENI)  And I understand that you are designated on topic 4 as to the technical and factual aspects of topic 4.    07:34:34 / 07:34:35 / 07:34:38

Are you prepared to testify regarding topic 4?    07:34:43 / 07:34:45

A.  Yes, on the technical aspects.    07:34:49

Q.  Okay.  And do you have personal knowledge about this topic?    07:34:51 / 07:34:53

A.  Yes.    07:34:57

Q.  Okay.    07:34:58

MS. VALLABHANENI:  If we can also scroll down to topic 5, please.    07:35:00 / 07:35:01

Q.  (BY MS. VALLABHANENI)  Are you prepared to testify on the technical or factual aspects of topic 5?    07:35:08 / 07:35:09 / 07:35:14

A.  Yes.    07:35:18

Q.  Okay.  And do you have personal knowledge about topic 5?    07:35:19 / 07:35:21

A.  Yes.    07:35:24

Q.  Okay.    07:35:25

MS. VALLABHANENI:  And if we can    07:35:27

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari
Conducted on December 10, 2025                    28

go down to topic 7, please.

Q.  (BY MS. VALLABHANENI)  Are you prepared to testify regarding topic 7, subject to Slayback's objections and responses?

A.  Yes, I am prepared, but few aspects of this I will not be able to answer because we don't deal with those things.

Q.  Okay.  Understood.

Do you have personal knowledge about this topic?

MR. LIEF:  Objection to the form.

A.  Yes, on the known topics, yes, I do have personal knowledge.

Q.  (BY MS. VALLABHANENI)  Okay.  And you said that a few aspects regarding this topic you won't be able to answer because "we" don't deal with these things, I think.  By "we," did you mean Slayback?

A.  Yes.  For example, the synthesis identification, characterization, so we don't deal with these aspects for the raw materials -- raw materials, like API and excipients.

(Reporter clarification.)

MS. VALLABHANENI:  "Excipients" is what he said.

Q.   (BY MS. VALLABHANENI)   So who deals with the synthesis identification and characterization of the ingredients in Slayback's NDA?          07:37:23 07:37:28 07:37:30 07:37:32

A.   So we generally do not deal with these aspects.   We rely on the vendors.          07:37:38 07:37:41

Q.   And who are the vendors?          07:37:45

A.   There are designated vendors for each ingredient used in the composition, and we rely mainly with the aspect of the synthesis identification and characterization on those vendors.          07:37:52 07:37:57 07:38:03 07:38:07 07:38:09

Q.   And did you speak with anyone at those vendors regarding this topic?          07:38:09 07:38:12

A.   No.          07:38:16

Q.   Okay.          07:38:17

MS. VALLABHANENI:   If we can scroll down to topic 8, please.          07:38:20 07:38:21

Q.   (BY MS. VALLABHANENI)   Dr. Chinnari, are you prepared to testify regarding topic 8, subject to Slayback's objections and responses?          07:38:28 07:38:29 07:38:33

A.   Yes.          07:38:47

Q.   Okay.   And do you have personal knowledge regarding this topic?          07:38:47 07:38:50

MR. LIEF:   Objection to the form.          07:38:52

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari
Conducted on December 10, 2025                    30

A.  Yes.

Q.  (BY MS. VALLABHANENI)  Okay.

MS. VALLABHANENI:  If we can go on to topic 9, please.

Q.  (BY MS. VALLABHANENI)  Dr. Chinnari, are you prepared to testify regarding topic 9?

A.  Yes.

Q.  And do you have personal knowledge regarding this topic?

A.  Yes.

Q.  Okay.

MS. VALLABHANENI:  If we can go on to topic 10, please.

Q.  (BY MS. VALLABHANENI)  Are you prepared to testify regarding topic 10?

A.  Yes.

Q.  And do you have personal knowledge about this topic?

MR. LIEF:  Objection, form.

A.  Yes.

MS. VALLABHANENI:  And scroll to topic 11, please.

Q.  (BY MS. VALLABHANENI)  Are you prepared to testify regarding topic 11?

A.  Yes.

07:38:57
07:38:58
07:39:01
07:39:02
07:39:08
07:39:09
07:39:16
07:39:16
07:39:18
07:39:23
07:39:23
07:39:26
07:39:27
07:39:35
07:39:37
07:39:52
07:39:53
07:39:54
07:39:55
07:39:59
07:40:08
07:40:09
07:40:10
07:40:13
07:40:22

Q.  And do you have personal knowledge of topic 11?

MR. LIEF:  Objection, form.

A.  Yes, I do, but if you're talking about commercial batches -- so to my knowledge I can answer what I know, but the commercial batches are dealt with the quality assurance team.

Q.  (BY MS. VALLABHANENI)  Can you repeat that, the commercial batches are dealt with what?

A.  By the quality assurance team.

Q.  Got it.  Thank you.

MS. VALLABHANENI:  And if we can scroll to topic 12.

Q.  (BY MS. VALLABHANENI)  Are you prepared to testify today regarding topic 12?

A.  Yes.

Q.  And do you have any personal knowledge regarding this topic?

MR. LIEF:  Objection, form.

A.  Yes.

Q.  (BY MS. VALLABHANENI)  Okay.  And if we can go to topic 13, please.

Are you prepared to testify regarding topic 13?

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari

Conducted on December 10, 2025                              32

A.  Yes, here with respect to the delivery, date of manufacturing; so these are the responsibility of the supply chain, but to my knowledge, what I know, I can testify.

Q.  Okay.  So you do have personal knowledge regarding the -- at least aspects of this topic; is that right?

MR. LIEF:  Objection, form.

A.  Yes.

MS. VALLABHANENI:  And if we can scroll down to topic 14, please.

Q.  (BY MS. VALLABHANENI)  Are you prepared to testify regarding topic 14?

A.  Partly, yes.

Q.  What part are you prepared to testify on?

A.  I know what vendors we are using, but we don't speak to vendors directly.  The supply chain team talks to the vendors.

Q.  Okay.  So do you have some personal knowledge regarding this topic?

MR. LIEF:  Objection to the form.

A.  Yes.

MS. VALLABHANENI:  And scroll down to topic 15, please.

Q.  (BY MS. VALLABHANENI)  And are you

prepared to testify regarding topic 15?    07:43:23

A.  Yes.    07:43:30

Q.  Do you have any personal knowledge about this topic?    07:43:31 07:43:33

MR. LIEF:  Same objection.    07:43:35

A.  So the knowledge is based on the review of the certificate of analysis of the bendamustine.    07:43:42 07:43:45

Q.  (BY MS. VALLABHANENI)  Okay.  Thank you. If we can move on to topic 16.  Are you prepared to testify on topic 16, Dr. Chinnari?    07:43:54 07:43:56 07:44:01

A.  Yes.    07:44:18

Q.  And do you have personal knowledge regarding this topic?    07:44:21 07:44:24

MR. LIEF:  Same objection.    07:44:26

A.  Yes.    07:44:29

MS. VALLABHANENI:  And can we scroll down to topic 30, please?    07:44:32 07:44:33

Q.  (BY MS. VALLABHANENI)  Dr. Chinnari, are you prepared to testify regarding topic 30?    07:44:45 07:44:46

A.  Yes, here I can tell what I know, but I'm not -- I want to specify that I'm not the patent lawyer.    07:44:55 07:45:00 07:45:04

Q.  Understood.    07:45:04

And you have personal knowledge regarding this topic?    07:45:11 07:45:13

MR. LIEF:  Objection to the form.          07:45:14

A.  Yes.          07:45:17

Q.  (BY MS. VALLABHANENI)  Okay.  Couple more and then we'll be done with this.          07:45:18 07:45:21

MS. VALLABHANENI:  Can you scroll down to 39, please?          07:45:23 07:45:24

Q.  (BY MS. VALLABHANENI)  Do you understand -- oh, are you prepared to testify regarding topic 39, Dr. Chinnari?          07:45:33 07:45:33 07:45:37

MR. LIEF:  Objection.          07:45:41

A.  Yes, I can testify what I know, but I am not a patent lawyer.          07:45:54 07:45:58

Q.  (BY MS. VALLABHANENI)  And do you have personal knowledge about this topic?          07:45:59 07:46:01

MR. LIEF:  Same objection, form.          07:46:03

A.  Yes.          07:46:06

Q.  (BY MS. VALLABHANENI)  Okay.          07:46:07

MS. VALLABHANENI:  Scroll to topic 40.          07:46:10 07:46:11

Q.  (BY MS. VALLABHANENI)  Dr. Chinnari, are you prepared to testify regarding topic 40, and in particular, any factual or technical elements of this topic?          07:46:14 07:46:15 07:46:18 07:46:24

MR. LIEF:  Same objections and as previously stated in listing his topics.          07:46:27 07:46:30

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari
Conducted on December 10, 2025                    35

A.  Yes, on the technical aspects.

Q.  (BY MS. VALLABHANENI)  Okay.  And do you have personal knowledge -- knowledge about this topic?

MR. LIEF:  Objection, form.

A.  Yes.

MS. VALLABHANENI:  Okay.  If you can scroll down to topic 41.

Q.  (BY MS. VALLABHANENI)  Are you prepared to testify regarding topic 41?

A.  I can talk on the technical aspects here.

Q.  Okay.  And do you have any personal knowledge about this topic?

MR. LIEF:  Objection to form.

A.  Yes, on the technical aspects.

Q.  (BY MS. VALLABHANENI)  Okay.

MS. VALLABHANENI:  We can take this down.

Can we please bring up tab 4 and mark that as Chinnari Exhibit 3.

EXHIBIT TECH:  Stand by.

(Whereupon Exhibit Number 3 was marked for identification.)

Q.  (BY MS. VALLABHANENI)  And Dr. Chinnari, I guess before we get that exhibit up, can you

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari
Conducted on December 10, 2025                         36

tell me a little bit about your education                    07:47:59

background?                                                   07:48:01

    A.   Yeah.   My education is in pharmaceutical            07:48:05

sciences.   I have completed my master's in                  07:48:12

pharmaceutical sciences, and I'm pursuing my                 07:48:14

doctorate degree as of now.                                  07:48:19

    Q.   Okay.   And what did you specialize in in            07:48:21

undergrad or for your master's degree?                       07:48:25

    A.   Master's was the pharmaceutical sciences,           07:48:29

formulation development mainly.                              07:48:34

            EXHIBIT TECH:   Stand by.   Document             07:48:40

is on the screen.   Document is in the Zoom chat.            07:48:47

            MS. VALLABHANENI:   Thank you.                   07:48:52

            Can you zoom in on this, please?                 07:48:57

    Q.   (BY MS. VALLABHANENI)   Dr. Chinnari, this          07:49:04

is a copy in front of you of a LinkedIn profile             07:49:05

for Harish Chinnari, Senior Director at Slayback            07:49:10

Pharma.                                                      07:49:16

            Do you recognize this as your LinkedIn          07:49:17

profile?                                                     07:49:19

    A.   Yes, I do.                                          07:49:20

    Q.   Okay.   Do you know if this is a current           07:49:21

profile?                                                     07:49:26

    A.   Yes.                                                07:49:39

    Q.   Okay.   And so you updated it recently; is          07:49:40

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari

Conducted on December 10, 2025                37

that right?

A.  Yes, this seems to be an updated one.

Q.  Okay.  Great.

MR. LIEF:  And I'm going to just lodge an objection to the document, which seems to be incomplete.

MS. VALLABHANENI:  Okay.  So if we can scroll down to your work experience, please.

Q.  (BY MS. VALLABHANENI)  So it looks like you got your first job working in formulation development at Strides Arcolab Limited; is that right?

A.  Yes, that was my first job.

Q.  Okay.  And can you tell me a little bit about what your work there entailed?

A.  I worked as a formulation scientist there.

Q.  And did you work on any injectable formulations while you worked there?

A.  Yes, I did.

Q.  Okay.  And then you joined Dr. Reddy's Laboratories; is that right?

MR. LIEF:  Objection.

A.  That's right.

Q.  (BY MS. VALLABHANENI)  Okay.  And what were your responsibilities at Dr. Reddy's?

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari

Conducted on December 10, 2025                    38

A.  I was working as a formulation development scientist.

Q.  And what kinds of projects did you work on?  To be clear here, I'm not asking for confidential information regarding your work at Dr. Reddy's, I just want to get a sense of the type of products you worked on while you were there.

A.  I worked on injectable projects.

Q.  Okay.  After Dr. Reddy's, did you work -- you worked at Mylan Laboratories, is that right, from 20 -- 2009 to 2013?

A.  Yes, that's right.

Q.  Okay.  And you held several roles at Mylan, right?

A.  Yes, that's right.

Q.  Okay.  Why don't you just tell me or describe to me the different roles you had at Mylan.

A.  So here I was working as a team lead for the development of steroidal H1s, so that include injectable ophthalmics and nasals.  So there was a designation change due to promotion, but the responsibilities remained same.

Q.  Okay.  And did you say that you worked on

injectable formulations?  Did I hear that right?

A.  Yes.

Q.  Okay.  And then where did you work after Mylan?

A.  I worked with Hospira.  That is now Pfizer.

Q.  Okay.  And did you work on injectable formulations while you were at Hospira?

A.  Yes.

Q.  Okay.  And then where did you work after Hospira?

A.  I worked with Lupin.

Q.  And what was your role at Lupin?

A.  I was a team lead for formulation development of steroidal H1s.

Q.  And did you work on injectable formulations while you were team lead at Lupin?

A.  Yes.

Q.  Okay.  And where did you work after Lupin?

A.  After Lupin, I joined Slayback Pharmaceuticals.

Q.  Okay.  And you joined back in 2017; is that right?

A.  That's right.

Q.  And what was your role at Slayback in

2017?

A.   That role in Slayback is kind of a group lead, wherein formulation development, analytical development, and project managers report to me.

Q.   Is that in your current role, or was this back in 2017?

A.   It is the same responsibility what I carry as of now.

Q.   Okay.  Is it right that you started out as an associate director and then you were promoted to director?

A.   Yes, that's right.

Q.   Okay.  What year was that?

MR. LIEF:  Objection to the form.

A.   So as the profile says, it is 2020.

Q.   (BY MS. VALLABHANENI)  Okay.  And then you were promoted to senior director, and that's your current role; is that right?

A.   That's right.

Q.   Okay.  And can you tell me a little bit more about your responsibilities in your current role?

A.   So my responsibility is to develop product from scratch into commercialization and so

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari
Conducted on December 10, 2025                    41

understand all the product development aspects,          07:55:57

be it formulation, analytical, and bring to the          07:56:04

closure.                                                 07:56:07

Q.  Okay.  And you're based in Hyderabad; is             07:56:08

that right?                                              07:56:08

A.  Yes, that's right.                                   07:56:13

Q.  Okay.  So were you involved at all in the            07:56:14

formulation or development of Slayback's NDA             07:56:20

product?                                                 07:56:24

MR. LIEF:  Objection to the form.              07:56:26

A.  Yes, I am involved.                                  07:56:31

Q.  (BY MS. VALLABHANENI)  How did you get               07:56:33

involved?  Were you brought on early on in the           07:56:39

project?                                                 07:56:45

A.  I am working on this project since my                07:56:46

joining.                                                 07:56:52

Q.  Okay.  So back in 2017; is that right?               07:56:52

A.  That's right.                                        07:56:56

Q.  Okay.  Were you involved in preparing                07:56:59

Slayback's NDA for its product?                          07:57:01

A.  Can you repeat?                                       07:57:07

Q.  Sure.                                                07:57:08

You -- do you understand that Slayback            07:57:09

had to submit an NDA to the FDA for its product?         07:57:13

A.  Yes.                                                 07:57:18

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari

Conducted on December 10, 2025                    42

Q.  And were you involved in putting together that NDA at all?

A.  Yes, me and my team were involved.

Q.  And how were you involved?  Did you draft portions of the NDA?

A.  Most of the documents were draft with respect to the technical aspects from my team, and I would have reviewed those during the NDA submission.

Q.  Okay.  Besides your team, was there anyone else at Slayback involved in preparing Slayback's NDA?

A.  For the technical aspects, it was me and my team.

Q.  Okay.  What about other aspects of the NDA, were there other individuals involved?

A.  Yes, it will be regulatory team.

Q.  Anyone else?

A.  On drafting, I believe it is the formulation, analytical, and regulatory.

Q.  Okay.  Thank you.

So just going back to your role as senior director, how many people report to you?

A.  Close to 15.

Q.  And those are all direct reports?

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari

Conducted on December 10, 2025                    43

A.   Yes.                                              07:59:12

Q.   And do you have team meetings with those          07:59:12
15 employees?                                          07:59:16

A.   Team meetings happen specific to project,         07:59:23
and specific project leads will be involved            07:59:26
during the meeting.                                    07:59:30

Q.   Okay.  And of those 15 people on your             07:59:31
team, how many of them worked on Slayback's NDA        07:59:36
product?                                               07:59:40

A.   So mainly Somashekhar and Chinnu were             07:59:54
driving this.                                          07:59:58

Q.   Anyone else?                                      08:00:01

A.   I believe no.                                     08:00:07

Q.   Okay.  And how often did you meet with            08:00:08
Somashekhar and Chinnu regarding Slayback's NDA        08:00:16
product?                                               08:00:21

            MR. LIEF:  Object to the form.             08:00:22

Q.   (BY MS. VALLABHANENI)  I can rephrase if          08:00:30
that was a confusing question.                         08:00:31

A.   We meet as and when required.                     08:00:34

      (Reporter clarification.)                        08:00:45

Q.   (BY MS. VALLABHANENI)  So you didn't have,        08:00:45
let's say, like, designated weekly meetings            08:00:47
regarding the Slayback NDA product, right?             08:00:51

A.   That's right.                                     08:00:55

Q.  Okay.  Who do you report to?  Who is your direct report?

MR. LIEF:  Form.

A.  I report to Dr. Sumitra Pillai.  She's the R&D head.

Q.  (BY MS. VALLABHANENI)  Okay.  Do you work regularly with anyone else at Slayback in a different group?

A.  Specific to what?

Q.  That's a good question.

Do you work with anyone at Slayback in the regulatory or legal department regarding any of the products you work on?

A.  With the regulatory, yes.  Not with the legal.

Q.  Okay.  Do you work with any other group regarding any of the products you work on, or is it just regulatory?

A.  So we work with quality assurance team, also.

Q.  Okay.  And what projects have you worked on during your tenure at Slayback besides the NDA product?

MR. LIEF:  So I'll caution you with regard to non-bendamustine products.  If

08:00:56
08:01:01
08:01:03
08:01:06
08:01:12
08:01:13
08:01:15
08:01:18
08:01:23
08:01:27
08:01:28
08:01:31
08:01:35
08:01:42
08:01:45
08:01:45
08:01:49
08:01:52
08:01:56
08:02:00
08:02:01
08:02:09
08:02:15
08:02:18
08:02:20

they're not public yet, I prefer that that not be part of this case, but you should answer.

Q. (BY MS. VALLABHANENI) Yeah. To be clear, if anything is confidential or still in development, you don't need to answer to that. I'm just curious what other types of products you've worked on, if they were injectables.

A. Yes, I have worked on injectables, inhalation products in Slayback tenure.

Q. Okay. And do you have any equity in Slayback?

A. I think that's confidential.

Q. Do you own any stock in Slayback?

MR. LIEF: You can answer that, but if I didn't say it before, we'll mark the whole transcript "highly confidential" under the protective order.

08:02:25
08:02:31
08:02:37
08:02:38
08:02:42
08:02:44
08:02:47
08:02:52
08:02:57
08:03:02
08:03:11
08:03:12
08:03:14
08:03:17
08:03:18
08:03:21
08:03:23
08:03:30
08:03:31
08:03:33
08:03:35
08:03:39
08:03:39
08:03:46
08:03:51

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari

Conducted on December 10, 2025                46

Q.  Okay.

MS. VALLABHANENI:  You can take this document down.

Q.  (BY MS. VALLABHANENI)  Okay. Dr. Chinnari, were you employed at Slayback when it decided to create -- or develop, I should say, the NDA product which became Vivimusta?

A.  No.

Q.  Okay.  Were you -- so -- so is it safe to say you were not involved in the decision to create the bendamustine hydrochloride injection product?

MR. LIEF:  Objection to the form.

A.  That's right, I -- I was not involved in the decision-making, but the project -- when the project was given, we started developing.

Q.  (BY MS. VALLABHANENI)  Do you know who in Slayback was involved in decision-making to develop the NDA product?

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari

Conducted on December 10, 2025                    47

A.  I was not there, so I don't know.    08:05:17

Q.  Okay.  But you did say earlier that you were involved in the regulatory submission of the NDA product; is that right?    08:05:22  08:05:26  08:05:28

MR. LIEF:  Objection to form.    08:05:31

A.  That's right.    08:05:32

Q.  (BY MS. VALLABHANENI)  Okay.  And you had a supervisory role in the development of the NDA product, right?    08:05:33  08:05:37  08:05:41

MR. LIEF:  Same objection.    08:05:42

A.  That's right.    08:05:45

Q.  (BY MS. VALLABHANENI)  And so when Slayback was putting together the NDA application, did your team or other teams at Slayback have any meetings or discussions regarding the preparation of the NDA submission?    08:05:45  08:05:51  08:05:56  08:06:01  08:06:04

A.  Yes, we generally meet to discuss any documents, drafting, reviewing.    08:06:13  08:06:18

Q.  And you were involved in these discussions or these meetings?    08:06:21  08:06:23

A.  Yes.    08:06:27

Q.  Okay.  And you said earlier that you reviewed portions of the NDA that your team drafted; is that right?    08:06:28  08:06:32  08:06:36

A.  That's right.    08:06:40

Q. Did you review any correspondence with the FDA?

A. Yes, I do.

Q. Okay. Do you understand why Slayback decided to create a Bendamustine Hydrochloride Injection product?

MR. LIEF: Objection, scope.

A. That was a business decision.

Q. (BY MS. VALLABHANENI) Do you know who was involved in that decision?

A. The management.

Q. Who specifically, if you're aware?

A. I think that is a management-level decision, so I cannot specify any one person that -- so they took the decision on this.

Q. Did management ever explain to you its decision to develop the NDA product?

A. When I joined -- so the development has started already. So I took the responsibility to draft and submit the NDA.

Q. Okay. So no one explained to you when you joined why they were developing the product, you just came on and started developing; is that right?

A. My responsibility is to deliver the

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari

Conducted on December 10, 2025          49

product as I'm doing.

Q.  Okay.  And do you know if Slayback has filed any NDAs or ANDAs on other bendamustine products?

A.  Can you be specific?

Q.  Sure.

Besides the product that we're talking about today, the NDA product, do you know if Slayback has any other bendamustine products that it's filed an NDA or an ANDA with, with the FDA?

A.  Yes, we filed two NDA products.

Q.  Okay.

MS. VALLABHANENI:  Okay.  We've been going for a little over an hour, so I think it's okay to take maybe a five-minute break here.

MR. LIEF:  Is that okay, Mr. Chinnari?

THE WITNESS:  Yeah, sure.  Yeah.

MS. VALLABHANENI:  Okay.

THE VIDEOGRAPHER:  Great.  We are going off the record.  The time is 9:09 a.m.

(Break taken from 8:09 a.m. to 8:17 a.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 9:17 a.m.

Q.  (BY MS. VALLABHANENI)  Welcome back.

MS. VALLABHANENI:  Can we please pull up Tab 5 and mark that as Chinnari Exhibit 4?

EXHIBIT TECH:  Please stand by.

MS. VALLABHANENI:  And for the record, this is a document with beginning Bates Number SLAY-VIVMUS0000012.

(Whereupon Exhibit Number 4 was marked for identification.)

EXHIBIT TECH:  Document is on screen.  Document is in the Zoom chat.

MS. VALLABHANENI:  And if we could zoom in on this document.  Thank you.

Q.  (BY MS. VALLABHANENI)  Mr. Chinnari, do you recognize this document?

Would you like me to repeat the question, Mr. Chinnari?

A.  No.  So this -- see, I have not drafted this.  This seems to be an NDA submission application.

Q.  Uh-huh.  So you have not seen this document before; is that right?

A.  Yeah, that's true.

08:17:30
08:17:49
08:17:51
08:17:55
08:17:56
08:18:02
08:18:06
08:18:06
08:18:11
08:18:11
08:19:35
08:19:35
08:19:36
08:19:40
08:19:41
08:19:45
08:19:50
08:20:38
08:20:42
08:20:44
08:20:49
08:20:55
08:20:56
08:20:58
08:21:01

Q.  Okay.  But you understand it to be an NDA submission for Slayback's NDA product, right?

A.  Seems like it.

Q.  Okay.

MS. VALLABHANENI:  Why don't we just -- if you can scroll down a little bit to the middle of the page.  Yep.

Q.  (BY MS. VALLABHANENI)

And the RLD for this product is the Belrapzo; is that right?

A.  I cannot see that.  Can you please direct me to that particular section?

Q.  Sure.  Actually, it's not in this section. I'm just asking if you understand the RLD for this product to be Belrapzo.

A.  Yeah, that NDA was referenced to Belrapzo.

Q.  Okay.

MS. VALLABHANENI:

08:22:34
08:22:47
08:22:49
08:22:51
08:22:55
08:22:57
08:23:00
08:23:04
08:23:04
08:23:12
08:23:13
08:23:18
08:23:22
08:23:25
08:23:28
08:23:31
08:23:33
08:23:36
08:23:38
08:23:42
08:23:45
08:23:46
08:23:50
08:23:58
08:24:04

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025                    53

08:24:08

08:24:12

08:24:14

08:24:16

08:24:16

08:24:23

08:24:25

08:24:27

08:24:30

08:24:32

08:24:35

08:24:42

08:24:42

08:24:47

08:24:51

08:24:52

08:24:56

08:25:01

08:25:08

08:25:10

08:25:12

08:25:17

08:25:19

08:25:24

08:25:27

Transcript of Harish Chinnari
Conducted on December 10, 2025

08:25:32
08:25:32
08:25:44
08:25:45
08:25:50
08:25:56
08:25:58
08:26:01
08:26:02
08:26:07
08:26:12
08:26:13
08:26:19
08:26:20
08:26:26
08:26:29
08:26:34
08:26:39
08:26:45
08:26:48
08:26:54
08:26:56
08:26:56
08:26:58
08:27:21

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari
Conducted on December 10, 2025                55

08:27:24
08:27:29
08:27:34
08:27:41
08:27:42
08:27:44
08:27:51
08:27:54
08:28:00
08:28:03
08:28:06
08:28:14
08:28:20
08:28:27
08:28:32
08:28:36
08:28:39
08:28:42
08:28:44
08:28:48
08:28:52
08:29:02
08:29:07
08:29:15
08:29:20

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

56

Q. (BY MS. VALLABHANENI) Okay.

MS. VALLABHANENI: If we can pull this document down and we can pull up Tab 6 and mark it as Exhibit 5.

EXHIBIT TECH: Please stand by.

(Whereupon Exhibit Number 5 was marked for identification.)

MS. VALLABHANENI:  And for the record, this is a document with beginning Bates Number SLAY-VIVMUS0000029.

MR. LIEF:  If I could have two seconds to get a glass of water.  I'm sorry.

MS. VALLABHANENI:  No, I'll wait until you're back.

EXHIBIT TECH:  Document is on screen and in the Zoom chat.

MS. VALLABHANENI:  Looks like Mr. Lief is back, so I'll start.

If you can scroll down to the second page, please, and if you can zoom in on this.  Great.

Q.  (BY MS. VALLABHANENI)  Mr. Chinnari, do you -- have you seen this document before?

A.  This communication was before my joining, actually.

Q.  Okay.  So you've never seen this document before; is that right?

A.  Yes, I've not seen this document.

Q.  Okay.  But you can see on -- at least on this page, it says, ███████████████

███

████

08:30:46
08:30:47
08:30:52
08:31:19
08:31:20
08:31:24
08:31:25
08:31:50
08:31:51
08:31:57
08:31:58
08:32:00
08:32:02
08:32:07
08:32:18
08:32:20
08:33:10
08:33:12
08:33:13
08:33:15
08:33:19
08:33:20
08:33:23
08:33:31
08:33:31

08:33:31

08:33:34

08:33:39

08:33:43

08:33:48

08:33:51

08:33:52

08:34:04

08:34:07

08:34:09

08:34:11

08:34:15

08:34:15

08:34:19

08:34:23

08:34:23

08:34:27

08:34:32

08:34:41

08:34:42

08:34:52

08:34:54

08:34:54

08:34:57

08:34:59

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari

Conducted on December 10, 2025

59

08:35:02

08:35:06

08:35:07

08:35:12

08:35:17

08:35:26

08:35:29

08:35:29

08:35:32

08:35:36

08:35:44

08:35:47

08:35:52

08:36:07

08:36:11

08:36:15

08:36:15

08:36:19

08:36:25

08:36:30

08:36:31

08:36:33

08:36:43

08:36:45

08:36:46

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari

Conducted on December 10, 2025                    60

08:36:51

08:36:56

08:37:07

08:37:07

08:37:20

08:37:25

08:37:31

08:37:37

08:37:40

08:37:45

08:37:49

08:37:55

08:37:59

08:38:16

08:38:16

08:38:20

08:38:29

08:38:35

08:38:40

08:38:45

08:38:47

08:38:47

08:38:55

08:39:02

08:39:13

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025                61

08:39:17

08:39:21

08:39:23

08:39:24

08:39:25

08:39:26

08:39:27

08:39:27

08:39:33

08:39:34

08:39:37

08:39:44

08:39:45

08:39:48

08:39:50

08:39:55

08:39:56

08:40:03

08:40:03

08:40:04

08:40:07

08:40:13

08:40:16

08:40:24

08:40:28

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari
Conducted on December 10, 2025                    62

08:40:33

08:40:34

08:40:38

08:40:43

08:40:45

08:40:46

08:40:50

08:40:50

08:40:55

08:41:06

08:41:08

08:41:11

08:41:22

08:41:26

08:41:28

08:41:31

08:41:34

08:41:45

08:41:46

08:41:48

08:41:50

08:41:53

08:41:56

08:41:56

08:42:00

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025                           63

██████████████████████████████████████        08:42:10

███████████████████████████████████████        08:42:15

████████████████████████████        08:42:21

███████████████████████████████████████        08:42:23

██████████████████████████████████        08:42:25

████████████████████████████████        08:42:27

████████████████████        08:42:33

██████████████████        08:42:42

Q.   (BY MS. VALLABHANENI)  Okay.        08:42:42

MS. VALLABHANENI:  Okay.  You can        08:42:57
take this document down.        08:42:58

Can we pull up Tab 7.  I think we        08:43:01
can mark that as Chinnari Exhibit 6.        08:43:05

(Whereupon Exhibit Number 6 was        08:43:08
marked for identification.)        08:43:09

MS. VALLABHANENI:  And just for        08:43:09
the record, this is a document with beginning        08:43:10
Bates Number SLAY-VIVMUS0000018.        08:43:12

EXHIBIT TECH:  Please stand by.        08:43:21
Document is on screen.  Document is in the Zoom        08:43:58
chat.        08:44:02

MS. VALLABHANENI:  Okay.        08:44:02

Q.   (BY MS. VALLABHANENI)  So this is a        08:44:02
document dated August 31st, 2018, original New        08:44:04
Drug application cover letter Annexure-1.        08:44:10

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari
Conducted on December 10, 2025

64



HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari

Conducted on December 10, 2025                    65

08:46:58

08:47:05

08:47:07

08:47:11

08:47:11

08:47:13

08:47:16

08:47:20

08:47:28

08:47:29

08:47:30

08:47:36

08:47:37

08:47:40

08:47:44

08:47:50

08:47:53

08:47:57

08:48:01

08:48:04

08:48:06

08:48:08

08:48:08

08:48:11

08:48:15

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025                    66





Transcript of Harish Chinnari
Conducted on December 10, 2025                    68

08:51:17
08:51:23
08:51:27
08:51:31
08:51:33
08:51:39
08:51:42
08:51:47
08:51:47
08:51:55
08:51:56
08:52:09
08:52:14
08:52:15
08:52:18
08:52:20
08:52:23
08:52:27
08:52:29
08:52:31
08:52:34
08:52:38
08:52:39
08:52:39
08:52:45



HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

71

08:56:03

08:56:04

08:56:09

08:56:11

08:56:17

08:56:21

08:56:28

08:56:36

08:56:47

08:56:48

08:56:50

08:56:50

08:56:50

08:56:51

08:56:52

08:56:58

08:57:00

08:57:05

08:57:11

08:57:13

08:57:16

08:57:22

08:57:22

08:57:28

08:57:31

MS. VALLABHANENI:  You can take that down.

Can we please pull up Tab 8 and go ahead and mark that as Chinnari Exhibit 7.

And for the record, this is a document with beginning Bates Number SLAY-VIVMUS0000322.

(Whereupon Exhibit Number 7 was marked for identification.)

Q.  (BY MS. VALLABHANENI)  Okay. Mr. Chinnari, so this is Section 2.3, the Quality Overall Summary.

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025                73

Take a minute to look through the document, if you need, but once you're done, can you let me know if you recognize the document?

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

74

09:02:01

09:02:05

09:02:13

09:02:15

09:02:16

09:02:22

09:02:26

09:02:30

09:02:35

09:02:43

09:02:43

09:02:55

09:03:01

09:03:01

09:03:05

09:03:13

09:03:15

09:03:22

09:03:26

09:03:26

09:03:38

09:03:44

09:03:47

09:03:58

09:04:02



THE VIDEOGRAPHER:  Sorry to interrupt, counsel, this is Nick, the videographer.  I just want you to know we have about five minutes left on this video segment.

MS. VALLABHANENI:  Sure.  I'll finish up.

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari
Conducted on December 10, 2025

76



HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

77



HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari

Conducted on December 10, 2025                                    78

▬▬▬▬▬▬▬▬▬▬▬▬▬                                    09:09:12

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬                                    09:09:18

▬▬▬▬▬▬▬▬                                    09:09:25

Q.  Okay.                                    09:09:26

MS. VALLABHANENI:  How much time do we have left on the record?                                    09:09:32

THE VIDEOGRAPHER:  Two minutes.                                    09:09:35

MS. VALLABHANENI:  Do you want to switch it out now, because I have a couple more questions.                                    09:09:38

THE VIDEOGRAPHER:  Yeah, if that's okay with you.                                    09:09:42

MS. VALLABHANENI:  Yeah, that's fine.                                    09:09:44

THE VIDEOGRAPHER:  Okay.  We are going off the record.  The time is 10:09 a.m.                                    09:09:45

(Break taken from 9:09 a.m. to 9:20 a.m.)                                    09:09:49

THE VIDEOGRAPHER:  We are back on the record.  The time is 10:20 a.m.                                    09:20:18

Q.  (BY MS. VALLABHANENI)  Okay.  I think we were looking at Chinnari Exhibit 7.                                    09:20:27

MS. VALLABHANENI:  Can we pull that back up, please?  And go down to the page ending in 324.                                    09:20:40

Transcript of Harish Chinnari
Conducted on December 10, 2025

EXHIBIT TECH:   Stand by.

09:20:47

08:57:12

09:21:06

09:21:11

09:21:15

09:21:18

09:21:19

09:21:22

09:21:29

09:21:33

09:21:38

09:21:40

09:21:44

09:21:50

09:21:54

09:22:00

09:22:03

09:22:09

09:22:12

09:22:15

09:22:18

09:22:20

09:22:25

09:22:36

09:22:39

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari
Conducted on December 10, 2025

80

09:22:42
09:22:44
09:22:47
09:22:50
09:22:57
09:23:03
09:23:04
09:23:06
09:23:07
09:23:08
09:23:10
09:23:14
09:23:16
09:23:22
09:23:27
09:23:30
09:23:34
09:23:34
09:23:37
09:23:40
09:23:44
09:23:47
09:23:52
09:23:58
09:24:00

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

81

09:24:05

09:24:11

09:24:11

09:24:15

09:24:29

09:24:31

09:24:34

09:24:39

09:24:40

09:24:42

09:24:45

09:24:48

09:24:51

09:24:56

09:24:56

09:24:58

09:24:59

09:25:05

09:25:09

09:25:10

09:25:14

09:25:19

09:25:23

09:25:25

09:25:27

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025                82

09:25:38

09:25:41

09:25:44

09:25:50

09:25:53

09:25:57

09:26:03

09:26:03

09:26:05

09:26:13

09:26:18

09:26:21

09:26:23

09:26:25

09:26:29

09:26:34

09:26:37

09:26:42

09:26:46

09:26:49

09:26:51

09:26:57

09:26:58

09:27:04

09:27:21

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

83

09:27:24

09:27:28

09:27:29

09:27:29

09:27:34

09:27:36

09:27:43

09:27:43

09:27:44

09:27:49

09:27:57

09:27:57

09:28:00

09:28:03

09:28:06

09:28:10

09:28:11

09:28:15

09:28:19

09:28:19

09:28:22

09:28:36

09:28:38

09:28:43

09:28:46

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari
Conducted on December 10, 2025

84

09:28:51

09:28:59

09:29:03

09:29:10

09:29:14

09:29:17

09:29:20

09:29:21

09:29:24

09:29:25

09:29:28

09:29:33

09:29:36

09:29:38

09:29:45

09:29:48

09:29:54

09:29:57

09:29:59

09:30:06

09:30:09

09:30:13

09:30:16

09:30:16

09:30:17

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025                    85

09:30:19
09:30:23
09:30:26
09:30:35
09:30:39
09:30:44
09:30:45
09:30:48
09:30:51
09:30:55
09:30:55
09:31:00
09:31:01
09:31:03
09:31:05
09:31:10
09:31:15
09:31:16
09:31:18
09:31:19
09:31:35
09:31:36
09:31:38
09:31:40
09:31:42

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

86

| | |
|---|---|
| | 09:31:44 |
| | 09:31:47 |
| | 09:31:55 |
| | 09:31:59 |
| | 09:32:01 |
| | 09:32:05 |
| | 09:32:06 |
| | 09:32:06 |
| | 09:32:07 |
| | 09:32:08 |
| | 09:32:08 |
| | 09:32:13 |
| | 09:32:18 |
| | 09:32:26 |
| | 09:32:26 |
| | 09:32:29 |
| | 09:32:35 |
| | 09:32:40 |
| | 09:32:41 |
| | 09:32:44 |
| | 09:32:48 |
| | 09:32:50 |
| | 09:32:57 |
| | 09:33:00 |
| | 09:33:04 |

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari

Conducted on December 10, 2025                    87

09:33:07

09:33:09

09:33:12

09:33:19

09:33:21

09:33:27

09:33:30

09:33:35

09:33:37

09:33:38

09:33:39

09:33:43

09:33:47

09:33:52

09:33:53

09:33:58

09:34:01

09:34:03

09:34:07

09:34:11

09:34:18

09:34:23

09:34:27

09:34:30

09:34:32

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari

Conducted on December 10, 2025

88

09:34:34

09:34:38

09:34:42

09:34:44

09:34:46

09:34:48

09:34:51

09:34:55

09:34:55

09:34:59

09:35:02

09:35:05

09:35:10

09:35:13

09:35:18

09:35:18

09:35:20

09:35:24

09:35:28

09:35:29

09:35:35

09:35:38

09:35:42

09:35:43

09:35:45

Transcript of Harish Chinnari
Conducted on December 10, 2025

89

09:35:48
09:35:51
09:35:55
09:35:57
09:36:01
09:36:04
09:36:07
09:36:11
09:36:17
09:36:23
09:36:28
09:36:28
09:36:31
09:36:35
09:36:39
09:36:41
09:36:44
09:36:44
09:36:47
09:36:57
09:36:59
09:37:13
09:37:18
09:37:20
09:37:27

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari
Conducted on December 10, 2025

90



HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

91

09:38:40

09:38:54

09:39:01

09:39:08

09:39:12

09:39:15

09:39:24

09:39:27

09:39:32

09:39:34

09:39:37

09:39:48

09:39:52

09:39:57

09:39:57

09:39:58

09:40:00

09:40:05

09:40:10

09:40:16

09:40:20

09:40:23

09:40:24

09:40:31

09:40:36

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari
Conducted on December 10, 2025                    92

09:40:39
09:40:44
09:40:46
09:40:46
09:41:01
09:41:05
09:41:08
09:41:12
09:41:15
09:41:19
09:41:19
09:41:26
09:41:36
09:41:40
09:41:47
09:41:49
09:41:49
09:41:54
09:41:57
09:42:01
09:42:04
09:42:09
09:42:11
09:42:15
09:42:25

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

93

09:42:26
09:42:28
09:42:32
09:42:44
09:42:47
09:42:51
09:43:01
09:43:04
09:43:09
09:43:11
09:43:17
09:43:21
09:43:25
09:43:34
09:43:34
09:43:39
09:43:43
09:43:44
09:43:45
09:43:49
09:43:50
09:43:50
09:43:53
09:43:55
09:44:00

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari

Conducted on December 10, 2025

94

09:44:20

09:44:23

09:44:25

09:44:33

09:44:38

09:44:56

09:44:58

09:45:10

09:45:18

09:45:23

09:45:24

09:45:27

09:45:34

09:45:36

09:45:37

09:45:42

09:45:46

09:45:49

09:45:53

09:45:58

09:46:03

09:46:07

09:46:24

09:46:37

09:46:55

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari
Conducted on December 10, 2025

95



MS. VALLABHANENI:  Okay.  We can take this down.

So the next couple of documents I have are actually quite long.  So I think, Jason, if you're okay, we can end for today and pick up tomorrow.

MR. LIEF:  Okay.  So it's -- at least on my clock, I don't know what it is in India now, and so -- but on my clock, it's 10:50 a.m. here on the East Coast in the United States.

We did offer until 11:30 a.m. today; however, I think because of the remote

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari

Conducted on December 10, 2025                    97

nature of the whole thing, we should all be accommodating.

As I had mentioned in some correspondence, if we get late in the day today or tomorrow and the witness is tired because it's evening there, I would hope we would accommodate in the same way.

If you want to end today a little early, okay, but, you know, there is that time there. I would hope it would not push us later tomorrow, is my point.

MS. VALLABHANENI: That is not the plan.

MR. LIEF: Understood.

MS. VALLABHANENI: I just don't want to get cut off halfway through a long document.

MR. LIEF: Understood. Then that's fine.

MS. VALLABHANENI: Okay. So we'll end for today and pick up again tomorrow. Thank you, Mr. Chinnari.

THE VIDEOGRAPHER: This marks the end of this segment of the deposition of Harish Chinnari. We are going off the record. The

time is 10:51 a.m.                                                 09:51:15

(Deposition concluded.)

I, HARISH CHINNARI, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.


_____
HARISH CHINNARI


THE STATE OF _____)

COUNTY OF _____)


Before me, _____, on

this day personally appeared HARISH CHINNARI,

known to me (or proved to me under oath or

through _____)

(description of identity card or other document)

to be the person whose name is subscribed to the

foregoing instrument and acknowledged to me that

they executed the same for the purposes and

consideration therein expressed.

Given under my hand and seal of office this

_____ day of _____,

_____.


_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____
COMMISSION EXPIRES: _____

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari
Conducted on December 10, 2025

100

                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS,      )
INC., and EAGLE SUB 1       )
LLC,                        )
                            )
    Plaintiffs,             )
                            )
VS.                         )
                            ) C.A. NO.: 24-65-JLH
SLAYBACK PHARMA LLC and     )
AZURITY                     )
PHARMACEUTICALS, INC.,      )
                            )
    Defendants.             )

                  REPORTER'S CERTIFICATION
                DEPOSITION OF HARISH CHINNARI
                     DECEMBER 10, 2025

    I, Annette Peltier, Certified Shorthand

Reporter in and for the State of Texas, hereby

certify to the following:

    That the witness, HARISH CHINNARI, was duly

sworn by the officer and that the transcript of

the oral deposition is a true record of the

testimony given by the witness;

    That the original deposition was delivered to

Ms. Vallabhaneni, Custodial Attorney.

    That a copy of this certificate was served on

all parties shown herein on _____.

    I further certify that pursuant to FRCP Rule

30(e)(1) that the signature of the deponent:

    XXX was requested by the deponent or a party

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari
Conducted on December 10, 2025                    101

before the completion of the deposition and that signature is to be returned within 30 days from the date of receipt of the transcript.  If returned, the attached changes and signature page contains any changes and the reasons therefore.

____ was not requested by the deponent or party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this testimony was taken.  Further, I am not a relative or employee of any attorney of record in this cause, nor am I financially or otherwise interested in the outcome of the action.

Certified to by me this 17th day of December, 2025.

_____
Annette Peltier, Texas CSR 3253
Expiration Date:  10/31/27
Firm Registration No. 686
451 Hungerford Drive
Suite 400
Rockville, MD 20850
Phone: 888.433.3767
Fax: 888.503.3767

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

102

**A**

**able**
28:6, 28:16

**about**
6:18, 9:25, 10:17, 17:15, 17:16, 18:15, 19:22, 20:3, 21:1, 22:19, 26:24, 27:12, 27:22, 28:9, 30:17, 31:4, 33:3, 34:14, 35:3, 35:13, 36:1, 37:15, 40:22, 42:15, 49:8, 55:5, 75:20, 85:5, 87:16, 95:20, 95:23

**above**
73:15, 99:3

**above-styled**
2:4

**absolute**
76:11, 76:20

**accelerated**
68:18, 70:7, 71:20

**accommodate**
97:7

**accommodating**
97:2

**accurate**
8:18, 10:15, 70:25, 71:8

**accurately**
74:1, 74:6

**acidity**
83:6, 89:10

**acknowledged**
99:17

**act**
89:14

**action**
101:11, 101:15

**active**
21:23, 22:3, 54:1, 66:24, 67:21

**activities**
55:24, 74:25, 75:5, 91:13, 95:17, 96:4, 96:8

**acts**
81:21

**actually**
12:4, 13:21, 18:15, 52:5, 57:18, 93:22, 96:16

**adair**
3:21

**addition**
81:22

**additional**
13:23

**adjournment**
4:8

**adjuster**
89:9

**administration**
66:25, 67:22

**administrative**
8:1

**advance**
5:17

**affix**
99:2

**after**
8:11, 10:2, 38:10, 39:3, 39:10, 39:19, 39:20, 91:23

**again**
9:1, 22:20, 22:21, 25:7, 56:2, 64:20, 94:24, 97:21

**against**
85:4

**agree**
69:12, 71:15, 79:21, 87:2, 87:4

**ahead**
9:18, 12:11, 23:18, 68:7, 72:17, 84:9

**aid**
83:14, 83:24

**al**
5:23

**alcohol**
66:19, 67:9, 68:4, 76:4, 76:11, 76:19, 83:1, 84:22, 85:10, 86:2, 89:13, 90:8

**all**
6:7, 25:12, 41:1, 41:7, 42:2, 42:25, 74:7, 75:7, 77:9, 77:22, 84:11, 86:12, 92:7, 94:1, 94:2, 97:1, 100:32

**allow**
25:13

**almost**
84:11

**already**
48:19, 55:15

**also**
3:18, 22:18, 27:15, 44:20, 55:5, 56:7, 75:12, 76:11, 76:23, 84:3, 89:14, 95:17

**alston**
3:24

**alternate**
91:20

**alternative**
89:22, 90:1, 90:14, 90:22, 91:5, 91:9, 92:3, 92:17

**always**
9:4

**amendments**
20:10

**americas**
3:7

**analysis**
33:7

**analytical**
15:17, 17:17, 40:4, 41:2, 42:20, 94:7, 95:8, 95:24

**anda**
49:10

**andas**
49:3

**annette**
1:33, 2:6, 7:1, 100:22, 101:20

**annexure-1**
4:28, 63:25

**another**
5:5, 9:4

**answer**
8:21, 9:5, 9:7, 9:13, 9:21, 10:9, 10:11, 12:7, 12:15, 12:23, 13:8, 14:2, 15:21, 16:1, 22:25, 28:6, 28:16, 31:6, 45:2, 45:5, 45:14, 52:22, 53:20, 65:6, 72:8

**answered**
26:9, 61:5

**answering**
82:13

**anticipate**
5:3

**antioxidant**
79:5, 79:8, 79:9, 79:13, 79:19, 79:21, 79:22, 80:20, 81:6, 81:11, 82:5, 82:19

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

103

**████████**
25:9, 79:25,
80:2, 80:4,
80:14
**any**
5:8, 5:17,
7:23, 8:1, 8:3,
8:4, 9:17,
10:14, 10:15,
10:17, 10:18,
11:1, 11:22,
12:6, 13:1,
13:6, 13:11,
13:13, 13:16,
13:17, 14:18,
16:8, 16:11,
20:10, 21:1,
21:15, 22:6,
22:12, 25:8,
31:18, 33:3,
34:22, 35:12,
37:17, 44:12,
44:16, 44:17,
45:10, 45:13,
45:20, 46:4,
47:15, 47:17,
48:1, 48:14,
49:3, 49:9,
52:22, 53:16,
54:19, 55:5,
59:25, 60:1,
62:8, 62:11,
65:6, 65:7,
69:5, 69:7,
72:9, 74:21,
75:11, 75:23,
76:1, 79:9,
79:10, 82:15,
83:20, 85:14,
89:8, 91:4,
91:13, 92:17,
92:21, 93:11,
94:11, 94:15,
101:5, 101:10,
101:13
**anybody**
16:14

**anyone**
11:6, 14:18,
26:3, 29:13,
42:10, 42:18,
43:12, 44:7,
44:11, 59:4,
64:15, 92:22
**anything**
10:1, 12:4,
19:24, 45:4,
53:20, 55:20,
56:8, 87:25,
88:9, 88:17,
91:21
**api**
28:22, 63:1,
63:6
**apologies**
18:13
**apologize**
5:17
**apotex**
5:24, 6:17,
6:20
**appearances**
4:4
**appeared**
99:12
**application**
4:23, 21:16,
21:18, 47:14,
50:22, 53:7,
53:24, 63:25,
75:2
**applied**
66:5
**approved**
86:5
**aqueous**
86:17, 87:23,
88:7, 88:14,
89:2, 89:14
**arcolab**
37:11
**around**
12:18
**asked**
10:2, 17:5,

17:10, 17:13,
26:9, 55:12,
61:5
**asking**
17:16, 38:4,
52:6, 69:24,
79:16, 93:8,
93:9
**aspect**
29:10
**aspects**
25:8, 25:9,
25:11, 25:24,
26:20, 26:23,
27:7, 27:10,
27:18, 28:5,
28:15, 28:21,
29:6, 32:6,
35:1, 35:11,
35:15, 41:1,
42:7, 42:13,
42:15, 64:17,
75:12
**assay**
94:7, 95:8
**assigned**
14:16
**assisted**
64:16
**associate**
40:11
**assume**
9:14
**assurance**
31:7, 31:11,
44:19
**atmosphere**
83:15
**attached**
2:11, 101:4
**attending**
5:2, 6:8
**attorney**
10:1, 100:30,
101:13
**attorneys**
53:17, 53:20,
101:11

**attribute**
82:1
**attributes**
81:17, 82:15
**audibly**
8:19
**august**
63:24
**avenue**
3:7
**awarded**
23:12
**aware**
5:6, 48:12,
60:5, 85:14,
88:17
**away**
5:9
**azurity**
1:13, 6:23,
14:19, 17:24,
19:19, 20:25,
100:13

**B**

**b**
65:16
**b)(2**
20:16, 21:9,
21:15, 55:8,
56:10, 56:14
**b)(6**
4:18, 24:3,
24:10
**b-a-t-t-a-n-i**
15:2
**back**
24:14, 39:22,
40:7, 41:17,
42:22, 50:1,
50:3, 54:24,
57:7, 57:11,
59:14, 60:12,
60:24, 62:25,
65:12, 78:19,
78:24, 82:23,
90:21, 93:1
**background**
36:2

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

104

**backup**
5:7
**based**
7:16, 33:6,
41:4, 54:15,
54:19, 61:10,
72:5, 95:17,
96:3
**basically**
17:17
**basis**
21:17, 53:17,
69:5, 69:7,
70:14, 71:24,
72:2, 72:9
**batches**
31:5, 31:6,
31:9
**bates**
50:8, 57:2,
63:18, 72:19
**battani**
14:22, 15:1,
17:24
**baxter**
5:24, 6:20
**became**
46:13
**because**
9:1, 10:23,
17:16, 22:16,
26:14, 28:6,
28:16, 52:12,
53:7, 67:20,
68:2, 78:9,
96:25, 97:5
**become**
55:23
**been**
7:5, 7:19,
7:22, 49:15,
59:11, 74:16,
75:13
**before**
2:6, 5:16,
7:19, 7:22, 8:1,
8:4, 9:5, 9:7,
9:21, 17:21,

17:24, 19:15,
23:10, 23:12,
24:4, 35:25,
45:15, 50:24,
55:14, 57:16,
57:17, 57:20,
60:13, 60:17,
64:7, 66:10,
70:22, 71:4,
82:24, 86:23,
88:24, 95:21,
99:11, 101:1,
101:8
**beginning**
50:8, 57:2,
63:17, 72:19
**begins**
5:20, 55:14
**behalf**
3:3, 3:11,
6:13, 6:16,
19:18, 24:21
**being**
74:12
**believe**
42:19, 43:13,
59:14, 69:5,
69:8, 71:24,
72:2, 72:10,
92:25
**bell**
60:4
**below**
73:19, 76:9
**belrapzo**
21:20, 22:3,
52:2, 52:7,
52:8, 58:18,
59:10, 85:1,
85:5, 85:8,
85:16, 93:5,
93:12, 93:25
**bendamustine**
20:16, 21:25,
22:2, 23:13,
33:7, 46:17,
48:5, 49:3,
49:9, 51:10,

58:12, 59:18,
63:2, 65:19,
66:15, 66:17,
67:2, 73:16,
84:19, 90:4,
90:7, 90:16
**bendeka**
58:3, 58:7,
58:11, 58:18,
59:10, 61:1,
61:7, 61:17,
85:2
**benefit**
93:3
**benefits**
93:11
**besides**
16:14, 42:10,
44:22, 46:3,
49:7, 74:22,
88:18
**best**
5:5
**between**
67:7, 85:15,
85:23, 94:19
**bioavailability**
65:1, 65:17,
65:25, 67:14
**bioequivalence**
64:22, 65:1,
65:14, 65:18,
66:1, 67:14
**biowaiver**
66:9
**bird**
3:24
**bit**
36:1, 37:14,
40:21, 51:6,
51:12, 52:12,
94:23
**blanket**
83:18, 84:8
**blanketing**
84:4
**blow**
19:2, 68:12

**both**
8:15, 8:18,
14:24, 15:7,
15:20, 19:18,
20:24, 51:24,
55:22, 79:25,
82:5, 87:1
**bottom**
52:15, 76:10,
84:16
**brand**
22:9, 23:12
**break**
9:17, 9:22,
10:2, 49:16,
49:24, 78:17
**breaks**
9:19
**bring**
13:5, 18:4,
23:17, 35:19,
41:2
**brought**
41:13
**business**
48:8, 58:19,
59:12, 61:20,
93:7, 93:15

---
**C**
---

**c-h-i-n-n-u**
15:5
**call**
93:7
**called**
23:13
**came**
48:23
**can't**
10:14
**cannot**
48:14, 52:3,
54:23, 58:21,
81:1
**capability**
85:23
**card**
99:15

**carry**
40:8
**case**
6:1, 7:23, 8:4,
45:2
**catch**
71:13
**cause**
2:4, 101:14
**caution**
11:10, 17:9,
44:24, 52:21,
53:13, 53:19,
55:19, 56:7,
65:5, 66:10
**cautions**
55:5
**central**
2:6
**certain**
19:19, 23:5
**certificate**
4:12, 33:7,
100:31
**certification**
52:16, 52:20,
52:25, 53:11,
53:18, 54:9,
54:25, 55:3,
55:9, 55:16,
100:18
**certified**
2:7, 100:22,
101:16
**certify**
100:24, 100:33,
101:9
**cfr**
65:15, 66:3,
66:12, 67:18,
67:20, 67:25,
68:1, 68:2, 68:7
**chain**
32:3, 32:18
**change**
38:23, 66:18,
67:8
**changed**
74:15

**changes**
101:4, 101:5
**characterization**
28:20, 29:3,
29:11, 62:1
**chart**
73:12, 73:14,
73:15, 74:5,
74:6, 74:15,
74:23, 79:3,
82:16, 82:23,
86:12
**chat**
18:9, 18:15,
18:20, 19:13,
23:23, 24:8,
36:12, 50:13,
57:9, 63:21
**checked**
53:23, 53:25
**checkmark**
52:14, 52:16
**checks**
53:2
**chinnari**
1:20, 2:2,
4:21, 5:22, 7:4,
7:9, 7:15, 18:4,
19:8, 22:24,
23:18, 24:1,
24:5, 25:1,
25:16, 25:18,
26:16, 29:19,
30:5, 33:10,
33:18, 34:9,
34:20, 35:20,
35:24, 36:15,
36:17, 46:11,
49:19, 50:5,
50:16, 50:19,
57:15, 63:13,
64:1, 64:24,
72:17, 72:24,
78:22, 79:3,
94:9, 97:22,
97:25, 99:1,
99:6, 99:12,
100:19, 100:25

**chinnu**
14:23, 15:5,
15:17, 16:10,
17:15, 43:10,
43:15, 95:13,
95:14, 95:20
**chose**
13:6, 53:11,
58:17, 78:1,
95:7, 95:14,
95:24
**chris**
3:24
**chronic**
51:20
**civil**
2:9
**clarification**
28:23, 43:21
**clarify**
9:11, 13:21
**clear**
10:20, 16:25,
22:19, 24:7,
38:4, 45:3,
74:11
**clearing**
16:12
**clearly**
8:15, 8:19
**client**
10:1
**cll**
51:24
**cll"**
51:16
**clock**
96:20, 96:21
**close**
42:24
**closure**
41:3
**cmo**
60:10
**co-solvent**
76:7, 76:15,
76:17, 76:21,
81:22, 84:22,

89:15, 89:16
**co-solvents**
89:13
**coast**
96:22
**code**
22:13, 23:5
**coding**
60:9, 60:10
**column**
81:10, 82:16,
83:10
**come**
53:9, 56:13
**comes**
55:9, 55:21
**comment**
54:23
**commercial**
31:5, 31:6,
31:9
**commercialization**
40:25
**commission**
99:27
**communication**
57:17
**communications**
53:16
**companies**
21:2
**company**
45:20, 54:16,
59:11, 59:16,
66:8
**complete**
10:15
**completed**
36:4
**completion**
101:1, 101:8
**component**
73:18, 77:18,
80:24
**components**
74:7, 77:9,
77:22
**composition**
29:9, 58:11,

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

106

73:16, 74:19,
75:1, 84:18,
90:3, 92:6
**computer**
5:9
**concluded**
98:2
**concluding**
93:4
**conditions**
68:19, 69:1,
69:2, 70:9,
71:21
**confer**
9:24
**confidential**
1:21, 6:22,
38:5, 45:4,
45:12, 45:16
**confusing**
43:19
**connect**
5:14
**connecting**
5:15
**consider**
77:20
**consideration**
99:19
**considered**
58:4, 74:21,
90:13
**container-closure**
68:20
**contains**
101:5
**content**
67:1, 67:23,
81:6, 81:11,
81:18, 81:21,
81:23, 82:5
**contents**
12:4
**context**
21:8
**contribution**
80:25, 82:11
**control**
18:24

**conversation**
8:11
**conversations**
5:11
**conveyed**
56:1
**copy**
36:16, 100:31
**correct**
11:22, 11:23,
12:22, 17:23,
69:5, 69:17,
70:12, 71:25,
72:1, 72:4,
73:12, 74:12,
74:13, 79:17,
87:18, 99:3
**correspondence**
48:1, 57:23,
58:2, 97:4
**could**
18:10, 19:2,
24:16, 50:14,
57:4, 64:20
**counsel**
6:9, 9:24,
10:8, 10:10,
18:24, 19:4,
25:21, 75:18,
101:9
**county**
99:9
**couple**
11:14, 11:16,
13:20, 34:3,
78:9, 91:18,
96:15
**court**
1:1, 4:12,
5:25, 6:25, 8:9,
8:14, 9:1, 26:7,
80:6, 100:1
**cover**
4:28, 63:25,
64:4
**covered**
10:18
**create**
46:12, 46:17,

48:5
**created**
84:8
**crr**
1:33
**csr**
1:33, 2:6,
101:20
**curious**
45:6
**current**
36:22, 40:6,
40:19, 40:22,
74:18
**currently**
74:12
**custodial**
100:30
**cut**
97:16

---
**D**
---

**data**
68:17, 70:6,
70:12, 70:15,
71:8, 71:19,
72:5, 82:6
**date**
6:2, 32:2,
71:16, 101:3,
101:21
**dated**
63:24
**dates**
11:11, 11:15,
59:23
**dating**
68:12, 68:15,
68:16, 70:4,
70:6, 71:19
**day**
97:4, 99:12,
99:21, 101:16
**days**
101:2
**deal**
28:7, 28:16,
28:21, 29:5

**deals**
29:1
**dealt**
31:7, 31:9
**december**
1:22, 2:5, 6:2,
100:20, 101:16
**decided**
46:12, 48:5,
59:9, 91:25
**decision**
46:16, 48:8,
48:10, 48:14,
48:15, 48:17,
58:19, 58:20,
59:4, 59:13,
93:9, 93:16,
93:23
**decision-making**
46:21, 46:24
**decisions**
58:22
**declaration**
8:4
**dedicated**
59:18
**defendant**
6:16
**defendants**
1:16, 3:11,
6:19, 100:16
**definition**
20:12, 20:19
**degradation**
63:2, 63:6
**degree**
36:6, 36:8
**dehydrated**
66:19, 67:9,
68:4, 76:4,
76:11, 76:19,
82:25, 84:22,
85:9, 86:2,
89:13, 90:8
**delaware**
1:2, 6:1, 100:2
**deliver**
48:25

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

107

**delivered**
100:29
**delivery**
32:1
**department**
44:12
**departments**
58:24
**depends**
55:2
**deponent**
100:34, 100:35,
101:7
**depos**
6:6, 7:2
**deposed**
7:19, 7:22
**deposition**
1:19, 2:1,
4:16, 4:19,
5:21, 6:8, 6:21,
11:2, 11:3,
14:17, 16:13,
20:23, 24:3,
24:10, 95:21,
97:24, 98:2,
99:2, 100:19,
100:27, 100:29,
101:1, 101:8
**derived**
17:11
**describe**
38:18, 74:1,
74:7, 96:8
**described**
74:14, 74:22
**description**
4:15, 99:15
**designated**
13:13, 20:3,
24:21, 25:1,
26:14, 26:17,
27:6, 29:8,
43:23
**designation**
38:23
**detector**
94:16, 94:20,

94:21, 95:2,
95:5
**develop**
40:24, 46:12,
46:25, 48:17,
55:12, 56:10,
56:14, 59:8,
61:21, 94:3
**developed**
95:11, 95:12
**developing**
46:22, 48:22,
48:23, 59:18,
60:7, 61:12
**development**
15:16, 15:18,
36:10, 37:11,
38:1, 38:21,
39:15, 40:3,
40:4, 41:1,
41:8, 45:5,
47:8, 48:18,
55:14, 55:24,
61:14, 62:1,
74:24, 75:11,
75:24, 91:1,
92:1, 92:7,
96:10
**difference**
66:2, 67:7,
94:18
**differences**
85:15
**different**
38:18, 44:8,
58:24, 69:9,
72:3, 72:10,
73:22, 80:1,
91:7, 92:22
**differentiate**
86:25
**difficult**
52:12
**direct**
42:25, 44:2,
52:3
**directed**
14:15

**directions**
17:12
**directly**
32:17
**director**
4:22, 36:17,
40:11, 40:12,
40:18, 42:23
**discuss**
11:12, 14:17,
14:21, 16:13,
47:17
**discussed**
11:12, 11:16,
12:4, 14:20,
14:22, 19:24
**discussion**
58:24
**discussions**
5:8, 11:14,
16:9, 16:16,
17:11, 47:15,
47:19
**dissolved**
84:2, 87:19,
87:24, 88:1,
88:6, 88:13
**district**
1:1, 1:2, 5:25,
100:1, 100:2
**doctorate**
36:6
**document**
4:26, 18:23,
18:25, 19:9,
19:11, 19:12,
19:14, 23:16,
23:22, 23:23,
23:25, 24:4,
24:6, 24:8,
36:11, 36:12,
37:5, 46:9,
50:8, 50:12,
50:13, 50:15,
50:17, 50:24,
54:21, 56:21,
57:2, 57:8,
57:16, 57:19,

57:21, 62:10,
63:11, 63:17,
63:20, 63:24,
64:2, 64:6,
64:13, 64:16,
72:19, 73:2,
73:3, 73:4,
76:2, 97:17,
99:15
**documents**
12:6, 12:13,
12:21, 13:2,
13:3, 13:6,
13:12, 13:16,
13:19, 13:23,
13:24, 14:4,
14:7, 14:11,
14:12, 14:18,
16:8, 16:11,
42:6, 47:18,
62:9, 63:4,
96:15
**doing**
8:16, 49:1,
90:25
**done**
8:12, 10:25,
24:19, 34:4,
56:11, 62:2,
62:13, 62:21,
62:24, 73:2,
74:25, 75:6,
75:8, 75:13,
75:24, 84:4,
92:15, 96:3
**dosage**
66:24, 67:21
**doubts**
16:12, 16:25
**douglas**
3:24
**down**
8:17, 9:2,
23:16, 24:13,
26:12, 27:4,
27:16, 28:1,
29:18, 32:11,
32:23, 33:17,

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

108

34:6, 35:8,
35:18, 37:8,
46:9, 51:6,
51:13, 52:11,
54:4, 54:7,
56:21, 57:12,
58:9, 63:11,
64:10, 68:11,
72:15, 73:10,
73:12, 78:24,
81:3, 84:15,
85:19, 94:23,
96:14
**download**
18:10, 24:8
**dr**
7:9, 19:8,
22:24, 24:5,
25:18, 26:16,
29:19, 30:5,
33:10, 33:18,
34:9, 34:20,
35:24, 36:15,
37:20, 37:25,
38:6, 38:10,
44:4, 46:11,
64:24
**draft**
42:4, 42:6,
48:20
**drafted**
47:24, 50:20,
64:3
**drafting**
42:19, 47:18
**drive**
101:23
**driving**
43:11
**drug**
21:8, 21:13,
21:17, 21:19,
59:10, 61:1,
63:25, 66:4,
66:17, 66:25,
67:2, 67:22,
68:14, 70:3,
79:14, 79:15,

79:23, 80:21,
80:24, 81:12,
82:2, 82:6,
82:12, 82:17,
82:18, 84:18,
84:19, 85:24,
86:6, 90:4,
90:7, 90:13,
90:15, 91:24
**drug"**
58:4
**due**
38:23
**duly**
2:3, 7:5,
100:25
**duration**
69:2
**during**
11:24, 12:5,
12:6, 13:5,
16:9, 21:15,
42:8, 43:6,
44:22, 74:24,
75:10, 83:14,
84:3, 88:10,
91:3, 91:8,
91:12, 92:1,
92:8, 92:12
**duty**
69:22

---
**E**
---

**e)(1**
100:34
**each**
5:16, 20:3,
24:10, 29:8,
71:11, 73:18,
80:23, 82:10,
92:20
**eagle**
1:4, 1:5, 5:22,
84:21, 90:6,
100:4, 100:5
**eagle's**
4:18, 24:2,
85:1, 85:2,

85:4, 85:8,
93:5, 93:24
**earlier**
16:24, 47:2,
47:22, 90:24,
95:19, 96:2
**early**
41:13, 61:14,
74:24, 75:4,
75:24, 90:25,
97:9
**ease**
20:23
**east**
96:22
**educate**
13:12
**education**
36:1, 36:3
**effort**
95:13
**elements**
34:22
**else**
11:6, 11:21,
16:14, 19:24,
42:11, 42:18,
43:12, 44:7,
81:25, 88:1,
88:9, 88:17
**employed**
46:11, 101:10
**employee**
101:13
**employees**
43:3, 60:1
**enabled**
5:12
**end**
96:17, 97:8,
97:21, 97:24
**ending**
64:11, 73:10,
78:25, 81:4,
84:14, 85:20,
89:21, 94:5
**entail**
61:13

**entailed**
37:15
**entire**
92:6
**equity**
45:10, 46:4
**equivalence**
93:17, 93:24
**equivalent**
85:8, 90:15,
93:5, 93:12,
94:4
**esquire**
3:5, 3:12
**essentially**
24:9
**established**
51:9
**estimated**
81:23
**et**
5:23
**ethanol**
76:12, 76:20,
81:18, 81:21,
82:5
**evaluated**
91:8
**even**
10:8, 56:9,
89:14
**evening**
7:10, 97:6
**ever**
7:22, 7:25,
8:3, 48:16,
59:4, 59:8
**every**
80:24, 82:10
**everyone**
5:2
**everything**
9:2, 76:17,
77:19, 91:16
**evidence**
85:23
**exact**
59:23

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

109

**exactly**
11:15, 12:17,
12:18
**examination**
4:6, 7:7
**example**
22:13, 28:19,
77:12
**except**
66:18, 84:21,
85:9, 90:8, 99:3
**exception**
9:23, 68:3
**excipient**
78:2, 81:1,
82:10, 89:8
**excipients**
28:22, 28:24,
85:24, 86:1,
86:12
**executed**
99:18
**exhibit**
4:16, 4:17,
4:20, 4:23,
4:26, 4:28,
4:31, 5:1, 18:5,
18:6, 18:13,
18:15, 18:21,
18:23, 19:3,
23:18, 23:19,
23:20, 23:22,
24:1, 35:20,
35:21, 35:22,
35:25, 36:11,
50:5, 50:6,
50:10, 50:12,
56:22, 56:23,
56:24, 57:8,
63:13, 63:14,
63:19, 72:17,
72:21, 78:22,
79:1
**exhibits**
4:14, 18:9
**experience**
17:18, 37:8,
94:11, 94:15

**experiments**
75:6, 75:8
**expiration**
68:12, 68:15,
68:16, 70:4,
70:5, 71:18,
101:21
**expired**
53:25
**expires**
99:27
**explain**
17:1, 48:16,
53:17, 56:3,
65:3, 76:14,
83:23
**explained**
48:21
**explanation**
59:1
**expressed**
99:19
**extent**
17:10, 17:13,
22:19, 25:6,
55:19
**external**
60:17, 60:20,
60:22

**F**

**facilitates**
76:18
**factual**
27:7, 27:18,
34:22, 69:22
**fair**
11:18
**familiar**
19:16
**fax**
101:27
**fda**
41:24, 48:2,
49:11, 68:24,
69:10, 69:22,
69:24, 73:6,
86:5, 91:19,

93:4, 93:11,
94:3
**federal**
2:9
**feel**
24:7
**few**
11:19, 14:9,
26:14, 28:5,
28:15, 61:24
**figured**
55:15
**filed**
49:3, 49:10,
49:12, 55:3
**filing**
80:3, 80:13,
80:19, 92:5
**filled**
53:4
**filling**
54:18, 84:3
**final**
75:1, 81:1
**finalized**
95:18, 96:4
**financially**
101:14
**fine**
53:21, 78:14,
85:6, 97:19
**finish**
9:5, 9:7, 75:22
**finished**
24:18
**finishing**
91:17
**firm**
101:22
**first**
7:5, 8:6,
19:16, 37:10,
37:13, 64:20,
85:22, 85:25,
90:21
**five**
75:20
**five-minute**
49:16

**fluid**
77:24, 86:18,
86:22, 86:25,
87:4, 89:3
**following**
100:24
**follows**
7:6
**foregoing**
99:1, 99:17
**form**
14:1, 15:14,
16:18, 20:5,
20:20, 24:23,
28:11, 29:25,
30:19, 31:3,
31:20, 32:8,
32:21, 34:1,
34:15, 35:5,
35:14, 40:15,
41:10, 43:17,
44:3, 46:1,
46:19, 47:5,
53:4, 54:18,
54:20, 55:4,
55:18, 56:7,
56:17, 66:24,
67:10, 67:21,
70:21, 74:17,
81:14, 84:10,
85:11, 87:8,
88:2, 88:20,
90:18
**formulation**
15:16, 17:18,
25:5, 25:10,
36:10, 37:10,
37:16, 38:1,
39:14, 40:3,
41:2, 41:8,
42:20, 55:13,
55:24, 60:6,
66:15, 67:1,
67:7, 67:23,
68:3, 74:2,
74:14, 76:16,
79:8, 79:19,
80:20, 83:21,

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

110

83:25, 84:1,
86:1, 91:20,
92:1, 92:3,
92:18, 92:23
**formulations**
37:18, 39:1,
39:8, 39:17,
74:21, 84:6,
89:23, 90:2,
90:22, 91:5,
91:10, 91:18,
91:24, 92:8,
92:11
**formulators**
60:25
**frcp**
100:33
**free**
24:7
**front**
24:1, 36:16
**full**
7:12
**function**
73:18, 73:23,
77:3, 79:4,
83:5, 89:8,
89:9, 89:18,
89:19
**functions**
76:20, 78:2,
83:8, 89:7,
89:20
**further**
17:1, 51:12,
58:9, 75:2,
88:14, 100:33,
101:9, 101:12

**G**

**gained**
23:10
**general**
53:14, 53:22
**generally**
25:10, 29:5,
47:17, 52:24
**generated**
68:17, 70:7,

71:20
**generic**
45:24
**getting**
12:3
**give**
8:21, 10:15,
11:11
**given**
46:22, 52:23,
99:20, 100:28
**glass**
57:5
**glycol**
66:20, 67:9,
76:24, 83:6,
86:3, 89:11,
89:12
**go**
8:7, 9:18,
9:19, 9:21,
12:11, 14:4,
23:18, 25:13,
28:1, 30:3,
30:12, 31:23,
54:24, 56:15,
64:10, 64:20,
68:11, 72:16,
78:24, 81:3,
81:9, 82:23,
84:9, 84:15,
85:19, 90:21
**going**
8:10, 9:14,
10:7, 17:9,
19:5, 20:9,
20:15, 20:23,
22:14, 24:14,
37:4, 42:22,
49:15, 49:23,
54:6, 78:16,
93:1, 94:25,
97:25
**gone**
68:7, 75:1
**good**
7:9, 7:11, 9:8,
10:19, 19:3,

19:7, 44:10
**govindaraja**
7:14
**great**
37:3, 49:22,
57:14, 94:8
**ground**
8:7, 10:18
**group**
40:2, 44:8,
44:16
**guess**
35:25, 56:4,
94:19

**H**

**h1s**
38:21, 39:15
**halfway**
97:16
**hand**
99:20
**handling**
60:17, 60:19
**happen**
43:4
**happened**
17:21
**happens**
61:24
**happy**
9:19
**hard**
19:12
**harish**
1:20, 2:2,
4:21, 5:22, 7:4,
7:14, 36:17,
97:24, 99:1,
99:6, 99:12,
100:19, 100:25
**head**
44:5
**heads**
8:22
**healthcare**
5:24
**hear**
8:15, 10:7,

39:1, 80:8
**hearing**
8:1
**heisler**
3:20, 6:6
**held**
38:14, 84:20
**help**
5:13, 24:25
**hence**
66:4, 67:18,
68:7, 90:12,
92:9
**here**
5:20, 8:8,
8:23, 19:17,
32:1, 33:20,
35:11, 38:4,
38:20, 49:17,
53:11, 55:7,
56:3, 58:1,
61:1, 62:2,
67:11, 68:14,
68:24, 69:3,
69:6, 69:11,
69:23, 70:2,
70:13, 70:16,
70:18, 72:4,
72:11, 74:23,
76:22, 77:5,
77:8, 82:20,
85:7, 85:14,
85:17, 89:6,
89:16, 90:1,
91:9, 91:17,
92:23, 93:2,
95:16, 96:22
**hereby**
99:2, 100:23
**herein**
100:32
**hereto**
2:11
**hey**
56:14
**high**
56:3, 76:14
**highly**
1:21, 6:22,

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

111

**hope**
97:6, 97:10
**hopping**
10:24
**hospira**
39:5, 39:8,
39:11
**hour**
49:15
**however**
96:25
**hplc**
94:7, 94:12,
94:19, 94:21,
95:8
**hungerford**
101:23
**hyderabad**
41:4
**hydrochloride**
20:16, 21:25,
23:13, 46:17,
48:5, 51:10,
58:13, 59:19,
65:19, 66:16,
66:17, 67:3,
73:17, 84:20,
90:5, 90:7,
90:16
**hydrochloride's**
22:2
**hydroxide**
83:1, 83:4,
86:4, 86:13,
86:15, 86:17,
87:3, 87:6,
87:12, 87:17,
87:19, 87:24,
88:1, 88:6,
88:11, 88:13,
88:18, 88:22,
88:25, 89:14

**I**

**identical**
58:12, 90:6
**identification**
18:7, 23:21,

45:16
28:20, 29:2,
29:11, 35:23,
50:11, 56:25,
63:15, 72:22
**identify**
5:13, 5:15,
6:10
**identity**
99:15
**idrs**
60:23
**implicated**
6:20
**important**
8:18, 9:3
**inaccuracies**
54:20
**inaccurate**
70:15, 70:20,
71:25
**inactive**
66:18, 67:8,
86:4
**inc**
1:5, 1:14,
5:23, 84:21,
90:6, 100:5,
100:14
**include**
38:22, 92:17
**incomplete**
37:6, 51:17
**incorrect**
79:13
**increase**
45:24
**index**
4:1
**india**
7:16, 96:21
**indicate**
52:15
**indications**
51:13
**individuals**
15:7, 15:20,
15:25, 16:14,
16:17, 42:16

**inert**
83:15
**information**
25:6, 38:5,
52:22, 53:8,
55:11, 56:3,
56:9, 69:17,
69:19, 69:22,
70:25, 71:24
**ingredient**
21:24, 22:3,
29:9, 66:19,
67:8, 82:1,
82:11
**ingredients**
29:3, 73:23,
73:24, 74:6,
74:7, 75:9,
75:11, 76:3,
86:4, 91:6,
91:7, 92:14,
92:19, 92:20
**inhalation**
45:9
**injectable**
37:17, 38:9,
38:22, 39:1,
39:7, 39:16,
84:12
**injectables**
45:7, 45:8
**injection**
20:17, 23:13,
46:17, 48:6,
51:10, 58:13,
59:19, 65:19,
66:16, 66:18,
67:3, 73:17,
84:20, 86:6,
90:5, 90:7,
90:16
**instance**
2:3
**instructions**
61:20
**instructs**
10:11
**instrument**
94:13, 99:17

**intended**
68:21
**interested**
101:15
**internal**
60:1
**internally**
22:12, 23:5
**interrupt**
75:18
**interruptions**
5:18
**intravenous**
86:5
**investigated**
89:23, 90:2,
90:23, 91:10
**investments**
45:20, 45:23
**invited**
22:16
**involved**
41:7, 41:11,
41:13, 41:19,
42:1, 42:3,
42:4, 42:11,
42:16, 43:5,
46:16, 46:20,
46:24, 47:3,
47:19, 48:10,
60:12, 93:23
**ip**
52:24, 53:1,
53:9, 55:9,
55:23

**J**

**janulis**
54:10, 54:12,
54:14
**jason**
3:12, 6:15,
96:17
**joan**
54:10
**job**
1:30, 8:16,
37:10, 37:13,

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

112

55:13
**joined**
17:21, 17:24,
37:20, 39:20,
39:22, 48:18,
48:22
**joining**
41:16, 57:17
**justification**
59:3, 81:10,
81:20, 82:8,
82:16

**K**

**keep**
19:5, 24:13,
54:6, 94:25
**keeping**
8:10
**kick**
61:22
**kind**
40:2, 63:3,
79:10
**kinds**
38:3
**know**
8:17, 12:16,
22:16, 24:17,
31:6, 32:4,
32:16, 33:20,
34:11, 36:22,
45:23, 46:23,
47:1, 48:9,
49:2, 49:8,
54:14, 54:17,
58:7, 58:20,
59:7, 59:12,
59:17, 59:21,
60:3, 60:12,
60:14, 60:25,
64:12, 66:7,
73:3, 74:20,
75:4, 75:19,
77:11, 77:15,
83:20, 84:25,
87:5, 87:6,
87:12, 95:7,

95:14, 96:20,
97:9
**knowledge**
20:2, 25:25,
26:24, 27:11,
27:21, 28:9,
28:13, 29:23,
30:8, 30:17,
31:1, 31:5,
31:18, 32:4,
32:5, 32:20,
33:3, 33:6,
33:12, 33:24,
34:14, 35:3,
35:13, 54:19
**known**
22:5, 23:4,
28:12, 76:11,
99:13

**L**

**l-o-u-r-d-u**
15:5
**lab**
60:17, 60:20,
60:22, 60:23
**laboratories**
37:21, 38:11
**largely**
25:7
**last**
11:14, 11:16,
11:18, 13:20,
16:19, 58:10,
83:9, 84:15
**late**
97:4
**later**
19:23, 97:10
**latham**
3:6, 6:13
**launch**
53:24
**lawyer**
10:6, 33:22,
34:12, 65:7
**lawyers**
11:1, 52:23,

55:6, 55:21,
56:8
**lead**
17:17, 38:20,
39:14, 39:17,
40:3, 91:18
**leading**
95:13
**leads**
43:5
**leaf**
24:9
**least**
32:6, 57:22,
69:17, 96:20
**left**
75:20, 78:6
**legal**
21:10, 44:12,
44:15, 53:3,
56:13, 68:5,
85:11
**leif**
3:12
**let's**
8:6, 43:23,
76:3, 89:21,
91:24
**letter**
4:28, 63:25,
64:4
**letters**
24:24
**leukemia"**
51:20
**level**
56:4, 76:15
**life**
68:25, 69:9,
69:13, 72:3,
72:11, 82:3,
82:18
**life"**
81:13
**limited**
37:11
**line**
73:14

**linkedin**
4:20, 36:16,
36:19
**list**
78:1, 89:5,
92:2
**listed**
21:8, 21:13,
21:16, 21:19,
58:4, 59:10,
61:1, 66:17,
67:2, 74:6,
76:5, 76:7,
77:11, 77:25,
79:4, 83:1,
83:5, 84:19,
86:13, 89:16,
89:18, 89:20,
90:7, 90:15,
92:7, 92:9,
92:23
**listing**
34:25
**lists**
24:9, 73:22,
76:23, 81:6,
81:17, 81:18,
86:12, 95:4
**literature**
61:25, 62:6,
62:11, 62:12,
62:13, 62:16,
62:21, 62:25,
63:4
**little**
10:20, 19:6,
36:1, 37:14,
40:21, 49:15,
51:6, 51:12,
52:12, 52:14,
94:23, 97:8
**llc**
1:6, 1:12,
20:25, 100:6,
100:12
**lodge**
37:5
**long**
15:19, 70:8,

Case 1:24-cv-00065-JLH    Document 530-1    Filed 08/07/26    Page 528 of 1024 PageID #: 32611
HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

113

96:16, 97:16
**long-term**
68:19, 71:21
**longer**
70:25
**look**
18:10, 73:1,
76:3, 76:9,
83:12
**looked**
92:11, 92:19,
93:2
**looking**
56:2, 78:22,
82:24, 91:6,
92:22
**looks**
37:9, 57:10
**lourdu**
14:23, 15:4,
15:5, 15:17
**lupin**
39:12, 39:13,
39:17, 39:19,
39:20
**lymphocytic**
51:20

**M**

**machine**
2:8
**made**
58:20, 58:22,
61:7, 93:8,
93:16
**mainly**
14:15, 17:5,
17:15, 29:10,
36:10, 43:10,
60:10
**maintain**
83:14
**major**
77:8, 77:17,
77:18
**make**
8:15, 8:24,
9:15, 10:4,

10:12, 21:3
**makes**
10:5
**making**
8:17
**management**
48:11, 48:16
**management-level**
48:13
**managers**
40:4
**manufacturing**
32:2, 83:14,
84:3, 87:5,
87:11, 87:13,
88:10, 88:18
**many**
12:13, 42:23,
43:8, 75:6,
75:10, 86:5,
89:7
**marathon**
9:19
**mark**
6:22, 18:4,
18:9, 23:18,
35:20, 45:15,
50:5, 56:22,
63:13, 72:17
**marked**
18:7, 23:21,
24:1, 35:23,
50:11, 56:25,
63:15, 72:22
**market**
74:12, 74:16,
86:7
**marketed**
74:8, 74:18
**marketing**
68:21
**marks**
97:23
**marx**
3:13, 6:16
**master's**
36:4, 36:8,
36:9

**materials**
28:21, 28:22
**matter**
5:22, 71:3
**maybe**
24:25, 49:16
**md**
101:25
**mean**
13:3, 28:18,
58:25, 71:5,
71:8, 77:7,
86:24, 88:3,
91:12
**means**
77:8
**meant**
17:1
**mechanisms**
89:23, 90:2,
90:22, 91:10
**media**
5:21
**meet**
11:1, 11:4,
11:6, 11:8,
16:21, 26:3,
43:14, 43:20,
47:17
**meeting**
43:6
**meetings**
11:22, 11:25,
12:5, 12:6,
13:5, 13:17,
15:24, 43:2,
43:4, 43:23,
47:15, 47:20
**melanie**
18:12
**melody**
3:21
**mentioned**
90:24, 95:19,
97:3
**met**
11:5, 11:13,
11:18

**method**
17:16, 94:7,
95:8, 95:10,
95:25, 96:9,
96:10
**metrics**
17:19
**mg**
73:17, 90:5,
90:8
**mic**
5:10
**microphone**
18:14, 80:11
**middle**
51:7
**might**
10:8, 53:16
**milligram**
65:20
**milliliter**
65:20
**minute**
73:1
**minutes**
15:22, 75:20,
78:7, 95:21
**mischaracterizes**
17:4, 80:10,
93:19
**ml**
90:5, 90:8
**modifications**
61:7
**moiety**
66:24, 67:21
**molecule**
79:10
**moment**
18:21
**monitor**
6:3
**monothioglycerol**
79:3, 81:7,
86:2
**month**
68:15, 70:3
**months**
68:17, 68:18,

Case 1:24-cv-00065-JLH    Document 530-1    Filed 08/07/26    Page 529 of 1024 PageID
#: 32612
HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

114

**more**
15:22, 25:10,
34:3, 40:22,
54:16, 65:9,
78:9

**morning**
7:9, 7:11

**most**
42:6

**move**
33:9

**much**
26:15, 78:5

**multiple**
77:13, 78:2,
78:3

**mute**
5:10

**mylan**
38:11, 38:15,
38:19, 39:4

**N**

**name**
7:12, 7:14,
15:4, 15:13,
20:24, 22:9,
22:12, 22:13,
23:5, 23:6,
23:10, 23:12,
51:9, 54:9,
60:1, 99:16

**names**
14:24, 22:6,
22:8

**nanometer**
95:9

**nanometers**
95:4, 95:15,
95:24

**nasals**
38:22

**nature**
97:1

**nda**
4:23, 4:26,

70:7, 70:8,
71:20, 71:21
19:20, 20:8,
20:9, 20:11,
20:15, 20:18,
21:9, 21:20,
21:24, 22:5,
22:11, 22:15,
22:18, 23:4,
23:9, 29:4,
41:8, 41:20,
41:24, 42:2,
42:5, 42:8,
42:12, 42:16,
43:8, 43:15,
43:24, 44:23,
46:13, 46:25,
47:4, 47:8,
47:13, 47:16,
47:23, 48:17,
48:20, 49:8,
49:10, 49:12,
50:21, 51:1,
51:2, 52:8,
58:3, 60:7,
62:3, 66:1,
68:25, 69:8,
69:13, 70:22,
71:4, 71:6,
71:7, 72:3,
72:10, 73:6,
74:2, 74:8,
74:22, 75:2,
76:21, 77:21,
84:20, 85:4,
85:5, 85:15,
92:3, 92:5,
92:24, 96:11

**ndas**
49:3

**need**
8:23, 9:17,
9:24, 21:16,
45:5, 55:20,
73:2

**needed**
9:12, 79:22

**neither**
101:9

**neutralize**
83:6

**neutralizing**
89:10

**never**
57:19, 64:6

**new**
3:8, 3:15,
63:24

**next**
9:6, 52:17,
54:5, 66:23,
84:14, 94:22,
96:15

**nhl**
51:24

**nick**
3:20, 6:6,
75:18

**nitrogen**
83:10, 83:13,
83:17, 83:18,
83:21, 83:24,
84:1, 84:4,
84:5, 84:8,
84:11

**nodding**
8:21

**non-bendamustine**
44:25

**nonprivileged**
25:6

**notably**
58:10

**notary**
99:25

**note**
6:18, 10:22,
58:1, 58:9

**noted**
99:3

**notes**
11:24

**notice**
4:16, 4:19,
8:8, 24:3

**nowhere**
81:25

**number**
4:15, 5:21,

6:1, 12:16,
12:17, 12:19,
18:6, 20:10,
23:20, 35:22,
50:9, 50:10,
56:24, 57:3,
58:3, 63:14,
63:18, 72:19,
72:21, 81:6,
84:20, 85:5,
91:13, 96:5

**numbered**
2:4

**ny**
3:8, 3:15

**O**

**oath**
7:6, 99:13

**object**
10:7, 43:17,
87:8

**objection**
14:1, 15:14,
16:18, 17:3,
20:5, 20:20,
21:10, 22:15,
22:20, 22:21,
24:23, 26:5,
26:8, 28:11,
29:25, 30:19,
31:3, 31:20,
32:8, 32:21,
33:5, 33:14,
34:1, 34:10,
34:15, 35:5,
35:14, 37:5,
37:22, 40:15,
41:10, 46:1,
46:19, 47:5,
47:10, 48:7,
51:17, 51:21,
55:4, 55:18,
56:6, 56:17,
61:3, 62:17,
63:7, 65:21,
67:10, 67:16,
68:5, 70:21,

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

115

71:10, 74:17,
80:9, 80:10,
80:16, 81:14,
84:10, 85:11,
86:9, 87:14,
87:22, 88:2,
88:12, 88:20,
90:18, 93:18
**objections**
4:18, 24:2,
25:20, 26:18,
28:4, 29:21,
34:24
**objects**
10:8
**obligated**
10:9
**obtained**
52:24, 53:1
**off-the-record**
5:8
**offer**
96:24
**office**
99:20
**officer**
100:26
**often**
43:14
**oh**
34:8
**once**
73:2
**one**
5:5, 5:21,
6:18, 9:3, 9:23,
11:21, 18:4,
18:21, 37:2,
48:14, 48:21,
54:24, 74:22,
80:25, 83:8,
89:7, 89:18,
89:20, 91:25,
92:23
**only**
6:23, 9:19,
67:6, 80:25,
91:23

**ophthalmics**
38:22
**oral**
1:19, 2:1,
100:27
**order**
8:14, 45:17,
63:5
**original**
58:2, 63:24,
100:29
**other**
6:19, 17:13,
19:23, 21:1,
22:6, 42:15,
42:16, 44:16,
45:6, 45:20,
46:4, 47:14,
49:3, 49:9,
71:11, 74:21,
75:11, 81:17,
82:15, 82:19,
84:5, 85:14,
89:19, 92:11,
99:15
**otherwise**
101:14
**out**
17:11, 40:10,
53:4, 54:18,
55:15, 61:22,
62:5, 78:9
**outcome**
101:15
**outside**
13:17, 13:24
**over**
5:5, 8:7, 9:3,
11:18, 49:15,
58:25, 60:18,
71:11, 81:9
**overall**
4:31, 72:25,
73:5
**own**
14:9, 14:13,
17:14, 45:13,
62:13, 62:21,

62:25, 80:24,
82:11
**oxygen**
79:11, 84:2

---
**P**
---

**p3**
53:23
**p4**
52:17, 52:19,
53:11, 53:18,
53:25, 54:25
**page**
4:2, 4:10,
4:15, 19:16,
24:14, 51:7,
54:5, 57:13,
57:23, 64:11,
64:20, 68:11,
73:10, 73:11,
73:14, 78:24,
81:4, 82:23,
84:14, 84:16,
85:20, 89:21,
94:5, 94:22,
94:24, 101:5
**pages**
1:31
**paragraph**
66:14, 84:15,
90:11, 93:2
**parameters**
92:14
**part**
32:15, 45:2,
94:21, 96:9,
96:11
**participate**
54:18
**particular**
25:4, 34:22,
52:4, 66:4,
88:21
**parties**
6:7, 100:32,
101:11
**partly**
32:14

**parts**
25:1, 25:3
**party**
100:35, 101:8
**patent**
33:21, 34:12,
52:15, 53:11,
53:18, 54:1,
55:2, 55:8,
55:16
**patents**
53:23
**pathways**
63:3, 63:6
**pdf**
73:11
**pe1**
60:4, 60:5
**peg**
77:1, 77:4,
77:20, 77:23,
81:22
**peltier**
1:33, 2:6, 7:1,
100:22, 101:20
**pending**
9:21
**people**
42:23, 43:7,
60:15, 61:20,
93:15
**performed**
91:14
**period**
68:15, 70:4
**permission**
69:24
**person**
48:14, 58:21,
99:16
**personal**
20:2, 25:25,
26:24, 27:11,
27:21, 28:9,
28:13, 29:23,
30:8, 30:17,
31:1, 31:18,
32:5, 32:19,

33:3, 33:12, 33:24, 34:14, 35:3, 35:12

**personally**
99:12

**pfizer**
39:6

**ph**
89:9

**pharma**
1:12, 4:22, 20:25, 36:18, 58:3, 65:16, 100:12

**pharma's**
90:4

**pharmaceutical**
36:3, 36:5, 36:9, 73:23, 77:3, 79:4, 83:5, 84:21

**pharmaceutically**
90:14, 94:4

**pharmaceuticals**
1:4, 1:14, 5:23, 21:1, 39:21, 90:6, 100:4, 100:14

**phone**
5:15, 101:26

**pick**
96:18, 97:21

**pillai**
44:4

**pind**
58:2

**place**
66:19, 67:9

**placed**
18:9

**plaintiffs**
1:8, 2:3, 3:3, 6:14, 100:8

**plan**
97:13

**planet**
6:6, 7:2

**please**
5:4, 5:6, 5:10,

5:12, 5:15, 6:9, 7:12, 9:11, 9:18, 9:21, 14:25, 18:3, 18:5, 23:2, 24:13, 25:19, 26:12, 27:16, 28:1, 29:18, 30:4, 30:13, 30:22, 31:23, 32:11, 32:24, 33:17, 34:6, 35:19, 36:14, 37:8, 50:4, 50:6, 52:3, 56:23, 57:13, 63:19, 72:16, 78:24

**point**
14:3, 69:14, 69:15, 69:16, 72:6, 92:21, 97:11

**polyethylene**
76:23, 83:6, 86:3

**portion**
77:9, 77:18

**portions**
42:5, 47:23

**possibility**
66:3

**praveen**
60:16

**pre-ind**
57:23, 69:23, 71:6

**predated**
59:15

**prefer**
45:1, 77:14

**preferred**
77:16

**prep**
10:25

**preparation**
47:16, 87:16, 88:21

**preparations**
19:23

**prepare**
11:2, 19:25, 26:4

**prepared**
11:3, 25:21, 25:23, 26:21, 27:8, 27:17, 28:2, 28:5, 29:20, 30:6, 30:14, 30:23, 31:15, 31:24, 32:12, 32:15, 33:1, 33:9, 33:19, 34:8, 34:21, 35:9, 64:13

**preparing**
41:19, 42:11, 64:16

**present**
3:18, 11:22, 15:24, 77:10, 86:5

**presented**
66:12, 73:18

**previously**
34:25

**privilege**
9:25, 10:1

**privileged**
56:2

**procedure**
2:9

**proceeding**
5:2, 5:7

**process**
83:14, 83:24, 87:6, 87:11, 87:13, 88:10, 88:15, 88:18, 92:14

**processes**
91:7

**produce**
8:12

**produced**
2:2

**products**
38:7, 44:13, 44:17, 44:25, 45:6, 45:9, 45:24, 49:4, 49:9, 49:12, 84:12, 86:6, 94:2

**profile**
4:20, 36:16, 36:20, 36:23, 40:16

**program**
59:18, 59:21, 60:2, 60:11, 60:13

**project**
23:10, 40:4, 41:14, 41:15, 43:4, 43:5, 46:21, 46:22, 55:14, 60:17, 62:14, 62:22

**projects**
38:3, 38:9, 44:21

**promoted**
40:11, 40:18

**promotion**
38:23

**properties**
63:1

**proposal**
69:14, 69:18, 69:25, 70:1, 71:6, 71:7

**proposed**
51:13, 58:3, 66:15, 67:1, 67:23, 68:11, 68:14, 68:16, 68:20, 70:2, 70:5, 71:18, 82:6, 90:13

**propylene**
66:20, 67:9, 89:10, 89:12

**protect**
79:10

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

117

**protective**
45:17
**proved**
99:13
**provided**
12:21, 66:2
**providing**
69:25
**provisions**
2:10
**public**
45:1, 99:25
**pull**
50:4, 56:20,
56:21, 63:12,
72:16, 78:23
**purpose**
76:15, 79:7,
79:9, 92:5
**purposes**
5:7, 11:13,
99:18
**pursuant**
2:9, 65:15,
100:33
**pursue**
91:25, 93:16,
93:24
**pursuing**
36:5
**push**
97:10
**put**
18:14, 88:9
**putting**
8:16, 42:1,
47:13, 91:4

**Q**

**qualitative**
73:15, 84:17,
90:3
**qualitatively**
58:11
**quality**
4:31, 31:7,
31:11, 44:19,
72:25, 73:5

**quantitative**
73:16, 84:17,
90:3
**quantitatively**
58:12
**question**
8:20, 9:6, 9:7,
9:11, 9:13,
9:20, 9:21,
9:25, 10:3,
10:9, 10:10,
10:11, 22:25,
25:17, 43:19,
44:10, 50:19,
54:24, 72:9,
82:14
**questions**
10:7, 10:17,
14:4, 17:6,
17:8, 17:10,
17:13, 22:17,
78:10
**quickly**
10:23, 24:24,
76:4
**quite**
26:14, 72:8,
96:16

**R**

**r&d**
44:5, 55:23,
56:5, 59:17,
60:11, 61:23,
61:24
**ramya**
3:5, 6:12
**rather**
13:6
**raw**
28:21, 28:22
**re-specify**
71:5
**read**
6:19, 19:6,
24:17, 58:14,
62:8, 66:21,
67:4, 68:22,

69:6, 69:11,
70:10, 70:16,
73:20, 84:23,
86:8, 90:9,
90:17, 91:17,
99:1
**reading**
70:18
**realtime**
2:7, 3:22
**realtimed**
1:19, 2:1
**reason**
10:14
**reasons**
101:5
**recall**
12:10, 12:13,
16:23, 17:8,
62:15
**receipt**
101:3
**received**
19:13
**receiving**
3:22
**recently**
36:25
**recognize**
19:11, 36:19,
50:17, 64:1,
73:3, 73:4
**recollect**
76:2
**recollection**
14:14
**record**
2:10, 7:13,
8:11, 20:8,
49:23, 50:2,
50:8, 57:2,
63:17, 72:18,
78:6, 78:16,
78:20, 97:25,
100:27, 101:13
**recording**
5:7
**reddy's**
37:20, 37:25,

38:6, 38:10
**refer**
20:8, 20:14,
20:24, 60:1,
60:6
**reference**
16:8, 16:11,
21:8, 21:13,
21:16, 21:19,
24:24, 82:4
**referenced**
23:7, 52:8
**referred**
22:12, 23:9,
77:1
**referring**
20:9, 20:15,
85:1, 85:2
**refresh**
14:13
**regard**
44:25
**regarding**
9:25, 10:1,
19:19, 24:22,
25:22, 26:1,
26:22, 27:8,
28:3, 28:15,
29:14, 29:20,
29:24, 30:6,
30:9, 30:15,
30:24, 31:16,
31:19, 31:24,
32:6, 32:13,
32:20, 33:1,
33:13, 33:19,
33:25, 34:9,
34:21, 35:10,
38:5, 43:15,
43:24, 44:12,
44:17, 47:16,
91:21
**registration**
101:22
**regularly**
44:7
**regulatory**
42:17, 42:20,

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

118

44:12, 44:14,
44:18, 47:3,
53:2, 53:6,
53:8, 55:1,
55:7, 55:16,
55:22, 56:13,
64:14
**relate**
19:20
**related**
101:10
**relative**
101:13
**relayed**
55:11, 55:23,
56:5, 59:4
**rely**
29:6, 29:9
**remain**
83:22
**remained**
38:24
**remains**
83:21
**remarks**
81:10, 82:9
**remember**
5:4, 5:10,
11:15, 12:17,
12:19, 63:8,
75:7, 76:1
**remote**
6:5, 96:25
**remotely**
5:2, 6:8
**remove**
84:2
**repeat**
7:20, 22:20,
23:1, 23:2,
25:17, 31:8,
41:21, 50:18,
51:18, 87:9,
93:20
**rephrase**
43:18, 93:22
**report**
15:10, 15:15,

40:5, 42:23,
44:1, 44:2,
44:4, 54:12,
69:22, 96:10
**reported**
1:32, 2:8
**reporter**
2:7, 5:13, 7:1,
8:9, 8:14, 9:2,
26:7, 28:23,
43:21, 80:6,
100:23
**reporter's**
4:12, 100:18
**reports**
42:25
**represent**
6:11, 6:24
**representing**
6:6, 7:1
**request**
10:2, 10:19,
14:7, 64:21,
65:13, 66:8,
68:8
**requested**
65:24, 67:13,
67:18, 68:15,
70:4, 100:35,
101:7
**requests**
65:16, 67:13
**required**
43:20, 79:13,
80:21, 81:11,
82:1, 82:17
**requirement**
65:15, 67:17,
67:20
**requirements**
64:22, 65:18
**respect**
25:4, 25:8,
32:1, 42:7
**respond**
55:20
**responses**
4:17, 24:2,

26:19, 28:4,
29:21
**responsibilities**
37:25, 38:24,
40:22
**responsibility**
32:3, 40:8,
40:24, 48:19,
48:25
**responsible**
15:16, 15:17
**returned**
101:2, 101:4
**reveal**
14:3, 17:12,
17:14, 55:21,
56:8
**revealed**
52:23, 65:8
**revealing**
53:16, 53:20
**review**
12:6, 13:6,
13:16, 13:19,
14:7, 14:10,
14:13, 33:6,
48:1, 62:11,
75:23
**reviewed**
12:14, 13:2,
13:12, 13:23,
13:24, 14:12,
14:18, 42:8,
47:23, 62:15,
63:5
**reviewing**
47:18
**reword**
9:12
**ring**
60:4
**rld**
52:1, 52:6,
58:17, 61:17,
67:8, 67:24,
68:3
**rockville**
101:25

**role**
39:13, 39:25,
40:2, 40:6,
40:19, 40:23,
42:22, 47:8
**roles**
38:14, 38:18
**route**
66:25, 67:22
**row**
95:1, 95:5
**rule**
100:33
**rules**
2:9, 8:7, 10:18
**run**
5:3
**running**
91:6

S

**s**
90:6
**s-o-m-a-s-h-e-k--
a-r**
15:1
**safe**
46:15
**said**
11:21, 16:24,
28:14, 28:25,
47:22, 53:21,
56:1, 60:19,
62:4, 62:20,
86:23, 88:25,
93:15, 96:2
**same**
22:2, 22:18,
33:5, 33:14,
34:15, 34:24,
38:24, 40:8,
47:10, 51:21,
53:13, 53:19,
55:5, 55:19,
62:4, 66:10,
67:2, 67:24,
68:2, 78:2,
80:16, 84:12,

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

119

86:20, 86:21,
86:23, 87:1,
87:14, 87:22,
97:7, 99:3,
99:18
**satisfactory**
68:17, 70:6,
71:19, 72:5
**satisfies**
66:11, 67:17,
67:20, 67:25,
68:1, 68:2, 68:7
**say**
6:23, 9:2,
11:18, 25:12,
38:25, 43:23,
45:15, 46:13,
46:16, 47:2,
55:20, 56:14,
67:6, 71:1,
71:2, 71:9,
71:14, 91:19,
91:24, 92:5
**saying**
12:2, 70:17,
70:24, 80:7,
85:7, 88:5,
93:11
**says**
40:16, 51:9,
51:13, 51:16,
51:19, 52:15,
57:23, 58:1,
58:10, 65:15,
66:14, 66:23,
68:13, 70:2,
70:5, 73:15,
76:8, 76:11,
81:10, 81:21,
82:5, 83:10,
83:13, 84:17,
85:12, 85:22,
85:25, 89:22,
90:1, 90:12,
90:21, 91:9,
94:6, 95:2
**sciences**
36:4, 36:5,

36:9
**scientific**
25:2, 25:9,
25:10
**scientist**
17:18, 37:16,
38:2
**scope**
48:7, 87:15,
88:12, 88:20
**scratch**
40:25
**screen**
8:9, 18:24,
19:9, 23:23,
36:12, 50:13,
57:9, 63:20
**screening**
74:25, 75:5,
91:2, 91:3,
91:8, 91:13,
91:21, 91:23,
92:8, 92:12,
92:13, 95:16,
95:17, 96:3,
96:4, 96:8
**scroll**
24:13, 24:14,
26:12, 27:4,
27:16, 29:18,
30:21, 31:14,
32:11, 32:23,
33:17, 34:5,
34:18, 35:8,
37:8, 51:6,
52:11, 54:4,
57:12, 73:10,
73:12, 94:23,
94:24
**seal**
99:20
**search**
61:25, 62:6,
62:12, 62:13,
62:16, 62:21,
62:25
**second**
15:4, 57:13,

66:14, 90:11,
90:12, 93:1
**seconds**
57:5
**section**
4:32, 51:9,
52:4, 52:5,
52:11, 53:4,
54:4, 54:9,
72:24, 82:9,
85:22, 89:22,
89:24, 89:25,
94:6
**see**
14:4, 18:19,
19:9, 19:10,
50:20, 51:8,
52:3, 52:12,
52:13, 52:18,
53:22, 54:8,
54:11, 54:19,
57:22, 58:1,
58:6, 65:13,
66:14, 69:23,
73:14, 76:4,
79:2, 79:6,
81:5, 82:4,
82:14, 83:1,
84:16, 85:21,
89:24, 89:25,
94:9, 94:10,
95:1
**seems**
19:16, 37:2,
37:5, 50:21,
51:3, 64:3,
69:23, 73:8,
75:15
**seen**
19:14, 24:4,
24:6, 50:23,
54:21, 57:16,
57:19, 57:21,
64:6
**segment**
75:20, 97:24
**select**
13:1

**sell**
45:25
**senior**
4:21, 36:17,
40:18, 42:23
**sense**
8:24, 9:15,
10:4, 10:5,
10:12, 21:3,
38:6
**sentence**
58:10, 66:23,
85:25, 90:12,
90:21
**separately**
16:21
**served**
24:11, 100:31
**setty**
7:14
**several**
11:18, 38:14,
73:22
**shaking**
8:22
**share**
18:16
**shared**
76:2
**shelf**
68:25, 69:9,
69:13, 72:3,
72:11, 81:13,
82:3, 82:18
**shorthand**
2:8, 100:22
**should**
5:9, 6:21,
45:2, 46:12,
52:23, 65:8,
83:22, 94:6,
97:1
**shouldn't**
11:12, 17:12,
55:21
**shown**
100:32
**shows**
89:12

**sic**
65:16
**side**
25:2
**signature**
4:10, 99:2,
100:34, 101:2,
101:4
**signature-mig2k**
101:18
**similar**
56:18, 66:16,
84:19
**similarly**
25:3
**since**
8:6, 41:15,
59:11, 74:15
**sitting**
85:13
**six**
68:17, 70:7,
71:20
**slay-vivmus**
4:24, 4:27,
4:29, 4:33,
50:9, 57:3,
63:18, 72:20
**slayback**
1:12, 4:22,
5:24, 6:16,
6:23, 14:19,
17:24, 19:18,
20:18, 20:24,
20:25, 22:11,
22:12, 22:15,
23:5, 23:9,
24:11, 24:21,
26:3, 28:18,
36:17, 39:20,
39:25, 40:2,
41:23, 42:11,
43:24, 44:7,
44:11, 44:22,
45:9, 45:11,
45:13, 46:5,
46:11, 46:24,
47:13, 47:15,

48:4, 49:2,
49:9, 53:11,
53:18, 58:2,
58:17, 59:9,
59:17, 59:25,
60:7, 60:9,
60:25, 61:21,
62:9, 64:13,
65:16, 65:24,
66:4, 66:8,
67:13, 69:9,
69:21, 69:24,
71:23, 72:6,
72:9, 74:21,
77:16, 77:20,
80:15, 80:19,
85:7, 89:5,
90:4, 92:18,
92:22, 93:4,
93:10, 93:16,
95:7, 95:12,
100:12
**slayback's**
4:17, 19:20,
20:8, 20:9,
20:14, 20:16,
21:20, 21:24,
22:5, 22:9,
23:4, 24:2,
25:20, 26:18,
28:3, 29:4,
29:21, 41:8,
41:20, 42:12,
43:8, 43:15,
45:24, 51:2,
62:3, 66:14,
67:1, 67:7,
67:23, 68:24,
69:8, 69:13,
71:17, 73:6,
74:2, 74:8,
76:21, 84:18,
85:15, 90:13
**slow**
10:20
**slowly**
5:4
**smoothly**
5:3

**sodium**
83:1, 83:4,
86:3, 86:13,
86:15, 86:17,
87:3, 87:6,
87:12, 87:17,
87:19, 87:23,
88:1, 88:5,
88:10, 88:13,
88:18, 88:22,
88:25, 89:14
**sold**
74:12
**solubilization**
76:18
**solubilize**
77:9
**solubilized**
77:23
**solubilizes**
77:18
**solution**
86:18, 87:17,
87:23, 88:7,
88:9, 88:14,
88:22, 89:2
**solvent**
76:17, 77:12,
77:21, 77:23,
77:25, 86:16,
86:19, 86:21,
86:25, 87:3,
87:4, 87:7,
87:13, 87:20,
89:1, 89:3,
89:5, 89:9
**soma**
17:20
**somashekhar**
14:22, 15:1,
15:15, 16:9,
17:23, 43:10,
43:15
**some**
8:7, 10:7,
17:5, 24:24,
32:19, 90:25,
95:16, 97:3

**something**
56:18, 80:7
**somewhere**
59:24
**sorry**
7:20, 12:11,
16:5, 18:12,
25:18, 26:7,
57:5, 58:25,
64:19, 71:12,
75:17, 80:11,
84:9
**sort**
8:23
**sound**
9:8
**speak**
5:4, 8:19, 9:3,
10:19, 10:23,
15:20, 29:13,
32:17, 58:25,
95:23
**speaking**
5:13, 5:16
**specialize**
36:7
**species**
79:11, 84:2
**specific**
17:5, 17:6,
17:7, 43:4,
43:5, 44:9,
49:5, 58:21,
61:15, 62:10,
62:18, 65:9,
68:25, 74:3,
79:16, 96:1
**specifically**
10:10, 21:2,
48:12
**specified**
69:3, 76:22
**specify**
33:21, 48:14,
91:21
**speed**
26:13
**spell**
14:24

**spend**
26:15
**spoke**
15:25, 95:20
**sri**
3:5
**st**
63:24
**stability**
68:19, 69:1,
70:8, 71:21,
79:14, 79:22,
80:21, 80:25,
81:11, 82:2,
82:6, 82:12,
82:17
**stabilize**
81:1
**stable**
68:14, 70:3,
79:25
**stage**
74:24, 91:2,
91:3, 91:8,
91:13, 91:17,
91:22, 91:23,
92:9, 92:12
**stand**
23:19, 35:21,
36:11, 50:6,
56:23, 63:19,
79:1
**standing**
22:15, 22:21
**stars**
83:13
**start**
10:24, 56:15,
57:11, 61:22
**started**
40:10, 46:22,
48:19, 48:23,
59:22, 59:23,
60:11, 60:13,
60:25, 62:5,
62:9, 62:12,
62:22
**state**
2:8, 6:10,

7:12, 82:17,
82:20, 99:8,
99:26, 100:23
**stated**
2:10, 25:21,
34:25, 72:4,
72:11, 81:15,
81:24, 81:25
**statement**
92:9
**states**
1:1, 5:25,
83:16, 96:23,
100:1
**stenographically**
1:32
**steroidal**
38:21, 39:15
**still**
45:4
**stock**
45:13, 45:21,
46:4
**strategy**
55:2, 55:8,
55:17, 55:22,
56:1, 56:4
**street**
3:14
**strength**
66:25, 67:22
**strides**
37:11
**strike**
13:4, 14:11,
16:23, 23:8,
59:2, 69:20
**stuff**
63:3
**sub**
1:5, 100:5
**subbappa**
60:16, 60:19,
75:14, 75:25,
90:25, 91:4
**subject**
20:17, 25:20,
26:17, 28:3,

29:21
**submission**
4:23, 21:15,
42:9, 47:3,
47:16, 50:21,
51:2, 54:1,
70:23, 71:4
**submit**
41:24, 48:20,
94:3
**submitted**
8:3, 71:17,
73:6, 85:4
**subscribed**
99:16
**substance**
79:14, 79:23,
80:22, 81:12,
82:2, 82:17,
85:24
**suite**
101:24
**sumitra**
44:4
**summary**
4:31, 72:25,
73:5, 94:6
**supervisory**
47:8
**supplements**
20:10
**supply**
32:3, 32:17
**supported**
68:16, 70:6,
71:19
**supports**
85:23
**suppose**
66:2
**sure**
7:21, 8:15,
8:17, 10:5,
10:22, 13:4,
18:20, 23:3,
41:22, 49:6,
49:20, 52:5,
61:16, 62:19,

64:5, 65:10,
68:1, 74:4,
75:3, 75:21,
82:8, 85:5,
87:10, 88:4,
91:3, 93:14,
93:21
**switch**
58:17, 59:10,
78:9
**sworn**
2:3, 7:3, 7:5,
100:26
**symbols**
76:10
**synthesis**
28:19, 29:2,
29:10
**system**
68:20

**T**

**tab**
18:4, 23:17,
35:19, 50:5,
56:21, 63:12,
72:16
**table**
73:19, 76:8,
76:9, 81:17,
83:10, 83:12,
89:5
**take**
11:24, 22:15,
22:21, 23:15,
35:17, 46:8,
49:16, 63:11,
72:14, 73:1,
91:16, 91:19,
96:14
**taken**
1:23, 2:4,
49:24, 78:17,
101:12
**taking**
8:17, 9:2
**talk**
5:5, 19:22,

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

122

**talking**
8:12, 17:15,
22:19, 31:4,
49:7, 62:10,
71:11, 87:16
**talks**
32:18
**team**
14:20, 15:8,
15:12, 15:13,
31:7, 31:11,
32:18, 38:20,
39:14, 39:17,
42:3, 42:7,
42:10, 42:14,
42:17, 43:2,
43:4, 43:8,
44:19, 47:14,
47:23, 52:25,
53:1, 53:2,
53:3, 53:6,
53:8, 53:9,
55:9, 55:15,
55:23, 56:5,
59:5, 60:18,
64:14, 64:15,
94:14
**teams**
47:14
**tech**
3:21, 5:1,
18:13, 18:21,
18:23, 19:3,
23:19, 23:22,
35:21, 36:11,
50:6, 50:12,
56:23, 57:8,
63:19, 79:1
**technical**
25:2, 25:8,
25:11, 25:23,
26:20, 26:23,
27:7, 27:10,
27:18, 34:22,
35:1, 35:11,
35:15, 42:7,
42:13, 64:17

**technical-related**
5:18
**tell**
33:20, 36:1,
37:14, 38:17,
40:21, 61:10,
62:24, 66:6,
79:12
**telling**
68:24
**tenure**
44:22, 45:9
**term**
60:4, 70:8,
82:15
**terminologies**
66:12, 77:13,
78:3, 94:17
**test**
94:7, 95:8,
95:24
**testified**
7:5, 7:25
**testify**
13:14, 19:18,
19:25, 24:21,
25:22, 26:4,
26:21, 27:8,
27:18, 28:3,
29:20, 30:6,
30:15, 30:24,
31:16, 31:24,
32:4, 32:13,
32:15, 33:1,
33:10, 33:19,
34:8, 34:11,
34:21, 35:10
**testimony**
10:15, 100:28,
101:12
**testing**
65:1, 65:18,
66:1, 92:19
**tests**
91:6
**texas**
2:6, 2:8,
100:23, 101:20

**th**
3:14, 6:2,
101:16
**thank**
5:1, 5:19,
10:22, 15:6,
17:22, 18:2,
18:17, 23:24,
25:14, 31:12,
33:8, 36:13,
42:21, 50:15,
54:5, 97:21
**themselves**
6:10
**therapeutic**
66:24, 67:21,
93:24
**therapeutically**
90:15, 93:12,
94:4
**therefore**
101:6
**therein**
99:19
**thing**
9:20, 97:1
**things**
28:7, 28:17,
61:24, 75:10
**think**
16:10, 16:24,
22:14, 25:12,
26:14, 28:17,
45:12, 48:13,
49:15, 54:4,
62:20, 63:12,
70:14, 70:19,
78:21, 80:7,
88:25, 90:24,
94:24, 95:19,
96:16, 96:25
**through**
24:9, 25:5,
25:13, 73:1,
97:16, 99:14
**throughout**
81:12, 82:3,
82:18

**time**
2:6, 5:16, 6:3,
9:18, 26:15,
49:23, 50:2,
53:23, 53:24,
54:1, 59:6,
59:15, 59:19,
69:15, 69:16,
71:23, 72:7,
78:5, 78:16,
78:20, 80:3,
80:13, 80:18,
92:21, 97:9,
98:1
**times**
10:6, 11:18
**tired**
97:5
**today**
6:5, 7:1, 8:11,
10:15, 11:2,
11:3, 13:14,
31:16, 49:8,
85:14, 95:20,
96:17, 96:25,
97:4, 97:8,
97:21
**today's**
6:2, 20:23
**together**
42:1, 47:13,
91:4
**told**
69:9, 77:17,
77:22, 82:10,
92:13
**tomorrow**
8:12, 96:18,
97:5, 97:11,
97:21
**took**
48:15, 48:19,
60:18, 61:7
**topic**
24:13, 24:17,
24:22, 25:1,
25:3, 25:5,
25:22, 26:1,

35:11

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

26:4, 26:12, 26:17, 26:22, 26:25, 27:4, 27:6, 27:7, 27:9, 27:12, 27:16, 27:19, 27:22, 28:1, 28:3, 28:10, 28:15, 29:14, 29:18, 29:20, 29:24, 30:4, 30:6, 30:9, 30:13, 30:15, 30:18, 30:22, 30:24, 31:2, 31:14, 31:16, 31:19, 31:23, 31:25, 32:6, 32:11, 32:13, 32:20, 32:24, 33:1, 33:4, 33:9, 33:10, 33:13, 33:17, 33:19, 33:25, 34:9, 34:14, 34:18, 34:21, 34:23, 35:4, 35:8, 35:10, 35:13

**topics**
13:13, 14:15, 19:19, 19:22, 19:25, 20:3, 24:10, 25:7, 26:15, 28:12, 34:25

**tough**
19:6

**transcript**
6:21, 8:13, 8:17, 45:16, 100:26, 101:3

**trial**
7:25

**true**
50:25, 69:5, 79:18, 92:10, 99:3, 100:27

**try**
9:12, 76:2

**trying**
17:20, 70:18, 92:20

**turn**
84:14, 89:21, 94:5, 94:22

**turned**
18:14

**two**
16:14, 16:17, 49:12, 57:4, 76:10, 78:7, 83:13, 91:24

**type**
7:23, 8:1, 8:4, 38:7, 55:2, 60:1

**types**
45:6

---

**U**

**uh-huh**
50:23, 61:19, 87:20, 91:15

**uh-huhs**
8:22

**unable**
5:14

**under**
45:16, 51:8, 52:14, 54:8, 54:9, 64:21, 65:13, 68:11, 68:17, 68:18, 70:7, 70:8, 71:20, 71:21, 76:10, 81:20, 82:15, 82:16, 82:25, 83:9, 83:12, 84:8, 85:22, 99:13, 99:20

**undergrad**
36:8

**understand**
9:10, 17:6, 17:21, 19:17,

20:12, 20:13, 20:19, 21:23, 24:20, 26:16, 27:5, 34:8, 41:1, 41:23, 48:4, 51:1, 52:6, 55:7, 62:14, 62:21, 63:5, 64:24, 69:21, 70:17, 74:5, 77:6, 80:1, 86:15, 92:18, 92:21, 94:17

**understanding**
10:20, 12:1, 17:19, 21:7, 21:13, 24:25, 52:19, 53:10, 53:14, 53:22, 55:1, 58:16, 59:9, 61:11, 64:25, 65:2, 65:4, 65:7, 65:11, 65:24, 66:7, 68:6, 70:19, 71:18, 80:23, 93:3, 93:10, 94:2

**understandings**
55:6

**understood**
9:14, 12:20, 22:23, 28:8, 33:23, 51:25, 63:1, 80:19, 97:14, 97:18

**united**
1:1, 5:24, 96:22, 100:1

**unless**
10:10, 21:1

**until**
57:7, 96:24

**updated**
36:25, 37:2

**use**
20:24, 51:14,

60:1, 77:14, 77:16, 84:11, 85:9, 92:23

**using**
32:16, 84:4, 89:2, 94:19, 95:8

**usp**
86:2

**usp-nf**
86:2, 86:3, 86:4

**usually**
53:1

**uv**
94:16, 94:19, 94:21, 95:2, 95:4

---

**V**

**value**
45:24

**vehicle**
77:4, 77:6, 77:8, 77:12, 77:14, 77:16, 78:1

**vein**
84:12

**vendors**
29:6, 29:7, 29:8, 29:12, 29:14, 32:16, 32:17, 32:18

**verbal**
8:21

**verse**
5:23

**versus**
94:19

**via**
1:23, 5:15

**video**
5:12, 5:14, 6:3, 6:7, 75:20

**videoconference**
1:23

**videographer**
3:20, 5:20,

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

124

6:5, 6:19, 6:25, 8:10, 49:22, 50:1, 75:17, 75:19, 78:7, 78:11, 78:15, 78:19, 97:23

**videotaped**
1:19, 2:1, 5:21

**vivimusta**
22:10, 23:7, 23:11, 46:13, 74:9, 74:15

**vivimusta's**
74:11

**vivo**
64:21, 64:25, 65:14, 65:17, 65:25, 67:14

**voice**
6:9

**volume**
1:21

**vs**
1:10, 100:10

### W

**wait**
9:4, 9:6, 57:6

**waiver**
64:21, 64:25, 65:14, 65:17, 65:25, 66:3, 66:7, 67:13, 67:18, 68:8

**want**
22:20, 24:8, 25:17, 26:15, 33:21, 38:6, 56:14, 75:19, 78:8, 90:20, 91:19, 97:8, 97:16

**wanted**
16:25, 54:24

**water**
57:5, 87:19, 87:21, 87:24, 88:6, 88:13,

88:19, 88:23

**watkins**
3:6, 6:13

**way**
97:7

**we'll**
6:22, 14:4, 18:20, 19:22, 34:4, 45:15, 97:20

**we're**
8:12, 49:7

**we've**
22:16, 49:14

**week**
16:19

**weekly**
43:23

**weeks**
11:14, 11:16, 11:19, 13:20

**welcome**
50:3

**west**
3:14

**whatever**
18:9, 92:6

**wherein**
40:3

**whereupon**
18:6, 23:20, 35:22, 50:10, 56:24, 63:14, 72:21

**whether**
55:1, 85:2, 87:12, 93:10

**whole**
45:16, 97:1

**windels**
3:13, 6:16

**wish**
25:13

**within**
22:18, 101:2

**without**
12:3, 53:15, 53:20, 79:19

**witness**
2:2, 7:3, 49:20, 52:22, 65:6, 97:5, 100:25, 100:28

**wording**
65:21

**work**
21:5, 37:8, 37:15, 37:17, 38:3, 38:5, 38:10, 39:3, 39:7, 39:10, 39:16, 39:19, 44:6, 44:11, 44:13, 44:16, 44:17, 44:19, 56:9, 56:15, 61:14, 61:23, 61:24, 75:13, 75:24, 91:1, 92:1, 92:18

**worked**
37:16, 37:18, 38:7, 38:9, 38:11, 38:25, 39:5, 39:12, 43:8, 44:21, 45:7, 45:8, 94:13

**working**
37:10, 38:1, 38:20, 41:15

**works**
54:16

**wouldn't**
14:3

**written**
51:22, 53:7, 67:11, 69:6, 69:11, 70:13, 70:16, 70:18, 70:20, 70:22, 71:3, 77:5, 85:17

### X

**xxx**
100:35

### Y

**yeah**
7:11, 11:13, 16:4, 36:3, 45:3, 49:20, 50:25, 51:19, 52:8, 54:6, 65:9, 73:12, 78:11, 78:13, 93:8, 94:24

**year**
40:14

**yep**
18:11, 24:14, 51:7, 84:16

**york**
3:8, 3:15

**yourself**
5:15

### Z

**zoom**
1:23, 3:21, 18:15, 23:23, 36:12, 36:14, 50:13, 50:15, 52:11, 57:9, 57:13, 63:20

### .

**.1061**
3:16

**.1200**
3:9

**.3767**
101:26, 101:27

### 0

**0000012**
4:24, 50:9

**0000018**
4:29, 63:18

**0000029**
4:27, 57:3

**0000322**
4:33, 72:20

**020**
64:11, 68:11

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

**03**
2:5
**05**
6:4
**09**
38:12, 49:23, 49:24, 78:16, 78:17

---
**1**
---

**10**
1:22, 2:5, 6:2, 12:18, 30:13, 30:15, 78:16, 78:20, 96:22, 98:1, 100:20, 101:21
**100**
65:19, 73:17, 90:5, 90:8
**10019**
3:15
**10020**
3:8
**101**
1:31
**11**
30:22, 30:24, 31:2, 96:24
**12**
31:14, 31:16, 68:18, 70:8, 71:21, 81:6
**1271**
3:7
**13**
31:23, 31:25, 38:12
**14**
32:11, 32:13
**15**
32:24, 33:1, 42:24, 43:3, 43:7, 51:13
**156**
3:14
**16**
25:5, 33:9,

33:10
**17**
4:16, 49:25, 50:2, 101:16

---
**2**
---

**2.3**
4:32, 72:24
**20**
12:18, 38:12, 52:11, 52:14, 78:18, 78:20
**2009**
38:12
**2013**
38:12
**2015**
59:24, 60:12, 60:24
**2016**
59:15, 60:24
**2017**
39:22, 40:1, 40:7, 41:17, 60:13, 62:9, 62:12, 62:22, 62:25
**2018**
63:24, 71:17, 71:23, 80:13
**2020**
40:16
**2025**
1:22, 2:5, 6:3, 100:20, 101:17
**205580**
84:20
**208194**
58:3
**20850**
101:25
**21**
65:15
**212.237**
3:16
**212.906**
3:9
**212209**
20:10

**23**
4:19
**235**
95:4, 95:8, 95:15, 95:24
**24**
1:11, 6:1, 68:15, 70:3, 100:11
**27**
101:21

---
**3**
---

**30**
4:18, 15:22, 24:3, 24:10, 25:5, 33:17, 33:19, 95:20, 96:24, 100:34, 101:2
**302.22**
65:16
**31**
54:4, 54:9, 63:24, 101:21
**324**
73:10, 78:25, 82:23
**325**
84:14
**3253**
101:20
**329**
85:20
**331**
81:4
**335**
89:21
**35**
4:22
**367**
94:5
**368**
94:24
**39**
25:7, 34:6, 34:9

---
**4**
---

**40**
25:7, 34:19,

34:21
**400**
76:24, 77:1, 77:4, 77:20, 77:23, 81:22, 86:3, 101:24
**41**
35:8, 35:10
**451**
101:23
**4ml**
73:17

---
**5**
---

**50**
4:24, 96:22
**505**
20:16, 21:9, 21:15, 55:8, 56:10, 56:14
**51**
2:5, 98:1
**56**
3:14, 4:27

---
**6**
---

**611396**
1:30
**64**
4:29
**65**
1:11, 6:1, 100:11
**686**
101:22

---
**7**
---

**7**
2:5
**72**
4:33

---
**8**
---

**8**
6:4, 49:24, 49:25
**888.433**
101:26

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari
Conducted on December 10, 2025

126

**888.503**
101:27

**9**

**9**
49:23, 50:2,
78:17, 78:18
**97**
4:8
**98**
4:10
**99**
4:12

# Exhibit 6

**Redacted Public Version**



**Planet Depos**
*We Make It Happen™*

**HIGHLY CONFIDENTIAL**

# Transcript of Harish Chinnari, Volume 2

**Date:** December 11, 2025
**Case:** Eagle Pharmaceuticals, Inc., et al. -v- Apotex/Slayback/Baxter Healthcare

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS, )
INC., and EAGLE SUB 1 )
LLC, )
                      )
    Plaintiffs, )
                      )
VS. )
                      ) C.A. NO.: 24-65-JLH
SLAYBACK PHARMA LLC and )
AZURITY )
PHARMACEUTICALS, INC., )
                      )
    Defendants. )

------------------------------------

ORAL, REALTIMED, VIDEOTAPED DEPOSITION OF

HARISH CHINNARI

HIGHLY CONFIDENTIAL - VOLUME 2 OF 2

DECEMBER 11, 2025

TAKEN VIA ZOOM VIDEOCONFERENCE

------------------------------------

JOB NO.: 611397

PAGES: 102 - 179

REPORTED STENOGRAPHICALLY BY:

ANNETTE PELTIER, CSR, CRR

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025          103

ORAL, REALTIMED, VIDEOTAPED DEPOSITION OF
HARISH CHINNARI, produced as a witness at the
instance of the Plaintiffs, and duly sworn, was
taken in the above-styled and numbered cause on
DECEMBER 11, 2025, from 7:04 a.m. to 9:16 a.m.
Central time, before Annette Peltier, CSR, Texas
Certified Realtime Reporter, in and for the
State of Texas, reported by machine shorthand
pursuant to the Federal Rules of Civil Procedure
and the provisions stated on the record or
attached hereto.

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025

104

                    A P P E A R A N C E S


ON BEHALF OF THE PLAINTIFFS:

          RAMYA SRI VALLABHANENI, ESQUIRE
          Latham Watkins
          1271 Avenue of the Americas
          New York, NY 10020
          212.906.1200


ON BEHALF OF THE DEFENDANTS:

          JASON LEIF, ESQUIRE
          Windels Marx
          156 West 56th Street
          New York, NY 10019
          212.237.1061


ALSO PRESENT:

          Nick Heisler, Videographer
          Josh Chastain, Zoom Tech

RECEIVING REALTIME:

          MS. Vallabhaneni

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025                    105

                        Index
                                                Page

Appearances.............................. 104

Continued Examination by Ms. Vallabhaneni 106

Adjournment.............................. 177

Signature Page........................... 178

Court Reporter's Certificate............. 179

                     Exhibits
Number      Description                     Page

Exhibit 9   2.3P Drug Product
            SLAY-VIVIMUSTA0000322......... 109

Exhibit 10  Bio-Waiver Request
            SLAY-VIVMUS0000096............ 115

Exhibit 11  Biowaiver request -
            Annexure 1
            SLAY-VIVMUS0000094............ 118

Exhibit 12  Technical Summary Report
            SLAY-VIVMUS0000098............ 120

Exhibit 13  Manufacturing Process Development
            Portion of the NDA for
            Slayback's NDA Product
            SLAY-VIVMUS0000691............ 141

Exhibit 14  2.3.P Drug Product
            SLAY-VIVMUS0000243............ 147

Exhibit 15  Batch Manufacturing Record
            SLAY-VIVMUS0137635............ 154

Exhibit 16  Technical Summary Report
            SLAY-VIVMUS0071382............ 157

Exhibit 17  Manufacturing Composition and
            Procedure
            SLAY-VIVMUS0047232............ 160

Exhibit 18  Label for Vivimusta
            SLAY-VIVMUS0011500............ 166

THE VIDEOGRAPHER:  Here begins media number one in the videotaped deposition of Harish Chinnari, continued.

The date is December 12 -- excuse me, December 11th, 2025, and the time on the video monitor is 7:04 a.m.

Our court reporter may now swear in the witness and we'll proceed.

THE COURT REPORTER:  We're not swearing in the witness because he's already sworn.

HARISH CHINNARI, CONTINUED
Having been previously duly sworn, continued to testify upon his oath as follows:

CONTINUED EXAMINATION
BY MS. VALLABHANENI:

Q.  Good morning -- or good evening, Mr. Chinnari.  I hope you had a good day of rest?

A.  Good morning.  Thank you, yes.

Q.  Before we get started, I just want to confirm:  Did you speak to anyone or to your lawyers about the substance of your testimony yesterday?

A.  No.

Q.  Okay.  Could we --                           07:04:51

MS. VALLABHANENI:  Josh, do you                  07:04:55
mind bringing up the document labeled tab 8?  I  07:04:56
think it was marked as an exhibit yesterday.     07:05:01

EXHIBIT TECH:  So you don't want                 07:05:06
this marked today?                               07:05:08

MS. VALLABHANENI:  No.                           07:05:10

EXHIBIT TECH:  Understood.  Tab 8                07:05:12
is on screen.                                    07:05:14

MS. VALLABHANENI:  Sorry.  Jason,                07:05:22
did you say something?                           07:05:23

MR. LIEF:  Yeah, I'm sorry, which                07:05:24
exhibit is this?  You said "tab 8."  Was it      07:05:26
marked?                                          07:05:29

MS. VALLABHANENI:  Yeah, it was                  07:05:30
marked.                                          07:05:31

Josh, there's a marked version.                  07:05:32
Could we -- I don't remember the exhibit number. 07:05:35
It could be Exhibit 7.                           07:05:38

EXHIBIT TECH:  I don't have the                  07:05:40
marked exhibits from yesterday.  I just have the 07:05:41
original documents that were provided.  I can -- 07:05:44
I can put my own Exhibit 7 marking on it, if     07:05:47
you'd like.                                      07:05:50

MS. VALLABHANENI:  Okay.  We'll                  07:05:52

just -- Jason, I'm just going to remark it then.                    07:05:53

MR. LIEF:  That makes sense.                    07:05:55

MS. VALLABHANENI:  Okay.  Yeah,                    07:05:57
we'll start from -- can you please mark this as                    07:05:58
Exhibit 9?                    07:06:00

(Whereupon Exhibit Number 9 was                    07:06:08
marked for identification.)                    07:06:10

MS. VALLABHANENI:  And just for                    07:06:10
the record, this is a document with the starting                    07:06:11
Bates number SLAY-VIVIMUSTA0000322.                    07:06:16

And if you can blow this up, Josh.                    07:06:24

Okay.                    07:06:29

Q.   (BY MS. VALLABHANENI)  Okay, Mr. Chinnari,                    07:06:32
do you see the document in front of you labeled                    07:06:34
"2.3.P Drug Product"?                    07:06:37

A.   Yes.  Can you please put this document in                    07:06:40
the chat, as well?                    07:06:42

Q.   Sure.                    07:06:45

EXHIBIT TECH:  Okay.  The document                    07:07:17
has been uploaded to the chat.                    07:07:18

07:07:23

07:07:25

07:07:28

07:07:33

07:08:16

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

110

07:09:46

07:09:50

07:09:55

07:09:55

07:10:00

07:10:04

07:10:08

07:10:14

07:10:19

07:10:20

07:10:21

07:10:27

07:10:34

07:10:40

07:10:40

07:10:56

07:10:58

07:11:00

07:11:01

07:11:03

07:11:04

07:11:09

07:11:14

07:11:17

07:11:28

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025                    111

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

113

07:14:18
07:14:24
07:14:26
07:14:28
07:14:30
07:14:34
07:14:35
07:14:49
07:14:51
07:14:57
07:15:01
07:15:03
07:15:10
07:15:11
07:15:12
07:15:14
07:15:22
07:15:25
07:15:30
07:15:31
07:15:32
07:15:36
07:15:39
07:15:41
07:15:45

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025                    114

Q.  Okay.

            MS. VALLABHANENI:  You can take that document down.

            If you can pull up tab 34, and we'll mark this as Chinnari Exhibit 10.

            And for the record, this is a document with beginning Bates number

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025                          115

SLAY-VIVMUS0000096.                                     07:17:21

                    And if you can also put this in    07:17:27

the chat for Mr. Lief and Mr. Chinnari.                07:17:29

                    (Whereupon Exhibit Number 10 was   07:17:33

            marked for identification.)                07:17:55

            EXHIBIT TECH:  Document is on              07:17:55

screen.                                                07:17:57

            MS. VALLABHANENI:  Thank you.  If          07:17:57

you can zoom in, please, Josh.  Thank you.             07:18:03

    Q.  (BY MS. VALLABHANENI)  Okay.                   07:18:11

Mr. Chinnari, do you recognize this document?          07:18:14

    A.  Yes.                                           07:18:37

                                                       07:18:37

                                                       07:18:42

                                                       07:18:46

                                                       07:18:49

                                                       07:18:51

                                                       07:18:59

                                                       07:19:01

                                                       07:19:01

                                                       07:19:03

                                                       07:19:05

                                                       07:19:08

                                                       07:19:10

                                                       07:19:10

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025                117

Q.  Okay.  Okay.

MS. VALLABHANENI:  Can we pull up

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025
118

tab 18 and we can mark that as Chinnari

Exhibit 11?

EXHIBIT TECH:  Stand by.

(Whereupon Exhibit Number 11 was

marked for identification.)

MS. VALLABHANENI:  And for the

record, this is a document with beginning Bates

number SLAY-VIVMUS0000094.

And Josh, if you can just blow up

the document a little.  Thank you.

Q.  (BY MS. VALLABHANENI)  Mr. Chinnari, do

you recognize this document?

A.  Yes, I do.

07:22:11
07:22:16
07:22:17
07:22:18
07:22:19
07:22:19
07:22:20
07:22:23
07:22:46
07:22:50
07:22:52
07:22:56
07:23:33
07:23:34
07:23:38
07:23:40
07:23:42
07:23:46
07:23:52
07:23:54
07:23:56
07:24:01
07:24:06
07:24:07
07:24:11

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

119

MS. VALLABHANENI:  If we can pull up tab 19, and we can mark that as Chinnari Exhibit 12.

EXHIBIT TECH:  Stand by.

(Whereupon Exhibit Number 12 was marked for identification.)

MS. VALLABHANENI:  And for the record, this is a document with beginning Bates number SLAY-VIVMUS0000098.

Q.  (BY MS. VALLABHANENI)  Mr. Chinnari, do you recognize this document?

A.  Yes, I do.

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025                    121

07:27:33
07:27:33
07:27:36
07:27:38
07:27:41
07:27:42
07:27:45
07:27:50
07:27:51
07:27:56
07:27:56
07:28:02
07:28:05
07:28:07
07:28:12
07:28:18
07:28:21
07:28:27
07:28:29
07:28:35
07:28:38
07:28:41
07:28:42
07:28:47
07:28:50

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025                    122

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025                    123

07:30:06

07:30:07

07:30:08

07:30:15

07:30:17

07:30:22

07:30:25

07:30:33

07:30:33

07:30:39

07:30:40

07:30:43

07:30:46

07:30:48

07:30:49

07:30:50

07:31:08

07:31:11

07:31:11

07:31:17

07:31:21

07:31:21

07:31:24

07:31:25

07:31:29

124

07:31:43
07:31:44
07:31:46
07:32:13
07:32:15
07:32:21
07:32:23
07:32:26
07:32:28
07:32:31
07:32:32
07:32:33
07:32:36
07:32:38
07:32:39
07:32:39
07:32:41
07:32:43
07:32:45
07:32:46
07:32:46
07:32:49
07:32:52
07:33:13
07:33:15

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025                    125

07:33:16

07:33:21

07:33:22

07:33:26

07:33:30

07:33:33

07:33:36

07:33:37

07:33:40

07:33:48

07:33:51

07:33:55

07:34:00

07:34:03

07:34:04

07:34:08

07:34:13

07:34:17

07:34:30

07:34:31

07:34:35

07:34:43

07:34:47

07:34:50

07:34:55

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

127

07:36:36
07:36:39
07:36:41
07:36:45
07:36:46
07:36:46
07:36:47
07:36:49
07:36:54
07:36:57
07:37:01
07:37:01
07:37:02
07:37:04
07:37:10
07:37:19
07:37:20
07:37:23
07:37:26
07:37:27
07:37:29
07:37:32
07:37:34
07:37:36
07:37:39

07:37:44

07:37:46

07:37:48

07:37:52

07:37:53

07:37:57

07:38:00

07:38:02

07:38:08

07:38:10

07:38:10

07:38:11

07:38:11

07:38:12

07:38:16

07:38:16

07:38:20

07:38:23

07:38:28

07:38:33

07:38:35

07:38:40

07:38:44

07:38:51

07:38:53

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025

131

07:41:43

07:41:46

07:41:48

07:41:49

07:41:51

07:41:55

07:41:57

07:42:00

07:42:03

07:42:03

07:42:06

07:42:11

07:42:15

07:42:18

07:42:21

07:42:27

07:42:28

07:42:31

07:42:32

07:42:34

07:42:38

07:42:43

07:42:47

07:42:51

07:42:52

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

132

07:42:55
07:42:58
07:43:03
07:43:04
07:43:11
07:43:14
07:43:20
07:43:24
07:43:28
07:43:36
07:43:41
07:43:45
07:43:50
07:43:53
07:43:57
07:43:59
07:44:04
07:44:09
07:44:14
07:44:17
07:44:22
07:44:25
07:44:28
07:44:31
07:44:31

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025                    133

07:44:37
07:44:41
07:44:46
07:44:49
07:44:52
07:44:54
07:44:58
07:45:02
07:45:06
07:45:07
07:45:10
07:45:12
07:45:14
07:45:14
07:45:16
07:45:20
07:45:24
07:45:30
07:45:35
07:45:43
07:45:46
07:45:49
07:45:51
07:45:54
07:45:56

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025

135

07:47:54

07:47:56

07:47:58

07:48:07

07:48:10

07:48:13

07:48:18

07:48:24

07:48:28

07:48:34

07:48:37

07:48:42

07:48:47

07:48:50

07:48:53

07:48:57

07:48:58

07:49:04

07:49:07

07:49:09

07:49:11

07:49:18

07:49:20

07:49:22

07:49:24



MS. VALLABHANENI: Can we -- we can -- we can take this document down.

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

137

If we can pull up tab eight, which I believe is Chinnari Exhibit 9 again...

EXHIBIT TECH:  Exhibit 9 is up.

MS. VALLABHANENI:  Thank you.  If you can turn to page ending in 395, and if you can blow up the chart a little bit further.

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025                                    138

07:53:07

07:53:10

07:53:14

07:53:18

07:53:24

07:53:45

07:53:49

07:53:50

07:53:54

07:54:00

07:54:03

07:54:12

07:54:14

07:54:16

07:54:16

07:54:27

07:54:30

07:54:32

07:54:33

07:54:36

07:54:41

07:54:49

07:54:52

07:54:57

07:55:01

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

07:55:03

07:55:07

07:55:10

07:55:14

07:55:19

07:55:20

07:55:23

07:55:31

07:55:35

07:55:43

07:55:49

07:55:51

07:55:54

07:55:58

07:56:06

07:56:10

07:56:19

07:56:23

07:56:27

07:56:31

07:56:35

07:56:46

07:56:50

07:56:53

07:56:57

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

07:57:01
07:57:04
07:57:06
07:57:08
07:57:24
07:57:34
07:57:43
07:57:49
07:57:54
07:57:54
07:57:58
07:58:12
07:58:22
07:58:25
07:58:29
07:58:31
07:58:32
07:58:37
07:58:46
07:58:53
07:58:56
07:59:01
07:59:04
07:59:06
07:59:15

MS. VALLABHANENI:  You can take this down.

If we can pull up tab 35.

EXHIBIT TECH:  Stand by.

MS. VALLABHANENI:  And I think we can mark this as Chinnari Exhibit 12; is that right?

MR. LIEF:  I think it's 13.

MS. VALLABHANENI:  13.

(Whereupon Exhibit Number 13 was marked for identification.)

MS. VALLABHANENI:  And for the record, this is a document with beginning Bates number SLAY-VIVMUS0000691.

MR. LIEF:  If you could put it in the chat.  Thanks.

Q.  (BY MS. VALLABHANENI)  Mr. Chinnari, do you recognize this document?

A.  Yes.

08:03:14

08:03:17

08:03:22

08:03:27

08:03:31

08:03:34

08:03:36

08:03:39

08:03:44

08:03:46

08:03:47

08:03:50

08:03:55

08:03:55

08:03:56

08:04:02

08:04:06

08:04:11

08:04:12

08:04:15

08:04:19

08:04:24

08:04:28

08:04:28

08:04:32

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

144

08:04:33
08:04:37
08:04:43
08:04:46
08:04:47
08:04:51
08:04:54
08:04:58
08:04:59
08:05:05
08:05:07
08:05:08
08:05:12
08:05:16
08:05:17
08:05:17
08:05:24
08:05:27
08:05:28
08:05:30
08:05:33
08:05:37
08:05:39
08:05:40
08:05:41

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025                    145

08:07:10

08:07:15

08:07:17

08:07:21

08:07:26

08:07:32

08:07:33

08:07:34

08:07:36

08:07:41

08:07:44

08:07:49

08:07:49

08:07:59

08:08:01

08:08:02

08:08:04

08:08:06

08:08:07

08:08:11

08:08:14

08:08:19

08:08:20

08:08:20

08:08:22

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025                    147

[REDACTED]

[REDACTED]

[REDACTED]

MS. VALLABHANENI:  We can take that document down.

I think now would be time for maybe a five-minute break.

MR. LIEF:  Five minutes?  Did you want 10?

MS. VALLABHANENI:  That's fine.

MR. LIEF:  Yeah.

THE VIDEOGRAPHER:  Off the record at 8:09.

(Break taken from 8:09 a.m. to 8:19 a.m.)

THE VIDEOGRAPHER:  Back on the record at 8:19.

Q.  (BY MS. VALLABHANENI)  Welcome back, Mr. Chinnari.

A.  Thank you.

MS. VALLABHANENI:  Could we please pull up tab 36, and we can mark that as Chinnari Exhibit 14.

EXHIBIT TECH:  Stand by.

(Whereupon Exhibit Number 14 was

marked for identification.)

MS. VALLABHANENI:  And for the record, this is a document with beginning Bates number SLAY-VIVMUS0000243.

EXHIBIT TECH:  Document is up, and sending to the chat now.

MS. VALLABHANENI:  Josh, can you blow this up a little bit when you get a chance? Thank you.

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

08:23:21

08:23:23

08:23:29

08:23:34

08:23:34

08:23:35

08:23:36

08:23:37

08:23:38

08:23:55

08:24:01

08:24:02

08:24:08

08:24:15

08:24:15

08:24:16

08:24:23

08:24:28

08:24:45

08:24:48

08:24:49

08:24:52

08:24:56

08:24:56

08:25:02

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025                                150

08:25:03

08:25:06

08:25:10

08:25:10

08:25:14

08:25:21

08:25:23

08:25:26

08:25:27

08:25:28

08:25:29

08:25:30

08:25:31

08:25:34

08:25:35

08:25:38

08:25:43

08:25:44

08:25:45

08:25:51

08:25:52

08:25:53

08:25:54

08:25:56

08:25:56

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025                    151

08:25:57

08:26:00

08:26:01

08:26:02

08:26:07

08:26:09

08:26:09

08:26:12

08:26:16

08:26:21

08:26:33

08:26:38

08:26:43

08:26:48

08:26:50

08:26:57

08:26:58

08:26:59

08:27:04

08:27:09

08:27:10

08:27:14

08:27:14

08:27:17

08:27:21

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

152

08:27:25

08:27:27

08:27:28

08:27:32

08:27:36

08:27:38

08:27:39

08:27:43

08:27:48

08:27:51

08:27:54

08:27:57

08:27:59

08:28:01

08:28:04

08:28:06

08:28:25

08:28:26

08:28:27

08:28:34

08:28:34

08:28:39

08:28:41

08:28:45

08:28:50

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025                    153

08:28:53

08:28:58

08:29:00

08:29:01

08:29:02

08:29:07

08:29:10

08:29:16

08:29:17

08:29:23

08:29:31

08:29:33

08:29:38

08:29:41

08:29:45

08:29:46

08:29:50

08:29:54

08:29:54

08:29:59

08:30:03

08:30:06

08:30:08

08:30:10

08:30:13

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025                    154

Q.  Okay.

MS. VALLABHANENI:  We can take this down.

If you can pull up tab 37 and we'll mark it as Exhibit 15, please.

(Whereupon Exhibit Number 15 was marked for identification.)

EXHIBIT TECH:  Stand by.

MS. VALLABHANENI:  And just for the record, this is a document with beginning Bates number SLAY-VIVMUS0137635.

EXHIBIT TECH:  Exhibit is on screen.

MS. VALLABHANENI:  Thank you.

Q.  (BY MS. VALLABHANENI)  Mr. Chinnari, do you recognize this document?

A.  Yes.

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025                    155

08:32:12

08:32:13

08:32:16

08:32:21

08:32:22

08:32:24

08:32:25

08:32:37

08:32:47

08:32:48

08:32:53

08:32:54

08:32:54

08:32:56

08:33:01

08:33:09

08:33:09

08:33:13

08:33:16

08:33:24

08:33:26

08:33:28

08:33:30

08:33:34

08:33:38

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

156

08:33:43

08:33:46

08:33:50

08:33:55

08:33:58

08:34:02

08:34:03

08:34:07

08:34:11

08:34:11

08:34:16

08:34:17

08:34:20

08:34:28

08:34:31

08:34:32

08:34:36

08:34:38

08:34:43

08:34:43

08:34:44

08:34:46

08:34:49

08:34:53

08:34:58

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025                    157

Q.  Okay.

            MS. VALLABHANENI:  We can take that down.

            If you can please pull up tab 30, and we can mark that as Chinnari Exhibit 16.

            EXHIBIT TECH:  Stand by.

            (Whereupon Exhibit Number 16 was marked for identification.)

            MS. VALLABHANENI:  And for the record, this is a document with beginning Bates number SLAY-VIVMUS0071382.

Q.  (BY MS. VALLABHANENI)  Mr. Chinnari, do you recognize this document?

A.  Yes, I recognize.

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025                    158

08:36:52

08:36:55

08:37:09

08:37:10

08:37:14

08:37:15

08:37:23

08:37:27

08:37:30

08:37:33

08:37:35

08:37:39

08:37:42

08:37:43

08:37:50

08:37:53

08:37:56

08:38:04

08:38:06

08:38:07

08:38:08

08:38:15

08:38:16

08:38:21

08:38:21

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025                    159

Q.   (BY MS. VALLABHANENI)   Okay.

        MS. VALLABHANENI:  You can take that down.

        Let's pull up tab 32, and we can mark that as Chinnari Exhibit 17.

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025                    160

EXHIBIT TECH:  Stand by.

(Whereupon Exhibit Number 17 was

marked for identification.)

MS. VALLABHANENI:  And for the

record this is a document with beginning Bates

number SLAY-VIVMUS0047232.

EXHIBIT TECH:  Document is on

screen.

Q.  (BY MS. VALLABHANENI)  Mr. Chinnari, do

you recognize this document?

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

161

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

162

08:43:37

08:43:41

08:43:43

08:43:45

08:43:46

08:43:49

08:43:54

08:44:00

08:44:08

08:44:10

08:44:13

08:44:14

08:44:15

08:44:19

08:44:21

08:44:29

08:44:30

08:44:33

08:44:33

08:44:38

08:44:44

08:44:47

08:44:53

08:44:54

08:44:55

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025                                          163

08:44:59

08:45:04

08:45:13

08:45:18

08:45:21

08:45:25

08:45:25

08:45:31

08:45:32

08:45:33

08:45:34

08:45:37

08:45:42

08:45:43

08:45:51

08:45:54

08:46:01

08:46:06

08:46:12

08:46:13

08:46:14

08:46:18

08:46:21

08:46:22

08:46:22

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025                    164

08:46:25

08:46:30

08:46:31

08:46:32

08:46:35

08:46:39

08:46:40

08:46:41

08:46:42

08:46:43

08:46:45

08:46:50

08:46:54

08:46:58

08:47:00

08:47:06

08:47:06

08:47:06

08:47:11

08:47:15

08:47:17

08:47:21

08:47:21

08:47:26

08:47:32

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025                        165

08:47:36
08:47:38
08:47:41
08:47:46
08:47:48
08:47:50
08:47:58
08:48:06
08:48:07
08:48:10
08:48:16
08:48:19
08:48:23
08:48:28
08:48:31
08:48:36
08:48:41
08:48:42
08:48:51
08:48:53
08:48:54
08:48:55
08:48:58
08:49:04
08:49:07

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025

166

███████████████████████████████████

████████████████████████████████

████████

Q.  Okay.

MS. VALLABHANENI:  You can take that down.

If we can pull up tab Number 38, and we can mark it as Exhibit 18.

(Whereupon Exhibit Number 18 was marked for identification.)

EXHIBIT TECH:  Stand by.

MS. VALLABHANENI:  For the record, this is a document with beginning Bates number SLAY-VIVMUS0011500.

EXHIBIT TECH:  Document is on screen.

MS. VALLABHANENI:  And if you can blow up the first half of this document.

Q.  (BY MS. VALLABHANENI)  And Mr. Chinnari, have you seen this document before?

A.  This seems to be the label for Vivimusta.

Q.  Okay.  And do you understand this to be the approved label for Vivimusta?

MR. LIEF:  Objection.

A.  This label is dated February 2024.

Q.   (BY MS. VALLABHANENI)  And do you know if the Vivimusta was approved at that time?

A.   Yes, of course.

Q.   Okay.  So on the first page under "Indications and Usage," it says:  "Vivimusta is an alkylating drug indicated for treatment of patients with" one, "chronic lymphocytic leukemia (CLL)"; and then the second bullet says, "Indolent B-cell non-Hodgkin's lymphoma, (NHL)."

Did I read that right?

A.   Yes.  They are the indications as listed on the label.

Q.   Okay.  And do you understand that these are the same indications listed for Belrapzo?

A.   I believe so, but I need to cross-check the label.

Q.   Okay.

MS. VALLABHANENI:  If we can go to page ending in 514... there's a section called "11, Description."

Q.   (BY MS. VALLABHANENI)  Do you see that?

A.   Yes, I can.

Q.   Okay.  And then the first paragraph describes bendamustine hydrochloride and the

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025                    168

chemical name, and then it actually lists the                08:53:30

structure of it, right?                                      08:53:33

    A.  That's right.                                        08:53:37

    Q.  Okay.  And then underneath that structure            08:53:38

there's a paragraph that reads, "Vivimusta"...               08:53:41

"is intended for intravenous use after dilution              08:53:44

with either 0.9 percent sodium chloride                      08:53:48

injection, USP or 2.5 percent                                08:53:53

dextrose/0.45 percent sodium chloride injection,             08:53:58

USP.  It is supplied as a" clear -- "as a                    08:54:03

sterile, clear, and colorless to yellow solution             08:54:06

in a clear glass multiple-dose vial.  Each                   08:54:08

milliliter contains 25 milligrams of                         08:54:13

bendamustine hydrochloride equivalent to 22.7 mg             08:54:16

of bendamustine, 5 mg of monothioglycerol, 39.45             08:54:21

mg"... "of absolute alcohol and q.s to 1                     08:54:28

milliliter polyethylene glycol 400.  Sodium                  08:54:32

hydroxide is used to adjust pH of polyethylene               08:54:38

glycol 400."                                                 08:54:44

        Did I read that right?                               08:54:45

    A.  Yes.                                                  08:54:46

    Q.  And so this paragraph describes all the              08:54:46

different components of Vivimusta; is that                    08:54:49

right?                                                       08:54:49

    A.  That's right; but as I told you, ██████              08:55:04

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025                        169

Q. Okay. You have no -- so this -- this isn't the approved label for Vivimusta currently, right?

MR. LIEF: Objection to the form.

A. Yes, this label is dated February 2024.

Q. (BY MS. VALLABHANENI) Okay. All right.

MS. VALLABHANENI: You can take that down.

Q. (BY MS. VALLABHANENI) Mr. Chinnari, do you know what the approved indications are for Bendeka?

A.   I need to verify this from the label, but what I know is the indications seems to be same.

Q.   (BY MS. VALLABHANENI)  And you understand Bendeka is a liquid solution, right?

A.   That's right.

Q.   Okay.  Do you know if it needs to be diluted?

A.   Yes.

Q.   Okay.  Do you know when the product became available on the market, the U.S. market?

A.   I don't remember the date.

Q.   Okay.  Are you familiar with the drug Treanda?

A.   Yes.

Q.   Do you know what the approved indications are for Treanda?

MR. LIEF:  Scope.

A.   I don't remember.

Q.   (BY MS. VALLABHANENI)  Okay.  And do you know if Treanda is a powder or liquid solution?

A.   If I remember right, Treanda had two presentations; one was a lyophilized powder, and one was a liquid composition; but the liquid composition was withdrawn or discontinued later.

Q.   Are you familiar with Breckenridge

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025                    171

Pharma's generic bendamustine product?    08:58:09

A.  Can you repeat?    08:58:12

Q.  Sure.    08:58:13

Have you heard of Breckenridge Pharma?    08:58:14

A.  I didn't get that, actually.    08:58:21

Q.  Sorry, say that again?    08:58:22

A.  I didn't really get that.    08:58:26

Q.  Sure.    08:58:27

(Talking over each other.)    08:58:27

Q.  (BY MS. VALLABHANENI)  Breckenridge,    08:58:28
B-R-E-C-K-E-N-R-I-D-G-E.    08:58:29

A.  No, I'm not aware of this.    08:58:36

Q.  Okay.  Are you familiar with Dr. Reddy's    08:58:38
generic bendamustine product?    08:58:47

MR. LIEF:  Objection, scope.    08:58:49

A.  I'm not familiar.  I know they have a    08:58:57
product, but I'm not familiar with their    08:58:59
product.    08:59:02

Q.  (BY MS. VALLABHANENI)  Do you know if it's    08:59:02
a powder or liquid product?    08:59:04

A.  It should be a liquid, from my    08:59:15
understanding.    08:59:17

Q.  Do you know what the approved indications    08:59:17
are for that product?    08:59:19

MR. LIEF:  Objection, scope.    08:59:21

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025                    172

A.  No.                                                         08:59:22

Q.  (BY MS. VALLABHANENI)  Okay.                                08:59:22

A.  No.                                                         08:59:23

Q.  Are you familiar with Hospira's generic                    08:59:24
bendamustine product?                                          08:59:31

A.  No.  I haven't gone through the production                  08:59:34
reports.                                                        08:59:39

Q.  Okay.  What about Eugia Pharma's generic                   08:59:39
product?                                                        08:59:43

A.  No.                                                         08:59:46

Q.  Norvium Biosciences generic bendamustine                   08:59:46
product?                                                       08:59:53

A.  No, I'm not aware.                                          08:59:56

Q.  Okay.  How about Apotex's generic                          08:59:57
bendamustine product?                                          09:00:04

A.  No.                                                         09:00:06

Q.  Okay.  Baxter Healthcare's generic                         09:00:07
bendamustine product?                                          09:00:15

A.  No.                                                         09:00:16

Q.  Do you know if any of the products that we                 09:00:17
just talked about can be substituted for                       09:00:32
Slayback's bendamustine-based product?                         09:00:37

          MR. LIEF:  Objection, scope.                         09:00:40

A.  No, I don't know.                                           09:00:46

Q.  (BY MS. VALLABHANENI)  Okay.  Do you know                  09:00:47

what an anti-CD20 antibody is?          09:00:48

          MR. LIEF:  Objection, scope.          09:00:54

     A.  No.          09:00:55

     Q.  (BY MS. VALLABHANENI)  Do you know what          09:00:56
they do?          09:00:57

     A.  No, I don't know.          09:00:59

     Q.  Okay.  Do you know if these anti-CD20          09:01:00
antibodies can be substituted for a          09:01:04
bendamustine-based formulation?          09:01:07

     A.  I'm not aware.          09:01:13

     Q.  Okay.  Do you know what a BTK inhibitor          09:01:14
is?          09:01:19

     A.  No.  I am not a physician.          09:01:23

     Q.  Okay.  Do you know what a PI3K inhibitor          09:01:25
is?          09:01:29

     A.  No.          09:01:31

     Q.  What about a Bcl-2 inhibitor?          09:01:31

     A.  No.          09:01:37

     Q.  Okay.  Do you know if any of these three          09:01:37
inhibitors I just mentioned are equivalent          09:01:41
treatment options to a bendamustine-containing          09:01:45
formulation?          09:01:47

          MR. LIEF:  Objection, scope.          09:01:49

     A.  No, I'm not aware.          09:01:53

     Q.  (BY MS. VALLABHANENI)  Okay.  Do you know          09:01:54

what a CAR T cell therapy is?    09:02:00

A.   No.    09:02:07

Q.   Do you know if CAR T cell therapy and a bendamustine-containing formulation are equivalent treatment options for patients with NHL and CLL?    09:02:08 / 09:02:14 / 09:02:17 / 09:02:22

MR. LIEF:  Objection, scope.    09:02:23

A.   No, I'm not aware.    09:02:28

Q.   (BY MS. VALLABHANENI)  Okay.    09:02:30

A.   I'm not a physician.    09:02:30

Q.   Do you know what an antibody drug conjugate is?    09:02:31 / 09:02:34

A.   No.    09:02:37

Q.   What about a T-cell engager?    09:02:38

A.   No.    09:02:46

Q.   Monoclonal antibody?    09:02:46

A.   No.    09:02:50

Q.   Okay.  So do you know if any of the three things we just talked about, ANTIBODY DRUG CONJUGATE, T-cell engager, or a monoclonal antibody and a bendamustine-containing formulation are equivalent treatment options for patients with NHL and CLL?    09:02:51 / 09:02:54 / 09:02:59 / 09:03:05 / 09:03:06 / 09:03:09

MR. LIEF:  Objection, scope.    09:03:12

A.   No, I really don't know.  So I'm not a    09:03:13

physician, I cannot answer these questions.

Q.  (BY MS. VALLABHANENI)  Okay.  Have you heard of an immunotherapy drug called Keytruda?

A.  No.

Q.  Okay.  Do you know if immunotherapy drugs like Keytruda and others are -- and a bendamustine-containing formulation are equivalent treatment options?

MR. LIEF:  Objection, scope.

A.  No, I don't know.  I'm not a physician.

Q.  (BY MS. VALLABHANENI)  Are you familiar generally with chemotherapy drugs?

A.  I don't understand what is chemotherapy, but specific to what, I don't --

Q.  Okay.

A.  -- know what you're asking.

Q.  Sure.

Do you know if certain chemotherapy drugs and a bendamustine-containing formulation are equivalent treatment options for patients with NHL and CLL?

MR. LIEF:  Objection, scope.

A.  No, I don't know.

Q.  (BY MS. VALLABHANENI)  Okay.

MS. VALLABHANENI:  I think we can

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025                    176

take a very quick five-minute break and then come back on.

THE WITNESS:  Ten minutes, please.

MS. VALLABHANENI:  Sure.

THE VIDEOGRAPHER:  All right.  Off the record at 9:04.

(Break taken from 9:04 a.m. to 9:14 a.m.)

THE VIDEOGRAPHER:  Back on the record at 9:14.

MS. VALLABHANENI:  I have no further questions.  So thank you, doctor -- Mr. Chinnari.

THE WITNESS:  Thank you.

MR. LIEF:  I will first note, for the record, that we did invite questions regarding ██████████████████████ ████████████████████████████████ ██████████████████████████████ ████████████████████████████████ ██████

I have no questions at this time.

MS. VALLABHANENI:  Okay.

THE VIDEOGRAPHER:  All right.  If there's nothing further, I will go ahead and

take us off the record.    09:15:23

This concludes the video recorded    09:15:24
deposition of Harish Chinnari.  Off the record    09:15:27
at 9:15 a.m.    09:15:30

(Deposition concluded.)    09:15:36

(Discussion about video orders.)    09:15:57

MR. LIEF:  We'll take whatever    09:15:57
they take on that and similarly on the    09:15:58
transcript.    09:16:00

(Deposition concluded.)

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025    178

    I, HARISH CHINNARI, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.


                    _____
                    HARISH CHINNARI


THE STATE OF _____)

COUNTY OF _____)


    Before me, _____, on

this day personally appeared HARISH CHINNARI,

known to me (or proved to me under oath or

through _____)

(description of identity card or other document)

to be the person whose name is subscribed to the

foregoing instrument and acknowledged to me that

they executed the same for the purposes and

consideration therein expressed.

    Given under my hand and seal of office this

_____ day of _____,

_____.


                    _____
                    NOTARY PUBLIC IN AND FOR
                    THE STATE OF _____
                    COMMISSION EXPIRES: _____

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025          179

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS,    )
INC., and EAGLE SUB 1     )
LLC,                      )
                          )
     Plaintiffs,          )
                          )
VS.                       )
                          ) C.A. NO.: 24-65-JLH
SLAYBACK PHARMA LLC and   )
AZURITY                   )
PHARMACEUTICALS, INC.,    )
                          )
     Defendants.          )

REPORTER'S CERTIFICATION
DEPOSITION OF HARISH CHINNARI - Volume 2 of 2
DECEMBER 11, 2025

I, Annette Peltier, Certified Shorthand

Reporter in and for the State of Texas, hereby

certify to the following:

That the witness, HARISH CHINNARI, was duly

sworn by the officer and that the transcript of

the oral deposition is a true record of the

testimony given by the witness;

That the original deposition was delivered to

Ms. Vallabhaneni, Custodial Attorney.

That a copy of this certificate was served on

all parties shown herein on _____.

I further certify that pursuant to FRCP Rule

30(e)(1) that the signature of the deponent:

XXX was requested by the deponent or a party

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025                    180

before the completion of the deposition and that
signature is to be returned within 30 days from
the date of receipt of the transcript.  If
returned, the attached changes and signature
page contains any changes and the reasons
therefore.

____ was not requested by the deponent or
party before the completion of the deposition.

I further certify that I am neither counsel
for, related to, nor employed by any of the
parties or attorneys in the action in which this
testimony was taken.  Further, I am not a
relative or employee of any attorney of record
in this cause, nor am I financially or otherwise
interested in the outcome of the action.

Certified to by me this 18th day of December,
2025.


_____
Annette Peltier, Texas CSR 3253
Expiration Date:  10/31/27
Firm Registration No. 686
451 Hungerford Drive
Suite 400
Rockville, MD 20850
Phone: 888.433.3767
Fax: 888.503.3767

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025                      181

**A**

**about**
106:23, 121:3,
124:12, 125:25,
131:21, 132:20,
133:8, 138:16,
149:19, 152:25,
155:14, 165:9,
172:8, 172:14,
172:21, 173:17,
174:14, 174:19,
176:19, 177:6
**above**
115:21, 127:17,
137:16, 178:3
**above-styled**
103:4
**absolute**
142:14, 142:23,
143:2, 143:13,
144:14, 144:22,
145:12, 145:15,
146:9, 168:16
**accelerated**
109:10, 109:15,
109:25, 110:5,
113:17
**acceptance**
137:19
**accuracy**
128:12, 143:8,
146:16, 146:25,
150:15, 155:18,
156:23
**accurate**
126:1, 133:2,
161:14
**ach**
109:16
**acknowledged**
178:17
**across**
136:20
**action**
180:11, 180:15
**acts**
151:13, 163:18

**actually**
132:6, 135:22,
137:14, 165:13,
168:1, 171:5
**add**
156:2
**added**
151:9, 152:12,
155:14, 156:13,
163:2, 163:5,
164:15, 165:5,
169:1
**adding**
164:25
**additional**
112:18, 112:22
**adjournment**
105:8
**adjust**
162:14, 163:2,
168:18
**adjustment**
163:16
**affix**
178:2
**after**
119:19, 134:11,
168:6
**again**
116:18, 130:8,
132:14, 135:10,
136:9, 137:2,
139:19, 171:6
**agree**
135:3, 142:20,
143:1, 143:25,
159:16, 161:13,
163:21
**ahead**
111:3, 125:21,
127:7, 133:12,
176:25
**alcohol**
116:8, 119:11,
142:15, 168:16
**alkylating**
167:6
**all**
121:15, 139:25,

153:5, 164:11,
164:20, 165:1,
165:20, 168:22,
169:10, 169:20,
176:5, 176:24,
179:32
**allows**
117:9
**almost**
165:24, 166:2
**already**
106:10, 151:21,
152:4
**also**
104:18, 115:2,
117:8, 156:1
**amendments**
140:8
**americas**
104:7
**amit**
122:8, 122:12,
122:13
**analysis**
158:10
**angle**
134:7, 136:5
**annette**
102:33, 103:6,
179:22, 180:20
**annexure**
105:23, 120:15
**answer**
175:1
**answering**
129:22, 132:15
**anti-cd**
173:1, 173:7
**antibodies**
173:8
**antibody**
173:1, 174:11,
174:16, 174:19,
174:21
**anticipated**
125:13
**antioxidant**
151:15

**any**
112:18, 113:1,
138:4, 138:9,
139:12, 139:13,
139:17, 139:24,
139:25, 146:24,
150:14, 153:23,
155:17, 156:22,
161:20, 165:25,
172:20, 173:19,
174:18, 180:5,
180:10, 180:13
**anyone**
106:22, 121:17,
140:5
**anywhere**
169:10
**api**
151:15
**apotex's**
172:14
**apparently**
141:2
**appearances**
105:4
**appeared**
178:12
**approval**
110:11, 110:22,
132:12, 132:13,
140:20, 141:3
**approve**
129:19
**approved**
122:7, 125:3,
125:6, 125:10,
125:22, 126:18,
129:21, 139:14,
166:23, 167:2,
169:10, 169:16,
169:24, 170:15,
171:23
**approximately**
156:2
**aqueous**
163:1

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

182

**around**
164:19
**asking**
131:4, 135:24,
175:16
**assurance**
139:8, 139:19,
139:21, 140:2
**attached**
103:11, 180:4
**attorney**
179:30, 180:13
**attorneys**
180:11
**attributes**
127:19, 152:23
**author**
160:18
**available**
125:6, 125:11,
125:22, 126:9,
127:10, 128:17,
129:18, 130:12,
132:22, 158:18,
159:19, 170:10
**avenue**
104:7
**aware**
138:8, 139:11,
171:12, 172:13,
173:10, 173:24,
174:8
**azurity**
102:13, 179:13

**B**

**b**
120:24
**b-cell**
167:9
**b-r-e-c-k-e-n-r--
i-d-g-e**
171:11
**back**
118:22, 122:18,
137:15, 147:16,
147:18, 176:2,
176:9

**bad**
113:15
**base**
116:16
**based**
111:8, 112:22,
125:8, 127:17,
131:4, 131:11,
131:12, 135:17,
156:7
**basically**
126:12
**basis**
140:21
**batch**
105:37, 138:9,
138:23, 139:3,
139:7, 139:25,
152:10, 152:14,
153:19, 154:19,
155:2, 155:3,
157:2, 157:4,
157:7, 160:13,
161:18, 161:23,
161:25, 162:1,
162:3, 162:6,
169:7
**batches**
111:21, 111:22,
112:9, 114:14,
139:12, 139:17,
140:7, 140:19,
140:25, 149:18,
153:2, 153:17,
155:3, 155:4,
161:21
**bates**
108:10, 114:25,
118:7, 120:9,
141:18, 148:3,
154:11, 157:18,
160:5, 166:13
**battani**
160:18, 160:19
**baxter**
172:17
**bcl-2**
173:17

**became**
170:9
**because**
106:10, 112:21,
125:20, 127:9,
128:16, 128:22,
130:11, 130:17,
133:2, 133:15,
135:4, 140:1,
143:20, 145:12,
145:23, 151:8,
164:20
**been**
106:13, 108:20,
139:12, 139:17,
140:6, 162:10
**before**
103:6, 106:21,
113:16, 115:16,
142:5, 154:24,
155:14, 158:2,
158:21, 160:14,
166:20, 178:11,
180:1, 180:8
**beginning**
114:25, 118:7,
120:9, 141:18,
148:3, 154:10,
157:18, 160:5,
166:13
**begins**
106:1
**behalf**
104:3, 104:11
**believe**
114:11, 125:19,
137:2, 167:16
**below**
109:9, 115:21,
122:6, 152:21
**belrapzo**
123:13, 124:4,
124:10, 124:13,
124:15, 125:18,
125:20, 126:13,
126:24, 127:9,
128:7, 128:17,
128:22, 129:3,

129:12, 129:17,
129:18, 130:1,
130:11, 130:19,
130:23, 131:6,
131:15, 131:16,
131:22, 132:6,
132:9, 132:18,
132:19, 132:21,
133:5, 133:14,
133:17, 133:18,
133:21, 135:5,
135:7, 135:15,
136:12, 136:16,
167:15
**bendamustine**
111:23, 112:9,
116:3, 116:5,
119:6, 119:9,
122:24, 123:12,
123:20, 125:2,
125:16, 126:7,
126:18, 127:21,
127:24, 128:1,
129:6, 129:11,
134:13, 134:18,
142:16, 143:22,
144:21, 145:5,
145:14, 145:18,
146:11, 150:6,
151:16, 151:25,
167:25, 168:14,
168:15, 171:1,
171:14, 172:5,
172:11, 172:15,
172:18
**bendamustine-bas-
ed**
172:22, 173:9
**bendamustine-con-
taining**
173:21, 174:4,
174:21, 175:7,
175:19
**bendeka**
124:13, 125:6,
125:12, 125:23,
126:5, 126:9,
126:13, 126:17,

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025

183

127:1, 127:9, 128:18, 128:23, 130:13, 130:17, 130:23, 131:6, 131:13, 131:16, 131:21, 132:24, 133:4, 133:18, 133:20, 134:12, 135:4, 135:11, 136:12, 169:25, 170:4

**besides**
121:17

**between**
133:16

**bio-waiver**
105:19, 115:13

**biosciences**
172:11

**biowaiver**
105:22, 116:20, 117:3, 117:10, 117:15, 117:17, 117:20, 118:14, 118:17, 118:22, 119:16

**bit**
137:6, 148:8, 149:10

**biweekly**
140:21

**blow**
108:11, 110:16, 118:9, 137:6, 148:8, 149:10, 155:7, 158:6, 166:18

**board**
136:21

**both**
110:2, 118:19, 131:21, 132:12

**bottom**
110:17, 111:9, 137:13, 152:16, 155:25

**break**
147:7, 147:14,

176:1, 176:7

**breckenridge**
170:25, 171:4, 171:10

**brief**
111:15

**bring**
116:17

**bringing**
107:3

**btk**
173:11

**bubbling**
155:24

**bullet**
167:8

**business**
117:14

---
### C

**called**
119:2, 143:5, 165:4, 167:20, 175:3

**can't**
122:7

**cannot**
138:6, 139:22, 159:12, 159:14, 175:1

**capacity**
135:25

**car**
174:1, 174:3

**card**
178:15

**care**
156:1

**cause**
103:4, 180:14

**cell**
174:1, 174:3

**centigrade**
110:13

**central**
103:6

**certain**
175:18

**certificate**
105:12, 158:9, 179:31

**certification**
179:18

**certified**
103:7, 179:22, 180:16

**certify**
179:24, 179:33, 180:9

**cfr**
117:9

**chance**
148:8

**change**
119:10, 161:21

**changed**
138:4

**changes**
180:4, 180:5

**characterization**
127:20

**characterized**
143:20, 145:23

**chart**
134:8, 134:11, 136:9, 136:17, 137:6, 137:17, 137:24, 149:12, 152:22, 152:25, 153:10, 155:8, 155:10

**chastain**
104:21

**chat**
108:17, 108:20, 115:3, 141:21, 148:6, 148:14

**check**
138:6

**chemical**
127:19, 168:1

**chemotherapy**
175:12, 175:13, 175:18

**chinnari**
102:20, 103:2,

106:3, 106:12, 106:18, 108:13, 108:21, 110:21, 114:23, 115:3, 115:11, 118:1, 118:11, 120:3, 120:11, 121:7, 124:21, 129:23, 134:25, 137:2, 137:7, 141:11, 141:22, 147:19, 147:22, 148:12, 149:12, 154:15, 157:13, 157:20, 159:3, 159:25, 160:9, 166:19, 169:23, 176:13, 177:3, 178:1, 178:6, 178:12, 179:19, 179:25

**chloride**
168:7, 168:9

**chronic**
167:7

**civil**
103:9

**clarifying**
157:6

**clauses**
117:9, 117:11

**clear**
168:10, 168:11, 168:12

**cll**
174:6, 174:23, 175:21

**cll)"**
167:8

**clock**
176:20

**close**
156:1

**closure**
112:11

**co-solvent**
151:13, 163:19

**collected**
113:10

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025

184

colorless
168:11
column
119:1, 119:4,
150:1, 150:5
come
140:22, 141:3,
176:2
comes
139:22
coming
140:14
comment
136:6, 138:6
commercial
111:22, 138:9,
139:2, 155:2
commercialized
125:4, 125:10
commercially
126:8
commission
178:27
commits
112:6
committed
111:14, 111:19,
114:4
communications
140:24
compare
132:6, 162:1
compared
125:23, 128:18,
130:13, 131:12,
132:18
compares
116:13
comparison
125:12, 127:17,
132:23
complete
145:19
completed
114:13, 114:15
completely
145:18, 162:20,
163:6, 163:10,

163:22, 163:25,
164:8, 164:15,
165:1
completion
180:1, 180:8
compliance
138:21
compliant
117:10
comply
138:10, 139:13
component
169:6
components
152:12, 164:12,
168:23, 169:12
composition
105:43, 116:1,
119:1, 119:5,
126:5, 126:17,
127:18, 131:24,
133:19, 145:19,
151:7, 160:12,
170:23, 170:24
compounding
149:24, 150:4
concerning
160:24
concerns
139:24
conclude
132:17, 134:16,
135:12
concluded
127:20, 128:5,
129:24, 131:14,
132:4, 132:8,
132:25, 133:20,
135:1, 135:4,
135:7, 177:5,
177:10
concludes
177:2
conclusion
127:14, 127:16,
128:10, 128:22,
129:5, 129:9,
132:3, 132:11,

135:2
condition
109:17, 109:18,
109:19, 109:20
conditions
109:7
conducted
145:3, 145:11
confidential
102:21
confirm
106:22
conjugate
174:12, 174:20
connection
133:16
consideration
178:19
contact
140:10
container
112:11
contains
151:21, 152:4,
168:13, 180:5
content
153:10, 153:20
continue
112:7, 113:23,
114:6
continued
105:6, 106:3,
106:12, 106:13,
106:15
continuing
112:7, 113:8
contribute
163:17
control
149:13, 149:17,
149:19, 152:19
copy
179:31
corden
111:25, 112:6,
112:14, 112:17,
113:9, 113:22,
114:5, 114:13,

138:17, 138:19,
139:1, 140:5,
140:6, 140:11,
140:12, 140:18,
140:25, 161:25,
162:1, 162:6
corden's
138:22
correct
115:17, 130:2,
149:2, 151:2,
153:24, 153:25,
156:8, 178:3
correctly
117:13
could
107:1, 107:18,
107:19, 110:20,
110:21, 132:7,
141:20, 147:21,
149:10
counsel
180:9
county
178:9
course
167:3
court
102:1, 105:12,
106:7, 106:9,
179:1
created
160:24
criteria
137:19
critical
127:19, 149:13,
149:20
cross-check
167:16
crr
102:33
csr
102:33, 103:6,
180:20
current
138:7
currently
123:25, 125:5,

Case 1:24-cv-00065-JLH   Document 530-1   Filed 08/07/26   Page 627 of 1024 PageID
#: 32710
HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

185

125:22, 169:17
**custodial**
179:30
**cut**
111:4

**D**

**data**
109:10, 109:11,
109:25, 110:2,
110:5, 110:6,
110:24, 111:5,
111:8, 112:18,
112:20, 112:22,
113:2, 113:9,
113:10, 113:18,
114:8, 121:14,
127:20, 129:20,
132:11, 153:24
**date**
106:4, 113:6,
170:11, 180:3,
180:21
**dated**
166:25, 169:19
**day**
106:18, 178:12,
178:21, 180:16
**days**
180:2
**debate**
124:17
**december**
102:22, 103:5,
106:4, 106:5,
179:20, 180:16
**decided**
135:6
**decision**
117:15, 117:19,
117:22
**decision-making**
117:21
**defendants**
102:16, 104:11,
179:16
**degrees**
110:13

**dehydrated**
116:8, 119:11,
142:15
**delaware**
102:2, 179:2
**delivered**
179:29
**deponent**
179:34, 179:35,
180:7
**deposition**
102:19, 103:1,
106:2, 177:3,
177:5, 177:10,
178:2, 179:19,
179:27, 179:29,
180:1, 180:8
**describes**
167:25, 168:22
**description**
105:15, 167:21,
169:13, 178:15
**determine**
122:21, 124:7,
145:4
**developed**
120:18
**development**
105:29, 141:25,
149:4
**dextrose**
168:9
**differ**
137:19
**difference**
119:21, 134:5
**different**
118:19, 118:20,
122:15, 140:14,
143:5, 146:4,
146:5, 149:16,
153:17, 161:21,
168:23
**diluted**
170:7
**dilution**
168:6
**directed**
140:20

**directly**
121:4
**discontinued**
170:24
**discuss**
139:24, 141:4
**discussed**
117:8, 130:10,
140:1, 160:20
**discussion**
177:6
**discussions**
140:15
**dispensing"**
149:22
**displaces**
165:16
**dissolution**
162:22
**dissolve**
142:16, 143:21,
146:11
**dissolved**
162:20, 163:6,
163:10, 163:22,
163:25, 164:8,
164:13, 164:15,
164:21, 165:2,
165:11, 165:14,
165:16, 165:19,
165:23, 166:1
**dissolver**
156:4
**dissolves**
150:6, 151:25
**distinct**
164:19
**district**
102:1, 102:2,
179:1, 179:2
**doctor**
176:12
**document**
107:3, 108:9,
108:14, 108:16,
108:19, 112:19,
114:21, 114:25,
115:6, 115:11,

115:16, 116:24,
118:7, 118:10,
118:12, 118:16,
118:21, 120:9,
120:12, 120:18,
120:21, 121:13,
121:19, 123:16,
124:12, 124:16,
124:18, 125:25,
130:5, 130:9,
131:1, 131:3,
131:21, 132:21,
133:7, 133:9,
133:22, 135:22,
135:24, 136:25,
138:5, 141:18,
141:23, 147:5,
148:3, 148:5,
148:10, 148:13,
148:18, 148:23,
149:2, 154:10,
154:16, 154:24,
154:25, 157:18,
157:21, 158:1,
158:3, 160:5,
160:7, 160:10,
160:14, 160:17,
161:5, 166:13,
166:15, 166:18,
166:20, 178:15
**documents**
107:22, 118:19,
160:23
**doing**
113:9, 113:23,
144:12
**done**
125:11, 127:8,
132:10, 145:20,
162:10
**dosage**
164:13
**doubt**
128:12, 143:7,
143:9, 146:16,
146:25, 147:2,
150:15, 153:23,
155:17, 156:22

Case 1:24-cv-00065-JLH    Document 530-1    Filed 08/07/26    Page 628 of 1024 PageID
#: 32711
HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

186

**down**
114:21, 116:12, 118:24, 120:21, 127:14, 134:8, 134:23, 136:25, 137:15, 140:22, 141:7, 142:8, 147:5, 149:9, 153:6, 154:3, 157:11, 159:23, 166:6, 169:22
**dr**
171:13
**drawn**
132:11
**drive**
180:23
**drug**
105:16, 105:34, 108:15, 109:5, 111:20, 111:22, 111:25, 112:15, 115:22, 116:2, 119:6, 119:8, 122:23, 123:6, 123:11, 123:20, 123:25, 124:3, 124:8, 124:9, 125:1, 125:4, 127:21, 127:24, 129:8, 129:11, 129:25, 134:12, 134:16, 134:18, 135:8, 135:11, 135:13, 135:18, 136:1, 137:19, 137:25, 138:2, 142:10, 142:16, 143:21, 144:2, 146:10, 148:11, 152:19, 167:6, 170:12, 174:11, 174:19, 175:3
**drugs**
175:5, 175:12, 175:19
**duly**
103:3, 106:13,

179:25
**during**
112:23, 115:18, 116:24, 140:15, 140:19

**E**

**e)(1**
179:34
**each**
136:18, 136:21, 147:2, 153:19, 165:7, 168:12, 171:9
**eagle**
102:4, 102:5, 116:7, 122:25, 123:12, 123:21, 125:7, 179:4, 179:5
**earlier**
130:11, 138:17, 155:3, 156:17, 160:20
**early**
114:17
**eight**
137:1, 161:10
**either**
168:7
**else**
121:17, 124:17, 141:1, 143:11
**employed**
180:10
**employee**
180:13
**emprove**
158:11
**ending**
109:3, 110:16, 120:22, 122:18, 137:5, 138:15, 142:9, 149:9, 152:16, 155:7, 158:6, 161:5, 167:20
**engager**
174:14, 174:20

**ensure**
138:20
**entire**
140:14
**equal**
129:7
**equivalence**
122:22, 124:8
**equivalent**
126:14, 126:24, 126:25, 127:23, 128:7, 128:23, 129:3, 129:6, 129:16, 130:1, 130:3, 130:24, 131:7, 131:15, 131:17, 132:2, 132:5, 132:9, 132:18, 133:1, 133:3, 133:5, 133:10, 133:21, 134:1, 134:17, 135:8, 135:14, 135:20, 168:14, 173:20, 174:5, 174:22, 175:8, 175:20
**esquire**
104:5, 104:12
**essential**
158:11
**establish**
129:15
**established**
124:10, 126:22
**establishing**
126:24
**ethanol**
142:14, 142:23, 143:2, 143:12, 144:13, 144:22, 145:12, 145:15, 146:9, 150:7, 151:19, 152:8
**eugia**
172:8
**evaluated**
125:5, 125:21

**evening**
106:17
**every**
165:24, 166:2
**everything**
164:11
**examination**
105:6, 106:15
**except**
116:7, 119:10, 178:3
**excipient**
147:3
**excipients**
143:17, 143:19, 144:2, 144:7, 144:13, 145:21, 145:23, 146:4, 146:21
**excuse**
106:4, 122:2
**executed**
178:18
**execution**
140:19, 141:2
**exhibit**
105:16, 105:19, 105:22, 105:26, 105:29, 105:34, 105:37, 105:40, 105:43, 105:47, 107:4, 107:5, 107:8, 107:13, 107:18, 107:19, 107:20, 107:23, 108:5, 108:6, 108:19, 114:23, 115:4, 115:6, 118:2, 118:3, 118:4, 120:4, 120:5, 120:6, 120:14, 120:20, 137:2, 137:3, 141:9, 141:11, 141:15, 147:23, 147:24, 147:25, 148:5, 154:5, 154:6, 154:8,

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

187

154:12, 157:13,
157:14, 157:15,
159:25, 160:1,
160:2, 160:7,
166:8, 166:9,
166:11, 166:15

**exhibits**
105:14, 107:21,
119:22, 120:1

**experience**
131:5, 135:17

**expiration**
180:21

**expires**
178:27

**explain**
109:14, 110:20,
117:7, 165:12,
165:14

**explains**
149:16

**expressed**
178:19

**extrapolating**
127:3, 133:7

**F**

**failed**
138:10

**failure**
139:13

**fair**
145:11

**familiar**
170:12, 170:25,
171:13, 171:16,
171:17, 172:4,
175:11

**far**
140:9

**fax**
180:27

**fda**
108:23, 110:8,
110:25, 111:5,
111:7, 112:18,
112:20, 114:11,
117:11, 125:3,

129:19, 129:20,
129:21, 132:12,
158:2

**fda's**
112:23

**february**
166:25, 169:19

**federal**
103:9

**fifteen**
176:20

**filed**
140:8

**filing**
112:19, 138:5,
148:24

**final**
164:1, 164:13,
164:20

**financially**
180:14

**fine**
113:15, 125:14,
147:10

**fine-tuning**
161:24, 162:10

**finish**
150:23

**firm**
180:22

**first**
115:15, 122:20,
124:5, 125:15,
130:8, 142:13,
149:21, 152:10,
162:22, 165:1,
166:18, 167:4,
167:24, 176:15

**five**
147:8, 153:7

**five-minute**
147:7, 176:1

**floating**
164:19, 164:24

**focusing**
163:3

**following**
137:23, 179:24

**follows**
106:14

**foregoing**
178:1, 178:17

**form**
110:7, 113:12,
126:15, 127:2,
128:8, 128:24,
130:20, 131:8,
131:19, 133:6,
133:11, 134:2,
135:9, 150:10,
150:13, 155:19,
157:3, 158:17,
158:25, 159:7,
159:18, 161:16,
162:8, 163:14,
164:23, 169:18

**formulation**
116:13, 116:14,
135:17, 136:1,
173:9, 173:22,
174:4, 174:22,
175:7, 175:19,
176:17

**frcp**
179:33

**frequency**
140:22

**frequently**
109:24

**front**
108:14

**function**
146:6

**functioning**
163:12

**functions**
140:14, 142:25,
143:4, 143:10,
146:3, 146:21,
147:3, 156:21

**further**
136:10, 137:6,
165:5, 176:12,
176:25, 179:33,
180:9, 180:12

**future**
111:22

**G**

**gap**
133:15

**generally**
175:12

**generated**
132:11

**generic**
171:1, 171:14,
172:4, 172:8,
172:11, 172:14,
172:17

**give**
124:22, 148:16

**given**
178:20, 179:28

**glass**
168:12

**glove**
159:10

**glycol**
116:9, 119:12,
168:17, 168:19

**go**
111:3, 120:21,
122:18, 127:7,
127:13, 130:7,
133:12, 134:8,
142:8, 149:9,
152:15, 153:5,
164:5, 167:19,
176:25

**goes**
112:20, 115:25

**going**
108:1, 113:22

**gone**
172:6

**good**
106:17, 106:18,
106:20, 148:17

**grant**
117:11

**granted**
132:13

**great**
110:19

Case 1:24-cv-00065-JLH   Document 530-1   Filed 08/07/26   Page 630 of 1024 PageID
#: 32713
HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

188

group
122:15
guess
113:11, 114:1,
121:11

**H**

half
166:18
hand
159:15, 178:20
hands
159:10
happen
140:1
harish
102:20, 103:2,
106:3, 106:12,
121:7, 177:3,
178:1, 178:6,
178:12, 179:19,
179:25
healthcare's
172:17
heard
171:4, 175:3
heisler
104:20
held
116:6
help
155:22
hence
117:11, 125:11,
126:8, 132:23,
133:19, 145:3,
163:18, 165:6
here
106:1, 110:3,
113:21, 123:6,
123:19, 126:4,
127:4, 129:4,
129:24, 130:16,
130:21, 133:24,
135:10, 138:5,
138:8, 139:11,
142:22, 143:5,
143:11, 143:17,

144:1, 144:4,
144:17, 145:1,
146:2, 146:8,
146:20, 151:1,
151:14, 151:23,
152:3, 152:7,
152:9, 153:2,
163:3, 163:12,
163:15, 165:16,
169:6, 169:7
hereby
112:6, 178:2,
179:23
herein
179:32
hereto
103:11
higher
109:18
highly
102:21
hold
159:10, 159:14
holders
112:21
hope
106:18
hospira's
172:4
hour
176:19
hungerford
180:23
hydrochloride
111:23, 112:9,
116:3, 116:5,
119:7, 119:9,
122:24, 123:12,
123:21, 125:2,
125:16, 126:7,
126:18, 127:22,
127:24, 128:1,
129:7, 129:11,
134:13, 134:18,
142:17, 143:22,
144:21, 145:5,
145:14, 146:11,
150:6, 151:16,

151:25, 167:25,
168:14
hydroxide
150:19, 151:1,
151:9, 151:11,
151:22, 152:5,
152:11, 156:10,
156:12, 158:11,
158:14, 158:18,
159:5, 159:14,
159:19, 162:19,
162:23, 162:25,
163:4, 163:11,
163:15, 164:25,
165:4, 168:18,
169:1

**I**

identical
126:6, 126:20,
130:18, 131:23,
133:19, 133:25
identification
108:7, 115:5,
118:5, 120:7,
141:16, 148:1,
154:7, 157:16,
160:3, 166:10
identity
178:15
immunotherapy
175:3, 175:5
important
144:20
inc
102:5, 102:14,
116:7, 179:5,
179:14
included
118:17
includes
136:17, 152:22
including
137:18
increase
114:9
index
105:1

indicated
167:6
indicates
160:17
indications
167:5, 167:12,
167:15, 169:24,
170:2, 170:15,
171:23
individuals
140:18
indolent
167:9
information
119:20
ingredient
136:18, 136:21
ingredients
136:12
inhibitor
173:11, 173:14,
173:17
inhibitors
173:20
initiated
120:24
injectable
165:25
injection
111:23, 112:9,
116:3, 116:6,
119:7, 119:9,
122:24, 123:12,
123:21, 125:2,
125:17, 126:7,
126:19, 127:22,
127:25, 128:1,
129:11, 134:13,
134:19, 168:8,
168:9, 169:3
instance
103:3
instrument
178:17
intended
168:6
interact
140:4, 140:12,

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025

189

140:17
**interacting**
140:6
**interested**
180:15
**interruption**
111:15
**intravenous**
168:6
**invite**
176:16
**isolated**
109:17, 111:2
**itself**
163:12, 165:2

**J**

**jason**
104:12, 107:10,
108:1, 150:11
**job**
102:30
**josh**
104:21, 107:2,
107:17, 108:11,
115:9, 118:9,
134:23, 148:7,
149:8
**justification**
137:18
**justifies**
119:21

**K**

**keytruda**
175:3, 175:6
**kind**
166:2
**know**
110:4, 111:3,
112:17, 112:25,
113:4, 122:8,
123:9, 124:2,
131:1, 131:3,
131:9, 131:11,
131:16, 131:20,
134:6, 135:23,
138:3, 139:20,

144:20, 145:13,
167:1, 169:9,
169:24, 170:2,
170:6, 170:9,
170:15, 170:20,
171:16, 171:19,
171:23, 172:20,
172:24, 172:25,
173:4, 173:6,
173:7, 173:11,
173:14, 173:19,
173:25, 174:3,
174:11, 174:18,
174:25, 175:5,
175:10, 175:16,
175:18, 175:23
**knowledge**
110:1, 138:12,
139:15, 139:17
**known**
178:13
**kumar**
122:8, 122:12,
122:13

**L**

**lab**
160:12, 161:23
**label**
105:47, 166:21,
166:23, 166:25,
167:13, 167:17,
169:10, 169:16,
169:19, 170:1
**labeled**
107:3, 108:14,
118:14, 158:9
**language**
119:15
**last**
120:21, 122:9,
127:15, 134:10,
134:24, 153:7
**late**
114:17
**later**
152:14, 170:24
**latham**
104:6

**latina**
111:25, 112:6,
154:21
**lawyers**
106:23
**leaving**
176:19
**legal**
116:21, 131:8,
135:21, 136:3
**leif**
104:12
**less**
153:20
**let's**
139:2, 159:24
**leukemia**
167:8
**lief**
107:12, 108:2,
110:7, 113:12,
115:3, 116:21,
117:4, 123:2,
123:15, 124:11,
124:16, 126:15,
127:2, 128:8,
128:14, 128:24,
130:20, 130:25,
131:8, 131:19,
133:6, 133:11,
134:2, 135:9,
135:21, 136:3,
141:13, 141:20,
143:14, 143:23,
144:8, 144:15,
144:24, 145:8,
145:16, 145:25,
146:12, 146:18,
147:1, 147:8,
147:11, 150:10,
150:13, 150:16,
150:20, 151:3,
151:20, 152:2,
155:19, 157:3,
158:17, 158:25,
159:7, 159:11,
159:18, 161:16,
161:22, 162:8,

163:14, 164:3,
164:9, 164:23,
166:24, 169:18,
170:17, 171:15,
171:25, 172:23,
173:2, 173:23,
174:7, 174:24,
175:9, 175:22,
176:15, 177:7
**life**
109:6, 110:12,
110:22, 113:11,
114:11
**likely**
162:7
**limit**
137:8, 153:1,
153:13
**limits**
137:24, 138:4,
138:11, 138:21,
139:4
**line**
125:13, 126:4,
144:19, 156:1,
156:2
**liquid**
170:4, 170:20,
170:23, 171:20,
171:21
**list**
123:19, 169:5,
169:7
**listed**
116:5, 119:8,
122:23, 123:11,
123:20, 123:25,
124:9, 125:1,
125:4, 127:24,
129:3, 129:8,
129:10, 130:15,
134:12, 134:17,
135:11, 136:18,
137:8, 138:4,
139:3, 143:4,
143:11, 146:6,
153:2, 167:12,
167:15, 169:12

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

190

**lists**
136:11, 153:16,
161:9, 168:1
**little**
118:10, 136:9,
137:6, 148:8,
149:10, 152:14
**llc**
102:6, 102:12,
112:1, 115:22,
116:2, 179:6,
179:12
**long**
113:9, 114:1
**long-term**
109:11, 109:16,
109:19, 110:6,
110:24, 111:2,
112:7, 113:1,
113:8, 113:23,
114:8
**look**
119:25, 152:13
**looked**
118:18, 119:16,
120:15, 121:13
**looking**
114:7, 144:6,
161:12, 162:5
**looks**
122:8
**loud**
155:22
**lymphocytic**
167:7
**lymphoma**
167:9
**lyophilized**
170:22

**M**

**machine**
103:8
**made**
117:15, 117:22,
126:2, 128:21,
132:23
**make**
117:19

**makes**
108:2
**manufacture**
138:22
**manufacturer**
111:20, 112:1,
112:15
**manufacturing**
105:29, 105:37,
105:43, 140:7,
141:25, 154:19,
157:4, 157:7,
160:11, 160:25,
161:9, 161:12,
161:14, 161:17,
161:20, 161:25,
162:6, 162:14
**many**
114:3
**map**
154:18
**mark**
108:4, 114:23,
118:1, 120:3,
141:11, 147:22,
154:5, 157:13,
159:25, 166:8
**marked**
107:4, 107:6,
107:14, 107:16,
107:17, 107:21,
108:7, 115:5,
118:5, 120:7,
141:16, 148:1,
154:7, 157:16,
160:3, 166:10
**market**
123:25, 125:5,
125:11, 125:21,
126:9, 128:17,
130:11, 139:13,
170:10
**marketed**
112:10, 123:7,
123:13, 129:12,
129:17, 130:1,
130:19, 132:7
**marking**
107:23

**marx**
104:13
**maybe**
140:21, 147:7,
162:9, 176:18
**md**
180:25
**mean**
111:4, 155:20
**means**
163:11, 164:1
**media**
106:2
**meeting**
128:2
**megs**
116:6
**mention**
150:19, 150:25
**mentioned**
152:3, 156:17,
169:9, 173:20
**metadata**
160:17
**mg**
119:9, 127:22,
168:14, 168:15,
168:16
**might**
155:22
**milligram**
116:4
**milligrams**
111:24, 112:10,
168:13
**milliliter**
168:13, 168:17
**milliliters**
111:24, 112:10,
116:4, 116:6,
119:10, 127:23,
156:2
**mind**
107:3
**minute**
124:22
**minutes**
147:8, 176:3

**mischaracterizes**
123:3, 123:16,
124:12, 143:15,
143:24, 144:9,
144:16, 144:25,
145:17, 146:1,
146:13, 146:19,
150:21, 151:4,
151:20, 164:4,
164:10
**miscible**
165:6
**mishram**
122:10, 122:11,
122:12, 122:13
**mixture**
150:7, 151:19,
152:1, 152:8,
152:14
**module**
111:14, 111:20
**monitor**
106:6, 138:24
**monitoring**
138:20
**monoclonal**
174:16, 174:20
**monohydrate**
142:17, 143:22,
144:21, 145:5,
145:15
**monothioglycerol**
150:5, 151:15,
151:24, 168:15
**months**
109:10, 109:11,
109:20, 110:5,
110:6, 110:12,
110:13, 110:22,
110:23, 111:1,
111:2, 113:17,
113:18, 114:3,
114:8, 114:10,
114:12
**more**
113:13, 116:22,
121:21, 134:6,
144:10

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

191

**morning**
106:17, 106:20
**mostly**
169:12
**multiple**
142:25, 143:9,
146:3, 146:21,
147:3, 156:21
**multiple-dose**
168:12
**must**
122:8
**myself**
111:17

**N**

**name**
121:22, 122:9,
124:3, 139:22,
168:1, 178:16
**naoh**
155:14, 156:3,
156:8, 156:10,
162:15, 163:21,
164:18, 164:19
**nda**
105:30, 105:31,
108:24, 109:25,
111:1, 111:21,
112:21, 113:22,
125:2, 125:9,
125:17, 125:23,
126:7, 126:19,
126:23, 126:25,
127:10, 127:25,
128:6, 128:18,
129:2, 129:8,
129:11, 129:16,
130:13, 131:13,
131:14, 132:4,
134:13, 134:19,
135:11, 135:15,
136:15, 138:9,
138:20, 142:1,
142:21, 142:24,
143:2, 145:24,
148:21, 152:24,
160:25, 161:15

**ndas**
131:21, 131:22
**necessary**
165:18
**need**
109:17, 109:20,
138:6, 161:25,
167:16, 170:1
**needs**
110:8, 170:6
**neither**
180:9
**neutralization**
155:11, 155:23,
156:24
**neutralize**
151:9, 151:12,
155:15, 156:16
**neutralized**
152:4, 152:7,
152:11
**never**
140:1
**new**
104:8, 104:15
**next**
112:4, 125:13,
126:4, 145:3,
149:24, 153:5,
153:12, 153:16
**nhl**
167:10, 174:6,
174:23, 175:21
**nick**
104:20
**nitrogen**
155:25, 165:11,
165:13, 165:16,
166:2
**non-hodgkin's**
167:9
**noncompliant**
139:7, 139:18
**normal**
162:25, 165:3,
169:1
**norvium**
172:11

**notably**
126:5
**notary**
178:25
**note**
176:15
**noted**
178:3
**nothing**
143:11, 176:25
**notified**
139:6, 139:9
**notifying**
139:2
**nozzle**
156:4
**number**
105:15, 106:2,
107:18, 108:6,
108:10, 114:25,
115:4, 118:4,
118:8, 120:6,
120:10, 125:17,
126:7, 127:25,
141:15, 141:19,
147:25, 148:4,
154:6, 154:11,
157:15, 157:19,
160:2, 160:6,
166:7, 166:9,
166:13
**numbered**
103:4
**ny**
104:8, 104:15

**O**

**oath**
106:14, 178:13
**object**
150:12, 150:24
**objection**
110:7, 113:12,
116:21, 117:4,
123:2, 123:15,
124:11, 126:15,
127:2, 128:8,
128:14, 128:24,

130:20, 130:25,
131:8, 131:19,
133:6, 133:11,
134:2, 135:9,
135:21, 136:3,
136:4, 143:14,
143:23, 144:8,
144:15, 144:24,
145:8, 145:16,
145:25, 146:12,
146:18, 147:1,
150:10, 150:13,
150:16, 150:20,
151:3, 152:2,
155:19, 157:3,
158:17, 158:25,
159:7, 159:11,
159:18, 161:16,
161:22, 162:8,
163:14, 164:3,
164:9, 164:23,
166:24, 169:18,
171:15, 171:25,
172:23, 173:2,
173:23, 174:7,
174:24, 175:9,
175:22
**obtain**
140:20
**office**
178:20
**officer**
179:26
**often**
140:17
**oh**
122:1, 137:14
**once**
163:25
**one**
106:2, 160:12,
167:7, 170:22,
170:23
**ongoing**
112:7, 113:1,
113:23
**only**
110:4, 110:23,

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025

192

140:23, 143:17
**options**
173:21, 174:5,
174:22, 175:8,
175:20
**oral**
102:19, 103:1,
179:27
**orders**
177:6
**original**
107:22, 179:29
**other**
164:12, 165:7,
171:9, 176:20,
178:15
**others**
175:6
**otherwise**
180:14
**out**
155:22
**outcome**
180:15
**over**
171:9
**overall**
108:23, 148:20,
163:16, 164:15
**own**
107:23, 111:6
**oxygen**
165:11, 165:14,
165:17, 165:20,
165:23, 166:1

**P**

**p**
111:14
**page**
105:2, 105:10,
105:15, 109:3,
110:16, 111:10,
112:5, 120:22,
122:18, 127:15,
130:8, 130:9,
137:5, 137:13,
137:14, 138:15,

142:9, 149:9,
152:16, 152:17,
153:5, 155:7,
158:6, 158:9,
161:5, 161:8,
167:4, 167:20,
180:5
**pages**
102:31
**paragraph**
109:9, 115:20,
122:20, 124:24,
125:15, 134:11,
144:19, 167:24,
168:5, 168:22
**parameter**
152:25
**parameters**
149:14, 149:20
**parentheses**
142:14
**part**
108:22, 110:17,
117:20, 118:17,
121:25, 122:3,
127:14, 128:22,
142:4, 149:6,
151:7
**particle**
164:24
**particles**
164:19, 165:3
**particular**
130:4, 130:5,
139:25, 161:18
**parties**
179:32, 180:11
**party**
179:35, 180:8
**patients**
167:7, 174:5,
174:23, 175:20
**pdf**
149:3
**peg**
142:14, 142:20,
143:12, 144:13,
144:22, 145:12,

145:15, 146:9,
150:7, 151:9,
151:12, 151:18,
151:21, 152:1,
152:3, 152:4,
152:7, 152:8,
152:10, 155:10,
155:15, 155:23,
156:13, 156:17,
156:24, 162:15,
162:20, 163:2,
163:5, 163:23,
164:21, 165:6,
165:10
**peg-**
163:6
**pellets**
158:11, 158:15,
158:16, 158:19,
158:21, 158:23,
159:5, 159:6,
159:8, 159:14,
159:20
**peltier**
102:33, 103:6,
179:22, 180:20
**people**
117:14
**percent**
153:13, 153:21,
168:7, 168:8,
168:9
**perfect**
153:8
**performed**
111:25
**period**
114:9
**person**
122:15, 140:10,
140:13, 160:20,
178:16
**personal**
135:25
**personally**
140:4, 178:12
**ph**
162:15, 163:2,

163:16, 168:18
**pharma**
102:12, 111:25,
112:1, 112:6,
115:22, 116:2,
154:21, 171:4,
179:12
**pharma's**
171:1, 172:8
**pharmaceutical**
122:22, 124:7
**pharmaceutically**
126:13, 126:23,
126:25, 127:23,
128:6, 128:23,
129:2, 129:6,
129:16, 129:25,
130:2, 130:24,
131:7, 131:15,
131:17, 132:2,
132:5, 132:8,
132:17, 133:1,
133:3, 133:4,
133:10, 133:21,
134:1, 134:17,
135:7, 135:14,
135:20
**pharmaceuticals**
102:4, 102:14,
116:7, 122:25,
123:13, 123:22,
179:4, 179:14
**phone**
180:26
**phrase**
132:1, 133:23
**physician**
173:13, 174:10,
175:1, 175:10
**pi3k**
173:14
**place**
116:8, 119:11,
148:14
**places**
146:4
**plaintiffs**
102:8, 103:3,

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025

193

104:3, 179:8
**please**
108:4, 108:16,
109:2, 115:9,
116:22, 119:20,
123:17, 147:21,
148:14, 152:16,
154:5, 157:12,
158:6, 159:4,
176:3
**point**
114:12, 128:20,
132:22, 133:17
**polyethylene**
168:17, 168:18
**portion**
105:30, 142:1,
155:8
**position**
111:7, 131:18
**post-approval**
110:17, 111:10
**powder**
170:20, 170:22,
171:20
**prepare**
162:25, 165:3
**prepared**
121:20, 156:3,
156:8
**preparing**
121:18
**present**
104:18, 164:1,
166:1
**presentations**
170:22
**presented**
143:17
**previous**
137:13, 137:14,
143:4
**previously**
106:13, 156:3,
156:8
**prior**
120:20, 148:24
**procedure**
103:9, 105:44,

160:12, 160:25,
161:9, 161:13,
161:15, 161:17,
161:21, 161:23,
162:2, 162:6,
162:14
**proceed**
106:8
**process**
105:29, 121:12,
141:25, 149:13,
149:16, 149:20,
149:21, 151:11,
165:15
**produced**
103:2, 144:4
**product**
105:16, 105:31,
105:34, 108:15,
108:24, 109:5,
110:11, 110:23,
111:6, 111:20,
111:23, 112:1,
112:15, 112:24,
115:23, 116:2,
119:6, 119:8,
122:23, 123:6,
123:11, 123:20,
123:25, 124:3,
124:8, 124:9,
125:1, 125:6,
125:22, 125:24,
126:23, 126:25,
127:21, 128:6,
128:18, 129:2,
129:16, 129:21,
129:25, 130:14,
131:13, 131:14,
132:5, 134:16,
134:18, 135:8,
135:11, 135:13,
135:18, 137:20,
137:25, 138:2,
138:10, 138:20,
138:23, 142:1,
142:16, 142:21,
142:24, 143:3,
143:21, 145:24,

146:10, 148:11,
149:3, 152:19,
152:24, 161:1,
161:15, 164:2,
164:14, 164:20,
165:25, 166:3,
170:9, 171:1,
171:14, 171:17,
171:18, 171:20,
171:24, 172:5,
172:9, 172:12,
172:15, 172:18,
172:22
**production**
162:11, 172:6
**products**
111:1, 172:20
**proposed**
109:6, 114:10,
115:22, 116:2,
119:6, 122:23,
123:6, 124:8,
125:23, 126:23,
127:21, 128:1,
128:6, 130:13,
134:16, 135:8,
135:13, 137:24
**propylene**
116:8, 119:11
**protocol**
110:18, 111:11,
114:4, 114:11
**proved**
178:13
**provided**
107:22, 111:8,
112:18, 119:21,
132:12, 138:23,
138:25
**provisions**
103:10
**public**
178:25
**pull**
114:22, 117:25,
120:2, 137:1,
141:8, 147:22,
154:4, 157:12,

159:24, 166:7
**purge**
165:10
**purging**
165:12, 166:2
**purpose**
122:21, 124:6,
156:16
**purposes**
178:18
**pursuant**
103:9, 179:33
**put**
107:23, 108:16,
115:2, 120:17,
141:20, 151:18

---

**Q**

**q1**
135:12
**q2**
135:12
**qualitative**
116:1, 118:25,
119:5, 126:20,
127:18, 131:23
**qualitatively**
126:6, 130:18,
133:24, 134:15,
135:5, 135:18
**quality**
108:22, 122:14,
127:19, 139:8,
139:19, 139:21,
140:2, 148:20,
152:23
**quantitative**
116:1, 118:25,
119:5, 126:20,
127:18, 131:24
**quantitatively**
126:6, 130:18,
133:25, 134:14,
134:15, 135:5,
135:18
**quantity**
136:18
**question**
113:15, 123:17,

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025

194

124:21, 129:23, 132:15, 146:23, 146:24, 150:23, 159:3, 165:9, 176:18

**questioning**
125:14

**questions**
175:1, 176:12, 176:16, 176:20, 176:22

**quick**
165:9, 176:1

**quite**
122:7, 129:22

**quote**
145:13, 155:24

**R**

**r&d**
117:17, 117:22, 139:24

**ramya**
104:5

**range**
162:15

**read**
112:2, 112:12, 116:10, 119:13, 122:7, 123:1, 123:4, 124:24, 126:10, 127:4, 128:3, 134:20, 137:21, 142:18, 144:23, 145:1, 145:7, 145:9, 150:8, 155:21, 156:5, 156:23, 158:12, 162:17, 167:11, 168:20, 178:1

**readily**
150:6, 151:25

**reads**
127:17, 146:2, 146:14, 165:10, 168:5

**really**
171:7, 174:25

**realtime**
103:7, 104:22

**realtimed**
102:19, 103:1

**reason**
128:12, 143:7, 144:7, 146:16, 146:25, 150:15, 153:23, 155:17, 156:22, 161:20

**reasons**
180:5

**receipt**
180:3

**received**
148:15

**receiving**
104:22

**recognize**
108:22, 115:11, 118:12, 120:12, 141:23, 148:12, 148:18, 154:16, 154:18, 157:21, 157:22, 160:10

**record**
103:10, 105:37, 108:9, 114:24, 118:7, 120:9, 138:23, 141:18, 147:12, 147:17, 148:3, 154:10, 154:19, 157:18, 160:5, 162:1, 166:12, 169:8, 176:6, 176:10, 176:16, 177:1, 177:3, 179:27, 180:13

**recorded**
177:2

**records**
152:10, 155:3

**reddy's**
171:13

**reduce**
165:11

**reduces**
165:13

**refer**
119:20

**referenced**
120:15, 120:20

**referred**
123:6

**referring**
118:22, 125:16

**regarding**
140:2, 140:25, 176:17

**registration**
114:14, 140:8, 155:4, 180:22

**regulatory**
117:18, 117:23, 121:25, 122:3, 134:7, 136:5

**related**
180:10

**relative**
180:13

**release**
137:20, 138:24

**remaining**
152:12

**remark**
108:1

**remarks**
119:2, 150:2, 150:4

**remember**
107:18, 113:6, 113:7, 114:15, 117:13, 160:15, 170:11, 170:18, 170:21

**remove**
165:19, 165:22

**repeat**
111:17, 123:17, 124:21, 159:3, 171:2

**report**
105:26, 105:40, 122:1, 142:4, 149:4, 157:23

**reported**
102:32, 103:8,

110:3

**reporter**
103:7, 106:7, 106:9, 179:23

**reporter's**
105:12, 179:18

**reports**
121:4, 172:7

**represent**
160:16

**request**
105:19, 105:22, 112:23, 115:13, 116:20, 117:3, 117:15, 117:17, 118:17, 118:22, 119:16

**request-annexure**
118:15

**requested**
117:11, 179:35, 180:7

**required**
140:23, 161:24

**requirement**
110:9, 111:1

**respect**
131:23, 140:7, 144:3

**respective**
145:6

**responsibility**
138:22

**responsible**
138:19, 139:1

**rest**
106:19

**results**
153:1, 153:19

**returned**
180:2, 180:4

**review**
112:23, 121:12, 121:14, 139:23, 142:4, 148:16

**reviewed**
116:24, 121:7, 121:22, 148:23,

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

195

155:3, 158:1,
158:3
**reviews**
111:5
**right-hand**
119:2
**rld**
116:14
**rockville**
180:25
**row**
155:8, 155:10
**rule**
179:33
**rules**
103:9

---
**S**
---

**said**
107:13, 113:16,
117:14, 120:23,
124:14, 126:12,
126:17, 127:8,
133:18, 140:3,
163:4, 163:21,
164:7
**same**
116:4, 117:4,
119:7, 119:15,
126:19, 128:14,
130:25, 133:25,
134:15, 135:1,
135:6, 135:12,
135:19, 136:20,
142:23, 145:8,
146:3, 147:1,
150:16, 152:2,
154:25, 159:11,
160:20, 161:22,
167:15, 170:2,
178:3, 178:18
**samples**
126:9, 132:22
**saturation**
144:20, 145:4,
145:13
**say**
107:11, 126:16,

128:25, 129:1,
133:2, 133:10,
135:19, 135:24,
139:2, 142:10,
145:11, 146:20,
147:2, 152:7,
162:7, 171:6
**saying**
151:14, 151:24
**says**
109:5, 109:10,
110:17, 111:10,
111:13, 112:5,
119:4, 119:19,
120:23, 120:24,
121:6, 121:22,
122:6, 122:20,
123:19, 124:6,
124:16, 124:18,
125:1, 126:5,
129:9, 134:12,
137:17, 142:13,
144:19, 145:3,
146:8, 150:2,
150:5, 152:8,
152:19, 153:10,
153:13, 153:15,
155:10, 158:10,
158:14, 161:8,
162:14, 165:10,
167:5, 167:9
**scale**
162:11
**scheduled**
140:21
**scope**
136:4, 170:17,
171:15, 171:25,
172:23, 173:2,
173:23, 174:7,
174:24, 175:9,
175:22
**screen**
107:9, 115:7,
134:21, 149:12,
154:13, 160:8,
166:16
**scroll**
116:12, 118:24,

134:22, 136:9,
137:12, 137:15,
153:5
**seal**
178:20
**second**
111:13, 111:19,
115:25, 124:24,
130:9, 144:19,
161:5, 167:8
**section**
135:2, 142:9,
148:20, 156:24,
161:8, 167:20,
169:13
**see**
108:14, 109:4,
109:8, 109:23,
111:9, 111:12,
111:18, 113:21,
114:10, 115:20,
119:1, 119:24,
120:23, 121:21,
122:20, 129:19,
132:10, 134:10,
134:21, 137:8,
137:10, 142:11,
142:12, 146:5,
149:11, 149:15,
150:1, 152:10,
152:18, 153:9,
153:11, 155:9,
158:8, 167:22
**seek**
110:21
**seeking**
110:11
**seem**
162:9
**seems**
155:2, 160:11,
166:21, 170:2
**seen**
115:16, 115:18,
154:24, 158:21,
160:14, 166:20
**sending**
148:6

**sense**
108:2
**sentence**
111:13, 111:19,
115:25, 119:19,
124:6, 126:16,
134:10, 134:25,
135:10, 142:13,
145:3, 146:2,
146:14
**served**
179:31
**shelf**
109:6, 110:12,
110:22, 113:10,
114:10
**shorthand**
103:8, 179:22
**should**
114:17, 124:1,
124:4, 142:10,
171:21
**shown**
179:32
**side**
119:2
**signature**
105:10, 121:9,
178:2, 179:34,
180:2, 180:4
**signature-p1kal**
180:18
**signatures**
120:23, 121:22
**signed**
149:1, 149:3
**similar**
162:7, 162:9
**similarly**
177:8
**since**
112:18, 125:4,
134:12, 138:5
**single**
139:22, 140:13
**sitting**
138:8, 139:11
**six**
109:10, 109:20

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

196

**slash**
112:11
**slay-vivimusta**
105:17, 108:10
**slay-vivmus**
105:20, 105:24,
105:27, 105:32,
105:35, 105:38,
105:41, 105:45,
105:48, 115:1,
118:8, 120:10,
141:19, 148:4,
154:11, 157:19,
160:6, 166:14
**slayback**
102:12, 109:24,
110:4, 110:11,
110:21, 112:1,
112:14, 112:21,
112:25, 113:16,
113:21, 115:14,
115:22, 116:2,
116:13, 117:2,
117:14, 125:21,
126:12, 126:21,
127:25, 128:5,
128:18, 128:21,
129:15, 129:24,
130:12, 131:13,
131:14, 132:1,
132:16, 133:1,
135:4, 135:13,
137:24, 138:1,
138:3, 139:2,
139:7, 139:16,
144:5, 145:11,
145:24, 152:24,
179:12
**slayback's**
105:31, 108:24,
118:17, 119:6,
122:22, 124:8,
134:16, 138:9,
138:20, 142:1,
142:21, 142:24,
143:2, 146:10,
148:21, 160:25,
161:15, 172:22

**slide**
115:15
**slight**
161:24
**small**
158:23, 159:6
**sodium**
150:19, 151:1,
151:8, 151:11,
151:21, 152:5,
152:11, 156:10,
156:12, 158:11,
158:14, 158:18,
159:5, 159:14,
159:19, 162:19,
162:22, 162:25,
163:4, 163:11,
163:15, 164:25,
165:3, 168:7,
168:9, 168:17,
168:25
**solid**
144:6, 158:16,
159:17, 159:20,
164:24
**solubility**
142:10, 144:2,
144:6, 144:12,
144:20, 145:4,
145:14
**solubilization**
163:17
**solubilized**
165:7
**soluble**
145:18
**solution**
151:10, 151:19,
155:15, 156:3,
156:8, 156:12,
156:13, 156:17,
162:20, 163:1,
163:4, 163:15,
163:22, 164:14,
164:21, 165:1,
165:4, 165:5,
168:11, 169:1,
170:4, 170:20

**solvent**
163:12, 163:18
**somashekhar**
120:25, 121:2,
121:18, 121:20,
160:18, 160:19,
160:24
**some**
117:9, 162:9
**something**
107:11, 124:17,
141:1
**sorry**
107:10, 107:12,
111:3, 122:2,
123:9, 130:9,
133:13, 134:14,
137:14, 150:11,
157:5, 159:1,
171:6
**spa**
154:21
**speak**
106:22, 140:23
**specific**
113:13, 116:22,
130:4, 132:15,
140:25, 143:16,
143:19, 144:1,
144:10, 145:20,
145:21, 175:14
**specifically**
139:20
**specification**
128:2, 137:8,
137:20, 137:23,
138:1, 138:4,
138:11, 138:21,
138:25, 139:3,
152:23, 153:1,
153:13
**specifications**
137:17, 138:2,
138:7, 139:14
**specify**
139:22
**sri**
104:5

**srikanth**
121:23, 121:24
**stability**
109:5, 109:10,
109:11, 109:15,
109:21, 109:25,
110:5, 110:6,
110:18, 110:24,
111:11, 111:21,
112:8, 113:1,
113:8, 113:17,
113:18, 113:23,
114:2, 114:5,
114:8, 114:11,
114:12, 137:18,
138:2, 138:24
**stand**
118:3, 120:5,
141:9, 147:24,
154:8, 157:14,
160:1, 166:11
**start**
108:4
**started**
106:21
**starting**
108:9, 115:22
**starts**
111:19
**state**
103:8, 131:2,
131:4, 135:22,
178:8, 178:26,
179:23
**stated**
103:10, 124:5,
130:21, 164:11
**statement**
126:2, 128:13,
143:8, 146:17,
146:25, 150:15,
151:1, 151:5,
155:18, 156:23
**states**
102:1, 109:23,
129:5, 132:21,
133:22, 135:10,
144:17, 155:24,

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

197

stenographically
179:1

step
102:32

steps
149:21, 162:13,
163:3, 164:21,
165:9, 165:10,
165:18, 165:24

steps
149:17, 161:10

sterile
168:11

still
112:14, 114:7,
147:2, 151:12,
163:18, 164:5,
169:7

stirring
155:25

storage
109:7, 109:17,
109:19

straight
130:8

strategy
149:13, 149:17,
149:19

street
104:14

strike
122:2, 123:10

structure
168:2, 168:4

studied
144:3

studies
109:6, 111:21,
112:8, 113:17,
113:24, 114:2,
137:18, 144:12

study
109:15, 109:20,
113:1, 113:9,
122:21, 124:7,
125:12, 127:9,
130:5, 130:12,
131:12, 132:10,
132:19, 133:17,

133:20, 143:16,
143:19, 144:1,
144:17, 145:3,
145:11, 145:20

sub
102:5, 179:5

submission
110:25, 111:21,
112:8, 113:19,
115:19, 116:25,
149:17, 158:2

submissions
110:1

submit
111:1, 117:19

submitted
108:23, 110:2,
110:5, 110:23,
112:22, 113:1,
113:5, 115:14,
117:3, 118:20,
129:20, 142:5

subscribed
178:16

substance
106:23, 142:10,
144:3

substances
146:9

substantially
129:7

substituted
172:21, 173:8

suite
180:24

summary
105:26, 105:40,
108:23, 120:18,
148:20, 157:23,
161:14

supplied
168:10

support
109:6, 122:14

supporting
119:20

sure
108:18, 116:23,

120:17, 123:18,
124:23, 144:11,
146:7, 155:21,
171:3, 171:8,
175:17, 176:4

suspend
155:24

swear
106:7

swearing
106:10

sworn
103:3, 106:11,
106:13, 179:26

system
112:11, 151:13,
163:16, 164:6,
164:16, 166:1

**T**

t-cell
174:14, 174:20

tab
107:3, 107:8,
107:13, 114:22,
118:1, 120:3,
137:1, 141:8,
147:22, 154:4,
157:12, 159:24,
166:7

table
115:21, 116:13,
118:25, 134:9,
136:11, 137:9

tables
143:5

take
114:20, 119:25,
136:25, 141:6,
147:4, 151:14,
152:13, 154:2,
157:10, 159:22,
166:5, 169:21,
176:1, 177:1,
177:7, 177:8

taken
102:23, 103:4,
147:14, 176:7,

takes
180:12

taking
111:5, 111:7

talk
155:25

talked
133:8, 151:5

talking
138:16, 172:21,
174:19

talks
121:3, 132:20,
155:13, 171:9

team
124:12, 125:25,
131:21, 149:19,
152:25

tech
122:3, 139:8,
139:19, 139:21,
139:23, 139:24,
140:2, 140:12,
140:14, 140:18

technical
104:21, 107:5,
107:8, 107:20,
108:19, 115:6,
118:3, 120:5,
137:3, 141:9,
147:24, 148:5,
154:8, 154:12,
157:14, 160:1,
160:7, 166:11,
166:15

tell
105:26, 105:40,
157:23

ten
120:19, 121:11

term
176:3

terms
130:2

test
153:20

testify
152:25

testify
106:14

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

198

**testimony**
106:23, 179:28,
180:12
**testing**
114:13, 114:16,
157:2
**texas**
103:6, 103:8,
179:23, 180:20
**th**
104:14, 106:5,
125:3, 180:16
**thank**
106:20, 109:3,
115:8, 115:9,
118:10, 137:4,
147:20, 148:9,
149:9, 153:8,
154:14, 157:5,
158:7, 176:12,
176:14
**thanks**
141:21
**therapy**
174:1, 174:3
**therefore**
180:6
**therein**
178:19
**thing**
164:12
**things**
139:25, 174:19
**think**
107:4, 116:16,
117:14, 120:24,
127:3, 127:14,
141:10, 141:13,
147:6, 161:20,
163:20, 175:25,
176:18
**three**
112:8, 153:2,
153:16, 173:19,
174:18
**through**
172:6, 178:14
**time**
103:6, 106:5,

110:25, 111:6,
113:19, 114:9,
114:12, 126:22,
127:11, 128:20,
132:23, 133:17,
147:6, 148:16,
167:2, 176:22
**times**
118:20
**titled**
148:11
**today**
107:6, 138:9,
139:11, 162:5
**told**
136:5, 142:25,
146:3, 168:25
**top**
109:5, 112:5,
158:7, 158:8,
161:8
**topics**
141:3
**touched**
116:16
**transcript**
177:9, 179:26,
180:3
**treanda**
170:13, 170:16,
170:20, 170:21
**treatment**
167:6, 173:21,
174:5, 174:22,
175:8, 175:20
**true**
178:3, 179:27
**trust**
160:23
**trying**
132:1, 132:16,
165:19
**turn**
109:3, 110:15,
112:4, 137:5,
138:14, 155:6,
158:5, 161:5
**two**
121:21, 143:16,

143:19, 144:2,
144:3, 144:7,
144:13, 146:8,
170:21

---
**U**
---

**uh-huh**
124:25, 162:24
**under**
118:25, 119:4,
120:22, 121:22,
142:9, 149:12,
150:4, 155:23,
156:24, 162:13,
167:4, 178:13,
178:20
**underlying**
121:14
**underneath**
121:6, 158:10,
168:4
**understand**
117:2, 117:5,
118:16, 123:24,
125:9, 125:17,
129:10, 130:23,
131:6, 133:23,
145:20, 166:22,
167:14, 170:3,
175:13
**understanding**
116:19, 117:7,
125:8, 129:14,
131:5, 136:2,
136:15, 171:22
**understood**
107:8, 140:16,
149:7, 162:4,
162:12
**undertook**
121:12
**united**
102:1, 179:1
**until**
141:2
**upload**
111:6
**uploaded**
108:20

**usage**
167:5
**use**
109:24, 116:7,
130:2, 168:6
**usp**
142:15, 168:8,
168:10
**utilized**
126:8

---
**V**
---

**vacuum**
156:1
**vehicle**
142:21, 142:24,
143:2, 143:6,
143:12
**vehicles**
142:15, 143:20,
145:6, 145:24,
146:10
**vendor**
157:1, 157:6
**verify**
170:1
**version**
107:17, 127:8,
138:7
**via**
102:23
**vial**
168:12
**video**
106:6, 177:2,
177:6
**videoconference**
102:23
**videographer**
104:20, 106:1,
147:12, 147:16,
176:5, 176:9,
176:24
**videotaped**
102:19, 103:1,
106:2
**vivimusta**
105:47, 110:11,

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

199

123:7, 126:22,
132:7, 132:17,
132:19, 132:25,
133:3, 133:16,
135:14, 166:21,
166:23, 167:2,
167:5, 168:5,
168:23, 169:6,
169:11, 169:16
**volume**
102:21, 179:19
**vs**
102:10, 179:10

**W**
**waiver**
117:12
**want**
106:21, 107:5,
124:17, 124:20,
136:6, 146:20,
147:9, 159:2,
165:22, 165:25
**wanted**
116:17, 145:13,
165:8
**water**
153:10, 153:14,
153:20, 162:23,
163:1, 165:2,
165:6, 169:3,
169:5, 169:9
**watkins**
104:6
**way**
152:9, 153:6
**we'll**
106:8, 107:25,
108:4, 114:23,
152:13, 154:5,
177:7
**we're**
106:9, 132:19
**weekly**
140:21
**weight**
153:14
**welcome**
147:18

**went**
125:21
**west**
104:14
**whatever**
109:16, 111:7,
112:20, 140:22,
141:3, 164:14,
177:7
**whereupon**
108:6, 115:4,
118:4, 120:6,
141:15, 147:25,
154:6, 157:15,
160:2, 166:9
**whether**
123:24, 131:16,
136:1, 139:17
**white**
158:23, 159:6
**windels**
104:13
**withdrawn**
139:12, 170:24
**within**
139:3, 165:7,
180:2
**without**
132:18
**witness**
103:2, 106:8,
106:10, 176:3,
176:14, 179:25,
179:28
**wordings**
125:9
**worked**
121:18
**working**
135:25
**works**
112:14, 160:20
**written**
127:4, 128:9,
142:19, 142:22,
145:1, 150:17,
152:9
**wrote**
113:22

**X**
**xxx**
179:35

**Y**
**yeah**
107:12, 107:15,
108:3, 110:19,
113:14, 115:24,
127:8, 147:11,
148:15, 148:16,
153:7, 158:7,
159:5
**years**
135:25
**yellow**
168:11
**yep**
153:7
**yesterday**
106:24, 107:4,
107:21, 116:17,
117:8, 121:3
**york**
104:8, 104:15

**Z**
**zoom**
102:23, 104:21,
115:9

**.**
**.1061**
104:16
**.1200**
104:9
**.2**
111:20
**.3767**
180:26, 180:27
**.8**
111:14, 111:20

**0**
**0.45**
168:9
**0.9**
168:7

**0000094**
105:24, 118:8
**0000096**
105:20, 115:1
**0000098**
105:27, 120:10
**0000243**
105:35, 148:4
**0000322**
105:17, 108:10
**0000691**
105:32, 141:19
**0011500**
105:48, 166:14
**0047232**
105:45, 160:6
**0071382**
105:41, 157:19
**0137635**
105:38, 154:11
**04**
103:5, 106:6,
176:6, 176:7
**09**
147:13, 147:14

**1**
**10**
105:19, 114:23,
115:4, 147:9,
163:2, 180:21
**10.0**
162:15
**10.5**
162:16, 163:2
**100**
111:24, 112:10,
116:3, 116:6,
119:9, 127:22
**10019**
104:15
**10020**
104:8
**102**
102:31
**104**
105:4
**105**
120:22

HIGHLY CONFIDENTIAL
Transcript of Harish Chinnari, Volume 2
Conducted on December 11, 2025

200

**106**
105:6
**109**
105:17
**11**
102:22, 103:5,
105:22, 106:5,
118:2, 118:4,
167:21, 179:20
**115**
105:20
**118**
105:24
**12**
105:26, 106:4,
109:11, 110:6,
110:23, 111:2,
113:18, 114:7,
120:4, 120:6,
141:11
**120**
105:27
**1271**
104:7
**13**
105:29, 141:13,
141:14, 141:15
**14**
105:34, 147:23,
147:25, 176:8,
176:10
**141**
105:32
**147**
105:35
**15**
105:37, 125:3,
154:5, 154:6,
177:4
**154**
105:38
**156**
104:14
**157**
105:41
**16**
103:5, 105:40,
157:13, 157:15

**160**
105:45
**166**
105:48
**17**
105:43, 159:25,
160:2
**177**
105:8
**178**
105:10
**179**
102:31, 105:12
**18**
105:47, 118:1,
166:8, 166:9,
180:16
**19**
120:3, 147:15,
147:17

___
**2**
___
**2**
153:13
**2.3**
105:16, 105:34,
108:15, 148:11
**2.5**
168:8
**20**
156:2, 173:1,
173:7
**2018**
125:3
**2019**
114:17
**2020**
114:18
**2024**
166:25, 169:19
**2025**
102:22, 103:5,
106:5, 179:20,
180:17
**205580**
125:3, 125:17,
126:8, 126:19,
127:10, 127:25,

129:12, 131:22,
134:13, 134:19,
135:12, 135:15,
136:15
**20850**
180:25
**208550**
129:8
**212.237**
104:16
**212.906**
104:9
**22.7**
168:14
**233**
161:6
**24**
102:11, 110:12,
110:13, 110:22,
114:10, 114:12,
179:11
**25**
168:13
**262**
149:9
**27**
155:8, 155:10,
180:21
**284**
152:16

___
**3**
___
**3.2**
111:14, 111:20
**30**
157:12, 179:34,
180:2
**31**
180:21
**32**
159:24
**3253**
180:20
**34**
114:22
**35**
141:8
**36**
147:22

**37**
154:4
**38**
166:7
**39.45**
168:15
**395**
137:5
**396**
109:3
**397**
158:6

___
**4**
___
**400**
110:16, 142:14,
142:20, 143:12,
144:13, 144:22,
145:12, 145:15,
146:9, 150:7,
151:9, 151:12,
151:18, 151:21,
152:1, 152:3,
152:4, 152:7,
152:8, 155:10,
155:15, 155:23,
156:13, 156:17,
156:24, 162:15,
162:20, 163:2,
163:5, 163:6,
163:23, 164:21,
165:6, 165:10,
168:17, 168:19,
180:24
**401**
112:5, 138:15
**451**
180:23

___
**5**
___
**514**
167:20
**5580**
125:9
**56**
104:14

___
**6**
___
**611397**
102:30

HIGHLY CONFIDENTIAL

Transcript of Harish Chinnari, Volume 2

Conducted on December 11, 2025

201

**647**
155:7
**65**
102:11, 179:11
**686**
180:22
**6n**
156:3, 162:15

### 7

**7**
103:5, 106:6
**700**
142:9

### 8

**8**
147:13, 147:14, 147:15, 147:17
**888.433**
180:26
**888.503**
180:27

### 9

**9**
103:5, 176:6, 176:7, 176:8, 176:10, 177:4
**99**
122:19

# EXHIBIT 7

## Redacted Public Version

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC<br><br>Plaintiffs,<br><br>v.<br><br>APOTEX INC., AND APOTEX CORP.,<br><br>Defendants. | C.A. No. 24-64-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC<br><br>Plaintiffs,<br><br>v.<br><br>SLAYBACK PHARMA LLC, AND AZURITY PHARMACEUTICALS, INC.<br><br>Defendants. | C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |
| EAGLE PHARMACEUTICALS, INC. AND EAGLE SUB1 LLC,<br><br>Plaintiffs,<br><br>v.<br><br>BAXTER HEALTHCARE CORPORATION,<br><br>Defendant. | C.A. No. 24-66-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |

**OPENING EXPERT REPORT OF DR. BERNHARDT TROUT, PH.D.**

**TABLE OF CONTENTS**

I.      BACKGROUND AND QUALIFICATIONS .................................................................1

        A.      Introduction.....................................................................................................1

        B.      Education and Experience................................................................................2

        C.      Compensation .................................................................................................4

        D.      Expert Testimony in Last Four Years ..............................................................4

II.     MATERIALS CONSIDERED ..................................................................................5

III.    PERSON OF ORDINARY SKILL IN THE ART.......................................................5

IV.     LEGAL STANDARDS ...........................................................................................7

        A.      Infringement....................................................................................................8

        B.      Claim Construction .........................................................................................9

        C.      Claim Types...................................................................................................13

        D.      Claim Interpretation ......................................................................................13

V.      THE ASSERTED PATENTS ..................................................................................14

VI.     TECHNICAL BACKGROUND..............................................................................16

VII.    ASSERTED CLAIMS ...........................................................................................20

        A.      Overview.......................................................................................................20

        B.      Claim Structure .............................................................................................24

        C.      Specification .................................................................................................26

        D.      Prosecution History.......................................................................................47

        E.      Extrinsic Evidence ........................................................................................56

VIII.   EAGLE'S PATENTED BELRAPZO® PRODUCT..................................................56

IX.     TEVA'S BENDEKA® PRODUCT .........................................................................57

X.      APOTEX'S NDA PRODUCT.................................................................................58

        A.      Description of Composition............................................................................59

i

B.      Shelf Life & Impurities ...........................................................................60

XI.     SLAYBACK'S NDA PRODUCT ........................................................................61

A.      Description of Composition ....................................................................61

B.      Shelf Life & Impurities ...........................................................................63

XII.    BAXTER'S NDA PRODUCT..............................................................................63

A.      Description of Composition ....................................................................64

B.      Shelf Life & Impurities ...........................................................................66

XIII.   DEFENDANTS INFRINGE THE ASSERTED PATENTS ...............................66

A.      "pharmaceutically acceptable fluid".......................................................67

1.      █████████████████████████████████████
        ██████████████████████████████████████

█       ██████████████████████████████████████
        ██████████████████████████████████████

█       ██████████████████████████████████████
        ██████████████████████████████████████

█       ██████████████████████████████████████
        ██████████████████████████████████████

B.      "wherein the total impurities resulting from the degradation of the
        bendamustine is less than about 5% peak area response as determined by
        HPLC at a wavelength of 223 nm after at least about 15 months at a
        temperature of about 5° C. to about 25° C.".........................................123

XIV.    BELRAPZO® AND BENDEKA® PRACTICE THE ASSERTED PATENTS ............123

A.      Belrapzo® and Bendeka® Embody the Asserted Patents ...................124

1.      Liquid Bendamustine-Containing Composition .....................125

2.      Bendamustine or a Pharmaceutically Acceptable Salt Thereof...............127

3.      Concentration ..........................................................................129

4.      Composition.............................................................................129

5.      Impurity Profile.......................................................................137

B.      Discussion...............................................................................................139

        1.      "pharmaceutically acceptable fluid"........................................................139

        2.      "wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.".........140

XV.    THE RELATIVE VALUE OF THE ASSERTED PATENTS.......................................146

XVI.  CLAIM CHARTS SHOWING THAT BENDEKA® AND BELRAPZO® PRACTICE THE ASSERTED PATENTS......................................................................153

      A.     U.S. Patent No. 11,872,214................................................................................153

      B.     U.S. Patent No. 12,138,248................................................................................158

## I.    Background and Qualifications

### A.    Introduction

1.    I have been retained by counsel for Plaintiffs Eagle Pharmaceuticals, Inc. and Eagle Sub 1 LLC ("Eagle") to provide technical assistance and expert opinions in the above-captioned litigations.   I understand these litigations are related to Eagle's patents and Belrapzo® (bendamustine hydrochloride) drug product, among other things.  Specifically, I understand that Defendants Apotex Inc. and Apotex Corp. (collectively, "Apotex"), Slayback Pharma LLC and Azurity Pharmaceuticals, Inc. (collectively, "Slayback), and Baxter Healthcare Corp. ("Baxter") (each collectively a "Defendant" and together "Defendants") market and sell versions of Belrapzo® (bendamustine hydrochloride) that were approved through the United States Food and Drug Administration's ("FDA's") 505(b)(2) New Drug Application ("NDA") process (each Defendant's "NDA Product" collectively "Defendants' NDA Products").

2.    I understand that Eagle currently asserts that each Defendant's NDA Product infringes certain claims of U.S. Patent No. 11,872,214 (the "'214 patent") and U.S. Patent No. 12,138,248 (collectively, the "Asserted Patents").  I understand that the Asserted Patents share the same specification.   The claims of the Asserted Patents that I understand Eagle asserts each Defendant infringes (the "Asserted Claims") are identified in the table below.

| Asserted Patent[1] | Asserted Claims |
|---|---|
| U.S. Patent No. 11,872,214 | 1-9 |
| U.S. Patent No. 12,138,248 | 1-6, 8-11, 15, 20 |

---

[1] I understand that U.S. Patent No. 11,844,783 (the "'783 patent") is no longer asserted in these cases.  *See* C.A. No. 24-64, D.I. 305; C.A. No. 24-65, D.I. 294; C.A. No. 24-66, D.I. 252.  I offer no opinions on the '783 patent.

1

**B.    Education and Experience**

3.    In this section, I will describe my background which includes decades of experience in the formulation of parenteral drugs.  My background and qualifications are more fully set forth in my curriculum vitae, attached as **Exhibit A**, which also contains a comprehensive list of my publications, patents, books, and presentations.

4.    I am the Raymond F. Baddour Professor of Chemical Engineering at the Massachusetts Institute of Technology ("MIT").  My research focuses generally on pharmaceutical development and manufacturing research.  I have held various teaching positions at MIT since January of 1998.

5.    In 1998, I became an Assistant Professor of Chemical Engineering at MIT.  In 2003, I became an Associate Professor of Chemical Engineering at MIT.  In 2008, I became a full Professor of Chemical Engineering at MIT.  From 2006-2014, I was the Co-Chair of Chemical and Pharmaceutical Engineering Singapore-MIT Alliance Program.  In 2007, I co-founded the Novartis-MIT Center for Continuous Manufacturing with several colleagues and served as Director of the Center from 2007-2019.

6.    I have taught more than 1,000 students in undergraduate and graduate university chemical engineering courses, including courses in Thermodynamics, Chemical Reactor Engineering, Kinetics of Biological and Chemical Systems, Chemical Kinetics and Reactor Design, Process Engineering Laboratory, Molecular Computational Methods in Chemical Engineering, and Chemical Engineering Design Module.  I have taught and supervised graduate students (at both the Masters and Ph.D. level), post-doctoral researchers, and research scientists with a primary emphasis on pharmaceutical development and manufacturing research.  The research of these supervisees often encompasses parenteral formulation (in particular intravenous and subcutaneous) with an emphasis on stabilization approaches for these formulations.

2

7.      I am also familiar with the principles behind and interpretation of high performance liquid chromatography ("HPLC") and have frequently relied on this analytical technique during my career, as well as other techniques, including stability and solubility testing.

8.      I have consulted widely for industry, particularly in the fields of pharmaceutical development and manufacturing, including stabilization of pharmaceuticals and delivery.  I also work closely with the United States Food and Drug Administration ("FDA"), including as a consultant for FDA Advisory Committee for Pharmaceutical Science and Clinical Pharmacology. In addition, I work with other regulatory agencies, such as the European Medicines Agency and Japan's Pharmaceutical and Medical Devices Agency.  I also work with the United States Pharmacopeia and was recently a member of their Expert Panel on Quality Standards for Pharmaceutical Continuous Manufacturing.  In addition, I am Co-Chair of the International Symposium on Continuous Manufacturing of Pharmaceuticals, a group which promotes integrated continuous manufacturing and works with industry and regulatory authorities across the globe, hosting meetings, and writing white papers.

9.      I am a member of various professional societies, including the American Institute of Chemical Engineers, American Chemical Society, and American Association of Pharmaceutical Scientists.

10.      I have published over 200 papers in peer reviewed journals in the field of pharmaceutical formulation and stabilization, physical chemistry, chemical engineering, and pharmaceutical development and manufacturing.  I am a named inventor on at least 19 pending and/or issued patents.  I regularly give invited lectures, including keynote and plenary lectures to academics, professional organizations, regulatory bodies, including the FDA, and industry.

11.    I received the National Science Foundation Graduate Research Fellowship from 1991 to 1994.  From 1996-1997, I received the Max-Planck Institute Fellowship for Biophysical Chemistry.  In 2000-2004, I received the National Science Foundation Faculty Early Career Development ("CAREER") Award.  I received the Ford Motor Company Young Investigator Award in 2001.  In 2011, I received the Impact Award from the Computational Molecular Science and Engineering Forum of the American Institute of Chemical Engineers.  In 2012, my continuous manufacturing technology led to the Manufacturing Technology Runner-Up for the Wall Street Journal Technology Innovation Award.  In 2014, I received the Counsel for Chemical Research Collaboration Award.  I received the Medicine Maker "Power List" award in 2015, 2016, 2017, and 2019.  In 2015, I received the American Institute of Chemical Engineers Division 15 Plenary Speaking Award.  For a complete list of my awards and honors, please see my curriculum vitae attached hereto as **Exhibit A**.

12.    Based on my experience and qualifications, I consider myself to be an expert in pharmaceutical technology, including the formulation of liquid injectable drug products.

### C.    Compensation

13.    ███████████████████████████████████████████████████ ███████  My compensation is not contingent on the nature of my opinions or the outcome of these cases.

### D.    Expert Testimony in Last Four Years

14.    During the previous four years, I have testified as an expert by deposition and at trial in the cases identified in **Exhibit B** of my report.

## II.    MATERIALS CONSIDERED

15.    This report contains a statement of my present opinions and the bases for those opinions, including the data and other information that I considered in forming these opinions.

16.    If I am called to testify as an expert witness at trial, I anticipate that my testimony may concern the matters addressed in this report and any other reports that I may issue.  My testimony may also include responses to facts, arguments, allegations, or references raised by each Defendant or their experts.  I reserve the right to address materials that may later become available, such as expert reports, declarations, deposition testimony, documents.  I also reserve the right present visual aids and demonstrative exhibits that illustrate my analysis and opinions.

17.    This report is based on the information currently available to me.  Should additional information become available, I reserve the right to amend or supplement my opinions.

18.    A list of documents that I considered to form my opinions is attached as **Exhibit C**. In addition, I also considered my training, knowledge, understanding of scientific texts and principles, and experience in the relevant scientific disciplines, as well as the materials cited herein.

## III.    PERSON OF ORDINARY SKILL IN THE ART

19.    For purposes of this report, I was asked to assume that the priority date for the Asserted Claims of the Asserted Patents is January 28, 2010, which I was informed by counsel for Eagle is the filing date of the first provisional application to which the Asserted Patents claim priority.  However, my opinions (including regarding the qualifications of the POSA and my infringement analysis) would not change if the priority date is determined to be January 28, 2011, which I have been informed is the filing date of the Asserted Patents' non-provisional application.

20.    I was informed by counsel for Eagle that the POSA is a hypothetical person who is presumed to be familiar with the relevant scientific field and its literature at the time of the inventions.  This hypothetical person is also a person of ordinary creativity capable of

5

understanding the scientific principles applicable to the pertinent field.  I understand a POSA is presumed to be one who thinks along the lines of conventional wisdom in the art and is not one who undertakes to innovate.

21.    I understand that factors for determining the ordinary skill in the art may include one or more of the following: (1) the educational level of the inventor(s); (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) the sophistication of the relevant technology; and (6) the educational level of workers active in the field.  I have considered these factors in my analysis.

22.    For example, Dr. Nageshwara R. Palepu and Dr. Phillip Christopher Buxton, the named inventors for the Asserted Patents, have doctoral degrees in pharmaceutical chemistry and organic chemistry, respectively.  *See* EAGLEBEN-SA_00271860 at -877-79 (Palepu Dep.  Tr. 17:17-19:18 (Nov. 29, 2018)); Buxton Dep.  Tr. 111:14-16 (Aug. 21, 2025).

23.    I understand that in a prior litigation regarding patents related to the '483 patent, the Court adopted the following definition of a POSA: "[T]he person of ordinary skill in the art would have had the skills, education, and expertise of a team of individuals working together to formulate a liquid injectable drug product.  Such a team would have included individuals with doctoral degrees in chemistry, biochemistry, pharmaceutics, pharmaceutical sciences, chemical engineering, biochemical engineering or related fields, with at least two years of post-graduate experience in developing liquid injectable drug products, or master's or bachelor's degrees in similar fields of study, with a commensurate increase in their years of postgraduate experience. Such a team also would have been familiar with a variety of issues relevant to developing liquid injectable drug formulations, including, among other things, solubility, stability, pharmacokinetics, pharmacodynamics, and other pharmaceutical characteristics.  Such a team also

6

would have included persons with expertise in analytical chemistry, including the detection and measurement of chemical degradants. The team also would have included skilled medical professionals that have experience in selecting, dispensing, administering cancer treatments including treatments for patients with chronic lymphocytic leukemia and indolent B cell non-Hodgkin's lymphoma. The medical professional would have a medical degree and several years of experience in the clinical development of drugs, including cytotoxic drugs those that are administered intravenously and are prescribed/ordered, dispensed and administered in a manner that is safe and appropriate for patient treatment. This team would further include individuals that are or have regular interactions with oncologists, pharmacologists, toxicologists, clinical oncology pharmacists, specialty pharmacists, oncology nurses, and the like." Stipulation & Order Regarding the Definition of a Person of Ordinary Skill in the Art at 2, *Eagle Pharms. Inc. v. Slayback Pharma LLC*, C.A. No. 21-1256-CFC (D. Del. Sept. 29, 2022); *see also Eagle Pharms., Inc. v. Slayback Pharma LLC*, No. CV 21-1256-CFC-JLH, 2022 WL 14460937 at *3 (D. Del. Oct. 25, 2022), aff'd, No. 2023-1110, 2024 WL 163341 (Fed. Cir. Jan. 16, 2024). I agree with this definition and have adopted this same definition in forming my opinions described in this report.

24.      A similar definition of a person of ordinary skill was adopted by a Delaware court for patents in this same family. *See Cephalon, Inc. v. Slayback Pharma LLC*, 456 F. Supp. 3d 594, 603 (D. Del. 2020).

25.      At the time of the priority date of the Asserted Patents, I had at least the background and qualifications of a person of ordinary skill in the art.

## IV.    LEGAL STANDARDS

26.      In forming my opinions, I applied the following legal standards that were explained to me by counsel for Eagle.

7

27.     I understand that a two-step analysis is used to determine whether a patent claim is infringed.  I understand that the first step is to determine the proper meaning and scope of the asserted claims, which to the extent terms are disputed, is done by the Court.  I applied the Court's claim construction of the relevant disputed terms to my opinions.  I further applied an agreed-upon construction between the parties to my opinions.  For other terms, I understand that I am to use the plain and ordinary meaning of that term to a person of ordinary skill in the art at the time of the patent's filing date, and I have done so in my report.

28.     I understand that the second step of the infringement analysis is to compare the claims as construed to the accused product to determine whether it satisfies the claim elements.  I also understand that to find infringement of a patent claim, the Court must find that the accused products would meet each element of the asserted claim, either literally or under the "doctrine of equivalents."  As relevant to my opinions in this case, I understand that a claim element is met literally if the claim element can be found in the accused product.  I understand that claim element is met under the doctrine of equivalents if it includes a feature that is equivalent to a limitation of the claim.

### A.     Infringement

29.     I understand that a party directly infringes a patent if that person makes, uses, offers to sell, or sells any patented invention within the United States or imports to the United States any patented invention during the term of the patent.

30.     I understand that when considering whether a person or entity infringes a patent, each asserted claim must be considered individually against an accused product.

31.     I understand that an accused product may still infringe an asserted claim under the "doctrine of equivalents," even if it does not literally infringe the asserted claim.  I understand that under this doctrine, an accused product can still be infringing if it includes a feature that is

8

equivalent to a limitation of the claim.  When determining whether there is infringement under the doctrine of equivalents, I have been informed that I must look at each individual limitation of the asserted claim and decide whether the product has an identical or equivalent feature to that individual claim limitation.

32.    To determine whether a product feature is equivalent to a claim limitation, I understand I can evaluate whether a POSA would find that the differences between the feature and the claim limitation were insubstantial at the time of alleged infringement.  I also understand that the feature in the accused product is equivalent if it performs substantially the same function, in substantially the same way, to achieve substantially the same result as the claim limitation.

33.    I further understand that a feature in an accused product is equivalent to a claim limitation if the two are insubstantially different with respect to the role played by the claim limitation in the context of the specific patent claim.  I also understand that differences in chemical properties between a claimed element and an alleged equivalent are insubstantial when those differences do not affect how the claimed invention works.

34.    I understand that Eagle must prove infringement by a preponderance of the evidence, which means more probable than not.

### B.    Claim Construction

35.    As noted above, relevant to my opinions, I reviewed the Court's *Markman* Opinion and I understand that the Court has construed one of the disputed claim terms as set forth in the chart below.  *See* C.A. No. 24-64, D.I. 111; C.A. No. 24-65, D.I. 92; C.A. No. 24-66, D.I. 86.

9

| Claim Term | Court's Construction |
|---|---|
| "wherein the bendamustine concentration in the composition is from about 25 mg/mL"<br><br>'214 Patent, claims 1 and 6 | "wherein the bendamustine concentration in the composition is about 25 mg/mL" |

36.    I understand that the parties agreed to the following construction of the claim term "pharmaceutically acceptable fluid," as set forth below.  *See* C.A. No. 24-64, D.I. 98 at 3 & D.I. 180 & 182.  I applied this construction in my analysis and in this report.

| Claim Term | Parties Agreed-Upon Construction |
|---|---|
| "pharmaceutically acceptable fluid"<br><br>'214 patent, claims 1 and 6<br>'248 patent, claims 1 and 8 | "a fluid which is suitable for pharmaceutical use" |

37.    I also understand that the parties have proposed the following constructions as set forth in the chart below.  *See* C.A. No. 24-64, D.I. 98 at 4, 16 & D.I. 180 & 182.

| Claim Term | Eagle's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "a liquid bendamustine-containing composition comprising"<br><br>'783 patent, claim 1<br>'214 patent, claims 1 and 6<br>'248 patent, claims 1 and 8 | Plain and ordinary meaning, i.e., "a liquid bendamustine-containing composition that includes, but is not limited to" | Plain and ordinary meaning, i.e., "a liquid bendamustine-containing composition including," but it cannot open the closed "consisting of" / "consists of" limitation. |
| "a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol"<br>'783 patent, claim 1<br>'214 patent, claim 1<br>'248 patent, claim 1 | "a fluid which is suitable for pharmaceutical use that is limited to polyethylene glycol and optionally, one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol (but does not exclude impurities and substances unrelated to this element)" | "a fluid suitable for pharmaceutical use having only polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol, as ingredients" |

10

| | | |
|---|---|---|
| "wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol" <br> '214 patent, claim 6 <br> '248 patent, claim 8 | "wherein the fluid which is suitable for pharmaceutical use is limited to polyethylene glycol and optionally, one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol (but does not exclude impurities and substances unrelated to this element)" | "wherein the fluid suitable for pharmaceutical use has only polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol, as ingredients" |

38.     I reviewed the Court's Order after the *Markman* hearing and I understand that the Court will address any necessary claim construction of the above "comprising" and "consisting of" claim terms at summary judgment and/or jury instructions. *See* C.A. No. 24-64, D.I. 111; C.A. No. 24-65, D.I. 92; C.A. No. 24-66, D.I. 86.

39.     I understand from my review of the Joint Claim Construction Brief (C.A. No. 24-64, D.I. 98; C.A. No. 24-65, D.I. 79, C.A. No. 24-66, D.I. 75) and the *Markman* hearing transcript that the parties agree that the "comprising" claim term that applies to the liquid bendamustine formulation as a whole "includes, but is not limited to" the components of the formulation set forth in subsequent limitations.

40.     I also understand from my review of the Joint Claim Construction Brief (C.A. No. 24-64, D.I. 98; C.A. No. 24-65, D.I. 79, C.A. No. 24-66, D.I. 75) and the *Markman* hearing transcript that the parties agree that the "consisting of" limitation has two legal exceptions, regardless of whether those exceptions are recited in the construction of the term.

41.     Thus, I understand from my review of the Joint Claim Construction Brief (C.A. No. 24-64, D.I. 98; C.A. No. 24-65, D.I. 79, C.A. No. 24-66, D.I. 75) and the *Markman* hearing transcript that the disputes over the construction of the "consisting of" claim term are limited to (1) whether the "unrelated" exception applies to the specific element where the "consisting of" term is nested in a limitation as opposed to the preamble (as Eagle proposes) or whether the

11

"unrelated" exception applies to the entire invention (as Defendants propose); and (2) the "as ingredients" language in Defendants' proposed construction.

42.    As discussed below, in my opinion, a POSA reading the Asserted Claims in light of the specification would understand the "liquid bendamustine-containing composition comprising" means the liquid bendamustine composition as a whole can contain additional unrecited elements and a POSA would understand that "a pharmaceutically acceptable fluid consisting of" limits only that element of the liquid bendamustine composition, subject to the legal "impurities" and "unrelated to the element" exceptions.

43.    For clarity, as discussed below, applying either Eagle's or Defendants' proposed construction to the "comprising" and "consisting of" terms, would not impact my infringement analysis.

44.    I was informed by counsel that the parties agreed no other terms require construction and all other claim terms have their plain and ordinary meaning to a POSA, in the context of the specification. I applied the plain and ordinary meaning for all other claim terms.

45.    I was informed by counsel that Defendants contend several claim terms are indefinite in their Final Invalidity Contentions. I understand that the parties agreed not to address indefiniteness at the claim construction stage. *See* C.A. No. 24-64, D.I. 87; C.A. No. 24-65, D.I. 66; C.A. No. 24-66, D.I. 67. I was informed that indefiniteness may be a basis for patent invalidity and Defendants' experts may address one or more of the indefiniteness contentions in their invalidity reports. I have been informed that Eagle will have an opportunity to respond to any such contentions in a responsive report and I reserve the right to respond to any such indefiniteness contentions at that time.

### C.    Claim Types

46.    I was informed by counsel that the Asserted Claims of the '214 patent and '248 patent are "formulation" claims (also known as "composition" claims), which delineate specific components of the formulation.  I further understand that the process or method of manufacture of the claimed formulation is not relevant to the infringement inquiry.  Specifically, I understand that the Asserted Claims are not "product by process" claims, which are those that define a product in terms of the process used to make that product.  I further understand that the Asserted Claims are not "method-of-manufacturing" claims, which are those that describe the steps or processes involved in creating or manufacturing the invention.

47.    I therefore understand that the relevant infringement inquiry for the Asserted Claims is whether a Defendant's NDA Product contains the formulation components at the time of infringement.  I understand the time of infringement is when a Defendant's NDA Product is imported, made, offered for sale, sold, and/or used in the United States.  I was informed by Dr. Vellturo that the below table identifies the approximate month of first sale and date of infringement of each Defendant's NDA Product.

| Defendant | Date of First Sale |
|---|---|
| Apotex | April 2023 |
| Slayback | December 2022 |
| Baxter | February 2023 |

### D.    Claim Interpretation

48.    I understand that the plain and ordinary meaning of the claims is interpreted in light of the claim language itself, the specification, and the prosecution history.

49.    I understand that claim language itself along with the structure of the claim informs how a POSA would understand the claim.  Specifically, I have been informed that when a claim is structured with clauses separated by line indentations, each clause represents a different element

13

of the invention. Accordingly, I understand, for example, that the "pharmaceutically acceptable fluid consisting of" is a separate element from the "stabilizing amount of antioxidant."

50.    I also understand that when "consisting of" is nested in one element of the claim as opposed to contained in the preamble of the claim, only the specific element of the claim is limited by the "consisting of," and the remainder of the claim is governed by "comprising." Accordingly, I understand that in these claims the "pharmaceutically acceptable fluid" is the only element of the claim limited by the "consisting of" language.

51.    I further understand that claims do not have to cover every embodiment of an invention disclosed in the specification. Specifically, I understand that the patentee can draft different claims to cover different embodiments.

## V.    THE ASSERTED PATENTS

52.    At a high level, the Asserted Patents[2] describe and claim, *inter alia*, long-term storage stable liquid bendamustine formulations.

53.    Bendamustine (4-(5-[bis(2-chloroethyl)amino]-1-methyl-1H-benzo[d]imidazol-2-yl)butanoic acid) hydrochloride is a chemical compound that is used as an active ingredient in certain drug products including Belrapzo®, Bendeka®, and each of the Defendant's NDA Products.

54.    Bendamustine is a bifunctional alkylating agent whose chemical structure contains a mechlorethamine group (2-chloroethlyamine, a nitrogen mustard), a benzimidazole ring (1*H*-1,3-benzimidazole), and a butyric acid group (a carboxylic acid).

---

[2] I understand the Asserted Patents share the same specification. I cite to the '214 patent throughout as representative.

14

*See, e.g.*, EAGLEBEN-SA_00339347 (Belrapzo® Label 2024) at -364-65.

55.     Bendamustine hydrochloride has a molecular formula of $C_{16}H_{21}Cl_2N_3O_2 \cdot HCl$ and a molecular weight of approximately 394.7 g/mol. EAGLEBEN-SA_00339347 (Belrapzo® Label 2024) at -365.

56.     Bendamustine was first synthesized in 1963, in East Germany. As of the priority date, bendamustine had been marketed as the active ingredient in several approved lyophilized (i.e., powdered) drug products, including Treanda® (2008-), Ribomustin (1993-), and Cytostasan (1971-1992). *See* '214 Patent at 1:44-48.

57.     I understand that the Asserted Patents share the same specification. As the specification explains, aqueous formulations were not suitable for "long-term storage in liquid form" because they required reconstitution in water, which caused the bendamustine within them to degrade rapidly. '214 patent, 1:61-63. In addition, reconstitution of these formulations was "clinically inconvenient." *Id.*, 1:64-66. The inventions in the Asserted Patents address these problems by describing and claiming liquid bendamustine compositions comprising novel combinations of ingredients suitable for long-term storage.

58.     I will discuss the specific limitations of the Asserted Claims in detail below, but as a general matter, the Asserted Patents claim liquid formulations comprising bendamustine or a pharmaceutically acceptable salt thereof, polyethylene glycol, optionally a co-solvent selected from the group of propylene glycol, ethanol, benzyl alcohol and glycofurol, and an antioxidant,

15

such as monothioglycerol, with a specific amount of impurities present in the compositions after storage for certain time periods at certain temperatures.

## VI.    TECHNICAL BACKGROUND

59.    A pharmaceutical formulation is the finished composition of a drug product, combining the active pharmaceutical ingredient (API), which delivers the therapeutic effect, with one or more inactive components (excipients).  Formulations are designed for various routes of administration, such as oral, topical, inhalation, and parenteral.  In industry usage, "parenteral" refers to dosage forms administered by injection, including intravenous (IV) products.  IV formulations are delivered into the bloodstream via a needle or catheter inserted into a vein.

60.    Excipients are the non-active constituents of a drug product-ingredients other than the API-introduced during manufacture to perform defined technological or biopharmaceutical functions.  In practice, excipients can serve as solvents or co-solvents, solubilizers, chelating agents, antioxidants, preservatives, pH adjusters, buffers, bulking/fillers, and other functionality-driven roles within the formulation.

61.    The selection and control of every excipient—including the solvent system, solubilizers, stabilizers, buffers, preservatives (if applicable), tonicity agents, and chelators—are guided by pharmacopeial standards and ICH/FDA expectations to assure safety, efficacy, manufacturability, and shelf-life stability in clinical use.

62.    Solvents are a class of excipients.  Their primary role is to dissolve the active ingredient and other excipients and create a uniform, molecularly dispersed liquid medium. Example pharmaceutical solvents include ethanol, propylene glycol, and polyethylene glycol.

63.    Solutes are dissolved into the solvent system to perform specific functions (*e.g.*, the API delivers therapeutic effect; antioxidants mitigate oxidative degradation; buffers and pH adjusters set or maintain acidity/basicity). As such, they are different than solvents.

16

64.    pH adjusters are one example of a solute.  They are acids or bases that are added to a formulation to control the solution's acidity/alkalinity by shifting hydrogen ion activity; operationally, pH is monitored on a logarithmic scale and adjusted to a defined target range for product performance and stability.

65.    pH is a measure of the acidity or basicity of a solution. pH is calculated using the following formula, $pH = -\log[H^+]$, where $[H^+]$ is the concentration of $H^+$ ions in the solution.  The pH scale is logarithmic and generally runs from 0-14, wherein solutions with a $pH = 0$ to just under 7 are considered acidic, $pH =$ just over 7-14 is considered basic, and $pH = 7$ is considered neutral.

66.    The lower the pH, the more acidic the solution and the higher the pH, the more basic the solution.  A "strong" acid or base dissociates completely in water, while a "weak" acid or base only partially dissociates, establishing an equilibrium with its conjugate.  As an example, hydrochloric acid (HCl) is a strong acid, whereas acetic acid (found in vinegar) is considered a weak acid.  Similarly, sodium hydroxide is considered a strong base, whereas ammonia is considered a weak base.  Strong acids have very low pKa whereas strong bases have a very high pKa. Finally, a "buffer" is a solution that resists changes in pH when small amounts of acid or base are added, typically consisting of a weak acid and its conjugate base (or a weak base and its conjugate acid).  *See* EAGLEBEN-SA_00362099 (Vollhardt 1999) at -100-04; EAGLEBEN-SA_00361441 (Remington 2000) at -443.

67.    The pH of pharmaceutical formulations is commonly adjusted to either increase or decrease the pH to optimize drug solubility, stability, activity, and absorption.  *See* EAGLEBEN-SA_00361441 (Remington 2000) at -444-45.  If the pH of the formulation or an excipient needs to be raised, the formulator may add a strong base such as NaOH.

17

68.     The FDA has recognized the use of NaOH for this purpose by classifying this chemical as a "pH control agent."  *See* FDA §184.1763, 48 FR 52444, Nov. 18, 1983.  Vice versa, if the pH must be lowered, the formulator may add a strong acid such as HCl.

69.     In parenteral drug products, FDA treats pH adjusters as inactive ingredients generally used as needed (quantum satis) or in small amounts to bring each batch into the specified pH range.  Water for injection is sometimes used during the manufacturing process as a process aid to form an aqueous solution with the pH adjuster

70.     Sodium hydroxide (NaOH), a solid, is by far the most typical example of a basic pH adjuster.  When introduced, NaOH increases the hydroxide ion ($OH^-$, the anion formed when water loses a proton) concentration, thus, neutralizing the $H^+$ acidic species and being consumed in the neutralization process. In doing so, NaOH does not create a new solvent phase.

71.     PEG 400 is a low molecular weight polyethylene glycol that is highly polar and capable of extensive hydrogen bonding and cation coordination. *See* EAGLEBEN-SA_00315043 (Handbook of Pharmaceutical Excipients) at -588-93.  PEG 400 contains some water, whether as an intentional component, impurity, or as adventitious moisture.  ████████████

██████████████████████████

█████████████████████

72.     When NaOH is added to PEG 400 the base dissolves, facilitated by the aqueous fraction, and dissociates to produce $Na^+$ and $OH^-$. *See, e.g.* EAGLEBEN-SA_00288234 (Zimmerman 1997) at -240.  PEG 400 participates in solvation through its ether oxygens, coordinating $Na^+$ and hydrogen-bonding with both water and hydroxide. *Id.* This solvation environment lowers ion pairing and enhances the effective mobility and activity of $OH^-$. The immediate chemical consequence is an increase in the free hydroxide ion concentration.

18

73.     Any acidic species present in the PEG 400 will be neutralized preferentially. These include hydronium ($H_3O^+$) or "free $H^+$" in strongly acidic systems, weakly acidic solutes like degradation products, residual mineral acids from processing, and carbonic acid/bicarbonate generated by dissolution of atmospheric $CO_2$. Hydroxide reacts with these acids to form water (an impurity controlled for in the final formulation).

74.     Neutralization proceeds via classical acid–base reactions in which hydroxide accepts a proton from the acidic species to yield water. For a monoprotic acid HA, the net reaction is $OH^- + HA \rightarrow A^- + H_2O$. *See, e.g.*, EAGLEBEN-SA_00076285 (Poulsen 2010) at -286; EAGLEBEN-SA_00362257 (Zumdahl 2007) at -657-59.

75.     The pH observed after NaOH addition reflects the hydrogen ion activity in the PEG 400, which must be measured in the presence of water. The NaOH addition satisfies neutralization of existing acids and increases hydroxide ion activity. *See, e.g.*, EAGLEBEN-SA_00258396 (pH Measurement/Adjustment of PEG 400 Using 1N NaOH Solution) at -398 ("PEG 400 may contain acidic substances which tends to neutralize any NaOH added"). The overall outcome is effective neutralization without formation of a new solvent phase.

76.     When solid sodium hydroxide is dissolved into PEG 400 ████████████████ ████████████ , it dissolves (facilitated by the small water fraction present in PEG 400 ██████ ████████████ , dissociating into $Na^+$ and $OH^-$; PEG's ether oxygens solvate the cation while hydrogen bonding with water and hydroxide increases the apparent basicity of the medium. The resulting hydroxide neutralizes available acidic species in the PEG matrix (*e.g.*, hydronium, formic acid, other low-level organic acids from PEG handling/oxidation, residual mineral acids, degradants, carbonic acid), forming water, $Na^+$, and the corresponding conjugate bases. This neutralization consumes essentially all added hydroxide, driving the activity of free NaOH toward

19

zero, and the system relaxes to an acid–base equilibrium characterized by a PEG-based continuous liquid phase (the solvent) containing low-level, nonfunctional inorganic counterions (*e.g.*, Na$^+$) and conjugate bases incidental to neutralization; no new solvent phase is created and PEG 400 remains the vehicle. I refer to this overall sequence as "effective consumption" and the sodium hydroxide and/or the hydroxide ions as "effectively consumed."

## VII. ASSERTED CLAIMS

77.  I understand that Eagle is currently asserting that each Defendant infringes claims 1-9 of the '214 patent and claims 1-6, 8-11, 15, and 20 of the '248 patent.

78.  Claims 1 and 6 of the '214 patent are independent claims; the remainder of the asserted claims of the '214 patent are dependent claims.

79.  Claims 1 and 8 of the '248 patent are independent claims; the remainder of the asserted claims of the '248 patent are dependent claims.

### A. Overview

80.  Claim 1 of the '214 patent recites a liquid bendamustine composition in a sterile vial containing a solvent system and an antioxidant that exhibits a certain impurity profile. Independent claim 1 recites:

> 1. A sterile vial containing a liquid bendamustine-containing composition comprising
> about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 25 mg/mL;
> a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
> a stabilizing amount of an antioxidant,
> wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

81.     Consistent with the Court's *Markman* Order, I understand that "from about 25 mg/mL" in the claim has been corrected to "about 25 mg/mL." I apply that correction throughout my analysis.

82.     Dependent claim 2 of the '214 patent recites the same limitations as claim 1 and further requires that the antioxidant is monothioglycerol.

83.     Dependent claim 3 of the '214 patent recites the same limitations as claim 1 and further requires that the antioxidant is monothioglycerol at a concentration of about 5 mg/mL.

84.     Dependent claim 4 of the '214 patent recites the same limitations as claim 1 and further requires that the composition is stable for at least about 15 months at 5° C. or for at least about 15 months at 25° C.

85.     Dependent claim 5 of the '214 patent recites the same limitations as claim 1 and further requires that the composition contain ethanol as a co-solvent.

86.     Similar to claim 1, independent claim 6 of the '214 patent recites a liquid bendamustine composition containing a solvent system and an antioxidant that exhibits a certain impurity profile. Claim 6 recites:

> 6. A liquid bendamustine-containing composition comprising 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid;
> wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
> wherein the bendamustine concentration in pharmaceutically acceptable fluid is from about 25 mg/mL,
> wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

21

87. Consistent with the Court's *Markman* Order, I understand that "from about 25 mg/mL" in the claim has been corrected to "about 25 mg/mL." I apply that correction throughout my analysis.

88. Dependent claim 7 the '214 patent recites the same limitations as claim 6 and further requires that the antioxidant is monothioglycerol.

89. Dependent claim 8 of the '214 patent recites the same limitations as claim 6 and further requires that the antioxidant is monothioglycerol at a concentration of about 5 mg/mL.

90. Dependent claim 9 of the '214 patent recites the same limitations as claim 6 and further requires that the composition contain ethanol as a co-solvent.

91. Claim 1 of the '248 patent recites a liquid bendamustine composition in a sterile container with a solvent system and an antioxidant that exhibits a certain impurity profile. Independent claim 1 recites:

> 1. A sterile container containing a liquid bendamustine-containing composition comprising
> bendamustine, or a pharmaceutically acceptable salt thereof,
>     wherein the bendamustine concentration in the composition is from about 25 mg/mL;
> a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
> a stabilizing amount of an antioxidant,
> wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

92. Dependent claim 2 of the '248 patent recites the same limitations as claim 1 and further requires that the antioxidant is monothioglycerol.

93. Dependent claim 3 of the '248 patent recites the same limitations as claim 1 and further requires that the antioxidant is monothioglycerol at a concentration of about 5 mg/mL.

22

94. Dependent claim 4 of the '248 patent recites the same limitations as claim 1 and further requires that the composition is stable for at least about 15 months at 5° C. or for at least about 15 months at 25° C.

95. Dependent claim 5 of the '248 patent recites the same limitations as claim 1 and further requires that the composition contain a co-solvent selected from the group of propylene glycol, ethanol, benzyl alcohol, and glycofurol.

96. Dependent claim 6 of the '248 patent recites the same limitations as claim 1 and further requires that composition has about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof.

97. Similar to claim 1, independent claim 8 of the '248 patent recites a liquid bendamustine composition containing a solvent system and an antioxidant that exhibits a certain impurity profile.  Claim 8 recites:

> 8. A liquid bendamustine-containing composition comprising bendamustine, or a pharmaceutically acceptable salt thereof,
>     and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid;
> wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
> wherein the bendamustine concentration in the pharmaceutically acceptable fluid is about 25 mg/mL,
> wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

98. Dependent claim 9 of the '248 patent recites the same limitations as claim 8 and further requires that the antioxidant is monothioglycerol.

99. Dependent claim 10 of the '248 patent recites the same limitations as claim 8 and further requires that the antioxidant is monothioglycerol at a concentration of about 5 mg/mL.

23

100.    Dependent claim 11 of the '248 patent recites the same limitations as claim 8 and further requires that the composition contain a co-solvent selected from the group of propylene glycol, ethanol, benzyl alcohol, and glycofurol.

101.    Dependent claim 15 of the '248 patent recites the same limitations as claim 5 and further requires that solvent system of composition is limited to polyethylene glycol and ethanol.

102.    Dependent claim 20 of the '248 patent recites the same limitations as claim 11 and further requires that solvent system of composition is limited to polyethylene glycol and ethanol.

**B.    Claim Structure**

103.    As discussed above, the independent claims of the Asserted Patents generally recite liquid bendamustine compositions "comprising" certain components, *i.e.* "including but not limited to" the components set forth in each claim. A POSA would understand that means that the liquid bendamustine composition can have other components, like a pH adjustor, that are not listed in the following claim limitations yet are still within the scope of the claims. Specifically, a POSA would understand that the liquid bendamustine composition must have ***at least*** three components to be within the scope of the claims: (1) bendamustine or a pharmaceutically acceptable salt thereof; (2) a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally a co-solvent; and (3) antioxidant. If a fourth unclaimed non-solvent component were added to the liquid bendamustine formulation, like a pH adjustor, a POSA would understand the additional component to be part of the liquid bendamustine composition "comprising," and thus still fall within the scope of the claims.

104.    The structure of the claim with "comprising" in the preamble and the "consisting of" or "consist of" nested in the pharmaceutically acceptable fluid element of the claim means a POSA would understand only the pharmaceutically acceptable fluid element to be limited in this claim. A POSA would understand that the pharmaceutically acceptable fluid is a solvent system

24

that is limited to polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol, with the legal exceptions for impurities and other substances unrelated to the pharmaceutically acceptable fluid element.

105.    A POSA reviewing the Asserted Claims would also understand that each claimed component has a specific function within the liquid bendamustine formulation. For example, a POSA would understand that the "bendamustine or pharmaceutically acceptable salt thereof" is the active pharmaceutical ingredient or "API" and the "antioxidant" is the stabilizer. Since the pharmaceutically acceptable fluid is limited to polyethylene glycol, propylene glycol, ethanol, benzyl alcohol, and glycofurol, and defined in the specification as "a fluid which is suitable for pharmaceutical use," a POSA would review the specification to determine how polyethylene glycol, propylene glycol, ethanol, benzyl alcohol, and glycofurol function in the liquid bendamustine formulations as described. That review would demonstrate that each is a solvent.

106.    Additionally, a POSA would understand that the claims expressly require a "liquid bendamustine-containing composition" with a pharmaceutically acceptable fluid "consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol," and specific long-term impurity limits—hallmarks of a dissolved active in a solvent system, not a dry composition or mere diluent-added-at-use. The Asserted Patents highlight that one advantage of the inventive "liquid compositions" are "ready to use or ready for further dilution," *i.e.*, eliminating reconstitution of a lyophilized formulation. A POSA would understand that this requires bendamustine to be in solution (or at minimum fully dispersible) in the pharmaceutically acceptable fluid, *i.e.*, that the fluid is functioning as the solvent for bendamustine.

107.    Defendants' "as ingredients" language in its proposed construction of the "consisting of" claim term does not change my analysis of what the pharmaceutically acceptable

25

fluid _is_.  I understand the phrase "as ingredients" simply reflects that the pharmaceutically acceptable fluid is limited to the solvent "ingredients" set forth in the element; it does not alter the functional classification that governs the fluid element.  Other materials present "as ingredients" in the composition—such as a pH adjuster, antioxidant, or trace residuals—remain ingredients of the composition but are not part of the fluid element unless they are themselves one of the listed solvents.  Put differently, calling all components "ingredients" does not recharacterize a pH adjuster or a process residual as a solvent, nor does it expand the closed solvent list.  The claim structure and the formulation's functional roles remain dispositive: the pharmaceutically acceptable fluid is the solvent system (PEG, optionally with the listed co-solvents), and other ingredients are dissolved in that fluid but do not become part of it.

### C.    Specification

108.    Reviewing the specification, a POSA would understand that the claimed liquid bendamustine formulations will be "used in the treatment of a number of cancers including leukemias, Hodgkins disease and multiple myelomas."  *See, e.g.*, '214 patent at 1:44-48.  The specification states that:

> Since the active ingredient portion of the inventive composition is an FDA-approved drug, those of ordinary skill will recognize that the doses of bendamustine employed in this aspect of the invention will be similar to those employed in any treatment regimens designed for bendamustine as marketed under the trade name TREANDA.  ***The patient package insert containing dosing information is incorporated herein by reference***.

'214 patent at 5:29-36

109.    The TREANDA® dosing information, incorporated by reference, states that for both CLL and NHL, the reconstituted and diluted drug product was to be "infused intravenously" over certain time periods.  EAGLEBEN-SA_00174217 (TREANDA® Label 4/2009) at -217.  A POSA would understand, through the specification's incorporation of the dosing information for

26

TREANDA® that the claimed bendamustine liquid compositions also would be infused intravenously. *See, e.g.*, '214 patent at 5:25-39.  A POSA would understand that for the claimed liquid bendamustine formulations to be safe for administration by such an infusion the bendamustine and any excipients would have to be fully dissolved, as any particulate matter in the solution could lead to serious adverse patient effects, including death.  Accordingly, a POSA would understand in reviewing the elements of the claim that the pharmaceutically acceptable fluid must be the solvent (or solvent system) for the bendamustine and other excipients.

110.    A POSA would also understand that each pharmaceutically acceptable fluid listed in the claims—polyethylene glycol, propylene glycol, ethanol, benzyl alcohol, and glycofurol— are solvents for bendamustine, used to dissolve poorly soluble or unstable actives to form injectable solutions.  The specification explains that bendamustine is hydrolytically unstable in water and that the inventive compositions achieve long-term stability using non-aqueous solvent systems (e.g., PEG, PG, ethanol) plus stabilizers, which a POSA would understand to constitute a solvent/cosolvent system to reduce hydrolysis and control degradation.  *See, e.g.*, '214 patent at 1:60-63, 3:39-41; 3:62-64.

111.    The specification even provides a mechanistic observation—PEG hydroxyl groups are less reactive than PG hydroxyls—linking solvent choice to the rate of ester formation and impurity control, which a POSA would read as further evidence that the "pharmaceutically acceptable fluid" is chosen and used as the solvent environment governing bendamustine's chemical stability.  *See, e.g.*, '214 patent at 3:62-4:2 ("As a result, the ester forms at a slower rate in polyethylene glycol than propylene glycol and the resulting bendamustine degradants are unexpectedly and substantially reduced over extended periods of time when PEG is a substantial part of the pharmaceutically acceptable fluid.").

112.    The specification defines the "pharmaceutically acceptable fluid' as "a **fluid** which is suitable for pharmaceutical use." *See, e.g.*, '214 patent at 2:56-58 (emphasis added).  Thus, a POSA would understand the pharmaceutically acceptable fluid term in the claim refers only to "fluids" and not "solids."

113.    The specification states: "In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof." '214 patent at 3:39-41.  A POSA would thus look at the list of pharmaceutically acceptable fluids recited in the claim to determine whether those fluids are solvents for bendamustine.  Each of those listed in the claims at issue are solvents, such that a POSA would understand the pharmaceutically acceptable fluid limitation in the claim to have the function of solvent in the claimed formulation.  Here, as other descriptions in the specification confirm, propylene glycol, ethanol, benzyl alcohol, and glycofurol are all solvents for bendamustine.

114.    For example, the specification explains that for the "pharmaceutically acceptable fluid" to be "sufficient" for use, it must contain the "amount which allows the bendamustine to be dissolved or dispersed to a degree which renders the liquid composition ready for use." '214 patent at 6:30-33.  Therefore, a POSA would understand that the pharmaceutically acceptable fluid is the solvent because its purpose is to dissolve the bendamustine so that the injectable formulation is ready for use or ready for dilution.

115.    The specification also identifies "preferred" pharmaceutically acceptable fluids, *i.e.* solvents, as "PG, PEG or ethanol." '214 patent at 4:59-60.  By identifying the "preferred pharmaceutically acceptable fluids" exclusively as solvents, the specification confirms that this claim element addresses the solvent system (the continuous liquid phase supplying solvency,

polarity, viscosity, and miscibility), not every component that may be dissolved within that system or used transiently to condition it.

116. The specification also confirms that in preferred embodiments the pharmaceutically acceptable fluid consists of a mixture of solvents in an amount that always adds up to 100%. By specifying mixtures like "about 95% PEG and about 5% PG," "about 90% PEG and about 10% PG," and ranges "about 95:5 to about 50:50," the specification treats the fluid as a closed component comprised solely of solvents. This is exactly how solvent systems are conventionally expressed: as ratios of constituent solvents totaling 100%. And there is no "room" for the pharmaceutically acceptable fluid to be anything other than a solvent. Moreover, the passage specifying PEG molecular weight (PEG 400) further underscores that the "fluid" element is the solvent system itself.

> In other embodiments of the invention however, the pharmaceutically acceptable fluid is a mixture of PEG and PG. For example, the pharmaceutically acceptable fluid can include about 50% PEG and about 50% PG. Alternatively, pharmaceutically acceptable fluid includes about 95% PEG and about 5% PG. The amount of PEG and PG can also be varied within the ranges, i.e. the ratio of PEG:PG in the pharmaceutically acceptable fluid can range from about 95:5 to about 50:50. Within this range, is a pharmaceutically acceptable fluid containing about 75% PEG and about 25% PG, and preferably 80% PEG and 20% PG. In another embodiment, a pharmaceutically acceptable fluid can include about 85% PEG and about 15% PG while another preferred pharmaceutically acceptable fluid includes about 90% PEG and about 10% PG. The molecular weight of the PEG will be within the range of pharmaceutically acceptable weights although PEG 400 is preferred in many aspects of the invention.

'214 patent at 3:43-61.

117. The specification differentiates between what the pharmaceutically acceptable fluid "is" and what can be "included" in the pharmaceutically acceptable fluid. The specification states that pharmaceutically acceptable fluid "is" the solvent, for example PEG or PG. *See, e.g.*, '214

29

patent at 3:42-43 ("Within this aspect, the pharmaceutically acceptable fluid **is** propylene glycol (PG) or polyethylene glycol (PEG)."), 3:42-45 ("In other embodiments of the invention however, the pharmaceutically acceptable fluid **is** a mixture of PEG and PG."). The specification demonstrates that the pharmaceutically acceptable fluid (solvent), can have other elements "included" in it in some embodiments. *See, e.g.*, *id.* at 3:1-8 ("In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions including: a) bendamustine or a pharmaceutically acceptable salt thereof; and b) a pharmaceutically acceptable fluid **including** i) PEG, PG or mixtures thereof; and ii) a stabilizing amount of an antioxidant."). That these other elements, like an antioxidant, can be "included" in the pharmaceutically acceptable fluid in some embodiments does not change how a POSA would understand what the pharmaceutically acceptable fluid "is," which is a solvent. In fact, the contrast between the "is" statements and statements like for foregoing (that the fluid can "include" an antioxidant) underscores that the fluid is a solvent or solvent system.

118.    The specification also defines the pharmaceutically acceptable fluid by listing exemplary solvents—PG, PEG, ethanol, benzyl alcohol, glycofurol, or DMSO—and then separates stabilizers/salts as additional components.

- '214 patent at 2:3-8: "In other aspects of the invention, the bendamustine-containing compositions include a) a pharmaceutically acceptable fluid which contains one or more of propylene glycol, ethanol, polyethylene glycol, benzyl alcohol and glycofurol, and b) a stabilizing amount of a chloride salt. In other aspects of the invention, the bendamustine-containing compositions include DMSO (dimethyl sulfoxide) as part of the pharmaceutically acceptable fluid included therein."

30

- '214 patent at 4:49-57: "In accordance with other aspects of the invention, there are provided long term storage stable bendamustine-containing compositions, including: a) bendamustine or a pharmaceutically acceptable salt thereof; b) a pharmaceutically acceptable fluid including one or more of the following: PG, ethanol, PEG, benzyl alcohol and glycofurol; and c) a stabilizing amount of a chloride salt."

119.   In every experimental example in the specification, the pharmaceutically acceptable fluid is the liquid medium in which bendamustine HCl is "dissolved" to a stated concentration using one or more of the claimed solvents, with an "added" antioxidant or chloride salt.  The examples confirm that the "pharmaceutically acceptable fluid" element is the solvent for the bendamustine and the antioxidant/chloride salt are additional components.

120.   Example 1 "dissolv[es] bendamustine HCl" in ethanol, PG, or benzyl alcohol, with and without the added chloride salt, and quantifies stability.  Reviewing Example 1, a POSA would understand that ethanol, propylene glycol, and benzyl alcohol are solvents for bendamustine because.  Indeed, the text under Table 1 specifically refers to ethanol, propylene glycol, and benzyl alcohol as "solvent[s]."

### Example 1

Bendamustine-containing compositions were prepared *by dissolving* bendamustine HCl to a concentration of 10 mg/ml in one of ethanol, propylene glycol and benzyl alcohol as indicated in Table 1 below….

## TABLE 1

### Stability of Bendamustine HCl

| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
|---|---|---|---|---|
| BDM - 10 mg/mL Choline chloride - | | Initial | 10.43 | 0.27 |
| 215 mg/mL | 40° C. | 48 hrs | 10.48 | 1.27 |
| Ethanol qs to 1 mL | | 7 day | 10.26 | 2.11 |
| BDM - 10 mg/mL | | Initial | 10.55 | 0.27 |
| Ethanol qs to 1 mL | 40° C. | 48 hrs | 10.30 | 2.39 |
| | | 7 day | 9.55 | 6.66 |

### TABLE 1-continued

### Stability of Bendamustine HCl

| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
|---|---|---|---|---|
| BDM - 10 mg/mL | | Initial | 9.99 | 0.21 |
| Choline chloride - | 40° C. | 48 hrs | 9.95 | 0.60 |
| 215 mg/mL | | | | |
| Propylene glycol | | 7 day | 9.43 | 2.31 |
| qs to 1 mL | | | | |
| BDM - 10 mg/mL | | Initial | 9.68 | 0.21 |
| Propylene glycol | 40° C. | 48 hrs | 9.45 | 0.88 |
| qs to 1 mL | | 7 day | 9.00 | 3.44 |
| BDM - 10 mg/mL | | Initial | 9.95 | 1.19 |
| Choline Chloride - | 40° C. | 48 hrs | 9.89 | 3.51 |
| 215 mg/mL | | 7 day | 8.97 | 4.24 |
| Benzyl alcohol | | | | |
| qs to 1 mL | | | | |
| BDM - 10 mg/mL | | Initial | 9.52 | 0.33 |
| Benzyl alcohol qs | 40° C. | 48 hrs | 8.67 | 4.18 |
| to 1 mL | | 7 day | 7.49 | 7.84 |

Note:

In Table 1 the total % impurities include total contributions from peaks at various RRTs.

> As shown in Table 1, the bendamustine formulations are very stable in solutions containing *solvent* and chloride salt. Table 1 shows that bendamustine, ***when dissolved*** at a concentration of about 10 mg/mL, in a pharmaceutically acceptable fluid, such as ethanol and propylene glycol, and containing a stabilizing amount of a chloride salt, such as choline chloride, had less than about 5% after at least 7 days storage at 40° C."

'214 patent at 6:45-7:26 (emphasis added).

121.    Example 2 dissolves bendamustine HCl in DMSO—a recognized solvent—and presents the evaluation of degradants, again using the fluid as the solvent medium. Reviewing

32

Example 2, a POSA would understand that DMSO is also a solvent for bendamustine, but it is not

a claimed solvent.

Example 2

> Bendamustine-containing compositions were prepared *by dissolving* bendamustine HCl to a concentration of 10 mg/ml in DMSO….

TABLE 2

| Formulation | Temp | Time | Content (mg/mL) | % Total Imp |
|---|---|---|---|---|
| Stability of Bendamustine HCl in DMSO | | | | |
| BDM - 10 mg/mL DMSO qs to 1 mL | 40° C. | Initial | 10.2 | 0.23 |
| | | 48 hrs | 9.80 | 0.30 |
| | | 1 week | 10.0 | 0.56 |

Note:
In Table 2 the total % impurities include total contributions from peaks at various RRTs

> Table 2 shows that bendamustine, *when dissolved* in DMSO, had substantially no increase in total degradants.

'214 patent at 7:47-8:2 (emphasis added).

122.    Reviewing Example 3, a POSA would understand polyethylene glycol to be a

solvent for bendamustine within the scope of the Asserted Claims, specifically a preferred solvent

for bendamustine since all of the other solvents within the scope of the claim are optional.

Example 3

> Bendamustine-containing compositions were prepared *by dissolving* bendamustine HCl to a concentration of 20 mg/ml in polyethylene glycol 400 and 5 mg/ml of lipoic acid was added as a stabilizing antioxidant as indicated in Table 3 below….

33

## TABLE 3

Stability of Bendamustine (20 mg/ml) in PEG 400 and Antioxidants

| Antioxidant | T °C. | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid | 25 | 15 | 98.5 | <LD | 0.23 |
| 5 mg/ml | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

As shown in Table 3, bendamustine, **when dissolved in a pharmaceutically acceptable fluid**, such as polyethylene glycol, in the presence of a stabilizing amount of an oxidant, such as lipoic acid, had substantially no increase in total degradants after a period of 15 days. The data presented in Table 3 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of an antioxidant having a shelf life of at 45 least about 15 months at 5° C. and 25° C.

'214 patent at 8:10-8:53 (emphasis added).

123. Examples 1-3 are all examples of liquid bendamustine compositions where the pharmaceutically acceptable fluid is a single solvent for bendamustine. The specification makes clear that the pharmaceutically acceptable fluid is the vehicle in which the bendamustine is dissolved making clear the pharmaceutically acceptable fluid is the solvent. Specifically, similar to the formulation recited in the Asserted Claims, Example 3 is a liquid bendamustine containing composition where the pharmaceutically acceptable fluid is the solvent polyethylene glycol, and a stabilizing amount of antioxidant is "added" *i.e.* a separate component.

124. Examples 4-8 dissolve bendamustine HCl in PEG/PG mixtures, with antioxidants, and report impurity profiles over time, which are solvent/cosolvent systems used to create stable

34

liquid drug solutions. Specifically, for each example liquid bendamustine composition, the pharmaceutically acceptable fluid is a solvent system where polyethylene glycol is the main solvent and propylene glycol is the co-solvent. Again, the examples demonstrate that the pharmaceutically acceptable fluid is the solvent for the bendamustine and the antioxidant by confirming that the bendamustine and antioxidant are "dissolved in a pharmaceutically acceptable fluid" of polyethylene glycol and propylene glycol.

125. Example 4 describes liquid bendamustine compositions with a 90% polyethylene glycol and 10% propylene glycol solvent system with different "added" antioxidants. Specifically, Example 4 describes liquid bendamustine concentrations where the bendamustine is "dissolved in a pharmaceutically acceptable fluid, such as a combination of polyethylene glycol and propylene glycol" so a POSA would again understand that the pharmaceutically acceptable fluid, when containing a mixture of polyethylene glycol and a propylene glycol functions as the solvent system for the formulation dissolving the bendamustine HCl and any other excipients including the antioxidant.

Example 4

> Bendamustine-containing compositions were prepared ***by dissolving*** bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 5 mg/ml of thioglycerol, a-lipoic acid or dihydrolipoic acid was added as a stabilizing antioxidant as indicated in Table 4 below….

35

TABLE 4

Stability of Bendamustine (50 mg/ml) in 90%
PEG 400, 10% Propylene Glycol and Antioxidant

| | | | | | % Impurities RRT | | % |
| | | | | | | | |
| Antioxidant | T (° C.) | Time | Content (mg/mL) | % Initial | HP1 0.59 | PG ester 1.10 | Total Imps |
|---|---|---|---|---|---|---|---|
| Thioglycerol | 40 | initial | 48.8 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 48.5 | 99.4 | 0.06 | 0.20 | 0.71 |
| α-lipoic acid | 40 | initial | 49 | 100 | <LD | <LD | 0 |
| | 40 | 15 days | 48.8 | 99.6 | 0.19 | 0.13 | 0.32 |
| | 40 | 1 month | 48.7 | 99.4 | 0.34 | 0.26 | 0.79 |
| Dihydrolipoic acid | 40 | initial | 49.3 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 47.7 | 97.4 | 0.63 | 0.12 | 1.84 |

<LD = Below Level of Detection

As shown in Table 4, bendamustine, ***when dissolved in a pharmaceutically acceptable fluid***, such as a combination of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of an antioxidant, such as thioglycerol, a-lipoic acid or dihydrolipoic acid, had substantially no increase in total degradants after a period of 1 month.

'214 patent at 8:55-9:67 (emphasis added).

126. Example 5 describes liquid bendamustine compositions with solvent system that is a mix of polyethylene glycol and propylene glycol in different ratios, with an "added" antioxidant. Specifically, Example 5 notes that the liquid bendamustine composition was "prepared by dissolving bendamustine HCl … in a mixture of polyethylene glycol 400 and propylene glycol" confirming that a POSA would understand the mixture of polyethylene glycol 400 and propylene glycol is the solvent system.

Example 5

Bendamustine-containing compositions were prepared ***by dissolving*** bendamustine HCl to a concentration of 50 mg/ml in a mixture of polyethylene glycol 400 and propylene glycol as indicated in Table 5 below. 5 mg/ml of lipoic acid was added as a stabilizing antioxidant….

36

TABLE 5

Stability of Bendamustine (50 mg/ml) and Lipoic Acid (5 mg/ml) in PEG400 and Propylene glycol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | HP1 0.58 | PG ester 1.10 | PG ester 1.13 | % Total Imp. |
|---|---|---|---|---|---|---|---|---|
| BDM— | Initial | | 49.6 | 100 | BDL | BDL | BDL | 0.18 |
| 50 mg/mL | 40° C. | 1 W | 49.0 | 98.8 | 0.05 | 0.13 | BDL | 0.38 |
| Lipoic acid— | | 15 d | 48.3 | 97.4 | 0.08 | 0.26 | BDL | 0.55 |
| 5 mg/mL | | 1 M | 48.0 | 96.8 | 0.11 | 0.43 | 0.13 | 1.03 |
| PEG | 25° C. | 15 d | 49.6 | 100.0 | BDL | 0.10 | BDL | 0.30 |
| 400:PG | | 1 M | 48.4 | 97.6 | 0.05 | 0.19 | BDL | 0.43 |
| (75:25) qs to 1 mL | 5° C. | 1 M | 49.6 | 100.0 | BDL | 0.07 | BDL | 0.27 |
| BDM— | Initial | | 50.2 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/mL | 40° C. | 1 W | 49.9 | 99.4 | BDL | 0.15 | BDL | 0.30 |
| Lipoic acid— | | 15 d | 49.1 | 97.8 | 0.06 | 0.35 | BDL | 0.73 |
| 5 mg/mL | | 1 M | 49.0 | 97.6 | 0.09 | 0.90 | 0.25 | 1.82 |
| PEG | 25° C. | 15 d | 49.9 | 99.4 | BDL | 0.12 | BDL | 0.32 |
| 400:PG | | 1 M | 49.7 | 99.0 | BDL | 0.25 | BDL | 0.59 |
| (50:50) qs to 1 mL | 5° C. | 1 M | 50.0 | 99.6 | BDL | 0.11 | BDL | 0.33 |
| BDM— | Initial | | 50.8 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/mL | 40° C. | 1 W | 50.4 | 99.2 | BDL | 0.11 | BDL | 0.30 |
| Lipoic acid— | | 15 d | 49.7 | 97.8 | 0.07 | 0.17 | BDL | 0.43 |
| 5 mg/mL | | 1 M | 49.7 | 97.8 | 0.13 | 0.27 | 0.09 | 0.84 |
| PEG | 25° C. | 15 d | 50.8 | 100.0 | BDL | 0.10 | BDL | 0.26 |
| 400:PG | | 1 M | 50.8 | 100.0 | 0.05 | 0.14 | BDL | 0.39 |
| (90:10) qs to 1 mL | 5° C. | 1 M | 50.8 | 100.0 | BDL | 0.06 | BDL | 0.34 |

BDL = Below Detectaole Limit

As shown in Table 5, bendamustine, ***when dissolved in certain mixtures of polyethylene glycol and propylene glycol*** and a stabilizing amount of lipoic acid, had substantially no increase in total degradants after a period of 1 month.

'214 patent at 10:5-10:51 (emphasis added).

127.    Example 6 describes liquid bendamustine compositions in a 90% polyethylene glycol and a 10% propylene glycol solvent system with different amounts of antioxidant "added." Specifically, a POSA would understand the language "bendamustine solutions are stable when dissolved in mixtures of PEG and PG" to confirm that polyethylene glycol ("PEG") and propylene glycol ("PG") are the solvent for the bendamustine composition.

Example 6

37

Bendamustine-containing compositions were prepared *by dissolving* bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol and a-lipoic acid was added as a stabilizing antioxidant as indicated in Table 6 below….

TABLE 6

Stability of Bendamustine in 90% PEG 400, 10% PG and α-lipoic acid

| Formulation | Temp | Time Per. | Amt. mg/ml | % of Initial | 0.59 | 1.10 | 1.13 | 1.15 | 1.17 | 1.20 | 1.22 | 1.30 | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BDM— | Initial | | 51.0 | 100 | 0.20 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.26 |
| 50 mg/mL | 40° C. | 1 M | 50.5 | 99.0 | 0.21 | 0.31 | 0.13 | 0.07 | 0.13 | 0.10 | <LD | <LD | 0.95 |
| α-lipoic | | 2 M | 49.7 | 97.5 | 0.22 | 0.71 | 0.28 | 0.14 | 0.12 | 0.21 | 0.12 | <LD | 2.02 |
| acid— | | 3 M | 48.7 | 95.5 | 0.22 | 1.01 | 0.45 | 0.21 | 0.14 | 0.37 | 0.16 | 0.05 | 2.96 |
| 10 mg/mL | 25° C. | 3 M | 50.5 | 99.0 | 0.20 | 0.36 | 0.07 | <LD | <LD | 0.10 | <LD | <LD | 0.73 |
| PEG | | 6 M | 50.4 | 98.8 | 0.22 | 0.60 | 0.17 | 0.06 | 0.06 | 0.09 | 0.10 | 0.08 | 1.44 |
| 400:PG | 5° C. | 6 M | 50.9 | 99.8 | 0.16 | 0.05 | <LD | <LD | <LD | <LD | <LD | <LD | 0.21 |
| (90:10) qs | | 12 M | 50.6 | 99.2 | 0.20 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | 0.38 |
| to 1 mL | | | | | | | | | | | | | |
| BDM— | Initial | | 50.3 | 100 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | <LD | 0.18 |
| 50 mg/mL | 40° C. | 1 M | 50.0 | 99.4 | 0.19 | 0.32 | 0.08 | 0.06 | 0.08 | 0.06 | 0.06 | <LD | 0.85 |
| α-lipoic | | 2 M | 49.8 | 99.0 | 0.19 | 0.65 | 0.21 | 0.12 | 0.13 | 0.23 | 0.14 | 0.06 | 1.85 |
| acid— | | 3 M | 49.5 | 98.4 | 0.15 | 0.89 | 0.37 | 0.17 | 0.13 | 0.32 | 0.10 | <LD | 2.40 |
| 15 mg/mL | | 6 M | 47.0 | 93.4 | 0.20 | 1.76 | 0.66 | 0.19 | 0.31 | 0.47 | 0.33 | 0.17 | 4.93 |
| PEG | 25° C. | 3 M | 50.0 | 99.4 | 0.20 | 0.35 | 0.08 | <LD | <LD | <LD | 0.11 | <LD | 0.79 |
| 400:PG | | 6 M | 49.5 | 98.4 | 0.19 | 0.58 | 0.15 | 0.06 | 0.07 | 0.09 | 0.08 | 0.10 | 1.38 |
| (90:10) qs | 5° C. | 6 M | 50.3 | 100 | 0.17 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.23 |
| to 1 mL | | 12 M | 50.2 | 99.8 | 0.19 | 0.15 | <LD | <LD | <LD | <LD | <LD | <LD | 0.34 |

<LD = Below Level of Detection

The data reported in Table 6 along with the data in Table 5 demonstrates that *bendamustine solutions are stable when dissolved in mixtures of PEG and PG* and 5-15 mg/mL a-lipoic acid. As shown in Table 6, *bendamustine, when dissolved in combinations of polyethylene glycol and propylene glycol*, in the presence of a stabilizing amount of lipoic acid, had less than 3% increase in total degradants after a period of 3 months at 40° C.

'214 patent at 10:58-11:44 (emphasis added).

128. Example 7 describes liquid bendamustine compositions in a 90% polyethylene glycol and a 10% propylene glycol solvent system at different temperatures with an antioxidant "added." Specifically, a POSA would understand the language "bendamustine, when dissolved in a combination of polyethylene glycol and propylene glycol" to confirm that polyethylene glycol ("PEG") and propylene glycol ("PG") are the solvent for the bendamustine composition.

38

Example 7

Bendamustine-containing compositions were prepared *by dissolving* bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 2.5 mg/ml of thioglycerol was added as an antioxidizing agent.….

TABLE 7

Stability of Bendamustine in 90% PEG 400, 10% PG and Thioglycerol

| Formulation | Temp | Time Per. | Amt mg/ml | % of Initial | RRTs of degradants | | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0.15 | 0.37 | 1.10 | 1.13 | 1.15 | 1.17 | 1.18 | 1.20 | 1.22 | |
| BDM— | Initial | | 50.3 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| 50 mg/mL | 40° C. | 15 d | 50.2 | 99.8 | BDL | BDL | 0.18 | BDL | BDL | BDL | 0.05 | 0.08 | BDL | 0.31 |
| Thio | | 1 M | 49.9 | 99.2 | BDL | 0.12 | 0.32 | 0.07 | BDL | BDL | 0.09 | 0.08 | BDL | 0.75 |
| glycerol— | | 2 M | 49.1 | 97.6 | BDL | 0.18 | 0.56 | 0.24 | 0.09 | 0.17 | 0.19 | 0.12 | 0.11 | 1.76 |
| 2.5 mg/mL | | 3 M | 48.8 | 97.0 | BDL | 0.23 | 0.85 | 0.34 | 0.16 | 0.30 | 0.34 | 0.29 | 0.19 | 2.94 |
| PEG | 25° C. | 3 M | 49.9 | 99.2 | 0.06 | 0.12 | 0.23 | 0.07 | BDL | 0.06 | 0.07 | 0.06 | BDL | 0.67 |
| 400:PG | | 6 M | 49.3 | 98.0 | BDL | 0.23 | 0.53 | 0.22 | 0.11 | BDL | 0.21 | 0.22 | 0.20 | 2.07 |
| (90:10) qs | | | | | | | | | | | | | | |
| to 1 mL | | | | | | | | | | | | | | |

BDL = Below Detectable Limit

The stability is similar to that of a-lipoic acid samples in Example 6 above. As shown in Table 7, *bendamustine, when dissolved in a combination of polyethylene glycol and propylene glycol*, and a stabilizing amount of thioglycerol, had less than 3% increase in total degradants after a period of 3 months at 40° C.

'214 patent at 12:34-13:6 (emphasis added).

129. Example 8 describes "bendamustine-containing compositions … prepared by dissolving bendamustine HCl … in 85% PEG 400 and 15% PG." A POSA would understand the "by dissolving … in 85% PEG 400 to 15% PG" language to mean that the PEG/PG mixture is the solvent system for the bendamustine composition.

Example 8

Bendamustine-containing compositions were prepared *by dissolving* bendamustine HCl to a concentration of 50 mg/ml in 85% PEG 400 and 15% PG in the presence of 5 mg/ml of thioglycerol...….

39

### TABLE 8

Stability of Bendamustine in 85% PEG 400, 15% PG and Thioglycerol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Total Imp. |
|---|---|---|---|---|---|
| BDM - 50 mg/mL | Initial | | 51.5 | 100 | 0.12 |
| Thioglycerol - 5 mg/mL | 40° C. | 1 M | 50.4 | 97.9 | 1.18 |
| PEG 400:PG (85:15) qs | 25° C. | 1 M | 51.4 | 99.8 | 0.41 |
| to 1 mL | | 3 M | 50.4 | 97.9 | 1.21 |
| | 5° C. | 3 M | 51.0 | 99.0 | 0.26 |

'214 patent at 13:13-13:36 (emphasis added).

130. These examples repeatedly emphasize that the compositions are "bendamustine-containing compositions" with bendamustine "dissolved" to a target mg/mL level in the specified fluid(s), and then assess formation of bendamustine degradants under storage—an experimental design that confirms the role of the "pharmaceutically acceptable fluid" as the solvent vehicle for the active.

131. Given the specification's identification and repeated descriptions of pharmaceutical solvents as the "pharmaceutically acceptable fluid," the explicit "dissolving" steps and kit instructions requiring a sufficient amount of pharmaceutically acceptable fluid to dissolve or disperse bendamustine, the solvent-mechanism discussion, and the ready-to-dilute liquid description—a POSA would conclude that the "pharmaceutically acceptable fluid" recited in the Asserted Claims refers to the solvent or cosolvent system used to dissolve bendamustine and other excipients for stable liquid pharmaceutical compositions.

132. A POSA reviewing the Asserted Claims would also understand that each claimed component has a specific function within the liquid bendamustine formulation. For example, a POSA would understand that the bendamustine or pharmaceutically acceptable salt thereof is the

active pharmaceutical ingredient or "API," the pharmaceutically acceptable fluid is the solvent system, and the antioxidant is the antioxidant/stabilizer. Accordingly, another component that has a different function, such as sodium hydroxide which is a solid and a pH adjustor, would covered by the "comprising" in preamble.

133.    As noted, given the incorporation of the TREANDA® dosing information into the specification, a POSA would understand that the liquid bendamustine-containing compositions of the Asserted Claims are liquid bendamustine formulations that will eventually be diluted and infused intravenously to treat cancer patients. Accordingly, everything in the formulation has to be dissolved in the fluid to be an acceptable for infusion. That various components of the liquid bendamustine formulation are dissolved in the pharmaceutically acceptable fluid does not fundamentally redefine what the pharmaceutically acceptable fluid *is*—a solvent or solvent system. That the components of the composition are dissolved into the pharmaceutically acceptable fluid also does not redefine the pharmaceutically acceptable fluid to include ingredients that are not fluids. For example, that the bendamustine hydrochloride (a solid) is dissolved in the pharmaceutically acceptable fluid does not transform the pharmaceutically acceptable fluid into a different component within the formulation. Rather, the pharmaceutically acceptable fluid is always the solvent; anything dissolved in it does not change the substance of the pharmaceutically acceptable fluid in the context of the Asserted Claims.

134.    The language of independent Claim 6 in the '214 patent and Claim 8 in the '248 patent confirms my opinion. Claim 6 recites that the bendamustine and antioxidant are "in a pharmaceutically acceptable fluid," *i.e.* a solvent. That solvent "consists of" *i.e.* "is" polyethylene glycol and optionally one of the other listed co-solvents. In other words, that other components are *in* the pharmaceutically acceptable fluid does not change the fact that the only components of

41

the pharmaceutically acceptable fluid, *i.e.* solvents, in the composition are PEG and the optional co-solvents as set forth in the claim. Thus, if there was another component that was added *in* to the pharmaceutically acceptable fluid, like sodium hydroxide, a POSA would understand it to be another component of the composition, not part of the pharmaceutically acceptable fluid.

> 6. A liquid bendamustine-containing composition comprising 100 mg of <u>bendamustine</u>, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an <u>antioxidant</u>, ***in a pharmaceutically acceptable fluid***;
> wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
> wherein the bendamustine concentration in pharmaceutically acceptable fluid is from about 25 mg/mL,
> wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

135. Moreover, a POSA would understand that since bendamustine is a solid, for the "liquid bendamustine-containing composition" to be liquid, the bendamustine needs to be fully dissolved in a solution. Accordingly, one of the claim elements must be a solvent for bendamustine. EAGLEBEN-SA_00362257 (Zumdahl 2007) at -373 (defining solvent as "the dissolving medium in a solution"). Since the other listed claim elements are bendamustine (the active ingredient) and an antioxidant, the pharmaceutically acceptable fluid has to be the solvent. A solid pH adjuster like NaOH is not a solvent because it is neither a fluid nor does it dissolve any formulation components. Thus, a POSA would understand that NaOH is not part of the pharmaceutically acceptable fluid.

136. In their infringement contentions, Defendants point to other embodiments in the specification (shown below) to argue that they show that the pharmaceutically acceptable fluid can encompass more than solvents. Specifically, Defendants rely on certain embodiments where the

42

pharmaceutically acceptable fluid allegedly encompasses the solvents and the stabilizing amount of chloride salt/antioxidant.  I disagree and understand that is not how claim scope is determined.  The claims—not the breadth of the specification—govern infringement.  Here, the claims expressly limit the "pharmaceutically acceptable fluid" element by "consisting of" language that lists only solvents (polyethylene glycol and, optionally, one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol).

| Asserted Patents' Shared Specification Disclosure | Citation |
|---|---|
| "a pharmaceutically acceptable fluid which can include in some embodiments PEG, PG or mixtures thereof and an antioxidant or chloride ion source." | '214 patent at Abstract |
| In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions including:<br>a) bendamustine or a pharmaceutically acceptable salt thereof; and<br>b) a pharmaceutically acceptable fluid including<br>i) PEG, PG or mixtures thereof; and<br>ii) a stabilizing amount of an antioxidant. | '214 patent at 3:1-8 |
| In view of the foregoing, some preferred long term storage stable bendamustine-containing compositions in accordance with the invention compositions include:<br>I. a) bendamustine or a pharmaceutically acceptable salt thereof; and<br>b) a pharmaceutically acceptable fluid including<br>i) polyethylene glycol and propylene glycol; and<br>ii) a stabilizing amount of thioglycerol; or<br>II. a) about 50 mg/mL bendamustine or a pharmaceutically acceptable salt thereof; and<br>b) a pharmaceutically acceptable fluid including<br>i) about 90% PEG and about 10% PG; and<br>ii) about 2.5 mg/mL thioglycerol | '214 patent at 4:31-43 |
| "Another embodiment of the invention includes methods of preparing bendamustine-containing compositions described herein.  The methods include reconstituting lyophilized bendamustine in a pharmaceutically acceptable fluid containing one of the following:<br>A) i) PEG, PG or mixtures thereof; and<br>ii) a stabilizing amount of an antioxidant;<br>B) i) one of more of PG, ethanol, PEG, benzyl alcohol and glycofurol; and<br>ii) a stabilizing amount of a chloride salt; or<br>C) DMSO." | '214 patent at 5:40-50 |
| "The methods include combining an amount of bendamustine or a pharmaceutically acceptable salt thereof with a sufficient amount of a pharmaceutically acceptable fluid containing one of the following:<br>A) i) PEG, PG or mixtures thereof; and | '214 patent at 5:56-65 |

| | |
|---|---|
| ii) a stabilizing amount of an antioxidant;<br>B) i) one of more of PG, ethanol, PEG, benzyl alcohol and glycofurol; and<br>    ii) a stabilizing amount of a chloride salt; or<br>C) DMSO." | |
| "A further aspect of the invention includes kits containing lyophilized bendamustine or a pharmaceutically acceptable salt thereof in a first container or vial; and, in a second container a sufficient amount of a pharmaceutically acceptable fluid such as those described herein, i.e., one of the following:<br>A) i) PEG, PG or mixtures thereof; and<br>    ii) a stabilizing amount of an antioxidant;<br>B) i) one of more of PG, ethanol, PEG, benzyl alcohol and glycofurol; and<br>    ii) a stabilizing amount of a chloride salt; or<br>C) DMSO." | '214 patent at 6:18-29 |
| Examples<br><br>The following examples serve to provide further appreciation of the invention but are not meant in any way to restrict the effective scope of the invention. [. . .]<br><br>Example 1<br>[. . .]<br>As shown in Table 1, the bendamustine formulations are very stable in solutions containing solvent and chloride salt.  Table 1 shows that bendamustine, when dissolved at a concentration of about 10 mg/mL, in a pharmaceutically acceptable fluid, such as ethanol and propylene glycol, *and* containing a stabilizing amount of a chloride salt, such as choline chloride, had less than about 5% after at least 7 days storage at 40o C." | '214 patent at 6:39-7:33 |

137.    Additionally, the embodiments Defendants point to recite that the pharmaceutically acceptable fluid "includes" or "contains" the stabilizing amount of chloride salt/antioxidant.  *See*, *e.g.*, *id.*  But as noted supra at ¶ 117, the specification uses the language "is" when describing the solvent or solvent system.  A POSA would recognize that the use of "contains" or "includes" may refer to an excipient dissolved in the solvent or system but "is" does not.  Moreover, regardless of what these embodiments show, other embodiments (shown below) separate the pharmaceutically acceptable fluid and the antioxidant.

| Asserted Patents' Shared Specification Disclosure | Citation |
|---|---|
| In other aspects of the invention, the bendamustine-containing compositions include | '214 patent at 2:3-8 |

44

| | |
|---|---|
| a) a pharmaceutically acceptable fluid which contains one or more of propylene glycol, ethanol, polyethylene glycol, benzyl alcohol and glycofurol, and<br>b) a stabilizing amount of a chloride salt. | |
| In accordance with other aspects of the invention, there are provided long term storage stable bendamustine-containing compositions, including:<br>a) bendamustine or a pharmaceutically acceptable salt thereof;<br>b) a pharmaceutically acceptable fluid including one or more of the following: PG, ethanol, PEG, benzyl alcohol and glycofurol; and<br>c) a stabilizing amount of a chloride salt. | '214 patent at 4:49-57 |

138. Further, I understand that the claims do not need to cover each embodiment described by specification and here the claims are directed to the embodiments where the pharmaceutically acceptable fluid is the solvent system and is separate from the antioxidant. Accordingly, the unclaimed embodiments where the pharmaceutically acceptable fluid is stated to "include" or "contain" the solvent and a chloride salt or antioxidant does not alter how a POSA would understand the Asserted Claims.

139. Defendants' cited specification passages identify other formulation embodiments and solutes, but they do not transform the "pharmaceutically acceptable fluid" element into something other than the solvent system recited by the Asserted Claims. And even if they somehow did shed light on the content of a particular "pharmaceutically acceptable fluid," the fact remains that the ones recited in the Asserted Claims are all solvents and in the context of those claims, those statements would at best refer to unclaimed embodiments. The specification is clear that "[i]n several embodiments of the invention . . . the pharmaceutically acceptable fluid is propylene glycol (PG) or polyethylene glycol (PEG)." '214 patent at 3:42-43. The asserted claims reflect such embodiments, as they require PEG and optionally one of the other recited solvents. Thus, at worst, a POSA would view the statements relied upon by Defendants as merely describing unclaimed embodiments, which has no impact on the meaning of the "consisting of" claim element _**in the Asserted Claims**_.

45

140. The specification passages cited by Defendants actually confirm this solvent/solute distinction. For example, where the specification discusses "a pharmaceutically acceptable fluid" together with "a stabilizing amount of a chloride salt," the chloride salt is an added solute serving a stabilizing function; it is not part of the solvent system. Likewise, references to "antioxidants" are to a separate formulation component used in stabilizing amounts, not to the solvent fluid itself. And passages identifying "DMSO" simply describe distinct, alternative fluid embodiments not claimed in the asserted solvent-limited claims. None of these disclosures convert non-solvent solutes into part of the "pharmaceutically acceptable fluid" element in the Asserted Claims.

141. The "consisting of" transition appears in the solvent element—not in the preamble or as a global limitation on the entire composition. As a result, the presence of other, unrelated solutes (e.g., antioxidant, chloride salt) dissolved in the solvent does not vitiate the "consisting of" fluid limitation. It simply means those materials are present in the composition but are not part of the solvent system element. That reading is consistent with the ordinary meaning of solvent versus solute in solution chemistry and with how the specification itself organizes the formulation components (solvent fluid on one hand; stabilizers, salts, and antioxidant on the other).

142. Defendants' reliance on Example 1 and similar passages describing solutions "containing solvent **and** chloride salt" underscores the point: the solvent(s) (e.g., PEG, PG, ethanol) form the pharmaceutically acceptable fluid; the chloride salt is a separate stabilizing solute dissolved in that fluid. The fact that the specification discloses such embodiments does not mean the solvent element in the asserted "consisting of" claims includes salts; to the contrary, it confirms the solvent/solute separation the claims adopt.

143. Even within the unclaimed embodiments, the solvent elements are always listed separate from the other components confirming that solvents are separate from salts/antioxidants.

46

For example, in the below embodiment "i) PEG, PG or mixtures thereof" is element "i)" and "ii) a stabilizing amount of antioxidant" is element "ii)."  A POSA would therefore understand that the solvents were a different component than the antioxidant and in the Asserted Claims the pharmaceutically acceptable fluid is limited to the solvent components which informs a POSA's understanding that the pharmaceutically acceptable fluid in the Asserted Claims is the solvent.

> In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions including:
>   a) bendamustine or a pharmaceutically acceptable salt thereof; and
>   b) a pharmaceutically acceptable fluid including
>       i) PEG, PG or mixtures thereof; and
>       ii) a stabilizing amount of an antioxidant

'214 patent at 3:1-8.

144.    Taken as a whole, these disclosures show a consistent and uniform disclosure: the "pharmaceutically acceptable fluid" is the solvent medium (PEG, PG, ethanol, benzyl alcohol, glycofurol, or DMSO), expressed either singly or as solvent-only mixtures totaling 100%, while antioxidants, chloride salts, and other additives are separate formulation components present in the solution.  This structure aligns with how a POSA would distinguish and understand a solvent system (the continuous liquid phase) from dissolved stabilizers or other excipients.

### D.    Prosecution History

145.    In their infringement contentions, Defendants also point to the "including" language used to describe the pharmaceutically acceptable fluid in the specification to support their assertion that the pharmaceutically acceptable fluid in the claims encompasses more than solvents.  However, I understand that during prosecution the pharmaceutically acceptable fluid limitation was limited to certain solvents using the "consisting of" language in response to a

47

rejection over the prior art reference Drager. EAGLEBEN-SA_00074939 (U.S. Patent Pub. No. 2011/0190363 Drager).

146.    The original claims in the '214 patent, which is U.S. Patent App.  No. 18/081,251, did not include the pharmaceutically acceptable fluid language, they only claimed the solvent, polyethylene glycol.

---

1.    A sterile vial containing a liquid bendamustine-containing composition comprising bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL;

polyethylene glycol; and

a stabilizing amount of an antioxidant.

---

EAGLEBEN-SA_00001077 ('214 Patent File History) at -1105.

147.    The Examiner originally rejected the claims on March 14, 2023 over Drager, reasoning that it taught liquid bendamustine formulations with the solvent polyethylene glycol.[3]

---

Regarding claims 1 and 11, Drager et al. teach that it has been discovered that stable formulation of bendamustine or a pharmaceutical salt thereof can be obtained by mixing with a polar aprotic solvent such as polyethylene glycol ([0016]; claims 1, 3, 4) such as PEG300 or PEG400 [0030] as well as antioxidants such as vitamin E, ascorbic acid, BHA, BHT, propyl gallate ([0030]; claim 11), which naturally stabilizes the composition.

---

EAGLEBEN-SA_00001077 ('214 Patent File History) at -1173.

---

[3] The Examiner incorrectly refers to polyethylene glycol as a polar aprotic solvent in this rejection, likely because the focus of Drager is on formulations with polar aprotic solvents.  Polyethylene glycol 300 and 400 are polar protic solvents.

48

148.    In response, on June 14, 2023, Eagle amended the claims to recite a specific group of polar protic solvents adding the limitation "a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol." Since the original claims recited the solvent polyethylene glycol, a POSA would understand that the pharmaceutically acceptable fluid in this claim also refers to the solvent polyethylene glycol and as amended a limited group of optional polar protic co-solvents. Specifically, the claim amendment limits the solvent to only the listed polar protic solvents using the "consisting of" language to limit the inclusion of any polar aprotic solvents as taught by Drager.

> 1.    (Currently Amended) A sterile vial containing a liquid bendamustine-containing composition comprising
>
> bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL;
>
> a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and
>
> a stabilizing amount of an antioxidant.

EAGLEBEN-SA_00001077 ('214 Patent File History) at -1272.

149.    In explaining the reasons why the claim amendments make the claims patentable over the teachings of Drager, Eagle stated that Drager teaches bendamustine compositions that must comprise polar "aprotic" solvents and the amended claims are limited to formulations with polar protic solvents.

49

**Claim Rejections – 35 U.S.C. § 103**

Claims 1-3, 6-8, 11-13, and 16-18 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over U.S. Publication No. 2011/0190363 (hereinafter "Drager"). *Office Action*, at 6. Applicant requests reconsideration and withdrawal of the rejection.

The claims are directed to liquid, bendamustine-containing compositions comprising 20 mg/mL to about 60 mg/mL of bendamustine, along with a stabilizing amount of an antioxidant, in polyethylene glycol. Polyethylene glycol is "protic" and has the following general formula:

50



Drager's composition must comprise a polar "aprotic" solvent, for example, dimethylacetamide, dimethyl sulfoxide, dimethylformamide, or 1-methyl-2-pyrrolidinone. Drager at *e.g.*, paragraphs [0014], [0017]. Drager explains that polar, aprotic solvents are sufficiently non-nucleophilic towards bendamustine such that polar aprotic solvent-bendamustine adducts do not form over the course of typical commercial storage conditions. Drager at paragraph [0015].

Drager teaches that each of its formulations must include some amount of polar aprotic solvent. While Drager references that polar protic solvent may be used, that is only *in addition to, not instead of*, the polar aprotic solvent. Drager fails to disclose or suggest any bendamustine formulations with solvent systems composed of protic solvent in the absence of any aprotic solvent. Indeed, Drager teaches away from the use of formulations including only polar protic solvent, stating that "while nonaqueous polar protic solvents are of sufficient nucleophilicity to form potentially undesirable polar protic solvent-bendamustine adducts, such adducts will not form during typical commercial storage if the concentration of the polar protic solvent is kept within the scope of the present invention." Drager at paragraph [0019]. Drager's Figure 3 depicts bendamustine degradation in protic solvent (99% propylene glycol) at 5 °C and 25 °C:

*See also,* Drager at paragraph [0036], stating "As can be seen in FIG. 3, bendamustine (BM1) in 99% propylene glycol degrades significantly when stored at 25 °C for less than 100 days. After storage at 5 °C for about 365 days, the purity of the bendamustine is about 80% or less."

Even if the person of ordinary skill in the art were motivated to include a polar protic solvent in a bendamustine formulation, Drager provides no motivation or reason to use polyethylene glycol, specifically. Rather, polyethylene glycol is included – without emphasis or differentiation – in a laundry list of pharmaceutically acceptable nonaqueous polar protic solvents. Polyethylene glycol is not otherwise mentioned in Drager, nor is its use exemplified. The generic list of nonaqueous polar protic ingredients would not have motivated a person of ordinary skill to use polyethylene glycol in a bendamustine formulation. *See, e.g.,* Expert Report of Dr. Siepmann at page 23 *et seq.*[1] *See also, Cephalon, Inc. v. Slayback Pharma Limited Liability Co.,* CA 17-1154-CFC, Opinion (D. Del. April 27, 2020) at 14-15 (court determining that "Drager also taught that protic solvents-i.e., solvents including PEG and PG, that have OH groups-are acceptable to use with bendamustine but only when combined with aprotic solvents."); at 19-20, 21-22 (court determining that Drager teaches away from using polyols such as PEG with bendamustine); at 22-23 (court determining that a person of ordinary skill would have followed Drager's teaching not to use protic solvents such as PEG).

In order to arrive at any claimed composition, the person of ordinary skill in the art would have had to modify Drager's formulations to remove polar aprotic solvent. This proposed modification would have changed the principle of operation of Drager and a *prima facie* case of obviousness cannot be supported. *See* MPEP 2143(VI). Moreover, even if the person of ordinary skill in the art considered removing Drager's required polar aprotic solvent, they would not have had any reasonable expectation of successfully producing a stable liquid formulation of bendamustine in view of Drager's evidence that bendamustine degrades without the polar aprotic solvent. The claims are patentable over Drager and Applicant requests reconsideration and withdrawal of the rejection.

EAGLEBEN-SA_00001077 ('214 Patent File History) at -1274-76.

150.    The Examiner agreed that Drager did not teach a liquid bendamustine formulation limited to polar protic solvents as the claims were now limited to in view of the "pharmaceutically

acceptable fluid consisting of" language.  Thus, on July 11, 2023, the Examiner withdrew the prior rejection of the claims over Drager, as shown below.

> **Withdrawn rejections**
>
> Applicant's amendments and arguments filed 6/14/23 are acknowledged and have been fully considered.  The Examiner has re-weighed all the evidence of record. Any rejection and/or objection not specifically addressed below is herein withdrawn.
>
> Claims 1-3, 6-8, 11-13 and 16-18 were rejected under 35 U.S.C. 103(a) as being unpatentable over Drager et al. (US 20110190363 of record, with benefit of PCT/US09/58023 filed September 23, 2009, which claims priority form provisional 61100074 filed September 25, 2008); Claims 4, 5, 14 and 15 were rejected under 35 U.S.C. 103(a) as being unpatentable over Drager et al. (US 20110190363), as applied to claims 1-3, 6-8, 11-13 and 16-18 above, in further view of Tait et al. (WO 0202125), of record; Claims 9 and 10 were rejected under 35 U.S.C. 103(a) as being unpatentable over Drager et al. (US 20110190363 with benefit of PCT/US09/58023 filed September 23, 2009, which claims priority form provisional 61100074 filed September 25, 2008).
>
> Applicant's amendments and arguments are persuasive and the rejections are withdrawn.

EAGLEBEN-SA_00001077 ('214 Patent File History) at -1899-90.

151.    In evaluating the amended claims with the "pharmaceutically acceptable fluid consisting of" language, in the July 11, 2023 office action, the Examiner issued a new office action citing another prior art reference, Brittain. EAGLEBEN-SA_00091744 (US Patent Pub. No. 2006/0159713 Brittain).   The Examiner's office action confirms that the Examiner—who I understand is presumed to be a POSA—understood the "pharmaceutically acceptable fluid" element referred to "the liquid carrier for the ultimate dosage form," *i.e.* the solvent.

> Brittain et al. teach that ***the liquid carrier for the ultimate dosage*** form can be from a limited list of liquid polyethyelene glycol, propylene glycol, ethanol or mixtures thereof [0067], thereby providing an immediately envisaged embodiment with a pharmaceutically acceptable fluid that consists of polyethyelene glycol and optionally one or more of propylene glycol and ethanol.

EAGLEBEN-SA_00001077 ('214 Patent File History) at -1904 (emphasis added).

152.    In responding to the Examiner's office action citing Brittain on July 28, 2023, Eagle refers to the claims as having "polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol" confirming that "pharmaceutically acceptable fluid" refers to the recited solvents.  Eagle then distinguished Brittain based on the claimed concentration. Concentration is the measure of the amount of a dissolved substance (bendamustine) divided by the total amount of solvent.  Eagle explained it claimed "concentrated bendamustine liquids" using polyethylene glycol as the solvent in the claimed formulation as opposed to Brittain which taught lyophilize powders reconstituted in water.

> The pending claims recite, among other things, liquid bendamustine-containing compositions having from about 20 mg/mL to about 60 mg/mL of bendamustine; ***polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol***; and an antioxidant.  The recited compositions are not reconstituted lyophilized powders; they are concentrated, bendamustine-containing liquids for administration through infusion with an appropriate diluent.
>
> […]
>
> Brittain refers to polyethylene glycol as an example of a "liquid carrier or vehicle" for preparing the ultimate dosage form. (Brittain at paragraph [0067]).  Brittain does not suggest, however, that the skilled person should deviate from the concentrations specified by Treanda®.
>
> While Treanda® refers to a concentrated solution of bendamustine which is subsequently further diluted for administration, it is clear that Treanda® refers to 5 mg/mL (bendamustine in water), which is much more dilute than presently claimed.  Treanda® then instructs

54

that this concentration should be "immediately" transferred to an infusion bag to provide the 0.2-0.6 mg/mL concentration for administration. Without Applicant's disclosure, those skilled in the art would have had no reason to prepare more concentrated bendamustine liquids, e.g., 20 mg/mL to 60 mg/mL.

EAGLEBEN-SA_00001077 ('214 Patent File History) at -925-27 (emphasis added).

153.    In the Examiner's subsequent office action on August 21, 2023, the Examiner again confirms that the pharmaceutically acceptable fluid consisting of refers to the solvent system necessary to obtain the claimed concentration of bendamustine in the liquid bendamustine formulation because the pharmaceutically acceptable fluid needs to be added in an amount to obtain the required concentration, *i.e.* dissolve the relevant amount of bendamustine.

> Brittain et al. teach and suggest that the vials contain about 10-500 mg bendamustine lyophilized powder [0099] and occupy between 30-50% of the vial volume and teach 20 ml vials [0151] as well as 50 ml vials [0008]. Accordingly, the ordinary artisan would have a reasonable expectation of success ***in adding enough pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally propylene glycol or ethanol to the sterile vial to obtain a concentration of about 20-60 mg/ml*** or about 25 mg/ml bendamustine prior to administration based on vial size and bendamustine amount.

EAGLEBEN-SA_00001077 ('214 Patent File History) at -027-28.

154.    And in that same office action the Examiner from August 21, 2023 in responding to Eagle's arguments the Examiner again characterized the pharmaceutically acceptable fluids as "suitable" because it they are "carriers to provide a liquid formulation of bendamustine."

> Brittain teach and suggest both aqueous carriers and ***suitable other carriers to provide a liquid formulation of bendamustine*** [0090] where the "suitable other carriers" include polyols such as propylene glycol or liquid polyethylene glycols [0067].

EAGLEBEN-SA_00001077 ('214 Patent File History) at -026-27.

155.    The prosecution history further confirms that a POSA would understand the "pharmaceutically acceptable fluid" of the Asserted Claims refers only to solvents.

55

### E.    Extrinsic Evidence

156.    I understand that the same "pharmaceutically acceptable fluid" was at issue in a prior litigation that Eagle filed against Slayback asserting a patent is related to, and shares the same specification as, the Asserted Patents.  I understand that, on appeal in that case, the Federal Circuit found "the specification here repeatedly discloses ethanol as serving that purpose, i.e. the specification expressly discloses ethanol as a 'pharmaceutically acceptable fluid.'" *Eagle Pharms. Inc. v. Slayback Pharma LLC*, 958 F.3d 1171, 1177 (Fed. Cir. 2020).  The Federal Circuit also found "that purpose" was as a "pharmaceutically acceptable solvent." *Id.*  I further understand that Slayback previously characterized "ethanol as an alternative solvent to PG," which further informs a POSA's understanding that the pharmaceutically acceptable fluid element refers only to solvents, especially where as here it is limited to a finite list of solvents.  *Id.* at 1174.

## VIII.  EAGLE'S PATENTED BELRAPZO® PRODUCT

157.    Belrapzo® is a liquid injectable anti-cancer drug product indicated for the treatment of chronic lymphocytic leukemia ("CLL") and indolent B-cell non-Hodgkin lymphoma ("NHL").

158.    Belrapzo®'s active pharmaceutical ingredient is bendamustine hydrochloride. Bendamustine has the International Union of Pure and Applied Chemistry ("IUPAC") name 4-{5-[bis(2-chloroethyl)amino]-1-methyl-1H-benzimidazol-2-yl}butanoic acid, the chemical formula $C_{16}H_{21}Cl_2N_3O_2$, and the following chemical structure.

(I)

*See* '214 patent at 1:30-43.

159.    Belrapzo®'s inactive ingredients include polyethylene glycol 400, propylene glycol, and monothioglycerol.  Sodium hydroxide and Water for Injection may also be used to modify the pH of the PEG 400.

160.

## IX.    TEVA'S BENDEKA® PRODUCT

161.    Like Belrapzo®, Bendeka® is a liquid injectable anti-cancer drug product indicated for the treatment of CLL and NHL.

162.    Bendeka®'s active pharmaceutical ingredient is bendamustine hydrochloride. Bendamustine has the International Union of Pure and Applied Chemistry ("IUPAC") name 4-{5-[bis(2-chloroethyl)amino]-1-methyl-1H-benzimidazol-2-yl}butanoic acid, the chemical formula $C_{16}H_{21}Cl_2N_3O_2$, and the following chemical structure.

*See* '214 patent at 1:30-43.

163.    Bendeka®'s inactive ingredients include polyethylene glycol 400, propylene glycol, and monothioglycerol.  Sodium hydroxide and Water for Injection may also be used to modify the pH of the PEG 400.

164.    █████████████████████████████████████████████████████████████ :

## X.    APOTEX'S NDA PRODUCT

165.    I understand that Apotex received FDA Approval for New Drug Application No. 215033 ("Apotex's NDA"), for its Bendamustine Hydrochloride Injection, 100 mg/mL product as described in Apotex's NDA ("Apotex's NDA Product") on December 7, 2022.  EAGLEBEN-SA_00363856 (Apotex FDA Approval Letter).

58

166.    I reviewed the "Label" (EAGLEBEN-SA_00363834 (Apotex Label 12/2022); EAGLEBEN-SA_00363817 (Apotex Label 4/2024))[4] for Apotex's NDA Product, which sets forth the essential scientific information needed for the safe and effective use of Apotex's NDA Product. *See* 21 CFR § 201.56, *id.* at § 201.57.

167.    The Label for Apotex's NDA Product states that Apotex's NDA Product is manufactured by "MSN Laboratories Prive Limited, India."  EAGLEBEN-SA_00363834 (Apotex Label 12/2022) at -855; EAGLEBEN-SA_00363817 (Apotex Label 4/2024) at -833.  Therefore, I understand that Apotex's NDA Product is manufactured in India and the final formulation packaged in vials is imported into the United States for use and sale.

### A.    Description of Composition

168.    Apotex's Label sets forth a "Description" of the composition of Apotex's NDA Product: "Each milliliter contains 25 mg of bendamustine hydrochloride, USP, 38 mg (3.8%) absolute ethanol, 5 mg monothioglycerol, NF in polyethylene glycol 400, and 0.08 mg sodium hydroxide is used to adjust the acidity of polyethylene glycol 400 NF."  EAGLEBEN-SA_00363834 (Apotex Label 12/2022) at -849; EAGLEBEN-SA_00363817 (Apotex Label 4/2024) at -828.

169.    Like Belrapzo® and Bendeka®, Apotex's NDA Product is a sterile, liquid injectable anti-cancer drug product provided in a vial.  According to the label, Apotex's NDA Product is "a sterile, clear, and colorless to yellow solution in a multiple-dose clear glass vial." EAGLEBEN-SA_00363834 (Apotex Label 12/2022) at -849; EAGLEBEN-SA_00363817 (Apotex Label 4/2024) at -828.

---

[4] I understand the "Apotex Label 12/2022" and the "Apotex Label 4/2024" are the FDA Approved Labels for Apotex's NDA Product published on Drugs@FDA, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm.

170.    Like Belrapzo® and Bendeka®, Apotex's NDA Product includes 25 mg/mL bendamustine hydrochloride.  EAGLEBEN-SA_00363834 (Apotex Label 12/2022) at -849; EAGLEBEN-SA_00363817 (Apotex Label 4/2024) at -828.  Bendamustine hydrochloride is a pharmaceutically acceptable salt of bendamustine.  Bendamustine hydrochloride is the active pharmaceutical ingredient in Apotex's NDA Product (i.e. the biologically active ingredient).

171.    Like Belrapzo® and Bendeka®, Apotex's NDA Product includes a quantity of polyethylene glycol 400 sufficient to increase the total amount of the drug product to the desired amount.    EAGLEBEN-SA_00363834 (Apotex Label 12/2022) at -849; EAGLEBEN-SA_00363817 (Apotex Label 4/2024) at -828.  Polyethylene glycol is a component of the pharmaceutically acceptable fluid in Apotex's NDA Product.  *See, e.g.*, '214 patent at 3:42-43.

172.    Apotex's NDA Product includes 38 mg (3.8%) absolute ethanol.  EAGLEBEN-SA_00363834 (Apotex Label 12/2022) at -849; EAGLEBEN-SA_00363817 (Apotex Label 4/2024) at -828.  Ethanol is a component of the pharmaceutically acceptable fluid in Apotex's NDA Product.  *See, e.g.*, '214 patent at 7:29-30.

173.    Like Belrapzo® and Bendeka®, Apotex's NDA Product includes 5 mg monothioglycerol.  EAGLEBEN-SA_00363834 (Apotex Label 12/2022) at -849; EAGLEBEN-SA_00363817 (Apotex Label 4/2024) at -828.  Monothioglycerol is an antioxidant in Apotex's NDA Product and 5 mg/mL of monothioglycerol is a stabilizing amount of antioxidant.  *See, e.g.*, '214 patent at 4:3-30; *see also, e.g.*, EAGLEBEN-SA_00315043 (Handbook of Pharmaceutical Excipients) at -209 ("Monothioglycerol is used as an antioxidant in pharmaceutical formulations, mainly in parenteral preparations.").

### B.    Shelf Life & Impurities

174.    Apotex's NDA Product has a shelf-life of at least 24 months "when stored between 2°C and 8°C."   EAGLEBEN-SA_00363856 (Apotex FDA Approval Letter) at -857.  Thus,

60

according to Apotex and as verified by the FDA, Apotex's stability data demonstrate that Apotex's NDA Product is stable for at least two years when stored under the recommended storage conditions.

## XI.    SLAYBACK'S NDA PRODUCT

175.    I understand that Slayback received FDA Approval for New Drug Application No. 212209 ("Slayback's NDA"), for its Bendamustine Hydrochloride Injection, 100 mg/mL product as described in Slayback's NDA ("Slayback's NDA Product"), commercially sold under the name "Vivimusta," on December 7, 2022.   EAGLEBEN-SA_00363957 (Slayback FDA Approval Letter).

176.    I reviewed the "Label" (EAGLEBEN-SA_00363932 (Slayback Label 12/2022); EAGLEBEN-SA_00363910 (Slayback Label 2/2024))[5] for Slayback's NDA Product, which sets forth the essential scientific information needed for the safe and effective use of Slayback's NDA Product.  *See* 21 CFR § 201.56, *id.* at § 201.57.

177.    The Label for Slayback's NDA Product states that Slayback's NDA Product is manufactured at a facility in "Sermoneta (LT), Italy."   EAGLEBEN-SA_00363932 (Slayback Label 12/2022) at -953; EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at -931.  Therefore, I understand that Slayback's NDA Product is manufactured in Italy and the final formulation packaged in vials is imported into the United States for use and sale.

### A.    Description of Composition

178.    Slayback's Label sets forth a "Description" of the composition of Slayback's NDA Product: "Each milliliter contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of

---

[5] I understand the "Slayback Label 12/2022" and the "Slayback Label 2/2024" are the FDA Approved Labels for Slayback's NDA Product published on Drugs@FDA, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm.

bendamustine, 5 mg of monothioglycerol, 39.45 mg (5% v/v) of absolute alcohol, and q.s. to 1 mL polyethylene glycol 400." EAGLEBEN-SA_00363932 (Slayback Label 12/2022) Label at -946-47; EAGLEBEN-SA_00363910 (Slayback Label 2/2024) Label at -924. Slayback's 2/2024 Label states: "Sodium hydroxide is used to adjust pH of polyethylene glycol 400." EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at -924.

179.    Like Belrapzo® and Bendeka®, Slayback's NDA Product is a sterile, liquid injectable anti-cancer drug product provided in a vial. Slayback's Label states that Slayback's NDA Product is "supplied as a sterile, clear, and colorless to yellow solution in a multiple-dose vial." EAGLEBEN-SA_00363932 (Slayback Label 12/2022) at -946-47; EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at -924.

180.    Like Belrapzo® and Bendeka®, Slayback's NDA Product includes 25 mg/mL bendamustine hydrochloride. EAGLEBEN-SA_00363932 (Slayback Label 12/2022) at -946-47; EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at -924. Bendamustine hydrochloride is a pharmaceutically acceptable salt of bendamustine. Bendamustine hydrochloride is the active pharmaceutical ingredient in Slayback's NDA Product (i.e. the biologically active ingredient).

181.    Like Belrapzo® and Bendeka®, Slayback's NDA Product includes a quantity of polyethylene glycol 400 sufficient to increase the total amount of the drug product to the desired amount. EAGLEBEN-SA_00363932 (Slayback Label 12/2022) Label at -946-47; EAGLEBEN-SA_00363910 (Slayback Label 2/2024) Label at -924. Polyethylene glycol is a component of the pharmaceutically acceptable fluid in Slayback's NDA Product. *See, e.g.*, '214 patent at 3:42-43.

182.    Slayback's NDA Product includes 39.45 mg dehydrated alcohol. EAGLEBEN-SA_00363932 (Slayback Label 12/2022) at -946-47; EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at -924. Absolute alcohol is a synonym for ethanol. *See* EAGLEBEN-SA_00315043

(Handbook of Pharmaceutical Excipients) at -089.  Ethanol is a component of the pharmaceutically acceptable fluid in Slayback's NDA Product.  *See, e.g.*, '214 patent at 7:29-30.

183.    Like Belrapzo® and Bendeka®, Slayback's NDA Product includes 5 mg monothioglycerol.    EAGLEBEN-SA_00363932 (Slayback Label 12/2022) at -946-47; EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at -924.  Monothioglycerol is an antioxidant in Slayback's NDA Product and 5 mg/mL of monothioglycerol is a stabilizing amount of antioxidant.  *See, e.g.*, '214 patent at 4:3-30; EAGLEBEN-SA_00315043 (Handbook of Pharmaceutical Excipients) at -209 ("Monothioglycerol is used as an antioxidant in pharmaceutical formulations, mainly in parenteral preparations.").

### B.    Shelf Life & Impurities

184.    Slayback's NDA Product has a shelf-life of at least 24 months "when stored at 2°C to 8°C."  EAGLEBEN-SA_00363954 (Slayback FDA Approval Letter) at -955.  Thus, according to Slayback and as verified by the FDA, Slayback's stability data demonstrates that Slayback's NDA Product is stable for at least two years when stored under the recommended storage conditions.

### XII.    BAXTER'S NDA PRODUCT

185.    I understand that Baxter received FDA Approval for New Drug Application No. 216078 ("Baxter's NDA"), for its Bendamustine Hydrochloride Injection, 100 mg/mL product as described in Baxter's NDA ("Baxter's NDA Product") on December 15, 2022.  EAGLEBEN-SA_00363906 (Baxter FDA Approval Letter).

186.    I reviewed the "Label" (EAGLEBEN-SA_00363883 (Baxter Label 12/2022); EAGLEBEN-SA_00363860(Baxter Label 2/2024))[6] for Baxter's NDA Product, which sets forth the essential scientific information needed for the safe and effective use of Baxter's NDA Product. *See* 21 CFR § 201.56, *id.* at § 201.57.

187.    The Label for Baxter's NDA Product states that Baxter's NDA Product is "Made in Germany."   EAGLEBEN-SA_00363883 (Baxter Label 12/2022) at -905; EAGLEBEN-SA_00363860 (Baxter Label 2/2024) at -882.  Therefore, I understand that Baxter's NDA Product is manufactured in Germany and the final formulation packaged in vials is imported into the United States for use and sale.

## A.    Description of Composition

188.    Baxter's Label sets forth a "Description" of the composition of Baxter's NDA Product: "Each milliliter contains 25 mg of bendamustine hydrochloride (equivalent to 22.7 mg bendamustine free base), 0.1 g of alcohol, USP (equivalent to 0.1 g absolute ethanol), 5 mg of monothioglycerol, NF (used as an antioxidant) and q.s. to 1 mL polyethylene glycol 400, NF. Sodium hydroxide, NF may have been used to adjust the acidity of polyethylene glycol 400." EAGLEBEN-SA_00363883 (Baxter Label 12/2022) at -898; EAGLEBEN-SA_00363860 (Baxter Label 2/2024) at -875.

189.    Like Belrapzo® and Bendeka®, Baxter's NDA Product is a sterile, liquid injectable anti-cancer drug product provided in a vial.  According to the label, Baxter's NDA Product is "supplied as a sterile, clear, and colorless to yellow solution in a multiple-dose clear glass vial."

---

[6] I understand the "Baxter Label 12/2022" and the "Baxter Label 2/2024" are the FDA Approved Labels    for    Baxter's    NDA    Product    published    on    Drugs@FDA, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm.

EAGLEBEN-SA_00363883 (Baxter Label 12/2022) at -898; EAGLEBEN-SA_00363860 (Baxter Label 2/2024) at -875.

190.    Like Belrapzo® and Bendeka®, Baxter's NDA Product includes 25 mg/mL bendamustine hydrochloride. *See, e.g.*, EAGLEBEN-SA_00363883 (Baxter Label 12/2022) at -898; EAGLEBEN-SA_00363860 (Baxter Label 2/2024) at -875. Bendamustine hydrochloride is a pharmaceutically acceptable salt of bendamustine. Bendamustine hydrochloride is the active pharmaceutical ingredient in Slayback's NDA Product (i.e. the biologically active ingredient).

191.    Like Belrapzo® and Bendeka®, Baxter's NDA Product includes a quantity of polyethylene glycol 400 sufficient to increase the total amount of the drug product to the desired amount.    EAGLEBEN-SA_00363883 (Baxter Label 12/2022) at -898; EAGLEBEN-SA_00363860 (Baxter Label 2/2024) at -875. Polyethylene glycol is a component of the pharmaceutically acceptable fluid in Baxter's NDA Product. *See, e.g.*, '214 patent at 3:42-43.

192.    Baxter's NDA Product includes 0.1 g alcohol. EAGLEBEN-SA_00363883 (Baxter Label 12/2022) at -898; EAGLEBEN-SA_00363860 (Baxter Label 2/2024) at -875. Alcohol is a synonym for ethanol. *See* EAGLEBEN-SA_00315043 (2009 Pharmaceutical Handbook of Excipients) at -089. Ethanol is a component of the pharmaceutically acceptable fluid in Baxter's NDA Product. *See, e.g.*, '214 patent at 7:29-30.

193.    Like Belrapzo® and Bendeka®, Baxter's NDA Product includes 5 mg monothioglycerol. EAGLEBEN-SA_00363883 (Baxter Label 12/2022) at -898; EAGLEBEN-SA_00363860 (Baxter Label 2/2024) at -875. Monothioglycerol is an antioxidant in Baxter's NDA Product and 5 mg/mL of monothioglycerol is a stabilizing amount of antioxidant. *See, e.g.*, '214 patent at 4:3-30; EAGLEBEN-SA_00315043 (Handbook of Pharmaceutical Excipients) at -

209 ("Monothioglycerol is used as an antioxidant in pharmaceutical formulations, mainly in parenteral preparations.").

**B.  Shelf Life & Impurities**

194.  Baxter's NDA Product has a shelf-life of at least 18 months "when stored at 2°C to 8°C."  EAGLEBEN-SA_00363906 (Baxter FDA Approval Letter) at -907.  Thus, according to Baxter and as verified by the FDA, Baxter's stability data demonstrates that Baxter's NDA Product is stable for at least two years when stored under the recommended storage conditions.

**XIII.  DEFENDANTS INFRINGE THE ASSERTED PATENTS**

195.  Based on the analysis below, it is my opinion that Apotex's NDA Product, Slayback's NDA Product, and Baxter's NDA Product (collectively, "Defendants' NDA Products") literally infringe the Asserted Claims of the Asserted Patents.  As discussed above, based on their publicly available Label, Defendants' NDA Products literally meet each and every limitation of the Asserted Claims.  To be clear, I have identified additional evidence that confirms my infringement conclusions for each of the Apotex, Slayback, and Baxter NDA Products.  I discuss each in further detail and include additional evidence of the infringement by each Defendant's NDA Product in Appendix A (Apotex), Appendix B (Slayback), and Appendix C (Baxter).

196.  I understand that Defendants do not dispute that they make, use, offer for sale, and sell in the United States, as well as import into the United States, liquid bendamustine products in sterile vials/containers in accordance with their FDA approved Label.  *See* EAGLEBEN-SA_00363834 (Apotex Label 12/2022); EAGLEBEN-SA_00363817 (Apotex Label 4/2024); EAGLEBEN-SA_00363932 (Slayback Label 12/2022); EAGLEBEN-SA_00363910 (Slayback Label 2/2024); EAGLEBEN-SA_00363883 (Baxter Label 12/2022); EAGLEBEN-SA_00363860 (Baxter Label 2/2024).  I also understand that Defendants do not dispute that their NDA Products contain about 100 mg of bendamustine HCl, have a concentration of about 25 mg/mL, and contain

66

5 mg/mL of the antioxidant monothioglycerol as described on their FDA approved Label. *Id.* I also understand that Defendants do not dispute that their NDA Products contain polyethylene glycol 400 and ethanol. *Id.*

197.    I generally focused my analysis on the Label for Defendants' NDA Products because I understand that this information must contain an accurate "Description" of the drug product including the "qualitative and/or quantitative ingredient information" for the drug product at the time of importation, sale, and/or use, which I understand is the relevant time period for infringement. 21 CFR § 201.57. I understand Defendants contend that the steps of their individual manufacturing process in how/when the sodium hydroxide is added to their NDA Products is relevant to the infringement inquiry. I disagree because I understand that the Asserted Claims are composition claims; they are not "product by process" or "method" of manufacturing claims. As such, what matters is what is in Defendants' NDA Products at the time of infringement, *i.e.* at the time of the accused making, using, offering for sale, selling, and/or importing. However, I address Defendants individual contentions regarding their specific manufacturing processes in Appendices A, B, and C, none of which change my opinion that Defendants' NDA Products infringe the Asserted Claims even if sodium hydroxide is added to the formulation during manufacturing.

### A.    "pharmaceutically acceptable fluid"

198.    I understand that Defendants contend their NDA Products do not meet the "pharmaceutically acceptable fluid" limitation. Specifically, I understand that Defendants contend that the inclusion of sodium hydroxide in their NDA Products means that they do not meet the "pharmaceutically acceptable fluid" limitation recited in each Asserted Claim. *See* C.A. No. 24-64, D.I. 44, 45, 60, 69; *Markman* Hearing Transcript. I disagree. For the reasons explained below, each Defendant's NDA Product meets the "pharmaceutically acceptable fluid" limitation even if

sodium hydroxide is added to their NDA Products during the manufacture process and further assuming that it persists in the finished NDA Product.

### 1. Sodium Hydroxide Is Not Part of the Pharmaceutically Acceptable Fluid

199. As explained in Section VII, a POSA would understand the claimed "pharmaceutically acceptable fluid" to be a solvent for bendamustine. Sodium hydroxide (also referred to as "NaOH") is not a solvent. ████████████ it is a solid.

200. Below are photographs of sodium hydroxide pellets used in pharmaceutical formulations taken from Dr. Kittendorf's laboratory.



201. Consistent with those photographs, the Handbook of Pharmaceutical Excipients contains the following "Description" of sodium hydroxide that confirms it is a solid: "Sodium hydroxide occurs as a white or nearly white fused mass. It is available in small pellets, flakes, sticks, and other shapes or forms. It is hard and brittle and shows a crystalline fracture." *See* EAGLEBEN-SA_00315043 (Handbook of Pharmaceutical Excipients) at -719.

202.    The Label for each Defendant's NDA Products confirms that polyethylene glycol 400 and ethanol are the solvent/vehicle for Defendants' liquid bendamustine products and the sodium hydroxide is an added solid component.

203.    The "Description" section of the Label for each Defendant's NDA Product sets out the composition and assigns functional roles.

| Defendant | 2024 Label[7] |
|---|---|
| **Apotex** EAGLEBEN-SA_00363817 (Apotex Label 4/2024) at -828 | **Description:** Each milliliter contains 25 mg of bendamustine hydrochloride, USP, 38 mg (3.8%) absolute ethanol, 5 mg monothioglycerol, NF in polyethylene glycol 400, and 0.08 mg sodium hydroxide is used to adjust the acidity of polyethylene glycol 400 NF. |
| **Slayback** EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at -924 | **Description:** Each milliliter contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, 39.45 mg (5% v/v) of absolute alcohol, and q.s. to 1 mL polyethylene glycol 400.  Sodium hydroxide is used to adjust pH of polyethylene glycol 400. |
| **Baxter** EAGLEBEN-SA_00363860 (Baxter Label 2/2024) at -875 | **Description:** Each milliliter contains 25 mg of bendamustine hydrochloride (equivalent to 22.7 mg bendamustine free base), 0.1 g of alcohol, USP (equivalent to 0.1 g absolute ethanol), 5 mg of monothioglycerol, NF (used as an antioxidant) and q.s. to 1 mL polyethylene glycol 400, NF.  Sodium hydroxide, NF may have been used to adjust the acidity of polyethylene glycol 400. |

204.    Apotex's Label states "sodium hydroxide is used to adjust the acidity of polyethylene glycol 400."  This single sentence both itemizes the composition and assigns the function of sodium hydroxide.  The other formulation components are "**in** polyethylene glycol 400" making clear to a POSA that the function of the PEG 400 is the primary solvent and the other components, including the sodium hydroxide, are dissolved in the PEG 400/ethanol solvent

---

[7] I cite to the text from each Defendants 2024 Label which is the most recent label available on the FDA website.  My opinion regarding infringement is the same for the time period during which Defendants were using the Labels approved with their NDA Products dated 12/2022.

system. Thus, a POSA would understand the sodium hydroxide in Apotex's NDA Product is a solid and a pH adjustor, not a solvent and thus not part of the pharmaceutically acceptable fluid limitation of the Asserted Claims. Indeed, the Apotex Label consistently distinguishes the solvents from other dissolved components by both placement and function. The solvents are polyethylene glycol 400 and absolute ethanol. The label identifies ethanol in a quantified mass-per-milliliter form and locates it grammatically with polyethylene glycol 400 in the phrase "in polyethylene glycol 400," which is how a parenteral solution would typically identify a solvent/co-solvent matrix. *Id.* That same sentence then immediately distances sodium hydroxide from the co-solvent system and function, assigning it a different role: it "is used to adjust the acidity of polyethylene glycol 400 NF." *Id.* The structure and syntax matter: the solvents are presented as the liquid medium ("in polyethylene glycol 400" with an "absolute ethanol" co-solvent amount), whereas NaOH is expressly presented as a pH adjuster with an instrumental purpose clause. The language is not consistent with sodium hydroxide being part of the pharmaceutically acceptable fluid, *i.e.* solvent system; the label speaks of NaOH only as a means to achieve the desired acidity of PEG 400, not as a solvent or co-solvent.

205. Slayback's Label states, in a separate clause, "Sodium hydroxide is used to adjust pH of polyethylene glycol 400." The placement of the sodium hydroxide in a separate clause indicates it is a separate formulation component, not the solvent system for bendamustine HCl, indeed, it is even defined by a certain functional role, pH adjuster. Read in context, this two sentence description tells a POSA that PEG 400 is the primary vehicle (i.e., solvent) (the "q.s. to 1 mL" medium), ethanol is the co-solvent (quantified at 5% v/v), monothioglycerol is the antioxidant (quantified at 5 mg/mL), and sodium hydroxide serves a distinct and separate function as a pH adjuster for PEG 400. The grammar and placement matter: the solvents are presented as

70

the liquid medium of the solution (PEG 400 with quantified ethanol), whereas sodium hydroxide is expressly identified only for pH adjustment, not as part of the solvent system.  Thus, a POSA would understand the sodium hydroxide in Slayback's NDA Product is a solid and a pH adjustor, not a solvent and thus not part of the pharmaceutically acceptable fluid limitation of the Asserted Claims.

206.    Baxter's Label states, in a separate clause, "Sodium hydroxide, NF may have been used to adjust the acidity of polyethylene glycol 400."  Notably, the label states sodium hydroxide may have been used, it is not a required component of Baxter's NDA Product.  Read in context, these two sentences tell a POSA that PEG 400 is the primary vehicle (the "q.s. to 1 mL" medium), ethanol is a co-solvent (quantified at 5% v/v), monothioglycerol is the antioxidant (quantified at 5 mg/mL), and sodium hydroxide serves a distinct and separate function as an optional pH adjuster for PEG 400.  The grammar and placement matter: the solvents are presented as the liquid medium of the solution (PEG 400 with quantified ethanol), whereas sodium hydroxide is expressly identified only for pH adjustment, not as part of the solvent system.  Thus, a POSA would understand the sodium hydroxide in Baxter's NDA Product is a solid and a pH adjustor, not a solvent and thus not part of the pharmaceutically acceptable fluid limitation of the Asserted Claims.

| Eagle/Teva | 2024 Label[8] |
|---|---|
| **Belrapzo®** <br> EAGLEBEN-SA_00339347 <br> (Belrapzo® Label 2024) at -365 | **Description:** Each milliliter contains 25 mg of bendamustine hydrochloride, USP, 0.1 mL of propylene glycol, USP, 5 mg of monothioglycerol, NF (used as an antioxidant) and q.s. to 1 mL polyethylene glycol 400, NF (sodium hydroxide, NF and water for injection, USP are used to prepare a 1N NaOH solution that may be used for pH modification of PEG 400). |

---

[8] Again, I cite to the text from the 2024 Labels for Bendeka® and Belrapzo® which are the most recent labels available on the FDA website.  My opinion regarding the label text is the same even for prior versions of the Bendeka® and Belrapzo® labels.

71

| **Bendeka®** EAGLEBEN-SA_00340559 (Bendeka® Label 2024) at -578 | **Description:** Each milliliter contains 25 mg of bendamustine hydrochloride, USP, 0.1 mL of Propylene Glycol, USP, 5 mg of Monothioglycerol, NF, in Polyethylene Glycol 400, NF. Sodium hydroxide may have been used to adjust the acidity of polyethylene glycol 400. |
|---|---|

207.    Eagle's labels for Bendeka® and Belrapzo® follow this same grammatical convention reinforcing a POSA's understanding.  Again, in a separate clause (either a separate sentence or set off by parentheses), the labels state that sodium hydroxide may have been used to adjust the acidity/pH of polyethylene glycol 400.  The separation of sodium hydroxide from the rest of the formulation components indicated reinforces that it is a separate component, not the solvent system for bendamustine HCl, indeed, it is even defined by a certain functional role, pH adjuster.  Read in context, the description tells a POSA that PEG 400 is the primary vehicle (the "q.s. to 1 mL" or "in polyethylene" medium), propylene glycol is the co-solvent (quantified in 0.1 mL), monothioglycerol is the antioxidant (quantified at 5 mg), and sodium hydroxide serves a distinct and separate function as an optional pH adjuster for PEG 400.  The grammar and placement matter: the solvents are presented as the liquid medium of the solution (PEG 400 with quantified propylene glycol), whereas sodium hydroxide is expressly identified only for pH adjustment, not as part of the solvent system.  Thus, a POSA would understand the sodium hydroxide in Bendeka® and Belrapzo® is a solid and a pH adjustor, not a solvent and thus not part of the pharmaceutically acceptable fluid limitation of the Asserted Claims.

208.    These distinctions in function are reinforced by the dosage form characterization in each Defendants' Label, which mimics the Bendeka® and Belrapzo® labels.  Each Defendant's NDA Product is a "solution" that is later diluted into standard infusion diluents.  The dosage form is described as a sterile, clear, and colorless to yellow solution in a multiple-dose vial, and the preparation/use instructions direct the user to withdraw the solution and dilute it only into 0.9% Sodium Chloride Injection, USP, or 2.5% Dextrose/0.45% Sodium Chloride Injection, USP,

72

yielding a clear and colorless to slightly yellow solution within a specified final concentration range.

| Defendant | 2024 Label |
|---|---|
| **Apotex**<br><br>EAGLEBEN-SA_00363817 (Apotex Label 4/2024 Label) at -818-20, -828 | **Intravenous Infusion:** Aseptically withdraw the volume needed for the required dose from the 25 mg/mL solution as per Table A below and immediately transfer to a 500 mL infusion bag of one of the following diluents:<br>- 0.9% Sodium Chloride Injection, USP; or<br>- 2.5% Dextrose/0.45% Sodium Chloride Injection, USP.<br><br>**Dosage Forms and Strengths:** Injection: 100 mg/4 mL (25 mg/mL) as clear and colorless to yellow solution in a multiple-dose vial.<br><br>**Description:** Bendamustine hydrochloride injection for intravenous use is supplied as a sterile, clear, and colorless to yellow solution in a multiple-dose clear glass vial.  Each milliliter contains 25 mg of bendamustine hydrochloride, USP, 38 mg (3.8%) absolute ethanol, 5 mg monothioglycerol, NF in polyethylene glycol 400, and 0.08 mg sodium hydroxide is used to adjust the acidity of polyethylene glycol 400 NF. |
| **Slayback**<br><br>EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at -912-13, -924 | **Intravenous Infusion:** Aseptically withdraw the volume needed for the required dose from the 25 mg/mL solution as per Table 1 below and immediately transfer to a 250 mL infusion bag of one of the following diluents:<br>- 0.9% Sodium Chloride Injection, USP; or<br>- 2.5% Dextrose/0.45% Sodium Chloride Injection, USP.<br><br>**Dosage Forms and Strengths:** Injection: 100 mg/4 mL (25 mg/mL) as a clear and colorless to yellow solution in a multiple-dose vial.<br><br>**Description:** VIVIMUSTA (bendamustine hydrochloride injection) is intended for intravenous use after dilution with either 0.9% Sodium Chloride Injection, USP or 2.5% Dextrose/0.45% Sodium Chloride Injection, USP.  It is supplied as a sterile, clear, and colorless to yellow solution in a clear glass multiple-dose vial.  Each milliliter contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, 39.45 mg (5% v/v) of absolute alcohol, and q.s. to 1 mL polyethylene glycol 400. Sodium hydroxide is used to adjust pH of polyethylene glycol 400. |

| | |
|---|---|
| **Baxter**<br><br>EAGLEBEN-SA_00363860 (Baxter Label 2/2024) at -862-64, -875 | **Preparation for Intravenous Administration:** Aseptically withdraw the volume needed for the required dose from the 25 mg/mL solution as per Table A below and immediately transfer to a 500 mL infusion bag of one of the following diluents:<br>- 0.9% Sodium Chloride Injection, USP; or<br>- 2.5% Dextrose/0.45% Sodium Chloride Injection, USP.<br><br>**Dosage Forms and Strengths:** Injection: 100 mg/4 mL (25 mg/mL) as clear and colorless to yellow solution in a multiple-dose vial.<br><br>**Description:** Bendamustine hydrochloride injection for intravenous use is supplied as a sterile, clear, and colorless to yellow solution in a multiple-dose clear glass vial. Each milliliter contains 25 mg of bendamustine hydrochloride (equivalent to 22.7 mg bendamustine free base), 0.1 g of alcohol, USP (equivalent to 0.1 g absolute ethanol), 5 mg of monothioglycerol, NF (used as an antioxidant) and q.s. to 1 mL polyethylene glycol 400, NF. |

209.    The intravenous administration directives are consistent with a PEG/ethanol solvent system carrying dissolved bendamustine and antioxidant, and the Description section expressly assigns sodium hydroxide a different role—used to adjust the acidity/pH of polyethylene glycol 400 NF—rather than listing it as a solvent or co-solvent. Nowhere does Apotex's label characterize NaOH as part of the fluid medium of the drug product; it is referenced solely for pH adjustment, while polyethylene glycol 400 and absolute ethanol form the pharmaceutically acceptable fluid, *i.e.* solvents.

210.    The solvents identified on the Label for each Defendant's NDA Product are those universally understood to function as solvents for drug-in-solution parenterals—polyethylene glycol and ethanol—while monothioglycerol is the antioxidant and sodium hydroxide is referenced only for adjusting acidity/pH. Nothing in the Label for Defendants' NDA Products suggests that

74

sodium hydroxide is a fluid or that it carries any solvent role; instead, its express role is a corrective for the acidity of PEG 400 NF.

211.    Sodium hydroxide, a solid, is a commonly used pH adjustor in pharmaceutical formulations.  The Handbook of Pharmaceutical Excipients explains in the "Applications in Pharmaceutical Formulation or Technology" section that "Sodium hydroxide is widely used in pharmaceutical formulations to adjust the pH of solutions.  It can also be used to react with weak acids to form salts."  EAGLEBEN-SA_00315043 (Handbook of Pharmaceutical Excipients) at -719.

212.    FDA Regulations state that the sodium hydroxide, a solid, is a pH adjustor, specifically that sodium hydroxide is an ingredient that "is used as a pH control agent as defined in § 170.3(o)(23)." 21 CFR § 184.1763.  Section 170.3(o)(23) defines "pH control agents" as "substances added to change or maintain active acidity or basicity, including buffers, acids, alkalies, and neutralizing agents." 21 CFR § 170.3(o)(23).  Conversely, section 170.3(o)(27) defines "solvents and vehicles" as "substances used to extract or dissolve another substance." 21 CFR § 170.3(o)(27).

213.    The FDA treats inactive ingredients "added to adjust the pH" differently from other ingredients in the drug product like the solvent and antioxidant. 21 CFR § 201.100(b)(5)(iii).  The regulation states that "the names of all inactive ingredients" must be included on the Label for the drug product, and specifically if the drug product "is intended for administration by parenteral injection, the quantity or proportion of all inactive ingredients" must be included on the label.  *Id.* The only exception is for "***ingredients added to adjust the pH*** or to make the drug isotonic" those ingredients "may be declared by name and a statement of their effect."  *Id.*  Defendants list sodium hydroxide as an ingredient on their Label by name with a statement of effect, differentiating

75

sodium hydroxide from the other components of their NDA Products, particularly the solvent system.  This separate treatment of sodium hydroxide on the label of each Defendant's NDA Product informs a POSA that the sodium hydroxide is not part of the pharmaceutically acceptable fluid, *i.e.* solvent, it is a different component of the liquid bendamustine-containing composition that would be governed by the "comprising" in the preamble.

214.    Second, each of the Defendants' labels confirms that the NaOH is used to adjust the acidity of the PEG.  They refer to it as PEG 400 even assuming that NaOH is added to the PEG.  Thus, whether or not NaOH is used, the primary solvent remains PEG 400.  *See* EAGLEBEN-SA_00363817 (Apotex Label 4/2024) at -828 ("Each milliliter ***contains*** 25 mg of bendamustine hydrochloride, USP, ***38 mg (3.8%) absolute ethanol***, 5 mg monothioglycerol, NF ***in polyethylene glycol 400***, and 0.08 mg ***sodium hydroxide is used to adjust the acidity of polyethylene glycol 400 NF***"); EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at -924 ("Each milliliter ***contains*** 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, ***39.45 mg (5% v/v) of absolute alcohol***, and ***q.s. to 1 mL polyethylene glycol 400***.  ***Sodium hydroxide is used to adjust pH of polyethylene glycol 400***"); EAGLEBEN-SA_00363860 (Baxter Label 2/2024) at -875 ("Each milliliter ***contains*** 25 mg of bendamustine hydrochloride (equivalent to 22.7 mg bendamustine free base), ***0.1 g of alcohol, USP (equivalent to 0.1 g absolute ethanol)***, 5 mg of monothioglycerol, NF (used as an antioxidant) and ***q.s. to 1 mL polyethylene glycol 400, NF***.  ***Sodium hydroxide, NF may have been used to adjust the acidity of polyethylene glycol 400***").  Thus, per the plain language of the Defendants' labels, the pharmaceutically acceptable fluid in each is PEG 400 and ethanol.

215.    I understand that Defendants may contend that the NaOH in their NDA Products is significant to the stability of the PEG and therefore part of the "pharmaceutically acceptable fluid."

76

I disagree.  An ingredient's classification as part of the pharmaceutically acceptable fluid turns on whether it provides the liquid solvent medium that dissolves and carries the drug.  PEG (with any designated co-solvent) fulfills that solvent role by supplying the continuous liquid phase and the solvation capacity for bendamustine and the antioxidant.  In contrast, sodium hydroxide is added in small amounts as a pH-adjusting agent and in accomplishing that function is effectively consumed. It does not contribute solvent capacity or form a liquid phase.

216.    The stability of PEG as an excipient is governed by well-characterized degradation pathways (*e.g.*, oxidative formation of low-molecular species) that are controlled by excipient quality, antioxidant selection, oxygen exposure, temperature, and storage conditions.  The addition of small quantities of base to condition the acidity of the matrix does not convert sodium hydroxide into a solvent or change the identity of PEG; it simply sets the composition's pH within a target range.  A pH control agent can influence rates of acid- or base-catalyzed reactions, but that instrumental effect does not create or redefine the solvent system.  Scientifically, the solvent remains PEG (with any co-solvent), while the base serves a transient conditioning function.

217.    The chemistry of bendamustine explains why NaOH (a strong base) is used at all. Bendamustine hydrochloride contains a carboxylic acid (butanoic acid) functionality, as reflected in its established chemical name, which makes the dissolved drug inherently acidic and tends to depress the bulk pH of the solution matrix.  EAGLEBEN-SA_00237739 (Pencheva 2008) at -740. That acidic contribution comes from the drug itself, not from the solvent.  As a result, small amounts of sodium hydroxide may be added to the PEG vehicle to neutralize trace acidity and set the overall composition to a target pH range through effective consumption.

218.    A POSA would have known in the context of this invention that the liquid bendamustine-containing composition must be a solution since it would be ultimately

77

intravenously infused into a human to treat certain blood cancers. *See* § VII.C. Thus, a POSA would know that the solubility of bendamustine in the formulation would need to be higher than the target concentration in order to prevent the bendamustine from precipitating out of solution. If the concentration of bendamustine were to exceed the solubility of bendamustine in the formulation, then the bendamustine would tend to precipitate out as a solid, yielding a suspension and not a solution. In a solution, the drug molecules (or ions) are individualized, whereas in a suspension drug particles (consisting of numerous drug molecules/ions) are dispersed in a liquid. The POSA would have understood that suspensions present a host of additional complications, such as potential agglomeration, lack of dosage uniformity, sedimentation, and caking. *See, e.g.*, EAGLEBEN-SA_00077744 (Spiegel 1963) at -746 ("A parenteral solution avoids the disadvantages inherent in suspensions, such as nonuniform dosage, caking, and possible slow release of the medicament when it is not desired."). I do not understand Defendants to contend that the POSA would have been motivated or had reason to make a formulation that is not fully solubilized.

219. Moreover, the POSA would have understood that the presence of solid particles in the diluted infusion solution would present a serious health concern. *See* EAGLEBEN-SA_00263816 ((33d ed. released Nov. 1, 2009, official May 1, 2010) ("USP 33")) at -823 ("All articles intended for parenteral administration shall be prepared in a manner designed to exclude particulate matter as defined in Particulate Matter in Injections <788> and other foreign matter."); EAGLEBEN-SA_00263808 (1 U.S. PHARMACOPEIA <1> Injections 34 (32d ed. official May 1, 2009) ("USP 32")) at -810 ("Today, it is recognized that the presence of particles in solution, particularly if injected intravenously, can be harmful. While the data defining the extent of risk and the effects produced are still limited, it has been shown that particles of lint, rubber, insoluble

78

chemicals, and other foreign matter can produce emboli in the vital organs of animals and man. Further, it has been shown that the development of infusion phlebitis may be related to the presence of particulate matter in the intravenous fluids."). For that reason, intravenous products may not be formulated as suspensions. *See* EAGLEBEN-SA_00074239 (Boylan 2002) at -252 (listing acceptable dosage forms). The POSA would therefore have considered a risk of solid particles in the liquid concentrate formulation to be undesirable, since such particles could fail to dissolve completely in the admixed solution for infusion. *See, e.g.*, EAGLEBEN-SA_00361644 (Remington 2006) at -658 (noting that parenteral products "must be free from visible particulate matter" and that "freedom from . . . visible particulate contamination must be maintained throughout the shelflife of the product").

220. I note that all of the Defendants' NDA Products comprise a liquid concentrate formulation that is "clear." EAGLEBEN-SA_00363834 (Apotex Label 12/2022) at -838, -848-49; EAGLEBEN-SA_00363817 (Apotex Label 4/2024) at -820, -828; EAGLEBEN-SA_00363932 (Slayback Label 12/2022) at -935, -946-47 ; EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at -913, -924; EAGLEBEN-SA_00363883 (Baxter Label 12/2022) at -887, -898; EAGLEBEN-SA_00363860 (Baxter Label 2/2024) at -864, -875. This requirement is in accord with my opinion that the bendamustine should be completely dissolved in the liquid concentrate formulation and thus the pharmaceutically acceptable fluid must be the solvent. Since sodium hydroxide is not a solvent, it is not part of the pharmaceutically acceptable fluid element as claimed.

221. Defendants' products satisfy the pharmaceutically acceptable fluid limitation even under their proposed construction. First, Defendants' construction is identical to Eagle's proposed construction but for the proposed inclusion of the words "as ingredients" at the end. Defendants

also preserve implicitly the ordinary rule that impurities and substances unrelated to the fluid element are not excluded.  Viewed through that lens, the "as ingredients" phrase is superfluous; it does not expand or contract the closed set of solvents that can constitute the pharmaceutically acceptable fluid.

| Claim Term | Eagle's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol" <br> '783 patent, claim 1 <br> '214 patent, claim 1 <br> '248 patent, claim 1 | "a fluid which is suitable for pharmaceutical use that is limited to polyethylene glycol and optionally, one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol (but does not exclude impurities and substances unrelated to this element)" | "a fluid suitable for pharmaceutical use having only polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol, as ingredients" |
| "wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol" <br> '214 patent, claim 6 <br> '248 patent, claim 8 | "wherein the fluid which is suitable for pharmaceutical use is limited to polyethylene glycol and optionally, one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol (but does not exclude impurities and substances unrelated to this element)" | "wherein the fluid suitable for pharmaceutical use has only polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol, ***as ingredients***" |

222.    A POSA would recognize that the only pharmaceutically acceptable fluids in their respective products are PEG 400 and ethanol—both recited in the Asserted Claims.  Thus, the only pharmaceutically acceptable fluid ingredients in each of the Defendants' Products are PEG 400 and ethanol.  Put another way, the only solvents forming the solvent systems in those products are PEG 400 and Ethanol.  Thus, the Defendants' NDA Products satisfy the pharmaceutically acceptable fluid limitation even under their proposed construction.

223.    In each product, ███████████████████████████████████████████████████

████████████████████████████████████████.    The solvent system—the continuous liquid phase that dissolves and carries bendamustine and the antioxidant—therefore consists of PEG 400 and ethanol.  Under Defendants' own construction, those are the only pharmaceutically acceptable fluid "ingredients," because those are the only materials that serve the solvent role.  The addition of "as ingredients" does not convert a pH adjuster into a solvent or add a new solvent to the closed list.

224.    The claim architecture reinforces this conclusion.    The overall composition "comprises" various components, and the pharmaceutically acceptable fluid sub-element "consists of" a limited set of solvents.  Under the claims' structure, any pH adjuster, process residual ions, or trace water—if present and not performing the solvent role—fall within the open "comprising" aspect of the composition and outside the closed solvent element.  This is precisely how a skilled team would classify Defendants' products.  Sodium hydroxide, a solid, is a pH adjuster used in small, q.s.-to-effect amounts to raise the pH of the PEG 400; it is not the continuous liquid phase and does not supply solvation capacity.  Any residual sodium after neutralization is present in trace amounts, functionally inert counterions ordinarily associated with PEG and its conditioning.

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████    None of these materials becomes a pharmaceutically acceptable fluid "ingredient" under Defendants' construction because none is one of the listed solvents and none performs the solvent role.

225.    Defendants' products therefore satisfy the pharmaceutically acceptable fluid limitation even under Defendants' proposed construction of the term.  A POSA would conclude that the only pharmaceutically acceptable fluid ingredients are PEG 400 and ethanol, which are

expressly recited.  To the extent sodium hydroxide is present at all, it resides in the open "comprising" portion of the claim as a pH adjuster and is unrelated to the solvent element. Accordingly, each product remains a liquid bendamustine-containing composition that satisfies every element of the asserted claims, including the pharmaceutically acceptable fluid limitation as Defendants propose to construe it.

226.    Additionally, as noted previously, Defendants' labels expressly state that when included in the composition, sodium hydroxide is used to adjust the acidity of polyethylene glycol 400 NF.    EAGLEBEN-SA_00363817 (Apotex Label 4/2024) at -828;    EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at -924; EAGLEBEN-SA_00363860 (Baxter Label 2/2024) at -875.  The PEG 400 so treated expressly remains "polyethylene glycol 400," as each label identifies the vehicle as "polyethylene glycol 400" in the same Description section that notes sodium hydroxide's pH-adjustment role.  *Id.*  Thus, per the Defendants' labels, the only "ingredients" in their pharmaceutically acceptable fluids are PEG 400 and ethanol.

### 2.    Even If The Sodium Hydroxide Is Part of the Pharmaceutically Acceptable Fluid, Defendants' NDA Products Still Infringe

227.    I have been informed that there are two legal "exceptions" to the "consisting of"/"consists of" claim language for (1) impurities normally associated with the component (the "Impurities Exception"); (2) substances unrelated to the element (the "Unrelated Exception").

228.    I have also concluded that the Defendants' products satisfy each exception under both proposed constructions.  Eagle's proposed construction explicitly includes a reference to the exceptions, and I understand and have been informed that even though Defendants do not include such a reference in their proposed construction, they acknowledge that both exceptions are recognized with regard to "consisting of" claim limitations.  Thus, my conclusions below are applicable regardless of which construction may be adopted.

229.    I have further concluded that the Defendants' products satisfy each exception under both proposed constructions.  Eagle's proposed construction explicitly includes a reference to the exceptions, and I understand and have been informed that even though Defendants do not include such a reference in their proposed construction, they acknowledge that both exceptions are recognized with regard to "consisting of" claim limitations.  Thus, my conclusions below are applicable regardless of which construction may be adopted.

230.    Regarding the Impurities Exception, I understand that if an ingredient is added intentionally is can still fall within the Impurities Exception if is an ingredient normally associated with the component.

231.    Regarding the Unrelated Exception, I understand that Defendants contend that the Unrelated Exception does not apply to the element, but rather that it applies to the entire "invention."  I do not agree with Defendants contention because the "consisting of"/"consists of" is limited to the specific pharmaceutically acceptable fluid element, it is not contained in the preamble and thus it is not applicable to the entire "invention."  I understand that Defendants do not dispute that the "consisting of"/"consists of" limits only the pharmaceutically acceptable fluid element.  Therefore, I believe the Unrelated Exception applies to substances unrelated to the pharmaceutically acceptable fluid element and I apply that understanding in my analysis.

### a.    Impurity Exception

232.    Even were I to assume that the NaOH should be considered part of the pharmaceutically acceptable fluid claim element, it is my opinion that it—and any associated byproducts—fall within the impurity exception.  Whether a POSA would consider sodium hydroxide an "impurity" in the pharmaceutically acceptable fluid turns on how the material functions and persists in the finished composition and how it is treated under well-established

83

impurity frameworks, not merely on whether it was deliberately used at some earlier processing step.

233.    An "impurity" is any residual component of a drug product that remains in the final product—often as a byproduct of a neutralization reaction or a manufacturing process aide—this includes inorganic species introduced intentionally or inadvertently during manufacture that persist in the finished material. *See* EAGLEBEN-SA_00362089 (USP 232) ("impurities may occur naturally, be added intentionally, or be introduced inadvertently"); EAGLEBEN-SA_00361489 (Q3D(R2) ICH Guideline 2022); EAGLEBEN-SA_00361465 (Q3B(R2) FDA Guidance 2006).

234.    In particular, compendial and ICH frameworks recognize that inorganic species (including elemental residues and salts) arising from processing can be impurities in drug products, even when they or their precursors were intentionally used to condition the material during manufacture. *See* EAGLEBEN-SA_00362089 (USP 232) at -089; EAGLEBEN-SA_00361489 (Q3D(R2) ICH Guideline 2022) at -490.

235.    FDA guidance classifies "Na" *i.e.* sodium as an "elemental impurity." EAGLEBEN-SA_00361489 (Q3D(R2) ICH Guideline 2022) at -496. The guidance document states that "Na" is an elemental impurity that is not inherently toxic and thus does not require a formal risk assessment for toxicity but should still be evaluated and controlled for other reasons, such as quality, or for specific, high-dose, or parenteral administration routes. *Id.*

236.    Applied here, sodium hydroxide is or may be introduced in a small quantity to adjust acidity during preparation of the PEG-based vehicle. Once dissolved, NaOH dissociates and in accomplishing its pH adjusting function is effectively consumed. Any persistent inorganic residues are not active ingredients or functional excipients, and they are not the solvent itself. A

84

POSA would understand that under compendial and ICH definitions, they are properly regarded as inorganic impurities of the finished material, consistent with the treatment of elemental and inorganic residues that originate from reagents and processing aids used during manufacture. EAGLEBEN-SA_00362089 (USP 232    Elemental Impurities) at -089; EAGLEBEN-SA_00361489  (Q3D(R2) ICH Guideline 2022) at -496; *see also* EAGLEBEN-SA_00361465 (Q3B(R2) FDA Guidance 2006).

237.    Compendial practice further distinguishes between the liquid solvent system (the pharmaceutically acceptable fluid) and non-solvent species present at low levels.  USP's impurity framework describes impurities in drug products as arising from drug degradation, excipient interactions, or introduction during manufacture, and it specifically contemplates that inorganic and elemental residues may remain after processing—regardless of whether they or their precursors were purposefully used or incidentally introduced.  EAGLEBEN-SA_00361434  (USP 1086) at -435 (explaining that "Inorganic impurities," including inorganic salts, "can result from the manufacturing process"); *see also* EAGLEBEN-SA_00361447 (ANDAs: Impurities in Drug Products FDA Guidance 2010) at -448 (recommending that "degradation products" for a particular drug product be listed "to predict the degradation profile for the commercial product" as a result of "manufacture[] by the proposed commercial process.").

238.    Regulatory impurity paradigms also focus on what is in the finished composition. For drug products, specifications list and control degradants and other toxic impurities expected under manufacturing and storage, including species arising from excipient interactions and processing.  Even though the amount of "Na" does not appear in the list of elemental impurities that must be controlled in the final drug product, a POSA would still consider it an impurity, just a non-toxic one that does not have a specific PDE.  The presence of an impurity turns on its

85

detectability in the finished article, not on whether its precursor was used purposefully upstream. Intentional use of a reagent to condition an excipient does not reclassify residual inorganic species as "solvent" or "excipient" rather than impurities. EAGLEBEN-SA_00361489 (Q3D(R2) ICH Guideline 20222) at -496 ("elements included in this guideline have been placed into three classes based on their toxicity (PDE) and likelihood of occurrence in the *drug product*.").

239.    USP's impurity chapters and FDA-recognized guidance repeatedly define impurities by what remains in the drug substance or drug product, not by the manufacturer's intent when using a processing aid or reagent. EAGLEBEN-SA_00361447 (ANDAs: Impurities in Drug Products FDA Guidance 2010) at -447 ("This guidance provides recommendations on what chemistry manufacturing, and controls (CMC) information sponsors should include regarding . . . impurities that are classified as degradation products *in drug products*") (emphasis altered); *see also* EAGLEBEN-SA_00362089 (USP 232) at -089 (referring to impurities in the "drug product" throughout). Organic and inorganic impurities can be present whether introduced purposefully (e.g., catalysts, neutralizing agents, process aids) or inadvertently; when they persist in the finished article at reportable levels, they are impurities. *See id.*

240.    Defendants assert that NaOH cannot be an "impurity" because it is intentionally added to adjust PEG acidity and purportedly enhance stability. But I understand that NaOH can qualify as an impurity even if it is added intentionally. Moreover, in the pharmaceutical field, the classification turns on what persists in the finished material and its role, not merely on intent during processing. *See* EAGLEBEN-SA_00362089 (USP 232) at -089 ("impurities may occur naturally, be added intentionally, or be introduced inadvertently"); EAGLEBEN-SA_00361489 (Q3D(R2) ICH Guideline 2022) at -489 (explaining that impurities may arise in the final drug product "from several sources"). Intentionally used reagents frequently give rise to low-level inorganic residues

86

(even the reagent itself) that persist as nonfunctional species in the finished drug product; they do not become part of the solvent system by virtue of upstream, instrumental use to condition pH.

241.    Thus, even if NaOH is "deliberately added" upstream to adjust PEG acidity, the scientific and regulatory question is whether any resultant inorganic residues are present in the finished PEG-based solvent matrix and, if so, at what level and with what controls.  As noted *supra*, when the NaOH is added to each Defendant's NDA Product it eventually dissociates into $Na^+$ and $OH^-$ ions and then reacts with the acids in the PEG 400 resulting in $Na^+$ ions and water (together with the $H^+$ and $OH^-$ equilibrium) remaining as counteranions.  Under USP and ICH practice, those persistent residues are impurities of the finished material—not part of the solvent system—and are treated and limited as such.  *See*  EAGLEBEN-SA_00362089 (USP 232) at 1; EAGLEBEN-SA_00361489 (Q3D(R2) ICH Guideline 2022) at -496.  ███████████████

██████████████████████████████████████████████████

████████████████████████████  and that it dissociates, reacts, and leaves $Na^+$ and $H_2O$ remaining in each Defendant's NDA Product reinforces that the remaining sodium in each Defendant's NDA Products is an impurity.  Even if some NaOH were to remain in the products as sold in the United States, it would be a trivial amount that would likewise be considered an impurity existing in equilibrium.

242.    Defendants also contend that because NaOH can be studied for its effect on stability, it cannot be an impurity.  That confuses function with classification. The scientific reality is that base addition to the PEG vehicle counters the acidic pull from bendamustine hydrochloride (which bears a butanoic acid functionality), and by accomplishing its pH adjusting function, is effectively consumed.  *See*  █████████████████████████████████████

What persists in the finished PEG matrix at low levels are sodium counterions, water, and related

87

innocuous inorganic residues—species that do not provide solvent capacity and are controlled as impurities under the above frameworks.  Under ICH/FDA practice, the fact that a reagent's use was "purposeful" upstream has no bearing on whether residual nonfunctional species are impurities at release; classification depends on persistence, role, and control in the final product. EAGLEBEN-SA_00361577 (Q3B(R2) ICH Guideline 2006) at -584-85.

243.    Well-established principles of PEG manufacture (particularly for PEG 400), routine pharmaceutical processing practices, and the chemical behavior of sodium hydroxide in PEG-containing systems, further inform a POSA that any sodium hydroxide (or remaining related substances) present in the PEG solvent of Defendants' NDA Products is, at most, an impurity ordinarily associated with PEG.

244.    Polyethylene glycol is commonly produced through polymerization processes that employ acidic or basic catalysts.  For lower molecular weight PEG grades—such as PEG 400—basic (alkali) catalysts, including sodium hydroxide, are widely used to facilitate and control the polymerization. *See* EAGLEBEN-SA_00361850 (U.S. Patent No. 8,722,814) at 2:4-36 (assigned to Croda Int'l PLC).

245.    As a result of these catalytic processes, PEG materials frequently contain trace amounts of inorganic residues, including sodium species and related salts, at parts-per-million levels.  EAGLEBEN-SA_00361593 (Harris 1985) at -596-97. ("PEG's are quite pure materials, having only trace (ppm) amounts of impurities such as dioxane, salts, aldehydes, and free ethylene oxide.").

246.    These materials are not introduced to perform any discrete function in the finished drug product; rather, they reflect an acceptable impurity profile of PEG arising from the

88

manufacturing process and subsequent purification limitations.  Consistent with this, standard quality descriptions for PEG acknowledge trace salt species among typical residuals.

247.    In line with these principles, commercial PEG suppliers like Croda use sodium hydroxide as a catalyst or process aid in producing highly purified PEG 400 grades (e.g., "Super Refined PEG 400"), and that trace sodium is therefore anticipated within the normal impurity profile of such PEG excipients.  *See* EAGLEBEN-SA_00361850 (U.S. Patent No. 8,722,814) at 2:4-36 (assigned to Croda Int'l PLC).

248.    Beyond their origin in PEG manufacture, sodium species can also arise when formulators use sodium hydroxide during pharmaceutical processing to adjust the pH of PEG or PEG-containing solutions.  The use of sodium hydroxide for pH adjustment is common practice because PEG grades can exhibit slightly acidic profiles and certain actives or formulation constraints require mild alkalization to maintain stability, solubility, or compatibility. EAGLEBEN-SA_00315043 (Handbook of Pharmaceutical Excipients) at -588-93.

249.    PEG is known to undergo oxidative degradation which results in the formation of formic acid, among other degradative products.  *See generally* EAGLEBEN-SA_00361705 (Sakharov 2001); EAGLEBEN-SA_00361483 (Glastrup 1996) at -483.  Formic acid has the chemical formula HCOOH and comprises a carboxylic acid.  Acids such as formic acid reduce the pH of a solution.  Therefore, a PEG solution exposed to oxidizing conditions will result in the formation of formic acid and consequently have a lower pH than a neutral PEG solution.

250.    Acids further undergo neutralization reaction with bases.  For example, formic acid would be expected to react with a strong base such as NaOH to form water and sodium formate (see below).  As the acid is neutralized, the pH of the solution is expected to rise.  Therefore, if a

89

PEG solution that contains formic acid is subsequently treated with NaOH, the pH of the PEG solution will rise.

251.    When sodium hydroxide is added for this purpose, it is dissolved completely under mixing, and its hydroxide ions react with available acidic moieties in the system.    *See* EAGLEBEN-SA_00361705 (Sakharov 2001) at -707 (explaining that "[t]he oxidizability of PEGs results from the presence of primary hydroxyl groups, which are readily deprotonated under the action of bases."). The hydroxide is thereby consumed, while sodium ions remain in solution, typically as counterions paired with trace acidic species. These remaining sodium ions do not perform a functional excipient role or contribute to the solvent system; they represent the nonreactive residue that is ordinarily associated with the PEG-containing matrix after pH adjustment.

252.    Specifically, upon dissolution, sodium hydroxide dissociates into sodium and hydroxide ions. The $OH^-$ reacts with acidic impurities (for example, carboxylic acids or other weakly acidic residues) to form their corresponding conjugate bases and water. *See, e.g.*, EAGLEBEN-SA_00361712 (OECD SIDS Sodium Hydroxide) at -718. In PEG-containing formulations, the hydroxide ions are consumed through neutralization reactions with acidic impurities or excipients present in trace amounts. EAGLEBEN-SA_00361705 (Sakharov 2001) at -707. The limited sodium ions that persist are chemically innocuous in the formulation context and constitute a residual impurity rather than an independently functioning component. *See, e.g.*, EAGLEBEN-SA_00361459   (Conquer  Science  Ion  Chromatography) ("Analyzing  Inorganic

Anions and Cations: Many pharmaceuticals may contain residual inorganic ions from the manufacturing process, such as sulfate, chloride, or sodium. IC is ideal for identifying and quantifying these impurities to ensure they are within acceptable limits."). From an analytical perspective, such sodium would be expected to appear within customary elemental impurity assessments of PEG or PEG-based formulations, aligning with the class of trace inorganic species typically detected with PEG excipients and anticipated by routine elemental testing.

253. A POSA would therefore characterize any sodium detected in a PEG 400-based solvent system as an impurity ordinarily associated with PEG, arising either from the PEG's manufacturing catalyst system or from routine pH-adjustment steps during processing. In either pathway, the sodium residue is incidental to the PEG excipient and is present at low levels consistent with recognized impurity profiles for PEG.

254. Sodium hydroxide—and more precisely, the sodium present following dissolution and neutralization—would be regarded by a person of ordinary skill in the art as an impurity ordinarily associated with PEG, particularly PEG 400. It is a well-understood and routinely anticipated residual associated with PEG that does not alter the qualitative identity of the pharmaceutically acceptable fluid or its characterization as a PEG/ethanol solvent system.

255. A POSA would also understand that adding small amounts of sodium hydroxide to a PEG-based formulation for pH adjustment does not transform PEG into a different substance. PEG 400 remains PEG 400. That is precisely what Defendants tell the public in their respective Labels. *See* EAGLEBEN-SA_00363817 (Apotex Label 4/2024) at -828; EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at -924; EAGLEBEN-SA_00363860 (Baxter Label 2/2024) at -875. This conclusion follows from the chemical identity of PEG as a nonionic

91

polyether, the function and fate of sodium hydroxide in formulation practice, and the analytical attributes by which PEG is identified and controlled in pharmaceutical applications.

256.    PEG is a poly(ethylene oxide) polyether with terminal hydroxyl groups and an established molecular weight range for a given grade (e.g., PEG 400). *See e.g.*, EAGLEBEN-SA_00361593 (Harris 1985) at -596 (defining PEG as a "polyoxyethylene[] having hydroxyl endgroups and a molecular weight of 20,000 daltons or less" for purposes of its review).  Its identity is defined by its backbone structure, functionality, and characteristic distribution (polydispersity), not by the incidental presence of trace acid/base species used in processing or pH control.  The presence of a pH adjuster does not alter the polyether backbone or convert PEG into a different chemical class.

257.    When sodium hydroxide, a solid, is added to a PEG-based system for pH adjustment, it dissociates into sodium and hydroxide ions.  The hydroxide neutralizes trace acidic species (e.g., residual acidic impurities or excipients), while sodium ions remain as innocuous counterions. PEG 400 itself is a neutral polyether; it does not become an ionically bound "PEG salt" by virtue of NaOH addition. *See* EAGLEBEN-SA_00315043 (Handbook of Pharmaceutical Excipients) at -588-93.  Although PEG's terminal hydroxyls can be deprotonated under strong basic conditions to form transient alkoxides, the formulation conditions used for pH adjustment do not change the PEG backbone or its identity. *See* EAGLEBEN-SA_00288234 (Zimmerman 1997) at -240.  In typical pharmaceutical practice, any transient alkoxide equilibrates back to the alcohol in the presence of trace water or upon dilution, and no new covalent species of PEG are formed by the mere addition of small quantities of NaOH. *Id.*

258.    From a formulation perspective, PEG functions as a solvent/vehicle due to its polarity, hydrogen-bonding capacity, viscosity, and miscibility characteristics.  EAGLEBEN-

92

SA_00315043 (Handbook of Pharmaceutical Excipients) at -588-93.  The addition of NaOH for pH control does not confer a new functional class on PEG or ethanol, nor does it convert the solvent system into a different excipient system.  The solvent properties of PEG (e.g., viscosity range, refractive index, solvency for the drug and antioxidant, miscibility with ethanol and water for dilution) remain those of PEG.  A POSA would therefore continue to identify the solvent as PEG 400 (with ethanol as a co-solvent), with NaOH, a solid, acting only as a pH adjuster.

259.    Industry-standard tests used to confirm PEG identity and compliance—such as infrared spectroscopy for the polyether signature, average molecular weight and polydispersity by GPC, hydroxyl value, viscosity, density, and refractive index—are insensitive to the presence of trace sodium ions at levels used for pH adjustment. *See, e.g.*, ███████████████████████ ███████████████████████████ These tests continue to identify the excipient as PEG of the specified grade. If NaOH addition had chemically altered PEG (e.g., through backbone cleavage or derivatization), those changes would be detectable as shifts in molecular weight distribution, spectral features, or functional group analysis. Routine control data and basic chemical understanding do not show such transformations under standard pH-adjustment practices, confirming that PEG remains PEG.

260.    In pharmaceutical practice, excipients supplied as compendial grade (e.g., USP/NF) are manufactured and released to meet monograph specifications, which often include a defined pH or acidity/alkalinity range for aqueous preparations of the excipient.  ███████ ████████████████████████████████████ To meet those specifications or their own targets, manufacturers or drug product formulators may adjust the excipient's pH using small amounts of acid (such as hydrochloric acid) or base (such as sodium

hydroxide).  Such adjustments are routine and contemplated by compendial control strategies; they do not alter the excipient's chemical identity or functional classification.

261.    For PEG grades used as solvents, any pH adjustment performed to meet compendial or internal specifications simply conditions the excipient matrix to the target range.  The potential presence of trace sodium or chloride ions arising from such neutralization is consistent with normal impurity profiles for compendial materials and does not convert PEG into a different substance or functional class.  Thus, whether PEG has been pH-adjusted with HCl or NaOH, it remains PEG, and the solvent system remains the PEG-based continuous phase (with ethanol as applicable). These routine compendial pH adjustments further confirm that acid/base reagents used for specification compliance are unrelated to the pharmaceutically acceptable fluid element, which is defined by the solvent's role in dissolving and carrying bendamustine and other excipients.

262.    Using sodium hydroxide to adjust the acidity of excipients is a common, routine step in formulation development and manufacture.  Such use does not reclassify the solvent excipient or change its identity.  A POSA would understand that the role of NaOH is relevant to achieve target pH while the solvent system remains the same.  Thus, even if NaOH is considered part of the pharmaceutically acceptable fluid (it is not), the component listed as PEG remains chemically and functionally PEG.

### b.    Unrelated to the Claim Element Exception

263.    As explained above, I am advised that the Unrelated Exception applies to the "pharmaceutically acceptable fluid element" not the entire invention because the "consisting of" is nested in the "pharmaceutically acceptable fluid" element whereas the claims contain the term "comprising" in the preamble.  Thus, I understand that the "consisting of" language is not in the preamble so it does not apply to the entire invention, does not limit the entire composition, and thus does not mean that the "unrelated" claim element must be unrelated to the liquid bendamustine

94

composition writ large. As Defendants' proposed construction for "comprising" concedes, the "liquid bendamustine-containing composition" "includes, but is not limited to" the three formulation components: bendamustine HCl, pharmaceutically acceptable fluid(s), antioxidant. In short, I understand that only the "pharmaceutically acceptable fluid" is limited to the recited elements and thus to meet the unrelated exception, the additional element must be unrelated to the specific claim element that is subject to the "consisting of" language.

264.    It is my opinion that even if one considers NaOH and any byproducts to be part of the "pharmaceutically acceptable fluid" claim element, it would fall within the unrelated exception. The limited element here, the "pharmaceutically acceptable fluid," refers to the liquid medium that provides the solvent capacity for the formulation. Specifically, the "pharmaceutically acceptable fluid" element is tied to solubilization of bendamustine (and other excipients) within a liquid medium suitable for storage and use. In Defendants' NDA Products, which are PEG/ethanol-based liquid bendamustine products, the pharmaceutically acceptable fluid is the solvent system that dissolves the drug substance and other excipients and determines key physicochemical attributes such as solvency, polarity, viscosity, and dilution behavior. In each Defendant's NDA Product, the polyethylene glycol/ethanol solvent system fulfills this role. Sodium hydroxide, in contrast, is used as a pH-adjusting agent. Its function is to neutralize trace acidity and set the excipient matrix within a target pH range; it does not dissolve other components as a solvent, nor does it contribute to the liquid medium's solvation mechanisms.

265.    A POSA would understand that the pharmaceutically acceptable fluid limitation is related to solubility from the structure of the claim and the specification as a whole. With regard to the claims, the text expressly links bendamustine concentration to the solvent element by reciting a "liquid bendamustine-containing composition" and then specifying "the bendamustine

95

concentration in the pharmaceutically acceptable fluid" (which "consists of" PEG and optionally the listed organic solvents), thereby defining the pharmaceutically acceptable fluid as the solvent medium in which bendamustine is dissolved to the claimed mg/mL levels.

266. With regard to the specification, a POSA would appreciate its teachings in consecutive paragraphs, excerpted as follows:

> In some aspects of the invention, the bendamustine concentration in the inventive compositions is from about 10 mg/mL to about 100 mg/mL, preferably 20 mg/mL to about 60 mg/mL. Preferably the bendamustine concentration in the inventive compositions is from about 25 mg/mL to about 50 mg/mL, and more preferably from about 30 mg/mL to about 50 mg/mL.
>
> * * *
>
> In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof. Within this aspect, the pharmaceutically acceptable fluid is propylene glycol (PG) or polyethylene glycol (PEG). In other embodiments of the invention however, the pharmaceutically acceptable fluid is a mixture of PEG and PG.

'214 patent at 3:25-45.

When these descriptions in the specification are considered in light of the pharmaceutically acceptable fluids listed in the independent claims—polyethylene glycol, propylene glycol, ethanol, benzyl alcohol and glycofurol—a POSA would understand that, in the claims at issue, the pharmaceutically acceptable fluid _is_ a solvent for bendamustine and that the claim element at issue is directed to solubility. And a POSA would appreciate that the preferred solvents are associated with achieving the preferred bendamustine concentration in a liquid composition.

267. A POSA also would look to the examples. In Example 1, the inventors report on testing "Bendamustine-containing compositions [which] were prepared by *dissolving* bendamustine HCl to a concentration of *10 mg/ml* in one of ethanol, propylene glycol and benzyl alcohol as indicated in Table 1 below." '214 patent at 6:45-7:45. Subsequently, in Example 3, the

inventors report on "Bendamustine-containing compositions [which] were prepared by *dissolving* bendamustine HCl to a concentration of *20 mg/ml* in polyethylene glycol 400." '214 patent at 8:10-55. Then in Example 4, the inventors report on "Bendamustine-containing compositions [which] were prepared by *dissolving* bendamustine HCl to a concentration of *50 mg/ml* in 90% polyethylene glycol 400 and 10% propylene glycol." '214 patent at 8:56-10:3. In each such example, the operative language is "dissolving" a specified concentration of bendamustine into a solvent that is recited in the Asserted Claims. Thus, the POSA would understand that, consistent with the claim structure, the specification supports that the pharmaceutically acceptable fluid limitation relates to solubilizing the requisite concentration of bendamustine into the liquid bendamustine composition.

268. A POSA would further look to the prosecution history, which confirms this understanding. During the examination process, the Examiner cited Brittain as providing a reasonable expectation of success that "in adding enough pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally propylene glycol or ethanol to the sterile vial to obtain a concentration of about 20–60 mg/mL or about 25 mg/mL bendamustine prior to administration," based on vial size and bendamustine amount taught in the prior art. EAGLEBEN-SA_00001077 ('214 File History) at -027–28. That articulation treats the "pharmaceutically acceptable fluid consisting of [PEG and optional co-solvent]" as the solvent that must be added in the appropriate amount to dissolve the bendamustine to the claimed mg/mL concentration. A POSA would recognize that the Examiner's own description aligns the fluid element with the solubilizing solvent system necessary to reach the target concentration in the vial.

269. Eagle's response further confirms that understanding by distinguishing the prior art on concentration and solvent grounds. Eagle explained that Treanda's 5 mg/mL aqueous

97

solution—immediately diluted to 0.2–0.6 mg/mL for administration—does not suggest the claimed 20–60 mg/mL concentrated liquids in non-aqueous PEG-based solvents. EAGLEBEN-SA_00001077 ('214 Patent File History) at -926-27. In this context, "polyethylene glycol and optionally one or more of [the listed organic solvents]" functions as the solvent system that enables dissolution and storage at 20–60 mg/mL.

270.    The Examiner's subsequent office action returned to the same premise, again stating that the artisan would have a reasonable expectation of success "in adding enough pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally propylene glycol or ethanol … to obtain a concentration of about 20–60 mg/mL … prior to administration," based on Brittain's vial and content disclosures. EAGLEBEN-SA_00001077 ('214 File History) at -027–28. This confirms that the Examiner (a POSA) understood the "pharmaceutically acceptable fluid consisting of" clause in the Asserted Claims to name the solvent(s) the POSA would add—and in which the POSA would dissolve bendamustine and the other excipients—to reach the claimed mg/mL concentration in the liquid composition.

271.    A POSA likewise would appreciate that the pharmaceutically acceptable fluid limitation relates to solubility given their knowledge of the field. The identity of a solvent is determined by its role as the primary liquid component in which other substances are dissolved and by its contribution to solution thermodynamics and transport properties. The defining characteristics of a solvent system are its composition (the major liquid phase), its ability to solubilize the solutes, and its persistence as the continuous phase before and after dilution and use. EAGLEBEN-SA_00361824 (Burke 1984) ("[T]he effectiveness of a solvent depends on its ability to adequately dissolve one material while leaving other materials unaffected."). A pH adjustment is not intrinsic to being a solvent. An ingredient that is added in small quantity to change acidity

98

or basicity—especially one whose reactive component is effectively consumed by neutralization—does not thereby become a solvent or co-solvent.  Sodium hydroxide, when introduced for pH control, dissociates into sodium and hydroxide ions; the hydroxide reacts with acidic species and is effectively consumed, while residual sodium remains as a low-level counterion.  This behavior is characteristic of a pH control agent, not of a solvent.

272.     The distinction is further reinforced by how the formulation components behave physically and chemically.  The solvents (PEG and ethanol) are fully miscible liquids that together form the continuous phase responsible for solubilizing bendamustine and the antioxidant.  Sodium hydroxide is not a liquid and is not a solvent for bendamustine or any other component of the formulation.  It is introduced in solid form and must itself be dissolved into the PEG/ethanol matrix.  Its purpose is not to provide solvent capacity but to condition the medium's acidity.  The fact that sodium hydroxide itself must be dissolved into the PEG/ethanol matrix underscores that it is a solute or processing aid, not part of the solvent system.  After neutralization, what remains functionally as the pharmaceutically acceptable fluid is the PEG/ethanol medium; sodium hydroxide does not persist as a discrete liquid phase or as a component that imparts solvent properties.

273.     Analytical control principles used in pharmaceutical development align with this classification.  Identity and performance of the solvent system are established and controlled by measurements such as viscosity, refractive index, density, and, for PEG, average molecular weight distribution.  These attributes derive from the PEG/ethanol composition and remain characteristic of that solvent system irrespective of trace ionic species introduced during pH adjustment.  Conversely, assessments of pH and neutralization endpoints confirm the instrumental use of sodium hydroxide and the absence of free base in the finished product.  In this framework, sodium

hydroxide plays a conditional, consumptive role that is scientifically unrelated to the solvent function.

274.    Accordingly, even if sodium hydroxide were deemed to be "part of" the pharmaceutically acceptable fluid, a POSA would understand its role and fate to be unrelated to the solvent element of the invention and thus not part of the "pharmaceutically acceptable fluid" as claimed in this invention.  The pharmaceutically acceptable fluid is the PEG-based solvent system that dissolves and carries the active and excipients.  Sodium hydroxide is a pH control agent that is effectively consumed in accomplishing its pH adjusting function during manufacture and does not contribute to the solvent capacity of the liquid medium.  Its presence or byproducts are incidental to achieving the target acidity and do not alter the composition, identity, or function of the solvent system.

275.    Moreover, NaOH is added to the PEG of the liquid bendamustine solutions to raise the pH of the entire liquid bendamustine formulation.  Specifically, because bendamustine exhibits a relatively low pKa, controlled addition of base is used to raise the pH of the entire solution matrix to a target range that optimizes stability and compatibility. *See, e.g.*, ████████████████ ████████████████████████████████  This operation adjusts the acidity of the composition as a whole; it does not create or modify the identity of the solvent system.  The fact that sodium hydroxide is dosed to condition the global pH—rather than to provide solvency— confirms it is unrelated to the "pharmaceutically acceptable fluid" element, which is defined by PEG (with ethanol as co-solvent) serving as the liquid medium.

276.    Defendants argue that because NaOH is added to "modify the PEG," it cannot be "unrelated" to the pharmaceutically acceptable fluid.  I disagree.  Initially, the premise is contradicted by each of the Defendants' labels, which indicate that even when pH adjusted with

100

NaOH, the PEG 400 remains PEG 400. EAGLEBEN-SA_00363834 (Apotex Label 12/2022) at -848-49; EAGLEBEN-SA_00363817 (Apotex Label 4/2024) at -828; EAGLEBEN-SA_00363932 (Slayback Label 12/2022) at -946-47; EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at -924; EAGLEBEN-SA_00363883 (Baxter Label 12/2022) at -898; EAGLEBEN-SA_00363860 (Baxter Label 2/2024) at -875. Moreover, the "pharmaceutically acceptable fluid" element is defined by the material that provides the continuous liquid medium and solvent capacity for the drug and excipients. In these formulations, polyethylene glycol (with any designated co-solvent) supplies solvency, viscosity, polarity, and miscibility-i.e., the attributes by which a solvent system is identified and controlled. By contrast, NaOH is introduced in small quantity as a pH-control reagent. It is dissolved into the solvent system and its hydroxide is effectively consumed; it neither provides a liquid phase nor contributes solvent capacity. Its purpose and mode of action are therefore distinct from, and unrelated to, the solvent role that defines the claim element.

277. The fact that NaOH is added "to adjust the acid value of PEG" does not make it part of the solvent system; it confirms NaOH's instrumental function as a conditioning reagent. Scientifically, conditioning the acidity of an excipient does not alter its qualitative identity or transform the conditioning agent into a co-solvent. PEG remains the solvent before and after pH adjustment because the polyether backbone, molecular weight distribution, viscosity, refractive index, and solvency characteristics that define PEG's identity and function as a vehicle do not change as a result of trace neutralization. The reagent's role is to set the composition's acidity within a target range, not to dissolve the drug or carry excipients as part of the continuous phase.

278. Defendants' assertion that pH modification is "crucial" to stability does not change this analysis. Indeed, the antioxidant is likewise related to stability, but the claims make clear that it is not part of the fluid. A processing aid like NaOH can be deliberately used to condition the pH

101

of the solvent and still be functionally unrelated to the solvent element of the claim. The "unrelated" inquiry turns on whether the added material performs the solvent function in the finished composition, not on whether its use during manufacture facilitates a desired product attribute. Here, NaOH is not a solvent for bendamustine (or anything else in the composition). It is not even a liquid. It is added to the PEG (the vehicle) and dissolved into it; it does not create or constitute a separate liquid phase. After neutralization, what persists is the PEG-based solvent matrix (with the designated co-solvent), carrying bendamustine and the antioxidant in solution. Any residual sodium present is incidental to neutralization and does not supply solvency.

279. Defendants' "equilibrium" framing, *i.e.* that the NaOH is continuously disassociating into its ions and reassociating into salt form also does not render NaOH related to the solvent element. Dynamic acid-base equilibria in a solution do not convert buffering or neutralizing reagents into solvent components. The scientific question remains whether the species at issue supply the continuous liquid phase and solvation mechanisms specified by the claim element. NaOH does not. It is a solid and a pH adjuster added to the vehicle; PEG (with any designated co-solvent) is the pharmaceutically acceptable fluid. Accordingly, even accepting that NaOH is used to condition PEG's acidity, it remains unrelated to the "pharmaceutically acceptable fluid" element of the invention.

280. The argument that, because an acid-base equilibrium exists, there is NaOH in the final liquid formulation at any given time conflates routine ionic equilibria with solvent identity. In a PEG-based formulation, NaOH dissolves and dissociates into $Na^+$ and $OH^-$. The hydroxide reacts with available acidic species (including acidic impurities in PEG and acidity contributed by bendamustine hydrochloride), forming water and corresponding conjugate bases. Under typical formulation conditions, the hydroxide added for pH control is effectively consumed, driving the

102

activity of free NaOH toward zero. EAGLEBEN-SA_00362092 (Villiers 2009) at -093, -097-98. What remains are: (1) the PEG-based continuous liquid phase that imparts solvency, viscosity, polarity, and miscibility (the pharmaceutically acceptable fluid), and; (2) low-level inorganic counterions (e.g., $Na^+$) and conjugate bases that are incidental to neutralization. EAGLEBEN-SA_00362092 (Villiers 2009) at -093, -097-98.

281.    Defendants' own premise underscores that NaOH is introduced as a pH-adjusting reagent added to the PEG vehicle, rather than as a solvent.  Conditioning an excipient's acidity is a routine processing step in which the base is effectively consumed and the resulting PEG-based medium remains the solvent system. Any residual $Na^+$ or conjugate base reflects the effective consumption process, not a change in the identity or function of the pharmaceutically acceptable fluid.

282.    Even accepting that a "vast majority" but not necessarily 100% of hydroxide is consumed (*i.e.* effective consumption), the possibility of trace, transient free base does not alter the identity of the solvent system.  Trace ions or neutral species in equilibrium at low activity do not redefine the pharmaceutically acceptable fluid; they are incidental to pH control and not part of the solvent function.  Consistent with analytical practice, any residual sodium species present at low levels are treated as nonfunctional residues managed by specification or as part of the ordinary impurity/ionic content of the matrix, not as solvent constituents.

### c.    Unrelated to the Invention

283.    As discussed above, I do not believe the unrelated exception applies to the entire invention because the "consisting of" is nested in the "pharmaceutically acceptable fluid" element. However, even if the unrelated exception were applied to the entire invention (it is not), the addition of sodium hydroxide as a pH adjuster is unrelated to the claimed liquid bendamustine-containing composition with the particular stability profile because once the NaOH is added to the

103

formulation and performs the neutralization of the PEG 400, what persists is the PEG 400-based solvent matrix (with the designated co-solvent), carrying bendamustine and the antioxidant in solution. Any residual sodium present is incidental to neutralization, does not supply solvency, and does not impact stability. Indeed, the remaining sodium ions serve no purpose in the formulation and are unrelated to the liquid bendamustine composition as a whole.

284. Defendants' "equilibrium" framing, *i.e.* that the NaOH is continuously disassociating into its ions and reassociating into salt form also does not render NaOH related to the invention. Dynamic acid-base equilibria in a solution do not convert buffering or neutralizing reagents into critical formulation components. The scientific question remains whether the species at issue is necessary to achieve a liquid bendamustine formulation with the recited stability profile. NaOH is not. Moreover, once NaOH is added to the vehicle, it is dissociated into its parts, reacted, and the remaining pieces are non-functional.

285. The argument that, because an acid-base equilibrium exists, there is NaOH in the final liquid formulation at any given time conflates routine ionic equilibria with purposeful presence. As explained above, this just is the effective consumption process. When NaOH is added to a PEG-based formulation, NaOH dissolves and dissociates into $Na^+$ and $OH^-$. The hydroxide reacts with available acidic species (including acidic impurities in PEG and acidity contributed by bendamustine hydrochloride), forming water and corresponding conjugate bases. Under typical formulation conditions, the hydroxide added for pH control is effectively consumed, driving the activity of free NaOH toward zero. What remains are: (1) the PEG-based continuous liquid phase that imparts solvency, viscosity, polarity, and miscibility (the pharmaceutically acceptable fluid), and; (2) low-level inorganic counterions (e.g., $Na^+$) and conjugate bases that are incidental to neutralization.

104

286.    Defendants' own premise underscores that NaOH is introduced as a pH-adjusting reagent added to the PEG vehicle, rather than as a solvent.  Conditioning an excipient's acidity is a routine processing step in which the base is effectively consumed; the resulting PEG-based medium remains and any residual $Na^+$ or conjugate base reflects the chemistry of neutralization and is an unrelated byproduct of the reaction.

287.    Indeed, when NaOH is added to the liquid bendamustine composition during manufacturing, the vast majority of hydroxide is reacted, and what remains are $Na^+$ ions and the possibility of trace free base.  These remaining trace ions or neutral species in equilibrium at low activity do not redefine the liquid bendamustine formulation which is characterized by the major remaining components: bendamustine HCl, PEG 400, ethanol, and monothioglycerol.  Consistent with analytical practice, any residual sodium species present at low levels are treated as nonfunctional residues managed by specification and irrelevant to the final liquid bendamustine-containing composition.

### d.    Doctrine of Equivalents

288.    I understand that, for purposes of the doctrine of equivalents, a claim limitation is "equivalent" to an element in an accused product if they are insubstantially different.  I further understand that equivalence may be shown via the function, way, result test (i.e., whether the PEG pH adjusted with NaOH performs substantially the same function in substantially the same way to obtain the same result as the claim limitation).

289.    If sodium hydroxide were determined to be part of the pharmaceutically acceptable fluid (for the reasons stated above, it is not), a POSA would nonetheless understand that PEG 400 adjusted with sodium hydroxide is equivalent to PEG 400 that has not been so treated for purposes of the asserted claims.  Any differences between PEG 400 not adjusted with NaOH and PEG that

105

has been contacted with small amounts of sodium hydroxide for pH control are insubstantial in both chemical identity and formulation performance.

290. Defendants' labeling underscores the point. Each label states that the composition contains PEG 400, and states that it remains PEG 400 even if, in Apotex's language, "sodium hydroxide is used to adjust the acidity of the polyethylene glycol 400."

| Defendant | 2024 Label |
|---|---|
| **Apotex** EAGLEBEN-SA_00363817 (Apotex Label 4/2024) at -828 | **Description:** Each milliliter contains 25 mg of bendamustine hydrochloride, USP, 38 mg (3.8%) absolute ethanol, 5 mg monothioglycerol, NF in polyethylene glycol 400, and 0.08 mg sodium hydroxide is used to adjust the acidity of polyethylene glycol 400 NF. |
| **Slayback** EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at -924 | **Description:** Each milliliter contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, 39.45 mg (5% v/v) of absolute alcohol, and q.s. to 1 mL polyethylene glycol 400. Sodium hydroxide is used to adjust pH of polyethylene glycol 400. |
| **Baxter** EAGLEBEN-SA_00363860 (Baxter Label 2/2024) at -875 | **Description:** Each milliliter contains 25 mg of bendamustine hydrochloride (equivalent to 22.7 mg bendamustine free base), 0.1 g of alcohol, USP (equivalent to 0.1 g absolute ethanol), 5 mg of monothioglycerol, NF (used as an antioxidant) and q.s. to 1 mL polyethylene glycol 400, NF. Sodium hydroxide, NF may have been used to adjust the acidity of polyethylene glycol 400. |

291. PEG is a neutral, nonionic polyether whose identity is defined by its polymer backbone and molecular weight distribution. Harris at 326 (defining PEG as a "polyoxyethylene[] having hydroxyl endgroups and a molecular weight of 20,000 daltons or less" for purposes of its review). EAGLEBEN-SA_00315043 (Handbook of Pharmaceutical Excipients) at -588-93. The addition of limited amounts of sodium hydroxide to a PEG-based solvent system for the purpose of pH adjustment does not alter the PEG backbone, create a new class of excipient, or impart a different functional role to the solvent. *Id.* In practice, the hydroxide introduced by sodium hydroxide is effectively consumed by neutralization of trace acidic species, and the remaining

106

sodium appears as a nonfunctional counterion. EAGLEBEN-SA_00361459 (Conquer Science Ion Chromatography). Because the amount of base introduced for pH adjustment is small and targeted to achieve a particular acidity range, essentially all added hydroxide is consumed in these neutralization reactions through the effective consumption process as explained previously. A POSA would understand that PEG 400 remains chemically and functionally PEG 400.

292.    From a formulation standpoint, the solvent system's key properties— hydrogen-bonding capacity, polarity, solvency toward bendamustine and antioxidant, viscosity, refractive index, and miscibility with ethanol and aqueous diluents—are not meaningfully changed by the presence of trace sodium arising from pH adjustment. The solution continues to behave as a PEG/ethanol solvent system carrying dissolved bendamustine and antioxidant, with sodium hydroxide serving only as a pH adjuster.

293.    Evaluated through the lens of function, way, and result, it is my opinion that PEG 400 that has not been pH adjusted with NaOH and PEG 400 that "has been" or "may have been" adjusted with sodium hydroxide are equivalent. The function, way, and result are the same.

294.    In both systems, the PEG 400 solvent functions as a pharmaceutically acceptable carrier for bendamustine, providing the liquid medium in which the drug and antioxidant are dissolved and stabilized prior to dilution for administration. Sodium hydroxide, where present, is used instrumentally to adjust acidity; it does not introduce a new solvent function. EAGLEBEN-SA_00315043 (Handbook of Pharmaceutical Excipients) -719 ("Sodium hydroxide is widely used in pharmaceutical formulations to adjust the pH of solutions."). The PEG 400 has the identical function in each circumstance.

295.    Both systems employ PEG (with ethanol as co-solvent) the same way—to solubilize bendamustine using the same mechanisms of solvation and miscibility. Where sodium

107

hydroxide is added, it acts by neutralizing trace acidity in the PEG matrix; this neutralization does not alter the polyether structure or the solvation mechanism of PEG.

296.    Both systems achieve the result of a solvent system that can solubilize the recited bendamustine concentration.  The presence of trace sodium after neutralization does not change the identity of the solvent system or the clinical use, handling, or performance of the drug product.

297.    Similarly, the differences between PEG 400 as supplied by a manufacturer and PEG 400 contacted with small amounts of sodium hydroxide for pH adjustment are analytically and practically insubstantial.  The polymer's covalent structure and molecular weight distribution remain within the same PEG grade specifications.  The solvent properties relevant to the formulation's performance remain those of PEG, with no new functional category created.  Any sodium present after neutralization is a residual, nonfunctional species routinely anticipated within PEG's impurity profile and does not affect how the formulation performs or is used.

298.    A POSA would view the difference between "PEG 400 solvent" and "PEG 400 solvent whose acidity was pH-adjusted with a small amount of NaOH during manufacture" as insubstantial relative to the solvent element's role.  The continuous phase is the same PEG-based liquid medium; the mechanism of solvation is unchanged; and the observed performance (dissolution and ready-to-dilute handling) is the same result of a properly conditioned PEG solvent system.  This is precisely the kind of trivial or insubstantial alteration the doctrine of equivalents is designed to capture.

299.    Similarly, a POSA would view the difference between "PEG Solvent" and "PEG solvent + inert $Na^+$ ions," which is what remains after the neutralization step occurs, to be insubstantially different because the $Na^+$ ions serve no purpose in the liquid bendamustine formulation.  To the extent there is any residual difference in the PEG 400 after neutralization, it

108

consists of trace sodium ions remaining as low-level, functionally inert counterions—levels that are ordinarily associated with PEG manufacturing and quality control and that a POSA would not regard as altering solvent identity or function. Compared to PEG lots that require no pH adjustment, the only meaningful distinction is the presence of these trace $Na^+$ ions, which do not change the continuous phase or its solvation mechanism. This is precisely the sort of trivial or insubstantial variation the doctrine of equivalents is designed to capture at the element level.

300. In my opinion, even if sodium hydroxide were deemed part of the pharmaceutically acceptable fluid (it is not), a PEG/ethanol solvent system that has been pH-adjusted with sodium hydroxide is equivalent to a PEG/ethanol solvent system that was not pH-adjusted for purposes of the Asserted Claims. It performs the same function, in the same way, to achieve the same result, and any difference is scientifically and practically insubstantial.

301. To the extent that any Defendant contends that a pharmaceutically acceptable fluid that "includes sodium hydroxide" cannot be equivalent to one "consisting of" the listed solvents, and that NaOH's role (allegedly crucial to stability) means PEG-with-NaOH differs in function, way, and result from PEG. I disagree. Under the doctrine of equivalents, the inquiry is element-by-element and asks whether the accused variant performs substantially the same function, in substantially the same way, to achieve substantially the same result—or, alternatively, whether any differences are insubstantial to a skilled artisan at the time of infringement. This analysis confirms equivalence here.

302. The asserted limitation is the "pharmaceutically acceptable fluid consisting of" specific solvents. The element's function is to provide the continuous liquid medium that dissolves and carries bendamustine (and antioxidant) through manufacture, storage, and dilution. PEG (with the optional co-solvent) supplies that solvent role. A small amount of NaOH used to condition

109

acidity is not the fluid medium and does not supply solvent capacity, it is a pH-control reagent introduced into the same solvent to tune acidity. The doctrine of equivalents asks whether the solvent element in the accused product performs the same function, in the same way, with the same result as the claimed solvent element.

303. Where Defendants' NDA Products solvent element remains a PEG-based fluid serving the same role, the incidental presence of a pH adjuster dissolved in that fluid does not, as a scientific matter, transform the solvent into a different ingredient or new liquid phase. The doctrine of equivalents may reach insubstantial variations without "vitiating" the element, so long as the equivalence analysis does not eliminate the limitation's substance. Here, the limitation— PEG (and optional co-solvent) as the solvent—remains fully operative in the accused product.

304. Defendants' assertion that Eagle refers to "modified PEG" in its batch manufacturing records does not defeat equivalence. Referring in development or regulatory dialogue to "modified PEG-NaOH" signals that PEG was pH-adjusted, not that a different solvent species replaced PEG or that NaOH assumes the solvent role. As noted previously, both the Bendeka® and Belrapzo® Labels explicitly state that any PEG 400 treated with NaOH remains PEG 400. *See* EAGLEBEN-SA_00339347 (Belrapzo® Label 2024) at -365; EAGLEBEN-SA_00340559 (Bendeka® Label 2024) at -578. The doctrine of equivalents examines the role of the claimed element, not project nomenclature; a PEG-based fluid that still acts as the solvent remains equivalent at the element level.

305. To the extent that Defendants argue that prosecution history estoppel bars the doctrine of equivalence because the solvent element was amended to "consisting of" a specific list of fluids during prosecution, I disagree. In my opinion, that estoppel does not apply to the doctrine of equivalence theory I advance, for three reasons.

110

306.    First, the doctrine of equivalence theory here does not seek to treat sodium hydroxide as an additional "solvent" or to add a new, unrecited solvent into the closed fluid element.  The equivalence at issue is between "PEG solvent" and "PEG solvent whose acidity was pH-adjusted with NaOH," or "PEG solvent" and "PEG solvent plus inert trace $Na^+$ after neutralization."   In both scenarios, the solvent element remains PEG (with the designated co-solvent, ethanol, where present).  The alleged equivalent is not an unlisted solvent; it is the same PEG solvent system conditioned to a target acidity with functionally inert residual sodium.  Because the fluid element remains PEG (with or without ethanol), applying DOE here does not reach or reclaim any unlisted solvent excluded by the "consisting of" amendment.

307.    Second, even if a presumption of estoppel arose from the "consisting of" amendment, the record and the science show that the rationale for that amendment was tangential to the equivalent I advance.  The amendment narrowed the solvent element to a specific set of polar protic solvents in order to distinguish from liquid bendamustine composition with polar aprotic solvents, not to exclude pH adjusters or trace ions associated with excipient conditioning.  The reason for the amendment was to define the vehicle—not to preclude routine pH control of that vehicle or to bar PEG lots that carry trace sodium (whether from manufacture or neutralization).  The asserted equivalent—PEG solvent properly conditioned to the target acidity with only residual $Na^+$—does not implicate the rationale for the narrowing and therefore falls within the tangential-relation exception.

308.    Third, the doctrine of equivalence theory does not vitiate the "consisting of" limitation.  The solvent element remains closed to the listed solvents and, in the accused products (Defendants' NDA Products), remains exactly those solvents (PEG and ethanol).  Recognizing equivalence between PEG and PEG conditioned to the correct acidity—with only inert, trace $Na^+$

111

remaining—does not erase the closed nature of the solvent list or collapse the limitation. The all-elements rule is satisfied: the solvent element is still PEG (with or without ethanol), fully operative in Defendants' NDA Product.

309.    For completeness, I also note that the asserted equivalence does not ensnare the prior art. It does not expand the solvent element beyond the recited polar protic vehicles, nor does it capture aqueous or polar aprotic vehicles disclosed in the art. The hypothetical claim necessary to cover the accused product would remain "PEG (with or without ethanol) solvent" with routine pH conditioning of that solvent—well within the field's ordinary practices and distinct from the prior art polar aprotic solvent teachings. Accordingly, even if a court were to consider doctrine of equivalents after finding no literal infringement, prosecution history estoppel would not bar the particular doctrine of equivalents theory I advance. The solvent element remains the recited PEG (with or without ethanol) system; the only asserted "difference" is the presence of trace, inert Na+ after neutralization—an insubstantial variation that is tangential to the reason for any narrowing and that does not vitiate the claim limitation.

### 3.    U.S. Patent Pub. No. 2013/0210879 ("the '879 Publication")

310.    I understand that Defendants assert that a later-filed Eagle patent publication is relevant to how a POSA would understand the pharmaceutically acceptably fluid limitation of the Asserted Claims. I disagree. From a scientific standpoint, the classification of an ingredient as part of the "pharmaceutically acceptable fluid" turns on its physicochemical role and measurable behavior in the formulation, not on how a separate publication published more than three years after the priority date of the Asserted Patents may characterize components in a different context or embodiment. A POSA would not reclassify sodium hydroxide as part of the pharmaceutically acceptable fluid based on statements in a separate publication. The classification depends on the excipient's role and the formulation's observed properties. Under those scientific criteria, PEG

112

(and ethanol) are the pharmaceutically acceptable fluid, and sodium hydroxide is a pH control agent that does not alter the identity or solvent function of PEG.

311. The solvent system in Defendants' NDA Products is defined by the substances that provide the liquid medium in which the drug and other excipients are dissolved and that govern the solution's solvency, polarity, viscosity, and dilution behavior. In these PEG-based systems, polyethylene glycol (with ethanol as applicable) provides those solvent functions. Sodium hydroxide, when present in small amounts, operates as a pH-adjusting agent whose hydroxide is effectively consumed; it does not supply solvent capacity and does not become a co-solvent by virtue of its instrumental use.

312. The identity and role of an excipient are determined by how it functions in the formulation and how it is detected and controlled analytically. PEG is a neutral polyether whose identity is established by its polymer backbone, molecular weight distribution, and characteristic physical properties (such as viscosity and refractive index). EAGLEBEN-SA_00361593 (Harris 1985) at -596 (defining PEG as a "polyoxyethylene[] having hydroxyl endgroups and a molecular weight of 20,000 daltons or less" for purposes of its review); EAGLEBEN-SA_00315043 (Handbook of Pharmaceutical Excipients) at -588-93. Those attributes define PEG as the solvent/vehicle. The presence of sodium hydroxide for pH control does not alter the PEG backbone, create a new solvent phase, or change the solvation mechanism by which PEG and ethanol dissolve bendamustine and the antioxidant. Instead, hydroxide ions are effectively consumed. Accordingly, sodium hydroxide does not satisfy the scientific criteria that would classify it as part of the solvent system.

313. Moreover, whether a later publication describes a "pharmaceutically acceptable fluid" as potentially comprising sodium hydroxide does not change these scientific facts. A

113

scientist evaluates the fluid system by its functional performance and measurable composition: which components deliver solvent capacity; which components are present to adjust pH or otherwise condition the matrix; and whether any added reagent persists in a way that contributes materially to the solvent role. On that evidence-driven basis, PEG and ethanol remain the solvents, and sodium hydroxide—if used—remains a pH adjuster that is effectively consumed and does not convert the solvent system into something else.

314. The '879 publication's discussion of "apparent pH of PEG" confirms a POSA's understand that the pH adjustment of PEG reflects a quality-control and conditioning step for the excipient lot, not a change to solvent identity in the nonaqueous solution. "Apparent pH" for PEG is measured by dispersing PEG in water under a pharmacopeial test; it is a lot attribute of the raw excipient, not the pH of the nonaqueous PEG matrix. A POSA would read the described addition of a small amount of base to PEG as an upstream pH-conditioning practice to improve batch-to-batch reproducibility as precisely the sort of instrumental use of a pH adjuster that does not convert the adjuster into a co-solvent or alter PEG's identity as the vehicle. The finished solvent system remains PEG (with any designated co-solvent), defined and verified by PEG's polyether backbone, molecular weight distribution, and characteristic fluid properties; NaOH does not become "part of the fluid" simply because it was used to set an excipient attribute.

315. The fact that the '879 Publication examples evaluate stability as a function of NaOH dose does not make NaOH a solvent component. Stability in solution is well known to depend on the acidity/basicity of the solvent environment; tuning pH can dramatically affect degradation pathways without altering which materials constitute the continuous liquid phase. The functional roles remain distinct: the solvent(s) provide solvation and carry the API and excipients;

the pH adjuster is a conditioning reagent to set acidity.  A POSA would not infer from stability sensitivity that NaOH "is the fluid" or that it shares the solvent role.

316.    That the '879 Publication uses the same generic definition ("a fluid suitable for pharmaceutical use") does not collapse the solvent/solute distinction or override the scientific classification above. "Fluid suitable for pharmaceutical use" describes suitability for use as a vehicle; it does not dictate composition or assign solvent function to every material present.  Where the formulation uses PEG (and an optional co-solvent) as the continuous liquid phase, those solvents are the "pharmaceutically acceptable fluid."  Materials added in small amounts for pH control remain pH adjusters dissolved in that fluid.

317.    Prosecution arguments advanced years later in a different application do not change how a POSA classifies components in the compositions and claims at issue here.  Whether a later publication framed an alternative embodiment as a "fluid comprising PEG and NaOH" does not alter the scientific roles in these PEG-based solutions: PEG (with or without a co-solvent) is the solvent system; NaOH is a pH adjuster that is effectively consumed and does not contribute solvent capacity.  Thus, a POSA would understand that NaOH is not part of the "pharmaceutically acceptable fluid" element.

**4.**    ███████████████████████████████████████████ **Does Not Avoid Infringement**

318.    █████████████████████████████████████████████





320.    In my opinion, ████████████████████████████████ it is not "part of" the "pharmaceutically acceptable fluid" for all the reasons stated previously.

321.    Thus, in my opinion, ██████████████████████████

322.    The pharmaceutically acceptable fluid is the continuous liquid medium that provides solvation capacity and governs the formulation's liquid-phase properties; here, PEG (with

116

any designated co-solvent) supplies those functions.  NaOH is introduced as a pH-adjusting reagent in small, q.s.-to-effect amounts, and it is effectively consumed;

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████. And I once again note that none of the Asserted Claims is a method of manufacture or product-by-process claim.

323.    Thus, the focus for purposes of infringement is on the composition of the product that is sold/imported/offered for sale in the United States—not on what happens in Italy or India during manufacture.  None of the products that I have concluded fall within the scope of the Asserted Claims ███████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████ EAGLEBEN-SA_00339347 (Belrapzo®

Label 2024) at -365.

| Product | Description |
| --- | --- |
| **Belrapzo®** EAGLEBEN-SA_00339347 (Belrapzo® Label 2024) at -365 | **Description:** Each milliliter contains 25 mg of bendamustine hydrochloride, USP, 0.1 mL of propylene glycol, USP, 5 mg of monothioglycerol, NF (used as an antioxidant) and q.s. to 1 mL polyethylene glycol 400, NF (sodium hydroxide, NF and water for injection, USP are used to prepare a 1N NaOH solution that may be used for pH modification of PEG 400). |
| **Bendeka®** EAGLEBEN-SA_00340559 (Bendeka® Label 2024) at -578 | **Description:** Each milliliter contains 25 mg of bendamustine hydrochloride, USP, 0.1 mL of Propylene Glycol, USP, 5 mg of Monothioglycerol, NF, in Polyethylene Glycol 400, NF. Sodium hydroxide may have been used to adjust the acidity of polyethylene glycol 400. |
| **Apotex** EAGLEBEN-SA_00363817 (Apotex Label 4/2024) at -828 | **Description:** Each milliliter contains 25 mg of bendamustine hydrochloride, USP, 38 mg (3.8%) absolute ethanol, 5 mg monothioglycerol, NF in polyethylene glycol 400, and 0.08 mg sodium hydroxide is used to adjust the acidity of polyethylene glycol 400 NF. |

117

| | |
|---|---|
| **Slayback** EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at -924 | **Description:** Each milliliter contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, 39.45 mg (5% v/v) of absolute alcohol, and q.s. to 1 mL polyethylene glycol 400.  Sodium hydroxide is used to adjust pH of polyethylene glycol 400. |
| **Baxter** EAGLEBEN-SA_00363860 (Baxter Label 2/2024) at -875. | **Description:** Each milliliter contains 25 mg of bendamustine hydrochloride (equivalent to 22.7 mg bendamustine free base), 0.1 g of alcohol, USP (equivalent to 0.1 g absolute ethanol), 5 mg of monothioglycerol, NF (used as an antioxidant) and q.s. to 1 mL polyethylene glycol 400, NF. Sodium hydroxide, NF may have been used to adjust the acidity of polyethylene glycol 400. |

324. ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████ ████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

325. ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

326. ██████████████████████████████████████████

████████████████████████ ████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████



327.

328.

329. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

330. Specifically, here, a POSA would begin from the well-known premise ██

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

120

331. Against that backdrop, the fact that ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████

332. The same evidence underscores why ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████

333. In other words, ████████████████████████████████████

████████████████████████████████    ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

334.    Once introduced, NaOH dissociates into $Na^+$ and $OH^-$; the hydroxide neutralizes acidic species and is effectively consumed, leaving the same PEG-based solvent matrix. ▮

335.    The ordinary chemistry of acid-base neutralization underscores the point.    In solution, NaOH is effectively consumed leading to a defined pH. *See, e.g.*, EAGLEBEN-SA_00288234 (Zimmerman 1997) at -240.

336.    Thus,

**B.**   **"wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C."**

337.   I understand that one or more Defendants contend that their NDA Products do not infringe the "stability" or "impurities profile" limitation. I disagree. In my opinion, each Defendant's NDA Product has less than 5% total impurities resulting from the degradation of the bendamustine as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

338.   I understand from Defendants' FDA approval materials that each Defendant's NDA Product is approved with a shelf life of at least 18 months when stored between about 2°C and 8°C, which encompasses "about 5°C," and therefore necessarily exceeds "at least about 15 months" at the claimed temperature range of about 5°C to about 25°C. *See* EAGLEBEN-SA_00363856 (Apotex FDA Approval Letter) at -857 (24 month shelf life at approval); EAGLEBEN-SA_00363957 (Slayback FDA Approval Letter) at -958 (24 month shelf life at approval); EAGLEBEN-SA_00363906 (Baxter FDA Approval Letter) at -907 (18 month shelf life at approval).

339.   I provide my further analysis of how each Defendant's NDA Product infringes this limitation in Appendices A, B, and C to this report.

## XIV.   BELRAPZO® AND BENDEKA® PRACTICE THE ASSERTED PATENTS

123

340.    I was asked by counsel to analyze whether Eagle's Belrapzo® product and Teva's Bendeka® product embody the Asserted Claims of the Asserted Patents.  Based on my analysis, Belrapzo® and Bendeka® both practice the Asserted Claims of the Asserted Patents.

### A.    Belrapzo® and Bendeka® Embody the Asserted Patents

341.    As an initial matter,



*See, e.g.*, EAGLEBEN-SA_00347643 (                    ) at -649.

342.    I discuss in detail below how Belrapzo® and Bendeka® meet each limitation of the Asserted Claims and rely on Dr. Jeffery Kittendorf's opinions, where appropriate.  In the following

124

section, which is incorporated herein by reference, I provide a claim chart showing how Belrapzo®

and Bendeka® meet each limitation in the Asserted Claims.  I also note that my analysis of

Belrapzo® and Bendeka® is consistent with my analysis establishing that each of the Defendants'

NDA Products infringe the Asserted Claims.  *See* Appendices A, B, and C.

### 1.    Liquid Bendamustine-Containing Composition

343.    I reviewed the FDA-approved label and several NDA documents for Belrapzo®

and Bendeka®, which support my opinion that Belrapzo® and Bendeka® practice the Asserted

Claims of the Asserted Patents.  I discuss several of these documents below.

344.    Belrapzo® and Bendeka® are both liquid bendamustine-containing compositions.

Section 11 of the Belrapzo® and Bendeka® Labels describe their formulations as follows:

> BELRAPZO (bendamustine hydrochloride) injection for intravenous use is supplied as a sterile, clear, and colorless to yellow ready-to-dilute solution in a multiple-dose clear glass vial.  Each milliliter contains 25 mg of bendamustine hydrochloride, USP, 0.1 mL of propylene glycol, USP, 5 mg of monothioglycerol, NF (used as an antioxidant) and q.s. to 1 mL polyethylene glycol 400, NF (sodium hydroxide, NF and water for injection, USP are used to prepare a 1N NaOH solution that may be used for pH modification of PEG 400).

> BENDEKA (bendamustine hydrochloride) injection for intravenous use is supplied as a sterile, clear, and colorless to yellow ready-to-dilute solution in a multiple-dose clear glass vial.  Each milliliter contains 25 mg of bendamustine hydrochloride, USP, 0.1 mL of Propylene Glycol, USP, 5 mg of Monothioglycerol, NF, in Polyethylene Glycol 400, NF.  Sodium hydroxide may have been used to adjust the acidity of polyethylene glycol 400.

EAGLEBEN-SA_00339347 (Belrapzo® Label 2024) at -365; EAGLEBEN-SA_00340559 (Bendeka® Label 2024) at -578.

345.    Other statements in the Belrapzo® and Bendeka® Labels confirm that Belrapzo®

and Bendeka® are liquid bendamustine-containing compositions.  *See, e.g.*, EAGLEBEN-

SA_00339347 (Belrapzo® Label 2024) at -352 ("BELRAPZO is a clear and colorless to yellow

solution."); *id.* at -354 ("DOSAGE FORMS AND STRENGTHS: Injection: 100 mg/4 mL (25 mg/mL) as a clear and colorless to yellow ready-to-dilute solution in a multiple dose vial."); *id.* at -370 ("How Supplied: BELRAPZO (bendamustine hydrochloride) is supplied in individual cartons of 5 mL clear multiple-dose vials containing 100 mg of bendamustine hydrochloride as a clear, and colorless to yellow ready-to-dilute solution."); EAGLEBEN-SA_00340559 (Bendeka® Label 2024) at -564 ("At room temperature, BENDEKA is a clear, and colorless to yellow ready-to-dilute solution."); at -641 ("DOSAGE FORMS AND STRENGTHS: Injection: 100 mg/4 mL (25 mg/mL) as a clear and colorless to yellow ready-to-dilute solution in a multiple dose vial."); at -583 ("How Supplied: BENDEKA (bendamustine hydrochloride) injection is supplied in individual cartons of 5 mL clear multiple-dose vials containing 100 mg of bendamustine hydrochloride as a clear, and colorless to yellow ready-to-dilute solution.").

346. █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

347. ████████████████████████████████████████████████████████████████████████████████████████████████

126



## 2.    Bendamustine or a Pharmaceutically Acceptable Salt Thereof

348.    Eagle's Belrapzo® and Bendeka® comprise 1H-Benzimidazole-2-butanoic acid, 5-[bis(2-chloroethyl)amino]-methyl-, hydrochloride (1:1).

349.    The Belrapzo® and Bendeka® Labels state that both comprise "the active ingredient, bendamustine hydrocholoride," which it explains as follows:

> The chemical name of bendamustine hydrochloride is 1H-benzimidazole-2-butanoic acid, 5-[bis(2-chloroethyl)amino]- 1-methyl-, monohydrochloride.  Its empirical molecular formula is $C_{16}H_{21}Cl_2N_3O_2 \cdot HCl$, and the molecular weight is 394.7.

EAGLEBEN-SA_00339347 (Belrapzo® Label 2024) at -365; EAGLEBEN-SA_00340559 (Bendeka® Label 2024) at -578.

350.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.



351.

### 3.    Concentration

352.    Belrapzo® and Bendeka® comprise 100 mg of bendamustine hydrochloride with a bendamustine concentration in the composition of about 25 mg/mL.

353.    Belrapzo® and Bendeka® contain "100 mg of bendamustine hydrochloride" and "[e]ach milliliter of the injection contains 25 mg of bendamustine hydrochloride." EAGLEBEN-SA_00339347 (Belrapzo® Label 2024) at -365, -370; EAGLEBEN-SA_00340559 (Bendeka® Label 2024) at -578, -583.

354.

### 4.    Composition

355.



a.    **Bendamustine Hydrochloride**

357.

[REDACTED]

358.    Bendamustine hydrochloride is a pharmaceutically acceptable salt of bendamustine.  As discussed above, bendamustine hydrochloride is the active pharmaceutical ingredient in Belrapzo® and Bendeka® (i.e., the biologically active ingredient in those products). *See, e.g.*, EAGLEBEN-SA_00339347 (Belrapzo® Label 2024) at -349; EAGLEBEN-SA_00340559 (Bendeka® Label 2024) at -578.

359.    The Belrapzo® label states that Belrapzo® (bendamustine hydrochloride for injection) "is an alkylating drug indicated for patients with [CLL and NHL]."  EAGLEBEN-SA_00339347 (Belrapzo® Label 2024) at -350.  The Bendeka® label has the same description for Bendeka.  *See* EAGLEBEN-SA_00340559 (Bendeka® Label 2024) at -562.

360.    The FDA determined that multiple bendamustine hydrochloride drug products, including Bendeka® and Belrapzo®, are suitable for pharmaceutical use.  *See* EAGLEBEN-SA_00339347 (Belrapzo® Label 2024); EAGLEBEN-SA_00340559 (Bendeka® Label 2024).

### b.    Pharmaceutically Acceptable Fluid

361.    Belrapzo® and Bendeka® comprise a pharmaceutically acceptable fluid consisting of polyethylene glycol and propylene glycol.

### i.    Polyethylene Glycol 400

362.    [REDACTED]

131



363.

366.

367. The FDA determined that multiple drug products containing propylene glycol, including Belrapzo® and Bendeka®, are suitable for pharmaceutical use. *See* EAGLEBEN-SA_00339347 (Belrapzo® Label 2024); EAGLEBEN-SA_00340559 (Bendeka® Label 2024).

### ii.     Propylene Glycol



133



### c.    Stabilizing Amount of Antioxidant

374.

376.    For the purposes of the asserted patents, monothioglycerol is also referred to as thioglycerol. *See, e.g.*, '214 patent at 4:23.

---

[9] For the purposes of the Asserted Patents, monothioglycerol is also referred to as thioglycerol. *See, e.g.*, '214 patent at 4:23.

377. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████

378.     The FDA determined that multiple drug products containing monothioglycerol, including Belrapzo® and Bendeka®, are suitable for pharmaceutical use.  *See* EAGLEBEN-SA_00339347 (Belrapzo® Label 2024); EAGLEBEN-SA_00340559 (Bendeka® Label 2024).

### d.      Sodium Hydroxide

379.     The labels for Belrapzo® and Bendeka® state that sodium hydroxide may have been used to adjust the pH/acidity of polyethylene glycol 400.  EAGLEBEN-SA_00339347 (Belrapzo® Label 2024) at -365; EAGLEBEN-SA_00340559 (Bendeka® Label 2024) at -578. The Belrapzo® Label states "sodium hydroxide, NF and water for injection, USP are used to prepare a 1N NaOH solution that may be used for pH modification of PEG 400." EAGLEBEN-SA_00339347 (Belrapzo® Label 2024) at -365.  The Bendeka® Label states "Sodium hydroxide may have been used to adjust the acidity of polyethylene glycol 400." EAGLEBEN-SA_00340559 (Bendeka® Label 2024) at -578.

380.     ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████    ██████████████████████████████████████

████████████████████████████████████████████████

███████    ███████████████████████████████████████████

█████████████████████████████████████████████████

    ██    █████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████. *See, e.g.*, EAGLEBEN-SA_00361457 (Bolenbaugh 1912) at -457.

383.    █████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

384.    The foregoing materials further support my conclusions that Belrapzo® and Bendeka® practice the Asserted Claims. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████

### 5.    Impurity Profile

385.    ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████



137



[REDACTED]

390. The Belrapzo® and Bendeka® Labels state that Belrapzo® and Bendeka® should be stored in a refrigerator between 2° to 8° C (or 36° to 46° F). EAGLEBEN-SA_00339347 (Belrapzo® Label 2024) at -370; EAGLEBEN-SA_00340559 (Bendeka® Label 2024) at -583.

**B.    Discussion**

### 1.    "pharmaceutically acceptable fluid"

391. I understand that one or more Defendants contend that Belrapzo® and/or Bendeka® do not meet the "pharmaceutically acceptable fluid" limitation for the same reasons they contend that their NDA Products do not infringe the "pharmaceutically acceptable fluid" limitation. [REDACTED]

139

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████. ████████████████████████████████████  The sodium hydroxide is a solid, it is not part of the pharmaceutically acceptable fluid, which is a solvent, it is just another component of the liquid bendamustine composition, specifically a pH adjuster, that falls within the scope of the "comprising" term of Asserted Claims.  Accordingly, ██████████████████████████████████████████████████████████████████  the fact that sodium hydroxide may be added to Belrapzo® and Bendeka® during manufacturing to adjust the acidity of PEG does not impact my opinion that Belrapzo® and Bendeka® practice the Asserted Claims.

> **2.** **"wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C."**

392.    I understand that one or more Defendants dispute whether Belrapzo® practices the Asserted Claims which require the claimed compositions to meet a certain stability profile "wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C."  Based on the results of Dr. Kittendorf's testing, I disagree.

393.    First, Dr. Kittendorf's experiments and analysis are the kinds of facts and data that I, as a POSA, would reasonably rely upon in formulating, validating, and controlling a liquid injectable drug product.  In this field, the skilled team is multidisciplinary by necessity.  It includes formulation scientists, analytical chemists, stability scientists, quality-control and quality-assurance personnel, and clinical and medical professionals.  Within that team construct, it is

140

standard practice for the formulator and chemistry, manufacturing, and controls ("CMC") lead to rely on the work product of qualified analytical and stability colleagues—method validations, chromatographic data, release and stability testing, spectral assessments, impurity identifications and quantitation, and statistical shelf-life justifications—when making technical determinations about solubility, stability, specifications, expiry dating, and comparability.

394. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████

██    ████████████████████████████████████████

███████████████████████████████████████████████

141

[REDACTED]

396. As a formulator in this field, I routinely and reasonably rely on such analytical and stability work when forming technical conclusions; it is neither expected nor efficient for a formulator to personally generate every chromatogram or replicate every stability timepoint. Instead, the accepted practice is to evaluate the method's validation status, the data's conformance to system-suitability and control requirements, and the integrity of the trending, and then to integrate those results into formulation and regulatory conclusions. That is what I have done here.

397. I understand that the stability profile limitation should be construed according to its "plain and ordinary meaning in light of the specification." I apply this construction in my analysis.

398. In accordance with the plain and ordinary meaning, a POSA would understand "the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C" in Belrapzo®. [REDACTED]

[REDACTED]

142

399.

400. Furthermore,

Collectively, those studies demonstrate that representative batches of Belrapzo® have much less than about 5% total impurities at a temperature of about 5° C. *See* ¶¶ 388-390.

401.

.

402. To the extent that one or more Defendants dispute infringement based on the HPLC analytical methods used, I disagree, including because of Dr. Kittendorf's conclusions. I understand that Dr. Kittendorf has performed multiple experiments involving Bendeka® and has concluded, based on those experiments, that Bendeka® has less than about 5% total impurities, as calculated on a normalized peak area response basis as determined by HPLC at a wavelength of 223 nm, after at least about 15 months at a temperature of from about 5° C. to about 25° C. EAGLEBEN-SA_00353427 (Dr. Kittendorf's Expert Report in *Eagle Pharms. Inc, v. Hospira,*

143

*Inc.*, No. 18-1074 (D. Del.)) at -447-48. Since Belrapzo® has the identical formulation, a POSA would understand Belrapzo® to have the same impurity measure as Bendeka®.

403. First, I understand that Dr. Kittendorf's experiments provide direct evidence that Belrapzo® and Bendeka® meets the stability profile of the claims. Specifically, I note that Dr. Kittendorf measured the amounts of total impurities in representative batches of the Bendeka® using HPLC analysis at a wavelength of 223 nm and determined that those batches had less than about 5% total impurities, as calculated on a normalized peak area response basis after about ███ ████████████████████████████████ *See* EAGLEBEN-SA_00353427 (Dr. Kittendorf's Expert Report in Eagle Pharms. Inc, v. Hospira, Inc., No. 18-1074 (D. Del.)) at -447-48. Since Belrapzo® and Bendeka® have identical formulations, I understand Dr. Kittendorf's testing of Bendeka® to be equally applicable to Belrapzo®. Thus, Dr. Kittendorf's experiments demonstrate that the Belrapzo® "has less than about 5% total impurities, as calculated on a normalized peak area response basis as determined by HPLC at a wavelength of 223 nm, after at least about 15 months at a temperature of from about 5° C.," irrespective of the Eagle's methods for measuring the amounts of impurities in Belrapzo®.

404. Second, I understand that Dr. Kittendorf's experiments establish that Belrapzo® stability data shows that the Belrapzo® meets the stability profile of the claims. Specifically, I understand that Dr. Kittendorf compared the amounts of total impurities in batches of Bendeka® using HPLC analysis █████████████████████████████████ ████████████████████████████████████████████████████. *See* EAGLEBEN-SA_00353427 (Dr. Kittendorf's Expert Report in *Eagle Pharms. Inc, v. Hospira, Inc.*, No. 18-1074 (D. Del.)) at -447-48. ████████████████████████ ████████████████████████████████████████████████████████████

144

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

405.    Because, as discussed above, the Eagle's long-term stability data report that representative batches of Belrapzo® have less than about 5% total impurities after 15 months of storage at a temperature of about 5° C, Eagle's stability data also demonstrate that Belrapzo® and Bendeka® meet the stability profile of the claims. *See* ¶¶ 388-390. ████████████████

████████████████████████████████████████████████████████████

████████    EAGLEBEN-SA_00353427 (Dr. Kittendorf's Expert Report in *Eagle Pharms. Inc, v. Hospira, Inc.*, No. 18-1074 (D. Del.)) at -447-48.

406.    Third, I understand that Dr. Kittendorf concluded that HPLC analysis at a wavelength of 223 nm is a valid method for measuring the amounts of total impurities in Bendeka® and Belrapzo® because the formulation is the same.    EAGLEBEN-SA_00353427 (Dr. Kittendorf's Expert Report in *Eagle Pharms. Inc, v. Hospira, Inc.*, No. 18-1074 (D. Del.)) at -447-48. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████.

407.    In addition to Belrapzo®'s specifications, long-term storage data, and Dr. Kittendorf's experiments and analysis, ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

145



408.    Since I understand that the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. in Belrapzo® and Bendeka®, I understand the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. in Belrapzo® and Bendeka®.

## XV.    THE RELATIVE VALUE OF THE ASSERTED PATENTS

409.



146

411. There are

412. There are





414.

417.    In my opinion, for the reasons described throughout this report, the inventions claimed in the Asserted Patents—███████████████████████████████████████—are foundational and enabling patents.  They disclose and claim the critical formulation components that makes a ready-to-dilute, long-term storage-stable liquid bendamustine feasible for commercial products like Belrapzo® and Bendeka®—namely, liquid bendamustine-containing compositions with less than about 5% total impurities after at least about 15 months at about 5-25°C using specific non-aqueous solvent systems and antioxidants at therapeutically relevant concentrations. Those are precisely the stability and formulation attributes that enable a commercially viable, refrigerator-stable ready-to-dilute product and obviate lyophilization and complicated reconstitution steps.  A POSA would view the inventions claimed in the Asserted Patents as the technical bedrock, and thus as foundational and enabling relative to later innovations.  Indeed, as I discuss in this report, at least three companies—Apotex, Slayback, and Baxter—all use this important technology in their infringing liquid bendamustine products.

418.    The specification expressly frames the invention as long-term storage-stable liquid compositions "substantially free of impurities" after the claimed aging at 5-25°C and emphasizes their ready-to-dilute character, which is the key advance for Belrapzo® and Bendeka®'s formulation profile.  Similarly, a POSA would recognize that ████████████████████ advances presuppose and build upon these formulation attributes, providing an incremental benefit.  Short-duration infusions at clinically relevant doses require a stable, concentrated liquid drug with controlled impurities, acceptable osmolality/viscosity, and dilution compatibility furnished by the formulation patents.

419.    From a POSA's perspective, ██████████████████████████████ ██████████████████████—claim treatment methods that reduce infusion volume and time by

151

administering bendamustine in about 120 mL or less over about 10-15 minutes, to address clinical needs such as sodium/fluid restriction and improved patient tolerance. Those method claims explicitly rely on using concentrated liquid bendamustine compositions with predominantly PEG-based solvents and optionally an antioxidant that remain in solution at the higher concentrations and smaller volumes—*i.e.*, the very liquid bendamustine formulation platform disclosed and claimed in the formulation family—so that therapeutic doses can be delivered without precipitation or instability during short infusions. Stated plainly, the inventions claimed in the rapid-administration patents presuppose the existence of a stable, concentrated, non-aqueous ready-to-dilute formulation; without that foundational formulation, the claimed small-volume (*e.g.*, 50-100 mL) and short-time (e.g., ≤10-15 minutes) administration regimens could not be practiced reliably at clinically required doses because bendamustine would exceed solubility and/or degrade in aqueous diluents. Accordingly, a POSA would view the formulation patents as the technical bedrock and enabling technology for the later rapid-administration method claims, not vice versa.

420. ███████████████████████████████████████████████████—the '270 patent—discloses and claims lyophilized formulations and associated degradation control for that dosage form. From a POSA's perspective, I understand from Dr. Ashraf and Dr. Attia that liquid bendamustine products (e.g., Belrapzo and Bendeka) are preferred over lyophilized bendamustine products because the former has advantages that the latter does not, such as that lyophilized bendamustine products must be reconstituted before use. The disadvantages with lyophilized bendamustine products further shows that the Asserted Patents are relatively more valuable than the inventions claimed in the '270 patent. In my opinion, a POSA would view the Asserted Patents as more foundational, enabling, and relatively more valuable than the '270 patent.

## XVI.  CLAIM CHARTS SHOWING THAT BENDEKA® AND BELRAPZO® PRACTICE THE ASSERTED PATENTS

### A.  U.S. Patent No. 11,872,214

| U.S. Patent No. 11,872,214 | | |
|---|---|---|
| **'214 Patent Claim** | **Belrapzo®** | **Bendeka®** |
| **Claim 1:** A sterile vial containing a liquid bendamustine-containing composition comprising | Belrapzo® is a liquid bendamustine composition contained in a sterile vial. ¶ 344. | Bendeka® is a liquid bendamustine composition contained in a sterile vial. ¶ 344. |
| about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 25 mg/mL; | Belrapzo® comprises bendamustine hydrochloride as the active pharmaceutical ingredient. ¶¶ 355, 356, 358. Bendamustine hydrochloride is a pharmaceutically acceptable salt of bendamustine. Each vial of Belrapzo® comprises about 100 mg bendamustine hydrochloride. ¶¶ 345, 346, 352. Belrapzo® comprises about 25 mg/mL bendamustine hydrochloride. ¶¶ 341, 344, 346. | Bendeka® comprises bendamustine hydrochloride as the active pharmaceutical ingredient. ¶¶ 355, 356, 358. Bendamustine hydrochloride is a pharmaceutically acceptable salt of bendamustine. Each vial of Bendeka® comprises about 100 mg bendamustine hydrochloride. ¶¶ 345, 346, 352. Bendeka® comprises about 25 mg/mL bendamustine hydrochloride. ¶¶ 341, 344, 346. |
| a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and | Belrapzo® includes a pharmaceutically acceptable fluid consisting of polyethylene glycol 400 and propylene glycol. ¶¶ 344, 361. | Bendeka® includes a pharmaceutically acceptable fluid consisting of polyethylene glycol 400 and propylene glycol. ¶¶ 344, 361. |
| a stabilizing amount of an antioxidant; | Belrapzo® comprises 5 mg/mL monothioglycerol, which is a stabilizing amount of an antioxidant. ¶¶ 341, 344, 374. | Bendeka® comprises 5 mg/mL monothioglycerol, which is a stabilizing amount of an antioxidant. ¶¶ 341, 344, 374. |
| wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as | Belrapzo® has the same formulation as Bendeka®. | Representative batches of Bendeka® have less than about 5% total impurities after 15 months of storage at about 5° C., as |

153

| U.S. Patent No. 11,872,214 | | |
|---|---|---|
| **'214 Patent Claim** | **Belrapzo®** | **Bendeka®** |
| determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. | Representative batches of Bendeka® have less than about 5% total impurities after 15 months of storage at about 5° C., as calculated on a normalized peak area response basis as determined by high performance liquid chromatography at a wavelength of 223 nm. ¶¶ 388, 405. <br><br> ■■■■ | calculated on a normalized peak area response basis as determined by high performance liquid chromatography at a wavelength of 223 nm. ¶¶ 388, 405. <br><br> ■■■■ |
| **Claim 2:** The sterile vial of claim 1, wherein the antioxidant is monothioglycerol. | Belrapzo® satisfies the limitations of claim 1, as set forth above. <br><br> Belrapzo® comprises the antioxidant monothioglycerol. ¶¶ 341, 344, 374. | Bendeka® satisfies the limitations of claim 1, as set forth above. <br><br> Bendeka® comprises the antioxidant monothioglycerol. ¶¶ 341, 344, 374 . |
| **Claim 3:** The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL. | Belrapzo® satisfies the limitations of claim 1, as set forth above. <br><br> Belrapzo® comprises the antioxidant monothioglycerol in a concentration of 5 mg/mL. ¶¶ 341, 344, 374. | Bendeka® satisfies the limitations of claim 1, as set forth above. <br><br> Bendeka® comprises the antioxidant monothioglycerol in a concentration of 5 mg/mL. ¶¶ 341, 344, 374. |
| **Claim 4:** The composition of claim 1, wherein the composition is stable for at | Belrapzo® satisfies the limitations of claim 1, as set forth above. | Bendeka® satisfies the limitations of claim 1, as set forth above. |

| U.S. Patent No. 11,872,214 | | |
|---|---|---|
| **'214 Patent Claim** | **Belrapzo®** | **Bendeka®** |
| least about 15 months at 5° C. or for at least about 15 months at 25° C. | Belrapzo® is stable for at least for at least about 15 months at 5° C. ¶¶ 388, 405. For the reasons stated explained above, Bendeka®, which has the same formulation as Belrapzo®, has less than about 5% total impurities after 15 months of storage at about 5° C., as calculated on a normalized peak area response basis as determined by high performance liquid chromatography at a wavelength of 223 nm, making it stable. ¶¶ 388, 405. | Bendeka® is stable for at least for at least about 15 months at 5° C. ¶¶ 388, 405. For the reasons stated explained above, Bendeka® has less than about 5% total impurities after 15 months of storage at about 5° C., as calculated on a normalized peak area response basis as determined by high performance liquid chromatography at a wavelength of 223 nm, making it stable. ¶¶ 388, 405. |
| **Claim 5:** The sterile vial of claim 1, wherein the liquid bendamustine-containing composition further comprises ethanol. | Belrapzo® satisfies the limitations of claim 1, as set forth above.<br><br>Belrapzo®'s pharmaceutically acceptable fluid consists of propylene glycol, which is insubstantially different from ethanol and functions in the same way to achieve the same result. *See* ¶¶ 156, 372. | Bendeka® satisfies the limitations of claim 1, as set forth above.<br><br>Bendeka®'s pharmaceutically acceptable fluid consists of propylene glycol, which is insubstantially different from ethanol and functions in the same way to achieve the same result. *See* ¶¶ 156, 372. |
| **Claim 6:** A liquid bendamustine-containing composition comprising | Belrapzo® is a liquid bendamustine-containing composition. ¶¶ 344, 345. | Bendeka® is a liquid bendamustine-containing composition. ¶¶ 344, 345. |
| 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, and | Belrapzo® comprises bendamustine hydrochloride as the active pharmaceutical ingredient. ¶¶ 355, 356, 358. Bendamustine hydrochloride is a pharmaceutically acceptable salt of bendamustine. Each vial of Belrapzo® comprises about 100 mg bendamustine hydrochloride. ¶¶ 345, 346, 352. | Bendeka® comprises bendamustine hydrochloride as the active pharmaceutical ingredient. ¶¶ 355, 356, 358. Bendamustine hydrochloride is a pharmaceutically acceptable salt of bendamustine. Each vial of Bendeka® comprises about 100 mg bendamustine hydrochloride. ¶¶ 345, 346, 352. |

| U.S. Patent No. 11,872,214 | | |
|---|---|---|
| **'214 Patent Claim** | **Belrapzo®** | **Bendeka®** |
| a stabilizing amount of an antioxidant, | Belrapzo® comprises 5 mg/mL monothioglycerol, which is a stabilizing amount of an antioxidant. ¶¶ 341, 344, 374 . | Bendeka® comprises 5 mg/mL monothioglycerol, which is a stabilizing amount of an antioxidant. ¶¶ 341, 344, 374 . |
| in a pharmaceutically acceptable fluid; wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and | Belrapzo® includes a pharmaceutically acceptable fluid consisting of polyethylene glycol 400 and propylene glycol. ¶¶ 344, 361. | Bendeka® includes a pharmaceutically acceptable fluid consisting of polyethylene glycol 400 and propylene glycol. ¶¶ 344, 361. |
| wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 25 mg/mL, | Belrapzo® comprises about 25 mg/mL bendamustine hydrochloride. ¶¶ 341, 344, 346. | Bendeka® comprises about 25 mg/mL bendamustine hydrochloride. ¶¶ 341, 344, 346. |
| wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. | Belrapzo® has the same formulation as Bendeka®.<br><br>Representative batches of Bendeka® have less than about 5% total impurities after 15 months of storage at about 5° C., as calculated on a normalized peak area response basis as determined by high performance liquid chromatography at a wavelength of 223 nm. ¶¶ 388, 405. | Representative batches of Bendeka® have less than about 5% total impurities after 15 months of storage at about 5° C., as calculated on a normalized peak area response basis as determined by high performance liquid chromatography at a wavelength of 223 nm. ¶¶ 388, 405. |

| U.S. Patent No. 11,872,214 | | |
|---|---|---|
| **'214 Patent Claim** | **Belrapzo®** | **Bendeka®** |
| | ███████████████████. | |
| **Claim 7:** The composition of claim 6, wherein the antioxidant is monothioglycerol. | Belrapzo® satisfies the limitations of claim 6, as set forth above.<br><br>Belrapzo® comprises the antioxidant monothioglycerol. ¶¶ 341, 344, 374. | Bendeka® satisfies the limitations of claim 6, as set forth above.<br><br>Bendeka® comprises the antioxidant monothioglycerol. ¶¶ 341, 344, 374. |
| **Claim 8:** The composition of claim 6, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL. | Belrapzo® satisfies the limitations of claim 6, as set forth above.<br><br>Belrapzo® comprises the antioxidant monothioglycerol in a concentration of 5 mg/mL. ¶¶ 341, 344, 374. | Bendeka® satisfies the limitations of claim 6, as set forth above.<br><br>Bendeka® comprises the antioxidant monothioglycerol in a concentration of 5 mg/mL. ¶¶ 341, 344, 374. |
| **Claim 9:** The composition of claim 6, further comprising ethanol. | Belrapzo® satisfies the limitations of claim 1, as set forth above.<br><br>Belrapzo®'s pharmaceutically acceptable fluid consists of polyethylene glycol and propylene glycol.  Propylene glycol is insubstantially different from ethanol and functions in the same way to achieve the same result. ¶¶ 344, 361. | Bendeka® satisfies the limitations of claim 1, as set forth above.<br><br>Bendeka®'s pharmaceutically acceptable fluid consists of polyethylene glycol and propylene glycol.  Propylene glycol is insubstantially different from ethanol and functions in the same way to achieve the same result. ¶¶ 344, 361. |

B.    U.S. Patent No. 12,138,248

| U.S. Patent No. 12,138, 248 | | |
|---|---|---|
| **'248 Patent Claim** | **Belrapzo®** | **Bendeka®** |
| **Claim 1:** A sterile container containing a liquid bendamustine-containing composition comprising | Belrapzo® is a liquid bendamustine composition contained in a sterile vial. ¶ 344. | Bendeka® is a liquid bendamustine composition contained in a sterile vial. ¶ 344. |
| bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is about 25 mg/mL; | Belrapzo® comprises bendamustine hydrochloride as the active pharmaceutical ingredient. ¶¶ 355, 356, 358. Bendamustine hydrochloride is a pharmaceutically acceptable salt of bendamustine. Belrapzo® comprises about 25 mg/mL bendamustine hydrochloride. ¶¶ 341, 344, 346. | Bendeka® comprises bendamustine hydrochloride as the active pharmaceutical ingredient. ¶¶ 355, 356, 358. Bendamustine hydrochloride is a pharmaceutically acceptable salt of bendamustine. Bendeka® comprises about 25 mg/mL bendamustine hydrochloride. ¶¶ 341, 344, 346. |
| a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and | Belrapzo® includes a pharmaceutically acceptable fluid consisting of polyethylene glycol 400 and propylene glycol. ¶¶ 344, 361. | Bendeka® includes a pharmaceutically acceptable fluid consisting of polyethylene glycol 400 and propylene glycol. ¶¶ 344, 361. |
| a stabilizing amount of an antioxidant, | Belrapzo® comprises 5 mg/mL monothioglycerol, which is a stabilizing amount of an antioxidant. ¶¶ 341, 344, 374. | Bendeka® comprises 5 mg/mL monothioglycerol, which is a stabilizing amount of an antioxidant. ¶¶ 341, 344, 374. |
| wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. | Belrapzo® has the same formulation as Bendeka®.<br><br>Representative batches of Bendeka® have less than about 5% total impurities after 15 months of storage at about 5° C., as calculated on a normalized peak area response basis as determined by high | Representative batches of Bendeka® have less than about 5% total impurities after 15 months of storage at about 5° C., as calculated on a normalized peak area response basis as determined by high performance liquid chromatography at a wavelength of 223 nm. ¶¶ 388, 405. |

| U.S. Patent No. 12,138, 248 | | |
|---|---|---|
| **'248 Patent Claim** | **Belrapzo®** | **Bendeka®** |
| | performance liquid chromatography at a wavelength of 223 nm. ¶¶ 388, 405. | |
| **Claim 2:** The sterile container of claim 1, wherein the antioxidant is monothioglycerol. | Belrapzo® satisfies the limitations of claim 1, as set forth above.<br><br>Belrapzo® comprises the antioxidant monothioglycerol. ¶¶ 341, 344, 374. | Bendeka® satisfies the limitations of claim 1, as set forth above.<br><br>Bendeka® comprises the antioxidant monothioglycerol. ¶¶ 341, 344, 374. |
| **Claim 3:** The sterile container of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL. | Belrapzo® satisfies the limitations of claim 1, as set forth above.<br><br>Belrapzo® comprises the antioxidant monothioglycerol in a concentration of 5 mg/mL. ¶¶ 341, 344, 374. | Bendeka® satisfies the limitations of claim 1, as set forth above.<br><br>Bendeka® comprises the antioxidant monothioglycerol in a concentration of 5 mg/mL. ¶¶ 341, 344, 374. |
| **Claim 4:** The sterile container of claim 1, wherein the composition is stable for at least about 15 months at 5° C. or for at least about 15 months at 25° C. | Belrapzo® satisfies the limitations of claim 1, as set forth above.<br><br>Belrapzo® is stable for at least for at least about 15 months at 5° C. ¶¶ 388, 405. For the reasons stated explained above, Bendeka®, which has the same formulation as Belrapzo®, has less than about 5% total impurities after 15 months | Bendeka® satisfies the limitations of claim 1, as set forth above.<br><br>Bendeka® is stable for at least for at least about 15 months at 5° C. ¶¶ 388, 405. For the reasons stated explained above, Bendeka® has less than about 5% total impurities after 15 months of storage at about 5° C., as calculated on a normalized |

| U.S. Patent No. 12,138, 248 | | |
|---|---|---|
| **'248 Patent Claim** | **Belrapzo®** | **Bendeka®** |
| | of storage at about 5° C., as calculated on a normalized peak area response basis as determined by high performance liquid chromatography at a wavelength of 223 nm, making it stable. ¶¶ 388, 405. | peak area response basis as determined by high performance liquid chromatography at a wavelength of 223 nm, making it stable. ¶¶ 388, 405. |
| **Claim 5:** The sterile container of claim 1, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol. | Belrapzo® satisfies the limitations of claim 1, as set forth above.<br><br>Belrapzo® includes a pharmaceutically acceptable fluid that consists of polyethylene glycol 400 and propylene glycol. ¶¶ 344, 361. | Bendeka® satisfies the limitations of claim 1, as set forth above.<br><br>Bendeka® includes a pharmaceutically acceptable fluid that consists of polyethylene glycol 400 and propylene glycol. ¶¶ 344, 361. |
| **Claim 6:** The sterile container of claim 1, wherein the liquid bendamustine-containing composition comprises about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof. | Belrapzo® satisfies the limitations of claim 1, as set forth above.<br><br>Each vial of Belrapzo® comprises about 100 mg bendamustine hydrochloride, which is a pharmaceutically acceptable salt of bendamustine. ¶¶ 345, 346, 352. | Bendeka® satisfies the limitations of claim 1, as set forth above.<br><br>Each vial of Bendeka® comprises about 100 mg bendamustine hydrochloride, which is a pharmaceutically acceptable salt of bendamustine. ¶¶ 345, 346, 352. |
| **Claim 8:** A liquid bendamustine-containing composition comprising | Belrapzo® is a liquid bendamustine-containing composition. ¶¶ 344-347. | Bendeka® is a liquid bendamustine-containing composition. ¶¶ 344-347. |
| bendamustine, or a pharmaceutically acceptable salt thereof, and | Belrapzo® comprises bendamustine hydrochloride as the active pharmaceutical ingredient. ¶¶ 355, 356, 358. Bendamustine hydrochloride is a pharmaceutically acceptable salt of bendamustine. | Bendeka® comprises bendamustine hydrochloride as the active pharmaceutical ingredient. ¶¶ 355, 356, 358. Bendamustine hydrochloride is a pharmaceutically acceptable salt of bendamustine. |
| a stabilizing amount of an antioxidant, | Belrapzo® comprises 5 mg/mL monothioglycerol, which is a stabilizing amount of an antioxidant. ¶¶ 341, 344, 374. | Bendeka® comprises 5 mg/mL monothioglycerol, which is a stabilizing amount of an antioxidant. ¶¶ 341, 344, 374. |

160

| U.S. Patent No. 12,138, 248 | | |
|---|---|---|
| **'248 Patent Claim** | **Belrapzo®** | **Bendeka®** |
| in a pharmaceutically acceptable fluid; wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and | Belrapzo® includes a pharmaceutically acceptable fluid consisting of polyethylene glycol 400 and propylene glycol. ¶¶ 344, 361. | Bendeka® includes a pharmaceutically acceptable fluid consisting of polyethylene glycol 400 and propylene glycol. ¶¶ 344, 361. |
| wherein the bendamustine concentration in the pharmaceutically acceptable fluid is about 25 mg/mL, | Belrapzo® comprises about 25 mg/mL bendamustine hydrochloride. ¶¶ 341, 344, 346. | Bendeka® comprises about 25 mg/mL bendamustine hydrochloride. ¶¶ 341, 344, 346. |
| wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. | Belrapzo® has the same formulation as Bendeka®. Representative batches of Bendeka® have less than about 5% total impurities after 15 months of storage at about 5° C., as calculated on a normalized peak area response basis as determined by high performance liquid chromatography at a wavelength of 223 nm. ¶¶ 388, 405. | Representative batches of Bendeka® have less than about 5% total impurities after 15 months of storage at about 5° C., as calculated on a normalized peak area response basis as determined by high performance liquid chromatography at a wavelength of 223 nm. ¶¶ 388, 405. |
| **Claim 9:** The composition of claim 8, wherein the antioxidant is monothioglycerol. | Belrapzo® satisfies the limitations of claim 8, as set forth above. | Bendeka® satisfies the limitations of claim 8, as set forth above. |

| U.S. Patent No. 12,138, 248 | | |
|---|---|---|
| **'248 Patent Claim** | **Belrapzo®** | **Bendeka®** |
| | Belrapzo® comprises the antioxidant monothioglycerol. ¶¶ 341, 344, 374. | Bendeka® comprises the antioxidant monothioglycerol. ¶¶ 341, 344, 374. |
| **Claim 10:** The composition of claim 8, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL. | Belrapzo® satisfies the limitations of claim 8, as set forth above.<br><br>Belrapzo® comprises the antioxidant monothioglycerol in a concentration of 5 mg/mL. ¶¶ 341, 344, 374. | Bendeka® satisfies the limitations of claim 8, as set forth above.<br><br>Bendeka® comprises the antioxidant monothioglycerol in a concentration of 5 mg/mL. ¶¶ 341, 344, 374. |
| **Claim 11:** The composition of claim 8, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol. | Belrapzo® satisfies the limitations of claim 8, as set forth above.<br><br>Belrapzo® includes a pharmaceutically acceptable fluid that consists of polyethylene glycol 400 and propylene glycol. ¶¶ 344, 361. | Bendeka® satisfies the limitations of claim 8, as set forth above.<br><br>Bendeka® includes a pharmaceutically acceptable fluid that consists of polyethylene glycol 400 and propylene glycol. ¶¶ 344, 361. |
| **Claim 15:** The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and ethanol. | Belrapzo® satisfies the limitations of claims 1 and 5, as set forth above.<br><br>Belrapzo®'s pharmaceutically acceptable fluid consists of polyethylene glycol and propylene glycol. Propylene glycol is insubstantially different from ethanol and functions in the same way to achieve the same result. *See* ¶¶ 156, 192, 372. | Bendeka® satisfies the limitations of claims 1 and 5, as set forth above.<br><br>Bendeka®'s pharmaceutically acceptable fluid consists of polyethylene glycol and propylene glycol. Propylene glycol is insubstantially different from ethanol and functions in the same way to achieve the same result. *See* ¶¶ 156, 192, 372. |
| **Claim 20:** The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and ethanol. | Belrapzo® satisfies the limitations of claims 8 and 11, as set forth above.<br><br>Belrapzo®'s pharmaceutically acceptable fluid consists of polyethylene glycol 400 and propylene glycol. Propylene glycol is | Bendeka® satisfies the limitations of claims 8 and 11, as set forth above.<br><br>Bendeka®'s pharmaceutically acceptable fluid consists of polyethylene glycol 400 and propylene glycol. Propylene glycol is |

| U.S. Patent No. 12,138, 248 | | |
|---|---|---|
| **'248 Patent Claim** | **Belrapzo®** | **Bendeka®** |
| | insubstantially different from ethanol and functions in the same way to achieve the same result. *See* ¶¶ 156, 192, 372. | insubstantially different from ethanol and functions in the same way to achieve the same result. *See* ¶¶ 156, 192, 372. |

Dated: 2/6/26

_____

Dr. Bernhardt L. Trout, Ph.D.

# Exhibit 8

## Redacted Public Version

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC<br><br>Plaintiffs,<br><br>v.<br><br>SLAYBACK PHARMA LLC, AND AZURITY PHARMACEUTICALS, INC.<br><br>Defendants. | C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |

## REPLY REPORT OF DR. BERNHARDT TROUT, PH.D.

**TABLE OF CONTENTS**

I.      INTRODUCTION ....................................................................................................1

II.     SUMMARY OF OPINIONS .................................................................................1

III.    LEGAL STANDARDS .........................................................................................2

        A.   The "Disclosed-But-Not-Claimed" Doctrine Does Not Apply To Eagle's Doctrine Of Equivalents Theory....................................................2

        B.   Impurity Exception Is Not Limited to Unintentionally Added Substances .............3

        C.   The "Unrelated" Exception Applies to the Claim Element, Not the Entire Invention ................................................................5

        D.   The Scope of "Consisting Of" Is Limited by Its Nesting in the Claim...................6

IV.     TECHNICAL BACKGROUND............................................................................7

        A.   States of Matter and the Definition of Fluids.............................................8

        B.   Dissolution Does Not Transform a pH Adjuster Into a Solvent ............................11

        C.   Dr. Sinko's Discussion of Co-Solvents Is Inapplicable to Sodium Hydroxide .................................................13

        D.   Stability and Stability Testing: Relevance to the Pharmaceutically Acceptable Fluid ................................................15

        E.   Acids, Bases, and pH: Function Defines Classification .......................................16

        F.   Conservation of Mass Does Not Alter Functional Classification..........................19

        G.   PEG 400 and the Role of pH Adjustment................................................22

V.      ASSERTED PATENTS AND ASSERTED CLAIMS.......................................23

VI.     SLAYBACK'S NDA PRODUCT INFRINGES THE ASSERTED CLAIMS................26

        A.   Slayback's NDA Product.........................................................................33

        B.   ███████████████████████████████████████████████████████████████ ........................................................40

D.      Sodium Hydroxide Falls Within the Impurity Exception to "Consisting Of"..................................................................................................................43

E.      Sodium Hydroxide Is Unrelated to the "Pharmaceutically Acceptable Fluid" Limitation ............................................................................................46

F.      "Pharmaceutically Acceptable Fluid" Refers to the Solvent System ....................49

    1.      Opinion Is Consistent with the Agreed Construction and Court's Guidance During *Markman* Hearing ........................................................49

    2.      Dr. Sinko Ignores the Court's Guidance and the Parties Agreed Construction....................................................................................................57

    3.      Specification and Prosecution History Confirm the Solvent Function ......................................................................................................59

    4.      Dr. Sinko's Remaining Arguments Are Unpersuasive ..............................62

G.      Sodium Hydroxide Is Not a Co-Solvent for Bendamustine..................................64

H.      Claim Architecture Informs POSA's Understanding of the Asserted Claims ......................................................................................................................72

I.      ██████████████████████████ ............................................................73

J.      Slayback's NDA Product Also Infringes Under the Doctrine of Equivalents..............................................................................................................80

VII.    DR. SMITH DOES NOT CHALLENGE THAT SLAYBACK INFRINGES THE IMPURITIES LIMITATION OF THE ASSERTED CLAIMS .......................................89

VIII.   PATENTS-IN-SUIT ARE FOUNDATIONAL................................................................91

IX.     PRIOR LITIGATIONS AND OTHER PATENTS IN FAMILY DO NOT UNDERMINE THE VALUE OF THE ASSERTED PATENTS....................................94

A.      Overview of the Patents in the Formulation Family...............................................95

B.      Slayback Is an Adjudicated Infringer of Eagle's Patents.......................................98

C.      Disclosure-Dedication Decision Led to Asserted Patents .....................................99

D.      Asserted Patents Provide Significant Benefits.....................................................101

E.      Slayback's Own Conduct Confirms the Value of the Formulation Patents.........102

X.    THE PUBLISHED PATENT APPLICATIONS IN THE CHEN-BRIDGETECH
      AND JHU-SIGNPATH AGREEMENTS ARE NOT TECHNICALLY
      COMPARABLE TO THE ASSERTED PATENTS ......................................................104

      A.    2006 Chen-Bridgetech Agreement ......................................................................107

      B.    2013 Johns Hopkins-Signpath Agreement...........................................................118

## I.    INTRODUCTION

1.    I submitted an Opening Expert Report in this case on February 6, 2026 and a Responsive Expert Report on March 16, 2026.

2.    I provided a copy of my current curriculum vitae attached as Exhibit A to my Opening Expert Report.  I also provided a list of each case in which I have testified as an expert in trial or deposition as Exhibit B to my Opening Expert Report.

3.    In this Reply Expert Report, I respond to the opinions offered by Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s (collectively, "Slayback") expert Dr. Patrick Sinko in his Rebuttal Expert Report dated March 16, 2026.

4.    As part of my analysis, I considered the materials cited in Appendix A to the Reply Expert Report.

5.    I incorporate by reference the entirety of my Opening Expert Report and my Responsive Expert Report, including the opinions and documents set forth and considered therein.

## II.    SUMMARY OF OPINIONS

6.    Slayback's NDA Product infringes the Asserted Claims, both literally and under the doctrine of equivalents.  The term "pharmaceutically acceptable fluid" in the context of the entire claim limitation at issue in the claims of the Asserted Patents, refers to the solvent/co-solvent(s).  Slayback's NDA Product has a "pharmaceutically acceptable fluid" consisting of the solvent PEG 400 and the co-solvent ethanol, both of which are expressly listed in the Asserted Claims.

7.    The Asserted Patents are foundational and enabling patents that disclose and claim the critical formulation components that make a ready-to-dilute, long-term storage-stable liquid bendamustine feasible for commercial products.

1

8. The other published patent applications Dr. Sinko discusses are not technically comparable to the Asserted Patents.

9. The other patent publications and technology discussed in the 2006 Chen-Bridgetech Agreement and the 2013 Johns Hopkins-Signpath Agreement are not technically comparable to the Asserted Patents.

### III. LEGAL STANDARDS

10. I incorporate the legal standards in my Opening and Responsive Expert Reports.

11. In addition to the legal standards set forth in my Opening Expert Report and my Responsive Expert Report, I address certain legal principles recited in Dr. Sinko's report that are incomplete, inaccurate, or misleadingly framed. Where Dr. Sinko's recitation of legal standards is consistent with my Opening Report, I do not repeat them here. I address below only those areas where correction or clarification is necessary.

#### A. The "Disclosed-But-Not-Claimed" Doctrine Does Not Apply To Eagle's Doctrine Of Equivalents Theory

12. Dr. Sinko states that "the doctrine of equivalents cannot be applied to argue that a chemical disclosed in a patent specification, but not claimed in the claims, is an equivalent," and applies this principle to ████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████ Sinko Rebuttal Report ¶ 35. This legal standard, which appears to invoke the disclosure-dedication doctrine, is inapplicable to Eagle's doctrine of equivalents theory for several reasons.

13. I understand from counsel for Eagle that the disclosure-dedication doctrine applies where the specification discloses a workable alternative that the patentee chose not to claim, thereby "dedicating" that alternative to the public. However, the doctrine does not apply where

2

the specification does not disclose the alternative at issue as a workable alternative.  Here, the specification of the patents in suit does not disclose ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

14.    I also understand that the disclosure-dedication doctrine bars a patentee from recapturing, through the doctrine of equivalents, a specific alternative that was disclosed but not claimed.  It does not bar equivalents arguments where the alleged equivalent is not a disclosed-but-unclaimed alternative substance.  Eagle's doctrine of equivalents theory does not argue that

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████   Trout Main Body of Opening Report ¶¶ 298-299, 306–309.  The disclosed-but-not-claimed doctrine has no bearing on that theory.

**B.    Impurity Exception Is Not Limited to Unintentionally Added Substances**

15.    Dr. Sinko states that "an ingredient that is purposefully added and impacts the performance of the product is not an impurity."  Sinko Rebuttal Report ¶ 38.  I understand that this assertion rule misstates the applicable legal standard.  In my opinion, Dr. Sinko's statement also contradicts the scientific standard in several important respects.

3

16.    I have been informed by counsel for Eagle that the impurity exception to "consisting of" asks whether a substance is "normally associated with" or "normally present in" the claimed component—not whether it was intentionally introduced during manufacturing.  The inquiry focuses on what persists in the finished product and its functional role.  As I addressed at length in the Main Body of my Opening Report, sodium hydroxide—and more precisely, the sodium and other inorganic residues that remain following its dissolution and neutralization—fall squarely within this exception for several independent reasons.  Among other things, I explained that NaOH and its residues qualify as impurities under USP, ICH, and FDA frameworks because the classification turns on what persists in the finished material and its role—not on whether the substance was intentionally added during processing; that FDA guidance itself classifies sodium as an "elemental impurity"; that PEG manufacturers like Croda routinely use NaOH as a catalyst, such that trace sodium is expected within PEG's normal impurity profile (indeed, the Certificate of Analysis for the PEG 400 used in Belrapzo®, Bendeka®, and Slayback's NDA Product lists "residual sodium" at up to 5 ppm); that the amount of NaOH added to Slayback's NDA product is

█████████████████████████████████████████████████████████

███████    *See, e.g.*, Trout Main Body of Opening Report ¶¶ 232-254.

17.    Importantly, this understanding of impurities is consistent with the well-established pharmaceutical regulatory frameworks that govern impurity classification.  As I explained in the Main Body of my Opening Report, the United States Pharmacopeia ("USP") Chapter 232 states that "impurities may occur naturally, be added intentionally, or be introduced inadvertently." Trout Main Body of Opening Report ¶ 233.  Similarly, ICH Guideline Q3D(R2) explains that impurities may arise in the final drug product "from several sources," without regard to whether they were purposefully or inadvertently introduced.  Trout Main Body of Opening Report ¶ 233.

4

Under these authoritative frameworks, the deliberate upstream use of a reagent does not automatically disqualify the resulting residues from classification as impurities in the finished product.  What matters is whether the resultant inorganic residues persist in the finished composition and, if so, at what level and with what controls—not whether the substance's precursor was used purposefully upstream. Trout Main Body of Opening Report ¶ 238-239. Indeed, under ICH/FDA practice, classification depends on persistence, role, and control in the final product; intentionally used reagents frequently give rise to low-level inorganic residues that persist as nonfunctional species in the finished drug product, and they do not become part of the solvent system by virtue of upstream, instrumental use to condition pH.  Trout Main Body of Opening Report ¶ 240-242.

> **C.    The "Unrelated" Exception Applies to the Claim Element, Not the Entire Invention**

18.    Dr. Sinko frames the second exception to "consisting of" as requiring the additional component to be "unrelated to the invention" and illustrates the exception with an analogy to a spatula in a kit.  Sinko Rebuttal Report ¶ 38.  While I have been informed by counsel for Eagle that this analogy derives from a specific case, Dr. Sinko presents it as though it defines the full scope of the exception. In doing so, he adopts Slayback's contested legal position—treating a single case example as the governing legal standard for when the exception may apply, rather than recognizing it as one illustrative application among others.

19.    I have been informed, and the parties' Joint Claim Construction Brief confirms, that the scope of the "unrelated" exception is disputed.  Trout Main Body of Opening Report ¶¶ 41, 231.  Eagle's position, which I believe is correct, is that when "consisting of" is nested in a particular claim element rather than placed in the preamble, the "unrelated" inquiry applies to that specific element—here, the pharmaceutically acceptable fluid—and not to the entire invention.

5

Trout Main Body of Opening Report ¶¶ 231, 263.  Slayback contends that the exception requires the additional component to be unrelated to the invention as a whole.

20.     This distinction is significant and should not be elided in a recitation of applicable legal standards.  The claim architecture of the Asserted Patents uses "comprising" in the preamble and nests "consisting of" in the pharmaceutically acceptable fluid element.  Trout Main Body of Opening Report ¶¶ 50, 103-104.    Thus, the "consisting of" language limits only the pharmaceutically acceptable fluid element, and the remainder of the claim is governed by the open-ended "comprising" term.  I have been informed that because the "consisting of" does not appear in the preamble and does not limit the entire composition, the "unrelated" exception should likewise be measured against the specific element to which the "consisting of" attaches— namely, the pharmaceutically acceptable fluid and not the entirety of the claim, namely the bendamustine-containing composition.  Trout Main Body of Opening Report ¶ 263.

### D.     The Scope of "Consisting Of" Is Limited by Its Nesting in the Claim

21.     Dr. Sinko states in ¶ 36 that "'consisting of' is a phrase that requires the accused product to have only what is listed after the words 'consisting of' and nothing else."  Sinko Rebuttal Report ¶ 36.  While ¶ 37 partially corrects this by acknowledging that when "consisting of" applies only to a particular limitation, it closes only that limitation, the initial framing in ¶ 36 is overbroad as applied to the Asserted Claims and could mislead the factfinder.

22.     The Asserted Claims use "comprising" in the preamble and nest "consisting of" (or "consists of") within the pharmaceutically acceptable fluid element.  Trout Main Body of Opening Report ¶¶ 50, 103-104.  Both parties agree on this structural point.  The correct legal standard, as I applied in the Main Body of my Opening Report, is that the "comprising" term in the preamble means the liquid bendamustine composition as a whole "includes, but is not limited to" the recited components, while only the pharmaceutically acceptable fluid sub-element is limited by the

6

"consisting of" language, subject to the legal exceptions for impurities and substances unrelated to that element. Trout Main Body of Opening Report ¶¶ 42, 104.

## IV. TECHNICAL BACKGROUND

23. Dr. Sinko devotes the entirety of his "Scientific Background" section to establishing general principles of chemistry—states of matter, dissolution, conservation of mass, and acid-base chemistry—that, while uncontroversial in isolation, are irrelevant to the dispositive non-infringement argument Slayback raises in this case: whether sodium hydroxide is the "pharmaceutically acceptable fluid" as that term is used in the Asserted Claims and therefore falls outside the scope of the "consisting of" limitation. Sinko Rebuttal Report ¶¶ 40-42. Dr. Sinko's Scientific Background is designed to support a single flawed premise: that because sodium hydroxide dissolves in PEG and is therefore no longer in a solid physical state, it must be classified as a "fluid" within the meaning of the claims. Sinko Rebuttal Report ¶¶ 53, 56, 121-126. This premise fundamentally misunderstands the Asserted Claims, which define the "pharmaceutically acceptable fluid" not by physical state but by function—specifically, the solvent function of dissolving bendamustine to create a stable, ready-to-dilute liquid composition. Trout Main Body of Opening Report ¶¶ 114, 131-132; Trout Rebuttal Report ¶¶ 32, 38.

24. As I explained in my Main Body of my Opening Report, a POSA would understand that the "pharmaceutically acceptable fluid" recited in the Asserted Claims refers to the solvent/ co-solvent system used to dissolve bendamustine and other excipients for stable liquid pharmaceutical compositions. Trout Main Body of Opening Report ¶¶ 131-132. The specification expressly defines a "pharmaceutically acceptable fluid" as "a fluid which is suitable for pharmaceutical use" and further explains that for the fluid to be "sufficient" for use, it must contain the "amount which allows the bendamustine to be dissolved." Trout Rebuttal Report ¶ 44; '214 patent at 2:56-58, 6:30-33. The Asserted Claims limit the pharmaceutically acceptable fluid by

7

"consisting of" language to polyethylene glycol, propylene glycol, ethanol, benzyl alcohol, and glycofurol—all of which are solvents for bendamustine. (Trout Main Body of Opening Report ¶ 134; Trout Rebuttal Report ¶¶ 48, 68). Nothing in Dr. Sinko's general chemistry tutorial addresses this claim-specific context.

### A.    States of Matter and the Definition of Fluids

25.    Dr. Sinko devotes extensive discussion in his report to the definitions of "solids," "liquids," and "fluids," asserting that a POSA would define a fluid as "a substance that flows" and that, because ███████████████████████████████████████████, it should be considered a fluid rather than a solid. Sinko Rebuttal Report ¶¶ 41-49. Dr. Sinko's reliance on general dictionary definitions and physics textbooks misses the point. The relevant inquiry under the Asserted Claims is not whether a given substance "flows" in the abstract; it is what function that substance serves in the claimed formulation.

26.    I have previously explained that the "pharmaceutically acceptable fluid" is a specific claim element referring to the solvent system, not a general descriptor of any substance in a liquid or flowing state. Trout Main Body of Opening Report ¶¶ 132, 134; Trout Rebuttal Report ¶¶ 22, 43. The Asserted Claims use the word "liquid" in the preamble ("liquid bendamustine-containing composition") to describe the physical state of the overall composition, and the phrase "pharmaceutically acceptable fluid" in the claim body to identify the solvent system. A POSA would understand the distinction between these two terms, as the specification, prosecution history, and Slayback's own documents all confirm. Trout Rebuttal Report ¶¶ 38, 63, 112.

27.    Dr. Sinko's citations to sources such as The American Heritage College Dictionary, the Oxford Thesaurus of English, Sears' College Physics, and Landau's Fluid Mechanics are not relevant because none of those general references addresses the specific claim term "pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more

8

of propylene glycol, ethanol, benzyl alcohol and glycofurol." Sinko Rebuttal Report ¶¶ 46-48; Trout Rebuttal Report ¶ 73. As I explained in my Responsive Report, I understand that patent claims are interpreted in light of intrinsic evidence—the claims, specification, and prosecution history—not isolated dictionary definitions. Trout Rebuttal Report ¶¶ 73-75. The intrinsic evidence here uniformly confirms that the "pharmaceutically acceptable fluid" refers to the solvent system, regardless of whether "liquid" and "fluid" may share overlapping physical descriptions in other contexts. Trout Rebuttal Report ¶¶ 73, 144.

28. Moreover, Dr. Sinko's assertion that the patents-in-suit "do not provide any definition of the words 'solid,' 'liquid,' or 'fluid'" is misleading. Sinko Rebuttal Report ¶ 42. While the patents do not provide independent definitions of "solid" and "liquid," the specification does define "pharmaceutically acceptable fluid" as "a fluid which is suitable for pharmaceutical use" and further ties suitability to the fluid's capacity to dissolve bendamustine. Trout Rebuttal Report ¶ 44; '214 patent at 2:56-58, 6:30-33; Examples 1-8. Dr. Sinko ignores this intrinsic definition and corresponding intrinsic evidence entirely.

29. Dr. Sinko's "melting point" argument is particularly misplaced. Dr. Sinko asserts that ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████ Sinko Rebuttal Report ¶¶ 49, 54, 131-136. But the question is not whether sodium hydroxide is above its melting point or whether it undergoes a phase change upon dissolution; it is whether sodium hydroxide performs the solvent function that defines the pharmaceutically acceptable fluid claim element. It does not. If dissolution into a liquid medium were sufficient to make a substance part of the pharmaceutically acceptable fluid, then bendamustine hydrochloride—also a solid that dissolves and dissociates when added to PEG—

9

would likewise become part of the fluid element.  Trout Main Body of Opening Report ¶ 135.  No one contends that bendamustine thereby becomes part of the pharmaceutically acceptable fluid. The dissolution of a solute into a solvent does not erase the solute/solvent distinction that is fundamental to pharmaceutical formulation science, and Dr. Sinko's own sources confirm as much: even when sodium chloride dissolves in water, the solvent remains water and the solute remains sodium chloride, regardless of the phase change. Sinko Rebuttal Report ¶¶ 51-55.

30.    Dr. Sinko cites sources describing dissolution as "akin to melting" to argue that NaOH undergoes a state change and therefore becomes a fluid.  Sinko Rebuttal Report ¶ 54.  But this analogy, even if chemically descriptive of the phase transition at a molecular level, does not address the relevant question: what functional role does the dissolved species play in the formulation?  As I explained in the Main Body of my Opening Report, sodium hydroxide is introduced in small, q.s.-to-effect amounts as a pH-adjusting reagent, and its hydroxide is effectively consumed through neutralization, leaving low-level inorganic counterions (*e.g.*, $Na^+$) and conjugate bases that are nonfunctional residues.  Trout Main Body of Opening Report ¶¶ 271-272, 280-282.  Whether one describes that process as "dissolution" or "melting" or any other physical chemistry term, the result is the same: the NaOH does not dissolve other components as a solvent, nor does it contribute to the liquid medium's solvation mechanisms.  Trout Main Body of Opening Report ¶ 264.

31.    Slayback's own labels confirm this functional distinction and refute the melting point argument on its own terms.  Each label identifies PEG 400 as the vehicle, ethanol as the co-solvent, and sodium hydroxide solely as a pH adjuster—not as a solvent, co-solvent, or part of the pharmaceutically acceptable fluid. Trout Main Body of Opening Report ¶¶ 202-207.  If dissolved NaOH truly "became" part of the pharmaceutically acceptable fluid upon dissolution, one would

10

expect labels and FDA classifications to reflect that characterization. They do not. The FDA required Slayback to list sodium hydroxide as a separate inactive ingredient used "to adjust pH of polyethylene glycol 400"—language that presupposes NaOH is distinct from, and acts upon, the PEG vehicle. Trout Main Body of Opening Report ¶¶ 202-207; Sinko Rebuttal Report ¶ 72.

32.    Furthermore, the fact that sodium hydroxide must itself be dissolved into the PEG/ethanol matrix underscores that it is a solute or processing aid, not part of the solvent system. Trout Main Body of Opening Report ¶ 272. The solvent dissolves; the solute is dissolved. Dr. Sinko's own framework confirms this: he acknowledges the solute/solvent distinction and the convention that "the component of a solution whose physical state is preserved during solution formation is known as the solvent." Sinko Rebuttal Report ¶ 51. PEG 400's physical state is preserved when NaOH is added; it remains a liquid polyether vehicle. Sodium hydroxide's physical state is not preserved; it goes from a solid to a dissolved species. Under Dr. Sinko's own cited authority, PEG is the solvent and NaOH is the solute.

### B.    Dissolution Does Not Transform a pH Adjuster Into a Solvent

33.    Dr. Sinko's discussion of pharmaceutical dosage forms, solutions, and the dissolution process is similarly misdirected. Sinko Rebuttal Report ¶¶ 50-56. Dr. Sinko correctly states that when a solid dissolves in a liquid, the resulting solution is homogeneous and the solute's constituent atoms or molecules are molecularly dispersed. Sinko Rebuttal Report ¶¶ 52-53. But Dr. Sinko then makes an unsupported leap: he asserts that because dissolved sodium hydroxide is no longer in a solid physical state, it must therefore be classified as part of the "pharmaceutically acceptable fluid." Sinko Rebuttal Report ¶¶ 53, 56, 121-126. This reasoning conflates dissolution with reclassification.

34.    By Dr. Sinko's logic, every component dissolved in the solvent system—including the bendamustine hydrochloride itself and the antioxidant monothioglycerol—would become the

11

"pharmaceutically acceptable fluid" upon dissolution, which would render the claim structure non-sensical.  Trout Main Body of Opening Report ¶¶ 133-134.  Bendamustine hydrochloride is also a solid that dissolves in the PEG-based solvent system.  Under Dr. Sinko's reasoning, bendamustine too would become a "fluid" upon dissolution—yet no one contends that dissolved bendamustine is part of the "pharmaceutically acceptable fluid."  Trout Main Body of Opening Report ¶¶ 133-134.  The Asserted Claims expressly recite that bendamustine is "in" the pharmaceutically acceptable fluid, not that it "is" the pharmaceutically acceptable fluid.  Trout Main Body of Opening Report ¶ 134; Trout Rebuttal Report ¶ 32.  The same distinction applies to sodium hydroxide: that it dissolves in the PEG-based solvent system does not make it part of that solvent system.

36. As I have previously explained, the fact that various components of the liquid bendamustine formulation are dissolved in the pharmaceutically acceptable fluid does not fundamentally redefine what the pharmaceutically acceptable fluid is—a solvent or solvent system.  Trout Main Body of Opening Report ¶¶ 132-133.  The pharmaceutically acceptable fluid is always the solvent; anything dissolved in it does redefine what the pharmaceutically acceptable fluid is in the context of the Asserted Claims.  Trout Main Body of Opening Report ¶ 133.

36. Dr. Sinko's reliance on Bancroft's 1935 article ("All liquid solutions are mixtures of liquids") and Goodwin's 2002 article comparing dissolution to melting are similarly irrelevant to the claim construction question at hand.  Sinko Rebuttal Report ¶¶ 53-54.  These references address the physical chemistry of phase transitions; they do not speak to the functional classification of formulation components within a patented pharmaceutical composition.  A POSA analyzing the Asserted Claims would classify components by their role in the formulation—

12

solvent, active ingredient, antioxidant, pH adjuster—not merely by their physical state after mixing.  Trout Rebuttal Report ¶¶ 66-68; Trout Main Body of Opening Report ¶ 132.

**C.    Dr. Sinko's Discussion of Co-Solvents Is Inapplicable to Sodium Hydroxide**

37.    Dr. Sinko further contends that a dissolved solute can itself act as a "co-solvent" for other solutes, and he attempts to characterize sodium hydroxide as a co-solvent for bendamustine.  Sinko Rebuttal Report ¶¶ 57-58, 174, 181.  This argument is unfounded.  As I explained in the Main Body of my Opening Report, sodium hydroxide is not a liquid and is not a solvent for bendamustine or any other component of the formulation.  Trout Main Body of Opening Report ¶¶ 199, 272.  It is introduced in solid form and must itself be dissolved into the PEG/ethanol matrix.  Trout Main Body of Opening Report ¶ 272.  Its purpose is not to provide solvent capacity but to condition the medium's acidity.  Trout Main Body of Opening Report ¶¶ 272, 215.  The fact that sodium hydroxide itself must be dissolved into the PEG/ethanol matrix underscores that it is a solute or processing aid, not the solvent system.

38.    Dr. Sinko also invokes the Parsons article "Solution in a Dissolved Solid" and the Yan article concerning dissolving cellulose ███████████████████ to support his co-solvent theory.  Sinko Rebuttal Report ¶ 58.  However, these references involve entirely different contexts—Parsons addresses freezing-point phenomena and Yan describes an ███████████ ██████████████████████████████████ than anything used in pharmaceutical pH adjustment.  Neither reference is relevant to the question of whether sodium hydroxide functions as a co-solvent in Slayback's NDA Product.

39.    Dr. Sinko's assertion that ████████████████████████████ ████████████████████████████████████████ ████████████  Sinko Rebuttal Report ¶ 181.  Many formulation variables—including pH, temperature, ionic strength, and surfactant levels—can influence solubility without themselves

13

being classified as solvents.  Trout Main Body of Opening Report ¶ 271.  A pH adjuster can influence rates of acid- or base-catalyzed reactions and solubility conditions, but that instrumental effect does not create or redefine the solvent system.  Trout Main Body of Opening Report ¶ 216. Scientifically, the solvent remains PEG (with any co-solvent), while the base serves a transient conditioning function.  That is precisely what Slayback has repeatedly represented to ▮▮▮▮▮ the public.  EAGLEBEN-SA_00363932 (Slayback Label 12/2022); EAGLEBEN-SA_00363910 (Slayback Label 2/2024); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Fundamentally, if NaOH truly was a co-solvent, why did Slayback identify PEG as the solvent and ethanol as the only co-solvent?  My conclusion is that Slayback honestly and accurately described its solvent system as comprising only PEG 400 and ethanol, and its non-infringement position is a contrived argument at odds with fundamental science and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮

40.     Dr. Sinko also argues that "an excipient can have more than one functional role in a formulation."  Sinko Rebuttal Report ¶ 183.  While this general principle is true in the abstract, Dr. Sinko provides no credible evidence that sodium hydroxide actually functions as a co-solvent in the specific formulations at issue.  Trout Main Body of Opening Report ¶¶ 271-272.  The Defendants' own labels, NDA documents, and corporate testimony all confirm that sodium hydroxide functions as a pH adjuster—not a solvent or co-solvent.  Trout Rebuttal Report ¶¶ 96-100, 105-107.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮  Trout Rebuttal Report ¶¶ 105, 113.

14

41. ██████████████████████████████████████████████████

████████████████████████████████████████ Sinko Rebuttal Report ¶

59. This argument is irrelevant.  The Asserted Claims here are for PEG-based liquid bendamustine

formulations.  ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████ Trout Rebuttal Report ¶ 75.

**D.    Stability and Stability Testing: Relevance to the Pharmaceutically Acceptable Fluid**

42.    Dr. Sinko discusses stability and stability testing principles, including that stability is measured using HPLC techniques and that HPLC methods must be properly validated.  Sinko Rebuttal Report ¶¶ 60-62.  These general principles are uncontroversial as a matter of pharmaceutical science, and I do not disagree that stability testing is important or that HPLC methods require validation.

43.    However, Dr. Sinko's purpose in raising stability testing is to support his later argument that sodium hydroxide improves the stability of the formulation and therefore must be considered "related to" the pharmaceutically acceptable fluid.  Sinko Rebuttal Report ¶¶ 142-143, 158-160.  This chain of reasoning is flawed because it conflates an ingredient's effect on the overall formulation with its classification as the solvent system.  The antioxidant monothioglycerol also improves stability—indeed, the claims expressly require "a stabilizing amount of an antioxidant"—yet Dr. Sinko does not contend that the antioxidant is part of the pharmaceutically acceptable fluid.  Trout Main Body of Opening Report ¶ 132.  A POSA would classify formulation

15

components by function: the solvent dissolves the drug and other excipients; the antioxidant assists by reducing degradation; and the pH adjuster conditions the acidity of the medium. (Trout Rebuttal Report ¶¶ 66-68). That an ingredient may contribute to stability does not make it part of the solvent system.

### E.    Acids, Bases, and pH: Function Defines Classification

44.    Dr. Sinko's background discussion of acids, bases, and pH is largely uncontroversial as a matter of general chemistry. Sinko Rebuttal Report ¶¶ 63-67. I agree that one could consider that acids release hydrogen ions, bases release hydroxide ions, and pH is the negative logarithm of the hydrogen ion concentration. Sinko Rebuttal Report ¶¶ 63-64; Trout Main Body of Opening Report ¶ 67. I also agree that pH can be an important aspect of a pharmaceutical formulation, affecting both the solubility and stability of the drug product. Sinko Rebuttal Report ¶ 65.

45.    However, Dr. Sinko's purpose in presenting this background is to support his argument that the "unrelated exception" to "consisting of" does not apply because, in his view, sodium hydroxide is "not unrelated to" the pharmaceutically acceptable fluid element. Sinko Rebuttal Report ¶¶ 155-160. Specifically, Dr. Sinko contends that NaOH is "directly related to the claim limitation 'pharmaceutically acceptable fluid consisting of'" because of its impact on the stability of the bendamustine formulation as a whole. Sinko Rebuttal Report ¶ 160; *see also id.* ¶¶ 142-143 (arguing that NaOH has a "long-lasting, beneficial impact on the stability of the entire formulation"). His reasoning rests on the claim that NaOH adjusts pH, pH affects stability, and therefore NaOH must be related to the fluid element. Sinko Rebuttal Report ¶¶ 65-66, 142-143, 155-160.

46.    This argument does not follow—and in fact undermines Dr. Sinko's own position. Dr. Sinko's evidence demonstrates that NaOH's role is to adjust the pH of the overall formulation

16

to improve the stability of the bendamustine-containing composition as a whole.  Sinko Rebuttal Report ¶¶ 142-143 (describing NaOH's impact on "the stability of the entire formulation"); *id.* ¶ 160 (linking NaOH to "the related stability of the bendamustine formulations"). If NaOH's contribution is to the global stability of the composition—not to the solvent function of dissolving and carrying the drug—then a POSA would understand it to be a component of the broader "liquid bendamustine-containing composition" governed by the "comprising" language in the claim preamble, not a component of the "pharmaceutically acceptable fluid" element governed by "consisting of."  Trout Main Body of Opening Report ¶¶ 213, 264, 275.  The claims distinguish between the overall composition (which "comprises" multiple components including bendamustine and an antioxidant) and the specific fluid sub-element (which "consists of" a list of solvents/carriers). NaOH's stability contribution—like that of the antioxidant—places it in the former category, not the latter. Trout Main Body of Opening Report ¶ 278.

47.    Indeed, as I have previously explained, the antioxidant is likewise related to stability, but the claims make clear that it is not part of the pharmaceutically acceptable fluid. Trout Main Body of Opening Report ¶¶ 132, 278.  A processing aid like NaOH can be deliberately used to condition the pH of the solvent and still be functionally unrelated to the solvent element of the claim.  Trout Main Body of Opening Report ¶ 264.  The "unrelated" inquiry turns on whether the added material performs the solvent function in the finished composition, not on whether its use during manufacture facilitates a desired product attribute such as stability.  Trout Main Body of Opening Report ¶¶ 264, 271, 278.  Here, NaOH is not a solvent for bendamustine or anything else in the composition; it is a solid, not even a liquid, and it does not provide the continuous liquid medium that dissolves and carries the drug.  Trout Main Body of Opening Report ¶¶ 199, 272.

17

48.      Dr. Sinko also cites the 2025 FDA Guidance for pH Adjusters and the acid-base neutralization equation for hydrochloric acid and sodium hydroxide.  Sinko Rebuttal Report ¶ 67. That pH adjusters participate in acid-base reactions and can form buffer systems is uncontested; indeed, this is consistent with the classification of NaOH as a pH control agent rather than a solvent.  The FDA's own Guidance recognizes that "a pH adjuster can become an indistinguishable part of the buffer," confirming that the NaOH functions to modify acidity and is effectively consumed—it does not become the  solvent.

49.      The FDA has classified sodium hydroxide as a "pH control agent" under 21 CFR § 184.1763, which defines pH control agents as "substances added to change or maintain active acidity or basicity, including buffers, acids, alkalies, and neutralizing agents."  Trout Main Body of Opening Report ¶ 212.  This is a distinct classification from "solvents and vehicles," which section 170.3(o)(27) defines as "substances used to extract or dissolve another substance."  Trout Main Body of Opening Report ¶ 212.  The Handbook of Pharmaceutical Excipients likewise confirms that "[s]odium hydroxide is widely used in pharmaceutical formulations to adjust the pH of solutions"—not as a solvent.  Trout Main Body of Opening Report ¶¶ 211, 294.

Scientific publications align—sodium hydroxide is not a solvent, it is a solute. *See, e.g.*, Slayback Ex. 6, Brown & LeMay at 84 ("In discussing solutions it is often convenient to call one component the solvent and the others solutes.  The component of a solution whose physical state is preserved when the solution is formed is known as the solvent.  For example, when sodium chloride (a solid) is mixed with water, the resultant solution is a liquid. Consequently, water is referred to as the solvent and sodium chloride as the solute.  If all components of a solution are in the same state, the one present in greatest amount if called the solvent."), *id.* at 68 ("███████ ███████████████████████████████████ ████

18

██████████████████████████████████████████████████████████

████████████████████████████; Slayback Ex. 21, Goodwin at 393 ("All that is requires is a liquid (solvent) and another substance, solid, liquid, or gas (the solute), which will mix with it intimately under prevailing conditions and in the proportions present. The resulting liquid is a solution."). Sodium hydroxide is a white crystalline solid that is highly soluble in water. EAGLEBEN-SA_00376310 (Remington 2006) at 1089-90; EAGLEBEN-SA_00361690 (EMPROVE NaOH Data Sheet) at -695 (Water solubility = 1.090 g/L at 20 °C"). ████████

████████████████████████████████████████████████████████████

██████████████████████████████████████Slayback Ex. 19, Patrick J. Sinko, Martin's Physical Pharmacy and Pharmaceutical Sciences: Physical Chemical and Biopharmaceutical Principles in the Pharmaceutical Sciences (8th ed. 2024) ("The constituent present in the greater amount in a binary solution is arbitrarily designated as the solvent and the constituent in the lesser amount as the solute. When a solid is dissolved in a liquid, however, the liquid is usually taken as the solvent and the solid as the solute, irrespective of the relative amounts of the constituents. █████████████████████████████████████ ██████████████████████).

### F. Conservation of Mass Does Not Alter Functional Classification

50. Dr. Sinko invokes the law of conservation of mass to argue that sodium hydroxide does not "disappear" when it reacts with acidic species in PEG. Sinko Rebuttal Report ¶ 68. I have never contended that atoms are destroyed during a chemical reaction. The law of conservation of mass is undisputed. But this fundamental principle does not address the question at hand: whether, after sodium hydroxide has been dissolved ████████████████████ acid-base neutralization, the resulting ionic residues constitute part of the "pharmaceutically acceptable fluid" within the meaning of the Asserted Claims.

19

51.      When sodium hydroxide is added to PEG 400, it dissolves and dissociates into sodium (Na+) and hydroxide (OH−) ions.  Trout Main Body of Opening Report ¶¶ 257, 280.  The hydroxide ions react with available acidic species—including acidic impurities in PEG and acidity contributed by bendamustine hydrochloride—forming water and corresponding conjugate bases. Trout Main Body of Opening Report ¶ 280.  Under typical formulation conditions, the hydroxide added for pH control ███████████████████████████████████████████████.  Trout Main Body of Opening Report ¶ 280.  What remains are: (1) the PEG-based continuous liquid phase that imparts solvency, viscosity, polarity, and miscibility (the pharmaceutically acceptable fluid), and (2) low-level inorganic counterions (*e.g.*, Na+) and conjugate bases that are incidental to neutralization.  Trout Main Body of Opening Report ¶¶ 280-281.

52.      Dr. Sinko's conservation-of-mass argument thus proves nothing that is in dispute. The atoms of sodium and hydroxide persist in the system—this is elementary chemistry.  But the relevant question is whether those residual species perform the solvent function that defines the "pharmaceutically acceptable fluid."  Trout Main Body of Opening Report ¶¶ 271-272.  They do not.   Trace ions and neutral species in equilibrium at low activity do not redefine the pharmaceutically acceptable fluid; they are incidental to pH control and not part of the solvent function.  Trout Main Body of Opening Report ¶ 282.  Consistent with analytical practice, any residual sodium species present at low levels are treated as nonfunctional residues managed by specification or as part of the ordinary impurity or ionic content of the matrix, not as solvent constituents.  Trout Main Body of Opening Report ¶ 282.

53.      Dr. Sinko also asserts that ██████████████████████████████████ ████████████████████████████████████████████████████████████ Sinko Rebuttal Report ¶ 68.  This too is unremarkable.  As I explained in the Main Body of my

Opening Report, ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████    Trout Main Body of Opening Report ¶¶ 329, 331-332.

54.    The same is true for Slayback's NDA Product. ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

21

███████████████████████████████████████████████████████

██████████████████████████████████    Trout Opening Report Appendix B ¶¶ 116, 130.

### G.    PEG 400 and the Role of pH Adjustment

55.    Dr. Sinko's discussion of PEG's properties, including that PEG-400 is a commonly used liquid version of PEG and that PEG is known to contain certain acidic impurities such as acetic acid and formic acid, is consistent with my own discussion of PEG chemistry.  Sinko Rebuttal Report ¶¶ 69-70.  I agree that PEG is known to contain certain acidic impurities that develop during manufacture, and that the addition of sodium hydroxide to PEG will result in the formation of buffer systems from the neutralization of those acids.  Sinko Rebuttal Report ¶ 70; Trout Main Body of Opening Report ¶¶ 257, 280.  However, this routine neutralization chemistry does not alter the classification of sodium hydroxide as a pH adjuster or convert it into a solvent.

56.    As I explained in the Main Body of my Opening Report, adding small amounts of sodium hydroxide to a PEG-based formulation for pH adjustment does not transform PEG 400 into a different substance.  Trout Main Body of Opening Report ¶¶ 259-261, 291-297.  PEG 400 remains PEG 400.  Trout Main Body of Opening Report ¶ 291.  That is precisely what Defendants tell the public in their respective Labels, each of which continues to identify the vehicle as "polyethylene glycol 400" even after pH adjustment with sodium hydroxide.  Trout Main Body of Opening Report ¶¶ 214, 226.  The polymer's covalent structure and molecular weight distribution remain within the same PEG grade specifications, and the solvent properties relevant to the formulation's performance remain those of PEG.  Trout Main Body of Opening Report ¶ 297.  Industry-standard tests used to confirm PEG identity—such as infrared spectroscopy for the polyether signature, average molecular weight and polydispersity by GPC, hydroxyl value, viscosity, density, and refractive index—are insensitive to the presence of ████████████ at levels used for pH adjustment.  Trout Main Body of Opening Report ¶ 259.

22

57.     In sum, Dr. Sinko's Scientific Background section presents well-established principles of general chemistry in a manner calculated to obscure the central question in this case. The dispute is not whether dissolved sodium hydroxide "flows" or whether atoms persist after a chemical reaction—those propositions are trivially true. The dispute is whether sodium hydroxide is a "pharmaceutically acceptable fluid" as that term is used in the Asserted Claims. Trout Main Body of Opening Report ¶¶ 131-132; Trout Rebuttal Report ¶ 32. A POSA would answer that question by reference to function: the pharmaceutically acceptable fluid is the solvent system that dissolves and carries bendamustine for stable liquid pharmaceutical compositions, and sodium hydroxide—a solid introduced as a pH adjuster that is ███████████████████████████— is not part of that solvent system. Trout Main Body of Opening Report ¶¶ 271-272, 280-282, 318; Trout Rebuttal Report ¶¶ 68, 83. Nothing in Dr. Sinko's generic chemistry background alters this conclusion.

## V.     ASSERTED PATENTS AND ASSERTED CLAIMS

58.     Dr. Sinko devotes considerable space to recounting the prosecution history of the Asserted Patents. Sinko Rebuttal Report ¶¶ 81-120. Although I addressed the prosecution history in detail in the Main Body of my Opening Report ¶¶ 145-155, and in my Rebuttal Report, Trout Rebuttal Report ¶¶ 54-64, several of Dr. Sinko's characterizations are misleading or incorrect, and I address those here.

59.     First, Dr. Sinko frames the filing of the patent applications that led to the Asserted Patents as a reaction to the prior litigation involving the '483 Patent, implying that the applications were filed in bad faith or as an effort to circumvent the prior court ruling. Sinko Rebuttal Report ¶¶ 82-83. I understand that prior litigation is not pertinent to the infringement inquiry, which is exclusively determined by comparing the accused product to the claims of the patents in suit, as construed by the Court. Dr. Sinko offers no reason why the prior litigation would be pertinent to

23

the comparison of the properly-construed claims to the Slayback NDA Product and, as such, I do not see how that litigation is relevant in any way to the infringement inquiry.

60. In any event, this framing is misleading. The Asserted Patents are part of a patent family that traces back to a provisional application filed in January 2010. Trout Main Body of Opening Report ¶¶ 52, 145-146. Continuation applications are a routine and lawful mechanism for obtaining claims directed to different aspects of an invention disclosed in a common specification. That Eagle filed continuation applications does not suggest anything improper.

61. Second, Dr. Sinko asserts that the initial claims in the applications leading to the Asserted Patents "did not have the 'pharmaceutically acceptable fluid consisting of' limitation" and that this limitation was "later added to obtain allowance of the claims-in-suit." Sinko Rebuttal Report ¶ 83. While it is true that the "consisting of" language was added by amendment during prosecution, Dr. Sinko omits the critical context. As I explained in the Main Body of my Opening Report, the original claims in the '214 patent application already recited the solvent, polyethylene glycol. Trout Main Body of Opening Report ¶ 146. The amendment added the "pharmaceutically acceptable fluid consisting of" limitation to distinguish the claims from the Drager prior art reference, which taught bendamustine formulations that required polar aprotic solvents. Trout Main Body of Opening Report ¶¶ 148-150. The amendment thus narrowed the solvent system to polar protic solvents—it did not add an entirely new concept. A POSA would understand that the "consisting of" limitation addresses only the solvent system and does not speak to whether other non-solvent components (like pH adjusters) may be present in the overall composition, which is governed by the open "comprising" preamble. Trout Main Body of Opening Report ¶¶ 149-150; Trout Rebuttal Report ¶¶ 54-62.

24

62. Third, Dr. Sinko places great emphasis on the Abandoned Patent Application Publication (U.S. Patent Publication No. 2013/0210879), asserting that Eagle ███████████████

███████████████████████████████████ ███████████

███████████████████████████████████████████████

Sinko Rebuttal Report ¶ 86. This argument is misleading for the reasons I addressed in the Main Body of my Opening Report. Trout Main Body of Opening Report ¶¶ 310-317. Indeed, Dr. Sinko even notes the '879 Publication is a separate application that does not claim priority to the same provisional application as the Asserted Patents. Sinko Rebuttal Report ¶ 86. The fact that the '879 Publication discussed the use of sodium hydroxide to adjust the pH of PEG does not mean that the Asserted Claims were intended to cover or exclude sodium hydroxide as a component of the "pharmaceutically acceptable fluid." Rather, sodium hydroxide is a pH adjuster—a separate formulation component that falls within the open "comprising" preamble of the Asserted Claims. Trout Main Body of Opening Report ¶¶ 314-317. That the Asserted Claims "do not claim or mention sodium hydroxide" is entirely consistent with the fact that a POSA would not consider sodium hydroxide to be part of (or pertinent to) the "pharmaceutically acceptable fluid" element, just as the Asserted Claims do not mention other formulation components that might be present (such as nitrogen headspace gas or specific container materials) that may also be present in a liquid bendamustine composition.

63. Fourth, Dr. Sinko asserts that during prosecution of the '707 Patent, ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████ Trout Main Body of Opening

25

Report ¶¶ 330-332. ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████ Trout

Main Body of Opening Report ¶¶ 329-335; Trout Opening Report Appendix B ¶ 139.

64.    Fifth, Dr. Sinko's account of the prosecution history, while largely accurate as to the sequence of events, selectively emphasizes certain aspects to support his non-infringement theory.  For example, Dr. Sinko notes that during prosecution, the applicants emphasized the importance of PEG as a solvent and the role of antioxidants in achieving stability.  Sinko Rebuttal Report ¶¶ 94, 96, 109-110, 112.  I agree with those characterizations—they are consistent with my opinion that the "pharmaceutically acceptable fluid" refers to the solvent system and that the antioxidant is a separate claim element.  Trout Main Body of Opening Report ¶¶ 131-134.  Nothing in the prosecution history that Dr. Sinko recounts supports his theory that sodium hydroxide—a solid pH adjuster—is part of (or pertinent to) the "pharmaceutically acceptable fluid consisting of" limitation.

65.    Finally, regarding the claims themselves, Dr. Sinko reproduces the Asserted Claims of the '214 and '248 Patents at paragraphs 119-120 of his report.  I do not take issue with the text of the claims as reproduced.  I have addressed the proper interpretation and scope of these claims in detail in the Main Body of my Opening Report ¶¶ 77-156, and my Rebuttal Report ¶¶ 16-145, and I incorporate those discussions here by reference.

## VI.    SLAYBACK'S NDA PRODUCT INFRINGES THE ASSERTED CLAIMS

66.    Dr. Sinko devotes his non-infringement analysis (Section VIII) to three central contentions: ████████████████████████████████████████

████████████████████████████████ (Sinko Rebuttal Report ¶¶ 121-136);

26

(2) that sodium hydroxide does not "disappear" when added to the formulation and therefore must be counted as an ingredient that precludes infringement (Sinko Rebuttal Report ¶¶ 137-149); and (3) ██████████████████████████████████████████████████ ████████████████████████ (Sinko Rebuttal Report ¶¶ 206-215).  Dr. Sinko further argues that neither the impurity exception nor the unrelated exception to "consisting of" applies (Sinko Rebuttal Report ¶¶ 150-160), that "fluids" should not be limited to solvents (Sinko Rebuttal Report ¶¶ 161-173), ██████████████████████ (Sinko Rebuttal Report ¶¶ 174-183), that sodium hydroxide must be governed by the "consisting of" limitation rather than the "comprising" preamble (Sinko Rebuttal Report ¶¶ 184-189), and that there is no infringement under the doctrine of equivalents (Sinko Rebuttal Report ¶¶ 190-205).  As I explained in my Opening Report and Rebuttal Report, all of these contentions are incorrect.  Before addressing Dr. Sinko's specific arguments, however, it is important to frame the proper inquiry.

67.     The question presented by the "pharmaceutically acceptable fluid" claim element is not "what ingredients are present in or dissolved in the pharmaceutically acceptable fluid?"  The question is "what is the pharmaceutically acceptable fluid?"  As I explained in my Opening Report, the pharmaceutically acceptable fluid is the solvent.  Trout Main Body of Opening Report ¶¶ 103-106, 132-134.  Everything else in the formulation—the bendamustine, the antioxidant, and any other excipient including a pH adjuster like sodium hydroxide—is dissolved in the pharmaceutically acceptable fluid.  But being dissolved in the pharmaceutically acceptable fluid does not make a component one.  Trout Main Body of Opening Report ¶ 133.

68.     This is fundamental science.  Trout Main Body of Opening Report ¶¶ 62-63; Slayback Ex. 19, Martin's Physical Pharmacy and Pharmaceutical Sciences at 111-12 ("The constituent present in the greater amount in a binary solution is arbitrarily designated as the solvent

27

and the constituent in the lesser amount as the solute. When a solid is dissolved in a liquid, however, the liquid is usually taken as the solvent and the solid as the solute, irrespective of the relative amounts of the constituents. ████████████████████████████████ ████████████████████████████ A solute, once dissolved, does not become the solvent—it is dissolved in the solvent or solvent system.  Trout Main Body of Opening Report ¶¶ 133-134; Slayback Ex. 6, Brown & LeMay, Chemistry: The Central Science, at 84 ("In discussing solutions it is often convenient to call one component the solvent and the others solutes. The component of a solution whose physical state is preserved when the solution is formed is known as the solvent. For example, when sodium chloride (a solid) is mixed with water, the resultant solution is a liquid. Consequently, water is referred to as the solvent and sodium chloride as the solute. If all components of a solution are in the same state, the one present in greatest amount is called the solvent."); Slayback Ex. 21, Goodwin, *Is Salt Melting When It Dissolves in Water?*, J. Chem. Educ., Vol. 79, No. 3, at 393 (2002) ("All that is required is a liquid (solvent) and another substance, solid, liquid, or gas (the solute), which will mix with it intimately under prevailing conditions and in the proportions present. The resulting liquid is a solution.").

69. ████████████████████████████████████████████████████
████████████████████████████████████. EAGLEBEN-SA_00315043 (Handbook of Pharmaceutical Excipients) at -719 ("Sodium hydroxide occurs as a white or nearly white fused mass. It is available in small pellets, flakes, sticks, and other shapes or forms. It is hard and brittle and shows a crystalline fracture."); EAGLEBEN-SA_00361690 (EMPROVE NaOH Data Sheet) at -695 (Water solubility = 1,090 g/L at 20 °C). ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ when sodium hydroxide is dissolved in PEG 400 or in a PEG/ethanol solvent system: NaOH is a solid solute that dissolves into the solvent vehicle—it does not thereby become part of the solvent or transform the solvent into a different substance. Trout Main Body of Opening Report ¶¶ 272, 278 (explaining that "[t]he fact that sodium hydroxide itself must be dissolved into the PEG/ethanol matrix underscores that it is a solute or processing aid, not part of the solvent system" and that "NaOH is not a solvent for bendamustine (or anything else in the composition). It is not even a liquid."). Thus, a POSA would understand from fundamental solution chemistry that sodium hydroxide is a solute dissolved in the pharmaceutically acceptable fluid, not a component of it.

70.    This distinction is critical because Dr. Sinko's entire noninfringement theory depends on conflating what is "in" the pharmaceutically acceptable fluid with what the pharmaceutically acceptable fluid "is." The specification itself draws this distinction. It states that the pharmaceutically acceptable fluid "is" the solvent—for example, "the pharmaceutically acceptable fluid is propylene glycol (PG) or polyethylene glycol (PEG)"—while using different language ("includes" or "contains") to describe other components dissolved in the fluid. Trout Main Body of Opening Report ¶ 117; '214 patent at 3:42-45. As I explained in my Opening Report, "[t]hat various components of the liquid bendamustine formulation are dissolved in the pharmaceutically acceptable fluid does not fundamentally redefine what the pharmaceutically acceptable fluid is—a solvent or solvent system." Trout Main Body of Opening Report ¶ 133. And "[t]hat the components of the composition are dissolved into the pharmaceutically acceptable

29

fluid also does not redefine the pharmaceutically acceptable fluid to include ingredients that are not fluids." Trout Main Body of Opening Report ¶ 133.

71.     The claim structure reinforces this understanding. Independent Claim 6 of the '214 patent and Claim 8 of the '248 patent recite bendamustine and an antioxidant "in a pharmaceutically acceptable fluid; wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol." Trout Main Body of Opening Report ¶ 134. The "in a pharmaceutically acceptable fluid" language tells a POSA that other components (bendamustine, antioxidant) are in the fluid—they are solutes dissolved in the solvent. The "consists of" language then tells a POSA what the fluid is—PEG and optionally one or more of the listed co-solvents. Trout Main Body of Opening Report ¶ 134. Thus, if there is another component that is added in to the pharmaceutically acceptable fluid, like sodium hydroxide, a POSA would understand it to be another component of the composition, not part of the pharmaceutically acceptable fluid. Trout Main Body of Opening Report ¶ 134.

72.     Moreover, because the overall composition "comprises" various components, and the pharmaceutically acceptable fluid sub-element "consists of" a limited set of solvents, any pH adjuster, process residual ions, ████████ —if present and not performing the solvent role— fall within the open "comprising" aspect of the composition and outside the specific solvent element. Trout Main Body of Opening Report ¶ 224. This is precisely how a POSA would classify Slayback's NDA Product: PEG 400 and ethanol are the pharmaceutically acceptable fluid; sodium hydroxide, monothioglycerol, and bendamustine are other components dissolved in that fluid. Trout Main Body of Opening Report ¶ 222.

30

73.    Before turning to Dr. Sinko's specific arguments, I note at the outset that the Asserted Claims are composition claims. They are not method of manufacture claims or product-by-process claims. What matters for purposes of infringement is the composition of Slayback's NDA Product at the time of making, using, offering for sale, selling, and/or importing—not how or when individual ingredients are added during an intermediate manufacturing step. Trout Main Body of Opening Report ¶ 197. ███████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████. The infringement analysis compares the finished product to the claims, and the finished product is a sterile, clear solution in a vial containing PEG 400 and ethanol as the solvent system, with bendamustine, monothioglycerol, and the residues of pH adjustment dissolved therein. Trout Main Body of Opening Report ¶¶ 175–184, 197.

74.    I understand from counsel for Eagle that where a patent claim is directed to a finished pharmaceutical product—rather than a method of manufacture—the relevant comparison for infringement purposes is the composition of the product in its final form. Independent Claim 1 of the '214 patent recites "[a] sterile vial containing a liquid bendamustine-containing composition"—language that describes a finished product that has been filled into a sterile vial, sealed, and is ready for clinical use (*i.e.*, withdrawal, dilution, and subsequent intravenous administration). Trout Main Body of Opening Report ¶¶ 80-81; '214 patent, Claim 1. A POSA reading the claim language in view of the specification would conclude that the claim refers to a final product packaged in a sterile vial ready for dilution and administration—not an intermediate manufacturing step. The same is true for Claim 1 of the '248 patent, which recites "[a] sterile

31

container containing a liquid bendamustine-containing composition"—again, language directed to a finished, packaged product. '248 patent, Claim 1; Trout Main Body of Opening Report ¶¶ 91-92. Independent Claims 6 of the '214 patent and 8 of the '248 patent each recite "a liquid bendamustine-containing composition" with specific long-term impurity limits—characteristics that are assessed in the finished product over time, not during an intermediate manufacturing step. None of these aspects of the claimed product make sense in the context of an intermediate product. A sterile vial or sterile container is the final package in which the product is stored, shipped, and dispensed; it is not a manufacturing vessel. And the requirement that total impurities remain below about 5% "after at least about 15 months at a temperature of about 5° C. to about 25° C." is a shelf-life specification that applies to the product as stored—not a parameter measured during compounding. Trout Main Body of Opening Report ¶¶ 103-106.

75. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████ .

32

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ The Asserted Claims define what the pharmaceutically acceptable fluid is (PEG and optionally one or more of the listed co-solvents) and separately identify the antioxidant as a distinct element. This three-element claim structure—API, solvent, and antioxidant—applies to the finished composition in the sterile vial or sterile container, not to how ingredients are sequenced during manufacture. With this framework and the functional delineations in mind, I now turn to Dr. Sinko's specific arguments.

### A.    Slayback's NDA Product

76.    Dr. Sinko's description of Slayback's NDA Product at paragraphs 71-78 is largely consistent with my own description of the product. Sinko Rebuttal Report ¶¶ 71-78; Trout Main Body of Opening Report ¶¶ 175-184. I agree that Slayback's Label sets for the ingredients in Slayback's NDA Product and that each milliliter contains 25 mg of bendamustine hydrochloride, 5 mg of monothioglycerol, 39.45 mg (5% v/v) of absolute alcohol, and q.s. to 1 mL polyethylene glycol 400, and that sodium hydroxide is used to adjust pH of polyethylene glycol 400. Trout Main Body of Opening Report ¶ 178. However, Dr. Sinko's characterization of the Label is misleading in several respects.

77.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ The FDA's requirement under 21 CFR § 201.100(b) that all "inactive ingredients" be listed on the label does not mean that every listed inactive ingredient is part of the "pharmaceutically acceptable fluid" as that term is used in

33

the Asserted Claims.  Trout Main Body of Opening Report ¶¶ 213-214.  Indeed, the FDA treats pH adjusters differently from other inactive ingredients: under 21 CFR § 201.100(b)(5)(iii), "ingredients added to adjust the pH or to make the drug isotonic" need only "be declared by name and a statement of their effect"—precisely the form that Slayback's Label uses for sodium hydroxide.  Trout Main Body of Opening Report ¶ 213.  This separate regulatory treatment confirms that the FDA recognizes pH adjusters as functionally distinct from the solvent system.

78.    Indeed, Slayback is well aware of these labeling and regulatory requirements and how to comply with them—

34

███████████████████████████████████████████████████

████████████████████████████████████████ .

79.     Second, Dr. Sinko asserts that sodium hydroxide is an "inactive ingredient" or "excipient" that is "part of the formulation" and that "[i]nactive ingredients or excipients are not the same thing as degradants or impurities." Sinko Rebuttal Report ¶ 72. I do not dispute that sodium hydroxide is deliberately added to the formulation. But the question is not whether sodium hydroxide is "part of the formulation" in a general regulatory sense—the question is whether it is part of the specific claim element "pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol." Trout Main Body of Opening Report ¶¶ 132, 199. For the reasons I have explained, sodium hydroxide is a pH adjuster that falls within the open "comprising" preamble of the Asserted Claims, not the "consisting of" limitation that applies only to the solvent system. Trout Main Body of Opening Report ¶¶ 134, 224.

80.     Third, Dr. Sinko emphasizes that the Slayback NDA Product is a "clear solution" in which "every other inactive ingredient" is dissolved. Sinko Rebuttal Report ¶ 77. I agree that Slayback's NDA Product is a clear solution. That is entirely consistent with my opinion. A clear solution is exactly what one would expect from a liquid bendamustine-containing composition in which the API, antioxidant, and pH adjuster are all dissolved in the pharmaceutically acceptable fluid (the PEG 400/ethanol solvent system). Trout Main Body of Opening Report ¶¶ 133, 179. That the sodium hydroxide is dissolved in the solution does not make it part of the solvent system, any more than the dissolved bendamustine or the dissolved monothioglycerol are part of the solvent system. Trout Main Body of Opening Report ¶¶ 133-134. ███████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████ Slayback does not describe sodium hydroxide as a "solvent" anywhere. That is because it is indisputably not a solvent.

81.    Fourth, Dr. Sinko's reference to Eagle's Senior Vice President, Head Global Manufacturing And Supply, Mr. David S. Bricker's testimony that Eagle's products are clear solutions and that he had never heard of bendamustine precipitating out of solution is unremarkable.  Sinko Rebuttal Report ¶ 78.  I agree with Mr. Bricker.  That is exactly what the Asserted Claims contemplate: a liquid bendamustine-containing composition where the bendamustine is fully dissolved in the pharmaceutically acceptable fluid (the solvent system).  Trout Main Body of Opening Report ¶¶ 218-220.

**B.**    ████████████████████████████████████████████████

82.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ This argument is incorrect for the reasons I have explained at length in my Opening Report and Rebuttal Report, and for the additional reasons set forth below.

83.    First, Dr. Sinko's assertion incorrectly focuses on the method of manufacture for the Slayback Product rather than the product as imported and sold in the United States.  The claims at issue are neither method of manufacture claims nor product-by-process claims.  And the labels for the Slayback Product are at odds with Dr. Sinko's assertion.  The December 2022 label states:

36

> Each milliliter contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, 39.45 mg dehydrated alcohol, and q.s. to 1 mL polyethylene glycol 400.

EAGLEBEN-SA_00363932 (Slayback Label 12/2022).

In 2024, the label was revised to state:

> Each milliliter contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, 39.45 mg (5% v/v) of absolute alcohol, and q.s. to 1 mL polyethylene glycol 400. Sodium hydroxide is used to adjust pH of polyethylene glycol 400.

EAGLEBEN-SA_00363910 (Slayback Label 2/2024).

84.    ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████



37

[REDACTED]

85.     Dr. Sinko's argument also ignores the fact that following the addition of any NaOH, Slayback states that the PEG 400 remains PEG 400.  Thus, in its 2024 label, Slayback states "Sodium hydroxide is used to adjust pH of polyethylene 400."  EAGLEBEN-SA_00363910 (Slayback Label 2/2024).  Thus, the lone solvents remain PEG 400 and ethanol.  No label or FDA document submitted by Slayback supports the notion that sodium hydroxide [REDACTED] instead is part of the solvent system for the Slayback Product.

86.     Third, Dr. Sinko's argument rests on a fundamental conflation of two distinct concepts: the physical state of a substance (whether it "flows") and what the "pharmaceutically acceptable fluid" actually is under the Asserted Claims.  Trout Main Body of Opening Report ¶¶ 131-135; Trout Rebuttal Report ¶¶ 37-38, 43-48.  The "pharmaceutically acceptable fluid" is a specific claim element referring to the solvent system—not a general descriptor of any substance in a liquid or flowing state.  Trout Main Body of Opening Report ¶ 132; Trout Rebuttal Report ¶ 43.

87.     [REDACTED] Trout Main Body of Opening Report ¶¶ 333-335.  By Dr. Sinko's logic, saline solution also "flows" and is also a "fluid," but no one would contend that adding a drop of saline to a PEG-based formulation converts the saline into part of the "pharmaceutically acceptable fluid consisting of" the enumerated solvents.  The entire

liquid bendamustine composition "flows"—it is, after all, a liquid—but the "pharmaceutically acceptable fluid" is the solvent system within that liquid composition—not every substance that happens to be in a liquid or dissolved state. As I framed at the outset, the question is what the pharmaceutically acceptable fluid is, not what is dissolved in it. Sodium hydroxide is dissolved in the pharmaceutically acceptable fluid; it is not the pharmaceutically acceptable fluid. Trout Main Body of Opening Report ¶ 134; Trout Rebuttal Report ¶¶ 37-38.

88.    Dr. Sinko also relies heavily on the Abandoned Patent Application Publication (the '879 Publication). Sinko Rebuttal Report ¶¶ 122, 126. As I explained in the Main Body of my Opening Report, the '879 Publication is a separate patent application that does not share the same priority chain as the Asserted Patents, was filed more than three years after the priority date, includes a different inventor, and was ultimately abandoned. Trout Main Body of Opening Report ¶¶ 310-317. Whatever language the '879 Publication used does not control what the "pharmaceutically acceptable fluid consisting of" the five enumerated solvents is in the Asserted Claims and I do not believe that a POSA would consider it pertinent at all to the appropriate meaning of that term. Trout Main Body of Opening Report ¶¶ 310-313. A POSA evaluates what the fluid is by its functional performance and measurable composition under the Asserted Claims, not by how a separate abandoned publication may have characterized components in the context of a different invention. Trout Main Body of Opening Report ¶ 313.

89.    Dr. Sinko also cites inventor testimony from Dr. Sundaram and Dr. Buxton, and references to other Eagle patent applications involving pemetrexed and topotecan formulations, to argue that ███████████████████████████████████████████ ███████████████████████████████ Sinko Rebuttal Report ¶¶ 123-125. These references are irrelevant. The Asserted Claims here are for nonaqueous, PEG-based liquid

39

bendamustine formulations with a specific "consisting of" limitation that restricts the pharmaceutically acceptable fluid to five enumerated solvents. Trout Rebuttal Report ¶ 75. ██████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████ .

90.     Dr. Sinko's further assertion that sodium hydroxide "is not a solid" when dissolved is addressed in the above (§ IV.B) in the Technical Background section of this report. Sinko Rebuttal Report ¶¶ 131-136. As I explained there, the relevant inquiry is not the physical state of sodium hydroxide after dissolution but what the pharmaceutically acceptable fluid is. Even accepting that dissolved sodium hydroxide is no longer in a solid physical state, that does not make it the pharmaceutically acceptable fluid or any part of it. The pharmaceutically acceptable fluid is the solvent system—PEG 400 and ethanol—and sodium hydroxide is a different component dissolved in that system. Trout Main Body of Opening Report ¶¶ 132-134.

### C.     Sodium Hydroxide Is Effectively Consumed and Does Not Persist as a Functional Ingredient

91.     Dr. Sinko argues that sodium hydroxide does not "disappear" after it is added to the formulation and that my use of the terms "neutralized" or "consumed" is incorrect. Sinko Rebuttal Report ¶¶ 137-149. Dr. Sinko mischaracterizes my position. I have never contended that atoms are destroyed during a chemical reaction or that sodium hydroxide literally "disappears." Trout Main Body of Opening Report ¶¶ 280-282. What I have explained is that when sodium hydroxide is added to PEG for pH adjustment, it dissociates into sodium ($Na+$) and hydroxide ($OH-$) ions, the hydroxide ions react with available acidic species, and the hydroxide is thereby ████████████████████████████████████████████ . Trout Main Body of Opening Report ¶ 280. What remains are low-level inorganic counterions (*e.g.*, $Na+$) and

conjugate bases that are incidental to neutralization and do not perform the solvent function. Trout Main Body of Opening Report ¶¶ 280-282.

92.    Dr. Sinko asserts that "[a] POSA would not adopt a claim construction that ignored deliberately added ingredients that subsequently undergo chemical reaction after being added." Sinko Rebuttal Report ¶ 139. The Asserted Claims do not ignore sodium hydroxide—the open "comprising" preamble permits additional components beyond those listed in the "consisting of" element. Trout Main Body of Opening Report ¶ 224. The question is not whether sodium hydroxide is "ignored" but rather where it falls in the claim architecture: it is a component of the liquid bendamustine-containing composition (governed by "comprising") but not a component of the pharmaceutically acceptable fluid (governed by "consisting of"). Trout Main Body of Opening Report ¶¶ 132, 224.

93.    Dr. Sinko draws an analogy to a chef's recipe, arguing that "[a] pharmaceutical formulator identifies those chemicals that will be added to a formulation in the same way that a chef will list ingredients in a recipe" and that "[t]he fact that those ingredients may chemically change over time . . . does not change their status as ingredients from a definitional standpoint." Sinko Rebuttal Report ¶ 141. This analogy, while colorful, actually supports my position. In a recipe, one distinguishes between the cooking medium (oil, butter, broth) and other ingredients (salt, pepper, spices) that are added to the medium. Adding salt to a sauce does not make the salt part of the "cooking oil"; it remains a separate ingredient that seasons the dish. Similarly, adding sodium hydroxide to PEG does not make it part of the "pharmaceutically acceptable fluid"; it remains a separate component that adjusts the pH; here, as Slayback states, it "is used to adjust pH of polyethylene 400." EAGLEBEN-SA_00363910 (Slayback Label 2/2024); *see also* Trout Main Body of Opening Report ¶¶ 132, 199.

41

94. Dr. Sinko further contends that the "long-lasting impacts of sodium hydroxide on stability indicate that it has not disappeared or been 'effectively consumed.'" Sinko Rebuttal Report ¶¶ 142-143, 148. This confuses two different questions. The first question—whether pH adjustment improves stability—is uncontested. I agree that adjusting the pH of the PEG can improve the stability of the bendamustine formulation. Trout Main Body of Opening Report ¶ 275. The second question—whether an ingredient's impact on stability makes it part of the solvent system—is the one that matters for claim construction, and the answer is no. Trout Main Body of Opening Report ¶ 278. The antioxidant monothioglycerol also has a "long-lasting impact" on stability, yet Dr. Sinko does not contend it is part of the pharmaceutically acceptable fluid. Trout Main Body of Opening Report ¶ 278. The "consisting of" limitation in the Asserted Claims identifies the solvent system by its solvation function, not by which ingredients affect stability.

95. Dr. Sinko argues that I have "provide[d] no evidence that the entirety of the added

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ Trout Main Body of Opening Report ¶ 282.

96. Dr. Sinko also points to the elevated pH in Slayback's NDA Product (pH rising from ~5.4-6.9 to ~10.0-10.1 during manufacturing) as evidence of the "lasting impact" of sodium

42

hydroxide and the "presence of excess hydroxide ions." Sinko Rebuttal Report ¶ 146-147. The pH elevation is the predictable consequence of neutralizing acidic species in the PEG. Trout Main Body of Opening Report ¶ 275. A system at pH 10 contains elevated hydroxide ion concentration, but this reflects the equilibrium state of the acid-base system, not the persistence of undissociated NaOH as an ingredient. As explained above, under typical formulation conditions, the hydroxide added for pH control is effectively consumed, leaving little dissolved NaOH in equilibrium. Moreover, the pH of the PEG drops significantly after bendamustine hydrochloride (an acid) is dissolved in the solution—as Dr. Sinko himself acknowledges. Sinko Rebuttal Report ¶ 76. The final pH of the composition reflects the overall acid-base equilibrium of the entire formulation, not the persistence of "excess" NaOH.

97. ██████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████

## D. Sodium Hydroxide Falls Within the Impurity Exception to "Consisting Of"

98. Dr. Sinko argues that sodium hydroxide cannot be an impurity because it is an "inactive ingredient" deliberately added to the formulation, and that inactive ingredients and

43

impurities are "mutually exclusive categories."  Sinko Rebuttal Report ¶¶ 150-154.  This argument misapprehends the relevant inquiry.

99.    The question under the impurity exception to "consisting of" is not whether sodium hydroxide was intentionally added during manufacturing.  The question is what persists in the finished pharmaceutical product and how those residual species are properly classified.  Trout Main Body of Opening Report ¶¶ 232-254.  As I explained in the Main Body of my Opening Report, when sodium hydroxide is added to PEG for pH adjustment, it dissociates and the hydroxide ions react with available acidic species, leaving behind low-level sodium counterions (Na+) and conjugate bases.  Trout Main Body of Opening Report ¶¶ 280-282.  These residual sodium species are properly classified as impurities under applicable compendial and regulatory frameworks.

100.    Dr. Sinko cites the ICH definition of impurity as "[a]ny component of the drug product which is not the chemical entity defined as the drug substance or an excipient in the drug product."  Sinko Rebuttal Report ¶ 152.  But the ICH and USP frameworks also recognize that impurities "may occur naturally, be added intentionally, or be introduced inadvertently during manufacture."  Trout Main Body of Opening Report ¶ 240.  The fact that sodium hydroxide is deliberately added as a processing aid does not preclude its residual ionic products from being classified as impurities in the finished product.  Indeed, ICH Q3D(R2) classifies sodium as an elemental impurity that must be evaluated in pharmaceutical products.  Trout Main Body of Opening Report ¶ 241.  Sodium is also ordinarily associated with PEG from its manufacturing catalyst system—sodium hydroxide is used as a catalyst in the production of PEG itself—and is thus an impurity that a POSA would expect to find in any PEG-based formulation regardless of

44

whether additional NaOH is added for pH adjustment.  Trout Main Body of Opening Report ¶¶ 247-250.

101.    Dr. Sinko further contends that the reaction products of sodium hydroxide and acids (*e.g.*, sodium acetate buffer species) are not impurities but "functional components of the formulation that improve its performance." Sinko Rebuttal Report ¶ 154.  This argument conflates the processing step (adding NaOH to adjust pH) with the identity of what remains.  The buffer species formed from neutralization of trace acidic impurities in PEG are themselves trace-level species that do not perform any solvent function.  Trout Main Body of Opening Report ¶ 282.  The remaining $Na^+$ and $OH^-$ ions are governed by the PEG 400 specification as part of the ordinary ionic content of the PEG matrix, not as a discrete functional component of the solvent system.  Trout Main Body of Opening Report ¶ 282.  The FDA's own requirement that sodium hydroxide be listed on the label by "name and a statement of their effect" under 21 CFR § 201.100(b)(5)(iii)— the specific provision for pH adjusters—rather than by quantitative amount as required for other inactive ingredients, is consistent with ███████████████████████████████ ███████████████████████████████████.  Trout Main Body of Opening Report ¶ 213.

102.    ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

45

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

**E.    Sodium Hydroxide Is Unrelated to the "Pharmaceutically Acceptable Fluid" Limitation**

103.    Dr. Sinko argues that sodium hydroxide is "related" to the "pharmaceutically acceptable fluid consisting of" limitation for two reasons: (1) ████████████████████████ ████████████ and (2) because sodium hydroxide improves the stability of the formulation.  Sinko Rebuttal Report ¶¶ 155-160.  Both arguments fail.

104.    Again, the claims at issue are not method of manufacturing claims or product-by-process claims, and ████████████████████████████████████████ ████████████████████  *See supra* ¶ 83.  And even the updated Slayback label indicates that the sodium hydroxide is used to modify the pH of PEG 400—which remains PEG 400.

105.    Dr. Sinko's first argument also is circular.  He contends that sodium hydroxide is "related" to the claim's "fluid" limitation "because it is a fluid."  Sinko Rebuttal Report ¶ 156.  This reasoning assumes the very conclusion at issue—whether sodium hydroxide is part of the "pharmaceutically acceptable fluid."  As I have explained, the "pharmaceutically acceptable fluid" is a specific claim element referring to the solvent system, not a catch-all for any substance in a liquid state.  Trout Main Body of Opening Report ¶ 132; Trout Rebuttal Report ¶ 43.  Indeed, if being "a fluid" were sufficient to make a substance part of the "pharmaceutically acceptable fluid," then the same reasoning would require treating bendamustine hydrochloride and the antioxidant monothioglycerol as part of the pharmaceutically acceptable fluid as well—both are dissolved in the finished formulation and therefore exist in a liquid state.  Trout Main Body of Opening Report ¶¶ 133-134; Sinko Rebuttal Report ¶¶ 55-56 (acknowledging that solids dissolved in a fluid

46

become fluid themselves). But the Asserted Claims expressly recite bendamustine and the antioxidant as separate elements from the pharmaceutically acceptable fluid, confirming that being dissolved in, or existing as, a liquid does not make a substance part of the "pharmaceutically acceptable fluid" element. Trout Main Body of Opening Report ¶¶ 105, 132, 134; Trout Rebuttal Report ¶¶ 30, 68. Dr. Sinko's reasoning would collapse the claim's carefully drawn distinctions among the API, the antioxidant, and the solvent system, rendering the nested "consisting of" limitation meaningless. The "unrelated" inquiry asks whether sodium hydroxide performs the solvent function that defines the "pharmaceutically acceptable fluid" element—not whether it happens to be in a liquid or dissolved state. Trout Main Body of Opening Report ¶¶ 264, 271. Sodium hydroxide does not perform a solvent function; it performs a pH-conditioning function. Trout Main Body of Opening Report ¶ 272.

106.    Dr. Sinko's second argument—that sodium hydroxide is "related" because it improves stability—improperly conflates separate claim elements. Sinko Rebuttal Report ¶¶ 157-160. The Asserted Claims contain three distinct compositional elements: (1) bendamustine, (2) a pharmaceutically acceptable fluid consisting of the enumerated solvents, and (3) a stabilizing amount of an antioxidant. Trout Main Body of Opening Report ¶ 131. The claims then recite a stability limitation as a property of a claimed composition. Stability is addressed by the antioxidant element and the total-impurities limitation—not by the "pharmaceutically acceptable fluid" element. Trout Main Body of Opening Report ¶ 278. If every component that "relates to" stability were deemed part of the pharmaceutically acceptable fluid, then the antioxidant monothioglycerol—which unquestionably improves stability—would also be part of the fluid, an assertion Dr. Sinko does not advance. Trout Main Body of Opening Report ¶ 278. This point is particularly telling because monothioglycerol is itself a liquid at room temperature—it is, by any

47

definition, a "fluid"—and it directly contributes to stability, yet Dr. Sinko does not contend that monothioglycerol is part of the "pharmaceutically acceptable fluid consisting of" the enumerated solvents. If Dr. Sinko's reasoning were correct—that any fluid that contributes to stability is "related to" the pharmaceutically acceptable fluid element—then monothioglycerol would be subject to the same analysis. That Dr. Sinko does not extend his argument to monothioglycerol reveals the flaw in his logic: a component's physical state and its effect on stability do not determine whether it is the pharmaceutically acceptable fluid. What determines the pharmaceutically acceptable fluid is the solvent function. Trout Main Body of Opening Report ¶¶ 132, 278.

107.    Moreover, sodium hydroxide is not necessary for the stability of the claimed formulations. ███████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████    NaOH is only needed to condition PEG lots that have suboptimal incoming pH due to variable levels of acidic impurities from PEG manufacturing. Trout Main Body of Opening Report ¶ 275. The purpose of the NaOH addition is to ensure that the PEG—the actual solvent—is in a pH range where its acidic impurities do not catalyze ester degradation of bendamustine. Trout Main Body of Opening Report ¶ 275. This is a conditioning step applied to the solvent, not a redefinition of the solvent itself. A POSA would understand that a substance used to condition the properties of a solvent is not thereby transformed into the solvent, any more than a water treatment chemical added to purify water becomes part of the water itself.

108.    Dr. Sinko's reliance on the Abandoned Patent Application Publication's description of sodium hydroxide as contributing to stability is also not relevant. Sinko Rebuttal Report ¶¶ 142, 158. As I have explained, the '879 Publication is a separate application that does not share the

48

same priority chain as the Asserted Patents and was ultimately abandoned. Trout Main Body of Opening Report ¶¶ 310-317. More fundamentally, that sodium hydroxide affects the pH environment of the formulation—and that pH in turn affects stability—does not make sodium hydroxide "related to" the solvent element of the claims any more than the antioxidant's effect on stability makes it "related to" the solvent element. Trout Main Body of Opening Report ¶ 278. The "unrelated" exception examines whether the additional component performs the function of the claim element, and sodium hydroxide does not perform a solvent function. Trout Main Body of Opening Report ¶¶ 264-271.

### F.    "Pharmaceutically Acceptable Fluid" Refers to the Solvent System

109.    Dr. Sinko argues that the term "pharmaceutically acceptable fluid" should not be limited to solvents and that, even if it were so limited, ███████████████████████████

███████████ Sinko Rebuttal Report ¶¶ 161-173. Both contentions are incorrect.

#### 1.    Opinion Is Consistent with the Agreed Construction and Court's Guidance During *Markman* Hearing

110.    As a threshold matter, my opinion that the "pharmaceutically acceptable fluid" in the Asserted Claims refers to the solvent system is not a new or additional claim construction. Trout Main Body of Opening Report § VII. The phrase "pharmaceutically acceptable fluid" is part of a limitation that recites: "a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol" / "wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol." A POSA would understand that each of propylene glycol, ethanol, benzyl alcohol and glycofurol is a solvent for bendamustine. *See, e.g.*, '214 Patent at Examples 1-8; Trout Main Body of Opening Report ¶¶ 110, 113, 120. Thus, the intrinsic evidence (the claim language, specification, and prosecution history) confirm

49

to a POSA that given the agreed construction of "pharmaceutically acceptable fluid," the claim limitation at issue recites the solvent PEG and "optionally one or more of" the other recited solvents (propylene glycol, ethanol, benzyl alcohol and glycofurol). Trout Main Body of Opening Report § VII.A-E. Thus, my opinions are not a new or additional claim construction, but a faithful application of the agreed construction of "pharmaceutically acceptable fluid" to the entire claim limitation at issue.

111. Moreover, my opinions also reflect a technical application of how a POSA would apply the agreed construction—"a fluid which is suitable for pharmaceutical use"—to the specific claim language and other intrinsic evidence. *See* C.A. No. 24-64, D.I. 98 at 3 & D.I. 180 & 182. I understand from counsel for Eagle that the Court's claim construction does not foreclose expert testimony/opinions explaining how the construed terms would apply to the accused products. Trout Main Body of Opening Report ¶¶ 27-28. Rather, the purpose of expert testimony/opinions at the infringement stage is to bridge the gap between the legal meaning of the claim terms and the technical facts of the accused products. Trout Main Body of Opening Report ¶¶ 104-105. That is precisely what I did. I apply the agreed construction of "a fluid which is suitable for pharmaceutical use" to the specific technical facts of Apotex's NDA Product, informed by the intrinsic evidence including the specification and prosecution history, and conclude that it infringes the Asserted Claims. Trout Main Body of Opening Report ¶¶ 104-134.

112. Further, I have reviewed the transcript of the *Markman* hearing in this case, and during that hearing, the Court recognized that applying the "consisting of" and "comprising" claim terms to particular formulation components is a factual inquiry appropriate for expert analysis. Trout Rebuttal Report ¶¶ 18, 120-123. The Court expressly stated that it would not adopt either party's proposed constructions of "a liquid bendamustine-containing composition comprising" or

50

"a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol" / "wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol" at the claim construction stage because "we all know what comprising and consisting of are," and "[a]dopting one or the other side's proposals is not going to help" and would "just invite word games later." Markman Tr. at 69:2-6; Trout Main Body of Opening Report ¶¶ 37-38. The Court deferred the remaining disputes to summary judgment and jury instructions, recognizing that the resolution of how the "consisting of" limitation applies to specific formulation components is an as-applied question. See C.A. No. 24-64, D.I. 111; Trout Main Body of Opening Report ¶ 38.

113.    My opinion is consistent with the Court's instructions and framework from the *Markman* hearing. I have not proposed a new construction of "pharmaceutically acceptable fluid" that departs from the agreed construction. Trout Rebuttal Report ¶¶ 22, 43. Rather, I explain how a POSA reading the Asserted Claims—in which every enumerated substance in the "consisting of" limitation is a solvent for bendamustine—would understand that the pharmaceutically acceptable fluid is the solvent system in the bendamustine-containing composition, and that the sodium hydroxide added to the PEG 400 in the Slayback manufacturing process is not part of that pharmaceutically acceptable fluid (nor is its reaction products). Trout Main Body of Opening Report ¶¶ 105, 110, 113-114, 131-134; Trout Rebuttal Report ¶¶ 22, 32, 43-48, 68. This is the ordinary work of an infringement expert: applying the construed claim terms to the technical facts to determine whether a product falls within the scope of the claims. Trout Main Body of Opening Report ¶¶ 104-105.

51

114.     To the extent that my opinions are deemed to be claim construction (which I disagree with), I further understand from counsel that courts have broad discretion to revisit, clarify, and even supplement their claim constructions as their understanding of the technology and issues evolves over the course of a case—including at summary judgment or trial—particularly where the issues are complex or the meaning of the claims was not fully resolved at the *Markman* stage. I understand from counsel that when a court elaborates on or clarifies what is inherent in an agreed or previously adopted construction, it is not changing the construction—it is making plain what the construction already meant. I further understand from counsel that it is common for parties to agree on a claim construction, only to have their dispute evolve to a point where they realize that further construction is necessary to resolve the infringement question. I understand that when such a dispute arises, the court is not bound by the parties' prior stipulation and has an independent obligation as a matter of law to construe the claim term to the extent necessary to resolve the dispute—even if the parties previously agreed to a construction that did not fully address the issue. To the extent that Slayback contends that my opinions implicate the appropriate construction of "pharmaceutically acceptable fluid," (which appears to be the situation here), I believe that when applied to the entire claim limitation at issue, the agreed construction—"a fluid which is suitable for pharmaceutical use"—indicates to a POSA that the fluid must include the solvent PEG and optionally one of the other recited solvents. But to the extent that Slayback claims that the agreed construction means something other than what a POSA would understand, then the agreed construction does not on its face resolve what counts as the "pharmaceutically acceptable fluid" versus what is merely dissolved or included within it. C.A. No. 24-64, D.I. 98 at 3 & D.I. 180 & 182. The Court recognized as much at the *Markman* hearing when she deferred those as-applied questions rather than adopting either party's proposed constructions. Markman Tr. at 69:2-

52

6; *see also* C.A. No. 24-64, D.I. 111.  I understand from counsel that when parties raise an actual dispute regarding the proper scope of claim terms, the court must resolve it, and that this resolution can occur at any phase of the litigation—not only at the *Markman* hearing.  My opinions here will assist the Court and the finder of fact in resolving that dispute by explaining, from a technical standpoint, what is inherent in the agreed construction when read in light of the intrinsic evidence.

115.    Eagle's position is consistent with the position it took during the *Markman* hearing that the "pharmaceutically acceptable fluid" in the Asserted Claims refers to the solvent system, and the "consisting of" limitation restricts additional solvents but does not exclude formulation components that serve a different function.  Trout Main Body of Opening Report ¶¶ 104-134; Trout Rebuttal Report ¶¶ 22, 26-32, 43-48, 66-70.  That is exactly what Eagle's counsel argued at the *Markman* hearing, and my testimony supplies additional technical support from the intrinsic record—the specification's dissolution language, the prosecution history's focus on solvents, and the Examiner's characterization of the fluids as "carriers"—for the same position.  *See* Markman Tr. at 21:3-6, 25:17-20, 28:9-17; Trout Main Body of Opening Report ¶¶ 114, 131, 145-155; Trout Rebuttal Report ¶¶ 44, 54-64, 115-118.  My opinion does not alter the agreed construction; it explains, as a matter of technical fact, how a POSA would apply that construction to the accused products.  Trout Rebuttal Report ¶¶ 22, 43; Trout Main Body of Opening Report ¶¶ 104-105.

116.    Dr. Sinko asserts that "plaintiffs did not raise the claim construction argument that 'a fluid is a solvent' during the claim construction / Markman phase of this case" and that "plaintiffs may not be permitted to argue this claim construction at all."  Sinko Rebuttal Report ¶ 162.  This assertion is factually incorrect and reflects a fundamental misunderstanding of what was actually disputed at the *Markman* hearing.

117.    As a preliminary matter, Dr. Sinko conflates two separate claim construction issues. The parties separately agreed on a construction for the sub-term "pharmaceutically acceptable fluid" standing alone—"a fluid which is suitable for pharmaceutical use." C.A. No. 24-64, D.I. 98 at 3 & D.I. 180 & 182. But the entire phrase "a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol" / "wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol" was a separately disputed term that was the subject of competing proposed constructions and extensive argument at the *Markman* hearing. C.A. No. 24-64, D.I. 98 at 2-3. The meaning of the pharmaceutically acceptable fluid in the context of the "consisting of" limitation—including what counts as the "fluid" versus what is merely dissolved or included within it—was disputed at the *Markman* hearing. That dispute necessarily encompassed whether the pharmaceutically acceptable fluid refers to the solvent system.

118.    The *Markman* hearing transcript demonstrates that Eagle's counsel expressly presented the position that the pharmaceutically acceptable fluid functions as the solvent system. Counsel explained: "the solvent system that is used here is—it is a mixture of PEG and PG. That is what we are saying is the pharmaceutically acceptable fluid." Markman Tr. at 21:3-6. Counsel further stated that "the fluid is holding the other components. That's its—that is its function. It's dissolving the other components." Markman Tr. at 28:9-11. The Court then asked: "Is a solvent. So you're saying solvent now?" and counsel confirmed: "Yes. . . . It is functioning as a solvent." Markman Tr. at 28:13-17. The Court agreed with this characterization, stating: "I agree with you on that. . . . I think you're right about that. But you made a choice to say 'consisting of,' and so it seems to me you can't have other solvents." Markman Tr. at 25:21-25. Eagle agreed it "can't

54

have other solvents, subject to the known exceptions." Markman Tr. at 26:1-2. The Court then confirmed the "first sort of fence": "Cannot have other solvents in the infringing product." Markman Tr. at 26:13-14. And in her oral ruling, the Court stated: "I think we all agree that there can't be another solvent system that's not on the list of pharmaceutically acceptable fluids." Markman Tr. at 67:23-25. The entire discussion between the Court and both parties was framed in terms of solvents—not in terms of the dictionary meaning of "fluid" relied upon by Dr. Sinko.

119.     Defense counsel's own arguments at the *Markman* hearing confirm that the solvent characterization was the central dispute. Defense counsel argued that Eagle "didn't want to ask that pharmaceutically acceptable fluid be a solvent, because they can't do that" since "pharmaceutically acceptable fluid is an agreed claim term" that "means a fluid which is suitable for pharmaceutical use." Markman Tr. at 39:3-7. But this argument only underscores the point: Defense counsel acknowledged that the question of whether the pharmaceutically acceptable fluid refers to the solvent was squarely at issue—Defense simply disagreed with Eagle's position. The fact that the parties had a separate agreed construction for the sub-term "pharmaceutically acceptable fluid" did not prevent the parties from disputing what that fluid means in the context of the "consisting of" limitation, which was the disputed term before the Court. The Court resolved what it could at that stage—establishing that no additional solvents are permitted and that liquid antioxidants do not take a product outside the claims—and deferred the remaining as-applied questions to summary judgment and jury instructions. Markman Tr. at 67:14-68:4, 69:2-6. Dr. Sinko's contention that the solvent characterization was never raised during the *Markman* phase is contradicted by the hearing transcript and by Defense counsel's own arguments at that hearing.

120.     During the *Markman* hearing, Eagle's counsel explained that the "solvent system that is used here is—it is a mixture of PEG and PG. That is what we are saying is the

55

pharmaceutically acceptable fluid." Markman Tr. at 21:3-6. The Court engaged extensively with this framing, and Eagle's counsel confirmed: "the fluid is holding the other components. That's its—that is its function. It's dissolving the other components." Markman Tr. at 28:9-11. The Court then asked: "Is a solvent. So you're saying solvent now?" and counsel confirmed: "Yes. . . . It is functioning as a solvent." Markman Tr. at 28:13-17. Thus, the characterization of the pharmaceutically acceptable fluid as the solvent system was squarely before the Court and part of the record of the claim construction proceeding. Trout Rebuttal Report ¶¶ 122, 148; Trout Main Body of Opening Report ¶¶ 104-105.

121.    Eagle's counsel further explained the prosecution history basis for this understanding. When the claims were amended to add the "consisting of" limitation with the pharmaceutically acceptable fluid, "we only talked about that solvent." Markman Tr. at 25:17-20. The Court expressly agreed: "I agree with you on that. . . . I think you're right about that." Markman Tr. at 25:21-23. The Court then established what it called the "first sort of fence"—that an accused product "[c]annot have other solvents in the infringing product." Markman Tr. at 26:12-14. Eagle's counsel agreed: "You can't have DMSO, correct." Markman Tr. at 26:21.

122.    In its oral ruling, the Court confirmed its understanding of this framework, stating: "I agree with Defendants, in the abstract, that you can't have in the product another fluid that is a pharmaceutically acceptable fluid that is not on the list and still infringe. I agree with them." Markman Tr. at 67:14-17. In the same breath, however, the Court drew a critical distinction regarding components that happen to be liquids but serve a different function: "That said, I'm not willing to say, at this point, that a product that has, for example, liquid Vitamin E as an antioxidant doesn't infringe because it's a liquid. Because the patent claim expressly allows for an antioxidant as a separate element." Markman Tr. at 67:18-22. The Court further stated: "I think we all agree

56

that there can't be another solvent system that's not on the list of pharmaceutically acceptable fluids. But I'm not going to say that the use of an antioxidant, that someone might characterize as a solvent because it's capable of dissolving a solid, would take a product outside of the scope of the claims." Markman Tr. at 67:23-68:4.

123.    The Court's guidance thus embodies precisely the functional distinction I apply in my analysis: (a) the "consisting of" limitation forecloses additional solvents that are not on the enumerated list; but (b) components that serve a different function in the formulation—such as an antioxidant—are not rendered non-infringing simply because they happen to be in liquid form. Markman Tr. at 67:14-68:4. This is the functional analysis I have applied throughout my reports. Trout Rebuttal Report ¶¶ 22, 26-32, 66-70; Trout Main Body of Opening Report ¶¶ 104-134, 199-225.

### 2.    Dr. Sinko Ignores the Court's Guidance and the Parties Agreed Construction

124.    Dr. Sinko's opinions are irreconcilable with the Court's guidance and the parties agreed construction. Dr. Sinko argues that "pharmaceutically acceptable fluid" should not be limited to solvents and that the broadest possible dictionary definition of "fluid"—a substance that flows—should control the analysis. Sinko Rebuttal Report ¶¶ 161-173. But this approach ignores how a POSA would understand the agreed construction—"a fluid which is suitable for pharmaceutical use"—in the context of the Asserted Claims' "consisting of" limitation, which enumerates five specific solvents. Trout Main Body of Opening Report ¶¶ 105, 110, 113, 134; Trout Rebuttal Report ¶¶ 43-44, 48, 68, 71-72. A POSA reading that construction in light of the intrinsic evidence would understand that the "pharmaceutically acceptable fluid" is the solvent system for the liquid bendamustine formulation. Trout Main Body of Opening Report ¶¶ 105, 131-132; Trout Rebuttal Report ¶¶ 22, 32, 43-48.

57

125.    The Court's *Markman* hearing discussion makes this especially clear.  At the hearing, Eagle's counsel explained the distinction between what "is" the pharmaceutically acceptable fluid and what is merely "included" or dissolved within it, drawing from the specification's own language.  Markman Tr. at 18:17-21:12; *see also* Trout Main Body of Opening Report ¶ 117; Trout Rebuttal Report ¶ 45.  The Court engaged with both parties' arguments and then drew a specific line: no additional solvents, but liquid antioxidants do not take a product outside the claims.  Markman Tr. at 67:14-68:4.  Dr. Sinko's approach—treating any liquid substance in the formulation as a "pharmaceutically acceptable fluid" subject to the "consisting of" limitation—is precisely the position the Court rejected when it declined to say that "a product that has, for example, liquid Vitamin E as an antioxidant doesn't infringe because it's a liquid." Markman Tr. at 67:19-20.

126.    Similarly, the Court rejected the broad reading that any substance which "someone might characterize as a solvent because it's capable of dissolving a solid, would take a product outside of the scope of the claims."  Markman Tr. at 68:1-4.  ███████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████ falls squarely within the type of argument the Court found unpersuasive.  Trout Main Body of Opening Report ¶¶ 199-225; Trout Rebuttal Report ¶¶ 83-92.  The Court's guidance directs that the infringement inquiry turns on a component's function in the formulation—not on whether, in the abstract, a substance could theoretically dissolve something.  Markman Tr. at 67:14-68:4; Trout Rebuttal Report ¶¶ 66-70.

127.    Dr. Sinko also attempts to elevate extrinsic evidence—dictionary definitions, physics textbooks, and other patents—over the intrinsic record that the parties and the Court

58

already considered.  Sinko Rebuttal Report ¶¶ 163-167.  But the intrinsic evidence uniformly confirms that the enumerated fluids function as solvents: the specification defines suitability by reference to the fluid's capacity to dissolve bendamustine ('214 patent at 6:30-33); the prosecution history focused exclusively on distinguishing solvents from the prior art; and the Examiner characterized the pharmaceutically acceptable fluid as "the liquid carrier for the ultimate dosage form."  Trout Main Body of Opening Report ¶¶ 114, 145-155; Trout Rebuttal Report ¶¶ 44, 54-64, 63, 115-118; EAGLEBEN-SA_00001077 ('214 Patent File History) at -1904.  I understand that under established claim construction principles, extrinsic evidence like generic dictionary definitions cannot override this consistent intrinsic record.  Trout Rebuttal Report ¶¶ 73-76.

### 3.    Specification and Prosecution History Confirm the Solvent Function

128.    Dr. Sinko points to the specification's statement that "pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof."  Sinko Rebuttal Report ¶ 164, citing '214 Patent, Col. 3, lines 39-41.  As I explained in the Main Body of my Opening Report, this passage describes "several embodiments of the invention"—not the Asserted Claims.  Trout Main Body of Opening Report ¶ 113.  The Asserted Claims are narrower than the full scope of the specification.  The "consisting of" limitation restricts the pharmaceutically acceptable fluid to five specific substances—PEG, propylene glycol, ethanol, benzyl alcohol, and glycofurol—all of which are solvents for bendamustine.  Trout Main Body of Opening Report ¶ 134.  That the specification describes broader embodiments in which the fluid "may or may not" be a solvent does not override the specific claim language, which identifies only solvents.  Trout Main Body of Opening Report ¶ 113; Trout Rebuttal Report ¶ 68.

129.    Dr. Sinko asserts that the claims "do not use the word 'solvent' anywhere" and that "if the applicants wanted to limit the claims to only solvents, they could have used the word 'solvent.'" Sinko Rebuttal Report ¶¶ 163, 166.  This argument ignores the actual claim language.

59

The claims do not use the generic word "fluid" standing alone—they use the specific phrase "pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol." The "consisting of" limitation itself identifies the specific fluids, and every one of them is a solvent for bendamustine. Trout Main Body of Opening Report ¶ 134. A POSA reading the claims would understand that the patentees defined the pharmaceutically acceptable fluid by enumerating specific solvents, not by invoking any broad dictionary definition of "fluid." Trout Rebuttal Report ¶ 68.

130. The prosecution history confirms this understanding. The original claims in the '214 patent application did not include the "pharmaceutically acceptable fluid" language—they claimed only the solvent, polyethylene glycol. Trout Main Body of Opening Report ¶ 146. When the Examiner rejected the original claims over Drager, the rejection was based on Drager's teaching of bendamustine formulations using polyethylene glycol as a potential solvent—not based on other formulation components like pH adjusters or stabilizers. Trout Main Body of Opening Report ¶ 147; EAGLEBEN-SA_00001077 ('214 Patent File History) at -1173. Eagle then amended the claims to add the "pharmaceutically acceptable fluid consisting of" limitation, restricting the solvent system to a specific group of polar protic solvents to distinguish from Drager's polar aprotic solvents. Trout Main Body of Opening Report ¶¶ 148-149; EAGLEBEN-SA_00001077 ('214 Patent File History) at -1272, -1274-76. Eagle's arguments to overcome Drager focused exclusively on the solvent—Eagle identified one critical modification needed: removal of polar aprotic solvents. Eagle did not argue that the "consisting of" amendment excluded Drager's other components, such as complexing agents or fillers, confirming that the amendment addressed only the solvent system. Trout Rebuttal Report ¶¶ 58-59.

60

131.    The Examiner's subsequent treatment of the amended claims further confirms this understanding.  In evaluating the claims against the Brittain prior art reference, the Examiner—who I understand is presumed to be a POSA—characterized the "pharmaceutically acceptable fluid" as "the liquid carrier for the ultimate dosage form," *i.e.*, the solvent. Trout Main Body of Opening Report ¶ 151; EAGLEBEN-SA_00001077 ('214 Patent File History) at -1904. The Examiner specifically equated Brittain's reference to "the liquid carrier for the ultimate dosage form" with the claim's "pharmaceutically acceptable fluid that consists of polyethylene glycol and optionally one or more of propylene glycol and ethanol."  Trout Main Body of Opening Report ¶ 151.  And in a subsequent office action, the Examiner again characterized the pharmaceutically acceptable fluids as "suitable" because they are "carriers to provide a liquid formulation of bendamustine."  Trout Main Body of Opening Report ¶ 154; EAGLEBEN-SA_00001077 ('214 Patent File History) at -026-27.  The Examiner's consistent use of "carrier" terminology—standard pharmaceutical vocabulary for a solvent or vehicle—confirms that both the Patent Office and a POSA understood the "pharmaceutically acceptable fluid" to refer to the solvent system, not to every substance present in the formulation.  Trout Rebuttal Report ¶¶ 63, 115-118.

132.    The significance of this prosecution history was acknowledged at the *Markman* hearing.  Eagle's counsel explained that when the amendment was made going to "consisting of," and putting pharmaceutically acceptable fluid into the claim, "we only talked about that solvent."  Markman Tr. at 25:17-20.  The Court expressly agreed: "I agree with you on that. . . .  I think you're right about that.  But you made a choice to say 'consisting of,' and so it seems to me you can't have other solvents."  Markman Tr. at 25:21-25.  Eagle agreed it "can't have other solvents, subject to the known exceptions."  Markman Tr. at 26:1-2.  The Court then confirmed: "Cannot have other solvents in the infringing product; right? . . .  But you can't have another solvent that's

not in here.  Can't have DMSO."  Markman Tr. at 26:13-20.  Eagle confirmed: "You can't have DMSO, correct."  Markman Tr. at 26:21.  This exchange confirms that both the Court and the parties understood the "consisting of" limitation to restrict the solvent system—not merely any substance that happens to be a fluid.  Trout Rebuttal Report ¶¶ 54-64, 122; Trout Main Body of Opening Report ¶¶ 145-155.

133.    The Court also confirmed its understanding that the solvent systems distinguished during prosecution cannot be in Defendants' products.  Eagle's counsel agreed "that the solvent systems that you distinguished are not—can't be in the Defendants' products."  Markman Tr. at 29:6-8.  Counsel further explained: "we don't think that the solvent and anything that's put into the solvent is the solvent system.  We think the solvent is the mixture of solvents, like PEG plus PG, PEG plus ethanol."  Markman Tr. at 30:3-6.  This is exactly the distinction I apply in my analysis: the pharmaceutically acceptable fluid is the mixture of solvents (PEG and ethanol in Slayback's NDA Product), not everything dissolved within that solvent system.  Trout Main Body of Opening Report ¶¶ 105, 131-134, 199-225; Trout Rebuttal Report ¶¶ 22, 32, 43-48, 68.

### 4.    Dr. Sinko's Remaining Arguments Are Unpersuasive

134.    Dr. Sinko further contends that there is "no particular reason to characterize the specific fluids recited in the patent claim as 'solvents' as opposed to 'organic fluids' or 'non-aqueous fluids' or 'carriers' or 'diluents.'" Sinko Rebuttal Report ¶ 167.  To the contrary, there is a very particular reason: each of the five enumerated substances dissolves bendamustine, and the specification ties the sufficiency of the fluid to its capacity to dissolve the drug.  Trout Rebuttal Report ¶ 44; '214 patent at 6:30-33.  The specification specifically states that "a sufficient amount of a pharmaceutically acceptable fluid" is "an amount which allows the bendamustine to be dissolved." '214 patent at 6:30-33.  That is what a solvent does—it serves as the vehicle for

dissolving a solute. A POSA would understand this language to define the pharmaceutically acceptable fluid by its solvation function. Trout Main Body of Opening Report ¶¶ 114, 131-132.

135. Dr. Sinko's argument regarding Example 1 and Table 1 of the specification—that these formulations do not contain PEG and therefore "do not fall within the claims at all"—is irrelevant to how a POSA would understand the "pharmaceutically acceptable fluid" term. Sinko Rebuttal Report ¶ 171. Example 1 identifies ethanol and propylene glycol as "solvents" in the context of bendamustine formulations, which is consistent with the understanding that the enumerated fluids serve a solvent function. Trout Main Body of Opening Report ¶ 142. That Example 1 does not include PEG does not undermine the broader point, subsequent Examples describe bendamustine being "dissolved" in PEG 400, demonstrating that it too is a solvent for the bendamustine. Trout Main Body of Opening Report ¶ 142; '214 patent at Examples 3-8.

136. Dr. Sinko also argues that my distinction between what "is" the fluid and what is "included" in the fluid is undermined by the Abandoned Publication's use of the word "included" to describe PEG and PG. Sinko Rebuttal Report ¶ 168. As I have explained repeatedly, the '879 Publication is a separate application that is not related to the Asserted Patents, has an additional different inventor, and the claims were abandoned. Trout Main Body of Opening Report ¶¶ 310-317. Here, the Asserted Claims use "consisting of" language that limits the pharmaceutically acceptable fluid to five enumerated solvents. The linguistic choices in an abandoned, unrelated application do not influence how a POSA would understand the Asserted Claims. Trout Rebuttal Report ¶ 75.

137. Finally, Dr. Sinko asserts that "stray references to solvents in the file history do not constitute limiting language." Sinko Rebuttal Report ¶ 173. As I explained in my Opening Report, the references to solvents in the prosecution history are not "stray"—they are consistent with the

63

systematic treatment of the pharmaceutically acceptable fluid as a solvent system throughout the intrinsic record, including the specification's definition tying suitability to dissolution capacity, the enumeration of five known solvents in the "consisting of" limitation, and the prosecution arguments distinguishing the claimed solvent system from the prior art's aprotic solvents. Trout Main Body of Opening Report ¶¶ 145-155; Trout Rebuttal Report ¶¶ 54-64.

138.    In sum, Dr. Sinko's approach contradicts the agreed construction as applied in light of the Court's guidance. The Court drew a clear line: no additional solvents, but components serving different functions—even if they happen to be liquids—do not violate the "consisting of" limitation. Markman Tr. at 67:14-68:4. Dr. Sinko's attempt to redefine "pharmaceutically acceptable fluid" by its broadest dictionary meaning, rather than by the function it serves in the Asserted Claims, would effectively read the "consisting of" limitation out of the claims and produce the very result the Court declined to endorse. Trout Rebuttal Report ¶¶ 68, 71-76; Trout Main Body of Opening Report ¶¶ 105, 134. My opinion applies the agreed construction faithfully—explaining to the finder of fact how a POSA, informed by the specification, prosecution history, and the Court's own guidance, would understand the "pharmaceutically acceptable fluid" to be the solvent system and would apply that understanding to determine whether a given formulation component falls within or outside that element. Trout Main Body of Opening Report ¶¶ 104-134; Trout Rebuttal Report ¶¶ 22, 32, 43-48, 66-70.

### G.    Sodium Hydroxide Is Not a Co-Solvent for Bendamustine

139.    Even if the term "pharmaceutically acceptable fluid" were construed to include solvents only, ███████████████████████████████████████████ ████████████████████ Sinko Rebuttal Report ¶¶ 174-183. This argument fails for multiple independent reasons.

64

██    ████████████████████████████████████████████████████████████

████████████████████████████████    The Slayback Label's "Description" of the composition states: "Each milliliter contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, 39.45 mg (5% v/v) of absolute alcohol, and q.s. to 1 mL polyethylene glycol 400."  AGLEBEN-SA_00363910 (Slayback Label 2/2024) at -924; Trout Main Body of Opening Report ¶ 178; Trout Appendix B ¶ 16.  A separate clause states: "Sodium hydroxide is used to adjust pH of polyethylene glycol 400."  EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at -924; Trout Main Body of Opening Report ¶ 178; Appendix B ¶¶ 52, 105.  That is the product accused of infringement, and it identifies sodium hydroxide solely by its pH-adjustment function—████████████████████████████████████████████

████████    Indeed, the structure and syntax of the Label matter: the solvents are presented as the liquid medium ("in polyethylene glycol 400" with an "absolute ethanol" co-solvent amount), whereas sodium hydroxide is expressly presented as a pH adjuster with an instrumental purpose clause, and is placed in a separate sentence from the solvent components.   Trout Main Body of Opening Report ¶¶ 204-205; Trout Rebuttal Report ¶¶ 97-98.  ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████

141.   ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████





67



145.

146.





70

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████

## H.    Claim Architecture Informs POSA's Understanding of the Asserted Claims

154.    Dr. Sinko argues that sodium hydroxide cannot be governed by the "comprising" language in the preamble because, if sodium hydroxide is a fluid, it must be governed by the "fluid consisting of" limitation instead.  Sinko Rebuttal Report ¶¶ 184-189.  This argument is premised entirely on Dr. Sinko's incorrect assumption that sodium hydroxide is part of the "pharmaceutically acceptable fluid"—an assumption I have addressed at length above and in my prior reports.  Trout Main Body of Opening Report ¶¶ 131-135, 199; Trout Rebuttal Report ¶¶ 37-48.

155.    Notably, Dr. Sinko's own report repeatedly confirms that sodium hydroxide is part of the overall "formulation" or "product"—not part of the "pharmaceutically acceptable fluid." Dr. Sinko describes sodium hydroxide as "an inactive ingredient in the Slayback NDA Product," as "an inactive ingredient that participates in the formulation," and as one of the "chemicals that will be added to a formulation."  Sinko Rebuttal Report ¶¶ 72, 139, 141, 143, 149.  Dr. Sinko's own language thus draws exactly the distinction that the claim architecture requires: sodium hydroxide is a component of the liquid bendamustine-containing composition (governed by "comprising") but not a component of the pharmaceutically acceptable fluid (governed by "consisting of").  Trout Main Body of Opening Report ¶¶ 132, 224.

156.    Dr. Sinko contends that my position is internally inconsistent: that I call sodium hydroxide a "solid" but then argue it is governed by "liquid . . . comprising."  Sinko Rebuttal Report ¶ 186.  There is no inconsistency.  The preamble recites a "liquid bendamustine-containing

72

composition comprising" certain elements. The word "liquid" describes the overall physical state of the composition—*i.e.*, it is a liquid formulation not a lyophilized or other solid formulation. Trout Rebuttal Report ¶¶ 37-38. The word "comprising" is the transitional phrase that opens the claim to additional, unnamed components. Trout Main Body of Opening Report ¶ 224; Trout Rebuttal Report ¶ 30. ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ The finished composition is unquestionably a liquid. That is entirely consistent with sodium hydroxide being a component of the liquid composition (governed by "comprising") without being a component of the pharmaceutically acceptable fluid (governed by "consisting of"). Trout Main Body of Opening Report ¶¶ 132, 224.

157. Dr. Sinko further argues that if categorizing a chemical as a "liquid" makes its use an infringement while categorizing it as a "fluid" makes it non-infringing, "the claim is contradictory." Sinko Rebuttal Report ¶ 189. There is no contradiction. The terms "liquid" and "fluid" serve different functions in the claim. "Liquid" in the preamble describes the physical state of the overall composition. "Pharmaceutically acceptable fluid" in the claim body identifies a specific compositional element—the solvent system. Trout Rebuttal Report ¶¶ 37-38. These are distinct claim terms with distinct meanings, and a POSA would understand them as such. The claim does not ask whether sodium hydroxide is a "liquid" or a "fluid" in the abstract; it asks whether sodium hydroxide is part of the "pharmaceutically acceptable fluid consisting of" the five enumerated solvents. For all the reasons I have explained, it is not.

I. ██████████████████████████████████

██ ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Case 1:24-cv-00065-JLH   Document 530-1   Filed 08/07/26   Page 891 of 1024 PageID #: 32974



74



75





77



79



### J.    Slayback's NDA Product Also Infringes Under the Doctrine of Equivalents

173.    Dr. Sinko argues that even if sodium hydroxide does not literally preclude infringement, the doctrine of equivalents cannot save Eagle's infringement case because (1) prosecution history estoppel bars the doctrine, and (2) there is no equivalence on the merits.  Sinko Rebuttal Report ¶¶ 190-205.  I disagree on both points.

174.    As an initial matter, as I explained in my Opening Report, there is literal infringement of each Asserted Claim.  Trout Main Body of Opening Report ¶¶ 198-227.  The doctrine of equivalents analysis is presented as an alternative argument in the event the Court were to conclude that sodium hydroxide is part of the pharmaceutically acceptable fluid—a conclusion I do not agree with.  Trout Main Body of Opening Report ¶¶ 289-300.

175.    Regarding prosecution history estoppel, Dr. Sinko contends that the narrowing amendment adding the "consisting of" limitation creates a presumption of estoppel that bars the doctrine of equivalents.  Sinko Rebuttal Report ¶¶ 191-195.  As I explained in my Opening Report, even if a presumption of estoppel arises, it is rebutted here because the amendment was tangential to the accused equivalent.  Trout Main Body of Opening Report ¶¶ 289-293.

176.    I understand from counsel for Eagle that the tangential-relation exception applies when the reason for the narrowing amendment is peripheral, or only tangentially related, to the equivalent in question, and that a narrowing amendment does not surrender equivalents that were

never implicated by the prior art or the rationale for the amendment. I also understand that the scope of any estoppel must fit the nature of the narrowing amendment, and that where the prior art that prompted the amendment did not teach the accused equivalent—and where the aspect of the claim element in which the equivalent departs from literal compliance was never at issue during prosecution—the amendment bears no more than a tangential relation to the equivalent and estoppel does not apply. Applying those principles to the facts here, the tangential exception plainly applies.

177.   The amendment adding the "consisting of" limitation was made to distinguish the Drager prior art, which taught bendamustine formulations requiring polar aprotic solvents like dimethylformamide and dimethylacetamide. Trout Main Body of Opening Report ¶¶ 148-150; EAGLEBEN-SA_00001077 ('214 Patent File History) at -1274-76. The Examiner rejected the original claims because Drager taught liquid bendamustine formulations using polyethylene glycol as a potential solvent. EAGLEBEN-SA_00001077 ('214 Patent File History) at -1173. In response, Eagle amended the claims to recite a "pharmaceutically acceptable fluid consisting of" a specific set of polar protic solvents, thereby excluding Drager's polar aprotic solvents from the solvent system. EAGLEBEN-SA_00001077 ('214 Patent File History) at -1272. The Examiner agreed and withdrew the rejection. EAGLEBEN-SA_00001077 ('214 Patent File History) at -1899-90. Thus, the amendment narrowed the solvent system from any fluid to specific polar protic solvents—it had nothing to do with pH adjusters, processing aids, or trace ions associated with excipient conditioning. Trout Main Body of Opening Report ¶ 292.

178.   Sodium hydroxide is not a polar aprotic solvent, not a polar protic solvent, and not a solvent of any kind. The accused equivalent here is not an unlisted solvent being smuggled into the pharmaceutically acceptable fluid element; it is the same PEG solvent system whose acidity

81

was conditioned with a pH adjuster. Trout Main Body of Opening Report ¶¶ 306-307. Because the rationale for the amendment (excluding polar aprotic solvents from the solvent system) has nothing to do with pH adjustment of that solvent system, the reason for the amendment is tangential to the accused equivalent. Trout Main Body of Opening Report ¶ 293.

179.    Eagle's amendment surrendered polar aprotic solvents like DMA for a purpose—to distinguish Drager's formulations. It did not surrender trace processing aids like NaOH that have no solvent function in the system. Trout Main Body of Opening Report ¶¶ 289-293. Drager did not teach the use of the accused equivalent—a PEG solvent system conditioned with trace NaOH as a pH adjuster. The accused equivalent (PEG that has been pH-adjusted, ███████████ ██████████████████████████) falls into an entirely different category from the polar aprotic solvents that prompted the amendment. Trout Main Body of Opening Report ¶¶ 305-309. The amendment addressed the identity of the solvent—not the presence of ████████████████ ████████ dissolved in that solvent. NaOH was never at issue during prosecution; Drager did not disclose or suggest a PEG formulation conditioned with NaOH, and the Examiner never identified NaOH or any pH adjuster as a basis for rejection. The aspect of the claim element in which the accused equivalent departs from literal compliance—███████████████████████████ ████████—was simply not implicated by the amendment. Eagle's amendment to a limited list of polar protic solvents did not surrender a formulation that uses the very same listed solvents, merely conditioned with a non-solvent pH adjuster—just as, in my understanding from counsel for Eagle that, narrowing from a broad drug class to a specific drug would not surrender functionally identical salt forms of that same drug; adding a property-exclusion limitation would not surrender components with negligible, non-functional traces of that property; adding a specific nucleic acid limitation would not surrender functionally equivalent nucleic acids performing the same method;

82

and adding a spacing limitation would not surrender equivalent structures that included the required spacing. In each of those situations, the narrowing amendment was directed at one category of subject matter—a different drug, a reactive coating, a different method, a different structural configuration—and the accused equivalent fell into an entirely different category that was peripheral to the reason for the amendment.

180.    Indeed, during the *Markman* hearing when Eagle's counsel raised the prosecution history amendment to add the "pharmaceutically acceptable fluid consisting of" to overcome Drager's teaching of polar aprotic "solvent[s]," the Court expressly agreed with Eagle's interpretation of the purpose of the amendment. *See* Markman Tr. at 25:17-23.

181.    The same principle applies with even greater force here, because Eagle's amendment was not centered on whether ███████████████████████ would be present in the claimed solvent system. No prior art reference cited by the Examiner described pH-adjusted PEG such that Eagle had to address pH adjusters to obtain allowance. The amendment introduced a specific solvent list to distinguish a prior art reference that used different solvents—it did not purport to address, and had no reason to address, whether a pH adjuster dissolved in the claimed solvents would be present in the finished formulation. In my understanding, when a narrowing amendment adds multiple features or aspects to a claim limitation, the scope of any resulting estoppel tracks only the specific aspect that was relevant to patentability—not every aspect of the added language. Here, the "consisting of" limitation addressed the type of solvent; it did not address the presence or absence of dissolved processing aids. A POSA reviewing the prosecution history would understand that the amendment was directed at excluding Drager's aprotic solvents and would have no reason to believe that Eagle intended to surrender formulations using the very

83

solvents it claimed, merely because those solvents were conditioned with a non-solvent processing aid.

182.    Dr. Sinko's assertion that the amendment is not tangential because ████████

████████████████████████████████████████████████████████████████████████████

misapprehends the inquiry.  Sinko Rebuttal Report ¶ 192.  In the doctrine of equivalents context, we are already assuming for argument's sake that sodium hydroxide is part of the pharmaceutically acceptable fluid.  The relevant question is not whether NaOH is a fluid, but whether the reason for the narrowing amendment is tangential to the accused equivalent.  I understand from counsel for Eagle that whether an amendment was merely tangential must be decided in the context of the invention disclosed in the patent and the prosecution history, and that there is no bright-line rule that an amendment relating to the same claim element forecloses the tangential exception.  Here, the prosecution history makes clear that the amendment was made to exclude polar aprotic solvents like DMA from the solvent system—not to exclude pH adjusters or ████████ associated with excipient conditioning.  Trout Main Body of Opening Report ¶¶ 305-309.  The accused equivalent—PEG solvent that has been pH-adjusted with NaOH, ████████████████████ ████████—does not implicate the rationale for the narrowing amendment.  Trout Main Body of Opening Report ¶ 307.  Because the prior art that gave rise to the amendment did not teach the accused equivalent, and because the particular departure from literal claim language ████████ ████████) was never at issue during prosecution, the tangential exception applies.  Dr. Sinko's argument conflates the identity of the accused equivalent with the reason for the amendment.

84

183.    On the merits, Dr. Sinko argues that PEG treated with NaOH is not equivalent to PEG alone because the "result" is different—"stability versus instability." Sinko Rebuttal Report ¶¶ 199-201. This mischaracterizes the function-way-result analysis.

184.    First, Dr. Sinko conflates the recited function of the overall formulation (achieving stability) with the function of the specific claim element at issue (providing a solvent medium). The doctrine of equivalents analyzes each claim element separately. The relevant claim element is the "pharmaceutically acceptable fluid"—the solvent system. The function of PEG in the formulation is to dissolve and carry bendamustine. Trout Main Body of Opening Report ¶ 296. PEG that has been pH-adjusted with NaOH performs precisely the same solvation function as PEG that has not been so treated—it dissolves and carries bendamustine in the same way, through the same mechanisms of solvation and miscibility. Trout Main Body of Opening Report ¶¶ 295-296. The question is whether pH-adjusted PEG performs substantially the same solvent function, in substantially the same way, to achieve substantially the same solvent result as PEG alone. It does. Trout Main Body of Opening Report ¶¶ 293-296.

185.    Second, Dr. Sinko's "stability versus instability" framing is factually incorrect. The patent specification itself discloses formulations that are stable without sodium hydroxide—and none of the specification's examples uses NaOH. Example 3 of the specification reports bendamustine dissolved in PEG 400 with lipoic acid as an antioxidant, with "substantially no increase in total degradants after a period of 15 days" at 40° C—and expressly states that "[t]he data presented in Table 3 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of an antioxidant having a shelf life of at least about 15 months at 5° C. and 25° C." '214 patent at 8:26-53. Examples 4 through 8 similarly report stable formulations using PEG/PG solvent systems and antioxidants with no

85

NaOH, with data supporting shelf lives of "at least about 2 years" under ambient or refrigerated conditions. '214 patent at 8:55-13:36.  These formulations without NaOH achieve long-term stability at refrigerated conditions—which is exactly how all of these products are stored.  All of the marketed products—Belrapzo®, Bendeka®, and Slayback's NDA Product—are labeled for refrigerated storage at 2° C to 8° C. EAGLEBEN-SA_00339347 (Belrapzo® Label 2024) at -370; EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at -924; EAGLEBEN-SA_00363860 (Baxter Label 2/2024) at -875.  Thus, the record does not support Dr. Sinko's premise that without NaOH there is "instability"—the formulations are stable at their actual storage conditions without NaOH.  The result of the solvent element is the same: a liquid medium that dissolves and carries 25 mg/mL bendamustine in a stable formulation.

186.    Critically, PEG 400 remains PEG 400 after pH adjustment with sodium hydroxide. Trout Main Body of Opening Report ¶ 291.  As I explained in the Main Body of my Opening Report, adding small amounts of NaOH to PEG 400 for pH adjustment does not transform PEG 400 into a different substance.  Trout Main Body of Opening Report ¶¶ 259-261, 291-297.  The polymer's covalent structure, molecular weight distribution, and solvent properties remain unchanged.  Trout Main Body of Opening Report ¶ 297.  Industry-standard identity tests—infrared spectroscopy, GPC molecular weight, hydroxyl value, viscosity, density, and refractive index— are insensitive to the presence of trace sodium ions at pH-adjustment levels.  Trout Main Body of Opening Report ¶ 259.  If PEG 400 were not PEG 400 after pH adjustment, Slayback could not honestly label its product as containing "polyethylene glycol 400"—but that is exactly how Slayback, Eagle, and every other Defendant labels its product.  Trout Main Body of Opening Report ¶¶ 214, 226.



189.    Putting it all together, PEG 400 that has been pH-adjusted with NaOH satisfies the

function-way-result test as compared to PEG 400 alone.  The function of the "pharmaceutically

acceptable fluid" element is to dissolve and carry bendamustine in a stable liquid formulation. Trout Main Body of Opening Report ¶ 296.  PEG 400 that has been pH-adjusted with NaOH performs the identical solvation function: it dissolves 25 mg/mL of bendamustine hydrochloride (with the co-solvent PG or ethanol) and maintains the drug in solution throughout the product's shelf life.  Trout Main Body of Opening Report ¶ 296.  PEG 400's solvation function depends on its polyether backbone and hydroxyl end-groups, which interact with bendamustine through hydrogen bonding and dipole-dipole interactions.  Trout Main Body of Opening Report ¶¶ 62-63, 296.  These molecular-level solvation mechanisms are unchanged by the presence of █████ ███ at pH-adjustment concentrations.  Trout Main Body of Opening Report ¶¶ 259, 297.  The way in which pH-adjusted PEG 400 performs its solvation function is likewise the same.  In both cases, PEG 400 acts as a non-aqueous liquid medium that provides a continuous polar protic phase in which bendamustine dissolves.  Trout Main Body of Opening Report ¶¶ 295-296.  The mechanism of solvation—dissolution of bendamustine into PEG 400's polyether matrix through polar interactions—is identical.  Trout Main Body of Opening Report ¶¶ 295-296.  And the result is the same: a stable, non-aqueous liquid bendamustine composition at 25 mg/mL with less than 5% total impurities over the recited time period.  Trout Main Body of Opening Report ¶ 296.  As I discussed above, the patent specification itself demonstrates that PEG-based formulations are stable without NaOH—Examples 3 through 8 report shelf lives of 15 months to 2 years at refrigerated and ambient conditions without any NaOH—and all marketed products, with and without NaOH, are stored under the same refrigerated conditions (2° C to 8° C).  '214 patent at 8:26-13:36; EAGLEBEN-SA_00339347 (Belrapzo® Label 2024) at -370; EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at -924.  Dr. Sinko's contrary arguments—that the "result" is "stability versus instability," that the "way" is different because NaOH minimizes ester degradation, and

88

that there is a "substantial difference" ████████████████████████████████ ███████████ all conflate the claimed function of the overall formulation with the function of the specific claim element at issue, and are factually incorrect for the reasons I explain above. Sinko Rebuttal Report ¶¶ 199-205.

190.    For all of these reasons, to the extent the doctrine of equivalents analysis is reached, PEG 400 that has been pH-adjusted with NaOH performs substantially the same function (dissolving and carrying bendamustine), in substantially the same way (by providing a non-aqueous liquid medium with appropriate solvation characteristics), to achieve substantially the same result (a stable liquid bendamustine composition at 25 mg/mL with less than 5% total impurities) and there are insubstantial differences between PEG 400 and PEG 400 that has been pH adjusted with NaOH.   Trout Main Body of Opening Report ¶¶ 289-300.   Thus, there is infringement under the doctrine of equivalents.

## VII.   DR. SMITH DOES NOT CHALLENGE THAT SLAYBACK INFRINGES THE IMPURITIES LIMITATION OF THE ASSERTED CLAIMS

191.    As an initial matter, it is worth noting what Dr. Smith does not address.  Although Dr. Smith devotes his entire report to arguing that Eagle has not established infringement of the impurity limitation, his arguments are directed entirely at the methodology of Dr. Kittendorf's testing—specifically, that Dr. Kittendorf's HPLC method was not properly validated and that his peak area response quantitation method rests on a false assumption regarding equal response factors.  Smith Rebuttal Report ¶¶ 67-101.  Dr. Smith's conclusion is expressly limited to stating that Dr. Kittendorf's results do not establish infringement of the impurity limitation.  Smith Rebuttal Report ¶¶ 108-111.  He does not offer any affirmative opinion that total impurities in Slayback's NDA Product or Belrapzo®/Bendeka® are above 5%, nor does he provide any testing of his own to support such a conclusion.

89

192. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████ And Dr. Smith does not dispute Eagle's own stability data for Belrapzo®

and Bendeka®, ████████████████████████████████████████

██████████████████████████, or the prior stipulation that Belrapzo® meets the same

impurity limitation. Trout Main Body of Opening Report ¶¶ 388-390, 407. Each of these facts

independently establishes that Slayback's NDA Product and Belrapzo®/Bendeka® satisfy the

claimed impurity limitation, yet Dr. Smith is silent on all of them.

193. Indeed, Dr. Kittendorf's testing is only one of multiple independent bases for my

opinion. Trout Appendix B ¶¶ 182-196. As set forth in my Opening Report, my opinion that

Slayback's NDA Product satisfies the impurities limitation rests on five independent lines of

evidence: (1) ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ (5) Dr. Kittendorf's direct HPLC

testing at 223 nm, which provides additional confirmatory evidence, *see* Kittendorf Opening

90

Report at ¶¶ 54-56.  For Belrapzo® and Bendeka®, the evidence similarly includes Eagle's own stability data, specifications and shelf life, the prior stipulation that Belrapzo® meets the impurity limitation, and Dr. Kittendorf's testing of Bendeka® in the Hospira litigation confirming total impurities far below 5% at 223 nm. Trout Main Body of Opening Report ¶¶ 388-390, 400, 407; EAGLEBEN-SA_00353427 (Kittendorf Hospira Report) at -444-48.

194.    Fundamentally, the impurities present in Slayback's NDA Product and Belrapzo®/Bendeka® are real, physical substances that exist in the product in fixed amounts. Trout Appendix B ¶¶ 191-193; Kittendorf Opening Report ¶¶ 54-57.  ███████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████    Eagle represented to the FDA that its HPLC measurements of total impurities in Belrapzo® and Bendeka® were valid, and the FDA accepted those representations in granting Eagle at least a 30-month shelf life. Trout Main Body of Opening Report ¶¶ 400, 405. Those measurements—from both Slayback and Eagle—show total impurities ███████ and no change in testing methodology can alter that physical reality.

195.    In sum, Dr. Smith's criticisms of Dr. Kittendorf's methodology, even if credited, would not undermine my infringement conclusion because Dr. Kittendorf's testing is only one of several independent bases for that conclusion. Trout Appendix B at ¶¶ 182-196.  ███████████

████████████████████████████████████████

████████████████████████████████████████

█████████████

## VIII.    PATENTS-IN-SUIT ARE FOUNDATIONAL

196.    Dr. Sinko contends that the Asserted Patents are not "foundational" because bendamustine has existed since the 1960s, the claims represent merely "incremental

91

improvements" to a known drug, and the applicants pursued "ever-shifting" claim variations over time. Sinko Rebuttal Report ¶¶ 235-241. Dr. Sinko's arguments misapprehend the nature of the inventions claimed in the Asserted Patents and their significance to the field.

197.    As I explained in the Main Body of my Opening Report, the inventions claimed in the Asserted Patents are foundational and enabling because they disclose and claim the critical formulation components that make a ready-to-dilute, long-term storage-stable liquid bendamustine feasible for commercial products like Belrapzo® and Bendeka®. Trout Main Body of Opening Report ¶¶ 409-420. That bendamustine itself was discovered in the 1960s does not diminish the significance of the Asserted Patents. The drug molecule alone cannot treat patients; it must be formulated into a dosage form that is stable, safe, and administrable. Trout Main Body of Opening Report ¶ 410. Before the inventions claimed in the Asserted Patents, the only commercially available bendamustine product in the United States was Treanda®—a lyophilized powder that required time-consuming reconstitution, presented risks of dosing errors, and was clinically inconvenient. '214 patent at 1:63-67; Trout Main Body of Opening Report ¶ 57. The Asserted Patents solved the formulation challenge of achieving long-term storage stability in a liquid form—something that had eluded the field for decades despite the drug's known therapeutic value. Trout Main Body of Opening Report ¶¶ 411-412.

198.    Dr. Sinko dismisses the convenience advantage of a liquid formulation over lyophilized powder as merely "incremental," noting that the Court found Slayback's NDA Product was not "ready-to-use" and required significant preparation and dilution. Sinko Rebuttal Report ¶ 237. This argument conflates two different concepts. The "ready to use" limitation was a claim element in the '483 Patent that is not present in the Asserted Claims. Trout Main Body of Opening Report ¶ 146. The Asserted Claims are directed to liquid bendamustine-containing compositions

92

with specific stability attributes—they do not require the composition to be "ready to use" without any further preparation.  That the prior court found the Slayback NDA Product was not "ready to use" under the '483 Patent's claim language is irrelevant to whether the Asserted Patents' liquid formulation innovations are foundational.  The foundational contribution is achieving a stable liquid form at all—eliminating the need for reconstitution from a lyophilized powder—not the question of how many additional dilution steps remain before infusion.  Trout Main Body of Opening Report ¶ 413.

199.    Dr. Sinko's argument that Eagle pursued "ever-shifting" claim variations over time actually underscores the breadth and depth of the inventive contribution.  Sinko Rebuttal Report ¶ 238.  The Asserted Patents are part of a large patent family that traces back to a provisional application filed in January 2010 and encompasses numerous innovations in liquid bendamustine formulation science—including the selection of non-aqueous solvent systems, the use of antioxidants to combat oxidative degradation, and stability testing protocols.  Trout Main Body of Opening Report ¶¶ 52, 145-146, 409.  That the inventors made multiple inventive contributions across these applications reflects the complexity of the formulation challenge, not the insignificance of any individual contribution.  A POSA would understand that formulating a stable liquid dosage form of bendamustine in a non-aqueous solvent system required solving multiple interdependent scientific problems—solvent selection, impurity control, and oxidative stabilization—and the Asserted Patents claim the specific combination of features that enabled commercially viable products.  Trout Main Body of Opening Report ¶¶ 414-416.

200.    Dr. Sinko points to other patents in the family—including the '483 Patent, the '707 Patent, the '831 Patent, and others—and argues that "[i]f the stability of the formulations is foundational, that was covered in many prior applications and issued patents that are not in-suit

93

here." Sinko Rebuttal Report ¶ 239. That multiple patents in the same family address different aspects of liquid bendamustine formulation science does not make any one of them non-foundational; it demonstrates that the entire field of stable liquid bendamustine formulations is an area of significant innovation. The Asserted Patents claim the specific combination of a non-aqueous solvent system (PEG and optionally listed co-solvents), an antioxidant, and demonstrated long-term stability (less than 5% total impurities after at least 15 months at 5-25°C). Trout Main Body of Opening Report ¶ 131. This combination of claim elements defines the formulation architecture that every commercial liquid bendamustine product on the U.S. market practices. Trout Main Body of Opening Report ¶¶ 417-420.

201. Finally, Dr. Sinko asserts that "[i]f the use of sodium hydroxide is key, plaintiffs abandoned the patent application that would have covered that." Sinko Rebuttal Report ¶ 241. This is a non sequitur. The Asserted Patents do not recite the use of sodium hydroxide, and I have never argued that the use of sodium hydroxide is "key" to the Asserted Patents' foundational nature. The Asserted Patents are foundational because they claim the solvent system, antioxidant, and stability attributes that enable commercially viable liquid bendamustine products. Trout Main Body of Opening Report ¶ 417. Sodium hydroxide is a pH adjuster used during manufacturing—not a claimed element and not the basis for the patents' foundational contribution.

## IX. PRIOR LITIGATIONS AND OTHER PATENTS IN FAMILY DO NOT UNDERMINE THE VALUE OF THE ASSERTED PATENTS

202. It is my understanding from counsel that Slayback contends that the existence of prior patents in the same patent family and prior litigations between Eagle and Slayback (and others) demonstrates that the Asserted Patents provide no incremental benefits and offer no advantages. More specifically, I understand from counsel that Slayback takes the position that the Asserted Patents provide no new benefits over the earlier patents in the family, they merely expand

94

the list of acceptable co-solvents to include ethanol while teaching the same information as the '707 patent which issued in 2013. I further understand from counsel that Slayback contends that any benefits of the liquid bendamustine formulation—such as eliminating the need for reconstition, reducing dosing errors, and improving convenience—were already realized by earlier liquid formulations marketed under prior patents in the family, and that Eagle is merely attempting to reclaim rights to ethanol-containing formulations that a court previously found were dedicated to the public through the disclosure-dedication doctrine. Finally, I understand from counsel that Slayback relies on these contentions in arguing that the Asserted Patents do not confer additional advantages and therefore have limited or no value.

203.    I do not agree with any of these contentions, and I do not believe the prior litigation history is pertinent to the merits of this case. Eagle's infringement case rests on two patents—the '214 patent and the '248 patent—and the evidence needed to prove infringement of those patents does not require reference to any prior case or any other patent in the family. Each patent in the family claims distinct subject matter, and each must be evaluated on its own terms. Slayback's premise—that the Asserted Patents add nothing because earlier patents in the family already delivered the benefits of liquid bendamustine—is fundamentally flawed for the reasons set forth below.

### A.    Overview of the Patents in the Formulation Family

204.    The Asserted Patents are part of a family of ten formulation patents, all titled "Formulations of Bendamustine," that share the same specification and claim priority to Application No. 13/016,473, filed January 28, 2011, and Provisional Application No. 61/299,100, filed January 28, 2010. Each successive patent in the family is a continuation of the prior application, and each claims distinct embodiments of the inventive liquid bendamustine compositions. A brief summary of each patent follows.

95

- **U.S. Patent No. 8,609,707** (the "'707 patent"), issued December 17, 2013, is the first formulation patent in the family. The '707 patent claims long-term storage stable non-aqueous liquid bendamustine compositions comprising bendamustine or a pharmaceutically acceptable salt thereof and a pharmaceutically acceptable fluid comprising about 90% PEG and about 10% PG, together with a stabilizing amount of an antioxidant. Dependent claims specify antioxidant type (*e.g.*, thioglycerol), antioxidant concentration ranges, and bendamustine concentrations from about 20 mg/mL to about 50 mg/mL.

- **U.S. Patent No. 9,265,831** (the "'831 patent"), issued February 23, 2016, is a continuation of the '707 patent. The '831 patent claims liquid bendamustine compositions comprising PEG and about 5% to about 10% PG, with a stabilizing amount of an antioxidant and specified PEG-to-PG ratios (about 95:5, about 90:10, about 85:15, about 80:20, and about 75:25), along with stability limitations on PG ester formation. Certain claims further specify a bendamustine concentration from about 25 mg/mL to about 50 mg/mL.

- **U.S. Patent No. 9,572,796** (the "'796 patent"), issued February 21, 2017, is a continuation of the '831 patent. Like the '831 patent, the '796 patent claims liquid bendamustine compositions comprising PEG and PG with a stabilizing antioxidant, and includes claims directed to specified PEG-to-PG ratios and stability limitations.

- **U.S. Patent No. 9,572,797** (the "'797 patent"), issued February 21, 2017, is also a continuation in the same chain. The '797 patent claims liquid bendamustine compositions with PEG/PG ratios and an antioxidant, and further includes method-of-treatment claims for treating leukemia, Hodgkin's disease, or multiple myeloma by administering the

96

claimed compositions. Certain claims require that the antioxidant is thioglycerol or monothioglycerol.

- **U.S. Patent No. 10,010,533** (the "'533 patent"), issued July 3, 2018, is a continuation of the '797 patent.  The '533 patent claims liquid bendamustine compositions comprising about 5% to about 10% PG, PEG, and a stabilizing amount of an antioxidant selected from a specified group, with detailed PG ester stability limitations over defined storage periods and temperatures.

- **U.S. Patent No. 11,103,483** (the "'483 patent"), issued August 31, 2021, is a continuation of the '533 patent. The '483 patent claims "ready to use" liquid bendamustine compositions comprising PEG, a stabilizing amount of an antioxidant, and a bendamustine concentration from about 10 mg/mL to about 100 mg/mL, with less than about 5% peak area response of total impurities after at least 15 months at about 5°C to about 25°C.

- **U.S. Patent No. 11,844,783** (the "'783 patent"), issued December 19, 2023, is a continuation of the '483 patent.  The '783 patent claims liquid bendamustine compositions in a pharmaceutically acceptable fluid consisting of PEG and optionally one or more of PG, ethanol, benzyl alcohol, and glycofurol, with a stabilizing amount of an antioxidant and the same impurity limitations.  The '783 patent claimed additional co-solvent options beyond PG alone, expressly reciting ethanol among the optional co-solvents.

- **U.S. Patent No. 11,872,214** (the "'214 patent"), issued January 16, 2024, is one of the two Asserted Patents.  Like the '783 patent, the '214 patent claims liquid bendamustine compositions in a pharmaceutically acceptable fluid consisting of PEG and optionally one or more of PG, ethanol, benzyl alcohol, and glycofurol, with a stabilizing amount of an

97

antioxidant and a bendamustine concentration of about 25 mg/mL, with less than about 5% total impurities after at least about 15 months at about 5°C to about 25°C.

- **U.S. Patent No. 12,138,248** (the "'248 patent"), issued November 12, 2024, is the second Asserted Patent. The '248 patent contains claims that are substantially similar to the '214 patent, directed to liquid bendamustine compositions with the same pharmaceutically acceptable fluid, antioxidant, and impurity limitations.

- **U.S. Patent No. 12,343,333** (the "'333 patent"), issued July 1, 2025, is the most recent patent in the family. The '333 patent claims liquid bendamustine compositions with the same general claim structure as the '214 and '248 patents, directed to compositions in a pharmaceutically acceptable fluid consisting of PEG and optionally one or more specified co-solvents, with a stabilizing amount of an antioxidant.

205. As the foregoing demonstrates, each patent in the family claims distinct embodiments of the same inventive concept—a long-term storage stable liquid bendamustine formulation. The earlier patents (the '707, '831, '796, '797, and '533 patents) focused on compositions with specified ratios of PEG and PG together with an antioxidant. The later patents (the '783, '214, '248, and '333 patents) encompass additional co-solvent options disclosed in the shared specification to expressly recite ethanol among the optional co-solvents in the pharmaceutically acceptable fluid. All ten patents share the same specification describing the applicable underlying technology and the same substantial advantages over prior lyophilized bendamustine products.

## B. Slayback Is an Adjudicated Infringer of Eagle's Patents

206. Slayback has a long history as an adjudicated and stipulated infringer of Eagle's bendamustine patents. The litigation history between Eagle and Slayback begins with the original

Bendeka® litigation. *See generally*, *Cephalon, Inc. v. Slayback Pharma LLC*, 456 F. Supp. 3d 594 (D. Del. 2020). In that case, Teva Pharmaceuticals, Cephalon, and Eagle sued Slayback (along with Apotex, Fresenius Kabi, and Mylan) under the Hatch-Waxman Act for seeking to bring to market generic versions of Eagle's Bendeka® product, indicated for the treatment of chronic lymphocytic leukemia ("CLL") and indolent B-cell non-Hodgkin lymphoma ("NHL").

207. At trial, Slayback stipulated to infringement of the asserted claims. Following a seven-day bench trial, Chief Judge Connolly found that all asserted claims of the asserted patents were not invalid and that the defendants infringed and induced infringement of each of the asserted claims. The court rejected each of the defendants' invalidity challenges, including obviousness under 35 U.S.C. § 103, indefiniteness, lack of enablement, and lack of written description. Accordingly, Slayback is enjoined from launching a generic version of Eagle's Bendeka® product. *See Cephalon, Inc. v. Slayback Pharma LLC*, C.A. No. 17-1154-CFC, D.I. 421 at ¶ 10 (D. Del. Aug. 5, 2021).

## C. Disclosure-Dedication Decision Led to Asserted Patents

208. Having been adjudicated an infringer of Eagle's patents covering Bendeka® in the original Cephalon litigation, and with Bendeka® enjoying orphan drug exclusivity that precluded the FDA from approving any other manufacturer's application to market the same drug to treat the same rare disease, Slayback was effectively excluded from entering the liquid bendamustine market as a generic of Bendeka®. Slayback accordingly pivoted: rather than pursue a generic of Bendeka®, it filed NDA No. 212209 via the 505(b)(2) pathway, selecting Eagle's Belrapzo® as its reference listed drug. Slayback's formulation differed from Belrapzo® only by the choice of co-solvent—substituting ethanol for propylene glycol—while otherwise replicating Belrapzo®'s composition. Trout Appendix B ¶ 198.

209.    Initially, Eagle brought suit against Slayback's NDA Product asserting the earlier formulation patents in this family that claim embodiments with PEG and PG as the solvent system arguing that Slayback's replacement of PG with ethanol still infringed under the doctrine of equivalents.    Slayback moved for judgment on the pleadings contending that the earlier formulation patents disclosed ethanol as an alternative but did not claim it, thereby dedicating ethanol-containing formulations to the public.  *See Eagle Pharms. Inc. v. Slayback Pharma LLC*, 958 F.3d 1171, 1177 (Fed. Cir. 2020).

210.    Critically, the disclosure-dedication decision did not hold that ethanol-containing formulations were worthless, unpatentable, or devoid of innovation.  The decision held only that the prior formulation patents in the family had disclosed ethanol as an alternative co-solvent without claiming it, and that the doctrine of equivalents could not be used to recapture what had been dedicated to the public.  Eagle did precisely what the court's decision instructed: it went back to the Patent Office and obtained claims for its invention that explicitly recite ethanol as co-solvent with PEG.  The '214 and '248 patents specifically claim a pharmaceutically acceptable fluid "consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol."  By obtaining issued patents with claims that expressly recite ethanol as one of the enumerated co-solvents, Eagle now holds the right to exclude others from making, using, or selling the claimed formulations.  Ethanol-containing formulations within the scope of the '214 and '248 patent claims are no longer dedicated to the public—they are Eagle's intellectual property, protected by duly issued United States patents, and Eagle has the exclusive right to practice them.  Slayback's Vivimusta® product practices the very formulation covered by those claims, and Slayback clearly infringes by doing so.

100

### D.    Asserted Patents Provide Significant Benefits

211.    Slayback's contention that the Asserted Patents offer no incremental benefits or "no advantages is contradicted by the patents' own specification and the evidence in this case. The specification of the '214 and '248 patents explains that the stability of bendamustine in water "is measured in hours, and is therefore, not suitable for long-term storage in liquid form." '214 patent at 1:61-63. Although the lyophilized form possessed good chemical stability, "reconstitution of the lyophile is clinically inconvenient, taking 15–30 mins with implications of chemical instability." '214 patent at 1:63-66. The specification describes the inventive liquid compositions as having "substantially improved long term stability when compared to currently available formulations," noting that the compositions are "substantially free of impurities after at least about 15 months at a temperature of from about 5° C. to about 25° C." and are "advantageously ready to use or ready for further dilution" without the need for reconstitution of lyophilized powders. '214 patent at 2:18-27.

212.    The Asserted Patents enabled the first commercially acceptable set of liquid bendamustine products. Despite bendamustine having been synthesized in 1963, it took decades for it to be marketed as a liquid formulation. *See* Brittain 2006 ¶¶ 7-8. It was only available as a lyophilized powder under trade names such as Treanda®, Ribomustin®, and Cytostasan®. '214 patent at 1:44-48. Eagle's inventions solved the substantial difficulties associated with developing a liquid bendamustine formulation that had stymied the field for over four decades. Indeed, the only other company to attempt to launch a liquid bendamustine product failed due to "issues involve[ing] the following: presence of particulate matter in the IV bag post-dilution, breaking or failure of the CSTD components, and CSTD leakage. The culprit is one of the drug's ingredients, N-dimethylacetamide (DMA), according to Teva's investigation." EAGLEBEN-SA_00374303 (DrugTopics: FDA Treanda Warning); EAGLEBEN-SA_00374301 (PharmacyLearningNetwork:

101

FDA Drug Safety Alert for Liquid Treanda). This underscores the difficulty of producing a commercially viable liquid bendamustine product. In contrast, Bendeka® was launched in 2016 and Belrapzo® was launched in 2018 and both remain the only non-infringing liquid bendamustine products on the market.

213. Moreover, the fact that the Asserted Patents share a specification with earlier formulation patents in the family does not mean the Asserted Patents provide no benefits. I understand that even if multiple patents in the same family disclose the same underlying technology, each patent claims distinct embodiments of the invention. The specification discloses multiple embodiments to achieve the same end—a stable, long-term-storage liquid bendamustine formulation. Some patents in the family claim specific ratios of PG to PEG, while the Asserted Patents claim PEG with optionally one or more of a defined set of co-solvents including ethanol. The fact that one set of claims emphasizes particular solvent ratios while another claims alternative co-solvents does not make one set more or less valuable—both represent valuable ways to achieve the same formulation goal of a stable, ready-to-dilute liquid bendamustine composition.

214. The benefits of the Asserted Patents are not measured solely by what was "added" relative to earlier claims in the same family—they are measured by the benefits that flow from practicing the claimed elements vis-à-vis the prior art. Eagle's own patents are not prior art to the Asserted Patents. A person of ordinary skill practicing the claimed formulations of the '214 and '248 patents obtains the full set of advantages described in the specification: a liquid, ready-to-dilute formulation with substantially improved long-term stability, elimination of the need for reconstitution, reduced risk of dosing errors, and greater convenience for healthcare providers.

### E.    Slayback's Own Conduct Confirms the Value of the Formulation Patents

215. Slayback's own commercial behavior is the strongest evidence that the Asserted Patents provide significant advantages. Slayback chose to develop a liquid bendamustine product

102

rather than a lyophilized powder precisely because ██████████████████████████

████████████████    Mathew Tr. 4:1-7. Slayback deliberately developed a product that is

"Pharmaceutically Alternative and Therapeutically Equivalent" to Eagle's Belrapzo®, differing

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

216.    A company does not invest in developing, obtaining FDA approval for, and marketing a product if the underlying technology has no value. The very formulation elements that Slayback practices—PEG 400 as the primary solvent, ethanol as a co-solvent, monothioglycerol as an antioxidant, all yielding a stable liquid with low impurities suitable for long-term storage—are precisely the elements claimed in the '214 and '248 patents.

217.    In sum, although I do not believe the prior litigation history is relevant, when properly understood, it demonstrates that Slayback is an adjudicated infringer of Eagle's bendamustine formulation patents and that those patents have consistently been upheld as valid. The disclosure-dedication decision in one earlier case did not render the underlying technology valueless; rather, it identified that a gap in claim coverage that Eagle had not yet claimed certain embodiments disclosed in the shared specification of the '214 and '248 patents, which now explicitly claim ethanol-containing formulations. Those formulations are no longer dedicated to the public—they are Eagle's intellectual property, and Slayback infringes them. The patent specification itself describes the claimed compositions as a major advance over prior lyophilized formulations, and Slayback's own conduct—developing, marketing, and selling Vivimusta® by leveraging the same formulation technology—confirms the substantial value the Asserted Patents provide.

X.    THE PUBLISHED PATENT APPLICATIONS IN THE CHEN-BRIDGETECH AND JHU-SIGNPATH AGREEMENTS ARE NOT TECHNICALLY COMPARABLE TO THE ASSERTED PATENTS

218.    Dr. Sinko discusses three "other patent documents" and opines on their "comparability" to the Asserted Patents.  Sinko Rebuttal Report ¶¶ 242-247.  Specifically, Dr. Sinko analyzes U.S. Patent Application Publication No. 2006/0024360 and WO 2006/015120 (both of which relate to alpha-tocopheryl succinate formulations and have the same disclosure), as well as U.S. Patent Application Publication No. 2013/0330412 (relating to polymeric nanoparticle formulations).  Dr. Sinko asserts that these patent publications "share features" with the Asserted Patents because they also claim liquid formulations for cancer drugs.  Sinko Rebuttal Report ¶¶ 243-247.  He also notes that some of their claims are "broader" than the claims of the Asserted Patents because they cover "a broader class of drugs," *i.e.* more than one cancer drug.  *Id.*  These three publications are among the patent publications covered by two third-party license agreements—the 2006 Chen-Bridgetech Agreement and the 2013 Johns Hopkins-Signpath Agreement (both defined below).  I was asked to analyze whether the technology in the patent publications covered by these agreements is comparable to the technology described and claimed in the Asserted Patents.  I understand Slayback's damages expert, Mr. Malackowski, relies on both third-party agreements in his reasonable royalty analysis.  While I understand from counsel that Eagle has objected to Slayback's reliance on these third-party agreements because they were not timely produced or disclosed in fact discovery, to the extent that Slayback is allowed to rely on them in this case, it is my opinion that none of the patent publications licensed in either the 2006 Chen-Bridgetech Agreement or the 2013 Johns Hopkins-Signpath Agreement are technically comparable to the Asserted Patents.

219.    Notably, although Dr. Sinko opines on the three patent publications identified above, he does not opine on all of the patent publications covered by these agreements, nor does

104

he address the technical comparability of either agreement as a whole. For instance, the 2006 Chen-Bridgetech Agreement covers four Subject Products under multiple patent applications. Dr. Sinko discusses only the publications relating to the lyophilized docetaxel and paclitaxel emulsion formulations—*i.e.*, U.S. Patent Application Publication No. 2006/0024360 and WO 2006/015120 (corresponding to U.S. Patent Application No. 11/192,439 and International PCT Application No. PCT/US2005/026783). He does not address the patent publications relating to the lyophilized vancomycin formulation (U.S. Patent Application No. 10/889,226 and International PCT Application No. PCT/US2005/024594) or the lyophilized clarithromycin formulation (U.S. Patent Application No. 10/895,018), which are also covered by that agreement. Nor does he address the vitamin E succinate stabilized pharmaceutical compositions disclosed in U.S. Provisional Patent Application Nos. 60/764,061 and 60/771,816. None of these applications or publications that Dr. Sinko did not address are comparable, from a technical perspective, to the Asserted Patents.

220. To the extent Dr. Sinko is intending to opine that the three publications he cites are technically comparable to the Asserted Patents, I disagree. As an initial matter, each document Dr. Sinko cites—U.S. Patent Application Publication No. 2006/0024360; WO 2006/015120; and U.S. Patent Application Publication No. 2013/0330412—is an unexamined published patent application, not an issued patent. None of these publications have been through the rigorous examination process that the Asserted Patents underwent. Nor were any of their claims allowed by any Patent Office; thus, they are not entitled to the presumption of validity afforded to the Asserted Patents. In fact, each of these applications was eventually abandoned. Comparing the value of unexamined patent applications to issued patents is inherently misleading. Published patent applications afford no right to exclude others from making, using, or selling the invention

105

in the market—they are, by definition, less valuable than issued patents (*e.g.*, the Asserted Patents) because they confer no enforceable patent rights.

221.    Moreover, the patent documents Dr. Sinko identifies relate to entirely different drugs (alpha-tocopheryl succinate, paclitaxel, and unspecified "chemotherapeutic agents"), formulation technologies (colloidal dispersions and polymeric nanoparticles), and stability challenges as compared to the Asserted Patents.  Trout Main Body of Opening Report ¶¶ 409-420. Every drug presents unique formulation challenges dictated by its specific chemical properties, degradation pathways, and solubility profile.  The challenge of formulating a stable, nonaqueous liquid dosage form of bendamustine—a molecule with highly labile aliphatic chlorine atoms that undergoes rapid hydrolysis in water—is specific to bendamustine and has no meaningful parallel in the colloidal dispersion or polymeric nanoparticle technologies Dr. Sinko cites.  Trout Main Body of Opening Report ¶¶ 410-412; '214 patent at 1:56-63.

222.    Dr. Sinko's observation that these three other patent publications are "broader" than the Asserted Patents because they cover multiple cancer drugs does not support the conclusion that the publications are comparable to the Asserted Patents.  Sinko Rebuttal Report ¶¶ 245, 247.  Even assuming that claim scope were relevant to assessing technical comparability, Dr. Sinko provides no evidence that anyone has ever practiced the technology in these patent publications.  In contrast, every company currently selling a liquid bendamustine product in the United States market (Eagle, Teva, Apotex, Slayback, and Baxter) practices the Asserted Patents.  Trout Main Body of Opening Report ¶¶ 417-420.  The validity of the Asserted Patents was previously upheld at trial, where the court rejected each of the defendants' invalidity challenges, including obviousness, indefiniteness, lack of enablement, and lack of written description, which is itself an indicator of patent value. *See supra* ¶ 207.  By contrast, Dr. Sinko offers no evidence that the patent applications he cites

have ever been asserted. Nor could they have been asserted because unexamined applications confer no enforceable rights. The Asserted Claims are directed to a specific formulation solution for a specific drug with specific stability challenges, and their demonstrated commercial value evidenced by widespread market practice has no meaningful parallel in the unexamined, unpracticed patent applications Dr. Sinko identifies. Trout Main Body of Opening Report ¶¶ 409-420.

223. Accordingly, it is my opinion that the publications Dr. Sinko identifies are not technically comparable to the Asserted Patents. Below, I provide a detailed analysis addressing the technology licensed in the 2006 Chen-Bridgetech Agreement and 2013 Johns Hopkins-Signpath Agreement, setting forth the bases for my opinion that none of the patent publications are technically comparable to the Asserted Patents.

A.    2006 Chen-Bridgetech Agreement

224. I was asked to review the Agreement for Purchase and Sale of Rights for Products between Andrew Xian Chen and Bridgetech Holdings International, Inc. (the "2006 Chen-Bridgetech Agreement"), which has an effective date of April 29, 2006. SLAY-VIVMUS0227539 at -539. Under this agreement, the Seller granted Bridgetech an exclusive license to develop, modify, enhance, improve, make, have made, use, import, offer for sale, sell, and have sold the Subject Products solely in the Territory, defined as the People's Republic of China, Hong Kong, Macau, and Taiwan. SLAY-VIVMUS0227539 at -542 (§§ 1.14, 2.1).

225. As set forth in Appendix A to the 2006 Chen-Bridgetech Agreement, the Subject Products are: (1) a lyophilized docetaxel intravenous emulsion formulation for cancer treatment (under U.S. Patent Application No. 11/192,439, International Patent Cooperation Treaty

Application No. PCT/US2005/026783[1], U.S. Provisional Application Nos. 60/764,061 and 60/771,816); (2) a lyophilized paclitaxel intravenous emulsion formulation for cancer treatment (under U.S. Patent Application No. 11/192,439 and International PCT Application No. PCT/US2005/026783[2], and U.S. Provisional Application Nos. 60/764,061 and 60/771,816); (3) a lyophilized vancomycin intravenous emulsion formulation for infectious diseases (under U.S. Patent Application No. 10/889,226 and International PCT Application No. PCT/US2005/024594[3]); and (4) a lyophilized clarithromycin intravenous emulsion formulation for infectious diseases (under U.S. Patent Application No. 10/895,018[4]). SLAY-VIVMUS0227539 at -554 (Appendix A).

226.    For consistency and clarity, as explained in footnotes 1-4, I analyze the following publications which contain the disclosures of the technology covered by the 2006 Chen-Bridgetech Agreement: WO 2006/015120, entitled "Stabsle Injectable Composition of Alpha Tocopheryl

---

[1] The 2006 Chen-Bridgetech Agreement contains a typographical error omitting the "PCT" from the application number and instead referring to "WO patent application US2005/026783." SLAY-VIVMUS0227539 at -554 (Appendix A). I understand that U.S. Patent Application No. 11/192,439 published as U.S. Patent Publication No. 2006/0024360 and International PCT Application No. PCT/US2005/026783 published as International Publication No. WO 2006/015120 ("WO '120"). I understand the content of these disclosures is identical; thus, for consistency, I cite only to WO '120. Additionally, U.S. Provisional Application Nos. 60/764,061 and 60/771,816 contain similar disclosures and both published as U.S. Patent No. 8,470,873 ("'873 Patent"). For consistency, I analyze the disclosure of the '873 Patent.

[2] See *supra* Footnote 1. All of these publications describe lyophilized docetaxel and paclitaxel intravenous emulsion formulation(s) for cancer treatment.

[3] The 2006 Chen-Bridgetech Agreement contains a similar typographical error omitting the "PCT" from the application number and instead referring to "WO patent application US2005/024594." SLAY-VIVMUS0227539 at -554 (Appendix A). I understand that U.S. Patent Application No. 10/889,226 published as U.S. Patent Publication No. 2006/0008480 and International PCT Application No. PCT/US2005/024594 published as International Publication No. WO 2006/017246 ("WO '246"). I understand the content of these disclosures is identical; thus, for consistency, I cite only to WO '246.

[4] U.S. Patent Application No. 10/895,018 published as U.S. Patent Publication No. 2005/0049209 (the '209 Publication"). It never issued as a patent.

108

Succinate, Analogues and Salts Thereof" ("WO '120"); WO 2006/017246, entitled "Compositions for Delivering Highly Water Soluble Drugs" ("WO '246"); U.S. Patent No. 8,470,873, entitled "Vitamin E Succinate Stabilized Pharmaceutical Compositions, Methods for the Preparation and the Use Thereof" (the "'873 Patent"); and U.S. Patent Application Publication No. 2005/0049209, entitled "Pharmaceutical Compositions for Delivering Macrolides" (the "'209 Publication").  The technology licensed in the 2006 Chen-Bridgetech Agreement is fundamentally different from, and not comparable to, the technology in the Asserted Patents for at least six reasons.

227.    First, the Subject Products in the 2006 Chen-Bridgetech Agreement are lyophilized emulsion formulations, meaning they are in powder form and require reconstitution prior to administration.  SLAY-VIVMUS0227539 at -554 (Appendix A).  This is true not only of the alpha-tocopheryl succinate formulations described in WO '120 (as discussed by Dr. Sinko and analyzed above ¶¶ 218-220), but also of every other publication covering the licensed technology.

- WO '246 describes lyophilized formulations of its oil-in-water emulsions as "oil-in-solid dispersion system[s]" prepared by freeze-drying.  WO '246 at p. 7.  The resulting solid can be "reconstituted at a later date and diluted with water to reform the oil-in-water emulsion before injection."  WO '246 at p. 20.  WO '246's claims cover lyophilized formulations that, "when hydrated, produce[]" the emulsion compositions.  WO '246 at Claims 24-25.

- The '209 Publication likewise describes lyophilized formulations of macrolide oil-in-water emulsions—solid "oil-in-solid dispersion system[s]" that must be reconstituted with water to reform an oil-in-water emulsion before injection.  '209 Publication at [0145]-[0146].

- Similarly, the the preferred embodiments in the '873 Patent are dried solid compositions— prepared by vacuum-drying, freeze-drying, or spray-drying VES-stabilized emulsions— that are "substantially free of water" and must be rehydrated with water before injection.

109

'873 Patent at 3:13-25; 5:1-20. The '873 Patent teaches that removing water is essential to prevent hydrolytic degradation of docetaxel, the active ingredient. *Id.* at 9:60-10:10.

228.    In contrast, the Asserted Patents claim liquid bendamustine compositions that are ready-to-dilute and suitable for long-term storage in liquid form, specifically eliminating the need for reconstitution. Trout Main Body of Opening Report ¶ 417; '214 Patent at 1:61-2:3. The specification explains that prior aqueous bendamustine formulations were not suitable for "long-term storage in liquid form" because reconstitution caused bendamustine to degrade rapidly and was "clinically inconvenient." '214 Patent at 1:61-66; Trout Main Body of Opening Report ¶ 57. The 2006 Chen-Bridgetech Agreement's Subject Products—lyophilized powders requiring reconstitution, whether formulated as alpha-tocopheryl succinate dispersions (WO '120), oil-in-water emulsions of highly water-soluble drugs (WO '246), macrolide oil-in-water emulsions (the '209 Publication), or VES-stabilized docetaxel emulsions (the '873 Patent)—suffer from the same disadvantages that were overcome by the inventions claimed in the Asserted Patents.

229.    Second, the Subject Products in the Chen-Bridgetech Agreement are emulsion formulations, meaning they require an emulsion system to make the active ingredient water-soluble. SLAY-VIVMUS0227539 at -553 (Appendix A). This multi-phase, aqueous-based formulation approach is shared by all four publications covering the licensed technology.

- WO '120 describes injectable compositions of alpha-tocopheryl succinate—a semisynthetic vitamin E analogue—as colloidal dispersions and dry solids that, upon mixing with an aqueous medium, form colloidal dispersions. WO '120 at Abstract, pp. 2-3. WO '120 specifically teaches that the compositions take the form of oil-in-water emulsions, solid-in-water suspensions, and freeze-dried solid dispersions, each requiring water as the continuous phase and having an average particle size less than about 1,000

110

nm.  WO '120 at pp. 5-8.  The formulations require at least one component selected from an oil component, a phospholipid, and an antioxidant, dispersed in an aqueous medium.  WO '120 at pp. 5-6.  A colloidal dispersion, as defined by WO '120, is "a system in which particles of colloidal size of any nature (*e.g.*, solid, liquid or gas) are dispersed in a continuous phase of a different composition (or state)."  WO '120 at p. 21.

- WO '246 describes oil-in-water emulsion compositions containing sub-micron size oil droplets, comprising triglyceride oil, stabilizers, emulsifiers, and water.  WO '246 at p. 7.  An "oil-in-water emulsion" as defined in WO '246 is "a colloidal dispersion system[] in which liquid oil is dispersed in small droplets (the discrete phase) in an aqueous medium (the continuous phase), wherein in excess of 80% of the drug is dissolved and remains in the oil droplets."  WO '246 at p. 8.  Each independent claim of WO '246 requires water as a component of the emulsion.  WO '246 at Claims 1, 19-23.  The formulations comprise triglyceride oils (soybean oil, medium chain triglycerides such as Miglyol 812), phospholipid emulsifiers (egg lecithin, soy lecithin), stabilizers (oleic acid, vitamin E succinate, riboflavin-5-phosphate, cholesterol sulfate), and water.  WO '246 at pp. 9-13.

- The '209 Publication likewise describes injectable oil-in-water emulsions in which liquid oil droplets are dispersed in an aqueous continuous phase. '209 Publication at [0044]-[0045].  An "oil-in-water emulsion" "refers to a colloidal dispersion system in which liquid oil is dispersed in small droplets (the discrete phase, also referred to as 'the oil phase') in an aqueous medium (the continuous phase, also referred to as 'the aqueous phase')". '209 Publication at [0045].  Each independent claim of the '209 Publication requires water as a component of the emulsion. '209 Publication at Claims 1, 24.  The formulations comprise an oil component (vegetable oil, medium chain triglycerides), one or more phospholipids,

111

and water, with the macrolide drug dissolved in the oil droplets. '209 Publication at [0020]-[0024]. The aqueous phase constitutes at least about 70% by weight of the emulsion composition. '209 Publication at [0121].

- The '873 Patent similarly describes oil-in-water emulsions comprising oil droplets in an aqueous medium, stabilized by submicron particles of vitamin E succinate ("VES"). '873 Patent at 2:40-60; 4:67-5:5. The emulsions comprise injectable oils (vegetable oil, medium chain triglycerides), phospholipids, cholesterol, water, and VES as a stabilizer. '873 Patent at 3:35-60. The '873 Patent also describes suspension compositions in which submicron solid particles of a pharmacologically active agent are dispersed in an aqueous medium and stabilized by VES. '873 Patent at 4:15-30; Claim 8.

230. All four of these multi-phase, aqueous-based formulation approaches are technically distinct from the Asserted Patents' true-solution approach, in which bendamustine is dissolved in a nonaqueous solvent system consisting of polyethylene glycol and optionally propylene glycol, ethanol, benzyl alcohol, and/or glycofurol, together with an antioxidant. '214 Patent at 3:40-4:30, Claims 1, 6; Trout Main Body of Opening Report ¶¶ 80-82. The 2006 Chen-Bridgetech technology disperses solid or liquid particles in an aqueous continuous phase; the Asserted Patents achieve a homogeneous liquid solution in a nonaqueous medium—this is a fundamentally different formulation paradigm.

231. Third, the lyophilized emulsion formulations covered by the 2006 Chen-Bridgetech Agreement may not achieve the same degree of long-term stability as the liquid bendamustine formulations claimed in the Asserted Patents.

- WO '120 acknowledges that prior alpha-tocopheryl succinate formulations were severely unstable: within two weeks of storage at 5°C, the formulations "turned into yellow-green

112

color with noticeable curd-like precipitates formed," and "[a]n i.v. injection of such formulations into mice immediately caused death." WO '120 at p. 4. Even the improved formulations described in WO '120 define chemical stability as a loss of intact alpha-tocopheryl succinate of "no more than about 15%" (and in certain embodiments up to 20%) over at least six months at room temperature. WO '120 at pp. 8-9; Claim 19.

- WO '246 reports stability data for its vinorelbine emulsions showing that the liquid emulsion was physically stable at 2-8°C for at least 12 weeks (3 months), as measured by maintenance of average droplet size and absence of large droplets (>5 micron in diameter). WO '246 at pp. 33-34, Example 9. Chemical stability showed vinorelbine purity declining from 98.5% to 97.2% at 40°C after 4 weeks, and at 25°C, purity remained at approximately 98.7-99.0% through 12 weeks. WO '246 at pp. 32-33, Example 9. However, at elevated temperatures and at neutral pH, the emulsions were notably unstable: at pH 7.4, vinorelbine recovery dropped to approximately 90% within 7 days at 25°C or 40°C. WO '246 at p. 25, Table 2. Physical stability was also compromised, with emulsions stored at -20°C or 5°C at pH 7.4 developing "noticeable curd-like precipitates" and large droplets within 7 days. WO '246 at p. 25, Table 3. These stability parameters—with meaningful stability demonstrated only under refrigerated, acidic conditions—are fundamentally different from the Asserted Patents' stability framework.

- The '209 Publication reports stability in terms of emulsion physical stability (droplet size, absence of large droplets) and chemical stability (clarithromycin concentration recovery). '209 Publication at [0164]-[0165], Tables 2.1-2.2. After 14 months of storage at 5°C, the clarithromycin concentration remained unchanged and the average droplet size was maintained at about 140-170 nm. '209 Publication at [0169], Table 4.1. However, the

113

stability prognosis was projected at a shelf life of "at least 1-1.5 years at 5°C", and notably, at higher temperatures, chemical stability was not maintained: at 25°C, clarithromycin concentration recovery dropped to approximately 93% by 7.5 months, and at 40°C, concentration dropped to approximately 24% by 7.5 months. '209 Publication at [0170]-[0171], Tables 4.1-4.2.

- The '873 Patent describes docetaxel emulsion stability in terms of concentration, purity, and droplet diameter. '873 Patent at 27:25-60 (Example 5). Chemical stability for certain VES-stabilized emulsions showed docetaxel purity declining from 99.5% to 98.0% (by peak area) after 12 months at 5°C, and to 97.4% after 12 months at 25°C. '873 Patent at 29:25-50 (Batch No. 4 Table). The '873 Patent achieves retention of "no less than 90%" of intact docetaxel for at least 6 months. '873 Patent at 10:15-25.

232. By contrast, the Asserted Patents require less than about 5% total impurities (by HPLC at 223 nm) after at least about 15 months at 5°C to 25°C. '214 Patent, Claim 1. This markedly more stringent criterion—less than 5% total impurities after 15 months across the full 5-25°C range, for a ready-to-dilute liquid—reflects the superior technological advance of the Asserted Patents, which at best achieves 15-20% degradation after 6 months (WO '120), physical stability of only 3 months under refrigerated acidic conditions for a liquid emulsion that is preferably lyophilized (WO '246), projected 1-1.5 year shelf life only at refrigerated temperatures for a colloidal emulsion (the '209 Publication), or 90% intact drug retention in a lyophilized solid requiring reconstitution (the '873 Patent). Trout Main Body of Opening Report ¶¶ 417-418.

233. Fourth, all four Subject Products in the 2006 Chen-Bridgetech Agreement involve active pharmaceutical ingredients that are entirely different from bendamustine.

114

- Two of the Subject Products—the lyophilized vancomycin and lyophilized clarithromycin intravenous emulsion formulations—are used to treat infectious diseases such as pneumonia, not cancer.  SLAY-VIVMUS0227539 at -554 (Appendix A).  WO '246 confirms that its emulsion compositions are directed to "highly water-soluble, venous toxic and weakly basic" drugs, including vancomycin, norvancomycin, dopamine, ciprofloxacin, doxorubicin, daunorubicin, and vinca alkaloids such as vinorelbine.  WO '246 at pp. 6-7.  Several of these drugs—vancomycin, norvancomycin, ciprofloxacin, and dopamine—are used to treat infectious diseases or other non-oncological conditions, not cancer.  WO '246 at p. 7.  WO '246's primary focus is vinorelbine, a vinca alkaloid approved for breast cancer and non-small cell lung cancer—an entirely different class of chemotherapeutic agent from bendamustine.  WO '246 at pp. 2-3.  The '209 Publication confirms that the macrolide formulations are intended for treating "bacterial and/or other microbial infections," including "upper and lower respiratory tract infections, skin infections, atypical mycobacterial infections and Helicobacter pylori infection." '209 Publication at [0040], [0158].  Macrolide antibiotics such as clarithromycin, erythromycin, and azithromycin are an entirely different class of drugs from bendamustine hydrochloride. '209 Publication at [0022], [0047].

- The other two Subject Products—the lyophilized docetaxel and paclitaxel emulsion formulations—are used to treat cancer, but involve taxoid drugs that present entirely different formulation challenges from bendamustine.  The '873 Patent explains that docetaxel is "highly lipophilic and practically insoluble in water" and is "very unstable in the presence of water" due to hydrolysis of its N-tert-butyl ester group, whereas

115

bendamustine's instability stems from rapid hydrolysis of its labile aliphatic chlorine atoms in aqueous environments. '873 Patent at 1:30-50; '214 Patent at 1:61-66.

234. Every drug presents unique formulation challenges dictated by its chemical properties, degradation pathways, and solubility profile, and a POSA would not consider any of these emulsion formulations to be technically comparable to a liquid bendamustine composition. The Asserted Patents are directed to bendamustine hydrochloride, an alkylating drug for CLL and NHL. Trout Main Body of Opening Report ¶¶ 157-158; '214 Patent at 1:44-48. None of the four licensed products involves bendamustine or any alkylating agent.

235. Fifth, none of the licensed intellectual property covered by the 2006 Chen-Bridgetech Agreement claims bendamustine, any alkylating agent, or any nonaqueous PEG-based solvent system. SLAY-VIVMUS0227539 at -553 (Appendix A).

- WO '120's independent claims are directed to colloidal dispersions or dry solids of alpha-tocopheryl succinate in an aqueous medium—none recites bendamustine, any alkylating agent, or any nonaqueous PEG-based solvent. WO '120 at Claims 1-2, 26.

- WO '246's independent claims are directed to oil-in-water emulsions comprising triglyceride oil, an emulsifier, a stabilizer, water, and a highly water-soluble drug, or lyophilized formulations thereof—again, none recites bendamustine, any alkylating agent, or any nonaqueous PEG-based solvent. WO '246 at Claims 1, 19-25, 27. Although WO '246 mentions polyethylene glycols among inactive ingredients used to "adjust the tonicity of the emulsion," the PEG functions as a tonicity agent—not as the primary solvent, as in the Asserted Patents. WO '246 at p. 20; *see also* pp. 9-13.

- The '209 Publication's independent claims are directed to macrolide oil-in-water emulsions comprising a vegetable oil, phospholipids, and water, or lyophilized

116

formulations thereof—none recites bendamustine, PEG as a solvent, propylene glycol, benzyl alcohol, or glycofurol. '209 Publication at Claims 1, 24, 49; *id.* at [0020]-[0028].

- The '873 Patent's independent claims are limited to docetaxel in VES-stabilized oil-in-water emulsions or suspensions in aqueous media—none recite bendamustine or any nonaqueous PEG-based solvent. '873 Patent at Claims 1, 8.  Although the '209 Publication and '873 Patent mention PEG among hydrophilic polymers that may act as cryoprotectants or bulking agents in lyophilized formulations, the PEG functions as a processing aid—not as a solvent for dissolving a drug substance.  '209 Publication at [0156]; '873 Patent at 19:25-40.  The stabilization mechanism in the '873 Patent is also fundamentally different: it relies on VES—an "amphiphobic" molecule insoluble in both water and oil—to stabilize emulsion droplets by imparting negative surface charges (Zeta potential of -20 mV to -50 mV), which is unrelated to the Asserted Patents' nonaqueous PEG/antioxidant approach. '873 Patent at 5:50-6:15.

236.    None of these publications claims a ready-to-dilute, nonaqueous liquid formulation of bendamustine with specific solvent systems and antioxidants designed for long-term storage stability.  Trout Opening Report ¶ 417; '214 Patent at 1:61-2:3, Claims 1, 6.

237.    Sixth, I understand that the licensed intellectual property under the 2006 Chen-Bridgetech Agreement consists predominantly of patent applications and a published PCT application—not issued patents.  SLAY-VIVMUS0227539 at -553 (Appendix A).  The '209 Publication never issued as a patent.  WO '246 is a PCT application that does not itself confer enforceable patent rights.  Unlike an issued patent, an application or publication does not confer the right to exclude others from making, using, selling, offering for sale, or importing the claimed invention—it may never be granted as an issued patent.  Although U.S. Patent No. 8,470,873

117

eventually was granted as an issued patent, the technology it describes—VES-stabilized docetaxel emulsions in aqueous colloidal systems with no nonaqueous PEG-based solvent—is fundamentally different from the Asserted Patents for the reasons discussed above. The Asserted Patents are issued U.S. patents conferring enforceable exclusionary rights over a superior formulation technology, further underscoring why the technology licensed in the 2006 Chen-Bridgetech Agreement is not comparable and why the Asserted Patents are relatively more valuable. Trout Main Body of Opening Report ¶¶ 409-411.

238.    For these reasons, the technology licensed under the 2006 Chen-Bridgetech Agreement is not technically comparable to the Asserted Patents. The Asserted Patents represent a superior invention: a liquid, ready-to-dilute bendamustine formulation achieving less than 5% total impurities after 15 months through a nonaqueous PEG/antioxidant solvent system. Trout Opening Report ¶¶ 417-420. The 2006 Chen-Bridgetech Agreement covers lyophilized aqueous emulsions of entirely different active ingredients—alpha-tocopheryl succinate with up to 15-20% degradation after six months (WO '120), vancomycin and vinorelbine with physical stability of only 3 months under refrigerated acidic conditions (WO '246), macrolide antibiotics for bacterial infections with 1-1.5 year shelf life only at refrigerated temperatures (the '209 Publication), and VES-stabilized docetaxel requiring lyophilization (the '873 Patent)—none involving bendamustine or a nonaqueous PEG-based solvent. SLAY-VIVMUS0227539 at -542, -553 to -554; WO '120 at pp. 8-9, Claims 1-27; WO '246 at Claims 1-31; '209 Publication at Claims 1, 24, 49; '873 Patent at Claims 1-27.

### B.    2013 Johns Hopkins-Signpath Agreement

239.    The Exclusive License Agreement between The Johns Hopkins University ("JHU") and Signpath Pharma ("Signpath") (the "2013 Johns Hopkins-Signpath Agreement") is dated June 5, 2013. SLAY-VIVMUS0227465 at -465. Under this agreement, JHU granted Signpath Pharma

118

an exclusive license to make, have made, use, import, offer to sell, and sell Licensed Products and perform Licensed Services in the Licensed Territory, which was worldwide.    SLAY-VIVMUS0227465 at -468 (§ 2.1), -485 (Ex. A, § 5).  The Licensed Field of Use was defined as the "use of the licensed polymeric formulation incorporating curcumin and chemotherapeutic agents for treating cancer."  SLAY-VIVMUS0227465 at -485 (Ex. A, § 3).

240.    As set forth in Exhibit A to the Johns Hopkins-Signpath Agreement, the licensed invention is:  "A composite polymeric nanoparticle for overcoming multidrug resistance to cancer chemotherapeutics and treatment-related systemic toxicity," with JHU Reference No. C11349, invented by Anirban Maitra and Dipankar Pramanik.  SLAY-VIVMUS0227465 at -485 (Ex. A, § 1).  The licensed applications/publications were U.S. Provisional Patent Application 61/421,709 and International Patent Application No. PCT/US2011/063870.[5]  SLAY-VIVMUS0227465 at -485 (Ex. A, § 1).  There are no issued patents licensed under this agreement.  Both of the applications licensed under this agreement were ultimately abandoned.

241.    The technology licensed in the 2013 Johns Hopkins-Signpath Agreement is fundamentally different from and not comparable to the Asserted Patents for at least six reasons.

242.    First, the licensed technology relates to composite polymeric nanoparticles designed to overcome multidrug resistance to cancer chemotherapeutics and treatment-related systemic toxicity.  SLAY-VIVMUS0227465 at -485 (Exhibit A, § 1).  WO 2012/078831, entitled "Smart Polymeric Nanoparticles Which Overcome Multidrug Resistance to Cancer

---

[5] I have been informed that the provisional application and international patent application were published as U.S. Patent Publication No. 2013/0330412 and International Patent Publication No. WO 2012/078831, respectively, and that both publications contain the same disclosure. For consistency I analyze and cite to the disclosures of WO 2012/078831 throughout but note that my analysis applies equally to U.S. Provisional Patent Application 61/421,709 and International Patent Application No. PCT/US2011/063870.

Chemotherapeutics and Treatment-Related Systemic Toxicity," describes cross-linked polymeric nanoparticles, preferably 50-100 nm in diameter, comprising a hydrophobic core that encapsulates curcumin and a hydrophilic shell with one or more chemotherapeutic agents, such as doxorubicin, conjugated to or otherwise associated with the shell surface. WO 2012/078831 at Abstract, pp. 4-5. This technology addresses a fundamentally different problem than the Asserted Patents. The nanoparticle technology is designed to overcome drug resistance—*i.e.*, the failure of cancer cells to respond to chemotherapeutic agents due to overexpression of drug efflux transporter proteins, specifically three classes of ABC transporters: MDR1/ABCB1 (P-glycoprotein), MRP-1/ABCC1, and ABCG2/BCRP. *Id.* at pp. 5-6. The technology also addresses treatment-related systemic toxicity, particularly doxorubicin-induced cardiotoxicity, nephrotoxicity, gastrointestinal toxicity, and bone marrow suppression. *Id.* at pp. 6-7. By contrast, bendamustine, the active ingredient in the compositions claimed by the Asserted Patents, is used to treat cancer—specifically CLL and NHL—not overcoming resistance to treatments or reducing treatment toxicity. Trout Main Body of Opening Report ¶¶ 157-158; '214 Patent at 1:44-48.

243.    Second, the nanoparticle technology described in WO 2012/078831 is based on a polymeric substrate formed from monomers consisting of N-isopropylacrylamide (NIPAAM), acrylic acid (AA), and at least one vinyl monomer selected from vinyl acetate, 4-vinyl benzoic acid, methylmethacrylate, vinylmethacrylate, N-vinylpyrrolidone, N-vinyl piperidone, N-vinyl caprolactam, N-vinyl carbazole, and styrene, at specific molar ratios of 50-70:10-30:10-30 for NIPAAM:AA:vinyl monomer. WO 2012/078831 at Claims 1, 10, 13. These nanoparticles are synthesized through free radical polymerization using ammonium persulfate (APS) as an initiator and ferrous ammonium sulfate (FAS) as an activator in an $N_2$ atmosphere, with N,N'-methylene-bis-acrylamide (MBA) as a cross-linking agent. *Id.* at pp. 18-19. The nanoparticles must be

120

designed to have a lower critical solution temperature (LCST) above 37°C to remain stable at body temperature, a constraint that is modulated by adjusting the molar ratios of the constituent monomers. *Id.* at Claims 1, 10; pp. 14-15. This polymer chemistry platform is unrelated to the nonaqueous liquid formulation approach in the Asserted Patents, which uses polyethylene glycol-based solvent systems with an antioxidant stabilizer to achieve long-term stability. Trout Main Body of Opening Report ¶¶ 411, 417; '214 Patent at 3:40-4:30, Claims 1, 6. The nanoparticle technology involves a different formulation paradigm—solid polymeric particles dispersed in a carrier fluid—rather than a liquid composition of a dissolved active pharmaceutical ingredient in a nonaqueous solvent. WO 2012/078831 at Abstract, Claim 13.

244. Third, the nanoparticle formulation relates to delivering curcumin in combination with chemotherapeutic agents. The claims in WO 2012/078831 limit the chemotherapeutic agents to those "selected from the group consisting of anthracyclines, taxanes, chemotherapeutic platinum compounds, and topoisomerase inhibitors"—*i.e.*, doxorubicin, daunorubicin, paclitaxel and other taxanes, cisplatin and other platinum compounds, and topoisomerase inhibitors. WO 2012/078831 at Claims 1, 10, 13; Abstract. None of these agents is bendamustine. The preferred embodiment described in WO 2012/078831 is "NanoDoxCurc" (NDC), a composite nanoparticle with doxorubicin covalently grafted to the nanoparticle surface and curcumin encapsulated in its hydrophobic core, which was tested in doxorubicin-resistant cancer cell lines (NCI/ADR, PC-3A, RPMI8226/Dox) and xenograft models. WO 2012/078831 at pp. 27-28. The Asserted Patents, by contrast, are specifically directed to bendamustine formulations with well-defined compositions, concentrations, and stability profiles. '214 Patent, Claims 1, 6; Trout Opening Report ¶¶ 80-82. A POSA would understand that a polymeric nanoparticle platform designed to deliver curcumin

121

combined with doxorubicin to overcome drug resistance is technically and commercially distinct from a liquid, ready-to-dilute bendamustine formulation designed for long-term storage stability.

245.    Fourth, the nanoparticle technology described in WO 2012/078831 involves sophisticated surface chemistry and multifunctional "smart" properties, including optional PEGylation with polyethylene glycol chains of varying length (50-8,000 Daltons) conjugated to reactive carboxylic groups on the nanoparticle surface for long circulation in blood, ligand attachment for tissue-specific targeting, fluorophore tagging for diagnostic and imaging applications, and mucoadhesive properties enabling oral bioavailability.  WO 2012/078831 at pp. 3-4, 5-6, Claims 9-13.  These design features have no analog in the Asserted Patents, which are directed to a pharmaceutical formulation of bendamustine dissolved in a defined nonaqueous solvent system with a stabilizing antioxidant. '214 Patent at 3:40-4:30.  Notably, although the WO 2012/078831 nanoparticles optionally use PEG on their surface, PEG in that context functions as a surface coating for steric stabilization and immune evasion—not as a solvent for dissolving an active pharmaceutical ingredient—this is an entirely different use from the Asserted Patents, where PEG is the primary solvent component of the pharmaceutically acceptable fluid.  *Id.*, Claims 1, 6.

246.    Fifth, the provisional patent application and international provisional patent application licensed under the 2013 Johns Hopkins-Signpath Agreement—U.S. Provisional Patent Application 61/421,709 and International Patent Application PCT/US2011/063870—claim methods for preparing polymeric nanoparticles having an LCST above 37°C for systemic administration, polymeric nanoparticle compositions comprising NIPAAM/AA/vinyl monomer substrates with entrapped curcumin and surface-associated chemotherapeutic agents, and injectable formulations of such nanoparticles dispersed in a carrier fluid.  SLAY-VIVMUS0227465 at -485 (Ex. A, § 1); WO 2012/078831 at Claims 1, 10, 13.  No claim of WO

122

2012/078831 recites bendamustine, nonaqueous solvent systems, polyethylene glycol as a solvent, or long-term storage stability of a dissolved liquid pharmaceutical composition. WO 2012/078831 at Claims 1-20. These patent applications are directed to a different field of pharmaceutical science than the Asserted Patents, which claim liquid bendamustine compositions with defined stability profiles. Trout Opening Report ¶ 417; '214 Patent, Claims 1, 6.

247.    Sixth, the intellectual property licensed under the 2013 Johns Hopkins-Signpath Agreement consists of a U.S. provisional patent application (61/421,709) and an international patent application (PCT/US2011/063870)—not issued patents. SLAY-VIVMUS0227465 at -485 (Ex. A, § 1). A provisional patent application does not mature into an enforceable patent unless a non-provisional application is filed, examined, and allowed. A PCT international application is similarly a filing mechanism that does not itself confer enforceable patent rights in any jurisdiction. Neither a provisional application nor a PCT application grants its owner the right to exclude others from making, using, selling, offering for sale, or importing the claimed invention. The Asserted Patents, by contrast, are issued U.S. patents that confer enforceable exclusionary rights. The intellectual property licensed under the 2013 Johns Hopkins-Signpath Agreement are significantly less valuable than the Asserted Patents. Trout Main Body of Opening Report ¶¶ 409-411.

248.    For these reasons, the technology licensed under the 2013 Johns Hopkins-Signpath Agreement is not technically comparable to the Asserted Patents. The Asserted Patents represent a more commercially significant and valuable invention: a ready-to-dilute liquid bendamustine formulation that achieves long-term storage stability in a defined nonaqueous solvent system, is used to treat specific hematological cancers, and is practiced by FDA-approved commercial drugs that have achieved success in the United States. Trout Opening Report ¶¶ 417-420. The 2013 Johns Hopkins-Signpath Agreement, by contrast, covers an early-stage polymeric nanoparticle

123

drug delivery platform designed to overcome multidrug resistance—an entirely different technical problem—using entirely different formulation chemistry (cross-linked NIPAAM/AA/vinyl monomer polymeric substrates rather than PEG-based liquid solvents), different active ingredients (curcumin plus doxorubicin rather than bendamustine), and different therapeutic mechanisms (MDR protein inhibition and systemic toxicity reduction rather than direct cancer treatment), all licensed under unissued patent applications rather than issued patents.  SLAY-VIVMUS0227465 at -485 (Ex. A); WO 2012/078831 at Abstract, Claims 1-20.

249.    In sum, the technology licensed in the 2006 Chen-Bridgetech Agreement and the 2013 Johns Hopkins-Signpath Agreement is not technically comparable to the Asserted Patents.

124

Dated:    4-13-26    _____
Dr. Bernhardt L. Trout, Ph.D.

# EX. 12
# REDACTED IN ITS ENTIRETY

# Exhibit 13

**Redacted Public Version**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC<br><br>Plaintiffs,<br><br>v.<br><br>SLAYBACK PHARMA LLC, AND AZURITY PHARMACEUTICALS, INC.,<br><br>Defendants. | C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |

**APPENDIX B: SLAYBACK ADDITIONAL EVIDENCE OF INFRINGEMENT**

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................1

II.     MATERIALS CONSIDERED ...............................................................................1

III.    SUMMARY OF OPINIONS...................................................................................3

IV.     SLAYBACK'S NDA PRODUCT ...........................................................................3

        A.      Description of Composition......................................................................4

                1.      Bendamustine Hydrochloride ......................................................8

                2.      Polyethylene Glycol 400..............................................................10

                3.      Ethanol .........................................................................................11

                4.      Monothioglycerol..........................................................................12

                5.      Sodium Hydroxide .......................................................................13

        B.      Manufacturing Process............................................................................15

                1.      Sodium Hydroxide Specifications ...............................................24

                2.      Polyethylene Glycol 400 Specifications .....................................24

                3.      Ethanol Specifications .................................................................25

        C.      Specifications...........................................................................................26

        D.      Stability Data ...........................................................................................28

V.      INFRINGEMENT....................................................................................................30

        A.      Discussion................................................................................................30

                1.      "pharmaceutically acceptable fluid".............................................30

                2.      "wherein the total impurities resulting from the degradation of the
                        bendamustine is less than about 5% peak area response as
                        determined by HPLC at a wavelength of 223 nm after at least
                        about 15 months at a temperature of about 5° C. to about 25° C."............59

i

VI.    WILLFUL INFRINGEMENT ............................................................................................65

VII.   SLAYBACK INFRINGEMENT CLAIM CHARTS .........................................................70

     A.    U.S. Patent No. 11,872,214.....................................................................................70

     B.    U.S. Patent No. 12,138,248.....................................................................................72

## I.    INTRODUCTION

1.    In this Appendix B, I discuss in further detail and include additional evidence of infringement of the Asserted Claims by Slayback Pharma LLC and Azurity Pharmaceuticals, Inc. (collectively, "Slayback") through Slayback's making, using, offering for sale, selling, and importing into the United States, as described in New Drug Application No. 212209 ("Slayback's NDA"), its Bendamustine Hydrochloride Injection, 100 mg/4 mL product commercially sold under the tradename Vivimusta ("Slayback's NDA Product" or "Vivimusta").[1]

2.    I understand that Eagle has asserted that Slayback infringes certain claims of U.S. Patent No. 11,872,214 (the "'214 patent"); and U.S. Patent No. 12,138,248 (collectively, the "Asserted Patents" or the "Patents-in-Suit"). I understand that the Asserted Patents share the same specification. The claims of the Asserted Patents that I understand Eagle asserts Slayback infringes ("Asserted Claims") are identified in the table below.

| Asserted Patents | Asserted Claims |
|---|---|
| U.S. Patent No. 11,872,214 | 1-9 |
| U.S. Patent No. 12,138,248 | 1-6, 8-11, 15, 20 |

3.    This report sets forth further evidence supporting my opinion that Slayback's NDA Product infringes the Asserted Claims of the Asserted Patents.

## II.    MATERIALS CONSIDERED

4.    This report contains a statement of my additional opinions and includes the further bases and reasons for my opinions, including the additional data and other information that I have considered in forming these opinions.

---

[1] ██████████████████████████████████████████████████

5.      If I am called to testify as an expert witness at trial, I anticipate that my testimony may concern the matters addressed in this report.  In addition to the opinions and bases set forth in this report, my testimony may include responses to facts, arguments, allegations, or references raised by Slayback or their experts relating to this litigation.  Additionally, my testimony may address materials that may later become available, such as expert reports, declarations, deposition testimony, any additional arguments that Slayback may assert in this litigation, and any issues that may arise at trial.  In connection with my testimony, I may present visual aids and demonstrative exhibits that illustrate the analysis and my opinions discussed in this report.

6.      This report is based on the information currently available to me.  Should additional information become available, including later produced documents and testimony from depositions not yet taken, I reserve the right to amend or supplement my opinions set out in this report.

7.      In formulating the opinions contained in this report, I have considered my training, knowledge, my understanding of scientific texts and principles, and my experience in the relevant scientific disciplines, as well as the materials cited herein.

8.      If asked, I will be prepared to present a basic tutorial to explain the terms and concepts related to the opinions set forth in my expert report, as well as to provide further background on liquid injectable formulations, the state of the art, the level of skill in the art, and the patents at issue.  That tutorial may include demonstrative exhibits and models, including models generated by software.

9.      A list of documents considered is attached as **Exhibit B1**.  In addition to these materials, I may consider additional documents and information in forming any rebuttal opinions.

2

10.    I incorporate by reference the entirety of the Main Body of my Opening Report, including the opinions and documents set forth and considered therein.

### III.    SUMMARY OF OPINIONS

11.    This Appendix B contains additional evidence supporting the opinions set forth in the Main Body of my Opening Report regarding the infringement of the Asserted Claims by making, using, offering for sale, selling, and importing in the United States Slayback's NDA Product. I have concluded that each vial of Slayback's NDA Product described in NDA No. 212209 and Slayback's Approved Labeling[2] that has been imported, sold and offered for sale in the United States since December 2022 infringes the Asserted Claims of the Asserted Patents.

12.    In my opinion, Slayback's NDA Product infringes claims 1-9 of the '214 patent and claims 1-6, 8-11, 15, 20 of the '248 patent. In particular, it is my opinion that Slayback's NDA Product has a "pharmaceutically acceptable fluid" consisting of polyethylene glycol 400 and ethanol.  Slayback's NDA Product also has less than about 5% total impurities resulting from the degradation of bendamustine as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C.

### IV.    SLAYBACK'S NDA PRODUCT

13.    In addition to the or "Label" (SLAY-VIVMUS0009435 (12/2022); SLAY-VIVMUS0011522 (2/2024)) that I reviewed and discuss in the Main Body of my Opening Report,

---

2



I have also reviewed the relevant sections of Slayback's NDA submissions, including Slayback's "Quality Overall Summary" (SLAY-VIVMUS0000243 & SLAY-VIVMUS0000322); "Description and Composition" (SLAY-VIVMUS0000472); "Pharmaceutical Development Report" (SLAY-VIVMUS0000494/SLAY-VIVMUS0000513); "Specifications" (SLAY-VIVMUS0005655; SLAY-VIVMUS0010979; SLAY-VIVMUS0010977; SLAY-VIVMUS0010981); and "Stability Data" (SLAY-VIVMUS0011140). Collectively, these documents set forth the description, specifications, and stability of Slayback's NDA Product.

14.    Slayback's corporate representatives confirmed that Slayback's NDA is accurate to the best of its knowledge and Slayback is not aware of any mistakes.  Gonti Dep. Tr. at 63:6-19.

**A.    Description of Composition**

15.    ████████████████████████████████████████████

████████████████████████████████████████████████

████

4



16.    Slayback's Label sets forth the same "Description" of the composition of Slayback's NDA Product: "Each milliliter contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, 39.45 mg (5% v/v) of absolute alcohol, and q.s. to 1 mL polyethylene glycol 400. Sodium hydroxide is used to adjust pH of polyethylene glycol 400."  SLAY-VIVMUS0009435 (12/2022 Label) at -450 (omits the sodium hydroxide sentence); SLAY-VIVMUS0011522 (2/2024 Label) at -536.

17.





████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████

    ██        ████████████████████████████████████

████████████████████████████████████████████████████

██

    ██        ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████    ████████████████████████

██████████    ██████████████████████████████████████

██████████████████████████████████

##### 1.      Bendamustine Hydrochloride

26.      Like Belrapzo® and Bendeka®, each vial of Slayback's NDA Product includes 100 mg of bendamustine hydrochloride at a concentration of 25 mg/mL. SLAY-VIVMUS0009435 (12/2022 Label) at -450; SLAY-VIVMUS0011522 (2/2024 Label) at -536; SLAY-VIVMUS0000472 (Description and Composition) at -472; SLAY-VIVMUS0000243 (Quality Overall Summary) at -243. █████████████████████████████████

████████    ███████████████████████████████████████

████████████████████████████████████████ Bendamustine hydrochloride is the active pharmaceutical ingredient in Slayback's NDA Product (*i.e.* the biologically active ingredient).



30.     Slayback's Label states that "Vivimusta is an alkylating drug indicated for treatment of patients with: (1) Chronic lymphocytic leukemia (CLL); (2) Indolent B-cell non-Hodgkin lymphoma (NHL) that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen." SLAY-VIVMUS0009435 (12/2022 Label) at -435; SLAY-VIVMUS0011522 (2/2024 Label) at -522.

31.





### 2.    Polyethylene Glycol 400

35.    Like Belrapzo® and Bendeka®, Slayback's NDA Product consists of a quantity of polyethylene glycol 400 sufficient to increase the total amount of the drug product to the desired amount.  SLAY-VIVMUS0009435 (12/2022 Label) at -450; SLAY-VIVMUS0011522 (2/2024 Label) at -536.  Polyethylene glycol, along with ethanol, is the pharmaceutically acceptable fluid in Slayback's NDA Product.  *See, e.g.*, '214 patent at 3:42-43.



████    ██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████

████    ██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████

████    ██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████

### 3.    Ethanol

42.    Slayback's NDA Product includes 39.45 mg dehydrated alcohol.    SLAY-VIVMUS0009435 (12/2022 Label) at -450; SLAY-VIVMUS0011522 (2/2024 Label) at -536.

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████    Ethanol, along with propylene glycol 400, is the pharmaceutically acceptable fluid in Slayback's NDA Product. *See, e.g.*, '214 patent at 7:29-30.

43.    ██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████    Alcohol is

11

a synonym for ethanol. *See* EAGLEBEN-SA_00315043 (Handbook of Pharmaceutical Excipients) at -089.

44.



#### 4.      Monothioglycerol

47.      Like Belrapzo® and Bendeka®, Slayback's NDA Product includes 5 mg monothioglycerol. SLAY-VIVMUS0009435 (12/2022 Label) at -450; SLAY-VIVMUS0011522 (2/2024 Label) at -536. Monothioglycerol is an antioxidant in Slayback's NDA Product and 5 mg/mL of monothioglycerol is a stabilizing amount of antioxidant. *See, e.g.*, '214 patent at 4:3-30; EAGLEBEN-SA_00315043 (Handbook of Pharmaceutical Excipients) at -209 ("Monothioglycerol is used as an antioxidant in pharmaceutical formulations, mainly in parenteral preparations.").

48.

49. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████

█  ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

█  ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████   *see also* Albert Bolenbaugh, *Contraction Produced by Solution of Salts*, 5 J. AM. PHARM. ASSOC. 38, 38 (1912).

### 5.   Sodium Hydroxide

52.   Slayback's Label states that Slayback's NDA Product includes "q.s." sodium hydroxide.  SLAY-VIVMUS0009435 (12/2022 Label) at -450; SLAY-VIVMUS0011522 (2/2024 Label) at -536.  Slayback's Label states "Sodium hydroxide is used to adjust pH of polyethylene glycol 400." SLAY-VIVMUS0011522 (2/2024 Label) at -536.

53.   ████████████████████████████████████

████████████████████████████████    ███████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████

54.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████



14

58.    The foregoing materials further support my conclusions in the Main Body of my Opening Report and refute Slayback's contentions regarding infringement. ▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

### B.    Manufacturing Process

▌    ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

15





17





19

20













77.     Even the purest form of ethanol, a "non-aqueous" solvent, contains some water, and standard "alcohol" or "ethanol" can contain as much as 4.9% water. EAGLEBEN-SA_00315043 (2009 Pharmaceutical Handbook of Excipients) at -088 (showing the term ethanol is used to describe "the material containing water and 95.1-96.9% v/v of [ethanol] at 20 C").

25



██████████████████████████████████████████████████████████████

██████████████████████████ .



████████████████████████████████████



28



90.     Dr. Kittendorf's analysis confirms that representative batches of Slayback's NDA Product have far lower than about 5% total impurities after 15 months of storage at a temperature of about 5° C. For example, Dr. Kittendorf found that a representative sample of Slayback's NDA Product had well below 5% total impurities after 21 months of storage at a temperature of 5° C when tested at 223 nm. *See* Kittendorf Opening Report ¶¶ 54-56.

29

## V.    INFRINGEMENT

91.    In my opinion, each vial of the Slayback NDA Product infringes the Asserted Claims of the Asserted Patents. Each vial of Slayback's NDA Product as imported, used, and sold in the United States meets every limitation of the Asserted Claims.

92.    Claim charts analyzing each of the Asserted Claims are set forth below.  I understand that Slayback only disputes infringement of certain limitations.  Because Slayback's Non-Infringement Contentions and interrogatory responses regarding infringement are unclear in many respects, I have attempted to respond to Slayback's contentions based on the limited information Slayback has disclosed.

### A.    Discussion

### 1.    "pharmaceutically acceptable fluid"

93.    I understand Slayback disputes whether it infringes the Asserted Claims which require a pharmaceutically acceptable fluid "consisting of" or that "consists of" polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

 I disagree.

94.    In my opinion, for the reasons set forth below and those set forth in the Main Body of my Opening Report, Slayback's NDA Product includes a "pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol" and "a pharmaceutically acceptable fluid [that] consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol."

The pharmaceutically acceptable fluid in Slayback's NDA Product is a combination of PEG 400 and ethanol.

95.    As discussed in the Main Body of my Opening Report, I understand that the parties have agreed and the specification defines "a pharmaceutically acceptable fluid" as "a fluid which is suitable for pharmaceutical use."  Trout Main Body Opening Report ¶ 36.  I apply this construction in my analysis.

96.    In accordance with the parties' agreed upon construction, as discussed in the Main Body of my Opening Report, as a POSA, in applying the specification's definition of "a pharmaceutically acceptable fluid" I understand this construction limits the pharmaceutically acceptable fluid to only "fluids" ███████████  Trout Main Body Opening Report ¶ 112.

97.    Further, in accordance with the parties' agreed upon construction, as discussed in the Main Body of my Opening Report, as a POSA, in applying the specification's definition of "a pharmaceutically acceptable fluid" in light of the solvents specified in the independent claims of the Asserted Patents, I understand that for the fluid to be "suitable for pharmaceutical use" in the context of the claims, the fluid must a solvent for bendamustine.  Trout Main Body Opening Report ¶ 105-06.  The only such solvent fluids in Slayback's NDA Product are PEG 400 and ethanol, and those are specified in each of the Asserted Claims.

98.    A POSA would understand Slayback's NDA Product includes a pharmaceutically acceptable fluid "consisting of" or that "consists of" polyethylene glycol and ethanol.  Slayback does not dispute that polyethylene glycol 400 and ethanol are solvents in Slayback's NDA Product. *See* ¶¶ 16, 32, 35.  Slayback also does not dispute polyethylene glycol 400 functions as a vehicle/solvent in its NDA Product. *See* ¶¶ 15, 37, 39.  Slayback further does not dispute that ethanol functions as a co-solvent in its NDA Product. *See* ¶¶ 15, 43, 45.

31

99.     In addition, the Asserted Patents describe both polyethylene glycol and ethanol as "pharmaceutically acceptable fluids," specifically, "solvents." *See* '214 patent at 3:39-45 (PEG); 7:25-26 (ethanol).   The specification even refers to PEG and ethanol as "preferred pharmaceutically acceptable fluids." '214 patent at 4:59-60.   ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

        **a.**     ████████████████████

100. ████████████████████████████████

████████████████   ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

        ██   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

        ██   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

32

████████████████████████████████████████████████████████

████████████████████████████████████

██    ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

██    ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████    ████████████████████████████████

█████████████████████████████  As noted in the Main Body of my Opening Report, a POSA would understand that as used to adjust the pH of PEG 400, any sodium hydroxide used to adjust pH will disassociate and be effectively consumed. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████

105.    Additionally, Slayback's Label for its NDA Product states that "sodium hydroxide is used to adjust pH of polyethylene glycol 400." *See* ¶¶ 52, 53. ████████████████████

████████████████████████████████████

33



**b.** ▮▮▮▮▮▮▮▮▮▮▮

107. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As I explain in the Main Body of my Opening Report, I understand that the claims at issue are neither method of manufacture claims nor product-by-process claims—they are composition claims, and the relevant time period to assess infringement is at importation, use, or sale of the accused composition. Trout Main Body Opening Report at ¶¶ 46, 197. I understand that Slayback's NDA Product is manufactured in Italy and then the final finished product is imported and sold in the United States. *See* Trout Main Body Opening Report at ¶ 177. Thus, I understand the analysis focuses on what is in the final formulation, not steps of a manufacturing process what is used during manufacturing.

108. Slayback's NDA Product is described accurately by its product "Description" in the approved labeling. *See* ¶¶ 14, 16. That description identifies only two solvents—PEG 400 and ethanol. ¶ 16. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

109. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

34









121. ███████████████████████████████████████████████████

████ Co-solvents are present in meaningful proportion (*e.g.*, 5–10% v/v) to modulate solvent polarity. Ethanol appears at that level and is listed/controlled as such. ████████████████████████

39





d.

130.



42



e.

135.

136.

43





45



46



**f.     PEG 400 in Slayback's NDA Product Is Pharmaceutically Acceptable and Remains PEG 400 After "Neutralization"**

150.

48



49

50

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████  A POSA would not conclude that a compendial PEG 400 ceases to be PEG 400 when its acidity is adjusted during compounding of a PEG-based solution. In fact, Slayback's labeling says the opposite. *See* SLAY-VIVMUS0009435 (12/2022 Label) at -450; SLAY-VIVMUS0011522 (2/2024 Label) at -536.

████  ██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████  ██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████

51

[REDACTED]

### g.    NaOH Raises the pH of the Overall Composition

161. [REDACTED]

162. The claims recite a liquid bendamustine-containing composition "comprising" specified elements, followed by a solvent sub-element that "consists of" specified fluids. In that

structure, a component used to raise the pH of the entire composition fits within the open "comprising" language of the overall composition and does not enter the closed list of the pharmaceutically acceptable fluid.

163. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████

    ██    ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████

    ██    ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████



*See* ¶ 16.

h.    **Impurities**

████ ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████

████ ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ A POSA

would understand that to obtain polyethylene glycol 400 in the specified pH range it might be necessary for the manufacturer to add NaOH to the polyethylene glycol 400 to raise the pH to be within the proper specification. *See, e.g.*, EAGLEBEN-SA_00248700 ('672 Patent App. File History) at -822 ("[I]t would be obvious to add sodium hydroxide in an amount sufficient to obtain a solution with a pH that is about neutral or 'about 7.'"). Therefore, a POSA would understand that compendial polyethylene glycol 400 may contain residual sodium from the sodium hydroxide used to pH adjust the polyethylene glycol 400 to within the compendial range.

████ ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

55

56



57

176. ███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████ █

███████████████████████████████████████████

████████████████████████████████

██ ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

██ ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



2.  **"wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C."**

182.    I understand Slayback disputes whether it infringes the Asserted Claims which

require the claimed compositions to meet a certain stability profile "wherein the total impurities

59

resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C." Specifically, I understand that Slayback contends that it does not infringe this element of the Asserted Claims because Slayback's NDA Product has not been shown to include less than about 5% peak areas response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. Based on the results of Dr. Kittendorf's testing, I disagree.

183.    In my opinion, each vial of Slayback's NDA Product as imported, used, and sold in the United States has total impurities resulting from the degradation of the bendamustine of less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

184.    As discussed in the Main Body of my Opening Report, I understand that the stability profile limitation should be construed according to its "plain and ordinary meaning in light of the specification." I apply this construction in my analysis. In connection with my opinions on this issue, I have been informed that the term "a" in a patent claim is a term of art meaning "one or more." Thus, the stability limitation is satisfied in Slayback's NDA Product meets the stability profile at one or more temperatures between about 5° C. to about 25° C.

185.    I have concluded that Slayback's NDA Product meets the required stability profile at its NDA testing condition of 5° C and at its intended storage temperature condition, which includes temperatures ranging from 5° C to 8° C. *See* SLAY-VIVMUS0009435 (12/2022 Label) ("Store VIVIMUSTA (bendamustine hydrochloride injection) refrigerated at 2°C to 8°C (36°F to 46°F).") at -454; SLAY-VIVMUS0011522 (2/2024 Label) at -541 (same); *see also* ¶ 88.

60



186.    In accordance with the plain and ordinary meaning, a POSA would understand "the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C" in Slayback's NDA Product. █████████████████ ██████████████████████████

187.    As discussed above, Slayback's specifications require that each vial of Slayback's NDA Product must have total impurities well below 5% throughout its shelf-life.  Specifically, Slayback's NDA Product cannot have more than ███████████████████ ████████████████████ under Slayback's recommended storage conditions (*i.e.*, at temperatures of about 5° C). *See* ¶ 84.

61



189.    Collectively, those studies demonstrate that representative batches of Slayback's NDA Product have total impurities well below 5% total impurities at a temperature of about 5° C. *See* ¶ 90.

190.    ████████████████████████████████████████ Dr. Kittendorf's experiments indicate that "the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C" in Slayback's NDA Product.  To the extent that Slayback disputes infringement based on the HPLC analytical methods used, I disagree, including because of Dr. Kittendorf's conclusions.  I understand that Dr. Kittendorf has performed multiple experiments involving Bendeka® and Slayback's NDA Product and has concluded, based on those experiments, that Slayback's NDA Product has less than about

5% total impurities, as calculated on a normalized peak area response basis as determined by HPLC at a wavelength of 223 nm, after at least about 15 months at a temperature of from about 5° C. to about 25° C. EAGLEBEN-SA_00353427 (Dr. Kittendorf's Expert Report in *Eagle Pharms. Inc*, v. *Hospira, Inc.*, No. 18-1074 (D. Del.)) at -447-48; Kittendorf Opening Report ¶ 58.

191.    First, I understand that Dr. Kittendorf's experiments provide direct evidence that Slayback's NDA Product meets the stability profile of the claims.  Specifically, I understand that Dr. Kittendorf measured the amounts of total impurities in representative samples of Slayback's NDA Product using HPLC analysis at a wavelength of 223 nm and determined that those samples had less than about 5% total impurities, as calculated on a normalized peak area response basis after about 21 months at a temperature of about 5° C. *See* Kittendorf Opening Report ¶¶ 54-56. Thus, Dr. Kittendorf's experiments demonstrate that Slayback's NDA Product are "has less than about 5% total impurities, as calculated on a normalized peak area response basis as determined by HPLC at a wavelength of 223 nm, after at least about 15 months at a temperature of from about 5° C.," irrespective of ████████████████████████████████████

██████████████████████████████████████████████

192.    Second, I understand that Dr. Kittendorf's experiments establish that Slayback's stability data shows that Slayback's NDA Product meets the stability profile of the claims. Specifically, I understand that Dr. Kittendorf compared the amounts of total impurities in samples of Slayback's NDA Product using HPLC analysis at wavelengths of 223 nm ███████ and concluded that the amounts of total impurities measured were essentially the same, regardless of the wavelength. *See* Kittendorf Opening Report ¶¶ 54-55. ██████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

193. ██████████████████████████████████████████

194.     Third, I understand that Dr. Kittendorf concluded that HPLC analysis at a wavelength of 223 nm is a valid method for measuring the amounts of total impurities in Slayback's NDA Product. *See* Kittendorf Opening Report ¶ 36, 55.  Because, as discussed above, Slayback's specifications require Slayback's NDA Product to have much less than 5.0% total impurities, specifically not more than 1.9% during the course of Slayback's ████ shelf life at temperatures of about 5° C, Slayback's specifications overlap with the range of compositions recited in the claims. *See* ¶¶ 84, 90.

195.     In addition to Slayback's specifications and long-term storage data and Dr. Kittendorf's experiments and analysis, ████████████████████████████████

64

196.    Since I understand the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. in Slayback's NDA Product, I understand the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. in Slayback's NDA Product.

## VI.    WILLFUL INFRINGEMENT

197.    █████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

███    ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████

██   ████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████   Slayback's label describes a ready-to-dilute, nonaqueous solution in which "each milliliter contains 25 mg of bendamustine hydrochloride … 5 mg of monothioglycerol … 39.45 mg (5% v/v) of absolute alcohol, and q.s. to 1 mL polyethylene glycol 400. Sodium hydroxide is used to adjust pH of polyethylene glycol 400." SLAY-VIVMUS0011522 (2/2024 Label) at -536. ██████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

██   ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



Slayback's label likewise identifies PEG 400 and absolute ethanol in the "Description," while listing sodium hydroxide solely "to adjust pH." SLAY-VIVMUS0011522 (2/2024 Label) at -536. Slayback's Contraindications section lists hypersensitivity to bendamustine, PEG 400, dehydrated alcohol, or monothioglycerol—not sodium hydroxide—consistent with PEG/ethanol being the solvent system and the antioxidant being present in a meaningful quantity, while NaOH is a small-amount pH adjuster. SLAY-VIVMUS0011522 (2/2024 Label) at -522. The alignment between this role assignment and the asserted claim elements is exact.

202.

68

## VII.   SLAYBACK INFRINGEMENT CLAIM CHARTS

### A.   U.S. Patent No. 11,872,214

| '214 Patent Claim | Slayback's NDA Product |
|---|---|
| **Claim 1:** A sterile vial containing a liquid bendamustine-containing composition comprising | Slayback's NDA Product is a liquid bendamustine composition contained in a sterile vial. ¶¶ 20, 22, 24. |
| about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 25 mg/mL; | Slayback's NDA Product comprises bendamustine hydrochloride as the active pharmaceutical ingredient. ¶¶ 15, 26, 27.  Bendamustine hydrochloride is a pharmaceutically acceptable salt of bendamustine.  Each vial of Slayback's NDA Product comprises about 100 mg bendamustine hydrochloride. ¶¶ 15, 17, 26. Slayback's NDA Product comprises about 25 mg/mL bendamustine hydrochloride. ¶¶ 15, 16, 26. |
| a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and | Slayback's NDA Product includes a pharmaceutically acceptable fluid consisting of polyethylene glycol 400 and ethanol. ¶¶ 15, 18, 31. |
| a stabilizing amount of an antioxidant; | Slayback's NDA Product comprises 5 mg/mL monothioglycerol, which is a stabilizing amount of an antioxidant. ¶¶ 15, 16, 47. |
| wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. |  |
| **Claim 2:** The sterile vial of claim 1, wherein the antioxidant is monothioglycerol. | Slayback's NDA Product satisfies the limitations of claim 1, as set forth above.<br><br>Slayback's NDA Product comprises the antioxidant monothioglycerol. ¶¶ 15, 16, 47. |

| '214 Patent Claim | Slayback's NDA Product |
|---|---|
| **Claim 3:** The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL. | Slayback's NDA Product satisfies the limitations of claim 1, as set forth above.<br><br>Slayback's NDA Product comprises the antioxidant monothioglycerol in a concentration of 5 mg/mL. ¶¶ 15, 16, 47. |
| **Claim 4:** The composition of claim 1, wherein the composition is stable for at least about 15 months at 5° C. or for at least about 15 months at 25° C. | Slayback's NDA Product satisfies the limitations of claim 1, as set forth above.<br><br>███████████████████████████████████ |
| **Claim 5:** The sterile vial of claim 1, wherein the liquid bendamustine-containing composition further comprises ethanol. | Slayback's NDA Product satisfies the limitations of claim 1, as set forth above.<br><br>Slayback's NDA Product's pharmaceutically acceptable fluid consists of polyethylene glycol 400 and ethanol. ¶¶ 15, 18, 31. |
| **Claim 6:** A liquid bendamustine-containing composition comprising | Slayback's NDA Product is a liquid bendamustine-containing composition. ¶¶ 20, 22, 24. |
| 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, and | Slayback's NDA Product comprises bendamustine hydrochloride as the active pharmaceutical ingredient. ¶¶ 15, 26, 27. Bendamustine hydrochloride is a pharmaceutically acceptable salt of bendamustine. Each vial of Slayback's NDA Product comprises about 100 mg bendamustine hydrochloride. ¶¶ 15, 17, 26 . |
| a stabilizing amount of an antioxidant, | Slayback's NDA Product comprises 5 mg/mL monothioglycerol, which is a stabilizing amount of an antioxidant. ¶¶ 15, 16, 47. |
| in a pharmaceutically acceptable fluid; wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and | Slayback's NDA Product includes a pharmaceutically acceptable fluid consisting of polyethylene glycol 400 and ethanol. ¶¶ 15, 18, 31. |
| wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 25 mg/mL, | Slayback's NDA Product comprises about 25 mg/mL bendamustine hydrochloride. ¶¶ 15, 16, 26. |

71

| '214 Patent Claim | Slayback's NDA Product |
|---|---|
| wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. | █████████████████████ |
| **Claim 7:** The composition of claim 6, wherein the antioxidant is monothioglycerol. | Slayback's NDA Product satisfies the limitations of claim 6, as set forth above.<br><br>Slayback's NDA Product comprises the antioxidant monothioglycerol. ¶¶ 15, 16, 47. |
| **Claim 8:** The composition of claim 6, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL. | Slayback's NDA Product satisfies the limitations of claim 6, as set forth above.<br><br>Slayback's NDA Product comprises the antioxidant monothioglycerol in a concentration of 5 mg/mL. ¶¶ 15, 16, 47. |
| **Claim 9:** The composition of claim 6, further comprising ethanol. | Slayback's NDA Product satisfies the limitations of claim 1, as set forth above.<br><br>Slayback's NDA Product's pharmaceutically acceptable fluid consists of polyethylene glycol and ethanol. ¶¶ 15, 18, 31. |

## B.    U.S. Patent No. 12,138,248

| '248 Patent Claim | Slayback's NDA Product |
|---|---|
| **Claim 1:** A sterile container containing a liquid bendamustine-containing composition comprising | Slayback's NDA Product is a liquid bendamustine composition contained in a sterile vial. ¶¶ 20, 22, 24. |
| bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is about 25 mg/mL; | Slayback's NDA Product comprises bendamustine hydrochloride as the active pharmaceutical ingredient. ¶¶ 15, 26, 27.  Bendamustine hydrochloride is a pharmaceutically acceptable salt of bendamustine.  Slayback's NDA Product comprises about 25 mg/mL bendamustine hydrochloride. ¶¶ 15, 16, 26. |

72

| '248 Patent Claim | Slayback's NDA Product |
|---|---|
| a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and | Slayback's NDA Product includes a pharmaceutically acceptable fluid consisting of polyethylene glycol 400 and ethanol. ¶¶ 15, 18, 31. |
| a stabilizing amount of an antioxidant, | Slayback's NDA Product comprises 5 mg/mL monothioglycerol, which is a stabilizing amount of an antioxidant. ¶¶ 15, 16, 47. |
| wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. | ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ |
| **Claim 2:** The sterile container of claim 1, wherein the antioxidant is monothioglycerol. | Slayback's NDA Product satisfies the limitations of claim 1, as set forth above.<br><br>Slayback's NDA Product comprises the antioxidant monothioglycerol. ¶¶ 15, 16. |
| **Claim 3:** The sterile container of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL. | Slayback's NDA Product satisfies the limitations of claim 1, as set forth above.<br><br>Slayback's NDA Product comprises the antioxidant monothioglycerol in a concentration of 5 mg/mL. ¶¶ 15, 16, 47. |
| **Claim 4:** The sterile container of claim 1, wherein the composition is stable for at least about 15 months at 5° C. or for at least about 15 months at 25° C. | Slayback's NDA Product satisfies the limitations of claim 1, as set forth above.<br><br>█████████████████████████████████ █████████████████████████████████ █████████████████████████████████ |
| **Claim 5:** The sterile container of claim 1, wherein the pharmaceutically acceptable | Slayback's NDA Product satisfies the limitations of claim 1, as set forth above. |

| '248 Patent Claim | Slayback's NDA Product |
|---|---|
| fluid consists of polyethylene glycol and one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol. | Slayback's NDA Product includes a pharmaceutically acceptable fluid that consists of polyethylene glycol 400 and ethanol. ¶¶ 15, 18, 31. |
| **Claim 6:** The sterile container of claim 1, wherein the liquid bendamustine-containing composition comprises about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof. | Slayback's NDA Product satisfies the limitations of claim 1, as set forth above.<br><br>Each vial of Slayback's NDA Product comprises about 100 mg bendamustine hydrochloride, which is a pharmaceutically acceptable salt of bendamustine. ¶¶ 15, 16, 26. |
| **Claim 8:** A liquid bendamustine-containing composition comprising | Slayback's NDA Product is a liquid bendamustine-containing composition. ¶¶ 15, 16, 26. |
| bendamustine, or a pharmaceutically acceptable salt thereof, and | Slayback's NDA Product comprises bendamustine hydrochloride as the active pharmaceutical ingredient. ¶¶ 15, 26, 27.  Bendamustine hydrochloride is a pharmaceutically acceptable salt of bendamustine. |
| a stabilizing amount of an antioxidant, | Slayback's NDA Product comprises 5 mg/mL monothioglycerol, which is a stabilizing amount of an antioxidant. ¶¶ 15, 16, 47. |
| in a pharmaceutically acceptable fluid; wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and | Slayback's NDA Product includes a pharmaceutically acceptable fluid consisting of polyethylene glycol 400 and ethanol. ¶¶ 15, 18, 31. |
| wherein the bendamustine concentration in the pharmaceutically acceptable fluid is about 25 mg/mL, | Slayback's NDA Product comprises about 25 mg/mL bendamustine hydrochloride. ¶¶ 15, 16, 26. |
| wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. | ███████████████████████████████████████ |

| '248 Patent Claim | Slayback's NDA Product |
|---|---|
| ██████████████ | ██████████████████████████████████ |
| **Claim 9:** The composition of claim 8, wherein the antioxidant is monothioglycerol. | Slayback's NDA Product satisfies the limitations of claim 8, as set forth above.<br><br>Slayback's NDA Product comprises the antioxidant monothioglycerol. ¶¶ 15, 16, 47. |
| **Claim 10:** The composition of claim 8, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL. | Slayback's NDA Product satisfies the limitations of claim 8, as set forth above.<br><br>Slayback's NDA Product comprises the antioxidant monothioglycerol in a concentration of 5 mg/mL. ¶¶ 15, 16, 47. |
| **Claim 11:** The composition of claim 8, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol. | Slayback's NDA Product satisfies the limitations of claim 8, as set forth above.<br><br>Slayback's NDA Product includes a pharmaceutically acceptable fluid that consists of polyethylene glycol 400 and ethanol. ¶¶ 15, 18, 31. |
| **Claim 15:** The sterile container of claim 5, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and ethanol. | Slayback's NDA Product satisfies the limitations of claims 1 and 5, as set forth above.<br><br>Slayback's NDA Product's pharmaceutically acceptable fluid consists of polyethylene glycol and ethanol. ¶¶ 15, 18, 31. |
| **Claim 20:** The composition of claim 11, wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and ethanol. | Slayback's NDA Product satisfies the limitations of claims 8 and 11, as set forth above.<br><br>Slayback's NDA Product's pharmaceutically acceptable fluid consists of polyethylene glycol and ethanol. ¶¶ 15, 18, 31. |

75

Dated: 2/6/26

_____
Dr. Bernhardt L. Trout, Ph.D.

# EX. 14
# REDACTED IN ITS ENTIRETY