# EXHIBIT B

# REDACTED
# PUBLIC VERSION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1, LLC., <br><br> PLAINTIFFS, <br><br><br> V. <br><br><br><br> SLAYBACK PHARMA LLC AND AZURITY PHARMACEUTICALS, INC., <br><br> DEFENDANTS. | C.A. NO. 24-65-JLH <br><br> (CONSOLIDATED) <br><br> HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY |

# EXPERT REPORT OF CHRISTOPHER A. VELLTURO, PH.D.

I. OVERVIEW ................................................................................................................ 1

   A. QUALIFICATIONS AND EXPERIENCE ................................................................ 1

   B. STATEMENT OF ASSIGNMENT ........................................................................ 1

   C. DOCUMENTS/MATERIALS CONSIDERED .......................................................... 2

   D. EXHIBITS ..................................................................................................... 3

   E. SUMMARY OF CONCLUSIONS ......................................................................... 3

II. BACKGROUND ......................................................................................................... 7

   A. RELEVANT ENTITIES ..................................................................................... 7

     1. Eagle ................................................................................................... 7

     2. Teva .................................................................................................... 8

     3. Apotex ................................................................................................. 8

     4. Baxter .................................................................................................. 9

     5. Slayback .............................................................................................. 9

   B. CHRONIC LYMPHOCYTIC LEUKEMIA (CLL) ................................................. 10

     1. Symptoms ........................................................................................... 10

     2. Treatments .......................................................................................... 12

   C. NON-HODGKIN LYMPHOMA (NHL) ............................................................ 13

     1. Symptoms ........................................................................................... 14

     2. Treatments .......................................................................................... 15

   D. OVERVIEW OF THE LIQUID BENDAMUSTINE MARKETPLACE ......................... 16

     1. Bendamustine Dosage Formulations ...................................................... 16

     2. Demand for Liquid Bendamustine Products ............................................ 17

     3. Supply of Bendamustine Products .......................................................... 19

   E. PHARMACEUTICAL INDUSTRY CONTEXT ..................................................... 23

     1. Buy-and-Bill Procurement .................................................................... 23

     2. Insurance Coverage ............................................................................. 26

     3. Generic Competition ............................................................................ 28

III. THE ASSERTED PATENTS AND EAGLE'S INFRINGEMENT CLAIMS ................................... 31

   A. U.S. PATENT NO. 11,872,214 ("THE '214 PATENT") .................................... 31

   B. U.S. PATENT NO. 12,138,248 ("THE '248 PATENT") .................................... 31

IV. DAMAGES METHODOLOGY OVERVIEW ....................................................................... 32

**V.     LOST PROFIT DAMAGES** .................................................................................................. **34**

    A.     *PANDUIT* FACTOR 1: DEMAND FOR THE PATENTED PRODUCTS ................................ 34

    B.     *PANDUIT* FACTOR 2: ABSENCE OF NON-INFRINGING SUBSTITUTES.......................... 38

    C.     *PANDUIT* FACTOR 3: MANUFACTURING/MARKETING CAPABILITY TO EXPLOIT DEMAND ............... 46

    D.     PANDUIT FACTOR 4: QUANTIFICATION OF LOST PROFITS ........................................ 50

        1.     *Quantification of Lost Profits Attributable to Slayback's Infringement* ................ 50

        2.     *Summary* ................................................................................................ 65

**VI.    REASONABLE ROYALTY DAMAGES (IN THE ALTERNATIVE TO LOST PROFITS)** ............ **65**

    A.     OVERVIEW ................................................................................................ 65

    B.     INITIAL CONDITIONS AND PARAMETERS .......................................................... 67

        1.     *Date of Hypothetical Negotiation* .................................................................. 67

        2.     *Parties to the Hypothetical Negotiation* .......................................................... 67

        3.     *Nature of the Hypothetical License* ................................................................ 67

        4.     *Patent Validity, Enforceability, and Infringement* ............................................ 68

        5.     *Full Information, Reasonable Foresight, and Consistency of Forecasts* ................... 68

    C.     *GEORGIA-PACIFIC* FACTOR 15 ..................................................................... 69

        1.     *Eagle's Minimum Willingness to Accept* ......................................................... 72

        2.     *Slayback's Maximum Willingness to Pay* ........................................................ 73

        3.     *Conclusion: Georgia-Pacific Factor 15 Analysis* .............................................. 74

    D.     CONSIDERATION OF THE REMAINING *GEORGIA-PACIFIC* FACTORS ...................... 74

        1.     ▮▮▮▮▮▮▮▮▮▮▮ .................................................................................... 75

        2.     *Eagle's Settlement Agreements* .................................................................... 79

        3.     *Georgia-Pacific Factor 1 Conclusion* ............................................................ 79

    E.     CONCLUSIONS ON REASONABLE ROYALTY FOR THE ASSERTED PATENTS .................. 98

    F.     COMPUTATION OF REASONABLE ROYALTY DAMAGES .......................................... 99

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

## I. OVERVIEW

### A. Qualifications and Experience

1. I am the founder and president of Quantitative Economic Solutions, LLC, a microeconomic consulting firm.  I received a Doctor of Philosophy degree (Ph.D.) in Economics from the Massachusetts Institute of Technology in Cambridge, Massachusetts in 1989.  My fields of specialization include industrial organization and econometrics.  My curriculum vitae, which lists my testimony for the last four years and my publications, is attached as Exhibit 1.

2. I have extensive experience in the valuation of intellectual property and in the assessment of economic injury/damages sustained as a result of copyright, trademark, and/or patent infringement.  Industries that I have studied in this context include: pharmaceutical products, medical devices, over-the-counter medications and instruments, consumer products, computer hardware and software, semiconductors, and many others.

3. I have studied the pharmaceutical industry extensively and along a number of dimensions.  From an intellectual property standpoint, I have analyzed patent infringement damages issues (including lost profits, price erosion, and reasonable royalties), commercial success and nexus, and irreparable harm.  I have also studied the pharmaceutical industry in the context of merger reviews in the United States and abroad, in private antitrust actions, and in the context of contract disputes.  I have previously served as an expert in damages assessment, economics generally, statistics/econometrics, and as an expert on the pharmaceutical industry in particular.  In addition, I have designed licensing programs for patent holders on several occasions, including programs for intellectual property relating to pharmaceuticals.

### B. Statement of Assignment

4. I have been retained by counsel for Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC (collectively "Eagle" or "Plaintiffs") in connection with the above captioned litigation.[1]  I have been asked to perform an economic analysis to assess the appropriate measure and quantum of damages to Eagle as a result of the infringement of claims 1-9 of U.S. Patent No. 11,872,214 ("the '214 patent") and claims 1-6, 8-11, 15, and 20 of U.S. Patent No. 12,138,248 ("the '248 patent")

---

[1] QES is being compensated for my time spent on this matter at an hourly rate of $1,250, which is my customary rate. Payment is not contingent on the outcome of this matter.  QES is also compensated for the time spent on this matter by persons working at my direction.  Those rates are lower than my hourly rate.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

(collectively, the "Asserted Patents") by Slayback Pharma LLC and Azurity Pharmaceuticals, Inc., (collectively, "Defendants" or "Slayback").[2]

5.     Around December 7, 2022, Slayback secured final FDA approval for, and soon after commercially launched, its liquid bendamustine product called VIVIMUSTA® ("Vivimusta," the "Accused Product," or "Slayback's liquid bendamustine product").[3]

6.     I understand that Eagle alleges that Slayback infringes the Asserted Patents by making, using, selling, and/or offering for sale in the U.S., as well as importing into the U.S., the Accused Product without Eagle's authorization.  Accordingly, in this report, I have been asked to perform an economic analysis to assess an appropriate measure and quantum of damages to assist a trier of fact in determining the damages to Eagle due to this infringement.  For the purposes of my damages analysis, I assume the Asserted Patents are valid and infringed.

7.     I understand that Eagle contends that its Belrapzo product, as well as Teva's Bendeka product, practice the Asserted Patents.  I also understand that Eagle contends that Apotex's, Slayback's, and Baxter's liquid bendamustine products infringe the Asserted Patents.  While I am not opining on liability or whether these products actually practice the Asserted Patents, in this report I estimate damages attributable to Slayback's infringing sales of the Accused Product.  I undertake my analysis with the understanding that Apotex's, Baxter's, and Slayback's liquid bendamustine products available on the market infringe the Asserted Patents.

### C.  Documents/Materials Considered

8.     In connection with this case, I, or others working under my direction, have considered information from the following sources:

- Financial documents, including sales and cost data produced in this case;
- Publicly available financial statements;
- Documents produced relating to business strategy, pricing, and financial matters;
- Produced and/or public marketing materials and product information for Belrapzo and Bendeka;
- Conversations with experts retained by Eagle, including Dr. Bernhardt Trout, Dr. Khaleel K. Ashraf, and Dr. Caroline Attia;

---

[2] I refer to Slayback and Azurity collectively as "Slayback" for ease of exposition.
[3] EAGLEBEN-SA_00364331 at 331, 334.

- Conversations with Eagle current and former employees, including Christopher Krawtschuk, David Bricker, and Alan Eagle;

- Opening Expert Report of Bernhardt Trout, Ph.D., February 6, 2026 ("Trout Opening Report"), and Appendix B thereto.

- Court filings in this case; and

- Deposition testimony and exhibits.

9.   A complete list of the information I considered in forming my opinions is in Exhibit 2 to this report.

10.   My findings at this point are based on the information available to me.  I may revise or supplement my opinions based on additional discovery and analyses.  I may also provide additional analyses (including, but not limited to, additional expert reports) if I am called upon to do so, including a response to any opinions offered by experts on behalf of Slayback.

**D.  Exhibits**

11.   At trial, I may provide and rely on visual aids and/or demonstrative exhibits to demonstrate basic principles of economics, calculations of damages, in general and in this case, and my opinions expressed herein and the bases for them, and enlargements of documents considered in forming my opinions.

**E.  Summary of Conclusions**

12.   █████████████████████████████████████████████

█████████  █████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

13.   ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

14.  **Lost Profits Damages.**  A reasonable hypothesis in situations where an incumbent pharmaceutical brand faces infringing competitive pharmaceutical products is that the supplier of the incumbent product may sustain harm in the form of "lost profits."  Such lost profits can be driven by two related dynamics.



- Factor 1 (demand for the patented product): ███████████████████████████████████████████████████████████

- Factor 2 (absence of acceptable non-infringing substitutes): █████████████████████████████████████████████████████████████████████████████

- Factor 3 (manufacturing and marketing capacity): ██████████████████████████████████████████████████████████████

- Factor 4 (quantification of lost profits): ███████████████████████████████

16.  Under Factor 4, my analysis of Eagle's aggregate lost profits ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[4] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F. 2d 1152 (6th Cir. 1978).

17.

18. **Reasonable Royalty Damages.** In the event that the finder of fact determines lost profits should not be awarded, I have also undertaken a reasonable royalty damages assessment. I understand reasonable royalty damages are generally assessed under the framework of a "hypothetical negotiation" at which the parties sit down on the eve of first infringement to negotiate a license via which the patentee grants rights to the infringer to practice the patent(s)-at-issue. In the present case, I understand that the application of this framework yields ███████ ████████████████████████████████████████████████ Under this framework, I evaluate the fifteen factors enumerated in *Georgia-Pacific Corporation v. United States Plywood Corporation* (the "*Georgia-Pacific* Factors").[7]

19. Under *Georgia-Pacific* Factor 15, the central focus of the hypothetical negotiation would be Eagle's expected sales and profits for Belrapzo and royalties associated with Bendeka that the Accused

---

5 ███████████████████████████████████████████████████

[7] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████

- Eagle's "minimum willingness to accept" would be ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████ This measure forms the bottom of the Edgeworth Box.

- ████████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ This measure forms the top of the Edgeworth Box.

20. ████████████████████████████████████████ I assess the remaining *Georgia-Pacific* Factors to determine where relative to the bounds the reasonable royalty rate would fall. █ ███████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████

21. Applied to Slayback's ████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

**Figure 2: Reasonable Royalty Damages Summary**
**Q1 2024 – Q3 2025**
*($ millions)*
*Source: Exhibits 7, 8*



22.    I discuss the bases for these opinions in the remainder of this report.  In Section II, I provide background relevant to my economic analyses, including about the present parties, relevant marketplace, and the pharmaceutical industry more broadly.  In Section III, I provide my understanding of the Asserted Patents and Eagle's infringement allegations.  In Section IV, I provide an overview of the framework for my damages analysis.  In Sections V and VI, I provide my lost profits and reasonable royalty damages assessments, respectively.

## II.    BACKGROUND

### A.  Relevant Entities

#### 1.  Eagle

23.    Eagle is a pharmaceutical company focused on critical care and oncology treatments.[8]  It is headquartered in New Jersey and has facilities and offices in Massachusetts and Indiana.[9]  Eagle became a publicly traded company on February 12, 2014.[10]

24.    Eagle's portfolio includes ███████████████████████████████████████ ███.[11]  Eagle's products include:



---

[8] EAGLEBEN-SA_00366636 at 636; EAGLEBEN-SA_00364462 at 468.
[9] EAGLEBEN-SA_00363514 at 542.
[10] EAGLEBEN-SA_00367201 at 201.
[11] EAGLEBEN-SA_00366641 at 641-642; EAGLEBEN-SA_00366638 at 638-639; EAGLEBEN-SA_00364462 at 468.
[12] EAGLEBEN-SA_00366641 at 641-642.
[13] EAGLEBEN-SA_00366641 at 641-642; EAGLEBEN-SA_00364462 at 468.
[14] EAGLEBEN-SA_00366641 at 641-642.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

- ██████████████████████████████████████████████ [15]

25. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ [16]

### 2. Teva

26. Teva Pharmaceutical ("Teva") is a biopharmaceutical company headquartered in Tel Aviv, Israel, with over 37,000 employees globally.[17]  Teva produces generic medicines and develops specialty and biopharmaceutical treatments.[18]  Teva markets over 500 generic prescription products in more than 1,500 strengths and packaging forms.[19]  As of January 2026, Teva had ██████████████

████████████████████████████████████████ [20]

### 3. Apotex

27. Apotex Inc. is a Canadian pharmaceutical company founded in 1974 and currently headquartered in Toronto, Canada.[21]  As the largest Canadian-owned pharmaceutical company and a top-5 supplier of generic medications in the United States,[22] Apotex Inc. manufactures and distributes approximately 800 products serving approximately 70 countries across a range of therapeutic areas, including oncology, neurology, pain management, and women's health.[23]  Apotex Inc.'s portfolio spans generic medications, biosimilars, and innovative and specialty medicines, with a primary focus on generics – offering nearly 460 generic products.[24]

28. Apotex Corp., also a named defendant in the litigation, is a wholly owned subsidiary of and designated U.S. agent for Apotex Inc., with a place of business in Weston, Florida.[25]  Apotex Corp. is a generic pharmaceutical company that sells generic pharmaceuticals throughout the U.S.,

---

[15] EAGLEBEN-SA_00364462 at 476.
[16] EAGLEBEN-SA_00366638 at 638-639.
[17] EAGLEBEN-SA_00367663 at 664-665; EAGLEBEN-SA_00367667 at 668.
[18] EAGLEBEN-SA_00367663 at 664-665.
[19] EAGLEBEN-SA_00367669.
[20] EAGLEBEN-SA_00367171 at 171-172.
[21] EAGLEBEN-SA_00367752 at 753; EAGLEBEN-SA_00363465 at 465.
[22] EAGLEBEN-SA_00363451 at 451; EAGLEBEN-SA_00364619 at 619.
[23] EAGLEBEN-SA_00368159 at 159-160; EAGLEBEN-SA_00363461 at 461; EAGLEBEN-SA_00368170 at 170-171.
[24] EAGLEBEN-SA_00368165 at 165-166; EAGLEBEN-SA_00364619 at 619.
[25] First Amended Complaint, p. 2; EAGLEBEN-SA_00363463 at 463.

with over 130 products across 12 therapeutic areas.[26]  Apotex Inc. and Apotex Corp. are collectively referred to as "Apotex" hereinafter.

### 4. Baxter

29.    Baxter is a multinational corporation founded in 1931 that "provides a broad portfolio of essential healthcare products," including "generic injectable pharmaceuticals."[27]  Baxter is divided into three segments: Medical Products & Therapies, Healthcare Systems & Technologies, and Pharmaceuticals.[28]  Baxter's Pharmaceuticals segment is responsible for specialty injectable pharmaceuticals, inhaled anesthetics, and drug compounding services.[29]  Baxter's Pharmaceuticals portfolio includes over 80 drug products spanning premix medications, vials, syringes, and tablets.[30]

### 5. Slayback

30.    Slayback is a specialty pharmaceutical company focused on manufacturing generic pharmaceutical products.[31]  It was founded in 2011 and is currently based in New Jersey.[32]  Slayback's portfolio includes the following products:[33]

- generic baclofen, used for treating muscle spasms caused by certain conditions;[34]
- dexmedetomidine hydrochloride, used as a sedative;[35]
- hydroxyprogesterone caproate, used to lower the risk of preterm birth in pregnant women;[36]
- icatibant, used to treat sudden attacks of hereditary angioedema;[37]
- testosterone gel, indicated for hormone replacement in men unable to produce enough testosterone;[38]
- Merzee, a prescription birth control;[39] and

---

[26] EAGLEBEN-SA_00364623 at 623.
[27] EAGLEBEN-SA_00364940 at 943.
[28] EAGLEBEN-SA_00364940 at 944.
[29] EAGLEBEN-SA_00364940 at 944.
[30] *See* EAGLEBEN-SA_00368089.
[31] EAGLEBEN-SA_00367754 at 754.
[32] EAGLEBEN-SA_00367754 at 754.
[33] *See, e.g.*, EAGLEBEN-SA_00366839 at 839-840.
[34] EAGLEBEN-SA_00367428 at 429.
[35] EAGLEBEN-SA_00365230 at 231.
[36] EAGLEBEN-SA_00367374 at 374.
[37] EAGLEBEN-SA_00367379 at 379.
[38] EAGLEBEN-SA_00367425 at 426.
[39] EAGLEBEN-SA_00366759 at 760.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

- Vivimusta, indicated for the treatment of chronic lymphocytic leukemia and non-Hodgkin lymphoma.[40]

31. Slayback was acquired by Azurity Pharmaceuticals ("Azurity") in September 2023 and is now a wholly owned subsidiary of Azurity.[41] Azurity is a pharmaceutical company headquartered in Massachusetts with a portfolio of over 50 medicines.[42] Azurity's products focus on serving the needs of "small patient groups" and "treating rare or 'orphan' conditions… meeting the needs of particular populations" and span anti-infective, cardiovascular, central nervous system, gastrointestinal, endocrine, and oncology therapeutic areas in seven dosage forms.[43]

### B. Chronic Lymphocytic Leukemia (CLL)

32. Chronic lymphocytic leukemia ("CLL") is a form of blood cancer wherein white blood cells in bone marrow become cancerous.[44] CLL is a chronic form of leukemia, meaning that it progresses more slowly than acute types of leukemia, but it is more difficult to cure.[45] CLL affects the body's lymphocytes, a type of white blood cell that fights disease, which reduces the body's ability to fight infection.[46]

33. CLL most commonly affects adults 65 and over.[47] CLL is one of the most common forms of leukemia in adults, accounting for 1 in 3 new cases of leukemia in the U.S. and affecting about 5 in 100,000 people in the U.S.[48] The American Cancer Society estimates that there will be nearly 23,000 new cases of CLL and over 4,000 deaths from CLL in 2026.[49]

#### 1. Symptoms

34. Patients with CLL may not have symptoms for months or years after diagnosis.[50] When symptoms manifest, they may include fatigue caused by anemia, fever, swollen lymph nodes, night sweats, weight loss, loss of appetite, frequent infections, and/or pain or fullness under the ribs.[51]

---

[40] *See, e.g.*, EAGLEBEN-SA_00363775.
[41] EAGLEBEN-SA_00364646 at 646.
[42] EAGLEBEN-SA_00363498 at 498; EAGLEBEN-SA_00364643 at 643.
[43] EAGLEBEN-SA_00364648 at 648.
[44] EAGLEBEN-SA_00367414 at 414; EAGLEBEN-SA_00367349 at 349.
[45] EAGLEBEN-SA_00364859 at 860.
[46] EAGLEBEN-SA_00367349 at 349; EAGLEBEN-SA_00367423 at 423.
[47] EAGLEBEN-SA_00367414 at 414.
[48] EAGLEBEN-SA_00367414 at 414; EAGLEBEN-SA_00364801 at 801.
[49] EAGLEBEN-SA_00364801 at 801.
[50] EAGLEBEN-SA_00364810 at 810; EAGLEBEN-SA_00367414 at 415.
[51] EAGLEBEN-SA_00367414 at 415; EAGLEBEN-SA_00367349 at 350.

CLL can cause low red blood cell counts (a condition known as anemia) which can cause tiredness, lightheadedness, or shortness of breath.[52]  CLL can also lead to low platelet counts, which can lead to serious bleeding.[53]

35.    Since CLL targets white blood cells that fight disease, patients with CLL are immunocompromised, meaning that their immune system cannot effectively respond to infections.[54]  Therefore, patients with CLL are at higher risk of respiratory infections, such as pneumonia, and infections of the skin, soft tissue, and urinary tract.[55]  Some chemotherapy drugs and other drugs used to treat CLL can further compromise the immune system in the process of treating the cancer.[56]

36.    In a phenomenon known as Richter syndrome, CLL may transform into diffuse large B-cell lymphoma, a type of non-Hodgkin lymphoma, or, more rarely, Hodgkin lymphoma.[57]  Richter syndrome affects less than 10% to 20% of patients with CLL.[58]  CLL may also rarely progress to prolymphocytic leukemia, a rare and aggressive form of leukemia "characterized by the out-of-control growth" of B lymphocytes,[59] or acute lymphocytic leukemia.[60]

37.    CLL's five year survival rate is 80%, meaning that 80% of patients with CLL survive for five years or more after diagnosis.[61]  However, the prognosis can vary significantly depending on risk factors like age and certain genetic characteristics of the cancer.[62]  Physicians often group a patient's prognosis into one of four risk groups: low risk, intermediate or moderate risk, high risk, and very high risk.[63]  Patients in the low-risk group have a 95% five-year survival rate, whereas the high and very high-risk groups have only a 65% and 25% five-year survival rate respectively.[64]

---

[52] EAGLEBEN-SA_00364817 at 819.
[53] EAGLEBEN-SA_00364817 at 819.
[54] EAGLEBEN-SA_00365174 at 174-175; EAGLEBEN-SA_00367324 at 326.
[55] EAGLEBEN-SA_00365174 at 174-175; EAGLEBEN-SA_00367088 at 089.
[56] EAGLEBEN-SA_00364817 at 817; EAGLEBEN-SA_00363568 at 568-569.
[57] EAGLEBEN-SA_00367387 at 387; EAGLEBEN-SA_00364854 at 857.
[58] EAGLEBEN-SA_00367387 at 388
[59] EAGLEBAN-SA_00364662 at 662; EAGLEBEN-SA_00364699 at 699; EAGLEBEN-SA_00364859 at 861-862.
[60] EAGLEBEN-SA_00364854 at 858.
[61] EAGLEBEN-SA_00364873 at 874.
[62] EAGLEBEN-SA_00364873 at 874.
[63] EAGLEBEN-SA_00364873 at 874-875.
[64] EAGLEBEN-SA_00364873 at 875-876.

## 2. Treatments

38. With rare exceptions, CLL is currently considered an uncurable disease.[65] Since research has shown that "no harm comes from the watch-and-wait approach when compared with immediate treatment for early-stage CLL," doctors usually advise a watch-and-wait approach, or observation, for early-stage CLL without symptoms to avoid the side effects of treatment.[66] Observation includes physical exams and monitoring a patient's blood counts.[67] Treatment options for CLL are dependent on age, overall health, and genetic mutations in leukemia cells.[68]

39. When physicians decide to begin treatment, there are a variety of treatment options available. The most common therapies for CLL are targeted therapy, immunotherapy, and chemotherapy.[69] These therapies can be used alone, but many treatments involve a combination of two therapies, as in the case of chemoimmunotherapy (a combination of chemotherapy and immunotherapy).[70] CLL is generally treated with pharmaceutical products.[71] However, there are some non-pharmaceutical options such as radiation, surgery, and stem cell transplants that are used in select cases.[72]

40. Targeted therapy drugs target specific proteins in CLL cells and typically come in the form of a pill.[73] Targeted drug treatments include BTK inhibitors, BCL-2 inhibitors, and PI3K inhibitors. BTK inhibitors target the BTK protein that helps CLL cells grow and survive.[74] BTK inhibitors include ibrutinib, acalabrutinib, zanubrutinib, and pirtobrutinib.[75] BCL-2 inhibitors target the BCL-2 protein that helps CLL cells live longer.[76] PI3K inhibitors, which include the drugs idelalisib and duvelisib, target the PI3K protein that affects cell growth.[77]

---

[65] EAGLEBEN-SA_00301145 at 151; EAGLEBEN-SA_00367414 at 414; EAGLEBEN-SA_00363571 at 574.
[66] EAGLEBEN-SA_00364854 at 854; Conversation with Dr. Khaleel K. Ashraf, Clinical Expert on Behalf of Eagle ("Ashraf Conversation").
[67] EAGLEBEN-SA_00364854 at 855.
[68] EAGLEBEN-SA_00364854 at 854; Ashraf Conversation.
[69] EAGLEBEN-SA_00364854 at 857.
[70] EAGLEBEN-SA_00364854 at 857.
[71] EAGLEBEN-SA_00364854 at 855.
[72] EAGLEBEN-SA_00364854 at 856; EAGLEBEN-SA_00368081 at 082.
[73] EAGLEBEN-SA_00364822 at 822-825.
[74] EAGLEBEN-SA_00364822 at 822-825.
[75] EAGLEBEN-SA_00364822 at 822-823.
[76] EAGLEBEN-SA_00364822 at 824.
[77] EAGLEBEN-SA_00364822 at 825.

41. Immunotherapy is a type of treatment that boosts the patient's immune system or "uses lab-made versions of the normal parts of the immune system to kill cancer cells or slow their growth."[78] Immunotherapy treatments for CLL use monoclonal antibodies, which are "lab-made versions of immune system proteins" that "attach to a specific target."[79] Monoclonal antibodies include anti-CD20 antibodies, which include rituximab, obinutuzumab, and ofatumumab, and anti-CD52 antibodies, which includes alemtuzumab.[80] Anti-CD20 immunotherapy is given through infusion into a vein (IV) or, in some cases, a shot under the skin.[81]

42. Chemotherapy uses drugs that attack cells that divide quickly, such as cancer cells.[82] These drugs are taken by mouth or injected into a vein or muscle.[83] However, many healthy cells in the human body also divide quickly and therefore can be affected by chemotherapy, leading to significant side effects.[84] Chemotherapy drugs include fludarabine, cyclophosphamide, chlorambucil, corticosteroids, and bendamustine.[85] Newer targeted therapy and immunotherapy drugs are more effective than chemotherapy and do not have as severe of side effects.[86] As a result, chemotherapies like bendamustine are generally only used when other treatments have previously failed or are not an option.[87]

### C. Non-Hodgkin Lymphoma (NHL)

43. Non-Hodgkin lymphoma (NHL) is a cancer that starts in the lymphatic system and affects B lymphocytes, T lymphocytes, or natural killer cells.[88] Hodgkin lymphoma affects B lymphocytes and involves the presence of Reed-Sternberg cells, which are large, abnormal lymphocytes that may contain more than one nucleus.[89] NHL is much more common than Hodgkin lymphoma[90] and is "one of the most common cancers in the United States."[91] There were an estimated 19,000

---

[78] EAGLEBEN-SA_00367093 at 093.
[79] EAGLEBEN-SA_00367093 at 093.
[80] EAGLEBEN-SA_00367093 at 093-096.
[81] EAGLEBEN-SA_00367093 at 094.
[82] EAGLEBEN-SA_00364797 at 797-798.
[83] EAGLEBEN-SA_00364797 at 797-798.
[84] EAGLEBEN-SA_00364797 at 797-798.
[85] EAGLEBEN-SA_00364797 at 797-798.
[86] EAGLEBEN-SA_00367653 at 653; EAGLEBEN-SA_00364797 at 797-798; EAGLEBEN-SA_00368081.
[87] EAGLEBEN-SA_00364797 at 797-798; Conversation with Dr. Caroline Attia, Clinical Expert on Behalf of Eagle ("Attia Conversation"); Ashraf Conversation.
[88] EAGLEBEN-SA_00364849 at 852.
[89] EAGLEBEN-SA_00367357 at 360; EAGLEBEN-SA_00364681 at 682-683; EAGLEBEN-SA_00364796 at 796.
[90] EAGLEBEN-SA_00367357 at 360.
[91] EAGLEBEN-SA_00364804 at 804.

deaths related to NHL in 2025.[92]  More than half of NHL patients are older than 65 years old when they are first diagnosed.[93]  NHL can be classified by the type of lymphocyte in which it starts.[94]  B-cell lymphoma affects B lymphocytes, which help protect the body against viruses and bacteria by producing antibodies, and T-cell lymphoma affects T lymphocytes, which directly destroy bacteria or cells infected with viruses.[95]  90% of patients diagnosed with NHL have B-cell lymphoma.[96]

44.    NHL can be further classified by how fast it grows or spreads.[97]  Indolent lymphomas grow slowly and may benefit from the watch and wait approach, while aggressive lymphomas grow quickly and require immediate treatment.[98]  Belrapzo and Bendeka are indicated to treat indolent B-cell NHL.[99]

## 1.    Symptoms

45.    The symptoms associated with NHL vary depending on the type of lymphoma.[100]  Symptoms may include swollen lymph nodes in the neck, armpit, and groin, fever and chills, night sweats, fatigue, weight loss, chest pain, shortness of breath, severe or frequent infections, and easy bruising or bleeding.[101]  Patients with NHL also have a weakened immune system, which can be exacerbated by treatment.[102]  The 5-year relative survival rate for NHL is 74.2%, meaning that 74.2% of patients will survive for at least 5 years after diagnosis.[103]  NHL progression is classified into four stages based on the spread of the disease, each with varying survival rates:[104]

- Stage 1: the lymphoma is in only one lymph node or one single organ.  The five-year survival rate is over 88%;

- Stage 2: the lymphoma has spread to at least two lymph nodes or organs.  The five-year survival rate is 79%;

---

[92] EAGLEBEN-SA_00367454 at 454.
[93] EAGLEBEN-SA_00364804 at 805.
[94] EAGLEBEN-SA_00364658 at 658.
[95] EAGLEBEN-SA_00364658 at 658-661; EAGLEBEN-SA_00367343 at 344.
[96] EAGLEBEN-SA_00367343 at 344.
[97] EAGLEBEN-SA_00364849 at 852.
[98] EAGLEBEN-SA_00364849 at 852; EAGLEBEN-SA_00364863 at 863; EAGLEBEN-SA_00364756 at 759-763.
[99] EAGLEBEN-SA_00364257 at 257; EAGLEBEN-SA_00364307 at 307.
[100] EAGLEBEN-SA_00364813 at 813.
[101] EAGLEBEN-SA_00364813 at 813-814; EAGLEBEN-SA_00367364 at 368.
[102] EAGLEBEN-SA_00367457 at 457.
[103] EAGLEBEN-SA_00367454 at 454.
[104] EAGLEBEN-SA_00364806 at 806-807; EAGLEBEN-SA_00367961 at 962.

- Stage 3: the lymphoma has spread to lymph nodes both above and below the diaphragm or to lymph nodes above the diaphragm and to the spleen.  The five-year survival rate is 74%;

- Stage 4: the lymphoma has spread widely outside of the lymphatic system.  The five-year survival rate is 64%.

### 2. Treatments

46.  In this subsection, I focus on treatments for B-cell NHL, which Belrapzo and Bendeka are indicated to treat.[105]  Similar to CLL, doctors may recommend a "watch and wait" approach for patients with slow-developing NHL.[106]  Indolent NHL diagnosed in Stage I or Stage II can generally be treated with radiation therapy alone.[107]  For patients with Stage III or Stage IV indolent B-cell NHL, physicians commonly use a combination of chemotherapy and monoclonal antibodies.[108]

47.  In treating slow-growing or indolent B-cell NHL, common first-line treatments include zanubrutinib, rituximab, and ibrutinib, either alone or in combination with chemotherapy.[109]  I note that some therapies, including bendamustine, can only be prescribed after a patient's NHL has progressed with treatment with rituximab.[110]  Rituximab was approved as the branded drug RITUXAN™ on November 26, 1997.[111]  Rituximab is a monoclonal antibody directed against the CD20 antigen, a type of B cell which is found on malignant B lymphocytes and research has indicated is critical to the survival of large cell lymphoma tumors.[112]

48.  Bendamustine is also commonly used to treat indolent B-cell NHL if patients experience disease progression after treatment with rituximab.[113]  There are several different types and classifications for NHL beyond indolent B-cell which can impact the choice of appropriate treatment.[114]

---

[105] EAGLEBEN-SA_00364257 at 257; EAGLEBEN-SA_00364307 at 307.
[106] EAGLEBEN-SA_00367433 at 434; EAGLEBEN-SA_00364703 at 703.
[107] EAGLEBEN-SA_00367099 at 100-101; EAGLEBEN-SA_00364827 at 829.
[108] EAGLEBEN-SA_00364827 at 830; EAGLEBEN-SA_00364685 at 687-697.
[109] EAGLEBEN-SA_00367099 at 100-101.
[110] EAGLEBEN-SA_00364685 at 687-697; EAGLEBEN-SA_00364257 at 257.
[111] EAGLEBEN-SA_00368134 at 134; EAGLEBEN-SA_00367591 at 591.
[112] EAGLEBEN-SA_00367591 at 591.
[113] EAGLEBEN-SA_00364827 at 230; EAGLEBEN-SA_00364685 at 687-697.
[114] EAGLEBEN-SA_00364844 at 845; EAGLEBEN-SA_00364685 at 687-697; EAGLEBEN-SA_00364827 at 827.

### D. Overview of the Liquid Bendamustine Marketplace

#### 1. Bendamustine Dosage Formulations

49. Bendamustine is marketed both as powder (i.e., lyophilized) and liquid dosage formulations. I understand that powdered bendamustine needs to be reconstituted in sterile water for injection while liquid bendamustine only needs to be diluted before use.[115] I discuss the clinical differences and resulting prescription preferences between powder and liquid bendamustine below.

50. The dosage formulation of bendamustine is a significant factor when HCPs are deciding which bendamustine product to prescribe. Powder formulations of bendamustine must be reconstituted in a sterile environment before use, whereas liquid bendamustine can be diluted without reconstitution.[116] As such, I understand from Dr. Attia and Dr. Ashraf that healthcare providers find liquid bendamustine products more convenient and advantageous as compared to powder bendamustine products, and that removing the reconstitution step reduces incidence of errors in preparation of bendamustine for treatment.[117] Improper preparation or administration of bendamustine can lead to serious adverse effects and harm to patients, especially older patients who are more likely to have a comorbidity.[118] Furthermore, ███████████████████████ ████████████████████████████████████ ███████████████████████████████ ██ ███████████████████████████████████ ████████████████████████████████████

---

[115] EAGLEBEN-SA_00364280 at 280; EAGLEBEN-SA_00363505 at 506-507; EAGLEBEN-SA_00364156 at 156; EAGLEBEN-SA_00366756 at 756. Conversation with Dr. Bernhardt Trout, Technical Expert on Behalf of Eagle ("Trout Conversation").

[116] *See, e.g.,* EAGLEBEN-SA_00364280 at 280; EAGLEBEN-SA_00363505 at 506-507; EAGLEBEN-SA_00364156 at 156; EAGLEBEN-SA_00366756 at 756.

[117] Attia Conversation; Ashraf Conversation; Trout Conversation.

[118] Attia Conversation; Ashraf Conversation; EAGLEBEN-SA_00364257 at 257; EAGLEBEN-SA_00363615 at 622-624; EAGLEBEN-SA_00363579 at 579; EAGLEBEN-SA_00363607 at 607.

[119] EAGLEBEN-SA_00301654 at 657; EAGLEBEN-SA_00301145 at 156-157. *See also* Deposition of Jeffrey Lovesy, February 6, 2026 ("Lovesy Deposition"), p. 84.

[120] EAGLEBEN-SA_00368079 at 079.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

51.    The advantages of liquid bendamustine are further confirmed █████████████████████



53.    Belrapzo, Bendeka, and Slayback's Accused Product, as well as Apotex's and Baxter's liquid bendamustine products are all liquid forms of bendamustine.  Therefore, I focus my analysis on the liquid bendamustine marketplace.

### 2.    Demand for Liquid Bendamustine Products

54.    The two indications Belrapzo and Bendeka are approved to treat, CLL and NHL, are both treated by hematologists and oncologists.[126]  I understand from Dr. Ashraf that the factors that drive prescribing decisions do not significantly differ for physicians that treat CLL and NHL.[127]

55.    As with many pharmaceutical products, especially when treating incurable or fatal diseases, efficacy is a key consideration when physicians are choosing the appropriate treatment for a patient with CLL or NHL.[128]  However, I understand from Dr. Attia and Dr. Ashraf that safety and tolerability are particularly important factors in treating CLL and NHL.[129]  First, as noted above, these diseases are often diagnosed in patients over 65 and carry increased risk for elderly

[121] Deposition of Josh Mathew, December 17, 2025 ("Mathew Deposition"), pp. 10-11.
[122] Mathew Deposition, pp. 84-87.
[123] Deposition of Alan Eagle, November 18, 2025 ("Eagle Deposition"), pp. 27, 59, and 118.
[124] Eagle Deposition, pp. 27-28.
[125] Eagle Deposition, pp. 113-114.
[126] EAGLEBEN-SA_00364839 at 840; EAGLEBEN-SA_00364844 at 845.
[127] Ashraf Conversation.
[128] Ashraf Conversation. *See, e.g.,* EAGLEBEN-SA_00301145 at 151.  *See also* EAGLEBEN-SA_00301145 at 148, 171; EAGLEBEN-SA_00301654 at 658; EAGLEBEN-SA_00301683 at 690; EAGLEBEN-SA_00367242 at 242.
[129] Ashraf Conversation; Attia Conversation.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY                                                                                          17

patients.[130] Treatments for NHL and CLL, and in particular chemotherapy treatments like bendamustine, may have significant side effects.[131] These side effects include extreme fatigue, increased risk of infections, hair loss, and gastrointestinal issues.[132] Especially in older patients, tolerability of treatment is an important demand factor because of common comorbidities and lower tolerance of adverse effects.[133] ███████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████

56.    While chemotherapy products like bendamustine can be an important part of treatment for patients with CLL and NHL, these products also target and kill a range of fast growing cells in a patient's body beyond cancer cells.[135] Due to the highly toxic nature of liquid bendamustine products, they are administered by prescription only and can only be given "by or under the direct supervision of [a] doctor."[136] If not administered correctly, liquid bendamustine products can result in serious adverse effects, including fatalities.[137] As a result, they must be administered only by licensed healthcare professionals, or HCPs, who are trained to ensure their safe and proper use.[138]

57.    Another driver that influences the demand for liquid bendamustine products is cost. As discussed in Section II.E.1 below, liquid bendamustine is administered by healthcare providers and is subject to a buy-and-bill reimbursement structure, wherein healthcare providers first order the medication and are then reimbursed by Medicare Part B or commercial health plans.[139] The reimbursement for a medication is calculated based on the drug's average sales price.[140]

---

[130] Sections II.B, II.C.
[131] Sections II.B, II.C.
[132] EAGLEBEN-SA_00368081 at 084.
[133] Ashraf Conversation. *See e.g.,* EAGLEBEN-SA_00364713 at 717; EAGLEBEN-SA_00363579 at 579; EAGLEBEN-SA_00363607 at 607-612.
[134] EAGLEBEN-SA_00301140 at 143. *See also* EAGLEBEN-SA_00301654 at 660; EAGLEBEN-SA_00301145 at 148, 171; EAGLEBEN-SA_00057723, p. 4.
[135] Sections II.B, II.C; EAGLEBEN-SA_00363489 at 494.
[136] EAGLEBEN-SA_00368175 at 176; EAGLEBEN-SA_00364257 at 257.
[137] *See, e.g.,* EAGLEBEN-SA_00363615 at 622-624. Ashraf Conversation.
[138] EAGLEBEN-SA_00368175 at 176; EAGLEBEN-SA_00363615 at 622-624; EAGLEBEN-SA_00363505 at 506-507.
[139] EAGLEBEN-SA_00367468 at 469; EAGLEBEN-SA_00365180 at 180; EAGLEBEN-SA_00367397 at 398-399; 401.
[140] EAGLEBEN-SA_00365179; EAGLEBEN-SA_00367410 at 411.

58.    I understand cost can be an important factor for pharmacists when differentiating liquid bendamustine products.[141]  For example, ██████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

### 3.    Supply of Bendamustine Products

59.    In this section, I discuss the bendamustine products available for treatment of CLL and NHL. The only liquid bendamustine products available in the market during the damages period are Eagle's Belrapzo product, Teva's Bendeka product, Slayback's Vivimusta liquid bendamustine product, Apotex's liquid bendamustine product, and Baxter's liquid bendamustine product.[146]

### a.    Belrapzo

60.    Belrapzo is a bendamustine hydrochloride injection approved for the treatment of CLL and indolent B-cell NHL that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen.[147]  Belrapzo was approved by the FDA in May 2018 and is supplied by Eagle Pharmaceuticals.[148]

---

[141] Attia Conversation.
[142] EAGLEBEN-SA_00301145 at 168.
[143] EAGLEBEN-SA_00301145 at 161.
[144] Deposition of Christopher Krawtschuk, December 5, 2025 ("Krawtschuk Deposition"), Exhibit 3, p. 1 (EAGLEBEN-SA_00351787 at 787).
[145] Ashraf Conversation.
[146] Mathew Deposition, pp. 77, 107-111.
[147] EAGLEBEN-SA_00364280 at 280.
[148] EAGLEBEN-SA_00363429 at 429.

61.    Belrapzo is available as a 100 mg/4 ml (or 25 mg/ml) ready-to-dilute intravenous solution and does not require reconstitution.[149]  Belrapzo's recommended dosage for CLL is "100 mg/m² administered intravenously over 30 minutes on Days 1 and 2 of a 28-day cycle, up to 6 cycles" and "120 mg/m² administered intravenously over 60 minutes on Days 1 and 2 of a 21-day cycle, up to 8 cycles" for NHL.[150]

### b.    Bendeka

62.    Bendeka is a bendamustine hydrochloride injection approved for the treatment of CLL and indolent B-cell NHL that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen.[151]  Bendeka was approved by the FDA in December 2015.[152]

63.    Bendeka was developed by Eagle Pharmaceuticals.[153]   ███████████████████████ ██████████████████████████████████████████ ██████████████   Bendeka is currently distributed by Teva.[155]

64.    Bendeka is available in as a 100 mg/4 ml (25 mg/ml) ready-to-use intravenous solution formulation.[156]  Bendeka's recommended dosage is "100 mg/m² administered intravenously over 10 minutes on Days 1 and 2 of a 28-day cycle for CLL, up to 6 cycles" and "120 mg/m² administered intravenously over 10 minutes on Days 1 and 2 of a 21-day cycle, up to 8 cycles" for NHL.[157]

### c.    Treanda

65.    Treanda is a bendamustine hydrochloride product approved for the treatment of CLL and indolent B cell NHL that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen.[158]  Treanda is manufactured by Cephalon.[159]

---

[149] EAGLEBEN-SA_00368145 at 145; EAGLEBEN-SA_00057716 at 717.
[150] EAGLEBEN-SA_00364280 at 280.
[151] EAGLEBEN-SA_00364307 at 307.
[152] EAGLEBEN-SA_00364303 at 303, 306.
[153] EAGLEBEN-SA_00364303 at 303.
[154] EAGLEBEN-SA_00072300 at 301, 307-308, 325-326.  Teva acquired Cephalon in 2011.  *See,* EAGLEBEN-SA_00367601 at 601.
[155] *See, e.g.*, EAGLEBEN-SA_00368077 at 078.
[156] EAGLEBEN-SA_00364307 at 307.
[157] EAGLEBEN-SA_00364307 at 307.
[158] EAGLEBEN-SA_00364156 at 156.
[159] EAGLEBEN-SA_00368133 at 133.

66.    Treanda was approved by the FDA in a lyophilized powder formulation in 2008 and as a solution in November 2014.[160]  Treanda's intravenous solution dosage form is now discontinued.[161] Treanda's recommended dosage for CLL is "100 mg/m² administered intravenously over 30 minutes on Days 1 and 2 of a 28-day cycle, up to 6 cycles" and "120 mg/m² administered intravenously over 60 minutes on Days 1 and 2 of a 21-day cycle, up to 8 cycles" for NHL.[162]

67.    Accord Healthcare, Dr. Reddy's, Eugia Pharma, and Meitheal produce generic versions of powdered Treanda.[163]  Accord Healthcare and Dr. Reddy's generic powder Treanda were approved in December 2022, and Eugia Pharma and Meitheal's generic powder Treanda were approved in June 2023.[164]  Apotex also marketed a generic powder bendamustine, which was approved on June 5, 2023, but this product was discontinued.[165]

### d.  Vivimusta

68.    Vivimusta is a liquid bendamustine hydrochloride product approved for the treatment of CLL and indolent B cell non-Hodgkin lymphoma that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen.[166]  Vivimusta was approved by the FDA in December 2022 and is manufactured by Azurity, Slayback's parent company.[167]

69.    Vivimusta is available as a 100 mg/4 ml (25 mg/ml) ready-to-dilute intravenous solution formulation.[168]  Vivimusta's recommended dosage for CLL is "100 mg/m² administered intravenously over 20 minutes on Days 1 and 2 of a 28-day cycle for up to 6 cycles" and "120 mg/m² administered intravenously over 10 minutes on Days 1 and 2 of a 21-day cycle for up to 8 cycles" for NHL.[169]

---

[160] EAGLEBEN-SA_00364156 at 156; EAGLEBEN-SA_00368133 at 133.  *See also* EAGLEBEN-SA_00301145 at 156.
[161] EAGLEBEN-SA_00368133 at 133; EAGLEBEN-SA_00365285 at 286.
[162] EAGLEBEN-SA_00364156 at 156.
[163] EAGLEBEN-SA_00368133 at 133.
[164] EAGLEBEN-SA_00368143 at 144; EAGLEBEN-SA_00368141 at 142; EAGLEBEN-SA_00368157 at 158; EAGLEBEN-SA_00368150 at 151.
[165] EAGLEBEN-SA_00368139 at 140.
[166] EAGLEBEN-SA_00364365 at 365.
[167] EAGLEBEN-SA_00368152 at 152; EAGLEBEN-SA_00354646 at 646.
[168] EAGLEBEN-SA_00368152 at 152.
[169] EAGLEBEN-SA_00364365 at 366.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

70. Vivimusta was approved through the 505(b)2 FDA pathway which is distinct from the traditional generic drug FDA approval pathway.[170]  A 505(b)2 New Drug Application (NDA) is an application that contains full reports of investigations of safety and effectiveness but where at least some of the information required for approval comes from studies not conducted by or for the applicant and for which the applicant has not obtained a right of reference.[171]  Slayback used Belrapzo as the reference product when developing and securing FDA approval for Vivimusta.[172]  Further, I understand that Vivimusta is pharmaceutically equivalent to Belrapzo.[173]

### e.  Apotex's Liquid Bendamustine Product

71. On June 8, 2021, Apotex filed NDA 215033 for a bendamustine hydrochloride injection,[174] and the FDA granted approval in December 2022.[175]  Apotex subsequently launched its liquid bendamustine product on April 26, 2023.[176]  Apotex's liquid bendamustine product is available as a 100 mg/4 ml (25 mg/ml) intravenous solution.[177]  Apotex's liquid bendamustine product was originally indicated for the treatment of both CLL and indolent B-cell NHL.[178]  The original recommended dosage for CLL is "100 mg/m² administered intravenously over 30 minutes on Days 1 and 2 of a 28-day cycle, up to 6 cycles" and "120 mg/m² administered intravenously over 60 minutes on Days 1 and 2 of a 21-day cycle for up to 8 cycles" for NHL.[179]  On April 15, 2024, Apotex submitted a supplemental NDA to the FDA requesting that the indication for CLL be removed;[180] the indication for Apotex's liquid bendamustine product was subsequently updated to only include indolent B-cell NHL.[181]  Apotex continues to market, and the FDA continues to list, its liquid bendamustine product as "bioequivalent" to Belrapzo, which is indicated for both CLL and indolent B-cell NHL.[182]

---

[170] EAGLEBEN-SA_00364331 at 331.
[171] EAGLEBEN-SA_00366812 at 813; EAGLEBEN-SA_00366765 at 769.
[172] EAGLEBEN-SA_00364335 at 338.
[173] Deposition of Harish Chinnari, December 10, 2025 ("Chinnari Deposition"), p. 129.
[174] EAGLEBEN-SA_00364387 at 387.
[175] EAGLEBEN-SA_00368154 at 154.
[176] EAGLEBEN-SA_00364621 at 621.
[177] EAGLEBEN-SA_00368156 at 156.
[178] EAGLEBEN-SA_00364365 at 365.
[179] EAGLEBEN-SA_00364396 at 396.
[180] EAGLEBEN-SA_00364391 at 391, 395.
[181] EAGLEBEN-SA_00364418 at 418.
[182] EAGLEBEN-SA_00363480 at 480; EAGLEBEN-SA_00368132 at 132.

### f.    Baxter's Liquid Bendamustine Product

72.    Baxter submitted NDA 216078 for a bendamustine hydrochloride injection on September 14, 2021 and submitted an amendment on October 31, 2022; the FDA granted tentative approval on July 14, 2022 and final approval on December 15, 2022.[183]  Baxter's liquid bendamustine product is indicated for use in treating CLL and indolent B-cell NHL.[184]  The recommended dosage for CLL is "100 mg/m² administered intravenously over 30 minutes on Days 1 and 2 of a 28-day cycle, up to 6 cycles" and "120 mg/m² administered intravenously over 60 minutes on Days 1 and 2 of a 21-day cycle for up to 8 cycles" for NHL.[185]  The FDA lists Baxter's liquid bendamustine product as therapeutically equivalent to Belrapzo.[186]

### E.  Pharmaceutical Industry Context

73.    To understand the competitive dynamics associated with competition between Eagle and other companies supplying liquid bendamustine products in the United States, it is important to understand how prescriptions are generated and paid for in the U.S. healthcare system.  It is also important to understand how participants in those systems are affected by the existence of generic products.  In the following subsections, I first provide an overview of the salient details of pharmaceutical insurance coverage, including buy-and-bill procurement, and then discuss the impact of generic competition on participants of that system.

### 1.  Buy-and-Bill Procurement

74.    In this section, I discuss the unique dynamics present in infusion product marketplaces.  Unlike other pharmaceutical products, infusion products must be administered by a healthcare provider; therefore, the reimbursement structure for infusion products differs as well.[187]  Examples of provider-administered drugs include injectables, biologicals, immunoglobulins, and other products.[188]  These products, including liquid bendamustine injections (as discussed below), follow

---

[183] EAGLEBEN-SA_00364435 at 435, 438.
[184] EAGLEBEN-SA_00364439 at 439.
[185] EAGLEBEN-SA_00364439 at 440.
[186] EAGLEBEN-SA_00368132 at 132.
[187] EAGLEBEN-SA_00365180 at 180; EAGLEBEN-SA_00367468 at 469; EAGLEBEN-SA_00367397 at 399-401.
[188] EAGLEBEN-SA_00365278 at 279.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

a buy-and-bill reimbursement structure wherein physician offices receive reimbursement for medications used for in-office administration.[189]

75. Liquid bendamustine injection products are classified as prescription-only medications and are thus not available for purchase or use in the U.S. without a prescription from a healthcare provider.[190] Liquid bendamustine injection products are prescribed by healthcare providers such as oncologists or hematologists.[191]

76. Due to the highly toxic nature of liquid bendamustine products, they can only be given "by or under the direct supervision of [a] doctor" and cannot be directly purchased by end customers.[192] If not administered correctly, liquid bendamustine products can result in serious adverse effects, including fatalities.[193] As a result, they must be administered only by licensed healthcare professionals, or HCPs, who are trained to ensure their safe and proper use.[194]

77. Buy-and-bill medications are typically reimbursed by Medicare Part B or commercial health plans.[195] Healthcare providers first order the medication ("buy") and then receive reimbursements from third-party payers ("bill").[196] Medicare Part B covers a limited number of outpatient prescription drugs under certain conditions, including injectable and infused drugs.[197] Medicare typically reimburses offices for Part B drugs based on the drug's average sales price, calculated from sales data submitted by manufacturers.[198] Medicare pays 106 percent of a drug's average sales price for drugs furnished in physician offices; oral anticancer, oral antiemetic and immunosuppressive drugs; inhalation drugs; home infusion drugs, and clotting factor.[199]

### a. J-Code Designations

78. The Healthcare Common Procedure Coding System ("HCPCS") is a standardized medical coding system used in the U.S. to ensure that health insurance programs can process claims in an orderly

---

[189] EAGLEBEN-SA_00367468 at 469. *See also* EAGLEBEN-SA_00367397 at 399-401.
[190] EAGLEBEN-SA_00368132 at 132; EAGLEBEN-SA_00368175 at 176.
[191] EAGLEBEN-SA_00367404 at 406; EAGLEBEN-SA_00363470. *See, e.g.*, EAGLEBEN-SA_00301145 at 160.
[192] EAGLEBEN-SA_00368175 at 176.
[193] *See, e.g.*, EAGLEBEN-SA_00363615 at 622-624. Ashraf Conversation.
[194] EAGLEBEN-SA_00368175 at 176.
[195] EAGLEBEN-SA_00367468 at 469; EAGLEBEN-SA_00365180 at 180.
[196] EAGLEBEN-SA_00367468 at 469.
[197] EAGLEBEN-SA_00367397 at 398-401.
[198] EAGLEBEN-SA_00365179; EAGLEBEN-SA_00367410 at 411.
[199] EAGLEBEN-SA_00367410 at 411.

and consistent manner.[200]  It is divided into two main subsystems – Level I and Level II.[201]  Each product is assigned a J-Code, which is a HCPCS Level II billing code used by practices and hospitals to receive reimbursement in U.S. healthcare reimbursement, mainly for physician-administered drugs that are not taken orally.[202]

79.    The use of J-Code in medical billing is usually accompanied by the other CPT codes, which are known as procedure-based codes used by the physicians.[203]  The combination of J and CPT codes ensures the accurate reporting of medication types and dosages, facilitating the billing process for healthcare providers.[204]  Currently, Belrapzo has a shared J-Code with Apotex and Baxter's liquid bendamustine products since they are recognized as "therapeutically equivalent" in the Orange Book.[205]

80.    Acquiring a unique J-Code for a drug product can be beneficial for pharmaceutical manufacturers, as sharing a J-Code with manufacturers of the same product makes managing ASP for that product and therefore reimbursement rates difficult.[206]

81.    Having a unique J-Code also helps with differentiating a manufacturer's product in the market.

[200] EAGLEBEN-SA_00365177 at 177.
[201] EAGLEBEN-SA_00365177 at 177.
[202] *See, e.g.*, Eagle Deposition, p. 159; EAGLEBEN-SA_00364877 at 878-879.
[203] EAGLEBEN-SA_00364138 at 138.
[204] EAGLEBEN-SA_00364877 at 878-879.
[205] Eagle Deposition, p. 158; Krawtschuk Deposition, Exhibit 3, p. 3 (EAGLEBEN-SA_00351787 at 789).
[206] *See, e.g.*, Eagle Deposition, pp. 158-163, 204-205, 255-256, Exhibit 6, p. 13 (EAGLEBEN-SA_00344370 at 382); Lovesy Deposition, pp. 102-105.
[207] EAGLEBEN-SA_00301654 at 669.
[208] *See, e.g.*, EAGLEBEN-SA_00266221; EAGLEBEN-SA_00367234 at 234.
[209] EAGLEBEN-SA_00367232 at 232.
[210] EAGLEBEN-SA_00367236 at 236.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████

### 2.  Insurance Coverage

83.  In the U.S., the vast majority of the population have some form of health insurance coverage to finance their healthcare expenditures, which include prescription drug spending.[214]  Health insurers serve as third parties who pay providers on behalf of patients.  These third-party payers ("TPPs") include employment-based private insurance plans, managed care organizations ("MCOs"), and federal programs such as Medicare or Medicaid.[215]  Private insurers, Medicare, and Medicaid account for a majority of retail spending on prescription drugs.[216]  Payers balance the generosity of their pharmacy benefit (primarily in terms of cost-sharing and breadth of coverage) against the cost.[217]

84.  Pharmacy benefit managers ("PBMs") manage prescription drugs expenses on behalf of health care payers.[218]  PBMs handle prescription billing, negotiate drug prices with drug suppliers, and create retail pharmacy networks.[219]  PBMs help health plans control costs by designing and maintaining formularies, which are lists of drugs covered by the insurance plan that determine where prescription drugs can be filled and patients' out-of-pocket costs, and utilization management tools.[220]

85.  An important aspect of a pharmaceutical product's competitive position is its position (or "tier") in these formularies.[221]  Formularies are typically divided into tiers based on drug characteristics, price, and other considerations.[222]  Tiers determine the level of cost-sharing patients must

---

[211] EAGLEBEN-SA_00367238 at 238.
[212] EAGLEBEN-SA_00367240 at 240.
[213] Eagle Deposition, pp. 162-163.  *See also* Eagle Deposition, Exhibit 6 (EAGLEBEN-SA_00344370 at 382).
[214] EAGLEBEN-SA_00367173 at 173; EAGLEBEN-SA_00367475 at 485, 532.
[215] EAGLEBEN-SA_00367966 at 966; EAGLEBEN-SA_00367860 at 860-861; EAGLEBEN-SA_00367475 at 489.
[216] EAGLEBEN-SA_00367309 at 309.
[217] EAGLEBEN-SA_00367543 at 547.
[218] EAGLEBEN-SA_00364042 at 042.
[219] EAGLEBEN-SA_00367543 at 546-547.
[220] EAGLEBEN-SA_00367604 at 605; EAGLEBEN-SA_00367392 at 392-393.
[221] EAGLEBEN-SA_00367392 at 393-394.
[222] EAGLEBEN-SA_00367392 at 393-394; EAGLEBEN-SA_00364134 at 134-135.

contribute when they fill their prescriptions.[223]  A drug on a lower, more-preferred tier (e.g., tier 1) is typically associated with lower cost-sharing requirements than drugs placed on higher, less-preferred tiers.[224]  Tier 1 is typically associated with generics, while top tiers involve specialty products.[225]  Some drugs are simply not covered under some formularies, in which case the patient bears the entire burden of paying for the drug.[226]

86. PBMs use formularies as strategic leverage to negotiate rebates from drug manufacturers in exchange for preferred placement within health insurance plans.[227]  These rebates are often negotiated differently depending on the channel, such as Medicare versus commercial insurance, and the specific terms of the rebate contracts.[228]  As a result, the net price – the actual amount paid after rebates – can vary across channels.[229]

87. Once a generic equivalent of a branded drug becomes available, the generic drug is typically placed in a preferred position on a formulary as compared to the branded drug and, thus, is associated with lower patient cost-sharing.[230]  For example, the generic is commonly placed on tier 1, while the branded drug is downgraded to a non-preferred tier (or excluded from formulary coverage altogether).[231]  As I discuss below, the rapid downgrade in formulary position – in combination with other factors – leads to steep and immediate losses in sales volumes for branded products upon the entry of generic equivalents.

88. The highly consolidated nature of the PBM marketplace means that PBMs have concentrated negotiating power vis-à-vis drug manufacturers.  In 2021, three PBMs (Caremark, Express Scripts, and OptumRx) handled an estimated 80 percent of total equivalent prescription claims in the U.S.[232]  In recent years, these PBMs have increasingly excluded branded drugs from their

---

[223] EAGLEBEN-SA_00367392 at 393-394.
[224] EAGLEBEN-SA_00367392 at 393-394.
[225] EAGLEBEN-SA_00367080 at 083; EAGLEBEN-SA_00367392 at 393-394.  *See also,* EAGLEBEN-SA_00367543 at 568-569.
[226] *See, e.g.,* EAGLEBEN-SA_00367615 at 616; EAGLEBEN-SA_00364076 at 076.
[227] EAGLEBEN-SA_00367671 at 671.  PBMs serve and are often owned by third-party payers, including commercial insurance companies, and negotiate supply and reimbursement arrangements for pharmaceuticals.  Group Purchasing Organizations, on the other hand, serve hospitals and other healthcare providers by negotiating contracts with suppliers, including medical device companies and drug manufacturers.  *See* EAGLEBEN-SA_00367071 at 071.
[228] *See, e.g.,* EAGLEBEN-SA_00364882 at 891-892.
[229] *See, e.g.,* EAGLEBEN-SA_00364882 at 891-892.
[230] *See, e.g.,* EAGLEBEN-SA_00367440 at 441.
[231] *See, e.g.,* EAGLEBEN-SA_00367440 at 446; EAGLEBEN-SA_00364120 at 121.
[232] EAGLEBEN-SA_00365274 at 274.

formularies.  From 2014 to 2022, 1,357 unique prescription drugs were excluded from standard formularies by one or more of these three PBMs for at least 1 year.[233]  Of these, 654 were single-source branded drugs at the time of exclusion.[234]  In conjunction with formularies, PBMs also use prior authorization, step therapy, and quantity limits to restrict use of a particular drug or limit how much a drug can be dispensed for one prescription.[235]

### 3. Generic Competition

89.    Generic entry invariably has a profound effect on the demand for and price of the corresponding branded drug, ultimately leading to the virtual extinction of the brand.  Indeed, studies of the effect of generic entry indicate that the volume share of the branded reference drug typically declines by 40 to 80 percent within six months of generic entry, up to 85 percent within 18 months, and up to 90 percent within two years.[236]  Furthermore, the speed with which generic entrants capture share from branded drugs has increased in recent decades.  For example, branded products' share of prescriptions for a molecule 12 months after generic entry was slightly below 50 percent for molecules that lost patent protection in 1999 and 2000, and just between 20 and 25 percent for those that lost patent protection between 2017 and 2019.[237]  Driving these outcomes are physicians' and payers' price/cost considerations (which are generally tied to drug placement on insurance formularies) as well as pharmacy-level dynamics driven by generic substitution laws and pharmacies' financial incentives.[238]

90.    As noted above, the tiered cost structure of insurance formularies forms the basis for competitive dynamics with respect to pricing in pharmaceutical marketplaces, including (in particular) where generic products are available on the market.[239]  Because manufacturers of generic substitutes may charge significantly lower prices than those charged by branded drug manufacturers, payers commonly place branded drugs on less preferred formulary tiers than their generic equivalents.  This is meant to discourage prescriptions for the branded drug – which is more expensive – by

---

[233] EAGLEBEN-SA_00364115 at 116.
[234] EAGLEBEN-SA_00364115 at 116.
[235] EAGLEBEN-SA_00367080 at 084.
[236] See, e.g., EAGLEBEN-SA_00367673 at 681; EAGLEBEN-SA_00367708 at 738; EAGLEBEN-SA_00365182 at 191.
[237] See EAGLEBEN-SA_00365182 at 191.  Moreover, this trend is visible as early as 2004, see EAGLEBEN-SA_00365182 at 191.
[238] See Section II.E.2.
[239] See Section II.E.2.

making the cost of the branded drug more expensive to the patient than the generic substitute. The diminished formulary coverage and disadvantaged pricing of the branded reference product commonly affect its sales relative to those of the generic product.

91.    Additionally, the speed of generic penetration and the magnitude of the discount below brand price depend in part on the number of generics that enter the marketplace.[240]  For example, a 2019 study evaluating median generic prices relative to brand price before generic entry showed that among drugs with initial generic entry from 2015 to 2017, generic drug prices and the generic-to-brand price ratio generally decreased with each additional generic producer.[241]

92.    Regulations governing how branded and generic prescriptions are dispensed at pharmacies also favor use (and sales) of generic products.  Once a generic substitute launches in the marketplace, it is advantaged by pharmacy-level prescription dispensing regulations.  As of 2019, every U.S. state had some form of generic substitution law that facilitates the substitution of prescriptions with the generic version of the prescribed drug.[242]  Moreover, generic substitution is mandated by law in 19 U.S. states and territories.[243]  Therefore, even if corresponding brand and generic products were priced at parity, regulations governing pharmacy-level practices provide a competitive advantage to the generic.  Only when a prescribing physician actively marks a branded prescription with "dispense as written" or "brand medically necessary" must the pharmacy that fills that prescription provide the branded drug instead of its generic substitute.[244]

93.    In addition to the legal incentives favoring generic substitution, pharmacies are also financially incentivized to dispense generic medications.  Research shows that "retail pharmacies profit more when dispensing generic versus branded drugs."[245]  Payers also monetarily reward pharmacies for dispensing generics.[246]

---

[240] *See, e.g.*, EAGLEBEN-SA_00367056 at 057.

[241] EAGLEBEN-SA_00367056 at 057.  Previous research demonstrates similar results.  For example, a 2011 study showed that relative to a marketplace with only one generic entrant, U.S. price-per-dose decreased approximately 47 percent with two or three generic entrants and 74 percent with four or more generic entrants.  *See* EAGLEBEN-SA_00367708 at 723, 728, 740; ($0.47 - $0.88) / $0.88 = - 46.6%; ($0.23 - $0.88) / ($0.88) = -73.9%.

[242] Generic substitution is permitted by law in 31 out of the 50 states and in the District of Columbia.  Generic substitution is mandated by law in the other 19 states.  EAGLEBEN-SA_00364626 at 627, 630, 632.

[243] EAGLEBEN-SA_00364626 at 632.

[244] EAGLEBEN-SA_00367065.

[245] EAGLEBEN-SA_00367072 at 073; EAGLEBEN-SA_00367970 at 975.

[246] EAGLEBEN-SA_00367072 at 076.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

### a. AB-Rated and AP-Rated Generics

94. The FDA assigns generic drugs a therapeutic equivalence code that shows whether the drug is therapeutically equivalent to other prescriptions.[247] Drugs coded as AB under a heading are considered therapeutically equivalent only to other drugs coded as AB under that same heading.[248] AB rated drugs are drugs with "actual or potential bioequivalence issues (such as different excipients, pill formulations or vehicles of delivery) that have been resolved with in vitro and/or in vivo evidence."[249]

95. AP-rated drugs are generic drugs "with no known or suspected bioequivalence problems" that are injectable or non-injectable aqueous preparations.[250] Apotex and Baxter's liquid bendamustine products are AP-rated, with Belrapzo under the same heading.[251]

### b. 505(b)(2) NDAs

96. Drugs can be approved along several different pathways, all with varying requirements of investigations of safety and effectiveness and reliance upon previous investigations.[252] A 505(b)(2) New Drug Application (NDA) is an application that contains full reports of investigations of safety and effectiveness but where at least some of the information required for approval comes from studies not conducted by or for the applicant and for which the applicant has not obtained a right of reference.[253] The Section 505(b)(2) drug approval pathway allows changes in characteristics such as dose or dosage form and often requires data beyond bioavailability studies.[254]

97. Vivimusta was approved by the FDA via the 505(b)(2) NDA process using Belrapzo as the reference drug.[255] █████████████████████████████████

---

[247] EAGLEBEN-SA_00366814 at 818.
[248] EAGLEBEN-SA_00366814 at 818.
[249] EAGLEBEN-SA_00364003 at 012.
[250] EAGLEBEN-SA_00364078 at 079.
[251] EAGLEBEN-SA_00368132 at 132.
[252] EAGLEBEN-SA_00366812 at 813.
[253] EAGLEBEN-SA_00366812 at 813; EAGLEBEN-SA_00366765 at 769.
[254] EAGLEBEN-SA_00365193 at 193.
[255] EAGLEBEN-SA_00364335 at 338.

████████████████████████ ██████████████████████████
████████████████████████████████████████████████████ .

### III.  THE ASSERTED PATENTS AND EAGLE'S INFRINGEMENT CLAIMS

#### A.  U.S. Patent No. 11,872,214 ("the '214 patent")

98.  The '214 patent, titled "Formulations of bendamustine," issued on January 16, 2024 and has an estimated expiration date of January 28, 2031.[257]  I understand from Dr. Trout that the '214 patent shares a specification with the '248 patent, both of which disclose and claim novel liquid bendamustine-containing compositions that are suitable for long-term storage.[258]  I understand that these patents address and explain the need for a liquid form of bendamustine, which is used to treat various cancers.[259]  Specifically, I understand that the patents explain that then-existing lyophilized formulations were clinically inconvenient and not suitable for long-term storage.[260]

99.  I understand that the '214 patent, specifically, claims a liquid bendamustine-containing formulation comprising about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more co-solvents chosen from propylene glycol, ethanol, benzyl alcohol, and glycofurol, and a stabilizing antioxidant, such as monothioglycerol, with a limit on the total impurities present in the composition as a result of bendamustine degradation over a specific time at a specific temperature.[261] I further understand that the '214 patent also claims a sterile vial containing the same.[262]

#### B.  U.S. Patent No. 12,138,248 ("the '248 patent")

100.  The '248 patent, titled "Formulations of bendamustine," issued on November 12, 2024 and has an estimated expiration date of January 28, 2031.[263]  I understand from Dr. Trout that the '248 patent, specifically, claims a liquid bendamustine-containing composition that comprises bendamustine, or a pharmaceutically acceptable salt thereof, a pharmaceutically acceptable fluid consisting of

---

[256] Chinnari Deposition, pp. 123-130.
[257] EAGLEBEN-SA_00368093 at 093.
[258] Trout Conversation; Trout Opening Report, § V and § VII.A-C.
[259] Trout Conversation; Trout Opening Report, § V and § VII.A-C.
[260] Trout Conversation; Trout Opening Report, § V and § VII.A-C.
[261] Trout Conversation; Trout Opening Report, § VII.
[262] Trout Conversation; Trout Opening Report, § VII.
[263] EAGLEBEN-SA_00368106 at 106.

polyethylene glycol and optionally one or more co-solvents chosen from propylene glycol, ethanol, benzyl alcohol, and glycofurol, and a stabilizing antioxidant, such as monothioglycerol, with a limit on the total impurities present in the composition as a result of bendamustine degradation over a specific time at a specific temperature.[264]  I further understand that the '248 patent also claims a sterile container containing the same.[265]

## IV.    DAMAGES METHODOLOGY OVERVIEW

101.    I understand that U.S. patent law seeks to compensate the patent holder for financial harm incurred as a result of infringement.  Specifically, Section 284 of the Patent Act (35 USC §284) provides that, when a patent has been found to be valid and infringed,

> *The court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.*

102.    One common form of damages sustained by patentees when infringers introduce products that compete with those of the patentee is lost profits.  Lost profits represent losses to the patentee in terms of reduced sales and/or lower prices sustained due to infringement.  Below, I undertake an assessment of the suitability and quantum of a lost profits consideration based on the standards set forth in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*[266]  Under the *Panduit* "test," a patentee is entitled to lost profits if it can establish four factors: 1) existing demand for the patented product(s); 2) an absence of acceptable non-infringing substitutes; 3) manufacturing and marketing capacity; and 4) the amount of lost profit.  In this context, I consider the extent to which Slayback's infringement may have caused Eagle lost profits due to lost sales of Belrapzo and lost royalties from lost sales of Bendeka and/or due to price erosion on sales of Belrapzo and royalties of Bendeka that Eagle retained.

103.    Furthermore, I understand that the Federal Circuit in *Grain Processing Corp. v. Am. Maize-Prods. Co.* stated:[267]

> When basing the alleged lost profits on lost sales, the patent owner has an initial burden to show a reasonable probability that he would have made the asserted sales "but for"

---

[264] Trout Conversation; Trout Opening Report, § VII.
[265] Trout Conversation; Trout Opening Report, § VII.
[266] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F. 2d 1152 (6th Cir. 1978).
[267] *Grain Processing Corp. v. Am. Maize-Prods. Co.,* 185 F.3d 1341, 1352-53 (Fed. Cir. 1999).

the infringement. … Once the patent owner establishes a reasonable probability of "but for" causation, "the burden then shifts to the accused infringer to show that [the patent owner's 'but for' causation claim] is unreasonable for some or all of the lost sales."

104. I understand that, in January 2024, Eagle filed two separate district court actions accusing Apotex and Baxter's liquid bendamustine products of infringing the '214 patent and the '248 patent. In calculating damages due to Slayback's infringement, based on my understanding that Apotex and Baxter's liquid bendamustine products also infringe the Asserted Patents, I therefore assume those products are not available on the market in a world where the Asserted Patents are valid and infringed.

105. In Section V, I address each *Panduit* Factor assuming that both the '214 patent and '248 patent are valid and infringed. I understand that, absent a license to the Asserted Patents, Slayback cannot continue selling the Accused Product in the United States after the first Asserted Patent issued. To reconstruct the "but for" world, I understand and assume that each liquid bendamustine product from Apotex and Baxter that are accused of infringing the Asserted Patents would not be available on the market. I therefore undertake my quantification of Eagle's lost profits understanding that Belrapzo and Bendeka are the only liquid bendamustine products available on the market in a world "but for" the infringement. In the background and patent summary sections above I have discussed both marketplace dynamics and history relevant to my discussion in the following sections. In Figure 3 below, I present a timeline of certain events relevant to my damages analysis. As shown below, the damages period applicable under Eagle's allegations begins in January 2024.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

**Figure 3: Timeline of Liquid Bendamustine Product Releases and Asserted Patents**



## V. LOST PROFIT DAMAGES

### A. *Panduit* Factor 1: Demand for the Patented Products

106. Under *Panduit* Factor 1, I assess demand for the products that practice the Asserted Patents. The Court of Appeals for the Federal Circuit provided an assessment of the first *Panduit* factor in *DePuy Spine, Inc. v. Medtronic Safamor Danek, Inc.*:

> All that the first factor states, and thus requires, is 'demand for the patented product.' … This factor does not require any allocation of consumer demand among the various limitations recited in a patent claim. Instead, the first Panduit factor simply asks whether demand existed for the 'patented product,' i.e., a product that is 'covered by the patent in suit' or that 'directly competes with the infringing device.' … As we have held, the focus on particular features corresponding to individual claim limitations is unnecessary when considering whether demand exists for a patented product under the first *Panduit* factor.[268]

---

[268] *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1331 (Fed. Cir. 2009). *See also Versata Software, Inc. v. SAP Am., Inc.,* 717 F.3d 1255, 1265-66 (Fed. Cir. 2013) ("The Panduit factors do not require showing demand for a particular embodiment of the patented functionality … Nor does it require any allocation of consumer demand among the various limitations recited in a patent claim. In other words, the Panduit factors place no qualitative requirement on the level of demand necessary to show lost profits."); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1360-1361 (Fed. Cir. 2012) ("ATC argues that the record does not link market demand with the claimed fringe-effect capacitance limitation. This argument

107.   I further understand that, where the patentee's product competes in the same market as the Accused Product, a high volume of allegedly infringing sales can prove the requisite demand under the first *Panduit* factor.[269]

108.   To assess demand, I consider the actual historical sales and prescriptions of Belrapzo, Bendeka, and each of Apotex, Baxter, and Slayback's liquid bendamustine products.  I understand from Dr. Trout that each of these products practice at least one claim of the Asserted Patents.[270]  Based on my analysis, as discussed below, substantial demand exists for the patented products and those products have been commercially successful in the marketplace.

109.   Figures 4 and 5 below report Eagle's U.S. quarterly net sales of Belrapzo and Teva's U.S. quarterly net sales of Bendeka since their respective launches.  As shown, Belrapzo and Bendeka have generated significant revenues for Eagle and Teva. ███████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ ███████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████

---

fails because the first Panduit factor 'does not require any allocation of consumer demand among the various limitations recited in a patent claim.'").

[269] *Gyromat Corp. v. Champion Spark Plug Co.,* 735 F.2d 549, 552 (Fed. Cir. 1984) ("The substantial number of sales by Champion of infringing products containing the patented features itself is compelling evidence of the demand for the product. Champion's sales necessarily meant that there were buyers who wanted the product and were willing to pay Champion's price, which was substantially the same as that of Gyromat."); *Parker-Hannifin Corp. v. Champion Labs., Inc.,* No. 06-cv-2616, 2008 WL 1843922, at *7 (N.D. Ohio Apr. 22, 2008) (explaining that, "[i]n the Gyromat case," the Federal Circuit "found that proof of sales of an infringing product was sufficient to establish demand for the patented product even where defendant demonstrated sales of a non-infringing product.")

[270] Trout Conversation; Opening Expert Report of Dr. Bernhardt Trout, Ph.D., February 6, 2026 ("Trout Opening Report"), § XIII.

[271] Exhibits 9, 10.

[272] ███████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

**Figure 4: Eagle U.S. Net Sales of Belrapzo**
**Q2 2018 – Q2 2025**
*($ millions)*
*Source: Exhibit 9*



**Figure 5: Teva U.S. Net Sales of Bendeka**
**Q1 2016 – Q2 2025**
*($ millions)*
*Source: Exhibit 10*



110. Further, Belrapzo and Bendeka ███████████████████████████████████
As shown in Exhibit 11, since Bendeka's commercial launch in January 2016, ███████
████████████████████████████████████████████████████████████████████
████████[273] ████████████████████████████████████████████████

111. Since their launches, Slayback's Vivimusta product, as well as Apotex's and Baxter's liquid
bendamustine products, ████████████████████████. Importantly, because I
understand from Dr. Trout that each of these products infringe the Asserted Patents, and I
understand from Dr. Ashraf the demand that exists from prescribers and patients for these

---

[273] Exhibit 11; EAGLEBEN-SA_00367593 at 594.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY                                                                     37

products are primarily due to

████████████████████████████████████████████████████████████.[274]

112. As shown in Exhibit 12, from May 2023 through November 2025, ████████████████████ ████████████████████████████████████████████████████.[275]  As shown in Exhibit 13, from February 2023 through September 2025, Baxter sold ████████████████████████ ████████████████████████████████  As shown in Exhibit 14, from December 2022 through September 2025, Slayback sold ████████████████████████████████ ████████████████████████

113. In total, through Q2 2025, there have been ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████ s████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████  ████████████████████████████████████████

### B. *Panduit* Factor 2: Absence of Non-Infringing Substitutes

114. Under this factor, I consider whether there would have been any acceptable, non-infringing alternatives to Belrapzo in the reconstructed "but for" market.  I briefly discuss each element and then provide my analysis of this factor below.

115. First, with respect to availability, I understand that "substitutes only theoretically possible will not" preclude lost profits.[279]  I also understand that "[t]he critical time period for determining availability of an alternative is the period of infringement for which the patent owner claims damages, i.e., the accounting period."[280]  In addition, while I understand that a non-infringing alternative need not be on the market during the infringement period to factor into a lost profits analysis, I also understand that "when an alleged alternative is not on the market during the

---

[274] Trout Conversation; Trout Opening Report, § XIII; Ashraf Conversation.
[275] Exhibit 12.
[276] Exhibit 13.  I understand that redacted versions of certain financial documents from Apotex and Baxter have been designated for use in estimating damages.  I use these redacted versions when using data from Apotex and Baxter.
[277] Exhibit 14.
[278] ██████████████████████████████████████████████████████████████████████████████
*See* Exhibits 9, 10, 12, 13, 14, net sales and unit sales summed through Q2 2025.
[279] *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999).
[280] *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999), citing *State Indus.*, 883 F.2d at 1579; *Panduit*, 575 F.2d at 1162.

accounting period, a trial court may reasonably infer that it was not available as a non-infringing substitute at that time"[281] and, thus, "[t]he accused infringer then has the burden to overcome this inference by showing that the substitute was available."[282]  I understand that having "the necessary equipment, know-how, and experience" to make an alternative product during the relevant time period may render the product "available,"[283] but the "high cost of a necessary material"[284] or a "finding that an infringer had to design or invent around the patented technology to develop an alleged substitute weighs against a finding of availability."[285]

116. Second, with respect to acceptability, I understand "[t]he correct inquiry under *Panduit* is whether a non-infringing alternative would be acceptable compared to the patent owner's product, not whether it is a substitute for the infringing product."[286]  I also understand that "[t]he mere existence of a competing device does not necessarily make that device an acceptable substitute,"[287] because a product "which lacks the advantages of the patented product can hardly be termed a substitute acceptable to the customer who wants those advantages."[288]  Further, I understand that "[t]o be deemed acceptable, the alleged acceptable non-infringing substitute must not have a disparately higher price than or possess characteristics significantly different from the patented product."[289]  "In other words, buyers must view the substitute as equivalent to the patented device."[290]  Finally, I understand that this factor "must be viewed of limited influence where the infringer knowingly made and sold the patented product for years while ignoring the 'substitute.'"[291]

---

[281] *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999).

[282] *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999).

[283] *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999).

[284] *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999).

[285] *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119 (Fed. Cir. 2003).

[286] *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1361 (Fed. Cir. 2012).

[287] *Standard Havens Products, Inc., v. Gencor Industries, Inc.,* 953 F.2d 1360 (Fed. Cir. 1992), citing *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 901, 229 USPQ 525, 529 (Fed. Cir. 1986).

[288] *Standard Havens Products, Inc., v. Gencor Industries, Inc.,* 953 F.2d 1360 (Fed. Cir. 1992), citing *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 901, 229 USPQ 525, 529 (Fed. Cir. 1986).

[289]  *Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1142 (Fed. Cir. 1991).

[290] *American Seating Company, v. USSC Group, Inc.,* 514 F.3d U.S.P.Q.2d 1683 (Fed. Cir. 2008).

[291] *Panduit Corp., v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978)

117. Third, with respect to non-infringement, I understand the hypothetical but for market must be reconstructed with "likely outcomes with infringement factored out of the economic picture."[292] Thus, to be "available," a proposed alternative must not infringe either of the Asserted Patents.[293]

118.

[292] *Grain Processing Corp. v. Am. Maize-Prods. Co.,* 185 F.3d 1341 (Fed. Cir. 1999).

[293] *See, e.g., Gyromat Corp. v. Champion Spark Plug Co.,* 735 F.2d 549, 553 (Fed. Cir. 1984) ("The master's finding that no acceptable noninfringing substitutes were available is not undermined by, but is fully consistent with, the fact that long-stroke systems also infringed the patent."); *Micro Motion, Inc. v. Kane Steel Co., Inc.,* 894 F.2d 1318, 1322 (Fed. Cir. 1990) ("There is precedent for finding causation despite an alternative source of supply if that source is an infringer."); *Rite-Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1548 (Fed. Cir. 1995) ("Here, the only substitute for the patented device was the ADL-100, another of the patentee's devices. Such a substitute was not an 'acceptable, non-infringing substitute' within the meaning of Panduit because, being patented by Rite-Hite, it was not available to customers except from Rite-Hite."); *State Indus., Inc. v. Mor-Flo Indus., Inc.,* 883 F.2d 1573, 1578 (Fed. Cir. 1989) ("If the court is correct in its finding that the other competitors were likely infringers of one or the other of [the plaintiff's] patents, [the plaintiff] would have been entitled to" lost profits); *Parker-Hannifin Corp. v. Champion Labs., Inc.,* No. 06-cv-2616, 2008 WL 3166318, at *6 (N.D. Ohio Aug. 4, 2008) ("In light of State, the Court finds that plaintiffs are entitled to argue that the alleged substitutes infringe patents not at issue here. This result is not illogical, as defendant would have it. … [I]f the alleged substitutes infringe any one of plaintiffs' patents, those substitutes are illegally on the market and it would thus be reasonable to conclude that plaintiffs would make those sales instead."); *GlaxoSmithKline LLC v. Teva Pharm. USA, Inc.,* 7 F.4th 1320, 1341 (Fed. Cir. 2021) ("'[i]t doesn't matter whether the sales by other generic suppliers would be noninfringing, because the ultimate use of those products by doctors would be infringing and thus not a permissible consideration.' … Had another generic producer made those sales, those uses too would have been infringing. The other generic carvedilol producers were, therefore, not noninfringing alternatives.").

[294] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Fifth Supplemental Response to Plaintiffs' Common Interrogatories (No. 7), December 5 2025, pp. 8-11, 13-15.

[295] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Fifth Supplemental Response to Plaintiffs' Common Interrogatories (No. 7), December 5, 2025, pp. 8-11. See also, Deposition of Harish Chinnari, February 20, 2026 ("Chinnari February 20, 2026 Deposition"), p. 34.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

 I address each alternative below.

120.

---

█ Ashraf Conversation; Attia Conversation; Trout Conversation; Trout Opening Report, § XIII.

[297] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Fifth Supplemental Response to Plaintiffs' Common Interrogatories (No. 7), December 5, 2025, pp. 8-11.

[298] *See* Section II.D.3.b.

[299] Trout Conversation; Trout Opening Report, § XIV.

[300] Exhibit 10.

[301] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Fifth Supplemental Response to Plaintiffs' Common Interrogatories (No. 7), December 5, 2025, pp. 8-11.

[302] Trout Conversation; Trout Opening Report, § XIII.

[303] Complaint, January 17, 2024, Case 1:24-cv-00064-JLH; Complaint for Patent Infringement, January 17, 2024, Case 1:24-cv-00066-JLH; *Pall Corp. v. Micron Separations, Inc.,* 66 F.3d 1211 (Fed. Cir. 1995).

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

122. Third, Slayback identified ███████████████████████████████████████████████

███████████████████████████████████ ████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████ ███████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████

123. ████████████████████████████████ █████████████████████████████

██████████████████████████████████████████.[306] ████████████████

████████████████████████████████████████████████████████ I

discuss some of these documents in my *Panduit* Factor 4 analysis, which I incorporate herein by

reference.

124. Further, Teva markets both ██████████████████████████████████████

███████████████ ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

█████████ ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████

[304] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Fifth Supplemental Response to Plaintiffs' Common Interrogatories (No. 7), December 5, 2025, pp. 8-11.

[305] Ashraf Conversation; Attia Conversation. *See also* Lovesy Deposition, p. 84.

[306] *See, e.g.*, SLAY-VIVMUS0089522 at 533; Mathew Deposition, p. 173.

[307] Eagle Deposition, Exhibit 4 (EAGLEBEN-SA_00344611 at 648).

[308] EAGLEBEN-SA_00072401 at 401-402; *See also,* Teva 2025 10-K Annual Report, available at Teva SEC form 10-K (2025), pp. 4, 10 (available at EAGLEBEN-SA_00368190 at 195, 201).

[309] *See, e.g.*, EAGLEBEN-SA_00368133 at 133.

[310] Trout Conversation; Trout Opening Report, § XIII.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

125. ███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████.

126. Additionally, I understand that Slayback identified a ███████████████████

███████████████████████████████████████████████

████████ ███████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████ ████████████

████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

127. More broadly, based on the economic principle of revealed preference,[314] a physician's choice of medication when writing a prescription demonstrates that the physician regards the prescribed medication as more appropriate, all things considered, for the treatment of the patient in question than other available options. I understand this is particularly relevant in ██████████████████

████████████████████████████████████ █████ ███████

███████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████

128. I understand that █████████████████████████████████████

█████████████████████████████████████████████████

<hr />

[311] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Fifth Supplemental Response to Plaintiffs' Common Interrogatories (No. 7), December 5, 2025, pp. 13-15.
[312] Ashraf Conversation.
[313] Mathew Deposition, Exhibit 21 (SLAY-VIVMUS0072988) at 010-011.
[314] EAGLEBEN-SA_00367840.
[315] Ashraf Conversation.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



[316] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Fifth Supplemental Response to Plaintiffs' Common Interrogatories (No. 7), December 5, 2025, pp. 14-15; SLAY-VIVMUS0226550 at 554-555. ███████████ ███████████████████████████████████████████████████████ Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 5, 2026, p. 1.  See also, Chinnari February 20, 2026 Deposition, pp. 80-81.

[317] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 5, 2026, pp. 1, 6.

[318] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 5, 2026, p. 6; Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Fifth Supplemental Response to Plaintiffs' Common Interrogatories (No. 7), December 5, 2025, pp. 11, 14-15; EAGLEBEN-SA_00368152.

[319] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 5, 2026, p. 5-6.

[320] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 5, 2026, p. 5-6.

[321] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 5, 2026, p. 5-6; SLAY-VIVMUS0180466.

[322] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Amended Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 13, 2026, p. 6.   See also, Chinnari February 20, 2026 Deposition, p. 70.

[323] Chinnari February 20, 2026 Deposition, p. 70.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY                                                                        44



129.

[324] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Amended Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 13, 2026, p. 6.
[325] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Amended Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 13, 2026, pp. 7-8.
[326] Attia Conversation.
[327] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s Response to Plaintiffs' Fifth Set of Individual Interrogatories (Nos. 10-12), February 5, 2026, p. 7.
[328] *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999).

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

### C. *Panduit* Factor 3: Manufacturing/Marketing Capability to Exploit Demand

130. I understand that *Panduit* analysis further requires consideration of whether the patentee had the manufacturing and marketing capability to exploit the demand for the patented and infringing product(s) and capture the sales claimed as lost. Here, I consider whether Eagle would have had the capacity to make the unit sales on which I assess lost profits under my consideration of *Panduit* Factor 4 below.

131. I begin my analysis of *Panduit* Factor 3 by outlining some relevant background. As discussed above, ███████████████████████████████████████████████████

---

[329] Conversation with David S. Bricker, Senior Vice President of Eagle ("Bricker Conversation"); Deposition of David Bricker, November 25, 2025 ("Bricker Deposition"), p. 38; Krawtschuk Deposition, pp. 63-64; EAGLEBEN-SA_00321346; EAGLEBEN-SA_00347581.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY                                                                46

**Figure 6: But-For and Actual Bendeka and Belrapzo Liquid Bendamustine Unit Sales Q4 2021 – Q2 2025**

*Source: Exhibit 15*



132.   Additionally, ████████████████████████████████████████████████████████████████████████████████████████████████[330] ████████████████████████████████████████████████████████████████████████████████[331] ████████████████████████████████████████████████████████████████████████[332] ███████████████████████████████████████[333]

133.   ██████████████████████████████████████████████████████████████████████████████████████████████████[333] ████████████████████████████████████████████████████████████████████████████████

---

[330] Bricker Deposition, pp. 17-18; EAGLEBEN-SA_00367464 at 466.

[331] EAGLEBEN-SA_00333015 at 015-016; Bricker Deposition, p. 23.

[332] EAGLEBEN-SA_00332934 at 934-939, 966, 968; EAGLEBEN-SA_00332859 at 859; EAGLEBEN-SA_00332905 at 905-907; Bricker Deposition, pp. 23-25.

[333] *See also* Krawtschuk Deposition, Exhibit 16, p. 1 (EAGLEBEN-SA_00347509 at 509).

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

134.  As part of my analysis, [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

---

[334] Bricker Deposition, p. 116.
[335] Bricker Deposition, p. 25-26.
[336] [REDACTED]
[337] [REDACTED]
*See* Exhibit 15.
[338] Bricker Conversation.
[339] EAGLEBEN-SA_00352405.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

[REDACTED]

340 Bricker Deposition, p. 116-121.

341 Exhibit 15.

342 EAGLEBEN-SA_00353678, Sheets "2022Q1", "2022Q2", "2022Q3" and "2022Q4".

343 EAGLEBEN-SA_00353678, Sheets "2023Q1", "2023Q2", "2023Q3" and "2023Q4".

344 EAGLEBEN-SA_00353678, Sheet "2023Q4".

345 EAGLEBEN-SA_00353678, Sheet "2024Q1".

346

347 Conversation with Alan Eagle, Vice President of Eagle ("Eagle Conversation").

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

138. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

### D. Panduit Factor 4: Quantification of Lost Profits

139. *Panduit* Factor 4 requires the patentee's lost profits be quantified in a reliable, non-speculative manner.[348]

#### 1. Quantification of Lost Profits Attributable to Slayback's Infringement

140. Commonly, harm to the reference brand upon entry of a pharmaceutically equivalent product includes lost profits of one or both of two forms – lost profits due to lost unit sales (on which the brand loses its incremental profit per unit for those lost units), and lost profits due to price erosion (where the brand's realized effective net price on its retained sales is lower than it would have been "but for" the entry).

141. In this section, I ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

142. ████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

---

[348] *See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F. 2d 1152 (6th Cir. 1978).

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

**Figure 7: Eagle Belrapzo U.S. Actual and But-for Net Sales**
**Q4 2021 – Q2 2025**
*($ millions)*
*Source: Exhibit 15*



**Figure 8: Teva Bendeka U.S. Actual and But-for Net Sales**
**Q4 2021 – Q2 2025**
*($ millions)*
*Source: Exhibit 15*

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

143. The details underlying my estimations for the lost profits due to Slayback's infringement of the Asserted Patents are in the sections below.

### a.  Key Marketplace Dynamics



---

[349] Mathew Deposition, pp. 114-119, Exhibit 14.  *See also* Mathew Deposition, pp. 120-125, Exhibit 15.

[350] SLAY-VIVMUS0072180 at 180-181.

[351] Chinnari Deposition, pp. 123-135.

[352] Mathew Deposition, pp. 114-119, Exhibit 14; Eagle Deposition, Exhibit 4, p. 38 (EAGLEBEN-SA_00344611 at 648).  *See also* Mathew Deposition, pp. 120-125, Exhibit 15.

[353] Krawtschuk Deposition, pp. 34-37, 146-147.

[354] Attia Conversation; Ashraf Conversation.

[355] Eagle Conversation.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



### b. "But-For" Incremental Profit and Unit Sales

147. As mentioned above, Slayback launched Vivimusta in December 2022, before the first Asserted Patent issued on January 16, 2024. █████████████████████████████

149. As a first step, I allocate ███████████████████████████

---

[356] Eagle Deposition, Exhibit 4, p. 38 (EAGLEBEN-SA_00344611 at 648).

[357] Mathew Deposition, pp. 156-160, Exhibit 19 (SLAY-VIVMUS0216524) at 527.

[358] Trout Conversation; Trout Opening Report, § XIII.

[359] Trout Conversation; Trout Opening Report, § XIII.

[360] EAGLEBEN-SA_00364335 at 338.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



See, e.g., EAGLEBEN-SA_00363577 at 577; Krawtschuk Deposition, Exhibit 12 (EAGLEBEN-SA_00351791).

[362] Exhibit 17.

[363] Exhibit 15.

[364] Exhibit 15.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████ █

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████ ████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

██████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████ ████████████████

██████████████████████████████████████████████████

███████████ ██████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

### c.  Eagle Lost Profits

154.  In this section, I describe the conclusions and methodology I use to quantify Eagle's lost profits – incorporating my findings about the "but-for" state of the world from the previous section.  I proceed through the following steps to analyze Eagle's lost profits in this subsection:

•

---

[365] Exhibit 15.
[366] I understand that ███████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████
[367] Exhibit 15.
[368] *See* EAGLEBEN-SA_00367203 at 206.
[369] Exhibit 15.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



---

370 EAGLEBEN-SA_00364335 at 338; Chinnari Deposition, pp. 123-130.
371 Eagle Conversation.

**Figure 9: Eagle U.S. Belrapzo Actual and But-For Unit Sales**
**Q4 2021 – Q2 2025**
*Source: Exhibit 15*



157. ████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████ ████████████

████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████ ███████████

████████████████████████████████████████████

---

[372] Exhibit 17.
[373] *See* Exhibit 17.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY                                                   57

[REDACTED]

---

[374] Exhibit 17.

[375] Section V.D.1.a.

[376] [REDACTED]

**Figure 10: Eagle U.S. Actual and But-For Belrapzo Net Price per Unit**
**Q4 2021 – Q2 2025**
*Source: Exhibit 15*



159. Furthermore,

**Figure 11: Teva U.S. Actual and But-For Bendeka Net Price per Unit**
**Q4 2021 – Q2 2025**
*Source: Exhibit 15*



160. Finally, I note that

---

[377] Mathew Deposition, pp. 156-160, Exhibit 19 (SLAY-VIVMUS0216524 at 527).
[378] Mathew Deposition, pp. 145-147.
[379] SLAY-VIVMUS0175102, sheet

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



**Figure 12: Aggregate U.S. Actual Unit Sales of Liquid Bendamustine**
**Q4 2020 – Q2 2025**
*Source: Exhibit 15*



162.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY                                              61



---

[380] Sections II.B, II.C.  *See also* EAGLEBEN-SA_00364713 at 717; EAGLEBEN-SA_00367099 at 100-101.
[381] Sections II.B, II.C.
[382] Attia Conversation; Ashraf Conversation.
[383] Exhibit 3.
[384] Exhibit 4.
[385] Exhibits 4, 18.
[386] Exhibit 5.
[387] Exhibit 5.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY                                                          62



388 Exhibit 6.

389 Exhibit 6.

390 EAGLEBEN-SA_00346062 at 066; EAGLEBEN-SA_00367197 at 197. ████████████████████
*see, e.g.*, EAGLEBEN-SA_00346062 at 414.

391 EAGLEBEN-SA_00346062 at 078, 082.

392 EAGLEBEN-SA_00346062 at 077-078, 082.

393 EAGLEBEN-SA_00346062 at 078.

394 EAGLEBEN-SA_00367197 at 197; Krawtschuk Conversation; Krawtschuk Deposition, pp. 34-37.

395 Krawtschuk Conversation; Krawtschuk Deposition, pp. 34-37, 146-147.

396 Exhibit 19; Krawtschuk Deposition, pp. 34-37, 146-147; Krawtschuk Conversation.



397 Krawtschuk Deposition, pp. 45-47.
398 EAGLEBEN-SA_00367197 at 197.
399 EAGLEBEN-SA_00366581 at 596; Krawtschuk Deposition, p. 37.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY                                                64



## 2. Summary

167. ████████████████████████████████████████████████████████
████████████████████████████████████████

## VI. REASONABLE ROYALTY DAMAGES (IN THE ALTERNATIVE TO LOST PROFITS)

### A. Overview

169. As noted in the previous section, ████████████████████████████████
████████████████████████ Here, I provide a reasonable royalty assessment on

---

[400] ████████████████████████████████████████████████████

[402] Exhibit 20.

[40] ████████████████████████████████████████████████████
████████████████████████████ *See* Exhibits 4, 6.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

Slayback's infringing units should the finder of fact determine damages should be awarded in the form of a reasonable royalty.

170.  I understand a reasonable royalty is determined by assessing a hypothetical licensing negotiation between the patentee and infringer(s) on the eve of the first alleged infringement.  I thus evaluate the likely outcome of a hypothetical negotiation between Eagle and Slayback on ███████████

███████████████████████████████████████

████  I understand that, as part of each hypothetical negotiation, the parties arrive with the common understanding that the Accused Patents are valid, enforceable, and infringed by the Accused Product.  I approach my analysis utilizing the fifteen *Georgia-Pacific* Factors, which provide a useful economic framework for assessing the evidence as to the likely outcome of a hypothetical licensing negotiation.

171.  As also noted, ██████████████████████

████████████████████████████

█████████████████████████████████

█████████████████████████████████

██████████████████████████

██████████████████████████

████████████████████████████████

█████████████████████████

█████████████████████████

████████████████████████████

█████████████████████████████████

████████████████████████████████

█████████████████████████

████████████████████████████████

█████████████████████████

██████████████████████████████

███████████████████████████████

███████████████████████████████

████████

### B. Initial Conditions and Parameters

#### 1. Date of Hypothetical Negotiation

172. I understand that the hypothetical negotiation is assumed to take place on the eve of first infringement.  In this case, I understand ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ █ ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████

#### 2. Parties to the Hypothetical Negotiation

174. As noted above, I understand that Eagle is the assignee and owner of the Asserted Patents.  At the hypothetical negotiation, Eagle would be sitting across the negotiating table from Slayback.  Importantly, I assume the hypothetical negotiation contemplates a "but-for" world in which all infringing liquid bendamustine products would no longer be available because of a common understanding that the Asserted Patents are enforceable, valid, and infringed, as explained below.

#### 3. Nature of the Hypothetical License

175. In constructing the hypothetical negotiation, I seek to create a licensing scenario that is consistent with what an actual negotiation at the time of first alleged infringement would have looked like and with the actual relationship between the hypothetical licensor and licensee.  In the present case, I assume the parties would have negotiated a non-exclusive license to the Asserted Patents

---

[404] EAGLEBEN-SA_00333048 at 048, 051-052.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

for Slayback to use in conjunction with making, offering for sale, selling, using, and importing the Accused Product.  This non-exclusive license would also be limited to the U.S. and would not include a license to any other patents or intellectual property, such as trade secrets or copyrights.

### 4. Patent Validity, Enforceability, and Infringement

176. Since damages are to be assessed only if the Asserted Patents are found to be valid and infringed, the hypothetical licensing scenario assumes that the parties arrive at the negotiating table with a common understanding that the Asserted Patents are valid and enforceable, and that the Accused Product infringes those patents. Thus, I assume the parties at the hypothetical negotiation would have considered the Asserted Patents to be enforceable, valid, and infringed.  In the context of the present hypothetical negotiation, based on my understanding from Dr. Trout, the parties would understand that Slayback, Apotex, and Baxter's liquid bendamustine products infringe the Asserted Patents.

### 5. Full Information, Reasonable Foresight, and Consistency of Forecasts

177. In the hypothetical licensing analysis, the parties are assumed to have had full information and reasonable foresight as to trends in the marketplace.  The assumption of full information does not imply that the parties to the hypothetical negotiation know the future, but rather that the parties "put their cards on the table," i.e., they have access to the same information, so that neither can exploit an informational advantage over the other in the bargaining process.[405]

178. Further, I assume that, in forecasting any expected benefit to Slayback of taking a license and the expected cost to Eagle of granting a license, the parties would have had reasonable foresight with which to estimate projected values.  Given full information and reasonable foresight, I assume that the parties would have had common expectations regarding the demand for liquid bendamustine products.  Without this assumption, the hypothetical negotiation construct could break down even though, given full information, reasonable foresight, and agreement that the patents-in-suit are valid, enforceable, and infringed, the parties would rationally have been able to negotiate a royalty, as they are required to do in a reasonable royalty damages assessment.

---

[405] *See, e.g.*, EAGLEBEN-SA_00368349 at 353.

### C. *Georgia-Pacific* Factor 15[406]

179.   As noted above, I begin my assessment of the *Georgia-Pacific* Factors with Factor 15.  Before proceeding to the details of my analysis of Factor 15, I explain my general approach to analyzing this Factor and the impact of the circumstances of the present case on this analysis.

180.    As the licensor, the patentee would not be willing to accept less in royalties than the expected financial cost of granting such a license.[408]  Correspondingly, as the licensee, the infringer would consider the royalties relative to the expected additional value it would have anticipated realizing as a direct result of having access to the invention taught by the patent(s)-in-suit.[409]  Reasonable parties at the negotiating table would have considered these figures as important benchmarks in the likely outcome of their licensing negotiation.  One can imagine that the lowest amount the patentee would accept could, in certain situations, be higher than the most the licensee would be willing to pay.  This is particularly likely in situations where the presence of the licensee could generate price competition that would further harm the licensor's business.[410]

181.   Indeed, ████████████████████ in the case of a hypothetical negotiation between a patentee producer of a branded pharmaceutical and a manufacturer of an infringing generic equivalent is inherently complicated by the fact that the business model of the brand producer is, to a significant extent, based on its possession of patent protection for its products, while that of the generic manufacturer is, by definition, based on the absence of such protection.  Brand producers seek to utilize patent protection to secure a return on their investments in research and

---

[406] This Factor is: "The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee - who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention - would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license."

[407] ████████████████████████████████████████████

[410] In general, this potential problem can be mitigated to some degree by the setting of a substantial per-unit royalty, which would factor into the licensee's incremental costs, and thus, its pricing decisions.

development; to that end, they typically invest in promotion of the innovative products they commercialize for at least some period of time, and seek to maintain supra-competitive pricing at least as long as there is no available generic competitor. Generic manufacturers generally compete on price relative to the branded product and other generic entrants, and do not typically invest in the promotion their products to physicians and consumers to the same degree.

182. A simple thought experiment shows that, while generic manufacturers' products can be profitable, the overall profitability of a drug is greater when it is offered only as a branded product than when generic versions are introduced. Brand manufacturers are free, if they choose, to implement a "generic" business model by abandoning promotion and cutting price; the fact that they do not do so implies that they have found that such a business model would be less profitable than their "brand" business model. The existence of licenses granted by brand producers to generic manufacturers (including licenses involving Eagle and certain generic manufacturers discussed under Factor 1, below) does not contradict this conclusion, as such licenses are invariably granted under conditions of uncertainty regarding the validity, enforceability, and/or infringement of the brand producer's patents, not under the conditions of validity and infringement assumed here.

183. One way of viewing a hypothetical negotiation between a patentee producer of a branded pharmaceutical and a manufacturer of an infringing generic equivalent is to conclude that the Another way of characterizing this situation is that the parties disagree over the nature of the licensed use of the patent(s)-in-suit: the generic manufacturer desires a license to sell a generic equivalent of the branded product, while the branded producer would only be willing to contemplate a possible license under which only the branded product continues to be marketed and sold, with the generic manufacturer being licensed to produce some of the branded units. As an economic matter, such a license could be mutually acceptable only if the generic manufacturer has a cost advantage in manufacture and/or distribution.

184. I understand that in such situations courts have upheld reasonable royalty damages awards in excess of the maximum the infringer would have been willing to pay for a license to the patents-

in-suit, and I have sought to compensate the patentee through the reasonable royalty. [411] Following these principles, █████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████████████████████████. I derive this royalty as the minimum dollars per unit Eagle would have charged Slayback for a license under which Eagle would be compensated for the specific impact described in Section V.D – i.e., the impact on Eagle's profitability due to its expected loss of unit sales to Slayback. Since this is the royalty Eagle would have required in order to be compensated for Slayback's continued infringing sales, it largely governs the remainder of my *Georgia-Pacific* analysis.

185. Under Factor 15, I also consider Slayback's maximum willingness to pay. First, I recognize that

█████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
██████████████████████████████    ██████████████████████████████████
██████████████████████████████████████████████████████████
███████████████████████████████████████████████

186. I also note that, since the hypothetical negotiation would result in a royalty sufficient to compensate Eagle and that would not further degrade the branded price, I model the royalty rate in dollars per unit rather than as a percentage of net sales. I do this because a percentage royalty could not ensure Slayback would charge a price that would enable branded Belrapzo to price as it would in the absence of additional competitors (and thus compensate Eagle while allowing it to continue implementing its branded product pricing model).

---

[411] *Monsanto Co. v. Ralph,* 382 F.3d 1374 (Fed. Cir. 2004).

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

### 1. Eagle's Minimum Willingness to Accept

187. The minimum royalty Eagle would have been willing to accept at the hypothetical negotiation would be ██████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████ I lay out the steps of my calculations below.

188. ██████████████████████████████████████████████████ ██████████████████████████████████████████████ █████████████████████████████████████

189. ████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████ ████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████████.

190. ██████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████████████. Because the hypothetical negotiation is meant to reflect, to the extent reasonable, the parties' ex ante expectations, I first discount the profits Eagle would expect to lose to Slayback and Slayback's actual infringing units to the hypothetical negotiation date to account for time and uncertainty. █ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████████████████

---

412 ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████

negotiation date.[413]  After discounting to the net present value as of the date of the hypothetical negotiation, the ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████.

191. ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████  ██████████████████
████████████████████████

## 2. Slayback's Maximum Willingness to Pay

192. From the perspective of Slayback, it is faced with the option of taking a license to the Asserted Patents and making its projected sales of the licensed product (Vivimusta), or forgoing all the incremental revenue/profits associated with doing so.  As a matter of economics, Slayback would therefore be willing to pay ████████████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████-  ████████████████████████████
████████████████████████████████████████████████████████████████

---

[413] EAGLEBE-SA_00368131 at 131.  ████████████████████████████████████
███████████████████  ██████████████████████████████
[414]  Exhibit 23.  ███████████████████████████████████████████████████████
see Exhibit 14.
[415] SLAY-VIVMUS0226486.  ████████████████████████████████████████

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



### 3. Conclusion: *Georgia-Pacific* Factor 15 Analysis

196. In Figure 14 below, I summarize my conclusions as to ███████████████████
██████████████████████████████████████████████████████████
████████████████    These form the boundaries of the Edgeworth Box.

**Figure 14: Hypothetical Negotiation** ████████████

*Sources: Exhibits 22, 23*



| | |
|---|---|
| **Eagle Minimum Willingness to Accept per Unit** | ████ |
| **Slayback Maximum Willingness to Pay per Unit** | ████ |

197. In the next section, I evaluate the remaining *Georgia-Pacific* Factors to determine where relative to this starting point a reasonable royalty rate would most likely fall.

### D. Consideration of the Remaining *Georgia-Pacific* Factors

198. In this section, I consider the remaining *Georgia-Pacific* Factors in the context of the present hypothetical negotiation.  In particular, I evaluate the relevant considerations raised under each

---

[416] *See* Exhibits 9, 23. ███████████████████████████████████████
████████████████ *see, e.g.,* EAGLEBEN-SA_00363437.
[417] I understand ████████████████████████████████████████████. As
████████████████████████████ EAGLEBE-SA_00368131 at 131.

Factor and whether they suggest any adjustment to the rates derived under my consideration of Factor 15 may be warranted.

**Factor 1: The royalties received by the patentee for the licensing of the patents-in-suit, proving or tending to prove an established royalty.**

199. I understand that ███████████████████████████████████████████
██████████████████████████████████████████

    **1.** ████████████████████



[418] *See, e.g.,* Plaintiffs Eagle Pharmaceuticals, Inc.'s and Eagle Sub1 LLC's Second Supplemental Objections and Responses to Slayback Pharma LLC and Azurity Pharmaceuticals Inc.'s Second Set of Interrogatories (No. 4), December 3, 2025, pp. 12, 47.

[419] ███████████████████████████████ *See* EAGLEBEN-SA_00367601 at 601.

[420] EAGLEBEN-SA_00072300 at 300, 305; EAGLEBEN-SA_00367655; EAGLEBEN-SA_00366546 at 555-556.

[421] EAGLEBEN-SA_00072300 at 301. █████████████████████████████
███████████████████████████████████████. *See* EAGLEBEN-SA_00072300 at 368-369; EAGLEBEN-SA_00364180.

[422] *See, e.g.,* EAGLEBEN-SA_00365443 at 474-476. *See also* EAGLEBEN-SA_00333070 at 070.

[423] EAGLEBEN-SA_00367662.

[424] EAGLEBEN-SA_00072300 at 307.

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY



425 EAGLEBEN-SA_00072300 at 305, 308; EAGLEBEN-SA_00364204 at 205; EAGLEBEN-SA_00364180 at 181.
426 EAGLEBEN-SA_00072300 at 312.
427 EAGLEBEN-SA_00072300 at 305, 360-362.
428 EAGLEBEN-SA_00367462 at 463; EAGLEBEN-SA_00367460 at 461.
429 *See* EAGLEBEN-SA_00072300 at 305, 360; EAGLEBEN-SA_00368093 at 093; EAGLEBEN-SA_00368106 at 106; Trout Opening Report, § 415.
430 EAGLEBEN-SA_00072300 at 325-326.
431 Trout Opening Report, § XV.
432 EAGLEBEN-SA_00072300 at 318, 321.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

204.

[433] EAGLEBEN-SA_00072300 at 330-331.

[434] *See, e.g.*, Eagle SEC Form 10-K (2017), pp. 18-19 (available at EAGLEBEN-SA_00365443 at 474-476).

[435] EAGLEBEN-SA_00072300 at 331.

[436] *See* EAGLEBEN-SA_0347562, EAGLEBEN-SA_00347565, EAGLEBEN-SA_00072401, EAGLEBEN-SA_00347573.

[437] EAGLEBEN-SA_0347562 at 562.

[438] EAGLEBEN-SA_00345611 at 784.

[439] EAGLEBEN-SA_00345611 at 785.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



---

440 EAGLEBEN-SA_00345611 at 790-791.
441 EAGLEBEN-SA_00345611 at 785; EAGLEBEN-SA_00072300 at 303.
442 EAGLEBEN-SA_00345611 at 790-791.
443 EAGLEBEN-SA_00347565 at 565-566.
444 EAGLEBEN-SA_00347565 at 566.
445 EAGLEBEN-SA_00347573 at 573-574.
446 EAGLEBEN-SA_00072401 at 401-402.
447 EAGLEBEN-SA_00072401 at 401-402.
448 Exhibit 10.
449 Exhibits 10, 11.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



450 ████████████████████████, *see* Exhibit 11.
451 EAGLEBEN-SA_00333070 at 070.
452 EAGLEBEN-SA_00333070 at 070, 074-076, 078, 085, 091.
453 EAGLEBEN-SA_00333048 at 048.
454 EAGLEBEN-SA_00333048 at 048, 051-052, 055.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



455 EAGLEBEN-SA_00072300 at 301.
456 EAGLEBEN-SA_00072300 at 301.
457 EAGLEBEN-SA_00072300 at 301.
45 ███████████████████████████████████████████ EAGLEBEN-SA_00072300 at 366.
459 EAGLEBEN-SA_00072300 at 301.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

460 *See* Section II.D.3.
461 EAGLEBEN-SA_00072300 at 321.
462 EAGLEBEN-SA_00072300 at 322.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

[463] EAGLEBEN-SA_00366841 at 867.

[464] EAGLEBEN-SA_00365311 at 403-404.  EAGLEBEN-SA_00366644 at 728-729, 733-734.

*see* EAGLEBEN-SA_00365311 at 373-375.

222. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

465 Trout Opening Report ¶¶ 409-416.

466 Trout Opening Report ¶¶ 409-416.

467 Trout Opening Report ¶¶ 417-419.

468 Trout Opening Report ¶¶ 417-419.

469 Trout Opening Report ¶ 418.

470 Trout Opening Report ¶ 420; EAGLEBEN-SA_00072300 at 366. ███████████████████

███████████████████████████████████████████████

EAGLEBEN-SA_00072300 at 374, 379.

471

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

---

[472] EAGLEBEN-SA_00072401 at 401-402.

[473] EAGLEBEN-SA_00072401 at 401-402.

[474] ███████████████████████████████████████████████ *See* Exhibits 7, 8.

**Factor 2: The rates paid by the licensee for the use of other patents comparable to the patent-in-suit.**

225. ███████████████████████████████████████████████████

███████████████████████████████████████████ ████████████

███████████████████████████████████████

**Factor 3: The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.**

226. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

**Factor 4: The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.**

228. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████

[475] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc's Fourth Supplemental Response to Plaintiff's Common Interrogatories (No. 7), November 4, 2025, pp. 3, 27.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

[REDACTED]

**Factor 5: The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are the inventor and promoter.**

231. Slayback's Vivimusta is a product that directly competes with Belrapzo and Bendeka in the liquid bendamustine marketplace. As such, Slayback and Eagle have a competitive commercial relationship at the hypothetical negotiation. As discussed above, [REDACTED]

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

**Factor 6: The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.**

232.

**Factor 7: The duration of the patent and the term of the license.**

233.

**Factor 8: The established profitability of the product made under the patent; its commercial success; and its current popularity.**

235. I understand that Belrapzo and Bendeka are both commercial products covered by the Asserted Patents.

236.

---

[476] EAGLEBEN-SA_00072401 at 401-402.
[477] Exhibits 9-11.
[478] Exhibits 9-11.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



---

[479] ███████████████

[480] Exhibits 9-11.

[481] Exhibit 12.

[482] Exhibit 13.  I understand that redacted versions of certain documents from Baxter and Apotex have been designated for use in estimating damages.  I use these redacted versions when using data from Baxter and Apotex.

[483] Exhibit 14.

[484] ████████████████████████████████████████████████████████
███

**Factor 9: The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.**

**Factor 10: The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.**

240. These two Factors focus on the observed value of the invention in the hands of the patentee, the infringer, and potential others in the marketplace. As they share this common analytic thread, I treat them collectively here.

241. █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[485] Trout Conversation.

[486] Trout Conversation.

[487] Ashraf Conversation; Attia Conversation.

[488] Attia Conversation.

[489] Trout Conversation; Attia Conversation.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY                                                                 90

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████.

**Factor 11: The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.**

243.   ██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████    ████████████████████

████████████████████████████████████████████████

████████████

████████████████████████████████████████████████████

██████████████████████████████████████

**Factor 12: The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.**

246.   ████████████████████████████████████████████

██████████████████████████████████████████████████

---

490 Exhibits 8, 14, 18.
491 Trout Conversation; Attia Conversation.
492 SLAY-VIVMUS0010634 at 648.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



---

503 EAGLEBEN-SA_00347200 at 235.
504 EAGLEBEN-SA_00347200 at 204, 208.
505 EAGLEBEN-SA_00347200 at 208.
506 EAGLEBEN-SA_00347200 at 203.
507 EAGLEBEN-SA_00347240 at 240-241.
508 EAGLEBEN-SA_00347245 at 245.
509 EAGLEBEN-SA_00347247 at 247.
510 EAGLEBEN-SA_00242343 at 343.
51 ███████████████████████████████████. *See* EAGLEBEN-SA_00242379 at 379 and ███████████████████████████. *See* EAGLEBEN-SA_00242379.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY                                                          93



512 EAGLEBEN-SA_00242343 at 343-344, 347-349.

513 EAGLEBEN-SA_00242343 at 347. ████████████████████████████
████████      *See* EAGLEBEN-SA_00242338 at 338.

514 EAGLEBEN-SA_00242343 at 348.

515 EAGLEBEN-SA_00242343 at 349. ████████████████████████████
████████████████████████████████████████████████████
████████████████████████.  EAGLEBEN-SA_00242343 at 345.

516 EAGLEBEN-SA_00242343 at 348.

517 EAGLEBEN-SA_00242343 at 352-353.

518 EAGLEBEN-SA_00242343 at 350-351, 377-378.

519 EAGLEBEN-SA_00242343 at 347, 351.

520 EAGLEBEN-SA_00242343 at 351.

521 EAGLEBEN-SA_00242343 at 347, 350.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

███████████████████████████████████

██████████████████████████████████████████████

       ███████████████████████████

██████████████████████████████████████████████

       █████████████████████████████████████████████

       ██████████████████████████████████████████

       ████████████████████████████████████████████

       █████████████████████████████████████████████

       ████████████████████████████████████ ██ ██

       ████████████████████████████████████████

       █████████████████████ ██ ████████████████████

       ███████████████████████████████████████

       ████████████████████████████████████████████

       ████████████████████████████████

██████████████████████████████████████████████

       ████████████████████████████████████ ██ ████

       ███████████████████████████████████████

       ████████████████████████████████████████

       ██████████████████████████████████████████

       █████████████████████████████ ██ █████████████████

       ██████████████████████████████████████████

       ██████████████████████████████

████████████████████████

---

[522] EAGLEBEN-SA_00242379 at 379-380.
[523] EAGLEBEN-SA_00242379 at 380.
[524] EAGLEBEN-SA_00242379 at 379.
[525] EAGLEBEN-SA_00242379 at 380.
[526] EAGLEBEN-SA_00242382 at 382.
[527] EAGLEBEN-SA_00242382 at 382-383.
[528] EAGLEBEN-SA_00242339.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

256.



[529] EAGLEBEN-SA_00259185 at 185, 191, 194, 197.

[530] EAGLEBEN-SA_00259185 at 188, 241.

[531] EAGLEBEN-SA_00259185 at 213-214.

[532] ██████████████████████████████████████████████████████████████████████
██████.

[533] EAGLEBEN-SA_00259185 at 213-214.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

96

259.

**Factor 13: The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.**

261.

---

534 EAGLEBEN-SA_00259185 at 214.
535 EAGLEBEN-SA_00259185 at 199-212.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



262.

263.

264.

**Factor 14: The opinion testimony of qualified experts.**

265.

**E. Conclusions on Reasonable Royalty for the Asserted Patents**

266. At the outset of my *Georgia-Pacific* analysis, I evaluated Factor 15. As discussed,

267. Under my consideration of the remaining *Georgia-Pacific* Factors, I find that most factors called for

Further I find that

---

536 *Compare* Exhibits 9, 14. *See also* Mathew Deposition, pp. 148-149.

53

*See* Exhibit 22-A.

████████████████████████████████████████████████████████████████████████

███████████████████████████████

268. To determine the reasonable royalty rate per unit the parties would have agreed to, I refer back to the results of my Edgeworth Box analysis.  Given ████████████████████████████████████

████████████████    ████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████ [538] I reserve the right to update these amounts to reflect supplemental data production if asked to do so and in accordance with the Court's schedule.[539]

### F.  Computation of Reasonable Royalty Damages

269. As shown in Exhibit 21, ███████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████  ███████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████ I report these results in Exhibit 8.

---

[538] ██████████████████████████.  *See* Exhibits 7, 8.

[539] Additionally, I reserve the right, if requested by the Court or finder of fact, to calculate and offer an opinion regarding an appropriate post-verdict ongoing royalty.

[540] ████████████████████████████████████████████████████████████████████████
████████████████████████████████  *See* Exhibit 22-A.

[541] Exhibit 7.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

March 6, 2026

Christopher A. Vellturo, Ph.D.